| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 10:46 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | FW: A letter from the House Gun Violence Prevention Task Force |
| **Attach:** | 2018-07-26_GVPTF_Defense Distributed letter.pdf |

Incoming. ███████████████████████

**Official**

**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Friday, July 27, 2018 10:36 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: A letter from the House Gun Violence Prevention Task Force

FYI – CCU will task to PM.

**From:** Ornstein, Nick <Nick.Ornstein@mail.house.gov>
**Sent:** Thursday, July 26, 2018 6:25 PM
**To:** House Liaison <House@state.gov>
**Cc:** Rhinehart, Melanie <Melanie.Rhinehart@mail.house.gov>; Goedke, Jennifer <Jennifer.Goedke@mail.house.gov>; Macfarlane, Alex <Alex.Macfarlane@mail.house.gov>
**Subject:** A letter from the House Gun Violence Prevention Task Force

Please deliver the attached letter from the leaders of the House Gun Violence Prevention Task Force to Secretary of State Mike Pompeo.

Thank you.

──────

**Nick Ornstein**
Legislative Correspondent
Congressman Mike Thompson (CA-05)
231 Cannon House Office Building
Washington, DC 20515
(202) 225-3311
nick.ornstein@mail.house.gov

WASHAR0000564

## Congress of the United States
### Washington, DC 20515

July 26, 2018

Secretary Mike Pompeo
Department of State
2201 C Street NW
Washington, DC 20230

Dear Mr. Secretary:

As leaders of the House Gun Violence Prevention Task Force, we urge you to suspend plans to grant Defense Distributed a special license to publish gun blueprints online and to maintain the existing ban on publication of any such gun schematics. The State Department's recent about-face on allowing publication of this dangerous data is both shocking and outside of its lawful authority.

Widespread publication of 3-D-printed gun blueprints would be extremely dangerous because individuals prohibited by law from having guns could easily arm themselves. Convicted felons would be able to skip the dealer licensing system, bypass a criminal background check, and print a gun at home using commercially available technology. Firearm traffickers would be able to print unserialized guns, which are untraceable by law enforcement. And terrorists would be able to make guns entirely out of plastic and sneak them through metal detectors.

Given the clear public safety threat the publication of these blueprints pose, granting this special license makes no sense. As we understand, until recently, the State Department barred publication of 3-D-printed gun blueprints because it violates the Arms Control Export Act of 1974. Please explain why the State Department's understanding of the Arms Control Export Act has changed.

The State Department must return to its well-reasoned position on stopping the publication of 3-D-printed gun blueprints. We look forward to your swift and detailed response.

Sincerely,

MIKE THOMPSON
Member of Congress

DAVID N. CICILLINE
Member of Congress

WASHAR0000565

## Congress of the United States
### Washington, DC 20515

VAL DEMINGS
Member of Congress

ELIZABETH ESTY
Member of Congress

SHEILA JACKSON LEE
Member of Congress

ROBIN KELLY
Member of Congress

GRACE NAPOLITANO
Member of Congress

RICHARD NOLAN
Member of Congress

ED PERLMUTTER
Member of Congress

DAVID PRICE
Member of Congress

KATHLEEN RICE
Member of Congress

BOBBY SCOTT
Member of Congress

JOSE SERRANO
Member of Congress

JACKIE SPEIER
Member of Congress

PRINTED ON RECYCLED PAPER

WASHAR0000566

| | |
|---|---|
| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
| **Sent:** | Thursday, July 26, 2018 11:32 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | FW: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion |

FYI—the Court has ordered a hearing on the TRO motion for today at 2:30 PM.
**Official**
**UNCLASSIFIED**

**From:** Robinson, Stuart J. (CIV) [mailto:Stuart.J.Robinson@usdoj.gov]
**Sent:** Thursday, July 26, 2018 11:29 AM
**To:** Rogers, Shana A; Soskin, Eric (CIV)
**Subject:** Fwd: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion
**Importance:** High
Shana, FYI
Sent from my Verizon, Samsung Galaxy smartphone
-------- Original message --------
From: TXW_USDC_Notice@txwd.uscourts.gov
Date: 7/26/18 8:22 AM (GMT-08:00)
To: cmecf_notices@txwd.uscourts.gov
Subject: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court [LIVE]

### Western District of Texas

### Notice of Electronic Filing

The following transaction was entered on 7/26/2018 at 10:21 AM CDT and filed on 7/26/2018
**Case Name:** Defense Distributed et al v. United States Department of State et al
**Case Number:** 1:15-cv-00372-RP
**Filer:**
**Document Number:** 101

**Docket Text:**
**ORDER Setting Telephonic Hearing on [98] MOTION for Hearing re [97] MOTION for Temporary Restraining Order , [96] MOTION to Intervene, [97] MOTION for Temporary Restraining Order : Motion Hearing set for 7/26/2018 at 02:30 PM before Judge Robert Pitman. Signed by Judge**

WASHAR0000567

**Robert Pitman. (dl)**

**1:15-cv-00372-RP Notice has been electronically mailed to:**

Alan Gura alan@gurapllc.com, a1@alangura.com

David S. Morris dmorris@fr.com, hart@fr.com, litz@fr.com

Eric J. Soskin eric.soskin@usdoj.gov

J. David Cabello dcabello@blankrome.com, jwatkins@blankrome.com, mhindman@blankrome.com

Joshua Michael Blackman joshblackman@gmail.com, me@joshblackman.com

Matthew A. Goldstein matthew@goldsteinpllc.com

Stuart Justin Robinson stuart.j.robinson@usdoj.gov

W. Thomas Jacks jacks@fr.com, edockets@fr.com, litz@fr.com

William B. Mateja bmateja@sheppardmullin.com, dpuente@sheppardmullin.com, jhoggan@sheppardmullin.com

**1:15-cv-00372-RP Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1080075687 [Date=7/26/2018] [FileNumber=19613803-0] [55798c8db5bb5990f2dd11f849a2da4b47d7ff39b5351b99f835068a53d68eb3cf54e5e2f898da311079935bfded59bdb3f8b194c8b5add4e9fb40438e59050f]]

WASHAR0000568

**MATTHEW A. GOLDSTEIN, PLLC**
**INTERNATIONAL TRADE**
1875 CONNECTICUT AVE NW, 10TH FL
WASHINGTON, D.C. 20009

**BY ELECTRONIC MAIL**
(c/o Eric.Soskin@usdoj.gov)

April 17, 2018

Mr. Eric Soskin
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, D.C. 20530

**SUBJECT:    Acceptance of Response to Offer of Settlement**
              Case No. 15-cv-372-RP

Dear Mr. Soskin:

Our understanding is that the scope of "technical data that is the subject of this matter," as defined in the DEFENDANTS' RESPONSE TO OFFER OF SETTLEMENT for Case No. 15-cv-372-RP includes the Published Files, the Ghost Gunner Files, and the CAD Files.

We further understand that the scope of "technical data that is the subject of this matter" further includes the Other Files insofar as those files regard items exclusively in Category I(a) of the United States Munitions List (USML), or items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

We further understand that Category I(a) includes non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm), to include barrels and receivers that would comprise such arms.

Based on the above understandings, Plaintiffs accept Defendants' RESPONSE TO OFFER OF SETTLEMENT for Case No. 15-cv-372-RP.

Further pursuant to the terms of Defendants' RESPONSE TO OFFER OF SETTLEMENT, please advise on the Department of Justice's final approval of the settlement.

Very truly yours,

Matthew A. Goldstein

cc:    Stuart Robinson, Department of Justice (Stuart.J.Robinson@usdoj.gov)

WASHAR0000569



GURA &
POSSESSKY

916 PRINCE STREET, SUITE 107
ALEXANDRIA, VIRGINIA 22314
TEL 703.835.9085
FAX 703.997.7665

WWW.GURAPOSSESSKY.COM

June 3, 2016

The Hon. Lyle W. Cace
Clerk, United States Court of Appeals
  for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130

> Re:    *Defense Distributed* v. *U.S. Dep't of State*
>        U.S. Court of Appeals, 5th Cir., No. 15-50759

Supplemental Authority per Fed. R. App. P. 28(j)

Dear Mr. Cace:

Defendants claim that the "ITAR does not regulate any activities except those that constitute 'exports' . . ." ROA.521. Defendants further claim that "exporting" includes posting technical data to the Internet for public use. ROA.890; Appellees' Br. 13, 18.

On the eve of oral argument below on Plaintiffs' Motion for Preliminary Injunction, Defendants published a notice of proposed rulemaking to amend ITAR's definition of "export" to include posting technical data to the Internet:

> Paragraph (a)(7) is added for the release of information to a public network, such as the Internet. This makes more explicit the existing control in (a)(4), which includes the publication of "technical data" to the Internet due to its inherent accessibility by foreign persons. This means that before posting information to the Internet, you should determine whether the information is "technical data." You should review the USML, and if there is doubt about whether the information is "technical data," you may request a commodity jurisdiction determination from the Department. If so, a license or other authorization, as described in

Mr. Cace
Page Two

> § 120.11(b), will generally be required to post such "technical data" to the Internet. Posting "technical data" to the Internet without a Department or other authorization is a violation of the ITAR even absent specific knowledge that a foreign national will read the "technical data."

80 Fed. Reg. 31,529 (June 3, 2015) (Defendant Peartree as agency contact).

Today, on the eve of oral argument before this Court, Defendants published an Interim Final Rule (the "Final Rule") amending the definition of "export." See 81 Fed. Reg. 35,611 (June 3, 2016) (Defendant Peartree as agency contact) (attached).

Defendants' Final Rule does not add proposed subparagraph (a)(7) to the ITAR definition of "export," instead stating without explanation that the section will be addressed in a separate rulemaking. In fact, the Final Rule does not mention postings to the Internet as a form of export at all.

Defendants' Final Rule also fails to explain Defendants' radical departure from their previous position that postings to the Internet already fall with the definition of "export."

Sincerely,

/s/ Alan Gura

Alan Gura
Counsel for Plaintiffs-Appellants

Certificate of Compliance

This letter complies with the word count limitation of Fed. R. App. 28(j), as its body contains 344 words as automatically totaled by WordPerfect X4.


/s/ Alan Gura
Alan Gura


Certificate of Service

On this, the 3rd  day of June, 2016, I electronically filed the attached Letter with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Alan Gura
Alan Gura


WASHAR0000572

between 9 a.m. and 4 p.m., Monday through Friday.

## V. Objections and Hearing Requests

Any person who will be adversely affected by this regulation may file with the Division of Dockets Management (see **ADDRESSES**) either electronic or written objections. Each objection shall be separately numbered, and each numbered objection shall specify with particularity the provision of the regulation to which objection is made and the grounds for the objection. Each numbered objection on which a hearing is requested shall specifically so state. Failure to request a hearing for any particular objection shall constitute a waiver of the right to a hearing on that objection. Each numbered objection for which a hearing is requested shall include a detailed description and analysis of the specific factual information intended to be presented in support of the objection in the event that a hearing is held. Failure to include such a description and analysis for any particular objection shall constitute a waiver of the right to a hearing on the objection.

It is only necessary to send one set of documents. Identify documents with the docket number found in brackets in the heading of this document. Any objections received in response to the regulation may be seen in the Division of Dockets Management between 9 a.m. and 4 p.m., Monday through Friday, and will be posted to the docket at *http://www.regulations.gov*.

## List of Subjects in 21 CFR Part 573

Animal feeds, Food additives.

Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs and redelegated to the Center for Veterinary Medicine, 21 CFR part 573 is amended as follows:

## PART 573—FOOD ADDITIVES PERMITTED IN FEED AND DRINKING WATER OF ANIMALS

■ 1. The authority citation for part 573 continues to read as follows:

**Authority:** 21 U.S.C. 321, 342, 348.

■ 2. Add § 573.304 to read as follows:

### § 573.304   Chromium Propionate.

The food additive chromium propionate may be safely used in animal feed as a source of supplemental chromium in accordance with the following prescribed conditions:

(a) The additive is manufactured by the reaction of a chromium salt with propionic acid, at an appropriate

stoichiometric ratio, to produce triaqua-(mu$_3$-oxo) hexakis (mu$_2$-propionato-$O,O'$) trichromium propionate with the empirical formula, [Cr$_3$(O)(CH$_3$CH$_2$CO$_2$)$_6$(H$_2$O)$_3$] CH$_3$CH$_2$CO$_2$.

(b) The additive shall be incorporated at a level not to exceed 0.2 milligrams of chromium from chromium propionate per kilogram feed in broiler chicken complete feed.

(c) The additive meets the following specifications:

(1) Total chromium content, 8 to 10 percent.

(2) Hexavalent chromium content, less than 2 parts per million.

(3) Arsenic, less than 1 part per million.

(4) Cadmium, less than 1 part per million.

(5) Lead, less than 0.5 part per million.

(6) Mercury, less than 0.5 part per million.

(7) Viscosity, not more than 2,000 centipoise.

(d) The additive shall be incorporated into feed as follows:

(1) It shall be incorporated into each ton of complete feed by adding no less than one pound of a premix containing no more than 181.4 milligrams of added chromium from chromium propionate per pound.

(2) The premix manufacturer shall follow good manufacturing practices in the production of chromium propionate premixes. Inventory, production, and distribution records must provide a complete and accurate history of product production.

(3) Chromium from all sources of supplemental chromium cannot exceed 0.2 parts per million of the complete feed.

(e) To assure safe use of the additive in addition to the other information required by the Federal Food, Drug, and Cosmetic Act:

(1) The label and labeling of the additive, any feed premix, and complete feed shall contain the name of the additive.

(2) The label and labeling of the additive and any feed premix shall also contain:

(i) A guarantee for added chromium content.

(ii) Adequate directions for use and cautions for use including this statement: Caution: Follow label directions. Chromium from all sources of supplemental chromium cannot exceed 0.2 parts per million of the complete feed.

Dated: May 26, 2016.

**Tracey Forfa,**

*Acting Director, Center for Veterinary Medicine.*

[FR Doc. 2016–13082 Filed 6–2–16; 8:45 am]

**BILLING CODE 4164–01–P**

## DEPARTMENT OF STATE

**22 CFR Parts 120, 123, 124, 125, and 126**

**[Public Notice: 9487]**

**RIN 1400–AD70**

## International Traffic in Arms: Revisions to Definition of Export and Related Definitions

**AGENCY:** Department of State.

**ACTION:** Interim final rule.

**SUMMARY:** As part of the President's Export Control Reform (ECR) initiative, the Department of State amends the International Traffic in Arms Regulations (ITAR) to update the definitions of "export," and "reexport or retransfer" in order to continue the process of harmonizing the definitions with the corresponding terms in the Export Administration Regulations (EAR), to the extent appropriate. Additionally, the Department creates definitions of "release" and "retransfer" in order to clarify and support the interpretation of the revised definitions that are in this rulemaking. The Department creates new sections of the ITAR detailing the scope of licenses, unauthorized releases of controlled information and revises the section on "exports" of technical data to U.S. persons abroad. Finally, the Department consolidates regulatory provisions on the treatment of foreign dual and third country national employees within one exemption.

**DATES:** The rule is effective on September 1, 2016. The Department of State will accept comments on this interim final rule until July 5, 2016.

**ADDRESSES:** Interested parties may submit comments within 30 days of the date of publication by one of the following methods:

• *Email: DDTCPublicComments@state.gov* with the subject line, "ITAR Amendment—Final Revisions to Definitions."

• *Internet:* At *www.regulations.gov*, search for this notice by using this rule's RIN (1400–AD70).

Comments received after that date may be considered, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they

WASHAR0000573

do not desire to be made public or information for which a claim of confidentiality is asserted because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls Web site at *www.pmddtc.state.gov*. Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov*, leaving the fields that would identify the commenter blank and including no identifying information in the comment itself. Comments submitted via *www.regulations.gov* are immediately available for public inspection.

**FOR FURTHER INFORMATION CONTACT:** Mr. C. Edward Peartree, Director, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–1282; email *DDTCResponseTeam@ state.gov*. ATTN: ITAR Amendment— Revisions to Definitions. The Department of State's full retrospective plan can be accessed at *http:// www.state.gov/documents/organization/ 181028.pdf*.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.,* defense articles and defense services, are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations ("EAR," 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR create license requirements for exports and reexports of controlled items. Items not subject to the ITAR or to the exclusive licensing jurisdiction of any other set of regulations are subject to the EAR.

BIS is concurrently publishing amendments (BIS companion rule) to definitions, including "export," "reexport," "release," and "transfer (in-country)" in the EAR.

**Changes in This Rule**

The following changes are made to the ITAR with this interim final rule: (i) Revisions to the definitions for "export" and "reexport or retransfer;" (ii) new definitions for "release" and "retransfer;" (iii) new sections of the ITAR detailing the scope of licenses, unauthorized releases of information; (iv) revisions to the section on "exports" of technical data to U.S. persons abroad; and (v) consolidates §§ 124.16 and 126.18 within one exemption. The remaining definitions published in the June 3, 2015 proposed rule (80 FR 31525), will be the subject of separate rulemakings and the public comments on those definitions will be addressed therein.

The Department received several public comments that address the rule as a whole. These comments are addressed here. Comments on a specific definition or other proposed change are addressed below in the relevant section of the rule.

Several commenters replied to DDTC's request for public comments on the effective date described in the proposed rule, suggesting dates ranging from 60 to 180 days. Some commenters also requested that the rule be published as an interim final rule to allow additional public comments. The Department partially accepts these comments. The Department determined that the changes to definitions and additional definitions included in this rule can be implemented with minimal impact on the export control management systems. However, the Department agrees that additional public comment on all aspects of this rule may be beneficial. Therefore, the rule will be effective 90 days from publication, with a public comment period of 30 days to allow the Department to make any necessary improvements to the rule prior to it becoming effective.

One commenter suggested that the Department place all terms defined within the ITAR in quotations marks, as is done in the EAR. The Department does not accept this comment. The Department has determined that the addition of quotation marks will not enhance the readability of the ITAR.

Several commenters noted that the revised and new definitions in the proposed rule created layered definitions, where exporters must understand multiple definitions of words used within a definition. The Department recognizes that the new definitions require additional study of the new regulations.

One commenter suggested that the Department harmonize § 126.1 with the list of restricted destinations under the EAR, specifically Crimea. The Department does not accept this comment. The imposition of a license requirement under the EAR is not the same as a presumption of denial for exports to a destination listed under § 126.1. All defense articles require authorization from the Department for "export" or "reexport" to, or "retransfer" within, Ukraine and Russia, and all applications are processed consistent with U.S. government policy.

One commenter requested that the Department adopt an intra-company transfer exception, authorizing exports and reexports between company facilities in different destinations. This suggestion is outside the scope of the rulemaking and the Department does not accept the comment.

*1. Export Definition Revised*

The Department revises the definition of "export" in § 120.17 to better align with the EAR's revised definition of the term and to remove activities associated with the further movement of a defense article or its "release" outside the United States, which now fall within the definition of "reexport" in § 120.19 or "retransfer" in § 120.51. The definition is revised to explicitly identify that §§ 126.16 and 126.17 (exemptions pursuant to the Australia and United Kingdom Defense Trade Cooperation Treaties) have their own definitions of "export," which apply exclusively to those exemptions.

Although the wording of paragraph (a)(1) of this section has changed, the scope of the control is the same. Paragraph (a)(2) includes the control listed in the former paragraph (a)(4) (transfer of technical data to a foreign person). Paragraph (a)(3) includes the control listed in the former paragraph (a)(2) (transfer of registration, control, or ownership to a foreign person of an aircraft, vessel, or satellite). Paragraph (a)(4) includes the control listed in the former paragraph (a)(3) (transfer in the United States to foreign embassies). Paragraph (a)(5) maintains the control on performing a defense service. Paragraph (a)(6) is retained from the existing text to continue to advise exporters that the launch of a launch vehicle or payload does not constitute an export, but may involve a defense service. Paragraph (b) is added to clarify that disclosing technical data to a foreign person in the United States is deemed to be an "export" to all countries in which the foreign person holds or has held citizenship or holds permanent residency.

In response to public comments, the Department revised proposed paragraph (a)(4) to clarify that it is the "release" or transfer to an embassy or one of its agencies or subdivisions that is the activity of concern. This includes transfers to employees of an embassy or other foreign persons who will take the defense article to an embassy.

The Department also removed proposed paragraphs (a)(6) and (7). Proposed paragraph (a)(6) is no longer necessary, and the Department will address controls on encrypted technical data in a separate rulemaking. Proposed paragraph (a)(7) will also be addressed in a separate rulemaking, and until such time, the existing ITAR controls remain in place.

One commenter suggested that the Department adopt the definition of "export" that was in the EAR, which states "[e]xport means an actual shipment or transmission of items out of the United States," and state that the other activities identified in § 120.17 are "subject to the regulations in the same manner and with the same effect as an export." The Department does not accept this comment. All of the activities identified in this section are an "export."

Several commenters stated that the definition of "export" is too broad, as individuals may share information that they do not believe to be technical data and accidentally violate the ITAR. The Department does not accept this comment. For information to be ITAR-controlled, it must be directly related to a defense article or specifically enumerated on the USML, and not satisfy one of the exclusions in § 120.10(b).

One commenter suggested that the Department revise paragraphs (a)(1) and (2) so that (a)(1) includes only hardware exports and (a)(2) includes all technical data exports, whether to a foreign person in the United States or to someone in another country. The Department does not accept this comment. A major purpose of this rule is to harmonize the ITAR with the EAR, and the Department determined it would better align the definition of "export" by adopting the EAR's framework of including one paragraph for an "export" that moves a defense article to another country, whether tangible or intangible, and another paragraph that addresses the "export" of technical data to foreign persons in the United States.

One commenter suggested that the changes to paragraph (a)(2), which define transfers to a foreign person in the United States as an "export," and transfers to a foreign person outside the United States, but within one foreign country, as a "reexport" under § 120.19(a)(2), would preclude a U.S. company from obtaining a DSP–5 to authorize their overseas foreign national employee to receive technical data. The Department does not accept this comment. The sending or taking of technical data out of the United States

to a foreign person employee will remain an "export" under paragraph (a)(1).

One commenter requested that the Department exclude software object code from paragraph (a)(2) so that the provision of ITAR-controlled object code to a foreign person is not an "export." The Department does not accept this comment. Due to the sensitivity of items that remain defense articles following the revisions on the USML through ECR, retaining those items that provide the United States a critical military or intelligence advantage, ITAR control of the "release" of object code that is within the scope of the USML to foreign persons is appropriate.

Several commenters requested that the Department remove the portion of (a)(6) that addressed the provision of physical access to technical data. The Department has removed paragraph (a)(6). However, as described above for paragraph (a)(7), while the act of providing physical access does not constitute an "export," any release of technical data to a foreign person is an "export," "reexport," or "retransfer" and will require authorization from the Department. If a foreign person views or accesses technical data as a result of being provided physical access, then an "export" requiring authorization will have occurred and the person who provided the foreign person with physical access to the technical data is an exporter responsible for ITAR compliance.

A commenter suggested that the Department revise paragraph (b) to state that only the last country of citizenship or permanent residency be considered for foreign persons, to harmonize with the EAR. The Department does not accept this comment. A main tenet of ECR is that the ITAR will have higher walls around fewer, more sensitive items, and this aspect of the control system is an example of the more stringent controls that the ITAR maintains.

One commenter noted that the preamble to the proposed rule and paragraph (b) are inconsistent because the preamble language was not limited to "releases" in the United States. The Department confirms that a disclosure to a foreign person in the United States is an "export," while a "release" to a third-country foreign person abroad is a "reexport," and a "release" to a foreign person within their own country is a "retransfer." However, all such activities require authorization, and all citizenships held and any permanent residency status must be accounted for in the authorization.

One commenter requested the Department define permanent residency. The Department notes that permanent resident is defined at 8 U.S.C. Chapter 12, Immigration and Nationality, for the purpose of U.S. law. For the purpose of the ITAR related to third-country foreign persons in a foreign country, the Department generally considers the right to reside in the country indefinitely, be employed by an employer in the country, to make unlimited entry and exit to/from the country without a visa, and rights of voting or office holding in making a determination.

### 2. Reexport Definition Revised

The Department revises the definition of "reexport" in § 120.19 to better align with the EAR's revised definition and describe transfers of items subject to the jurisdiction of the ITAR between two foreign countries. The activities identified are the same as those in paragraphs (a)(1) through (3) of the revised definition of "export," except that the shipment, "release," or transfer is between two foreign countries or is to a third country national foreign person outside of the United States.

One commenter requested that the Department address the implications of § 124.16 and § 126.18 on the control in § 120.19(a)(2). The Department notes that § 120.19(a)(2) does not impose a new license requirement. However, the Department has determined that the authorization that may be requested for an agreement under § 124.16 may be used for any authorization from the Department. Therefore, § 124.16 is converted into an exemption and moved to § 126.18(d).

One commenter requested that the Department state that no "reexport" occurs if an item is moved from one foreign country to another either under the possession of the same end user or by being sent to the same end user. The Department does not accept this comment. Any movement of a defense article between two foreign countries is a "reexport" and requires an authorization. However, an "export" authorization may authorize further "reexport."

### 3. Release Definition Added

The Department adds a definition of "release" in § 120.50. This term is added to harmonize with the EAR, which has long used the term to cover activities that disclose information to foreign persons. "Release" includes the activities encompassed within the undefined term "disclose." The activities that are captured include allowing a foreign person to inspect a

defense article in a way that reveals technical data to the foreign person and oral or written exchanges of technical data with a foreign person. The adoption of the definition of "release" does not change the scope of activities that constitute an "export" and other controlled transactions under the ITAR. The word software was removed from the proposed definition of "release" because the Department is not revising the definitions of defense article and technical data at this time, and as such, all ITAR controlled software remains technical data under § 120.10.

Several commenters requested that the Department revise (a)(1) by replacing inspection with examination or "close examination" and state that such inspection or examination must "actually reveal technical data or software" to the foreign person. The Department does not accept this comment. Inspection and examination are synonyms. Adding the modifier "close" may be appropriate in certain circumstances, but other defense articles may not require a close examination for the "release" of technical data to occur. The Department is confident that limiting the control to situations where a visual or other inspection "releases" technical data sets the appropriate scope of control. Additionally, the Department confirms that the information about the defense article must be technical data and not simply attributes, such as size or weight.

### 4. Retransfer Definition Added

The Department adds a definition of "retransfer" in § 120.51. This interim final rule moves "retransfer" from the definition of "reexport" in § 120.19, better describes the activities being regulated and harmonizes it with the EAR, which controls "exports," "reexports," and "transfers (in country)" as discrete events. Under the definition adopted in this interim final rule, a "retransfer" occurs with a change of end use or end user within the same foreign territory. Certain activities may fit within the definition of "reexport" and "retransfer," such as the disclosure of technical data to a third country national abroad. Authorizations to "reexport" or "retransfer" a defense article are generally issued through the General Correspondence process under § 123.9(c), or by an exemption.

One commenter requested that the Department confirm that the new definition of "retransfer"—*i.e.*, a change in end use or end user—means that authorizations will no longer be required for transfers to subcontractors or intermediate consignees within the same country. The Department does not

accept this comment. Providing a defense article to a subcontractor, or any party not explicitly authorized, for additional processing or repair is a change in the end user and end use of the defense article. Such a "retransfer" requires authorization, even if the party is required to return the defense article to the transferor.

One commenter requested that the Department remove "change of end use" from the definition of "retransfer," asserting that this is an expansion of the scope of activities controlled under the ITAR. The commenter alternatively requested that the Department confirm that the party responsible for any violation due to change in end use is the ultimate consignee. The Department does not accept these comments. Change in end use is within the prior definition of reexport/retransfer that was in § 120.19. An ultimate consignee may also contact the Department to obtain authorization for a change in end use under § 123.9(c). If a violation does occur, the Department will assess responsibility pursuant to its civil enforcement authority based on the relative culpability of all of the parties to the transaction. (See, *e.g.*, § 127.1(c)).

### 5. Exemption for the Export of Technical Data to or for U.S. Persons Abroad Revised

The Department revises § 125.4(b)(9) to better harmonize controls on the "release" of controlled information to U.S. persons abroad and to update the provisions of this section. The most significant updates are that foreign persons authorized to receive technical data in the United States will be eligible to receive that same technical data abroad, when on temporary assignment on behalf of their employer, and that the exemption will now authorize a "reexport" or "retransfer" as well. The revisions also clarify that a person travelling abroad may use this exemption to "export" technical data for their own use abroad. In all events, the technical data must be secured while abroad to prevent unauthorized "release."

In response to public comments, the Department includes the ability to use this exception to authorize "reexports" and "retransfers," in addition to "exports." The Department also revises the introductory text from the proposed text to clarify that the requirement that a person be travelling or on temporary assignment abroad only applies to foreign person employees, maintaining the current scope of the exemption for U.S. persons. Further, the Department removes the additional proposed recordkeeping requirement, as the

Department has determined that the recordkeeping requirements in § 123.26 applicable to all exemptions are sufficient.

One commenter noted that the data security provisions appear to be wholly within the control of the person abroad, and not the exporter, at least in instances where the exporter is not also the person abroad. The Department agrees that the person in possession of the technical data abroad will have the primary responsibility for ensuring that the technical data is adequately secured, consistent with paragraph (b)(9)(ii). As with all "exports," however, the exporter is responsible for ITAR compliance and must, prior to using the exemption, be confident that the person abroad is aware of the requirement and will properly implement the necessary security.

One commenter requested that the Department remove the reference to "encryption of the technical data" from the security provision in subparagraph (ii). The Department partially accepts this comment. Subparagraph (ii) requires that sufficient security precautions be taken and has been revised to clarify that the list of security precautions is exemplary.

One commenter requested that the Department explicitly state that technical data stored on servers in the United States may be accessed by a U.S. person in a foreign country through a secure/encrypted connection, using this exemption. The Department confirms that a U.S. person or authorized foreign person may access technical data in the United States from abroad using a secure connection. This activity constitutes an "export" of the technical data because it is sent to the foreign country, even if only as a transient or temporary document in electronic storage, and such export may be authorized by this exemption.

One commenter requested that the Department include foreign subsidiaries and affiliates of U.S. companies in paragraph (b)(9), so long as the foreign subsidiary or affiliate is authorized to receive the technical data. The Department does not accept this comment. If an authorization exists that allows a foreign subsidiary or affiliate access to technical data, that authorization is an authorization to "export" that technical data to its employees within the approved territory. If the employees are outside of approved territory, they are not authorized to receive the technical data.

One commenter requested that the Department clarify whether a party who followed DDTC guidance in direct conflict with the National Industrial

Security Program Operating Manual (NISPOM), as provided by subparagraph (v), would be at risk of violating the NISPOM. The Department notes that the Secretary of State has the authority to impose different conditions on "exports" apart from those imposed by the Department of Defense, as noted in 71 FR 20534, 20535 (April 21, 2006), and that this paragraph is not being revised by the current rulemaking.

One commenter requested that the Department clarify whether a U.S. person sending or taking technical data overseas on an encrypted device for his personal use or use by another U.S. person is engaged in an "export." As noted above, the Department will address the proposed § 120.52(a)(4) in a separate rulemaking.

One commenter requested that the Department insert a note cross-referencing to § 120.52 for other options for sending information to persons abroad. As noted above, the Department will address the proposed § 120.52 in a separate rulemaking.

One commenter stated that this section implies that technical data sent to a foreign country in compliance with the proposed § 120.52(a)(4) is an "export." As noted above, the Department will address the proposed § 120.52 in a separate rulemaking.

### 6. Scope of License Added

The Department adds § 123.28 and § 124.1(e) to clarify the scope of a license, in the absence of a proviso, and to state that authorizations are granted based on the information provided by the applicant. This means that while providing false information to the U.S. government as part of the application process for the "export," "reexport," or "retransfer" of a defense article or the performance of a defense service is a violation of the ITAR (*see* § 127.2(a)), the Department may also deny, revoke, suspend, or amend the license under § 126.7(a) as a result of the false information.

One commenter suggested that the Department not adopt these sections, as an exporter could identify a defense article, end user, or end use in the supporting documentation for a license application that the Department did not intend to authorize in the license itself. The Department does not accept this comment. The Department reviews all information submitted by an applicant and includes provisos to condition the scope of the authorization to the defense articles, parties, and end uses that are intended to be authorized.

### Request for Comments

The Department invites public comment on any of the definitions set forth in this rulemaking.

### Regulatory Findings

#### Administrative Procedure Act

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the U. S. government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this rulemaking is exempt from the rulemaking provisions of the APA, the Department is publishing this rule with a 30-day provision for public comment and without prejudice to its determination that controlling the import and export of defense articles and defense services is a foreign affairs function.

#### Regulatory Flexibility Act

Since the Department is of the opinion that this rulemaking is exempt from the rulemaking provisions of 5 U.S.C. 553, there is no requirement for an analysis under the Regulatory Flexibility Act.

#### Unfunded Mandates Reform Act of 1995

This rulemaking does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

#### Small Business Regulatory Enforcement Fairness Act of 1996

For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Act"), a major rule is a rule that the Administrator of the OMB Office of Information and Regulatory Affairs finds has resulted or is likely to result in: (1) An annual effect on the economy of $100,000,000 or more; (2) a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions; or (3) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.

The Department does not believe this rulemaking will have an annual effect on the economy of $100,000,000 or more, nor will it result in a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions, or have significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and foreign markets. The proposed means of solving the issue of data protection are both familiar to and extensively used by the affected public in protecting sensitive information.

#### Executive Orders 12372 and 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

#### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The executive orders stress the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rulemaking has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rulemaking has been reviewed by the Office of Management and Budget (OMB).

#### Executive Order 12988

The Department of State has reviewed the rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to

WASHAR0000577

eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department of State has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

*Paperwork Reduction Act*

This rulemaking does not impose any new reporting or recordkeeping requirements subject to the Paperwork Reduction Act, 44 U.S.C. Chapter 35; however, the Department of State seeks public comment on any unforeseen potential for increased burden.

**List of Subjects**

*22 CFR 120 and 125*

Arms and munitions, Classified information, Exports.

*22 CFR 123*

Arms and munitions, Exports, Reporting and recordkeeping requirements.

*22 CFR Part 124*

Arms and munitions, Exports, Technical assistance.

*22 CFR 126*

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 120, 123, 124, 125, and 126 are amended as follows:

**PART 120—PURPOSE AND DEFINITIONS**

■ 1. The authority citation for part 120 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2794; 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 120.17 is revised to read as follows:

**§ 120.17   Export.**

(a) Except as set forth in § 126.16 or § 126.17, *export* means:

(1) An actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner;

(2) Releasing or otherwise transferring technical data to a foreign person in the United States (a "deemed export");

(3) Transferring registration, control, or ownership of any aircraft, vessel, or satellite subject to the ITAR by a U.S. person to a foreign person;

(4) Releasing or otherwise transferring a defense article to an embassy or to any of its agencies or subdivisions, such as a diplomatic mission or consulate, in the United States;

(5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad; or

(6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter. However, for certain limited purposes (see § 126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services.

(b) Any release in the United States of technical data to a foreign person is deemed to be an export to all countries in which the foreign person has held or holds citizenship or holds permanent residency.

■ 3. Section 120.19 is revised to read as follows:

**§ 120.19   Reexport.**

(a) *Reexport* means:

(1) An actual shipment or transmission of a defense article from one foreign country to another foreign country, including the sending or taking of a defense article to or from such countries in any manner;

(2) Releasing or otherwise transferring technical data to a foreign person who is a citizen or permanent resident of a country other than the foreign country where the release or transfer takes place (a "deemed reexport"); or

(3) Transferring registration, control, or ownership of any aircraft, vessel, or satellite subject to the ITAR between foreign persons.

(b) Any release outside the United States of technical data to a foreign person is deemed to be a reexport to all countries in which the foreign person has held or holds citizenship or holds permanent residency.

■ 4. Section 120.50 is added to read as follows:

**§ 120.50   Release.**

(a) Technical data is released through:

(1) Visual or other inspection by foreign persons of a defense article that reveals technical data to a foreign person; or

(2) Oral or written exchanges with foreign persons of technical data in the United States or abroad.

(b) [Reserved]

■ 5. Section 120.51 is added to read as follows:

**§ 120.51   Retransfer.**

A retransfer is a change in end use or end user of a defense article within the same foreign country.

**PART 123—LICENSES FOR THE EXPORT AND TEMPORARY IMPORT OF DEFENSE ARTICLES**

■ 6. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec. 1205(a), Pub. L. 107–228; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 7. Section 123.28 is added to read as follows:

**§ 123.28   Scope of a license.**

Unless limited by a condition set out in a license, the export, reexport, retransfer, or temporary import authorized by a license is for the item(s), end-use(s), and parties described in the license application and any letters of explanation. DDTC grants licenses in reliance on representations the applicant made in or submitted in connection with the license application, letters of explanation, and other documents submitted.

**PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES**

■ 8. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 9. Section 124.1 is amended by adding paragraph (e) to read as follows:

**§ 124.1   Manufacturing license agreements and technical assistance agreements.**

\*    \*    \*    \*    \*

(e) Unless limited by a condition set out in an agreement, the export, reexport, retransfer, or temporary import authorized by a license is for the item(s), end-use(s), and parties described in the agreement, license, and any letters of explanation. DDTC approves agreements and grants licenses in reliance on representations the applicant made in or submitted in connection with the agreement, letters of explanation, and other documents submitted.

**§ 124.8   [Amended]**

■ 10. Section 124.8 is amended by removing "§§ 124.16 and 126.18" and

adding "§ 126.18" in its place in paragraph (5).

## § 124.12 [Amended]

■ 11. Section 124.12 is amended by removing paragraph (a)(10).

## § 124.16 [Removed and Reserved]

■ 12. Section 124.16 is removed and reserved.

## PART 125—LICENSES FOR THE EXPORT OF TECHNICAL DATA AND CLASSIFIED DEFENSE ARTICLES

■ 13. The authority citation for part 125 continues to read as follows:

**Authority:** Secs. 2 and 38, 90, 90 Stat. 744 (22 U.S.C. 2752, 2778); 22 U.S.C. 2651a; E.O. 13637, 78 FR 16129.

■ 14. Section 125.4 is amended by revising paragraph (b)(9) to read as follows:

### § 125.4 Exemptions of general applicability.

\*       \*       \*       \*       \*

(b) \* \* \*

(9) Technical data, including classified information, regardless of media or format, exported, reexported, or retransferred by or to a U.S. person, or a foreign person employee of a U.S. person travelling or on temporary assignment abroad, subject to the following restrictions:

(i) Foreign persons may only export, reexport, retransfer, or receive such technical data as they are authorized to receive through a separate license or other approval.

(ii) The technical data exported, reexported, or retransferred under this authorization may only be possessed or used by a U.S. person or authorized foreign person. Sufficient security precautions must be taken to prevent the unauthorized release of the technical data. Such security precautions may include encryption of the technical data; the use of secure network connections, such as virtual private networks; the use of passwords or other access restrictions on the electronic device or media on which the technical data is stored; and the use of firewalls and other network security measures to prevent unauthorized access.

(iii) The individual is an employee of the U.S. government or is directly employed by a U.S. person and not by a foreign subsidiary.

(iv) Technical data authorized under this exception may not be used for foreign production purposes or for defense services unless authorized through a license or other separate approval.

(v) Classified information is sent or taken outside the United States in accordance with the requirements of the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case such guidance must be followed).

\*       \*       \*       \*       \*

## PART 126—GENERAL POLICIES AND PROVISIONS

■ 15. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791, and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Sections 7045 and 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 16. Section 126.18 is amended by removing "§ 124.16" in paragraph (a) and adding "paragraph (d) of this section" in its place, and adding paragraph (d).

The addition reads as follows:

### § 126.18 Exemptions regarding intra-company, intra-organization, and intra-governmental transfers to employees who are dual nationals or third-country nationals.

\*       \*       \*       \*       \*

(d) Notwithstanding any other provisions of this subchapter, no approval is needed from the Directorate of Defense Trade Controls (DDTC) for the reexport of unclassified defense articles or defense services to individuals who are dual national or third-country national employees of a foreign business entity, foreign governmental entity, or international organization, that is an authorized end-user, foreign signatory, or consignee (including approved sub-licensees) for those defense articles or defense services, when such individuals are:

(1) Bona fide regular employees directly employed by the foreign business entity, foreign governmental entity, or international organization;

(2) Nationals exclusively of countries that are members of NATO, the European Union, Australia, Japan, New Zealand, or Switzerland;

(3) Within the physical territories of the countries listed in paragraph (d)(2) of this section or the United States during the reexport;

(4) Signatory to a Non-Disclosure Agreement, unless their employer is a signatory or sublicensee to an agreement under § 124.1 authorizing those defense articles or defense services; and

(5) Not the recipient of any permanent transfer of hardware.

Dated: May 23, 2016.

**Rose E. Gottemoeller,**

*Under Secretary, Arms Control and International Security, Department of State.*

[FR Doc. 2016–12732 Filed 6–2–16; 8:45 am]

**BILLING CODE 4710–25–P**

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

### 33 CFR Part 100

**[Docket Number USCG–2016–0385]**

**RIN 1625–AA08**

### Special Local Regulation; Tri-City Water Follies Spring Testing, Kennewick, WA

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary interim rule; request for comments.

**SUMMARY:** The Coast Guard is establishing a Special Local Regulation for all navigable waters within the Columbia River in the vicinity of Columbia Park, commencing at the Interstate 395 Bridge and continuing up river approximately 2.0 miles and terminating at the northern end of Wade Island, during the Tri-City Water Follies Spring Testing event. The special local regulation is needed to protect personnel, vessels, and the marine environment from potential hazards created by high-speed watercraft. Entry of vessels or persons into this area is prohibited unless specifically authorized by the Captain of the Port Columbia River or his designated representative.

**DATES:** This rule is effective from June 3, 2016 through June 10, 2016 at 6 p.m. This rule will be enforced from June 10, 2016 at 7 a.m. through June 10, 2016 at 6 p.m. Comments and related material must be received by the Coast Guard on or before July 5, 2016.

**ADDRESSES:** To view documents mentioned in this preamble as being available in the docket, go to *http://www.regulations.gov,* type USCG–2016–0385 in the "SEARCH" box and click "SEARCH." Click on Open Docket Folder on the line associated with this rule. You may submit comments identified by docket number USCG–2016–0385 using the Federal eRulemaking Portal at *http://www.regulations.gov.* See the "Public Participation and Request for Comments" portion of the

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
RON JOHNSON, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies——and the U.S. Transportation Security Agency——all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

WASHAR0000580

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

WASHAR0000581

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER          THOMAS SHEEHY
CHIEF OF STAFF        STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed firearms would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

WASHAR0000582

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

ELIOT L. ENGEL
Ranking Member

WASHAR0000583

| **From:** | Heidema, Sarah J </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=988657EBED564D51A4569D583B8C4E81-HEIDEMA, SA> |
|---|---|
| **Sent:** | Tuesday, July 24, 2018 8:27 AM |
| **To:** | Tucker, Maureen E <TuckerME@state.gov> |
| **Subject:** | FW: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns |
| **Attach:** | 07-20-18 Letter to Secretary Pompeo Regarding 3-D Printed Arms.pdf |

Per our conversation

**Official**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Date:** July 20, 2018 at 4:37:58 PM EDT
**To:** Miller, Michael F <Millermf@state.gov>, Paul, Joshua M <PaulJM@state.gov>, Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>, Fite, David <david_fite@foreign.senate.gov>, Oliver, Stacie <stacie_oliver@foreign.senate.gov>
**Subject:** Rep. Engel Letter to Sec. Pompeo on 3D Printed guns
Mike, et.al.:
I wanted you to be aware of the attached letter from Rep. Engel to Secretary Pompeo urging a delay of the implementation of the settlement in Defense Distributed v. U.S. State Department, given the significant security threat that would occur immediately upon release of the software. The letter also is being sent to H. Rep. Engel has directed that the letter be released to the public. As you are no doubt aware, the terms of the settlement are already being widely reported in the media this afternoon.
Ed
Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

WASHAR0000584

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER        THOMAS SHEEHY
CHIEF OF STAFF    STAFF DIRECTOR

ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR



One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed fireams would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

ELIOT L. ENGEL
Ranking Member

# Exhibit C

WASHAR0000587

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0000589

counsel with all information necessary to effectuate this payment.
The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0000590

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4. *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0000591

5.      *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.      *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.      *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0000592

8. *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9. *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0000593

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0000594

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0000595

# Exhibit B

WASHAR0000596

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, SECOND )
AMENDMENT FOUNDATION, INC., and )
CONN WILLIAMSON, )
                                 )
     Plaintiffs, )
                                   )
BRADY CAMPAIGN TO PREVENT GUN ) CIVIL ACTION NO: 1:15-cv-372-RP
VIOLENCE, EVERYTOWN FOR GUN )
SAFETY ACTION FUND, INC., and )
GIFFORDS, )
                                   )
     Plaintiffs-Intervenors, )
                                   )
     v. )
                                   )
UNITED STATES DEPARTMENT OF )
STATE; MICHAEL R. POMPEO, in his )
official capacity as Secretary of State; )
DIRECTORATE OF DEFENSE TRADE )
CONTROLS, )
                                   )
     Defendants. )
                                   )

## **COMPLAINT IN INTERVENTION**

WASHAR0000597

Plaintiffs-Intervenors Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc., and Giffords (hereinafter "Intervenors") submit this Complaint in Intervention and allege, upon information and belief, the following:

## INTRODUCTION

1.       "At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." Defendants' Motion to Dismiss Second Amended Complaint at 1, filed Apr. 6, 2018 (ECF No. 92) ("Motion to Dismiss").

2.       Defense Distributed develops Computer Aided Design ("CAD") files for the purpose of enabling anyone to automatically manufacture guns on 3-D printers.  The company's stated objective is to ensure global, unrestricted access to firearms by postings its files online. Due to the Government's recent about-face in this case, Defense Distributed is set to do just that:



WASHAR0000598

3.      According to the Government's previous submissions to this Court, making Defense Distributed's CAD files "available online through unrestricted access to the Internet would provide any [terrorist organization] with defense articles, including firearms, at its convenience, subject only to its access to a 3D printer, an item that is commercially available. Terrorist groups and other actors could then potentially manufacture and use such weapons against the United States or its allies." Declaration of Lisa V. Aguirre, ¶ 35(b), Exhibit A to Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF Nos. 32, 32-1) ("Aguirre Decl.").

4.      As recently as April of this year, the Government stressed to this Court the potentially devastating national security implications if Defense Distributed's files were made available online.  The Government represented to this Court that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3,7.

5.      However, mere weeks after the Government urged this Court to dismiss this lawsuit citing the national security concerns raised by the possibility of foreign nationals or terrorists acquiring the Plaintiffs' CAD files, they offered a settlement agreement to the Plaintiffs (the "Settlement Agreement") which gave the Plaintiffs everything they asked for, and more.

6.      Pursuant to the terms of the Settlement Agreement, in exchange for dismissing the lawsuit, the Government has agreed to: (i) draft and fully pursue a notice of rulemaking and a final rule to remove the files at issue from the jurisdiction of the International Traffic in Arms Regulations ("ITAR"); (ii) temporarily modify Category I of the United States Munitions List

WASHAR0000599

("USML") to exclude the files at issue from ITAR; (iii) issue a letter to the Plaintiffs that their files are exempt from ITAR; (iv) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue; and (v) pay the Plaintiffs almost $40,000.

7.　　As a direct consequence of the Settlement Agreement, Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018. According to news reports, in addition to the older gun models, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons." "The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable." According to Wilson: "What's about to happen is a Cambrian explosion of the digital content related to firearms." Wilson says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."



WASHAR0000600

8.     The Government entered into the Settlement Agreement in contravention of the statutes and regulations which govern the export designation process.  Among other things, upon information and belief, the State Department: (i) has not provided the relevant Congressional committees with the 30 days-notice to "temporarily" modify the munitions lists; (ii) has not received the concurrence of the Secretary of Defense to "temporarily" change the designation of the files at issues; and (iii) has not followed established commodity jurisdiction procedures before agreeing to temporarily exempt the CAD files at issue from ITAR.

9.     The "temporary modification" of USML Category I is especially troubling because it involves making Defense Distributed's files available on the internet, which largely overrides the later need to formally modify the relevant rules.  Moreover, the Settlement Agreement covers not only the files that were developed by Defense Distributed at the beginning of this litigation, but also new files that have been developed since that time – which the Government has presumably not even seen.

10.     In addition, the Government has acted in an arbitrary and capricious manner, and has abused its discretion, by (i) failing to consider evidence relevant to ITAR jurisdiction over the CAD files; (ii) drastically changing long-established practice and policy without any explanation; and (iii) failing to study the national security implications of exempting the CAD files from ITAR.  The Settlement Agreement does not make any reference whatsoever to a determination by the Government regarding the national security implications of the agreement.

11.     Tellingly, even the notices of proposed rules, which the Departments of State and Commerce published on May 24, 2018 to amend the ITAR, make no mention of the dangers posed by the files falling into the hands of terrorist organizations, insurgent groups, transnational organized criminal organizations, or states subject to the U.S. or U.N. arms embargoes.

WASHAR0000601

12.     For all these reasons, and others detailed below, the Government Defendants have violated the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers.   This complaint seeks to declare the Settlement Agreement invalid, and to enjoin the Plaintiffs and Government Defendants from giving effect to the agreement, to the extent it  permits Defense Distributed to make its files available online.

## JURISDICTION AND VENUE

13.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 2201 and 2202.

14.     Venue is premised on the principal place of business for Plaintiff Defense Distributed, which is located within the Western District of Texas.

## PARTIES

15.      Plaintiff Defense Distributed is a Texas corporation, whose principal place of business is located in Austin, Texas.  Defense Distributed develops CAD files to enable anyone to automatically manufacture firearms on 3-D printers.  The company also manufactures and sells a "computer-controlled milling machine" called the "Ghost Gunner," which is "designed to allow its owner to carve gun parts out of [  ] aluminum."  Defense Distributed is a party to the Settlement Agreement.

16.     Defense Distributed was started by Cody Wilson, a self-proclaimed anarchist, who believes that "governments should live in fear of their citizenry."  The company's objective is for everyone in the world to have access to guns and to make gun regulations impossible. After publicizing the Settlement Agreement, Wilson said that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun Control."

WASHAR0000602

17.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington.  It is a party to the Settlement Agreement.  In a press release announcing the settlement, SAF founder Alan M. Gottlieb declared it to be "a devastating blow to the gun prohibition lobby[.]"

18.     Upon information and belief, Conn Williamson is a natural person and a citizen of the United States and the State of Washington.  He is a party to the Settlement Agreement.

19.     Defendant the United States Department of State  ("State Department") is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act ("AECA").   The State Department is a party to the Settlement Agreement in this case.

20.     Defendant Michael R. Pompeo is sued in his official capacity as the Secretary of State.  In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.   The Secretary of State is a party to the Settlement Agreement in this case.

21.     Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR. The DDTC is a party to the Settlement Agreement in this case.

22.     Plaintiff-Intervenor the Brady Campaign to Prevent Gun Violence ("The Brady Campaign") is a nation-wide gun violence prevention organization with members spread across all fifty states and the District of Columbia, and established membership groups in Austin, TX and Houston, TX. The Brady Campaign is headquartered in Washington, DC and was founded in

WASHAR0000603

1974 as the National Council to Control Handguns. The Brady Campaign took its current name in 2001, in honor of former White House Press Secretary Jim Brady, who was shot during the assassination attempt on Ronald Reagan, and his wife Sarah Brady.

23.      The Brady Campaign seeks a safer future for every American where hundreds of gun injuries and deaths a day are no longer normal. It focuses on three impact-driven solutions to further its mission of reducing gun deaths: 1) Strengthening gun laws, with a particular focus on the national background check system; 2) reducing the flow of crime guns to urban communities most impacted by gun violence; and 3) meaningfully communicating to gun owners about the dangers of loaded, unlocked guns in the home. The Brady Campaign's sister organization, The Brady Center to Prevent Gun Violence, is a non-profit organization dedicated to reducing gun violence through education, research, and direct legal advocacy on behalf of victims and communities affected by gun violence.  It filed an amicus brief in this case on February 18, 2016. In addition, the Brady Campaign and Brady Center submitted comments to the proposed rule changes implicated in the Settlement Agreement. The Brady Campaign also filed a Freedom of Information Act request with the federal government immediately upon learning of the Settlement Agreement.

24.      Plaintiff-Intervenor Everytown for Gun Safety Action Fund, Inc. is a nation-wide gun violence prevention organization, with members spread across all fifty states.  Everytown is headquartered in New York, NY. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Connecticut.  Currently, the mayors of 8 Texas cities are part of the Mayors Against Illegal Guns

- 8 -

WASHAR0000604

coalition.   Everytown and its members and supporters work in all 50 states and in Congress to

support the passage and enforcement of gun safety laws that, among other things, help keep guns

out of the hands of prohibited persons and other individuals with dangerous histories and help

law enforcement apprehend and prosecute those who violate U.S. and state gun

laws.  Immediately upon learning of the Settlement Agreement in this case, Everytown submitted

a federal Freedom of Information Act request seeking disclosure of documents pertaining to the

settlement.

   25.  Plaintiff-Intervenor Giffords is a 501(c)(4) gun violence prevention organization

founded by former Congresswoman Gabrielle Giffords and her husband, Captain Mark Kelly, a

retired Navy combat veteran and NASA astronaut.   Headquartered in Washington, D.C.,

Giffords researches, writes, and proposes policies that make Americans safer and mobilizes

voters and lawmakers in support of safer gun laws.   Its mission is to address the issue of gun

violence in communities across the country, and to that end, Giffords works to affect legislation,

shape the national dialogue, and reduce gun violence.   Since its founding after the Sandy Hook

Elementary School shooting in Newtown, Connecticut, Giffords has been involved in the

passage of more than 200 new strong gun laws in 45 states and Washington, D.C.

   26.  Giffords and its sister 501(c)(3) organization, Giffords Law Center to Prevent

Gun Violence, recently submitted public comments on the proposed rule changes by the State

Department and Commerce Department that would deregulate the publication of computerized

blueprints for the production 3D printed guns. In that comment, Giffords opined that the

proposed changes "would represent a dramatic change in the regulatory structure governing

firearm experts," and that they "may not adequately address our national security, foreign policy,

international crime, or terrorism threats," and expressed concern that the changes "will result in

WASHAR0000605

an increase in the number of untraceable firearms in circulation." *See* Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), *available at* http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf.

## FACTS

### *The Statutory and Regulatory Framework*

27.     The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. 22 U.S.C. § 2751.

28.     Under the AECA, "[t]he President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). Items designated as defense articles or services constitute the United States Munitions List ("USML"). *Id.* at § 2778(a)(1). Category I of the USML lists articles, services, and related technical data for "Firearms, Close Assault Weapons and Combat Shotguns."

29.     Among other things, Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(I)(a). "Technical data" is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a). Technical data includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation," and exempts information already in the public domain, as defined in Section 120.11. *Id.* § 120.10.

WASHAR0000606

30. "[T]he 'technical data' provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML. Such export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly. Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR." Aguirre Decl. ¶ 14.

31. Pursuant to Executive Order 13637, the President has delegated his AECA authority to the State Department. In turn, the State Department has promulgated the ITAR, which is administered by the DDTC. *See* 22 C.F.R. §§ 120-130. Among other things, the DDTC is tasked with maintaining, reviewing and clarifying the USML.

32. Pursuant to Executive Order 13637, §1(n), "[d]esignations including changes in designations, by the Secretary of items or categories that shall be considered as defense articles and defense services subject to export control under section 38 ( 22 U.S.C. 2778) shall have the concurrence of the Secretary of Defense."

33. In addition, the Executive Branch must give notice to the International Relations Committee of the House of Representatives and to the Committee on Foreign Relations of the Senate at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1). Such notification must be made in accordance with the procedures applicable to reprogramming notifications under § 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. *Id.*

- 11 -

WASHAR0000607

34.　　ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation. However, it may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

35.　　For situations where there is doubt that a particular item to be exported falls on the USML, ITAR contains a commodity jurisdiction "CJ" procedure. 22 C.F.R. § 120.4. Upon written request, the DDTC will provide a determination as to whether a certain item, service, or data is within the scope of ITAR. *Id.*

36.　　The "CJ" determination "entails consultation among the Department of State, Defense, Commerce and other U.S. Government agencies and industry in appropriate cases." *Id.* Assessments are made on a case-by-case basis, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application. *Id.* A determination made pursuant to the commodity jurisdiction process takes into account "(i) [t]he form and fit of the article; and (ii) [t]he function and performance capability of the article." Aguirre Decl. ¶ 20.

37.　　22 C.F.R. § 120.4(f) requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures. State shall notify Defense and Commerce of the initiation and conclusion of each case."

**The Computer Files at Issue**

38.　　In or around early May 2013, Defense Distributed posted a number of CAD Files on DefCad.org, a website it created to serve as an open-source repository for weapons designs, including data to automatically manufacture the "Liberator" pistol. The Liberator is a plastic firearm which contains 6-oz piece of steel, which can be easily removed, enabling it to avoid detection in walk-through metal detectors.

WASHAR0000608

39.     These CAD files are "data files" that are "essentially blueprints that can be read by CAD software."  Letter from Jahna M. Hartwig on behalf of Defense Distributed to the DDTC, dated June 21, 2013.  They are "indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components." Motion to Dismiss at 1.

40.     On May 8, 2013, the Office of Defense Trade Controls Compliance, which is responsible for compliance with and civil enforcement of the AECA and ITAR, sent Defense Distributed a letter noting that "it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC."

41.     The letter explained that "disclosing (including oral or visual disclosure) or transferring foreign data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR."  It requested that Defense Distributed remove ten specific CAD files from public access "immediately" and submit them for CJ determination. Defense Distributed filed a request for CJ determinations for these files on June 21, 2015.

42.     In January 2015, while consideration of Defense Distributed's original CAD file submission was ongoing, Defense Distributed submitted a CJ request for the "Ghost Gunner," an automated firearms metal milling machine.  In April 2015, the DDTC determined that the Ghost Gunner was not subject to the jurisdiction of the State Department, but that the "project files and data files for producing a defense article on a 3D printer or similar device constituted technical data on that defense article that would be subject to ITAR regulation."  Aguirre Decl. ¶ 28.

43.     The DDTC completed its review of Defense Distributed's original requests on June 4, 2015 and determined that six of the files were subject to ITAR control: (i) the Liberator

WASHAR0000609

pistol; (ii) the .22 caliber electric pistol; (iii) the 5.56/.223 muzzle brake; (iv) the Springfield XD-40 tactical slide assemble; (v) the sub-caliber insert;  and (vi) the VZ-58 front sight.

44.    In making its CJ determination, the DDTC noted that the CAD files at issue "can be used to 'automatically find, align, and mill' a defense article such as a firearm on a 3D printer or other manufacturing device. Manufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which merely *guides* the manufacture of a defense article and requires additional craftsmanship, know-how, tools, and materials."  Aguirre Decl. ¶ 29(c).

***The Current Lawsuit***

45.    The Plaintiffs filed this action in May 2015, alleging that the Government Defendants' actions violated the First, Second and Fifth Amendments.  In addition, the Plaintiffs alleged that the Government Defendants had engaged in *ultra vires* conduct.   Among other things, the Plaintiffs sought an injunction to prevent the Government Defendants and "all persons in active concert with them" from barring Defense Distributed's export of CAD files.

46.    In response to the Plaintiffs' motion for a preliminary injunction, the Government Defendants argued, *inter alia,* that they were "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF No 32).

47.    The Government Defendants argued that "[t]he CAD files are 'technical data' that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a

WASHAR0000610

foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations." *Id.* at 7.

48.     Along with its opposition to Plaintiffs' preliminary injunction motion, the Government Defendants submitted an affidavit from Lisa V. Aguirre, the Director of the Office of Defense Trade Controls Management.  Among other things, Director Aguirre concluded that: (i) "[t]he 'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States"; (ii) making the CAD files available online would provide terrorist organizations with firearms, which could be used against the United States or its allies; and (iii) "[a]cess to weapons technology coupled with the uncontrolled ubiquitous means of productions . . . could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies." Aguirre Decl. ¶ 35.

49.     Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests.   *Def. Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015).  This Court found that "[f]acilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict." *Id.* at 691 (internal quotations omitted).  In addition, this Court noted that the Plaintiffs had "not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

50.     On appeal, the Fifth Circuit upheld this Court's preliminary injunction ruling. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  In so doing, the

WASHAR0000611

Fifth Circuit focused on the national security implications and the permanent nature of the internet, explaining that:

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide . . . **Because those files would never go away**, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. **Thus, the national defense and national security interest would be harmed forever**.

*Id.* at 461 (emphasis added).

51.     On January 8, 2018, the Supreme Court denied the Plaintiffs' petition for a writ of certiorari. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

52.     After the Supreme Court denied certiorari, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018. *See* ECF Nos. 77, 88 and 90.

53.     On April 6, 2018, the Government Defendants filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3, 7.

54.     The Government Defendants explained to the Court that the files at issue "directly facilitate the manufacture of weapons" through "automated processes." *Id.* at 1, 9.

55.     The Government Defendants urged this Court to dismiss the Plaintiffs' lawsuit because:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United

WASHAR0000612

> States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability.

*Id.* at 1.

56.    Mere weeks after the Government stressed the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority." Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement, filed Apr. 30, 2018 (ECF No. 93).

57.    According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted." Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018*), available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

58.    On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018." (ECF No. 95).

59.    As of the date of this filing, the parties have not yet filed a stipulation of dismissal with this Court.

***The Settlement Agreement***

60.    The Settlement Agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the Plaintiffs.

61.    What appears to be an accurate copy of the agreement is now available on the internet. *See* https://www.exportlawblog.com/docs/Defense%20Distributed%

- 17 -

WASHAR0000613

20Settlement%20Agreement.pdf. A copy of the posted agreement is provided with this Complaint as **Exhibit C.**

62.     Pursuant to the Settlement Agreement, in consideration for the Plaintiffs' dismissing the action, the Government Defendants have agreed to:

   a. "[C]ommit[ ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

   b. "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action.  The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

   c. "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

   d. "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

   e. Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

63.     Importantly, par. 1(a), (b) and (d) cover the broad category of files referred to as "the technical data that is the subject of this Action."  This term is defined in the Settlement Agreement to include "Other Files," as long as those files "regard items exclusively: (a) in Category I(a) of the [USML], as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment."  *Id.* ¶ 12.

- 18 -

WASHAR0000614

64.     "Other Files" are those that "Defense Distributed has and will continue to create and possess . . . that contain technical information, to include design drawings, rendered images, written manufacturing instructions[.]"   Second Amended Complaint, ¶ 44, filed Mar. 6, 2018 (ECF No. 90).  In other words, they are files that the Government has presumably not seen yet.

65.     Under the Settlement Agreement, the Department of Justice is prohibited from filing a stipulation of dismissal any earlier than five business days after announcement of the "temporary" modification to the USML Category I and issuance of a letter to Plaintiffs that their files are approved for public release in any form and exempt from ITAR.   Id. ¶ 2.  In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018.

66.     The Settlement Agreement does not indicate that any analysis, study or determination was made by the Government Defendants, in consultation with other agencies, before the Government Defendants agreed to remove the CAD Files from the USML Category I. In fact, the Settlement Agreement states that it "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

67.     Upon information and belief, neither the House Committee on Foreign Relations (formerly known as the International Relations of the House of Representatives), nor the Committee on Foreign Relations of the Senate received the required 30-days advance notice of the "temporary modifications" described in pars. 1(b) or (d) of the Settlement Agreement.

68.     In addition, there is no indication in the Settlement Agreement that the Secretary of Defense has concurred in the changes to designation agreed to in the Settlement Agreement, as required by Executive Order 13637.   There is also no indication that the Government

WASHAR0000615

Defendants have followed the established procedures for making a CJ determination before allowing Defense Distributed to export its data.

69.     Upon publicizing the Settlement Agreements, the Plaintiffs have repeatedly and adamantly made claims about the impact of the agreement on all gun violence prevention efforts. Among other things, Cody Wilson tweeted a photo of a tombstone announcing the death of "gun control," and stated that "[a]ll this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns . . . No amount of petitions or die-ins or anything else can change that."

**The Notices of Proposed Rulemaking**

70.     As promised, on May 24, 2018, the government published notices of proposed rulemaking by the State and Commerce Departments, which would remove Plaintiffs' CAD files from the USML Category I. *See* International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and II, 83 Fed. Reg. 24,198 (May 24, 2018); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (May 24, 2018).

71.     According to the Department of State's Notice of Proposed Rule, it "is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use." According to the State Department, the articles that would be removed from the list "do not meet this standard." For this reason, the notice proposes to remove all non-automatic firearms up to .50 caliber (and any related technical data) from the USML under the jurisdiction of the State Department, and move jurisdiction over these

WASHAR0000616

products over to the Commerce Department, which, due to its looser export controls,[1] do not typically take action to prohibit the publication of the data.

72.     The Department of Commerce's Proposed Rule, filed the same day, describes how its Export Administration Regulations ("EAR") will apply to items no longer controlled under the USML. Although the Department of Commerce would not comprehensively restrict the export of technology related to firearms, it would have authority to impose a restriction on a case-by-case basis if it determines the export would be contrary to the national security or foreign policy interests of the United States, the promotion of human rights, or regional stability. *See* 15 C.F.R. § 742.6.   But the Department of Commerce cannot restrict the export of technology already in the public domain, including through posting on publicly available sites on the Internet.   *See* 15 C.F.R. §§ 734.3(b)(3), 734.7(a)(4).   If the terms of the Settlement Agreement take effect and Defense Distributed makes its repository of files available online, the Department of Commerce will be unable to make an independent determination about whether national security or other concerns warrant restricting the unlimited dissemination of those files in accordance with the EAR.

73.     The public comment period for both notices concluded on July 9, 2018, the day before the Plaintiffs went public with the Settlement Agreement.

---

[1]     ITAR requires any exporter of items of the Munitions List to register with the State Department, *see* 22 C.F.R. 122.1(a), but Commerce  Department regulations include no similar registration requirement.

WASHAR0000617

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
*ULTRA VIRES* CONDUCT
(Against Plaintiffs[2] and Defendants)

74.     Intervenors repeat and reallege paragraphs 1-73.

75.     Under the Administrative Procedure Act ("APA"), a court must set "aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

76.     The Government Defendants' agreement to and execution of the Settlement Agreement constitutes a final agency action and is *ultra vires* conduct which should be set aside by the Court.

77.     The Government Defendants may only exercise the authority conferred to them by statute.  However, neither the AECA nor ITAR confer upon the Government Defendants the power to modify the USML Category I, temporarily or otherwise, without 30 days-notice to the relevant Congressional committees and without concurrence of the Defense Department.

78.     Here, upon information and belief, the Government Defendants did not provide advance notice of the proposed temporary removal to the House Committee on Foreign Affairs and to the Committee on Foreign Relations of the Senate, and did not receive the concurrence of the Secretary of Defense.

79.     According to Rep. Engel, Ranking Member of the House Committee on Foreign Affairs, notice of the terms of the settlement has not been provided by the President or the State Department.  *See* "Engel Decries State Department Policy to Allow 3-D Gun Printing," Press

---

[2]     For this, and all other counts in this Complaint in Intervention, the Intervenors name the Plaintiffs pursuant to Rule 19(a) of the Federal Rules of Civil Procedure for the limited purpose of ensuring that a full remedy may be ordered.

WASHAR0000618

Release (July 20, 2018), *available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

80.    The Government Defendants also lack statutory authority to determine that the Plaintiffs' CAD files should be removed from the Category I list without following the "established procedures" for commodity jurisdiction.  This is especially relevant here, because, in effect, the "temporary modifications" at issue will negate – in large part – the need for final rulemaking with respect to the data at issue, because once the data is on the internet, the damage to national security concerns will be irreparable.

81.    In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, it may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

82.    Here, the temporary modification agreed to by the Settlement Agreement is not in the interest of the security and foreign policy of the United States, and, upon information and belief, the Government Defendants have made no determination otherwise.

83.    In addition, the Government Defendants lack statutory authority to allow "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints. *See* Settlement Agreement, ¶ 1(d).

84.    Neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement.  However, the ordinary meaning of these terms implies that this provision purports to allow "any United States person" to manufacture, sell and possess firearms made from the files.  If so, this provision can be interpreted to violate numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by

- 23 -

WASHAR0000619

minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.). It
also violates numerous analogous state criminal statutes.

85.     The Government Defendants do not have the statutory authority to amend, rescind
or waive any portion of the Gun Control Act, or analogous state statutes.

86.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors
are entitled to a declaration that the Settlement Agreement is unlawful insofar as it purports to
allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to
prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the
extent it purports to permit Defense Distributed to make its files available online.

**COUNT II**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –**
**AGENCY ACTION NOT IN ACCORDANCE WITH LAW**
(Against Plaintiffs and Government Defendants)

87.     Intervenors repeat and reallege paragraphs 1-86.

88.     Under the APA, a court must set "aside agency action" that is "not in accordance
with law." 5 U.S.C. § 706(2)(A).

89.     As alleged above, upon information and belief, the Government Defendants did
not give 30 days-notice to the required Congressional Committees or receive concurrence from
the Secretary of Defense before agreeing, through the Settlement Agreement, to temporarily
modify USML Category I to remove the data files at issue from ITAR regulation.  *See*
Settlement Agreement, ¶¶1(b), (d).

90.     In addition, upon information and belief, the Government Defendants did not
follow established procedures before granting the Plaintiffs an exception to ITAR jurisdiction.

91.     Furthermore, the Government Defendants cannot permit "any United States
person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's

WASHAR0000620

automated blueprints, because "use" or "otherwise benefit" may be read to allow prohibited individuals to possess, manufacture or sell firearms made from the computer files at issue. *See* Settlement Agreement, ¶ 1(d); Gun Control Act, 18 U.S.C. 921 *et seq.*

92.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

### COUNT III
#### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
#### ARBITRARY AND CAPRICIOUS AGENCY ACTION
(Against Plaintiffs and Government Defendants)

93.     Intervenors repeat and reallege paragraphs 1-92.

94.     Under the APA, a court must set "aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

95.     A court may hold that an agency action is arbitrary and capricious when an agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.  In addition, an agency's departure from prior practice can serve as an additional basis for finding an agency's interpretation to be arbitrary and capricious.

96.     Here, upon information and belief, the Government Defendants have provided no explanation for their shift in policies, which they have repeatedly articulated to this Court. They have released no reports, no studies or analysis in connection with the Settlement Agreement to explain why the files at issue should be removed from ITAR regulation.  It appears that the

WASHAR0000621

Government Defendants have also entirely failed to consider or to acknowledge the serious national security concerns created by the export of the CAD files.

97.     In fact, according to par. 5 of the Settlement Agreement, the agreement "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

98.     Here, the Government Defendants have agreed to (i) draft and fully pursue a notice of rulemaking and a final rule to remove the files at issue from ITAR regulation; (ii) temporarily modify the USML Category I list to exclude the files at issue from ITAR regulations; and (iii) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue."

99.     These agency actions are arbitrary and capricious because the Government Defendants have not offered a reasoned explanation for ignoring or countermanding their earlier factual determinations or representations to this Court, the Fifth Circuit and the United States Supreme Court.  They are also arbitrary and capricious because they are contrary to the purposes of the AECA which requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms export.  *See* 22 U.S.C. § 2751.

100.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

WASHAR0000622

## COUNT IV
### VIOLATION OF SEPARATION OF POWERS
(Against Plaintiffs and Government Defendants)

101.     Intervenors repeat and reallege paragraphs 1-100.

102.     The Constitution vests the power to legislate to Congress, not the Executive Branch

103.     Here, in the Settlement Agreement, the Government Defendants have agreed to temporarily modify the USML Category I to permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints.

104.     Because neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement, this provision may be interpreted to allow "any United States person" to manufacture, sell and possess firearms made from the files.  If so, this provision violates numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.).  As discussed above, the Government Defendants do not have the power to nullify or amend the provisions of the Gun Control Act.

105.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed the Plaintiffs to make its files available online.

WASHAR0000623

### REQUESTED RELIEF

WHEREFORE, Intervenors pray that this Court:

a)      Declare the Settlement Agreement unlawful to the extent it permits Defense Distributed to make its files available online;

b)      Enjoin the Plaintiffs and Defendants from putting any provision of the Settlement Agreement into effect to the extent that such permission purports to permit Defense Distributed to make its files available online;

c)      Enjoin the Plaintiffs from making their files available online; and

d)      Grant such other relief as the Court may deem just and proper.

Dated: July 25, 2018                        Respectfully Submitted,

                                             /s/ J. David Cabello
                                            BLANK ROME LLP
                                            J. David Cabello
                                            Texas Bar No. 03574500
                                            717 Texas Avenue
                                            Suite 1400
                                            Houston, TX 77002
                                            (713) 632-8696
                                            dcabello@blankrome.com

                                            John D. Kimball (pending *pro hac vice*)
                                            N.Y. Bar No. 1416031
                                            The Chrysler Building
                                            405 Lexington Ave.
                                            New York, NY 10174
                                            (212) 885-5000

- 28

WASHAR0000624

# Exhibit A

WASHAR0000625

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT EMERGENCY
MOTION TO INTERVENE BY INTERVENORS THE BRADY CAMPAIGN
TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY
ACTION FUND, INC. AND GIFFORDS**

WASHAR0000626

TO THE HONORABLE COURT:

Pursuant to Fed. R. Civ. P. 24, The Brady Campaign to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords (collectively "Proposed Intervenors") respectfully and urgently move the Court to:

A. Permit the Proposed Intervenors to intervene in this litigation and file the Complaint in Intervention annexed as **Exhibit B**;[1] and

B. Grant such other and further relief as may be appropriate.

If the Court grants intervention, Proposed Intervenors also request by separate motion, filed contemporaneously with this motion, a temporary restraining order and preliminary injunction. Injunctive relief is necessary to prevent the irreparable harm to the security of the United States and its citizens that will result from the performance of the Settlement Agreement (attached as **Exhibit C**) and Defense Distributed's publication of Weapon Schematics on the Internet.

## BACKGROUND

This case began because the United States government correctly found that the publication on the internet of Defense Distributed's blueprints for the 3-D printing of certain weapons threatened national security. As stated by the Fifth Circuit:

> The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiff-Appellants very strong constitutional rights under these circumstances…[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security."

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016).

---

[1] If this Court determines that the Proposed Intervenors do not satisfy the test for intervention under Fed. R. Civ. P. 24, the Proposed Intervenors request leave to file the proposed complaint in intervention as a new, related action in this Court, and further request that the Court preserve the status quo pending such filing (which would similarly seek immediate injunctive relief).

139718.00601/110549050v.6

WASHAR0000627

With no justification whatsoever and in violation of the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers, the Government has capitulated to plaintiffs' position and agreed to completely abandon the numerous valid reasons it had asserted for blocking the export of Defense Distributed's plans. This Court previously found that the Government's position was likely to succeed. It is shocking, therefore, that the Government has abdicated the correct position it took concerning national security. The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community.

Plaintiffs and the Government have agreed to settle all issues in this litigation by August 4, 2018. The terms of the Settlement Agreement allow Defense Distributed to publicly upload blueprints of firearms and firearm components to the Internet, so that any terrorist group or individual in the world with access to the Internet and a three-dimensional ("3D") printer can create guns and gun components, with modifications that make these weapons untraceable and undetectable. Specifically, the Settlement Agreement permits Defense Distribution to begin publishing these files on July 27, 2018, even though the parties are not set to enter a stipulation of dismissal until August 4, 2018.

Most alarmingly, the Government, which up until a few months ago was vigorously defending this suit and fighting to prevent Defense Distributed from publishing these files, has suddenly done a complete about-face and contractually obligated itself to exempt Defense Distributed's files from the International Traffic in Arms Regulations, 22 C.F.R Part 120 et seq. ("ITAR"), despite the State Department's official determination in 2015 that the disputed files are subject to ITAR. Due to the nature of the modern Internet, the harm from Defense Distributed's publication of these files is irreversible. A temporary restraining order and preliminary injunction

3

139718.00601/110549050v.6

WASHAR0000628

to enjoin Defense Distributed and the Government are not merely necessary forms of relief, but quite simply the *only* available forms of relief that will prevent these files from becoming publicly available worldwide and jeopardizing the national security of the United States and its citizens.

Proposed Intervenors are asking the Court to preserve the status quo and simply seek to continue down the sensible path that the Government, until recently, was advocating and this Court found was likely to succeed.

The procedural and factual record relied upon is attached as Appendix 1.

## POINT ONE
## INTERVENORS HAVE STANDING TO INTERVENE

### A. Standard for intervention.

FRCP 24 establishes the criteria for intervention, and is to be liberally construed. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (citing *Texas v. United States*, 805 F.3d 653, 656 (5th Cir. 2015)). Courts "should allow intervention when no one would be hurt and the greater justice could be attained." *Id.* Rule 24 establishes two kinds of intervention: intervention of right and permissive intervention. *See* FED. R. CIV. P. 24(a)-(b).

Federal Rule of Civil Procedure 24(a)(2) provides that, upon timely application, a party shall be permitted to intervene as a matter of right when the party:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a)(2).

Under this standard, four criteria must be satisfied to support intervention as of right: (1) the motion to intervene must be timely; (2) the applicant must have a cognizable interest in the action; (3) the applicant must be so situated that the disposition of the action may, as a practical

4

WASHAR0000629

matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit. *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015); FED. R. CIV. P. 24(a).  "'Rule 24 is to be construed liberally . . . and doubts resolved in favor of the proposed intervenor.'" *See Poynor v. Chesapeake Energy Ltd. P'ship (In re Lease Oil Antitrust Litig.)*, 570 F.3d 244, 248 (5th Cir. 2009) (internal citations omitted). Proposed Intervenors satisfy these requirements and should be permitted to intervene.

   1.   The Motion to Intervene is timely.

   Proposed Intervenors have taken prompt action to intervene and file this Motion shortly after acquiring the full text of the Settlement Agreement from the Internet on or about July 19, 2018.  Proposed Intervenors had not intervened here previously because they agreed with the Government's position. The Fifth Circuit has held, as is the case here, that by filing of a motion to intervene, "less than one month after learning of their interest in [the] case, [movants] discharged their duty to act quickly."  *See Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977)).

   With respect to the second factor, the Fifth Circuit has emphasized that the relevant prejudice is that created by the intervenor's *delay* in seeking to intervene after it learns of its interest, not prejudice to existing parties if intervention is allowed.  *See Ceres Gulf v. Cooper,* 957 F.2d 1199, 1203 (5th Cir. 1992).  As noted, the Proposed Intervenors did not unduly delay the filing of this Motion, and acted promptly after learning of its need to defend its interest in this matter.  Prior to obtaining a copy of the Settlement Agreement, which revealed the parties current intentions, Proposed Intervenors were operating under the information and belief, supported by the Court docket and pleadings filed in this matter, that the Government defendants had been and were representing their interests and national security.

5

WASHAR0000630

Under the third factor, the Proposed Intervenors would be severely prejudiced and suffer irreparable harm if not allowed to intervene. Importantly, once Defense Distributed weapon's data is released to the internet, the damage to national security will be irreversible.

Lastly, there are no unusual circumstances here which weigh against intervention. Rather, the Government's sudden abandonment of its longstanding position and the national security issues that are at stake, are both unusual circumstances that weigh heavily in favor of intervention.

2.  The Proposed Intervenors have a cognizable interest in the instant litigation.

The inquiry under the second requirement of Rule 24(a), "turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *See Texas*, 805 F.3d at 657 (5th Cir. 2015). Accordingly, an interest that is "concrete, personalized, and legally protectable is sufficient to support intervention." *Id.* at 658. Specifically, the Fifth Circuit has concluded that a party has "a legally protectable interest in the regulatory scheme" when the party or their membership are the "intended beneficiaries" of the policy under challenge." *See Wal-Mart*, 834 F.3d at 566-67 (5th Cir. 2016). The Fifth Circuit has also held that "public spirited" civic organizations that successfully petition adoption of a law may intervene to vindicate their "particular interest" in protecting that law. *Id.* (citing *City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291, 294 (5th Cir. 2012)). Proposed Intervenors meet this test.

The Plaintiffs have declared that because of the Settlement Agreement, the work that Proposed Intervenors are dedicated to will be imeasureably more difficult, if not impossible. Proposed Intervenors and their members work to pass and enforce gun safety laws in Congress and throughout the country. Upon publication of the Settlement Agreement, Cody Wilson, the president of Defense Distributed announced that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun

6

WASHAR0000631

Control."  Plaintiff Second Amendment Foundation declared that that Settlement Agreement is a "a devastating blow to the gun prohibition lobby[.]"  Proposed Intervenors have a concrete, personalized, and legally protectable interest in this litigation because the intent of the Plaintiffs, through the Settlement Agreement, is to make Proposed Intervenors' work untenable. As a result of the Settlement Agreement, Proposed Intervenors will be forced to expend additional resources to protect their respective missions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (where defendant's alleged conduct "perceptibly impaired" an organizational plaintiff's ability to carry out its mission and caused a "drain on the organization's resources – there can be no question that the organization has suffered the requisite injury in fact."); *Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 788 (W.D Tex. 2015) ("An organization can demonstrate injury 'by [alleging] that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and perceptibly impaired the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'") (quoting *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010)). In this case, because Proposed Intervenors assert a "procedural interest" to protect their "concrete interest," they "can assert that right without meeting all the normal standards for redressbility and immediacy" required for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n. 7 (1992).

> 3. The Disposition of the action threatens to create a practical impediment to the Proposed Intervenors' ability to protect its members' interest.

Proposed Intervenors would be seriously prejudiced if this Motion is not granted, as the implementation of the Settlement Agreement would undermine their stated mission statements and seriously impact members' interest and safety.  The release of Defense Distributed's weapon's data via the internet, once permitted, cannot be reversed, mitigated, or undone, and would cause direct, substantial, and irreversible harm to the Proposed Intervenors and its members.

7

WASHAR0000632

As the Government has advocated throughout this matter, the dissemination of such information will negatively impact the national security of the United States and its citizens. Therefore, because Proposed Intervenors' and their members' interests would be practically impeded if the Settlement Agreement were implemented, Proposed Intervenors should be permitted to intervene at this juncture.

    4.  <u>No existing party adequately represents the Proposed Intervenors' interest.</u>

Clearly the Government no longer adequately represents the Proposed Intervenors' interest.

**B. Alternatively, permissive intervention is warranted under Rule 24(b).**

If this Court decides that Proposed Intervenors are not entitled to intervene as of right, they should be permitted to intervene under Rule 24(b). Under Rule 24(b)(1)(B), the Court may, in its discretion, permit intervention on a timely motion when the potential intervenor "has a claim or defense that shares with the main action a common question of law or fact." *See Graham v. Evangeline Par. Sch. Bd.*, 132 F. App'x 507, 511 (5th Cir. 2005). The "claim or defense" portion of Rule 24(b)(2) has been construed liberally by the Fifth Circuit. *See Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006). Moreover, "it is settled law in this circuit that permissive intervention is 'wholly discretionary with the [district] court.'" *See United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 416 (5th Cir. 1991) (internal citation omitted). Proposed Intervenors satisfy these factors, and this Court is within its discretion to permit them to intervene.

**C. Proposed Intervenor's are not required to establish independent standing to intervene.**

The Fifth Circuit has ruled that "Article III does not require intervenors to independently possess standing where the intervention is into a ***subsisting*** and ***continuing*** Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one

8

WASHAR0000633

subsisting party with standing to do so." *See Steward v. Abbott*, 189 F. Supp. 3d 620, 625 (W.D. Tex. 2016) (emphasis added) (internal citations omitted); *see also Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006); *Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998) (agreeing with "the better reasoning in cases which hold that Article III does not require intervenors to possess standing"). This Court has acknowledged it is "tasked with safeguarding separation of powers" and held that "[p]rovided that such a case or controversy exists, it is immaterial to the court's jurisdiction whether an intervening party, proceeding alone, could have satisfied the requirements of Article III." *Steward*, 189 F. Supp. 3d at 626 (W.D. Tex. 2016) (internal citation omitted). Accordingly, "[o]nce a valid Article III case-or-controversy is present, the court's jurisdiction vests," and "[t]he presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established." *See Ruiz*, 161 F.3d at 832 (5th Cir. 1998) (rejecting argument that intervenor required standing to invoke the court's jurisdiction to decide the merits of their claims, reasoning that "[t]he court's jurisdiction in [the] case ha[d] already been invoked by the original parties").[2]

---

[2]  Even if this Court were to require Proposed Intervenors to prove independent standing to intervene, Proposed Intervenors are able to establish the necessary elements of injury, causation, and redressability. *See LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) ("The three well-known components of standing are injury in fact, causation, and redressability"). "For an issue to be ripe for adjudication, a plaintiff must show that he 'will sustain immediate injury" and "that such injury would be redressed by the relief requested,'" *See Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994) (*citing Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81, 98 S. Ct. 2620, 2635, 57 L. Ed. 2d 595 (1978)).

Here, as described above, the Proposed Intervenors would be immediately and irreparably injured by the implementation of the Settlement Agreement and the dissemination of Defense Distributed's weapons data via the internet, as once the information is released online, it cannot be reversed, nor can its potential effects be mitigated, or undone. *Def. Distributed*, 838 F.3d at 461 (5th Cir. 2016) (emphasis added). In spite of the Government's prior strong defense of this matter, the Settlement Agreement now abandons those same pressing national security concerns raised by the possibility of foreign nationals or terrorists acquiring Defense Distributed's weapons files. Accordingly, Proposed Intervenors' injury would be directly caused by the implementation of the recent Settlement Agreement reached by the parties. *Id.* at 431 (5th Cir. 2011) ("[t]he

9

WASHAR0000634

**CONCLUSION**

The Court should enter an order permitting Proposed Intervenors to file a Complaint in

Intervention.

---

causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable,'" to the parties and/or the conduct at issue); Dkt. 32-1. Additionally, it is clear that the intervention and the requested injunction, if granted, will prevent the immediate and irreparable harm to the Proposed Intervenors, among others, caused by the possibly illegal implementation of the Settlement Agreement and the irreversible dissemination of Defense Distributed's blueprints for untraceable lethal weapons via the internet. *Id.*

Proposed Intervenors may also establish associational standing to intervene on behalf of their individual members. An organizational plaintiff may have Article III standing either in its own right, "if it meets the same standing test that applies to individuals[,]" or associational standing on behalf of its members, if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Steward*, 189 F. Supp. 3d at 630-31 (W.D. Tex. 2016) (internal citations omitted). Here, Proposed Intervenors' members are American citizens and the intended beneficiaries of gun control and anti-terror laws enacted by this country. By virtue of the Settlement Agreement, and the online publishing of Defense Distributed's weapons files, the security and safety of Proposed Intervenors' members is directly threatened. As the Government has previously cited, Proposed Intervenors' members will be subjected to increase risk from terroristic and violent threats, at home, in public places, and while traveling abroad if Defense Distributed's data is released. *See* Dkt. 32, 32-1. Second, the interests that Proposed Intervenors and their individual members seek to protect relate to the prevention of gun violence, which is germane to each organization's purpose, and which is essential to each of their individual members. Finally, it is undisputed that the interests which Proposed Intervenors and their individual members seek to assert do not require direct participation by the individual members in the lawsuit. The Government defendants have previously and adequately represented the individual members' interests in this litigation for over three (3) years without the members' direct participation in this case. Proposed Intervenors will represent the interests of their individual members that have now been abandoned by the Government defendants by virtue of the Settlement Agreement.

10

WASHAR0000635

Dated:  July 25, 2018                                     Respectfully submitted,

                                                         */s/ David Cabello*
                                                         J. David Cabello
                                                         Blank Rome LLP
                                                         Texas State Bar No. 03574500
                                                         717 Texas Avenue
                                                         Suite 1400
                                                         Houston, TX 77002
                                                         Telephone: (713) 228-6601
                                                         Facsimile: (713) 228 6605
                                                         E-mail: dcabello@blankrome.com

                                                         John D. Kimball (pending *pro hac vice*)
                                                         Blank Rome LLP
                                                         N.Y. Bar No. 1416031
                                                         The Chrysler Building
                                                         405 Lexington Ave.
                                                         New York, NY 10174
                                                         (212) 885-5000

                                                         **Attorneys for The Brady Campaign to
                                                         Prevent Gun Violence, Everytown for Gun
                                                         Safety Action Fund, Inc., and Giffords**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

                                                         */s/M'Liss Hindman*
                                                         M'Liss Hindman
                                                         Paralegal

139718.00601/110549050v.6

WASHAR0000636

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL., | § | |
| | § | |
| Defendants. | § | |

**JOINT EMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER AND FOR PRELIMINARY INJUNCTION BY PROPOSED INTERVENORS
THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., AND GIFFORDS**

Pursuant to Fed. R. Civ. P. 65 Proposed Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords ("Giffords"), (collectively "Proposed Intervenors") respectfully and urgently moves the Court to:

A. Enter a temporary restraining order enjoining Defendants from performing under the Settlement Agreement (**Exhibit A**) discussed below, as this would cause immediate and irreparable harm to United States national security directly affecting the safety of individual U.S. citizens;

B. Enter a temporary restraining order enjoining the Plaintiffs from publishing the Published Files, Ghost Gunner Files, CAD Files, and Other Files (the "Weapon Schematics"), as defined in the Settlement Agreement, in order to prevent the immediate and irreparable harm that would result from publishing these files;

C. Enter a preliminary injunction enjoining the parties from performing the settlement agreement; and

D. Grant such other and further relief as may be appropriate.

In support of their motion, Proposed Intervenors would respectfully show the Court as follows:

## INTRODUCTION AND BACKGROUND

The factual and procedural background of this case have been briefed in the Appendix to Proposed Intervenors' Joint Emergency Motion to Intervene, which was filed contemporaneously with this Motion.

WASHAR0000638

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER AND MOTION FOR SAME

To establish the need for a temporary restraining order and preliminary injunction pursuant FRCP 65, the movant has to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any prejudice the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Janvey v. Alguire*, 628 F.3d 164, 174 (5th Cir. 2010).

**A. Proposed Intervenors are likely to succeed on the merits; the Proposed Intervenors satisfy the requisite elements of a claim under the APA.**

To make out an APA violation, the Plaintiffs must show that rulemaking through the terms of the settlement are arbitrary and capricious. 5 U.S.C.A. § 706(2)(A); *Taylor v. Fed. Aviation Admin.*, No. 16-1302, 2018 WL 3320874 (D.C. Cir. July 6, 2018). To obtain APA standing, a party must show that its grievance falls within the zone of interests protected by the Arms Export Control Act. In addition, the party will need to show that it would suffer an injury-in-fact to obtain standing under Article III of the U.S. Constitution. See *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000).

1. <u>The Proposed Intervenors have standing.</u>

The APA allows a person adversely affected by an agency action, including new rulemaking, to challenge that action. The court will set aside new regulations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . ." 5 U.S.C. § 702. Only final agency actions can be challenged. 5 U.S.C. § 704.

Proposed Intervenors are adversely affected by the temporary removal of small arms and associated technology from the USML because (1) the removal will allow for the release of

WASHAR0000639

firearms technology by Defense Distributed that enable violations of state and federal law that impact public safety, (2) the safety and security of state residents is compromised by the proliferation of unregistered firearms within the state, and (3) the safety and security of state residents who travel abroad is compromised by the proliferation of small arms and associated technology to produce small arms in other countries. In addition, according to the Plaintiffs, implementation of the Settlement Agreement will directly undermine the work of Proposed Intervenors.

We understand that as matter of judicial self-governance, courts review prudential considerations with regard to standing to limit parties to those which are directly affected by an action. Prudential standing in an APA claim looks to whether "the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected by the statute in question." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998). That is to say, the party's interest must have a "rough correspondence" with the purpose of the underlying statute. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939 (9th Cir. 2013). Thus, at least to some degree, the interests of a party must line up with the purpose of the AECA.

In this regard, it is noteworthy that the "zone of interests" test is not meant to be "especially demanding." *Match-E-Be-Nash-She-Wish-Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). The test forecloses suit only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit." Hence, the zone of interest test only "requires some indicia – however slight – that the litigant before the court was intended to be protected, benefited or

4

WASHAR0000640

regulated by the statute under which suit is brought." *Public Citizen v. FTC*, 869 F.2d 1541, 1547 (D.C. Cir. 1989); see *Autolog Corp. v. Regan*, 731 F.2d 25, 29-30 (D.C. Cir. 1984) ("Courts should give broad compass to a statute's 'zone of interests' in recognition that this test was originally intended to expand the number of litigants able to assert their rights in court").

Here, the Proposed Intervenors clearly meet this test, as associations promoting gun safety laws to minimize violence and injuries with members who would be directly affected by release of this information in the United States and when traveling abroad. The Proposed Intervenors are vulnerable to the precise sort of harm that ITAR's assault on international terrorism is intended to shield.

2. The temporary removal of items from the USML through the settlement is arbitrary and capricious.

The Proposed Intervenors can satisfy the above-delineated requirements to state a claim under APA Section 7, because the consequences of allowing the Settlement Agreement to become effective include: (1) direct contradiction of the legislative intent underlying the AECA and amending the AECA to codify the then-existing classifications of items of on the USML, (2) State Department and other agencies' failure to study or otherwise consider the national security and international stability effects of these actions, in violation of the purpose of the AECA, (3) release of this information to the Internet as a result of the settlement before completing its APA rulemaking after receiving comments on the NPRM, and (4) inexplicable, unjustified reversal of the position of the U.S. Government with regard to the national security ramifications of allowing the online distribution of files to enable the 3-D printing by reference to the Weapons Schematics.

i. Violation of AECA purpose.

The AECA requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. 22 U.S.C.

WASHAR0000641

§ 2751. Neither the settlement agreement nor the proposed rulemaking to finalize the reclassification of small arms technology off of the USML address how these rule changes will impact the international trade in arms or potentially destabilizing effects. This total lack of consideration of the central purpose of the AECA demonstrates that the government's action was ill-considered: "Deference is not owed when the agency has completely failed to address some factor of consideration of which was essential to [making an] informed decision." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) (internal quotation marks and citation omitted).

    ii.   <u>Failure to study.</u>

In previous rulemakings removing certain items from the USML, the Department of State undertook significant efforts to understand the ramifications to national security interests. For example, before removing certain Global Position System receivers from the USML, the State Department headed an interagency working group to review the regulation of commercial satellites and related technology and whether removal would jeopardize national security interests. Amendment to the ITAR, 57 Fed. Reg. 41,077 (Sept. 9, 1992). An agency's rulemaking is arbitrary and capricious if the agency cannot explain a connection between the logic of the rule and its purported factual basis. *See We Who Care, Inc. v. Sullivan*, 756 F. Supp. 42, 46-47 (D. Me. 1991) (finding that revised regulation establishing $1,500 as the maximum equity in an automobile that an individual could have to obtain benefits under the Aid to Families with Dependent Children program was arbitrary and capricious because the survey on which the change was based was unavailable and the agency was unable to provide basic information about how the survey was conducted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

6

WASHAR0000642

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### iii.    Failure to follow procedural requirements.

The AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), notice of the terms of the settlement has not been provided by the President or the State Department.

Although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, they may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. As Congressman Engel noted: "[i]t stretches credulity to believe that release of this information is in the U.S. interest." *Engel Decries State Department Policy to Allow 3-D Gun Printing*, Press Release (July 20, 2018),

7

WASHAR0000643

*available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

Here, the release of the information as a result of the settlement, prior to the completion of the required APA rulemaking process, essentially circumvents the entire rulemaking process, without providing any justification for such action, and is thus clearly tantamount to arbitrary and capricious action in contravention of the APA.

Indeed, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Where an agency makes a determination to remove a protection from a regulatory scheme, an adequate basis and explanation for that rescission is expected. *See* 15 U.S.C.A. §§ 1381 et seq., 1392(a), (b), (f)(1,3,4); 5 U.S.C.A. § 706; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856 (1983).

Here, the terms of the settlement directly contradict the arguments made by the U.S. Government parties in seeking to dismiss Defense Distributed's challenge.

    iv.   <u>The terms of the settlement are a final agency action.</u>

The APA authorizes judicial review of final agency actions. 5 U.S.C. § 704. Agency action is "final" if two conditions are met. First, the action must mark the end of the agency's decision-making process. Second, the action must be one by which "rights or obligations have been determined," or from "which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 247 (3d Cir.

WASHAR0000644

2011).[1] A settlement agreement can qualify as final agency action. *United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008).

The executive branch cannot hide behind Presidential powers to achieve a particular domestic objective. When it does so, the executive branch exceeds the statutory authority granted to it by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952) ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress -- it directs that a presidential policy be executed in a manner prescribed by the President."); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), vacated and remanded on other grounds, 471 U.S. 1113 (1985) ("The Court in Youngstown was therefore concerned with whether injunctive relief may appropriately issue to restrain the executive's unlawful action with respect to domestic affairs where the domestic problem might have a secondary effect on foreign affairs."); *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 296 (4th Cir. 2018) ("In sum, the President claims the authority to indefinitely set his own

---

[1] In *Minard*, an oil company obtained a preliminary injunction against implementation of a settlement agreement between the Forest Service and environmental groups. That settlement required the Forest Service to conduct an environmental analysis before issuing a "Notice to Proceed" ("NTP") to mineral rights owners in the Alleghany National Forest. An NTP is required to proceed with extraction activity. In implementing the settlement, the Forest Service placed a moratorium on issuance of NTPs. The Third Circuit found that the moratorium constituted a final agency action, while the settlement agreement itself was an "intermediate agency action", which, under the APA, is "subject to review on the review of the final agency action." *Id.* at 249, n. 7 (quoting 5 U.S.C. § 704). The Third Circuit found that the Forest Service had failed to abide by APA rulemaking requirements in implementing its new policy on issuing NTPs. *Id.* The Third Circuit upheld the district court's preliminary injunction: the district court's injunction enjoined the Forest Service from requiring the environmental analysis before issuing NTPs, ended the moratorium, and prevented further implementation of the settlement agreement. *See Minard Run Oil Co. v. United States Forest Serv.*, No. 09-125, 2009 U.S. Dist. LEXIS 116520 (W.D. Pa. Dec. 15, 2009). Here, the settlement action must be considered final agency action, because the settlement will have immediate and substantial effect through release of the information to the internet. As noted by the Fifth Circuit in affirming this Court's denial for a preliminary injunction, the files would be "freely available worldwide…Thus, the national defense and national security interest would be harmed forever."

9

WASHAR0000645

immigration and travel policies with respect to every foreign nation and class of immigrants, under any circumstances, exigent or not, that he sees fit. Such authority is dangerously similar to lawmaking and intrudes on Congress's plenary power over immigration").

**3. There is a threat of irreparable injury if the injunction is denied.**

The threat of irreparable injury to the United States and its citizens has been briefed in the Motion to Intervene and accompanying Appendix 1. If the Government is permitted to perform under the Settlement Agreement, despite the numerous and blatant APA violations in the Settlement Agreement, United States national security will suffer irreparable injury.

**4. The threatened injury outweighs any prejudice the injunction might cause the parties.**

This Court has already found that the Plaintiff's interest in protecting its constitutional rights does not outweigh "the public's keen interest in restricting the export of defense articles." *Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 690 (W.D. Tex. 2015).

**5. The injunction will not disserve the public interest.**

An injunction will not disserve the public interest. On the contrary, the primary aim of the injunction is to serve the public interest by enjoining plaintiffs and defendants from taking action that will irreparably harm the security of the United States and its citizens. *See id.* ("Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling 'export' of such materials stands in sharp contrast to Defendants' assertion of the public interest.").

## CONCLUSION

For these reasons, Proposed Intervenors respectfully request the Court grant a temporary restraining order and schedule a hearing concerning the motion for preliminary injunction.

WASHAR0000646

Dated:  July 25, 2018

Respectfully submitted,

*/s/* David Cabello

J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

*/s/ M'Liss Hindman*

M'Liss Hindman
Paralegal

11

WASHAR0000647

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

## INTERVENORS' REQUEST FOR AN EMERGENCY HEARING FOR TEMPORARY RESTRAINING ORDER

Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords, (collectively "Intervenors") file this Request for an Emergency Hearing on their Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). As fully briefed in the Motion for Temporary Restraining Order and Preliminary Injunction, time is of the essence. Plaintiffs will publish their Weapon Schematics as early as Friday July 27, 2018. Once these files are published on the Internet, United States national security and its citizens will be irreparably harmed. For this reason, Intervenors respectfully request this Court to grant an emergency hearing on **Thursday July 26, 2018**. For cause, Intervenors show the following:

1. As detailed in the Motion, Plaintiffs and Defendants (the Government) have entered into a Settlement Agreement. This Settlement Agreement permits Plaintiffs to publish, including on the Internet, files that can be used to print firearms and firearm components with a three-dimensional ("3D") printer.

2. The Government had previously deemed these files to fall within the scope of ITAR and, until very recently, vigorously defended its position against Plaintiffs. Now,

WASHAR0000648

the Government has entered into this Settlement Agreement. Several provisions of the Settlement Agreement violate the Administrative Procedure Act ("APA"). Intervenors can show a strong likelihood of success on the merits of claims of APA violations by the Government.

3. Publication of these files on the Internet will cause irreparable harm to the United States and its citizens, as it will allow the global community unfettered access to blueprints for the creation of untraceable and undetectable weapons, which will threaten the security of the United States and its citizens. Due to the nature of the modern Internet, once these files are publicly released, the damage cannot be undone. The balance of harm and the public interest favors granting a temporary restraining order and preliminary injunction.

Intervenors respectfully submit this request to set their Motion for an emergency hearing as requested herein, and for such and other relief as it may be entitled.

WASHAR0000649

Dated: July 25, 2018

Respectfully submitted,

*/s/* David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

*/s/ M'Liss Hindman*
M'Liss Hindman
Paralegal

WASHAR0000650

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

LMO/TD

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

# United States Senate

WASHINGTON, DC 20510

July 23, 2018

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Sessions:

We write with great alarm over the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's decision that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for three-dimensional ("3-D") printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations. Indeed, as recently as April 2018, the government filed a motion to dismiss in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

In a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing tutorials in any form. The government also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with DOJ's previous position and is as dangerous as it is confounding. The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad. It also sets a dangerous precedent in defending against other legally sound determinations made by the State Department under the Arms Export Control Act and the International Traffic in Arms Regulations.

We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course. We ask that, prior to August 1, 2018,

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

1

WASHAR0000653

DOJ provide us with a copy of the fully executed settlement agreement, and a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

2

WASHAR0000654

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 20, 2018 6:09 PM |
| **To:** | Kaidanow, Tina S <KaidanowTS@state.gov> |
| **Cc:** | Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Strike, Andrew P <StrikeAP@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov> |
| **Subject:** | Fwd: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns |
| **Attach:** | 07-20-18 Letter to Secretary Pompeo Regarding 3-D Printed Arms.pdf |

Dear AMB Kaidanow,

We wanted to flag for your awareness and attention this incoming letter from REP Engel regarding the Defense Distributed settlement. While coordination continues on a briefing to the Hill, Rep Engel suggests that the settlement may have exceeded the Department's authorizations, and is urging us to suspend its implementation. He has already provided this letter to the media, and we are getting a late Friday burst of inquiries, for which we are sticking to the existing guidance, but explaining off the record that we are an export control agency, and domestic firearms policy concerns should be directed to others.



Thanks,

Josh

---

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Date:** July 20, 2018 at 4:37:58 PM EDT
**To:** Miller, Michael F <Millermf@state.gov>, Paul, Joshua M <PaulJM@state.gov>, Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>, Fite, David <david_fite@foreign.senate.gov>, Oliver, Stacie <stacie_oliver@foreign.senate.gov>
**Subject:** Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Mike, et.al.:
I wanted you to be aware of the attached letter from Rep. Engel to Secretary Pompeo urging a delay of the implementation of the settlement in Defense Distributed v. U.S. State Department, given the significant security threat that would occur immediately upon release of the software. The letter also is being sent to H. Rep. Engel has directed that the letter be released to the public. As you are no doubt aware, the terms of the settlement are already being widely reported in the media this afternoon.
Ed

Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

WASHAR0000656

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER          THOMAS SHEEHY
CHIEF OF STAFF       STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Dear Mr. Secretary:

        I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms.  This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms.  This action was taken in settling a lawsuit: Defense Distributed v. United States.

        There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer.  This defeats US laws which require background checks on the sale of weaponry.  The danger is magnified because 3-D printed fireams would be made of plastic and, therefore, undetectable by most security systems.  With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

        Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

*Eliot L. Engel*

ELIOT L. ENGEL
Ranking Member

WASHAR0000658



**United States Department of State**
*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington, D.C. 20522-0112*

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:    Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.*, No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as *"Defense Distributed"*). As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed*.

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13). It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

1

WASHAR0000659

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release. To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution). As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

2

WASHAR0000660

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
RON PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

LMO/7D

conviction, to build their own gun.  These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act.  Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

# United States Senate

WASHINGTON, DC 20510

July 23, 2018

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Sessions:

We write with great alarm over the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's decision that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for three-dimensional ("3-D") printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations. Indeed, as recently as April 2018, the government filed a motion to dismiss in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[i]

In a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing tutorials in any form. The government also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with DOJ's previous position and is as dangerous as it is confounding. The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad. It also sets a dangerous precedent in defending against other legally sound determinations made by the State Department under the Arms Export Control Act and the International Traffic in Arms Regulations.

We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course. We ask that, prior to August 1, 2018,

---

[i] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

1

WASHAR0000663

DOJ provide us with a copy of the fully executed settlement agreement, and a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

2

| | |
|---|---|
| **From:** | Monjay, Robert <MonjayR@state.gov> |
| **Sent:** | Tuesday, April 10, 2018 7:46 PM |
| **To:** | Kottmyer, Alice M <KottmyerAM@state.gov>; Peckham, Yvonne M <PeckhamYM@state.gov> |
| **Cc:** | Davidson-Hood, Simon <DavidsonHoodS@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: Cat I-III rule |
| **Attach:** | Cat I-III Combined PR - FRN 17.docx |

Alice,

Thank you.

Yvonne,

Attached, please find a clean copy of the latest version of AE30 for uploading to OMB.

Thank you

Rob

**Official - SBU**

**UNCLASSIFIED**

**From:** Kottmyer, Alice M
**Sent:** Tuesday, April 10, 2018 5:44 PM
**To:** Monjay, Robert; Hart, Robert L
**Cc:** Davidson-Hood, Simon; Peckham, Yvonne M; Kottmyer, Alice M
**Subject:** Cat I-III rule

Hi Robs –

Sarah Bashadi is looking for the latest version of AE30. She said that one of you might have it. She wants Yvonne to upload a clean version into ROCIS.

If you're reading emails, please let us know if you can send it.

**Alice Kottmyer**
**Attorney-Adviser | Office of Management**
**Office of the Legal Adviser**
**202-647-2199 | *BB 202-679-8083***
**Official**

**UNCLASSIFIED**

WASHAR0000665

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 5:18 PM |
| **To:** | Kaidanow, Tina S <KaidanowTS@state.gov> |
| **Cc:** | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov> |
| **Subject:** | RE: DD Settlement: Cong/Pub State of Play |

By way of a late breaking update, Dave just received the following from a media source – Los Angeles and the Manhattan DA are stepping into the issue, though it does not seem they are taking any legal actions.



For Immediate Release July 25, 2018

**PAGV CO-CHAIRS TO STATE DEPARTMENT: BLOCK RELEASE OF DOWNLOADABLE BLUEPRINTS FOR DO-IT-YOURSELF, 3D-PRINTED GUNS**

**Los Angeles, CA and New York, NY** : Los Angeles City Attorney Mike Feuer and Manhattan District Attorney Cyrus Vance, Jr.,, co-chairs of Prosecutors Against Gun Violence, today released the following joint statement urging the U.S. State Department to block the online release of blueprints for do-it-yourself, 3D-printed guns:

"In a matter of days, the State Department is preparing to allow unlimited online access to schematic designs that enable 3D printing of untraceable guns. In a complete reversal of longstanding regulatory oversight, the State Department has decided to provide a special exemption to a private company, Defense Distributed, to post its gun blueprints online.

"**No one is safer if criminals can print untraceable guns on demand.** Allowing this exemption from federal rules would be an unconscionable mistake, making it all-too-easy for anyone with a dangerous history – including terrorists and domestic abusers who cannot pass a background check – to download files and print a functional gun with 3D printers available to any consumer. This decision undermines the critical public safety laws that prosecutors enforce day in and day out.

"Invisible to metal detectors, these plastic guns could easily be smuggled onto airplanes, and into concerts, festivals, and government buildings. Untraceable, they would undermine the work of law enforcement by crippling criminal investigations before they even began. The State Department must not allow this company to have a special exemption to these rules. These blueprints should not be published under any circumstances."

-30-

Official - SBU
UNCLASSIFIED
...........................................................................................................................................................................................

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:01 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>
**Subject:** DD Settlement: Cong/Pub State of Play

Dear AMB Kaidanow,

This email provides a summary of today's Congressional and public interest in the pending Defense Distributed settlement.

**Congressional**
- SEN Menendez raised the settlement in his opening statement at S's Hearing, and SEN Markey posed a question on it to S during that hearing.
  - CPA, DDTC and L/PM had fortunately cobbled together immediately before the Hearing a contingency bullet for S to use (attached). In the event, he told SEN Markey he'd "take a look at it". The Hearing remains ongoing at this hour.
- We have prepared a response to REP Engel's letter to S, which is on its way through you for clearance. We hope to provide the response in advance of tomorrow's signing of the Settlement letter.
- In addition, SEN Menendez <u>issued a statement</u> calling on S to "intervene and review" the settlement (he followed this up with a letter at 4.50pm), while Senators Nelson, Markey, Murphy, Blumenthal and Feinstein <u>co-signed a letter</u> on the topic to the Attorney General.
- We also continue to receive clarifying questions from SFRC and HFAC staff subsequent to yesterday's briefing.

**Public**
- Media continues to pick up on this story; highlights today include an entire 45-minute segment of NPR's <u>On Point dedicated</u> to the topic, as well as expanding international media coverage.
- We understand that DDTC has received a large volume of calls and emails from the public in addition to the more formal media inquiries that CPA has been dealing with, and in addition to the automated outreach DDTC has encountered.
- Gun Control NGOs including the Brady Campaign, Giffords, Everytown, and Moms Demand Action have been highlighting the issue on social media in advance of the injunction they intend to submit tomorrow, and a <u>petition on Change.org</u> has garnered almost 30,000 signatures, most of them today.
- A summary of today's press reporting on the topic is attached, and the Google Tends chart for worldwide searches on 3D guns is as

follows:

Interest over time 



Thanks,
Josh

_____
**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.7878 | 📱 BlackBerry: 202.679.6724 | 📠 Fax: 202.647.4055
✉ e-mail: *PaulJM@State.Gov* | 🕘 Web: *www.state.gov/t/pm/*
🐦 http://twitter.com/StateDeptPM
Stay connected with *State.gov*:

This message is *UNCLASSIFIED*, per E.O. 12958
**Official - SBU**
**UNCLASSIFIED**

MATTHEW A. GOLDSTEIN, PLLC
**INTERNATIONAL TRADE**
1875 CONNECTICUT AVE NW, 10TH FL
WASHINGTON, D.C. 20009

**BY ELECTRONIC MAIL**
(c/o Eric.Soskin@usdoj.gov)

April 17, 2018

Mr. Eric Soskin
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, D.C. 20530

**SUBJECT:**   **Acceptance of Response to Offer of Settlement**
Case No. 15-cv-372-RP

Dear Mr. Soskin:

Our understanding is that the scope of "technical data that is the subject of this matter," as defined in the DEFENDANTS' RESPONSE TO OFFER OF SETTLEMENT for Case No. 15-cv-372-RP includes the Published Files, the Ghost Gunner Files, and the CAD Files.

We further understand that the scope of "technical data that is the subject of this matter" further includes the Other Files insofar as those files regard items exclusively in Category I(a) of the United States Munitions List (USML), or items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

We further understand that Category I(a) includes non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm), to include barrels and receivers that would comprise such arms.

Based on the above understandings, Plaintiffs accept Defendants' RESPONSE TO OFFER OF SETTLEMENT for Case No. 15-cv-372-RP.

Further pursuant to the terms of Defendants' RESPONSE TO OFFER OF SETTLEMENT, please advise on the Department of Justice's final approval of the settlement.

Very truly yours,

Matthew A. Goldstein

cc:   Stuart Robinson, Department of Justice (Stuart.J.Robinson@usdoj.gov)

WASHAR0000668

**From:** Hart, Robert L <HartRL@state.gov>
**Sent:** Wednesday, July 18, 2018 3:54 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Defense Distributed Case
**Attach:** Defense Distributed Settlement Signed 4814-9819-4796_1.pdf

███████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 18, 2018 3:53 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** FW: Defense Distributed Case

████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 18, 2018 3:30 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Defense Distributed Case

Dear all,

████████████████████████████████████████████████████████████████

Josh
**Official - SBU**
**UNCLASSIFIED**

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 3:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Defense Distributed Case

As far as I can tell, DDTC essentially exempted the information in these particular files from the USML. The settlement says that DDTC approved the technical data in question for public release, but I don't t think it gives a reason for this determination.

Please note as a threshold matter that we assume the below questions pertain to settlement item 1(c).

1. Is that characterization correct? The Published Files, Ghost Gunner Files, and CAD files (as defined in the Settlement Agreement), by virtue of having been approved for public release pursuant to ITAR §125.4 (b)(13), are to be exempt from ITAR licensing requirements.

2. Are the data in question applicable to Category I(a) items? The data in question is defined within the Settlement Agreement, and constitutes a range of computer-aided design files that pertain to Category I (a), I(g), or I(h) articles.

3. Why were the data approved for public release? The Department, in coordination with interagency partners, has recently conducted a national security analysis of USML Category I in the context of drafting and publishing a proposed rule that would move certain defense articles (including technical data) to Department of Commerce jurisdiction. Since the data in question was determined in the context

of that effort not to provide a critical military or intelligence advantage (*see* ITAR §120.3(b)), the
Department – in coordination with the Department of Defense – further determined that it was
appropriate to approve the data for public release.

Thanks,
Paul

**From:** Paul, Joshua M [mailto:PaulJM@state.gov]
**Sent:** Wednesday, July 18, 2018 8:08 AM
**To:** Kerr, Paul <PKERR@crs.loc.gov>
**Subject:** RE: Defense Distributed Case

Yes, please do; not sure what we will be able to answer, but by all means ask.

**Official**
**UNCLASSIFIED**

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 7:56 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed Case

Josh,

Could I send a question or two about it? It's gotten some attention up here.

Thanks,
Paul

WASHAR0000670

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.   *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

   (a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

   (b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0000672

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0000673

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0000674

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

WASHAR0000675

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement.* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0000676

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

-   The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

-   The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

WASHAR0000677

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0000678

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 5:13 PM |
| To: | Hart, Robert L <HartRL@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Carter, Rachel <CarterR@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| Subject: | RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD |
| Attach: | DD QA.docx |

████████████████

**Official**

**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 5:09 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Carter, Rachel <CarterR@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Re: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:05:03 PM
**To:** PM-Staffers Mailbox; Carter, Rachel
**Cc:** Heidema, Sarah J; Hart, Robert L
**Subject:** RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

████████████████████████████████████

**Official**

**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Wednesday, July 25, 2018 5:04 PM
**To:** Carter, Rachel <CarterR@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

Josh, Rachel,

████████████████████

Alicia Loucks
X76604
This email is UNCLASSIFIED.

**From:** PM-Staffers Mailbox
**Sent:** Wednesday, July 25, 2018 9:39 AM
**To:** Hart, Robert L; PM-Staffers Mailbox
**Cc:** Heidema, Sarah J; Dearth, Anthony M; Carter, Rachel; Paul, Joshua M

**Subject:** RE: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

███████████████████████████████████████████████████

Alicia Loucks
X76604
This email is UNCLASSIFIED.

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 9:28 AM
**To:** PM-Staffers Mailbox
**Cc:** Heidema, Sarah J; Dearth, Anthony M
**Subject:** FW: New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

███████████████████████████████████████████████████

Thanks,
Rob Hart
202.736.9221 | hartrl@state.gov
**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, July 24, 2018 5:17 PM
**To:** DDTC Tasker DL <DDTCTaskerDL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** New PM Tasker: Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD

Dear all:
Please see new PM tasker for Q&A on the Defense Distributed Protest Issue for PM A/S Nominee R. Clarke Cooper's Hearing, TBD.
Please submit by Friday, July 27 at noon.
Please follow instructions in the tasker and use proper templates.
All OpenNet taskers can be found here.
Please let us know if you have any questions.
Best,
Alicia Loucks
X76604
This email is UNCLASSIFIED.

This email is UNCLASSIFIED.

**From:** Carter, Rachel
**Sent:** Tuesday, July 24, 2018 4:47 PM
**To:** PM-Staffers Mailbox
**Cc:** Chandler, Karen R
**Subject:** Tasker for A/S Cooper Nomination Package

Hi Staffers,
Would you please task a Q/A for A/S Cooper on the Defense Distributed protest issue to CPA? The Q/A should be cleared by DDTC.
Thank you!
Best,
Rachel

WASHAR0000683

**Official**
**UNCLASSIFIED**

WASHAR0000684

| From: | Hart, Robert L <HartRL@state.gov> |
|---|---|
| Sent: | Thursday, March 29, 2018 4:54 PM |
| To: | Freeman, Jeremy B <FreemanJB@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov> |
| Subject: | RE: PM Final: Defense Distributed offer of settlement |
| Attach: | DDTC DD Counteroffer v3.docx; Defense Distributed - Second Amended Complaint.pdf |

Thanks,

Rob Hart

202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

Thanks,
Jeremy and Anna

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

Best,
Anna

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

████████████████████████████████████████████

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,

PDAS Kaidanow approved without changes or comment.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve

**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox

**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement

PDAS Kaidanow,

Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement

Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case.  That additional info should go up along with this approval request.
Thanks.

**Official - Transitory**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.  Rob Hart said he is available to answer any questions.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov


**Official - SBU**
**UNCLASSIFIED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § | Case No. 15-CV-372-RP |
| | § | |
| | § | SECOND AMENDED |
| Plaintiffs, | § | COMPLAINT |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; | § § § § § § § § § § § § § | |
| | § | |
| Defendants. | § | |
| | § | |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

1

WASHAR0000690

Contrary to the Justice Department's warning that such actions are unconstitutional, Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120 *et seq.* ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open forums, regarding arms in common use for lawful purposes. Defendants' censorship of Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments to the United States Constitution. Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this prior restraint scheme, and to recover money damages to compensate for the harm such application has already caused.

*The Parties*

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including in Texas. The purposes of SAF include promoting, securing, and expanding access to the exercise of the right to keep and bear arms; and education, research, publishing and legal

WASHAR0000691

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3.  Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4.  Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

5.  Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.  Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7.  Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8.  Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

WASHAR0000692

Case 1:15-cv-00372-RP Document 90 Filed 08/16/18 Page 4 of 15

JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.     The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.     Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.     The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id.*

14.     The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

4

WASHAR0000693

15.     The scope of technical data subject to ITAR control, as described on the U.S.

Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants

constantly change, often without notice, their views of what this scope entails.

16.     Americans have submitted thousands of written requests, known as "commodity

jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.     From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the

ITAR imposed a prepublication approval requirement on publications of privately generated

ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S.

Government approval for the publication of technical data falling within the definition in §

125.01, including such data as may be developed under other than U.S. Government contract, is

on the person or company seeking publication."

18.     Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel

issued a series of written opinions advising Congress, the White House, and the Department of

State that the use of the ITAR to impose a prior restraint on publications of privately generated

unclassified information into the public domain violated the First Amendment of the United

States Constitution (the "Department of Justice memoranda").

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to

Defendant DDTC, issued official guidance providing that "[a]pproval is not required for

publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to

Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote 3 from the ITAR,

expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

WASHAR0000694

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

21.     In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22.     Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

### The Published Files

23.     Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

24.     Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

25.     Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

WASHAR0000695

26.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

7

WASHAR0000696

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015 — nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case — Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHAR0000697

38.     Defense Distributed submitted another commodity jurisdiction request for the
Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction
request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software,
data files, project files, coding, and models for producing a defense article, to include 80% AR-
15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with
[the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it
did seek a determination as to whether the software necessary to build and operate the Ghost
Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the
machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related
to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to
DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted
the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated
December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was
made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and
Enforcement Division for further questions on public release of the CAD files. However,
because this is not the DDTC division responsible for issuing licenses or other forms of DDTC
authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for
guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

9

WASHAR0000698

43.     To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45.     Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46.     The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a).  For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id*.

47.     DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

10

48.     The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

*Great, Irreparable, and Continuing Harm*

49.     But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50.     DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

COUNT ONE

ULTRA VIRES GOVERNMENT ACTION

51.     Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.     The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

11

WASHAR0000700

Case 1:15-cv-00372-RP Document 90 Filed 03/16/18 Page 12 of 25

## COUNT TWO

### RIGHT OF FREE SPEECH — U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

## COUNT THREE

### RIGHT TO KEEP AND BEAR ARMS — U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

12

WASHAR0000701

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW — U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

WASHAR0000702

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.     A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.     A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the First Amendment to the United States Constitution;

3.     A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to public speech, to include the Internet posting of files used in the production of arms of the kind in common use for traditional lawful purposes, including but not limited to the Subject Files, violates the Second Amendment to the United States Constitution;

4.     A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5.     An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against public speech on privately generated unclassified information;

14

WASHAR0000703

6. An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7. Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8. Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                    Respectfully submitted,

/s/ Alan Gura                              /s/ William B. Mateja
Alan Gura                                  William B. Mateja
Virginia Bar No. 68842*                    Texas State Bar No. 13185350
Gura PLLC                                  POLSINELLI P.C.
916 Prince Street, Suite 107               2950 N. Harwood, Suite 2100
Alexandria, Virginia 22314                 Dallas, Texas 75201
703.835.9085/Fax 703.997.7665              214.397.0030/Fax 214.397.0033
alan@gurapllc.com                          Mateja@polsinelli.com


/s/ Matthew Goldstein                      /s/ Josh Blackman
Matthew Goldstein                          Josh Blackman
D.C. Bar No. 975000*                       Virginia Bar No. 78292
Matthew A. Goldstein, PLLC                 1303 San Jacinto Street
1875 Connecticut Avenue, N.W.              Houston, Texas 77002
10th Floor                                 202.294.9003/Fax: 713.646.1766
Washington, DC 20009                       joshblackman@gmail.com
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com


/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com                             *Admitted pro hac vice

WASHAR0000704

**From:**     Paul, Joshua M <PaulJM@state.gov>
**Sent:**     Tuesday, January 2, 2018 11:29 AM
**To:**       Noonan, Michael J <NoonanMJ@state.gov>; Chen, Rachael J <ChenRJ@state.gov>; PM-DTCP-DL <PM-DTCP@state.gov>
**Cc:**       PM-CPA <PM-CPA@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:**  RE: Proposed bill on Cats 1-3

---

**From:** Noonan, Michael J
**Sent:** Tuesday, January 02, 2018 11:28 AM
**To:** Paul, Joshua M; Chen, Rachael J; PM-DTCP-DL
**Cc:** PM-CPA; Miller, Michael F
**Subject:** RE: Proposed bill on Cats 1-3

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Tuesday, January 2, 2018 11:26 AM
**To:** Chen, Rachael J <ChenRJ@state.gov>; PM-DTCP-DL <PM-DTCP@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** RE: Proposed bill on Cats 1-3

**From:** Chen, Rachael J
**Sent:** Tuesday, January 02, 2018 11:24 AM
**To:** PM-DTCP-DL
**Cc:** PM-CPA; Miller, Michael F
**Subject:** Proposed bill on Cats 1-3
FYI,
The attached bill to be introduced by Rep. Torres seeks to:
To amend the Arms Export Control Act to prohibit the removal of certain
items under category I, II, or III of the United States Munitions List
for purposes of transferring the item to or controlling the item under
any portion of the Commerce Control List of dual-use items in the
Export Administration Regulations.
Best,
Rachael
**Official**
**UNCLASSIFIED**

WASHAR0000705

| From: | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
|-------|-----------------------------------------------------|
| Sent: | Thursday, July 26, 2018 7:01 PM |
| To: | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Davis, Terry L <DavisTL@state.gov>; Shin, Jae E <ShinJE@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Dearth, Anthony M <DearthAM@state.gov> |
| Cc: | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov> |
| Subject: | T approved AM on DD |

T approved all four recommendations on AM about Defense Distributed. Final sent on high side.

Best,
Samantha Sison
PM/FO SharePoint
202-647-0561

WASHAR0000706

Application of Specially Designed to USML Categories I – III

USML Categories I – III, collectively, have eleven instances of the phrase "specifically designed or modified" or a variation thereof, which must be replaced by "specially designed." Category I also has one instance of "having a special military application," which should be replaced with "specially designed for military application."

Three of the twelve paragraphs with "specially designed" in the revised Categories would be for end-items, so the definition in §120.41 does not result in the movement of any items to the CCL.

One paragraph would be for techniques and equipment for signature reduction of Category II armament. Techniques include coatings, and we have not determined whether materials, such as coating, are eligible for the paragraph (b) releases under §120.41. The current understanding is that they are not, but that is subject to review with the next revision to Category XIII. Coatings in Category XII are explicitly eligible for the paragraph (b) releases. The equipment for signature reduction would be eligible for the paragraph (b) releases, which may be inconsistent with historical treatment of this paragraph.

The remaining paragraphs are for tooling, test and evaluation equipment, parts, components, accessories, attachments and associated equipment and other equipment. Any items under these paragraphs that can be used in or with an item subject to the EAR are eligible to be removed from the USML by the application of paragraph (b)(3) of §120.41. Of specific concern would be the catch-all entry for parts, components, accessories, attachments and associated equipment specially designed for USML Categories II defense articles. Components for howitzers and other Category II systems are USML controlled, even if they were modified from a commercial component. The application of paragraph (b)(3) of §120.41 is intended to remove from munitions control, those items that are a variant of a commercial component with only fit changes. We cannot say with certainty how many, or which, items will move from the USML to the CCL, but we can say with certainty there will be some.

WASHAR0000707

§121.1  The United States Munitions List.

Category I—Firearms and Related Articles

*(c) Firearms or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) ~~having a special military application regardless of caliber~~ specially designed for military application.

*(e) Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their ~~specifically designed, modified or adapted~~ specially designed components and parts.

(i) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) ~~directly related to the defense articles described in paragraphs (a) through (h) of this category.~~, as follows:

(1) Technical data and software, only for development or production, and defense services directly related to the defense articles described in paragraph (a) of this category or paragraphs (g) and (h) related to paragraph (a).

(2) Technical data, software, and defense services directly related to the defense articles described in paragraphs (b) through (h) of this category.

**Category II— Guns and Armament**

 (b) Flame throwers ~~specifically designed or modified~~ specially designed for military application.

*(d) Kinetic energy weapon systems, as follows:

(1) ~~specifically designed or modified~~ Specially designed for destruction or rendering mission-abort of a target.

(e) Signature control materials (e.g., parasitic, structural, coatings, screening) techniques, and equipment, ~~specifically designed, developed, configured, adapted or modified~~ specially designed to alter or reduce the signature (e.g., muzzle flash suppression, radar, infrared, visual, laser/electro-optical, acoustic) of defense articles controlled by this category.

*(f) Engines ~~specifically designed or modified~~ specially designed for the self-propelled guns and howitzers in paragraph (a) of this category.

(g) Tooling and equipment ~~specifically designed or modified~~ specially designed for the production of defense articles controlled by this category.

(h) Test and evaluation equipment and test models ~~specifically designed or modified~~ specially designed for the articles controlled by this category. This includes but is not limited to diagnostic instrumentation and physical test models.

(j) All other parts, components, ~~parts,~~ accessories, attachments and associated equipment ~~specifically designed or modified~~ specially designed for the articles in paragraphs (a) through (i) of this category. This includes but is not limited to mounts and carriages for the articles controlled in this category.

**Category III—Ammunition/Ordnance**

(b) Ammunition/ordnance handling equipment ~~specifically designed or modified~~ specially designed for the articles controlled in this category, such as, belting, linking, and de-linking equipment.

(c) Equipment and tooling ~~specifically designed or modified~~ specially designed for the production of defense articles controlled by this category.

(d) Parts, ~~C~~components, ~~parts,~~ accessories, attachments and associated equipment, as follows ~~specifically designed or modified for the articles in this category~~:

*(1) Guidance and control components specially designed for the articles in paragraph (a) of this category;

*(2) Safing, arming and fuzing components (including target detection and localization devices) specially designed for the articles in paragraph (a) of this category; and

(3) All other components, parts, accessories, attachments and associated equipment specially designed for the articles in paragraphs (a) through (c) of this category.

(e) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) ~~directly related to the defense articles described in paragraphs (a) through (d) of this category~~, as follows:

(1) Technical data and software, only for development, and defense services directly related to the defense articles that are described in paragraph (a) of this category and specially design for use with defense articles described in paragraph (a) of category I.

(2) Technical data, software, and defense services directly related to the defense articles described in paragraphs (a) through (d) of this category, except as described in paragraph (e)(1).

WASHAR0000709



**DEPARTMENT OF DEFENSE**
DEFENSE OFFICE OF PREPUBLICATION AND SECURITY REVIEW
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

December 22, 2014
Ref: 14-S-2473

Mr. Cody R. Wilson
Defense Distributed
1101 West 34th Street, #340
Austin, TX 78705

Dear Mr. Wilson:

This is a clarification to the enclosed September 25, 2014, correspondence providing public release approval of the indicated documents titled:

- "AR-15 Lower Receiver"

The Defense Office of Prepublication and Security Review (DOPSR) desires to clarify the previous approval for public release was in compliance with the International Traffic in Arms Regulations (ITAR) 125.4(b)(13) including ITAR 125.4(a) which states this exemption "are also not applicable for purposes of establishing offshore procurement arrangements *or producing defense articles offshore...*"

In other words, only the **rendered images** previously requested for review (hard copy or electronic) included within the subject request are **APPROVED** for public release as previously stated in our 25 September letter, *however, to clarify,* public release approval of **the actual electronic CAD files** your request letter states "can be used with a 3D printer or a computer numerical control machine to *produce* the hardware depicted in the rendered images of the electronic files" cannot be approved under ITAR 125.4(b)(13), DOPSR's sole ITAR mention, and **are therefore beyond the purview of DOPSR.**

DOPSR recommends you contact the Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance regarding public release of any electronic CAD files that can assist in *producing* defense articles controlled under the ITAR.

Please direct any questions regarding this case to Mr. Donald Kluzik at 703-614-4931, email: donald.e.kluzik.civ@mail.mil.

Sincerely,

M. M. Langerman
Chief

Enclosures:
As stated

WASHAR0000710

| From: | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
|---|---|
| Sent: | Friday, May 4, 2018 11:43 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Subject: | AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations |
| Attach: | (FT_441541) 201812286-FD_Tab-4.pdf; (F_441536) 201812286-FD.pdf; (FT_441537) 201812286-FD_Tab-1.pdf; (FT_441538) 201812286-FD_Tab-2.pdf; (FT_441539) 201812286-FD_Tab-3.pdf |

RMA – S approved.  See attached.

Best,

Bill Hayes
<u>PM/FO SharePoint</u>
Staff Assistant
202-647-8089



# INTERNATIONAL TRAFFIC IN ARMS REGULATIONS

# (ITAR)

The source of this document is the Electronic Code of Federal Regulations Web site, authorized and maintained by the National Archives and Records Administration, Office of the Federal Register, and the Government Printing Office.

Updated as of September 9, 2011.

WASHAR0000712

## PART 120—PURPOSE AND DEFINITIONS

**Section Contents**
§ 120.1   General authorities and eligibility.
§ 120.2   Designation of defense articles and defense services.
§ 120.3   Policy on designating and determining defense articles and services.
§ 120.4   Commodity jurisdiction.
§ 120.5   Relation to regulations of other agencies.
§ 120.6   Defense article.
§ 120.7   Significant military equipment.
§ 120.8   Major defense equipment.
§ 120.9   Defense service.
§ 120.10   Technical data.
§ 120.11   Public domain.
§ 120.12   Directorate of Defense Trade Controls.
§ 120.13   United States.
§ 120.14   Person.
§ 120.15   U.S. person.
§ 120.16   Foreign person.
§ 120.17   Export.
§ 120.18   Temporary import.
§ 120.19   Reexport or retransfer.
§ 120.20   License.
§ 120.21   Manufacturing license agreement.
§ 120.22   Technical assistance agreement.
§ 120.23   Distribution agreement.
§ 120.24   Port Directors.
§ 120.25   Empowered Official.
§ 120.26   Presiding Official.
§ 120.27   U.S. criminal statutes.
§ 120.28   Listing of forms referred to in this subchapter.
§ 120.29   Missile Technology Control Regime.
§ 120.30   The Automated Export System (AES).
§ 120.31   North Atlantic Treaty Organization.
§ 120.32   Major non-NATO ally.

**Authority:**   Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2794; E.O. 11958, 42 FR 4311; E.O. 13284, 68 FR 4075; 3 CFR, 1977 Comp. p. 79; 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920.

**Source:**   58 FR 39283, July 22, 1993, unless otherwise noted.

### § 120.1   General authorities and eligibility.

WASHAR0000713

(a) Section 38 of the Arms Export Control Act (22 U.S.C. 2778) authorizes the President to control the export and import of defense articles and defense services. The statutory authority of the President to promulgate regulations with respect to exports of defense articles and defense services was delegated to the Secretary of State by Executive Order 11958, as amended. This subchapter implements that authority. By virtue of delegations of authority by the Secretary of State, these regulations are primarily administered by the Deputy Assistant Secretary for Defense Trade Controls and Managing Director of Defense Trade Controls, Bureau of Political-Military Affairs.

(b)(1) *Authorized officials.* All authorities conferred upon the Deputy Assistant Secretary for Defense Trade Controls or the Managing Director of Defense Trade Controls by this subchapter may be exercised at any time by the Under Secretary of State for Arms Control and International Security or the Assistant Secretary of State for Political-Military Affairs unless the Legal Adviser or the Assistant Legal Adviser for Political-Military Affairs of the Department of State determines that any specific exercise of this authority under this paragraph may be inappropriate.

(2) In the Bureau of Political-Military Affairs, there is a Deputy Assistant Secretary for Defense Trade Controls (DAS—Defense Trade Controls) and a Managing Director of Defense Trade Controls (MD—Defense Trade Controls). The DAS—Defense Trade Controls and the MD—Defense Trade Controls are responsible for exercising the authorities conferred under this subchapter. The DAS—Defense Trade Controls is responsible for oversight of the defense trade controls function. The MD—Defense Trade Controls is responsible for the Directorate of Defense Trade Controls, which oversees the subordinate offices described in paragraphs (b)(2)(i) through (b)(2)(iv) of this section.

(i) The Office of Defense Trade Controls Management and the Director, Office of Defense Trade Controls Management, which have responsibilities related to management of defense trade controls operations, to include the exercise of general authorities in this part 120, and the design, development, and refinement of processes, activities, and functional tools for the export licensing regime and to effect export compliance/enforcement activities;

(ii) The Office of Defense Trade Controls Licensing and the Director, Office of Defense Trade Controls Licensing, which have responsibilities related to licensing or other authorization of defense trade, including references under parts 120, 123, 124, 125, 126, 129 and 130 of this subchapter;

(iii) The Office of Defense Trade Controls Compliance and the Director, Office of Defense Trade Controls Compliance, which have responsibilities related to violations of law or regulation and compliance therewith, including references contained in parts 122, 126, 127, 128 and 130 of this subchapter, and that portion under part 129 of this subchapter pertaining to registration;

(iv) The Office of Defense Trade Controls Policy and the Director, Office of Defense Trade Controls Policy, which have responsibilities related to the general policies of defense trade, including references under this part 120 and part 126 of this subchapter, and the commodity jurisdiction procedure under this subchapter, including under this part 120.

2

WASHAR0000714

(c) *Eligibility.* Only U.S. persons (as defined in §120.15) and foreign governmental entities in the United States may be granted licenses or other approvals (other than retransfer approvals sought pursuant to this subchapter). Foreign persons (as defined in §120.16) other than governments are not eligible. U.S. persons who have been convicted of violating the criminal statutes enumerated in §120.27, who have been debarred pursuant to part 127 or 128 of this subchapter, who are the subject of an indictment involving the criminal statutes enumerated in §120.27, who are ineligible to contract with, or to receive a license or other form of authorization to import defense articles or defense services from any agency of the U.S. Government, who are ineligible to receive export licenses (or other forms of authorization to export) from any agency of the U.S. Government, who are subject to Department of State Suspension/Revocation under §126.7(a)(1) through (a)(7) of this subchapter, or who are ineligible under §127.7(c) of this subchapter are generally ineligible. Applications for licenses or other approvals will be considered only if the applicant has registered with the Directorate of Defense Trade Controls pursuant to part 122 of this subchapter. All applications and requests for approval must be signed by a U.S. person who has been empowered by the registrant to sign such documents.

(d) The exemptions provided in this subchapter do not apply to transactions in which the exporter or any party to the export (as defined in §126.7(e) of this subchapter) is generally ineligible as set forth above in paragraph (c) of this section, unless an exception has been granted pursuant to §126.7(c) of this subchapter.

[58 FR 39283, July 22, 1993, as amended at 68 FR 7417, Feb. 14, 2003; 68 FR 51171, Aug. 26, 2003; 68 FR 57352, Oct. 3, 2003; 70 FR 34653, June 15, 2005; 71 FR 20536, Apr. 21, 2006]

## § 120.2   Designation of defense articles and defense services.

The Arms Export Control Act (22 U.S.C. 2778(a) and 2794(7)) provides that the President shall designate the articles and services deemed to be defense articles and defense services for purposes of this subchapter. The items so designated constitute the United States Munitions List and are specified in part 121 of this subchapter. Such designations are made by the Department of State with the concurrence of the Department of Defense. For a determination on whether a particular item is included on the U.S. Munitions List *see* §120.4(a).

## § 120.3   Policy on designating and determining defense articles and services.

An article or service may be designated or determined in the future to be a defense article (see §120.6) or defense service (see §120.9) if it:

(a) Is specifically designed, developed, configured, adapted, or modified for a military application, and

(i) Does not have predominant civil applications, and

(ii) Does not have performance equivalent (defined by form, fit and function) to those of an article or service used for civil applications; or

3

WASHAR0000715

(b) Is specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary.

The intended use of the article or service after its export ( *i.e.* , for a military or civilian purpose) is not relevant in determining whether the article or service is subject to the controls of this subchapter. Any item covered by the U.S. Munitions List must be within the categories of the U.S. Munitions List. The scope of the U.S. Munitions List shall be changed only by amendments made pursuant to section 38 of the Arms Export Control Act (22 U.S.C. 2778).

### § 120.4   Commodity jurisdiction.

 (a) The commodity jurisdiction procedure is used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List. It may also be used for consideration of a redesignation of an article or service currently covered by the U.S. Munitions List. The Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List. Upon electronic submission of a Commodity Jurisdiction (CJ) Determination Form (Form DS–4076), the Directorate of Defense Trade Controls shall provide a determination of whether a particular article or service is covered by the U.S. Munitions List. The determination, consistent with §§120.2, 120.3, and 120.4, entails consultation among the Departments of State, Defense, Commerce, and other U.S. Government agencies and industry in appropriate cases.

(b) Registration with the Directorate of Defense Trade Controls as defined in part 122 of this subchapter is not required prior to submission of a commodity jurisdiction request. If it is determined that the commodity is a defense article or defense service covered by the U.S. Munitions List, registration is required for exporters, manufacturers, and furnishers of such defense articles and defense services (see part 122 of this subchapter), as well as for brokers who are engaged in brokering activities related to such articles or services.

(c) Requests shall identify the article or service, and include a history of this product's design, development, and use. Brochures, specifications, and any other documentation related to the article or service should be submitted as electronic attachments per the instructions for Form DS–4076.

(d)(1) A determination that an article or service does not have predominant civil applications shall be made by the Department of State, in accordance with this subchapter, on a case-by-case basis, taking into account:

(i) The number, variety and predominance of civil applications;

(ii) The nature, function and capability of the civil applications; and

(iii) The nature, function and capability of the military applications.

WASHAR0000716

(2) A determination that an article does not have the performance equivalent, defined by form, fit and function, to those used for civil applications shall be made by the Department of State, in accordance with this subchapter, on a case-by-case basis, taking into account:

(i) The nature, function, and capability of the article;

(ii) Whether the components used in the defense article are identical to those components originally developed for civil use.

Note: The form of the item is its defined configuration, including the geometrically measured configuration, density, and weight or other visual parameters which uniquely characterize the item, component or assembly. For software, form denotes language, language level and media. The fit of the item is its ability to physically interface or interconnect with or become an integral part of another item. The function of the item is the action or actions it is designed to perform.

(3) A determination that an article has significant military or intelligence applications such that it is necessary to control its export as a defense article shall be made, in accordance with this subchapter, on a case-by-case basis, taking into account:

(i) The nature, function, and capability of the article;

(ii) The nature of controls imposed by other nations on such items (including Wassenaar Arrangement and other multilateral controls), and

(iii) That items described on the Wassenaar Arrangement List of Dual-Use Goods and Technologies shall not be designated defense articles or defense services unless the failure to control such items on the U.S. Munitions List would jeopardize significant national security or foreign policy interests.

(e) The Directorate of Defense Trade Controls will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction. If after 45 days the Directorate of Defense Trade Controls has not provided a final commodity jurisdiction determination, the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing.

(f) State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures. State shall notify Defense and Commerce of the initiation and conclusion of each case.

(g) A person may appeal a commodity jurisdiction determination by submitting a written request for reconsideration to the Managing Director of the Directorate of Defense Trade Controls. The Directorate of Defense Trade Controls will provide a written response of the Managing Director's determination within 30 days of receipt of the appeal. If desired, an appeal of the Managing Director's decision can then be made directly through the Deputy Assistant Secretary for Defense Trade Controls to the Assistant Secretary for Political-Military Affairs.

WASHAR0000717

[58 FR 39283, July 22, 1993, as amended at 71 FR 20536, Apr. 21, 2006; 75 FR 46843, Aug. 4, 2010]

### § 120.5   Relation to regulations of other agencies.

If an article or service is covered by the U.S. Munitions List, its export is regulated by the Department of State, except as indicated otherwise in this subchapter. For the relationship of this subchapter to regulations of the Department of Energy and the Nuclear Regulatory Commission, see §123.20 of this subchapter. The Attorney General controls permanent imports of articles and services covered by the U.S. Munitions Import List from foreign countries by persons subject to U.S. jurisdiction (27 CFR part 447). In carrying out such functions, the Attorney General shall be guided by the views of the Secretary of State on matters affecting world peace, and the external security and foreign policy of the United States. The Department of Commerce regulates the export of items on the Commerce Control List (CCL) under the Export Administration Regulations (15 CFR parts 730 through 799).

[71 FR 20537, Apr. 21, 2006]

### § 120.6   Defense article.

*Defense article* means any item or technical data designated in §121.1 of this subchapter. The policy described in §120.3 is applicable to designations of additional items. This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in §121.1 of this subchapter. It does not include basic marketing information on function or purpose or general system descriptions.

### § 120.7   Significant military equipment.

 (a) *Significant military equipment* means articles for which special export controls are warranted because of their capacity for substantial military utility or capability.

(b) Significant military equipment includes:

(1) Items in §121.1 of this subchapter which are preceded by an asterisk; and

(2) All classified articles enumerated in §121.1 of this subchapter.

[58 FR 39283, July 22, 1993, as amended at 62 FR 67275, Dec. 24, 1997]

### § 120.8   Major defense equipment.

Pursuant to section 47(6) of the Arms Export Control Act (22 U.S.C. 2794(6) note), *major defense equipment* means any item of significant military equipment (as defined in §120.7) on the U.S. Munitions List having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000.

WASHAR0000718

### § 120.9   Defense service.

(a) *Defense service* means:

(1) The furnishing of assistance (including training) to foreign persons, whether in the United States or abroad in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles;

(2) The furnishing to foreign persons of any technical data controlled under this subchapter (see §120.10), whether in the United States or abroad; or

(3) Military training of foreign units and forces, regular and irregular, including formal or informal instruction of foreign persons in the United States or abroad or by correspondence courses, technical, educational, or information publications and media of all kinds, training aid, orientation, training exercise, and military advice. (See also §124.1.)

(b) [Reserved]

[62 FR 67275, Dec. 24, 1997]

### § 120.10   Technical data.

(a) *Technical data* means, for purposes of this subchapter:

(1) Information, other than software as defined in §120.10(a)(4), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation.

(2) Classified information relating to defense articles and defense services;

(3) Information covered by an invention secrecy order;

(4) Software as defined in §121.8(f) of this subchapter directly related to defense articles;

(5) This definition does not include information concerning general scientific, mathematical or engineering principles commonly taught in schools, colleges and universities or information in the public domain as defined in §120.11. It also does not include basic marketing information on function or purpose or general system descriptions of defense articles.

(b) [Reserved]

[58 FR 39283, July 22, 1993, as amended at 61 FR 48831, Sept. 17, 1996; 71 FR 20537, Apr. 21, 2006]

7

WASHAR0000719

## § 120.11   Public domain.

(a) *Public domain* means information which is published and which is generally accessible or available to the public:

(1) Through sales at newsstands and bookstores;

(2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3) Through second class mailing privileges granted by the U.S. Government;

(4) At libraries open to the public or from which the public can obtain documents;

(5) Through patents available at any patent office;

(6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release ( *i.e.* , unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also §125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

(b) [Reserved]

## § 120.12   Directorate of Defense Trade Controls.

Directorate of Defense Trade Controls, Bureau of Political-Military Affairs, Department of State, Washington, DC 20522–0112.

[71 FR 20537, Apr. 21, 2006]

WASHAR0000720

### § 120.13   United States.

*United States,* when used in the geographical sense, includes the several states, the Commonwealth of Puerto Rico, the insular possessions of the United States, the District of Columbia, the Commonwealth of the Northern Mariana Islands, any territory or possession of the United States, and any territory or possession over which the United States exercises any powers of administration, legislation, and jurisdiction.

### § 120.14   Person.

*Person* means a natural person as well as a corporation, business association, partnership, society, trust, or any other entity, organization or group, including governmental entities. If a provision in this subchapter does not refer exclusively to a foreign person (§120.16) or U.S. person (§120.15), then it refers to both.

### § 120.15   U.S. person.

*U.S. person* means a person (as defined in §120.14 of this part) who is a lawful permanent resident as defined by 8 U.S.C. 1101(a)(20) or who is a protected individual as defined by 8 U.S.C. 1324b(a)(3). It also means any corporation, business association, partnership, society, trust, or any other entity, organization or group that is incorporated to do business in the United States. It also includes any governmental (federal, state or local) entity. It does not include any foreign person as defined in §120.16 of this part.

[71 FR 20537, Apr. 21, 2006]

### § 120.16   Foreign person.

*Foreign person* means any natural person who is not a lawful permanent resident as defined by 8 U.S.C. 1101(a)(20) or who is not a protected individual as defined by 8 U.S.C. 1324b(a)(3). It also means any foreign corporation, business association, partnership, trust, society or any other entity or group that is not incorporated or organized to do business in the United States, as well as international organizations, foreign governments and any agency or subdivision of foreign governments (e.g., diplomatic missions).

[71 FR 20537, Apr. 21, 2006]

### § 120.17   Export.

 (a) *Export* means:

(1) Sending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data; or

WASHAR0000721

(2) Transferring registration, control or ownership to a foreign person of any aircraft, vessel, or satellite covered by the U.S. Munitions List, whether in the United States or abroad; or

(3) Disclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government (e.g., diplomatic missions); or

(4) Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad; or

(5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.

(6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter. However, for certain limited purposes (see §126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services.

(b) [Reserved]

## § 120.18   Temporary import.

*Temporary import* means bringing into the United States from a foreign country any defense article that is to be returned to the country from which it was shipped or taken, or any defense article that is in transit to another foreign destination. Temporary import includes withdrawal of a defense article from a customs bonded warehouse or foreign trade zone for the purpose of returning it to the country of origin or country from which it was shipped or for shipment to another foreign destination. Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives (see 27 CFR parts 447, 478, 479, and 555).

[71 FR 20537, Apr. 21, 2006]

## § 120.19   Reexport or retransfer.

*Reexport* or *retransfer* means the transfer of defense articles or defense services to an end use, end user or destination not previously authorized.

## § 120.20   License.

*License* means a document bearing the word "license" issued by the Directorate of Defense Trade Controls or its authorized designee which permits the export or temporary import of a specific defense article or defense service controlled by this subchapter.

[71 FR 20537, Apr. 21, 2006]

10

WASHAR0000722

## § 120.21   Manufacturing license agreement.

An agreement (e.g., contract) whereby a U.S. person grants a foreign person an authorization to manufacture defense articles abroad and which involves or contemplates:

(a) The export of technical data (as defined in §120.10) or defense articles or the performance of a defense service; or

(b) The use by the foreign person of technical data or defense articles previously exported by the U.S. person. (See part 124 of this subchapter).

## § 120.22   Technical assistance agreement.

An agreement (e.g., contract) for the performance of a defense service(s) or the disclosure of technical data, as opposed to an agreement granting a right or license to manufacture defense articles. Assembly of defense articles is included under this section, provided production rights or manufacturing know-how are not conveyed. Should such rights be transferred, §120.21 is applicable. (See part 124 of this subchapter).

## § 120.23   Distribution agreement.

An agreement (e.g., a contract) to establish a warehouse or distribution point abroad for defense articles exported from the United States for subsequent distribution to entities in an approved sales territory (see part 124 of this subchapter).

## § 120.24   Port Directors.

*Port Directors of U.S. Customs and Border Protection* means the U.S. Customs and Border Protection Port Directors at the U.S. Customs and Border Protection Ports of Entry (other than the port of New York, New York where their title is the Area Directors).

[70 FR 50959, Aug. 29, 2005]

## § 120.25   Empowered Official.

 (a) *Empowered Official* means a U.S. person who:

(1) Is directly employed by the applicant or a subsidiary in a position having authority for policy or management within the applicant organization; and

(2) Is legally empowered in writing by the applicant to sign license applications or other requests for approval on behalf of the applicant; and

(3) Understands the provisions and requirements of the various export control statutes and regulations, and the criminal liability, civil liability and administrative penalties for violating the Arms Export Control Act and the International Traffic in Arms Regulations; and

WASHAR0000723

(4) Has the independent authority to:

(i) Enquire into any aspect of a proposed export or temporary import by the applicant, and

(ii) Verify the legality of the transaction and the accuracy of the information to be submitted; and

(iii) Refuse to sign any license application or other request for approval without prejudice or other adverse recourse.

(b) [Reserved]

## § 120.26   Presiding Official.

*Presiding Official* means a person authorized by the U.S. Government to conduct hearings in administrative proceedings.

## § 120.27   U.S. criminal statutes.

(a) For purposes of this subchapter, the phrase *U.S. criminal statutes* means:

(1) Section 38 of the Arms Export Control Act (22 U.S.C. 2778);

(2) Section 11 of the Export Administration Act of 1979 (50 U.S.C. app. 2410);

(3) Sections 793, 794, or 798 of title 18, United States Code (relating to espionage involving defense or classified information) or §2339A of such title (relating to providing material support to terrorists);

(4) Section 16 of the Trading with the Enemy Act (50 U.S.C. app. 16);

(5) Section 206 of the International Emergency Economic Powers Act (relating to foreign assets controls; 50 U.S.C. 1705);

(6) Section 30A of the Securities Exchange Act of 1934 (15 U.S.C. 78dd–1) or section 104 of the Foreign Corrupt Practices Act (15 U.S.C. 78dd–2);

(7) Chapter 105 of title 18, United States Code (relating to sabotage);

(8) Section 4(b) of the Internal Security Act of 1950 (relating to communication of classified information; 50 U.S.C. 783(b));

(9) Sections 57, 92, 101, 104, 222, 224, 225, or 226 of the Atomic Energy Act of 1954 (42 U.S.C. 2077, 2122, 2131, 2134, 2272, 2274, 2275, and 2276);

(10) Section 601 of the National Security Act of 1947 (relating to intelligence identities protection; 50 U.S.C. 421);

WASHAR0000724

(11) Section 603(b) or (c) of the Comprehensive Anti-Apartheid Act of 1986 (22 U.S.C. 5113(b) and (c)); and

(12) Section 371 of title 18, United States Code (when it involves conspiracy to violate any of the above statutes).

(13) Sections 3, 4, 5, and 6 of the Prevention of Terrorist Access to Destructive Weapons Act of 2004, relating to missile systems designed to destroy aircraft (18 U.S.C. 2332g), prohibitions governing atomic weapons (42 U.S.C. 2122), radiological dispersal services (18 U.S.C. 2332h), and variola virus (18 U.S.C. 175b);

(b) [Reserved]

[58 FR 39283, July 22, 1993, as amended at 71 FR 20537, Apr. 21, 2006]

## § 120.28   Listing of forms referred to in this subchapter.

The forms referred to in this subchapter are available from the following government agencies:

(a) Department of State, Bureau of Political-Military Affairs, Directorate of Defense Trade Controls, Washington, DC 20522–0112.

(1) Application/License for permanent export of unclassified defense articles and related technical data (Form DSP–5).

(2) Application for registration (Form DSP–9).

(3) Application/License for temporary import of unclassified defense articles (Form DSP–61).

(4) Application/License for temporary export of unclassified defense articles (Form DSP–73).

(5) Non-transfer and use certificate (Form DSP–83).

(6) Application/License for permanent/temporary export or temporary import of classified defense articles and related classified technical data (Form DSP–85).

(7) Authority to Export Defense Articles and Defense Services sold under the Foreign Military Sales program (Form DSP–94).

(8) Commodity Jurisdiction (CJ) Determination Form (Form DS–4076).

(b) Department of Commerce, Bureau of Industry and Security:

(1) International Import Certificate (Form BIS–645P/ATF–4522/DSP–53).

(2) Shipper's Export Declaration (Form No. 7525–V).

13

WASHAR0000725

(3) Department of Defense, Defense Security Cooperation Agency: Letter of Offer and Acceptance (DD Form 1513).

[58 FR 39283, July 22, 1993, as amended at 68 FR 61100, Oct. 27, 2003; 71 FR 20537, Apr. 21, 2006; 75 FR 46844, Aug. 4, 2010]

### § 120.29   Missile Technology Control Regime.

(a) For purposes of this subchapter, *Missile Technology Control Regime (MTCR)* means the policy statement between the United States, the United Kingdom, the Federal Republic of Germany, France, Italy, Canada, and Japan, announced on April 16, 1987, to restrict sensitive missile-relevant transfers based on the MTCR Annex, and any amendments thereto;

(b) The term *MTCR Annex* means the Guidelines and Equipment and Technology Annex of the MTCR, and any amendments thereto;

(c) *List of all items on the MTCR Annex.* Section 71(a) of the Arms Export Control Act (22 U.S.C. §2797) refers to the establishment as part of the U.S. Munitions List of a list of all items on the MTCR Annex, the export of which is not controlled under section 6(l) of the Export Administration Act of 1979 (50 U.S.C. app. 2405(l)), as amended. In accordance with this provision, the list of MTCR Annex items shall constitute all items on the U.S. Munitions List in §121.16 of this subchapter.

### § 120.30   The Automated Export System (AES).

The Automated Export System (AES) is the Department of Commerce, Bureau of Census, electronic filing of export information. The AES shall serve as the primary system for collection of export data for the Department of State. In accordance with this subchapter U.S. exporters are required to report export information using AES for all hardware exports. Exports of technical data and defense services shall be reported directly to the Directorate of Defense Trade Controls (DDTC). Also, requests for special reporting may be made by DDTC on a case-by-case basis, (e.g., compliance, enforcement, congressional mandates).

[68 FR 61100, Oct. 27, 2003]

### § 120.31   North Atlantic Treaty Organization.

*North Atlantic Treaty Organization (NATO)* is comprised of the following member countries: Belgium, Bulgaria, Canada, Czech Republic, Denmark, Estonia, France, Germany, Greece, Hungary, Iceland, Italy, Latvia, Lithuania, Luxembourg, The Netherlands, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Turkey, United Kingdom and the United States.

[70 FR 50959, Aug. 29, 2005]

### § 120.32   Major non-NATO ally.

WASHAR0000726

*Major non-NATO ally* means a country that is designated in accordance with §517 of the Foreign Assistance Act of 1961 (22 U.S.C. 2321k) as a major non-NATO ally for purposes of the Foreign Assistance Act of 1961 and the Arms Export Control Act (22 U.S.C. 2751 *et seq.* ) (22 U.S.C. 2403(q)). The following countries have been designated as major non-NATO allies: Argentina, Australia, Bahrain, Egypt, Israel, Japan, Jordan, Kuwait, Morocco, New Zealand, Pakistan, the Philippines, Thailand, and Republic of Korea. Taiwan shall be treated as though it were designated a major non-NATO ally (as defined in section 644(q) of the Foreign Assistance Act of 1961 (22 U.S.C. 2403(q)).

[70 FR 50959, Aug. 29, 2005]

**§120.33  [Reserved]**

**§120.34  [Reserved]**

**§120.35  [Reserved]**

**§120.36  [Reserved]**

**§120.37  [Reserved]**

**§120.38  [Reserved]**

**§ 120.39   Regular employee.**

(a) A regular employee means for purposes of this subchapter:

(1) An individual permanently and directly employed by the company, or

(2) An individual in a long term contractual relationship with the company where the individual works at the company's facilities, works under the company's direction and control, works full time and exclusively for the company, and executes nondisclosure certifications for the company, and where the staffing agency that has seconded the individual has no role in the work the individual performs (other than providing that individual for that work) and the staffing agency would not have access to any controlled technology (other than where specifically authorized by a license).

[76 FR 28177, May 16, 2011]

WASHAR0000727

**Intentionally Blank**

16

WASHAR0000728

# PART 121—THE UNITED STATES MUNITIONS LIST

## Section Contents

### Enumeration of Articles

§ 121.1   General. The United States Munitions List.
§ 121.2   Interpretations of the U.S. Munitions List and the Missile Technology Control Regime Annex.
§ 121.3   Aircraft and related articles.
§ 121.4   [Reserved]
§ 121.5   Apparatus and devices under Category IV(c).
§§ 121.6-121.7   [Reserved]
§ 121.8   End-items, components, accessories, attachments, parts, firmware, software and systems.
§ 121.9   [Reserved]
§ 121.10   Forgings, castings and machined bodies.
§ 121.11   Military demolition blocks and blasting caps.
§§ 121.12-121.14   [Reserved]
§ 121.15   Vessels of war and special naval equipment.
§ 121.16   Missile Technology Control Regime Annex.

**Authority:**   Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp. p. 79; 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920.

**Source:**   58 FR 39287, July 22, 1993, unless otherwise noted.

### Enumeration of Articles

### § 121.1   General. The United States Munitions List.

(a) The following articles, services and related technical data are designated as defense articles and defense services pursuant to §§38 and 47(7) of the Arms Export Control Act (22 U.S.C. 2778 and 2794(7)). Changes in designations will be published in the Federal Register. Information and clarifications on whether specific items are defense articles and services under this subchapter may appear periodically through the Internet Web site of the Directorate of Defense Trade Controls.

(b) *Significant military equipment:* An asterisk precedes certain defense articles in the following list. The asterisk means that the article is deemed to be "Significant Military Equipment" to the extent specified in §120.7 of this subchapter. The asterisk is placed as a convenience to help identify such articles. Note that technical data directly related to the manufacture or production

WASHAR0000729

of any defense articles enumerated in any category that are designated as Significant Military Equipment (SME) shall itself be designed SME.

(c) *Missile Technology Control Regime Annex (MTCR)*. Certain defense articles and services are identified in §121.16 as being on the list of MTCR Annex items on the United States Munitions List. These are articles as specified in §120.29 of this subchapter and appear on the list at §121.16.

**Category I—Firearms, Close Assault Weapons and Combat Shotguns**

*(a) Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

*(b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

*(c) Firearms or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

*(d) Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

*(e) Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

(f) Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)

*(g) Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

(h) Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

(i) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

18

WASHAR0000730

(3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4) A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5) A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

(6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

Note: This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730–799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g. §§123.17, 123.18 and 125.4).

## Category II—Guns and Armament

*(a) Guns over caliber .50 (12.7mm, whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons and recoilless rifles.

(b) Flame throwers specifically designed or modified for military application.

(c) Apparatus and devices for launching or delivering ordnance, other than those articles controlled in Category IV.

*(d) Kinetic energy weapon systems specifically designed or modified for destruction or rendering mission-abort of a target.

(e) Signature control materials (e.g., parasitic, structural, coatings, screening) techniques, and equipment specifically designed, developed, configured, adapted or modified to alter or reduce the signature (e.g., muzzle flash suppression, radar, infrared, visual, laser/electro-optical, acoustic) of defense articles controlled by this category.

*(f) Engines specifically designed or modified for the self-propelled guns and howitzers in paragraph (a) of this category.

(g) Tooling and equipment specifically designed or modified for the production of defense articles controlled by this category.

WASHAR0000731

(h) Test and evaluation equipment and test models specifically designed or modified for the articles controlled by this category. This includes but is not limited to diagnostic instrumentation and physical test models.

(i) Autoloading systems for electronic programming of projectile function for the defense articles controlled in this Category.

(j) All other components, parts, accessories, attachments and associated equipment specifically designed or modified for the articles in paragraphs (a) through (i) of this category. This includes but is not limited to mounts and carriages for the articles controlled in this category.

(k) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (j) of this category. Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(l) The following interpretations explain and amplify the terms used in this category and elsewhere in this subchapter:

(1) The kinetic energy weapons systems in paragraph (d) of this category include but are not limited to:

(i) Launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6km/s, in single or rapid fire modes, using methods such as: electromagnetic, electrothermal, plasma, light gas, or chemical;

(ii) Prime power generation, electric armor, energy storage, thermal management; conditioning, switching or fuel-handling equipment; and the electrical interfaces between power supply gun and other turret electric drive function;

(iii) Target acquisition, tracking fire control or damage assessment systems; and

(iv) Homing seeker, guidance or divert propulsion (lateral acceleration) systems for projectiles.

(2) The articles in this category include any end item, component, accessory, attachment part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category.

(3) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application.

**Category III—Ammunition/Ordnance**

*(a) Ammunition/ordnance for the articles in Categories I and II of this section.

20

WASHAR0000732

(b) Ammunition/ordnance handling equipment specifically designed or modified for the articles controlled in this category, such as, belting, linking, and de-linking equipment.

(c) Equipment and tooling specifically designed or modified for the production of defense articles controlled by this category.

(d) Components, parts, accessories, attachments and associated equipment specifically designed or modified for the articles in this category:

*(1) Guidance and control components for the articles in paragraph (a) of this category;

*(2) Safing, arming and fuzing components (including target detection and localization devices) for the articles in paragraph (a) of this category; and

(3) All other components, parts, accessories, attachments and associated equipment for the articles in paragraphs (a) through (c) of this category.

(e) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (d) of this category. Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(f) The following explains and amplifies the terms used in this category and elsewhere in this subchapter:

(1) The components, parts, accessories and attachments controlled in this category include, but are not limited to cartridge cases, powder bags (or other propellant charges), bullets, jackets, cores, shells (excluding shotgun shells), projectiles (including canister rounds and submunitions therefor), boosters, firing components therefor, primers, and other detonating devices for the defense articles controlled in this category.

(2) This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting or popping.

(3) Equipment and tooling in paragraph (c) of this category does not include equipment for hand-loading ammunition.

(4) The articles in this category include any end item, component, accessory, attachment, part, firmware, software, or system that has been designed or manufactured using technical data and defense services controlled by this category.

(5) The articles specifically designed or modified for military application controlled in this category include any article specifically developed, configured, or adapted for military application

21

WASHAR0000733

**Category IV—Launch Vehicles, Guided Missiles, Ballistic Missiles, Rockets, Torpedoes, Bombs and Mines**

*(a) Rockets (including but not limited to meteorological and other sounding rockets), bombs, grenades, torpedoes, depth charges, land and naval mines, as well as launchers for such defense articles, and demolition blocks and blasting caps. (See §121.11.)

*(b) Launch vehicles and missile and anti-missile systems including but not limited to guided, tactical and strategic missiles, launchers, and systems.

(c) Apparatus, devices, and materials for the handling, control, activation, monitoring, detection, protection, discharge, or detonation of the articles in paragraphs (a) and (b) of this category. (See §121.5.)

*(d) Missile and space launch vehicle powerplants.

*(e) Military explosive excavating devices.

*(f) Ablative materials fabricated or semi-fabricated from advanced composites (e.g., silica, graphite, carbon, carbon/carbon, and boron filaments) for the articles in this category that are derived directly from or specifically developed or modified for defense articles.

*(g) Non/nuclear warheads for rockets and guided missiles.

(h) All specifically designed or modified components, parts, accessories, attachments, and associated equipment for the articles in this category.

(i) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (h) of this category. (See §125.4 of this subchapter for exemptions.) Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

**Category V—Explosives and Energetic Materials, Propellants, Incendiary Agents and Their Constituents**

*(a) Explosives, and mixtures thereof:

(1) ADNBF (aminodinitrobenzofuroxan or 7-Amino 4,6-dinitrobenzofurazane-1-oxide) (CAS 97096–78–1);

(2) BNCP (cis-bis (5-nitrotetrazolato) tetra amine-cobalt (III) perchlorate) (CAS 117412–28–9);

(3) CL–14 (diamino dinitrobenzofuroxan or 5,7-diamino-4,6-dinitrobenzofurazane-1-oxide) (CAS 117907–74–1);

WASHAR0000734

(4) CL–20 (HNIW or Hexanitrohexaazaisowurtzitane); (CAS 135285–90-4); chlathrates of CL–20 (see paragraphs (g)(3) and (4) of this category);

(5) CP (2-(5-cyanotetrazolato) penta aminecobalt (III) perchlorate); (CAS 70247–32–4);

(6) DADE (1,1-diamino-2,2-dinitroethylene, FOX7);

(7) DDFP (1,4-dinitrodifurazanopiperazine);

(8) DDPO (2,6-diamino-3,5-dinitropyrazine-1-oxide, PZO); (CAS 194486–77–6);

(9) DIPAM (3,3′-Diamino-2,2′,4,4′,6,6′-hexanitrobiphenyl or dipicramide) (CAS 17215–44–0);

(10) DNGU (DINGU or dinitroglycoluril) (CAS 55510–04–8);

(11) Furazans, as follows:

(i) DAAOF (diaminoazoxyfurazan);

(ii) DAAzF (diaminoazofurazan) (CAS 78644–90–3);

(12) HMX and derivatives (see paragraph (g)(5) of this category):

(i) HMX (Cyclotetramethylenetetranitramine; octahydro-1,3,5,7-tetranitro-1,3,5,7-tetrazine; 1,3,5,7-tetranitro-1,3,5,7-tetraza-cyclooctane; octogen, octogene) (CAS 2691–41–0);

(ii) Diflouroaminated analogs of HMX;

(iii) K–55 (2,4,6,8-tetranitro-2,4,6,8-tetraazabicyclo [3,3,0]-octanone-3, tetranitrosemiglycouril, or keto-bicyclic HMX) (CAS 130256-72–3);

(13) HNAD (hexanitroadamantane) (CAS 143850–71–9);

(14) HNS (hexanitrostilbene) (CAS 20062–22–0);

(15) Imidazoles, as follows:

(i) BNNII (Octohydro-2,5-bis(nitroimino) imidazo [4,5-d]Imidazole);

(ii) DNI (2,4-dinitroimidazole) (CAS 5213–49–0);

(iii) FDIA (1-fluoro-2,4-dinitroimidazole);

(iv) NTDNIA (N-(2-nitrotriazolo)-2,4-dinitro-imidazole);

(v) PTIA (1-picryl-2,4,5-trinitroimidazole);

23

WASHAR0000735

(16) NTNMH (1-(2-nitrotriazolo)-2-dinitromethylene hydrazine);

(17) NTO (ONTA or 3-nitro-1,2,4-triazol-5-one) (CAS 932–64–9);

(18) Polynitrocubanes with more than four nitro groups;

(19) PYX (2,6-Bis(picrylamino)-3,5-dinitropyridine) (CAS 38082–89–2);

(20) RDX and derivatives:

(i) RDX (cyclotrimethylenetrinitramine), cyclonite, T4, hexahydro-1,3,5-trinitro-1,3,5-triazine, 1,3,5-trinitro-1,3,5-triaza-cyclohexane, hexogen, or hexogene) (CAS 121–82–4);

(ii) Keto-RDX (K–6 or 2,4,6-trinitro-2,4,6-triazacyclohexanone (CAS 115029–35–1);

(21) TAGN (Triaminoguanidinenitrate) (CAS 4000–16–2);

(22) TATB (Triaminotrinitrobenzene) (CAS 3058–38–6) (see paragraph (g)(7) of this category);

(23) TEDDZ (3,3,7,7-tetrabis(difluoroamine) octahydro-1,5-dinitro-1,5-diazocine;

(24) Tetrazoles, as follows:

(i) NTAT (nitrotriazol aminotetrazole);

(ii) NTNT (1-N-(2-nitrotriazolo)-4-nitrotetrazole);

(25) Tetryl (trinitrophenylmethylnitramine) (CAS 479–45–8);

(26) TNAD (1,4,5,8-tetranitro-1,4,5,8-tetraazadecalin) (CAS 135877-16–6)(see paragraph (g)(6) of this category);

(27) TNAZ (1,1,3-trinitroazetidine) (CAS 97645–24–4) (see paragraph (g)(2) of this category);

(28) TNGU (SORGUYL or tetranitroglycoluril) (CAS 55510–03–7);

(29) TNP (1,4,5,8-tetranitro-pyridazino [4,5-d] pyridazine) (CAS 229176–04–9);

(30) Triazines, as follows:

(i) DNAM (2-oxy-4,6-dinitroamino-s-triazine) (CAS 19899–80–0);

(ii) NNHT (2-nitroimino-5-nitro-hexahydro-1,3,5 triazine) (CAS 130400–13–4);

(31) Triazoles, as follows:

24

WASHAR0000736

(i) 5-azido-2-nitrotriazole;

(ii) ADHTDN (4-amino-3,5-dihydrazino-1,2,4-triazole dinitramide)(CAS 1614–08–0);

(iii) ADNT (1-amino-3,5-dinitro-1,2,4-triazole);

(iv) BDNTA ([Bis-dinitrotriazole]amine);

(v) DBT (3,3′-dinitro-5,5-bi-1,2,4-triazole) (CAS 30003–46–4);

(vi) DNBT (dinitrobistriazole) (CAS 70890–46–9);

(vii) NTDNA (2-nitrotriazole 5-dinitramide) (CAS 75393–84–9);

(viii) NTDNT (1-N-(2-nitrotriazolo) 3,5-dinitro-triazole);

(ix) PDNT (1-picryl-3,5-dinitrotriazole);

(x) TACOT (tetranitrobenzotriazolobenzotriazole) (CAS 25243–36–1);

(32) Any explosive not listed elsewhere in paragraph (a) of this category with a detonation velocity exceeding 8,700m/s at maximum density or a detonation pressure exceeding 34 Gpa (340 kbar).

(33) Other organic explosives not listed elsewhere in paragraph (a) of this category yielding detonation pressures of 25 Gpa (250 kbar) or more that will remain stable at temperatures of 523K (250°C) or higher for periods of 5 minutes or longer;

(34) Diaminotrinitrobenzene (DATB) (CAS 1630–08–6);

(35) Any other explosive not elsewhere identified in this category specifically designed, modified, adapted, or configured (e.g., formulated) for military application.

*(b) Propellants:

(1) Any United Nations (UN) Class 1.1 solid propellant with a theoretical specific impulse (under standard conditions) of more than 250 seconds for non-metallized, or 270 seconds for metallized compositions;

(2) Any UN Class 1.3 solid propellant with a theoretical specific impulse (under standard conditions) of more than 230 seconds for non-halogenized, or 250 seconds for non-metallized compositions;

(3) Propellants having a force constant of more than 1,200 kJ/Kg;

WASHAR0000737

(4) Propellants that can sustain a steady-state burning rate more than 38mm/s under standard conditions (as measured in the form of an inhibited single strand) of 6.89 Mpa (68.9 bar) pressure and 294K (21 °C);

(5) Elastomer modified cast double based propellants with extensibility at maximum stress greater than 5% at 233 K (−40 C);

(6) Any propellant containing substances listed in Category V;

(7) Any other propellant not elsewhere identified in this category specifically designed, modified, adapted, or configured (e.g., formulated) for military application.

(c) Pyrotechnics, fuels and related substances, and mixtures thereof:

(1) Alane (aluminum hydride)(CAS 7784–21–6);

(2) Carboranes; decaborane (CAS 17702–41–9); pentaborane and derivatives thereof;

(3) Hydrazine and derivatives:

(i) Hydrazine (CAS 302–01–2) in concentrations of 70% or more (not hydrazine mixtures specially formulated for corrosion control);

(ii) Monomethyl hydrazine (CAS 60–34–4);

(iii) Symmetrical dimethyl hydrazine (CAS 540–73–8);

(iv) Unsymmetrical dimethyl hydrazine (CAS 57–14–7);

(4) Liquid fuels specifically formulated for use by articles covered by Categories IV, VI, and VIII;

(5) Spherical aluminum powder (CAS 7429–90–5) in particle sizes of 60 micrometers or less manufactured from material with an aluminum content of 99% or more;

(6) Metal fuels in particle form whether spherical, atomized, spheroidal, flaked or ground, manufactured from material consisting of 99% or more of any of the following:

(i) Metals and mixtures thereof:

(A) Beryllium (CAS 7440–41–7) in particle sizes of less than 60 micrometers;

(B) Iron powder (CAS 7439–89–6) with particle size of 3 micrometers or less produced by reduction of iron oxide with hydrogen;

(ii) Mixtures, which contain any of the following:

26

WASHAR0000738

(A) Boron (CAS 7440–42–8) or boron carbide (CAS 12069–32–8) fuels of 85% purity or higher and particle sizes of less than 60 micrometers;

(B) Zirconium (CAS 7440–67–7), magnesium (CAS 7439–95–4) or alloys of these in particle sizes of less than 60 micrometers;

(iii) Explosives and fuels containing the metals or alloys listed in paragraphs (c)(6)(i) and (c)(6)(ii) of this category whether or not the metals or alloys are encapsulated in aluminum, magnesium, zirconium, or beryllium;

(7) Pyrotechnics and pyrophoric materials specifically formulated for military purposes to enhance or control the production of radiated energy in any part of the IR spectrum.

(8) Titanium subhydride (TiHn) of stoichiometry equivalent to n = 0.65–1.68;

(9) Military materials containing thickeners for hydrocarbon fuels specially formulated for use in flame throwers or incendiary munitions; metal stearates or palmates (also known as octol); and M1, M2 and M3 thickeners;

(10) Any other pyrotechnic, fuel and related substance and mixture thereof not elsewhere identified in this category specifically designed, modified, adapted, or configured (e.g., formulated) for military application.

(d) Oxidizers, to include:

(1) ADN (ammonium dinitramide or SR–12) (CAS 140456–78–6);

(2) AP (ammonium perchlorate) (CAS 7790–98–9);

(3) BDNPN (bis,2,2-dinitropropylnitrate) (CAS 28464–24–6);

(4) DNAD (1,3-dinitro-1,3-diazetidine) (CAS 78246–06–7);

(5) HAN (Hydroxylammonium nitrate) (CAS 13465–08–2);

(6) HAP (hydroxylammonium perchlorate) (CAS 15588–62–2);

(7) HNF (Hydrazinium nitroformate) (CAS 20773–28–8);

(8) Hydrazine nitrate (CAS 37836–27–4);

(9) Hydrazine perchlorate (CAS 27978–54–7);

(10) Liquid oxidizers comprised of or containing inhibited red fuming nitric acid (IRFNA) (CAS 8007–58–7) or oxygen diflouride;

WASHAR0000739

(11) Perchlorates, chlorates, and chromates composited with powdered metal or other high energy fuel components controlled by this category;

(12) Any other oxidizer not elsewhere identified in this category specifically designed, modified, adapted, or configured (e.g., formulated) for military application.

*(e) Binders, and mixtures thereof:

(1) AMMO (azidomethylmethyloxetane and its polymers) (CAS 90683–29–7) (see paragraph (g)(1) of this category);

(2) BAMO (bisazidomethyloxetane and its polymers) (CAS 17607–20–4) (see paragraph (g)(1)of this category);

(3) BTTN (butanetrioltrinitrate) (CAS 6659–60–5) (see paragraph (g)(8) of this category);

(4) FAMAO (3-difluoroaminomethyl-3-azidomethyl oxetane) and its polymers;

(5) FEFO (bis-(2-fluoro-2,2-dinitroethyl)formal) (CAS 17003–79–1);

(6) GAP (glycidylazide polymer) (CAS 143178–24–9) and its derivatives;

(7) HTPB (hydroxyl terminated polybutadiene) with a hydroxyl functionality equal to or greater than 2.2 and less than or equal to 2.4, a hydroxyl value of less than 0.77 meq/g, and a viscosity at 30 °C of less than 47 poise (CAS 69102–90–5);

(8) NENAS (nitratoethylnitramine compounds) (CAS 17096–47–8, 85068-73–1 and 82486–82–6);

(9) Poly-NIMMO (poly nitratomethylmethyoxetane, poly-NMMO, (poly[3-nitratomethyl-3-methyl oxetane]) (CAS 84051–81–0);

(10) Energetic monomers, plasticizers and polymers containing nitro, azido nitrate, nitraza or difluoromaino groups specially formulated for military use;

(11) TVOPA 1,2,3-Tris [1,2-bis(difluoroamino) ethoxy]propane; tris vinoxy propane adduct; (CAS 53159–39–0);

(12) Polynitrorthocarbonates;

(13) FPF–1 (poly-2,2,3,3,4,4-hexafluoro pentane-1,5-diolformal) (CAS 376–90–9);

(14) FPF–3 (poly-2,4,4,5,5,6,6-heptafluoro-2-trifluoromethyl-3-oxaheptane-1,7-diolformal);

(15) PGN (Polyglycidylnitrate or poly(nitratomethyl oxirane); poly-GLYN); (CAS 27814–48–8);

WASHAR0000740

(16) N-methyl-p-nitroaniline;

(17) Low (less than 10,000) molecular weight, alcohol-functionalized, poly(epichlorohydrin); poly(epichlorohydrindiol); and triol;

(18) Bis(2,2-dinitropropyl) formal and acetal;

(19) Any other binder and mixture thereof not elsewhere identified in this category specifically designed, modified, adapted, or configured (e.g., formulated) for military application.

(f) Additives:

(1) Basic copper salicylate (CAS 62320–94–9);

(2) BHEGA (Bis-(2-hydroxyethyl)glycolamide) (CAS 17409–41–5);

(3) Ferrocene Derivatives:

(i) Butacene (CAS 125856–62–4);

(ii) Catocene (2,2-Bis-ethylferrocenyl propane) (CAS 37206–42–1);

(iii) Ferrocene carboxylic acids;

(iv) n-butyl-ferrocene (CAS 31904–29–7);

(4) Lead beta-resorcylate (CAS 20936–32–7);

(5) Lead citrate (CAS 14450–60–3);

(6) Lead-copper chelates of beta-resorcylate or salicylates (CAS 68411–07–4);

(7) Lead maleate (CAS 19136–34–6);

(8) Lead salicylate (CAS 15748–73–9);

(9) Lead stannate (CAS 12036–31–6);

(10) MAPO (tris-1-(2-methyl)aziridinyl phosphine oxide) (CAS 57–39–6); BOBBA–8 (bis(2-methyl aziridinyl) 2-(2-hydroxypropanoxy) propylamino phosphine oxide); and other MAPO derivatives;

(11) Methyl BAPO (Bis(2-methyl aziridinyl) methylamino phosphine oxide) (CAS 85068–72–0);

(12) 3-Nitraza-1,5 pentane diisocyanate (CAS 7406–61–9);

29

WASHAR0000741

(13) Organo-metallic coupling agents, specifically:

(i) Neopentyl[diallyl]oxy, tri [dioctyl] phosphatotitanate (CAS 103850–22–2); also known as titanium IV, 2,2[bis 2-propenolato-methyl, butanolato, tris (dioctyl) phosphato] (CAS 110438–25–0), or LICA 12 (CAS 103850–22–2);

(ii) Titanium IV, [(2-propenolato-1) methyl, n-propanolatomethyl] butanolato-1, tris(dioctyl)pyrophosphate, or KR3538;

(iii) Titanium IV, [2-propenolato-1)methyl, propanolatomethyl] butanolato-1, tris(dioctyl) phosphate;

(14) Polyfunctional aziridine amides with isophthalic, trimesic (BITA or butylene imine trimesamide), isocyanuric, or trimethyladipic backbone structures and 2-methyl or 2-ethyl substitutions on the aziridine ring and its polymers;

(15) Superfine iron oxide ($Fe_2O_3$hematite) with a specific surface area more than 250 m$^2$/g and an average particle size of 0.003 [micro]m or less (CAS 1309–37–1);

(16) TEPAN (tetraethylenepentaamineacrylonitrile) (CAS 68412–45–3); cyanoethylated polyamines and their salts;

(17) TEPANOL (Tetraethylenepentaamineacrylo-nitrileglycidol) (CAS 110445–33–5); cyanoethylated polyamines adducted with glycidol and their salts;

(18) TPB (triphenyl bismuth) (CAS 603–33–8);

(19) PCDE (Polycyanodifluoroaminoethyleneoxide);

(20) BNO (Butadienenitrileoxide);

(21) Any other additive not elsewhere identified in this category specifically designed, modified, adapted, or configured (e.g., formulated) for military application.

(g) Precursors, as follows:

(1) BCMO (bischloromethyloxetane) (CAS 142173–26–0) (see paragraphs (e)(1) and (2) of this category);

(2) Dinitroazetidine-t-butyl salt (CAS 125735–38–8) (see paragraph (a)(27) of this category);

(3) HBIW (hexabenzylhexaazaisowurtzitane) (CAS 124782–15–6) (see paragraph (a)(4) of this category);

(4) TAIW (tetraacetyldibenzylhexa-azaisowurtzitane) (see paragraph (a)(4) of this category);

30

WASHAR0000742

(5) TAT (1, 3, 5, 7-tetraacetyl-1, 3, 5, 7-tetraaza-cyclooctane) (CAS 41378–98–7) (see paragraph (a)(12) of this category);

(6) Tetraazadecalin (CAS 5409–42–7) (see paragraph (a)(26) of this category);

(7) 1,3,5-trichorobenzene (CAS 108–70–3) (see paragraph (a)(22) of this category);

(8) 1,2,4-trihydroxybutane (1,2,4-butanetriol) (CAS 3068–00–6) (see paragraph (e)(3) of this category);

(h) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles numerated in paragraphs (a) through (g) of this category. (See §125.4 of this subchapter for exemptions.) Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(i) The following interpretations explain and amplify the terms used in this category and elsewhere in this subchapter.

(1) Category V contains explosives, energetic materials, propellants and pyrotechnics and specially formulated fuels for aircraft, missile and naval applications. Explosives are solid, liquid or gaseous substances or mixtures of substances, which, in their primary, booster or main charges in warheads, demolition or other military applications, are required to detonate.

(2) Paragraph (c)(6)(ii)(A) of this category does not control boron and boron carbide enriched with boron-10 (20% or more of total boron-10 content.

(3) The resulting product of the combination of any controlled or non-controlled substance compounded or mixed with any item controlled by this subchapter is also subject to the controls of this category.

Note 1: To assist the exporter, an item has been categorized by the most common use. Also, a reference has been provided to the related controlled precursors (e.g., see paragraph (a)(12) of this category). Regardless of where the item has been placed in the category, all exports are subject to the controls of this subchapter.

Note 2: Chemical Abstract Service (CAS) registry numbers do not cover all the substances and mixtures controlled by this category. The numbers are provided as examples to assist the government agencies in the license review process and the exporter when completing their license application and export documentation.

**Category VI—Vessels of War and Special Naval Equipment.**

*(a) Warships, amphibious warfare vessels, landing craft, mine warfare vessels, patrol vessels and any vessels specifically designed or modified for military purposes. (See §121.15.)

31

WASHAR0000743

(b) Patrol craft without armor, armament or mounting surfaces for weapon systems more significant than .50 caliber machine guns or equivalent and auxiliary vessels. (See §121.15.)

*(c) Turrets and gun mounts, arresting gear, special weapons systems, protective systems, submarine storage batteries, catapults, mine sweeping equipment (including mine countermeasures equipment deployed by aircraft) and other significant naval systems specifically designed or modified for combatant vessels.

(d) Harbor entrance detection devices (magnetic, pressure, and acoustic) and controls therefor.

*(e) Naval nuclear propulsion plants, their land prototypes, and special facilities for their construction, support, and maintenance. This includes any machinery, device, component, or equipment specifically developed, designed or modified for use in such plants or facilities. (See §123.20)

(f) All specifically designed or modified components, parts, accessories, attachments, and associated equipment for the articles in paragraphs (a) through (e) of this category.

(g) Technical data (as defined in §120.10) and defense services (as defined in §120.9) directly related to the defense articles enumerated in paragraphs (a) through (f) of this category. (See §125.4 for exemptions.) Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

**Category VII—Tanks and Military Vehicles**

*(a) Military type armed or armored vehicles, military railway trains, and vehicles specifically designed or modified to accommodate mountings for arms or other specialized military equipment or fitted with such items.

*(b) Military tanks, combat engineer vehicles, bridge launching vehicles, half-tracks and gun carriers.

(c) Military trucks, trailers, hoists, and skids specifically designed, modified, or equipped to mount or carry weapons of Categories I, II and IV of this section or for carrying and handling the articles in paragraph (a) of Categories III and IV of this section.

*(d) Military recovery vehicles.

*(e) Amphibious vehicles.

*(f) Engines specifically designed or modified for the vehicles in paragraphs (a), (b), and (e) of this category.

WASHAR0000744

(g) All specifically designed or modified components, parts, accessories, attachments, and associated equipment for the articles in this category, including but not limited to military bridges and deep water fording kits.

(h) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (g) of this category. Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(i) The following explains and amplifies the terms used in this category and elsewhere in this subchapter.

(1) An amphibious vehicle in paragraph (e) of this category is an automotive vehicle or chassis which embodies all-wheel drive, is equipped to meet special military requirements, and which has sealed electrical system or adaptation features for deep water fording.

(2) The articles in this category include any end item, component, accessory, attachment part, firmware, software or system that has been designed or manufactured using technical data and defense service controlled by this category.

**Category VIII—Aircraft and Associated Equipment**

*(a) Aircraft, including but not limited to helicopters, non-expansive balloons, drones, and lighter-than-air aircraft, which are specifically designed, modified, or equipped for military purposes. This includes but is not limited to the following military purposes: Gunnery, bombing, rocket or missile launching, electronic and other surveillance, reconnaissance, refueling, aerial mapping, military liaison, cargo carrying or dropping, personnel dropping, airborne warning and control, and military training. (See §121.3.)

*(b) Military aircraft engines, except reciprocating engines, specifically designed or modified for the aircraft in paragraph (a) of this category, and all specifically designed military hot section components ( *i.e.* , combustion chambers and liners; high pressure turbine blades, vanes, disks and related cooled structure; cooled low pressure turbine blades, vanes, disks and related cooled structure; cooled augmenters; and cooled nozzles) and digital engine controls (e.g., Full Authority Digital Engine Controls (FADEC) and Digital Electronic Engine Controls (DEEC)). However, if such military hot section components and digital engine controls are manufactured to engineering drawings dated on or before January 1, 1970, with no subsequent changes or revisions to such drawings, they are controlled under Category VIII(h).

*(c) Cartridge-actuated devices utilized in emergency escape of personnel and airborne equipment (including but not limited to airborne refueling equipment) specifically designed or modified for use with the aircraft and engines of the types in paragraphs (a) and (b) of this category.

WASHAR0000745

(d) Launching and recovery equipment for the articles in paragraph (a) of this category, if the equipment is specifically designed or modified for military use. Fixed land-based arresting gear is not included in this category.

*(e) Inertial navigation systems, aided or hybrid inertial navigation systems, Inertial Measurement Units (IMUs), and Attitude and Heading Reference Systems (AHRS) specifically designed, modified, or configured for military use and all specifically designed components, parts and accessories. For other inertial reference systems and related components refer to Category XII(d).

Note: (1) Category XII(d) or Category VIII(e) does not include quartz rate sensors if such items:

(i) Are integrated into and included as an integral part of a commercial primary or commercial standby instrument system for use on civil aircraft prior to export or exported solely for integration into such a commercial primary or standby instrument system, and

(ii) When the exporter has been informed in writing by the Department of State that a specific quartz rate sensor integrated into a commercial primary or standby instrument system has been determined to be subject to the licensing jurisdiction of the Department of Commerce in accordance with this section.

(2) For controls in these circumstances, see the Commerce Control List. In all other circumstances, quartz rate sensors remain under the licensing jurisdiction of the Department of State under Category XII(d) or Category VIII(e) of the U.S. Munitions List and subject to the controls of the ITAR.

(f) Developmental aircraft, engines, and components thereof specifically designed, modified, or equipped for military uses or purposes, or developed principally with U.S. Department of Defense funding, excluding such aircraft, engines, and components subject to the jurisdiction of the Department of Commerce.

Note: Developmental aircraft, engines, and components thereof, having no commercial application at the time of this amendment and which have been specifically designed for military uses or purposes, or developed principally with U.S. Department of Defense funding, will be considered eligible for a CCL license when actually applied to a commercial aircraft or commercial aircraft engine program. Exporters may seek to establish commercial application either on a case-by-case basis through submission of documentation demonstrating application to a commercial program in requesting an export license application from Commerce in respect of a specific export or, in the case of use for broad categories of aircraft, engines, or components, a commodity jurisdiction from State.

*(g) Ground effect machines (GEMS) specifically designed or modified for military use, including but not limited to surface effect machines and other air cushion vehicles, and all components, parts, and accessories, attachments, and associated equipment specifically designed or modified for use with such machines.

WASHAR0000746

(h) Components, parts, accessories, attachments, and associated equipment (including ground support equipment) specifically designed or modified for the articles in paragraphs (a) through (d) of this category, excluding aircraft tires and propellers used with reciprocating engines.

Note: The Export Administration Regulations (EAR) administered by the Department of Commerce control any component, part, accessory, attachment, and associated equipment (including propellers) designed exclusively for civil, non-military aircraft (see §121.3 of this subchapter for the definition of military aircraft) and control any component, part, accessory, attachment, and associated equipment designed exclusively for civil, non-military aircraft engines. The International Traffic in Arms Regulations administered by the Department of State control any component, part, accessory, attachment, and associated equipment designed, developed, configured, adapted or modified for military aircraft, and control any component, part, accessory, attachment, and associated equipment designed, developed, configured, adapted or modified for military aircraft engines. For components and parts that do not meet the above criteria, including those that may be used on either civil or military aircraft, the following requirements apply. A non-SME component or part (as defined in §§121.8(b) and (d) of this subchapter) that is not controlled under another category of the USML, that: (a) Is standard equipment; (b) is covered by a civil aircraft type certificate (including amended type certificates and supplemental type certificates) issued by the Federal Aviation Administration for a civil, non-military aircraft (this expressly excludes military aircraft certified as restricted and any type certification of Military Commercial Derivative Aircraft); and (c) is an integral part of such civil aircraft, is subject to the jurisdiction of the EAR. In the case of any part or component designated as SME in this or any other USML category, a determination that such item may be excluded from USML coverage based on the three criteria above always requires a commodity jurisdiction determination by the Department of State under §120.4 of this subchapter. The only exception to this requirement is where a part or component designated as SME in this category was integral to civil aircraft prior to August 14, 2008. For such part or component, U.S. exporters are not required to seek a commodity jurisdiction determination from State, unless doubt exists as to whether the item meets the three criteria above (See §120.3 and §120.4 of this subchapter). Also, U.S. exporters are not required to seek a commodity jurisdiction determination from State regarding any non-SME component or part (as defined in §§121.8(b) and (d) of this subchapter) that is not controlled under another category of the USML, unless doubt exists as to whether the item meets the three criteria above (See §120.3 and §120.4 of this subchapter). These commodity jurisdiction determinations will ensure compliance with this section and the criteria of Section 17(c) of the Export Administration Act of 1979. In determining whether the three criteria above have been met, consider whether the same item is common to both civil and military applications without modification of the item's form, fit, or function. Some examples of parts or components that are not common to both civil and military applications are tail hooks, rotodomes, and low observable rotor blades. "Standard equipment" is defined as a part or component manufactured in compliance with an established and published industry specification or an established and published government specification (e.g., AN, MS, NAS, or SAE). Parts and components that are manufactured and tested to established but unpublished civil aviation industry specifications and standards are also "standard equipment," e.g., pumps, actuators, and generators. A part or component is not standard equipment if there are any performance, manufacturing or testing requirements beyond such specifications and standards. Simply testing a part or component to meet a military specification or standard for civil purposes does not in and of itself change the

WASHAR0000747

jurisdiction of such part or component. Integral is defined as a part or component that is installed in an aircraft. In determining whether a part or component may be considered as standard equipment and integral to a civil aircraft (e.g., latches, fasteners, grommets, and switches) it is important to carefully review all of the criteria noted above. For example, a part approved solely on a non-interference/provisions basis under a type certificate issued by the Federal Aviation Administration would not qualify. Similarly, unique application parts or components not integral to the aircraft would also not qualify.

(i) Technical data (as defined in §120.10) and defense services (as defined in §120.9) directly related to the defense articles enumerated in paragraphs (a) through (h) of this category (see §125.4 for exemptions), except for hot section technical data associated with commercial aircraft engines. Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

**Category IX—Military Training Equipment and Training**

(a) Training equipment specifically designed, modified, configured or adapted for military purposes, including but not limited to weapons system trainers, radar trainers, gunnery training devices, antisubmarine warfare trainers, target equipment, armament training units, pilot-less aircraft trainers, navigation trainers and human-rated centrifuges.

(b) Simulation devices for the items covered by this subchapter.

(c) Tooling and equipment specifically designed or modified for the production of articles controlled by this category.

(d) Components, parts, accessories, attachments, and associated equipment specifically designed, modified, configured, or adapted for the articles in paragraphs (a), (b) and (c) of this category.

(e) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (d) of this category.

(f) The following interpretations explain and amplify terms used in this category and elsewhere in this subchapter:

(1) The weapons systems trainers in paragraph (a) of this category include individual crew stations and system specific trainers;

(2) The articles in this category include any end item, components, accessory, part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category;

(3) The defense services and related technical data in paragraph (f) of this category include software and associated databases that can be used to simulate trainers, battle management, test

WASHAR0000748

scenarios/models, and weapons effects. In any instance when the military training transferred to a foreign person does not use articles controlled by the U.S. Munitions List, the training may nevertheless be a defense service that requires authorization in accordance with this subchapter. See e.g., §120.9 and §124.1 of this subchapter for additional information on military training.

## Category X—Protective Personnel Equipment and Shelters

(a) Protective personnel equipment specifically designed, developed, configured, adapted, modified, or equipped for military applications. This includes but is not limited to:

(1) Body armor;

(2) Clothing to protect against or reduce detection by radar, infrared (IR) or other sensors at wavelengths greater than 900 nanometers, and the specially treated or formulated dyes, coatings, and fabrics used in its design, manufacture, and production;

(3) Anti-Gravity suits (G-suits);

(4) Pressure suits capable of operating at altitudes above 55,000 feet sea level;

(5) Atmosphere diving suits designed, developed, modified, configured, or adapted for use in rescue operations involving submarines controlled by this subchapter;

(6) Helmets specially designed, developed, modified, configured, or adapted to be compatible with military communication hardware or optical sights or slewing devices;

(7) Goggles, glasses, or visors designed to protect against lasers or thermal flashes discharged by an article subject to this subchapter.

(b) Permanent or transportable shelters specifically designed and modified to protect against the effect of articles covered by this subchapter as follows:

(1) Ballistic shock or impact;

(2) Nuclear, biological, or chemical contamination.

(c) Tooling and equipment specifically designed or modified for the production of articles controlled by this category.

(d) Components, parts, accessories, attachments, and associated equipment specifically designed, modified, configured, or adapted for use with the articles in paragraphs (a) through (c) of this category.

(e) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (d) of this category.

WASHAR0000749

(f) The following interpretations explain and amplify the terms used in this category and throughout this subchapter: (1) The body armor covered by this category does not include Type 1, Type 2, Type 2a, or Type 3a as defined by the National Institute of Justice Classification;

(2) The articles in this category include any end item, components, accessory, attachment, part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category;

(3) Pressure suits in paragraph (a) (4) of this category include full and partial suits used to simulate normal atmospheric pressure conditions at high altitude.

**Category XI—Military Electronics**

(a) Electronic equipment not included in Category XII of the U.S. Munitions List which is specifically designed, modified or configured for military application. This equipment includes but is not limited to:

*(1) Underwater sound equipment to include active and passive detection, identification, tracking, and weapons control equipment.

*(2) Underwater acoustic active and passive countermeasures and counter-countermeasures.

(3) Radar systems, with capabilities such as:

*(i) Search,

*(ii) Acquisition,

*(iii) Tracking,

*(iv) Moving target indication,

*(v) Imaging radar systems,

(vi) Any ground air traffic control radar which is specifically designed or modified for military application.

*(4) Electronic combat equipment, such as:

(i) Active and passive countermeasures,

(ii) Active and passive counter-countermeasures, and

(iii) Radios (including transceivers) specifically designed or modified to interfere with other communication devices or transmissions.

38

WASHAR0000750

*(5) Command, control and communications systems to include radios (transceivers), navigation, and identification equipment.

(6) Computers specifically designed or developed for military application and any computer specifically modified for use with any defense article in any category of the U.S. Munitions List.

(7) Any experimental or developmental electronic equipment specifically designed or modified for military application or specifically designed or modified for use with a military system.

*(b) Electronic systems or equipment specifically designed, modified, or configured for intelligence, security, or military purposes for use in search, reconnaissance, collection, monitoring, direction-finding, display, analysis and production of information from the electromagnetic spectrum and electronic systems or equipment designed or modified to counteract electronic surveillance or monitoring. A system meeting this definition is controlled under this subchapter even in instances where any individual pieces of equipment constituting the system may be subject to the controls of another U.S. Government agency. Such systems or equipment described above include, but are not limited to, those:

(1) Designed or modified to use cryptographic techniques to generate the spreading code for spread spectrum or hopping code for frequency agility. This does not include fixed code techniques for spread spectrum.

(2) Designed or modified using burst techniques (e.g., time compression techniques) for intelligence, security or military purposes.

(3) Designed or modified for the purpose of information security to suppress the compromising emanations of information-bearing signals. This covers TEMPEST suppression technology and equipment meeting or designed to meet government TEMPEST standards. This definition is not intended to include equipment designed to meet Federal Communications Commission (FCC) commercial electro-magnetic interference standards or equipment designed for health and safety.

(c) Components, parts, accessories, attachments, and associated equipment specifically designed or modified for use with the equipment in paragraphs (a) and (b) of this category, except for such items as are in normal commercial use.

(d) Technical data (as defined in §120.10) and defense services (as defined in §120.9) directly related to the defense articles enumerated in paragraphs (a) through (c) of this category. (See §125.4 for exemptions.) Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated as SME.

**Category XII—Fire Control, Range Finder, Optical and Guidance and Control Equipment**

*(a) Fire control systems; gun and missile tracking and guidance systems; gun range, position, height finders, spotting instruments and laying equipment; aiming devices (electronic, optic, and

WASHAR0000751

acoustic); bomb sights, bombing computers, military television sighting and viewing units, and periscopes for the articles of this section.

*(b) Lasers specifically designed, modified or configured for military application including those used in military communication devices, target designators and range finders, target detection systems, and directed energy weapons.

*(c) Infrared focal plane array detectors specifically designed, modified, or configured for military use; image intensification and other night sighting equipment or systems specifically designed, modified or configured for military use; second generation and above military image intensification tubes (defined below) specifically designed, developed, modified, or configured for military use, and infrared, visible and ultraviolet devices specifically designed, developed, modified, or configured for military application. Military second and third generation image intensification tubes and military infrared focal plane arrays identified in this subparagraph are licensed by the Department of Commerce (ECCN 6A002A and 6A003A)) when part of a commercial system ( *i.e.,* those systems originally designed for commercial use). This does not include any military system comprised of non-military specification components. Replacement tubes or focal plane arrays identified in this paragraph being exported for commercial systems are subject to the controls of the ITAR.

Note: *Special definition.* For purposes of this subparagraph, *second and third generation image intensification tubes* are defined as having: A peak response within the 0.4 to 1.05 micron wavelength range and incorporating a microchannel plate for electron image amplification having a hole pitch (center-to-center spacing) of less than 25 microns and having either:

(a) An S–20, S–25 or multialkali photocathode; or

(b) A GaAs, GaInAs, or other compound semiconductor photocathode.

*(d) Inertial platforms and sensors for weapons or weapon systems; guidance, control and stabilization systems except for those systems covered in Category VIII; astro-compasses and star trackers and military accelerometers and gyros. For aircraft inertial reference systems and related components refer to Category VIII.

(e) Components, parts, accessories, attachments and associated equipment specifically designed or modified for the articles in paragraphs (a) through (d) of this category, except for such items as are in normal commercial use.

(f) Technical data (as defined in §120.10) and defense services (as defined in §120.9) directly related to the defense articles enumerated in paragraphs (a) through (e) of this category. (See §125.4 for exemptions.) Technical data directly related to manufacture and production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated as SME.

**Category XIII—Auxiliary Military Equipment**

40

WASHAR0000752

(a) Cameras and specialized processing equipment therefor, photointerpretation, stereoscopic plotting, and photogrammetry equipment which are specifically designed, developed, modified, adapted, or configured for military purposes, and components specifically designed or modified therefor;

(b) Military Information Security Assurance Systems and equipment, cryptographic devices, software, and components specifically designed, developed, modified, adapted, or configured for military applications (including command, control and intelligence applications). This includes:
(1) Military cryptographic (including key management) systems, equipment assemblies, modules, integrated circuits, components or software with the capability of maintaining secrecy or confidentiality of information or information systems, including equipment and software for tracking, telemetry and control (TT&C) encryption and decryption;

(2) Military cryptographic (including key management) systems, equipment, assemblies, modules, integrated circuits, components of software which have the capability of generating spreading or hopping codes for spread spectrum systems or equipment;

(3) Military cryptanalytic systems, equipment, assemblies, modules, integrated circuits, components or software;

(4) Military systems, equipment, assemblies, modules, integrated circuits, components or software providing certified or certifiable multi-level security or user isolation exceeding Evaluation Assurance Level (EAL) 5 of the Security Assurance Evaluation Criteria and software to certify such systems, equipment or software;

(5) Ancillary equipment specifically designed, developed, modified, adapted, or configured for the articles in paragraphs (b)(1), (2), (3), and (4) of this category.

(c) Self-contained diving and underwater breathing apparatus as follows:

(1) Closed and semi-closed (rebreathing) apparatus;

(2) Specially designed components and parts for use in the conversion of open-circuit apparatus to military use; and,

(3) Articles exclusively designed for military use with self-contained diving and underwater swimming apparatus.

(d) Carbon/carbon billets and preforms not elsewhere controlled by this subchapter (e.g., Category IV) which are reinforced with continuous unidirectional tows, tapes, or woven cloths in three or more dimensional planes (e.g., 3D, 4D) specifically designed, developed, modified, configured or adapted for defense articles.

(e) Armor (e.g., organic, ceramic, metallic), and reactive armor and components, parts and accessories not elsewhere controlled by this subchapter which have been specifically designed, developed, modified, configured or adapted for a military application.

41

WASHAR0000753

(f) Structural materials, including carbon/carbon and metal matrix composites, plate, forgings, castings, welding consumables and rolled and extruded shapes that have been specifically designed, developed, configured, modified or adapted for defense articles.

(g) Concealment and deception equipment specifically designed, developed, modified, configured or adapted for military application, including but not limited to special paints, decoys, smoke or obscuration equipment and simulators and components, parts and accessories specifically designed, developed, modified, configured or adapted therefor.

(h) Energy conversion devices for producing electrical energy from nuclear, thermal, or solar energy, or from chemical reaction that are specifically designed, developed, modified, configured or adapted for military application.

(i) Metal embrittling agents.

*(j) Hardware and equipment, which has been specifically designed or modified for military applications, that is associated with the measurement or modification of system signatures for detection of defense articles. This includes but is not limited to signature measurement equipment; reduction techniques and codes; signature materials and treatments; and signature control design methodology.

(k) Tooling and equipment specifically designed or modified for the production of articles controlled by this category.

(l) Technical data (as defined in §120.10 of this subchapter), and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (k) of this category. (See also, §123.20 of this subchapter.) Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designed SME.

(m) The following interpretations explain and amplify terms used in this category and elsewhere in this subchapter:

(1) Paragraph (d) of this category does not control carbon/carbon billets and preforms where reinforcement in the third dimension is limited to interlocking of adjacent layers only, and carbon/carbon 3D, 4D, etc. end items that have not been specifically designed or modified for military applications (e.g., brakes for commercial aircraft or high speed trains);

(2) Metal embrittlement agents in paragraph (i) of this category are non-lethal weapon substances that alter the crystal structure of metals within a short time span. Metal embrittling agents severely weaken metals by chemically changing their molecular structure. These agents are compounded in various substances to include adhesives, liquids, aerosols, foams and lubricants.

WASHAR0000754

**Category XIV—Toxicological Agents, Including Chemical Agents, Biological Agents, and Associated Equipment**

*(a) Chemical agents, to include:

(1) Nerve agents:

(i) O-Alkyl (equal to or less than $C_{10}$, including cycloalkyl) alkyl (Methyl, Ethyl, n-Propyl or Isopropyl)phosphonofluoridates, such as: Sarin (GB): O-Isopropyl methylphosphonofluoride (CAS 107–44–8) (CWC Schedule 1A); and Soman (GD): O-Pinacolyl methylphosphonofluoride (CAS 96–64–0) (CWC Schedule 1A);

(ii) O-Alkyl (equal to or less than $C_{10}$, including cycloalkyl) N,N-dialkyl (Methyl, Ethyl, n-Propyl or Isopropyl)phosphoramidocyanidates, such as: Tabun (GA): O-Ethyl N, N-dimethylphosphoramidocyanidate (CAS 77–81–6) (CWC Schedule 1A);

(iii) O-Alkyl (H or equal to or less than $C_{10}$, including cycloalkyl) S–2-dialkyl (Methyl, Ethyl, n-Propyl or Isopropyl)aminoethyl alkyl (Methyl, Ethyl, n-Propyl or Isopropyl)phosphonothiolates and corresponding alkylated and protonated salts, such as: VX: O-Ethyl S-2-diisopropylaminoethyl methyl phosphonothiolate (CAS 50782–69–9) (CWC Schedule 1A);

(2) Amiton: O,O-Diethyl S-[2(diethylamino)ethyl] phosphorothiolate and corresponding alkylated or protonated salts (CAS 78–53–5) (CWC Schedule 2A);

(3) Vesicant agents:

(i) Sulfur mustards, such as: 2-Chloroethylchloromethylsulfide (CAS 2625–76–5) (CWC Schedule 1A); Bis(2-chloroethyl)sulfide (CAS 505–60–2) (CWC Schedule 1A); Bis(2-chloroethylthio)methane (CAS 63839–13–6) (CWC Schedule 1A); 1,2-bis (2-chloroethylthio)ethane (CAS 3563–36–8) (CWC Schedule 1A); 1,3-bis (2-chloroethylthio)-n-propane (CAS 63905–10–2) (CWC Schedule 1A); 1,4-bis (2-chloroethylthio)-n-butane (CWC Schedule 1A); 1,5-bis (2-chloroethylthio)-n-pentane (CWC Schedule 1A); Bis (2-chloroethylthiomethyl)ether (CWC Schedule 1A); Bis (2-chloroethylthioethyl)ether (CAS 63918–89–8) (CWC Schedule 1A);

(ii) Lewisites, such as: 2-chlorovinyldichloroarsine (CAS 541–25–3) (CWC Schedule 1A); Tris (2-chlorovinyl) arsine (CAS 40334–70–1) (CWC Schedule 1A); Bis (2-chlorovinyl) chloroarsine (CAS 40334–69–8) (CWC Schedule 1A);

(iii) Nitrogen mustards, such as: HN1: bis (2-chloroethyl) ethylamine (CAS 538–07–8) (CWC Schedule 1A); HN2: bis (2-chloroethyl) methylamine (CAS 51–75–2) (CWC Schedule 1A); HN3: tris (2-chloroethyl)amine (CAS 555–77–1) (CWC Schedule 1A);

(iv) Ethyldichloroarsine (ED);

(v) Methyldichloroarsine (MD);

43

WASHAR0000755

(4) Incapacitating agents, such as:

(i) 3-Quinuclindinyl benzilate (BZ) (CAS 6581–06–2) (CWC Schedule 2A);

(ii) Diphenylchloroarsine (DA) (CAS 712–48–1);

(iii) Diphenylcyanoarsine (DC);

*(b) Biological agents and biologically derived substances specifically developed, configured, adapted, or modified for the purpose of increasing their capability to produce casualties in humans or livestock, degrade equipment or damage crops.

*(c) Chemical agent binary precursors and key precursors, as follows:

(1) Alkyl (Methyl, Ethyl, n-Propyl or Isopropyl) phosphonyl diflourides, such as: DF: Methyl Phosphonyldifluoride (CAS 676–99–3) (CWC Schedule 1B); Methylphosphinyldiflouride;

(2) O-Alkyl (H or equal to or less than $C_{10}$, including cycloalkyl) O–2-dialkyl (methyl, ethyl, n-Propyl or isopropyl)aminoethyl alkyl (methyl, ethyl, N-propyl or isopropyl)phosphonite and corresponding alkylated and protonated salts, such as: QL: O-Ethyl-2-di-isopropylaminoethyl methylphosphonite (CAS 57856–11–8) (CWC Schedule 1B);

(3) Chlorosarin: O-Isopropyl methylphosphonochloridate (CAS 1445–76–7) (CWC Schedule 1B);

(4) Chlorosoman: O-Pinakolyl methylphosphonochloridate (CAS 7040–57–5) (CWC Schedule 1B);

(5) DC: Methlyphosphonyl dichloride (CAS 676–97–1) (CWC Schedule 2B); Methylphosphinyldichloride;

(d) Tear gases and riot control agents including:

(1) Adamsite (Diphenylamine chloroarsine or DM) (CAS 578–94–9);

(2) CA (Bromobenzyl cyanide) (CAS 5798–79–8);

(3) CN (Phenylacyl chloride or w-Chloroacetophenone) (CAS 532–27-4);

(4) CR (Dibenz-(b,f)-1,4-oxazephine) (CAS 257–07–8);

(5) CS (o-Chlorobenzylidenemalononitrile or o-Chlorobenzalmalononitrile) (CAS 2698–41–1);

(6) Dibromodimethyl ether (CAS 4497–29–4);

(7) Dichlorodimethyl ether (ClCi) (CAS 542–88–1);

44

WASHAR0000756

(8) Ethyldibromoarsine (CAS 683–43–2);

(9) Bromo acetone;

(10) Bromo methylethylketone;

(11) Iodo acetone;

(12) Phenylcarbylamine chloride;

(13) Ethyl iodoacetate;

(e) Defoliants, as follows:

(1) Agent Orange (2,4,5–Trichlorophenoxyacetic acid mixed with 2,4-dichlorophenoxyacetic acid);

(2) LNF (Butyl 2-chloro-4-fluorophenoxyacetate)

*(f) Equipment and its components, parts, accessories, and attachments specifically designed or modified for military operations and compatibility with military equipment as follows:

(1) The dissemination, dispersion or testing of the chemical agents, biological agents, tear gases and riot control agents, and defoliants listed in paragraphs (a), (b), (d), and (e), respectively, of this category;

(2) The detection, identification, warning or monitoring of the chemical agents and biological agents listed in paragraph (a) and (b) of this category;

(3) Sample collection and processing of the chemical agents and biological agents listed in paragraph (a) and (b) of this category;

(4) Individual protection against the chemical and biological agents listed in paragraphs (a) and (b) of this category.

(5) Collective protection against the chemical agents and biological agents listed in paragraph (a) and (b) of this category.

(6) Decontamination or remediation of the chemical agents and biological agents listed in paragraph (a) and (b) of this category.

(g) Antibodies, polynucleoides, biopolymers or biocatalysts specifically designed or modified for use with articles controlled in paragraph (f) of this category.

(h) Medical countermeasures, to include pre- and post-treatments, vaccines, antidotes and medical diagnostics, specifically designed or modified for use with the chemical agents listed in

45

WASHAR0000757

paragraph (a) of this category and vaccines with the sole purpose of protecting against biological agents identified in paragraph (b) of this category. Examples include: barrier creams specifically designed to be applied to skin and personal equipment to protect against vesicant agents controlled in paragraph (a) of this category; atropine auto injectors specifically designed to counter nerve agent poisoning.

(i) Modeling or simulation tools specifically designed or modified for chemical or biological weapons design, development or employment. The concept of modeling and simulation includes software covered by paragraph (m) of this category specifically designed to reveal susceptibility or vulnerability to biological agents or materials listed in paragraph (b) of this category.

(j) Test facilities specifically designed or modified for the certification and qualification of articles controlled in paragraph (f) of this category.

(k) Equipment, components, parts, accessories, and attachments, exclusive of incinerators (including those which have specially designed waste supply systems and special handling facilities), specifically designed or modified for destruction of the chemical agents in paragraph (a) or the biological agents in paragraph (b) of this category. This destruction equipment includes facilities specifically designed or modified for destruction operations.

(l) Tooling and equipment specifically designed or modified for the production of articles controlled by paragraph (f) of this category.

(m) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) related to the defense articles enumerated in paragraphs (a) through (l) of this category. (See §125.4 of this subchapter for exemptions.) Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this Category that are designated as Significant Military Equipment (SME) shall itself be designated as SME.

(n) The following interpretations explain and amplify the terms used in this category and elsewhere in this subchapter.

(1) A chemical agent in category XIV(a) is a substance having military application, which by its ordinary and direct chemical action, produces a powerful physiological effect.

(2) The biological agents or biologically derived substances in paragraph (b) of this category are those agents and substances capable of producing casualties in humans or livestock, degrading equipment or damaging crops and which have been modified for the specific purpose of increasing such effects. Examples of such modifications include increasing resistance to UV radiation or improving dissemination characteristics. This does not include modifications made only for civil applications (e.g., medical or environmental use).

(3) The destruction equipment controlled by this category related to biological agents in paragraph (b) is that equipment specifically designed to destroy only the agents identified in paragraph (b) of this category.

WASHAR0000758

(4)(i) The individual protection against the chemical and biological agents controlled by this category includes military protective clothing and masks, but not those items designed for domestic preparedness (e.g., civil defense). Domestic preparedness devices for individual protection that integrate components and parts identified in this subparagraph are licensed by the Department of Commerce when such components are:

(A) Integral to the device;

(B) inseparable from the device; and,

(C) incapable of replacement without compromising the effectiveness of the device.

(ii) Components and parts identified in this subparagraph exported for integration into domestic preparedness devices for individual protection are subject to the controls of the ITAR;

(5) Technical data and defense services in paragraph (l) include libraries, databases and algorithms specifically designed or modified for use with articles controlled in paragraph (f) of this category.

(6) The tooling and equipment covered by paragraph (l) of this category includes molds used to produce protective masks, over-boots, and gloves controlled by paragraph (f) and leak detection equipment specifically designed to test filters controlled by paragraph (f) of this category.

(7) The resulting product of the combination of any controlled or non-controlled substance compounded or mixed with any item controlled by this subchapter is also subject to the controls of this category.

Note 1: This Category does not control formulations containing 1% or less CN or CS or individually packaged tear gases or riot control agents for personal self-defense purposes.

Note 2: Categories XIV(a) and (d) do not include the following:

(1) Cyanogen chloride;

(2) Hydrocyanic acid;

(3) Chlorine;

(4) Carbonyl chloride (Phosgene);

(5) Ethyl bromoacetate;

(6) Xylyl bromide;

(7) Benzyl bromide;

WASHAR0000759

(8) Benzyl iodide;

(9) Chloro acetone;

(10) Chloropicrin (trichloronitromethane);

(11) Fluorine;

(12) Liquid pepper.

Note 3: Chemical Abstract Service (CAS) registry numbers do not cover all the substances and mixtures controlled by this category. The numbers are provided as examples to assist the government agencies in the license review process and the exporter when completing their license application and export documentation.

Note 4: With respect to U.S. obligations under the Chemical Weapons Convention (CWC), refer to Chemical Weapons Convention Regulations (CWCR) (15 CFR parts 710 through 722). As appropriate, the CWC schedule is provided to assist the exporter.

Note 5: Pharmacological formulations containing nitrogen mustards and certain reference standards for these drugs are not considered to be chemical agents and are licensed by the Department of Commerce when:

(1) The drug is in the form of a final medical product; or

(2) The reference standard contains salts of HN2 [bis(2-chloroethyl) methylamine], the quantity to be shipped is 150 milligrams or less, and individual shipments do not exceed twelve per calendar year per end user.

Technical data for the production of HN1 [bis(2-chloroethyl)ethylamine]; HN2 [bis(2-chloroethyl)methylamine], HN3 [tris(2-chloroethyl)amine]; or salts of these, such as tris (2-chloroethyl)amine hydrochloride, remains controlled under this Category.

**Category XV—Spacecraft Systems and Associated Equipment**

*(a) Spacecraft, including communications satellites, remote sensing satellites, scientific satellites, research satellites, navigation satellites, experimental and multi-mission satellites.

*Note to paragraph (a): Commercial communications satellites, scientific satellites, research satellites and experimental satellites are designated as SME only when the equipment is intended for use by the armed forces of any foreign country.

(b) Ground control stations for telemetry, tracking and control of spacecraft or satellites, or employing any of the cryptographic items controlled under category XIII of this subchapter.

WASHAR0000760

(c) Global Positioning System (GPS) receiving equipment specifically designed, modified or configured for military use; or GPS receiving equipment with any of the following characteristics:

(1) Designed for encryption or decryption (e.g., Y-Code) of GPS precise positioning service (PPS) signals;

(2) Designed for producing navigation results above 60,000 feet altitude and at 1,000 knots velocity or greater;

(3) Specifically designed or modified for use with a null steering antenna or including a null steering antenna designed to reduce or avoid jamming signals;

(4) Designed or modified for use with unmanned air vehicle systems capable of delivering at least a 500 kg payload to a range of at least 300 km.

Note: GPS receivers designed or modified for use with military unmanned air vehicle systems with less capability are considered to be specifically designed, modified or configured for military use and therefore covered under this paragraph (d)(4).)

Any GPS equipment not meeting this definition is subject to the jurisdiction of the Department of Commerce (DOC). Manufacturers or exporters of equipment under DOC jurisdiction are advised that the U.S. Government does not assure the availability of the GPS P-Code for civil navigation. It is the policy of the Department of Defense (DOD) that GPS receivers using P-Code without clarification as to whether or not those receivers were designed or modified to use Y-Code will be presumed to be Y-Code capable and covered under this paragraph. The DOD policy further requires that a notice be attached to all P-Code receivers presented for export. The notice must state the following: "ADVISORY NOTICE: This receiver uses the GPS P-Code signal, which by U.S. policy, may be switched off without notice."

(d) Radiation-hardened microelectronic circuits that meet or exceed all five of the following characteristics:

(1) A total dose of $5 \times 10^5$ Rads (Si);

(2) A dose rate upset threshold of $5 \times 10^8$ Rads (Si)/sec;

(3) A neutron dose of $1 \times 10^{14}$ n/cm$^2$ (1 MeV equivalent);

(4) A single event upset rate of $1 \times 10^{-10}$ errors/bit-day or less, for the CREME96 geosynchronous orbit, Solar Minimum Environment;

(5) Single event latch-up free and having a dose rate latch-up threshold of $5 \times 10^8$ Rads (Si).

(e) All specifically designed or modified systems or subsystems, components, parts, accessories, attachments, and associated equipment for the articles in this category, including the articles

49

identified in section 1516 of Public Law 105–261: satellite fuel, ground support equipment, test equipment, payload adapter or interface hardware, replacement parts, and non-embedded solid propellant orbit transfer engines (see also Categories IV and V in this section).

Note: This coverage by the U.S. Munitions List does not include the following unless specifically designed or modified for military application (see §120.3 of this subchapter): (For controls on these items see the Export Administration Regulations, Commerce Control List (15 CFR Parts 730 through 799).)

(1) Space qualified travelling wave tubes (also known as helix tubes or TWTs), microwave solid state amplifiers, microwave assemblies, and travelling wave tube amplifiers operating at frequencies equal to or less than 31GHz.

(2) Space qualified photovoltaic arrays having silicon cells or having single, dual, triple junction solar cells that have gallium arsenide as one of the junctions.

(3) Space qualified tape recorders.

(4) Atomic frequency standards that are not space qualified.

(5) Space qualified data recorders.

(6) Space qualified telecommunications systems, equipment and components not designed or modified for satellite uses.

(7) Technology required for the development or production of telecommunications equipment specifically designed for non-satellite uses.

(8) Space qualified focal plane arrays having more than 2048 elements per array and having a peak response in the wavelength range exceeding 300nm but not exceeding 900nm.

(9) Space qualified laser radar or Light Detection and Ranging (LIDAR) equipment.

(f) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the articles enumerated in paragraphs (a) through (e) of this category, as well as detailed design, development, manufacturing or production data for all spacecraft and specifically designed or modified components for all spacecraft systems. This paragraph includes all technical data, without exception, for all launch support activities (e.g., technical data provided to the launch provider on form, fit, function, mass, electrical, mechanical, dynamic, environmental, telemetry, safety, facility, launch pad access, and launch parameters, as well as interfaces for mating and parameters for launch.) (See §124.1 for the requirements for technical assistance agreements before defense services may be furnished even when all the information relied upon by the U.S. person in performing the defense service is in the public domain or is otherwise exempt from the licensing requirements of this subchapter.) Technical data directly related to the manufacture or production of any article enumerated elsewhere in this category that is designated as Significant Military Equipment (SME) shall itself

WASHAR0000762

be designated SME. Further, technical data directly related to the manufacture or production of all spacecraft, notwithstanding the nature of the intended end use (e.g., even where the hardware is not SME), is designated SME.

Note to paragraph (f): The special export controls contained in §124.15 of this subchapter are always required before a U.S. person may participate in a launch failure investigation or analysis and before the export of any article or defense service in this category for launch in, or by nationals of, a country that is not a member of the North Atlantic Treaty Organization or a major non-NATO ally of the United States. Such special export controls also may be imposed with respect to any destination as deemed appropriate in furtherance of the security and foreign policy of the United States.

## Category XVI—Nuclear Weapons, Design and Testing Related Items

*(a) Any article, material, equipment, or device which is specifically designed or modified for use in the design, development, or fabrication of nuclear weapons or nuclear explosive devices. (See §123.20 of this subchapter and Department of Commerce Export Administration Regulations, 15 CFR 742.3 and 744.2).

*(b) Any article, material, equipment, or device which is specifically designed or modified for use in the devising, carrying out, or evaluating of nuclear weapons tests or any other nuclear explosions (including for modeling or simulating the employment of nuclear weapons or the integrated operational use of nuclear weapons), except such items as are in normal commercial use for other purposes.

*(c) Nuclear radiation detection and measurement devices specifically designed or modified for military applications.

(d) All specifically designed or modified components and parts, accessories, attachments, and associated equipment for the articles in this category.

(e) Technical data (as defined in §120.10 of this subchapter), and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (d) of this category. (See also, §123.20 of this subchapter.) Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

## Category XVII—Classified Articles, Technical Data and Defense Services Not Otherwise Enumerated

(a) All articles, technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) relating thereto which are classified in the interests of national security and which are not otherwise enumerated in the U.S. Munitions List.

## Category XVIII—Directed Energy Weapons

WASHAR0000763

*(a) Directed energy weapon systems specifically designed or modified for military applications (e.g., destruction, degradation or rendering mission-abort of a target). These include, but are not limited to:

(1) Laser systems, including continuous wave or pulsed laser systems, specifically designed or modified to cause blindness;

(2) Lasers of sufficient continuous wave or pulsed power to effect destruction similar to the manner of conventional ammunition;

(3) Particle beam systems;

(4) Particle accelerators that project a charged or neutral particle beam with destructive power;

(5) High power radio-frequency (RF) systems;

(6) High pulsed power or high average power radio frequency beam transmitters that produce fields sufficiently intense to disable electronic circuitry at distant targets;

(7) Prime power generation, energy storage, switching, power conditioning, thermal management or fuel-handling equipment;

(8) Target acquisition or tracking systems;

(9) Systems capable or assessing target damage, destruction or mission-abort;

(10) Beam-handling, propagation or pointing equipment;

(11) Equipment with rapid beam slew capability for rapid multiple target operations;

(12) Negative ion beam funneling equipment; and,

(13) Equipment for controlling and slewing a high-energy ion beam.

*(b) Equipment specifically designed or modified for the detection or identification of, or defense against, articles controlled in paragraph (a) of this category.

(c) Tooling and equipment specifically designed or modified for the production of defense articles controlled by this category.

(d) Test and evaluation equipment and test models specifically designed or modified for the defense articles controlled by this category. This includes, but is not limited to, diagnostic instrumentation and physical test models.

(e) Components, parts, accessories, attachments and associated equipment specifically designed or modified for the articles in paragraphs (a) through (d) of this category.

WASHAR0000764

(f) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (e) of this category. Technical data directly related to the manufacture or production of any defense articles enumerated in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(g) The following interpretations explain and amplify terms used in this category and elsewhere in this subchapter:

(1) The components, parts, accessories, attachments and associated equipment include, but are not limited to adaptive optics and phase conjugators components, space-qualified accelerator components, targets and specifically designed target diagnostics, current injectors for negative hydrogen ion beams, and space-qualified foils for neutralizing negative hydrogen isotope beams.

(2) The particle beam systems in paragraph (a)(3) of this category include devices embodying particle beam and electromagnetic pulse technology and associated components and subassemblies (e.g., ion beam current injectors, particle accelerators for neutral or charged particles, beam handling and projection equipment, beam steering, fire control, and pointing equipment, test and diagnostic instruments, and targets) which are specifically designed or modified for directed energy weapon applications.

(3) The articles controlled in this category include any end item, component, accessory, attachment, part, firmware, software or system that has been designed or manufactured using technical data and defense services controlled by this category.

(4) The articles specifically designed or modified for military application controlled in this category include any articles specifically developed, configured, or adapted for military application.

**Category XIX [Reserved]**

**Category XX—Submersible Vessels, Oceanographic and Associated Equipment**

*(a) Submersible vessels, manned or unmanned, tethered or untethered, designed or modified for military purposes, or powered by nuclear propulsion plants.

*(b) Swimmer delivery vehicles designed or modified for military purposes.

(c) Equipment, components, parts, accessories, and attachments specifically designed or modified for any of the articles in paragraphs (a) and (b) of this category.

(d) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a) through (c) of this category. (See §125.4 of this subchapter for exemptions.) Technical data directly related to the manufacture or production of any defense articles enumerated elsewhere in

WASHAR0000765

this Category that are designated as Significant Military Equipment (SME) shall itself be designated as SME.

## Category XXI—Miscellaneous Articles

(a) Any article not specifically enumerated in the other categories of the U.S. Munitions List which has substantial military applicability and which has been specifically designed, developed, configured, adapted, or modified for military purposes. The decision on whether any article may be included in this category shall be made by the Director, Office of Defense Trade Controls Policy.

(b) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraph (a) of this category.

[58 FR 39287, July 22, 1993]

**Editorial Note:**   For Federal Register citations affecting §121.1, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and on GPO Access.

### § 121.2   Interpretations of the U.S. Munitions List and the Missile Technology Control Regime Annex.

The following interpretations (listed alphabetically) explain and amplify the terms used in §121.1. These interpretations have the same force as if they were a part of the U.S. Munitions List (USML) category to which they refer. In addition, all the items listed in §121.16 shall constitute all items on the United States Munitions List which are Missile Technology Control Regime Annex items in accordance with section 71(a) of the Arms Export Control Act.

### § 121.3   Aircraft and related articles.

In Category VIII, *aircraft* means aircraft designed, modified, or equipped for a military purpose, including aircraft described as "demilitarized." All aircraft bearing an original military designation are included in Category VIII. However, the following aircraft are not included so long as they have not been specifically equipped, re-equipped, or modified for military operations:

(a) Cargo aircraft bearing "C" designations and numbered C–45 through C–118 inclusive, C–121 through C–125 inclusive, and C–131, using reciprocating engines only.

(b) Trainer aircraft bearing "T" designations and using reciprocating engines or turboprop engines with less than 600 horsepower (s.h.p.)

(c) Utility aircraft bearing "U" designations and using reciprocating engines only.

(d) All liaison aircraft bearing an "L" designation.

54

WASHAR0000766

(e) All observation aircraft bearing "O" designations and using reciprocating engines.

## § 121.4   [Reserved]

## § 121.5   Apparatus and devices under Category IV(c).

Category IV includes but is not limited to the following: Fuzes and components specifically designed, modified or configured for items listed in that category, bomb racks and shackles, bomb shackle release units, bomb ejectors, torpedo tubes, torpedo and guided missile boosters, guidance systems equipment and parts, launching racks and projectors, pistols (exploders), ignitors, fuze arming devices, intervalometers, thermal batteries, hardened missile launching facilities, guided missile launchers and specialized handling equipment, including transporters, cranes and lifts designed to handle articles in paragraphs (a) and (b) of this category for preparation and launch from fixed and mobile sites. The equipment in this category includes robots, robot controllers and robot end-effectors specially designed or modified for military applications.

## §§ 121.6-121.7   [Reserved]

## § 121.8   End-items, components, accessories, attachments, parts, firmware, software and systems.

 (a) An *end-item* is an assembled article ready for its intended use. Only ammunition, fuel or another energy source is required to place it in an operating state.

(b) A *component* is an item which is useful only when used in conjunction with an end-item. A major component includes any assembled element which forms a portion of an end-item without which the end-item is inoperable. (Example: Airframes, tail sections, transmissions, tank treads, hulls, etc.) A minor component includes any assembled element of a major component.

(c) *Accessories* and *attachments* are associated equipment for any component, end-item or system, and which are not necessary for their operation, but which enhance their usefulness or effectiveness. (Examples: Military riflescopes, special paints, etc.)

(d) A *part* is any single unassembled element of a major or a minor component, accessory, or attachment which is not normally subject to disassembly without the destruction or the impairment of design use. (Examples: Rivets, wire, bolts, etc.)

(e) Firmware and any related unique support tools (such as computers, linkers, editors, test case generators, diagnostic checkers, library of functions and system test diagnostics) specifically designed for equipment or systems covered under any category of the U.S. Munitions List are considered as part of the end-item or component. *Firmware* includes but is not limited to circuits into which software has been programmed.

(f) *Software* includes but is not limited to the system functional design, logic flow, algorithms, application programs, operating systems and support software for design, implementation, test,

WASHAR0000767

operation, diagnosis and repair. A person who intends to export software only should, unless it is specifically enumerated in §121.1 (e.g., XIII(b)), apply for a technical data license pursuant to part 125 of this subchapter.

(g) A *system* is a combination of end-items, components, parts, accessories, attachments, firmware or software, specifically designed, modified or adapted to operate together to perform a specialized military function.

## § 121.9   [Reserved]

## § 121.10   Forgings, castings and machined bodies.

Articles on the U.S. Munitions List include articles in a partially completed state (such as forgings, castings, extrusions and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions List (including components, accessories, attachments and parts as defined in §121.8), then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this subchapter, except for such items as are in normal commercial use.

## § 121.11   Military demolition blocks and blasting caps.

Military demolition blocks and blasting caps referred to in Category IV(a) do not include the following articles:

(a) Electric squibs.

(b) No. 6 and No. 8 blasting caps, including electric ones.

(c) Delay electric blasting caps (including No. 6 and No. 8 millisecond ones).

(d) Seismograph electric blasting caps (including SSS, Static-Master, Vibrocap SR, and SEISMO SR).

(e) Oil well perforating devices.

## §§ 121.12-121.14   [Reserved]

## § 121.15   Vessels of war and special naval equipment.

Vessels of war means vessels, waterborne or submersible, designed, modified or equipped for military purposes, including vessels described as developmental, "demilitarized" or decommissioned. Vessels of war in Category VI, whether developmental, "demilitarized" and/or decommissioned or not, include, but are not limited to, the following:

(a) Combatant vessels: (1) Warships (including nuclear-powered versions):

WASHAR0000768

(i) Aircraft carriers.

(ii) Battleships.

(iii) Cruisers.

(iv) Destroyers.

(v) Frigates.

(vi) Submarines.

(2) Other Combatants:

(i) Patrol Combatants (e.g., including but not limited to PHM).

(ii) Amphibious Aircraft/Landing Craft Carriers.

(iii) Amphibious Materiel/Landing Craft Carriers.

(iv) Amphibious Command Ships.

(v) Mine Warfare Ships.

(vi) Coast Guard Cutters (e.g., including but not limited to: WHEC, WMEC).

(b) Combatant Craft: (1) Patrol Craft (patrol craft described in §121.1, Category VI, paragraph (b) are considered non-combatant):

(i) Coastal Patrol Combatants.

(ii) River, Roadstead Craft (including swimmer delivery craft).

(iii) Coast Guard Patrol Craft (e.g., including but not limited to WPB).

(2) Amphibious Warfare Craft:

(i) Landing Craft (e.g., including but not limited to LCAC).

(ii) Special Warfare Craft (e.g., including but not limited to: LSSC, MSSC, SDV, SWCL, SWCM).

(3) Mine Warfare Craft and Mine Countermeasures Craft (e.g., including but not limited to: MCT, MSB).

(c) Non-Combatant Auxiliary Vessels and Support Ships:

WASHAR0000769

(1) Combat Logistics Support:

(i) Underway Replenishment Ships.

(ii) Surface Vessel and Submarine Tender/Repair Ships.

(2) Support Ships:

(i) Submarine Rescue Ships.

(ii) Other Auxiliaries (e.g., including but not limited to: AGDS, AGF, AGM, AGOR, AGOS, AH, AP, ARL, AVB, AVM, AVT).

(d) Non-Combatant Support, Service and Miscellaneous Vessels (e.g., including but not limited to: DSRV, DSV, NR, YRR).

[58 FR 60115, Nov. 15, 1993]

### § 121.16   Missile Technology Control Regime Annex.

Some of the items on the Missile Technology Control Regime Annex are controlled by both the Department of Commerce on the Commodity Control List and by the Department of State on the United States Munitions List. To the extent an article is on the United States Munitions List, a reference appears in parentheses listing the U.S. Munitions List category in which it appears. The following items constitute all items on the Missile Technology Control Regime Annex which are covered by the U.S. Munitions List:

Item 1—Category I

Complete rocket systems (including ballistic missile systems, space launch vehicles, and sounding rockets (see §121.1, Cat. IV(a) and (b))) and unmanned air vehicle systems (including cruise missile systems, see §121.1, Cat. VIII (a), target drones and reconnaissance drones (see §121.1, Cat. VIII (a))) capable of delivering at least a 500 kg payload to a range of at least 300 km.

Item 2—Category I

Complete subsystems usable in the systems in Item 1 as follows:

(a) Individual rocket stages (see §121.1, Cat. IV(h));

(b) Reentry vehicles (see §121.1, Cat. IV(g)), and equipment designed or modified therefor, as follows, except as provided in Note (1) below for those designed for non-weapon payloads;

(1) Heat shields and components thereof fabricated of ceramic or ablative materials (see §121.1, Cat. IV(f));

58

WASHAR0000770

(2) Heat sinks and components thereof fabricated of light-weight, high heat capacity materials;

(3) Electronic equipment specially designed for reentry vehicles (see §121.1, Cat. XI(a)(7));

(c) Solid or liquid propellant rocket engines, having a total impulse capacity of $1.1 \times 10$ N-sec $(2.5 \times 10$ lb-sec) or greater (see §121.1, Cat. IV, (h)).

(d) "Guidance sets" capable of achieving system accuracy of 3.33 percent or less of the range (e.g., a CEP of 1 j,. or less at a range of 300 km), except as provided in Note (1) below for those designed for missiles with a range under 300 km or manned aircraft (see §121.1, Cat. XII(d));

(e) Thrust vector control sub-systems, except as provided in Note (1) below for those designed for rocket systems that do not exceed the range/payload capability of Item 1 (see §121.1, Cat. IV);

(f) Warhead safing, arming, fuzing, and firing mechanisms, except as provided in Note (1) below for those designed for systems other than those in Item 1 (see §121.1, Cat. IV(h)).

Notes to Item 2

(1) The exceptions in (b), (d), (e), and (f) above may be treated as Category II if the subsystem is exported subject to end use statements and quantity limits appropriate for the excepted end use stated above.

(2) CEP (circle of equal probability) is a measure of accuracy, and defined as the radius of the circle centered at the target, at a specific range, in which 50 percent of the payloads impact.

(3) A "guidance set" integrates the process of measuring and computing a vehicle's position and velocity ( i.e. , navigation) with that of computing and sending commands to the vehicle's flight control systems to correct the trajectory.

(4) Examples of methods of achieving thrust vector control which are covered by (e) include:

(i) Flexible nozzle;

(ii) Fluid or secondary gas injection;

(iii) Movable engine or nozzle; Deflection of exhaust gas stream (jet vanes or probes); or

(v) Use of thrust tabs.

Item 3—Category II

Propulsion components and equipment usable in the systems in Item 1, as follows:

WASHAR0000771

(a) Lightweight turbojet and turbofan engines (including) turbocompound engines) that are small and fuel efficient (see §121.1, both Cat. IV(h) and VIII(b));

(b) Ramjet/Scramjet/pulse jet/combined cycle engines, including devices to regulate combustion, and specially designed components therefor (see §121.1, both Cat. IV(h) and Cat. VIII(b));

(c) Rocket motor cases, "interior lining", "insulation" and nozzles therefor (see §121.1, Cat. IV(h) and Cat. V(c));

(d) Staging mechanisms, separation mechanisms, and interstages therefor (see §121.1, Cat. IV(c) and (h));

(e) Liquid and slurry propellant (including oxidizers) control systems, and specially designed components therefor, designed or modified to operate in vibration environments of more than 100 g RMS between 20 Hz and,000 Hz (see §121.1, Cat. IV(c) and (h));

(f) Hybrid rocket motors and specially designed components therefor (see §121.1, Cat. IV(h)).

Notes to Item 3

(1) Item 3(a) engines may be exported as part of a manned aircraft or in quantities appropriate for replacement parts for manned aircraft.

(2) In Item 3(C), "interior lining" suited for the bond interface between the solid propellant and the case or insulating liner is usually a liquid polymer based dispersion of refractory or insulating materials, e.g., carbon filled HTPB or other polymer with added curing agents to be sprayed or screeded over a case interior (see §121.1, Cat. V(c)).

(3) In Item 3(c), "insulation" intended to be applied to the components of a rocket motor, *i.e.*, the case, nozzle inlets, case closures, includes cured or semi-cured compounded rubber sheet stock containing an insulating or refractory material. It may also be incorporated as stress relief boots or flaps.

(4) The only servo valves and pumps covered in (e) above, are the following:

(i) Servo valves designed for flow rates of 24 liters per minute or greater, at an absolute pressure of 7,000 kPa (1,000 psi) or greater, that have an actuator response time of less than 100 msec;

(ii) Pumps, for liquid propellants, with shaft speeds equal to or greater than 8,000 RPM or with discharge pressures equal to or greater than 7,000 kPa (1,000 psi).

(5) Item 3(e) systems and components may be exports as part of a satellite.

Item 4—Category II

Propellants and constituent chemicals for propellants as follows:

WASHAR0000772

(a) Propulsive substances:

(1) Hydrazine with a concentration of more than 70 percent and its derivatives including monomethylhydrazine (MMH);

(2) Unsymmetric dimethylhydrazine (UDHM);

(3) Ammonium perchlorate;

(4) Sphercical aluminum powder with particle of uniform diameter of less than $500 \times 10^{-6}$M (500 microns) and an aluminum content of 97 percent or greater;

(5) Metal fuels in particle sizes less than $500 \times 10^{-6}$M (500 microns), whether spherical, atomized, spheriodal, flaked or ground, consisting of 97 percent or more of any of the following: zirconium, beryllium, boron, magnesium, zinc, and alloys of these;

(6) Nitroamines (cyclotetramethylenetetranitramene (HMX), cyclotrimethylenetrinitramine (RDX);

(7) Percholrates, chlorates or chromates mixed with powdered metals or other high energy fuel components;

(8) Carboranes, decaboranes, pentaboranes and derivatives thereof;

(9) Liquid oxidizers, as follows:

(i) Nitrogen dioxide/dinitrogen tetroxide;

(ii) Inhibited Red Fuming Nitric Acid (IRFNA);

(iii) Compounds composed of fluorine and one or more of other halogens, oxygen or nitrogen.

(b) Polymeric substances:

(1) Hydroxyterminated polybutadiene (HTPB);

(2) Glycidylazide polymer (GAP).

(c) Other high energy density propellants such a Boron Slurry having an energy density of $40 \times 10$ joules/kg or greater.

(d) Other propellants additives and agents:

(1) Bonding agents as follows:

(i) Tris (1(2methyl)aziridinyl phosphine oxide (MAPO);

61

WASHAR0000773

(ii) Trimesol 1(2)ethyl)aziridine (HX868, BITA);

(iii) "Tepanol" (HX878), reaction product of tetraethylenepentamine, acrylonitrile and glycidol;

(iv) "Tepan" (HX879), reaction product of tet enepentamine and acrylonitrile;

(v) Polyfunctional aziridene amides with isophthalic, trimesic, isocyanuric, or trimethyladipic backbone also having a 2methyl or 2ethyl aziridine group (HX752, HX872 and HX877).

(2) Curing agents and catalysts as follows:

(i) Triphenyl bismuth (TPB);

(ii) Burning rate modifiers as follows:

(iii) Catocene;

(iv) Nbutylferrocene;

(v) Other ferrocene derivatives.

(3) Nitrate esters and nitrato plasticizers as follows:

(i) 1,2,4butanetriol trinitrate (BTTN).

(4) Stabilizers as follows:

(i) Nmethylpnitroaniline.

Item 8—Category II

Structural materials usable in the systems in Item 1, as follows:

(a) Composite structures, laminates, and manufactures thereof, including resin impregnated fibre prepregs and metal coated fibre preforms therefor, specially designed for use in the systems in Item 1 and the subsystems in Item 2 made either with organix matrix or metal matrix utilizing fibrous or filamentary reinforcements having a specific tensile strength greater than $7.62 \times 10^4$ m ($3 \times 10^6$ inches) and a specific modules greater than $3.18 \times 10^6$ m ($1.25 \times 10^8$ inches), (see §121.1, Category IV (f), and Category XIII (d));

(b) Resaturated pyrolized ( *i.e.* , carbon-carbon) materials designed for rocket systems, (see §121.1 Category IV (f));

(c) Fine grain recrystallized bulk graphites (with a bulk density of at least 1.72 g/cc measured at 15 degrees C), pyrolytic, or fibrous reinforced graphites useable for rocket nozzles and reentry vehicle nose tips (see §121.1, Category IV (f) and Category XIII;

WASHAR0000774

(d) Ceramic composites materials (dielectric constant less than 6 at frequencies from 100 Hz to 10,000 MHz) for use in missile radomes, and bulk machinable silicon-carbide reinforced unfired ceramic useable for nose tips (see §121.1, Category IV (f));

Item 9—Category II

Instrumentation, navigation and direction finding equipment and systems, and associated production and test equipment as follows; and specially designed components and software therefor:

(a) Integrated flight instrument systems, which include gyrostabilizers or automatic pilots and integration software therefor; designed or modified for use in the systems in Item 1 (See §121.1, Category XII(d));

(b) Gyro-astro compasses and other devices which derive position or orientation by means of automatically tracking celestial bodies or satellites (see §121.1, Category XV(d));

(c) Accelerometers with a threshold of 0.05 g or less, or a linearity error within 0.25 percent of full scale output, or both, which are designed for use in inertial navigation systems or in guidance systems of all types (see §121.1, Category VIII(e) and Category XII (d));

(d) All types of gyros usable in the systems in Item 1, with a rated drift rate stability of less than 0.5 degree (1 sigma or rms) per hour in a 1 q environment (see §121.1, Category VIII(e) and Category XII(d));

(e) Continuous output accelerometers or gyros of any type, specified to function at acceleration levels greater than 100 g (see §121.1, Category XII(d));

(f) Inertial or other equipment using accelerometers described by subitems (c) and (e) above, and systems incorporating such equipment, and specially designed integration software therefor (see §121.1, Category VIII (e) and Category XII(d));

Notes to Item 9

(1) Items (a) through (f) may be exported as part of a manned aircraft or satellite or in quantities appropriate for replacement parts for manned aircraft.

(2) In subitem (d):

(i) Drift rate is defined as the time rate of output deviation from the desired output. It consists of random and systematic components and is expressed as an equivalent angular displacement per unit time with respect to inertial space.

(ii) Stability is defined as standard deviation (1 sigma) of the variation of a particular parameter from its calibrated value measured under stable temperature conditions. This can be expressed as a function of time.

WASHAR0000775

Item 10—Category II

Flight control systems and "technology" as follows; designed or modified for the systems in Item 1.

(a) Hydraulic, mechanical, electro-optical, or electro-mechanical flight control systems (including fly-by-wire systems), (see §121.1, Category IV (h));

(b) Attitude control equipment, (see §121.1, Category IV, (c) and (h));

(c) Design technology for integration of air vehicle fuselage, propulsion system and lifting control surfaces to optimize aerodynamic performance throughout the flight regime of an unmanned air vehicle, (see §121.1, Category VIII (k));

(d) Design technology for integration of the flight control, guidance, and propulsion data into a flight management system for optimization of rocket system trajectory, (see §121.1, Category IV (i)).

Note to Item 10

Items (a) and (b) may be exported as part of a manned aircraft or satellite or in quantities appropriate for replacement parts for manned aircraft.

Item 11—Category II

Avionics equipment, "technology" and components as follows; designed or modified for use in the systems in Item 1, and specially designed software therefor:

(a) Radar and laser radar systems, including altimeters (see §121.1, Category XI(a)(3));

(b) Passive sensors for determining bearings to specific electromagnetic sources (direction finding equipment) or terrain characteristics (see §121.1, Category XI(b) and (d));

(c) Global Positioning System (GPS) or similar satellite receivers;

(1) Capable of providing navigation information under the following operational conditions:

(i) At speeds in excess of 515 m/sec (1,000 nautical miles/hours); and

(ii) At altitudes in excess of 18 km (60,000 feet), (see §121.1, Category XV(d)(2); or

(2) Designed or modified for use with unmanned air vehicles covered by Item 1 (see §121.1, Category XV(d)(4)).

(d) Electronic assemblies and components specifically designed for military use and operation at temperatures in excess of 125 degrees C, (see §121.1, Category XI(a)(7)).

WASHAR0000776

(e) Design technology for protection of avionics and electrical subsystems against electromagnetic pulse (EMP) and electromagnetic interference (EMI) hazards from external sources, as follows, (see §121.1, Category XI (b)).

(1) Design technology for shielding systems;

(2) Design technology for the configuration of hardened electrical circuits and subsystems;

(3) Determination of hardening criteria for the above.

Notes to Item 11

(1) Item 11 equipment may be exported as part of a manned aircraft or satellite or in quantities appropriate for replacement parts for manned aircraft.

(2) Examples of equipment included in this Item:

(i) Terrain contour mapping equipment;

(ii) Scene mapping and correlation (both digital and analog) equipment;

(iii) Doppler navigation radar equipment;

(iv) Passive interferometer equipment;

(v) Imaging sensor equipment (both active and passive);

(3) In subitem (a), laser radar systems embody specialized transmission, scanning, receiving and signal processing techniques for utilization of lasers for echo ranging, direction finding and discrimination of targets by location, radial speed and body reflection characteristics.

Item 12—Category II

Launch support equipment, facilities and software for the systems in Item 1, as follows:

(a) Apparatus and devices designed or modified for the handling, control, activation and launching of the systems in Item 1, (see §121.1, Category IV(c));

(b) Vehicles designed or modified for the transport, handling, control, activation and launching of the systems in Item 1, (see §121.1, Category VII(d));

(c) Telemetering and telecontrol equipment usable for unmanned air vehicles or rocket systems, (see §121.1, Category XI(a));

(d) Precision tracking systems:

WASHAR0000777

(1) Tracking systems which use a translb nv installed on the rocket system or unmanned air vehicle in conjunction with either surface or airborne references or navigation satellite systems to provide real-time measurements of in-flight position and velocity, (see §121.1, Category XI(a));

(2) Range instrumentation radars including associated optical/infrared trackers and the specially designed software therefor with all of the following capabilities (see §121.1, Category XI(a)(3)):

(i) angular resolution better than 3 milli-radians (0.5 mils);

(ii) range of 30 km or greater with a range resolution better than 10 meters RMS;

(iii) velocity resolution better than 3 meters per second.

(3) Software which processes post-flight, recorded data, enabling determination of vehicle position throughout its flight path (see §121.1, Category IV(i)).

Item 13—Category II

Analog computers, digital computers, or digital differential analyzers designed or modified for use in the systems in Item 1 (see §121.1, Category XI (a)(6), having either of the following characteristics:

(a) Rated for continuous operation at temperature from below minus 45 degrees C to above plus 55 degrees C; or

(b) Designed as ruggedized or "radiation hardened".

Note to Item 13

Item 13 equipment may be exported as part of a manned aircraft or satellite or in quantities appropriate for replacement parts for manned aircraft.

Item 14—Category II

Analog-to-digital converters, usable in the system in Item 1, having either of the following characteristics:

(a) Designed to meet military specifications for ruggedized equipment (see §121.1, Category XI(d)); or,

(b) Designed or modified for military use (see §121.1, Category XI(d)); and being one of the following types:

(1) Analog-to-digital converter "microcircuits," which are "radiation hardened" or have all of the following characteristics:

66

WASHAR0000778

(i) Having a resolution of 8 bits or more;

(ii) Rated for operation in the temperature range from below minus 54 degrees C to above plus 125 degrees C; and

(iii) Hermetically sealed.

(2) Electrical input type analog-to-digital converter printed circuit boards or modules, with all of the following characteristics:

(i) Having a resolution of 8 bits or more;

(ii) Rated for operation in the temperature range from below minus 45 degrees C to above plus 55 degrees C; and

(iii) Incorporated "microcircuits" listed in (1), above.

Item 16—Category II

Specially designed software, or specially designed software with related specially designed hybrid (combined analog/digital) computers, for modeling, simulation, or design integration of the systems in Item 1 and Item 2 (see §121.1, Category IV(i) and Category XI(a)(6)).

Note to Item 16

The modelling includes in particular the aerodynamic and thermodynamic analysis of the system.

Item 17—Category II

Materials, devices, and specially designed software for reduced observables such as radar reflectivity, ultraviolet/infrared signatures on acoustic signatures ( *i.e.* , stealth technology), for applications usable for the systems in Item 1 or Item 2 (see §121.1, Category XIII (e) and (k)), for example:

(a) Structural material and coatings specially designed for reduced radar reflectivity;

(b) Coatings, including paints, specially designed for reduced or tailored reflectivity or emissivity in the microwave, infrared or ultraviolet spectra, except when specially used for thermal control of satellites.

(c) Specially designed software or databases for analysis of signature reduction.

(d) Specially designed radar cross section measurement systems (see §121.1, Category XI(a)(3)).

Item 18—Category II

WASHAR0000779

Devices for use in protecting rocket systems and unmanned air vehicles against nuclear effects (e.g. Electromagnetic Pulse (EMP), X-rays, combined blast and thermal effects), and usable for the systems in Item 1, as follows (see §121.1, Category IV (c) and (h)):

(a) "Radiation Hardened" "microcircuits" and detectors (see §121.1, Category XI(c)(3) Note: This commodity has been formally proposed for movement to category XV(e)(2) in the near future).

(b) Radomes designed to withstand a combined thermal shock greater than 1000 cal/sq cm accompanied by a peak over pressure of greater than 50 kPa (7 pounds per square inch) (see §121.1, Category IV(h)).

Note to Item 18(a)

A detector is defined as a mechanical, electrical, optical or chemical device that automatically identifies and records, or registers a stimulus such as an environmental change in pressure or temperature, an electrical or electromagnetic signal or radiation from a radioactive material. The following pages were removed from the final ITAR for replacement by DDTC's updated version §6(l) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(l)), as amended. In accordance with this provision, the list of MTCR Annex items shall constitute all items on the U.S. Munitions List in §121.16.

[58 FR 39287, July 22, 1993, as amended at 71 FR 20539, Apr. 21, 2006]

WASHAR0000780

## PART 122—REGISTRATION OF MANUFACTURERS AND EXPORTERS

**Section Contents**

§ 122.1   Registration requirements.
§ 122.2   Submission of registration statement.
§ 122.3   Registration fees.
§ 122.4   Notification of changes in information furnished by registrants.
§ 122.5   Maintenance of records by registrants.

**Authority:**   Secs. 2 and 38, Public Law 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778); E.O. 11958, 42 FR 4311; 1977 Comp. p. 79, 22 U.S.C. 2651a.

**Source:**   58 FR 39298, July 22, 1993, unless otherwise noted.

### § 122.1   Registration requirements.

(a) Any person who engages in the United States in the business of either manufacturing or exporting defense articles or furnishing defense services is required to register with the Directorate of Defense Trade Controls. For the purpose of this subchapter, engaging in the business of manufacturing or exporting defense articles or furnishing defense services requires only one occasion of manufacturing or exporting a defense article or furnishing a defense service. Manufacturers who do not engage in exporting must nevertheless register.

(b) *Exemptions.* Registration is not required for:

(1) Officers and employees of the United States Government acting in an official capacity.

(2) Persons whose pertinent business activity is confined to the production of unclassified technical data only.

(3) Persons all of whose manufacturing and export activities are licensed under the Atomic Energy Act of 1954, as amended.

(4) Persons who engage only in the fabrication of articles for experimental or scientific purpose, including research and development.

(c) *Purpose.* Registration is primarily a means to provide the U.S. Government with necessary information on who is involved in certain manufacturing and exporting activities. Registration does not confer any export rights or privileges. It is generally a precondition to the issuance of any license or other approval under this subchapter.

[58 FR 39298, July 22, 1993, as amended at 71 FR 20540, Apr. 21, 2006]

WASHAR0000781

**§ 122.2   Submission of registration statement.**

(a) *General.* The Department of State Form DS–2032 (Statement of Registration) and the transmittal letter required by paragraph (b) of this section must be submitted by an intended registrant with a payment by check drawn against the registrant's account, payable to the Department of State of the fee prescribed in §122.3(a) of this subchapter. Checks must be in U.S. currency, and must be payable through a U.S. financial institution. In addition, the Statement of Registration and transmittal letter must be signed by a senior officer (e.g., Chief Executive Officer, President, Secretary, Partner, Member, Treasurer, General Counsel) who has been empowered by the intended registrant to sign such documents. The intended registrant also shall submit documentation that demonstrates that it is incorporated or otherwise authorized to do business in the United States. The Directorate of Defense Trade Controls will notify the registrant if the Statement of Registration is incomplete either by notifying the registrant of what information is required or through the return of the entire registration package. Registrants may not establish new entities for the purpose of reducing registration fees.

(b) *Transmittal letter.* A letter of transmittal, signed by an authorized senior officer of the intended registrant, shall accompany each Statement of Registration.

(1) The letter shall state whether the intended registrant, chief executive officer, president, vice-presidents, other senior officers or officials (e.g. comptroller, treasurer, general counsel) or any member of the board of directors:

(i) Has ever been indicted for or convicted of violating any of the U.S. criminal statutes enumerated in §120.27 of this subchapter; or

(ii) Is ineligible to contract with, or to receive a license or other approval to import defense articles or defense services from, or to receive an export license or other approval from, any agency of the U.S. Government.

(2) The letter shall also declare whether the intended registrant is owned or controlled by foreign persons (as defined in §120.16 of this subchapter). If the intended registrant is owned or controlled by foreign persons, the letter shall also state whether the intended registrant is incorporated or otherwise authorized to engage in business in the United States.

(c) *Definition.* For purpose of this section, *ownership* means that more than 50 percent of the outstanding voting securities of the firm are owned by one or more foreign persons. *Control* means that one or more foreign persons have the authority or ability to establish or direct the general policies or day-to-day operations of the firm. Control is presumed to exist where foreign persons own 25 percent or more of the outstanding voting securities if no U.S. persons control an equal or larger percentage.

[58 FR 39298, July 22, 1993, as amended at 69 FR 70889, Dec. 8, 2004; 71 FR 20540, Apr. 21, 2006; 73 FR 55440, Sept. 25, 2008]

**§ 122.3   Registration fees.**

WASHAR0000782

(a) A person who is required to register must do so on an annual basis upon submission of a completed Form DS–2032, transmittal letter, and payment of a fee as follows:

(1) *Tier 1* : A set fee of $2,250 per year is required for new registrants or registrants for whom the Directorate of Defense Trade Controls has not reviewed, adjudicated or issued a response to any applications during a 12-month period ending 90 days prior to expiration of the current registration.

(2) *Tier 2* : A set fee of $2,750 per year is required for registrants for whom the Directorate of Defense Trade Controls has reviewed, adjudicated or issued a response to between one and ten applications during a 12-month period ending 90 days prior to expiration of the current registration.

(3) *Tier 3* : The third tier is for registrants for whom the Directorate of Defense Trade Controls has reviewed, adjudicated or issued a response to more than ten applications during a 12-month period ending 90 days prior to expiration of the current registration. For this tier, registrants will pay a fee of $2,750 plus an additional fee based on the number of applications for which the Directorate of Defense Trade Controls has reviewed, adjudicated or issued a response. The additional fee will be determined by multiplying $250 times the number of applications over ten for whom the Directorate of Defense Trade Controls has reviewed, adjudicated or issued a response during a 12-month period ending 90 days prior to expiration of the current registration.

(4) For registrants, including universities, exempt from income taxation pursuant to 26 U.S.C. 501(c)(3), their fee may be reduced to the Tier 1 registration fee provided a copy of their certification letter from the Internal Revenue Service is submitted with their registration package. To be eligible, the registrant and all of its subsidiaries/affiliates must be exempt from income taxation pursuant to 26 U.S.C. 501(c)(3).

(5) The fee for registrants whose total registration fee is greater than 3% of the total value of applications for whom the Directorate of Defense Trade Controls has reviewed, adjudicated or issued a response during the 12-month period ending 90 days prior to expiration of the current registration will be reduced to 3% of such total application value or $2,750, whichever is greater.

(6) For those renewing a registration, notice of the fee due for the next year's registration will be sent to the registrant of record at least 60 days prior to its expiration date.

(7) For purposes of this subsection, *"applications"* refers to the actions enumerated within parts 123 through 126 of this subchapter that require the Directorate of Defense Trade Controls to review, adjudicate and issue responses. Only those applications that the Department has taken final action on and provided response to will be counted in determining the annual registration fee. Those applications that are "returned without action" or "denied" will not be counted.

(b) *Expiration of registration.* A registrant must submit its request for registration renewal at least 30 days but no earlier than 60 days prior to the expiration date.

WASHAR0000783

(c) *Lapse in registration.* A registrant who fails to renew a registration and, after an intervening period, seeks to register again must pay registration fees for any part of such intervening period during which the registrant engaged in the business of manufacturing or exporting defense articles or defense services.

[58 FR 39298, July 22, 1993, as amended at 62 FR 27497, May 20, 1997; 69 FR 70889, Dec. 8, 2004; 70 FR 50959, Aug. 29, 2005; 73 FR 41259, July 18, 2008; 73 FR 55440, Sept. 25, 2008]

### § 122.4   Notification of changes in information furnished by registrants.

 (a) A registrant must, within five days of the event, notify the Directorate of Defense Trade Controls by registered mail if:

(1) Any of the persons referred to in §122.2(b) are indicted for or convicted of violating any of the U.S. criminal statutes enumerated in §120.27 of this subchapter, or become ineligible to contract with, or to receive a license or other approval to export or temporarily import defense articles or defense services from any agency of the U.S. government; or

(2) There is a material change in the information contained in the Statement of Registration, including a change in the senior officers; the establishment, acquisition or divestment of a subsidiary or foreign affiliate; a merger; a change of location; or the dealing in an additional category of defense articles or defense services.

(b) A registrant must notify the Directorate of Defense Trade Controls by registered mail at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity thereof. Such notice does not relieve the registrant from obtaining the approval required under this subchapter for the export of defense articles or defense services to a foreign person, including the approval required prior to disclosing technical data. Such notice provides the Directorate of Defense Trade Controls with the information necessary to determine whether the authority of §38(g)(6) of the Arms Export Control Act regarding licenses or other approvals for certain sales or transfers of defense articles or data on the U.S. Munitions List should be invoked (see §§120.10 and 126.1(e) of this subchapter).

(c) The new entity formed when a registrant merges with another company or acquires, or is acquired by, another company or a subsidiary or division of another company shall advise the Directorate of Defense Trade Controls of the following:

(1) The new firm name and all previous firm names being disclosed;

(2) The registration number that will survive and those that are to be discontinued (if any);

(3) The license numbers of all approvals on which unshipped balances will be shipped under the surviving registration number, since any license not the subject of notification will be considered invalid; and

WASHAR0000784

(4) Amendments to agreements approved by the Directorate of Defense Trade Controls to change the name of a party to those agreements. The registrant must, within 60 days of this notification, provide to the Directorate of Defense Trade Controls a signed copy of an amendment to each agreement signed by the new U.S. entity, the former U.S. licensor and the foreign licensee. Any agreements not so amended will be considered invalid.

(d) Prior approval by the Directorate of Defense Trade Controls is required for any amendment making a substantive change.

[58 FR 39298, July 22, 1993, as amended at 71 FR 20540, Apr. 21, 2006]

## § 122.5  Maintenance of records by registrants.

 (a) A person who is required to register must maintain records concerning the manufacture, acquisition and disposition (to include copies of all documentation on exports using exemptions and applications and licenses and their related documentation), of defense articles; of technical data; the provision of defense services; brokering activities; and information on political contributions, fees, or commissions furnished or obtained, as required by part 130 of this subchapter. Records in an electronic format must be maintained using a process or system capable of reproducing all records on paper. Such records when displayed on a viewer, monitor, or reproduced on paper, must exhibit a high degree of legibility and readability. (For the purpose of this section, "legible" and "legibility" mean the quality of a letter or numeral that enables the observer to identify it positively and quickly to the exclusion of all other letters or numerals. "Readable" and "readability" means the quality of a group of letters or numerals being recognized as complete words or numbers.) This information must be stored in such a manner that none of it may be altered once it is initially recorded without recording all changes, who made them, and when they were made. For processes or systems based on the storage of digital images, the process or system must afford accessibility to all digital images in the records being maintained. All records subject to this section must be maintained for a period of five years from the expiration of the license or other approval, to include exports using an exemption (See §123.26 of this subchapter); or, from the date of the transaction (e.g., expired licenses or other approvals relevant to the export transaction using an exemption). The Managing Director, Directorate of Defense Trade Controls, and the Director of the Office of Defense Trade Controls Licensing, may prescribe a longer or shorter period in individual cases.

(b) Records maintained under this section shall be available at all times for inspection and copying by the Directorate of Defense Trade Controls or a person designated by the Directorate of Defense Trade Controls (e.g., the Diplomatic Security Service) or U.S. Immigration and Customs Enforcement, or U.S. Customs and Border Protection. Upon such request, the person maintaining the records must furnish the records, the equipment, and if necessary, knowledgeable personnel for locating, reading, and reproducing any record that is required to be maintained in accordance with this section.

[70 FR 50959, Aug. 29, 2005]

WASHAR0000785

**Intentionally Blank**

WASHAR0000786

## PART 123—LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

**Section Contents**

§ 123.1   Requirement for export or temporary import licenses.
§ 123.2   Import jurisdiction.
§ 123.3   Temporary import licenses.
§ 123.4   Temporary import license exemptions.
§ 123.5   Temporary export licenses.
§ 123.6   Foreign trade zones and U.S. Customs and Border Protection bonded warehouses.
§ 123.7   Exports to warehouses or distribution points outside the United States.
§ 123.8   Special controls on vessels, aircraft and satellites covered by the U.S. Munitions List.
§ 123.9   Country of ultimate destination and approval of reexports or retransfers.
§ 123.10   Non-transfer and use assurances.
§ 123.11   Movements of vessels and aircraft covered by the U.S. Munitions List outside the United States.
§ 123.12   Shipments between U.S. possessions.
§ 123.13   Domestic aircraft shipments via a foreign country.
§ 123.14   Import certificate/delivery verification procedure.
§ 123.15   Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.
§ 123.16   Exemptions of general applicability.
§ 123.17   Exports of firearms and ammunition.
§ 123.18   Firearms for personal use of members of the U.S. Armed Forces and civilian employees of the U.S. Government.
§ 123.19   Canadian and Mexican border shipments.
§ 123.20   Nuclear related controls.
§ 123.21   Duration, renewal and disposition of licenses.
§ 123.22   Filing, retention, and return of export licenses and filing of export information.
§ 123.23   Monetary value of shipments.
§ 123.24   Shipments by U.S. Postal Service.
§ 123.25   Amendments to licenses.
§ 123.26   Recordkeeping requirement for exemptions.
§ 123.27   Special licensing regime for export to U.S. allies of commercial communications satellite components, systems, parts, accessories, attachments and associated technical data.

**Authority:**   Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2753; E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp. p. 79; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228.

**Source:**   58 FR 39299, July 22, 1993, unless otherwise noted.

### § 123.1   Requirement for export or temporary import licenses.

 (a) Any person who intends to export or to import temporarily a defense article must obtain the approval of the Directorate of Defense Trade Controls prior to the export or temporary import,

WASHAR0000787

unless the export or temporary import qualifies for an exemption under the provisions of this subchapter. Applications for export or temporary import must be made as follows:

(1) Applications for licenses for permanent export must be made on Form DSP–5 (unclassified);

(2) Applications for licenses for temporary export must be made on Form DSP–73 (unclassified);

(3) Applications for licenses for temporary import must be made on Form DSP–61 (unclassified); and

(4) Applications for the export or temporary import of classified defense articles or classified technical data must be made on Form DSP–85.

(b) Applications for Department of State export licenses must be confined to proposed exports of defense articles including technical data.

(c) As a condition to the issuance of a license or other approval, the Directorate of Defense Trade Controls may require all pertinent documentary information regarding the proposed transaction and proper completion of the application form as follows:

(1) Form DSP–5, DSP–61, DSP–73, and DSP–85 applications must have an entry in each block where space is provided for an entry. All requested information must be provided.

(2) Attachments and supporting technical data or brochures should be submitted in seven collated copies. Two copies of any freight forwarder lists must be submitted. If the request is limited to renewal of a previous license or for the export of spare parts, only two sets of any attachment (including freight forwarder lists) and one copy of the previous license should be submitted. In the case of fully electronic submissions, unless otherwise expressly required by the Directorate of Defense Trade Controls, applicants need not provide multiple copies of supporting documentation and attachments, supporting technical data or brochures, and freight forwarder lists.

(3) A certification letter signed by an empowered official must accompany all application submissions (see §126.13 of this subchapter).

(4) An application for a license under this part for the permanent export of defense articles sold commercially must be accompanied by a copy of a purchase order, letter of intent or other appropriate documentation. In cases involving the U.S. Foreign Military Sales program, three copies of the relevant Department of Defense Form 1513 are required, unless the procedures of §126.4(c) or §126.6 of this subchapter are followed.

(5) Form DSP–83, duly executed, must accompany all license applications for the permanent export of significant military equipment, including classified hardware or classified technical data (see §§123.10 and 125.3 of this subchapter).

WASHAR0000788

(6) A statement concerning the payment of political contributions, fees and commissions must accompany a permanent export application if the export involves defense articles or defense services valued in an amount of $500,000 or more and is being sold commercially to or for the use of the armed forces of a foreign country or international organization (see part 130 of this subchapter).

(d) Provisions for furnishing the type of defense services described in §120.9(a) of this subchapter are contained in part 124 of this subchapter. Provisions for the export or temporary import of technical data and classified defense articles are contained in part 125 of this subchapter.

(e) A request for a license for the export of unclassified technical data (DSP–5) related to a classified defense article should specify any classified technical data or material that subsequently will be required for export in the event of a sale.

[58 FR 39299, July 22, 1993, as amended at 70 FR 50960, Aug. 29, 2005; 71 FR 20540, Apr. 21, 2006]

## § 123.2   Import jurisdiction.

The Department of State regulates the temporary import of defense articles. Permanent imports of defense articles into the United States are regulated by the Department of the Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives under the direction of the Attorney General (see 27 CFR parts 447, 478, 479, and 555).

[71 FR 20540, Apr. 21, 2006]

## § 123.3   Temporary import licenses.

 (a) A license (DSP–61) issued by the Directorate of Defense Trade Controls is required for the temporary import and subsequent export of unclassified defense articles, unless exempted from this requirement pursuant to §123.4. This requirement applies to:

(1) Temporary imports of unclassified defense articles that are to be returned directly to the country from which they were shipped to the United States;

(2) Temporary imports of unclassified defense articles in transit to a third country;

(b) A bond may be required as appropriate (see part 125 of this subchapter for license requirements for technical data and classified defense articles.)

[58 FR 39299, July 22, 1993, as amended at 71 FR 20540, Apr. 21, 2006]

## § 123.4   Temporary import license exemptions.

WASHAR0000789

(a) Port Directors of U.S. Customs and Border Protection shall permit the temporary import (and subsequent export) without a license, for a period of up to 4 years, of unclassified U.S.-origin defense items (including any items manufactured abroad pursuant to U.S. Government approval) if the item temporarily imported:

(1) Is serviced (e.g., inspection, testing, calibration or repair, including overhaul, reconditioning and one-to-one replacement of any defective items, parts or components, but excluding any modifications, enhancement, upgrade or other form of alteration or improvement that changes the basic performance of the item), and is subsequently returned to the country from which it was imported. Shipment may be made by the U.S. importer or a foreign government representative of the country from which the goods were imported; or

(2) Is to be enhanced, upgraded or incorporated into another item which has already been authorized by the Directorate of Defense Trade Controls for permanent export; or

(3) Is imported for the purpose of exhibition, demonstration or marketing in the United States and is subsequently returned to the country from which it was imported; or

(4) Has been rejected for permanent import by the Department of the Treasury and is being returned to the country from which it was shipped; or

(5) Is approved for such import under the U.S. Foreign Military Sales (FMS) program pursuant to an executed U.S. Department of Defense Letter of Offer and Acceptance (LOA).

Note: These Exceptions do not apply to shipments that transit the U.S. to or from Canada (see §123.19 and §126.5 of this subchapter for exceptions).

(b) Port Directors of U.S. Customs and Border Protection shall permit the temporary import (but not the subsequent export) without a license of unclassified defense articles that are to be incorporated into another article, or modified, enhanced, upgraded, altered, improved or serviced in any other manner that changes the basic performance or productivity of the article prior to being returned to the country from which they were shipped or prior to being shipped to a third country. A DSP–5 is required for the reexport of such unclassified defense articles after incorporation into another article, modification, enhancement, upgrading, alteration or improvement.

(c) *Requirements*. To use an exemption under §123.4 (a) or (b), the following criteria must be met:

(1) The importer must meet the eligibility requirements set forth in §120.1(b) of this subchapter;

(2) At the time of export, the ultimate consignee named on the Shipper's Export Declaration (SED) must be the same as the foreign consignee or end-user of record named at the time of import; and

WASHAR0000790

(3) As stated in §126.1 of this subchapter, the temporary import must not be from or on behalf of a proscribed country listed in that section unless an exception has been granted in accordance with §126.3 of this subchapter.

(d) *Procedures.* To the satisfaction of the Port Director of U.S. Customs and Border Protection, the importer and export must comply with the following procedures:

(1) At the time of temporary import—

(i) File and annotate the applicable U.S. Customs and Border Protection document (e.g., Form CF 3461, 7512, 7501, 7523 or 3311) to read: "This shipment is being imported in accordance with and under the authority of 22 CFR 123.4(a) (identify subsection)," and

(ii) Include, on the invoice or other appropriate documentation, a complete list and description of the defense article(s) being imported, including quantity and U.S. dollar value; and

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the Directorate of Defense Trade Controls (DDTC) registered and eligible exporter, or an agent acting on the filer's behalf, must electronically file the export information using the Automated Export System (AES), and identify 22 CFR 123.4 as the authority for the export and provide, as requested by U.S. Customs and Border Protection, the entry document number or a copy of the U.S. Customs and Border Protection document under which the article was imported.

[58 FR 39299, July 22, 1993, as amended at 64 FR 17533, Apr. 12, 1999; 68 FR 61101, Oct. 27, 2003; 70 FR 50960, Aug. 29, 2005]

### § 123.5   Temporary export licenses.

 (a) The Directorate of Defense Trade Controls may issue a license for the temporary export of unclassified defense articles (DSP–73). Such licenses are valid only if the article will be exported for a period of less than 4 years and will be returned to the United States and transfer of title will not occur during the period of temporary export. Accordingly, articles exported pursuant to a temporary export license may not be sold or otherwise permanently transferred to a foreign person while they are overseas under a temporary export license. A renewal of the license or other written approval must be obtained from the Directorate of Defense Trade Controls if the article is to remain outside the United States beyond the period for which the license is valid.

(b) *Requirements.* Defense articles authorized for temporary export under this section may be shipped only from a port in the United States where a Port Director of U.S. Customs and Border Protection is available, or from a U.S. Post Office (see 39 CFR part 20), as appropriate. The license for temporary export must be presented to the Port Director of U.S. Customs and Border Protection who, upon verification, will endorse the exit column on the reverse side of the license. In some instances of the temporary export of technical data (e.g., postal shipments), self-endorsement will be necessary (see §123.22(b)). The endorsed license for temporary export is to be retained by the licensee. In the case of a military aircraft or vessel exported under its own

WASHAR0000791

power, the endorsed license must be carried on board such vessel or aircraft as evidence that it has been duly authorized by the Department of State to leave the United States temporarily.

(c) Any temporary export license for hardware that is used, regardless of whether the hardware was exported directly to the foreign destination or returned directly from the foreign destination, must be endorsed by the U.S. Customs and Border Protection in accordance with the procedures in §123.22 of this subchapter.

[70 FR 50960, Aug. 29, 2005]

## § 123.6   Foreign trade zones and U.S. Customs and Border Protection bonded warehouses.

Foreign trade zones in the United States and U.S. Customs and Border Protection bonded warehouses are considered integral parts of the United States for the purpose of this subchapter. An export license is therefore not required for shipment between the United States and a foreign trade zone or a U.S. Customs and Border Protection bonded warehouse. In the case of classified defense articles, the provisions of the Department of Defense National Industrial Security Program Operating Manual will apply. An export license is required for all shipments of articles on the U.S. Munitions List from foreign trade zones and U.S. Customs and Border Protection bonded warehouses to foreign countries, regardless of how the articles reached the zone or warehouse.

[71 FR 20540, Apr. 21, 2006]

## § 123.7   Exports to warehouses or distribution points outside the United States.

Unless the exemption under §123.16(b)(1) is used, a license is required to export defense articles to a warehouse or distribution point outside the United States for subsequent resale and will normally be granted only if an agreement has been approved pursuant to §124.14 of this subchapter.

## § 123.8   Special controls on vessels, aircraft and satellites covered by the U.S. Munitions List.

(a) Transferring registration or control to a foreign person of any aircraft, vessel, or satellite on the U.S. Munitions List is an export for purposes of this subchapter and requires a license or written approval from the Directorate of Defense Trade Controls. This requirement applies whether the aircraft, vessel, or satellite is physically located in the United States or abroad.

(b) The registration in a foreign country of any aircraft, vessel or satellite covered by the U.S. Munitions List which is not registered in the United States but which is located in the United States constitutes an export. A license or written approval from the Directorate of Defense Trade Controls is therefore required. Such transactions may also require the prior approval of the U.S. Department of Transportation's Maritime Administration, the Federal Aviation Administration or other agencies of the U.S. Government.

WASHAR0000792

[71 FR 20540, Apr. 21, 2006]

## § 123.9   Country of ultimate destination and approval of reexports or retransfers.

(a) The country designated as the country of ultimate destination on an application for an export license, or on a Shipper's Export Declaration where an exemption is claimed under this subchapter, must be the country of ultimate end-use. The written approval of the Directorate of Defense Trade Controls must be obtained before reselling, transferring, transshipping, or disposing of a defense article to any end user, end use or destination other than as stated on the export license, or on the Shipper's Export Declaration in cases where an exemption is claimed under this subchapter. Exporters must ascertain the specific end-user and end-use prior to submitting an application to the Directorate of Defense Trade Controls or claiming an exemption under this subchapter.

(b) The exporter shall incorporate the following statement as an integral part of the bill of lading, and the invoice whenever defense articles on the U.S. Munitions List are to be exported:

These commodities are authorized by the U.S. Government for export only to [country of ultimate destination] for use by [end-user]. They may not be transferred, transshipped on a non-continuous voyage, or otherwise be disposed of in any other country, either in their original form or after being incorporated into other end-items, without the prior written approval of the U.S. Department of State."

(c) A U.S. person or a foreign person requesting approval for the reexport or retransfer, or change in end-use, of a defense article shall submit a written request which shall be subject to all the documentation required for a permanent export license (see §123.1) and shall contain the following:

(1) The license number under which the defense article was previously authorized for export from the United States;

(2) A precise description, quantity and value of the defense article;

(3) A description of the new end-use; and

(4) Identification of the new end-user.

(d) The written approval of the Directorate of Defense Trade Controls must be obtained before reselling, transferring, transshipping on a non-continuous voyage, or disposing of a defense article in any country other than the country of ultimate destination, or anyone other than the authorized end-user, as stated on the Shipper's Export Declaration in cases where an exemption is claimed under this subchapter.

(e) Reexports or retransfers of U.S.-origin components incorporated into a foreign defense article to NATO, NATO agencies, a government of a NATO country, or the governments of Australia,

WASHAR0000793

Japan, New Zealand, or South Korea, are authorized without the prior written approval of the Directorate of Defense Trade Controls, provided:

(1) The U.S.-origin components were previously authorized for export from the United States, either by a license or an exemption;

(2) The U.S.-origin components are not significant military equipment, the items are not major defense equipment sold under contract in the amount of $25,000,000 ($25 million) or more; the articles are not defense articles or defense services sold under a contract in the amount of $100,000,000 ($100 million) or more; and are not identified in part 121 of this subchapter as Missile Technology Control Regime (MTCR) items; and

(3) The person reexporting the defense article must provide written notification to the Directorate of Defense Trade Controls of the retransfer not later than 30 days following the reexport. The notification must state the articles being reexported and the recipient government.

(4) In certain cases, the Managing Director, Directorate of Defense Trade Controls or the Director, Office of Defense Trade Controls Licensing, may place retransfer restrictions on a license prohibiting use of this exemption.

[58 FR 39299, July 22, 1993, as amended at 71 FR 20541, Apr. 21, 2006; 73 FR 15885, Mar. 26, 2008; 73 FR 38343, Aug. 3, 2009]

## § 123.10   Non-transfer and use assurances.

(a) A nontransfer and use certificate (Form DSP–83) is required for the export of significant military equipment and classified articles, including classified technical data. A license will not be issued until a completed Form DSP–83 has been received by the Directorate of Defense Trade Controls. This form is to be executed by the foreign consignee, foreign end-user, and the applicant. The certificate stipulates that, except as specifically authorized by prior written approval of the Department of State, the foreign consignee and foreign end-user will not reexport, resell or otherwise dispose of the significant military equipment enumerated in the application outside the country named as the location of the foreign end-use or to any other person.

(b) The Directorate of Defense Trade Controls may also require a DSP–83 for the export of any other defense articles, including technical data, or defense services.

(c) When a DSP–83 is required for an export of any defense article or defense service to a non-governmental foreign end-user, the Directorate of Defense Trade Controls may require as a condition of issuing the license that the appropriate authority of the government of the country of ultimate destination also execute the certificate.

[71 FR 20541, Apr. 21, 2006]

WASHAR0000794

**§ 123.11   Movements of vessels and aircraft covered by the U.S. Munitions List outside the United States.**

(a) A license issued by the Directorate of Defense Trade Controls is required whenever a privately-owned aircraft or vessel on the U.S. Munitions List makes a voyage outside the United States.

(b) Exemption. An export license is not required when a vessel or aircraft referred to in paragraph (a) of this section departs from the United States and does not enter the territorial waters or airspace of a foreign country if no defense articles are carried as cargo. Such a vessel or aircraft may not enter the territorial waters or airspace of a foreign country before returning to the United States, or carry as cargo any defense article, without a temporary export license (Form DSP–73) from the Department of State. (See §123.5.)

[58 FR 39299, July 22, 1993, as amended at 71 FR 20541, Apr. 21, 2006]

**§ 123.12   Shipments between U.S. possessions.**

An export license is not required for the shipment of defense articles between the United States, the Commonwealth of Puerto Rico, and U.S. possessions. A license is required, however, for the export of defense articles from these areas to foreign countries.

**§ 123.13   Domestic aircraft shipments via a foreign country.**

A license is not required for the shipment by air of a defense article from one location in the United States to another location in the United States via a foreign country. The pilot of the aircraft must, however, file a written statement with the Port Director of U.S. Customs and Border Protection at the port of exit in the United States. The original statement must be filed at the time of exit with the Port Director of U.S. Customs and Border Protection. A duplicate must be filed at the port of reentry with the Port Director of U.S. Customs and Border Protection, who will duly endorse it and transmit it to the Port Director of U.S. Customs and Border Protection at the port of exit. The statement will be as follows:

Domestic Shipment Via a Foreign Country of Articles on the U.S. Munitions List

Under penalty according to Federal law, the undersigned certifies and warrants that all the information in this document is true and correct, and that the equipment listed below is being shipped from (U.S. port of exit) via (foreign country) to (U.S. port of entry), which is the final destination in the United States.

*Description of Equipment*

Quantity_____
Equipment_____
Value_____
Signed_____

WASHAR0000795

Endorsement: U.S. Customs and Border Protection Inspector.

Port of Exit_____
Date_____
Signed_____

Endorsement: U.S. Customs and Border Protection Inspector.

Port of Entry_____
Date_____

[70 FR 50961, Aug. 29, 2005]

### § 123.14   Import certificate/delivery verification procedure.

 (a) The Import Certificate/Delivery Verification Procedure is designed to assure that a commodity imported into the territory of those countries participating in IC/DV procedures will not be diverted, transshipped, or reexported to another destination except in accordance with export control regulations of the importing country.

(b) *Exports* . The Directorate of Defense Trade Controls may require the IC/DV procedure on proposed exports of defense articles to non-government entities in those countries participating in IC/DV procedures. In such cases, U.S. exporters must submit both an export license application (the completed Form DSP–5) and the original Import Certificate, which must be provided and authenticated by the government of the importing country. This document verifies that the foreign importer complied with the import regulations of the government of the importing country and that the importer declared the intention not to divert, transship or reexport the material described therein without the prior approval of that government. After delivery of the commodities to the foreign consignee, the Directorate of Defense Trade Controls may also require U.S. exporters to furnish Delivery Verification documentation from the government of the importing country. This documentation verifies that the delivery was in accordance with the terms of the approved export license. Both the Import Certificate and the Delivery Verification must be furnished to the U.S. exporter by the foreign importer.

(c) *Triangular transactions.* When a transaction involves three or more countries that have adopted the IC/DV procedure, the governments of these countries may stamp a triangular symbol on the Import Certificate. This symbol is usually placed on the Import Certificate when the applicant for the Import Certificate (the importer) states either (1) that there is uncertainty whether the items covered by the Import Certificate will be imported into the country issuing the Import Certificate; (2) that he or she knows that the items will not be imported into the country issuing the Import Certificate; or (3) that, if the items are to be imported into the country issuing the Import Certificate, they will subsequently be reexported to another destination. All parties, including the ultimate consignee in the country of ultimate destination, must be shown on the completed Import Certificate.

[58 FR 39299, July 22, 1993, as amended at 71 FR 20541, Apr. 21, 2006]

WASHAR0000796

**§ 123.15   Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.**

(a) The Arms Export Control Act requires that a certification be provided to the Congress prior to the granting of any license or other approval for transactions, in the amounts described below, involving exports of any defense articles and defense services and for exports of major defense equipment, as defined in §120.8 of this subchapter. Approvals may not be granted when the Congress has enacted a joint resolution prohibiting the export. Certification is required for any transaction involving:

(1) A license for the export of major defense equipment sold under a contract in the amount of $14,000,000 or more, or for defense articles and defense services sold under a contract in the amount of $50,000,000 or more to any country that is not a member country of the North Atlantic Treaty Organization (NATO), or Australia, Japan, New Zealand, or South Korea that does not authorize a new sales territory; or

(2) A license for export to a country that is a member country of the North Atlantic Treaty Organization (NATO), or Australia, Japan, New Zealand, or South Korea of major defense equipment sold under a contract in the amount of $25,000,000 or more, or for defense articles and defense services sold under a contract in the amount of $100,000,000 or more and provided the transfer does not include any other countries; or

(3) A license for export of a firearm controlled under Category I of the United States Munitions List, of this subchapter, in an amount of $1,000,000 or more.

(b) Unless an emergency exists which requires the proposed export in the national security interests of the United States, approval may not be granted for any transaction until at least 15 calendar days have elapsed after receipt by the Congress of the certification required by 22 U.S.C. 2776(c)(1) involving the North Atlantic Treaty Organization, any member country of the Organization, or Australia, Japan, New Zealand, or South Korea or at least 30 calendar days have elapsed for any other country; in the case of a license for an export of a commercial communications satellite for launch from, and by nationals of, the Russian Federation, Ukraine, or Kazakhstan, until at least 15 calendar days after the Congress receives such certification.

(c) Persons who intend to export defense articles and defense services pursuant to any exemption in this subchapter under the circumstances described in this section must provide written notification to the Directorate of Defense Trade Controls and include a signed contract and a DSP–83 signed by the applicant, the foreign consignee and the end-user.

[70 FR 34654, June 15, 2005, as amended at 73 FR 38343, Aug. 3, 2009]

**§ 123.16   Exemptions of general applicability.**

(a) The following exemptions apply to exports of unclassified defense articles for which no approval is needed from the Directorate of Defense Trade Controls. These exemptions do not apply to: Proscribed destinations under §126.1 of this subchapter; exports for which

WASHAR0000797

Congressional notification is required (see §123.15 of this subchapter); MTCR articles; Significant Military Equipment (SME); and may not be used by persons who are generally ineligible as described in §120.1(c) of this subchapter. All shipments of defense articles, including those to and from Canada, require a Shipper's Export Declaration (SED) or notification letter. If the export of a defense article is exempt from licensing, the SED must cite the exemption. Refer to §123.22 for Shipper's Export Declaration and letter notification requirements.

(b) The following exports are exempt from the licensing requirements of this subchapter.

(1) Port Directors of U.S. Customs and Border Protection shall permit the export without a license of defense hardware being exported in furtherance of a manufacturing license agreement, technical assistance agreement, distribution agreement or an arrangement for distribution of items identified in Category XIII(b)(1), approved in accordance with part 124, provided that:

(i) The defense hardware to be exported supports the activity and is identified by item, quantity and value in the agreement or arrangement; and

(ii) Any provisos or limitations placed on the authorized agreement or arrangement are adhered to; and

(iii) The exporter certifies on the Shipper's Export Declaration that the export is exempt from the licensing requirements of this subchapter. This is done by writing, "22 CFR 123.16(b)(1) and the agreement or arrangement (identify/state number) applicable"; and

(iv) The total value of all shipments does not exceed the value authorized in the agreement or arrangement.

(v) In the case of a distribution agreement, export must be made directly to the approved foreign distributor.

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of components or spare parts (for exemptions for firearms and ammunition see §123.17) without a license when the total value does not exceed $500 in a single transaction and:

(i) The components or spare parts are being exported to support a defense article previously authorized for export; and

(ii) The spare parts or components are not going to a distributor, but to a previously approved end-user of the defense articles; and

(iii) The spare parts or components are not to be used to enhance the capability of the defense article;

(iv) Exporters shall not split orders so as not to exceed the dollar value of this exemption;

WASHAR0000798

(v) The exporter may not make more than 24 shipments per calendar year to the previously authorized end user;

(vi) The exporter must certify on the Shipper's Export Declaration that the export is exempt from the licensing requirements of this subchapter. This is done by writing 22 CFR 123.16(b)(2) applicable.

(3) Port Directors of U.S. Customs and Border Protection shall permit the export without a license, of packing cases specially designed to carry defense articles.

(4) Port Directors of U.S. Customs and Border Protection shall permit the export without a license, of unclassified models or mock-ups of defense articles, provided that such models or mock-ups are nonoperable and do not reveal any technical data in excess of that which is exempted from the licensing requirements of §125.4(b) of this subchapter and do not contain components covered by the U.S. Munitions List (see §121.8(b) of this subchapter). Some models or mockups built to scale or constructed of original materials can reveal technical data. U.S. persons who avail themselves of this exemption must provide a written certification to the Port Director of U.S. Customs and Border Protection that these conditions are met. This exemption does not imply that the Directorate of Defense Trade Controls will approve the export of any defense articles for which models or mocks-ups have been exported pursuant to this exemption.

(5) Port Directors of U.S. Customs and Border Protection shall permit the temporary export without a license of unclassified defense articles to any public exhibition, trade show, air show or related event if that article has previously been licensed for a public exhibition, trade show, air show or related event and the license is still valid. U.S. persons who avail themselves of this exemption must provide a written certification to the Port Director of U.S. Customs and Border Protection that these conditions are met.

(6) For exemptions for firearms and ammunition for personal use refer to §123.17.

(7) For exemptions for firearms for personal use of members of the U.S. Armed Forces and civilian employees see §123.18.

(8) For exports to Canada refer to §126.5 of this subchapter.

(9) Port Directors of U.S. Customs and Border Protection shall permit the temporary export without a license by a U.S. person of any unclassified component, part, tool or test equipment to a subsidiary, affiliate or facility owned or controlled by the U.S. person (see §122.2(c) of this subchapter) if the component, part, tool or test equipment is to be used for manufacture, assembly, testing, production, or modification provided:

(i) The U.S. person is registered with the Directorate of Defense Trade Controls and complies with all requirements set forth in part 122 of this subchapter;

(ii) No defense article exported under this exemption may be sold or transferred without the appropriate license or other approval from the Directorate of Defense Trade Controls.

WASHAR0000799

(10) Port Directors of U.S. Customs and Border Protection shall permit, without a license, the permanent export, and temporary export and return to the United States, by accredited U.S. institutions of higher learning of articles fabricated only for fundamental research purposes otherwise controlled by Category XV (a) or (e) in §121.1 of this subchapter when all of the following conditions are met:

(i) The export is to an accredited institution of higher learning, a governmental research center or an established government funded private research center located within countries of the North Atlantic Treaty Organization (NATO) or countries which have been designated in accordance with section 517 of the Foreign Assistance Act of 1961 as a major non-NATO ally (and as defined further in section 644(q) of that Act) for purposes of that Act and the Arms Export Control Act, or countries that are members of the European Space Agency or the European Union and involves exclusively nationals of such countries;

(ii) All of the information about the article(s), including its design, and all of the resulting information obtained through fundamental research involving the article will be published and shared broadly within the scientific community, and is not restricted for proprietary reasons or specific U.S. government access and dissemination controls or other restrictions accepted by the institution or its researchers on publication of scientific and technical information resulting from the project or activity (See §120.11 of this subchapter); and

(iii) If the article(s) is for permanent export, the platform or system in which the article(s) may be incorporated must be a satellite covered by §125.4(d)(1)(iii) of this subchapter and be exclusively concerned with fundamental research and only be launched into space from countries and by nationals of countries identified in this section.

[58 FR 39299, July 22, 1993, as amended at 59 FR 29951, June 10, 1994; 59 FR 45622, Sept. 2, 1994; 67 FR 15100, Mar. 29, 2002; 70 FR 50961, Aug. 29, 2005; 71 FR 20541, Apr. 21, 2006]

## § 123.17   Exports of firearms and ammunition.

(a) Except as provided in §126.1 of this subchapter, Port Directors of U.S. Customs and Border Protection shall permit the export without a license of components and parts for Category I(a) firearms, except barrels, cylinders, receivers (frames) or complete breech mechanisms when the total value does not exceed $100 wholesale in any transaction.

(b) Port Directors of U.S. Customs and Border Protection shall permit the export without a license of nonautomatic firearms covered by Category I(a) of §121.1 of this subchapter if they were manufactured in or before 1898, or are replicas of such firearms.

(c) Port Directors of U.S. Customs and Border Protection shall permit U.S. persons to export temporarily from the United States without a license not more than three nonautomatic firearms in Category I(a) of §121.1 of this subchapter and not more than 1,000 cartridges therefor, provided that:

(1) A declaration by the U.S. person and an inspection by a customs officer is made;

WASHAR0000800

(2) The firearms and accompanying ammunition must be with the U.S. person's baggage or effects, whether accompanied or unaccompanied (but not mailed); and

(3) They must be for that person's exclusive use and not for reexport or other transfer of ownership. The foregoing exemption is not applicable to a crew-member of a vessel or aircraft unless the crew-member declares the firearms to a Customs officer upon each departure from the United States, and declares that it is his or her intention to return the article(s) on each return to the United States. It is also not applicable to the personnel referred to in §123.18.

(d) Port Directors of U.S. Customs and Border Protection shall permit a foreign person to export without a license such firearms in Category I(a) of §121.1 of this subchapter and ammunition therefor as the foreign person brought into the United States under the provisions of 27 CFR 478.115(d). (The latter provision specifically excludes from the definition of importation the bringing into the United States of firearms and ammunition by certain foreign persons for specified purposes.)

(e) Port Directors of U.S. Customs and Border Protection shall permit U.S. persons to export without a license ammunition for nonautomatic firearms referred to in paragraph (a) of this section if the quantity does not exceed 1,000 cartridges (or rounds) in any shipment. The ammunition must also be for personal use and not for resale or other transfer of ownership. The foregoing exemption is also not applicable to the personnel referred to in §123.18.

(f) Except as provided in §126.1 of this subchapter, Port Directors of U.S. Customs and Border Protection shall permit U.S. persons to export temporarily from the United States without a license one set of body armor covered by Category X(a)(1) of this subchapter provided that:

(1) A declaration by the U.S. person and an inspection by a customs officer is made;

(2) The body armor is with the U.S. person's baggage or effects, whether accompanied or unaccompanied (but not mailed);

(3) The body armor is for that person's exclusive use and not for re-export or other transfer of ownership; and

(4) If the body armor is lost or otherwise not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in §127.12(c)(2) of this subchapter entitled "Voluntary disclosures."

(g) The license exemption set forth in paragraph (f) of this section is also available for the temporary export of body armor for personal use to Afghanistan and to Iraq provided that:

(1) The conditions in paragraphs (f)(1)–(f)(3) of this section are met;

(2) For temporary exports to Iraq the U.S. person utilizing the license exemption is either a person affiliated with the U.S. Government traveling on official business or is a person not affiliated with the U.S. Government but traveling to Iraq under a direct authorization by the

89

Government of Iraq and engaging in humanitarian activities for, on behalf of, or at the request of the Government of Iraq.

[58 FR 39299, July 22, 1993, as amended at 64 FR 17534, Apr. 12, 1999; 70 FR 50962, Aug. 29, 2005; 71 FR 20541, Apr. 21, 2006; 74 FR 39213, Aug. 6, 2009]

### § 123.18   Firearms for personal use of members of the U.S. Armed Forces and civilian employees of the U.S. Government.

The following exemptions apply to members of the U.S. Armed Forces and civilian employees of the U.S. Government who are U.S. persons (both referred to herein as personnel). The exemptions apply only to such personnel if they are assigned abroad for extended duty. These exemptions do not apply to dependents.

(a) *Firearms.* Port Directors of U.S. Customs and Border Protection shall permit nonautomatic firearms in Category I(a) of §121.1 of this subchapter and parts therefor to be exported, except by mail, from the United States without a license if:

(1) They are consigned to servicemen's clubs abroad for uniformed members of the U.S. Armed Forces; or,

(2) In the case of a uniformed member of the U.S. Armed Forces or a civilian employee of the Department of Defense, they are for personal use and not for resale or other transfer of ownership, and if the firearms are accompanied by a written authorization from the commanding officer concerned; or

(3) In the case of other U.S. Government employees, they are for personal use and not for resale or other transfer of ownership, and the Chief of the U.S. Diplomatic Mission or his designee in the country of destination has approved in writing to Department of State the import of the specific types and quantities of firearms into that country. The exporter shall provide a copy of this written statement to the Port Director of U.S. Customs and Border Protection.

(b) *Ammunition.* Port Directors of U.S. Customs and Border Protection shall permit not more than 1,000 cartridges (or rounds) of ammunition for the firearms referred to in paragraph (a) of this section to be exported (but not mailed) from the United States without a license when the firearms are on the person of the owner or with his baggage or effects, whether accompanied or unaccompanied (but not mailed).

[58 FR 39299, July 22, 1993, as amended at 70 FR 50962, Aug. 29, 2005]

### § 123.19   Canadian and Mexican border shipments.

A shipment originating in Canada or Mexico which incidentally transits the United States en route to a delivery point in the same country that originated the shipment is exempt from the requirement for an in transit license.

WASHAR0000802

### § 123.20   Nuclear related controls.

(a) The provisions of this subchapter do not apply to equipment, technical data or services in Category VI(e) and Category XVI of §121.1 of this subchapter to the extent such equipment, technical data or services are under the export control of the Department of Energy or the Nuclear Regulatory Commission pursuant to the Atomic Energy Act of 1954, as amended, and the Nuclear Non-Proliferation Act of 1978, as amended, or is a government transfer authorized pursuant to these Acts.

(b) The transfer of materials, including special nuclear materials, nuclear parts of nuclear weapons, or other non-nuclear parts of nuclear weapons systems involving Restricted Data or of assistance involving any person directly or indirectly engaging in the production or use thereof is prohibited except as authorized by the Atomic Energy Act of 1954, as amended. The transfer of Restricted Data or such assistance is prohibited except as authorized by the Atomic Energy Act of 1954, as amended. The technical data or defense services relating to nuclear weapons, nuclear weapons systems or related defense purposes (and such data or services relating to applications of atomic energy for peaceful purposes, or related research and development) may constitute Restricted Data or such assistance, subject to the foregoing prohibition.

(c) A license for the export of any machinery, device, component, equipment, or technical data relating to equipment referred to in Category VI(e) of §121.1 of this subchapter will not be granted unless the proposed equipment comes within the scope of an existing Agreement for Cooperation for Mutual Defense Purposes concluded pursuant to the Atomic Energy Act of 1954, as amended, with the government of the country to which the Article is to be exported. Licenses may be granted in the absence of such an agreement only:

(1) If the proposed export involves an article which is identical to that in use in an unclassified civilian nuclear power plant,

(2) If the proposed export has no relationship to naval nuclear propulsion, and

(3) If it is not for use in a naval propulsion plant.

[67 FR 58988, Sept. 19, 2002]

### § 123.21   Duration, renewal and disposition of licenses.

(a) A license is valid for four years. The license expires when the total value or quantity authorized has been shipped or when the date of expiration has been reached, whichever occurs first. Defense articles to be shipped thereafter require a new application and license. The new application should refer to the expired license. It should not include references to any defense articles other than those of the unshipped balance of the expired license.

(b) Unused, expired, expended, suspended, or revoked licenses must be returned immediately to the Department of State.

WASHAR0000803

**§ 123.22   Filing, retention, and return of export licenses and filing of export information.**

 (a) Any export, as defined in this subchapter, of a defense article controlled by this subchapter, to include defense articles transiting the United States, requires the electronic reporting of export information. The reporting of the export information shall be to the U.S. Customs and Border Protection using the Automated Export System (AES) or directly to the Directorate of Defense Trade Controls (DDTC). Any license or other approval authorizing the permanent export of hardware must be filed at a U.S. Port before any export. Licenses or other approvals for the permanent export of technical data and defense services shall be retained by the applicant who will send the export information directly to DDTC. Temporary export or temporary import licenses for such items need not be filed with the U.S. Customs and Border Protection, but must be presented to the U.S. Customs and Border Protection for decrementing of the shipment prior to departure and at the time of entry. The U.S. Customs and Border Protection will only decrement a shipment after the export information has been filed correctly using the AES. Before the export of any hardware using an exemption in this subchapter, the DDTC registered applicant/exporter, or an agent acting on the filer's behalf, must electronically provide export information using the AES (see paragraph (b) of this section). In addition to electronically providing the export information to the U.S. Customs and Border Protection before export, all the mandatory documentation must be presented to the port authorities (e.g., attachments, certifications, proof of AES filing; such as the External Transaction Number (XTN) or Internal Transaction Number (ITN)). Export authorizations shall be filed, retained, decremented or returned to DDTC as follows:

(1) *Filing of licenses and documentation for the permanent export of hardware.* For any permanent export of hardware using a license (e.g., DSP–5, DSP–94) or an exemption in this subchapter, the exporter must, prior to an AES filing, deposit the license and provide any required documentation for the license or the exemption with the U.S. Customs and Border Protection, unless otherwise directed in this subchapter (e.g., §125.9). If necessary, an export may be made through a port other than the one designated on the license if the exporter complies with the procedures established by the U.S. Customs and Border Protection.

(2) *Presentation and retention by the applicant of temporary licenses and related documentation for the export of unclassified defense articles.* Licenses for the temporary export or temporary import of unclassified defense articles need not be filed with the U.S. Customs and Border Protection, but must be retained by the applicant and presented to the U.S. Customs and Border Protection at the time of temporary import and temporary export. When a defense article is temporarily exported from the United States and moved from one destination authorized on a license to another destination authorized on the same or another temporary license, the applicant, or an agent acting on the applicant's behalf, must ensure that the U.S. Customs and Border Protection decrements both temporary licenses to show the exit and entry of the hardware.

(b) *Filing and reporting of export information* —(1) *Filing of export information with the U.S. Customs and Border Protection.* Before exporting any hardware controlled by this subchapter, using a license or exemption, the DDTC registered applicant/exporter, or an agent acting on the filer's behalf, must electronically file the export information with the U.S. Customs and Border

WASHAR0000804

Protection using the Automated Export System (AES) in accordance with the following timelines:

(i) *Air or truck shipments.* The export information must be electronically filed at least 8 hours prior to departure.

(ii) *Sea or rail Shipments.* The export information must be electronically filed at least 24 hours prior to departure.

(2) *Emergency shipments of hardware that cannot meet the pre-departure filing requirements.* U.S. Customs and Border Protection may permit an emergency export of hardware by truck (e.g., departures to Mexico or Canada) or air, by a U.S. registered person, when the exporter is unable to comply with the SED filing timeline in paragraph (b)(1)(i) of this section. The applicant, or an agent acting on the applicant's behalf, in addition to providing the export information electronically using the AES, must provide documentation required by the U.S. Customs and Border Protection and this subchapter. The documentation provided to the U.S. Customs and Border Protection at the port of exit must include the External Transaction Number (XTN) or Internal Transaction Number (ITN) for the shipment and a copy of a notification to DDTC stating that the shipment is urgent and why. The original of the notification must be immediately provided to DDTC. The AES filing of the export information when the export is by air must be at least two hours prior to any departure from the United States; and, when a truck shipment, at the time when the exporter provides the articles to the carrier or at least one hour prior to departure from the United States, when the permanent export of the hardware has been authorized for export:

(i) In accordance with §126.4 of this subchapter, or

(ii) On a valid license ( *i.e.,* DSP–5, DSP–94) and the ultimate recipient and ultimate end user identified on the license is a foreign government.

(3) *Reporting of export information on technical data and defense service.* When an export is being made using a DDTC authorization (e.g., technical data license, agreement or a technical data exemption provided in this subchapter), the DDTC registered exporter will retain the license or other approval and provide the export information electronically to DDTC as follows:

(i) *Technical data license.* Prior to the permanent export of technical data licensed using a Form DSP–5, the applicant shall electronically provide export information using the system for direct electronic reporting to DDTC of export information and self validate the original of the license. When the initial export of all the technical data authorized on the license has been made, the license must be returned to DDTC. Exports of copies of the licensed technical data should be made in accordance with existing exemptions in this subchapter. Should an exemption not apply, the applicant may request a new license.

(ii) *Manufacturing license and technical assistance agreements.* Prior to the initial export of any technical data and defense services authorized in an agreement the U.S. agreement holder must electronically inform DDTC that exports have begun. In accordance with this subchapter, all

WASHAR0000805

subsequent exports of technical data and services are not required to be filed electronically with DDTC except when the export is done using a U.S. Port. Records of all subsequent exports of technical data shall be maintained by the exporter in accordance with this subchapter and shall be made immediately available to DDTC upon request. Exports of technical data in furtherance of an agreement using a U.S. Port shall be made in accordance with §125.4 of this subchapter and made in accordance with the procedures in paragraph (b)(3)(iii) of this section.

(iii) *Technical data and defense service exemptions.* In any instance when technical data is exported using an exemption in this subchapter (e.g., §§125.4(b)(2), 125.4(b)(4), 126.5) from a U.S. port, the exporter is not required to report using AES, but must, effective January 18, 2004, provide the export data electronically to DDTC. A copy of the electronic notification to DDTC must accompany the technical data shipment and be made available to the U.S. Customs and Border Protection upon request.

Note to paragraph (b)(3)(iii): Future changes to the electronic reporting procedure will be amended by publication of a rule in theFederal Register.Exporters are reminded to continue maintaining records of all export transactions, including exemption shipments, in accordance with this subchapter.

(c) *Return of licenses.* All licenses issued by the Directorate of Defense Trade Controls (DDTC) must be returned to the DDTC in accordance with the following:

(1) *License filed with the U.S. Customs and Border Protection.* The U.S. Customs and Border Protection must return to the DDTC any license when the total value or quantity authorized has been shipped or when the date of expiration is reached, whichever occurs first.

(2) *Licenses not filed with the U.S. Customs and Border Protection.* Any license that is not filed with the U.S. Customs and Border Protection (e.g., oral or visual technical data releases or temporary import and export licenses retained in accordance with paragraph (a)(2) of this section), must be returned by the applicant to the DDTC no later than 60 days after the license has been expended (e.g., total value or quantity authorized has been shipped) or the date of expiration, whichever occurs first.

[68 FR 61101, Oct. 27, 2003, as amended at 70 FR 50962, Aug. 29, 2005]

## § 123.23  Monetary value of shipments.

Port Directors of U.S. Customs and Border Protection shall permit the shipment of defense articles identified on any license when the total value of the export does not exceed the aggregate monetary value (not quantity) stated on the license by more than ten percent, provided that the additional monetary value does not make the total value of the license or other approval for the export of any major defense equipment sold under a contract reach $14,000,000 or more, and provided that the additional monetary value does not make defense articles or defense services sold under a contract reach the amount of $50,000,000 or more.

[70 FR 50963, Aug. 29, 2005]

WASHAR0000806

## § 123.24   Shipments by U.S. Postal Service.

(a) The export of any defense hardware using a license or exemption in this subchapter by the U.S. Postal Service must be filed with the U.S. Customs and Border Protection using the Automated Export System (AES) and the license must be filed with the U.S. Customs and Border Protection before any hardware is actually sent abroad by mail. The exporter must certify the defense hardware being exported in accordance with this subchapter by clearly marking on the package "This export is subject to the controls of the ITAR, 22 CFR (identify section for an exemption) or (state license number) and the export has been electronically filed with the U.S. Customs and Border Protection using the Automated Export System (AES)."

(b) The export of any technical data using a license in this subchapter by the U.S. Postal Service must be notified electronically directly to the Directorate of Defense Trade Controls (DDTC). The exporter, using either a license or exemption, must certify, by clearly marking on the package, "This export is subject to the controls of the ITAR, 22 CFR (identify section for an exemption) or (state license number)." For those exports using a license, the exporter must also state "The export has been electronically notified directly to DDTC." The license must be returned to DDTC upon completion of the use of the license ( *see* §123.22(c)).

[68 FR 61102, Oct. 27, 2003, as amended at 70 FR 50963, Aug. 29, 2005]

## § 123.25   Amendments to licenses.

(a) The Directorate of Defense Trade Controls may approve an amendment to a license for permanent export, temporary export and temporary import of unclassified defense articles. A suggested format is available from the Directorate of Defense Trade Controls.

(b) The following types of amendments to a license that will be considered: Addition of U.S. freight forwarder or U.S. consignor; change due to an obvious typographical error; change in source of commodity; and change of foreign intermediate consignee if that party is only transporting the equipment and will not process (e.g., integrate, modify) the equipment. For changes in U.S. dollar value see §123.23.

(c) The following types of amendments to a license will not be approved: Additional quantity, changes in commodity, country of ultimate destination, end-use or end-user, foreign consignee and/or extension of duration. The foreign intermediate consignee may only be amended if that party is acting as freight forwarder and the export does not involve technical data. A new license is required for these changes. Any new license submission must reflect only the unshipped balance of quantity and dollar value.

[58 FR 39299, July 22, 1993, as amended at 71 FR 20542, Apr. 21, 2006]

## § 123.26   Recordkeeping requirement for exemptions.

When an exemption is claimed for the export of unclassified technical data, the exporter must maintain a record of each such export. The business record should include the following

WASHAR0000807

information: A description of the unclassified technical data, the name of the recipient end-user, the date and time of the export, and the method of transmission.

### § 123.27  Special licensing regime for export to U.S. allies of commercial communications satellite components, systems, parts, accessories, attachments and associated technical data.

(a) U.S. persons engaged in the business of exporting specifically designed or modified components, systems, parts, accessories, attachments, associated equipment and certain associated technical data for commercial communications satellites, and who are so registered with the Directorate of Defense Trade Controls pursuant to part 122 of this subchapter, may submit license applications for multiple permanent and temporary exports and temporary imports of such articles for expeditious consideration without meeting the documentary requirements of §123.1(c)(4) and (5) concerning purchase orders, letters of intent, contracts and non-transfer and end use certificates, or the documentary requirements of §123.9, concerning approval of re-exports or re-transfers, when all of the following requirements are met:

(1) The proposed exports or re-exports concern exclusively one or more countries of the North Atlantic Treaty Organization (see §120.31 of this subchapter) and/or one or more countries which have been designated in accordance with section 517 of the Foreign Assistance Act of 1961 and with section 1206 of the Foreign Relations Authorization Act, Fiscal Year 2003 as a major non-NATO ally (see §120.32 of this subchapter).

(2) The proposed exports concern exclusively one or more foreign persons (e.g., companies or governments) located within the territories of the countries identified in paragraph (a)(1) of this section, and one or more commercial communications satellite programs included within a list of such persons and programs approved by the U.S. Government for purposes of this section, as signified in a list of such persons and programs that will be publicly available through the Internet Web site of the Directorate of Defense Trade Controls and by other means.

(3) The articles are not major defense equipment sold under a contract in the amount of $14,000,000 or more or defense articles or defense services sold under a contract in the amount of $50,000,000 or more (for which purpose, as is customary, exporters may not split contracts or purchase orders). Items meeting these statutory thresholds must be submitted on a separate license application to permit the required notification to Congress pursuant to section 36(c) of the Arms Export Control Act.

(4) The articles are not detailed design, development, manufacturing or production data and do not involve the manufacture abroad of significant military equipment.

(5) The U.S. exporter provides complete shipment information to the Directorate of Defense Trade Controls within 15 days of shipment by submitting a report containing a description of the item and the quantity, value, port of exit, and end-user and country of destination of the item, and at that time meets the documentary requirements of §123.1(c)(4) and (5), the documentary requirements of §123.9 in the case of re-exports or re-transfers, and, other documentary requirements that may be imposed as a condition of a license (e.g., parts control plans for

WASHAR0000808

MTCR-controlled items). The shipment information reported must include a description of the item and quantity, value, port of exit and end user and country of destination of the item.

(6) At any time in which an item exported pursuant to this section is proposed for re-transfer outside of the approved territory, programs or persons (e.g., such as in the case of an item included in a satellite for launch beyond the approved territory), the detailed requirements of §123.9 apply with regard to obtaining the prior written consent of the Directorate of Defense Trade Controls.

(b) The re-export or re-transfer of the articles authorized for export (including to specified re-export destinations) in accordance with this section do not require the separate prior written approval of the Directorate of Defense Trade Controls provided all of the requirements in paragraph (a) of this section are met.

(c) The Directorate of Defense Trade Controls will consider, on a case-by-case basis, requests to include additional foreign companies and satellite programs within the geographic coverage of a license application submitted pursuant to this section from countries not otherwise covered, who are members of the European Space Agency or the European Union. In no case, however, can the provisions of this section apply or be relied upon by U.S. exporters in the case of countries who are subject to the mandatory requirements of Section 1514 of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999 (Pub. L. 105–261), concerning national security controls on satellite export licensing.

(d) Registered U.S. exporters may request at the time of a license application submitted pursuant to this section that additional foreign persons or communications satellite programs be added to the lists referred to in paragraph (a)(2) of this section, which additions, if approved, will be included within the publicly available lists of authorized recipients and programs.

[65 FR 34091, May 26, 2000, as amended at 67 FR 58988, Sept. 19, 2002; 69 FR 40314, July 2, 2004; 70 FR 50963, Aug. 29, 2005; 71 FR 20542, Apr. 21, 2006]

WASHAR0000809

**Intentionally Blank**

WASHAR0000810

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT AND OTHER DEFENSE SERVICES

**Section Contents**

§ 124.1   Manufacturing license agreements and technical assistance agreements.
§ 124.2   Exemptions for training and military service.
§ 124.3   Exports of technical data in furtherance of an agreement.
§ 124.4   Deposit of signed agreements with the Directorate of Defense Trade Controls.
§ 124.5   Proposed agreements that are not concluded.
§ 124.6   Termination of manufacturing license agreements and technical assistance agreements.
§ 124.7   Information required in all manufacturing license agreements and technical assistance agreements.
§ 124.8   Clauses required both in manufacturing license agreements and technical assistance agreements.
§ 124.9   Additional clauses required only in manufacturing license agreements.
§ 124.10   Nontransfer and use assurances.
§ 124.11   Congressional certification pursuant to Section 36(d) of the Arms Export Control Act.
§ 124.12   Required information in letters of transmittal.
§ 124.13   Procurement by United States persons in foreign countries (offshore procurement).
§ 124.14   Exports to warehouses or distribution points outside the United States.
§ 124.15   Special Export Controls for Defense Articles and Defense Services Controlled under Category XV: Space Systems and Space Launches.
§ 124.16   Special retransfer authorizations for unclassified technical data and defense services to member states of NATO and the European Union, Australia, Japan, New Zealand, and Switzerland.

**Authority:**   Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp., p. 79; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261.

**Source:**   58 FR 39305, July 22, 1993, unless otherwise noted.

### § 124.1   Manufacturing license agreements and technical assistance agreements.

(a) *Approval.* The approval of the Directorate of Defense Trade Controls must be obtained before the defense services described in §120.9(a) of this subchapter may be furnished. In order to obtain such approval, the U.S. person must submit a proposed agreement to the Directorate of Defense Trade Controls. Such agreements are generally characterized as manufacturing license agreements, technical assistance agreements, distribution agreements, or off-shore procurement agreements, and may not enter into force without the prior written approval of the Directorate of Defense Trade Controls. Once approved, the defense services described in the agreements may generally be provided without further licensing in accordance with §§124.3 and 125.4(b)(2) of this subchapter. The requirements of this section apply whether or not technical data is to be disclosed or used in the performance of the defense services described in §120.9(a) of this

WASHAR0000811

subchapter (e.g., all the information relied upon by the U.S. person in performing the defense service is in the public domain or is otherwise exempt from licensing requirements of this subchapter pursuant to §125.4 of this subchapter). This requirement also applies to the training of any foreign military forces, regular and irregular, in the use of defense articles. Technical assistance agreements must be submitted in such cases. In exceptional cases, the Directorate of Defense Trade Controls, upon written request, will consider approving the provision of defense services described in §120.9(a) of this subchapter by granting a license under part 125 of this subchapter.

(b) *Classified articles.* Copies of approved agreements involving the release of classified defense articles will be forwarded by the Directorate of Defense Trade Controls to the Defense Security Service of the Department of Defense.

(c) *Amendments.* Changes to the scope of approved agreements, including modifications, upgrades, or extensions must be submitted for approval. The amendments may not enter into force until approved by the Directorate of Defense Trade Controls.

(d) *Minor amendments.* Amendments which only alter delivery or performance schedules, or other minor administrative amendments which do not affect in any manner the duration of the agreement or the clauses or information which must be included in such agreements because of the requirements of this part, do not have to be submitted for approval. One copy of all such minor amendments must be submitted to the Directorate of Defense Trade Controls within thirty days after they are concluded.

[71 FR 20542, Apr. 21, 2006, as amended at 75 FR 52624, Aug. 27, 2010]

## § 124.2   Exemptions for training and military service.

(a) Technical assistance agreements are not required for the provision of training in the basic operation and maintenance of defense articles lawfully exported or authorized for export to the same recipient. This does not include training in intermediate and depot level maintenance.

(b) Services performed as a member of the regular military forces of a foreign nation by U.S. persons who have been drafted into such forces are not deemed to be defense services for purposes of §120.9 of this subchapter.

(c) NATO countries, Australia, Japan, and Sweden, in addition to the basic maintenance training exemption provided in §124.2(a) and basic maintenance information exemption in §125.4(b)(5) of this subchapter, no technical assistance agreement is required for maintenance training or the performance of maintenance, including the export of supporting technical data, when the following criteria can be met:

(1) Defense services are for unclassified U.S.-origin defense articles lawfully exported or authorized for export and owned or operated by and in the inventory of NATO or the Federal Governments of NATO countries, Australia, Japan or Sweden.

100

WASHAR0000812

(2) This defense service exemption does not apply to any transaction involving defense services for which congressional notification is required in accordance with §123.15 and §124.11 of this subchapter.

(3) Maintenance training or the performance of maintenance must be limited to inspection, testing, calibration or repair, including overhaul, reconditioning and one-to-one replacement of any defective items, parts or components; and excluding any modification, enhancement, upgrade or other form of alteration or improvement that enhances the performance or capability of the defense article. This does not preclude maintenance training or the performance of maintenance that would result in enhancements or improvements only in the reliability or maintainability of the defense article, such as an increased mean time between failure (MTBF).

(4) Supporting technical data must be unclassified and must not include software documentation on the design or details of the computer software, software source code, design methodology, engineering analysis or manufacturing know-how such as that described in paragraphs (c)4)(i) through (c)(4)(iii) as follows:

(i) *Design methodology,* such as: The underlying engineering methods and design philosophy utilized ( *i.e.,* the "why" or information that explains the rationale for particular design decision, engineering feature, or performance requirement); engineering experience (e.g., lessons learned); and the rationale and associated databases (e.g., design allowables, factors of safety, component life predictions, failure analysis criteria) that establish the operational requirements (e.g., performance, mechanical, electrical, electronic, reliability and maintainability) of a defense article.

(ii) *Engineering analysis,* such as: Analytical methods and tools used to design or evaluate a defense article's performance against the operational requirements. Analytical methods and tools include the development and/or use of mockups, computer models and simulations, and test facilities.

(iii) *Manufacturing know-how,* such as: Information that provides detailed manufacturing processes and techniques needed to translate a detailed design into a qualified, finished defense article.

(5) This defense service exemption does not apply to maintenance training or the performance of maintenance and service or the transfer of supporting technical data for the following defense articles:

(i) All Missile Technology Control Regime Annex Items;

(ii) Firearms listed in Category I; and ammunition listed in Category III for the firearms in Category I;

(iii) Nuclear weapons strategic delivery systems and all components, parts, accessories and attachments specifically designed for such systems and associated equipment;

WASHAR0000813

(iv) Naval nuclear propulsion equipment listed in Category VI(e);

(v) Gas turbine engine hot sections covered by Categories VI(f) and VIII(b);

(vi) Category VIII(f);

(vii) Category XII(c);

(viii) Chemical agents listed in Category XIV (a), biological agents in Category XIV (b), and equipment listed in Category XIV (c) for dissemination of the chemical agents and biological agents listed in Categories XIV (a) and (b);

(ix) Nuclear radiation measuring devices manufactured to military specifications listed in Category XVI(c);

(x) Category XV;

(xi) Nuclear weapons design and test equipment listed in Category XVI;

(xii) Submersible and oceanographic vessels and related articles listed in Category XX(a) through (d);

(xiii) Miscellaneous articles covered by Category XXI.

(6) *Eligibility criteria for foreign persons.* Foreign persons eligible to receive technical data or maintenance training under this exemption are limited to nationals of the NATO countries, Australia, Japan, or Sweden.

[58 FR 39305, July 22, 1993, as amended at 65 FR 45283, July 21, 2000; 66 FR 35899, July 10, 2001; 71 FR 20543, Apr. 21, 2006]

## § 124.3   Exports of technical data in furtherance of an agreement.

(a) *Unclassified technical data.* The U.S. Customs and Border Protection or U.S. Postal authorities shall permit the export without a license of unclassified technical data if the export is in furtherance of a manufacturing license or technical assistance agreement which has been approved in writing by the Directorate of Defense Trade Controls (DDTC) and the technical data does not exceed the scope or limitations of the relevant agreement. The approval of the DDTC must be obtained for the export of any unclassified technical data that may exceed the terms of the agreement.

(b) *Classified technical data.* The export of classified information in furtherance of an approved manufacturing license or technical assistance agreement which provides for the transmittal of classified information does not require further approval from the Directorate of Defense Trade Controls when:

WASHAR0000814

(1) The United States party certifies to the Department of Defense transmittal authority that the classified information does not exceed the technical or product limitations in the agreement; and

(2) The U.S. party complies with the requirements of the Department of Defense National Industrial Security Program Operating Manual concerning the transmission of classified information (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case the latter guidance must be followed) and any other requirements of cognizant U.S. departments or agencies.

[58 FR 39305, July 22, 1993, as amended at 68 FR 61102, Oct. 27, 2003; 70 FR 50963, Aug. 29, 2005; 71 FR 20543, Apr. 21, 2006]

### § 124.4   Deposit of signed agreements with the Directorate of Defense Trade Controls.

 (a) The United States party to a manufacturing license or a technical assistance agreement must file one copy of the concluded agreement with the Directorate of Defense Trade Controls not later than 30 days after it enters into force. If the agreement is not concluded within one year of the date of approval, the Directorate of Defense Trade Controls must be notified in writing and be kept informed of the status of the agreement until the requirements of this paragraph or the requirements of §124.5 are satisfied.

(b) In the case of concluded agreements involving coproduction or licensed production outside of the United States of defense articles of United States origin, a written statement must accompany filing of the concluded agreement with the Directorate of Defense Trade Controls, which shall include:

(1) The identity of the foreign countries, international organization, or foreign firms involved;

(2) A description and the estimated value of the articles authorized to be produced, and an estimate of the quantity of the articles authorized to be produced:

(3) A description of any restrictions on third-party transfers of the foreign-manufactured articles; and

(4) If any such agreement does not provide for United States access to and verification of quantities of articles produced overseas and their disposition in the foreign country, a description of alternative measures and controls to ensure compliance with restrictions in the agreement on production quantities and third-party transfers.

[62 FR 67276, Dec. 24, 1997, as amended at 71 FR 20543, Apr. 21, 2006]

### § 124.5   Proposed agreements that are not concluded.

The United States party to any proposed manufacturing license agreement or technical assistance agreement must inform the Directorate of Defense Trade Controls if a decision is made not to conclude the agreement. The information must be provided within 60 days of the date of the

WASHAR0000815

decision. These requirements apply only if the approval of the Directorate of Defense Trade Controls was obtained for the agreement to be concluded (with or without any provisos).

[71 FR 20543, Apr. 21, 2006]

### § 124.6   Termination of manufacturing license agreements and technical assistance agreements.

The U.S. party to a manufacturing license or a technical assistance agreement must inform the Directorate of Defense Trade Controls in writing of the impending termination of the agreement not less than 30 days prior to the expiration date of such agreement.

[71 FR 20543, Apr. 21, 2006]

### § 124.7   Information required in all manufacturing license agreements and technical assistance agreements.

The following information must be included in all proposed manufacturing license agreements and technical assistance agreements. The information should be provided in terms which are as precise as possible. If the applicant believes that a clause or that required information is not relevant or necessary, the applicant may request the omission of the clause or information. The transmittal letter accompanying the agreement must state the reasons for any proposed variation in the clauses or required information.

(1) The agreement must describe the defense article to be manufactured and all defense articles to be exported, including any test and support equipment or advanced materials. They should be described by military nomenclature, contract number, National Stock Number, nameplate data, or other specific information. Supporting technical data or brochures should be submitted in seven copies. Only defense articles listed in the agreement will be eligible for export under the exemption in §123.16(b)(1) of this subchapter.

(2) The agreement must specifically describe the assistance and technical data, including the design and manufacturing know-how involved, to be furnished and any manufacturing rights to be granted;

(3) The agreement must specify its duration; and

(4) The agreement must specifically identify the countries or areas in which manufacturing, production, processing, sale or other form of transfer is to be licensed.

### § 124.8   Clauses required both in manufacturing license agreements and technical assistance agreements.

The following statements must be included both in manufacturing license agreements and in technical assistance agreements:

WASHAR0000816

(1) "This agreement shall not enter into force, and shall not be amended or extended, without the prior written approval of the Department of State of the U.S. Government."

(2) "This agreement is subject to all United States laws and regulations relating to exports and to all administrative acts of the U.S. Government pursuant to such laws and regulations."

(3) "The parties to this agreement agree that the obligations contained in this agreement shall not affect the performance of any obligations created by prior contracts or subcontracts which the parties may have individually or collectively with the U.S. Government."

(4) "No liability will be incurred by or attributed to the U.S. Government in connection with any possible infringement of privately owned patent or proprietary rights, either domestic or foreign, by reason of the U.S. Government's approval of this agreement."

(5) The technical data or defense service exported from the United States in furtherance of this agreement and any defense article which may be produced or manufactured from such technical data or defense service may not be transferred to a foreign person except pursuant to §§124.16 and 126.18, as specifically authorized in this agreement, or where prior written approval of the Department of State has been obtained.

(6) "All provisions in this agreement which refer to the United States Government and the Department of State will remain binding on the parties after the termination of the agreement."

[58 FR 39305, July 22, 1993, as amended at 76 FR 28177, May 16, 2011]

## § 124.9   Additional clauses required only in manufacturing license agreements.

(a) *Clauses for all manufacturing license agreements.* The following clauses must be included only in manufacturing license agreements:

(1) "No export, sale, transfer, or other disposition of the licensed article is authorized to any country outside the territory wherein manufacture or sale is herein licensed without the prior written approval of the U.S. Government unless otherwise exempted by the U.S. Government. Sales or other transfers of the licensed article shall be limited to governments of countries wherein manufacture or sale is hereby licensed and to private entities seeking to procure the licensed article pursuant to a contract with any such government unless the prior written approval of the U.S. Government is obtained."

(2) "It is agreed that sales by licensee or its sub-licensees under contracts made through the U.S. Government will not include either charges for patent rights in which the U.S. Government holds a royalty-free license, or charges for data which the U.S. Government has a right to use and disclose to others, which are in the public domain, or which the U.S. Government has acquired or is entitled to acquire without restrictions upon their use and disclosure to others."

(3) "If the U.S. Government is obligated or becomes obligated to pay to the licensor royalties, fees, or other charges for the use of technical data or patents which are involved in the

105

WASHAR0000817

manufacture, use, or sale of any licensed article, any royalties, fees or other charges in connection with purchases of such licensed article from licensee or its sub-licensees with funds derived through the U.S. Government may not exceed the total amount the U.S. Government would have been obligated to pay the licensor directly."

(4) "If the U.S. Government has made financial or other contributions to the design and development of any licensed article, any charges for technical assistance or know-how relating to the item in connection with purchases of such articles from licensee or sub-licensees with funds derived through the U.S. Government must be proportionately reduced to reflect the U.S. Government contributions, and subject to the provisions of paragraphs (a) (2) and (3) of this section, no other royalties, or fees or other charges may be assessed against U.S. Government funded purchases of such articles. However, charges may be made for reasonable reproduction, handling, mailing, or similar administrative costs incident to the furnishing of such data."

(5) "The parties to this agreement agree that an annual report of sales or other transfers pursuant to this agreement of the licensed articles, by quantity, type, U.S. dollar value, and purchaser or recipient, shall be provided by (applicant or licensee) to the Department of State." This clause must specify which party is obligated to provide the annual report. Such reports may be submitted either directly by the licensee or indirectly through the licensor, and may cover calendar or fiscal years. Reports shall be deemed proprietary information by the Department of State and will not be disclosed to unauthorized persons. See §126.10(b) of this subchapter.

(6) (Licensee) agrees to incorporate the following statement as an integral provision of a contract, invoice or other appropriate document whenever the licensed articles are sold or otherwise transferred:

These commodities are authorized for export by the U.S. Government only to (country of ultimate destination or approved sales territory). They may not be resold, diverted, transferred, transshipped, or otherwise be disposed of in any other country, either in their original form or after being incorporated through an intermediate process into other end-items, without the prior written approval of the U.S. Department of State.

(b) *Special clause for agreements relating to significant military equipment.* With respect to an agreement for the production of significant military equipment, the following additional provisions must be included in the agreement:

(1) "A completed nontransfer and use certificate (DSP–83) must be executed by the foreign end-user and submitted to the Department of State of the United States before any transfer may take place."

(2) "The prior written approval of the U.S. Government must be obtained before entering into a commitment for the transfer of the licensed article by sale or otherwise to any person or government outside of the approved sales territory."

## § 124.10   Nontransfer and use assurances.

106

WASHAR0000818

(a) Types of agreements requiring assurances. With respect to any manufacturing license agreement or technical assistance agreement which relates to significant military equipment or classified defense articles, including classified technical data, a Nontransfer and Use Certificate (Form DSP–83) (see §123.10 of this subchapter) signed by the applicant and the foreign party must be submitted to the Directorate of Defense Trade Controls. With respect to all agreements involving classified articles, including classified technical data, an authorized representative of the foreign government must sign the DSP–83 (or provide the same assurances in the form of a diplomatic note), unless the Directorate of Defense Trade Controls has granted an exception to this requirement. The Directorate of Defense Trade Controls may require that a DSP–83 be provided in conjunction with an agreement that does not relate to significant military equipment or classified defense articles. The Directorate of Defense Trade Controls may also require with respect to any agreement that an appropriate authority of the foreign party's government also sign the DSP–83 (or provide the same assurances in the form of a diplomatic note).

(b) *Timing of submission of assurances.* Submission of a Form DSP–83 and/or diplomatic note must occur as follows:

(1) Agreements which have been signed by all parties before being submitted to the Directorate of Defense Trade Controls may only be submitted along with any required DSP–83 and/or diplomatic note.

(2) If an agreement has not been signed by all parties before being submitted, the required DSP–83 and/or diplomatic note must be submitted along with the signed agreement.

Note to paragraph (b): In no case may a transfer occur before a required DSP–83 and/or diplomatic note has been submitted to the Directorate of Defense Trade Controls.

[59 FR 29951, June 10, 1994, as amended at 71 FR 20543, Apr. 21, 2006]

### § 124.11   Congressional certification pursuant to Section 36(d) of the Arms Export Control Act.

(a) The Arms Export Control Act requires that a certification be provided to the Congress prior to the granting of any approval of a manufacturing license agreement or technical assistance agreement as defined in Sections 120.21 and 120.22 respectively for the manufacturing abroad of any item of significant military equipment (see §120.7 of this subchapter) that is entered into with any country regardless of dollar value. Additionally, any manufacturing license agreement or technical assistance agreement providing for the export of major defense equipment, as defined in §120.8 of this subchapter shall also require a certification when meeting the requirements of §123.15 of this subchapter.

(b) Unless an emergency exists which requires the immediate approval of the agreement in the national security interests of the United States, approval may not be granted until at least 15 calendar days have elapsed after receipt by the Congress of the certification required by 22 U.S.C. 2776(d)(1) involving the North Atlantic Treaty Organization, any member country of that Organization, or Australia, Japan, New Zealand, or South Korea or at least 30 calendar days have

WASHAR0000819

elapsed for any other country. Approvals may not be granted when the Congress has enacted a joint resolution prohibiting the export.

(c) Persons who intend to export defense articles and defense services pursuant to any exemption in this subchapter under the circumstances described in this section and section 123.15 must provide written notification to the Directorate of Defense Trade Controls and include a signed contract and a DSP–83 signed by the applicant, the foreign consignee and the end-user.

[70 FR 34654, June 15, 2005, as amended at 73 FR 38343, Aug. 3, 2009]

### § 124.12   Required information in letters of transmittal.

(a) An application for the approval of a manufacturing license or technical assistance agreement with a foreign person must be accompanied by an explanatory letter. The original letter and seven copies of the letter and eight copies of the proposed agreement shall be submitted to the Directorate of Defense Trade Controls. The explanatory letter shall contain:

(1) A statement giving the applicant's Directorate of Defense Trade Controls registration number.

(2) A statement identifying the licensee and the scope of the agreement.

(3) A statement identifying the U.S. Government contract under which the equipment or technical data was generated, improved, or developed and supplied to the U.S. Government, and whether the equipment or technical data was derived from any bid or other proposal to the U.S. Government.

(4) A statement giving the military security classification of the equipment or technical data.

(5) A statement identifying any patent application which discloses any of the subject matter of the equipment or technical data covered by an invention secrecy order issued by the U.S. Patent and Trademark Office.

(6) A statement of the actual or estimated value of the agreement, including the estimated value of all defense articles to be exported in furtherance of the agreement or amendments thereto. If the value is $500,000 or more, an additional statement must be made regarding the payment of political contributions, fees or commissions, pursuant to part 130 of this subchapter.

(7) A statement indicating whether any foreign military sales credits or loan guarantees are or will be involved in financing the agreement.

(8) The agreement must describe any classified information involved and identify, from Department of Defense form DD254, the address and telephone number of the U.S. Government office that classified the information.

(9) For agreements that may require the export of classified information, the Defense Investigative Service cognizant security offices that have responsibility for the facilities of the

WASHAR0000820

U.S. parties to the agreement shall be identified. The facility security clearance codes of the U.S. parties shall also be provided.

(10) A statement specifying whether the applicant is requesting retransfer of defense articles and defense services pursuant to §124.16 of this subchapter.

(b) The following statements must be made in the letter of transmittal:

(1) "If the agreement is approved by the Department of State, such approval will not be construed by (the applicant) as passing on the legality of the agreement from the standpoint of antitrust laws or other applicable statutes, nor will (the applicant) construe the Department's approval as constituting either approval or disapproval of any of the business terms or conditions between the parties to the agreement."

(2) "The (applicant) will not permit the proposed agreement to enter into force until it has been approved by the Department of State."

(3) "The (applicant) will furnish the Department of State with one copy of the signed agreement (or amendment) within 30 days from the date that the agreement is concluded and will inform the Department of its termination not less than 30 days prior to expiration and provide information on the continuation of any foreign rights or the flow of technical data to the foreign party. If a decision is made not to conclude the proposed agreement, the applicant will so inform the Department within 60 days."

(4) "If this agreement grants any rights to sub-license, it will be amended to require that all sub-licensing arrangements incorporate all the provisions of the basic agreement that refer to the U.S. Government and the Department of State ( *i.e.* , 22 CFR 124.9 and 124.10)."

[58 FR 39305, July 22, 1993, as amended at 71 FR 20543, Apr. 21, 2006; 72 FR 71786, Dec. 19, 2007]

### § 124.13   Procurement by United States persons in foreign countries (offshore procurement).

Notwithstanding the other provisions in part 124 of this subchapter, the Directorate of Defense Trade Controls may authorize by means of a license (DSP–5) the export of unclassified technical data to foreign persons for offshore procurement of defense articles, provided that:

(a) The contract or purchase order for offshore procurement limits delivery of the defense articles to be produced only to the person in the United States or to an agency of the U.S. Government; and

(b) The technical data of U.S.-origin to be used in the foreign manufacture of defense articles does not exceed that required for bid purposes on a build-to-print basis (build-to-print means producing an end-item ( *i.e.* , system, subsystem or component) from technical drawings and specifications (which contain no process or know-how information) without the need for

109

WASHAR0000821

additional technical assistance). Release of supporting documentation (e.g., acceptance criteria, object code software for numerically controlled machines) is permissible. Build-to-print does not include the release of any information which discloses design methodology, engineering analysis, detailed process information or manufacturing know-how); and

(c) The contract or purchase order between the person in the United States and the foreign person:

(1) Limits the use of the technical data to the manufacture of the defense articles required by the contract or purchase order only; and

(2) Prohibits the disclosure of the data to any other person except subcontractors within the same country; and

(3) Prohibits the acquisition of any rights in the data by any foreign person; and

(4) Provides that any subcontracts between foreign persons in the approved country for manufacture of equipment for delivery pursuant to the contract or purchase order contain all the limitations of this paragraph (c); and

(5) Requires the foreign person, including subcontractors, to destroy or return to the person in the United States all of the technical data exported pursuant to the contract or purchase order upon fulfillment of their terms; and

(6) Requires delivery of the defense articles manufactured abroad only to the person in the United States or to an agency of the U.S. Government; and

(d) The person in the United States provides the Directorate of Defense Trade Controls with a copy of each contract, purchase order or subcontract for offshore procurement at the time it is accepted. Each such contract, purchase order or subcontract must clearly identify the article to be produced and must identify the license number or exemption under which the technical data was exported; and

(e) Licenses issued pursuant to this section must be renewed prior to their expiration if offshore procurement is to be extended beyond the period of validity of the original approved license. In all instances a license for offshore procurement must state as the purpose "Offshore procurement in accordance with the conditions established in the ITAR, including §124.13. No other use will be made of the technical data." If the technical data involved in an offshore procurement arrangement is otherwise exempt from the licensing requirements of this subchapter (e.g., §126.4), the DSP–5 referred to in the first sentence of this section is not required. However, the exporter must comply with the other requirements of this section and provide a written certification to the Directorate of Defense Trade Controls annually of the offshore procurement activity and cite the exemption under which the technical data was exported. The exemptions under §125.4 of this subchapter may not be used to establish offshore procurement arrangements.

WASHAR0000822

[58 FR 39305, July 22, 1993, as amended at 64 FR 17534, Apr. 12, 1999; 71 FR 20543, Apr. 21, 2006]

## § 124.14   Exports to warehouses or distribution points outside the United States.

(a) *Agreements.* Agreements (e.g., contracts) between U.S. persons and foreign persons for the warehousing and distribution of defense articles must be approved by the Directorate of Defense Trade Controls before they enter into force. Such agreements will be limited to unclassified defense articles and must contain conditions for special distribution, end-use and reporting. Licenses for exports pursuant to such agreements must be obtained prior to exports of the defense articles unless an exemption under §123.16(b)(1) of this subchapter is applicable.

(b) *Required information.* Proposed warehousing and distribution agreements (and amendments thereto) shall be submitted to the Directorate of Defense Trade Controls for approval. The following information must be included in all such agreements:

(1) A description of the defense articles involved including test and support equipment covered by the U.S. Munitions List. This shall include when applicable the military nomenclature, the Federal stock number, nameplate data, and any control numbers under which the defense articles were developed or procured by the U.S. Government. Only those defense articles specifically listed in the agreement will be eligible for export under the exemption in §123.16(b)(1) of this subchapter.

(2) A detailed statement of the terms and conditions under which the defense articles will be exported and distributed;

(3) The duration of the proposed agreement;

(4) Specific identification of the country or countries that comprise the distribution territory. Distribution must be specifically limited to the governments of such countries or to private entities seeking to procure defense articles pursuant to a contract with a government within the distribution territory or to other eligible entities as specified by the Directorate of Defense Trade Controls. Consequently, any deviation from this condition must be fully explained and justified. A nontransfer and use certificate (DSP–83) will be required to the same extent required in licensing agreements under §124.9(b).

(c) *Required statements.* The following statements must be included in all warehousing and distribution agreements:

(1) "This agreement shall not enter into force, and may not be amended or extended, without the prior written approval of the Department of State of U.S. Government."

(2) "This agreement is subject to all United States laws and regulations related to exports and to all administrative acts of the United States Government pursuant to such laws and regulations.

WASHAR0000823

(3) "The parties to this agreement agree that the obligations contained in this agreement shall not affect the performance of any obligations created by prior contracts or subcontracts which the parties may have individually or collectively with the U.S. Government."

(4) "No liability will be incurred by or attributed to the U.S. Government in connection with any possible infringement of privately owned patent or proprietary rights, either domestic or foreign by reason of the U.S. Government's approval of this agreement."

(5) "No export, sale, transfer, or other disposition of the defense articles covered by this agreement is authorized to any country outside the distribution territory without the prior written approval of the Directorate of Defense Trade Controls of the U.S. Department of State."

(6) "The parties to this agreement agree that an annual report of sales or other transfers pursuant to this agreement of the licensed articles, by quantity, type, U.S. dollar value, and purchaser or recipient shall be provided by (applicant or licensee) to the Department of State." This clause must specify which party is obligated to provide the annual report. Such reports may be submitted either directly by the licensee or indirectly through the licensor, and may cover calendar or fiscal years. Reports shall be deemed proprietary information by the Department of State and will not be disclosed to unauthorized persons. (See §126.10(b) of this subchapter.)

(7) (Licensee) agrees to incorporate the following statement as an integral provision of a contract, invoice or other appropriate document whenever the articles covered by this agreement are sold or otherwise transferred:

These commodities are authorized for export by the U.S. Government only to (country of ultimate destination or approved sales territory). They may not be resold, diverted, transferred, transshipped, or otherwise be disposed of in any other country, either in their original form or after being incorporated through an intermediate process into other end-items, without the prior written approval of the U.S. Department of State.

(8) "All provisions in this agreement which refer to the United States Government and the Department of State will remain binding on the parties after the termination of the agreement."

(9) Additional clause. Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (e.g., sporting firearms for commercial resale, cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

(d) *Special clauses for agreements relating to significant military equipment.* With respect to agreements for the warehousing and distribution of significant military equipment, the following additional provisions must be included in the agreement:

WASHAR0000824

(1) A completed nontransfer and use certificate (DSP–83) must be executed by the foreign end-user and submitted to the U.S. Department of State before any transfer may take place.

(2) The prior written approval of the U.S. Department of State must be obtained before entering into a commitment for the transfer of the licensed article by sale or otherwise to any person or government outside the approved distribution territory.

(e) *Transmittal letters.* Requests for approval of warehousing and distribution agreements with foreign persons must be made by letter. The original letter and seven copies of the letter and seven copies of the proposed agreement shall be submitted to the Directorate of Defense Trade Controls. The letter shall contain:

(1) A statement giving the applicant's Directorate of Defense Trade Controls registration number.

(2) A statement identifying the foreign party to the agreement.

(3) A statement identifying the defense articles to be distributed under the agreement.

(4) A statement identifying any U.S. Government contract under which the equipment may have been generated, improved, developed or supplied to the U.S. Government, and whether the equipment was derived from any bid or other proposal to the U.S. Government.

(5) A statement that no classified defense articles or classified technical data are involved.

(6) A statement identifying any patent application which discloses any of the subject matter of the equipment or related technical data covered by an invention secrecy order issued by the U.S. Patent and Trademark Office.

(f) *Required clauses.* The following statements must be made in the letter of transmittal:

(1) "If the agreement is approved by the Department of State, such approval will not be construed by (applicant) as passing on the legality of the agreement from the standpoint of antitrust laws or other applicable statutes, nor will (the applicant) construe the Department's approval as constituting either approval or disapproval of any of the business terms or conditions between the parties to the agreement."

(2) "The (applicant) will not permit the proposed agreement to enter into force until it has been approved by the Department of State."

(3) "(Applicant) will furnish the Department of State with one copy of the signed agreement (or amendment thereto) within 30 days from the date that the agreement is concluded, and will inform the Department of its termination not less than 30 days prior to expiration. If a decision is made not to conclude the proposed agreement, (applicant) will so inform the Department within 60 days."

[58 FR 39305, July 22, 1993, as amended at 71 FR 20544, Apr. 21, 2006]

WASHAR0000825

**§ 124.15   Special Export Controls for Defense Articles and Defense Services Controlled under Category XV: Space Systems and Space Launches.**

(a) The export of any satellite or related item (see §121.1, Category XV(a) and (e)) or any defense service controlled by this subchapter associated with the launch in, or by nationals of, a country that is not a member of the North Atlantic Treaty Organization or a major non-NATO ally of the United States always requires special exports controls, in addition to other export controls required by this subchapter, as follows:

(1) All licenses and other requests for approval require a technology transfer control plan (TTCP) approved by the Department of Defense and an encryption technology control plan approved by the National Security Agency. Drafts reflecting advance discussions with both agencies must accompany submission of the license application or proposed technical assistance agreement, and the letter of transmittal required in §124.12 must identify the U.S. Government officials familiar with the preparation of the draft TTCPs. The TTCP must require any U.S. person or entity involved in the export to notify the Department of Defense in advance of all meetings and interactions with any foreign person or entity that is a party to the export and require such U.S. person or entity to certify that it has complied with this notification requirement within 30 days after launch.

(2) The U.S. person must make arrangements with the Department of Defense for monitoring. The costs of such monitoring services must be fully reimbursed to the Department of Defense by the U.S. person receiving such services. The letter of transmittal required under §124.12 must also state that such reimbursement arrangements have been made with the Department of Defense and identify the specific Department of Defense official with whom these arrangements have been made. As required by Public Law 105–261, such monitoring will cover, but not be limited to—

(i) Technical discussions and activities, including the design, development, operation, maintenance, modification, and repair of satellites, satellite components, missiles, other equipment, launch facilities, and launch vehicles;

(ii) Satellite processing and launch activities, including launch preparation, satellite transportation, integration of the satellite with the launch vehicle, testing and checkout prior to launch, satellite launch, and return of equipment to the United States;

(iii) Activities relating to launch failure, delay, or cancellation, including post-launch failure investigations or analyses with regard to either the launcher or the satellite; and

(iv) All other aspects of the launch.

(b) Mandatory licenses for launch failure (crash) investigations or analyses: In the event of a failure of a launch from a foreign country (including a post liftoff failure to reach proper orbit)—

(1) The activities of U.S. persons or entities in connection with any subsequent investigation or analysis of the failure continue to be subject to the controls established under section 38 of the

114

WASHAR0000826

Arms Export Control Act, including the requirements under this subchapter for express approval prior to participation in such investigations or analyses, regardless of whether a license was issued under this subchapter for the initial export of the satellite or satellite component;

(2) Officials of the Department of Defense must monitor all activities associated with the investigation or analyses to insure against unauthorized transfer of technical data or services and U.S. persons must follow the procedures set forth in paragraphs (a)(1) and (a)(2) of this Category.

(c) Although Public Law 105–261 does not require the application of special export controls for the launch of U.S.-origin satellites and components from or by nationals of countries that are members of NATO or major non-NATO allies, such export controls may nonetheless be applied, in addition to any other export controls required under this subchapter, as appropriate in furtherance of the security and foreign policy of the United States. Further, the export of any article or defense service controlled under this subchapter to any destination may also require that the special export controls identified in paragraphs (a)(1) and (a)(2) of this category be applied in furtherance of the security and foreign policy of the United States.

(d) Mandatory licenses for exports to insurance providers and underwriters: None of the exemptions or sub-licensing provisions available in this subchapter may be used for the export of technical data in order to obtain or satisfy insurance requirements. Such exports are always subject to the prior approval and re-transfer requirements of sections 3 and 38 of the Arms Export Control Act, as applied by relevant provisions of this subchapter.

[64 FR 13681, Mar. 22, 1999]

### § 124.16   Special retransfer authorizations for unclassified technical data and defense services to member states of NATO and the European Union, Australia, Japan, New Zealand, and Switzerland.

The provisions of §124.8(5) of this subchapter notwithstanding, the Department may approve access to unclassified defense articles exported in furtherance of or produced as a result of a TAA/MLA, and retransfer of technical data and defense services to individuals who are dual national or third-country national employees of the foreign signatory or its approved sub-licensees, including the transfer to dual nationals or third-country nationals who are bona fide regular employees, directly employed by the foreign signatory or approved sub-licensees, provided they are nationals exclusively of countries that are members of NATO the European Union, Australia, Japan, New Zealand, and Switzerland and their employer is a signatory to the agreement or has executed a Non Disclosure Agreement. The retransfer must take place completely within the physical territories of these countries or the United States. Permanent retransfer of hardware is not authorized.

[76 FR 28177, May 16, 2011]

WASHAR0000827

**Intentionally Blank**

116

WASHAR0000828

## PART 125—LICENSES FOR THE EXPORT OF TECHNICAL DATA AND CLASSIFIED DEFENSE ARTICLES

**Section Contents**

§ 125.1   Exports subject to this part.
§ 125.2   Exports of unclassified technical data.
§ 125.3   Exports of classified technical data and classified defense articles.
§ 125.4   Exemptions of general applicability.
§ 125.5   Exemptions for plant visits.
§ 125.6   Certification requirements for exemptions.
§ 125.7   Procedures for the export of classified technical data and other classified defense articles.
§ 125.8   [Reserved]
§ 125.9   Filing of licenses and other authorizations for exports of classified technical data and classified defense articles.

**Authority:**   Secs. 2 and 38, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778); E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp. p.79; 22 U.S.C. 2651a.

**Source:**   58 FR 39310, July 22, 1993, unless otherwise noted.

### § 125.1   Exports subject to this part.

 (a) The controls of this part apply to the export of technical data and the export of classified defense articles. Information which is in the public domain (see §120.11 of this subchapter and §125.4(b)(13)) is not subject to the controls of this subchapter.

(b) A license for the export of technical data and the exemptions in §125.4 may not be used for foreign production purposes or for technical assistance unless the approval of the Directorate of Defense Trade Controls has been obtained. Such approval is generally provided only pursuant to the procedures specified in part 124 of this subchapter.

(c) Technical data authorized for export may not be reexported, transferred or diverted from the country of ultimate end-use or from the authorized foreign end-user (as designated in the license or approval for export) or disclosed to a national of another country without the prior written approval of the Directorate of Defense Trade Controls.

(d) The controls of this part apply to the exports referred to in paragraph (a) of this section regardless of whether the person who intends to export the technical data produces or manufactures defense articles if the technical data is determined by the Directorate of Defense Trade Controls to be subject to the controls of this subchapter.

117

WASHAR0000829

(e) The provisions of this subchapter do not apply to technical data related to articles in Category VI(e) and Category XVI. The export of such data is controlled by the Department of Energy and the Nuclear Regulatory Commission pursuant to the Atomic Energy Act of 1954, as amended, and the Nuclear Non-Proliferation Act of 1978.

[58 FR 39310, July 22, 1993, as amended at 71 FR 20544, Apr. 21, 2006]

## § 125.2   Exports of unclassified technical data.

(a) *License*. A license (DSP–5) is required for the export of unclassified technical data unless the export is exempt from the licensing requirements of this subchapter. In the case of a plant visit, details of the proposed discussions must be transmitted to the Directorate of Defense Trade Controls for an appraisal of the technical data. Seven copies of the technical data or the details of the discussion must be provided.

(b) *Patents*. A license issued by the Directorate of Defense Trade Controls is required for the export of technical data whenever the data exceeds that which is used to support a domestic filing of a patent application or to support a foreign filing of a patent application whenever no domestic application has been filed. Requests for the filing of patent applications in a foreign country, and requests for the filing of amendments, modifications or supplements to such patents, should follow the regulations of the U.S. Patent and Trademark Office in accordance with 37 CFR part 5. The export of technical data to support the filing and processing of patent applications in foreign countries is subject to regulations issued by the U.S. Patent and Trademark Office pursuant to 35 U.S.C. 184.

(c) *Disclosures*. Unless otherwise expressly exempted in this subchapter, a license is required for the oral, visual or documentary disclosure of technical data by U.S. persons to foreign persons. A license is required regardless of the manner in which the technical data is transmitted (e.g., in person, by telephone, correspondence, electronic means, etc.). A license is required for such disclosures by U.S. persons in connection with visits to foreign diplomatic missions and consular offices.

[58 FR 39310, July 22, 1993, as amended at 71 FR 20544, Apr. 21, 2006]

## § 125.3   Exports of classified technical data and classified defense articles.

(a) A request for authority to export defense articles, including technical data, classified by a foreign government or pursuant to Executive Order 12356, successor orders, or other legal authority must be submitted to the Directorate of Defense Trade Controls for approval. The application must contain full details of the proposed transaction. It should also list the facility security clearance code of all U.S. parties on the license and include the Defense Security Service cognizant security office of the party responsible for packaging the commodity for shipment. A nontransfer and use certificate (Form DSP–83) executed by the applicant, foreign consignee, end-user and an authorized representative of the foreign government involved will be required.

118

WASHAR0000830

(b) Classified technical data which is approved by the Directorate of Defense Trade Controls either for export or reexport after a temporary import will be transferred or disclosed only in accordance with the requirements in the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case the latter guidance must be followed). Any other requirements imposed by cognizant U.S. departments and agencies must also be satisfied.

(c) The approval of the Directorate of Defense Trade Controls must be obtained for the export of technical data by a U.S. person to a foreign person in the U.S. or in a foreign country unless the proposed export is exempt under the provisions of this subchapter.

(d) All communications relating to a patent application covered by an invention secrecy order are to be addressed to the U.S. Patent and Trademark Office (see 37 CFR 5.11).

[58 FR 39310, July 22, 1993, as amended at 71 FR 20544, Apr. 21, 2006]

### § 125.4   Exemptions of general applicability.

 (a) The following exemptions apply to exports of technical data for which approval is not needed from the Directorate of Defense Trade Controls. The exemptions, except for paragraph (b)(13) of this section, do not apply to exports to proscribed destinations under §126.1 of this subchapter or for persons considered generally ineligible under §120.1(c) of this subchapter. The exemptions are also not applicable for purposes of establishing offshore procurement arrangements or producing defense articles offshore (*see* §124.13), except as authorized under §125.4(c). Transmission of classified information must comply with the requirements of the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade controls, in which case the latter guidance must be followed) and the exporter must certify to the transmittal authority that the technical data does not exceed the technical limitation of the authorized export.

(b) The following exports are exempt from the licensing requirements of this subchapter.

(1) Technical data, including classified information, to be disclosed pursuant to an official written request or directive from the U.S. Department of Defense;

(2) Technical data, including classified information, in furtherance of a manufacturing license or technical assistance agreement approved by the Department of State under part 124 of this subchapter and which meet the requirements of §124.3 of this subchapter;

(3) Technical data, including classified information, in furtherance of a contract between the exporter and an agency of the U.S. Government, if the contract provides for the export of the data and such data does not disclose the details of design, development, production, or manufacture of any defense article;

WASHAR0000831

(4) Copies of technical data, including classified information, previously authorized for export to the same recipient. Revised copies of such technical data are also exempt if they pertain to the identical defense article, and if the revisions are solely editorial and do not add to the content of technology previously exported or authorized for export to the same recipient;

(5) Technical data, including classified information, in the form of basic operations, maintenance, and training information relating to a defense article lawfully exported or authorized for export to the same recipient. Intermediate or depot-level repair and maintenance information may be exported only under a license or agreement approved specifically for that purpose;

(6) Technical data, including classified information, related to firearms not in excess of caliber .50 and ammunition for such weapons, except detailed design, development, production or manufacturing information;

(7) Technical data, including classified information, being returned to the original source of import;

(8) Technical data directly related to classified information which has been previously exported or authorized for export in accordance with this part to the same recipient, and which does not disclose the details of the design, development, production, or manufacture of any defense article;

(9) Technical data, including classified information, and regardless of media or format, sent or taken by a U.S. person who is an employee of a U.S. corporation or a U.S. Government agency to a U.S. person employed by that U.S. corporation or to a U.S. Government agency outside the United States. This exemption is subject to the limitations of §125.1(b) of this subchapter and may be used only if:

(i) The technical data is to be used outside the United States solely by a U.S. person;

(ii) The U.S. person outside the United States is an employee of the U.S. Government or is directly employed by the U.S. corporation and not by a foreign subsidiary; and

(iii) The classified information is sent or taken outside the United States in accordance with the requirements of the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case the latter guidance must be followed).

(10) Disclosures of unclassified technical data in the U.S. by U.S. institutions of higher learning to foreign persons who are their bona fide and full time regular employees. This exemption is available only if:

(i) The employee's permanent abode throughout the period of employment is in the United States;

WASHAR0000832

(ii) The employee is not a national of a country to which exports are prohibited pursuant to §126.1 of this subchapter; and

(iii) The institution informs the individual in writing that the technical data may not be transferred to other foreign persons without the prior written approval of the Directorate of Defense Trade Controls;

(11) Technical data, including classified information, for which the exporter, pursuant to an arrangement with the Department of Defense, Department of Energy or NASA which requires such exports, has been granted an exemption in writing from the licensing provisions of this part by the Directorate of Defense Trade Controls. Such an exemption will normally be granted only if the arrangement directly implements an international agreement to which the United States is a party and if multiple exports are contemplated. The Directorate of Defense Trade Controls, in consultation with the relevant U.S. Government agencies, will determine whether the interests of the United States Government are best served by expediting exports under an arrangement through an exemption (see also paragraph (b)(3) of this section for a related exemption);

(12) Technical data which is specifically exempt under part 126 of this subchapter; or

(13) Technical data approved for public release ( *i.e.* , unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review. This exemption is applicable to information approved by the cognizant U.S. Government department or agency for public release in any form. It does not require that the information be published in order to qualify for the exemption.

(c) Defense services and related unclassified technical data are exempt from the licensing requirements of this subchapter, to nationals of NATO countries, Australia, Japan, and Sweden, for the purposes of responding to a written request from the Department of Defense for a quote or bid proposal. Such exports must be pursuant to an official written request or directive from an authorized official of the U.S. Department of Defense. The defense services and technical data are limited to paragraphs (c)(1), (c)(2), and (c)(3) of this section and must not include paragraphs (c)(4), (c)(5), and (c)(6) of this section which follow:

(1) *Build-to-Print.* "Build-to-Print" means that a foreign consignee can produce a defense article from engineering drawings without any technical assistance from a U.S. exporter. This transaction is based strictly on a "hands-off" approach since the foreign consignee is understood to have the inherent capability to produce the defense article and only lacks the necessary drawings. Supporting documentation such as acceptance criteria, and specifications, may be released on an as-required basis ( *i.e.* "must have") such that the foreign consignee would not be able to produce an acceptable defense article without this additional supporting documentation. Documentation which is not absolutely necessary to permit manufacture of an acceptable defense article ( *i.e.* "nice to have") is not considered within the boundaries of a "Build-to-Print" data package;

(2) *Build/Design-to-Specification.* "Build/Design-to-Specification" means that a foreign consignee can design and produce a defense article from requirement specifications without any

121

technical assistance from the U.S. exporter. This transaction is based strictly on a "hands-off" approach since the foreign consignee is understood to have the inherent capability to both design and produce the defense article and only lacks the necessary requirement information;

(3) *Basic Research.* "Basic Research" means a systemic study directed toward greater knowledge or understanding of the fundamental aspects of phenomena and observable facts without specific applications towards processes or products in mind. It does not include "Applied Research" ( *i.e.* a systemic study to gain knowledge or understanding necessary to determine the means by which a recognized and specific need may be met. It is a systematic application of knowledge toward the production of useful materials, devices, and systems or methods, including design, development, and improvement of prototypes and new processes to meet specific requirements.);

(4) *Design Methodology,* such as: The underlying engineering methods and design philosophy utilized ( *i.e.,* the "why" or information that explains the rationale for particular design decision, engineering feature, or performance requirement); engineering experience (e.g., lessons learned); and the rationale and associated databases (e.g., design allowables, factors of safety, component life predictions, failure analysis criteria) that establish the operational requirements (e.g., performance, mechanical, electrical, electronic, reliability and maintainability) of a defense article. (Final analytical results and the initial conditions and parameters may be provided.)

(5) *Engineering Analysis,* such as: Analytical methods and tools used to design or evaluate a defense article's performance against the operational requirements. Analytical methods and tools include the development and/or use of mockups, computer models and simulations, and test facilities. (Final analytical results and the initial conditions and parameters may be provided.)

(6) *Manufacturing Know-how,* such as: information that provides detailed manufacturing processes and techniques needed to translate a detailed design into a qualified, finished defense article. (Information may be provided in a build-to-print package that is necessary in order to produce an acceptable defense article.)

(d)(1) Defense services for the items identified in §123.16(b)(10) of this subchapter exported by accredited U.S. institutions of higher learning are exempt from the licensing requirements of this subchapter when the export is:

(i) To countries identified in §123.16(b)(10)(i) of this subchapter and exclusively to nationals of such countries when engaged in international fundamental research conducted under the aegis of an accredited U.S. institution of higher learning; and

(ii) In direct support of fundamental research as defined in §120.11(8) of this subchapter being conducted either at accredited U.S. institutions of higher learning or an accredited institution of higher learning, a governmental research center or an established government funded private research center located within the countries identified in §123.16(b)(10)(i) of this subchapter; and

(iii) Limited to discussions on assembly of any article described in §123.16(b)(10) of this subchapter and or integrating any such article into a scientific, research, or experimental satellite.

WASHAR0000834

(2) The exemption in paragraph (d)(1) of this section, while allowing accredited U.S. institutions of higher learning to participate in technical meetings with foreign nationals from countries specified in §123.16(b)(10)(i) of this subchapter for the purpose of conducting space scientific fundamental research either in the United States or in these countries when working with information that meets the requirements of §120.11 of this subchapter in activities that would generally be controlled as a defense service in accordance with §124.1(a) of this subchapter, does not cover:

(i) Any level of defense service or information involving launch activities including the integration of the satellite or spacecraft to the launch vehicle;

(ii) Articles and information listed in the Missile Technology Control Regime (MTCR) Annex or classified as significant military equipment; or

(iii) The transfer of or access to technical data, information, or software that is otherwise controlled by this subchapter.

[58 FR 39310, July 22, 1993, as amended at 65 FR 45284, July 21, 2000; 66 FR 35900, July 10, 2001; 67 FR 15101, Mar. 29, 2002; 71 FR 20545, Apr. 21, 2006; 75 FR 52624, 52626, Aug. 27, 2010]

## § 125.5  Exemptions for plant visits.

(a) A license is not required for the oral and visual disclosure of unclassified technical data during the course of a classified plant visit by a foreign person, provided: The classified visit has itself been authorized pursuant to a license issued by the Directorate of Defense Trade Controls; or the classified visit was approved in connection with an actual or potential government-to-government program or project by a U.S. Government agency having classification jurisdiction over the classified defense article or classified technical data involved under Executive Order 12356 or other applicable Executive Order; and the unclassified information to be released is directly related to the classified defense article or technical data for which approval was obtained and does not disclose the details of the design, development, production or manufacture of any other defense articles. In the case of visits involving classified information, the requirements of the Department of Defense National Industrial Security Program Operating Manual must be met (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case the latter guidance must be followed).

(b) The approval of the Directorate of Defense Trade Controls is not required for the disclosure of oral and visual classified information to a foreign person during the course of a plant visit approved by the appropriate U.S. Government agency if: The requirements of the Department of Defense National Industrial Security Program Operating Manual have been met (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case the latter guidance must be followed); the classified information is directly related to that which was approved by the U.S. Government agency; it does not exceed that for which approval was obtained; and it does not disclose the details of the design, development, production or manufacture of any defense articles.

WASHAR0000835

(c) A license is not required for the disclosure to a foreign person of unclassified technical data during the course of a plant visit (either classified or unclassified) approved by the Directorate of Defense Trade Controls or a cognizant U.S. Government agency provided the technical data does not contain information in excess of that approved for disclosure. This exemption does not apply to technical data which could be used for design, development, production or manufacture of a defense article.

[71 FR 20545, Apr. 21, 2006]

## § 125.6   Certification requirements for exemptions.

(a) To claim an exemption for the export of technical data under the provisions of this subchapter (e.g., §§125.4 and 125.5), the exporter must certify that the proposed export is covered by a relevant section of this subchapter, to include the paragraph and applicable subparagraph. Certifications consist of clearly marking the package or letter containing the technical data "22 CFR [insert ITAR exemption] applicable." This certification must be made in written form and retained in the exporter's files for a period of 5 years (see §123.22 of this subchapter).

(b) For exports that are oral, visual, or electronic the exporter must also complete a written certification as indicated in paragraph (a) of this section and retain it for a period of 5 years.

[68 FR 61102, Oct. 27, 2003]

## § 125.7   Procedures for the export of classified technical data and other classified defense articles.

(a) All applications for the export or temporary import of classified technical data or other classified defense articles must be submitted to the Directorate of Defense Trade Controls on Form DSP–85.

(b) An application for the export of classified technical data or other classified defense articles must be accompanied by seven copies of the data and a completed Form DSP–83 (see §123.10 of this subchapter). Only one copy of the data or descriptive literature must be provided if a renewal of the license is requested. All classified materials accompanying an application must be transmitted to the Directorate of Defense Trade Controls in accordance with the procedures contained in the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case the latter guidance must be followed).

[71 FR 20546, Apr. 21, 2006]

## § 125.8   [Reserved]

## § 125.9   Filing of licenses and other authorizations for exports of classified technical data and classified defense articles.

WASHAR0000836

Licenses and other authorizations for the export of classified technical data or classified defense articles will be forwarded by the Directorate of Defense Trade Controls to the Defense Security Service of the Department of Defense in accordance with the provisions of the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case the latter guidance must be followed). The Directorate of Defense Trade Controls will forward a copy of the license to the applicant for the applicant's information. The Defense Security Service will return the endorsed license to the Directorate of Defense Trade Controls upon completion of the authorized export or expiration of the license, whichever occurs first.

[71 FR 20546, Apr. 21, 2006]

WASHAR0000837

**Intentionally Blank**

WASHAR0000838

## PART 126—GENERAL POLICIES AND PROVISIONS

**Section Contents**
§ 126.1   Prohibited exports and sales to certain countries.
§ 126.2   Temporary suspension or modification of this subchapter.
§ 126.3   Exceptions.
§ 126.4   Shipments by or for United States Government agencies.
§ 126.5   Canadian exemptions.
§ 126.6   Foreign-owned military aircraft and naval vessels, and the Foreign Military Sales program.
§ 126.7   Denial, revocation, suspension or amendment of licenses and other approvals.
§ 126.8   [Reserved]
§ 126.9   Advisory opinions and related authorizations.
§ 126.10   Disclosure of information.
§ 126.11   Relations to other provisions of law.
§ 126.12   Continuation in force.
§ 126.13   Required information.
§ 126.14   Special comprehensive export authorizations for NATO, Australia, and Japan.
§ 126.15   Expedited processing of license applications for the export of defense articles and defense services to Australia or the United Kingdom.

**Authority:**   Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp., p.79; 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p.899; Sec. 1225, Pub. L. 108–375.

**Source:**   58 FR 39312, July 22, 1993, unless otherwise noted.

### § 126.1   Prohibited exports, imports, and sales to or from certain countries.

(a) *General.* It is the policy of the United States to deny licenses and other approvals for exports and imports of defense articles and defense services destined for or originating in certain countries. This policy applies to Belarus, Cuba, Eritrea, Iran, North Korea, Syria, and Venezuela. This policy also applies to countries with respect to which the United States maintains an arms embargo (e.g., Burma, China, and the Republic of the Sudan) or whenever an export would not otherwise be in furtherance of world peace and the security and foreign policy of the United States. Information regarding certain other embargoes appears elsewhere in this section. Comprehensive arms embargoes are normally the subject of a State Department notice published in theFederal Register.The exemptions provided in the regulations in this subchapter, except §123.17 of this subchapter, do not apply with respect to articles originating in or for export to any proscribed countries, areas, or persons in this §126.1.

 (b) *Shipments.* A defense article licensed for export under this subchapter may not be shipped on a vessel, aircraft or other means of conveyance which is owned or operated by, or leased to or from, any of the proscribed countries or areas.

WASHAR0000839

(c) *Exports and sales prohibited by United Nations Security Council embargoes.* Whenever the United Nations Security Council mandates an arms embargo, all transactions that are prohibited by the embargo and that involve U.S. persons (see §120.15 of this subchapter) anywhere, or any person in the United States, and defense articles or services of a type enumerated on the United States Munitions List (22 CFR part 121), irrespective of origin, are prohibited under the ITAR for the duration of the embargo, unless the Department of State publishes a notice in the Federal Register specifying different measures. This would include, but is not limited to, transactions involving trade by U.S. persons who are located inside or outside of the United States in defense articles or services of U.S. or foreign origin that are located inside or outside of the United States. United Nations Security Council arms embargoes include, but are not necessarily limited to, the following countries:

(1) Cote d'Ivoire (see also paragraph (q) of this section).

(2) Democratic Republic of Congo (see also paragraph (i) of this section).

(3) Eritrea.

(4) Iraq (see also paragraph (f) of this section).

(5) Iran.

(6) Lebanon (see also paragraph (t) of this section).

(7) Liberia (see also paragraph (o) of this section).

(8) Libya (see also paragraph (k) of this section).

(9) North Korea.

(10) Somalia (see also paragraph (m) of this section).

(11) Sudan.

(d) *Terrorism.* Exports to countries which the Secretary of State has determined to have repeatedly provided support for acts of international terrorism are contrary to the foreign policy of the United States and are thus subject to the policy specified in paragraph (a) of this section and the requirements of section 40 of the Arms Export Control Act (22 U.S.C. 2780) and the Omnibus Diplomatic Security and Anti-Terrorism Act of 1986 (22 U.S.C. 4801, note). The countries in this category are: Cuba, Iran, Sudan, and Syria.

(e) *Proposed sales.* No sale or transfer and no proposal to sell or transfer any defense articles, defense services or technical data subject to this subchapter may be made to any country referred to in this section (including the embassies or consulates of such a country), or to any person acting on its behalf, whether in the United States or abroad, without first obtaining a license or written approval of the Directorate of Defense Trade Controls. However, in accordance with

WASHAR0000840

paragraph (a) of this section, it is the policy of the Department of State to deny licenses and approvals in such cases. Any person who knows or has reason to know of such a proposed or actual sale, or transfer, of such articles, services or data must immediately inform the Directorate of Defense Trade Controls.

(f) *Iraq.* It is the policy of the United States to deny licenses or other approvals for exports and imports of defense articles and defense services, destined for or originating in Iraq, except that a license or other approval may be issued, on a case-by-case basis for:

(1) Non-lethal military equipment; and

(2) Lethal military equipment required by the Government of Iraq or coalition forces.

(g) *Afghanistan.* It is the policy of the United States to deny licenses or other approvals for exports and imports of defense articles and defense services, destined for or originating in Afghanistan, except that a license or other approval may be issued, on a case-by-case basis, for the Government of Afghanistan or coalition forces. In addition, the names of individuals, groups, undertakings, and entities subject to broad prohibitions, including arms embargoes, due to their affiliation with the Taliban, Al-Qaida, or those associated with them, are published in lists maintained by the Security Council committees established pursuant to United Nations Security Council resolutions 1267 and 1988.

(h) [Reserved]

(i) *Democratic Republic of the Congo.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in the Democratic Republic of the Congo, except that a license or other approval may be issued, on a case-by-case basis, for:

(1) Defense articles and defense services for the Government of the Democratic Republic of the Congo as notified in advance to the Committee of the Security Council concerning the Democratic Republic of the Congo;

(2) Defense articles and defense services intended solely for the support of or use by the United Nations Organization Mission in the Democratic Republic of the Congo (MONUC);

(3) Personal protective gear temporarily exported to the Democratic Republic of the Congo by United Nations personnel, representatives of the media, and humanitarian and development workers and associated personnel, for their personal use only; and

(4) Non-lethal military equipment intended solely for humanitarian or protective use, and related technical assistance and training, as notified in advance to the Committee of the Security Council concerning the Democratic Republic of the Congo.

WASHAR0000841

(j) *Haiti*. (1) It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Haiti, except that a license or other approval may be issued, on a case-by-case basis, for:

(i) Defense articles and defense services intended solely for the support of or use by security units that operate under the command of the Government of Haiti;

(ii) Defense articles and defense services intended solely for the support of or use by the United Nations or a United Nations-authorized mission; and

(iii) Personal protective gear for use by personnel from the United Nations and other international organizations, representatives of the media, and development workers and associated personnel.

(2) All shipments of arms and related materials consistent with such exemptions shall only be made to Haitian security units as designated by the Government of Haiti, in coordination with the U.S. Government.

(k) *Libya*. It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Libya, except where it determines, upon case-by-case review, that the transaction (or activity) is not prohibited under applicable U.N. Security Council resolutions and that the transaction (or activity) is in furtherance of the national security and foreign policy of the United States.

(l) *Vietnam*. It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Vietnam, except that a license or other approval may be issued, on a case-by-case basis, for:

(1) Non-lethal defense articles and defense services, and

(2) Non-lethal, safety-of-use defense articles (e.g., cartridge actuated devices, propellant actuated devices and technical manuals for military aircraft for purposes of enhancing the safety of the aircraft crew) for lethal end-items.

For non-lethal defense end-items, no distinction will be made between Vietnam's existing and new inventory.

(m) *Somalia*. It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Somalia, except that a license or other approval may be issued, on a case-by-case basis, for:

(1) Defense articles and defense services intended solely for support for the African Union Mission to Somalia (AMISOM); and

(2) Defense services for the purpose of helping develop security sector institutions in Somalia that further the objectives of peace, stability and reconciliation in Somalia, after advance

WASHAR0000842

notification of the proposed export by the United States Government to the UNSC Somalia Sanctions Committee and the absence of a negative decision by that committee.

Exemptions from the licensing requirement may not be used with respect to any export to Somalia unless specifically authorized in writing by the Directorate of Defense Trade Controls.

(n) *Sri Lanka.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Sri Lanka, except that a license or other approval may be issued, on a case-by-case basis, for humanitarian demining.

(o) *Liberia.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Liberia, except that a license or other approval may be issued, on a case-by-case basis, for:

(1) Defense articles and defense services for the Government of Liberia as notified in advance to the Committee of the Security Council concerning Liberia;

(2) Defense articles and defense services intended solely for support of or use by the United Nations Mission in Liberia (UNMIL);

(3) Personal protective gear temporarily exported to Liberia by United Nations personnel, representatives of the media and humanitarian and development workers and associated personnel, for their personal use only; and

(4) Non-lethal military equipment intended solely for humanitarian or protective use, and related technical assistance and training, as notified in advance to the Committee of the Security Council concerning Liberia.

(p) *Fiji.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Fiji, except that a license or other approval may be issued, on a case-by-case basis, for defense articles and defense services intended solely in support of peacekeeping activities.

(q) *Côte d'Ivoire.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Côte d'Ivoire, except that a license or other approval may be issued, on a case-by-case basis, for:

(1) Defense articles and defense services intended solely for support of or use by the United Nations Operations in Côte d'Ivoire (UNOCI) and the French forces that support them;

(2) Non-lethal military equipment intended solely for humanitarian or protective use, and related technical assistance and training, as approved in advance to the Committee of the Security Council concerning Côte d'Ivoire;

WASHAR0000843

(3) Personal protective gear temporarily exported to Côte d'Ivoire by United Nations personnel, representatives of the media and humanitarian and development workers and associated personnel, for their personal use only;

(4) Supplies temporarily exported to Côte d'Ivoire to the forces of a State which is taking action, in accordance with international law, solely and directly to facilitate the evacuation of its nationals and those for whom it has consular responsibility in Côte d'Ivoire, as notified in advance to the Committee of the Security Council concerning Côte d'Ivoire; and

(5) Non-lethal equipment intended solely to enable the Ivorian security forces to use only appropriate and proportionate force while maintaining public order, as approved in advance by the Sanctions Committee.

(r) *Cyprus.* It is the policy of the United States to deny licenses or other approvals, for exports or imports of defense articles and defense services destined for or originating in Cyprus, except that a license or other approval may be issued, on a case-by-case basis, for the United Nations Forces in Cyprus (UNFICYP) or for civilian end-users.

(s) *Zimbabwe.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe, except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe). Such exports may meet the licensing exemptions of §123.17 of this subchapter.

(t) *Lebanon.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Lebanon, except that a license or other approval may be issued, on a case-by-case basis, for the United Nations Interim Force in Lebanon (UNIFIL) and as authorized by the Government of Lebanon.

(u) *Yemen.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Yemen, except that a license or other approval may be issued, on a case-by-case basis, for:

(1) Non-lethal defense articles and defense services; and

(2) Non-lethal, safety-of-use defense articles (e.g., cartridge actuated devices, propellant actuated devices and technical manuals for military aircraft for purposes of enhancing the safety of the aircraft crew) for lethal end-items.

[58 FR 39312, July 22, 1993]

**Editorial Note:**   For Federal Register citations affecting §126.1, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and on GPO Access.

## § 126.2   Temporary suspension or modification of this subchapter.

WASHAR0000844

The Deputy Assistant Secretary for Defense Trade Controls or the Managing Director, Directorate of Defense Trade Controls, may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States.

[71 FR 20546, Apr. 21, 2006]

## § 126.3  Exceptions.

In a case of exceptional or undue hardship, or when it is otherwise in the interest of the United States Government, the Director, Office of Defense Trade Controls may make an exception to the provisions of this subchapter.

## § 126.4  Shipments by or for United States Government agencies.

 (a) A license is not required for the temporary import, or temporary export, of any defense article, including technical data or the performance of a defense service, by or for any agency of the U.S. Government for official use by such an agency, or for carrying out any foreign assistance, cooperative project or sales program authorized by law and subject to control by the President by other means. This exemption applies only when all aspects of a transaction (export, carriage, and delivery abroad) are affected by a United States Government agency or when the export is covered by a United States Government Bill of Lading. This exemption, however, does not apply when a U.S. Government agency acts as a transmittal agent on behalf of a private individual or firm, either as a convenience or in satisfaction of security requirements. The approval of the Directorate of Defense Trade Controls must be obtained before defense articles previously exported pursuant to this exemption are permanently transferred (e.g., property disposal of surplus defense articles overseas) unless the transfer is pursuant to a grant, sale, lease, loan or cooperative project under the Arms Export Control Act or a sale, lease or loan under the Foreign Assistance Act of 1961, as amended, or the defense articles have been rendered useless for military purposes beyond the possibility of restoration.

Note: *Special definition.* For purposes of this section, defense articles exported abroad for incorporation into a foreign launch vehicle or for use on a foreign launch vehicle or satellite that is to be launched from a foreign country shall be considered a permanent export.

(b) This section does not authorize any department or agency of the U.S. Government to make any export which is otherwise prohibited by virtue of other administrative provisions or by any statute.

(c) A license is not required for the temporary import, or temporary or permanent export, of any classified or unclassified defense articles, including technical data or the performance of a defense service, for end-use by a U.S. Government Agency in a foreign country under the following circumstances:

(1) The export or temporary import is pursuant to a contract with, or written direction by, an agency of the U.S. Government; and

WASHAR0000845

(2) The end-user in the foreign country is a U.S. Government agency or facility, and the defense articles or technical data will not be transferred to any foreign person; and

(3) The urgency of the U.S. Government requirement is such that the appropriate export license or U.S. Government Bill of Lading could not have been obtained in a timely manner.

(d) A Shipper's Export Declaration (SED), required under §123.22 of this subchapter, and a written statement by the exporter certifying that these requirements have been met must be presented at the time of export to the appropriate Port Director of U.S. Customs and Border Protection or Department of Defense transmittal authority. A copy of the SED and the written certification statement shall be provided to the Directorate of Defense Trade Controls immediately following the export.

[58 FR 39312, July 22, 1993, as amended at 70 FR 50964, Aug. 29, 2005]

## § 126.5   Canadian exemptions.

(a) *Temporary import of defense articles.* Port Director of U.S. Customs and Border Protection and postmasters shall permit the temporary import and return to Canada without a license of any unclassified defense articles (see §120.6 of this subchapter) that originate in Canada for temporary use in the United States and return to Canada. All other temporary imports shall be in accordance with §§123.3 and 123.4 of this subchapter.

(b) *Permanent and temporary export of defense articles.* Except as provided below, the Port Director of U.S. Customs and Border Protection and postmasters shall permit, when for end-use in Canada by Canadian Federal or Provincial governmental authorities acting in an official capacity or by a Canadian-registered person or return to the United States, the permanent and temporary export to Canada without a license of defense articles and related technical data identified in 22 CFR 121.1. The above exemption is subject to the following limitations: Defense articles and related technical data, and defense services identified in paragraphs (b)(1) through (b)(21) of this section and exports that transit third countries. Such limitations also are subject to meeting the requirements of this subchapter, (to include 22 CFR 120.1(c) and (d), parts 122 and 123 (except insofar as exemption from licensing requirements is herein authorized) and §126.1, and the requirement to obtain non-transfer and use assurances for all significant military equipment. For purposes of this section, "Canadian-registered person" is any Canadian national (including Canadian business entities organized under the laws of Canada), dual citizen of Canada and a third country (subject to §126.1), and permanent resident registered in Canada in accordance with the Canadian Defense Production Act, and such other Canadian Crown Corporations identified by the Department of State in a list of such persons publicly available through the Internet Web site of the Directorate of Defense Trade Controls and by other means. The defense articles, related technical data, and defense services identified in 22 CFR 121.1 continuing to require a license are:

(1) All classified articles, technical data and defense services covered by §121.1 of this subchapter.

WASHAR0000846

(2) All Missile Technology Control Regime (MTCR) Annex Items.

(3) Defense services covered by part 124 of this subchapter, except for those in paragraph (c) of this section.

(4) Any transaction involving the export of defense articles and defense services for which congressional notification is required in accordance with §123.15 and §124.11 of this subchapter.

(5) All technical data and defense services for gas turbine engine hot sections covered by Categories VI(f) and VIII(b). (This does not include hardware).

(6) Firearms, close assault weapons and combat shotguns listed in Category I.

(7) Ammunition listed in Category III for the firearms in Category I.

(8) Nuclear weapons strategic delivery systems and all components, parts, accessories and attachments specifically designed for such systems and associated equipment.

(9) Naval nuclear propulsion equipment listed in Category VI(e).

(10) All Category VIII(a) items, and developmental aircraft, engines and components identified in Category VIII(f).

(11) All Category XII(c), except any 1st- and 2nd-generation image intensification tube and 1st- and 2nd-generation image intensification night sighting equipment. End items (see §121.8 of this subchapter) in Category XII(c) and related technical data limited to basic operations, maintenance and training information as authorized under the exemption in §125.4(b)(5) of this subchapter may be exported directly to a Canadian Government entity ( *i.e.* federal, provincial, territorial, or municipal) without a license.

(12) Chemical agents listed in Category XIV (a), (d), and (e), biological agents and biologically derived substances in Category XIV (b), and equipment listed in Category XIV (f) for dissemination of the chemical agents and biological agents listed in Category XIV (a), (b), (d), and (e).

(13) Nuclear radiation measuring devices manufactured to military specifications listed in Category XVI(c).

(14) All spacecraft in Category XV(a), except commercial communications satellites.

(15) Category XV(c), except end items (see §121.8 of this subchapter) for end use by the Federal Government of Canada exported directly or indirectly through a Canadian-registered person.

(16) Category XV(d).

WASHAR0000847

(17) The following systems, components and parts included within the coverage of Category XV(e):

(i) Anti-jam systems with the ability to respond to incoming interference by adaptively reducing antenna gain (nulling) in the direction of the interference.

(ii) Antennas:

(A) With aperture (overall dimension of the radiating portions of the antenna) greater than 30 feet; or

(B) With all sidelobes less than or equal to −35dB, relative to the peak of the main beam; or

(C) Designed, modified, or configured to provide coverage area on the surface of the earth less than 200 nautical miles in diameter, where "coverage area" is defined as that area on the surface of the earth that is illuminated by the main beam width of the antenna (which is the angular distance between half power points of the beam).

(iii) Optical intersatellite data links (cross links) and optical ground satellite terminals.

(iv) Spaceborne regenerative baseband processing (direct up and down conversion to and from baseband) equipment.

(v) Propulsion systems which permit acceleration of the satellite on-orbit ( *i.e.,* after mission orbit injection) at rates greater than 0.1g.

(vi) Attitude control and determination systems designed to provide spacecraft pointing determination and control or payload pointing system control better than 0.02 degrees per axis.

(vii) All specifically designed or modified systems, components, parts, accessories, attachments, and associated equipment for all Category XV(a) items, except when specifically designed or modified for use in commercial communications satellites.

(18) Nuclear weapons, design and testing equipment listed in Category XVI.

(19) Submersible and oceanographic vessels and related articles listed in Category XX(a) through (d).

(20) Miscellaneous articles covered by Category XXI.

(21) Man-portable air defense systems, and their parts and components, and technical data for such systems covered by Category IV.

(c) *Defense service exemption.* A defense service is exempt from the licensing requirements of part 124 of this subchapter, when the following criteria can be met.

136

WASHAR0000848

(1) The item, technical data, defense service and transaction is not identified in paragraphs (b)(1) through (21) of this section; and

(2) The transfer of technical data and provision of defense service is limited to the following activities:

(i) Canadian-registered person or a registered and eligible U.S. company (in accordance with part 122 of this subchapter) preparing a quote or bid proposal in response to a written request from a Department or Agency of the United States Federal Government or from a Canadian Federal, Provincial, or Territorial Government; or

(ii) Produce, design, assemble, maintain or service a defense article ( *i.e.* , hardware, technical data) for use by a registered U.S. company; or, a U.S. Federal Government Program; or for end use in a Canadian Federal, Provincial, or Territorial Government Program; and

(iii) The defense services and technical data are limited to that defined in paragraph (c)(6) of this section; and

(3) The Canadian contractor and subcontractor certify, in writing, to the U.S. exporter that the technical data and defense service being exported will be used only for an activity identified in paragraph (c)(2) of this section; and

(4) A written arrangement between the U.S. exporter and the Canadian recipient (such as a consummated Non-Disclosure or other multi-party agreement, Technology Transfer Control Plan, contract or purchase order) must:

(i) Limit delivery of the defense articles being produced directly to an identified manufacturer in the United States registered in accordance with part 122 of this subchapter; a Department or Agency of the United States Federal Government; a Canadian-registered person authorized in writing to manufacture defense articles by and for the Government of Canada; a Canadian Federal, Provincial, or Territorial Government; and

(ii) Prohibit the disclosure of the technical data to any other contractor or subcontractor who is not a Canadian-registered person; and

(iii) Provide that any subcontract contain all the limitations of this section; and

(iv) Require that the Canadian contractor, including subcontractors, destroy or return to the U.S. exporter in the United States all of the technical data exported pursuant to the contract or purchase order upon fulfillment of the contract, unless for use by a Canadian or United States Government entity that requires in writing the technical data be maintained. The U.S. exporter must be provided written certification that the technical data is being retained or destroyed; and

(v) Include a clause requiring that all documentation created from U.S. technical data contain the statement, "This document contains technical data, the use of which is restricted by the U.S. Arms Export Control Act. This data has been provided in accordance with, and is subject to, the

WASHAR0000849

limitations specified in §126.5 of the International Traffic In Arms Regulations (ITAR). By accepting this data, the consignee agrees to honor the requirements of the ITAR"; and

(5) The U.S. exporter must provide the Directorate of Defense Trade Controls a semi-annual report of all their on-going activities authorized under this section. The report shall include the article(s) being produced; the end user(s) ( *i.e.* , name of U.S. or Canadian company); the end item into which the product is to be incorporated; the intended end use of the product (e.g., United States or Canadian Defense contract number and identification of program); the name and address of all the Canadian contractors and subcontractors; and

(6) The defense services and technical data are limited to those in paragraphs (c)(6)(i), (ii), (iii) and (iv), and do not include paragraphs (c)(6)(v), (vi) and (vii) of this section:

(i) *Build-to-print.* "Build-to-print" means that a foreign consignee can produce a defense article from engineering drawings without any technical assistance from a U.S. exporter. This transaction is based strictly on a "hand-off" approach because the foreign consignee is understood to have the inherent capability to produce the defense article and only lacks the necessary drawings. Supporting documentation such as acceptance criteria, and specifications, may be released on an as-required basis ( *i.e.* "must have") such that the foreign consignee would not be able to produce an acceptable defense article without this additional supporting documentation. Documentation which is not absolutely necessary to permit manufacture of an acceptable defense article ( *i.e.* "nice to have") is not considered within the boundaries of a "Build-to-print" data package; and/or

(ii) *Build/Design-to-specification.* "Build/Design-to-specification" means that a foreign consignee can design and produce a defense article from requirement specifications without any technical assistance from the U.S. exporter. This transaction is based strictly on a "hands-off" approach since the foreign consignee is understood to have the inherent capability to both design and produce the defense article and only lacks the necessary requirement information; and/or

(iii) *Basic research.* "Basic research" means a systemic study directed toward greater knowledge or understanding of the fundamental aspects of phenomena and observable facts without specific applications towards processes or products in mind. It does not include "Applied Research" ( *i.e.* a systemic study to gain knowledge or understanding necessary to determine the means by which a recognized and specific need may be met. It is a systematic application of knowledge toward the production of useful materials, devices, and systems or methods, including design, development, and improvement of prototypes and new processes to meet specific requirements.); and

(iv) *Maintenance* ( *i.e.,* inspection, testing, calibration or repair, including overhaul, reconditioning and one-to-one replacement of any defective items, parts or components, but excluding any modification, enhancement, upgrade or other form of alteration or improvement that changes the basic performance of the item); and does not include

(v) *Design methodology,* such as: The underlying engineering methods and design philosophy utilized ( *i.e.,* the "why" or information that explains the rationale for particular design decision,

WASHAR0000850

engineering feature, or performance requirement); engineering experience (e.g., lessons learned); and the rationale and associated databases (e.g., design allowables, factors of safety, component life predictions, failure analysis criteria) that establish the operational requirements (e.g., performance, mechanical, electrical, electronic, reliability and maintainability) of a defense article. (Final analytical results and the initial conditions and parameters may be provided.)

(vi) *Engineering analysis,* such as: Analytical methods and tools used to design or evaluate a defense article's performance against the operational requirements. Analytical methods and tools include the development and/or use of mockups, computer models and simulations, and test facilities. (Final analytical results and the initial conditions and parameters may be provided.)

(vii) *Manufacturing know-how,* such as: Information that provides detailed manufacturing processes and techniques needed to translate a detailed design into a qualified, finished defense article. (Information may be provided in a build-to-print package identified in paragraph (c)(6)(i) of this section that is necessary in order to produce an acceptable defense article.).

(d) *Reexports/retransfer.* Reexport/re-transfer in Canada to another end user or end use or from Canada to another destination, except the United States, must in all instances have the prior approval of the Directorate of Defense Trade Controls. Unless otherwise exempt in this subchapter, the original exporter is responsible, upon request from a Canadian-registered person, for obtaining or providing reexport/retransfer approval. In any instance when the U.S. exporter is no longer available to the Canadian end user the request for reexport/retransfer may be made directly to Department of State, Directorate of Defense Trade Controls. All requests must include the information in §123.9(c) of this subchapter. Reexport/retransfer approval is acquired by:

(1) If the reexport/retransfer being requested could be made pursuant to this section ( *i.e.,* a retransfer within Canada to another eligible Canadian recipient under this section) if exported directly from the U.S., upon receipt by the U.S. company of a request by a Canadian end user, the original U.S. exporter is authorized to grant on behalf of the U.S. Government by confirming in writing to the Canadian requester that the reexport/retransfer is authorized subject to the conditions of this section; or

(2) If the reexport/retransfer is to an end use or end user that, if directly exported from the U.S. requires a license, retransfer must be handled in accordance with §123.9 of this subchapter.

Notes to §126.5: 1. In any instance when the exporter has knowledge that the defense article exempt from licensing is being exported for use other than by a qualified Canadian-registered person or for export to another foreign destination, other than the United States, in its original form or incorporated into another item, an export license must be obtained prior to the transfer to Canada.

2. Additional exemptions exist in other sections of this subchapter that are applicable to Canada, for example Secs. 123.9, 125.4 and 124.2, which allows for the performance of defense services related to training in basic operations and maintenance, without a license, for defense articles lawfully exported, including those identified in paragraphs (b)(1) through (21) of this section.

WASHAR0000851

[66 FR 10576, Feb. 16, 2001; 66 FR 36834, July 13, 2001, as amended at 67 FR 78686, Dec. 26, 2002; 70 FR 34654, June 15, 2005; 70 FR 39919, July 12, 2005; 70 FR 50964, Aug. 29, 2005; 71 FR 20546, Apr. 21, 2006]

### § 126.6   Foreign-owned military aircraft and naval vessels, and the Foreign Military Sales program.

(a) A license from the Directorate of Defense Trade Controls is not required if:

(1) The article or technical data to be exported was sold, leased, or loaned by the Department of Defense to a foreign country or international organization pursuant to the Arms Export Control Act or the Foreign Assistance Act of 1961, as amended, and

(2) The article or technical data is delivered to representatives of such a country or organization in the United States; and

(3) The article or technical data is to be exported from the United States on a military aircraft or naval vessel of that government or organization or via the Defense Transportation Service (DTS).

(b) *Foreign military aircraft and naval vessels* . A license is not required for the entry into the United States of military aircraft or naval vessels of any foreign state if no overhaul, repair, or modification of the aircraft or naval vessel is to be performed. However, Department of State approval for overflight (pursuant to the 49 U.S.C. 40103) and naval visits must be obtained from the Bureau of Political-Military Affairs, Office of International Security Operations.

(c) *Foreign Military Sales Program*. A license from the Directorate of Defense Trade Controls is not required if the defense article or technical data or a defense service to be transferred was sold, leased or loaned by the Department of Defense to a foreign country or international organization under the Foreign Military Sales (FMS) Program of the Arms Export Control Act pursuant to an Letter of Offer and Acceptance (LOA) authorizing such transfer which meets the criteria stated below:

(1) Transfers of the defense articles, technical data or defense services using this exemption may take place only during the period which the FMS Letter of Offer and Acceptance (LOA) and implementing USG FMS contracts and subcontracts are in effect and serve as authorization for the transfers hereunder in lieu of a license. After the USG FMS contracts and subcontracts have expired and the LOA no longer serves as such authorization, any further provision of defense articles, technical data or defense services shall not be covered by this section and shall instead be subject to other authorization requirements of this subchapter; and

(2) The defense article, technical data or defense service to be transferred are specifically identified in an executed LOA, in furtherance of the Foreign Military Sales Program signed by an authorized Department of Defense Representative and an authorized representative of the foreign government, and

WASHAR0000852

(3) The transfer of the defense article and related technical data is effected during the duration of the relevant Letter of Offer and Acceptance (LOA), similarly a defense service is to be provided only during the duration of the USG FMS contract or subcontract and not to exceed the specified duration of the LOA, and

(4) The transfer is not to a country identified in §126.1 of this subchapter, and

(5) The U.S. person responsible for the transfer maintains records of all transfers in accordance with part 122 of this subchapter, and

(6) For transfers of defense articles and technical data,

(i) The transfer is made by the relevant foreign diplomatic mission of the purchasing country or its authorized freight forwarder, provided that the freight forwarder is registered with the Directorate of Defense Trade Controls pursuant to part 122 of this subchapter, and

(ii) At the time of shipment, the Port Director of U.S. Customs and Border Protection is provided an original and properly executed DSP–94 accompanied by a copy of the LOA and any other documents required by U.S. Customs and Border Protection in carrying out its responsibilities. The Shippers Export Declaration or, if authorized, the outbound manifest, must be annotated "This shipment is being exported under the authority of Department of State Form DSP–94. It covers FMS Case [insert case identification], expiration [insert date]. 22 CFR 126.6 applicable. The U.S. Government point of contact is ____, telephone number ____," and

(iii) If, classified hardware and related technical data are involved the transfer must have the requisite USG security clearance and transportation plan and be shipped in accordance with the Department of Defense National Industrial Security Program Operating Manual, or

(7) For transfers of defense services:

(i) A contract or subcontract between the U.S. person(s) responsible for providing the defense service and the USG exists that:

(A) Specifically defines the scope of the defense service to be transferred;

(B) Identifies the FMS case identifier,

(C) Identifies the foreign recipients of the defense service

(D) Identifies any other U.S. or foreign parties that may be involved and their roles/responsibilities, to the extent known when the contract is executed,

(E) Provides a specified period of duration in which the defense service may be performed, and

(ii) The U.S. person(s) identified in the contract maintain a registration with the Directorate of Defense Trade Controls for the entire time that the defense service is being provided. In any

WASHAR0000853

instance when the U.S. registered person(s) identified in the contract employs a subcontractor, the subcontractor may only use this exemption when registered with DDTC, and when such subcontract meets the above stated requirements, and

(iii) In instances when the defense service involves the transfer of classified technical data, the U.S. person transferring the defense service must have the appropriate USG security clearance and a transportation plan, if appropriate, in compliance with the Department of Defense National Industrial Security Program Operating Manual, and

(iv) The U.S. person responsible for the transfer reports the initial transfer, citing this section of the ITAR, the FMS case identifier, contract and subcontract number, the foreign country, and the duration of the service being provided to the Directorate of Defense Trade Controls using DDTC's Direct Shipment Verification Program.

[65 FR 45287, July 21, 2000, as amended at 70 FR 50964, Aug. 29, 2005; 71 FR 20546, Apr. 21, 2006]

### § 126.7   Denial, revocation, suspension or amendment of licenses and other approvals.

(a) *Policy* . Licenses or approvals shall be denied or revoked whenever required by any statute of the United States (see §§127.7 and 127.11 of this subchapter). Any application for an export license or other approval under this subchapter may be disapproved, and any license or other approval or exemption granted under this subchapter may be revoked, suspended, or amended without prior notice whenever:

(1) The Department of State deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, or is otherwise advisable; or

(2) The Department of State believes that 22 U.S.C. 2778, any regulation contained in this subchapter, or the terms of any U.S. Government export authorization (including the terms of a manufacturing license or technical assistance agreement, or export authorization granted pursuant to the Export Administration Act, as amended) has been violated by any party to the export or other person having significant interest in the transaction; or

(3) An applicant is the subject of an indictment for a violation of any of the U.S. criminal statutes enumerated in §120.27 of this subchapter; or

(4) An applicant or any party to the export or the agreement has been convicted of violating any of the U.S. criminal statutes enumerated in §120.27 of this subchapter; or

(5) An applicant is ineligible to contract with, or to receive a license or other authorization to import defense articles or defense services from, any agency of the U.S. Government; or

(6) An applicant, any party to the export or agreement, any source or manufacturer of the defense article or defense service or any person who has a significant interest in the transaction has been debarred, suspended, or otherwise is ineligible to receive an export license or other authorization

WASHAR0000854

from any agency of the U.S. government (e.g., pursuant to debarment by the Department of Commerce under 15 CFR part 760 or by the Department of State under part 127 or 128 of this subchapter); or

(7) An applicant has failed to include any of the information or documentation expressly required to support a license application or other request for approval under this subchapter or as required in the instructions in the applicable Department of State form; or

(8) An applicant is subject to sanctions under other relevant U.S. laws (e.g., the Missile Technology Controls title of the National Defense Authorization Act for FY 1991 (Pub. L. 101–510); the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (Pub. L. 102–182); or the Iran-Iraq Arms Non-Proliferation Act of 1992 (Pub. L. 102–484)).

(b) *Notification* . The Directorate of Defense Trade Controls will notify applicants or licensees or other appropriate United States persons of actions taken pursuant to paragraph (a) of this section. The reasons for the action will be stated as specifically as security and foreign policy considerations permit.

(c) *Reconsideration* . If a written request for reconsideration of an adverse decision is made within 30 days after a person has been informed of the decision, the U.S. person will be accorded an opportunity to present additional information. The case will then be reviewed by the Directorate of Defense Trade Controls.

(d) *Reconsideration of certain applications*. Applications for licenses or other requests for approval denied for repeated failure to provide information or documentation expressly required will normally not be reconsidered during the thirty day period following denial. They will be reconsidered after this period only after a final decision is made on whether the applicant will be subject to an administrative penalty imposed pursuant to this subchapter. Any request for reconsideration shall be accompanied by a letter explaining the steps that have been taken to correct the failure and to ensure compliance with the requirements of this subchapter.

(e) *Special definition*. For purposes of this section, the term *party to the export* means:

(1) The chief executive officer, president, vice-presidents, other senior officers and officials (e.g., comptroller, treasurer, general counsel) and any member of the board of directors of the applicant;

(2) The freight forwarders or designated exporting agent of the applicant; and

(3) Any consignee or end-user of any item to be exported.

[58 FR 39312, July 22, 1993, as amended at 71 FR 20546, Apr. 21, 2006]

## § 126.8   [Reserved]

## § 126.9   Advisory opinions and related authorizations.

143

WASHAR0000855

(a) *Advisory opinion* . Any person desiring information as to whether the Directorate of Defense Trade Controls would be likely to grant a license or other approval for the export or approval of a particular defense article or defense service to a particular country may request an advisory opinion from the Directorate of Defense Trade Controls. Advisory opinions are issued on a case-by-case basis and apply only to the particular matters presented to the Directorate of Defense Trade Controls. These opinions are not binding on the Department of State, and may not be used in future matters before the Department. A request for an advisory opinion must be made in writing and must outline in detail the equipment, its usage, the security classification (if any) of the articles or related technical data, and the country or countries involved. An original and seven copies of the letter must be provided along with seven copies of suitable descriptive information concerning the defense article or defense service.

(b) *Related authorizations* . The Directorate of Defense Trade Controls may, as appropriate, in accordance with the procedures set forth in paragraph (a) of this section, provide export authorization, subject to all other relevant requirements of this subchapter, both for transactions that have been the subject of advisory opinions requested by prospective U.S. exporters, or for the Directorate's own initiatives. Such initiatives may cover pilot programs, or specifically anticipated circumstances for which the Directorate considers special authorizations appropriate.

[71 FR 20547, Apr. 21, 2006]

## § 126.10   Disclosure of information.

(a) *Freedom of information* . Subchapter R of this title contains regulations on the availability to the public of information and records of the Department of State. The provisions of subchapter R apply to such disclosures by the Directorate of Defense Trade Controls.

(b) *Determinations required by law.* Section 38(e) of the Arms Export Control Act (22 U.S.C. 2778) provides by reference to certain procedures of the Export Administration Act that certain information required by the Department of State in connection with the licensing process may generally not be disclosed to the public unless certain determinations relating to the national interest are made in accordance with the procedures specified in that provision, except that the names of the countries and types and quantities of defense articles for which licenses are issued under this section shall not be withheld from public disclosure unless the President determines that release of such information would be contrary to the national interest. Registration with the Directorate of Defense Trade Controls is required of certain persons, in accordance with Section 38 of the Arms Export Control Act. The requirements and guidance are provided in the ITAR pursuant to parts 122 and 129. Registration is generally a precondition to the issuance of any license or other approvals under this subchapter, to include the use of any exemption. Therefore, information provided to the Department of State to effect registration, as well as that regarding actions taken by the Department of State related to registration, may not generally be disclosed to the public. Determinations required by Section 38(e) shall be made by the Assistant Secretary for Political-Military Affairs.

(c) *Information required under part 130.* Part 130 of this subchapter contains specific provisions on the disclosure of information described in that part.

WASHAR0000856

(d) *National Interest Determinations.* In accordance with section 38(e) of the Arms Export Control Act (22 U.S.C. 2778(e)), the Secretary of State has determined that the following disclosures are in the national interest of the United States:

(1) Furnishing information to foreign governments for law enforcement or regulatory purposes; and

(2) Furnishing information to foreign governments and other agencies of the U.S. Government in the context of multilateral or bilateral export regimes (e.g., the Missile Technology Control Regime, the Australia Group, and Wassenaar Arrangement).

[58 FR 39312, July 22, 1993, as amended at 62 FR 67276, Dec. 24, 1997; 70 FR 50965, Aug. 29, 2005; 71 FR 20547, Apr. 21, 2006]

## § 126.11   Relations to other provisions of law.

The provisions in this subchapter are in addition to, and are not in lieu of, any other provisions of law or regulations. The sale of firearms in the United States, for example, remains subject to the provisions of the Gun Control Act of 1968 and regulations administered by the Department of Justice. The performance of defense services on behalf of foreign governments by retired military personnel continues to require consent pursuant to part 3a of this title. Persons who intend to export defense articles or furnish defense services should not assume that satisfying the requirements of this subchapter relieves one of other requirements of law.

[71 FR 20547, Apr. 21, 2006]

## § 126.12   Continuation in force.

All determinations, authorizations, licenses, approvals of contracts and agreements and other action issued, authorized, undertaken, or entered into by the Department of State pursuant to section 414 of the Mutual Security Act of 1954, as amended, or under the previous provisions of this subchapter, continue in full force and effect until or unless modified, revoked or superseded by the Department of State.

## § 126.13   Required information.

 (a) All applications for licenses (DSP–5, DSP–61, DSP–73, and DSP–85), all requests for approval of agreements and amendments thereto under part 124 of this subchapter, and all requests for written authorizations must include a letter signed by a responsible official empowered by the applicant and addressed to the Directorate of Defense Trade Controls, stating whether:

(1) The applicant or the chief executive officer, president, vice-presidents, other senior officers or officials (e.g., comptroller, treasurer, general counsel) or any member of the board of directors is the subject of an indictment for or has been convicted of violating any of the U.S. criminal

145

WASHAR0000857

statutes enumerated in §120.27 of this subchapter since the effective date of the Arms Export Control Act, Public Law 94–329, 90 Stat. 729 (June 30, 1976);

(2) The applicant or the chief executive officer, president, vice-presidents, other senior officers or officials (e.g., comptroller, treasurer, general counsel) or any member of the board of directors is ineligible to contract with, or to receive a license or other approval to import defense articles or defense services from, or to receive an export license or other approval from, any agency of the U.S. Government;

(3) To the best of the applicant's knowledge, any party to the export as defined in §126.7(e) has been convicted of violating any of the U.S. criminal statutes enumerated in §120.27 of this subchapter since the effective date of the Arms Export Control Act, Public Law 94–329, 90 Stat. 729 (June 30, 1976), or is ineligible to contract with, or to receive a license or other approval to import defense articles or defense services from, or to receive an export license or other approval from any agency of the U.S. government; and

(4) The natural person signing the application, notification or other request for approval (including the statement required by this subsection) is a citizen or national of the United States, has been lawfully admitted to the United States for permanent residence (and maintains such a residence) under the Immigration and Nationality Act, as amended (8 U.S.C. 1101(a), section 101(a)20, 60 Stat. 163), or is an official of a foreign government entity in the United States.

(b) In addition, all applications for licenses must include, on the application or an addendum sheet, the complete names and addresses of all U.S. consignors and freight forwarders, and all foreign consignees and foreign intermediate consignees involved in the transaction. If there are multiple consignors, consignees or freight forwarders, and all the required information cannot be included on the application form, an addendum sheet and seven copies containing this information must be provided. The addendum sheet must be marked at the top as follows: "Attachment to Department of State License Form (insert DSP–5, 61, 73, or 85, as appropriate) for Export of (insert commodity) valued at (insert U.S. dollar amount) to (insert country of ultimate destination)." The Directorate of Defense Trade Controls will impress one copy of the addendum sheet with the Department of State seal and return it to the applicant with each license. The sealed addendum sheet must remain attached to the license as an integral part thereof. Port Directors of U.S. Customs and Border Protection and Department of Defense transmittal authorities will permit only those U.S. consignors or freight forwarders listed on the license or sealed addendum sheet to make shipments under the license, and only to those foreign consignees named on the documents. Applicants should list all freight forwarders who may be involved with shipments under the license to ensure that the list is complete and to avoid the need for amendments to the list after the license has been approved. If there are unusual or extraordinary circumstances that preclude the specific identification of all the U.S. consignors and freight forwarders and all foreign consignees, the applicant must provide a letter of explanation with each application.

(c) In cases when foreign nationals are employed at or assigned to security-cleared facilities, provision by the applicant of a Technology Control Plan (available from the Defense Security Service) will facilitate processing.

WASHAR0000858

[58 FR 39312, July 22, 1993, as amended at 70 FR 50965, Aug. 29, 2005; 71 FR 20547, Apr. 21, 2006; 75 FR 52624, Aug. 27, 2010]

## § 126.14   Special comprehensive export authorizations for NATO, Australia, Japan, and Sweden.

 (a) *Comprehensive authorizations.* With respect to NATO members, Australia, Japan, and Sweden, the Directorate of Defense Trade Controls may provide the comprehensive authorizations described in paragraphs (a) and (b) of this section for circumstances where the full parameters of a commercial export endeavor including the needed defense exports can be well anticipated and described in advance, thereby making use of such comprehensive authorizations appropriate.

(1) *Major project authorization.* With respect to NATO members, Australia, Japan, and Sweden, the Directorate of Defense Trade Controls may provide comprehensive authorizations for well circumscribed commercially developed "major projects", where a principal registered U.S. exporter/prime contractor identifies in advance the broad parameters of a commercial project including defense exports needed, other participants (e.g., exporters with whom they have "teamed up," or subcontractors), and foreign government end users. Projects eligible for such authorization may include a commercial export of a major weapons system for a foreign government involving, for example, multiple U.S. suppliers under a commercial teaming agreement to design, develop and manufacture defense articles to meet a foreign government's requirements. U.S. exporters seeking such authorization must provide detailed information concerning the scope of the project, including other exporters, U.S. subcontractors, and planned exports (including re-exports) of defense articles, defense services, and technical data, and meet the other requirements set forth in paragraph (b) of this section.

(2) *Major program authorization.* With respect to NATO members, Australia, Japan, and Sweden, the Directorate of Defense Trade Controls may provide comprehensive authorizations for well circumscribed commercially developed "major program". This variant would be available where a single registered U.S. exporter defines in advance the parameters of a broad commercial program for which the registrant will be providing all phases of the necessary support (including the needed hardware, technical data, defense services, development, manufacturing, and logistic support). U.S. exporters seeking such authorization must provide detailed information concerning the scope of the program, including planned exports (including re-exports) of defense articles, defense services, and technical data, and meet the other requirements set forth in paragraph (b) of this section.

(3)(i) *Global project authorization.* With respect to NATO members, Australia, Japan, and Sweden, the Directorate of Defense Trade Controls may provide a comprehensive "Global Project Authorization" to registered U.S. exporters for exports of defense articles, technical data or defense services in support of government to government cooperative projects (covering research and development or production) with one of these countries undertaken pursuant to an agreement between the U.S. Government and the government of such country, or a memorandum of understanding/agreement between the Department of Defense and the country's Ministry of Defense.

147

WASHAR0000859

(ii) A set of standard terms and conditions derived from and corresponding to the breadth of the activities and phases covered in such a cooperative MOU will provide the basis for this comprehensive authorization for all U.S. exporters (and foreign end users) identified by DoD as participating in such cooperative project. Such authorizations may cover a broad range of defined activities in support of such programs including multiple shipments of defense articles and technical data and performance of defense services for extended periods, and re-exports to approved end users.

(iii) Eligible end users will be limited to ministries of defense of MOU signatory countries and foreign companies serving as contractors of such countries.

(iv) Any requirement for non-transfer and use assurances from a foreign government may be deemed satisfied by the signature by such government of a cooperative agreement or by its ministry of defense of a cooperative MOU/MOA where the agreement or MOU contains assurances that are comparable to that required by a DSP–83 with respect to foreign governments and that clarifies that the government is undertaking responsibility for all its participating companies. The authorized non-government participants or end users (e.g., the participating government's contractors) will still be required to execute DSP–83s.

(4) *Technical data supporting an acquisition, teaming arrangement, merger, joint venture authorization.* With respect to NATO member countries, Australia, Japan, and Sweden, the Directorate of Defense Trade Controls may provide a registered U.S. defense company a comprehensive authorization to export technical data in support of the U.S. exporter's consideration of entering into a teaming arrangement, joint venture, merger, acquisition, or similar arrangement with prospective foreign partners. Specifically, the authorization is designed to permit the export of a broadly defined set of technical data to qualifying well established foreign defense firms in NATO countries, Australia, Japan, or Sweden in order to better facilitate a sufficiently in depth assessment of the benefits, opportunities and other relevant considerations presented by such prospective arrangements. U.S. exporters seeking such authorization must provide detailed information concerning the arrangement, joint venture, merger or acquisition, including any planned exports of defense articles, defense services, and technical data, and meet the other requirements set forth in paragraph (b) of this section.

(b) *Provisions and requirements for comprehensive authorizations.* Requests for the special comprehensive authorizations set forth in paragraph (a) of this section should be by letter addressed to the Directorate of Defense Trade Controls. With regard to a commercial major program or project authorization, or technical data supporting a teaming arrangement, merger, joint venture or acquisition, registered U.S. exporters may consult the Managing Director of the Directorate of Defense Trade Controls about eligibility for and obtaining available comprehensive authorizations set forth in paragraph (a) of this section or pursuant to §126.9(b).

(1) Requests for consideration of all such authorizations should be formulated to correspond to one of the authorizations set out in paragraph (a) of this section, and should include:

(i) A description of the proposed program or project, including where appropriate a comprehensive description of all phases or stages; and

WASHAR0000860

(ii) Its value; and

(iii) Types of exports needed in support of the program or project; and

(iv) Projected duration of same, within permissible limits; and

(v) Description of the exporter's plan for record keeping and auditing of all phases of the program or project; and

(vi) In the case of authorizations for exports in support of government to government cooperative projects, identification of the cooperative project.

(2) Amendments to the requested authorization may be requested in writing as appropriate, and should include a detailed description of the aspects of the activities being proposed for amendment.

(3) The comprehensive authorizations set forth in paragraph (a) of this section may be made valid for the duration of the major commercial program or project, or cooperative project, not to exceed 10 years.

(4) Included among the criteria required for such authorizations are those set out in part 124, e.g., §§124.7, 124.8 and 124.9, as well as §§125.4 (technical data exported in furtherance of an agreement) and 123.16 (hardware being included in an agreement). Provisions required will also take into account the congressional notification requirements in §§123.15 and 124.11 of the ITAR. Specifically, comprehensive congressional notifications corresponding to the comprehensive parameters for the major program or project or cooperative project should be possible, with additional notifications such as those required by law for changes in value or other significant modifications.

(5) All authorizations will be consistent with all other applicable requirements of the ITAR, including requirements for non-transfer and use assurances (see §§123.10 and 124.10), congressional notifications (e.g., §§123.15 and 124.11), and other documentation (e.g., §§123.9 and 126.13).

(6) Special auditing and reporting requirements will also be required for these authorizations. Exporters using special authorizations are required to establish an electronic system for keeping records of all defense articles, defense services and technical data exported and comply with all applicable requirements for submitting shipping or export information within the allotted time.

[65 FR 45285, July 21, 2000, as amended at 66 FR 35900, July 10, 2001; 71 FR 20548, Apr. 21, 2006]

**§ 126.15   Expedited processing of license applications for the export of defense articles and defense services to Australia or the United Kingdom.**

WASHAR0000861

(a) Any application submitted for authorization of the export of defense articles or services to Australia or the United Kingdom will be expeditiously processed by the Department of State, in consultation with the Department of Defense. Such license applications will not be referred to any other Federal department or agency, except when the defense articles or defense services are classified or exceptional circumstances apply. (See section 1225, Pub. L. 108–375).

(b) To be eligible for the expedited processing in paragraph (a) of this section, the destination of the prospective export must be limited to Australia or the United Kingdom. No other country may be included as intermediary or ultimate end-user.

[70 FR 39919, July 12, 2005]

**§126.16  [Reserved]**

**§126.17  [Reserved]**

### § 126.18  Exemptions regarding intra-company, intra-organization, and intra-governmental transfers to employees who are dual nationals or third-country nationals.

(a) Subject to the requirements of paragraphs (b) and (c) of this section and notwithstanding any other provisions of this part, and where the exemption provided in §124.16 cannot be implemented because of applicable domestic laws, no approval is needed from the Directorate of Defense Trade Controls (DDTC) for the transfer of unclassified defense articles, which includes technical data (see §120.6), to or within a foreign business entity, foreign governmental entity, or international organization that is an authorized end-user or consignee (including approved sub-licensees) for those defense articles, including the transfer to dual nationals or third-country nationals who are bona fide regular employees, directly employed by the foreign consignee or end-user. The transfer of defense articles pursuant to this section must take place completely within the physical territory of the country where the end-user is located, where the governmental entity or international organization conducts official business, or where the consignee operates, and be within the scope of an approved export license, other export authorization, or license exemption.

(b) The provisions of §127.1(b) are applicable to any transfer under this section. As a condition of transferring to foreign person employees described in paragraph (a) of this section any defense article under this provision, any foreign business entity, foreign governmental entity, or international organization, as a "foreign person" within the meaning of §120.16, that receives a defense article, must have effective procedures to prevent diversion to destinations, entities, or for purposes other than those authorized by the applicable export license or other authorization (e.g., written approval or exemption) in order to comply with the applicable provisions of the Arms Export Control Act and the ITAR.

(c) The end-user or consignee may satisfy the condition in paragraph (b) of this section, prior to transferring defense articles, by requiring:

(1) A security clearance approved by the host nation government for its employees, or

WASHAR0000862

(2) The end-user or consignee to have in place a process to screen its employees and to have executed a Non-Disclosure Agreement that provides assurances that the employee will not transfer any defense articles to persons or entities unless specifically authorized by the consignee or end-user. The end-user or consignee must screen its employees for substantive contacts with restricted or prohibited countries listed in §126.1. Substantive contacts include regular travel to such countries, recent or continuing contact with agents, brokers, and nationals of such countries, continued demonstrated allegiance to such countries, maintenance of business relationships with persons from such countries, maintenance of a residence in such countries, receiving salary or other continuing monetary compensation from such countries, or acts otherwise indicating a risk of diversion. Although nationality does not, in and of itself, prohibit access to defense articles, an employee who has substantive contacts with persons from countries listed in §126.1(a) shall be presumed to raise a risk of diversion, unless DDTC determines otherwise. End-users and consignees must maintain a technology security/clearance plan that includes procedures for screening employees for such substantive contacts and maintain records of such screening for five years. The technology security/clearance plan and screening records shall be made available to DDTC or its agents for civil and criminal law enforcement purposes upon request.

[76 FR 28177, May 16, 2011]

WASHAR0000863

**Intentionally Blank**

152

WASHAR0000864

## PART 127—VIOLATIONS AND PENALTIES

**Section Contents**

§ 127.1   Violations.
§ 127.2   Misrepresentation and omission of facts.
§ 127.3   Penalties for violations.
§ 127.4   Authority of U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection officers.
§ 127.5   Authority of the Defense Security Service.
§ 127.6   Seizure and forfeiture in attempts at illegal exports.
§ 127.7   Debarment.
§ 127.8   Interim suspension.
§ 127.9   Applicability of orders.
§ 127.10  Civil penalty.
§ 127.11  Past violations.
§ 127.12  Voluntary disclosures.

**Authority:**   Secs. 2, 38, and 42, Public Law 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2791); E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp., p. 79; 22 U.S.C. 401; 22 U.S.C. 2651a; 22 U.S.C. 2779a; 22 U.S.C. 2780.

**Source:**   58 FR 39316, July 22, 1993, unless otherwise noted.

### § 127.1   Violations.

(a) It is unlawful:

(1) To export or attempt to export from the United States, or to reexport or retransfer or attempt to reexport or retransfer from one foreign destination to another foreign destination by a U.S. person of any defense article or technical data or by anyone of any U.S. origin defense article or technical data or to furnish any defense service for which a license or written approval is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;

(2) To import or attempt to import any defense article whenever a license is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;

(3) To conspire to export, import, reexport or cause to be exported, imported or reexported, any defense article or to furnish any defense service for which a license or written approval is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;

153

WASHAR0000865

(4) To violate any of the terms or conditions of licenses or approvals granted pursuant to this subchapter.

(5) To engage in the United States in the business of either manufacturing or exporting defense article or furnishing defense services without complying with the registration requirements. For the purposes of this subchapter, engaging in the business of manufacturing or exporting defense articles or furnishing defense services requires only one occasion of manufacturing or exporting a defense article or furnishing a defense service; or

(6) To engage in the business of brokering activities for which registration, a license or written approval is required by this subchapter without first registering or obtaining the required license or written approval from the Directorate of Defense Trade Controls. For the purposes of this subchapter, engaging in the business of brokering activities requires only one occasion of engaging in an activity as reflected in §129.2(b).

(b) Any person who is granted a license or other approval under this subchapter is responsible for the acts of employees, agents, and all authorized persons to whom possession of the licensed defense article or technical data has been entrusted regarding the operation, use, possession, transportation, and handling of such defense article or technical data abroad. All persons abroad subject to U.S. jurisdiction who obtain temporary custody of a defense article exported from the United States or produced under an agreement described in part 124 of this subchapter, and irrespective of the number of intermediate transfers, are bound by the regulations of this subchapter in the same manner and to the same extent as the original owner or transferer.

(c) A person with knowledge that another person is then ineligible pursuant to §120.1(c) or §126.7 of this subchapter or subject to an order of debarment or interim suspension, may not, directly or indirectly, in any manner or capacity, without prior disclosure of the facts to, and written authorization from, the Directorate of Defense Trade Controls:

(1) Apply for, obtain, or use any export control document as defined in §127.2(b) for such debarred, suspended, or ineligible person; or

(2) Order, buy, receive, use, sell, deliver, store, dispose of, forward, transport, finance, or otherwise service or participate in any transaction which may involve any defense article or the furnishing of any defense service for which a license or approval is required by this subchapter for export, where such debarred, suspended, or ineligible person may obtain any benefit therefrom or have any direct or indirect interest therein.

(d) No person may knowingly or willfully cause, or aid, abet, counsel, demand, induce, procure or permit the commission of any act prohibited by, or the omission of any act prohibited by, or the omission of any act required by 22 U.S.C. 2778, 22 U.S.C. 2779, or any regulation, license, approval, or order issued thereunder.

[58 FR 39316, July 22, 1993, as amended at 71 FR 20548, Apr. 21, 2006]

## § 127.2   Misrepresentation and omission of facts.

WASHAR0000866

(a) It is unlawful to use any export or temporary import control document containing a false statement or misrepresenting or omitting a material fact for the purpose of exporting any defense article or technical data or the furnishing of any defense service for which a license or approval is required by this subchapter. Any false statement, misrepresentation, or omission of material fact in an export or temporary import control document will be considered as made in a matter within the jurisdiction of a department or agency of the United States for the purposes of 18 U.S.C. 1001, 22 U.S.C. 2778 and 22 U.S.C. 2779.

(b) For the purpose of this section, *export or temporary import control documents* include the following:

(1) An application for a permanent export or a temporary import license and supporting documents.

(2) Shipper's Export Declaration.

(3) Invoice.

(4) Declaration of destination.

(5) Delivery verification.

(6) Application for temporary export.

(7) Application for registration.

(8) Purchase order.

(9) Foreign import certificate.

(10) Bill-of-lading.

(11) Airway bill.

(12) Nontransfer and use certificate.

(13) Any other document used in the regulation or control of a defense article, defense service or technical data for which a license or approval is required by this subchapter.

### § 127.3   Penalties for violations.

Any person who willfully:

(a) Violates any provision of section 38 or section 39 of the Arms Export Control Act (22 U.S.C. 2778 and 2779), or any undertaking specifically required by part 124 of this subchapter; or

WASHAR0000867

(b) In a registration, license application or report required by §38 or §39 of the Arms Export Control Act (22 U.S.C. 2778 and 2779) or by any rule or regulation issued under either section, makes any untrue statement of a material fact or omits a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be subject to a fine or imprisonment, or both, as prescribed by 22 U.S.C. 2778(c).

[58 FR 39316, July 22, 1993, as amended at 71 FR 20549, Apr. 21, 2006]

### § 127.4   Authority of U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection officers.

(a) U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection officers may take appropriate action to ensure observance of this subchapter as to the export or the attempted export of any defense article or technical data, including the inspection of loading or unloading of any vessel, vehicle, or aircraft. This applies whether the export is authorized by license or by written approval issued under this subchapter.

(b) U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection officers have the authority to investigate, detain or seize any export or attempted export of defense articles or technical data contrary to this subchapter.

(c) Upon the presentation to a U.S. Customs and Border Protection Officer of a license or written approval authorizing the export of any defense article, the customs officer may require the production of other relevant documents and information relating to the proposed export. This includes an invoice, order, packing list, shipping document, correspondence, instructions, and the documents otherwise required by the U.S. Customs and Border Protection or U.S. Immigration and Customs Enforcement.

[70 FR 50965, Aug. 29, 2005]

### § 127.5   Authority of the Defense Security Service.

In the case of exports involving classified technical data or defense articles, the Defense Security Service may take appropriate action to ensure compliance with the Department of Defense National Industrial Security Program Operating Manual (unless such requirements are in direct conflict with guidance provided by the Directorate of Defense Trade Controls, in which case the latter guidance must be followed). Upon a request to the Defense Security Service regarding the export of any classified defense article or technical data, the Defense Security Service official or a designated government transmittal authority may require the production of other relevant documents and information relating to the proposed export.

[71 FR 20549, Apr. 21, 2006]

### § 127.6   Seizure and forfeiture in attempts at illegal exports.

WASHAR0000868

(a) An attempt to export from the United States any defense articles in violation of the provisions of this subchapter constitutes an offense punishable under section 401 of title 22 of the United States Code. Whenever it is known or there is probable cause to believe that any defense article is intended to be or is being or has been exported or removed from the United States in violation of law, such article and any vessel, vehicle or aircraft involved in such attempt is subject to seizure, forfeiture and disposition as provided in section 401 of title 22 of the United States Code.

(b) Similarly, an attempt to violate any of the conditions under which a temporary export or temporary import license was issued pursuant to this subchapter or to violate the requirements of §123.2 of this subchapter also constitutes an offense punishable under section 401 of title 22 of the United States Code, and such article, together with any vessel, vehicle or aircraft involved in any such attempt is subject to seizure, forfeiture, and disposition as provided in section 401 of title 22 of the United States Code.

## § 127.7  Debarment.

(a) *Debarment.* In implementing §38 of the Arms Export Control Act, the Assistant Secretary of State for Political-Military Affairs may prohibit any person from participating directly or indirectly in the export of defense articles, including technical data, or in the furnishing of defense services for which a license or approval is required by this subchapter for any of the reasons listed below. Any such prohibition is referred to as a debarment for purposes of this subchapter. The Assistant Secretary of State for Political-Military Affairs shall determine the appropriate period of time for debarment, which shall generally be for a period of three years. However, reinstatement is not automatic and in all cases the debarred person must submit a request for reinstatement and be approved for reinstatement before engaging in any export or brokering activities subject to the Arms Export Control Act or this subchapter.

(b) *Grounds.* (1) The basis for a statutory debarment, as described in paragraph (c) of this section, is any conviction for violating the Arms Export Control Act (see §127.3 of this subchapter) or any conspiracy to violate the Arms Export Control Act.

(2) The basis for administrative debarment, described in part 128 of this subchapter, is any violation of 22 U.S.C. 2778 or any rule or regulation issued thereunder when such a violation is of such a character as to provide a reasonable basis for the Directorate of Defense Trade Controls to believe that the violator cannot be relied upon to comply with the statute or these rules or regulations in the future, and when such violation is established in accordance with part 128 of this subchapter.

(c) *Statutory debarment.* Section 38(g)(4) of the Arms Export Control Act prohibits the issuance of licenses to persons who have been convicted of violating the U.S. criminal statutes enumerated in §120.27 of this subchapter. Discretionary authority to issue licenses is provided, but only if certain statutory requirements are met. It is the policy of the Department of State not to consider applications for licenses or requests for approvals involving any person who has been convicted of violating the Arms Export Control Act or convicted of conspiracy to violate that Act for a three year period following conviction. Such individuals shall be notified in writing that

WASHAR0000869

they are debarred pursuant to this policy. A list of persons who have been convicted of such offenses and debarred for this reason shall be published periodically in the Federal Register. Debarment in such cases is based solely upon the outcome of a criminal proceeding, conducted by a court of the United States, that established guilt beyond a reasonable doubt in accordance with due process. The procedures of part 128 of this subchapter are not applicable in such cases.

(d) *Appeals.* Any person who is ineligible pursuant to paragraph (c) of this section may appeal to the Under Secretary of State for Arms Control and International Security for reconsideration of the ineligibility determination. The procedures specified in §128.13 of this subchapter will be used in submitting a reconsideration appeal.

[58 FR 39316, July 22, 1993, as amended at 71 FR 20549, Apr. 21, 2006]

## § 127.8  Interim suspension.

(a) The Managing Director of the Directorate of Defense Trade Controls or the Director of the Office of Defense Trade Controls Compliance is authorized to order the interim suspension of any person when the Managing Director or Director of Compliance believes that grounds for debarment (as defined in §127.7 of this part) exist and where and to the extent the Managing Director or Director of Compliance, as applicable, finds that interim suspension is reasonably necessary to protect world peace or the security or foreign policy of the United States. The interim suspension orders prohibit that person from participating directly or indirectly in the export of any defense article or defense service for which a license or approval is required by this subchapter. The suspended person shall be notified in writing as provided in §127.7(c) of this part (statutory debarment) or §128.3 of this subchapter (administrative debarment), whichever is appropriate. In both cases, a copy of the interim suspension order will be served upon that person in the same manner as provided in §128.3 of this subchapter. The interim suspension order may be made immediately effective, without prior notice. The order will state the relevant facts, the grounds for issuance of the order, and describe the nature and duration of the interim suspension. No person may be suspended for a period exceeding 60 days, absent extraordinary circumstances, (e.g., unless proceedings under §127.7(c) of this part or under part 128 of this subchapter, or criminal proceedings, are initiated).

(b) A motion or petition to vacate or modify an interim suspension order may be filed at any time with the Under Secretary of State for Arms Control and International Security. After a final decision is reached, the Managing Director of the Directorate of Defense Trade Controls will issue an appropriate order disposing of the motion or petition and will promptly inform the respondent accordingly.

[71 FR 20549, Apr. 21, 2006]

## § 127.9  Applicability of orders.

For the purpose of preventing evasion, orders of the Assistant Secretary of State for Political-Military Affairs debarring a person under §127.7, and orders of the Managing Director, Directorate of Defense Trade Controls or Director of the Office of Defense Trade Controls

WASHAR0000870

Compliance suspending a person under §127.8, may be made applicable to any other person who may then or thereafter (during the term of the order) be related to the debarred person by affiliation, ownership, control, position of responsibility, or other commercial connection. Appropriate notice and opportunity to respond to the basis for the suspension will be given.

[71 FR 20550, Apr. 21, 2006]

## § 127.10   Civil penalty.

 (a) The Assistant Secretary of State for Political-Military Affairs is authorized to impose a civil penalty in an amount not to exceed that authorized by 22 U.S.C. 2778, 2779a and 2780 for each violation of 22 U.S.C. 2778, 2779a and 2780, or any regulation, order, license or approval issued thereunder. This civil penalty may be either in addition to, or in lieu of, any other liability or penalty which may be imposed.

(b) The Directorate of Defense Trade Controls may make:

(1) The payment of a civil penalty under this section or

(2) The completion of any administrative action pursuant to this part 127 or 128 of this subchapter a prior condition for the issuance, restoration, or continuing validity of any export license or other approval.

[58 FR 39316, July 22, 1993, as amended at 62 FR 67276, Dec. 24, 1997; 71 FR 20550, Apr. 21, 2006]

## § 127.11   Past violations.

 (a) *Presumption of denial.* Pursuant to section 38 of the Arms Export Control Act, licenses or other approvals may not be granted to persons who have been convicted of violating any of the U.S. criminal statutes enumerated in §120.27 of this subchapter or who are ineligible to receive any export licenses from any agency of the U.S. Government, subject to a narrowly defined statutory exception. This provision establishes a presumption of denial for licenses or other approvals involving such persons. This presumption is applied by the Directorate of Defense Trade Controls to all persons convicted or deemed ineligible in this manner since the effective date of the Arms Export Control Act (Public Law 94–329; 90 Stat. 729) (June 30, 1976).

(b) *Policy.* An exception to the policy of the Department of State to deny applications for licenses or other approvals that involve persons described in paragraph (a) of this section shall not be considered unless there are extraordinary circumstances surrounding the conviction or ineligibility to export, and only if the applicant demonstrates, to the satisfaction of the Assistant Secretary of State for Political-Military Affairs, that the applicant has taken appropriate steps to mitigate any law enforcement and other legitimate concerns, and to deal with the causes that resulted in the conviction, ineligibility, or debarment. Any person described in paragraph (a) of this section who wishes to request consideration of any application must explain, in a letter to the Managing Director, Directorate of Defense Trade Controls, the reasons why the application

WASHAR0000871

should be considered. If the Assistant Secretary of State for Political-Military Affairs concludes that the application and written explanation have sufficient merit, the Assistant Secretary shall consult with the Office of the Legal Adviser and the Department of the Treasury regarding law enforcement concerns, and may also request the views of other departments, including the Department of Justice. If the Directorate of Defense Trade Controls does grant the license or other approval, subsequent applications from the same person need not repeat the information previously provided but should instead refer to the favorable decision.

(c) *Debarred persons.* Persons debarred pursuant to §127.7(c) (statutory debarment) may not utilize the procedures provided by this section while the debarment is in force. Such persons may utilize only the procedures provided by §127.7(d) of this part.

[71 FR 20550, Apr. 21, 2006]

## § 127.12  Voluntary disclosures.

(a) *General policy.* The Department strongly encourages the disclosure of information to the Directorate of Defense Trade Controls by persons (see §120.14 of this subchapter) that believe they may have violated any export control provision of the Arms Export Control Act, or any regulation, order, license, or other authorization issued under the authority of the Arms Export Control Act. The Department may consider a voluntary disclosure as a mitigating factor in determining the administrative penalties, if any, that should be imposed. Failure to report a violation may result in circumstances detrimental to U.S. national security and foreign policy interests, and will be an adverse factor in determining the appropriate disposition of such violations.

(b) *Limitations.* (1) The provisions of this section apply only when information is provided to the Directorate of Defense Trade Controls for its review in determining whether to take administrative action under part 128 of this subchapter concerning a violation of the export control provisions of the Arms Export Control Act and these regulations.

(2) The provisions of this section apply only when information is received by the Directorate of Defense Trade Controls for review prior to such time that either the Department of State or any other agency, bureau, or department of the United States Government obtains knowledge of either the same or substantially similar information from another source and commences an investigation or inquiry that involves that information, and that is intended to determine whether the Arms Export Control Act or these regulations, or any other license, order, or other authorization issued under the Arms Export Control Act has been violated.

(3) The violation(s) in question, despite the voluntary nature of the disclosure, may merit penalties, administrative actions, sanctions, or referrals to the Department of Justice to consider criminal prosecution. In the latter case, the Directorate of Defense Trade Controls will notify the Department of Justice of the voluntary nature of the disclosure, although the Department of Justice is not required to give that fact any weight. The Directorate of Defense Trade Controls has the sole discretion to consider whether "voluntary disclosure," in context with other relevant information in a particular case, should be a mitigating factor in determining what, if any,

WASHAR0000872

administrative action will be imposed. Some of the mitigating factors the Directorate of Defense Trade Controls may consider are:

(i) Whether the transaction would have been authorized, and under what conditions, had a proper license request been made;

(ii) Why the violation occurred;

(iii) The degree of cooperation with the ensuing investigation;

(iv) Whether the person has instituted or improved an internal compliance program to reduce the likelihood of future violation;

(v) Whether the person making the disclosure did so with the full knowledge and authorization of the person's senior management. (If not, then the Directorate will not deem the disclosure voluntary as covered in this section.)

(4) The provisions of this section do not, nor should they be relied on to, create, confer, or grant any rights, benefits, privileges, or protection enforceable at law or in equity by any person in any civil, criminal, administrative, or other matter.

(c) *Notification.* (1) Any person wanting to disclose information that constitutes a voluntary disclosure should, in the manner outlined below, initially notify the Directorate of Defense Trade Controls immediately after a violation is discovered and then conduct a thorough review of all defense trade transactions where a violation is suspected.

(i) If the notification does not contain all the information required by 127.12(c)(2) of this section, a full disclosure must be submitted within 60 calendar days of the notification, or the Directorate of Defense Trade Controls will not deem the notification to qualify as a voluntary disclosure.

(ii) If the person is unable to provide a full disclosure within the 60 calendar day deadline, an empowered official (see §120.25 of this subchapter) or a senior officer may request an extension of time in writing. A request for an extension must specify what information required by §127.12(c)(2) of this section could not be immediately provided and the reasons why.

(iii) Before approving an extension of time to provide the full disclosure, the Directorate of Defense Trade Controls may require the requester to certify in writing that they will provide the full disclosure within a specific time period.

(iv) Failure to provide a full disclosure within a reasonable time may result in a decision by the Directorate of Defense Trade Controls not to consider the notification as a mitigating factor in determining the appropriate disposition of the violation. In addition, the Directorate of Defense Trade Controls may direct the requester to furnish all relevant information surrounding the violation.

(2) Notification of a violation must be in writing and should include the following information:

161

WASHAR0000873

(i) A precise description of the nature and extent of the violation (e.g., an unauthorized shipment, doing business with a party denied U.S. export privileges, etc.);

(ii) The exact circumstances surrounding the violation (a thorough explanation of why, when, where, and how the violation occurred);

(iii) The complete identities and addresses of all persons known or suspected to be involved in the activities giving rise to the violation (including mailing, shipping, and e-mail addresses; telephone and fax/facsimile numbers; and any other known identifying information);

(iv) Department of State license numbers, exemption citation, or description of any other authorization, if applicable;

(v) U.S. Munitions List category and subcategory, product description, quantity, and characteristics or technological capability of the hardware, technical data or defense service involved;

(vi) A description of corrective actions already undertaken that clearly identifies the new compliance initiatives implemented to address the causes of the violations set forth in the voluntary disclosure and any internal disciplinary action taken; and how these corrective actions are designed to deter those particular violations from occurring again;

(vii) The name and address of the person making the disclosure and a point of contact, if different, should further information be needed.

(3) Factors to be addressed in the voluntary disclosure include, for example, whether the violation was intentional or inadvertent; the degree to which the person responsible for the violation was familiar with the laws and regulations, and whether the person was the subject of prior administrative or criminal action under the AECA; whether the violations are systemic; and the details of compliance measures, processes and programs, including training, that were in place to prevent such violations, if any. In addition to immediately providing written notification, persons are strongly urged to conduct a thorough review of all export-related transactions where a possible violation is suspected.

(d) *Documentation.* (1) The written disclosure should be accompanied by copies of substantiating documents. Where appropriate, the documentation should include, but not be limited to:

(i) Licensing documents (e.g., license applications, export licenses and end-user statements), exemption citation, or other authorization description, if any;

(ii) Shipping documents (e.g., shipper's export declarations, airway bills and bills of lading);

(iii) Any other relevant documents must be retained by the person making the disclosure until the Directorate of Defense Trade Controls requests them or until a final decision on the disclosed information has been made.

WASHAR0000874

(e) *Certification.* A certification must be submitted stating that all of the representations made in connection with the voluntary disclosure are true and correct to the best of that person's knowledge and belief. Certifications should be executed by an empowered official (See §120.25 of this subchapter), or by a senior officer (e.g. chief executive officer, president, vice-president, comptroller, treasurer, general counsel, or member of the board of directors). If the violation is a major violation, reveals a systemic pattern of violations, or reflects the absence of an effective compliance program, the Directorate of Defense Trade Controls may require that such certification be made by a senior officer of the company.

(f) *Oral presentations.* Oral presentation is generally not necessary to augment the written presentation. However, if the person making the disclosure believes a meeting is desirable, a request should be included with the written presentation.

(g) Send voluntary disclosures to the Office of Defense Trade Controls Compliance, Directorate of Defense Trade Controls. Consult the Directorate of Defense Trade Controls Web site at *http://www.pmddtc.state.gov* for the appropriate street address.

[58 FR 39316, July 22, 1993, as amended at 70 FR 34655, June 15, 2005; 71 FR 20550, Apr. 21, 2006; 72 FR 70778, Dec. 13, 2007]

WASHAR0000875

**Intentionally Blank**

WASHAR0000876

# PART 128—ADMINISTRATIVE PROCEDURES

**Section Contents**
§ 128.1   Exclusion of functions from the Administrative Procedure Act.
§ 128.2   Administrative Law Judge.
§ 128.3   Institution of Administrative Proceedings.
§ 128.4   Default.
§ 128.5   Answer and demand for oral hearing.
§ 128.6   Discovery.
§ 128.7   Prehearing conference.
§ 128.8   Hearings.
§ 128.9   Proceedings before and report of Administrative Law Judge.
§ 128.10  Disposition of proceedings.
§ 128.11  Consent agreements.
§ 128.12  Rehearings.
§ 128.13  Appeals.
§ 128.14  Confidentiality of proceedings.
§ 128.15  Orders containing probationary periods.
§ 128.16  Extension of time.
§ 128.17  Availability of orders.

**Authority:**   Secs. 2, 38, 40, 42, and 71, Arms Export Control Act. 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791, and 2797); E.O. 11958, 42 FR 4311; 22 U.S.C. 2651a; E.O. 12291, 46 FR 1981.

**Source:**   58 FR 39320, July 22, 1993, unless otherwise noted.

## § 128.1   Exclusion of functions from the Administrative Procedure Act.

The Arms Export Control Act authorizes the President to control the import and export of defense articles and services in furtherance of world peace and the security and foreign policy of the United States. It authorizes the Secretary of State to make decisions on whether license applications or other written requests for approval shall be granted, or whether exemptions may be used. It also authorizes the Secretary of State to revoke, suspend or amend licenses or other written approvals whenever the Secretary deems such action to be advisable. The administration of the Arms Export Control Act is a foreign affairs function encompassed within the meaning of the military and foreign affairs exclusion of the Administrative Procedure Act and is thereby expressly exempt from various provisions of that Act. Because the exercising of the foreign affairs function, including the decisions required to implement the Arms Export Control Act, is highly discretionary, it is excluded from review under the Administrative Procedure Act.

[61 FR 48831, Sept. 17, 1996]

WASHAR0000877

## § 128.2   Administrative Law Judge.

The Administrative Law Judge referred to in this part is an Administrative Law Judge appointed by the Department of State. The Administrative Law Judge is authorized to exercise the powers and perform the duties provided for in §§127.7, 127.8, and 128.3 through 128.16 of this subchapter.

[71 FR 20551, Apr. 21, 2006]

## § 128.3   Institution of Administrative Proceedings.

 (a) *Charging letters.* The Managing Director, Directorate of Defense Trade Controls, with the concurrence of the Office of the Legal Adviser, Department of State, may initiate proceedings to impose debarment or civil penalties in accordance with §127.7 or §127.10 of this subchapter, respectively. Administrative proceedings shall be initiated by means of a charging letter. The charging letter will state the essential facts constituting the alleged violation and refer to the regulatory or other provisions involved. It will give notice to the respondent to answer the charges within 30 days, as provided in §128.5(a), and indicate that a failure to answer will be taken as an admission of the truth of the charges. It will inform the respondent that he or she is entitled to an oral hearing if a written demand for one is filed with the answer or within seven (7) days after service of the answer. The respondent will also be informed that he or she may, if so desired, be represented by counsel of his or her choosing. Charging letters may be amended from time to time, upon reasonable notice.

(b) *Service.* A charging letter is served upon a respondent:

(1) If the respondent is a resident of the United States, when it is mailed postage prepaid in a wrapper addressed to the respondent at that person's last known address; or when left with the respondent or the agent or employee of the respondent; or when left at the respondent's dwelling with some person of suitable age and discretion then residing herein; or

(2) If the respondent is a non-resident of the United States, when served upon the respondent by any of the foregoing means. If such methods of service are not practicable or appropriate, the charging letter may be tendered for service on the respondent to an official of the government of the country wherein the respondent resides, provided that there is an agreement or understanding between the United States Government and the government of the country wherein the respondent resident permitting this action.

[61 FR 48831, Sept. 17, 1996, as amended at 71 FR 20551, Apr. 21, 2006]

## § 128.4   Default.

 (a) *Failure to answer.* If the respondent fails to answer the charging letter, the respondent may be held in default. The case shall then be referred to the Administrative Law Judge for consideration in a manner as the Administrative Law Judge may consider appropriate. Any order

WASHAR0000878

issued shall have the same effect as an order issued following the disposition of contested charges.

(b) *Petition to set aside defaults.* Upon showing good cause, any respondent against whom a default order has been issued may apply to set aside the default and vacate the order entered thereon. The petition shall be submitted to duplicate to the Assistant Secretary for Political-Military Affairs, U.S. Department of State, 2201 C Street, NW., Washington, DC 20520. The Director will refer the petition to the Administrative Law Judge for consideration and a recommendation. The Administrative law Judge will consider the application and may order a hearing and require the respondent to submit further evidence in support of his or her petition. The filing of a petition to set aside a default does not in any manner affect an order entered upon default and such order continues in full force and effect unless a further order is made modifying or terminating it.

[61 FR 48832, Sept. 17, 1996]

## § 128.5  Answer and demand for oral hearing.

 (a) *When to answer.* The respondent is required to answer the charging letter within 30 days after service.

(b) *Contents of answer.* An answer must be responsive to the charging letter. It must fully set forth the nature of the respondent's defense or defenses. In the answer, the respondent must admit or deny specifically each separate allegation of the charging letter, unless the respondent is without knowledge, in which case the respondent's answer shall so state and the statement shall operate as denial. Failure to deny or controvert any particular allegation will be deemed an admission thereof. The answer may set forth such additional or new matter as the respondent believes support a defense or claim of mitigation. Any defense or partial defense not specifically set forth in an answer shall be deemed waived. Evidence offered thereon by the respondent at a hearing may be refused except upon good cause being shown. If the respondent does not demand an oral hearing, he or she shall transmit, within seven (7) days after the service of his or her answer, original or photocopies of all correspondence, papers, records, affidavits, and other documentary or written evidence having any bearing upon or connection with the matters in issue. If any such materials are in language other than English, translations into English shall be submitted at the same time.

(c) *Submission of answer.* The answer, written demand for oral hearing (if any) and supporting evidence required by §128.5(b) shall be in duplicate and mailed or delivered to the designated Administrative Law Judge. A copy shall be simultaneously mailed to the Managing Director, Directorate of Defense Trade Controls, SA–1, Room 1200, Department of State, Washington, DC 20522–0112, or delivered to 2401 Street, NW., Washington, DC addressed to Managing Director, Directorate of Defense Trade Controls, SA–1, Room 1200, Department of State, Washington, DC 20037.

[58 FR 39320, July 22, 1993, as amended at 61 FR 48832, Sept. 17, 1996; 71 FR 20551, Apr. 21, 2006]

WASHAR0000879

## § 128.6  Discovery.

(a) *Discovery by the respondent.* The respondent, through the Administrative Law Judge, may request from the Directorate of Defense Trade Controls any relevant information, not privileged or otherwise not authorized for release, that may be necessary or helpful in preparing a defense. The Directorate of Defense Trade Controls may provide any relevant information, not privileged or otherwise not authorized for release, that may be necessary or helpful in preparing a defense. The Directorate of Defense Trade Controls may supply summaries in place of original documents and may withhold information from discovery if the interests of national security or foreign policy so require, or if necessary to comply with any statute, executive order or regulation requiring that the information not be disclosed. The respondent may request the Administrative Law Judge to request any relevant information, books, records, or other evidence, from any other person or government agency so long as the request is reasonable in scope and not unduly burdensome.

(b) *Discovery by the Directorate of Defense Trade Controls.* The Directorate of Defense Trade Controls or the Administrative Law Judge may make reasonable requests from the respondent of admissions of facts, answers to interrogatories, the production of books, records, or other relevant evidence, so long as the request is relevant and material.

(c) *Subpoenas.* At the request of any party, the Administrative Law Judge may issue subpoenas, returnable before him, requiring the attendance of witnesses and the production of books, records, and other documentary or physical evidence determined by he Administrative Law Judge to be relevant and material to the proceedings, reasonable in scope, and not unduly burdensome.

(d) *Enforcement of discovery rights.* If the Directorate of Defense Trade Controls fails to provide the respondent with information in its possession which is not otherwise available and which is necessary to the respondent's defense, the Administrative Law Judge may dismiss the charges on her or his own motion or on a motion of the respondent. If the respondent fails to respond with reasonable diligence to the requests for discovery by the Directorate of Defense Trade Controls or the Administrative Law Judge, on her or his own motion or motion of the Directorate of Defense Trade Controls, and upon such notice to the respondent as the Administrative Law Judge may direct, may strike respondent's answer and declare the respondent in default, or make any other ruling which the Administrative Law Judge deems necessary and just under the circumstances. If a third party fails to respond to the request for information, the Administrative Law Judge shall consider whether the evidence sought is necessary to a fair hearing, and if it is so necessary that a fair hearing may not be held without it, the Administrative Law Judge shall determine whether substitute information is adequate to protect the rights of the respondent. If the Administrative Law Judge decides that a fair hearing may be held with the substitute information, then the proceedings may continue. If not, then the Administrative Law Judge may dismiss the charges.

[61 FR 48832, Sept. 17, 1996, as amended at 71 FR 20551, Apr. 21, 2006]

## § 128.7  Prehearing conference.

WASHAR0000880

(a)(1) The Administrative Law Judge may, upon his own motion or upon motion of any party, request the parties or their counsel to a prehearing conference to consider:

(i) Simplification of issues;

(ii) The necessity or desirability of amendments to pleadings;

(iii) Obtaining stipulations of fact and of documents to avoid unnecessary proof; or

(iv) Such other matter as may expedite the disposition of the proceeding.

(2) The Administrative Law Judge will prepare a summary of the action agreed upon or taken at the conference, and will incorporate therein any written stipulations or agreements made by the parties.

(3) The conference proceedings may be recorded magnetically or taken by a reporter and transcribed, and filed with the Administrative Law Judge.

(b) If a conference is impracticable , the Administrative Law Judge may request the parties to correspond with the person to achieve the purposes of a conference. The Administrative Law Judge shall prepare a summary of action taken as in the case of a conference.

[61 FR 48832, Sept. 17, 1996, as amended at 71 FR 20551, Apr. 21, 2006]

## § 128.8   Hearings.

(a) A respondent who had not filed a timely written answer is not entitled to a hearing, and the case may be considered by the Administrative Law Judge as provided in §128.4(a). If any answer is filed, but no oral hearing demanded, the Administrative Law Judge may proceed to consider the case upon the written pleadings and evidence available. The Administrative Law Judge may provide for the making of the record in such manner as the Administrative Law Judge deems appropriate. If respondent answers and demands an oral hearing, the Administrative Law Judge, upon due notice, shall set the case for hearing, unless a respondent has raised in his answer no issues of material fact to be determined. If respondent fails to appear at a scheduled hearing, the hearing nevertheless may proceed in respondent's absence. The respondent's failure to appear will not affect the validity of the hearing or any proceedings or action thereafter.

(b) The Administrative Law Judge may administer oaths and affirmations. Respondent may be represented by counsel. Unless otherwise agreed by the parties and the Administrative Law Judge the proceeding will be taken by a reporter or by magnetic recording, transcribed, and filed with the Administrative Law Judge. Respondent may examine the transcript and may obtain a copy upon payment of proper costs.

[61 FR 48833, Sept. 17, 1996]

## § 128.9   Proceedings before and report of Administrative Law Judge.

WASHAR0000881

(a) The Administrative Law Judge may conform any part of the proceedings before him or her to the Federal Rules of Civil Procedure. The record may be made available in any other administrative or other proceeding involving the same respondent.

(b) The Administrative Law Judge, after considering the record, will prepare a written report. The report will include findings of fact, findings of law, a finding whether a law or regulation has been violated, and the Administrative Law Judge's recommendations. It shall be transmitted to the Assistant Secretary for Political-Military Affairs, Department of State.

[61 FR 48833, Sept. 17, 1996]

### § 128.10   Disposition of proceedings.

Where the evidence is not sufficient to support the charges, the Managing Director, Directorate of Defense Trade Controls or the Administrative Law Judge will dismiss the charges. Where the Administrative Law Judge finds that a violation has been committed, the Administrative Law Judge's recommendation shall be advisory only. The Assistant Secretary of State for Political-Military Affairs will review the record, consider the report of the Administrative Law Judge, and make an appropriate disposition of the case. The Managing Director may issue an order debarring the respondent from participating in the export of defense articles or technical data or the furnishing of defense services as provided in §127.7 of this subchapter, impose a civil penalty as provided in §127.10 of this subchapter, or take such action as the Administrative Law Judge may recommend. Any debarment order will be effective for the period of time specified therein and may contain such additional terms and conditions as are deemed appropriate. A copy of the order together with a copy of the Administrative Law Judge's report will be served upon the respondent.

[71 FR 20552, Apr. 21, 2006]

### § 128.11   Consent agreements.

(a) The Directorate of Defense Trade Controls and the respondent may, by agreement, submit to the Administrative Law Judge a proposal for the issuance of a consent order. The Administrative Law Judge will review the facts of the case and the proposal and may conduct conferences with the parties and may require the presentation of evidence in the case. If the Administrative Law Judge does not approve the proposal, the Administrative Law Judge will notify the parties and the case will proceed as though no consent proposal had been made. If the proposal is approved, the Administrative Law Judge will report the facts of the case along with recommendations to the Assistant Secretary of State for Political-Military Affairs. If the Assistant Secretary of State for Political-Military Affairs does not approve the proposal, the case will proceed as though no consent proposal had been made. If the Assistant Secretary of State for Political-Military Affairs approves the proposal, an appropriate order may be issued.

(b) Cases may also be settled prior to service of a charging letter. In such an event, a proposed charging letter shall be prepared, and a consent agreement and order shall be submitted for the approval and signature of the Assistant Secretary for Political-Military Affairs, and no action by

WASHAR0000882

the Administrative Law Judge shall be required. Cases which are settled may not be reopened or appealed.

[61 FR 48833, Sept. 17, 1996, as amended at 71 FR 20552, Apr. 21, 2006]

## § 128.12   Rehearings.

The Administrative Law Judge may grant a rehearing or reopen a proceeding at any time for the purpose of hearing any relevant and material evidence which was not known or obtainable at the time of the original hearing. A report for rehearing or reopening must contain a summary of such evidence, and must explain the reasons why it could not have been presented at the original hearing. The Administrative Law Judge will inform the parties of any further hearing, and will conduct such hearing and submit a report and recommendations in the same manner as provided for the original proceeding (Described in §128.10).

[61 FR 48833, Sept. 17, 1996]

## § 128.13   Appeals.

 (a) *Filing of appeals.* An appeal must be in writing, and be addressed to and filed with the Under Secretary of State for Arms Control and International Security, Department of State, Washington, DC 20520. An appeal from a final order denying export privileges or imposing civil penalties must be filed within 30 days after receipt of a copy of the order. If the Under Secretary cannot for any reason act on the appeal, he or she may designate another Department of State official to receive and act on the appeal.

(b) *Grounds and conditions for appeal.* The respondent may appeal from the debarment or from the imposition of a civil penalty (except the imposition of civil penalties pursuant to a consent order pursuant to §128.11) upon the ground: (1) That the findings of a violation are not supported by any substantial evidence; (2) that a prejudicial error of law was committed: or (3) that the provisions of the order are arbitrary, capricious, or an abuse of discretion. The appeal must specify upon which of these grounds the appeal is based and must indicate from which provisions of the order the appeal is taken. An appeal from an order issued upon default will not be entertained if the respondent has failed to seek relief as provided in §128.4(b).

(c) *Matters considered on appeal.* An appeal will be considered upon the basis of the assembled record. This record consists of (but is not limited to) the charging letter, the respondent's answer, the transcript or magnetic recording of the hearing before the Administrative Law Judge, the report of the Administrative Law Judge, the order of the Assistant Secretary of State for Political-Military Affairs, and any other relevant documents involved in the proceedings before the Administrative Law Judge. The Under Secretary of State for Arms Control and International Security may direct a rehearing and reopening of the proceedings before the Administrative Law Judge if he or she finds that the record is insufficient or that new evidence is relevant and material to the issues and was not known and was not reasonably available to the respondent at the time of the original hearings.

171

WASHAR0000883

(d) *Effect of appeals.* The taking of an appeal will not stay the operation of any order.

(e) *Preparation of appeals* —(1) *General requirements.* An appeal shall be in letter form. The appeal and accompanying material should be filed in duplicate, unless otherwise indicated, and a copy simultaneously mailed to the Managing Director, Directorate of Defense Trade Controls, SA–1, Room 1200, Department of State, Washington, DC 20522–0112 or delivered to 2401 E Street, NW., Washington, DC addressed to Managing Director, Directorate of Defense Trade Controls, SA–1, Room 1200, Department of State, Washington, DC 20037.

(2) *Oral presentation.* The Under Secretary of State for Arms Control and International Security may grant the appellant an opportunity for oral argument and will set the time and place for oral argument and will notify the parties, ordinarily at least 10 days before the date set.

(f) *Decisions.* All appeals will be considered and decided within a reasonable time after they are filed. An appeal may be granted or denied in whole or in part, or dismissed at the request of the appellant. The decision of the Under Secretary of State for Arms Control and International Security will be final.

[58 FR 39320, July 22, 1993, as amended at 61 FR 48833, Sept. 17, 1996; 71 FR 20552, Apr. 21, 2006]

## § 128.14   Confidentiality of proceedings.

Proceedings under this part are confidential. The documents referred to in §128.17 are not, however, deemed to be confidential. Reports of the Administrative Law Judge and copies of transcripts or recordings of hearings will be available to parties and, to the extent of their own testimony, to witnesses. All records are available to any U.S. Government agency showing a proper interest therein.

[61 FR 48834, Sept. 17, 1996]

## § 128.15   Orders containing probationary periods.

 (a) *Revocation of probationary periods.* A debarment or interim suspension order may set a probationary period during which the order may be held in abeyance for all or part of the debarment or suspension period, subject to the conditions stated therein. The Managing Director, Directorate of Defense Trade Controls, may apply, without notice to any person to be affected thereby, to the Administrative Law Judge for a recommendation on the appropriateness of revoking probation when it appears that the conditions of the probation have been breached. The facts in support of the application will be presented to the Administrative Law Judge, who will report thereon and make a recommendation to the Assistant Secretary of State for Political-Military Affairs. The latter will make a determination whether to revoke probation and will issue an appropriate order. The party affected by this action may request the Assistant Secretary of State for Political-Military Affairs to reconsider the decision by submitting a request within 10 days of the date of the order.

WASHAR0000884

(b) *Hearings* —(1) *Objections upon notice.* Any person affected by an application upon notice to revoke probation, within the time specified in the notice, may file objections with the Administrative Law Judge.

(2) *Objections to order without notice.* Any person adversely affected by an order revoking probation, without notice may request that the order be set aside by filing his objections thereto with the Administrative Law Judge. The request will not stay the effective date of the order or revocation.

(3) *Requirements for filing objections.* Objections filed with the Administrative Law Judge must be submitted in writing and in duplicate. A copy must be simultaneously submitted to the Directorate of Defense Trade Controls. Denials and admissions, as well as any mitigating circumstances, which the person affected intends to present must be set forth in or accompany the letter of objection and must be supported by evidence. A request for an oral hearing may be made at the time of filing objections.

(4) *Determination.* The application and objections thereto will be referred to the Administrative Law Judge. An oral hearing if requested, will be conducted at an early convenient date, unless the objections filed raise no issues of material fact to be determined. The Administrative Law Judge will report the facts and make a recommendation to the Assistant Secretary for Political-Military Affairs, who will determine whether the application should be granted or denied and will issue an appropriate order. A copy of the order and of the Administrative Law Judge's report will be furnished to any person affected thereby.

(5) *Effect of revocation on other actions.* The revocation of a probationary period will not preclude any other action concerning a further violation, even where revocation is based on the further violation.

[61 FR 48834, Sept. 17, 1996, as amended at 71 FR 20552, Apr. 21, 2006]

## § 128.16   Extension of time.

The Administrative Law Judge, for good cause shown, may extend the time within which to prepare and submit an answer to a charging letter or to perform any other act required by this part.

[61 FR 48834, Sept. 17, 1996]

## § 128.17   Availability of orders.

All charging letters, debarment orders, orders imposing civil penalties, probationary periods, and interim suspension orders are available for public inspection in the Public Reading Room of the Department of State.

WASHAR0000885

**Intentionally Blank**

174

WASHAR0000886

## PART 129—REGISTRATION AND LICENSING OF BROKERS

**Section Contents**

§ 129.1   Purpose.
§ 129.2   Definitions.
§ 129.3   Requirement to register.
§ 129.4   Registration statement and fees.
§ 129.5   Policy on embargoes and other proscriptions.
§ 129.6   Requirement for license/approval.
§ 129.7   Prior approval (license).
§ 129.8   Prior notification.
§ 129.9   Reports.
§ 129.10   Guidance.

**Authority:**   Sec. 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778).

**Source:**   62 FR 67276, Dec. 24, 1997, unless otherwise noted.

### § 129.1   Purpose.

Section 38(b)(1)(A)(ii) of the Arms Export Control Act (22 U.S.C. 2778) provides that persons engaged in the business of brokering activities shall register and pay a registration fee as prescribed in regulations, and that no person may engage in the business of brokering activities without a license issued in accordance with the Act.

### § 129.2   Definitions.

 (a) *Broker* means any person who acts as an agent for others in negotiating or arranging contracts, purchases, sales or transfers of defense articles or defense services in return for a fee, commission, or other consideration.

(b) *Brokering activities* means acting as a broker as defined in §129.2(a), and includes the financing, transportation, freight forwarding, or taking of any other action that facilitates the manufacture, export, or import or a defense article or defense service, irrespective of its origin. For example, this includes, but is not limited to, activities by U.S. persons who are located inside or outside of the United States or foreign persons subject to U.S. jurisdiction involving defense articles or defense services of U.S. or foreign origin which are located inside or outside of the United States. But, this does not include activities by U.S. persons that are limited exclusively to U.S. domestic sales or transfers (e.g., not for export or re-transfer in the United States or to a foreign person). For the purposes of this subchapter, engaging in the business of brokering activities requires only one action as described above.

WASHAR0000887

(c) The term "foreign defense article or defense service" includes any non-United States defense article or defense service of a nature described on the United States Munitions List regardless of whether such article or service is of United States origin or whether such article or service contains United States origin components.

[62 FR 67276, Dec. 24, 1997, as amended at 71 FR 20553, Apr. 21, 2006]

## § 129.3   Requirement to register.

(a) Any U.S. person, wherever located, and any foreign person located in the United States or otherwise subject to the jurisdiction of the United States (notwithstanding §120.1(c)), who engages in the business of brokering activities (as defined in this part) with respect to the manufacture, export, import, or transfer of any defense article or defense service subject to the controls of this subchapter (see part 121) or any "foreign defense article or defense service" (as defined in §129.2) is required to register with the Directorate of Defense Trade Controls.

(b) *Exemptions.* Registration under this section is not required for:

(1) Employees of the United States Government acting in official capacity.

(2) Employees of foreign governments or international organizations acting in official capacity.

(3) *Persons exclusively in the business of financing, transporting, or freight forwarding, whose business activities do not also include brokering defense articles or defense services.* For example, air carriers and freight forwarders who merely transport or arrange transportation for licensed United States Munitions List items are not required to register, nor are banks or credit companies who merely provide commercially available lines or letters of credit to persons registered in accordance with part 122 of this subchapter required to register. However, banks, firms, or other persons providing financing for defense articles or defense services would be required to register under certain circumstances, such as where the bank or its employees are directly involved in arranging arms deals as defined in §129.2(a) or hold title to defense articles, even when no physical custody of defense articles is involved.

[62 FR 67276, Dec. 24, 1997, as amended at 71 FR 20553, Apr. 21, 2006]

## § 129.4   Registration statement and fees.

(a) *General.* The Department of State Form DS–2032 (Statement of Registration) and the transmittal letter meeting the requirements of §122.2(b) of this subchapter must be submitted by an intended registrant with a payment by check, payable to the Department of State, of the fees prescribed in Section 122.3(a) of this subchapter. Foreign brokers must submit a check in U.S. dollars payable through a U.S. financial institution that includes the registrant's legal name and address on the check. The Statement of Registration and transmittal letter must be signed by a senior officer (e.g., Chief Executive Officer, President, Secretary, Partner, Member, Treasurer, General Counsel) who has been empowered by the intended registrant to sign such documents. The intended registrant shall also submit documentation that demonstrates that it is incorporated

WASHAR0000888

or otherwise authorized to do business in the United States. The requirement to submit a Department of State Form DS–2032 and to submit documentation demonstrating incorporation or authorization to do business in the United States does not exclude foreign persons from the requirement to register. Foreign persons who are required to register shall provide information that is substantially similar in content as that which a U.S. person would provide under this provision (e.g., foreign business license or similar authorization to do business). The Directorate of Defense Trade Controls will notify the registrant if the Statement of Registration is incomplete either by notifying the registrant of what information is required or through the return of the entire registration package with payment. Registrants may not establish new entities for the purpose of reducing registration fees.

(b) A person required to register under this part who is already registered as a manufacturer or exporter in accordance with part 122 of this subchapter must also provide notification of this additional activity by submitting to the Directorate of Defense Trade Controls by registered mail a transmittal letter meeting the requirements of §122.2(b) and citing the existing registration, and must pay an additional fee according to the schedule prescribed in §122.3(a). Any person who registers coincidentally as a broker as defined in §129.2 of this subchapter and as a manufacturer or exporter must submit a Statement of Registration that reflects the brokering activities, the §122.2(b) transmittal letter, as well as the additional fee for registration as a broker.

(c) Other provisions of part 122, in particular, §122.4 concerning notification of changes in information furnished by registrants and §122.5 concerning maintenance of records by registrants, apply equally to registration under this part (part 129).

[62 FR 67276, Dec. 24, 1997, as amended at 69 FR 70889, Dec. 8, 2004; 71 FR 20553, Apr. 21, 2006; 73 FR 55441, Sept. 25, 2008]

## § 129.5   Policy on embargoes and other proscriptions.

(a) The policy and procedures set forth in this subparagraph apply to brokering activities defined in §129.2 of this subchapter, regardless of whether the persons involved in such activities have registered or are required to register under §129.3 of this subchapter.

(b) No brokering activities or brokering proposals involving any country referred to in §126.1 of this subchapter may be carried out by any person without first obtaining the written approval of the Directorate of Defense Trade Controls.

(c) No brokering activities or proposal to engage in brokering activities may be carried out or pursued by any person without the prior written approval of the Directorate of Defense Trade Controls in the case of other countries or persons identified from time to time by the Department of State through notice in the Federal Register, with respect to which certain limitations on defense articles or defense services are imposed for reasons of U.S. national security or foreign policy or law enforcement interests (e.g., an individual subject to debarment pursuant to §127.7 of this subchapter).

WASHAR0000889

(d) No brokering activities or brokering proposal may be carried out with respect to countries which are subject to United Nations Security Council arms embargo (see also §121.1(c)).

(e) In cases involving countries or persons subject to paragraph (b), (c), or (d), above, it is the policy of the Department of State to deny requests for approval, and exceptions may be granted only rarely, if ever. Any person who knows or has reason to know of brokering activities involving such countries or persons must immediately inform the Directorate of Defense Trade Controls.

[62 FR 67276, Dec. 24, 1997, as amended at 71 FR 20553, Apr. 21, 2006]

## § 129.6   Requirement for license/approval.

(a) No person may engage in the business of brokering activities without the prior written approval (license) of, or prior notification to, the Directorate of Defense Trade Controls, except as follows:

(b) A license will not be required for:

(1) Brokering activities undertaken by or for an agency of the United States Government—

(i) For use by an agency of the United States Government; or

(ii) For carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.

(2) Brokering activities that are arranged wholly within and destined exclusively for the North Atlantic Treaty Organization, any member country of that Organization, Australia, Japan, New Zealand, or South Korea, except in the case of the defense articles or defense services specified in §129.7(a) of this subchapter, for which prior approval is always required.

[62 FR 67276, Dec. 24, 1997, as amended at 71 FR 20553, Apr. 21, 2006; 73 FR 38344, Aug. 3, 2009]

## § 129.7   Prior approval (license).

(a) The following brokering activities require the prior written approval of the Directorate of Defense Trade Controls:

(1) Brokering activities pertaining to certain defense articles (or associated defense services) covered by or of a nature described by part 121, to or from any country, as follows:

(i) Fully automatic firearms and components and parts therefor;

(ii) Nuclear weapons strategic delivery systems and all components, parts, accessories, attachments specifically designed for such systems and associated equipment;

WASHAR0000890

(iii) Nuclear weapons design and test equipment of a nature described by Category XVI of part 121;

(iv) Naval nuclear propulsion equipment of a nature described by Category VI(e);

(v) Missile Technology Control Regime Category I items (§121.16);

(vi) Classified defense articles, services and technical data;

(vii) Foreign defense articles or defense services (other than those that are arranged wholly within and destined exclusively for the North Atlantic Treaty Organization, Australia, Japan, New Zealand, or South Korea ( *see* §§129.6(b)(2) and 129.7(a)).

(2) Brokering activities involving defense articles or defense services covered by, or of a nature described by part 121, of this subchapter, in addition to those specified in §129.7(a), that are designated as significant military equipment under this subchapter, for or from any country not a member of the North Atlantic Treaty Organization, Australia, Japan, New Zealand, or South Korea whenever any of the following factors are present:

(i) The value of the significant military equipment is $1,000,000 or more;

(ii) The identical significant military equipment has not been previously licensed for export to the armed forces of the country concerned under this subchapter or approved for sale under the Foreign Military Sales Program of the Department of Defense;

(iii) Significant military equipment would be manufactured abroad as a result of the articles or services being brokered; or

(iv) The recipient or end user is not a foreign government or international organization.

(b) The requirements of this section for prior written approval are met by any of the following:

(1) A license or other written approval issued under parts 123, 124, or 125 of this subchapter for the permanent or temporary export or temporary import of the particular defense article, defense service or technical data subject to prior approval under this section, provided the names of all brokers have been identified in an attachment accompanying submission of the initial application; or

(2) A written statement from the Directorate of Defense Trade Controls approving the proposed activity or the making of a proposal or presentation.

(c) Requests for approval of brokering activities shall be submitted in writing to the Directorate of Defense Trade Controls by an empowered official of the registered broker; the letter shall also meet the requirements of §126.13 of this subchapter.

WASHAR0000891

(d) The request shall identify all parties involved in the proposed transaction and their roles, as well as outline in detail the defense article and related technical data (including manufacturer, military designation and model number), quantity and value, the security classification, if any, of the articles and related technical data, the country or countries involved, and the specific end use and end user(s).

[62 FR 67276, Dec. 24, 1997, as amended at 71 FR 20553, Apr. 21, 2006; 73 FR 38344, Aug. 3, 2009; 75 FR 52625, Aug. 27, 2010]

### § 129.8   Prior notification.

 (a) Prior notification to the Directorate of Defense Trade Controls is required for brokering activities with respect to significant military equipment valued at less than $1,000,000, except for sharing of basic marketing information (e.g., information that does not include performance characteristics, price and probable availability for delivery) by U.S. persons registered as exporters under part 122.

(b) The requirement of this section for prior notification is met by informing the Directorate of Defense Trade Controls by letter at least 30 days before making a brokering proposal or presentation. The Directorate of Defense Trade Controls will provide written acknowledgment of such prior notification to confirm compliance with this requirement and the commencement of the 30-day notification period.

[62 FR 67276, Dec. 24, 1997, as amended at 71 FR 20553, Apr. 21, 2006; 75 FR 52625, Aug. 27, 2010]

### § 129.9   Reports.

Any person required to register under this part shall provide annually a report to the Directorate of Defense Trade Controls enumerating and describing its brokering activities by quantity, type, U.S. dollar value, and purchaser(s) and recipient(s), license(s) numbers for approved activities and any exemptions utilized for other covered activities.

[71 FR 20554, Apr. 21, 2006]

### § 129.10   Guidance.

Any person desiring guidance on issues related to this part, such as whether an activity is a brokering activity within the scope of this Part, or whether a prior approval or notification requirement applies, may seek guidance in writing from the Directorate of Defense Trade Controls. The procedures and conditions stated in §126.9 apply equally to requests under this section.

[71 FR 20554, Apr. 21, 2006]

WASHAR0000892

## PART 130—POLITICAL CONTRIBUTIONS, FEES AND COMMISSIONS

**Section Contents**

§ 130.1   Purpose.
§ 130.2   Applicant.
§ 130.3   Armed forces.
§ 130.4   Defense articles and defense services.
§ 130.5   Fee or commission.
§ 130.6   Political contribution.
§ 130.7   Supplier.
§ 130.8   Vendor.
§ 130.9   Obligation to furnish information to the Directorate of Defense Trade Controls.
§ 130.10   Information to be furnished by applicant or supplier to the Directorate of Defense Trade Controls.
§ 130.11   Supplementary reports.
§ 130.12   Information to be furnished by vendor to applicant or supplier.
§ 130.13   Information to be furnished to applicant, supplier or vendor by a recipient of a fee or commission.
§ 130.14   Recordkeeping.
§ 130.15   Confidential business information.
§ 130.16   Other reporting requirements.
§ 130.17   Utilization of and access to reports and records.

**Authority:**   Sec. 39, Arms Export Control Act, 90 Stat. 767 (22 U.S.C. 2779); E.O. 11958, 42 FR 4311, 3 CFR, 1977 Comp. p. 79; 22 U.S.C. 2651a.

**Source:**   58 FR 39323, July 22, 1993, unless otherwise noted.

### § 130.1   Purpose.

Section 39(a) of the Arms Export Control Act (22 U.S.C. 2779) provides that the Secretary of State shall prescribe regulations with respect to reporting on certain payments relating to sales of defense articles and defense services. The provisions of this part implement that requirement. Definitions which apply to this part are contained in §§130.2 through 130.8.

### § 130.2   Applicant.

*Applicant* means any person who applies to the Directorate of Defense Trade Controls for any license or approval required under this subchapter for the export of defense articles or defense services valued in an amount of $500,000 or more which are being sold commercially to or for the use of the armed forces of a foreign country or international organization. This term also includes a person to whom the required license or approval has been given.

WASHAR0000893

[71 FR 20554, Apr. 21, 2006]

## § 130.3   Armed forces.

*Armed forces* means the army, navy, marine, air force, or coast guard, as well as the national guard and national police, of a foreign country. This term also includes any military unit or military personnel organized under or assigned to an international organization.

## § 130.4   Defense articles and defense services.

*Defense articles and defense services* have the meaning given those terms in paragraphs (3), (4) and (7) of section 47 of the Arms Export Control Act (22 U.S.C. 2794 (3), (4), and (7)). When used with reference to commercial sales, the definitions in §§120.6 and 120.9 of this subchapter apply.

## § 130.5   Fee or commission.

 (a) *Fee or commission* means, except as provided in paragraph (b) of this section, any loan, gift, donation or other payment of $1,000 or more made, or offered or agreed to be made directly or indirectly, whether in cash or in kind, and whether or not pursuant to a written contract, which is:

(1) To or at the direction of any person, irrespective of nationality, whether or not employed by or affiliated with an applicant, a supplier or a vendor; and

(2) For the solicitation or promotion or otherwise to secure the conclusion of a sale of defense articles or defense services to or for the use of the armed forces of a foreign country or international organization.

(b) The term fee or commission does not include:

(1) A political contribution or a payment excluded by §130.6 from the definition of political contribution;

(2) A normal salary (excluding contingent compensation) established at an annual rate and paid to a regular employee of an applicant, supplier or vendor;

(3) General advertising or promotional expenses not directed to any particular sale or purchaser; or

(4) Payments made, or offered or agreed to be made, solely for the purchase by an applicant, supplier or vendor of specific goods or technical, operational or advisory services, which payments are not disproportionate in amount with the value of the specific goods or services actually furnished.

[58 FR 39323, July 22, 1993, as amended at 71 FR 20554, Apr. 21, 2006]

WASHAR0000894

## § 130.6   Political contribution.

*Political contribution* means any loan, gift, donation or other payment of $1,000 or more made, or offered or agreed to be made, directly or indirectly, whether in cash or in kind, which is:

(a) To or for the benefit of, or at the direction of, any foreign candidate, committee, political party, political faction, or government or governmental subdivision, or any individual elected, appointed or otherwise designated as an employee or officer thereof; and

(b) For the solicitation or promotion or otherwise to secure the conclusion of a sale of defense articles or defense services to or for the use of the armed forces of a foreign country or international organization. Taxes, customs duties, license fees, and other charges required to be paid by applicable law or regulation are not regarded as political contributions.

## § 130.7   Supplier.

*Supplier* means any person who enters into a contract with the Department of Defense for the sale of defense articles or defense services valued in an amount of $500,000 or more under section 22 of the Arms Export Control Act (22 U.S.C. 2762).

## § 130.8   Vendor.

 (a) *Vendor* means any distributor or manufacturer who, directly or indirectly, furnishes to an applicant or supplier defense articles valued in an amount of $500,000 or more which are end-items or major components as defined in §121.8 of this subchapter. It also means any person who, directly or indirectly, furnishes to an applicant or supplier defense articles or services valued in an amount of $500,000 or more when such articles or services are to be delivered (or incorporated in defense articles or defense services to be delivered) to or for the use of the armed forces of a foreign country or international organization under:

(1) A sale requiring a license or approval from the Directorate of Defense Trade Controls under this subchapter; or

(2) A sale pursuant to a contract with the Department of Defense under section 22 of the Arms Export Control Act (22 U.S.C. 2762).

(b) [Reserved]

[58 FR 39323, July 22, 1993, as amended at 71 FR 20554, Apr. 21, 2006]

## § 130.9   Obligation to furnish information to the Directorate of Defense Trade Controls.

 (a)(1) Each applicant must inform the Directorate of Defense Trade Controls as to whether the applicant or its vendors have paid, or offered or agreed to pay, in respect of any sale for which a license or approval is requested:

WASHAR0000895

(i) Political contributions in an aggregate amount of $5,000 or more, or

(ii) Fees or commissions in an aggregate amount of $100,000 or more. If so, applicant must furnish to the Directorate of Defense Trade Controls the information specified in §130.10. The furnishing of such information or an explanation satisfactory to the Managing Director of the Directorate of Defense Trade Controls as to why all the information cannot be furnished at that time is a condition precedent to the granting of the relevant license or approval.

(2) The requirements of this paragraph do not apply in the case of an application with respect to a sale for which all the information specified in §130.10 which is required by this section to be reported shall already have been furnished.

(b) Each supplier must inform the Directorate of Defense Trade Controls as to whether the supplier or its vendors have paid, or offered or agreed to pay, in respect of any sale:

(1) Political contributions in an aggregate amount of $5,000 or more, or

(2) Fees or commissions in an aggregate amount of $100,000 or more. If so, the supplier must furnish to the Directorate of Defense Trade Controls the information specified in §130.10. The information required to be furnished pursuant to this paragraph must be so furnished no later than 30 days after the contract award to such supplier, or such earlier date as may be specified by the Department of Defense. For purposes of this paragraph, a contract award includes a purchase order, exercise of an option, or other procurement action requiring a supplier to furnish defense articles or defense services to the Department of Defense for the purposes of §22 of the Arms Export Control Act (22 U.S.C. 2762).

(c) In determining whether an applicant or its vendors, or a supplier or its vendors, as the case may be, have paid, or offered or agreed to pay, political contributions in an aggregate amount of $5,000 or more in respect of any sale so as to require a report under this section, there must be included in the computation of such aggregate amount any political contributions in respect of the sale which are paid by or on behalf of, or at the direction of, any person to whom the applicant, supplier or vendor has paid, or offered or agreed to pay, a fee or commission in respect of the sale. Any such political contributions are deemed for purposes of this part to be political contributions by the applicant, supplier or vendor who paid or offered or agreed to pay the fee or commission.

(d) Any applicant or supplier which has informed the Directorate of Defense Trade Controls under this section that neither it nor its vendors have paid, or offered or agreed to pay, political contributions or fees or commissions in an aggregate amount requiring the information specified in §130.10 to be furnished, must subsequently furnish such information within 30 days after learning that it or its vendors had paid, or offered or agreed to pay, political contributions or fees or commissions in respect of a sale in an aggregate amount which, if known to applicant or supplier at the time of its previous communication with the Directorate of Defense Trade Controls, would have required the furnishing of information under §130.10 at that time. Any report furnished under this paragraph must, in addition to the information specified in §130.10,

184

include a detailed statement of the reasons why applicant or supplier did not furnish the information at the time specified in paragraph (a) or paragraph (b) of this section, as applicable.

[58 FR 39323, July 22, 1993, as amended at 71 FR 20554, Apr. 21, 2006]

### § 130.10   Information to be furnished by applicant or supplier to the Directorate of Defense Trade Controls.

(a) Every person required under §130.9 to furnish information specified in this section in respect to any sale must furnish to the Directorate of Defense Trade Controls:

(1) The total contract price of the sale to the foreign purchaser;

(2) The name, nationality, address and principal place of business of the applicant or supplier, as the case may be, and, if applicable, the employer and title;

(3) The name, nationality, address and principal place of business, and if applicable, employer and title of each foreign purchaser, including the ultimate end-user involved in the sale;

(4) Except as provided in paragraph (c) of this section, a statement setting forth with respect to such sale:

(i) The amount of each political contribution paid, or offered or agreed to be paid, or the amount of each fee or commission paid, or offered or agreed to be paid;

(ii) The date or dates on which each reported amount was paid, or offered or agreed to be paid;

(iii) The recipient of each such amount paid, or intended recipient if not yet paid;

(iv) The person who paid, or offered or agreed to pay such amount; and

(v) The aggregate amounts of political contributions and of fees or commission, respectively, which shall have been reported.

(b) In responding to paragraph (a)(4) of this section, the statement must:

(1) With respect to each payment reported, state whether such payment was in cash or in kind. If in kind, it must include a description and valuation thereof. Where precise amounts are not available because a payment has not yet been made, an estimate of the amount offered or agreed to be paid must be provided;

(2) With respect to each recipient, state:

(i) Its name;

(ii) Its nationality;

WASHAR0000897

(iii) Its address and principal place of business;

(iv) Its employer and title; and

(v) Its relationship, if any, to applicant, supplier, or vendor, and to any foreign purchaser or end-user.

(c) In submitting a report required by §130.9, the detailed information specified in paragraph (a)(4) and (b) of this section need not be included if the payments do not exceed:

(1) $2,500 in the case of political contributions; and

(2) $50,000 in the case of fees or commissions.

In lieu of reporting detailed information with respect to such payments, the aggregate amount thereof must be reported, identified as miscellaneous political contributions or miscellaneous fees or commissions, as the case may be.

(d) Every person required to furnish the information specified in paragraphs (a) and (b) of this section must respond fully to each subdivision of those paragraphs and, where the correct response is "none" or "not applicable," must so state.

[58 FR 39323, July 22, 1993, as amended at 71 FR 20554, Apr. 21, 2006]

## § 130.11  Supplementary reports.

 (a) Every applicant or supplier who is required under §130.9 to furnish the information specified in §130.10 must submit a supplementary report in connection with each sale in respect of which applicant or supplier has previously been required to furnish information if:

(1) Any political contributions aggregating $2,500 or more or fees or commissions aggregating $50,000 or more not previously reported or paid, or offered or agreed to be paid by applicant or supplier or any vendor;

(2) Subsequent developments cause the information initially reported to be no longer accurate or complete (as in the case where a payment actually made is substantially different in amount from a previously reported estimate of an amount offered or agreed to be paid); or

(3) Additional details are requested by the Directorate of Defense Trade Controls with respect to any miscellaneous payments reported under §130.10(c).

(b) Supplementary reports must be sent to the Directorate of Defense Trade Controls within 30 days after the payment, offer or agreement reported therein or, when requested by the Directorate of Defense Trade Controls, within 30 days after such request, and must include:

WASHAR0000898

(1) Any information specified in §130.10 required or requested to be reported and which was not previously reported; and

(2) The Directorate of Defense Trade Controls license number, if any, and the Department of Defense contract number, if any, related to the sale.

[58 FR 39323, July 22, 1993, as amended at 71 FR 20554, Apr. 21, 2006]

### § 130.12   Information to be furnished by vendor to applicant or supplier.

(a) In order to determine whether it is obliged under §130.9 to furnish the information specified in §130.10 with respect to a sale, every applicant or supplier must obtain from each vendor, from or through whom the applicant acquired defense articles or defense services forming the whole or a part of the sale, a full disclosure by the vendor of all political contributions or fees or commission paid, by vendor with respect to such sale. Such disclosure must include responses to all the information pertaining to vendor required to enable applicant or supplier, as the case may be, to comply fully with §§130.9 and 130.10. If so required, they must include the information furnished by each vendor in providing the information specified.

(b) Any vendor which has been requested by an applicant or supplier to furnish an initial statement under paragraph (a) of this section must, except as provided in paragraph (c) of this section, furnish such statement in a timely manner and not later than 20 days after receipt of such request.

(c) If the vendor believes that furnishing information to an applicant or supplier in a requested statement would unreasonably risk injury to the vendor's commercial interests, the vendor may furnish in lieu of the statement an abbreviated statement disclosing only the aggregate amount of all political contributions and the aggregate amount of all fees or commissions which have been paid, or offered or agreed to be paid, or offered or agreed to be paid, by the vendor with respect to the sale. Any abbreviated statement furnished to an applicant or supplier under this paragraph must be accompanied by a certification that the requested information has been reported by the vendor directly to the Directorate of Defense Trade Controls. The vendor must simultaneously report fully to the Directorate of Defense Trade Controls all information which the vendor would otherwise have been required to report to the applicant or supplier under this section. Each such report must clearly identify the sale with respect to which the reported information pertains.

(d)(1) If upon the 25th day after the date of its request to vendor, an applicant or supplier has not received from the vendor the initial statement required by paragraph (a) of this section, the applicant or supplier must submit to the Directorate of Defense Trade Controls a signed statement attesting to:

(i) The manner and extent of applicant's or supplier's attempt to obtain from the vendor the initial statement required under paragraph (a) of this section;

(ii) Vendor's failure to comply with this section; and

WASHAR0000899

(iii) The amount of time which has elapsed between the date of applicant's or supplier's request and the date of the signed statement;

(2) The failure of a vendor to comply with this section does not relieve any applicant or supplier otherwise required by §130.9 to submit a report to the Directorate of Defense Trade Controls from submitting such a report.

[58 FR 39323, July 22, 1993, as amended at 71 FR 20555, Apr. 21, 2006]

### § 130.13   Information to be furnished to applicant, supplier or vendor by a recipient of a fee or commission.

(a) Every applicant or supplier, and each vendor thereof;

(1) In order to determine whether it is obliged under §130.9 or §130.12 to furnish information specified in §130.10 with respect to a sale; and

(2) Prior to furnishing such information, must obtain from each person, if any, to whom it has paid, or offered or agreed to pay, a fee or commission in respect of such sale, a timely statement containing a full disclosure by such a person of all political contributions paid, or offered or agreed to be paid, by it or on its behalf, or at its direction, in respect of such sale. Such disclosure must include responses to all the information required to enable the applicant, supplier or vendor, as the case may be, to comply fully with §§130.9, 130.10, and 130.12.

(b) In obtaining information under paragraph (a) of this section, the applicant, supplier or vendor, as the case may be, must also require each person to whom a fee or commission is paid, or offered or agreed to be paid, to furnish from time to time such reports of its political contributions as may be necessary to enable the applicant, supplier or vendor, as the case may be, to comply fully with §§130.9, 130.10, 130.11, and 130.12.

(c) The applicant supplier or vendor, as the case may be, must include any political contributions paid, or offered or agreed to be paid, by or on behalf of, or at the direction of, any person to whom it has paid, or offered or agreed to pay a fee or commission in determining whether applicant, supplier or vendor is required by §§130.9, 130.11, and 130.12 to furnish information specified in §130.10.

### § 130.14   Recordkeeping.

Each applicant, supplier and vendor must maintain a record of any information it was required to furnish or obtain under this part and all records upon which its reports are based for a period of not less than five years following the date of the report to which they pertain.

### § 130.15   Confidential business information.

(a) Any person who is required to furnish information under this part may identify any information furnished hereunder which the person considers to be confidential business

WASHAR0000900

information. No person, including any applicant or supplier, shall publish, divulge, disclose, or make known in any manner, any information so identified by a vendor or other person unless authorized by law or regulation.

(b) For purposes of this section, *confidential business information* means commercial or financial information which by law is entitled to protection from disclosure. (See, e.g., 5 U.S.C. 552(b) (3) and (4); 18 U.S.C. 1905; 22 U.S.C. 2778(e); Rule 26(c)(7), Federal Rules of Civil Procedure.)

## § 130.16   Other reporting requirements.

The submission of reports under this part does not relieve any person of any requirements to furnish information to any federal, state, or municipal agency, department or other instrumentality as required by law, regulation or contract.

## § 130.17   Utilization of and access to reports and records.

(a) All information reported and records maintained under this part will be made available, upon request for utilization by standing committees of the Congress and subcommittees thereof, and by United States Government agencies, in accordance with §39(d) of the Arms Export Control Act (22 U.S.C. 2779(d)), and reports based upon such information will be submitted to Congress in accordance with sections 36(a)(7) and 36(b)(1) of that Act (22 U.S.C. 2776(a)(7) and (b)(1)) or any other applicable law.

(b) All confidential business information provided pursuant to this part shall be protected against disclosure to the extent provided by law.

(c) Nothing in this section shall preclude the furnishing of information to foreign governments for law enforcement or regulatory purposes under international arrangements between the United States and any foreign government.

[58 FR 39323, July 22, 1993, as amended at 71 FR 20555, Apr. 21, 2006]

WASHAR0000901

**From:**      Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:**      Tuesday, July 10, 2018 11:17 AM
**To:**        Richard Ashooh <Richard.Ashooh@bis.doc.gov>; Matthew Borman
              <Matthew.Borman@bis.doc.gov>; Lopes, Alexander <alexander.lopes@bis.doc.gov>;
              Clagett, Steven <steven.clagett@bis.doc.gov>; Karen NiesVogel
              <Karen.NiesVogel@bis.doc.gov>; Jeff Bond <Jeff.Bond@bis.doc.gov>; Elan Mitchell-
              Gee <Elan.Mitchell-Gee@bis.doc.gov>; Hillary Hess <Hillary.Hess@bis.doc.gov>;
              Susan Kramer <Susan.Kramer@bis.doc.gov>; Steven Schrader
              <Steven.Schrader@bis.doc.gov>; Douglas Hassebrock
              <Douglas.Hassebrock@bis.doc.gov>; Kevin Kurland <Kevin.Kurland@bis.doc.gov>;
              Michael Vaccaro <Michael.Vaccaro@bis.doc.gov>; Monjay, Robert
              <MonjayR@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Abraham, Liz
              <LAbraham@doc.gov>
**Subject:**   Comment period had ended for firearms rule. Commerce received 1,621 comments.

---

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 1,619 comments in regulations.gov.  We received one additional comment by mail and one by email, so the working total right now is 1,621.

<u>Here is a more detailed breakdown if interested:</u>
Total submission in regulations.gov:  2954
Unique comments: 1,559 (+ 160 bulk comments), so total comments received in regulaitons.gov is 1,619.
Duplicate comments received: 1,235 (+ 160 bulk comments that will be posted as representative samples in regulations.gov), so in total 1,395 of the comments fall into the bulk category.

We should be done with checking in and posting the bulk comments today and dealing with the duplicates.

We plan to have all of the comments posted in regulations.gov within 2 weeks by 7/24/18.

Rob,
Once you get an idea on the total number of comments received by State, can you send that to us?

Thanks,
Tim

WASHAR0000902

| From: | Timothy Mooney <Timothy.Mooney@bis.doc.gov> |
|---|---|
| Sent: | Monday, July 30, 2018 9:42 AM |
| To: | Monjay, Robert <MonjayR@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov> |
| Subject: | Comments on Cat I-III rule. How are you guys coming on your comments? |

Hi Rob,

The comments on the Commerce rule are posted in regulations.gov and on the BIS website.

The comments received on the Commerce Cat I-III firearms proposed rule have been categorized and divided into tabs to ease the review process.

How are you coming on getting thee State comments posted?  Do you have the total number of comments received?

The Tab folders use the same naming convention as referenced below:

‗
Identification of tabs

**SUPPORTIVE**
Tab 1_Detailed supportive_Commerce firearms comments
Tab 2_Bulk_or bulk like or less detailed supportive_Commerce firearms comments

‗
**NOT SUPPORTIVE**
Tab 3_Detailed NOT supportive_Commerce firearms comments
Tab 4A_Bulk NOT supportive_Commerce firearms rule
- Tab 4B_Bulk like_NOT  supportive_1 of 8_Commerce firearms rule 1 to 200
- Tab 4C_Bulk like_NOT  supportive_2 of 8_Commerce firearms rule 201 to 400
- Tab 4D_Bulk like_NOT  supportive_3 of 8_Commerce firearms rule 401 to 600
- Tab 4E_Bulk like_NOT  supportive_4 of 8_Commerce firearms rule 601 to 800
- Tab 4F_Bulk like_NOT  supportive_5 of 8_Commerce firearms rule 801 to 1000
- Tab 4G_Bulk like_NOT  supportive_6 of 8_Commerce firearms rule 1001 to 1200
- Tab 4H_Bulk like_NOT  supportive_7 of 8_Commerce firearms rule 1201 to 1400
- Tab 4I_Bulk like_NOT  supportive_8 of 8_Commerce firearms rule 1401 to 1540

We posted the comments in sequential order on the BIS website.  If you guys think it would be helpful for you, I can send you the PDFs, but email.  Ity would need to be in several emails though.  Glad to do it if you want those.

**High Level Summary of Comments on Commerce Categories I-III (Firearms) Rule**
On May 24, 2018, Commerce published the proposed rule, *Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)* (83 FR 24166). State published their proposed rule on the same day.  The comment period on the Commerce and State proposed rules closed on July 9, 2018. On July 18, Commerce completed posting the 1,745 public comments (a total of 1,965 pages) received. Comments may be viewed on the BIS website by selecting the "Regulations" tab and then the "Proposed Rule Public Comments" tab. Comments are also posted on regulations.gov under docket number BIS-2017-0004. Commerce received 2,956 public submissions on the rule. Posted comments consist of 1,540 unique comments and 135 bulk comments representing the additional 1,256 comments. 30 comments were not appropriate to post. Almost all of the bulk comment activity was generated by people that opposed the rule. One bulk comment was received from someone supportive of the rule.

**Types of comments received**

WASHAR0000903

| Type of comments | Number of comments | % of total posted |
|---|---|---|
| *Supportive, detailed | 15 | 0.8% |
| Supportive, bulk/bulk like, or less detailed | 41 | 2.3% |
| *Opposed, detailed | 27 | 1.5% |
| Opposed, bulk | 127 (another 1256 received, but not posted because duplicates) | 7.2% |
| Opposed, bulk like, or less detailed | 1535 | 87.9% |

Thanks,
Tim

WASHAR0000904

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Wednesday, July 18, 2018 4:33 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| **Cc:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | FW: Defense Distributed Case |

███████████████████████████████████████████████

Thanks,

Rob Hart

202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 18, 2018 4:17 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Defense Distributed Case

███████████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 18, 2018 3:54 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Defense Distributed Case

████

Rob Hart

202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 18, 2018 3:53 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** FW: Defense Distributed Case

████████████

WASHAR0000905

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 18, 2018 3:30 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Defense Distributed Case

Dear all,

███████████████████████████████████████████████████████████

Josh

**Official - SBU**
**UNCLASSIFIED**

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 3:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Defense Distributed Case

As far as I can tell, DDTC essentially exempted the information in these particular files from the USML. The settlement says that DDTC approved the technical data in question for public release, but I don't t think it gives a reason for this determination.

Please note as a threshold matter that we assume the below questions pertain to settlement item 1(c).

1. Is that characterization correct? The Published Files, Ghost Gunner Files, and CAD files (as defined in the Settlement Agreement), by virtue of having been approved for public release pursuant to ITAR §125.4(b)(13), are to be exempt from ITAR licensing requirements.
2. Are the data in question applicable to Category I(a) items? The data in question is defined within the Settlement Agreement, and constitutes a range of computer-aided design files that pertain to Category I (a), I(g), or I(h) articles.
3. Why were the data approved for public release? The Department, in coordination with interagency partners, has recently conducted a national security analysis of USML Category I in the context of drafting and publishing a proposed rule that would move certain defense articles (including technical data) to Department of Commerce jurisdiction. Since the data in question was determined in the context of that effort not to provide a critical military or intelligence advantage (*see* ITAR §120.3(b)), the Department – in coordination with the Department of Defense – further determined that it was appropriate to approve the data for public release.

Thanks,
Paul

**From:** Paul, Joshua M [mailto:PaulJM@state.gov]
**Sent:** Wednesday, July 18, 2018 8:08 AM
**To:** Kerr, Paul <PKERR@crs.loc.gov>

WASHAR0000906

**Subject:** RE: Defense Distributed Case

Yes, please do; not sure what we will be able to answer, but by all means ask.

**Official**
**UNCLASSIFIED**

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 7:56 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed Case

Josh,

Could I send a question or two about it? It's gotten some attention up here.

Thanks,
Paul

WASHAR0000907

| **From:** | Monjay, Robert </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AF1B425AD6B74F96A14ADE7CA3A1E30A-MONJAY, ROB> |
| **Sent:** | Monday, July 9, 2018 2:45 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | FW: ITAR Amendment—Categories I, II, and III |
| **Attach:** | MembersofCongress_CommentsonITAR.PDF |

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Monday, July 9, 2018 10:57 AM
**To:** Miller, Michael F <Millermf@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>
**Subject:** FW: ITAR Amendment—Categories I, II, and III

Heads up -

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Monday, July 09, 2018 10:52 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: ITAR Amendment—Categories I, II, and III

FYI

**From:** Parish, William J
**Sent:** Monday, July 09, 2018 10:05 AM
**To:** Forsythe, Eden <Eden.Forsythe@mail.house.gov>
**Cc:** Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: ITAR Amendment—Categories I, II, and III

Hi Eden,

Thank you for reaching out to flag the letter.  I have included my colleague, Tamara, who now covers PM equities.

Thank you,
Will

**Official**
**UNCLASSIFIED**

**From:** Forsythe, Eden <Eden.Forsythe@mail.house.gov>

WASHAR0000908

**Sent:** Thursday, July 05, 2018 1:58 PM
**To:** Parish, William J <ParishWJ@state.gov>
**Subject:** FW: ITAR Amendment—Categories I, II, and III

Hi William, I want to flag a letter my boss is leading regarding proposed changes to ITAR.

Many thanks,
Eden

---

**From:** Forsythe, Eden
**Sent:** Thursday, July 5, 2018 1:48 PM
**To:** 'DDTCPublicComments@state.gov' <DDTCPublicComments@state.gov>
**Subject:** ITAR Amendment—Categories I, II, and III

Attached please find a letter from Members of Congress regarding proposed changes to International Traffic in Arms Regulations.

Eden Forsythe
Legislative Counsel
Office of Congressman Sandy Levin (MI-09)
1236 Longworth House Office Building
202-225-4961

WASHAR0000909

# Congress of the United States
## House of Representatives
### Washington, DC 20515

July 5th, 2018

Secretary Mike Pompeo            Secretary Wilbur Ross
Department of State               Department of Commerce
2201 C Street NW                 1401 Constitution Avenue NW
Washington, DC 20230             Washington, DC 20520

Dear Secretaries Pompeo and Ross:

We write to express our deep concern about proposed regulatory changes that would transfer control and licensing of exports of semi-automatic assault weapons, high capacity ammunition magazines and related military items from the Department of State to the Department of Commerce. We urge you to postpone implementation of these proposed changes until important issues can be addressed.

Under the current regulatory framework established under the Arms Export Control Act, export of items that are primarily for military use are regulated pursuant to the International Traffic in Arms Regulations administered by the State Department. Such items are included on United States Munitions List and are subject to stringent controls that are aimed at restricting access to military items to approved foreign governments. Exporters must be registered with the State Department and end-users are monitored under  the Blue Lantern program, which provides inventory management control and accountability of all commercial arms sales and transfers. Transferring regulation of such military exports to the Department of Commerce would make it more likely that U.S.-origin weapons will end up in the hands of traffickers, terrorists, and cartels, and put them into global commerce.

We are also concerned that proposed rule changes will significantly reduce Congressional oversight and undermine efforts to prevent and prosecute firearms trafficking.  Specifically, current regulations require Congressional notification of an intended commercial firearms sale in excess of $1 million. By contrast, licenses issued by the Commerce Department are not notified to the Congress, or subject to prior review. In addition, the Foreign Assistance Act also prohibits sale of such defense articles to countries where governments have engaged in a consistent pattern of gross violations of internationally recognized human rights.

The volume of U.S. military small arms exports, which is already substantial, is certain to increase if regulation is moved to the Commerce Department. In the past year alone, Congress has

PRINTED ON RECYCLED PAPER

been notified of some $660 million of firearms sales regulated under the United States Munitions List

The ramifications of the proposed transfer of oversight from the State Department to the Commerce Department are very serious: arms manufacturers and brokers of semi-automatic assault weapons will no longer be required to register with the State Department; training on the use of these items will no longer require a license, allowing private security contractors to train foreign militias in sensitive combat techniques without proper vetting; prosecutors will have less documentary evidence to prosecute arms dealers; and elected officials will have less say in the export of dangerous weapons.

For all these reasons, we urge you to postpone the proposed regulatory transfer until these important issues can be addressed.


Sander Levin

Eliot Engel

James P. McGovern

Norma J. Torres

Jamie Raskin

WASHAR0000911

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Friday, July 20, 2018 4:57 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Foster, John A <FosterJA2@state.gov> |
| **Subject:** | FW: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns |
| **Attach:** | 07-20-18 Letter to Secretary Pompeo Regarding 3-D Printed Arms.pdf |

████████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

---

**From:** Miller, Michael F
**Sent:** Friday, July 20, 2018 4:40 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Inbound...

**Official**
**UNCLASSIFIED**

---

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 4:35 PM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David <david_fite@foreign.senate.gov>; Oliver, Stacie <stacie_oliver@foreign.senate.gov>
**Subject:** Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Mike, et.al.:

I wanted you to be aware of the attached letter from Rep. Engel to Secretary Pompeo urging a delay of the implementation of the settlement in Defense Distributed v. U.S. State Department, given the significant security threat that would occur immediately upon release of the software. The letter also is being sent to H. Rep. Engel has directed that the letter be released to the public. As you are no doubt aware, the terms of the settlement are already being widely reported in the media this afternoon.

Ed

Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER        THOMAS SHEEHY
CHIEF OF STAFF    STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed firearms would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

WASHAR0000913

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

    Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

    The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

        Sincerely,

        *Eliot L. Engel*

        ELIOT L. ENGEL
        Ranking Member

WASHAR0000914

| From: | DDTCPublicComments </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A242253C9C004D44ACE54288D1C03619-DDTCPUBLICC> |
|---|---|
| Sent: | Tuesday, May 29, 2018 9:47 AM |
| To: | DDTCPublicComments <DDTCPublicComments@state.gov> |
| Subject: | FW: Two Gun Issue Papers |

Mr. Koelling: Thank you very much for keeping me in the loop. I did open the proposed "Final" rule ( 146 pages if I opened the right one ?? ). It looks like most of these proposed Regs have to do with re-classification of guns and components with a lot of narrative on export/import which small, local gun smiths have nothing to do with. They just fix our guns at the local level. If these new Regs do save the Government money and time, we appreciate this effort.

Is there any way to obtain a narrative in lay person's language that just says in common language what these Regs will do and the practical effect on those of us who own guns ?  I found the Regs very technical with a lot of acronyms the lay person, ( me ) will not understand.

I also noted that the date in these Regs that spoke to the date for what is an "antique" gun is incorrect. These Regs say a gun manufactured on or before 1890 is an "antique" but the Federal Law that says what is or is not an "antique" gun says any gun made on or before 1898 is an "antique ?? Could you please change that part of the proposed Regs to be consistent with the Federal law and BATF Regs on this subject ?

I never did find in these proposed "Final" Regs the answer to my original question which was, and still is, are small business gun smiths being classified as "gun manufacturers" or not and if yes, why ?

Thanks again. I really do appreciate your working with me on this subject. Those of us who like "antique" guns will more than appreciate a change to the 1898 date and I'd sure like an answer to my original question if at all possible. – Dick Loper

**Official**
**UNCLASSIFIED**

| From: | Peckham, Yvonne M <PeckhamYM@state.gov> |
|---|---|
| Sent: | Thursday, July 12, 2018 6:51 AM |
| To: | Monjay, Robert <MonjayR@state.gov> |
| Cc: | Peckham, Yvonne M <PeckhamYM@state.gov>; Kottmyer, Alice M <KottmyerAM@state.gov> |
| Subject: | FW: You have received a FileCatalyst Webmail package from FDMS EXTRACT |

Rob,

Sending you the comments received for AE30.

Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

**From:** FDMS EXTRACT <USG_ERULE_EXTRACT@bah.com>
**Sent:** Wednesday, July 11, 2018 3:19 PM
**To:** Peckham, Yvonne M <PeckhamYM@state.gov>
**Subject:** You have received a FileCatalyst Webmail package from FDMS EXTRACT

**Enterprise solution for sending large files**

**You received a File Package from FDMS EXTRACT**

Click on the tracking number to download your files

| | |
|---|---|
| **Sender's Name:** | FDMS EXTRACT |
| **Link to download:** | https://filetransfer.fdms.gov/fcweb/GET/123R0JPQJ902GN0B |
| | Please use the following PIN number to download the files: 648142<br>For security reasons, the file will be downloaded with the .z1p extension. After your file download is complete, open the folder where you saved the file and rename the file with the extension changed from 'z1p' to 'zip'.<br>Your file package will be available for 14 days. |
| **Unable to open the link?** | Click on this link https://filetransfer.fdms.gov/fcweb/jsp/downloadFiles.jsp and paste the following tracking number: 123R0JPQJ902GN0B and then enter the PIN (if required). |
| **Message from Sender:** | Your FDMS bulk extract is ready to be downloaded. |
| **Files Sent with Package:** | DOS-2017-0046 2018-07-11 15-01-38.z1p |
| **Total File Size:** | 9922 KB |

**Thank you for using FileCatalyst®.**

WASHAR0000916

| | |
|---|---|
| **From:** | Candace Goforth <candace@goforthandexport.com> |
| **Sent:** | Tuesday, July 10, 2018 8:42 PM |
| **To:** | DDTCPublicComments <DDTCPublicComments@state.gov> |
| **Cc:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | ITAR Amendment-Categories I, II and III |
| **Attach:** | GTA Public Comments - DOS 7-10-2018.pdf |

Hello,

Please find attached GTA's public comments for the subject proposed rule.

Thanks,
Candace

Candace M. J. Goforth
Managing Director
Goforth Trade Advisors LLC
(w) +1-703-722-8116
(f) +1-703-982-7711
www.goforthandexport.com



10 July 2018

*Via Email*

Mr. Robert Monjay
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
U.S. Department of State
2401 E Street, NW
SA-1, 12th Floor
Washington, DC 20037

Email:          DDTCPublicComments@state.gov

Reference:   RIN 1400–AE30

Subject:       International Traffic in Arms Regulations: U.S. Munitions List Categories I, II,
                     and III

Dear Mr. Monjay:

Goforth Trade Advisors LLC (GTA) respectfully submits the following comments on various
proposed revisions to the International Traffic in Arms Regulations (ITAR) in response to the
*International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III*, 83 Fed.
Reg. 101 (May 24, 2018). We greatly appreciate the Directorate of Defense Trade Controls'
(DDTC) efforts in continuing to move forward with the changes envisioned by Export Control
Reform. Based upon our previous government service and recent experience in assisting industry
with the implementation of Export Control Reform, we would like to draw the attention of DDTC
to certain issues and concerns with the proposed revisions to the ITAR.

Please see our detailed comments below.

**ITAR § 123.15(a)(3) – The proposed revision expands current Congressional threshold**

> One commenting party expressed concern that the proposed revisions to ITAR §
> 123.15(a)(3) expands the scope of Congressional notification for USML Category
> I articles by including paragraphs (e) and (g) in the proposed revised language. The
> commenting party recommended the revised language read "Category I paragraphs
> (a) through (d)."

The current language of ITAR §123.15(a)(3) requires Congressional notification of firearms in the
amount of $1,000,000 without the designation of specific USML paragraphs. This has not been an

228 S. Washington Street ◦ Suite 330 ◦ Alexandria, Virginia ◦ 22314
Phone: +1-703-722-8116 ◦ Fax: +1-703-982-7711
Email: info@goforthandexport.com ◦ Website: www.goforthandexport.com

WASHAR0000918

issue since the current USML I(j)((1) provides a definition of firearm which limits such notification to articles controlled in USML I(a) through (d). The proposed Note 2 to Category I provides a new definition for firearm that maintains the intent of the current definition. In using either definition, the inclusion of articles controlled in paragraphs (e) and (g) in ITAR §123.15(a)(3) expands the current scope of Congressional notification which only applies to firearms.

This change was addressed in the preamble to the proposed rule. If expansion was intended and this section remains unchanged, GTA recommends providing an explanation in the preamble to the final rule.

To address these concerns, GTA recommends revising the proposed language as follows:

> *"(3) A license for export of defense articles controlled under Category I paragraphs (a) through (d) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more."*

### ITAR §123.18 – The removal of this exemption requires a conforming change to ITAR §123.16(b)(7)

> One commenting party noted that the removal of the exemption at ITAR §123.18 requires a conforming change at ITAR §123.16(b)(7). The commenting party recommended placing ITAR §123.16(b)(7) in Reserve as the referenced exemption – ITAR §123.18 – has been removed and placed in reserve.

The language at ITAR §123.16(b)(7) points to the exemption at ITAR §123.18 for firearms for personal use of members of the U.S. Armed Forces and civilian employees. This proposed rule removes that exemption and places the section in reserve.

To address these concerns, GTA recommends placing ITAR §123.16(b)(7) in Reserve.

### Other Areas for Considerations for Final Rule

GTA commends DDTC on the comprehensive review of the ITAR to identify conforming changes resulting from the proposed revisions to these USML categories. To further assist DDTC, GTA provides two additional sections of the ITAR which may require revision.

The first section is Supplement 1 to Part 126. The language in Supplement 1 refers to the current control language for USML Categories I, II and III, and several of these paragraphs have been revised or placed in Reserve due to transition the jurisdiction of the Export Administration Regulations (EAR). GTA suggests reviewing revising the language therein.

The other section is the technical data exemption at ITAR §125.4(b)(6). The current language refers to "…firearms not in excess of caliber .50 and ammunition for such weapons…" This section may not require revision however, GTA suggests a review is needed to ensure consistency with language in other areas of the ITAR.

WASHAR0000919

Thank you for the opportunity to present GTA's views concerning the proposed revisions to the ITAR.

If you have any questions concerning this submission, please contact the undersigned at (703) 722-8116 ext 101 or by e-mail at candace@goforthandexport.com.

Sincerely,

Candace M. J. Goforth
Managing Director

| | |
|---|---|
| **From:** | Peckham, Yvonne M <PeckhamYM@state.gov> |
| **Sent:** | Monday, March 12, 2018 9:52 AM |
| **To:** | Monjay, Robert <MonjayR@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Cc:** | Peckham, Yvonne M <PeckhamYM@state.gov> |
| **Subject:** | Proposed Firearms rule CAT 1-3 |
| **Attach:** | Cat I-III Combined PR - FRN 15 (with redline revisions to Part 129)(PRA Section from OMB with Comments).docx |

Good morning Rob,

Please verify that Jasmeet have the most recent clean version for today's 11am discussion.

The most recent version that I have is attached, but Jasmeet has a different version on her invite.

Thank you,
Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Foster, John A <FosterJA2@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 9:26 AM |
| **To:** | Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| **Cc:** | Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: Cat I-III Public Comments |

Simon,

Sounds like a plan.

Best,
John

**From:** Davidson-Hood, Simon
**Sent:** Wednesday, July 25, 2018 9:25 AM
**To:** Foster, John A <FosterJA2@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cat I-III Public Comments

Morning John,

In carving these up, you take the first 24 and I'll take the remaining 25.  Thus, in the share drive Rob referred to, you take the comments from "Aaron Carp" to "Loper FW," and I'll take "Mark Baines" to "William Root."  Sound good?

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Mobile: 202-674-5208
Email: davidsonhoodS@state.gov
SIPR: Davidson-hoodS@state.sgov.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, July 20, 2018 7:36 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Cat I-III Public Comments

Simon,
If you have time to start reviewing the Cat I-III public comments and creating the comment matrix next week, that would be great. I went through all the comments and identified 49 for use in the interagency review. They are in the below folder, and consolidated in the attached PDF.

S:\RMA\ITAR Rules\Cat I\Public Comments

Thanks
Rob
*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*


**Official - SBU**
**UNCLASSIFIED**

| From: | Heidema, Sarah J <HeidemaSJ@state.gov> |
|-------|------------------------------------------|
| Sent: | Wednesday, July 11, 2018 4:17 PM |
| To: | Cavnar, Anna <CavnarA@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| Subject: | RE: Cody Wilson's claims on settlement |

███████████████████████

**Official**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, July 11, 2018 4:02 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

███████████████████████████████

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 12:42 PM
**To:** Heidema, Sarah J; Hart, Robert L; Paul, Joshua M
**Cc:** Miller, Michael F; Monjay, Robert; Rogers, Shana A; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement

Sarah,

████████████████████████████████
████████████████████████████████
████████████████████████████████

Thanks,
Dave
_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:   202.647.8757 | ✆ BlackBerry:  202.550.3482 |
✉ e-mail:   *mckeebydi@state.gov* | 🖥 Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

🆒 🆒 🆒 🆒 🆒 🆒 🆒

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 12:41 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Dave-

████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:40 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob,

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



Please advise and thanks,
Dave

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:   202.647.8757 | 📠   BlackBerry:  202.550.3482 |
✉ e-mail:   *mckeebydi@state.gov* | ☝ Web:  *www.state.gov/t/pm /* |Twitter:  *@StateDeptPM*

Stay connected with *State.gov:*

**From:** Hart, Robert L
**Sent:** Wednesday, July 11, 2018 11:26 AM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Best,
Dave

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:   202.647.8757 | 📠   BlackBerry:  202.550.3482 |
✉ e-mail:   *mckeebydi@state.gov* | ☝ Web:  *www.state.gov/t/pm /* |Twitter:  *@StateDeptPM*

Stay connected with *State.gov:*

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 10:20 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** Cody Wilson's claims on settlement

Josh-



https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.

WASHAR0000926



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not

WASHAR0000927

seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkelman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in, enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the Ghost Gunner

*Michelle Groskopf*

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

WASHAR0000928

*Michelle Groskopf*

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire online community of DIY gunmakers. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of 3-D-printable semiautomatics who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called Crypto Wars of the 1990s. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance. he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, Daniel Bernstein, sued the government with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

WASHAR0000929

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era where Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

## More Great WIRED Stories

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is *really really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Candace Goforth <███████@goforthandexport.com> |
| **Sent:** | Tuesday, July 10, 2018 4:44 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | Re: Firearms rule comments... |

Thanks, Rob! I will send in tonight to the collective email with a copy to you. I suspect I won't have any original comments. :-)

And thanks! She has been a joy!!

Thanks,
Candace

Sent via the BlackBerry Hub for Android
--------------------------------------------------------------------------------

**From:** MonjayR@state.gov
**Sent:** July 10, 2018 14:47
**To:** ███████@goforthandexport.com
**Subject:** RE: Firearms rule comments...

Candace,
As you know, we accept all comments received up until the close of the comment period. After that, we will continue to evaluate any comments that we are able to. I am consolidating comments and deduping. If you can provide it in the next few days, I can still include it in the package. After that, I can still review it, but we will not be able to formally respond to it or make changes that are not supported by other comments.

And congratulations!!!
Thanks
Rob

**Official
UNCLASSIFIED**

**From:** Candace Goforth <███████@goforthandexport.com>
**Sent:** Tuesday, July 10, 2018 2:54 PM
**To:** Monjay, Robert <MonjayR@state.gov>
**Subject:** Firearms rule comments...

Hi Rob,

I hope this email finds you doing well! :-) I realize the public comment period for Cats I-III closed yesterday but would you entertain some late comments? I have been distracted with my recently adopted baby girl (not an excuse but an excuse :-)) but still like to provide some input. And not on the brokering part (I think Wolf is tackling that...)!

Thanks,
Candace

Sent via the BlackBerry Hub for Android

WASHAR0000931

| | |
|---|---|
| **From:** | Gormsen, Eric T (OLP) <Eric.T.Gormsen@usdoj.gov> |
| **Sent:** | Wednesday, July 18, 2018 5:54 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | Re: ITAR Amendment – Categories I, II, and III |

July 18, 2018

Rob,

I have checked with ATF and the report may be posted.

Thanks for checking with us first,

Eric

Signed ...
--- Eric Taylor Gormsen ---
Office of Legal Policy
Department of Justice
(202) 514-4087
Fax: 353-2374

On Jul 11, 2018, at 3:35 PM, Monjay, Robert <MonjayR@state.gov> wrote:

> Eric,
> We received the below public comment, with the attached ATF White Paper on options to reduce or
> modify firearms. I received this same paper from Pat Peterson at the NSC last year with an SBU/CUI
> designation. The paper is also marked "not for public distribution" on its cover page. This public comment
> came in via email, so it has not been made available for public review yet. I see several website that have
> the document, all of which identify it as the result of a leak. Do you know if this paper has been approved
> for public release? If so, does ATF have any objection if we post it to our website with the public
> comments? If not, we will need to determine if we can withhold the document and redact the comment
> where it references it.
> Thanks
> Rob
>
> *Robert J. Monjay*
> *U.S. Department of State*
> *Office of Defense Trade Controls Policy*
> *Phone: 202.663.2817*
> *Email: MonjayR@state.gov*
> *SIPR: MonjayR@state.sgov.gov*
>
>
> **Official - SBU**
> **UNCLASSIFIED**
>
> **Official - SBU**
> **UNCLASSIFIED**
>
> **From:** Steve Baker <█████@thebakerfamily.org>

**Sent:** Friday, May 18, 2018 6:34 AM
**To:** DDTCPublicComments <DDTCPublicComments@state.gov>
**Subject:** Re: ITAR Amendment – Categories I, II, and III

A few minor corrections to my email below.

1. A Special Occupational Taxpayer stamp is not required to manufacture or sell magazines over 50+ rounds nor is a FFL required as it is an accessory, not a firearm. The SOT and FFL are required only for manufacturing or selling NFA firearms and suppressors.
2. By extrapolation, there are likely over one million suppressors (silencers) lawfully in civilian hands per the ATF's NFA registry database (the NFRTR). The attached Washington Post article is focused on civilian use of firearms suppressors and their history in the US and in Europe. It should further illuminate the fact that firearms suppressors are definitely "not inherently for military end use." Their wide availability in civilian markets in European countries further negates any claim that suppressors somehow contain any critical military or intelligence advantaged technology that would justify continued inclusion on the USML.


On May 18, 2018, at 3:23 AM, Steve Baker <████@thebakerfamily.org> wrote:

Suppressors and 50+ round magazines are not inherently for military end use and are commonly available in commercial retail gun stores that have paid the Special Occupational Tax Stamp. These stores are common in the over 40 states that do not have Prohibition-era laws prohibiting silencers. It is unclear why the Department of State would remove semi-automatic firearms from the USML but retain the burdensome registration fee for companies that manufacture suppressors and high-capacity magazines - many of which DO NOT export any of their products. In aggregate, civilian sales of these items over the last couple of decades far outnumber contract sales of these accessories to the US military or the militaries of other countries. In fact, most small companies that manufacture these items sell them exclusively into domestic markets for lawful use by private parties. Sound suppressors are becoming widely accepted by civilian gun owners and despite the current $200 transfer tax and burdensome paperwork, they are in common use at rifle ranges in the above 40+ states. They are also legal in a growing number of states for use in hunting since they reduce the likelihood of hearing loss in hunters and in their animal companions afield.

The decision to retain 50+ round magazines and sound suppressors on the USML seems to contradict the Department of State's stated goal to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."

President Trump has required federal agencies to take a long, hard look at the efficacy of their regulations and to take action to roll back or eliminate unnecessary or obsolete regulations. To this end, the Bureau of Alcohol, Tobacco, Firearms and Explosives put forth a framework white paper for firearm deregulation options that the Bureau views as not compromising its public safety mission. Part of the deregulation framework outlined in the ATF's white paper is a long overdue proposal relating to firearm suppressors - removing them from the purview of the National Firearms Act and regulating their manufacture and transfer the same as ordinary Title I firearms under the 1968 Gun Control Act. The following attached document is authored by Ronald

Turk, Associate Deputy Director (Chief Operating Officer) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  For relevant input related to the proposed ITAR Amendment and firearms suppressors, refer to section 8 as it outlines the ATF's deregulation proposal to treat firearm sound suppressors (silencers) the same as ordinary Title I firearms - the same firearms that the ITAR Amendment proposes to transfer from the USML to the Department of Commerce EAR regime.

Steve Baker
Arvada, CO

<Options to Reduce or Modify Firearms Regulations.pdf>

WASHAR0000934

**Billing Code: 3510-33-P**

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 736, 740, 742, 743, 744, 746, ▮ , 762, 748, 772 and 774**

**[Docket No.]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML).**

**AGENCY:  Bureau of Industry and Security, Department of Commerce.**

1

**ACTION:  Proposed rule.**

**SUMMARY:**

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I – Firearms, Close Assault Weapons and Combat Shotguns; Category II – Guns and Armament; and Category III – Ammunition/Ordnance would be controlled under the Commerce Control List (CCL).  This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.

**DATES:** Comments must be received by [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES:**  You may submit comments by any of the following methods:

- Submit comments via Federal eRulemaking Portal: http://www.regulations.gov.  You can find this proposed rule by searching on its regulations.gov docket number, which is BIS-2017-0004.

- By mail or delivery to Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of Commerce, Room 2099B, 14th Street and Pennsylvania Avenue, NW, Washington, DC 20230.  Refer to RIN 0694-AF47.

2

**FOR FURTHER INFORMATION CONTACT:**  Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641 or e-mail steven.clagett@bis.doc.gov.

**SUPPLEMENTARY INFORMATION:**

**Background**

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I – Firearms, Close Assault Weapons and Combat Shotguns; Category II – Guns and Armament; and Category III  – Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR).  This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments.  The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the

3

United States, and are almost exclusively available from the United States.  If an article satisfies one or both of those criteria, the article remains on the USML.  If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule.  Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6."  The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR.  The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located.  The second character is a letter in the range A through E that identifies the product group within a CCL Category.  With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN.  Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

4

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs.  Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5."  These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non-military applications.  As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items.  BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule.  BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada.

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to ████████████████ firearms



WASHAR0000944

appropriately and to make better use of its export control resources.  BIS encourages comments from the public on this aspect of the proposed rule.

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in Arms Regulations (ITAR), 22 CFR parts 120-130, and not to the list of defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purpose of permanent import under its regulations at 27 CFR part 447.  Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA.  All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR.  The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the  AECA, 22 U.S.C. 2778 *et seq*., for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items.   After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule  also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available.  Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other

6

articles controlled under the ITAR.  There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities.  Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public.  Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

An additional justification for the change in the jurisdictional status of the items described in this rule is that the current ITAR controls burden U.S. industry without any proportionate benefits to United States national security or foreign policy objectives.  Similar to the challenges faced by other industries, the firearms trade has been negatively affected by the incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content.  Currently, under the ITAR, any part, component, accessory, or attachment for any of the firearms described in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated into foreign-made items or reexported to any third country.  Under the EAR, the *de minimis* provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may not be subject to the EAR, provided the U.S.-origin items meet the applicable *de minimis* level for the country of reexport.  Similarly, a technical drawing of such part, component, accessory or attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person concerning those items, such as the application of protective coatings.  Moreover, a U.S. person engaged in manufacturing or exporting these items or providing related defense services must register with the State Department under the ITAR.  Thus, even if a U.S. company can manufacture or service these items at a lower cost in the United States as compared to the cost

7

for a U.S. or foreign company to manufacture or service the items outside of the United States, the ITAR's restrictions may render the items unattractive or uncompetitive for foreign manufacturers.  The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR."  (*See* part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology."  While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734, which would exclude certain information and software from control.  For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (*i.e.*, unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR."  (*See* §§ 734.3(b) and 734.7(a).)  Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR.  (*See* 734.3(b)(3)(v).)

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA.  The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML.  The report must "describe the nature of any controls to be imposed on that item under any other provision of law."  22 U.S.C. 2778(f)(1).

WASHAR0000947

This Commerce proposed rule is being published simultaneously with a Department of State proposed rule.  Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML.  The Department of State proposed rule would revise Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML so that they describe in positive terms the defense articles that should remain on the USML.  The Department of Commerce rule would add to the CCL items that the President determines no longer warrant control under the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL.  This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether readers find this reorganization helpful.  In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items.  Readers are invited to comment on the appropriateness of these license

9

requirements and licensing policies.  Readers are also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

**Detailed Description of Changes Proposed by This Rule**

**Creation of new ECCNs.**

This proposed rule would create 17 new ECCNs to control items proposed for removal from the USML.  A discussion of each new ECCN and the controls that would apply to items under that ECCN follows below.

*New ECCN 0A501: Firearms and related commodities.*

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components:"

- Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);

- Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);

- Detachable magazines with a capacity of greater than 16 rounds but less than 50 rounds that are "specially designed" for the firearms listed above;

10

WASHAR0000949

- Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and

- Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, or disconnectors) if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) as specified in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations:  Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This proposed rule would add a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also adds a second note to ECCN 0A501 would state that certain firearms and similar items are EAR99, *i.e.*, subject to the EAR but not on the CCL.  Those items are:  Antique firearms (*i.e.*, those manufactured before 1890) and reproductions thereof, muzzle loading black

11

WASHAR0000950

powder firearms except those designs based on centerfire weapons of a post 1937 design, BB

guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described

below, items previously determined to be "subject to the EAR" under a commodity jurisdiction

determination issued by the U.S. Department of State that were designated as EAR99 would

generally not be classified in any of the new ECCNs that would be created with this proposed

rule.  This would be consistent with Supplement No. 1 to Part 736, General Order No. 5,

paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release

from "specially designed."  As a conforming change, this proposed rule would revise paragraph

(e)(3) of General Order No. 5 to add a reference to "0x5zz" (to account for new ECCNs 0A501,

0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502 described

below).  The "600 series" and 9x515 (spacecraft and related items) are already included in

paragraph (e)(3), and those references remain unchanged.

_New ECCN 0A502:  Shotguns and certain related commodities._

New ECCN 0A502 would control both the shotguns currently on the USML that are to be

added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts"

and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater).

Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of

Firearms Convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and

end user) and United Nations (UN) reasons.  Shotguns with a barrel length less than 18 inches

would be controlled under NS Column 1, CC Column 1, FC, UN and AT Column 1 plus regional

stability (RS Column 1), consistent with their current control on the USML.  The shotguns

12

controlled in 0A502 currently controlled in ECCN 0A984 would not be controlled for national security reasons because they are not on the WAML.

*New ECCN 0A503:  Discharge type arms, and certain other commodities*.

This rule would replace existing ECCN 0A985 with a new ECCN 0A503.  The rule would add "non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and 'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML.  Renumbering this ECCN would cause entries controlling firearms and related items to be placed in close proximity to each other, which would make it easier for readers to identify items on the CCL.

*New ECCN 0A504:  Optical sighting devices and certain related commodities*.

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms.  The reasons for control table, which currently states, *inter alia*, that the Firearms Convention (FC) reason for control applies to "optical sights for firearms," would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices.  In addition, BIS would add an RS control to for certain riflescopes.  These riflescopes would be identified in their own paragraph in the ECCN under 0A504.i.  The riflescopes in this paragraph would be limited to those "specially designed" for use in firearms that are "subject to the ITAR."  An exclusion would be included in the criteria of this paragraph to ensure less sensitive riflescopes that would be moved from ECCN 0A987 to 0A504 on the effective date of a final rule, that currently are not RS controlled under the EAR, would not be controlled under this paragraph.  This rule would also add a note to

13

this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" is what would be used to determine whether a riflescope is "specially designed" for purposes of this paragraph.

  This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the FC reason for control.  The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

_New ECCN 0A505:  Ammunition and certain related commodities._

        New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that would be classified under proposed ECCN 0A501, and for most "parts" and "components" of such ammunition.  Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included.  This proposed rule would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells.  Buckshot shotgun shells would be subject to the CC Column 1, FC Column 1 and UN reasons for control.  Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control.  Only "parts" and "components" would be eligible for License Exception LVS.  Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles would remain in USML Category III.  Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition,

14

WASHAR0000953

ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III.  Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States.  Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations and anti-terrorism reasons only.  Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes.  Possession of this ammunition does not confer a military advantage on the United States.  This rule proposes adding three notes to clarify the scope of "parts" and "components" for ammunition classified under ECCN 0A505.  Note 1 to 0A505.c would clarify the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants would be controlled under 1A984 and not 0A505.  Separately, Note 2 to 0A505.x would include an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers.  Note 3 to 0A505.x would clarify that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

_New ECCN 0A602: Guns and Armament_.

15

New ECCN 0A602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters.  It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML.  Note 2 to 0A602 confirms that black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99.  Inclusion of these guns and armament on the CCL is appropriate because they do not confer a significant military or intelligence advantage on the United States.  The guns controlled in this ECCN are between 98 and 127 years old.  The parts, components, accessories and attachments controlled in this ECCN include some that are for modern artillery.  Modern artillery will remain on the USML, along with the most sensitive "parts," "components," "accessories" and "attachments" for these USML items.  This proposed rule adds a note to clarify that "parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are not subject to the EAR.  The USML Order of Review and CCL Order of Review already provide guidance for making such a jurisdictional and classification determination, but to highlight that these "parts," "components," "accessories" and "attachments" are not classified under paragraph (x) of 0A602, this rule proposes adding a note.

### New ECCN 0B501: Test, inspection and production equipment for firearms.

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated in ECCN

16

WASHAR0000955

0A501 or USML Category I."  This new ECCN would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items.  The four specific types of machinery are: small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines.  The class of items covers dies, fixtures and other tooling "specially designed" for the "production" of items in the State Department proposed rule for USML Category I or ECCN 0A501.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501.  In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e.  Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability (RS) reason for control from RS Column 2 to RS Column 1.  This would

17

cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve a license.

*New ECCN 0B505:  Test, inspection and production equipment for ammunition.*

New ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition).  Equipment for manufacturing shotgun shells that do not contain buckshot would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986.  ECCN 0B505 would not include equipment for the hand loading of cartridges and shotgun shells, so this rule specifies this in the heading.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes.  Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602: Test, inspection and production equipment for certain guns and armament.*

18

New ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated or otherwise described in ECCN 0A602.a or USML Category II.  ECCN 0B602 would control eight specific types of equipment that currently are listed in paragraphs .e through .l of ECCN 2B018.  Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor; Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses.  ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II).  Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1.  This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

19

WASHAR0000958

*New ECCN 0D501: Software for firearms and certain related commodities*.

New ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or equipment under 0B501 except those commodities classified under 0A501.y.  "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505: Software for ammunition and certain related commodities*.

New ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and "specially designed" parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602: Software for guns and armament and certain related items*.

New ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

20

*New ECCN 0E501: Technology for firearms and certain related items.*

New ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" "required" for the "development" and "production" of firearms other than shotguns.  This new ECCN also would apply the anti-terrorism and United Nations reasons for control to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms.  Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502: Technology for shotguns.*

New ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" required for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" required for the "development" or "production" of shotguns in ECCN 0E984.  The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length.  BIS believes that "technology" related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based solely on the barrel length of the shotgun would likely be ineffective.

*New ECCN 0E504: Technology for certain optical sighting devices.*

21

New ECCN 0E504 would replace existing ECCN 0E987, which controls ''technology'' ''required'' for the ''development,'' or ''production'' of certain commodities controlled by 0A504.  The new ECCN number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.  New ECCN 0E504 would also impose a United Nations (UN) control on the entire entry.

_New ECCN 0E505: Technology for ammunition and related items._

New ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and "parts" and "components)"; 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505.  "Technology" for the "development" or "production" of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons.  United Nations and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for that ammunition and "technology" for "software" for that ammunition.  Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

22

WASHAR0000961

_New ECCN 0E602: Technology for guns and armament, including technology for test, inspection and production equipment and software for guns and armament_.

New ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by ECCNs 0A602 or 0B602, or "software" controlled by 0D602**.**

**Revisions to seven ECCNs.**

To conform to new _Federal Register Drafting Handbook_ requirements, the amendatory instructions in this proposed rule would set forth the entire text of the seven ECCNs to be revised.  To help the public understand what specific parts of the ECCNs would be different, the narrative below describes the amendments in detail.

_Revision to ECCN 0A018_.

With the proposed removal of ECCN 0A984 and the addition of 0A502 described above, this proposed rule would make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL.  This change includes the removal of the note to 0A018.c.

_Revision to ECCN 0E982_.

23

WASHAR0000962

ECCN 0E982 controls "technology" exclusively for the "development" or "production" of equipment controlled by ECCN 0A982 or 0A985.  This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revision to ECCN 1A984.*

To clarify an existing agency practice of controlling shotguns shells that contain only chemical irritants under 1A984, this proposed rule would revise the heading of 1A984.  As described above, the same type of clarification would be made to ECCN 0A505.c under new Note 1 to paragraph (c).  BIS considers these to be conforming changes to the removal of ECCN 0A986 and the addition of ECCN 0A505.c in this proposed rule.

*Revisions to ECCN 2B004.*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B602 and 0B606.  This rule would make no substantive changes to ECCN 2B004.

*Revisions to ECCN 2B018.*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN 0B602.  It would remove paragraph .n, because the commodities listed in that paragraph would be controlled under either ECCNs 0B501 or 0B602 or under existing ECCN 0B606 in this proposed rule.  It would remove paragraphs .a through .d, .m and .s, because the commodities listed in those paragraphs would be controlled in ECCN 0B606.  It would remove paragraphs .o,

24

.p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN 0B501.  The commodities described in the MT control in ECCN 2B018 currently listed as MT controlled elsewhere in the EAR, so no additional changes are needed to add these commodities to other ECCNs.

_Revisions to ECCN 2D018_.

Currently ECCN 2D018 controls software for the "development," "production" or "use" of equipment controlled by ECCN 2B018.  As a conforming change, this rule would replace the control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

_Revisions to ECCN 7A611_.

As a conforming change, this rule would remove the reference to 0A987 in the Related Controls paragraph (2) and add in its place 0A504.

**Removal of nine ECCNs.**

_Removal of ECCN 0A918_.

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons.  This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control.  Bayonets and the "technology" to produce them are available in many countries.  Possession of bayonets does not confer a significant

25

WASHAR0000964

military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective. Therefore, for these reasons, this proposed rule does not retain a regional stability (RS column 2) control on bayonets because it is no longer warranted.

*Removal of ECCN 0A984*.

This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either proposed ECCN 0A502 or 0A505.  As conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1) and in ECCN 0A018.

*Removal of ECCN 0A985*.

This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by proposed ECCN 0A503.  As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A503 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0E982.

*Removal of ECCN 0A986*.

This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by proposed 0A505.c, including less than lethal rounds.

26

WASHAR0000965

As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505, as appropriate in §§ 742.17(f); 742.19(a)(1); 746.3(b)(2) and 748.12(a)(1).

*Removal of ECCN 0A987*.

This proposed rule would remove ECCN 0A987 because proposed ECCN 0A504 would control all commodities currently controlled by ECCN 0A987.  As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504, as appropriate in §§ 740.16(b)(2)(iv); 742.7(a)(1); 742.17(f); 744.9(a)(1) and (b); and 748.12(a)(1); and in ECCN 7A611.

*Removal of ECCN 0B986*.

This proposed rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in proposed ECCN 0B505.c.  As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

*Removal of ECCN 0E918*.

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons.  Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

*Removal of ECCN 0E984*.

27

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and buckshot shotgun shells, because such "technology" would be controlled under proposed ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun shells).  As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

*Removal of ECCN 0E987*.

This proposed rule would remove ECCN 0E987 because proposed ECCN 0E504 would control all "technology" currently controlled by ECCN 0E987.  As conforming change, references to ECCN 0E987 would be replaced with references to ECCN 0E504, as appropriate in §§ 740.20(b)(2)(ii) and 742.7(a)(1).

**Conforming change to General Order No. 5**

This proposed rule would amend General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that would be created by this rule.  This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs would include new ECCN 0A501, 0A502, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E505.  Paragraph (e)(2) is important because, for example, it ensures that items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an

28

amendment to the CCL.  For example, most swivels and scope mounts for firearms have previously been determined through the CJ and classification process to not be "subject to the ITAR" and designated as EAR99.  The classification of such "parts" would not be changed, provided the "part" was not subsequently changed, which would require a separate jurisdiction and classification analysis.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition that would be added to the EAR**

This proposed rule would apply the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A505, 0B501, 0B505, 0A504, 0D501, 0D505, 0E501, 0E504 and 0E505.  That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world."  This proposed rule would also revise the regional stability licensing policy set forth in the last sentence of paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items.  This proposed rule would add ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify these firearms and related items will be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1.  Lastly, this proposed rule would add a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; would

29

be subject to a policy of denial when there is reason to believe the transaction involves certain

parties of concern.  In addition, transactions involving criminal organizations, rebel groups, street

gangs, or other similar groups or individuals, that may be disruptive to regional stability,

including within individual countries; would be subject to a policy of denial.

**Availability of License Exceptions.**

Many of the items in the new "600 series" ECCNs generally would be eligible for the

same license exceptions and subject to the same restrictions on use of license exceptions as other

"600 series" ECCNs.  BIS intends that those restrictions be no more restrictive than the ITAR

license exemption restrictions that currently apply to those items.

For the ECCNs currently on the CCL that would be renumbered and placed in closer

proximity to the firearms-related items that would be removed from the USML and added to the

CCL, these existing firearms-related items would continue to be eligible for the same EAR

license exceptions, as they were prior to publication of this rule, unless otherwise restricted under

§ 740.2, if the requirements of the license exceptions are met.

_License Exception:  Shipments of limited value (LVS)._

Under this proposed rule, complete firearms controlled under ECCN 0A501 would not be

eligible for License Exception LVS, 15 CFR 740.3.  Firearms "parts," "components,"

"accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames),

30

complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with a limit of $500 on net value per shipment.  In addition, receivers (frames), complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them.  BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR 123.17(a)).  This LVS proposal would be less restrictive than the current ITAR provision in two respects.  First, the value limit per shipment would be $500 compared to $100 in the ITAR.  Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value.  BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current prices.  In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

31

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary imports, exports, reexports, and transfers (in-country) (TMP)*.

This proposed rule would amend the regulations at § 740.9 to state that License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740) or Russia.  In addition, this proposed rule would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5.  It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia.  These prohibitions would apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR)

32

and inspection, test, calibration, and repair (§ 740.9(a)(6) of the ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███ ▓

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or ultimately destined for certain proscribed countries.  ██████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

███████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

**Commented [A4]:** ██████████████████████████ ██ ██████████████████████████████ ██████████████████████████ ████████████████████ ████████████

33



The proposed rule would include a note to License Exception TMP to direct exporters to contact U.S. Customs and Border Protection (CBP) at the port of import or ▊ export for the proper procedures for importing or exporting 0A501 firearms under CBP's regulations, including what documentation may need to be filed or presented to a CBP Port Director and any other CBP applicable requirements.

*License Exception: Governments, international organizations, international inspections under the Chemical Weapons Convention, and the International Space Station (GOV).*

This proposed rule would revise the regulations at § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S government agencies and official and personal use by U.S. government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR.  This proposed authorization under License Exception GOV would treat

34

0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV.  It would not impose certain restrictions that are imposed by the current ITAR license exemption.  The ITAR exemption authorizes exports of only non-automatic firearms and "parts" and "components."  License Exception GOV would authorize non-automatic and semi-automatic firearms and "parts" and "components."

The ITAR exemption (22 CFR 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country.  The exporter must present a copy of the written statement to the CBP Port Director.  License Exception GOV would impose none of the foregoing limitations.  BIS believes that the limitations are unnecessary.  The EAR control exports for national security and foreign policy reasons.  BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States.  Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States.  Export license requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b) – to, for or on

35

behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO.  However, this rule would add some additional restrictions for E:1 and E:2 countries.  This proposed rule would exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. government official use.  In addition, to better ensure compliance with section 6(j) of the EAA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this proposed rule would add a new Note 1 to paragraph (b)(2), which would restrict the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

*License Exception:  Baggage (BAG)*.

This proposed rule would revise License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad.  This proposed change to License Exception BAG would be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use.  This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms. ███████████
████████████████████████████████████████

36



37



Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is

38

License Exception BAG, that the exporter is compliant with its terms.  Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: http://www.cbp.gov/xp/cgov/toolbox/ports/.

This proposed rule also would revise License Exception BAG to allow other persons leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States.  This change would be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States.  This proposed rule would not make changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (e)(2).

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████                                    ███████████████████████

*License Exception STA*.

This proposed rule would revise the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments"

WASHAR0000978

controlled under ECCN 0A501 ineligible for License Exception STA.  Only those "parts,"

"components," "accessories," and "attachments" that are controlled under paragraph .x (*i.e.*,

those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed

either on the CCL or USML) are eligible for export under License Exception STA.  Items

controlled under ECCNs 0A502 and 0A503are also excluded from STA eligibility.

This proposed rule would exempt gun "parts," "components," "accessories" and

"attachments" controlled under ECCN 0A501.x; test, inspection and production equipment and

"parts," "components," "accessories" and "attachments" in ECCN 0B501; "software" in 0D501;

and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth

in § 740.20(b)(3)(ii) that applies to "600 series" items.  That end-use limitation is intended to

ensure that the military-related items controlled by most 600 series ECCNs are ultimately used

by appropriate agencies of the governments of certain U.S allies or multilateral export control

regime members.  Because the aforementioned exempted items are not of a military nature, the

limitation is not necessary.  As a conforming change, this proposed rule also would remove

ECCNs 0A985 and 0E987 in paragraph (b)(2)(ii) and add in their place 0A503 and 0E504.  This

change does not change the availability of License Exception STA, but simply reflects the fact

that these items would now be controlled under ECCNs 0A503 and 0E504 and the License

Exception STA exclusion would continue to apply to them.

**Support documentation for firearms, parts, components, accessories, and attachments**

**controlled by ECCN 0A501.**

40

This proposed rule would require that for commodities controlled by ECCN 0A501 exported or reexported transactions for which a license would be required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms.  That import permit would be a record that must be kept by the exporter or reexporter as required by part 762 of the EAR.  The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented.  Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement.  To implement this change, this proposed rule would revise § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

█████████████████████████████████████████████████████

███████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

41



42

WASHAR0000981

███████████████████████████████████████████████

█████████████████████████████████████

████████████████████



**Conventional arms reporting for certain exports of ECCN 0A501.a and .b commodities**

In § 743.4 (Conventional arms reporting), this rule would revise paragraph (c)(1)(i) and

(c)(2)(i) to add ECCN 0A501.a and .b as commodities that would require Wassenaar

Arrangement reporting and United Nations reporting under this conventional arms reporting

section of the EAR.  This requirement would assist the United States Government to meet its

multilateral commitments for the special reporting requirements for exports of certain items

listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional Arms

when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or

GOV (see part 740 of the EAR) or the Validated End User authorization (see § 748.15 of the

EAR) and for United Nations reporting.  License Exceptions LVS and STA are identified in §

743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two

license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be

limited to exports authorized License Exceptions TMP, GOV and RPL or the Validated End

User authorization.  This rule also adds contact information for these reports.

██████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████



44

WASHAR0000983

**Changes to EAR recordkeeping requirements for firearms being moved to the CCL.**

In Part 762 (Recordkeeping), this rule would make two changes to the recordkeeping requirements under the EAR.  These changes would specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this rule would redesignate paragraph (a)(11) as (a)(12) and add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502.  The "exporter" or any other "party to the transaction" that creates or receives such records would be the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this rule would narrow the scope of an exemption from the EAR recordkeeping requirements for warranty certificates.  This rule would narrow this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record would need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States.  This would be an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business

45

and are records that should be easily accessible.  These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items.

The public may submit comments on whether they agree with this BIS determination that these changes described above to the EAR recordkeeping requirements would not result in increased burdens under the EAR.

**Alignment with the Wassenaar Arrangement Munitions List.**

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML.  USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML.  USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

Rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production equipment, "software" and "technology" for munitions list items in categories ML 18, ML 21 and ML 22, respectively, this rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), "software" (0D501, 0D602 and 0D505) and "technology" (0E501, 0E602 and 0E505).  BIS believes that including the ECCNs for test, inspection and production equipment, "software," and "technology" in the same category as the items to which they relate results in an easier way to understand than CCL than using separate categories.

46

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

**Appropriate delayed effective date for a final rule.**

BIS also invites comments from the public on the appropriate delayed effective date needed to prepare for the changes included in this proposed rule if published in final form.  A 180-day delayed effective date was used for many of the other rules that moved items from the USML to the CCL, but certain rules included shorter delayed effective dates.  BIS requests the public to provide comments on whether 180-delayed effective date is warranted, or if some shorter period, such as 90-day delated effective date is warranted for this proposed rule if published in final form.

**Request for Comments.**

All comments on this proposed rule must be in writing and submitted via the Federal rulemaking portal www.regulations.gov or by mail or delivery to the address identified in the addresses section of this proposed rule.  All comments (including any personal identifiable information) would be available for public inspection and copying.  Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

**Export Administration Act**

47

Although the Export Administration Act of 1979 expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of August 15, 2017, 82 FR 39005 (August 16, 2017), has continued the Export Administration Regulations in effect under the International Emergency Economic Powers Act.  BIS continues to carry out the provisions of the Export Administration Act of 1979, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222, as amended by Executive Order 13637.

**Executive Order Requirements**

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity).  Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.  This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866.  Although the items identified in this proposed rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR.  Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

48

WASHAR0000987

This proposed rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce proposed rules are most accurately described as "net deregulatory actions." The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two proposed rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the EO do not use the term "net deregulatory action," but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce proposed rules are closely linked and are best viewed as a consolidated regulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL would result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

To appropriately control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce proposed rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to appropriately control these items that would be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other

49

requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens, including financial costs, would be reduced significantly.  The EAR is a  more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much more efficient way that would significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the item were "subject to the ITAR."  Deregulatory does not mean a decontrol of these items.

      For those items in USML Categories I, II and III that would move by this rule to the CCL, BIS would be collecting the necessary information using the form associated with OMB Control No. 0694-0088.  BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission.  Using the State Department's estimate that 10,000 applicants annually would move from the USML to the CCL and BIS's estimate that 6,000 of the 10,000 applicants would require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR.  Those companies are currently using the State Department's forms associated with OMB Control No. 1405-0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours.  Thus subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours.  The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR.  There may also be other State Department forms that will no longer need to be submitted and that may further reduce the burden hours for applicants.

      In addition to the reduced burden hours of 5,620 hours, there would also be direct cost savings that would result from the 10,000 license applications no longer being required under the

WASHAR0000989

ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. The Department of Commerce does not charge a registration fee to apply for a license under the EAR. Therefore, in addition to the reduced burden hours of 5,620 hours, the movement of these items from the ITAR would result in a direct cost savings of $2,500,000 per year to the exporting public because there is no fee charged by the Department of Commerce to apply for a license.

For these reasons, the Department of State and Department of Commerce proposed rules should be viewed as two integral regulatory actions that would result in an overall reduction in regulatory burden on exporters and are therefore characterized for purposes of E.O. 13771 as "deregulatory actions," or as described here more accurately as "net deregulatory actions."

The Departments of State and Commerce for purposes of E.O. 13771 have agreed to equally share the cost burden reductions that would result from the publication of these two integral regulatory actions. The Department of State would receive 50% and the Department of Commerce would receive 50% for purposes of calculating the deregulatory benefit of these two integral regulatory actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" would result in a cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings of $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of Commerce.

51

WASHAR0000990

For purposes of the Department of State, the "net deregulatory actions" would result in a cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours.  The reduction in burden hours by 2,810 would result in an additional cost savings of $126,281 to the exporting public.  Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of State.

The Department of Commerce welcomes comments from the public on the analysis under E.O. 13771 described here.  Comments from companies that would no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that would move to the CCL would be particularly helpful for the Department of Commerce and Department of State to receive and may result in additional burden hour savings depending on the reduction in the number of registrants.  Comments are also encouraged on any of the other collections that may be relevant for the items that would move from the USML to the CCL.  In particular, data on Department of State forms that would no longer need to be submitted would be helpful to receive.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.) (PRA), unless that collection of information displays a currently valid OMB control number.

This proposed regulation involves ███ collections currently approved by OMB under these BIS collections and control numbers:  Simplified Network Application Processing

52

System (control number 0694-0088), which includes, among other things, license applications;

License Exceptions and Exclusions (control number 0694-0137); Import Certificates and End-

User Certificates (control number 0694-0093); ████ Five Year Records Retention Period (control

number 0694-0096); ██████████████████████████

███████████████████████

This proposed rule would affect the information collection, under control number 0694-

0088, associated with the multi-purpose application for export licenses.  This collection carries a

burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833

hours.  BIS believes that the combined effect of all rules to be published adding items removed

from the ITAR to the EAR that would increase the number of license applications to be

submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900

(30,000 transactions at 43.8 minutes each) under this control number.  For those items in USML

Categories I, II and III that would move by this rule to the CCL, the State Department estimates

that 10,000 applicants annually will move from the USML to the CCL.  BIS estimates that 6,000

of the 10,000 applicants would require licenses under the EAR, resulting in a burden of 4,380

hours under this control number.  Those companies are currently using the State Department's

forms associated with OMB Control No. 1405-0003 for which the burden estimate is 1 hour per

submission, which for 10,000 applications results in a burden of 10,000 hours.  Thus, subtracting

the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden

would be reduced by 5,620 hours.  (*See* the description above for the E.O. 13771 analysis for

additional information on the cost benefit savings and designation of the two rules as "net

deregulatory actions".)

53

This proposed rule would also affect the information collection under control number 0694-0137, addressing the use of license exceptions and exclusions.  Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, would become eligible for License Exception STA under this proposed rule.  Additionally, test, inspection and production equipment and "software" and "technology" related to those firearms and "parts" may become eligible for License Exception STA.  BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the burden associated with control number 0694-0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

BIS expects that this increase in burden as a result of the increased use of License Exception STA would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR.  This proposed rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms.  BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for

54

WASHAR0000993

defense articles in the inventories of the United States and its NATO and other close allies.
However, under the EAR, as specified in this proposed rule, a number of low-level parts would
be eligible for export under License Exception STA and would therefore not require a license to
such destinations.

This proposed rule would also affect the information collection under control number
0694-0096, for the five-year recordkeeping retention because of two changes this rule would
make to Part 762 of the EAR.  This rule would add a new paragraph (a)(55) to specify the
following information must be kept as an EAR record: serial number, make, model, and caliber
for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18
inches controlled in 0A502.  This rule would also require warranty certificates for these items to
be retained for EAR recordkeeping.  However, because these records are already created and
kept as part of normal business recordkeeping purposes, this expansion is not anticipated to
create any new or increased burden under the EAR.

Even in situations in which a license would be required under the EAR, the burden would
likely be reduced compared to a license requirement under the ITAR.  In particular, license
applications for exports of "technology" controlled by ECCN 0E501 would likely be less
complex and burdensome than the authorizations required to export ITAR-controlled technology,
*i.e.*, Manufacturing License Agreements and Technical Assistance Agreements (as a result of the
differences in the scope of the ITAR's and the EAR's technology controls).

This proposed rule would have a minimal effect on the information collection under
control number 0694-0093, import certificates and end-user certificates.  This regulation would
require that for shipments requiring a license of firearms, "parts," "components," "accessories,"

55

and "attachments" controlled under ECCN 0A501, the exporter obtain a copy of the import certificate or permit if the importing country requires one for importing firearms.  License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement.  BIS expects that this requirement would result in no change in the burden under control number 0694-0093.  This proposed rule also would require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection.  As the State Department also requires that persons temporarily exporting firearms, parts and components declare the items to CBP, BIS does not expect that the requirement in this proposed rule would result in a change in burden under control number 0694-0093.



56

WASHAR0000995



Any comments regarding the collection of information associated with this proposed rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by e-mail to Jasmeet_K._Seehra@omb.eop.gov, or by fax to (202) 395-7285.

**Administrative Procedure Act and Regulatory Flexibility Act Requirements**

57

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.,* generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the proposed rule would not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a proposed rule would not have a significant impact on a substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis.  Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule would not have a significant impact on a substantial number of small entities.

*Number of Small Entities*

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses.  Although BIS is unable to estimate the exact number of small entities that would be affected by this proposed rule, it acknowledges that this proposed rule would affect some unknown number.

*Economic Impact*

This proposed rule and the companion State rule would assist in making the United States Munitions List (22 CFR part 121) (USML) into a more "positive" list, *i.e.,* a list that does not use generic, catch-all controls on any "part," "component," "accessory," "attachment," or "end item" that was in any way specifically modified for a defense article, regardless of the article's military

58

or intelligence significance or non-military applications.  At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the Commerce Control List (CCL).  Such items, along with certain military items that currently are on the CCL, would be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs.  In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs.  This proposed rule addresses USML Category I, II and III articles that would be removed from the USML and added to the CCL.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns," consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, software, and technology.  Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms.  However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR.  Department of State officials have informed BIS that license applications for such parts and components are a high percentage of the license applications for USML articles reviewed by that department.  Such parts and components are more likely to be produced by small businesses than are complete firearms.

Category II of the USML, entitled "Guns and Armament," encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, software and technology.  Modern large guns would remain on the USML.  Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL.  Unless specified elsewhere on the

59

WASHAR0000998

CCL or the USML, "parts," "components," "accessories," "attachments," production equipment, "software" and "technology" for large guns would be controlled on the CCL.

Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The proposed rule also applies to "parts," "components," production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this proposed rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this proposed rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this proposed rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this proposed rule would benefit from the elimination of some license requirements implemented by this proposed rule. Six types of "parts" and "components," identified in ECCN 0A501.y, would be designated

60

immediately as "parts" and "components" that, even if "specially designed" for a military use or a Category I firearm, have little or no military significance.  These "parts" and "components," which under the ITAR require a license to nearly all destinations would, under the EAR, would require a license to Cuba, Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with "parts" and "components" that would be placed on the CCL by this proposed rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments valued at $500 or less, "parts" and "components" being exported for use as replacement parts, and temporary exports.  Similarly, exports and reexports of Category II firearms "parts," "components," "accessories," and "attachments" that would be placed on the CCL by this proposed rule would become eligible for those license exceptions, although the value limit would be $3,000.  Category III ammunition placed on the CCL by this proposed rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved to the CCL, the number of destinations for which a license is required would remain largely unchanged.  However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application.  There is no such requirement under the CCL licensing procedure.

61

This difference gives the CCL applicant at least two advantages.  First, the applicant has a way of determining whether the U.S. Government would authorize the transaction before it enters into potentially lengthy, complex and expensive sales presentations or contract negotiations.  Under the USML licensing procedure, the applicant would need to caveat all sales presentations with a reference to the need for government approval and would more likely have to engage in substantial effort and expense with the risk that the government might reject the application.  Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract.  It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this proposed rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR.  This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms.  Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year.  There are no registration or application processing fees for applications to export items currently listed on the CCL.  Once the items that are the subject to this proposed rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State would find their registration fees reduced if the number of USML licenses

WASHAR0001001

those entities need declines.  If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

Finally, *de minimis* treatment under the EAR would become available for all items that this proposed rule would transfer from the USML to the CCL.  Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product.  This proposed rule would apply that same principle to "600 series" items only if the foreign- made item is being exported to a country that is subject to a United States arms embargo.  In all other cases, foreign-made products that incorporate items that this proposed rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent.  Because including small amounts of U.S.-origin content would not subject foreign-made products to the EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin "parts" and "components," a development that potentially would mean greater sales for U.S. suppliers, including small entities.

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat.  However, BIS believes that the increased burden imposed by those actions would be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

63

BIS is unable to determine the precise number of small entities that would be affected by this proposed rule. Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this proposed rule would be offset by a reduction in the number of items that would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin "parts" and "components," which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content.  For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

**List of Subjects**

*15 CFR Parts 740 and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

64

Exports, Reporting and recordkeeping requirements, Terrorism.

*15 CFR Parts 736 and 772*

Exports.

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

15 CFR Part 762

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, ███ 762, 772 and 774 of the Export Administration Regulations (15 CFR parts 730-774) are proposed to be amended as follows:

PART 736 – [AMENDED]

1. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR

65

44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168;

Notice of May 3, 2016, 81 FR 27293 (May 5, 2016); Notice of August 15, 2017, 82 FR 39005

(August 16, 2017); Notice of November 8, 2016, 81 FR 79379 (November 10, 2016).

     2. In Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as

follows:

**SUPPLEMENT NO. 1 TO PART 736 - GENERAL ORDERS**

*\*\*\*\*\**

**(e)** *General Order No. 5*

*\*\*\*\*\**

**(3) Prior commodity jurisdiction determinations**. If the U.S. State Department has previously

determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed

in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz

ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for

purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series"

ECCN, a 0x5zz ECCN, or a 9x515 ECCN.  If the item was not listed elsewhere on the CCL at

the time of such determination (*i.e.*, the item was designated EAR99), the item shall remain

designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the

CCL or to the USML, respectively.

*\*\*\*\*\**

66

**PART 740 – [AMENDED]**

3. The authority citation for 15 CFR part 740 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228;  E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

4. Section 740.9 is amended by:

a.  Adding ▮▮▮▮ sentences at the end of paragraph (a) introductory text;

b.  Adding one sentence at the end of paragraph (b) introductory text; and

c.  Adding paragraph (b)(5) to read as follows:

**§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).**

\*   \*   \*   \*   \*

(a)  \*   \*   \*  This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia.  The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair").  In addition, this paragraph (a) may not be used to

67

export more than 75 firearms per shipment. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

Commented ██████  |

\*   \*   \*   \*   \*

(b)  \*   \*   \*  No provision of paragraph (b), other than (b)(3), (b)(4), or (b)(5) of this section, may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\*   \*   \*   \*   \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.*  This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia; and

68

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.*

destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to

Russia;

WASHAR0001008

*Note 4 to paragraph (b)(5):* *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and importers should contact U.S. Customs and Border Protection (CBP) at the port of import or export, or at the CBP website, for the proper procedures for importing or exporting firearms controlled ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 under CBP's regulations, including what documentation may need to be filed or presented to a CBP Port Director and any other applicable CBP requirements.*

\* \* \* \* \*

5. Section 740.11 is amended by adding a sentence at the end of the introductory text to the section to read as follows:

**§ 740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).**

\* \* \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (b)(2)(ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country are eligible only for transactions described in paragraphs (b)(2)(i) and (b)(2)(ii) solely for U.S. government official use of this section.

\* \* \* \* \*

*Note 1 to paragraph (b)(2):* *Items controlled for NS, MT, CB, NP, FC or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end-users of a government in a Country Group E:1, or E:2 country.*

70

WASHAR0001009



\* \* \* \* \*

6. Section 740.14 is amended by revising ████████████ the heading to paragraph (e)█ and by adding paragraphs (e)(3) and (e)(4) to read as follows:

**§ 740.14 Baggage (BAG).**

\* \* \* \* \*

████████

████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████

_(e) *Special provisions for firearms and ammunition.*

\* \* \* \* \*

71

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control.  Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception.  All ██████████████████ ████████████████████████████████████ ████████████████████-exported under this License Exception must be returned to the United States.

> **Commented** ██ ██
> ████████████████████
> ████████████ ████
> ████████████████

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the

72

United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonresident alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the provisions of Department of Justice Regulations at 27 CFR 478.115(d).

*   *   *   *   *

     7.  Section 740.16 is amended by removing "0A987" from paragraphs (b)(2)(iv) and adding in its place "0A504".

     8.  Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

**§ 740.20 License Exception Strategic Trade Authorization (STA).**

*   *   *   *   *

(b)   *   *   *

(2)   *   *   *

    (ii) License Exception STA may not be used for:

        (A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503, 0E504, 0E982; or

73

WASHAR0001012

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

*   *   *   *   *


**PART 742 – [AMENDED]**

9.  The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 8, 2016, 81 FR 79379 (November 10, 2016).

10.  Section 742.6 is amended by revising the first and last (6th) sentence of paragraph (b)(1)(i) and adding a new (7th) sentence at the end of paragraph (b)(1)(i) to read as follows:

**§742.6 Regional stability.**

*   *   *   *   *

(b)  *   *   *

(1)  *   *   *

74

(i)  Applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0A504, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. *** When destined to the People's Republic of China or a country listed in Country Group E:1 in supplement no. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial.  In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries; will be subject to a policy of denial.

*   *   *   *   *

11.  Section 742.7 is amended by revising paragraphs (a)(1), (a)(2), (a)(3), (a)(4) and (c) to read as follows:

**§ 742.7 Crime control and detection.**

(a)  *   *   *

(1)  Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section.  A license is required to countries listed in

75

WASHAR0001014

CC Column 1 (Supplement No. 1 to part 738 of the EAR).  Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2)  Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3)  Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4)  Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982.  Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

76

WASHAR0001015

(c) *Contract sanctity*.  Contract sanctity date: August 22, 2000.  Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

12.  Section 742.17 is amended by:

a. Revising the first sentence of paragraph (a) and

b. Revising paragraph (f) to read as follows:

**§ 742.17  Exports of firearms to OAS member countries.**

(a)  *License requirements*. BIS maintains a licensing system for the export of firearms and related items to all OAS member countries.  *   *   *

*   *   *   *   *

(f) *Items/Commodities*.  Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d).  (See Supplement No. 1 to part 774 of the EAR).

*   *   *   *   *

**Section 742.19 [AMENDED]**

13. Section 742.19(a)(1) is amended by:

a. Removing "0A986" and adding in its place "0A505.c"; and

77

b. Removing "0B986" and adding in its place "0B505.c".


**PART 743 – [AMENDED]**

14. The authority citation for 15 CFR part 743 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783;  E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

15. Section 743.4 is amended by:

a.   Revising paragraph (c)(1)(i) and (c)(2)(i); and

b.   Revising paragraph (h) to read as follows:


**§ 743.4 Conventional arms reporting.**

*   *   *   *   *

(c) *   *   *

(1) *   *   *

(i) ECCN 0A501.a and .b.

*   *   *   *   *

(2) *   *   *

(i) ECCN 0A501.a and .b.

78

\*   \*   \*   \*   \*

(h) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel. (202) 482-0092, Fax: (202) 482-4094.  Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (c)(2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel. (202) 482-4188, Fax: (202) 482-4145.



79



80

WASHAR0001019

███████████████████████████████████

███████████████████████████████████

████████████████████████



**PART 744 – [AMENDED]**

16.  The authority citation for 15 CFR part 744 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of September 15, 2016, 81 FR 64343 (September 19, 2016); Notice of November 8, 2016, 81 FR 79379 (November 10, 2016); Notice of January 13, 2017, 82 FR 6165 (January 18, 2017).

17.  Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) and (b) and adding in its place "0A504".

**PART 746 – [AMENDED]**

81

18.  The authority citation for 15 CFR part 746 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 287c; Sec 1503, Pub. L. 108-11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007-7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 3, 2016, 81 FR 27293 (May 5, 2016); Notice of August 16, 2017, 82 FR 39005 (August 15, 2017).

19.  Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

20.  Section 746.7 is amended in paragraph (a)(1) by:

a. Adding ECCN "0A503" immediately before 0A980 in the list of ECCNs; and

b. Removing  ECCN "0A985".

**PART 748 – [AMENDED]**

21.  The authority citation for 15 CFR part 748 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 15, 2017).

82

WASHAR0001021



83

WASHAR0001022

2~~12~~.  Section 748.12 is amended by:

a. Revising the heading;

b. Adding introductory text to the section;

c. Revising paragraph (a) introductory text;

d. Revising paragraph (a)(1);

e. Redesignating note to paragraph (c)(8) as note 1 to paragraph (c)(8); and

f. Adding paragraph (e) and note 2 to paragraph (e) to read as follows.

**§ 748.12 Firearms import certificate or import permit.**

License applications for certain firearms and related commodities require support documents in accordance with this section.  For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section.  For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

84

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS.  This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1)  *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d).

*   *   *   *   *

(e)  *Requirement to obtain an import certificate or permit for other than OAS member states*.  If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1)  A license is not required for the export or reexport; or

(2)  The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraph (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)  *License application procedure.*

(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

85

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

*Note 2 to paragraph (e).*  *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) because that statement is not issued by a government.*



86



87





\* \* \* \* \*

**PART 762 – [AMENDED]**

23.  The authority citation for part 762 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

24.  Section 762.2 is amended by redesignating paragraph (a)(11) and (a)(12), and adding a new paragraph (a)(11) to read as follows:

**§ 762.2 Records to be retained.**

(a)  *Records required to be retained.*

\*\*\*\*\*

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been

88

WASHAR0001027

exported.  The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that

creates or receives such records is a person responsible for retaining this record.

*****

25.  Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3 Records exempt from recordkeeping requirements.**

(a) The following types of records have been determined to be exempt from the recordkeeping

requirement procedures:

*****

(5)  Warranty certificate, except for a warranty certificate issued for an address located outside

the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel

length less than 18 inches controlled in 0A502;

*****

**PART 772 – [AMENDED]**

23.  The authority citation for part 772 is revised to read as follows:

**Authority:**  50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3

CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

**Section 772.1 – [Amended]**

89

24.  In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c."

**PART 774 - [AMENDED]**

25. The authority citation for 15 CFR part 774 is revised to read as follows:

**Authority:**  50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

26.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), revise Export Control Classification Number (ECCN) 0A018 (which includes removing and reserving paragraph (c), including the removal of the Note to paragraph (c), in the items paragraph in List of Items Controlled section) to read as follows:

**Supplement No. 1 to Part 774 – The Commerce Control List**

\*   \*   \*   \*   \*

**0A018 Items on the Wassenaar Munitions List (see List of Items Controlled).**

90

WASHAR0001029

**License Requirements**

*Reason for Control*:  NS, AT, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry | See § 746.1(b) for UN controls. |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:*   $3000 for 0A018.b

$1500 for 0A018.c and .d

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: (1) See also 0A979, 0A988, and 22 CFR 121.1 Categories I(a), III(b-d),

and X(a).  (2) See ECCN 0A617.y.1 and .y.2 for items formerly controlled by ECCN 0A018.a.

(3) See ECCN 1A613.c for military helmets providing less than NIJ Type IV protection and

ECCN 1A613.y.1 for conventional military steel helmets that, immediately prior to July 1, 2014

91

were classified under 0A018.d and 0A988.   (4) See 22 CFR 121.1 Category X(a)(5) and (a)(6) for controls on other military helmets.

*Related Definitions*: N/A

*Items*:

a.  [RESERVED]

b.  "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR." (See 22 CFR parts 120 through 130);

**Note to 0A018.b***:  0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:*

*a.  Ammunition crimped without a projectile (blank star);*

*b.  Dummy ammunition with a pierced powder chamber;*

*c.  Other blank and dummy ammunition, not incorporating components designed for live ammunition.*

c.  [RESERVED]

d.  [RESERVED]

92

WASHAR0001031

27.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export Control Classification Numbers (ECCNs) 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504 and 0A505 to read as follows:

**0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y | NS Column 1 |
| RS applies to entire entry except 0A501.y | RS Column 1 |
| FC applies to entire entry except 0A501.y | FC Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500 for 0A501.c, .d, and .x.

93

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls*: (1) Firearms that are fully automatic, and magazines with a capacity of 50 rounds or greater, are "subject to the ITAR."  (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR.  (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions*: N/A

*Items:*

a.    Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b.    Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

94

c.      The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d.      Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

e.      Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a  or .b of this entry.

f. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y.      Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

     y.1.     Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

95

y.2.     Scope mounts or accessory rails;

y.3.     Iron sights;

y.4.     Sling swivels;

y.5.     Butt plates or recoil pads; and

y.6.     Bayonets.

*Technical Note 1 to 0A501:  The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

*Note 1 to 0A501:  Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

**0A502 Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control*:   RS, CC, FC, UN, AT, NS

96

WASHAR0001035

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | RS Column 1 |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of  end user | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement | CC Column 3 |
| UN applies to entire entry | See § 746.1(b) for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm) | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

97

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  This entry does not control combat shotguns and fully automatic

shotguns.  Those shotguns are "subject to the ITAR."

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and**
**"specially designed" "parts" and "components" of those projectiles; and devices to**
**administer electric shock, for example, stun guns, shock batons, shock shields, electric**
**cattle prods, immobilization guns and projectiles; except equipment used exclusively to**
**treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting**
**use; and "specially designed" "parts" and "components," n.e.s.**

**License Requirements**

*Reason for Control:*  CC, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| CC applies to entire entry | A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on |

98

WASHAR0001037

| | the Commerce Country Chart.  (See part 742 of the EAR for additional information). |
|---|---|
| UN applies to entire entry | See § 746.1(b) for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982.  Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

99

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g and .i of this entry | FC Column 1 |
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See §746.1(b) for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* N/A

*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 µA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a.      Telescopic sights.

100

WASHAR0001039

b.      Holographic sights.

c.      Reflex or "red dot" sights.

d.      Reticle sights.

e.      Other sighting devices that contain optical elements.

f.       Laser aiming devices or laser illuminators ''specially designed'' for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.


   ***Note 1 to 0A504.f:*** *0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*


g.      Lenses, other optical elements and adjustment mechanisms for articles in paragraphs a, b, c, d, e or i.

h.      [Reserved]

i.      Riflescopes that were not "subject to the EAR" as of [INSERT DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."


   ***Note 2 to paragraph i:***  For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" is what is used to determine whether the riflescope is "specially designed."


**0A505  Ammunition as follows (see List of Items Controlled).**

101

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x | NS Column 1 |
| RS applies to 0A505.a and .x | RS Column 1 |
| CC applies to 0A505.b | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to  0A505.a, .d  and .x | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons.  The Commerce Country Chart is not designed to determine AT licensing requirements for this entry.  See §742.19 of the EAR for additional information. |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $100 for items in 0A505.x

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

102

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls*:  (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions*:  N/A

*Items*:

a.      Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.

b.      Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c.      Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

*Note 1 to 0A505.c:  Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

WASHAR0001042

d.      Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

*Note 2 to 0A505.x:  The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

*Note 3 to 0A505.x:  The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

28.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export Control Classification Numbers (ECCNs) 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

WASHAR0001043

**0A602  Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not

be used for any item in 0A602.

105

WASHAR0001044

**List of Items Controlled**

*Related Controls*: (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR."  (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions*:  N/A

*Items*:

a.      Guns and armament manufactured between 1890 and 1919.

b.      Military flame throwers with an effective range less than 20 meters.

c. through w.   [Reserved]

x.       "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

*Note 1 to 0A602:  "Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

*Note 2 to 0A602:  Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants designated EAR99.*

106

**ECCN 0A918 – [Removed]**

29.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A918.

**ECCN 0A984 – [Removed]**

30.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A984.

**ECCN 0A985 – [Removed]**

31.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A985.

**ECCN 0A986 – [Removed]**

32.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A986.

WASHAR0001046

**ECCN 0A987 – [Removed]**

33. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove ECCN 0A987.

34. In Supplement No. 1 to part 774( the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the header that reads: "B. 'Test', 'Inspection' and 'Production Equipment' and the entry for Export Control Classification Number (ECCN) 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*:  NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment | NS Column 1 |

108

| | |
|---|---|
| for ECCN 0A501.y | |
| RS applies to entire entry except equipment for ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *LVS:* $3000

    *GBS:* N/A

    *CIV:* N/A

**Special conditions for STA**

    *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

    *Related Controls:* N/A

    *Related Definitions:* N/A

    *Items:*

WASHAR0001048

a.      Small arms chambering machines.

b.      Small arms deep hole drilling machines and drills therefor.

c.      Small arms rifling machines.

d.      Small arms spill boring machines.

e.      Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

   *Reason for Control:* NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to paragraphs  .a, .d  and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of |

110

WASHAR0001049

| | these items to North Korea for anti-terrorism reasons. |
|---|---|

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

> *LVS:* $3000

> *GBS:* N/A

> *CIV:* N/A

**Special conditions for STA**

> *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

> *Related Controls*: N/A

> *Related Definitions*: N/A

> *Items*:

a.    Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b.    Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c.    Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

111

d.    Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w    [Reserved]

x.    "Parts" and "components" "specially designed" for a commodity subject to control in
paragraph .a of this entry.

    35.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear
Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export Control
Classification Numbers (ECCNs) 0B521 and 0B604, an entry for ECCN 0B602 to read as
follows:

**0B602 Test, inspection, and production "equipment" and related commodities "specially
designed" for the "development" or "production" of commodities enumerated or otherwise
described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

    *Reason for Control:* NS, RS, UN, AT

112

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

    *LVS:* $3000

    *GBS:* N/A

    *CIV:* N/A

**Special conditions for STA**

    *STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

    *Related Controls:* N/A

    *Related Definitions:* N/A

    *Items:*

a.    The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:

WASHAR0001052

a.1.    Gun barrel rifling and broaching machines and tools therefor;

a.2.    Gun barrel rifling machines;

a.3.    Gun barrel trepanning machines;

a.4.    Gun boring and turning machines;

a.5.    Gun honing machines of 6 feet (183 cm) stroke or more;

a.6.    Gun jump screw lathes;

a.7.    Gun rifling machines; and

a. 8.    Gun straightening presses.

b.    Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c.    Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d.    Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**ECCN 0B986 – [Removed]**

114

36. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0B986.

37. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | NS Column 1 |

115

| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | RS Column 1 |
|---|---|
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *CIV*:  N/A

    *TSR*:  N/A

**Special conditions for STA**

    *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

    *Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR" (See 22 CFR 121.1, Category I).

    *Related Definitions*:  N/A

    *Items*: The list of items controlled is contained in this ECCN heading.

116

WASHAR0001055

**0D505  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to "software" for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

117

WASHAR0001056

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR" (See 22 CFR § 121.1, Category III).

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

38. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

118

WASHAR0001057

**0D602  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).**

**License Requirements**

    *Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *CIV*:  N/A

    *TSR*:  N/A

**Special conditions for STA**

    *STA*:    Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

119

WASHAR0001058

**List of Items Controlled**

*Related Controls*:  (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k).   (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions*:  N/A

*Items*:   "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

39.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0E018 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

120

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

121

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:

a.      "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

b.      "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502  "Technology" "required" for the "development" or "production," of commodities controlled by 0A502.**

**License Requirements**

*Reason for Control*:  CC, UN

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) for UN controls |

122

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0E504 ''Technology'' ''required'' for the ''development,'' or ''production'' of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.**

**License Requirements**

*Reason for Control:* RS, UN, AT

| *Controls* | *Country Chart (See Supp. No. 1 part 738)* |
|---|---|
| RS applies to entire entry | RS Column 1 |

123

| UN applies to entire entry | See § 746.1(b) for UN controls |
|---|---|
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

      *CIV:*   N/A

      *TSR:*   N/A

**List of Items Controlled**

      *Related Controls*: N/A

      *Related Definitions*: N/A

      *Items*: The list of items controlled is contained in the ECCN heading.

**0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.**

**License Requirements**

124

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505 | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505 | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b | CC Column 1 |
| AT applies to "technology" for | AT Column 1 |

125

| | |
|---|---|
| "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x | |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR" (See 22 CFR § 121.1, Category III).

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in this ECCN heading.

126

40.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0E521 and 0E606 an entry for ECCN 0E602:

**0E602  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

127

WASHAR0001066

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls*:  Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**ECCN 0E918 – [REMOVED]**

41.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E918.

128

42.  In Supplement No. 1 to Part 774, the Commerce Control List, Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), revise Export Control Classification Number (ECCN) 0E982 (which includes removing "0A985" from the heading and the "Control(s)" paragraph and adding in its place "0A503") to read as follows.

**0E982 "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.**

**License Requirements**

*Reason for Control:*   CC

| *Control(s)* |
| --- |
| CC applies to "technology" for items controlled by 0A982 or 0A503.  A license is required for ALL destinations, except Canada, regardless of end-use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.   (See part 742 of the EAR for additional information.) |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

129

WASHAR0001068

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**ECCN 0E984 – [REMOVED]**

43.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E984.

**ECCN 0E987 – [REMOVED]**

44.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E987.

130

45.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 1 – Special Materials and Related Equipment, Chemicals, "Microorganisms" and "Toxins," revise Export Control Classification Number (ECCN) 1A984 (which includes revising the heading) to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

*Reason for Control*:   CC

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

131

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

46.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 –
Materials Processing, revise Export Control Classification Number (ECCN) 2B004 (which
includes removing "2B018" from the related controls paragraph and adding in its place "0B501,
0B602, 0B606") to read as follows:

**2B004 Hot "isostatic presses" having all of the characteristics described in the List of Items
Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control*:  NS, MT NP, AT

132

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 2 |
| MT applies to entire entry | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa | NP Column 1 |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS*:   N/A

*GBS*:   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  (1) See ECCN 2D001 for software for items controlled under this entry.

(2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009.  (4) For additional

133

WASHAR0001072

controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104 and 2B204.  (5) Also see ECCNs 2B117 and 2B999.a.

*Related Definitions*: N/A

*Items*:

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K  (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

**Technical Note:**  *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside*

134

WASHAR0001073

*diameter of the insulated furnace chamber, depending on which of the two chambers is located*

*inside the other.*

47.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 –

Materials Processing, revise Export Control Classification Number (ECCN) 2B018 to read as

follows:

**2B018  Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry.  Commodities formerly controlled by

paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606.  Commodities

formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602.

Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by

ECCN 0B501.  Commodities formerly controlled by paragraph .n of this entry are controlled in

ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in

ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of

the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML

Category II.

48.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 –

Materials Processing, revise Export Control Classification Number (ECCN) 2D018 to read as

follows:

135

**2D018 "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry.  See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

49.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number  (ECCN) 2E001 (which includes removing "2B018" and the comma that follows it from the Control(s) table) to read as follows:

**2E001 "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|

136

| | |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002 | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201 or 2D202 for NP reasons | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons | NP Column 2 |
| CB applies to "technology"   for equipment | CB Column 2 |

137

WASHAR0001076

| | |
|---|---|
| controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351 | |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire

138

WASHAR0001077

entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: See also <u>2E101</u>, <u>2E201</u>, and <u>2E301</u>

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Note:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

50.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number (ECCN) 2E002 (which includes removing "2B018" and the comma that follows it from the Control(s) table) to read as follows:

WASHAR0001078

**2E002 "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009 | NS Column 1 |
| MT applies to "technology"  for  equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons | NP Column 1 |

140

| | |
|---|---|
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

141

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

51. In Supplement No. 1 to part 774 (the Commerce Control List), Category 7—Navigation and Avionics, revise Export Control Classification Number (ECCN) 7A611  (which includes revising Related Controls paragraph (2) in the List of Items Controlled section) to read as follows:

**7A611  Military fire control, laser, imaging, and guidance equipment, as follows (see List of**

142

**Items Controlled).**

**License Requirements**

    *Reason for Control*: NS, MT, RS, AT, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738).* |
|---|---|
| NS applies to entire entry except 7A611.y | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c | MT Column 1 |
| RS applies to entire entry except 7A611.y | RS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry except 7A611.y | See § 746.1(b) for UN controls |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *LVS:* $1500

    *GBS:* N/A

    *CIV:* N/A

**Special Conditions for STA**

143

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls*:  (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR.  (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103.  (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment.  (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.

*Related Definitions*: N/A

*Items*:

a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

144

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102 or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

      y.1 [RESERVED]

DATED:

Richard E. Ashooh

Assistant Secretary

for Export Administration

145

| | |
|---|---|
| **From:** | Monjay, Robert <MonjayR@state.gov> |
| **Sent:** | Wednesday, July 11, 2018 8:59 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov> |
| **Cc:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| **Subject:** | RE: Public Comments on Cats I-III Rules |

The two other signers are Feinstein and Cardin, both of whom were on the letter in the fall and were initiators of the GAO review of the rules, and whom we've not spoken to about this.

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 11, 2018 7:50 AM
**To:** Monjay, Robert <MonjayR@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 4:07 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

For anyone interested. https://www.regulations.gov/document?D=DOS-2017-0046-3131



Thanks

Rob

**Official**
**UNCLASSIFIED**

---

**From:** Paul, Joshua M
**Sent:** Tuesday, July 10, 2018 2:19 PM
**To:** Monjay, Robert <MonjayR@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J
<HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>;
Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-
CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

Hi – a birdie tells me you should check the comments for one from a certain Mr. Robert Menendez and colleagues,
submitted around 8pm last night.

**Official**
**UNCLASSIFIED**

---

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 2:03 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M
<DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex
J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** Public Comments on Cats I-III Rules

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 3,250 total public comments. 3181 comments came in through regulations.gov and 69 comments came in
via email.

We are reviewing the comments for duplicates and bulk submissions (form letters), which should reduce the number of
unique comments that we need to address. More info to follow.
Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Monday, July 9, 2018 12:31 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Cavnar, Anna <CavnarA@state.gov> |
| **Subject:** | RE: Reporter hoping to talk about legal settlement with Defense Distributed |

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Monday, July 9, 2018 12:24 PM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Cavnar, Anna <CavnarA@state.gov>
**Subject:** FW: Reporter hoping to talk about legal settlement with Defense Distributed

**Official - SBU**
**UNCLASSIFIED**

**From:** Strike, Andrew P
**Sent:** Monday, July 9, 2018 12:06 PM
**To:** Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Cappiello, Cheryl A <CappielloCA@state.gov>; Thibodeau, Jessica K <ThibodeauJK@state.gov>; Ricci, Anthony <RicciA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

(+ PM/DDTC)

███████████████

**Official**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Monday, July 9, 2018 11:53 AM
**To:** Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Mason, Julia N <MasonJN@state.gov>; PM-CPA <PM-CPA@state.gov>; Cappiello, Cheryl A <CappielloCA@state.gov>; Thibodeau, Jessica K <ThibodeauJK@state.gov>; Ricci, Anthony <RicciA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

███████████████████████████████████████

**From:** Fabry, Steven F
**Sent:** Monday, July 09, 2018 11:10 AM
**To:** Wall, Amanda J; Mason, Julia N; PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Ricci, Anthony; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

███████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Wall, Amanda J
**Sent:** Monday, July 09, 2018 11:03 AM
**To:** Mason, Julia N; PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Fabry, Steven F; Ricci, Anthony
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

██████████████████████

This email is UNCLASSIFIED.

**From:** Mason, Julia N
**Sent:** Monday, July 09, 2018 11:02 AM
**To:** PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Wall, Amanda J
**Subject:** FW: Reporter hoping to talk about legal settlement with Defense Distributed

█████████████████████████

**From:** Andy Greenberg <agreenberg@wired.com>
**Sent:** Monday, July 09, 2018 10:55 AM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Reporter hoping to talk about legal settlement with Defense Distributed

State Department press contacts,

I'm a reporter with WIRED Magazine in New York, and I'm writing a story about the outcome of a three-year lawsuit brought against the State Department by a group called Defense Distributed and the Second Amendment Foundation.

It's my understanding that the plaintiffs were suing the State Department for allegedly unconstitutional attempts to prevent them from publishing technical digital files and models for guns on the web.

Now Defense Distributed tells me that the State Department has offered a settlement that essentially concedes most points of their argument and allows them (and others) to publish those firearm files online.

I'm working on a feature about the outcome of this lawsuit and how Defense Distributed plans to exploit that outcome: They now intend to publish a collection of gun files online that they've been preparing for some time.

Can someone at the State Department please get in touch to talk about the thinking behind this settlement and what it represents for arms control in the US and abroad?

I'm afraid that my deadline is rather pressing: I'd really appreciate a chance to talk to someone today if possible, or tomorrow at the very latest.

Thanks very much for your help and hope to hear from you soon!

Andy Greenberg
Senior Writer
WIRED
1 World Trade Center, NY, NY 10007
(917) 348-5427
**Official - Transitory**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Noonan, Michael J <NoonanMJ@state.gov> |
| **Sent:** | Wednesday, February 14, 2018 1:12 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Subject:** | RE: Status of Export Control rules for CATS 1-3 -- DHS edits to the State rule and other items in preparation for next week's call |
| **Attach:** | 2018-2-12 Talking points and background for Cats I II III NOV 2017 for sending to NSC (MJN).docx |

First glance thoughts.

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, February 14, 2018 12:32 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** FW: Status of Export Control rules for CATS 1-3 -- DHS edits to the State rule and other items in preparation for next week's call

FYI.

**From:** Peterson, Patricia R. EOP/NSC [mailto:Patricia_R_Peterson@nsc.eop.gov]
**Sent:** Wednesday, February 14, 2018 11:14 AM
**To:** Seehra, Jasmeet K. EOP/OMB; Fischler, Danny (Danny.Fischler@hq.dhs.gov); Gormsen, Eric T (OLP); Plotnick, Sarah (Federal); Krueger, Thomas G; Peckham, Yvonne M; Hart, Robert L; Monjay, Robert; Laychak, Michael R SES DTSA EO (US); Minnifield, Tracy J CIV DTSA LD (US); Mueller, Andrew J CIV DTSA LD (US); Daoussi, Susan G CIV DTSA LD (US); Timothy Mooney; Abraham, Liz (Federal); Larysa.A.Simms@usdoj.gov; Eric.M.Epstein@usdoj.gov; John Sonderman; Kevin Kurland; Akram, Elyas CIV DTSA LD (US); Clagett, Steven; Tafe, Christopher J; Brown, Rebecca J; RENKEMA, SETH D; Koelling, Richard W; BLenihan@doc.gov; Paul, Joshua M; Oukrop, Kenneth Jeffrey (Ken) CIV DTSA LD (US); Cooper, John M; Faulkner, Charles S
**Cc:** Seehra, Jasmeet K. EOP/OMB; Bashadi, Sarah O. EOP/OMB; Hayden, Peter R. EOP/NSC; Picard, Vincent M. EOP/NSC; Bulgrin, Julie K. EOP/NSC
**Subject:** RE: Status of Export Control rules for CATS 1-3 -- DHS edits to the State rule and other items in preparation for next week's call

Folks –



**From:** Seehra, Jasmeet K. EOP/OMB [mailto:Jasmeet_K._Seehra@omb.eop.gov]
**Sent:** Wednesday, February 14, 2018 8:56 AM
**To:** Fischler, Danny (Danny.Fischler@hq.dhs.gov) <Danny.Fischler@hq.dhs.gov>; Gormsen, Eric T (OLP) <Eric.T.Gormsen@usdoj.gov>; Plotnick, Sarah (Federal) <splotnick@doc.gov>; 'Krueger, Thomas G' <KruegerTG@state.gov>; Peckham, Yvonne M <PeckhamYM@state.gov>; HartRL@state.gov; Robert J. Monjay <MonjayR@state.gov>; Laychak, Michael R SES DTSA EO (US) <michael.r.laychak.civ@mail.mil>; Minnifield, Tracy J CIV DTSA LD (US) <tracy.j.minnifield.civ@mail.mil>; Mueller, Andrew J CIV DTSA LD (US) <andrew.j.mueller2.civ@mail.mil>; Daoussi, Susan G CIV DTSA LD (US) <susan.g.daoussi.civ@mail.mil>; Timothy Mooney

<Timothy.Mooney@bis.doc.gov>; Abraham, Liz (Federal) <LAbraham@doc.gov>; Larysa.A.Simms@usdoj.gov;
Eric.M.Epstein@usdoj.gov; John Sonderman <John.Sonderman@bis.doc.gov>; Kevin Kurland
<Kevin.Kurland@bis.doc.gov>; Akram, Elyas CIV DTSA LD (US) <elyas.akram.civ@mail.mil>; Steven Clagett
<Steven.Clagett@bis.doc.gov>; Tafe, Christopher J <Christopher.J.Tafe@ice.dhs.gov>; Brown, Rebecca J
<Rebecca.J.Brown@ice.dhs.gov>; RENKEMA, SETH D <SETH.D.RENKEMA@CBP.DHS.GOV>; Koelling, Richard W
<KoellingRW@state.gov>; Oukrop, Kenneth Jeffrey (Ken) CIV DTSA LD (US) <kenneth.j.oukrop.civ@mail.mil>
**Cc:** Seehra, Jasmeet K. EOP/OMB <Jasmeet_K._Seehra@omb.eop.gov>; Bashadi, Sarah O. EOP/OMB
<Sarah_O._Bashadi@omb.eop.gov>; Peterson, Patricia R. EOP/NSC <Patricia_R_Peterson@nsc.eop.gov>
**Subject:** RE: Status of Export Control rules for CATS 1-3 -- DHS edits to the State rule and other items in preparation for
next week's call
**Importance:** High

Folks –



| From: | Kaidanow, Tina S <KaidanowTS@state.gov> |
|---|---|
| Sent: | Tuesday, March 27, 2018 4:47 PM |
| To: | Hart, Robert L <HartRL@state.gov> |
| Cc: | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| Subject: | RE: Status of USML Categories I-III revision |

Thanks, Rob, appreciate this.  Please keep me posted on where things stand.

**Official**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 1:38 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** Status of USML Categories I-III revision

Ambassador Kaidanow,

Tony Dearth relayed your request for a status update on the USML Categories I-III revisions. The proposed rule remains under OMB review, with the next round of interagency comments due to OMB by COB tomorrow (3/28). The substantive aspects of the interagency review appear to be winding down and we have pressed at the staff level for OMB to finalize review. However, as the review period continues, DHS/CBP and DOJ/ATF have in turn continued to raise issues of varying levels of significance.

Once interagency review is concluded, it is not clear what the next step will be. The NSC (specifically Pat Peterson, who has since returned to DOD) had indicated that they would like to join publication of the proposed rule with the Arms Transfer Initiative and suppressor policy rollout. Pat stated in late February that she was preparing a DC on these issues. We have had no further updates, despite requests. Both DDTC and BIS have requested that OMB release the rules back to the agencies for publication at the conclusion of review, but OMB deferred to NSC. Rob Monjay has followed up with Pat's replacement, Jodi Kouts, to make the same request for release for the rules and to seek an update regarding any potential DC. Jodi acknowledged our request and is seeking an update for us today.

Please let us know if you have any questions.

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Friday, October 16, 2015 8:52 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Nilsson, Brian H <NilssonBH@state.gov>; Charles Kinney <Charles.Kinney@bis.doc.gov> |
| **Cc:** | Peartree, C Edward <PeartreeCE@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: Cats. I -- III |
| **Attach:** | Letter - Kerry ECRI - 05Oct2015.pdf |

FYSA: The letter's we received were to Kerry with a CC to the DOC Sec. ████████████

████████████████████████████████████████

This email is UNCLASSIFIED.

**From:** Paul, Joshua M
**Sent:** Friday, October 16, 2015 7:58 AM
**To:** Nilsson, Brian H; Charles Kinney
**Cc:** Peartree, C Edward; Monjay, Robert; Heidema, Sarah J
**Subject:** RE: Cats. I -- III

Thanks – ████████████████████████ We received all the same letters (plus a couple more); ████████████████████████████████

Josh

**From:** Nilsson, Brian H
**Sent:** Thursday, October 15, 2015 5:37 PM
**To:** Charles Kinney
**Cc:** Paul, Joshua M
**Subject:** RE: Cats. I -- III

Hi – thanks much, I'm finding my way around State and everyone has been super-helpful!

████████████████████████████████████████

████████████████████████████████████████

Hope all's well!
Brian

-----Original Message-----
From: Charles Kinney [mailto:Charles.Kinney@bis.doc.gov]
Sent: Thursday, October 15, 2015 5:07 PM
To: Nilsson, Brian H
Subject: Cats. I -- III

Brian,

First... Huge congratulations on your new challenging position and promotion through the Administration;

Second... we have received separate letters from Senators Corker, Thune, and Rep. Byrne. Each are addressed to Secretary Kerry and to Secretary Pritzker and ask that the promulgation of the rules for Cats. I - III be expedited as rapidly as possible.

████████████████████████████████████████



Thanks,
Charles

This email is UNCLASSIFIED.

WASHAR0001092

BOB CORKER
TENNESSEE
http://www.corker.senate.gov/

425 DIRKSEN SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-3344
FAX (202) 228-0566

COMMITTEES:

BANKING, HOUSING,
AND URBAN AFFAIRS

BUDGET

FOREIGN RELATIONS

SPECIAL COMMITTEE ON AGING

## United States Senate

October 5, 2015

The Honorable John F. Kerry
Secretary of State
United States Department of State
Washington, DC 20520

Dear Secretary Kerry,

I write to you today to express my support for the Export Control Reform (ECR) Initiative. Significant progress has been made in advancing ECR. However, I ask that you work to expeditiously complete the review of the remaining categories of the U.S. Munitions List (USML) and publish for public comment the proposed rules to move eligible dual use items to the Commerce Control List (CCL).

In particular, I understand the interagency review of Categories I-III was completed some time ago and that the proposed rules have been drafted and vetted through the interagency task force, but have yet to be published for public comment. Given this advanced stage in the process, I ask that you inform me as to when the proposed rules for these categories will be published in the Federal Register for public comment.

Completing the reform and modernization of the United States export control regime is important to ensuring U.S. national security interests and helping U.S. companies remain competitive in the current global economy.

Thank you for your quick response to this inquiry.

Sincerely,

Bob Corker
United States Senator

CC: The Honorable Penny Pritzker, Secretary of Commerce

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, October 16, 2015 7:58 AM |
| **To:** | Nilsson, Brian H <NilssonBH@state.gov>; Charles Kinney <Charles.Kinney@bis.doc.gov> |
| **Cc:** | Peartree, C Edward <PeartreeCE@state.gov>; Monjay, Robert <MonjayR@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: Cats. I -- III |

███████████████████████████████████████████████████

Josh

**From:** Nilsson, Brian H
**Sent:** Thursday, October 15, 2015 5:37 PM
**To:** Charles Kinney
**Cc:** Paul, Joshua M
**Subject:** RE: Cats. I -- III
Hi – thanks much, I'm finding my way around State and everyone has been super-helpful!

███████████████████████████████████████████████████

Hope all's well!
Brian

-----Original Message-----
From: Charles Kinney [mailto:Charles.Kinney@bis.doc.gov]
Sent: Thursday, October 15, 2015 5:07 PM
To: Nilsson, Brian H
Subject: Cats. I -- III

Brian,

First... Huge congratulations on your new challenging position and promotion through the Administration;

Second... we have received separate letters from Senators Corker, Thune, and Rep. Byrne. Each are addressed to Secretary Kerry and to Secretary Pritzker and ask that the promulgation of the rules for Cats. I - III be expedited as rapidly as possible. ████████

███████████████████████████████████████████████████

Thanks,
Charles

This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | Nilsson, Brian H <NilssonBH@state.gov> |
| **Sent:** | Friday, October 16, 2015 9:44 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Charles Kinney <Charles.Kinney@bis.doc.gov> |
| **Cc:** | Peartree, C Edward <PeartreeCE@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: Cats. I -- III |
| **Attach:** | Sen Daines. ECR letter.pdf.msg |

████████████████████████████████████████████████████████████

Just got another one, I'm attaching, this one only to Secretary Kerry.


This email is UNCLASSIFIED.


**From:** Heidema, Sarah J
**Sent:** Friday, October 16, 2015 8:52 AM
**To:** Paul, Joshua M; Nilsson, Brian H; Charles Kinney
**Cc:** Peartree, C Edward; Monjay, Robert
**Subject:** RE: Cats. I -- III

FYSA:  The letter's we received were to Kerry with a CC to the DOC Sec.  (see attached), ██████
███████████████████████████████████████████████████████████████


This email is UNCLASSIFIED.


**From:** Paul, Joshua M
**Sent:** Friday, October 16, 2015 7:58 AM
**To:** Nilsson, Brian H; Charles Kinney
**Cc:** Peartree, C Edward; Monjay, Robert; Heidema, Sarah J
**Subject:** RE: Cats. I -- III

Thanks – ████████████████████████████████████ We received all the same letters (plus a couple more); █████████████████████████████████████
████████████████████████████████

Josh

**From:** Nilsson, Brian H
**Sent:** Thursday, October 15, 2015 5:37 PM
**To:** Charles Kinney
**Cc:** Paul, Joshua M
**Subject:** RE: Cats. I -- III

Hi – thanks much, I'm finding my way around State and everyone has been super-helpful!

It does make sense to me that we jointly respond; I'm adding Josh Paul to see what he advises.

Meanwhile, I do not have movement yet on Cats. I-III – I was scheduled to see the Deputy National Security Advisor last Thursday but that got postponed so I've just today reached out to get on her calendar again.  In my view the answer remains the same – we have planned to publish these rules last, after publishing some particularly complex and difficult categories, and still need to publish another of these categories again in proposed (Cat XII) so we are not quite ready yet.

Hope all's well!

Brian

-----Original Message-----
From: Charles Kinney [mailto:Charles.Kinney@bis.doc.gov]
Sent: Thursday, October 15, 2015 5:07 PM
To: Nilsson, Brian H
Subject: Cats. I -- III

Brian,

First... Huge congratulations on your new challenging position and promotion through the Administration;

Second... we have received separate letters from Senators Corker, Thune, and Rep. Byrne.  Each are addressed to Secretary Kerry and to Secretary Pritzker and ask that the promulgation of the rules for Cats. I - III be expedited as rapidly as possible.

Thanks,
Charles


This email is UNCLASSIFIED.

**From:**      Larry Keane <███@nssf.org>
**Sent:**      Friday, October 16, 2015 9:36 AM
**To:**        Nilsson, Brian H <NilssonBH@state.gov>
**Subject:**   Sen Daines. ECR letter.pdf
**Attach:**    101515 ECR letter.pdf; ATT00001.htm

FYI - more still in process

WASHAR0001097

STEVE DAINES
MONTANA

320 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-2651

COMMITTEES
APPROPRIATIONS
COMMERCE, SCIENCE AND
TRANSPORTATION
ENERGY AND NATURAL
RESOURCES
INDIAN AFFAIRS

## United States Senate

October 15, 2015

The Honorable John Kerry
Secretary
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Kerry:

I write to express my support for the prompt completion and implementation of the Export Control Reform Initiative (ECR). While progress has been made, completing the ECR is critical to ensuring that U.S. companies are able to effectively engage in global commerce and are not burdened by duplicative or unduly onerous regulations.

I understand that there has been a long-term effort under the ECR to revise the U.S. Munitions List Categories I, II, and III and move eligible dual use items to the Commerce Control List (CCL). I ask that you continue to move forward with this effort and publish the proposed rules for transferring suitable items within these categories to the CCL for public comment as soon as possible.

Implementing an efficient and consistent export control protocol is an important aspect of U.S. national security and can assist U.S. companies in exporting their goods abroad and growing our economy. With this in mind, I request that you complete the ECR in an expeditious manner and provide a timeline for publishing the proposed rules for comment.

Thank you for your consideration, and I look forward to your prompt response and staying in close contact on this critically important issue.

Sincerely,

STEVE DAINES
United States Senator

Lawrence G. Keane
Senior Vice President, Assistant Secretary
& General Counsel
National Shooting Sports Foundation
11 Mile Hill Road
Newtown, CT 06470-2359
W: ███████████████
M: ██████████
███████████████
www.nssf.org

NSSF is the firearms industry's trade association.

| | |
|---|---|
| **From:** | Kevin Wolf <Kevin.Wolf@bis.doc.gov> |
| **Sent:** | Thursday, May 7, 2015 9:20 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; 'michael.r.laychak.civ@mail.mil' |
| **Cc:** | Handelman, Kenneth B <HandelmanKB@state.gov>; Hillary Hess <Hillary.Hess@bis.doc.gov>; Peartree, C Edward <PeartreeCE@state.gov>; Monjay, Robert <MonjayR@state.gov>; 'Brian_H._Nilsson@nsc.eop.gov'; Tucker, Maureen E <TuckerME@state.gov> |
| **Subject:** | Re: For your review: Cat I-III Combined PR - FRN 2 |

---

We will, to the extent not inconsistent with work on the other rules ahead in the queue from the DC list. We also have a WH-required Cuba rule we need to do. Soon, but measured.

**********************************************
This Message was sent from my Blackberry Mobile Device.
**********************************************

**From**: Heidema, Sarah J [mailto:HeidemaSJ@state.gov]
**Sent**: Thursday, May 07, 2015 09:03 AM Eastern Standard Time
**To**: Kevin Wolf; 'michael.r.laychak.civ@mail.mil' <michael.r.laychak.civ@mail.mil>
**Cc**: Handelman, Kenneth B <HandelmanKB@state.gov>; Hillary Hess; Peartree, C Edward <PeartreeCE@state.gov>; Monjay, Robert <MonjayR@state.gov>; Nilsson, Brian H. (Brian_H._Nilsson@nsc.eop.gov) <Brian_H._Nilsson@nsc.eop.gov>; Tucker, Maureen E <TuckerME@state.gov>
**Subject**: For your review: Cat I-III Combined PR - FRN 2

Please find attached the revised rule for Cats I, II, and III.  We've combined them into one rule and made a few other changes needed to conform to regulatory changes made since the rule was initially drafted.  Given the DC schedule, we'd appreciate it if you could review this rule in by noon tomorrow.  Thanks much for your expeditious review!

Sarah


Sarah Heidema
Chief, Regulatory and Multilateral Affairs
Office of Defense Trade Controls Policy
Department of State
202-663-2809



This email is UNCLASSIFIED.

WASHAR0001100

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.   *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0001102

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0001104

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0001105

8. *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9. *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0001107

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _____, 2018

Dated: _Jun. 29_, 2018

_____
Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _____, 2018

_____
Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001108

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,                §
    Plaintiffs,                          §
                                         §
v.                                          §      No. 1:15-cv-372-RP
                                         §
U.S. DEPARTMENT OF STATE, et al.,           §
    Defendants.                          §

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.

Dated: June 29, 2018

Respectfully submitted,

Matthew Goldstein
D.C. Bar No. 975000*
Snell & Wilmer LLP
One South Church Ave., Ste. 1500
Tucson, Arizona 85701
520.882.1248 / Fax 520.884.1294
mgoldstein@swlaw.com

Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

ERIC J. SOSKIN
Pennsylvania Bar No. 200663
Senior Trial Counsel

1

WASHAR0001109

703.835.9085/Fax 703.997.7665

alan@guraplic.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

2

WASHAR0001110

| | |
|---|---|
| **From:** | Timothy Mooney <Timothy.Mooney@bis.doc.gov> |
| **Sent:** | Tuesday, July 10, 2018 11:17 AM |
| **To:** | Richard Ashooh <Richard.Ashooh@bis.doc.gov>; Matthew Borman <Matthew.Borman@bis.doc.gov>; Lopes, Alexander <alexander.lopes@bis.doc.gov>; Clagett, Steven <steven.clagett@bis.doc.gov>; Karen NiesVogel <Karen.NiesVogel@bis.doc.gov>; Jeff Bond <Jeff.Bond@bis.doc.gov>; Elan Mitchell-Gee <Elan.Mitchell-Gee@bis.doc.gov>; Hillary Hess <Hillary.Hess@bis.doc.gov>; Susan Kramer <Susan.Kramer@bis.doc.gov>; Steven Schrader <Steven.Schrader@bis.doc.gov>; Douglas Hassebrock <Douglas.Hassebrock@bis.doc.gov>; Kevin Kurland <Kevin.Kurland@bis.doc.gov>; Michael Vaccaro <Michael.Vaccaro@bis.doc.gov>; Monjay, Robert <MonjayR@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Abraham, Liz <LAbraham@doc.gov> |
| **Subject:** | Comment period had ended for firearms rule. Commerce received 1,621 comments. |

---

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 1,619 comments in regulations.gov.  We received one additional comment by mail and one by email, so the working total right now is 1,621.

<u>Here is a more detailed breakdown if interested:</u>
Total submission in regulations.gov:  2954
Unique comments: 1,559 (+ 160 bulk comments), so total comments received in regulaitons.gov is 1,619.
Duplicate comments received: 1,235 (+ 160 bulk comments that will be posted as representative samples in regulations.gov), so in total 1,395 of the comments fall into the bulk category.

We should be done with checking in and posting the bulk comments today and dealing with the duplicates.

We plan to have all of the comments posted in regulations.gov within 2 weeks by 7/24/18.

Rob,
Once you get an idea on the total number of comments received by State, can you send that to us?

Thanks,
Tim

| From: | Hart, Robert L <HartRL@state.gov> |
|---|---|
| Sent: | Wednesday, July 11, 2018 10:16 AM |
| To: | Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Soskin, Eric (CIV) <Eric.Soskin@usdoj.gov>; Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| Subject: | Defense Distributed article |

---

Hi all, Wired ran this yesterday on Defense Distributed and the settlement: https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

| From: | Candace Goforth <█████@goforthandexport.com> |
| Sent: | Tuesday, July 10, 2018 2:54 PM |
| To: | Monjay, Robert <MonjayR@state.gov> |
| Subject: | Firearms rule comments... |

Hi Rob,

I hope this email finds you doing well! :-) I realize the public comment period for Cats I-III closed yesterday but would you entertain some late comments? I have been distracted with my recently adopted baby girl (not an excuse but an excuse :-)) but still like to provide some input. And not on the brokering part (I think Wolf is tackling that...)!

Thanks,
Candace

Sent via the BlackBerry Hub for Android

WASHAR0001113

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.   *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

   (a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

   (b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0001114

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0001115

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0001116

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0001117

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement
     of Plaintiffs and Defendants entered into in good faith, and no statement, remark,
     agreement or understanding, oral or written, which is not contained therein, shall be
     recognized or enforced. Plaintiffs acknowledge and agree that no promise or
     representation not contained in this Settlement Agreement has been made to them and
     they acknowledge and represent that this Settlement Agreement contains the entire
     understanding between Plaintiffs and Defendants and contains all terms and conditions
     pertaining to the compromise and settlement of the disputes referenced herein. Nor does
     the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose
     other than the desire of the Parties to reach a full and final conclusion of the Action, and
     to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an
     instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof
     be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the
     benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,
     assigns and personal representatives, including any persons, entities, departments or
     agencies succeeding to the interests or obligations of the Parties.

WASHAR0001118

8.     *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
       Settlement Agreement with their counsel, who has explained these documents to them
       and that they understand all of the terms and conditions of this Settlement Agreement.
       Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
       the contents thereof, and execute this Settlement Agreement of their own free act and
       deed. The undersigned represent that they are fully authorized to enter into this
       Settlement Agreement.

9.     *Execution:* This Settlement Agreement may be executed in one or more counterparts,
       each of which shall be deemed an original, and all of which together constitute one and
       the same instrument, and photographic copies of such signed counterparts may be used in
       lieu of the original.

10.    *Jointly Drafted Agreement.* This Settlement Agreement shall be considered a jointly
       drafted agreement and shall not be construed against any party as the drafter.

11.    *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
       requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
       Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
       state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0001119

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.  *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0001120

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001121

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Monday, July 9, 2018 10:57 AM |
| To: | Miller, Michael F <Millermf@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov> |
| Subject: | FW: ITAR Amendment—Categories I, II, and III |
| Attach: | MembersofCongress_CommentsonITAR.PDF |

Heads up -

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Monday, July 09, 2018 10:52 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: ITAR Amendment—Categories I, II, and III

FYI

**From:** Parish, William J
**Sent:** Monday, July 09, 2018 10:05 AM
**To:** Forsythe, Eden <Eden.Forsythe@mail.house.gov>
**Cc:** Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: ITAR Amendment—Categories I, II, and III

Hi Eden,

Thank you for reaching out to flag the letter.  I have included my colleague, Tamara, who now covers PM equities.

Thank you,
Will

**Official**
**UNCLASSIFIED**

**From:** Forsythe, Eden <Eden.Forsythe@mail.house.gov>
**Sent:** Thursday, July 05, 2018 1:58 PM
**To:** Parish, William J <ParishWJ@state.gov>
**Subject:** FW: ITAR Amendment—Categories I, II, and III

Hi William, I want to flag a letter my boss is leading regarding proposed changes to ITAR.

Many thanks,
Eden

**From:** Forsythe, Eden
**Sent:** Thursday, July 5, 2018 1:48 PM

**To:** 'DDTCPublicComments@state.gov' <DDTCPublicComments@state.gov>
**Subject:** ITAR Amendment—Categories I, II, and III

Attached please find a letter from Members of Congress regarding proposed changes to International Traffic in Arms Regulations.

Eden Forsythe
Legislative Counsel
Office of Congressman Sandy Levin (MI-09)
1236 Longworth House Office Building
202-225-4961

WASHAR0001123