# Congress of the United States
## House of Representatives
### Washington, DC 20515

July 5th, 2018

Secretary Mike Pompeo
Department of State
2201 C Street NW
Washington, DC 20230

Secretary Wilbur Ross
Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20520

Dear Secretaries Pompeo and Ross:

We write to express our deep concern about proposed regulatory changes that would transfer control and licensing of exports of semi-automatic assault weapons, high capacity ammunition magazines and related military items from the Department of State to the Department of Commerce. We urge you to postpone implementation of these proposed changes until important issues can be addressed.

Under the current regulatory framework established under the Arms Export Control Act, export of items that are primarily for military use are regulated pursuant to the International Traffic in Arms Regulations administered by the State Department.  Such items are included on United States Munitions List and are subject to stringent controls that are aimed at restricting access to military items to approved foreign governments.  Exporters must be registered with the State Department and end-users are monitored under   the Blue Lantern program, which provides inventory management control and accountability of all commercial arms sales and transfers.
Transferring regulation of such military exports to the Department of Commerce would make it more likely that U.S.-origin weapons will end up in the hands of traffickers, terrorists, and cartels, and put them into global commerce.

We are also concerned that proposed rule changes will significantly reduce Congressional oversight and undermine efforts to prevent and prosecute firearms trafficking.  Specifically, current regulations require Congressional notification of an intended commercial firearms sale in excess of $1 million. By contrast, licenses issued by the Commerce Department are not notified to the Congress, or subject to prior review. In addition, the Foreign Assistance Act also prohibits sale of such defense articles to countries where governments have engaged in a consistent pattern of gross violations of internationally recognized human rights.

The volume of U.S. military small arms exports, which is already substantial, is certain to increase if regulation is moved to the Commerce Department. In the past year alone, Congress has

PRINTED ON RECYCLED PAPER

been notified of some $660 million of firearms sales regulated under the United States Munitions List

The ramifications of the proposed transfer of oversight from the State Department to the Commerce Department are very serious: arms manufacturers and brokers of semi-automatic assault weapons will no longer be required to register with the State Department; training on the use of these items will no longer require a license, allowing private security contractors to train foreign militias in sensitive combat techniques without proper vetting; prosecutors will have less documentary evidence to prosecute arms dealers; and elected officials will have less say in the export of dangerous weapons.

For all these reasons, we urge you to postpone the proposed regulatory transfer until these important issues can be addressed.

Sander Levin

Eliot Engel

James P. McGovern

Norma J. Torres

Jamie Raskin

WASHAR0001125

| | |
|---|---|
| **From:** | Monjay, Robert </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AF1B425AD6B74F96A14ADE7CA3A1E30A-MONJAY, ROB> |
| **Sent:** | Monday, July 9, 2018 2:45 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | FW: ITAR Amendment—Categories I, II, and III |
| **Attach:** | MembersofCongress_CommentsonITAR.PDF |

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Monday, July 9, 2018 10:57 AM
**To:** Miller, Michael F <Millermf@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>
**Subject:** FW: ITAR Amendment—Categories I, II, and III

Heads up -

**Official - SBU**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Monday, July 09, 2018 10:52 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: ITAR Amendment—Categories I, II, and III

FYI

**From:** Parish, William J
**Sent:** Monday, July 09, 2018 10:05 AM
**To:** Forsythe, Eden <Eden.Forsythe@mail.house.gov>
**Cc:** Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: ITAR Amendment—Categories I, II, and III

Hi Eden,

Thank you for reaching out to flag the letter.  I have included my colleague, Tamara, who now covers PM equities.

Thank you,
Will

**Official**
**UNCLASSIFIED**

**From:** Forsythe, Eden <Eden.Forsythe@mail.house.gov>

**Sent:** Thursday, July 05, 2018 1:58 PM
**To:** Parish, William J <ParishWJ@state.gov>
**Subject:** FW: ITAR Amendment—Categories I, II, and III

Hi William, I want to flag a letter my boss is leading regarding proposed changes to ITAR.

Many thanks,
Eden

---

**From:** Forsythe, Eden
**Sent:** Thursday, July 5, 2018 1:48 PM
**To:** 'DDTCPublicComments@state.gov' <DDTCPublicComments@state.gov>
**Subject:** ITAR Amendment—Categories I, II, and III

Attached please find a letter from Members of Congress regarding proposed changes to International Traffic in Arms Regulations.

Eden Forsythe
Legislative Counsel
Office of Congressman Sandy Levin (MI-09)
1236 Longworth House Office Building
202-225-4961

# Congress of the United States
## House of Representatives
### Washington, DC 20515

July 5th, 2018

Secretary Mike Pompeo
Department of State
2201 C Street NW
Washington, DC 20230

Secretary Wilbur Ross
Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20520

Dear Secretaries Pompeo and Ross:

We write to express our deep concern about proposed regulatory changes that would transfer control and licensing of exports of semi-automatic assault weapons, high capacity ammunition magazines and related military items from the Department of State to the Department of Commerce. We urge you to postpone implementation of these proposed changes until important issues can be addressed.

Under the current regulatory framework established under the Arms Export Control Act, export of items that are primarily for military use are regulated pursuant to the International Traffic in Arms Regulations administered by the State Department. Such items are included on United States Munitions List and are subject to stringent controls that are aimed at restricting access to military items to approved foreign governments. Exporters must be registered with the State Department and end-users are monitored under the Blue Lantern program, which provides inventory management control and accountability of all commercial arms sales and transfers. Transferring regulation of such military exports to the Department of Commerce would make it more likely that U.S.-origin weapons will end up in the hands of traffickers, terrorists, and cartels, and put them into global commerce.

We are also concerned that proposed rule changes will significantly reduce Congressional oversight and undermine efforts to prevent and prosecute firearms trafficking. Specifically, current regulations require Congressional notification of an intended commercial firearms sale in excess of $1 million. By contrast, licenses issued by the Commerce Department are not notified to the Congress, or subject to prior review. In addition, the Foreign Assistance Act also prohibits sale of such defense articles to countries where governments have engaged in a consistent pattern of gross violations of internationally recognized human rights.

The volume of U.S. military small arms exports, which is already substantial, is certain to increase if regulation is moved to the Commerce Department. In the past year alone, Congress has

PRINTED ON RECYCLED PAPER

been notified of some $660 million of firearms sales regulated under the United States Munitions List

The ramifications of the proposed transfer of oversight from the State Department to the Commerce Department are very serious: arms manufacturers and brokers of semi-automatic assault weapons will no longer be required to register with the State Department; training on the use of these items will no longer require a license, allowing private security contractors to train foreign militias in sensitive combat techniques without proper vetting; prosecutors will have less documentary evidence to prosecute arms dealers; and elected officials will have less say in the export of dangerous weapons.

For all these reasons, we urge you to postpone the proposed regulatory transfer until these important issues can be addressed.


Sander Levin

Eliot Engel

James P. McGovern

Norma J. Torres

Jamie Raskin

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Friday, July 20, 2018 4:57 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Foster, John A <FosterJA2@state.gov> |
| **Subject:** | FW: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns |
| **Attach:** | 07-20-18 Letter to Secretary Pompeo Regarding 3-D Printed Arms.pdf |

███████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

---

**From:** Miller, Michael F
**Sent:** Friday, July 20, 2018 4:40 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Inbound...

**Official**
**UNCLASSIFIED**

---

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 4:35 PM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David <david_fite@foreign.senate.gov>; Oliver, Stacie <stacie_oliver@foreign.senate.gov>
**Subject:** Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Mike, et.al.:

I wanted you to be aware of the attached letter from Rep. Engel to Secretary Pompeo urging a delay of the implementation of the settlement in Defense Distributed v. U.S. State Department, given the significant security threat that would occur immediately upon release of the software. The letter also is being sent to H.  Rep. Engel has directed that the letter be released to the public.  As you are no doubt aware, the terms of the settlement are already being widely reported in the media this afternoon.

Ed

Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

WASHAR0001130

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER        THOMAS SHEEHY
CHIEF OF STAFF    STAFF DIRECTOR

ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR



One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed fireams would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

WASHAR0001131

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Use of this temporary ITAR authority also suggests that Department officials sought a
way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires
advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to
suspend the Department's implementation of the settlement immediately and prevent the
inappropriate and dangerous release of this technical information.

Sincerely,

ELIOT L. ENGEL
Ranking Member

| From: | Peckham, Yvonne M <PeckhamYM@state.gov> |
|---|---|
| Sent: | Thursday, July 12, 2018 6:51 AM |
| To: | Monjay, Robert <MonjayR@state.gov> |
| Cc: | Peckham, Yvonne M <PeckhamYM@state.gov>; Kottmyer, Alice M <KottmyerAM@state.gov> |
| Subject: | FW: You have received a FileCatalyst Webmail package from FDMS EXTRACT |

Rob,

Sending you the comments received for AE30.

Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

---

**From:** FDMS EXTRACT <USG_ERULE_EXTRACT@bah.com>
**Sent:** Wednesday, July 11, 2018 3:19 PM
**To:** Peckham, Yvonne M <PeckhamYM@state.gov>
**Subject:** You have received a FileCatalyst Webmail package from FDMS EXTRACT

**Enterprise solution for sending large files**

**You received a File Package from FDMS EXTRACT**

Click on the tracking number to download your files

| | |
|---|---|
| **Sender's Name:** | FDMS EXTRACT |
| **Link to download:** | https://filetransfer.fdms.gov/fcweb/GET/123R0JPQJ902GN0B |
| | Please use the following PIN number to download the files: 648142 <br> For security reasons, the file will be downloaded with the .z1p extension. After your file download is complete, open the folder where you saved the file and rename the file with the extension changed from 'z1p' to 'zip'. <br> Your file package will be available for 14 days. |
| **Unable to open the link?** | Click on this link https://filetransfer.fdms.gov/fcweb/jsp/downloadFiles.jsp and paste the following tracking number: 123R0JPQJ902GN0B and then enter the PIN (if required). |
| **Message from Sender:** | Your FDMS bulk extract is ready to be downloaded. |
| **Files Sent with Package:** | DOS-2017-0046 2018-07-11 15-01-38.z1p |
| **Total File Size:** | 9922 KB |

**Thank you for using FileCatalyst®.**

| | |
|---|---|
| **From:** | Candace Goforth <██████@goforthandexport.com> |
| **Sent:** | Tuesday, July 10, 2018 8:42 PM |
| **To:** | DDTCPublicComments <DDTCPublicComments@state.gov> |
| **Cc:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | ITAR Amendment-Categories I, II and III |
| **Attach:** | GTA Public Comments - DOS 7-10-2018.pdf |

Hello,

Please find attached GTA's public comments for the subject proposed rule.

Thanks,
Candace

Candace M. J. Goforth
Managing Director
Goforth Trade Advisors LLC
██████████
www.goforthandexport.com



10 July 2018

*Via Email*

Mr. Robert Monjay
Office of Defense Trade Controls Policy
Directorate of Defense Trade Controls
U.S. Department of State
2401 E Street, NW
SA-1, 12th Floor
Washington, DC 20037

Email:          DDTCPublicComments@state.gov

Reference:    RIN 1400–AE30

Subject:       International Traffic in Arms Regulations: U.S. Munitions List Categories I, II,
               and III

Dear Mr. Monjay:

Goforth Trade Advisors LLC (GTA) respectfully submits the following comments on various
proposed revisions to the International Traffic in Arms Regulations (ITAR) in response to the
*International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III*, 83 Fed.
Reg. 101 (May 24, 2018).  We greatly appreciate the Directorate of Defense Trade Controls'
(DDTC) efforts in continuing to move forward with the changes envisioned by Export Control
Reform.  Based upon our previous government service and recent experience in assisting industry
with the implementation of Export Control Reform, we would like to draw the attention of DDTC
to certain issues and concerns with the proposed revisions to the ITAR.

Please see our detailed comments below.

### ITAR § 123.15(a)(3) – The proposed revision expands current Congressional threshold

> One commenting party expressed concern that the proposed revisions to ITAR §
> 123.15(a)(3) expands the scope of Congressional notification for USML Category
> I articles by including paragraphs (e) and (g) in the proposed revised language.  The
> commenting party recommended the revised language read "Category I paragraphs
> (a) through (d)."

The current language of ITAR §123.15(a)(3) requires Congressional notification of firearms in the
amount of $1,000,000 without the designation of specific USML paragraphs. This has not been an

228 S. Washington Street ⋄ Suite 330 ⋄ Alexandria, Virginia ⋄ 22314
Phone: +1-703-722-8116 ⋄ Fax: +1-703-982-7711
E-mail: info@goforthandexport.com ⋄ Website: www.goforthandexport.com

WASHAR0001135

issue since the current USML I(j)((1) provides a definition of firearm which limits such notification to articles controlled in USML I(a) through (d). The proposed Note 2 to Category I provides a new definition for firearm that maintains the intent of the current definition. In using either definition, the inclusion of articles controlled in paragraphs (e) and (g) in ITAR §123.15(a)(3) expands the current scope of Congressional notification which only applies to firearms.

This change was addressed in the preamble to the proposed rule. If expansion was intended and this section remains unchanged, GTA recommends providing an explanation in the preamble to the final rule.

To address these concerns, GTA recommends revising the proposed language as follows:

> *"(3) A license for export of defense articles controlled under Category I paragraphs (a) through (d) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more."*

**ITAR §123.18 – The removal of this exemption requires a conforming change to ITAR §123.16(b)(7)**

> One commenting party noted that the removal of the exemption at ITAR §123.18 requires a conforming change at ITAR §123.16(b)(7). The commenting party recommended placing ITAR §123.16(b)(7) in Reserve as the referenced exemption – ITAR §123.18 – has been removed and placed in reserve.

The language at ITAR §123.16(b)(7) points to the exemption at ITAR §123.18 for firearms for personal use of members of the U.S. Armed Forces and civilian employees. This proposed rule removes that exemption and places the section in reserve.

To address these concerns, GTA recommends placing ITAR §123.16(b)(7) in Reserve.

**Other Areas for Considerations for Final Rule**

GTA commends DDTC on the comprehensive review of the ITAR to identify conforming changes resulting from the proposed revisions to these USML categories. To further assist DDTC, GTA provides two additional sections of the ITAR which may require revision.

The first section is Supplement 1 to Part 126. The language in Supplement 1 refers to the current control language for USML Categories I, II and III, and several of these paragraphs have been revised or placed in Reserve due to transition the jurisdiction of the Export Administration Regulations (EAR). GTA suggests reviewing revising the language therein.

The other section is the technical data exemption at ITAR §125.4(b)(6). The current language refers to "…firearms not in excess of caliber .50 and ammunition for such weapons…" This section may not require revision however, GTA suggests a review is needed to ensure consistency with language in other areas of the ITAR.

WASHAR0001136

Thank you for the opportunity to present GTA's views concerning the proposed revisions to the ITAR.

If you have any questions concerning this submission, please contact the undersigned at (703) 722-8116 ext 101 or by e-mail at candace@goforthandexport.com.

Sincerely,

Candace M. J. Goforth
Managing Director

| From: | Monjay, Robert <MonjayR@state.gov> |
|---|---|
| Sent: | Tuesday, July 10, 2018 2:03 PM |
| To: | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov> |
| Cc: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Subject: | Public Comments on Cats I-III Rules |

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 3,250 total public comments. 3181 comments came in through regulations.gov and 69 comments came in via email.

We are reviewing the comments for duplicates and bulk submissions (form letters), which should reduce the number of unique comments that we need to address. More info to follow.
Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official**
**UNCLASSIFIED**

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.   *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

(a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

(b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0001139

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(e) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0001141

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0001142

5.  *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement
    of Plaintiffs and Defendants entered into in good faith, and no statement, remark,
    agreement or understanding, oral or written, which is not contained therein, shall be
    recognized or enforced. Plaintiffs acknowledge and agree that no promise or
    representation not contained in this Settlement Agreement has been made to them and
    they acknowledge and represent that this Settlement Agreement contains the entire
    understanding between Plaintiffs and Defendants and contains all terms and conditions
    pertaining to the compromise and settlement of the disputes referenced herein. Nor does
    the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose
    other than the desire of the Parties to reach a full and final conclusion of the Action, and
    to resolve the Action without the time and expense of further litigation.

6.  *Amendments:* This Settlement Agreement cannot be modified or amended except by an
    instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof
    be waived other than by a written waiver, signed by the Parties.

7.  *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the
    benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,
    assigns and personal representatives, including any persons, entities, departments or
    agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0001143

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
      Settlement Agreement with their counsel, who has explained these documents to them
      and that they understand all of the terms and conditions of this Settlement Agreement.
      Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
      the contents thereof, and execute this Settlement Agreement of their own free act and
      deed. The undersigned represent that they are fully authorized to enter into this
      Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,
      each of which shall be deemed an original, and all of which together constitute one and
      the same instrument, and photographic copies of such signed counterparts may be used in
      lieu of the original.

10.   *Jointly Drafted Agreement.* This Settlement Agreement shall be considered a jointly
      drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
      requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
      Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
      state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0001144

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items.

7

WASHAR0001145

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001146

| From: | Hart, Robert L <HartRL@state.gov> |
|---|---|
| Sent: | Wednesday, July 18, 2018 4:19 PM |
| To: | Paul, Joshua M <PaulJM@state.gov>; PM-CPA <PM-CPA@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Foster, John A <FosterJA2@state.gov> |
| Subject: | RE: Defense Distributed Case |

Let's chat about this offline if you have a moment before the end of the day. 6-9221

ITAR §§120.17 (export), 120.10 (technical data), and 120.11 (public domain) are the key definitions for consideration if we can say "it depends" and point them to the regulations as an interim measure.

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 18, 2018 4:03 PM
**To:** Hart, Robert L <HartRL@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Defense Distributed Case

██████████████████ Thank you.

Here's a further follow up from CRS ███████████████████████████████:

is it accurate to say that posting technical data online that is covered by the USML/ITAR is considered an export?

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 18, 2018 3:56 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Foster, John A <FosterJA2@state.gov>
**Subject:** RE: Defense Distributed Case

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

Thanks,

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**

**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 18, 2018 3:30 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Defense Distributed Case

Dear all,

Please see below Qs from CRS; ███████████████████████████████████████
███████████████████████████████████████████

Josh

**Official - SBU**
**UNCLASSIFIED**

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 3:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Defense Distributed Case

As far as I can tell, DDTC essentially exempted the information in these particular files from the USML. The settlement says that DDTC approved the technical data in question for public release, but I don't t think it gives a reason for this determination.

1. Is that characterization correct?
2. Are the data in question applicable to Category I(a) items?
3. Why were the data approved for public release?

Thanks,
Paul

**From:** Paul, Joshua M [mailto:PaulJM@state.gov]
**Sent:** Wednesday, July 18, 2018 8:08 AM
**To:** Kerr, Paul <PKERR@crs.loc.gov>
**Subject:** RE: Defense Distributed Case

Yes, please do; not sure what we will be able to answer, but by all means ask.

**Official**
**UNCLASSIFIED**

**From:** Kerr, Paul <PKERR@crs.loc.gov>
**Sent:** Wednesday, July 18, 2018 7:56 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed Case

Josh,

Could I send a question or two about it? It's gotten some attention up here.

Thanks,
Paul

WASHAR0001149

| From: | Kouts, Jodi L. EOP/NSC <Jodi.L.Kouts@nsc.eop.gov> |
|-------|---------------------------------------------------|
| Sent: | Wednesday, July 11, 2018 8:05 AM |
| To: | Monjay, Robert <MonjayR@state.gov> |
| Subject: | RE: ITAR Amendment – Categories I, II, and III |

Hey Rob,

Jodi L. Kouts
Director for Nonproliferation and Strategic Trade
National Security Council
202-456-9182
Secure: 456-9182
jodi.l.kouts@nsc.eop.gov
SIPR:  jkouts@nsc.eop.sgov.gov
JWICS:  jkouts@nsc.eop.ic.gov

**From:** DDTCPublicComments <DDTCPublicComments@state.gov>
**Sent:** Tuesday, July 10, 2018 6:07 PM
**To:** Kouts, Jodi L. EOP/NSC <Jodi.L.Kouts@nsc.eop.gov>
**Subject:** FW: ITAR Amendment – Categories I, II, and III

Jodi,
We received the below public comment, with the attached ATF White Paper on options to reduce or modify firearms. I received this same paper from Pat Peterson last year with an SBU/CUI designation. The paper is also marked "not for distribution" on its cover page. This public comment came in via email, so it has not been made available for public review yet. Do you know if this paper has been approved for public release? If so, can we post it to our website with the public comments? If not, we will have to withhold it and figure out what to do with the comment below describing it.
Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official - SBU**
**UNCLASSIFIED**

**From:** Steve Baker <sbaker@thebakerfamily.org>
**Sent:** Friday, May 18, 2018 6:34 AM

**To:** DDTCPublicComments <DDTCPublicComments@state.gov>
**Subject:** Re: ITAR Amendment – Categories I, II, and III

A few minor corrections to my email below.

1. A Special Occupational Taxpayer stamp is not required to manufacture or sell magazines over 50+ rounds nor is a FFL required as it is an accessory, not a firearm.  The SOT and FFL are required only for manufacturing or selling NFA firearms and suppressors.
2. By extrapolation, there are likely over one million suppressors (silencers) lawfully in civilian hands per the ATF's NFA registry database (the NFRTR).  The attached Washington Post article is focused on civilian use of firearms suppressors and their history in the US and in Europe.  It should further illuminate the fact that firearms suppressors are definitely "not inherently for military end use."  Their wide availability in civilian markets in European countries further negates any claim that suppressors somehow contain any critical military or intelligence advantaged technology that would justify continued inclusion on the USML.


On May 18, 2018, at 3:23 AM, Steve Baker <████@thebakerfamily.org> wrote:

Suppressors and 50+ round magazines are not inherently for military end use and are commonly available in commercial retail gun stores that have paid the Special Occupational Tax Stamp.
 These stores are common in the over 40 states that do not have Prohibition-era laws prohibiting silencers. It is unclear why the Department of State would remove semi-automatic firearms from the USML but retain the burdensome registration fee for companies that manufacture suppressors and high-capacity magazines - many of which DO NOT export any of their products. In aggregate, civilian sales of these items over the last couple of decades far outnumber contract sales of these accessories to the US military or the militaries of other countries.  In fact, most small companies that manufacture these items sell them exclusively into domestic markets for lawful use by private parties.  Sound suppressors are becoming widely accepted by civilian gun owners and despite the current $200 transfer tax and burdensome paperwork, they are in common use at rifle ranges in the above 40+ states.  They are also legal in a growing number of states for use in hunting since they reduce the likelihood of hearing loss in hunters and in their animal companions afield.

The decision to retain 50+ round magazines and sound suppressors on the USML seems to contradict the Department of State's stated goal to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."

President Trump has required federal agencies to take a long, hard look at the efficacy of their regulations and to take action to roll back or eliminate unnecessary or obsolete regulations.  To this end, the Bureau of Alcohol, Tobacco, Firearms and Explosives put forth a framework white paper for firearm deregulation options that the Bureau views as not compromising its public safety mission.  Part of the deregulation framework outlined in the ATF's white paper is a long overdue proposal relating to firearm suppressors -  removing them from the purview of the National Firearms Act and regulating their manufacture and transfer the same as ordinary Title I firearms under the 1968 Gun Control Act.  The following attached document is authored by Ronald Turk, Associate Deputy Director (Chief Operating Officer) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  For relevant input related to the proposed ITAR Amendment and firearms suppressors, refer to section 8 as it outlines the ATF's deregulation proposal to treat firearm sound suppressors (silencers) the same as ordinary Title I firearms - the same firearms that the ITAR Amendment proposes to transfer from the USML to the Department of Commerce EAR regime.

Steve Baker

WASHAR0001151

Arvada, CO

WASHAR0001152



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

April 5, 2017

M-17-21

MEMORANDUM FOR: REGULATORY POLICY OFFICERS AT EXECUTIVE
DEPARTMENTS AND AGENCIES AND MANAGING
AND EXECUTIVE DIRECTORS OF CERTAIN AGENCIES
AND COMMISSIONS

FROM: Dominic J. Mancini, Acting Administrator
Office of Information and Regulatory Affairs

SUBJECT: Guidance Implementing Executive Order 13771, Titled "Reducing
Regulation and Controlling Regulatory Costs"

## I. Introduction

This guidance, in the form of Questions and Answers (Q&As), addresses the requirements of
Executive Order (EO) 13771, titled "Reducing Regulation and Controlling Regulatory Costs." It
applies to Fiscal Years (FY) 2017 and beyond. This guidance supplements the Office of
Management and Budget (OMB) interim guidance issued on February 2, 2017, titled "Interim
Guidance Implementing Section 2 of the EO of January 30, 2017, Titled 'Reducing Regulation
and Controlling Regulatory Costs.'" While OMB's Office of Information and Regulatory Affairs
(OIRA) believes this guidance largely treats the subjects covered in the February 2, 2017 interim
guidance in a consistent manner, where these two memoranda are in conflict, this guidance
supersedes the previous guidance. It reflects OIRA's consideration of the comments received in
response to the February 2, 2017, interim guidance. Comments sent by members of the public are
available on Regulations.gov in docket ID OMB-2017-0002.

## II. General Requirements

The guidance explains, for purposes of implementing Section 2, the following requirements:

- "Unless prohibited by law, whenever an executive department or agency . . . publicly
  proposes for notice and comment or otherwise promulgates a new regulation, it shall
  identify at least two existing regulations to be repealed." Sec. 2(a).
- "For fiscal year 2017 . . . the heads of all agencies are directed that the total incremental
  cost of all new regulations, including repealed regulations, to be finalized this year shall be
  no greater than zero, unless otherwise required by law or consistent with advice provided in
  writing by the Director of the Office of Management and Budget . . . ." Sec. 2(b).
- "In furtherance of the requirement of subsection (a) of this section, any new incremental
  costs associated with new regulations shall, to the extent permitted by law, be offset by the
  elimination of existing costs associated with at least two prior regulations." Sec. 2(c).

In general, executive departments or agencies ("agencies") may comply with those requirements by issuing two EO 13771 deregulatory actions (described below) for each EO 13771 regulatory action (described below). The incremental costs associated with EO 13771 regulatory actions must be fully offset by the savings of EO 13771 deregulatory actions.

In addition, agencies planning to issue one or more EO 13771 regulatory actions on or before September 30, 2017, should for each such EO 13771 regulatory action:

- Identify two existing regulatory actions the agency plans to eliminate or propose for elimination on or before September 30, 2017 in a reasonable period of time before the agency issues the EO 13771 regulatory action; and
- Fully offset the total incremental cost of such EO 13771 regulatory action as of September 30, 2017.

Guidance on the requirements of Section 3(a) is forthcoming.

Beginning with FY 2018, Section 3(d) requires the Director of OMB to identify to agencies a total amount of incremental costs (or "regulatory cap" as stated in Section 2) for all EO 13771 deregulatory and EO 13771 regulatory actions finalized during the fiscal year. The total incremental cost imposed by each agency should not exceed the agency's allowance for that fiscal year, unless required by law or approved by the Director. The total incremental cost allowance may be an increase or reduction in total regulatory cost, and will be informed by agencies' draft submissions for the *Regulatory Plan*.

Please consult with OIRA if you have any particular questions regarding the applicability or interpretation of EO 13771 not addressed in these Q&As.

Agencies should continue to comply with all applicable laws and requirements. In addition, EO 12866 remains the primary governing EO regarding regulatory planning and review. Accordingly, among other requirements, except where prohibited by law, agencies must continue to assess and consider both the benefits and costs of regulatory actions, including deregulatory actions, when making regulatory decisions, and issue regulations only upon a reasoned determination that benefits justify costs.

## III.      Definitions

This section provides definitions for terms used in this guidance. The definitions should not necessarily be applied to other sections of EO 13771 that this guidance does not cover, and do not replace definitions used in other EOs or statutes.

WASHAR0001154

**Q1.    *What is an "agency"?***

A:  An "agency," unless otherwise indicated, means any authority of the United States that is an "agency" under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5). A cabinet department is considered a single agency for purposes of EO 13771 compliance.

**Q2.    *What is an "EO 13771 regulatory action"?***

A:  An "EO 13771 regulatory action" is:

> (i) A significant regulatory action as defined in Section 3(f) of EO 12866 that has been finalized and that imposes total costs greater than zero; or

> (ii) A significant guidance document (*e.g.,* significant interpretive guidance) reviewed by OIRA under the procedures of EO 12866 that has been finalized and that imposes total costs greater than zero.

For example, EO 13771 regulatory actions include negotiated rulemakings that are significant as defined in Section 3(f) of EO 12866, that have been finalized, and that impose total costs greater than zero.

**Q3.    *What is a "significant guidance document"?***

A:  As defined in OMB's *Final Bulletin for Agency Good Guidance Practices,* a "significant guidance document" is a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to:

> (i) Lead to an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;
> (ii) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;
> (iii) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or
> (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in EO 12866, as further amended.

A significant guidance document does not include legal advisory opinions for internal Executive Branch use and not for release (such as Department of Justice Office of Legal Counsel opinions); briefs and other positions taken by agencies in investigations, pre-litigation, litigation, or other enforcement proceedings; speeches; editorials; media interviews; press materials; Congressional correspondence; guidance documents that pertain to a military or foreign affairs function of the United States (other than guidance on procurement or the import or export of non-defense articles and services); grant solicitations;

3

WASHAR0001155

warning letters; case or investigatory letters responding to complaints involving fact-specific determinations; purely internal agency policies guidance documents that pertain to the use, operation or control of a government facility; internal guidance documents directed solely to other Federal agencies; and any other category of significant guidance documents exempted by an agency in consultation and concurrence with the OIRA Administrator. In the list above, "internal" policies and guidance documents do not include those that materially affect an agency's interactions with non-Federal entities, even if nominally directed only to agency personnel. For example, an internal directive to field staff on how to implement a regulatory requirement could be a significant guidance document if it satisfied any of (i) through (iv) above.

If they satisfy the definition above, modifications to existing guidance and interpretative documents would be considered significant guidance documents.

### *Q4.    What is an "EO 13771 deregulatory action"?*

A:  An "EO 13771 deregulatory action" is an action that has been finalized and has total costs less than zero. An EO 13771 deregulatory action qualifies as both: (1) one of the actions used to satisfy the provision to repeal or revise at least two existing regulations for each regulation issued, and (2) a cost savings for purposes of the total incremental cost allowance. EO 13771 deregulatory actions are not limited to those defined as significant under EO 12866 or OMB's *Final Bulletin on Good Guidance Practices.*

An EO 13771 deregulatory action may be issued in the form of an action in a wide range of categories of actions, including, but not limited to:

- Informal, formal, and negotiated rulemaking;
- Guidance and interpretative documents;
- Some actions related to international regulatory cooperation; and
- Information collection requests that repeal or streamline recordkeeping, reporting, or disclosure requirements.

Significant proposed rules issued before noon on January 20, 2017, that are formally withdrawn by notice in the *Federal Register* and removed from the *Unified Agenda of Regulatory and Deregulatory Actions* may qualify as repeal actions, but do not qualify for cost savings.

Please consult with OIRA regarding other actions your agency believes should qualify as an EO 13771 deregulatory action.

### *Q5.    What does "offset" mean?*

A:  The term "offset" means at least two EO 13771 deregulatory actions have been taken per EO 13771 regulatory action and that the incremental cost of the EO 13771 regulatory action has been appropriately counterbalanced by incremental cost savings from EO 13771 deregulatory actions, consistent with the agency's total incremental cost allowance.

4

WASHAR0001156

**Q6.    *What is a "statutorily or judicially required" rulemaking?***

A:  A statutorily required rulemaking is one for which Congress has provided by statute an explicit requirement and explicit timeframe for rulemaking. For example, a statute that states, an agency "shall issue nutrition labeling requirements within 10 years" of the statute's enactment date would be considered a statutorily required rule.

A judicially required rulemaking is one for which there is a judicially established binding deadline for rulemaking, including deadlines established by settlement agreement or consent decree.

Agencies should consult with OIRA to determine whether a rule falls within the definition of a statutorily or judicially required rulemaking.

**Q7.    *What is a rule issued with respect to a "national security function" of the United States?***

A:  For the purposes of EO 13771, a regulation issued with respect to a national security function is a regulation that satisfies the two following requirements:

  (1) The benefit-cost analysis demonstrates that the regulation is anticipated to improve national security as its primary direct benefit; and
  (2) (A) For regulations the agency considers legislative rules: OIRA and the agency agree the regulation qualifies for a "good cause" exception under 5 U.S.C. 553(b)(3)(B); or (B) For other regulations (including significant guidance) the agency and OIRA agree that applying the requirements of EO 13771 to the regulation would be impracticable or contrary to public interest.

**Q8.    *What is "total incremental cost"?***

A:  The term "total incremental cost" means the sum of all costs from EO 13771 regulatory actions minus the cost savings from EO 13771 deregulatory actions.

**IV.    Scope Questions**

**Q9.    *Which new regulations as defined in EO 13771 must be offset?***

A:  Agencies are required to offset EO 13771 regulatory actions issued after noon on January 20, 2017. This includes those EO 13771 regulatory actions that are rules finalizing a Notice of Proposed Rulemaking (or in certain instances an interim final rule; see Question 11 for a further discussion) issued before noon on January 20, 2017.

Agencies should use the existing significance determination process outlined in EO 12866 for determining whether an action is an EO 13771 regulatory action. Agencies should not assume that actions that appear, or have appeared, in the *Unified Agenda of Regulatory and*

WASHAR0001157

*Deregulatory Actions* as nonsignificant have been determined by OIRA to be nonsignificant. Agencies should obtain an affirmative significance determination from OIRA before publishing regulatory actions.

**Q10.   *How are interim and direct final rules treated?***

A: In general, significant interim and direct final rules must be offset. However, a significant interim final rule or direct final rule may qualify for an exemption with respect to the timing for identifying and issuing the EO 13771 deregulatory actions.

**Q11.   *How are significant rules that finalize interim final rules (IFR) treated?***

A: If the final rule neither increases nor decreases the cost of the IFR, then the action does not need to be offset nor does it qualify as an EO 13771 deregulatory action. If the final rule includes changes that increase the cost of the IFR, then the final rule must be offset (however, if the final rule imposes only *de minimis* costs relative to the IFR, the final rule may qualify for an exemption). If the final rule reduces the cost of the IFR, then the rule and the cost savings relative to the IFR may qualify as an EO 13771 deregulatory action.

**Q12.   *Must agencies identify EO 13771 deregulatory actions for significant advance notices of proposed rulemaking (ANPRM)?***

A: No. With respect to rulemaking, the requirements of EO 13771 do not apply to pre-notice of proposed rulemaking activities such as ANPRMs.

**Q13.   *How are regulatory actions that implement Federal spending programs or establish fees and penalties treated?***

A: In general, Federal spending regulatory actions that cause only income transfers between taxpayers and program beneficiaries (*e.g.*, regulations associated with Pell grants and Medicare spending) are considered "transfer rules" and are not covered by EO 13771. Additionally, an action that establishes a new fee or changes the existing fee for a service, without imposing any new costs, does not need to be offset; nor does an action that establishes new penalties or fines or changes those already in existence.

However, in some cases, such regulatory actions may impose requirements apart from transfers, or transfers may distort markets causing inefficiencies. In those cases, the actions would need to be offset to the extent they impose more than *de minimis* costs. Examples of ancillary requirements that may require offsets include new reporting or recordkeeping requirements or new conditions, other than user fees, for receiving a grant, a loan, or a permit. Analogously, if an action reduces the stringency of requirements or conditions for transfer recipients or permit holders, the action may qualify as an EO 13771 deregulatory action. Also, an action that causes transfers that, for example, induce moral hazard or other inefficient behavior may need to be offset and an action that reduces such transfers may qualify as an EO 13771 deregulatory action.

6

WASHAR0001158

Please consult with OIRA on these actions, especially with regards to potential distortionary costs due to transfers. See OMB Circular A-4 for a discussion of the distinction between transfers and costs generally.

**Q14.   *How are activities treated that are associated with regulatory cooperation or international standards?***

A:   Regulatory activities associated with regulatory cooperation with foreign governments that reduce costs to entities or individuals within the United States, including at the border, or otherwise lower the cost of regulations on the United States economy, may qualify as EO 13771 deregulatory actions. Activities associated with standard-setting that reduce costs to entities or individuals within the United States may also qualify as EO 13771 deregulatory actions. However, agency actions to harmonize with the standards of an international body or foreign government that increase costs on United States entities or individuals may need to be offset. OIRA recognizes such harmonization could also lead to operating efficiencies for businesses that agencies may be able to capture in their analysis of the benefits and costs of EO 13771 actions.

Agencies should consult OIRA on how to treat specific regulatory activities related to regulatory cooperation or international standard-setting.

**Q15.   *Do regulatory actions overturned by subsequently enacted laws qualify for savings?***

A:   Generally, yes. OIRA considers Acts of Congress that overturn final regulatory actions, such as disapprovals of rules under the Congressional Review Act, to operate in a similar manner as agency EO 13771 deregulatory actions.

**Q16.   *Do regulatory actions that are vacated or remanded by a court qualify as EO 13771 deregulatory actions?***

A:   If a regulatory action issued before noon on January 20, 2017, is vacated by a judicial order for which all appeals have been resolved, OIRA will consider on a case-by-case basis whether the regulatory action being vacated qualifies as an EO 13771 deregulatory action.

If an EO 13771 regulatory action was issued on or after noon on January 20, 2017, any judicial order for which all appeals have been resolved vacating the regulatory action, and any related subsequent agency action (such as a withdrawal of a vacated regulation from the Code of Federal Regulations in order to comply with the order), will not qualify as an EO 13771 deregulatory action. Any EO 13771 deregulatory actions used to offset a vacated EO 13771 regulatory action, however, would be available to offset other EO 13771 regulatory actions (after accounting for any sunk costs incurred in complying with the vacated action).

If a court permits a regulatory action to remain in effect after a judicial remand for further agency proceedings, such as through remand without vacatur, the remanded action remains in effect. Therefore, there is no action at the time of remand that could qualify as an EO 13771

WASHAR0001159

deregulatory action. In the same way that an agency complies with EO 12866 when issuing a subsequent agency action to revise a remanded regulatory action, an agency will similarly need to comply with EO 13771. A subsequent agency action may qualify as an EO 13771 deregulatory action if the subsequent agency action is deregulatory in nature, or may need to be offset if the action is a significant regulatory action that is final and that imposes costs (*i.e.,* an EO 13771 regulatory action).

Agencies should notify OIRA of any judicial decisions that affect regulatory actions subject to EO 13771.

**Q17.** ***What happens if an EO 13771 deregulatory action is remanded or vacated by a court?***

A: As in the answer to the previous question, OIRA recognizes the inherent case-by-case nature of the issues raised by the potential remand or vacatur of an EO 13771 deregulatory action. For example, such decisions may happen years after a rule is finalized, and may affect compliance with both the cost allowances and the repeal provisions established pursuant to EO 13771. The agency should contact OIRA to determine how a remand or vacatur of an EO 13771 deregulatory action affects the agency's obligations under EO 13771.

**Q18.** ***Does EO 13771 apply to significant regulatory actions in which the law prohibits the consideration of costs in determining a statutorily required standard?***

A: Because EO 13771 applies only to the extent permitted by law, agencies are still required to comply with their statutory obligations. Accordingly, if a statute prohibits consideration of cost in taking a particular regulatory action, EO 13771 does not change the agency's obligations under that statute. However, agencies will generally be required to offset the costs of such regulatory actions through other deregulatory actions taken pursuant to statutes that do not prohibit consideration of costs. Because each agency's obligations will differ depending on the particular statutory language at issue, these issues must be addressed on a case-by-case basis.

Please consult with OIRA regarding questions about particular statutory language and its relationship to EO 13771.

**Q19.** ***How do the requirements of EO 13771 apply to significant regulatory actions issued by one agency that do not have the force and effect of law until adopted, with or without change, by another agency?***

A: Because the agency authorities that establish such sequential or otherwise overlapping regulatory responsibilities differ by program, these actions will need to be handled on a case-by-case basis. However, agencies in these circumstances should always work together to avoid double-counting costs and cost savings; they should also work together as closely as possible when developing regulatory approaches for such programs. In cases where one agency's action does not qualify as an EO 13771 regulatory action because it is not a significant regulatory action under EO 12866, associated actions by other agencies may still be covered by EO 13771.

8

**Q20.** *Does EO 13771 apply to regulatory actions of independent regulatory agencies?*

A: No. EO 13771 applies only to those agencies that meet the definition of "agency" in this guidance. Nevertheless, independent regulatory agencies are encouraged to identify existing regulations that, if repealed or revised, would achieve cost savings that would fully offset the costs of significant regulatory actions while continuing to meet the agency's statutory obligations.

## V.     Accounting Questions

**Q21.**  *How should costs and cost savings be measured?*

A: Except where noted in other portions of this guidance, costs should be estimated using the methods and concepts appearing in OMB Circular A-4. There are several types of impacts that, under OMB Circular A-4, could be reasonably categorized as either benefits or costs, with the only difference being the sign (positive or negative) on the estimates. In most cases where there is ambiguity in the categorization of impacts, agencies should conform to the accounting conventions they have followed in past analyses. For example, if medical cost savings due to safety regulations have historically been categorized as benefits rather than reduced costs, they should continue to be categorized as benefits for EO 13771 regulatory actions. Identifying cost savings, such as fuel savings associated with energy efficiency investments, as benefits is a common accounting convention followed in OIRA's reports to Congress on the benefits and costs of Federal regulations.

Cost savings estimates for EO 13771 deregulatory actions should follow the same conventions, but in reverse. Only those impacts that have been traditionally estimated as costs when taking a regulatory action should be counted as cost savings when taking an EO 13771 deregulatory action. For example, the medical cost savings described above as historically being counted as benefits when regulating should not then be counted as "negative cost savings" when deregulating.

An agency that has used different accounting conventions across different past analyses should consult with OIRA regarding the categorization of ambiguous impacts. In general, when faced with ambiguity, OIRA will attempt to achieve greater consistency in the categorization of similar types of costs and benefits across different agencies.

OIRA notes that rules that cause an increase in the resources used by Federal agencies to accomplish their programmatic goals may need to be offset, and rules that reduce the real resources used by Federal agencies to accomplish their goals may qualify as EO 13771 deregulatory actions. These types of impacts have long been considered regulatory costs under OMB Circular A-4, and are a component of the costs OIRA includes in its reports to Congress on the benefits and costs of Federal regulations.

For EO 13771 deregulatory actions that revise or repeal recently issued rules, agencies generally should not estimate cost savings that exceed the costs previously projected for the

9

relevant requirements, unless credible new evidence show that costs were previously underestimated. On the other hand, a less recent regulatory impact analysis (RIA) may need revision to reflect, among other things, the fact that only costs occurring after the effective date of the regulatory repeal should be the basis for the cost savings estimate (*i.e.,* agencies should not count sunk costs). Where an agency believes it can significantly improve upon a prior cost estimate, especially a recent one, through methodological enhancements, the agency should first discuss those methodologies with OIRA.

**Q22.** ***How should cost savings be determined for regulatory actions that expand consumption and/or production options?***

A: For regulatory actions that expand consumption and/or production options—sometimes referred to as "enabling" regulatory actions or regulations—cost savings should include the full opportunity costs of the previously forgone activities. Opportunity cost in this context would equal the sum of consumer and producer surplus, minus any fixed costs. See OMB Circular A-4 for a more detailed discussion of these concepts.

Generally, "one-time" regulatory actions (*i.e.,* those actions that are not periodic in nature) that expand consumption and/or production options would qualify as EO 13771 deregulatory actions.

There may be situations where this approach for determining the cost offsets generated by an enabling regulatory action is inappropriate. For instance, this approach may not be appropriate in certain circumstances where, if an agency were to fail to issue a regulatory action, a significant existing and ongoing economic activity would be prohibited. See Question 26. Cost offsets for such regulatory actions will be determined on a case-by-case basis.

Please consult with OIRA on all such non-routine regulations.

**Q23.** ***How does Executive Order 13771 apply to routine hunting and fishing regulatory actions?***

A. Routine hunting and fishing regulatory actions that establish annual harvest limits are not required to be offset, and are not eligible to be used as cost savings. This includes migratory bird hunting frameworks under the Migratory Bird Treaty Act and fishery management plans and amendments under the Magnuson-Stevens Fishery Conservation and Management Act. This exemption does not apply to regulatory actions that affect hunting and fishing activity that are not routine regulatory actions.

**Q24.** ***What base year should agencies use?***

A: Agencies should adjust all estimates to 2016 dollars using the GDP deflator, as released on March 30, 2017, until further guidance is provided by OIRA.

WASHAR0001162

**Q25.** *How should agencies calculate cost and cost savings for the purpose of EO 13771 accounting?*

A:  Agencies should calculate the present value (as of 2016) of costs for EO 13771 regulatory actions and cost savings for EO 13771 deregulatory actions over the full duration of the expected effects of the actions using both 7 percent and 3 percent end-of-period discount rates.

**Q26.** *In determining costs and cost savings under EO 13771, how should regulatory baselines be determined?*

A:  For the most part, agencies should follow the guidance about regulatory baselines provided in OMB Circular A-4. However, there can be uncertainty, which is recognized in OMB Circular A-4, regarding how best to capture the directive to assess impacts against the state of the world in the absence of the regulation. Provided below are two cases in which this uncertainty, or other challenges arising in the context of OMB Circular A-4, have often been addressed by performing analyses with multiple baselines. In each of these cases, OIRA has also provided guidance about how to determine costs or cost savings for the purposes of EO 13771:

   (1) When a regulatory action finalizes an interim final rule (IFR), agencies are typically encouraged to present two sets of estimates: the overall regulatory impacts and the incremental impacts relative to the IFR. For purposes of determining costs or available cost savings under EO 13771, agencies finalizing an IFR should include only the incremental impacts of the final rule, relative to the IFR.
   (2) There are multiple Federal programs and policies—such as discharge general permitting under the Clean Water Act or Medicare quality performance tracking— that are updated or renewed at regular intervals via rulemaking. Because these updates reliably occur, an assessment of the incremental changes between the previous and updated programs is often much more informative than a comparison of the updated programs against hypothetical discontinuance. Although multiple-baseline analysis is likely to continue to be encouraged in such cases for analysis conducted under EO 12866, for purposes of EO 13771, costs or cost savings should be determined by the incremental changes between previous and updated programs. For example, if an agency is statutorily or judicially required to issue a regulation every five years to permit or prohibit an activity, and the agency previously issued a regulation to address the requirement, the appropriate baseline to use for estimating the costs or cost savings of the new regulation under EO 13771 is likely the existing regulation (or interim operating conditions if there is temporarily no regulation in effect).

Please consult with OIRA if you have questions regarding the appropriate baseline upon which to calculate costs or cost savings.

11

WASHAR0001163

***Q27.    How should agencies treat unquantified costs and cost savings?***

A:  As stated in OMB Circular A-4, agencies should use their best efforts to monetize the effects of both regulatory actions and deregulatory actions and, in some cases, significant guidance documents. Depending on the likely magnitude of the effects, such efforts may include conducting or sponsoring studies to develop monetized estimates. In proposed/draft regulatory actions expected to lead to EO 13771 regulatory actions or EO 13771 deregulatory actions agencies should, at a minimum, clearly identify any non-monetized costs or cost savings, explain the key reason(s) why monetization is not possible, discuss any information the agency has that is relevant to estimating such costs, and request information from the public to monetize such costs at the final stage.

The weight assigned to unquantified effects will depend on their significance and degree of certainty, and will be handled on a case-by-case basis. See OMB Circular A-4 for more information on unquantified costs.

***Q28.    How should agencies treat EO 13771 regulatory actions and EO 13771 deregulatory actions published by multiple agencies?***

A:  These will be handled on a case-by-case basis. Agencies should consult OIRA as early as possible to determine the appropriate treatment of the action.

***Q29.    Can agencies "bank" cost savings and deregulatory actions?***

A:  Yes. Agencies may bank both EO 13771 deregulatory actions and the associated cost savings for use in the same or a subsequent fiscal year towards EO 13771's requirement to identify at least two existing regulations to be repealed (unless prohibited by law) and, separately, to comply with the total incremental cost allowance. Surplus EO 13771 deregulatory actions and cost savings do not expire at the end of a fiscal year and can be used in subsequent fiscal years.

For example, if an agency issues four EO 13771 deregulatory actions, the agency may apply them to up to two subsequent EO 13771 regulatory actions, including those occurring in a future fiscal year. Regardless, at the end of each fiscal year, an agency must be able to identify, and should have finalized, twice as many EO 13771 deregulatory actions as EO 13771 regulatory actions.

Similarly, if an agency issues two EO 13771 deregulatory actions with total cost savings of $200 million to offset the cost of an EO 13771 regulatory action with a cost of $150 million, the agency may bank the surplus cost savings of $50 million to offset the cost of another EO 13771 regulatory action, regardless of when the latter action is issued. See Questions 24 and 25 for accounting conventions that allow for appropriate comparison of costs and cost savings experienced at different time periods.

12

***Q30.  Can EO 13771 deregulatory actions (and associated cost savings) be transferred within an agency?***

A:  Yes. The requirements of EO 13771 apply agency-wide. An EO 13771 deregulatory action issued by a component in one agency can be used to offset an EO 13771 regulatory action issued by a different component in that same agency.

***Q31.  Can EO 13771 deregulatory actions (and associated cost savings) be transferred between agencies?***

A:  An agency that is not able to identify sufficient EO 13771 deregulatory actions for an EO 13771 regulatory action it intends to issue may submit a written request to the Director of OMB to assess whether the transfer of EO 13771 deregulatory action credits (after consultation with the supplying agency) would be appropriate before submitting the EO 13771 regulatory action to OMB for review under EO 12866. However, if the transfer is not appropriate, the agency must identify adequate offsets absent an exemption.

## VI.    Process Questions

***Q32.  How does EO 13771 affect the consideration of regulatory benefits or other requirements under EO 12866?***

A:  EO 13771 does not change the requirements of EO 12866, which remains the primary governing EO regarding regulatory review and planning. In particular, EO 13771 has no effect on the consideration of benefits in informing any regulatory decisions. For all EO 13771 regulatory actions and EO 13771 deregulatory actions, except where prohibited by law, agencies must continue to assess and consider both benefits and costs and comply with all existing requirements and guidance, including but not limited to those in EO 12866 and OMB Circular A-4.

***Q33.  Which EO 13771 regulatory actions might qualify for a full or partial exemption from EO 13771 requirements?***

A:  The following categories of EO 13771 regulatory actions may qualify for a full or partial exemption from EO 13771's requirements: 1) expressly exempt actions; 2) emergency actions; 3) statutorily or judicially required actions; and 4) *de minimis* actions. These categories are not exhaustive. For any EO 13771 regulatory action an agency believes qualifies for an exemption under any of the circumstances provided below, agencies should submit exemption requests to OIRA prior to submitting the action to OMB for review under EO 12866 or prior to publication of the EO 13771 regulatory action if it was not subject to EO 12866 review.

- Expressly exempt – EO 13771 expressly exempts regulations issued with respect to a military, national security (see Question 7 above), or foreign affairs function, and regulations related to agency organization, management, or personnel. These actions qualify for a full exemption. See 5 USC 553.

13

WASHAR0001165

- <u>Emergencies</u> -- EO 13771 regulatory actions addressing emergencies such as critical health, safety, financial, non-exempt national security matters, or for some other compelling reason, may qualify for an exemption. In most cases, exemptions for such rules will be granted with respect to the timing of required offsets, allowing the agency to address the emergency before identifying and issuing EO 13771 deregulatory actions. Agencies will generally still be required to offset such actions. If necessary, the costs of such actions, and the requirement to identify for repeal at least two existing regulations, will be moved to the subsequent fiscal year for purposes of determining EO 13771 compliance.
- <u>Statutorily or judicially required</u> -- EO 13771 does not prevent agencies from issuing regulatory actions in order to comply with an imminent statutory or judicial deadline, even if they are not able to satisfy EO 13771's requirements by the time of issuance. However, agencies will be required to offset any such EO 13771 regulatory actions as soon as practicable thereafter. In addition, this flexibility may not apply to discretionary provisions attached to EO 13771 regulatory actions required to comply with statutory or judicial deadlines.
- *De minimis* -- EO 13771 regulatory actions with *de minimis* costs may qualify for an exemption. For example, if OIRA designates a proposed rule as significant under EO 12866 because it raises novel legal or policy issues, and the agency estimates the action would have present value costs of $50,000 spread over a large number of persons and/or entities, OIRA may exempt the action from some or all of the requirements of EO 13771.

**Q34.   *Is a significant final regulatory action exempt from the requirements of EO 13771 if the action was designated not significant at a prior stage?***

A:   Generally, no. Any regulatory action that is identified as significant at the final rule stage that imposes total costs greater than zero would need to be offset to comply with EO 13771, regardless of the determination in an earlier phase. Therefore, the agency should consult OIRA as soon as possible if it believes an action that was not determined to be significant at the draft or proposed rule stage may now be determined to be significant, perhaps due to substantive issues identified through public comment or further agency analysis.

**Q35.   *How should agencies prioritize existing requirements to repeal or revise?***

A:   Agencies should follow the requirements in EO 13777 for prioritizing existing requirements to repeal or revise. EO 13777 establishes Regulatory Reform Task Forces in agencies, and directs those task forces to evaluate existing regulations and make recommendations to the agency head regarding their repeal, replacement, or modification, consistent with applicable law. EO 13777 directs each Regulatory Reform Task Force to identify regulations that:

- Eliminate jobs, or inhibit job creation;
- Are outdated, unnecessary, or ineffective;
- Impose costs that exceed benefits;
- Create a serious inconsistency or otherwise interfere with regulatory reform initiatives and policies;

14

WASHAR0001166

- Are inconsistent with the requirements of section 515 of the Treasury and General Government Appropriations Act, 2001 (44 U.S.C. 3516 note), or the guidance issued pursuant to that provision, in particular those regulations that rely in whole or in part on data, information, or methods that are not publicly available or that are insufficiently transparent to meet the standard for reproducibility; or
- Derive from or implement EOs or other Presidential directives that have been subsequently rescinded or substantially modified.

EO 13777 further directs each Regulatory Reform Task Force to seek input and other assistance, as permitted by law, from entities significantly affected by Federal regulations, including State, local, and tribal governments, small businesses, consumers, non-governmental organizations, and trade associations. Input from such public engagement may be used to prioritize recommendations to repeal or revise.

Finally, where the costs of an EO 13771 regulatory action will be incurred entirely or to a large degree by a certain sector or geographic area, the agency should prioritize EO 13771 deregulatory actions that affect the same sector or geographic area, to the extent feasible and permitted by law.

### Q36.  *Can regulatory and deregulatory actions be bundled in the same action?*

A:  Yes, under certain circumstances. Many actions submitted to OIRA for review under EO 12866 consist of logically connected changes to multiple but related sections of the Code of Federal Regulations. For example, a rule exempting some categories of regulated entities from compliance with a previously issued regulation may also require eligible entities to submit additional documentation to demonstrate eligibility for the exemption. In these cases, it may be legitimate and appropriate to pursue such changes through a single "bundled" action, and this guidance is not meant to materially change agency decision making in this area. Where an agency combines such provisions, the cost impact (the difference between costs imposed and cost savings, per Question 21) of such rules will generally determine whether such actions are EO 13771 regulatory actions that need to be offset, or EO 13771 deregulatory actions. Agencies, however, should avoid artificially bundling provisions that are not logically connected in a single regulatory action. OIRA may determine that the regulatory and deregulatory portions of the rule should be considered separately for purposes of EO 13771 compliance.

Agencies should consult with OIRA when considering bundling regulatory and deregulatory actions.

### Q37.  *When and how should agencies identify EO 13771 deregulatory actions?*

A:  The agency's *Unified Agenda of Regulatory and Deregulatory Actions* should reflect compliance with the requirements of EO 13771, and should include, to the extent practicable, EO 13771 deregulatory actions that, when combined with EO 13771 deregulatory actions that are not regulations (such as Paperwork Reduction Act information collection reforms), are sufficient to offset those actions appearing in the Agenda that are or are expected to result

WASHAR0001167

in EO 13771 regulatory actions. At a minimum, the agency should identify all EO 13771 deregulatory actions, along with cost savings estimates, by the time it submits to OMB for review under EO 12866 the corresponding EO 13771 regulatory action. In the rare event that an agency is unable to identify sufficient EO 13771 deregulatory actions, OIRA will address such a situation on a case-by-case basis.

While each *Federal Register* notice should identify whether the regulation is an EO 13771 regulatory action, there is no need to discuss specific offsetting EO 13771 deregulatory actions within the same *Federal Register* entry. Additionally, offsetting the costs of regulatory actions to comply with the requirements of EO 13771 should not serve as the basis or rationale, in whole or in part, for issuing an EO 13771 deregulatory action.

### Q38. When must identified EO 13771 deregulatory actions be finalized?

A: To the extent practicable, agencies should issue EO 13771 deregulatory actions before or concurrently with the EO 13771 regulatory actions they are intended to offset. By the end of each fiscal year, including any carryover from previous fiscal years, agencies should have: (1) issued at least twice the number of EO 13771 deregulatory actions as EO 13771 regulatory actions; and (2) appropriately offset the cost of all final EO 13771 regulatory actions issued. The offset should be consistent with their respective total incremental cost allowance for future fiscal years, and agencies are expected to maintain compliance, to the extent practicable, throughout the year. These requirements exclude those EO 13771 regulatory actions issued during the year for which either law prohibits compliance with EO 13771 or the agency received an exemption from OIRA. When an agency receives a partial exemption from OIRA (*e.g.*, with respect to the timing of EO 13771 deregulatory actions), the requirements should be addressed as soon as practicable. Agencies should plan in advance and leave sufficient time, if necessary, for OIRA to complete its review under EO 12866 or the Paperwork Reduction Act, and for agencies to publish in the *Federal Register* any EO 13771 deregulatory actions needed to comply with EO 13771 before the end of each fiscal year.

### Q39. What happens if an agency is not in full compliance with the requirements of EO 13771 at the end of a fiscal year?

A: If, by the end of a fiscal year, an agency does not finalize at least twice as many EO 13771 deregulatory actions as EO 13771 regulatory actions issued during the fiscal year, or has not met its total incremental cost allowance for that fiscal year, the agency must, within 30 days of the end of the fiscal year, submit for the OMB Director's approval, a plan for coming into full compliance with EO 13771 that addresses each of the following:

(1) The reasons for, and magnitude of, non-compliance;
(2) How and when the agency will come into full compliance; and
(3) Any other relevant information requested by the Director.

This excludes EO 13771 regulatory actions that are exempt or where compliance with EO 13771 is prohibited by law.

16

OMB may recommend that an agency take additional steps to achieve compliance, such as publishing a notice in the *Federal Register* requesting ideas from the public on EO 13771 deregulatory actions to pursue. OMB may also request that agencies post plans approved by the Director.

This guidance is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

17

WASHAR0001169

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Tuesday, September 26, 2017 2:22 PM |
| **To:** | Nilsson, Brian H <NilssonBH@state.gov> |
| **Cc:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| **Subject:** | CATs 1-3 |

Brian,

Just wanted to touch base with you to flag SEN Cardin's questions on CATS 1-3 at AMB Kaidanow's Hearing this morning: see 1:38:46 and onwards of the video, here:

https://www.foreign.senate.gov/hearings/managing-security-assistance-to-support-foreign-policy

Thanks,

Josh

_____

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.7878 | 📱 BlackBerry: 202.679.6724 | 📠 Fax: 202.647.4055
✉ e-mail: ***PaulJM@State.Gov*** | 🖑 Web: ***www.state.gov/t/pm / PaulJM@State.Gov*** |
〰 http://twitter.com/StateDeptPM
Stay connected with *State.gov*:

This message is ***UNCLASSIFIED***, per E.O. 12958

| | |
|---|---|
| **From:** | Timothy Mooney <Timothy.Mooney@bis.doc.gov> |
| **Sent:** | Friday, September 15, 2017 11:37 AM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | Did you guys see this article? |

Rob,

I just saw this in the new clips BIS OCPA sends around.

Tim


10. The United States Munitions List: When Guns Come Off of the ITAR
National Law Review
Thursday, September 14, 2017
Lisa Mays, Reid Whitten
https://www.natlawreview.com/article/united-states-munitions-list-when-guns-come-itar


In our blog shop, most of the news we scan is the nerdy minutia of regulatory nuance. But the other day, we found big news, a real scoop. The ITAR will be rewritten to remove guns and ammunition from its control.

Yes, you read that correctly, a plan has been proposed within the State Department to migrate the first three categories of the International Traffic in Arms Regulations (ITAR) to the control of the Export Administration Regulations within the coming year. Whether the State Department will go so far as to rename ITAR Part 121 the United States Munitions List (USML), the "United States List" remains to be seen.

The Proposed Changes

The proposed amendment to the ITAR appeared in notes on the Defense Trade Advisory Group (DTAG) meeting on Friday, September 8. For those of us who don't live and breathe the ITAR, DTAG is the State Department's working group that provides the Bureau of Political-Military Affairs with a formal channel to consult the private sector on all things concerning munitions exports.

According to those notes, USML Categories I, II, and III are expected to move from the USML to the EAR's Commerce Control List (CCL) in 2018. Those categories are as follows:

•Category I – Firearms, Close Assault Weapons and Combat Shotguns;


•Category II – Guns and Armament; and


•Category III – Ammunition/Ordnance


Who will benefit from the reform?

U.S. gun and ammunition manufacturers will have an increased capacity to reach a larger customer base without as many restrictions on the export of their products. U.S. firearm manufacturers and exporters will likely see a reduction in export compliance obligations. Arms sales from the United States will likely grow, and the United States will likely continue to hold and expand its share of the international arms market.

As just one example of the reduced regulatory burden, firearm, ammunition, and ordinance manufacturers would likely not have to register as ITAR manufacturers or exporters. That registration requires yearly renewal and the base cost of registration is more than two thousand dollars. Thereafter, those exporters would not need to apply for the more difficult to obtain ITAR export licenses in order to sell their products for foreign countries.

What restrictions will limit the export of guns and ammunition?

The change in control does not equate to a free for all. We expect that many of the former Category I, II, and III items will migrate to the "600 series" of the CCL. Those 600-series items generally require licenses for exports or reexports, except when the item is exported or reexported to Canada or, when operating under license exception, any of the countries party to the Strategic Trade Authorization (STA).[1]

Where a license is required, exporters will still need to apply for a license through the Simplified Network Application Process Redesign (SNAP-R) maintained by the Department of Commerce Bureau of Industry and Security. Customs will also continue to require exporters to file an Electronic Export Information (EEI) submission.

Your approach

As always, your approach depends on your risk tolerance.

If your company is the quick draw type, it may choose to wait until the rules finalizing the migration are published to take action.

If your company takes time to sight, aim, and control its breathing before firing, you may choose to analyze your company's controls and create logistics plans for exporting Category I, II, or III under the new regulations. It may be worth taking a close look at your current company procedures and operations to anticipate how you can adjust your business operations to adapt to the changes. It will be important to note, however, that the U.S. firearms industry is also regulated under other federal and state firearm laws.

Whichever path you may choose, we recommend not discounting the benefits of taking a targeted approach to review and revise your company procedures and operations as appropriate.

| From: | Monjay, Robert </O=SBUSTATE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MONJAY, ROBERT9A6> |
|---|---|
| Sent: | Tuesday, September 26, 2017 3:50 PM |
| To: | Robert Monjay <rmonjay@gmail.com> |
| Subject: | Fw: CATs 1-3 |

Sent from my BlackBerry 10 smartphone.

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Tuesday, September 26, 2017 8:21 PM
**To:** Nilsson, Brian H
**Cc:** PM-DTCP-RMA
**Subject:** CATs 1-3

Brian,

Just wanted to touch base with you to flag SEN Cardin's questions on CATS 1-3 at AMB Kaidanow's Hearing this morning: see 1:38:46 and onwards of the video, here:

https://www.foreign.senate.gov/hearings/managing-security-assistance-to-support-foreign-policy

Thanks,

Josh

_____

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.7878 | 📱 BlackBerry: 202.679.6724 | 🖨 Fax: 202.647.4055
✉ e-mail: *__PaulJM@State.Gov__* | ☝ Web: *__www.state.gov/t/pm / PaulJM@State.Gov__* |
🌐 http://twitter.com/StateDeptPM
Stay connected with *State.gov*:

This message is *__UNCLASSIFIED__*, per E.O. 12958

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Tuesday, October 3, 2017 1:45 PM |
| **To:** | PM-DTCL-Mgt <PM-DTCL-Mgt@state.gov> |
| **Cc:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; PM-CPA <PM-CPA@state.gov>; Robbins, Hailey <RobbinsH2@state.gov> |
| **Subject:** | FW: State's current clearance/consult process w/re: CCL Series 600 export licenses |

DDTC Colleagues,

█████████████████████████████████

Thanks,

Josh

**From:** Fite, David (Foreign Relations) [mailto:David_Fite@foreign.senate.gov]
**Sent:** Tuesday, October 03, 2017 1:43 PM
**To:** Paul, Joshua M; Parish, William J
**Subject:** State's current clearance/consult process w/re: CCL Series 600 export licenses

How does this process work at this point?  Does DDTC review all proposed licenses?  What other bureaus at State get involved, and how regularly?

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Wednesday, September 27, 2017 11:21 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Nilsson, Brian H <NilssonBH@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: CATs 1-3

███████████████████████████████████████████████████████

**From:** Heidema, Sarah J
**Sent:** Wednesday, September 27, 2017 11:20 AM
**To:** Monjay, Robert; Paul, Joshua M; Nilsson, Brian H
**Cc:** PM-DTCP-RMA
**Subject:** RE: CATs 1-3

████████████████████████████████████

**Official**

**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Tuesday, September 26, 2017 5:47 PM
**To:** Paul, Joshua M; Nilsson, Brian H
**Cc:** PM-DTCP-RMA
**Subject:** Re: CATs 1-3

███████████████████████████████████████████████████████

Sent from my BlackBerry 10 smartphone.

**From:** Paul, Joshua M
**Sent:** Tuesday, September 26, 2017 10:55 PM
**To:** Nilsson, Brian H
**Cc:** PM-DTCP-RMA
**Subject:** RE: CATs 1-3

███████████████████████████████████████████████████████

Josh

**From:** Nilsson, Brian H
**Sent:** Tuesday, September 26, 2017 4:53 PM
**To:** Paul, Joshua M
**Cc:** PM-DTCP-RMA
**Subject:** RE: CATs 1-3

███████████████████████████████████████████████████████

**From:** Nilsson, Brian H
**Sent:** Tuesday, September 26, 2017 3:51 PM
**To:** Paul, Joshua M
**Cc:** PM-DTCP-RMA
**Subject:** RE: CATs 1-3

███████████████████████████████████████████████████████

WASHAR0001175

**From:** Paul, Joshua M
**Sent:** Tuesday, September 26, 2017 2:22 PM
**To:** Nilsson, Brian H
**Cc:** PM-DTCP-RMA
**Subject:** CATs 1-3

Brian,

Just wanted to touch base with you to flag SEN Cardin's questions on CATS 1-3 at AMB Kaidanow's Hearing this morning: see 1:38:46 and onwards of the video, here:

https://www.foreign.senate.gov/hearings/managing-security-assistance-to-support-foreign-policy

Thanks,

Josh

_____

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone: 202.647.7878 | ▯ BlackBerry: 202.679.6724 | ▤ Fax: 202.647.4055

✉ e-mail: ***PaulJM@State.Gov*** | ◌ Web: ***www.state.gov/t/pm / PaulJM@State.Gov*** |

▨ http://twitter.com/StateDeptPM
Stay connected with *State.gov*:



WASHAR0001176

| From: | Timothy Mooney <Timothy.Mooney@bis.doc.gov> |
|---|---|
| Sent: | Friday, September 15, 2017 12:11 PM |
| To: | Monjay, Robert <MonjayR@state.gov> |
| Subject: | RE: Did you guys see this article? |

Thanks, Rob.

Tim

-----Original Message-----
From: Monjay, Robert [mailto:MonjayR@state.gov]
Sent: Friday, September 15, 2017 12:06 PM
To: Timothy Mooney
Subject: RE: Did you guys see this article?

███████████████████████████████████████████████████

-----Original Message-----
From: Timothy Mooney [mailto:Timothy.Mooney@bis.doc.gov]
Sent: Friday, September 15, 2017 11:37 AM
To: Monjay, Robert <MonjayR@state.gov>
Subject: Did you guys see this article?

Rob,

███████████████████████████████████████████████████

Tim

10. The United States Munitions List: When Guns Come Off of the ITAR National Law Review Thursday, September 14, 2017 Lisa Mays, Reid Whitten https://www.natlawreview.com/article/united-states-munitions-list-when-guns-come-itar

In our blog shop, most of the news we scan is the nerdy minutia of regulatory nuance. But the other day, we found big news, a real scoop. The ITAR will be rewritten to remove guns and ammunition from its control.

Yes, you read that correctly, a plan has been proposed within the State Department to migrate the first three categories of the International Traffic in Arms Regulations (ITAR) to the control of the Export Administration Regulations within the coming year. Whether the State Department will go so far as to rename ITAR Part 121 the United States Munitions List (USML), the "United States List" remains to be seen.

The Proposed Changes

The proposed amendment to the ITAR appeared in notes on the Defense Trade Advisory Group (DTAG) meeting on Friday, September 8. For those of us who don't live and breathe the ITAR, DTAG is the State Department's working group that provides the Bureau of Political-Military Affairs with a formal channel to consult the private sector on all things concerning munitions exports.

According to those notes, USML Categories I, II, and III are expected to move from the USML to the EAR's Commerce Control List (CCL) in 2018. Those categories are as follows:

*Category I - Firearms, Close Assault Weapons and Combat Shotguns;


*Category II - Guns and Armament; and


*Category III - Ammunition/Ordnance


Who will benefit from the reform?

U.S. gun and ammunition manufacturers will have an increased capacity to reach a larger customer base without as many restrictions on the export of their products. U.S. firearm manufacturers and exporters will likely see a reduction in export compliance obligations. Arms sales from the United States will likely grow, and the United States will likely continue to hold and expand its share of the international arms market.

As just one example of the reduced regulatory burden, firearm, ammunition, and ordinance manufacturers would likely not have to register as ITAR manufacturers or exporters. That registration requires yearly renewal and the base cost of registration is more than two thousand dollars. Thereafter, those exporters would not need to apply for the more difficult to obtain ITAR export licenses in order to sell their products for foreign countries.

What restrictions will limit the export of guns and ammunition?

The change in control does not equate to a free for all. We expect that many of the former Category I, II, and III items will migrate to the "600 series" of the CCL. Those 600-series items generally require licenses for exports or reexports, except when the item is exported or reexported to Canada or, when operating under license exception, any of the countries party to the Strategic Trade Authorization (STA).[1]

Where a license is required, exporters will still need to apply for a license through the Simplified Network Application Process Redesign (SNAP-R) maintained by the Department of Commerce Bureau of Industry and Security. Customs will also continue to require exporters to file an Electronic Export Information (EEI) submission.

Your approach

As always, your approach depends on your risk tolerance.

If your company is the quick draw type, it may choose to wait until the rules finalizing the migration are published to take action.

If your company takes time to sight, aim, and control its breathing before firing, you may choose to analyze your company's controls and create logistics plans for exporting Category I, II, or III under the new regulations. It may be worth taking a close look at your current company procedures and operations to anticipate how you can adjust your business operations to adapt to the changes. It will be important to note, however, that the U.S. firearms industry is also regulated under other federal and state firearm laws.

WASHAR0001178

Whichever path you may choose, we recommend not discounting the benefits of taking a targeted approach to review and revise your company procedures and operations as appropriate.
Official
UNCLASSIFIED

| | |
|---|---|
| **From:** | Krueger, Thomas G <KruegerTG@state.gov> |
| **Sent:** | Friday, October 13, 2017 1:40 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: Final rule draft |
| **Attach:** | Draft Commerce firearms proposed rule FINAL.docx |

Small revisions.

**Official**
**UNCLASSIFIED**

**From:** Krueger, Thomas G
**Sent:** Friday, October 13, 2017 12:11 PM
**To:** Monjay, Robert
**Subject:** Final rule draft

Attached is what I intend to send to the ISN FO.  L/EB is taking one last look.

Thomas Krueger
Senior Foreign Affairs Officer
Officer of Conventional Arms Threat Reduction
Bureau of International Security and Nonproliferation
Department of State
(202) 647-1837

**Official**
**UNCLASSIFIED**

WASHAR0001180

| | |
|---|---|
| **From:** | Nilsson, Brian H <NilssonBH@state.gov> |
| **Sent:** | Wednesday, September 6, 2017 11:05 AM |
| **To:** | McKeeby, David I <McKeebyDI@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Cc:** | Monjay, Robert <MonjayR@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Subject:** | RE: Firearms Rollout |

This is in my view MOST appropriate given the subject matter…



**From:** McKeeby, David I
**Sent:** Wednesday, September 06, 2017 10:09 AM
**To:** Paul, Joshua M; Heidema, Sarah J
**Cc:** Nilsson, Brian H; Monjay, Robert; Hart, Robert L
**Subject:** RE: Firearms Rollout

I'll have a double—



_____
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | 📱 BlackBerry: 202.550.3482 |
✉ e-mail: *mckeebydi@state.gov* | 🖱 Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, September 06, 2017 10:06 AM
**To:** Heidema, Sarah J
**Cc:** Nilsson, Brian H; Monjay, Robert; Hart, Robert L; McKeeby, David I
**Subject:** RE: Firearms Rollout





WASHAR0001183



**Official**
**UNCLASSIFIED**

WASHAR0001184

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

**Statistical Analysis of Effects of the Creation on 600-series and 9x515 Items
on Licensing and Exports**
October 15, 2013 to June 30, 2017

## I.      Overview of License Applications for 600-Series and 9x515 Items

The license applications for items in the 18 categories of the United States Munitions List (USML) showed an overall average decline of 55.2 % from 4,308 to 1,928 per month through June 30, 2017.  The average monthly drop of 2,380 in license applications is the result of certain items that do not warrant control on the USML transitioning to the Commerce Control List (CCL).  The biggest drop in license applications was those impacted by the fourth regulatory change involving the transition of satellites with a 83.4% decline.  The Directorate of Defense Trade Controls (DDTC) of the U.S. Department of State estimates a 45% decline in license applications will be shown when all USML categories have been reviewed.

### DDTC Average Monthly applications by USML to CCL Regulatory Change



Source: Directorate of Defense Trade Controls of the U.S. Department of State, August 2017

### BIS Average Monthly Applications by USML to CCL Regulatory Change
October 15, 2013 to June 30, 2017



Source: Commerce U.S. Exports Exporter Support System, August 2017

WASHAR0001185

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

## II.   Overview of BIS License Applications

From October 15, 2013 to June 30, 2017, BIS has processed a total of 48,903[1] applications for 600-series and 9x515 items.

➢          Approved applications were 43,377, 88.7% of the total applications;
➢          Returned without action (RWA) were 5,336, 10.9% of the total; and
➢          Denied applications were 190 applications, 0.4% of the total.

**Total BIS License Applications for 600-Series and 9x515 Items (by Count)**
Effective Date to June 30, 2017



Source: Commerce U.S. Exports Exporter Support System, August 2017

**BIS License Applications for 600-Series and 9x515 Items by Decisions**
Effective Date to June 30, 2016



| | 1st Rule Aircraft and Gas Turbine Engines Oct. 15,2013 | 2nd Rule Vehicles and Vessels Jan. 6, 2014 | 3rd Rule Missiles and Explosives Jul. 1, 2014 | 4th Rule Satellites Jun. 27, 2014 | 5th Rule Military Electronics Dec. 30, 2014 | 6th Rule Toxicologic al Agents Dec. 31, 2016 | 7th Rule Fire Control and Sensors Dec. 31, 2016 |
|---|---|---|---|---|---|---|---|
| Approved | 26,296 | 4,091 | 4,048 | 2,646 | 7,079 | 79 | 316 |
| RWA | 2,708 | 772 | 525 | 570 | 1,034 | 12 | 42 |
| Denid | 45 | 29 | 14 | 72 | 29 | 2 | 0 |

Source: Commerce U.S. Exports Exporter Support System, August 2017

---

[1] Note: This number for the total applications is slightly smaller than the sum of all applications by each rule in the two charts on this page because license applications containing multiple ECCNs may be associated with more than one regulatory change. For instance, a single application containing 9A610 and 0A606 items would be counted in both the 1st rule column and the 2nd rule column.

WASHAR0001186

### BIS Yearly License Applications for 600-Series and 9x515 Items (by Count)
#### Effective Date to June 30, 2017



| | 1st Rule Aircraft and Gas Turbine Engines | 2nd Rule Vehicles and Vessels | 3rd Rule Missiles and Explosives | 4th Rule Satellites | 5th Rule Military Electronics | 6th Rule Toxicological Agents | 7th Rule Fire Control |
|---|---|---|---|---|---|---|---|
| 2013 | 597 | - | - | - | - | - | - |
| 2014 | 7,625 | 1,164 | 566 | 220 | 6 | - | - |
| 2015 | 8,864 | 1,585 | 1,462 | 1,247 | 2,924 | - | - |
| 2016 | 7,817 | 1,328 | 1,655 | 1,146 | 3,299 | - | - |
| Jan. - Jun. 2017 | 4,146 | 815 | 904 | 675 | 1,913 | 93 | 358 |

Source: Commerce U.S. Exports Exporter Support System, August 2017

From October 15, 2013 to June 30, 2017, BIS has processed applications for 600-series and 9x515 items for a value of $132.5 billion.
➤ Approved applications valued at $121.7 billion, 91.8% of the total applications;
➤ Returned without action (RWA) valued at $10.2 billion, 7.7% of the total; and
➤ Denied applications valued at $562.2 million, 0.4% of the total.

### BIS License Applications for 600-Series and 9x515 Items (by Value)
#### Effective Date to June 30, 2017
#### $million



| | 1st Rule Aircraft and Gas Turbine Engines Oct. 15, 2013 | 2nd Rule Vehicles and Vessels Jan. 6, 2014 | 3rd Rule Missiles and Explosives Jul. 1, 2014 | 4th Rule Satellites Jun. 27, 2014 | 5th Rule Military Electronics Dec. 30, 2014 | 6th Rule Toxicological Agents Dec. 31, 2016 | 7th Rule Fire Control and Sensors Dec. 31, 2017 |
|---|---|---|---|---|---|---|---|
| Approved | $77,249.3 | $8,398.1 | $4,314.3 | $18,656.9 | $12,779.9 | $31.2 | $233.1 |
| RWA | $5,839.8 | $2,086.7 | $378.6 | $898.4 | $971.7 | $4.7 | $16.8 |
| Denid | $293.5 | $220.0 | $9.0 | $32.5 | $7.2 | $0.1 | $0.0 |

Source: Commerce U.S. Exports Exporter Support System, August 2017

WASHAR0001187

In the last 13 months from June 2016 to June 2017, the average monthly BIS approvals for 600-Series and 9x515 ECCNs were 1,148 while the average monthly BIS approvals for legacy ECCNs were 1,379. The average monthly approvals of 2,527 for all ECCNs indicates an increase of 48.6% from the average monthly approvals of 1,700 during the fiscal year of 2012 to 2013, prior to the first regulatory change including the transition from the USML to the CCL becoming effective.

### Trends in BIS Approved License Applications
### June 2016 to June 2017



Source: Commerce U.S. Exports Exporter Support System, August 2017

WASHAR0001188

BIS/Office of Technology Evaluation          Prepared for BIS Management                          August 18, 2017

Of the total 43,377 BIS approved licenses for 600-series and 9x515 items from October 15, 2013 to June, 2017, 29,039 (66.9% of the total approved licenses) were issued for exports to the top 15 destinations by license count.  The top destinations were Japan with 5,295 approved licenses (12.2% of the total); the United Kingdom with 4,327 (10.0%), and South Korea with 2,376 (5.5%).



**Top Fifteen Destinations of BIS Approved Licenses for 600-Series and 9x515 Items by License Count**
October 15, 2013 to June 30, 2017

Source: Commerce U.S. Exports Exporter Support System, August 2017

5

WASHAR0001189

**Top Ten Approved ECCNs for 600-Series and 9x515 Items by Count**
October 15, 2013 - June 30, 2017

| ECCN | Description | Total Approved | Value $million |
|------|-------------|----------------|----------------|
| 9A610 | Military aircraft and related commodities | 19,919 | $44,665.1 |
| 3A611 | Military electronics | 6,502 | $12,706.7 |
| 9A619 | Military gas turbine engines and related commodities | 4,437 | $27,367.7 |
| 9E610 | Technology "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing of military aircraft and related commodities controlled by 9A610, equipment controlled by 9B610, materials controlled by 9C610 or software controlled by 9D610. | 3,935 | $2,049.1 |
| 0A606 | Ground vehicles and related commodities | 2,697 | $7,713.5 |
| 9A515 | Spacecraft and related commodities | 1,814 | $14,443.8 |
| 1A613 | Armored and protective "equipment" and related commodities | 1,540 | $2,533.5 |
| 9E619 | Technology "required" for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishment of military gas turbine engines and related commodities controlled by 9A619, equipment controlled by 0B619, materials controlled by 9C619, or software controlled by 9D619. | 1,464 | $1,264.0 |
| 9E515 | Technology "required" for the "development," "production," operation, installation, repair, overhaul, or refurbishing of "spacecraft" and related commodities | 1,401 | $351.9 |
| 3E611 | Technology "required" for military electronics | 1,318 | $98.5 |

Source: Commerce U.S. Exports Exporter Support System, August 2017

WASHAR0001190

BIS/Office of Technology Evaluation          Prepared for BIS Management                    August 18, 2017

## III.    Overview of U.S. Exports of 600-Series and 9x515 Items

U.S. exports of 600-Series and 9x515 items from October 15, 2013 to June 30, 2017 totaled 325,790 shipments[2] for approximately $21.7 billion.





---

[2] Shipments are defined as exports being sent from one order party to one consignee located in a single country of destination on a single conveyance on the same day.

WASHAR0001191

BIS/Office of Technology Evaluation          Prepared for BIS Management                    August 18, 2017

Of the $21.7 billion in U.S. exports of 600-Series and 9x515 items from October 15, 2013 to June 30, 2017, $20.2 billion (92.9% of the total) was shipped under BIS jurisdiction; and $1.5 billion (7.1%) was shipped under DDTC jurisdiction[3].

### U.S. Exports of 600-Series and 9x515 Items
### Under BIS and DDTC Jurisdictions (by Value)
October 15, 2013 to June 30, 2017
$million



Source: Automated Export System, August 2017

---

[3] Note: The totals above under DDTC jurisdiction are derived from Exporter reporting of USML categories with an .x paragraph when the 600-Series ECCN has also been reported in the AES transaction.

WASHAR0001192

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

**IV.      Overview of U.S. Exports of 600-Series and 9x515 items under BIS Jurisdiction**

Of the $20.2 billion in U.S. exports of 600-series and 9x515 items under BIS jurisdiction from October 15, 2013 to June 30, 2017, the top 15 destinations were Japan with $3.0 billion (14.9% of the total value), Canada with $1.7 billion (8.6%) and United Kingdom with $1.7 billion (8.5%).

**Top Fifteen Destinations of U.S. Exports of 600-Series and 9x515 Items (by Value) under BIS Jurisdiction**
October 15, 2013 to June 30, 2017

| Country | Shipment Counts | % of Total Shipment Count | Value $million | % of Total Value |
|---|---|---|---|---|
| Japan | 29,269 | 9.6% | $3,012.6 | 14.9% |
| Canada | 26,284 | 8.6% | $1,734.4 | 8.6% |
| United Kingdom | 34,948 | 11.5% | $1,723.2 | 8.5% |
| French Guiana | 53 | 0.02% | $1,304.7 | 6.5% |
| South Korea | 22,417 | 7.4% | $1,235.6 | 6.1% |
| France | 7,787 | 2.6% | $1,136.6 | 5.6% |
| Israel | 12,640 | 4.1% | $669.9 | 3.3% |
| Australia | 10,111 | 3.3% | $629.8 | 3.1% |
| Germany | 13,837 | 4.5% | $621.1 | 3.1% |
| Mexico | 12,794 | 4.2% | $610.8 | 3.0% |
| United Arab Emirates | 11,724 | 3.8% | $533.5 | 2.6% |
| Italy | 9,504 | 3.1% | $531.7 | 2.6% |
| Kazakhstan | 9 | 0.003% | $502.5 | 2.5% |
| Brazil | 3,333 | 1.1% | $446.1 | 2.2% |
| Singapore | 12,934 | 4.2% | $444.0 | 2.2% |
| **Top 15 Total** | **207,644** | | **$15,136.5** | |
| **Top 15 Total/ Grand Total** | | **68.2%** | | **75.0%** |
| **Grand Total** | **304,602** | | **$20,187.7** | |

Note: The Guiana Space Center, run by France and European Union, is located in French Guiana.

Source: Automated Export System, August 2017

WASHAR0001193

BIS/Office of Technology Evaluation          Prepared for BIS Management                    August 18, 2017

Of the $20.2 billion in U.S. exports of 600-series and 9x515 items under BIS jurisdiction from October 15, 2013 to June 30, 2017, the ECCN with the top export value is 9A610 for military aircraft and related commodities created by the first USML to CCL regulatory change with $8.3 billion (41.0% of the total value).

Ranking No. 2 is ECCN 9A515 for "Spacecraft" and related commodities created by the fourth USML to CCL regulatory change with $4.7 billion (23.4%).

Ranking No. 3 is ECCN 9A619 for military gas turbine engines and related commodities created by the first USML to CCL regulatory change with $3.3 billion (16.3%).

Ranking No. 4 is ECCN 3A616 for military electronics created by the fifth USML to CCL regulatory change with $1.5 billion (7.5%).

Ranking No. 5 is ECCN 0A606 for ground vehicles and related commodities created by the second USML to CCL regulatory change with $886.7 million (4.4%).

**Top Ten ECCNs of U.S. Exports of 600-Series and 9x515 Items (by Value)**
**under BIS Jurisdiction**
October 15, 2013 to June 30, 2017

| ECCN | Description | Shipment Counts | % of Total Shipment Counts | Value $million | % of Total Value |
|---|---|---|---|---|---|
| 9A610 | Military aircraft and related commodities | 174,628 | 57.3% | $8,275.3 | 41.0% |
| 9A515 | "Spacecraft" and related commodities | 7,674 | 2.5% | $4,725.5 | 23.4% |
| 9A619 | Military gas turbine engines and related commodities | 48,395 | 15.9% | $3,282.9 | 16.3% |
| 3A611 | Military electronics | 23,615 | 7.8% | $1,523.3 | 7.5% |
| 0A606 | Ground vehicles and related commodities | 25,954 | 8.5% | $886.7 | 4.4% |
| 1A613 | Armored and protective "equipment" and related commodities | 4,864 | 1.6% | $286.3 | 1.4% |
| 9A604 | Commodities related to launch vehicles, missiles, and rockets | 3,729 | 1.2% | $220.7 | 1.1% |
| 9B610 | Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated in ECCN 9A610 or USML Category VIII | 2,432 | 0.8% | $216.9 | 1.1% |
| 0A614 | Military training "equipment" | 4,033 | 1.3% | $196.6 | 1.0% |
| 8A609 | Surface vessels of war and related commodities | 1,155 | 0.4% | $144.1 | 0.7% |
| Top Ten Total | | 296,479 | | $19,758.4 | |
| Top Ten Total/ Grand Total | | | 97.3% | | 97.9% |
| Grand Total | | 304,602 | | $20,187.7 | |

Source: Automated Export System, August 2017

WASHAR0001194

BIS/Office of Technology Evaluation          Prepared for BIS Management                    August 18, 2017

Of the $20.2 billion in U.S. exports of 600-series and 9x515 items under BIS jurisdiction from October 15, 2013 to June 30, 2017, licensed exports totaled $11.0 billion (54.8% of the total); STA totaled $2.9 billion (14.6%); and NLR to Canada and 9A515.e items to all destinations totaled $1.7 billion (8.5%).



### U.S. Exports of 600-Series and 9x515 Items by BIS License Type
October 15, 2013 to June 30, 2017

Source: Automated Export System, August 2017

### U.S. Exports of 600-Seris and 9x515 Items by BIS License Type
October 15, 2013 to June 30, 2017

|        | License Type | Shipment Counts | % of Total Shipment Counts | Value $million | % of Total Value |
|--------|--------------|-----------------|----------------------------|----------------|------------------|
| C30 | Licensed | 151,129 | 49.6% | $11,056.3 | 54.8% |
| C59 | STA | 25,584 | 8.4% | $2,937.7 | 14.6% |
| C32& C33 | NLR to Canada and 9A515.e | 25,828 | 8.5% | $1,722.1 | 8.5% |
| C41 | RPL | 34,165 | 11.2% | $1,624.3 | 8.0% |
| C42 | GOV | 23,625 | 7.8% | $1,237.8 | 6.1% |
| C60 | NLR .y 600-Series | 25,641 | 8.4% | $927.8 | 4.6% |
| C40 | TMP | 14,245 | 4.7% | $662.6 | 3.3% |
| C35 | LVS | 3,297 | 1.1% | $17.8 | 0.1% |
| C44 | TSU | 451 | 0.1% | $0.5 | 0.003% |
|  | Others | 637 | 0.2091% | $0.8 | 0.004% |
| **Total** |  | **304,602** |  | **$20,187.7** |  |

Source: Automated Export System, August 2017

WASHAR0001195

## IV.      License Applications and Exports by Each USML to CCL Regulatory Change

## A.       The First USML to CCL Regulatory Change- Aircraft and Gas Turbine Engines

The license applications for items in categories VIII (Aircraft) and XIX (Gas Turbine Engines) of the United States Munitions List (USML) have declined 66.5% from an average of 1,513 to 507 per month through June 30, 2017.  The average monthly drop of 1,006 in license applications is the result of certain items transitioning to the Commerce Control List (CCL).



Source: The Directorate of Defense Trade Controls of the U.S. Department of State, August 2017

WASHAR0001196

Since the first USML to CCL regulatory change became effective on October 15, 2013, the average number of BIS processed licenses for the ten 600-Series items created by this rule is 647 per month through June 30, 2017.  The approval rate is 90.6%.

### BIS License Processing for the First USML to CCL Regulatory Change
#### October 15, 2013 to June 30, 2017



Source: Commerce U.S. Exports Exporter Support System, August 2017.

WASHAR0001197

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

From October 15, 2013 to June 30, 2017, U.S. exports of items under the first USML to CCL regulatory change – Aircraft and Gas Turbine Engines items (9x610 and 9y619) under BIS jurisdiction totaled 228,092 shipments for $11.9 billion.



**U.S. Yearly Exports under the First USML to CCL Regulatory Change under BIS Jurisdiction**
October 15, 2013 to June 30, 2017
$million

Source: Automated Export System, August 2017



**U.S. Quarterly Exports under the First USML to CCL Regulatory Change under BIS Jurisdiction**
October 15, 2013 to June 30, 2017
$million

Source: Automated Export System, August 2017

WASHAR0001198

**The First Transition Rule-Aircraft and Gas Turbines**
**Top 15 Destinations of U.S. Exports under BIS Jurisdiction**
October 15, 2013 to June 30, 2017

| Country | Shipment Count | % of Total Shipment Count | Value $million | % of Total Value |
|---|---|---|---|---|
| Japan | 20,463 | 9.0% | $2,020.1 | 17.0% |
| Canada | 17,427 | 7.6% | $1,442.2 | 12.2% |
| United Kingdom | 24,067 | 10.6% | $1,356.3 | 11.4% |
| South Korea | 16,327 | 7.2% | $936.1 | 7.9% |
| Italy | 7,408 | 3.2% | $431.9 | 3.6% |
| Israel | 8,350 | 3.7% | $424.8 | 3.6% |
| Germany | 8,877 | 3.9% | $414.7 | 3.5% |
| Singapore | 11,786 | 5.2% | $406.1 | 3.4% |
| United Arab Emirates | 10,711 | 4.7% | $366.5 | 3.1% |
| Spain | 6,702 | 2.9% | $339.8 | 2.9% |
| Taiwan | 6,658 | 2.9% | $318.8 | 2.7% |
| Saudi Arabia | 4,063 | 1.8% | $251.3 | 2.1% |
| Australia | 7,584 | 3.3% | $195.1 | 1.6% |
| Mexico | 9,252 | 4.1% | $183.0 | 1.5% |
| Poland | 5,155 | 2.3% | $182.9 | 1.5% |
| **Top 15 Total** | **164,830** | | **$9,269.6** | |
| **Top 15 Total/ Grand Total** | | **72.3%** | | **78.1%** |
| **Grand Total** | **228,092** | | **$11,865.2** | |

Source: Automated Export System, August 2017

WASHAR0001199

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

Of the $11.9 billion in U.S. exports of 600-series items in the first USML to CCL regulatory change under BIS jurisdiction from October 15, 2013 to June 30, 2017, licensed exports totaled $5.8 billion (49.2% of the total); Servicing and replacement of parts and equipment totaled $1.4 billion (11.8%) and Strategic Trade Authorization (STA) totaled $1.3 billion (11.3%).



**U.S. Exports under the First USML to CCL Regulatory Change by BIS License Type**
October 15, 2013 to June 30, 2017
$million

Source: Automated Export System, August 2017

BIS License Exceptions:

STA: Strategic Trade Authorization
NLR: No License Required
RPL: Servicing and replacement of parts and equipment
GOV: Governments, international organizations, international inspections under the Chemical Weapons Convention, and the International Space Station
TMP: Temporary imports, exports, reexports, and transfers (in-country)
LVS: Shipments of limited value
TSU: Technology and software-unrestricted

16

WASHAR0001200

BIS/Office of Technology Evaluation          Prepared for BIS Management                    August 18, 2017

**B.      The Second USML to CCL Regulatory Change – Vehicles and Vessels**

The license applications for items in categories VI (Vessels), VII (Vehicles), XIII (Auxiliary Military
Equipment) and XX (Submersible Vessels) of the United States Munitions List (USML) have declined
40.9% from an average of 484 to 286 per month through June 30, 2017.  The average monthly drop of
198 license applications is the result of certain items transitioning to the Commerce Control List (CCL).



Source: The Directorate of Defense Trade Controls of the U.S. Department of State, August 2017

17

BIS/Office of Technology Evaluation        Prepared for BIS Management        August 18, 2017

Since the second USML to CCL regulatory change became effective on January 6, 2014, the average number of BIS license applications for the nineteen 600-Series items created by this rule is 117 per month through June 30, 2017.  The approval rate is 83.6%.



**BIS License Processing for the Second USML to CCL Regulatory Change**
January 6, 2014 to June 30, 2017

Source: Commerce U.S. Exports Exporter Support System, August 2017

WASHAR0001202

From January 6, 2014 to June 30, 2017, U.S. exports of items in the second USML to CCL regulatory change – Vehicles and Vessels items (0y606, 8y609, 8y620 and 0y617) under BIS jurisdiction totaled 28,249 shipments for $1.1 billion.





WASHAR0001203

**The Second Transition Rule-Vehicles and Vessels**
**Top 15 Destinations of U.S. Exports under BIS Jurisdiction**
January 6, 2014 to June 30, 2017

| Country | Shipment Count | % of Total Shipment Count | Value $million | % of Total Value |
|---|---|---|---|---|
| South Korea | 4,242 | 15.0% | $162.4 | 18.2% |
| Israel | 2,614 | 9.3% | $157.6 | 12.6% |
| Canada | 5,027 | 17.8% | $137.8 | 9.3% |
| Iraq | 108 | 0.4% | $96.1 | 8.2% |
| Turkey | 539 | 1.9% | $59.8 | 3.7% |
| United Kingdom | 4,817 | 17.1% | $46.2 | 3.7% |
| United Arab Emirates | 361 | 1.3% | $44.9 | 3.4% |
| Australia | 742 | 2.6% | $41.8 | 3.4% |
| Japan | 3,040 | 10.8% | $37.4 | 3.2% |
| Saudi Arabia | 451 | 1.6% | $36.9 | 2.9% |
| Kuwait | 304 | 1.1% | $36.3 | 2.7% |
| Germany | 971 | 3.44% | $27.5 | 2.4% |
| Tunisia | 9 | 0.0% | $25.2 | 1.8% |
| Belgium | 146 | 0.5% | $24.4 | 1.6% |
| Afghanistan | 226 | 0.8% | $18.7 | 1.5% |
| **Top 15 Total** | **23,597** | | **$952.9** | |
| **Top 15 Total/ Grand Total** | | **83.5%** | | **83.8%** |
| **Grand Total** | **28,249** | | **$1,136.5** | |

Source: Automated Export System, August 2017

WASHAR0001204

Of the $1.1 billion in U.S. exports of 600-series items in the second USML to CCL regulatory change under BIS jurisdiction from January 6, 2014 to June 30, 2017, licensed exports totaled $711.3 million (62.6% of the total); No License Required (NLR) for .y 600-series items totaled $183.3 million (16.1%); and NLR for 600-series items to Canada totaled $103.0 million (9.1%).



**U.S. Exports under the Second USML to CCL Regulatory Change by BIS License Type**
January 6, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017

BIS License Exceptions:

NLR: No License Required
GOV: Governments, international organizations, international inspections under the Chemical Weapons Convention and the International Space Station
STA: Strategic Trade Authorization
RPL: Servicing and replacement of parts and equipment
TMP: Temporary imports, exports, reexports, and transfers (in-country)
LVS: Shipments of limited value
TSU: Technology and software-unrestricted

WASHAR0001205

### C.      The Third USML to CCL Regulatory Change – Missiles and Explosives

The license applications for items in categories IV (Missiles), V (Explosives), IX (Military Training Equipment), X (Protective Personnel Equipment) and XVI (Nuclear Weapons Design and Test Equipment) of the United States Munitions List (USML) have declined 33.1% from an average of 500 to 334 per month through June 30, 2017.  The average monthly drop of 166 in license applications is the result of certain items transitioning to the Commerce Control List (CCL).



Source: The Directorate of Defense Trade Controls of the U.S. Department of State, August 2017

WASHAR0001206

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

Since the third USML to CCL regulatory change became effective on July 1, 2014, the average number of BIS license applications for the twenty 600-Series items created by this rule is 127 per month through June 30, 2017. The approval rate is 88.3%.

### BIS License Applications for the Third USML to CCL Regulatory Change
July 1, 2014 to June 30, 2017



Source: Commerce U.S. Exports Exporter Support System, August 2017

WASHAR0001207

From July 1, 2014 to June 30, 2017, U.S. exports of items in the third USML to CCL regulatory change – Missiles and Explosives items (0y604, 0y614, 1y608 and 1y613) under BIS jurisdiction totaled 13,777 shipments for $825.8 million.



**U.S. Exports under the Third USML to CCL Regulatory Change under BIS Jurisdiction**
July 1, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017



**U.S. Quarterly Exports under the Third USML to CCL Regulatory Change under BIS Jurisdiction**
July 1, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017

WASHAR0001208

### The Third Transition Rule-Missiles and Explosives
### Top 15 Destinations of U.S. Exports under BIS Jurisdiction
July 1, 2014 to June 30, 2017

| Country | Shipment Count | % of Total Shipment Count | Value $million | % of Total Value |
|---|---|---|---|---|
| Japan | 1,185 | 8.6% | $130.1 | 15.8% |
| Mexico | 1,977 | 14.4% | $105.0 | 12.7% |
| United Kingdom | 1,803 | 13.1% | $88.7 | 10.7% |
| Australia | 507 | 3.7% | $76.9 | 9.3% |
| Turkey | 159 | 1.2% | $56.5 | 6.8% |
| United Arab Emirates | 176 | 1.3% | $53.2 | 6.4% |
| Israel | 593 | 4.3% | $37.5 | 4.5% |
| South Korea | 361 | 2.6% | $32.3 | 3.9% |
| Germany | 1,038 | 7.5% | $31.3 | 3.8% |
| Canada | 1,375 | 10.0% | $25.6 | 3.1% |
| Saudi Arabia | 190 | 1.4% | $24.7 | 3.0% |
| Netherlands | 195 | 1.4% | $15.4 | 1.9% |
| Greece | 149 | 1.1% | $13.8 | 1.7% |
| Belgium | 38 | 0.3% | $13.6 | 1.7% |
| Italy | 138 | 1.0% | $11.1 | 1.3% |
| **Top 15 Total** | **9,884** | | **$715.8** | |
| **Top 15 Total/ Grand Total** | | **71.7%** | | **86.7%** |
| **Grand Total** | **13,777** | | **$825.8** | |

Source: Automated Export System, August 2017

WASHAR0001209

BIS/Office of Technology Evaluation          Prepared for BIS Management                    August 18, 2017

Of the $825.8 million of U.S. exports of 600-series items in the third USML to CCL regulatory change under BIS jurisdiction from July 1, 2014 to June 30, 2017, licensed exports totaled $497.8 million (60.3% of the total); Strategic Trade Authorization (STA) totaled $114.6 million (13.9%); and Temporary imports, exports, reexports, and transfers (in-country) (TMP) totaled $86.8 million (10.5%).



Source: Automated Export System, August 2017

BIS License Exceptions:

STA: Strategic Trade Authorization
TMP: Temporary imports, exports, reexports, and transfers (in-country)
GOV: Governments, international organizations, international inspections under the Chemical Weapons Convention and the International Space Station
NLR: No License Required
RPL: Servicing and replacement of parts and equipment

WASHAR0001210

**D.      The Fourth USML to CCL Regulatory Change – Satellites**

The license applications for items in category XV- Satellites of the United States Munitions List (USML) have declined 82.0% from an average of 365 to 66 per month through June 30, 2017.  The average monthly drop of 304 in license applications is the result of certain items transitioning to the Commerce Control List (CCL).



Source: The Directorate of Defense Trade Controls of the U.S. Department of State, August 2017

WASHAR0001211

BIS/Office of Technology Evaluation          Prepared for BIS Management                          August 18, 2017

Since the fourth USML to CCL regulatory change became effective on June 27, 2014, the average number of BIS license applications for the four 9x515 items created by this rule is 94 per month through June 30, 2017. The approval rate is 80.6%.



**BIS License Applications for the Fourth USML to CCL Regulatory Change**
June 27, 2014 to June 30, 2017

Source: Commerce U.S. Exports Exporter Support System, August 2017

WASHAR0001212

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

From June 27, 2014 to June 30, 2017, U.S. exports of items under the fourth USML to CCL regulatory change – Satellites items (9x515) under BIS jurisdiction totaled 8,390 shipments for $4.8 billion.



**U.S. Exports under the Fourth USML to CCL Regulatory Change under BIS Jurisdiction**
June 27, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017



**U.S. Quarterly Exports under the Fourth USML to CCL Regulatory Change under BIS Jurisdiction**
June 27, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017

WASHAR0001213

**The Fourth Transition Rule-Satellite**
**Top 15 Destinations of U.S. Exports under BIS Jurisdiction by Value**
June 27, 2014 to June 30, 2017

| Country | Shipment Count | % of Total Shipment Count | Value $million | % of Total Value |
|---|---|---|---|---|
| French Guiana | 49 | 0.6% | $1,304.7 | 27.4% |
| France | 1,049 | 12.5% | $930.3 | 19.5% |
| Kazakhstan | 5 | 0.1% | $441.7 | 9.3% |
| Brazil | 8 | 0.1% | $331.6 | 7.0% |
| Japan | 1,129 | 13.5% | $325.1 | 6.8% |
| Mexico | 32 | 0.4% | $292.5 | 6.1% |
| Australia | 106 | 1.3% | $242.9 | 5.1% |
| Panama | 1 | 0.0% | $131.6 | 2.8% |
| Bermuda | 22 | 0.3% | $128.7 | 2.7% |
| Germany | 1,561 | 18.6% | $93.2 | 2.0% |
| United Kingdom | 798 | 9.5% | $87.1 | 1.8% |
| Thailand | 12 | 0.1% | $80.9 | 1.7% |
| Bulgaria | 9 | 0.1% | $77.9 | 1.6% |
| India | 246 | 2.9% | $38.0 | 0.8% |
| Spain | 784 | 9.3% | $37.0 | 0.8% |
| **Top 15 Total** | **5,811** | | $4,543.0 | |
| **Top 15 Total/ Grand Total** | | **69.3%** | | **95.3%** |
| **Grand Total** | **8,390** | | **$4,768.1** | |

Note: The Guiana Space Center, run by France and European Union, is located in French Guiana.

Source: Automated Export System, August 2017

WASHAR0001214

Of the $4.8 billion in U.S. exports of 9x515 items in the fourth USML to CCL regulatory change under BIS jurisdiction from June 27, 2014 to June 30, 2017, licensed exports totaled $3.4 billion (72.0% of the total); Strategic Trade Authorization (STA) totaled $985.8 million (20.7%); and No License Required (NLR) to Canada and 9A515.e items to all other destinations totaled $230.8 million (4.8%).



**U.S. Exports under the Fourth USML to CCL Regulatory Change Satellites by BIS License Type**
June 27, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017

BIS License Exceptions:

STA: Strategic Trade Authorization
NLR: No License Required
TMP: Temporary imports, exports, reexports, and transfers (in-country)
GOV: Governments, international organizations, international inspections under the Chemical Weapons Convention and the International Space Station
RPL: Servicing and replacement of parts and equipment

31

WASHAR0001215

**E.    The Fifth USML to CCL Regulatory Change – Military Electronics**

The license applications for items in category XI – Military Electronics of the United States Munitions List (USML) have declined 52.9% from an average of 1,294 to 605 per month through June 30, 2017. The average monthly drop of 689 license applications is the result of certain items transitioning to the Commerce Control List (CCL).



Source: The Directorate of Defense Trade Controls of the U.S. Department of State, August 2017

WASHAR0001216

Since the fifth USML to CCL regulatory change became effective on December 30, 2014, the average number of BIS license applications for the eight 600-Series items created by this rule is 272 per month through June 30, 2017.  The approval rate is 86.9%.



**BIS License Applications for the Fifth USML to CCL Regulatory Change**
December 30, 2014 to June 30, 2017

Source: Commerce U.S. Exports Exporter Support System, August 2017

WASHAR0001217

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

From the effective date of December 30, 2014 to June 30, 2017, U.S. exports of items in the fifth USML to CCL regulatory change – Military Electronics items (3y611 and 9y620) under BIS jurisdiction totaled 20,900 shipments for $1.3 billion.



**U.S. Exports under the Fifth USML to CCL Regulatory Change under BIS Jurisdiction**
December 30, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017



**U.S. Quarterly Exports under the Fifth USML to CCL Regulatory Change under BIS Jurisdiction**
December 30, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017

34

WASHAR0001218

BIS/Office of Technology Evaluation          Prepared for BIS Management                    August 18, 2017

**The Fifth Transition Rule-Military Electronics**
**Top 15 Destinations of U.S. Exports under BIS Jurisdiction**
December 30, 2014 to June 30, 2017

| Country | Shipment Count | % of Total Shipment Count | Value $million | % of Total Value |
|---|---|---|---|---|
| Japan | 3,329 | 15.9% | $494.2 | 37.6% |
| United Kingdom | 3,274 | 15.7% | $139.6 | 10.6% |
| Canada | 1,591 | 7.6% | $90.0 | 6.9% |
| South Korea | 1,188 | 5.7% | $79.6 | 6.1% |
| Australia | 1,107 | 5.3% | $71.0 | 5.4% |
| United Arab Emirates | 395 | 1.9% | $63.1 | 4.8% |
| Germany | 1,315 | 6.3% | $53.0 | 4.0% |
| Israel | 1,013 | 4.8% | $46.5 | 3.5% |
| Italy | 1,286 | 6.2% | $45.8 | 3.5% |
| Saudi Arabia | 499 | 2.4% | $43.7 | 3.3% |
| Taiwan | 345 | 1.7% | $39.0 | 3.0% |
| France | 960 | 4.6% | $32.1 | 2.4% |
| Luxembourg | 116 | 0.6% | $30.5 | 2.3% |
| India | 550 | 2.6% | $23.1 | 1.8% |
| Turkey | 517 | 2.5% | $20.8 | 1.6% |
| **Top 15 Total** | **17,485** | | **$1,271.8** | |
| **Top 15 Total/ Grand Total** | | **83.7%** | | **96.9%** |
| **Grand Total** | **20,900** | | **$1,312.9** | |

Source: Automated Export System, August 2017

WASHAR0001219

Of the $1.3 billion in U.S. exports of 600-series items in the fifth USML to CCL regulatory change under BIS jurisdiction from December 30, 2014 to June 30, 2017, licensed exports totaled $567.9 million (36.7% of the total); Strategic Trade Authorization (STA) totaled $454.5 million (29.4%) and Servicing and replacement of parts and equipment (RPL) totaled $177.9 million (11.5%).



**U.S. Exports under the Fifth USML to CCL Regulatory Change**
**Military Electronics**
**by BIS License Type**
December 30, 2014 to June 30, 2017
$million

Source: Automated Export System, August 2017

<u>BIS License Exceptions:</u>

STA: Strategic Trade Authorization
RPL: Servicing and replacement of parts and equipment
GOV: Governments, international organizations, international inspections under the Chemical Weapons Convention, and the International Space Station
NLR: No License Required
TMP: Temporary imports, exports, reexports, and transfers (in-country)

WASHAR0001220

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

### F.      The Sixth USML to CCL Regulatory Change – Toxicological Agents

The license applications for items in category XIV – Toxicological Agents and Category XVIII –
Directed Energy Weapons of the United States Munitions List (USML) have declined 22.7% from an
average of 131 to 113 per month through June 30, 2017.  The average monthly drop of 18 license
applications is the result of certain items transitioning to the Commerce Control List (CCL).



Source: The Directorate of Defense Trade Controls of the U.S. Department of State, August 2017

WASHAR0001221

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

Since the sixth USML to CCL regulatory change became effective on December 31, 2016, the average number of BIS license applications for the eight 600-Series items created by this rule is 16 per month through  June 30, 2017.  The approval rate is 84.9%.

**BIS License Applications for the Sixth USML to CCL Regulatory Change**
December 31, 2016 to June 30, 2017



Source: Commerce U.S. Exports Exporter Support System, August 2017

From the effective date of December 31, 2016 to June 30, 2017, U.S. exports of items in the sixth USML to CCL regulatory change –Toxicological Agents items (1x607) under BIS jurisdiction totaled 73 shipments for $2.9 million.

| The Sixth Transition Rule - Toxicological Agents<br>Top 5 Destinations of U.S. Exports under BIS Jurisdiction by Value<br>December 31, 2016 to June 30, 2017 | | | | |
|---|---|---|---|---|
| Country | Shipment Count | % of Total Shipment Count | Value | % of Total Value |
| Turkey | 3 | 4.1% | $556,949 | 18.9% |
| Honduras | 2 | 2.7% | $452,925 | 15.4% |
| Australia | 10 | 13.7% | $385,331 | 13.1% |
| Belgium | 1 | 1.4% | $362,501 | 12.3% |
| Luxembourg | 1 | 1.4% | $362,501 | 12.3% |
| **Top 5 Total/ Grand Total** | **17** | **23.3%** | **$2,120,207** | **72.0%** |
| **Grand Total** | **73** | | **$2,945,225** | |

Source: Automated Export System, August 2017

WASHAR0001222

BIS/Office of Technology Evaluation          Prepared for BIS Management                          August 18, 2017

### U.S. Exports under the Sixth USML to CCL Regulatory Change under BIS Jurisdiction
December 31, 2016 to June 30, 2017
$million



Source: Automated Export System, August 2017

### U.S. Exports under the Sixth USML to CCL Regulatory Change Toxicological Agents By BIS License Type
December 31, 2016 to June 30, 2017



Source: Automated Export System, August 2017

39

WASHAR0001223

BIS/Office of Technology Evaluation          Prepared for BIS Management          August 18, 2017

### G.    The Seventh USML to CCL Regulatory Change – Fire Control

The license applications for items in category XII – Fire Control, Laser, Imaging, and Guidance Equipment of the United States Munitions List (USML) have **increased** from an average of 21.9 to 22.4 per month through June 30, 2017.



Source: The Directorate of Defense Trade Controls of the U.S. Department of State, August 2017

WASHAR0001224

BIS/Office of Technology Evaluation          Prepared for BIS Management                    August 18, 2017

Since the seventh USML to CCL regulatory change became effective on December 31, 2016, the average number of BIS license applications for the four 600-Series items created by this rule is 60 per month through    June 30, 2017.  The approval rate is 88.3%.

### BIS License Applications for the Seventh USML to CCL Regulatory Change
#### December 31, 2016 to June 30, 2017



Source: Commerce U.S. Exports Exporter Support System, August 2017

From the effective date of December 31, 2016 to June, 2017, U.S. exports of items in the seventh USML to CCL regulatory change – Fire Control/sensors and night vision items (7x611) under BIS jurisdiction totaled 612 shipments for $23.8 million.

### U.S. Exports under the Seventh USML to CCL Regulatory Change under BIS Jurisdiction
#### December 31, 2016 to June 30, 2017
#### $million



WASHAR0001225

BIS/Office of Technology Evaluation　　　　Prepared for BIS Management　　　　August 18, 2017



**U.S. Exports under the Seventh USML to CCL Regulatory Change**
**Fire Control/Sensors/Night Vision**
**by BIS License Type**
**December 31, 2016 to June 30, 2017**

Source: Automated Export System, August 2017

**The Seventh USML to CCL Regulatory Change - Fire Control**
**Top 10 Destinations of U.S. Exports under BIS Jurisdiction by Value**
**December 31, 2016 to June 30, 2017**

| Country | Shipment Count | % of Total Shipment Count | Value | % of Total Value |
|---|---|---|---|---|
| United Kingdom | 127 | 20.8% | $4.6 | 19.6% |
| Japan | 33 | 5.4% | $2.8 | 11.7% |
| South Korea | 48 | 7.8% | $2.3 | 9.6% |
| France | 30 | 4.9% | $1.7 | 7.1% |
| Israel | 26 | 4.2% | $1.7 | 7.0% |
| Oman | 2 | 0.3% | $1.4 | 6.1% |
| Canada | 54 | 8.8% | $1.3 | 5.7% |
| United Arab Emirates | 23 | 3.8% | $1.3 | 5.5% |
| Luxembourg | 3 | 0.5% | $1.3 | 5.4% |
| Germany | 30 | 4.9% | $0.9 | 3.7% |
| **Top 10 Total/ Grand Total** | **376** | **61.4%** | **$19.3** | **81.3%** |
| **Grand Total** | **612** | | **$23.8** | |
| Source: Automated Export System, August 2017 | | | | |

42

WASHAR0001226

Public Law 113–276
113th Congress

## An Act

To provide for the transfer of naval vessels to certain foreign recipients, and for other purposes.

<div style="text-align: right">Dec. 18, 2014<br>[S. 1683]</div>

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.**

In this Act, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Relations of the Senate; and

(2) the Committee on Foreign Affairs of the House of Representatives.

# TITLE I—TRANSFER OF EXCESS UNITED STATES NAVAL VESSELS

Naval Vessel Transfer Act of 2013.

**SEC. 101. SHORT TITLE.**

This title may be cited as the "Naval Vessel Transfer Act of 2013".

**SEC. 102. TRANSFER OF NAVAL VESSELS TO CERTAIN FOREIGN RECIPIENTS.**

President.

(a) TRANSFERS BY GRANT TO MEXICO.—The President is authorized to transfer to the Government of Mexico the OLIVER HAZARD PERRY class guided missile frigates USS CURTS (FFG–38) and USS MCCLUSKY (FFG–41) on a grant basis under section 516 of the Foreign Assistance Act of 1961 (22 U.S.C. 2321j).

(b) TRANSFER BY SALE TO THE TAIPEI ECONOMIC AND CULTURAL REPRESENTATIVE OFFICE IN THE UNITED STATES.—The President is authorized to transfer the OLIVER HAZARD PERRY class guided missile frigates USS TAYLOR (FFG–50), USS GARY (FFG–51), USS CARR (FFG–52), and USS ELROD (FFG–55) to the Taipei Economic and Cultural Representative Office in the United States (which is the Taiwan instrumentality designated pursuant to section 10(a) of the Taiwan Relations Act (22 U.S.C. 3309(a))) on a sale basis under section 21 of the Arms Export Control Act (22 U.S.C. 2761).

(c) ALTERNATIVE TRANSFER AUTHORITY.—Notwithstanding the authority provided in subsections (a) and (b) and to transfer specific vessels to specific countries, the President is authorized to transfer any vessel named in this title to any country named in this section, subject to the same conditions that would apply for such country under this section, such that the total number of vessels transferred

WASHAR0001227

128 STAT. 2990          PUBLIC LAW 113–276—DEC. 18, 2014

to such country does not exceed the total number of vessels authorized for transfer to such country by this section.

(d) GRANTS NOT COUNTED IN ANNUAL TOTAL OF TRANSFERRED EXCESS DEFENSE ARTICLES.—The value of a vessel transferred to another country on a grant basis pursuant to authority provided by subsection (a) shall not be counted against the aggregate value of excess defense articles transferred in any fiscal year under section 516 of the Foreign Assistance Act of 1961 (22 U.S.C. 2321j).

(e) COSTS OF TRANSFERS.—Any expense incurred by the United States in connection with a transfer authorized by this section shall be charged to the recipient notwithstanding section 516(e) of the Foreign Assistance Act of 1961 (22 U.S.C. 2321j(e)).

(f) REPAIR AND REFURBISHMENT IN UNITED STATES SHIPYARDS.—To the maximum extent practicable, the President shall require, as a condition of the transfer of a vessel under this section, that the recipient to which the vessel is transferred have such repair or refurbishment of the vessel as is needed, before the vessel joins the naval forces of that recipient, performed at a shipyard located in the United States.

*Time period.*

(g) EXPIRATION OF AUTHORITY.—The authority to transfer a vessel under this section shall expire at the end of the 3-year period beginning on the date of the enactment of this Act.

# TITLE II—ADDITIONAL PROVISIONS

### SEC. 201. ENHANCED CONGRESSIONAL OVERSIGHT OF ARMS SALES, INCLUDING TO THE MIDDLE EAST.

Section 36 of the Arms Export Control Act (22 U.S.C. 2776) is amended by adding at the end the following new subsection:

*Deadline. President.*

"(i) PRIOR NOTIFICATION OF SHIPMENT OF ARMS.—At least 30 days prior to a shipment of defense articles subject to the requirements of subsection (b) at the joint request of the Chairman and Ranking Member of the Committee on Foreign Relations of the Senate or the Committee on Foreign Affairs of the House of Representatives, the President shall provide notification of such pending shipment, in unclassified form, with a classified annex as necessary, to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives.".

### SEC. 202. INCREASE IN ANNUAL LIMITATION ON TRANSFER OF EXCESS DEFENSE ARTICLES.

Section 516(g)(1) of the Foreign Assistance Act of 1961 (22 U.S.C. 2321j(g)(1)) is amended by striking "$425,000,000" and inserting "$500,000,000".

### SEC. 203. INTEGRATED AIR AND MISSILE DEFENSE PROGRAMS AT TRAINING LOCATIONS IN SOUTHWEST ASIA.

Section 544(c) of the Foreign Assistance Act of 1961 (22 U.S.C. 2347c(c)) is amended by adding at the end the following new paragraph:

*President. Reports. Deadline.*

"(4) The President shall report to the appropriate congressional committees (as defined in section 656(e)) annually on the activities undertaken in the programs authorized under this subsection.".

### SEC. 204. LICENSING OF CERTAIN COMMERCE-CONTROLLED ITEMS.

Section 38 of the Arms Export Control Act (22 U.S.C. 2778) is amended by adding at the end the following new subsection:

"(k) LICENSING OF CERTAIN COMMERCE-CONTROLLED ITEMS.—

"(1) IN GENERAL.—A license or other approval from the Department of State granted in accordance with this section may also authorize the export of items subject to the Export Administration Regulations if such items are to be used in or with defense articles controlled on the United States Munitions List.

"(2) OTHER REQUIREMENTS.—The following requirements shall apply with respect to a license or other approval to authorize the export of items subject to the Export Administration Regulations under paragraph (1):

"(A) Separate approval from the Department of Commerce shall not be required for such items if such items are approved for export under a Department of State license or other approval.

"(B) Such items subject to the Export Administration Regulations that are exported pursuant to a Department of State license or other approval would remain under the jurisdiction of the Department of Commerce with respect to any subsequent transactions.

"(C) The inclusion of the term 'subject to the EAR' or any similar term on a Department of State license or approval shall not affect the jurisdiction with respect to such items.

"(3) DEFINITION.—In this subsection, the term 'Export Administration Regulations' means—

"(A) the Export Administration Regulations as maintained and amended under the authority of the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.); or

"(B) any successor regulations.".

## SEC. 205. AMENDMENTS RELATING TO REMOVAL OF MAJOR DEFENSE EQUIPMENT FROM UNITED STATES MUNITIONS LIST.

(a) REQUIREMENTS FOR REMOVAL OF MAJOR DEFENSE EQUIPMENT FROM UNITED STATES MUNITIONS LIST.—Section 38(f) of the Arms Export Control Act (22 U.S.C. 2778(f)) is amended by adding at the end the following:

"(5)(A) Except as provided in subparagraph (B), the President shall take such actions as may be necessary to require that, at the time of export or reexport of any major defense equipment listed on the 600 series of the Commerce Control List contained in Supplement No. 1 to part 774 of subtitle B of title 15, Code of Federal Regulations, the major defense equipment will not be subsequently modified so as to transform such major defense equipment into a defense article.

"(B) The President may authorize the transformation of any major defense equipment described in subparagraph (A) into a defense article if the President—

"(i) determines that such transformation is appropriate and in the national interests of the United States; and

"(ii) provides notice of such transformation to the chairman of the Committee on Foreign Affairs of the House of Representatives and the chairman of the Committee on Foreign Relations of the Senate consistent with the notification requirements of section 36(b)(5)(A) of this Act.

*Applicability.*

*President.*

*Determination.*

*Notification.*

WASHAR0001229

128 STAT. 2992       PUBLIC LAW 113–276—DEC. 18, 2014

Definition.

"(C) In this paragraph, the term 'defense article' means an item designated by the President pursuant to subsection (a)(1).".

(b) NOTIFICATION AND REPORTING REQUIREMENTS FOR MAJOR DEFENSE EQUIPMENT REMOVED FROM UNITED STATES MUNITIONS LIST.—Section 38(f) of the Arms Export Control Act (22 U.S.C. 2778(f)), as amended by this section, is further amended by adding at the end the following:

President.

"(6) The President shall ensure that any major defense equipment that is listed on the 600 series of the Commerce Control List contained in Supplement No. 1 to part 774 of subtitle B of title 15, Code of Federal Regulations, shall continue to be subject to the notification and reporting requirements of the following provisions of law:

"(A) Section 516(f) of the Foreign Assistance Act of 1961 (22 U.S.C. 2321j(f)).

"(B) Section 655 of the Foreign Assistance Act of 1961 (22 U.S.C. 2415).

"(C) Section 3(d)(3)(A) of this Act.

"(D) Section 25 of this Act.

"(E) Section 36(b), (c), and (d) of this Act.".

## SEC. 206. AMENDMENT TO DEFINITION OF "SECURITY ASSISTANCE" UNDER THE FOREIGN ASSISTANCE ACT OF 1961.

Section 502B(d) of the Foreign Assistance Act of 1961 (22 U.S.C. 2304(d)) is amended—

(1) in paragraph (1), by striking "and" at the end; and

(2) by amending paragraph (2)(C) to read as follows:

"(C) any license in effect with respect to the export to or for the armed forces, police, intelligence, or other internal security forces of a foreign country of—

"(i) defense articles or defense services under section 38 of the Armed Export Control Act (22 U.S.C. 2778); or

"(ii) items listed under the 600 series of the Commerce Control List contained in Supplement No. 1 to part 774 of subtitle B of title 15, Code of Federal Regulations;".

## SEC. 207. AMENDMENTS TO DEFINITIONS OF "DEFENSE ARTICLE" AND "DEFENSE SERVICE" UNDER THE ARMS EXPORT CONTROL ACT.

Section 47 of the Arms Export Control Act (22 U.S.C. 2794) is amended—

(1) in the matter preceding subparagraph (A) of paragraph (3), by striking "includes" and inserting "means, with respect to a sale or transfer by the United States under the authority of this Act or any other foreign assistance or sales program of the United States"; and

(2) in paragraph (4), by striking "includes" and inserting "means, with respect to a sale or transfer by the United States under the authority of this Act or any other foreign assistance or sales program of the United States,".

## SEC. 208. TECHNICAL AMENDMENTS.

(a) IN GENERAL.—The Arms Export Control Act (22 U.S.C. 2751 et seq.) is amended—

(1) in sections 3(a), 3(d)(1), 3(d)(3)(A), 3(e), 5(c), 6, 21(g), 36(a), 36(b)(1), 36(b)(5)(C), 36(c)(1), 36(f), 38(f)(1), 40(f)(1), 40(g)(2)(B), 101(b), and 102(a)(2), by striking "the Speaker of the House of Representatives and" each place it appears and inserting "the Speaker of the House of Representatives, the Committee on Foreign Affairs of the House of Representatives, and"; <span style="float:right">22 USC 2753, 2755, 2756, 2761, 2776, 2778, 2780, 2799.</span>

(2) in section 21(i)(1) by inserting after "the Speaker of the House of Representatives" the following ", the Committees on Foreign Affairs and Armed Services of the House of Representatives,"; <span style="float:right">22 USC 2761.</span>

(3) in sections 25(e), 38(f)(2), 38(j)(3), and 38(j)(4)(B), by striking "International Relations" each place it appears and inserting "Foreign Affairs"; <span style="float:right">22 USC 2765, 2778.</span>

(4) in sections 27(f) and 62(a), by inserting after "the Speaker of the House of Representatives," each place it appears the following: "the Committee on Foreign Affairs of the House of Representatives,"; and <span style="float:right">22 USC 2767, 2796.</span>

(5) in section 73(e)(2), by striking "the Committee on National Security and the Committee on International Relations of the House of Representatives" and inserting "the Committee on Armed Services and the Committee on Foreign Affairs of the House of Representatives". <span style="float:right">22 USC 2797.</span>

(b) OTHER TECHNICAL AMENDMENTS.—

(1) ARMS EXPORT CONTROL ACT.—The Arms Export Control Act (22 U.S.C. 2751 et seq.), as amended by subsection (a), is further amended—

(A) in section 38— <span style="float:right">22 USC 2778.</span>

(i) in subsection (b)(1), by redesignating the second subparagraph (B) (as added by section 1255(b) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (Public Law 100–204; 101 Stat. 1431)) as subparagraph (C);

(ii) in subsection (g)(1)(A)—

(I) in clause (xi), by striking "; or" and inserting ", or"; and

(II) in clause (xii)—

(aa) by striking "section" and inserting "sections"; and

(bb) by striking "(18 U.S.C. 175b)" and inserting "(18 U.S.C. 175c)"; and

(iii) in subsection (j)(2), in the matter preceding subparagraph (A), by inserting "in" after "to"; and

(B) in section 47(2), in the matter preceding subparagraph (A), by striking "sec. 21(a),," and inserting "section 21(a),". <span style="float:right">22 USC 2794.</span>

(2) FOREIGN ASSISTANCE ACT OF 1961.—Section 502B of the Foreign Assistance Act of 1961 (22 U.S.C. 2304) is amended—

(A) in subsection (b), by striking "Wherever applicable, a description" and inserting "Wherever applicable, such report shall include a description"; and

(B) in subsection (d)(2)(B), by striking "credits" and inserting "credits)".

WASHAR0001231

128 STAT. 2994          PUBLIC LAW 113–276—DEC. 18, 2014

5 USC app. 2411
note.

**SEC. 209. APPLICATION OF CERTAIN PROVISIONS OF EXPORT ADMINIS-
TRATION ACT OF 1979.**

(a) PROTECTION OF INFORMATION.—Section 12(c) of the Export
Administration Act of 1979 (50 U.S.C. App. 2411(c)) has been in
effect from August 20, 2001, and continues in effect on and after
the date of the enactment of this Act, pursuant to the International
Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) and
notwithstanding section 20 of the Export Administration Act of
1979 (50 U.S.C. App. 2419). Section 12(c)(1) of the Export Adminis-
tration Act of 1979 is a statute covered by section 552(b)(3) of
title 5, United States Code.

Time period.

(b) TERMINATION DATE.—Subsection (a) terminates at the end
of the 4-year period beginning on the date of the enactment of
this Act.

Approved December 18, 2014.

LEGISLATIVE HISTORY—S. 1683:

CONGRESSIONAL RECORD, Vol. 160 (2014):
    Dec. 4, considered and passed Senate.
    Dec. 10, considered and passed House.

○

WASHAR0001232

Questions for the Record Submitted to
Acting Assistant Secretary Tina S. Kaidanow
by Senator Ben Cardin #12
Senate Foreign Relations Committee
September 26, 2017

**Question:**

In 2002, Congress took positive action to increase oversight over defense articles in Category I of the USML by amending Section 36 of the Arms Export Control Act (AECA) to set a significantly lower dollar-value threshold for transmitting a Congressional Notification of a sale of Category I items for congressional review and resolution of disapprovals.  The transfer of significant defense articles from USML Category I to the Commerce Control List (CCL) would remove these articles from the AECA's requirement for notification to Congress of proposed sales at the $1 million level. In so doing, this transfer would undermine Congressional action to require increased congressional oversight over these sales.

- Has State's Legal Advisor considered this aspect of the proposed transfer of items from the USML to the CCL?
- If so, what was the determination made by State's Legal Advisor, and what was the rationale for such determination?

**Answer:**

All proposed and final State rules transferring defense articles from the control of State to the Department of Commerce that have been made pursuant to the reform efforts begun in August 2009 have been reviewed by all relevant offices within State, including the Office of the Legal Adviser.  The current proposed State rule regarding transfer of certain defense articles in Categories I-III of the USML has also undergone such review in its proposed form and will undergo additional review prior to the publication of any final rule.  In preparing its proposed rule, the Department was cognizant of the 2002 amendment to the AECA requiring Section 36 notification of certain proposed exports of firearms and the possible implications for Congressional oversight.  I can assure you that the Department is fully supportive of the notification requirement in that amendment, and I further note that Section 5 of Executive Order

WASHAR0001233

13637, March 8, 2013, provides for the implementation of procedures for notification of the export of firearms to the extent required as a matter of statute or regulation.   The Department is fully committed to continuing to provide notification to Congress of all transactions of defense articles subject to its jurisdiction, firearms or other, that meet the requisite statutory thresholds under Section 36 of the AECA.  For matters outside of its jurisdiction, State refers you to the Department of Commerce.

WASHAR0001234

Approved:    PM – Tina Kaidanow, Acting                (TK)

Drafted:

Clearances:

WASHAR0001235

Questions for the Record Submitted to
Acting Assistant Secretary Tina S. Kaidanow
by Senator Ben Cardin #12
Senate Foreign Relations Committee
September 26, 2017

**Question:**

In 2002, Congress took positive action to increase oversight over defense articles in Category I of the USML by amending Section 36 of the Arms Export Control Act (AECA) to set a significantly lower dollar-value threshold for transmitting a Congressional Notification of a sale of Category I items for congressional review and resolution of disapprovals. The transfer of significant defense articles from USML Category I to the Commerce Control List (CCL) would remove these articles from the AECA's requirement for notification to Congress of proposed sales at the $1 million level. In so doing, this transfer would undermine Congressional action to require increased congressional oversight over these sales.

- Has State's Legal Advisor considered this aspect of the proposed transfer of items from the USML to the CCL?
- If so, what was the determination made by State's Legal Advisor, and what was the rationale for such determination?

**Answer:**

All proposed and final State rules transferring defense articles from the control of State to the Department of Commerce that have been made pursuant to the reform efforts begun in August 2009 have been reviewed by all relevant offices within State, including the Office of the Legal Adviser. The current proposed State rule regarding transfer of certain defense articles in Categories I-III of the USML has also undergone such review in its proposed form and will undergo additional review prior to the publication of any final rule. In preparing its proposed rule, the Department was cognizant of the 2002 amendment to the AECA requiring Section 36 notification of certain proposed exports of firearms and the possible implications for Congressional oversight. I can assure you that the Department is fully supportive of the notification requirement in that amendment, and I further note that Section 5 of Executive Order

WASHAR0001236

13637, March 8, 2013, provides for the implementation of procedures for notification of the export of firearms to the extent required as a matter of statute or regulation.   The Department is fully committed to continuing to provide notification to Congress of all transactions of defense articles subject to its jurisdiction, firearms or other, that meet the requisite statutory thresholds under Section 36 of the AECA.  For matters outside of its jurisdiction, State refers you to the Department of Commerce.

WASHAR0001237

Approved:    PM – Tina Kaidanow, Acting                (TK)

Drafted:

Clearances:

WASHAR0001238



United States Department of State

*Washington, D.C. 20520*

DEC 2 7 2017

The Honorable
Benjamin Cardin
United States Senate
Washington, DC 20510

Dear Senator Cardin:

Thank you for your letter dated September 15 outlining your concerns regarding proposed changes to Categories I, II, and III of the U.S. Munitions List (USML) and the considered transfer of small arms, light weapons, and associated equipment and ammunition to the Commerce Control List (CCL) regulated by the Department of Commerce.

We appreciate your support for the Export Control Reform Initiative efforts, which have rationalized and streamlined the United States Munitions List (USML) and made it easier for American small businesses to understand the relevant rules and successfully compete in the global marketplace.

The Department of State recognizes the sensitivities and foreign policy implications associated with the sale and export of small arms, light weapons, and associated equipment and ammunition. The deliberative interagency review process to consider potential changes to the treatment of Categories I, II, and III is identical to the approach that was applied to prior reviews of other USML categories.

The proposed rules are currently being reviewed by the interagency, led by the Office of Management and Budget, and will then be published in the Federal Register with a request for public comment. Additionally, no significant changes to the content of Categories I, II, and III will occur until any final rules moving such items from the USML to the Commerce Control List are published. State will notify Congress in accordance with section 38(f) of the Arms Export Control Act and offer additional briefings on the matter once the final rules have been approved by the interagency.

We refer you to the Department of Commerce, Bureau of Industry and Security (BIS) for more information regarding its implementation of export controls on firearms that may become subject to its jurisdiction. BIS may be reached at 202-482-2721.

-2-

We hope this information is useful. Please let us know if we can be helpful on this or any other issue now or in the future.

Sincerely,

Mary K. Water

Charles S. Faulkner
Bureau of Legislative Affairs

WASHAR0001240



United States Department of State

*Washington, D.C. 20520*

DEC 27 2017

The Honorable
Patrick J. Leahy
United States Senate
Washington, DC 20510

Dear Senator Leahy:

Thank you for your letter dated September 15 outlining your concerns regarding proposed changes to Categories I, II, and III of the U.S. Munitions List (USML) and the considered transfer of small arms, light weapons, and associated equipment and ammunition to the Commerce Control List (CCL) regulated by the Department of Commerce.

We appreciate your support for the Export Control Reform Initiative efforts, which have rationalized and streamlined the United States Munitions List (USML) and made it easier for American small businesses to understand the relevant rules and successfully compete in the global marketplace.

The Department of State recognizes the sensitivities and foreign policy implications associated with the sale and export of small arms, light weapons, and associated equipment and ammunition. The deliberative interagency review process to consider potential changes to the treatment of Categories I, II, and III is identical to the approach that was applied to prior reviews of other USML categories.

The proposed rules are currently being reviewed by the interagency, led by the Office of Management and Budget, and will then be published in the Federal Register with a request for public comment. Additionally, no significant changes to the content of Categories I, II, and III will occur until any final rules moving such items from the USML to the Commerce Control List are published. State will notify Congress in accordance with section 38(f) of the Arms Export Control Act and offer additional briefings on the matter once the final rules have been approved by the interagency.

We refer you to the Department of Commerce, Bureau of Industry and Security (BIS) for more information regarding its implementation of export controls on firearms that may become subject to its jurisdiction. BIS may be reached at 202-482-2721.

WASHAR0001241

-2-

We hope this information is useful. Please let us know if we can be helpful on this or any other issue now or in the future.

Sincerely,

*Mary K. Waters*

Charles S. Faulkner
Bureau of Legislative Affairs

WASHAR0001242



United States Department of State

*Washington, D.C. 20520*

DEC 2 7 2017

The Honorable
Dianne Feinstein
United States Senate
Washington, DC 20510

Dear Senator Feinstein:

Thank you for your letter dated September 15 outlining your concerns regarding proposed changes to Categories I, II, and III of the U.S. Munitions List (USML) and the considered transfer of small arms, light weapons, and associated equipment and ammunition to the Commerce Control List (CCL) regulated by the Department of Commerce.

We appreciate your support for the Export Control Reform Initiative efforts, which have rationalized and streamlined the United States Munitions List (USML) and made it easier for American small businesses to understand the relevant rules and successfully compete in the global marketplace.

The Department of State recognizes the sensitivities and foreign policy implications associated with the sale and export of small arms, light weapons, and associated equipment and ammunition. The deliberative interagency review process to consider potential changes to the treatment of Categories I, II, and III is identical to the approach that was applied to prior reviews of other USML categories.

The proposed rules are currently being reviewed by the interagency, led by the Office of Management and Budget, and will then be published in the Federal Register with a request for public comment. Additionally, no significant changes to the content of Categories I, II, and III will occur until any final rules moving such items from the USML to the Commerce Control List are published. State will notify Congress in accordance with section 38(f) of the Arms Export Control Act and offer additional briefings on the matter once the final rules have been approved by the interagency.

We refer you to the Department of Commerce, Bureau of Industry and Security (BIS) for more information regarding its implementation of export controls on firearms that may become subject to its jurisdiction. BIS may be reached at 202-482-2721.

-2-

We hope this information is useful. Please let us know if we can be helpful on this or any other issue now or in the future.

Sincerely,

*Mary K. Water*

Charles S. Faulkner
Bureau of Legislative Affairs

WASHAR0001244

Approved:    PM: Tina Kaidanow                    TK

Drafted:

Clearances:

WASHAR0001245

# Congressional Correspondence

<u>Unclassified</u>

**Subject: Regarding:** 2017 outlining concerns regarding proposed changes to Categories I, II, and III of the U.S. Munitions List (USML) and the considered transfer of small arms, light weapons, and associated equipment and ammunition to the Commerce Control List (CCL) regulated by the Department of Commerce.

H20170926=003          Cardin, Leahy, Feinstein          12/18/17

Waters ___ m~ ___

Faulkner ___ ⟋ ___ edits

Cooper
Bronson ⱴ

WASHAR0001246

NO DISCERNIBLE CLASSIFICATION

**Harris, Amanda M**

| | |
|---|---|
| **From:** | H Taskers <dont_reply_SP2010@state.gov> |
| **Sent:** | Monday, December 18, 2017 9:58 AM |
| **To:** | Harris, Amanda M |
| **Subject:** | H Task Clearance (P) has completed on H20170926=003 Cardin-Multi-signer (Feinstein, and Leahy) letter expressing concern over the removal of lethal small arms, light weapons, and associated equipment and ammunition from Categories I, II, and III of the In |

## *H Task Clearance (P)* has completed on H20170926=003 Cardin-Multi-signer (Feinstein, and Leahy) letter expressing concern over the removal of lethal small arms, light weapons, and associated equipment and ammunition from Categories I, II, and III of the International Trafficking in Arms Regula.

H Task Clearance (P) on H20170926=003 Cardin-Multi-signer (Feinstein, and Leahy) letter expressing concern over the removal of lethal small arms, light weapons, and associated equipment and ammunition from Categories I, II, and III of the International Trafficking in Arms Regula has successfully completed. All participants have completed their tasks.

Approved by Harris, Amanda M

Approved by Bronson, Karen L

View the workflow history.

NO DISCERNIBLE CLASSIFICATION

WASHAR0001247

(ORDER LIST: 583 U.S.)

MONDAY, JANUARY 8, 2018

CERTIORARI -- SUMMARY DISPOSITIONS

17-263       SANDERS, AMY V. JONES, LAMAR

The petition for a writ of certiorari is granted.  The
judgment is vacated, and the case is remanded to the United
States Court of Appeals for the Sixth Circuit for further
consideration in light of *Manuel* v. *Joliet*, 580 U.S. __ (2017).

17-270       WHITE, JIMMIE E. V. UNITED STATES

The petition for a writ of certiorari is granted.  The
judgment is vacated, and the case is remanded to the United
States Court of Appeals for the Sixth Circuit for further
consideration in light of the confession of error by the
Solicitor General in his brief for the United States filed on
November 30, 2017.

ORDERS IN PENDING CASES

17M71        RICHTER, WILLIAM V. MARQUIS, NORMA

17M72        STEWART, SHIRLEY A. V. UNITED STATES

The motions to direct the Clerk to file petitions for writs
of certiorari out of time are denied.

17M73        DOE, JOHN V. UNITED STATES

The motion for leave to file a petition for a writ of
certiorari with the supplemental appendix under seal is denied.

17M74        OTCHKOV, NIKOLAY V. EVERETT, ALAN, ET AL.

The motion to direct the Clerk to file a petition for a writ
of certiorari out of time is denied.

WASHAR0001248

15-1439     CYAN, INC., ET AL. V. BEAVER CTY. EMPLOYEES, ET AL.

            The motion of petitioners to strike the supplemental brief
            of respondents is granted.

16-1495     HAYS, KS V. VOGT, MATTHEW JACK D.

            The motion of the Solicitor General for leave to participate
            in oral argument as *amicus curiae* and for divided argument is
            granted.  Justice Gorsuch took no part in the consideration or
            decision of this motion.

17-419      DAWSON, JAMES, ET UX. V. STEAGER, WV STATE TAX COMM'R

17-532      HERRERA, CLAYVIN V. WYOMING

17-571      FOURTH ESTATE PUB. BENEFIT CORP. V. WALL-STREET.COM, LLC, ET AL.

            The Solicitor General is invited to file briefs in these
            cases expressing the views of the United States.

17-5256     DAKER, WASEEM V. TOOLE, WARDEN

17-5974     SHEKHEM EL BEY, YA'SHUA A. V. UNITED STATES, ET AL.

17-6059     WELLS, KELVIN V. BERRYHILL, ACTING COMM'R OF SSA

            The motions of petitioners for reconsideration of orders
            denying leave to proceed *in forma pauperis* are denied.

17-6521     A. I. V. M. A.

17-6649     NICHOLSON, DONNA V. PEORIA, IL, ET AL.

            The motions of petitioners for leave to proceed *in forma
            pauperis* are denied.  Petitioners are allowed until January 29,
            2018, within which to pay the docketing fees required by Rule
            38(a) and to submit petitions in compliance with Rule 33.1 of
            the Rules of this Court.

                              **CERTIORARI DENIED**

16-970      RINEHART, BRANDON L. V. CALIFORNIA

16-1369     ARIZONA V. BAHR, SANDRA L., ET AL.

WASHAR0001249

16-1449    DIRECTV, LLC, ET AL. V. HALL, MARLON, ET AL.

16-8929    HOGAN, LAQUINCE T. V. KELLEY, DIR., AR DOC

16-9705    HAWKINS, JEFFREY V. MICHIGAN

16-9727    MUA, JOSEPHAT, ET AL. V. CA CASUALTY INDEMNITY EXCHANGE

17-94      STAGG P.C. V. DEPT. OF STATE, ET AL.

17-160     POUNCY, OMAR R. V. PALMER, WARDEN

17-162     LEYSE, MARK V. LIFETIME ENTERTAINMENT SERVICES

17-175     BARTEE, EMMANUEL Q. V. UNITED STATES

17-190     DEFENSE DISTRIBUTED, ET AL. V. DEPT. OF STATE, ET AL.

17-195     NEELY, JUDGE, ETC. V. WY COMM'N ON JUDICIAL CONDUCT

17-215  )  MASSACHUSETTS V. WAMPANOAG TRIBE, ET AL.
        )
17-216  )  AQUINNAH, MA, ET AL. V. WAMPANOAG TRIBE, ET AL.

17-260     HARWOOD, TODD V. KING, SUSAN J.

17-294     THOMPSON, KAREN V. PARK, KELLY S.

17-297     ROTHBARD, JEFFREY V. UNITED STATES

17-299     TEXAS V. KLEINERT, CHARLES

17-311     CHAN, PUI-KWONG, ET AL. V. YANG, BAIZHEN, ET AL.

17-313     LEDEZMA-COSINO, SALOMON V. SESSIONS, ATT'Y GENERAL

17-326     JOHNSON, RAHEEM C. V. VIRGINIA

17-343     CONVERGEX GROUP, ET AL. V. FLETCHER, LANDOL

17-355     HESSEMANN, CAROLANN V. RESTIVO, JOHN, ET AL.

17-358     AMALFITANO, MICHAEL V. GOOGLE LLC

17-363     VELERON HOLDING, B.V. V. MORGAN STANLEY, ET AL.

17-365     KINDRED HOSPITALS EAST, LLC V. ESTATE OF KLEMISH, ET AL.

17-375     KOKOCINSKI, CHARLOTTE V. COLLINS, ARTHUR D., ET AL.

17-379     ECHOSTAR SATELLITE V. FL DEPT. OF REVENUE, ET AL.

17-383     DOWNEY, CHRISTOPHER P. V. DEPT. OF ARMY, ET AL.

17-384     SELLS, CRYSTAL V. CSX TRANSPORTATION, INC.

WASHAR0001250

| | |
|---|---|
| 17-389 | HAMILTON, PAUL C. V. CABRAL, CHRISTOBAL, ET AL. |
| 17-396 | LAY, VIRGINIA V. SINGING RIVER HEALTH SYSTEM |
| 17-415 | R.J. REYNOLDS TOBACCO, ET AL. V. GRAHAM, TERESA |
| 17-417 | HOPE, MAURICE S. V. CARTLEDGE, WARDEN |
| 17-441 | FERRELLGAS PARTNERS, ET AL. V. MORGAN-LARSON, ET AL. |
| 17-448 | JACKSON, THOMAS S. V. UNITED STATES |
| 17-449 | AMERICAN TRIUMPH LLC, ET AL. V. TABINGO, ALLAN A. |
| 17-455 | FIRST SOUTHERN NATIONAL BANK V. SUNNYSLOPE HOUSING |
| 17-478 | MURRAY ENERGY CORP., ET AL. V. PRUITT, SCOTT |
| 17-479 | TSO, REECE N. V. UNITED STATES |
| 17-519 | ALL-TAG SECURITY, S.A., ET AL. V. CHECKPOINT SYSTEMS, INC. |
| 17-522 | HANKINS, ANNE M. V. UNITED STATES |
| 17-547 | BARBER, RIMS, ET AL. V. BRYANT, GOV. OF MS, ET AL. |
| 17-548 | RED BEAR, BERNADINE V. SESDAC, INC. |
| 17-554 | SCOTT, THEODORE V. MARYLAND |
| 17-556 | RIDGEWAY, CHRISTOPHER, ET AL. V. STRYKER CORPORATION, ET AL. |
| 17-568 | RIDDELL, DAVID J. V. FLORIDA, ET AL. |
| 17-572 | C. R. V. S. R., ET AL. |
| 17-574 | KINNEY, CHARLES V. CLARK, MICHELLE R. |
| 17-577 | DU, TRI Q. V. NJ COMMITTEE ON CHARACTER |
| 17-590 | LEWIS, ALWIN C. V. SUPERIOR COURT OF CA, ET AL. |
| 17-595 | COLBERT, CHRISTOPHER, ET AL. V. CHICAGO, IL, ET AL. |
| 17-597 | CLEMONS, CARLOS V. DELTA AIRLINES, INC. |
| 17-598 | SMITH, ANTHONY W. V. BNSF RAILWAY CO. |
| 17-599 | SAIA, LOUIS V. FLYING J. INC., ET AL. |
| 17-600 | ALEM, DANIEL V. ARNOLD, WARDEN |
| 17-601 | MEDRANO-ARZATE, RICARDO, ET AL. V. MAY, PAUL C., ET AL. |
| 17-603 | HAZEN, RICHARD, ET AL. V. HOLMES BEACH, FL |

WASHAR0001251

17-604     LOGAN, STEVEN T. V. TEXAS

17-607     JARRETT, ROBERT L. V. CA DEPT. OF HEALTH CARE, ET AL.

17-611     LOCK, CHRISTOPHER, ET AL. V. TORRES, CINDIA, ET AL.

17-612     QIAN, ZIFEN V. CAROL WILSON FINE ARTS, INC.

17-616     S. A. B. V. SESSIONS, ATT'Y GEN.

17-620     E. L. V. VOLUNTARY INTERDISTRICT CHOICE

17-621     WHITE, MICHAEL B. V. CORCORAN, COLLENE K.

17-622     CORRIGAN, JOHN L. V. UNITED STATES

17-628     SPRINT COMMUNICATIONS CO. V. LOZIER, RICHARD W., ET AL.

17-629     SCOTT, DANE M. V. LOHMAN, DALE B.

17-636     CAMPEAU, DAVID F. V. SANDERCOCK, PROTHONOTARY, ET AL.

17-639     RINE, JANA Y. V. MOORE BROTHERS, INC., ET AL.

17-640     SMITH, TINA M. V. TEXAS

17-642     CAMPAIGN FOR S. EQUALITY, ET AL. V. BRYANT, GOV. OF MS, ET AL.

17-644     BANGERA, DOMINIC A. V. OHIO

17-645     RECOGNICORP, LLC V. NINTENDO CO., LTD., ET AL.

17-648     RAIMONDO, ANTHONY P. V. ARIAS, JOSE A.

17-653     GONZALEZ-CANTU, ANGELICA V. SESSIONS, ATT'Y GEN.

17-655     ALI, MUSSA V. CARNEGIE INSTITUTION, ET AL.

17-657     BI-STATE DEV. AGENCY V. UNITED STATES, EX REL. FIELDS

17-660     HEALEY, MARK V. HEALEY, EDWIN N., ET AL.

17-661     HEREDIA, HOXQUELIN G. V. SESSIONS, ATT'Y GEN.

17-665     JAYASUNDERA, SUMINDA V. GARCIA, AIMEE, ET AL.

17-668     PAULS, MANAL V. HOFFNER, WARDEN

17-673     ENGLISH, MARILYNN V. BAC HOME LOANS SERVICING LP

17-676     GRESHAM, VICTOR, ET AL. V. SWANSON, ATT'Y GEN. OF MN

17-677     GRESHAM, VICTOR, ET AL. V. PICKER, MICHAEL, ET AL.

17-679     WHITCHURCH, JULIE P. V. VIZANT TECHNOLOGIES, ET AL.

WASHAR0001252

17-686     QUINN, JOHN G. V. GUERRERO, JESUS D., ET AL.

17-687     INTERNATIONAL FIDELITY INSURANCE V. HAWAII

17-693     EDIONWE, ALEXANDER V. BAILEY, GUY, ET AL.

17-697     SMARTFLASH LLC, ET AL. V. APPLE INC.

17-703     TILLETT, JERRI J. V. BLM, ET AL.

17-705     BETTS-GASTON, AVALON V. UNITED STATES

17-709     ZADA, JOSEPH V. UNITED STATES

17-710     RAKOWSKY, NATALIYA V. OPM

17-711     APPLEBAUM, ERIC V. UNITED STATES

17-716     PRISM TECHNOLOGIES V. T-MOBILE USA

17-718     BRAVO-ESCOBAR, HERIBERTO V. SESSIONS, ATT'Y GEN.

17-720     HARDESTY, JOE, ET UX. V. CA STATE MINING BOARD

17-726     FEAS, ALINA V. UNITED STATES

17-727     HYATT CORPORATION V. UNITE HERE LOCAL 1

17-728     GAZELLE, FREDERICK V. SHULKIN, SEC. OF VA

17-734     KNIGHT, ANTHONY M. V. SEC

17-745     GARDNER, ELIZABETH, ET VIR V. IRS

17-746     GARDNER, FREDRIC, ET UX. V. CIR

17-754     WEISSKOPF, R. DAVID V. MARCUS, PHILIP, ET AL.

17-761     LI, FENG V. MATAL, JOSEPH, ET AL.

17-763     O'GRADY, BRIAN, ET AL. V. NUFIC

17-764     MILLER, ROBERT M. V. MSPB

17-777     LOPEZ, JUAN V. UNITED STATES

17-794     SHETTY, NIKI-ALEXANDER V. WELLS FARGO BANK, ET AL.

17-796     STEVENSON, TIMOTHY V. MARYLAND

17-797     COOKE, RONALD N. V. VIRGINIA

17-799     HARVEY, DANNY V. UNITED STATES

17-812     CORTES-MENDOZA, SERGIO V. UNITED STATES

WASHAR0001253

17-817      AUSTIN, TX, ET AL. V. REAGAN NAT'L ADVERTISING

17-821      DAILEY, WARREN V. UNITED STATES

17-825      NELLUM, MONTELL V. UNITED STATES

17-832      STERN, PETER K. V. UNITED STATES

17-835      GUTMAN, CAROL-LISA V. UNITED STATES

17-836      MYERS, REBA M. V. UNITED STATES

17-849      WILKERSON, DENNIS M. V. UNITED STATES

17-5126     MOHAMUD, MOHAMED O. V. UNITED STATES

17-5229     GALATI, RONALD V. UNITED STATES

17-5244     ENGEL, JULIUS M. V. STATE BAR OF CA

17-5343     DEAN, ERNEST L. V. OREGON

17-5347     LINDSEY, MICHAEL V. INDIANA

17-5381     GRAY, WILLIAM L. V. VASQUEZ, WARDEN

17-5420     BELSER, MARVIN V. JAMES, BRENDA, ET AL.

17-5442     HARDY, RENDELL C. V. UNITED STATES

17-5452     SURIANO, JACK M. V. WISCONSIN

17-5456     MYERS, RONALD B. V. UNITED STATES

17-5471     CASTILLO, ALDO V. UNITED STATES

17-5472     CASTILLO, LUIS A. V. UNITED STATES

17-5477     SCHNEIDER, COLT D. V. UNITED STATES

17-5489     BROWN, ADE V. PEREZ, VERONICA, ET AL.

17-5527     REYES, FERNANDO B. V. UNITED STATES

17-5532     PENA-TRUJILLO, JOSE V. UNITED STATES

17-5578     HASSAN ALI, MAHDI V. MINNESOTA

17-5660     WHEELER, JAMES G. V. UNITED STATES

17-5674     RAINER, ATORRUS L. V. COLORADO

17-5677     LUCERO, GUY V. COLORADO

17-5693     DEGRAFFENRIED, FREDERICK V. UNITED STATES

7

WASHAR0001254

17-5700     ARMSTRONG, CHERYL V. COLORADO

17-5704     GARCIA, JAIME S. V. UNITED STATES

17-5724   )  SMITH, DEARICK V. UNITED STATES
          )
17-5732   )  HAMPTON, RUSSELL V. UNITED STATES
          )
17-5741   )  JACKSON, MICHAEL V. UNITED STATES

17-5725     SANTOS, RAFAEL E. V. ILLINOIS

17-5746     MEJIA-GUERRA, DARWIN J. V. UNITED STATES

17-5804     PETERSON, QUINTON V. WEST VIRGINIA

17-5939     PANDELI, DARREL P. V. ARIZONA

17-5948     MADRID-MARTINEZ, NILSON V. UNITED STATES

17-6025     THOMAS, BLAIR V. UNITED STATES

17-6036     DIAL, SHAUNDELLE V. UNITED STATES

17-6068     ABDUR'RAHMAN, ABU A., ET AL. V. PARKER, COMM'R, TN DOC, ET AL.

17-6071     MERCER, GREGORY S. V. FAIRFAX COUNTY BOARD, ET AL.

17-6072     MERCER, GREGORY S. V. POWERS, TRICIA W.

17-6074     ALLEN, WILLIAM G. V. WESTBROOKS, WARDEN

17-6099     VENTA, GUSTAVO V. JARVIS, WARDEN

17-6127     PRYSTASH, JOSEPH V. DAVIS, DIR., TX DCJ

17-6133     WARKENTIN, KEITH V. FEDERATED LIFE INSURANCE CO.

17-6190     IMPERATO, DANIEL V. SEC

17-6239     MOORE, LEE E. V. MITCHELL, WARDEN

17-6246     JOHNSON, JAMARR V. UNITED STATES

17-6269     RICHARDSON, CURRY S. V. DAVIS, DIR., TX  DCJ

17-6288     RILEY, JOSH R. V. DAVIS, DIR., TX DCJ

17-6308     WARREN, GREGORY V. SAWYER, CATHY J., ET AL.

17-6309     WALKER, RUSSELL F. V. HOKE BOARD OF ELECTIONS, ET AL.

17-6310     STANCU, JOHN V. STARWOOD HOTELS, ET AL.

17-6317     KAEDING, MARK H. V. SCHWEITZER, WARDEN

WASHAR0001255

17-6327     SOTELO CANTU, JAVIER V. C. R. FISCHER & SONS, INC.

17-6331     WILLIAMS, DAVE V. JIN, B.

17-6333     WILLIAMS, JAYLAN R. V. TEXAS

17-6337     JACOBS, ERIKA V. CLAYTON CTY. SOL. GEN. OFFICE

17-6352     ALEXANDER, STEVEN E. V. CALIFORNIA

17-6360     KILLE, DAVID A. V. OLSON, DEBBIE L.

17-6362     KENNEDY, CHRISTOPHER L. V. KERNAN, SEC., CA DOC

17-6366     TIMMS, PAUL D. V. DAVIS, DIR., TX DCJ

17-6367     THOMPSON, DWAYNE M. V. PLAYERS PLACE LAKESIDE, ET AL.

17-6370     WILLIAMS, BOBBY O. V. LASHBROOK, WARDEN

17-6375     DONCHEV, FAITH V. DeSIMONE, DENNIS

17-6376     SIMMONS, NIKO V. HAAS, WARDEN

17-6378     RIEDLINGER, DARY G. V. EVERETT, WA

17-6379     REID, TOBIAS R. V. CLEVELAND POLICE DEPT., ET AL.

17-6385     SANDOVAL, DAVID R. V. DAVIS, DIR., TX DCJ

17-6386     RODRIGUEZ, HUGO L. V. KLEE, WARDEN

17-6387     JONES, DANIEL L. V. NEBRASKA

17-6388     JACKSON, ROY V. VANNOY, WARDEN

17-6393     LAVELLE, MARY L. V. U.S. BANK NATIONAL ASSOCIATION

17-6396     KELLY, BERNARD V. HAAS, WARDEN

17-6405     YOUNG, CHRISTOPHER V. DAVIS, DIR., TX DCJ

17-6411     SHEPHERD, MAURICE V. CLAY, SUPT., LUMBERTON

17-6412     QUADIR, MOHAMMED V. NY STATE DEPT. OF LABOR

17-6413     JARA, ABDULLAHI H. V. STANDARD PARKING, ET AL.

17-6414     COLLINS, OLUFEMI S., ET UX. V. JPMORGAN CHASE BANK, ET AL.

17-6419     MOLDER, KIRK R. V. KIRKEGARD, WARDEN, ET AL.

17-6420     SMITH, CHARLES V. AKPORE, KEVWE, ET AL.

17-6425     JAMES, VAUGHN E. V. PENNSYLVANIA

9

WASHAR0001256

17-6427     MOTT, CLARENCE V. VANNOY, WARDEN

17-6428     PEREZ, ALEX V. CALIFORNIA

17-6430     SPAH, JANELLE R. V. SPAH, STEVEN P.

17-6435     HUBBARD, CHARLES D. V. CALIFORNIA

17-6437     HAWES, LANCE D. V. PALMER, WARDEN, ET AL.

17-6442     VEGA, JUAN F. V. FL DEPT. OF CHILDREN & FAMILIES

17-6446     WESSINGER, TODD V. VANNOY, WARDEN

17-6448     VINCENT, CLAUDE P. V. SHULKIN, SEC. OF VA

17-6449     TIBBETTS, RAYMOND V. JENKINS, WARDEN

17-6450     LAI, KENNEY S. V. NEW YORK, NY

17-6451     JACK, CLARENCE V. HOOPER, WARDEN

17-6453     ITURBE-GONZALEZ, ANGEL V. UNITED STATES

17-6457     JONES, THOMAS E. V. WILBERT BURIAL VAULT, ET AL.

17-6458     JONES, LAWRENCE V. BONDI, ATT'Y GEN. OF FL, ET AL.

17-6460     SHINE, DEANNA V. MORRIS, JUDITH K., ET AL.

17-6461     SMITH, GALEN J. V. ENCINO GARDENS APARTMENTS, INC.

17-6462     SHAPIRO, ROBERT V. ACCU, ET AL.

17-6465     BRAUNSTEIN, STEVEN V. BAKER, WARDEN, ET AL.

17-6468     WILLIAMS, CHARLES V. WETZEL, SEC., PA DOC, ET AL.

17-6469     TOLBERT, KUNTA V. WOODS, WARDEN

17-6471     WILLIAMS, JAMES V. MARYLAND

17-6473     VITASEK, ARTHUR L. V. ARIZONA

17-6474     BURNS, RONALD V. JOHNSON, ADM'R, NJ, ET AL.

17-6475     BIGBEE, ROOSEVELT V. LEBO, WARDEN

17-6478     NEWTON, DONTA V. MARYLAND

17-6479     MITSKOG, MARNE K. V. MSPB

17-6480     K. Y. J. V. TX DEPT. OF FAMILY

17-6481     LUCKETT, CHARLES E. V. CALIFORNIA

WASHAR0001257

17-6482     LANE, MICHAEL E. V. TEXAS

17-6483     McGRATH, GEORGE V. MASSACHUSETTS

17-6485     SHARP, RICHARD V. HAMMERS, JUSTIN

17-6486     SPELLMAN, REGINALD B. V. LANE, WARDEN

17-6487     SIMS, CANDACE J. V. JONES, SEC., FL DOC, ET AL.

17-6491     KENNEDY, MICHAEL A. V. CT. OF CRIM. APP. OF TX, ET AL.

17-6492     DAVIS, TROY V. VANNOY, WARDEN

17-6493     SANDERS, ERIC A. V. WAL-MART STORES EAST, L.P.

17-6496     JOHNSON, MARCUS P. V. HAWKINS, ADM'R, NASH

17-6500     HOWELL, DANNY V. BROWN, SUPT., WABASH

17-6501     HETTINGA, WYLMINA E. V. LOUMENA, TIMOTHY P.

17-6504     MONTGOMERY, MATTHEW V. GREEN, WARDEN, ET AL.

17-6505     FAVORS, ALEXIS R. V. UNITED STATES

17-6506     CODY, JOHN V. OHIO

17-6511     WRIGHT, WILLIE F. V. WRIGHT, KENYA Y.

17-6512     VASQUEZ, ISRAEL S. V. TEXAS

17-6517     HAMILTON, ROHAN V. GRIFFIN, SUPT., GREEN HAVEN

17-6518   ) FLETCHER, MATTHEW V. SOTO, WARDEN
          )
17-6718   ) FLETCHER, JENNIFER V. DOBSON-DAVIS, WARDEN

17-6522     LUCAS, CHRISTINE M. V. WARD, CARRIE, ET AL.

17-6525     RIDEOUT, MARVIN V. CLARKE, DIR., VA DOC

17-6527     RHODES, KAVIN MAURICE V. ROWE, WARDEN, ET AL.

17-6531     HUMPHREY, JAMES V. DOUMA, WARDEN

17-6532     FERGUSON, BARRY V. VANNOY, WARDEN

17-6533     JARED H. V. ILLINOIS

17-6534     FARLOW, STEVEN V. KERNAN, SEC., CA DOC

17-6535     GIBBS, PAUL D. V. SMITH, WARDEN

17-6536     BLACK, ROBERT V. CALIFORNIA APPELLATE PROJECT

11

WASHAR0001258

17-6537    BENAVIDES, RAUL V. DAVIS, DIR., TX DCJ

17-6539    McKNIGHT, EUGENE D. V. MOORE, WARDEN

17-6541    VARGAS, IVAN V. CALIFORNIA

17-6545    WORRELL, KAHLID Y. V. TEXAS

17-6547    H. K. V. V. FL. DEPT. OF CHILDREN, ET AL.

17-6550    DREW, THOMAS V. WETZEL, SEC., PA DOC, ET AL.

17-6553    GLICK, RON D. V. TOWNSEND, ANGELA J., ET AL.

17-6559    HORNER, KIMBERLY V. UNITED STATES

17-6561    SMALL, ALBERT N. V. MARYLAND

17-6566    AGUILAR, DAVID L. V. TEXAS

17-6569    TIPTON, DARNELL V. PFISTER, WARDEN

17-6570    MOSS, JAMES V. OLSON, WARDEN

17-6574    MORANT, LEON V. FLORIDA

17-6575    HARASZEWSKI, HUBERT D. V. LIZARRAGA, WARDEN, ET AL.

17-6578    MONTES, MICHAEL V. KERNAN, SEC., CA DOC

17-6579    MOTHERSHED, GEORGE L. V. APACHE CORP., ET AL.

17-6585    GRIFFIN, JAMES V. TEXAS

17-6586    HUBERT, ANDRE D. V. TEXAS

17-6590    SMITH, GEROME V. TENNESSEE

17-6591    RUSHINSKY, JOHN J. V. ARIZONA

17-6593    SERNAS, ALEX A. V. ARIZONA

17-6595    LINDSEY, WILLIAM A. V. COLORADO

17-6598    MILLER, TERESA V. WV DOC, ET AL.

17-6600    JONES, DONALD S. V. WILLIAMS, WARDEN

17-6601    JONES, DIAGO M. V. MICHIGAN

17-6604    LINDSAY, THEODUS V. GLICK, WILLIAM, ET AL.

17-6605    MARTIN, JEROME V. HAAS, WARDEN

17-6608    GIBBS, SAMMY V. JONES, SEC., FL DOC

WASHAR0001259

17-6612     BIRD, CHESTER L. V. PACHECO, WARDEN, ET AL.

17-6614     CLINE, DONALD R. V. NORTH CAROLINA

17-6615     BATTLES, STEVE V. DAVIS, DIR., TX DCJ

17-6617     TURNER, JOHN E. V. NEVADA

17-6620     YOUNG, RUBIN V. WHITE, CHRISTINA, ET AL.

17-6621     WATSON, CARMEN N. V. MYLAN PHARMACEUTICALS, INC.

17-6623     YOUNG, GREGORY L. V. TAMPKINS, WARDEN

17-6624     TAPIA, GERARDO L. V. SULLIVAN, WARDEN

17-6625     WRIGHT, FRANKLIN H. V. HUGHES SOCOL PIERS RESNICK & DYM

17-6627     MANN, VINCE V. BAUMAN, WARDEN

17-6630     CAMPBELL, DANNY R. V. BEAR, WARDEN

17-6631     McCAIN, ERIC R. V. NEBRASKA

17-6635     COVIL, BRIONNE A. V. VIRGINIA

17-6640     SMITH, LADONTE M. V. TENNESSEE

17-6642     CAMPBELL, STEVEN V. TANNER, WARDEN

17-6645     MILLER, JARROD J. V. SHERMAN, WARDEN

17-6646     BEASLEY, WINIFRED V. BEASLEY, KEVIN, ET AL.

17-6652     MITCHELL, OCTAVIA V. CHICAGO, IL, ET AL.

17-6653     CURRY, ROBERT V. LASHBROOK, WARDEN

17-6654     PHILLIPOS, ROBEL V. UNITED STATES

17-6655     SCHULER, EUGENE P. V. CLARKE, DIR., VA DOC

17-6658     CRUZ-RIVERA, LUCIO V. PASH, WARDEN

17-6659     MOON, ERNEST V. SCOTT, WARDEN

17-6660     BREWER, DARRON V. ILLINOIS

17-6662     ADAMS, OSCAR D. V. SMITH, WARDEN, ET AL.

17-6663     BANNERMAN, ALEXANDER V. MILLER, WARDEN, ET AL.

17-6665     MOODY, WALTER L. V. DUNN, COMM'R, AL DOC

17-6670     ZEIGLER, ANDRE L. V. YATES, SHERRY, ET AL.

WASHAR0001260

17-6671    WHITE, JOSEPH V. DETROIT MENTAL HEALTH, ET AL.

17-6672    VICKERS, GEORGE T. V. LINK, SUPT., GRATERFORD, ET AL.

17-6673    WARENBACK, DOUGLAS H. V. NEVADA

17-6675  )  RACHEL, DAVID P. V. UNITED STATES
         )
17-6703  )  BREWER, STEVEN V. UNITED STATES

17-6677    NEAL, MICHAEL V. PIERCE, WARDEN, ET AL.

17-6679    ALLEN, BRUCE V. KERNAN, SEC., CA DOC, ET AL.

17-6686    EMMEL, KAREN V. AMTRUST-NP SFR, VENTURE, LLC

17-6687    BOMBER, DAVID M. V. CLARKE, DIR., VA DOC

17-6689    CHALMERS, TYRONE V. TENNESSEE

17-6691    COLON, WILLIAM V. PENNSYLVANIA

17-6692    CLARK, LAMAR E. V. PALMER, WARDEN

17-6693    KUN, ALBERT M. V. STATE BAR OF CA

17-6694    LAHR, JEREMY V. INDIANA

17-6695    JOHNSON, STEVEN A. V. EBBERT, WARDEN

17-6697    FERRIS, EDWARD L. V. UNITED STATES

17-6698    CUTULLE, JOEL S. V. UNITED STATES

17-6699    ASAELI, BENJAMIN S. V. BOE, SUPT., CLALLAM BAY

17-6700    DIAZ-RODRIGUEZ, FERNANDO V. UNITED STATES

17-6701    COLE, AKIDA S. V. MICHIGAN

17-6702    BAGGOTT, ROBERT V. UNITED STATES

17-6706    RICHARDSON, ERIC V. UNITED STATES

17-6707    WURIE, BRIMA V. UNITED STATES

17-6709    GONSALVES, STANLEY V. UNITED STATES

17-6710    GEBRETSADIKE, AWOKE V. TRAVELERS HOME INSURANCE

17-6711    GALVAN, GLORIA V. UNITED STATES

17-6713    AGE, LOUIS T. V. UNITED STATES

17-6717    VEREEN, OMAR V. UNITED STATES

WASHAR0001261

17-6723      BOND, PAMELA S. V. SSA

17-6725      PLATO, RICHARD M. V. UNITED STATES

17-6733      GOFFER, ZVI V. UNITED STATES

17-6734      WASHINGTON, TIMOTHY D. V. UNITED STATES

17-6736      VAZQUEZ-AMPARAN, ERNESTO V. UNITED STATES

17-6737      TAPIA, LUIS M. V. UNITED STATES

17-6746      COSTELLA, KEITH J. V. CALIFORNIA

17-6747      DAMM, GREGORY P. V. UNITED STATES

17-6748      MENDOZA, MARCOS V. CALIFORNIA

17-6752      HERNANDEZ-VASQUEZ, ANDRES A. V. UNITED STATES

17-6757      BROWDER, BRIAN S. V. UNITED STATES

17-6760      GIBSON, LAMAR V. UNITED STATES

17-6761      GARCIA-ACOSTA, JESUS V. UNITED STATES

17-6762      FRIAS, LUIS V. UNITED STATES

17-6763      FORD, CALVIN V. UNITED STATES

17-6764      GUTIERREZ-YANEZ, JOSE V. UNITED STATES

17-6765      GARCIA-ORTIZ, JOSE V. UNITED STATES

17-6766      FLEMING, WILLIAM V. BRENNAN, POSTMASTER GEN.

17-6768      SHIPTON, DENNIS G. V. UNITED STATES

17-6771      ROBINSON, KEEVEN D. V. PFEIFFER, WARDEN

17-6772      RIOS-DIAZ, JORGE V. UNITED STATES

17-6773      SANDERS, CORTEZ V. UNITED STATES

17-6774      BROWN, EDWARD J. V. KANSAS

17-6775      BARNETT, ALAN B. D. V. UNITED STATES

17-6776      FAIRCLOTH, JAMES A. V. RAEMISCH, DIR., CO DOC, ET AL.

17-6777      FLOOD, CEDRIC V. WILLIAMS, WARDEN

17-6778      AKARD, JEFFREY V. UNITED STATES

17-6782      DIXON, JEROME V. UNITED STATES

15

WASHAR0001262

17-6783     CROCKETT, WARDELL V. UNITED STATES

17-6785     MILAN, JORGE L. V. UNITED STATES

17-6786     MURPHY, CAROL V. MAINE

17-6787     PEARSEY, VERNARD J. V. UNITED STATES

17-6788     MUSTAFARAJ, FATMIR V. UNITED STATES

17-6791     BLACKWELL, FAIGER M. V. UNITED STATES

17-6793     SERRANO, ANDY V. UNITED STATES

17-6794     SMITH, KEVIN V. UNITED STATES

17-6795     SHEPHEARD, DENNIS M. V. UNITED STATES

17-6799     NUGENT, BYRON V. UNITED STATES

17-6804     BLACK, GARY V. MASSACHUSETTS

17-6807     WATKINS, ANTON V. UNITED STATES

17-6809     DIPPOLITO, DALIA V. FLORIDA

17-6811     RILEY, JOHN D. V. UNITED STATES

17-6812     STRAW, ANDREW U. V. SUPREME COURT OF IN, ET AL.

17-6821     BARNETT, TERRENCE J. V. UNITED STATES

17-6822     MADISON, JOHNNY V. UNITED STATES

17-6824     GEASLAND, RICHARD V. UNITED STATES

17-6826     GJELI, YLLI V. UNITED STATES

17-6827     IBARRA CARDONA, BALTAZAR V. UNITED STATES

17-6828     HENRY, CLIFFORD E., ET AL. V. UNITED STATES

17-6832     PENN, JESSE N. V. UNITED STATES

17-6833     OATMAN, WESLEY C. V. UNITED STATES

17-6834     LATKA, RICHARD D. V. UNITED STATES

17-6835     JENNINGS, RANDALL V. UNITED STATES

17-6837     PETERSEN, DAVID V. UNITED STATES

17-6841     WRIGHT, KENNEDY V. JONES, SEC., FL DOC, ET AL.

17-6845     WHITE, RAYMOND A. V. UNITED STATES

WASHAR0001263

17-6851    MARIA, GRAY V. MUNIZ, WARDEN

17-6854    PERALTA SANCHEZ, RUFINO V. UNITED STATES

17-6857    LEWIS, DAVID V. UNITED STATES

17-6858    MALDONADO, VICTOR H. V. UNITED STATES

17-6860    BELIN, KING V. UNITED STATES

17-6864    PHILIPPEAUX, PHILANDER V. UNITED STATES

17-6865    PATEL, BABUBHAI V. McKESSON CORP.

17-6866    MEANS, ALFRED V. PENNSYLVANIA

17-6870    JACKSON, WILLIAM V. UNITED STATES

17-6871    JOHNSON, DONALD M. V. UNITED STATES

17-6873    KING, MATTHEW J. V. UNITED STATES

17-6876    RIVERA, MARCEL A. V. UNITED STATES

17-6878    ROMERO-PAYAN, JOSE R. V. UNITED STATES

17-6880    ROCKWELL, MATTHEW G. V. COLORADO

17-6884    UBALDO, CESAR P. V. UNITED STATES

17-6888    THOMPSON, MARCUS D. V. UNITED STATES

17-6889    TELEMAQUE, STEPHEN V. UNITED STATES

17-6893    WOODARD, WILLIE G. V. UNITED STATES

17-6894    WATERS, THOMAS B. V. UNITED STATES

17-6895    VELIZ, TEODORO V. GRIFFIN, SUPT., GREEN HAVEN

17-6896    BUNCH, TORRANCE V. UNITED STATES

17-6900    BUTLER, LOUIS R. V. KELLEY, DIR., AR DOC

17-6906    LEWIS, REGINALD S. V. LINK, SUPT., GRATERFORD, ET AL.

17-6907    KE, LEI V. DREXEL UNIVERSITY, ET AL.

17-6911    GALLARZO, JESUS V. UNITED STATES

17-6913    CONE, JOHN E. V. UNITED STATES

17-6915    BROWN, NATHAN V. UNITED STATES

17-6916    JONES, RONALD V. DELAWARE

17

WASHAR0001264

17-6919     MARTIN, RAYMOND M. V. UNITED STATES

17-6925     SUTTON, LEONA L. V. UNITED STATES

17-6930     CAMICK, LESLIE L. V. UNITED STATES

17-6933     PEAK, CLORETHA W. V. UNITED STATES

17-6941     MOORE, ANTONIO J. V. UNITED STATES

17-6947     MOSELEY, TIMOTHY D. V. KEMPER, WARDEN

17-6948     JONES, PATRICK A. V. UNITED STATES

17-6949     McCLAIN, SHAWN V. UNITED STATES

17-6955     DIGGS, BEVERLY V. DUKE, SEC. OF HOMELAND SECURITY

17-6956     BAMDAD, MASOUD V. BAIRD, WARDEN, ET AL.

17-6957     HAGOS, ABRAHAM V. RAEMISCH, DIR., CO DOC, ET AL.

17-6959     PENSON, GORDIE L. V. UNITED STATES

17-6960     NWAFOR, LEONARD U. V. UNITED STATES

17-6961     DIPPOLITO, FRANK V. UNITED STATES, ET AL.

17-6962     MORRIS, JAMES V. U.S. SENTENCING COMM., ET AL.

17-6964     LUNA, PASCUAL V. UNITED STATES

17-6966     MADISON, CHARLES L. V. UNITED STATES

17-6970     REID, CLINTON M. V. UNITED STATES

17-6974     KELLEY, MICHAEL V. UNITED STATES

17-6976     JACOBS, SAMUEL B. V. UNITED STATES

17-6977     LEGORETTA, MARTIN C. V. UNITED STATES

17-6979     GARCIA-PUGA, JOSE F. V. UNITED STATES

17-6982     MORAL, CARLOS E. V. KANSAS

17-6983     MORALES, MARIA V. UNITED STATES

17-6984     WHEELER, ANGEL V. KANSAS

17-6985     WEATHERMAN, CHARLES B. V. UNITED STATES

17-6986     WASHINGTON, ASKIA V. UNITED STATES

17-6988     WILLIAMS, WEBSTER D. V. UNITED STATES

WASHAR0001265

17-6990     TERRY, BRIAN V. UNITED STATES

17-6993     BROWN, CHAD W. V. UNITED STATES

17-6996     FACEN, TABARI V. UNITED STATES

17-6998     LOVERA, DIANA V. UNITED STATES

17-7001     RUVALCABA-MORALES, RACHEL V. UNITED STATES

17-7004     POSLEY, BRIAN L. V. UNITED STATES

17-7006     CANNET, FRANZ P. V. UNITED STATES

17-7007     DINGLE, LEON V. UNITED STATES

17-7012     TAYLOR, GLORIA P. V. UNITED STATES

17-7014     NWOKEDI, ADOLPHUS V. UNITED STATES

17-7020     SANCHEZ, EDGAR V. MATEVOUSIAN, WARDEN

17-7021     KOONTZ, DONALD S. V. UNITED STATES

17-7023     HERRNANDEZ-QUINTANIA, PEDRO V. UNITED STATES

17-7025     OCHOA-CALEDO, JOSE V. UNITED STATES

17-7029     PILOTO, DARCY V. UNITED STATES

17-7030     BROCK, TROUN V. V. UNITED STATES

17-7032     SPENGLER, ANDREW R. V. CHANDLER, WARDEN

17-7034     BAILEY, DEON A. V. UNITED STATES

17-7048     STURDIVANT, DEVON R. V. UNITED STATES

17-7050     STEWARD, RICKY L. V. UNITED STATES

17-7051     RECENDIS-HERRERA, JUAN L. V. UNITED STATES

17-7052     STEWART, CHARLES H. V. UNITED STATES

17-7069     BELTON, MARCUS V. UNITED STATES

17-7070     BURNS, DEBORAH B. V. UNITED STATES

17-7073     SANDOVAL-ENRIQUE, MANUEL V. UNITED STATES

            The petitions for writs of certiorari are denied.

17-249      YOUNG, AMY, ET AL. V. BORDERS, SHERIFF, ET AL.

            The motion of Rutherford Institute for leave to file a brief

WASHAR0001266

as *amicus curiae* is granted.  The motion of Second Amendment Foundation, Inc. for leave to file a brief as *amicus curiae* is granted.  The petition for a writ of certiorari is denied.

17-346     TOUCHET, SAUL C. V. ESTIS WELL SERVICE, ET AL.

The motion of Seafarers' Rights International for leave to file a brief as *amicus curiae* is granted.  The motion of Global Maritime Ministries, Inc. New Orleans for leave to file a brief as *amicus curiae* is granted.  The petition for a writ of certiorari is denied.

17-445     WESTBROOKS, WARDEN V. ALLEN, WILLIAM G.

The motion of respondent for leave to proceed *in forma pauperis* is granted.  The petition for a writ of certiorari is denied.

17-447     WINDOW ROCK UNIFIED SCH. DIST. V. REEVES, ANN, ET AL.

The motion of National School Boards Association, et al. for leave to file a brief as *amici curiae* is granted.  The petition for a writ of certiorari is denied.

17-465     PROPERTY OWNERS V. US FISH AND WILDLIFE, ET AL.

The motion of Property and Environment Research Center for leave to file a brief as *amicus curiae* is granted.  The petition for a writ of certiorari is denied.

17-517     UPPAL, NEELAM V. HEALTH LAW FIRM

The motion of respondent for attorney's fees and sanctions is denied.  The petition for a writ of certiorari is denied.

17-551     TAFT, FOSTER V. NABISCO, ET AL.

The petition for a writ of certiorari is denied.  Justice Alito took no part in the consideration or decision of this petition.

20

WASHAR0001267

17-569          BAMBERGER ROSENHEIM, LTD. V. OA DEVELOPMENT, INC.

                The motion of The Center for Arbitration and Dispute
                Resolution In Israel for leave to file a brief as *amicus curiae*
                is granted.  The petition for a writ of certiorari is denied.

17-606          COOPER, GARTH V. COUNTRYWIDE HOME LOANS, ET AL.

                The petition for a writ of certiorari before judgment is
                denied.

17-613          SHAO, LINDA V. WANG, TSAN-KUEN

                The motion of Mothers of Lost Children for leave to file a
                brief as *amicus curiae* is granted.  The petition for a writ of
                certiorari is denied.

17-627          SPRINT COMMUNICATIONS CO. V. CENTURYTEL OF CHATHAM, ET AL.

                The motion of Verizon for leave to file a brief as *amicus
                curiae* is granted.  The petition for a writ of certiorari is
                denied.

17-652          HENRY, MARIE V. MT. DORA, FL, ET AL.

                The motion of The National Bar Association for leave to file
                a brief as *amicus curiae* is granted.  The motion of National
                Association for Public Defense for leave to file a brief as
                *amicus curiae* is granted.  The motion of National Juvenile
                Defender Center for leave to file a brief as *amicus curiae* is
                granted.  The petition for a writ of certiorari is denied.

17-6318         JONES, JAMES E. V. USDC SC

                The petition for a writ of certiorari is denied.  Justice
                Kagan took no part in the consideration or decision of this
                petition.

17-6488    )    REYNOLDS, NATHANAEL L. V. SOUTH CAROLINA, ET AL.
           )
17-6489    )    REYNOLDS, NATHANAEL L. V. SOUTH CAROLINA, ET AL.

WASHAR0001268

17-6516     AMIR-SHARIF, LaKEITH R. V. TX DCJ, ET AL.

      The motions of petitioners for leave to proceed *in forma pauperis* are denied, and the petitions for writs of certiorari are dismissed.  See Rule 39.8.  As the petitioners have repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioners unless the docketing fees required by Rule 38(a) are paid and the petitions are submitted in compliance with Rule 33.1.  See *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

17-6530     GARDNER, STEVEN V. CAPOZZA, WARDEN, ET AL.

      The petition for a writ of certiorari is denied.  Justice Alito took no part in the consideration or decision of this petition.

17-6546     YORK, REGINALD R. V. CALIFORNIA

17-6581     WANZER, JERRY V. PERALTA, JESUS M., ET AL.

17-6582     WANZER, JERRY V. GLOOR, DEBRA, ET AL.

      The motions of petitioners for leave to proceed *in forma pauperis* are denied, and the petitions for writs of certiorari are dismissed.  See Rule 39.8.

17-6599     LOGAN, NICKIE R. V. DIST. ATT'Y OF ALLEGHENY CTY.

      The petition for a writ of certiorari before judgment is denied.

17-6685     HAMILTON, JAN B. V. COLORADO

      The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed.  See Rule 39.8.  As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept

WASHAR0001269

any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1.  See *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

17-6741    SCARPA, GREGORY V. UNITED STATES

The petition for a writ of certiorari is denied.  Justice Sotomayor took no part in the consideration or decision of this petition.

17-6840    WARREN, JOHNNY S. V. UNITED STATES

The petition for a writ of certiorari is denied.  Justice Kagan and Justice Gorsuch took no part in the consideration or decision of this petition.

17-6850    HAMMONS, BRITT J. V. UNITED STATES

17-6932    KUTZ, ERIC S. V. UNITED STATES

The petitions for writs of certiorari are denied.  Justice Gorsuch took no part in the consideration or decision of these petitions.

17-6958    CARY, JERRY L. V. PEARSON, WARDEN

The motion of petitioner for leave to proceed *in forma pauperis* is denied, and the petition for a writ of certiorari is dismissed.  See Rule 39.8.  As the petitioner has repeatedly abused this Court's process, the Clerk is directed not to accept any further petitions in noncriminal matters from petitioner unless the docketing fee required by Rule 38(a) is paid and the petition is submitted in compliance with Rule 33.1.  See *Martin* v. *District of Columbia Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

WASHAR0001270

17-6963      PORTER, RICHARD V. FOX, WARDEN, ET AL.

       The petition for a writ of certiorari is denied.  Justice
Kagan took no part in the consideration or decision of this
petition.

17-7008      HENTHORN, HAROLD V. UNITED STATES

       The petition for a writ of certiorari is denied.  Justice
Gorsuch took no part in the consideration or decision of this
petition.

<div align="center">

**HABEAS CORPUS DENIED**

</div>

17-6903      IN RE ARTHUR ROUSE

17-6920      IN RE DeANGELO JONES

17-6939      IN RE MASAO YONAMINE

17-6951      IN RE TED OSWALD

17-7049      IN RE ALPHONSO SANDERS

17-7077      IN RE GARVESTER BRACKEN

17-7119      IN RE JARON R. BRICE

       The petitions for writs of habeas corpus are denied.

<div align="center">

**MANDAMUS DENIED**

</div>

17-588       IN RE AJAY KAJLA

17-631       IN RE MICHAEL C. TURZAI, ET AL.

17-6336      IN RE DANTE KEELING

17-6613      IN RE TARYN CHRISTIAN

       The petitions for writs of mandamus are denied.

17-6510      IN RE TERRY G. WATSON

       The petition for a writ of mandamus and/or prohibition is
denied.

17-6544      IN RE STEPHEN F. ULRICH

       The motion of petitioner for leave to proceed *in forma*

<div align="center">

24

</div>

*pauperis* is denied, and the petition for a writ of
mandamus and/or prohibition is dismissed.  See Rule 39.8.  As
the petitioner has repeatedly abused this Court's process, the
Clerk is directed not to accept any further petitions in
noncriminal matters from petitioner unless the docketing fee
required by Rule 38(a) is paid and the petition is submitted in
compliance with Rule 33.1.  See *Martin* v. *District of Columbia
Court of Appeals*, 506 U. S. 1 (1992) (*per curiam*).

17-6648     IN RE LAKESHA NORINGTON

        The petition for a writ of mandamus and/or prohibition is
denied.

**REHEARINGS DENIED**

16-1468     KERNAN, SEC., CA DOC V. CUERO, MICHAEL D.

16-6372     WILSON, JOHN J. V. CARLOS, JUAN, ET AL.

16-8062     OKON, ENAMIDEM C. V. DOOLEY, WARDEN

16-8580     BENTZ, LEONARD J. V. NEVADA

16-8925     REDRICK, ROGER V. UNITED STATES

16-8959     HASTYE, ALTON V. TOLSON, DIANA

16-9028     ANDOE, JOHNNY R. V. OTTER, C. L., ET AL.

16-9031     LIN, CHAO H., ET UX. V. TD WATERSTONE

16-9037     IN RE STEVEN W. BONILLA

16-9059     IN RE SAMUEL A. McCORMICK

16-9078     RUDGE, WILLIAM J. V. STUART, FL

16-9120     McSMITH, DEREK L. V. BANK OF AMERICA

16-9272     ROBINSON, KATHERINE B., ET AL. V. DEA, ET AL.

16-9293     SAIDIN, MOHAMMAD V. NEGRON, SAM, ET AL.

16-9426     WILSON, JOHNER T. V. SHULTZ, LON W.

16-9530     DAKER, WASEEM V. GEORGIA

WASHAR0001272

16-9531     DAKER, WASEEM V. GEORGIA

16-9532     DAKER, WASEEM V. GEORGIA

16-9565     IN RE CHRISTOPHER PARKER

16-9684     TIBBS, MARK V. MARYLAND

17-193      DUNN, COMM'R, AL DOC V. MADISON, VERNON

17-213      YU, XIAO-YING V. MD DEPT. OF HEALTH, ET AL.

17-256      SHAO, LINDA V. McMANIS FAULKNER, LLP, ET AL.

17-280      PURPURA, NICHOLAS V. CHRISTIE, GOV. OF NJ, ET AL.

17-337      BENT, MICHAEL S. V. LASHWAY, PATRICIA, ET AL.

17-347      VILLARREAL, ALBERTO A. V. TEXAS

17-484      GOSSAGE, HENRY E. V. MERIT SYSTEMS PROTECTION BOARD

17-488      HENDRIX, KIMBERLY D. V. WAL-MART STORES, ET AL.

17-495      DONNELL, LAMON S. V. UNITED STATES

17-5009     BLACK, JASON V. SUTTON, WARDEN

17-5027     STECHAUNER, MATTHEW C. V. SMITH, WARDEN

17-5130     PELINO, VITO A. V. HENS-GRECO, KATHRYN, ET AL.

17-5133     MURPHY, CRAIG D. V. DEPT. OF EDUCATION

17-5160     AGUILAR, MANUEL M. V. UNITED STATES

17-5208     SCHUMAKER, BRIAN W. V. UNITED STATES

17-5241     SCHWERS, CLAYTON A. V. ALBUQUERQUE, NM, ET AL.

17-5361     COOK, ROBERT C. V. MICHIGAN

17-5375     GOUCH-ONASSIS, DEBORAH E. V. UNITED STATES

17-5376     GIRMA, LULU V. EEOC

17-5528     ALMENDAREZ, MICHAEL A. V. DAVIS, DIR., TX DCJ

17-5533     IN RE KEVIN POLLINS

17-5547     WAHEED, ABUWI M. V. NEW YORK, NY, ET AL.

17-5625     CANNON, JOHN C. V. DAVIS, DIR., TX DCJ

17-5667     AUSTIN, STEVE V. FLORIDA

WASHAR0001273

17-5705    HAWKINS, JAMES V. TENNESSEE

17-5797    MARSHALL, DARRELL L. V. DETROIT, MI, ET AL.

17-5827    IN RE TOMMY PHILLIPS

17-5842    WOODSON, CARSTON M. V. UNITED STATES

17-5843    WOODSON, CARSTON M. V. UNITED STATES

17-5844    WOODSON, CARSTON M. V. UNITED STATES

17-5845    WOODSON, CARSTON M. V. UNITED STATES

17-5846    WOODSON, CARSTON M. V. UNITED STATES

17-5849    MILLER, TERESA V. WEST VIRGINIA

17-5851    MAJOR, SARGENT K. V. WYOMING

17-5858    WOODSON, CARSTON M. V. UNITED STATES

17-5859    WOODSON, CARSTON M. V. UNITED STATES

17-5864    ZIRUS, SCOTT A. V. TEXAS

17-5914    IN RE MICHAEL A. KENNEDY

17-5924    STANDRIDGE, RICHARD E. V. SHARTLE, WARDEN

17-5940    SAMPLE, MICHAEL V. TENNESSEE

17-5979    NORWOOD, MARION A. V. UNITED STATES

17-6060    IN RE JAMES R. YOUNG

17-6066    KANDI, EMIEL A. V. UNITED STATES

17-6073    SHARIATI, MAHBOBEH V. UNITED STATES

17-6094    SMORYNSKI, DANIEL V. UNITED STATES

17-6131    MALEKPOUR, SHAHRAM V. CHAO, SEC. OF TRANSP.

17-6191    FLUKER, FELECIA V. BRENNAN, POSTMASTER GEN.

17-6272    MAGGIO, MICHAEL A. V. UNITED STATES

17-6319    LOWE, KEVIN V. UNITED STATES

         The petitions for rehearing are denied.

17-309     SNYDER, DALE, ET AL. V. ACORD CORP., ET AL.

17-5831    KOYLE, SHERWIN V. V. SAND CANYON CORP., ET AL.

WASHAR0001274

The petitions for rehearing are denied.  Justice Gorsuch took no part in the consideration or decision of these petitions.

17-5041     JOSEPH, RAFAEL A. V. SAFEHAVEN CEC, ET AL.

17-5311     THORN, DARREL V. McGARY, MELVIN, ET AL.

The motions for leave to file petitions for rehearing are denied.

## ATTORNEY DISCIPLINE

D-3005     IN THE MATTER OF DISBARMENT OF ANDRE MICHNIAK

Andre Michniak, of King of Prussia, Pennsylvania, having been suspended from the practice of law in this Court by order of November 27, 2017; and a rule having been issued and served upon him requiring him to show cause why he should not be disbarred; and the time to file a response having expired;

It is ordered that is disbarred from the practice of law in this Court.

D-3006     IN THE MATTER OF DISBARMENT OF RUFUS SETH WILLIAMS

Rufus Seth Williams, of Philadelphia, Pennsylvania, having been suspended from the practice of law in this Court by order of November 27, 2017; and a rule having been issued and served upon him requiring him to show cause why he should not be disbarred; and the time to file a response having expired;

It is ordered that Rufus Seth Williams is disbarred from the practice of law in this Court.

D-3010     IN THE MATTER OF DISBARMENT OF RAYMOND EDWARD CLUTTS

Raymond Edward Clutts, of Robinson, Illinois, having been suspended from the practice of law in this Court by order of November 27, 2017; and a rule having been issued and served upon

WASHAR0001275

him requiring him to show cause why he should not be disbarred; and the time to file a response having expired;

It is ordered that Raymond Edward Clutts is disbarred from the practice of law in this Court.

WASHAR0001276

Cite as: 583 U. S. ____ (2018)          1

Per Curiam

# SUPREME COURT OF THE UNITED STATES

### KEITH THARPE *v.* ERIC SELLERS, WARDEN

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 17–6075.   Decided January 8, 2018

PER CURIAM.

Petitioner Keith Tharpe moved to reopen his federal habeas corpus proceedings regarding his claim that the Georgia jury that convicted him of murder included a white juror, Barney Gattie, who was biased against Tharpe because he is black. See Fed. Rule Civ. Proc. 60(b)(6). The District Court denied the motion on the ground that, among other things, Tharpe's claim was procedurally defaulted in state court. The District Court also noted that Tharpe could not overcome that procedural default because he had failed to produce any clear and convincing evidence contradicting the state court's determination that Gattie's presence on the jury did not prejudice him. See *Tharpe* v. *Warden*, No. 5:10–cv–433 (MD Ga., Sept. 5, 2017), App. B to Pet. for Cert. 19.

Tharpe sought a certificate of appealability (COA). The Eleventh Circuit denied his COA application after deciding that jurists of reason could not dispute that the District Court's procedural ruling was correct. See *Tharpe* v. *Warden*, 2017 WL 4250413, *3 (Sept. 21, 2017). The Eleventh Circuit's decision, as we read it, was based solely on its conclusion, rooted in the state court's factfinding, that Tharpe had failed to show prejudice in connection with his procedurally defaulted claim, *i.e.*, that Tharpe had "failed to demonstrate that Barney Gattie's behavior 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Ibid.* (quoting *Brecht* v. *Abrahamson*, 507 U. S. 619, 637 (1993)).

WASHAR0001277

Per Curiam

Our review of the record compels a different conclusion. The state court's prejudice determination rested on its finding that Gattie's vote to impose the death penalty was not based on Tharpe's race. See *Tharpe* v. *Warden*, No. 93–cv–144 (Super. Ct. Butts Cty., Ga., Dec. 1, 2008), App. F to Pet. for Cert. 102. And that factual determination is binding on federal courts, including this Court, in the absence of clear and convincing evidence to the contrary. See 28 U. S. C. §2254(e)(1). Here, however, Tharpe produced a sworn affidavit, signed by Gattie, indicating Gattie's view that "there are two types of black people: 1. Black folks and 2. Niggers"; that Tharpe, "who wasn't in the 'good' black folks category in my book, should get the electric chair for what he did"; that "[s]ome of the jurors voted for death because they felt Tharpe should be an example to other blacks who kill blacks, but that wasn't my reason"; and that, "[a]fter studying the Bible, I have wondered if black people even have souls." App. B to Pet. for Cert. 15–16 (internal quotation marks omitted). Gattie's remarkable affidavit—which he never retracted—presents a strong factual basis for the argument that Tharpe's race affected Gattie's vote for a death verdict. At the very least, jurists of reason could debate whether Tharpe has shown by clear and convincing evidence that the state court's factual determination was wrong. The Eleventh Circuit erred when it concluded otherwise.

The question of prejudice—the ground on which the Eleventh Circuit chose to dispose of Tharpe's application—is not the only question relevant to the broader inquiry whether Tharpe should receive a COA. The District Court denied Tharpe's Rule 60(b) motion on several grounds not addressed by the Eleventh Circuit. We express no view of those issues here. In light of the standard for relief from judgment under Rule 60(b)(6), which is available only in " 'extraordinary circumstances,' " *Gonzalez* v. *Crosby*, 545 U. S. 524, 536 (2005), Tharpe faces a high bar in showing

WASHAR0001278

Per Curiam

that jurists of reason could disagree whether the District Court abused its discretion in denying his motion. It may be that, at the end of the day, Tharpe should not receive a COA. And review of the denial of a COA is certainly not limited to grounds expressly addressed by the court whose decision is under review. But on the unusual facts of this case, the Court of Appeals' review should not have rested on the ground that it was indisputable among reasonable jurists that Gattie's service on the jury did not prejudice Tharpe.

We therefore grant Tharpe's motion to proceed *in forma pauperis*, grant the petition for certiorari, vacate the judgment of the Court of Appeals, and remand the case for further consideration of the question whether Tharpe is entitled to a COA.

*It is so ordered.*

Cite as: 583 U. S. ____ (2018)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

## KEITH THARPE *v.* ERIC SELLERS, WARDEN

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 17–6075.   Decided January 8, 2018

JUSTICE THOMAS, with whom JUSTICE ALITO and
JUSTICE GORSUCH join, dissenting.

If bad facts make bad law, then "unusual facts" inspire
unusual decisions. *Ante,* at 3.  In its brief *per curiam*
opinion, the Court misreads a lower court's opinion to find
an error that is not there, and then refuses to entertain
alternative grounds for affirmance.  The Court does this to
accomplish little more than a do-over in the Court of Ap-
peals: As it concedes, petitioner Keith Tharpe faces a "high
bar" on remand to obtain even a certificate of appealability
(COA). *Ante,* at 2.

One might wonder why the Court engages in this point-
less exercise.  The only possible explanation is its concern
with the "unusual facts" of this case, specifically a juror
affidavit that expresses racist opinions about blacks.  The
opinions in the affidavit are certainly odious.  But their
odiousness does not excuse us from doing our job correctly,
or allow us to pretend that the lower courts have not done
theirs.

The responsibility of courts is to decide cases, both usual
and unusual, by neutrally applying the law.  The law
reflects society's considered judgments about the balance
of competing interests, and we must respect those judg-
ments.  In bending the rules here to show its concern for a
black capital inmate, the Court must think it is showing
its concern for racial justice.  It is not.  Its summary vaca-
tur will not stop Tharpe's execution or erase the "unusual
fac[t]" of the affidavit.  It will only delay justice for Ja-
quelin Freeman, who was also black, who is ignored by the

WASHAR0001280

THOMAS, J., dissenting

majority, and who was murdered by Tharpe 27 years ago. I respectfully dissent.

## I

The Court's terse opinion tells the reader that this case involves a petitioner, a juror, an affidavit, and a prejudice determination. But it involves much more than that. This case also has a victim, a second affidavit, numerous depositions, factfinding by a state court, and several decisions from federal judges that provide multiple grounds for denying a COA. I will briefly provide this omitted context.

## A

Keith Tharpe's wife, Migrisus, left him in 1990. Despite a no-contact order, Tharpe called her and told her that if she wanted to "'play dirty'" he would show her "'what dirty was.'" *Tharpe* v. *Warden*, 834 F. 3d 1323, 1325 (CA11 2016). The next morning, Tharpe ambushed his wife and her sister, Jaquelin Freeman, as they drove to work, pulling his truck in front of their car and forcing them to stop. Tharpe aimed a shotgun at the car and ordered his wife to get into his truck. He then told Freeman that he was going to "'f— [her] up'" and took her to the rear of his truck. *Ibid.* Tharpe shot Freeman, rolled her body into a ditch, reloaded, and shot her again, killing her. After murdering Freeman, Tharpe kidnaped and raped his wife, leaving Freeman's body lying in the ditch. Freeman's husband found her a short time later, while driving their children to school.

A jury convicted Tharpe of malice murder and two counts of aggravated kidnaping. After hearing the evidence, the jury needed less than two hours to return a unanimous sentence of death. As aggravating factors, the jury found that Tharpe murdered Freeman while committing two other capital felonies—the aggravated kidnapings of his wife and Freeman—and that the murder was outra-

WASHAR0001281

Thomas, J., dissenting

geously or wantonly vile, horrible, or inhuman.

### B

More than seven years after his trial, Tharpe's lawyers interviewed one of his jurors, Barney Gattie. The resulting affidavit stated that Gattie knew Freeman, and that her family was "what [he] would call a nice [b]lack family." *Tharpe* v. *Warden*, No. 5:10–cv–433 (MD Ga., Sept. 5, 2017), App. B to Pet. for Cert. 15. The affidavit continued that, in Gattie's view, "there are two types of black people: 1. Black folks and 2. Niggers." *Ibid.* Tharpe "wasn't in the 'good' black folks category," according to the affidavit, and if Freeman had been "the type Tharpe is, then picking between life and death for Tharpe wouldn't have mattered so much." *Id.*, at 16. But because Freeman and her family were "good black folks," the affidavit continued, Gattie thought Tharpe "should get the electric chair for what he did." *Ibid.* Gattie's affidavit went on to explain that "[a]fter studying the Bible," he had "wondered if black people even have souls." *Ibid.* The affidavit also noted that some of the other jurors "wanted blacks to know they weren't going to get away with killing each other." *Ibid.*

A couple of days later, the State obtained another affidavit from Gattie. In that second affidavit, Gattie stated that he "did not vote to impose the death penalty because [Tharpe] was a black man," but instead because the evidence presented at trial justified it and because Tharpe showed no remorse. Record in No. 5:10–cv–433 (MD Ga., June 21, 2017) (Record), Doc. 77–3, p. 2. The affidavit explained that Gattie had consumed "seven or more beers" on the afternoon he signed the first affidavit. *Ibid.* Although he had signed it, he "never swore to [it] nor was [he] ever asked if [the] statement was true and accurate." *Id.*, at 3. He also attested that many of the statements in the first affidavit "were taken out of context and simply not accurate." *Ibid.* And he felt that the lawyers who took it

"were deceiving and misrepresented what they stood for." *Id.,* at 5.

A state postconviction court presided over Gattie's deposition. Gattie again testified that, although he signed the affidavit, he did not swear to its contents. Gattie also testified that when he signed the affidavit he had consumed "[m]aybe a 12 pack, [and] a few drinks of whiskey, over the period of the day." *Id.,* Doc. 15–8, p. 80. Tharpe's lawyers did not question Gattie about the contents of his first affidavit at the deposition. They instead spent much of the deposition asking Gattie unrelated questions about race, which the state court ruled irrelevant—like whether he was familiar with Uncle Tom's Cabin or whether his granddaughter would play with a black doll. The lawyers' failure to address the contents of Gattie's first affidavit troubled the state court. Just before it permitted Gattie to leave, the court advised Tharpe's lawyers that it might "totally discoun[t]" Gattie's first affidavit, and it again invited them to ask Gattie questions about its contents. *Id.,* at 105. Tharpe's lawyers declined the opportunity.

The state court also heard deposition testimony from ten of Tharpe's other jurors and received an affidavit from the eleventh. None of the jurors, two of whom were black, corroborated the statements in Gattie's first affidavit about how some of the jurors had considered race. The ten jurors who testified all said that race played no role in the jury's deliberations. The eleventh juror did not mention any consideration of race either.

## C

Tharpe sought state postconviction relief. One of his claims was that "improper racial animus . . . infected the deliberations of the jury." *Tharpe* v. *Warden,* 2017 WL 4250413, *1 (CA11, Sept. 21, 2017).

The state court rejected this claim for two reasons. First, Tharpe could not prove juror misconduct because

WASHAR0001283

THOMAS, J., dissenting

Georgia law did not allow parties to impeach a jury verdict with post-trial testimony from jurors. *Tharpe* v. *Warden*, No. 93–cv–144 (Super. Ct. Butts Cty., Ga., Dec. 1, 2008), App. F to Pet. for Cert. 99–101. Second, Tharpe had procedurally defaulted his claim because he had failed to raise it on direct appeal, and he could not establish cause and prejudice to overcome that default. *Id.*, at 102. Tharpe's allegation of ineffective assistance of counsel was insufficient to establish cause because he had "failed to establish the requisite deficiency or prejudice." *Ibid.* And Tharpe failed to establish prejudice because the state court credited Gattie's testimony that he had not relied on race when voting to sentence Tharpe. *Id.,* at 102–103.

D

Tharpe then raised his juror-bias claim in a federal petition for a writ of habeas corpus. The United States District Court for the Middle District of Georgia denied his claim as procedurally defaulted. The District Court acknowledged that ineffective assistance of counsel can provide cause to overcome a procedural default, but it explained that Tharpe "fail[ed] to provide any details regarding this allegation." 2017 WL 4250413, *2. The District Court concluded that Tharpe "ha[d] not established that his counsels' ineffectiveness constituted cause to overcome the procedural defaul[t]" and that he "failed to show actual prejudice." *Ibid.*

Tharpe did not seek a COA on his juror-bias claim. The United States Court of Appeals for the Eleventh Circuit affirmed the District Court's decision, *Tharpe*, 834 F. 3d 1323, and this Court denied certiorari, *Tharpe* v. *Sellers*, 582 U. S. ___ (2017).

In June 2017, Tharpe moved to reopen his federal habeas proceedings under Federal Rule of Civil Procedure 60(b). He pointed to this Court's recent decisions in *Buck* v. *Davis*, 580 U. S. ___ (2017), and *Pena-Rodriguez* v.

THOMAS, J., dissenting

*Colorado*, 580 U. S. ___ (2017), as extraordinary circumstances that entitled him to relief.  According to Tharpe, *Buck* established that extraordinary circumstances are present when a defendant was sentenced due to his race and new law provides an opportunity to consider the merits of his previously defaulted, race-based sentencing claim.  *Pena-Rodriguez* supplied that new law, Tharpe argued, because it held that a state no-impeachment rule must yield when there is a "clear statement that indicates [a juror] relied on racial stereotypes or animus to convict a criminal defendant." 580 U. S., at ___ (slip op., at 17).

The District Court denied Tharpe's motion.  It first explained that *Pena-Rodriguez* announced a new procedural rule that does not apply retroactively on federal collateral review.  App. B to Pet. for Cert. 6–14.  It alternatively deferred to the state court's finding that Tharpe could not prove cause or prejudice to overcome his procedural default.  *Id.*, at 18–21.  After the depositions of Gattie and ten other jurors, the state court credited Gattie's testimony that he did not vote for death based on race.  *Id.*, at 21. The District Court deferred to that credibility determination, and nothing in *Pena-Rodriguez* undermined that determination.  App. B to Pet. for Cert. 19–21.

The Eleventh Circuit denied a COA.  It explained that the District Court had concluded in its first decision that Tharpe failed to prove cause and prejudice.  2017 WL 4250413, *2.  The District Court had later rejected Tharpe's Rule 60(b) motion both because *Pena-Rodriguez* was not retroactively applicable on federal collateral review and because it "presumed the correctness" of the state court's finding that Tharpe failed to "'establish cause and prejudice.'"  2017 WL 4250413, *2.  The Eleventh Circuit then offered two reasons why Tharpe was not entitled to a COA.  First, Tharpe had not "'made a substantial showing of the denial of a constitutional right.'"

WASHAR0001285

THOMAS, J., dissenting

*Id.*, at \*3 (quoting 28 U. S. C. §2253(c)(2)). "As the [state court] and the District Court found, Tharpe failed to demonstrate that Barney Gattie's behavior 'had substantial and injurious effect or influence in determining the jury's verdict.'" 2017 WL 4250413, \*3 (quoting *Brecht* v. *Abrahamson*, 507 U. S. 619, 637 (1993)). "Nor," the Eleventh Circuit continued, "has Tharpe shown that 'jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" 2017 WL 4250413, \*3 (quoting *Slack* v. *McDaniel*, 529 U. S. 473, 484 (2000)).[1]

Shortly before his execution, Tharpe filed a petition for a writ of certiorari and a stay application with this Court. We issued a stay.

## II

To obtain a COA, Tharpe must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*, at 484. The Court is not willing to say that Tharpe can satisfy this standard. See *ante*, at 3 ("It may be that, at the end of the day, Tharpe should not receive a COA"). Instead, its opinion makes two moves. First, it "read[s]" the decision below as resting "solely" on Tharpe's "fail[ure] to show prejudice" to overcome his procedural default. *Ante*, at 1. It does not read the decision as reaching cause, and it declines to consider that or any other alternative reason to affirm the Eleventh Circuit. See *ante*, at 1–2. Second, the Court holds, contrary to the Eleventh Circuit, that jurists of reason could debate whether Tharpe has proven prejudice. See *ante*, at 2. Neither of the Court's moves is justified.

---

[1] The Eleventh Circuit also held that Tharpe had not exhausted his *Pena-Rodriguez* claim in state court. 2017 WL 4250413, \*4.

WASHAR0001286

THOMAS, J., dissenting

A

1

The majority misreads the decision below as resting "solely" on prejudice. See *ante,* at 1. The Eleventh Circuit addressed cause as well.

The Eleventh Circuit first held that Tharpe had failed to make a "'substantial showing of the denial of a constitutional right,'" explaining that he had "failed to demonstrate that . . . Gattie's behavior 'had substantial and injurious effect or influence in determining the jury's verdict.'" 2017 WL 4250413, *3 (quoting *Brecht, supra,* at 637). Then the Eleventh Circuit alternatively held that Tharpe had not "shown that 'jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" 2017 WL 4250413, *3 (quoting *Slack, supra,* at 484). The "procedural ruling" of the District Court rested on both cause and prejudice—as the Eleventh Circuit explained earlier in its opinion, quoting the District Court at length. See 2017 WL 4250413, *2. Indeed, neither party suggests that the Eleventh Circuit's decision did not reach cause, and both parties briefed the issue to this Court. See Brief in Opposition 16–17; Reply Brief 7–8. The Court's reading of the decision below is untenable.

Even if its reading were tenable, the Court does not explain why the strong medicine of a summary disposition is warranted here. Summary decisions are "rare" and "usually reserved by this Court for situations in which . . . the decision below is clearly in error." *Schweiker* v. *Hansen,* 450 U. S. 785, 791 (1981) (Marshall, J., dissenting). The majority's reading of the decision below is not the better one, much less the clearly correct one. By adopting the least charitable reading of the Eleventh Circuit's decision, the majority "disrespects the judges of the courts of appeals, who are appointed and confirmed as we are." *Wellons* v. *Hall,* 558 U. S. 220, 228 (2010) (Scalia, J., dissenting). This Court should not "vacate and send back

THOMAS, J., dissenting

their authorized judgments for inconsequential imperfection of opinion—as though we were schoolmasters grading their homework." *Ibid.* In fact, "[a]n appropriately self-respecting response to today's summary vacatur would be summary reissuance of the same opinion," *ibid.,* with a sentence clarifying that the Eleventh Circuit agrees with the District Court's decision on cause.

2

Putting aside its misreading of the decision below, the Court inexplicably declines to consider alternative grounds for affirmance. The Court acknowledges that our review "is certainly not limited to grounds expressly addressed by the court whose decision is under review." *Ante,* at 3. But the Court does not explain why it nonetheless limits itself to the question of prejudice. The Court's self-imposed limitation is inexcusable given that Tharpe's collateral challenges to his sentence have lasted 24 years, the Court's failure to consider alternative grounds has halted an imminent execution, the alternative grounds were reached below, several of them were briefed here, and many of them are obviously correct. In fact, the District Court identified two grounds for denying Tharpe relief that no reasonable jurist could debate.

First, no reasonable jurist could argue that *Pena-Rodriguez* applies retroactively on collateral review. *Pena-Rodriguez* established a new rule: The opinion states that it is answering a question "left open" by this Court's earlier precedents. 580 U. S., at ___ (slip op., at 13). A new rule does not apply retroactively unless it is substantive or a "watershed rul[e] of criminal procedure." *Teague* v. *Lane,* 489 U. S. 288, 311 (1989) (plurality opinion). Since *Pena-Rodriguez* permits a trial court "to consider [certain] evidence," 580 U. S., at ___ (slip op., at 17), and does not "alte[r] the range of conduct or the class of persons that the law punishes," *Schriro* v. *Summerlin,* 542 U. S. 348,

WASHAR0001288

THOMAS, J., dissenting

353 (2004), it cannot be a substantive rule.[2]  And Tharpe
does not even attempt to argue that *Pena-Rodriguez* estab-
lished a watershed rule of criminal procedure—a class of
rules that is so "narrow" that it is "'unlikely that any has
yet to emerge.'" *Schriro, supra,* at 352 (quoting *Tyler* v.
*Cain,* 533 U. S. 656, 667, n. 7 (2001); alterations omitted).
Nor could he.  Not even the right to have a jury decide a
defendant's eligibility for death counts as a watershed rule
of criminal procedure.  *Schriro, supra,* at 355–358.[3]

Second, no reasonable jurist could argue that Tharpe
demonstrated cause for his procedural default.  The only
cause that Tharpe raised in state court was ineffective
assistance of counsel.  The state court rejected this claim
because Tharpe presented only a conclusory allegation to
support it.  No reasonable jurist could debate that deci-
sion.  Nor could a reasonable jurist debate the cause ar-
gument that Tharpe raises here.  In his reply brief in
support of certiorari in this Court, Tharpe argues that he

_____

[2]Moreover, because the state court considered Tharpe's evidence of
racial bias anyway, despite Georgia's no-impeachment rule, no reason-
able jurist could argue that *Pena-Rodriguez* presents an extraordinary
circumstance that entitles Tharpe to reopen his judgment under Rule
60(b).  He has already received the benefit of the rule announced in
*Pena-Rodriguez.*

[3]Even if Tharpe could show that *Pena-Rodriguez* is retroactive under
*Teague* and could overcome his procedural default, no reasonable jurist
could argue that he has stated a valid juror-bias claim on the merits.
The state court concluded that his claim failed in the absence of any
admissible evidence to support it.  See *Tharpe* v. *Warden*, No. 93–cv–
144 (Super. Ct. Butts Cty., Ga., Dec. 1, 2008), App. F to Pet. for Cert.
102.  To obtain federal habeas relief, Tharpe must show that this
merits decision "was contrary to, or involved an unreasonable applica-
tion of, clearly established Federal law, as determined by the Supreme
Court of the United States."  28 U. S. C. §2254(d)(1).  Since the state
court issued its decision nearly a decade before *Pena-Rodriguez*, no
reasonable jurist could argue that the state court's decision was con-
trary to clearly established law at "the time the state court render[ed]
its decision."  *Cullen* v. *Pinholster*, 563 U. S. 170, 182 (2011) (internal
quotation marks omitted).

WASHAR0001289

THOMAS, J., dissenting

did not have to raise his claim of juror bias on direct appeal. Reply Brief 7–8. But Tharpe never raised this argument in state court, so the state court did not err in failing to accept it. Nor did the District Court abuse its discretion in failing to address it, since Tharpe merely mentioned it in a footnote in his reply brief where he was explaining the state court's decision. And even if Tharpe's description of Georgia law is correct and relevant in a federal habeas proceeding, he offers no explanation for why he waited seven years after his trial to obtain Gattie's affidavit. See *Fults* v. *GDCP Warden*, 764 F. 3d 1311, 1317 (CA11 2014). In short, Tharpe has not offered a viable argument on cause in any court.

## B

On the one issue it does address—prejudice—the Court falters again. Its conclusion that reasonable jurists could debate prejudice plows through three levels of deference. First, it ignores the deference that appellate courts must give to trial courts' findings on questions of juror bias. See *Skilling* v. *United States*, 561 U. S. 358, 396 (2010) ("In reviewing claims [of juror bias], the deference due to district courts is at its pinnacle: 'A trial court's findings of juror impartiality may be overturned only for manifest error'" (quoting *Mu'Min* v. *Virginia*, 500 U. S. 415, 428 (1991))). Then, it ignores the deference that federal habeas courts must give to state courts' factual findings. See 28 U. S. C. §2254(e)(1). Finally, it ignores the deference that federal appellate courts must give to federal district courts' discretionary decisions under Rule 60(b). See *Browder* v. *Director, Dept. of Corrections of Ill.*, 434 U. S. 257, 263, n. 7 (1978).

With all this deference, no reasonable jurist could debate the question of prejudice. The state court's finding that Tharpe "failed to show that any alleged racial bias of Mr. Gattie's was the basis for sentencing" him, App. F to

THOMAS, J., dissenting

Pet. for Cert. 102, was supported by ample evidence. Gattie testified in his second affidavit that he did not impose a death sentence because of Tharpe's race. He also denied having sworn to the first affidavit and explained that he had consumed a substantial amount of alcohol on the day he signed it. Gattie's testimony was consistent with the testimony of the other ten jurors deposed in front of the trial court, each of whom testified that they did not consider race and that race was not discussed during their deliberations. To be sure, there was some evidence cutting the other way—most notably, Gattie's first affidavit. But the state court heard all of the evidence, saw the witnesses' demeanor, and decided to credit Gattie's testimony that he did not vote for the death penalty because of Tharpe's race. Even if we were reviewing the state court directly, its finding would be entitled to substantial deference. See *Skilling, supra,* at 396.

But we are not reviewing the state court directly. Instead, the relevant question is whether a reasonable jurist could argue that the District Court abused its discretion by concluding that the state court's decision to credit Gattie's testimony has not been rebutted by clear and convincing evidence. Even if "[r]easonable minds reviewing the record might disagree about" the evidence, "on habeas review that does not suffice to supersede the [state] court's credibility determination." *Rice* v. *Collins,* 546 U. S. 333, 341–342 (2006). And even if we might have made a different call, abuse-of-discretion review means we cannot "substitute [our] judgment for that of the district court." *Horne* v. *Flores,* 557 U. S. 433, 493 (2009) (BREYER, J., dissenting). Under these standards, no reasonable jurist could argue that Tharpe rebutted the state court's decision by clear and convincing evidence, much less that the District Court's deference to the state court's credibility determination was an abuse of discretion.

WASHAR0001291

THOMAS, J., dissenting

### III

The Court is cognizant of the weakness of Tharpe's claims. It openly anticipates that he will not be able to obtain a COA, which makes sense given the insurmountable barriers he faces on remand. Moreover, the Court's preliminary decision that reasonable jurists could debate prejudice says little about how a court of appeals could ever rule in Tharpe's favor on the merits of that question, given the multiple levels of deference that apply. At most, then, the Court's decision merely delays Tharpe's inevitable execution.

The Court tries to justify its decision "on the unusual facts of this case." *Ante,* at 3. But there is nothing unusual about deferring to a district court's decision to defer to a state court's credibility findings. This case involves a mine-run denial of a COA by a lower court on the eve of an execution, one that this Court routinely denies certiorari to address.

Today's decision can be explained only by the "unusual fac[t]" of Gattie's first affidavit. *Ibid.* The Court must be disturbed by the racist rhetoric in that affidavit, and must want to do something about it. But the Court's decision is no profile in moral courage. By remanding this case to the Court of Appeals for a useless do-over, the Court is not doing Tharpe any favors. And its unusual disposition of his case callously delays justice for Jaquelin Freeman, the black woman who was brutally murdered by Tharpe 27 years ago. Because this Court should not be in the business of ceremonial handwringing, I respectfully dissent.

WASHAR0001292

| | |
|---|---|
| **From:** | Timothy Mooney <Timothy.Mooney@bis.doc.gov> |
| **Sent:** | Thursday, April 12, 2018 11:14 AM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: Cats I-III |
| **Attach:** | OIRA webpage indicating review of Commerce firearms rule is completed.png; OIRA webpage indicating review of State Cat I II and III rule is complet....png |

Rob,

I was just getting ready to send this email out to the BIS group:

OMB has completed its review of the Commerce and State Categories I, II, and III rules.

The public can see that OMB has completed its review of the Commerce rule based on the short blurb included in the attached from reginfo.gov.  OMB also concluded their review of the State rule.  I attached those website blurbs for reference and also links to the website.  OGC is checking with Jasmeet to see if any additional information may be available to the public at this point, but we believe the limited information in the attached is what the public can see:

Reginfo.gov website indicating OIRA has completed its review of the Commerce rule:
https://www.reginfo.gov/public/do/eoReviewSearch

Reginfo.gov website indicating OIRA has completed its review of the State rule:
https://www.reginfo.gov/public/do/eoReviewSearch


**We had to update one of the web addresses in the rule for that Annex A, so OGC at Commerce will re-upload the rule to OMB, and then OGC will be cleared to give the docket number.  So we also done with the OMB review process.**

**Tim**

**From:** Monjay, Robert [mailto:MonjayR@state.gov]
**Sent:** Thursday, April 12, 2018 11:09 AM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Subject:** Cats I-III

Tim,
We got word that OMB concluded its review yesterday. Have you heard the same on your rule?
Thanks
Rob



## Office of Information and Regulatory Affairs (OIRA)
### Executive Order Submissions with Review Completed in Last 30 Days
April 12, 2018

### Department of Commerce

AGENCY: DOC-BIS                    RIN: 0694-AF47          Status: Concluded

TITLE: Revisions to the Export Administration Regulations: Control of Firearms and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List

STAGE: Proposed Rule              ECONOMICALLY SIGNIFICANT: No
RECEIVED DATE: 09/26/2017          LEGAL DEADLINE: None
REVIEW EXTENDED
** COMPLETED: 04/11/2018           COMPLETED ACTION: Consistent with Change

WASHAR0001294



OFFICE of INFORMATION and REGULATORY AFFAIRS

Reginfo.gov

U.S. General Services...

Search: ○ Agenda   ○ Reg Review   ○ ICR

| Home | Unified Agenda | Regulatory Review | Information Collection Review | FAQs / Resources | Contact Us |

Office of Information and Regulatory Affairs (OIRA)
Executive Order Submissions with Review Completed in Last 30 Days
April 12, 2018

Department of State

AGENCY: STATE                                    RIN: 1400-AE50                              Status: Concluded
TITLE: International Traffic in Arms Regulations: Categories I, II, and III
STAGE: Proposed Rule                             ECONOMICALLY SIGNIFICANT: No
RECEIVED DATE: 09/28/2017                        LEGAL DEADLINE: None
REVIEW EXTENDED
** COMPLETED: 04/11/2018                          COMPLETED ACTION: Consistent with Change

Note: "**" denotes recent change in status.

About Us  |  Related Resources  |  Disclosure  |  Accessibility  |  Privacy Policy  |  Contact Us

  

WASHAR0001295

**From:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Sent:** Wednesday, April 18, 2018 8:39 AM
**To:** Monjay, Robert <MonjayR@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Re: United States Munitions List to the Commerce Control List

---

**From:** Monjay, Robert <MonjayR@state.gov>
**Date:** April 18, 2018 at 6:47:12 AM EDT
**To:** McKeeby, David I <McKeebyDI@state.gov>, PM-CPA <PM-CPA@state.gov>, Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Re: United States Munitions List to the Commerce Control List

Dave,

Thanks
Rob

---

**From:** McKeeby, David I <McKeebyDI@state.gov>
**Date:** April 18, 2018 at 11:32:36 AM GMT+2
**To:** Monjay, Robert <MonjayR@state.gov>, PM-CPA <PM-CPA@state.gov>, Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Re: United States Munitions List to the Commerce Control List

Rob:

Best,
--D--

Sent from my BlackBerry 10 smartphone.

**From:** Monjay, Robert
**Sent:** Wednesday, April 18, 2018 4:47 AM
**To:** PM-CPA; Heidema, Sarah J
**Cc:** Hart, Robert L
**Subject:** Fwd: United States Munitions List to the Commerce Control List



**From:** ███████████████████4@gmail.com>
**Date:** April 18, 2018 at 10:34:37 AM GMT+2
**To:** Monjay, Robert <MonjayR@state.gov>
**Subject:** United States Munitions List to the Commerce Control List

Hi Robert,

I'm looking for information regarding the rule change in the link below.

https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=1400-AE30

Is this rule now in place? If not can you give a time frame when it can be expected to pass and or the process for it to be passed?

Regards
███████████

**From:** McKeeby, David I <McKeebyDI@state.gov>
**Sent:** Wednesday, April 18, 2018 8:58 AM
**To:** Monjay, Robert <MonjayR@state.gov>
**Subject:** Re: United States Munitions List to the Commerce Control List



Best,
--D--

Sent from my BlackBerry 10 smartphone.

**From:** Monjay, Robert
**Sent:** Wednesday, April 18, 2018 7:42 AM
**To:** McKeeby, David I
**Subject:** Re: United States Munitions List to the Commerce Control List

Rob

---

**From:** McKeeby, David I <McKeebyDI@state.gov>
**Date:** April 18, 2018 at 1:22:33 PM GMT+2
**To:** Monjay, Robert <MonjayR@state.gov>
**Subject:** Re: United States Munitions List to the Commerce Control List

Best,
--D--

WASHAR0001298

Sent from my BlackBerry 10 smartphone.

**From:** Monjay, Robert
**Sent:** Wednesday, April 18, 2018 7:17 AM
**To:** McKeeby, David I
**Subject:** Re: United States Munitions List to the Commerce Control List

██████████████████████████████████████████████

**From:** McKeeby, David I <McKeebyDI@state.gov>
**Date:** April 18, 2018 at 1:11:48 PM GMT+2
**To:** Monjay, Robert <MonjayR@state.gov>
**Subject:** Re: United States Munitions List to the Commerce Control List

Rob:

████████████████████████████████████

Best,
--D--

Sent from my BlackBerry 10 smartphone.

**From:** Monjay, Robert
**Sent:** Wednesday, April 18, 2018 6:47 AM
**To:** McKeeby, David I; PM-CPA; Heidema, Sarah J
**Cc:** Hart, Robert L
**Subject:** Re: United States Munitions List to the Commerce Control List

Dave,

████████████████████████████████████████████████

Thanks
Rob

**From:** McKeeby, David I <McKeebyDI@state.gov>
**Date:** April 18, 2018 at 11:32:36 AM GMT+2
**To:** Monjay, Robert <MonjayR@state.gov>, PM-CPA <PM-CPA@state.gov>, Heidema, Sarah J
<HeidemaSJ@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Re: United States Munitions List to the Commerce Control List

Rob:

████████████████████████████████████████████

Best,
--D--

Sent from my BlackBerry 10 smartphone.

**From:** Monjay, Robert
**Sent:** Wednesday, April 18, 2018 4:47 AM
**To:** PM-CPA; Heidema, Sarah J
**Cc:** Hart, Robert L
**Subject:** Fwd: United States Munitions List to the Commerce Control List

Josh and Sarah,

████████████████████████████████████████████

Thanks
Rob

---

**From:** ████████████████ @gmail.com>
**Date:** April 18, 2018 at 10:34:37 AM GMT+2
**To:** Monjay, Robert <MonjayR@state.gov>
**Subject:** United States Munitions List to the Commerce Control List

Hi Robert,

I'm looking for information regarding the rule change in the link below.

https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=1400-AE30

Is this rule now in place? If not can you give a time frame when it can be expected to pass and or the process for it to be passed?

Regards

████████████████

WASHAR0001300

| **From:** | ███████████ @comcast.net> |
| **Sent:** | Thursday, April 26, 2018 1:53 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | Status |

My name is Michael Lemley owner of Chicken Ranch Firearms. Im a small business and would like to apply for my 07 manufacturing license. I am inquiring about the status of the attached proposal.
Thank you!

https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=1400-AE30
Sent from XFINITY Connect Application

WASHAR0001301

**From:** ████████████████ @gmail.com>
**Sent:** Wednesday, April 18, 2018 4:34 AM
**To:** Monjay, Robert <MonjayR@state.gov>
**Subject:** United States Munitions List to the Commerce Control List

Hi Robert,

I'm looking for information regarding the rule change in the link below.

https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=1400-AE30

Is this rule now in place? If not can you give a time frame when it can be expected to pass and or the process for it to be passed?

Regards
████████████

| | |
|---|---|
| **From:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Sent:** | Friday, May 4, 2018 11:43 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| **Subject:** | AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations |
| **Attach:** | (FT_441541) 201812286-FD_Tab-4.pdf; (F_441536) 201812286-FD.pdf; (FT_441537) 201812286-FD_Tab-1.pdf; (FT_441538) 201812286-FD_Tab-2.pdf; (FT_441539) 201812286-FD_Tab-3.pdf |

RMA – S approved.  See attached.

Best,

Bill Hayes
<u>PM/FO SharePoint</u>
Staff Assistant
202-647-8089

WASHAR0001303

Billing Code 4710-25

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10094]**

**RIN 1400-AE30**

**Amendment to the International Traffic in Arms Regulations:  Revision of U.S. Munitions List Categories I, II, and III**

**AGENCY:**  Department of State.

**ACTION:**  Proposed rule.

**SUMMARY:**  The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).

**DATES:**  The Department will accept comments on this proposed rule until [insert date 45 days from date of publication in the *Federal Register*].

**ADDRESSES:**

Interested parties may submit comments within 45 days of the date of publication by one of the following methods:

- E-mail:  *DDTCPublicComments@state.gov* with the subject line, "ITAR Amendment – Categories I, II, and III."
- Internet:  At *www.regulations.gov,* search for this notice by using this rule's RIN (1400-AE30).

Comments received after that date will be considered if feasible, but consideration cannot be assured. Those submitting comments should not

WASHAR0001304

include any personally identifying information they do not desire to be made public or information for which a claim of confidentiality is asserted, because those comments and/or transmittal e-mails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at *www.pmddtc.state.gov*. Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov*, leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.

**FOR FURTHER INFORMATION CONTACT:** Robert Monjay, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663-2817; e-mail *DDTCPublicComments@state.gov*. ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120-130). The items subject to the jurisdiction of the ITAR, *i.e.*, "defense articles," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730-774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. The Department of Commerce is publishing a companion rule in this edition of the *Federal Register*.

2

WASHAR0001305

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the United States Munitions List under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR Part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1(b) of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including

3

facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule proposes adding a new paragraph (b)(2)(vii) to section 129.2 to update the enumerated list of actions that are not considered brokering.  This change is a conforming change and is needed to address the movement of items from the USML to the CCL that will be subject to the brokering controls, to ensure that the US government does not impose a double licensing requirement on the export, reexport or retransfer of such items.

The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

**Revision of Category I**

This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in

WASHAR0001307

Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used

WASHAR0001308

in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".

**Revision of Category II**

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f), engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (j)(11).

WASHAR0001309

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

**Revision of Category III**

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the

7

WASHAR0001310

EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

**Conforming ITAR Changes**

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions at §123.17, as the paragraphs in that section (a) through (e) that describe the firearms exemptions will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, §123.16(b)(6) will be revised to describe only the remaining exemption at §123.17 (personal protective gear), and §123.16(b)(7) will be reserved. Section 123.17 will be amended to remove subparagraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of §124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in §126.1(s) will be revised to remove reference to the firearms exemption in §123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21).  Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USMIL

8

that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are on the USMIL for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

**Request for Comments**

The Department welcomes comments from the public and specifically requests input on the following matters:

1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in its Munitions List Categories 1, 2 and 3 (WA-ML1, WA-ML2 and WA-ML3). Readers are asked to identify any potential gap in coverage brought about by the changes for USML Categories I, II and III contained in this notice and the new Category 0, 0x5zz ECCNs published separately by the Department of Commerce when reviewed together.

2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms, large guns, armaments, ordnance and ammunition. The public should provide any specific examples of firearms (or parts, components, accessories thereof), large guns, armaments, ordnance or ammunition whose jurisdiction is unclear based on this revision.

3) The Department has, in the past, adopted a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL. The Department seeks to allow industry sufficient time to implement this rule, including time to make changes to IT systems,

9

technology controls plans, and other business processes. The public should provide input on the time necessary to implement any final rule for these categories, as well as a description of any increased burden that, in the view of the commenter, would be imposed on businesses or individuals should this rule be adopted.

**REGULATORY ANALYSIS AND NOTICES**

*Administrative Procedure Act*

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, the Department is publishing this proposed rule with a 45-day provision for public comment.

*Regulatory Flexibility Act*

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

*Unfunded Mandates Reform Act of 1995*

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions

10

were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

*Executive Orders 12372 and 13132*

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

*Executive Orders 12866 and 13563*

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL. We request comment from the public on any impact that would be imposed on the public if this rule were adopted.

11

WASHAR0001314

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this proposed rule would decrease the number of license applications submitted to the Department under OMB Control No. 1405-0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department will be eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions will require an individual validated license. The Department of Commerce will be collecting the information necessary to process license applications under OMB Control No. 0694-0088.  The Department of Commerce estimates that OMB Control No. 0694-0088 takes approximately 43.8 minutes for a manual or electronic submission. The Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection. The Department estimates a reduction in burden of 10,000 hours due to the proposed transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce will be 4,380 burden hours. Therefore, the net burden would be reduced by 5,620 hours.

12

The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80. There may also be other State Department forms that will no longer need to be submitted and that may further reduce the burden hours for applicants. The Department is seeking comments on the reduction from the other forms, as referenced below.

In addition to the reduction in burden hours, there will be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to exporters under the EAR and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to

13

WASHAR0001316

taxpayers, because they would no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.

The Department welcomes comments from the public on the net reduction in burden described within this section, particularly if there are additional burden reductions that are not reflected here (please provide number of hours or cost) or if the estimates noted here appear otherwise inaccurate.

Estimated cost savings

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from Executive Order 13771 (82 FR 9339, February 3, 2017). Although the Department is of the opinion that this proposed rule is exempt from E.O. 13771 and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, this proposed rule is expected to be an EO 13771 deregulatory action. The Department has conducted this analysis in close consultation with the Department of Commerce. The total annual recurring dollar cost savings is estimated to be $1,376,281 for purposes of E.O. 13771 for the Department of State.

*Executive Order 12988*

The Department of State has reviewed this rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

14

The Department of State has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

*Paperwork Reduction Act*

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

The Department of State believes there would be a reduction in burden for OMB Control No. 1405-0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data. This form is an application that, when completed and approved by Department of State, constitutes the official record and authorization for the commercial export of unclassified U.S. Munitions List articles and technical data, pursuant to the AECA and ITAR. For an analysis of the reduction in burden for OMB Control No. 1405-0003, see the above Section for E.O. 12866. The Department of State requests comments on the collection of information or potential reduction in burden be sent also to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for Department of State, at OIRA_Submission@omb.eop.gov or Attention: Desk Officer for Department of State, Office of Information and Regulatory Affairs of OMB, 725 17th St NW, Washington, D.C. 20503.

**List of Subjects in Parts 121, 123, 124, 126, and 129**

15

Arms and munitions, Exports

Accordingly, for the reasons set forth above, Title 22, Chapter I, Subchapter M, parts 121, 123, 124, 126, and 129 are proposed to be amended as follows:

## PART 121 – THE UNITED STATES MUNITIONS LIST

1. The authority citation for part 121 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112-239; E.O. 13637, 78 FR 16129.

2. Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

## §121.1 The United States Munitions List.

### I—Firearms and Related Articles

*(a) Firearms using caseless ammunition.

*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms (PGFs)), and specially designed parts and components therefor.

*Note to paragraph (c):* Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

*(e) Silencers, mufflers, and sound suppressors, and specially designed parts and components therefor.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

16

WASHAR0001319

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm.

(3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* §120.10 of this subchapter) and defense services (*see* §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* §125.4 of this subchapter for exemptions.)

(j)-(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* §120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* §123.1(b) of this subchapter).

*Note 1 to Category I:* Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude: any non-automatic or semi-automatic firearms to .50 caliber (12.7 mm) inclusive; non-automatic shotguns; BB, pellet, and muzzle loading (*e.g.*, black powder) firearms; and parts, components, accessories,

17

and attachments of firearms and shotguns in paragraph (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730-774).

*Note 2 to Category I:* The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant.

(2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

**Category II— Guns and Armament**

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (12.7 mm) (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction

18

WASHAR0001321

determination (*see* §120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

*Note 1 to paragraph (a)***:** This paragraph does not include:  Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; or black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602.

*Note 2 to paragraph (a)*:  Guns and armament when integrated into their carrier (*e.g.*, ships, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with a minimum effective range of 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

*Note to paragraph (d):* Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses

19

larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)-(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independently powered ammunition handling systems and platform interface components as follows:

(i) Mounts;

(ii) Carriages;

20

WASHAR0001323

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(9)*:  For weapons mounts specially designed for ground vehicles, *see* Category VII.

(10) Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(11) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(15) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

21

WASHAR0001324

*(16) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* §120.10 of this subchapter) and defense services (*see* §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* §125.4 of this subchapter for exemptions.)

(l)-(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* §120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):*  Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* §123.1(b) of this subchapter).

**Category III — Ammunition and Ordnance**

*(a) Ammunition, as follows:

(1) Ammunition that incorporates a projectile controlled in paragraphs (d)(1) or (d)(3) of this category;

22

WASHAR0001325

(2) Ammunition preassembled into links or belts;

(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4)*:  Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

(7) Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles;

(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* §120.4 of this subchapter), or (c) identified in

WASHAR0001326

the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

*Note to paragraph (d)(2):* This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

24

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):*  This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

25

WASHAR0001328

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* §120.10 of this subchapter) and defense services (*see* §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* §125.4 of this subchapter for exemptions.).

(f)-(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* §120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x)*:  Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* §123.1(b) of this subchapter).

*Notes to Category III*:

1. This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

2. This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

26

WASHAR0001329

3. Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

* * * * *

## PART 123 – LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

3.  The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112-55; Section 1261, Pub. L. 112-239; E.O. 13637, 78 FR 16129.

4.  Section 123.15 is amended by revising paragraph (a)(3), as follows:

## § 123.15  Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.

(a) * * *

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, of this subchapter, in an amount of $1,000,000 or more.

* * * * *

5.  Section 123.16 is amended by revising paragraphs (b)(2) and (b)(6), and by removing paragraph (b)(7) and placing it in reserve, as follows:

## §123.16  Exemptions of general applicability.

* * * * *

(b) * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

WASHAR0001330

* * * * *

(6) For exemptions for personal protective gear, refer to §123.17 of this subchapter.

(7) [Reserved]

* * * * *

6.  Section 123.17 is amended by revising the section heading, and removing paragraphs (a) through (e) and placing them in reserve and by revising paragraph (j), as follows:

**§123.17  Exemption for personal protective gear.**

(a) – (e) [Reserved]

* * * * *

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

* * * * *

7.  Section 123.18 is removed and reserved.

**§123.18  [Reserved]**

**PART 124 – AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES**

8.  The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111-266; Section 1261, Pub. L. 112-239; E.O. 13637, 78 FR 16129.

9.  Section 124.14 is amended by revising paragraph (c)(9) to read as

28

WASHAR0001331

follows:

## §124.14  Exports to warehouses or distribution points outside the United States.

* * * * *

(c) * * *

 (9) Additional clause.  Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (*e.g.*, cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

* * * * *

## PART 126 – GENERAL POLICIES AND PROVISIONS

10. The authority citation for part 126 continues to read as follows:

**Authority:**  Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p.899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111-117; Pub. L. 111-266; Section 7045, Pub. L. 112-74; Section 7046, Pub. L. 112-74; E.O. 13637, 78 FR 16129.

11. Section 126.1 is amended by revising paragraph (s) to read as follows:

## §126.1  Prohibited exports, imports, and sales to or from certain countries.

* * * * *

29

WASHAR0001332

(s) *Zimbabwe.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe, except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

* * * * *

**PART 129 -- REGISTRATION AND LICENSING OF BROKERS**

12. The authority citation for part 129 continues to read as follows:

**Authority**:  Section 38, Pub. L. 104-164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

13. Section 129.1 is amended by revising paragraph (b) to read as follows:

**§129.1   Purpose.**

* * * * *

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

14. Section 129.2 is amended by revising paragraph (b)(2)(v) by removing the word "or" at the end of the paragraph, adding the word "or" at the end of paragraph (b)(2)(vi), and adding a new paragraph (b)(2)(vii), to read as follows:

**§129.2   Definitions.**

* * * * *

(b) * * *

30

WASHAR0001333

(2) * * *

(vii) Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter.

*****

15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i), to read as follows:

§129.4    Requirement for approval.

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (see §120.44 of this subchapter, and §129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (*see* 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of §121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the U.S. Munitions Import List (*see* 27 CFR 447.21);

* * * * *

16. Section 129.6 is amended by revising paragraph (b)(3)(i), to read as follows:

§129.6    Procedures for obtaining approval.

* * * * *

(b) * * *

(3) * * *

31

WASHAR0001334

(i) The U.S. Munitions List or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

WASHAR0001335

| | |
|---|---|
| **From:** | Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| **Sent:** | Friday, May 4, 2018 4:56 PM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations |

Yes.

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Email: davidsonhoodS@state.gov
SIPR: Davidson-hoodS@state.sgov.gov

**Official**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Friday, May 4, 2018 4:45 PM
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

███████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, May 4, 2018 4:43 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Fwd: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Simon,

████████████████████████████████

Thanks
Rob

**From:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Date:** May 4, 2018 at 2:19:54 PM EDT
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>, Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations



Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

---

**From:** Monjay, Robert
**Sent:** Friday, May 04, 2018 1:20 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Bill,

Rob

**Official - SBU**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Friday, May 4, 2018 11:43 AM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

RMA – S approved.  See attached.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

WASHAR0001338

| | |
|---|---|
| **From:** | Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| **Sent:** | Friday, May 4, 2018 4:56 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Hart, Robert L <HartRL@state.gov> |
| **Subject:** | RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations |

Already done.

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Email: davidsonhoodS@state.gov
SIPR: Davidson-hoodS@state.sgov.gov

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, May 4, 2018 4:43 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Fwd: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Simon,

███████████████████████████████████

Thanks
Rob

**From:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Date:** May 4, 2018 at 2:19:54 PM EDT
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>, Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations



Best,

Bill Hayes
<u>PM/FO SharePoint</u>
Staff Assistant
202-647-8089

---

**From:** Monjay, Robert
**Sent:** Friday, May 04, 2018 1:20 PM
**To:** PM-Staffers Mailbox <<u>PM-StaffersMailbox@state.gov</u>>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Bill,

Thanks
Rob

**Official - SBU**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Friday, May 4, 2018 11:43 AM
**To:** PM-DTCP-RMA <<u>PM-DTCP-RMA@state.gov</u>>
**Subject:** AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

RMA – S approved.  See attached.

Best,

Bill Hayes
<u>PM/FO SharePoint</u>
Staff Assistant
202-647-8089

| | |
|---|---|
| **From:** | Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| **Sent:** | Friday, May 4, 2018 4:57 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Subject:** | RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations |

Quite alright.  They're flying around today.

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Email: davidsonhoodS@state.gov
SIPR: Davidson-hoodS@state.sgov.gov

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, May 4, 2018 4:52 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Yeah, sorry. I started at the bottom of the inbox.

**From:** Hart, Robert L <HartRL@state.gov>
**Date:** May 4, 2018 at 4:45:06 PM EDT
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, May 4, 2018 4:43 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>

**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** Fwd: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Simon,

███████████████████████████████████████

Thanks
Rob

---

**From:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Date:** May 4, 2018 at 2:19:54 PM EDT
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>, Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations



Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

---

**From:** Monjay, Robert
**Sent:** Friday, May 04, 2018 1:20 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Bill,

███████████████████████████████

Thanks
Rob

**Official - SBU**
**UNCLASSIFIED**

---

**From:** PM-Staffers Mailbox
**Sent:** Friday, May 4, 2018 11:43 AM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the

International Traffic in Arms Regulations

RMA – S approved.  See attached.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

WASHAR0001343

| | |
|---|---|
| **From:** | Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| **Sent:** | Friday, May 4, 2018 1:50 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Hart, Robert L <HartRL@state.gov> |
| **Subject:** | RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations |
| **Attach:** | DS-5.pdf |

Hi Rob,

I put it in the RMA/Cat I, Proposed Rule Final Package folder on the share drive.

Best,
*SDH*

Regulatory and Multilateral Affairs
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
Department of State
Tel: 202-663-2811
Email: davidsonhoodS@state.gov
SIPR: Davidson-hoodS@state.sgov.gov

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, May 4, 2018 1:01 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** FW: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Do you have the DS-5 for this? If not, can you get it?

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Friday, May 4, 2018 11:43 AM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

RMA – S approved.  See attached.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089



U.S. Department of State

**REQUISITION FOR PUBLISHING, REPRODUCTION, AND DISTRIBUTION SERVICES**

| | | | |
|---|---|---|---|
| Security Classification | Work Order Number (For GPS Use Only) | Request Date (mm-dd-yyyy) | Due Date (mm-dd-yyyy) |

## SECTION 1: SERVICE CATEGORY

Service Category:   Federal Register Publication

## SECTION 2: REQUESTOR'S INFORMATION

| Contact Person | E-mail Address |
|---|---|
| Simon Davidson-Hood | davidsonhoods@state.gov |

| Telephone Number | Office Symbol | Room Number | Building |
|---|---|---|---|
| 202-663-2811 | PM/DTCP | 1304 | SA1 |

## SECTION 3: JOB INFORMATION

Title of job to be reproduced or Title of Job

Amendment to the International Traffic in Arms Regulations: Revision of USML Categories I-III

## SECTION 4: AUTHORIZATION

FUNDS AVAILABLE

| Name of Authorizing Official | Phone Number | E-mail Address | Estimated Cost |
|---|---|---|---|
| Karen Lewis Budget Analyst ISN-PM-AVC/EX/RM | | | 125 x 32 = 4,000 |

Authorizing Official Signature   *Karen Lewis*   4/17/18      Date (mm-dd-yyyy)

SIGNATURE          DATE

| Appropriation | Allotment | Obligation Number | Organization Code | Function Code | Object Code | Amount |
|---|---|---|---|---|---|---|
| 19 XD413.0 | 1039 | 8D9100X | 014800 | 2122 | 2488 | #4,000 |

DS-5
06-2015

| | |
|---|---|
| **From:** | Tucker, Maureen E <TuckerME@state.gov> |
| **Sent:** | Friday, May 4, 2018 5:01 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations |

Thanks Rob, going forward, T will approve and sign rules.

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, May 4, 2018 4:57 PM
**To:** Tucker, Maureen E <TuckerME@state.gov>
**Subject:** Fwd: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Maureen,
I am sure you saw this, but I wanted to highlight it for you. S approves the Cats I-III AM and PDAS Kaidanow signed it this afternoon. PM/CPA is working on setting up the briefing for week after next and we'll seek to publish it at the same time.
Thanks
Rob

---

**From:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Date:** May 4, 2018 at 11:42:45 AM EDT
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

RMA – S approved.  See attached.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮@trex-arms.com> |
| **Sent:** | Tuesday, May 1, 2018 12:48 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RIN 1400-AE30 |

Hello Robert,

You were listed as the contact for a rule change (**RIN:** 1400-AE30), so I'm reaching out to you.
https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=1400-AE30

Our company is planning to enter the firearms manufacturing business and this proposed rule change would be very beneficial to us. Is there any way to find out how the change is progressing, or when it might go into effect? Is there a comment period, and if so, where would I submit one?

Thank you for your time,





| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Monday, May 14, 2018 12:43 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | Cats I-III Cheat Sheet (004) |
| **Attach:** | Cats I-III Cheat Sheet (004).docx |

**Official**
**UNCLASSIFIED**

WASHAR0001348

| | |
|---|---|
| **From:** | Timothy Mooney <Timothy.Mooney@bis.doc.gov> |
| **Sent:** | Thursday, May 10, 2018 9:23 AM |
| **To:** | Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| **Cc:** | Monjay, Robert <MonjayR@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Subject:** | Copy of the signed Commerce rule. Can you send me an electronic copy of the State signed rule? |
| **Attach:** | 05.4.18 Signed Commerce firearms proposed rule for sending to OFR for publication.docx; 05.4.18 Signed Commerce firearms proposed rule for sending to OFR for publication.pdf |

Hi Simon,

Attached is the Word version and scanned PDF copy of the signed Commerce rule.

Can you guys send me if you have a scanned copy of the signed State rule that you could send me?

If you don't have a scanned copy, then a copy of the Word version works, too.  Just want to make sure we have the final signed version.

Thanks,
Tim

WASHAR0001349

**Billing Code: 3510-33-P**

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774**

**[Docket No. 111227796-5786-01]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML).**

**AGENCY:  Bureau of Industry and Security, Department of Commerce.**

**ACTION:  Proposed rule.**

WASHAR0001350

**SUMMARY:**

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I – Firearms, Close Assault Weapons and Combat Shotguns; Category II – Guns and Armament; and Category III – Ammunition/Ordnance would be controlled under the Commerce Control List (CCL).  This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.

**DATES:** Comments must be received by [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES:**  You may submit comments by any of the following methods:

- Submit comments via Federal eRulemaking Portal: http://www.regulations.gov.  You can find this proposed rule by searching on its regulations.gov docket number, which is BIS-2017-0004.

- By mail or delivery to Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of Commerce, Room 2099B, 14th Street and Pennsylvania Avenue, NW, Washington, DC 20230.  Refer to RIN 0694-AF47.

2

WASHAR0001351

**FOR FURTHER INFORMATION CONTACT:**  Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641 or e-mail steven.clagett@bis.doc.gov.

**SUPPLEMENTARY INFORMATION:**

**Background**

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I – Firearms, Close Assault Weapons and Combat Shotguns; Category II – Guns and Armament; and Category III – Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR).  This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments.  The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the

3

WASHAR0001352

United States, and are almost exclusively available from the United States.  If an article satisfies one or both of those criteria, the article remains on the USML.  If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule.  Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6."  The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR.  The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located.  The second character is a letter in the range A through E that identifies the product group within a CCL Category.  With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN.  Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

4

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non-military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items. BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada. As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule.

WASHAR0001354

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in Arms Regulations (ITAR), 22 CFR parts 120-130, and not to the list of defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA, 22 U.S.C. 2778 *et seq.*, for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items. After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available. Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR. There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive

WASHAR0001355

shooting, and other non-military activities.  Because of the popularity of shooting sports in the

United States, for example, many large chain retailers carry a wide inventory of the firearms

described in the new ECCNs for sale to the general public.  Firearms available through U.S.

retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber

bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

       An additional justification for the change in the jurisdictional status of the items

described in this rule is that the current ITAR controls burden U.S. industry without any

proportionate benefits to United States national security or foreign policy objectives.  Similar to

the challenges faced by other industries, the firearms trade has been negatively affected by the

incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content.  Currently,

under the ITAR, any part, component, accessory, or attachment for any of the firearms described

in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated

into foreign-made items or reexported to any third country.  Under the EAR, the *de minimis*

provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may

not be subject to the EAR, provided the U.S.-origin items meet the applicable *de minimis* level

for the country of reexport.  Similarly, a technical drawing of such part, component, accessory or

attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person

concerning those items, such as the application of protective coatings.  Moreover, a U.S. person

engaged in manufacturing or exporting these items or providing related defense services must

register with the State Department under the ITAR.  Thus, even if a U.S. company can

manufacture or service these items at a lower cost in the United States as compared to the cost

for a U.S. or foreign company to manufacture or service the items outside of the United States,

the ITAR's restrictions may render the items unattractive or uncompetitive for foreign

WASHAR0001356

manufacturers.  The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR."  (*See* part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology."  While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control.  For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (*i.e.*, unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR."  (*See* §§ 734.3(b) and 734.7(a).)  Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR.  (*See* 734.3(b)(3)(v).)

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA.  The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML.  The report must "describe the nature of any controls to be imposed on that item under any other provision of law."  22 U.S.C. 2778(f)(1).

8

WASHAR0001357

This Commerce proposed rule is being published simultaneously with a Department of State proposed rule. Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML. The Department of State proposed rule would revise Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML so that they describe in positive terms the defense articles that should remain on the USML. The Department of Commerce rule would add to the CCL items that the President determines no longer warrant control under the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL. This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether the public find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. The public is invited to comment on the appropriateness of these license requirements and licensing policies. The public is also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

**Detailed Description of Changes Proposed by This Rule**

9

**Creation of new ECCNs.**

This proposed rule would create 17 new ECCNs to control items proposed for removal from the USML.  A discussion of each new ECCN and the controls that would apply to items under that ECCN follows below.

*New ECCN 0A501: Firearms and related commodities.*

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components:"

- Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);

- Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);

- Detachable magazines with a capacity of greater than 16 rounds but less than 50 rounds that are "specially designed" for the firearms listed above;

- Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and

- Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors,

10

WASHAR0001359

pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, or disconnectors) if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) as specified in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This proposed rule would add a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also would add a second note to ECCN 0A501 to state that certain firearms and similar items are EAR99, *i.e.*, subject to the EAR but not on the CCL. Those items are: Antique firearms (*i.e.*, those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 would

11

WASHAR0001360

generally not be classified in any of the new ECCNs that would be created with this proposed rule. This would be consistent with Supplement No. 1 to Part 736, General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release from "specially designed." As a conforming change, this proposed rule would revise paragraph (e)(3) of General Order No. 5 to add a reference to "0x5zz" (to account for new ECCNs 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502 described below). The "600 series" and 9x515 (spacecraft and related items) are already included in paragraph (e)(3), and those references remain unchanged.

_New ECCN 0A502:  Shotguns and certain related commodities._

New ECCN 0A502 would control both the shotguns currently on the USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater). Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of Firearms Convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and end user) and United Nations (UN) reasons. Shotguns with a barrel length less than 18 inches would be controlled under NS Column 1, CC Column 1, FC, UN and AT Column 1 plus regional stability (RS Column 1), consistent with their current control on the USML. The shotguns controlled in 0A502 currently controlled in ECCN 0A984 would not be controlled for national security reasons because they are not on the WAML.

_New ECCN 0A503:  Discharge type arms, and certain other commodities._

This rule would replace existing ECCN 0A985 with a new ECCN 0A503. The rule would add "non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and

WASHAR0001361

'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML.  Renumbering this ECCN would cause entries controlling firearms and related items to be placed in close proximity to each other, which would make it easier for readers to identify items on the CCL.

### New ECCN 0A504:  Optical sighting devices and certain related commodities.

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms.  The reasons for control table, which currently states, *inter alia*, that the Firearms Convention (FC) reason for control applies to "optical sights for firearms," would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices.  In addition, BIS would add an RS control for certain riflescopes.  These riflescopes would be identified in their own paragraph in the ECCN under 0A504.i.  The riflescopes in this paragraph would be limited to those "specially designed" for use in firearms that are "subject to the ITAR."  An exclusion would be included in the criteria of this paragraph to ensure less sensitive riflescopes that would be moved from ECCN 0A987 to 0A504 on the effective date of a final rule, that currently are not RS controlled under the EAR, would not be controlled under this paragraph.  This rule would also add a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" is what would be used to determine whether a riflescope is "specially designed" for purposes of this paragraph.

This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the FC reason for control.  The new number

WASHAR0001362

is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

*New ECCN 0A505:  Ammunition and certain related commodities.*

New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that would be classified under proposed ECCN 0A501, and for most "parts" and "components" of such ammunition.  Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included.  This proposed rule would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells.  Buckshot shotgun shells would be subject to the CC Column 1, FC Column 1 and UN reasons for control.  Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control.  Only "parts" and "components" would be eligible for License Exception LVS.  Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles would remain in USML Category III.  Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III.  Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States.  Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations

14

and anti-terrorism reasons only.  Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes.  Possession of this ammunition does not confer a military advantage on the United States.  This rule proposes adding three notes to clarify the scope of "parts" and "components" for ammunition classified under ECCN 0A505.  Note 1 to 0A505.c would clarify the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants would be controlled under 1A984 and not 0A505.  Separately, Note 2 to 0A505.x would include an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers.  Note 3 to 0A505.x would clarify that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

*New ECCN 0A602: Guns and Armament.*

New ECCN 0A602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters.  It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML.  Note 2 to 0A602 confirms that

15

black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99. Inclusion of these guns and armament on the CCL is appropriate because they do not confer a significant military or intelligence advantage on the United States. The guns controlled in this ECCN are between 98 and 127 years old. The parts, components, accessories and attachments controlled in this ECCN include some that are for modern artillery. Modern artillery will remain on the USML, along with the most sensitive "parts," "components," "accessories" and "attachments" for these USML items. This proposed rule adds a note to clarify that "parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are not subject to the EAR. The USML Order of Review and CCL Order of Review already provide guidance for making such a jurisdictional and classification determination, but to highlight that these "parts," "components," "accessories" and "attachments" are not classified under paragraph (x) of 0A602, this rule proposes adding a note.

*New ECCN 0B501: Test, inspection and production equipment for firearms.*

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated in ECCN 0A501 or USML Category I." This new ECCN would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items. The four specific types of machinery are: small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures and other tooling "specially designed" for the

16

WASHAR0001365

"production" of items in the State Department proposed rule for USML Category I or ECCN 0A501.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501.  In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e.  Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability (RS) reason for control from RS Column 2 to RS Column 1.  This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

*New ECCN 0B505:  Test, inspection and production equipment for ammunition.*

WASHAR0001366

New ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition). Equipment for manufacturing shotgun shells that do not contain buckshot would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986. ECCN 0B505 would not include equipment for the hand loading of cartridges and shotgun shells, so this rule specifies this in the heading.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes. Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602: Test, inspection and production equipment for certain guns and armament.*

New ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated or otherwise described in ECCN 0A602.a or USML Category II. ECCN 0B602 would control eight specific types of equipment that currently are listed in paragraphs .e through .l of ECCN 2B018. Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor;

18

WASHAR0001367

Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses.  ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II).  Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1.  This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

*New ECCN 0D501: Software for firearms and certain related commodities.*

New ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or equipment under 0B501 except those

19

WASHAR0001368

commodities classified under 0A501.y.  "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505: Software for ammunition and certain related commodities.*

New ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and "specially designed" parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602: Software for guns and armament and certain related items.*

New ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

*New ECCN 0E501: Technology for firearms and certain related items.*

New ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" "required" for the "development" and "production" of firearms other than shotguns.  This new ECCN also would apply the anti-terrorism and United Nations reasons for

WASHAR0001369

control to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms. Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502: Technology for shotguns.*

New ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" required for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" required for the "development" or "production" of shotguns in ECCN 0E984. The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length. BIS believes that "technology" related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based solely on the barrel length of the shotgun would likely be ineffective.

*New ECCN 0E504: Technology for certain optical sighting devices.*

New ECCN 0E504 would replace existing ECCN 0E987, which controls ''technology'' ''required'' for the ''development,'' or ''production'' of certain commodities controlled by 0A504. The new ECCN number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other. New ECCN 0E504 would also impose a United Nations (UN) control on the entire entry.

21

WASHAR0001370

*New ECCN 0E505: Technology for ammunition and related items.*

New ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and "parts" and "components); 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505. "Technology" for the "development" or "production" of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons. United Nations and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for that ammunition and "technology" for "software" for that ammunition. Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

*New ECCN 0E602: Technology for guns and armament, including technology for test, inspection and production equipment and software for guns and armament.*

New ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair,

22

WASHAR0001371

overhaul or refurbishing of commodities controlled by ECCNs 0A602 or 0B602, or "software" controlled by 0D602.

**Revisions to seven ECCNs.**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this proposed rule would set forth the entire text of the seven ECCNs to be revised. To help the public understand what specific parts of the ECCNs would be different, the narrative below describes the amendments in detail.

*Revision to ECCN 0A018.*

With the proposed removal of ECCN 0A984 and the addition of 0A502 described above, this proposed rule would make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL. This change includes the removal of the note to 0A018.c.

*Revision to ECCN 0E982.*

ECCN 0E982 controls "technology" exclusively for the "development" or "production" of equipment controlled by ECCN 0A982 or 0A985. This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revision to ECCN 1A984.*

To clarify an existing agency practice of controlling shotguns shells that contain only chemical irritants under 1A984, this proposed rule would revise the heading of 1A984. As

WASHAR0001372

described above, the same type of clarification would be made to ECCN 0A505.c under new

Note 1 to paragraph (c).  BIS considers these to be conforming changes to the removal of ECCN

0A986 and the addition of ECCN 0A505.c in this proposed rule.

*Revisions to ECCN 2B004.*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the

related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B602 and

0B606.  This rule would make no substantive changes to ECCN 2B004.

*Revisions to ECCN 2B018.*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from

ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN

0B602.  It would remove paragraph .n, because the commodities listed in that paragraph would

be controlled under either ECCNs 0B501 or 0B602 or under existing ECCN 0B606 in this

proposed rule.  It would remove paragraphs .a through .d, .m and .s, because the commodities

listed in those paragraphs would be controlled in ECCN 0B606.  It would remove paragraphs .o,

.p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN

0B501.  The commodities described in the MT control in ECCN 2B018 currently listed as MT

are controlled elsewhere in the EAR, so no additional changes are needed to add these

commodities to other ECCNs.

*Revisions to ECCN 2D018.*

Currently ECCN 2D018 controls software for the "development," "production" or "use"

of equipment controlled by ECCN 2B018.  As a conforming change, this rule would replace the

24

WASHAR0001373

control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

*Revisions to ECCN 7A611.*

As a conforming change, this rule would remove the reference to 0A987 in the Related Controls paragraph (2) and add in its place 0A504.

**Removal of nine ECCNs.**

*Removal of ECCN 0A918.*

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons. This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control. Bayonets and the "technology" to produce them are available in many countries. Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective. Therefore, for these reasons, this proposed rule does not retain a regional stability (RS column 2) control on bayonets because it is no longer warranted.

*Removal of ECCN 0A984.*

This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either proposed ECCN 0A502 or 0A505. As

25

WASHAR0001374

conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1) and in ECCN 0A018.

*Removal of ECCN 0A985.*

This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by proposed ECCN 0A503. As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A503 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0E982.

*Removal of ECCN 0A986.*

This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by proposed 0A505.c, including less than lethal rounds. As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505, as appropriate in §§ 742.17(f); 742.19(a)(1); 746.3(b)(2) and 748.12(a)(1).

*Removal of ECCN 0A987.*

This proposed rule would remove ECCN 0A987 because proposed ECCN 0A504 would control all commodities currently controlled by ECCN 0A987. As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504, as appropriate in §§ 740.16(b)(2)(iv); 742.7(a)(1); 742.17(f); 744.9(a)(1) and (b); and 748.12(a)(1); and in ECCN 7A611.

*Removal of ECCN 0B986.*

WASHAR0001375

This proposed rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in proposed ECCN 0B505.c.  As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

*Removal of ECCN 0E918.*

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons.  Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

*Removal of ECCN 0E984.*

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and buckshot shotgun shells, because such "technology" would be controlled under proposed ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun shells).  As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

*Removal of ECCN 0E987.*

This proposed rule would remove ECCN 0E987 because proposed ECCN 0E504 would control all "technology" currently controlled by ECCN 0E987.  As conforming change, references to ECCN 0E987 would be replaced with references to ECCN 0E504, as appropriate in §§ 740.20(b)(2)(ii) and 742.7(a)(1).

27

WASHAR0001376

**Conforming change to General Order No. 5**

This proposed rule would amend General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that would be created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs would include new ECCN 0A501, 0A502, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E505. Paragraph (e)(2) is important because, for example, it ensures that items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an amendment to the CCL. For example, most swivels and scope mounts for firearms have previously been determined through the CJ and classification process to not be "subject to the ITAR" and designated as EAR99. The classification of such "parts" would not be changed, provided the "part" was not subsequently changed, which would require a separate jurisdiction and classification analysis.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition that would be added to the EAR**

This proposed rule would apply the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A505,

WASHAR0001377

0B501, 0B505, 0A504, 0D501, 0D505, 0E501, 0E504 and 0E505.  That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world."  This proposed rule would also revise the regional stability licensing policy set forth in the last sentence of paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items.  This proposed rule would add ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items will be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1.  Lastly, this proposed rule would add a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items would be subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern.  In addition, transactions involving criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries would be subject to a policy of denial.


**Availability of License Exceptions.**

Many of the items in the new "600 series" ECCNs generally would be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs.  BIS intends that those restrictions be no more restrictive than the ITAR license exemption restrictions that currently apply to those items.

WASHAR0001378

For the ECCNs currently on the CCL that would be renumbered and placed in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL, these existing firearms-related items would continue to be eligible for the same EAR license exceptions, as they were prior to publication of this rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

*License Exception:  Shipments of limited value (LVS).*

Under this proposed rule, complete firearms controlled under ECCN 0A501 would not be eligible for License Exception LVS, 15 CFR 740.3.  Firearms "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with a limit of $500 on net value per shipment.  In addition, receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them.  BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR 123.17(a)).  This LVS proposal would be less restrictive than the current ITAR provision in two respects.  First, the value limit per shipment would be $500 compared to $100 in the ITAR.  Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value.  BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current

WASHAR0001379

prices. In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary imports, exports, reexports, and transfers (in-country) (TMP).*

This proposed rule would amend the regulations at § 740.9 to state that License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740). License Exception TMP would also not be available to export or reexport some firearms and ammunition shipped from or manufactured in the Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. In addition, this proposed rule

31

WASHAR0001380

would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5.  It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by proposed 0A501 that is also excluded under Annex A available on the Federal rulemaking portal (*http://www.regulations.gov*) under this proposed rule's *regulations.gov* docket number, which is BIS–2017-0004  (the prohibition would not apply to such firearms), and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan.  These prohibitions would apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR).  Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters would continue to be required to file Electronic Export Information (EEI) to the Automated Export System (AES) for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

WASHAR0001381

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or ultimately destined for certain proscribed or restricted countries.  Certain information as described below would also be collected by CBP on behalf of BIS and done under existing or new Commerce paperwork collections.  The proposed rule would also make eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

Upon the entry portion of a temporary import, the temporary importer would be required to provide the required statement to U.S. Customs and Border Protection (CBP), as proposed in paragraph (b)(5)(iv)(A).

The temporary importer would be required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as proposed in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as proposed in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as proposed in paragraph (b)(5)(v) would be required to provide the temporary import documentation (*i.e.*, the invoice used at the

WASHAR0001382

time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This information would be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

The proposed rule would include a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, international organizations, international inspections under the Chemical Weapons Convention, and the International Space Station (GOV).*

This proposed rule would revise the regulations at § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S government agencies and official and personal use by U.S. government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This proposed authorization under License Exception GOV would treat 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV. It would not impose certain restrictions that are imposed by the current ITAR license exemption. The ITAR exemption authorizes exports of only non-automatic firearms and "parts" and "components." License Exception GOV would authorize non-automatic and semi-automatic firearms and "parts" and "components."

WASHAR0001383

The ITAR exemption (22 CFR 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country.  The exporter must present a copy of the written statement to the CBP Port Director.  License Exception GOV would impose none of the foregoing limitations.  BIS believes that the limitations are unnecessary.  The EAR control exports for national security and foreign policy reasons.  BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States.  Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States.  Export license requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b) – to, for or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO.  However, this rule would add some additional restrictions for E:1 and E:2 countries.  This proposed rule would exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. government official use.  In addition, to better

WASHAR0001384

ensure compliance with section 6(j) of the EAA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this proposed rule would add a new Note 1 to paragraph (b)(2), which would restrict the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

*License Exception:  Baggage (BAG).*

This proposed rule would revise License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad.  This proposed change to License Exception BAG would be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use.  This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms.  Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by this rule, BIS is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG.  BIS is aware that U.S. Customs and Border Protection (CBP) has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to operational challenges related to implementation.  *See* the following CBP website page for additional information:

36

https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.  BIS is proposing in this rule to ensure consistency with the current ITAR filing requirements and any measures that are being used at this time to track such temporary exports of personally-owned firearms and ammunition.  Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published.  If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition.  BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as comments on the current practice of using the CBP Form 4457, as well as any other suggestions on alternative approaches for tracking such information.

Though BIS does not require prior authorization to use License Exception BAG, in order to facilitate the physical movement and subsequent importation of firearms authorized under this license exception, this information would need to be collected by CBP by requiring EEI filing in AES.

Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms.  Should exporters desire to

37

WASHAR0001386

contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: http://www.cbp.gov/xp/cgov/toolbox/ports/.

This proposed rule also would revise License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change would be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This proposed rule would not make changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (e)(2).

As a clarification to License Exception BAG, this proposed rule would add two sentences to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. These two sentences would not change the existing requirement and have been included to assist the public in better identifying these special provisions.

*License Exception STA.*

This proposed rule would revise the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x (*i.e.*, those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed

38

WASHAR0001387

either on the CCL or USML) are eligible for export under License Exception STA.  Items

controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

This proposed rule would exempt gun "parts," "components," "accessories" and

"attachments" controlled under ECCN 0A501.x; test, inspection and production equipment and

"parts," "components," "accessories" and "attachments" in ECCN 0B501; "software" in 0D501;

and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth

in § 740.20(b)(3)(ii) that applies to "600 series" items.  That end-use limitation is intended to

ensure that the military-related items controlled by most 600 series ECCNs are ultimately used

by appropriate agencies of the governments of certain U.S allies or multilateral export control

regime members.  Because the aforementioned exempted items are not of a military nature, the

limitation is not necessary.  As a conforming change, this proposed rule also would remove

ECCNs 0A985 and 0E987 in paragraph (b)(2)(ii) and add in their place 0A503 and 0E504.  This

change does not change the availability of License Exception STA, but simply reflects the fact

that these items would now be controlled under ECCNs 0A503 and 0E504 and the License

Exception STA exclusion would continue to apply to them.

**Support documentation for firearms, parts, components, accessories, and attachments**

**controlled by ECCN 0A501.**

This proposed rule would require that for commodities controlled by ECCN 0A501

exported or reexported transactions for which a license would be required, the exporter or

reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if

the importing country requires such permits for import of firearms.  That import permit would be

WASHAR0001388

a record that must be kept by the exporter or reexporter as required by part 762 of the EAR.  The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented.  Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement.  To implement this change, this proposed rule would revise § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for firearms and ammunition would be limited to the authorized end use and end users.**

Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL would be limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application.  This means any change in the authorized end use or end user for a licensed transaction would require a BIS authorization.  This existing requirement of BIS licenses is specified in § 750.7(a) and on the boiler plate text included on all BIS licenses.  These requirements would also be applied to firearms and ammunition licenses.  A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a BIS license, would require a BIS authorization.  BIS

WASHAR0001389

does not propose any changes in this rule to these well-established and understood requirements on using BIS licenses.  Applicants for firearms and ammunition licenses are also advised that BIS would continue to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter or transferor using a BIS license, including for firearms and ammunition licenses, would also be required pursuant to § 750.7(a) to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them.  As an additional safeguard for firearms and ammunition licenses, BIS would when warranted include a license condition that would require the exporter, reexporter or transferor to receive from the other parties identified on the license a confirmation in writing that those other parties had received and agreed to the terms and conditions of the license.  For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records."  The documents described in this paragraph would be required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional arms reporting for certain exports of ECCN 0A501.a and .b commodities**

In § 743.4 (Conventional arms reporting), this rule would revise paragraph (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that would require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting

WASHAR0001390

section of the EAR.  This requirement would assist the United States Government to meet its multilateral commitments for the special reporting requirements for exports of certain items listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional Arms when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or GOV (see part 740 of the EAR) or the Validated End User authorization (see § 748.15 of the EAR) and for United Nations reporting.  License Exceptions LVS and STA are identified in § 743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be limited to exports authorized License Exceptions TMP, GOV and RPL or the Validated End User authorization.  This rule also adds contact information for these reports.

**Changes to export clearance requirements for firearms being moved to the CCL.**

In Part 758 (Export Clearance Requirements), this rule would make certain changes to clarify that a filing of Electronic Export Information (EEI) to the Automated Export System (AES) would be required for exports of the firearms transferred from the USML pursuant to this rule regardless of value or destination, including exports to Canada.  As noted above, this requirement will also apply, as is presently the case under the ITAR, for temporary exports of such items pursuant to License Exception TMP or BAG.

In addition, this rule proposes to expand the data elements required as part of an AES filing for these items to include serial numbers, make, model and caliber.  This requirement would ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations, including those associated with

WASHAR0001391

the temporary export and subsequent return of controlled firearms and unused ammunition. Similar to the description above regarding whether BIS would publish an EEI filing requirement in AES for personally-owned firearms and ammunition exported under License Exception BAG in the final rule, these expanded data elements required as part of an AES filing would be included in the final rule if CBP has made such data easily enterable in AES. If the necessary changes were not made by the time the final rule was to be published, CBP may continue to rely on CBP Form 4457 as described above.


**Entry clearance requirements for temporary imports**

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items in this rule that transfer from the USML in the ITAR to become subject to the EAR, BIS would need to create a process under the EAR to impose entry clearance requirements for temporary imports of such items based on BIS's authorities over U.S. exports.


Therefore, BIS proposes a temporary imports entry clearance requirement by adding new § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the USMIL in 27 CFR § 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS would not impose a license requirement for such imports, but this information would be necessary to facilitate the

43

export after a temporary import.  The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR.

BIS is particularly interested in receiving comments on these temporary import provisions in § 758.10 and the subsequent export under paragraph (b)(5) of License Exception TMP.  A license requirement is not being proposed for these temporary imports, but BIS is proposing an entry clearance requirement whereby, as described above, the exporter at the time of import would need to make a legal representation to the U.S. Government under the EAR that the item was being temporarily imported into the United States for subsequent export under paragraph (b)(5) of License Exception TMP.  BIS also welcomes comments on whether there are advantages to how the ITAR regulates temporary imports of USMIL items that should be incorporated into the Commerce final rule.

**Changes to EAR recordkeeping requirements for firearms being moved to the CCL.**
In Part 762 (Recordkeeping), this rule would make two changes to the recordkeeping requirements under the EAR.  These changes would specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this rule would redesignate paragraph (a)(11) as (a)(12) and add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502.  The

WASHAR0001393

"exporter" or any other "party to the transaction" that creates or receives such records would be the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this rule would narrow the scope of an exemption from the EAR recordkeeping requirements for warranty certificates.  This rule would narrow this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record would need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States.  This would be an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business and are records that should be easily accessible.  These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items.

The public may submit comments on whether they agree with this BIS determination that these changes described above to the EAR recordkeeping requirements would not result in increased burdens under the EAR.

**Alignment with the Wassenaar Arrangement Munitions List.**

45

WASHAR0001394

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML. USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML. USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

Rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production equipment, "software" and "technology" for munitions list items in categories ML 18, ML 21 and ML 22, respectively, this rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), "software" (0D501, 0D602 and 0D505) and "technology" (0E501, 0E602 and 0E505). BIS believes that including the ECCNs for test, inspection and production equipment, "software," and "technology" in the same category as the items to which they relate results in an easier way to understand the CCL than using separate categories.

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

**Appropriate delayed effective date for a final rule.**

BIS also invites comments from the public on the appropriate delayed effective date needed to prepare for the changes included in this proposed rule if published in final form. A 180-day delayed effective date was used for many of the other rules that moved items from the USML to the CCL, but certain rules included shorter delayed effective dates. BIS requests the public to provide comments on whether 180-delayed effective date is warranted, or if some

WASHAR0001395

shorter period, such as 90-day delated effective date is warranted for this proposed rule if published in final form.

**Request for Comments.**

All comments on this proposed rule must be in writing and submitted via the Federal rulemaking portal www.regulations.gov or by mail or delivery to the address identified in the addresses section of this proposed rule. All comments (including any personal identifiable information) would be available for public inspection and copying. Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

**Export Administration Act**

Although the Export Administration Act of 1979 expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of August 15, 2017, 82 FR 39005 (August 16, 2017), has continued the Export Administration Regulations in effect under the International Emergency Economic Powers Act. BIS continues to carry out the provisions of the Export Administration Act of 1979, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222, as amended by Executive Order 13637.

**Executive Order Requirements**

WASHAR0001396

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity).  Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.  This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this proposed rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR.  Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This proposed rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce proposed rule.  This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that would be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective.  Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens,

48

including financial costs, would be reduced significantly. The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much more efficient way that would significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the item were "subject to the ITAR." Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II and III that would move by this rule to the CCL, BIS would be collecting the necessary information using the form associated with OMB Control No. 0694-0088. BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission. Using the State Department's estimate that 10,000 applicants annually would move from the USML to the CCL and BIS's estimate that 6,000 of the 10,000 applicants would require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR. Those companies are currently using the State Department's forms associated with OMB Control No. 1405-0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours. The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there would also be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of

49

WASHAR0001398

brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee.  The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities.  The Department of Commerce would incur additional costs to administer these controls and process license applications.  However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications.  Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated cost savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce proposed rules are expected to be "net deregulatory actions."  The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two proposed rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the EO do not use the term "net deregulatory action," but rather refer to deregulatory actions.  As outlined above, the Departments of State and Commerce proposed rules are closely linked and

50

WASHAR0001399

are best viewed as a consolidated regulatory action although being implemented by two different agencies.  Also, as noted above, items may not be subject to both sets of regulations.  Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL would result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

The Departments of State and Commerce for purposes of E.O. 13771 have agreed to equally share the cost burden reductions that would result from the publication of these two integral regulatory actions.  The Department of State would receive 50% and the Department of Commerce would receive 50% for purposes of calculating the deregulatory benefit of these two integral regulatory actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours.  The reduction in burden hours by 2,810 would result in an additional cost savings of [1] $126,281 to the exporting public.  Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of Commerce.

For purposes of the Department of State, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours.  The reduction in burden hours by 2,810 would result in an additional cost savings

---

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour.  Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

WASHAR0001400

of $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of State.

The Department of Commerce welcomes comments from the public on the analysis under E.O. 13771 described here. Comments from companies that would no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that would move to the CCL would be particularly helpful for the Department of Commerce and Department of State to receive. Comments are also encouraged on any of the other collections that may be relevant for the items that would move from the USML to the CCL. In particular, data on Department of State forms that would no longer need to be submitted would be helpful to receive.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.) (PRA), unless that collection of information displays a currently valid OMB control number.

This proposed regulation involves four collections currently approved by OMB under these BIS collections and control numbers: Simplified Network Application Processing System (control number 0694-0088), which includes, among other things, license applications; License Exceptions and Exclusions (control number 0694-0137); Import Certificates and End-User Certificates (control number 0694-0093); Five Year Records Retention Period (control number

52

0694-0096); and the U.S. Census Bureau collection for the Automated Export System (AES)

Program (control number 0607-0152).

This proposed rule would affect the information collection, under control number 0694-0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR that would increase the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II and III that would move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants would require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405-0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden would be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as "net deregulatory actions".)

This proposed rule would also affect the information collection under control number 0694-0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, would become eligible for License Exception STA under

WASHAR0001402

this proposed rule.  Additionally, test, inspection and production equipment and "software" and "technology" related to those firearms and "parts" may become eligible for License Exception STA.  BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the burden associated with control number 0694-0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

BIS expects that this increase in burden as a result of the increased use of License Exception STA would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR.  This proposed rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms.  BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this proposed rule, a number of low-level parts would be eligible for export under License Exception STA and would therefore not require a license to such destinations.

WASHAR0001403

This proposed rule would also affect the information collection under control number 0694-0096, for the five-year recordkeeping retention because of two changes this rule would make to Part 762 of the EAR.  This rule would add a new paragraph (a)(55) to specify the following information must be kept as an EAR record: serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502.  This rule would also require warranty certificates for these items to be retained for EAR recordkeeping.  However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license would be required under the EAR, the burden would likely be reduced compared to a license requirement under the ITAR.  In particular, license applications for exports of "technology" controlled by ECCN 0E501 would likely be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.*, Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This proposed rule would affect the information collection under control number 0694-0093, import certificates and end-user certificates because of the changes included in this proposed rule.  First, this regulation would require that for shipments requiring a license of firearms, "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, the exporter obtain a copy of the import certificate or permit if the importing country requires one for importing firearms.  License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement.  BIS expects that this requirement would result in no change in the burden under

55

control number 0694-0093.  Second, this proposed rule also would require that prior to

departure, travelers leaving the United States and intending to temporarily export firearms, parts,

and components controlled under ECCN 0A501 under License Exception BAG declare the

firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for

inspection.  As the State Department also requires that persons temporarily exporting firearms,

parts and components declare the items to CBP, BIS does not expect that the requirement in this

proposed rule would result in a change in burden under control number 0694-0093.

Third, this proposed rule would affect the information collection under control number 0694-

0093 by creating a new temporary import entry clearance requirement by adding § 758.10.  This

new section would be limited to items in this rule that are both "subject to the EAR" and on the

United States Munitions List (USMIL) in 27 CFR § 447.21.  To allow such items to temporarily

enter the U.S., this rule proposes a process to collect identifying information for the sole purpose

of tracking items being temporarily imported for subsequent export under License Exception

TMP.  BIS would not impose a license requirement for such imports, but collecting this

information would be necessary to facilitate the export after a temporary import.  The temporary

import entry clearance requirement in § 758.10 would also conform to the requirement in

License Exception TMP under § 740.9(b)(5), so providing this information to CBP at the entry

after a temporary import would facilitate the export phase of a temporary import under License

Exception TMP.  At the time of entry for a temporary import, the importer would need to

provide a statement to CBP indicating that this shipment was being temporarily imported in

accordance with the EAR for subsequent export in accordance with and under the authority of

License Exception TMP.  The entry clearance requirement would be an EAR requirement and

any false representation made under the new § 758.10 would be a violation of the EAR.  The

WASHAR0001405

importer would also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value.  If imported for a trade show, exhibition, demonstration, or testing, the temporary importer would need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States.  Lastly, at the time of exportation, as requested by CBP, the exporter, or an agent acting on his or her behalf, would have to provide the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported under this proposed entry clearance requirement.  As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this proposed rule would result in a change in burden under control number 0694-0093, but because of the decrease under the burden imposed under the State collection the burden on the public will not change.

This proposed rule would also affect the information collection under control number 0607-0152, for filing EEI in AES because of one change this rule would make to Part 758 of the EAR.  Under new paragraph (b)(10), EEI would be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.  Exports of these USML firearms and ammunition prior to moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection would not change for the exporter.  For some exporters, however, there

WASHAR0001406

may be an EEI filing requirement that would otherwise not have existed, such as for the export of a firearm that would be controlled under ECCN 0A501.a authorized under License Exception BAG or the export of certain firearms or ammunition to Canada.

The proposed rule would include a requirement that, for all exports of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter provide to CBP the serial number, make, model, and caliber for each firearm being exported. The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL. The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651-0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule. Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this proposed rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by e-mail to Jasmeet_K._Seehra@omb.eop.gov, or by fax to (202) 395-7285.

**Administrative Procedure Act and Regulatory Flexibility Act Requirements**

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.,* generally requires an agency

58

WASHAR0001407

to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the proposed rule would not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a proposed rule would not have a significant impact on a substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis.  Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule would not have a significant impact on a substantial number of small entities.

*Number of Small Entities*

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses.  Although BIS is unable to estimate the exact number of small entities that would be affected by this proposed rule, it acknowledges that this proposed rule would affect some unknown number.

*Economic Impact*

This proposed rule and the companion State rule would assist in making the United States Munitions List (22 CFR part 121) (USML) into a more "positive" list, *i.e.*, a list that does not use generic, catch-all controls on any "part," "component," "accessory," "attachment," or "end item" that was in any way specifically modified for a defense article, regardless of the article's military or intelligence significance or non-military applications.  At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the

59

WASHAR0001408

Commerce Control List (CCL). Such items, along with certain military items that currently are on the CCL, would be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs. In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs. This proposed rule addresses USML Category I, II and III articles that would be removed from the USML and added to the CCL.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns," consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, software, and technology. Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms. However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR. Department of State officials have informed BIS that license applications for such parts and components are a high percentage of the license applications for USML articles reviewed by that department. Such parts and components are more likely to be produced by small businesses than are complete firearms.

Category II of the USML, entitled "Guns and Armament," encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, software and technology. Modern large guns would remain on the USML. Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL. Unless specified elsewhere on the CCL or the USML, "parts," "components," "accessories," "attachments," production equipment, "software" and "technology" for large guns would be controlled on the CCL.

60

WASHAR0001409

Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The proposed rule also applies to "parts," "components," production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this proposed rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this proposed rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this proposed rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this proposed rule would benefit from the elimination of some license requirements implemented by this proposed rule. Six types of "parts" and "components," identified in ECCN 0A501.y, would be designated immediately as "parts" and "components" that, even if "specially designed" for a military use or a Category I firearm, have little or no military significance. These "parts" and "components,"

61

WASHAR0001410

which under the ITAR require a license to nearly all destinations would, under the EAR, require a license to Cuba, Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with "parts" and "components" that would be placed on the CCL by this proposed rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments valued at $500 or less, "parts" and "components" being exported for use as replacement parts, and temporary exports.  Similarly, exports and reexports of Category II firearms "parts," "components," "accessories," and "attachments" that would be placed on the CCL by this proposed rule would become eligible for those license exceptions, although the value limit would be $3,000.  Category III ammunition placed on the CCL by this proposed rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved to the CCL, the number of destinations for which a license is required would remain largely unchanged.  However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application.  There is no such requirement under the CCL licensing procedure. This difference gives the CCL applicant at least two advantages.  First, the applicant has a way of determining whether the U.S. Government would authorize the transaction before it enters

WASHAR0001411

into potentially lengthy, complex and expensive sales presentations or contract negotiations. Under the USML licensing procedure, the applicant would need to caveat all sales presentations with a reference to the need for government approval and would more likely have to engage in substantial effort and expense with the risk that the government might reject the application. Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract. It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this proposed rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR. This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms. Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year. There are no registration or application processing fees for applications to export items currently listed on the CCL. Once the items that are the subject to this proposed rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State could find their registration fees reduced if the number of USML licenses those entities need declines. If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

63

Finally, *de minimis* treatment under the EAR would become available for all items that this proposed rule would transfer from the USML to the CCL.  Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product.  This proposed rule would apply that same principle to "600 series" items only if the foreign- made item is being exported to a country that is subject to a United States arms embargo.  In all other cases, foreign-made products that incorporate items that this proposed rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent.  Because including small amounts of U.S.-origin content would not subject foreign-made products to the EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin "parts" and "components," a development that potentially would mean greater sales for U.S. suppliers, including small entities.

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat.  However, BIS believes that the increased burden imposed by those actions would be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

BIS is unable to determine the precise number of small entities that would be affected by this proposed rule.  Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this proposed rule would be offset by a reduction in the number of items that

WASHAR0001413

would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin "parts" and "components," which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content.  For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

**List of Subjects**

*15 CFR Parts 740 and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

Exports, Reporting and recordkeeping requirements, Terrorism.

*15 CFR Parts 736 and 772*

WASHAR0001414

Exports.

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

15 CFR Part 762

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774 of the Export Administration Regulations (15 CFR parts 730-774) are proposed to be amended as follows:

## PART 736 – [AMENDED]

1. The authority citation for 15 CFR part 736 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

WASHAR0001415

2. In Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

## SUPPLEMENT NO. 1 TO PART 736 - GENERAL ORDERS

*****

**(e)** *General Order No. 5*

*****

**(3) Prior commodity jurisdiction determinations**. If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN.  If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.*, the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

*****

## PART 740 – [AMENDED]

3. The authority citation for 15 CFR part 740 continues to read as follows:

WASHAR0001416

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

4. Section 740.9 is amended by:

a. Adding five sentences at the end of paragraph (a) introductory text;

b. Adding one sentence at the end of paragraph (b) introductory text; and

c. Adding paragraph (b)(5) to read as follows:

**§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).**

\*   \*   \*   \*   \*

(a)  \*   \*   \*  This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI

68

WASHAR0001417

filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by 0A501 that is specified under Annex A available on the Federal rulemaking portal (*http://www.regulations.gov*) under *regulations.gov* docket number BIS–2017-0004, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).

\* \* \* \* \*

(b) \* \* \* No provision of paragraph (b), other than (b)(3), (b)(4), or (b)(5) of this section, may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\* \* \* \* \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

69

WASHAR0001418

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A available on the Federal rulemaking portal (*http://www.regulations.gov*) under *regulations.gov* docket number BIS–2017-0004; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR section 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration

WASHAR0001419

documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to this paragraph (b)(5)(iv)(B) to U.S. Customs and Border Protection at the time of export.

*Note 4 to paragraph (b)(5):* *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\* \* \* \* \*

5.  Section 740.11 is amended by adding a sentence at the end of the introductory text to the section to read as follows:

**§ 740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).**

\* \* \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (b)(2)(ii) of this section.  Any item listed in a 0x5zz ECCN for export,

WASHAR0001420

reexport, or transfer (in-country) to an E:1 country are eligible only for transactions described in paragraphs (b)(2)(i) and (b)(2)(ii) solely for U.S. government official use of this section.

\* \* \* \* \*

*Note 1 to paragraph (b)(2):  Items controlled for NS, MT, CB, NP, FC or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end-users of a government in a Country Group E:1, or E:2 country.*

\* \* \* \* \*

6. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (e)(4) to read as follows:

**§ 740.14 Baggage (BAG).**

\* \* \* \* \*

(b) *Eligibility.*

\* \* \* \* \*

(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving.  For special provisions regarding firearms and ammunition, see paragraph (e) of this section.  For special

72

WASHAR0001421

provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph, see paragraph (g).  For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

*   *   *   *   *

 (e) *Special provisions for firearms and ammunition.*

*   *   *   *   *

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii)  "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control.  Accordingly, except as provided in paragraph (e)(4) of this

73

WASHAR0001422

section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may

not be exported permanently under this License Exception.  All firearms, "parts," "components,"

"accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition

controlled under ECCN 0A505.a exported under this License Exception must be returned to the

United States.

      (v) Travelers leaving the United States temporarily are required to declare the firearms,

"parts," "components," "accessories," "attachments," and ammunition being exported under this

license exception to a Customs and Border Protection (CBP) officer prior to departure from the

United States and present such items to the CBP officer for inspection, confirming that the

authority for the export is License Exception BAG and that the exporter is compliant with its

terms.

(4) A nonresident alien leaving the United States may export or reexport under this License

Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under

ECCN 0A505 as he or she brought into the United States under the provisions of Department of

Justice Regulations at 27 CFR 478.115(d).

\*   \*   \*   \*   \*

      7.  Section 740.16 is amended by removing "0A987" from paragraphs (b)(2)(iv) and

adding in its place "0A504".

      8.  Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

74

WASHAR0001423

**§ 740.20 License Exception Strategic Trade Authorization (STA).**

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

   (ii) License Exception STA may not be used for:

      (A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982;

0A983; 0A503, 0E504, 0E982; or

      (B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\* \* \* \* \*

**PART 742 – [AMENDED]**

   9.  The authority citation for part 742 continues to read as follows:

   **Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42

U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559;

E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993

Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR

58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783;

Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of

WASHAR0001424

August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

    10.   Section 742.6 is amended by revising the first and last (6th) sentence of paragraph (b)(1)(i) and adding a new (7th) sentence at the end of paragraph (b)(1)(i) to read as follows:

**§742.6 Regional stability.**

\*   \*   \*   \*   \*

(b)   \*   \*   \*

(1)   \*   \*   \*

(i)   Applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0A504, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. \*\*\* When destined to the People's Republic of China or a country listed in Country Group E:1 in supplement no. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial.  In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

WASHAR0001425

\* \* \* \* \*

11.  Section 742.7 is amended by revising paragraphs (a)(1), (a)(2), (a)(3), (a)(4) and (c) to read as follows:

## § 742.7 Crime control and detection.

(a)  \*  \*  \*

(1)  Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section.  A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR).  Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2)  Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

77

WASHAR0001426

(3)  Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4)  Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982.  Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

(c)  *Contract sanctity*.  Contract sanctity date: August 22, 2000.  Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

   12.   Section 742.17 is amended by:

   a. Revising the first sentence of paragraph (a) and

   b. Revising paragraph (f) to read as follows:

## § 742.17  Exports of firearms to OAS member countries.

(a)  *License requirements*. BIS maintains a licensing system for the export of firearms and related items to all OAS member countries.  *   *   *

WASHAR0001427

\* \* \* \* \*

(f) *Items/Commodities*.   Items requiring a license under this section are ECCNs 0A501 (except

0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d).  (See Supplement No.

1 to part 774 of the EAR).

\* \* \* \* \*

**Section 742.19 [AMENDED]**

13. Section 742.19(a)(1) is amended by:

a. Removing "0A986" and adding in its place "0A505.c"; and

b. Removing "0B986" and adding in its place "0B505.c".

**PART 743 – [AMENDED]**

14. The authority citation for 15 CFR part 743 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*;  50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3

CFR, 2001 Comp., p. 783;  E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR

16129; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

15. Section 743.4 is amended by:

a.   Revising paragraph (c)(1)(i) and (c)(2)(i); and

b.   Revising paragraph (h) to read as follows:

79

WASHAR0001428

## § 743.4 Conventional arms reporting.

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \*

(i) ECCN 0A501.a and .b.

\* \* \* \* \*

(2) \* \* \*

(i) ECCN 0A501.a and .b.

\* \* \* \* \*

(h) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel. (202) 482-0092, Fax: (202) 482-4094.  Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (c)(2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel. (202) 482-4188, Fax: (202) 482-4145.


## PART 744 – [AMENDED]

16.  The authority citation for 15 CFR part 744 continues to read as follows:

WASHAR0001429

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786;  Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of September 18, 2017, 82 FR 43825 (September 19, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018).

17.  Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) and (b) and adding in its place "0A504".


## PART 746 – [AMENDED]

18.  The authority citation for 15 CFR part 746 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 287c; Sec 1503, Pub. L. 108-11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007-7, 72 FR 1899, 3 CFR, 2006 Comp., p.

WASHAR0001430

325; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

19.  Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

20.  Section 746.7 is amended in paragraph (a)(1) by:

a. Adding ECCN "0A503" immediately before 0A980 in the list of ECCNs; and

b. Removing  ECCN "0A985".

## PART 748 – [AMENDED]

21.  The authority citation for 15 CFR part 748 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

22.  Section 748.12 is amended by:

a. Revising the heading;

b. Adding introductory text to the section;

c. Revising paragraph (a) introductory text;

WASHAR0001431

d. Revising paragraph (a)(1);

e. Redesignating note to paragraph (c)(8) as note 1 to paragraph (c)(8); and

f. Adding paragraph (e) and note 2 to paragraph (e) to read as follows.

## § 748.12 Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section.  For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section.  For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS.  This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1)  *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d).

*   *   *   *   *

83

WASHAR0001432

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1)  A license is not required for the export or reexport; or

(2)  The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraph (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)  *License application procedure.*

(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

   **Note 2 to paragraph (e).** *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) because that statement is not issued by a government.*

**PART 758 – [AMENDED]**

   23.  The authority citation for part 758 continues to read as follows:

WASHAR0001433

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

24.  Section 758.1 is amended as follows:

a. In paragraph (b), by revising paragraphs (7), (8) and (9), and adding a new paragraph (10);

b. In paragraph (c), by revising paragraph (1); and

c. In paragraph (g), by adding a new paragraph (4), to read as follows:

**§ 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).**

\*   \*   \*   \*   \*

(b)  \*   \*   \*   \*   \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

WASHAR0001434

(10)  For all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

*  *  *  *  *

(c) Exemptions.  *  *  *

(1) License Exception Baggage (BAG), except for exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, as set forth in §740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

*  *  *  *  *

(g) *  *  *  *  *

(4) *Exports of Firearms and Related Items.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model number, caliber and serial number of the exported items.

*  *  *  *  *

 25.  Part 758 is amended by adding Section 758.10 to read as follows:

## § 758.10  Entry clearance requirements for temporary imports.

WASHAR0001435

(a) *Scope.* This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR § 447.21). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR for permanent return to the United States are outside of the scope of this section because the items are not considered temporary imports, but these items must have met the export clearance requirements specified in § 758.1 of the EAR. See paragraph (a)(2) of this section for permanent import requirements.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b).

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of the Port Directors of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be

WASHAR0001436

exported in accordance with and under the authority of License Exception TMP (15 CFR section 740.9(b)(5));"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

*Note to paragraph (b)(1): In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A available on the Federal rulemaking portal (http://www.regulations.gov) under regulations.gov docket number BIS–2017-0004, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).*

WASHAR0001437

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide as requested by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported. *See* also the additional requirements inspection in § 758.1(g)(4).

**PART 762 – [AMENDED]**

26.  The authority citation for part 762 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

27.  Section 762.2 is amended by redesignating paragraph (a)(11) and (a)(12), and adding a new paragraph (a)(11) to read as follows:

**§ 762.2 Records to be retained.**

(a)  *Records required to be retained.*

\*   \*   \*   \*   \*

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been

WASHAR0001438

exported.  The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record.

\*  \*  \*  \*  \*

28.  Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3 Records exempt from recordkeeping requirements.**

(a) The following types of records have been determined to be exempt from the recordkeeping requirement procedures:

\*  \*  \*  \*  \*

(5)  Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

\*  \*  \*  \*  \*

**PART 772 – [AMENDED]**

29.  The authority citation for part 772 continues to read as follows:

**Authority:**  50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

**Section 772.1 – [Amended]**

WASHAR0001439

30.  In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c".

**PART 774 - [AMENDED]**

31. The authority citation for 15 CFR part 774 continues to read as follows:

**Authority:**  50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

32.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), revise Export Control Classification Number (ECCN) 0A018 (which includes removing and reserving paragraph (c), including the removal of the Note to paragraph (c), in the items paragraph in List of Items Controlled section) to read as follows:

**Supplement No. 1 to Part 774 – The Commerce Control List**

\* \* \* \* \*

**0A018 Items on the Wassenaar Munitions List (see List of Items Controlled).**

WASHAR0001440

**License Requirements**

*Reason for Control*:   NS, AT, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry | NS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry | See § 746.1(b) for UN controls. |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:*   $3000 for 0A018.b

$1500 for 0A018.c and .d

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: (1) See also 0A979, 0A988, and 22 CFR 121.1 Categories I(a), III(b-d),

and X(a).  (2) See ECCN 0A617.y.1 and .y.2 for items formerly controlled by ECCN 0A018.a.

(3) See ECCN 1A613.c for military helmets providing less than NIJ Type IV protection and

ECCN 1A613.y.1 for conventional military steel helmets that, immediately prior to July 1, 2014

92

WASHAR0001441

were classified under 0A018.d and 0A988.   (4) See 22 CFR 121.1 Category X(a)(5) and (a)(6) for controls on other military helmets.

*Related Definitions*: N/A

*Items*:

a.  [RESERVED]

b.  "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130);

**Note to 0A018.b**:  *0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:*

*a.  Ammunition crimped without a projectile (blank star);*

*b.  Dummy ammunition with a pierced powder chamber;*

*c.  Other blank and dummy ammunition, not incorporating components designed for live ammunition.*

c.  [RESERVED]

d.  [RESERVED]

WASHAR0001442

33.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear

Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export

Control Classification Numbers (ECCNs) 0A018 and 0A521, entries for ECCNs 0A501, 0A502,

0A503, 0A504 and 0A505 to read as follows:

**0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y | NS Column 1 |
| RS applies to entire entry except 0A501.y | RS Column 1 |
| FC applies to entire entry except 0A501.y | FC Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500 for 0A501.c, .d, and .x.

94

WASHAR0001443

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls*: (1) Firearms that are fully automatic, and magazines with a capacity of 50 rounds or greater, are "subject to the ITAR."  (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR.  (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions*: N/A

*Items*:

a.      Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b.      Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

95

WASHAR0001444

c.    The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d.    Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

e.    Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a  or .b of this entry.

f. through w. [Reserved]

x.    "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y.    Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

y.1.    Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

WASHAR0001445

y.2.    Scope mounts or accessory rails;

y.3.    Iron sights;

y.4.    Sling swivels;

y.5.    Butt plates or recoil pads; and

y.6.    Bayonets.

*Technical Note 1 to 0A501:* *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

*Note 1 to 0A501:* *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

**0A502 Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control:* RS, CC, FC, UN, AT, NS

97

WASHAR0001446

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | RS Column 1 |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of  end user | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement | CC Column 3 |
| UN applies to entire entry | See § 746.1(b) for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm) | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

WASHAR0001447

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  This entry does not control combat shotguns and fully automatic shotguns.  Those shotguns are "subject to the ITAR."

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.**

**License Requirements**

*Reason for Control:*  CC, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on |

99

WASHAR0001448

| | the Commerce Country Chart.  (See part 742 of the EAR for additional information). |
|---|---|
| UN applies to entire entry | See § 746.1(b) for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*  N/A

*GBS:*  N/A

*CIV:*  N/A

**List of Items Controlled**

*Related Controls*: Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982.  Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

WASHAR0001449

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g and .i of this entry | FC Column 1 |
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See §746.1(b) for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

 *LVS:* N/A

 *GBS:* N/A

 *CIV:* N/A

**List of Items Controlled**

 *Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 µA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

 *Related Definitions:* N/A

 *Items:*

a. Telescopic sights.

WASHAR0001450

b. Holographic sights.

c. Reflex or "red dot" sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators ''specially designed'' for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

*Note 1 to 0A504.f:* 0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e or .i.

h. [Reserved]

i. Riflescopes that were not "subject to the EAR" as of [INSERT DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

*Note 2 to paragraph i:* For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" is what is used to determine whether the riflescope is "specially designed."

**0A505  Ammunition as follows (see List of Items Controlled).**

WASHAR0001451

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x | NS Column 1 |
| RS applies to 0A505.a and .x | RS Column 1 |
| CC applies to 0A505.b | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to  0A505.a, .d  and .x | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons.  The Commerce Country Chart is not designed to determine AT licensing requirements for this entry.  See §742.19 of the EAR for additional information. |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $100 for items in 0A505.x

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

103

WASHAR0001452

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls*:  (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR."  (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions*:  N/A

*Items*:

a.        Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.

b.        Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c.        Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

**Note 1 to 0A505.c:**  *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

WASHAR0001453

d.      Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

   *Note 2 to 0A505.x:  The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

   *Note 3 to 0A505.x:  The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

34.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export Control Classification Numbers (ECCNs) 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

WASHAR0001454

**0A602  Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

106

WASHAR0001455

**List of Items Controlled**

*Related Controls*: (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR." (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions*:  N/A

*Items*:

a.      Guns and armament manufactured between 1890 and 1919.

b.      Military flame throwers with an effective range less than 20 meters.

c. through w.   [Reserved]

x.      "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

*Note 1 to 0A602: "Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

*Note 2 to 0A602: Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants designated EAR99.*

107

WASHAR0001456

**ECCN 0A918 – [Removed]**

35.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A918.

**ECCN 0A984 – [Removed]**

36.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A984.

**ECCN 0A985 – [Removed]**

37.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A985.

**ECCN 0A986 – [Removed]**

38.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A986.

WASHAR0001457

**ECCN 0A987 – [Removed]**

39. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove ECCN 0A987.

40. In Supplement No. 1 to part 774( the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the header that reads: "B. 'Test', 'Inspection' and 'Production Equipment' and the entry for Export Control Classification Number (ECCN) 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*:  NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment | NS Column 1 |

WASHAR0001458

| | |
|---|---|
| for ECCN 0A501.y | |
| RS applies to entire entry except equipment for ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

WASHAR0001459

a.      Small arms chambering machines.

b.      Small arms deep hole drilling machines and drills therefor.

c.      Small arms rifling machines.

d.      Small arms spill boring machines.

e.      Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

   *Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to paragraphs  .a, .d  and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of |

WASHAR0001460

| | these items to North Korea for anti-terrorism reasons. |
|---|---|

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA:*  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

a.    Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b.    Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c.    Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

WASHAR0001461

d.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w   [Reserved]

x.      "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

41.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export Control Classification Numbers (ECCNs) 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

WASHAR0001462

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a.   The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:

114

WASHAR0001463

a.1.    Gun barrel rifling and broaching machines and tools therefor;

a.2.    Gun barrel rifling machines;

a.3.    Gun barrel trepanning machines;

a.4.    Gun boring and turning machines;

a.5.    Gun honing machines of 6 feet (183 cm) stroke or more;

a.6.    Gun jump screw lathes;

a.7.    Gun rifling machines; and

a. 8.   Gun straightening presses.

b.    Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c.    Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d.    Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.


**ECCN 0B986 – [Removed]**

WASHAR0001464

42. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0B986.

43. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | NS Column 1 |

WASHAR0001465

| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | RS Column 1 |
|---|---|
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR" (See 22 CFR 121.1, Category I).

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

WASHAR0001466

**0D505  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to "software" for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

118

WASHAR0001467

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR" (See 22 CFR § 121.1, Category III).

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

44. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

WASHAR0001468

**0D602**  **"Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*:   Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

WASHAR0001469

**List of Items Controlled**

*Related Controls*:  (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k).   (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions*:  N/A

*Items*:   "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.


45.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0E018 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:


**0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

WASHAR0001470

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

WASHAR0001471

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:

a.       "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

b.       "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502  "Technology" "required" for the "development" or "production," of commodities controlled by 0A502.**

**License Requirements**

*Reason for Control*:  CC, UN

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) for UN controls |

123

WASHAR0001472

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0E504 ''Technology'' ''required'' for the ''development,'' or ''production'' of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.**

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry | RS Column 1 |

124

WASHAR0001473

| UN applies to entire entry | See § 746.1(b) for UN controls |
|---|---|
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.**

**License Requirements**

125

WASHAR0001474

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505 | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505 | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b | CC Column 1 |
| AT applies to "technology" for | AT Column 1 |

126

WASHAR0001475

| | |
|---|---|
| "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x | |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

    *CIV*:  N/A

    *TSR*:  N/A

**Special conditions for STA**

    *STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

    *Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR" (See 22 CFR § 121.1, Category III).

    *Related Definitions*: N/A

    *Items*: The list of items controlled is contained in this ECCN heading.

WASHAR0001476

46.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0E521 and 0E606 an entry for ECCN 0E602:

**0E602  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

WASHAR0001477

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls*:  Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**ECCN 0E918 – [REMOVED]**

47.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E918.

WASHAR0001478

48. In Supplement No. 1 to Part 774, the Commerce Control List, Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), revise Export Control Classification Number (ECCN) 0E982 (which includes removing "0A985" from the heading and the "Control(s)" paragraph and adding in its place "0A503") to read as follows.

**0E982 "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.**

**License Requirements**

*Reason for Control:* CC

| *Control(s)* |
|---|
| CC applies to "technology" for items controlled by 0A982 or 0A503. A license is required for ALL destinations, except Canada, regardless of end-use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:* N/A

130

WASHAR0001479

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**ECCN 0E984 – [REMOVED]**

49.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E984.

**ECCN 0E987 – [REMOVED]**

50.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E987.

WASHAR0001480

51.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 1 – Special Materials and Related Equipment, Chemicals, "Microorganisms" and "Toxins," revise Export Control Classification Number (ECCN) 1A984 (which includes revising the heading) to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

*Reason for Control*:   CC

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

WASHAR0001481

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

52.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 –

Materials Processing, revise Export Control Classification Number (ECCN) 2B004 (which

includes removing "2B018" from the related controls paragraph and adding in its place "0B501,

0B602, 0B606") to read as follows:

**2B004 Hot "isostatic presses" having all of the characteristics described in the List of Items
Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control*:  NS, MT NP, AT

133

WASHAR0001482

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 2 |
| MT applies to entire entry | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa | NP Column 1 |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS*:   N/A

*GBS*:   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  (1) See ECCN 2D001 for software for items controlled under this entry.

(2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009.  (4) For additional

WASHAR0001483

controls on dies, molds and tooling, see ECCNs 1B101.d, 2B104 and 2B204.   (5) Also see ECCNs 2B117 and 2B999.a.

*Related Definitions*: N/A

*Items*:

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

    b.1. A maximum working pressure exceeding 207 MPa;

    b.2. A controlled thermal environment exceeding 1,773 K  (1,500 °C); *or*

    b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

**Technical Note:**  *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside*

WASHAR0001484

*diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

53.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number (ECCN) 2B018 to read as follows:

**2B018  Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry.  Commodities formerly controlled by paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606.  Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602.  Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501.  Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

54.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number (ECCN) 2D018 to read as follows:

WASHAR0001485

**2D018 "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry.  See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

55.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number  (ECCN) 2E001 (which includes removing "2B018" and the comma that follows it from the Control(s) table) to read as follows:

**2E001 "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|

WASHAR0001486

| | |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002 | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201 or 2D202 for NP reasons | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment | CB Column 2 |

138

WASHAR0001487

| | |
|---|---|
| controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351 | |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or

139

WASHAR0001488

"Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: See also 2E101, 2E201, and 2E301

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Note:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

56.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number (ECCN) 2E002 (which includes removing "2B018" and the comma that follows it from the Control(s) table) to read as follows:

WASHAR0001489

**2E002 "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

## License Requirements

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009 | NS Column 1 |
| MT applies to "technology"  for  equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons | NP Column 1 |

141

WASHAR0001490

| | |
|---|---|
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

WASHAR0001491

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

57. In Supplement No. 1 to part 774 (the Commerce Control List), Category 7— Navigation and Avionics, revise Export Control Classification Number (ECCN) 7A611 (which includes revising Related Controls paragraph (2) in the List of Items Controlled section) to read as follows:

**7A611  Military fire control, laser, imaging, and guidance equipment, as follows (see List of**

WASHAR0001492

**Items Controlled).**

**License Requirements**

*Reason for Control*: NS, MT, RS, AT, UN

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738).* |
|---|---|
| NS applies to entire entry except 7A611.y | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c | MT Column 1 |
| RS applies to entire entry except 7A611.y | RS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry except 7A611.y | See § 746.1(b) for UN controls |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

   *LVS:* $1500

   *GBS:* N/A

   *CIV:* N/A

**Special Conditions for STA**

WASHAR0001493

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.

*Related Definitions*: N/A

*Items*:

a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

WASHAR0001494

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102 or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]

DATED:  May 4, 2018

Richard E. Ashooh

Assistant Secretary

for Export Administration

WASHAR0001495

**Billing Code: 3510-33-P**

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774**

**[Docket No. 111227796-5786-01]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML).**

**AGENCY:  Bureau of Industry and Security, Department of Commerce.**

**ACTION:  Proposed rule.**

1

WASHAR0001496

**SUMMARY:**

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I – Firearms, Close Assault Weapons and Combat Shotguns; Category II – Guns and Armament; and Category III – Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.

**DATES:** Comments must be received by [INSERT DATE 45 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES:** You may submit comments by any of the following methods:

- Submit comments via Federal eRulemaking Portal: http://www.regulations.gov. You can find this proposed rule by searching on its regulations.gov docket number, which is BIS-2017-0004.

- By mail or delivery to Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of Commerce, Room 2099B, 14th Street and Pennsylvania Avenue, NW, Washington, DC 20230. Refer to RIN 0694-AF47.

2

WASHAR0001497

**FOR FURTHER INFORMATION CONTACT:**  Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641 or e-mail steven.clagett@bis.doc.gov.

**SUPPLEMENTARY INFORMATION:**

**Background**

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I – Firearms, Close Assault Weapons and Combat Shotguns; Category II – Guns and Armament; and Category III – Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR).  This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments.  The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the

3

WASHAR0001498

United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

4

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs.  Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5."  These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non-military applications.  As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items.  BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule.  BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada. As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources.  BIS encourages comments from the public on this aspect of the proposed rule.

WASHAR0001500

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in Arms Regulations (ITAR), 22 CFR parts 120-130, and not to the list of defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447.  Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA.  All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR.  The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA, 22 U.S.C. 2778 *et seq.*, for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items.  After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available.  Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR.  There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive

6

WASHAR0001501

shooting, and other non-military activities.  Because of the popularity of shooting sports in the

United States, for example, many large chain retailers carry a wide inventory of the firearms

described in the new ECCNs for sale to the general public.  Firearms available through U.S.

retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber

bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

  An additional justification for the change in the jurisdictional status of the items

described in this rule is that the current ITAR controls burden U.S. industry without any

proportionate benefits to United States national security or foreign policy objectives.  Similar to

the challenges faced by other industries, the firearms trade has been negatively affected by the

incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content.  Currently,

under the ITAR, any part, component, accessory, or attachment for any of the firearms described

in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated

into foreign-made items or reexported to any third country.  Under the EAR, the *de minimis*

provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may

not be subject to the EAR, provided the U.S.-origin items meet the applicable *de minimis* level

for the country of reexport.  Similarly, a technical drawing of such part, component, accessory or

attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person

concerning those items, such as the application of protective coatings.  Moreover, a U.S. person

engaged in manufacturing or exporting these items or providing related defense services must

register with the State Department under the ITAR.  Thus, even if a U.S. company can

manufacture or service these items at a lower cost in the United States as compared to the cost

for a U.S. or foreign company to manufacture or service the items outside of the United States,

the ITAR's restrictions may render the items unattractive or uncompetitive for foreign

WASHAR0001502

manufacturers.  The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR."  (*See* part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology."  While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control.  For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (*i.e.*, unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR."  (*See* §§ 734.3(b) and 734.7(a).)  Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR.  (*See* 734.3(b)(3)(v).)

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA.  The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML.  The report must "describe the nature of any controls to be imposed on that item under any other provision of law."  22 U.S.C. 2778(f)(1).

8

WASHAR0001503

This Commerce proposed rule is being published simultaneously with a Department of State proposed rule. Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML. The Department of State proposed rule would revise Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML so that they describe in positive terms the defense articles that should remain on the USML. The Department of Commerce rule would add to the CCL items that the President determines no longer warrant control under the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL. This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether the public find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. The public is invited to comment on the appropriateness of these license requirements and licensing policies. The public is also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

**Detailed Description of Changes Proposed by This Rule**

WASHAR0001504

**Creation of new ECCNs.**

This proposed rule would create 17 new ECCNs to control items proposed for removal from the USML. A discussion of each new ECCN and the controls that would apply to items under that ECCN follows below.

*New ECCN 0A501: Firearms and related commodities.*

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components:"

- Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);

- Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);

- Detachable magazines with a capacity of greater than 16 rounds but less than 50 rounds that are "specially designed" for the firearms listed above;

- Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and

- Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors,

10

WASHAR0001505

pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, or disconnectors) if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) as specified in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This proposed rule would add a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also would add a second note to ECCN 0A501 to state that certain firearms and similar items are EAR99, *i.e.*, subject to the EAR but not on the CCL. Those items are: Antique firearms (*i.e.*, those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 would

11

WASHAR0001506

generally not be classified in any of the new ECCNs that would be created with this proposed rule. This would be consistent with Supplement No. 1 to Part 736, General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release from "specially designed." As a conforming change, this proposed rule would revise paragraph (e)(3) of General Order No. 5 to add a reference to "0x5zz" (to account for new ECCNs 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502 described below). The "600 series" and 9x515 (spacecraft and related items) are already included in paragraph (e)(3), and those references remain unchanged.

*New ECCN 0A502:  Shotguns and certain related commodities.*

New ECCN 0A502 would control both the shotguns currently on the USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater). Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of Firearms Convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and end user) and United Nations (UN) reasons. Shotguns with a barrel length less than 18 inches would be controlled under NS Column 1, CC Column 1, FC, UN and AT Column 1 plus regional stability (RS Column 1), consistent with their current control on the USML. The shotguns controlled in 0A502 currently controlled in ECCN 0A984 would not be controlled for national security reasons because they are not on the WAML.

*New ECCN 0A503:  Discharge type arms, and certain other commodities.*

This rule would replace existing ECCN 0A985 with a new ECCN 0A503. The rule would add "non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and

12

WASHAR0001507

'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML. Renumbering this ECCN would cause entries controlling firearms and related items to be placed in close proximity to each other, which would make it easier for readers to identify items on the CCL.

<u>*New ECCN 0A504: Optical sighting devices and certain related commodities*</u>.

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms. The reasons for control table, which currently states, *inter alia*, that the Firearms Convention (FC) reason for control applies to "optical sights for firearms," would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices. In addition, BIS would add an RS control for certain riflescopes. These riflescopes would be identified in their own paragraph in the ECCN under 0A504.i. The riflescopes in this paragraph would be limited to those "specially designed" for use in firearms that are "subject to the ITAR." An exclusion would be included in the criteria of this paragraph to ensure less sensitive riflescopes that would be moved from ECCN 0A987 to 0A504 on the effective date of a final rule, that currently are not RS controlled under the EAR, would not be controlled under this paragraph. This rule would also add a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" is what would be used to determine whether a riflescope is "specially designed" for purposes of this paragraph.

This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the FC reason for control. The new number

13

WASHAR0001508

is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

_New ECCN 0A505:  Ammunition and certain related commodities._

New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that would be classified under proposed ECCN 0A501, and for most "parts" and "components" of such ammunition.  Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included.  This proposed rule would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells.  Buckshot shotgun shells would be subject to the CC Column 1, FC Column 1 and UN reasons for control.  Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control.  Only "parts" and "components" would be eligible for License Exception LVS.  Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles would remain in USML Category III.  Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III.  Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States.  Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations

14

and anti-terrorism reasons only.  Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes.  Possession of this ammunition does not confer a military advantage on the United States.  This rule proposes adding three notes to clarify the scope of "parts" and "components" for ammunition classified under ECCN 0A505.  Note 1 to 0A505.c would clarify the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants would be controlled under 1A984 and not 0A505.  Separately, Note 2 to 0A505.x would include an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers.  Note 3 to 0A505.x would clarify that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.


_New ECCN 0A602: Guns and Armament._

New ECCN 0A602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters.  It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML.  Note 2 to 0A602 confirms that

WASHAR0001510

black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed

for use with black powder propellants are designated EAR99.  Inclusion of these guns and

armament on the CCL is appropriate because they do not confer a significant military or

intelligence advantage on the United States.  The guns controlled in this ECCN are between 98

and 127 years old.  The parts, components, accessories and attachments controlled in this ECCN

include some that are for modern artillery.  Modern artillery will remain on the USML, along

with the most sensitive "parts," "components," "accessories" and "attachments" for these USML

items.  This proposed rule adds a note to clarify that "parts," "components," "accessories" and

"attachments" specified in USML subcategory II(j) are not subject to the EAR.  The USML

Order of Review and CCL Order of Review already provide guidance for making such a

jurisdictional and classification determination, but to highlight that these "parts," "components,"

"accessories" and "attachments" are not classified under paragraph (x) of 0A602, this rule

proposes adding a note.


*New ECCN 0B501: Test, inspection and production equipment for firearms*.

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and

related commodities for the 'development' or 'production' of commodities enumerated in ECCN

0A501 or USML Category I."  This new ECCN would apply the national security (NS Column

1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1)

reasons for control to four specific types of machinery and to one class of items.  The four

specific types of machinery are: small arms chambering machines, small arms deep hole drilling

machines and drills therefor, small arms rifling machines, and small arms spill boring machines.

The class of items covers dies, fixtures and other tooling "specially designed" for the

16

"production" of items in the State Department proposed rule for USML Category I or ECCN 0A501.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501.  In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e.  Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability (RS) reason for control from RS Column 2 to RS Column 1.  This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

*New ECCN 0B505:  Test, inspection and production equipment for ammunition.*

WASHAR0001512

New ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition).  Equipment for manufacturing shotgun shells that do not contain buckshot would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986.  ECCN 0B505 would not include equipment for the hand loading of cartridges and shotgun shells, so this rule specifies this in the heading.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes.  Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602: Test, inspection and production equipment for certain guns and armament.*

New ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated or otherwise described in ECCN 0A602.a or USML Category II.  ECCN 0B602 would control eight specific types of equipment that currently are listed in paragraphs .e through .l of ECCN 2B018.  Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor;

WASHAR0001513

Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses.  ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II).  Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1.  This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

*New ECCN 0D501: Software for firearms and certain related commodities.*

New ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or equipment under 0B501 except those

19

commodities classified under 0A501.y. "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505: Software for ammunition and certain related commodities.*

New ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and "specially designed" parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602: Software for guns and armament and certain related items.*

New ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

*New ECCN 0E501: Technology for firearms and certain related items.*

New ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" "required" for the "development" and "production" of firearms other than shotguns. This new ECCN also would apply the anti-terrorism and United Nations reasons for

WASHAR0001515

control to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms. Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502: Technology for shotguns.*

New ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" required for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" required for the "development" or "production" of shotguns in ECCN 0E984. The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length. BIS believes that "technology" related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based solely on the barrel length of the shotgun would likely be ineffective.

*New ECCN 0E504: Technology for certain optical sighting devices.*

New ECCN 0E504 would replace existing ECCN 0E987, which controls ''technology'' ''required'' for the ''development,'' or ''production'' of certain commodities controlled by 0A504. The new ECCN number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other. New ECCN 0E504 would also impose a United Nations (UN) control on the entire entry.

21

WASHAR0001516

*New ECCN 0E505: Technology for ammunition and related items.*

New ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and "parts" and "components); 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505.  "Technology" for the "development" or "production" of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons.  United Nations and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for that ammunition and "technology" for "software" for that ammunition.  Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

*New ECCN 0E602: Technology for guns and armament, including technology for test, inspection and production equipment and software for guns and armament.*

New ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair,

22

WASHAR0001517

overhaul or refurbishing of commodities controlled by ECCNs 0A602 or 0B602, or "software" controlled by 0D602.

**Revisions to seven ECCNs.**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this proposed rule would set forth the entire text of the seven ECCNs to be revised. To help the public understand what specific parts of the ECCNs would be different, the narrative below describes the amendments in detail.

*Revision to ECCN 0A018.*

With the proposed removal of ECCN 0A984 and the addition of 0A502 described above, this proposed rule would make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL. This change includes the removal of the note to 0A018.c.

*Revision to ECCN 0E982.*

ECCN 0E982 controls "technology" exclusively for the "development" or "production" of equipment controlled by ECCN 0A982 or 0A985. This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revision to ECCN 1A984.*

To clarify an existing agency practice of controlling shotguns shells that contain only chemical irritants under 1A984, this proposed rule would revise the heading of 1A984. As

WASHAR0001518

described above, the same type of clarification would be made to ECCN 0A505.c under new

Note 1 to paragraph (c).  BIS considers these to be conforming changes to the removal of ECCN

0A986 and the addition of ECCN 0A505.c in this proposed rule.

*Revisions to ECCN 2B004.*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the

related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B602 and

0B606.  This rule would make no substantive changes to ECCN 2B004.

*Revisions to ECCN 2B018.*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from

ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN

0B602.  It would remove paragraph .n, because the commodities listed in that paragraph would

be controlled under either ECCNs 0B501 or 0B602 or under existing ECCN 0B606 in this

proposed rule.  It would remove paragraphs .a through .d, .m and .s, because the commodities

listed in those paragraphs would be controlled in ECCN 0B606.  It would remove paragraphs .o,

.p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN

0B501.  The commodities described in the MT control in ECCN 2B018 currently listed as MT

are controlled elsewhere in the EAR, so no additional changes are needed to add these

commodities to other ECCNs.

*Revisions to ECCN 2D018.*

Currently ECCN 2D018 controls software for the "development," "production" or "use"

of equipment controlled by ECCN 2B018.  As a conforming change, this rule would replace the

WASHAR0001519

control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

*Revisions to ECCN 7A611.*

As a conforming change, this rule would remove the reference to 0A987 in the Related Controls paragraph (2) and add in its place 0A504.

**Removal of nine ECCNs.**

*Removal of ECCN 0A918.*

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons. This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control. Bayonets and the "technology" to produce them are available in many countries. Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective. Therefore, for these reasons, this proposed rule does not retain a regional stability (RS column 2) control on bayonets because it is no longer warranted.

*Removal of ECCN 0A984.*

This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either proposed ECCN 0A502 or 0A505. As

25

WASHAR0001520

conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1) and in ECCN 0A018.

*Removal of ECCN 0A985.*

This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by proposed ECCN 0A503.  As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A503 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0E982.

*Removal of ECCN 0A986.*

This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by proposed 0A505.c, including less than lethal rounds. As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505, as appropriate in §§ 742.17(f); 742.19(a)(1); 746.3(b)(2) and 748.12(a)(1).

*Removal of ECCN 0A987.*

This proposed rule would remove ECCN 0A987 because proposed ECCN 0A504 would control all commodities currently controlled by ECCN 0A987.  As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504, as appropriate in §§ 740.16(b)(2)(iv); 742.7(a)(1); 742.17(f); 744.9(a)(1) and (b); and 748.12(a)(1); and in ECCN 7A611.

*Removal of ECCN 0B986.*

WASHAR0001521

This proposed rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in proposed ECCN 0B505.c.  As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

*Removal of ECCN 0E918.*

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons.  Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

*Removal of ECCN 0E984.*

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and buckshot shotgun shells, because such "technology" would be controlled under proposed ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun shells).  As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

*Removal of ECCN 0E987.*

This proposed rule would remove ECCN 0E987 because proposed ECCN 0E504 would control all "technology" currently controlled by ECCN 0E987.  As conforming change, references to ECCN 0E987 would be replaced with references to ECCN 0E504, as appropriate in §§ 740.20(b)(2)(ii) and 742.7(a)(1).

27

WASHAR0001522

**Conforming change to General Order No. 5**

This proposed rule would amend General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that would be created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs would include new ECCN 0A501, 0A502, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E505. Paragraph (e)(2) is important because, for example, it ensures that items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an amendment to the CCL. For example, most swivels and scope mounts for firearms have previously been determined through the CJ and classification process to not be "subject to the ITAR" and designated as EAR99. The classification of such "parts" would not be changed, provided the "part" was not subsequently changed, which would require a separate jurisdiction and classification analysis.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition that would be added to the EAR**

This proposed rule would apply the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A505,

28

WASHAR0001523

0B501, 0B505, 0A504, 0D501, 0D505, 0E501, 0E504 and 0E505. That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world." This proposed rule would also revise the regional stability licensing policy set forth in the last sentence of paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items. This proposed rule would add ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items will be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1. Lastly, this proposed rule would add a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items would be subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern. In addition, transactions involving criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries would be subject to a policy of denial.

**Availability of License Exceptions.**

Many of the items in the new "600 series" ECCNs generally would be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs. BIS intends that those restrictions be no more restrictive than the ITAR license exemption restrictions that currently apply to those items.

WASHAR0001524

For the ECCNs currently on the CCL that would be renumbered and placed in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL, these existing firearms-related items would continue to be eligible for the same EAR license exceptions, as they were prior to publication of this rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

*License Exception:  Shipments of limited value (LVS).*

Under this proposed rule, complete firearms controlled under ECCN 0A501 would not be eligible for License Exception LVS, 15 CFR 740.3.  Firearms "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with a limit of $500 on net value per shipment.  In addition, receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them.  BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR 123.17(a)).  This LVS proposal would be less restrictive than the current ITAR provision in two respects.  First, the value limit per shipment would be $500 compared to $100 in the ITAR.  Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value.  BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current

WASHAR0001525

prices.  In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary imports, exports, reexports, and transfers (in-country) (TMP).*

This proposed rule would amend the regulations at § 740.9 to state that License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740).  License Exception TMP would also not be available to export or reexport some firearms and ammunition shipped from or manufactured in the Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan.  In addition, this proposed rule

31

WASHAR0001526

would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5.  It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by proposed 0A501 that is also excluded under Annex A available on the Federal rulemaking portal (*http://www.regulations.gov*) under this proposed rule's *regulations.gov* docket number, which is BIS–2017-0004  (the prohibition would not apply to such firearms), and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan.  These prohibitions would apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR).  Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters would continue to be required to file Electronic Export Information (EEI) to the Automated Export System (AES) for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

WASHAR0001527

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or ultimately destined for certain proscribed or restricted countries. Certain information as described below would also be collected by CBP on behalf of BIS and done under existing or new Commerce paperwork collections. The proposed rule would also make eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

Upon the entry portion of a temporary import, the temporary importer would be required to provide the required statement to U.S. Customs and Border Protection (CBP), as proposed in paragraph (b)(5)(iv)(A).

The temporary importer would be required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as proposed in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as proposed in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as proposed in paragraph (b)(5)(v) would be required to provide the temporary import documentation (*i.e.*, the invoice used at the

33

WASHAR0001528

time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This information would be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

The proposed rule would include a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, international organizations, international inspections under the Chemical Weapons Convention, and the International Space Station (GOV).*

This proposed rule would revise the regulations at § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S government agencies and official and personal use by U.S. government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This proposed authorization under License Exception GOV would treat 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV. It would not impose certain restrictions that are imposed by the current ITAR license exemption. The ITAR exemption authorizes exports of only non-automatic firearms and "parts" and "components." License Exception GOV would authorize non-automatic and semi-automatic firearms and "parts" and "components."

34

WASHAR0001529

The ITAR exemption (22 CFR 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country. The exporter must present a copy of the written statement to the CBP Port Director. License Exception GOV would impose none of the foregoing limitations. BIS believes that the limitations are unnecessary. The EAR control exports for national security and foreign policy reasons. BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States. Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States. Export license requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b) – to, for or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO. However, this rule would add some additional restrictions for E:1 and E:2 countries. This proposed rule would exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. government official use. In addition, to better

35

ensure compliance with section 6(j) of the EAA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this proposed rule would add a new Note 1 to paragraph (b)(2), which would restrict the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

*License Exception:  Baggage (BAG).*

This proposed rule would revise License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad.  This proposed change to License Exception BAG would be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use.  This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms.  Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by this rule, BIS is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG.  BIS is aware that U.S. Customs and Border Protection (CBP) has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to operational challenges related to implementation.  *See* the following CBP website page for additional information:

36

WASHAR0001531

https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C.  BIS is proposing in this rule to ensure consistency with the current ITAR filing requirements and any measures that are being used at this time to track such temporary exports of personally-owned firearms and ammunition.  Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published.  If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition.  BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as comments on the current practice of using the CBP Form 4457, as well as any other suggestions on alternative approaches for tracking such information.

Though BIS does not require prior authorization to use License Exception BAG, in order to facilitate the physical movement and subsequent importation of firearms authorized under this license exception, this information would need to be collected by CBP by requiring EEI filing in AES.

Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms.  Should exporters desire to

37

contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: http://www.cbp.gov/xp/cgov/toolbox/ports/.

This proposed rule also would revise License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change would be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This proposed rule would not make changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (e)(2).

As a clarification to License Exception BAG, this proposed rule would add two sentences to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. These two sentences would not change the existing requirement and have been included to assist the public in better identifying these special provisions.

*License Exception STA.*

This proposed rule would revise the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x (*i.e.*, those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed

38

either on the CCL or USML) are eligible for export under License Exception STA. Items controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

This proposed rule would exempt gun "parts," "components," "accessories" and "attachments" controlled under ECCN 0A501.x; test, inspection and production equipment and "parts," "components," "accessories" and "attachments" in ECCN 0B501; "software" in 0D501; and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth in § 740.20(b)(3)(ii) that applies to "600 series" items. That end-use limitation is intended to ensure that the military-related items controlled by most 600 series ECCNs are ultimately used by appropriate agencies of the governments of certain U.S allies or multilateral export control regime members. Because the aforementioned exempted items are not of a military nature, the limitation is not necessary. As a conforming change, this proposed rule also would remove ECCNs 0A985 and 0E987 in paragraph (b)(2)(ii) and add in their place 0A503 and 0E504. This change does not change the availability of License Exception STA, but simply reflects the fact that these items would now be controlled under ECCNs 0A503 and 0E504 and the License Exception STA exclusion would continue to apply to them.

**Support documentation for firearms, parts, components, accessories, and attachments controlled by ECCN 0A501.**

This proposed rule would require that for commodities controlled by ECCN 0A501 exported or reexported transactions for which a license would be required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit would be

39

WASHAR0001534

a record that must be kept by the exporter or reexporter as required by part 762 of the EAR.  The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented.  Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement.  To implement this change, this proposed rule would revise § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for firearms and ammunition would be limited to the authorized end use and end users.**

Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL would be limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application.  This means any change in the authorized end use or end user for a licensed transaction would require a BIS authorization.  This existing requirement of BIS licenses is specified in § 750.7(a) and on the boiler plate text included on all BIS licenses.  These requirements would also be applied to firearms and ammunition licenses.  A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a BIS license, would require a BIS authorization.  BIS

40

WASHAR0001535

does not propose any changes in this rule to these well-established and understood requirements on using BIS licenses. Applicants for firearms and ammunition licenses are also advised that BIS would continue to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter or transferor using a BIS license, including for firearms and ammunition licenses, would also be required pursuant to § 750.7(a) to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them. As an additional safeguard for firearms and ammunition licenses, BIS would when warranted include a license condition that would require the exporter, reexporter or transferor to receive from the other parties identified on the license a confirmation in writing that those other parties had received and agreed to the terms and conditions of the license. For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records." The documents described in this paragraph would be required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional arms reporting for certain exports of ECCN 0A501.a and .b commodities**

In § 743.4 (Conventional arms reporting), this rule would revise paragraph (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that would require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting

WASHAR0001536

section of the EAR.  This requirement would assist the United States Government to meet its

multilateral commitments for the special reporting requirements for exports of certain items

listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional Arms

when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or

GOV (see part 740 of the EAR) or the Validated End User authorization (see § 748.15 of the

EAR) and for United Nations reporting.  License Exceptions LVS and STA are identified in §

743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two

license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be

limited to exports authorized License Exceptions TMP, GOV and RPL or the Validated End

User authorization.  This rule also adds contact information for these reports.


**Changes to export clearance requirements for firearms being moved to the CCL.**

In Part 758 (Export Clearance Requirements), this rule would make certain changes to clarify

that a filing of Electronic Export Information (EEI) to the Automated Export System (AES)

would be required for exports of the firearms transferred from the USML pursuant to this rule

regardless of value or destination, including exports to Canada.  As noted above, this

requirement will also apply, as is presently the case under the ITAR, for temporary exports of

such items pursuant to License Exception TMP or BAG.

In addition, this rule proposes to expand the data elements required as part of an AES filing for

these items to include serial numbers, make, model and caliber.  This requirement would ensure

law enforcement officials are able to effectively verify that firearms exports are properly

authorized and in conformance with all applicable regulations, including those associated with

WASHAR0001537

the temporary export and subsequent return of controlled firearms and unused ammunition. Similar to the description above regarding whether BIS would publish an EEI filing requirement in AES for personally-owned firearms and ammunition exported under License Exception BAG in the final rule, these expanded data elements required as part of an AES filing would be included in the final rule if CBP has made such data easily enterable in AES.  If the necessary changes were not made by the time the final rule was to be published, CBP may continue to rely on CBP Form 4457 as described above.

**Entry clearance requirements for temporary imports**

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S.  To preserve the treatment of temporary import transactions for items in this rule that transfer from the USML in the ITAR to become subject to the EAR, BIS would need to create a process under the EAR to impose entry clearance requirements for temporary imports of such items based on BIS's authorities over U.S. exports.

Therefore, BIS proposes a temporary imports entry clearance requirement by adding new § 758.10.  This new section would be limited to items in this rule that are both "subject to the EAR" and on the USMIL in 27 CFR § 447.21.  To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export.  BIS would not impose a license requirement for such imports, but this information would be necessary to facilitate the

43

WASHAR0001538

export after a temporary import.  The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR.

BIS is particularly interested in receiving comments on these temporary import provisions in § 758.10 and the subsequent export under paragraph (b)(5) of License Exception TMP.  A license requirement is not being proposed for these temporary imports, but BIS is proposing an entry clearance requirement whereby, as described above, the exporter at the time of import would need to make a legal representation to the U.S. Government under the EAR that the item was being temporarily imported into the United States for subsequent export under paragraph (b)(5) of License Exception TMP.  BIS also welcomes comments on whether there are advantages to how the ITAR regulates temporary imports of USMIL items that should be incorporated into the Commerce final rule.

**Changes to EAR recordkeeping requirements for firearms being moved to the CCL.**
In Part 762 (Recordkeeping), this rule would make two changes to the recordkeeping requirements under the EAR.  These changes would specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this rule would redesignate paragraph (a)(11) as (a)(12) and add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502.  The

44

WASHAR0001539

"exporter" or any other "party to the transaction" that creates or receives such records would be the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this rule would narrow the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. This rule would narrow this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record would need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States. This would be an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business and are records that should be easily accessible. These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items.

The public may submit comments on whether they agree with this BIS determination that these changes described above to the EAR recordkeeping requirements would not result in increased burdens under the EAR.

**Alignment with the Wassenaar Arrangement Munitions List.**

WASHAR0001540

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML. USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML. USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

Rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production equipment, "software" and "technology" for munitions list items in categories ML 18, ML 21 and ML 22, respectively, this rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), "software" (0D501, 0D602 and 0D505) and "technology" (0E501, 0E602 and 0E505). BIS believes that including the ECCNs for test, inspection and production equipment, "software," and "technology" in the same category as the items to which they relate results in an easier way to understand the CCL than using separate categories.

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

**Appropriate delayed effective date for a final rule.**

BIS also invites comments from the public on the appropriate delayed effective date needed to prepare for the changes included in this proposed rule if published in final form. A 180-day delayed effective date was used for many of the other rules that moved items from the USML to the CCL, but certain rules included shorter delayed effective dates. BIS requests the public to provide comments on whether 180-delayed effective date is warranted, or if some

WASHAR0001541

shorter period, such as 90-day delated effective date is warranted for this proposed rule if published in final form.

**Request for Comments.**

All comments on this proposed rule must be in writing and submitted via the Federal rulemaking portal www.regulations.gov or by mail or delivery to the address identified in the addresses section of this proposed rule. All comments (including any personal identifiable information) would be available for public inspection and copying. Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

**Export Administration Act**

Although the Export Administration Act of 1979 expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of August 15, 2017, 82 FR 39005 (August 16, 2017), has continued the Export Administration Regulations in effect under the International Emergency Economic Powers Act. BIS continues to carry out the provisions of the Export Administration Act of 1979, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222, as amended by Executive Order 13637.

**Executive Order Requirements**

WASHAR0001542

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this proposed rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR. Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This proposed rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce proposed rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that would be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens,

48

WASHAR0001543

including financial costs, would be reduced significantly.  The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much more efficient way that would significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the item were "subject to the ITAR."  Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II and III that would move by this rule to the CCL, BIS would be collecting the necessary information using the form associated with OMB Control No. 0694-0088.  BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission.  Using the State Department's estimate that 10,000 applicants annually would move from the USML to the CCL and BIS's estimate that 6,000 of the 10,000 applicants would require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR.  Those companies are currently using the State Department's forms associated with OMB Control No. 1405-0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours.  Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours.  The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there would also be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR.  The Department of State charges a registration fee to apply for a license under the ITAR.  Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of

49

WASHAR0001544

brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated cost savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce proposed rules are expected to be "net deregulatory actions." The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two proposed rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the EO do not use the term "net deregulatory action," but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce proposed rules are closely linked and

WASHAR0001545

are best viewed as a consolidated regulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL would result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

The Departments of State and Commerce for purposes of E.O. 13771 have agreed to equally share the cost burden reductions that would result from the publication of these two integral regulatory actions. The Department of State would receive 50% and the Department of Commerce would receive 50% for purposes of calculating the deregulatory benefit of these two integral regulatory actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings of [1] $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of Commerce.

For purposes of the Department of State, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings

---

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour. Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

WASHAR0001546

of $126,281 to the exporting public.  Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of State.

The Department of Commerce welcomes comments from the public on the analysis under E.O. 13771 described here.  Comments from companies that would no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that would move to the CCL would be particularly helpful for the Department of Commerce and Department of State to receive.  Comments are also encouraged on any of the other collections that may be relevant for the items that would move from the USML to the CCL. In particular, data on Department of State forms that would no longer need to be submitted would be helpful to receive.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.) (PRA), unless that collection of information displays a currently valid OMB control number.

This proposed regulation involves four collections currently approved by OMB under these BIS collections and control numbers:  Simplified Network Application Processing System (control number 0694-0088), which includes, among other things, license applications; License Exceptions and Exclusions (control number 0694-0137); Import Certificates and End-User Certificates (control number 0694-0093); Five Year Records Retention Period (control number

WASHAR0001547

0694-0096); and the U.S. Census Bureau collection for the Automated Export System (AES) Program (control number 0607-0152).

This proposed rule would affect the information collection, under control number 0694-0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR that would increase the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II and III that would move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants would require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405-0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden would be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as "net deregulatory actions".)

This proposed rule would also affect the information collection under control number 0694-0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, would become eligible for License Exception STA under

WASHAR0001548

this proposed rule.  Additionally, test, inspection and production equipment and "software" and "technology" related to those firearms and "parts" may become eligible for License Exception STA.  BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the burden associated with control number 0694-0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

BIS expects that this increase in burden as a result of the increased use of License Exception STA would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR.  This proposed rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms.  BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this proposed rule, a number of low-level parts would be eligible for export under License Exception STA and would therefore not require a license to such destinations.

54

WASHAR0001549

This proposed rule would also affect the information collection under control number 0694-0096, for the five-year recordkeeping retention because of two changes this rule would make to Part 762 of the EAR. This rule would add a new paragraph (a)(55) to specify the following information must be kept as an EAR record: serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. This rule would also require warranty certificates for these items to be retained for EAR recordkeeping. However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license would be required under the EAR, the burden would likely be reduced compared to a license requirement under the ITAR. In particular, license applications for exports of "technology" controlled by ECCN 0E501 would likely be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.*, Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This proposed rule would affect the information collection under control number 0694-0093, import certificates and end-user certificates because of the changes included in this proposed rule. First, this regulation would require that for shipments requiring a license of firearms, "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, the exporter obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement. BIS expects that this requirement would result in no change in the burden under

55

WASHAR0001550

control number 0694-0093.  Second, this proposed rule also would require that prior to

departure, travelers leaving the United States and intending to temporarily export firearms, parts,

and components controlled under ECCN 0A501 under License Exception BAG declare the

firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for

inspection.  As the State Department also requires that persons temporarily exporting firearms,

parts and components declare the items to CBP, BIS does not expect that the requirement in this

proposed rule would result in a change in burden under control number 0694-0093.

Third, this proposed rule would affect the information collection under control number 0694-

0093 by creating a new temporary import entry clearance requirement by adding § 758.10.  This

new section would be limited to items in this rule that are both "subject to the EAR" and on the

United States Munitions List (USMIL) in 27 CFR § 447.21.  To allow such items to temporarily

enter the U.S., this rule proposes a process to collect identifying information for the sole purpose

of tracking items being temporarily imported for subsequent export under License Exception

TMP.  BIS would not impose a license requirement for such imports, but collecting this

information would be necessary to facilitate the export after a temporary import.  The temporary

import entry clearance requirement in § 758.10 would also conform to the requirement in

License Exception TMP under § 740.9(b)(5), so providing this information to CBP at the entry

after a temporary import would facilitate the export phase of a temporary import under License

Exception TMP.  At the time of entry for a temporary import, the importer would need to

provide a statement to CBP indicating that this shipment was being temporarily imported in

accordance with the EAR for subsequent export in accordance with and under the authority of

License Exception TMP.  The entry clearance requirement would be an EAR requirement and

any false representation made under the new § 758.10 would be a violation of the EAR.  The

WASHAR0001551

importer would also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value. If imported for a trade show, exhibition, demonstration, or testing, the temporary importer would need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States. Lastly, at the time of exportation, as requested by CBP, the exporter, or an agent acting on his or her behalf, would have to provide the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported under this proposed entry clearance requirement. As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this proposed rule would result in a change in burden under control number 0694-0093, but because of the decrease under the burden imposed under the State collection the burden on the public will not change.

This proposed rule would also affect the information collection under control number 0607-0152, for filing EEI in AES because of one change this rule would make to Part 758 of the EAR. Under new paragraph (b)(10), EEI would be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada. Exports of these USML firearms and ammunition prior to moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection would not change for the exporter. For some exporters, however, there

WASHAR0001552

may be an EEI filing requirement that would otherwise not have existed, such as for the export of a firearm that would be controlled under ECCN 0A501.a authorized under License Exception BAG or the export of certain firearms or ammunition to Canada.

The proposed rule would include a requirement that, for all exports of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter provide to CBP the serial number, make, model, and caliber for each firearm being exported.  The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL.  The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651-0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad).  There is no change to the information being collected or to the burden hours as a result of this rule.  Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this proposed rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by e-mail to Jasmeet_K._Seehra@omb.eop.gov, or by fax to (202) 395-7285.

**Administrative Procedure Act and Regulatory Flexibility Act Requirements**

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.,* generally requires an agency

WASHAR0001553

to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the proposed rule would not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a proposed rule would not have a significant impact on a substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis.  Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule would not have a significant impact on a substantial number of small entities.

*Number of Small Entities*

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses.  Although BIS is unable to estimate the exact number of small entities that would be affected by this proposed rule, it acknowledges that this proposed rule would affect some unknown number.

*Economic Impact*

This proposed rule and the companion State rule would assist in making the United States Munitions List (22 CFR part 121) (USML) into a more "positive" list, *i.e.*, a list that does not use generic, catch-all controls on any "part," "component," "accessory," "attachment," or "end item" that was in any way specifically modified for a defense article, regardless of the article's military or intelligence significance or non-military applications.  At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the

WASHAR0001554

Commerce Control List (CCL). Such items, along with certain military items that currently are on the CCL, would be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs. In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs. This proposed rule addresses USML Category I, II and III articles that would be removed from the USML and added to the CCL.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns," consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, software, and technology. Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms. However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR. Department of State officials have informed BIS that license applications for such parts and components are a high percentage of the license applications for USML articles reviewed by that department. Such parts and components are more likely to be produced by small businesses than are complete firearms.

Category II of the USML, entitled "Guns and Armament," encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, software and technology. Modern large guns would remain on the USML. Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL. Unless specified elsewhere on the CCL or the USML, "parts," "components," "accessories," "attachments," production equipment, "software" and "technology" for large guns would be controlled on the CCL.

WASHAR0001555

Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The proposed rule also applies to "parts," "components," production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this proposed rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this proposed rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this proposed rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this proposed rule would benefit from the elimination of some license requirements implemented by this proposed rule. Six types of "parts" and "components," identified in ECCN 0A501.y, would be designated immediately as "parts" and "components" that, even if "specially designed" for a military use or a Category I firearm, have little or no military significance. These "parts" and "components,"

WASHAR0001556

which under the ITAR require a license to nearly all destinations would, under the EAR, require a license to Cuba, Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with "parts" and "components" that would be placed on the CCL by this proposed rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments valued at $500 or less, "parts" and "components" being exported for use as replacement parts, and temporary exports. Similarly, exports and reexports of Category II firearms "parts," "components," "accessories," and "attachments" that would be placed on the CCL by this proposed rule would become eligible for those license exceptions, although the value limit would be $3,000. Category III ammunition placed on the CCL by this proposed rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved to the CCL, the number of destinations for which a license is required would remain largely unchanged. However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application. There is no such requirement under the CCL licensing procedure. This difference gives the CCL applicant at least two advantages. First, the applicant has a way of determining whether the U.S. Government would authorize the transaction before it enters

WASHAR0001557

into potentially lengthy, complex and expensive sales presentations or contract negotiations. Under the USML licensing procedure, the applicant would need to caveat all sales presentations with a reference to the need for government approval and would more likely have to engage in substantial effort and expense with the risk that the government might reject the application. Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract. It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this proposed rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR. This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms. Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year. There are no registration or application processing fees for applications to export items currently listed on the CCL. Once the items that are the subject of this proposed rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State could find their registration fees reduced if the number of USML licenses those entities need declines. If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

63

WASHAR0001558

Finally, *de minimis* treatment under the EAR would become available for all items that this proposed rule would transfer from the USML to the CCL.  Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product.  This proposed rule would apply that same principle to "600 series" items only if the foreign- made item is being exported to a country that is subject to a United States arms embargo.  In all other cases, foreign-made products that incorporate items that this proposed rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent.  Because including small amounts of U.S.-origin content would not subject foreign-made products to the EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin "parts" and "components," a development that potentially would mean greater sales for U.S. suppliers, including small entities.

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat.  However, BIS believes that the increased burden imposed by those actions would be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

BIS is unable to determine the precise number of small entities that would be affected by this proposed rule.  Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this proposed rule would be offset by a reduction in the number of items that

WASHAR0001559

would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin "parts" and "components," which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content. For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

**List of Subjects**

*15 CFR Parts 740 and 748*

      Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 742*

      Exports, Terrorism.

*15 CFR Part 743*

      Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

      Exports, Reporting and recordkeeping requirements, Terrorism.

*15 CFR Parts 736 and 772*

WASHAR0001560

Exports.

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

15 CFR Part 762

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774 of the Export Administration Regulations (15 CFR parts 730-774) are proposed to be amended as follows:

## PART 736 – [AMENDED]

1. The authority citation for 15 CFR part 736 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

WASHAR0001561

2. In Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

## SUPPLEMENT NO. 1 TO PART 736 - GENERAL ORDERS

*****

**(e)** *General Order No. 5*

*****

**(3) Prior commodity jurisdiction determinations**. If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN.  If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.*, the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

*****

## PART 740 – [AMENDED]

3. The authority citation for 15 CFR part 740 continues to read as follows:

WASHAR0001562

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

4. Section 740.9 is amended by:

a. Adding five sentences at the end of paragraph (a) introductory text;

b. Adding one sentence at the end of paragraph (b) introductory text; and

c. Adding paragraph (b)(5) to read as follows:

**§ 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).**

\*   \*   \*   \*   \*

(a)  \*   \*   \*  This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI

68

WASHAR0001563

filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by 0A501 that is specified under Annex A available on the Federal rulemaking portal (*http://www.regulations.gov*) under *regulations.gov* docket number BIS–2017-0004, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).

\*   \*   \*   \*   \*

(b)  \*  \*  \* No provision of paragraph (b), other than (b)(3), (b)(4), or (b)(5) of this section, may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\*   \*   \*   \*   \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

69

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A available on the Federal rulemaking portal (*http://www.regulations.gov*) under *regulations.gov* docket number BIS–2017-0004; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR section 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration

70

documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to this paragraph (b)(5)(iv)(B) to U.S. Customs and Border Protection at the time of export.

*Note 4 to paragraph (b)(5): In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

* * * * *

5.  Section 740.11 is amended by adding a sentence at the end of the introductory text to the section to read as follows:

## § 740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

*  *  *  Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (b)(2)(ii) of this section.  Any item listed in a 0x5zz ECCN for export,

71

WASHAR0001566

reexport, or transfer (in-country) to an E:1 country are eligible only for transactions described in paragraphs (b)(2)(i) and (b)(2)(ii) solely for U.S. government official use of this section.

*   *   *   *   *

*Note 1 to paragraph (b)(2):*  *Items controlled for NS, MT, CB, NP, FC or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end-users of a government in a Country Group E:1, or E:2 country.*

*   *   *   *   *

6. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (e)(4) to read as follows:

## § 740.14 Baggage (BAG).

*   *   *   *   *

(b) *Eligibility.*

*   *   *   *   *

(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving.  For special provisions regarding firearms and ammunition, see paragraph (e) of this section.  For special

WASHAR0001567

provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph, see paragraph (g).  For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\* \* \* \* \*

 (e) *Special provisions for firearms and ammunition*.

\* \* \* \* \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii)  "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control.  Accordingly, except as provided in paragraph (e)(4) of this

WASHAR0001568

section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonresident alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the provisions of Department of Justice Regulations at 27 CFR 478.115(d).

*   *   *   *   *

7.  Section 740.16 is amended by removing "0A987" from paragraphs (b)(2)(iv) and adding in its place "0A504".

8.  Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

74

WASHAR0001569

**§ 740.20 License Exception Strategic Trade Authorization (STA).**

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503, 0E504, 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\* \* \* \* \*

**PART 742 – [AMENDED]**

9.  The authority citation for part 742 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 3201 *et seq.*; 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of

WASHAR0001570

August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

10.   Section 742.6 is amended by revising the first and last (6th) sentence of paragraph (b)(1)(i) and adding a new (7th) sentence at the end of paragraph (b)(1)(i) to read as follows:

**§742.6 Regional stability.**

*   *   *   *   *

(b)  *   *   *

(1)  *   *   *

(i)  Applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0A504, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. *** When destined to the People's Republic of China or a country listed in Country Group E:1 in supplement no. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial.  In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

WASHAR0001571

\* \* \* \* \*

11. Section 742.7 is amended by revising paragraphs (a)(1), (a)(2), (a)(3), (a)(4) and (c) to read as follows:

## § 742.7 Crime control and detection.

(a) \* \* \*

(1) Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

WASHAR0001572

(3)  Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4)  Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982.  Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

(c)  *Contract sanctity.*  Contract sanctity date: August 22, 2000.  Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

*   *   *   *   *

12.  Section 742.17 is amended by:

a. Revising the first sentence of paragraph (a) and

b. Revising paragraph (f) to read as follows:

**§ 742.17  Exports of firearms to OAS member countries.**

(a)  *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries.  *   *   *

WASHAR0001573

\*  \*  \*  \*  \*

(f) *Items/Commodities*.   Items requiring a license under this section are ECCNs 0A501 (except

0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d).  (See Supplement No.

1 to part 774 of the EAR).

\*  \*  \*  \*  \*

**Section 742.19 [AMENDED]**

13. Section 742.19(a)(1) is amended by:

a. Removing "0A986" and adding in its place "0A505.c"; and

b. Removing "0B986" and adding in its place "0B505.c".

**PART 743 – [AMENDED]**

14. The authority citation for 15 CFR part 743 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*;  50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3

CFR, 2001 Comp., p. 783;  E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR

16129; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

15. Section 743.4 is amended by:

a.   Revising paragraph (c)(1)(i) and (c)(2)(i); and

b.   Revising paragraph (h) to read as follows:

WASHAR0001574

**§ 743.4 Conventional arms reporting.**

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \*

(i) ECCN 0A501.a and .b.

\* \* \* \* \*

(2) \* \* \*

(i) ECCN 0A501.a and .b.

\* \* \* \* \*

(h) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel. (202) 482-0092, Fax: (202) 482-4094.  Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (c)(2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel. (202) 482-4188, Fax: (202) 482-4145.

**PART 744 – [AMENDED]**

16.  The authority citation for 15 CFR part 744 continues to read as follows:

WASHAR0001575

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 3201 et seq.; 42 U.S.C. 2139a; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786;  Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of September 18, 2017, 82 FR 43825 (September 19, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018).

17.  Section 744.9 is amended by removing "0A987" from paragraphs (a)(1) and (b) and adding in its place "0A504".


**PART 746 – [AMENDED]**

18.  The authority citation for 15 CFR part 746 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 22 U.S.C. 287c; Sec 1503, Pub. L. 108-11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003-23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007-7, 72 FR 1899, 3 CFR, 2006 Comp., p.

WASHAR0001576

325; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

19.   Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

20.   Section 746.7 is amended in paragraph (a)(1) by:

a. Adding ECCN "0A503" immediately before 0A980 in the list of ECCNs; and

b. Removing  ECCN "0A985".

## PART 748 – [AMENDED]

21.   The authority citation for 15 CFR part 748 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

22.   Section 748.12 is amended by:

a. Revising the heading;

b. Adding introductory text to the section;

c. Revising paragraph (a) introductory text;

82

WASHAR0001577

d. Revising paragraph (a)(1);

e. Redesignating note to paragraph (c)(8) as note 1 to paragraph (c)(8); and

f. Adding paragraph (e) and note 2 to paragraph (e) to read as follows.

## § 748.12 Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section.  For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section.  For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the OAS.  This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1)  *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d).

\*   \*   \*   \*   \*

83

WASHAR0001578

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1)  A license is not required for the export or reexport; or

(2)  The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraph (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)  *License application procedure.*

(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

   **Note 2 to paragraph (e).**  *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) because that statement is not issued by a government.*

**PART 758 – [AMENDED]**

   23.  The authority citation for part 758 continues to read as follows:

WASHAR0001579

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

24.   Section 758.1 is amended as follows:

a. In paragraph (b), by revising paragraphs (7), (8) and (9), and adding a new paragraph (10);

b. In paragraph (c), by revising paragraph (1); and

c. In paragraph (g), by adding a new paragraph (4), to read as follows:

**§ 758.1 The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).**

\*   \*   \*   \*   \*

(b) \*   \*   \*   \*   \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

WASHAR0001580

(10)  For all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

\*   \*   \*   \*   \*

(c) Exemptions. \*   \*   \*

(1) License Exception Baggage (BAG), except for exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, as set forth in §740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

\*   \*   \*   \*   \*

(g) \*   \*   \*   \*   \*

(4) *Exports of Firearms and Related Items.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model number, caliber and serial number of the exported items.

\*   \*   \*   \*   \*

25.  Part 758 is amended by adding Section 758.10 to read as follows:

**§ 758.10  Entry clearance requirements for temporary imports.**

WASHAR0001581

(a) *Scope*. This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR § 447.21). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR for permanent return to the United States are outside of the scope of this section because the items are not considered temporary imports, but these items must have met the export clearance requirements specified in § 758.1 of the EAR. See paragraph (a)(2) of this section for permanent import requirements.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b).

 (2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports*. To the satisfaction of the Port Directors of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be

WASHAR0001582

exported in accordance with and under the authority of License Exception TMP (15 CFR section 740.9(b)(5));"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

*Note to paragraph (b)(1): In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A available on the Federal rulemaking portal (http://www.regulations.gov) under regulations.gov docket number BIS–2017-0004, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).*

88

WASHAR0001583

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide as requested by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported. *See* also the additional requirements inspection in § 758.1(g)(4).

**PART 762 – [AMENDED]**

26. The authority citation for part 762 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

27. Section 762.2 is amended by redesignating paragraph (a)(11) and (a)(12), and adding a new paragraph (a)(11) to read as follows:

**§ 762.2 Records to be retained.**

(a) *Records required to be retained.*

\* \* \* \* \*

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been

WASHAR0001584

exported. The "exporter" or any other party to the transaction (*see* § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record.

\* \* \* \* \*

28. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3 Records exempt from recordkeeping requirements.**

(a) The following types of records have been determined to be exempt from the recordkeeping requirement procedures:

\* \* \* \* \*

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502;

\* \* \* \* \*

**PART 772 – [AMENDED]**

29. The authority citation for part 772 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

**Section 772.1 – [Amended]**

WASHAR0001585

30.  In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c".

## PART 774 - [AMENDED]

31. The authority citation for 15 CFR part 774 continues to read as follows:

**Authority:**  50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

32.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), revise Export Control Classification Number (ECCN) 0A018 (which includes removing and reserving paragraph (c), including the removal of the Note to paragraph (c), in the items paragraph in List of Items Controlled section) to read as follows:

**Supplement No. 1 to Part 774 – The Commerce Control List**

\*   \*   \*   \*   \*

**0A018 Items on the Wassenaar Munitions List (see List of Items Controlled).**

WASHAR0001586

**License Requirements**

*Reason for Control*:   NS, AT, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry | See § 746.1(b) for UN controls. |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:*   $3000 for 0A018.b

$1500 for 0A018.c and .d

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: (1) See also 0A979, 0A988, and 22 CFR 121.1 Categories I(a), III(b-d),

and X(a).  (2) See ECCN 0A617.y.1 and .y.2 for items formerly controlled by ECCN 0A018.a.

(3) See ECCN 1A613.c for military helmets providing less than NIJ Type IV protection and ECCN

1A613.y.1 for conventional military steel helmets that, immediately prior to July 1, 2014 were

WASHAR0001587

classified under 0A018.d and 0A988.   (4) See 22 CFR 121.1 Category X(a)(5) and (a)(6) for controls on other military helmets.

*Related Definitions*: N/A

*Items*:

a.  [RESERVED]

b.  "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130);

**Note to 0A018.b**:  *0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:*

*a.   Ammunition crimped without a projectile (blank star);*

*b.   Dummy ammunition with a pierced powder chamber;*

*c.   Other blank and dummy ammunition, not incorporating components designed for live ammunition.*

c.  [RESERVED]

d.  [RESERVED]

WASHAR0001588

33. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export Control Classification Numbers (ECCNs) 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504 and 0A505 to read as follows:

**0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| *Control(s)* | *Country Chart (See Supp. No. 1 to part 738)* |
|---|---|
| NS applies to entire entry except 0A501.y | NS Column 1 |
| RS applies to entire entry except 0A501.y | RS Column 1 |
| FC applies to entire entry except 0A501.y | FC Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500 for 0A501.c, .d, and .x.

94

WASHAR0001589

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls*: (1) Firearms that are fully automatic, and magazines with a capacity of 50 rounds or greater, are "subject to the ITAR."  (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR.  (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions*: N/A

*Items*:

a.      Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b.      Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

95

c.      The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d.      Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

e.      Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a  or .b of this entry.

f. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y.      Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

y.1.     Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

WASHAR0001591

y.2.    Scope mounts or accessory rails;

y.3.    Iron sights;

y.4.    Sling swivels;

y.5.    Butt plates or recoil pads; and

y.6.    Bayonets.

*Technical Note 1 to 0A501:*  *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

*Note 1 to 0A501:*  *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

**0A502 Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control*:   RS, CC, FC, UN, AT, NS

97

WASHAR0001592

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | RS Column 1 |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement | CC Column 3 |
| UN applies to entire entry | See § 746.1(b) for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm) | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

WASHAR0001593

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  This entry does not control combat shotguns and fully automatic shotguns.  Those shotguns are "subject to the ITAR."

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0A503 Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.**

**License Requirements**

*Reason for Control:*  CC, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | A license is required for ALL destinations, except Canada, regardless of end use.  Accordingly, a column specific to this control does not appear on |

99

WASHAR0001594

| | the Commerce Country Chart.  (See part 742 of the EAR for additional information). |
|---|---|
| UN applies to entire entry | See § 746.1(b) for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

  *LVS:*   N/A

  *GBS:*   N/A

  *CIV:*   N/A

**List of Items Controlled**

  *Related Controls*: Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982.  Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

  *Related Definitions*: N/A

  *Items*: The list of items controlled is contained in the ECCN heading.

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

  *Reason for Control:* FC, RS, CC, UN

100

WASHAR0001595

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g and .i of this entry | FC Column 1 |
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See §746.1(b) for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

    *LVS:* N/A

    *GBS:* N/A

    *CIV:* N/A

**List of Items Controlled**

    *Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 µA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

    *Related Definitions:* N/A

    *Items:*

a.    Telescopic sights.

WASHAR0001596

b.       Holographic sights.

c.       Reflex or "red dot" sights.

d.       Reticle sights.

e.       Other sighting devices that contain optical elements.

f.        Laser aiming devices or laser illuminators ''specially designed'' for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

*Note 1 to 0A504.f:* *0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g.       Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e or .i.

h.       [Reserved]

i.        Riflescopes that were not "subject to the EAR" as of [INSERT DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

*Note 2 to paragraph i:*  For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" is what is used to determine whether the riflescope is "specially designed."

**0A505  Ammunition as follows (see List of Items Controlled).**

WASHAR0001597

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x | NS Column 1 |
| RS applies to 0A505.a and .x | RS Column 1 |
| CC applies to 0A505.b | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to  0A505.a, .d  and .x | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons.  The Commerce Country Chart is not designed to determine AT licensing requirements for this entry.  See §742.19 of the EAR for additional information. |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $100 for items in 0A505.x

*GBS*: N/A

*CIV*: N/A

**Special conditions for STA**

WASHAR0001598

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls*:  (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR."  (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions*:  N/A

*Items*:

a.　　Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.

b.　　Buckshot (No. 4 .24'' diameter and larger) shotgun shells.

c.　　Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

**Note 1 to 0A505.c:**  *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

WASHAR0001599

d.      Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x.      "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

   *Note 2 to 0A505.x:*  *The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

   *Note 3 to 0A505.x:*  *The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

   34.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export Control Classification Numbers (ECCNs) 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

WASHAR0001600

**0A602  Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA:*  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

WASHAR0001601

**List of Items Controlled**

*Related Controls*: (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR."  (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions*:  N/A

*Items*:

a.      Guns and armament manufactured between 1890 and 1919.

b.      Military flame throwers with an effective range less than 20 meters.

c. through w.   [Reserved]

x.       "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

*Note 1 to 0A602:  "Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

*Note 2 to 0A602:  Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants designated EAR99.*

WASHAR0001602

**ECCN 0A918 – [Removed]**

35.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A918.

**ECCN 0A984 – [Removed]**

36.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A984.

**ECCN 0A985 – [Removed]**

37.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A985.

**ECCN 0A986 – [Removed]**

38.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0A986.

WASHAR0001603

**ECCN 0A987 – [Removed]**

39. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove ECCN 0A987.

40. In Supplement No. 1 to part 774( the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the header that reads: "B. 'Test', 'Inspection' and 'Production Equipment' and the entry for Export Control Classification Number (ECCN) 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*:  NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|

WASHAR0001604

| | |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

**List of Items Controlled**

WASHAR0001605

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a.      Small arms chambering machines.

b.      Small arms deep hole drilling machines and drills therefor.

c.      Small arms rifling machines.

d.      Small arms spill boring machines.

e.      Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |

111

WASHAR0001606

| UN applies to entire entry | See § 746.1 for UN controls |
|---|---|
| AT applies to paragraphs .a, .d and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons. |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

a.      Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

WASHAR0001607

b.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d.      Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w    [Reserved]

x.      "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

41.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between entries for Export Control Classification Numbers (ECCNs) 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

WASHAR0001608

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

WASHAR0001609

a.      The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:

    a.1.     Gun barrel rifling and broaching machines and tools therefor;

    a.2.     Gun barrel rifling machines;

    a.3.     Gun barrel trepanning machines;

    a.4.     Gun boring and turning machines;

    a.5.     Gun honing machines of 6 feet (183 cm) stroke or more;

    a.6.     Gun jump screw lathes;

    a.7.     Gun rifling machines; and

    a. 8.    Gun straightening presses.

b.      Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c.      Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d.      Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**ECCN 0B986 – [Removed]**

WASHAR0001610

42. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0B986.

43. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | NS Column 1 |

WASHAR0001611

| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | RS Column 1 |
|---|---|
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR" (See 22 CFR 121.1, Category I).

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

WASHAR0001612

**0D505  "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to "software" for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

WASHAR0001613

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls*:  "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR" (See 22 CFR § 121.1, Category III).

*Related Definitions*:  N/A

*Items*: The list of items controlled is contained in this ECCN heading.

44. In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

WASHAR0001614

**0D602** **"Software" "specially designed"** for the **"development," "production,"** operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*:    Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

WASHAR0001615

**List of Items Controlled**

*Related Controls*:  (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k).   (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions*:  N/A

*Items*:   "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

45.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0E018 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

WASHAR0001616

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

WASHAR0001617

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:

a.      "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

b.      "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502  "Technology" "required" for the "development" or "production," of commodities controlled by 0A502.**

**License Requirements**

*Reason for Control*:  CC, UN

| *Controls* | *Country Chart (See Supp. No. 1 part 738)* |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) for UN controls |

123

WASHAR0001618

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0E504 ''Technology'' ''required'' for the ''development,'' or ''production'' of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.**

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry | RS Column 1 |

WASHAR0001619

| UN applies to entire entry | See § 746.1(b) for UN controls |
|---|---|
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in the ECCN heading.

**0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.**

**License Requirements**

125

WASHAR0001620

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505 | NS Column 1 |
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505 | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b | CC Column 1 |

WASHAR0001621

| | |
|---|---|
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

*Related Controls*:  Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR" (See 22 CFR § 121.1, Category III).

*Related Definitions*: N/A

*Items*: The list of items controlled is contained in this ECCN heading.

127

WASHAR0001622

46.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), add, between the entries for Export Control Classification Numbers (ECCNs) 0E521 and 0E606 an entry for ECCN 0E602:

**0E602  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

WASHAR0001623

*CIV*:  N/A

*TSR*:  N/A

**Special conditions for STA**

*STA*:  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls*:  Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:  "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**ECCN 0E918 – [REMOVED]**

47.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E918.

129

48.  In Supplement No. 1 to Part 774, the Commerce Control List, Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), revise Export Control Classification Number (ECCN) 0E982 (which includes removing "0A985" from the heading and the "Control(s)" paragraph and adding in its place "0A503") to read as follows.

**0E982 "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.**

**License Requirements**

*Reason for Control:*   CC

| Control(s) |
| --- |
| CC applies to "technology" for items controlled by 0A982 or 0A503.  A license is required for ALL destinations, except Canada, regardless of end-use.  Accordingly, a column specific to this control does not appear on the Commerce Country Chart.  (See part 742 of the EAR for additional information.) |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

130

WASHAR0001625

*TSR:*    N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**ECCN 0E984 – [REMOVED]**

49.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E984.

**ECCN 0E987 – [REMOVED]**

50.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 0 – Nuclear Materials, Facilities & Equipment (and Miscellaneous Items), remove Export Control Classification Number (ECCN) 0E987.

131

WASHAR0001626

51. In Supplement No. 1 to part 774 (the Commerce Control List), Category 1 – Special Materials and Related Equipment, Chemicals, "Microorganisms" and "Toxins," revise Export Control Classification Number (ECCN) 1A984 (which includes revising the heading) to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

*Reason for Control*:   CC

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

132

WASHAR0001627

*LVS:*   N/A

*GBS:*   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

52.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 –

Materials Processing, revise Export Control Classification Number (ECCN) 2B004 (which

includes removing "2B018" from the related controls paragraph and adding in its place "0B501,

0B602, 0B606") to read as follows:

**2B004 Hot "isostatic presses" having all of the characteristics described in the List of Items**

**Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control*:  NS, MT NP, AT

133

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 2 |
| MT applies to entire entry | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa | NP Column 1 |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS*:   N/A

*GBS*:   N/A

*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  (1) See ECCN 2D001 for software for items controlled under this entry.

(2) See ECCNs 2E001 ("development"), 2E002 ("production"), and 2E101 ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009.  (4) For additional controls on dies,

WASHAR0001629

molds and tooling, see ECCNs 1B101.d, 2B104 and 2B204.  (5) Also see ECCNs 2B117 and 2B999.a.

*Related Definitions*: N/A

*Items*:

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K  (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

*Technical Note:  The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside*

WASHAR0001630

*diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

    53.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number (ECCN) 2B018 to read as follows:

**2B018   Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry.  Commodities formerly controlled by paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606.  Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602.  Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501.  Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

    54.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number (ECCN) 2D018 to read as follows:

WASHAR0001631

**2D018 "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry.  See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

55.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number  (ECCN) 2E001 (which includes removing "2B018" and the comma that follows it from the Control(s) table) to read as follows:

**2E001 "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|

WASHAR0001632

| | |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002 | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201 or 2D202 for NP reasons | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment | CB Column 2 |

WASHAR0001633

| | |
|---|---|
| controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351 | |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or

WASHAR0001634

"Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: See also 2E101, 2E201, and 2E301

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**Note:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

56.  In Supplement No. 1 to part 774 (the Commerce Control List), Category 2 – Materials Processing, revise Export Control Classification Number (ECCN) 2E002 (which includes removing "2B018" and the comma that follows it from the Control(s) table) to read as follows:

WASHAR0001635

**2E002 "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

## License Requirements

*Reason for Control*:  NS, MT, NP, CB, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009 | NS Column 1 |
| MT applies to "technology"  for  equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons | NP Column 1 |

WASHAR0001636

| | |
|---|---|
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons | NP Column 2 |
| CB applies to "technology" for equipment Controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g | CB Column 2 |
| AT applies to entire entry | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*CIV:*   N/A

*TSR:*   Yes, except N/A for MT

WASHAR0001637

**Special Conditions for STA**

*STA:*   License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

57. In Supplement No. 1 to part 774 (the Commerce Control List), Category 7—Navigation and Avionics, revise Export Control Classification Number (ECCN) 7A611 (which includes revising Related Controls paragraph (2) in the List of Items Controlled section) to read as follows:

**7A611  Military fire control, laser, imaging, and guidance equipment, as follows (see List of**

143

WASHAR0001638

**Items Controlled).**

**License Requirements**

*Reason for Control*: NS, MT, RS, AT, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738). |
|---|---|
| NS applies to entire entry except 7A611.y | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c | MT Column 1 |
| RS applies to entire entry except 7A611.y | RS Column 1 |
| AT applies to entire entry | AT Column 1 |
| UN applies to entire entry except 7A611.y | See § 746.1(b) for UN controls |

**List Based License Exceptions** (See Part 740 for a description of all license exceptions)

*LVS:* $1500

*GBS:* N/A

*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used

WASHAR0001639

for any item in 7A611.

**List of Items Controlled**

*Related Controls*:  (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR.  (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103.  (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment.  (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.

*Related Definitions*: N/A

*Items*:

a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.

b. to w. [RESERVED]

x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:

1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;

2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102 or 7A103; or

145

WASHAR0001640

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

   y.1 [RESERVED]

DATED:  5 . 4 . 18

Richard E. Ashooh

Assistant Secretary

for Export Administration

WASHAR0001641

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Friday, May 11, 2018 9:52 AM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations |

<div style="background:black"> </div>

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, May 11, 2018 9:50 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Josh,

<div style="background:black"> </div>

Thanks
Rob

**From:** Paul, Joshua M <PaulJM@state.gov>
**Date:** May 11, 2018 at 7:56:18 AM EDT
**To:** Monjay, Robert <MonjayR@state.gov>, PM-CPA <PM-CPA@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>, Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

<div style="background:black"> </div>

Thanks,

J

**Official - SBU**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Friday, May 04, 2018 1:01 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F

<Millermf@state.gov>
**Subject:** FW: AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

Josh and Co,
The Secretary approved the rules for signature and publication. I believe that means that you will now work with BIS and DOD to schedule briefings?
Thanks
Rob

**Official - SBU**
**UNCLASSIFIED**


**From:** PM-Staffers Mailbox
**Sent:** Friday, May 4, 2018 11:43 AM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** AM for S: Proposed Amendment to the International Traffic in Arms Regulations Proposed Amendment to the International Traffic in Arms Regulations

RMA – S approved.  See attached.

Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

| From: | Timothy Mooney <Timothy.Mooney@bis.doc.gov> |
|---|---|
| Sent: | Monday, May 14, 2018 12:44 PM |
| To: | Monjay, Robert <MonjayR@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov> |
| Subject: | RE: Copy of the signed Commerce rule. Can you send me an electronic copy of the State signed rule? |

Thanks, Rob.

Tim

**From:** Monjay, Robert <MonjayR@state.gov>
**Sent:** Monday, May 14, 2018 12:43 PM
**To:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: Copy of the signed Commerce rule. Can you send me an electronic copy of the State signed rule?

Tim,
Attached is a PDF of the rule with the final OFR edits. Please use this version of the DOS rule.
Thanks
Rob

**Official**
**UNCLASSIFIED**

**From:** Timothy Mooney <Timothy.Mooney@bis.doc.gov>
**Sent:** Friday, May 11, 2018 12:49 PM
**To:** Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Monjay, Robert <MonjayR@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: Copy of the signed Commerce rule. Can you send me an electronic copy of the State signed rule?

Simon,

Can you send me a scanned copy of the signed State rule?

But a Word version is also fine.  For our own internal reference, I want to make sure I have the most recent version.

Thanks,
Tim

**From:** Timothy Mooney
**Sent:** Thursday, May 10, 2018 9:23 AM
**To:** Simon Davidson-Hood (davidsonhoodS@state.gov) <davidsonhoodS@state.gov>
**Cc:** Robert Monjay (monjayr@state.gov) <monjayr@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L (HartRL@state.gov) <HartRL@state.gov>
**Subject:** Copy of the signed Commerce rule. Can you send me an electronic copy of the State signed rule?

Hi Simon,

Attached is the Word version and scanned PDF copy of the signed Commerce rule.

Can you guys send me if you have a scanned copy of the signed State rule that you could send me?

If you don't have a scanned copy, then a copy of the Word version works, too.  Just want to make sure we have the final signed version.

Thanks,
Tim

WASHAR0001645

| From: | FRpublications <FRpublications@state.gov> |
|---|---|
| Sent: | Monday, May 21, 2018 9:18 AM |
| To: | Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| Cc: | Kottmyer, Alice M <KottmyerAM@state.gov>; Peckham, Yvonne M <PeckhamYM@state.gov> |
| Subject: | FW: SCHEDULED: Document Number - 2018-10366 |

Good morning,
Proposed rule RIN 1400-AE30 scheduled for publication on 5-24-2018.

Thank you,
Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

**From:** noreply@fedreg.gov <noreply@fedreg.gov>
**Sent:** Friday, May 18, 2018 3:47 PM
**To:** FRpublications <FRpublications@state.gov>
**Cc:** JSHELLEY@GPO.GOV
**Subject:** SCHEDULED: Document Number - 2018-10366

Please do not reply directly to this e-mail. If you have any questions or comments regarding this email, please contact Jason Shelley.

Attention : Ernesto Rivera, (STATE) State Department

Document 2018-10366, Category PROPOSED RULES has been scheduled to publish on 05-24-2018.
This document will be placed on public inspection on 05-21-2018 08:45:00.

The subject of this document is International Traffic in Arms Regulations:.
The submitting Agency is (STATE) State Department.
The Docket Id is Public Notice 10094.
The RIN is 1400-AE30.
This document has an effective date of NA.
The comments due date is 07-09-2018.
The separate part # for this document is 3.
Agency/CFR Title/CFR Part:
(STATE) State Department, CFR Title is 22, CFR Part is 121,123,124,126,129

DEPARTMENT OF STATE
22 CFR Parts 121, 123, 124, 126, and 129
[Public Notice 10094]
RIN 1400-AE30

WASHAR0001646

International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

AGENCY: Department of State.

ACTION: Proposed rule.

SUMMARY: The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).

[...]

| | |
|---|---|
| **From:** | Koelling, Richard W <KoellingRW@state.gov> |
| **Sent:** | Tuesday, May 29, 2018 7:56 AM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | FW: Two Gun Issue Papers |

Feather in your cap.

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

**Official**
**UNCLASSIFIED**

**From:** ▉▉▉▉▉▉▉@wyoming.com>
**Sent:** Friday, May 25, 2018 5:09 PM
**To:** Monjay, Robert <MonjayR@state.gov>
**Cc:** chob416holly heussner <holly.heussner@mail.house.gov>; ▉▉▉▉▉▉▉▉▉▉@hotmail.com>; Koelling,
Richard W <KoellingRW@state.gov>
**Subject:** Re: Two Gun Issue Papers

Thank you very much. This e-mail from you I think provides the answers we
were looking for and I very much appreciate it. I'm not speaking for the
WACA, but I can personally support the positions you convey in your e-mail
below.

Yes, please do consider my request that the date for "antique" firearms be
changed from 1890 to 1898 as is now found in the BATF rules. I think this
1898 date is also in the Federal Legislation that established what is, or
is not, considered an "antique" firearm.

Again, thank you for your prompt attention to our concerns. — Dick Loper

**From:** Monjay, Robert
**Sent:** Friday, May 25, 2018 2:54 PM
**To:** ▉▉▉▉▉
**Cc:** chob416holly heussner ; ▉▉▉▉▉ ; Koelling, Richard W
**Subject:** RE: Two Gun Issue Papers

Mr. Loper,
We formally published the proposed rules in the Federal Register yesterday. In the announcement on our website
(https://www.pmddtc.state.gov/?id=ddtc_public_portal_news_and_events), we included a summary document that
sets out a summary of the key points with respect to the items that will transfer to the Department of Commerce and
those that will stay with the Department of State, which I have attached for your convenience.

With respect to the use of 1890, rather than 1898, I am happy to consider your email below as a public comment on the
rule requesting that we make this change. Once the public comment period has closed on July 9, 2018, we will consider
all of the public comments and address them in the final rules. Please let me know if you would like your email to be
considered a public comment or please feel free to submit a public comment on this or any other parts of the rules,

either to DDTCpubliccomments@state.gov or through regulations.gov, as described on the rules.

Regarding gunsmiths and manufacturer registration requirements, these rules do not address these issues directly. However, the ITAR only includes a manufacturer registration requirement for items that are on the United States Munitions List (USML), and these rules propose to remove nearly all non-automatic and semi-automatic firearms, as well as parts, components, accessories and attachments, from the USML. So, a gunsmith who only works with items that will be removed from the USML will no longer need to determine whether they are a manufacturer under the ITAR. We will be maintaining automatic firearms, their major components (but not ones common between automatic and semi-automatic firearms), silences/sound suppressors, automatic stabilization or aiming systems, drums and magazines for greater than 50 rounds, and parts and components for converting a semi-automatic firearm into an automatic firearm. So manufacturers of these items will continue to be required to register with DDTC.

Please let me know if you have any further questions.
Thank you
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official**
**UNCLASSIFIED**

**From:** Koelling, Richard W
**Sent:** Tuesday, May 22, 2018 12:29 PM
**To:** dloper <dloper@wyoming.com>; Monjay, Robert <MonjayR@state.gov>
**Cc:** chob416holly heussner <holly.heussner@mail.house.gov>; wacamike <m.d.hunter63@hotmail.com>
**Subject:** RE: Two Gun Issue Papers

Mr. Loper,
Glad to be of service and pleased that you find our efforts of value to you. On your "interpretation" requests, I'm looping in Mr. Rob Monjay, who should be able to provide you some assistance In this area. Again, please feel free to reach out to me directly if you have any further comments or questions.

Kind regards,

Rick Koelling

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

**Official**
**UNCLASSIFIED**

**From:** dloper <dloper@wyoming.com>

**Sent:** Tuesday, May 22, 2018 11:57 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Cc:** chob416holly heussner <holly.heussner@mail.house.gov>██████@wyoming.com;
██████ @hotmail.com>
**Subject:** Re: Two Gun Issue Papers
**Importance:** High

Mr. Koelling: Thank you very much for keeping me in the loop. I did open
the proposed "Final" rule ( 146 pages if I opened the right one ?? ). It
looks like most of these proposed Regs have to do with re-classification of
guns and components with a lot of narrative on export/import which small,
local gun smiths have nothing to do with. They just fix our guns at the
local level. If these new Regs do save the Government money and time, we
appreciate this effort.

Is there any way to obtain a narrative in lay person's language that just
says in common language what these Regs will do and the practical effect on
those of us who own guns ?  I found the Regs very technical with a lot of
acronyms the lay person, ( me ) will not understand.

I also noted that the date in these Regs that spoke to the date for what is
an "antique" gun is incorrect. These Regs say a gun manufactured on or
before 1890 is an "antique" but the Federal Law that says what is or is not
an "antique" gun says any gun made on or before 1898 is an "antique ??
Could you please change that part of the proposed Regs to be consistent
with the Federal law and BATF Regs on this subject ?

I never did find in these proposed "Final" Regs the answer to my original
question which was, and still is, are small business gun smiths being
classified as "gun manufacturers" or not and if yes, why ?

Thanks again. I really do appreciate your working with me on this subject.
Those of us who like "antique" guns will more than appreciate a change to
the 1898 date and I'd sure like an answer to my original question if at all
possible. – Dick Loper

**From:** Koelling, Richard W
**Sent:** Tuesday, May 15, 2018 1:17 PM
**To:** Heussner, Holly ; ██████
**Cc:** Cook, Daniel L ; Paul, Joshua M ; Heidema, Sarah J
**Subject:** RE: Two Gun Issue Papers

Mr. Loper,
I hope all is well with you and yours. This morning the Office of Defense Trade Controls Policy published its proposed
rule for revising United States Munitions List Categories I-III (Firearms, Guns and Armament, and
Ammunition/Ordnance).  Please note this rule is "proposed" vice "final." What this means is that the language in this
draft rule is not locked in per se. As such we at the Department of State are soliciting feedback from the public on our
proposed text. We invite you and your associates to write back to us per the instructions in the draft to convey any
comments or concerns you may have.

For ease of use, I've provided the link here: https://www.pmddtc.state.gov/.  On the home page, please scroll down to the
notice entitled, "Proposed Amendment to International Traffic in Arms Regulations." You will find a link that will take
you to the rule.

Again, if you have any questions, please feel free to reach out to me personally. For questions related to registration, please feel free to reach out to Mr. Cook cc'd here.

Kind regards,

Rick Koelling

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

**Official**
**UNCLASSIFIED**

---

**From:** Koelling, Richard W
**Sent:** Thursday, April 5, 2018 1:07 PM
**To:** 'Heussner, Holly' <Holly.Heussner@mail.house.gov>; ███████@wyoming.com>
**Cc:** Cook, Daniel L <CookDL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Two Gun Issue Papers

Mr. Loper,
As promised, here is the link to the Directorate of Defense Trade Controls (DDTC) home page, where you can learn more about the International Traffic in Arms Regulations (ITAR) and defense trade. The "Getting Started" menu item may be a good place to begin your review.

http://www.pmddtc.state.gov

We also discussed the Advisory Opinion process, and how you might obtain a formal DDTC opinion on any obligations you might have under the ITAR. The DDTC Response Team is available to help you submit a request, if you are interested.

Additionally, I mentioned the Defense Trade Advisory Group, our channel to interact with and obtain recommendations from the public and our regulated community on our regulations and operations. More information on the DTAG is available here.

Again, if you have any questions, please feel free to reach out to Dan or to me anytime.

Best,

Rick Koelling

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

**Official**
**UNCLASSIFIED**

---

**From:** Koelling, Richard W

WASHAR0001651

**Sent:** Thursday, April 5, 2018 11:47 AM
**To:** 'Heussner, Holly' <Holly.Heussner@mail.house.gov> ███████████@wyoming.com>
**Cc:** Cook, Daniel L <CookDL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Two Gun Issue Papers

Holly, great to have you on board. We're also looping in Josh Paul from CPA (cc'd here).

Kind regards,

Rick Koelling

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

**Official**
**UNCLASSIFIED**

**From:** Heussner, Holly <Holly.Heussner@mail.house.gov>
**Sent:** Thursday, April 5, 2018 11:17 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; ███████████@wyoming.com>
**Cc:** Cook, Daniel L <CookDL@state.gov>
**Subject:** RE: Two Gun Issue Papers

Thanks for cc'ing me on this. I would like to be on the call as well. If this time still works for all parties, we can use our office's conference line: Call In number: 202-593-3000; Participant Code: 333158.

Let me know if that works.

Thanks,
Holly

**Holly Heussner | Legislative Assistant**
Congressman Liz Cheney (WY-AL)
Cannon HOB 416 | 202-225-2311

**From:** Koelling, Richard W [mailto:KoellingRW@state.gov]
**Sent:** Thursday, April 5, 2018 11:04 AM
**To:** ███████████@wyoming.com>
**Cc:** Cook, Daniel L <CookDL@state.gov>; Heussner, Holly <Holly.Heussner@mail.house.gov>
**Subject:** RE: Two Gun Issue Papers

Sir,
We will be happy to reach out to the number you've provided next hour.

Rick

WASHAR0001652

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828

**Official**
**UNCLASSIFIED**

**From:** ███████@wyoming.com>
**Sent:** Thursday, April 5, 2018 10:00 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>
**Cc:** Cook, Daniel L <CookDL@state.gov>; chob416holly heussner <holly.heussner@mail.house.gov>
**Subject:** Re: Two Gun Issue Papers
**Importance:** High

Yes, Thank you for reaching out to me. I'll be pleased to be on a call with you today at 10 PM mountain time.

Has Holly conveyed to you my concern ? When I was a Director on the Winchester Association, it came to our attention that the DDTC was considering adding local gunsmiths to the definition of a "gun manufacturer". This is of serious concern to many of us because most of our local gun smiths only fix guns, adjust the sites, fix broken gun stocks, etc., they don't manufacture them. We are told many local gunsmiths will just simply go out of business if they are designated a gun "manufacturer" and have to pay fees and additional paperwork. We need local gunsmiths very badly.

Please convey a call in number or call me and I'll be please to visit with you. Can Holly also be on the call ? Thanks – Dick Loper 307-332-2601.

**From:** Koelling, Richard W
**Sent:** Thursday, April 05, 2018 7:43 AM
**To:** ███████@wyoming.com
**Cc:** Cook, Daniel L
**Subject:** Two Gun Issue Papers

Mr. Loper,
Earlier this week, Mr. Cook, our Compliance Chief of Registration, and I received copies of the subject papers you submitted to Ms. Heussner late last year. I understand you are interested in discussing these at length and am hoping to find an opportunity where the three of us are available to do just that. While Mr. Cook and Compliance has the lead for this issue, I wanted to reach out to you personally to see if you are available for a conference phone call later today. I am proposing 12 noon our time, 10 yours—assuming you are in Mountain Time. Please let me know if this works for you. We look forward to speaking with you.

Kind regards,

Rick Koelling

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy

WASHAR0001653

Department of State
202-663-2828

**Official**
**UNCLASSIFIED**

WASHAR0001654

| **From:** | Peckham, Yvonne M <PeckhamYM@state.gov> |
| **Sent:** | Monday, May 21, 2018 11:21 AM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Kottmyer, Alice M <KottmyerAM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>; Peckham, Yvonne M <PeckhamYM@state.gov> |
| **Subject:** | RE: SCHEDULED: Document Number - 2018-10366 |

Rob,
The Federal Register had notified BIS that due to the large document they agreed to place it on public inspection 5/21/18 (earlier than the scheduled date of 5/23/18) but that the publication date would remain 5/24/18.

They apologized for not conveying this to State and added that the publication date cannot be changed.

Thank you,
Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

**From:** Monjay, Robert
**Sent:** Monday, May 21, 2018 10:51 AM
**To:** Peckham, Yvonne M <PeckhamYM@state.gov>
**Cc:** Kottmyer, Alice M <KottmyerAM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: SCHEDULED: Document Number - 2018-10366

Yvonne,
Can you find out why this is on public display for three days? If it is on public display today, then it should publish tomorrow, right?
Thanks
Rob

**Official**
**UNCLASSIFIED**

**From:** FRpublications
**Sent:** Monday, May 21, 2018 9:18 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Kottmyer, Alice M <KottmyerAM@state.gov>; Peckham, Yvonne M <PeckhamYM@state.gov>
**Subject:** FW: SCHEDULED: Document Number - 2018-10366

Good morning,
Proposed rule RIN 1400-AE30 scheduled for publication on 5-24-2018.

Thank you,
Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

**From:** noreply@fedreg.gov <noreply@fedreg.gov>
**Sent:** Friday, May 18, 2018 3:47 PM
**To:** FRpublications <FRpublications@state.gov>
**Cc:** JSHELLEY@GPO.GOV
**Subject:** SCHEDULED: Document Number - 2018-10366

Please do not reply directly to this e-mail. If you have any questions or comments regarding this email, please contact Jason Shelley.

Attention : Ernesto Rivera, (STATE) State Department

Document 2018-10366, Category PROPOSED RULES has been scheduled to publish on 05-24-2018.
This document will be placed on public inspection on 05-21-2018 08:45:00.

The subject of this document is International Traffic in Arms Regulations:.
The submitting Agency is (STATE) State Department.
The Docket Id is Public Notice 10094.
The RIN is 1400-AE30.
This document has an effective date of NA.
The comments due date is 07-09-2018.
The separate part # for this document is 3.
Agency/CFR Title/CFR Part:
(STATE) State Department, CFR Title is 22, CFR Part is 121,123,124,126,129

DEPARTMENT OF STATE
22 CFR Parts 121, 123, 124, 126, and 129
[Public Notice 10094]
RIN 1400-AE30

International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

AGENCY: Department of State.
ACTION: Proposed rule.
SUMMARY: The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).
[...]

| | |
|---|---|
| **From:** | Peckham, Yvonne M <PeckhamYM@state.gov> |
| **Sent:** | Monday, May 21, 2018 10:52 AM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Kottmyer, Alice M <KottmyerAM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov> |
| **Subject:** | RE: SCHEDULED: Document Number - 2018-10366 |

A request has been sent.

Yvonne

Yvonne Peckham
Management Analyst
Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

**From:** Monjay, Robert
**Sent:** Monday, May 21, 2018 10:51 AM
**To:** Peckham, Yvonne M <PeckhamYM@state.gov>
**Cc:** Kottmyer, Alice M <KottmyerAM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Subject:** RE: SCHEDULED: Document Number - 2018-10366

Yvonne,
Can you find out why this is on public display for three days? If it is on public display today, then it should publish tomorrow, right?
Thanks
Rob

**Official**
**UNCLASSIFIED**

**From:** FRpublications
**Sent:** Monday, May 21, 2018 9:18 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Monjay, Robert <MonjayR@state.gov>; Davidson-Hood, Simon <DavidsonHoodS@state.gov>
**Cc:** Kottmyer, Alice M <KottmyerAM@state.gov>; Peckham, Yvonne M <PeckhamYM@state.gov>
**Subject:** FW: SCHEDULED: Document Number - 2018-10366

Good morning,
Proposed rule RIN 1400-AE30 scheduled for publication on 5-24-2018.

Thank you,
Yvonne

Yvonne Peckham
Management Analyst

Office of Directives Management
Department of State
Suite 2400, SA 22
1800 G Street NW
Washington, DC
202-312-9613

**From:** noreply@fedreg.gov <noreply@fedreg.gov>
**Sent:** Friday, May 18, 2018 3:47 PM
**To:** FRpublications <FRpublications@state.gov>
**Cc:** JSHELLEY@GPO.GOV
**Subject:** SCHEDULED: Document Number - 2018-10366

Please do not reply directly to this e-mail. If you have any questions or comments regarding this email, please contact Jason Shelley.

Attention : Ernesto Rivera, (STATE) State Department

Document 2018-10366, Category PROPOSED RULES has been scheduled to publish on 05-24-2018.
This document will be placed on public inspection on 05-21-2018 08:45:00.

The subject of this document is International Traffic in Arms Regulations:.
The submitting Agency is (STATE) State Department.
The Docket Id is Public Notice 10094.
The RIN is 1400-AE30.
This document has an effective date of NA.
The comments due date is 07-09-2018.
The separate part # for this document is 3.
Agency/CFR Title/CFR Part:
(STATE) State Department, CFR Title is 22, CFR Part is 121,123,124,126,129

DEPARTMENT OF STATE
22 CFR Parts 121, 123, 124, 126, and 129
[Public Notice 10094]
RIN 1400-AE30

International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

AGENCY: Department of State.
ACTION: Proposed rule.
SUMMARY: The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).
[...]

WASHAR0001658

| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Tuesday, June 26, 2018 4:24 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov> |
| **Subject:** | Defense Distributed - Proposed Revised Settlement - State comments 061318 - DOJ responses |
| **Attach:** | Defense Distributed - Proposed Revised Settlement - State comments 061318 - DOJ responses.docx |

**Official**
**UNCLASSIFIED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § | Case No. 15-CV-372-RP |
| | § | |
| | § | SECOND AMENDED |
| Plaintiffs, | § | COMPLAINT |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

1

WASHAR0001660

Contrary to the Justice Department's warning that such actions are unconstitutional, Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120 *et seq*. ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open forums, regarding arms in common use for lawful purposes. Defendants' censorship of Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments to the United States Constitution. Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this prior restraint scheme, and to recover money damages to compensate for the harm such application has already caused.

*The Parties*

1.     Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including in Texas. The purposes of SAF include promoting, securing, and expanding access to the exercise of the right to keep and bear arms; and education, research, publishing and legal

2

WASHAR0001661

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3.      Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4.      Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq*. ("AECA").

5.      Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.      Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7.      Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8.      Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

WASHAR0001662

JURISDICTION AND VENUE

9.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.    The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.    Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.    The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id*.

14.    The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

WASHAR0001663

15. The scope of technical data subject to ITAR control, as described on the U.S. Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants constantly change, often without notice, their views of what this scope entails.

16. Americans have submitted thousands of written requests, known as "commodity jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

### History of Defendants' Prior Restraint Scheme

17. From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the ITAR imposed a prepublication approval requirement on publications of privately generated ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication."

18. Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of written opinions advising Congress, the White House, and the Department of State that the use of the ITAR to impose a prior restraint on publications of privately generated unclassified information into the public domain violated the First Amendment of the United States Constitution (the "Department of Justice memoranda").

19. In 1980, the Department of State Office of Munitions Control, the predecessor to Defendant DDTC, issued official guidance providing that "[a]pproval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."

20. Thereafter, the Department of State removed Footnote 3 from the ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

WASHAR0001664

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

21.     In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22.     Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

*The Published Files*

23.     Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

24.     Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

25.     Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

6

WASHAR0001665

26.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

7

WASHAR0001666

31. Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32. On June 4, 2015 — nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case — Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33. DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34. Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35. Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36. On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37. On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

8

WASHAR0001667

38.     Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

WASHAR0001668

43. To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

### Prior Restraint on Other Files

44. Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45. Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

### High Price Tag for Public Speech Licenses

46. The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a). For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47. DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

10

WASHAR0001669

48. The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

*Great, Irreparable, and Continuing Harm*

49. But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50. DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

COUNT ONE

ULTRA VIRES GOVERNMENT ACTION

51. Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52. The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

11

WASHAR0001670

COUNT TWO

RIGHT OF FREE SPEECH — U.S. CONST. AMEND. I

53.    Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.    Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.    Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.    Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.    Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT THREE

RIGHT TO KEEP AND BEAR ARMS — U.S. CONST. AMEND. II

58.    Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.    The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.    If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

WASHAR0001671

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

<div align="center">COUNT FOUR</div>

<div align="center">RIGHT TO DUE PROCESS OF LAW— U.S. CONST. AMEND. V</div>

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution  requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

WASHAR0001672

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2. A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the First Amendment to the United States Constitution;

3. A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to public speech, to include the Internet posting of files used in the production of arms of the kind in common use for traditional lawful purposes, including but not limited to the Subject Files, violates the Second Amendment to the United States Constitution;

4. A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5. An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against public speech on privately generated unclassified information;

14

WASHAR0001673

6.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7.      Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.      Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                    Respectfully submitted,

/s/ Alan Gura                              /s/ William B. Mateja
Alan Gura                                  William B. Mateja
Virginia Bar No. 68842*                    Texas State Bar No. 13185350
Gura PLLC                                  POLSINELLI P.C.
916 Prince Street, Suite 107               2950 N. Harwood, Suite 2100
Alexandria, Virginia 22314                 Dallas, Texas 75201
703.835.9085/Fax 703.997.7665             214.397.0030/Fax 214.397.0033
alan@gurapllc.com                          Mateja@polsinelli.com

/s/ Matthew Goldstein                      /s/ Josh Blackman
Matthew Goldstein                          Josh Blackman
D.C. Bar No. 975000*                       Virginia Bar No. 78292
Matthew A. Goldstein, PLLC                 1303 San Jacinto Street
1875 Connecticut Avenue, N.W.              Houston, Texas 77002
10th Floor                                 202.294.9003/Fax: 713.646.1766
Washington, DC 20009                       joshblackman@gmail.com
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com                             *Admitted pro hac vice

15

WASHAR0001674

| | |
|---|---|
| **From:** | Mueller, Andrew J CIV DTSA LD (US) <andrew.j.mueller2.civ@mail.mil> |
| **Sent:** | Tuesday, November 14, 2017 4:01 PM |
| **To:** | Monjay, Robert <MonjayR@state.gov>; Daoussi, Susan G CIV DTSA LD (US) <susan.g.daoussi.civ@mail.mil> |
| **Subject:** | RE: [Non-DoD Source] FW: Commerce comments on State's Export Control Reform Rule for Categories 1-3. (BIS responses on State rule for sending back to OMB) (UNCLASSIFIED) |
| **Attach:** | smime.p7m |

Content-Type: multipart/signed; protocol="application/x-pkcs7-signature";
      micalg=SHA1; boundary="----=_NextPart_000_0171_01D35D61.B3DC5A90"

------=_NextPart_000_0171_01D35D61.B3DC5A90
Content-Type: text/plain;
      charset="us-ascii"
Content-Transfer-Encoding: 7bit

CLASSIFICATION: UNCLASSIFIED

Rob,
Our technical analysis has determined that there is no such thing as a grenade launcher
"specially designed to fire only non-lethal or less-than-lethal projectiles".  So, we
recommending the removal of grenade launchers from ECCN 0A503 altogether.  They need
to remain controlled under USML Cat II(a)(4).

We are also not sure if 0A505 is the right place for the non-lethal/less lethal grenades either.
We are okay with them being listed in the CCL however.   Since 2012, Commerce has been
trying unsuccessfully to insert these "civil use" grenade launchers and grenades into 0A985
along with the (electricity) discharge weapons, which essentially is being replaced by 0A503.

Thank you.
Andy

-----Original Message-----
From: Monjay, Robert [mailto:MonjayR@state.gov]
Sent: Tuesday, November 14, 2017 10:57 AM
To: Mueller, Andrew J CIV DTSA LD (US) <andrew.j.mueller2.civ@mail.mil>; Daoussi, Susan
G CIV DTSA LD (US) <susan.g.daoussi.civ@mail.mil>
Subject: RE: [Non-DoD Source] FW: Commerce comments on State's Export Control Reform
Rule for Categories 1-3. (BIS responses on State rule for sending back to OMB)
(UNCLASSIFIED)

Great, thanks for taking this on. We are fine with going with a less technical parameter, like
"specially designed to fire only non-lethal or less-than-lethal projectiles" but think that a
technical parameter is better.

-----Original Message-----
From: Mueller, Andrew J CIV DTSA LD (US) [mailto:andrew.j.mueller2.civ@mail.mil]
Sent: Monday, November 13, 2017 11:31 AM
To: Monjay, Robert <MonjayR@state.gov>; Daoussi, Susan G CIV DTSA LD (US)
<susan.g.daoussi.civ@mail.mil>
Subject: RE: [Non-DoD Source] FW: Commerce comments on State's Export Control Reform
Rule for Categories 1-3. (BIS responses on State rule for sending back to OMB)
(UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Rob,

We have our tech experts looking into this.  Both the 37mm threshold as well as the smooth vs. rifled bore characteristics are problematic in distinguishing military from civil uses.  More to follow.

Thank you.
Andy

-----Original Message-----
From: Monjay, Robert [mailto:MonjayR@state.gov]
Sent: Thursday, November 9, 2017 6:25 PM
To: Daoussi, Susan G CIV DTSA LD (US) <susan.g.daoussi.civ@mail.mil>; Mueller, Andrew J CIV DTSA LD (US) <andrew.j.mueller2.civ@mail.mil>
Subject: [Non-DoD Source] FW: Commerce comments on State's Export Control Reform Rule for Categories 1-3. (BIS responses on State rule for sending back to OMB)

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

_____

Susan and Andy,

BIS continues to want us to remove the 37mm limitation on release of grenade launchers for non-lethal and less than lethal grenades. BIS suggested in its own rule that the distinction be between rifled and unrifled grenade launchers. Does DOD have a position on which it prefers?

They want to control bump stocks and other items that allow a semiautomatic to increase its rate of fire. Their rationale is that these are accessories for semiautomatic rifles, and they are going to create a paragraph for it to even further limit the availability of license exceptions. Thoughts?

Thanks

Rob

WASHAR0001677

Official - SBU

UNCLASSIFIED

From: Seehra, Jasmeet K. EOP/OMB [Caution-mailto:Jasmeet_K._Seehra@omb.eop.gov]
Sent: Thursday, November 09, 2017 5:23 PM
To: Krueger, Thomas G <KruegerTG@state.gov>; McClung, Gailyn W
<McClungGW@state.gov>; Aron, David H <AronDH@state.gov>; Monjay, Robert
<MonjayR@state.gov>; Peckham, Yvonne M <PeckhamYM@state.gov>
Cc: Seehra, Jasmeet K. EOP/OMB <Jasmeet_K._Seehra@omb.eop.gov>; Bashadi, Sarah
O. EOP/OMB <Sarah_O._Bashadi@omb.eop.gov>; Peterson, Patricia R. EOP/NSC
<Patricia_R_Peterson@nsc.eop.gov>
Subject: Commerce comments on State's Export Control Reform Rule for Categories 1-3.
(BIS responses on State rule for sending back to OMB)

Please see attached.

CLASSIFICATION: UNCLASSIFIED
Official
UNCLASSIFIED

CLASSIFICATION: UNCLASSIFIED

------=_NextPart_000_0171_01D35D61.B3DC5A90
Content-Type: application/pkcs7-signature; name="smime.p7s"
Content-Transfer-Encoding: base64
Content-Disposition: attachment; filename="smime.p7s"

MIAGCSqGSIb3DQEHAqCAMIACAQExCzAJBgUrDgMCGgUAMIAGCSqGSIb3DQEHAQAA
oIISBjCCA3Aw
ggJYoAMCAQICAQUwDQYJKoZIhvcNAQEFBQAwZzELMAkGA1UEBhMCVVMxGDAWBgN
VBAoTD1UuUy4g
R292ZXJubWVudDEMMAoGA1UECxMDRG9EMQwwCgYDVQQLEwNQS0kxFjAUBgNVBA
MTDURvRCBSb290
IENBIDIwHhcNMDQxMjEzMTUwMDEwWhcNMjkxMjA1MTUwMDEwWjBbMQswCQYDVQQ
GEwJVUzEYMBYG
A1UEChMPVS5TLiBHb3Zlcm5tZW50MQwwCgYDVQQLEwNEb0QxDDAKBgNVBAsTA1BLS
TEWMBQGA1UE
AxMNRG9EIFJvb3QgQ0EgMjCCASIwDQYJKoZIhvcNAQEBBQADggEPADCCAQoCggEBA
MAswfaNO6z/
PzzWcb64dCIH7HBBFfyrQOMHqsHD2J/+2kw6vz/l2Ch7SzYBwKxFJcPSDgqPhRhkED0aE3
Aqb47X
3I2Ts0EPOCHNravCPSoF01cRNw3NjFH5k+PMRkkhjhS0zcsUPjjNcjHuqxLyZeo0LIZd/+5jdctt
upE0/J7z9C0cvlDEQt9ZiP9qs/qobD3LVnFxBZa7n4DlgEVZZ0Gw68OtYKSAdQYXnA70Q+CZ
Dhv7

f/WzzLKBgrH9MsG4vkGkZLVgOlpRMlzO3kEsGUdcSRBkuXSph0GvfW66wbihv2UxOgRn+b
W7jpKK

AGO4seaMOF+D/1DVO6Jda7IQzGMCAwEAAaM/MD0wHQYDVR0OBBYEFEI0uwxeunr+AlT
ve6DGlcYJ

gHCWMAsGA1UdDwQEAwIBhjAPBgNVHRMBAf8EBTADAQH/MA0GCSqGSIb3DQEBBQUA
A4IBAQCYkY0/

ici79cBpcyk7Nay6swh2PXAJkumERCEBfRR2G+5RbB2NFTctezFp9JpEuK9GzDT6I8sDJxnS
gyF1

K+fgG5km3IRAleio0sz2WFxm7z9KlxCCHboKot1bBiudp2RO6y4BNaS0PxOtVeTVc6hpmxHx
mPlx

Hm9A1Ph4n46RoG9wBJBmqgYrzuF6krV94eDRIuehOi3MsZ0fBUTth5nTTRpwOcEEDOV+2f
Gv1yAO

8SJ6JaRzmcw/pAcnlqiile2CuRbTnguHwsHyiPVi32jfx7xpUe2xXNxUVCkPCTmarAPB2wxNrm
8K

ehZJ8b+R0jiU0/aVLLdsyUK2jcqQjYXZMIIEuzCCA6OgAwIBAgICB6AwDQYJKoZIhvcNAQEF
BQAw

WzELMAkGA1UEBhMCVVMxGDAWBgNVBAoTD1UuUy4gR292ZXJubWVudDEMMAoGA1
UECxMDRG9EMQww

CgYDVQQLEwNQS0kxFjAUBgNVBAMTDRvRCBSb290IENBIDIwWhcNMTUwOTIzMTM0M
TU0WhcNMjEw

OTIyMTM0MTU0WjBdMQswCQYDVQQGEwJVUzEYMBYGA1UEChMPVS5TLiBHb3Zlcm5tZ
W50MQwwCgYD

VQQLEwNEb0QxDDAKBgNVBAsTA1BLSTEYMBYGA1UEAxMPRE9EIEVNQUIMIENBLTM0
MIIBIjANBgkq

hkiG9w0BAQEFAAOCAQ8AMIIBCgKCAQEAI9rPJyF3FMITkbUCbyRbHPGfd9K7RKdmnCE2
57ehsNm7

nM7Q9zxc8SpbTSDbOaP3WqovS5bmsSE+IeWR/MhTGV4VMKztZmkGea8WYd5zooz+Ormf
uoxEoCy5

Ciya+RT+wLOwH0ApD4doIkrkZd2Q2ZJeL/8pDDj1hPAMLpTfJbekNsQ3hsWnKp7AWVsliY4I
R8u0

RYmX4LHYM5hN+qf6uiOLK6U/pcXcyRa3ymxiqq0gkVKqzybqKjlF4JucUU9zTc/Rcm2XSQEFI
5ni

GI1YRRcrwGdl88TEYqcD8LfqAfKtVHvKy6nQ49L2S8qXQi7p9DmBbGf0c9gZFxG2SAo19wlD
AQAB

o4IBhTCCAYEwHQYDVR0OBBYEFA+GWX7j+ucT+zE7wTkMfGCLQMLdMB8GA1UdIwQYM
BaAFEI0uwxe

unr+AlTve6DGlcYJgHCWMBIGA1UdEwEB/wQIMAYBAf8CAQAwDAYDVR0kBAUwA4ABAD
AOBgNVHQ8B

Af8EBAMCAYYwZgYDVR0gBF8wXTALBgIghkgBZQIBCwUwCwYJYIZIAWUCAQsJMAsGCW
CGSAFIAgEL

ETALBgIghkgBZQIBCxIwCwYJYIZIAWUCAQsTMAwGCmCGSAFIAwIBAxowDAYKYIZIAWU
DAgEDGzA3

BgNVHR8EMDAuMCygKqAohiZodHRwOi8vY3JsLmRpc2EubWlsL2NybC9ET0RST09UQ0Ey
LmNybDBs

BggrBgEFBQcBAQRgMF4wOgYIKwYBBQUHMAKGLmh0dHA6Ly9jcmwuZGlzYS5taWWwaX
NzdWVkWVkdG8v

RE9EUk9PVENBMI9JVC5wN2MwIAYIKwYBBQUHMAGGFGh0dHA6Ly9Y3NwLmRpc2Eubil
WIsMA0GCSqG

SIb3DQEBBQUAA4IBAQBU9C9y03/5bT/I09cfBTJDhgP5zoFm45xTzfA47ENg9zj7VntEUG9K

WASHAR0001679

H4lk

gnIxrD+phx5kGZgpxK218MWlQKWutYtrFeeS+RBisyVEGEtF2JjYEmQ4dUAOfVEy2iE/6jlg7J
WB

3nPNCVYjWsvYAwrtciclM/xdAbuBm1valn5TFGwp3UQNMfkbiYs6luVubPmO760ruzCJyDwc
Oopb

raZJ3BNqMVbPHL68axpk8mKE83k6WgqMYlEsolA2F95OSPuB+3jjC6U0fehSz5Ud4xmFdFV
4AiW6

mgCYy1RZxwPO7HovxjRs+tg8UtwcOjnVBPpM5Qh8+8BEUs7sjKlow1tHMIIEwDCCA6igAwlB
AgID

CuN3MA0GCSqGSIb3DQEBBQUAMF0xCzAJBgNVBAYTAlVTMRgwFgYDVQQKEw9VLlMul
EdvdmVybm1l

bnQxDDAKBgNVBAsTA0RvRDEMMAoGA1UECxMDUEtJMRgwFgYDVQQDEw9ET0QgRU1
BSUwgQ0EtMzQw

HhcNMTYwNTlzMDAwMDAwWhcNMTkwNTE5MjM1OTU9WjB9MQswCQYDVQQGEwJVUz
EYMBYGA1UECgMP

VS5TLiBHb3Zlcm5tZW50MQwwCgYDVQQLEwNEb0QxDDAKBgNVBAsTA1BLSTENMAsGA
1UECxMERFRT

QTEpMCcGA1UEAxMgTVVFTExFUi5BTkRSSVcuSk9lQU5OLjEwMTkxMTcxNDEwggEiMA0
GCSqGSIb3

DQEBAQUAA4IBDwAwggEKAoIBAQCVsJc6cMcrikRPxtZ8mVUXf4EGmN2LOLAwfylTeGiW
HfDXQCn4

Ufcdmw9J480ymrmYpfGcrAm3/zO8c+y9ooVo3HOWbGylj
teF8G2n86XXJARUSDcnGtpVNpZOAqOI

/oKZlI1vdmc2z4fYMFfgOpV12/UhnRhLAeEUeRxC+VYwhpPURsusuFZaEyKdq+fKACvriq8/h
CDJ

lhFvfyt8G9UgCXlC0W0ml4aQ4GBd3Bu5/Llv45L2uWswutx7gperquS0ocduh3WEwgh3dyOR8
ahQ

YUiQ5clSOCmmDiEuUtBXAUbPSP989MP+PfjsDRL3WPeSJSI4O4VukSlnoBw3V6K3AgMBA
AGjggFn

MIIBYzAfBgNVHSMEGDAWgBQPhll+4/rnE/sxO8E5DHxgi0DC3TA6BgNVHR8EMzAxMC+gL
aArhilo

dHRwOi8vY3JsLmRpc2M2eubWlsL2NybC9ET0RFTUFJTENBXzM0LmNybDAOBgNVHQ8BAf8
EBAMCBSAw

IwYDVR0gBBwwGjALBglghkgBZQIBCwkwCwYJYlZIAWUCAQsTMB0GA1UdDgQWBBTsupf
LhyN8KVdA

b7KQssdaWCZGGDBoBggrBgEFBQcBAQRcMFowNgYIKwYBBQUHMAKGKmh0dHA6Ly9jc
mwuZGlzYS5t

aWwvc2lnbi9ET0RFTUFJTENBXzM0Lmlj jAgBggrBgEFBQcwAYYUaHR0cDovL29jc3AuZGl
zYS5t

aWwwKQYDVR0RBCIwIIEeYW5kcmV3Lmboub XVlbGxlcjIuY2l2QG1haWwub WlsMBsGA1UdC
QQUMBlw

EAYIKwYBBQUHCQQxBBMCVVMwDQYJKoZIhvcNAQEFBQADggEBAFjK4zeVGN20zYimq
bN8K7nWpa3L

3wwHRl6Uw23b/qygpDIomkr6JA9Cn5vQxQPISEZUmOp+huJgraD1gNxCSuEjOSnDbXtud5S
PenLl

6A3HhOylbdk5Wyyn7P+s61YMk1XVmB8LndEMpVEy2bc87vZLEBOyyCqrIX6eLKOWw9CLc
5brWo4T

3IXutJC8XTaKKroDIAotvDCfEpygAfycMbv8g5lYUb4pEWQ6Dc8fT3cgcrE3TZ/VTfpXd/yUy04
Y

WASHAR0001680

1F64NmdxNlfeJVL+37xOjURcB+xwPBSSZmWe5KSro1qrZTm4J2uBf5lit/JzWgJ3jJMYotlCKo
FR

ctcXxW2/m3IwggULMIID86ADAgECAgMK43IwDQYJKoZIhvcNAQEFBQAwXTELMAkGA1UE
BhMCVVMx

GDAWBgNVBAoTD1UuUy4gR292ZXJubWVudDEMMAoGA1UECxMDRG9EMQwwCgYDVQ
QLEwNQS0kxGDAW

BgNVBAMTD0RPRCBFTUFJTCBDQS0zNDAeFw0xNjA1MjMwMDAwMDBaFw0xOTA1MTky
MzU5NTlaMH0x

CzAJBgNVBAYTAlVTMRgwFgYDVQQKEw9VLlMuIEdvdmVybm1lbnQxDDAKBgNVBAsTA0R
vRDEMMAoG

A1UECxMDUEtJMQ0wCwYDVQQLEwREVFNBMSkwJwYDVQQDEyBNVUVMTEVSLkFORF
JFVy5KT0hBTk4u

MTAxOTMxNzE0MTCCASIwDQYJKoZIhvcNAQEBBQADggEPADCCAQoCggEBAK+XMH/c
ONMWlD5Db2z1

wxuAjCTfiT8KKW33pn3R85u3YCmXQH0gJ0pyRAA8c0ylqRC8Y/28r6ORyz9X1worMBwtZQz
moLQN

frs9DcHebcZL8xz1roqBV804HNwln89cOfiDNdHuCTAOgZtqvPl10264NvGIh5CDQJ91SvBdX
1MO

q0cKk4Pmgh2J39uQhgY2N/KdFdxLy4HVQu8lITKYZ6abdrxuktAeqkCFh2xrAWoMHdAar5R4
xrE6

qZ9v9Mlzkbimccev4DVh5IMJgJF+isrBtHaLlX2lU9mzEGPnQvA819GP25hbUJRw7AExEF9xc
ROL

gbqHCaBL9GDfqzmUiJkCAwEAAaOCAblwggGuMB8GA1UdIwQYMBaAFA+GWX7j+ucT+zE
7wTkMfGCL

QMLdMDoGA1UdHwQzMDEwL6AtoCuGKWh0dHA6Ly9jcmwuZGlzYS5taWwvY3JsL0RPRE
VNQUIMQ0Ff

MzQuY3JsMA4GA1UdDwEB/wQEAwIGwDAjBgNVHSAEHDAaMAsGCWCGSAFlAgELCTAL
BglghkgBZQIB

CxMwHQYDVR0OBBYEFBnRy7i1GTxqmfE6DKqYmswDqvQoMGgGCCsGAQUFBwEBBFw
wWjA2BggrBgEF

BQcwAoYqaHR0cDovL2NybC5kaXNhLm1pbC9zaWduL0RPREVNQUlMQ0FfMzQuУ2VyMC
AGCCsGAQUF

BzABhhRodHRwOi8vb2NzcC5kaXNhLm1pbDBJBgNVHREEQjBAgR5hbmRyZXZXcuai5tdWVsb
GVyMi5j

aXZASAWFpbC5taWWygHgYKKwYBBAGCNxQCA6AQDA4xMDE5MzE3MTQxQG1pbDAbBgN
VHQkEFDASMBAG

CCsGAQUFBwkEMQQTAlVTMCkGA1UdJQQiMCAGCisGAQQBgjcUAglGCCsGAQUFBwM
CBggrBgEFBQcD

BDANBgkqhkiG9w0BAQUFAAOCAQEAXvN/RV9enRd/DdWVRNZzhv2sE0lxCChTBE5HXQr
eLLR/u2hy

nNA+YpY011GK8upelBuugHoGCI8kR50jUcnL/Uc242ZpXu3eMBbX1aSaSDx8GwMYMGdyT
WPVEZll

l5mWfsu9t158Htt7riS6ihDDDi5k62wg23yOzfAfz52wSlKUda0N2naOQooa/qXKVY9mMdioZd1
Y

J3CN+Cjj9Z0bpfKU8L3toyV5uV5rXNmRYW1vgR//A+xTuEtePJU2ho5+dTooeRyiffc70TDaH+
zS

eoR24h6kyv6t5M0Oe8R97dGM77aGe+vU6azXrvToJFH9RfxnHY/lcXXZVVxr0jzg4DGCAv4w
ggL6

AgEBMGQwXTELMAkGA1UEBhMCVVMxGDAWBgNVBAoTD1UuUy4gR292ZXJubWVudDE

WASHAR0001681

MMAoGA1UECxMD

RG9EMQwwCgYDVQQLEwNQS0kxGDAWBgNVBAMTD0RPRCBFTUFJTCBDQS0zNAlDCu
NyMAkGBSsOAwla

BQCgggFvMBgGCSqGSlb3DQEJAzELBgkqhkiG9w0BBwEwHAYJKoZlhvcNAQkFMQ8XDTE
3MTExNDlx

MDAzM1owIwYJKoZlhvcNAQkEMRYEFAkH5vRtod291SfunCg/tZcCoROuMCQGCSqGSlb3
DQEJDzEX

MBUwCgYIKoZlhvcNAwcwBwYFKw4DAhowcwYJKwYBBAGCNxAEMWYwZDBdMQswCQY
DVQQGEwJVUzEY

MBYGA1UEChMPVS5TLiBHb3Zlcm5tZW50MQwwCgYDVQQLEwNEb0QxDDAKBgNVBAsT
A1BLSTEYMBYG

A1UEAxMPRE9EIEVNQUlMIENBLTM0AgMK43cwdQYLKoZlhvcNAQkQAgsxZqBkMF0xCzA
JBgNVBAYT

AlVTMRgwFgYDVQQKEw9VLlMulEdvdmVybm1lbnQxDDAKBgNVBAsTA0RvRDEMMAoGA1
UECxMDUEtJ

MRgwFgYDVQQDEw9ET0QgRU1BSUwgQ0EtMzQCAwrjdzANBgkqhkiG9w0BAQEFAASCA
QCPK6tp1/HI

MafPW59SvYHz8s8vpTZUhhrTFY89m21ZrtE/NzxTBV0UKlJraAzNfA1idGzTztZ1q8VjXg/mRq
TA

vHqcVo2YOWpxS42O/0XJXPS6dvGbTdf6sUz0NN1IZEywwyKer4kMQqy15CrKudzuamnZFP
7PtZBq

tA6gwEr1AX2BwYvk9K0/HEA/dw7pmvJZcUAxLEVFdDrOsxocxwmG+bSHCVHDma9Rbl6CY
/TT+wjH

kY9X8n8FOreYvF0NsfhP5Qtg6Z0So2WJnQTJlMLi1VLAwwP7ETeif3dDJ+fuRj5/xMtdm+4k0
WBW

ilWF4FC+TRczGeyyifslr9kvXQVbAAAAAAAA

------=_NextPart_000_0171_01D35D61.B3DC5A90--

WASHAR0001682

| From: | Jimeno, Sylvia M <JimenoSM@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 10:27 AM |
| To: | SPAM (Anti-Virus Group) <SPAM@state.gov>; Matthews, DeMetrius E <MatthewsDE@state.gov> |
| Cc: | FACC SWOs <FACCSWOs@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Miller, Valerie E <MillerVE@state.gov> |
| Subject: | RE: INC000006228346 | INC000006230597 - follow-up |

Please advise how we can further assist. You can call me directly.
I do see that a block was implemented by PSD. Let me know if spam mail is continuing and if further blocking is needed.

Thanks

Sylvia Jimeno |Virus Incident Response Team (VIRT)
Vanguard 2.2.2 | AAST Team | CACI
IRM/FO/ITI/SI/AV
Desk phone: (703) 866-7252
Annex/location: SA-7B | email : JimenoSM@state.gov
Foreign Operations Catalog of Services


**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

**From:** Matthews, DeMetrius E
**Sent:** Wednesday, July 25, 2018 4:20 PM
**To:** SPAM (Anti-Virus Group) <SPAM@state.gov>
**Cc:** FACC SWOs <FACCSWOs@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>
**Subject:** Fw: INC000006228346 | INC000006230597 - follow-up

SPAM/VIRT Team,

Please assist the PM/DDTC team with the large number of emails they have been receiving. These messages are originating from a web address where concerned citizens are sending unwanted emails to their distribution list in large volumes. These message appear to be increasing in volume as well. These emails are text-only, are not a cybersecurity threat at this time, and requires SPAM's action. Please assist Mr. Pritchard and the PM/DDTC team in implementing a countermeasure that would minimize the effects of these emails.

CIRT is requesting assistance from the SPAM team to address this issue.


v/r,


DeMetrius Matthews
FACC Senior Watch Officer/Section Chief
Cyber Incident Response Team
Office of Cyber Monitoring and Operations
DS/CTS/CMO/MIRD
301-985-8347 (CIRT)
MatthewsDE@STATE.GOV
MatthewsDE@STATE.SGOV.GOV

"Amateurs talk about tactics, but professionals study logistics."
- Gen. Robert H. Barrow, USMC



**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 3:14 PM
**To:** CIRT; Harvey, Arthur T; Adebayo, Adeyinka O; Belcastro, Angelo
**Cc:** Vanguard_PSD_Ops; Wrege, Karen M; CIRT Tier2; FACC SWOs; Herbert, Dion L; Eickenberg, Robert G; Buchholz, Daniel O; Dearth, Anthony M; Giuliano, Lysa C
**Subject:** RE: INC000006228346 | INC000006230597 - follow-up

It has been brought to the attention that the emails generated from bounces.list.everytown.org were created from https://act.everytown.org/sign/stop-downloadable-guns/ from concerned citizens.

[Send your email]: STOP Downloadable Guns

act.everytown.org

Do-it-yourself, downloadable guns are incredibly dangerous. And a State Department special exemption would allow public access to online instructions on how to make your own, untraceable gun with a 3D printer. Email Secretary Pompeo NOW to stop this.


Therefore should these emails be bounced back or should they be quarantined? Or is there another option?

WASHAR0001683

The call volume continues to increase, as do the new emails from different domains.
PM/DDTC is still seeking guidance at this time.

Thank you

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

**Official - SBU (Sensitive-Law Enforcement)**
**UNCLASSIFIED**

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 2:34 PM
**To:** CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>
**Subject:** RE: INC000006228346 | INC000006230597

Just to clarify, it seems that this is a coordinated email and phone campaign from concerned citizens.

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

**Official - SBU (Sensitive-Law Enforcement)**
**UNCLASSIFIED**

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 1:48 PM
**To:** CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>
**Subject:** RE: INC000006228346 | INC000006230597 Spam Campaign

PM /DDTC continues to receive spam emails.

The initial emails came from "bounces.list.everytown.org" and have subsided as of yesterday evening.
However, today PM/DDTC's Response team's call line (202) 663-1282 is being flooded with calls similar to the spam emails AND new emails are appearing with different subject lines and body text.

The bounces.list.everytown.org generated more than 52,000 emails to ddtcresponse@state.gov
There are more than 2,400 emails that have been received by ddtcresponse@state.gov from these new emails, and they continue.

PM/DDTC is requesting assistance. I have included copies of the new emails that are arriving.

Thank you

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

**Official - SBU (Sensitive-Law Enforcement)**
**UNCLASSIFIED**

**From:** CIRT
**Sent:** Wednesday, July 25, 2018 3:44 AM
**To:** Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT <CIRT@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Automated Remedy Notification <AutomatedRemedyNotification@state.gov>
**Subject:** INC000006228346 | INC000006230597, Security Question, Washington DC

Colleagues,

Thank you for reporting this event to CIRT.

CIRT has created ticket # **INC000006228346**  to track this event.

CIRT will respond with findings as they become available.

Please "Reply All", making sure to include "Automated Remedy Notification" and the CIRT ticket number when responding to this email.

Thank you,

Computer Incident Response Team (CIRT)
Office of Cyber Monitoring and Operations
CTS/CMO/MIRD/CIRT
United States Department of State
Phone: 301-985-8347
E-mail: CIRT@state.gov
~TW/CC

**Official - SBU (Sensitive-Law Enforcement)**
**UNCLASSIFIED**

**From:** Harvey, Arthur T
**Sent:** Tuesday, July 24, 2018 8:53 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Yinka, did the customer ever respond to your request for verification the emails from "bounces.list.everytown.org" have subsided?

V/r

Arthur Harvey, CISSP | Firewall Operations - Swing Shift Lead
Vanguard 2.2.1 | SAIC Team | Terra Cotta
Department of State | IRM/OPS/ENM/PSD
202.453.9730 (Office)
Location: SA-9 LL2 |2070
Email: Harveyat@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 4:21 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

I'm seeing messages from bounces@bounces.list.everytown.org to ddtcresponseteam@state.gov being dropped by the MTAs content filter.

WASHAR0001685



**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:58 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

They are still coming in

**Official**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 3:51 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

We've made adjustments to the block. Are they still coming in?

**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:45 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

WASHAR0001686

Attached are examples of how they are coming in

**Official**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 3:37 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Are they coming from bounce@list.everytown.org?

**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:35 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Adeyinka Adebayo

Unfortunately, the emails are still coming in. I have added a rule to delete those emails with the subject line containing "please stop the release of downloadable guns". However, it is having a hard time keeping up.

Currently there are 50,000+ emails

Any assistance is greatly appreciated

Thank you


**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov



**Official**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 2:55 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>
**Subject:** INC000006228346

Mr. Pritchard,
            bounce@list.everytown.org has been added to the email scanning appliance blacklist. Please verify you're no longer receiving email from that address. Thanks.

Adeyinka Adebayo | Firewall Engineer
Vanguard 2.2.1 Contract | SAIC Team | Terra Cotta Technologies.
Supporting U.S. Department of State | IRM/OPS/ENM/OPS
Desk: (202) 634-0270
Annex/location: SA-9 / NW4-133A| Email: adebayoao@state.gov

NO DISCERNIBLE CLASSIFICATION

## Smith, Rickita L

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 7:42 PM |
| **To:** | PM-DTCP-RMA |
| **Cc:** | Heidema, Sarah J; Miller, Michael F; Carter, Rachel; Kaidanow, Tina S; PM-CPA; Litzenberger, Earle D (Lee); Legal-PM-DL |
| **Subject:** | Fwd: CPA Media Monitoring: Reuters: Federal Judge Denies Last Ditch Effort To Block Release Of 3-D-Printed Gun Blueprints |

Federal Judge Denies Last Ditch Effort To Block Release Of 3D-Printed Gun Blueprints
The judge said he was sympathetic to the gun control groups' concerns but questioned their legal standing to intervene in the case.

Jon Herskovitz

JON HERSKOVITZ / REUTERS
AUSTIN, Texas (Reuters) - A U.S. judge on Friday rejected a last-ditch effort by gun control groups to block the Trump administration from allowing the public to download blueprints for 3-D printable guns, declining to intervene just days before the designs are expected to go online.

U.S. District Judge Robert Pitman in Austin, Texas, denied the request for an order by the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence at a hearing, saying he would state the reasons for his decision in a written order to follow.

At the hearing, the judge said he was sympathetic to the gun control groups' concerns but questioned their legal standing to intervene in the case.

The groups sought to intervene following a June settlement between Defense Distributed and the U.S. government allowing the company to legally publish gun blueprints online, something its website says it plans to do by Aug. 1.

The government ordered the blueprints taken down in 2013 and Defense Distributed founder Cody Wilson sued in 2015, claiming his First Amendment and Second Amendment rights had been violated.

The government had until recently argued the blueprints posed a national security risk. Gun control groups said there had been no explanation for the June settlement and the administration's abrupt reversal on the issue.

Lawyers for the Brady Center declined to comment on Pitman's ruling after the hearing.

The groups in court filings said not halting the blueprint distribution by a Texas-based company called Defense Distributed would "cause immediate and irreparable harm to the United States national security" and that of individual U.S. citizens.

   NO DISCERNIBLE CLASSIFICATION

WASHAR0001688

NO DISCERNIBLE CLASSIFICATION

"The stated goal of Defense Distributed is to sound the death knell for gun control," David Cabello, a lawyer for the Brady Center, told Pitman during the hearing.

The 3-D files include blueprints for a plastic AR-15 semiautomatic assault rifle, a weapon that has been used in many U.S. mass shootings, as well as other firearms.

Joshua Blackman, a lawyer for Defense Distributed, said he was grateful for the judge's ruling. During the hearing Blackman said the gun control groups were trying to litigate a political dispute in court.

Wilson, a self-declared Texas anarchist, said in an online video that the blueprints were downloaded more than 400,000 times before they were taken down in 2013.

Lawrence Keane, general counsel for the National Shooting Sports Foundation, a trade association for gun manufacturers, told Reuters concerns over 3-D printable guns were overblown.

"I don't see it likely at all that criminals will use this clunky and expensive technology," Keane said. The NSSF is not involved in the case.

WASHAR0001689

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 4:14 PM |
| **To:** | PM-DTCP-RMA; Legal-PM-DL |
| **Cc:** | PM-CPA; PM-DDTC-Directors-DL; Miller, Michael F |
| **Subject:** | CPA Media Monitoring: Twitter: Congressional reactions to Defense Distributed settlement |

[cid:image001.png@01D29279.128F6050]
[cid:image009.png@01D42432.69EBC1D0]

[cid:image010.png@01D42432.69EBC1D0]

[cid:image011.png@01D42432.69EBC1D0]
[cid:image012.png@01D42432.69EBC1D0]

Links:  https://twitter.com/ChrisMurphyCT/status/1022187139491090433
        https://twitter.com/ChrisVanHollen/status/1022179423783735298
https://twitter.com/SenatorMenendez/status/1022145377385017349
https://twitter.com/SenFeinstein/status/1022201362770264065

_____
Matthew Marquis
Office of Congressional & Public Affairs Bureau of Political-Military Affairs (PM/CPA) U.S. Department of State

Phone:    202.647.6968
e-mail:    MarquisMR@state.gov<mailto:MarquisMR@state.gov> |  Web: www.state.gov/t/pm
/<http://www.state.gov/t/pm%20/> |Twitter: @StateDeptPM

Stay connected with State.gov:

[cid:image001.png@01CF5314.69A33A30]<http://twitter.com/StateDept>[cid:image002.png@01CF5314.69A33A30]<http://statedept.tumblr.com/>[cid:image003.png@01CF5314.69A33A30]<http://www.state.gov/misc/echannels/66791.htm>[cid:image004.png@01CF5314.69A33A30]<http://www.facebook.com/usdos>[cid:image005.png@01CF5314.69A33A30]<http://www.flickr.com/photos/statephotos>[cid:image006.png@01CF5314.69A33A30]<http://www.youtube.com/user/statevideo>[cid:image007.png@01CF5314.69A33A30]<https://plus.google.com/u/0/102630068213960289352#102630068213960289352/posts>

Official
UNCLASSIFIED

Official
UNCLASSIFIED

WASHAR0001690

Received: from MWHPR09CA0043.namprd09.prod.outlook.com (2603:10b6:300:6d::29)
by DM2PR09MB0624.namprd09.prod.outlook.com (2a01:111:e400:511f::12) with
Microsoft SMTP Server (version=TLS1_2,
cipher=TLS_ECDHE_RSA_WITH_AES_256_GCM_SHA384) id 15.20.995.19; Fri, 27 Jul
2018 23:35:21 +0000
Received: from CY1GCC01FT011.eop-gcc01.prod.protection.outlook.com
(2a01:111:f400:7d02::209) by MWHPR09CA0043.outlook.office365.com
(2603:10b6:300:6d::29) with Microsoft SMTP Server (version=TLS1_2,
cipher=TLS_ECDHE_RSA_WITH_AES_256_CBC_SHA384) id 15.20.995.17 via Frontend
Transport; Fri, 27 Jul 2018 23:35:20 +0000
Authentication-Results: spf=softfail (sender IP is 32.66.86.51)
smtp.mailfrom=gmail.com; usdos.mail.onmicrosoft.com; dkim=pass (signature was
verified) header.d=gmail.com;usdos.mail.onmicrosoft.com; dmarc=pass
action=none header.from=gmail.com;
Received-SPF: SoftFail (protection.outlook.com: domain of transitioning
gmail.com discourages use of 32.66.86.51 as permitted sender)
Received: from mail.state.gov (32.66.86.51) by
CY1GCC01FT011.mail.protection.outlook.com (10.97.0.250) with Microsoft SMTP
Server (version=TLS1_2,
cipher=TLS_ECDHE_RSA_WITH_AES_256_CBC_SHA384_P256) id
15.20.952.17 via Frontend Transport; Fri, 27 Jul 2018 23:35:20 +0000
Received: from EWAPPSERAR05.appservices.state.sbu (10.68.83.46) by
EWAPPSERHEX04.appservices.state.sbu (10.68.108.4) with Microsoft SMTP Server
(version=TLS1_2, cipher=TLS_ECDHE_RSA_WITH_AES_256_CBC_SHA384_P384) id
15.1.1466.3; Fri, 27 Jul 2018 19:35:18 -0400
Received: from EWAPPSERAR05.appservices.state.sbu (10.68.83.46) by
EWAPPSERAR05.appservices.state.sbu (10.68.83.46) with Microsoft SMTP Server
(version=TLS1_2, cipher=TLS_ECDHE_RSA_WITH_AES_256_CBC_SHA384_P384) id
15.1.669.32; Fri, 27 Jul 2018 17:35:18 -0600
Received: from EWMAILINLINLINE02.state.gov (10.68.128.72) by
EWAPPSERAR05.appservices.state.sbu (10.68.83.46) with Microsoft SMTP Server
id 15.1.669.32 via Frontend Transport; Fri, 27 Jul 2018 17:35:18 -0600
Received: by EWMAILINLINLINE02.state.gov (Postfix, from userid 600)
        id 41clgp3TPWz16kCM; Fri, 27 Jul 2018 23:34:51 +0000 (UTC)
Received: from ipss1-host81.is.centurylink.net (ipss1-host81.is.centurylink.net
[65.127.216.81])
        by EWMAILINLINLINE02.state.gov (Postfix) with ESMTPS id 41clgC4pkYz16kDJ
        for <pauljm@state.gov>; Fri, 27 Jul 2018 23:34:47 +0000 (UTC)
X-Qwest-Status: hEUBLG9ErOsrnKeZ
Received: from haig-ee.state.gov (unknown [169.253.9.82])
        by ipss1-host81.is.centurylink.net (Postfix) with ESMTP id A5BF64BCFC58
        for <pauljm@state.gov>; Fri, 27 Jul 2018 23:34:44 +0000 (UTC)
Received-SPF: Pass (haig-ee.state.gov: domain of
███████████@gmail.com designates 209.85.217.178 as permitted
sender) identity=mailfrom; client-ip=209.85.217.178;
receiver=haig-ee.state.gov;
envelope-from=██████████@gmail.com";
x-sender=██████████@gmail.com"; x-conformance=spf_only;
x-record-type="v=spf1"

WASHAR0001691

Received-SPF: None (haig-ee.state.gov: no sender authenticity
  information available from domain of
  postmaster@mail-ua0-f178.google.com) identity=helo;
  client-ip=209.85.217.178; receiver=haig-ee.state.gov;
  envelope-from="███████@gmail.com";
  x-sender="postmaster@mail-ua0-f178.google.com";
  x-conformance=spf_only
Authentication-Results-Original: haig-ee.state.gov; spf=Pass
  smtp.mailfrom=███████@gmail.com; spf=None
  smtp.helo=postmaster@mail-ua0-f178.google.com; dkim=pass (signature verified)
  header.i=@gmail.com
IronPort-PHdr: =?us-ascii?q?9a23=3AYrrKMRL4zviqNqPm39mcpTZcNBhigK39O0su0rRi?=
  =?us-
  ascii?q?jrtPdqq5+JG7ZR7Q4PxsiBnCWoCJsqsZ2dqTiLjpXCk72bjEsH0Gd8YSBRoMiM?=
  =?us-ascii?q?FTggV4RcDcVh29I/ntYCg3Ws9FUQ098g=3D=3D?=
X-IronPort-Anti-Spam-Filtered: true
X-IronPort-Anti-Spam-Result: =?us-ascii?q?A0AgBQAHq1tbhrLZVdFdHgEGDlMktoE+K?=
  =?us-
  ascii?q?IN+gR2CUJBUgwKHWGiHBlcQCwWHZBkHATgUAQIBAQEBAQEBARQBAQEICwsI
  KSM?=
  =?us-
  ascii?q?MhU8RHQEbHgMSEDAHAiQBEQEFASI1gn4pgT4BAxWddoMePlExiCYRgSGBEQU
  BF?=
  =?us-
  ascii?q?4J1BYNRChkmDVeCSwlGEohwF4IAgRGCXQeILIJVAodaCBYbhgWLMklJiHyEHoI?
  =
  =?us-ascii?q?cjGiBHplIDyGBN4FzMxojgQGCOIIZDA4JEYM0im4jMI9VAQE?=
X-IPAS-Result: =?us-
  ascii?q?A0AgBQAHq1tbhrLZVdFdHgEGDlMktoE+KIN+gR2CUJBUgwK?=
  =?us-
  ascii?q?HWGiHBlcQCwWHZBkHATgUAQIBAQEBARQBAQEICwsIKSMMhU8RHQEb
  HgMSE?=
  =?us-
  ascii?q?DAHAiQBEQEFASI1gn4pgT4BAxWddoMePlExiCYRgSGBEQUBF4J1BYNRChkmD
  Ve?=
  =?us-
  ascii?q?CSwlGEohwF4IAgRGCXQeILIJVAodaCBYbhgWLMklJiHyEHoIcjGiBHplIDyGBN?=
  =?us-ascii?q?4FzMxojgQGCOIIZDA4JEYM0im4jMI9VAQE?=
X-IronPort-AV: E=Sophos;i="5.51,411,1526342400";
  d="scan'208,217";a="198672070"
Received: from mail-ua0-f178.google.com ([209.85.217.178])
  by haig-ee.state.gov with ESMTP/TLS/AES128-GCM-SHA256; 27 Jul 2018 23:34:43 +0000
Received: by mail-ua0-f178.google.com with SMTP id i4-v6so4416429uak.0
      for <pauljm@state.gov>; Fri, 27 Jul 2018 16:34:43 -0700 (PDT)
DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
      d=gmail.com; s=20161025;
      h=mime-version:from:date:message-id:subject:to;
      bh=KZ17ceTYHqKmpvURITOwMgxIXz80eJLw260M0CzrS+I=;

WASHAR0001692

b=ghDdmgRMudWedM3m7GUGP/omRvhpI7/tYlHTlSm0m8WVjsVtZfKWGcyDxKc3F/Hdla

ulJvMBjL4hxAvADcJ7kXOhqhfWSu3w3C8XryGm3kkRxWGANmSTP2VpoCUOqmaK1GPj7Y

B9BNTmCnLkFjQ1WKFouU2d9KzugmPuZshJV9tMEaTR78eyQqKYvoFaHXtV/iGFwHFtMd

i3bHjxl15Tms3sFWvwr9lSYqeqOUqdMopVGhc93D93Bz82UqpTZ21KNaLH/qzMdin/wW
    hnj6YJXXIS0C3A6lh+YLEOXI1Qe8tx9hm8Wyv5h1jG7n+CX0SUDjAsz9pxO4aSBkAfnZ
    bwOA==
X-Google-DKIM-Signature: v=1; a=rsa-sha256; c=relaxed/relaxed;
    d=1e100.net; s=20161025;
    h=x-gm-message-state:mime-version:from:date:message-id:subject:to;
    bh=KZ17ceTYHqKmpvURITOwMgxlXz80eJLw260M0CzrS+l=;
    b=JCUxlA6N0BrTjnzbXlkoRkpXFsSnhjCzV7XjjaoljV1KBk5+XdrkCPRcMdTLnQ5bE5
    TpsmwnFA1USgu/k6QYxz72OK/GAeZjwagAXxtAChpes9nX3Pbc0aj6t/LE16jg1dsqo7

OECvrEIYVHL8xsGLIoN5yDHwmqnAaLGnq3czYDzrm+RD5lImPvWCE7jnacC+L7jOT3kt

EvL6bAkRPbSL/YH65//gE8M2iAUbCsS86EVgkjdI4Vw7qd5dV6NRcfPz60AwRFUEWUFV

YvDmb9ebvno/U7DBQQSd0zo42ENm8su5mpCmiVvUkm6tEBiv372RJkrzZU2bJQyasxbg
    m49A==
X-Gm-Message-State:
AOUpUIG3rNB28PpPrrhW+CvsHarOWfauG4/H9pi2J+CB+cOuFGIxrdg0
    JGnkJ+DQwHPqX0Dh4Q78tnqx7pJA7iVrOuJVl0NMxxdG
X-Google-Smtp-Source:
AAOMgpftwY8R1hz+tRQ7hzJkxQ2wX8S+Xm3qEL3j1/yRz9WxoR2TUhSWKXOXl3nrY8NRK
pV8O/OnJ8bbZgmca7wFvgc=
X-Received: by 2002:ab0:30d2:: with SMTP id c18-v6mr6342966uam.58.1532734482563;
 Fri, 27 Jul 2018 16:34:42 -0700 (PDT)
Received: by 2002:ab0:2895:0:0:0:0:0 with HTTP; Fri, 27 Jul 2018 16:34:22
 -0700 (PDT)
From: Josh Paul ███████@gmail.com>
Date: Fri, 27 Jul 2018 19:34:22 -0400
Message-ID: <CAF_UBREBCT3JwaZY5F5gAE2QrsB15qOnnmcg19TY-
tPyCsN2vQ@mail.gmail.com>
Subject: CPA Media Monitoring: Reuters: Federal Judge Denies Last Ditch Effort
 To Block Release Of 3D-Printed Gun Blueprints
To: pauljm <pauljm@state.gov>
Content-Type: multipart/alternative;
    boundary="_ff3a9df9-ef9d-4f18-a025-1273023a0df0_"
Return-Path:███████@gmail.com
X-OrganizationHeadersPreserved: EWAPPSERHEX04.appservices.state.sbu
X-MS-Exchange-Organization-OriginalArrivalTime: 27 Jul 2018 23:35:20.1260
 (UTC)
X-MS-Exchange-Organization-ExpirationStartTime: 27 Jul 2018 23:35:20.5322
 (UTC)
X-MS-Exchange-Organization-ExpirationStartTimeReason: Original Submit
X-MS-Exchange-Organization-ExpirationInterval: 2:00:00:00.0000000

WASHAR0001693

X-MS-Exchange-Organization-ExpirationIntervalReason: Original Submit
X-MS-Exchange-Organization-Network-Message-Id: 57d2e3ac-eaa1-48fa-a497-08d5f4199e05
X-MS-Exchange-Organization-OriginalServerIPAddress: 10.97.0.250
X-MS-Exchange-Organization-MessageScope: c1a75832-8264-4507-a6e1-9074ca861b6d
X-MS-Exchange-Forest-MessageScope: c1a75832-8264-4507-a6e1-9074ca861b6d
X-EOPAttributedMessage: 0
X-MS-Exchange-Organization-TargetResourceForest: namprd09.prod.outlook.com
X-MS-Exchange-Organization-MessageDirectionality: Originating
X-MS-Exchange-Organization-Id: 66cf5074-5afe-48d1-a691-a12b2121f44b
X-MS-Exchange-Organization-MessageInboundConnectorType: OnPremises
X-MS-Exchange-Organization-MessageInboundConnectorName: Inbound from
 cf8d0917-4e3c-459b-9c10-bbc1fab2860b
X-MS-Exchange-Organization-Base64-MessageInboundConnectorData:

TgBhAG0AZQA9AEkAbgBiAG8AdQBuAGQAIABmAHIAbwBtACAAYwBmADgAZAAwADkAMQQA3AC0ANABlADMAYwAtADQANQA5AGIALQA5AGMAMQAwAC0AYgBiAGMAYwGyADgANgAwAGIAOwBDAG8AbgBuAGUAYwB0AG8AcgBUAHkAcABlAD0ATwBuAFAA
cgBlAG0AaQBzAGUAcwA7AFQAZQBuAGEAbgB0AEkAZAA9ADYANgBjAGYANQAwADcANAAtADUAYQBmAGUALQA0AGQAZAAxAC0AYQY2A2ADkAMQAtAGEAMQAyAGIAMgAxADIAMQBmADQANABiAA==
MQBmADQANABiAA==

X-MS-Exchange-Organization-MessageInboundConnectorData: Name=Inbound from
 cf8d0917-4e3c-459b-9c10-bbc1fab2860b;ConnectorType=OnPremises;TenantId=66cf5074-5afe-48d1-a691-a12b2121f44b
X-MS-Exchange-Organization-OriginalAttributedTenantConnectingIp: TenantId=66cf5074-5afe-48d1-a691-a12b2121f44b;Ip=[32.66.86.51];Helo=[mail.state.gov]
X-MS-Exchange-Organization-OriginalClientIPAddress: 10.68.128.72
X-MS-Exchange-Organization-Processed-By-Journaling: Journal Agent
X-CrossPremisesHeadersPromoted: CY1GCC01FT011.eop-gcc01.prod.protection.outlook.com
X-MS-Exchange-Organization-Cross-Premises-Headers-Promoted: CY1GCC01FT011.eop-gcc01.prod.protection.outlook.com
X-CrossPremisesHeadersFiltered: CY1GCC01FT011.eop-gcc01.prod.protection.outlook.com
X-MS-Exchange-Organization-Cross-Premises-Headers-Processed: CY1GCC01FT011.eop-gcc01.prod.protection.outlook.com
X-MS-Exchange-Organization-ConnectingIP: 32.66.86.51
X-MS-Exchange-Organization-Exchange-Diagnostics-Stage-SecureDataContainer: 0
X-MS-Exchange-Organization-MxPointsToUs: true
X-MS-Exchange-Organization-VBR-Class: Good
X-MS-Exchange-Organization-SpoofDetection-Frontdoor-DisplayDomainName: gmail.com
X-MS-Exchange-Organization-Antispam-Routing-Category: 1
X-Forefront-Antispam-Report:
CIP:32.66.86.51;IPV:CAL;CTRY:US;EFV:NLI;SFV:SFE;SFS:;DIR:INB;SFP:;SCL:-1;SRVR:DM2PR09MB0624;H:mail.state.gov;FPR:;SPF:None;LANG:en;
X-MS-Exchange-Organization-Originating-Country: US
X-MS-Exchange-Organization-Scanned-By-IP-Filter: true
X-MS-Exchange-Organization-OriginalEnvelopeRecipients:
PaulJM@usdos.mail.onmicrosoft.com
X-MS-Exchange-Organization-MxRecordAlignment: 0
X-MS-Exchange-Organization-TLSSubject: CN=mail.state.gov, OU=Hybrid,

OU=Exchange, OU=PKI, OU=Enterprise Services, DC=appservices, DC=state, DC=sbu
X-MS-Exchange-Organization-RepTable-Version: 636679872000000000
X-MS-Exchange-Organization-HMATPModel-Spf: 3
X-MS-Exchange-Organization-HMATPModel-FeatureReputationValues-Spam: 116;0;-
1;119;119;-1;137;137;-1;-1;-1;680;-1;10;-1
X-MS-Exchange-Organization-HMATPModel-FeatureReputationValues-Phish: 5;0;-1;12;12;-
1;13;13;-1;-1;-1;26;-1;0;-1
X-MS-Exchange-Organization-HMATPModel-Recipient:
<PII:H101(Zosi/DCX0Xp5pPfIeSJpqppomaOlXFwvgbfEEUcFWs8=)>@usdos.mail.onmicrosof
t.com
X-Microsoft-Exchange-Diagnostics:
1;CY1GCC01FT011;1:PvedCQ25DQzP4lKCNx03M+6bmgUWODJ6b2y870wHKQnd7JRFGo
tdFBsiB14jkgQN2TfJaj356oWdcDQ+4PUBUX75Kqg4pAL9h7Vn2NgyO358pcUqqr8uHkPkIph
W9XUq
X-MS-Exchange-Organization-OrderedPrecisionLatencyInProgress:
LSRV=MWHPR09CA0043.namprd09.prod.outlook.com:TOTAL-FE=0.109|SMRE-
PEN=0.116(SMRPI=0.069(SMRPI-FrontendProxyAgent=0.069));2018-07-27T23:35:20.895Z
X-MS-Exchange-Organization-MessageLatency: SRV=CY1GCC01FT011.eop-
gcc01.prod.protection.outlook.com:TOTAL-FE=0.765|SMRI-
PEN=0.763(SMRRC=0.353(SMRRC-Protocol
 Filter Agent=0.353)|SMREH=0.356(SMREH-Protocol Filter Agent=0.355 ))
X-MS-Exchange-Organization-MessageLatency:
SRV=MWHPR09CA0043.namprd09.prod.outlook.com:TOTAL-FE=0.575|SMRE-
PEN=0.508(SMRPI=0.069(SMRPI-FrontendProxyAgent=0.069)|SMSC=0.350|D-PEN=0.042
 )
X-MS-Exchange-Forest-ArrivalHubServer: DM2PR09MB0624.namprd09.prod.outlook.com
X-MS-Exchange-Organization-AuthSource: EWAPPSERAR05.appservices.state.sbu
X-MS-Exchange-Organization-AuthAs: Anonymous
X-MS-Exchange-Organization-FromEntityHeader: HybridOnPrem
X-MS-Exchange-Organization-OriginatorOrganization: state.gov
X-OriginatorOrg: state.gov
X-MS-Exchange-Organization-TransportTrafficType: Email
X-MS-Exchange-Organization-TransportTrafficSubType:
X-MS-PublicTrafficType: Email
X-MS-Exchange-Organization-Antispam-ProtocolFilterHub-ScanContext:
ProtocolFilterHub:SmtpOnEndOfData;
X-MS-Office365-Filtering-Correlation-Id: 57d2e3ac-eaa1-48fa-a497-08d5f4199e05
X-MS-Exchange-Organization-Auth-DmarcStatus: Pass
X-Microsoft-Antispam:
BCL:0;PCL:0;RULEID:(7020095)(4652040)(8989117)(5600074)(711020)(4608076)(2017052
603328)(7153060);SRVR:DM2PR09MB0624;
X-Microsoft-Exchange-Diagnostics:
1;DM2PR09MB0624;3:H2evEHNfNeKglCWNmxUn9uCVbYrVYlHI9iopM88+VJNcHQ/r3rwQA
R0k2uXf14Ng4VeJc0fXnLVhrStXUKSzeUZZ0d+bS4B9/A4jUcsOfhPU3nDRNeeVV8aLSZmlc
HPYRd0sWhWRGsTaWKvJoBVP/Fv3IsccatbNAyIUeSFMH8/tujcfLwredU3aQJLPE/wekp6Ag
J46QlRXpK/YzaTkGV7xbWqfswz3bInATET830nd90rZRYXDvsJccAZitXICP6Jlk/K7GPqas8v1
JaLOutufNss9Q7hQy067BC84ZAEtqXcWXug2rrZcHQV/XH3AsCEhuDyQrHoGJFXh3089Aa2
lYHR8YT21FBy9O3bFsyl=;25:IcoEFrFPlY7SsnByCSdi9FoZLDeR4VQuljUm6PZ3BkLO0THxit
KKGjzSq2pXa6MY2CjsvQfyZCpbMlw34wdW70uOcCgUq8Q/+eHFKaGK1E0JGArXF+ucADm

Rlurq/GrcL3/1/ADU23jkTz7hiUv3wdEBlkXYO6Ya9oJA3APgZAD/pWGQz/tJ9Pp/STktsO91m3
pUWrE70Jo3cKb4FAGlQzRB0U4pxQUWto4Hhuewv2CnXa5AH2Pezv/5paVvypTvmQB7whd
cQYJas88UvW10y4SQaKtO9USlFepq/7UnZ1UYWxnpl+qEBsKANbk1cByFRzBep8wVbfV5X
4aT3gjq9V4R23PfcLl9OwJJf0lWV6c=
X-MS-Exchange-Organization-OriginalSize: 21224
X-MS-TrafficTypeDiagnostic: DM2PR09MB0624:
X-MS-Exchange-Organization-HygienePolicy: Premium
X-MS-Exchange-Forest-IndexAgent-0:
AQ0CZW4AAbcHAAAPAAADH4slAAAAAAAEAM1WTXMbxxEdkARBglLtnH
KdY1IFMlQU/wBalGzZKUlFUE5VboPdATDiYAeemSUMn/Q3XOX8rfwA
/ZK87t5dAiSrfPEhVShydz56Xr9+/Wb/++fx6LUtbTRef1+XC6uvbO
Vs0v80Kesrl4ulfjWfh5j1TdDf+FDc6mvrrUlWv5vrF1dn76Orsi31
t3WF+dqu6T2NRzdLqz9yxGRcqfG2MUmn7Wpt8tJmV+gcNJ70AhuLUO
UYvF7EUK/T50+/0khhY5X0rM76p9qm7EKFY7DDRe3tAoBTNIXpqgVF
lhDxzlYWTxy2AMTz8ej7UOnvbEy34c7IX/D+7q3+7tX19Id3P765+b
f+m75+9eEG7+PR5YfpzZu3E31jfwbQv1zbGhHTX/WZvtQfzqfnTTal
9zq60mx1tB9tQakb7cHWWclsWWFrtn0iMQI6Yw4J4U2sV2ttypWrXM
rRUIZ6HsNKG+/DhhPDsnU988JWGTaVD6ZEjJZnjcP0i7Mrza9m5pnP
NNGlLTziPiTnY42yAjx4tdhq+YTSJrcA1Qbv9ue1JlVti4BsEYV4ZA
auCKcrciOV6zCzSPW9yytTEe+XiO6qhkLCAClxycAV15DhYm2lkBxx
RHPfRFNu9UtLIOnY99ECa2ZF/eiCt1DCRL+6s3GbwQDHoLmpmdu8RT
g54ltHzJck3c3vRNMmo2hLa0DaYgKBbokokmiofUm6yraBbVKohOWl
S8SqS1QmJGv0JrqcbZsNzpoHKhzYusy8vTsh/380A/Vko8QU6sUy7y
8W+BTDoMlYSDZnb1dE38zmjUWuV3ZuKzS/SAF4SP9NBVgji4BCVbxn
T8ZFQLLVlk5kwH4ryk5LTnpH0ql5lCWsbF7SfofRjZ0ll4lAiNdlvf
amStlVJKTLenGun7c53mPg2jQi3Dkjm1skQw1FFP394vkLzuKp7Oah
rqi+LwNU+i/nlQidakzlxq8nuvDGrVhBkMhrF6HzSxxeCgklO7WoYL
kzGB3lT3pJvUys3kGY0Fz5GD8tqavsPLRYYAC0mbioH2e0DomtqGlf
lUHYooZA4VMu3Z6z/h+4EWsRYdD2HZIqkAWA28aOlHw66KEc2pLvux
e0CheZxXqNFNF2MQFHEAm6BNKQH7pzi4ku8l73i2uJ+0AwUsGqcRiO
HmvPAp1ze9/32L66HeVaw5vmjpY3qVaB+PS5lWTHni7belPOUJMRCz
ubGSK1IW4B1dqnRSLG8fnTb4WpMeUAvXTklkSUi9GuTWR3Xpq4apv9
Q+Vo75TsJj0u3OdP/2l4hl2FOZlq3Z0rayzhTitcdr8ACVLHwZQ9G1
cJ+RDt8yeBOu6ZRJpuvB8OpG8r6z2XZMeAJgTgyuBl/dLMsCBM+Kqj
+j1ZPvhcAAvNfVDWsSV6v0Z0XaEulspU+Lq0D+8zQ82dyBUvr8+efw
1CVs7UOawMjZmUTO2ph+beEqKNNWsWmaHyJtFxnaRDV1Q4pmuFjTot
Q6D643Yy5CnIGv8DNQEwwe7jKvFXQ1rWBt8zprhFhAd5P8HrZM/YF2
gHO699xxJ7/45+cZU+Yqc7revLp74gNtStOW4bp/fQwlJ1BgOgF2iU
1LwGqK4LkJD4FuWRrJ+fUZ8ZsKX52EG3xwLmlZs06HarGh+GN5U2CL
sPLlextB8lCLaSDwps/cfFxeTi4kJnt7K7nxrbBv8j9xVjiHw5/2AN
2f8CVxJ9liIFkH3P5du2T6ZNLfV0jS8uOC+JmicpT1gSllWah8Ldex
kxCorruSlyHeFDjWabr737m5Yc+lkPK8FPk/iO21TSem+QCrlTBrmW
7ibvbi0ZNV+BQl0R6YowHhEcxsgkMl0XalDqVj5i6NOrSu4OM7ZYVs
GHxZZ7kAnhypxraqC30+lramTyM1fdBX8nWt+56dXBQJ301fGxGhyp
vjwcqEM8YBwPBz01Uod4PlRHI/UMfzGFlZjC86l6Jg/4Yc2xOjlRQ1
55imX44RULhmoky47UoIszUuOBGh7T6YOBOu31Do6UEgxYDBjY21MH
RwTgHlh7UANS8HyhvsRGOVqm8AwMhz3sVr2eOlTl4wAwjtSxgOHnPn
7HDEkSFLR0em8oYDAiR0tYQbu7RWAlsA5kG22EU4Qc2SJHdCB3D+1R
lYZdXpKaLNhfc9LyM2zZGP4hRelyHDJsYl71sQUR8DvlkoFPoQXjEl

WASHAR0001696

NEImvkCBwnWWNEIAlg+R32+IQRxibBO2C0uHco8WU7DpUgIs529vik
TVkOwiwehGEu2anEIDUnzGp3CvLCCH5HLcOd8mU7QDbJ8qvEwe8r9S
fRZFvrk646UneZEkLk0Lalo67i0lZdgvgL5M/UWIoLak65QIJKGOhz
HMkUr12VpV6cy6hDPuqdtrp9JmtkXEJJCbqukQdByIdSu3VC5aQa8l
vBjx40lEAVikScGO33clrCQWP1Bct1IGEla2k6zB71+glVv6E6pZFW
LSekIqQ26vAw/nGXuwigk3e3hsva35kaCH6piDiAFKjPG8Vexm2bA4
Yclf4jmhTliBIlba8/UGrXM0U8O/occLTBYEchljmsh/UJb53Gxuxd
DXjpjj2/En7GsksMp3NCnhp1xAoPGIG1MqR7SXceQiP/A7LFL+LMEQ
AAAQ7PAVJIdHJpZXZlck9wZXJhbd9yLDEwLDl7UmV0cmlldmVyVyT3BI
cmF0b3l3NMTEsMjtQb3N0RG9jUGFyc2VyLDB3LcmF0b3l3NMTEsMDtQb3NTAsMDtQb3MTAsMDtQb3
N0RG9jUGFyc2VyLDB3BIcmF0b3l3NMTEsMDtQb3M0N0V29yZEJyZWFrZXrZXJE
aWFnbm9zdGljT3BIcmF0b3l3NMTAsMjtQb3M0N0V29yZEJyZWFrZXJEaW
Fnbm9zdGljT3BIcmF0b3l3NMTEsMDtUmFuc2BvcnRXcml0ZXJJQcm9k dWNiciwyMCw0NQ==
X-MS-Exchange-Forest-IndexAgent: 1 2197
X-MS-Exchange-Forest-EmailMessageHash: E41C0259
X-MS-Exchange-Forest-Language: en
X-MS-Exchange-Organization-IsPotentialIntraOrgMail: False
X-MS-Exchange-Organization-Antispam-PreContentFilter-PolicyLoadTime:
MAOSUB:41;SLOSUB:0;SAORES:63;SLORES:39;
X-MS-Exchange-Organization-MessageFingerprint:
AE8BF1C8.8FF65323.EDD35569.4EEACF48.20405
X-MS-Exchange-Organization-Antispam-PreContentFilter-ScanContext:
CategorizerOnSubmitted;CategorizerOnResolved;
X-MS-Exchange-Organization-AVScannedByV2: Command;Symantec;Microsoft
X-MS-Exchange-Organization-AVScanComplete: true
X-MS-Exchange-Organization-Recipient-Limit-Verified: True
X-MS-Exchange-Organization-TotalRecipientCount: 1
X-MS-Exchange-Organization-HMATPModel-DkimAuthStatus: 1
X-MS-Exchange-Organization-HMATPModel-DmarcAuthStatus: 1
X-Microsoft-Exchange-Diagnostics:
1;DM2PR09MB0624;31:pT4fY18Lo4waTYsTdz1WWs33itH/9siMVvbpQIIEu5OvUsy1YeZXdt
WfN8zuPPoQMOhrQMJFINuCTCRr8U66mSqokrx4XyVtINKyY0bJVKDU/3d3ficoQ/sFxNRJc5
Jcig6UbeDBeZVhWXrkd3pq9xjpYmBag0Qq9uhUIibgnmnaY+NhBkCnX/ttq593ErB9iKG+rNzv
BmEJzgXD53/FkMOYjtedsnsp265vkndbcCg=;20:8MEsSUO2tYOlZ1wxh0QPs0tbRmckCOYF
MRXF8prjOrz8XVMXi2dE48tPqStTPfDNxwbAtkjDLiA3DvnoCuit5Vzc4nomV7FX4u1vCd+NuE
0XaB7rK6brV+L38+RB15Vy0KGJUXyeFdj6fJ7D47Oi05ERXNRGP+uiHlahr/G9v94cCUqCR5
Y0Isuwv3M1HeCgVuYlWKVXw/djXnjldkUPdq+AHn0yo89hBv3fz2l1OMEFOrJbFXdcjxH4olYa
CGVMs4P6d/uEQclA6qdKPsr+Jm0CqojsclMfW952Kx69J2GZGrMr/sGZW9w/SNhDBv3awu2
KOucBxTroT2AeyeftFVtCRAcsaPewbW8GJ4EdaQ42mWvdMN9W3JTzhI8mtKAoDJLOu2
WqxkEg96O1wVYX8DUbOmv3+coHb+7bz2JLNqr7anv9T2Y76GrHeY8bJzmwX029w0h+Ocx
GI9r5SYAiaq5t4g8jL+fZfAhV9qboqPmLk6wWGXMDZZ5oG+Y1wHR
X-MS-Exchange-Organization-Rules-Execution-History: 5a993c27-f186-423b-ab5c-
b9a4a9ae0cc1%%%901af5c8-0185-444c-b679-d930c21a923d%%178e050f-8847-4a1a-
a4e2-7934d0d37028%%%e8157cfd-040b-44a4-9cc9-86d0a8754ad4%%%4a44c540-762d-
46a3-8114-7212bef5c230%%%b47ba64a-a66e-4a77-8fa1-3d7fdc11c8d4%%%c9f789d0-
346d-45fa-b110-252829d3c341%%%ae6070cd-bad5-4857-9b31-6b485bb63219
X-MS-Exchange-Forest-RulesExecuted: DM2PR09MB0624
X-MS-Exchange-Organization-RulesExecuted: DM2PR09MB0624
X-MS-Exchange-Organization-DlpRules-Execution-History: 700807ac-4bf2-4126-9ffb-

WASHAR0001697

9693473774c5%%%8ca57b97-9945-4b08-b790-cb0118617e2d
X-MS-Exchange-Organization-DlpRulesExecuted: DM2PR09MB0624
X-MS-Exchange-Organization-Antispam-ContentFilter-ScanContext:
CategorizerOnResolved;CategorizerOnRouted;
X-MS-Exchange-Organization-TT-Fingerprint:
AE8BF1C8.8FF65323.EDD35569.4AEACF48.20405
X-MS-Exchange-Organization-ASDirectionalityType: 1
X-MS-Exchange-Organization-Antiphish-V2: SKP-NOT-ATP
X-MS-Exchange-Organization-CFA-UserOption: 1
X-Exchange-Antispam-Report-Test:
UriScan:(72170088055959)(209352067349851)(192374486261705);
X-MS-Exchange-Organization-Feature-Long: 0     201:3532     202:2968     203:1  205:1
      208:81 215:3506     235:1  236:1  238:1  239:1  241:1  243:1  244:3  245:1  246:1
247:1
      248:3  252:1  1004:fedex.com      1006:request,order,prevent,violat,secur,risk
      1007:Latn     1013:32.66.86.51     1014:gmail.com     1015:gmail.com
1019:mail.state.gov
      1020:gmail.com     1030:gmail.com     1034:C3F59982@state.gov
1035:gmail.com
X-MS-Exchange-Organization-HeloRdns: mail.state.gov;
X-Exchange-Antispam-Report-CFA-Test:
BCL:0;PCL:0;RULEID:(2401047)(8121501046)(823300264)(823330083)(3231311)(901025)(
902075)(913088)(7045084)(944500087)(944510158)(944921075)(946801078)(946901078)(9
300000187)(9301000187)(52103095)(52105095)(52106170)(52401285)(52601095)(5250509
5)(52406095)(52305095)(52206095)(93006095)(93005095)(3002001)(10201501046)(161000
1)(8301001075)(8301003183)(201708071742011)(7699016);SRVR:DM2PR09MB0624;BCL:
0;PCL:0;RULEID:;SRVR:DM2PR09MB0624;
X-Microsoft-Exchange-Diagnostics:
1;DM2PR09MB0624;4:Ta8eNT2Kd4b8EQEwFidhVAHcTPoOfk34xoqVIpPiTBL5m4L9vy1JOo
Whs6hwjjoLyPs2RKue7z/CPENWAqCO8w4pAFtPQXn3+ghrLVb8mZOIqhkIaSbaBBuC923/ID
JCZmFciljhrQhymCYVO2P8+t1tfu7TetLa1hD0XcQmluxBrvhu5pBBJU8
+LagxCBGUTVef+/MxOv8JLK4BIhBfZEm7mfcpqiZxhyYcom/EeL01Fbqt0l9zGMPPeReHGsU
Xvfn8gMXYxDiWHz4+QS4wWqnGlY/Z9OzfxNwDNDCpyaimM2la/cc7ysNgMBuXOed+yAinK
5ldIFH05sePbbHguCUUUkKrt++EFRrViIDK7YNouOwbrZ6ge2tzADnsrI00;23:hs4ns0NhWplO
PAJ/gLJqBorDod/2hxXyggJ0mH2Y29zal1g9/xBJdba1EYmaGcocynjk7bTgHgrpCvVhnbk/gM6
aXBITNZYuk3G5sgPneLNFEG7Ow8ie6SOrlzIO4aMBJUhcQXiYHLHzJITO1PDiCr5lQ+dypLu
z+HL35lCIVD8cUmVID98E5XWBSIUU7oZp
X-MS-Exchange-Organization-SCL: -1
X-MS-Exchange-Organization-Antispam-ScanContext: DIR:Originating;SFV:SFE;SKIP:0;
X-MS-Exchange-Organization-Antispam-PostContentFilter-ScanContext:
CategorizerOnResolved;CategorizerOnRouted;
X-Microsoft-Antispam-Message-Info:
7HXM7RmbzvmvJ1JNfORNDbTWmgORDfpYCrfiTYXF5fhGp7y0RqCFhfTTec+PkNT84sX/VZ
sxsxX0GDkTrHfwIibJ2IhNkkUtz/hbeE1y3YNdpXmgHJpCEXDf7Aq5Ff9D/hkkh+IpV4oZaYkykr
9YLnGK62g4S1iq+ppeFKr9hfFI7DtwzTAIeh8KMEPAWM+TMjePfnBqzjq7bq1AwgHJj6KDvo0
3rIHYnOHh2Aw3e5Ht9jEl9Qr8i3yqc8kXzQZmKbq7kOvKe8BObM0WMVynw3XdrTKIBxeSYu
d/dHTI/XmMK0M9woFKHdtZfKejVACa3wEjXQVhYTNWeYEc0LMGLuJrAp8HD1vI+9K84yjCD
OiU59WTuMDrHAKXrQ+JgmtsHo96dmAXyOEnMTwA138wVZfybrWsPq/jeidPik2d03QhjXNV
mDJqMOSalAB7YG4NF2V2jqdkPFCQW1RWfUSe20PCsrYmLN5b0BAxbWCIUfRLiE7DpmT

CKjHxSpkhuTYcdPYlbmTLNSrV9ZdH04R4Tjs1AiZ9LM19SiWIitk+00d9WLbaMkEf04N2sL9Or
gJYuPMmCijFLHoxDTncCVm49EChE98/yK6anfLdDd0so9mcZszBnT+afYlS7K3imIL6/4U05U
yAW4eN35ZlpFw6DaU6cjxIwBWpf/4KoayUfRG7bW1cBfPS6fhEjgz67Afw1kkEf7P9fbF7x088
kLYjOUnsVqtvgxbKCLzbxVP0aG3Cv/JeVP11kArqjMW68dve
X-Microsoft-Exchange-Diagnostics:
1;DM2PR09MB0624;6:DpAEMIb6X1fqVhYOQCBph4wXSvgoMnxbVRrMRsunZqdTK0G0SHa
fah2StexGk8EFTiBWS3h0tOPVA0YsQLzE7OMqmf7G7pzEszOTEsljRgmS8jPmcuQmBAQX9
vfkSj+rnXKmeTFS62Fsl4QnO69vTKwomMIPwaQY/1xJRajFYhpE3tTydEpXYXTK03eiuqG5F
Bm67na7T7M05FXdDgUyVXW4salVU+rQXVo9eJ+rUyIVjBZfbNAJX0liyvR+cSfbSqFipzx1ms
Dh7gonreI8ix5NpvvvwEQABMP1kLt/9FxxV5CmPylz+HT4Ns4OdnusHtZy5LgF4FD664u/Ap4
E2ggF5yh/a9yrKlOsJ4B969ffwHPZszxMoXf9u+GpHf3viGtGquVhDvt0fA8k8I49w/qA34L+DJT
aEgU6u2ytNfUbhm7hXEu3EukCj3Kx+4KJgt59Y3H5PBrQLVEYSMRntw==;5:7R16Gv0x6dRy
Dgoi7FZ7o6s+aSqFjas1tHgjLqWL3YuD+NcG0Gl31feDl9y8GLfZO0QjGpTwXy7UzBlJyvGjil4
Nm7bA+Wk7hAFKMmYxooZ0DelQlmO6qWFnXkdIM4+LFSsdLw/suk2pNKTRJ3BzglotpQ70X
Tb6BIdjNnBGBhk=;7:Lp1/PEVCcjYPa8Rh6Jc34+PoN06I0PGl0eV98y2JJG88GVlur++ESzQF
snekDi91CdqhZND1PJJPqXpPlfa+VskKLywKeKmJeleZJbLYltClTtnEZUlNlRH1oymhUzag/0E
pppj6vqzIuS3VNmi9Gs4efR0g7PWeUAsbIaRWyHjCOnNmBpbMTQu/OogJ207cbG2XZmJ5O
+B6oI/D7xCkQRHszcZYdYBvq3AKmwc3af/3v6/SP+cv30zakzYQA+2f
X-MS-Exchange-Organization-GroupForkPerf: VCL=0;VL=0

SpamDiagnosticOutput: 1:3
X-MS-Exchange-Organization-Cross-Session-Cache: =?us-
ascii?Q?00CIP=3D32.66.86.51;EIPC0=3D2055,950,2005,2006,2007,2008,200?=
 =?us-ascii?Q?9,2010,2011,2012,2013,2014,951,2000,2050,2051,2052,952,902,2?=
 =?us-ascii?Q?054,2016,903,905,904,901,2015,2001,3000,3010,907,2003,2002,9?=
 =?us-ascii?Q?67,2004,2058,2059,2060,2017,5011,5001,5051,5060,5050,5052,50?=
 =?us-ascii?Q?10,906,5059,5057,5058,5053,5056,5024,5030,5031,5036,5035,503?=
 =?us-ascii?Q?4,5038,5020,5037,5040,5021,5032,5039,5029,5026,5023,5022,502?=
 =?us-ascii?Q?8,5055,5027,5025,5033,5054,5002,5003,5005;MIPC0=3D952;REP=3D?=
 =?us-ascii?Q?;SL=3D3;EMSL=3D1;SCL=3D0;BL=3D0;RL=3D1;PID=3D0;PL=3D0;EXPID?=
 =?us-ascii?Q?=3D;SAUTHOP=3D1;EIPC1=3D2055,950,2005,2006,2007,2008,2009,20?=
 =?us-ascii?Q?10,2011,2012,2013,2014,951,2000,2050,2051,2052,952,902,2054,?=
 =?us-ascii?Q?2016,903,905,904,901,2015,2001,3000,3010,907,2003,2002,967,2?=
 =?us-ascii?Q?004,2058,2059,2060,2017,5011,5001,5051,5060,5050,5052,5010,9?=
 =?us-ascii?Q?06,5059,5057,5058,5053,5056,5024,5030,5031,5036,5035,5034,50?=
 =?us-ascii?Q?38,5020,5037,5040,5021,5032,5039,5029,5026,5023,5022,5028,50?=
 =?us-ascii?Q?55,5027,5025,5033,5054,5002,5003,5005,6002,2019,2056,2018,60?=
 =?us-ascii?Q?01,2057,2053;MIPC1=3D952,2014,950,2003,951,902,5011,2018;A?=
 =?us-
ascii?Q?=3D00;MX=3D00;RMX=3D00;PTR=3D02;SPF=3D031joshuampaul@gmail.c?=
 =?us-ascii?Q?om;DKIM=3D0020161025.=5Fdomainkey.gmail.com\;az1yc2E7IHA9TUl?=
 =?us-
ascii?Q?JQklqQU5CZ2txaGtpRzl3MEJBUUVGQUFPQ0FROEFNSUlCQ2dLQ0FRRUF2aVB
?=
 =?us-
ascii?Q?HQms0WkI2NFVmU3FXeUFpY2RSN2xvZGh5dGGFIK0VZUlFWdEtEaE0rMW1YakV?
=
 =?us-ascii?Q?xUnR
QL3BEVDNzQmhhemttQTQ4bjJrNU5KVXlNRW9POG5JMnI2c1VBKy9Eb20?=
 =?us-

WASHAR0001699

ascii?Q?1alJCWnA2cURLSk93ako1Ui9PcEhhbWxSRytZUkpRcVJ0cUVnU2lKV0c3aDd?=
 =?us-
ascii?Q?lZkdZV21oNFVSaEZNOWs5K3JtRy9Dd0Nnd3g3RXQrYzhPTWxuZ2FMbDA0L2J?=
 =?us-
ascii?Q?QbWZwamRFeUxXeU5pbWs3NjFDWDZLeW16WWlSRE56MU1PSk9KN096RmFT
NFB?=
 =?us-
ascii?Q?GYlZMbjBtNW1mMEhWTnRCcFB3V3VDTnZhRlZmbFVZeEV5YmxiQjZoL29XT1B?=
 =?us-
ascii?Q?HYnpvU2d0UkE0N1NlVjUzU3daaklzVnBicTRMeFVXOUl4QUV3WXpHY1NnWjR?=
 =?us-
ascii?Q?uNVE4WDhUbmRvd3NEVXpvY2NQRkdoZHdJREFRUI=3D;DMARC=3D00joshua
?=
 =?us-
ascii?Q?mpaul@gmail.com\;dj1ETUFSQzE7IHA9bm9uZTsgc3A9cXVhcmFudGluZTs?=
 =?us-
ascii?Q?gcnVhPW1haWx0bzpYYWlsYXV0aC1yZXBvcnRzQGdvb2dsZS5jb20=3D;EIPC?=
 =?us-ascii?Q?2=3D1607,1609,30002,1803,1608,796,2055,6002,2019,2056,2018,2?=
 =?us-ascii?Q?050,2051,2052,2054,6001,2057,2053;MIPC2=3D;FPR=3DAE8BF1C8.8F?=
 =?us-
ascii?Q?F65323.EDD35569.4AEACF48.20405;PReRC=3D1;NoDLx=3D1;GWS=5FRea?=
 =?us-
ascii?Q?d=3DV2;TP=5FPTL=3D4;BMASV=3D6891;BMAPV=3D9938;CMASV=3D258;CM?=
 =?us-
ascii?Q?APV=3D10000;IdDom=3D5;SFA=5FSFV=3DSFE;SFA=5FASC=3D0;SFA=5FIs?=
 =?us-
ascii?B?QVNGPTA7U0ZBX1NDTD0tMTtESVl9MTtVUF9GVj1BbGxvdztVUF9GQz1TQUw7?
=
 =?us-
ascii?B?VVBfU0FMPUFsbG93O1BWX1VWPUFMVztQVl9VVlQ9U0VMO1NWX0Y9QWxsb3c
7?=
 =?us-ascii?Q?SV=5FFS=3DUse?=
X-MS-Exchange-Organization-Cross-Session-Cache: 01r
X-MS-Exchange-Organization-Processed-By-Gcc-Journaling: Journal Agent
X-Microsoft-Exchange-Diagnostics:
1;DM2PR09MB0624;20:1F1VnN1XP8RS21ihr5p6tdmMuM2PcEVPNLzBn+lj/4Y58peDZUujYc
pmhKFmKc6pUs+GAYB6v9qFbTbfksBtdhKGg4RUaaW42z48aQawD5MglA+YsOh839r6A3za
Nqk7t9lTODpt7VSvZrc+Fi8kaADTFesX49pXhMwUb927DZawwFj1Knt0MvTHOAU800NYE2oI
EM1HrH+7c2GA1WhdErQugF//hfxMxO9gZWnXkp0+UKoiKCBDwpdB5Ud4hjSuCCvV+6ErdY
6t0l0+u03VECVucB/9T6LmIeQe5JfMYp2bpxZdXGBizOt1mMMlq02+RcVz9aURkkGOrXl7Jm
95z1UOzW55ApxEvhPlHE8dsHRAw8cjejxTKyoR+Z9W/yG9nlBAsRXQpo/8OBC4tVquN35gD
Z0JYu68SQuHlmOn/c31BsnKxtrb8+akvDYZ8EPDwhQucK7CrszRl/RRsPYbOMAQgvrPYgW
6w4TRhfqMit208Ypfv9i9buKMXT5IyZKy
MIME-Version: 1.0


--_ff3a9df9-ef9d-4f18-a025-1273023a0df0_
Content-Type: text/plain; charset="UTF-8"
Content-Transfer-Encoding: quoted-printable

WASHAR0001700

Federal Judge Denies Last Ditch Effort To Block Release Of 3D-Printed Gun
Blueprints
The judge said he was sympathetic to the gun control groups=E2=80=99 concer=
ns but
questioned their legal standing to intervene in the case.

Jon Herskovitz

JON HERSKOVITZ / REUTERS
AUSTIN, Texas (Reuters) - A U.S. judge on Friday rejected a last-ditch
effort by gun control groups to block the Trump administration from
allowing the public to download blueprints for 3-D printable guns,
declining to intervene just days before the designs are expected to go
online.

U.S. District Judge Robert Pitman in Austin, Texas, denied the request for
an order by the Brady Center to Prevent Gun Violence, Everytown for Gun
Safety and the Giffords Law Center to Prevent Gun Violence at a hearing,
saying he would state the reasons for his decision in a written order to
follow.

At the hearing, the judge said he was sympathetic to the gun control
groups=E2=80=99 concerns but questioned their legal standing to intervene i=
n the
case.

The groups sought to intervene following a June settlement between Defense
Distributed and the U.S. government allowing the company to legally publish
gun blueprints online, something its website says it plans to do by Aug. 1.

The government ordered the blueprints taken down in 2013 and Defense
Distributed founder Cody Wilson sued in 2015, claiming his First Amendment
and Second Amendment rights had been violated.

The government had until recently argued the blueprints posed a national
security risk. Gun control groups said there had been no explanation for
the June settlement and the administration=E2=80=99s abrupt reversal on the=
 issue.

Lawyers for the Brady Center declined to comment on Pitman=E2=80=99s ruling=
 after
the hearing.

The groups in court filings said not halting the blueprint distribution by
a Texas-based company called Defense Distributed would =E2=80=9Ccause immed=
iate and
irreparable harm to the United States national security=E2=80=9D and that o=
f
individual U.S. citizens.

=E2=80=9CThe stated goal of Defense Distributed is to sound the death knell=
 for gun
control,=E2=80=9D David Cabello, a lawyer for the Brady Center, told Pitman=
 during
the hearing.

The 3-D files include blueprints for a plastic AR-15 semiautomatic assault
rifle, a weapon that has been used in many U.S. mass shootings, as well as
other firearms.

Joshua Blackman, a lawyer for Defense Distributed, said he was grateful for
the judge=E2=80=99s ruling. During the hearing Blackman said the gun contro=
l groups
were trying to litigate a political dispute in court.

Wilson, a self-declared Texas anarchist, said in an online video that the
blueprints were downloaded more than 400,000 times before they were taken
down in 2013.

Lawrence Keane, general counsel for the National Shooting Sports
Foundation, a trade association for gun manufacturers, told Reuters
concerns over 3-D printable guns were overblown.

=E2=80=9CI don=E2=80=99t see it likely at all that criminals will use this =
clunky and
expensive technology,=E2=80=9D Keane said. The NSSF is not involved in the =
case.

--_ff3a9df9-ef9d-4f18-a025-1273023a0df0_
Content-Type: text/html; charset="UTF-8"
Content-Transfer-Encoding: quoted-printable

<meta http-equiv=3D"Content-Type" content=3D"text/html; charset=3Dutf-8"><d=
iv dir=3D"ltr"><div>Federal Judge Denies Last Ditch Effort To Block Release=
 Of 3D-Printed Gun Blueprints<br></div><div>The judge said he was sympathet=
ic to the gun control groups=E2=80=99 concerns but questioned their legal s=
tanding to intervene in the case.</div><div><br></div><div>Jon Herskovitz</=
div><div><br></div><div>JON HERSKOVITZ / REUTERS</div><div>AUSTIN, Texas (R=
euters) - A U.S. judge on Friday rejected a last-ditch effort by gun contro=
l groups to block the Trump administration from allowing the public to down=
load blueprints for 3-D printable guns, declining to intervene just days be=
fore the designs are expected to go online.</div><div><br></div><div>U.S. D=
istrict Judge Robert Pitman in Austin, Texas, denied the request for an ord=
er by the Brady Center to Prevent Gun Violence, Everytown for Gun Safety an=
d the Giffords Law Center to Prevent Gun Violence at a hearing, saying he w=
ould state the reasons for his decision in a written order to follow.</div>=
<div><br></div><div>At the hearing, the judge said he was sympathetic to th=
e gun control groups=E2=80=99 concerns but questioned their legal standing =

WASHAR0001702

to intervene in the case.</div><div><br></div><div>The groups sought to int=
ervene following a June settlement between Defense Distributed and the U.S.=
 government allowing the company to legally publish gun blueprints online, =
something its website says it plans to do by Aug. 1.</div><div><br></div><d=
iv>The government ordered the blueprints taken down in 2013 and Defense Dis=
tributed founder Cody Wilson sued in 2015, claiming his First Amendment and=
 Second Amendment rights had been violated.</div><div><br></div><div>The go=
vernment had until recently argued the blueprints posed a national security=
 risk. Gun control groups said there had been no explanation for the June s=
ettlement and the administration=E2=80=99s abrupt reversal on the issue.</d=
iv><div><br></div><div>Lawyers for the Brady Center declined to comment on =
Pitman=E2=80=99s ruling after the hearing.</div><div><br></div><div>The gro=
ups in court filings said not halting the blueprint distribution by a Texas=
-based company called Defense Distributed would =E2=80=9Ccause immediate an=
d irreparable harm to the United States national security=E2=80=9D and that=
 of individual U.S. citizens.</div><div><br></div><div>=E2=80=9CThe stated =
goal of Defense Distributed is to sound the death knell for gun control,=E2=
=80=9D David Cabello, a lawyer for the Brady Center, told Pitman during the=
 hearing.</div><div><br></div><div>The 3-D files include blueprints for a p=
lastic AR-15 semiautomatic assault rifle, a weapon that has been used in ma=
ny U.S. mass shootings, as well as other firearms.</div><div><br></div><div=
>Joshua Blackman, a lawyer for Defense Distributed, said he was grateful fo=
r the judge=E2=80=99s ruling. During the hearing Blackman said the gun cont=
rol groups were trying to litigate a political dispute in court.</div><div>=
<br></div><div>Wilson, a self-declared Texas anarchist, said in an online v=
ideo that the blueprints were downloaded more than 400,000 times before the=
y were taken down in 2013.</div><div><br></div><div>Lawrence Keane, general=
 counsel for the National Shooting Sports Foundation, a trade association f=
or gun manufacturers, told Reuters concerns over 3-D printable guns were ov=
erblown.</div><div><br></div><div>=E2=80=9CI don=E2=80=99t see it likely at=
 all that criminals will use this clunky and expensive technology,=E2=80=9D=
 Keane said. The NSSF is not involved in the case.</div><div><br></div><div=
><br></div><div><br></div><div><br></div><div><br></div><div><br></div></di=
v>

--_ff3a9df9-ef9d-4f18-a025-1273023a0df0_--

WASHAR0001703

# WILLIAMS MULLEN

Jahna M. Hartwig
Direct Dial: 202.293-8145
jhartwig@williamsmullen.com

June 21, 2013

Ms. Sarah Heidema
U.S. Department of State
Directorate of Defense Trade Controls
PM/DDTC, SA-1, Room 1200
2401 E Street, NW
Washington, DC 20037

Subject:   Commodity Jurisdiction Requests for Data Files Posted by Defense Distributed

Enclosures:   (1) Printouts of Drawings from Files Posted at DEFCAD.org
(2) Wikipedia Page for 125mm BK-14M HEAT
(3) Thingiverse Page for Sound Moderator
(4) Thingiverse Page for VZ-58 Front Sight
(5) Examples of Solvent Trap Adapters
(6) Examples of CAD Files for .22 Pistols
(7) Examples of CAD Files for Muzzle Brakes
(8) Examples of CAD Files for Slide Assemblies
(9) Examples of CAD Files for Voltlock System

Dear Ms. Heidema:

Defense Distributed has been requested by DTCC/END to submit requests for
commodity jurisdiction determinations in connection with Case No. 13-0001444 for ten sets of
data files posted to DEFCAD.org.  As demonstrated below, the files are primarily Computer
Aided Design (CAD) data files and should be considered public domain information that is
excluded from the ITAR pursuant to Section 120.11.  Defense Distributed therefore respectfully
requests a determination that these files are not subject to the ITAR.

## COMMODITY DESCRIPTIONS

Each of these Commodity Jurisdiction requests relates to data files, almost all of which
are essentially blueprints that can be read by CAD software.  A description of each file or set of
files is set out below.  The files are in one of the following formats:

- STL (STereoLithography or Standard Tessellation Language) is a file format
native to the stereolithography CAD software and can be used with some 3D
printers. "Stereolithography" is a means of creating physical 3D models of objects
using resin or carefully cut and joined pieces of paper.  STL files describe only

WASHAR0001714

the surface geometry of a three dimensional object without any representation of color, texture or other common CAD model attributes.
- The IGS (Initial Graphics Exchange Specification) file format is the standard format for transferring three-dimensional models between CAD programs. IGS files can store wireframe models, surface or solid object representations, circuit diagrams, and other objects.
- SLDPRT is the proprietary image file format associated with the SolidWorks brand CAD software. SLDPRT files contain three-dimensional images of one specific part of a product.
- SKP is the CAD drawing format for Google Sketchup, which is a quick, entry-level 3D drawing program.

There are also a small number of Word (.DOC), text (.TXT) or image (.JPG or .BMP) files. A printout of each file is attached to the relevant DS-4076.

As explained further below, each of these files either was previously placed in the public domain or contains only public domain information.

**1. Liberator Pistol Data Files**

The files for the Liberator Pistol include sixteen STL files for the various parts and components of the pistol, two "read me" text files that explain how to lawfully assemble the pistol, a diagram of a pistol, and a permissive software license. If printed on a 3D printer, the parts could be assembled into a single shot .380 caliber firearm.

**2. .22 Electric Data Files**

The files for the .22 Electric are two stereolithography (STL) CAD files for models of a barrel and grip for a .22 caliber pistol. If printed, the barrel would be a plastic cylinder with a .22 mm bore and the grip would be a plastic piece with two 5mm diameter holes. If those pieces were printed in plastic and used with an electronic system and firing mechanism, the barrel would be expected to fail upon firing.

**3. 125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File**

The file is a STL CAD file for a model of a BK-14M high explosive anti-tank warhead without fins. The model, if printed on a 3D printer, would be a solid piece of plastic in the shape of the warhead, but would not be capable of functioning as a warhead.

**4. 5.56/.223 Muzzle Brake Data Files**

The data files are three different CAD file formats (.IGS, .SLDPRT, and .STL) for a model of a 5.56/.223 muzzle brake. If printed on a 3D printer, the model would be a plastic piece in the shape of the muzzle brake, but would be expected to fail if used with a weapon.

**5. Springfield XD-40 Tactical Slide Assembly Data Files**

The files are nineteen Computer Aided Design (CAD) data files in the SolidWorks .SLDPRT file format for models of components of a pistol slide for the Springfield XD-40. The

components, if printed on a 3D printer, would be plastic pieces in the shape of the components of the slide assembly, but would be expected to fail if used with a weapon.

### 6. Sound Moderator – Slip On File

The file is a stereolithography CAD file for a model of a slip-on sound moderator for an air gun. The model, if printed on a 3D printer, would work with an air gun, but would likely melt if used with a firearm.

### 7. "The Dirty Diane" ½-28 to ¾-16 STP S3600 Oil Filter Silencer Adapter Files

The file is a CAD data file in the SolidWorks .SLDPRT file format for a model of an oil filter silencer adapter that is typically produced in stainless steel. If printed on a 3D printer, this item could be used as a solvent trap adapter, which is used to catch solvents that are used in the process of cleaning a gun. While a metal solvent trap adapter could be used as a silencer, a plastic adapter would likely melt if used with a weapon as a silencer.

### 8. 12 Gauge to .22 CB Sub-Caliber Insert Files

The files are a SKP CAD file for a model of a sub-caliber insert, two renderings of the sub-caliber insert, and a "read me" text file providing information about the National Firearms Act and the Undetectable Firearms Act. This item, if printed on a 3D printer, would be a plastic cylinder with a .22 bore, and would be expected to fail if used with a weapon.

### 9. Voltlock Electronic Black Powder System Files

The files are twelve CAD files for models of cylinders of various bores with a touch hole. Eleven of the files are in the STL file format and one is in the IGS format. If those pieces were printed on a 3D printer and used with an electronic ignition, the barrel would be expected to fail.

### 10. VZ-58 Front Sight Files

The files are a SolidWorks CAD file in the .SLDPRT file format and a rendering of a model of a sight for a VZ-58 rifle. If printed on a 3D printer and used with a weapon, the sight would be expected to fail.

## DATA ORIGIN

With the exception of item 1 (Liberator Pistol Data Files), each of these files was provided to Defense Distributed by the creator of the files identified in the DS4076. In addition, as explained below, many of these files were originally posted to www.thingiverse.com or other internet sites, and were freely available to any person with access to the internet.

The Liberator Pistol CAD files were developed by Defense Distributed. The Liberator pistol was designed as a combination of already extant and working files and concepts. The pistol frame, trigger housing, and grip specifications were all taken directly from an AR-15 lower receiver file that is in the public domain. The spring file is taken from a toy car file available on Thingiverse. The hammer relies on striking a common roofing nail, and the barrel is a cylinder bored for .380. The gun functions because of the properties of the .380 cartridge – the brass

WASHAR0001716

Defense Distributed CJ Requests
June 21, 2013
Page 4

casing itself is relied on to act as a breech. The printed and assembled gun is a simple improvised weapon, not as complex as many of the improvised weapons of the 20th century, those available in Army manuals, etc. All of the technologies used to create the Liberator data files are widely available in the public domain.

## IDENTICAL & SIMILAR FILES

The Liberator Pistol data files are for an improvised firearm that is similar to and based on numerous items that are available on the internet as well as in various books. The Library of Congress online catalog lists numerous books on gunsmithing, including

- Clyde Baker, Modern gunsmithing; a manual of firearms design, construction, and remodeling for amateurs & professionals (1959)
- John E. Traister, Clyde Baker's Modern gunsmithing : a revision of the classic (1981)
- Frank de Haas, Mr. Single Shot's gunsmithing idea book (1983)
- Roy F. Dunlop, Gunsmithing (1996),
- Franklin Fry, Gunsmithing fundamentals : a guide for professional results (1988),
- James Virgil Howe, The modern gunsmith : a guide for the amateur and professional gunsmith in the design and construction of firearms, with practical suggestions for all who like guns (1982),
- Gérard Métral, A do-it-yourself submachine gun: it's homemade, 9mm, lightweight, durable, and it'll never be on any import ban lists! (1995),
- Jack Mitchell, The Gun digest book of pistolsmithing (1980),
- J. Parrish Stelle, The gunsmith's manual; a complete handbook for the American gunsmith (1883), and
- Patrick Sweeney, Gunsmithing: pistols & revolvers (2009),

among many others. Examples of online sources include:

- http://www.weaponscombat.com/zip-pipe-and-pen-guns
- http://www.infinitearms.com/images2/v/manuals/Misc+Gun+Plans
- http://thehomegunsmith.com
- http://www.scribd.com/doc/24445441/Pen-Gun-Mk1-Blueprint
- https://www.google.com/search?q=zip+gun+blueprints&rlz=1C1SKPM_enUS43
  6US489&source=lnms&tbm=isch&sa=X&ei=9t-
  oUZybJILm8wSx0YHoBg&ved=0CAoQ_AUoAQ&biw=1600&bih=837
- http://ebookbrowse.com/gu/guns-homemade

Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun.

A drawing of the 125 BK-14M HEAT (Item 3), including measurements, is currently available on Wikipedia at http://en.wikipedia.org/wiki/File:125mm_BK-14m_HEAT.JPG.

WASHAR0001717

Defense Distributed CJ Requests
June 21, 2013
Page 5

The Sound Moderator CAD file (Item 6) was published on Thingiverse on March 3, 2011 and is still available on that site at http://www.thingiverse.com/thing:6808. The VZ-58 Front Sight (Item 10) was also published to Grabcad on December 14, 2012 and is still available on that site at http://grabcad.com/library/front-sight-for-vz-dot-58-rifle.

The Oil Filter Silencer Adapter is identical to Solvent Trap Adapters, which are produced by numerous manufacturers and available as commercial products on many websites, including amazon.com. (see http://www.amazon.com/s/ref=nb_sb_noss_1?url=search-alias%3Dautomotive&field-keywords=solvent+trap+adapter&rh=n%3A15684181%2Ck%3Asolvent+trap+adapter.) These items appear to be commercial products that would be subject to the EAR. As such, any related technologies or technical data would also be subject to the EAR.

Examples of CAD files similar to the .22 Electric Pistol (Item 2), Muzzle Brake (Item 4), Slide Assembly (Item 5), and Voltlock Electronic Black Powder System (Item 9) that are currently available on the internet are attached to the relevant DS4076.

As demonstrated above, all of the technical information included in the data files posted to DEFCAD.org was previously available in the public domain. As such, this information is excluded from the definition of "technical data" by 22 C.F.R. § 120.10(a)(5). For these reasons, Defense Distributed respectfully requests that the Department determine that the subject data files posted to DEFCAD.org are not subject to the ITAR.

This submission contains Defense Distributed confidential business information. We respectfully request that the submission be kept confidential. If you need additional information regarding this submission, please contact me at 202-293-8145 or jhartwig@williamsmullen.com.

Sincerely,

Jahna M. Hartwig

# Enclosures

WASHAR0001719

[Billing Code 4710-25]

**DEPARTMENT OF STATE**

**22 CFR Parts 121, 123, 124, and 126**

**RIN 1400-AC90**

**Public Notice: [        ]**

**Amendment to the International Traffic in Arms Regulations:  Revision of U.S. Munitions List Categories I, II, and III.**

**AGENCY:**  Department of State.

**ACTION:**  Proposed rule.

**SUMMARY:**  The Department of State proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms and related articles), II (guns and armament) and III (ammunition and ordinance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting control on the USML.  Items removed from the USML would become subject to the Export Administration Regulations (EAR), 15 CFR Parts 730 through 774.

**DATES:**  The Department of State will accept comments on this proposed rule until [insert date 60 days from date of publication in the *Federal Register*].

**ADDRESSES:**

Interested parties may submit comments within 60 days of the date of publication by one of the following methods:

- E-mail:  *DDTCPublicComments@state.gov* with the subject line, "ITAR Amendment – Categories I, II, and III."

- Internet:  At *www.regulations.gov,* search for this notice by using this rule's RIN (1400-AC90).

Comments received after that date will be considered if feasible, but consideration cannot be assured.  Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of confidentiality is asserted because those comments and/or transmittal e-mails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at *www.pmddtc.state.gov.*  Parties who wish to comment anonymously may do so by submitting their comments via

WASHAR0001720

*www.regulations.gov*, leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.

**FOR FURTHER INFORMATION CONTACT:** Mr. C. Edward Peartree, Director, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663-2792; e-mail *DDTCPublicComments@state.gov*. ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120-130). The items subject to the jurisdiction of the ITAR, *i.e.*, "defense articles," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations ("EAR," 15 CFR parts 730-774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports.

The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, largely because they are items widely available in retail outlets in the U.S. and abroad.

**Revision of Category I**

This proposed rule revises USML Category I, covering firearms and related articles, to control only weapons that are uniquely military or that are not otherwise widely available for commercial sale. In particular, the revised category would not include non-automatic and semi-automatic firearms currently controlled under subparagraph (a), and parts, components, accessories, and attachments specially designed for those articles. Such items would become subject to the new 600 series controls in Category 0 of the CCL published separately by the Department of Commerce.

WASHAR0001721

A new (x) paragraph has been added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the application.

**Revision of Category II**

This proposed rule revises USML Category II, covering guns and armament, to establish a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, would be revised to enumerate the articles controlled therein.

Paragraph (a) would be revised to enumerate the articles controlled in that paragraph.  The articles covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) are listed in paragraph (a)(4).  A new paragraph (a)(10) is added for developmental guns and armaments funded by the Department of Defense, and the specially designed parts and components of those developmental guns and armaments. The articles controlled in paragraph (f), engines for self-propelled guns and howitzers in paragraph (a), would be on the CCL in proposed CCL ECCN 0A606.  Tooling and equipment for the production of articles controlled in USML Category I, currently in paragraph (g), would be under proposed CCL ECCN 0B602.  Test and evaluation equipment, now in paragraph (h), would be under proposed CCL ECCN 0B602. Autoloading systems currently controlled in paragraph (i) would be moved to paragraphs (j)(10) and (j)(12).

A new (x) paragraph has been added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

**Revision of Category III**

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the proposed changes to Category I.

-4-

Most significantly, paragraphs (a) and (d) would be revised to remove broad catch-alls and enumerate the articles to be controlled therein.  For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, is revised to specifically list the ammunition that it controls.  A new paragraph (a)(10) is added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition.  Ammunition not enumerated in paragraph (a) will be subject to the EAR.  Likewise, revised paragraph (d), which controls parts and components, enumerates the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, is removed and placed into reserve.  The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph has been added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

**Conforming ITAR Changes**

Additionally, conforming changes are made to several sections of the ITAR that refer to the current controls in USML Category I(a).  These sections are amended because they all refer to firearms that are to be controlled on the CCL.  Section 123.16(b)(2) is revised to removed reference to the firearms exemptions at §123.17, as the paragraphs in that section (a through e) that describe the firearms exemptions are removed as a consequence of the proposed control of non-automatic and semi-automatic firearms on the CCL.  For the same reason, §§123.16(b)(6) and (b)(7) are revised, the former to describe the remaining exemption at §123.17 (personal protective gear), and the latter placed into reserve.  Section 123.18, as it describes exemptions for firearms that are to be controlled for export by the Department of Commerce, is removed and placed into reserve.  Revision of §124.14(c)(9) removes as an example "sporting firearms for commercial resale." Section 126.1(a) is revised to remove reference to the firearms

WASHAR0001723

exemption at §123.17. The policy guidance on Zimbabwe in §126.1(s) is revised to remove reference to the firearm exemption.

**Request for Comments**

The Department welcomes comments from the public and specifically requests input on the following matters:

1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in Munitions List Category 1 (WA-ML1). Readers are asked to identify any potential gap in coverage brought about by the proposed rules for Category I contained in this notice and the new Category 0 ECCNs published separately by the Department of Commerce when reviewed together.

2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms. The public should provide any specific examples of firearms (or parts, components, accessories thereof) or ammunition whose jurisdiction would be in doubt based on this revision.

**REGULATORY ANALYSIS AND NOTICES**

*Administrative Procedure Act*

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this rule is exempt from the rulemaking provisions of the APA, the Department is publishing this rule with a 60-day provision for public comment and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function. As noted above, and also without prejudice to the Department position that this rulemaking is not subject to the APA, the Department previously published a related Advance Notice of Proposed Rulemaking (RIN 1400-AC78) on December 10, 2010 (75 FR 76935), and accepted comments for 60 days.

*Regulatory Flexibility Act*

Since the Department is of the opinion that this rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

*Unfunded Mandates Reform Act of 1995*

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This proposed rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

*Executive Orders 12372 and 13132*

This proposed rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this proposed rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this proposed rulemaking.

*Executive Orders 12866 and 13563*

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

WASHAR0001725

*Executive Order 12988*

The Department of State has reviewed this proposed rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department of State has determined that this proposed rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law.  Accordingly, Executive Order 13175 does not apply to this proposed rulemaking.

*Paperwork Reduction Act*

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.  This proposed rule would affect the following approved collections:  1) Statement of Registration, DS-2032, OMB No. 1405-0002; 2) Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data, DSP-5, OMB No. 1405-0003; 3) Application/License for Temporary Import of Unclassified Defense Articles, DSP-61, OMB No. 1405-0013; 4) Nontransfer and Use Certificate, DSP-83, OMB No. 1405-0021; 5) Application/License for Permanent/Temporary Export or Temporary Import of Classified Defense Articles and Classified Technical Data, DSP-85, OMB No. 1405-0022; 6) Application/License for Temporary Export of Unclassified Defense Articles, DSP-73, OMB No. 1405-0023; 7) Statement of Political Contributions, Fees, or Commissions in Connection with the Sale of Defense Articles or Services, OMB No. 1405-0025; 8) Authority to Export Defense Articles and Services Sold Under the Foreign Military Sales (FMS) Program, DSP-94, OMB No. 1405-0051; 9) Application for Amendment to License for Export or Import of Classified or Unclassified Defense Articles and Related Technical Data, DSP-6, -62, -74, -119, OMB No. 1405-0092; 10) Request for Approval of Manufacturing License Agreements, Technical Assistance Agreements, and Other Agreements, DSP-5, OMB No. 1405-0093; 11) Maintenance of Records by Registrants, OMB No. 1405-0111; 12)

Annual Brokering Report, DS-4142, OMB No. 1405-0141; 13) Brokering Prior Approval (License), DS-4143, OMB No. 1405-0142; 14) Projected Sale of Major Weapons in Support of Section 25(a)(1) of the Arms Export Control Act, DS-4048, OMB No. 1405-0156; 15) Export Declaration of Defense Technical Data or Services, DS-4071, OMB No. 1405-0157; 16) Request for Commodity Jurisdiction Determination, DS-4076, OMB No. 1405-0163; 17) Request to Change End-User, End-Use, and/or Destination of Hardware, DS-6004, OMB No. 1405-0173; 18) Request for Advisory Opinion, DS-6001, OMB No. 1405-0174; 19) Voluntary Disclosure, OMB No. 1405-0179; and 20) Technology Security/Clearance Plans, Screening Records, and Non-Disclosure Agreements Pursuant to 22 CFR 126.18, OMB No. 1405-0195.  The Department of State believes there will be minimal changes to these collections.  The Department of State believes the effect of this rule would decrease the number of license applications by approximately 10,000 annually.  The Department of State requests comments on the potential reduction in burden.

**List of Subjects in Parts 121, 123, 124, and 126**

Arms and munitions, Exports

Accordingly, for the reasons set forth above, Title 22, Chapter I, Subchapter M, parts 121, 123, 124, and 126 are proposed to be amended as follows:

**PART 121 – THE UNITED STATES MUNITIONS LIST**

1.  The authority citation for part 121 continues to read as follows:

**Authority:**  Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112-239; E.O. 13637, 78 FR 16129.

2.  Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

**§121.1  The United States Munitions List.**

* * * * *

**I—Firearms and Related Articles**

*(a) Firearms using caseless ammunition.

*(b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

(c) [Reserved]

WASHAR0001727

*(d) Fully automatic shotguns regardless of gauge.

*(e) Silencers, mufflers, and sound suppressors, and specially designed parts and components therefor.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum magazines for firearms to .50 caliber inclusive (12.7 mm) with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm.

(i) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of this category and classified technical data directly related to items controlled in ECCNs 0A601, 0B601, 0C601, 0D601, 0E601 and defense services using the classified technical data..  (*See* §125.4 of this subchapter for exemptions.)

(k)-(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (see §120.42 of this subchapter) used in or with defense articles controlled in this category.

*Note to paragraph (x):*  Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see §123.1(b) of this subchapter).

*Note 1 to Category I:* Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude:  any non-automatic or semi-automatic firearms to caliber .50 inclusive (12.7 mm); non-automatic shotguns; BB, pellet, and muzzle loading (*e.g.*, black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraph (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730-744).

WASHAR0001728

*Note 2 to Category I:* The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant.

(2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(3) Caseless ammunition is small arms ammunition that eliminates the cartridge case that holds the primer, propellant, and projectile together as a unit.

**Category II— Guns and Armament**

(a) Guns and armament greater than .50 caliber, as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(5):* This paragraph does not control guns and armament greater than .50 caliber (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (see §120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(5):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(5):* This provision is applicable to those contracts or other funding authorizations that are dated XXXX, 2016, or later.

*Note 1 to paragraph (a)***:** This paragraph does not include: Non-automatic rifles, carbines, and pistols between .50 and .72 caliber that are controlled on the CCL under ECCN 0A601; shotguns controlled on the CCL under ECCN 0A984; or black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602.

WASHAR0001729

*Note 2 to paragraph (a)*:  Guns and armament when integrated into their carrier (*e.g.*, ships, ground vehicles, or aircraft) are controlled in the category associated with the carrier.  Self-propelled guns and armament are controlled in USML Category VII.  Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with a minimum effective range of 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission–abort of a target.

*Note to paragraph (d)*:  Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: electromagnetic, electrothermal, plasma, light gas, or chemical.  This does not include launch systems and subsystems used for research and testing facilities subject to the EAR and controlled in CCL ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f) [Reserved]

(g) [Reserved]

(h) [Reserved]

(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

WASHAR0001730

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independently powered ammunition handling systems and platform interface components as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

*Note to paragraph (j)(9):* For weapons mounts specially designed for ground vehicles, *see* Category VII.

(10) Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(11) Independent ammunition handling systems; ammunition containers/drums, ammunition chutes, ammunition conveyor elements, ammunition container/drum entrance and exit units and aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(12) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(13) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(14) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the

WASHAR0001731

corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0C602, 0D602, and 0E602 and defense services using the classified technical data.  (*See* §125.4 of this subchapter for exemptions.)

(l)-(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (see §120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x)*:  Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see §123.1(b) of this subchapter).

**Category III — Ammunition and Ordnance**

*(a) Ammunition, as follows:

(1) Ammunition that incorporates a projectile controlled in paragraphs (d)(1) or (d)(3) of this category;

(2) Ammunition preassembled into links or belts;

(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

(4) Caseless ammunition manufactured with smokeless powder;

*Note to paragraph (a)(4)*:  Caseless ammunition is ammunition that eliminates the cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having

peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

(7) Ammunition for fully automatic firearms or guns which fire superposed or stacked projectiles;

(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

*Note 1 to paragraph (a)(10):* This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (see §120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

*Note 2 to paragraph (a)(10):* Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

*Note 3 to paragraph (a)(10):* This provision is applicable to those contracts or other funding authorizations that are dated XXXX, 2016, or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

*Note to paragraph (d)(2):*  This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Hardened cores, regardless of caliber, produced from one or a combination of the following:  tungsten, steel, or beryllium copper alloys;

(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

*Note to paragraph (d)(10):*  This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A603, 0B603, 0C603, 0D603, and 0E603 and defense services using the classified technical data. (*See* §125.4 of this subchapter for exemptions.).

(f)-(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (see §120.42 of this subchapter) used in or with defense articles.

*Note to paragraph (x):* Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see §123.1(b) of this subchapter).

*Notes to Category III*:

1. This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

2. This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

3. 37 mm grenades used for non-lethal projectiles for riot control are under the jurisdiction of the Department of Commerce.

\* \* \* \* \*

**PART 123 – LICENSES FOR THE EXPORT OF DEFENSE ARTICLES**

3. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2753; E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp. p. 79; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228.

    4.  Section 123.16 is amended by revising paragraphs (b)(2) and (b)(6), and by removing paragraph (b)(7) and placing it in reserve, as follows:

**§123.16  Exemptions of general applicability.**

* * * * *

(b) * * *

* * * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

* * * * *

(6) For exemptions for personal protective gear, refer to §123.17 of this subchapter.

(7) [Reserved]

* * * * *

    5.  Section 123.17 is amended by revising the section header, and removing paragraphs (a) through (e) and placing them in reserve, as follows.

**§123.17  Exemption for personal protective gear.**

(a) – (e) [Reserved]

* * * * *

    6.  Section 123.18 is removed and reserved.

**§123.18  [Reserved]**

**PART 124 – AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES**

    7.  The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp., p. 79; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261; Pub. L. 111–266.

    8.  Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

**§124.14  Exports to warehouses or distribution points outside the United States.**

WASHAR0001736

\* \* \* \* \*

(c) \* \* \*

\* \* \* \* \*

(9) Additional clause. Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (*e.g.*, cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

\* \* \* \* \*

**PART 126 – GENERAL POLICIES AND PROVISIONS**

9. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); E.O. 11958, 42 FR 4311; 3 CFR, 1977 Comp., p.79; 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p.899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111-117; Pub. L. 111-266; Section 7045, Pub. L. 112-74; Section 7046, Pub. L. 112-74.

10. Section 126.1 is amended by revising paragraphs (a) and (s) to read as follows:

**§126.1 Prohibited exports, imports, and sales to or from certain countries.**

(a) *General.* It is the policy of the United States to deny licenses and other approvals for exports and imports of defense articles and defense services destined for or originating in certain countries. The exemptions provided in in this subchapter, except §§126.4 and 126.6 of this subchapter or when the recipient is a U.S. government department or agency, do not apply with respect to defense articles or defense services originating in or for export to any proscribed countries, areas, or persons. (*See* §129.7 of this subchapter, which imposes restrictions on brokering activities similar to those in this section.)

\* \* \* \* \*

(s) *Zimbabwe.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in

WASHAR0001737

-19-

Zimbabwe, except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

* * * * *


_____          _____
        (Date)                              Rose E. Gottemoeller,
                                            Acting Under Secretary,
                                   Arms Control and International Security,
                                            Department of State.

REC1|APPROVE|3-19-2017



201702649
**United States Department of State**

*Washington, D.C.  20520*

SENSITIVE BUT UNCLASSIFIED                    March 16, 2017

**ACTION MEMO FOR THE SECRETARY**

FROM:       PM – Tina Kaidanow

SUBJECT:    (SBU) Approval for Transition of Certain Firearms-Related U.S. Munitions List
            Categories I-III Items to Commerce Control

**Recommendation**
        (SBU) That you agree to request the National Security Advisor reverse the Fall 2016
National Security Council decision to place on hold the publication of a proposed rule, and its
companion rule from the Department of Commerce, that would transfer export controls for
certain firearms, parts and components thereof, and related ammunition, from the Department of
State to the Department of Commerce.  (Approve/Disapprove by 03/23/17)

**Background**
        (U) Since 2009, the Department, in conjunction with the Department of Commerce and
with strong interagency support, has significantly revised the control lists that underpin the
U.S. export control system.  This effort has established a clear line between the United States
Munitions List (USML) and the Commerce Control List (CCL), and it has narrowed the scope of
the USML to items with a critical military or intelligence advantage.  Thus far, this methodology
was used to successfully revise 18 of the 21 categories of the USML.  The remaining three
USML categories consist of:

- Category I:  Firearms, Close Assault Weapons, and Combat Shotguns;
- Category II:  Guns and Armament; and
- Category III:  Ammunition/Ordnance.

The Department currently controls all firearms and ammunition for export overseas with the
exception of shotguns, which are divided between the two control lists, and standard shotgun
ammunition.



WASHAR0001739

SENSITIVE BUT UNCLASSIFIED
-2-



<u>Attachment</u>:
      Proposed Rule

SENSITIVE BUT UNCLASSIFIED

WASHAR0001740

SENSITIVE BUT UNCLASSIFIED
-3-



WASHAR0001741

UNCLASSIFIED

## "Major" versus "Non Major" Rule

For the purposes of the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Act"), a "major" rule is a rule that the Administrator of the OMB Office of Information and Regulatory Affairs finds has resulted or is likely to result in:

(a)   an annual effect on the economy of $100,000,000 or more;

(b)   a major increase in costs or prices for consumers, individual industries, federal, state or local government agencies, or geographic regions; or

(c) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of U.S.-based enterprises to compete with foreign-based enterprises in domestic and foreign markets.
(5 U.S.C. 804(2))



WASHAR0001742

UNCLASSIFIED

## Roll Out Plan for Publishing Proposed Rules on USML Cats I-III

Unlike the recent roll out of the President's Conventional Arms Transfer policy, the Roll Out plan for the publication of draft rules on the U.S. Munitions List (USML) Categories I-III avoids a high-profile set of engagements, and is designed to minimize the politicization of these rules.

### Key Messages:

- The Administration is publishing proposed rules to amend Categories I, II, and III of the USML in the International Traffic in Arms Regulations (ITAR).  These proposed rules will transfer oversight for the export of some types of firearms, ammunition, and related items included in these categories from the Department of State to the Department of Commerce.

- The Administration is publishing these draft rules after an extensive interagency process between the Departments of State, Commerce, DHS, and other stakeholders.  This review reexamined longstanding policies and regulatory processes to ensure that U.S. industry has every advantage in the global marketplace, while at the same time ensuring the responsible export of arms.

- These are proposed rules, not final rules.  They are being published for public comment and may be subject to modifications before final rules are published.

### What These Proposed Rules Do

- Under these proposed rules, firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets will remain under State Department export licensing controls.

- Items that are widely available in retail outlets that are also currently regulated by the State Department authorities as set forth under Categories I, II, and III of the USML in the ITAR will be subject to the new 500 series controls in Category 0 of the U.S. Department of Commerce's Commerce Control List (CCL) in its Export Administration Regulations (EAR), which will remain subject to export licensing requirements, interagency review, and monitoring of commercial entities involved in export and sales.

### Tic-Toc

D-2:

- State/PM conducts backgrounder with media outlet, embargoed until the rule is publicly available. (Likely:  Washington Times)

- State, Commerce, and DoD (Defense Technology Security Administration (DTSA)) provide briefing to Committee Staff (HFAC, SFRC, SBANK) on draft rules.

UNCLASSIFIED

WASHAR0001743

- After briefing, State/H makes calls to Senators Feinstein and Leahy, who are expected to oppose the proposal.

D-1:

- State, Commerce, and DoD (DTSA) provide briefing to Committee Member Staff (PRMs) (HFAC, SFRC, SBANK) on draft rules.
- Rule goes on "public display," becomes available via FRN Website.
- State releases Fact Sheet
- Myths and Facts Sheet posted to Export.Gov
- Embargo lifted
- State and Commerce conduct press call with firearms media outlets and bloggers (*Guns and Ammo*, *American Handgunner*, *Combat Handguns*, *Recoil*, *Ammoland*, *Tactical Life*, *Shooting Times*, *American Rifleman*)
- State and Commerce conduct press call with media outlets catering to the Hill and lobbying community including *Politico*, *The Hill*, *CQ*, *Bloomberg*, *Breitbart*, *Daily Caller*

D:

- Draft rule formally published in Federal Register
- State conducts background briefing with NGO community, including *Small Arms Monitor*, *Security Assistance Monitor*, *Forum on the Arms Trade*, etc.

WASHAR0001744

UNCLASSIFIED
-3-



UNCLASSIFIED

WASHAR0001745

REC1|APPROVE|5-3-2018
REC2|APPROVE|5-3-2018



201812286
**United States Department of State**

*Washington, D.C.   20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                              April 30, 2018

**ACTION MEMO FOR THE SECRETARY**

FROM:        PM – Tina Kaidanow, Senior Bureau Official

SUBJECT:   (SBU) Proposed Amendment to the International Traffic in Arms Regulations
                      (ITAR):  Revision of U.S. Munitions List (USML) Categories I, II, and III

**Recommendations**
(SBU) That you:

(1) Authorize Principal Deputy Assistant Secretary Kaidanow to sign the *Federal
Register* notice that will publish proposed revisions to the ITAR as discussed below.
(Approve/Disapprove by 05/07/18)

(2) Concur that this rule is not a "major" rule for the purposes of the Small Business
Regulatory Enforcement Fairness Act of 1996.  (Approve/Disapprove by 05/07/18)

**Background**
(SBU) State and Commerce regulate the export of different kinds of technologies.  Under the
ITAR, State has jurisdiction over defense articles and services, which are regulated through
control of the 21 categories of military technologies comprising the USML.  Under the Export
Administration Regulation, Commerce regulates dual-use technologies on its Commerce Control
List (CCL).  State's export control process, administered by PM's Directorate of Defense Trade
Controls, is more restrictive as a general matter due to the militarily critical nature of the
technologies concerned.  Conversely, Commerce-controlled items are generally less sensitive
and the procedures for exporting less burdensome.



WASHAR0001746

SENSITIVE BUT UNCLASSIFIED
-2-



(SBU) Section 38(a)(1) of the Arms Export Control Act authorizes the President to designate the defense articles and defense services which constitute the USML and to promulgate regulations for the import and export of such articles and services.  The President delegated this authority to the Secretary of State in E.O. 13637.

Attachments:
       Tab 1 – *Federal Register* Notice of Proposed Rulemaking
       Tab 2 – Background on "Major" vs. "Non Major" Rules
       Tab 3 – Key Background Documents (2015 Deputies Meetings, and 2017 AM to the
               Secretary, Letter to the NSA, and NSA's Response)
       Tab 4 – Roll out Plan for Publishing Proposed Rules on USML Cats I-III

WASHAR0001747

SENSITIVE BUT UNCLASSIFIED

-3-



WASHAR0001748

REC1|APPROVE|7-26-2018
REC2|APPROVE|7-26-2018
REC3|APPROVE|7-26-2018
REC4|APPROVE|7-26-2018



201821192
**United States Department of State**

*Washington, D.C.   20520*

SENSITIVE BUT UNCLASSIFIED                          July 26, 2018

**ACTION MEMO FOR UNDER SECRETARY THOMPSON (T)**

FROM:          PM – Tina Kaidanow, Acting Assistant Secretary

SUBJECT:     (U) Concluding the Department's Settlement with Defense Distributed

**BLUF:**          (SBU) The below actions are required to comply with the Defense Distributed
                       settlement agreement.

**Recommendations**
(U) That in order for the Department of State to comply with its obligations in its settlement
agreement with Defense Distributed you:

(1) Approve a temporary modification pursuant to International Traffic in Arms
    Regulations §126.2 to exclude specified Defense Distributed litigation-related
    technical data from U.S. Munitions List (USML) Category I.  (Approve/Disapprove
    by 07/26/2018)

(2) Approve the posting of the attached DDTC website notice to announce the above-
    referenced temporary modification to USML Category I.  (Approve/Disapprove by
    07/26/2018)

(3) Direct Acting Deputy Assistant Secretary for Defense Trade Controls, Michael
    Miller, to sign the attached letter informing Defense Distributed that, pursuant to
    ITAR § 125.4(b)(13), the Department is a cognizant U.S. government agency with
    authority to approve technical data for public release and that it hereby grants
    approval for the enumerated technical data in the letter to be released into the public
    domain.  (Approve/Disapprove by 07/26/2018)

(4) Direct that actions (2) and (3) take place on July 27, 2018, unless the Department is
    enjoined from doing so or Defense Distributed agrees to postpone the deadline.
    (Approve/Disapprove by 07/26/2018)

**Background**
(SBU) Defense Distributed (DD) is a Texas-based nonprofit corporation that makes available via
the Internet computer-aided design (CAD) files for the three-dimensional printing of firearms

SENSITIVE BUT UNCLASSIFIED

WASHAR0001749

SENSITIVE BUT UNCLASSIFIED
-2-

and firearm components.  In May 2013, PM's Directorate of Defense Trade Controls (DDTC) sent a letter to DD stating that certain files it had posted on the Internet appeared to be defense articles controlled pursuant to the International Traffic in Arms Regulations (ITAR) and requested that DD remove the files from the Internet and submit a commodity jurisdiction (CJ) request to DDTC.  DD complied with the letter and DDTC concluded in the CJ that some, but not all, of the files were subject to the ITAR because they conveyed information required to produce defense articles described in Category I of the ITAR's USML.

(SBU) Beginning in September 2014, DD submitted several requests to the DoD's Defense Office of Prepublication and Security Review (DOPSR) to request a review and approval for public release of the ITAR-controlled files pursuant to ITAR § 125.4(b)(13).  DOPSR stated that review of the CAD files was beyond its purview and referred DD to DDTC regarding the request for approval for public release.  DD did so in January 2015.  Before DDTC responded, DD sued the Department.  DD's primary claim was that the Department had subjected its free speech rights to an unconstitutional prior restraint by preventing it from posting files on the Internet DD failed to obtain a preliminary injunction.

(U) On June 29, 2018 the parties reached a settlement agreement that placed three substantive obligations on the Department:

1. To pursue publication in the Federal Register of a final rule revising USML Category I that excludes specified technical data at issue in the DD litigation;
2. To issue via a DDTC website announcement a temporary modification to USML Category I that excludes enumerated technical data at issue in the litigation pursuant to ITAR § 126.2; and
3. To issue a letter to DD that, consistent with ITAR § 125.4(b)(13), advises that the Department is a cognizant U.S. government agency with authority to approve technical data for public release and grants approval for the technical data enumerated in the letter to be released into the public domain.



WASHAR0001750

SENSITIVE BUT UNCLASSIFIED
-3-

Three organizations that pursue gun control filed court documents yesterday seeking a temporary restraining order prohibiting the Department's compliance with the settlement.  A hearing is being held today.

Attachments:
        Tab 1 – DDTC Website Announcement
        Tab 2 – Letter to Defense Distributed
        Tab 3 – Settlement Agreement

SENSITIVE BUT UNCLASSIFIED

WASHAR0001751

SENSITIVE BUT UNCLASSIFIED
-4-



WASHAR0001752

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § | Case No. _1:15-cv-372_ |
| | § | COMPLAINT |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE; JOHN F. KERRY, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, individually and in his official capacity as Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; C. EDWARD PEARTREE, individually and in his official capacity as Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; SARAH J. HEIDEMA, individually and in her official capacity as Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; and GLENN SMITH, individually and in his official capacity as Senior Advisor, Office of Defense Trade Controls, Bureau of Political Military Affairs, Department of State, | § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |
| _____ | §| |

COMPLAINT

COME NOW the Plaintiffs, Defense Distributed and Second Amendment Foundation, Inc.,

by and through undersigned counsel, and complain of Defendants as follows:

1

WASHAR0001753

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 70 (1963). The prior restraint system challenged here cannot overcome its presumption of invalidity.

Contrary to the Justice Department's warning that such actions are unconstitutional, Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120 *et seq.* ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open forums, regarding arms in common use for lawful purposes. Defendants' censorship of Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments to the United States Constitution. Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this prior restraint scheme, and to recover money damages to compensate for the harm such application has already caused.

*The Parties*

1.    Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.    Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in

2

WASHAR0001754

Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including

Texas. The purposes of SAF include promoting the exercise of the right to keep and bear arms; and

education, research, publishing and legal action focusing on the constitutional right to privately own

and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its

members.

  3.  Defendant the United States Department of State is an executive agency of the

United States government responsible for administering and enforcing the ITAR under the authority

of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

  4.  Defendant John F. Kerry is sued in his official capacity as the Secretary of the

Department of State. In this capacity, he is responsible for the operation and management of the

Department, and this includes the operation and management of the Directorate of Defense Trade

Controls ("DDTC") and administration and enforcement of the ITAR.

  5.  Defendant DDTC is a subordinate unit within the Department of State Bureau of

Political and Military Affairs responsible for administering and enforcing the ITAR.

  6.  Defendant Kenneth B. Handelman is sued individually and in his official capacity as

the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-

Military Affairs. In his official capacity, Handelman is responsible for the operation and

management of DDTC, and this includes administration and enforcement of the ITAR.

  7.  Defendant C. Edward Peartree is sued individually and in his official capacity as the

Director of the Office of Defense Trade Controls Policy Division. In his official capacity, he is

responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures;

implementation of regulatory changes as a result of defense trade reforms; and providing guidance to

industry on ITAR requirements.

WASHAR0001755

8.      Defendant Sarah Heidema is sued individually and in her official capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy. In her official capacity, she is responsible for administration of the ITAR, implementation of regulatory changes as a result of defense trade reforms, and providing guidance to industry on ITAR requirements.

9.      Defendant Glenn Smith is sued individually and in his official capacity as the Senior Advisor, Office of Defense Trade Controls. At times relevant to this Complaint, Smith served as the Chief of the DDTC Enforcement Division. In that official capacity, Smith was responsible for enforcing ITAR requirements.

JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

11.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a substantial part of the events and omissions giving rise to the claim occurred, and the Plaintiff resides, within the Western District of Texas.

STATEMENT OF FACTS

*Defendants' Prior Restraint Scheme*

12.     The AECA affords the President limited control over the export of "defense articles." 22 U.S.C. § 2778(a)(1). Although the AECA does not expressly authorize control over "technical data," the ITAR, which implements the Act, includes "technical data" within its definition of "defense articles." 22 C.F.R. § 120.6.

13.     The ITAR broadly defines "technical data" as information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or

4

WASHAR0001756

modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles." *Id.*

14. The ITAR requires advance government authorization to export technical data. Criminal penalties for unauthorized exports of technical data and other violations of the ITAR include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per violation. 22 U.S.C. § 2778(c). Civil penalties include fines of up to $500,000 per violation. 22 U.S.C. § 2778(e).

15. The scope of technical data subject to ITAR control, as described on the U.S. Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants constantly change, without notice, their views of what this scope entails.

16. Accordingly, Americans have submitted thousands of written requests, known as "commodity jurisdiction requests," to Defendant DDTC, operated by the individual Defendants, for official determinations as to ITAR's scope.

17. From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the ITAR imposed a prepublication approval requirement on publications of privately generated ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication."

18. Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of written opinions advising Congress, the White House, and the Department of State that the use of the ITAR to impose a prior restraint on publications of privately generated unclassified

5

WASHAR0001757

information into the public domain violated the First Amendment of United States Constitution (the "Department of Justice memoranda"). Defendants Handelman, Peartree, and Heidema were aware of these memoranda at all times relevant to this Complaint.

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to Defendant DDTC, issued a official guidance providing that "[a]pproval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote Number 3 from the ITAR, expressly intending to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (December 6, 1984). As such, to the extent ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

<div align="center">*The Published Files*</div>

21.     Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR technical data is freely published in books, scientific journals, and on the Internet.

22.     Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, and also to generate revenue with which to sustain itself.

23.     Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

<div align="center">6</div>

WASHAR0001758

24.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission, and also generated advertising revenue. At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

25.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, acting alone or in concert with other government actors, the Defendants sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

26.     At the time it posted the Published Files, Defense Distributed did not know that the Defendants would demand to pre-approve public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with Defendants' demands and removed all of the Published Files from its servers.

27.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a). Defense Distributed complied with Defendants' request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

7

WASHAR0001759

28.     Defendants identify the Department of Defense Office of Prepublication Review and

Security ("DOPSR") as the government agency from which private persons must obtain prior

approval for publication of privately generated technical information subject to ITAR control.

Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision,

standard of review, or an appeals process for DOPSR public release determinations. Worsening this

situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

29.     Nearly two years having passed since Defense Distributed submitted its commodity

jurisdiction requests for the Published Files, Defendants have still not responded to those requests.

*The "Ghost Gunner" Files*

30.     On September 25, 2014, Defense Distributed sent DOPSR a request for

prepublication approval for public release of files containing technical information on a machine,

named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts

(the "Ghost Gunner Files").

31.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused

to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost

Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed

submit another commodity jurisdiction request to the Defendants.

32.     Defense Distributed submitted another commodity jurisdiction request for the Ghost

Gunner to Defendants on January 2, 2015.

33.     On April 13, 2015, Defendant DDTC determined that the Ghost Gunner machine is

not subject to ITAR, but that "software, data files, project files, coding, and models for producing a

defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the

Department of State in accordance with [ITAR]." Defense Distributed did not seek a determination

8

with respect to such files, but it did seek a determination as to whether the software necessary to

build and operate the Ghost Gunner machine is ITAR-controlled. Defendant DDTC subsequently

clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its

ruling with respect to software related to the production of a "defense article."

<p align="center">*Prior Restraint on CAD Files*</p>

34.     Since September 2, 2014, Defense Distributed has made multiple requests to

DOPSR for prepublication review of certain computer-aided design ("CAD") files.

35.     On December 31, 2014, nearly four months after Defense Distributed submitted the

first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22,

2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in

part, with specific direction from Defendant Smith.

36.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and

Enforcement Division for further questions on public release of the CAD files. However, because

this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization,

on January 5, 2015, Defense Distributed sent a written request to Defendants for guidance on how

to obtain authorization from DDTC Compliance for release of the CAD files. To date, Defendants

have not responded to Defense Distributed's request for guidance.

<p align="center">*Prior Restraint on Other Files*</p>

37.     Defense Distributed has and will continue to create and possess other files that

contain technical information, to include design drawings, rendered images, written manufacturing

instructions, and other technical information that Defense Distributed intends to post to public

forums on the Internet. Many of these files are described in the USML.

<p align="center">9</p>

WASHAR0001761

38.     Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. But for Defendants' prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*Great, Irreparable, and Continuing Harm*

39.     But for Defendants' impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

40.     Defendants' acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by Defendants' actions. Defendants' acts have further caused Defense Distributed to suffer monetary loss as a result of its inability to publish the Subject Files.

COUNT ONE
ULTRA VIRES GOVERNMENT ACTION

41.     Paragraphs 1 through 40 are incorporated as though fully set forth herein.

42.     The Defendants' imposition of the prepublication requirement, on any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendant' imposition of the prepublication approval requirement is ultra

10

WASHAR0001762

vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

## COUNT TWO
### RIGHT OF FREE SPEECH—U.S. CONST. AMEND. I

43.     Paragraphs 1 through 42 are incorporated as though fully set forth herein.

44.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' speech, as an unconstitutional prior restraint on protected expression.

45.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

46.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

47.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

## COUNT THREE
### RIGHT TO KEEP AND BEAR ARMS—U.S. CONST. AMEND. II

48.     Paragraphs 1 through 47 are incorporated as though fully set forth herein.

49.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms. See, *e.g. Mance* v. *Holder*, 2015 WL 567302 *15 n. 8, 2015 U.S. Dist. LEXIS 16679 *25 n.8 (N.D.

11

WASHAR0001763

Tex. Feb. 11, 2015) ("the Court finds that operating a business that provides Second Amendment services is generally protected by the Second Amendment, and prohibitions on firearms sales are subject to similar scrutiny.").

50.　　If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for traditional lawful purposes violates the Second Amendment. *District of Columbia* v. *Heller*, 554 U.S. 570, 627 (2008).

51.　　By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs' from publishing the subject files, which concern the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

<div align="center">

COUNT FOUR
RIGHT TO DUE PROCESS OF LAW—U.S. CONST. AMEND. V

</div>

52.　　Paragraphs 1 through 51 are incorporated as though fully set forth herein.

53.　　The Due Process Clause of the Fifth Amendment to the United States Constitution requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

54.　　On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

55.　　As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, continuing refusal to advise Defense Distributed of what speech requires prior

<div align="center">12</div>

WASHAR0001764

approval, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FIVE
VIOLATION OF CONSTITUTIONAL RIGHTS—*BIVENS* ACTION

56.     Paragraphs 1 through 55 are incorporated as though fully set forth herein.

57.     By maintaining and enforcing the prepublication approval requirement and forbidding Defense Distributed from publishing the Subject Files, Defendants are propagating customs, policies, and practices that are unlawful under clearly established law and that violate Defense Distributed's individual rights and those of its patrons under the First, Second and Fifth Amendments to the United States Constitution.

58.     As a direct cause of Defendants Handelman, Peartree, Heidema, and Smith's violations of Defense Distributed's rights and the rights of its patrons, Defense Distributed suffered financial losses, entitling Defense Distributed to recover compensatory damages from Defendants Handelman, Peartree, Heidema, and Smith.

59.     Defendants Handelman, Peartree, Heidema, and Smith acted with evil motive, actual malice, oppression, intent to injure, or reckless or callous disregard for Defense Distributed's rights, such that punitive and exemplary damages are appropriate.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

13

WASHAR0001765

1.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' posting of the Subject Files, violates the First Amendment to the United States Constitution;

3.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' posting of the Subject Files, violates the Second Amendment to the United States Constitution;

4.      A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' posting of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against privately generated unclassified information;

6.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' publication of the Subject Files;

7.      An award of compensatory and punitive and exemplary damages to Defense Distributed against Handelman, Peartree, Heidema, and Smith in an amount according to proof at trial, owing to their direct actions that caused or contributed to Defense Distributed's injuries;

14

WASHAR0001766

8.  Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

9.  Any other further relief as the Court deems just and appropriate.

PLAINTIFF DEFENSE DISTRIBUTED DEMANDS TRIAL BY JURY ON THE ISSUE OF

DAMAGES.

Dated: May 6, 2015                          Respectfully submitted,

GURA & POSSESSKY, PLLC                       FISH & RICHARDSON P.C.

Alan Gura                                    */s/ William B. Mateja*
Virginia Bar No. 68842*                      William T. "Tommy" Jacks
Gura & Possessky, PLLC                       Texas State Bar No. 10452000
105 Oronoco Street, Suite 305                William B. Mateja
Alexandria, Virginia 22314                   Texas State Bar No. 13185350
703.835.9085 / Fax 703.997.7665              David S. Morris
alan@gurapossessky.com                       Texas State Bar No. 24032877
                                             FISH & RICHARDSON P.C.
Matthew Goldstein                            One Congress Plaza, Suite 810
D.C. Bar No. 975000*                         111 Congress Avenue
Matthew A. Goldstein, PLLC                   Austin, Texas 78701
1012 14th Street NW, Suite 620               (512) 472-5070 (Telephone)
Washington, DC 20005                         (512) 320-8935 (Facsimile)
202.550.0040/Fax 202.683.6679                jacks@fr.com
matthew@goldsteinpllc.com                    dmorris@fr.com
                                             mateja@fr.com
Josh Blackman
Virginia Bar No. 78292*
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admission pro hac vice pending

WASHAR0001767



**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

In Reply refer to
DDTC Case CJ 1083-14 (RE-ISSUE)

APR 1 5 2015

YOUR SUBMISSION DATED:  January 2, 2015

COMMODITY JURISDICTION DETERMINATION FOR:  **Ghost Gunner Machine, Plastic Mounting Jig, User Instructions, and Software**

The product described in your submission is a one cubic foot box that functions as a 3-axis, computer-numerically-controlled (CNC) press capable of automatically milling parts out of various materials through software designs.

A technical review of your commodity jurisdiction (CJ) request has been concluded by the requisite agencies of the United States Government.  A split jurisdiction determination of this request has been determined, as follows:

> The Department of State has determined that the **Ghost Gunner, its plastic mounting jig, operating software, and production and operation instructions are not subject to the jurisdiction of the Department of State.**  However, export may require authorization from the Department of Commerce (DOC).  Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy other applicable requirements prior to export.

> The Department of State has determined that the **project files, data files, or any form of technical data for producing a defense article, including an 80% AR-15 lower receiver, are subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR 120 through 130).**  They are

Continued on Page Two

Cody R. Wilson
Defense Distributed, Inc.
1101 W 34th Street, #340
Austin, TX 78705
crw@defdist.org

WASHAR0001768

Page Two

In Reply refer to
DDTC Case CJ 1083-14

> designated as technical data under Category I(i) of the United
> States Munitions List (USML).  A license or other approval is
> required pursuant to the ITAR prior to any export or temporary
> import.

Should you not agree with this determination and have additional facts not
included in the original submission, you may submit a new CJ request.  If you do
not agree with this determination and have no additional facts to present, you may
request that this determination be reviewed by the Deputy Assistant Secretary of
State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Samuel
Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

      (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

      (b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0001771

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0001772

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0001773

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

WASHAR0001774

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
      Settlement Agreement with their counsel, who has explained these documents to them
      and that they understand all of the terms and conditions of this Settlement Agreement.
      Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
      the contents thereof, and execute this Settlement Agreement of their own free act and
      deed. The undersigned represent that they are fully authorized to enter into this
      Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,
      each of which shall be deemed an original, and all of which together constitute one and
      the same instrument, and photographic copies of such signed counterparts may be used in
      lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
      drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
      requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
      Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
      state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0001775

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
-   The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
-   The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0001776

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _____, 2018

Dated: _June 29_, 2018

_____
Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _____, 2018

_____
Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001777

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,        §
    Plaintiffs,                        §
                                  §
                                  §
v.                                  §        No. 1:15-cv-372-RP
                                  §
U.S. DEPARTMENT OF STATE, et al.,   §
    Defendants.                        §

**STIPULATION OF DISMISSAL WITH PREJUDICE**

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.


Dated: June 29, 2018                       Respectfully submitted,


Matthew Goldstein
D.C. Bar No. 975000*                       CHAD A. READLER
Snell & Wilmer LLP                         Acting Assistant Attorney General
One South Church Ave., Ste. 1500           Civil Division
Tucson, Arizona 85701
520.882.1248 / Fax 520.884.1294            ANTHONY J. COPPOLINO
mgoldstein@swlaw.com                       Deputy Branch Director
                                           Federal Programs Branch

Alan Gura
Virginia Bar No. 68842*
Gura PLLC                                  ERIC J. SOSKIN
916 Prince Street, Suite 107               Pennsylvania Bar No. 200663
Alexandria, Virginia 22314                 Senior Trial Counsel


1

WASHAR0001778

703.835.9085/Fax 703.997.7665

alan@guraplic.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

2

WASHAR0001779

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0001780

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d) Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e) Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment. The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0001783

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement
      of Plaintiffs and Defendants entered into in good faith, and no statement, remark,
      agreement or understanding, oral or written, which is not contained therein, shall be
      recognized or enforced. Plaintiffs acknowledge and agree that no promise or
      representation not contained in this Settlement Agreement has been made to them and
      they acknowledge and represent that this Settlement Agreement contains the entire
      understanding between Plaintiffs and Defendants and contains all terms and conditions
      pertaining to the compromise and settlement of the disputes referenced herein. Nor does
      the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose
      other than the desire of the Parties to reach a full and final conclusion of the Action, and
      to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an
      instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof
      be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the
      benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,
      assigns and personal representatives, including any persons, entities, departments or
      agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0001784

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
    Settlement Agreement with their counsel, who has explained these documents to them
    and that they understand all of the terms and conditions of this Settlement Agreement.
    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
    the contents thereof, and execute this Settlement Agreement of their own free act and
    deed. The undersigned represent that they are fully authorized to enter into this
    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,
    each of which shall be deemed an original, and all of which together constitute one and
    the same instrument, and photographic copies of such signed counterparts may be used in
    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0001785

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
-   The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
-   The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
-   The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0001786

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _____, 2018

Dated: ___June 29___, 2018

_____
Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _____, 2018

_____
Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001787

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,      §
    Plaintiffs,                             §
                               §
                               §
v.                                             §          No. 1:15-cv-372-RP
                               §
U.S. DEPARTMENT OF STATE, et al.,  §
    Defendants.                            §

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.


Dated: June 29, 2018               Respectfully submitted,


Matthew Goldstein
D.C. Bar No. 975000*
Snell & Wilmer LLP
One South Church Ave., Ste. 1500
Tucson, Arizona 85701
520.882.1248 / Fax 520.884.1294
mgoldstein@swlaw.com

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314

ERIC J. SOSKIN
Pennsylvania Bar No. 200663
Senior Trial Counsel

1

WASHAR0001788

703.835.9085/Fax 703.997.7665

alan@guraplic.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

2

WASHAR0001789

| From: | Heidema, Sarah J <HeidemaSJ@state.gov> |
| --- | --- |
| Sent: | Wednesday, July 11, 2018 10:56 AM |
| To: | Cavnar, Anna <CavnarA@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| Subject: | FW: Cody Wilson's claims on settlement |

FYSA

**Official
UNCLASSIFIED**

From: Heidema, Sarah J
Sent: Wednesday, July 11, 2018 10:20 AM
To: Paul, Joshua M <PaulJM@state.gov>
Cc: McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
Subject: Cody Wilson's claims on settlement

Josh-



https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

WASHAR0001790

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

WASHAR0001791

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkelman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in, enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the

WASHAR0001792

Ghost Gunner

*Michelle Groskopf*

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

*Michelle Groskopf*

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire <u>online community of DIY gunmakers</u>. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of <u>3-D-printable semiautomatics</u> who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called <u>Crypto Wars of the 1990s</u>. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance. he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, <u>Daniel Bernstein, sued the government</u> with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and scare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation,

WASHAR0001793

certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era where Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

## More Great WIRED Stories

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is really *really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error,

WASHAR0001794

please notify us immediately by e-mail, and delete the original message.
**Official**
**UNCLASSIFIED**

WASHAR0001795

| | |
|---|---|
| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
| **Sent:** | Wednesday, July 11, 2018 1:02 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | FW: Cody Wilson's claims on settlement |
| **Attach:** | Press Points on Defense Distributed.docx |

Anna, Jeremy,

███████████████████████████████████████████████████████

Thanks,
Shana

**Official - SBU**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 12:42 PM
**To:** Heidema, Sarah J; Hart, Robert L; Paul, Joshua M
**Cc:** Miller, Michael F; Monjay, Robert; Rogers, Shana A; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement

Sarah,

Thanks, and completely agreed.

███████████████████████████████████████████████

Thanks,
Dave

_____
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:   202.647.8757 | 🖥   BlackBerry: 202.550.3482 |
✉ e-mail:   *mckeebydi@state.gov* | ✎ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

▨ ▨ ▨ ▨ ▨ ▨ ▨

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 12:41 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Dave-

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:40 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob:

Thanks for that – how does this sound to you guys:

Please advise and thanks,
Dave
_____
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.8757 | 📱   BlackBerry:  202.550.3482 |

WASHAR0001797

✉ e-mail:   **mckeebydi@state.gov** | ✆ Web: **www.state.gov/t/pm /** | Twitter: **@StateDeptPM**

Stay connected with *State.gov*:

🄴 🄴 🄴 🄴 🄴 🄴 🄴

**From:** Hart, Robert L
**Sent:** Wednesday, July 11, 2018 11:26 AM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

A few edits on first impression below--

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Sarah:



Best,
Dave
_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.8757 | 📱   BlackBerry: 202.550.3482 |
✉ e-mail:     *mckeebydi@state.gov* | 🖱 Web: *www.state.gov/t/pm* | Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

📧 📧 📧 📧 📧 📧 📧

---

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 10:20 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L
<HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** Cody Wilson's claims on settlement

Josh-

https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

WASHAR0001800

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a

kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

WASHAR0001802

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkelman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in,

WASHAR0001803