enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the Ghost Gunner

*Michelle Groskopf*

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

*Michelle Groskopf*

WASHAR0001804

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire online community of DIY gunmakers. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in

WASHAR0001805

doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of 3-D-printable semiautomatics who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called Crypto Wars of the 1990s. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance. he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, Daniel Bernstein, sued the government with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch

WASHAR0001806

to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server

rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era where Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in

advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

---

## More Great WIRED Stories

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is really *really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
**Official**
**UNCLASSIFIED**

WASHAR0001809

# BLANKROME

717 Texas Avenue | Suite 1400 | Houston, TX 77002
blankrome.com

| | |
|---|---|
| *Phone:* | *(713) 632-8696* |
| *Fax:* | *(713) 228-6605* |
| *Email:* | *dcabello@blankrome.com* |

July 24, 2018

**<u>Via Hand Delivery</u>**

The Honorable Robert Pitman
United States District Court for the
Western District of Texas
501 West 5th St., Suite 5300
Austin, TX 78701

           Re:    *Defense Distributed et al v. United States Department of State et al.,*
                  (Case No. 15-CV-00372-RP).

Dear Judge Pitman:

      We write on behalf of the Brady Center to Prevent Gun Violence ("Brady Center"), Everytown for Gun Safety ("Everytown"), and Giffords Law Center to Prevent Gun Violence ("Giffords"), the leading organizations dedicated to the prevention of gun violence in America.

      We submitted an *amicus curiae* brief in the Fifth Circuit appeal in this matter on behalf of the Brady Center, and the Court's opinion invited us to remain involved as follows:

> The amicus briefs submitted in this case were very helpful and almost all supported Plaintiff-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016).

      Earlier this month, Giffords and the Brady Center submitted public comments on proposed rule changes by the State and Commerce Departments that would deregulate the posting of blueprints for the production of 3D printed guns like that planned by Defense Distributed here.[1]

---

[1] Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), available at http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf. A copy of both comments is attached as **<u>Exhibit A.</u>**

WASHAR0001810

BLANKROME

July 24, 2018
Page 2

Giffords and Brady expressed concern that the proposed rules would not adequately protect the nation's national security, foreign policy and anti-terrorism interests, and also questioned whether the proposed rules adequately addressed around the contemplated changes. Giffords noted in particular that the proposed changes would "result in an increase in the number of untraceable firearms" made with "3D printing technology" and questioned the effect of the proposed changes on this ongoing litigation.

We respectfully submit this letter to bring to the Court's attention the troubling, dangerous, time-sensitive, and potentially illegal terms of the settlement agreement recently executed by the parties. Immediately upon learning about the settlement, Everytown and the Brady Center submitted Freedom of Information Act ("FOIA") requests to the Department of Justice and the Department of State for additional information about the settlement and the surrounding circumstances. Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions. The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world. These are the very concerns which prompted the government's intervention in the first place.

We appreciate the unusual nature of this letter and wish to advise that we are working diligently to take legal action in this Court, including seeking immediate injunctive relief. We intend to do so by July 26, 2018. In this regard, as this Court may be aware, pursuant to the now-public settlement agreement in this matter, plaintiff Defense Distributed intends to make all of its firearms-related Computer Assisted Design ("CAD") files available via its website within a matter of days, by August 1, 2018, if not sooner. It is highly unlikely that the Government will provide any additional documents regarding this settlement pursuant to the Brady Center's FOIA requests before the parties implement the key terms of this settlement. Given the extremely short time frame and the potentially significant and permanent impact to national security and public safety of making the CAD files available online, we feel compelled to bring this issue to Your Honor's attention as soon as practicably possible, so that this Court has the opportunity to take any steps it deems proper to see that justice is done while this matter is still pending, *see* Fed. R. Civ. P. 1, including but not limited to calling the parties in to discuss the issues laid out below.

Background

As this Court is aware, the plaintiffs filed this action in 2015, seeking, *inter alia*, an injunction to prevent the government from barring Defense Distributed's export of CAD files. These files "directly facilitate the manufacture of weapons" through "automated processes."

BLANKROME

July 24, 2018
Page 3

<u>Defendants' Motion to Dismiss Second Amended Complaint</u> at 1,9, filed Apr. 6, 2018 (ECF No. 92). The Government strenuously objected to the plaintiffs' request for an injunction, arguing that it was "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." <u>Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction</u>, filed June 10, 2015 (ECF No 32). Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests. The Fifth Circuit upheld this Court's ruling, *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016), and the Supreme Court denied the Plaintiffs' petition for a writ of certiorari earlier this year. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

After the Supreme Court denied cert, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018. *See* ECF Nos. 77, 88 and 90. On April 6, 2108, the Government filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." <u>Motion to Dismiss</u> at 3,7 (ECF No. 92). The Government told this Court that:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability.

*Id.* at 1.

Mere weeks after the Government stressed to this Court the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority." <u>Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement</u> filed Apr. 30, 2018 (ECF No. 93). According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they

BLANKROME

July 24, 2018
Page 4

wanted."[2]  On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018."  (ECF No. 95).

The settlement agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the plaintiffs.[3]  What appears to be an accurate copy of the agreement is now available on the internet.[4]  A copy of the posted agreement is attached hereto as **Exhibit B.**

Pursuant to the Settlement Agreement, in consideration for the plaintiffs' dismissing the action, the Government has agreed to:

a.  "[C]ommit[  ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

b.  "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action.  The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

c.  "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD DFiles are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

---

[2]     Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018*), available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[3]     *See e.g.,* Greenberg, *supra* n.1; Josh Blackman, "DOJ, Second Amendment Foundation Reach Settlement in Defense Distributed Lawsuit," Josh Blackman's Blog (Jul. 10, 2018), *available at* http://joshblackman.com/blog/2018/07/10/doj-second-amendment-foundation-reach-settlement-in-defense-distributed-lawsuit/.

[4]     *See* "Settlement Agreement," https://www.exportlawblog.com/docs/Defense%20Distributed%20Settlement%20Agreement.pdf ; Alexander Bosch, "The Daily Bugle Weekly Highlights: Week 28 (9-13 Jul 2018), Full Circle Compliance, https://fullcirclecompliance.eu/the-daily-bugle-weekly-highlights-week-28-9-13-jul-2018/.

BLANKROME

July 24, 2018
Page 5

      d.   "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

      e.   Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

      Pursuant to the terms of the Settlement Agreement, counsel for the Government is prohibited from filing a stipulation of dismissal with this Court any earlier than 5 business days after announcement of the "temporary" modification to the USML Category I list and issuance of a letter to the plaintiffs that their files are approved for public release in any form and exempt from ITAR. *Id.* ¶ 2. In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018. This timing is critical because Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018. *See* https://defdist.org/ ("The age of the downloadable gun formally begins.").

      In addition to previously posted files for making firearms, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons."[5] Throughout the litigation, Defense Distributed has "developed a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s."[6] The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable."[7] The database of blueprints "will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines."[8] According to Wilson: "What's about to happen is a Cambrian explosion of

---

[5]     Greenberg, *supra* at n. 1.

[6]     Deanna Paul, "Meet the man who might have brought on the age of 'downloadable guns,'" Washington Post (July 18, 2018), available at https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.725b8a04f11a.

[7]     Greenberg, *supra* at n.1. (emphasis added)

[8]     *Id.*

BLANKROME

July 24, 2018
Page 6

the digital content related to firearms."[9] He says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."[10]

As promised, on May 24, 2018, the Government published notices of proposed rulemaking by the State and Commerce Departments, which would remove plaintiffs' data from the USML Category I list.[11]  Neither notice mentions Defense Distributed or the role that the Settlement Agreement played in promulgation of the notices. The public comment period for both notices concluded on July 9, 2018, the day before the plaintiffs in this action went public with the Settlement Agreement.[12]

<u>Discussion</u>

Under the Administrative Procedure Act ("APA"), final agency action may be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Here, the Government's sudden and complete about-face on the national security and national defense implications in this case raises numerous questions as to APA and other potential violations of law.  We summarize just a few of the most urgent potential violations here which will be elaborated upon in further detail in our forthcoming legal submissions and request for immediate injunctive relief.

First, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Here, there is nothing contained in either the Settlement Agreement or the proposed rules explaining why the Government no longer believes that firearms manufactured from the plaintiffs' CAD files "could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons."   <u>Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction</u>, filed June 10, 2015 (ECF No 32).

---

[9]      *Id.*

[10]     *Id.*

[11]     International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 83 Fed. Reg. 24198 (proposed May 24, 2018) (to be codified at 22 C.F.R. 121, 123, 124, 126, and 129); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the USML, 83 Fed. Reg. 24166 (proposed May 24, 2018) (to be codified at 15 C.F.R. 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774).

[12]     *Id.*

BLANKROME

July 24, 2018
Page 7

In addition, the Government's promise of a "temporary modification" as of July 27, 2018 to exempt Defense Distributed's data from the Category I list, while the revised proposed rule is pending, is deeply troubling. As the Government is surely aware, when it comes to the internet, there is no such thing as "temporary." Once the files are available for download online, the damages to national security concerns will be irreparably done. Thus, even if the State Department and Commerce Department ultimately decide not to promulgate the new proposed regulations, all of Defense Distributed's files will already be in the public domain. In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, the government may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. In short, this is for all practical purposes "final agency action" which makes this action subject to challenge now. As Congressman Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), recently noted: "it stretches credulity to believe that release of this information is in the U.S. interest."[13]

Furthermore, the AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Rep. Engel, notice of the terms of the settlement have not been provided to the House Committee by the President or the State Department.[14]

Additionally, the settlement agreement raises serious questions as to whether it is "in accordance with law" because it can be read to authorize violation of multiple provisions of the federal Gun Control Act, 18 U.S.C. § 921 *et seq.* Provision 1(d) of the Settlement Agreement purports to permit "any United States person" to "use, reproduce, or otherwise benefit from" the Defense Distributed files. If a minor, felon, domestic abuser or an individual who has been adjudicated mentally incompetent "uses" or "otherwise benefits" the files by possessing or manufacturing firearms, then the Gun Control Act is violated (as well as innumerable similar state

---

[13]    Engel Decries State Department Policy to Allow 3-D Gun Printing, Press Release (July 20, 2018), available at https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

[14]    *Id.*

BLANKROME

July 24, 2018
Page 8

laws). *See, e.g.,* 18 U.S.C. §§ 922(x)(2) and 922(g) (prohibiting categories of person from possessing a firearm). The State Department of course has no power to override the mandates of a federal criminal statute.

These are just a few of the many troubling potential APA and other legal violations that may have occurred in connection with the settlement of this matter.

<u>Conclusion</u>

We are aware that under ordinary circumstances, a settlement agreement resulting in a voluntary stipulation of dismissal is not subject to review or inquiry by the Court. However, this settlement is far from ordinary. It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order. It is also, we believe, illegal. For these reasons, the undersigned attorneys are currently exploring legal action asserting that the Settlement Agreement violates the Administrative Procedure Act, the Arms Export Control Act, the International Traffic in Arms Regulations, the Gun Control Act, and the Separation of Powers required by the United States Constitution. However, given the short time frame before Defense Distributed's repository is set to go live, we urge this Court to consider calling the parties before it to explain these extraordinary, dangerous and potentially unlawful developments. As noted, we intend to file legal papers and a request for immediate injunctive relief.

BLANKROME

July 24, 2018
Page 9

Respectfully submitted,

BLANK ROME LLP
J. David Cabello
Texas Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
(713) 632-8696

John D. Kimball
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

cc:    Alan Gura (counsel for Plaintiff) (Via E-mail)
David S. Morris (counsel for Plaintiff)
Joshua Michael Blackman (counsel for Plaintiff)
W. Thomas Jacks (counsel for Plaintiff)
William Mateja (counsel for Plaintiff)
Eric J. Soskin (counsel for Defendants)
Stuart Justin Robinson (counsel for Defendants)

WASHAR0001818

# **Exhibit A**

WASHAR0001819



July 9, 2018

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

Director of Defense Trade Controls
U.S. Department of State
DDTCPublicComments@state.gov

AND
Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230

RE: Docket Nos. DOS-2017-0046, BIS-2017-0004

**ITAR Amendment -- Categories I, II, and III and Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

This comment is submitted on behalf of Giffords and Giffords Law Center ("Giffords") in response to the Proposed Rules published by the Departments of State and Commerce on May 24, 2018 regarding the classification and administration of exports of certain firearms and ammunition. The Proposed Rules are complex and would represent a dramatic change in the regulatory structure governing firearm exports. We are concerned that the Proposed Rules may not adequately address our national security, foreign policy, international crime, or terrorism threats.  In sum, we are concerned about potential loss of life.  We also believe the Proposed Rules do not adequately address the need for transparency so Congress and the public may understand the impact of these Rules on potential weapons exports.

Giffords is committed to advancing common-sense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington, DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, participate in critical gun-violence-prevention litigation, and educate the public on the proven solutions that reduce gun violence.

WASHAR0001820



## THE PROPOSED RULES APPEAR DRIVEN BY THE INTERESTS OF THE GUN INDUSTRY

Even the National Rifle Association (NRA) admits that the Proposed Rules were drafted with "the goal of increasing U.S. manufacturers' and businesses' worldwide competitiveness." These Rules are "designed to enhance the competitiveness of American companies in the firearms and ammunition sectors," allowing firearms and ammunition "to be subject to a more business-friendly regulatory climate."[1]

We are concerned that the Proposed Rules elevate the desire of American gun manufacturers to compete with international arms dealers over the danger that exported firearms will contribute to international gun crime and violence. The United States must not prioritize gun industry profits over human lives.

## THE PROPOSED RULES WILL DRAMATICALLY CHANGE THE LAW, RISKING NEW LOOPHOLES

We are concerned that the Proposed Rules, by shifting firearms and ammunition from the United States Munitions List (USML) to the Commerce Control List (CCL), would weaken oversight over exports of these items. As even the NRA has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly," whereas regulation under the CCL "is more flexible." The NRA has also admitted that license applications for items on the USML are subject to "more stringent vetting" than items on the CCL.[2]

The Departments of State and Commerce, in drafting the Proposed Rules, have made some efforts to ensure that exports of firearms and ammunition will still be subject to oversight. But the dramatic nature of the proposed changes, and the complexity of the Proposed Rules raise serious concerns about hidden loopholes. Some areas of potential concern include:

- Congressional notification and the methods for Congress to disapprove of proposed firearm exports;
- The extent to which the Commerce Department monitors the end-users of its products; and the extent to which Congress and the public have access to information about the results of this monitoring;
- The online posting of designs for the production of firearms, and their use in the 3D printing of untraceable firearms;
- Firearms training provided to foreign security forces;
- The reporting of political contributions by gun exporters and related entities;
- The Commerce Department's bandwidth to properly oversee these exports; and
- The regulation of brokers who act as middlemen in firearms transactions, and the threat that firearms will be diverted by these middlemen to violent ends.

---

[1] National Rifle Association, *Trump Administration's Proposed Rulemakings a Win-Win for America's Firearms Industry, National Security*, https://www.nraila.org/articles/20180525/trump-administration-s-proposed-rulemakings-a-win-win-for-americas-firearms-industry-national-security

[2] Ibid.

WASHAR0001821



According to the State Department's Proposed Rules, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." This statement seems to directly contradict the statement in the Commerce Department's Proposed Rules that "BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by the proposed rule." The Commerce Department later clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR." While we recognize that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.

We are also particularly concerned that these changes will result in an increase in the number of untraceable firearms in circulation. As 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements increases. Under current law, the proliferation of 3D printed firearms is held in check by the Fifth Circuit's decision in *Defense Distributed v. U.S. Dep't of State*,[3] which upheld the State Department's decision that the posting of online data for the 3D printing of firearms fell within the USML. The Proposed Rules would throw that determination into question.

Inadequate gun safety laws cost human lives. When gun purchasers are not properly vetted and laws against gun trafficking are not properly enforced, guns often fall into the wrong hands and are used to perpetrate horrendous crimes and violence. The U.S. experiences this loss of life on a daily basis, with over 90 people killed each day.  We do not wish to see a similar effect on an international level from the weakening of our laws regarding gun exports.

### THIS CHANGE LACKS SUFFICIENT CONGRESSIONAL NOTIFICATION REQUIREMENTS

We have not seen anything in the Proposed Rules that would continue Congressional notification requirements for any of the Category I firearms that are being moved to the CCL. There are several types of sales controlled under the Arms Export Control Act that require Congressional notification. Under current law, a certification must be provided to Congress prior to the granting of any license or other approval for transactions involving the export of a firearm controlled under Category I of the USML in an amount of $1 million or more.[4] Congress then has the ability to enact a joint resolution prohibiting the export, which would prevent the State Department from licensing the sale. Congress generally is given 15 days or 30 days to review the transaction before a license can be granted, depending on the items being exported and the

---

[3] 838 F.3d 451 (5th Cir. 2016).
[4] See 22 U.S.C. § 2776, 22 C.F.R. 123.15(a)(3).

WASHAR0001822



country to which it is being exported. While there are Congressional notification requirements for certain products that are controlled under the CCL, it seems that such notification requirements would not be as broad that as under the USML.

Congress should continue to receive advance notification of transactions involving firearms and to have the opportunity to prohibit these exports when appropriate. The Proposed Rules should be strengthened to protect Congress's authority in this area.

## THE CHANGE MAY RESULT IN LESS TRANSPARENT END-USE MONITORING

We are concerned about a possible reduction in the monitoring of the end-users of exported firearms and publicly available information about this monitoring. The State Department currently monitors the end-users of firearm exports through its Blue Lantern program. Public reporting of Blue Lantern information is mandatory[5] and there are readily available statistics about the results. While the Commerce Department also conducts end use monitoring, there does not appear to be as fulsome a public reporting requirement for these end use checks as under the Blue Lantern program.

The Proposed Rules do not discuss end use monitoring of the items being moved to the CCL. It is reasonable to assume that these items will fall under the general Bureau of Industry and Security end use check program. This end use check program is not as well-publicized or as formal as the Blue Lantern program, and only a very small percentage of exported items are reviewed. If the Proposed Rules move forward, this program must be strengthened to address the need to monitor the end-users of exported firearms and provide the public with information about the results.

## THIS CHANGE IGNORES THE MILITARY NATURE OF MANY FIREARMS

The Proposed Rules are based on an assumption that automatic firearms are designed for and used by the military, and semiautomatic firearms are not "inherently military." This is inaccurate. Consequently, we question the President's determination that semiautomatic firearms and ammunition no longer warrant control under the USML.

In fact, members of the U.S. armed forces routinely use firearms in semiautomatic mode in combat conditions, and the designs of many semiautomatic firearms are inherently military. Assault rifles like the AR-15 were originally designed for military use. Earlier models included a selective fire option that allowed service members to switch easily between automatic and semiautomatic modes. The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in

---

[5] 22 U.S.C.§§ 2785, 2394, 2394-1a

WASHAR0001823



semiautomatic mode. Shooting in semiautomatic mode is more accurate and hence more lethal.[6] In fact, some members of the military use the semiautomatic mode exclusively.

The fact that some gun enthusiasts "enjoy" shooting these weapons and have labeled this activity "modern sport shooting" or "tactical shooting" does not change the design or purpose of these firearms or the danger they pose in civilian hands. The horrendous rise in mass shootings our country has suffered and the frequency with which these firearms are used in these shootings testify to this danger.

Military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. Because of the dangerous nature of these weapons, D.C. and seven states, including the populous states of California and New York, ban them.[7] Because of the military nature and serious lethality of these weapons; they belong on the USML.

## THERE ARE ALTERNATIVES TO THE PROPOSED RULES THAT HAVE NOT BEEN EXPLORED

The real concern that seems to be driving this significant change in the way the U.S. government regulates firearms exports is that firearms and ammunition manufacturers are currently required to register with the State Department and pay a registration fee. According to the NRA, "Any business that manufactures an item on the USML, or even just a part or component of such an item, also has to register with the State Department and pay an annual fee, which is currently set at $2,250. This registration is required even if the manufacturer has no intent to ever export the items. ... Manufacturers of items on the CCL, or their parts or components, do not have to pay an annual registration fee to the Commerce Department."[8]

The registration fee appears to be the NRA's primary concern with the current system for regulating the export of firearms and ammunition. The simple solution to this problem might be to waive the fee for manufacturers who do not, in reality, export these items. Waiving the fee would relieve industry of this "burden" without undoing the important policy choices made by the State Department in the regulation of these exports or requiring the Commerce Department to "reinvent the wheel" with respect to these regulations. While we would not necessarily support this proposal (it might shift the costs of manufacturer

---

[6]With AR-15s, Mass Shooters Attack With the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html.

[7] See Giffords Law Center to Prevent Gun Violence, *Assault Weapons* at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/.

[8] National Rifle Association, *supra*.

WASHAR0001824



registration to the taxpayers), we urge the Administration to carefully and thoroughly consider other alternatives to the Proposed Rules.


Sincerely,

Lindsay Nichols
Giffords Federal Policy Director


**ABOUT GIFFORDS LAW CENTER**

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

WASHAR0001825



Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

*Filed via email to DDTCPublicComments@state.gov; electronically via
http://www.regulations.gov*

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are
national leaders in strengthening, supporting and expanding gun laws, policies, and practices in
the United States.  Our complimentary missions are to significantly decrease the number of gun
deaths and injuries in America.  We achieve this by amplifying the voice of the American public;
changing social norms through public health and safety programs; and holding the gun industry
accountable for dangerous and irresponsible practices and products.[1]  These comments are
submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use
and transfer of legal firearms within and outside of the United States by advocating for
appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate
of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and
Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"),
which seek comments on the transfer of certain firearms and related items from the International
Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export
Administration Regulations' ("EAR") Commerce Control List ("CCL").   In particular, the
Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms,
including those used by the military, (along with their components and ammunition) from USML
Categories I, II, and III, where they are classified as significant military equipment, to the CCL,
where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the
military (and related items) from the stringent control of the USML to the more permissive regime
administered by the Commerce Department would be contrary to Congressional intent and would
undermine U.S national security interests, international stability and the protection of human
rights.  We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see www.bradycampaign.org.

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale. The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms. The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers. Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change. Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict. In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions. Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates. In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight. To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale. As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors. Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States. The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

WASHAR0001827

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

**1.  Types of Firearms that Would be Released from State Department Control**

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction.  For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
| --- | --- | --- |
| • M40A5 (used by US Marines)<br>• M24 (used by US Army) | • L115A3 (used by UK Armed Forces)<br>• Barrett M82 (used by multiple armies including US) | • Knight's Armament M110 (used by US Army) |
| **Sidearms Used by Armed Forces** | | |
| • Sig Sauer XM17 and XM 18 pistols (used by US Army)<br>• Glock M007 (Glock 19M) pistol (used by US Marines) | • Heckler & Koch Mk 23 pistol (used by US Special Forces) | • SIG Sauer Mk 25 (used by Navy Seals) |
| **Semi-automatic Assault Rifles** | | |
| • Bushmaster XM15 (AR-type rifle)<br>• Daniel Defense M4A1 rifles (AR-type rifle)<br>• IWI TAVOR<br>• Kalashnikov KR-9 (AK-type rifle) | • Kel-Tec Sub-2000<br>• Mossberg MMR Tactical rifles (AR-type rifle)<br>• POF USA P415 (AR-type rifle) | • SIG Sauer MCX rifles<br>• SKS assault rifle (predecessor to the AK-47)<br>• Sturm, Ruger & Co. AR-556 rifles (AR-type rifle) |
| **Semiautomatic Assault Pistols** | | |
| • Bushmaster SquareDrop pistol<br>• CZ Scorpion pistol | • CORE Rifle Systems Core 14 Roscoe pistol<br>• Daniel Defense MH18 pistol | • PAP M92 pistol |

3

WASHAR0001828

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers.  They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military.  Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

**2.  The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR**

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export.  Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments." AECA § 1.  In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest." EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making.  The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security.  Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review.  Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions.  The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

4

WASHAR0001829

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors.  Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses.  It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

**3.** **The Firearms at Issue are not Widely Available for Commercial Sale**

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3]  The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public.  Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed.   Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons.  By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] *Id.*

[5] *Id.*

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, *Small Arms Survey* (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

WASHAR0001830

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

**4.** **Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements**

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

**5.** **The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight**

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b).  This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

WASHAR0001831

items and any related steps that will be taken to confirm compliance with the ITAR.  The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary.  In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities.  Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government.  As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

### **6.** **Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements**

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress.  This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more."  *See* ITAR § 123.15(a)(3).  The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11]  Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests.  For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors.  Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns.  In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns.  This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5.  "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules. *See* EAR §§ 743.5.; 772.1.

WASHAR0001832

**7.   The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS. *See* EAR § 734.3(b)(3). Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical. In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR. In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS. If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code. However, while the EAR control certain technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls. *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR. *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**8.   The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

WASHAR0001833

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency. Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS). This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment. While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation. The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous. Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations. This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation. Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales. It is through this method that approximately at least one in five guns are sold in the United States today without a background check. Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports). While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States. Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

**9. The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies. The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial. As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

WASHAR0001834

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content. *See* EAR § 734.4.  Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR.  Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product.  With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1.  However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR.  As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines.  Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction.  This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy.  Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.

WASHAR0001835

# Exhibit B

WASHAR0001836

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0001837

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0001838

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0001839

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0001840

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement
     of Plaintiffs and Defendants entered into in good faith, and no statement, remark,
     agreement or understanding, oral or written, which is not contained therein, shall be
     recognized or enforced. Plaintiffs acknowledge and agree that no promise or
     representation not contained in this Settlement Agreement has been made to them and
     they acknowledge and represent that this Settlement Agreement contains the entire
     understanding between Plaintiffs and Defendants and contains all terms and conditions
     pertaining to the compromise and settlement of the disputes referenced herein. Nor does
     the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose
     other than the desire of the Parties to reach a full and final conclusion of the Action, and
     to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an
     instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof
     be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the
     benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,
     assigns and personal representatives, including any persons, entities, departments or
     agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0001841

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0001842

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0001843

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001844

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.   *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

   (a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

   (b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0001846

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0001847

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.  *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0001848

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0001849

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
      Settlement Agreement with their counsel, who has explained these documents to them
      and that they understand all of the terms and conditions of this Settlement Agreement.
      Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
      the contents thereof, and execute this Settlement Agreement of their own free act and
      deed. The undersigned represent that they are fully authorized to enter into this
      Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,
      each of which shall be deemed an original, and all of which together constitute one and
      the same instrument, and photographic copies of such signed counterparts may be used in
      lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
      drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
      requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
      Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
      state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0001850

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0001851

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _____, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _____, 2018

_____
Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001852

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,  §
    Plaintiffs,  §
      §
v.  §     No. 1:15-cv-372-RP
      §
U.S. DEPARTMENT OF STATE, et al.,  §
    Defendants.  §

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.

Dated: June 29, 2018          Respectfully submitted,

Matthew Goldstein
D.C. Bar No. 975000*
Snell & Wilmer LLP
One South Church Ave., Ste. 1500
Tucson, Arizona 85701
520.882.1248 / Fax 520.884.1294
mgoldstein@swlaw.com

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314

ERIC J. SOSKIN
Pennsylvania Bar No. 200663
Senior Trial Counsel

1

703.835.9085/Fax 703.997.7665

alan@guraplic.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

2

WASHAR0001854

# Exhibit C

WASHAR0001855

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0001856

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0001857

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0001858

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

WASHAR0001859

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0001860

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
    Settlement Agreement with their counsel, who has explained these documents to them
    and that they understand all of the terms and conditions of this Settlement Agreement.
    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
    the contents thereof, and execute this Settlement Agreement of their own free act and
    deed. The undersigned represent that they are fully authorized to enter into this
    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,
    each of which shall be deemed an original, and all of which together constitute one and
    the same instrument, and photographic copies of such signed counterparts may be used in
    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0001861

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.    *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0001862

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018


Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018


Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001863

# Exhibit B

WASHAR0001864

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON,<br><br>    Plaintiffs,<br><br>BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., and GIFFORDS,<br><br>    Plaintiffs-Intervenors,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS,<br><br>    Defendants. | CIVIL ACTION NO: 1:15-cv-372-RP |

## COMPLAINT IN INTERVENTION

WASHAR0001865

Plaintiffs-Intervenors Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc., and Giffords (hereinafter "Intervenors") submit this Complaint in Intervention and allege, upon information and belief, the following:

## INTRODUCTION

1.    "At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." Defendants' Motion to Dismiss Second Amended Complaint at 1, filed Apr. 6, 2018 (ECF No. 92) ("Motion to Dismiss").

2.    Defense Distributed develops Computer Aided Design ("CAD") files for the purpose of enabling anyone to automatically manufacture guns on 3-D printers. The company's stated objective is to ensure global, unrestricted access to firearms by postings its files online. Due to the Government's recent about-face in this case, Defense Distributed is set to do just that:



WASHAR0001866

3.      According to the Government's previous submissions to this Court, making Defense Distributed's CAD files "available online through unrestricted access to the Internet would provide any [terrorist organization] with defense articles, including firearms, at its convenience, subject only to its access to a 3D printer, an item that is commercially available. Terrorist groups and other actors could then potentially manufacture and use such weapons against the United States or its allies." Declaration of Lisa V. Aguirre, ¶ 35(b), Exhibit A to Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF Nos. 32, 32-1) ("Aguirre Decl.").

4.      As recently as April of this year, the Government stressed to this Court the potentially devastating national security implications if Defense Distributed's files were made available online.  The Government represented to this Court that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3,7.

5.      However, mere weeks after the Government urged this Court to dismiss this lawsuit citing the national security concerns raised by the possibility of foreign nationals or terrorists acquiring the Plaintiffs' CAD files, they offered a settlement agreement to the Plaintiffs (the "Settlement Agreement") which gave the Plaintiffs everything they asked for, and more.

6.      Pursuant to the terms of the Settlement Agreement, in exchange for dismissing the lawsuit, the Government has agreed to: (i) draft and fully pursue a notice of rulemaking and a final rule to remove the files at issue from the jurisdiction of the International Traffic in Arms Regulations ("ITAR"); (ii) temporarily modify Category I of the United States Munitions List

- 3

("USML") to exclude the files at issue from ITAR; (iii) issue a letter to the Plaintiffs that their files are exempt from ITAR; (iv) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue; and (v) pay the Plaintiffs almost $40,000.

7.      As a direct consequence of the Settlement Agreement, Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018. According to news reports, in addition to the older gun models, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons." "The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable." According to Wilson: "What's about to happen is a Cambrian explosion of the digital content related to firearms." Wilson says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."



WASHAR0001868

8.      The Government entered into the Settlement Agreement in contravention of the statutes and regulations which govern the export designation process.  Among other things, upon information and belief, the State Department: (i) has not provided the relevant Congressional committees with the 30 days-notice to "temporarily" modify the munitions lists; (ii) has not received the concurrence of the Secretary of Defense to "temporarily" change the designation of the files at issues; and (iii) has not followed established commodity jurisdiction procedures before agreeing to temporarily exempt the CAD files at issue from ITAR.

9.      The "temporary modification" of USML Category I is especially troubling because it involves making Defense Distributed's files available on the internet, which largely overrides the later need to formally modify the relevant rules.  Moreover, the Settlement Agreement covers not only the files that were developed by Defense Distributed at the beginning of this litigation, but also new files that have been developed since that time – which the Government has presumably not even seen.

10.     In addition, the Government has acted in an arbitrary and capricious manner, and has abused its discretion, by (i) failing to consider evidence relevant to ITAR jurisdiction over the CAD files; (ii) drastically changing long-established practice and policy without any explanation; and (iii) failing to study the national security implications of exempting the CAD files from ITAR.  The Settlement Agreement does not make any reference whatsoever to a determination by the Government regarding the national security implications of the agreement.

11.     Tellingly, even the notices of proposed rules, which the Departments of State and Commerce published on May 24, 2018 to amend the ITAR, make no mention of the dangers posed by the files falling into the hands of terrorist organizations, insurgent groups, transnational organized criminal organizations, or states subject to the U.S. or U.N. arms embargoes.

WASHAR0001869

12.     For all these reasons, and others detailed below, the Government Defendants have violated the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers.   This complaint seeks to declare the Settlement Agreement invalid, and to enjoin the Plaintiffs and Government Defendants from giving effect to the agreement, to the extent it  permits Defense Distributed to make its files available online.

## JURISDICTION AND VENUE

13.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 2201 and 2202.

14.     Venue is premised on the principal place of business for Plaintiff Defense Distributed, which is located within the Western District of Texas.

## PARTIES

15.      Plaintiff Defense Distributed is a Texas corporation, whose principal place of business is located in Austin, Texas.  Defense Distributed develops CAD files to enable anyone to automatically manufacture firearms on 3-D printers.  The company also manufactures and sells a "computer-controlled milling machine" called the "Ghost Gunner," which is "designed to allow its owner to carve gun parts out of [  ] aluminum."  Defense Distributed is a party to the Settlement Agreement.

16.     Defense Distributed was started by Cody Wilson, a self-proclaimed anarchist, who believes that "governments should live in fear of their citizenry."  The company's objective is for everyone in the world to have access to guns and to make gun regulations impossible. After publicizing the Settlement Agreement, Wilson said that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun Control."

- 6

WASHAR0001870

17.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington.  It is a party to the Settlement Agreement.  In a press release announcing the settlement, SAF founder Alan M. Gottlieb declared it to be "a devastating blow to the gun prohibition lobby[.]"

18.     Upon information and belief, Conn Williamson is a natural person and a citizen of the United States and the State of Washington.  He is a party to the Settlement Agreement.

19.     Defendant the United States Department of State  ("State Department") is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act ("AECA").   The State Department is a party to the Settlement Agreement in this case.

20.     Defendant Michael R. Pompeo is sued in his official capacity as the Secretary of State.  In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.   The Secretary of State is a party to the Settlement Agreement in this case.

21.     Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR. The DDTC is a party to the Settlement Agreement in this case.

22.     Plaintiff-Intervenor the Brady Campaign to Prevent Gun Violence ("The Brady Campaign") is a nation-wide gun violence prevention organization with members spread across all fifty states and the District of Columbia, and established membership groups in Austin, TX and Houston, TX. The Brady Campaign is headquartered in Washington, DC and was founded in

- 7

WASHAR0001871

1974 as the National Council to Control Handguns. The Brady Campaign took its current name in 2001, in honor of former White House Press Secretary Jim Brady, who was shot during the assassination attempt on Ronald Reagan, and his wife Sarah Brady.

23.    The Brady Campaign seeks a safer future for every American where hundreds of gun injuries and deaths a day are no longer normal. It focuses on three impact-driven solutions to further its mission of reducing gun deaths: 1) Strengthening gun laws, with a particular focus on the national background check system; 2) reducing the flow of crime guns to urban communities most impacted by gun violence; and 3) meaningfully communicating to gun owners about the dangers of loaded, unlocked guns in the home. The Brady Campaign's sister organization, The Brady Center to Prevent Gun Violence, is a non-profit organization dedicated to reducing gun violence through education, research, and direct legal advocacy on behalf of victims and communities affected by gun violence.  It filed an amicus brief in this case on February 18, 2016. In addition, the Brady Campaign and Brady Center submitted comments to the proposed rule changes implicated in the Settlement Agreement. The Brady Campaign also filed a Freedom of Information Act request with the federal government immediately upon learning of the Settlement Agreement.

24.    Plaintiff-Intervenor Everytown for Gun Safety Action Fund, Inc. is a nation-wide gun violence prevention organization, with members spread across all fifty states.  Everytown is headquartered in New York, NY. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Connecticut.  Currently, the mayors of 8 Texas cities are part of the Mayors Against Illegal Guns

WASHAR0001872

coalition. Everytown and its members and supporters work in all 50 states and in Congress to support the passage and enforcement of gun safety laws that, among other things, help keep guns out of the hands of prohibited persons and other individuals with dangerous histories and help law enforcement apprehend and prosecute those who violate U.S. and state gun laws. Immediately upon learning of the Settlement Agreement in this case, Everytown submitted a federal Freedom of Information Act request seeking disclosure of documents pertaining to the settlement.

25.     Plaintiff-Intervenor Giffords is a 501(c)(4) gun violence prevention organization founded by former Congresswoman Gabrielle Giffords and her husband, Captain Mark Kelly, a retired Navy combat veteran and NASA astronaut. Headquartered in Washington, D.C., Giffords researches, writes, and proposes policies that make Americans safer and mobilizes voters and lawmakers in support of safer gun laws. Its mission is to address the issue of gun violence in communities across the country, and to that end, Giffords works to affect legislation, shape the national dialogue, and reduce gun violence. Since its founding after the Sandy Hook Elementary School shooting in Newtown, Connecticut, Giffords has been involved in the passage of more than 200 new strong gun laws in 45 states and Washington, D.C.

26.     Giffords and its sister 501(c)(3) organization, Giffords Law Center to Prevent Gun Violence, recently submitted public comments on the proposed rule changes by the State Department and Commerce Department that would deregulate the publication of computerized blueprints for the production 3D printed guns. In that comment, Giffords opined that the proposed changes "would represent a dramatic change in the regulatory structure governing firearm experts," and that they "may not adequately address our national security, foreign policy, international crime, or terrorism threats," and expressed concern that the changes "will result in

WASHAR0001873

an increase in the number of untraceable firearms in circulation." *See* Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), *available at* http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf.

## FACTS

### The Statutory and Regulatory Framework

27.     The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. 22 U.S.C. § 2751.

28.     Under the AECA, "[t]he President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). Items designated as defense articles or services constitute the United States Munitions List ("USML"). *Id.* at § 2778(a)(1). Category I of the USML lists articles, services, and related technical data for "Firearms, Close Assault Weapons and Combat Shotguns."

29.     Among other things, Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(I)(a). "Technical data" is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a). Technical data includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation," and exempts information already in the public domain, as defined in Section 120.11. *Id.* § 120.10.

WASHAR0001874

30.     "[T]he 'technical data' provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML.  Such export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly.  Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR."  Aguirre Decl. ¶ 14.

31.     Pursuant to Executive Order 13637, the President has delegated his AECA authority to the State Department.  In turn, the State Department has promulgated the ITAR, which is administered by the DDTC.  *See* 22 C.F.R. §§ 120-130. Among other things, the DDTC is tasked with maintaining, reviewing and clarifying the USML.

32.     Pursuant to Executive Order 13637, §1(n), "[d]esignations including changes in designations, by the Secretary of items or categories that shall be considered as defense articles and defense services subject to export control under section 38 ( 22 U.S.C. 2778) shall have the concurrence of the Secretary of Defense."

33.     In addition, the Executive Branch must give notice to the International Relations Committee of the House of Representatives and to the Committee on Foreign Relations of the Senate at least 30 days in advance of removing an item from the USML.  22 U.S.C. § 2778(f)(1).  Such notification must be made in accordance with the procedures applicable to reprogramming notifications under § 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1].  *Id.*

WASHAR0001875

34.     ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation.  However, it may do so only "in the interest of the security and foreign policy of the United States."  22 C.F.R. § 126.2.

35.     For situations where there is doubt that a particular item to be exported falls on the USML, ITAR contains a commodity jurisdiction "CJ" procedure.  22 C.F.R. § 120.4.  Upon written request, the DDTC will provide a determination as to whether a certain item, service, or data is within the scope of ITAR.  *Id.*

36.     The "CJ" determination "entails consultation among the Department of State, Defense, Commerce and other U.S. Government agencies and industry in appropriate cases."  *Id.*  Assessments are made on a case-by-case basis, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application.  *Id.*  A determination made pursuant to the commodity jurisdiction process takes into account "(i) [t]he form and fit of the article; and (ii) [t]he function and performance capability of the article."  Aguirre Decl. ¶ 20.

37.     22 C.F.R. § 120.4(f) requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures.  State shall notify Defense and Commerce of the initiation and conclusion of each case."

***The Computer Files at Issue***

38.     In or around early May 2013, Defense Distributed posted a number of CAD Files on DefCad.org, a website it created to serve as an open-source repository for weapons designs, including data to automatically manufacture the "Liberator" pistol.  The Liberator is a plastic firearm which contains 6-oz piece of steel, which can be easily removed, enabling it to avoid detection in walk-through metal detectors.

WASHAR0001876

39.     These CAD files are "data files" that are "essentially blueprints that can be read

by CAD software."  Letter from Jahna M. Hartwig on behalf of Defense Distributed to the

DDTC, dated June 21, 2013.  They are "indispensable to a three-dimensional ("3-D") printing

process used to create firearms and their components." Motion to Dismiss at 1.

40.     On May 8, 2013, the Office of Defense Trade Controls Compliance, which is

responsible for compliance with and civil enforcement of the AECA and ITAR, sent Defense

Distributed a letter noting that "it is unlawful to export any defense article or technical data for

which a license or written approval is required without first obtaining the required authorization

from the DDTC."

41.     The letter explained that "disclosing (including oral or visual disclosure) or

transferring foreign data to a foreign person, whether in the United States or abroad, is

considered an export under § 120.17 of the ITAR."  It requested that Defense Distributed remove

ten specific CAD files from public access "immediately" and submit them for CJ determination.

Defense Distributed filed a request for CJ determinations for these files on June 21, 2015.

42.     In January 2015, while consideration of Defense Distributed's original CAD file

submission was ongoing, Defense Distributed submitted a CJ request for the "Ghost Gunner," an

automated firearms metal milling machine.  In April 2015, the DDTC determined that the Ghost

Gunner was not subject to the jurisdiction of the State Department, but that the "project files and

data files for producing a defense article on a 3D printer or similar device constituted technical

data on that defense article that would be subject to ITAR regulation."  Aguirre Decl. ¶ 28.

43.     The DDTC completed its review of Defense Distributed's original requests on

June 4, 2015 and determined that six of the files were subject to ITAR control: (i) the Liberator

WASHAR0001877

pistol; (ii) the .22 caliber electric pistol; (iii) the 5.56/.223 muzzle brake; (iv) the Springfield XD-40 tactical slide assemble; (v) the sub-caliber insert;  and (vi) the VZ-58 front sight.

44.     In making its CJ determination, the DDTC noted that the CAD files at issue "can be used to 'automatically find, align, and mill' a defense article such as a firearm on a 3D printer or other manufacturing device. Manufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which merely *guides* the manufacture of a defense article and requires additional craftsmanship, know-how, tools, and materials."  Aguirre Decl. ¶ 29(c).

***The Current Lawsuit***

45.     The Plaintiffs filed this action in May 2015, alleging that the Government Defendants' actions violated the First, Second and Fifth Amendments.  In addition, the Plaintiffs alleged that the Government Defendants had engaged in *ultra vires* conduct.   Among other things, the Plaintiffs sought an injunction to prevent the Government Defendants and "all persons in active concert with them" from barring Defense Distributed's export of CAD files.

46.     In response to the Plaintiffs' motion for a preliminary injunction, the Government Defendants argued, *inter alia,* that they were "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF No 32).

47.     The Government Defendants argued that "[t]he CAD files are 'technical data' that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a

WASHAR0001878

foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations." *Id.* at 7.

48.    Along with its opposition to Plaintiffs' preliminary injunction motion, the Government Defendants submitted an affidavit from Lisa V. Aguirre, the Director of the Office of Defense Trade Controls Management.  Among other things, Director Aguirre concluded that: (i) "[t]he 'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States"; (ii) making the CAD files available online would provide terrorist organizations with firearms, which could be used against the United States or its allies; and (iii) "[a]ccess to weapons technology coupled with the uncontrolled ubiquitous means of productions . . . could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies." Aguirre Decl. ¶ 35.

49.    Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests.   *Def. Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015).  This Court found that "[f]acilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict." *Id.* at 691 (internal quotations omitted).  In addition, this Court noted that the Plaintiffs had "not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

50.    On appeal, the Fifth Circuit upheld this Court's preliminary injunction ruling. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  In so doing, the

WASHAR0001879

Fifth Circuit focused on the national security implications and the permanent nature of the internet, explaining that:

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide . . . *Because those files would never go away*, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. *Thus, the national defense and national security interest would be harmed forever.*

*Id.* at 461 (emphasis added).

51.    On January 8, 2018, the Supreme Court denied the Plaintiffs' petition for a writ of certiorari. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

52.    After the Supreme Court denied certiorari, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018. *See* ECF Nos. 77, 88 and 90.

53.    On April 6, 2018, the Government Defendants filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3,7.

54.    The Government Defendants explained to the Court that the files at issue "directly facilitate the manufacture of weapons" through "automated processes." *Id.* at 1, 9.

55.    The Government Defendants urged this Court to dismiss the Plaintiffs' lawsuit because:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United

WASHAR0001880

> States to other countries (or otherwise provided to foreigners) without
> authorization, where, beyond the reach of U.S. law, they could be used to
> threaten U.S. national security, U.S. foreign policy interests, or
> international peace and stability.

*Id.* at 1.

56.     Mere weeks after the Government stressed the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority." Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement, filed Apr. 30, 2018 (ECF No. 93).

57.     According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted." Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018*), available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

58.     On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018." (ECF No. 95).

59.     As of the date of this filing, the parties have not yet filed a stipulation of dismissal with this Court.

***The Settlement Agreement***

60.     The Settlement Agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the Plaintiffs.

61.     What appears to be an accurate copy of the agreement is now available on the internet. *See* https://www.exportlawblog.com/docs/Defense%20Distributed%

- 17 -

WASHAR0001881

20Settlement%20Agreement.pdf. A copy of the posted agreement is provided with this Complaint as **Exhibit C.**

62.    Pursuant to the Settlement Agreement, in consideration for the Plaintiffs' dismissing the action, the Government Defendants have agreed to:

a. "[C]ommit[ ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

b. "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

c. "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

d. "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

e. Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

63.    Importantly, par. 1(a), (b) and (d) cover the broad category of files referred to as "the technical data that is the subject of this Action." This term is defined in the Settlement Agreement to include "Other Files," as long as those files "regard items exclusively: (a) in Category I(a) of the [USML], as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment." *Id.* ¶ 12.

- 18 -

64.     "Other Files" are those that "Defense Distributed has and will continue to create and possess . . . that contain technical information, to include design drawings, rendered images, written manufacturing instructions[.]"   Second Amended Complaint, ¶ 44, filed Mar. 6, 2018 (ECF No. 90).  In other words, they are files that the Government has presumably not seen yet.

65.     Under the Settlement Agreement, the Department of Justice is prohibited from filing a stipulation of dismissal any earlier than five business days after announcement of the "temporary" modification to the USML Category I and issuance of a letter to Plaintiffs that their files are approved for public release in any form and exempt from ITAR.   Id. ¶ 2.  In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018.

66.     The Settlement Agreement does not indicate that any analysis, study or determination was made by the Government Defendants, in consultation with other agencies, before the Government Defendants agreed to remove the CAD Files from the USML Category I. In fact, the Settlement Agreement states that it "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

67.     Upon information and belief, neither the House Committee on Foreign Relations (formerly known as the International Relations of the House of Representatives), nor the Committee on Foreign Relations of the Senate received the required 30-days advance notice of the "temporary modifications" described in pars. 1(b) or (d) of the Settlement Agreement.

68.     In addition, there is no indication in the Settlement Agreement that the Secretary of Defense has concurred in the changes to designation agreed to in the Settlement Agreement, as required by Executive Order 13637.   There is also no indication that the Government

- 19 -

WASHAR0001883

Defendants have followed the established procedures for making a CJ determination before allowing Defense Distributed to export its data.

69.     Upon publicizing the Settlement Agreements, the Plaintiffs have repeatedly and adamantly made claims about the impact of the agreement on all gun violence prevention efforts. Among other things, Cody Wilson tweeted a photo of a tombstone announcing the death of "gun control," and stated that "[a]ll this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns . . .No amount of petitions or die-ins or anything else can change that."

**_The Notices of Proposed Rulemaking_**

70.     As promised, on May 24, 2018, the government published notices of proposed rulemaking by the State and Commerce Departments, which would remove Plaintiffs' CAD files from the USML Category I.  *See* International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and II, 83 Fed. Reg. 24,198 (May 24, 2018); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (May 24, 2018).

71.     According to the Department of State's Notice of Proposed Rule, it "is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."  According to the State Department, the articles that would be removed from the list "do not meet this standard."   For this reason, the notice proposes to remove all non-automatic firearms up to .50 caliber (and any related technical data) from the USML under the jurisdiction of the State Department, and move jurisdiction over these

WASHAR0001884

products over to the Commerce Department, which, due to its looser export controls,[1] do not typically take action to prohibit the publication of the data.

72.      The Department of Commerce's Proposed Rule, filed the same day, describes how its Export Administration Regulations ("EAR") will apply to items no longer controlled under the USML. Although the Department of Commerce would not comprehensively restrict the export of technology related to firearms, it would have authority to impose a restriction on a case-by-case basis if it determines the export would be contrary to the national security or foreign policy interests of the United States, the promotion of human rights, or regional stability. *See* 15 C.F.R. § 742.6.   But the Department of Commerce cannot restrict the export of technology already in the public domain, including through posting on publicly available sites on the Internet.   *See* 15 C.F.R. §§ 734.3(b)(3), 734.7(a)(4).   If the terms of the Settlement Agreement take effect and Defense Distributed makes its repository of files available online, the Department of Commerce will be unable to make an independent determination about whether national security or other concerns warrant restricting the unlimited dissemination of those files in accordance with the EAR.

73.      The public comment period for both notices concluded on July 9, 2018, the day before the Plaintiffs went public with the Settlement Agreement.

---

[1]      ITAR requires any exporter of items of the Munitions List to register with the State Department, *see* 22 C.F.R. 122.1(a), but Commerce  Department regulations include no similar registration requirement.

WASHAR0001885

## CAUSES OF ACTION

### COUNT I
VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
*ULTRA VIRES* CONDUCT
(Against Plaintiffs[2] and Defendants)

74.     Intervenors repeat and reallege paragraphs 1-73.

75.     Under the Administrative Procedure Act ("APA"), a court must set "aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

76.     The Government Defendants' agreement to and execution of the Settlement Agreement constitutes a final agency action and is *ultra vires* conduct which should be set aside by the Court.

77.     The Government Defendants may only exercise the authority conferred to them by statute.  However, neither the AECA nor ITAR confer upon the Government Defendants the power to modify the USML Category I, temporarily or otherwise, without 30 days-notice to the relevant Congressional committees and without concurrence of the Defense Department.

78.     Here, upon information and belief, the Government Defendants did not provide advance notice of the proposed temporary removal to the House Committee on Foreign Affairs and to the Committee on Foreign Relations of the Senate, and did not receive the concurrence of the Secretary of Defense.

79.     According to Rep. Engel, Ranking Member of the House Committee on Foreign Affairs, notice of the terms of the settlement has not been provided by the President or the State Department.  *See* "Engel Decries State Department Policy to Allow 3-D Gun Printing," Press

---

[2]     For this, and all other counts in this Complaint in Intervention, the Intervenors name the Plaintiffs pursuant to Rule 19(a) of the Federal Rules of Civil Procedure for the limited purpose of ensuring that a full remedy may be ordered.

WASHAR0001886

Release (July 20, 2018), *available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

80.     The Government Defendants also lack statutory authority to determine that the Plaintiffs' CAD files should be removed from the Category I list without following the "established procedures" for commodity jurisdiction.  This is especially relevant here, because, in effect, the "temporary modifications" at issue will negate – in large part – the need for final rulemaking with respect to the data at issue, because once the data is on the internet, the damage to national security concerns will be irreparable.

81.     In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, it may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

82.     Here, the temporary modification agreed to by the Settlement Agreement is not in the interest of the security and foreign policy of the United States, and, upon information and belief, the Government Defendants have made no determination otherwise.

83.     In addition, the Government Defendants lack statutory authority to allow "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints. *See* Settlement Agreement, ¶ 1(d).

84.     Neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement.  However, the ordinary meaning of these terms implies that this provision purports to allow "any United States person" to manufacture, sell and possess firearms made from the files.  If so, this provision can be interpreted to violate numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by

WASHAR0001887

minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.). It
also violates numerous analogous state criminal statutes.

85.     The Government Defendants do not have the statutory authority to amend, rescind
or waive any portion of the Gun Control Act, or analogous state statutes.

86.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors
are entitled to a declaration that the Settlement Agreement is unlawful insofar as it purports to
allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to
prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the
extent it purports to permit Defense Distributed to make its files available online.

### COUNT II
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
### AGENCY ACTION NOT IN ACCORDANCE WITH LAW
(Against Plaintiffs and Government Defendants)

87.     Intervenors repeat and reallege paragraphs 1-86.

88.     Under the APA, a court must set "aside agency action" that is "not in accordance
with law." 5 U.S.C. § 706(2)(A).

89.     As alleged above, upon information and belief, the Government Defendants did
not give 30 days-notice to the required Congressional Committees or receive concurrence from
the Secretary of Defense before agreeing, through the Settlement Agreement, to temporarily
modify USML Category I to remove the data files at issue from ITAR regulation.  *See*
Settlement Agreement, ¶¶1(b), (d).

90.     In addition, upon information and belief, the Government Defendants did not
follow established procedures before granting the Plaintiffs an exception to ITAR jurisdiction.

91.     Furthermore, the Government Defendants cannot permit "any United States
person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's

WASHAR0001888

automated blueprints, because "use" or "otherwise benefit" may be read to allow prohibited individuals to possess, manufacture or sell firearms made from the computer files at issue. *See* Settlement Agreement, ¶ 1(d); Gun Control Act, 18 U.S.C. 921 *et seq.*

92.      For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

## COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – ARBITRARY AND CAPRICIOUS AGENCY ACTION
(Against Plaintiffs and Government Defendants)

93.      Intervenors repeat and reallege paragraphs 1-92.

94.      Under the APA, a court must set "aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

95.      A court may hold that an agency action is arbitrary and capricious when an agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.  In addition, an agency's departure from prior practice can serve as an additional basis for finding an agency's interpretation to be arbitrary and capricious.

96.      Here, upon information and belief, the Government Defendants have provided no explanation for their shift in policies, which they have repeatedly articulated to this Court. They have released no reports, no studies or analysis in connection with the Settlement Agreement to explain why the files at issue should be removed from ITAR regulation.  It appears that the

WASHAR0001889

Government Defendants have also entirely failed to consider or to acknowledge the serious national security concerns created by the export of the CAD files.

97.    In fact, according to par. 5 of the Settlement Agreement, the agreement "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

98.    Here, the Government Defendants have agreed to (i) draft and fully pursue a notice of rulemaking and a final rule to remove the files at issue from ITAR regulation; (ii) temporarily modify the USML Category I list to exclude the files at issue from ITAR regulations; and (iii) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue."

99.    These agency actions are arbitrary and capricious because the Government Defendants have not offered a reasoned explanation for ignoring or countermanding their earlier factual determinations or representations to this Court, the Fifth Circuit and the United States Supreme Court.  They are also arbitrary and capricious because they are contrary to the purposes of the AECA which requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms export.  *See*  22 U.S.C. § 2751.

100.    For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

WASHAR0001890

## COUNT IV
## VIOLATION OF SEPARATION OF POWERS
(Against Plaintiffs and Government Defendants)

101.      Intervenors repeat and reallege paragraphs 1-100.

102.      The Constitution vests the power to legislate to Congress, not the Executive Branch

103.      Here, in the Settlement Agreement, the Government Defendants have agreed to temporarily modify the USML Category I to permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints.

104.      Because neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement, this provision may be interpreted to allow "any United States person" to manufacture, sell and possess firearms made from the files. If so, this provision violates numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.). As discussed above, the Government Defendants do not have the power to nullify or amend the provisions of the Gun Control Act.

105.      For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online. Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed the Plaintiffs to make its files available online.

WASHAR0001891

## REQUESTED RELIEF

WHEREFORE, Intervenors pray that this Court:

a) Declare the Settlement Agreement unlawful to the extent it permits Defense Distributed to make its files available online;

b) Enjoin the Plaintiffs and Defendants from putting any provision of the Settlement Agreement into effect to the extent that such permission purports to permit Defense Distributed to make its files available online;

c) Enjoin the Plaintiffs from making their files available online; and

d) Grant such other relief as the Court may deem just and proper.

Dated: July 25, 2018        Respectfully Submitted,

                       _/s/ J. David Cabello_
                       BLANK ROME LLP
                       J. David Cabello
                       Texas Bar No. 03574500
                       717 Texas Avenue
                       Suite 1400
                       Houston, TX 77002
                       (713) 632-8696
                       dcabello@blankrome.com

                       John D. Kimball (pending _pro hac vice_)
                       N.Y. Bar No. 1416031
                       The Chrysler Building
                       405 Lexington Ave.
                       New York, NY 10174
                       (212) 885-5000

WASHAR0001892

# Exhibit A

WASHAR0001893

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT EMERGENCY
MOTION TO INTERVENE BY INTERVENORS THE BRADY CAMPAIGN
TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY
ACTION FUND, INC. AND GIFFORDS**

WASHAR0001894

TO THE HONORABLE COURT:

Pursuant to Fed. R. Civ. P. 24, The Brady Campaign to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords (collectively "Proposed Intervenors") respectfully and urgently move the Court to:

A. Permit the Proposed Intervenors to intervene in this litigation and file the Complaint in Intervention annexed as **Exhibit B**;[1] and

B. Grant such other and further relief as may be appropriate.

If the Court grants intervention, Proposed Intervenors also request by separate motion, filed contemporaneously with this motion, a temporary restraining order and preliminary injunction. Injunctive relief is necessary to prevent the irreparable harm to the security of the United States and its citizens that will result from the performance of the Settlement Agreement (attached as **Exhibit C**) and Defense Distributed's publication of Weapon Schematics on the Internet.

## BACKGROUND

This case began because the United States government correctly found that the publication on the internet of Defense Distributed's blueprints for the 3-D printing of certain weapons threatened national security. As stated by the Fifth Circuit:

> The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiff-Appellants very strong constitutional rights under these circumstances…[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security."

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016).

---

[1] If this Court determines that the Proposed Intervenors do not satisfy the test for intervention under Fed. R. Civ. P. 24, the Proposed Intervenors request leave to file the proposed complaint in intervention as a new, related action in this Court, and further request that the Court preserve the status quo pending such filing (which would similarly seek immediate injunctive relief).

2

WASHAR0001895

With no justification whatsoever and in violation of the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers, the Government has capitulated to plaintiffs' position and agreed to completely abandon the numerous valid reasons it had asserted for blocking the export of Defense Distributed's plans. This Court previously found that the Government's position was likely to succeed. It is shocking, therefore, that the Government has abdicated the correct position it took concerning national security. The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community.

Plaintiffs and the Government have agreed to settle all issues in this litigation by August 4, 2018. The terms of the Settlement Agreement allow Defense Distributed to publicly upload blueprints of firearms and firearm components to the Internet, so that any terrorist group or individual in the world with access to the Internet and a three-dimensional ("3D") printer can create guns and gun components, with modifications that make these weapons untraceable and undetectable. Specifically, the Settlement Agreement permits Defense Distribution to begin publishing these files on July 27, 2018, even though the parties are not set to enter a stipulation of dismissal until August 4, 2018.

Most alarmingly, the Government, which up until a few months ago was vigorously defending this suit and fighting to prevent Defense Distributed from publishing these files, has suddenly done a complete about-face and contractually obligated itself to exempt Defense Distributed's files from the International Traffic in Arms Regulations, 22 C.F.R Part 120 et seq. ("ITAR"), despite the State Department's official determination in 2015 that the disputed files are subject to ITAR. Due to the nature of the modern Internet, the harm from Defense Distributed's publication of these files is irreversible. A temporary restraining order and preliminary injunction

3

WASHAR0001896

to enjoin Defense Distributed and the Government are not merely necessary forms of relief, but quite simply the *only* available forms of relief that will prevent these files from becoming publicly available worldwide and jeopardizing the national security of the United States and its citizens.

Proposed Intervenors are asking the Court to preserve the status quo and simply seek to continue down the sensible path that the Government, until recently, was advocating and this Court found was likely to succeed.

The procedural and factual record relied upon is attached as Appendix 1.

## POINT ONE
## INTERVENORS HAVE STANDING TO INTERVENE

### A. Standard for intervention.

FRCP 24 establishes the criteria for intervention, and is to be liberally construed. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (citing *Texas v. United States*, 805 F.3d 653, 656 (5th Cir. 2015)). Courts "should allow intervention when no one would be hurt and the greater justice could be attained." *Id.* Rule 24 establishes two kinds of intervention: intervention of right and permissive intervention. *See* FED. R. CIV. P. 24(a)-(b).

Federal Rule of Civil Procedure 24(a)(2) provides that, upon timely application, a party shall be permitted to intervene as a matter of right when the party:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a)(2).

Under this standard, four criteria must be satisfied to support intervention as of right: (1) the motion to intervene must be timely; (2) the applicant must have a cognizable interest in the action; (3) the applicant must be so situated that the disposition of the action may, as a practical

4

WASHAR0001897

matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit. *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015); FED. R. CIV. P. 24(a). "'Rule 24 is to be construed liberally . . . and doubts resolved in favor of the proposed intervenor.'" *See Poynor v. Chesapeake Energy Ltd. P'ship (In re Lease Oil Antitrust Litig.)*, 570 F.3d 244, 248 (5th Cir. 2009) (internal citations omitted). Proposed Intervenors satisfy these requirements and should be permitted to intervene.

    1. <u>The Motion to Intervene is timely.</u>

    Proposed Intervenors have taken prompt action to intervene and file this Motion shortly after acquiring the full text of the Settlement Agreement from the Internet on or about July 19, 2018. Proposed Intervenors had not intervened here previously because they agreed with the Government's position. The Fifth Circuit has held, as is the case here, that by filing of a motion to intervene, "less than one month after learning of their interest in [the] case, [movants] discharged their duty to act quickly." *See Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977)).

    With respect to the second factor, the Fifth Circuit has emphasized that the relevant prejudice is that created by the intervenor's *delay* in seeking to intervene after it learns of its interest, not prejudice to existing parties if intervention is allowed. *See Ceres Gulf v. Cooper,* 957 F.2d 1199, 1203 (5th Cir. 1992). As noted, the Proposed Intervenors did not unduly delay the filing of this Motion, and acted promptly after learning of its need to defend its interest in this matter. Prior to obtaining a copy of the Settlement Agreement, which revealed the parties current intentions, Proposed Intervenors were operating under the information and belief, supported by the Court docket and pleadings filed in this matter, that the Government defendants had been and were representing their interests and national security.

5

WASHAR0001898

Under the third factor, the Proposed Intervenors would be severely prejudiced and suffer irreparable harm if not allowed to intervene. Importantly, once Defense Distributed weapon's data is released to the internet, the damage to national security will be irreversible.

Lastly, there are no unusual circumstances here which weigh against intervention. Rather, the Government's sudden abandonment of its longstanding position and the national security issues that are at stake, are both unusual circumstances that weigh heavily in favor of intervention.

    2.   <u>The Proposed Intervenors have a cognizable interest in the instant litigation.</u>

The inquiry under the second requirement of Rule 24(a), "turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *See Texas*, 805 F.3d at 657 (5th Cir. 2015). Accordingly, an interest that is "concrete, personalized, and legally protectable is sufficient to support intervention." *Id.* at 658. Specifically, the Fifth Circuit has concluded that a party has "a legally protectable interest in the regulatory scheme" when the party or their membership are the "intended beneficiaries" of the policy under challenge." *See Wal-Mart*, 834 F.3d at 566-67 (5th Cir. 2016). The Fifth Circuit has also held that "public spirited" civic organizations that successfully petition adoption of a law may intervene to vindicate their "particular interest" in protecting that law. *Id.* (citing *City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291, 294 (5th Cir. 2012)). Proposed Intervenors meet this test.

The Plaintiffs have declared that because of the Settlement Agreement, the work that Proposed Intervenors are dedicated to will be immeasureably more difficult, if not impossible. Proposed Intervenors and their members work to pass and enforce gun safety laws in Congress and throughout the country. Upon publication of the Settlement Agreement, Cody Wilson, the president of Defense Distributed announced that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun

139718.00601/110549050v.6

WASHAR0001899

Control." Plaintiff Second Amendment Foundation declared that that Settlement Agreement is a

"a devastating blow to the gun prohibition lobby[.]" Proposed Intervenors have a concrete,

personalized, and legally protectable interest in this litigation because the intent of the Plaintiffs,

through the Settlement Agreement, is to make Proposed Intervenors' work untenable. As a result

of the Settlement Agreement, Proposed Intervenors will be forced to expend additional resources

to protect their respective missions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)

(where defendant's alleged conduct "perceptibly impaired" an organizational plaintiff's ability to

carry out its mission and caused a "drain on the organization's resources – there can be no question

that the organization has suffered the requisite injury in fact."); *Am. Civ. Rights Union v. Martinez-*

*Rivera*, 166 F. Supp. 3d 779, 788 (W.D Tex. 2015) ("An organization can demonstrate injury 'by

[alleging] that it had diverted significant resources to counteract the defendant's conduct; hence,

the defendant's conduct significantly and perceptibly impaired the organization's ability to provide

its 'activities—with the consequent drain on the organization's resources.'") (quoting *N.A.A.C.P.*

*v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010)). In this case, because Proposed Intervenors

assert a "procedural interest" to protect their "concrete interest," they "can assert that right without

meeting all the normal standards for redressbility and immediacy" required for standing. *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 572 n. 7 (1992).

> 3. <u>The Disposition of the action threatens to create a practical impediment to the Proposed
> Intervenors' ability to protect its members' interest.</u>

Proposed Intervenors would be seriously prejudiced if this Motion is not granted, as the

implementation of the Settlement Agreement would undermine their stated mission statements and

seriously impact members' interest and safety. The release of Defense Distributed's weapon's

data via the internet, once permitted, cannot be reversed, mitigated, or undone, and would cause

direct, substantial, and irreversible harm to the Proposed Intervenors and its members.

139718.00601/110549050v.6

WASHAR0001900

Case 4:15-cv-00372-RP   Document 96-1   Filed 07/25/18   Page 9 of 12

As the Government has advocated throughout this matter, the dissemination of such information will negatively impact the national security of the United States and its citizens. Therefore, because Proposed Intervenors' and their members' interests would be practically impeded if the Settlement Agreement were implemented, Proposed Intervenors should be permitted to intervene at this juncture.

    4.  <u>No existing party adequately represents the Proposed Intervenors' interest.</u>

Clearly the Government no longer adequately represents the Proposed Intervenors' interest.

**B. Alternatively, permissive intervention is warranted under Rule 24(b).**

If this Court decides that Proposed Intervenors are not entitled to intervene as of right, they should be permitted to intervene under Rule 24(b). Under Rule 24(b)(1)(B), the Court may, in its discretion, permit intervention on a timely motion when the potential intervenor "has a claim or defense that shares with the main action a common question of law or fact." *See Graham v. Evangeline Par. Sch. Bd.*, 132 F. App'x 507, 511 (5th Cir. 2005). The "claim or defense" portion of Rule 24(b)(2) has been construed liberally by the Fifth Circuit. *See Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006). Moreover, "it is settled law in this circuit that permissive intervention is 'wholly discretionary with the [district] court.'" *See United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 416 (5th Cir. 1991) (internal citation omitted). Proposed Intervenors satisfy these factors, and this Court is within its discretion to permit them to intervene.

**C. Proposed Intervenor's are not required to establish independent standing to intervene.**

The Fifth Circuit has ruled that "Article III does not require intervenors to independently possess standing where the intervention is into a ***subsisting*** and ***continuing*** Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one

8

WASHAR0001901

subsisting party with standing to do so." *See Steward v. Abbott*, 189 F. Supp. 3d 620, 625 (W.D. Tex. 2016) (emphasis added) (internal citations omitted); *see also Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006); *Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998) (agreeing with "the better reasoning in cases which hold that Article III does not require intervenors to possess standing"). This Court has acknowledged it is "tasked with safeguarding separation of powers" and held that "[p]rovided that such a case or controversy exists, it is immaterial to the court's jurisdiction whether an intervening party, proceeding alone, could have satisfied the requirements of Article III." *Steward*, 189 F. Supp. 3d at 626 (W.D. Tex. 2016) (internal citation omitted). Accordingly, "[o]nce a valid Article III case-or-controversy is present, the court's jurisdiction vests," and "[t]he presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established." *See Ruiz*, 161 F.3d at 832 (5th Cir. 1998) (rejecting argument that intervenor required standing to invoke the court's jurisdiction to decide the merits of their claims, reasoning that "[t]he court's jurisdiction in [the] case ha[d] already been invoked by the original parties").[2]

---

[2] Even if this Court were to require Proposed Intervenors to prove independent standing to intervene, Proposed Intervenors are able to establish the necessary elements of injury, causation, and redressability. *See LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) ("The three well-known components of standing are injury in fact, causation, and redressability"). "For an issue to be ripe for adjudication, a plaintiff must show that he 'will sustain immediate injury' and "that such injury would be redressed by the relief requested,'" *See Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994) (*citing Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81, 98 S. Ct. 2620, 2635, 57 L. Ed. 2d 595 (1978)).

     Here, as described above, the Proposed Intervenors would be immediately and irreparably injured by the implementation of the Settlement Agreement and the dissemination of Defense Distributed's weapons data via the internet, as once the information is released online, it cannot be reversed, nor can its potential effects be mitigated, or undone. *Def. Distributed*, 838 F.3d at 461 (5th Cir. 2016) (emphasis added). In spite of the Government's prior strong defense of this matter, the Settlement Agreement now abandons those same pressing national security concerns raised by the possibility of foreign nationals or terrorists acquiring Defense Distributed's weapons files. Accordingly, Proposed Intervenors' injury would be directly caused by the implementation of the recent Settlement Agreement reached by the parties. *Id.* at 431 (5th Cir. 2011) ("[t]he

9

WASHAR0001902

## CONCLUSION

The Court should enter an order permitting Proposed Intervenors to file a Complaint in Intervention.

---

causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable,'" to the parties and/or the conduct at issue); Dkt. 32-1. Additionally, it is clear that the intervention and the requested injunction, if granted, will prevent the immediate and irreparable harm to the Proposed Intervenors, among others, caused by the possibly illegal implementation of the Settlement Agreement and the irreversible dissemination of Defense Distributed's blueprints for untraceable lethal weapons via the internet. *Id.*

Proposed Intervenors may also establish associational standing to intervene on behalf of their individual members. An organizational plaintiff may have Article III standing either in its own right, "if it meets the same standing test that applies to individuals[,]" or associational standing on behalf of its members, if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Steward*, 189 F. Supp. 3d at 630-31 (W.D. Tex. 2016) (internal citations omitted). Here, Proposed Intervenors' members are American citizens and the intended beneficiaries of gun control and anti-terror laws enacted by this country. By virtue of the Settlement Agreement, and the online publishing of Defense Distributed's weapons files, the security and safety of Proposed Intervenors' members is directly threatened. As the Government has previously cited, Proposed Intervenors' members will be subjected to increase risk from terroristic and violent threats, at home, in public places, and while traveling abroad if Defense Distributed's data is released. *See* Dkt. 32, 32-1. Second, the interests that Proposed Intervenors and their individual members seek to protect relate to the prevention of gun violence, which is germane to each organization's purpose, and which is essential to each of their individual members. Finally, it is undisputed that the interests which Proposed Intervenors and their individual members seek to assert do not require direct participation by the individual members in the lawsuit. The Government defendants have previously and adequately represented the individual members' interests in this litigation for over three (3) years without the members' direct participation in this case. Proposed Intervenors will represent the interests of their individual members that have now been abandoned by the Government defendants by virtue of the Settlement Agreement.

10

WASHAR0001903

Dated: July 25, 2018                          Respectfully submitted,

                                               */s/ David Cabello*
                                               J. David Cabello
                                               Blank Rome LLP
                                               Texas State Bar No. 03574500
                                               717 Texas Avenue
                                               Suite 1400
                                               Houston, TX 77002
                                               Telephone: (713) 228-6601
                                               Facsimile: (713) 228 6605
                                               E-mail: dcabello@blankrome.com

                                               John D. Kimball (pending *pro hac vice*)
                                               Blank Rome LLP
                                               N.Y. Bar No. 1416031
                                               The Chrysler Building
                                               405 Lexington Ave.
                                               New York, NY 10174
                                               (212) 885-5000

                                               **Attorneys for The Brady Campaign to**
                                               **Prevent Gun Violence, Everytown for Gun**
                                               **Safety Action Fund, Inc., and Giffords**

### CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

                                             */s/ M'Liss Hindman*
                                             M'Liss Hindman
                                             Paralegal

139718.00601/110549050v.6

WASHAR0001904

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**JOINT EMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER AND FOR PRELIMINARY INJUNCTION BY PROPOSED INTERVENORS
THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., AND GIFFORDS**

WASHAR0001905

Pursuant to Fed. R. Civ. P. 65 Proposed Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords ("Giffords"), (collectively "Proposed Intervenors") respectfully and urgently moves the Court to:

A. Enter a temporary restraining order enjoining Defendants from performing under the Settlement Agreement (**Exhibit A**) discussed below, as this would cause immediate and irreparable harm to United States national security directly affecting the safety of individual U.S. citizens;

B. Enter a temporary restraining order enjoining the Plaintiffs from publishing the Published Files, Ghost Gunner Files, CAD Files, and Other Files (the "Weapon Schematics"), as defined in the Settlement Agreement, in order to prevent the immediate and irreparable harm that would result from publishing these files;

C. Enter a preliminary injunction enjoining the parties from performing the settlement agreement; and

D. Grant such other and further relief as may be appropriate.

In support of their motion, Proposed Intervenors would respectfully show the Court as follows:

## INTRODUCTION AND BACKGROUND

The factual and procedural background of this case have been briefed in the Appendix to Proposed Intervenors' Joint Emergency Motion to Intervene, which was filed contemporaneously with this Motion.

WASHAR0001906

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER AND MOTION FOR SAME

To establish the need for a temporary restraining order and preliminary injunction pursuant FRCP 65, the movant has to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any prejudice the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Janvey v. Alguire*, 628 F.3d 164, 174 (5th Cir. 2010).

**A. Proposed Intervenors are likely to succeed on the merits; the Proposed Intervenors satisfy the requisite elements of a claim under the APA.**

To make out an APA violation, the Plaintiffs must show that rulemaking through the terms of the settlement are arbitrary and capricious. 5 U.S.C.A. § 706(2)(A); *Taylor v. Fed. Aviation Admin.*, No. 16-1302, 2018 WL 3320874 (D.C. Cir. July 6, 2018). To obtain APA standing, a party must show that its grievance falls within the zone of interests protected by the Arms Export Control Act. In addition, the party will need to show that it would suffer an injury-in-fact to obtain standing under Article III of the U.S. Constitution. See *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000).

1. <u>The Proposed Intervenors have standing.</u>

The APA allows a person adversely affected by an agency action, including new rulemaking, to challenge that action. The court will set aside new regulations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . ." 5 U.S.C. § 702. Only final agency actions can be challenged. 5 U.S.C. § 704.

Proposed Intervenors are adversely affected by the temporary removal of small arms and associated technology from the USML because (1) the removal will allow for the release of

3

firearms technology by Defense Distributed that enable violations of state and federal law that impact public safety, (2) the safety and security of state residents is compromised by the proliferation of unregistered firearms within the state, and (3) the safety and security of state residents who travel abroad is compromised by the proliferation of small arms and associated technology to produce small arms in other countries. In addition, according to the Plaintiffs, implementation of the Settlement Agreement will directly undermine the work of Proposed Intervenors.

We understand that as matter of judicial self-governance, courts review prudential considerations with regard to standing to limit parties to those which are directly affected by an action. Prudential standing in an APA claim looks to whether "the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected by the statute in question." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998). That is to say, the party's interest must have a "rough correspondence" with the purpose of the underlying statute. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939 (9th Cir. 2013). Thus, at least to some degree, the interests of a party must line up with the purpose of the AECA.

In this regard, it is noteworthy that the "zone of interests" test is not meant to be "especially demanding." *Match-E-Be-Nash-She-Wish-Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). The test forecloses suit only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit." Hence, the zone of interest test only "requires some indicia – however slight – that the litigant before the court was intended to be protected, benefited or

4

WASHAR0001908

regulated by the statute under which suit is brought." *Public Citizen v. FTC*, 869 F.2d 1541, 1547 (D.C. Cir. 1989); *see Autolog Corp. v. Regan*, 731 F.2d 25, 29-30 (D.C. Cir. 1984) ("Courts should give broad compass to a statute's 'zone of interests' in recognition that this test was originally intended to expand the number of litigants able to assert their rights in court").

Here, the Proposed Intervenors clearly meet this test, as associations promoting gun safety laws to minimize violence and injuries with members who would be directly affected by release of this information in the United States and when traveling abroad. The Proposed Intervenors are vulnerable to the precise sort of harm that ITAR's assault on international terrorism is intended to shield.

2. The temporary removal of items from the USML through the settlement is arbitrary and capricious.

The Proposed Intervenors can satisfy the above-delineated requirements to state a claim under APA Section 7, because the consequences of allowing the Settlement Agreement to become effective include: (1) direct contradiction of the legislative intent underlying the AECA and amending the AECA to codify the then-existing classifications of items of on the USML, (2) State Department and other agencies' failure to study or otherwise consider the national security and international stability effects of these actions, in violation of the purpose of the AECA, (3) release of this information to the Internet as a result of the settlement before completing its APA rulemaking after receiving comments on the NPRM, and (4) inexplicable, unjustified reversal of the position of the U.S. Government with regard to the national security ramifications of allowing the online distribution of files to enable the 3-D printing by reference to the Weapons Schematics.

i. Violation of AECA purpose.

The AECA requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. 22 U.S.C.

5

§ 2751. Neither the settlement agreement nor the proposed rulemaking to finalize the reclassification of small arms technology off of the USML address how these rule changes will impact the international trade in arms or potentially destabilizing effects. This total lack of consideration of the central purpose of the AECA demonstrates that the government's action was ill-considered: "Deference is not owed when the agency has completely failed to address some factor of consideration of which was essential to [making an] informed decision." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) (internal quotation marks and citation omitted).

      ii.   <u>Failure to study.</u>

In previous rulemakings removing certain items from the USML, the Department of State undertook significant efforts to understand the ramifications to national security interests. For example, before removing certain Global Position System receivers from the USML, the State Department headed an interagency working group to review the regulation of commercial satellites and related technology and whether removal would jeopardize national security interests. Amendment to the ITAR, 57 Fed. Reg. 41,077 (Sept. 9, 1992). An agency's rulemaking is arbitrary and capricious if the agency cannot explain a connection between the logic of the rule and its purported factual basis. *See We Who Care, Inc. v. Sullivan*, 756 F. Supp. 42, 46-47 (D. Me. 1991) (finding that revised regulation establishing $1,500 as the maximum equity in an automobile that an individual could have to obtain benefits under the Aid to Families with Dependent Children program was arbitrary and capricious because the survey on which the change was based was unavailable and the agency was unable to provide basic information about how the survey was conducted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

WASHAR0001910

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### iii.    Failure to follow procedural requirements.

The AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), notice of the terms of the settlement has not been provided by the President or the State Department.

Although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, they may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. As Congressman Engel noted: "[i]t stretches credulity to believe that release of this information is in the U.S. interest." *Engel Decries State Department Policy to Allow 3-D Gun Printing*, Press Release (July 20, 2018),

7

WASHAR0001911

*available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

Here, the release of the information as a result of the settlement, prior to the completion of the required APA rulemaking process, essentially circumvents the entire rulemaking process, without providing any justification for such action, and is thus clearly tantamount to arbitrary and capricious action in contravention of the APA.

Indeed, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Where an agency makes a determination to remove a protection from a regulatory scheme, an adequate basis and explanation for that rescission is expected. *See* 15 U.S.C.A. §§ 1381 et seq., 1392(a), (b), (f)(1,3,4); 5 U.S.C.A. § 706; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856 (1983).

Here, the terms of the settlement directly contradict the arguments made by the U.S. Government parties in seeking to dismiss Defense Distributed's challenge.

iv.     The terms of the settlement are a final agency action.

The APA authorizes judicial review of final agency actions. 5 U.S.C. § 704. Agency action is "final" if two conditions are met. First, the action must mark the end of the agency's decision-making process. Second, the action must be one by which "rights or obligations have been determined," or from "which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 247 (3d Cir.

WASHAR0001912

2011).[1] A settlement agreement can qualify as final agency action. *United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008).

The executive branch cannot hide behind Presidential powers to achieve a particular domestic objective. When it does so, the executive branch exceeds the statutory authority granted to it by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952) ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress -- it directs that a presidential policy be executed in a manner prescribed by the President."); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), vacated and remanded on other grounds, 471 U.S. 1113 (1985) ("The Court in Youngstown was therefore concerned with whether injunctive relief may appropriately issue to restrain the executive's unlawful action with respect to domestic affairs where the domestic problem might have a secondary effect on foreign affairs."); *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 296 (4th Cir. 2018) ("In sum, the President claims the authority to indefinitely set his own

---

[1] In *Minard*, an oil company obtained a preliminary injunction against implementation of a settlement agreement between the Forest Service and environmental groups. That settlement required the Forest Service to conduct an environmental analysis before issuing a "Notice to Proceed" ("NTP") to mineral rights owners in the Alleghany National Forest. An NTP is required to proceed with extraction activity. In implementing the settlement, the Forest Service placed a moratorium on issuance of NTPs. The Third Circuit found that the moratorium constituted a final agency action, while the settlement agreement itself was an "intermediate agency action", which, under the APA, is "subject to review on the review of the final agency action." *Id.* at 249, n. 7 (quoting 5 U.S.C. § 704). The Third Circuit found that the Forest Service had failed to abide by APA rulemaking requirements in implementing its new policy on issuing NTPs. *Id.* The Third Circuit upheld the district court's preliminary injunction: the district court's injunction enjoined the Forest Service from requiring the environmental analysis before issuing NTPs, ended the moratorium, and prevented further implementation of the settlement agreement. *See Minard Run Oil Co. v. United States Forest Serv.*, No. 09-125, 2009 U.S. Dist. LEXIS 116520 (W.D. Pa. Dec. 15, 2009). Here, the settlement action must be considered final agency action, because the settlement will have immediate and substantial effect through release of the information to the internet. As noted by the Fifth Circuit in affirming this Court's denial for a preliminary injunction, the files would be "freely available worldwide…Thus, the national defense and national security interest would be harmed forever."

9

WASHAR0001913

immigration and travel policies with respect to every foreign nation and class of immigrants, under any circumstances, exigent or not, that he sees fit. Such authority is dangerously similar to lawmaking and intrudes on Congress's plenary power over immigration").

**3. There is a threat of irreparable injury if the injunction is denied.**

The threat of irreparable injury to the United States and its citizens has been briefed in the Motion to Intervene and accompanying Appendix 1. If the Government is permitted to perform under the Settlement Agreement, despite the numerous and blatant APA violations in the Settlement Agreement, United States national security will suffer irreparable injury.

**4. The threatened injury outweighs any prejudice the injunction might cause the parties.**

This Court has already found that the Plaintiff's interest in protecting its constitutional rights does not outweigh "the public's keen interest in restricting the export of defense articles." *Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 690 (W.D. Tex. 2015).

**5. The injunction will not disserve the public interest.**

An injunction will not disserve the public interest. On the contrary, the primary aim of the injunction is to serve the public interest by enjoining plaintiffs and defendants from taking action that will irreparably harm the security of the United States and its citizens. *See id.* ("Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling 'export' of such materials stands in sharp contrast to Defendants' assertion of the public interest.").

## CONCLUSION

For these reasons, Proposed Intervenors respectfully request the Court grant a temporary restraining order and schedule a hearing concerning the motion for preliminary injunction.

WASHAR0001914

Dated: July 25, 2018                    Respectfully submitted,

                                         /s/ David Cabello
                                         J. David Cabello
                                         Blank Rome LLP
                                         Texas State Bar No. 03574500
                                         717 Texas Avenue
                                         Suite 1400
                                         Houston, TX 77002
                                         Telephone: (713) 228-6601
                                         Facsimile: (713) 228 6605
                                         E-mail: dcabello@blankrome.com

                                         John D. Kimball (pending *pro hac vice*)
                                         Blank Rome LLP
                                         N.Y. Bar No. 1416031
                                         The Chrysler Building
                                         405 Lexington Ave.
                                         New York, NY 10174
                                         (212) 885-5000

                                         **Attorneys for Proposed Intervenors**


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).


                          /s/ M'Liss Hindman
                          M'Liss Hindman
                          Paralegal


11

WASHAR0001915

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**INTERVENORS' REQUEST FOR AN EMERGENCY HEARING FOR
TEMPORARY RESTRAINING ORDER**

Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords, (collectively "Intervenors") file this Request for an Emergency Hearing on their Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). As fully briefed in the Motion for Temporary Restraining Order and Preliminary Injunction, time is of the essence. Plaintiffs will publish their Weapon Schematics as early as Friday July 27, 2018. Once these files are published on the Internet, United States national security and its citizens will be irreparably harmed. For this reason, Intervenors respectfully request this Court to grant an emergency hearing on **Thursday July 26, 2018**. For cause, Intervenors show the following:

1.  As detailed in the Motion, Plaintiffs and Defendants (the Government) have entered into a Settlement Agreement. This Settlement Agreement permits Plaintiffs to publish, including on the Internet, files that can be used to print firearms and firearm components with a three-dimensional ("3D") printer.

2.  The Government had previously deemed these files to fall within the scope of ITAR and, until very recently, vigorously defended its position against Plaintiffs. Now,

WASHAR0001916

the Government has entered into this Settlement Agreement. Several provisions of the Settlement Agreement violate the Administrative Procedure Act ("APA"). Intervenors can show a strong likelihood of success on the merits of claims of APA violations by the Government.

3. Publication of these files on the Internet will cause irreparable harm to the United States and its citizens, as it will allow the global community unfettered access to blueprints for the creation of untraceable and undetectable weapons, which will threaten the security of the United States and its citizens. Due to the nature of the modern Internet, once these files are publicly released, the damage cannot be undone. The balance of harm and the public interest favors granting a temporary restraining order and preliminary injunction.

Intervenors respectfully submit this request to set their Motion for an emergency hearing as requested herein, and for such and other relief as it may be entitled.

WASHAR0001917

Dated: July 25, 2018

Respectfully submitted,

*/s/* David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

*/s/M'Liss Hindman*
M'Liss Hindman
Paralegal

WASHAR0001918

| From: | Cavnar, Anna </O=SBUSTATE/OU=NCC AG/CN=RECIPIENTS/CN=CAVNARA> |
|---|---|
| Sent: | Wednesday, July 11, 2018 4:02 PM |
| To: | McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| Subject: | RE: Cody Wilson's claims on settlement |
| Attach: | Press Points on Defense Distributed (L 2).docx |



**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 12:42 PM
**To:** Heidema, Sarah J; Hart, Robert L; Paul, Joshua M
**Cc:** Miller, Michael F; Monjay, Robert; Rogers, Shana A; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement

Sarah.

Thanks,
Dave

---
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:  202.647.8757 | 🖳  BlackBerry:  202.550.3482 |
✉ e-mail:  *mckeebydi@state.gov* | 🖰  Web:  *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

[icons]

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 12:41 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Dave-

Official
UNCLASSIFIED

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:40 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob:

Please advise and thanks,
Dave

---
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.8757 | 🖥 BlackBerry:  202.550.3482 |
✉ e-mail:     *mckeebydi@state.gov* | 🖱  Web:  *www.state.gov/t/pm /* |Twitter:  *@StateDeptPM*

Stay connected with *State.gov*:



**From:** Hart, Robert L
**Sent:** Wednesday, July 11, 2018 11:26 AM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Sarah:

Best,
Dave

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.8757 | 🖥 BlackBerry:  202.550.3482 |
✉ e-mail:     *mckeebydi@state.gov* | 🖱  Web:  *www.state.gov/t/pm /* |Twitter:  *@StateDeptPM*

Stay connected with *State.gov*:

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 10:20 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** Cody Wilson's claims on settlement

Josh-

https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.

WASHAR0001921



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not

WASHAR0001922

seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkleman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in, enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the Ghost Gunner

*Michelle Groskopf*

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

WASHAR0001923

*Michelle Groskopf*

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire online community of DIY gunmakers. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of 3-D-printable semiautomatics who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called Crypto Wars of the 1990s. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance, he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, Daniel Bernstein, sued the government with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

WASHAR0001924

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era when Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

## More Great WIRED Stories

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is *really really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
**Official**
**UNCLASSIFIED**

WASHAR0001925

| | |
|---|---|
| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
| **Sent:** | Wednesday, July 11, 2018 3:45 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Cody Wilson's claims on settlement |
| **Attach:** | Press Points on Defense Distributed (L 2).docx; 2018-10366.pdf |



**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, July 11, 2018 3:18 PM
**To:** Freeman, Jeremy B; Rogers, Shana A
**Subject:** RE: Cody Wilson's claims on settlement



**From:** Freeman, Jeremy B
**Sent:** Wednesday, July 11, 2018 3:11 PM
**To:** Cavnar, Anna; Rogers, Shana A
**Subject:** RE: Cody Wilson's claims on settlement

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, July 11, 2018 2:19 PM

**To:** Rogers, Shana A; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement

████████████████████████████████████████████████████████

---

**From:** Rogers, Shana A
**Sent:** Wednesday, July 11, 2018 1:02 PM
**To:** Cavnar, Anna; Freeman, Jeremy B
**Subject:** FW: Cody Wilson's claims on settlement

Anna, Jeremy,

████████████████████████████████████████████████████

Thanks,
Shana

**Official - SBU**
**UNCLASSIFIED**

---

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 12:42 PM
**To:** Heidema, Sarah J; Hart, Robert L; Paul, Joshua M
**Cc:** Miller, Michael F; Monjay, Robert; Rogers, Shana A; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement

Sarah,

████████████████████████████████████████████████

Thanks,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.8757 | 📱   BlackBerry:  202.550.3482 |
✉ e-mail:      *mckeebydi@state.gov* | ☞ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

🗏 🗏 🗏 🗏 🗏 🗏 🗏

---

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 12:41 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>

**Subject:** RE: Cody Wilson's claims on settlement

Dave-



**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:40 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob:

Please advise and thanks,
Dave

_____
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.8757 | 🖥 BlackBerry: 202.550.3482 |
✉ e-mail:      *mckeebydi@state.gov* | ✎ Web: *www.state.gov/t/pm/* | Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

🗔 🗔 🗔 🗔 🗔 🗔 🗔

---

**From:** Hart, Robert L
**Sent:** Wednesday, July 11, 2018 11:26 AM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

---

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Sarah:

████████████████████████████████

Best,
Dave
_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.8757 | 🖥 BlackBerry:  202.550.3482 |
✉ e-mail:      *mckeebydi@state.gov* | ✍ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*


Stay connected with *State.gov*:

🅴 🅴 🅴 🅴 🅴 🅴 🅴

.....................................................................................................................................................

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 10:20 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** Cody Wilson's claims on settlement

Josh-

https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where

WASHAR0001931

anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database,

and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

WASHAR0001933

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkelman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in,

WASHAR0001934

enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the Ghost Gunner

*Michelle Groskopf*

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

*Michelle Groskopf*

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire online community of DIY gunmakers. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in

doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of 3-D-printable semiautomatics who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called Crypto Wars of the 1990s. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance, he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, Daniel Bernstein, sued the government with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch

WASHAR0001937

to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server

rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era where Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in

WASHAR0001939

advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

## More Great WIRED Stories

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is really *really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
**Official**
**UNCLASSIFIED**

WASHAR0001940

## DEPARTMENT OF STATE

**22 CFR Parts 121, 123, 124, 126, and 129**

[Public Notice 10094]

RIN 1400–AE30

## International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**AGENCY:** Department of State.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).

**DATES:** The Department will accept comments on this proposed rule until July 9, 2018.

**ADDRESSES:** Interested parties may submit comments within 45 days of the date of publication by one of the following methods:

• *Email: DDTCPublicComments@ state.gov* with the subject line, "ITAR Amendment—Categories I, II, and III."

• *Internet:* At *www.regulations.gov*, search for this notice using Docket DOS–2017–0046.

Comments received after that date will be considered if feasible, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of confidentiality is asserted, because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at *www.pmddtc.state.gov.* Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov*, leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.

**FOR FURTHER INFORMATION CONTACT:** Robert Monjay, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–2817; email *DDTCPublicComments@state.gov.*

ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.*, "defense articles," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. The Department of Commerce is publishing a companion rule in this edition of the **Federal Register**.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the United States Munitions List under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1(b) of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the

U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule proposes adding a new paragraph (b)(2)(vii) to § 129.2 to update the enumerated list of actions that are not considered brokering. This change is a conforming change and is needed to address the movement of items from the USML to the CCL that will be subject to the brokering controls, to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport or retransfer of such items.

The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

## Revision of Category I

This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all

WASHAR0001941

weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".

**Revision of Category II**

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f),

engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (11).

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

**Revision of Category III**

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

**Conforming ITAR Changes**

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions in § 123.17(a) through (e), which describe the firearms exemptions, because the paragraphs will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, § 123.16(b)(6) will be revised to describe only the remaining exemption at § 123.17 (personal protective gear), and § 123.16(b)(7) will be reserved. Section 123.17 will be amended to remove paragraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of § 124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in § 126.1(s) will be revised to remove reference to the firearms exemption in § 123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are on the USMIL for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

**Request for Comments**

The Department welcomes comments from the public and specifically requests input on the following matters:

(1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in its Munitions List Categories 1, 2 and 3 (WA–ML1, WA–ML2 and WA–ML3). Readers are asked to identify any potential gap in coverage

brought about by the changes for USML Categories I, II and III contained in this notice and the new Category 0, 0x5zz ECCNs published separately by the Department of Commerce when reviewed together.

(2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms, large guns, armaments, ordnance and ammunition. The public should provide any specific examples of firearms (or parts, components, accessories thereof), large guns, armaments, ordnance or ammunition whose jurisdiction is unclear based on this revision.

(3) The Department has, in the past, adopted a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL. The Department seeks to allow industry sufficient time to implement this rule, including time to make changes to IT systems, technology controls plans, and other business processes. The public should provide input on the time necessary to implement any final rule for these categories, as well as a description of any increased burden that, in the view of the commenter, would be imposed on businesses or individuals should this rule be adopted.

## Regulatory Analysis and Notices

### Administrative Procedure Act

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, the Department is publishing this proposed rule with a 45-day provision for public comment.

### Regulatory Flexibility Act

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

### Unfunded Mandates Reform Act of 1995

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

### Executive Orders 12372 and 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL. We request comment from the public on any impact that would be imposed on the public if this rule were adopted.

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this proposed rule would decrease the number of license applications

submitted to the Department under OMB Control No. 1405–0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department will be eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions will require an individual validated license. The Department of Commerce will be collecting the information necessary to process license applications under OMB Control No. 0694–0088. The Department of Commerce estimates that OMB Control No. 0694–0088 takes approximately 43.8 minutes for a manual or electronic submission. The Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection. The Department estimates a reduction in burden of 10,000 hours due to the proposed transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce will be 4,380 burden hours. Therefore, the net burden would be reduced by 5,620 hours. The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80. There may also be other State Department forms that will no longer need to be submitted and that may further reduce the burden hours for applicants. The Department is seeking comments on the reduction from the other forms, as referenced below.

In addition to the reduction in burden hours, there will be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other

related activities. The Department of
Commerce would incur additional costs
to administer these controls and process
license applications. However, the
Department of Commerce does not
charge a registration fee to exporters
under the EAR and we are unable to
estimate the increase in costs to the
Department of Commerce to process the
new license applications. Therefore, we
are unable to provide an estimate of the
net change in resource costs to the
government from moving these items
from the ITAR to the EAR. It is the case,
however, that the movement of these
items from the ITAR would result in a
direct transfer of $2,500,000 per year
from the government to the exporting
public, less the increased cost to
taxpayers, because they would no longer
pay fees to the State Department and
there is no fee charged by the
Department of Commerce to apply for a
license.

The Department welcomes comments
from the public on the net reduction in
burden described within this section,
particularly if there are additional
burden reductions that are not reflected
here (please provide number of hours or
cost) or if the estimates noted here
appear otherwise inaccurate.

Estimated Cost Savings

The Department of State is of the
opinion that controlling the import and
export of defense articles and services is
a foreign affairs function of the United
States government and that rules
implementing this function are exempt
from Executive Order 13771 (82 FR
9339, February 3, 2017). Although the
Department is of the opinion that this
proposed rule is exempt from E.O.
13771 and without prejudice to its
determination that controlling the
import and export of defense services is
a foreign affairs function, this proposed
rule is expected to be an E.O. 13771
deregulatory action. The Department
has conducted this analysis in close
consultation with the Department of
Commerce. The total annual recurring
dollar cost savings is estimated to be
$1,376,281 for purposes of E.O. 13771
for the Department of State.

*Executive Order 12988*

The Department of State has reviewed
this rulemaking in light of sections 3(a)
and 3(b)(2) of Executive Order 12988 to
eliminate ambiguity, minimize
litigation, establish clear legal
standards, and reduce burden.

*Executive Order 13175*

The Department of State has
determined that this rulemaking will
not have tribal implications, will not

impose substantial direct compliance
costs on Indian tribal governments, and
will not preempt tribal law.
Accordingly, Executive Order 13175
does not apply to this rulemaking.

*Paperwork Reduction Act*

Notwithstanding any other provision
of law, no person is required to respond
to, nor is subject to a penalty for failure
to comply with, a collection of
information, subject to the requirements
of the Paperwork Reduction Act of 1995
(44 U.S.C. 3501 *et seq.*) (PRA), unless
that collection of information displays a
currently valid OMB control number.

The Department of State believes
there would be a reduction in burden
for OMB Control No. 1405–0003,
Application/License for Permanent
Export of Unclassified Defense Articles
and Related Unclassified Technical
Data. This form is an application that,
when completed and approved by
Department of State, constitutes the
official record and authorization for the
commercial export of unclassified U.S.
Munitions List articles and technical
data, pursuant to the AECA and ITAR.
For an analysis of the reduction in
burden for OMB Control No. 1405–0003,
see the above Section for E.O. 12866.
The Department of State requests
comments on the collection of
information or potential reduction in
burden be sent also to the Office of
Information and Regulatory Affairs of
OMB, Attention: Desk Officer for
Department of State, at *OIRA_
Submission@omb.eop.gov* or Attention:
Desk Officer for Department of State,
Office of Information and Regulatory
Affairs of OMB, 725 17th St. NW,
Washington, DC 20503.

List of Subjects in 22 CFR Parts 121,
123, 124, 126, and 129

Arms and munitions, Exports.
Accordingly, for the reasons set forth
above, title 22, chapter I, subchapter M,
parts 121, 123, 124, 126, and 129 are
proposed to be amended as follows:

PART 121—THE UNITED STATES
MUNITIONS LIST

■ 1. The authority citation for part 121
continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–
629, 90 Stat. 744 (22 U.S.C. 2752, 2778,
2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112
Stat. 1920; Section 1261, Pub. L. 112–239;
E.O. 13637, 78 FR 16129.

■ 2. Section 121.1 is amended by
revising U.S. Munitions List Categories
I, II, and III to read as follows:

§ 121.1   The United States Munitions List.
\*     \*     \*     \*     \*

Category I—Firearms and Related
Articles

\*(a) Firearms using caseless
ammunition.
\*(b) Fully automatic firearms to .50
caliber (12.7 mm) inclusive.
\*(c) Firearms specially designed to
integrate fire control, automatic
tracking, or automatic firing (*e.g.,*
Precision Guided Firearms (PGFs)), and
specially designed parts and
components therefor.

**Note to paragraph (c):** Integration does not
include only attaching to the firearm or rail.

\*(d) Fully automatic shotguns
regardless of gauge.
\*(e) Silencers, mufflers, and sound
suppressors, and specially designed
parts and components therefor.
(f) [Reserved]
(g) Barrels, receivers (frames), bolts,
bolt carriers, slides, or sears specially
designed for the articles in paragraphs
(a), (b), and (d) of this category.
(h) Parts, components, accessories,
and attachments, as follows:
(1) Drum and other magazines for
firearms to .50 caliber (12.7 mm)
inclusive with a capacity greater than 50
rounds, regardless of jurisdiction of the
firearm, and specially designed parts
and components therefor;
(2) Parts and components specially
designed for conversion of a semi-
automatic firearm to a fully automatic
firearm.
(3) Accessories or attachments
specially designed to automatically
stabilize aim (other than gun rests) or for
automatic targeting, and specially
designed parts and components
therefor.
(i) Technical data (*see* § 120.10 of this
subchapter) and defense services (*see*
§ 120.9 of this subchapter) directly
related to the defense articles described
in paragraphs (a), (b), (d), (e), (g), and (h)
of this category and classified technical
data directly related to items controlled
in ECCNs 0A501, 0B501, 0D501, and
0E501 and defense services using the
classified technical data. (*See* § 125.4 of
this subchapter for exemptions.)
(j)–(w) [Reserved]
(x) Commodities, software, and
technology subject to the EAR (*see*
§ 120.42 of this subchapter) used in or
with defense articles.

**Note to paragraph (x):** Use of this
paragraph is limited to license applications
for defense articles where the purchase
documentation includes commodities,
software, or technology subject to the EAR
(*see* § 123.1(b) of this subchapter).

**Note 1 to Category I:** Paragraphs (a), (b),
(d), (e), (g), (h), and (i) of this category
exclude: Any non-automatic or semi-

WASHAR0001944

automatic firearms to .50 caliber (12.7 mm) inclusive; non-automatic shotguns; BB, pellet, and muzzle loading (*e.g.*, black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730 through 774).

**Note 2 to Category I:** The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant.

(2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

## Category II—Guns and Armament

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(5):** This paragraph does not control guns and armament greater than .50 caliber (12.7 mm) (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(5):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(5):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

**Note 1 to paragraph (a):** This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; or black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602.

**Note 2 to paragraph (a):** Guns and armament when integrated into their carrier (*e.g.*, ships, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with a minimum effective range of 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

**Note to paragraph (d):** Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independently powered ammunition handling systems and platform interface components as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

**Note to paragraph (j)(9):** For weapons mounts specially designed for ground vehicles, *see* Category VII.

(10) Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(11) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(15) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(16) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

## Category III—Ammunition and Ordnance

*(a) Ammunition, as follows:
(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;
(2) Ammunition preassembled into links or belts;
(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;
(4) Caseless ammunition manufactured with smokeless powder;

**Note to paragraph (a)(4):** Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;
(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;
(7) Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles;
(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;
(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or
(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(10):** This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(10):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(10):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:
(1) Belting, linking, and de-linking equipment; or
(2) Fuze setting devices.
(c) [Reserved]
(d) Parts and components for the articles in this category, as follows:
(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;
(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

**Note to paragraph (d)(2):** This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;
(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);
(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;
(6) Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;
(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;
(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;
(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;
(10) Primers other than Boxer, Berdan, or shotshell types;

**Note to paragraph (d)(10):** This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;
(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;
(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;
(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or
*(15) Any part, component, accessory, attachment, equipment, or system that:
(i) Is classified;
(ii) Contains classified software; or
(iii) Is being developed using classified information.
"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.
(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.).
(f)–(w) [Reserved]
(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Notes to Category III: 1.** This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.
**2.** This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.
**3.** Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

\*      \*      \*      \*      \*

## PART 123—LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

■ 3. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778,

2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112–55; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 61296.

■ 4. Section 123.15 is amended by revising paragraph (a)(3) to read as follows:

**§ 123.15   Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.**

(a) * * *

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more.

*       *       *       *       *

■ 5. Section 123.16 is amended by revising paragraphs (b)(2) introductory text and (b)(6) and removing and reserving paragraph (b)(7) to read as follows:

**§ 123.16   Exemptions of general applicability.**

*       *       *       *       *

(b) * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

*       *       *       *       *

(6) For exemptions for personal protective gear, refer to § 123.17.

*       *       *       *       *

■ 6. Section 123.17 is amended by revising the section heading, removing and reserving paragraphs (a) through (e), and revising paragraph (j) to read as follows:

**§ 123.17   Exemption for personal protective gear.**

*       *       *       *       *

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

*       *       *       *       *

**§ 123.18   [Removed and Reserved]**

■ 7. Section 123.18 is removed and reserved.

**PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES**

■ 8. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 61296.

■ 9. Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

**§ 124.14   Exports to warehouses or distribution points outside the United States.**

*       *       *       *       *

(c) * * *

(9) Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (*e.g.,* cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

*       *       *       *       *

**PART 126—GENERAL POLICIES AND PROVISIONS**

■ 10. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Section 7045, Pub. L. 112–74; Section 7046, Pub. L. 112–74; E.O. 13637, 78 FR 61296.

■ 11. Section 126.1 is amended by revising paragraph(s) to read as follows:

**§ 126.1   Prohibited exports, imports, and sales to or from certain countries.**

*       *       *       *       *

(s) *Zimbabwe.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe,

except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

*       *       *       *       *

**PART 129—REGISTRATION AND LICENSING OF BROKERS**

■ 12. The authority citation for part 129 continues to read as follows:

**Authority:** Section 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

■ 13. Section 129.1 is amended by revising paragraph (b) to read as follows:

**§ 129.1   Purpose.**

*       *       *       *       *

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

■ 14. Section 129.2 is amended by:

■ a. In paragraph (b)(2)(v), removing the word "or" at the end of the paragraph;

■ b. Removing the period at the end of paragraph (b)(2)(vi) and adding "; or" in its place; and

■ c. Adding paragraph (b)(2)(vii).

The addition reads as follows:

**§ 129.2   Definitions.**

*       *       *       *       *

(b) * * *

(2) * * *

(vii) Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter.

*       *       *       *       *

■ 15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i) to read as follows:

**§ 129.4   Requirement for approval.**

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (*see* § 120.44 of this subchapter, and § 129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (*see* 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of § 121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the

U.S. Munitions Import List (*see* 27 CFR 447.21);

* * * * *

■ 16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

§ 129.6   **Procedures for obtaining approval.**

* * * * *

(b) * * *

(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

[FR Doc. 2018–10366 Filed 5–21–18; 8:45 am]

**BILLING CODE 4710–25–P**

WASHAR0001948

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

(a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

(b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0001949

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0001950

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0001951

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.      *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0001952

5.      *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.      *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.      *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0001953

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
    Settlement Agreement with their counsel, who has explained these documents to them
    and that they understand all of the terms and conditions of this Settlement Agreement.
    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
    the contents thereof, and execute this Settlement Agreement of their own free act and
    deed. The undersigned represent that they are fully authorized to enter into this
    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,
    each of which shall be deemed an original, and all of which together constitute one and
    the same instrument, and photographic copies of such signed counterparts may be used in
    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0001954

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0001955

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

_____

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

_____

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0001956

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,                §
    Plaintiffs,                           §
                                  §
                                  §
v.                                          §        No. 1:15-cv-372-RP
                                  §
U.S. DEPARTMENT OF STATE, et al.,           §
    Defendants.                           §

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.


Dated: June 29, 2018                              Respectfully submitted,

_____
Matthew Goldstein                                 CHAD A. READLER
D.C. Bar No. 975000*                              Acting Assistant Attorney General
Snell & Wilmer LLP                                Civil Division
One South Church Ave., Ste. 1500
Tucson, Arizona 85701                             ANTHONY J. COPPOLINO
520.882.1248 / Fax 520.884.1294                   Deputy Branch Director
mgoldstein@swlaw.com                              Federal Programs Branch

Alan Gura
Virginia Bar No. 68842*                           _____
Gura PLLC
916 Prince Street, Suite 107                      ERIC J. SOSKIN
Alexandria, Virginia 22314                        Pennsylvania Bar No. 200663
                                                  Senior Trial Counsel

1

WASHAR0001957

703.835.9085/Fax 703.997.7665

alan@gurapllc.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

WASHAR0001958

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § | Case No. 15-CV-372-RP |
| | § | |
| | § | SECOND AMENDED |
| Plaintiffs, | § | COMPLAINT |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; | § § § § § § § § § § § § § | |
| | § | |
| Defendants. | § | |
| | § | |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

1

WASHAR0001959

Contrary to the Justice Department's warning that such actions are unconstitutional, Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120 *et seq.* ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open forums, regarding arms in common use for lawful purposes. Defendants' censorship of Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments to the United States Constitution. Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this prior restraint scheme, and to recover money damages to compensate for the harm such application has already caused.

*The Parties*

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including in Texas. The purposes of SAF include promoting, securing, and expanding access to the exercise of the right to keep and bear arms; and education, research, publishing and legal

2

WASHAR0001960

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3. Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4. Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

5. Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6. Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7. Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8. Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

3

WASHAR0001961

JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.     The AECA affords the President limited control over the export of "defense articles." 22 U.S.C. § 2778(a)(1).

12.     Although the AECA does not expressly authorize control over "technical data," the ITAR, which implements the Act, includes "technical data" within its definition of "defense articles." 22 C.F.R. § 120.6.

13.     The ITAR broadly defines "technical data" as information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles." *Id.*

14.     The ITAR requires advance government authorization to export technical data. Criminal penalties for unauthorized exports of technical data and other violations of the ITAR include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22 U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

4

15.    The scope of technical data subject to ITAR control, as described on the U.S.

Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants

constantly change, often without notice, their views of what this scope entails.

16.    Americans have submitted thousands of written requests, known as "commodity

jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.    From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the

ITAR imposed a prepublication approval requirement on publications of privately generated

ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S.

Government approval for the publication of technical data falling within the definition in §

125.01, including such data as may be developed under other than U.S. Government contract, is

on the person or company seeking publication."

18.    Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel

issued a series of written opinions advising Congress, the White House, and the Department of

State that the use of the ITAR to impose a prior restraint on publications of privately generated

unclassified information into the public domain violated the First Amendment of the United

States Constitution (the "Department of Justice memoranda").

19.    In 1980, the Department of State Office of Munitions Control, the predecessor to

Defendant DDTC, issued official guidance providing that "[a]pproval is not required for

publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to

Section 125.11 does not establish a prepublication review requirement."

20.    Thereafter, the Department of State removed Footnote 3 from the ITAR,

expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

5

WASHAR0001963

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

  21.  In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

  22.  Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

*The Published Files*

  23.  Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

  24.  Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

  25.  Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

6

WASHAR0001964

26.    In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.    At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.    Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.    At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.    The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

WASHAR0001965

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015 — nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case — Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHAR0001966

38.     Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

WASHAR0001967

43. To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44. Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45. Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46. The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a). For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47. DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

10

WASHAR0001968

48.     The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

### Great, Irreparable, and Continuing Harm

49.     But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50.     DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

### COUNT ONE

### ULTRA VIRES GOVERNMENT ACTION

51.     Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.     The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

11

WASHAR0001969

COUNT TWO

RIGHT OF FREE SPEECH — U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT THREE

RIGHT TO KEEP AND BEAR ARMS — U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

WASHAR0001970

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554
U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and
forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of
firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers,
members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants'
application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW—U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States
Constitution  requires the Government to provide fair notice of what is prohibited, prohibits
vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad,
vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to
injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication
approval requirement, failure to clearly describe the information subject to the prior restraint,
and failure to provide a process for timely review of Defense Distributed's speech have deprived
Defense Distributed of its right to fair notice of what is required under the law and adequate
process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to
injunctive relief against Defendants' application of the prior restraint.

13

WASHAR0001971

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the First Amendment to the United States Constitution;

3.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to public speech, to include the Internet posting of files used in the production of arms of the kind in common use for traditional lawful purposes, including but not limited to the Subject Files, violates the Second Amendment to the United States Constitution;

4.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5.    An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against public speech on privately generated unclassified information;

WASHAR0001972

6.     An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7.     Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.     Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                    Respectfully submitted,

/s/ Alan Gura                              /s/ William B. Mateja
Alan Gura                                  William B. Mateja
Virginia Bar No. 68842*                    Texas State Bar No. 13185350
Gura PLLC                                  POLSINELLI P.C.
916 Prince Street, Suite 107               2950 N. Harwood, Suite 2100
Alexandria, Virginia 22314                 Dallas, Texas 75201
703.835.9085/Fax 703.997.7665             214.397.0030/Fax 214.397.0033
alan@gurapllc.com                          Mateja@polsinelli.com

/s/ Matthew Goldstein                      /s/ Josh Blackman
Matthew Goldstein                          Josh Blackman
D.C. Bar No. 975000*                       Virginia Bar No. 78292
Matthew A. Goldstein, PLLC                 1303 San Jacinto Street
1875 Connecticut Avenue, N.W.              Houston, Texas 77002
10th Floor                                 202.294.9003/Fax: 713.646.1766
Washington, DC 20009                       joshblackman@gmail.com
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com                             *Admitted pro hac vice

15

WASHAR0001973

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § | Case No. 15-CV-372-RP |
| | § | |
| | § | SECOND AMENDED |
| Plaintiffs, | § | COMPLAINT |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, | § | |
| in his official capacity as Secretary of State; | § | |
| DIRECTORATE OF DEFENSE TRADE CONTROLS, | § | |
| Department of State Bureau of Political Military Affairs; | § | |
| MIKE MILLER, in his official capacity as Acting | § | |
| Deputy Assistant Secretary, Defense Trade Controls, | § | |
| Bureau of Political Military Affairs, Department of | § | |
| State; and SARAH J. HEIDEMA, in her official | § | |
| capacity as Acting Director, Office of Defense Trade | § | |
| Controls Policy, Bureau of Political Military Affairs, | § | |
| Department of State; | § | |
| | § | |
| Defendants. | § | |
| | § | |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

1

WASHAR0001974

Contrary to the Justice Department's warning that such actions are unconstitutional,

Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120

*et seq.* ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open

forums, regarding arms in common use for lawful purposes. Defendants' censorship of

Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is

applied, violate the First, Second, and Fifth Amendments to the United States Constitution.

Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this

prior restraint scheme, and to recover money damages to compensate for the harm such

application has already caused.

### The Parties

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of

the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place

of business is located in Austin, Texas. Defense Distributed was organized and is operated for

the purpose of defending the civil liberty of popular access to arms guaranteed by the United

States Constitution through facilitating global access to, and the collaborative production of,

information and knowledge related to the three-dimensional ("3D") printing of arms; and to

publish and distribute, at no cost to the public, such information and knowledge on the Internet

in promotion of the public interest.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit

membership organization incorporated under the laws of Washington with its principal place of

business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide,

including in Texas. The purposes of SAF include promoting, securing, and expanding access to

the exercise of the right to keep and bear arms; and education, research, publishing and legal

WASHAR0001975

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3.      Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4.      Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq*. ("AECA").

5.      Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.      Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7.      Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8.      Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

WASHAR0001976

JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.      The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.      Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.      The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id*.

14.      The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

4

WASHAR0001977

15.     The scope of technical data subject to ITAR control, as described on the U.S. Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants constantly change, often without notice, their views of what this scope entails.

16.     Americans have submitted thousands of written requests, known as "commodity jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.     From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the ITAR imposed a prepublication approval requirement on publications of privately generated ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication."

18.     Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of written opinions advising Congress, the White House, and the Department of State that the use of the ITAR to impose a prior restraint on publications of privately generated unclassified information into the public domain violated the First Amendment of the United States Constitution (the "Department of Justice memoranda").

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to Defendant DDTC, issued official guidance providing that "[a]pproval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote 3 from the ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

5

WASHAR0001978

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on

private, non-classified speech, the requirement was ostensibly removed in 1984.

21.     In 1995, Defendant the United States Department of State conceded in federal

court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable

interpretation of the provision, one that people of ordinary intelligence are least likely to assume

is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S.

Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22.     Prior to May 2013, Defendant the United States Department of State had not only

disavowed the prior restraint in public notices and in federal court, it had never publicly enforced

a prior restraint under the ITAR.

*The Published Files*

23.     Posting technical data on the Internet is perhaps the most common and effective

means of creating and disseminating information. A cursory search on Google and other Internet

search engines evidences that ITAR-controlled technical data is freely published in books,

scientific journals, and on the Internet.

24.     Plaintiff Defense Distributed publishes files on the Internet as a means of

fulfilling its primary missions to promote the right to keep and bear arms and to educate the

public.

25.     Defense Distributed privately generated technical information regarding a number

of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles,

and a handgun (the "Published Files").

6

WASHAR0001979

26. In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27. At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28. Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29. At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30. The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

WASHAR0001980

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015 — nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case — Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHAR0001981

38.     Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39.     On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40.     Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.     On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42.     The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

WASHAR0001982

43.     To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45.     Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46.     The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a). For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id*.

47.     DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

10

WASHAR0001983

48.     The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

*Great, Irreparable, and Continuing Harm*

49.     But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50.     DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

COUNT ONE

ULTRA VIRES GOVERNMENT ACTION

51.     Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.     The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

11

WASHAR0001984

COUNT TWO

RIGHT OF FREE SPEECH — U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT THREE

RIGHT TO KEEP AND BEAR ARMS — U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

12

WASHAR0001985

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW— U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution  requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

13

WASHAR0001986

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against

Defendants as follows:

1.    A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null

and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.    A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to Plaintiffs' public speech, to

include Internet postings of the Subject Files, violates the First Amendment to the United States

Constitution;

3.    A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to public speech, to include the

Internet posting of files used in the production of arms of the kind in common use for traditional

lawful purposes, including but not limited to the Subject Files, violates the Second Amendment

to the United States Constitution;

4.    A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to Plaintiffs' public speech, to

include Internet postings of the Subject Files, violates the Fifth Amendment to the United States

Constitution;

5.    An order permanently enjoining Defendants, their officers, agents, servants,

employees, and all persons in active concert or participation with them who receive actual notice

of the injunction, from enforcing the prepublication approval requirement against public speech

on privately generated unclassified information;

14

WASHAR0001987

6.      An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7.      Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.      Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                           Respectfully submitted,

/s/ Alan Gura
Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314
703.835.9085/Fax 703.997.7665
alan@gurapllc.com

/s/ Matthew Goldstein
Matthew Goldstein
D.C. Bar No. 975000*
Matthew A. Goldstein, PLLC
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20009
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
 jacks@fr.com
dmorris@fr.com

/s/ William B. Mateja
William B. Mateja
Texas State Bar No. 13185350
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
214.397.0030/Fax 214.397.0033
Mateja@polsinelli.com

/s/ Josh Blackman
Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admitted pro hac vice

15

## §2717. Defense trade controls registration fees

For each fiscal year, 100 percent of the registration fees collected by the Office of Defense Trade Controls of the Department of State shall be credited to a Department of State account, to be available without fiscal year limitation. Fees credited to that account shall be available only for payment of expenses incurred for-

(1) contract personnel to assist in the evaluation of defense trade controls license applications, reduction in processing time for license applications, and improved monitoring of compliance with the terms of licenses;

(2) the automation of defense trade controls functions, including compliance and enforcement activities, and the processing of defense trade controls license applications, including the development, procurement, and utilization of computer equipment and related software; and

(3) the enhancement of defense trade export compliance and enforcement activities, including compliance audits of United States and foreign parties, the conduct of administrative proceedings, monitoring of end-uses in cases of direct commercial arms sales or other transfers, and cooperation in proceedings for enforcement of criminal laws related to defense trade export controls.

WASHAR0001989

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
    Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
    Defendants.

No. 1:15-cv-372-RP

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

WASHAR0001990

**TABLE OF CONTENTS**

BACKGROUND ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     Plaintiffs' First Amendment Claims Should Be Dismissed ..........................................2

     A.    The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components ...........................................................................................................2

     B.    If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny. ............................................................................5

     C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad ................8

     D.    ITAR's Export Controls Are Not An Unconstitutional Prior Restraint ......10

II.    Plaintiffs' Second Amendment Claims Should Be Dismissed .....................................13

     A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge .............13

           1.    Defense Distributed Has Not Suffered a Harm to Second Amendment Interests. ..........................................................................14

           2.    SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any Second Amendment Injury is Not Traceable to Defendants' Acts. .......................................................15

     B.    Plaintiffs' Second Amendment Challenge Fails on the Merits .....................16

III.   Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ...........................19

CONCLUSION ....................................................................................................................20

WASHAR0001991

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010) ........................................................................................................15

*Bernstein v. U.S. Dep't. of Justice,*
192 F.3d 1308 (9th Cir. 1999) ........................................................................................................4

*Bernstein v. U.S. Dep't. of Justice,*
176 F.3d 1132 (9th Cir. 1999) ........................................................................................................4

*Bonds v. Tandy,*
457 F.3d 409 (5th Cir. 2006) ........................................................................................................14

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ....................................................................................................................8, 9

*Brockett v. Spokane Arcades,*
472 U.S. 491 (1985) ........................................................................................................................9

*Brown v. Entm't Merchs. Ass'n,*
564 U.S. 786 (2011) ......................................................................................................................17

*Brown v. Livingston,*
524 F. Appx. 111 (5th Cir. 2013) ................................................................................................15

*Bullfrog Films v. Wick,*
646 F. Supp. 492 (C.D. Cal. 1986) ................................................................................................4

*Capital Cities/ABC, Inc. v. Brady,*
740 F. Supp. 1007 (S.D.N.Y. 1990) ............................................................................................11

*Catholic Leadership Coal. of Tex. v. Reisman,*
764 F.3d 409 (5th Cir. 2014) ........................................................................................................10

*CFTC v. Vartuli,*
228 F.3d 94 (2d Cir. 2000) .......................................................................................................3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) ..........................................................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4,*
541 U.S. 774 (2004) ................................................................................................................11, 12

ii

WASHAR0001992

*Collins v. Morgan Stanley Dean Witter*,
   224 F.3d 496 (5th Cir. 2000) ............................................................................................. 3

*Def. Distributed v. Dep't of State*,
   121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ................................................... *passim*

*Def. Distributed v. Dep't of State*,
   838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
   rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
   *certiorari* denied, 138 S. Ct. 638 (2018) ........................................................... *passim*

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................................................................ 16

*Equal Rights Ctr. v. Post Properties, Inc.*,
   633 F.3d 1136 (D.C. Cir. 2011) ................................................................................... 16

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ................................................................................. 13, 14

*Fontenot v. McCraw*,
   777 F.3d 741 (5th Cir. 2015) ........................................................................................ 14

*Forsyth Cnty. v. Nationalist Movement*,
   505 U.S. 123 (1992) ........................................................................................................ 11

*Freedman v. State of Md.*,
   380 U.S. 51 (1965) .......................................................................................................... 11

*FW/PBS v. City of Dallas*,
   493 U.S. 215 (1990) ........................................................................................................ 14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ........................................................................................................ 10

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) .................................................................................................. 4, 5, 6

*Hotze v. Burwell*,
   784 F.3d 984 (5th Cir. 2015) ........................................................................................ 14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557 (1995) ........................................................................................................ 3

*Junger v. Daley*,
   209 F.3d 481 (6th Cir. 2000) ........................................................................................ 5

WASHAR0001993

*Karn v. U.S. Dept. of State,*
 925 F.Supp. 1 (D.D.C. 1996) ............................................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
 604 F. Supp. 280 (D.D.C. 1984) ..........................................................................................4

*Lewis v. Casey,*
 518 U.S. 343 (1996) ..........................................................................................................14

*Mance v. Sessions,*
 880 F.3d 183 (5th Cir. 2018) ......................................................................................*passim*

*Matal v. Tam,*
 137 S. Ct. 1744 (2017) .........................................................................................................6

*Mather v. Central Pac. Bank,*
 2014 WL 5580963 (D. Haw. 2014) ...................................................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
 466 U.S. 789 (1984) ............................................................................................................9

*Milwaukee Police Ass'n v. Jones,*
 192 F.3d 742 (7th Cir. 1999) .............................................................................................10

*Miss. State Democratic Party v. Barbour,*
 529 F.3d 538 (5th Cir. 2008) .............................................................................................14

*N.Y. State Club Ass'n v. City of New York,*
 487 U.S. 1 (1988) ................................................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
 700 F.3d 185 (5th Cir. 2012) ...............................................................................15, 16, 17

*Near v. Minnesota ex rel. Olson,*
 283 U.S. 697 (1931) .....................................................................................................11, 12

*New York Times Co. v. United States,*
 403 U.S. 713 (1971) ..........................................................................................................11

*Oller v. Roussel,*
 609 F. App'x 770 (5th Cir. 2015) ......................................................................................12

*Petro-Chem Processing v. EPA,*
 866 F.2d 433 (D.C. Cir. 1989) ..........................................................................................16

*Prometheus Radio Project v. FCC,*
 373 F.3d 372 (3d Cir. 2004) ..........................................................................................8, 18

iv

*Pub. Citizen, Inc. v. Bomer*,
  274 F.3d 212 (5th Cir. 2001) .......................................................................... 14, 15

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) .................................................................................... 5, 6

*S. Utah Wild. Alliance v. Palma*,
  2011 WL 2565198 (D. Utah 2011) ....................................................................15

*Sec'y of State of Md. v. Munson*,
  467 U.S. 947 (1984) ...........................................................................................9

*Second Amendment Arms v. City of Chicago*,
  135 F. Supp. 3d 743 (N.D. Ill. 2015) .................................................................14

*Shelby Cty. v. Holder*,
  133 S. Ct. 2612 (2013) ......................................................................................17

*Se. Promotions v. Conrad*,
  420 U.S. 546 (1975) ..........................................................................................12

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ......................................................................................14

*Stagg P.C. v. U.S. Dep't of State*,
  158 F. Supp. 3d 203 (S.D.N.Y. 2016),
  *aff'd*, 673 F. App'x 93 (2d Cir. 2016),
  *cert. denied*, 138 S. Ct. 721 (2018) ................................................................ 6, 9

*Teixeira v. County of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ...................................................................13, 14, 17

*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................................................2

*U.nited States v. Hicks*,
  980 F.2d 963 (5th Cir. 1992) ............................................................................ 8, 9

*United States v. Hsu*,
  364 F.3d 192 (4th Cir. 2004) .............................................................................20

*United States v. Chi Mak*,
  683 F.3d 1126 (9th Cir. 2012) ....................................................................*passim*

*United States v. Edler Indus., Inc.*,
  579 F.2d 516 (9th Cir. 1978) ........................................................................ 6, 11

v

WASHAR0001995

*United States v. Martinez,*
   904 F.2d 601 (11th Cir. 1990)........................................................................................................7

*United States v. Posey,*
   864 F.2d 1487 (9th Cir. 1989)......................................................................................................6

*United States v. Williams,*
   553 U.S. 285 (2008)....................................................................................................................20

*United States v. Zhen Zhou Wu,*
   711 F.3d 1 (1st Cir. 2013),
   *cert. denied sub nom., Yufeng Wei v. United States,* 134 S. Ct. 365 (2013)..............................2, 20

*Universal City Studios, Inc. v. Corley,*
   273 F.3d 429 (2d Cir. 2001) .........................................................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
   454 U.S. 464 (1982) ...................................................................................................................16

*Virginia v. Hicks,*
   539 U.S. 113 (2003) .....................................................................................................................9

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013) ................................................................................................ 3, 4, 9

*Warth v. Seldin,*
   422 U.S. 490 (1975) .....................................................................................................................8

*Williams-Yulee v. Florida Bar,*
   135 S. Ct. 1656 (2015).................................................................................................................8

**STATUTES**

18 U.S.C. § 2339B.............................................................................................................................5

22 U.S.C. § 2778…………….............................................................................................*passim*

**REGULATIONS**

22 C.F.R. § 120.1 *et seq.*.................................................................................................................2

22 C.F.R. § 120.4....................................................................................................................... 2, 8

22 C.F.R. § 120.6.................................................................................................................. 2, 7, 20

22 C.F.R. § 120.10...........................................................................................................*passim*

WASHAR0001996

22 C.F.R. § 120.11 .................................................................................................................. 7, 11

22 C.F.R. § 120.17 ....................................................................................................................19

**RULES**

Fed. R. Civ. P. 12(b)(6)................................................................................................................4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014)...........................................................................................8

Constitutionality of the Proposed Revision of the International
  Traffic in Arms Regulations,
    5 Op. O.L.C. 202 (1981)……………………………………………………………………13

WASHAR0001997

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
    Plaintiffs,

v.                          No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
    Defendants.

---

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7. On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

1

WASHAR0001998

*I*"). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451

(5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138

S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the

Second Amended Complaint ("SAC"). *See* ECF No. 90.

     In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory

provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its employees. 22 C.F.R. 120.1(a).
> The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6.
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

*DD I* at 686-87.[1]  This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

**I.    Plaintiffs' First Amendment Claims Should Be Dismissed.**

    A.  The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

WASHAR0001999

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

WASHAR0002000

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

4

manufacturing firearms and defense articles.[6]

      B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

      "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

      The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

      In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

WASHAR0002002

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

6

WASHAR0002003

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g.*, *HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

7

WASHAR0002004

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants'
interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the
commodity jurisdiction request process for determining whether information is subject to its export
controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding
statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as
here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative
term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply
associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively
narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis,
concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion
incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported
distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-
71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not
dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d
372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness
can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla.
Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's
regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C. ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See*
SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may
only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In
circumstances where a regulation is alleged to be so broad that it is incapable of any permissible
application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper,
as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb
'export.'" *DD II*, 838 F.3d at 466-67. But the <u>noun</u> "export" is defined as "[a] product <u>or service</u>
created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th
ed. 2014) (emphasis added).

WASHAR0002005

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

9

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

### D. ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

10

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

11

WASHAR0002008

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

WASHAR0002009

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II. Plaintiffs' Second Amendment Claims Should Be Dismissed.

### A. Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

13

WASHAR0002010

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

    1.  <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

    To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

    Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

WASHAR0002011

rights have been injured in fact.  *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

2. SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any Second Amendment Injury is Not Traceable to Defendants' Acts.

Associational standing is available for Second Amendment claims under the same standards as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that "its members would otherwise have standing to sue in their own right,"[11] including by pleading that they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v. Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at 698. But the Court recognized this standard had been met not by the original Complaint, but by supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as to standing and have failed to cure this defect through two amended complaints, the Court should dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac. Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified" as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it seeks to protect are germane to the organization's purpose; and [that] . . . the participation of individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Defendants are not aware of any reason to believe that the Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at issue here or that participation of SAF's members would be required in this action.

WASHAR0002012

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

      B.  <u>Plaintiffs' Second Amendment Challenge Fails on the Merits.</u>

      In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

      The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

WASHAR0002013

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

17

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

WASHAR0002015

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at

protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the

ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not

just by transmission over the Internet. Given that the available alternatives clearly would be

ineffective at preventing the broad circumvention of export controls for munitions technology, and

that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the

equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling

interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for

the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III.  Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its

Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin

application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department.

Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally

vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR

amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to

former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as

to this claim, given that the AECA authorizes the regulation of exports and that Defense

Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the

conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply

this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis,

Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority

conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778

authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1)
("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2)
("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a
defense article to an embassy . . . in the United States").

WASHAR0002016

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

WASHAR0002017

Dated: April 6, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

/s/ ERIC J. SOSKIN
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

WASHAR0002018

## CERTIFICATE OF SERVICE

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

_/s/ Eric J. Soskin_____
ERIC J. SOSKIN
Senior Trial Counsel

WASHAR0002019

| | |
|---|---|
| **From:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Sent:** | Thursday, April 19, 2018 2:58 PM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Cavnar, Anna <CavnarA@state.gov> |
| **Subject:** | RE: offer |

Sure, will do.  Talk to you soon.

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, April 19, 2018 2:57 PM
**To:** Freeman, Jeremy B; Heidema, Sarah J; Cavnar, Anna
**Subject:** RE: offer

4:00 works for us. We shouldn't need the bridge if it's just the four of us talking from two locations, want to dial Sarah's office at 3-2809?

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, April 19, 2018 2:43 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Cavnar, Anna <CavnarA@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>
**Subject:** RE: offer

Great.  Would 4pm work?  We'd just need to leave in time for a 4:30 meeting.

**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Thursday, April 19, 2018 12:22 PM
**To:** Freeman, Jeremy B; Cavnar, Anna
**Cc:** Hart, Robert L
**Subject:** RE: offer

Ok, thanks for the update.  I'm available after 3pm this afternoon.

**Official - SBU**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Thursday, April 19, 2018 12:17 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Cavnar, Anna <CavnarA@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>

**Subject:** RE: offer

Hi Sarah – we should be able to get back to you with some possible times to talk later this afternoon.  Anna is in court at the moment and I'm heading into meetings, so we haven't had a chance to connect yet or to review the letter from plaintiffs.

Jeremy

**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Thursday, April 19, 2018 9:43 AM
**To:** Freeman, Jeremy B; Cavnar, Anna
**Cc:** Hart, Robert L
**Subject:** offer

Please let me know when you are free to chat about the reply to the offer and next steps

Sarah


Sarah J. Heidema
Director
PM/DTCP
202-663-2809



**Official**
**UNCLASSIFIED**

WASHAR0002021

| From: | Fabry, Steven F <FabrySF@state.gov> |
|---|---|
| Sent: | Thursday, April 12, 2018 7:42 PM |
| To: | Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| Subject: | RE: PDAS cleared: DD offer |

Josh and I just talked to Jennifer.  She's fine with going ahead.  Thanks,

-- Steve

**Official - SBU**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Thursday, April 12, 2018 6:14 PM
**To:** Cavnar, Anna; Freeman, Jeremy B (FreemanJB@state.gov)
**Subject:** FW: PDAS cleared: DD offer

Turns out Josh wants to discuss this with Jennifer, sigh.  Will try to do so tonight.

**Official - SBU**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Thursday, April 12, 2018 5:38 PM
**To:** Heidema, Sarah J
**Cc:** Cavnar, Anna; Freeman, Jeremy B; Fabry, Steven F; Monjay, Robert; Hart, Robert L; Miller, Michael F; Dearth, Anthony M; Koelling, Richard W; PM-Staffers Mailbox
**Subject:** PDAS cleared: DD offer

PDAS cleared with no edits.

Samantha Sison
PM/FO SharePoint
202-647-0561

**Official**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Thursday, April 12, 2018 4:44 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** For immediate review: DD offer

Staffers:

Attached is the draft of the Defense Distributed settlement offer that we clear.  There is little substantive difference from the offer Tina cleared before, however, it does open the scope of release into the public domain of certain additional tech data for firearms and their parts and components.  Any additional tech data added to this is tech data that we are already proposing to move to DOC in the I-III rule.  Please send any questions to the folks copied here.  L needs to send back the document to DOJ tomorrow morning, so please clear it back to all on this distro NLT 10am tomorrow.

I am out tomorrow, however, I can be reached at 2023024422 and L folks (Steve, Jeremy and Anna- copied here) should be able to address any questions.

Sarah

**Official**
**UNCLASSIFIED**

WASHAR0002023

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § Case No. 15-CV-372-RP |
| | § |
| | § SECOND AMENDED |
| Plaintiffs, | § COMPLAINT |
| | § |
| v. | § |
| | § |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, | § |
| in his official capacity as Secretary of State; | § |
| DIRECTORATE OF DEFENSE TRADE CONTROLS, | § |
| Department of State Bureau of Political Military Affairs; | § |
| MIKE MILLER, in his official capacity as Acting | § |
| Deputy Assistant Secretary, Defense Trade Controls, | § |
| Bureau of Political Military Affairs, Department of | § |
| State; and SARAH J. HEIDEMA, in her official | § |
| capacity as Acting Director, Office of Defense Trade | § |
| Controls Policy, Bureau of Political Military Affairs, | § |
| Department of State; | § |
| | § |
| Defendants. | § |
| | § |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

1

WASHAR0002024

Contrary to the Justice Department's warning that such actions are unconstitutional, Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120 *et seq*. ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open forums, regarding arms in common use for lawful purposes. Defendants' censorship of Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments to the United States Constitution. Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this prior restraint scheme, and to recover money damages to compensate for the harm such application has already caused.

*The Parties*

1.      Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including in Texas. The purposes of SAF include promoting, securing, and expanding access to the exercise of the right to keep and bear arms; and education, research, publishing and legal

WASHAR0002025

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3.     Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4.     Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

5.     Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.     Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7.     Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8.     Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

WASHAR0002026

JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.     The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.     Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.     The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id.*

14.     The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

4

WASHAR0002027

15.     The scope of technical data subject to ITAR control, as described on the U.S. Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants constantly change, often without notice, their views of what this scope entails.

16.     Americans have submitted thousands of written requests, known as "commodity jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.     From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the ITAR imposed a prepublication approval requirement on publications of privately generated ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication."

18.     Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of written opinions advising Congress, the White House, and the Department of State that the use of the ITAR to impose a prior restraint on publications of privately generated unclassified information into the public domain violated the First Amendment of the United States Constitution (the "Department of Justice memoranda").

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to Defendant DDTC, issued official guidance providing that "[a]pproval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote 3 from the ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

5

WASHAR0002028

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

21.     In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22.     Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

*The Published Files*

23.     Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

24.     Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

25.     Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

WASHAR0002029

26.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

7

WASHAR0002030

31.    Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.    On June 4, 2015 — nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case — Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.    DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.    Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.    Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.    On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.    On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHAR0002031

38.    Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39.    On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40.    Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41.    On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42.    The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

9

WASHAR0002032

43.     To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45.     Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46.     The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a).  For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47.     DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

10

48.     The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

### *Great, Irreparable, and Continuing Harm*

49.     But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50.     DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

### COUNT ONE

### ULTRA VIRES GOVERNMENT ACTION

51.     Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.     The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

WASHAR0002034

COUNT TWO

RIGHT OF FREE SPEECH — U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT THREE

RIGHT TO KEEP AND BEAR ARMS — U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

WASHAR0002035

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW— U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

13

WASHAR0002036

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against

Defendants as follows:

1.      A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null

and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.      A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to Plaintiffs' public speech, to

include Internet postings of the Subject Files, violates the First Amendment to the United States

Constitution;

3.      A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to public speech, to include the

Internet posting of files used in the production of arms of the kind in common use for traditional

lawful purposes, including but not limited to the Subject Files, violates the Second Amendment

to the United States Constitution;

4.      A declaration that Defendants' prepublication approval requirement for privately

generated unclassified information, on its face and as applied to Plaintiffs' public speech, to

include Internet postings of the Subject Files, violates the Fifth Amendment to the United States

Constitution;

5.      An order permanently enjoining Defendants, their officers, agents, servants,

employees, and all persons in active concert or participation with them who receive actual notice

of the injunction, from enforcing the prepublication approval requirement against public speech

on privately generated unclassified information;

WASHAR0002037

6.     An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7.     Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8.     Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018

Respectfully submitted,

/s/ Alan Gura
Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314
703.835.9085/Fax 703.997.7665
alan@gurapllc.com

/s/ William B. Mateja
William B. Mateja
Texas State Bar No. 13185350
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
214.397.0030/Fax 214.397.0033
Mateja@polsinelli.com

/s/ Matthew Goldstein
Matthew Goldstein
D.C. Bar No. 975000*
Matthew A. Goldstein, PLLC
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20009
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

/s/ Josh Blackman
Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

*Admitted pro hac vice

15

WASHAR0002038

| | |
|---|---|
| **From:** | Soskin, Eric (CIV) |
| **To:** | "Matthew Goldstein" |
| **Cc:** | Robinson, Stuart J. (CIV); Alan Gura; Josh Blackman; David Morris |
| **Subject:** | RE: Draft Motion to Stay and Order |
| **Date:** | Wednesday, May 16, 2018 9:59:00 AM |

Matt,

Thank you for providing the Case Fees and Costs Record, which we have reviewed in connection with our efforts to obtain Department of Justice approval for the settlement. While we appreciate your efforts to isolate those entries referenced in the Offer of Settlement, and while we do not contest the amount sought related to costs or DDTC registration fees, some of the other billings exceed what we consider to be reasonable in connection with the activities leading to litigation and settlement of your clients' claims. Among these are the hours related to a request for reconsideration of Defense Distributed's commodity jurisdiction request; instances of double billing for the same activity; excessive pre-litigation staffing; and excessive hours related to drafting of the amended complaints. Rather than contest these items line-by-line, we propose a 15 percent reduction in the fee request unrelated to costs and registration fees, i.e., reducing the $32,843 attorneys' fees request to $27,916.55, for a total fees and cost recovery of $39,581.55.

Best,
Eric

**From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
**Sent:** Tuesday, May 01, 2018 5:55 PM
**To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>
**Cc:** Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>; Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; David Morris <dmorris@fr.com>
**Subject:** Re: Draft Motion to Stay and Order

Eric,

Attached please find Plaintiffs' Case Fees and Costs Record.

Of course, please feel call me with any questions.

-Matt

Matthew A. Goldstein | Counsel
GOLDSTEIN PLLC
1875 Connecticut Ave NW, 10th Floor
Washington, D.C. 20009
C: 1.202.550.0040
www.GoldsteinPLLC.com

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error,

please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the attorney-client privilege. Thank you.

> On Apr 30, 2018, at 10:06 AM, Soskin, Eric (CIV) <eric.soskin@usdoj.gov> wrote:
>
> Matt,
>
> We'd prefer the wording in the attached. You have our consent to file with these changes, or happy to discuss if needed.
>
> Thanks,
> Eric
>
> ---
>
> **From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
> **Sent:** Sunday, April 29, 2018 6:42 PM
> **To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>
> **Cc:** Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; David Morris <dmorris@fr.com>
> **Subject:** Draft Motion to Stay and Order
>
> Eric and Stuart,
>
> Please see the attached draft Motion to Stay and form of order.
>
> Look okay to file?
>
> -Matt
>
> Matthew A. Goldstein | Counsel
> GOLDSTEIN PLLC
> 1875 Connecticut Ave NW, 10th Floor
> Washington, D.C. 20009
> C: 1.202.550.0040
> www.GoldsteinPLLC.com
>
> This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the

WASHAR0002040

attorney-client privilege. Thank you.
<DD Proposed Order (revised).docx><DD Motion to Stay (revised).docx>

WASHAR0002041

| From: | Soskin, Eric (CIV) |
|---|---|
| To: | "Matthew Goldstein" |
| Cc: | Robinson, Stuart J. (CIV); Alan Gura; Josh Blackman; David Morris |
| Subject: | RE: Draft Motion to Stay and Order |
| Date: | Wednesday, May 16, 2018 9:59:00 AM |

Matt,

Thank you for providing the Case Fees and Costs Record, which we have reviewed in connection with our efforts to obtain Department of Justice approval for the settlement. While we appreciate your efforts to isolate those entries referenced in the Offer of Settlement, and while we do not contest the amount sought related to costs or DDTC registration fees, some of the other billings exceed what we consider to be reasonable in connection with the activities leading to litigation and settlement of your clients' claims. Among these are the hours related to a request for reconsideration of Defense Distributed's commodity jurisdiction request; instances of double billing for the same activity; excessive pre-litigation staffing; and excessive hours related to drafting of the amended complaints. Rather than contest these items line-by-line, we propose a 15 percent reduction in the fee request unrelated to costs and registration fees, i.e., reducing the $32,843 attorneys' fees request to $27,916.55, for a total fees and cost recovery of $39,581.55.

Best,
Eric

**From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
**Sent:** Tuesday, May 01, 2018 5:55 PM
**To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>
**Cc:** Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>; Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; David Morris <dmorris@fr.com>
**Subject:** Re: Draft Motion to Stay and Order

Eric,

Attached please find Plaintiffs' Case Fees and Costs Record.

Of course, please feel call me with any questions.

-Matt

Matthew A. Goldstein | Counsel
GOLDSTEIN PLLC
1875 Connecticut Ave NW, 10th Floor
Washington, D.C. 20009
C: 1.202.550.0040
www.GoldsteinPLLC.com

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error,

please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the attorney-client privilege. Thank you.

> On Apr 30, 2018, at 10:06 AM, Soskin, Eric (CIV) <eric.soskin@usdoj.gov> wrote:
>
> Matt,
>
> We'd prefer the wording in the attached.  You have our consent to file with these changes, or happy to discuss if needed.
>
> Thanks,
> Eric
>
> ----------------------------------------------------
>
> **From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
> **Sent:** Sunday, April 29, 2018 6:42 PM
> **To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>
> **Cc:** Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; David Morris <dmorris@fr.com>
> **Subject:** Draft Motion to Stay and Order
>
> Eric and Stuart,
>
> Please see the attached draft Motion to Stay and form of order.
>
> Look okay to file?
>
> -Matt
>
> Matthew A. Goldstein | Counsel
> GOLDSTEIN PLLC
> 1875 Connecticut Ave NW, 10th Floor
> Washington, D.C. 20009
> C: 1.202.550.0040
> www.GoldsteinPLLC.com
>
> This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the

attorney-client privilege. Thank you.
<DD Proposed Order (revised).docx><DD Motion to Stay (revised).docx>

WASHAR0002044

| | |
|---|---|
| **From:** | Soskin, Eric (CIV) |
| **To:** | "Matthew Goldstein" |
| **Cc:** | Robinson, Stuart J. (CIV); Alan Gura; Josh Blackman; David Morris |
| **Subject:** | RE: Draft Motion to Stay and Order |
| **Date:** | Wednesday, May 16, 2018 9:59:00 AM |

Matt,

Thank you for providing the Case Fees and Costs Record, which we have reviewed in connection with our efforts to obtain Department of Justice approval for the settlement. While we appreciate your efforts to isolate those entries referenced in the Offer of Settlement, and while we do not contest the amount sought related to costs or DDTC registration fees, some of the other billings exceed what we consider to be reasonable in connection with the activities leading to litigation and settlement of your clients' claims. Among these are the hours related to a request for reconsideration of Defense Distributed's commodity jurisdiction request; instances of double billing for the same activity; excessive pre-litigation staffing; and excessive hours related to drafting of the amended complaints. Rather than contest these items line-by-line, we propose a 15 percent reduction in the fee request unrelated to costs and registration fees, i.e., reducing the $32,843 attorneys' fees request to $27,916.55, for a total fees and cost recovery of $39,581.55.

Best,
Eric

**From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
**Sent:** Tuesday, May 01, 2018 5:55 PM
**To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>
**Cc:** Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>; Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; David Morris <dmorris@fr.com>
**Subject:** Re: Draft Motion to Stay and Order

Eric,

Attached please find Plaintiffs' Case Fees and Costs Record.

Of course, please feel call me with any questions.

-Matt

Matthew A. Goldstein | Counsel
GOLDSTEIN PLLC
1875 Connecticut Ave NW, 10th Floor
Washington, D.C. 20009
C: 1.202.550.0040
www.GoldsteinPLLC.com

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error,

please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the attorney-client privilege. Thank you.

On Apr 30, 2018, at 10:06 AM, Soskin, Eric (CIV) <eric.soskin@usdoj.gov> wrote:

Matt,

We'd prefer the wording in the attached.  You have our consent to file with these changes, or happy to discuss if needed.

Thanks,
Eric

**From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
**Sent:** Sunday, April 29, 2018 6:42 PM
**To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>
**Cc:** Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; David Morris <dmorris@fr.com>
**Subject:** Draft Motion to Stay and Order

Eric and Stuart,

Please see the attached draft Motion to Stay and form of order.

Look okay to file?

-Matt

Matthew A. Goldstein | Counsel
GOLDSTEIN PLLC
1875 Connecticut Ave NW, 10th Floor
Washington, D.C. 20009
C: 1.202.550.0040
www.GoldsteinPLLC.com

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the

attorney-client privilege. Thank you.
<DD Proposed Order (revised).docx><DD Motion to Stay (revised).docx>

WASHAR0002047

**MATTHEW A. GOLDSTEIN, PLLC**
**INTERNATIONAL TRADE**
1875 CONNECTICUT AVE NW, 10TH FL
WASHINGTON, D.C. 20009

**BY ELECTRONIC MAIL**
(c/o Eric.Soskin@usdoj.gov)

April 17, 2018

Mr. Eric Soskin
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, D.C. 20530

**SUBJECT:    Acceptance of Response to Offer of Settlement**
Case No. 15-cv-372-RP

Dear Mr. Soskin:

Our understanding is that the scope of "technical data that is the subject of this matter," as defined in the DEFENDANTS' RESPONSE TO OFFER OF SETTLEMENT for Case No. 15-cv-372-RP includes the Published Files, the Ghost Gunner Files, and the CAD Files.

We further understand that the scope of "technical data that is the subject of this matter" further includes the Other Files insofar as those files regard items exclusively in Category I(a) of the United States Munitions List (USML), or items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

We further understand that Category I(a) includes non-automatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm), to include barrels and receivers that would comprise such arms.

Based on the above understandings, Plaintiffs accept Defendants' RESPONSE TO OFFER OF SETTLEMENT for Case No. 15-cv-372-RP.

Further pursuant to the terms of Defendants' RESPONSE TO OFFER OF SETTLEMENT, please advise on the Department of Justice's final approval of the settlement.

Very truly yours,

Matthew A. Goldstein

cc:    Stuart Robinson, Department of Justice (Stuart.J.Robinson@usdoj.gov)

WASHAR0002048

## §2717. Defense trade controls registration fees

For each fiscal year, 100 percent of the registration fees collected by the Office of Defense Trade Controls of the Department of State shall be credited to a Department of State account, to be available without fiscal year limitation. Fees credited to that account shall be available only for payment of expenses incurred for-

(1) contract personnel to assist in the evaluation of defense trade controls license applications, reduction in processing time for license applications, and improved monitoring of compliance with the terms of licenses;

(2) the automation of defense trade controls functions, including compliance and enforcement activities, and the processing of defense trade controls license applications, including the development, procurement, and utilization of computer equipment and related software; and

(3) the enhancement of defense trade export compliance and enforcement activities, including compliance audits of United States and foreign parties, the conduct of administrative proceedings, monitoring of end-uses in cases of direct commercial arms sales or other transfers, and cooperation in proceedings for enforcement of criminal laws related to defense trade export controls.

WASHAR0002049

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Saturday, April 14, 2018 12:35 PM |
| To: | Cooper, John M <CooperJM3@state.gov>; Blaha, Charles O <BlahaCO@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Curran, Christopher P (Rome) <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C (Madrid) <HigginsSC@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants <SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T <ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Reeser, Tiffany R <ReeserTR@state.gov>; Killion, William <KillionW@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Finerty, Carol G (DRL) <FinertyCG@state.gov> |
| Subject: | RE: QFRMenendez313 |
| Attach: | ITAR Letter.pdf |

**Official**
**UNCLASSIFIED**

**From:** Cooper, John M
**Sent:** Saturday, April 14, 2018 12:16 PM
**To:** Paul, Joshua M ; Blaha, Charles O ; Koelling, Richard W ; Andrews, Cory ; Fabry, Steven F ; Curran, Christopher P ; Abisellan, Eduardo ; Higgins, Scott C ; Outzen, Richard H ; Wall, Amanda J ; Urena, Michael A ; McKay, Roland D ; Jost, Aaron W ; Lai, Borchien ; EUR-StaffAssistants
**Cc:** PM-CPA ; Legal-PM-DL ; SP_Staff Assistants ; Noonan, Michael J ; Christensen, Brent T ; PM/RSAT Team Leaders ; Bhatt, Aakash ; Faulkner, Charles S ; Reeser, Tiffany R ; Killion, William ; Steffens, Jessica L ; Finerty, Carol G (DRL)
**Subject:** RE: QFRMenendez313

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Saturday, April 14, 2018 12:09 PM
**To:** Blaha, Charles O <BlahaCO@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Cooper, John M <CooperJM3@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants <SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T <ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Reeser, Tiffany R <ReeserTR@state.gov>; Killion, William <KillionW@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Finerty, Carol G (DRL) <FinertyCG@state.gov>

**Subject:** RE: QFRMenendez313
Hi,

Josh
**Official**
**UNCLASSIFIED**

**From:** Blaha, Charles O
**Sent:** Saturday, April 14, 2018 12:02 PM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Cooper, John M <CooperJM3@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants <SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T <ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Reeser, Tiffany R <ReeserTR@state.gov>; Killion, William <KillionW@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Finerty, Carol G (DRL) <FinertyCG@state.gov>
**Subject:** RE: QFRMenendez313

**Official**
**UNCLASSIFIED**

**From:** Koelling, Richard W
**Sent:** Saturday, April 14, 2018 11:59 AM
**To:** Blaha, Charles O; Paul, Joshua M; Cooper, John M; Andrews, Cory; Fabry, Steven F; Curran, Christopher P; Abisellan, Eduardo; Higgins, Scott C; Outzen, Richard H; Wall, Amanda J; Urena, Michael A; McKay, Roland D; Jost, Aaron W; Lai, Borchien; EUR-StaffAssistants
**Cc:** PM-CPA; Legal-PM-DL; SP_Staff Assistants; Noonan, Michael J; Christensen, Brent T; PM/RSAT Team Leaders; Bhatt, Aakash; Faulkner, Charles S; Reeser, Tiffany R; Killion, William; Steffens, Jessica L; Finerty, Carol G (DRL)
**Subject:** RE: QFRMenendez313

Rick
Richard W. Koelling, Jr.

Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828
**Official**
**UNCLASSIFIED**

**From:** Blaha, Charles O
**Sent:** Saturday, April 14, 2018 11:44 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Cooper, John M <CooperJM3@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants <SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T <ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Reeser, Tiffany R <ReeserTR@state.gov>; Killion, William <KillionW@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Finerty, Carol G (DRL) <FinertyCG@state.gov>
**Subject:** RE: QFRMenendez313

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

Cob Blaha
**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Saturday, April 14, 2018 11:08 AM
**To:** Cooper, John M; Andrews, Cory; Koelling, Richard W; Fabry, Steven F; Curran, Christopher P; Abisellan, Eduardo; Higgins, Scott C; Outzen, Richard H; Wall, Amanda J; Urena, Michael A; McKay, Roland D; Jost, Aaron W; Lai, Borchien; EUR-StaffAssistants
**Cc:** PM-CPA; Legal-PM-DL; SP_Staff Assistants; Noonan, Michael J; Christensen, Brent T; PM/RSAT Team Leaders; Blaha, Charles O; Bhatt, Aakash; Faulkner, Charles S; Reeser, Tiffany R; Killion, William; Steffens, Jessica L
**Subject:** RE: QFRMenendez313
+Jess
**Official**
**UNCLASSIFIED**

**From:** Cooper, John M
**Sent:** Saturday, April 14, 2018 11:07 AM
**To:** Paul, Joshua M ; Andrews, Cory ; Koelling, Richard W ; Fabry, Steven F ; Curran, Christopher P ; Abisellan, Eduardo ; Higgins, Scott C ; Outzen, Richard H ; Wall, Amanda J ; Urena, Michael A ; McKay, Roland D ; Jost, Aaron W ; Lai, Borchien ; EUR-StaffAssistants
**Cc:** PM-CPA ; Legal-PM-DL ; SP_Staff Assistants ; Noonan, Michael J ; Christensen, Brent T ; PM/RSAT Team Leaders ; Blaha, Charles O ; Bhatt, Aakash ; Faulkner, Charles S ; Reeser, Tiffany R ; Killion, William
**Subject:** RE: QFRMenendez313

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Saturday, April 14, 2018 10:12 AM
**To:** Andrews, Cory <AndrewsC2@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Cooper, John M

<CooperJM3@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Curran, Christopher P <CurranCP@state.gov>;
Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Outzen, Richard H
<OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland
D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants
<EUR-StaffAssistants@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants
<SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T
<ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>; Blaha, Charles O
<BlahaCO@state.gov>
**Subject:** RE: QFRMenendez313

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Andrews, Cory
**Sent:** Saturday, April 14, 2018 10:10 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Cooper, John M <CooperJM3@state.gov>; Fabry, Steven F
<FabrySF@state.gov>; Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>;
Higgins, Scott C <HigginsSC@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Outzen, Richard H
<OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland
D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants
<EUR-StaffAssistants@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants
<SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T
<ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>; Blaha, Charles O
<BlahaCO@state.gov>
**Subject:** RE: QFRMenendez313

████████████████████████████████████████████

**Answer:**

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

**Cory Andrews**
**DRL/PPD**
**Ext. 7-4311**
**Official**
**UNCLASSIFIED**

**From:** Andrews, Cory
**Sent:** Saturday, April 14, 2018 10:07 AM
**To:** Koelling, Richard W; Cooper, John M; Fabry, Steven F; Curran, Christopher P; Abisellan, Eduardo; Higgins, Scott C; Paul, Joshua M;
Outzen, Richard H; Wall, Amanda J; Urena, Michael A; McKay, Roland D; Jost, Aaron W; Lai, Borchien; EUR-StaffAssistants
**Cc:** PM-CPA; Legal-PM-DL; SP_Staff Assistants; Noonan, Michael J; Christensen, Brent T; PM/RSAT Team Leaders; Blaha, Charles O
**Subject:** RE: QFRMenendez313
+ Cob Blaha
**Cory Andrews**

DRL/PPD
Ext. 7-4311
**Official - SBU**
**UNCLASSIFIED**

**From:** Koelling, Richard W
**Sent:** Saturday, April 14, 2018 9:48 AM
**To:** Cooper, John M; Fabry, Steven F; Curran, Christopher P; Abisellan, Eduardo; Higgins, Scott C; Paul, Joshua M; Outzen, Richard H;
Wall, Amanda J; Urena, Michael A; McKay, Roland D; Jost, Aaron W; Lai, Borchien; EUR-StaffAssistants; Andrews, Cory
**Cc:** PM-CPA; Legal-PM-DL; SP_Staff Assistants; Noonan, Michael J; Christensen, Brent T; PM/RSAT Team Leaders
**Subject:** RE: QFRMenendez313

████████████████████████████████████████████████████████

v/r Rick
Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828
**Official - SBU**
**UNCLASSIFIED**

**From:** Cooper, John M
**Sent:** Saturday, April 14, 2018 9:38 AM
**To:** Fabry, Steven F <FabrySF@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Curran, Christopher P
<CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Paul,
Joshua M <PaulJM@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena,
Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai,
Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov>; Andrews, Cory
<AndrewsC2@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants
<SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T
<ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>
**Subject:** RE: QFRMenendez313

████████████████████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Saturday, April 14, 2018 9:35 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Cooper, John M <CooperJM3@state.gov>; Curran, Christopher P
<CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Paul,
Joshua M <PaulJM@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena,
Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai,
Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov>; Andrews, Cory
<AndrewsC2@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants
<SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T
<ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>
**Subject:** RE: QFRMenendez313

████████████████████████████████████████████████████████

-- Steve
**Official - SBU**
**UNCLASSIFIED**

**From:** Koelling, Richard W
**Sent:** Saturday, April 14, 2018 9:32 AM
**To:** Cooper, John M; Curran, Christopher P; Abisellan, Eduardo; Higgins, Scott C; Paul, Joshua M; Outzen, Richard H; Wall, Amanda J; Urena, Michael A; McKay, Roland D; Jost, Aaron W; Lai, Borchien; EUR-StaffAssistants; Andrews, Cory
**Cc:** PM-CPA; Legal-PM-DL; SP_Staff Assistants; Noonan, Michael J; Christensen, Brent T; PM/RSAT Team Leaders
**Subject:** RE: QFRMenendez313

John,

Thank you.

Rick

Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828
**Official**
**UNCLASSIFIED**

**From:** Cooper, John M
**Sent:** Saturday, April 14, 2018 9:31 AM
**To:** Curran, Christopher P <CurranCP@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov>; Andrews, Cory <AndrewsC2@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants <SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T <ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>
**Subject:** RE: QFRMenendez313

**Answer:**

**Official**
**UNCLASSIFIED**

**From:** Curran, Christopher P
**Sent:** Saturday, April 14, 2018 8:48 AM
**To:** Koelling, Richard W <KoellingRW@state.gov>; Cooper, John M <CooperJM3@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov>; Andrews, Cory <AndrewsC2@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants <SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T

<ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>
**Subject:** RE: QFRMenendez313
Clear for D with edits (tracked).
Chris Curran
Special Assistant
Office of the Deputy Secretary
CurranCP@state.gov - 202.647.5888
**Question:**
I understand that State supports transferring control of lethal semiautomatic weapons and sniper rifles to the Commerce department, apparently in the belief that these dangerous weapons have somehow become less harmful. This move would not only subject these lethal weapons to less-stringent controls, but also conveniently remove them from being subject to Congressional review and disapproval – despite Congress's action in 2002 to subject them to greater oversight than tanks and aircraft. You may argue that State will still be able to intervene in proposed exports; to that I point out that State also proposed the sale of 27,000 assault weapons to the Philippine national police – who are conducting summary executions in the streets – and semiautomatic pistols to the same Turkish thugs who beat peaceful protestors in Washington last year – both of which were stopped only by the action of the Ranking Member, so I'm not reassured that State will intervene. Why does State believe that these weapons, which are much more likely to be misused – including being susceptible for transfer to terrorist and criminal networks – need to be subject to export requirements, in law and in regulation, than other lethal arms on the U.S. Munitions List?
**Answer:**



Official
UNCLASSIFIED

**From:** Koelling, Richard W
**Sent:** Saturday, April 14, 2018 8:42 AM
**To:** Cooper, John M <CooperJM3@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Higgins, Scott C <HigginsSC@state.gov>; Curran, Christopher P <CurranCP@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Outzen, Richard H <OutzenRH@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Urena, Michael A <UrenaMA@state.gov>; McKay, Roland D <McKayRD@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>; EUR-StaffAssistants <EUR-StaffAssistants@state.gov>; Andrews, Cory <AndrewsC2@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; SP_Staff Assistants <SP_StaffAssistants@state.gov>; Noonan, Michael J <NoonanMJ@state.gov>; Christensen, Brent T <ChristensenBT@state.gov>; PM/RSAT Team Leaders <PM_RSATTeamLeaders@state.gov>
**Subject:** QFRMenendez313

Very respectfully,
Rick Koelling
Richard W. Koelling, Jr.
Deputy Director (Acting)
Office of Defense Trade Controls Policy
Department of State
202-663-2828
Official

**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

**From:** Koelling, Richard W
**Sent:** Saturday, April 14, 2018 8:08 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** Michael Noonan <justnoonan@yahoo.com>
**Subject:** QFRMenendez314a (003)

Josh,

Rick
**Official**
**UNCLASSIFIED**

WASHAR0002057

# Congress of the United States
## Washington, DC 20515

August 29, 2016

The Honorable John F. Kerry
Secretary of State
2201 C Street NW
Washington, D.C.  20520

Dear Mr. Secretary,

We believe that the July 22 "guidance", requiring manufacturers and gunsmiths to register as exporters under the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR), and pay a $2,250 annual fee, is unnecessary and will have serious and negative consequences on the hundreds of thousands of small and medium-sized gunsmiths who operate in our districts.

The vast majority of our constituents engaged in gunsmithing make little to no income from their activities and often do it as a hobby or side business. They most certainly do not export firearms. They also do not manufacture firearms in any widely understood sense of the term. Therefore, it makes no sense for them to be required to pay $2,250 and register under AECA and ITAR. For those who do this work on the side - perhaps developing a small cottage business to supplement their income - the last thing they need is an edict from the federal government imposing crippling fees and requirements which are wholly unnecessary and nonsensical.

**We believe that the guidance effectively expands ITAR registration requirements and it should be rescinded immediately.**

**Expands ITAR Registrant Requirements**
We understand that the Directorate of Defense Trade Controls (DDTC) intended the 7-22-2016 guidance to simply clarify existing policy. In fact, in the opening of the guidance you state, "traditional gunsmithing activities do not constitute manufacturing for ITAR purposes, and therefore, do not require registration."

Unfortunately, the four pages which follow that introductory sentence run completely counter to your stated intent. As conveyed by the guidance from the DDTC, virtually any activity that involves modifications to an existing firearm to improve its accuracy or operation, or to change its caliber or round capacity would be treated by DDTC as controlled "manufacturing" of the firearm. While DDTC insists this is merely the "ordinary, contemporary, common meaning of 'manufacturing,'" it is anything but. Rather, DDTC's position is similar to claiming an auto mechanic who fixes or performs custom work on cars is a car manufacturer.

WASHAR0002058

Specifically, as outlined, the activity threshold that necessitates a type 07 FFL (Federal Firearms License-manufacturing) does not match up with the activities listed on page three of the guidance. That means that firearms dealers who engage in limited gunsmithing - activities that do not require a type 07 FFL - would still need to register with DDTC as manufacturers of a defense article listed on the United States Munitions List (USML).

**Gunsmiths Are Not Exporting Arms**
Not only does the guidance expand registration to gunsmiths who do not "manufacture" firearms, but also it also runs counter to the intent of AECA and ITAR, which are meant to control the production and exportation of military material, not the domestic repair or maintenance of a legal, common, and Constitutionally-protected product.

**The Big Picture & Best Solution: Move USML Items to Department of Commerce**
Finally, this would not be an issue if the Obama Administration finished its seven-year "Export Control Reform" initiative, which has bipartisan support in Congress. The very basis of that effort is the common sense notion that products intended only for military use should be subject to the highest standards of security and oversight, while regulation of products with general commercial applications should not unnecessarily hinder American business and innovation.

As part of the initiative, the Administration has been transferring regulatory responsibility for the USML from the State Department to the Commerce Department. So far, eighteen categories have been transferred; only three remain. We understand that draft regulations exist to finish the job in this export reform initiative.

**We urge you to publish the proposed rules to move the remaining three categories of USML to Commerce, which would make the problems raised in the 7-22-2016 guidance null and void.** On what date will the Administration finish the job and publish proposed rules in the Federal Register?

Our constituents need clarity and this guidance does not accomplish that end. The situation must be rectified and we ask for your immediate attention.

Sincerely

Steve Scalise (LA-01)

Patrick T. McHenry (NC-10)

Bob Goodlatte (VA-06)

Michael McCaul (TX-10)

WASHAR0002059

Steve Chabot (OH-01)

Dana Rohrabacher (CA-48)

Matt Salmon (AZ-05)

Tom Marino (PA-10)

Jeff Duncan (SC-03)

Mo Brooks (AL-05)

Randy K. Weber (TX-14)

Mark Meadows (NC-11)

Ted S. Yoho (FL-02)

Curt Clawson (FL-19)

Scott DesJarlais (TN-04)

Kevin Brady (TX-08)

Cresent Hardy (NV-04)

Chris Stewart (UT-02)

WASHAR0002060

Ralph Lee Abraham (LA-05)

John Fleming (LA-04)

Jody B. Hice (GA-10)

Dave Brat (VA-07)

Mark E. Amodei (NV-2)

Tom Cole (OK-04)

Christopher P. Gibson (NY-11)

Trent Kelly (MS-01)

Will Hurd (TX-23)

Keith J. Rothfus (PA-12)

Doug Lamborn (CO-05)

Robert J. Wittman (VA-01)

Mark Sanford (SC-01)

Todd Rokita (IN-4)

Ryan K. Zinke (MT-At Large)

Jeff Miller (FL-01)

Tom Graves (GA-14)

J. French Hill (AR-02)

Jeb Hensarling (TX-05)

Don Young (AK-At Large)

John Kline (MN-02)

Tom Price (GA-06)

Glenn Grothman (WI-06)

John R. Moolenaar (MI-04)

Brad R. Wenstrup (OH-02)

Gus M. Bilirakis (FL-12)

Steve Stivers (OH-15)

Charles W. Dent (PA-15)

WASHAR0002062

David Rouzer (NC-07)

Mike Rogers (AL-03)

Robert Aderholt (AL-04)

Tom Emmer (MN-06)

Mac Thornberry (TX-13)

Steve Womack (AR-03)

Bill Huizenga (MI-02)

Kenny Marchant (TX-24)

Jackie Walorski (IN-02)

Kevin Cramer (ND-At Large)

Robert Pittenger (NC-09)

Greg Walden (OR-02)

John Ratcliffe (TX-04)

Mike Pompeo (KS-04)

WASHAR0002063

Doug Collins (GA-09)

Paul A. Gosar (AZ-04)

Tim Murphy (PA-18)

Mike Bishop (MI-08)

George Holding (NC-13)

Glen "GT" Thompson (PA-05)

David P. Roe, MD (TN-01)

Earl L. "Buddy" Carter (GA-01)

Tom McClintock (CA-04)

Richard Hudson (NC-08)

Steve Pearce (NM-02)

Andy Harris (MD-01)

Mick Mulvaney (SC-05)

Charles W. Boustany, Jr., MD (LA-03)

WASHAR0002064

Diane Black (TN-06)

Marsha Blackburn (TN-07)

Evan Jenkins (WV-03)

Devin Nunes (CA-22)

Randy Neugebauer (TX-19)

Doug LaMalfa (CA-1)

Ken Buck (CO-04)

Bruce Westerman (AR-04)

Trey Gowdy (SC-04)

Jason Smith (MO-08)

Kristi Noem (SD-At Large)

Frank Guinta (NH-01)

Bradley Byrne (AL-01)

John Duncan (TN-02)

Michael C. Burgess (TX-26)

Chris Collins (NY-27)

Lamar Smith (TX-21)

Charles J. "Chuck" Fleischmann (TN-03)

Gregg Harper (MS-03)

Jim Jordan (OH-04)

Patrick J. Tiberi (OH-12)

Bill Posey (FL-08)

Bill Flores (TX-17)

Tim Walberg (MI-07)

Joe Wilson (SC-02)

Virginia Foxx (NC-05)

Bill Johnson (OH-06)

Robert E. Latta (OH-05)

Tim Huelskamp (KS-01)

Raul Labrador (ID-01)

Dan Newhouse (WA-04)

Mike Coffman (CO-06)

Mia B. Love (UT-04)

Rick W. Allen (GA-12)

Mike Kelly (PA-03)

John Katko (NY-24)

Richard Hanna (NY-22)

Adrian Smith (NE-03)

Stephen Lee Fincher (TN-08)

Alexander X. Mooney (WV-02)

Markwayne Mullin (OK-02)

Elise M. Stefanik (NY-21)

WASHAR0002067

Vicky Hartzler (MO-04)

WASHAR0002068

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.   *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)   Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)   Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0002069

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0002071

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.     *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0002072

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0002073

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0002074

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0002075

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _____, 2018

Dated: _June 29_, 2018

_____
Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _____, 2018

_____
Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0002076

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,           §
     Plaintiffs,                      §
                                      §
v.                                     §     No. 1:15-cv-372-RP
                                      §
U.S. DEPARTMENT OF STATE, et al.,      §
     Defendants.                      §

### STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.

Dated: June 29, 2018                        Respectfully submitted,

Matthew Goldstein                           CHAD A. READLER
D.C. Bar No. 975000*                        Acting Assistant Attorney General
Snell & Wilmer LLP                          Civil Division
One South Church Ave., Ste. 1500
Tucson, Arizona 85701                       ANTHONY J. COPPOLINO
520.882.1248 / Fax 520.884.1294             Deputy Branch Director
mgoldstein@swlaw.com                        Federal Programs Branch

Alan Gura
Virginia Bar No. 68842*
Gura PLLC                                    ERIC J. SOSKIN
916 Prince Street, Suite 107                Pennsylvania Bar No. 200663
Alexandria, Virginia 22314                  Senior Trial Counsel

1

WASHAR0002077

703.835.9085/Fax 703.997.7665

alan@guraplic.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

2

WASHAR0002078

| | |
|---|---|
| **From:** | Cavnar, Anna <CavnarA@state.gov> |
| **Sent:** | Monday, July 9, 2018 11:55 AM |
| **To:** | Soskin, Eric (CIV) <Eric.Soskin@usdoj.gov>; Robinson, Stuart J. (CIV) (Stuart.J.Robinson@usdoj.gov) |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | FW: Reporter hoping to talk about legal settlement with Defense Distributed |

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**From:** Fabry, Steven F
**Sent:** Monday, July 09, 2018 11:10 AM
**To:** Wall, Amanda J; Mason, Julia N; PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Ricci, Anthony; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed
It's Anna Cavnar and Jeremy Freeman who have the lead on this one; adding them.
**Official - SBU**
**UNCLASSIFIED**

**From:** Wall, Amanda J
**Sent:** Monday, July 09, 2018 11:03 AM
**To:** Mason, Julia N; PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Fabry, Steven F; Ricci, Anthony
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed
Adding Steve and Tony, who are tracking this case.
Best,
Amanda
This email is UNCLASSIFIED.

**From:** Mason, Julia N
**Sent:** Monday, July 09, 2018 11:02 AM
**To:** PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Wall, Amanda J
**Subject:** FW: Reporter hoping to talk about legal settlement with Defense Distributed
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
Thanks,
Julia

**From:** Andy Greenberg <agreenberg@wired.com>
**Sent:** Monday, July 09, 2018 10:55 AM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Reporter hoping to talk about legal settlement with Defense Distributed
State Department press contacts,
I'm a reporter with WIRED Magazine in New York, and I'm writing a story about the outcome of a three-year lawsuit brought against the State Department by a group called Defense Distributed and the Second Amendment Foundation.
It's my understanding that the plaintiffs were suing the State Department for allegedly unconstitutional attempts to prevent them from publishing technical digital files and models for guns on the web.
Now Defense Distributed tells me that the State Department has offered a settlement that essentially concedes most points of their argument and allows them (and others) to publish those firearm files online.
I'm working on a feature about the outcome of this lawsuit and how Defense Distributed plans to exploit that outcome: They now intend to publish a collection of gun files online that they've been preparing for some time.
Can someone at the State Department please get in touch to talk about the thinking behind this settlement and what it represents for arms control in the US and abroad?
I'm afraid that my deadline is rather pressing: I'd really appreciate a chance to talk to someone today if possible, or tomorrow at the very latest.
Thanks very much for your help and hope to hear from you soon!

Andy Greenberg
Senior Writer
WIRED
1 World Trade Center, NY, NY 10007
(917) 348-5427
**Official - Transitory**
**UNCLASSIFIED**

WASHAR0002080

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)   Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)   Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)   Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0002082

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0002083

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0002084

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

WASHAR0002085

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

WASHAR0002086

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0002087

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: _____, 2018

Dated: Jun 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: _____, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0002088

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

### STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson) and Defendants (the United States Department of State, the Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.

Dated: June 29, 2018

Respectfully submitted,

Matthew Goldstein
D.C. Bar No. 975000*
Snell & Wilmer LLP
One South Church Ave., Ste. 1500
Tucson, Arizona 85701
520.882.1248 / Fax 520.884.1294
mgoldstein@swlaw.com

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314

ERIC J. SOSKIN
Pennsylvania Bar No. 200663
Senior Trial Counsel

1

WASHAR0002089

703.835.9085/Fax 703.997.7665

alan@guraplle.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

2

WASHAR0002090

| | |
|---|---|
| **From:** | Freeman, Jeremy B </o=SBUState/ou=NCC AG/cn=Recipients/cn=FreemanJB> |
| **Sent:** | Friday, July 13, 2018 4:37 PM |
| **To:** | Foster, John A <FosterJA2@state.gov>; Cavnar, Anna <CavnarA@state.gov> |
| **Cc:** | Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| **Subject:** | RE: Clearance Request by COB Tomorrow: Defense Distributed Revised Settlement Item Two DDTC Website Announcement |

John –

This looks fine to me as revised. Anna is out this afternoon so she probably won't be able to review until Monday. In the meantime, I'll clean this up and run it by DOJ. I'll also check with DOJ on your question about the date of the settlement.

Thanks,

Jeremy

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Foster, John A
**Sent:** Friday, July 13, 2018 2:55 PM
**To:** Freeman, Jeremy B; Cavnar, Anna
**Cc:** Hart, Robert L; Monjay, Robert; Rogers, Shana A
**Subject:** RE: Clearance Request by COB Tomorrow: Defense Distributed Revised Settlement Item Two DDTC Website Announcement

Jeremy and Anna,

Just wanted to follow up to solicit your thoughts on the edits we made on top of yours yesterday.

Also, do you know the date the settlement was actually finalized? The attached version you sent us only has the plaintiffs' signature, and it was dated June 29.

Thanks,

John

**From:** Foster, John A
**Sent:** Thursday, July 12, 2018 3:22 PM
**To:** Freeman, Jeremy B <FreemanJB@state.gov>; Cavnar, Anna <CavnarA@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>
**Subject:** RE: Clearance Request by COB Tomorrow: Defense Distributed Revised Settlement Item Two DDTC Website Announcement

Jeremy and Anna,

Thanks for your prompt turn-around of the announcement, and thanks for helping us resolve the issue involving the compliant.

Rob and I just had a chance to go over your edits and comments, and we made a few of our own in response. Please let us know your thoughts when convenient.

Thanks,

John

**From:** Freeman, Jeremy B
**Sent:** Wednesday, July 11, 2018 5:17 PM
**To:** Foster, John A <FosterJA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>
**Subject:** RE: Clearance Request by COB Tomorrow: Defense Distributed Revised Settlement Item Two DDTC Website Announcement

John –

Anna and I reviewed the draft website announcement and our suggested changes are tracked here. If this looks ok to you as revised, please let us know and we will then send this on to DOJ for their review.

We don't see a problem with posting a file-stamped copy of the complaint (we have a login that allows us to access to the court's docket and can get a file-stamped copy for you) or the settlement agreement.

Jeremy

**Official - SBU (Attorney Work Product)**

**UNCLASSIFIED**

---

**From:** Foster, John A
**Sent:** Tuesday, July 10, 2018 1:23 PM
**To:** Cavnar, Anna; Freeman, Jeremy B
**Cc:** Hart, Robert L; Monjay, Robert
**Subject:** Clearance Request by COB Tomorrow: Defense Distributed Revised Settlement Item Two DDTC Website Announcement

Anna and Jeremy,

Following up on my email from last week about the Defense Distributed proposed revised settlement, we have moved on to draft the website announcement to comply with item two, which reads as follows:

2. Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of this matter. The announcement will appear on the Directorate of Defense Trade Controls website, www.pmddtc.state.gov, within 60 days of an agreement between the Parties to settle this matter. Following publication of the announcement on the website, the Parties will notify the Court that the announcement has been published and stipulating that Plaintiffs' claims are dismissed with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).

We based the language in the attached draft website announcement on both the language in ITAR § 126.2:

**§ 126.2 Temporary suspension or modification of this subchapter.**

The Deputy Assistant Secretary for Defense Trade Controls may order the temporary suspension or modification of any or all of the regulations of this subchapter in the interest of the security and foreign policy of the United States. and the definitions of the various files listed in the proposed revised settlement, a copy of which is also attached. Similar to the item three letter we sent you last week, we linked the file definitions back to the Plaintiffs' Second Amended Complaint to remove any doubt about what's being excluded from USML Category I. We are in somewhat of an awkward position, however, because it's unclear 1) whether we need to provide a link to Defense Distributed's Second Amended Complaint on DDTC's website; and 2) if so, where the link should be hosted. The document is current available via Scribd: https://www.scribd.com/document/370480661/Defense-Distributed-v-Department-of-State-Amended-Complaint, which admittedly is not an authoritative source. The document does not appear to be readily available on the District Court's website. DDTC could theoretically host a link to the complaint, but it's unclear whether that would be appropriate.

In sum, we are attempting to balance the need to comply with item two while effectively cabining the definition of the files with our interest in not inadvertently promoting dissemination of the files. Please let us know your thoughts on how to address this issue, and please also clear the attached announcement NLT COB tomorrow so that we can circulate it to a wider audience.

Thanks,

John

---

**From:** Cavnar, Anna
**Sent:** Thursday, July 5, 2018 3:45 PM
**To:** Foster, John A <FosterJA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Cc:** Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Clearance Request by COB Friday: Defense Distributed Revised Settlement Item Three Letter

Thanks, Jason. I just had a couple of small edits, attached. Let me know if you have any questions or concerns. I'll also send this to DOJ for their awareness.

Best,

Anna

SBU

This email is UNCLASSIFIED.

WASHAR0002092

**From:** Foster, John A
**Sent:** Tuesday, July 03, 2018 4:40 PM
**To:** Cavnar, Anna; Freeman, Jeremy B
**Cc:** Hart, Robert L; Monjay, Robert
**Subject:** Clearance Request by COB Friday: Defense Distributed Revised Settlement Item Three Letter

Anna and Jeremy,

As you are aware, the department is in the process of concluding a settlement agreement with Defense Distributed. As part of the third item under the revised settlement offer, we are obligated to provide a letter that approves the relevant files for public release under ITAR § 125.4(b)(13) and that recognizes DoS/DDTC as a cognizant USG agency with authority to issue said approval. The exact language from the revised settlement offer, a copy of which is attached, reads as follows:

> 3. Defendants' issuance of a letter to Plaintiffs, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13)

DTCP has drafted the attached letter to fulfill our obligations under item three. It draws closely from the revised settlement offer language. Please review and clear the letter by COB Friday, July 6, and please let us know if you have any questions.

Thanks,

John

**John A. Foster**
Office of Defense Trade Control Policy
Bureau of Political-Military Affairs
U.S. Department of State
Tel: 202-663-2816
Email: FosterJA2@state.gov

| | |
|---|---|
| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
| **Sent:** | Wednesday, July 11, 2018 3:45 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Cody Wilson's claims on settlement |
| **Attach:** | Press Points on Defense Distributed (L 2).docx; 2018-10366.pdf |

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, July 11, 2018 3:18 PM
**To:** Freeman, Jeremy B; Rogers, Shana A
**Subject:** RE: Cody Wilson's claims on settlement

**From:** Freeman, Jeremy B
**Sent:** Wednesday, July 11, 2018 3:11 PM
**To:** Cavnar, Anna; Rogers, Shana A
**Subject:** RE: Cody Wilson's claims on settlement
Some thoughts and comments here.

**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, July 11, 2018 2:19 PM
**To:** Rogers, Shana A; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement
A couple of edits from me, attached. Jeremy, would definitely appreciate it if you could take a look as well.

**From:** Rogers, Shana A
**Sent:** Wednesday, July 11, 2018 1:02 PM
**To:** Cavnar, Anna; Freeman, Jeremy B
**Subject:** FW: Cody Wilson's claims on settlement
Anna, Jeremy

Thanks,
Shana
**Official - SBU**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 12:42 PM
**To:** Heidema, Sarah J; Hart, Robert L; Paul, Joshua M
**Cc:** Miller, Michael F; Monjay, Robert; Rogers, Shana A; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement

Sarah,

Thanks, and completely agreed.

███████████████████████████

Thanks,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | 📱 BlackBerry: 202.550.3482 |
✉ e-mail: *mckeebydi@state.gov* | 🕊 Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



---

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 12:41 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Dave-

███████████████████████████

**Official**
**UNCLASSIFIED**

---

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:40 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob:

Thanks for that – how does this sound to you guys:

███████████████████████████

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | 🖥 BlackBerry: 202.550.3482 |
✉ e-mail: *mckeebydi@state.gov* | ☌ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:

**From:** Hart, Robert L
**Sent:** Wednesday, July 11, 2018 11:26 AM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M
<PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement
A few edits on first impression below--
Rob Hart
202.736.9221 | hartrl@state.gov
**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement



**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | ▤ BlackBerry: 202.550.3482 |
✉ e-mail: *mckeebydi@state.gov* | ✍ Web: *www.state.gov/t/pm/* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:

🄴 🄴 🄴 🄴 🄴 🄴 🄴

**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 10:20 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** Cody Wilson's claims on settlement



https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

WASHAR0002097

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also

WASHAR0002098

successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of

WASHAR0002099

the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

WASHAR0002100

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkelman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in, enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

WASHAR0002101

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the Ghost Gunner

*Michelle Groskopf*

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

*Michelle Groskopf*

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war

against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire online community of DIY gunmakers. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of 3-D-printable semiautomatics who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked

WASHAR0002103

prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called Crypto Wars of the 1990s. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance. he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, Daniel Bernstein, sued the government with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a

WASHAR0002105

curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era where Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

## More Great WIRED Stories

WASHAR0002106

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is really *really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
**Official**
**UNCLASSIFIED**

WASHAR0002107

## DEPARTMENT OF STATE

**22 CFR Parts 121, 123, 124, 126, and 129**

**[Public Notice 10094]**

**RIN 1400–AE30**

**International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).

**DATES:** The Department will accept comments on this proposed rule until July 9, 2018.

**ADDRESSES:** Interested parties may submit comments within 45 days of the date of publication by one of the following methods:

• *Email: DDTCPublicComments@ state.gov* with the subject line, "ITAR Amendment—Categories I, II, and III."

• *Internet:* At *www.regulations.gov,* search for this notice using Docket DOS–2017–0046.

Comments received after that date will be considered if feasible, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of confidentiality is asserted, because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at *www.pmddtc.state.gov.* Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov,* leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.

**FOR FURTHER INFORMATION CONTACT:** Robert Monjay, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–2817; email *DDTCPublicComments@state.gov.*

ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.,* "defense articles," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. The Department of Commerce is publishing a companion rule in this edition of the **Federal Register**.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the United States Munitions List under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1(b) of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the

U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule proposes adding a new paragraph (b)(2)(vii) to § 129.2 to update the enumerated list of actions that are not considered brokering. This change is a conforming change and is needed to address the movement of items from the USML to the CCL that will be subject to the brokering controls, to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport or retransfer of such items.

The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

### Revision of Category I

This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all

WASHAR0002108

weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".

## Revision of Category II

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f),

engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (11).

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

## Revision of Category III

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

## Conforming ITAR Changes

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions at § 123.17(a) through (e), which describe the firearms exemptions, because the paragraphs will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, § 123.16(b)(6) will be revised to describe only the remaining exemption at § 123.17 (personal protective gear), and § 123.16(b)(7) will be reserved. Section 123.17 will be amended to remove paragraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of § 124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in § 126.1(s) will be revised to remove reference to the firearms exemption in § 123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are on the USMIL for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

## Request for Comments

The Department welcomes comments from the public and specifically requests input on the following matters:

(1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in its Munitions List Categories 1, 2 and 3 (WA–ML1, WA–ML2 and WA–ML3). Readers are asked to identify any potential gap in coverage

**24200**   **Federal Register** / Vol. 83, No. 101 / Thursday, May 24, 2018 / Proposed Rules

brought about by the changes for USML Categories I, II and III contained in this notice and the new Category 0, 0x5zz ECCNs published separately by the Department of Commerce when reviewed together.

(2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms, large guns, armaments, ordnance and ammunition. The public should provide any specific examples of firearms (or parts, components, accessories thereof), large guns, armaments, ordnance or ammunition whose jurisdiction is unclear based on this revision.

(3) The Department has, in the past, adopted a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL. The Department seeks to allow industry sufficient time to implement this rule, including time to make changes to IT systems, technology controls plans, and other business processes. The public should provide input on the time necessary to implement any final rule for these categories, as well as a description of any increased burden that, in the view of the commenter, would be imposed on businesses or individuals should this rule be adopted.

## Regulatory Analysis and Notices

### Administrative Procedure Act

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, the Department is publishing this proposed rule with a 45-day provision for public comment.

### Regulatory Flexibility Act

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

### Unfunded Mandates Reform Act of 1995

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

### Executive Orders 12372 and 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL. We request comment from the public on any impact that would be imposed on the public if this rule were adopted.

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this proposed rule would decrease the number of license applications submitted to the Department under OMB Control No. 1405–0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department will be eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions will require an individual validated license. The Department of Commerce will be collecting the information necessary to process license applications under OMB Control No. 0694–0088. The Department of Commerce estimates that OMB Control No. 0694–0088 takes approximately 43.8 minutes for a manual or electronic submission. The Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection. The Department estimates a reduction in burden of 10,000 hours due to the proposed transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce will be 4,380 burden hours. Therefore, the net burden would be reduced by 5,620 hours. The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80. There may also be other State Department forms that will no longer need to be submitted and that may further reduce the burden hours for applicants. The Department is seeking comments on the reduction from the other forms, as referenced below.

In addition to the reduction in burden hours, there will be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other

related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to exporters under the EAR and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.

The Department welcomes comments from the public on the net reduction in burden described within this section, particularly if there are additional burden reductions that are not reflected here (please provide number of hours or cost) or if the estimates noted here appear otherwise inaccurate.

Estimated Cost Savings

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from Executive Order 13771 (82 FR 9339, February 3, 2017). Although the Department is of the opinion that this proposed rule is exempt from E.O. 13771 and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, this proposed rule is expected to be an E.O. 13771 deregulatory action. The Department has conducted this analysis in close consultation with the Department of Commerce. The total annual recurring dollar cost savings is estimated to be $1,376,281 for purposes of E.O. 13771 for the Department of State.

*Executive Order 12988*

The Department of State has reviewed this rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department of State has determined that this rulemaking will not have tribal implications, will not

impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

*Paperwork Reduction Act*

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

The Department of State believes there would be a reduction in burden for OMB Control No. 1405–0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data. This form is an application that, when completed and approved by Department of State, constitutes the official record and authorization for the commercial export of unclassified U.S. Munitions List articles and technical data, pursuant to the AECA and ITAR. For an analysis of the reduction in burden for OMB Control No. 1405–0003, see the above Section for E.O. 12866. The Department of State requests comments on the collection of information or potential reduction in burden be sent also to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for Department of State, at *OIRA_Submission@omb.eop.gov* or Attention: Desk Officer for Department of State, Office of Information and Regulatory Affairs of OMB, 725 17th St. NW, Washington, DC 20503.

List of Subjects in 22 CFR Parts 121, 123, 124, 126, and 129

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 121, 123, 124, 126, and 129 are proposed to be amended as follows:

**PART 121—THE UNITED STATES MUNITIONS LIST**

■ 1. The authority citation for part 121 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

**§ 121.1   The United States Munitions List.**

\*    \*    \*    \*    \*

**Category I—Firearms and Related Articles**

*(a) Firearms using caseless ammunition.

*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.,* Precision Guided Firearms (PGFs)), and specially designed parts and components therefor.

**Note to paragraph (c):** Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

*(e) Silencers, mufflers, and sound suppressors, and specially designed parts and components therefor.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm.

(3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Note 1 to Category I:** Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude: Any non-automatic or semi-

automatic firearms to .50 caliber (12.7 mm) inclusive; non-automatic shotguns; BB, pellet, and muzzle loading (*e.g.*, black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730 through 774).

**Note 2 to Category I:** The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant.

(2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

## Category II—Guns and Armament

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(5):** This paragraph does not control guns and armament greater than .50 caliber (12.7 mm) (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(5):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(5):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

**Note 1 to paragraph (a):** This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; or black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602.

**Note 2 to paragraph (a):** Guns and armament when integrated into their carrier (*e.g.*, ships, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with a minimum effective range of 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

**Note to paragraph (d):** Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independently powered ammunition handling systems and platform interface components as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

**Note to paragraph (j)(9):** For weapons mounts specially designed for ground vehicles, see Category VII.

(10) Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(11) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(15) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(16) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

Note to paragraph (x): Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

## Category III—Ammunition and Ordnance

\*(a) Ammunition, as follows:

(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

(2) Ammunition preassembled into links or belts;

(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

(4) Caseless ammunition manufactured with smokeless powder;

Note to paragraph (a)(4): Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

(7) Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles;

(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

Note 1 to paragraph (a)(10): This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

Note 2 to paragraph (a)(10): Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

Note 3 to paragraph (a)(10): This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

Note to paragraph (d)(2): This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.*, bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.*, fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.*, bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

Note to paragraph (d)(10): This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

\*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.).

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

Note to paragraph (x): Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

Notes to Category III: 1. This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

2. This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

3. Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

\*     \*     \*     \*     \*

## PART 123—LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

■ 3. The authority citation for part 123 continues to read as follows:

Authority: Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778,

2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112–55; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 4. Section 123.15 is amended by revising paragraph (a)(3) to read as follows:

**§ 123.15    Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.**

(a) * * *

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more.

* * * * *

■ 5. Section 123.16 is amended by revising paragraphs (b)(2) introductory text and (b)(6) and removing and reserving paragraph (b)(7) to read as follows:

**§ 123.16    Exemptions of general applicability.**

* * * * *

(b) * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

* * * * *

(6) For exemptions for personal protective gear, refer to § 123.17.

* * * * *

■ 6. Section 123.17 is amended by revising the section heading, removing and reserving paragraphs (a) through (e), and revising paragraph (j) to read as follows:

**§ 123.17    Exemption for personal protective gear.**

* * * * *

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

* * * * *

**§ 123.18    [Removed and Reserved]**

■ 7. Section 123.18 is removed and reserved.

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

■ 8. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 9. Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

**§ 124.14    Exports to warehouses or distribution points outside the United States.**

* * * * *

(c) * * *

(9) Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (e.g., cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

* * * * *

## PART 126—GENERAL POLICIES AND PROVISIONS

■ 10. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Section 7045, Pub. L. 112–74; Section 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 11. Section 126.1 is amended by revising paragraph(s) to read as follows:

**§ 126.1    Prohibited exports, imports, and sales to or from certain countries.**

* * * * *

(s) Zimbabwe. It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe,

except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

* * * * *

## PART 129—REGISTRATION AND LICENSING OF BROKERS

■ 12. The authority citation for part 129 continues to read as follows:

**Authority:** Section 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

■ 13. Section 129.1 is amended by revising paragraph (b) to read as follows:

**§ 129.1    Purpose.**

* * * * *

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

■ 14. Section 129.2 is amended by:

■ a. In paragraph (b)(2)(v), removing the word "or" at the end of the paragraph;

■ b. Removing the period at the end of paragraph (b)(2)(vi) and adding "; or" in its place; and

■ c. Adding paragraph (b)(2)(vii). The addition reads as follows:

**§ 129.2    Definitions.**

* * * * *

(b) * * *

(2) * * *

(vii) Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter.

* * * * *

■ 15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i) to read as follows:

**§ 129.4    Requirement for approval.**

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (see § 120.44 of this subchapter, and § 129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (see 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of § 121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the

U.S. Munitions Import List (*see* 27 CFR 447.21);

* * * * *

■ 16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

§ 129.6   **Procedures for obtaining approval.**

* * * * *

(b) * * *

(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

[FR Doc. 2018–10366 Filed 5–21–18; 8:45 am]

**BILLING CODE 4710–25–P**

| From: | McKeeby, David I <McKeebyDI@state.gov> |
|---|---|
| Sent: | Wednesday, July 11, 2018 4:17 PM |
| To: | Cavnar, Anna <CavnarA@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov> |
| Cc: | Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| Subject: | RE: Cody Wilson's claims on settlement |
| Attach: | 0711 Contingency Points--DDTC--Defense Distributed.docx |

██████████████████████████████████████████████████

Thanks,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | 📱 BlackBerry: 202.550.3482 |
✉ e-mail: *mckeeby@state.gov* | 🌐 Web: *www.state.gov/t/pm* / [Twitter: *@StateDeptPM*
Stay connected with *State.gov*:


**From:** Cavnar, Anna
**Sent:** Wednesday, July 11, 2018 4:02 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement
Some edits and comments from us, attached. We'll need to clear this with DOJ once it's cleaned up. Thanks.

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 12:42 PM
**To:** Heidema, Sarah J; Hart, Robert L; Paul, Joshua M
**Cc:** Miller, Michael F; Monjay, Robert; Rogers, Shana A; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Cody Wilson's claims on settlement
Sarah,
Thanks, and completely agreed.

███████████████████████████████████████████

Thanks,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | 📱 BlackBerry: 202.550.3482 |
✉ e-mail: *mckeeby@state.gov* | 🌐 Web: *www.state.gov/t/pm* / [Twitter: *@StateDeptPM*
Stay connected with *State.gov*:


**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 12:41 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement
Dave-

Official ████████████████████████████████████
UNCLASSIFIED

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:40 AM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement
Rob:

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Please advise and thanks,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | 📱 BlackBerry: 202.550.3482 |
✉ e-mail: *mckeeby@state.gov* | 🌐 Web: *www.state.gov/t/pm* / [Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**From:** Hart, Robert L
**Sent:** Wednesday, July 11, 2018 11:26 AM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement

Rob Hart
202.736.9221 | hartrl@state.gov
**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Wednesday, July 11, 2018 11:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** RE: Cody Wilson's claims on settlement



Best,
Dave
_____
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | 📱 BlackBerry: 202.550.3482 |
✉ e-mail: mckeeby@state.gov | 🌐 Web: www.state.gov/t/pm / |Twitter: @StateDeptPM
Stay connected with State.gov:



**From:** Heidema, Sarah J
**Sent:** Wednesday, July 11, 2018 10:20 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** McKeeby, David I <McKeebyDI@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Monjay, Robert <MonjayR@state.gov>
**Subject:** Cody Wilson's claims on settlement

https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/?mbid=social_fb

# A Landmark Legal Shift Opens Pandora's Box for DIY Guns

BY Andy Greenberg

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.[1]

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

Cody Wilson, the founder of Defense Distributed, plans to create the world's largest repository of digital gun files.

*Michelle Groskopf*

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms

WASHAR0002117

Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.

Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.

WASHAR0002118



All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make ensure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not

WASHAR0002119

seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkleman says. "When we say something is true, you absolutely know it's true."

One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Defense Distributed's optical comparator, a room-sized machine the group is using to convert physical guns to collections of digital measurements.

*Michelle Groskopf*

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in, enhance" Wilson jokes.

Wilson's first controversial innovation was to demonstrate how digital files could be converted to physical, deadly weapons.

*Michelle Groskopf*

He now sees an opportunity to cripple gun control with the opposite tactic: digitizing as many weapons as possible and making the files available to gunsmiths.

*Michelle Groskopf*

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

The staff of Defense Distributed: part startup, part advocacy group, part armed insurgency.

*Michelle Groskopf*

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

Most of Defense Distributed's staff work on the group's central source of revenue: building gun-making computer controlled milling machines called the Ghost Gunner

*Michelle Groskopf*

A Ghost Gunner can finish an AR-15 lower receiver, the central part of the rifle's frame, in a few hours. Defense Distributed has sold close to 6,000 of the machines.

WASHAR0002120

*Michelle Groskopf*

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire online community of DIY gunmakers. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of 3-D-printable semiautomatics who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called Crypto Wars of the 1990s. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance, he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, Daniel Bernstein, sued the government with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe.

But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually *is* a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from *The Decline and Fall of the Roman Empire* to *Hunger Games*. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

WASHAR0002121

To exploit a technical loophole that gives him access to military weapons files, Cody Wilson is also building a library. He proudly notes it will include the entire Criterion Collection on Blu-ray.

*Michelle Groskopf*

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson plans to bury this tombstone by his library's entrance. "It's maybe a little on the nose," he admits.

*Michelle Groskopf*

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

The flag of Goliad, which Wilson has adopted as a new symbol for his group. He suggests you interpret it as you will.

*Michelle Groskopf*

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era where Donald Trump is president and the law has surrendered to his will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

## More Great WIRED Stories

- This giant invasive flower can give you third-degree burns
- The Pentagon's dream team of tech-savvy soldiers
- PHOTO ESSAY: The annual super-celebration in Superman's real-world home
- It's time you learned about quantum computing
- Boeing's proposed hypersonic plane is really *really* fast
- Get even more of our inside scoops with our weekly Backchannel newsletter

[1]*Corrected 7/10/2018 2:30 EST to note that the first 3-D printed gun used .380-caliber ammunition, not .223-caliber.*

Sent from iPhone
703-307-8415
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
**Official**
**UNCLASSIFIED**

WASHAR0002122

| | |
|---|---|
| **From:** | Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov> |
| **Sent:** | Monday, July 9, 2018 11:57 AM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Soskin, Eric (CIV) <Eric.Soskin@usdoj.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Reporter hoping to talk about legal settlement with Defense Distributed |

████████████████████████████████

Best,
Stuart

**From:** Cavnar, Anna [mailto:CavnarA@state.gov]
**Sent:** Monday, July 09, 2018 8:55 AM
**To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** FW: Reporter hoping to talk about legal settlement with Defense Distributed

████████████████████████████████████████████████████

**From:** Fabry, Steven F
**Sent:** Monday, July 09, 2018 11:10 AM
**To:** Wall, Amanda J; Mason, Julia N; PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Ricci, Anthony; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Wall, Amanda J
**Sent:** Monday, July 09, 2018 11:03 AM
**To:** Mason, Julia N; PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Fabry, Steven F; Ricci, Anthony
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

████████████████████████████

Best,
Amanda


This email is UNCLASSIFIED.


**From:** Mason, Julia N
**Sent:** Monday, July 09, 2018 11:02 AM
**To:** PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Wall, Amanda J
**Subject:** FW: Reporter hoping to talk about legal settlement with Defense Distributed

████████████████████████

Thanks,
Julia

**From:** Andy Greenberg <agreenberg@wired.com>
**Sent:** Monday, July 09, 2018 10:55 AM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Reporter hoping to talk about legal settlement with Defense Distributed

State Department press contacts,

I'm a reporter with WIRED Magazine in New York, and I'm writing a story about the outcome of a three-year lawsuit brought against the State Department by a group called Defense Distributed and the Second Amendment Foundation.

It's my understanding that the plaintiffs were suing the State Department for allegedly unconstitutional attempts to prevent them from publishing technical digital files and models for guns on the web.

Now Defense Distributed tells me that the State Department has offered a settlement that essentially concedes most points of their argument and allows them (and others) to publish those firearm files online.

I'm working on a feature about the outcome of this lawsuit and how Defense Distributed plans to exploit that outcome: They now intend to publish a collection of gun files online that they've been preparing for some time.

Can someone at the State Department please get in touch to talk about the thinking behind this settlement and what it represents for arms control in the US and abroad?

I'm afraid that my deadline is rather pressing: I'd really appreciate a chance to talk to someone today if possible, or tomorrow at the very latest.

Thanks very much for your help and hope to hear from you soon!

Andy Greenberg
Senior Writer
WIRED
1 World Trade Center, NY, NY 10007
(917) 348-5427
**Official - Transitory**
**UNCLASSIFIED**

| From: | Mason, Julia N <MasonJN@state.gov> |
|---|---|
| Sent: | Friday, July 13, 2018 10:31 AM |
| To: | Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Cappiello McCarthy, Cheryl A <CappielloCA@state.gov>; Thibodeau, Jessica K <ThibodeauJK@state.gov>; Ricci, Anthony <RicciA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| Subject: | RE: Reporter hoping to talk about legal settlement with Defense Distributed |
| Attach: | New York Times request re_ Cody Wilson settlement.msg |

███████████████████████████████████████████████████

Thanks,
Julia
**Official - Transitory**
**UNCLASSIFIED**

**From:** Mason, Julia N
**Sent:** Monday, July 09, 2018 12:05 PM
**To:** Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Cappiello, Cheryl A <CappielloCA@state.gov>; Thibodeau, Jessica K <ThibodeauJK@state.gov>; Ricci, Anthony <RicciA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

████████████████████████████
**Official - Transitory**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Monday, July 09, 2018 11:53 AM
**To:** Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Mason, Julia N <MasonJN@state.gov>; PM-CPA <PM-CPA@state.gov>; Cappiello, Cheryl A <CappielloCA@state.gov>; Thibodeau, Jessica K <ThibodeauJK@state.gov>; Ricci, Anthony <RicciA@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

███████████████████████████████████████████████████

**From:** Fabry, Steven F
**Sent:** Monday, July 09, 2018 11:10 AM
**To:** Wall, Amanda J; Mason, Julia N; PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Ricci, Anthony; Cavnar, Anna; Freeman, Jeremy B
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

███████████████████████████████
**Official - SBU**
**UNCLASSIFIED**

**From:** Wall, Amanda J
**Sent:** Monday, July 09, 2018 11:03 AM
**To:** Mason, Julia N; PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Fabry, Steven F; Ricci, Anthony
**Subject:** RE: Reporter hoping to talk about legal settlement with Defense Distributed

███████████████████████████████
Best,
Amanda
This email is UNCLASSIFIED.

**From:** Mason, Julia N
**Sent:** Monday, July 09, 2018 11:02 AM
**To:** PM-CPA; Cappiello, Cheryl A; Thibodeau, Jessica K; Wall, Amanda J
**Subject:** FW: Reporter hoping to talk about legal settlement with Defense Distributed

███████████████████████████████████████████████████████████

**From:** Andy Greenberg <agreenberg@wired.com>
**Sent:** Monday, July 09, 2018 10:55 AM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Reporter hoping to talk about legal settlement with Defense Distributed

State Department press contacts,

I'm a reporter with WIRED Magazine in New York, and I'm writing a story about the outcome of a three-year lawsuit brought against the State Department by a group called Defense Distributed and the Second Amendment Foundation.

It's my understanding that the plaintiffs were suing the State Department for allegedly unconstitutional attempts to prevent them from publishing technical digital files and models for guns on the web.

Now Defense Distributed tells me that the State Department has offered a settlement that essentially concedes most points of their argument and allows them (and others) to publish those firearm files online.

I'm working on a feature about the outcome of this lawsuit and how Defense Distributed plans to exploit that outcome: They now intend to publish a collection of gun files online that they've been preparing for some time.

Can someone at the State Department please get in touch to talk about the thinking behind this settlement and what it represents for arms control in the US and abroad?

I'm afraid that my deadline is rather pressing: I'd really appreciate a chance to talk to someone today if possible, or tomorrow at the very latest.

Thanks very much for your help and hope to hear from you soon!

Andy Greenberg
Senior Writer
WIRED
1 World Trade Center, NY, NY 10007
(917) 348-5427
**Official - Transitory**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Hsu, Tiffany <tiffany.hsu@nytimes.com> |
| **Sent:** | Friday, July 13, 2018 9:31 AM |
| **To:** | PA Press Duty <PAPressDuty@state.gov> |
| **Subject:** | New York Times request re: Cody Wilson settlement |

Hello,

I am a business reporter with the New York Times. Can State provide a comment on the settlement in Defense Distributed et al v. Department of State? When was the settlement reached? Why is the government paying $39,000 of Mr. Wilson's legal fees? Why was the settlement reached now, when the case has extended for years?

Thank you,
Tiffany Hsu

--
212-556-1896
@tiffkhsu

WASHAR0002127



One Hundred Twelfth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.hcfa.house.gov

December 6, 2011

The Honorable Hillary Rodham Clinton
Secretary of State
U.S. Department of State
2201 C Street, N.W.
Washington, DC 20520

Dear Madam Secretary:

I am writing in regard to a presentation made by Assistant Secretary Andrew J. Shapiro on November 8th regarding proposed changes in the process for notifying Congress of major defense sales and the removal of defense articles from the United States Munitions List (USML), as required by the Arms Export Control Act (AECA). In that vein, I am requesting: (1) formal comments to both H.R. 2122, legislation I introduced on this issue, and to the proposals put forward by Ranking Member Howard L. Berman; (2) a formal, written legal analysis of the extent to which an entire USML category may be encompassed within the scope of a single 38(f) notification; and (3) a formal legislative request from the Executive Branch for authorization to create a single control list, and single licensing and enforcement agencies.

Madam Secretary, while I am open to working with the Administration to identify mutually acceptable process improvements in the consultation and notification process for arms sales, the framework proposed at the November 8th meeting raises concerns and is counterproductive.

Likewise, neither the plain meaning of section 38(f) of the Arms Export Control Act nor any applicable precedent justify the Department's apparent intention to submit an entire USML category within a single such notification. This view is shared on a bipartisan and bicameral basis.

The Administration should work with the Committees of jurisdiction to find a credible means to reconcile the unprecedented scope of the Administration's USML review with the statutory requirements of the AECA and related Congressional oversight

With the exception of one regrettable episode in 2006, every Administration and every Congress since enactment of the Arms Export Control Act has respected the protocols governing the notification of arms sales. These protocols provide a basis by which important national security and foreign policy questions can be addressed informally, before a notification is submitted. This process provides an effective means by which Congress can express its interest in U.S. sales of arms to foreign governments, and receive adequate notice before the commencement of the 30-day period provided for in the statute for deciding whether to prohibit a sale by enacting a resolution of

The Honorable Hillary Rodham Clinton
December 6, 2011
Page two

disapproval. The protocols thereby help to ensure that the Legislative and Executive Branches present a common position before the world on these sensitive matters.

The process proposed by the Department, however, would essentially eliminate these informal discussions. By endeavoring to curtail Executive-Legislative branch consultations on major arms sales, the Administration would make it more likely, not less, that conflict with Congress could erupt publicly over national security and foreign policy issues associated with major arms sales. Clearly, this unhelpful result would not be in the foreign policy nor national security interests of the United States.

In addition, the Administration's proposal appears to have been put forward without reference to legislation I have introduced on this issue or to proposals included in a letter from the Ranking Member of this Committee.

As you know, the comprehensive nature of the Administration's USML review presents extraordinary challenges with respect to the requirement for consultation with Congress. Because of the many complex technical and policy judgments that will be required, particularly with respect to major end-items, I have introduced legislation (H.R. 2122, the "Export Administration Renewal Act of 2011") that would prioritize the movement of low level parts and components currently controlled on the USML to the Commerce Control List.

In this context, I request that you provide formal comments to both H.R. 2122 and the proposals noted above put forward by the Ranking Member. Likewise, I request that you provide a formal, written legal analysis of the extent to which an entire USML category may be encompassed within the scope of a single 38(f) notification.

Finally, Congress has not yet received a formal legislative request from the Executive Branch for authorization to create a single control list, and single licensing and enforcement agencies. I request that you provide the Committee with an update on this matter and forward such legislation for our consideration.

The Committee is prepared to work constructively with the Department on these matters but is not willing to acquiesce to unilateral process changes that would significantly diminish Congressional oversight over either major arms sales or the proposed removal of defense articles from the U.S. Munitions List.

Thank you for your attention to these matters.

Sincerely,

ILEANA ROS-LEHTINEN
Chairman

| | |
|---|---|
| **From:** | Tucker, Maureen E <TuckerME@state.gov> |
| **Sent:** | Monday, November 7, 2011 10:01 AM |
| **To:** | Smith, Mark C <SmithMC@state.gov> |
| **Cc:** | Shapiro, Andrew J <ShapiroA@state.gov>; O'Neal, Kevin M <ONealKM@state.gov>; Reed, Julia G <ReedJG@state.gov>; McCormick, Beth M <mccormickbm@state.gov>; Kovac, Robert S <KovacRS@state.gov>; Quinn, David P <QuinnD@state.gov>; Meier, Michael W <MeierMW@state.gov> |
| **Subject:** | CN papers for Hill |
| **Attach:** | Proposed FMSDCS Process 10-26-11.doc; Proposed 38(f) Process 11-4-11final.doc |

HI Mark, here are the two papers for transmittal to the Hill today.  Thanks, Maureen

WASHAR0002130

**Proposed Process for Notifying Congress
of Foreign Military Sales and Direct Commercial Sales**

<u>Step 1</u> – Pre-decisional information will be shared with congressional staffs 5-10 days after received by the Department. This should give staffs approximately 50 additional days of advance notice for DCS and up to 14 additional days for FMS whereby they can analyze a proposed sale before it is submitted for a 20-day review.

<u>Step 2</u> – If a QME Determination report is required for a sale the Department will forward it prior to initiating the 20-day review period.  This will ensure congressional staffs have full details available during their analysis.

<u>Step 3</u> – Upon successful completion of the inter-agency review, the Department will deliver a draft notification electronically to staffs to start the 20-day review period.  For FMS to Non-NATO+5 countries the Administration will continue to meet the commitment made to the Senate by DOD in 1976 and provide a 20-day Informal Notification in lieu of the 20-day review. The 20-day review period or 20-day Informal Notification may be waived by congressional staffs for greater efficiencies.  (Note:  On rare occasions, the Department may wish to notify immediately without conducting a congressional staff review to meet emergency, operational, or support the requirements of close allies.  For particularly sensitive sales where the level of Congressional concern is likely to be high, such as the FMS Saudi Arabia arms sale in 2010, the Department would extend the review period to allow adequate time for briefings and meetings. However, these cases would be the exception to the 20-day review timeline.)

<u>Step 4</u> – On day 21, the Department will start the statutory 15- or 30-day notification as required by the AECA §3, or §36(b)/(c)/(d).  If congressional staffs have open questions, a case notification may still proceed.  If the Department decided to proceed with such a notification, Congressional staffs would be alerted to the Department's intent and offered an opportunity to have their Principal raise an objection or concern. If a concern or objection has been raised by conclusion of the 20-day review period, congressional staffs may request the review period be extended for 7 days in order to enable the Chairman or Ranking Member to address the issue with the Department. If a concern has been raised by a Principal, a notification will not go forward until the Department determines how and in what manner to address the concern of the Chairman or Ranking Member. Cases with raised concerns will not be forwarded for a statutory notification to Congress until the Department informs the Chairman and Ranking Member that the case will be moving forward.

WASHAR0002131

11/4/11

**Proposed Process for Notifying Congress
about Removals of Defense Articles from the U.S. Munitions List**

<u>**Reform-Related Removals**</u>

<u>Step 1</u> – The Department of State (the Department) will provide to SFRC and HFAC staffs proposed changes to the USML related to the Administration's Export Control Reform (ECR) initiative that would result in removals of items from the USML, once the proposed rule to implement the removal is near publication in the FR.  The Department will offer to brief staffs on the rule.  Provision of the proposed rule and the offer to brief on it will occur not less than **7 days** prior to publication, and can occur at any time during the year.  **Cumulative Days: 7**

<u>Step 2</u> – Changes to the USML (and the related proposed changes to the Commerce Control List (CCL)) will be published in the FR in proposed form with at least a **30-day** public comment period.  A State-led interagency team will be available to brief Members or staff as requested during that time.  **Cumulative Days: At least 37**

<u>Step 3</u> – The Department will revise **ECR-related** changes to the USML as warranted per the staff/public comments received, which can take from 10-20 business days (2-4 weeks).  **Cumulative Days: At least 47-67**

<u>Step 4</u> -- Once text is agreed interagency, the Department will provide the draft final rules, as well as deliver and post electronically notification of the resulting removals, to the staffs to start a **30-day** review period.  **Cumulative Days: At least 77-97**

<u>Step 5</u> – At the conclusion of the 30-day review period described in Step 4, State will deliver the formal 38(f) notification to start the **30-day** notification period required by the AECA.  This step can occur so long as Congress is not adjourned.  The Department will incrementally publish final rules once all proposed rules have been published.  C**umulative Days: At least 107-127**

<u>**Individual Removals**</u>

<u>Step 1</u> – The Department will deliver a draft, interagency agreed notification electronically to staffs to start a **30-day review** period.  During this period, which can occur at any time during the year, a State-led interagency team will be available for briefings at staff request.  This period may be extended for up to an **additional 7 days** at the Staff Director's written request, after which the process will proceed to the next step.  **Cumulative Days: 30-37**

<u>Step 2</u> – At the conclusion of the 30-day review period described in Step 1, the Department will start the **30-day** notification period required by Section 38(f) of the Arms Export Control Act.  This step can occur so long as Congress is not adjourned.  **Cumulative Days: 60-67**

<u>Step 3</u> – At the conclusion of the 30-day notification required by Section 38(f) of the AECA, if no Congressional action has been taken pursuant to Section 3 or 36, the rule change will be transmitted to the *Federal Register* (FR) for publication.

WASHAR0002132

**From:**      Paul, Joshua M <PaulJM@state.gov>
**Sent:**      Friday, July 27, 2018 7:53 PM
**To:**        Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>;
               Miller, Michael F <Millermf@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>;
               Darrach, Tamara A <DarrachTA@state.gov>; Kaidanow, Tina S
               <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>
**Cc:**        PM-CPA <PM-CPA@state.gov>
**Subject:**   42 Reps Urge Hearing on 3D Guns
**Attach:**    Hearing Letter.pdf

See attached, FYI. Sorry for poor quality, it's a screengrab off Twitter.

WASHAR0002133

Congress of the United States
Washington, DC 20515

July 26, 2018

The Honorable Bob Goodlatte
Chairman
Committee on the Judiciary
U.S. House of Representatives
2138 Rayburn HOB
Washington, DC 20515

The Honorable Edward R. Royce
Chairman
Committee on Foreign Affairs
U.S. House of Representatives
2170 Rayburn HOB
Washington, DC 20515

Dear Chairman Goodlatte and Chairman Royce:

We write to demand that you urgently schedule a joint hearing of the Judiciary and Foreign Affairs Committees to examine the recent settlement by the State Department and Department of Justice in the *Defense Distributed et al v. U.S. Department of State* case.

One week from today, Defense Distributed will be allowed to publish instructions for making guns at home. Using an inexpensive 3-D printer, anyone will be able to use these blueprints to turn modest raw materials into untraceable, fully functional firearms. So-called "ghost guns" do not bear a manufacturer's serial number and may be constructed using plastic materials that are impossible to screen at security checkpoints using metal detectors, like many used to keep guns out of airport terminals by the Transportation Security Administration. The free flow of this information on the internet will allow anyone to circumvent the Arms Export Control Act. More alarmingly, under the settlement anyone, even those who couldn't pass a background check, will be able to access these plans to print a gun with just a few clicks. These blueprints will allow individuals who have been convicted of felonies to skirt state and federal laws that prevent them from possessing firearms and put guns directly into dangerous hands. This settlement will put American lives at risk, and it demands our urgent attention.

The Trump Administration's decision to settle this case will only worsen the gun violence epidemic in America. This week, we marked the 20th anniversary of the assassination of two U.S. Capitol Police Officers on Capitol Hill. On July 24, 1998, Detective John M. Gibson and Officer Jacob J. Chestnut were shot and killed. In the 20 years since, Congress has spent millions of taxpayer dollars to harden the Capitol complex against attacks. We've added protective barriers, a new visitors center, and security checkpoints with scanners and metal detectors. Sadly, after 17 people were killed at Marjory Stoneman Douglas High School in Parkland, Florida, 10 people were killed at Santa Fe High School in Texas, and more than 20 other shootings in 2018, schools around the country are now engaging in a similar process of hardening their schools. They have to do this because guns are too easy to get in America. It's too easy for people who are not safe and responsible gun owners to get them. Unfortunately, Congress has offered only thoughts, prayers, and modest school security funding instead of making serious efforts to stop gun violence in America.

PRINTED ON RECYCLED PAPER

WASHAR0002134

Chairman Goodlatte, Chairman Royce
Page 2
July 26, 2018

Now, with this settlement, even those efforts will be in vain. We shouldn't have to wait for someone to kill someone in a House office building after sneaking past security with a plastic 3-D printed gun to do something to stop this. And we can't let another day go by allowing the paralysis and dysfunction of Congress to prevent us from making our communities safe.

The time to act was decades ago, but we failed. Let's do something now.

Sincerely,

Ted Deutch
MEMBER OF CONGRESS

Adriano Espaillat
MEMBER OF CONGRESS

Debbie Dingell
MEMBER OF CONGRESS

Alcee L. Hastings
MEMBER OF CONGRESS

Lloyd Doggett
MEMBER OF CONGRESS

Bill Pascrell, Jr.
MEMBER OF CONGRESS

Michael E. Capuano
MEMBER OF CONGRESS

MEMBER OF CONGRESS

MEMBER OF CONGRESS

Raul M. Grijalva
MEMBER OF CONGRESS

WASHAR0002135

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 4:36 PM |
| To: | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov> |
| Subject: | Austin Police Department Live Conference on 3D Printing |

FYI –
LIVE
80
# APD news conference regarding 3D printable guns.

https://www.pscp.tv/w/1OyKAQbplrWKb

---

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.7878 | 📱 BlackBerry: 202.679.6724 | 📠 Fax: 202.647.4055
✉ e-mail: *__PaulJM@State.Gov__* | 🖰 Web: *__www.state.gov/t/pm /__*
▨ http://twitter.com/StateDeptPM
Stay connected with *State.gov*:

This message is *__UNCLASSIFIED__*, per E.O. 12958
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 11:18 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: 3DPrint.com: We Have to Take a Stand on 3D Printed Guns |



**We Have to Take a Stand on 3D Printed Guns**
**By Joris Peels**
**25 July 2018**

I don't know where you stand politically on the gun debate, nor do I care. We must as a 3D printing industry collectively respond to the issue of getting dragged into the gun debate. We are being collectively smeared and our technology may be curtailed in its growth because of it.

Through politicians, lobbyists and rabble-rousers our industry is being politicized. Slowly but surely they will try to tear us asunder, separating us. What we need to keep in mind is that they don't care about us or our industry. They have ulterior motives meant to lead the world towards their way of thinking. They don't care what they say or do as long as their team wins. We should be mindful of much more powerful forces than we. You can already make guns in the US, you just need a license to distribute guns. The essential part of the "homebrew" gun was already perfectly possible. If they really wanted to 3D print guns they could have already done this. Instead, they wanted to 3D print attention and everyone fell for it. They went looking for a law suit to prolong the window of attention on them.

The gun people sued the government and the government settled. Now one political arm is settling while the other clamours for a legal solution. It seems like the politicians have found a way for both of them to win while they solve nothing for any of us.

We've become a political football not through our own doing but through circumstance. On the upside, we sold over a million 3D printers before one ended up in the hands of a bad guy. Media savvy, this person interjected themselves into America's gun debate. He became popular and sold many magazines while making comparatively few. The constant attention meant that more people talked about him.

The 3D printed gun was created by the media. It is they who I will blame once the first person dies because of this.

The media made the 3D printed gun, Cody just had the idea for it.

What if I told you that I could make any object out of glass, what would you say? What if I got to go to all the major TV stations to tell my glass blowing story? Nothing would happen. But, what if people kept talking about how I could blow "ghost guns" out of glass? Then eventually if the media gave me enough attention, I'd get enough money and supporters to make glass blown ghost guns happen. What is occurring is that media attention has created a self-fulfilling prophecy. Meanwhile, the current sharing and making of guns by the group advocating it is done using a CNC mill. The 3D printing element is just for marketing.

Making guns at home has been possible with CNC and other tools for many years. Indeed in any modern machine shop, one can find a myriad of tools much better suited to making guns than 3D printers are. Metal guns made with lathes and the like will outperform 3D printed ones by a significant margin.

The designs that are being made and distributed now are not optimized for 3D printing. Clearly, this is not being done by people who are familiar with the technology. The material choices and way they deal with certain engineering choices shows poor judgement and little 3D printing and engineering skill. It is at least reassuring that no one from our community seems to be involved. Instead, it is a group that wishes to become popular through exploiting high interest in the gun debate. This is actually very similar to how (INSERT SOMETHING ANYTHING HERE) is being politicized.

What is happening here is that certain legislators and the companies that they represent would like to implement

WASHAR0002137

DRM for 3D printing and restrict the technology. They periodically dig up the same lobbyist talking points: product safety, intellectual property, product liability etc. This lobbying and the same talking points are being spread in the US and EU.

It seems that there are people who wish to restrict the technology through specific legislation aimed at curtailing 3D printing.

This is inane. There is no need for separate safety, IP or liability law for 3D printing. It would be like having different free speech laws for things written by pencil from those written by pen. 3D printing is a technology for making things and should not be curtailed by laws throttling innovation.

The gun boogyman was weaned, popularized and created by the media and is now being used by lobbyists to introduce new legislation to hold back 3D printing.

3D printing democratizes innovation, production and competition. It would seem that there are people who are so afraid of this that they wish to legislate problems for 3D printing as a technology.

People have been trying since 2013 to present DRM as the solution for 3D printed guns.

Using DRM for 3D printers would be akin to installing an app on everyone's Google Drive or Microsoft Word to monitor for the typing of illegal phrases. Its easy to see where this in a design and engineering context could lead to problems.

DRM for 3D printing will not work because one could always circumvent it by making your own 3D printer without DRM.

In fact, DRM for 3D printers may very well be illegal in the EU, with certain files, especially medical ones and companies deploying a DRM tool that would take patient or personal data out of the EU or handle it incorrectly could be liable for significant fines under EU privacy laws.

On the one hand, you're saying that we can print guns, but you're simultaneously saying that adding some chip to every printer is going to somehow stop us?

What if I wanted to make a gun-like shape on a printer? Such as a tube, am I going to be stopped in creating this?

What if using the design freedom of 3D printing I was to make a supremely un-gunlike shape that worked as a gun? Would that be possible? Well…more than possible, along with speed, that is kind of the point of our technology.

There is nothing intrinsically new or particularly dangerous about 3D printed guns. The biggest threat at the moment is to the operator.

There are approximately 270 million guns in the US, every single one of them more dangerous and a better weapon than the 3D printed guns of now.

Having said that, if we talk about it long enough and people keep giving these guys money then they'll get there eventually. With 3D printing, given enough eyeballs all things are shallow.

Link: https://3dprint.com/220327/we-have-to-take-a-stand-on-3d-printed-guns/

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002138

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 8:19 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: ABC News: State Department defends allowing publication of blueprints to 3D print guns |

# CPA MEDIA MONITORING

**State Department defends allowing publication of blueprints to 3D print guns**
**By Karolina Rivas, Conor Finnegan**
**25 July 2018**

Just days before digital blueprints that would allow people to 3D print firearms are set to go live online, the State Department is defending the move to allow their publication, even as Secretary of State Mike Pompeo promised to look into the issue.

The Trump administration recently settled with a non-profit after it sued for the right to publish the code. While a State Department spokesperson pointed out that "the court did not rule in favor of the plaintiffs in this case," the administration settled anyway, in part, because there's no added public safety threat because "certain firearms and related items... are widely available" already, the spokesperson told ABC News.

The impending publication has garnered outrage among gun safety advocates, who warned it could create "untraceable" guns.

The controversy centers around Defense Distributed founder Cody Wilson's 2013 suit against the State Department after he was forced to take down blueprints his company posted online.

After a years-long legal battle, Wilson reached a settlement with the State Department to allow his company to post designs of various firearms for 3D printers. Among these weapons is an AR-15 - a weapon commonly known to be used in mass shootings.

Wilson has been vocal on social media about his company's goal to release the designs. After the settlement was reached, Wilson tweeted a photo of a headstone with the words "American Gun Control" engraved.

In a lengthy statement, the State Department spokesperson said that the Trump administration settled because new government regulations make the case moot. The Commerce Department is taking over the regulation of certain firearms -- a change that was implemented under the Obama administration, but accelerated under the Trump administration as it seeks "to create a simpler, more robust export control system that eases industry compliance, enhances enforceability, and better protects truly sensitive technologies."

In other words, they want to ease the restrictions on firearms that are "commercially available" and strengthen protection of more important weapons technology.

As the Commerce Department takes over, the regulation that barred Wilson from publishing has ended.

But while Pompeo told the Senate Foreign Relations Committee Wednesday that he would "take a look at," the administration has declined to take action to block Wilson's publication – which will relaunch on August 1, according to Defense Distributed.

After a security analysis, "It was determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States," the State Department spokesperson said -- so they don't need to block publication.

That has outraged gun safety advocates, with Sen. Ed Markey D-Mass. warning Pompeo to make sure guns "don't get into the wrong hands."

Military veterans from Everytown for Gun Safety Veteran Advisory Council are also calling on Pompeo to halt the distribution of the designs.

"We know firsthand the destructive power of firearms and the dangers of firearms in the wrong hands," the

letter states. "We support the federal laws that work to keep the public safe, which rely on criminal background checks to block gun possession by those who pose a danger to society. And we believe strongly that downloadable firearms will undermine those laws, [...]."

In particular, the group and other gun control advocates argue these guns are not traceable because they are produced without serial codes.

"Defense Distributed is not subtle with its aims: It has made it very clear that it intends to undermine the rule of law when it comes to firearms regulations," military veterans from the organization wrote Pompeo. "We urge you to not to allow the distribution of downloadable guns by exemption, settlement or rule, and stop these deadly blueprints from being released."

Link: https://abcnews.go.com/Politics/state-department-defends-allowing-publication-blueprints-3d-print/story?id=56817152

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 12:47 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Brady Campaign: What You Need to Know About the 3D Printing of Guns on Demand |

---

**CPA MEDIA MONITORING**

**What You Need to Know About the 3D Printing of Guns on Demand**
**By Jaime Bellemare**
**25 July 2018**

On August 1st the state of our nation's gun laws will be severely threatened by the 3D printing of firearms. The fact that we've even come this far, is curious at best. For five years, the State Department's legal team has been fighting and winning against a self described "crypto-anarchist" and his company, Defense Distributed, which has sought to make blueprints for 3D printed guns available online.

Only recently did the State Departments settle this case, completely reversing their prior position, and giving Defense Distributed everything they could have possibly wanted. While Brady's legal team has filed Freedom of Information Act (FOIA) requests to find out how and why this decision was made, the self-proclaimed "crypto-anarchist" will move forward to publish the blueprints for anyone and everyone to use. The Brady Center, along with Everytown and Giffords, is urging a Texas federal court to consider just how dangerous this could be and will be filing legal action.

**5 THINGS YOU NEED TO KNOW ABOUT 3D PRINTED GUNS**

Anyone, anywhere can build a gun on demand with no background check or without going through a licensed gun dealer.

3D printed firearms are untraceable, making the jobs of law enforcement much more difficult. These guns cannot be traced back to their producer or owner, making it possible to repeatedly violate gun manufacturing and sales restrictions on gun sales without fear of consequence.

3D guns are made almost completely of plastic -- meaning that conventional security methods like metal detectors will be rendered ineffective.

Unlimited access online to blueprints for 3D printed guns and the potential export of untraceable firearms is a threat to national and international defense and security.

3D gun blueprints are currently considered data that is governed by International Traffic in Arms Regulations (ITAR) and cannot be published without State Department authorization. The Trump Administration has proposed a new regulation to remove downloadable gun blueprints from this classification altogether, allowing anyone to post, repost, download, distribute and use 3D gun blueprints.

What can you do to stop this from becoming our new reality?

**Call Attorney General Jeff Sessions**

Jeff Sessions is responsible for representing the best interests of the United States in all legal matters. Call Sessions' office today and tell him to immediately take action and ensure that this settlement, allowing the public dissemination of information to make 3D guns, is stopped before it's too late.

The Department of Justice Public Switchboard is 202-514-2007. Make your voice heard today!

**Support Brady's Legal Team**

The Brady Center is working with other leading gun violence prevention organizations to take immediate action challenging the legality of making blueprints for 3D printed guns publicly accessible online. You can support this effort by making a donation to the Brady Center today.

Link: http://www.bradycampaign.org/blog/what-you-need-to-know-about-the-3d-printing-of-guns-on-demand

---

Matthew Marquis

WASHAR0002141

Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968

e-mail: ***MarquisMR@state.gov*** | Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 10:46 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Breitbart: Government Admits AR-15s Are Not Weapons of War |

---



**Government Admits AR-15s Are Not Weapons of War**
**By AWR Hawkins**
**23 July 2018**

In its settlement with Cody Wilson's Defense Distributed the government admitted that semi-automatic firearms below .50 caliber are not weapons of war.

On July 10, 2018, Breitbart News reported that the Second Amendment Foundation (SAF) brought a suit against the State Department on Wilson's behalf. The suit was filed in 2015 and was the result of State Department action to force Wilson to quit sharing 3-D gun files online.

Wilson and SAF fought the suit on First Amendment grounds and secured a settlement with the State Department and the Department of Justice, the latter of which finalizes the settlement.

The amended regulations proposed in the settlement show the government will no longer look at semi-automatic firearms below .50 caliber as "military equipment" or weapons of war.

In offering a definition of "military equipment" the settlement says:

The phrase "Military Equipment" means (1) Drums and other magazines for firearms to 50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of the jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specifically designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specifically designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specifically designed parts and components therefor.

Attorneys in the case expounded on the amended regulations by pointing out that the settlement "expressly acknowledges that non-automatic firearms up to .50 caliber widely available in retail outlets in the United States and abroad [a scope that includes AR-15 and other assault-style rifles], are not inherently military."

Second Amendment Foundation founder and executive vice president Alan Gottlieb spoke to Breitbart News about the settlement, saying:

Not only is this a First Amendment victory for free speech, it also is a devastating blow to the gun prohibition lobby. For years, anti-gunners have contended that modern semi-automatic sport-utility rifles are so-called "weapons of war," and with this settlement, the government has acknowledged they are nothing of the sort. The federal government now saying semi-automatic firearms below .50 caliber are not inherently military means that they are admitting that rifles like the AR-15 are civilian in nature. This makes perfect sense, as they existed years before the military adopted the fully automatic version.

Gottlieb added, "Gun rights organizations like the Second Amendment Foundation will now be able to use this government admission in debate and courtrooms from New York to California."

Link: https://www.breitbart.com/big-government/2018/07/23/government-admits-ar-15s-not-weapons-war/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

WASHAR0002143

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002144

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 3:47 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: CBS Philly: New Jersey Attorney General Sends 'Cease And Desist' Letter To Halt Company's Publication Of 3D-Printed Gun Instructions |

# CPA MEDIA MONITORING

**New Jersey Attorney General Sends 'Cease And Desist' Letter To Halt Company's Publication Of 3D-Printed Gun Instructions**
**By CBS Philly**
**26 July 2018**
TRENTON (CBS/AP) — New Jersey's attorney general wants a gun developer to halt plans to publish 3D-printed gun instructions online. Attorney General Gurbir Grewal sent a "cease and desist" letter to Texas-based firearm developer Defense Distributed on Thursday to stop the release.
Grewal calls it a threat to public safety.
"You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents," Grewal said in the letter. "The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms – and even to make assault weapons that are illegal in my state."
The State Department ruled in late June that directions for building the weapons could be published. The decision resolved a long-lingering dispute with Cody Wilson, owner of Defense Distributed. The company specializes in "open source" firearm designs that can be made with a 3D printer.
"Defense Distributed's plans to allow anyone with a 3-D printer to download a code and create a fully operational gun directly threatens the public safety of New Jersey's residents," said Grewal. "Posting this material online is no different than driving to New Jersey and handing out hard-copy files on any street corner. The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."
The firearms are made of polymer that can't be flagged by metal detectors. They're also untraceable because the guns are homemade and don't have serial numbers.
On Thursday, gun-control groups asked a federal court for a temporary injunction to block the State Department decision from taking effect.
Link: https://philadelphia.cbslocal.com/2018/07/26/new-jersey-attorney-general-sends-cease-and-desist-letter-to-halt-companys-publication-of-3d-printed-gun-instructions/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968
e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* /|Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 4:45 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Change.org Petition: Stop Defense Distributed From Releasing Downloadable Guns |



**CPA MEDIA MONITORING**

**Stop Defense Distributed From Releasing Downloadable Guns**
**By Change.org**
On August 1st, Defense Distributed plans to release downloadable gun blueprints to make untraceable, undetectable, plastic 3D printed guns. This could mean that anyone, including TERRORISTS, convicted FELONS, domestic ABUSERS and other dangerous people could print their own gun on demand.
If the State Department provides this special exemption, you will not be safe, even in secured areas because anyone could have a plastic gun.
IF YOU CARE ABOUT YOURSELF AND YOUR LOVED ONES, sign this petition and urge the US State Department to stop this dangerous reality!
Updates
9 hours ago
35,000 supporters
Link: https://www.change.org/p/stop-defense-distributed-from-releasing-downloadable-guns?recruiter=890898140&utm_campaign=signature_receipt&utm_medium=twitter&utm_source=share_petition

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:

**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 8:17 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: CNN Video: Pompeo commits to reviewing 3D-printed gun policy |



**Pompeo commits to reviewing 3D-printed gun policy**
**By CNN**
**25 July 2018**
**CPA Note: Follow link to view video**
Sen. Edward Markey (D-MA) asks Secretary of State Mike Pompeo not to allow downloadable blueprints for 3D-printed guns to be published online to prevent weapons from getting into the wrong hands.
Link: https://www.cnn.com/videos/politics/2018/07/25/3d-printed-guns-mike-pompeo-ed-markey-sot-lead-vpx.cnn

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:

**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 12:41 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Giffords: LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL |

## CPA MEDIA MONITORING

**LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL**
**Press Release**
**25 July 2018**
Attorneys representing the Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence and Everytown for Gun Safety have informed a Texas federal court that they anticipate filing legal action within days related to a settlement that would allow new designs for downloadable, untraceable guns to become public and available world-wide as early as August 1. The gun safety organizations urged the court to consider the public safety and national security risks posed by the settlement, which would let Defense Distributed — a company run by a self-proclaimed anarchist who wants to undermine gun safety laws — post its gun blueprints online in the form of Computer Aided Design files.
"[T]his settlement is far from ordinary," the gun safety organizations write in a letter available here. "It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order. It is also, we believe, illegal."
**BACKGROUND:**
Within days, the U.S. State Department is preparing to allow unlimited online access to schematic designs that enable 3D printing of untraceable guns, a reckless mistake and a grave public safety hazard.
Downloadable gun technology is profoundly dangerous, allowing anyone to build untraceable firearms on demand. With gun schematics in hand, a person can print their own firearm with a commercially available 3D printer—with no criminal background check, no serial number and completely outside the licensed dealer system. The plans enable the printing of purely plastic guns, undetectable by metal detectors, which could be snuck onto an airplane or into a government building. Indeed, journalists in Israel were able to print a Defense Distributed gun and get within arm's reach of the country's prime minister at the government capitol.
This major expansion of downloadable guns will also undermine the work of law enforcement, who may recover unserialized—and therefore untraceable—guns at crime scenes, and find their criminal investigations stalled before they even start.
Defense Distributed—the company that is set to receive a special State Department exemption to publish downloadable gun blueprints—is run by a self-described anarchist whose stated aim is to undermine and defeat gun laws by enabling anyone to print firearms. For several years, the State Department had blocked Defense Distributed from publishing its library of gun blueprints, in the form of Computer Aided Design ("CAD") files. The State Department had maintained these files were "technical data" on the United States Munitions List ("USML"), governed by the International Traffic in Arms Regulations ("ITAR")—and that they could not be published without State Department authorization.
As recently as April 2018, the government filed a motion to dismiss Defense Distributed's suit, arguing that serious national security concerns would be implicated by publication of the CAD files. However, just a few weeks later, the government offered to grant Defense Distributed a special exemption under the terms of a settlement agreement.
In the settlement agreement, which will be made final on or before August 4, 2018, the government agrees to

remove Defense Distributed's library of 3D gun printing designs from the USML and to allow "any United States person…to access, discuss, use, reproduce, or otherwise benefit" from the designs. Before removing items from the USML, the State Department was required by law to provide 30 days' advance notice to Congress — but Representative Eliot Engel (D-NY-16), the Ranking Member of the House Foreign Affairs Committee, has publicly stated that this has not occurred.

At the same time, the State Department has proposed a regulation that would broadly remove downloadable gun blueprints from the USML—and allow anyone to post blueprints online. The Defense Distributed settlement agreement commits the State Department to pursue a permanent regulatory change that would allow anyone to post, repost, download, distribute, and use any 3D gun printing design. The proposed ITAR regulation was posted shortly after the government agreed to the settlement. It covers exports of manufactured firearms themselves, as well as "technical data" like downloadable gun blueprints. The State Department could finalize the rule in the coming months.

The State Department has yet to acknowledge the settlement publicly, to disclose why it settled the case, or to explain what role the settlement played in the formal regulatory process.

Link: https://giffords.org/2018/07/3d-guns-law-center-group-letter/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002149

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Tuesday, July 24, 2018 2:16 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Koelling, Richard W <KoellingRW@state.gov> |
| **Subject:** | CPA Media Monitoring: Guns.com: Everytown, Schumer beat the drum to ban 3-D gun printing |



**Everytown, Schumer beat the drum to ban 3-D gun printing**
**By Chris Eger**
**24 July 2018**
With downloadable gun plans grabbing national headlines, Democrats and gun control groups are pushing for more regulation — which is a sure sign that they don't understand 2018.

On Capitol Hill, Senate Minority Leader Chuck Schumer, D-NY, last weekend blasted a pending move by President Trump's State Department to greenlight a Texas-based pro-gun group's ability to post plans online for "non-automatic firearms up to .50-caliber," such as the popular AR-15 and other semi-autos.

"Why in God's name is this administration allowing this to happen when it never was allowed before?" said Schumer. "We're asking them to immediately rescind such action, and if they don't, we will try to pass legislation preventing that. It makes no sense."

Schumer's rhetoric was prefaced last week by a New York Times editorial by former U.S. Rep. David Israel who held more regulation was needed to prevent the criminal underworld from easily printing "undetectable" plastic guns using an "inexpensive printer purchased online or at the neighborhood office supply store and a downloadable file."

However, Israel concedes in his piece that the current regulations on such guns still stand regardless of any pending move by the State Department. The Undetectable Firearms Act, signed into law by President Ronald Reagan in 1988, requires each gun made or sold in the country to have 3.7-ounces of metal content and is set to run through at least 2023.

The Texas group at the heart of the controversy is Cody Wilson's Defense Distributed, which is set to relaunch their DEFCAD project next month after a settlement negotiated with the State Department in a long-running lawsuit. Essentially, State argued it did not challenge the First Amendment right of Wilson to distribute the 3-D gun files domestically, only that it took an exception to the unfettered international distribution of what they argued was information that could be used by others to produce guns overseas, citing a violation of the International Traffic in Arms Regulations.

That objection is set to fall by the wayside as a result of the proposed settlement and DEFCAD, public and free to use, is ready to host CAD files for AR-15s, AR-10s, Czech Vz.58s, M1911 handguns and even popular guns such as the Ruger 10-22 and Beretta M9.

With the clock counting down to DEFCAD once again going live some five years after the federal government moved to shutter it, Everytown has mounted an online campaign to pressure Secretary of State Michael Pompeo to back out of the settlement, which both sides agreed to in June. The anti-gun group contends that allowing DefDist to move forward would "enable terrorists, convicted felons, and domestic abusers to simply download files online and print their own illegal and untraceable guns," and that, "It's unconscionable to allow criminals to print untraceable guns on demand."

What Everytown does not acknowledge is the fact that many of the past downloaders for Wilson's single-shot Liberator pistol when it went live for the first time in 2013 were overseas in countries such as Spain, Brazil,

Germany and the UK, and were quickly shared and torrented worldwide. More to the point, Wilson's group is not unique as a number of sites since then, such as FossCAD and GrabCAD, have long made 3-D gun files available to millions over the past several years. Code, once created and shared so extensively, is almost impossible to destroy. Going back even further, low-tech open source firearms plans and patent drawings have been circulating freely for centuries.

Still, with the federal government backing away from DefDist, Wilson sees the practice of downloadable gun files as moving into the mainstream. "I currently have no national legal barriers to continue or expand DEFCAD," he wrote in an email to TechCrunch. "This legal victory is the formal beginning to the era of downloadable guns. Guns are as downloadable as music. There will be streaming services for semi-automatics."

Link: https://www.guns.com/2018/07/24/everytown-schumer-beat-the-drum-to-ban-3-d-gun-printing/

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* /|Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 2:41 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun' |
| Attach: | Brady Motion to Intervene filing and NOA-20180726T183612Z-001.zip |

# CPA MEDIA MONITORING

**Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'**
**By Nick Wing**
**26 July 2018**
**CPA Note: Legal filings attached as .zip file**

The nation's leading gun safety groups are asking a judge to block an online company's plan to publish downloadable blueprints for 3D-printed plastic firearms, information that they say would open the door for people to secretly produce fully functional, untraceable weapons.

In a Thursday filing in the U.S. District Court for the District of Western Texas, the organizations questioned the federal government's recent decision to settle a lawsuit with Defense Distributed. The settlement allows the Texas-based digital firearms nonprofit company to post its controversial gun blueprints online, which it will begin doing on Aug. 1, according to the Defense Distributed website.

Defense Distributed celebrated the decision, saying it would soon bring upon the "age of the downloadable gun." But in a letter to the judge this week, gun safety groups called the agreement "troubling," "dangerous" and "potentially illegal," while claiming it could have a "significant and permanent impact" on national security and public safety. The three organizations — the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and Giffords Law Center to Prevent Gun Violence — are now seeking an emergency injunction to halt the publication of the blueprints. They want the court to have additional time to consider their concerns. A hearing is reportedly scheduled for Thursday afternoon.

In recent years, gun violence prevention advocates and lawmakers have raised fears about the rise of so-called "ghost guns" — homemade, often meticulously manufactured plastic or metal firearms made without serial numbers. As 3D printing technology becomes more widely accessible, they worry that this ghost gun ecosystem will only grow. And with advances in printing materials and an ever-expanding library of gun blueprints just a click away, they say the line between homemade firearms and professionally manufactured ones could become increasingly indistinct.

When police find guns at a crime scene, the Bureau of Alcohol, Tobacco, Firearms and Explosives can typically trace an attached serial number on the firearm back to a federally licensed dealer. This can help authorities identify suspects, crack down on bad actors and glean other vital information about how guns end up in the hands of criminals. But with ghost guns, there's no method of tracking and no way to deny a purchase by a prohibited individual because there's no point of sale.

Thursday's court filing request marks the latest chapter in a legal saga that began in 2013 when Defense Distributed founder and self-described anarchist Cody Wilson shot his way into headlines with a YouTube video. In the video, he shows off "the Liberator," a single-shot .380 caliber handgun made almost entirely of 3D-printed plastic.

A Liberator pistol appears on July 11, 2013 next to the 3D printer on which its components were made. The single-shot handgun was the first firearm made entirely with plastic components forged with a 3D printer and computer-aided design (CAD) files downloaded from the Internet.

The Liberator may look like a gun best suited for a Lego man, but it has since been shown to be able to fire a number of rounds without failing, so long as it's printed with a strong plastic. Months after Wilson released his

video, Israeli reporters smuggled a weapon based on his design through a metal detector and into an event featuring Prime Minister Benjamin Netanyahu. Although the Liberator contains a small strip of metal — which Wilson included to make it compliant under a U.S. law banning undetectable firearms — the journalists were reportedly able to get it through unnoticed.

With media outlets around the world covering the Liberator, it quickly caught the government's attention. The State Department took action against Wilson in 2013, accusing him of violating arms export control laws by releasing "technical data" related to prohibited munitions. It demanded that he take down blueprints for the Liberator and nine other firearms posted on the Defense Distributed website. By the time Wilson complied, more than 100,000 people had already downloaded the files, ensuring that they'd live on forever in darker corners of the web.

In 2015, Wilson sued the State Department, claiming the motion against him had violated his First Amendment right to free speech. At first, Wilson appeared to be facing an uphill battle. Federal courts batted down his team's request for a preliminary injunction against the State Department in 2015. The case was eventually kicked up to the Supreme Court, where it was denied earlier this year. As recently as April, the government seemed prepared to see their defense through.

Then late last month, the feds changed course, entering into a settlement with Defense Distributed that said the company could post its gun blueprints online after all. The government also agreed to reimburse Defense Distributed for nearly $40,000 in legal fees.

In the settlement, lawyers for the Justice Department said that under a recent proposal to loosen foreign arms trafficking regulations, Wilson's "technical data" — in this case, computer-aided design models of firearms — would be exempted from stricter licensing requirements.

But gun safety groups have raised issue with that claim. Although the Trump administration published notice of the proposed rule change in May, the groups point out it hasn't officially gone into effect yet.

This discrepancy is an example of the administration "putting the cart before the horse," Avery Gardiner, co-president of the Brady Campaign, told HuffPost. She also raised broader questions about the nature of the settlement, saying the government had done "a complete about face." It didn't solicit input from any gun safety group before making the decision, Gardiner added, saying it has yet to offer a detailed explanation for what prompted the shift.

The State Department has said little publicly about the settlement, except to note that it was voluntary and agreed upon by both parties. Neither Defense Distributed nor the law firm representing the company immediately responded to HuffPost's request for comment.

Shortly after the settlement was announced, the Brady Campaign filed a Freedom of Information Act, hoping to get additional details about the reversal. But those documents likely won't be returned until after Defense Distributed reposts the blueprints online, at which point the gun safety groups say the potential damage would be "irreparable."

"Part of what we're asking the judge to do is to keep the status quo as it is until we can get more information about what caused the government to change its mind and to see if that's proper," said Gardiner.

"This isn't the way we're supposed to govern," she added. "We're supposed to govern by having open and transparent processes."

Ghost gun technology has evolved rapidly since the early days of Wilson's Liberator. Defense Distributed has already developed schematics for an AR-15 — or technically for each of the dozens of components needed to construct one of the semi-automatic rifles — which they intend to make available to the public. With these blueprints, anyone with a 3D printer and the ability to follow directions could build their own military-style rifle without anyone else's knowledge.

The surreptitiousness of DIY gunsmithing is a draw for some firearms enthusiasts. Defense Distributed has profited off and propelled the practice by selling a $1,500 "Ghost Gunner" milling machine that can be programmed to construct individual firearm components out of metal to be assembled by the user.

With conventional firearms already being so easy to get ahold of in the U.S., whether legally or illegally, concerns about 3D-printed ghost guns may not be at the forefront of many people's minds. 3D printers are still expensive, and models capable of printing a functional gun can range from several thousand dollars to more than $500,000. Although that may be a deterrent now, Wilson has said his ultimate vision is to develop blueprints that will deliver working firearms even on the cheapest 3D printers.

"Anywhere there's a computer and an Internet connection, there would be the promise of a gun," he told Forbes in 2012.

That prospect has raised alarm among gun safety groups and law enforcement alike. So far, these weapons rarely factor into crimes. Although, they have been used in a few deadly shootings, including one by a convicted felon in California who otherwise would have been barred from purchasing guns through legal channels.

Unfettered access to 3D-printed gun blueprints could also have much broader implications overseas, the gun safety groups say, where people could use them to circumvent tougher gun laws or establish another arms pipeline to criminals or terrorists.

Wilson meanwhile seems to be reveling in the idea that his campaign could disrupt efforts to regulate firearms in the U.S. and abroad. In a tweet after the announcement of the settlement this month, he appeared to celebrate the death of "American gun control."

Wilson later told Wired that he was on the verge of unleashing a "Cambrian explosion" of digital content related to firearms. He hoped it could extinguish the current youth-led movement for stronger gun laws that emerged in response to routine gun violence and high-profile mass shootings in places like Las Vegas or Parkland, Florida.

"All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable," Wilson said. "No amount of petitions or die-ins or anything else can change that."

Over the past few days, congressional lawmakers have called for hearings on 3D-printed guns, as well as new legislation to block the release of Wilson's blueprints. At a Senate hearing on Wednesday, Secretary of State Mike Pompeo said he'd "take a look" at his department's policy on sharing that sort of data.

But with Aug. 1 rapidly approaching, Gardiner said she's worried the time to act is running out.

"We need to block this settlement from going into effect so that Congress can hold hearings and do its job as a check on the executive branch," said Gardiner. "It's unlikely that this all gets figured out and resolved unless there's a delay of the settlement going into effect."

Link: https://www.huffingtonpost.com/entry/3d-printed-guns-lawsuit_us_5b589e43e4b0de86f4929ea8?qp

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* /|Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING JOINT EMERGENCY MOTION FOR LEAVE TO
INTERVENE BY THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

The Court, having considered The Brady Campaign to Prevent Gun Violence, Everytown

for Gun Safety Fund Action, Inc., and Giffords' Joint Emergency Motion for Leave to Intervene

finds that Intervenor's motions should be GRANTED.

IT IS SO ORDERED that:

The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Fund Action,

Inc., and Giffords are Granted leave to intervene.

The Court Orders the clerk to file the original attachment, Complaint in Intervention.

_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

WASHAR0002155

# Exhibit B

WASHAR0002156

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | ) ) ) ) |
| Plaintiffs, | ) ) |
| BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., and GIFFORDS, | ) CIVIL ACTION NO: 1:15-cv-372-RP ) ) ) |
| Plaintiffs-Intervenors, | ) ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF STATE; MICHAEL R. POMPEO, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, | ) ) ) ) ) |
| Defendants. | ) ) ) |

## COMPLAINT IN INTERVENTION

Plaintiffs-Intervenors Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc., and Giffords (hereinafter "Intervenors") submit this Complaint in Intervention and allege, upon information and belief, the following:

## INTRODUCTION

1.      "At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." Defendants' Motion to Dismiss Second Amended Complaint at 1, filed Apr. 6, 2018 (ECF No. 92) ("Motion to Dismiss").

2.      Defense Distributed develops Computer Aided Design ("CAD") files for the purpose of enabling anyone to automatically manufacture guns on 3-D printers. The company's stated objective is to ensure global, unrestricted access to firearms by postings its files online. Due to the Government's recent about-face in this case, Defense Distributed is set to do just that:



WASHAR0002158

3.        According to the Government's previous submissions to this Court, making
Defense Distributed's CAD files "available online through unrestricted access to the Internet
would provide any [terrorist organization] with defense articles, including firearms, at its
convenience, subject only to its access to a 3D printer, an item that is commercially available.
Terrorist groups and other actors could then potentially manufacture and use such weapons
against the United States or its allies."  Declaration of Lisa V. Aguirre, ¶ 35(b), Exhibit A to
Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015
(ECF Nos. 32, 32-1) ("Aguirre Decl.").

4.        As recently as April of this year, the Government stressed to this Court the
potentially devastating national security implications if Defense Distributed's files were made
available online.  The Government represented to this Court that the CAD files at issue "can
unquestionably facilitate the creation of defense articles abroad" and that "the Department of
State has consistently and reasonably concluded that it is not possible to meaningfully curtail the
overseas dissemination of arms if unfettered access to technical data essential to the production
of those arms is permitted."  Motion to Dismiss at 3,7.

5.        However, mere weeks after the Government urged this Court to dismiss this
lawsuit citing the national security concerns raised by the possibility of foreign nationals or
terrorists acquiring the Plaintiffs' CAD files, they offered a settlement agreement to the Plaintiffs
(the "Settlement Agreement") which gave the Plaintiffs everything they asked for, and more.

6.        Pursuant to the terms of the Settlement Agreement, in exchange for dismissing the
lawsuit, the Government has agreed to: (i) draft and fully pursue a notice of rulemaking and a
final rule to remove the files at issue from the jurisdiction of the International Traffic in Arms
Regulations ("ITAR"); (ii) temporarily modify Category I of the United States Munitions List

WASHAR0002159

("USML") to exclude the files at issue from ITAR; (iii) issue a letter to the Plaintiffs that their files are exempt from ITAR; (iv) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue; and (v) pay the Plaintiffs almost $40,000.

7.      As a direct consequence of the Settlement Agreement, Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018.  According to news reports, in addition to the older gun models, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons." "The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable." According to Wilson: "What's about to happen is a Cambrian explosion of the digital content related to firearms." Wilson says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."



- 4

WASHAR0002160

8.      The Government entered into the Settlement Agreement in contravention of the statutes and regulations which govern the export designation process. Among other things, upon information and belief, the State Department: (i) has not provided the relevant Congressional committees with the 30 days-notice to "temporarily" modify the munitions lists; (ii) has not received the concurrence of the Secretary of Defense to "temporarily" change the designation of the files at issues; and (iii) has not followed established commodity jurisdiction procedures before agreeing to temporarily exempt the CAD files at issue from ITAR.

9.      The "temporary modification" of USML Category I is especially troubling because it involves making Defense Distributed's files available on the internet, which largely overrides the later need to formally modify the relevant rules. Moreover, the Settlement Agreement covers not only the files that were developed by Defense Distributed at the beginning of this litigation, but also new files that have been developed since that time – which the Government has presumably not even seen.

10.      In addition, the Government has acted in an arbitrary and capricious manner, and has abused its discretion, by (i) failing to consider evidence relevant to ITAR jurisdiction over the CAD files; (ii) drastically changing long-established practice and policy without any explanation; and (iii) failing to study the national security implications of exempting the CAD files from ITAR. The Settlement Agreement does not make any reference whatsoever to a determination by the Government regarding the national security implications of the agreement.

11.      Tellingly, even the notices of proposed rules, which the Departments of State and Commerce published on May 24, 2018 to amend the ITAR, make no mention of the dangers posed by the files falling into the hands of terrorist organizations, insurgent groups, transnational organized criminal organizations, or states subject to the U.S. or U.N. arms embargoes.

WASHAR0002161

12.     For all these reasons, and others detailed below, the Government Defendants have violated the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers.   This complaint seeks to declare the Settlement Agreement invalid, and to enjoin the Plaintiffs and Government Defendants from giving effect to the agreement, to the extent it permits Defense Distributed to make its files available online.

**JURISDICTION AND VENUE**

13.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 2201 and 2202.

14.     Venue is premised on the principal place of business for Plaintiff Defense Distributed, which is located within the Western District of Texas.

**PARTIES**

15.      Plaintiff Defense Distributed is a Texas corporation, whose principal place of business is located in Austin, Texas.  Defense Distributed develops CAD files to enable anyone to automatically manufacture firearms on 3-D printers.  The company also manufactures and sells a "computer-controlled milling machine" called the "Ghost Gunner," which is "designed to allow its owner to carve gun parts out of [ ] aluminum."  Defense Distributed is a party to the Settlement Agreement.

16.     Defense Distributed was started by Cody Wilson, a self-proclaimed anarchist, who believes that "governments should live in fear of their citizenry."  The company's objective is for everyone in the world to have access to guns and to make gun regulations impossible. After publicizing the Settlement Agreement, Wilson said that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun Control."

WASHAR0002162

17.    Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington.  It is a party to the Settlement Agreement.  In a press release announcing the settlement, SAF founder Alan M. Gottlieb declared it to be "a devastating blow to the gun prohibition lobby[.]"

18.    Upon information and belief, Conn Williamson is a natural person and a citizen of the United States and the State of Washington.  He is a party to the Settlement Agreement.

19.    Defendant the United States Department of State  ("State Department") is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act ("AECA").   The State Department is a party to the Settlement Agreement in this case.

20.    Defendant Michael R. Pompeo is sued in his official capacity as the Secretary of State.  In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.   The Secretary of State is a party to the Settlement Agreement in this case.

21.    Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR. The DDTC is a party to the Settlement Agreement in this case.

22.    Plaintiff-Intervenor the Brady Campaign to Prevent Gun Violence ("The Brady Campaign") is a nation-wide gun violence prevention organization with members spread across all fifty states and the District of Columbia, and established membership groups in Austin, TX and Houston, TX. The Brady Campaign is headquartered in Washington, DC and was founded in

WASHAR0002163

1974 as the National Council to Control Handguns. The Brady Campaign took its current name in 2001, in honor of former White House Press Secretary Jim Brady, who was shot during the assassination attempt on Ronald Reagan, and his wife Sarah Brady.

23.     The Brady Campaign seeks a safer future for every American where hundreds of gun injuries and deaths a day are no longer normal. It focuses on three impact-driven solutions to further its mission of reducing gun deaths: 1) Strengthening gun laws, with a particular focus on the national background check system; 2) reducing the flow of crime guns to urban communities most impacted by gun violence; and 3) meaningfully communicating to gun owners about the dangers of loaded, unlocked guns in the home. The Brady Campaign's sister organization, The Brady Center to Prevent Gun Violence, is a non-profit organization dedicated to reducing gun violence through education, research, and direct legal advocacy on behalf of victims and communities affected by gun violence.  It filed an amicus brief in this case on February 18, 2016. In addition, the Brady Campaign and Brady Center submitted comments to the proposed rule changes implicated in the Settlement Agreement. The Brady Campaign also filed a Freedom of Information Act request with the federal government immediately upon learning of the Settlement Agreement.

24.     Plaintiff-Intervenor Everytown for Gun Safety Action Fund, Inc. is a nation-wide gun violence prevention organization, with members spread across all fifty states.  Everytown is headquartered in New York, NY. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Connecticut.  Currently, the mayors of 8 Texas cities are part of the Mayors Against Illegal Guns

WASHAR0002164

coalition. Everytown and its members and supporters work in all 50 states and in Congress to support the passage and enforcement of gun safety laws that, among other things, help keep guns out of the hands of prohibited persons and other individuals with dangerous histories and help law enforcement apprehend and prosecute those who violate U.S. and state gun laws. Immediately upon learning of the Settlement Agreement in this case, Everytown submitted a federal Freedom of Information Act request seeking disclosure of documents pertaining to the settlement.

25. Plaintiff-Intervenor Giffords is a 501(c)(4) gun violence prevention organization founded by former Congresswoman Gabrielle Giffords and her husband, Captain Mark Kelly, a retired Navy combat veteran and NASA astronaut. Headquartered in Washington, D.C., Giffords researches, writes, and proposes policies that make Americans safer and mobilizes voters and lawmakers in support of safer gun laws. Its mission is to address the issue of gun violence in communities across the country, and to that end, Giffords works to affect legislation, shape the national dialogue, and reduce gun violence. Since its founding after the Sandy Hook Elementary School shooting in Newtown, Connecticut, Giffords has been involved in the passage of more than 200 new strong gun laws in 45 states and Washington, D.C.

26. Giffords and its sister 501(c)(3) organization, Giffords Law Center to Prevent Gun Violence, recently submitted public comments on the proposed rule changes by the State Department and Commerce Department that would deregulate the publication of computerized blueprints for the production 3D printed guns. In that comment, Giffords opined that the proposed changes "would represent a dramatic change in the regulatory structure governing firearm experts," and that they "may not adequately address our national security, foreign policy, international crime, or terrorism threats," and expressed concern that the changes "will result in

WASHAR0002165

an increase in the number of untraceable firearms in circulation." *See* Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), *available at* http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf.

## FACTS

*The Statutory and Regulatory Framework*

27.     The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The purpose of the AECA is to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. 22 U.S.C. § 2751.

28.     Under the AECA, "[t]he President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). Items designated as defense articles or services constitute the United States Munitions List ("USML"). *Id.* at § 2778(a)(1). Category I of the USML lists articles, services, and related technical data for "Firearms, Close Assault Weapons and Combat Shotguns."

29.     Among other things, Category I of the USML includes all firearms up to .50 caliber, and all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(I)(a). "Technical data" is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." *Id.* § 120.10(a). Technical data includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation," and exempts information already in the public domain, as defined in Section 120.11. *Id.* § 120.10.

- 10 -

WASHAR0002166

30.     "[T]he 'technical data' provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML. Such export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly. Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR." Aguirre Decl. ¶ 14.

31.     Pursuant to Executive Order 13637, the President has delegated his AECA authority to the State Department. In turn, the State Department has promulgated the ITAR, which is administered by the DDTC. *See* 22 C.F.R. §§ 120-130. Among other things, the DDTC is tasked with maintaining, reviewing and clarifying the USML.

32.     Pursuant to Executive Order 13637, §1(n), "[d]esignations including changes in designations, by the Secretary of items or categories that shall be considered as defense articles and defense services subject to export control under section 38 ( 22 U.S.C. 2778) shall have the concurrence of the Secretary of Defense."

33.     In addition, the Executive Branch must give notice to the International Relations Committee of the House of Representatives and to the Committee on Foreign Relations of the Senate at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1). Such notification must be made in accordance with the procedures applicable to reprogramming notifications under § 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. *Id.*

- 11 -

WASHAR0002167

34.     ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation.  However, it may do so only "in the interest of the security and foreign policy of the United States."  22 C.F.R. § 126.2.

35.     For situations where there is doubt that a particular item to be exported falls on the USML, ITAR contains a commodity jurisdiction "CJ" procedure.  22 C.F.R. § 120.4.  Upon written request, the DDTC will provide a determination as to whether a certain item, service, or data is within the scope of ITAR.  *Id.*

36.     The "CJ" determination "entails consultation among the Department of State, Defense, Commerce and other U.S. Government agencies and industry in appropriate cases."  *Id.*  Assessments are made on a case-by-case basis, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application.  *Id.*  A determination made pursuant to the commodity jurisdiction process takes into account "(i) [t]he form and fit of the article; and (ii) [t]he function and performance capability of the article."  Aguirre Decl. ¶ 20.

37.     22 C.F.R. § 120.4(f) requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures.  State shall notify Defense and Commerce of the initiation and conclusion of each case."

***The Computer Files at Issue***

38.     In or around early May 2013, Defense Distributed posted a number of CAD Files on DefCad.org, a website it created to serve as an open-source repository for weapons designs, including data to automatically manufacture the "Liberator" pistol.  The Liberator is a plastic firearm which contains 6-oz piece of steel, which can be easily removed, enabling it to avoid detection in walk-through metal detectors.

WASHAR0002168

39.     These CAD files are "data files" that are "essentially blueprints that can be read by CAD software." Letter from Jahna M. Hartwig on behalf of Defense Distributed to the DDTC, dated June 21, 2013.  They are "indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components." Motion to Dismiss at 1.

40.     On May 8, 2013, the Office of Defense Trade Controls Compliance, which is responsible for compliance with and civil enforcement of the AECA and ITAR, sent Defense Distributed a letter noting that "it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC."

41.     The letter explained that "disclosing (including oral or visual disclosure) or transferring foreign data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR."  It requested that Defense Distributed remove ten specific CAD files from public access "immediately" and submit them for CJ determination. Defense Distributed filed a request for CJ determinations for these files on June 21, 2015.

42.     In January 2015, while consideration of Defense Distributed's original CAD file submission was ongoing, Defense Distributed submitted a CJ request for the "Ghost Gunner," an automated firearms metal milling machine.  In April 2015, the DDTC determined that the Ghost Gunner was not subject to the jurisdiction of the State Department, but that the "project files and data files for producing a defense article on a 3D printer or similar device constituted technical data on that defense article that would be subject to ITAR regulation."  Aguirre Decl. ¶ 28.

43.     The DDTC completed its review of Defense Distributed's original requests on June 4, 2015 and determined that six of the files were subject to ITAR control: (i) the Liberator

- 13 -

WASHAR0002169

pistol; (ii) the .22 caliber electric pistol; (iii) the 5.56/.223 muzzle brake; (iv) the Springfield XD-40 tactical slide assemble; (v) the sub-caliber insert;  and (vi) the VZ-58 front sight.

44.      In making its CJ determination, the DDTC noted that the CAD files at issue "can be used to 'automatically find, align, and mill' a defense article such as a firearm on a 3D printer or other manufacturing device. Manufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which merely *guides* the manufacture of a defense article and requires additional craftsmanship, know-how, tools, and materials."  Aguirre Decl. ¶ 29(c).

*The Current Lawsuit*

45.      The Plaintiffs filed this action in May 2015, alleging that the Government Defendants' actions violated the First, Second and Fifth Amendments.  In addition, the Plaintiffs alleged that the Government Defendants had engaged in *ultra vires* conduct.   Among other things, the Plaintiffs sought an injunction to prevent the Government Defendants and "all persons in active concert with them" from barring Defense Distributed's export of CAD files.

46.      In response to the Plaintiffs' motion for a preliminary injunction, the Government Defendants argued, *inter alia,* that they were "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF No 32).

47.      The Government Defendants argued that "[t]he CAD files are 'technical data' that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a

- 14 -

WASHAR0002170

foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations." *Id.* at 7.

48.     Along with its opposition to Plaintiffs' preliminary injunction motion, the Government Defendants submitted an affidavit from Lisa V. Aguirre, the Director of the Office of Defense Trade Controls Management.  Among other things, Director Aguirre concluded that: (i) "[t]he 'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States"; (ii) making the CAD files available online would provide terrorist organizations with firearms, which could be used against the United States or its allies; and (iii) "[a]ccess to weapons technology coupled with the uncontrolled ubiquitous means of productions . . . could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies." Aguirre Decl. ¶ 35.

49.     Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests.  *Def. Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015).  This Court found that "[f]acilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict." *Id.* at 691 (internal quotations omitted).  In addition, this Court noted that the Plaintiffs had "not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

50.     On appeal, the Fifth Circuit upheld this Court's preliminary injunction ruling. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  In so doing, the

WASHAR0002171

Fifth Circuit focused on the national security implications and the permanent nature of the internet, explaining that:

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide . . . *Because those files would never go away*, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. *Thus, the national defense and national security interest would be harmed forever.*

*Id.* at 461 (emphasis added).

51.      On January 8, 2018, the Supreme Court denied the Plaintiffs' petition for a writ of certiorari. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

52.      After the Supreme Court denied certiorari, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018. *See* ECF Nos. 77, 88 and 90.

53.      On April 6, 2018, the Government Defendants filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3,7.

54.      The Government Defendants explained to the Court that the files at issue "directly facilitate the manufacture of weapons" through "automated processes." *Id.* at 1, 9.

55.      The Government Defendants urged this Court to dismiss the Plaintiffs' lawsuit because:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United

WASHAR0002172

> States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability.

*Id.* at 1.

56.     Mere weeks after the Government stressed the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority."  Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement, filed Apr. 30, 2018 (ECF No. 93).

57.     According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted."  Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018*), available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

58.     On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018."  (ECF No. 95).

59.     As of the date of this filing, the parties have not yet filed a stipulation of dismissal with this Court.

***The Settlement Agreement***

60.     The Settlement Agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the Plaintiffs.

61.     What appears to be an accurate copy of the agreement is now available on the internet. *See* https://www.exportlawblog.com/docs/Defense%20Distributed%

- 17 -

WASHAR0002173

20Settlement%20Agreement.pdf. A copy of the posted agreement is provided with this Complaint as **Exhibit C.**

      62.      Pursuant to the Settlement Agreement, in consideration for the Plaintiffs' dismissing the action, the Government Defendants have agreed to:

    a.  "[C]ommit[ ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

    b.  "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

    c.  "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

    d.  "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

    e.  Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

      63.      Importantly, par. 1(a), (b) and (d) cover the broad category of files referred to as "the technical data that is the subject of this Action." This term is defined in the Settlement Agreement to include "Other Files," as long as those files "regard items exclusively: (a) in Category I(a) of the [USML], as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment." *Id.* ¶ 12.

- 18 -

WASHAR0002174

64. "Other Files" are those that "Defense Distributed has and will continue to create and possess . . . that contain technical information, to include design drawings, rendered images, written manufacturing instructions[.]" Second Amended Complaint, ¶ 44, filed Mar. 6, 2018 (ECF No. 90). In other words, they are files that the Government has presumably not seen yet.

65. Under the Settlement Agreement, the Department of Justice is prohibited from filing a stipulation of dismissal any earlier than five business days after announcement of the "temporary" modification to the USML Category I and issuance of a letter to Plaintiffs that their files are approved for public release in any form and exempt from ITAR. Id. ¶ 2. In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018.

66. The Settlement Agreement does not indicate that any analysis, study or determination was made by the Government Defendants, in consultation with other agencies, before the Government Defendants agreed to remove the CAD Files from the USML Category I. In fact, the Settlement Agreement states that it "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

67. Upon information and belief, neither the House Committee on Foreign Relations (formerly known as the International Relations of the House of Representatives), nor the Committee on Foreign Relations of the Senate received the required 30-days advance notice of the "temporary modifications" described in pars. 1(b) or (d) of the Settlement Agreement.

68. In addition, there is no indication in the Settlement Agreement that the Secretary of Defense has concurred in the changes to designation agreed to in the Settlement Agreement, as required by Executive Order 13637. There is also no indication that the Government

- 19 -

WASHAR0002175

Defendants have followed the established procedures for making a CJ determination before allowing Defense Distributed to export its data.

69.     Upon publicizing the Settlement Agreements, the Plaintiffs have repeatedly and adamantly made claims about the impact of the agreement on all gun violence prevention efforts. Among other things, Cody Wilson tweeted a photo of a tombstone announcing the death of "gun control," and stated that "[a]ll this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns . . .No amount of petitions or die-ins or anything else can change that."

**The Notices of Proposed Rulemaking**

70.     As promised, on May 24, 2018, the government published notices of proposed rulemaking by the State and Commerce Departments, which would remove Plaintiffs' CAD files from the USML Category I. *See* International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and II, 83 Fed. Reg. 24,198 (May 24, 2018); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (May 24, 2018).

71.     According to the Department of State's Notice of Proposed Rule, it "is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use." According to the State Department, the articles that would be removed from the list "do not meet this standard." For this reason, the notice proposes to remove all non-automatic firearms up to .50 caliber (and any related technical data) from the USML under the jurisdiction of the State Department, and move jurisdiction over these

- 20

WASHAR0002176

products over to the Commerce Department, which, due to its looser export controls,[1] do not typically take action to prohibit the publication of the data.

72.     The Department of Commerce's Proposed Rule, filed the same day, describes how its Export Administration Regulations ("EAR") will apply to items no longer controlled under the USML. Although the Department of Commerce would not comprehensively restrict the export of technology related to firearms, it would have authority to impose a restriction on a case-by-case basis if it determines the export would be contrary to the national security or foreign policy interests of the United States, the promotion of human rights, or regional stability. *See* 15 C.F.R. § 742.6.   But the Department of Commerce cannot restrict the export of technology already in the public domain, including through posting on publicly available sites on the Internet.   *See* 15 C.F.R. §§ 734.3(b)(3), 734.7(a)(4).   If the terms of the Settlement Agreement take effect and Defense Distributed makes its repository of files available online, the Department of Commerce will be unable to make an independent determination about whether national security or other concerns warrant restricting the unlimited dissemination of those files in accordance with the EAR.

73.     The public comment period for both notices concluded on July 9, 2018, the day before the Plaintiffs went public with the Settlement Agreement.

---

[1]     ITAR requires any exporter of items of the Munitions List to register with the State Department, *see* 22 C.F.R. 122.1(a), but Commerce  Department regulations include no similar registration requirement.

- 21 -

WASHAR0002177

# CAUSES OF ACTION

## COUNT I
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
### *ULTRA VIRES* CONDUCT
(Against Plaintiffs[2] and Defendants)

74.     Intervenors repeat and reallege paragraphs 1-73.

75.     Under the Administrative Procedure Act ("APA"), a court must set "aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

76.     The Government Defendants' agreement to and execution of the Settlement Agreement constitutes a final agency action and is *ultra vires* conduct which should be set aside by the Court.

77.     The Government Defendants may only exercise the authority conferred to them by statute.  However, neither the AECA nor ITAR confer upon the Government Defendants the power to modify the USML Category I, temporarily or otherwise, without 30 days-notice to the relevant Congressional committees and without concurrence of the Defense Department.

78.     Here, upon information and belief, the Government Defendants did not provide advance notice of the proposed temporary removal to the House Committee on Foreign Affairs and to the Committee on Foreign Relations of the Senate, and did not receive the concurrence of the Secretary of Defense.

79.     According to Rep. Engel, Ranking Member of the House Committee on Foreign Affairs, notice of the terms of the settlement has not been provided by the President or the State Department.  *See* "Engel Decries State Department Policy to Allow 3-D Gun Printing," Press

---

[2]     For this, and all other counts in this Complaint in Intervention, the Intervenors name the Plaintiffs pursuant to Rule 19(a) of the Federal Rules of Civil Procedure for the limited purpose of ensuring that a full remedy may be ordered.

WASHAR0002178

Release (July 20, 2018), *available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

80.     The Government Defendants also lack statutory authority to determine that the Plaintiffs' CAD files should be removed from the Category I list without following the "established procedures" for commodity jurisdiction.  This is especially relevant here, because, in effect, the "temporary modifications" at issue will negate – in large part – the need for final rulemaking with respect to the data at issue, because once the data is on the internet, the damage to national security concerns will be irreparable.

81.     In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, it may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

82.     Here, the temporary modification agreed to by the Settlement Agreement is not in the interest of the security and foreign policy of the United States, and, upon information and belief, the Government Defendants have made no determination otherwise.

83.     In addition, the Government Defendants lack statutory authority to allow "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints. *See* Settlement Agreement, ¶ 1(d).

84.     Neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement.  However, the ordinary meaning of these terms implies that this provision purports to allow "any United States person" to manufacture, sell and possess firearms made from the files.  If so, this provision can be interpreted to violate numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by

WASHAR0002179

minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.). It also violates numerous analogous state criminal statutes.

85.     The Government Defendants do not have the statutory authority to amend, rescind or waive any portion of the Gun Control Act, or analogous state statutes.

86.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful insofar as it purports to allow Defense Distributed to post its files online. Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

**COUNT II**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –**
**AGENCY ACTION NOT IN ACCORDANCE WITH LAW**
(Against Plaintiffs and Government Defendants)

87.     Intervenors repeat and reallege paragraphs 1-86.

88.     Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

89.     As alleged above, upon information and belief, the Government Defendants did not give 30 days-notice to the required Congressional Committees or receive concurrence from the Secretary of Defense before agreeing, through the Settlement Agreement, to temporarily modify USML Category I to remove the data files at issue from ITAR regulation. *See* Settlement Agreement, ¶¶1(b), (d).

90.     In addition, upon information and belief, the Government Defendants did not follow established procedures before granting the Plaintiffs an exception to ITAR jurisdiction.

91.     Furthermore, the Government Defendants cannot permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's

- 24 -

WASHAR0002180

automated blueprints, because "use" or "otherwise benefit" may be read to allow prohibited individuals to possess, manufacture or sell firearms made from the computer files at issue. *See* Settlement Agreement, ¶ 1(d); Gun Control Act, 18 U.S.C. 921 *et seq.*

92.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

### COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
### ARBITRARY AND CAPRICIOUS AGENCY ACTION
(Against Plaintiffs and Government Defendants)

93.     Intervenors repeat and reallege paragraphs 1-92.

94.     Under the APA, a court must set "aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

95.     A court may hold that an agency action is arbitrary and capricious when an agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.  In addition, an agency's departure from prior practice can serve as an additional basis for finding an agency's interpretation to be arbitrary and capricious.

96.     Here, upon information and belief, the Government Defendants have provided no explanation for their shift in policies, which they have repeatedly articulated to this Court. They have released no reports, no studies or analysis in connection with the Settlement Agreement to explain why the files at issue should be removed from ITAR regulation.  It appears that the

WASHAR0002181

Government Defendants have also entirely failed to consider or to acknowledge the serious national security concerns created by the export of the CAD files.

97.     In fact, according to par. 5 of the Settlement Agreement, the agreement "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

98.     Here, the Government Defendants have agreed to (i) draft and fully pursue a notice of rulemaking and a final rule to remove the files at issue from ITAR regulation; (ii) temporarily modify the USML Category I list to exclude the files at issue from ITAR regulations; and (iii) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue."

99.     These agency actions are arbitrary and capricious because the Government Defendants have not offered a reasoned explanation for ignoring or countermanding their earlier factual determinations or representations to this Court, the Fifth Circuit and the United States Supreme Court.  They are also arbitrary and capricious because they are contrary to the purposes of the AECA which requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms export.  *See*  22 U.S.C. § 2751.

100.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

WASHAR0002182

## COUNT IV
### VIOLATION OF SEPARATION OF POWERS
(Against Plaintiffs and Government Defendants)

101.    Intervenors repeat and reallege paragraphs 1-100.

102.    The Constitution vests the power to legislate to Congress, not the Executive Branch

103.    Here, in the Settlement Agreement, the Government Defendants have agreed to temporarily modify the USML Category I to permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints.

104.    Because neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement, this provision may be interpreted to allow "any United States person" to manufacture, sell and possess firearms made from the files.  If so, this provision violates numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.).  As discussed above, the Government Defendants do not have the power to nullify or amend the provisions of the Gun Control Act.

105.    For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed the Plaintiffs to make its files available online.

WASHAR0002183

### REQUESTED RELIEF

WHEREFORE, Intervenors pray that this Court:

a)      Declare the Settlement Agreement unlawful to the extent it permits Defense Distributed to make its files available online;

b)      Enjoin the Plaintiffs and Defendants from putting any provision of the Settlement Agreement into effect to the extent that such permission purports to permit Defense Distributed to make its files available online;

c)      Enjoin the Plaintiffs from making their files available online; and

d)      Grant such other relief as the Court may deem just and proper.


Dated: July 25, 2018                          Respectfully Submitted,

                                              /s/ J. David Cabello
                                              BLANK ROME LLP
                                              J. David Cabello
                                              Texas Bar No. 03574500
                                              717 Texas Avenue
                                              Suite 1400
                                              Houston, TX 77002
                                              (713) 632-8696
                                              dcabello@blankrome.com

                                              John D. Kimball (pending *pro hac vice*)
                                              N.Y. Bar No. 1416031
                                              The Chrysler Building
                                              405 Lexington Ave.
                                              New York, NY 10174
                                              (212) 885-5000

WASHAR0002184

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX OF FACTS IN SUPPORT OF JOINT EMERGENCY
MOTION TO INTERVENE BY INTERVENORS
THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

Pursuant to Local Rule CV-7(d)(1), Proposed Intervenors submit this appendix of factual

bases relied upon.

**A. The Proposed Intervenors**

Proposed Intervenors are all nonprofit organizations committed to eliminating gun violence

through sensible gun control laws.[1]

**B. The Government's Restriction of Defense Distributed's Illegal Dissemination and
Export of Weapons Under ITAR.**

This Court previously made preliminary findings which were approved by the Fifth Circuit.

Dkt. 43; *Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 460-61 (5th Cir. 2016).

---

[1] The Brady Campaign to Prevent Gun Violence develops and implements extensive public health and safety programs. It represents victims of gun violence in cases against irresponsible gun sellers and owners. Through its public health and safety programs, it inspires safer attitudes and behaviors around the existing guns in homes and communities nationwide and new gun purchases taking place every day.

Everytown and its members and supporters work in all 50 states and in Congress to support the passage and enforcement of gun safety laws that, among other things, help keep guns out of the hands of prohibited persons and other individuals with dangerous histories and help law enforcement apprehend and prosecute those who violate U.S. and state gun laws.

WASHAR0002185

A detailed factual background of this litigation has been fully briefed. *See* Dkt. 32, pp. 3-7; *see also* Dkt. 43, pp. 1-4. A short summary of the relevant facts and the procedural background of the case is provided here.

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The goal of the AECA is to ensure that articles used in warfare or terrorism are not exported from the United States to other countries, where they could be a threat to United States national security, foreign policy, or international stability. The President has delegated the authority to implement these regulations to the State Department, which promulgated ITAR to implement the regulations. *See* Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130. ITAR is administered by the State Department's Directorate of Defense Trade Controls ("DDTC"). *Id.*

The U.S. Munitions List ("USM"), part of the AECA, identifies materials that constitute "defense articles and defense services" under the AECA. 22 C.F.R. Part 121. Category 1 of the

---

Giffords is a 501(c)(4) gun violence prevention organization founded by former Congresswoman Gabrielle Giffords and her husband, Captain Mark Kelly, a retired Navy combat veteran and NASA astronaut. Headquartered in Washington, D.C., Giffords researches, writes, and proposes policies that make Americans safer and mobilizes voters and lawmakers in support of safer gun laws. Its mission is to address the issue of gun violence in communities across the country, and to that end, Giffords works to affect legislation, shape the national dialogue, and reduce gun violence. Since its founding after the Sandy Hook Elementary School shooting in Newtown, Connecticut, Giffords has been involved in the passage of more than 200 new strong gun laws in 45 states and Washington, D.C.

Giffords and its sister 501(c)(3) organization, Giffords Law Center to Prevent Gun Violence, recently submitted public comments on the proposed rule changes by the State Department and Commerce Department that would deregulate the publication of computerized blueprints for the production of 3D printed guns. In that comment, Giffords opined that the proposed changes "would represent a dramatic change in the regulatory structure governing firearm experts," and that they "may not adequately address our national security, foreign policy, international crime, or terrorism threats," and expressed concern that the changes "will result in an increase in the number of untraceable firearms in circulation." *See* Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), *available at* http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf.

2

WASHAR0002186

USML includes (1) all firearms up to .50 caliber, and (2) all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(1)(a). Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles." *Id.* § 120.10(a).

In 2012, Defense Distributed began exporting technical data related to firearms through the publication of Computer Aided Design ("CAD") files, without restriction, on the Internet. Dkt. 32, p. 1; Dkt. 8, pp. 5-6. These CAD files are essentially blueprints for the creation of guns and gun components via a three-dimensional ("3D") printer. Dkt. 32, p. 5. In May 2013, the DDTC advised Defense Distributed that its publication of CAD files without authorization from the DDTC potentially violated the ITAR, specifically because the CAD files were being made available outside the United States. Over the next two years, the DDTC conducted a commodity jurisdiction procedure ("CJ review") and concluded that several of the published CAD files were subject to regulation under ITAR because they were technical data under Category 1 of the USML. Dkt. 32, pp. 5-7. To make the CAD files available outside the United States, ITAR required Defense Distributed to seek preapproval of publication from the DDTC.

## C. The Current Litigation

On May 6, 2015, plaintiffs initiated the present action, seeking a declaration that the DDTC's preapproval requirement for privately generated unclassified information was an unconstitutional *ultra vires* government action and violated the First, Second, and Fifth Amendments. Dkt. 1. Plaintiffs also sought to enjoin the DDTC from enforcing the prepublication approval requirement against them. *See* Dkt. 1, p. 14; *see generally* Dkt. 8. After a hearing, this Court denied plaintiffs request for preliminary injunction. Dkt. 43. The Fifth Circuit affirmed this

3

WASHAR0002187

Court's denial of preliminary injunction. *Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016). The Supreme Court denied writ of *certiorari*. Dkt. 76.

The parties continued litigating the merits of the case. However, on April 30, 2018, plaintiffs suddenly notified this Court that the parties had reached a tentative settlement agreement and requested a stay of the case, which was granted. Dkt. 93. On June 28, 2018, the parties informed the Court that the appropriate government actors had approved the parties' settlement agreement and that the parties would submit a stipulation of dismissal to the Court, on or before August 4, 2018. Dkt. 95.

### D. Motivation to Intervene.

1. The Settlement Agreement; an unjustified reversal of course.

Earlier this month, the Brady Campaign submitted a Freedom of Information Act request to the State Department to obtain a copy of the parties' Settlement Agreement. Proposed Intervenors received a full copy of the Settlement Agreement, which was posted on the internet on or around July 12, 2018. The Settlement Agreement contains several disturbing provisions that are an affront to the United States' system of governance and violate the APA. *See* Ex. 2. First, the Settlement Agreement contractually obligates the Government to revise ITAR to specifically exclude Defense Distributed's Ghost Gunner Files, CAD files, and Other Files[2] from the list of technical data in USML. Ex. A, p. 1, Section 1(a). In other words, the Government has promised a private party that it will use its executive power to amend federal regulations for the benefit of that specific party.

Second, the Government has contractually agreed to publicly announce a temporary modification of ITAR on the DDTC website. This temporary modification, which also exempts

---

[2] "Ghost Gunner Files," "CAD Files," and "Other Files" are defined to include the files the State Department determined were subject to ITAR. *See* Exhibit A, p.7; Dkt. 90, ¶¶ 36, 40, 44-45.

WASHAR0002188

Defense Distributed's files from regulation by ITAR, will be effective in the period prior to finalization of the revised ITAR provisions promised by the Government.

Finally, the Government has agreed to issue a letter, on or before July 27, 2018, authorizing Defense Distribution to begin the public release of its files, prior to dismissal of the suit. Notably, as drafted, the Settlement Agreement seeks to bypass any review, input, or approval by this Court as to the terms therein.

> 2. <u>The threat to national security.</u>

Defense Distributed's files are defense articles that will allow individuals across the globe to generate lethal firearms that are untraceable and that can be modified to be virtually undetectable in metal detectors. Dkt. 32, p. 8. This is particularly concerning to the State Department, because many foreign countries do not have sufficient security resources, and because this technology could be used by terrorist and guerrilla groups directing violence at the United States. *Id.* The State Department's recognition of the national security threat posed by the unrestricted publishing of these files is what caused the State Department to admonish Defense Distributed and conduct a review of these files beginning in 2013.

This Court is not a stranger to the national security issues raised by Defense Distributed's conduct. *See Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 691 (W.D. Tex. 2015) ("Defense Distributed admits its purpose is facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional printing of arms. Facilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict.") (internal citations and quotations omitted). And the Fifth Circuit, affirming this court's denial of plaintiffs request for a preliminary injunction, recognized the irreparable harm US national security would suffer if plaintiffs continued publication of its files:

5

WASHAR0002189

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and be freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs–Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. *Because those files would never go away*, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. *Thus, the national defense and national security interest would be harmed forever.*

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016) (emphasis added).

Numerous media channels have recognized the implications of Defense Distributed's files. For example, Fox News stated that after Defense Distributed's first publication of files in 2013, the countries with the most downloads of those files were Spain, the United States, Brazil, and Germany, proving that the publication of these files will have an international effect.[3] Fox News also noted that the 3D printers required to create functional guns cost as little as $2,000 and will make gun control "practically impossible."[4]

---

[3] John R. Lott, *This marks the end of gun control*, FOX NEWS, (July 21, 2018), http://www.foxnews.com/opinion/2018/07/20/this-marks-end-gun-control.html.
[4] *Id.*

6

WASHAR0002190

Dated:  July 25, 2018

Respectfully submitted,

 /s/ David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).


 /s/ M'Liss Hindman
M'Liss Hindman
Paralegal

WASHAR0002191

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**JOINT EMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER AND FOR PRELIMINARY INJUNCTION BY PROPOSED INTERVENORS
THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., AND GIFFORDS**

Pursuant to Fed. R. Civ. P. 65 Proposed Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords ("Giffords"), (collectively "Proposed Intervenors") respectfully and urgently moves the Court to:

A.  Enter a temporary restraining order enjoining Defendants from performing under the Settlement Agreement (**Exhibit A**) discussed below, as this would cause immediate and irreparable harm to United States national security directly affecting the safety of individual U.S. citizens;

B.  Enter a temporary restraining order enjoining the Plaintiffs from publishing the Published Files, Ghost Gunner Files, CAD Files, and Other Files (the "Weapon Schematics"), as defined in the Settlement Agreement, in order to prevent the immediate and irreparable harm that would result from publishing these files;

C.  Enter a preliminary injunction enjoining the parties from performing the settlement agreement; and

D.  Grant such other and further relief as may be appropriate.

In support of their motion, Proposed Intervenors would respectfully show the Court as follows:

## INTRODUCTION AND BACKGROUND

The factual and procedural background of this case have been briefed in the Appendix to Proposed Intervenors' Joint Emergency Motion to Intervene, which was filed contemporaneously with this Motion.

2

WASHAR0002193

**LEGAL STANDARD FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER AND MOTION FOR SAME**

To establish the need for a temporary restraining order and preliminary injunction pursuant FRCP 65, the movant has to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any prejudice the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Janvey v. Alguire*, 628 F.3d 164, 174 (5th Cir. 2010).

**A. Proposed Intervenors are likely to succeed on the merits; the Proposed Intervenors satisfy the requisite elements of a claim under the APA.**

To make out an APA violation, the Plaintiffs must show that rulemaking through the terms of the settlement are arbitrary and capricious. 5 U.S.C.A. § 706(2)(A); *Taylor v. Fed. Aviation Admin.*, No. 16-1302, 2018 WL 3320874 (D.C. Cir. July 6, 2018). To obtain APA standing, a party must show that its grievance falls within the zone of interests protected by the Arms Export Control Act. In addition, the party will need to show that it would suffer an injury-in-fact to obtain standing under Article III of the U.S. Constitution. See *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000).

1. The Proposed Intervenors have standing.

The APA allows a person adversely affected by an agency action, including new rulemaking, to challenge that action. The court will set aside new regulations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . ." 5 U.S.C. § 702. Only final agency actions can be challenged. 5 U.S.C. § 704.

Proposed Intervenors are adversely affected by the temporary removal of small arms and associated technology from the USML because (1) the removal will allow for the release of

3

WASHAR0002194

firearms technology by Defense Distributed that enable violations of state and federal law that impact public safety, (2) the safety and security of state residents is compromised by the proliferation of unregistered firearms within the state, and (3) the safety and security of state residents who travel abroad is compromised by the proliferation of small arms and associated technology to produce small arms in other countries. In addition, according to the Plaintiffs, implementation of the Settlement Agreement will directly undermine the work of Proposed Intervenors.

We understand that as matter of judicial self-governance, courts review prudential considerations with regard to standing to limit parties to those which are directly affected by an action. Prudential standing in an APA claim looks to whether "the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected by the statute in question." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998). That is to say, the party's interest must have a "rough correspondence" with the purpose of the underlying statute. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939 (9th Cir. 2013). Thus, at least to some degree, the interests of a party must line up with the purpose of the AECA.

In this regard, it is noteworthy that the "zone of interests" test is not meant to be "especially demanding." *Match-E-Be-Nash-She-Wish-Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). The test forecloses suit only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit." Hence, the zone of interest test only "requires some indicia – however slight – that the litigant before the court was intended to be protected, benefited or

4

WASHAR0002195

regulated by the statute under which suit is brought." *Public Citizen v. FTC*, 869 F.2d 1541, 1547 (D.C. Cir. 1989); see *Autolog Corp. v. Regan*, 731 F.2d 25, 29-30 (D.C. Cir. 1984) ("Courts should give broad compass to a statute's 'zone of interests' in recognition that this test was originally intended to expand the number of litigants able to assert their rights in court").

Here, the Proposed Intervenors clearly meet this test, as associations promoting gun safety laws to minimize violence and injuries with members who would be directly affected by release of this information in the United States and when traveling abroad. The Proposed Intervenors are vulnerable to the precise sort of harm that ITAR's assault on international terrorism is intended to shield.

2. The temporary removal of items from the USML through the settlement is arbitrary and capricious.

The Proposed Intervenors can satisfy the above-delineated requirements to state a claim under APA Section 7, because the consequences of allowing the Settlement Agreement to become effective include: (1) direct contradiction of the legislative intent underlying the AECA and amending the AECA to codify the then-existing classifications of items of on the USML, (2) State Department and other agencies' failure to study or otherwise consider the national security and international stability effects of these actions, in violation of the purpose of the AECA, (3) release of this information to the Internet as a result of the settlement before completing its APA rulemaking after receiving comments on the NPRM, and (4) inexplicable, unjustified reversal of the position of the U.S. Government with regard to the national security ramifications of allowing the online distribution of files to enable the 3-D printing by reference to the Weapons Schematics.

i. Violation of AECA purpose.

The AECA requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. 22 U.S.C.

5

WASHAR0002196

§ 2751. Neither the settlement agreement nor the proposed rulemaking to finalize the reclassification of small arms technology off of the USML address how these rule changes will impact the international trade in arms or potentially destabilizing effects. This total lack of consideration of the central purpose of the AECA demonstrates that the government's action was ill-considered: "Deference is not owed when the agency has completely failed to address some factor of consideration of which was essential to [making an] informed decision." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) (internal quotation marks and citation omitted).

     ii.   <u>Failure to study.</u>

In previous rulemakings removing certain items from the USML, the Department of State undertook significant efforts to understand the ramifications to national security interests. For example, before removing certain Global Position System receivers from the USML, the State Department headed an interagency working group to review the regulation of commercial satellites and related technology and whether removal would jeopardize national security interests. Amendment to the ITAR, 57 Fed. Reg. 41,077 (Sept. 9, 1992). An agency's rulemaking is arbitrary and capricious if the agency cannot explain a connection between the logic of the rule and its purported factual basis. *See We Who Care, Inc. v. Sullivan*, 756 F. Supp. 42, 46-47 (D. Me. 1991) (finding that revised regulation establishing $1,500 as the maximum equity in an automobile that an individual could have to obtain benefits under the Aid to Families with Dependent Children program was arbitrary and capricious because the survey on which the change was based was unavailable and the agency was unable to provide basic information about how the survey was conducted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

6

WASHAR0002197

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

iii. <u>Failure to follow procedural requirements.</u>

The AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), notice of the terms of the settlement has not been provided by the President or the State Department.

Although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, they may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. As Congressman Engel noted: "[i]t stretches credulity to believe that release of this information is in the U.S. interest." Engel Decries State Department Policy to Allow 3-D Gun Printing, Press Release (July 20, 2018),

7

WASHAR0002198

*available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

Here, the release of the information as a result of the settlement, prior to the completion of the required APA rulemaking process, essentially circumvents the entire rulemaking process, without providing any justification for such action, and is thus clearly tantamount to arbitrary and capricious action in contravention of the APA.

Indeed, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Where an agency makes a determination to remove a protection from a regulatory scheme, an adequate basis and explanation for that rescission is expected. *See* 15 U.S.C.A. §§ 1381 et seq., 1392(a), (b), (f)(1,3,4); 5 U.S.C.A. § 706; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856 (1983).

Here, the terms of the settlement directly contradict the arguments made by the U.S. Government parties in seeking to dismiss Defense Distributed's challenge.

     iv.    The terms of the settlement are a final agency action.

The APA authorizes judicial review of final agency actions. 5 U.S.C. § 704. Agency action is "final" if two conditions are met. First, the action must mark the end of the agency's decision-making process. Second, the action must be one by which "rights or obligations have been determined," or from "which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 247 (3d Cir.

WASHAR0002199

2011).[1]  A settlement agreement can qualify as final agency action. *United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008).

The executive branch cannot hide behind Presidential powers to achieve a particular domestic objective. When it does so, the executive branch exceeds the statutory authority granted to it by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952) ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress -- it directs that a presidential policy be executed in a manner prescribed by the President."); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), vacated and remanded on other grounds, 471 U.S. 1113 (1985) ("The Court in Youngstown was therefore concerned with whether injunctive relief may appropriately issue to restrain the executive's unlawful action with respect to domestic affairs where the domestic problem might have a secondary effect on foreign affairs."); *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 296 (4th Cir. 2018) ("In sum, the President claims the authority to indefinitely set his own

---

[1] In *Minard*, an oil company obtained a preliminary injunction against implementation of a settlement agreement between the Forest Service and environmental groups. That settlement required the Forest Service to conduct an environmental analysis before issuing a "Notice to Proceed" ("NTP") to mineral rights owners in the Alleghany National Forest. An NTP is required to proceed with extraction activity. In implementing the settlement, the Forest Service placed a moratorium on issuance of NTPs. The Third Circuit found that the moratorium constituted a final agency action, while the settlement agreement itself was an "intermediate agency action", which, under the APA, is "subject to review on the review of the final agency action." *Id.* at 249, n. 7 (quoting 5 U.S.C. § 704). The Third Circuit found that the Forest Service had failed to abide by APA rulemaking requirements in implementing its new policy on issuing NTPs. *Id.* The Third Circuit upheld the district court's preliminary injunction: the district court's injunction enjoined the Forest Service from requiring the environmental analysis before issuing NTPs, ended the moratorium, and prevented further implementation of the settlement agreement. *See Minard Run Oil Co. v. United States Forest Serv.*, No. 09-125, 2009 U.S. Dist. LEXIS 116520 (W.D. Pa. Dec. 15, 2009). Here, the settlement action must be considered final agency action, because the settlement will have immediate and substantial effect through release of the information to the internet. As noted by the Fifth Circuit in affirming this Court's denial for a preliminary injunction, the files would be "freely available worldwide…Thus, the national defense and national security interest would be harmed forever."

9

immigration and travel policies with respect to every foreign nation and class of immigrants, under any circumstances, exigent or not, that he sees fit. Such authority is dangerously similar to lawmaking and intrudes on Congress's plenary power over immigration").

**3. There is a threat of irreparable injury if the injunction is denied.**

The threat of irreparable injury to the United States and its citizens has been briefed in the Motion to Intervene and accompanying Appendix 1. If the Government is permitted to perform under the Settlement Agreement, despite the numerous and blatant APA violations in the Settlement Agreement, United States national security will suffer irreparable injury.

**4. The threatened injury outweighs any prejudice the injunction might cause the parties.**

This Court has already found that the Plaintiff's interest in protecting its constitutional rights does not outweigh "the public's keen interest in restricting the export of defense articles." *Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 690 (W.D. Tex. 2015).

**5. The injunction will not disserve the public interest.**

An injunction will not disserve the public interest. On the contrary, the primary aim of the injunction is to serve the public interest by enjoining plaintiffs and defendants from taking action that will irreparably harm the security of the United States and its citizens. *See id.* ("Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling 'export' of such materials stands in sharp contrast to Defendants' assertion of the public interest.").

## CONCLUSION

For these reasons, Proposed Intervenors respectfully request the Court grant a temporary restraining order and schedule a hearing concerning the motion for preliminary injunction.

WASHAR0002201

Dated:  July 25, 2018

Respectfully submitted,

*/s/* David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

*/s/ M'Liss Hindman*
M'Liss Hindman
Paralegal

11

WASHAR0002202

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL., | § | |
| | § | |
| Defendants. | § | |

**INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC, AND GIFFORDS' NOTICE
OF APPEARANCE OF LEAD COUNSEL J. DAVID CABELLO**

Intervenors The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety

Action Fund, Inc., and Giffords (collectively "Intervenors") notify the Court that J. David Cabello

of Blank Rome, LLP, has entered this action as Lead Attorney on their behalf. In connection with

this notice, Mr. Cabello requests that all future pleadings and other papers filed under Fed. R. Civ.

P. 5 be served on him at the below address and contact information.

**J. David Cabello
Blank Rome LLP
717 Texas Avenue, Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com**

1

WASHAR0002203

July 25, 2018                              Respectfully submitted,


                                          /s/ J. David Cabello
                                          J. David Cabello
                                          Attorney-in-Charge
                                          Texas State Bar No. 03574500
                                          Blank Rome LLP
                                          717 Texas Avenue
                                          Suite 1400
                                          Houston, TX 77002
                                          Telephone: (713) 228-6601
                                          Facsimile: (713) 228 6605
                                          E-mail: dcabello@blankrome.com

                                          John D. Kimball (pending *pro hac vice*)
                                          Blank Rome LLP
                                          N.Y. Bar No. 1416031
                                          The Chrysler Building
                                          405 Lexington Ave.
                                          New York, NY 10174
                                          (212) 885-5000

                                          **Attorneys for Intervenors**



## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).



                                          /s/M'Liss Hindman
                                          M'Liss Hindman
                                          Paralegal


2

WASHAR0002204

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**INTERVENORS' REQUEST FOR AN EMERGENCY HEARING FOR
TEMPORARY RESTRAINING ORDER**

Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords, (collectively "Intervenors") file this Request for an Emergency Hearing on their Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). As fully briefed in the Motion for Temporary Restraining Order and Preliminary Injunction, time is of the essence. Plaintiffs will publish their Weapon Schematics as early as Friday July 27, 2018. Once these files are published on the Internet, United States national security and its citizens will be irreparably harmed. For this reason, Intervenors respectfully request this Court to grant an emergency hearing on **Thursday July 26, 2018**. For cause, Intervenors show the following:

1. As detailed in the Motion, Plaintiffs and Defendants (the Government) have entered into a Settlement Agreement. This Settlement Agreement permits Plaintiffs to publish, including on the Internet, files that can be used to print firearms and firearm components with a three-dimensional ("3D") printer.

2. The Government had previously deemed these files to fall within the scope of ITAR and, until very recently, vigorously defended its position against Plaintiffs. Now,

WASHAR0002205

the Government has entered into this Settlement Agreement. Several provisions of the Settlement Agreement violate the Administrative Procedure Act ("APA"). Intervenors can show a strong likelihood of success on the merits of claims of APA violations by the Government.

3. Publication of these files on the Internet will cause irreparable harm to the United States and its citizens, as it will allow the global community unfettered access to blueprints for the creation of untraceable and undetectable weapons, which will threaten the security of the United States and its citizens. Due to the nature of the modern Internet, once these files are publicly released, the damage cannot be undone. The balance of harm and the public interest favors granting a temporary restraining order and preliminary injunction.

Intervenors respectfully submit this request to set their Motion for an emergency hearing as requested herein, and for such and other relief as it may be entitled.

WASHAR0002206

Dated: July 25, 2018

Respectfully submitted,

_/s/_ David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending _pro hac vice_)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

_/s/ M'Liss Hindman_
M'Liss Hindman
Paralegal

WASHAR0002207

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**JOINT EMERGENCY MOTION FOR LEAVE TO INTERVENE BY
INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

TO THE HONORABLE COURT:

Pursuant to Fed. R. Civ. P. 24, Intervenors The Brady Campaign to Prevent Gun

Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc.

("Everytown") and Giffords ("Giffords"), (collectively "Proposed Intervenors") seek leave to

intervene in this litigation. In support, Proposed Intervenors file 1) a Memorandum of Law in

support of their request to intervene (**Exhibit A**), 2) a Complaint in Intervention (**Exhibit B**), and

3) an Appendix of Facts. Proposed Intervenors are contemporaneously filing a motion for

temporary restraining order and preliminary injunction and requesting a hearing for the same.

Dated:  July 25, 2018

Respectfully submitted,

/s/ David Cabello

J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

/s/ M'Liss Hindman

M'Liss Hindman
Paralegal

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING REQUEST FOR AN EMERGENCY HEARING BY
INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

The Court, having considered Intervenors The Brady Campaign to Prevent Gun Violence,

Everytown for Gun Safety Action Fund, Inc., and Giffords' Emergency Motion for Hearing on

Temporary Restraining Order and Preliminary Injunction, finds that Intervenor's motions should

be GRANTED.

IT IS SO ORDERED that

The Court will hold a hearing on Intervenors' Motion for Preliminary Injunction and

Temporary Restraining Order on _____, July _____, 2018 at _____

a.m./p.m.

_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

WASHAR0002210

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING JOINT EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER AND MOTION
FOR PRELIMINARY INJUNCTION**

The Court, having considered Intervenors The Brady Campaign to Prevent Gun Violence,

Everytown for Gun Safety Action Fund, Inc., and Giffords Joint Emergency Motion for

Temporary Restraining Order, and Motion for Preliminary Injunction, finds that Intervenors'

motions should be GRANTED.

IT IS SO ORDERED that

1.  Until further order of this Court, pending hearing on Intervenors' motion for

    preliminary injunction, Plaintiffs are temporarily enjoined from publishing and/or

    exporting the Published Files, Ghost Gunner Files, CAD Files, and Other Files, as

    defined in the Settlement Agreement executed by the Plaintiffs and Defendants on

    June 29, 2018; and

2.  Until further order of this Court, pending hearing on Intervenors' motion for

    preliminary injunction, Plaintiffs and Defendants are enjoined from performing under

    the Settlement Agreement.

WASHAR0002211

The Court shall hold a hearing on Intervenors' Motion for Preliminary Injunction on

_____, 20_____ at _____ a.m./p.m.


_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

WASHAR0002212

# Exhibit A

WASHAR0002213

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT EMERGENCY
MOTION TO INTERVENE BY INTERVENORS THE BRADY CAMPAIGN
TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY
ACTION FUND, INC. AND GIFFORDS**

TO THE HONORABLE COURT:

Pursuant to Fed. R. Civ. P. 24, The Brady Campaign to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords (collectively "Proposed Intervenors") respectfully and urgently move the Court to:

A. Permit the Proposed Intervenors to intervene in this litigation and file the Complaint in Intervention annexed as **Exhibit B**;[1] and

B. Grant such other and further relief as may be appropriate.

If the Court grants intervention, Proposed Intervenors also request by separate motion, filed contemporaneously with this motion, a temporary restraining order and preliminary injunction. Injunctive relief is necessary to prevent the irreparable harm to the security of the United States and its citizens that will result from the performance of the Settlement Agreement (attached as **Exhibit C**) and Defense Distributed's publication of Weapon Schematics on the Internet.

## BACKGROUND

This case began because the United States government correctly found that the publication on the internet of Defense Distributed's blueprints for the 3-D printing of certain weapons threatened national security. As stated by the Fifth Circuit:

> The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiff-Appellants very strong constitutional rights under these circumstances…[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security."

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016).

---

[1] If this Court determines that the Proposed Intervenors do not satisfy the test for intervention under Fed. R. Civ. P. 24, the Proposed Intervenors request leave to file the proposed complaint in intervention as a new, related action in this Court, and further request that the Court preserve the status quo pending such filing (which would similarly seek immediate injunctive relief).

139718.00601/110549050v.6

WASHAR0002215

With no justification whatsoever and in violation of the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers, the Government has capitulated to plaintiffs' position and agreed to completely abandon the numerous valid reasons it had asserted for blocking the export of Defense Distributed's plans. This Court previously found that the Government's position was likely to succeed. It is shocking, therefore, that the Government has abdicated the correct position it took concerning national security. The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community.

Plaintiffs and the Government have agreed to settle all issues in this litigation by August 4, 2018. The terms of the Settlement Agreement allow Defense Distributed to publicly upload blueprints of firearms and firearm components to the Internet, so that any terrorist group or individual in the world with access to the Internet and a three-dimensional ("3D") printer can create guns and gun components, with modifications that make these weapons untraceable and undetectable. Specifically, the Settlement Agreement permits Defense Distribution to begin publishing these files on July 27, 2018, even though the parties are not set to enter a stipulation of dismissal until August 4, 2018.

Most alarmingly, the Government, which up until a few months ago was vigorously defending this suit and fighting to prevent Defense Distributed from publishing these files, has suddenly done a complete about-face and contractually obligated itself to exempt Defense Distributed's files from the International Traffic in Arms Regulations, 22 C.F.R Part 120 et seq. ("ITAR"), despite the State Department's official determination in 2015 that the disputed files are subject to ITAR. Due to the nature of the modern Internet, the harm from Defense Distributed's publication of these files is irreversible. A temporary restraining order and preliminary injunction

3

WASHAR0002216

to enjoin Defense Distributed and the Government are not merely necessary forms of relief, but quite simply the *only* available forms of relief that will prevent these files from becoming publicly available worldwide and jeopardizing the national security of the United States and its citizens.

Proposed Intervenors are asking the Court to preserve the status quo and simply seek to continue down the sensible path that the Government, until recently, was advocating and this Court found was likely to succeed.

The procedural and factual record relied upon is attached as Appendix 1.

## POINT ONE
## INTERVENORS HAVE STANDING TO INTERVENE

### A. Standard for intervention.

FRCP 24 establishes the criteria for intervention, and is to be liberally construed. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (citing *Texas v. United States*, 805 F.3d 653, 656 (5th Cir. 2015)). Courts "should allow intervention when no one would be hurt and the greater justice could be attained." *Id.* Rule 24 establishes two kinds of intervention: intervention of right and permissive intervention. *See* FED. R. CIV. P. 24(a)-(b).

Federal Rule of Civil Procedure 24(a)(2) provides that, upon timely application, a party shall be permitted to intervene as a matter of right when the party:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a)(2).

Under this standard, four criteria must be satisfied to support intervention as of right: (1) the motion to intervene must be timely; (2) the applicant must have a cognizable interest in the action; (3) the applicant must be so situated that the disposition of the action may, as a practical

4

WASHAR0002217

matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit. *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015); FED. R. CIV. P. 24(a). "'Rule 24 is to be construed liberally . . . and doubts resolved in favor of the proposed intervenor.'" *See Poynor v. Chesapeake Energy Ltd. P'ship (In re Lease Oil Antitrust Litig.)*, 570 F.3d 244, 248 (5th Cir. 2009) (internal citations omitted). Proposed Intervenors satisfy these requirements and should be permitted to intervene.

    1.  <u>The Motion to Intervene is timely.</u>

Proposed Intervenors have taken prompt action to intervene and file this Motion shortly after acquiring the full text of the Settlement Agreement from the Internet on or about July 19, 2018. Proposed Intervenors had not intervened here previously because they agreed with the Government's position. The Fifth Circuit has held, as is the case here, that by filing of a motion to intervene, "less than one month after learning of their interest in [the] case, [movants] discharged their duty to act quickly." *See Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977)).

With respect to the second factor, the Fifth Circuit has emphasized that the relevant prejudice is that created by the intervenor's *delay* in seeking to intervene after it learns of its interest, not prejudice to existing parties if intervention is allowed. *See Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 (5th Cir. 1992). As noted, the Proposed Intervenors did not unduly delay the filing of this Motion, and acted promptly after learning of its need to defend its interest in this matter. Prior to obtaining a copy of the Settlement Agreement, which revealed the parties current intentions, Proposed Intervenors were operating under the information and belief, supported by the Court docket and pleadings filed in this matter, that the Government defendants had been and were representing their interests and national security.

5

WASHAR0002218

Under the third factor, the Proposed Intervenors would be severely prejudiced and suffer irreparable harm if not allowed to intervene. Importantly, once Defense Distributed weapon's data is released to the internet, the damage to national security will be irreversible.

Lastly, there are no unusual circumstances here which weigh against intervention. Rather, the Government's sudden abandonment of its longstanding position and the national security issues that are at stake, are both unusual circumstances that weigh heavily in favor of intervention.

### 2. The Proposed Intervenors have a cognizable interest in the instant litigation.

The inquiry under the second requirement of Rule 24(a), "turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *See Texas*, 805 F.3d at 657 (5th Cir. 2015). Accordingly, an interest that is "concrete, personalized, and legally protectable is sufficient to support intervention." *Id.* at 658. Specifically, the Fifth Circuit has concluded that a party has "a legally protectable interest in the regulatory scheme" when the party or their membership are the "intended beneficiaries" of the policy under challenge." *See Wal-Mart*, 834 F.3d at 566-67 (5th Cir. 2016). The Fifth Circuit has also held that "public spirited" civic organizations that successfully petition adoption of a law may intervene to vindicate their "particular interest" in protecting that law. *Id.* (citing *City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291, 294 (5th Cir. 2012)). Proposed Intervenors meet this test.

The Plaintiffs have declared that because of the Settlement Agreement, the work that Proposed Intervenors are dedicated to will be imeasureably more difficult, if not impossible. Proposed Intervenors and their members work to pass and enforce gun safety laws in Congress and throughout the country. Upon publication of the Settlement Agreement, Cody Wilson, the president of Defense Distributed announced that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun

6

WASHAR0002219

Control." Plaintiff Second Amendment Foundation declared that that Settlement Agreement is a "a devastating blow to the gun prohibition lobby[.]" Proposed Intervenors have a concrete, personalized, and legally protectable interest in this litigation because the intent of the Plaintiffs, through the Settlement Agreement, is to make Proposed Intervenors' work untenable. As a result of the Settlement Agreement, Proposed Intervenors will be forced to expend additional resources to protect their respective missions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (where defendant's alleged conduct "perceptibly impaired" an organizational plaintiff's ability to carry out its mission and caused a "drain on the organization's resources – there can be no question that the organization has suffered the requisite injury in fact."); *Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 788 (W.D Tex. 2015) ("An organization can demonstrate injury 'by [alleging] that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and perceptibly impaired the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'") (quoting *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010)). In this case, because Proposed Intervenors assert a "procedural interest" to protect their "concrete interest," they "can assert that right without meeting all the normal standards for redressbility and immediacy" required for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n. 7 (1992).

> 3. The Disposition of the action threatens to create a practical impediment to the Proposed Intervenors' ability to protect its members' interest.

Proposed Intervenors would be seriously prejudiced if this Motion is not granted, as the implementation of the Settlement Agreement would undermine their stated mission statements and seriously impact members' interest and safety. The release of Defense Distributed's weapon's data via the internet, once permitted, cannot be reversed, mitigated, or undone, and would cause direct, substantial, and irreversible harm to the Proposed Intervenors and its members.

7

WASHAR0002220

As the Government has advocated throughout this matter, the dissemination of such information will negatively impact the national security of the United States and its citizens. Therefore, because Proposed Intervenors' and their members' interests would be practically impeded if the Settlement Agreement were implemented, Proposed Intervenors should be permitted to intervene at this juncture.

    4.  <u>No existing party adequately represents the Proposed Intervenors' interest.</u>

Clearly the Government no longer adequately represents the Proposed Intervenors' interest.

**B. Alternatively, permissive intervention is warranted under Rule 24(b).**

If this Court decides that Proposed Intervenors are not entitled to intervene as of right, they should be permitted to intervene under Rule 24(b). Under Rule 24(b)(1)(B), the Court may, in its discretion, permit intervention on a timely motion when the potential intervenor "has a claim or defense that shares with the main action a common question of law or fact." *See Graham v. Evangeline Par. Sch. Bd.*, 132 F. App'x 507, 511 (5th Cir. 2005). The "claim or defense" portion of Rule 24(b)(2) has been construed liberally by the Fifth Circuit. *See Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006). Moreover, "it is settled law in this circuit that permissive intervention is 'wholly discretionary with the [district] court.'" *See United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 416 (5th Cir. 1991) (internal citation omitted). Proposed Intervenors satisfy these factors, and this Court is within its discretion to permit them to intervene.

**C. Proposed Intervenor's are not required to establish independent standing to intervene.**

The Fifth Circuit has ruled that "Article III does not require intervenors to independently possess standing where the intervention is into a ***subsisting*** and ***continuing*** Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one

8

WASHAR0002221

subsisting party with standing to do so." *See Steward v. Abbott*, 189 F. Supp. 3d 620, 625 (W.D. Tex. 2016) (emphasis added) (internal citations omitted); *see also Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006); *Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998) (agreeing with "the better reasoning in cases which hold that Article III does not require intervenors to possess standing"). This Court has acknowledged it is "tasked with safeguarding separation of powers" and held that "[p]rovided that such a case or controversy exists, it is immaterial to the court's jurisdiction whether an intervening party, proceeding alone, could have satisfied the requirements of Article III." *Steward*, 189 F. Supp. 3d at 626 (W.D. Tex. 2016) (internal citation omitted). Accordingly, "[o]nce a valid Article III case-or-controversy is present, the court's jurisdiction vests," and "[t]he presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established." *See Ruiz*, 161 F.3d at 832 (5th Cir. 1998) (rejecting argument that intervenor required standing to invoke the court's jurisdiction to decide the merits of their claims, reasoning that "[t]he court's jurisdiction in [the] case ha[d] already been invoked by the original parties").[2]

---

[2]  Even if this Court were to require Proposed Intervenors to prove independent standing to intervene, Proposed Intervenors are able to establish the necessary elements of injury, causation, and redressability. *See LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) ("The three well-known components of standing are injury in fact, causation, and redressability"). "For an issue to be ripe for adjudication, a plaintiff must show that he 'will sustain immediate injury" and "that such injury would be redressed by the relief requested,'" *See Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994) (*citing Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81, 98 S. Ct. 2620, 2635, 57 L. Ed. 2d 595 (1978)).

Here, as described above, the Proposed Intervenors would be immediately and irreparably injured by the implementation of the Settlement Agreement and the dissemination of Defense Distributed's weapons data via the internet, as once the information is released online, it cannot be reversed, nor can its potential effects be mitigated, or undone. *Def. Distributed*, 838 F.3d at 461 (5th Cir. 2016) (emphasis added). In spite of the Government's prior strong defense of this matter, the Settlement Agreement now abandons those same pressing national security concerns raised by the possibility of foreign nationals or terrorists acquiring Defense Distributed's weapons files. Accordingly, Proposed Intervenors' injury would be directly caused by the implementation of the recent Settlement Agreement reached by the parties. *Id.* at 431 (5th Cir. 2011) ("[t]he

9

WASHAR0002222

## CONCLUSION

The Court should enter an order permitting Proposed Intervenors to file a Complaint in Intervention.

---

causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable,'" to the parties and/or the conduct at issue); Dkt. 32-1.  Additionally, it is clear that the intervention and the requested injunction, if granted, will prevent the immediate and irreparable harm to the Proposed Intervenors, among others, caused by the possibly illegal implementation of the Settlement Agreement and the irreversible dissemination of Defense Distributed's blueprints for untraceable lethal weapons via the internet.  *Id.*

Proposed Intervenors may also establish associational standing to intervene on behalf of their individual members.  An organizational plaintiff may have Article III standing either in its own right, "if it meets the same standing test that applies to individuals[,]" or associational standing on behalf of its members, if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Steward*, 189 F. Supp. 3d at 630-31 (W.D. Tex. 2016) (internal citations omitted).  Here, Proposed Intervenors' members are American citizens and the intended beneficiaries of gun control and anti-terror laws enacted by this country.  By virtue of the Settlement Agreement, and the online publishing of Defense Distributed's weapons files, the security and safety of Proposed Intervenors' members is directly threatened.  As the Government has previously cited, Proposed Intervenors' members will be subjected to increase risk from terroristic and violent threats, at home, in public places, and while traveling abroad if Defense Distributed's data is released.  *See* Dkt. 32, 32-1. Second, the interests that Proposed Intervenors and their individual members seek to protect relate to the prevention of gun violence, which is germane to each organization's purpose, and which is essential to each of their individual members.  Finally, it is undisputed that the interests which Proposed Intervenors and their individual members seek to assert do not require direct participation by the individual members in the lawsuit.  The Government defendants have previously and adequately represented the individual members' interests in this litigation for over three (3) years without the members' direct participation in this case.  Proposed Intervenors will represent the interests of their individual members that have now been abandoned by the Government defendants by virtue of the Settlement Agreement.

139718.00601/110549050v.6

WASHAR0002223

Dated:  July 25, 2018                    Respectfully submitted,

                                     */s/ David Cabello*
                                     J. David Cabello
                                     Blank Rome LLP
                                     Texas State Bar No. 03574500
                                     717 Texas Avenue
                                     Suite 1400
                                     Houston, TX 77002
                                     Telephone: (713) 228-6601
                                     Facsimile: (713) 228 6605
                                     E-mail: dcabello@blankrome.com

                                     John D. Kimball (pending *pro hac vice*)
                                     Blank Rome LLP
                                     N.Y. Bar No. 1416031
                                     The Chrysler Building
                                     405 Lexington Ave.
                                     New York, NY 10174
                                     (212) 885-5000

                                     **Attorneys for The Brady Campaign to**
                                     **Prevent Gun Violence, Everytown for Gun**
                                     **Safety Action Fund, Inc., and Giffords**

### CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

                                     */s/ M'Liss Hindman*
                                     M'Liss Hindman
                                     Paralegal

139718.00601/110549050v.6

WASHAR0002224

# Exhibit A

WASHAR0002225

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0002226

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0002227

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0002228

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

WASHAR0002229

5. *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6. *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7. *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0002230

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0002231

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.  *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0002232

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0002233

# Exhibit C

WASHAR0002234

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

      (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

      (b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0002235

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0002236

counsel with all information necessary to effectuate this payment. The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2. *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3. *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0002237

individual capacities, from any and all claims, demands and causes of action of every
kind, nature or description, whether currently known or unknown, which Plaintiffs may
have had, may now have, or may hereafter discover that were or could have been raised
in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed
as an admission by Defendants of the truth of any allegation or the validity of any claim
asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an
admission of any fault or omission in any act or failure to act. Nor is it a concession or
admission as to whether the monetary or equitable relief, attorneys' fees, costs, and
expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the
terms of the Settlement Agreement may be offered or received in evidence or in any way
referred to in any civil, criminal, or administrative action other than proceedings
permitted by law, if any, that may be necessary to consummate or enforce this Settlement
Agreement. The terms of this Settlement Agreement shall not be construed as an
admission by Defendants that the consideration to be given hereunder represents the
relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires*
actions, deny that they violated the First Amendment, Second Amendment, or Fifth
Amendment of the United States Constitution, and maintain that all of the actions taken
by Defendants with respect to Plaintiffs comply fully with the law, including the United
States Constitution.

4

WASHAR0002238

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0002239

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
    Settlement Agreement with their counsel, who has explained these documents to them
    and that they understand all of the terms and conditions of this Settlement Agreement.
    Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
    the contents thereof, and execute this Settlement Agreement of their own free act and
    deed. The undersigned represent that they are fully authorized to enter into this
    Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts,
    each of which shall be deemed an original, and all of which together constitute one and
    the same instrument, and photographic copies of such signed counterparts may be used in
    lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
    drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
    requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
    Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
    state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0002240

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this
Settlement Agreement without reliance on any representation by Defendants as to the
application of any such law.

12.　*Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of
Plaintiffs' Second Amended Complaint.

- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of
Plaintiffs' Second Amended Complaint.

- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs'
Second Amended Complaint.

- The phrase *"Other Files"* means the files described in paragraphs 44-45 of
Plaintiffs' Second Amended Complaint.

- The phrase *"Military Equipment"* means (1) Drum and other magazines for
firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds,
regardless of jurisdiction of the firearm, and specially designed parts and
components therefor; (2) Parts and components specially designed for conversion
of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or
attachments specially designed to automatically stabilize aim (other than gun
rests) or for automatic targeting, and specially designed parts and components
therefor.

- The phrase *"technical data that is the subject of the Action"* means: (1) the
Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other
Files insofar as those files regard items exclusively: (a) in Category I(a) of the
United States Munitions List (USML), as well as barrels and receivers covered by
Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0002241

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0002242

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 1:42 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Idaho Statesman: Gun-control advocates ask judge to block downloadable 3D guns |

# CPA MEDIA MONITORING

**Gun-control advocates ask judge to block downloadable 3D guns**
**By Cynthia Sewell**
**26 July 2018**
The Department of Justice quietly agreed to let a Texas man legally offer his downloadable plans to fabricate a 3D-printed gun starting Aug. 1.
When news broke nationally about the agreement over the past week, three national gun safety groups quickly headed to court to try to block the action.
The Brady Center to Prevent Gun Violence, Everytown for GunSafety and Giffords Law Center to Prevent Gun Violence have asked a federal judge in Texas to issue a temporary restraining order and preliminary injunction. The judge agreed to hold a hearing on the motions at 2:30 p.m. CDT on Thursday, July 26.
"We respectfully submit this letter to bring to the Court's attention the troubling, dangerous, time-sensitive, and potentially illegal terms of the settlement agreement," states the 35-page letter sent to the judge July 24.
"Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions. The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world."
Federal law already allows citizens to make their own firearms for personal use. But this do-it-yourself, high-tech gunsmithing has been in legal limbo since 2015. That's when the U.S. government shut down Texas-based Defense Distributed, just a few days after the company began sharing its 3D-printable gun plans for free online.
The organization's founder, Cody Wilson, sued. After a three-year legal battle, the Department of Justice capitulated and settled earlier this year.
The settlement goes into effect at the start of August. It gives Defense Distributed permission to resume free online distribution of blueprints for fabricating a firearm with a 3D printer — a decision supported by Second Amendment advocates and concerning to groups worried about gun violence.
Link: https://www.idahostatesman.com/news/northwest/idaho/article215566770.html

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 9:15 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Mic: Lawsuit moves to keep the blueprints for 3D printed guns off the web |

# CPA MEDIA MONITORING

**Lawsuit moves to keep the blueprints for 3D printed guns off the web**
**By Brianna Provenzano**
**25 July 2018**

Modern advancements in 3D printing technology have made it possible to produce fully functioning, deadly firearms, made entirely from plastic — all from the comfort of your own home. It's a process that the government has strictly regulated in the past. Now, however, thanks to a legal settlement reached by the Trump administration, that might be about to change.

On Tuesday, three prominent gun safety groups announced that they are preparing legal action in the coming days to prevent the U.S. State Department from allowing the blueprints for 3D-printed guns to be posted online. In an amicus brief filed on July 24, attorneys representing the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence objected to an imminent governmental rule change that would upend the regulatory structure governing firearm exports.

The shift stems from a settlement the government recently reached with Defense Distributed, a small, bullish nonprofit company that is believed to have posted the first set of online instructions on how to build a 3D-printable handgun in 2012.

The tangled mass of gun laws in play here goes back to 1988, when Ronald Reagan signed the Undetectable Firearms Act into law. The legislation made it illegal to manufacture, sell or possess any firearm "which is not as detectable ... by walk-through metal detectors" like those found in airport. This essentially banned firearms made from cheap polymers. Although the U.S. was decades away from honing the technology to 3D print plastic weapons when the law was written, it was renewed by the Clinton administration in 1998, by George W. Bush's White House in 2003 and again by Barack Obama in 2013.

Shortly after Obama reauthorized the 1988 law, the government ordered Cody Wilson, the then-25-year-old owner of Defense Distributed, to take down the blueprints for 3D-printed firearms the company had posted online on the grounds that he had run afoul of the Undetectable Firearms Act.

In a 2013 interview with the New York Times, Wilson was recalcitrant about the order of removal. It wasn't about increasing the number of firearms on the market, he argued — it was about reducing the government's role in regulating new technologies.

"I don't care about the project," he told the Times of Defense Distributed in 2003. "This is about the future of the freedom of information and regulation of the internet."

Soon afterward, Wilson filed suit against the State Department, arguing that by demanding he remove the blueprints from the internet, the government was infringing upon his Constitutionally-enshrined right to free speech.

After a protracted legal battle, the government offered to settle the Defense Distributed suit in April 2018, offering the company a special agreement to remove its 3D gun blueprints from the United States Munitions List and to allow "any United States person…to access, discuss, use, reproduce, or otherwise benefit" from the designs.

"[T]his settlement is far from ordinary," the gun safety organizations wrote in the letter. "It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order. It is also, we believe, illegal."

WASHAR0002244

In a New York Times op-ed piece, former U.S. Rep. Steve Israel, who has long been at odds with the gun lobby, wrote that while the settlement technically doesn't reverse the Undetectable Firearms Act, it "undermines it by making it easier for terrorists, criminals and minors to quietly produce deadly weapons with an inexpensive 3-D printer."

Thanks to the settlement, Defense Distributed now says it plans re-upload the blueprints for 3D-printed guns on Aug. 1, when the company says the, "age of the downloadable gun formally begins."

According to the letter the three gun violence prevention groups submitted in court on Tuesday, the company's plans only get grander from there. Wilson eventually hopes to expand the Defense Distributed website to contain "a repository of firearm blueprints for 'more exotic DIY semi-automatic weapons,' the letter claims. The company has allegedly had time to develop "a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s," which Wilson hopes to soon convert into a "searchable, user-generated database of practically any firearm imaginable."

Jonathan Lowy, the vice president of litigation for Brady, told Mic in a phone interview that if Defense Distributed has its way, "anybody in the world with access to the internet and a 3D printer could make all of the undetectable assault weapons or other guns that they wanted."

"That would include international terrorists, convicted felons — anybody," Lowy added. "This would blow right open the loopholes for any national or international prohibitions on people that should not have guns."

Link: https://mic.com/articles/190438/lawsuit-moves-to-keep-the-blueprints-for-3d-printed-guns-off-the-web#.F1MhgLWeJ

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 1:17 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Mox News: Video - THE AGE OF THE DOWNLOADABLE GUN HAS BEGUN! |

---



**THE AGE OF THE DOWNLOADABLE GUN HAS BEGUN!**
**By Mox News**
**26 July 2018**
Link to Video: https://www.youtube.com/watch?v=WNdpwF-canE

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:

**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 1:55 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: My Statesman: Editorial: Homemade 3-D printer guns should be regulated like any gun |

**CPA MEDIA MONITORING**

**Editorial: Homemade 3-D printer guns should be regulated like any gun**
**By MyStaesman**
**25 July 2018**

Gun rights advocates are calling it the beginning of the end of gun control.

They're celebrating. But the vast majority of Americans who support background checks for anyone seeking a gun should be alarmed.

The Trump administration recently settled a lawsuit filed by Cody Wilson, the former University of Texas law school student who earned national media attention in 2013 for fabricating a working handgun out of plastic using a 3-D printer. The Obama administration had ordered Wilson to take those gun plans off the Internet, but the settlement allows Wilson to post free, downloadable plans for that gun and other do-it-yourself firearms online, a click away from anyone who wishes to build his or her own gun.

No background check involved.

The Trump administration's wrong-headed capitulation to the gun lobby defies justification as the country grasps for ways to make the public safer from mass shootings and gun violence. Meeting with survivors of the Parkland high school mass shooting in February that killed 17 and injured 17 others, President Donald Trump vowed, "we're going to be very strong on background checks." After another gunman opened fire in May at Santa Fe High School, killing 10 and injuring 13 others, Trump pledged "to keep weapons out of the hands of those who pose a threat to themselves and to others."

All empty promises, if anyone can bypass background checks by building a gun with free plans on the Internet and easy-to-use machinery. Worse, it's easier than ever for someone to create an all-plastic gun, in violation of the law, to bypass the metal detectors that were meant to keep shooters out.

This technology also involves more durable metal firearms, not just plastic ones. Wilson's North Austin firm, Defense Distributed, raised money for its legal battle by selling a contraption called the Ghost Gunner, a computer-controlled milling machine about the size of a desktop computer unit that allows people to build their own untraceable handgun or AR-15-style rifle using metal parts. The $1,500 machine, designed so even a novice can use it, creates the body of the gun. The remaining components can be purchased online without a background check.

Federal law allows hobbyists to build their own guns for personal use. But the landscape has changed with 3-D printers, precise digital plans, and devices like the Ghost Gunner that allow anyone with a computer and a credit card to become a gun manufacturer.

Before the next tragic mass shooting, perhaps at the end of a homemade gun's barrel, we urge Congress to apply common-sense requirements to these DIY weapons.

People should be required to clear a firearm background check before they can buy a device like the Ghost Gunner or download the computer coding to create a gun with a 3-D printer. Congress should create serious fines to deter would-be offenders and ensure the Bureau of Alcohol, Tobacco, Firearms and Explosives has the resources needed to enforce such rules.

We don't buy the argument that the computer coding to build a gun with a 3-D printer is somehow protected speech under the First Amendment, as Wilson's lawsuit argued. This coding adds nothing to public discourse. It serves only as a tool to build a gun, a device that the U.S. Supreme Court has said may be subjected to

reasonable regulations to protect the public.

Congress should also address the fact that homemade guns do not have serial numbers, which undermines law enforcement officers' efforts to trace the origin of guns used in crimes. One possibility: Require people to bring in each homemade gun to receive a serial number. Another possibility: Assign a gunmaker ID number to each person who clears the background check for gun-making devices or files, then require they stamp that ID number on every gun they produce.

Finally, Congress should revisit the Undetectable Firearms Act of 1988, which banned all-plastic guns at a time when such devices didn't yet exist. The law is overdue for an update that addresses plastic guns fashioned by 3-D printers, providing specific guidance on the amount of metal and other characteristics that must be included, so the guns can't slip through screening devices. It should also be updated with significant penalties for violators.

These common-sense measures would not infringe on anyone's Second Amendment rights. They simply extend existing public safety measures to a new form of gun-making technology.

We recognize that any bill regulating guns faces an uphill climb in a Republican-controlled Congress that seems beholden to the National Rifle Association. But lawmakers should look to their constituents: Polls have consistently shown more than 80 percent of Americans support background checks for all gun purchases. So do nearly three-quarters of NRA members. And it wasn't that long ago that thousands of students across the country engaged in walk-outs demanding stronger gun safety laws.

Defense Distributed says it will post shareable 3-D printer files on its website for various guns on Aug. 1, ushering in what the firm calls "the age of the downloadable gun."

Congress has no excuse for inaction. Don't make promises after the next tragedy to close the loopholes we can already see.

Link: https://www.mystatesman.com/news/opinion/editorial-homemade-printer-guns-should-regulated-like-any-gun/j1wX4RxD8SOVfLz0SHXTVM/?utm_source=SND&utm_medium=Twitter&utm_campaign=mys

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 2:00 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Newtown Action Alliance: Press Release - Open Letter to President Donald Trump To Stop 3-D Plastic Guns |

**CPA MEDIA MONITORING**

**Open Letter to President Donald Trump To Stop 3-D Plastic Guns**
**By Newtown Action Alliance**
**26 July 2018**

Dear Mr. President:

We implore you to immediately stop Attorney General Jeff Sessions, U.S. Department of Justice, Secretary Pompeo, and the U.S. State Department from authorizing Defense Distributed to release downloadable files for 3-D guns. These files would allow anyone around the globe to make do-it-yourself, untraceable 3-D guns by circumventing any existing state and federal gun regulations, resulting in serious public safety and national security concerns.

Unless you stop the U.S. State Department from authorizing this special exemption for Defense Distributed, you are enabling terrorists, criminals, domestic abusers, and other prohibited firearm purchasers to use the downloadable gun technology. They would be able to print plastic guns that are undetectable by metal detectors at the White House and other government buildings, airports, office buildings and schools.

Earlier this year, the government filed a motion to dismiss Defense Distributed's lawsuit, citing serious national security concerns from global access to the computer-aided design (CAD) files. Then last month, the Department of Justice settled the lawsuit, agreed to allow the public release of Defense Distributed 3-D firearm printing tutorials and made an egregious decision to use our tax dollars to pay nearly $40,000 for the plaintiff's legal fees.

Please keep all Americans safe by helping to stop the U.S. State Department from establishing a permanent regulatory change that would provide unlimited online access to 3D gun printing design.

Thank you for your immediate attention to this urgent matter involving our national security.

Sincerely,
A New Routine for America
Alliance for Gun Responsibility
Arizonans for Gun Safety
Ceasefire Pennsylvania
Connecticut Against Gun Violence
Delaware Coalition Against Gun Violence
Faith Community of St. Sabina
Florida Coalition to Prevent Gun Violence
Franciscan Action Network
Franciscan Sisters of the Poor
G-PAC Illinois
Georgia Alliance for Social Justice
Georgia Student Alliance for Social Justice
Georgians for Gun Safety
Gun Violence Prevention Action Committee Illinois
Gun Violence Prevention Center of Utah
GunControlToday

WASHAR0002249

Healing 4 Our families & Our Nation
Herndon-Reston Coalition To End Gun Violence
Illinois Council Against Handgun Violence
Jr Newtown Action Alliance
League of Women Voters of Florida
Marylanders to Prevent Gun Violence
Massachusetts Coalition to Prevent Gun Violence
Michigan Coalition to Prevent Gun Violence
MomsRising
National Council of Jewish Women
New Mexicans to Prevent Gun Violence
Newtown Action Alliance
NoRA
North Carolinians Against Gun Violence
Ohio Coalition Against Gun Violence
One Pulse for America
Physicians for the Prevention of Gun Violence
Pride Fund to End Gun Violence
Protest Easy Guns
Psychiatrists for Gun Violence Prevention
Reconstructionist Rabbinical Association
San Diego for Gun Violence Prevention
Sandy Hook Promise
Silent March
Sisters of St. Francis of Philadelphia Justice, Peace and Integrity for Creation Committee
States United to Prevent Gun Violence
Stop Handgun Violence
Survivors Lead
The Campaign to Keep Guns Off Campus
The Connecticut Effect
The ENOUGH Campaign
Unitarian Universalist FaithAction New Jersey
Vision Quilt
WAVE Educational Fund
We the People for Sensible Gun Laws
Women's Voices Raised for Social Justice

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 2:29 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: NPR: On Point Podcast - The Age Of The 3D-Printed Gun |



**On Point Podcast - The Age Of The 3D-Printed Gun**
**By Anthony Brooks**
**25 July 2018**
**CPA Note: The discussion found at the below link includes extensive discussion of CATS 1-3 and the ITAR writ large.**
Coming soon — printing your own gun on a 3D printer. Is it the end of gun control?
**Guests**
**Andy Greenberg**, senior writer for Wired who has been following this story since 2013. (@a_greenberg)
**Avery Gardiner**, co-president of The Brady Center to Prevent Gun Violence, which filed an amicus brief in the case. (@AveryWGardiner)
**Dave Kopel**, associate policy analyst, Cato Institute. Research director at the Independence Institute. Adjunct professor of constitutional law at Denver University and author of "The Truth About Gun Control." (@davekopel)
Link: http://www.wbur.org/onpoint/2018/07/25/3d-printing-gun-control

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 4:10 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: NPR Austin: This Austinite Plans To Publish Designs Online For 3D-Printable Guns Next Week |

**CPA MEDIA MONITORING**

**This Austinite Plans To Publish Designs Online For 3D-Printable Guns Next Week**
**By Matt Largey**
**26 July 2018**

Austin-based Defense Distributed plans to launch an online database Wednesday of downloadable blueprints for a wide variety of guns that can be 3D-printed or milled at home. It's the culmination of a five-year court battle that pits free speech claims against the government's ability to control distribution and export of the means to produce firearms.

Cody Wilson made his first 3D-printed gun in 2013 – a single-shot pistol fabricated from resin that he called the "Liberator." He published the plans online; anyone could download the plans and print their own untraceable, plastic gun – with the right equipment.

Days later, the U.S. State Department warned Wilson that he was in violation of the International Trade in Arms Regulations, or ITAR. Wilson took the plans down, but sued the government, claiming it was a violation of his First Amendment rights.

The case wound its way for years through the courts. In April, the government settled with Wilson and his company, clearing the path for Defense Distributed to publish the Liberator plans – and plans for dozens of other weapons – for free on its website.

Wilson says his project has – at least symbolically – ended gun control in America.

But the Brady Campaign to Prevent Gun Violence and other gun control advocacy groups filed an emergency motion today in federal court to prevent the designs from being posted. The groups called the settlement dangerous and potentially illegal, and said it did not protect the nation's national security, foreign policy and anti-terrorism interests.

**A 'Radical Libertarian'**

On the day I visit, Wilson wears black jeans, a black T-shirt and round, black sunglasses. A toothpick hangs out of his mouth.

In the back of the Defense Distributed building, he's creating a library. DVDs, bookshelves lined with books, a microfiche machine, a server rack, drones and a bunch of rifles and handguns litter the space. He leans back on a couch as he explains his motivations and what he's been doing.

Wilson says his work on this project began in 2010 and 2011, when the online transparency site WikiLeaks published thousands of diplomatic cables from U.S. officials. He wondered: What is WikiLeaks for guns? What would that look like?

"You know," he says, "could the internet ever serve on-demand firearms or at least in a way that permanently undermines or subverts the common channels by which we expect guns to be delivered to the people?"

Wilson speaks in grandiose and heady terms about the "global power elite," the political scientist Francis Fukuyama and the idea that liberal democracies are the endpoint of political evolution — but that people yearn for something else. He points to Brexit and Donald Trump as evidence that change is afoot. (Wilson says he did not vote for Trump – that he does not vote – but that he is happy Trump is president, as opposed to Hillary Clinton.)

"At the end of the day, it's not even a contempt more than it is an ennui – a boredom," Wilson says. "Being sick of things as they are. Stuck."

WASHAR0002252

He sees his gun project as part of this.

"The internet allows you to puncture this – punch through this. Disrupt this, is probably the best word," he says. "I think the printable gun is a measure or at least an indication of this potential disruption."

Wilson calls himself a "radical libertarian" and an anarchist, though he has had connections with the "alt-right." Last year, he launched a crowdfunding website called Hatreon – a play on the site Patreon, which has strict hate-speech rules and has booted some far-right figures off the platform. They were welcomed on Hatreon. Wilson told Newsweek last year that he didn't plan to put many resources into the project; it's been unable to take donations since February.

His main focus is on the gun project.

"Obviously, power begins at the implements of power," he says. "And there's no better in 20th and 21st century discourse than the firearm."

**A Danger To National Security**

Of course, this all makes many people extremely nervous. After all, printing an untraceable firearm – from a plastic pistol to an AR-15 rifle – could put these weapons in the hands of people who mean to do harm, from international terrorists to domestic criminals.

"We have laws to keep guns out of the wrong hands – to require background checks when you buy guns at gun stores," says Jonathan Lowy, the vice president of litigation at the Brady Center. "That can be completely undercut if somebody can simply buy a 3D printer and crank out an AK-47 or AR-15 in their basement."

The Brady Center filed a motion to block Defense Distributed's settlement with the State Department. It asked the court to prevent the launch of the site until its claims are decided in court.

"The government for five years went into court and rightly talked about the tremendous danger to national security and international peace that was created if you posted plans for anyone to make their own assault weapons or guns," Lowy says. "The State Department has maintained the position that this is very dangerous and, yet, now it's going to allow it to happen."

For his part, Wilson says he gets why people feel uncomfortable about what he's doing – but he isn't sympathetic.

"Sometimes it's uncomfortable to be responsible or move into a new age of technical possibility," he says. "I suppose, then, people's feelings are kind of beside the point."

He knows what he's doing is provocative and disruptive.

"That's been my primary contribution – the ability to politically exploit these things."

**A Matter Of Free Speech**

The crux of Defense Distributed's case against the government was about the First – not the Second – Amendment. The company argues that rules blocking the publishing of these files on the internet represents an unconstitutional prior restraint on Wilson's free speech rights.

"Part of the issue in this case is the question of whether a computer file can be speech that's protected under the First Amendment," says Kit Walsh, an attorney with the Electronic Frontier Foundation, which filed a brief in support of Defense Distributed during the federal court proceedings. He says computer code is a set of instructions – like a recipe – and that the code for these gun blueprints simply describe shapes.

He argues the ITAR – the regulations the government used to block Wilson from publishing the files – lacked clear legal standards, deadlines and judicial review. He says it also puts the burden on individuals to prove they are not in violation of the regulations, rather than the government having to prove that they are.

"The law at issue here violates every one of those safeguards that are designed to make sure that when you have this kind of censorship system, it's not run in a way where the government can say, 'Oh, we don't like Cody Wilson, so he's not allowed to talk. But our buddies would be allowed to talk about the same topic,'" Walsh says.

The State Department did not make anyone available for an interview for this story, but in a statement, a spokesperson explained that the department decided to settle the case after developing new ITAR regulations over the past few years.

"In addition to reducing regulatory burden on U.S. industry," the statement reads, "these proposed regulations would eliminate the ITAR requirements at issue in this case, including the ITAR requirement to obtain U.S. Government authorization to post to the Internet technical data related to certain firearms and related items that are commercially available, such as those at issue in this case."

**Access For All**

Defense Distributed's headquarters – next to the train tracks in a North Austin industrial park – is almost

WASHAR0002253

invisible from the outside. There's no signage, just tinted glass doors. Inside, about a dozen employees are working on various projects. They're hand-making components for a machine called the "Ghost Gunner." The bread-box-sized milling machine can be used to finish partially fabricated gun parts – which are also being boxed up for shipping to customers. The company makes and sells about 10 of these Ghost Gunners a day, Wilson says.

One employee is working on the specifications for an exotic-looking revolver-type pistol that can be 3D printed out of resin.

There's also a customer service department – all of it in service of Wilson's big idea: that people should have access to the raw materials of their Second Amendment rights.

"In essence, it's only giving you the assurance that you can begin," he says. "Should you ever want to make the AR-15, you know you can. And there's three or four different ways you can do it. And I know that no matter what, I helped make that possible – or at least lowered that barrier of entry."

As for whether this will mean everyone will have access to guns – whether they would be otherwise barred from having one – Wilson doesn't see it that way. He contends that for someone intent on harming someone, it's quicker and easier to buy a gun on the black market. He also points out that people have been able to legally make guns at home for a long time.

"There already are as many guns as people in this country, right? I mean, your nightmare scenario is here," he says. "You can literally trip over like eight guns in this room and none of them were downloaded."

As for whether he'd feel responsible if someone did use a gun built with his downloaded plans to hurt or kill someone:

"I suppose," he says. "I think it would depend. Everything is situational, right? Based on the facts."

I ask Wilson about the role he sees himself playing in these events. Does he see himself as a hero? An anti-hero? He says he's surprised he's even been involved in it this long. He thought someone else would do it first.

"I have no particular will to turn this into a narrative about me in history," he says "I think the result now from this decision … is most people will assume that you could always download guns on the internet. ... I think people will just see downloadable guns as part of the early history of the internet, and I doubt I'll have much of a legacy in that."

Underneath a tree behind the Defense Distributed building, there's a polished granite headstone that reads: "AMERICAN GUN CONTROL."

"I don't believe that American gun control is literally dead, but I do believe that many times in our company's history we have spiritually killed American gun control," Wilson says with a chuckle. "We've killed its ambition. We've killed its practical purpose. We've killed its political dimensions or what was considered politically realistic. Of course, with immediate downloadable guns all over the internet, that's an important dimension of the right to keep and bear arms that will always be with us."

Surprisingly, Wilson says he does, in fact, believe in a measure of gun control. He says he's fine with local communities deciding – by consensus – what types of weapons they will and will not allow. His fight is with federal gun control. And unless gun control groups succeed in blocking his website – he's won.

Link: http://kut.org/post/austinite-plans-publish-designs-online-3d-printable-guns-next-week

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
| --- | --- |
| Sent: | Wednesday, July 25, 2018 11:42 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Prindle Post: Debating the Permissibility of Printable Guns |



**Debating the Permissibility of Printable Guns**
**By Rachel Robison-Greene**
**25 July 2018**
In 2013, Cody Wilson, a self-described anarchist, made headlines when he posted plans for a 3D printable pistol called "The Liberator" online. The state department intervened and shut down the site, but not before the plans for the weapon were downloaded over a million times. Wilson promptly sued the government. This week, the government reached a settlement with Wilson. The settlement is quite favorable to Wilson and other gun rights advocates—it allows Wilson and others to proceed with their mission to post the instructions online.
The 3D printable gun design instructs interested parties on how to print a handgun with the same material used to make Lego building blocks. The resultant guns do not have serial numbers, making them difficult if not impossible to trace. In the intervening time, Wilson has produced additional plans—plans for a Berretta M9 handgun and an AR-15. The M9 is a weapon used by the U.S Military and the AR-15 is a weapon commonly used by mass shooters.
Many gun rights advocates are quite pleased with the settlement. In their view, the government is moving in a dangerous direction with respect to Second Amendment rights. Discussion of increased gun control regulation is on the rise, and many fear that responsible gun ownership will be restricted or prohibited entirely based on the actions of an exceptionally small violent minority. 3D printable guns will allow gun advocates to produce guns that will not face government regulation. What's more, if the government is not aware that a citizen has a weapon, they're very unlikely to attempt to take that weapon away. Those who support the availability of printable gun plans frequently argue that guns are important for defense of life, liberty, and property. If they can print a gun or guns that the government doesn't know about, they never have to fear that they'll lose the protection that the gun affords.
Others support the settlement for reasons that are more theoretical. Some view the government's initial ban as a dangerous restriction of free speech rights. Wilson was engaging in a speech act when he posted the plans—he was making information available to the public. They argue that the government should not be restricting speech on the basis of content. It is worth noting that, though the technology involved in this case makes the case unique and unusual, the First Amendment question with respect to the availability of dangerous information is far from new. In 1969, in Brandenburg v. Ohio, the Supreme Court ruled that inflammatory speech cannot be restricted by the government unless it is "directed to inciting or promoting imminent lawless action and is likely to incite or promote such action." Free speech supporters of Wilson argue that his actions are no more likely to incite violence than traditional forms of gun ownership.
Those with libertarian political leanings may also defend Wilson's actions for theoretical reasons. They argue that governments should only be concerned with protecting the negative rights of citizens—the rights to life, liberty, and property. If private citizens want to print guns for non-violent, personal use, they should be free to do so. There is no reason to think that all, or even most, of the motivations people might have for printing weapons are nefarious. Many may simply want to test out a new technology in the service of a gun hobby. They argue that the government should not concern itself with such private actions.
On the practical side, many supporters of Wilson argue that fear about printable guns as a serious threat to public safety is fear of an imaginary bogeyman, often shouted about for reasons that are political. In truth, they argue, 3D guns are expensive to produce, time and labor intensive, and are made of material that is so weak it is

WASHAR0002255

likely to shatter in the course of one shot. The resulting shrapnel is potentially dangerous to the person firing the weapon. It is already legal for citizens to construct their own guns. There is no reason to believe that dangerous criminals will clamor in the direction of this method of producing them.

Many responded to the news of the settlement with utter astonishment—to them, it seems self-evident that untraceable, 3D printable guns are an atrocious idea. One need not be opposed to guns more generally to think that what Wilson has done and plans to do is exceptionally dangerous. Many responsible gun owners believe that there should be some regulations when it comes to gun ownership. These regulations save lives. Even if printable guns can only fire one shot, one shot can kill someone.

Those opposed to the settlement argue that it is deeply problematic that there are no background checks required for printing a gun. Convicted violent felons could print guns. People with a history of violent mental disorders could print guns. The government has a responsibility to look after the safety of its citizenry. Deadly weapons shouldn't fall into the wrong hands.

Opponents also argue that even if the government shouldn't typically involve itself in the private lives of citizens, the situation changes entirely when objects as deadly as guns are involved. Governments have an obligation to monitor and regulate exceptionally dangerous objects. What's more, serial numbers on guns are frequently used to solve crimes. The government has the obligation to do its best to prevent violent actions from occurring, but, barring this, it has obligations to achieve justice for victims and their families when violent crimes do take place. Even if the guns involved in a crime aren't destroyed when they are fired, they are made of material that is easily destroyed, making the recovery of the murder weapon involved in these cases impossible.

Finally, opponents of the technology and of dissemination of the plans point out that the Internet obviously isn't just for Americans. Those who put these plans on the Internet may be contributing to violence in other countries and they may well be arming our enemies.

Link: https://www.prindlepost.org/2018/07/debating-the-permissibility-of-printable-guns/

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002256

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Thursday, July 26, 2018 5:17 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: REP Schiff: Tweet |

# CPA MEDIA MONITORING

 Adam Schiff ✔
@RepAdamSchiff

 Follow

This dangerous move by Trump Admin to cater to the NRA poses a grave threat to public safety by making it possible for ANYONE with a 3D printer, including terrorists and domestic abusers, to print untraceable firearms without as much as a background check.



An AR-15 made at home? With 3D printing, 'the downloadable gun' becomes ...
Blueprints arriving Aug. 1 from Defense Distributed will let users make untraceable guns from home using 3D printers — no background check required
usatoday.com

5:29 PM - 26 Jul 2018

1,967 Retweets  3,338 Likes   

**Official**
**UNCLASSIFIED**

WASHAR0002257

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 12:06 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Morimoto, Sho J <MorimotoSJ@state.gov> |
| Subject: | CPA Media Monitoring: Senate Foreign Relations Committee: MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS |

# CPA MEDIA MONITORING

**MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS**
**By Senator Bob Menendez**
**25 July 2018**

WASHINGTON – U.S. Senator Bob Menendez, Ranking Member of the Senate Foreign Relations Committee, today called on U.S. Secretary of State Mike Pompeo to immediately intervene and review the surprising and sudden decision by his department to allow online public posting of 3-D printable gun blueprints in the next few days.

"It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States," said Sen. Menendez in a letter to Secretary Pompeo. "Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places."

Late last month, the Department of State suddenly settled a years-long lawsuit brought by gun activist Cody Wilson that began after the federal government blocked his company's website, Defense Distributed, for posting directions for a 3-D plastic printable pistol, citing international export law. According to news reports, as part of the settlement, the State Department will allow the company to begin posting do-it-yourself 3-D printable firearms blueprints by issuing a special exemption by July 27.

The Senator called on Pompeo to immediately review and reconsider the Department's position, asserting it runs afoul of federal law: "Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act."

A copy of the letter is below.

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount

to a permanent removal of an item from theUnited States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action. Sincerely,

Link: https://www.foreign.senate.gov/press/ranking/release/menendez-calls-on-secretary-pompeo-to-stop-online-posting-of-do-it-yourself-3-d-printable-gun-blueprints

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 11:21 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Snopes: Did the U.S. State Department Legalize the Publication of Instructions for 3D-Printed Guns? |

## CPA MEDIA MONITORING

**Did the U.S. State Department Legalize the Publication of Instructions for 3D-Printed Guns?**
**By Alex Kasprak**
**26 July 2018**

On 5 May 2013, an Austin-based non-profit named Defense Distributed uploaded software and schematic files that allowed for the creation of a fully functional, 3D-printed plastic gun they dubbed "The Liberator," as Forbes magazine reported at the time:

*All sixteen pieces of the Liberator prototype were printed in ABS plastic with a Dimension SST printer from 3D printing company Stratasys, with the exception of a single nail that's used as a firing pin. The gun is designed to fire standard handgun rounds, using interchangeable barrels for different calibers of ammunition.*

Just days later the State Department's Office of Defense Trade Controls Compliance wrote to Defense Distributed founder Cody Wilson demanding the removal of those files from the internet. The State Department's argument was that the information presented on Defense Distributed's website constituted an "export" of weapons in violation of the Arms Export Control Act and International Traffic in Arms Regulations (ITAR):

*Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation.*

The State Department required that Wilson remove the files from the internet until he had applied for specific approval for various elements of the gun. Wilson took down the files, but, along with the guns-rights organization Second Amendment Foundation, he filed a lawsuit in the Western District of Texas against the State Department seeking a preliminary injunction that would allow Defense Distributed to continue to publishing the Liberator schematics online.

The Western District of Texas court denied the request, and Defense Distributed appealed that ruling to the 5th Circuit Federal Court, which also denied the request. Defense Distributed then appealed that decision to the U.S. Supreme Court. The Supreme Court declined to hear arguments on the case on 8 January 2018, essentially upholding the 5th Circuit Court's decision.

**The State Department Settles with Defense Distributed**

On 10 July 2018, however, Defense Distributed and the Second Amendment Foundation announced that they had accepted a settlement agreement with the State Department. That agreement, in effect, will allow Defense Distributed to post designs for 3D printed guns online, and as part of the agreement the State Department will be required to issue a letter specifically stating that 3D printed designs do not fall under ITAR rules:

*The State Department shall produce] a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR …*

In a related press release, the Second Amendment Foundation described the ruling as a "victory for free speech" and a "devastating blow to the gun prohibition lobby." The settlement agreement stated that designs for any non-automatic firearms up to .50-caliber, including the AR-15 semi-automatic rifle, could be distributed online:

*Under terms of the settlement, the government has agreed to waive its prior restraint against the plaintiffs, allowing them to freely publish the 3-D files and other information at issue. The government has also agreed to*

*pay a significant portion of the plaintiffs' attorney's fees ... Significantly, the government expressly acknowledges that non-automatic firearms up to .50-caliber — including modern semi-auto sporting rifles such as the popular AR-15 and similar firearms — are not inherently military.*

On their website, Defense Distributed declared that "the age of the downloadable gun begins" 1 August 2018, the date on which Wilson plans to upload various gun designs. Wilson's plans have raised alarm among gun control advocates, with critics of the government's agreement saying that it represents a changing political climate at the U.S. State Department and not an actual reinterpretation of the law, as reported by the New York Times:

*The willingness to resolve the case — after the government had won some lower court judgments — has raised alarms among gun-control advocates, who said it would make it easier for felons and others to get firearms. Some critics said it suggested close ties between the Trump administration and gun-ownership advocates, filing requests for documents that might explain why the government agreed to settle.*

*The administration "capitulated in a case it had won at every step of the way," said J. Adam Skaggs, the chief counsel for the Giffords Law Center to Prevent Gun Violence. "This isn't a case where the underlying facts of the law changed. The only thing that changed was the administration."*

**The Broader Legal Ramifications**

Speaking to us by phone, Eugene Volokh, a professor at UCLA's School of Law and an expert on First and Second Amendment issues, explained to us that in a strictly legal sense, a settlement agreement does not constitute an official ccourt-mandated precedent. In a practical sense, however, the ruling will likely embolden other similar groups to design and publish similar schematics, he noted:

*What sets a precedent? A published opinion from a court, preferably an appellate court. But that's in the narrow sense, the way lawyers would talk about this precedent. If you're asking whether this settlement will have broader effect on other companies, the answer is absolutely.*

*This is the federal government, and the federal government usually tries to be fairly consistent in its actions, and it can be easily called on by people if it's being inconsistent. So the settlement, I think, will have substantial practical effect. Not just in Defense Distributed, but on other companies that are doing similar enough things.*

Though this case was brought to the courts with the help of a Second Amendment advocacy group, Volokh said he feels Defense Distributed's case is primarily a First Amendment issue:

*[Cody Wilson] is helping promote Second Amendment rights of others, but it's not clear he would have strong enough interest in their rights. And it's also not clear that the restriction would burden their rights that much under existing Second Amendment case law. So my suspicion is that the Second Amendment argument wasn't something that the federal government viewed as particularly impressive.*

*On the other hand, the First Amendment argument, that's the one that the four judges on the Fifth Circuit were particularly moved by. And I think it's quite a plausible argument about Defense Distributed's own rights. It says we want to put up information ... and you are stopping us from doing that and stopping us from communicating to other Americans about this sort of thing. So that's a pretty serious argument.*

**Where Does the Government Draw the Line on Dangerous Information?**

An obvious hypothetical scenario to test the limits of free speech might be whether someone could publicly post detailed instructions on how to make a hydrogen bomb online. As it turns out, this exact question was briefly handled by the courts in the late 1970s when the liberal magazine The Progressive sought to publish a meticulously researched article titled "The H-Bomb Secret: How We Got It, Why We're Telling It." That article purported to reveal how the U.S. Government built the powerful hydrogen bomb.

The article did not reveal classified information, relying only on publicly available information, but the U.S. Department of Energy sought to block the article's publication by asserting it was a violation of the the Atomic Energy Act. That act, in part, "prohibits anyone from communicating, transmitting or disclosing any restricted data to any person with reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation."

The US District Court for the Western District of Wisconsin laid bare the central problem the Progressive's case posed to the court and the country:

*A mistake in ruling against The Progressive will seriously infringe cherished First Amendment rights. If a preliminary injunction is issued, it will constitute the first instance of prior restraint against a publication in this fashion in the history of this country, to this Court's knowledge.*

*A mistake in ruling against the United States could pave the way for thermonuclear annihilation for us all. In that event, our right to life is extinguished and the right to publish becomes moot.*

In this instance, the Court did issue a preliminary injunction on 28 March 1979 blocking the publication of the

article, but the case was never decided on its merits — it was dismissed when another publication beat the Progressive to the punch with a similar story that included details on how to build a bomb.

As of 1 August 2018, Defense Distributed will start publishing detailed steps on how to create a variety of guns that require no registration or background check to manufacture. While the broader issue may well be litigated further, the current stance of the U.S. State Department is that Defense Distributed will not be violating any export control laws when they do so.

Link: https://www.snopes.com/news/2018/07/26/3d-printed-guns-legal/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: ***MarquisMR@state.gov*** | Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 3:58 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Sputnik: Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing' |

**CPA MEDIA MONITORING**

**Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing'**
**By Sputnik**
**25 July 2018**

Sputnik discussed 3D guns with Greg Shaffer, a former FBI officer, president of Shaffer Security Group and one of the US' leading policy experts on the prevention of domestic terrorism and active shooter events.

Gun rights activists in the United States will soon be able to post 3D printable gun plans online. In 2013, Cody Wilson, who describes himself as a post-left anarchist, posted plans for a 3D printed handgun called "The Liberator." The gun, which was made from plastic, had a metal firing pin and another piece of metal included to comply with the Undetectable Firearms Act.

**Sputnik**: What's your take on the decision made by the US court in regards to Cody Wilson and the Defense Distributed group?

**Greg Shaffer**: At this point they just aren't an issue. There's a reason that there has only been a few truly viable 3D printable gun designs. It's very difficult for them to make them, it's very time consuming, it's very expensive, it's difficult for a 3D printer to build something as complex as a weapon. They're working with complex plastics, they're limited to what type of objects they can actually print. For one, 3D printers cannot create a complex thing like a gun all in one piece; they are printed out in separate components and then later have to be assembled. It's a very difficult and time consuming process, and then you couple that with the fact that the type a gun that's chosen by people who commit heinous crimes or mass murders, those weapons are chosen for their ability to kill as many people as possible as quickly as possible and you're just not going to get that from a weapon produced by a 3D printer.

**Sputnik**: So in your view how justified are these concerns claiming that the decision will make it easier for terrorists and criminals to access weapons?

**Greg Shaffer**: Legislation is always chasing technology; so in a practical sense, for a terror attack or an active shooter, they're looking for mass casualties and these plastic 3D printable weapons don't allow for that; it's pretty much a one done deal: one or two shots is all you get out of these weapons. The explosive force of firing a bullet is just simply too powerful for the thermoplastic to survive. The United States laws already allow for individuals to manufacture their own weapons for personal use, and you have to also remember that right now, again technology moves a lot faster than legislation, but right now these plastic weapons are so bulky, as well, that they are very difficult to conceal. And again, they only have a one or two shot capacity before they just explode in the hand.

**Sputnik**: We have two issues from what I'm reading and understanding. One's obviously the fact that these guns can be printable, but also the fact that these printable guns cannot be traced; they're not registered. How dangerous is that?

**Greg Shaffer**: In America there really is no federal gun regulation requirement. When you purchase a weapon, yes, that serial number is associated with the buyer, but that buyer can then sell that weapon to anybody he wants. The fact that they're not traceable, or not registered, is not impacting because we don't have those laws and regulations on the book as it is now for the weapons.

**Sputnik**: Do you know what measures have to be taken by authorities to regulate this?

**Greg Shaffer**: Again, there's only been a few that ever worked; it's like focusing on 0.0001% of the problem.

WASHAR0002263

At this point in time, in the United States 85% of the states are not in compliance with federal regulations which require them to report on individuals that are prohibited from purchasing weapons. That's a much greater problem, having weapons in the hands of people who should not have weapons, than worrying about that small, small, infinitesimal percentage of 3D printable weapons that may work. 3D printable weapons are more of a novelty, more of a collector's item, than they are for mass killing. Guns are so easily accessible in the United States on the black market that these 3D printable guns are going to be more of a novelty then they are going to be a form of mass killing, or assassination, or terrorist attack.

**Sputnik**: We had this recent deadly shooting in Toronto, a few people were killed. In your view, what's the reason for the growing gun violence in Toronto this year?

**Greg Shaffer**: A lot has to do with the access to weapons. Toronto is a very short drive, a very short ferry ride to America and we have tens of thousands of illegal weapons coming across our southern border every day, some of them make it to the northern border into Canada. You've got to look at the root cause here: is it a gun problem or is it a socio-economic or cultural problem? You've got to look at what I consider five things that changed in our culture that have resulted in increased violence and this goes to Canada as well. I think violence in movies, violent video games are a huge factor; we have overmedication of our kids on antidepressants, our kids are no longer raised by a parent, they're raised by daycare, because both parents are either working or they're divorced; we have revolving doors on the judicial system, which doesn't hold people accountable for the crimes they commit — we let them in, we let them out. And remember religion; religion has exited the houses of virtually everybody across the world; we want religion to help us with our moral and ethical questions. So I think the question is not really a gun-related question, it's more of a cultural and socio-economic problem. Look at London, for example: their crime rate and murder rate is increasing dramatically as well, and they have some of the toughest gun laws in the world. This increase in gun violence in Toronto is, I think, because of the accessibility of weapons has increased, but they have the same problems that the Western world is having when it comes to cultural issues.

Link: https://sputniknews.com/analysis/201807251066659134-3d-guns-novelty-leading-security-explained/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* | Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 1:19 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: The Economist: Soon anyone will be able to learn how to print 3D guns |

---

# CPA MEDIA MONITORING

**Soon anyone will be able to learn how to print 3D guns**
**By The Economist**
**26 July 2018**

"THE age of the downloadable gun formally begins," proclaims the website of Defence Distributed, a group founded by Cody Wilson, a self-proclaimed crypto-anarchist. A settlement with the State Department at the end of June, reached after years of litigation, will allow the group to publish online blueprints for the 3D printing of guns and their parts from August 1st.

For gun-control advocates, this is a terrifying scenario. People who cannot pass a background check will be able to print a gun without a serial number, making the weapon impossible to trace, says Adam Skaggs of the Giffords Law Centre to Prevent Gun Violence. (Federal law requires licensed gun shops to run background checks, though this does not apply to private sales at fairs or on the internet.) His law centre is trying to get the courts to delay the settlement, at least.

Gun-rights crusaders such as Alan Gottlieb, whose Second Amendment Foundation helped Mr Wilson sue the federal government, hail the settlement as a victory for the First and Second Amendments. They argue that the government's ban in 2013 of the online publication of the blueprints infringed on both Mr Wilson's right to bear arms and his right to share information freely. Mr Gottlieb claims that background checks do not prevent mass shootings, and says that the guns in Mr Wilson's blueprints include metal, making them detectable by body scanners. "If you can own a gun, you should be allowed to make a gun," he argues.

Why did the government give up after three years of litigation and even agree to pay Mr Wilson's legal fees? Mr Gottlieb thinks it settled because it was worried about losing the case, and because it would have had to disclose details of arms imports and exports if the case had gone to trial. Mr Skaggs argues that the government settled because "this administration will give the gun industry anything it asks for". It is trying to deregulate gun exports. And it is nominating amenable judges whenever it can.

Plastic guns made with 3D printers are not yet very good. But downloadable files will soon be available that include rifles similar to the AR-15, a weapon used in recent mass shootings. Gun-control advocates say that even the simplest 3D-printed "Liberator" gun, which can fire only one shot, could wreak havoc if used against an aeroplane pilot. Moreover, the technology is improving. Soon 3D printers may produce sophisticated plastic guns. They can already print metal guns, although metal 3D printers cost the equivalent of an arsenal of traditional guns, so are unlikely to be widely used.

Democratic politicians such as Senator Chuck Schumer of New York vow to write a bill to suppress 3D-printed guns. But no new law is likely to pass before the mid-term elections. By then, hundreds of thousands of the new blueprints will have been downloaded.

Link: https://www.economist.com/united-states/2018/07/28/soon-anyone-will-be-able-to-learn-how-to-print-3d-guns

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968

e-mail: ***MarquisMR@state.gov*** | Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002266

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 10:46 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: The Economist: Why it is difficult to regulate 3D-printed guns |



**Why it is difficult to regulate 3D-printed guns**
**By The Economist**
**26 July 2018**
IN 2013 Cody Wilson, a self-described anarchist, fired the world's first 3D-printed handgun. It was a crude, single-shot pistol made almost entirely of plastic. He called it the Liberator (pictured) and posted the printing manual, in the form of software code, online. It was downloaded nearly 100,000 times and reposted elsewhere. Five days later the American government ordered Mr. Wilson to remove the files, which he did. But he contested the order in court, and years of litigation followed. Last month the case finally settled in his favour. On August 1st Mr. Wilson plans to repost the guide. Why did the government lose and what does that mean for gun regulation?
To stop Mr Wilson from posting his guide online, the federal government deployed an unusual and rather dubious legal strategy. The State Department accused him of violating export-control laws that prohibit disclosing technical data about military equipment and munitions to foreigners. These laws were designed to stop someone from, say, copying the blueprints of a nuclear submarine and passing them on to China. Mr. Wilson countered that the application of these laws to his case was misguided, given that gun-making manuals already exist in the public domain. His argument that the government order violated his free speech won out. Even if he had lost the case, it would have had little practical effect. Other sites had already reposted the manual. And Mr. Wilson had been lawfully mailing the code to American citizens. He has since focused on selling a more sophisticated product: a machine, dubbed the "Ghost Gunner", that carves the key component of an untraceable AR-15 rifle out of aluminium.
Amateur gun-making is not new. Federal law allows anyone to manufacture guns at home; a licence is required only to sell or trade them. But gun-control advocates worry about the 3D-printed type for two reasons: traceability and detectability. They lack the serial numbers that register mass-produced guns with the federal government, so they cannot easily be traced. Made of plastic, they can also slip through metal detectors. Neither feature is unique to 3D-printed guns, but the concern is that the technology's ease of use can turn anyone—especially those who might fail a background check—into a gunsmith. Technical know-how would no longer be required to make a firearm. And as 3D printers get cheaper or easier to rent, costs will go down too. Chuck Schumer, now the Senate minority leader, summed up this fear in 2013 when he warned that 3D printing would allow any bunch of felons or terrorists to "open a gun factory in their garage."
There are some ideas for containing the risk. One measure—which passed in California and took effect there this month—would require anyone who makes a gun at home to register it and apply for a state-issued serial number. The Californian law also bans the sale or trade of homemade guns. But enacting a law and enforcing it are separate matters. Arrests for non-compliance are likely only after an untraceable gun is used to commit a crime. And with some 300m firearms in America, skirting the rules to acquire a gun is not difficult, regardless of how it was made. As one gun-control expert put it, "It's a hell of regulatory challenge."
Link: https://www.economist.com/the-economist-explains/2018/07/26/why-it-is-difficult-to-regulate-3d-printed-guns

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)

U.S. Department of State

Phone: 202.647.6968

e-mail: ***MarquisMR@state.gov*** | Web: ***www.state.gov/t/pm*** / |Twitter: ***@StateDeptPM***

Stay connected with *State.gov*:

  

**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002268

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 2:34 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: The Hill: Anti-gun violence groups file to halt online posting of 3D-printed gun plans |



**Anti-gun violence groups file to halt online posting of 3D-printed gun plans**
By Jacqueline Thomsen
26 July 2018
Three prominent anti-gun violence groups filed a motion early Wednesday to block a settlement that would allow for plans for 3-D printed firearms to be posted online.
The Brady Center to Prevent Gun Violence, Everytown for Gun Safety and Giffords Law Center jointly filed in U.S. District Court in Texas an emergency motion to intervene and an emergency motion for a temporary restraining order and preliminary injunction in the case.
A representative for the Brady Center confirmed to The Hill that a closed hearing will be held in the case Thursday.
The federal government had settled a lawsuit with gun rights activist Cody Wilson late last month, allowing him and his company, Defense Distributed, to post and sell the plans for 3-D printed guns.
The government had initially ordered Wilson to remove the plans, first posted online in 2013, saying it violated international law on the export of defense materials. Wilson complied but sued the government in 2015.
The settlement exempts Wilson and his company from the restrictions on defense material exports, according to a copy of the settlement obtained by CNN.
The three anti-gun violence groups argue in the filings that the federal government was correct in initially finding that posting the plans on the internet "threatened national security."
"The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community," the court documents read.
The groups had announced that they would take legal action in a letter to U.S. District Judge Robert Pitman Wednesday.
"Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions," the letter reads.
"The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world."
Link: http://thehill.com/regulation/court-battles/399027-anti-gun-violence-groups-file-to-block-settlement-allowing-3d

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968
e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm/* | Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 3:28 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: The Truth About Guns: The Defense Distributed Settlement Isn't a Done Deal…Here's What's Next |



## The Defense Distributed Settlement Isn't a Done Deal…Here's What's Next
**By P.A. Deacon**
**26 July 2018**

What exactly happened with the lawsuit that Cody Wilson's Defense Distributed (DD) filed against the State Department? Specifically, why did the State Department settle the case to allow DD to put its files for 3D printed firearms on its website, DEFCAD?

### The Agreement

The State Department stated that the DEFCAD files posted by DD are exempt from the licensing requirements of the Arms Export Control Act's implementing regulations known as the International Traffic in Arms Regulations (ITAR). In the settlement, State only said that the files are exempt, but didn't give a reason or criteria to define the exemption.

Instead, the State Department agreed to publish the rationale and definitions of the exemption in a public rule making. That implies DD's lawsuit triggered a new type of exemption for the public sharing of non-military weapon designs and information.

Under 22 CFR 125.4 (b) the State Department lists exemptions from ITAR. It is interesting that subsections (b)(1) through (12) detail very specific reasons for exemption, but subsection (13) basically reads that something is exempt from ITAR if the State Department says so.

We will all take the win for an exemption, but that sort of ambiguity is dangerous.

### Free Speech

In its settlement with Defense Distributed, the State Department said that it would draft a new federal rule in the Federal Register to exclude the type of technical data that Defense Distributed put on DEFCAD. The new rule may explain why the State Department agreed to settle and permit publicly sharing the weapon design information published by DD.

Drafting a new rule can take weeks, months, or even years. According to the settlement, while the State Department is drafting the rule, it will put an announcement on its website that the State Department is temporarily permitting public sharing of DD's files.

The announcement will be online on or before July 27, 2018. In that announcement, State may include the reasons why it settled with DD, agreed to temporarily exempt the weapon designs from ITAR, and why the State Department committed to a new rulemaking to address when publically sharing weapons designs is exempt from ITAR.

People of the Gun are not the only ones interested in knowing why the State Department settled with DD. The Brady Campaign to Prevent Gun violence filed a Freedom of Information Act request (FOIA) to answer that question. This is ironic because the Brady Campaign is using a FOIA request in order to find new ways to suppress the freedom of information.

### The Fate of Military Equipment

According to the press release from the Second Amendment Foundation, the "government expressly acknowledges that non-automatic firearms up to .50-caliber – including modern semi-auto sporting rifles such as the popular AR-15 and similar firearms – are not inherently military."

This sounds great, but the devil is in the details of the new rule.

WASHAR0002270

First, this settlement agreement is not the same as the final regulation. The settlement may be helpful in another, future lawsuit, but this settlement cannot bind the outcome of the final regulation. Furthermore, the final regulation may not even mention the settlement's definition of "Military Equipment." It is important that the State Department cement this distinction in a binding government document, like the pending new rule.

Second, the State Department only promised a process to address the regulation. That process may be favorable to gun owners or it may be so narrow as to barely affect our purchase and ownership of firearms and the designs to make them.

The State Department will first publish a Notice of Proposed Rulemaking (NPRM) that will detail the potential new regulation exempting certain firearm designs intended for sharing. The NPRM will also detail the time period for the public to submit comments on the proposal in support or opposition.

This is a critical phase of the notice-and-comment process. After the comment period, the State Department may receive so much negative feedback on its proposal that it determines it should craft something much more restrictive of gun rights.

**What To Expect**

Based off the information we have now, we can make some cautious inferences as to what this could mean for gun control.

The State Department agreed to settle because it determined that the regulations don't permit the government to prevent file sharing. State also realized that the files don't fit within any of the current exemptions. That's why the State Department relied on the catch-all exemption in 22 CFR 125.4 (b)(13).

Since the settlement included a definition of military equipment as being larger than .50 caliber and fully automatic, the new proposed rule might be an important defense for America's most popular rifle.

But, this depends on how the State Department drafts the new proposed regulation.

**Payback**

Almost as gratifying as the settlement is the fact that the State Department agreed to pay Defense Distributed's legal fees, totaling $39,581. I know its tax money, but I choose to look on the bright side. It's a donation to the cause.

Link: http://www.thetruthaboutguns.com/2018/07/ttag-contributor/the-defense-distributed-settlement-isnt-a-done-deal-heres-whats-next/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 4:14 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Twitter: Congressional reactions to Defense Distributed settlement |



WASHAR0002272

 **Chris Murphy** ✔
@ChrisMurphyCT

 Follow ⌄

Why on earth would we want to make it possible for anyone - including felons and terrorists in the U.S. and abroad - to be able to print their own gun without a serial number or background check?



**An AR-15 made at home? With 3D printing, 'the downloadable gun' becomes …**
Blueprints arriving Aug. 1 from Defense Distributed will let users make untraceable guns from home using 3D printers — no background check required.
usatoday.com

11:29 AM - 25 Jul 2018

**575** Retweets  **1,150** Likes   

💬 120      🔁 575      ♡ 1.2K

WASHAR0002273

 **Chris Van Hollen** ⬤
@ChrisVanHollen

Follow ⌄

If you can't pass a background check, you shouldn't be able to get a gun—not from a store, from a gun show, or from parts you printed on a 3D printer and assembled at home. But Trump has made it easier to print and own a 3D gun without a background check—we must fight back!



**Giffords** ⬤ @GiffordsCourage
If you can't pass a background check, you shouldn't be able to build a gun in your basement.

While an overwhelmingly majority of Americans support background checks for...

10:59 AM - 25 Jul 2018

**65** Retweets **170** Likes

○ 15    ⟲ 65    ♡ 170

WASHAR0002274

 **Senator Bob Menendez** ◉
@SenatorMenendez

 Follow ⌄

Do-it-yourself, 3D printable guns. Yes, untraceable plastic guns.  No background checks. Thanks to @SecPompeo, starting August 1, blueprints to print AR-15's will be just a mouse-click away.  This must not happen.  foreign.senate.gov/press/ranking/

...



Sen. Bob Menendez
D., N.J.

"It is hard to see how making it easier for criminal & terrorist organizations to **obtain untraceable weapons** is in the foreign policy & national security interests of the United States,"

## Menendez Calls on Secretary Pompeo to Stop Online Posting of Do-it-Yourself, 3-D Printable Gun Blueprints

Sudden settlement by State Department will allow public release of 3-D printable firearm plans starting August 1. Ghost guns are untraceable, no background check required

8:43 AM - 25 Jul 2018

28 Retweets  52 Likes       

👥 Brady Campaign, Giffords, Everytown and 3 others

💬 11        🔁 28        ♡ 52

WASHAR0002275

 **Sen Dianne Feinstein** ◆
@SenFeinstein

 Follow ⌄

The Trump administration's decision to allow designs for a 3D printed gun to be distributed freely online is baffling and a complete about-face. It will allow terrorists and criminals to easily get their hands on guns.



**Senators Demand Answers from Justice Dept. on Dangerou...**
Washington – In the wake of the decision by the Department of Justice (DOJ) to settle a lawsuit brought against the Department of State by Defense Distributed and the Second Amendment ...
feinstein.senate.gov

12:26 PM - 25 Jul 2018

**578** Retweets  **968** Likes

💬 113   🔁 578   ♡ 968

Links: https://twitter.com/ChrisMurphyCT/status/1022187139491090433
https://twitter.com/ChrisVanHollen/status/1022179423783735298
https://twitter.com/SenatorMenendez/status/1022145377385017349
https://twitter.com/SenFeinstein/status/1022201362770264065

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official
UNCLASSIFIED
Official
UNCLASSIFIED**

WASHAR0002276

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 3:24 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Twitter: New Jersey AG sends Defense Distributed cease and desist letter |



 **NJ Attorney General Gurbir Grewal** ⬡

@NewJerseyOAG

Next week, a Texas-based company called Defense Distributed plans to publish computer files that would make it possible for anyone with a 3D printer to make their own untraceable assault weapons at home. This threatens all of us in New Jersey.

11:11 AM - 26 Jul 2018

**19** Retweets  **32** Likes    

♡ 5          �fi 19          ♡ 32

WASHAR0002277

 **NJ Attorney General Gurbir Grewal** 🌑
@NewJerseyOAG

 Follow ⌄

Releasing these computer codes would be no different than driving to NJ and handing out hard-copy files on any street corner. Defense Distributed must immediately drop its publication plans. We plan to sue by Aug. 1. Our cease-and-desist letter:

WASHAR0002278



PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

**State of New Jersey**
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
PO Box 080
TRENTON, NJ 08625-0080

GURBIR S. GREWAL
*Attorney General*

Defense Distributed
2320 Donley Dr., Suite C
Austin, TX 78758

July 26, 2018

To Whom It May Concern:

You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents. The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms—and even to make assault weapons that are illegal in my state. These computer codes are a threat to public safety, and posting them violates New Jersey's public nuisance and negligence laws. If you do not halt your efforts to proceed with publication, I will bring legal action against your company before August 1, 2018.

The computer files that you plan to publish will undermine the public safety of New Jersey residents. These files allow anyone with a 3-D printer to download your code and create a fully operational gun. More than that, the codes you plan to post will enable individuals to print assault weapons that are illegal in New Jersey. And because the printed guns would not have serial numbers, they would not be traceable by law enforcement. Worst of all, you are going to make the codes available to everyone—regardless of age, criminal status, or history of mental illness. That would undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands, and it would undermine the safety of our residents.

Not only are your codes dangerous, but posting them would also be illegal. New Jersey's law is clear: an individual who interferes with public health, safety, peace, and comfort violates our public nuisance law. *See James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-33 (App. Div. 2003). As New Jersey courts have held, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate our public nuisance law. *Id.* at 320. So when a group of manufacturers "flood[ed] the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market," New Jersey courts found they could be held responsible when their actions "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." *Id.* at 312. That is what your actions will do as well—make do-it-yourself guns available to anyone, even if the individuals are prohibited from owning guns because of prior convictions, history of mental illness, or history of domestic violence, even if the weapons they print are illegal in my

WASHAR0002279

July 26, 2018
Page 2

state, and even if they plan to use their weapons to further crimes and acts of violence. Because your actions will flood the illegal firearms market and pose a direct threat to the public safety of my state, they constitute a public nuisance.

Worse still, your comments make clear that you hope your actions will undermine all the efforts of states like New Jersey to keep guns out of criminals' hands. You have stated, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable."[1] You have also stated, "I'm not worried about public safety."[2] And on July 30, 2018, you tweeted a photo of a gravestone engraved with the words "American Gun Reform."[3] These comments show that you have no intention of precluding your printable-gun computer files, including designs for assault weapons, from winding up in the hands of criminals, minors, and the mentally ill. Not only does that reveal a lack of regard for safety, but it also shows that your interference with the public's health and safety is intentional and per se unreasonable. *James*, 359 N.J. Super. at 330.

Finally, your widespread dissemination of printable-gun computer files is negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey, and which will lead to an increase in expenditures of public funds for combating crime and protecting our resident's health. *See id.* at 308-24 (finding a legally valid negligence claim against some manufacturers of guns that flooded the illegal market). Your planned method of making codes available and your public comments show that you are ignoring and violating your duty. By broadly sharing an inherently dangerous product, you should reasonably foresee the resulting governmental and public costs and must bear them. *Id.* at 323-24.

As the chief law enforcement officer for New Jersey, I demand that you halt publication of the printable-gun computer files. Should you fail to comply with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018.

Sincerely,

Gurbir S. Grewal
Attorney General

---

Link: https://twitter.com/NewJerseyOAG/status/1022544937508851712

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:

**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 9:26 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Twitter: Rep. Deutsch calls for hearings on 3D printed guns |

# CPA MEDIA MONITORING

 **Rep. Ted Deutch** 
@RepTedDeutch

( Follow )  ∨

.@SenatorMenendez asked Sec Pompeo about the threat of 3D printed guns.

Pompeo didn't have any good answers.

Today, I called for House Foreign Affairs and Judiciary hearings to examine the Trump admin's settlement that will allow 3D printing plans for guns to go up online.

 **Senator Bob Menendez** @SenatorMenendez
At the Pompeo hearing just now, I brought up the danger of allowing do-it-yourself 3D printable firearm blueprints to be posted online. Untraceable plastic guns. No background checks. @SecPompeo said he'd look into...

Show this thread

3:09 PM - 26 Jul 2018

**443** Retweets **753** Likes   

♡ 26      ↻ 443      ♡ 753

WASHAR0002281

Link: https://twitter.com/RepTedDeutch/status/1022604783771963392?ref_src=twsrc%5Egoogle%7Ctwcamp%5Enews%7Ctwgr%5Etweet

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:  202.647.6968

e-mail: *__MarquisMR@state.gov__* | Web: *__www.state.gov/t/pm /__* |Twitter: *__@StateDeptPM__*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 3:57 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Twitter: Senator Bob Menendez on 3D printed firearms |



 **Senator Bob Menendez** ✔
@SenatorMenendez

 Follow ∨

Do-it-yourself 3D printable firearm blueprints could be posted online. Untraceable plastic guns. No background checks. One mouse click away. I pressed Secretary of State Pompeo on it, and he said he'd look into it, but he better hurry. They could go online in a matter of days



0:24   340 views

12:46 PM - 26 Jul 2018

**9** Retweets  **17** Likes

♡ 4      ⟲ 9      ♡ 17

Link: https://twitter.com/SenatorMenendez/status/1022568774434734080

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: ***MarquisMR@state.gov*** | Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***
Stay connected with *State.gov*:



**Official**

WASHAR0002284

**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002285

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 9:29 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Vice News: Gun control groups are racing against the clock to stop 3D gun blueprints from going online |

**CPA MEDIA MONITORING**

**Gun control groups are racing against the clock to stop 3D gun blueprints from going online**
**By Tess Owen**
**26 July 2018**

Blueprints for 3D-printed guns will start appearing online in just six days. With the clock ticking, lawmakers and gun control groups are scrambling to block the plans, which experts fear could lead the U.S. into a new era of homemade AR-15s and other guns the government can't trace.

Cody Wilson, a 29-year-old self-described "crypto-anarchist," recently won the right to upload his blueprints online after the Trump administration quietly settled his yearslong lawsuit against the State Department. Wilson sued the government on free speech grounds after State Department officials ordered him to take the blueprints down in 2013 or face hefty fines and jail time.

The settlement, handed down earlier this month, gave Wilson's company, Defense Distributed, the green light to resume uploading blueprints for 3D guns starting Aug. 1. And in the last few days, outrage over the Trump administration's decision to settle the long-stalled case has escalated.

The settlement reversed the position taken by the Obama administration, which held that publishing blueprints for 3D-printed guns posed a threat to public safety and national security. Democratic federal and state officials have now written to the Trump administration demanding explanation for the last-minute switch, threatening to take legal action against Wilson, and even considering legislation to outlaw the publication of his blueprints.

The most promising effort to thwart Wilson's plans came in the early hours of Thursday morning, when gun-control lobbying groups including The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, and Giffords Law Center to Prevent Gun Violence filed an emergency motion seeking a temporary restraining order against Wilson.

The U.S. District Court for the Western District of Texas in Austin agreed to schedule an emergency hearing for Thursday afternoon.

"The resulting settlement agreement, if carried through, threatens to undermine national security by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world," the groups wrote in a joint letter to a federal judge in Texas, where Wilson and his company are based.

The notion of making 3D-printed guns publicly available is particularly concerning to law enforcement because, like "ghost guns" (which are assembled using DIY kits), they don't have serial numbers. That makes them nearly impossible to trace if they're used to commit a crime.

Also on Thursday, New Jersey Attorney General Gurbir S. Grewal, a Democrat, sent a "cease and desist" letter to Defense Distributed that threatened to take legal action against Wilson and his company if they made blueprints for 3D-printed guns available to residents of New Jersey.

"Defense Distributed's plans to allow anyone with a 3D printer to download a code and create a fully operational gun directly threatens the public safety of New Jersey's residents," Grewal stated in the letter. "Posting this material online is no different than driving to New Jersey and handing out hard-copy files on any street corner. The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."

Democratic members of Congress are also ringing alarm bells.

During Wednesday's hearing on national security issues, Democrat Sen. Bob Menendez, the ranking member of the Senate Foreign Relations Committee, called on Secretary of State Mike Pompeo to conduct an immediate review of the Trump administration's settlement with Wilson.

"I understand that despite its ability to stop this ridiculous notion, the State Department is about to allow internet posting of do-it-yourself 3D-printable firearm blueprints," Menendez said. "Why on earth would the Trump administration make it easier for terrorists and gunmen to produce undetectable plastic guns?"

Menendez followed up with a letter to Pompeo, asking him to reconsider that Wilson's blueprints "runs afoul of federal law," specifically, the International Traffic In Arms Regulations (ITAR), which governs exports.

That was the same law that the State Department initially argued Wilson had broken back in 2013, when his legal woes first began.

New York Sen. Chuck Schumer was the first member of Congress to draw attention to development in Wilson's case this week — and hinted he'd be willing to introduce legislation to remedy the situation.

"Sadly, the feds are not only shoulder-shrugging this threat to public safety by refusing to fully enforce laws already on the books, but they could be sowing the seeds of real disaster by allowing dangerous ghost gun blueprints to be shared freely online," Schumer wrote. "I am not only sounding the alarm on this issue, but I have a message for the administration: Congress will use its powers to try and stop this madness."

Five Democratic senators, led by Edward Markey of Massachusetts, also wrote a letter to the Justice Department, which settled the lawsuit with Wilson, demanding that attorneys provide them with a copy of the settlement, a written explanation, and a briefing, all by Aug. 1.

"This settlement is inconsistent with DOJ's previous position and is as dangerous as it is confounding," the senators wrote in their letter to Attorney General Jeff Sessions. "The American people have a right to know why their government agreed to such a dangerous outcome."

Congressman Ted Deutch of Massachusetts also took a stand. On Thursday, he sent a letter, co-signed by 40 members of Congress, to the chairs of the Judiciary and Foreign Affairs Committees, calling on them to examine the settlement.

"The Trump Administration's decision to settle this case will only worsen the gun violence epidemic in America," Deutch wrote. "We shouldn't have to wait for someone to kill someone in a House office building after sneaking past security with a plastic 3D-printed gun to do something to stop this. And we can't let another day go by allowing the paralysis and dysfunction of Congress to prevent us from making our communities safe."

Link: https://news.vice.com/en_us/article/ev8b4p/gun-control-groups-are-racing-against-the-clock-to-stop-3d-gun-blueprints-from-going-online

WASHAR0002287

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web:  *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 10:51 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Washington Post" I'm a sheriff. Don't flood the country with 3D-printed guns. |

# CPA MEDIA MONITORING

**I'm a sheriff. Don't flood the country with 3D-printed guns.**
**By Paul Penzone**
**26 July 2018**

I am not fearful of firearms. I believe the Second Amendment was written with purpose and with sensitivity to generational circumstances. But what I am extremely concerned about is who has access to firearms and the devastation firearms are capable of in the wrong hands.

Imagine a world in which anyone — including terrorists, convicted felons and domestic abusers — has immediate access to untraceable guns. Now imagine that many of these guns are made entirely of plastic or other materials not recognized by traditional metal detectors.

This unmanageable scenario may soon become a reality. In fact, as soon as Aug. 1, anyone with an Internet connection and a 3D printer — readily available in stores and online — will be able to make an untraceable handgun, rifle or assault weapon with just a few clicks. This is because the State Department has decided to allow a private company to post gun blueprints online for anyone to access. This is a reckless and dangerous action that will enable the uncontrolled distribution of downloadable, do-it-yourself firearms.

As sheriff of the fourth-largest and fastest-growing county in the nation, I know first-hand the threat such weapons pose to society. But it doesn't require my 25 years of experience in law enforcement to know how dangerous firearms in the wrong hands can be. Downloadable guns undermine our federal and state gun-violence prevention laws, which help prevent people who pose a danger to themselves or others from accessing firearms. These laws are effective when law enforcement can conduct background checks and identify firearms through legally required serial numbers leading to a first point of purchase.

The ability to circumvent lawful and reasonable processes for purchase will undermine the work of all law enforcement. Our ability to trace guns recovered at crime scenes is a critical step in catching criminals and getting killers off our streets. Untraceable firearms will ultimately cripple investigations and provoke further violence by criminals.

Until recently, the State Department shared these concerns about the threat of downloadable, untraceable guns. For years, the agency had been fighting back a lawsuit from an online, open-source company that was forced by the department to pull down downloadable gun blueprints. That's because the department considered the online posting of the technology a violation of the International Traffic in Arms Regulations.

But the State Department reversed course a few months ago, unjustifiably and irresponsibly settling with the company and giving them a license to publish. And now, the company has scheduled to make its gun blueprints available online yet again on Aug. 1.

On that date, drug cartels, arms traffickers and terrorists will be able to increase their revenue and the volume of weaponry at the expense of our safety through an untraceable and unlimited method of firearms manufacturing and distribution. Ultimately, it is uncontrolled, irresponsible and unconscionable.

The State Department can stop this from happening by standing by its original decision to prevent digital, downloadable gun files from being posted online. This is absolutely a clear and present danger to public safety.

Link: https://www.washingtonpost.com/opinions/im-a-sheriff-dont-flood-this-country-with-3d-printed-guns/2018/07/26/38d9a9b8-9052-11e8-b769-e3fff17f0689_story.html?utm_term=.8c5b41557247

---

**Matthew Marquis**

WASHAR0002289

Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: ***MarquisMR@state.gov*** | Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 8:20 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: WPTV: Online plans to print 3-D guns concern dad of MSD shooting victim, law enforcement, politicians |

# CPA MEDIA MONITORING

**Online plans to print 3-D guns concern dad of MSD shooting victim, law enforcement, politicians**
**By Amy Lipman**
**25 July 2018**

PALM BEACH COUNTY, Fla. - As of Aug. 1, anyone with a 3-D printer could get the plans to print their very own gun, even an AR-15.

"This is the most important story in our country right now," said Fred Guttenberg, whose daughter Jaime died in the shooting at Marjory Stoneman Douglas High School in Parkland in February.

Back in 2013, Cody Wilson posted plans for a 3-D printed handgun online. The U.S. State Department told him to take the plans down, citing the International Traffic in Arms Regulations, which oversee the export of defense materials, services, and technical data.

Two years later, Wilson and his non-profit, Defense Distributed, sued the federal government saying the group has the right to post information online.

At the end of June, the government settled, allowing those plans to go back up online.

"This changes everything," Guttenberg said.

Guttenberg has been advocating for gun control since his daughter and 16 others died on Valentine's Day.

"It changes the entire discussion around gun violence prevention," he said.

He is up in Washington D.C. this week to speak out against Brett Kavanaugh becoming the next Supreme Court Justice. However, he decided to use this week's meetings with lawmakers, including a speech to the House Democratic Caucus, to inform them of the potential for people to soon be able to print their own plastic guns.

"My alarm bell went off when I realized most of them didn't know what I was talking about," he said.

Guttenberg is concerned printed plastic guns could get through metal detectors.

"So I said to all of the senators and congressmen, the next time you have a constituent in your office, they might have a gun," he said. "All of the school hardening talk that we've been doing in Florida and across the country, it won't matter. Airplanes, airports."

This could also allow people who can't legally buy a gun to create their own, although it would still be illegal for them to possess the gun.

"I think that you give an edge to the criminal," said Stuart Kaplan, former special agent for the FBI. "Or to a person who is in the planning or preparation stage to make it easier or more accessible for them to have a gun that is not even detectable or traceable, that presents an impact to our national security."

From a law enforcement standpoint, Kaplan said printed plastic guns are untraceable because they don't have serial numbers, which could hinder investigations.

"It's a ghost gun," he said.

While Kaplan said plastic could cause issues with the functionality of the gun, there have been plastic guns that have been proven to work.

"There have been some issues with the respect to the designing of plastic to be able to withstand a single discharge of a bullet. It takes a certain amount of chemical compounds to withstand basically the explosiveness of gunpowder. There have been failures, but there's also been some success," he said. "It can be proven to be deadly as a regular gun made out of metal."

Guttenberg thinks this concept could change the entire country.

WASHAR0002291

"If we don't stop this before August 1st and it goes online, it's too late," he said.

Guttenberg is working with politicians to try to get a court injunction to pause the release of the blueprints. U.S. Senator Bill Nelson and several other senators sent a letter to Attorney General Jeff Sessions about the issue.

"We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course," they wrote in the letter. "The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad."

The National Rifle Association spokeswoman said 3-D printed guns represent "freedom and innovation." She said laws already on the books would still prevent criminals from possessing printed guns.

Everytown has an online petition to stop the blueprints from being posted.

Link: https://www.wptv.com/news/state/online-plans-to-print-3-d-guns-concern-dad-of-msd-shooting-victim-law-enforcement-politicians

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| **From:** | Kaidanow, Tina S <KaidanowTS@state.gov> |
| **Sent:** | Friday, January 5, 2018 2:01 PM |
| **To:** | PM-All-Users <PM-All-Users@state.gov> |
| **Subject:** | Front Office changes |

Folks –

I am very happy to report that Lee Litzenberger has joined the front office as my Senior Advisor. Lee will be taking over the portfolio of Karen Williams, who is moving to the Redesign project full time. Lee will supervise the Congressional and Public Affairs and the Strategy and Resource Coordination teams. He will also serve as my primary backup when I am out of the office and will oversee the implementation of cross-cutting strategic, management, and workforce initiatives within the bureau.

Lee has come to us from the German Marshall Fund, where he was a Senior Fellow. Before going to the GMF, he served from 2014 to 2017 as the Deputy Chief of Mission and Chargé d'Affaires at the U.S. Mission to NATO in Brussels and simultaneously as the U.S. Deputy Permanent Representative to NATO. Prior to his assignment in Brussels, Lee was the NATO Deputy Senior Civilian Representative to Afghanistan in Kabul. He has also served as DCM in Serbia and Kyrgyzstan, and he brings three decades of experience in political-military affairs, Europe, and the Near Eastern Affairs bureau. Lee has strong ties to senior leadership at DoD and the Joint Staff, and he is experienced at working with Congress on security issues, both of which will bring great value to PM.

In this morning's staff meeting, I also announced a few other shifts in leadership of the bureau. I'm deeply appreciative to Mike Miller, who has agreed to become PM's Acting DAS for Defense Trade. In this role, Mike will oversee all the DDTC offices as well as the Regional Security and Arms Transfer (RSAT) office. I've also made some other changes to Acting DAS portfolios. Kevin O'Keefe is the Acting DAS for Security Assistance and will oversee the offices of Security Assistance (SA), Weapons Removal and Abatement (WRA), and Global Plans and Initiatives (GPI), a role he will rotate with Stan Brown. Tim Betts will continue as our Senior Advisor for Security Negotiations and Agreements (SNA) and will also oversee the office of State-Defense Integration (SDI) as an acting DAS. RADM Yvette Davids will also continue her excellent service as our Front Office military liaison, providing guidance and support to the military detailees assigned to the Department.

And finally, I would like to express my abiding gratitude to Karen Williams for her service to PM, particularly as she's borne the burden of wearing both a Redesign hat and a PM hat since last June. Karen will still be a part of PM administratively while working on the Redesign and may occasionally step in to sign papers when I am out of the office, as she retains certain authorities that cannot be re-delegated.

Here's wishing everyone a Happy New Year!

Tina

WASHAR0002293

| | |
|---|---|
| **From:** | Cavnar, Anna <CavnarA@state.gov> |
| **Sent:** | Monday, July 16, 2018 8:41 AM |
| **To:** | Fabry, Steven F <FabrySF@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| **Subject:** | Defense Distributed |

FYI from this weekend
https://www.nytimes.com/2018/07/13/business/downloadable-gun-allowed-alarming-activists.html?
hp&action=click&pgtype=Homepage&clickSource=story-heading&module=second-column-
region&region=top-news&WT.nav=top-news
**Official - Transitory**
**UNCLASSIFIED**

WASHAR0002294

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 4:49 PM |
| To: | Steffens, Jessica L <SteffensJL@state.gov>; PM-Strategy <PM-Strategy@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Brown, Stanley L <BrownSL@state.gov>; O'Keefe, Kevin P <OKeefeKP@state.gov>; Miller, Michael F <Millermf@state.gov>; Mak, Daniella <MakD@state.gov>; Martin, Davette T <MartinDT@state.gov>; Dudding, Maria <DuddingM@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Nute, Kathryn M <NuteKM3@state.gov>; McVerry, James <James.Mcverry.ctr@dla.mil> |
| Subject: | Defense Distributed Settlement Alerts for 25 July 2018 |

**CPA MEDIA MONITORING**

### Defense Distributed Settlement Alerts for 25 July 2018

"Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing'", Gun rights activists in the United States will soon be able to post 3D printable gun plans online. In 2013, Cody Wilson, who describes himself as a post-left anarchist, posted plans for a 3D printed handgun called "The Liberator." The gun, which was made from plastic, had a metal firing pin and another piece of metal included to comply with the Undetectable Firearms Act.

"Editorial: Homemade 3-D printer guns should be regulated like any gun", Federal law allows hobbyists to build their own guns for personal use. But the landscape has changed with 3-D printers, precise digital plans, and devices like the Ghost Gunner that allow anyone with a computer and a credit card to become a gun manufacturer.

"WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons", Normally, Americans would need to pass a background check before they can buy a gun, but freely-available blueprints for 3D-printed weapons could offer a way to bypass this law.

"What You Need to Know About the 3D Printing of Guns on Demand", While Brady's legal team has filed Freedom of Information Act (FOIA) requests to find out how and why this decision was made, the self-proclaimed "crypto-anarchist" will move forward to publish the blueprints for anyone and everyone to use. The Brady Center, along with Everytown and Giffords, is urging a Texas federal court to consider just how dangerous this could be and will be filing legal action.

"LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL", Attorneys representing the Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence and Everytown for Gun Safety have informed a Texas federal court that they anticipate filing legal action within days related to a settlement that would allow new designs for downloadable, untraceable guns to become public and available world-wide as early as August 1.

"MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS", U.S. Senator Bob Menendez, Ranking Member of the Senate Foreign Relations Committee, today called on U.S. Secretary of State Mike Pompeo to immediately intervene and review the surprising and sudden decision by his department to allow online public posting of 3-D printable gun blueprints in the next few days.

"Debating the Permissibility of Printable Guns", Those opposed to the settlement argue that it is deeply problematic that there are no background checks required for printing a gun. Convicted violent felons could print guns. People with a history of violent mental disorders could print guns. The government has a responsibility to look after the safety of its citizenry. Deadly weapons shouldn't fall into the wrong hands.

"We Have to Take a Stand on 3D Printed Guns", You can already make guns in the US, you just need a license to distribute guns. The essential part of the "homebrew" gun was already perfectly possible. If they really

WASHAR0002295

wanted to 3D print guns they could have already done this. Instead, they wanted to 3D print attention and everyone fell for it. They went looking for a law suit to prolong the window of attention on them.

"Government Admits AR-15s Are Not Weapons of War", Wilson and SAF fought the suit on First Amendment grounds and secured a settlement with the State Department and the Department of Justice, the latter of which finalizes the settlement. The amended regulations proposed in the settlement show the government will no longer look at semi-automatic firearms below .50 caliber as "military equipment" or weapons of war.

"Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1", A settlement earlier this year between the State Department and Texas-based Defense Distributed will let the nonprofit release blueprints for guns online starting Aug. 1, a development hailed by the group as the death of gun control in the United States.

"THE DANGERS OF 3D-PRINTED GUNS", The Trump Administration's ruling will recklessly allow anyone to post their gun blueprints online for anyone to download. That means people who are unable to pass a background check—like terrorists, convicted felons, and domestic abusers—will be able to 3D-print a gun out of the same type of plastic used to make LEGOs—without any attached serial numbers. This could have severe repercussions a decade from now if we allow weapons of this kind to multiply.

"Email NOW: Stop the Threat of Downloadable Guns", Do-it-yourself, downloadable guns are incredibly dangerous. And a State Department special exemption would allow a company run by a self-proclaimed anarchist to post its gun blueprints online in the form of files that can be sent directly to a 3D printer to print guns on demand.

"The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really", The lawsuit turns on whether or not the first and second amendment, allowing freedom of speech and the right to bear arms, protects someone like Wilson, who wishes to provide downloadable gun blueprints to make deadly, untraceable weapons.

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002296

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 4:47 PM |
| **To:** | Carter, Rachel <CarterR@state.gov>; PM-Strategy <PM-Strategy@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; Brown, Stanley L <BrownSL@state.gov>; O'Keefe, Kevin P <OKeefeKP@state.gov>; Miller, Michael F <Millermf@state.gov>; Mak, Daniella <MakD@state.gov>; Martin, Davette T <MartinDT@state.gov>; Dudding, Maria <DuddingM@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Nute, Kathryn M <NuteKM3@state.gov>; McVerry, James <James.Mcverry.ctr@dla.mil> |
| **Subject:** | Defense Distributed Settlement Alerts for 25 July 2018 |

---



## Defense Distributed Settlement Alerts for 25 July 2018

"Stop Defense Distributed From Releasing Downloadable Guns", On August 1st, Defense Distributed plans to release downloadable gun blueprints to make untraceable, undetectable, plastic 3D printed guns. This could mean that anyone, including TERRORISTS, convicted FELONS, domestic ABUSERS and other dangerous people could print their own gun on demand.

"This Austinite Plans To Publish Designs Online For 3D-Printable Guns Next Week", He argues the ITAR – the regulations the government used to block Wilson from publishing the files – lacked clear legal standards, deadlines and judicial review. He says it also puts the burden on individuals to prove they are not in violation of the regulations, rather than the government having to prove that they are.

"New Jersey Attorney General Sends 'Cease And Desist' Letter To Halt Company's Publication Of 3D-Printed Gun Instructions", "You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents," Grewal said in the letter. "The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms – and even to make assault weapons that are illegal in my state."

"The Defense Distributed Settlement Isn't a Done Deal…Here's What's Next", First, this settlement agreement is not the same as the final regulation. The settlement may be helpful in another, future lawsuit, but this settlement cannot bind the outcome of the final regulation. Furthermore, the final regulation may not even mention the settlement's definition of "Military Equipment." It is important that the State Department cement this distinction in a binding government document, like the pending new rule.

"Anti-gun violence groups file to halt online posting of 3D-printed gun plans", "The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community," the court documents read.

"Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'", Shortly after the settlement was announced, the Brady Campaign filed a Freedom of Information Act, hoping to get additional details about the reversal. But those documents likely won't be returned until after Defense Distributed reposts the blueprints online, at which point the gun safety groups say the potential damage would be "irreparable."

"Gun-control advocates ask judge to block downloadable 3D guns", The Department of Justice quietly agreed to let a Texas man legally offer his downloadable plans to fabricate a 3D-printed gun starting Aug. 1. When news broke nationally about the agreement over the past week, three national gun safety groups quickly headed to court to try to block the action.

"Soon anyone will be able to learn how to print 3D guns", For gun-control advocates, this is a terrifying scenario. People who cannot pass a background check will be able to print a gun without a serial number, making the weapon impossible to trace, says Adam Skaggs of the Giffords Law Centre to Prevent Gun Violence. (Federal law requires licensed gun shops to run background checks, though this does not apply to private sales at fairs or on the internet.) His law centre is trying to get the courts to delay the settlement, at least.

"Did the U.S. State Department Legalize the Publication of Instructions for 3D-Printed Guns?", As of 1 August 2018, Defense Distributed will start publishing detailed steps on how to create a variety of guns that require no registration or background check to manufacture. While the broader issue may well be litigated further, the current stance of the U.S. State Department is that Defense Distributed will not be violating any export control laws when they do so.

"I'm a sheriff. Don't flood the country with 3D-printed guns.", Until recently, the State Department shared these concerns about the threat of downloadable, untraceable guns. For years, the agency had been fighting back a lawsuit from an online, open-source company that was forced by the department to pull down downloadable gun blueprints. That's because the department considered the online posting of the technology a violation of the International Traffic in Arms Regulations.

"Why it is difficult to regulate 3D-printed guns", Chuck Schumer, now the Senate minority leader, summed up this fear in 2013 when he warned that 3D printing would allow any bunch of felons or terrorists to "open a gun factory in their garage."

"Lawsuit moves to keep the blueprints for 3D printed guns off the web", On Tuesday, three prominent gun safety groups announced that they are preparing legal action in the coming days to prevent the U.S. State Department from allowing the blueprints for 3D-printed guns to be posted online. In an amicus brief filed on July 24, attorneys representing the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence objected to an imminent governmental rule change that would upend the regulatory structure governing firearm exports.

"Online plans to print 3-D guns concern dad of MSD shooting victim, law enforcement, politicians", U.S. Senator Bill Nelson and several other senators sent a letter to Attorney General Jeff Sessions about the issue. "We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course," they wrote in the letter. "The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad."

"State Department defends allowing publication of blueprints to 3D print guns", After a security analysis, "It was determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States," the State Department spokesperson said -- so they don't need to block publication.

"Pompeo commits to reviewing 3D-printed gun policy", Sen. Edward Markey (D-MA) asks Secretary of State Mike Pompeo not to allow downloadable blueprints for 3D-printed guns to be published online to prevent weapons from getting into the wrong hands.

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968
e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Freeman, Jeremy B </o=SBUState/ou=NCC AG/cn=Recipients/cn=FreemanJB> |
|---|---|
| Sent: | Wednesday, July 25, 2018 9:46 AM |
| To: | Rogers, Shana A <RogersSA2@state.gov> |
| Subject: | DOJ reviewed the DAS letter |
| Attach: | FW_ Clearance Request by COB Friday_ Defense Distributed Revised Settlement Item Three Letter .msg; RE_ Clearance Request by COB Friday_ Defense Distributed Revised Settlement Item Three Letter .msg; FW_ Clearance Request by COB Friday_ Defense Distributed Revised Settlement Item Three Letter .msg |

See attached.
**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 10:52 AM |
| To: | McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Shin, Jae E <ShinJE@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov> |
| Subject: | Flagging: Multi-Senator Letter to DOJ |

Just posted by the co-signers:

DOJ provide us with a copy of the fully executed settlement agreement, and a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to stock a dangerous contents.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callum Stransene of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

2

**Official - SBU**
**UNCLASSIFIED**

WASHAR0002301

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 8:55 AM |
| **To:** | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | FW: 18.04.06 DOJ MTD.pdf |
| **Attach:** | 18.04.06 DOJ MTD.pdf |

FYI-
**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,

On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice. Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by the end of April?

| | |
|---|---|
| **From:** | Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov> |
| **Sent:** | Friday, July 27, 2018 6:44 PM |
| **To:** | Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | FW: Authorization to File Stipulation of Dismissal |
| **Attach:** | Defense Distributed Ltr DoJ Stipulation 27July2018.pdf; Stipulation of Dismissal.pdf |

For your records

**From:** Goldstein, Matthew A. [mailto:mgoldstein@swlaw.com]
**Sent:** Friday, July 27, 2018 3:29 PM
**To:** Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>
**Cc:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Alan Gura <Alan@gurapllc.com>; joshblackman@gmail.com; David Morris <dmorris@fr.com>
**Subject:** Authorization to File Stipulation of Dismissal
**Importance:** High

Stuart,

See the attached letter.

The Plaintiffs hereby authorize the Defendants to immediately file the Stipulation of Dismissal with Prejudice in the above-captioned action.

I also attached a copy of the Stipulation of Dismissal, which Defendants can countersign and file if the original stipulation is not available.

Thanks.

-Matt

Matthew A. Goldstein
Counsel
Snell & Wilmer
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
Office: 520-882-1248
Mobile: 202-550-0040
mgoldstein@swlaw.com www.swlaw.com

Snell & Wilmer

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the attorney-client privilege. Thank you.

# Snell & Wilmer
------- L.L.P. -------
LAW OFFICES

One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630
520.882.1200
520.884.1294 (Fax)
www.swlaw.com

DENVER
LAS VEGAS
LOS ANGELES
LOS CABOS
ORANGE COUNTY
PHOENIX
RENO
SALT LAKE CITY
TUCSON

Matthew A. Goldstein
(520) 882-1248
mgoldstein@swlaw.com

July 27, 2018

**VIA EMAIL**
(Stuart.J.Robinson@usdoj.gov)

Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, D.C. 20530

> **Re:**   **Authorization to File Stipulation of Dismissal**
> *Defense Distributed et al. v. U.S. Department of State, et al.*
> Case No. 1:15-cv-372-RP

Dear Stuart:

The Plaintiffs waive the 5 day provision in Section 2 of the Settlement Agreement and hereby authorize the Defendants to immediately file the Stipulation of Dismissal with Prejudice in the above-captioned action.

Very truly yours,

Snell & Wilmer

Matthew A. Goldstein
*Attorney for Defendants*

cc:   Eric Soskin (Eric.Soskin@usdoj.gov)

4825-3260-5294

WASHAR0002304

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,                §
    Plaintiffs,                            §
                                           §
v.                                          §    No. 1:15-cv-372-RP
                                           §
U.S. DEPARTMENT OF STATE, et al.,           §
    Defendants.                            §

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.

Dated: July 25, 2018

Matthew Goldstein
D.C. Bar No. 975000*
Snell & Wilmer LLP
One South Church Ave.
Tucson, Arizona 85701
520.882.1248 / Fax

Alan Gura
Virginia Bar No. 68842*
Gura PLLC
916 Prince Street, Suite 107
Alexandria, Virginia 22314
703.835.9085/Fax 703.997.7665

Respectfully submitted,


CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch


ERIC J. SOSKIN
Pennsylvania Bar No. 200663
Senior Trial Counsel

1

WASHAR0002305

alan@gurapllc.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

4826-8904-6380.1

WASHAR0002306

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER        THOMAS SHEEHY
CHIEF OF STAFF    STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed firearms would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

ELIOT L. ENGEL
Ranking Member

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL# **H2018** _O7 27 = OO4_ ACTION BUREAU: _PM_

DATE: ___JUL 2 7 2018___

## IPS:

___X___ SUBSTANTIVE

___X___ IMAGE ENTIRE DOCUMENT

# BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

_____ REPLY FOR SIGNATURE BY Mary K. Waters, Assistant Secretary, Bureau of Legislative Affairs

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE. PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____ OTHER ACTION: _____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
http://diplopedia.state.gov/index.php?title=Bureau _of Legislative Affairs Reference Documents#Yellow Border_

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE. PLEASE NOTIFY CCU VIA UNCLASS EMAIL OF ALL TRANSFERS OF ACTION****

Due Date _7/31/18_

ADDITIONAL INSTRUCTIONS:

_X_ Multi-signer Letter: _Senate (+ 8)_

___ Special Instructions:_____

___ EVEREST TASKER#_____

___ Please clear with NSC prior to submission to H

WASHAR0002309

**FROM: Mary K. Waters (H)**

**Congressional Correspondence**
**Recommendation**

JUL 27 2018

_____ **For Signature by Secretary Pompeo**

**For draft by _____ Bureau**

X **Tasked to the** _PM_ **Bureau for Signature by Mary K. Waters, Assistant Secretary, Legislative Affairs**

_____ **Tasked to _____ Bureau for signature by Post or Bureau**

_____ **FYI Only—No Reply Necessary**

**For _____ Bureau**

**Special Actions:**

X **Multi-signer letter:** Senate (+8)

_____ **Special Clearances:**

_____ **For S Staff Review (H Only)**

_____ **Everest Tasker# _____**

_____ **Special Instructions:_____**

WASHAR0002310

# United States Senate

WASHINGTON, DC 20510

July 26, 2018

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, DC 20520

Dear Secretary Pompeo:

We write with great alarm regarding the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation. We urge the State Department not to allow Defense Distributed to publish online blueprints for undetectable, three-dimensional ("3-D") printable firearms.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's determination that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for 3-D printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR). Indeed, as recently as April 2018, the Trump administration filed a motion to dismiss the suit in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

Despite the court's twice siding with the government's position, in a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing blueprints in any form. Specifically, the State Department has agreed to allow Defense Distributed to publish its blueprints by July 27, 2018 — by making a "temporary modification" of the United States Munitions List (USML) and granting Defense Distributed an "exemption" from ITAR regulations. The administration also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with the administration's previous position and is as dangerous as it is confounding. The settlement will allow these blueprints to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

abroad. It also sets a dangerous precedent in defending against challenges to other legally sound determinations made by the State Department under the Arms Export Control Act and ITAR.

Yesterday, in response to questioning by Senator Markey before the Senate Foreign Relations Committee, you committed to reviewing the decision to allow Defense Distributed to publish its blueprints online. In accordance with this commitment, we ask that you suspend the special treatment given to Defense Distributed while you undertake this review.

In addition to suspending these actions, we ask that, prior to August 1, 2018, the State Department provide us with a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Specifically we request a response to the following questions:

1. Does the State Department no longer believe that the online publication of blueprints for the 3-D printing of firearms is a violation of federal export controls? If so, when did this reversal of opinion occur and why? Was there a change in the law or the facts that prompted this change? If so, please explain the change in either the law or facts that prompted the change.

2. On May 24, 2018, the State and Commerce Departments published proposed rules to amend Categories I, II, and III of the USML and transfer from the State Department to the Commerce Department oversight over export of certain firearms, ammunition, and related items. What role did the Defense Distributed litigation play in deciding to publish these proposed rules? What analysis, if any, did the State and Commerce Departments undertake to evaluate the potential risks of the proposed rules changes on export controls on the online publication of blueprints for 3-D printed firearms? If the State Department did evaluate the risks, what risks were identified? Please identify the individuals involved in that analysis.

3. If these proposed rules are finalized and jurisdiction over technical data related to the design, production, or use of semi-automatic or military-style firearms is transferred to the Commerce Department, the release into the public domain of instructions for printing 3-D firearms will be permissible. Does the State Department have concerns about the dangerous consequences of this rules change? Did the State Department make the Commerce Department aware of the litigation between it and Defense Distributed and the Second Amendment Foundation, the terms of the settlement, or the consequences of online publication of blueprints for 3-D printed firearms? If so, please identify to whom and how that information was conveyed.

4. Given the risks of the government abdicating control over the online publication of blueprints for 3-D printed firearms, why did the State Department agree to move forward with the rulemaking? How does the State Department plan to mitigate these risks?

Secretary Pompeo
Page 3 of 4

5. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "draft and fully pursue . . . the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to the technical data that is the subject of the" litigation. Why did the State Department agree to this relief?

6. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department, "while the above-referenced final rule is in development," to announce "a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the" litigation, and to publish the announcement on the website of the Directorate of Defense Trade Controls on or before July 27, 2018. Why did the State Department agree to this relief? What will this temporary modification likely entail? Will the State Department put any restrictions on the types of 3D technical data that can be released to the public without prior U.S. government approval, including types of firearms, 3D printing, and materials, among other possible issues? Why did the State Department fail to provide 30 days' notice to the relevant congressional committees of its intention to remove Defense Distributed's "technical data" from the USML, as required by 22 U.S.C. § 2278(f)(1)?

7. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to issue "a letter to Plaintiffs on or before July 27, 2018 signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that [the 3-D printing files at issue in the litigation] are approved for public release (i.e., unlimited distribution) in any form and are exempt from the licensing requirements of ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)." Why did the State Department agree to this relief?

8. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to "acknowledg[e] and agree[] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce[,] or otherwise benefit from the" 3-D printing files at issue in the litigation. Why did the State Department agree to this relief?

9. The settlement agreement resolving the lawsuit brought by Defense Distributed and the Second Amendment Foundation obligates the State Department to pay the Plaintiffs $39,581.00, reported to be for a portion of their legal fees. Please identify what funding source within the government this payment was drawn from. Additionally, please provide information regarding why the State Department agreed to this relief.

We are concerned about the immediate impact of publishing these 3-D gun blueprints: Once the State Department allows them to circulate freely online, the threats to U.S. and international security will be irreversibly increased. We urge you not to grant this special treatment to Defense

Secretary Pompeo
Page 4 of 4

Distributed ----- but rather to postpone this action while you fulfill your commitment to review this decision, and until the above questions can be adequately addressed.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

Elizabeth Warren
United States Senator

Patrick Leahy
United States Senator

Richard J. Durbin
United States Senator

Benjamin L. Cardin
United States Senator

WASHAR0002314

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 10:47 AM |
| **To:** | Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Subject:** | FW: CPA Media Monitoring: Guns.com: Everytown, Schumer beat the drum to ban 3-D gun printing |

+LPM
**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Tuesday, July 24, 2018 2:16 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Koelling, Richard W <KoellingRW@state.gov>
**Subject:** CPA Media Monitoring: Guns.com: Everytown, Schumer beat the drum to ban 3-D gun printing



**Everytown, Schumer beat the drum to ban 3-D gun printing**
**By Chris Eger**
**24 July 2018**
With downloadable gun plans grabbing national headlines, Democrats and gun control groups are pushing for more regulation — which is a sure sign that they don't understand 2018.
On Capitol Hill, Senate Minority Leader Chuck Schumer, D-NY, last weekend blasted a pending move by President Trump's State Department to greenlight a Texas-based pro-gun group's ability to post plans online for "non-automatic firearms up to .50-caliber," such as the popular AR-15 and other semi-autos.
"Why in God's name is this administration allowing this to happen when it never was allowed before?" said Schumer. "We're asking them to immediately rescind such action, and if they don't, we will try to pass legislation preventing that. It makes no sense."
Schumer's rhetoric was prefaced last week by a New York Times editorial by former U.S. Rep. David Israel who held more regulation was needed to prevent the criminal underworld from easily printing "undetectable" plastic guns using an "inexpensive printer purchased online or at the neighborhood office supply store and a downloadable file."
However, Israel concedes in his piece that the current regulations on such guns still stand regardless of any pending move by the State Department. The Undetectable Firearms Act, signed into law by President Ronald Reagan in 1988, requires each gun made or sold in the country to have 3.7-ounces of metal content and is set to run through at least 2023.
The Texas group at the heart of the controversy is Cody Wilson's Defense Distributed, which is set to relaunch their DEFCAD project next month after a settlement negotiated with the State Department in a long-running lawsuit. Essentially, State argued it did not challenge the First Amendment right of Wilson to distribute the 3-D gun files domestically, only that it took an exception to the unfettered international distribution of what they argued was information that could be used by others to produce guns overseas, citing a violation of the International Traffic in Arms Regulations.
That objection is set to fall by the wayside as a result of the proposed settlement and DEFCAD, public and free to use, is ready to host CAD files for AR-15s, AR-10s, Czech Vz.58s, M1911 handguns and even popular guns such as the Ruger 10-22 and Beretta M9.
With the clock counting down to DEFCAD once again going live some five years after the federal government moved to shutter it, Everytown has mounted an online campaign to pressure Secretary of State Michael Pompeo to back out of the settlement, which both sides agreed to in June. The anti-gun group contends that allowing

DefDist to move forward would "enable terrorists, convicted felons, and domestic abusers to simply download files online and print their own illegal and untraceable guns," and that, "It's unconscionable to allow criminals to print untraceable guns on demand."

What Everytown does not acknowledge is the fact that many of the past downloaders for Wilson's single-shot Liberator pistol when it went live for the first time in 2013 were overseas in countries such as Spain, Brazil, Germany and the UK, and were quickly shared and torrented worldwide. More to the point, Wilson's group is not unique as a number of sites since then, such as FossCAD and GrabCAD, have long made 3-D gun files available to millions over the past several years. Code, once created and shared so extensively, is almost impossible to destroy. Going back even further, low-tech open source firearms plans and patent drawings have been circulating freely for centuries.

Still, with the federal government backing away from DefDist, Wilson sees the practice of downloadable gun files as moving into the mainstream. "I currently have no national legal barriers to continue or expand DEFCAD," he wrote in an email to TechCrunch. "This legal victory is the formal beginning to the era of downloadable guns. Guns are as downloadable as music. There will be streaming services for semi-automatics."
Link: https://www.guns.com/2018/07/24/everytown-schumer-beat-the-drum-to-ban-3-d-gun-printing/

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002316

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 10:47 AM |
| **To:** | Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Subject:** | FW: CPA Media Monitoring: New York Post: Chuck Schumer warns of 3-D printed 'ghost guns' |

+LPM
**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Monday, July 23, 2018 8:16 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** CPA Media Monitoring: New York Post: Chuck Schumer warns of 3-D printed 'ghost guns'



**Chuck Schumer warns of 3-D printed 'ghost guns'**
**By Shari Logan**
**22 July 2018**
Sen. Chuck Schumer is warning the public to watch out for 3-D printed guns — that people will be able to legally download starting on August 1.
Gun rights activists reached a settlement with the US State Department and Department of Justice last week that allows them to post detailed instructions, including plans, files and 3-D drawings of the weapons.
"This online site shows you, how at your home, with a simple 3D printer, you can make a plastic AR-15, an AR-10, a very dangerous semi-automatic assault-style weapons out of plastic in your own basement," Schumer said at a Sunday press conference.
The June 29 settlement stems from 2013 when the US government shut down Texas-based Defense Distributed when the website began sharing printable 3-D gun plans online — saying they were violating laws that regulate the export of guns since anyone, anywhere could download their plans.
The site's owner, Cody Wilson, sued and the US government reached a settlement with him allowing Defense Distributed to post the plans and agreeing to pay almost $40,000 of his legal fees.
Schumer warned that the results could be disastrous — and could potentially arm people who cannot legally purchase a gun under existing laws.
"The danger that could happen can be enormous," he said. "To have crazy people have easy access, to have terrorists have easy access to this kind of website and allow them to make plastic AR 15s undetected — so-called ghost guns — justifies the imagination."
The 3-D printed guns are inferior to firearms manufacturers traditionally make but still work. Printers run anywhere from $200 to hundreds of thousands.
Schumer demanded the federal government reverse its decision. He'll be making a bill with a solution to the ghost gun blueprints by the end of the week, his spokesperson said.
Link: https://nypost.com/2018/07/22/chuck-schumer-warns-of-3-d-printed-ghost-guns/

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone: 202.647.6968

WASHAR0002317

e-mail: ***MarquisMR@state.gov*** | Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 10:47 AM |
| To: | Legal-PM-DL <Legal-PM-DL@state.gov> |
| Subject: | FW: CPA Media Monitoring: The Guardian: DIY 3D-printed guns get go-ahead after Trump administration strikes court deal |

+LPM
**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Monday, July 23, 2018 10:44 AM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: The Guardian: DIY 3D-printed guns get go-ahead after Trump administration strikes court deal


CPA MEDIA MONITORING

**DIY 3D-printed guns get go-ahead after Trump administration strikes court deal**
**By Jamiles Lartey**
**23 July 2018**
From 1 August, thanks to the Trump administration, a commercially available software blueprint will allow people to make their own guns using ABS plastic resin and a 3D printer.
The green light came late last month, with a court settlement between the designer of the blueprint and the US state department. Gun rights advocates celebrated.
In a statement greeting the news, the Second Amendment Foundation founder and executive vice-president, Alan Gottlieb, said: "Not only is this a first amendment victory for free speech, it also is a devastating blow to the gun prohibition lobby."
Defense Distributed, the company behind the blueprint, declared: "The age of the downloadable gun formally begins."
Gun control advocates were alarmed. Nick Suplina, managing director of law and policy at Everytown for Gun Safety, said the settlement was "incredibly dangerous" and called on the state department to continue to block the publication of what he described as "deadly information".
"This settlement would enable convicted felons and domestic abusers to download schematics online and print their own illegal and untraceable guns," he said.
The lawsuit arose from a software file developed by a University of Texas law student, Cody Wilson. It was a blueprint for a single-shot 3D-printed handgun, named "The Liberator". The state department ordered Wilson to cease work, arguing that making the blueprint available would be akin to a violation of arms export statutes.
The libertarian-minded Wilson swiftly turned from a hobbyist to a crusader. "All I tried to do in law school was print a pistol and put it on the internet," he told the Guardian in 2016. "Now I'm on a ride I can't get off."
Wilson sued on the grounds that his design was protected by the first amendment. He also founded a non-profit, Defense Distributed. Celebrating the settlement, he tweeted an image of flowers laid at a plaque in memory of "American gun control".
Wilson's legal battle was largely financed by the sale of products which allow for the DIY production of metal-framed "ghost guns", which do not have serial numbers and are not subject to traditional gun control laws.
Defense Distributed sells users an "80% lower" – a piece of metal the government deems is only 80% a gun – and a milling machine that can, with a PC and the right software, bring the gun to completion.
On its website, the company describes the milling device as a way to "legally manufacture unserialized rifles and pistols in the comfort and privacy of home".
With the Liberator and other 3D-printed guns including AR-15 style rifles, users will not need a prefabricated

WASHAR0002319

"80% lower". They will be able instead to construct virtually an entire gun with any 3D printer and enough ABS plastic resin.

The gun does require a metal firing pin to operate. An additional piece of metal is included in the blueprint, to ensure compliance with the 1988 Undetectable Firearms Act.

Link: https://www.theguardian.com/us-news/2018/jul/23/3d-printed-guns-court-settlement-trump-administration-cody-wilson

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

WASHAR0002320

# BLANKROME

717 Texas Avenue | Suite 1400 | Houston, TX 77002
blankrome.com

| | |
|---|---|
| *Phone:* | *(713) 632-8696* |
| *Fax:* | *(713) 228-6605* |
| *Email:* | *dcabello@blankrome.com* |

July 24, 2018

<u>**Via Hand Delivery**</u>

The Honorable Robert Pitman
United States District Court for the
Western District of Texas
501 West 5th St., Suite 5300
Austin, TX 78701

> Re:  *Defense Distributed et al v. United States Department of State et al.,*
> (Case No. 15-CV-00372-RP).

Dear Judge Pitman:

We write on behalf of the Brady Center to Prevent Gun Violence ("Brady Center"), Everytown for Gun Safety ("Everytown"), and Giffords Law Center to Prevent Gun Violence ("Giffords"), the leading organizations dedicated to the prevention of gun violence in America.

We submitted an *amicus curiae* brief in the Fifth Circuit appeal in this matter on behalf of the Brady Center, and the Court's opinion invited us to remain involved as follows:

> The amicus briefs submitted in this case were very helpful and almost all supported Plaintiff-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016).

Earlier this month, Giffords and the Brady Center submitted public comments on proposed rule changes by the State and Commerce Departments that would deregulate the posting of blueprints for the production of 3D printed guns like that planned by Defense Distributed here.[1]

---

[1] Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), available at http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf. A copy of both comments is attached as **Exhibit A.**

WASHAR0002321

BLANKROME

July 24, 2018
Page 2

Giffords and Brady expressed concern that the proposed rules would not adequately protect the nation's national security, foreign policy and anti-terrorism interests, and also questioned whether the proposed rules adequately addressed around the contemplated changes. Giffords noted in particular that the proposed changes would "result in an increase in the number of untraceable firearms" made with "3D printing technology" and questioned the effect of the proposed changes on this ongoing litigation.

We respectfully submit this letter to bring to the Court's attention the troubling, dangerous, time-sensitive, and potentially illegal terms of the settlement agreement recently executed by the parties. Immediately upon learning about the settlement, Everytown and the Brady Center submitted Freedom of Information Act ("FOIA") requests to the Department of Justice and the Department of State for additional information about the settlement and the surrounding circumstances. Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions. The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world. These are the very concerns which prompted the government's intervention in the first place.

We appreciate the unusual nature of this letter and wish to advise that we are working diligently to take legal action in this Court, including seeking immediate injunctive relief. We intend to do so by July 26, 2018. In this regard, as this Court may be aware, pursuant to the now-public settlement agreement in this matter, plaintiff Defense Distributed intends to make all of its firearms-related Computer Assisted Design ("CAD") files available via its website within a matter of days, by August 1, 2018, if not sooner. It is highly unlikely that the Government will provide any additional documents regarding this settlement pursuant to the Brady Center's FOIA requests before the parties implement the key terms of this settlement. Given the extremely short time frame and the potentially significant and permanent impact to national security and public safety of making the CAD files available online, we feel compelled to bring this issue to Your Honor's attention as soon as practicably possible, so that this Court has the opportunity to take any steps it deems proper to see that justice is done while this matter is still pending, *see* Fed. R. Civ. P. 1, including but not limited to calling the parties in to discuss the issues laid out below.

<u>Background</u>

As this Court is aware, the plaintiffs filed this action in 2015, seeking, *inter alia*, an injunction to prevent the government from barring Defense Distributed's export of CAD files. These files "directly facilitate the manufacture of weapons" through "automated processes."

BLANKROME

July 24, 2018
Page 3

<u>Defendants' Motion to Dismiss Second Amended Complaint</u> at 1,9, filed Apr. 6, 2018 (ECF No. 92). The Government strenuously objected to the plaintiffs' request for an injunction, arguing that it was "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." <u>Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction</u>, filed June 10, 2015 (ECF No 32). Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests. The Fifth Circuit upheld this Court's ruling, *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016), and the Supreme Court denied the Plaintiffs' petition for a writ of certiorari earlier this year. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

After the Supreme Court denied cert, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018. *See* ECF Nos. 77, 88 and 90. On April 6, 2108, the Government filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." <u>Motion to Dismiss</u> at 3,7 (ECF No. 92). The Government told this Court that:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability.

*Id.* at 1.

Mere weeks after the Government stressed to this Court the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority." <u>Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement</u> filed Apr. 30, 2018 (ECF No. 93). According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they

WASHAR0002323

BLANKROME

July 24, 2018
Page 4

wanted."[2]  On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018."  (ECF No. 95).

The settlement agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the plaintiffs.[3]  What appears to be an accurate copy of the agreement is now available on the internet.[4]  A copy of the posted agreement is attached hereto as **Exhibit B.**

Pursuant to the Settlement Agreement, in consideration for the plaintiffs' dismissing the action, the Government has agreed to:

a.  "[C]ommit[  ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

b.  "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action.   The announcement will appear on the DDTC website,www.pmddtc.state.gov, on or before July 27, 2018."

c.  "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD DFiles are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

---

[2]      Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018), available at https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[3]      See e.g., Greenberg, supra n.1; Josh Blackman, "DOJ, Second Amendment Foundation Reach Settlement in Defense Distributed Lawsuit," Josh Blackman's Blog (Jul. 10, 2018), available at http://joshblackman.com/blog/2018/07/10/doj-second-amendment-foundation-reach-settlement-in-defense-distributed-lawsuit/.

[4]      See "Settlement Agreement," https://www.exportlawblog.com/docs/Defense%20Distributed%20Settlement%20Agreement.pdf ; Alexander Bosch, "The Daily Bugle Weekly Highlights: Week 28 (9-13 Jul 2018), Full Circle Compliance, https://fullcirclecompliance.eu/the-daily-bugle-weekly-highlights-week-28-9-13-jul-2018/.

BLANKROME

July 24, 2018
Page 5

    d.    "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

    e.    Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

       Pursuant to the terms of the Settlement Agreement, counsel for the Government is prohibited from filing a stipulation of dismissal with this Court any earlier than 5 business days after announcement of the "temporary" modification to the USML Category I list and issuance of a letter to the plaintiffs that their files are approved for public release in any form and exempt from ITAR. *Id.* ¶ 2. In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018. This timing is critical because Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018. *See* https://defdist.org/ ("The age of the downloadable gun formally begins.").

       In addition to previously posted files for making firearms, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons."[5] Throughout the litigation, Defense Distributed has "developed a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s."[6] The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable."[7] The database of blueprints "will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines."[8] According to Wilson: "What's about to happen is a Cambrian explosion of

---

[5]    Greenberg, *supra* at n. 1.

[6]    Deanna Paul, "Meet the man who might have brought on the age of 'downloadable guns,'" Washington Post (July 18, 2018), available at https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.725b8a04f11a.

[7]    Greenberg, *supra* at n.1. (emphasis added)

[8]    *Id.*

BLANKROME

July 24, 2018
Page 6

the digital content related to firearms."[9] He says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."[10]

As promised, on May 24, 2018, the Government published notices of proposed rulemaking by the State and Commerce Departments, which would remove plaintiffs' data from the USML Category I list.[11]  Neither notice mentions Defense Distributed or the role that the Settlement Agreement played in promulgation of the notices. The public comment period for both notices concluded on July 9, 2018, the day before the plaintiffs in this action went public with the Settlement Agreement.[12]

<u>Discussion</u>

Under the Administrative Procedure Act ("APA"), final agency action may be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Here, the Government's sudden and complete about-face on the national security and national defense implications in this case raises numerous questions as to APA and other potential violations of law.  We summarize just a few of the most urgent potential violations here which will be elaborated upon in further detail in our forthcoming legal submissions and request for immediate injunctive relief.

First, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Here, there is nothing contained in either the Settlement Agreement or the proposed rules explaining why the Government no longer believes that firearms manufactured from the plaintiffs' CAD files "could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons."   <u>Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction</u>, filed June 10, 2015 (ECF No 32).

---

[9]      *Id.*

[10]     *Id.*

[11]     International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 83 Fed. Reg. 24198 (proposed May 24, 2018) (to be codified at 22 C.F.R. 121, 123, 124, 126, and 129); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the USML, 83 Fed. Reg. 24166 (proposed May 24, 2018) (to be codified at 15 C.F.R. 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774).

[12]     *Id.*

WASHAR0002326

BLANKROME

July 24, 2018
Page 7

In addition, the Government's promise of a "temporary modification" as of July 27, 2018 to exempt Defense Distributed's data from the Category I list, while the revised proposed rule is pending, is deeply troubling.  As the Government is surely aware, when it comes to the internet, there is no such thing as "temporary."  Once the files are available for download online, the damages to national security concerns will be irreparably done.  Thus, even if the State Department and Commerce Department ultimately decide not to promulgate the new proposed regulations, all of Defense Distributed's files will already be in the public domain.   In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, the government may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.  In short, this is for all practical purposes "final agency action" which makes this action subject to challenge now. As Congressman Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), recently noted: "it stretches credulity to believe that release of this information is in the U.S. interest."[13]

Furthermore, the AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Rep. Engel, notice of the terms of the settlement have not been provided to the House Committee by the President or the State Department.[14]

Additionally, the settlement agreement raises serious questions as to whether it is "in accordance with law" because it can be read to authorize violation of multiple provisions of the federal Gun Control Act, 18 U.S.C. § 921 *et seq.*  Provision 1(d) of the Settlement Agreement purports to permit "any United States person" to "use, reproduce, or otherwise benefit from" the Defense Distributed files.  If a minor, felon, domestic abuser or an individual who has been adjudicated mentally incompetent "uses" or "otherwise benefits" the files by possessing or manufacturing firearms, then the Gun Control Act is violated (as well as innumerable similar state

---

[13]     Engel Decries State Department Policy to Allow 3-D Gun Printing, Press Release (July 20, 2018), available at https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

[14]     *Id.*

BLANKROME

July 24, 2018
Page 8

laws).  *See, e.g.,* 18 U.S.C. §§ 922(x)(2) and 922(g) (prohibiting categories of person from possessing a firearm).  The State Department of course has no power to override the mandates of a federal criminal statute.

These are just a few of the many troubling potential APA and other legal violations that may have occurred in connection with the settlement of this matter.

<u>Conclusion</u>

We are aware that under ordinary circumstances, a settlement agreement resulting in a voluntary stipulation of dismissal is not subject to review or inquiry by the Court.  However, this settlement is far from ordinary.  It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order.  It is also, we believe, illegal.  For these reasons, the undersigned attorneys are currently exploring legal action asserting that the Settlement Agreement violates the Administrative Procedure Act, the Arms Export Control Act, the International Traffic in Arms Regulations, the Gun Control Act, and the Separation of Powers required by the United States Constitution.  However, given the short time frame before Defense Distributed's repository is set to go live, we urge this Court to consider calling the parties before it to explain these extraordinary, dangerous and potentially unlawful developments.  As noted, we intend to file legal papers and a request for immediate injunctive relief.

BLANKROME

July 24, 2018
Page 9


Respectfully submitted,

BLANK ROME LLP
J. David Cabello
Texas Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
(713) 632-8696

John D. Kimball
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000


cc:    Alan Gura (counsel for Plaintiff) (Via E-mail)
       David S. Morris (counsel for Plaintiff)
       Joshua Michael Blackman (counsel for Plaintiff)
       W. Thomas Jacks (counsel for Plaintiff)
       William Mateja (counsel for Plaintiff)
       Eric J. Soskin (counsel for Defendants)
       Stuart Justin Robinson (counsel for Defendants)

WASHAR0002329

# **Exhibit A**

WASHAR0002330



July 9, 2018

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

Director of Defense Trade Controls
U.S. Department of State
DDTCPublicComments@state.gov

AND
Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230

RE: Docket Nos. DOS-2017-0046, BIS-2017-0004

**ITAR Amendment -- Categories I, II, and III and Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

This comment is submitted on behalf of Giffords and Giffords Law Center ("Giffords") in response to the Proposed Rules published by the Departments of State and Commerce on May 24, 2018 regarding the classification and administration of exports of certain firearms and ammunition. The Proposed Rules are complex and would represent a dramatic change in the regulatory structure governing firearm exports. We are concerned that the Proposed Rules may not adequately address our national security, foreign policy, international crime, or terrorism threats.  In sum, we are concerned about potential loss of life.  We also believe the Proposed Rules do not adequately address the need for transparency so Congress and the public may understand the impact of these Rules on potential weapons exports.

Giffords is committed to advancing common-sense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington, DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, participate in critical gun-violence-prevention litigation, and educate the public on the proven solutions that reduce gun violence.

WASHAR0002331



## THE PROPOSED RULES APPEAR DRIVEN BY THE INTERESTS OF THE GUN INDUSTRY

Even the National Rifle Association (NRA) admits that the Proposed Rules were drafted with "the goal of increasing U.S. manufacturers' and businesses' worldwide competitiveness." These Rules are "designed to enhance the competitiveness of American companies in the firearms and ammunition sectors," allowing firearms and ammunition "to be subject to a more business-friendly regulatory climate."[1]

We are concerned that the Proposed Rules elevate the desire of American gun manufacturers to compete with international arms dealers over the danger that exported firearms will contribute to international gun crime and violence. The United States must not prioritize gun industry profits over human lives.

## THE PROPOSED RULES WILL DRAMATICALLY CHANGE THE LAW, RISKING NEW LOOPHOLES

We are concerned that the Proposed Rules, by shifting firearms and ammunition from the United States Munitions List (USML) to the Commerce Control List (CCL), would weaken oversight over exports of these items. As even the NRA has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly," whereas regulation under the CCL "is more flexible." The NRA has also admitted that license applications for items on the USML are subject to "more stringent vetting" than items on the CCL.[2]

The Departments of State and Commerce, in drafting the Proposed Rules, have made some efforts to ensure that exports of firearms and ammunition will still be subject to oversight. But the dramatic nature of the proposed changes, and the complexity of the Proposed Rules raise serious concerns about hidden loopholes. Some areas of potential concern include:

- Congressional notification and the methods for Congress to disapprove of proposed firearm exports;
- The extent to which the Commerce Department monitors the end-users of its products; and the extent to which Congress and the public have access to information about the results of this monitoring;
- The online posting of designs for the production of firearms, and their use in the 3D printing of untraceable firearms;
- Firearms training provided to foreign security forces;
- The reporting of political contributions by gun exporters and related entities;
- The Commerce Department's bandwidth to properly oversee these exports; and
- The regulation of brokers who act as middlemen in firearms transactions, and the threat that firearms will be diverted by these middlemen to violent ends.

---

[1] National Rifle Association, *Trump Administration's Proposed Rulemakings a Win-Win for America's Firearms Industry, National Security*, https://www.nraila.org/articles/20180525/trump-administration-s-proposed-rulemakings-a-win-win-for-americas-firearms-industry-national-security

[2] Ibid.

WASHAR0002332



According to the State Department's Proposed Rules, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." This statement seems to directly contradict the statement in the Commerce Department's Proposed Rules that "BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by the proposed rule." The Commerce Department later clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR." While we recognize that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.

We are also particularly concerned that these changes will result in an increase in the number of untraceable firearms in circulation. As 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements increases. Under current law, the proliferation of 3D printed firearms is held in check by the Fifth Circuit's decision in *Defense Distributed v. U.S. Dep't of State*,[3] which upheld the State Department's decision that the posting of online data for the 3D printing of firearms fell within the USML. The Proposed Rules would throw that determination into question.

Inadequate gun safety laws cost human lives. When gun purchasers are not properly vetted and laws against gun trafficking are not properly enforced, guns often fall into the wrong hands and are used to perpetrate horrendous crimes and violence. The U.S. experiences this loss of life on a daily basis, with over 90 people killed each day.  We do not wish to see a similar effect on an international level from the weakening of our laws regarding gun exports.

## THIS CHANGE LACKS SUFFICIENT CONGRESSIONAL NOTIFICATION REQUIREMENTS

We have not seen anything in the Proposed Rules that would continue Congressional notification requirements for any of the Category I firearms that are being moved to the CCL. There are several types of sales controlled under the Arms Export Control Act that require Congressional notification. Under current law, a certification must be provided to Congress prior to the granting of any license or other approval for transactions involving the export of a firearm controlled under Category I of the USML in an amount of $1 million or more.[4] Congress then has the ability to enact a joint resolution prohibiting the export, which would prevent the State Department from licensing the sale. Congress generally is given 15 days or 30 days to review the transaction before a license can be granted, depending on the items being exported and the

---

[3] 838 F.3d 451 (5th Cir. 2016).

[4] See 22 U.S.C. § 2776, 22 C.F.R. 123.15(a)(3).

WASHAR0002333



country to which it is being exported. While there are Congressional notification requirements for certain products that are controlled under the CCL, it seems that such notification requirements would not be as broad that as under the USML.

Congress should continue to receive advance notification of transactions involving firearms and to have the opportunity to prohibit these exports when appropriate. The Proposed Rules should be strengthened to protect Congress's authority in this area.

## THE CHANGE MAY RESULT IN LESS TRANSPARENT END-USE MONITORING

We are concerned about a possible reduction in the monitoring of the end-users of exported firearms and publicly available information about this monitoring. The State Department currently monitors the end-users of firearm exports through its Blue Lantern program. Public reporting of Blue Lantern information is mandatory[5] and there are readily available statistics about the results. While the Commerce Department also conducts end use monitoring, there does not appear to be as fulsome a public reporting requirement for these end use checks as under the Blue Lantern program.

The Proposed Rules do not discuss end use monitoring of the items being moved to the CCL. It is reasonable to assume that these items will fall under the general Bureau of Industry and Security end use check program. This end use check program is not as well-publicized or as formal as the Blue Lantern program, and only a very small percentage of exported items are reviewed. If the Proposed Rules move forward, this program must be strengthened to address the need to monitor the end-users of exported firearms and provide the public with information about the results.

## THIS CHANGE IGNORES THE MILITARY NATURE OF MANY FIREARMS

The Proposed Rules are based on an assumption that automatic firearms are designed for and used by the military, and semiautomatic firearms are not "inherently military." This is inaccurate. Consequently, we question the President's determination that semiautomatic firearms and ammunition no longer warrant control under the USML.

In fact, members of the U.S. armed forces routinely use firearms in semiautomatic mode in combat conditions, and the designs of many semiautomatic firearms are inherently military. Assault rifles like the AR-15 were originally designed for military use. Earlier models included a selective fire option that allowed service members to switch easily between automatic and semiautomatic modes. The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in

---

[5] 22 U.S.C.§§ 2785, 2394, 2394-1a

WASHAR0002334



semiautomatic mode. Shooting in semiautomatic mode is more accurate and hence more lethal.[6] In fact, some members of the military use the semiautomatic mode exclusively.

The fact that some gun enthusiasts "enjoy" shooting these weapons and have labeled this activity "modern sport shooting" or "tactical shooting" does not change the design or purpose of these firearms or the danger they pose in civilian hands. The horrendous rise in mass shootings our country has suffered and the frequency with which these firearms are used in these shootings testify to this danger.

Military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. Because of the dangerous nature of these weapons, D.C. and seven states, including the populous states of California and New York, ban them.[7] Because of the military nature and serious lethality of these weapons; they belong on the USML.

## THERE ARE ALTERNATIVES TO THE PROPOSED RULES THAT HAVE NOT BEEN EXPLORED

The real concern that seems to be driving this significant change in the way the U.S. government regulates firearms exports is that firearms and ammunition manufacturers are currently required to register with the State Department and pay a registration fee. According to the NRA, "Any business that manufactures an item on the USML, or even just a part or component of such an item, also has to register with the State Department and pay an annual fee, which is currently set at $2,250. This registration is required even if the manufacturer has no intent to ever export the items. ... Manufacturers of items on the CCL, or their parts or components, do not have to pay an annual registration fee to the Commerce Department."[8]

The registration fee appears to be the NRA's primary concern with the current system for regulating the export of firearms and ammunition. The simple solution to this problem might be to waive the fee for manufacturers who do not, in reality, export these items. Waiving the fee would relieve industry of this "burden" without undoing the important policy choices made by the State Department in the regulation of these exports or requiring the Commerce Department to "reinvent the wheel" with respect to these regulations. While we would not necessarily support this proposal (it might shift the costs of manufacturer

---

[6]With AR-15s, Mass Shooters Attack With the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html.

[7] See Giffords Law Center to Prevent Gun Violence, *Assault Weapons* at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/.

[8] National Rifle Association, *supra.*

WASHAR0002335



registration to the taxpayers), we urge the Administration to carefully and thoroughly consider other alternatives to the Proposed Rules.

Sincerely,

Lindsay Nichols
Giffords Federal Policy Director

**ABOUT GIFFORDS LAW CENTER**

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

WASHAR0002336



Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

*Filed via email to DDTCPublicComments@state.gov; electronically via
http://www.regulations.gov*

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are
national leaders in strengthening, supporting and expanding gun laws, policies, and practices in
the United States. Our complimentary missions are to significantly decrease the number of gun
deaths and injuries in America. We achieve this by amplifying the voice of the American public;
changing social norms through public health and safety programs; and holding the gun industry
accountable for dangerous and irresponsible practices and products.[1] These comments are
submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use
and transfer of legal firearms within and outside of the United States by advocating for
appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate
of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and
Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"),
which seek comments on the transfer of certain firearms and related items from the International
Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export
Administration Regulations' ("EAR") Commerce Control List ("CCL"). In particular, the
Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms,
including those used by the military, (along with their components and ammunition) from USML
Categories I, II, and III, where they are classified as significant military equipment, to the CCL,
where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the
military (and related items) from the stringent control of the USML to the more permissive regime
administered by the Commerce Department would be contrary to Congressional intent and would
undermine U.S national security interests, international stability and the protection of human
rights. We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see www.bradycampaign.org.

WASHAR0002337

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale. The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms. The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers. Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change. Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict. In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions. Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates. In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight. To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale. As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors. Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States. The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

2

WASHAR0002338

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

**1.  Types of Firearms that Would be Released from State Department Control**

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction.  For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
|---|---|---|
| • M40A5 (used by US Marines)<br>• M24 (used by US Army) | • L115A3 (used by UK Armed Forces)<br>• Barrett M82 (used by multiple armies including US) | • Knight's Armament M110 (used by US Army) |
| **Sidearms Used by Armed Forces** | | |
| • Sig Sauer XM17 and XM 18 pistols (used by US Army)<br>• Glock M007 (Glock 19M) pistol (used by US Marines) | • Heckler & Koch Mk 23 pistol (used by US Special Forces) | • SIG Sauer Mk 25 (used by Navy Seals) |
| **Semi-automatic Assault Rifles** | | |
| • Bushmaster XM15 (AR-type rifle)<br>• Daniel Defense M4A1 rifles (AR-type rifle)<br>• IWI TAVOR<br>• Kalashnikov KR-9 (AK-type rifle) | • Kel-Tec Sub-2000<br>• Mossberg MMR Tactical rifles (AR-type rifle)<br>• POF USA P415 (AR-type rifle) | • SIG Sauer MCX rifles<br>• SKS assault rifle (predecessor to the AK-47)<br>• Sturm, Ruger & Co. AR-556 rifles (AR-type rifle) |
| **Semiautomatic Assault Pistols** | | |
| • Bushmaster SquareDrop pistol<br>• CZ Scorpion pistol | • CORE Rifle Systems Core 14 Roscoe pistol<br>• Daniel Defense MH18 pistol | • PAP M92 pistol |

3

WASHAR0002339

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers.  They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military.  Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

> ## 2.  The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export.  Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments."  AECA § 1.  In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest."  EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making.  The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security.  Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review.  Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions.  The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

WASHAR0002340

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors. Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses. It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

**3.** **The Firearms at Issue are not Widely Available for Commercial Sale**

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3] The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed. Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons. By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] *Id.*

[5] *Id.*

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

5

WASHAR0002341

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

### 4. Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

### 5. The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b). This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

WASHAR0002342

items and any related steps that will be taken to confirm compliance with the ITAR.  The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary.  In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities.  Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government.  As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

### **6.**   **Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements**

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress.  This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more."  *See* ITAR § 123.15(a)(3).  The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11]  Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests.  For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors.  Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns.  In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns.  This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5.  "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules. *See* EAR §§ 743.5.; 772.1.

WASHAR0002343

**<u>7.</u>**   **The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS.  *See* EAR § 734.3(b)(3).  Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical.  In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR.  In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS.  If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code.  However, while the EAR control certain technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR.  For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls.  *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR.  *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**<u>8.</u>**   **The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

WASHAR0002344

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency. Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS). This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment. While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation. The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous. Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations. This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation. Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales. It is through this method that approximately at least one in five guns are sold in the United States today without a background check. Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports). While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States. Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

**9.** **The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies. The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial. As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

9

WASHAR0002345

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content. *See* EAR § 734.4. Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR. Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product. With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1. However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR. As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines. Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction. This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy. Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.

WASHAR0002346

# Exhibit B

WASHAR0002347

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0002349

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0002350

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4. *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0002351

5.   *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.   *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.   *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0002352

8.  *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9.  *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0002353

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.    *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

-   The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

-   The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0002354

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0002355

| From: | ▮▮▮▮▮▮▮▮ <bounce@list.everytown.org> |
|---|---|
| Sent: | Tuesday, July 24, 2018 8:32 AM |
| To: | DDTC Response Team <DDTCResponseTeam@state.gov> |
| Subject: | Phil in 06040: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

▮▮▮▮▮▮▮▮ in 06040

<http://track.sp.actionkit.com/q/cQJXxAZUJkM-
cbEh2ochZQ~~/AAAAAQA~/RgRdOaFaPlcEd2F3ZEIKAAJaHFdbLXkxt1IaZGR0Y3Jlc3BvbnNldGVhbUBzdGF0ZS5nb3ZYBAAAAFg~>

WASHAR0002356

| | |
|---|---|
| **From:** | ▮▮▮▮▮bounce@list.everytown.org> |
| **Sent:** | Tuesday, July 24, 2018 8:31 AM |
| **To:** | DDTC Response Team <DDTCResponseTeam@state.gov> |
| **Subject:** | Patti in 98003: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

n 98003

<http://track.sp.actionkit.com/q/QFEsuImQ64UELity0jLvVA~~/AAAAAQA~/RgRdOaEiPlcEd2F3ZEIKAAciHFdbjhUY1FIaZGR0Y3Jlc3BvbnNldGVhbUBzdGF0ZS5nb3ZZBAAAAI

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 8:19 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: ABC News: State Department defends allowing publication of blueprints to 3D print guns |

# CPA MEDIA MONITORING

**State Department defends allowing publication of blueprints to 3D print guns**
**By Karolina Rivas, Conor Finnegan**
**25 July 2018**

Just days before digital blueprints that would allow people to 3D print firearms are set to go live online, the State Department is defending the move to allow their publication, even as Secretary of State Mike Pompeo promised to look into the issue.

The Trump administration recently settled with a non-profit after it sued for the right to publish the code.

While a State Department spokesperson pointed out that "the court did not rule in favor of the plaintiffs in this case," the administration settled anyway, in part, because there's no added public safety threat because "certain firearms and related items... are widely available" already, the spokesperson told ABC News.

The impending publication has garnered outrage among gun safety advocates, who warned it could create "untraceable" guns.

The controversy centers around Defense Distributed founder Cody Wilson's 2013 suit against the State Department after he was forced to take down blueprints his company posted online.

After a years-long legal battle, Wilson reached a settlement with the State Department to allow his company to post designs of various firearms for 3D printers. Among these weapons is an AR-15 - a weapon commonly known to be used in mass shootings.

Wilson has been vocal on social media about his company's goal to release the designs. After the settlement was reached, Wilson tweeted a photo of a headstone with the words "American Gun Control" engraved.

In a lengthy statement, the State Department spokesperson said that the Trump administration settled because new government regulations make the case moot. The Commerce Department is taking over the regulation of certain firearms -- a change that was implemented under the Obama administration, but accelerated under the Trump administration as it seeks "to create a simpler, more robust export control system that eases industry compliance, enhances enforceability, and better protects truly sensitive technologies."

In other words, they want to ease the restrictions on firearms that are "commercially available" and strengthen protection of more important weapons technology.

As the Commerce Department takes over, the regulation that barred Wilson from publishing has ended.

But while Pompeo told the Senate Foreign Relations Committee Wednesday that he would "take a look at," the

WASHAR0002358

administration has declined to take action to block Wilson's publication – which will relaunch on August 1, according to Defense Distributed.

After a security analysis, "It was determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States," the State Department spokesperson said -- so they don't need to block publication.

That has outraged gun safety advocates, with Sen. Ed Markey D-Mass. warning Pompeo to make sure guns "don't get into the wrong hands."

Military veterans from Everytown for Gun Safety Veteran Advisory Council are also calling on Pompeo to halt the distribution of the designs.

"We know firsthand the destructive power of firearms and the dangers of firearms in the wrong hands," the letter states. "We support the federal laws that work to keep the public safe, which rely on criminal background checks to block gun possession by those who pose a danger to society. And we believe strongly that downloadable firearms will undermine those laws, [...]."

In particular, the group and other gun control advocates argue these guns are not traceable because they are produced without serial codes.

"Defense Distributed is not subtle with its aims: It has made it very clear that it intends to undermine the rule of law when it comes to firearms regulations," military veterans from the organization wrote Pompeo. "We urge you to not to allow the distribution of downloadable guns by exemption, settlement or rule, and stop these deadly blueprints from being released."

Link: https://abcnews.go.com/Politics/state-department-defends-allowing-publication-blueprints-3d-print/story?id=56817152

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:     202.647.6968
e-mail:     *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002359



# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER

IPS CONTROL# **H2018** ⊘726 = ⊙⊙⊙   ACTION BUREAU: **H**

DATE: **JUL ? 6 2018**

## IPS:

___X____SUBSTANTIVE

___X____IMAGE ENTIRE DOCUMENT

# BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

_____✓_____REPLY FOR SIGNATURE BY Mary K. Waters, Assistant Secretary, Bureau of Legislative Affairs

_____ADDRESS ENVELOPE TO DISTRICT OFFICE

_____DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE. PHONE 7-1608 WHEN COMPLETED

_____FYI ONLY/NO RESPONSE NECESSARY

_____REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____OTHER ACTION: _____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

*****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE. PLEASE NOTIFY CCU VIA UNCLASS EMAIL OF ALL TRANSFERS OF ACTION*****

**Due Date** **7/31**

ADDITIONAL INSTRUCTIONS:

___Multi-signer Letter: _____

___Special Instructions:_____

___EVEREST TASKER#_____

___Please clear with NSC prior to submission to H

WASHAR0002360

**FROM: Mary K. Waters (H)**

**Congressional Correspondence**
**Recommendation**

JUL 2 6 2018

_____ **For Signature by Secretary Pompeo**

**For draft by _____ Bureau**

✗ **Tasked to the** _PM_ **Bureau for**
**Signature by Mary K. Waters,**
**Assistant Secretary, Legislative**
**Affairs**

_____ **Tasked to _____ Bureau for signature by**
**Post or Bureau**

_____ FYI Only—No Reply Necessary

For _____ Bureau

Special Actions:

_____ Multi-signer letter:

_____ Special Clearances:

_____ For S Staff Review (H Only)

_____ Everest Tasker# _____

_____ Special Instructions: _____

WASHAR0002361

HON CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate
COMMITTEE ON FOREIGN RELATIONS
WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

*LMO/TD*

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

WASHAR0002363

# United States Senate
WASHINGTON, DC 20510

July 23, 2018

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Sessions:

We write with great alarm over the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's decision that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for three-dimensional ("3-D") printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations. Indeed, as recently as April 2018, the government filed a motion to dismiss in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

In a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing tutorials in any form. The government also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with DOJ's previous position and is as dangerous as it is confounding. The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad. It also sets a dangerous precedent in defending against other legally sound determinations made by the State Department under the Arms Export Control Act and the International Traffic in Arms Regulations.

We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course. We ask that, prior to August 1, 2018,

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

1

DOJ provide us with a copy of the fully executed settlement agreement, and a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

2

WASHAR0002365

| | |
|---|---|
| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
| **Sent:** | Friday, July 27, 2018 6:12 PM |
| **To:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | FW: PM/DDTC spam campaign |

FYI.
**Official - SBU**
**UNCLASSIFIED**

**From:** Mummaw, Karen E
**Sent:** Friday, July 27, 2018 5:49 PM
**To:** Rogers, Shana A; Fabry, Steven F
**Cc:** Todd, William E (Ambassador); Bowden, Al J; Giuliano, Lysa C; Blackstone, Kevin; Wrege, Karen M; Miller, Glenn W
**Subject:** PM/DDTC spam campaign

Shana,

Per our conversation, on the recommendation of our Chief Information Security Officer, Al Bowden, I am not comfortable unblocking the *everytown.org* site at this time. Our firewall team continues to see rolling activity from this site. These are not individuals attempting to contact the Secretary, but this appears to be a BOT conducting a targeted spam campaign that could result in a denial of service for those targeted inboxes. We have currently received over 52,000 emails from this site. We will continue to monitor.

Al, please jump in if I have missed anything. Thank you, Karen
**Official**
**UNCLASSIFIED**

| From: |  <bounce@list.everytown.org> |
|---|---|
| Sent: | Tuesday, July 24, 2018 8:32 AM |
| To: | DDTC Response Team <DDTCResponseTeam@state.gov> |
| Subject: | Phil in 06040: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

▮▮▮▮▮▮▮ in 06040

<http://track.sp.actionkit.com/q/cQJXxAZUJkM-cbEh2ochZQ~~/AAAAAQA~/RgRdOaFaPlcEd2F3ZEIKAAJaHFdbLXkxt1IaZGR0Y3Jlc3BvbnNldGVhbUBzdGF0ZS5nb3ZYBAAAAFg~>

WASHAR0002367

| From: |  <bounce@list.everytown.org> |
|---|---|
| Sent: | Tuesday, July 24, 2018 8:31 AM |
| To: | DDTC Response Team <DDTCResponseTeam@state.gov> |
| Subject: | Patti in 98003: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

████ in 98003

<http://track.sp.actionkit.com/q/QFEsuImQ64UELity0jLvVA~~/AAAAAQA~/RgRdOaEiPlcEd2F3ZEIKAAciHFdbjhUY1FIaZGR0Y3Jlc3BvbnNldGVhbUBzdGF0ZS5nb3ZZBAAAAI

| | |
|---|---|
| **From:** | Kildow, Cassandra <KildowC@state.gov> |
| **Sent:** | Tuesday, July 17, 2018 4:59 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Ricci, Anthony <RicciA@state.gov>; Wall, Amanda J <WallAJ@state.gov> |
| **Cc:** | Loftus, Elizabeth <LoftusE@state.gov> |
| **Subject:** | FW: Request for Comment |

███████████████████████████████████████████████████████

Thanks,
Cassandra
**Official - SBU (Deliberative Process)**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Tuesday, July 17, 2018 4:55 PM
**To:** Thompson, Nicole A.; PM-CPA
**Cc:** Loftus, Elizabeth; Kildow, Cassandra
**Subject:** RE: Request for Comment

████████████████████

Best,
Dave
_____
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
☎ Phone: 202.647.8757 | 📱 BlackBerry: 202.550.3482 |
✉ e-mail: _mckeebydi@state.gov_ | 🖱 Web: _www.state.gov/t/pm /_ |Twitter: _@StateDeptPM_
Stay connected with _State.gov_:



**From:** Thompson, Nicole A.
**Sent:** Tuesday, July 17, 2018 4:54 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Cc:** Loftus, Elizabeth <LoftusE@state.gov>; Kildow, Cassandra <KildowC@state.gov>
**Subject:** Fw: Request for Comment

████████████████████████████████

Nicole

**From:** Thompson, Nicole A. <ThompsonNA2@state.gov>
**Sent:** Tuesday, July 17, 2018 3:29 PM
**To:** PA Press Duty
**Subject:** RE: Request for Comment

Got it.

**From:** Marrian Zhou <marrian.zhou@cbsinteractive.com>
**Sent:** Tuesday, July 17, 2018 3:29 PM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Request for Comment

Hello,
My name is Marrian Zhou and I'm a reporter for CNET. I'm writing about your settlement with Defense Distributed over publications regarding 3D printed plastic guns. Does it worry you that more people will get their hands on this design of an undetectable weapon? Do you have any comments?

Thanks.

Best,
Marrian Zhou
Staff Reporter at CNET
(212) 380-0283
www.cnet.com
**Official**
**UNCLASSIFIED**

WASHAR0002370

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 7:42 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Carter, Rachel <CarterR@state.gov>; Kaidanow, Tina S <KaidanowTS@state.gov>; PM-CPA <PM-CPA@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Subject: | Fwd: CPA Media Monitoring: Reuters: Federal Judge Denies Last Ditch Effort To Block Release Of 3D-Printed Gun Blueprints |

Federal Judge Denies Last Ditch Effort To Block Release Of 3D-Printed Gun Blueprints
The judge said he was sympathetic to the gun control groups' concerns but questioned their legal standing to intervene in the case.

Jon Herskovitz

JON HERSKOVITZ / REUTERS
AUSTIN, Texas (Reuters) - A U.S. judge on Friday rejected a last-ditch effort by gun control groups to block the Trump administration from allowing the public to download blueprints for 3-D printable guns, declining to intervene just days before the designs are expected to go online.

U.S. District Judge Robert Pitman in Austin, Texas, denied the request for an order by the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence at a hearing, saying he would state the reasons for his decision in a written order to follow.

At the hearing, the judge said he was sympathetic to the gun control groups' concerns but questioned their legal standing to intervene in the case.

The groups sought to intervene following a June settlement between Defense Distributed and the U.S. government allowing the company to legally publish gun blueprints online, something its website says it plans to do by Aug. 1.

The government ordered the blueprints taken down in 2013 and Defense Distributed founder Cody Wilson sued in 2015, claiming his First Amendment and Second Amendment rights had been violated.

The government had until recently argued the blueprints posed a national security risk. Gun control groups said there had been no explanation for the June settlement and the administration's abrupt reversal on the issue.

Lawyers for the Brady Center declined to comment on Pitman's ruling after the hearing.

The groups in court filings said not halting the blueprint distribution by a Texas-based company called Defense Distributed would "cause immediate and irreparable harm to the United States national security" and that of individual U.S. citizens.

"The stated goal of Defense Distributed is to sound the death knell for gun control," David Cabello, a lawyer for the Brady Center, told Pitman during the hearing.

WASHAR0002371

The 3-D files include blueprints for a plastic AR-15 semiautomatic assault rifle, a weapon that has been used in many U.S. mass shootings, as well as other firearms.

Joshua Blackman, a lawyer for Defense Distributed, said he was grateful for the judge's ruling. During the hearing Blackman said the gun control groups were trying to litigate a political dispute in court.

Wilson, a self-declared Texas anarchist, said in an online video that the blueprints were downloaded more than 400,000 times before they were taken down in 2013.

Lawrence Keane, general counsel for the National Shooting Sports Foundation, a trade association for gun manufacturers, told Reuters concerns over 3-D printable guns were overblown.

"I don't see it likely at all that criminals will use this clunky and expensive technology," Keane said. The NSSF is not involved in the case.

WASHAR0002372

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 7:52 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov> |
| **Subject:** | Fwd: CPA Media Monitoring: Settlement Instant Reax |

Via Twitter:

@Everytown
#StopDownloadableGuns Update: More than a hundred thousand messages and calls have been sent to the State Department this week, demanding that it stop the distribution of downloadable guns. But Trump's @StateDept is moving forward to enable anyone — including terrorists, convicted felons, and domestic abusers — to download plans to print functional, untraceable, and undetectable guns. We're appalled, but not defeated. The files will be posted on 8/1, so we have until then to drive as many messages as possible to @SecPompeo DEMANDING he STOP the distribution of downloadable guns. Thanks for being with us in this fight.

@RepEliotEngel
#3DGuns will be legal on Wednesday unless @SecPompeo says NO. Get the word out. Call your representative and senators — 202-224-3121. The #Trump Administration is trying to make the gun crisis even worse. #StopDownloadableGuns

WASHAR0002373

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 8:56 PM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Carter, Rachel <CarterR@state.gov>; PM-CPA <PM-CPA@state.gov> |
| **Subject:** | Fwd: CPA Media Monitoring: WaPo: Lawmakers are attempting to prevent the spread of 3-D-printed guns. It may be too late. |

Wrap-up of the story in tomorrow's Post:


Lawmakers are attempting to prevent the spread of 3-D-printed guns. It may be too late.
By Deanna Paul
Saturday, July 28th 2018

After a multi-year legal battle, the federal government last month entered into a settlement with Defense Distributed founder Cody Wilson, permitting him to publish his arsenal of firearm blueprints online. He intends to do so on Aug. 1. Lawmakers' eleventh-hour efforts have done nothing to halt his plans, and on Friday a federal judge denied a motion for an emergency injunction brought forward by a trio of gun-control groups.

Guttenberg, who has become a powerful voice against gun violence since his 14-year-old daughter was killed in the shooting at Stoneman Douglas High School in Parkland, Fla., told The Washington Post he was dismayed by his visit to the Hill. Five weeks have passed since the settlement was signed, yet only a handful of senators were aware of it, he said, adding that not a single House member knew either.

"I don't know how we got to this place and no one was paying attention," he lamented. "This is the safety of this country and its citizens who are now at risk in their offices, in courthouses and on airplanes."

Sen. Charles E. Schumer of New York led the call to action on Saturday, warning of the dangers posed by the weapons, sometimes dubbed "ghost guns," which are made from plastic and cannot be sensed by metal detectors.

"Ghost guns are as scary as they sound — a terrorist, someone who is mentally ill, a spousal abuser, or a felon can essentially open a gun factory in their garage. No background check, no training," he told The Post.

On Tuesday, Sen. Edward J. Markey, joined by Sens. Bill Nelson, Richard Blumenthal, Chris Murphy and Dianne Feinstein, all Democrats, sent a letter to Attorney General Jeff Sessions, demanding he explain the government's decision to settle.  (The Department of Justice declined to comment fort this story.) Nelson also plans to introduce a bill that would prohibit online publication of any digital file that can be downloaded or programmed to print a 3-D gun part.

Throughout the week, other lawmakers have joined the push: New Jersey's attorney general sent Wilson a cease-and-desist order, warning that making the digital files available to New Jersey residents was a violation of the state's law. Rep. Ted Deutch (D-Fla.) wrote a letter on Thursday co-signed by 40 members of the House calling for a hearing before the looming deadline.

"Maybe when my colleagues realize that the end result is a plastic gun possibly getting through security in the Rayburn [House office] building, they'll return to Washington and let us hold hearings on stopping this danger before it gets too far," Deutch told The Post.

But as time runs out, it remains unclear whether the belated efforts will succeed.

"All the letters are nice, but they do nothing," Guttenberg said. "At 12:01 on the 1st of August, it's going to be too late."

Wilson manufactured the first fully 3-D-printed pistol in April 2013, when he was 25. He posted the design files online, to an unregulated file-sharing website. In a few days the site saw more than 100,000 downloads for the firearms, which would not have serial numbers and thus be impossible to trace. The federal government alleged that by uploading the weapon blueprints, which constituted an export under the International Traffic in Arms Regulations (ITAR), Wilson had violated federal law.

After years of legal fighting, the federal government stunned both Wilson and gun-control advocate with a wholesale reversal of position. On June 29 it entered into a settlement with Wilson that, in addition to fronting $40,000 for his legal fees, crafted an exemption from the ITAR regulations, allowing Wilson's company to post 3-D firearm blueprints online for unlimited international distribution.

Wilson plans to relaunch next week.

Three organizations — the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence — jumped into the fight on Thursday, filing an emergency motion for a preliminary injunction. A hearing was held on Friday before federal Judge Robert Pitman in Austin, who had sided with the government in earlier litigation.

On Friday, however, Pitman sided with Wilson, denying the groups' motion.

Days from now, Wilson will likely be able to post far more than basic hand guns on a searchable database.

"Once the plans are up on the Internet, it's impossible to un-ring the bell," said Jonathan Lowy, vice president of litigation at the Brady Center. "The genie is out of the bottle and you can't put it back in."

WASHAR0002375

# BLANKROME

717 Texas Avenue | Suite 1400 | Houston, TX 77002
blankrome.com

| | |
|---|---|
| *Phone:* | *(713) 632-8696* |
| *Fax:* | *(713) 228-6605* |
| *Email:* | *dcabello@blankrome.com* |

July 24, 2018

**<u>Via Hand Delivery</u>**

The Honorable Robert Pitman
United States District Court for the
Western District of Texas
501 West 5th St., Suite 5300
Austin, TX 78701

        Re:    *Defense Distributed et al v. United States Department of State et al.,*
                (Case No. 15-CV-00372-RP).

Dear Judge Pitman:

    We write on behalf of the Brady Center to Prevent Gun Violence ("Brady Center"), Everytown for Gun Safety ("Everytown"), and Giffords Law Center to Prevent Gun Violence ("Giffords"), the leading organizations dedicated to the prevention of gun violence in America.

    We submitted an *amicus curiae* brief in the Fifth Circuit appeal in this matter on behalf of the Brady Center, and the Court's opinion invited us to remain involved as follows:

> The amicus briefs submitted in this case were very helpful and almost all supported Plaintiff-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016).

    Earlier this month, Giffords and the Brady Center submitted public comments on proposed rule changes by the State and Commerce Departments that would deregulate the posting of blueprints for the production of 3D printed guns like that planned by Defense Distributed here.[1]

---

[1] Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), available at http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf. A copy of both comments is attached as **<u>Exhibit A.</u>**

WASHAR0002376

BLANKROME

July 24, 2018
Page 2

Giffords and Brady expressed concern that the proposed rules would not adequately protect the nation's national security, foreign policy and anti-terrorism interests, and also questioned whether the proposed rules adequately addressed around the contemplated changes. Giffords noted in particular that the proposed changes would "result in an increase in the number of untraceable firearms" made with "3D printing technology" and questioned the effect of the proposed changes on this ongoing litigation.

We respectfully submit this letter to bring to the Court's attention the troubling, dangerous, time-sensitive, and potentially illegal terms of the settlement agreement recently executed by the parties. Immediately upon learning about the settlement, Everytown and the Brady Center submitted Freedom of Information Act ("FOIA") requests to the Department of Justice and the Department of State for additional information about the settlement and the surrounding circumstances. Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions. The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world. These are the very concerns which prompted the government's intervention in the first place.

We appreciate the unusual nature of this letter and wish to advise that we are working diligently to take legal action in this Court, including seeking immediate injunctive relief. We intend to do so by July 26, 2018. In this regard, as this Court may be aware, pursuant to the now-public settlement agreement in this matter, plaintiff Defense Distributed intends to make all of its firearms-related Computer Assisted Design ("CAD") files available via its website within a matter of days, by August 1, 2018, if not sooner. It is highly unlikely that the Government will provide any additional documents regarding this settlement pursuant to the Brady Center's FOIA requests before the parties implement the key terms of this settlement. Given the extremely short time frame and the potentially significant and permanent impact to national security and public safety of making the CAD files available online, we feel compelled to bring this issue to Your Honor's attention as soon as practicably possible, so that this Court has the opportunity to take any steps it deems proper to see that justice is done while this matter is still pending, *see* Fed. R. Civ. P. 1, including but not limited to calling the parties in to discuss the issues laid out below.

<u>Background</u>

As this Court is aware, the plaintiffs filed this action in 2015, seeking, *inter alia*, an injunction to prevent the government from barring Defense Distributed's export of CAD files. These files "directly facilitate the manufacture of weapons" through "automated processes."

BLANKROME

July 24, 2018
Page 3

<u>Defendants' Motion to Dismiss Second Amended Complaint</u> at 1,9, filed Apr. 6, 2018 (ECF No. 92). The Government strenuously objected to the plaintiffs' request for an injunction, arguing that it was "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." <u>Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction</u>, filed June 10, 2015 (ECF No 32).  Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests. The Fifth Circuit upheld this Court's ruling, *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016), and the Supreme Court denied the Plaintiffs' petition for a writ of certiorari earlier this year. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

After the Supreme Court denied cert, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018.  *See* ECF Nos. 77, 88 and 90.  On April 6, 2108, the Government filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." <u>Motion to Dismiss</u> at 3,7 (ECF No. 92).  The Government told this Court that:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability.

*Id.* at 1.

Mere weeks after the Government stressed to this Court the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority." <u>Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement</u> filed Apr. 30, 2018 (ECF No. 93). According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they

WASHAR0002378

BLANKROME

July 24, 2018
Page 4

wanted."[2]  On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018."  (ECF No. 95).

The settlement agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the plaintiffs.[3]  What appears to be an accurate copy of the agreement is now available on the internet.[4]  A copy of the posted agreement is attached hereto as **Exhibit B.**

Pursuant to the Settlement Agreement, in consideration for the plaintiffs' dismissing the action, the Government has agreed to:

a.  "[C]ommit[  ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

b.  "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action.   The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

c.  "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD DFiles are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

---

[2]      Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018), *available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

[3]      *See e.g.,* Greenberg, *supra* n.1; Josh Blackman, "DOJ, Second Amendment Foundation Reach Settlement in Defense Distributed Lawsuit," Josh Blackman's Blog (Jul. 10, 2018), *available at* http://joshblackman.com/blog/2018/07/10/doj-second-amendment-foundation-reach-settlement-in-defense-distributed-lawsuit/.

[4]      *See* "Settlement Agreement," https://www.exportlawblog.com/docs/Defense%20Distributed%20Settlement%20Agreement.pdf ; Alexander Bosch, "The Daily Bugle Weekly Highlights: Week 28 (9-13 Jul 2018), Full Circle Compliance, https://fullcirclecompliance.eu/the-daily-bugle-weekly-highlights-week-28-9-13-jul-2018/.

WASHAR0002379

BLANKROME

July 24, 2018
Page 5

      d.  "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

      e.  Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

      Pursuant to the terms of the Settlement Agreement, counsel for the Government is prohibited from filing a stipulation of dismissal with this Court any earlier than 5 business days after announcement of the "temporary" modification to the USML Category I list and issuance of a letter to the plaintiffs that their files are approved for public release in any form and exempt from ITAR.  *Id.* ¶ 2.  In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018.  This timing is critical because Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018.  *See* https://defdist.org/ ("The age of the downloadable gun formally begins.").

      In addition to previously posted files for making firearms, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons."[5] Throughout the litigation, Defense Distributed has "developed a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s."[6]  The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable."[7]  The database of blueprints "will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines."[8]  According to Wilson: "What's about to happen is a Cambrian explosion of

---

[5]      Greenberg, *supra* at n. 1.

[6]      Deanna Paul, "Meet the man who might have brought on the age of 'downloadable guns,'" Washington Post (July 18, 2018), available at https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.725b8a04f11a.

[7]      Greenberg, *supra* at n.1. (emphasis added)

[8]      *Id.*

WASHAR0002380

BLANKROME

July 24, 2018
Page 6

the digital content related to firearms."[9] He says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."[10]

As promised, on May 24, 2018, the Government published notices of proposed rulemaking by the State and Commerce Departments, which would remove plaintiffs' data from the USML Category I list.[11]  Neither notice mentions Defense Distributed or the role that the Settlement Agreement played in promulgation of the notices. The public comment period for both notices concluded on July 9, 2018, the day before the plaintiffs in this action went public with the Settlement Agreement.[12]

<u>Discussion</u>

Under the Administrative Procedure Act ("APA"), final agency action may be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Here, the Government's sudden and complete about-face on the national security and national defense implications in this case raises numerous questions as to APA and other potential violations of law.  We summarize just a few of the most urgent potential violations here which will be elaborated upon in further detail in our forthcoming legal submissions and request for immediate injunctive relief.

First, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Here, there is nothing contained in either the Settlement Agreement or the proposed rules explaining why the Government no longer believes that firearms manufactured from the plaintiffs' CAD files "could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons."   <u>Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction</u>, filed June 10, 2015 (ECF No 32).

---

[9]        *Id.*

[10]       *Id.*

[11]       International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III, 83 Fed. Reg. 24198 (proposed May 24, 2018) (to be codified at 22 C.F.R. 121, 123, 124, 126, and 129); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the USML, 83 Fed. Reg. 24166 (proposed May 24, 2018) (to be codified at 15 C.F.R. 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774).

[12]       *Id.*

WASHAR0002381

BLANKROME

July 24, 2018
Page 7


In addition, the Government's promise of a "temporary modification" as of July 27, 2018 to exempt Defense Distributed's data from the Category I list, while the revised proposed rule is pending, is deeply troubling. As the Government is surely aware, when it comes to the internet, there is no such thing as "temporary." Once the files are available for download online, the damages to national security concerns will be irreparably done. Thus, even if the State Department and Commerce Department ultimately decide not to promulgate the new proposed regulations, all of Defense Distributed's files will already be in the public domain. In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, the government may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. In short, this is for all practical purposes "final agency action" which makes this action subject to challenge now. As Congressman Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), recently noted: "it stretches credulity to believe that release of this information is in the U.S. interest."[13]

Furthermore, the AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Rep. Engel, notice of the terms of the settlement have not been provided to the House Committee by the President or the State Department.[14]

Additionally, the settlement agreement raises serious questions as to whether it is "in accordance with law" because it can be read to authorize violation of multiple provisions of the federal Gun Control Act, 18 U.S.C. § 921 *et seq.* Provision 1(d) of the Settlement Agreement purports to permit "any United States person" to "use, reproduce, or otherwise benefit from" the Defense Distributed files. If a minor, felon, domestic abuser or an individual who has been adjudicated mentally incompetent "uses" or "otherwise benefits" the files by possessing or manufacturing firearms, then the Gun Control Act is violated (as well as innumerable similar state

---

[13]     Engel Decries State Department Policy to Allow 3-D Gun Printing, Press Release (July 20, 2018), available at https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

[14]     *Id.*

WASHAR0002382

BLANKROME

July 24, 2018
Page 8

laws). *See, e.g.,* 18 U.S.C. §§ 922(x)(2) and 922(g) (prohibiting categories of person from possessing a firearm). The State Department of course has no power to override the mandates of a federal criminal statute.

These are just a few of the many troubling potential APA and other legal violations that may have occurred in connection with the settlement of this matter.

<u>Conclusion</u>

We are aware that under ordinary circumstances, a settlement agreement resulting in a voluntary stipulation of dismissal is not subject to review or inquiry by the Court. However, this settlement is far from ordinary. It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order. It is also, we believe, illegal. For these reasons, the undersigned attorneys are currently exploring legal action asserting that the Settlement Agreement violates the Administrative Procedure Act, the Arms Export Control Act, the International Traffic in Arms Regulations, the Gun Control Act, and the Separation of Powers required by the United States Constitution. However, given the short time frame before Defense Distributed's repository is set to go live, we urge this Court to consider calling the parties before it to explain these extraordinary, dangerous and potentially unlawful developments. As noted, we intend to file legal papers and a request for immediate injunctive relief.

WASHAR0002383

BLANKROME

July 24, 2018
Page 9

Respectfully submitted,

BLANK ROME LLP
J. David Cabello
Texas Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
(713) 632-8696

John D. Kimball
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

cc:    Alan Gura (counsel for Plaintiff) (Via E-mail)
       David S. Morris (counsel for Plaintiff)
       Joshua Michael Blackman (counsel for Plaintiff)
       W. Thomas Jacks (counsel for Plaintiff)
       William Mateja (counsel for Plaintiff)
       Eric J. Soskin (counsel for Defendants)
       Stuart Justin Robinson (counsel for Defendants)

WASHAR0002384

# **Exhibit A**

WASHAR0002385