

July 9, 2018

**SUBMITTED VIA FEDERAL E-RULEMAKING PORTAL**

Director of Defense Trade Controls
U.S. Department of State
DDTCPublicComments@state.gov

AND
Regulatory Policy Division,
Bureau of Industry and Security,
U.S. Department of Commerce, Room 2099B
14th Street and Pennsylvania Avenue NW
Washington, DC 20230

RE: Docket Nos. DOS-2017-0046, BIS-2017-0004

**ITAR Amendment -- Categories I, II, and III and Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List (USML)**

This comment is submitted on behalf of Giffords and Giffords Law Center ("Giffords") in response to the Proposed Rules published by the Departments of State and Commerce on May 24, 2018 regarding the classification and administration of exports of certain firearms and ammunition. The Proposed Rules are complex and would represent a dramatic change in the regulatory structure governing firearm exports. We are concerned that the Proposed Rules may not adequately address our national security, foreign policy, international crime, or terrorism threats.  In sum, we are concerned about potential loss of life.  We also believe the Proposed Rules do not adequately address the need for transparency so Congress and the public may understand the impact of these Rules on potential weapons exports.

Giffords is committed to advancing common-sense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington, DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, participate in critical gun-violence-prevention litigation, and educate the public on the proven solutions that reduce gun violence.

WASHAR0002386



## THE PROPOSED RULES APPEAR DRIVEN BY THE INTERESTS OF THE GUN INDUSTRY

Even the National Rifle Association (NRA) admits that the Proposed Rules were drafted with "the goal of increasing U.S. manufacturers' and businesses' worldwide competitiveness." These Rules are "designed to enhance the competitiveness of American companies in the firearms and ammunition sectors," allowing firearms and ammunition "to be subject to a more business-friendly regulatory climate."[1]

We are concerned that the Proposed Rules elevate the desire of American gun manufacturers to compete with international arms dealers over the danger that exported firearms will contribute to international gun crime and violence. The United States must not prioritize gun industry profits over human lives.

## THE PROPOSED RULES WILL DRAMATICALLY CHANGE THE LAW, RISKING NEW LOOPHOLES

We are concerned that the Proposed Rules, by shifting firearms and ammunition from the United States Munitions List (USML) to the Commerce Control List (CCL), would weaken oversight over exports of these items. As even the NRA has acknowledged, "items on the USML controlled under ITAR are generally treated more strictly," whereas regulation under the CCL "is more flexible." The NRA has also admitted that license applications for items on the USML are subject to "more stringent vetting" than items on the CCL.[2]

The Departments of State and Commerce, in drafting the Proposed Rules, have made some efforts to ensure that exports of firearms and ammunition will still be subject to oversight. But the dramatic nature of the proposed changes, and the complexity of the Proposed Rules raise serious concerns about hidden loopholes. Some areas of potential concern include:

- Congressional notification and the methods for Congress to disapprove of proposed firearm exports;
- The extent to which the Commerce Department monitors the end-users of its products; and the extent to which Congress and the public have access to information about the results of this monitoring;
- The online posting of designs for the production of firearms, and their use in the 3D printing of untraceable firearms;
- Firearms training provided to foreign security forces;
- The reporting of political contributions by gun exporters and related entities;
- The Commerce Department's bandwidth to properly oversee these exports; and
- The regulation of brokers who act as middlemen in firearms transactions, and the threat that firearms will be diverted by these middlemen to violent ends.

---

[1] National Rifle Association, *Trump Administration's Proposed Rulemakings a Win-Win for America's Firearms Industry, National Security*, https://www.nraila.org/articles/20180525/trump-administration-s-proposed-rulemakings-a-win-win-for-americas-firearms-industry-national-security

[2] Ibid.

WASHAR0002387



According to the State Department's Proposed Rules, "The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the [State] Department will be eligible for license exceptions or otherwise not require a separate license under the EAR." This statement seems to directly contradict the statement in the Commerce Department's Proposed Rules that "BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by the proposed rule." The Commerce Department later clarifies, "The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR." While we recognize that other forms of oversight may be available, this dramatic difference in the number of licenses raises our concern.

We are also particularly concerned that these changes will result in an increase in the number of untraceable firearms in circulation. As 3D printing technology becomes more widely available, the likelihood that it may be used to construct operable firearms that are exempt from serialization requirements increases. Under current law, the proliferation of 3D printed firearms is held in check by the Fifth Circuit's decision in *Defense Distributed v. U.S. Dep't of State*,[3] which upheld the State Department's decision that the posting of online data for the 3D printing of firearms fell within the USML. The Proposed Rules would throw that determination into question.

Inadequate gun safety laws cost human lives. When gun purchasers are not properly vetted and laws against gun trafficking are not properly enforced, guns often fall into the wrong hands and are used to perpetrate horrendous crimes and violence. The U.S. experiences this loss of life on a daily basis, with over 90 people killed each day.  We do not wish to see a similar effect on an international level from the weakening of our laws regarding gun exports.

## THIS CHANGE LACKS SUFFICIENT CONGRESSIONAL NOTIFICATION REQUIREMENTS

We have not seen anything in the Proposed Rules that would continue Congressional notification requirements for any of the Category I firearms that are being moved to the CCL. There are several types of sales controlled under the Arms Export Control Act that require Congressional notification. Under current law, a certification must be provided to Congress prior to the granting of any license or other approval for transactions involving the export of a firearm controlled under Category I of the USML in an amount of $1 million or more.[4] Congress then has the ability to enact a joint resolution prohibiting the export, which would prevent the State Department from licensing the sale. Congress generally is given 15 days or 30 days to review the transaction before a license can be granted, depending on the items being exported and the

---

[3] 838 F.3d 451 (5th Cir. 2016).
[4] See 22 U.S.C. § 2776, 22 C.F.R. 123.15(a)(3).

WASHAR0002388



country to which it is being exported. While there are Congressional notification requirements for certain products that are controlled under the CCL, it seems that such notification requirements would not be as broad that as under the USML.

Congress should continue to receive advance notification of transactions involving firearms and to have the opportunity to prohibit these exports when appropriate. The Proposed Rules should be strengthened to protect Congress's authority in this area.

## THE CHANGE MAY RESULT IN LESS TRANSPARENT END-USE MONITORING

We are concerned about a possible reduction in the monitoring of the end-users of exported firearms and publicly available information about this monitoring. The State Department currently monitors the end-users of firearm exports through its Blue Lantern program. Public reporting of Blue Lantern information is mandatory[5] and there are readily available statistics about the results. While the Commerce Department also conducts end use monitoring, there does not appear to be as fulsome a public reporting requirement for these end use checks as under the Blue Lantern program.

The Proposed Rules do not discuss end use monitoring of the items being moved to the CCL. It is reasonable to assume that these items will fall under the general Bureau of Industry and Security end use check program. This end use check program is not as well-publicized or as formal as the Blue Lantern program, and only a very small percentage of exported items are reviewed. If the Proposed Rules move forward, this program must be strengthened to address the need to monitor the end-users of exported firearms and provide the public with information about the results.

## THIS CHANGE IGNORES THE MILITARY NATURE OF MANY FIREARMS

The Proposed Rules are based on an assumption that automatic firearms are designed for and used by the military, and semiautomatic firearms are not "inherently military." This is inaccurate. Consequently, we question the President's determination that semiautomatic firearms and ammunition no longer warrant control under the USML.

In fact, members of the U.S. armed forces routinely use firearms in semiautomatic mode in combat conditions, and the designs of many semiautomatic firearms are inherently military. Assault rifles like the AR-15 were originally designed for military use. Earlier models included a selective fire option that allowed service members to switch easily between automatic and semiautomatic modes. The military included the option to fire in semiautomatic mode because military combat sometimes requires use of a firearm in

---

[5] 22 U.S.C.§§ 2785, 2394, 2394-1a

WASHAR0002389



semiautomatic mode. Shooting in semiautomatic mode is more accurate and hence more lethal.[6] In fact, some members of the military use the semiautomatic mode exclusively.

The fact that some gun enthusiasts "enjoy" shooting these weapons and have labeled this activity "modern sport shooting" or "tactical shooting" does not change the design or purpose of these firearms or the danger they pose in civilian hands. The horrendous rise in mass shootings our country has suffered and the frequency with which these firearms are used in these shootings testify to this danger.

Military-style semiautomatic firearms were used to perpetrate the tragedies that occurred in an elementary school in Newtown, Connecticut, at a music festival in Las Vegas, Nevada, at a workplace in San Bernardino, California, in a movie theatre in Aurora, Colorado, and at a high school in Parkland, Florida, among others. Because of the dangerous nature of these weapons, D.C. and seven states, including the populous states of California and New York, ban them.[7] Because of the military nature and serious lethality of these weapons; they belong on the USML.

## THERE ARE ALTERNATIVES TO THE PROPOSED RULES THAT HAVE NOT BEEN EXPLORED

The real concern that seems to be driving this significant change in the way the U.S. government regulates firearms exports is that firearms and ammunition manufacturers are currently required to register with the State Department and pay a registration fee. According to the NRA, "Any business that manufactures an item on the USML, or even just a part or component of such an item, also has to register with the State Department and pay an annual fee, which is currently set at $2,250. This registration is required even if the manufacturer has no intent to ever export the items. ... Manufacturers of items on the CCL, or their parts or components, do not have to pay an annual registration fee to the Commerce Department."[8]

The registration fee appears to be the NRA's primary concern with the current system for regulating the export of firearms and ammunition. The simple solution to this problem might be to waive the fee for manufacturers who do not, in reality, export these items. Waiving the fee would relieve industry of this "burden" without undoing the important policy choices made by the State Department in the regulation of these exports or requiring the Commerce Department to "reinvent the wheel" with respect to these regulations. While we would not necessarily support this proposal (it might shift the costs of manufacturer

---

[6] With AR-15s, Mass Shooters Attack With the Rifle Firepower Typically Used by Infantry Troops, NY Times, Feb. 28, 2018, https://www.nytimes.com/interactive/2018/02/28/us/ar-15-rifle-mass-shootings.html.

[7] See Giffords Law Center to Prevent Gun Violence, *Assault Weapons* at http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/.

[8] National Rifle Association, *supra*.

WASHAR0002390



registration to the taxpayers), we urge the Administration to carefully and thoroughly consider other alternatives to the Proposed Rules.


Sincerely,

*Lindsay Nichols*

Lindsay Nichols
Giffords Federal Policy Director

---

**ABOUT GIFFORDS LAW CENTER**

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

WASHAR0002391



Comments of the Brady Center and Brady Campaign to Prevent Gun Violence
On the
Department of State Proposed Rule to Amend the International Traffic in Arms Regulations:
U.S. Munitions List Categories I, II, and III
And the
Department of Commerce Proposed Rule Regarding Control of Firearms, Guns, Ammunition
and Related Articles the President Determines No Longer Warrant Control Under the United
States Munitions List

*Filed via email to DDTCPublicComments@state.gov; electronically via
http://www.regulations.gov*

Together the Brady Center and the Brady Campaign to Prevent Gun Violence ("Brady") are
national leaders in strengthening, supporting and expanding gun laws, policies, and practices in
the United States.  Our complimentary missions are to significantly decrease the number of gun
deaths and injuries in America.  We achieve this by amplifying the voice of the American public;
changing social norms through public health and safety programs; and holding the gun industry
accountable for dangerous and irresponsible practices and products.[1]  These comments are
submitted in furtherance of those shared goals. Brady specifically seeks to ensure the safe use
and transfer of legal firearms within and outside of the United States by advocating for
appropriate regulations that reflect the sensitive nature of the firearms industry.

Brady hereby comments on the proposed rules published by the Department of State's Directorate
of Defense Trade Controls ("DDTC") and the Department of Commerce's Bureau of Industry and
Security ("BIS") on May 24, 2018 (83 Fed. Reg. 24198; 83 Fed. Reg. 24166) ("Proposed Rules"),
which seek comments on the transfer of certain firearms and related items from the International
Traffic in Arms Regulations' ("ITAR") U.S. Munitions List ("USML") to the Export
Administration Regulations' ("EAR") Commerce Control List ("CCL").   In particular, the
Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms,
including those used by the military, (along with their components and ammunition) from USML
Categories I, II, and III, where they are classified as significant military equipment, to the CCL,
where they will be categorized as "600 Series" items

We respectfully submit that the proposed transfer of semi-automatic and firearms used by the
military (and related items) from the stringent control of the USML to the more permissive regime
administered by the Commerce Department would be contrary to Congressional intent and would
undermine U.S national security interests, international stability and the protection of human
rights.  We respectfully request that the State and Commerce Departments withdraw their current

---

[1] For more about Brady's mission and work, see www.bradycampaign.org.

proposed rules, and keep these dangerous weapons (and related items) subject to State Department jurisdiction on USML, consistent with well-settled and established practice.

Both the Proposed Rules indicate that the firearms at issue, which include armor-piercing sniper rifles used by the military, side arms used by the military, and semi-automatic rifles such as AR-15 and other military-style weapons, no longer warrant control under the ITAR because they are not "inherently military" or are widely available for commercial sale. The transfer of these items to Commerce Department jurisdiction is framed by DDTC and BIS as merely technical measures to reduce procedural burdens and compliance associated with exports of firearms. The reality, however, is that these rule changes would significantly weaken existing controls on the exports of military-style weapons, and would thereby increase the supply of such weapons to dangerous repressive regimes, rebel movements, criminals, and gun and drug traffickers. Many state and non-state groups in importing countries use semi-automatic weapons and sniper rifles in armed conflicts, drug trafficking and crime, and would be eager beneficiaries of the proposed rule changes. Further, if U.S. troops are called upon to intervene in certain conflicts, they may be exposed to significant danger from enemy combatants using military sniper rifles and semi-automatic weapons exported from the United States because of the weaker standards set forth in this rule change. Since Congress first imposed these regulations many years ago, the world has not suddenly become more safe, nor our military less at risk.

In granting statutory authority to regulate arms exports to the State Department in the Arms Export Control Act ("AECA"), Congress emphasized the importance of promoting regional stability and preventing armed conflict. In contrast, the delegation of export control authority to the Commerce Department in the Export Administration Act ("EAA") provides that the promotion of trade and other commercial interests are significant factors in agency decisions. Congress purposefully delegated the authority for licensing arms exports to the State Department, recognizing that the two agencies have very different mandates. In the State Department licensing process, international security and human rights are given more weight, while in the Commerce Department licensing process, commercial interests are given more weight. To transfer jurisdiction over these firearms, which have substantial military utility, from the State to the Commerce Department means that U.S. international security and human rights interests will not have the appropriate weight required before determining whether exports of firearms should be undertaken.

We also note that many of the firearms that are subject to the proposed rules are not widely available for commercial sale. As set forth in more detail below, a number of countries prohibit the commercial sale and civilian possession of semi-automatic weapons and military-style firearms, and therefore these weapons cannot be considered to be widely commercially available. Transferring semi-automatic firearms to the more permissive Commerce Department regime would result in less control over these items and a greater likelihood that they will end up in the hands of repressive regimes, terrorist organizations, criminal gangs, gun traffickers and other dangerous actors. Less stringent state gun laws in the United States already fuel a gun pipeline across the border into Mexico and other Central and Latin American countries, causing an increase in violent crime in those countries and subsequently higher numbers of displaced citizens of those countries fleeing across the border into the United States. The proposed transfer of the firearms in question to the less stringent regulation of items on the CCL would further exacerbate these existing problematic firearm and migration flow issues.

2

WASHAR0002393

We discuss below the various ways the current controls on exports of semi-automatic and military-style firearms would be weakened by the transfer of such items to the jurisdiction of the Commerce Department.

### 1. Types of Firearms that Would be Released from State Department Control

The Proposed Rules would transfer a broad range of semi-automatic and non-automatic firearms, including firearms typically used by the military and military-style firearms, to Commerce Department jurisdiction. For example, below is a non-exhaustive list of the types of weapons that would be transferred:

| Sniper Rifles Used by Armed Forces | | |
|---|---|---|
| • M40A5 (used by US Marines)<br>• M24 (used by US Army) | • L115A3 (used by UK Armed Forces)<br>• Barrett M82 (used by multiple armies including US) | • Knight's Armament M110 (used by US Army) |
| **Sidearms Used by Armed Forces** | | |
| • Sig Sauer XM17 and XM 18 pistols (used by US Army)<br>• Glock M007 (Glock 19M) pistol (used by US Marines) | • Heckler & Koch Mk 23 pistol (used by US Special Forces) | • SIG Sauer Mk 25 (used by Navy Seals) |
| **Semi-automatic Assault Rifles** | | |
| • Bushmaster XM15 (AR-type rifle)<br>• Daniel Defense M4A1 rifles (AR-type rifle)<br>• IWI TAVOR<br>• Kalashnikov KR-9 (AK-type rifle) | • Kel-Tec Sub-2000<br>• Mossberg MMR Tactical rifles (AR-type rifle)<br>• POF USA P415 (AR-type rifle) | • SIG Sauer MCX rifles<br>• SKS assault rifle (predecessor to the AK-47)<br>• Sturm, Ruger & Co. AR-556 rifles (AR-type rifle) |
| **Semiautomatic Assault Pistols** | | |
| • Bushmaster SquareDrop pistol<br>• CZ Scorpion pistol | • CORE Rifle Systems Core 14 Roscoe pistol<br>• Daniel Defense MH18 pistol | • PAP M92 pistol |

3

WASHAR0002394

The sniper rifles set forth above are some of the deadliest and most lethal firearms used on the battlefield when used by trained snipers.  They can be used to target battlefield commanders, radio or heavy weapon operators, and other equipment, inflicting considerable damage to troop morale.[2]

A number of the semi-automatic rifles set forth above, including the Bushmaster XM15 and the Mossberg MMR Tactical Rifle, are AR-15 style rifles that were originally based on the M16 automatic rifle used by the U.S. military.  Certain semi-automatic rifles, including the Kalashnikov KR-9 above, are based on the original design of the AK-47 automatic rifle used by many militaries and terrorist groups around the world.

### 2. The Firearms at Issue Would be Subject to a Less Stringent Licensing Policy and Review Process under the EAR

The transfer of the firearms at issue, including those set forth above, to BIS jurisdiction would likely result in more permissive licensing of these firearms for export.  Congress enacted the AECA, which provides the statutory authority for the ITAR, in order to "bring about arrangements for reducing the international trade in implements of war and to lessen the danger of outbreak of regional conflict and the burdens of armaments."  AECA § 1.  In contrast, the Export Administration Act ("EAA"), which provided the original statutory authority for the EAR, emphasizes in addition to national security concerns that "[i]t is the policy of the United States to minimize uncertainties in export control policy and to encourage trade with all countries with which the United States has diplomatic or trading relations, except those countries with which such trade has been determined by the President to be against the national interest."  EAA § 3.

The purposeful delegation of authority by Congress in the AECA to regulate arms to the State Department, rather than the Commerce Department, reflects the reality that these two agencies have very different mandates governing their priorities and decision-making.  The State Department's mission is to promote international security and human rights, while the Commerce Department is tasked with promoting and regulating trade and the interests of U.S. industry in addition to protecting national security.  Specifically, in the DDTC review process for firearms, U.S. national security, U.S. foreign policy, and human rights considerations are important elements of the review.  Under the BIS licensing process, commercial considerations would have a heighted significance, which would result in less stringent licensing decisions.  The risk associated with transferring semi-automatic and military-style firearms from the State Department to the Commerce Department is that the latter will elevate commercial interests associated with increasing beneficial trade and assisting U.S. companies, while deemphasizing international security and human rights concerns.

---

[2] Kyle Mizokami, "5 Sniper Rifles That Can Turn Any Solider into the Ultimate Weapon," National Interest (March 11, 2018), located at <http://nationalinterest.org/blog/the-buzz/5-sniper-rifles-can-turn-any-solider-the-ultimate-weapon-24851>.

WASHAR0002395

In addition, the State Department, unlike the Commerce Department, keeps a database of human rights violators that it uses to conduct Leahy Law vetting of military and police assistance overseas, and many recipients of exported firearms are military and police actors.  Under the ITAR, a license application involving firearms is reviewed against this database to prevent their use in human rights abuses.  It is not clear that this practice would continue once the licensing jurisdiction moves to the Commerce Department.

### **3.  The Firearms at Issue are not Widely Available for Commercial Sale**

The Commerce Department's proposed rule provides that the scope of the items that are to be moved from the USML to the CCL "is essentially commercial items widely available in retail outlets and less sensitive military items."[3]  The rule adds that: "There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities."[4]

The proposed rule, however, cites to examples of firearms sales in the United States rather than providing examples of countries that import firearms from the United States:

> "Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public.  Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their 'parts,' 'components,' 'accessories' and 'attachments.'"[5]

The U.S. market should not be the basis for assessing the commercial availability of firearms, as this is not the market to which the proposed rule would be directed.  Moreover, the U.S. retail firearms market is unique and cannot be used as a proxy for other markets, given that the United States, with less than 4.5% of the world's population, comprises more than 45% of the world's firearms in civilian possession.[6]

Furthermore, a number of importing countries outside the United States ban or otherwise substantially restrict the sale and transfer of firearms that are subject to the Proposed Rules, including semi-automatic and military-style weapons.  By way of example, in Mexico, there is only one retail outlet in the entire country for the legal purchase of any kind of firearm;[7] China bans firearm purchases for most people, and private gun ownership is almost unheard of;[8] Germany bans semi-automatic weapons not intended for hunting or marksmanship, as well as

---

[3] Department of Commerce, Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (proposed May 24, 2018).

[4] *Id.*

[5] *Id.*

[6] Aaron Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey (June 2018), located at <http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-BP-Civilian-Firearms-Numbers.pdf>.

[7] Kate Linthicum, "There is only one gun store in all of Mexico. So why is gun violence soaring?" The Los Angeles Times (May 24, 2018), located at <https://www.latimes.com/world/la-fg-mexico-guns-20180524-story.html>.

[8] Ben Blanchard, "Difficult to buy a gun in China, but not explosives," Reuters (October 2, 2015), located at <https://www.reuters.com/article/uk-china-security-idUSKCN0RV5QV20151002>.

WASHAR0002396

some multiple-shot semi-automatic firearms; Norway bans certain semi-automatic weapons; Great Britain bans military-style weapons; Spain bans firearms "designed for war use"; and many other countries ban "military style" and other high capacity weapons.[9]  In the vast majority of countries, according to one of the few studies of firearms regulations, "there is a presumption against civilians owning firearms unless certain conditions and requirements are met."[10]

Given the significant differences in the regulation of semi-automatic and non-automatic firearms outside the United States, it appears that firearms that are covered by this rule change as "widely commercially available" are, in fact, not only not widely commercially available in many countries, but outright banned in other major developed countries. Therefore, at a minimum, BIS and DDTC should withdraw the proposed rules and further study the retail or commercial availability worldwide of the firearms at issue prior to taking any regulatory action.

### 4. Under the EAR, Firearms Manufacturers Would no Longer be Subject to Registration Requirements

Under the ITAR, persons who engage in the business of manufacturing, exporting, or temporarily importing defense articles in the United States must register with the DDTC.  *See* ITAR Part 122. In order to register, manufacturers are required to submit a Statement of Registration and undergo a background check, and then must re-register and pay a registration fee annually.  In contrast, the EAR contain no such registration requirement, so firearms manufacturers will be able to engage in exports, re-exports, and other activities subject to the EAR, or seek an export license, without being subject to the additional controls of registering with the U.S. Government, being subject to a background check and paying an annual registration fee.   In addition, the U.S. Government would lose a valuable source of information about manufacturers of firearms in the United States, such as the registrant's name, address, organization stricture, directors and officers, foreign ownership, and whether directors or officers of the company have been charged, indicted or convicted of a U.S. or foreign crime.  This information is used by the U.S. Government to monitor gun manufacturers and exporters, and losing this source of information would increase the likelihood of dangerous firearms being manufactured and transferred in significant quantities without effective oversight.

### 5. The Proposed Rules Would Permit Foreign Companies to Assume Control of U.S. Firearms Manufacturers with Minimal Oversight

The ITAR require registrants to notify DDTC at least 60 days in advance of any intended sale or transfer to a foreign person of ownership or control of the registrant or any entity owned by the registrant.  *See* ITAR § 122.4(b).  This 60-day notification from the registrant must include detailed information about the foreign buyer, the target, and the nature of the transaction, including any post-closing rights the foreign buyer will have with regard to ITAR-controlled

---

[9] *See* Firearms-Control Legislation and Policy, Law Library of the Library of Congress, February 2013, located at <http://www.loc.gov/law/help/firearms-control/firearms-control.pdf>.

[10] Sarah Parker, "Balancing Act: Regulation of Civilian Firearm Possession," States of Security: Small Arms Survey 2011 6, located at <http://www.smallarmssurvey.org/fileadmin/docs/A-Yearbook/2011/en/Small-Arms-Survey-2011-Chapter-09-EN.pdf>.

WASHAR0002397

items and any related steps that will be taken to confirm compliance with the ITAR.  The 60-day rule ensures that DDTC is aware of acquisitions that pose potential threats to U.S. national security or foreign access to controlled commodities and technical data, and can coordinate review by the Committee on Foreign Investment in the United States ("CFIUS") as necessary.  In contrast, the EAR impose no such 60-day advance notification requirement for acquisitions of U.S. companies with sensitive items or technology by foreign entities.  Therefore, to the extent a U.S. manufacturer of semi-automatic or non-automatic firearms (and related items) is acquired by a foreign company, there would no longer be an advance notification required to the U.S. Government.  As such, the U.S. Government would be unaware of a potential acquisition of a U.S. firearms manufacturer by a foreign entity that could influence the sales and marketing activities of the manufacturer in a manner that undermines U.S. national security, international security, and human rights.

### **<u>6.</u>   Under the EAR, the Firearms at Issue Would no Longer be Subject to Congressional Reporting Requirements**

Once semi-automatic and military-style firearms are transferred to the CCL, there would no longer be any requirements for reporting significant sales of this significant military equipment to Congress.  This would result in less transparency and would weaken Congress's ability to monitor exports of dangerous firearms to other countries.

Under the ITAR, Congress must be provided with a certification prior to the granting of "[a] license for export of a firearm controlled under Category I of the [USML] in an amount of $1,000,000 or more."  *See* ITAR § 123.15(a)(3).  The EAR does not impose similar reporting requirements on firearms controlled as 600 Series items.[11]  Therefore, Congress would not be give advance notification of Commerce Department licensing of sizeable exports of firearms, undermining its oversight role with regard to these significant military equipment, which potentially could be diverted to repressive regimes, criminal enterprises, rebel factions, or terrorist organizations.

Congress has in the past played a vital role in halting arm sales that were inconsistent with U.S. interests.  For example, Congress halted the $1.2 million sale of 1,600 semi-automatic pistols to the security force of Turkish President Recep Tayyip Erdoğan in 2017 after reports of public beatings of protestors.  Furthermore, Senator Ben Cardin opposed the sale of 26,000 assault weapons to the Philippines police in 2016, citing grave human rights concerns.  In sum, the State Department's regulatory framework ensures that both Congress and the public are kept aware of arms sales that raise human rights and other concerns.  This critical oversight function, which stop transfers against U.S. national interests, would be lost if regulatory oversight of the firearms at issue were transferred to the Commerce Department.

---

[11] Under the EAR, items that are "600 Series Major Defense Equipment" are subject to Congressional notification requirements where such items are exported (a) in an amount exceeding $14,000,000 to a country outside the countries listed in Country Group A:5, or (b) in an amount exceeding $25,000,000, to a country listed in Country Group A:5.  "600 Series Major Defense Equipment" is defined as "[a]ny item listed in ECCN 9A610.a, 9A619.a, 9A619.b or 9A619.c, having a nonrecurring research and development cost of more than $50,000,000 or a total production cost of more than $200,000,000," which would not include the firearms affected by the Proposed Rules. *See* EAR §§ 743.5.; 772.1.

WASHAR0002398

**<u>7.</u>   The Firearms at Issue Would no Longer be Subject to the ITAR's Controls on Public Release of Controlled Technology**

It has been DDTC's long standing practice to require prior authorization for any public release of ITAR-controlled technical data, source code or software (e.g., posting controlled technical data on a public website). BIS, however, takes a less stringent approach to publicly available information, removing technology, software, and source code from EAR controls once the items are made public (or intended to be made public) without requiring prior authorization BIS.  *See* EAR § 734.3(b)(3).  Therefore, if jurisdiction over technical data related to the design, production or use of semi-automatic or military-style firearms transfers to BIS, there would no longer be any controls on companies or individuals releasing such sensitive information into the public domain.

This significant risk is not hypothetical.  In *Defense Distributed v. U.S. Department of State*, the Fifth Circuit ordered manufacturer Defense Distributed to remove 3-D printing instructions from the Internet after the State Department charged the company with violating the ITAR.  In contrast, under the proposed rules, such manufacturers would be able to freely release 3-D printing instructions and code into the public domain (and thereby enable the private production of firearms overseas and in the United States), as the EAR permit publication of source code and technology (except encryption source code and technology) without authorization from BIS.  If this were the case, the public would have significantly higher access to the knowledge needed to manufacture guns, which could result in huge increases in the private manufacture and transfer of firearms with little to no oversight by governments.

In general, items that would move to the CCL would be subject to existing EAR controls on technology, software, and source code.  However, while the EAR control certain technology, software, and source code set forth in the CCL, Section 734.3 excludes certain published information and software from control under the EAR.  For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restriction on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published manual would no longer be "subject to the EAR," and therefore no longer subject to export controls.  *See* EAR §§ 734.3(b) and 734.7(a). Non-proprietary system descriptions, including for firearms and related items, are another example of information that are not subject to the EAR.  *See* EAR § 734.3(b)(3)(v).

This lack of control on public release of technology, software and source code related to semi-automatic and non-automatic firearms appears to be a significant loophole that could be exploited to release sensitive design, production and use technology regarding highly dangerous weapons.

**<u>8.</u>   The Proposed Rules Would Remove Licensing Requirements for Temporary Imports, Creating Another Channel for Criminals to Obtain Dangerous Weapons in the United States**

Temporary imports (import into the United States of defense articles, technical data, and defense services on the USML and their subsequent export) are regulated by the ITAR (*see* ITAR Part

WASHAR0002399

123), while permanent imports of items on the U.S. Munitions Import List ("USMIL") are regulated by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The EAR imposes no import licensing requirements, so if semi-automatic or military-style firearms are transferred from the USML to the CCL, temporary imports of such items will not be regulated by any agency. Therefore, semi-automatic and military-style firearms could be freely imported into the United States without any authorization if the importer intends to subsequently export the items (the subsequent export of the item would require an export license from BIS). This includes temporary imports into the United States of semi-automatic and military-style firearms for gun shows, trade shows, or for repair or refurbishment. While the subsequent export of these firearms would require an export license from BIS, a key control that requires U.S. Government authorization *before* the import of the controlled firearms into the United States would be removed.

This approach would not only cause confusion and make compliance more difficult, but could result in more firearms flooding the U.S. market without any meaningful regulation. The United States already has a significant crime gun problem; while every firearm is manufactured as a legal consumer product, the opportunities for diversion to the criminal market are numerous. Guns are trafficked across jurisdictional lines, from states with weak laws to those cities and states where there are more gun regulations. This practice continues to fuel violence in cities like Chicago and Baltimore, which both have strong gun laws in place but border areas where it is easy to purchase multiple guns in one transaction with little or no regulation. Additionally, the large private sale loophole continues to put guns in the hands of dangerous criminals, who can exploit a system that only requires licensed gun dealers to conduct background checks on firearms sales. It is through this method that approximately at least one in five guns are sold in the United States today without a background check. Continually flooding the market with a supply of cheap handguns and assault rifles by permitting the legal "temporary import" of firearms that may never be re-exported will only exacerbate these problems.

Furthermore, the ATF does not have the capacity or resources to pursue the illegal distribution of firearms that were originally intended to be temporary imports, but are subsequently sold in the United States (thus making them permanent imports). While the ATF is tasked with regulating permanent imports of items on the USMIL, it is subject to severe resource constraints in exercising its jurisdiction, including finding and sanctioning individuals trying to distribute temporarily imported firearms in the United States. Therefore, the BIS export licensing process and the reality of the ATF's capacity together mean that illegal gun sales and transfers within the United States may skyrocket if the Proposed Rules go into effect.

<u>**9.**</u>   **The Proposed Rules Would Make it Easier For Foreign Gun Manufacturers to Sell and Distribute Firearms Based on U.S. Origin Components and Technology**

Under the ITAR, defense articles, such as firearms and their components and ammunition, require export licensing regardless of their destination, unless a narrow exemption applies. The ITAR "See-Through Rule" provides that foreign manufactured items are subject to the ITAR, including licensing requirements, if they contain any amount of U.S.-origin content subject to the ITAR, no matter how trivial. As such, foreign manufacturers must seek authorization from DDTC prior to exporting foreign items that incorporate ITAR-controlled components or technology in their foreign made item.

9

BIS, however, has a less strict approach to incorporation of U.S.-origin content than DDTC. Unlike the ITAR, the EAR apply the "De Minimis Rule" to foreign items that are manufactured using U.S.-origin content. *See* EAR § 734.4. Under the De Minimis Rule, foreign items that have less than 25% U.S.-origin controlled content (by value) are not subject to the controls of the EAR. Therefore, foreign manufacturers could use U.S.-origin components or technology to produce products that are not subject to U.S. export control laws if the value of the U.S.-origin controlled content is under 25% of the value of the final product. With regard to components of semi-automatic and non-automatic firearms transferred to the CCL, such items would remain subject to the ITAR's See-Through Rule when incorporated into a foreign firearm and exported to certain countries subject to U.S. unilateral or United Nations arms embargoes. *See* ITAR § 126.1. However, exports of such firearms with U.S. content outside of these arms embargoed countries would be subject to the more permissive De Minimis Rule under the EAR. As such, foreign manufacturers would be able to export semi-automatic and military-style firearms made using less than 25% U.S.-origin controlled content without any U.S. Government scrutiny to most countries around the world (except for those subject to U.S. or United Nations arms embargoes).

For example, under the current State Department rules, if a foreign gun manufacturer in Germany sourced its barrels from a U.S. company and the barrels made up 20% of the value of the foreign manufactured gun, that gun would be subject to ITAR licensing and congressional reporting requirements if the German manufacturer wanted to export such guns to the Philippines. Under the Commerce Department rules, such sales would not be subject to U.S. export control requirements.

Based on the foregoing, we urge DDTC and BIS to withdraw the proposed rule and keep semi-automatic and military-style guns (along with their components and ammunition) on the USML under DDTC jurisdiction. This approach would best support the safe use and export of firearms outside the United States.

Brady is available to comment further on this proposed rule change and any other agency initiatives impacting the domestic or global firearms policy. Please contact us by reaching out to Sean Kirkendall, Policy Director, Brady Campaign to Prevent Gun Violence, at skirkendall@bradymail.org or (202) 370-8145.

WASHAR0002401

# Exhibit B

WASHAR0002402

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.    *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

(a)    Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

(b)    Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0002404

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.    *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.    *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0002405

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0002406

5.      *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

6.      *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

7.      *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0002407

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0002408

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.    *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-    The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

-    The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

-    The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

-    The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

-    The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

-    The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0002409

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0002410

| | |
|---|---|
| **From:** | Miller, Michael F <Millermf@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 10:29 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Cc:** | Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |

███████████████████████████████████████████████████████

Official - Transitory
UNCLASSIFIED

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits

In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.

██████████████████████████████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits

How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Friday, July 27, 2018 9:46 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: 18.04.06 DOJ MTD.pdf |

████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:31 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:29 AM
**To:** Fabry, Steven F <FabrySF@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

██████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Friday, July 27, 2018 9:27 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:25 AM
**To:** Fabry, Steven F; Hart, Robert L; Heidema, Sarah J; Miller, Michael F; Rogers, Shana A; Freeman, Jeremy B
**Subject:** RE: 18.04.06 DOJ MTD.pdf

██████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Friday, July 27, 2018 9:23 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J

<HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>;
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████████████████
-- Steve

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:21 AM
**To:** Hart, Robert L; Heidema, Sarah J; Miller, Michael F; Rogers, Shana A; Freeman, Jeremy B; Fabry, Steven F
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Friday, July 27, 2018 9:18 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████████████████
████████████████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████████████
**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:07 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:01 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry,

Steven F <FabrySF@state.gov>;
**Subject:** RE: 18.04.06 DOJ MTD.pdf

███████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:00 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>;
Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F
<FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

█████████████████████████████

~~Official - SBU~~
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:55 AM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L
<HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry,
Steven F <FabrySF@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

FYI-
**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>;
Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,
On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice.
Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh
**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A
<DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by the
end of April?

# EXHIBIT 18

WASHAR0002415



<u>BY FEDERAL EXPRESS</u>
ADVANCE COPY BY ELECTRONIC MAIL
(whs.pentagon.esd.mbx.secrev@mail.mil)

September 2, 2014

Department of Defense
Office of Security Review
2A534, Pentagon
Washington DC 20301-1155

**Subject:**     **Request for OSR Review of AR-15 Lower Receiver Documents**

Dear Department Representative:

This is a request for review under ITAR Section 125.4(b)(13) and DoDD 5230.29.

Accompanying this letter please find the documents for review. They consist of two (2) electronic files (.STP, and .STL formats) for a lower receiver to the AR-15 rifle and five (5) rendered images of the electronic files. These documents are also attached to the email transmitting and advance copy of this letter.

The original of this letter, five (5) CD-ROMs containing the electronic files, and five (5) unbound copies of the rendered images for review, are being sent contemporaneously herewith by Federal Express.

The electronic files are Computer Assisted Drafting ("CAD") files that can be used with a 3D printer or a computer numerical control machine to produce the hardware depicted in the rendered images of the electronic files.

These documents were created by John Sullivan, who is an employee of Defense Distributed. Defense Distributed is a Texas corporation. It is registered with the Department of State as a Defense Article Manufacturer under registration number M-34702.

The information contained in the documents is NOT company proprietary, was NOT developed under any U.S. Government contract, and is NOT subject to any government contract restrictions on dissemination.

These documents are NOT in the public domain. However, public release of the information contained in documents will not harm national security because design

DefDist | 1101 W 34ᵗʰ St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 1 of 3

Scanned by CamScanner

App. 283

WASHAR0002416



specifications containing similar information and similar CAD files for AR-15 lower receivers are already publicly available online.

.STP and/or .STL files for AR-15 lower receivers are already publicly available for download at a variety of web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
http://grabcad.com/library/ar-15-lower-receiver
http://grabcad.com/library/a-printable-ar15-lower-receiver
https://grabcad.com/library/ar15-lower-concept-1
http://grabcad.com/library/ar-15-lower-receiver

Other CAD file formats for lower receivers to the AR-15 are also publicly available online at web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
www.cncguns.com/downloads.html

In addition, detailed design specifications for AR-15 lower receivers are also available online from a variety of sources, to include the following:

www.homegunsmith.com/archive/T6215.html
www.ar15.com/archive/topic.html?b=3&f=4&t=619878
www.advancedrifles.com/build-it-yourself
www.biggerhammer.net/ar15/cad/

I expect to publish the documents on the Defense Distributed website on or about October 1, 2014. OSR review of the documents is therefore needed before September 30, 2014, but review after this time is acceptable in lieu of return without action.

Response by email to me at crw@defdist.org is preferred. If mailing the response, the address for mailing is: 1101 West 34th St., #340, Austin, Texas 78705.

Thank you for your consideration in the matter. I can be reached at (501) 743-9680 with any questions, comments or concerns.

Sincerely,

Cody R. Wilson
Director
Defense Distributed, Inc.

DefDist | 1101 W 34ᵗʰ St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 2 of 3

Scanned by CamScanner

App. 284

WASHAR0002417



Att./Encl.:

    .IPT Electronic File for AR-15 Lower Receiver (CD-ROM)
    .STEP Electronic File for AR-15 Lower Receiver (CD-ROM)
    .STL Electronic File for AR-15 Lower Receiver (CD-ROM)
    5 Rendered Images of .STEP and .STL files

Scanned by CamScanner

App. 285

WASHAR0002418

# EXHIBIT 19

App. 286

WASHAR0002419



**BY FEDERAL EXPRESS**
ADVANCE COPY BY ELECTRONIC MAIL
(whs.pentagon.esd.mbx.secrev@mail.mil)

October 9, 2014

Department of Defense
Office of Security Review
2A534, Pentagon
Washington DC 20301-1155

Subject:    **Request for OSR Review of AR-15 Lower Receiver Documents (C)**

Dear Department Representative:

This is a request for review under ITAR Section 125.4(b)(13) and DoDD 5230.29.

Accompanying this letter please find the documents for review. They consist of two (2) electronic files (.STP, and .STL formats) for a lower receiver to the AR-15 rifle and five (5) rendered images of the electronic files. These documents are also attached to the email transmitting and this advance copy letter.

The original of this letter, five (5) CD-ROMs containing the electronic files, and five (5) unbound copies of the rendered images for review, are being sent contemporaneously herewith by Federal Express.

The electronic files are Computer Assisted Drafting ("CAD") files that can be used with a 3D printer or a computer numerical control machine to produce the hardware depicted in the rendered images of the electronic files.

These documents were created by John Sullivan, who is an employee of Defense Distributed. Defense Distributed is a Texas corporation. It is registered with the Department of State as a Defense Article Manufacturer under registration number M-34702.

The information contained in the documents is NOT company proprietary, was NOT developed under any U.S. Government contract, and is NOT subject to any government contract restrictions on dissemination.

These documents are NOT in the public domain. However, public release of the information contained in documents will not harm national security because design

DefDist | 1101 W 34ᵗʰ St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 1 of 3

App. 287

Scanned by CamScanner
WASHAR0002420



specifications containing similar information and similar CAD files for AR-15 lower receivers are already publicly available online.

.STP and/or .STL files for AR-15 lower receivers are already publicly available for download at a variety of web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
http://grabcad.com/library/ar-15-lower-receiver
http://grabcad.com/library/a-printable-ar15-lower-receiver
https://grabcad.com/library/ar15-lower-concept-1
http://grabcad.com/library/ar-15-lower-receiver

Other CAD file formats for lower receivers to the AR-15 are also publicly available online at web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
www.cncguns.com/downloads.html

In addition, detailed design specifications for AR-15 lower receivers are also available online from a variety of sources, to include the following:

www.homegunsmith.com/archive/T6215.html
www.ar15.com/archive/topic.html?b=3&f=4&t=619878
www.advancedrifles.com/build-it-yourself
www.biggerhammer.net/ar15/cad/

I expect to publish the documents on the Defense Distributed website on or about October 1, 2014. OSR review of the documents is therefore needed before November 3, 2014, but review after this time is acceptable in lieu of return without action.

Response by email to me at crw@defdist.org is preferred. If mailing the response, the address for mailing is: 1101 West 34th St., #340, Austin, Texas 78705.

Thank you for your consideration in the matter. I can be reached at (501) 743-9680 with any questions, comments or concerns.

Sincerely,

Cody R. Wilson
Director
Defense Distributed, Inc.

App. 288

Scanned by CamScanner
WASHAR0002421



Att./Encl.:

.STP Electronic File for AR-15 Lower Receiver (Collapsible Stock) (CD-ROM)
.STL Electronic File for AR-15 Lower Receiver (Collapsible Stock) (CD-ROM)
5 Rendered Images of .STP and .STL files



Scanned by CamScanner
WASHAR0002422

# EXHIBIT 20

WASHAR0002423



**BY FEDERAL EXPRESS**
ADVANCE COPY BY ELECTRONIC MAIL
(whs.pentagon.esd.mbx.secrev@mail.mil)

October 9, 2014

Defense Office of Prepublication and Security Review
Room 2A534
1155 Defense Pentagon
Washington DC 20301-1155

**Subject:**     **Request for OSR Review of AR-15 Lower Receiver Documents (M)**

Dear Department Representative:

This is a request for review under ITAR Section 125.4(b)(13) and DoDD 5230.29.

Accompanying this letter please find the documents for review. They consist of two (2) electronic files (.STP, and .STL formats) for a lower receiver to the AR-15 rifle and five (5) rendered images of the electronic files. These documents are also attached to the email transmitting and this advance copy letter.

The original of this letter, five (5) CD-ROMs containing the electronic files, and five (5) unbound copies of the rendered images for review, are being sent contemporaneously herewith by Federal Express.

The electronic files are Computer Assisted Drafting ("CAD") files that can be used with a 3D printer or a computer numerical control machine to produce the hardware depicted in the rendered images of the electronic files.

These documents were created by John Sullivan, who is an employee of Defense Distributed. Defense Distributed is a Texas corporation. It is registered with the Department of State as a Defense Article Manufacturer under registration number M-34702.

The information contained in the documents is NOT company proprietary, was NOT developed under any U.S. Government contract, and is NOT subject to any government contract restrictions on dissemination.

These documents are NOT in the public domain. However, public release of the information contained in documents will not harm national security because design

DefDist | 1101 W 34th St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 1 of 3

WASHAR0002424



specifications containing similar information and similar CAD files for AR-15 lower receivers are already publicly available online.

.STP and/or .STL files for AR-15 lower receivers are already publicly available for download at a variety of web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
http://grabcad.com/library/ar-15-lower-receiver
http://grabcad.com/library/a-printable-ar15-lower-receiver
https://grabcad.com/library/ar15-lower-concept-1
http://grabcad.com/library/ar-15-lower-receiver

Other CAD file formats for lower receivers to the AR-15 are also publicly available online at web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
www.cncguns.com/downloads.html

In addition, detailed design specifications for AR-15 lower receivers are also available online from a variety of sources, to include the following:

www.homegunsmith.com/archive/T6215.html
www.ar15.com/archive/topic.html?b=3&f=4&t=619878
www.advancedrifles.com/build-it-yourself
www.biggerhammer.net/ar15/cad/

I expect to publish the documents on the Defense Distributed website on or about October 1, 2014. OSR review of the documents is therefore needed before November 3, 2014, but review after this time is acceptable in lieu of return without action.

Response by email to me at crw@defdist.org is preferred. If mailing the response, the address for mailing is: 1101 West 34th St., #340, Austin, Texas 78705.

Thank you for your consideration in the matter. I can be reached at (501) 743-9680 with any questions, comments or concerns.

Sincerely,

Cody R. Wilson
Director
Defense Distributed, Inc.

DefDist | 1101 W 34th St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 2 of 3

WASHAR0002425

App. 292



Att./Encl.:

    .STP Electronic File for AR-15 Lower Receiver (Metal) (CD-ROM)
    .STL Electronic File for AR-15 Lower Receiver (Metal) (CD-ROM)
    5 Rendered Images of .STP and .STL files

WASHAR0002426

# EXHIBIT 21

WASHAR0002427



**BY FEDERAL EXPRESS**
ADVANCE COPY BY ELECTRONIC MAIL
(whs.pentagon.esd.mbx.secrev@mail.mil)

October 23, 2014

Defense Office of Prepublication and Security Review
Room 2A534
1155 Defense Pentagon
Washington DC 20301-1155

**Subject:      Request for OSR Review of AR-15 Lower Receiver Documents (C)**

Dear Department Representative:

This is a request for review under ITAR Section 125.4(b)(13) and DoDD 5230.29.

Accompanying this letter please find the documents for review. They consist of two (2) electronic files (.STP, and .STL formats) for a lower receiver to the AR-15 rifle and five (5) rendered images of the electronic files. These documents are also attached to the email transmitting and this advance copy letter.

The original of this letter, five (5) CD-ROMs containing the electronic files, and five (5) unbound copies of the rendered images for review, are being sent contemporaneously herewith by Federal Express.

The electronic files are Computer Assisted Drafting ("CAD") files that can be used with a 3D printer or a computer numerical control machine to produce the hardware depicted in the rendered images of the electronic files.

These documents were created by John Sullivan, who is an employee of Defense Distributed. Defense Distributed is a Texas corporation. It is registered with the Department of State as a Defense Article Manufacturer under registration number
M-34702.

The information contained in the documents is NOT company proprietary, was NOT developed under any U.S. Government contract, and is NOT subject to any government contract restrictions on dissemination.

These documents are NOT in the public domain. However, public release of the information contained in documents will not harm national security because design

DefDist | 1101 W 34th St. # 340 Austin, TX 78705 | DefDist.org

WASHAR0002428



specifications containing similar information and similar CAD files for AR-15 lower receivers are already publicly available online.

.STP and/or .STL files for AR-15 lower receivers are already publicly available for download at a variety of web addresses, to include the following:

> www.3dcadbrowser.com/download.aspx?3dmodel=42013
> http://grabcad.com/library/ar-15-lower-receiver
> http://grabcad.com/library/a-printable-ar15-lower-receiver
> https://grabcad.com/library/ar15-lower-concept-1
> http://grabcad.com/library/ar-15-lower-receiver

Other CAD file formats for lower receivers to the AR-15 are also publicly available online at web addresses, to include the following:

> www.3dcadbrowser.com/download.aspx?3dmodel=42013
> www.cncguns.com/downloads.html

In addition, detailed design specifications for AR-15 lower receivers are also available online from a variety of sources, to include the following:

> www.homegunsmith.com/archive/T6215.html
> www.ar15.com/archive/topic.html?b=3&f=4&t=619878
> www.advancedrifles.com/build-it-yourself
> www.biggerhammer.net/ar15/cad/

I expect to publish the documents on the Defense Distributed website on or about October 1, 2014. OSR review of the documents is therefore needed before November 3, 2014, but review after this time is acceptable in lieu of return without action.

Response by email to me at crw@defdist.org is preferred. If mailing the response, the address for mailing is: 1101 West 34th St., #340, Austin, Texas 78705.

Thank you for your consideration in the matter. I can be reached at (501) 743-9680 with any questions, comments or concerns.

Sincerely,

Cody R. Wilson
Director
Defense Distributed, Inc.

WASHAR0002429



Att./Encl.:

.STP Electronic File for AR-15 Lower Receiver (Collapsible Stock) (CD-ROM)
.STL Electronic File for AR-15 Lower Receiver (Collapsible Stock) (CD-ROM)
5 Rendered Images of .STP and .STL files

WASHAR0002430

# EXHIBIT 22

WASHAR0002431



**From:** King, Walter J CIV WHS ESD (US) walter.j.king.civ@mail.mil  📎
**Subject:** RE: Meeting re Open Defense Distributed Requests
**Date:** December 31, 2014 at 2:59 PM
**To:** matthew@goldsteinpllc.com

Matt,

You requested DOPSR respond NLT the end of the year on these issues in your 2 Dec e-mail.

I've attached three letters, the first clarifying case 15-S-2473 (only the printed or rendered images not the actual CAD files are cleared for public release), a copy of the original approval letter for that case, and the outcomes of 15-S-0358 and 15-S-0514 (again only the printed or rendered images are cleared for public release). Please see the letters for additional explanation.

I've been short staffed this holiday period and regret not sending them to you previously. Hard copies will also be sent regular mail.

R,

Wally King, P.E.
Chief, Technology Branch
Defense Office of Prepublication and Security Review
Department of Defense
Room 2A534, The Pentagon
Direct line: 703-614-4908
General line: 703-614-5001
http://www.dtic.mil/whs/esd/osr/

-----Original Message-----
From: matthew@goldsteinpllc.com [mailto:matthew@goldsteinpllc.com]
Sent: Wednesday, December 10, 2014 7:20 AM
To: King, Walter J CIV WHS ESD (US)
Subject: RE: Meeting re Open Defense Distributed Requests

Wally,

Files for the Collapsible stock receiver is attached.

-Matt

Matthew A. Goldstein | Counsel
1012 14th Street, NW, Suite 620
Washington, DC 20005
C: 1.202.550.0040
www.GoldsteinPLLC.com

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. Thank you.

--------- Original Message ---------
Subject: RE: Meeting re Open Defense Distributed Requests
From: "King, Walter J CIV WHS ESD (US)" <walter.j.king.civ@mail.mil>
Date: 12/9/14 1:30 pm
To: "Matthew Goldstein" <matthew@goldsteinpllc.com>

Matt,

    While you forwarded the 9 Oct letter a couple of times, I don't think the attachments made it to us. I can't find any evidence it was actually delivered to our SECREV account. Perhaps it was sent on the day we exceeded our storage allocation?

    Unlike the 23 Oct letter which had e-mail attachments when sent to our SECREV office e-mail account--so we could process that request even though the FedEx it referenced was returned to your client and not delivered.

R,

Wally

App. 299

WASHAR0002432

-----Original Message-----
From: Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
Sent: Wednesday, December 03, 2014 11:33 AM
To: King, Walter J CIV WHS ESD (US)
Cc: Kluzik, Donald E CIV WHS ESD (US)
Subject: Re: Meeting re Open Defense Distributed Requests
Importance: High

Thanks Wally.

The October 9 and 23 requests are for electronic files and images that pertain to two different AR-15 lower receiver variants (one is "metal" and the other is for "collapsible stock").

Were both requests consolidated and assigned re same case no (i.e., 15-S-0358)?

-Matt


Matthew A. Goldstein | Counsel
1012 14th Street, NW, Suite 620
Washington, DC 20005
C: +1.202.550.0040


> On Dec 3, 2014, at 9:37 AM, King, Walter J CIV WHS ESD (US) <walter.j.king.civ@mail.mil> wrote:
>
> Mr. Goldstein,
>
> This request was assigned case number 15-S-0358 (Mr. Don Kluzik is my AO), this case was assigned for review outside our organization, and is due back 5 Dec 2014. I know of no delays, but we don't consider the case late until the due date has passed.
>
> I'll contact the reviewing office next Monday if we don't get their response this week.
>
> While Tina assisted both of us in tracking down delivery difficulties she doesn't normally work security review cases. She is our dedicated security manager. It's ok to exclude her in future correspondence. You're welcome to contact myself or Mr. Kluzik for future updates.
>
> R,
>
> Wally
>
>
>
> -----Original Message-----
> From: Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
> Sent: Tuesday, December 02, 2014 2:14 PM
> To: King, Walter J CIV WHS ESD (US); Riley, Tina L CIV WHS ESD (US)
> Subject: Re: Meeting re Open Defense Distributed Requests
>
> Hit send too soon - requests are attached to this email.
>
> Thanks.
>
> -Matt
>
>
>> On Dec 2, 2014, at 2:12 PM, Matthew Goldstein <matthew@goldsteinpllc.com> wrote:
>>
>> Wally and Tina,
>>
>> Just checking in on status of the attached October Defense Distributed requests for OSR review/clearance.
>>
>> We'd like to get responses for the company by the end of the year. I'd like to visit with you in-person to informally discuss and perhaps answer any questions you may have if there's something in particular holding up the reviews.
>>
>> Are you available to meet Monday 12/8 at 11:00 am?
>>
>> Thanks.
>>
>> -Matt
>>
>>
>> Matthew A. Goldstein | Counsel
>> 1012 14th Street, NW, Suite 620
>> Washington, DC 20005

App. 300

WASHAR0002433

>> C: +1.202.550.0040
>> www.GoldsteinPLLC.com
>>
>> This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. Thank you.
>>
>>
>>
>>
>
>



14-S-2473 (clarification)
14-S-2473 ...d 0514.pdf

App. 301

WASHAR0002434



**DEPARTMENT OF DEFENSE**
DEFENSE OFFICE OF PREPUBLICATION AND SECURITY REVIEW
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

December 22, 2014
Ref: 14-S-2473

Mr. Cody R. Wilson
Defense Distributed
1101 West 34th Street, #340
Austin, TX 78705

Dear Mr. Wilson:

This is a clarification to the enclosed September 25, 2014, correspondence providing public release approval of the indicated documents titled:

- "AR-15 Lower Receiver"

The Defense Office of Prepublication and Security Review (DOPSR) desires to clarify the previous approval for public release was in compliance with the International Traffic in Arms Regulations (ITAR) 125.4(b)(13) including ITAR 125.4(a) which states this exemption "are also not applicable for purposes of establishing offshore procurement arrangements *or producing defense articles offshore...*"

In other words, only the **rendered images** previously requested for review (hard copy or electronic) included within the subject request are **APPROVED** for public release as previously stated in our 25 September letter, *however, to clarify,* public release approval of **the actual electronic CAD files** your request letter states "can be used with a 3D printer or a computer numerical control machine to *produce* the hardware depicted in the rendered images of the electronic files" cannot be approved under ITAR 125.4(b)(13), DOPSR's sole ITAR mention, and **are therefore beyond the purview of DOPSR.**

DOPSR recommends you contact the Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance regarding public release of any electronic CAD files that can assist in *producing* defense articles controlled under the ITAR.

Please direct any questions regarding this case to Mr. Donald Kluzik at 703-614-4931, email: donald.e.kluzik.civ@mail.mil.

Sincerely,

M. M. Langerman
Chief

Enclosures:
As stated

App. 302

September 25, 2014
Ref: 14-S-2473

Mr. Cody R. Wilson
Defense Distributed
1101 West 34th Street, #340
Austin, TX 78705

Dear Mr. Wilson:

This is in response to the enclosed September 2, 2014, correspondence requesting public release approval of the enclosed documents titled:

- "AR-15 Lower Receiver"

The documents are **APPROVED** for public release. However, this approval does not include any photograph, picture, exhibit, caption, or other supplemental material not specifically approved by this office. Our concurrence for release does not imply DoD endorsement or factual accuracy of the material.

Please direct any questions regarding this case to Mr. Donald Kluzik at 703-614-4931, email: donald.e.kluzik.civ@mail.mil.

Sincerely,

M. M. Langerman
Chief

Enclosures:
As stated

Prepared by: dekluzik:9/25/14:DOPSR:703-614-4931:gr ƊK pk_____

App. 303

WASHAR0002436



**DEPARTMENT OF DEFENSE**
DEFENSE OFFICE OF PREPUBLICATION AND SECURITY REVIEW
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

December 22, 2014
Ref: 15-S-0358
15-S-0514

Mr. Cody R. Wilson
Defense Distributed
1101 West 34th Street, #340
Austin, TX 78705

Dear Mr. Wilson:

This is in response to the letters requesting public release approval of the indicated documents titled:

- "AR-15 Lower Receiver (C)"
- "AR-15 Lower Receiver (M)"

The Defense Office of Prepublication and Security Review (DOPSR) must stay consistent with previous approvals for public release and in compliance with the International Traffic in Arms Regulations (ITAR) 125.4(b)(13) including ITAR 125.4(a) which states this exemption "are also not applicable for purposes of establishing offshore procurement arrangements *or producing defense articles offshore...*"

Therefore, only the **rendered images** requested for review (hard copy or electronic) included within the subject request are **APPROVED** for public release. Public release approval of **the actual electronic CAD files** your request letter states "can be used with a 3D printer or a computer numerical control machine to *produce* the hardware depicted in the rendered images of the electronic files" cannot be approved under ITAR 125.4(b)(13), DOPSR's sole ITAR mention, and **are therefore beyond the purview of DOPSR.**

DOPSR recommends you contact the Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance regarding public release of any electronic CAD files that can assist in *producing* defense articles controlled under the ITAR.

Please direct any questions regarding this case to Mr. Donald Kluzik at 703-614-4931, email: donald.e.kluzik.civ@mail.mil.

Sincerely,

M. M. Langorman
Chief

Enclosures:
As stated

App. 304

# EXHIBIT 23

WASHAR0002438

MATTHEW A. GOLDSTEIN, PLLC
INTERNATIONAL TRADE
1012 14TH STREET, NW, SUITE 620
WASHINGTON, D.C. 20005

**BY COURIER / FEDERAL EXPRESS**
Advanced Copy by Email to DDTCResponseTeam@state.gov

January 5, 2015

Ed Peartree, Director
Office of Defense Trade Controls Policy
U.S. Department of State
PM/DDTC, SA-1, 12th Floor
2401 E Street, NW
Washington, D.C. 20037

**SUBJECT: Advisory Opinion Request How to Obtain Prepublication Approval of CAD Files from DDTC Compliance and/or Other Agencies/DDTC Divisions**
Defense Distributed, Inc., PM/DDTC Code M-34702

Dear Mr. Peartree:

Pursuant to Section 126.9 and 129.10 of the International Traffic in Arms Regulations ("ITAR") (22 C.F.R. Sections 120-130), Defense Distributed requests an advisory opinion from the Directorate of Defense Trade Controls ("DDTC") on how to obtain prepublication approval from the Office of Defense Trade Controls Compliance ("DDTC Compliance") to transmit privately generated unclassified Computer Assisted Drawing ("CAD") files into the Internet and other public forums.

The request also seeks DDTC advisement on what kinds of software, CAD, and other electronic files are reviewable by the Department of Defense Department Office of Prepublication and Security Review ("DOPSR") for public release.

A copy of recent letters from DOPSR recommending that Defense Distributed pursue prepublication approval with DDTC Compliance for public postings of CAD files is provided with this request at Attachment 1.

A letter from Defense Distributed authorizing my law firm to file this request is enclosed at Attachment 2. Please direct any questions and all correspondence related to this request to my office. Communications to me at matthew@goldsteinpllc.com are preferred.

**I. BACKGROUND**

Defense Distributed is a Texas corporation, registered with the Department of State as a defense article manufacturer under PM/DDTC Code M-34702. The company has developed technical information that can be used to produce, manufacture, and assemble various parts components, accessories, and attachments to firearms that may be controlled under the ITAR.

WASHAR0002439

Following notification from DDTC in May 8, 2013, that the agency requires U.S. Government prior approval before publications of technical information into the public forums (Attachment 3), Defense Distributed has submitted requests for U.S. Government clearance of technical data on Defense Distributed projects to DOPSR.[1]

On September 2, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of certain CAD files. DOPSR assigned the request case no. 14-S-2473.

On October 9, 2014, Defense Distributed sent DOPSR two additional requests for prepublication approval for public release of certain CAD files. DOPSR assigned the requests case nos. 15-S-0358 and 15-S-0514.

Copies of the letters sent with Defense Distributed requests to DOPSR are provided at Attachment 4.

On December 31, 2014, DOPSR sent Plaintiff two letters (Attachment 1), postdated December 22, 2014, responding to the Defense Distributed CAD file release requests. The DOPSR letters state that DOPSR will not review the CAD files because the files can be used to "produce" defense articles and can be used in "offshore procurement." In the letters, DOPSR further states:

> DOPSR recommends you contact the Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance regarding public release of any electronic CAD files that can assist in *producing* defense articles controlled under the ITAR.

## II.  SPECIFIC REQUEST FOR GUIDANCE

Defense Distributed requests DDTC guidance on the following specific questions:

1.  What is the specific process for obtaining prepublication approval from DDTC Compliance to transmit privately generated unclassified CAD files, and other files into the Internet and other public forums?

2.  What kinds of software, CAD, and other electronic files are reviewable by DOPSR for public release?

3.  What kinds of software, CAD, and other electronic files are reviewable by DDTC Compliance for public release?

---

[1] In complying with current DDTC-imposed restrictions on publication of technical information into the public domain, Defense Distributed does not intent to, nor should it be considered to, waive any defense, claim or right under law.

WASHAR0002440

    4.     What kinds of software, CAD, and other electronic files are reviewable by other DDTC Divisions for public release?

## III.   REQUEST FOR EXPEDITED CONSIDERATION

        Defense Distributed understands that DDTC normally responds to advisory opinion requests in thirty (30) days. However, time is of the essence when speech restrained by a government agency. Accordingly, please advise if DDTC will require more than thirty (30) days to answer this request so that the Defense Distributed can plan accordingly.

        Thank you for your prompt attention to this matter and please contact me at 202-550-0040 or at matthew@goldsteinpllc.com if any additional information is needed.

        Yours truly,

Matthew A. Goldstein
Legal Counsel

**ENCLOSURES:**

Original and Seven (7) Copies of this Request

| | |
|---|---|
| Attachment 1 | Department of Defense December 22, 2015 Letter |
| Attachment 2 | Letter Authorizing Counsel to File Advisory Opinion Request |
| Attachment 3 | May 8, 2013 DDTC Letter to Defense Distributed |
| Attachment 4 | Defense Distributed Letters Accompanying Subject DOPSR Requests |

WASHAR0002441

# **ATTACHMENT 1**

WASHAR0002442



**DEPARTMENT OF DEFENSE**
DEFENSE OFFICE OF PREPUBLICATION AND SECURITY REVIEW
1155 DEFENSE PENTAGON
WASHINGTON,DC 20301-1155

December 22, 2014
Ref: 14-S-2473

Mr. Cody R. Wilson
Defense Distributed
1101 West 34th Street, #340
Austin, TX 78705

Dear Mr. Wilson:

This is a clarification to the enclosed September 25, 2014, correspondence providing public release approval of the indicated documents titled:

• "AR-15 Lower Receiver"

The Defense Office of Prepublication and Security Review (DOPSR) desires to clarify the previous approval for public release was in compliance with the International Traffic in Arms Regulations (ITAR) 125.4(b)(13) including ITAR 125.4(a) which states this exemption "are also not applicable for purposes of establishing offshore procurement arrangements *or producing defense articles offshore...*"

In other words, only the **rendered images** previously requested for review (hard copy or electronic) included within the subject request are **APPROVED** for public release as previously stated in our 25 September letter, *however, to clarify,* public release approval of **the actual electronic CAD files** your request letter states "can be used with a 3D printer or a computer numerical control machine to *produce* the hardware depicted in the rendered images of the electronic files" cannot be approved under ITAR 125.4(b)(13), DOPSR's sole ITAR mention, and **are therefore beyond the purview of DOPSR.**

DOPSR recommends you contact the Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance regarding public release of any electronic CAD files that can assist in *producing* defense articles controlled under the ITAR.

Please direct any questions regarding this case to Mr. Donald Kluzik at 703-614-4931, email: donald.e.kluzik.civ@mail.mil.

Sincerely,

M. M. Langerman
Chief

Enclosures:
As stated

App. 310

September 25, 2014
Ref: 14-S-2473

Mr. Cody R. Wilson
Defense Distributed
1101 West 34th Street, #340
Austin, TX 78705

Dear Mr. Wilson:

This is in response to the enclosed September 2, 2014, correspondence requesting public release approval of the enclosed documents titled:

- "AR-15 Lower Receiver"

The documents are **APPROVED** for public release. However, this approval does not include any photograph, picture, exhibit, caption, or other supplemental material not specifically approved by this office. Our concurrence for release does not imply DoD endorsement or factual accuracy of the material.

Please direct any questions regarding this case to Mr. Donald Kluzik at 703-614-4931, email: donald.e.kluzik.civ@mail.mil.

Sincerely,

M. M. Langerman
Chief

Enclosures:
As stated

Prepared by: dekluzik:9/25/14:DOPSR:703-614-4931:gr ꝺΚ pk____

App. 311

WASHAR0002444



**DEPARTMENT OF DEFENSE**
DEFENSE OFFICE OF PREPUBLICATION AND SECURITY REVIEW
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

December 22, 2014
Ref: 15-S-0358
15-S-0514

Mr. Cody R. Wilson
Defense Distributed
1101 West 34th Street, #340
Austin, TX 78705

Dear Mr. Wilson:

This is in response to the letters requesting public release approval of the indicated documents titled:

- "AR-15 Lower Receiver (C)"
- "AR-15 Lower Receiver (M)"

The Defense Office of Prepublication and Security Review (DOPSR) must stay consistent with previous approvals for public release and in compliance with the International Traffic in Arms Regulations (ITAR) 125.4(b)(13) including ITAR 125.4(a) which states this exemption "are also not applicable for purposes of establishing offshore procurement arrangements *or producing defense articles offshore...*"

Therefore, only the **rendered images** requested for review (hard copy or electronic) included within the subject request are **APPROVED** for public release. Public release approval of **the actual electronic CAD files** your request letter states "can be used with a 3D printer or a computer numerical control machine to *produce* the hardware depicted in the rendered images of the electronic files" cannot be approved under ITAR 125.4(b)(13), DOPSR's sole ITAR mention, and **are therefore beyond the purview of DOPSR.**

DOPSR recommends you contact the Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance regarding public release of any electronic CAD files that can assist in *producing* defense articles controlled under the ITAR.

Please direct any questions regarding this case to Mr. Donald Kluzik at 703-614-4931, email: donald.e.kluzik.civ@mail.mil.

Sincerely,

M. M. Langofman
Chief

Enclosures:
As stated

App. 312

**ATTACHMENT 2**

WASHAR0002446



**BY COURIER / FEDERAL EXPRESS**
Advanced Copy by Email to DDTCResponseTeam@state.gov

January 5, 2015

Ed Peartree, Director
Office of Defense Trade Controls Policy
U.S. Department of State
PM/DDTC, SA-1, 12th Floor
2401 E Street, NW
Washington, D.C. 20037

**SUBJECT:   Letter authorizing Matthew A. Goldstein, PLLC to submit Advisory Opinion Request on behalf of Defense Distributed**

Dear Sir or Madam:

  The Law Office of Matthew A. Goldstein, PLLC is authorized to submit an Advisory Opinion request to the Directorate of Defense Trade Controls ("DDTC") on behalf of Defense Distributed, Inc. for advisement on how to obtain prepublication approval from the Office of Defense Trade Controls Compliance ("DDTC Compliance") to transmit privately generated unclassified Computer Assisted Drawing ("CAD") files into the Internet and other public forums; and on what kinds of software, CAD, and other electronic files are reviewable by the Department of Defense Department Office of Prepublication and Security Review for public release.

  Defense Distributed authorizes DDTC personnel and other U.S. Government representatives to speak with and to release information pertaining to the request to Mr. Goldstein, who can be reached at:

    Matthew A. Goldstein
    1012 14th Street, NW, Suite 620
    Washington, DC 20005
    (202) 550-0040
    matthew@goldsteinpllc.com

  Thank you in advance for your consideration.

  Yours truly,

  Cody R. Wilson

DefDist | 1101 W 34th St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 1 of 2

App. 314



Principal, Defense Distributed, Inc.
1101 W 34th St. #340
Austin, Texas 78705
(501) 743-9680
crw@defcad.com



WASHAR0002448                                                           App. 315

**ATTACHMENT 3**

WASHAR0002449



United States Department of State

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*
*Washington, D.C. 20522-0112*

MAY 08 2013

In reply refer to



Mr. Cody Wilson
Defense Distributed

Dear Mr. Wilson:

The Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance, Enforcement Division (DTCC/END) is responsible for compliance with and civil enforcement of the Arms Export Control Act (22 U.S.C. 2778) (AECA) and the AECA's implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (ITAR). The AECA and the ITAR impose certain requirements and restrictions on the transfer of, and access to, controlled defense articles and related technical data designated by the United States Munitions List (USML) (22 C.F.R. Part 121).

DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation. For a complete definition of technical data, see § 120.10 of the ITAR. Pursuant to § 127.1 of the ITAR,

App. 317

WASHAR0002450

- 2 -

it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The Department believes Defense Distributed may not have established the proper jurisdiction of the subject technical data. To resolve this matter officially, we request that Defense Distributed submit Commodity Jurisdiction (CJ) determination requests for the following selection of data files available on DEFCAD.org, and any other technical data for which Defense Distributed is unable to determine proper jurisdiction:

1. Defense Distributed Liberator pistol
2. .22 electric
3. 125mm BK-14M high-explosive anti-tank warhead
4. 5.56/.223 muzzle brake
5. Springfield XD-40 tactical slide assembly
6. Sound Moderator – slip on
7. "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter
8. 12 gauge to .22 CB sub-caliber insert
9. Voltlock electronic black powder system
10. VZ-58 front sight.

DTCC/END requests that Defense Distributed submit its CJ requests within three weeks of receipt of this letter and notify this office of the final CJ determinations. All CJ requests must be submitted electronically through an online application using the DS-4076 Commodity Jurisdiction Request Form. The form, guidance for submitting CJ requests, and other relevant information such as a copy of the ITAR can be found on DDTC's website at http://www.pmddtc.state.gov.

Until the Department provides Defense Distributed with final CJ determinations, Defense Distributed should treat the above technical data as ITAR-controlled. This means that all such data should be removed from public access immediately. Defense Distributed should also review the remainder of the data made public on its website to

WASHAR0002451

- 3 -

determine whether any additional data may be similarly controlled and proceed according to ITAR requirements.

Additionally, DTCC/END requests information about the procedures Defense Distributed follows to determine the classification of its technical data, to include the aforementioned technical data files. We ask that you provide your procedures for determining proper jurisdiction of technical data within 30 days of the date of this letter to Ms. Bridget Van Buren, Compliance Specialist, Enforcement Division, at the address below:

<div align="center">Office of Defense Trade Controls Compliance</div>



We appreciate your full cooperation in this matter. Please note our reference number in any future correspondence.

<div align="center">Sincerely,</div>

Glenn E. Smith
Chief, Enforcement Division

App. 319

WASHAR0002452

# **ATTACHMENT 4**

WASHAR0002453



WASHAR0002454

**BY FEDERAL EXPRESS**
ADVANCE COPY BY ELECTRONIC MAIL
(whs.pentagon.esd.mbx.secrev@mail.mil)

September 2, 2014

Department of Defense
Office of Security Review
2A534, Pentagon
Washington DC 20301-1155

**Subject:     Request for OSR Review of AR-15 Lower Receiver Documents**

Dear Department Representative:

This is a request for review under ITAR Section 125.4(b)(13) and DoDD 5230.29.

Accompanying this letter please find the documents for review. They consist of two (2) electronic files (.STP, and .STL formats) for a lower receiver to the AR-15 rifle and five (5) rendered images of the electronic files. These documents are also attached to the email transmitting and advance copy of this letter.

The original of this letter, five (5) CD-ROMs containing the electronic files, and five (5) unbound copies of the rendered images for review, are being sent contemporaneously herewith by Federal Express.

The electronic files are Computer Assisted Drafting ("CAD") files that can be used with a 3D printer or a computer numerical control machine to produce the hardware depicted in the rendered images of the electronic files.

These documents were created by John Sullivan, who is an employee of Defense Distributed. Defense Distributed is a Texas corporation. It is registered with the Department of State as a Defense Article Manufacturer under registration number M-34702.

The information contained in the documents is NOT company proprietary, was NOT developed under any U.S. Government contract, and is NOT subject to any government contract restrictions on dissemination.

These documents are NOT in the public domain. However, public release of the information contained in documents will not harm national security because design

DefDist | 1101 W 34th St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 1 of 3



specifications containing similar information and similar CAD files for AR-15 lower receivers are already publicly available online.

.STP and/or .STL files for AR-15 lower receivers are already publicly available for download at a variety of web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
http://grabcad.com/library/ar-15-lower-receiver
http://grabcad.com/library/a-printable-ar15-lower-receiver
https://grabcad.com/library/ar15-lower-concept-1
http://grabcad.com/library/ar-15-lower-receiver

Other CAD file formats for lower receivers to the AR-15 are also publicly available online at web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
www.cncguns.com/downloads.html

In addition, detailed design specifications for AR-15 lower receivers are also available online from a variety of sources, to include the following:

www.homegunsmith.com/archive/T6215.html
www.ar15.com/archive/topic.html?b=3&f=4&t=619878
www.advancedrifles.com/build-it-yourself
www.biggerhammer.net/ar15/cad/

I expect to publish the documents on the Defense Distributed website on or about October 1, 2014. OSR review of the documents is therefore needed before September 30, 2014, but review after this time is acceptable in lieu of return without action.

Response by email to me at crw@defdist.org is preferred. If mailing the response, the address for mailing is: 1101 West 34th St., #340, Austin, Texas 78705.

Thank you for your consideration in the matter. I can be reached at (501) 743-9680 with any questions, comments or concerns.

Sincerely,

Cody R. Wilson
Director
Defense Distributed, Inc.

DefDist | 1101 W 34th St. # 340 Austin, TX 78705 | DefDist.org

WASHAR0002455



Att./Encl.:

.IPT Electronic File for AR-15 Lower Receiver (CD-ROM)
.STEP Electronic File for AR-15 Lower Receiver (CD-ROM)
.STL Electronic File for AR-15 Lower Receiver (CD-ROM)
5 Rendered Images of .STEP and .STL files



WASHAR0002456

App. 323



**BY FEDERAL EXPRESS**
ADVANCE COPY BY ELECTRONIC MAIL
(whs.pentagon.esd.mbx.secrev@mail.mil)

October 9, 2014

Department of Defense
Office of Security Review
2A534, Pentagon
Washington DC 20301-1155

**Subject:**      **Request for OSR Review of AR-15 Lower Receiver Documents (M)**

Dear Department Representative:

This is a request for review under ITAR Section 125.4(b)(13) and DoDD 5230.29.

Accompanying this letter please find the documents for review. They consist of two (2) electronic files (.STP, and .STL formats) for a lower receiver to the AR-15 rifle and five (5) rendered images of the electronic files. These documents are also attached to the email transmitting and this advance copy letter.

The original of this letter, five (5) CD-ROMs containing the electronic files, and five (5) unbound copies of the rendered images for review, are being sent contemporaneously herewith by Federal Express.

The electronic files are Computer Assisted Drafting ("CAD") files that can be used with a 3D printer or a computer numerical control machine to produce the hardware depicted in the rendered images of the electronic files.

These documents were created by John Sullivan, who is an employee of Defense Distributed. Defense Distributed is a Texas corporation. It is registered with the Department of State as a Defense Article Manufacturer under registration number M-34702.

The information contained in the documents is NOT company proprietary, was NOT developed under any U.S. Government contract, and is NOT subject to any government contract restrictions on dissemination.

These documents are NOT in the public domain. However, public release of the information contained in documents will not harm national security because design

DefDist | 1101 W 34th St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 1 of 3

App. 324



specifications containing similar information and similar CAD files for AR-15 lower receivers are already publicly available online.

.STP and/or .STL files for AR-15 lower receivers are already publicly available for download at a variety of web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
http://grabcad.com/library/ar-15-lower-receiver
http://grabcad.com/library/a-printable-ar15-lower-receiver
https://grabcad.com/library/ar15-lower-concept-1
http://grabcad.com/library/ar-15-lower-receiver

Other CAD file formats for lower receivers to the AR-15 are also publicly available online at web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
www.cncguns.com/downloads.html

In addition, detailed design specifications for AR-15 lower receivers are also available online from a variety of sources, to include the following:

www.homegunsmith.com/archive/T6215.html
www.ar15.com/archive/topic.html?b=3&f=4&t=619878
www.advancedrifles.com/build-it-yourself
www.biggerhammer.net/ar15/cad/

I expect to publish the documents on the Defense Distributed website on or about October 1, 2014. OSR review of the documents is therefore needed before November 3, 2014, but review after this time is acceptable in lieu of return without action.

Response by email to me at crw@defdist.org is preferred. If mailing the response, the address for mailing is: 1101 West 34th St., #340, Austin, Texas 78705.

Thank you for your consideration in the matter. I can be reached at (501) 743-9680 with any questions, comments or concerns.

Sincerely,

Cody R. Wilson
Director
Defense Distributed, Inc.

DefDist | 1101 W 34th St. # 340 Austin, TX 78705 | DefDist.org

Office of Security Review
Page 2 of 3

WASHAR0002458

App. 325



Att./Encl.:

      .STP Electronic File for AR-15 Lower Receiver (Metal) (CD-ROM)
      .STL Electronic File for AR-15 Lower Receiver (Metal) (CD-ROM)
      5 Rendered Images of .STP and .STL files



WASHAR0002459

App. 326



ADVANCE COPY BY ELECTRONIC MAIL
(whs.pentagon.esd.mbx.secrev@mail.mil)

October 9, 2014

Department of Defense
Office of Security Review
2A534, Pentagon
Washington DC 20301-1155

**Subject:**     **Request for OSR Review of AR-15 Lower Receiver Documents (C)**

Dear Department Representative:

This is a request for review under ITAR Section 125.4(b)(13) and DoDD 5230.29.

Accompanying this letter please find the documents for review. They consist of two (2) electronic files (.STP, and .STL formats) for a lower receiver to the AR-15 rifle and five (5) rendered images of the electronic files. These documents are also attached to the email transmitting and this advance copy letter.

The original of this letter, five (5) CD-ROMs containing the electronic files, and five (5) unbound copies of the rendered images for review, are being sent contemporaneously herewith by Federal Express.

The electronic files are Computer Assisted Drafting ("CAD") files that can be used with a 3D printer or a computer numerical control machine to produce the hardware depicted in the rendered images of the electronic files.

These documents were created by John Sullivan, who is an employee of Defense Distributed. Defense Distributed is a Texas corporation. It is registered with the Department of State as a Defense Article Manufacturer under registration number M-34702.

The information contained in the documents is NOT company proprietary, was NOT developed under any U.S. Government contract, and is NOT subject to any government contract restrictions on dissemination.

These documents are NOT in the public domain. However, public release of the information contained in documents will not harm national security because design

WASHAR0002460                                                          App. 327



specifications containing similar information and similar CAD files for AR-15 lower receivers are already publicly available online.

.STP and/or .STL files for AR-15 lower receivers are already publicly available for download at a variety of web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
http://grabcad.com/library/ar-15-lower-receiver
http://grabcad.com/library/a-printable-ar15-lower-receiver
https://grabcad.com/library/ar15-lower-concept-1
http://grabcad.com/library/ar-15-lower-receiver

Other CAD file formats for lower receivers to the AR-15 are also publicly available online at web addresses, to include the following:

www.3dcadbrowser.com/download.aspx?3dmodel=42013
www.cncguns.com/downloads.html

In addition, detailed design specifications for AR-15 lower receivers are also available online from a variety of sources, to include the following:

www.homegunsmith.com/archive/T6215.html
www.ar15.com/archive/topic.html?b=3&f=4&t=619878
www.advancedrifles.com/build-it-yourself
www.biggerhammer.net/ar15/cad/

I expect to publish the documents on the Defense Distributed website on or about October 1, 2014. OSR review of the documents is therefore needed before November 3, 2014, but review after this time is acceptable in lieu of return without action.

Response by email to me at crw@defdist.org is preferred. If mailing the response, the address for mailing is: 1101 West 34th St., #340, Austin, Texas 78705.

Thank you for your consideration in the matter. I can be reached at (501) 743-9680 with any questions, comments or concerns.

Sincerely,

Cody R. Wilson
Director
Defense Distributed, Inc.



Att./Encl.:

.STP Electronic File for AR-15 Lower Receiver (Collapsible Stock) (CD-ROM)
.STL Electronic File for AR-15 Lower Receiver (Collapsible Stock) (CD-ROM)
5 Rendered Images of .STP and .STL files



WASHAR0002462

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 10:47 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | RE: A letter from the House Gun Violence Prevention Task Force |

███████████████████████████████████

**Official**
**UNCLASSIFIED**
**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 10:46 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: A letter from the House Gun Violence Prevention Task Force
Incoming. Will need a different response.
**Official**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Friday, July 27, 2018 10:36 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: A letter from the House Gun Violence Prevention Task Force
FYI – CCU will task to PM.

**From:** Ornstein, Nick <Nick.Ornstein@mail.house.gov>
**Sent:** Thursday, July 26, 2018 6:25 PM
**To:** House Liaison <House@state.gov>
**Cc:** Rhinehart, Melanie <Melanie.Rhinehart@mail.house.gov>; Goedke, Jennifer <Jennifer.Goedke@mail.house.gov>; Macfarlane, Alex <Alex.Macfarlane@mail.house.gov>
**Subject:** A letter from the House Gun Violence Prevention Task Force
Please deliver the attached letter from the leaders of the House Gun Violence Prevention Task Force to Secretary of State Mike Pompeo.
Thank you.

_____
**Nick Ornstein**
Legislative Correspondent
Congressman Mike Thompson (CA-05)
231 Cannon House Office Building
Washington, DC 20515
(202) 225-3311
nick.ornstein@mail.house.gov

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 11:23 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | RE: A letter from the House Gun Violence Prevention Task Force |

Alright, we will put something together. In the meantime, any objection to my providing the press guidance to the Committees (see previous email).
**Official**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 10:51 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: A letter from the House Gun Violence Prevention Task Force
Josh-
With all these emailed questions and letters, it would be useful to get a list of outstanding responses that are due at the end of today.
Thanks much,
S
**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 10:46 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: A letter from the House Gun Violence Prevention Task Force
Incoming. Will need a different response.
**Official**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Friday, July 27, 2018 10:36 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: A letter from the House Gun Violence Prevention Task Force
FYI – CCU will task to PM.

**From:** Ornstein, Nick <Nick.Ornstein@mail.house.gov>
**Sent:** Thursday, July 26, 2018 6:25 PM
**To:** House Liaison <House@state.gov>
**Cc:** Rhinehart, Melanie <Melanie.Rhinehart@mail.house.gov>; Goedke, Jennifer <Jennifer.Goedke@mail.house.gov>; Macfarlane, Alex <Alex.Macfarlane@mail.house.gov>
**Subject:** A letter from the House Gun Violence Prevention Task Force
Please deliver the attached letter from the leaders of the House Gun Violence Prevention Task Force to Secretary of State Mike Pompeo.
Thank you.

**Nick Ornstein**
Legislative Correspondent
Congressman Mike Thompson (CA-05)
231 Cannon House Office Building
Washington, DC 20515
(202) 225-3311
nick.ornstein@mail.house.gov

WASHAR0002465

| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
|-----------|----------------------------------------|
| **Sent:** | Thursday, July 26, 2018 11:33 AM |
| **To:** | Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Soskin, Eric (CIV) <Eric.Soskin@usdoj.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion |

Thanks Stuart. Please let us know if we can support in any way.
**Official**
**UNCLASSIFIED**

**From:** Robinson, Stuart J. (CIV) [mailto:Stuart.J.Robinson@usdoj.gov]
**Sent:** Thursday, July 26, 2018 11:29 AM
**To:** Rogers, Shana A; Soskin, Eric (CIV)
**Subject:** Fwd: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion
**Importance:** High

Shana, FYI
Sent from my Verizon, Samsung Galaxy smartphone
-------- Original message --------
From: TXW_USDC_Notice@txwd.uscourts.gov
Date: 7/26/18 8:22 AM (GMT-08:00)
To: cmecf_notices@txwd.uscourts.gov
Subject: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court [LIVE]

### Western District of Texas

## Notice of Electronic Filing

The following transaction was entered on 7/26/2018 at 10:21 AM CDT and filed on 7/26/2018
**Case Name:**     Defense Distributed et al v. United States Department of State et al
**Case Number:**     1:15-cv-00372-RP
**Filer:**
**Document Number:** 101

**Docket Text:**
**ORDER Setting Telephonic Hearing on [98] MOTION for Hearing re [97] MOTION for Temporary Restraining Order , [96] MOTION to Intervene, [97] MOTION for Temporary Restraining Order : Motion Hearing set for 7/26/2018 at 02:30 PM before Judge Robert Pitman. Signed by Judge**

WASHAR0002466

**Robert Pitman. (dl)**

**1:15-cv-00372-RP Notice has been electronically mailed to:**

Alan Gura alan@gurapllc.com, a1@alangura.com

David S. Morris dmorris@fr.com, hart@fr.com, litz@fr.com

Eric J. Soskin eric.soskin@usdoj.gov

J. David Cabello dcabello@blankrome.com, jwatkins@blankrome.com, mhindman@blankrome.com

Joshua Michael Blackman joshblackman@gmail.com, me@joshblackman.com

Matthew A. Goldstein matthew@goldsteinpllc.com

Stuart Justin Robinson stuart.j.robinson@usdoj.gov

W. Thomas Jacks jacks@fr.com, edockets@fr.com, litz@fr.com

William B. Mateja bmateja@sheppardmullin.com, dpuente@sheppardmullin.com, jhoggan@sheppardmullin.com

**1:15-cv-00372-RP Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1080075687 [Date=7/26/2018] [FileNumber=19613803-0] [55798c8db5bb5990f2dd11f849a2da4b47d7ff39b5351b99f835068a53d68eb3cf 54e5e2f898da311079935bfded59bdb3f8b194c8b5add4e9fb40438e59050f]]

WASHAR0002467

| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Thursday, July 26, 2018 3:58 PM |
| **To:** | Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Soskin, Eric (CIV) <Eric.Soskin@usdoj.gov>; Coppolino, Tony (CIV) <Tony.Coppolino@usdoj.gov> |
| **Subject:** | RE: Call on TRO |

Got it. We will not issue the letter or post the web notice. Request that you let us know when/if to proceed with executing the terms of the settlement tomorrow.
**Official**
**UNCLASSIFIED**

**From:** Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>
**Sent:** Thursday, July 26, 2018 3:53 PM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Soskin, Eric (CIV) <Eric.Soskin@usdoj.gov>; Coppolino, Tony (CIV) <Tony.Coppolino@usdoj.gov>
**Subject:** RE: Call on TRO
**Importance:** High

All,
The TRO hearing has concluded. The Court asked that we reconvene tomorrow at 2:00 CT so he can have more time to consider the issues. He understands that the government intends to comply with the terms of the settlement agreement but asked that the agency maintain the status quo (i.e., don't do anything) until he rules on the motion. Critically, State must refrain from releasing the letter or posting the announcement before the court rules tomorrow. Please confirm receipt, and let me know if you have any questions.
Thanks,
Stuart

**From:** Robinson, Stuart J. (CIV)
**Sent:** Thursday, July 26, 2018 11:05 AM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Coppolino, Tony (CIV) <tcoppoli@CIV.USDOJ.GOV>
**Subject:** RE: Call on TRO
Plaintiffs will not agree to suspend the agreement.
Thanks,
Stuart

**From:** Robinson, Stuart J. (CIV)
**Sent:** Thursday, July 26, 2018 9:27 AM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Coppolino, Tony (CIV) <tcoppoli@CIV.USDOJ.GOV>
**Subject:** Re: Call on TRO
Great. Adding Tony Coppolino.
-------- Original message --------
From: "Rogers, Shana A" <RogersSA2@state.gov>
Date: 7/26/18 9:21 AM (GMT-08:00)
To: "Freeman, Jeremy B" <FreemanJB@state.gov>, "Fabry, Steven F" <FabrySF@state.gov>, "Heidema, Sarah J" <HeidemaSJ@state.gov>, "Robinson, Stuart J. (CIV)" <strobins@CIV.USDOJ.GOV>, "Soskin, Eric (CIV)" <ESoskin@civ.usdoj.gov>
Subject: Call on TRO

Stuart,
Can we plan to talk at 12:30? We can use the following conference line:
Dial-in number: 1-888-684-8852
Participant code: 6477838#
Host code: 7018
Thanks,
Shana
**Official**
**UNCLASSIFIED**

WASHAR0002469



**United States Department of State**
*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*
*Washington, D.C. 20522-0112*

July 27, 2018

Mr. Cody R. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.
c/o Mr. Matthew A. Goldstein
Snell & Wilmer
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630

RE:   Directorate of Defense Trade Controls Approval of Certain Files for Public Release

Dear Mr. Wilson, Defense Distributed, and Second Amendment Foundation, Inc.:

This letter is provided in accordance with section 1(c) of the Settlement Agreement in the matter of *Defense Distributed, et al., v. U.S. Department of State, et al.,* No. 15-cv-372-RP (W.D. Tx.) (hereinafter referred to as "*Defense Distributed*"). As used in this letter,

- The phrase "Published Files" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint in *Defense Distributed.*
- The phrase "Ghost Gunner Files" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint in *Defense Distributed.*
- The phrase "CAD Files" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint in *Defense Distributed.*

The Department understands that Defense Distributed submitted the Published Files, Ghost Gunner Files, and CAD Files to the Department of Defense's Defense Office of Prepublication and Security Review (DOPSR) in 2014 to request review for approval for public release pursuant to International Traffic in Arms Regulations (ITAR) § 125.4(b)(13). It is our further understanding that DOPSR did not make a determination on the eligibility of these files for release, but instead referred you to the Directorate of Defense Trade Controls (DDTC) regarding public release of these files.

1

WASHAR0002470

I advise you that for the purposes of ITAR § 125.4(b)(13), the Department of State is a cognizant U.S. government department or agency, and DDTC has authority to issue the requisite approval for public release. To that end, I approve the Published Files, Ghost Gunner Files, and CAD Files for public release (i.e., unlimited distribution). As set forth in ITAR § 125.4(b)(13), technical data approved for public release by the cognizant U.S. government department or agency is not subject to the licensing requirements of the ITAR.

Sincerely,

Acting Deputy Assistant Secretary for the
Directorate of Defense Trade Controls

2

**SFRC Hearing**
**Q&A on 3D Printing of Firearms Settlement**

IF ASKED: Will you postpone implementation of the settlement on 3D-printed firearms

- **I am aware of Congress' concerns on this matter, though I would observe that the Department's role in regulating firearms relates only to our control of exports.**

IF PRESSED: Will you postpone implementation of the settlement?

- **I am not in a position to comment on pending litigation.**

Background (*not for public use*):



| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 12:47 PM |
| To: | Marquis, Matthew R <MarquisMR@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | RE: CPA Media Monitoring: Brady Campaign: What You Need to Know About the 3D Printing of Guns on Demand |

(Note incoming FOIA)
**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Wednesday, July 25, 2018 12:47 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: Brady Campaign: What You Need to Know About the 3D Printing of Guns on Demand



**What You Need to Know About the 3D Printing of Guns on Demand**
**By Jaime Bellemare**
**25 July 2018**
On August 1st the state of our nation's gun laws will be severely threatened by the 3D printing of firearms. The fact that we've even come this far, is curious at best. For five years, the State Department's legal team has been fighting and winning against a self described "crypto-anarchist" and his company, Defense Distributed, which has sought to make blueprints for 3D printed guns available online.
Only recently did the State Departments settle this case, completely reversing their prior position, and giving Defense Distributed everything they could have possibly wanted. While Brady's legal team has filed Freedom of Information Act (FOIA) requests to find out how and why this decision was made, the self-proclaimed "crypto-anarchist" will move forward to publish the blueprints for anyone and everyone to use. The Brady Center, along with Everytown and Giffords, is urging a Texas federal court to consider just how dangerous this could be and will be filing legal action.
**5 THINGS YOU NEED TO KNOW ABOUT 3D PRINTED GUNS**
Anyone, anywhere can build a gun on demand with no background check or without going through a licensed gun dealer.
3D printed firearms are untraceable, making the jobs of law enforcement much more difficult. These guns cannot be traced back to their producer or owner, making it possible to repeatedly violate gun manufacturing and sales restrictions on gun sales without fear of consequence.
3D guns are made almost completely of plastic -- meaning that conventional security methods like metal detectors will be rendered ineffective.
Unlimited access online to blueprints for 3D printed guns and the potential export of untraceable firearms is a threat to national and international security.
3D gun blueprints are currently considered data that is governed by International Traffic in Arms Regulations (ITAR) and cannot be published without State Department authorization. The Trump Administration has proposed a new regulation to remove downloadable gun blueprints from this classification altogether, allowing anyone to post, repost, download, distribute and use 3D gun blueprints.
What can you do to stop this from becoming our new reality?
**Call Attorney General Jeff Sessions**
Jeff Sessions is responsible for representing the best interests of the United States in all legal matters. Call

Sessions' office today and tell him to immediately take action and ensure that this settlement, allowing the public dissemination of information to make 3D guns, is stopped before it's too late.

The Department of Justice Public Switchboard is 202-514-2007. Make your voice heard today!

**Support Brady's Legal Team**

The Brady Center is working with other leading gun violence prevention organizations to take immediate action challenging the legality of making blueprints for 3D printed guns publicly accessible online. You can support this effort by making a donation to the Brady Center today.

Link: http://www.bradycampaign.org/blog/what-you-need-to-know-about-the-3d-printing-of-guns-on-demand

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *__MarquisMR@state.gov__* | Web: *__www.state.gov/t/pm__ /* |Twitter: *__@StateDeptPM__*
Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**
**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Thursday, July 26, 2018 2:42 PM |
| **To:** | Marquis, Matthew R <MarquisMR@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | RE: CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun' |

████████████████████████████████████████████████

Official - SBU
UNCLASSIFIED

**From:** Marquis, Matthew R
**Sent:** Thursday, July 26, 2018 2:38 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'



**Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'**
**By Nick Wing**
**26 July 2018**
**CPA Note: Legal filings attached as .zip file**
The nation's leading gun safety groups are asking a judge to block an online company's plan to publish downloadable blueprints for 3D-printed plastic firearms, information that they say would open the door for people to secretly produce fully functional, untraceable weapons.
In a Thursday filing in the U.S. District Court for the District of Western Texas, the organizations questioned the federal government's recent decision to settle a lawsuit with Defense Distributed. The settlement allows the Texas-based digital firearms nonprofit company to post its controversial gun blueprints online, which it will begin doing on Aug. 1, according to the Defense Distributed website.
Defense Distributed celebrated the decision, saying it would soon bring upon the "age of the downloadable gun." But in a letter to the judge this week, gun safety groups called the agreement "troubling," "dangerous" and "potentially illegal," while claiming it could have a "significant and permanent impact" on national security and public safety. The three organizations — the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and Giffords Law Center to Prevent Gun Violence — are now seeking an emergency injunction to halt the publication of the blueprints. They want the court to have additional time to consider their concerns. A hearing is reportedly scheduled for Thursday afternoon.
In recent years, gun violence prevention advocates and lawmakers have raised fears about the rise of so-called "ghost guns" — homemade, often meticulously manufactured plastic or metal firearms made without serial numbers. As 3D printing technology becomes more widely accessible, they worry that this ghost gun ecosystem will only grow. And with advances in printing materials and an ever-expanding library of gun blueprints just a click away, they say the line between homemade firearms and professionally manufactured ones could become increasingly indistinct.
When police find guns at a crime scene, the Bureau of Alcohol, Tobacco, Firearms and Explosives can typically trace an attached serial number on the firearm back to a federally licensed dealer. This can help authorities identify suspects, crack down on bad actors and glean other vital information about how guns end up in the hands of criminals. But with ghost guns, there's no method of tracking and no way to deny a purchase by a

prohibited individual because there's no point of sale.

Thursday's court filing request marks the latest chapter in a legal saga that began in 2013 when Defense Distributed founder and self-described anarchist Cody Wilson shot his way into headlines with a YouTube video. In the video, he shows off "the Liberator," a single-shot .380 caliber handgun made almost entirely of 3D-printed plastic.

A Liberator pistol appears on July 11, 2013 next to the 3D printer on which its components were made. The single-shot handgun was the first firearm made entirely with plastic components forged with a 3D printer and computer-aided design (CAD) files downloaded from the Internet.

The Liberator may look like a gun best suited for a Lego man, but it has since been shown to be able to fire a number of rounds without failing, so long as it's printed with a strong plastic. Months after Wilson released his video, Israeli reporters smuggled a weapon based on his design through a metal detector and into an event featuring Prime Minister Benjamin Netanyahu. Although the Liberator contains a small strip of metal — which Wilson included to make it compliant under a U.S. law banning undetectable firearms — the journalists were reportedly able to get it through unnoticed.

With media outlets around the world covering the Liberator, it quickly caught the government's attention. The State Department took action against Wilson in 2013, accusing him of violating arms export control laws by releasing "technical data" related to prohibited munitions. It demanded that he take down blueprints for the Liberator and nine other firearms posted on the Defense Distributed website. By the time Wilson complied, more than 100,000 people had already downloaded the files, ensuring that they'd live on forever in darker corners of the web.

In 2015, Wilson sued the State Department, claiming the motion against him had violated his First Amendment right to free speech. At first, Wilson appeared to be facing an uphill battle. Federal courts batted down his team's request for a preliminary injunction against the State Department in 2015. The case was eventually kicked up to the Supreme Court, where it was denied earlier this year. As recently as April, the government seemed prepared to see their defense through.

Then late last month, the feds changed course, entering into a settlement with Defense Distributed that said the company could post its gun blueprints online after all. The government also agreed to reimburse Defense Distributed for nearly $40,000 in legal fees.

In the settlement, lawyers for the Justice Department said that under a recent proposal to loosen foreign arms trafficking regulations, Wilson's "technical data" — in this case, computer-aided design models of firearms — would be exempted from stricter licensing requirements.

But gun safety groups have raised issue with that claim. Although the Trump administration published notice of the proposed rule change in May, the groups point out it hasn't officially gone into effect yet.

This discrepancy is an example of the administration "putting the cart before the horse," Avery Gardiner, co-president of the Brady Campaign, told HuffPost. She also raised broader questions about the nature of the settlement, saying the government had done "a complete about face." It didn't solicit input from any gun safety group before making the decision, Gardiner added, saying it has yet to offer a detailed explanation for what prompted the shift.

The State Department has said little publicly about the settlement, except to note that it was voluntary and agreed upon by both parties. Neither Defense Distributed nor the law firm representing the company immediately responded to HuffPost's request for comment.

Shortly after the settlement was announced, the Brady Campaign filed a Freedom of Information Act, hoping to get additional details about the reversal. But those documents likely won't be returned until after Defense Distributed reposts the blueprints online, at which point the gun safety groups say the potential damage would be "irreparable."

"Part of what we're asking the judge to do is to keep the status quo as it is until we can get more information about what caused the government to change its mind and to see if that's proper," said Gardiner.

"This isn't the way we're supposed to govern," she added. "We're supposed to govern by having open and transparent processes."

Ghost gun technology has evolved rapidly since the early days of Wilson's Liberator. Defense Distributed has already developed schematics for an AR-15 — or technically for each of the dozens of components needed to construct one of the semi-automatic rifles — which they intend to make available to the public. With these blueprints, anyone with a 3D printer and the ability to follow directions could build their own military-style rifle without anyone else's knowledge.

WASHAR0002476

The surreptitiousness of DIY gunsmithing is a draw for some firearms enthusiasts. Defense Distributed has profited off and propelled the practice by selling a $1,500 "Ghost Gunner" milling machine that can be programmed to construct individual firearm components out of metal to be assembled by the user.

With conventional firearms already being so easy to get ahold of in the U.S., whether legally or illegally, concerns about 3D-printed ghost guns may not be at the forefront of many people's minds. 3D printers are still expensive, and models capable of printing a functional gun can range from several thousand dollars to more than $500,000. Although that may be a deterrent now, Wilson has said his ultimate vision is to develop blueprints that will deliver working firearms even on the cheapest 3D printers.

"Anywhere there's a computer and an Internet connection, there would be the promise of a gun," he told Forbes in 2012.

That prospect has raised alarm among gun safety groups and law enforcement alike. So far, these weapons rarely factor into crimes. Although, they have been used in a few deadly shootings, including one by a convicted felon in California who otherwise would have been barred from purchasing guns through legal channels.

Unfettered access to 3D-printed gun blueprints could also have much broader implications overseas, the gun safety groups say, where people could use them to circumvent tougher gun laws or establish another arms pipeline to criminals or terrorists.

Wilson meanwhile seems to be reveling in the idea that his campaign could disrupt efforts to regulate firearms in the U.S. and abroad. In a tweet after the announcement of the settlement this month, he appeared to celebrate the death of "American gun control."

Wilson later told Wired that he was on the verge of unleashing a "Cambrian explosion" of digital content related to firearms. He hoped it could extinguish the current youth-led movement for stronger gun laws that emerged in response to routine gun violence and high-profile mass shootings in places like Las Vegas or Parkland, Florida.

"All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable," Wilson said. "No amount of petitions or die-ins or anything else can change that."

Over the past few days, congressional lawmakers have called for hearings on 3D-printed guns, as well as new legislation to block the release of Wilson's blueprints. At a Senate hearing on Wednesday, Secretary of State Mike Pompeo said he'd "take a look" at his department's policy on sharing that sort of data.

But with Aug. 1 rapidly approaching, Gardiner said she's worried the time to act is running out.

"We need to block this settlement from going into effect so that Congress can hold hearings and do its job as a check on the executive branch," said Gardiner. "It's unlikely that this all gets figured out and resolved unless there's a delay of the settlement going into effect."

Link: https://www.huffingtonpost.com/entry/3d-printed-guns-lawsuit_us_5b589e43e4b0de86f4929ea8?qp

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm/* | Twitter: *@StateDeptPM*
Stay connected with *State.gov*:

**Official**

**UNCLASSIFIED**

**Official**

**UNCLASSIFIED**

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 12:57 PM |
| To: | Marquis, Matthew R <MarquisMR@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | RE: CPA Media Monitoring: The Sun: WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons |

+L/PM
This is about what I would expect from The Sun.
**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Wednesday, July 25, 2018 12:56 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: The Sun: WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons



**WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons**
**By George Harrison**
**25 July 2018**
MADE from the same plastic as LEGO bricks, this handgun looks more like a toy than a lethal weapon... but don't be fooled.
"The Liberator", as it's been named, is a fully-functioning gun which can be 3D-printed at home and used to fire real bullets.
Alarmingly, all it takes is an instruction manual download, a 3D printer and a couple of hours.
Then you'll end up with an untraceable firearm dubbed a "ghost gun" which can fire up to ten shots before the plastic barrel breaks down - not that it matters when you can just print a replacement.
**Made by 'one of the most dangerous men in the world'**
The gun is the brainchild of a Texan anarchist called Cody Wilson, a law-school dropout who has been described by gun control campaigners as one of the most dangerous men in the world.
But to his opponents' dismay, the 30-year-old recently won a landmark legal battle on free-speech grounds for the right to share the blueprints for The Liberator online. So now, anyone can print their own arsenal without leaving the house.
The homemade gun blueprints were briefly made public in 2013, and stayed online for two days before the US government intervened and blocked the files from being shared.
But thanks to Wilson's legal victory, from next week, they'll be allowed to go back online.
There are fears this could spark a wave of DIY guns springing up across Europe.
**Homemade guns on Britain's streets**
Tyler Koslow, editor at 3D printing magazine All3DP.com, told Sun Online: "The recent court settlement regarding 3D printable gun models will have a sizeable impact on the world, particularly in countries with strict gun control laws.
"Back when the first gun model was made public, three of the top five countries to download the model included Spain, Germany, and the UK. As a result, it will now be up to other countries to prevent 3D printable

WASHAR0002478

gun models from getting in the hands of their citizens."

**Guns that build themselves**

In America, it's fine to build guns for your own personal use, although the difficulties and costs of crafting guns in garages has limited this to a hobby for only the most dedicated gun-nuts.

These guns are made entirely of plastic apart from a metal firing pin and an additional sheet of metal - which Wilson was required by law to add so the weapon would still set off metal detectors.

The printing process works by dripping tiny beads of hot plastic on top of one another, following a pattern laid out by the blueprint diagram.

If you have a 3D printer - priced between £1000-£3000 - and access to the web, you'll be able to download the file, press start and let the gun build itself.

**The age of the downloadable gun has begun**

At the moment, it's not practical or cost-effective for most Americans to print their own guns at home, owing to the high cost of 3D printers and the relatively low quality of plastic guns.

Instead, most will just buy a conventional handgun for greater power, accuracy and durability.

But in Britain, tough firearms restrictions mean 3D printing offers a viable way to get hold of illegal weapons.

Gill Marshall-Andrews, chair of the Gun Control Network, told Sun Online: "An American is already 120 times more likely to be killed with a gun than a person living in the UK.

"The ability to download 3D plans and print a gun can only make matters worse."

**100,000 downloads**

The Liberator's blueprints were first posted online by Wilson back in 2013 when the gun was developed.

At the time, the State Department was concerned that citizens in other countries (like the UK) would end up downloading the designs and getting their own guns illegally.

So the US government blocked the files - but they had already been downloaded over 100,000 times and picked up by a slew of pirate websites.

**Build your own battle rifle**

Normally, Americans would need to pass a background check before they can buy a gun, but freely-available blueprints for 3D-printed weapons could offer a way to bypass this law.

And Wilson doesn't intend to stop at DIY plastic pistols.

The anarchist wants to develop more powerful printable weapons, including battle rifles, and also make them available online.

It's also likely that fellow gun enthusiasts will devise and share their own blueprints for different 3D-printed weapons, safe in the knowledge that doing so doesn't break any laws.

Now the starting gun has fired on the age of downloadable weapons, the DIY handgun may turn out to be just the beginning.

Link: https://www.thesun.co.uk/news/6850692/ghost-guns-3d-print/

_____

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone: 202.647.6968

e-mail: *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*
Stay connected with *State.gov*:



**Official**

**UNCLASSIFIED**

**Official**

**UNCLASSIFIED**

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER          THOMAS SHEEHY
CHIEF OF STAFF      STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed firearms would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

*Eliot L. Engel*

ELIOT L. ENGEL
Ranking Member

| From: | Rogers, Shana A <RogersSA2@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 6:14 PM |
| To: | Freeman, Jeremy B <FreemanJB@state.gov> |
| Subject: | Re: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement |

Sent from my BlackBerry 10 smartphone.

**From:** Freeman, Jeremy B
**Sent:** Wednesday, July 25, 2018 5:57 PM
**To:** Rogers, Shana A
**Subject:** RE: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement

Jeremy
**Official - SBU**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Wednesday, July 25, 2018 5:27 PM
**To:** 'Robinson, Stuart J. (CIV)'; Soskin, Eric (CIV); Rogers, Shana A; Cavnar, Anna
**Cc:** Fabry, Steven F
**Subject:** RE: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement

**Official - SBU**
**UNCLASSIFIED**

**From:** Robinson, Stuart J. (CIV) [mailto:Stuart.J.Robinson@usdoj.gov]
**Sent:** Wednesday, July 25, 2018 5:21 PM
**To:** Freeman, Jeremy B; Soskin, Eric (CIV); Rogers, Shana A; Cavnar, Anna
**Cc:** Fabry, Steven F
**Subject:** RE: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement

Hi Jeremy,

Thanks,
Stuart

**From:** Freeman, Jeremy B [mailto:FreemanJB@state.gov]
**Sent:** Wednesday, July 25, 2018 1:43 PM
**To:** Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>; Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>
**Cc:** Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement

Eric and Stuart —

Thanks,
Jeremy

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Robinson, Stuart J. (CIV) [mailto:Stuart.J.Robinson@usdoj.gov]
**Sent:** Wednesday, July 25, 2018 1:00 PM
**To:** Soskin, Eric (CIV); Freeman, Jeremy B; Rogers, Shana A; Cavnar, Anna
**Subject:** RE: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement

**From:** Soskin, Eric (CIV)
**Sent:** Wednesday, July 25, 2018 6:12 AM
**To:** Freeman, Jeremy B <FreemanJB@state.gov>; Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>; Rogers, Shana A <RogersSA2@state.gov>; Cavnar, Anna <CavnarA@state.gov>
**Subject:** Re: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement

Jeremy,

-Eric
Sent from my Verizon, Samsung Galaxy smartphone
-------- Original message --------
From: "Freeman, Jeremy B" <FreemanJB@state.gov>
Date: 7/25/18 8:04 AM (GMT-05:00)
To: "Robinson, Stuart J. (CIV)" <strobins@CIV.USDOJ.GOV>, "Rogers, Shana A" <RogersSA2@state.gov>, "Cavnar, Anna" <CavnarA@state.gov>
Cc: "Soskin, Eric (CIV)" <ESoskin@civ.usdoj.gov>
Subject: Re: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement
SBU Attorney Work Product

███████████████████████████████████████████████████████████

Thanks,
Jeremy
From: Robinson, Stuart J. (CIV)
Sent: Tuesday, July 24, 2018 8:29 PM
To: Rogers, Shana A; Freeman, Jeremy B; Cavnar, Anna
Cc: Soskin, Eric (CIV)
Subject: FW: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement


State folks,

███████████████████████████████████████████████████████████

Thank you,
Stuart

From: Hamra, Noe [mailto:nhamra@BlankRome.com]
Sent: Tuesday, July 24, 2018 11:07 AM
To: alan@gurapllc.com; dmorris@fr.com; joshblackman@gmail.com; jacks@fr.com; bmateja@sheppardmullin.com; Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>
Cc: Kimball, John D. <jkimball@BlankRome.com>
Subject: RE: Defense Distributed et al v. United States Department of State et al - Civil Docket No. 1:15-cv-00372-RP - Letter to Court re Settlement Agreement
Importance: High

Dear Counsel:

Please see the attached letter, which is on its way to be delivered to Judge Pitman.

Sincerely,

Noe S. Hamra | BLANKROME
The Chrysler Building | 405 Lexington Avenue | New York, NY 10174
O: 212.885.5430 | F: 917.332.3811 | nhamra@blankrome.com<mailto:nhamra@blankrome.com>


*********************************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

*********************************************************************************************

WASHAR0002484

| | |
|---|---|
| **From:** | Wall, Amanda J <WallAJ@state.gov> |
| **Sent:** | Friday, July 27, 2018 6:19 PM |
| **To:** | Fabry, Steven F <FabrySF@state.gov>; Dorosin, Joshua L <DorosinJL@state.gov>; Newstead, Jennifer G <NewsteadJG@state.gov> |
| **Cc:** | Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: PM/DDTC spam campaign |
| **Attach:** | Phil in 06040_ please stop the release of downloadable guns.msg; Patti in 98003_ please stop the release of downloadable guns.msg |

+ Jennifer for awareness.

**From:** Fabry, Steven F
**Sent:** Friday, July 27, 2018 6:18 PM
**To:** Dorosin, Joshua L; Wall, Amanda J
**Cc:** Rogers, Shana A; Freeman, Jeremy B
**Subject:** FW: PM/DDTC spam campaign

FYI, re the Dept's CIO decision (bottom email) not to unblock the domain sending DDTC emails on 3D printing of guns.

**Official - SBU**
**UNCLASSIFIED**

**From:** Wrege, Karen M
**Sent:** Friday, July 27, 2018 5:58 PM
**To:** Mummaw, Karen E; Rogers, Shana A; Fabry, Steven F
**Cc:** Todd, William E (Ambassador); Bowden, Al J; Giuliano, Lysa C; Blackstone, Kevin; Miller, Glenn W
**Subject:** RE: PM/DDTC spam campaign

I think that the Everytown website is how these emails are being generated.  Attached are sample emails.

Best,
Karen

**From:** Mummaw, Karen E
**Sent:** Friday, July 27, 2018 5:49 PM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Todd, William E (Ambassador) <ToddW@state.gov>; Bowden, Al J <BowdenAJ@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>; Blackstone, Kevin <BlackstoneCK@state.gov>; Wrege, Karen M <WregeKM@state.gov>; Miller, Glenn W <MillerGW@state.gov>
**Subject:** PM/DDTC spam campaign

Shana,
Per our conversation, on the recommendation of our Chief Information Security Officer, Al Bowden, I am not comfortable unblocking the *everytown.org* site at this time.   Our firewall team continues to see rolling activity from this site.  These are not individuals attempting to contact the Secretary, but this appears to be a BOT conducting a targeted spam campaign that could result in a denial of service for those targeted inboxes.  We have currently received over 52,000 emails from this site.  We will continue to monitor.

Al, please jump in if I have missed anything.  Thank you, Karen

**Official**
**UNCLASSIFIED**

WASHAR0002485

| From: |  <bounce@list.everytown.org> |
|---|---|
| Sent: | Tuesday, July 24, 2018 8:32 AM |
| To: | DDTC Response Team <DDTCResponseTeam@state.gov> |
| Subject: | Phil in 06040: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

n 06040

<http://track.sp.actionkit.com/q/cQJXxAZUJkM-
cbEh2ochZQ~~/AAAAAQA~/RgRdOaFaPlcEd2F3ZEIKAAJaHFdbLXkxt1IaZGR0Y3Jlc3BvbNldGVhbUBzdGF0ZS5nb3ZYBAAAAFg~>

| From: |  <bounce@list.everytown.org> |
|---|---|
| Sent: | Tuesday, July 24, 2018 8:31 AM |
| To: | DDTC Response Team <DDTCResponseTeam@state.gov> |
| Subject: | Patti in 98003: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

████████ n 98003

<http://track.sp.actionkit.com/q/QFEsuImQ64UELity0jLvVA~~/AAAAAQA~/RgRdOaEiPlcEd2F3ZEIKAAciHFdbjhUY1FIaZGR0Y3Jlc3BvbnNldGdVhbUBzdGF0ZS5nb3ZZBAAAAI

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 10:42 AM |
| **To:** | Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Cc:** | Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |

███████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - Transitory**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

██████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits

How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

███████████████████████████████████████████████

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

WASHAR0002489

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 10:32 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Cc:** | Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |

███████████████████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:31 AM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

**Official - Transitory**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

**Official - Transitory**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>

**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits

How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

WASHAR0002491

| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Friday, July 27, 2018 11:30 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 11:24 AM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Shana,



**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Thursday, July 26, 2018 2:11 PM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Josh,



Thanks,
Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Wednesday, July 25, 2018 1:38 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Freeman, Jeremy B
**Subject:** FW: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

DDTC,



Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 12:29 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Freeman, Jeremy B; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

+Tamara

███████████████████████████████████████████████████████████████

Josh

**How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?**

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

**Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.**

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

**Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.**

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

**In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.**

███████████████████████████████████████████████

**Official - Transitory**
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:54 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████████

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect? The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means? For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process? Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

**Official - Transitory**
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:44 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J

<HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████████████████████████████████

**Official - Transitory**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 10:42 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████████████
Rob Hart
202.736.9221 | hartrl@state.gov
**Official - Transitory**
UNCLASSIFIED

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████████████
Official - Transitory
UNCLASSIFIED

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits
In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.

████████████████████████████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits
How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

████████████████████████████████████████████████████████████████████████████

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would

be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

WASHAR0002495

**From:** Hart, Robert L <HartRL@state.gov>
**Sent:** Thursday, July 26, 2018 2:18 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

██████████████████████

202.736.9221 | hartrl@state.gov
**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Thursday, July 26, 2018 2:16 PM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>

████████████████████████████████████████████████████████████████████

**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Thursday, July 26, 2018 2:11 PM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
Josh,

████████████████████████████████████████████████████████████████████

Thanks,
Shana
**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Wednesday, July 25, 2018 1:38 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Freeman, Jeremy B
**Subject:** FW: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High
DDTC,

████████████████████████████████████████████████████████████████████

Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**

UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 12:29 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Freeman, Jeremy B; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

+Tamara

██████████████████████████████████████████████

Josh

**How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?**

██████████████████████████████████████████████

**Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.**

██████████████████████████████████████████████

**Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.**

██████████████████████████████████████████████

**In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.**

████████████████████████████

Official - Transitory

UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:54 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect? The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means? For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process? Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

Official - Transitory

UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:44 AM

**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 10:42 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - Transitory**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits
In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.

███████████████████████████████████████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F <Millermf@state.gov>) <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits
How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

███████████████████████████████████████████████████

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Thursday, July 26, 2018 2:09 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Cc:** | Rogers, Shana A <RogersSA2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov> |
| **Subject:** | RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |

███████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Thursday, July 26, 2018 2:07 PM
**To:** Freeman, Jeremy B <FreemanJB@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████████
Thanks,
Josh
**Official - SBU**
**UNCLASSIFIED**

**From:** Freeman, Jeremy B
**Sent:** Wednesday, July 25, 2018 5:32 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

█████████████████████████████████████████
**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:30 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Freeman, Jeremy B; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████
**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 4:43 PM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
Following up on this – L/PM, how is it looking?

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 12:29 PM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

+Tamara

███████████████████████████████████████████████████

Josh

**How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?**

███████████████████████████████████████████████████

**Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.**

███████████████████████████████████████████████████

**Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.**

███████████████████████████████████████████████████

**In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.**

███████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:54 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect? The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means? For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process? Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:44 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████████████████████████

**Official - Transitory**
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 10:42 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████████
Rob Hart
202.736.9221 | hartrl@state.gov
**Official - Transitory**
UNCLASSIFIED

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████████████████
Official - Transitory
UNCLASSIFIED

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits
In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.

████████████████████████████████████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits
How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

████████████████████████████████████████████████████████

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

| | |
|---|---|
| **From:** | Rogers, Shana A <RogersSA2@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 5:43 PM |
| **To:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | Re: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |

███████████████████████████

Sent from my BlackBerry 10 smartphone.

**From:** Freeman, Jeremy B
**Sent:** Wednesday, July 25, 2018 5:31 PM
**To:** Paul, Joshua M; Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

█████████████████████████████████████

Official - SBU
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:30 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Freeman, Jeremy B; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Official - Transitory
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 4:43 PM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

█████████████████████████████████████

Official - Transitory
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 12:29 PM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

+Tamara

██████████████████████████████████████████████████

Josh
**How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?**

WASHAR0002504

████████████████████████████████████████████

**Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.**

████████████████████████████████████████████

**Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.**

████████████████████████████████████████████

**In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.**

████████████████████████████████

Official - Transitory
UNCLASSIFIED
................................................................................

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:54 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect? The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means? For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process? Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

Official - Transitory
UNCLASSIFIED
................................................................................

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:44 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████████████

Official - Transitory
UNCLASSIFIED
................................................................................

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 10:42 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - Transitory**
**UNCLASSIFIED**
**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████

**Official - Transitory**
**UNCLASSIFIED**
**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits
In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.

███████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits
How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

███████████████████

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

███████████████████

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

███████████████████

WASHAR0002507

| | |
|---|---|
| **From:** | Kottmyer, Alice M <KottmyerAM@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 1:11 PM |
| **To:** | Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Cc:** | Kottmyer, Alice M <KottmyerAM@state.gov> |
| **Subject:** | RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |

███████████████████████

This email is UNCLASSIFIED.

---

**From:** Rogers, Shana A
**Sent:** Wednesday, July 25, 2018 12:38 PM
**To:** Kottmyer, Alice M; Freeman, Jeremy B; Fabry, Steven F
**Subject:** FW: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

Jeremy, Alice, Steve,

████████████████████████████████████████████████

Thanks,
Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

---

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 12:29 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Freeman, Jeremy B; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

+Tamara

████████████████████████████████████████████████

Josh

**How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?**

████████████████████████████████████████████████

**Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.**

████████████████████████████████████████████████

**Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.**

**In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.**

Official - Transitory
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:54 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Fite just added the following, but I think the draft below addresses this:

Official - Transitory
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:44 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Official - Transitory
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 10:42 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Rob Hart
202.736.9221 | hartrl@state.gov
Official - Transitory
UNCLASSIFIED

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

**Official - Transitory**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits

In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits

How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

| | |
|---|---|
| **From:** | Freeman, Jeremy B </o=SBUState/ou=NCC AG/cn=Recipients/cn=FreemanJB> |
| **Sent:** | Wednesday, July 25, 2018 12:46 PM |
| **To:** | Rogers, Shana A <RogersSA2@state.gov>; Kottmyer, Alice M <KottmyerAM@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |
| **Attach:** | Defense Distributed - briefing follow up questions.docx |

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**
**From:** Rogers, Shana A
**Sent:** Wednesday, July 25, 2018 12:38 PM
**To:** Kottmyer, Alice M; Freeman, Jeremy B; Fabry, Steven F
**Subject:** FW: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High
Jeremy, Alice, Steve

Thanks,
Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**
**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 12:29 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Freeman, Jeremy B; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High
+Tamara

Josh

**How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?**

**Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.**

**Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.**

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

**In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.**

███████████████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:54 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect? The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means? For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process? Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:44 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 10:42 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - Transitory**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>

**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits (proposed, likely far too loose language in red to Fite and Rice questions, for your editing pleasure)
**Official - Transitory**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits
In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.
A: (defer to L/PM on what we might be able/willing to provide)

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits
How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 12:10 PM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov>; Miller, Michael F <Millermf@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |

████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED
**From:** Hart, Robert L
**Sent:** Friday, July 27, 2018 12:01 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Miller, Michael F <Millermf@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
Rob Hart
202.736.9221 | hartrl@state.gov
**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED
**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 11:59 AM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Miller, Michael F <Millermf@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
New Fite question (but not really, in the sense that he has been asking this for about five years):
As a larger issue, can you provide to me a legal analysis of how ITAR 120.3(b) comports with the requirements of AECA Sec. 38?

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED
**From:** Rogers, Shana A
**Sent:** Friday, July 27, 2018 11:35 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 11:24 AM
**To:** Rogers, Shana A; Hart, Robert L; Heidema, Sarah J
**Cc:** Freeman, Jeremy B
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Shana

███████████████████████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Thursday, July 26, 2018 2:11 PM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Josh,

████████████████████████████████████████████████████████████████████

Thanks,
Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Wednesday, July 25, 2018 1:38 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Freeman, Jeremy B
**Subject:** FW: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

DDTC,

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 12:29 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Freeman, Jeremy B; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

+Tamara

████████████████████████████████████████████████████████████

Josh

**How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?**

████████████████████████████████████████████████████████████

███████████████████████████████████████████

**Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.**

███████████████████████████████████████████

**Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.**

███████████████████████████████████████████

**In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.**

████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:54 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:44 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 10:42 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov
**Official - Transitory**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

████████████████████████████████████████████

~~Official - Transitory~~
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits

In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.

████████████████████████████████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits

How long is "temporary" under ITAR 126.2? Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

████████████████████████████████████████████

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.

████████████████████████████████████████████

Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

████████████████████████████████████████████

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 12:09 PM |
| **To:** | Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | RE: Reported State Department Spokesperson Statement on 3D Guns |

We can circulate updated points with that aspect for clearance – Andy, over to you.

**Official - SBU**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Friday, July 27, 2018 12:01 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

██████████████████████████████████████████████████

MM

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 11:57 AM
**To:** Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

████████████████████████████
**Official - SBU**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Friday, July 27, 2018 11:56 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

███████████████████████████████████████████
**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 10:14 AM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>

**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Reported State Department Spokesperson Statement on 3D Guns



Official - SBU
UNCLASSIFIED

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 27, 2018 10:09 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns
Can I get a copy of the statement?

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 27, 2018 10:08 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns
This is a mischaracterization – and a misquoting – of our statements to the press on this matter. What we have told media is that "the settlement in this case comes *as* the U.S. Government is reviewing comments on new proposed regulations" (emphasis mine), not *because* of the regulations – this line is intended to provide context, not cause.

WASHAR0002519

**Official - SBU**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 27, 2018 9:57 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** Reported State Department Spokesperson Statement on 3D Guns

So there was this ABC news story that said this:

In a lengthy statement, the State Department spokesperson said that the Trump administration settled because new government regulations make the case moot. The Commerce Department is taking over the regulation of certain firearms -- a change that was implemented under the Obama administration, but accelerated under the Trump administration as it seeks "to create a simpler, more robust export control system that eases industry compliance, enhances enforceability, and better protects truly sensitive technologies." https://abcnews.go.com/Politics/state-department-defends-allowing-publication-blueprints-3d-print/story?id=56817152

Is this is accurate, it would seem to be an admission of an intent to circumvent the CATs I-III regulatory legal process. What exactly did the State Dept person say?

WASHAR0002520

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 12:25 PM |
| **To:** | Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | RE: Reported State Department Spokesperson Statement on 3D Guns |

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Friday, July 27, 2018 12:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

Josh,

Thanks,
Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege)**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 12:11 PM
**To:** Rogers, Shana A; Miller, Michael F; Freeman, Jeremy B; Heidema, Sarah J; Fabry, Steven F; Hart, Robert L
**Cc:** PM-CPA
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

**Official - SBU**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Friday, July 27, 2018 12:10 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

Josh,

Thanks,
Shana

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 11:57 AM
**To:** Miller, Michael F; Rogers, Shana A; Freeman, Jeremy B; Heidema, Sarah J; Fabry, Steven F; Hart, Robert L
**Cc:** PM-CPA
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

███████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Friday, July 27, 2018 11:56 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

███████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 10:14 AM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Reported State Department Spokesperson Statement on 3D Guns

WASHAR0002522

**Official - SBU**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 27, 2018 10:09 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

Can I get a copy of the statement?

---

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 27, 2018 10:08 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** RE: Reported State Department Spokesperson Statement on 3D Guns

This is a mischaracterization – and a misquoting – of our statements to the press on this matter. What we have told media is that "the settlement in this case comes *as* the U.S. Government is reviewing comments on new proposed regulations" (emphasis mine), not *because* of the regulations – this line is intended to provide context, not cause.

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 27, 2018 9:57 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** Reported State Department Spokesperson Statement on 3D Guns

So there was this ABC news story that said this:

In a lengthy statement, the State Department spokesperson said that the Trump administration settled because new government regulations make the case moot. The Commerce Department is taking over the regulation of certain firearms -- a change that was implemented under the Obama administration, but accelerated under the Trump administration as it seeks "to create a simpler, more robust export control system that eases industry compliance, enhances enforceability, and better protects truly sensitive technologies." https://abcnews.go.com/Politics/state-department-defends-allowing-publication-blueprints-3d-print/story?id=56817152

Is this is accurate, it would seem to be an admission of an intent to circumvent the CATs I-III regulatory legal process. What exactly did the State Dept person say?

# Congress of the United States
## Washington, DC 20515

May 4, 2018

The Honorable Jeff Sessions
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Attorney General Sessions,

As the original Sponsors of the James Zadroga, 9/11 Health and Compensation Act, we write to urge that you instruct the Federal Bureau of Investigation (FBI) to join in the investigation to find and arrest the scammers that have been contacting injured and ill 9/11 first responders in an effort to falsely gain their personal information to steal their identities. These fraudsters have been claiming to be with the Justice Department's own September 11th Victim Compensation Fund (VCF). This scheme is causing extreme stress in a group that already suffers from PTSD and other illnesses as a result of their service to this country.

While we have already reached out to the Federal Trade Commission, which has opened its own investigation and issued an alert, we believe that this matter warrants the full attention of the Department of Justice. Fraudsters seeking to prey on first responders –in the name of the Victim Compensation Fund—impersonating federal employees, are uniquely disgusting, and they should be apprehended and prosecuted to the fullest extent of the law as quickly as possible.

We thank you for your attention to this matter.

Sincerely,

PETER T. KING
Member of Congress

CAROLYN B. MALONEY
Member of Congress

JERROLD NADLER
Member of Congress

| | |
|---|---|
| **From:** | Freeman, Jeremy B </o=SBUState/ou=NCC AG/cn=Recipients/cn=FreemanJB> |
| **Sent:** | Wednesday, July 25, 2018 11:23 AM |
| **To:** | Wall, Amanda J <WallAJ@state.gov> |
| **Cc:** | Rogers, Shana A <RogersSA2@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | RE: Settlement |
| **Attach:** | Settlement Agreement (SIGNED) - Defense Distributed.pdf |

Yes – here it is.
**Official - SBU**
**UNCLASSIFIED**
......................................................................................................................................
**From:** Wall, Amanda J
**Sent:** Wednesday, July 25, 2018 11:21 AM
**To:** Freeman, Jeremy B
**Subject:** Settlement
Hi Jeremy – Do you have a copy of the draft settlement in the 3D printing case that you could pass along? Jennifer would like to have it handy for her meeting with the undersecretaries tomorrow morning.
Thanks,
Amanda

WASHAR0002525

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

   (a)      Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

   (b)      Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0002527

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.    *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.    *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0002528

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0002529

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

WASHAR0002530

8.    *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
      Settlement Agreement with their counsel, who has explained these documents to them
      and that they understand all of the terms and conditions of this Settlement Agreement.
      Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
      the contents thereof, and execute this Settlement Agreement of their own free act and
      deed. The undersigned represent that they are fully authorized to enter into this
      Settlement Agreement.

9.    *Execution:* This Settlement Agreement may be executed in one or more counterparts,
      each of which shall be deemed an original, and all of which together constitute one and
      the same instrument, and photographic copies of such signed counterparts may be used in
      lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
      drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
      requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
      Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
      state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

WASHAR0002531

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.    *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.
- The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.
- The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.
- The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.
- The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.
- The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0002532

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0002533

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| Defendants. | § | |

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and 41(a)(1)(B), and a

settlement agreement among Plaintiffs (Defense Distributed, Second Amendment Foundation,

Inc., and Conn Williamson) and Defendants (the United States Department of State, the

Secretary of State, the Directorate of Defense Trade Controls, the Deputy Assistant Secretary,

Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy), the

Plaintiffs and the Defendants hereby stipulate to the dismissal with prejudice of this action.

Dated: June 29, 2018                           Respectfully submitted,

_____
Matthew Goldstein                              CHAD A. READLER
D.C. Bar No. 975000*                           Acting Assistant Attorney General
Snell & Wilmer LLP                             Civil Division
One South Church Ave., Ste. 1500
Tucson, Arizona 85701                          ANTHONY J. COPPOLINO
520.882.1248 / Fax 520.884.1294                Deputy Branch Director
mgoldstein@swlaw.com                           Federal Programs Branch

Alan Gura
Virginia Bar No. 68842*
Gura PLLC                                       _____
916 Prince Street, Suite 107                   ERIC J. SOSKIN
Alexandria, Virginia 22314                     Pennsylvania Bar No. 200663
                                               Senior Trial Counsel

1

WASHAR0002534

703.835.9085/Fax 703.997.7665

alan@gurapllc.com
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, Texas 78701
512.472.5070 / Fax 512.320.8935
jacks@fr.com
dmorris@fr.com

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice

STUART J. ROBINSON
California Bar No. 267183
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 514-1500
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for Defendants*

2

WASHAR0002535

| | |
|---|---|
| **From:** | Wall, Amanda J <WallAJ@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 12:40 PM |
| **To:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: Settlement |

Thanks so much – I'm sure I had this somewhere but could not find it for some reason. Sorry for the trouble.

**From:** Freeman, Jeremy B
**Sent:** Wednesday, July 25, 2018 11:23 AM
**To:** Wall, Amanda J
**Cc:** Rogers, Shana A; Fabry, Steven F
**Subject:** RE: Settlement
Yes – here it is.
**Official - SBU**
**UNCLASSIFIED**

**From:** Wall, Amanda J
**Sent:** Wednesday, July 25, 2018 11:21 AM
**To:** Freeman, Jeremy B
**Subject:** Settlement
Hi Jeremy – Do you have a copy of the draft settlement in the 3D printing case that you could pass along? Jennifer would like to have it handy for her meeting with the undersecretaries tomorrow morning.
Thanks,
Amanda

WASHAR0002536

| | |
|---|---|
| **From:** | Freeman, Jeremy B </o=SBUState/ou=NCC AG/cn=Recipients/cn=FreemanJB> |
| **Sent:** | Thursday, March 29, 2018 4:21 PM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Cc:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |
| **Attach:** | DDTC DD Counteroffer v3.docx; Defense Distributed - Second Amended Complaint.pdf |

Rob,

[black redaction box]

Thanks,
Jeremy and Anna
**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

[black redaction box]

Thanks,
Rob Hart
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

WASHAR0002537

Rob,

███████████████████████████████████████████████████

Best,
Anna
**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

███████████████████████████████████████████████████

Thanks,
Rob Hart
202.736.9221 | hartrl@state.gov
**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement

Rob,
PDAS Kaidanow approved without changes or comment.

Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement

approve
**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>

**Subject:** For Review: FW: Defense Distributed offer of settlement
PDAS Kaidanow,
Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S.
District Court for the Western District of Texas.

Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement
Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some
background on this case. That additional info should go up along with this approval request.
Thanks.
**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement
Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case
currently before the U.S. District Court for the Western District of Texas. Rob Hart said he is available to answer any
questions.
Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W
<KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement
Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently
before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail
by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive
aspects of the offer as an ITAR matter.
To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.
Thanks,
Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division

WASHAR0002539

Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND AMENDMENT FOUNDATION, INC., and CONN WILLIAMSON, | § Case No. 15-CV-372-RP |
| | § |
| | § SECOND AMENDED |
| Plaintiffs, | § COMPLAINT |
| | § |
| v. | § |
| | § |
| U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary, Defense Trade Controls, Bureau of Political Military Affairs, Department of State; and SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State; | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| Defendants. | § |
| | § |

SECOND AMENDED COMPLAINT

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn

Williamson, by and through undersigned counsel, complain of Defendants as follows:

INTRODUCTION

"Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70

(1963). The prior restraint system challenged here cannot overcome its presumption of

invalidity.

1

WASHAR0002541

Contrary to the Justice Department's warning that such actions are unconstitutional, Defendants unlawfully apply the International Traffic in Arms Regulations, 22 C.F.R. Part 120 *et seq.* ("ITAR") to prohibit and frustrate Plaintiffs' public speech, on the Internet and other open forums, regarding arms in common use for lawful purposes. Defendants' censorship of Plaintiffs' speech, and the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments to the United States Constitution. Plaintiffs are entitled to declaratory and injunctive relief barring any further application of this prior restraint scheme, and to recover money damages to compensate for the harm such application has already caused.

*The Parties*

1.     Plaintiff Defense Distributed is a Texas corporation organized under the laws of the State of Texas, whose headquarters are located in Austin, Texas, and whose principal place of business is located in Austin, Texas. Defense Distributed was organized and is operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

2.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including in Texas. The purposes of SAF include promoting, securing, and expanding access to the exercise of the right to keep and bear arms; and education, research, publishing and legal

WASHAR0002542

action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of its members.

3.      Conn Williamson is a natural person and a citizen of the United States and the State of Washington.

4.      Defendant the United States Department of State is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act of 1976, 22 U.S.C. § 2778, *et seq.* ("AECA").

5.      Defendant Rex W. Tillerson is sued in his official capacity as the Secretary of State. In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.

6.      Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR.

7.      Defendant Mike Miller is sued in his official capacity as the Acting Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs. In his official capacity, Miller is responsible for the operation and management of DDTC, and this includes administration and enforcement of the ITAR.

8.      Defendant Sarah Heidema is sued in her official capacity as the Acting Director of the Office of Defense Trade Controls Policy Division. In her official capacity, she is responsible for administration of the ITAR, including ITAR's commodity jurisdiction procedures; implementation of regulatory changes as a result of defense trade reforms; and providing guidance to industry on ITAR requirements.

WASHAR0002543

JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

10.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a

substantial part of the events and omissions giving rise to the claim occurred, and Plaintiff

Defense Distributed resides, within the Western District of Texas.

STATEMENT OF FACTS

*Broad and Vague Scope of the ITAR*

11.      The AECA affords the President limited control over the export of "defense

articles." 22 U.S.C. § 2778(a)(1).

12.      Although the AECA does not expressly authorize control over "technical data,"

the ITAR, which implements the Act, includes "technical data" within its definition of "defense

articles." 22 C.F.R. § 120.6.

13.      The ITAR broadly defines "technical data" as information "required for the

design, development, production, manufacture, assembly, operation, repair, testing, maintenance

or modification of defense articles." 22 C.F.R. § 120.10. This includes "information in the form

of blueprints, drawings, photographs, plans, instructions or documentation" and "software"

"directly related to defense articles." *Id.*

14.      The ITAR requires advance government authorization to export technical data.

Criminal penalties for unauthorized exports of technical data and other violations of the ITAR

include, inter alia, prison terms of up to twenty (20) years and fines of up to $1,000,000 per

violation. 22 U.S.C. § 2778(c). Civil penalties include fines of over $1,000,000 per violation. 22

U.S.C. § 2778(e); 83 Fed. Reg. 234, 235 (Jan. 3, 2018).

4

WASHAR0002544

15.     The scope of technical data subject to ITAR control, as described on the U.S. Munitions List ("USML"), 22 C.F.R. § 121.1, is vague, ambiguous, and complex. Defendants constantly change, often without notice, their views of what this scope entails.

16.     Americans have submitted thousands of written requests, known as "commodity jurisdiction requests," to DDTC for official determinations as to the ITAR's scope.

*History of Defendants' Prior Restraint Scheme*

17.     From 1969 to 1984, Footnote 3 to former ITAR Section 125.11 implied that the ITAR imposed a prepublication approval requirement on publications of privately generated ITAR-controlled technical data, stating that "[t]he burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication."

18.     Beginning in 1978, the U.S. Department of Justice's Office of Legal Counsel issued a series of written opinions advising Congress, the White House, and the Department of State that the use of the ITAR to impose a prior restraint on publications of privately generated unclassified information into the public domain violated the First Amendment of the United States Constitution (the "Department of Justice memoranda").

19.     In 1980, the Department of State Office of Munitions Control, the predecessor to Defendant DDTC, issued official guidance providing that "[a]pproval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."

20.     Thereafter, the Department of State removed Footnote 3 from the ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682 (Dec.

WASHAR0002545

6, 1984). As such, to the extent the ITAR imposed any prepublication approval requirement on private, non-classified speech, the requirement was ostensibly removed in 1984.

21.     In 1995, Defendant the United States Department of State conceded in federal court that reading the ITAR as imposing a prior restraint "is by far the most **un**-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case." *Bernstein v. United States Department of State, et. al.*, No. C-95-0582, 1997 U.S. Dist. Lexis 13146 (N.D. Cal. August 25, 1997).

22.     Prior to May 2013, Defendant the United States Department of State had not only disavowed the prior restraint in public notices and in federal court, it had never publicly enforced a prior restraint under the ITAR.

*The Published Files*

23.     Posting technical data on the Internet is perhaps the most common and effective means of creating and disseminating information. A cursory search on Google and other Internet search engines evidences that ITAR-controlled technical data is freely published in books, scientific journals, and on the Internet.

24.     Plaintiff Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public.

25.     Defense Distributed privately generated technical information regarding a number of gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun (the "Published Files").

6

WASHAR0002546

26.     In December 2012, Defense Distributed began posting the Published Files on the Internet for free, at no cost to the public. That publication inherently advanced Defense Distributed's educational mission.

27.     At the time Defense Distributed posted the Published Files, there was no publicly known case of Defendants enforcing a prepublication approval requirement under the ITAR.

28.     Notwithstanding the Department of Justice memoranda, the 1980 guidance, the 1985 ITAR amendment, Defendant the United States Department of State's representations to a federal court in *Bernstein v. United States*, and Defendants' failure to previously enforce a prepublication approval requirement under the ITAR, on May 8, 2013, DDTC sent Defense Distributed a letter that warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

29.     At the time it posted the Published Files, Defense Distributed did not know that DDTC would demand pre-approval of public speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with DDTC's demands and removed all of the Published Files from its servers.

30.     The DDTC letter further directed Defense Distributed to submit the Published Files to DDTC for review using the DDTC "commodity jurisdiction" procedure, the ITAR procedure "used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).

WASHAR0002547

31.     Defense Distributed complied with DDTC's request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013.

32.     On June 4, 2015—nearly two years from the date of Defense Distributed's commodity jurisdiction requests and six days before their first responsive pleading was due in this case—Defendants issued a response to the ten commodity jurisdiction requests. They determined that six of the Published Files, including the handgun files, were ITAR-controlled.

*The "Ghost Gunner" Files*

33.     DDTC identifies the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control.

34.     Neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

35.     Worsening this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR.

36.     On September 25, 2014, Defense Distributed sent DOPSR a request for prepublication approval for public release of files containing technical information on a machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").

37.     On October 1, 2014, DOPSR sent Defense Distributed a letter stating that it refused to review Defense Distributed's request for approval because DOPSR was unsure whether the Ghost Gunner was subject to the ITAR. Also in its letter, DOPSR recommended that Defense Distributed submit another commodity jurisdiction request to DDTC.

WASHAR0002548

38. Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to DDTC on January 2, 2015.

39. On April 13, 2015, DDTC responded to the Ghost Gunner commodity jurisdiction request. It determined that the Ghost Gunner machine is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [the ITAR]." Defense Distributed did not seek a determination with respect to such files, but it did seek a determination as to whether the software necessary to build and operate the Ghost Gunner machine is ITAR-controlled. DDTC subsequently clarified that such software is, like the machine itself, not subject to ITAR controls, but reiterated its ruling with respect to files related to the production of a "defense article."

*Prior Restraint on CAD Files*

40. Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files.

41. On December 31, 2014, nearly four months after Defense Distributed submitted the first of the CAD review requests, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating that it refused to review the CAD files. DOPSR's decision was made, in whole or in part, with specific direction from DDTC.

42. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. However, because this is not the DDTC division responsible for issuing licenses or other forms of DDTC authorization, on January 5, 2015, Defense Distributed sent a written request to DDTC for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

9

WASHAR0002549

43.     To date, DDTC has not responded to Defense Distributed's request for guidance on how to obtain authorization from DDTC Compliance for release of the CAD files.

*Prior Restraint on Other Files*

44.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to public forums on the Internet. Many of these files are described in the USML.

45.     Plaintiff SAF's members, including, e.g., Conn Williamson and Peter Versnel, have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearms that they or others have created. They would access and share these files on the Internet, and use the files for various purposes, including the manufacture of firearms of the kind in common use that they would keep operable and use for self-defense, but cannot do so owing to the prepublication approval requirement. But for DDTC's prepublication approval requirement on such files, SAF would expend its resources to publish and promote, on the Internet, the distribution of Defense Distributed's various files, and similar files generated by its members and others.

*High Price Tag for Public Speech Licenses*

46.     The ITAR requires that any person who engages in the United States in the business of exporting technical data to register with the DDTC. *See* 22 C.F.R. § 122.1(a). For the purpose of the ITAR, engaging in such a business requires only one occasion of exporting technical data. *Id.*

47.     DDTC Registration is a precondition to the issuance of any license or other approval under the ITAR. *See* 22 C.F.R. § 122.1(c).

WASHAR0002550

48.     The base fee for DDTC registration is $2,250.00 a year. *See* 22 C.F.R. § 122.3(a). This fee increases based on the number of licenses requested in the previous year.

<div align="center">*Great, Irreparable, and Continuing Harm*</div>

49.     But for DDTC's impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Plaintiffs would freely distribute the Subject Files. Plaintiffs refrain from distributing the Subject Files because they reasonably fear that Defendants would pursue criminal and civil enforcement proceedings against Plaintiffs for doing so.

50.     DDTC's acts have thus caused irreparable injury to Plaintiffs, their customers, visitors, and members, whose First, Second, and Fifth Amendment rights are violated by DDTC's actions.

<div align="center">COUNT ONE</div>

<div align="center">ULTRA VIRES GOVERNMENT ACTION</div>

51.     Paragraphs 1 through 50 are incorporated as though fully set forth herein.

52.     The Defendants' imposition of the prepublication requirement, against any non-classified privately-generated speech, including on (but not limited to) the Subject Files, lies beyond any authority conferred upon them by Congress under the AECA, as confirmed by the 1985 ITAR amendment. Accordingly, Defendants' imposition of the prepublication approval requirement is ultra vires and Plaintiffs are entitled to injunctive relief against Defendants' application of the prepublication approval requirement.

WASHAR0002551

## COUNT TWO

### RIGHT OF FREE SPEECH — U.S. CONST. AMEND. I

53.     Paragraphs 1 through 52 are incorporated as though fully set forth herein.

54.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as an unconstitutional prior restraint on protected expression.

55.     Defendants' prepublication approval requirement is invalid on its face, and as applied to Plaintiffs' public speech, as overly broad, inherently vague, ambiguous, and lacking adequate procedural protections.

56.     Defendants' prepublication approval requirement is invalid as applied to Defense Distributed's posting of the Subject Files, because Defendants have selectively applied the prior restraint based on the content of speech and/or the identity of the speaker.

57.     Defendants' interruption and prevention of Plaintiffs from publishing the subject files, under color of federal law, violates Plaintiffs' rights under the First Amendment to the United States Constitution, causing Plaintiffs, their customers, visitors and members significant damages. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

## COUNT THREE

### RIGHT TO KEEP AND BEAR ARMS — U.S. CONST. AMEND. II

58.     Paragraphs 1 through 57 are incorporated as though fully set forth herein.

59.     The fundamental Second Amendment right to keep and bear arms inherently embodies two complimentary guarantees: the right to acquire arms, and the right to make arms.

60.     If one cannot acquire or create arms, one cannot exercise Second Amendment rights. Infringing upon the creation and acquisition of arms of the kind in common use for

12

WASHAR0002552

traditional lawful purposes violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

61.     By maintaining and enforcing the prepublication approval requirement and forbidding Plaintiffs from publishing the subject files, which enable the lawful manufacture of firearms, Defendants are violating the Second Amendment rights of Plaintiffs, their customers, members, and visitors. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

COUNT FOUR

RIGHT TO DUE PROCESS OF LAW— U.S. CONST. AMEND. V

62.     Paragraphs 1 through 61 are incorporated as though fully set forth herein.

63.     The Due Process Clause of the Fifth Amendment to the United States Constitution requires the Government to provide fair notice of what is prohibited, prohibits vague laws, and prevents arbitrary enforcement of the laws.

64.     On its face, Defendants' prepublication approval requirement is overly broad, vague, arbitrary, and lacks adequate procedural safeguards. Plaintiffs are therefore entitled to injunctive relief against Defendants' application of the prior restraint.

65.     As applied to Defense Distributed, Defendants' imposition of the prepublication approval requirement, failure to clearly describe the information subject to the prior restraint, and failure to provide a process for timely review of Defense Distributed's speech have deprived Defense Distributed of its right to fair notice of what is required under the law and adequate process, in violation of the Fifth Amendment. Defense Distributed is therefore entitled to injunctive relief against Defendants' application of the prior restraint.

WASHAR0002553

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information is, on its face and as applied to Plaintiffs' public speech, null and void, and of no effect, as an unconstitutional Ultra Vires government action.

2.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the First Amendment to the United States Constitution;

3.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to public speech, to include the Internet posting of files used in the production of arms of the kind in common use for traditional lawful purposes, including but not limited to the Subject Files, violates the Second Amendment to the United States Constitution;

4.    A declaration that Defendants' prepublication approval requirement for privately generated unclassified information, on its face and as applied to Plaintiffs' public speech, to include Internet postings of the Subject Files, violates the Fifth Amendment to the United States Constitution;

5.    An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against public speech on privately generated unclassified information;

WASHAR0002554

6. An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the prepublication approval requirement against Plaintiffs' public speech, to include Internet postings of the Subject Files;

7. Attorney fees and costs pursuant to 28 U.S.C. § 2412; and

8. Any other further relief as the Court deems just and appropriate.

Dated: January 31, 2018                    Respectfully submitted,

/s/ Alan Gura                              /s/ William B. Mateja
Alan Gura                                  William B. Mateja
Virginia Bar No. 68842*                    Texas State Bar No. 13185350
Gura PLLC                                  POLSINELLI P.C.
916 Prince Street, Suite 107               2950 N. Harwood, Suite 2100
Alexandria, Virginia 22314                 Dallas, Texas 75201
703.835.9085/Fax 703.997.7665             214.397.0030/Fax 214.397.0033
alan@gurapllc.com                          Mateja@polsinelli.com

/s/ Matthew Goldstein                      /s/ Josh Blackman
Matthew Goldstein                          Josh Blackman
D.C. Bar No. 975000*                       Virginia Bar No. 78292
Matthew A. Goldstein, PLLC                 1303 San Jacinto Street
1875 Connecticut Avenue, N.W.              Houston, Texas 77002
10th Floor                                 202.294.9003/Fax: 713.646.1766
Washington, DC 20009                       joshblackman@gmail.com
202.550.0040/Fax 202.683.6679
matthew@goldsteinpllc.com

/s/ David S. Morris
William T. "Tommy" Jacks
Texas State Bar No. 10452000
David S. Morris
Texas State Bar No. 24032877
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, Texas 78701
512.472.5070/Fax 512.320.8935
jacks@fr.com
dmorris@fr.com                             *Admitted pro hac vice

15

WASHAR0002555

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Wednesday, March 28, 2018 5:22 PM |
| **To:** | Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |

Thanks,

Rob Hart

202 736 9221 | hartrl@state.gov

**From:** Cavnar, Anna <CavnarA@state.gov>
**Date:** March 28, 2018 at 10:34:11 AM EDT
**To:** Hart, Robert L <HartRL@state.gov>, Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>, Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

Best,
Anna
**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

Thanks,
Rob Hart
202.736.9221 | hartrl@state.gov
**Official**
**UNCLASSIFIED**

WASHAR0002556

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement
Rob,
PDAS Kaidanow approved without changes or comment.
Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement
approve
**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement
PDAS Kaidanow,
Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas.

Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement
Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some background on this case. That additional info should go up along with this approval request.
Thanks.
**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>

WASHAR0002557

**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement

Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. Rob Hart said he is available to answer any questions.

Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement

Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive aspects of the offer as an ITAR matter.

To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.

Thanks,
Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Freeman, Jeremy B </o=SBUState/ou=NCC AG/cn=Recipients/cn=FreemanJB> |
| **Sent:** | Thursday, March 29, 2018 5:08 PM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| **Cc:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: PM Final: Defense Distributed offer of settlement |

██████████████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED
**From:** Hart, Robert L
**Sent:** Thursday, March 29, 2018 4:54 PM
**To:** Freeman, Jeremy B; Cavnar, Anna; Fabry, Steven F; Monjay, Robert
**Cc:** Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

Thanks,
Rob Hart
202.736.9221 | hartrl@state.gov
**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
UNCLASSIFIED

**From:** Freeman, Jeremy B
**Sent:** Thursday, March 29, 2018 4:21 PM
**To:** Hart, Robert L <HartRL@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement
Rob,

██████████████████████████████████████████████████

Thanks,
Jeremy and Anna
**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Wednesday, March 28, 2018 3:51 PM
**To:** Cavnar, Anna; Fabry, Steven F
**Cc:** Freeman, Jeremy B; Heidema, Sarah J
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Thanks,
Rob Hart
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

**From:** Cavnar, Anna
**Sent:** Wednesday, March 28, 2018 10:34 AM
**To:** Hart, Robert L <HartRL@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: PM Final: Defense Distributed offer of settlement

Rob,

Best,
Anna
**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 5:02 PM
**To:** Fabry, Steven F
**Cc:** Freeman, Jeremy B; Cavnar, Anna; Heidema, Sarah J
**Subject:** FW: PM Final: Defense Distributed offer of settlement

Thanks,
Rob Hart
202.736.9221 | hartrl@state.gov
**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 4:59 PM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W

<KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>;
Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** PM Final: Defense Distributed offer of settlement
Rob,
PDAS Kaidanow approved without changes or comment.
Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - Transitory**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Tuesday, March 27, 2018 4:45 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** RE: For Review: FW: Defense Distributed offer of settlement
approve
**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 2:57 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>
**Subject:** For Review: FW: Defense Distributed offer of settlement
PDAS Kaidanow,
Please see attached for your clearance an offer of settlement of the Defense Distributed case currently before the U.S.
District Court for the Western District of Texas.

Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Tuesday, March 27, 2018 2:47 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** RE: For Jessica: FW: Defense Distributed offer of settlement
Hi. I haven't made it through all of my emails given all the trip prep meetings, but DTC was going to send up some
background on this case. That additional info should go up along with this approval request.
Thanks.
**Official - Transitory**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Tuesday, March 27, 2018 9:55 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Subject:** For Jessica: FW: Defense Distributed offer of settlement
Jessica – please see attached for PDAS Kaidanow clearance an offer of settlement of the Defense Distributed case
currently before the U.S. District Court for the Western District of Texas. Rob Hart said he is available to answer any

questions.
Best,
Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089
**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Tuesday, March 27, 2018 9:50 AM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Koelling, Richard W
<KoellingRW@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Defense Distributed offer of settlement
Hello,

Attached for PDAS Kaidanow's review and clearance is an offer of settlement of the Defense Distributed case currently
before the U.S. District Court for the Western District of Texas. I will follow up with Alicia or Bill to explain in more detail
by phone. This document is being reviewed simultaneously by L/PM, but we request clearance on the substantive
aspects of the offer as an ITAR matter.
To meet L's timeline we would be grateful for clearance by COB today. Please call me if you have any questions.
Thanks,
Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov
**Official - SBU**
**UNCLASSIFIED**

**Smith, Rickita L**

| | |
|---|---|
| **From:** | Fabry, Steven F |
| **Sent:** | Thursday, March 29, 2018 5:45 PM |
| **To:** | Freeman, Jeremy B |
| **Subject:** | Tentative: L-DDTC Call on Defense Distributed |

1

WASHAR0002563

| | |
|---|---|
| **From:** | Soskin, Eric (CIV) |
| **To:** | "Matthew Goldstein" |
| **Cc:** | Robinson, Stuart J. (CIV); Alan Gura; Josh Blackman; David Morris |
| **Subject:** | RE: Draft Motion to Stay and Order |
| **Date:** | Wednesday, May 16, 2018 9:59:00 AM |

Matt,

Thank you for providing the Case Fees and Costs Record, which we have reviewed in connection with our efforts to obtain Department of Justice approval for the settlement. While we appreciate your efforts to isolate those entries referenced in the Offer of Settlement, and while we do not contest the amount sought related to costs or DDTC registration fees, some of the other billings exceed what we consider to be reasonable in connection with the activities leading to litigation and settlement of your clients' claims. Among these are the hours related to a request for reconsideration of Defense Distributed's commodity jurisdiction request; instances of double billing for the same activity; excessive pre-litigation staffing; and excessive hours related to drafting of the amended complaints. Rather than contest these items line-by-line, we propose a 15 percent reduction in the fee request unrelated to costs and registration fees, i.e., reducing the $32,843 attorneys' fees request to $27,916.55, for a total fees and cost recovery of $39,581.55.

Best,
Eric

**From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
**Sent:** Tuesday, May 01, 2018 5:55 PM
**To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>
**Cc:** Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>; Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; David Morris <dmorris@fr.com>
**Subject:** Re: Draft Motion to Stay and Order

Eric,

Attached please find Plaintiffs' Case Fees and Costs Record.

Of course, please feel call me with any questions.

-Matt

Matthew A. Goldstein | Counsel
GOLDSTEIN PLLC
1875 Connecticut Ave NW, 10th Floor
Washington, D.C. 20009
C: 1.202.550.0040
www.GoldsteinPLLC.com

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error,

WASHAR0002564

please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the attorney-client privilege. Thank you.

> On Apr 30, 2018, at 10:06 AM, Soskin, Eric (CIV) <eric.soskin@usdoj.gov> wrote:
>
> Matt,
>
> We'd prefer the wording in the attached. You have our consent to file with these changes, or happy to discuss if needed.
>
> Thanks,
> Eric
>
> ---
>
> **From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
> **Sent:** Sunday, April 29, 2018 6:42 PM
> **To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>
> **Cc:** Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; David Morris <dmorris@fr.com>
> **Subject:** Draft Motion to Stay and Order
>
> Eric and Stuart,
>
> Please see the attached draft Motion to Stay and form of order.
>
> Look okay to file?
>
> -Matt
>
> Matthew A. Goldstein | Counsel
> GOLDSTEIN PLLC
> 1875 Connecticut Ave NW, 10th Floor
> Washington, D.C. 20009
> C: 1.202.550.0040
> www.GoldsteinPLLC.com
>
> This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the

WASHAR0002565

attorney-client privilege. Thank you.
<DD Proposed Order (revised).docx><DD Motion to Stay (revised).docx>

WASHAR0002566

| From: | Paul, Joshua M </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FE0AF1773ED642DF9120291EA0A8C588-PAUL, JOSHU> |
|---|---|
| Sent: | Friday, July 27, 2018 7:53 PM |
| To: | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov> |
| Subject: | 42 Reps Urge Hearing on 3D Guns |
| Attach: | Hearing Letter.pdf |

See attached, FYI.  Sorry for poor quality, it's a screengrab off Twitter.

# Congress of the United States
## Washington, DC 20515

July 26, 2018

The Honorable Bob Goodlatte
Chairman
Committee on the Judiciary
U.S. House of Representatives
2138 Rayburn HOB
Washington, DC 20515

The Honorable Edward R. Royce
Chairman
Committee on Foreign Affairs
U.S. House of Representatives
2170 Rayburn HOB
Washington, DC 20515

Dear Chairman Goodlatte and Chairman Royce:

We write to demand that you urgently schedule a joint hearing of the Judiciary and Foreign Affairs Committees to examine the recent settlement by the State Department and Department of Justice's in the *Defense Distributed et al v. U.S. Department of State* case.

One week from today, Defense Distributed will be allowed to publish instructions for making guns at home. Using an inexpensive 3-D printer, anyone will be able to use these blueprints to turn modest raw materials into untraceable, fully functional firearms. So-called "ghost guns" do not bear a manufacturer's serial number and may be constructed using plastic materials that are impossible to screen at security checkpoints using metal detectors, like many used to keep guns out of airport terminals by the Transportation Security Administration. The free flow of this information on the internet will allow anyone to circumvent the Arms Export Control Act. More alarmingly, under the settlement anyone, even those who couldn't pass a background check, will be able to access these plans to print a gun with just a few clicks. These blueprints will allow individuals who have been convicted of felonies to skirt state and federal laws that prevent them from possessing firearms and put guns directly into dangerous hands. This settlement will put American lives at risk, and it demands our urgent attention.

The Trump Administration's decision to settle this case will only worsen the gun violence epidemic in America. This week, we marked the 20th anniversary of the assassination of two U.S. Capitol Police Officers on Capitol Hill. On July 24, 1998, Detective John M. Gibson and Officer Jacob J. Chestnut were shot and killed. In the 20 years since, Congress has spent millions of taxpayer dollars to harden the Capitol complex against attacks. We've added protective barriers, a new visitors center, and security checkpoints with scanners and metal detectors. Sadly, after 17 people were killed at Marjory Stoneman Douglas High School in Parkland, Florida, 10 people were killed at Santa Fe High School in Texas, and more than 20 other shootings in 2018, schools around the country are now engaging in a similar process of hardening their schools. They have to do this because guns are too easy to get in America. It's too easy for people who are not safe and responsible gun owners to get them. Unfortunately, Congress has offered only thoughts, prayers, and modest school security funding instead of making serious efforts to stop gun violence in America.

PRINTED ON RECYCLED PAPER

WASHAR0002568

Chairman Goodlatte, Chairman Royce
Page 2
July 26, 2018

Now, with this settlement, even those efforts will be in vain. We shouldn't have to wait for someone to kill someone in a House office building after sneaking past security with a plastic 3-D printed gun to do something to stop this. And we can't let another day go by allowing the paralysis and dysfunction of Congress to prevent us from making our communities safe.

The time to act was decades ago, but we failed. Let's do something now.

Sincerely,

Ted Deutch
MEMBER OF CONGRESS

Adriano Espaillat
MEMBER OF CONGRESS

Debbie Dingell
MEMBER OF CONGRESS

Alcee L. Hastings
MEMBER OF CONGRESS

Lloyd Doggett
MEMBER OF CONGRESS

Bill Pascrell, Jr.
MEMBER OF CONGRESS

Michael E. Capuano
MEMBER OF CONGRESS

MEMBER OF CONGRESS

MEMBER OF CONGRESS

Raul M. Grijalva
MEMBER OF CONGRESS

WASHAR0002569

| | |
|---|---|
| **From:** | Josh Paul <████████@gmail.com> |
| **Sent:** | Monday, May 14, 2018 6:25 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | Article |

FILE - In this July 10, 2013 file photo, semi-automatic handguns are seen displayed for purchase at an arms supply store in Springfield, Ill. Illinois State Police granted far fewer concealed carry permits statewide in 2015 than in 2014, according to numbers released by the agency. But while the number of granted permits is down, the number of objections to applications that were made by law enforcement has more than doubled. (AP Photo/Seth Perlman, File)
8'
FILE - In this July 10, 2013 file photo, semi-automatic handguns are seen displayed for purchase at an arms supply store in Springfield, Ill. Illinois State Police granted far fewer concealed carry permits statewide in 2015 than in 2014, according ... more >
Trump administration moves to shift gun export approval from State to Commerce
By Guy Taylor - The Washington Times - Updated: 6:10 p.m. on Monday, May 14, 2018
The Trump administration took a major formal step Monday toward officially shifting authority from the State Department to the Commerce Department over the approval of U.S. small arms exports, including semiautomatic rifles and weapons ranging in size up to .50 caliber.

In a closed-door briefing for lawmakers, State and Commerce officials outlined specifics of the shift long sought by small arms manufacturers as a way to cut red tape and boost exports — but decried by pro-regulation Democrats who warn the policy change could dissolve barriers designed to keep U.S.-made firearms from criminals and terrorists overseas.

While Congress could still block the initiative — Monday's briefing on Capitol Hill opened a public comment period that lasts for 45 days — administration officials are touting the policy as breakthrough for U.S. manufacturing and stress that key restrictions on exports to unsavory international buyers will remain in place.

PHOTOS: Best new handguns for 2018

What will change once the Commerce Department fully takes over as the point agency for licensing on small arms exports is that the "regulatory burden on the U.S. commercial firearms and ammunition industry" will be "significantly reduce[d]," says Principal Deputy Assistant Secretary of State Tina Kaidanow.

The shift will "promote American exports," Ms. Kaidanow told The Washington Times, asserting that officials are also "prioritizing national security controls and continuing our ability to restrict exports where human rights, illicit trafficking, and related issues may be of concern."

Currently, small arms export licensing is lumped under they same approval process as that for such major military weapons as advanced missile systems and tanks. Under the new policy, Commerce will be put in charge of overseeing exports of handguns, sporting rifles and such semiautomatic rifles as AR-15s, separating those personal protection and hunting firearms from the military-grade weaponry, which will still be governed by the State.

"One of the guideposts we used in writing the proposed policy change was to look at what's commercially available in sporting goods stores in the United States — products where the majority of the end users are not

military," a senior Commerce Department official told The Times.

A senior State Department official explained that "firearms that put out one bullet per pull of the trigger are going to Commerce, while the more than one bullet per pull will stay with State on the U.S. Munitions List (USML) that controls the sale of American military equipment to foreign buyers."

The biggest firearms whose export will now be run out of Commerce are .50 caliber rifles. What will stay at State go are certain types of ammunition, specifically magazines that carry more than 50 rounds, any belt-fed bullets, tracers and "developmental" ammunition proprietary to major defense companies.

There will also be major license exceptions put in place for under Commerce, including exceptions for companies with contracts to manufacture and maintain small arms for certain foreign police departments or for NATO and other close allies.

The policy shift will also do away with certain registration fees. Under the current system, any individual or company that manufactures a firearm or small arm component — whether or not they export it — is required to register with the State Department and pay an annual fee that starts at $2,250 per year.

The fee, which small arm manufacturing advocates say is prohibitive to individual gunsmiths and to U.S.-based companies that manufacture parts for bigger firms focused on exporting, will no longer exist under the Commerce-run approval system.

"Basically, the way the old system is set up right now, we're treating a guy in his garage who assists a foreign client in the design of a basic firearm as if he's a major defense contractor," said one of the officials who spoke on condition of anonymity with The Times. "We're treating him the same as we're treating Boeing right now and its not rational."

Critics say that's a talking point traceable back to the gun lobby. But firearms industry advocates say the new policy is something that's been in the making for years because of a grassroots outcry from small arm manufactures who employ some 190,000 people across all 50 States.

Started with Obama

The policy shift began under President Obama, whose senior aides reportedly agreed that State shouldn't be so deeply involved in controlling exports of products already sold with limited regulation in U.S. stores.

Mr. Obama was seen to be on the cusp of pushing through the shift to Commerce in 2012, but stalled amid outcry over small arms proliferation following the mass shooting that left 20 children dead that year at Sandy Hook Elementary School in Newtown, Connecticut.

Now that the shift is finally happening, advocates say it could grow revenues for the firearms industry by some $340 million a year and boost export sales by up to 20 percent.

"It's a major improvement and something we've been chasing for a long time," said Larry Keane of the National Shooting Sports Foundation, the nation's leading firearms industry trade association.

"It's a chance to compete in the global market on a more level playing field," Mr. Keane told The Times. "American companies lose business opportunities because of the current license export control regime without any benefit to national security."

WASHAR0002571

Concerns over national security

The issue of national security has hung in the backdrop as support for the policy shift gained steam.

A GOP-led effort last year saw dozens of House members pen a letter to the Trump administration calling on the White House to get on with the shift to help a U.S. businesses "access new markets, create new jobs and hire hard-working Americans."

Five Democrats joined a similar letter sent last May to the State Department by 29 senators. Among the Democrats who signed were Amy Klobuchar of Minnesota, Joe Donnelly of Indiana, Heidi Heitkamp of North Dakota and Joe Manchin of West Virginia.

But a separate letter penned by Democrats Ben Cardin of Maryland, Dianne Feinstein of California and Patrick Leahy of Vermont argued a shift to Commerce will result "in less rigorous oversight" of gun exports and "be directly contrary to congressional intent of the 2002 Arms Export Control Act."

The Senators specifically argued that approval for the export of .50 caliber rifles and semi-automatic firearms should remain under the State Department's domain on grounds an expanding number of them on the global market may increase the risk of their falling into the wrong hands internationally.

The Arms Control Association (ACA), an advocacy group accused by some conservatives of pushing leftist gun-control agendas, has argued that Commerce control over such exports would be "less restrictive" in a way could "enable illegal procurement and diversion of reclassified weapons."

The ACA argues on its website that loosened export approval requirements, coupled with "confusion over regulations, may also make it harder to identify and prosecute arms smugglers and illegal exporters." The association maintains that the State Department, not Commerce, has "the proper mandate to take into account the impact of firearms transfers on terrorist activity, human rights norms and other considerations beyond commercial interests."

Cardin vows to fight it

Mr. Cardin took the argument further Monday, telling The Times he's spent years advising "both the Obama and Trump administrations against this type of transfer."

"Weakened Congressional oversight of international small arms and munitions sales is extremely hazardous to global security," the Maryland Democrat said. "Small arms and light weapons are among the most lethal weapons that we and other countries export…[and] are most likely to be used to commit atrocities and suppress human rights, either by individuals, non-state groups, or governmental security and para-military forces."

"This decision is also politically tone-deaf as our nation reckons with a gun violence epidemic," Mr. Cardin asserted. "As the public comment period begins today, I encourage the American people and relevant stakeholders to weigh in with the administration and speak out against the forces really driving this policy change – the gun lobby."

Advocates of the policy change, as well as Commerce and State Department officials downplayed Mr. Cardin's concerns. One senior Commerce official stressed in an interview with The Times that the State Department will remain involved in an inter-agency review process for any export applications pertaining to buyers in foreign

WASHAR0002572

countries deemed sensitive.

"There's very little that we would approve under Commerce that we would not approve today under the current State Department run system," the official said. "What we're trying to do is reduce the burden it takes to get that license. But we're still going to do that same national security, foreign policy, human rights review. Something that we would deny today should continue to be denied tomorrow."

Sen. Steve Daines, a Montana Republican who pushed for the shift to Commerce, told The Times his state's "world-class firearm and ammunition manufacturers should not be burdened by unnecessary regulations and costs."

Trump administration officials say they hope the shift can be finalized quickly following a 45-day comment period that began Monday. Once it has passed, Congress could try to overturn the policy, but would have to pass legislation to do so — something officials say is unlikely given the near unanimous support the shift among Republicans.

Mr. Daines, meanwhile, said he wishes even more red tape were being cut. "While this is a step in the right direction," he said, "more work remains to be done and I will continue pushing."

Trump administration officials are eager to take credit, asserting the new policy amounts to "common-sense reforms" that fit with the president's view that "economic security is national security."

"President Trump is following through on his commitment to reduce the regulatory burden on American employers, which will result in more jobs and a stronger economy," a senior White House official told The Times.

Copyright © 2018 The Washington Times, LLC. Click here for reprint permission.

The Washington Times Comment Policy
The Washington Times is switching its third-party commenting system from Disqus to Spot.IM. You will need to either create an account with Spot.im or if you wish to use your Disqus account look under the Conversation for the link "Have a Disqus Account?". Please read our Comment Policy before commenting.
 NEXT ARTICLE

HOME  NEWS  OPINION  POLITICS  CULTURE  SPORTS  ADVERTISING  2ND AMENDMENT

WASHAR0002573

| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| Sent: | Monday, July 23, 2018 12:08 PM |
| To: | Darrach, Tamara A <DarrachTA@state.gov> |
| Subject: | Briefing on Defense Distributed Settlement |

We and L/PM can do any time tomorrow.  It will be unclassified.  Can you see when works for the staff, and let me know if you've had any response from DOJ?

Thanks so much,

Josh

_____

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.7878 | 🖳  BlackBerry: 202.679.6724 | 🖨   Fax: 202.647.4055
✉ e-mail:      *PaulJM@State.Gov* | ✐ Web: *www.state.gov/t/pm /*

🦜 http://twitter.com/StateDeptPM

Stay connected with *State.gov*:



This message is *__UNCLASSIFIED__*, per E.O. 12958

**Official**
**UNCLASSIFIED**

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER          THOMAS SHEEHY
CHIEF OF STAFF      STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed firearms would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

WASHAR0002575

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC  20520

      Use of this temporary ITAR authority also suggests that Department officials sought a
way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires
advance notification to Congress for any removal from the USML.

      The settlement of this lawsuit is slated to go into effect by July 27th.  I urge you to
suspend the Department's implementation of the settlement immediately and prevent the
inappropriate and dangerous release of this technical information.

                    Sincerely,

                    ELIOT L. ENGEL
                    Ranking Member

WASHAR0002576

| **From:** | Koran, Laura <Laura.Koran@turner.com> |
| **Sent:** | Thursday, July 26, 2018 2:11 PM |
| **To:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | CNN Q - Defense Distributed waiver |

Good afternoon,

Do you have any comment on the guidance the State Department is providing the company Defense Distributed as part of their settlement in a case involving the posting of printable gun plans online? I understand the State Department's Directorate of Defense Trade Controls was supposed to provide an ITAR waiver letter by tomorrow – has that happened?

Anything you can provide on this case would be greatly appreciated. Thanks!

Laura

**Laura C. Koran**
**CNN Washington**
(202) 898-7698 (office)
(202) 957-7310 (cell)
laura.koran@turner.com

WASHAR0002577

| From: | H_CCU@state.gov |
|-------|------------------|
| **Sent:** | Thursday, July 26, 2018 7:57 AM |
| **To:** | H_CCTasking-PM <H_CCTasking-PM@state.gov> |
| **Cc:** | Darrach, Tamara A <DarrachTA@state.gov>; H_CCU <H_CCU@state.gov> |
| **Subject:** | Control Number: H20180726=000 -- Member: Menendez, Robert -- Date Due: 7/31/2018 |
| **Attach:** | H20180726=000.pdf |

Congressional Correspondence - 2 day tasker

Control Number: **H20180726=000**
Date Due: **7/31/2018**
Actions:
• Reply for signature by Mary K. Waters, Assistant Secretary, Legislative Affairs.
Member: Menendez, Robert
Subject: Writing regarding the Department's decision on the 3D printing of functional firearms that would result in the suspension of ITAR restrictions required by the Arms Export Control Act.
2 Day Tasker

- For all correspondence that will be signed by the Secretary or other Principal: Please submit a draft response under cover of a **joint action memo by H and your Bureau.** Please submit the action memo on the **classified (high) side to the H Staffers.** Also, please advise the CCU on the unclassified (low) side when the action memo has been submitted.
- The attached Substantive Correspondence is due in the Congressional Correspondence Unit (CCU) on the due date indicated on the tasker.
- Document Requests: All request for DOS documents require an interim response to the Member within 2 days of the official tasker. The interim response acknowledges receipt of the request and advises that a search for the requested information has begun. All responsive documents must be cleared for release by P via action memo.
- All Unclassified responses to congressional inquiries should be submitted to the CCU on OpenNet, as a word document, named using the H Control Number (e.g. H20110321=000.docx for substantive or 11002201.docx for constituent). In the case of interim responses use the control number plus interim plus. (e.g. H20110321=000interim.docx for substantive or 11002201interim.docx for constituent)
- All Classified responses to congressional inquiries should be submitted to CCU on ClassNet to the ccu2ndtasker@state.sgov.gov email box, as a word document, named using the H Control Number (e.g. H20110321=000.docx for substantive or 11002201.docx for constituent). In the case of interim responses use the control number plus interim plus. (e.g. H20110321=000interim.docx for substantive or 11002201interim.docx for constituent)

WASHAR0002578



# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER

IPS CONTROL# **H2018** _O726 = OOO_    ACTION BUREAU: _H_

DATE: **JUL 2 6 2018**

## IPS:

___X___ SUBSTANTIVE

___X___ IMAGE ENTIRE DOCUMENT

## BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

_____✓_____ REPLY FOR SIGNATURE BY **Mary K. Waters, Assistant Secretary, Bureau of Legislative Affairs**

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE. PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____ OTHER ACTION: _____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
_http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border_

*****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE. PLEASE NOTIFY CCU VIA UNCLASS EMAIL OF ALL TRANSFERS OF ACTION*****

**Due Date** _7/31_

ADDITIONAL INSTRUCTIONS:

___Multi-signer Letter: _____

___Special Instructions: _____

___EVEREST TASKER# _____

___Please clear with NSC prior to submission to H

WASHAR0002579

**FROM: Mary K. Waters (H)**

**Congressional Correspondence Recommendation**

JUL 2 6 2018

_____ **For Signature by Secretary Pompeo**

**For draft by _____ Bureau**

_X_ **Tasked to the** _PM_ **Bureau for Signature by Mary K. Waters, Assistant Secretary, Legislative Affairs**

_____ **Tasked to _____ Bureau for signature by Post or Bureau**

_____ FYI Only—No Reply Necessary
For _____ Bureau

Special Actions:

_____ Multi-signer letter:

_____ Special Clearances:

_____ For S Staff Review (H Only)

_____ Everest Tasker# _____
_____ Special Instructions:_____

WASHAR0002580

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

# United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

LMO/TD

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 4:45 PM |
| To: | Steffens, Jessica L <SteffensJL@state.gov>; PM-Strategy <PM-Strategy@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Brown, Stanley L <BrownSL@state.gov>; O'Keefe, Kevin P <OKeefeKP@state.gov>; Miller, Michael F <Millermf@state.gov>; Mak, Daniella <MakD@state.gov>; Martin, Davette T <MartinDT@state.gov>; Dudding, Maria <DuddingM@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Nute, Kathryn M <NuteKM3@state.gov>; McVerry, James <James.Mcverry.ctr@dla.mil> |
| Subject: | CPA Media Monitoring: 25 July 2018 |



**Alerts for 25 July 2018**

"State Dept. official met with Taliban to kick-start Afghanistan peace talks: report", Alice Wells, the deputy assistant secretary of State for South and Central Asia, led a U.S. delegation to Doha, Qatar, where they met with members of the Taliban's political commission, the Journal reported.

"Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing'", Gun rights activists in the United States will soon be able to post 3D printable gun plans online. In 2013, Cody Wilson, who describes himself as a post-left anarchist, posted plans for a 3D printed handgun called "The Liberator." The gun, which was made from plastic, had a metal firing pin and another piece of metal included to comply with the Undetectable Firearms Act.

"The Case for a Free and Open Indo-Pacific", It is hard, however, to see that FOIP will destabilise Asia, as Michael D. Swaine argues. The the region is, after all, already unstable, thanks to Beijing's over-confident assertiveness, more than a decade of mixed messaging and half-hearted action from Washington, and 18 months of Trump's fickle and foolish personal diplomacy. It is not obvious that FOIP will make matters markedly worse, if it does indeed have an impact on the US's approach to the region, and there is reason to think it might make them better.

"Editorial: Homemade 3-D printer guns should be regulated like any gun", Federal law allows hobbyists to build their own guns for personal use. But the landscape has changed with 3-D printers, precise digital plans, and devices like the Ghost Gunner that allow anyone with a computer and a credit card to become a gun manufacturer.

"Pentagon Awards $300Mln to Deliver Javelin Missiles to Ukraine, 5 Other States", The US Army has awarded a $307 million Foreign Military Sales contract to Raytheon to supply more Javelin anti-tank missiles to Ukraine, Estonia and Lithuania as well as to Australia, Turkey and Taiwan, the Department of Defense said in a press release.

"WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons", Normally, Americans would need to pass a background check before they can buy a gun, but freely-available blueprints for 3D-printed weapons could offer a way to bypass this law.

"What You Need to Know About the 3D Printing of Guns on Demand", While Brady's legal team has filed Freedom of Information Act (FOIA) requests to find out how and why this decision was made, the self-proclaimed "crypto-anarchist" will move forward to publish the blueprints for anyone and everyone to use. The

WASHAR0002583

Brady Center, along with Everytown and Giffords, is urging a Texas federal court to consider just how dangerous this could be and will be filing legal action.

"LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL", Attorneys representing the Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence and Everytown for Gun Safety have informed a Texas federal court that they anticipate filing legal action within days related to a settlement that would allow new designs for downloadable, untraceable guns to become public and available world-wide as early as August 1.

"MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS", U.S. Senator Bob Menendez, Ranking Member of the Senate Foreign Relations Committee, today called on U.S. Secretary of State Mike Pompeo to immediately intervene and review the surprising and sudden decision by his department to allow online public posting of 3-D printable gun blueprints in the next few days.

"Debating the Permissibility of Printable Guns", Those opposed to the settlement argue that it is deeply problematic that there are no background checks required for printing a gun.  Convicted violent felons could print guns. People with a history of violent mental disorders could print guns. The government has a responsibility to look after the safety of its citizenry.  Deadly weapons shouldn't fall into the wrong hands.

"We Have to Take a Stand on 3D Printed Guns", You can already make guns in the US, you just need a license to distribute guns. The essential part of the "homebrew" gun was already perfectly possible. If they really wanted to 3D print guns they could have already done this. Instead, they wanted to 3D print attention and everyone fell for it. They went looking for a law suit to prolong the window of attention on them.

"Houthi rebels attack Saudi tanker in Red Sea: Coalition", Houthi rebels have attacked a Saudi oil tanker in the Red Sea, causing "minor damage" to the vessel, the Saudi-led Coalition said on Wednesday.

"Final US defence spending Bill expands pushback against China", Specifically, it calls for the Pentagon to adopt a more proactive role in assessing and strengthening Taiwan's ability to resist an invasion from China, which sees the democratically run island as a province.

"Government Admits AR-15s Are Not Weapons of War", Wilson and SAF fought the suit on First Amendment grounds and secured a settlement with the State Department and the Department of Justice, the latter of which finalizes the settlement. The amended regulations proposed in the settlement show the government will no longer look at semi-automatic firearms below .50 caliber as "military equipment" or weapons of war.

"Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1", A settlement earlier this year between the State Department and Texas-based Defense Distributed will let the nonprofit release blueprints for guns online starting Aug. 1, a development hailed by the group as the death of gun control in the United States.

"THE DANGERS OF 3D-PRINTED GUNS", The Trump Administration's ruling will recklessly allow anyone to post their gun blueprints online for anyone to download. That means people who are unable to pass a background check—like terrorists, convicted felons, and domestic abusers—will be able to 3D-print a gun out of the same type of plastic used to make LEGOs—without any attached serial numbers. This could have severe repercussions a decade from now if we allow weapons of this kind to multiply.

"Anglophone Revolt Seen Raising Risk of Civil War in Cameroon", Advocacy groups including Human Rights Watch have said the government's heavy-handed response contributed to an escalation of the conflict. Last week, the New York-based organization released satellite imagery showing security forces had torched dozens of villages, and accused them of committing torture and summary executions.

"800 US soldiers in Ghana for jungle warfare training at Achiase", Mr Jackson said although the partnership

was in full force there was no indication of an American military base as was feared and became the subject of heated discussions in the country when the US, Ghana Defense Cooperation Agreement came to light earlier this year as it was presented to Parliament for ratification.

"US to release $195 mln of suspended military aid to Cairo shortly: Sources", The United States will shortly release some military aid to Cairo it had suspended last year following talks with an Egyptian military delegation currently visiting Washington, sources close to the delegation told Ahram Online on Wednesday.

"UAE talks up diplomacy as Congress curtails US involvement in Yemen war", The conference report specifically demands that the Pentagon tell Congress whether US or Arab coalition forces violated federal law or Pentagon policy, while another provision restricts US refueling for the Yemen campaign unless the UAE and Saudi Arabia demonstrate efforts to support UN-backed peace talks, resolve the growing humanitarian crisis and cut down on civilian deaths.

"An Indo-Pacific Joint Multinational Training Command and Readiness Center?", Given the absence of a 'permanent' institution to plan Joint, Interagency, and Multinational (JIM) exercises, train personnel (professional military education (PME), conduct mission rehearsal exercises, as well as serving as a venue for developing joint/combined doctrine, standard operating procedures (SOPs) and tactics, techniques, and procedures (TTP) etc.: 1) could one be created, modelled conceptually on the North Atlantic Treaty Organization's (NATO) JMRC, and 2) would it disrupt/delay/reverse the improvements in interoperability already taking place?

"Bulgaria issues request for proposals for fighter jets", The ministry has called for bids for new or used jets from the United States (F-16 and F/A-18 Super Hornet), France (Dassault Rafale) and Sweden (Gripen C/D) as well as new jets from Germany (Eurofighter 3 Tranche) and used planes from Portugal (F-16), Israel (F-16) and Italy (Eurofighter Tranche 1).

"U.S. pastor on trial in Turkey moved to house arrest - CNN Turk", An American pastor on trial in Turkey on terrorism charges has been moved to house arrest, broadcaster CNN Turk said on Wednesday, a week after a court decided to keep him in jail in a case which has caused a rift with the United States.

"Email NOW: Stop the Threat of Downloadable Guns", Do-it-yourself, downloadable guns are incredibly dangerous. And a State Department special exemption would allow a company run by a self-proclaimed anarchist to post its gun blueprints online in the form of files that can be sent directly to a 3D printer to print guns on demand.

"The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really", The lawsuit turns on whether or not the first and second amendment, allowing freedom of speech and the right to bear arms, protects someone like Wilson, who wishes to provide downloadable gun blueprints to make deadly, untraceable weapons.

"India finalising negotiations for 48 additional Mi-17-V5 helicopters from Russia", Official Indian sources told Jane's on 23 July that the deal for the twin-engine helicopters – 38 of which are earmarked for the IAF – is likely to be signed during Russian President Vladimir Putin's visit to India in early October for the annual bilateral summit between the leaders of the two countries.

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:     MarquisMR@state.gov |   Web: www.state.gov/t/pm / |Twitter: @StateDeptPM

WASHAR0002585

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

WASHAR0002586

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 8:19 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: ABC News: State Department defends allowing publication of blueprints to 3D print guns |

## CPA MEDIA MONITORING

**State Department defends allowing publication of blueprints to 3D print guns**
**By Karolina Rivas, Conor Finnegan**
**25 July 2018**

Just days before digital blueprints that would allow people to 3D print firearms are set to go live online, the State Department is defending the move to allow their publication, even as Secretary of State Mike Pompeo promised to look into the issue.

The Trump administration recently settled with a non-profit after it sued for the right to publish the code.

While a State Department spokesperson pointed out that "the court did not rule in favor of the plaintiffs in this case," the administration settled anyway, in part, because there's no added public safety threat because "certain firearms and related items... are widely available" already, the spokesperson told ABC News.

The impending publication has garnered outrage among gun safety advocates, who warned it could create "untraceable" guns.

The controversy centers around Defense Distributed founder Cody Wilson's 2013 suit against the State Department after he was forced to take down blueprints his company posted online.

After a years-long legal battle, Wilson reached a settlement with the State Department to allow his company to post designs of various firearms for 3D printers. Among these weapons is an AR-15 - a weapon commonly known to be used in mass shootings.

Wilson has been vocal on social media about his company's goal to release the designs. After the settlement was reached, Wilson tweeted a photo of a headstone with the words "American Gun Control" engraved.

In a lengthy statement, the State Department spokesperson said that the Trump administration settled because new government regulations make the case moot. The Commerce Department is taking over the regulation of certain firearms -- a change that was implemented under the Obama administration, but accelerated under the Trump administration as it seeks "to create a simpler, more robust export control system that eases industry compliance, enhances enforceability, and better protects truly sensitive technologies."

In other words, they want to ease the restrictions on firearms that are "commercially available" and strengthen protection of more important weapons technology.

As the Commerce Department takes over, the regulation that barred Wilson from publishing has ended.

But while Pompeo told the Senate Foreign Relations Committee Wednesday that he would "take a look at," the

administration has declined to take action to block Wilson's publication – which will relaunch on August 1, according to Defense Distributed.

After a security analysis, "It was determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States," the State Department spokesperson said -- so they don't need to block publication.

That has outraged gun safety advocates, with Sen. Ed Markey D-Mass. warning Pompeo to make sure guns "don't get into the wrong hands."

Military veterans from Everytown for Gun Safety Veteran Advisory Council are also calling on Pompeo to halt the distribution of the designs.

"We know firsthand the destructive power of firearms and the dangers of firearms in the wrong hands," the letter states. "We support the federal laws that work to keep the public safe, which rely on criminal background checks to block gun possession by those who pose a danger to society. And we believe strongly that downloadable firearms will undermine those laws, [...]."

In particular, the group and other gun control advocates argue these guns are not traceable because they are produced without serial codes.

"Defense Distributed is not subtle with its aims: It has made it very clear that it intends to undermine the rule of law when it comes to firearms regulations," military veterans from the organization wrote Pompeo. "We urge you to not to allow the distribution of downloadable guns by exemption, settlement or rule, and stop these deadly blueprints from being released."

Link: https://abcnews.go.com/Politics/state-department-defends-allowing-publication-blueprints-3d-print/story?id=56817152

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968

e-mail:     *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002588

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 10:46 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Breitbart: Government Admits AR-15s Are Not Weapons of War |

**CPA MEDIA MONITORING**

**Government Admits AR-15s Are Not Weapons of War**
**By AWR Hawkins**
**23 July 2018**

In its settlement with Cody Wilson's Defense Distributed the government admitted that semi-automatic firearms below .50 caliber are not weapons of war.

On July 10, 2018, Breitbart News reported that the Second Amendment Foundation (SAF) brought a suit against the State Department on Wilson's behalf. The suit was filed in 2015 and was the result of State Department action to force Wilson to quit sharing 3-D gun files online.

Wilson and SAF fought the suit on First Amendment grounds and secured a settlement with the State Department and the Department of Justice, the latter of which finalizes the settlement.

The amended regulations proposed in the settlement show the government will no longer look at semi-automatic firearms below .50 caliber as "military equipment" or weapons of war.

In offering a definition of "military equipment" the settlement says:

The phrase "Military Equipment" means (1) Drums and other magazines for firearms to 50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of the jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specifically designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specifically designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specifically designed parts and components therefor.

Attorneys in the case expounded on the amended regulations by pointing out that the settlement "expressly acknowledges that non-automatic firearms up to .50 caliber widely available in retail outlets in the United States and abroad [a scope that includes AR-15 and other assault-style rifles], are not inherently military."

Second Amendment Foundation founder and executive vice president Alan Gottlieb spoke to Breitbart News about the settlement, saying:

Not only is this a First Amendment victory for free speech, it also is a devastating blow to the gun prohibition lobby. For years, anti-gunners have contended that modern semi-automatic sport-utility rifles are so-called "weapons of war," and with this settlement, the government has acknowledged they are nothing of the sort.

The federal government now saying semi-automatic firearms below .50 caliber are not inherently military means that they are admitting that rifles like  the AR-15 are civilian in nature. This makes perfect sense, as they

WASHAR0002589

existed years before the military adopted the fully automatic version.

Gottlieb added, "Gun rights organizations like the Second Amendment Foundation will now be able to use this government admission in debate and courtrooms from New York to California."

Link: https://www.breitbart.com/big-government/2018/07/23/government-admits-ar-15s-not-weapons-war/

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 3:47 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: CBS Philly: New Jersey Attorney General Sends 'Cease And Desist' Letter To Halt Company's Publication Of 3D-Printed Gun Instructions |

## CPA MEDIA MONITORING

**New Jersey Attorney General Sends 'Cease And Desist' Letter To Halt Company's Publication Of 3D-Printed Gun Instructions**
**By CBS Philly**
**26 July 2018**

TRENTON (CBS/AP) — New Jersey's attorney general wants a gun developer to halt plans to publish 3D-printed gun instructions online. Attorney General Gurbir Grewal sent a "cease and desist" letter to Texas-based firearm developer Defense Distributed on Thursday to stop the release.

Grewal calls it a threat to public safety.

"You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents," Grewal said in the letter. "The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms – and even to make assault weapons that are illegal in my state."

The State Department ruled in late June that directions for building the weapons could be published. The decision resolved a long-lingering dispute with Cody Wilson, owner of Defense Distributed. The company specializes in "open source" firearm designs that can be made with a 3D printer.

"Defense Distributed's plans to allow anyone with a 3-D printer to download a code and create a fully operational gun directly threatens the public safety of New Jersey's residents," said Grewal. "Posting this material online is no different than driving to New Jersey and handing out hard-copy files on any street corner. The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."

The firearms are made of polymer that can't be flagged by metal detectors. They're also untraceable because the guns are homemade and don't have serial numbers.

On Thursday, gun-control groups asked a federal court for a temporary injunction to block the State Department decision from taking effect.

Link: https://philadelphia.cbslocal.com/2018/07/26/new-jersey-attorney-general-sends-cease-and-desist-letter-to-halt-companys-publication-of-3d-printed-gun-instructions/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

WASHAR0002591

Phone:    202.647.6968

e-mail:    **_MarquisMR@state.gov_** |  Web: **_www.state.gov/t/pm /_** |Twitter: **_@StateDeptPM_**

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 4:45 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Change.org Petition: Stop Defense Distributed From Releasing Downloadable Guns |

## CPA MEDIA MONITORING

**Stop Defense Distributed From Releasing Downloadable Guns**
**By Change.org**

On August 1st, Defense Distributed plans to release downloadable gun blueprints to make untraceable, undetectable, plastic 3D printed guns. This could mean that anyone, including TERRORISTS, convicted FELONS, domestic ABUSERS and other dangerous people could print their own gun on demand.

If the State Department provides this special exemption, you will not be safe, even in secured areas because anyone could have a plastic gun.

IF YOU CARE ABOUT YOURSELF AND YOUR LOVED ONES, sign this petition and urge the US State Department to stop this dangerous reality!

Updates
9 hours ago
35,000 supporters

Link: https://www.change.org/p/stop-defense-distributed-from-releasing-downloadable-guns?recruiter=890898140&utm_campaign=signature_receipt&utm_medium=twitter&utm_source=share_petition

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:     *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm/* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| **Sent:** | Wednesday, July 18, 2018 10:02 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: CNET: Blueprints for 3D printed guns to again appear online |



**Blueprints for 3D printed guns to again appear online**
**By Marrian Zhou**
**17 July 2018**

Defense Distributed will soon be able to again publish designs for 3D printed guns.

The company's owner, Cody Wilson, confirmed in an email that he'll resume publication Aug. 1. Last week, the US Department of State agreed to waive its prior restraint order against Wilson and Defense Distributed, allowing them to freely publish designs and other technical files about 3D printed guns, according to a press release from the Second Amendment Foundation. The SAF joined Defense Distributed in a 2015 lawsuit over the restraint order.

"The government will draft and pursue regulatory amendments that eliminate ITAR [International Traffic in Arms Regulations] control over the technical information at the center of this case," Alan Gottlieb, founder and vice president of SAF, said in the release. "They will transfer export jurisdiction to the Commerce Department, [which] will allow Defense Distributed and SAF to publish information about 3D technology."

The State Department oversees the exports of defense products in accordance with the ITAR, which was why the department had the run-in with Defense Distributed, according to a State Department spokesperson. Since the Department of Commerce will take over the responsibility of regulating commercial arms trade and manufacturing, the State Department settled with Defense Distributed and SAF because the issues raised in the lawsuit won't be relevant to it in the near future.

The designs are free to download, Wilson said in an emailed statement. Asked whether it worries him that people with bad intentions might get their hands on his designs, he said, "no concerns regarding public access." In the SAF release, Gottleib called the settlement "a First Amendment victory for free speech" and "a devastating blow to the gun prohibition lobby."

In 2013, Wilson and his company debuted the world's first 3D printed gun, the Liberator, which was made out of plastic and could fire standard handgun rounds. Several months later, the State Department said Defense Distributed violated the ITAR by publishing its designs for the gun. The company then removed the files, according to Ars Technica.

Two years later, the company and SAF sued the Department of State, arguing the government can't prevent publication before it occurs.

Wilson's plastic gun is undetectable at airports and other metal-detection checkpoints. The Undetectable Firearms Act makes it a federal offense to "manufacture, import, sell, ship, deliver, possess, transfer or receive" a firearm capable of defeating airport metal detection.

Wilson told Ars Technica he's been cashing in from selling the Ghost Gunner, a home tool that lets people make

WASHAR0002594

a key gun part out of metal and use that part to build an untraceable firearm.

Link: https://www.cnet.com/news/blueprints-for-3d-printed-guns-to-again-appear-online/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002595

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 8:34 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Everytown: Email NOW: Stop the Threat of Downloadable Guns |

## CPA MEDIA MONITORING

**Email NOW: Stop the Threat of Downloadable Guns**
**By Everytown for Gun Safety**

**CPA Note: Everytown for Gun Safety organization has created an automatic mailing page protesting the recent settlement of 3-D printing of firearms**

Do-it-yourself, downloadable guns are incredibly dangerous. And a State Department special exemption would allow a company run by a self-proclaimed anarchist to post its gun blueprints online in the form of files that can be sent directly to a 3D printer to print guns on demand.

If the State Department provides this special exemption it would enable terrorists, convicted felons, and domestic abusers to download schematics online and print their own illegal and untraceable guns. Email Secretary of State Michael Pompeo NOW to urge him to STOP this special exemption.

*Dear Secretary Pompeo —*

*Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.*

*Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.*

*The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.*

Link: https://act.everytown.org/sign/stop-downloadable-guns/?source=twno_allsocial&refcode=twno_allsocial&utm_source=twno_allsocial&utm_medium=o&utm_campaign=allsocial

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:    202.647.6968
e-mail:    *MarquisMR@state.gov* | *www.state.gov/t/pm* / [Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002597

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 12:41 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Giffords: LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL |

# CPA MEDIA MONITORING

**LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL**
**Press Release**
**25 July 2018**

Attorneys representing the Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence and Everytown for Gun Safety have informed a Texas federal court that they anticipate filing legal action within days related to a settlement that would allow new designs for downloadable, untraceable guns to become public and available world-wide as early as August 1. The gun safety organizations urged the court to consider the public safety and national security risks posed by the settlement, which would let Defense Distributed — a company run by a self-proclaimed anarchist who wants to undermine gun safety laws — post its gun blueprints online in the form of Computer Aided Design files.

"[T]his settlement is far from ordinary," the gun safety organizations write in a letter available here. "It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order.  It is also, we believe, illegal."

**BACKGROUND:**

Within days, the U.S. State Department is preparing to allow unlimited online access to schematic designs that enable 3D printing of untraceable guns, a reckless mistake and a grave public safety hazard.

Downloadable gun technology is profoundly dangerous, allowing anyone to build untraceable firearms on demand. With gun schematics in hand, a person can print their own firearm with a commercially available 3D printer—with no criminal background check, no serial number and completely outside the licensed dealer system. The plans enable the printing of purely plastic guns, undetectable by metal detectors, which could be snuck onto an airplane or into a government building. Indeed, journalists in Israel were able to print a Defense Distributed gun and get within arm's reach of the country's prime minister at the government capitol.

This major expansion of downloadable guns will also undermine the work of law enforcement, who may recover unserialized—and therefore untraceable—guns at crime scenes, and find their criminal investigations stalled before they even start.

Defense Distributed—the company that is set to receive a special State Department exemption to publish downloadable gun blueprints—is run by a self-described anarchist whose stated aim is to undermine and defeat gun laws by enabling anyone to print firearms. For several years, the State Department had blocked Defense Distributed from publishing its library of gun blueprints, in the form of Computer Aided Design ("CAD") files. The State Department had maintained these files were "technical data" on the United States Munitions List

WASHAR0002598

("USML"), governed by the International Traffic in Arms Regulations ("ITAR")—and that they could not be published without State Department authorization.

As recently as April 2018, the government filed a motion to dismiss Defense Distributed's suit, arguing that serious national security concerns would be implicated by publication of the CAD files. However, just a few weeks later, the government offered to grant Defense Distributed a special exemption under the terms of a settlement agreement.

In the settlement agreement, which will be made final on or before August 4, 2018, the government agrees to remove Defense Distributed's library of 3D gun printing designs from the USML and to allow "any United States person…to access, discuss, use, reproduce, or otherwise benefit" from the designs. Before removing items from the USML, the State Department was required by law to provide 30 days' advance notice to Congress — but Representative Eliot Engel (D-NY-16), the Ranking Member of the House Foreign Affairs Committee, has publicly stated that this has not occurred.

At the same time, the State Department has proposed a regulation that would broadly remove downloadable gun blueprints from the USML—and allow anyone to post blueprints online. The Defense Distributed settlement agreement commits the State Department to pursue a permanent regulatory change that would allow anyone to post, repost, download, distribute, and use any 3D gun printing design. The proposed ITAR regulation was posted shortly after the government agreed to the settlement. It covers exports of manufactured firearms themselves, as well as "technical data" like downloadable gun blueprints. The State Department could finalize the rule in the coming months.

The State Department has yet to acknowledge the settlement publicly, to disclose why it settled the case, or to explain what role the settlement played in the formal regulatory process.

Link: https://giffords.org/2018/07/3d-guns-law-center-group-letter/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:     *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002599

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, May 16, 2018 4:15 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Guns America: New Trump Regs Would Alleviate Registration Costs for Gunsmiths, FFLs |



**New Trump Regs Would Alleviate Registration Costs for Gunsmiths, FFLs**
**By Jordan Michaels**
**16 May 2018**

A new proposed regulation announced this week by the Department of State could alleviate the massive annual registration fee that has for years kept small gunsmiths and FFLs out of business.

The regulatory amendment would transfer defense articles to the jurisdiction of the Department of Commerce if they are not inherently for military end use and are widely available in retail outlets. The change would remove the annual $2,250 fee required by the Department of State's Directorate of Defense Trade Control (DDTC), which the Obama administration imposed on gunsmiths who "manufacture" firearms and ammunition.

In 2012 the Obama administration stepped up enforcement of a regulation that required firearm and ammunition manufacturers to register with the DDTC under the International Traffic in Arms Regulations (ITAR). Because they said that even small gunsmiths engage in activities that are regulated under the ITAR. Many of these small shops closed down because they couldn't afford the annual registration fee along with compliance costs.

Now the Trump administration's Department of State is looking to revise these regulations by transferring items currently listed in the United States Munitions List and controlled by the ITAR to the Export Administration Regulations (EAR), which is controlled by the Department of Commerce. These items include non-automatic and semi-automatic firearms and ammunition, as well as their related parts and services. This is good news for gunsmiths because the Department of Commerce does not impose a registration requirement for the manufacture of controlled items and there is no annual fee.

Fully automatic weapons will remain under the ITAR, but so will suppressors, suppressor parts, and any related services. Magazines that have a capacity in excess of 50 rounds will also remain on the list, and companies that manufacture these accessories will be required to register under the ITAR.

The decision to retain these items in the USML seems to contradict the Department of State's stated goal to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."

Suppressors and 50+ round magazines are not inherently for military use and are widely available in commercial retail stores throughout the United States. It is unclear why the Department of State would deregulate semi-automatic firearms but retain the burdensome registration fee for companies that manufacture suppressors and high-capacity magazines.

Interested parties may submit comments on the new regs by emailing: DDTCPublicComments@state.gov with the subject line, "ITAR Amendment – Categories I, II, and III."

Link: https://www.gunsamerica.com/blog/trump-reg-registration-costs-ffl/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Tuesday, July 24, 2018 2:16 PM |
| To: | Heidema, Sarah J <HeidemaSJ@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Koelling, Richard W <KoellingRW@state.gov> |
| Subject: | CPA Media Monitoring: Guns.com: Everytown, Schumer beat the drum to ban 3-D gun printing |



**Everytown, Schumer beat the drum to ban 3-D gun printing**
**By Chris Eger**
**24 July 2018**

With downloadable gun plans grabbing national headlines, Democrats and gun control groups are pushing for more regulation — which is a sure sign that they don't understand 2018.

On Capitol Hill, Senate Minority Leader Chuck Schumer, D-NY, last weekend blasted a pending move by President Trump's State Department to greenlight a Texas-based pro-gun group's ability to post plans online for "non-automatic firearms up to .50-caliber," such as the popular AR-15 and other semi-autos.

"Why in God's name is this administration allowing this to happen when it never was allowed before?" said Schumer. "We're asking them to immediately rescind such action, and if they don't, we will try to pass legislation preventing that. It makes no sense."

Schumer's rhetoric was prefaced last week by a New York Times editorial by former U.S. Rep. David Israel who held more regulation was needed to prevent the criminal underworld from easily printing "undetectable" plastic guns using an "inexpensive printer purchased online or at the neighborhood office supply store and a downloadable file."

However, Israel concedes in his piece that the current regulations on such guns still stand regardless of any pending move by the State Department. The Undetectable Firearms Act, signed into law by President Ronald Reagan in 1988, requires each gun made or sold in the country to have 3.7-ounces of metal content and is set to run through at least 2023.

The Texas group at the heart of the controversy is Cody Wilson's Defense Distributed, which is set to relaunch their DEFCAD project next month after a settlement negotiated with the State Department in a long-running lawsuit. Essentially, State argued it did not challenge the First Amendment right of Wilson to distribute the 3-D gun files domestically, only that it took an exception to the unfettered international distribution of what they argued was information that could be used by others to produce guns overseas, citing a violation of the International Traffic in Arms Regulations.

That objection is set to fall by the wayside as a result of the proposed settlement and DEFCAD, public and free to use, is ready to host CAD files for AR-15s, AR-10s, Czech Vz.58s, M1911 handguns and even popular guns such as the Ruger 10-22 and Beretta M9.

WASHAR0002602

With the clock counting down to DEFCAD once again going live some five years after the federal government moved to shutter it, Everytown has mounted an online campaign to pressure Secretary of State Michael Pompeo to back out of the settlement, which both sides agreed to in June. The anti-gun group contends that allowing DefDist to move forward would "enable terrorists, convicted felons, and domestic abusers to simply download files online and print their own illegal and untraceable guns," and that, "It's unconscionable to allow criminals to print untraceable guns on demand."

What Everytown does not acknowledge is the fact that many of the past downloaders for Wilson's single-shot Liberator pistol when it went live for the first time in 2013 were overseas in countries such as Spain, Brazil, Germany and the UK, and were quickly shared and torrented worldwide. More to the point, Wilson's group is not unique as a number of sites since then, such as FossCAD and GrabCAD, have long made 3-D gun files available to millions over the past several years. Code, once created and shared so extensively, is almost impossible to destroy. Going back even further, low-tech open source firearms plans and patent drawings have been circulating freely for centuries.

Still, with the federal government backing away from DefDist, Wilson sees the practice of downloadable gun files as moving into the mainstream. "I currently have no national legal barriers to continue or expand DEFCAD," he wrote in an email to TechCrunch. "This legal victory is the formal beginning to the era of downloadable guns. Guns are as downloadable as music. There will be streaming services for semi-automatics."

Link: https://www.guns.com/2018/07/24/everytown-schumer-beat-the-drum-to-ban-3-d-gun-printing/

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:       *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 1:42 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Idaho Statesman: Gun-control advocates ask judge to block downloadable 3D guns |

---

**CPA MEDIA MONITORING**

**Gun-control advocates ask judge to block downloadable 3D guns**
**By Cynthia Sewell**
**26 July 2018**

The Department of Justice quietly agreed to let a Texas man legally offer his downloadable plans to fabricate a 3D-printed gun starting Aug. 1.

When news broke nationally about the agreement over the past week, three national gun safety groups quickly headed to court to try to block the action.

The Brady Center to Prevent Gun Violence, Everytown for GunSafety and Giffords Law Center to Prevent Gun Violence have asked a federal judge in Texas to issue a temporary restraining order and preliminary injunction.

The judge agreed to hold a hearing on the motions at 2:30 p.m. CDT on Thursday, July 26.

"We respectfully submit this letter to bring to the Court's attention the troubling, dangerous, time-sensitive, and potentially illegal terms of the settlement agreement," states the 35-page letter sent to the judge July 24.

"Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions. The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world."

Federal law already allows citizens to make their own firearms for personal use. But this do-it-yourself, high-tech gunsmithing has been in legal limbo since 2015. That's when the U.S. government shut down Texas-based Defense Distributed, just a few days after the company began sharing its 3D-printable gun plans for free online.

The organization's founder, Cody Wilson, sued. After a three-year legal battle, the Department of Justice capitulated and settled earlier this year.

The settlement goes into effect at the start of August. It gives Defense Distributed permission to resume free online distribution of blueprints for fabricating a firearm with a 3D printer — a decision supported by Second Amendment advocates and concerning to groups worried about gun violence.

Link: https://www.idahostatesman.com/news/northwest/idaho/article215566770.html

---

**Matthew Marquis**
Office of Congressional & Public Affairs

WASHAR0002604

Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:      ***MarquisMR@state.gov*** |   Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

WASHAR0002605

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 9:15 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Mic: Lawsuit moves to keep the blueprints for 3D printed guns off the web |

**CPA MEDIA MONITORING**

**Lawsuit moves to keep the blueprints for 3D printed guns off the web**
**By Brianna Provenzano**
**25 July 2018**

Modern advancements in 3D printing technology have made it possible to produce fully functioning, deadly firearms, made entirely from plastic — all from the comfort of your own home. It's a process that the government has strictly regulated in the past. Now, however, thanks to a legal settlement reached by the Trump administration, that might be about to change.

On Tuesday, three prominent gun safety groups announced that they are preparing legal action in the coming days to prevent the U.S. State Department from allowing the blueprints for 3D-printed guns to be posted online. In an amicus brief filed on July 24, attorneys representing the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence objected to an imminent governmental rule change that would upend the regulatory structure governing firearm exports.

The shift stems from a settlement the government recently reached with Defense Distributed, a small, bullish nonprofit company that is believed to have posted the first set of online instructions on how to build a 3D-printable handgun in 2012.

The tangled mass of gun laws in play here goes back to 1988, when Ronald Reagan signed the Undetectable Firearms Act into law. The legislation made it illegal to manufacture, sell or possess any firearm "which is not as detectable ... by walk-through metal detectors" like those found in airport. This essentially banned firearms made from cheap polymers. Although the U.S. was decades away from honing the technology to 3D print plastic weapons when the law was written, it was renewed by the Clinton administration in 1998, by George W. Bush's White House in 2003 and again by Barack Obama in 2013.

Shortly after Obama reauthorized the 1988 law, the government ordered Cody Wilson, the then-25-year-old owner of Defense Distributed, to take down the blueprints for 3D-printed firearms the company had posted online on the grounds that he had run afoul of the Undetectable Firearms Act.

In a 2013 interview with the New York Times, Wilson was recalcitrant about the order of removal. It wasn't about increasing the number of firearms on the market, he argued — it was about reducing the government's role in regulating new technologies.

"I don't care about the project," he told the Times of Defense Distributed in 2003. "This is about the future of the freedom of information and regulation of the internet."

Soon afterward, Wilson filed suit against the State Department, arguing that by demanding he remove the blueprints from the internet, the government was infringing upon his Constitutionally-enshrined right to free

speech.

After a protracted legal battle, the government offered to settle the Defense Distributed suit in April 2018, offering the company a special agreement to remove its 3D gun blueprints from the United States Munitions List and to allow "any United States person…to access, discuss, use, reproduce, or otherwise benefit" from the designs.

"[T]his settlement is far from ordinary," the gun safety organizations wrote in the letter. "It is dangerous, irreparable and – as the government itself has emphatically argued for years – raises issues of national defense and national security of the highest order. It is also, we believe, illegal."

In a New York Times op-ed piece, former U.S. Rep. Steve Israel, who has long been at odds with the gun lobby, wrote that while the settlement technically doesn't reverse the Undetectable Firearms Act, it "undermines it by making it easier for terrorists, criminals and minors to quietly produce deadly weapons with an inexpensive 3-D printer."

Thanks to the settlement, Defense Distributed now says it plans re-upload the blueprints for 3D-printed guns on Aug. 1, when the company says the, "age of the downloadable gun formally begins."

According to the letter the three gun violence prevention groups submitted in court on Tuesday, the company's plans only get grander from there. Wilson eventually hopes to expand the Defense Distributed website to contain "a repository of firearm blueprints for 'more exotic DIY semi-automatic weapons,' the letter claims. The company has allegedly had time to develop "a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s," which Wilson hopes to soon convert into a "searchable, user-generated database of practically any firearm imaginable."

Jonathan Lowy, the vice president of litigation for Brady, told Mic in a phone interview that if Defense Distributed has its way, "anybody in the world with access to the internet and a 3D printer could make all of the undetectable assault weapons or other guns that they wanted."

"That would include international terrorists, convicted felons — anybody," Lowy added. "This would blow right open the loopholes for any national or international prohibitions on people that should not have guns."

Link: https://mic.com/articles/190438/lawsuit-moves-to-keep-the-blueprints-for-3d-printed-guns-off-the-web#.F1MhgLWeJ

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:      *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002608

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Monday, July 23, 2018 8:16 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Hart, Robert L <HartRL@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Miller, Michael F <Millermf@state.gov>; Cavnar, Anna <CavnarA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Carter, Rachel <CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Kaidanow, Tina S <KaidanowTS@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | CPA Media Monitoring: New York Post: Chuck Schumer warns of 3-D printed 'ghost guns' |

**CPA MEDIA MONITORING**

**Chuck Schumer warns of 3-D printed 'ghost guns'**
**By Shari Logan**
**22 July 2018**

Sen. Chuck Schumer is warning the public to watch out for 3-D printed guns — that people will be able to legally download starting on August 1.

Gun rights activists reached a settlement with the US State Department and Department of Justice last week that allows them to post detailed instructions, including plans, files and 3-D drawings of the weapons.

"This online site shows you, how at your home, with a simple 3D printer, you can make a plastic AR-15, an AR-10, a very dangerous semi-automatic assault-style weapons out of plastic in your own basement," Schumer said at a Sunday press conference.

The June 29 settlement stems from 2013 when the US government shut down Texas-based Defense Distributed when the website began sharing printable 3-D gun plans online — saying they were violating laws that regulate the export of guns since anyone, anywhere could download their plans.

The site's owner, Cody Wilson, sued and the US government reached a settlement with him allowing Defense Distributed to post the plans and agreeing to pay almost $40,000 of his legal fees.

Schumer warned that the results could be disastrous — and could potentially arm people who cannot legally purchase a gun under existing laws.

"The danger that could happen can be enormous," he said. "To have crazy people have easy access, to have terrorists have easy access to this kind of website and allow them to make plastic AR 15s undetected — so-called ghost guns — justifies the imagination."

The 3-D printed guns are inferior to firearms manufacturers traditionally make but still work. Printers run anywhere from $200 to hundreds of thousands.

Schumer demanded the federal government reverse its decision. He'll be making a bill with a solution to the ghost gun blueprints by the end of the week, his spokesperson said.

Link: https://nypost.com/2018/07/22/chuck-schumer-warns-of-3-d-printed-ghost-guns/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:          202.647.6968
e-mail:          ***MarquisMR@state.gov*** |   Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002610

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 2:00 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Newtown Action Alliance: Press Release - Open Letter to President Donald Trump To Stop 3-D Plastic Guns |

## CPA MEDIA MONITORING

**Open Letter to President Donald Trump To Stop 3-D Plastic Guns**
**By Newtown Action Alliance**
**26 July 2018**

Dear Mr. President:
We implore you to immediately stop Attorney General Jeff Sessions, U.S. Department of Justice, Secretary Pompeo, and the U.S. State Department from authorizing Defense Distributed to release downloadable files for 3-D guns. These files would allow anyone around the globe to make do-it-yourself, untraceable 3-D guns by circumventing any existing state and federal gun regulations, resulting in serious public safety and national security concerns.

Unless you stop the U.S. State Department from authorizing this special exemption for Defense Distributed, you are enabling terrorists, criminals, domestic abusers, and other prohibited firearm purchasers to use the downloadable gun technology. They would be able to print plastic guns that are undetectable by metal detectors at the White House and other government buildings, airports, office buildings and schools.

Earlier this year, the government filed a motion to dismiss Defense Distributed's lawsuit, citing serious national security concerns from global access to the computer-aided design (CAD) files. Then last month, the Department of Justice settled the lawsuit, agreed to allow the public release of Defense Distributed 3-D firearm printing tutorials and made an egregious decision to use our tax dollars to pay nearly $40,000 for the plaintiff's legal fees.

Please keep all Americans safe by helping to stop the U.S. State Department from establishing a permanent regulatory change that would provide unlimited online access to 3D gun printing design.

Thank you for your immediate attention to this urgent matter involving our national security.

Sincerely,
A New Routine for America
Alliance for Gun Responsibility
Arizonans for Gun Safety
Ceasefire Pennsylvania
Connecticut Against Gun Violence
Delaware Coalition Against Gun Violence
Faith Community of St. Sabina
Florida Coalition to Prevent Gun Violence
Franciscan Action Network
Franciscan Sisters of the Poor
G-PAC Illinois

WASHAR0002611

Georgia Alliance for Social Justice
Georgia Student Alliance for Social Justice
Georgians for Gun Safety
Gun Violence Prevention Action Committee Illinois
Gun Violence Prevention Center of Utah
GunControlToday
Healing 4 Our families & Our Nation
Herndon-Reston Coalition To End Gun Violence
Illinois Council Against Handgun Violence
Jr Newtown Action Alliance
League of Women Voters of Florida
Marylanders to Prevent Gun Violence
Massachusetts Coalition to Prevent Gun Violence
Michigan Coalition to Prevent Gun Violence
MomsRising
National Council of Jewish Women
New Mexicans to Prevent Gun Violence
Newtown Action Alliance
NoRA
North Carolinians Against Gun Violence
Ohio Coalition Against Gun Violence
One Pulse for America
Physicians for the Prevention of Gun Violence
Pride Fund to End Gun Violence
Protest Easy Guns
Psychiatrists for Gun Violence Prevention
Reconstructionist Rabbinical Association
San Diego for Gun Violence Prevention
Sandy Hook Promise
Silent March
Sisters of St. Francis of Philadelphia Justice, Peace and Integrity for Creation Committee
States United to Prevent Gun Violence
Stop Handgun Violence
Survivors Lead
The Campaign to Keep Guns Off Campus
The Connecticut Effect
The ENOUGH Campaign
Unitarian Universalist FaithAction New Jersey
Vision Quilt
WAVE Educational Fund
We the People for Sensible Gun Laws
Women's Voices Raised for Social Justice

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:     *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov:*

WASHAR0002612



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002613

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 11:42 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Prindle Post: Debating the Permissibility of Printable Guns |



**Debating the Permissibility of Printable Guns**
**By Rachel Robison-Greene**
**25 July 2018**

In 2013, Cody Wilson, a self-described anarchist, made headlines when he posted plans for a 3D printable pistol called "The Liberator" online. The state department intervened and shut down the site, but not before the plans for the weapon were downloaded over a million times. Wilson promptly sued the government. This week, the government reached a settlement with Wilson. The settlement is quite favorable to Wilson and other gun rights advocates—it allows Wilson and others to proceed with their mission to post the instructions online.

The 3D printable gun design instructs interested parties on how to print a handgun with the same material used to make Lego building blocks. The resultant guns do not have serial numbers, making them difficult if not impossible to trace. In the intervening time, Wilson has produced additional plans—plans for a Berretta M9 handgun and an AR-15. The M9 is a weapon used by the U.S Military and the AR-15 is a weapon commonly used by mass shooters.

Many gun rights advocates are quite pleased with the settlement. In their view, the government is moving in a dangerous direction with respect to Second Amendment rights. Discussion of increased gun control regulation is on the rise, and many fear that responsible gun ownership will be restricted or prohibited entirely based on the actions of an exceptionally small violent minority. 3D printable guns will allow gun advocates to produce guns that will not face government regulation. What's more, if the government is not aware that a citizen has a weapon, they're very unlikely to attempt to take that weapon away. Those who support the availability of printable gun plans frequently argue that guns are important for defense of life, liberty, and property. If they can print a gun or guns that the government doesn't know about, they never have to fear that they'll lose the protection that the gun affords.

Others support the settlement for reasons that are more theoretical. Some view the government's initial ban as a dangerous restriction of free speech rights. Wilson was engaging in a speech act when he posted the plans—he was making information available to the public. They argue that the government should not be restricting speech on the basis of content. It is worth noting that, though the technology involved in this case makes the case unique and unusual, the First Amendment question with respect to the availability of dangerous information is far from new. In 1969, in Brandenburg v. Ohio, the Supreme Court ruled that inflammatory speech cannot be restricted by the government unless it is "directed to inciting or promoting imminent lawless action and is likely to incite or promote such action." Free speech supporters of Wilson argue that his actions are no more likely to incite violence than traditional forms of gun ownership.

Those with libertarian political leanings may also defend Wilson's actions for theoretical reasons. They argue that governments should only be concerned with protecting the negative rights of citizens—the rights to life, liberty, and property. If private citizens want to print guns for non-violent, personal use, they should be free to do so. There is no reason to think that all, or even most, of the motivations people might have for printing

weapons are nefarious.  Many may simply want to test out a new technology in the service of a gun hobby.  They argue that the government should not concern itself with such private actions.

On the practical side, many supporters of Wilson argue that fear about printable guns as a serious threat to public safety is fear of an imaginary bogeyman, often shouted about for reasons that are political.  In truth, they argue, 3D guns are expensive to produce, time and labor intensive, and are made of material that is so weak it is likely to shatter in the course of one shot. The resulting shrapnel is potentially dangerous to the person firing the weapon. It is already legal for citizens to construct their own guns.  There is no reason to believe that dangerous criminals will clamor in the direction of this method of producing them.

Many responded to the news of the settlement with utter astonishment—to them, it seems self-evident that untraceable, 3D printable guns are an atrocious idea.  One need not be opposed to guns more generally to think that what Wilson has done and plans to do is exceptionally dangerous. Many responsible gun owners believe that there should be some regulations when it comes to gun ownership.  These regulations save lives. Even if printable guns can only fire one shot, one shot can kill someone.

Those opposed to the settlement argue that it is deeply problematic that there are no background checks required for printing a gun.  Convicted violent felons could print guns. People with a history of violent mental disorders could print guns. The government has a responsibility to look after the safety of its citizenry.  Deadly weapons shouldn't fall into the wrong hands.

Opponents also argue that even if the government shouldn't typically involve itself in the private lives of citizens, the situation changes entirely when objects as deadly as guns are involved.  Governments have an obligation to monitor and regulate exceptionally dangerous objects. What's more, serial numbers on guns are frequently used to solve crimes. The government has the obligation to do its best to prevent violent actions from occurring, but, barring this, it has obligations to achieve justice for victims and their families when violent crimes do take place.  Even if the guns involved in a crime aren't destroyed when they are fired, they are made of material that is easily destroyed, making the recovery of the murder weapon involved in these cases impossible.

Finally, opponents of the technology and of dissemination of the plans point out that the Internet obviously isn't just for Americans.  Those who put these plans on the Internet may be contributing to violence in other countries and they may well be arming our enemies.

Link: https://www.prindlepost.org/2018/07/debating-the-permissibility-of-printable-guns/

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:     *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

WASHAR0002615

**Official**
**UNCLASSIFIED**

WASHAR0002616

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 8:15 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Science Alert: The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really |



**The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really**
**By Carly Cassella**
**24 July 2018**

For more than five years, Cody Wilson has been stuck in a legal battle with the US government over whether he should be able to post plans for a 3D-printed handgun that he likes to call "The Liberator."

The lawsuit turns on whether or not the first and second amendment, allowing freedom of speech and the right to bear arms, protects someone like Wilson, who wishes to provide downloadable gun blueprints to make deadly, untraceable weapons.

On June 29, the US government suddenly put an end to the discussion. The US State Department offered Wilson a settlement, allowing him to post his plans, files and 3D drawings online in any form starting next month. The State Department will also be reimbursing Wilson nearly $40,000 for his legal costs.

"We asked for the Moon and we figured the government would reject it, but they didn't want to go to trial," said Alan M. Gottlieb, a member of the Second Amendment Foundation, which helped in the case.

"The government fought us all the way and then all of the sudden folded their tent."

Along with The Liberator, Wilson's website will now be able to legally lay out their blueprints for a DIY Baretta M9 handgun and an AR-15 lower receiver – the latter being the same model used in three recent mass shootings in Las Vegas, Newtown, and Parkland.

"The age of the downloadable gun formally begins," the Second Amendment Foundation's website now reads.

But while the National Rifle Association and gun rights activists are praising the settlement, gun control proponents remain worried by the lack of restrictions for printable guns.

At the moment, most Americans cannot afford high-end 3D printers (the price can be as high as $600,000), but as the technology progresses that will inevitably begin to change. Even now, if you already own or have access to a 3D printer, it can be as cheap as $25 to make a 3D printed gun.

"We are looking at a world in which anyone with a little bit of cash can bring an undetectable gun that can fire multiple bullets anywhere — including planes, government buildings, sporting events and schools," said Senator Chuck Schumer at a recent press conference.

"3D printers are a miraculous technology that have the potential to revolutionize manufacturing, but we need to make sure they are not being used to make deadly, undetectable weapons."

WASHAR0002617

When it comes to gun terrorism, the possibilities are endless. Right now, it is theoretically possible, for instance, to create a 3D printed gun and its bullets solely from plastic, rendering metal detectors useless. An assailant could also send the blueprint to a 3D printer in any building, and then assemble the weapon once they are past security.

Plus, background checks are not needed to produce 3D printed guns, making it even more difficult for the government to keep track of who has them. Already, firearms that are made at home are known as "ghost guns" because they lack a serial number and are untraceable. All too often, these ghost guns end up in the wrong hands.

"Now, criminals have started using ghost guns as a way to circumvent assault weapon regulations," David Chipman, an advisor to the gun control advocacy group Giffords, told Vice News.

"I imagine that people will also start printing guns to get around laws."

America's decision is particularly startling given that other countries have taken an entirely different approach to the young technology.

In Japan, when a 28-year-old was found to have manufactured a plastic 3D-printed firearm, he was charged with violating the national weapons law and sent to prison for two years.

In the UK, it is highly illegal to create, buy or sell 3D printed guns. Back in 2013, police in the UK seized what they thought were 3D printed gun components (in the end, it turns out they were completely harmless spare parts).

In China, 3D printing firms must register with the authorities to prevent the technology from being used to produce illegal items.

In Australia, the laws on 3D printed guns are some of the toughest in the world. Some Australian states, for instance, have passed laws that equate possession of a 3D printed gun file to actual possession of a 3D printed gun, sending offenders to jail for up to 14 years. Even still, two years ago, several members of a Melbourne gang were arrested after it was found that they were manufacturing guns with a 3D printer.

Meanwhile, in the US, legal limits on the 3D printing of guns are few and far between. In fact, California is the only state in the country to pass a law that requires a 3D printed gun to be properly approved and registered. Anywhere else, and that gun can appear and disappear without a trace.

Link: https://www.sciencealert.com/the-us-just-made-it-legal-for-anyone-to-download-and-print-their-own-gun-yes-really

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002619

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 3:58 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Sputnik: Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing' |

## CPA MEDIA MONITORING

**Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing'**
**By Sputnik**
**25 July 2018**

Sputnik discussed 3D guns with Greg Shaffer, a former FBI officer, president of Shaffer Security Group and one of the US' leading policy experts on the prevention of domestic terrorism and active shooter events.

Gun rights activists in the United States will soon be able to post 3D printable gun plans online. In 2013, Cody Wilson, who describes himself as a post-left anarchist, posted plans for a 3D printed handgun called "The Liberator." The gun, which was made from plastic, had a metal firing pin and another piece of metal included to comply with the Undetectable Firearms Act.

**Sputnik**: What's your take on the decision made by the US court in regards to Cody Wilson and the Defense Distributed group?

**Greg Shaffer**: At this point they just aren't an issue. There's a reason that there has only been a few truly viable 3D printable gun designs. It's very difficult for them to make them, it's very time consuming, it's very expensive, it's difficult for a 3D printer to build something as complex as a weapon. They're working with complex plastics, they're limited to what type of objects they can actually print. For one, 3D printers cannot create a complex thing like a gun all in one piece; they are printed out in separate components and then later have to be assembled. It's a very difficult and time consuming process, and then you couple that with the fact that the type a gun that's chosen by people who commit heinous crimes or mass murders, those weapons are chosen for their ability to kill as many people as possible as quickly as possible and you're just not going to get that from a weapon produced by a 3D printer.

**Sputnik**: So in your view how justified are these concerns claiming that the decision will make it easier for terrorists and criminals to access weapons?

**Greg Shaffer**: Legislation is always chasing technology; so in a practical sense, for a terror attack or an active shooter, they're looking for mass casualties and these plastic 3D printable weapons don't allow for that; it's pretty much a one done deal: one or two shots is all you get out of these weapons. The explosive force of firing a bullet is just simply too powerful for the thermoplastic to survive. The United States laws already allow for individuals to manufacture their own weapons for personal use, and you have to also remember that right now, again technology moves a lot faster than legislation, but right now these plastic weapons are so bulky, as well, that they are very difficult to conceal. And again, they only have a one or two shot capacity before they just explode in the hand.

**Sputnik**: We have two issues from what I'm reading and understanding. One's obviously the fact that these guns can be printable, but also the fact that these printable guns cannot be traced; they're not registered. How

dangerous is that?

**Greg Shaffer**: In America there really is no federal gun regulation requirement. When you purchase a weapon, yes, that serial number is associated with the buyer, but that buyer can then sell that weapon to anybody he wants. The fact that they're not traceable, or not registered, is not impacting because we don't have those laws and regulations on the book as it is now for the weapons.

**Sputnik**: Do you know what measures have to be taken by authorities to regulate this?

**Greg Shaffer**: Again, there's only been a few that ever worked; it's like focusing on 0.0001% of the problem. At this point in time, in the United States 85% of the states are not in compliance with federal regulations which require them to report on individuals that are prohibited from purchasing weapons. That's a much greater problem, having weapons in the hands of people who should not have weapons, than worrying about that small, small, infinitesimal percentage of 3D printable weapons that may work. 3D printable weapons are more of a novelty, more of a collector's item, than they are for mass killing. Guns are so easily accessible in the United States on the black market that these 3D printable guns are going to be more of a novelty then they are going to be a form of mass killing, or assassination, or terrorist attack.

**Sputnik**: We had this recent deadly shooting in Toronto, a few people were killed. In your view, what's the reason for the growing gun violence in Toronto this year?

**Greg Shaffer**: A lot has to do with the access to weapons. Toronto is a very short drive, a very short ferry ride to America and we have tens of thousands of illegal weapons coming across our southern border every day, some of them make it to the northern border into Canada. You've got to look at the root cause here: is it a gun problem or is it a socio-economic or cultural problem? You've got to look at what I consider five things that changed in our culture that have resulted in increased violence and this goes to Canada as well. I think violence in movies, violent video games are a huge factor; we have overmedication of our kids on antidepressants, our kids are no  longer raised by a parent, they're raised by daycare, because both parents are either working or they're divorced; we have revolving doors on the judicial system, which doesn't hold people accountable for the crimes they commit — we let them in, we let them out. And remember religion; religion has exited the houses of virtually everybody across the world; we want religion to help us with our moral and ethical questions. So I think the question is not really a gun-related question, it's more of a cultural and socio-economic problem. Look at London, for example: their crime rate and murder rate is increasing dramatically as well, and they have some of the toughest gun laws in the world. This increase in gun violence in Toronto is, I think, because of the accessibility of weapons has increased, but they have the same problems that the Western world is having when it comes to cultural issues.

Link: https://sputniknews.com/analysis/201807251066659134-3d-guns-novelty-leading-security-explained/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:      *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002622

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 19, 2018 12:12 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: The Daily Dot: Cody Wilson on what's next for DefCad after 3D-printed gun court victory |



**Cody Wilson on what's next for DefCad after 3D-printed gun court victory**
**By Christina Bonnington**
**19 July 2018**

Five years ago, Cody Wilson successfully fired a round on a 3D-printed gun. He and members of his nonprofit, Defense Distributed, uploaded the design file and eight others to a website called DefCad so that anyone could download and 3D-print their own weapon. Unfortunately the move, seen by Wilson at the time as a way to initiate "social change and radical change," triggered some unexpected consequences: The U.S. State Department claimed Defense Distributed may have violated U.S. trade law by making firearm schematics available to foreign nationals.

Thus began what would become a years-long battle with the Department of Justice that finally ended last week. On July 10, Wilson revealed that government lawyers finally settled the suit, agreeing to exempt "the technical data that is the subject of the Action" from legal restriction. That is, Wilson and Defense Distributed are free to upload designs of working firearms to the internet; those files are legal to own and share, and the resulting weapons are legal to own.

While the legal challenges are over for Wilson, he now has a new set of difficulties to face as he builds DefCad back, tries to rebuild its community of people, bring in industry stakeholders, and prevent any sort of intellectual property war from happening.

"I'm just beginning—again—what I was doing five years ago," Wilson told the Daily Dot. "It's hard to have the same mental resolution. I don't remember exactly what it was I was doing five years ago. It's a lot of work, but it's about beginning something you used to find interesting and fascinating and returning to that."

Wilson spoke not with defeatism, but with a calm and an air of exhaustion. With good reason: Three years ago, it was "pretty clear" he wasn't going to win against the DoJ. There were years of evasive decisions, but nothing definitive—no relief. "I thought at best I'd get some kind of noble failure, and that would give me the moral authority to do the next thing," he said.

Wilson's battle with the State Department was essentially one of free speech versus Cold War-era firearms regulations. While Wilson and Defense Distributed did everything in their power to ensure their 3D-printed weapons followed U.S. firearm law (including acquiring a federal firearms license and including a thick steel bar in the handle of weapons, per the 1998 Undetectable Firearms Act), the State Department saw the operation as a violation of the International Traffic in Arms Regulations. ITAR is a set of trade laws that require exporters to get government approval before exporting firearms, and the State Department included blueprints and designs as part of ITAR's broad regulatory domain. It wasn't a battle of whether citizens had the legal right to download and 3D print their own guns—it was a question of whether foreign nationals downloading such plans was considered an export, or whether these CAD files fell under free speech and the public domain.

WASHAR0002623

The Department of Justice's settlement wasn't technically in his favor, Wilson said—but it did grant him everything he'd wanted out of the case, so in essence, it's still a legal victory for a man once selected as one of Wired's 15 most dangerous people in the world. (And for many, the decision was not surprising: Export lawyer Robert Clifton Burns told Ars Technica that a change in these laws was inevitable, because saying that "putting something on the Internet is an export to the entire world is ridiculous.")

Now, he has a chance to resume his original passion, but it won't be his day job. Wilson owns a manufacturing company in Austin, Texas, so he needs to run that operation to pay the bills while simultaneously working on the software company he was forced to put on hold for half a decade. DefCad goes back online Aug. 1, and the team already has some files ready to upload, as well as people it's invited to participate. The site, which is free to use, will be library portfolio-style, where users can search files by tag or category. The files themselves, too, are free to download.

Critics and gun control activists are rightfully alarmed by the settlement, which could give domestic abusers and felons easier access to firearms that background checks would typically prevent. It's also seen as a strategic move by the Trump administration to further its quest to deregulate and increase access to firearms.

Wilson, who's been dubbed a "technoanarchist," says that while he doesn't want people to do bad things, he's "kind of a fundamentalist when it comes to openness of speech and information." With DefCad back online, he's also excited to see how people will continue to experiment with 3D printers and to see what "interesting composite weapons" people have yet to imagine. He also sees the platform as educational, allowing people to study gun mechanisms and functions and use that knowledge to build new things.

While the legal battle over DefCad and the idea of 3D printable guns in the U.S. is now settled, it's a controversial topic that's unlikely to disappear from the public eye. For Cody Wilson, it means he can finally get back to business.

Link: https://www.dailydot.com/debug/cody-wilson-defcad-interview/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:        *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 1:19 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: The Economist: Soon anyone will be able to learn how to print 3D guns |

---

**CPA MEDIA MONITORING**

**Soon anyone will be able to learn how to print 3D guns**
**By The Economist**
**26 July 2018**

"THE age of the downloadable gun formally begins," proclaims the website of Defence Distributed, a group founded by Cody Wilson, a self-proclaimed crypto-anarchist. A settlement with the State Department at the end of June, reached after years of litigation, will allow the group to publish online blueprints for the 3D printing of guns and their parts from August 1st.

For gun-control advocates, this is a terrifying scenario. People who cannot pass a background check will be able to print a gun without a serial number, making the weapon impossible to trace, says Adam Skaggs of the Giffords Law Centre to Prevent Gun Violence. (Federal law requires licensed gun shops to run background checks, though this does not apply to private sales at fairs or on the internet.) His law centre is trying to get the courts to delay the settlement, at least.

Gun-rights crusaders such as Alan Gottlieb, whose Second Amendment Foundation helped Mr Wilson sue the federal government, hail the settlement as a victory for the First and Second Amendments. They argue that the government's ban in 2013 of the online publication of the blueprints infringed on both Mr Wilson's right to bear arms and his right to share information freely. Mr Gottlieb claims that background checks do not prevent mass shootings, and says that the guns in Mr Wilson's blueprints include metal, making them detectable by body scanners. "If you can own a gun, you should be allowed to make a gun," he argues.

Why did the government give up after three years of litigation and even agree to pay Mr Wilson's legal fees? Mr Gottlieb thinks it settled because it was worried about losing the case, and because it would have had to disclose details of arms imports and exports if the case had gone to trial. Mr Skaggs argues that the government settled because "this administration will give the gun industry anything it asks for". It is trying to deregulate gun exports. And it is nominating amenable judges whenever it can.

Plastic guns made with 3D printers are not yet very good. But downloadable files will soon be available that include rifles similar to the AR-15, a weapon used in recent mass shootings. Gun-control advocates say that even the simplest 3D-printed "Liberator" gun, which can fire only one shot, could wreak havoc if used against an aeroplane pilot. Moreover, the technology is improving. Soon 3D printers may produce sophisticated plastic guns. They can already print metal guns, although metal 3D printers cost the equivalent of an arsenal of traditional guns, so are unlikely to be widely used.

Democratic politicians such as Senator Chuck Schumer of New York vow to write a bill to suppress 3D-printed guns. But no new law is likely to pass before the mid-term elections. By then, hundreds of thousands of the new blueprints will have been downloaded.

WASHAR0002625

Link: https://www.economist.com/united-states/2018/07/28/soon-anyone-will-be-able-to-learn-how-to-print-3d-guns

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:        *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002626

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Monday, July 23, 2018 10:44 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: The Guardian: DIY 3D-printed guns get go-ahead after Trump administration strikes court deal |



**DIY 3D-printed guns get go-ahead after Trump administration strikes court deal**
**By Jamiles Lartey**
**23 July 2018**

From 1 August, thanks to the Trump administration, a commercially available software blueprint will allow people to make their own guns using ABS plastic resin and a 3D printer.

The green light came late last month, with a court settlement between the designer of the blueprint and the US state department. Gun rights advocates celebrated.

In a statement greeting the news, the Second Amendment Foundation founder and executive vice-president, Alan Gottlieb, said: "Not only is this a first amendment victory for free speech, it also is a devastating blow to the gun prohibition lobby."

Defense Distributed, the company behind the blueprint, declared: "The age of the downloadable gun formally begins."

Gun control advocates were alarmed. Nick Suplina, managing director of law and policy at Everytown for Gun Safety, said the settlement was "incredibly dangerous" and called on the state department to continue to block the publication of what he described as "deadly information".

"This settlement would enable convicted felons and domestic abusers to download schematics online and print their own illegal and untraceable guns," he said.

The lawsuit arose from a software file developed by a University of Texas law student, Cody Wilson. It was a blueprint for a single-shot 3D-printed handgun, named "The Liberator". The state department ordered Wilson to cease work, arguing that making the blueprint available would be akin to a violation of arms export statutes.

The libertarian-minded Wilson swiftly turned from a hobbyist to a crusader. "All I tried to do in law school was print a pistol and put it on the internet," he told the Guardian in 2016. "Now I'm on a ride I can't get off."

Wilson sued on the grounds that his design was protected by the first amendment. He also founded a non-profit, Defense Distributed. Celebrating the settlement, he tweeted an image of flowers laid at a plaque in memory of "American gun control".

Wilson's legal battle was largely financed by the sale of products which allow for the DIY production of metal-framed "ghost guns", which do not have serial numbers and are not subject to traditional gun control laws.

Defense Distributed sells users an "80% lower" – a piece of metal the government deems is only 80% a gun – and a milling machine that can, with a PC and the right software, bring the gun to completion.

WASHAR0002627

On its website, the company describes the milling device as a way to "legally manufacture unserialized rifles and pistols in the comfort and privacy of home".

With the Liberator and other 3D-printed guns including AR-15 style rifles, users will not need a prefabricated "80% lower". They will be able instead to construct virtually an entire gun with any 3D printer and enough ABS plastic resin.

The gun does require a metal firing pin to operate. An additional piece of metal is included in the blueprint, to ensure compliance with the 1988 Undetectable Firearms Act.

Link: https://www.theguardian.com/us-news/2018/jul/23/3d-printed-guns-court-settlement-trump-administration-cody-wilson

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web:  *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 2:34 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: The Hill: Anti-gun violence groups file to halt online posting of 3D-printed gun plans |

**CPA MEDIA MONITORING**

**Anti-gun violence groups file to halt online posting of 3D-printed gun plans**
**By Jacqueline Thomsen**
**26 July 2018**

Three prominent anti-gun violence groups filed a motion early Wednesday to block a settlement that would allow for plans for 3-D printed firearms to be posted online.

The Brady Center to Prevent Gun Violence, Everytown for Gun Safety and Giffords Law Center jointly filed in U.S. District Court in Texas an emergency motion to intervene and an emergency motion for a temporary restraining order and preliminary injunction in the case.

A representative for the Brady Center confirmed to The Hill that a closed hearing will be held in the case Thursday.

The federal government had settled a lawsuit with gun rights activist Cody Wilson late last month, allowing him and his company, Defense Distributed, to post and sell the plans for 3-D printed guns.

The government had initially ordered Wilson to remove the plans, first posted online in 2013, saying it violated international law on the export of defense materials. Wilson complied but sued the government in 2015.

The settlement exempts Wilson and his company from the restrictions on defense material exports, according to a copy of the settlement obtained by CNN.

The three anti-gun violence groups argue in the filings that the federal government was correct in initially finding that posting the plans on the internet "threatened national security."

"The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community," the court documents read.

The groups had announced that they would take legal action in a letter to U.S. District Judge Robert Pitman Wednesday.

"Simply put, the Department of Justice and State Department have suddenly and completely reversed themselves about the threats to public safety posed by plaintiffs' proposed actions," the letter reads.

"The resulting settlement agreement, if carried through, threatens to undermine national security and the national defense of the United States by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world."

WASHAR0002629

Link: http://thehill.com/regulation/court-battles/399027-anti-gun-violence-groups-file-to-block-settlement-allowing-3d

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:      *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002630

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 3:28 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: The Truth About Guns: The Defense Distributed Settlement Isn't a Done Deal…Here's What's Next |



**The Defense Distributed Settlement Isn't a Done Deal…Here's What's Next**
**By P.A. Deacon**
**26 July 2018**

What exactly happened with the lawsuit that Cody Wilson's Defense Distributed (DD) filed against the State Department? Specifically, why did the State Department settle the case to allow DD to put its files for 3D printed firearms on its website, DEFCAD?

**The Agreement**

The State Department stated that the DEFCAD files posted by DD are exempt from the licensing requirements of the Arms Export Control Act's implementing regulations known as the International Traffic in Arms Regulations (ITAR). In the settlement, State only said that the files are exempt, but didn't give a reason or criteria to define the exemption.

Instead, the State Department agreed to publish the rationale and definitions of the exemption in a public rule making. That implies DD's lawsuit triggered a new type of exemption for the public sharing of non-military weapon designs and information.

Under 22 CFR 125.4 (b) the State Department lists exemptions from ITAR. It is interesting that subsections (b) (1) through (12) detail very specific reasons for exemption, but subsection (13) basically reads that something is exempt from ITAR if the State Department says so.

We will all take the win for an exemption, but that sort of ambiguity is dangerous.

**Free Speech**

In its settlement with Defense Distributed, the State Department said that it would draft a new federal rule in the Federal Register to exclude the type of technical data that Defense Distributed put on DEFCAD. The new rule may explain why the State Department agreed to settle and permit publicly sharing the weapon design information published by DD.

Drafting a new rule can take weeks, months, or even years. According to the settlement, while the State Department is drafting the rule, it will put an announcement on its website that the State Department is temporarily permitting public sharing of DD's files.

The announcement will be online on or before July 27, 2018. In that announcement, State may include the reasons why it settled with DD, agreed to temporarily exempt the weapon designs from ITAR, and why the State Department committed to a new rulemaking to address when publically sharing weapons designs is

exempt from ITAR.

People of the Gun are not the only ones interested in knowing why the State Department settled with DD. The Brady Campaign to Prevent Gun violence filed a Freedom of Information Act request (FOIA) to answer that question. This is ironic because the Brady Campaign is using a FOIA request in order to find new ways to suppress the freedom of information.

**The Fate of Military Equipment**

According to the press release from the Second Amendment Foundation, the "government expressly acknowledges that non-automatic firearms up to .50-caliber – including modern semi-auto sporting rifles such as the popular AR-15 and similar firearms – are not inherently military."

This sounds great, but the devil is in the details of the new rule.

First, this settlement agreement is not the same as the final regulation. The settlement may be helpful in another, future lawsuit, but this settlement cannot bind the outcome of the final regulation. Furthermore, the final regulation may not even mention the settlement's definition of "Military Equipment." It is important that the State Department cement this distinction in a binding government document, like the pending new rule.

Second, the State Department only promised a process to address the regulation. That process may be favorable to gun owners or it may be so narrow as to barely affect our purchase and ownership of firearms and the designs to make them.

The State Department will first publish a Notice of Proposed Rulemaking (NPRM) that will detail the potential new regulation exempting certain firearm designs intended for sharing. The NPRM will also detail the time period for the public to submit comments on the proposal in support or opposition.

This is a critical phase of the notice-and-comment process. After the comment period, the State Department may receive so much negative feedback on its proposal that it determines it should craft something much more restrictive of gun rights.

**What To Expect**

Based off the information we have now, we can make some cautious inferences as to what this could mean for gun control.

The State Department agreed to settle because it determined that the regulations don't permit the government to prevent file sharing. State also realized that the files don't fit within any of the current exemptions. That's why the State Department relied on the catch-all exemption in 22 CFR 125.4 (b)(13).

Since the settlement included a definition of military equipment as being larger than .50 caliber and fully automatic, the new proposed rule might be an important defense for America's most popular rifle.

But, this depends on how the State Department drafts the new proposed regulation.

**Payback**

Almost as gratifying as the settlement is the fact that the State Department agreed to pay Defense Distributed's legal fees, totaling $39,581. I know its tax money, but I choose to look on the bright side. It's a donation to the cause.

Link: http://www.thetruthaboutguns.com/2018/07/ttag-contributor/the-defense-distributed-settlement-isnt-a-done-deal-heres-whats-next/

WASHAR0002632

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:      *MarquisMR@state.gov* |   Web:  *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

**From:**       Marquis, Matthew R <MarquisMR@state.gov>
**Sent:**       Wednesday, July 25, 2018 4:14 PM
**To:**         PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>
**Cc:**         PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:**    CPA Media Monitoring: Twitter: Congressional reactions to Defense Distributed settlement



 **Chris Murphy** ✔
@ChrisMurphyCT



Why on earth would we want to make it possible for anyone - including felons and terrorists in the U.S. and abroad - to be able to print their own gun without a serial number or background check?



**An AR-15 made at home? With 3D printing, 'the downloadable gun' becomes …**
Blueprints arriving Aug. 1 from Defense Distributed will let users make untraceable guns from home using 3D printers — no background check required.
usatoday.com

11:29 AM - 25 Jul 2018

**575** Retweets  **1,150** Likes   

♡ 120      ⟲ 575      ♡ 1.2K

WASHAR0002635

 **Chris Van Hollen** ●
@ChrisVanHollen

 Follow ⌄

If you can't pass a background check, you shouldn't be able to get a gun—not from a store, from a gun show, or from parts you printed on a 3D printer and assembled at home. But Trump has made it easier to print and own a 3D gun without a background check—we must fight back!

**Giffords** ● @GiffordsCourage
If you can't pass a background check, you shouldn't be able to build a gun in your basement.

While an overwhelmingly majority of Americans support background checks for...

10:59 AM - 25 Jul 2018

**65** Retweets **170** Likes   

○ 15      ⟲ 65      ♡ 170

WASHAR0002636



**Senator Bob Menendez** ⬤
@SenatorMenendez


Follow

Do-it-yourself, 3D printable guns. Yes, untraceable plastic guns.  No background checks. Thanks to @SecPompeo, starting August 1, blueprints to print AR-15's will be just a mouse-click away.  This must not happen.  foreign.senate.gov/press/ranking/

. . .



Sen. Bob Menendez
D., N.J.

"It is hard to see how making it easier for criminal & terrorist organizations to **obtain untraceable weapons** is in the foreign policy & national security interests of the United States,"

## Menendez Calls on Secretary Pompeo to Stop Online Posting of Do-it-Yourself, 3-D Printable Gun Blueprints

Sudden settlement by State Department will allow public release of 3-D printable firearm plans starting August 1. Ghost guns are untraceable, no background check required



8:43 AM - 25 Jul 2018

**28** Retweets  **52** Likes

⬤ ▨ ◗ ≋ ● ◑ ◉ ▨ ◉

⚇  Brady Campaign, Giffords, Everytown and 3 others

◯ 11        ⬔ 28        ♡ 52

WASHAR0002637

 **Sen Dianne Feinstein** ✔
@SenFeinstein



The Trump administration's decision to allow designs for a 3D printed gun to be distributed freely online is baffling and a complete about-face. It will allow terrorists and criminals to easily get their hands on guns.



**Senators Demand Answers from Justice Dept. on Dangerou...**
Washington – In the wake of the decision by the Department of Justice (DOJ) to settle a lawsuit brought against the Department of State by Defense Distributed and the Second Amendment ...
feinstein.senate.gov

12:26 PM – 25 Jul 2018

**578** Retweets  **968** Likes

💬 113   🔁 578   ♡ 968

Links:  https://twitter.com/ChrisMurphyCT/status/1022187139491090433
https://twitter.com/ChrisVanHollen/status/1022179423783735298
https://twitter.com/SenatorMenendez/status/1022145377385017349
https://twitter.com/SenFeinstein/status/1022201362770264065

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:   202.647.6968
e-mail:   *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm* /|Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

WASHAR0002638

**Official**
**UNCLASSIFIED**

WASHAR0002639

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Thursday, July 26, 2018 3:24 PM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Twitter: New Jersey AG sends Defense Distributed cease and desist letter |



 **NJ Attorney General Gurbir Grewal** ◉
@NewJerseyOAG

Next week, a Texas-based company called Defense Distributed plans to publish computer files that would make it possible for anyone with a 3D printer to make their own untraceable assault weapons at home. This threatens all of us in New Jersey.

11:11 AM - 26 Jul 2018

**19** Retweets  **32** Likes     

♡ 5       ♺ 19       ♡ 32

WASHAR0002640

 

**NJ Attorney General Gurbir Grewal** ●
@NewJerseyOAG

Releasing these computer codes would be no different than driving to NJ and handing out hard-copy files on any street corner. Defense Distributed must immediately drop its publication plans. We plan to sue by Aug. 1. Our cease-and-desist letter:

WASHAR0002641



PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

**State of New Jersey**
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
PO Box 080
TRENTON, NJ 08625-0080

GURBIR S. GREWAL
*Attorney General*

Defense Distributed
2320 Donley Dr., Suite C
Austin, TX 78758

July 26, 2018

To Whom It May Concern:

You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents. The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms—and even to make assault weapons that are illegal in my state. These computer codes are a threat to public safety, and posting them violates New Jersey's public nuisance and negligence laws. If you do not halt your efforts to proceed with publication, I will bring legal action against your company before August 1, 2018.

The computer files that you plan to publish will undermine the public safety of New Jersey residents. These files allow anyone with a 3-D printer to download your code and create a fully operational gun. More than that, the codes you plan to post will enable individuals to print assault weapons that are illegal in New Jersey. And because the printed guns would not have serial numbers, they would not be traceable by law enforcement. Worst of all, you are going to make the codes available to everyone—regardless of age, criminal status, or history of mental illness. That would undermine New Jersey's comprehensive scheme for keeping guns out of dangerous criminals' hands, and it would undermine the safety of our residents.

Not only are your codes dangerous, but posting them would also be illegal. New Jersey's law is clear: an individual who interferes with public health, safety, peace, and comfort violates our public nuisance law. *See James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 329-33 (App. Div. 2003). As New Jersey courts have held, "[n]o one can seriously debate" that regulated guns are "dangerous instrumentalities" and thus implicate our public nuisance law. *Id.* at 320. So when a group of manufacturers "flood[ed] the gun market" through a high volume of sales, while failing to develop "reasonable safeguards over the distribution scheme" and "refus[ing] to oversee or supervise the control of handgun distribution in order to prevent the foreseeable channeling of guns to such an illegal market," New Jersey courts found they could be held responsible when their actions "facilitate[d] the illegal sale of weapons to criminals and other unlawful users." *Id.* at 312. That is what your actions will do as well—make do-it-yourself guns available to anyone, even if the individuals are prohibited from owning guns because of prior convictions, history of mental illness, or history of domestic violence, even if the weapons they print are illegal in my

WASHAR0002642

July 26, 2018
Page 2

state, and even if they plan to use their weapons to further crimes and acts of violence. Because your actions will flood the illegal firearms market and pose a direct threat to the public safety of my state, they constitute a public nuisance.

Worse still, your comments make clear that you hope your actions will undermine all the efforts of states like New Jersey to keep guns out of criminals' hands. You have stated, "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable."[1] You have also stated, "I'm not worried about public safety."[2] And on July 30, 2018, you tweeted a photo of a gravestone engraved with the words "American Gun Reform."[3] These comments show that you have no intention of precluding your printable-gun computer files, including designs for assault weapons, from winding up in the hands of criminals, minors, and the mentally ill. Not only does that reveal a lack of regard for safety, but it also shows that your interference with the public's health and safety is intentional and per se unreasonable. *James*, 359 N.J. Super. at 330.

Finally, your widespread dissemination of printable-gun computer files is negligent because it encourages an illegal gun market, which will foreseeably lead to increased crime and violence in New Jersey, and which will lead to an increase in expenditures of public funds for combating crime and protecting our resident's health. *See id.* at 308-24 (finding a legally valid negligence claim against same manufacturers of guns that flooded the illegal market). Your planned method of making codes available and your public comments show that you are ignoring and violating your duty. By broadly sharing an inherently dangerous product, you should reasonably foresee the resulting governmental and public costs and must bear them. *Id.* at 323-24.

As the chief law enforcement officer for New Jersey, I demand that you halt publication of the printable-gun computer files. Should you fail to comply with this letter, my Office will initiate legal action barring you from publishing these files before August 1, 2018.

Sincerely,

Gurbir S. Grewal
Attorney General

Link: https://twitter.com/NewJerseyOAG/status/1022544937508851712

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:     *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

WASHAR0002643

**Official**
**UNCLASSIFIED**

WASHAR0002644

| From: | Strike, Andrew P <StrikeAP@state.gov> |
|---|---|
| Sent: | Wednesday, July 18, 2018 6:00 PM |
| To: | Davidson-Hood, Simon <DavidsonHoodS@state.gov>; Foster, John A <FosterJA2@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hess, Rachel <HessR@state.gov>; Monjay, Robert <MonjayR@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Vice: Get ready for the new era of 3D-printed guns starting August 1 |

## CPA MEDIA MONITORING

**Get ready for the new era of 3D-printed guns starting August 1**
Tess Owen
Jul 18, 2018

A self-described "crypto-anarchist" finally won his five-year legal battle to put blueprints for 3D-printed guns on the internet. And with that victory comes an uncertain future where anyone with the technology could potentially print an AR-15 untraceable by the government.

Cody Wilson's legal woes began in 2013, when he posted the world's first online manual for how to assemble a 3D-printed gun, "The Liberator" — a single shot pistol made largely of plastic. Days later, the State Department classified his blueprints as a violation of international export law and threatened Wilson with fines and jail time if he didn't remove them. A lengthy legal battle ensued.

Last week, however, the State Department finally settled a lawsuit with Wilson and his company, Defense Distributed; as of Aug. 1, he can continue publishing 3D-printed firearm blueprints online for anyone to download and use. Because people don't need to undergo a background check to print their own guns — nor do the guns need to have a serial number once assembled — the government has no real way of tracing what experts see as a new and troubling trend for gun enthusiasts.

Wilson even portrayed his victory as the death of gun control in America.

"Think bitcoin, or Wikileaks. Those are strategic forms of virtual anarchy," Wilson told VICE News. "It's people who create virtual forms of anarchy and push the government out of certain spheres."

He sees himself working within the tradition of crypto-anarchism and "cypherpunk" activism, which weaponizes technology to circumvent government controls and effect social or political change.

Law enforcement and gun control advocates view Wilson's plans for 3D-printed guns as similar to the rise of "ghost guns." They're DIY kits which buyers can then assemble without serial numbers, making them nearly impossible to track. (Wilson also sells these kits, through his offshoot company, "Ghost Gunners.")

"Five or ten years ago, it was just hobbyists doing this. No big deal," said David Chipman, who spent 25 years as a special agent at the Bureau of Alcohol, Tobacco, Firearms, and Explosives and is now the senior policy advisor at Giffords, a gun control advocacy group.

"Now, criminals have started using ghost guns as a way to circumvent assault weapon regulations. I imagine that people will also start printing guns to get around laws."

The quality of a plastic, printed gun is still inferior to the ones firearm manufacturers traditionally make, largely

WASHAR0002645

because of the limitations of the material used in 3D printing. But, as Wilson noted, they still work.

3D-printed guns are also still required to contain some metal, under the Undetectable Firearms Act, to set off detectors. Wilson's blueprints call for a metal firing pin, which is essentially a small nail. The printers also cost anywhere from $5,000 up to $600,000, with significant differences in product quality.

"The cost of 3D printing is still relatively high," said Avery Gardiner, co-president of the Brady Center for Gun Control, which has tracked Wilson's case closely over the years. "My concern is that most of the guns that are 3D-printed in the short term will be made by rich criminal syndicates that have the resources to do it."

Wilson's business, DEFCAD, is currently the only one authorized by the government to offer offer blueprints for 3D printing of firearms, according to the "Is this legal?" section of the site. But anyone who signs up can upload and share their own drawings and blueprints, which gives Wilson's company infinite potential to expand the reach of 3D firearm printing.

"I think this is a way of ensuring that our culture and industry makes it into the 21st century. Gun culture is always about ten years behind other industries. It's always lagging behind wherever Silicon Valley is," said Wilson. "Traditional types of gun producers come from an older school of thinking. They're former military and veterans, not people living fast lives with fast companies."

After Aug. 1, a range of blueprints will be available for download from Wilson's site, including the AR-15, VZ.58 (a Czechoslovakian assault rifle), and a 1911 Pistol.



The various types of 3D gun blueprints available on DEFCAD on Aug. 1.

**A SUDDEN DECISION**

Back in 2013, the Department of Homeland Security and the Joint Regional Intelligence Center **released a memo** stating that, given the significant advances in 3D printing technology, limiting access to printed firearms "may be impossible." Their memo made specific reference to Wilson and his company, Defense Distributed.

WASHAR0002646

Even by the time the State Department contacted Wilson and threatened him with jail time, his blueprints had been downloaded more than 100,000 times and posted elsewhere. (Many of those blueprints, and others, are likely still out on the dark web, Wilson said. But they're often piecemeal and not always reliable.)

With the backing of the Second Amendment Foundation, a pro-gun nonprofit based in Washington D.C., Wilson sued the State Department in 2015 on the grounds that the government had violated his First Amendment rights by asking him to take the blueprints offline. After a trial judge overseeing the case declined to grant a preliminary injunction that would have allowed him to keep the blueprints online, Wilson appealed to the Fifth Circuit about the injunction, which upheld the lower court's decision. The Supreme Court declined to hear his case.

And then, seemingly out of the blue, the State Department settled the case and approved 3D printing tutorials for "**public release** (i.e. unlimited distribution) in any form." The government also agreed to foot the bill for nearly $40,000 of Wilson's legal fees.

"Nothing had happened, and there was seemingly no impetus for why the Trump Administration decided to step and endanger public safety by allowing this man to put blueprints for making guns on the internet," said Gardiner, who also served as counsel to the assistant attorney general of antitrust at the Department of Justice from 2005 to 2008.

But Wilson has a different opinion of the outcome of his victory in the case.

"I'm not worried about public safety. As you might imagine, that's kind of my motivator," said Wilson. "I like being able to defeat any imagined confinements of the access to guns. Any legal scenario, I like being able to defeat that."

Link: https://news.vice.com/en_us/article/ev8xjn/get-ready-for-the-new-era-of-3d-printed-guns-starting-august-1?utm_source=vicenewstwitter



**Andrew P. Strike**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone: 202-736-7804 | 📱 BlackBerry: 202-701-5137 |

✉ E-mail: ***StrikeAP@state.gov*** | ✎ Web: ***www.state.gov/t/pm/*** | Twitter: ***@StateDeptPM***

Stay connected with *State.gov*:

**Official**
**UNCLASSIFIED**

WASHAR0002647

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Friday, July 27, 2018 9:29 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | CPA Media Monitoring: Vice News: Gun control groups are racing against the clock to stop 3D gun blueprints from going online |



**Gun control groups are racing against the clock to stop 3D gun blueprints from going online**
**By Tess Owen**
**26 July 2018**

Blueprints for 3D-printed guns will start appearing online in just six days. With the clock ticking, lawmakers and gun control groups are scrambling to block the plans, which experts fear could lead the U.S. into a new era of homemade AR-15s and other guns the government can't trace.

Cody Wilson, a 29-year-old self-described "crypto-anarchist," recently won the right to upload his blueprints online after the Trump administration quietly settled his yearslong lawsuit against the State Department. Wilson sued the government on free speech grounds after State Department officials ordered him to take the blueprints down in 2013 or face hefty fines and jail time.

The settlement, handed down earlier this month, gave Wilson's company, Defense Distributed, the green light to resume uploading blueprints for 3D guns starting Aug. 1. And in the last few days, outrage over the Trump administration's decision to settle the long-stalled case has escalated.

The settlement reversed the position taken by the Obama administration, which held that publishing blueprints for 3D-printed guns posed a threat to public safety and national security. Democratic federal and state officials have now written to the Trump administration demanding explanation for the last-minute switch, threatening to take legal action against Wilson, and even considering legislation to outlaw the publication of his blueprints.

The most promising effort to thwart Wilson's plans came in the early hours of Thursday morning, when gun-control lobbying groups including The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, and Giffords Law Center to Prevent Gun Violence filed an emergency motion seeking a temporary restraining order against Wilson.

The U.S. District Court for the Western District of Texas in Austin agreed to schedule an emergency hearing for Thursday afternoon.

"The resulting settlement agreement, if carried through, threatens to undermine national security by authorizing the posting and downloading of computer files allowing the fabrication of dangerous make-at-home firearms by any person anywhere in the world," the groups wrote in a joint letter to a federal judge in Texas, where Wilson and his company are based.

The notion of making 3D-printed guns publicly available is particularly concerning to law enforcement because, like "ghost guns" (which are assembled using DIY kits), they don't have serial numbers. That makes them nearly impossible to trace if they're used to commit a crime.

WASHAR0002648

Also on Thursday, New Jersey Attorney General Gurbir S. Grewal, a Democrat, sent a "cease and desist" letter to Defense Distributed that threatened to take legal action against Wilson and his company if they made blueprints for 3D-printed guns available to residents of New Jersey.

"Defense Distributed's plans to allow anyone with a 3D printer to download a code and create a fully operational gun directly threatens the public safety of New Jersey's residents," Grewal stated in the letter. "Posting this material online is no different than driving to New Jersey and handing out hard-copy files on any street corner. The federal government is no longer willing to stop Defense Distributed from publishing this dangerous code, and so New Jersey must step up."

Democratic members of Congress are also ringing alarm bells.

During Wednesday's hearing on national security issues, Democrat Sen. Bob Menendez, the ranking member of the Senate Foreign Relations Committee, called on Secretary of State Mike Pompeo to conduct an immediate review of the Trump administration's settlement with Wilson.

"I understand that despite its ability to stop this ridiculous notion, the State Department is about to allow internet posting of do-it-yourself 3D-printable firearm blueprints," Menendez said. "Why on earth would the Trump administration make it easier for terrorists and gunmen to produce undetectable plastic guns?"

Menendez followed up with a letter to Pompeo, asking him to reconsider that Wilson's blueprints "runs afoul of federal law," specifically, the International Traffic In Arms Regulations (ITAR), which governs exports.

That was the same law that the State Department initially argued Wilson had broken back in 2013, when his legal woes first began.

New York Sen. Chuck Schumer was the first member of Congress to draw attention to development in Wilson's case this week — and hinted he'd be willing to introduce legislation to remedy the situation.

"Sadly, the feds are not only shoulder-shrugging this threat to public safety by refusing to fully enforce laws already on the books, but they could be sowing the seeds of real disaster by allowing dangerous ghost gun blueprints to be shared freely online," Schumer wrote. "I am not only sounding the alarm on this issue, but I have a message for the administration: Congress will use its powers to try and stop this madness."

Five Democratic senators, led by Edward Markey of Massachusetts, also wrote a letter to the Justice Department, which settled the lawsuit with Wilson, demanding that attorneys provide them with a copy of the settlement, a written explanation, and a briefing, all by Aug. 1.

"This settlement is inconsistent with DOJ's previous position and is as dangerous as it is confounding," the senators wrote in their letter to Attorney General Jeff Sessions. "The American people have a right to know why their government agreed to such a dangerous outcome."

Congressman Ted Deutch of Massachusetts also took a stand. On Thursday, he sent a letter, co-signed by 40 members of Congress, to the chairs of the Judiciary and Foreign Affairs Committees, calling on them to examine the settlement.

"The Trump Administration's decision to settle this case will only worsen the gun violence epidemic in America," Deutch wrote. "We shouldn't have to wait for someone to kill someone in a House office building after sneaking past security with a plastic 3D-printed gun to do something to stop this. And we can't let another day go by allowing the paralysis and dysfunction of Congress to prevent us from making our communities safe."

Link: https://news.vice.com/en_us/article/ev8b4p/gun-control-groups-are-racing-against-the-clock-to-stop-3d-gun-blueprints-from-going-online

WASHAR0002649

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:     202.647.6968
e-mail:     *MarquisMR@state.gov* |   Web:  *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 18, 2018 10:25 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Washington Post: Meet the man who might have brought on the age of 'downloadable guns' |



**Meet the man who might have brought on the age of 'downloadable guns'**
**By Deanna Paul**
**18 July 2018**

During the summer of 2012, Cody Wilson hung around J&J, a car-repair shop run by two "goofy" guys in their late 20s. The Austin warehouse was crowded with engine blocks, car parts and Pelican boxes that never seemed to have been opened, but the 24-year-old came as he pleased, with access to shop machinery.

He had spent the larger part of his second year at the University of Texas Law School learning how to operate a 3-D printer. Familiar with the robust gun culture of the South from his Boy Scout years in Arkansas, he soon began to wonder whether he could create the first fully 3-D-printed, functional firearm.

Wilson was not confident it was feasible. The technology was new, and printable materials were brittle and plastic. But Wilson was motivated by curiosity, hypothesizing that he could design a printable weapon and build a platform for users to download gun blueprints without government regulation.

"Even I was glamoured by the magic of 3-D printing," he said, recalling when he removed the first functional plastic piece from the printer. "It had an unusual polymer, fleshy feel and a silicate structure about it that had to be washed off. All the trappings of some kind of alien birth."

Wilson admired the object. The screw, buffer tower, the grip face. They all had perfect resolution, he said. "That's the devilry of this technology. They can do things that have machine quality."

Wilson drove to west Texas and learned to assemble a gun, swapping in his printed part — a green lower receiver. He shot the low-powered AR-15 into the dirt five or six times before it broke. Wilson showcased the accomplishment on YouTube.

Convincing Americans that 3D-printing guns was a worthwhile endeavor proved to be a challenge, said Wilson, who had begun fundraising. His bleak investor base was mostly 3-D printer enthusiasts with several straggling gun-rights advocates. Gun owners could already own many guns. Why did they need new ones printed?
Green lower receiver for the AR-15 printed by Cody Wilson in November 2012. (Cody Wilson)
Less than two weeks passed before 20-year-old Adam Lanza opened fire at Sandy Hook Elementary School, fatally shooting 26 people before turning his weapon on himself. Suddenly, interest and his efforts changed.

"After Sandy Hook, everything was backward, cast as some kind of race condition: Is there gun control in America or 3-D printing of guns?" he said. No longer the outliers, Second Amendment support flowed in. "These things become about red team, blue team after a while," Wilson said.

With national interest piqued, Congress and the Obama administration stepped in, leading a nationwide crackdown on gun ownership. Citing corporate responsibility, websites took down gun files and online

WASHAR0002651

community forums removed gun enthusiasts. The Senate pushed for stronger laws and introduced the Manchin-Toomey Amendment in January 2013, calling for background checks on most firearm sales. The bill failed three months later.

Inspired by Julian Assange and WikiLeaks, Wilson and his friends set out to create an open-source platform.

"We wanted to be the wiki for guns," Wilson said. Defcad.com, an unregulated file-sharing website, launched, birthing what became the first 3-D-printing gun community.

Testing of the "Liberator," his first fully printed pistol, finished in late April 2013, during his second-year exams. He dropped out of the program the same week and uploaded his design files for ghost guns, firearms without serial numbers. In a few days, there were more than 100,000 downloads. Then he was stopped by the feds.

In May, Wilson told Infowars' Alex Jones, who has promoted various conspiracy theories, that the State Department emailed him demanding the files be taken down. The department alleged that by uploading a weapon blueprint, which constituted an export under the International Traffic in Arms Regulations (ITAR), Wilson was violating federal law. With 30 days to respond to government demands, Wilson removed the files from defcad.com, then filed suit against the U.S. government for violating his First Amendment right to free speech.

What frustrated Wilson was that the government was attempting to stop him from giving knowledge away.

"It's not that I'm a nihilist about it. I know that I can't control it moving forward, but that's the utopia of the present," Wilson said, calling himself a political romantic. "Good, something might happen that I can't anticipate! That's what inspires a bunch of burnouts like me."

He understood that the knowledge could be used for radical purposes. Still, he said, there was no way to "violate" his idea. In the public domain, the designs were "equally everyone's and no one's," he said.

At the time it was a pipe dream, but he hoped he had a case.

Joined by the Second Amendment Foundation, Wilson spent five years in litigation. In an unlikely turn of events, on June 22, the federal government settled. It was a narrow victory for First Amendment fans, coming under an administration usually perceived as hostile to free speech.

Second Amendment Foundation founder Alan Gottlieb, surprised the government settled after years of battle, said that the victory cemented gun-ownership law. "The government can no longer effectively ban guns in America because anyone can download the code and make a gun in their own home," he said.

Wilson, now 30, did not expect to win either. He expected to be content with a moral defeat, taking solace imagining the State Department tasked with the chore of regulating guns on the Internet.

"It's a troubling 180-degree turn by the State Department," said Adam Skaggs, chief counsel of Giffords Law Center to Prevent Gun Violence. "It's going to make it much easier for dangerous people, otherwise prohibited from getting guns, to get them."

Skaggs, like many anti-gun-violence proponents, blamed the policy U-turn on the Trump administration, saying it is more focused on the gun lobby's bidding than protecting public safety.

A State Department spokesman, however, told The Washington Post that this was a voluntary settlement agreed upon by both parties. The June 29 settlement, a copy of which was given to The Post, comes during a transfer of oversight from the State Department to the Department of Commerce.

WASHAR0002652

In 2010, when Barack Obama was president, the departments initiated an overhaul of the U.S. munitions list. Under the proposed regulations, the State Department would continue administrating exports under ITAR of military-grade firearms, munition and heavy artillery. Commercially available firearms and related manufacturing technology would transfer to Commerce control. "These proposed regulations would eliminate the ITAR requirements at issue in this case," the department spokesman said.

The Trump administration has surged forward with deregulating gun exports, though the initial transfer between departments was in 2015, under the Obama administration.

Weapon manufacturing, in the meantime, is moving away from 3-D printing. According to Adrian Bowyer, a retired engineer, 3-D printers aren't a suitable technology for weapon-making. The key component of a firearm is that it's cylindrical and rotationally symmetric. 3-D printers are also restricted to the available materials, and the ones that work with metals don't provide the best results.

Bowyer said that if he had an interest in making weapons, he would make them with conventional tools, like a lathe. "3-D printers are expensive. Even then, the end result is likely not to be as strong as a 200-year-old technology."

Because there has been a proliferation of guns built with do-it-yourself kits obtained online, gun-control advocates have maintained that 3-D-printed guns are a future threat. Finkler said that when printing technology becomes more reliable and affordable — which, he said, is undoubtedly coming — it will have dangerous consequences for public safety. "Climate change isn't affecting us today, but people can be concerned about the future," he analogized. For now, though, the 80-percent-unfinished DIY gun looms larger.

Wilson's website is scheduled to go back online Aug. 1. Throughout the litigation, he developed a trove of other 3-D-printable weapon blueprints, including Assembly AR-15s and AR-10s.

Regulating homemade weapons will be the future-facing obstacle. Several states introduced legislation increasing oversight, but with the proposed ITAR amendments, Wilson should be able to publish all of his blueprints.

"[Code] is the essence of expression," he said. "It meets all the requirements of speech — it's artistic and political, you can manipulate it, and it needs human involvement to become other things." Alternatively, he said a digital file is a weapon, but only in the nonlegal sense. "You can't characterize 16 lines of code as 'a gun.' It doesn't want to become anything; you still have to make it one."

Wilson relishes that he edged his way into American gun-control politics.

"Ghost guns are what got me where I got," he said. "My contribution is to create the hyperbole politicians talk about. Now the public can have access to them."

Link: https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.f57ef3f88e04

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:      *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

WASHAR0002653



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002654

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 8:20 AM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: WPTV: Online plans to print 3-D guns concern dad of MSD shooting victim, law enforcement, politicians |

## CPA MEDIA MONITORING

**Online plans to print 3-D guns concern dad of MSD shooting victim, law enforcement, politicians**
**By Amy Lipman**
**25 July 2018**

PALM BEACH COUNTY, Fla. - As of Aug. 1, anyone with a 3-D printer could get the plans to print their very own gun, even an AR-15.

"This is the most important story in our country right now," said Fred Guttenberg, whose daughter Jaime died in the shooting at Marjory Stoneman Douglas High School in Parkland in February.

Back in 2013, Cody Wilson posted plans for a 3-D printed handgun online. The U.S. State Department told him to take the plans down, citing the International Traffic in Arms Regulations, which oversee the export of defense materials, services, and technical data.

Two years later, Wilson and his non-profit, Defense Distributed, sued the federal government saying the group has the right to post information online.

At the end of June, the government settled, allowing those plans to go back up online.

"This changes everything," Guttenberg said.

Guttenberg has been advocating for gun control since his daughter and 16 others died on Valentine's Day.

"It changes the entire discussion around gun violence prevention," he said.

He is up in Washington D.C. this week to speak out against Brett Kavanaugh becoming the next Supreme Court Justice. However, he decided to use this week's meetings with lawmakers, including a speech to the House Democratic Caucus, to inform them of the potential for people to soon be able to print their own plastic guns.

"My alarm bell went off when I realized most of them didn't know what I was talking about," he said.

Guttenberg is concerned printed plastic guns could get through metal detectors.

"So I said to all of the senators and congressmen, the next time you have a constituent in your office, they might have a gun," he said. "All of the school hardening talk that we've been doing in Florida and across the country, it won't matter. Airplanes, airports."

This could also allow people who can't legally buy a gun to create their own, although it would still be illegal for them to possess the gun.

WASHAR0002655

"I think that you give an edge to the criminal," said Stuart Kaplan, former special agent for the FBI. "Or to a person who is in the planning or preparation stage to make it easier or more accessible for them to have a gun that is not even detectable or traceable, that presents an impact to our national security."

From a law enforcement standpoint, Kaplan said printed plastic guns are untraceable because they don't have serial numbers, which could hinder investigations.

"It's a ghost gun," he said.

While Kaplan said plastic could cause issues with the functionality of the gun, there have been plastic guns that have been proven to work.

"There have been some issues with the respect to the designing of plastic to be able to withstand a single discharge of a bullet. It takes a certain amount of chemical compounds to withstand basically the explosiveness of gunpowder. There have been failures, but there's also been some success," he said. "It can be proven to be deadly as a regular gun made out of metal."

Guttenberg thinks this concept could change the entire country.

"If we don't stop this before August 1st and it goes online, it's too late," he said.

Guttenberg is working with politicians to try to get a court injunction to pause the release of the blueprints.

U.S. Senator Bill Nelson and several other senators sent a letter to Attorney General Jeff Sessions about the issue.

"We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course," they wrote in the letter. "The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad."

The National Rifle Association spokeswoman said 3-D printed guns represent "freedom and innovation." She said laws already on the books would still prevent criminals from possessing printed guns.

Everytown has an online petition to stop the blueprints from being posted.

Link: https://www.wptv.com/news/state/online-plans-to-print-3-d-guns-concern-dad-of-msd-shooting-victim-law-enforcement-politicians

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:        *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



WASHAR0002656

**Official
UNCLASSIFIED**

**Official
UNCLASSIFIED**

WASHAR0002657

| From: | McKeeby, David I <McKeebyDI@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 4:59 PM |
| To: | Paul, Joshua M <PaulJM@state.gov> |
| Subject: | D2--MEDIA INQUIRY COUNT--16 so far |

JULY 24-25

- NBC NEWS (ARKIN): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- REUTERS (LYNCH): DDTC: DEFENSE DISTRIBUTED SETTLEMENT (PAUL)
- KUT (LARGEY-AUSTIN, TX NPR AFFILIATEI): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- FOLHA DE SAO PAULO (CARAZZAI-BRAZILI): DDTC: DEFENSE DISTRIBUTED SETTLEMENT

JULY 12-23

- WASHINGTON POST (PAUL): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- WASHINGTON TIMES (SHERFINSKI): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- WASHINGTON EXAMINER (GEHRKE): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- FOX NEWS (ROGERS): DDTC: DEFENSE DISTRIBUTED STTLEMENT
- NBC NEWS (ROMERO): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- BLOOMBERG (CAPPACCIO): DDTC: DEFENSE DISTRIBUTED STTLEMENT
- NOW THIS (HARJAI): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- CNET (ZHOU): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- NY TIMES (HSU): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- DALLAS MORNING NEWS (BRANHAM): DDTC: DEFENSE DISTRIBUTED SETTLEMENT
- WIRED (GREENBERG): L-DDTC: DEFENSE DISTRIBUTED SETTLEMENT (STRIKE)
- BLOOMBERG LAW (KRAMER) DDTC: DEFENSE DISTRIBUTED SETTLEMENT (STRIKE)

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.8757 | 🖨  BlackBerry: 202.550.3482 |
✉ e-mail:     *mckeebydi@state.gov* | ✍ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| Sent: | Tuesday, April 10, 2018 1:32 PM |
| To: | Heidema, Sarah J <HeidemaSJ@state.gov> |
| Cc: | McKeeby, David I <McKeebyDI@state.gov> |
| Subject: | DD Settlement |

Hi – is there anyone who could walk CPA through what's being proposed in terms of the DD settlement and where this all stands?

Thanks,

Josh

---

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.7878 | 🖳  BlackBerry: 202.679.6724 | 🖨   Fax: 202.647.4055
✉ e-mail:      *PaulJM@State.Gov* | ✍  Web: *www.state.gov/t/pm /*

🐦 http://twitter.com/StateDeptPM

Stay connected with *State.gov*:



This message is *UNCLASSIFIED*, per E.O. 12958

**Official**
**UNCLASSIFIED**

WASHAR0002659

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 4:47 PM |
| To: | Carter, Rachel <CarterR@state.gov>; PM-Strategy <PM-Strategy@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Brown, Stanley L <BrownSL@state.gov>; O'Keefe, Kevin P <OKeefeKP@state.gov>; Miller, Michael F <Millermf@state.gov>; Mak, Daniella <MakD@state.gov>; Martin, Davette T <MartinDT@state.gov>; Dudding, Maria <DuddingM@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Nute, Kathryn M <NuteKM3@state.gov>; McVerry, James <James.Mcverry.ctr@dla.mil> |
| Subject: | Defense Distributed Settlement Alerts for 25 July 2018 |



**Defense Distributed Settlement Alerts for 25 July 2018**

"Stop Defense Distributed From Releasing Downloadable Guns", On August 1st, Defense Distributed plans to release downloadable gun blueprints to make untraceable, undetectable, plastic 3D printed guns. This could mean that anyone, including TERRORISTS, convicted FELONS, domestic ABUSERS and other dangerous people could print their own gun on demand.

"This Austinite Plans To Publish Designs Online For 3D-Printable Guns Next Week", He argues the ITAR – the regulations the government used to block Wilson from publishing the files – lacked clear legal standards, deadlines and judicial review. He says it also puts the burden on individuals to prove they are not in violation of the regulations, rather than the government having to prove that they are.

"New Jersey Attorney General Sends 'Cease And Desist' Letter To Halt Company's Publication Of 3D-Printed Gun Instructions", "You are directed to cease and desist from publishing printable-gun computer files for use by New Jersey residents," Grewal said in the letter. "The files you plan to publish offer individuals, including criminals, codes that they can use to create untraceable firearms – and even to make assault weapons that are illegal in my state."

"The Defense Distributed Settlement Isn't a Done Deal…Here's What's Next", First, this settlement agreement is not the same as the final regulation. The settlement may be helpful in another, future lawsuit, but this settlement cannot bind the outcome of the final regulation. Furthermore, the final regulation may not even mention the settlement's definition of "Military Equipment." It is important that the State Department cement this distinction in a binding government document, like the pending new rule.

"Anti-gun violence groups file to halt online posting of 3D-printed gun plans", "The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community," the court documents read.

"Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'", Shortly after the settlement was announced, the Brady Campaign filed a Freedom of Information Act, hoping to get additional details about the reversal. But those documents likely won't be returned until after Defense Distributed reposts the blueprints online, at which point the gun safety groups say the potential damage would be "irreparable."

"Gun-control advocates ask judge to block downloadable 3D guns", The Department of Justice quietly agreed to let a Texas man legally offer his downloadable plans to fabricate a 3D-printed gun starting Aug. 1. When

news broke nationally about the agreement over the past week, three national gun safety groups quickly headed to court to try to block the action.

"Soon anyone will be able to learn how to print 3D guns", For gun-control advocates, this is a terrifying scenario. People who cannot pass a background check will be able to print a gun without a serial number, making the weapon impossible to trace, says Adam Skaggs of the Giffords Law Centre to Prevent Gun Violence. (Federal law requires licensed gun shops to run background checks, though this does not apply to private sales at fairs or on the internet.) His law centre is trying to get the courts to delay the settlement, at least.

"Did the U.S. State Department Legalize the Publication of Instructions for 3D-Printed Guns?", As of 1 August 2018, Defense Distributed will start publishing detailed steps on how to create a variety of guns that require no registration or background check to manufacture. While the broader issue may well be litigated further, the current stance of the U.S. State Department is that Defense Distributed will not be violating any export control laws when they do so.

"I'm a sheriff. Don't flood the country with 3D-printed guns.", Until recently, the State Department shared these concerns about the threat of downloadable, untraceable guns. For years, the agency had been fighting back a lawsuit from an online, open-source company that was forced by the department to pull down downloadable gun blueprints. That's because the department considered the online posting of the technology a violation of the International Traffic in Arms Regulations.

"Why it is difficult to regulate 3D-printed guns", Chuck Schumer, now the Senate minority leader, summed up this fear in 2013 when he warned that 3D printing would allow any bunch of felons or terrorists to "open a gun factory in their garage."

"Lawsuit moves to keep the blueprints for 3D printed guns off the web", On Tuesday, three prominent gun safety groups announced that they are preparing legal action in the coming days to prevent the U.S. State Department from allowing the blueprints for 3D-printed guns to be posted online. In an amicus brief filed on July 24, attorneys representing the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence objected to an imminent governmental rule change that would upend the regulatory structure governing firearm exports.

"Online plans to print 3-D guns concern dad of MSD shooting victim, law enforcement, politicians", U.S. Senator Bill Nelson and several other senators sent a letter to Attorney General Jeff Sessions about the issue. "We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course," they wrote in the letter. "The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad."

"State Department defends allowing publication of blueprints to 3D print guns", After a security analysis, "It was determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States," the State Department spokesperson said -- so they don't need to block publication.

"Pompeo commits to reviewing 3D-printed gun policy", Sen. Edward Markey (D-MA) asks Secretary of State Mike Pompeo not to allow downloadable blueprints for 3D-printed guns to be published online to prevent weapons from getting into the wrong hands.

---

Matthew Marquis
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:      ***MarquisMR@state.gov*** |   Web: ***www.state.gov/t/pm /*** |Twitter: ***@StateDeptPM***

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

WASHAR0002662

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 4:49 PM |
| **To:** | Steffens, Jessica L <SteffensJL@state.gov>; PM-Strategy <PM-Strategy@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; Brown, Stanley L <BrownSL@state.gov>; O'Keefe, Kevin P <OKeefeKP@state.gov>; Miller, Michael F <Millermf@state.gov>; Mak, Daniella <MakD@state.gov>; Martin, Davette T <MartinDT@state.gov>; Dudding, Maria <DuddingM@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Nute, Kathryn M <NuteKM3@state.gov>; McVerry, James <James.Mcverry.ctr@dla.mil> |
| **Subject:** | Defense Distributed Settlement Alerts for 25 July 2018 |



## Defense Distributed Settlement Alerts for 25 July 2018

"Security Expert on 3D Guns: 'More of a Novelty than Form of Mass Killing'", Gun rights activists in the United States will soon be able to post 3D printable gun plans online. In 2013, Cody Wilson, who describes himself as a post-left anarchist, posted plans for a 3D printed handgun called "The Liberator." The gun, which was made from plastic, had a metal firing pin and another piece of metal included to comply with the Undetectable Firearms Act.

"Editorial: Homemade 3-D printer guns should be regulated like any gun", Federal law allows hobbyists to build their own guns for personal use. But the landscape has changed with 3-D printers, precise digital plans, and devices like the Ghost Gunner that allow anyone with a computer and a credit card to become a gun manufacturer.

"WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons", Normally, Americans would need to pass a background check before they can buy a gun, but freely-available blueprints for 3D-printed weapons could offer a way to bypass this law.

"What You Need to Know About the 3D Printing of Guns on Demand", While Brady's legal team has filed Freedom of Information Act (FOIA) requests to find out how and why this decision was made, the self-proclaimed "crypto-anarchist" will move forward to publish the blueprints for anyone and everyone to use. The Brady Center, along with Everytown and Giffords, is urging a Texas federal court to consider just how dangerous this could be and will be filing legal action.

"LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL", Attorneys representing the Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence and Everytown for Gun Safety have informed a Texas federal court that they anticipate filing legal action within days related to a settlement that would allow new designs for downloadable, untraceable guns to become public and available world-wide as early as August 1.

"MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS", U.S. Senator Bob Menendez, Ranking Member of the Senate Foreign Relations Committee, today called on U.S. Secretary of State Mike Pompeo to immediately intervene and review the surprising and sudden decision by his department to allow online public posting of 3-D printable gun blueprints in the next few days.

WASHAR0002663

<u>"Debating the Permissibility of Printable Guns"</u>, Those opposed to the settlement argue that it is deeply problematic that there are no background checks required for printing a gun. Convicted violent felons could print guns. People with a history of violent mental disorders could print guns. The government has a responsibility to look after the safety of its citizenry. Deadly weapons shouldn't fall into the wrong hands.

<u>"We Have to Take a Stand on 3D Printed Guns"</u>, You can already make guns in the US, you just need a license to distribute guns. The essential part of the "homebrew" gun was already perfectly possible. If they really wanted to 3D print guns they could have already done this. Instead, they wanted to 3D print attention and everyone fell for it. They went looking for a law suit to prolong the window of attention on them.

<u>"Government Admits AR-15s Are Not Weapons of War"</u>, Wilson and SAF fought the suit on First Amendment grounds and secured a settlement with the State Department and the Department of Justice, the latter of which finalizes the settlement. The amended regulations proposed in the settlement show the government will no longer look at semi-automatic firearms below .50 caliber as "military equipment" or weapons of war.

<u>"Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1"</u>, A settlement earlier this year between the State Department and Texas-based Defense Distributed will let the nonprofit release blueprints for guns online starting Aug. 1, a development hailed by the group as the death of gun control in the United States.

<u>"THE DANGERS OF 3D-PRINTED GUNS"</u>, The Trump Administration's ruling will recklessly allow anyone to post their gun blueprints online for anyone to download. That means people who are unable to pass a background check—like terrorists, convicted felons, and domestic abusers—will be able to 3D-print a gun out of the same type of plastic used to make LEGOs—without any attached serial numbers. This could have severe repercussions a decade from now if we allow weapons of this kind to multiply.

<u>"Email NOW: Stop the Threat of Downloadable Guns"</u>, Do-it-yourself, downloadable guns are incredibly dangerous. And a State Department special exemption would allow a company run by a self-proclaimed anarchist to post its gun blueprints online in the form of files that can be sent directly to a 3D printer to print guns on demand.

<u>"The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really"</u>, The lawsuit turns on whether or not the first and second amendment, allowing freedom of speech and the right to bear arms, protects someone like Wilson, who wishes to provide downloadable gun blueprints to make deadly, untraceable weapons.

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:        *__MarquisMR@state.gov__* |   Web: *__www.state.gov/t/pm /__* |Twitter: *__@StateDeptPM__*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0002665

THE SECRETARY OF STATE
WASHINGTON

December 16, 2011

The Honorable
John F. Kerry, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 2050

Dear Chairman Kerry:

I appreciate your attention to issues that I raised with you in my March 25, letter on streamlining and improving consultation and notification processes for both proposed arms sales and changes to the U.S. Munitions List (USML), in accordance with the Arms Export Control Act (AECA). I sincerely regret that my prior efforts to schedule a meeting on this have not been successful. Fortunately, in the interim, my staff has met and discussed with yours plans that the Department has refined for proceeding more systematically and effectively with consultations and notification on proposed changes to the USML, as well as on proposed arms sales. Detailed plans concerning both processes, including envisioned timelines, have also been shared.

I am aware of Congress' continued interest in the consistency of our proposals with the law and precedent. I believe that the new processes for consulting and notifying both USML changes and arms sales are fully consistent with the AECA and will prove to be constructive and efficient. The processes will also provide Congress with a great deal more time than the law requires, allowing for thorough analytic review and oversight. Specifically, the planned processes aim to afford greater time for Congressional advance review where arms sales involve less closely allied nations and more sensitive items, and similarly where less routine, broader USML revisions – comprising part of our reform initiative's effort to comprehensively rebuild a control list – are put forward. We are now poised to begin implementing these new processes for consulting and notifying arms sales commencing in January, and for the notification of USML under Section 38(f) of the AECA commencing early in the second quarter of 2012. We intend to continue discussing these processes with you and your staff as we proceed.

- 2 -

These steps will help ensure that both arms sales and USML revisions proceed apace, constructively and efficiently with Congressional input and oversight, so as to further our goals of a transparent, predictable, and timely export control system. They will serve to maintain our security, improve our military interoperability with allies and partners, bolster our defense industrial base, and ensure a security of supply for our own military – to the good of our workforce. In sum, as General Dempsey noted in his recent letter, these approaches will further our national security and economic goals while maintaining Congress' vital role in these matters.

I am making senior Department officials available immediately to respond in the first instance to any questions, and look forward to working closely with you as we proceed in this endeavor.

Sincerely yours,

Hillary Rodham Clinton

WASHAR0002667

| From: | ▮▮▮▮▮▮▮ <bounce@list.everytown.org> |
|---|---|
| Sent: | Tuesday, July 24, 2018 8:32 AM |
| To: | DDTC Response Team <DDTCResponseTeam@state.gov> |
| Subject: | Phil in 06040: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

▮▮▮▮▮▮▮ in 06040

<http://track.sp.actionkit.com/q/cQJXxAZUJkM-cbEh2ochZQ~~/AAAAAQA~/RgRdOaFaPlcEd2F3ZEIKAAJaHFdbLXkxt1IaZGR0Y3Jlc3BvbNldGVhbUBzdGF0ZS5nb3ZYBAAAAFg~>

| From: | :bounce@list.everytown.org> |
|---|---|
| Sent: | Tuesday, July 24, 2018 8:31 AM |
| To: | DDTC Response Team <DDTCResponseTeam@state.gov> |
| Subject: | Patti in 98003: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

n 98003

<http://track.sp.actionkit.com/q/QFEsuImQ64UELity0jLvVA~~/AAAAAQA~/RgRdOaEiPlcEd2F3ZEIKAAciHFdbjhUY1FIaZGR0Y3Jlc3BvbnNldGVhbUBzdGF0ZS5nb3ZZBAAAAI

| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|-------|------|
| Sent: | Friday, July 27, 2018 8:55 AM |
| To: | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| Subject: | FW: 18.04.06 DOJ MTD.pdf |
| Attach: | 18.04.06 DOJ MTD.pdf |

FYI-

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,

On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice. Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by the end of April?

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
    Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
    Defendants.

No. 1:15-cv-372-RP

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

WASHAR0002671

**TABLE OF CONTENTS**

BACKGROUND ..................................................................................................................1

ARGUMENT .....................................................................................................................2

I.     Plaintiffs' First Amendment Claims Should Be Dismissed .............................................2

     A.    The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components ...........................................................................................2

     B.    If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny. ......................................................................5

     C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad .................................8

     D.    ITAR's Export Controls Are Not An Unconstitutional Prior Restraint .....................10

II.    Plaintiffs' Second Amendment Claims Should Be Dismissed ........................................13

     A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge ...........................13

          1.    Defense Distributed Has Not Suffered a Harm to Second Amendment Interests. ............................................................14

          2.    SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any Second Amendment Injury is Not Traceable to Defendants' Acts. ............................................15

     B.    Plaintiffs' Second Amendment Challenge Fails on the Merits ....................................16

III.   Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ...............................19

CONCLUSION ..................................................................................................................20

i

WASHAR0002672

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010) ...................................................................................15

*Bernstein v. U.S. Dep't. of Justice*,
   192 F.3d 1308 (9th Cir. 1999) ..................................................................................4

*Bernstein v. U.S. Dep't. of Justice*,
   176 F.3d 1132 (9th Cir. 1999) ..................................................................................4

*Bonds v. Tandy*,
   457 F.3d 409 (5th Cir. 2006) ...................................................................................14

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ............................................................................................8, 9

*Brockett v. Spokane Arcades*,
   472 U.S. 491 (1985) ...................................................................................................9

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011) .................................................................................................17

*Brown v. Livingston*,
   524 F. Appx. 111 (5th Cir. 2013) ...........................................................................15

*Bullfrog Films v. Wick*,
   646 F. Supp. 492 (C.D. Cal. 1986) ...........................................................................4

*Capital Cities/ABC, Inc. v. Brady*,
   740 F. Supp. 1007 (S.D.N.Y. 1990) ........................................................................11

*Catholic Leadership Coal. of Tex. v. Reisman*,
   764 F.3d 409 (5th Cir. 2014) ...................................................................................10

*CFTC v. Vartuli*,
   228 F.3d 94 (2d Cir. 2000) ...................................................................................3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) .....................................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4*,
   541 U.S. 774 (2004) .........................................................................................11, 12

WASHAR0002673

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ...................................................................................................... 3

*Def. Distributed v. Dep't of State*,
    121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ............................................................... *passim*

*Def. Distributed v. Dep't of State*,
    838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
    rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
    *certiorari* denied, 138 S. Ct. 638 (2018) .......................................................................... *passim*

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................................................................................... 16

*Equal Rights Ctr. v. Post Properties, Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ............................................................................................. 16

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ........................................................................................... 13, 14

*Fontenot v. McCraw*,
    777 F.3d 741 (5th Cir. 2015) ................................................................................................. 14

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ............................................................................................................... 11

*Freedman v. State of Md.*,
    380 U.S. 51 (1965) ................................................................................................................. 11

*FW/PBS v. City of Dallas*,
    493 U.S. 215 (1990) ............................................................................................................... 14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ............................................................................................................... 10

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .......................................................................................................... 4, 5, 6

*Hotze v. Burwell*,
    784 F.3d 984 (5th Cir. 2015) ................................................................................................. 14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ................................................................................................................. 3

*Junger v. Daley*,
    209 F.3d 481 (6th Cir. 2000) ................................................................................................... 5

WASHAR0002674

*Karn v. U.S. Dept. of State,*
   925 F.Supp. 1 (D.D.C. 1996) ................................................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
   604 F. Supp. 280 (D.D.C. 1984) ...........................................................................................4

*Lewis v. Casey,*
   518 U.S. 343 (1996) ...........................................................................................................14

*Mance v. Sessions,*
   880 F.3d 183 (5th Cir. 2018) ........................................................................................*passim*

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) .........................................................................................................6

*Mather v. Central Pac. Bank,*
   2014 WL 5580963 (D. Haw. 2014) ....................................................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) .............................................................................................................9

*Milwaukee Police Ass'n v. Jones,*
   192 F.3d 742 (7th Cir. 1999) ..............................................................................................10

*Miss. State Democratic Party v. Barbour,*
   529 F.3d 538 (5th Cir. 2008) ..............................................................................................14

*N.Y. State Club Ass'n v. City of New York,*
   487 U.S. 1 (1988) ................................................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
   700 F.3d 185 (5th Cir. 2012) .................................................................................15, 16, 17

*Near v. Minnesota ex rel. Olson,*
   283 U.S. 697 (1931) .....................................................................................................11, 12

*New York Times Co. v. United States,*
   403 U.S. 713 (1971) ...........................................................................................................11

*Oller v. Roussel,*
   609 F. App'x 770 (5th Cir. 2015) ......................................................................................12

*Petro-Chem Processing v. EPA,*
   866 F.2d 433 (D.C. Cir. 1989) ...........................................................................................16

*Prometheus Radio Project v. FCC,*
   373 F.3d 372 (3d Cir. 2004) ...........................................................................................8, 18

iv

*Pub. Citizen, Inc. v. Bomer*,
274 F.3d 212 (5th Cir. 2001) ........................................................................................... 14, 15

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015) ..................................................................................................... 5, 6

*S. Utah Wild. Alliance v. Palma*,
2011 WL 2565198 (D. Utah 2011) ...................................................................................15

*Sec'y of State of Md. v. Munson*,
467 U.S. 947 (1984) ...........................................................................................................9

*Second Amendment Arms v. City of Chicago*,
135 F. Supp. 3d 743 (N.D. Ill. 2015) ..............................................................................14

*Shelby Cty. v. Holder*,
133 S. Ct. 2612 (2013) ......................................................................................................17

*Se. Promotions v. Conrad*,
420 U.S. 546 (1975) ..........................................................................................................12

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ......................................................................................................14

*Stagg P.C. v. U.S. Dep't of State*,
158 F. Supp. 3d 203 (S.D.N.Y. 2016),
*aff'd*, 673 F. App'x 93 (2d Cir. 2016),
*cert. denied*, 138 S. Ct. 721 (2018) ............................................................................... 6, 9

*Teixeira v. County of Alameda*,
873 F.3d 670 (9th Cir. 2017) ................................................................................13, 14, 17

*Texas v. Johnson*,
491 U.S. 397 (1989) ...........................................................................................................2

*U.nited States v. Hicks*,
980 F.2d 963 (5th Cir. 1992) ............................................................................................8, 9

*United States v. Hsu*,
364 F.3d 192 (4th Cir. 2004) ...........................................................................................20

*United States v. Chi Mak*,
683 F.3d 1126 (9th Cir. 2012) ...................................................................................*passim*

*United States v. Edler Indus., Inc.*,
579 F.2d 516 (9th Cir. 1978) ........................................................................................ 6, 11

WASHAR0002676

*United States v. Martinez,*
  904 F.2d 601 (11th Cir. 1990)..............................................................................................................7

*United States v. Posey,*
  864 F.2d 1487 (9th Cir. 1989)..............................................................................................................6

*United States v. Williams,*
  553 U.S. 285 (2008)...........................................................................................................................20

*United States v. Zhen Zhou Wu,*
  711 F.3d 1 (1st Cir. 2013),
  *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013) .............................................. 2, 20

*Universal City Studios, Inc. v. Corley,*
  273 F.3d 429 (2d Cir. 2001) ................................................................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
  454 U.S. 464 (1982) ...........................................................................................................................16

*Virginia v. Hicks,*
  539 U.S. 113 (2003) .............................................................................................................................9

*Voting for Am., Inc. v. Steen,*
  732 F.3d 382 (5th Cir. 2013)....................................................................................................... 3, 4, 9

*Warth v. Seldin,*
  422 U.S. 490 (1975)..............................................................................................................................8

*Williams-Yulee v. Florida Bar,*
  135 S. Ct. 1656 (2015)..........................................................................................................................8

**STATUTES**

18 U.S.C. § 2339B.................................................................................................................................5

22 U.S.C. § 2778……………….....................................................................................................*passim*

**REGULATIONS**

22 C.F.R. § 120.1 *et seq.*.......................................................................................................................2

22 C.F.R. § 120.4............................................................................................................................ 2, 8

22 C.F.R. § 120.6...................................................................................................................... 2, 7, 20

22 C.F.R. § 120.10............................................................................................................................*passim*

WASHAR0002677

22 C.F.R. § 120.11 ......................................................................................................................... 7, 11

22 C.F.R. § 120.17 ...........................................................................................................................19


**RULES**

Fed. R. Civ. P. 12(b)(6).....................................................................................................................4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014)...........................................................................................8

Constitutionality of the Proposed Revision of the International
    Traffic in Arms Regulations,
        5 Op. O.L.C. 202 (1981)……………………………………………………………………13

WASHAR0002678

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al.,<br>    Plaintiffs, | § § § | |
| v. | § § § | No. 1:15-cv-372-RP |
| U.S. DEPARTMENT OF STATE, et al.,<br>    Defendants. | § § § | |

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7. On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

1

WASHAR0002679

*I*"). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451

(5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138

S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the

Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory

provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control
> the import and the export of defense articles and defense services" and to "promulgate
> regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1).
> The AECA imposes both civil and criminal penalties for violation of its provisions and
> implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e).
> The President has delegated his authority to promulgate implementing regulations to the
> Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"),
> are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its
> employees. 22 C.F.R. 120.1(a).
> The AECA directs that the "defense articles" designated under its terms constitute the
> United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a
> compendium of specific controlled items," rather it is a "series of categories describing the
> kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12
> (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term
> "defense articles" also specifically includes "technical data recorded or stored in any physical
> form, models, mockups or other items that reveal technical data directly relating to items
> designated in" the Munitions List. 22 C.F.R. § 120.6.
> A party unsure about whether a particular item is a "defense article" covered by the
> Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. §
> 120.4 (describing process). The regulations state the DDTC "will provide a preliminary
> response within 10 working days of receipt of a complete request for commodity jurisdiction
> ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant
> may request in writing to the Director, Office of Defense Trade Controls Policy that this
> determination be given expedited processing." *Id.*

*DD I* at 686-87.[1] This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

I.      **Plaintiffs' First Amendment Claims Should Be Dismissed.**

A.      The First Amendment Does Not Apply To The Export Of CAD Files That Function
        To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

2

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

WASHAR0002681

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

---

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

WASHAR0002682

manufacturing firearms and defense articles.[6]

B.  If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

WASHAR0002683

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

6

WASHAR0002684

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g.*, *HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

7

WASHAR0002685

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants'
interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the
commodity jurisdiction request process for determining whether information is subject to its export
controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding
statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as
here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative
term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply
associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively
narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis,
concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion
incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported
distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-
71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not
dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d
372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness
can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla.
Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's
regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C. ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See*
SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may
only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In
circumstances where a regulation is alleged to be so broad that it is incapable of any permissible
application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper,
as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb
'export.'" *DD II*, 838 F.3d at 466-67. But the <u>noun</u> "export" is defined as "[a] product <u>or service</u>
created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th
ed. 2014) (emphasis added).

WASHAR0002686

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

9

WASHAR0002687

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

### D. ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

10

WASHAR0002688

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

WASHAR0002689

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

12

WASHAR0002690

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II.    Plaintiffs' Second Amendment Claims Should Be Dismissed.

A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

13

WASHAR0002691

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

### 1. Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.

To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

14

WASHAR0002692

Case 2:20-cv-00103-RAP Document 1075 Filed 08/22/20 Page 308 of 535

rights have been injured in fact. *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

> 2. SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

Associational standing is available for Second Amendment claims under the same standards as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that "its members would otherwise have standing to sue in their own right,"[11] including by pleading that they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v. Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at 698. But the Court recognized this standard had been met not by the original Complaint, but by supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as to standing and have failed to cure this defect through two amended complaints, the Court should dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac. Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified" as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it seeks to protect are germane to the organization's purpose; and [that] . . . the participation of individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Defendants are not aware of any reason to believe that the Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at issue here or that participation of SAF's members would be required in this action.

WASHAR0002693

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

    B. Plaintiffs' Second Amendment Challenge Fails on the Merits.

    In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

    The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

16

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

17

WASHAR0002695

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

_____

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

WASHAR0002696

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III.  Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

WASHAR0002697

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

WASHAR0002698

Dated: April 6, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ ERIC J. SOSKIN*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

WASHAR0002699

## CERTIFICATE OF SERVICE

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

_/s/ Eric J. Soskin_____
ERIC J. SOSKIN
Senior Trial Counsel

| **From:** | Miller, Michael F <Millermf@state.gov> |
|---|---|
| **Sent:** | Tuesday, July 31, 2018 12:52 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | FW: 18.04.06 DOJ MTD.pdf |
| **Attach:** | 18.04.06 DOJ MTD.pdf |

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:55 AM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L
<HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry,
Steven F <FabrySF@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

FYI-

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>;
Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,

On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice.
Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A
<DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by
the end of April?

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
    Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
    Defendants.

No. 1:15-cv-372-RP

## **DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

WASHAR0002702

## TABLE OF CONTENTS

BACKGROUND ...................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.  Plaintiffs' First Amendment Claims Should Be Dismissed ............................................ 2

    A.  The First Amendment Does Not Apply To The Export Of CAD
        Files That Function To Automatically Create A Firearm Or Its
        Components ............................................................................................................ 2

    B.  If the First Amendment Applies, This Regulation Survives First
        Amendment Scrutiny. .......................................................................................... 5

    C.  ITAR's Export Controls Are Not Unconstitutionally Overbroad ............................... 8

    D.  ITAR's Export Controls Are Not An Unconstitutional Prior Restraint ..................... 10

II.  Plaintiffs' Second Amendment Claims Should Be Dismissed ....................................... 13

    A.  Plaintiffs Lack Standing to Bring a Second Amendment Challenge ........................... 13

        1.  Defense Distributed Has Not Suffered a Harm to Second
            Amendment Interests. .................................................................................. 14

        2.  SAF and Conn Williamson Have Failed to Plead Sufficient
            Allegations of Injury and Any Second Amendment Injury is Not
            Traceable to Defendants' Acts. ..................................................................... 15

    B.  Plaintiffs' Second Amendment Challenge Fails on the Merits ................................... 16

III.  Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ............................. 19

CONCLUSION ...................................................................................................................... 20

WASHAR0002703

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
627 F.3d 547 (5th Cir. 2010) ........................................................................................15

*Bernstein v. U.S. Dep't. of Justice*,
192 F.3d 1308 (9th Cir. 1999) ........................................................................................4

*Bernstein v. U.S. Dep't. of Justice*,
176 F.3d 1132 (9th Cir. 1999) ........................................................................................4

*Bonds v. Tandy*,
457 F.3d 409 (5th Cir. 2006) ........................................................................................14

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ........................................................................................8, 9

*Brockett v. Spokane Arcades*,
472 U.S. 491 (1985) ........................................................................................9

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................................................17

*Brown v. Livingston*,
524 F. Appx. 111 (5th Cir. 2013) ........................................................................................15

*Bullfrog Films v. Wick*,
646 F. Supp. 492 (C.D. Cal. 1986) ........................................................................................4

*Capital Cities/ABC, Inc. v. Brady*,
740 F. Supp. 1007 (S.D.N.Y. 1990) ........................................................................................11

*Catholic Leadership Coal. of Tex. v. Reisman*,
764 F.3d 409 (5th Cir. 2014) ........................................................................................10

*CFTC v. Vartuli*,
228 F.3d 94 (2d Cir. 2000) ........................................................................................3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ........................................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4*,
541 U.S. 774 (2004) ........................................................................................11, 12

WASHAR0002704

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ................................................................................................................. 3

*Def. Distributed v. Dep't of State*,
    121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ............................................................................. passim

*Def. Distributed v. Dep't of State*,
    838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
    rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
    *certiorari* denied, 138 S. Ct. 638 (2018) ........................................................................................... passim

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................................................................................................. 16

*Equal Rights Ctr. v. Post Properties, Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ........................................................................................................ 16

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...................................................................................................... 13, 14

*Fontenot v. McCraw*,
    777 F.3d 741 (5th Cir. 2015) ............................................................................................................ 14

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ............................................................................................................................. 11

*Freedman v. State of Md.*,
    380 U.S. 51 (1965) ............................................................................................................................... 11

*FW/PBS v. City of Dallas*,
    493 U.S. 215 (1990) ............................................................................................................................. 14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ............................................................................................................................. 10

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ......................................................................................................................... 4, 5, 6

*Hotze v. Burwell*,
    784 F.3d 984 (5th Cir. 2015) ............................................................................................................ 14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ............................................................................................................................... 3

*Junger v. Daley*,
    209 F.3d 481 (6th Cir. 2000) .............................................................................................................. 5

WASHAR0002705

*Karn v. U.S. Dept. of State,*
  925 F.Supp. 1 (D.D.C. 1996) ................................................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
  604 F. Supp. 280 (D.D.C. 1984)............................................................................................4

*Lewis v. Casey,*
  518 U.S. 343 (1996) .............................................................................................................14

*Mance v. Sessions,*
  880 F.3d 183 (5th Cir. 2018) .........................................................................................*passim*

*Matal v. Tam,*
  137 S. Ct. 1744 (2017)...........................................................................................................6

*Mather v. Central Pac. Bank,*
  2014 WL 5580963 (D. Haw. 2014) ......................................................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
  466 U.S. 789 (1984)...............................................................................................................9

*Milwaukee Police Ass'n v. Jones,*
  192 F.3d 742 (7th Cir. 1999).................................................................................................10

*Miss. State Democratic Party v. Barbour,*
  529 F.3d 538 (5th Cir. 2008).................................................................................................14

*N.Y. State Club Ass'n v. City of New York,*
  487 U.S. 1 (1988) ...................................................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
  700 F.3d 185 (5th Cir. 2012) ...................................................................................15, 16, 17

*Near v. Minnesota ex rel. Olson,*
  283 U.S. 697 (1931)........................................................................................................11, 12

*New York Times Co. v. United States,*
  403 U.S. 713 (1971)..............................................................................................................11

*Oller v. Roussel,*
  609 F. App'x 770 (5th Cir. 2015) ..........................................................................................12

*Petro-Chem Processing v. EPA,*
  866 F.2d 433 (D.C. Cir. 1989) ..............................................................................................16

*Prometheus Radio Project v. FCC,*
  373 F.3d 372 (3d Cir. 2004) ..............................................................................................8, 18

iv

*Pub. Citizen, Inc. v. Bomer,*
274 F.3d 212 (5th Cir. 2001) ................................................................................................... 14, 15

*Reed v. Town of Gilbert,*
135 S. Ct. 2218 (2015) ................................................................................................................. 5, 6

*S. Utah Wild. Alliance v. Palma,*
2011 WL 2565198 (D. Utah 2011) ............................................................................................. 15

*Sec'y of State of Md. v. Munson,*
467 U.S. 947 (1984) ........................................................................................................................ 9

*Second Amendment Arms v. City of Chicago,*
135 F. Supp. 3d 743 (N.D. Ill. 2015) ........................................................................................ 14

*Shelby Cty. v. Holder,*
133 S. Ct. 2612 (2013) .................................................................................................................. 17

*Se. Promotions v. Conrad,*
420 U.S. 546 (1975) ...................................................................................................................... 12

*Spokeo, Inc. v. Robins,*
136 S. Ct. 1540 (2016) .................................................................................................................. 14

*Stagg P.C. v. U.S. Dep't of State,*
158 F. Supp. 3d 203 (S.D.N.Y. 2016),
*aff'd,* 673 F. App'x 93 (2d Cir. 2016),
*cert. denied,* 138 S. Ct. 721 (2018) ............................................................................................. 6, 9

*Teixeira v. County of Alameda,*
873 F.3d 670 (9th Cir. 2017) ........................................................................................... 13, 14, 17

*Texas v. Johnson,*
491 U.S. 397 (1989) ........................................................................................................................ 2

*U.nited States v. Hicks,*
980 F.2d 963 (5th Cir. 1992) ..................................................................................................... 8, 9

*United States v. Hsu,*
364 F.3d 192 (4th Cir. 2004) ...................................................................................................... 20

*United States v. Chi Mak,*
683 F.3d 1126 (9th Cir. 2012) ............................................................................................. *passim*

*United States v. Edler Indus., Inc.,*
579 F.2d 516 (9th Cir. 1978) .................................................................................................. 6, 11

WASHAR0002707

*United States v. Martinez,*
904 F.2d 601 (11th Cir. 1990)............................................................................................................7

*United States v. Posey,*
864 F.2d 1487 (9th Cir. 1989)...........................................................................................................6

*United States v. Williams,*
553 U.S. 285 (2008)..........................................................................................................................20

*United States v. Zhen Zhou Wu,*
711 F.3d 1 (1st Cir. 2013),
*cert. denied sub nom., Yufeng Wei v. United States,* 134 S. Ct. 365 (2013) ................................ 2, 20

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001) .............................................................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
454 U.S. 464 (1982) .........................................................................................................................16

*Virginia v. Hicks,*
539 U.S. 113 (2003)...........................................................................................................................9

*Voting for Am., Inc. v. Steen,*
732 F.3d 382 (5th Cir. 2013) ...................................................................................................... 3, 4, 9

*Warth v. Seldin,*
422 U.S. 490 (1975)...........................................................................................................................8

*Williams-Yulee v. Florida Bar,*
135 S. Ct. 1656 (2015).......................................................................................................................8

**STATUTES**

18 U.S.C. § 2339B.............................................................................................................................5

22 U.S.C. § 2778……………….......................................................................................................*passim*

**REGULATIONS**

22 C.F.R. § 120.1 *et seq.*..................................................................................................................2

22 C.F.R. § 120.4.......................................................................................................................... 2, 8

22 C.F.R. § 120.6..................................................................................................................... 2, 7, 20

22 C.F.R. § 120.10...........................................................................................................................*passim*

WASHAR0002708

22 C.F.R. § 120.11 ................................................................................................................. 7, 11

22 C.F.R. § 120.17 ..................................................................................................................... 19

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014) ....................................................................................... 8

Constitutionality of the Proposed Revision of the International
   Traffic in Arms Regulations,
      5 Op. O.L.C. 202 (1981) ...................................................................... 13

WASHAR0002709

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
     Plaintiffs,

v.                              No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
     Defendants.

---

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7. On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

1

WASHAR0002710

*I*"). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451

(5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138

S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the

Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory

provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its employees. 22 C.F.R. 120.1(a).
>
> The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6.
>
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

*DD I* at 686-87.[1] This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

**I. Plaintiffs' First Amendment Claims Should Be Dismissed.**

A. The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

WASHAR0002711

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

WASHAR0002712

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

---

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

WASHAR0002713

manufacturing firearms and defense articles.[6]

   B.   If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.

   "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

   The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

   In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

WASHAR0002714

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

6

WASHAR0002715

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g.*, *HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

<div align="center">7</div>

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants' interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis, concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C. ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See* SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of any permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper, as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb 'export.'" *DD II*, 838 F.3d at 466-67. But the noun "export" is defined as "[a] product or service created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

WASHAR0002717

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

9

WASHAR0002718

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

> D. ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

10

WASHAR0002719

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

11

WASHAR0002720

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

WASHAR0002721

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II. Plaintiffs' Second Amendment Claims Should Be Dismissed.

A. Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

WASHAR0002722

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

    1.  <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

      To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

      Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

WASHAR0002723

rights have been injured in fact. *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

    2.  SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any
        <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

        Associational standing is available for Second Amendment claims under the same standards

as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,

700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that

"its members would otherwise have standing to sue in their own right,"[11] including by pleading that

they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

        Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their

alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such

files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion

that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would

keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the

usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v.

Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that

Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at

698. But the Court recognized this standard had been met not by the original Complaint, but by

supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory

allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF

No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as

to standing and have failed to cure this defect through two amended complaints, the Court should

dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac.

Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified"

as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

        Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it
seeks to protect are germane to the organization's purpose; and [that] . . . the participation of
individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med.
Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Defendants are not aware of any reason to believe that the
Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at
issue here or that participation of SAF's members would be required in this action.

WASHAR0002724

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

      B.  <u>Plaintiffs' Second Amendment Challenge Fails on the Merits.</u>

      In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

      The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

16

WASHAR0002725

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

WASHAR0002726

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

18

WASHAR0002727

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III. Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

WASHAR0002728

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

WASHAR0002729

Dated: April 6, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ ERIC J. SOSKIN*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

21

WASHAR0002730

**CERTIFICATE OF SERVICE**

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

_/s/ Eric J. Soskin_____
ERIC J. SOSKIN
Senior Trial Counsel

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Tuesday, July 31, 2018 12:54 PM |
| **To:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | FW: 18.04.06 DOJ MTD.pdf |
| **Attach:** | 18.04.06 DOJ MTD.pdf |

<div style="background-color:black; height:80px;"></div>

**Official**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Tuesday, July 31, 2018 12:52 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf


**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:55 AM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L
<HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry,
Steven F <FabrySF@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

FYI-

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>;
Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,

On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice.
Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM

WASHAR0002732

**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by the end of April?

WASHAR0002733

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
    Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
    Defendants.

§
§
§
§
§
§
§
§
§

No. 1:15-cv-372-RP

## **DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

BACKGROUND ....................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.    Plaintiffs' First Amendment Claims Should Be Dismissed............................................ 2

    A.    The First Amendment Does Not Apply To The Export Of CAD
    Files That Function To Automatically Create A Firearm Or Its
    Components ........................................................................................................... 2

    B.    If the First Amendment Applies, This Regulation Survives First
    Amendment Scrutiny. ........................................................................................... 5

    C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad................................ 8

    D.    ITAR's Export Controls Are Not An Unconstitutional Prior Restraint..................... 10

II.   Plaintiffs' Second Amendment Claims Should Be Dismissed....................................... 13

    A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge............................ 13

        1.    Defense Distributed Has Not Suffered a Harm to Second
        Amendment Interests............................................................................. 14

        2.    SAF and Conn Williamson Have Failed to Plead Sufficient
        Allegations of Injury and Any Second Amendment Injury is Not
        Traceable to Defendants' Acts.............................................................. 15

    B.    Plaintiffs' Second Amendment Challenge Fails on the Merits..................................... 16

III.  Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ............................. 19

CONCLUSION........................................................................................................................ 20

WASHAR0002735

# TABLE OF AUTHORITIES

**CASES**

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
    627 F.3d 547 (5th Cir. 2010) ...................................................................................................15

*Bernstein v. U.S. Dep't. of Justice,*
    192 F.3d 1308 (9th Cir. 1999) ...................................................................................................4

*Bernstein v. U.S. Dep't. of Justice,*
    176 F.3d 1132 (9th Cir. 1999) ...................................................................................................4

*Bonds v. Tandy,*
    457 F.3d 409 (5th Cir. 2006) ...................................................................................................14

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ...............................................................................................................8, 9

*Brockett v. Spokane Arcades,*
    472 U.S. 491 (1985) ...................................................................................................................9

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011) .................................................................................................................17

*Brown v. Livingston,*
    524 F. Appx. 111 (5th Cir. 2013) ...........................................................................................15

*Bullfrog Films v. Wick,*
    646 F. Supp. 492 (C.D. Cal. 1986) ...........................................................................................4

*Capital Cities/ABC, Inc. v. Brady,*
    740 F. Supp. 1007 (S.D.N.Y. 1990) ........................................................................................11

*Catholic Leadership Coal. of Tex. v. Reisman,*
    764 F.3d 409 (5th Cir. 2014) ...................................................................................................10

*CFTC v. Vartuli,*
    228 F.3d 94 (2d Cir. 2000) ...................................................................................................3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) .....................................................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4,*
    541 U.S. 774 (2004) .............................................................................................................11, 12

WASHAR0002736

*Collins v. Morgan Stanley Dean Witter,*
   224 F.3d 496 (5th Cir. 2000) ...................................................................................................... 3

*Def. Distributed v. Dep't of State,*
   121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ..............................................................*passim*

*Def. Distributed v. Dep't of State,*
   838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
   rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
   *certiorari* denied, 138 S. Ct. 638 (2018) ........................................................................*passim*

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................................................................ 16

*Equal Rights Ctr. v. Post Properties, Inc.,*
   633 F.3d 1136 (D.C. Cir. 2011) ............................................................................................ 16

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ........................................................................................... 13, 14

*Fontenot v. McCraw,*
   777 F.3d 741 (5th Cir. 2015) .................................................................................................. 14

*Forsyth Cnty. v. Nationalist Movement,*
   505 U.S. 123 (1992) ................................................................................................................ 11

*Freedman v. State of Md.,*
   380 U.S. 51 (1965) .................................................................................................................. 11

*FW/PBS v. City of Dallas,*
   493 U.S. 215 (1990) ................................................................................................................ 14

*Hazelwood Sch. Dist. v. Kuhlmeier,*
   484 U.S. 260 (1988) ................................................................................................................ 10

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ............................................................................................................. 4, 5, 6

*Hotze v. Burwell,*
   784 F.3d 984 (5th Cir. 2015) .................................................................................................. 14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
   515 U.S. 557 (1995) .................................................................................................................. 3

*Junger v. Daley,*
   209 F.3d 481 (6th Cir. 2000) .................................................................................................... 5

WASHAR0002737

*Karn v. U.S. Dept. of State,*
   925 F.Supp. 1 (D.D.C. 1996) ........................................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
   604 F. Supp. 280 (D.D.C. 1984) ..................................................................................4

*Lewis v. Casey,*
   518 U.S. 343 (1996) ....................................................................................................14

*Mance v. Sessions,*
   880 F.3d 183 (5th Cir. 2018) ...............................................................................*passim*

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) ..................................................................................................6

*Mather v. Central Pac. Bank,*
   2014 WL 5580963 (D. Haw. 2014) ............................................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ......................................................................................................9

*Milwaukee Police Ass'n v. Jones,*
   192 F.3d 742 (7th Cir. 1999) .......................................................................................10

*Miss. State Democratic Party v. Barbour,*
   529 F.3d 538 (5th Cir. 2008) .......................................................................................14

*N.Y. State Club Ass'n v. City of New York,*
   487 U.S. 1 (1988) ..........................................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
   700 F.3d 185 (5th Cir. 2012) ...........................................................................15, 16, 17

*Near v. Minnesota ex rel. Olson,*
   283 U.S. 697 (1931) ...............................................................................................11, 12

*New York Times Co. v. United States,*
   403 U.S. 713 (1971) ....................................................................................................11

*Oller v. Roussel,*
   609 F. App'x 770 (5th Cir. 2015) ................................................................................12

*Petro-Chem Processing v. EPA,*
   866 F.2d 433 (D.C. Cir. 1989) ....................................................................................16

*Prometheus Radio Project v. FCC,*
   373 F.3d 372 (3d Cir. 2004) .....................................................................................8, 18

iv

*Pub. Citizen, Inc. v. Bomer,*
274 F.3d 212 (5th Cir. 2001) ........................................................................................... 14, 15

*Reed v. Town of Gilbert,*
135 S. Ct. 2218 (2015) ......................................................................................................... 5, 6

*S. Utah Wild. Alliance v. Palma,*
2011 WL 2565198 (D. Utah 2011) ........................................................................................15

*Sec'y of State of Md. v. Munson,*
467 U.S. 947 (1984) ..................................................................................................................9

*Second Amendment Arms v. City of Chicago,*
135 F. Supp. 3d 743 (N.D. Ill. 2015) ....................................................................................14

*Shelby Cty. v. Holder,*
133 S. Ct. 2612 (2013) ............................................................................................................17

*Se. Promotions v. Conrad,*
420 U.S. 546 (1975) ................................................................................................................12

*Spokeo, Inc. v. Robins,*
136 S. Ct. 1540 (2016) ............................................................................................................14

*Stagg P.C. v. U.S. Dep't of State,*
158 F. Supp. 3d 203 (S.D.N.Y. 2016),
*aff'd,* 673 F. App'x 93 (2d Cir. 2016),
*cert. denied,* 138 S. Ct. 721 (2018) ...................................................................................... 6, 9

*Teixeira v. County of Alameda,*
873 F.3d 670 (9th Cir. 2017) ................................................................................... 13, 14, 17

*Texas v. Johnson,*
491 U.S. 397 (1989) ..................................................................................................................2

*U.nited States v. Hicks,*
980 F.2d 963 (5th Cir. 1992) ................................................................................................ 8, 9

*United States v. Hsu,*
364 F.3d 192 (4th Cir. 2004) .................................................................................................20

*United States v. Chi Mak,*
683 F.3d 1126 (9th Cir. 2012) ......................................................................................*passim*

*United States v. Edler Indus., Inc.,*
579 F.2d 516 (9th Cir. 1978) .............................................................................................. 6, 11

v

WASHAR0002739

*United States v. Martinez,*
   904 F.2d 601 (11th Cir. 1990)..............................................................................................................7

*United States v. Posey,*
   864 F.2d 1487 (9th Cir. 1989)..............................................................................................................6

*United States v. Williams,*
   553 U.S. 285 (2008)..............................................................................................................................20

*United States v. Zhen Zhou Wu,*
   711 F.3d 1 (1st Cir. 2013),
   *cert. denied sub nom., Yufeng Wei v. United States,* 134 S. Ct. 365 (2013)................................. 2, 20

*Universal City Studios, Inc. v. Corley,*
   273 F.3d 429 (2d Cir. 2001) ..................................................................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
   454 U.S. 464 (1982) ............................................................................................................................16

*Virginia v. Hicks,*
   539 U.S. 113 (2003)..............................................................................................................................9

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013)....................................................................................................... 3, 4, 9

*Warth v. Seldin,*
   422 U.S. 490 (1975)..............................................................................................................................8

*Williams-Yulee v. Florida Bar,*
   135 S. Ct. 1656 (2015)..........................................................................................................................8

## STATUTES

18 U.S.C. § 2339B.................................................................................................................................5

22 U.S.C. § 2778……………….........................................................................................................*passim*

## REGULATIONS

22 C.F.R. § 120.1 *et seq.*....................................................................................................................2

22 C.F.R. § 120.4......................................................................................................................... 2, 8

22 C.F.R. § 120.6...................................................................................................................... 2, 7, 20

22 C.F.R. § 120.10...........................................................................................................................*passim*

vi

22 C.F.R. § 120.11.........................................................................................................................7, 11

22 C.F.R. § 120.17............................................................................................................................19

**RULES**

Fed. R. Civ. P. 12(b)(6)......................................................................................................................4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014)..........................................................................................8

Constitutionality of the Proposed Revision of the International
  Traffic in Arms Regulations,
     5 Op. O.L.C. 202 (1981)……………………………………………………………13

WASHAR0002741

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
     Plaintiffs,

v.                                No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
     Defendants.

---

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7.  On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

1

WASHAR0002742

*I*"). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451

(5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138

S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the

Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory

provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its employees. 22 C.F.R. 120.1(a).
>
> The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6.
>
> A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

*DD I* at 686-87.[1] This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

**I.    Plaintiffs' First Amendment Claims Should Be Dismissed.**

  A.  The First Amendment Does Not Apply To The Export Of CAD Files That Function
      To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

WASHAR0002743

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.

[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

3

WASHAR0002744

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

___

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

4

manufacturing firearms and defense articles.[6]

B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

WASHAR0002746

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

6

WASHAR0002747

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g., HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

7

WASHAR0002748

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants' interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis, concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C. ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See* SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of any permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper, as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb 'export.'" *DD II*, 838 F.3d at 466-67. But the <u>noun</u> "export" is defined as "[a] product <u>or service</u> created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

WASHAR0002749

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

9

WASHAR0002750

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

### D.  ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

WASHAR0002751

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

11

WASHAR0002752

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

WASHAR0002753

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II.     **Plaintiffs' Second Amendment Claims Should Be Dismissed.**

A.     <u>Plaintiffs Lack Standing to Bring a Second Amendment Challenge</u>.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

WASHAR0002754

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

    1.  <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

WASHAR0002755

rights have been injured in fact. *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

    2.    SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any
             <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

Associational standing is available for Second Amendment claims under the same standards

as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,

700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that

"its members would otherwise have standing to sue in their own right,"[11] including by pleading that

they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their

alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such

files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion

that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would

keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the

usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v.

Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that

Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at

698. But the Court recognized this standard had been met not by the original Complaint, but by

supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory

allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF

No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as

to standing and have failed to cure this defect through two amended complaints, the Court should

dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac.

Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified"

as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it
seeks to protect are germane to the organization's purpose; and [that] . . . the participation of
individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med.
Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). Defendants are not aware of any reason to believe that the
Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at
issue here or that participation of SAF's members would be required in this action.

WASHAR0002756

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

B. Plaintiffs' Second Amendment Challenge Fails on the Merits.

In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

16

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

17

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra.* Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

WASHAR0002759

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III.  Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

WASHAR0002760

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

WASHAR0002761

Dated: April 6, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

/s/ ERIC J. SOSKIN
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

WASHAR0002762

**CERTIFICATE OF SERVICE**

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

  */s/ Eric J. Soskin*
ERIC J. SOSKIN
Senior Trial Counsel

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Friday, July 27, 2018 10:46 AM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | FW: A letter from the House Gun Violence Prevention Task Force |
| **Attach:** | 2018-07-26_GVPTF_Defense Distributed letter.pdf |

███████████████████

**Official**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Friday, July 27, 2018 10:36 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: A letter from the House Gun Violence Prevention Task Force

██████████████

**From:** Ornstein, Nick <Nick.Ornstein@mail.house.gov>
**Sent:** Thursday, July 26, 2018 6:25 PM
**To:** House Liaison <House@state.gov>
**Cc:** Rhinehart, Melanie <Melanie.Rhinehart@mail.house.gov>; Goedke, Jennifer <Jennifer.Goedke@mail.house.gov>; Macfarlane, Alex <Alex.Macfarlane@mail.house.gov>
**Subject:** A letter from the House Gun Violence Prevention Task Force

Please deliver the attached letter from the leaders of the House Gun Violence Prevention Task Force to Secretary of State Mike Pompeo.

Thank you.

──────

**Nick Ornstein**
Legislative Correspondent
Congressman Mike Thompson (CA-05)
231 Cannon House Office Building
Washington, DC 20515
(202) 225-3311
nick.ornstein@mail.house.gov

# Congress of the United States
## Washington, DC 20515

July 26, 2018

Secretary Mike Pompeo
Department of State
2201 C Street NW
Washington, DC 20230

Dear Mr. Secretary:

As leaders of the House Gun Violence Prevention Task Force, we urge you to suspend plans to grant Defense Distributed a special license to publish gun blueprints online and to maintain the existing ban on publication of any such gun schematics. The State Department's recent about-face on allowing publication of this dangerous data is both shocking and outside of its lawful authority.

Widespread publication of 3-D-printed gun blueprints would be extremely dangerous because individuals prohibited by law from having guns could easily arm themselves. Convicted felons would be able to skip the dealer licensing system, bypass a criminal background check, and print a gun at home using commercially available technology. Firearm traffickers would be able to print unserialized guns, which are untraceable by law enforcement. And terrorists would be able to make guns entirely out of plastic and sneak them through metal detectors.

Given the clear public safety threat the publication of these blueprints pose, granting this special license makes no sense. As we understand, until recently, the State Department barred publication of 3-D-printed gun blueprints because it violates the Arms Control Export Act of 1974. Please explain why the State Department's understanding of the Arms Control Export Act has changed.

The State Department must return to its well-reasoned position on stopping the publication of 3-D-printed gun blueprints. We look forward to your swift and detailed response.

Sincerely,

MIKE THOMPSON
Member of Congress

DAVID N. CICILLINE
Member of Congress

PRINTED ON RECYCLED PAPER

WASHAR0002765

**Congress of the United States**
**Washington, DC 20515**

VAL DEMINGS
Member of Congress

ELIZABETH ESTY
Member of Congress

SHEILA JACKSON LEE
Member of Congress

ROBIN KELLY
Member of Congress

GRACE NAPOLITANO
Member of Congress

RICHARD NOLAN
Member of Congress

ED PERLMUTTER
Member of Congress

DAVID PRICE
Member of Congress

KATHLEEN RICE
Member of Congress

BOBBY SCOTT
Member of Congress

JOSE SERRANO
Member of Congress

JACKIE SPEIER
Member of Congress

PRINTED ON RECYCLED PAPER

WASHAR0002766

| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| Sent: | Wednesday, July 11, 2018 12:56 PM |
| To: | svcSMARTCrossLow_SMG <svcSMARTCrossLowAA@smg.state.gov> |
| Subject: | FW: Any WAR items? |

**(SBU) Public Affairs Update:** CPA is coordinating a July 16 media preview teleconference by PDAS Kaidanow from the Farnborough International Air Show, which will provide an opportunity to showcase PM's focus on defense trade advocacy. On social media this week, CPA is featuring WRA blog posts on Iraq stabilization, pegged to the anniversary of the liberation of Mosul. We continue to monitor media interest in Turkey's defense trade plans, are preparing responses to DDTC's release of BAE from its Consent Agreement and legal settlement with Defense Distributed, and continues to coordinate with NSC and the interagency on roll-out planning for the CAT Policy 60-Day Implementation plan roll-out. (PM/CPA-McKeeby)

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Babington, Thomas M <BabingtonTM@state.gov> |
| **Sent:** | Thursday, July 26, 2018 12:25 PM |
| **To:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | FW: CBS EVENING NEWS: ON DEADLINE: Defense Distributed & SAF Settlement Inquiry |
| **Attach:** | 0711 CONTINGENCY POINTS--DDTC--DEFENSE DISTRIBUTED.docx |

PM Colleagues,

█████████████████████████████████████████████

Tom Babington
Press Officer

**Official**
**UNCLASSIFIED**

**From:** Flickinger, Ian <FlickingerI@cbsnews.com>
**Sent:** Thursday, July 26, 2018 12:05 PM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** CBS EVENING NEWS: ON DEADLINE: Defense Distributed & SAF Settlement Inquiry

Hello,

I hope all is well. I work in the research department at the CBS Evening News. Would someone be able to provide some guidance regarding the State Department's settlement with Defense Distributed, SAF and Conn Williamson?

Can you provide a statement explaining the State Department's decision to settle: what factors were weighed and what type of analysis was conducted in making the decision?

This would be for tonight's broadcast, our deadline is 3:30PM. Thanks so much in advance for your help with this. I can be reached at this email or by phone at 212-975-7178 if you have any questions.

Best,

Ian Flickinger
Research Department | CBS Evening News

PM Contingency Press Guidance
July 13, 2018

### Defense Trade: Defense Distributed 3D Printed Firearms Settlement

*BACKGROUND: The Department of Justice recently accepted an offer from Cody Wilson to settle a 2013 lawsuit against the Department's Directorate of Defense Trade Controls (DDTC). Wilson sued the Department in response to DDTC's blocking of Wilson's company, Defense Distributed, from posting online computer code, which could be loaded into a 3D printer, creates a functioning single-shot handgun. Meanwhile, under a parallel effort since 2010 to modernize export controls on defense products, the Department will no longer regulate the technology involved when new regulations are finalized later this year.*

*We settled at the plaintiff's request because new regulations will make the issues of the case irrelevant. Below are DOJ approved lines for discussing the settlement.*

- The United States strictly regulates the export of defense articles, including related manufacturing technologies and information, as an integral part of safeguarding U.S. national security and furthering U.S. foreign policy objectives in accordance with the Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR).

- This was a voluntary settlement entered into following negotiations between the Department of State and the plaintiffs. The court did not rule in favor of the plaintiffs in this case.  In other contexts, courts have upheld ITAR controls on technical data.

**Additional Points**

- The settlement in this case comes as the U.S. Government is reviewing comments on new proposed regulations to transfer oversight from the U.S. Department of State to the U.S. Department of Commerce of exports of firearms and related items that do not provide the United States with a critical military or intelligence advantage or, in the case of weapons, are not inherently for military end use, including many items that are widely available in retail outlets in the United States and abroad.

- These proposed regulations are part of an ongoing effort to create a simpler, more robust export control system that eases industry compliance, enhances enforceability, and better protects truly sensitive technologies.

- In addition to reducing regulatory burden on U.S. industry, these proposed regulations would eliminate the ITAR requirements at issue in this case, including the ITAR requirement to obtain U.S. Government authorization to post to the Internet technical data related to certain firearms and related items that are commercially available, such as those at issue in this case.

WASHAR0002769

- In the course of formulating these proposed regulations, the U.S. Government conducted a national security analysis in the context of the rulemaking effort. Based on this analysis, it was determined that certain firearms and related items that are widely available for commercial sale, and technical data related to those items, is of a type that does not offer a critical military or intelligence advantage to the United States, per section 120.3 of the ITAR, and therefore warrants export licensing requirements under the U.S. Department of Commerce's jurisdiction.

WASHAR0002770

Cleared:

| | | |
|---|---|---|
| PM/CPA: | JPaul | (ok) |
| DDTC: | SHeidema | (ok) |
| L/PM: | ACavnar | (ok) |
| DOJ: | SRobinson | (ok) |

WASHAR0002771

| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|-------|---|
| Sent: | Wednesday, July 25, 2018 12:06 PM |
| To: | Darrach, Tamara A <DarrachTA@state.gov> |
| Subject: | FW: CPA Media Monitoring: Senate Foreign Relations Committee: MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS |

FYSA-

**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Wednesday, July 25, 2018 12:06 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Morimoto, Sho J <MorimotoSJ@state.gov>
**Subject:** CPA Media Monitoring: Senate Foreign Relations Committee: MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS



**MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS**
**By Senator Bob Menendez**
**25 July 2018**

WASHINGTON – U.S. Senator Bob Menendez, Ranking Member of the Senate Foreign Relations Committee, today called on U.S. Secretary of State Mike Pompeo to immediately intervene and review the surprising and sudden decision by his department to allow online public posting of 3-D printable gun blueprints in the next few days.

"It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States," said Sen. Menendez in a letter to Secretary Pompeo. "Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places."

Late last month, the Department of State suddenly settled a years-long lawsuit brought by gun activist Cody Wilson that began after the federal government blocked his company's website, Defense Distributed, for posting directions for a 3-D plastic printable pistol, citing international export law. According to news reports, as part of the settlement, the State Department will allow the company to begin posting do-it-yourself 3-D printable firearms blueprints by issuing a special exemption by July 27.

The Senator called on Pompeo to immediately review and reconsider the Department's position, asserting it runs afoul of federal law: "Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act."

A copy of the letter is below.

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from theUnited States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Link: https://www.foreign.senate.gov/press/ranking/release/menendez-calls-on-secretary-pompeo-to-stop-online-posting-of-do-it-yourself-3-d-printable-gun-blueprints

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:       *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm/* |Twitter: *@StateDeptPM*

WASHAR0002773

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

WASHAR0002774

| | |
|---|---|
| **From:** | Abisellan, Eduardo <AbisellanE@state.gov> |
| **Sent:** | Thursday, July 26, 2018 2:55 PM |
| **To:** | Hart, Robert L <HartRL@state.gov> |
| **Cc:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov> |
| **Subject:** | FW: FLASH CLEARANCE: Action Memo to T regarding Defense Distributed Settlement Items |

Rob,

Approved/clear for T.

Vr/Ed

**Official - SBU**
**UNCLASSIFIED**

**From:** Thompson, Andrea L
**Sent:** Thursday, July 26, 2018 2:53 PM
**To:** Abisellan, Eduardo <AbisellanE@state.gov>
**Cc:** Tucker, Maureen E <TuckerME@state.gov>; Brechwald, Matthew J (T) <BrechwaldMJ2@state.gov>
**Subject:** RE: FLASH CLEARANCE: Action Memo to T regarding Defense Distributed Settlement Items

Approved.

Thanks Ed.

**Official - SBU**
**UNCLASSIFIED**

**From:** Abisellan, Eduardo
**Sent:** Thursday, July 26, 2018 12:59 PM
**To:** Thompson, Andrea L <ThompsonAL@state.gov>
**Cc:** Tucker, Maureen E <TuckerME@state.gov>; Brechwald, Matthew J (T) <BrechwaldMJ2@state.gov>
**Subject:** FW: FLASH CLEARANCE: Action Memo to T regarding Defense Distributed Settlement Items
**Importance:** High

Ma'am,

This is the memo Ambassador Kaidanow briefed you on this morning on actions required to be completed as part of the Defense Distributed (3d Printing of Guns) settlement agreement. These three actions are required to be completed by COB 27 July. ███████████████████████████████████
███████████

Vr/Ed

====================================================================================================

SENSITIVE BUT UNCLASSIFIED                                                 July 26, 2018

**ACTION MEMO FOR UNDER SECRETARY THOMPSON (T)**

FROM:     PM – Tina Kaidanow, Acting Assistant Secretary

SUBJECT:  (U) Concluding the Department's Settlement with Defense Distributed

BLUF:     (SBU) The below actions are required to comply with the referenced settlement agreement, to conclude Defense Distributed's litigation against the Department.

**Recommendations**
(U) That in order for the State Department to comply with its obligations in its settlement agreement with Defense Distributed you:

  (1) Approve a temporary modification pursuant to International Traffic in Arms Regulations §126.2 to exclude specified Defense Distributed litigation-related technical data from U.S. Munitions List (USML) Category I.  (Approve/Disapprove by July 26, 2018)

  (2) Approve the posting of the attached DDTC website notice to announce the above-referenced temporary modification to USML Category I.  (Approve/Disapprove by July 26, 2018)

  (3) Direct Acting Deputy Assistant Secretary for Defense Trade Controls, Mike Miller, to sign the attached letter informing Defense Distributed that, pursuant to ITAR § 125.4(b)(13), the State Department is a cognizant U.S. government agency with authority to approve technical data for public release and that it hereby grants approval for the enumerated technical data in the letter to be released into the public domain.  (Approve/Disapprove by July 26, 2018)

**Background**
(SBU) Defense Distributed (DD) is an Austin, Texas-based nonprofit corporation that makes available via the Internet computer-aided design (CAD) files for the three-dimensional printing of items, primarily firearms and firearm components. In May 2013, PM's Directorate of Defense Trade Controls (DDTC) sent a letter to DD stating that certain files it had posted on the Internet appeared to be defense articles controlled pursuant to the International Traffic in Arms Regulations (ITAR), and requested that DD remove the files from the Internet and submit a commodity jurisdiction (CJ) request to DDTC for the files in question. DD complied with the letter and DDTC concluded in the CJ that some, but not all, of the files were subject to the ITAR because they conveyed information required to produce defense articles described in Category I of the ITAR's U.S. Munitions List (USML).

(SBU) Beginning in September 2014, DD submitted several requests to the DoD's Defense Office of Prepublication and Security Review (DOPSR) to request a review and approval for public release of the ITAR-controlled files pursuant to ITAR § 125.4(b)(13). DOPSR would not determine the question regarding release of the CAD files, and referred DD to DDTC regarding the request for approval for public release. DD contacted DDTC in January 2015 per this matter. However, before DDTC responded, DD sued the State Department and various departmental officials in May 2015, alleging that the Department's actions had violated its First, Second, and Fifth Amendment rights, among other allegations. DD's primary claim was that the Department had subjected its free speech rights to an unconstitutional prior restraint by preventing it from posting files on the Internet. DD sought a preliminary injunction against enforcement of the ITAR regarding the files it had submitted to DDTC for review. In August 2015, the District Court for the Western District of Texas denied DD's preliminary injunction request, and in September 2016 the Court of Appeals for the Fifth Circuit affirmed the denial. In January 2018, the Supreme Court declined review, and the case was remanded to the District Court for proceedings on the merits.

WASHAR0002775

(U) On June 29, 2018 the parties reached a settlement agreement that placed three substantive obligations on the Department:

1. To pursue publication in the Federal Register of a final rule revising USML Category I that excludes specified technical data at issue in the DD litigation;
2. To issue via a DDTC website announcement a temporary modification to USML Category I that excludes enumerated technical data at issue in the litigation pursuant to ITAR § 126.2; and
3. To issue a letter to DD that, consistent with ITAR § 125.4(b)(13), advises that the State Department is a cognizant U.S. government agency with authority to approve technical data for public release and grants approval for the technical data enumerated in the letter to be released into the public domain.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, July 26, 2018 10:47 AM
**To:** Miller, Michael F <Millermf@state.gov>; Shin, Jae E <ShinJE@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Shufflebarger, Jamie <ShufflebargerJ@state.gov>; Ravi, Sunil K <RaviSK@state.gov>; Urena, Michael A <UrenaMA@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Tucker, Maureen E <TuckerME@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** FLASH CLEARANCE: Action Memo to T regarding Defense Distributed Settlement Items
**Importance:** High

All,

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

Thanks,

Rob Hart
Chief (Acting), Regulatory and Multilateral Affairs Division
Department of State | Directorate of Defense Trade Controls
202.736.9221 | hartrl@state.gov

**Official - SBU**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Thursday, July 26, 2018 3:49 PM |
| **To:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | FW: guns |

Does PA even talk to itself?

**Official**
**UNCLASSIFIED**

**From:** Greenan, Robert J
**Sent:** Thursday, July 26, 2018 3:46 PM
**To:** PM-CPA <PM-CPA@state.gov>; PA Press Duty <PAPressDuty@state.gov>
**Subject:** FW: guns

PM: Are you aware of this lawsuit? Have we updated lines on this issue? Thank you, Robert

**Official**
**UNCLASSIFIED**

**From:** Lee, Matthew <MVLee@ap.org>
**Sent:** Thursday, July 26, 2018 3:31 PM
**To:** Greenan, Robert J <GreenanRJ@state.gov>
**Subject:** guns

A coalition of gun-control groups has filed an appeal in federal court seeking to block a recent Trump administration ruling that will allow the publication of blueprints to build a 3D-printed firearm.
The firearms are made of polymer that can't be flagged by metal detectors. They're also untraceable because the guns are homemade and don't have serial numbers.
The State Department ruled in late June that directions for building the weapons could be published. The decision resolved a long-lingering dispute with Cody Wilson. He owns a Texas-based company that specializes in "open source" firearm designs that can be made with a 3D printer.
On Thursday, gun-control groups asked a federal court for a temporary injunction to block the State Department decision from taking effect.

The information contained in this communication is intended for the use of the designated recipients named above. If the reader of this communication is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify The Associated Press immediately by telephone at +1-212-621-1500 and delete this email. Thank you.

| | |
|---|---|
| **From:** | Darrach, Tamara A <DarrachTA@state.gov> |
| **Sent:** | Friday, July 20, 2018 4:14 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | FW: Monthly Arms Transfer - Reschedule |

Josh – FYI – David would like the 3D Gun Settlement Agreement briefing on Tuesday

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 4:12 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm nervous having the briefing on the 3D Gun Settlement Agreement postponed until Thursday, the day before State has to suspend the regulations to apparently allow the publication of the production technology to the rest of the world.   Can we have that briefing on Tuesday?

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, July 20, 2018 4:08 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Apologies everyone, we have to reschedule since Secretary Pompeo will be testifying on Wednesday.  Any chance you are available Thursday (7/26) at 10:00 am?

Thanks!
Tamara

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Friday, July 13, 2018 2:26 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Subject:** Monthly Arms Transfer

Good afternoon everyone,

Are you available for our monthly arms transfer briefing on July 25 at 10 am?  Let me know.

Thanks!
Tamara

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs |  U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

WASHAR0002778

| | |
|---|---|
| **From:** | Noonan, Michael J <NoonanMJ@state.gov> |
| **Sent:** | Friday, July 13, 2018 4:58 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Young, LaToya M <YoungLM2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov> |
| **Cc:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Hart, Robert L <HartRL@state.gov> |
| **Subject:** | FW: New PM Tasker: Control Number: H20180709=000 -- Member: Levin, Sander M.-- changes related to control and licensing of exports |
| **Attach:** | 18-062143 Draft Response to Sander Levin incoming 071218 (DDTC).docx; H20180709=000.pdf; 20180709-000 - DTCP draft v.7.docx |

Update:

Official
**UNCLASSIFIED**

**From:** Noonan, Michael J
**Sent:** Friday, July 13, 2018 1:22 PM
**To:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Young, LaToya M <YoungLM2@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Brechwald, Matthew J (T) <BrechwaldMJ2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Ravi, Sunil K <RaviSK@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; T_SpecAssts <T_SpecAssts@state.gov>; P_StaffAssistants <P_StaffAssistants@state.gov>
**Subject:** RE: New PM Tasker: Control Number: H20180709=000 -- Member: Levin, Sander M.--changes related to control and licensing of exports



Michael Noonan

X22788

**Official**
**UNCLASSIFIED**

**From:** PM-Staffers Mailbox
**Sent:** Monday, July 9, 2018 2:43 PM
**To:** DDTC Tasker DL <DDTCTaskerDL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; PM-CPA <PM-CPA@state.gov>
**Subject:** New PM Tasker: Control Number: H20180709=000 -- Member: Levin, Sander M.--changes related to control and licensing of exports

DDTC,

Samantha Sison
PM/FO SharePoint
202-647-0561

**From:** H_CCU@state.gov <H_CCU@state.gov>
**Sent:** Monday, July 9, 2018 2:07 PM
**To:** H_CCTasking-PM <H_CCTasking-PM@state.gov>
**Cc:** Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** Control Number: H20180709=000 -- Member: Levin, Sander M. -- Date Due: 7/13/2018

requested information has begun. All responsive documents must be cleared for release by P via action memo.

- All Unclassified responses to congressional inquiries should be submitted to the CCU on OpenNet, as a word document, named using the H Control Number (e.g. H20110321=000.docx for substantive or 11002201.docx for constituent). In the case of interim responses use the control number plus interim plus. (e.g. H20110321=000interim.docx for substantive or 11002201interim.docx for constituent)

- All Classified responses to congressional inquiries should be submitted to CCU on ClassNet to the ccu2ndtasker@state.sgov.gov email box, as a word document, named using the H Control Number (e.g. H20110321=000.docx for substantive or 11002201.docx for constituent). In the case of interim responses use the control number plus interim plus. (e.g. H20110321=000interim.docx for substantive or 11002201interim.docx for constituent)

**Official**
**UNCLASSIFIED**

WASHAR0002781



# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER

IPS CONTROL# **H2018** *0709- 000* ACTION BUREAU: *PM*

DATE: JUL 9 2018

## IPS:

___X___ SUBSTANTIVE

___X___ IMAGE ENTIRE DOCUMENT

## BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

_____✓_____ REPLY FOR SIGNATURE BY **Mary K. Waters, Assistant Secretary Legislative Affairs**

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____✓_____ OTHER ACTION: *Please coordinate response with Dept of Commerce*

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL OF ALL TRANSFERS OF ACTION****

### Due Date *07 / 13 / 18*

ADDITIONAL INSTRUCTIONS:

✓Multi-signer Letter: *Engel, McGovern, Torres, and Raskin*

_____

____Please clear with NSC prior to submission to H

____EVEREST TASKER#_____

**FROM:  A/S Mary K. Waters (H)**

**Congressional Correspondence**
**Recommendation**

JUL  9 2018

\_\_\_ **For Signature by Secretary**
**For draft by _____ Bureau**

\_\_\_\_ **For Signature by Mary K. Waters**
**For draft by _____ Bureau**

✓ **Tasked to the** _PM_ **Bureau for**
**Signature by Mary K. Waters**
**Assistant Secretary, Legislative Affairs**

\_\_\_\_\_ **Tasked to \_\_\_\_ Bureau for signature by**
**Post or Bureau**

_____ FYI Only—No Reply Necessary
For _____ Bureau

Special Actions:

✓ Multi-signer letters

✓ Special Clearances    _Commerce_

For S Staff Review (H Only)

Everest Tasker# _____

Special Instructions _____

WASHAR0002783

Congress of the United States
House of Representatives
Washington, DC 20515

LEGISLATIVE AFFAIRS

2018 JUL -9  P 12: 02

RECEIVED

July 5th, 2018

Secretary Mike Pompeo
Department of State
2201 C Street NW
Washington, DC 20230

Secretary Wilbur Ross
Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20520

Dear Secretaries Pompeo and Ross:

We write to express our deep concern about proposed regulatory changes that would transfer control and licensing of exports of semi-automatic assault weapons, high capacity ammunition magazines and related military items from the Department of State to the Department of Commerce. We urge you to postpone implementation of these proposed changes until important issues can be addressed.

Under the current regulatory framework established under the Arms Export Control Act, export of items that are primarily for military use are regulated pursuant to the International Traffic in Arms Regulations administered by the State Department. Such items are included on United States Munitions List and are subject to stringent controls that are aimed at restricting access to military items to approved foreign governments. Exporters must be registered with the State Department and end-users are monitored under the Blue Lantern program, which provides inventory management control and accountability of all commercial arms sales and transfers. Transferring regulation of such military exports to the Department of Commerce would make it more likely that U.S.-origin weapons will end up in the hands of traffickers, terrorists, and cartels, and put them into global commerce.

We are also concerned that proposed rule changes will significantly reduce Congressional oversight and undermine efforts to prevent and prosecute firearms trafficking. Specifically, current regulations require Congressional notification of an intended commercial firearms sale in excess of $1 million. By contrast, licenses issued by the Commerce Department are not notified to the Congress, or subject to prior review. In addition, the Foreign Assistance Act also prohibits sale of such defense articles to countries where governments have engaged in a consistent pattern of gross violations of internationally recognized human rights.

The volume of U.S. military small arms exports, which is already substantial, is certain to increase if regulation is moved to the Commerce Department. In the past year alone, Congress has

WASHAR0002784

been notified of some $660 million of firearms sales regulated under the United States Munitions List

The ramifications of the proposed transfer of oversight from the State Department to the Commerce Department are very serious: arms manufacturers and brokers of semi-automatic assault weapons will no longer be required to register with the State Department; training on the use of these items will no longer require a license, allowing private security contractors to train foreign militias in sensitive combat techniques without proper vetting; prosecutors will have less documentary evidence to prosecute arms dealers; and elected officials will have less say in the export of dangerous weapons.

For all these reasons, we urge you to postpone the proposed regulatory transfer until these important issues can be addressed.


Sander Levin

Eliot Engel

James P. McGovern

Norma J. Torres

Jamie Raskin

WASHAR0002785

| | |
|---|---|
| **From:** | Jhunjhunwala, Pooja <JhunjhunwalaP2@state.gov> |
| **Sent:** | Monday, July 16, 2018 10:02 AM |
| **To:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | FW: Request for Comment |

Colleagues – Can you pass your guidance? Thanks, Pooja

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Deanna <Deanna.Paul@washpost.com>
**Sent:** Monday, July 16, 2018 9:58 AM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Request for Comment

Hello,

I'm a journalist at The Washington Post and writing a story on Cody Wilson and the recent State Department settlement with him and the Second Amendment Foundation. I would like to speak with someone from your office for comment. Please let me know about availability, or I can be reached at the below number.

Thanks,


Deanna Paul
The Washington Post
General Assignments News
202.334.7372 | @thedeannapaul

WASHAR0002786

| **From:** | Chen, Rachael J <ChenRJ@state.gov> |
| **Sent:** | Sunday, June 17, 2018 9:00 PM |
| **To:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | FW: requesting meeting on firearms export regulation changes |

███████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Chen, Rachael J
**Sent:** Monday, June 18, 2018 8:51 AM
**To:** Jeff Abramson <jeff@forumarmstrade.org>; Cressey, Laura E <CresseyLE@state.gov>
**Cc:** Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** RE: requesting meeting on firearms export regulation changes

Hi Jeff,

Greetings from Singapore, where I've been helping out our particularly busy embassy for a few weeks.  I'll check in with my colleagues back in Washington to see if this would be feasible and circle back.

The office in PM that has the lead on this regulatory change is the Directorate of Defense Trade Controls, so after this message, I'll take Laura out of the chain—she's with RSAT, and not so focused on this change.

Best,
Rachael

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Friday, June 15, 2018 3:17 AM
**To:** Cressey, Laura E <CresseyLE@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>
**Subject:** requesting meeting on firearms export regulation changes

Director Cressey and Ms. Chen-

Thank you again for leading the US team (and organizing) the conversation last month on conventional arms transfer policy at the Stimson Center. As Rachel Stohl mentioned during that conversation, we would also welcome the chance to have a similar meeting to discuss the proposed new regulations regarding USML categories I to III. If it would be possible to do that in the next week or two, before the public comment period expires, that would be most helpful.

The Forum on the Arms Trade is maintaining a resource page (here) that provides links to the official documents and comment pages, media articles, and other resources. It won't be surprising that a number of us have concerns about the proposed regulations. We also have a number of questions and suggestions, and would welcome a cordial and frank conversation.

While I will be on vacation next week, I will follow emails on this and reply to assist in scheduling a meeting. Please do let me know what might be possible.

Many thanks in advance,

WASHAR0002787

Jeff

--
**Jeff Abramson**
Forum on the Arms Trade | <u>www.ForumArmsTrade.org</u> | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more <u>here</u>.



**Official**
**UNCLASSIFIED**

| **From:** | Babington, Thomas M <BabingtonTM@state.gov> |
| **Sent:** | Thursday, July 26, 2018 3:09 PM |
| **To:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | FW: Seeking comment on Defense Distributed settlement |

Over to you guys.

Best,

Tom Babington
Press Officer

**Official**
**UNCLASSIFIED**

**From:** Erik Larson (BLOOMBERG/ NEWSROOM:) <elarson4@bloomberg.net>
**Sent:** Thursday, July 26, 2018 3:07 PM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Seeking comment on Defense Distributed settlement

Hello.

I'm seeking comment on claims by national gun-control groups that the State
Department erred in reaching a settlement with Defense Distributed that
allows the company to publish CAD designs for firearms that can be used by
anyone to print functioning guns with a 3-D printer. How is this a good
idea and why did the agency reverse its position from just a few months
ago, that printed guns are a threat to national security? Thanks.

Erik Larson
Reporter, Bloomberg News
(212) 617-2086 | Desk
(347) 515-5566 | Cell
731 Lexington Avenue
New York, NY 10022

WASHAR0002789

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 7:42 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Cc: | Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Carter, Rachel <CarterR@state.gov>; Kaidanow, Tina S <KaidanowTS@state.gov>; PM-CPA <PM-CPA@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Subject: | Fwd: CPA Media Monitoring: Reuters: Federal Judge Denies Last Ditch Effort To Block Release Of 3D-Printed Gun Blueprints |

Federal Judge Denies Last Ditch Effort To Block Release Of 3D-Printed Gun Blueprints
The judge said he was sympathetic to the gun control groups' concerns but questioned their legal standing to intervene in the case.

Jon Herskovitz

JON HERSKOVITZ / REUTERS
AUSTIN, Texas (Reuters) - A U.S. judge on Friday rejected a last-ditch effort by gun control groups to block the Trump administration from allowing the public to download blueprints for 3-D printable guns, declining to intervene just days before the designs are expected to go online.

U.S. District Judge Robert Pitman in Austin, Texas, denied the request for an order by the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence at a hearing, saying he would state the reasons for his decision in a written order to follow.

At the hearing, the judge said he was sympathetic to the gun control groups' concerns but questioned their legal standing to intervene in the case.

The groups sought to intervene following a June settlement between Defense Distributed and the U.S. government allowing the company to legally publish gun blueprints online, something its website says it plans to do by Aug. 1.

The government ordered the blueprints taken down in 2013 and Defense Distributed founder Cody Wilson sued in 2015, claiming his First Amendment and Second Amendment rights had been violated.

The government had until recently argued the blueprints posed a national security risk. Gun control groups said there had been no explanation for the June settlement and the administration's abrupt reversal on the issue.

Lawyers for the Brady Center declined to comment on Pitman's ruling after the hearing.

The groups in court filings said not halting the blueprint distribution by a Texas-based company called Defense Distributed would "cause immediate and irreparable harm to the United States national security" and that of individual U.S. citizens.

"The stated goal of Defense Distributed is to sound the death knell for gun control," David Cabello, a lawyer for the Brady Center, told Pitman during the hearing.

The 3-D files include blueprints for a plastic AR-15 semiautomatic assault rifle, a weapon that has been used in many U.S. mass shootings, as well as other firearms.

Joshua Blackman, a lawyer for Defense Distributed, said he was grateful for the judge's ruling. During the hearing Blackman said the gun control groups were trying to litigate a political dispute in court.

Wilson, a self-declared Texas anarchist, said in an online video that the blueprints were downloaded more than 400,000 times before they were taken down in 2013.

Lawrence Keane, general counsel for the National Shooting Sports Foundation, a trade association for gun manufacturers, told Reuters concerns over 3-D printable guns were overblown.

"I don't see it likely at all that criminals will use this clunky and expensive technology," Keane said. The NSSF is not involved in the case.

WASHAR0002791

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| **Sent:** | Friday, July 27, 2018 7:52 PM |
| **To:** | Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| **Cc:** | Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel <CarterR@state.gov> |
| **Subject:** | Fwd: CPA Media Monitoring: Settlement Instant Reax |

Via Twitter:

@Everytown
#StopDownloadableGuns Update: More than a hundred thousand messages and calls have been sent to the State Department this week, demanding that it stop the distribution of downloadable guns. But Trump's @StateDept is moving forward to enable anyone — including terrorists, convicted felons, and domestic abusers — to download plans to print functional, untraceable, and undetectable guns. We're appalled, but not defeated. The files will be posted on 8/1, so we have until then to drive as many messages as possible to @SecPompeo DEMANDING he STOP the distribution of downloadable guns. Thanks for being with us in this fight.

@RepEliotEngel
#3DGuns will be legal on Wednesday unless @SecPompeo says NO. Get the word out. Call your representative and senators — 202-224-3121. The #Trump Administration is trying to make the gun crisis even worse. #StopDownloadableGuns

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 8:56 PM |
| To: | Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Carter, Rachel <CarterR@state.gov>; PM-CPA <PM-CPA@state.gov> |
| Subject: | Fwd: CPA Media Monitoring: WaPo: Lawmakers are attempting to prevent the spread of 3-D-printed guns. It may be too late. |

Wrap-up of the story in tomorrow's Post:

Lawmakers are attempting to prevent the spread of 3-D-printed guns. It may be too late.
By Deanna Paul
Saturday, July 28th 2018

After a multi-year legal battle, the federal government last month entered into a settlement with Defense Distributed founder Cody Wilson, permitting him to publish his arsenal of firearm blueprints online. He intends to do so on Aug. 1. Lawmakers' eleventh-hour efforts have done nothing to halt his plans, and on Friday a federal judge denied a motion for an emergency injunction brought forward by a trio of gun-control groups.

Guttenberg, who has become a powerful voice against gun violence since his 14-year-old daughter was killed in the shooting at Stoneman Douglas High School in Parkland, Fla., told The Washington Post he was dismayed by his visit to the Hill. Five weeks have passed since the settlement was signed, yet only a handful of senators were aware of it, he said, adding that not a single House member knew either.

"I don't know how we got to this place and no one was paying attention," he lamented. "This is the safety of this country and its citizens who are now at risk in their offices, in courthouses and on airplanes."

Sen. Charles E. Schumer of New York led the call to action on Saturday, warning of the dangers posed by the weapons, sometimes dubbed "ghost guns," which are made from plastic and cannot be sensed by metal detectors.

"Ghost guns are as scary as they sound — a terrorist, someone who is mentally ill, a spousal abuser, or a felon can essentially open a gun factory in their garage. No background check, no training," he told The Post.

On Tuesday, Sen. Edward J. Markey, joined by Sens. Bill Nelson, Richard Blumenthal, Chris Murphy and Dianne Feinstein, all Democrats, sent a letter to Attorney General Jeff Sessions, demanding he explain the government's decision to settle.  (The Department of Justice declined to comment fort this story.) Nelson also plans to introduce a bill that would prohibit online publication of any digital file that can be downloaded or programmed to print a 3-D gun part.

Throughout the week, other lawmakers have joined the push: New Jersey's attorney general sent Wilson a cease-and-desist order, warning that making the digital files available to New Jersey residents was a violation of the state's law. Rep. Ted Deutch (D-Fla.) wrote a letter on Thursday co-signed by 40 members of the House calling for a hearing before the looming deadline.

WASHAR0002793

"Maybe when my colleagues realize that the end result is a plastic gun possibly getting through security in the Rayburn [House office] building, they'll return to Washington and let us hold hearings on stopping this danger before it gets too far," Deutch told The Post.

But as time runs out, it remains unclear whether the belated efforts will succeed.

"All the letters are nice, but they do nothing," Guttenberg said. "At 12:01 on the 1st of August, it's going to be too late."

Wilson manufactured the first fully 3-D-printed pistol in April 2013, when he was 25. He posted the design files online, to an unregulated file-sharing website. In a few days the site saw more than 100,000 downloads for the firearms, which would not have serial numbers and thus be impossible to trace. The federal government alleged that by uploading the weapon blueprints, which constituted an export under the International Traffic in Arms Regulations (ITAR), Wilson had violated federal law.

After years of legal fighting, the federal government stunned both Wilson and gun-control advocate with a wholesale reversal of position. On June 29 it entered into a settlement with Wilson that, in addition to fronting $40,000 for his legal fees, crafted an exemption from the ITAR regulations, allowing Wilson's company to post 3-D firearm blueprints online for unlimited international distribution.

Wilson plans to relaunch next week.

Three organizations — the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and the Giffords Law Center to Prevent Gun Violence — jumped into the fight on Thursday, filing an emergency motion for a preliminary injunction. A hearing was held on Friday before federal Judge Robert Pitman in Austin, who had sided with the government in earlier litigation.

On Friday, however, Pitman sided with Wilson, denying the groups' motion.

Days from now, Wilson will likely be able to post far more than basic hand guns on a searchable database.

"Once the plans are up on the Internet, it's impossible to un-ring the bell," said Jonathan Lowy, vice president of litigation at the Brady Center. "The genie is out of the bottle and you can't put it back in."

WASHAR0002794

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
RON PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

**United States Senate**

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

LMO/TD

WASHAR0002795

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

WASHAR0002796

# United States Senate

WASHINGTON, DC 20510

July 23, 2018

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Sessions:

We write with great alarm over the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's decision that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for three-dimensional ("3-D") printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations. Indeed, as recently as April 2018, the government filed a motion to dismiss in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

In a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing tutorials in any form. The government also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with DOJ's previous position and is as dangerous as it is confounding. The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad. It also sets a dangerous precedent in defending against other legally sound determinations made by the State Department under the Arms Export Control Act and the International Traffic in Arms Regulations.

We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course. We ask that, prior to August 1, 2018,

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

1

DOJ provide us with a copy of the fully executed settlement agreement, and a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

Edward J. Markey
United States Senator

Bill Nelson
United States Senator

Richard Blumenthal
United States Senator

Christopher S. Murphy
United States Senator

Dianne Feinstein
United States Senator

2

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
RON PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

**United States Senate**

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies——and the U.S. Transportation Security Agency——all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

EDWARD R. ROYCE, CALIFORNIA
CHAIRMAN

AMY PORTER          THOMAS SHEEHY
CHIEF OF STAFF      STAFF DIRECTOR



ELIOT L. ENGEL, NEW YORK
RANKING DEMOCRATIC MEMBER

JASON STEINBAUM
DEMOCRATIC STAFF DIRECTOR

One Hundred Fifteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

July 20, 2018

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

I write to register my profound concern about an action by Department of State officials to remove from export controls certain software for 3-D printing of firearms. This is exceptionally dangerous because it will promote global availability of such technical information and consequent unrestricted manufacture of firearms. This action was taken in settling a lawsuit: Defense Distributed v. United States.

There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3-D printer. This defeats US laws which require background checks on the sale of weaponry. The danger is magnified because 3-D printed fireams would be made of plastic and, therefore, undetectable by most security systems. With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence.

Moreover, the text of the settlement, attached, suggests that the Department's officials are mis-using authority under Section 126.2 of the International Traffic in Arms Regulations to "temporarily" remove this technical information from the United States Munitions List (USML). However, as anyone who has ever posted something on the internet knows, once posted, the item is instantly and permanently available to all who seek it. Therefore, it is impossible to temporarily publish 3-D gun printing software on the internet. Inasmuch as Sec. 126.2 authority is reserved for use only in the interests of U.S. security and foreign policy, it stretches credulity to believe that release of this information is in the U.S. interest.

WASHAR0002801

The Honorable Mike Pompeo
Department of State
2201 C Street, NW
Washington, DC 20520

Use of this temporary ITAR authority also suggests that Department officials sought a way to avoid complying with Section 38(f) of the Arms Export Control Act, which requires advance notification to Congress for any removal from the USML.

The settlement of this lawsuit is slated to go into effect by July 27th. I urge you to suspend the Department's implementation of the settlement immediately and prevent the inappropriate and dangerous release of this technical information.

Sincerely,

ELIOT L. ENGEL
Ranking Member

| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| Sent: | Thursday, July 26, 2018 1:13 PM |
| To: | Marquis, Matthew R <MarquisMR@state.gov> |
| Subject: | mm |

https://www.youtube.com/watch?v=WNdpwF-canE

https://www.economist.com/united-states/2018/07/28/soon-anyone-will-be-able-to-learn-how-to-print-3d-guns

---

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.7878 | 🖳  BlackBerry: 202.679.6724 | 🖨   Fax: 202.647.4055
✉ e-mail:      *PaulJM@State.Gov* | ⌂  Web: *www.state.gov/t/pm /*

🐦 http://twitter.com/StateDeptPM

Stay connected with *State.gov*:



This message is *UNCLASSIFIED*, per E.O. 12958

**Official**
**UNCLASSIFIED**

| From: | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
|---|---|
| **Sent:** | Thursday, July 26, 2018 8:30 AM |
| **To:** | DDTC Tasker DL <DDTCTaskerDL@state.gov> |
| **Cc:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Miller, Michael F <Millermf@state.gov>; PM-CPA <PM-CPA@state.gov> |
| **Subject:** | New PM tasker for Control Number: H20180726=000 -- Member: Menendez - 3D Printing of Firearms. |
| **Attach:** | H20180726=000.pdf |

DDTC,



Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**From:** H_CCU@state.gov <H_CCU@state.gov>
**Sent:** Thursday, July 26, 2018 7:57 AM
**To:** H_CCTasking-PM <H_CCTasking-PM@state.gov>
**Cc:** Darrach, Tamara A <DarrachTA@state.gov>; H_CCU <H_CCU@state.gov>
**Subject:** Control Number: H20180726=000 -- Member: Menendez, Robert -- Date Due: 7/31/2018

Congressional Correspondence - 2 day tasker

## Control Number: **H20180726=000**
## Date Due: **7/31/2018**
Actions:
 • Reply for signature by Mary K. Waters, Assistant Secretary, Legislative Affairs.
Member: Menendez, Robert
Subject: Writing regarding the Department's decision on the 3D printing of functional firearms that would result in the suspension of ITAR restrictions required by the Arms Export Control Act.
2 Day Tasker

- For all correspondence that will be signed by the Secretary or other Principal: Please submit a draft response under cover of a **joint action memo by H and your Bureau.** Please submit the action memo on the **classified (high) side to the H Staffers.** Also, please advise the CCU on the unclassified (low) side when the action memo has been submitted.
- The attached Substantive Correspondence is due in the Congressional Correspondence Unit (CCU) on the due date indicated on the tasker.
- Document Requests: All request for DOS documents require an interim response to the Member within 2 days of the official tasker. The interim response acknowledges receipt of the request and advises that a search for the

requested information has begun. All responsive documents must be cleared for release by P via action memo.

- All Unclassified responses to congressional inquiries should be submitted to the CCU on OpenNet, as a word document, named using the H Control Number (e.g. H20110321=000.docx for substantive or 11002201.docx for constituent). In the case of interim responses use the control number plus interim plus. (e.g. H20110321=000interim.docx for substantive or 11002201interim.docx for constituent)

- All Classified responses to congressional inquiries should be submitted to CCU on ClassNet to the ccu2ndtasker@state.sgov.gov email box, as a word document, named using the H Control Number (e.g. H20110321=000.docx for substantive or 11002201.docx for constituent). In the case of interim responses use the control number plus interim plus. (e.g. H20110321=000interim.docx for substantive or 11002201interim.docx for constituent)

WASHAR0002805

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL# **H2018** ○726=○○○   ACTION BUREAU: ℍ

DATE:_____JUL 2 6 2018_____

## IPS:

___X___ SUBSTANTIVE

___X___ IMAGE ENTIRE DOCUMENT

# BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

_____✓_____ REPLY FOR SIGNATURE BY Mary K. Waters, Assistant Secretary, Bureau of Legislative Affairs

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____ OTHER ACTION: _____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

*****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION*****

**Due Date**_____7/31_____

ADDITIONAL INSTRUCTIONS:

___Multi-signer Letter: _____

___Special Instructions:_____

___EVEREST TASKER#_____

___Please clear with NSC prior to submission to H

WASHAR0002806

**FROM: Mary K. Waters (H)**

**Congressional Correspondence**
**Recommendation**

JUL 2 6 2018

_____ **For Signature by Secretary Pompeo**

**For draft by _____ Bureau**

X **Tasked to the** _Pm_ **Bureau for**
**Signature by Mary K. Waters,**
**Assistant Secretary, Legislative**
**Affairs**

_____ **Tasked to _____ Bureau for signature by**
**Post or Bureau**

_____ FYI Only—No Reply Necessary

For _____ Bureau

Special Actions:

_____ Multi-signer letter:

_____ Special Clearances:

_____ For S Staff Review (H Only)

_____ Everest Tasker# _____

_____ Special Instructions:_____

WASHAR0002807

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

**United States Senate**

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

LMO/TD

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

**FINAL**
**Interagency Talking Points for Categories I, II and III**
**Updated: April 20, 2018**

**Topline Talking Points:**

- The Departments of State and Commerce have submitted to the Office of the Federal Register proposed rules to amend Categories I, II and III of the U.S. Munitions List (USML) in the International Traffic in Arms Regulations (ITAR).  These proposed rules will transfer oversight for export of some types of firearms, ammunition, and related items included in these categories from the Department of State to the Department of Commerce.

- The National Security Council is working through the interagency process with the Departments of State, Commerce, Homeland Security, and other stakeholders to reexamine longstanding bureaucratic polices and regulatory processes to ensure that U.S. industries have every advantage in the global marketplace, while at the same time ensuring the responsible export of arms.

- These proposed rules will be made open for public comment and may be subject to modifications, prior to issuing final rules in the Federal Register.

**What These Proposed Rules Do**

- Under these proposed rules, firearms and related articles that are inherently for military end use or that are not otherwise widely available in retail outlets will remain under State Department export licensing controls.

- Items that are widely available in retail outlets that are also currently regulated by the State Department authorities as set forth under Categories I, II and III of the U.S. Munitions List (USML) in the International Traffic in Arms Regulations (ITAR) will be subject to the new 500 series controls in Category 0 of the U.S. Department of Commerce's Commerce Control List (CCL) in its Export Administration Regulations (EAR), which will remain subject to export licensing requirements, interagency review, and monitoring of commercial entities involved in export and sales.

**What These Proposed Rules DO NOT Do**

- These proposed rules <u>DO NOT</u> have any impact on the ability of American citizens in the United States to exercise their second amendment rights. These proposed changes relate only to the export and temporary importation of some types of firearms and ammunition.

- These proposed changes <u>DO NOT</u> decontrol exports of any firearms or ammunition.  This proposed transfer of some items from the U.S. Department of State's U.S. Munitions List (USML) in the International Traffic in Arms Regulations (ITAR), to the Department of Commerce's Commerce Control List (CCL) in its Export Administration Regulations (EAR)

will continue to require U.S. Government authorization, and exports will continue to be restricted where the risk of human rights abuses or illicit diversion are of concern.

**Benefits of Proposed Rules**

- The proposed rules are the product of a larger effort since 2010 to modernize the U.S. export control regulations under the International Traffic in Arms Regulations (ITAR) and Export Administration Regulations (EAR), to create a simpler, more robust system that eases industry compliance, improves enforceability, and better protects America's most sensitive technologies.

- These changes will significantly reduce the regulatory burden on the U.S. commercial firearms and ammunition industry, promote American exports, and clarify the regulatory requirements for independent gunsmiths, while at the same time prioritizing national security controls and continuing our ability to restrict exports where human rights, illicit trafficking, and related issues may be of concern.

- We anticipate that a number of firearms manufacturers, including many small businesses, that are currently required to register with the Department of State, will be relieved from an annual fee burden under this proposed rule. The Department of Commerce's Bureau of Industry and Security (BIS) does not have registration requirements or export licensing fees.

**Firearms Export Licensing by Commerce**

- The Department of Commerce has decades of experience in licensing firearms for export under the Export Administration Regulations (EAR).  This involves the export, reexport, and transfer (in-country) of 12-gauge shotguns, optical sighting devices for firearms, as well as law enforcement equipment that the United States has controlled and licensed unilaterally to address human rights concerns worldwide.

- The Department of Commerce Bureau of Industry and Security's (BIS) Export Enforcement (EE) vigorously enforces export controls for items under Commerce jurisdiction. The Department of Commerce, through EE, is the only export licensing agency with an in-house law enforcement component, and manages the Information Triage Unit, an interagency body that assembles and disseminates relevant information, including intelligence, to inform licensing and enforcement actions.

- BIS maintains a robust end-use verification program for items and locations that present the most cause for concern.  During Fiscal Year 2017, BIS conducted 1089 in-person checks in 58 countries.

- Each export license application undergoes a thorough interagency review process, which includes input from the Departments of Defense and State, and takes into account national security and human rights concerns.

WASHAR0002811

- The Department of Commerce has a law enforcement component dedicated to enforcing export law and regulations.

  o The Commerce Department's Bureau of Industry and Security (BIS) Export Enforcement (EE) is a specialized law enforcement organization recognized for its key role in support of international trade related national security and foreign policy investigations.

  o The Commerce Department's Bureau of Industry and Security (BIS) Export Enforcement (EE) accomplishes its mission through preventive and investigative enforcement activities and pursuing appropriate criminal and administrative sanctions against export violators.

- BIS maintains unique law enforcement authorities to disrupt criminal networks and break up conspiracies to illegally export a multitude of items, including firearms:

  o Temporary Denial Orders are issued by the Assistant Secretary for Export Enforcement, and deny the export privileges of a company or individual (whether in the U.S. or abroad) to prevent imminent or on-going export control violations.

  o The Commerce Department's Bureau of Industry and Security (BIS) Entity List is the primary tool to target individual bad actors. It contains a list of names of certain foreign persons, including businesses, research institutions, government and private organizations, and individuals that have been determined through an interagency review process to have engaged in activities contrary to U.S. national security and/or foreign policy interests. These persons are restricted from receiving items subject to U.S. jurisdiction unless authorized by a BIS license. The license review policy for most listed entities is a presumption of denial.

- The Commerce Department's Bureau of Industry and Security (BIS) Export Enforcement (EE) works closely with other U.S. law enforcement agencies.

**Recent Firearms Enforcement Actions**

- On February 9, 2017, Access USA Shipping, LLC, of Sarasota, Florida, agreed to a $27 million civil penalty to settle 129 counts of evasion, 17 counts of exporting or attempting to export crime control items, including rifle scopes, night vision lenses and weapons parts without the required license, and four counts of exporting or attempting to export to a sanctioned entity on the BIS Entity List without the required license.

- On August 30, 2017, Dmytro Medvedyev was sentenced in U.S. District Court for the District of Delaware in connection with the commission of identity theft to procure items, including combat rifle optics classified under Export Control Classification Number (ECCN) 0A987. Medvedyev subsequently utilized re-shippers in the State of Delaware

WASHAR0002812

to smuggle the optics to the Ukraine without the required export licenses.  Medvedyev was sentenced to 36 months in prison and will be deported following his sentence.

- In April and June 2017, Alfredo Montilla-Hernandez, Abrahan Aguilar-Sanchez, and Jose Gutierrez-Morales were sentenced in U.S. District Court for the Southern District of Florida to 30 months, 38 months, and 38 months in prison, respectively.  All of the sentences were in connection with a conspiracy amongst the defendants and others to procure and export firearms and ammunition, including shotgun shells controlled under ECCN 0A986, to Venezuela by concealing the items in car batteries.  An October 2016 examination of cargo at a Doral, Florida freight forwarder uncovered the items in the batteries. When Gutierrez-Morales and Montilla-Hernandez were arrested, a search of their vehicle revealed additional firearms, ammunition and optical sighting devices for firearms.

- In the last year, between February 15, 2017 and 2018, the Office of Export Enforcement (OEE) effected approximately 69 detentions of commodities classified on the Commerce Control List (CCL) under Export Control Classification Numbers (ECCNs) 0A984, 0A985, 0A986, and 0A987, to include shotguns, discharge type arms, shotgun shells, and optical sighting devices for firearms.  During the same time period, OEE participated in or led approximately 45 seizures of these same commodities.

**HSI Talking Points for Congress related to the Proposed Firearm Regulations**

- The U.S. Department of Homeland Security's U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) will maintain its authority to enforce the regulations governing the export of firearms and ammunition.  HSI will continue to have the broadest investigative authorities of any federal law enforcement agency to enforce export laws and regulations, combatting the illegal export of U.S. origin firearms and ammunition.

- HSI is committed to preventing the acquisition of these items by Transnational Criminal Organizations (TCOs) and individuals who utilize the items to further criminal activity and commit acts of violence.

- HSI, through its predecessor agency, the U.S. Customs Service, has been exercising its export enforcement authority for over 100 years.  HSI's overall counter-proliferation investigations mission is to prevent hostile nations, foreign adversaries, terrorist networks, and transnational criminal organizations from obtaining materials such as firearms that threaten the security of the United States and its allies.

- ICE HSI-led Border Enforcement Security Task Forces (BESTs) - There are currently 58 BESTs, encompassing 93 groups, located throughout the United States and Puerto Rico. BESTs comprise of over 1,000 law enforcement officers who collectively represent over 100 federal, state, local, and international law enforcement partners.  BESTs coordinate and pursue cross-border crimes, such as the international trafficking and smuggling of firearms,

ammunition, and explosives.  BESTs are located along the southwest border, the northern border, in major international airports and at strategic seaports.  Since inception, BEST units have seized more than 19,500 weapons and 1.5 million rounds of ammunition.

- ICE Special Agents are "customs officers" empowered with the search, seizure, and arrest authorities necessary to investigate and enforce all U.S. export laws and regulations, including firearms and ammunition export controls.

- ICE is the only agency with full statutory and regulatory authority to investigate criminal violations of all U.S. export control laws and regulations including those that regulate the export of firearms and ammunition.

- In addition to conducting domestic criminal investigations, HSI maintains an Office of International Operations with over 250 investigators in 67 offices and 8 Department of Defense Liaisons in 50 countries.  ICE HSI International Operations offices coordinate international investigations with foreign law enforcement counterparts and provide investigative support to ICE HSI domestic offices in combating transnational crime, such as the international trafficking and smuggling of firearms, ammunition, and explosives, as well as conduct international training and capacity building efforts overseas.

### ICE HSI Significant Firearms Smuggling Investigations

- Former Soldier Sentenced for Firearm Straw Purchasing Scheme - Firearms Destined for Members of the Gulf Cartel in Mexico https://www.justice.gov/usao-wdtx/pr/former-soldier-sentenced-firearm-straw-purchasing-scheme
- Nogales Man Sentenced to More than 7 Years for Attempting to Export Ammunition into Mexico https://www.ice.gov/news/releases/nogales-man-sentenced-more-7-years-attempting-export-ammunition-mexico
- Man Sentenced to Five Years in Prison for Trafficking Firearms to Guyana https://www.justice.gov/usao-ndga/pr/man-sentenced-five-years-prison-trafficking-firearms-guyana
- Kansas Man Sentenced to 52 Months for Exporting Firearms to Overseas Purchasers Using Hidden Marketplace Website https://www.justice.gov/opa/pr/kansas-man-sentenced-52-months-exporting-firearms-overseas-purchasers-using-hidden
- Final Person Sentenced to More Than 8 Years' Imprisonment in Scheme to Smuggle Guns to Lebanon https://www.justice.gov/usao-ndia/pr/final-person-sentenced-more-8-years-imprisonment-scheme-smuggle-guns-lebanon

### CBP Talking Points for Congress related to the Proposed Firearm Regulations

CBP will continue its front line efforts to enforce export firearm requirements for the United States regardless of the agency that publishes and maintains the requirements. CBP's mission has not changed and will enforce these requirements to the fullest extent of the law.

WASHAR0002815

Drafted:        Josh Paul, PM/CPA, 7-8787

Approved:       PM PDAS Tina Kaidanow

Cleared:        PM/FO:          A-DAS MMiller          (ok)
                PM/DTCP:        SHeidema               (ok)
                PM/DTCP:        RHart                  (ok)
                PM/DTCC:        DCook                  (ok)
                PM/DTCL:        TDavis                 (ok)
                PM/DTCM:        ADearth                (ok)
                PM/CPA:         JPaul                  (ok)
                ISN.CATR:       TKrueger               (ok)
                DRL:            MKozak                 (ok)
                L/PM:           SFabry                 (ok)
                L/M:            AKottmyer              (ok)
                T:              EAbisellan             (ok)
                H:              JCooper                (ok)
                D:              RMcKay                 (ok)
                P:              SHiggins               (ok)
                A/DIR:          YMPeckham              (ok)
                CGFS.GAO:       ZThompson              (ok)
                S/P:            ROutzen                (ok)
                R:              JGiordano-Schulz       (ok)
                PA:             RKim                   (ok)

                WH-NSC:         PPeterson              (ok)
                WH-OMB:         HSeehra                (ok)
                Commerce:       TMooney                (ok)
                DOJ:            EEpstein               (ok)
                DoD-DTSA:       MLaycheck              (ok)
                DHS-CBP:        DFischler              (ok)
                DHS-ICE:        CTafe                  (ok)

WASHAR0002816

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 4:06 PM |
| To: | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| Cc: | PM-All-Users <PM-All-Users@state.gov>; PM-Post-Officers-DL <PM_Post_Officers_DL@state.gov>; PM-POLAD-DL <PM-POLAD-DL@state.gov>; ISN-SCO-DL <ISN-SPC-DL@state.gov>; PM-CPA <PM-CPA@state.gov>; AVC-Press-DL <AVC-Press-DL@state.gov>; Fong, Isaac JY <FongIJY@state.gov>; Tucker, Maureen E <TuckerME@state.gov>; Ricci, Anthony <RicciA@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; Cooper, John M <CooperJM3@state.gov>; Sullivan, Jerry <SullivanJ@state.gov>; Saghieh, Luana <SaghiehL@state.gov>; Wyatt, James A <WyattJA@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Tian, Steven Y <TianSY@state.gov>; Lao-Talens, Daniel N <LaoTalensDN@state.gov>; Paolella, James H <PaolellaJH@state.gov>; Basley, Natasha M <BasleyNM@state.gov>; McVerry, James <James.Mcverry.ctr@dla.mil>; Carroll, Christienne <CarrollC@state.gov> |
| Subject: | PM NEWS CLIPS FOR JULY 23-27, 2018 |

<u>**PM NEWS CLIPS FOR July 23-27, 2018**</u>

<u>**Summary**</u>: This week saw extensive media coverage on the decision by the State Department and Department of Justice Department to reach a settlement in a lawsuit against Defense Distributed over the publishing of files for a 3D printed firearm. News of the settlement has drawn attention from multiple gun control organizations as well as a number of members of Congress. In response to the announcement a coalition of guns control organizations have jointly filed an emergency motion seeking a temporary restraining order to prevent the publishing of the designs, with the settlement going into effect August 1st. The issue was also brought up in a Senate Foreign Relations Committee hearing with Secretary of State Pompeo, and multiple members of House foreign Affairs and Judiciary Committees are seeking to have hearings on the matter in the near future.

Also of note this week is the expected passage of the 2019 National Defense Authorization Act, which includes a broad (though not simple or universal) waiver to CAATSA sanctions. The NDAA also specifically singled out Turkey, and would require a halt in the delivery of F-35 jets pending a report on defense trade and related issues. U.S-Turkish relations have been strained of late, with Turkey stating that they would not abide by U.S. sanctions on Iran and a recent announcement by President Trump that Turkey would be subject to sanctions if they did not release an American Pastor held in Turkish custody. Other developments of note are the U.S.-Australian ministerial meeting, the resumption of bombing against Houthi forces by the Saudi-led coalition, the repatriation of the remains of U.S. service members killed in the Korean War, an alleged meeting between senior U.S. officials and Taliban leaders to discuss peace negotiations, and the announcement that the U.S. would resume providing Egypt with Security Assistance funding that had been held since 2017 over human rights concerns.

(<u>**Editor's note:**</u> *The PM News Clips* is a digest of reports supplementing existing press clippings services that provides a representative sample of significant developments in the broader PM community of interest. **Links to these news items do not reflect official endorsement**.)

#### Front Office and Bureau Mentions

- Virginia-Pilot, "Press Release: Janus Global Operations clears ISIS-placed explosive devices from essential Iraqi food processing facility"
- Washington Times, "Turkey to continue importing Iranian oil, despite U.S. sanctions"
- Hankyoreh, "US pushes to increase South Korea's share of defense costs"
-------

#### Special Coverage: Defense Distributed

- Vice News, "Gun control groups are racing against the clock to stop 3D gun blueprints from going online"
- The Guardian, "DIY 3D-printed guns get go-ahead after Trump administration strikes court deal"
- New York Post, "Chuck Schumer warns of 3-D printed 'ghost guns'"
- My Statesman, "Editorial: Homemade 3-D printer guns should be regulated like any gun"
- The Sun, "WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons"
- Brady Campaign, "What You Need to Know About the 3D Printing of Guns on Demand"
- Giffords, "LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL."
- Senate Foreign Relations Committee, "MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS"
- Prindlepost, "Debating the Permissibility of Printable Guns"
- Breitbart, "Government Admits AR-15s Are Not Weapons of War"
- USA Today, "Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1"
- Everytown for Gun Safety, "The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really"
- 3D Print, "We Have to Take a Stand on 3D Printed Guns"
- KUT, "This Austinite Plans To Publish Designs Online For 3D-Printable Guns Next Week"
- CBS Philly, "New Jersey Attorney General Sends 'Cease And Desist' Letter To Halt Company's Publication Of 3D-Printed Gun Instructions"
- Truth About Guns, "The Defense Distributed Settlement Isn't a Done Deal…Here's What's Next"
- The Hill, "Anti-gun violence groups file to halt online posting of 3D-printed gun plans"
- Economist, "Soon anyone will be able to learn how to print 3D guns"
- Snopes, "Did the U.S. State Department legalize the publication of instructions for 3D-printed guns?"
- Washington Post, "I'm a sheriff. Don't flood the country with 3D-printed guns."
- Economist, "Why it is difficult to regulate 3D-printed guns"
- ABC News, "State Department defends allowing publication of blueprints to 3D print guns"
- CNN, "Pompeo commits to reviewing 3D-printed gun policy"

- Giffords, "THE DANGERS OF 3D-PRINTED GUNS"

**Congressional & Public Affairs (PM/CPA)**

USG/OTHER RELEASES
- DOS, "2018 Australia-U.S. Ministerial Consultations"
- DOS, "U.S. Condemns Deadly Attacks in Syria's Sweida Province"
- DOS, "Pastor Brunson Moved to House Arrest"
- DOS, "Crimea Declaration"
- DOS, "An Update on American Diplomacy To Advance our National Security Strategy"
- DOS, "Secretary Pompeo's Call With Turkey's Foreign Minister Mevlut Cavusoglu"
- DOD, "Readout of Secretary of Defense James N. Mattis' Meeting with Omani Foreign Minister Yusuf bin Alawi"

HILL NEWS
- Stars & Stripes, "Lawmakers prod Pentagon to consider more Europe-based troops"
- Firstpost, "US Congress asks Donald Trump administration to come up with strategy for 'measurable progress' on defence ties with India"
- Defense News, "Hardware, end-strength, Russia and China sanctions. Here's the deal lawmakers reached on the huge defense policy bill."
- Defense News, "Jim Mattis warns Congress not to block Turkey from F-35 program"
- Straits Times, "Final US defence spending Bill expands pushback against China"
- Washington Times, "Joni Ernst: U.S. must remain in Iraq to counter Iran, Russia"
- Financial Express, "Indo-US relations: Bill to enhance strategic relationship with New Delhi introduced by American lawmakers"

REPORTS/JOURNALS/MULTIMEDIA/COMMENTARY
- Japan Times, "It's too early to write off the Indo-Pacific strategy"
- The Wire, "The Case for a Free and Open Indo-Pacific"
- RealClear Defense, "An Indo-Pacific Joint Multinational Training Command and Readiness Center?"
- War on the Rocks, "Black Sea's Back, Alright? A New Special Series"
- National Interest, "Yemen Is Bad but It Would Be Worse Without U.S. Involvement"
- National Interest, "RIP Taiwan?"
- Defense One, "Use maritime-law trends to offset Beijing's gains in the South China Sea"
- Nikkei, "China's Belt and Road stirs up local anxieties"
- BESA Center, "Towards an Arab NATO?"
-------

**Regional Security, Arms Transfers, and Security Assistance (PM/RSAT & PM/SA)**

ARMS SALE POLICY
- Newsclick, "Weapons Made in America"
- Sputnik, "Pentagon Eyeing Lowering Transport Fees For Countries That Buy US Weapons"
- Financial Times, "Strong defence exports will boost US manufacturing base"
- The Intercept, "How a One-Word Loophole Will Make It Easier for the US to Sell Weapons to Governments That Kill Civilians"
- Reuters, "U.S. opens way for India to escape sanctions over Russia arms imports"

SECURITY SECTOR ASSISTANCE POLICY
- New York Times, "Despite Egypt's Dismal Human Rights Record, U.S. Restores Military Aid"
- Defense News, "US acts to release $195M in suspended military aid to Egypt"
- The Hill, "Final defense bill would limit US support to Saudi campaign in Yemen"
- Dialogo Americas, "The Best Learn from the Best"
- Daily Maverick, "African Security: Band-Aids and Shotgun Wounds"

AF
- Deutsche Welle, "Double debt risk for African countries that turn to China"
- Long War Journal, "Shabaab releases photos from inside joint US-Somali-Kenyan base"
- All Africa, "What peace will mean for Eritrea - Africa's 'North Korea'"
- National Interest, "America ignores Africa to its peril"
- Defence Web, "Suspected Boko Haram militants kill 18 in Chadian village"
- Taipei Times, "Xi arrives for visit in Africa as US interest wanes"
- Stars & Stripes, "Armed US drones up and running in Niger"
- Washington Post, "Extremists attack Somali military base in country's south"
- Bloomberg, "Anglophone Revolt Seen Raising Risk of Civil War in Cameroon"
- Washington Post, "Nigeria farmer-herder conflict now deadlier than Boko Haram"
- All Africa, "AU military chiefs raise red flag on foreign military bases"
- All Africa, "Troops carry massive security operation in Mogadishu"
- The Intercept, "Cameroon Is a Close US Ally — and Its Soldiers Carried Out a Shocking Execution of Women and Children"
- The Intercept, "US Secret Wars in Africa Rage On, Despite Talk of Downsizing"
- News24, "Africa's ability to deliver peace and security rests on fixing key relationships"
- Washington Post, "This little-known conflict in Nigeria is now deadlier than Boko Haram"
- Africa Prime News, "US Enhancing Military Partnerships In Africa, General Tod Says"

WASHAR0002818

EAP

- Business Insider, "Authorities respond to an explosion near the US Embassy in Beijing"
- South China Morning Post, "Chinese and US armed forces to team up for Asia-Pacific health meeting despite trade and security turmoil"
- Asia Times, "Philippines teeters between war and peace"
- Marine Corps Times, "Marine Corps presence in Australia to rise to 2,500 as soon as possible"
- Yahoo News, "Seoul considers reducing troops along N. Korea border zone (AFP)"
- Business Insider, "North Korea is dismantling a key missile testing site — and it's a big win for Trump"
- Business Insider, "A World War II battleground is now another flash point in China's influence campaign in the Pacific"
- Seattle Times, "CIA: China is waging a 'quiet kind of cold war' against US"
- Military Times, "US presses China and Russia to enforce sanctions on North Korea"
- RealClear Defense, "It's time to stop China's seaward expansion"
- Washington Post, "Philippine rebel chief: 30,000 rebels to be disarmed in deal"
- Defense News, "US Air Force is giving away retired turboprop light attack aircraft to Philippines"
- Washington Post, "The U.S. makes a new push to bolster Taiwan's military defenses. China won't like it."
- The Diplomat, "US-Philippines Alliance: Security Cooperation in the Headlines with Terror Aid Boost"
- Military Times, "Remains of fallen American troops headed back from North Korea"
- National Interest, "The return of the Asia-Pacific Quad"
- Channel News Asia, "South Korea scrambles jets to intercept Chinese warplane"

EUR

- Business Insider, "Great-power competition is growing in the Arctic, but lawmakers want to cut funding for the US's next icebreaker"
- US News, "U.S. General says future UK fighter jet must be compatible with F-35"
- Al Jazeera, "Turkey parliament approves new anti-terror law"
- Washington Examiner, "Turkey vows to keep buying Iranian oil: 'We will not obey'"
- Stars & Stripes, "Lawmakers prod Pentagon to consider more Europe-based troops"
- Reuters, "Bulgaria issues request for proposals for fighter jets"
- War on the Rocks, "The real roots of Germany's defense spending problem"
- Bloomberg, "F-35 transfers to Turkey held back under U.S. defense measure"
- Financial Times, "Georgia pledges to forge ahead with Nato ambitions"
- Russia Today, "Mattis slams 'authoritarian' Turkey but still wants it to buy F-35 jets – report"
- Washington Times, "Pentagon to send $200 million military aid package to Ukraine"
- The Times UK, "Moscow 'funds violence in Balkans' to thwart Nato expansion"
- Anadolu Agency, "Erdogan rejects reports on US prohibiting F-35 jet sale"
- International Policy Digest, "Baltic Peace Through NATO Strength"
- Act Media, "The minister of defence from Portugal confirmed that he would sell another five fighters F-16 to Romania"
- Reuters, "U.S., European allies map out larger role for F-35 fighter"
- Rustavi 2, "The US government will provide Georgia's coastal defense patrol boats for "Island" class"
- Sputnik, "Pentagon Awards $300Mln to Deliver Javelin Missiles to Ukraine, 5 Other States"
- Al-Monitor, "Washington ratchets up sanctions threats against Turkey"
- Newsweek, "Russia has sent thousands of troops and weapons to its western border, near US military and NATO allies"
- Defense News, "Poland switches gears to speed up Lockheed-made rocket launcher buy"
- The Hill, "Trump threatens Turkey with 'large sanctions' over detained pastor"
- Ahval, "Turkey secures $3.6 billion loan package from China"

NEA

- Reuters, "Islamic State kills 215 in southwest Syria attacks: local official"
- Reuters, "Wary of U.S. ally, Syrian Kurds look to Damascus for talks"
- The Hill, "Mattis: No changes on Syria from Trump"
- Al-Monitor, "UAE talks up diplomacy as Congress curtails US involvement in Yemen war"
- Al Bawaba, "Continuing protests in Iraq leaves 14 dead, 700 injured"
- Washington Post, "Qatar to upgrade air base used by U.S. to fight terrorism"
- Business Insider, "Israel fires missiles, 'intercepts' Syrian warplane after intense fighting"
- National Interest, "The real threat to America: Iran may close the Strait of Hormuz"
- Asia Times, "Saudi canal plans signal Qatar crisis still raging"
- Business Insider, "Trump pivots to confronting Iran with the 'fire and fury' approach — and it could crush the Islamic republic"
- Small Wars Journal, "A brewing proto-insurgency: Is Bahrain the next target of Iran's regional ambitions?"
- Reuters, "Islamic State makes comeback in Iraq with switch to guerrilla tactics"
- Reuters, "Russia and Qatar discuss S-400 missile systems deal TASS"
- Army Times, "US and Turkish troops coordinate patrols in tense Manbij region of Syria"
- Military Times, "Top Iranian general says his troops 'ready to confront' US"
- Washington Post, "U.S. allies have killed thousands of Yemeni civilians from the air. After 22 died at a wedding, one village asks, 'Why us?'"
- Reuters, "Yemen's Houthis say they attacked Abu Dhabi airport using drone"
- Reuters, "UAE ready to take on greater security burden in Middle East: minister"
- Reuters, "Saudi Arabia halts oil exports in Red Sea lane after Houthi attacks"
- Arabian Aerospace, "Saudi Arabia grows its Black Hawk fleet with $194m contract"
- Reuters, "Saudi-led coalition renews strikes on Yemen's main port city"
- Defense World, "Israel Eyes Fighters, Helicopters Purchase From Boeing Using US Military Aid"

WASHAR0002819

SCA
- The Atlantic, "'A sudden burst of movement' on the Afghan peace process"
- Indian Express, "India, US set to sign pact for secure military communications"
- HIS Janes, "India finalising negotiations for 48 additional Mi-17-V5 helicopters from Russia"
- Long War Journal, "Taliban overruns 2 districts in eastern Afghanistan"
- BBC, "Pakistan election: Dozens killed as voters go to polls"
- Business Insider, "The US government is okay with India's purchase of Russian weapons for now, but not for much longer"
- ABC News, "'Cautious optimism' Afghanistan strategy working: US general"
- Stars & Stripes, "US munition drops on Afghanistan on pace to set record this year"
- Financial Express, "Pakistan's Parliament needs to define status of armed forces"
- Eurasian Times, "Indian Army to be equipped with high mobility, light weight US, Korean artillery"
- Future Directions, "The United States in South Asia: The Pakistan Factor"
- Business Insider, "The US government is okay with India's purchase of Russian weapons for now, but not for much longer"
- Foreign Policy, "India Is the Weakest Link in the Quad"
- Reuters, "Islamic State claims suicide bombing targeting Afghan vice president- Amaq"
- The Hill, "State Dept. official met with Taliban to kick-start Afghanistan peace talks: report"
- Defence Aviation Post, "US, India working 'hand in glove' to strengthen diplomatic, military relations ahead of '2+2' dialogue, says Washington"
- Devdiscourse, "Boeing complete inaugural flights of Apache, Chinook choppers for India"

WHA
- Mintpress News, "US accuses China of seeking to build a "military base" in El Salvador commercial port"
- Boing Boing, "Could Brazil become a military dictatorship once again?"
- Sputnik, "Argentina ready to host several US military bases – reports"
- World Bulletin, "Argentina to lift ban on army role in internal security"
- EFE, "Argentina's Macri announces "modernization" of armed forces"
- National Interest, "The Canadian Army is short on machine guns"
- CGTN News, "Brazil's peacekeeping model"
- National Interest, "Russia's Next Big Military Sale: To Mexico?"
- National Defense Magazine, "United States, Canada studying options to replace Arctic early warning radars"
- CBS News, "Brazilian student gunned down in latest wave of violence in Nicaragua"

EXERCISES
- Newsclick, "Japan-India military exercises a harbinger of deeper ties"
- Taiwan News, "Taiwan invited to join US National Guard exercise for third time"
- Ghana Web, "800 US soldiers in Ghana for jungle warfare training at Achiase"
-------

**Directorate of Defense Trade Controls (PM/DDTC)**
- Arab Weekly, "Chinese commercial drones bring new uncertainties to old conflicts"
- Washington Examiner, "Treasury: Massachusetts smugglers helped Assad's chemical weapons program"
- WTOP, "How China, Russia, Iran target US with economic espionage"
-------

**Global Programs and Initiatives (PM/GPI)**

PEACEKEEPING
- Front Page Africa, "U.S., International Community Applauded for UNMIL's Success in Liberia"
- UN News, "INTERVIEW: 'Peacekeeping has a price,' says UN Peacekeeping chief, as risks grow and resources shrink"

WOMEN, PEACE, & SECURITY
- News Deeply, "Using Data to Link the Status of Women to Peace and Security"

MARITIME SECURITY
- Defence Web, "All crew kidnappings to date this year in the Gulf of Guinea – IMB"
- Xinhua, "IMB urges vigilance amid spike in piracy in Gulf of Guinea"
-------

**Weapons Removal & Abatement (PM/WRA)**
- Digital Trends, "Meet the gigantic machine that eats land mines for breakfast"
- Khmer Times, "CMAC needs $100 million for demining"
- Khmer Times, "Mines unearthed during flooding"
- EFE, "FARC dissidents burn mine clearance NGO's vehicle in Colombia"
-------

**Security Negotiations & Agreements (PM/SNA)**
- Marine Corps Times, "Here's why the Okinawa government is building shelters to protect schoolchildren from Marines"
- Yonhap News, "S. Korea, U.S. apart over 'operational military support' cost"

WASHAR0002820

- DOD, "U.S., South Korea Conclude 14th Integrated Defense Dialogue"

-------

**State-Defense Integration**
- *No updates*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Upcoming Think Tank Events**

**Reports**
- Carnegie Endowment, "The Military's Immunity in Egypt"
- CFR, "Cameroon's Failure of Politics"
- Critical Threats/AEI, "America Ignores Africa to Its Peril"
- CSIS, "NATO and the Claim the U.S. Bears 70% of the Burden: A False and Dysfunctional Approach to Burdensharing"
- CSIS, "Essential Imperatives for U.S. Arms Transfer Policy"
- POMED, Andrew Miller testimony before the U.S. House of Representatives Committee on Foreign Affairs Middle East and North Africa Subcommittee
- ISW, "Navigating the U.S.-Turkey Relationship Beyond the Quagmire"

**Events**

**7/30**
- No events of note.

**7/31**
- Hudson Institute, "Reforming the Committee on Foreign Investment in the United States" a panel to discuss the drivers, prospects, and implications of CFIUS reform.

**8/1-8/3**
- No events of note.

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968

e-mail:      *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm* /|Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov> |
| **Sent:** | Monday, May 14, 2018 5:13 PM |
| **To:** | Chen, Rachael J <ChenRJ@state.gov>; McKeeby, David I <McKeebyDI@state.gov>; Eugene Cottilli <Eugene.Cottilli@bis.doc.gov> |
| **Cc:** | Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | Re: Availability -- Cats I-III Backgrounders and Outreach |

0900 works for Matt. Can we push second call to 1330?


Kimberly K. Ekmark
Department of Commerce | BIS
202-705-9105


***********************************************
This Message was sent from my Mobile Device.
***********************************************

 On: 14 May 2018 16:24, "Chen, Rachael J" <ChenRJ@state.gov> wrote:
And for the Bromund call, 9:00.

**Official**
**UNCLASSIFIED**


**From:** McKeeby, David I
**Sent:** Monday, May 14, 2018 4:23 PM
**To:** Eugene Cottilli <Eugene.Cottilli@bis.doc.gov>; Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Availability -- Cats I-III Backgrounders and Outreach

Hey, Eugene:

We're aiming for 1300, which appears doable for our folks and not too late in the day.

Best,
Dave


_____
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.8757 | 🖳  BlackBerry:  202.550.3482 |
✉ e-mail:     _**mckeebydi@state.gov**_ | ◌🖉  Web: _**www.state.gov/t/pm /**_ |Twitter: _**@StateDeptPM**_

Stay connected with _State.gov_:



**From:** Eugene Cottilli <Eugene.Cottilli@bis.doc.gov>
**Sent:** Monday, May 14, 2018 4:15 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** Re: Availability -- Cats I-III Backgrounders and Outreach


Dave - as soon as I get some times from Matt, I will reply to the group.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This Message was sent from my Mobile Device.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On: 14 May 2018 12:05,
"McKeeby, David I" <McKeebyDI@state.gov> wrote:

Commerce Colleagues:

Dropping in to check availability tomorrow per Cats I-III roll-out for Matt Borman (or other Commerce briefer TBD) for 1) a call in the morning with Ted Bromund at Heritage to get him updated and to discuss a possible public event and 2) one, possible two calls in the afternoon with a) Hill/policy focused press (Politico, CQ, Bloomberg) and b) firearms publications.

Please advise and thanks,
Dave

_____
**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:        202.647.8757 | ▣   BlackBerry:  202.550.3482 |
✉ e-mail:        *mckeebydi@state.gov* | ✆ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



201821260
**United States Department of State**

*Washington, D.C.   20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                                    July 27, 2018

☐ Read by _____

**INFORMATION MEMO FOR THE SECRETARY**

FROM:          PM – Tina Kaidanow

SUBJECT:      (SBU) Executing Settlement Terms for *Defense Distributed* Litigation

**BLUF:**        (SBU) On June 29, 2018 the Department entered into a settlement agreement,
                concluded today, in the matter of *Defense Distributed, et al. v. Dep't of State* that
                allows the posting on the Internet certain files that facilitate the 3D-printing of
                specific firearms and related components.

(SBU) Defense Distributed (DD) is a Texas-based nonprofit corporation that makes available via
the internet computer-aided design (CAD) files for the three-dimensional printing of firearms
and related components.  In May 2013, PM's Directorate of Defense Trade Controls (DDTC)
sent a letter to DD stating that certain files it had posted on the internet appeared to be defense
articles controlled pursuant to the International Traffic in Arms Regulations (ITAR) and
requesting that DD remove the files from the Internet and submit a commodity jurisdiction (CJ)
request to DDTC.  DD complied with the letter, and DDTC concluded in the CJ that some, but
not all, of the files were subject to the ITAR because they conveyed information required to
produce defense articles described in Category I of the ITAR's U.S. Munitions List (USML).

(SBU) In September 2014, DD submitted requests to the DoD's Defense Office of
Prepublication and Security Review (DOPSR) to request approval for public release of the
ITAR-controlled files pursuant to ITAR § 125.4(b)(13).  DOPSR stated that review of the CAD
files was beyond its purview, and DD approached DDTC regarding public release.  However,
before DDTC responded, DD sued the Department, claiming that the Department had subjected
DD's free speech rights to an unconstitutional prior restraint by preventing it from posting files
on the internet.  DD failed to obtain a preliminary injunction. ▮

WASHAR0002824



(U) ▮▮▮▮▮▮▮▮▮ on June 29, 2018 the parties reached a settlement agreement that placed three substantive obligations on the Department:

1. To pursue publication in the Federal Register of a final rule revising USML Category I that excludes specified technical data at issue in the DD litigation;
2. To issue via a DDTC website announcement a temporary modification to USML Category I that excludes enumerated technical data at issue in the litigation pursuant to ITAR § 126.2; and
3. To issue a letter to DD that, consistent with ITAR § 125.4(b)(13), advises that the State Department is a cognizant U.S. government agency with authority to approve technical data for public release and grants approval for the technical data enumerated in the letter to be released into the public domain.

(SBU) The settlement agreement requires the Department to take the second and third actions by Friday, July 27.  Three organizations that pursue gun control filed court documents on July 25, 2018, seeking a temporary restraining order (TRO) prohibiting the Department's compliance with the settlement.  During a hearing on July 26, DOJ represented that the Department will not take the second or third actions before the court rules on the TRO.  The court denied the TRO late Friday afternoon, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮

(U) At your recent hearing, Senators Menendez and Markey raised this matter, and the Department received letters from Senators Menendez and Engel that are critical of the settlement, while Judiciary Committee Senators Nelson, Markey, Murphy, Blumenthal and Feinstein co-signed a letter on the topic to the Attorney General.  Opposition to the Department's decision to settle has spread beyond Washington, as evidenced by statements from the Manhattan and Los Angeles District Attorneys, a Washington Post op-ed by the Maricopa County, AZ, sheriff, and advocacy efforts by a number of nongovernmental organizations (including an online petition that has achieved 40,000 signatures this week).  This attention has driven over 50,000 emails and 5,000 phone calls to the Directorate of Defense Controls over the previous week.

WASHAR0002825

SENSITIVE BUT UNCLASSIFIED
-3-

Attachment:
      Tab 1 - *Defense Distributed* Settlement Agreement
      Tab 2 – Letters from Sens. Markey and Menendez
      Tab 3 – Letter from PM to Defense Distributed

SENSITIVE BUT UNCLASSIFIED

WASHAR0002826

SENSITIVE BUT UNCLASSIFIED
-4-

Approved:       PM:  Tina Kaidanow, Acting (TK)

Drafted:        PM/DTCP – Rob Hart, ext. 6-9221, cell 484-459-0217

Cleared:        PM/FO:        Lee Litzenberger          ok
                PM/DDTC:      Mike Miller               ok
                PM/DTCP:      Sarah Heidema             ok
                PM/DTCC:      Jae Shin                  ok
                PM/DTCL:      Terry Davis               ok
                PM/CPA:       Joshua Paul               ok
                D:            Jamie Shufflebarger       ok
                P:            Sunil Ravi                ok
                S/P:          Michael Urena             ok
                H:            Tamara Darrach            ok
                T:            Eduardo Abisellan         ok
                L/FO:         Josh Dorosin              ok

SENSITIVE BUT UNCLASSIFIED

WASHAR0002827

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
ROB PORTMAN, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

## United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

LMO/TB

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

WASHAR0002829

## United States Senate

WASHINGTON, DC 20510

July 23, 2018

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Sessions:

We write with great alarm over the decision last month by the Department of Justice (DOJ) to settle the lawsuit brought against the State Department by the gun rights advocacy groups Defense Distributed and the Second Amendment Foundation.

In 2015, Defense Distributed and the Second Amendment Foundation sued the State Department, challenging the State Department's decision that Defense Distributed violated federal export controls and its demand that Defense Distributed remove from the internet its blueprints for three-dimensional ("3-D") printable firearms. Throughout the course of the lawsuit, the government maintained that its position was well-supported under the Arms Export Control Act and the International Traffic in Arms Regulations. Indeed, as recently as April 2018, the government filed a motion to dismiss in which it argued that "[w]hatever informational value there may be in the process by which 3-D printing occurs," Defense Distributed's Computer Aided Design files "are indispensable to a [3-D] printing process used to create firearms and their components," and "are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export."[1]

In a stunning reversal of course last month, DOJ settled the suit and agreed to allow for the public release of Defense Distributed's 3-D firearm printing tutorials in any form. The government also made the puzzling decision to pay nearly $40,000 in legal fees to the plaintiffs using taxpayer dollars.

This settlement is inconsistent with DOJ's previous position and is as dangerous as it is confounding. The settlement will allow these tutorials to be posted online for unlimited distribution to anyone — including felons and terrorists — both here in the United States and abroad. It also sets a dangerous precedent in defending against other legally sound determinations made by the State Department under the Arms Export Control Act and the International Traffic in Arms Regulations.

We are alarmed by this settlement and request an immediate explanation for DOJ's and the State Department's abrupt and dangerous reversal of course. We ask that, prior to August 1, 2018,

---

[1] *Defense Distributed v. U.S. Dep't of State*, Case 1:15-cv-00372-RP, Defs.' Mot. Dismiss Second Am. Compl., at 1 (W.D. Tex. Apr. 6, 2018).

1

WASHAR0002830

DOJ provide us with a copy of the fully executed settlement agreement, and a written explanation and briefing on the reasoning behind the decision to settle this litigation in the manner it did. The American people have a right to know why their government agreed to such a dangerous outcome.

Thank you for your prompt attention to this matter. Should you have any questions about this request, please contact Callan Bruzzone of Senator Markey's staff at 202-224-2742.

Sincerely,

_____
Edward J. Markey
United States Senator

_____
Bill Nelson
United States Senator

_____
Richard Blumenthal
United States Senator

_____
Christopher S. Murphy
United States Senator

_____
Dianne Feinstein
United States Senator

2

| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Thursday, July 26, 2018 7:49 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Cc:** | Hart, Robert L <HartRL@state.gov> |
| **Subject:** | RE: "Temporary Suspension" |

Also, maybe suggest he cut back on viewings of "In the Line of Fire"  https://www.youtube.com/watch?v=tff_EEQt79s

Official
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Thursday, July 26, 2018 7:40 AM
**To:** Miller, Michael F <Millermf@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Subject:** RE: "Temporary Suspension"

Fighting off the urge to reply "We have not asked the Secret Service whether placing files on the internet constitutes an export."

Official
UNCLASSIFIED

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 8:18 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: "Temporary Suspension"

Has the Secret Service been consulted for its views on this matter?

**From:** Fite, David (Foreign Relations)
**Sent:** Wednesday, July 25, 2018 7:49 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Re: "Temporary Suspension"

Which raises two interesting questions:

1) does State/L have the right to definitively interpret the ITAR or not regarding my first set of questions;

2) regarding my second set of questions, does State, Justice, or both have the final say in what the settlement requires?

WASHAR0002832

Sent from my iPhone

On Jul 25, 2018, at 6:01 PM, Paul, Joshua M <PaulJM@state.gov> wrote:

Dear David,

It has been our aim to respond to your (and Ed's) questions today, but due in part to the interagency nature of this matter, I regret that we will not be able to do so.

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 12:19 PM
**To:** Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov)' <edmund.rice@mail.house.gov>; 'Jamie.mccormick@mail.house.gov' <Jamie.mccormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: "Temporary Suspension"

Just so I know, will State answer these questions today?

**From:** Fite, David (Foreign Relations)
**Sent:** Wednesday, July 25, 2018 10:52 AM
**To:** 'Miller, Michael F (Millermf@state.gov)' <Millermf@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>; 'Paul, Joshua M (PaulJM@state.gov)' <PaulJM@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov)' <edmund.rice@mail.house.gov>; 'Jamie.mccormick@mail.house.gov' <Jamie.mccormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: "Temporary Suspension"

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect?  The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means?  For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process?  Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

**From:** Fite, David (Foreign Relations)
**Sent:** Wednesday, July 25, 2018 9:20 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov;

WASHAR0002833

Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** "Temporary Suspension"

How long is "temporary" under ITAR 126.2?  Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

WASHAR0002834

| | |
|---|---|
| **From:** | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
| **Sent:** | Thursday, July 26, 2018 7:39 AM |
| **To:** | 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov> |
| **Cc:** | Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov); Jamie.mccormick@mail.house.gov; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov> |
| **Subject:** | RE: "Temporary Suspension" |

Hi,

I suspect we'll end up at least touching on this topic again when we see you this morning, but regarding your below questions, you will understand that the clearance process does not imply who has a 'final say' on anything.

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 7:49 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov); Jamie.mccormick@mail.house.gov; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Re: "Temporary Suspension"

Which raises two interesting questions:

1) does State/L have the right to definitively interpret the ITAR or not regarding my first set of questions;

2) regarding my second set of questions, does State, Justice, or both have the final say in what the settlement requires?

Sent from my iPhone

On Jul 25, 2018, at 6:01 PM, Paul, Joshua M <PaulJM@state.gov> wrote:

> Dear David,
>
> It has been our aim to respond to your (and Ed's) questions today, but due in part to the interagency nature of this matter, I regret that we will not be able to do so.
>
> Josh
>
> **Official**
> **UNCLASSIFIED**

WASHAR0002835

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 12:19 PM
**To:** Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov)' <edmund.rice@mail.house.gov>; 'Jamie.mccormick@mail.house.gov' <Jamie.mccormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: "Temporary Suspension"

Just so I know, will State answer these questions today?

**From:** Fite, David (Foreign Relations)
**Sent:** Wednesday, July 25, 2018 10:52 AM
**To:** 'Miller, Michael F (Millermf@state.gov)' <Millermf@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>; 'Paul, Joshua M (PaulJM@state.gov)' <PaulJM@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov)' <edmund.rice@mail.house.gov>; 'Jamie.mccormick@mail.house.gov' <Jamie.mccormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: "Temporary Suspension"

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect?  The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means?  For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process?  Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

**From:** Fite, David (Foreign Relations)
**Sent:** Wednesday, July 25, 2018 9:20 AM
**To:** Miller, Michael F <Millermf@state.gov> <Millermf@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** "Temporary Suspension"

How long is "temporary" under ITAR 126.2?  Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

| | |
|---|---|
| **From:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Sent:** | Friday, July 27, 2018 9:46 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov> |
| **Subject:** | RE: 18.04.06 DOJ MTD.pdf |

███████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:31 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:29 AM
**To:** Fabry, Steven F <FabrySF@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

███████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Friday, July 27, 2018 9:27 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M

**Sent:** Friday, July 27, 2018 9:25 AM
**To:** Fabry, Steven F; Hart, Robert L; Heidema, Sarah J; Miller, Michael F; Rogers, Shana A; Freeman, Jeremy B
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████

1877 336 1839
896 9221#

**Official - SBU**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Friday, July 27, 2018 9:23 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J
<HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman,
Jeremy B <FreemanJB@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████

-- Steve

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:21 AM
**To:** Hart, Robert L; Heidema, Sarah J; Miller, Michael F; Rogers, Shana A; Freeman, Jeremy B; Fabry, Steven F
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Friday, July 27, 2018 9:18 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F
<Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry,
Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU**
UNCLASSIFIED

---

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:08 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

███████████████████████████████████

**Official - SBU**
UNCLASSIFIED

---

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:07 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████████

**Official - SBU**
UNCLASSIFIED

---

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 9:01 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████████████████████████████

**Official - SBU**
UNCLASSIFIED

---

**From:** Heidema, Sarah J
**Sent:** Friday, July 27, 2018 9:00 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

████████████████████

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:55 AM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

FYI-

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,

On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice. Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by the end of April?

| | |
|---|---|
| **From:** | Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov> |
| **Sent:** | Friday, July 27, 2018 9:15 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov> |
| **Subject:** | RE: 18.04.06 DOJ MTD.pdf |

Please forward it

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 27, 2018 8:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: 18.04.06 DOJ MTD.pdf

Dear David,

On a technical legal question such as this, we would have to refer you in the first instance to the Department of Justice. Would you like to reach out to them directly, or shall I pass along your inquiry?

Josh

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Thursday, July 26, 2018 7:22 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** FW: 18.04.06 DOJ MTD.pdf

May I please get an analysis as to why this April 4th submission by the Department of Justice was so much in error by the end of April?

| **From:** | McKeeby, David I <McKeebyDI@state.gov> |
| **Sent:** | Friday, July 20, 2018 5:45 PM |
| **To:** | Thompson, Nicole A. <ThompsonNA2@state.gov>; PM-CPA <PM-CPA@state.gov> |
| **Subject:** | RE: 3-D Gun Query: Defense Distributed v United States settlement? |

Thanks—will close the loop with this guy…

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:       202.647.8757 | 📱   BlackBerry:  202.550.3482 |
✉ e-mail:       *mckeebydi@state.gov* | ✍ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



From: Thompson, Nicole A.
Sent: Friday, July 20, 2018 5:44 PM
To: PM-CPA <PM-CPA@state.gov>
Subject: 3-D Gun Query: Defense Distributed v United States settlement?


**Official
UNCLASSIFIED**

From: Thompson, Nicole A.
Sent: Friday, July 20, 2018 5:43 PM
To: 'Joel Gehrke' <jgehrke@washingtonexaminer.com>
Subject: RE: Defense Distributed v United States settlement?

Joel—

The relevant bureau at the Department will send a response to your questions promptly.

Nicole Thompson
Press Office, DOS

From: Joel Gehrke <jgehrke@washingtonexaminer.com>
Sent: Friday, July 20, 2018 5:39 PM
To: PA Press Duty <PAPressDuty@state.gov>
Subject: Defense Distributed v United States settlement?

Hello --

Do you have a comment on Ranking Member Engel's July 20 letter to Secretary Pompeo about the Defense
Distributed v United States settlement? Rep. Engel argues that the settlement will create a security risk through

WASHAR0002842

the proliferation of 3-D printed weaponry; he also suggests that the State Department is circumventing export controls on the technology and calls for a suspension of the settlement.

Does he misunderstand the settlement? Will the State Department comply with the suspension request?

Thank you,

Joel Gehrke

**Official**
**UNCLASSIFIED**

WASHAR0002843

| | |
|---|---|
| **From:** | Hart, Robert L <HartRL@state.gov> |
| **Sent:** | Thursday, July 26, 2018 11:50 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov> |
| **Cc:** | Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Subject:** | RE: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion |

The L email didn't have an attachment.

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Thursday, July 26, 2018 11:49 AM
**To:** Hart, Robert L <HartRL@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion

Thanks – was there a copy of the filing?

**Official**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Thursday, July 26, 2018 11:48 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** FW: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion
**Importance:** High

Rob Hart
202.736.9221 | hartrl@state.gov

**Official**
**UNCLASSIFIED**

**From:** Rogers, Shana A
**Sent:** Thursday, July 26, 2018 11:32 AM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** FW: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion

WASHAR0002844

**Importance:** High

FYI—the Court has ordered a hearing on the TRO motion for today at 2:30 PM.

**Official**
**UNCLASSIFIED**

.................................................................................................................................................

**From:** Robinson, Stuart J. (CIV) [mailto:Stuart.J.Robinson@usdoj.gov]
**Sent:** Thursday, July 26, 2018 11:29 AM
**To:** Rogers, Shana A; Soskin, Eric (CIV)
**Subject:** Fwd: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion
**Importance:** High

Shana, FYI


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: TXW_USDC_Notice@txwd.uscourts.gov
Date: 7/26/18 8:22 AM (GMT-08:00)
To: cmecf_notices@txwd.uscourts.gov
Subject: Activity in Case 1:15-cv-00372-RP Defense Distributed et al v. United States Department of State et al Order Setting Hearing on Motion


**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

<div align="center">

**U.S. District Court [LIVE]**

**Western District of Texas**

</div>

**Notice of Electronic Filing**

The following transaction was entered on 7/26/2018 at 10:21 AM CDT and filed on 7/26/2018
**Case Name:**        Defense Distributed et al v. United States Department of State et al
**Case Number:**      1:15-cv-00372-RP
**Filer:**
**Document Number:** 101


**Docket Text:**
**ORDER Setting Telephonic Hearing on [98] MOTION for Hearing re [97] MOTION for Temporary Restraining Order , [96] MOTION to Intervene, [97] MOTION for Temporary Restraining Order :**

**Motion Hearing set for 7/26/2018 at 02:30 PM before Judge Robert Pitman. Signed by Judge Robert Pitman. (dl)**


**1:15-cv-00372-RP Notice has been electronically mailed to:**

Alan Gura     alan@gurapllc.com, a1@alangura.com

David S. Morris     dmorris@fr.com, hart@fr.com, litz@fr.com

Eric J. Soskin     eric.soskin@usdoj.gov

J. David Cabello     dcabello@blankrome.com, jwatkins@blankrome.com, mhindman@blankrome.com

Joshua Michael Blackman     joshblackman@gmail.com, me@joshblackman.com

Matthew A. Goldstein     matthew@goldsteinpllc.com

Stuart Justin Robinson     stuart.j.robinson@usdoj.gov

W. Thomas Jacks     jacks@fr.com, edockets@fr.com, litz@fr.com

William B. Mateja     bmateja@sheppardmullin.com, dpuente@sheppardmullin.com, jhoggan@sheppardmullin.com

**1:15-cv-00372-RP Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:


**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1080075687 [Date=7/26/2018] [FileNumber=19613803-0] [55798c8db5bb5990f2dd11f849a2da4b47d7ff39b5351b99f835068a53d68eb3cf 54e5e2f898da311079935bfded59bdb3f8b194c8b5add4e9fb40438e59050f]]

WASHAR0002846

| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 1:06 PM |
| **To:** | Dearth, Anthony M <DearthAM@state.gov>; PM-CPA <PM-CPA@state.gov> |
| **Cc:** | Willbrand, Ryan T <WillbrandRT@state.gov> |
| **Subject:** | RE: Calls from the public about 3D printers |

We have talking points that are cleared we are using with the press, but I don't recommend that the DDTC RT try and take on this role with the general public – if this continues to escalate we could be talking hundreds of calls – or more – per hour.  We really need a dedicated voicemail only line for people to leave VMs that is separate from the DDTC RT line.  Can Karen Wrege set something like that up?

**Official - Transitory**
**UNCLASSIFIED**

**From:** Dearth, Anthony M
**Sent:** Wednesday, July 25, 2018 1:03 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Cc:** Willbrand, Ryan T <WillbrandRT@state.gov>
**Subject:** FW: Calls from the public about 3D printers

Appreciate guidance on the highlighted below.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

**Official - Transitory**
**UNCLASSIFIED**

**From:** Hall, John M
**Sent:** Wednesday, July 25, 2018 12:51 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; Wrege, Karen M <WregeKM@state.gov>; Dearth, Anthony M <DearthAM@state.gov>
**Cc:** Willbrand, Ryan T <WillbrandRT@state.gov>; DDTC Response Team <DDTCResponseTeam@state.gov>
**Subject:** RE: Calls from the public about 3D printers

Ed --  OK, but what should we do?  The volume is too great for us to fill out a ServiceNow ticket for each caller.  Should we take down names and phone numbers?  Or just keep a count?

Please bear in mind that people want to talk about this.  It would be very useful to have talking points to use in responding to these expressions of strongly held views.

John Hall
PM Response Team

*Note: Information in this message generally discusses controls and information contained in the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR), both of which are authoritative on this matter. The Response Team fields basic process and status questions, and assists exporters in identifying how to get answers to more complex questions handled by the*

WASHAR0002847

*Directorate of Defense Trade Control's licensing and compliance offices. The Response Team's services are not a substitute or replacement for the advisory opinion, general correspondence, and commodity jurisdiction processes delineated in the ITAR, which should be used to obtain authoritative guidance on export control issues, and do not in any way relieve exporters from their responsibilities to comply fully with the law and regulations.*

**Official - Transitory**
**UNCLASSIFIED**

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 12:47 PM
**To:** Hall, John M <HallJM@state.gov>; Wrege, Karen M <WregeKM@state.gov>; Dearth, Anthony M <DearthAM@state.gov>
**Cc:** Willbrand, Ryan T <WillbrandRT@state.gov>; DDTC Response Team <DDTCResponseTeam@state.gov>
**Subject:** RE: Calls from the public about 3D printers

John –

Per discussions with Karen Wrege, the response team should **not** be giving out the Comment Line number at this time. We need to understand the volume to prepare them for these calls. Understanding that they might already be getting some.

Thank you

Ed

**Official - Transitory**
**UNCLASSIFIED**

**From:** Hall, John M
**Sent:** Wednesday, July 25, 2018 12:06 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>
**Cc:** Willbrand, Ryan T <WillbrandRT@state.gov>; DDTC Response Team <DDTCResponseTeam@state.gov>
**Subject:** FW: Calls from the public about 3D printers

Ed:

Here's what I shared with Response Team/Help Desk colleagues, and we have started giving out the Comment Line number to people who call here.

John


John Hall
PM Response Team

*Note: Information in this message generally discusses controls and information contained in the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR), both of which are authoritative on this matter. The Response Team fields basic process and status questions, and assists exporters in identifying how to get answers to more complex questions handled by the Directorate of Defense Trade Control's licensing and compliance offices. The Response Team's services are not a substitute or replacement for the advisory opinion, general correspondence, and commodity jurisdiction processes delineated in the ITAR, which should be used to obtain authoritative guidance on export control issues, and do not in any way relieve exporters from their responsibilities to comply fully with the law and regulations.*

**Official - Transitory**

UNCLASSIFIED

**From:** Hall, John M
**Sent:** Wednesday, July 25, 2018 11:45 AM
**To:** Willbrand, Ryan T <WillbrandRT@state.gov>; Trinh21, Eric P <TrinhEP21@state.gov>; Price, John M <PriceJM@state.gov>; Pharr, Brian C <PharrBC@state.gov>; McElhaney, Adrienne R <McElhaneyAR2@state.gov>; Johnson, Theo R <JohnsonTR2@state.gov>; Asri, Nazha <AsriN@state.gov>; Rhett, Sheila <RhettS@state.gov>
**Cc:** DDTC Response Team <DDTCResponseTeam@state.gov>
**Subject:** Calls from the public about 3D printers

All:

I called the main Department of State switchboard, and the operator I spoke to said they have been getting some of these calls too.

If members of the public wish to express an opinion on any subject, they can call the **comment line** at 202-647-6575
and leave a message.  They need to press Option 8.

(If they call the DoS switchboard, the operators just transfer them to that comment line.)

It is possible that the voice mailbox will be full when they call.  If so, they should try again in 15-30 minutes, because the mailbox is emptied on a regular basis.

John


John Hall
PM Response Team

*Note: Information in this message generally discusses controls and information contained in the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR), both of which are authoritative on this matter. The Response Team fields basic process and status questions, and assists exporters in identifying how to get answers to more complex questions handled by the Directorate of Defense Trade Control's licensing and compliance offices. The Response Team's services are not a substitute or replacement for the advisory opinion, general correspondence, and commodity jurisdiction processes delineated in the ITAR, which should be used to obtain authoritative guidance on export control issues, and do not in any way relieve exporters from their responsibilities to comply fully with the law and regulations.*


**Official - Transitory**
**UNCLASSIFIED**

| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| Sent: | Thursday, May 10, 2018 8:13 AM |
| To: | Darrach, Tamara A <DarrachTA@state.gov> |
| Subject: | RE: Cats 1-3 Briefing |

██████████████████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Thursday, May 10, 2018 8:12 AM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Cats 1-3 Briefing

Josh,

██████████████████████████████████████████████████████

Thanks!

**From:** Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov>
**Date:** May 9, 2018 at 8:04:22 PM EDT
**To:** Paul, Joshua M <PaulJM@state.gov>, Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Cats 1-3 Briefing

Commerce is fine with providing the proposed rule prior to the briefing.

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Wednesday, May 09, 2018 3:25 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov>
**Subject:** RE: Cats 1-3 Briefing

Adding Kim, who has half the rules.

██████████████████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Wednesday, May 09, 2018 2:16 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: Cats 1-3 Briefing

███████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Sent:** Wednesday, May 09, 2018 2:07 PM
**To:** Rice, Edmund <Edmund.Rice@mail.house.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Cc:** BIS Legislative Affairs (kimberly.ekmark@bis.doc.gov) <kimberly.ekmark@bis.doc.gov>
**Subject:** RE: Cats 1-3 Briefing

███████████████████████████████████████
███████████████████████████████████████

Thanks,
Jamie

**From:** McCormick, Jamie
**Sent:** Wednesday, May 09, 2018 1:31 PM
**To:** Rice, Edmund <Edmund.Rice@mail.house.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Subject:** RE: Cats 1-3 Briefing

ok

**From:** Rice, Edmund
**Sent:** Wednesday, May 09, 2018 1:21 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Subject:** RE: Cats 1-3 Briefing

Ok for me.

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Wednesday, May 09, 2018 1:18 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Cats 1-3 Briefing

Thanks everyone!  Can we put a hold on Monday at 2:30 pm?  I am checking availability and will circle back shortly to confirm.

**Official**
**UNCLASSIFIED**

**From:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>

**Sent:** Wednesday, May 09, 2018 12:48 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Cats 1-3 Briefing

We have a staff meeting Mondays at 10:00.  But assuming nothing urgent suddenly crops up we could do later that morning or sometime in the afternoon.

Jamie

---

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Wednesday, May 09, 2018 12:43 PM
**To:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** Cats 1-3 Briefing

Hi everyone,

As you may know, John Cooper is leaving State and heading over to the Department of the Army.  Therefore, I will be taking on the PM portfolio for H and am looking forward to working with you.

We would like to schedule a classified briefing on Cats 1-3 for Monday, May 14th at 10 am.  Are you available at that time?

Thanks!
Tamara

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs |  U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FE0AF1773ED642DF9120291EA0A8C588-PAUL, JOSHU>
**Sent:** Wednesday, May 9, 2018 9:07 PM
**To:** Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov>
**Subject:** RE: Cats 1-3 Briefing

███████████████████████████████████

---

**From:** Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov>
**Date:** May 9, 2018 at 8:04:21 PM EDT
**To:** Paul, Joshua M <PaulJM@state.gov>, Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** RE: Cats 1-3 Briefing

███████████████████████████████████

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Wednesday, May 09, 2018 3:25 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Kimberly Ekmark <Kimberly.Ekmark@bis.doc.gov>
**Subject:** RE: Cats 1-3 Briefing

Adding Kim, who has half the rules.

███████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Wednesday, May 09, 2018 2:16 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: Cats 1-3 Briefing

███████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Sent:** Wednesday, May 09, 2018 2:07 PM
**To:** Rice, Edmund <Edmund.Rice@mail.house.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Cc:** BIS Legislative Affairs (kimberly.ekmark@bis.doc.gov) <kimberly.ekmark@bis.doc.gov>
**Subject:** RE: Cats 1-3 Briefing

By the way, not that I have lots of spare time to read through draft regulations at present, but normally State (and Commerce) circulate the proposed draft regulations to staff in advance of a briefing.

Thanks,
Jamie

**From:** McCormick, Jamie
**Sent:** Wednesday, May 09, 2018 1:31 PM
**To:** Rice, Edmund <Edmund.Rice@mail.house.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Subject:** RE: Cats 1-3 Briefing

ok

**From:** Rice, Edmund
**Sent:** Wednesday, May 09, 2018 1:21 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Subject:** RE: Cats 1-3 Briefing

Ok for me.

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Wednesday, May 09, 2018 1:18 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Cats 1-3 Briefing

Thanks everyone!  Can we put a hold on Monday at 2:30 pm?  I am checking availability and will circle back shortly to confirm.

**Official**
**UNCLASSIFIED**

**From:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Sent:** Wednesday, May 09, 2018 12:48 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Cats 1-3 Briefing

We have a staff meeting Mondays at 10:00.  But assuming nothing urgent suddenly crops up we could do later that morning or sometime in the afternoon.

Jamie

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Wednesday, May 09, 2018 12:43 PM

**To:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** Cats 1-3 Briefing

Hi everyone,

As you may know, John Cooper is leaving State and heading over to the Department of the Army.  Therefore, I will be taking on the PM portfolio for H and am looking forward to working with you.

We would like to schedule a classified briefing on Cats 1-3 for Monday, May 14th at 10 am.  Are you available at that time?

Thanks!
Tamara

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

**Official**
**UNCLASSIFIED**

| For Immediate Release | May 24, 2018 |
|---|---|

**Myth:** Transferring control of firearms from State to Commerce will result in deregulation of U.S. firearms exports, increasing numbers of U.S.-manufactured small arms around the world, and contributing to conflicts in places such as Africa or Central America or those involving gangs and non-state actors.

**Fact: The transfer of certain firearms to the control of the Department of Commerce does not deregulate the export of firearms. All firearms moved from the jurisdiction of the Department of State to the jurisdiction of the Department of Commerce will continue to require U.S. Government authorization. The U.S. Government is not considering removing the export authorization requirements for any firearms regardless of which agency has licensing jurisdiction or the proposed destination.**

**Myth:** Transferring control to Commerce will remove the requirement of U.S. Government authorization for firearms to many countries under License Exemption Strategic Trade Authorization (STA).

**Fact: The Commerce License Exception Strategic Trade Authorization (STA) may not be used for the firearms and shotguns that transition from the U.S. Munitions List (USML). Only long barreled shotguns that were previously controlled by Commerce may be exported using License Exception Strategic Trade Authorization.**

- **Additionally, the receivers, detachable magazines, and other significant parts and components of these formerly USML firearms, such as the barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" are similarly ineligible for export under license exception Strategic Trade Authorization.**

**Myth:** Even after this change, small U.S. gunsmiths will continue to be burdened by registration and requirement fees.

**Fact: Most gunsmiths are not required to register as manufacturers under the International Traffic in Arms Regulations (ITAR) today. Commerce does not have a registration requirement for manufacturers and exporters of the items under its jurisdiction. Therefore, small gunsmiths who do not manufacture, export, or broker the automatic weapons and other sensitive items that remain on the USML will no longer need to determine if they are required to register under the ITAR, but they may still be required to comply with Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) licensing requirements.**

WASHAR0002856

- **This reform will help to clarify what is controlled on which list, ending jurisdictional confusion and making it easier for exporters, especially small businesses, to comply with U.S. export controls.**

- **For those items moved from the U.S. Munitions List (USML) to the Commerce Control List (CCL), the export licensing requirements and process implemented by the Department of Commerce will be calibrated both to the sensitivity of the item and the proposed destination.**

- **As a result, foreign manufacturers will enjoy a greater opportunity to source from small U.S. companies.  This is good for: U.S. manufacturing, the defense industrial base, security of supply to the U.S. military, and interoperability with allies, to name but a few benefits.**

- **As part of the recent reforms to our export control system, the end-user screening lists maintained by State, Commerce, and the Treasury have all been compiled into a single list in one place:  www.export.gov/ecr/eg_main_023148.asp.  This single list has almost 8,000 line items. As a result, those companies that cannot afford to hire a screening service or read Federal Register notices every day can self-screen their sales orders to make sure they do not inadvertently send their products to a prohibited recipient.  In 2013, the average number of monthly downloads of the consolidated list was 34,000.  Upgrades made in November 2014, including a new "fuzzy logic" search tool added in mid-2015 that helps find listed entities without knowing the exact spelling, are resulting in hundreds of thousands of screens per day.**

- **A single application form is in development.  When deployed, this form will enable exporters to apply for licenses from any participating export control agency from the same starting point.**

**Myth:** The transfer of items from State Department export control to Commerce Department export control will also change items that are controlled for permanent import.

**Fact: The State and Commerce Department export control changes do not alter permanent import controls.**

- **The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) administers permanent import controls for Arms Export Control Act defense articles on the U.S. Munitions Import List.**

- **The transfer of items to the Commerce Department for export control does not change ATF permanent import controls.**

**Myth:** The licensing of U.S. arms by the Commerce Department will lead to less regulation, resulting in U.S.-origin items being more widely available for use in human rights abuses.

WASHAR0002857

**Fact: The movement of certain firearms to the Commerce Department will allow for more tailored export controls of items.**

- **The U.S. Government will continue its longstanding end-use monitoring efforts, including vetting of potential end-users, to help prevent human rights abuses. The U.S. Government is not removing the requirements of export authorization for firearms or ammunition.**

- **The Department of Defense and the Department of State will remain active in the process of determining how an item is controlled and reviewing export license applications for national security and foreign policy reasons, including the prevention of human rights abuses.**

**Myth:** The Commerce Department has a lack of subject matter experts in firearms licensing and control, making it a poor choice to control small arms exports.

**Fact: The Commerce Department has been licensing shotguns and shotgun ammunition for decades. The Commerce Department has investigated and disrupted numerous diversion rings and will bring that expertise to bear on small arms.**

**Myth:** U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) will lose the authority and jurisdiction to investigate the illegal export of those items being transferred (firearms, firearms parts, and ammunition) when this transition occurs.

**Fact: This transfer does not affect ICE HSI's authority or jurisdiction in any way. ICE HSI will continue to enforce the regulations governing the export of firearms, firearms parts, and ammunition.**

For further information, please contact the <u>Bureau of Political-Military Affairs</u>, Office of Congressional and Public Affairs at <u>PM-CPA@state.gov</u> and follow us on Twitter @StateDeptPM.

# # #

WASHAR0002858

# DEPARTMENT OF COMMERCE

## Bureau of Industry and Security

**15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

[Docket No. 111227796–5786–01]

RIN 0694–AF47

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)**

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns and Armament; and Category III—Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.

**DATES:** Comments must be received by July 9, 2018.

**ADDRESSES:** You may submit comments by any of the following methods:
• Submit comments via Federal eRulemaking Portal: *http://www.regulations.gov*. You can find this proposed rule by searching on its regulations.gov docket number, which is BIS–2017–0004.
• By mail or delivery to Regulatory Policy Division, U.S. Department of Commerce, Bureau of Industry and Security, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington, DC 20230. Refer to RIN 0694–AF47.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482–1641 or email *steven.clagett@bis.doc.gov*.

**SUPPLEMENTARY INFORMATION:**

## Background

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns and Armament; and Category III—Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR). This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments. The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a

letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: Howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non- military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items. BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada. As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule.

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in

Arms Regulations (ITAR), 22 CFR parts 120 through 130, and not to the list of defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA, 22 U.S.C. 2778 *et seq.*, for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items. After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available. Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR. There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

An additional justification for the change in the jurisdictional status of the items described in this rule is that the current ITAR controls burden U.S. industry without any proportionate benefits to United States national

security or foreign policy objectives. Similar to the challenges faced by other industries, the firearms trade has been negatively affected by the incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content. Currently, under the ITAR, any part, component, accessory or attachment for any of the firearms described in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated into foreign-made items or reexported to any third country. Under the EAR, the *de minimis* provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may not be subject to the EAR, provided the U.S.-origin items meet the applicable *de minimis* level for the country of reexport. Similarly, a technical drawing of such part, component, accessory or attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person concerning those items, such as the application of protective coatings. Moreover, a U.S. person engaged in manufacturing or exporting these items or providing related defense services must register with the State Department under the ITAR. Thus, even if a U.S. company can manufacture or service these items at a lower cost in the United States as compared to the cost for a U.S. or foreign company to manufacture or service the items outside of the United States, the ITAR's restrictions may render the items unattractive or uncompetitive for foreign manufacturers. The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR." (*See* part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology." While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (*i.e.*, unlimited distribution), the operation and maintenance information included in

that published operation and maintenance manual would no longer be "subject to the EAR." (*See* §§ 734.3(b) and 734.7(a).) Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR. (*See* § 734.3(b)(3)(v).)

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA. The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML. The report must "describe the nature of any controls to be imposed on that item under any other provision of law." 22 U.S.C. 2778(f)(1).

This Commerce proposed rule is being published simultaneously with a Department of State proposed rule. Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML. The Department of State proposed rule would revise Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML so that they describe in positive terms the defense articles that should remain on the USML. The Department of Commerce rule would add to the CCL items that the President determines no longer warrant control under the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL. This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether the public find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. The public is invited to comment on the appropriateness of these license requirements and licensing policies. The public is also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

WASHAR0002860

## Detailed Description of Changes Proposed by This Rule

### Creation of New ECCNs

This proposed rule would create 17 new ECCNs to control items proposed for removal from the USML. A discussion of each new ECCN and the controls that would apply to items under that ECCN follows below.

### New ECCN 0A501: Firearms and Related Commodities

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components:"

—Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);
—Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);
—Detachable magazines with a capacity of greater than 16 rounds but less than 50 rounds that are "specially designed" for the firearms listed above;
—Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and
—Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" (e.g., triggers, hammers, sears, or disconnectors) if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) or as specified in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This proposed rule would add a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also would add a second note to ECCN 0A501 to state that certain firearms and similar items are EAR99, i.e., subject to the EAR but not on the CCL. Those items are: Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 would generally not be classified in any of the new ECCNs that would be created with this proposed rule. This would be consistent with Supplement No. 1 to Part 736, General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release from "specially designed." As a conforming change, this proposed rule would revise paragraph (e)(3) of General Order No. 5 to add a reference to "0x5zz" (to account for new ECCNs 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502 described below). The "600 series" and 9x515 (spacecraft and related items) are already included in paragraph (e)(3), and those references remain unchanged.

### New ECCN 0A502: Shotguns and Certain Related Commodities

New ECCN 0A502 would control both the shotguns currently on the USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater). Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of Firearms Convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and end user) and United Nations (UN) reasons. Shotguns with a barrel length less than 18 inches would be controlled under NS Column 1, CC Column 1, FC, UN and AT Column 1 plus regional stability (RS Column 1), consistent with their current control on the USML. The shotguns controlled in 0A502 currently controlled in ECCN 0A984 would not be controlled for national security reasons because they are not on the WAML.

### New ECCN 0A503: Discharge Type Arms, and Certain Other Commodities

This rule would replace existing ECCN 0A985 with a new ECCN 0A503. The rule would add "non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and 'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML. Renumbering this ECCN would cause entries controlling firearms and related items to be placed in close proximity to each other, which would make it easier for readers to identify items on the CCL.

### New ECCN 0A504: Optical Sighting Devices and Certain Related Commodities

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms. The reasons for control table, which currently states, inter alia, that the Firearms Convention (FC) reason for control applies to "optical sights for firearms," would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices. In addition, BIS would add an RS control for certain riflescopes. These riflescopes would be identified in their own paragraph in the ECCN under 0A504.i. The riflescopes in this paragraph would be limited to those "specially designed" for use in firearms that are "subject to the ITAR." An exclusion would be included in the criteria of this paragraph to ensure less sensitive riflescopes that would be moved from ECCN 0A987 to 0A504 on the effective date of a final rule, that currently are not RS controlled under the EAR, would not be controlled under this paragraph. This rule would also add a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" is what would be used to determine whether a riflescope is "specially designed" for purposes of this paragraph.

This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the

FC reason for control. The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

### New ECCN 0A505: Ammunition and Certain Related Commodities

New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that would be classified under proposed ECCN 0A501, and for most "parts" and "components" of such ammunition. Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included. This proposed rule would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells. Buckshot shotgun shells would be subject to the CC Column 1, FC Column 1 and UN reasons for control. Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control. Only "parts" and "components" would be eligible for License Exception LVS. Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles would remain in USML Category III. Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III. Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations and anti-terrorism reasons only. Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes. Possession of this ammunition does not confer a military advantage on the United States. This rule proposes adding three notes to clarify the scope of "parts" and "components" for ammunition classified under ECCN 0A505. Note 1 to 0A505.c would clarify the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants would be controlled under 1A984 and not 0A505. Separately, Note 2 to 0A505.x would include an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers. Note 3 to 0A505.x would clarify that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

### New ECCN 0A602: Guns and Armament

New ECCN 0A602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters. It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML. Note 2 to 0A602 confirms that black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99. Inclusion of these guns and armament on the CCL is appropriate because they do not confer a significant military or intelligence advantage on the United States. The guns controlled in this ECCN are between 98 and 127 years old. The parts, components, accessories and attachments controlled in this ECCN include some that are for modern artillery. Modern artillery will remain on the USML, along with the most sensitive "parts," "components," "accessories" and "attachments" for these USML items. This proposed rule adds a note to clarify that "parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are not subject to the EAR. The USML Order of Review and CCL Order of Review already provide guidance for making such a jurisdictional and classification determination, but to highlight that these "parts," "components," "accessories" and "attachments" are not classified under paragraph (x) of 0A602, this rule proposes adding a note.

### New ECCN 0B501: Test, Inspection and Production Equipment for Firearms

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated in ECCN 0A501 or USML Category I." This new ECCN would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items. The four specific types of machinery are: Small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures and other tooling "specially designed" for the "production" of items in the State Department proposed rule for USML Category I or ECCN 0A501.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501. In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e. Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability (RS) reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

*New ECCN 0B505: Test, Inspection and Production Equipment for Ammunition*

New ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition). Equipment for manufacturing shotgun shells that do not contain buckshot would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986. ECCN 0B505 would not include equipment for the hand loading of cartridges and shotgun shells, so this rule specifies this in the heading.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes. Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602: Test, Inspection and Production Equipment for Certain Guns and Armament*

New ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated or otherwise described in ECCN 0A602.a or USML Category II. ECCN 0B602 would control eight specific types of equipment that currently are listed in paragraphs .e through .l of ECCN 2B018. Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor; Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses. ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and

fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in 0A602 or USML Category II). Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

*New ECCN 0D501: Software for Firearms and Certain Related Commodities*

New ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or equipment under 0B501 except those commodities classified under 0A501.y. "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505: Software for Ammunition and Certain Related Commodities*

New ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and "specially designed" parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism

controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602: Software for Guns and Armament and Certain Related Items*

New ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

*New ECCN 0E501: Technology for Firearms and Certain Related Items*

New ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" "required" for the "development" and "production" of firearms other than shotguns. This new ECCN also would apply the anti-terrorism and United Nations reasons for control to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms. Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502: Technology for Shotguns*

New ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" required for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" required for the "development" or "production" of shotguns in ECCN 0E984. The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length. BIS believes that "technology" related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based

solely on the barrel length of the shotgun would likely be ineffective.

*New ECCN 0E504: Technology for Certain Optical Sighting Devices*

New ECCN 0E504 would replace existing ECCN 0E987, which controls "technology" "required" for the "development," or "production" of certain commodities controlled by 0A504. The new ECCN number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other. New ECCN 0E504 would also impose a United Nations (UN) control on the entire entry.

*New ECCN 0E505: Technology for Ammunition and Related Items*

New ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and "parts" and "components); 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505. "Technology" for the "development" or "production" of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons. United States and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for that ammunition and "technology" for "software" for that ammunition. Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

*New ECCN 0E602: Technology for Guns and Armament, Including Technology for Test, Inspection and Production Equipment and Software for Guns and Armament*

New ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by ECCNs 0A602 or 0D602, or "software" controlled by 0D602.

**Revisions to Seven ECCNs**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this proposed rule would set forth the entire text of the seven ECCNs to be revised. To help the public understand what specific parts of the ECCNs would be different, the narrative below describes the amendments in detail.

*Revision to ECCN 0A018*

With the proposed removal of ECCN 0A984 and the addition of 0A502 described above, this proposed rule would make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL. This change includes the removal of the note to 0A018.c.

*Revision to ECCN 0E982*

ECCN 0E982 controls "technology" exclusively for the "development" or "production" of equipment controlled by ECCN 0A982 or 0A985. This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revision to ECCN 1A984*

To clarify an existing agency practice of controlling shotguns shells that contain only chemical irritants under 1A984, this proposed rule would revise the heading of 1A984. As described above, the same type of clarification would be made to ECCN 0A505.c under new Note 1 to paragraph (c). BIS considers these to be conforming changes to the removal of ECCN 0A986 and the addition of ECCN 0A505.c in this proposed rule.

*Revisions to ECCN 2B004*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B602 and 0B606. This rule would make no substantive changes to ECCN 2B004.

*Revisions to ECCN 2B018*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN 0B602. It would remove paragraph .n, because the commodities listed in that paragraph would be controlled under either ECCNs 0B501 or 0B602 or under existing ECCN 0B606 in this proposed rule. It would remove paragraphs .a through .d, .m and .s, because the commodities listed in those paragraphs would be controlled in ECCN 0B606. It would remove paragraphs .o, .p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN 0B501. The commodities described in the MT control in ECCN 2B018 currently listed as MT are controlled elsewhere in the EAR, so no additional changes are needed to add these commodities to other ECCNs.

*Revisions to ECCN 2D018*

Currently ECCN 2D018 controls software for the "development," "production" or "use" of equipment controlled by ECCN 2B018. As a conforming change, this rule would replace the control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

*Revisions to ECCN 7A611*

As a conforming change, this rule would remove the reference to 0A987 in the Related Controls paragraph (2) and add in its place 0A504.

**Removal of Nine ECCNs**

*Removal of ECCN 0A918*

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons. This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control. Bayonets and the "technology" to produce them are available in many countries. Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective. Therefore, for these reasons, this proposed rule does not retain a regional stability (RS column 2) control on bayonets because it is no longer warranted.

*Removal of ECCN 0A984*

This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either proposed ECCN 0A502 or 0A505. As conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1) and in ECCN 0A018.

### Removal of ECCN 0A985

This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by proposed ECCN 0A503. As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A503 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0E982.

### Removal of ECCN 0A986

This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by proposed 0A505.c, including less than lethal rounds. As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505, as appropriate in §§ 742.17(f); 742.19(a)(1); 746.3(b)(2) and 748.12(a)(1).

### Removal of ECCN 0A987

This proposed rule would remove ECCN 0A987 because proposed ECCN 0A504 would control all commodities currently controlled by ECCN 0A987. As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504, as appropriate in §§ 740.16(b)(2)(iv); 742.7(a)(1); 742.17(f); 744.9(a)(1) and (b); and 748.12(a)(1); and in ECCN 7A611.

### Removal of ECCN 0B986

This proposed rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in proposed ECCN 0B505.c. As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

### Removal of ECCN 0E918

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons. Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

### Removal of ECCN 0E984

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and shotgun shells, because such "technology" would be controlled under proposed ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun

shells). As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

### Removal of ECCN 0E987

This proposed rule would remove ECCN 0E987 because proposed ECCN 0E504 would control all "technology" currently controlled by ECCN 0E987. As conforming change, references to ECCN 0E987 would be replaced with references to ECCN 0E504, as appropriate in §§ 740.20(b)(2)(ii) and 742.7(a)(1).

### Conforming Change to General Order No. 5

This proposed rule would amend General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that would be created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs would include new ECCN 0A501, 0A502, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E505. Paragraph (e)(2) is important because, for example, it ensures that items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an amendment to the CCL. For example, most swivels and scope mounts for firearms have previously been determined through the CJ and classification process to not be "subject to the ITAR" and designated as EAR99. The classification of such "parts" would not be changed, provided the "part" was not subsequently changed, which would require a separate jurisdiction and classification analysis.

### Revisions to Regional Stability Licensing Policy for Firearms and Ammunition That Would Be Added to the EAR

This proposed rule would apply the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A505, 0B501, 0B505, 0A504, 0D501, 0D505, 0E501, 0E504 and 0E505. That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether the transaction is contrary to the national security or foreign policy interests of the United

States, including the foreign policy interest of promoting the observance of human rights throughout the world." This proposed rule would also revise the regional stability licensing policy set forth in the last sentence of paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items. This proposed rule would add ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items will be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1. Lastly, this proposed rule would add a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items would be subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern. In addition, transactions involving criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries would be subject to a policy of denial.

### Availability of License Exceptions

Many of the items in the new "600 series" ECCNs generally would be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs. BIS intends that those restrictions be no more restrictive than the ITAR license exemption restrictions that currently apply to those items.

For the ECCNs currently on the CCL that would be renumbered and placed in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL, these existing firearms-related items would continue to be eligible for the same EAR license exceptions, as they were prior to publication of this rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

### License Exception: Shipments of Limited Value (LVS)

Under this proposed rule, complete firearms controlled under ECCN 0A501 would not be eligible for License Exception LVS, 15 CFR 740.3. Firearms "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with

a limit of $500 on net value per shipment. In addition, receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them. BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR 123.17(a)). This LVS proposal would be less restrictive than the current ITAR provision in two respects. First, the value limit per shipment would be $500 compared to $100 in the ITAR. Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value. BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current prices. In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary Imports, Exports, Reexports, and Transfers (In-Country) (TMP)*

This proposed rule would amend the regulations at § 740.9 to state that

License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740). License Exception TMP would also not be available to export or reexport some firearms and ammunition shipped from or manufactured in the Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. In addition, this proposed rule would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5. It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by proposed 0A501 that is also excluded under Annex A in Supplement No. 4 to part 740 (the prohibition would not apply to such firearms), and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. These prohibitions would apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR). Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters would continue to be required to file Electronic Export Information (EEI) to the Automated Export System (AES) for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or

ultimately destined for certain proscribed or restricted countries. Certain information as described below would also be collected by CBP on behalf of BIS and done under existing or new Commerce paperwork collections. The proposed rule would also make eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

Upon the entry portion of a temporary import, the temporary importer would be required to provide the required statement to U.S. Customs and Border Protection (CBP), as proposed in paragraph (b)(5)(iv)(A).

The temporary importer would be required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as proposed in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as proposed in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as proposed in paragraph (b)(5)(v) would be required to provide the temporary import documentation (*i.e.*, the invoice used at the time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This information would be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

The proposed rule would include a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, International Organizations, International Inspections Under the Chemical Weapons Convention, and the International Space Station (GOV)*

This proposed rule would revise the regulations at § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S. government agencies and official and personal use by U.S. government employees (and the immediate families and household employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This proposed authorization under License Exception GOV would treat 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV. It would not impose certain restrictions that are imposed by the current ITAR license exemption. The ITAR exemption authorizes exports of only non-automatic firearms and "parts" and "components." License Exception GOV would authorize non-automatic and semi-automatic firearms and "parts" and "components."

The ITAR exemption (22 CFR 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country. The exporter must present a copy of the written statement to the CBP Port Director. License Exception GOV would impose none of the foregoing limitations. BIS believes that the limitations are unnecessary. The EAR control exports for national security and foreign policy reasons. BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States. Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States. Export license requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b)—to, for or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO. However, this rule would add some additional restrictions for E:1 and E:2 countries. This proposed rule would exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. government official use. In addition, to better ensure compliance with section 6(j) of the EAA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this proposed rule would add a new Note 1 to paragraph (b)(2), which would restrict the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

*License Exception: Baggage (BAG)*

This proposed rule would revise License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad. This proposed change to License Exception BAG would be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms. Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by this rule, BIS is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG. BIS is aware that U.S. Customs and Border Protection (CBP)

has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to operational challenges related to implementation. *See* the following CBP website page for additional information: *https://help.cbp.gov/app/answers/detail/a_id/323/~/traveling-outside-of-the-u.s.---temporarily-taking-a-firearm%2C-rifle%2C-gun%2C*. BIS is proposing in this rule to ensure consistency with the current ITAR filing requirements and any measures that are being used at this time to track such temporary exports of personally-owned firearms and ammunition. Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition. BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as comments on the current practice of using the CBP Form 4457, as well as any other suggestions on alternative approaches for tracking such information.

Though BIS does not require prior authorization to use License Exception BAG, in order to facilitate the physical movement and subsequent importation of firearms authorized under this license exception, this information would need to be collected by CBP by requiring EEI filing in AES.

Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms. Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: *http://www.cbp.gov/xp/cgov/toolbox/ports/*.

This proposed rule also would revise License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change would be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This proposed rule would not make changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (2).

As a clarification to License Exception BAG, this proposed rule would add two sentences to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. These two sentences would not change the existing requirement and have been included to assist the public in better identifying these special provisions.

*License Exception STA*

This proposed rule would revise the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x (*i.e.,* those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed either on the CCL or USML) are eligible for export under License Exception STA. Items controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

This proposed rule would exempt gun "parts," "components," "accessories" and "attachments" controlled under ECCN 0A501.x; test, inspection and production equipment and "parts," "components," "accessories" and "attachments" in ECCN 0B501; "software" in 0D501; and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth in § 740.20(b)(3)(ii) that applies to "600 series" items. That end-use limitation is intended to ensure that the military-related items controlled by most 600 series ECCNs are ultimately used by appropriate agencies of the governments of certain U.S allies or multilateral export control regime

members. Because the aforementioned exempted items are not of a military nature, the limitation is not necessary. As a conforming change, this proposed rule also would remove ECCNs 0A985 and 0E987 in paragraph (b)(2)(ii) and add in their place 0A503 and 0E504. This change does not change the availability of License Exception STA, but simply reflects the fact that these items would now be controlled under ECCNs 0A503 and 0E504 and the License Exception STA exclusion would continue to apply to them.

**Support Documentation for Firearms, Parts, Components, Accessories, and Attachments Controlled by ECCN 0A501**

This proposed rule would require that for commodities controlled by ECCN 0A501 exported or reexported transactions for which a license would be required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit would be a record that must be kept by the exporter or reexporter as required by part 762 of the EAR. The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented. Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement. To implement this change, this proposed rule would revise § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for Firearms and Ammunition Would Be Limited to the Authorized End Use and End Users**

Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL would be limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application. This means any change in the authorized end use or end user for a licensed transaction would require a BIS authorization. This existing

requirement of BIS licenses is specified in § 750.7(a) and on the boiler plate text included on all BIS licenses. These requirements would also be applied to firearms and ammunition licenses. A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a BIS license, would require a BIS authorization. BIS does not propose any changes in this rule to these well-established and understood requirements on using BIS licenses. Applicants for firearms and ammunition licenses are also advised that BIS would continue to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter or transferor using a BIS license, including for firearms and ammunition licenses, would also be required pursuant to § 750.7(a) to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them. As an additional safeguard for firearms and ammunition licenses, BIS would when warranted include a license condition that would require the exporter, reexporter or transferor to receive from the other parties identified on the license a confirmation in writing that those other parties had received and agreed to the terms and conditions of the license. For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records." The documents described in this paragraph would be required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional Arms Reporting for Certain Exports of ECCN 0A501.a and .b Commodities**

In § 743.4 (Conventional arms reporting), this rule would revise paragraphs (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that would require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR. This requirement would assist the United States Government to meet its multilateral commitments for the special reporting requirements for exports of certain items listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional

Arms when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or GOV (see part 740 of the EAR) or the Validated End User authorization (see § 748.15 of the EAR) and for United Nations reporting. License Exceptions LVS and STA are identified in § 743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be limited to exports authorized License Exceptions TMP, GOV and RPL or the Validated End User authorization. This rule also adds contact information for these reports.

## Changes to Export Clearance Requirements for Firearms Being Moved to the CCL

In part 758 (Export Clearance Requirements), this rule would make certain changes to clarify that a filing of Electronic Export Information (EEI) to the Automated Export System (AES) would be required for exports of the firearms transferred from the USML pursuant to this rule regardless of value or destination, including exports to Canada. As noted above, this requirement will also apply, as is presently the case under the ITAR, for temporary exports of such items pursuant to License Exception TMP or BAG.

In addition, this rule proposes to expand the data elements required as part of an AES filing for these items to include serial numbers, make, model and caliber. This requirement would ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations, including those associated with the temporary export and subsequent return of controlled firearms and unused ammunition. Similar to the description above regarding whether BIS would publish an EEI filing requirement in AES for personally-owned firearms and ammunition exported under License Exception BAG in the final rule, these expanded data elements required as part of an AES filing would be included in the final rule if CBP has made such data easily enterable in AES. If the necessary changes were not made by the time the final rule was to be published, CBP may continue to rely on CBP Form 4457 as described above.

## Entry Clearance Requirements for Temporary Imports

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items in this rule that transfer from the USML in the ITAR to become subject to the EAR, BIS would need to create a process under the EAR to impose entry clearance requirements for temporary imports of such items based on BIS's authorities over U.S. exports.

Therefore, BIS proposes a temporary imports entry clearance requirement by adding new § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the USML in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS would not impose a license requirement for such imports, but this information would be necessary to facilitate the export after a temporary import. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR.

BIS is particularly interested in receiving comments on these temporary import provisions in § 758.10 and the subsequent export under paragraph (b)(5) of License Exception TMP. A license requirement is not being proposed for these temporary imports, but BIS is proposing an entry clearance requirement whereby, as described above, the exporter at the time of import would need to make a legal representation to the U.S. Government under the EAR that the item was being temporarily imported into the United States for subsequent export under paragraph (b)(5) of License Exception TMP. BIS also welcomes comments on whether there are advantages to how the ITAR regulates temporary imports of USML items that should be incorporated into the Commerce final rule.

## Changes to EAR Recordkeeping Requirements for Firearms Being Moved to the CCL

In part 762 (Recordkeeping), this rule would make two changes to the recordkeeping requirements under the EAR. These changes would specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (see § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this rule would redesignate paragraph (a)(11) as (a)(12) and add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. The "exporter" or any other "party to the transaction" that creates or receives such records would be the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this rule would narrow the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. This rule would narrow this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record would need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States. This would be an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business and are records that should be easily accessible. These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items.

The public may submit comments on whether they agree with this BIS determination that these changes described above to the EAR recordkeeping requirements would not result in increased burdens under the EAR.

## Alignment With the Wassenaar Arrangement Munitions List

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML. USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML. USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

Rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production

equipment, "software" and "technology" for munitions list items in categories ML 18, ML 21 and ML 22, respectively, this rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), "software" (0D501, 0D602 and 0D505) and "technology" (0E501, 0E602 and 0E505). BIS believes that including the ECCNs for test, inspection and production equipment, "software," and "technology" in the same category as the items to which they relate results in an easier way to understand the CCL than using separate categories.

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

**Appropriate Delayed Effective Date for a Final Rule**

BIS also invites comments from the public on the appropriate delayed effective date needed to prepare for the changes included in this proposed rule if published in final form. A 180-day delayed effective date was used for many of the other rules that moved items from the USML to the CCL, but certain rules included shorter delayed effective dates. BIS requests the public to provide comments on whether 180-delayed effective date is warranted, or if some shorter period, such as 90-day delated effective date is warranted for this proposed rule if published in final form.

**Request for Comments**

All comments on this proposed rule must be in writing and submitted via the Federal rulemaking portal *www.regulations.gov* or by mail or delivery to the address identified in the addresses section of this proposed rule. All comments (including any personal identifiable information) would be available for public inspection and copying. Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

**Export Administration Act**

Although the Export Administration Act of 1979 expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of August 15, 2017, 82 FR 39005 (August 16, 2017), has continued the Export Administration Regulations in effect under the International Emergency

Economic Powers Act. BIS continues to carry out the provisions of the Export Administration Act of 1979, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222, as amended by Executive Order 13637.

**Executive Order Requirements**

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this proposed rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR. Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This proposed rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce proposed rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that would be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens, including financial costs, would be reduced significantly. The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much

more efficient way that would significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the item were "subject to the ITAR." Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II and III that would move by this rule to the CCL, BIS would be collecting the necessary information using the form associated with OMB Control No. 0694–0088. BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission. Using the State Department's estimate that 10,000 applicants annually would move from the USML to the CCL and BIS's estimate that 6,000 of the 10,000 applicants would require licenses under the EAR, that constitutes a burden of 4,380 hours of this collection under the EAR. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours. The other 4,000 applicants may use license exceptions under the EAR or the "no license required" designation, so these applicants would not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there would also be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications.

Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated Cost Savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce proposed rules are expected to be "net deregulatory actions." The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two proposed rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the E.O. do not use the term "net deregulatory action," but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce proposed rules are closely linked and are best viewed as a consolidated regulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL would result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

The Departments of State and Commerce for purposes of E.O. 13771 have agreed to equally share the cost burden reductions that would result from the publication of these two integral regulatory actions. The Department of State would receive 50% and the Department of Commerce would receive 50% for purposes of calculating the deregulatory benefit of these two integral regulatory actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in

burden hours by 2,810 would result in an additional cost savings of [1] $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of Commerce.

For purposes of the Department of State, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings of $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of State.

The Department of Commerce welcomes comments from the public on the analysis under E.O. 13771 described here. Comments from companies that would no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that would move to the CCL would be particularly helpful for the Department of Commerce and Department of State to receive. Comments are also encouraged on any of the other collections that may be relevant for the items that would move from the USML to the CCL. In particular, data on Department of State forms that would no longer need to be submitted would be helpful to receive.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

This proposed regulation involves four collections currently approved by OMB under these BIS collections and control numbers: Simplified Network Application Processing System (control number 0694–0088), which includes, among other things, license applications; License Exceptions and Exclusions (control number 0694–0137); Import Certificates and End-User Certificates (control number 0694–0093); Five Year Records Retention Period (control number 0694–0096); and the U.S. Census Bureau collection for

the Automated Export System (AES) Program (control number 0607–0152).

This proposed rule would affect the information collection, under control number 0694–0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR that would increase the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II and III that would move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants would require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden would be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as "net deregulatory actions".)

This proposed rule would also affect the information collection under control number 0694–0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, would become eligible for License Exception STA under this proposed rule. Additionally, test, inspection and production equipment and "software" and "technology" related to those firearms and "parts" may become eligible for License Exception STA. BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the burden associated with control number 0694–0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

---

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour. Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

BIS expects that this increase in burden as a result of the increased use of License Exception STA would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR. This proposed rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms. BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this proposed rule, a number of low-level parts would be eligible for export under License Exception STA and would therefore not require a license to such destinations.

This proposed rule would also affect the information collection under control number 0694–0096, for the five-year recordkeeping retention because of two changes this rule would make to part 762 of the EAR. This rule would add a new paragraph (a)(55) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. This rule would also require warranty certificates for these items to be retained for EAR recordkeeping. However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license would be required under the EAR, the burden would likely be reduced compared to a license requirement under the ITAR. In particular, license applications for exports of "technology" controlled by ECCN 0E501 would likely be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.,* Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This proposed rule would affect the information collection under control number 0694–0093, import certificates and end-user certificates because of the changes included in this proposed rule. First, this regulation would require that for shipments requiring a license of firearms, "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, the exporter obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement. BIS expects that this requirement would result in no change in the burden under control number 0694–0093. Second, this proposed rule also would require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection. As the State Department also requires that persons temporarily exporting firearms, parts and components declare the items to CBP, BIS does not expect that the requirement in this proposed rule would result in a change in burden under control number 0694–0093.

Third, this proposed rule would affect the information collection under control number 0694–0093 by creating a new temporary import entry clearance requirement by adding § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the United States Munitions List (USMIL) in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export under License Exception TMP. BIS would not impose a license requirement for such imports, but collecting this information would be necessary to facilitate the export after a temporary import. The temporary import entry clearance requirement in § 758.10 would also conform to the requirement in License Exception TMP under § 740.9(b)(5), so providing this information to CBP at the entry after a temporary import would facilitate the export phase of a temporary import under License Exception TMP. At the time of entry for a temporary import, the importer would need to provide a statement to CBP indicating that this shipment was being temporarily imported in accordance with the EAR for subsequent export in accordance with and under the authority of License Exception TMP. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR. The importer would also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value. If imported for a trade show, exhibition, demonstration, or testing, the temporary importer would need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States. Lastly, at the time of exportation, as requested by CBP, the exporter, or an agent acting on his or her behalf, would have to provide the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported under this proposed entry clearance requirement. As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this proposed rule would result in a change in burden under control number 0694–0093, but because of the decrease under the burden imposed under the State collection the burden on the public will not change.

This proposed rule would also affect the information collection under control number 0607–0152, for filing EEI in AES because of one change this rule would make to part 758 of the EAR. Under new paragraph (b)(10), EEI would be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada. Exports of these USML firearms and ammunition prior to

moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection would not change for the exporter. For some exporters, however, there may be an EEI filing requirement that would otherwise not have existed, such as for the export of a firearm that would be controlled under ECCN 0A501.a authorized under License Exception BAG or the export of certain firearms or ammunition to Canada.

The proposed rule would include a requirement that, for all exports of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter provide to CBP the serial number, make, model, and caliber for each firearm being exported. The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL. The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule. Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this proposed rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by email to *Jasmeet_K._Seehra@ omb.eop.gov,* or by fax to (202) 395–7285.

**Administrative Procedure Act and Regulatory Flexibility Act Requirements**

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.,* generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the proposed rule would not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a proposed rule would not have a significant impact on a

substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis. Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule would not have a significant impact on a substantial number of small entities.

*Number of Small Entities*

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses. Although BIS is unable to estimate the exact number of small entities that would be affected by this proposed rule, it acknowledges that this proposed rule would affect some unknown number.

*Economic Impact*

This proposed rule and the companion State rule would assist in making the United States Munitions List (22 CFR part 121) (USML) into a more "positive" list, *i.e.,* a list that does not use generic, catch-all controls on any "part," "component," "accessory," "attachment," or "end item" that was in any way specifically modified for a defense article, regardless of the article's military or intelligence significance or non-military applications. At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the Commerce Control List (CCL). Such items, along with certain military items that currently are on the CCL, would be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs. In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs. This proposed rule addresses USML Category I, II and III articles that would be removed from the USML and added to the CCL.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns," consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, software, and technology. Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms. However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR. Department of State officials have informed BIS that license applications for such parts and

components are a high percentage of the license applications for USML articles reviewed by that department. Such parts and components are more likely to be produced by small businesses than are complete firearms.

Category II of the USML, entitled "Guns and Armament," encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, software and technology. Modern large guns would remain on the USML. Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL. Unless specified elsewhere on the CCL or the USML, "parts," "components," "accessories," "attachments," production equipment, "software" and "technology" for large guns would be controlled on the CCL.

Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The proposed rule also applies to "parts," "components," production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this proposed rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this proposed rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this proposed rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this proposed

rule would benefit from the elimination of some license requirements implemented by this proposed rule. Six types of "parts" and "components," identified in ECCN 0A501.y, would be designated immediately as "parts" and "components" that, even if "specially designed" for a military use or a Category I firearm, have little or no military significance. These "parts" and "components," which under the ITAR require a license to nearly all destinations would, under the EAR, require a license to Cuba, Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with "parts" and "components" that would be placed on the CCL by this proposed rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments valued at $500 or less, "parts" and "components" being exported for use as replacement parts, and temporary exports. Similarly, exports and reexports of Category II firearms "parts," "components," "accessories," and "attachments" that would be placed on the CCL by this proposed rule would become eligible for those license exceptions, although the value limit would be $3,000. Category III ammunition placed on the CCL by this proposed rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved to the CCL, the number of destinations for which a license is required would remain largely unchanged. However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application. There is no such requirement under the CCL licensing procedure. This difference gives the CCL applicant at least two advantages. First, the applicant has a way of determining whether the U.S. Government would authorize the transaction before it enters into potentially lengthy, complex and expensive sales presentations or contract negotiations. Under the USML licensing procedure, the applicant would need to caveat all sales presentations with a reference to the need for government approval and would more likely have to engage in substantial effort and expense with the risk that the government might reject the application. Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract. It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this proposed rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR. This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms. Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year. There are no registration or application processing fees for applications to export items currently listed on the CCL. Once the items that are the subject to this proposed rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State could find their registration fees reduced if the number of USML licenses those entities need declines. If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

Finally, *de minimis* treatment under the EAR would become available for all items that this proposed rule would transfer from the USML to the CCL. Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product. This proposed rule would apply that same principle to "600 series" items only if the foreign-made item is being exported to a country that is subject to a United States arms embargo. In all other cases, foreign-made products that incorporate items that this proposed rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent. Because including small amounts of U.S.-origin content would not subject foreign-made products to the EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin "parts" and "components," a development that potentially would mean greater sales for U.S. suppliers, including small entities.

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat. However, BIS believes that the increased burden imposed by those actions would be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

BIS is unable to determine the precise number of small entities that would be affected by this proposed rule. Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this proposed rule would be offset by a reduction in the number of items that would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin "parts" and "components," which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content. For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

List of Subjects

*15 CFR Parts 736 and 772*

Exports.

*15 CFR Parts 740 and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

Exports, Reporting and recordkeeping requirements, Terrorism.

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

*15 CFR Part 758*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 762*

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774 of the Export Administration Regulations (15 CFR parts 730–774) are proposed to be amended as follows:

## PART 736—GENERAL PROHIBITIONS

■ 1. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 2. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

**Supplement No. 1 to Part 736—General Orders**

\*   \*   \*   \*   \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN. If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.,* the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\*   \*   \*   \*   \*

## PART 740—LICENSE EXCEPTIONS

■ 3. The authority citation for 15 CFR part 740 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 7201 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 4. Section 740.9 is amended by:
■ a. Adding five sentences at the end of paragraph (a) introductory text;
■ b. Adding one sentence at the end of paragraph (b)(1) introductory text;
■ c. Adding paragraph (b)(5); and
■ d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

### § 740.9   Temporary imports, exports, reexports, and transfers (in-country) (TMP).

\*   \*   \*   \*   \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured

in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).

\*   \*   \*   \*   \*

(b) \* \* \*
(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\*   \*   \*   \*   \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition,

WASHAR0002875

demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of the export.

***Note 1 to paragraph (b)(5):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\*　　\*　　\*　　\*　　\*

■ 5. Section 740.11 is amended by:
■ a. Adding a sentence at the end of the introductory text;
■ b. Adding Note 2 to paragraph (b)(2); and
■ c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

### § 740.11   Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

\* \* \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. government official use of this section.

\*　　\*　　\*　　\*　　\*

***Note 2 to paragraph (b)(2):*** *Items controlled for NS, MT, CB, NP, FC or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end-users of a government in a Country Group E:1, or E:2 country.*

\*　　\*　　\*　　\*　　\*

■ 6. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

### § 740.14   Baggage (BAG).

\*　　\*　　\*　　\*　　\*

(b) \* \* \*

(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\*　　\*　　\*　　\*　　\*

(e) *Special provisions for firearms and ammunition.* \* \* \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonresident alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the provisions of Department of Justice Regulations at 27 CFR 478.115(d).

\*　　\*　　\*　　\*　　\*

### § 740.16   [Amended]

■ 7. Section 740.16 is amended by removing "0A987" from paragraph (b)(2)(iv) and adding in its place "0A504".

■ 8. Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

### § 740.20   License Exception Strategic Trade Authorization (STA).

\*　　\*　　\*　　\*　　\*

(b) \* \* \*

(2) \* \* \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503; 0E504, 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\*　　\*　　\*　　\*　　\*

■ 9. Add Supplement No. 4 to part 740 to read as follows:

### Supplement No. 4 to Part 740—Annex A Firearm Models

(a) *Pistols/revolvers.*
(1) German Model P08 Pistol = SMCR.
(2) IZH 34M, .22 Target pistol.
(3) IZH 35M, .22 caliber Target pistol.
(4) Mauser Model 1896 pistol = SMCR.
(5) MC–57–1 pistol.
(6) MC–1–5 pistol.
(7) Polish Vis Model 35 pistol = SMCR.
(8) Soviet Nagant revolver = SMCR.
(9) TOZ 35, .22 caliber Target pistol.
(10) MTs 440.
(11) MTs 57–1.
(12) MTs 59–1.
(13) MTs 1–5.
(14) TOZ–35M (starter pistol).
(15) Biathlon–7K.
(b) *Rifles.*
(1) BARS–4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K = SMCR.

(6) German model G41 = SMCR.

(7) German model G43 = SMCR.

(8) IZH–94.

(9) LOS–7, bolt action.

(10) MC–7–07.

(11) MC–18–3.

(12) MC–19–07.

(13) MC–105–01.

(14) MC–112–02.

(15) MC–113–02.

(16) MC–115–1.

(17) MC–125/127.

(18) MC–126.

(19) MC–128.

(20) Saiga.

(21) Soviet Model 38 carbine = SMCR.

(22) Soviet Model 44 carbine-SMCR.

(23) Soviet Model 91/30 rifle = SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .22lr.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle = SMCR.

(30) Sever—double barrel.

(31) IZH18MH single barrel break action.

(32) MP–251 over/under rifle.

(33) MP–221 double barrel rifle.

(34) MP–141K.

(35) MP–161K.

(36) MTs 116–1.

(37) MTs 116M.

(38) MTs 112–02.

(39) MTs 115–1.

(40) MTs 113–02.

(41) MTs 105–01.

(42) MTs 105–05.

(43) MTs 7–17 combination gun.

(44) MTs 7–12–07 rifle/shotgun.

(45) MTs 7–07.

(46) MTs 109–12–07 rifle.

(47) MTs 109–07 rifle.

(48) MTs 106–07 combination.

(49) MTs 19–97.

(50) MTs 19–09.

(51) MTs 18–3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut–2.

(56) Berkut–2M1.

(57) Berkut–3.

(58) Berkut–2–1.

(59) Berkut–2M2.

(60) Berkut–3–1.

(61) Ots–25.

(62) MTs 20–07.

(63) LOS–7–1.

(64) LOS–7–2.

(65) LOS–9–1.

(66) Sobol (Sable).

(67) Rekord.

(68) Bars—4–1.

(69) Saiga.

(70) Saiga–M.

(71) Saiga–308.

(72) Saiga–308–1.

(73) Saiga–308–2.

(74) Saiga–9.

(75) Korshun.

(76) Ural–5–1.

(77) Ural 6–1.

(78) Ural–6–2.

(79) SM–2.

(80) Biatlon–7–3.

(81) Biatlon–7–4.

(82) Rekord–1.

(83) Rekord–2.

(84) Rekord–CISM.

(85) Rekord–1–308.

(86) Rekord–2–308.

(87) Rekord–1–308–CISM.

(88) VEPR.

(89) VEPR Super.

(90) VEPR Pioner.

(91) VEPR Safari.

(92) TOZ 109.

(93) KO 44–1.

(94) TOZ 78–01.

(95) KO 44.

(96) TOZ 99.

(97) TOZ 99–01.

(98) TOZ 55–01 Zubr.

(99) TOZ 55–2 Zubr.

(100) TOZ 120 Zubr.

(101) MTs 111.

(102) MTs 109.

(103) TOZ 122.

(104) TOZ 125.

(105) TOZ 28.

(106) TOZ 300.

## PART 742—CONTROL POLICY—CCL BASED CONTROLS

■ 10. The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 11. Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

### § 742.6   Regional stability.

\*   \*   \*   \*   \*

(b) \*   \*   \*

(1) \*   \*   \*

(i) Applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0A504, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. \* \* \* When destined to the People's Republic of China or a country listed in Country Group E:1 in supplement no. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial. In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

\*   \*   \*   \*   \*

■ 12. Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

### § 742.7   Crime control and detection.

(a) \* \* \*

(1) Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979, 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License

Requirements'' section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3) Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the ''License Requirements'' section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4) Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982. Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*     \*     \*     \*     \*

(c) *Contract sanctity.* Contract sanctity date: August 22, 2000. Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*     \*     \*     \*     \*

■ 13. Section 742.17 is amended by:
■ a. Revising the first sentence of paragraph (a); and
■ b. Revising paragraph (f) to read as follows:

#### §742.17   Exports of firearms to OAS member countries.

(a) *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries. \* \* \*

\*     \*     \*     \*     \*

(f) *Items/Commodities.* Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). (See Supplement No. 1 to part 774 of the EAR).

\*     \*     \*     \*     \*

#### §742.19   [AMENDED]

■ 14. Section 742.19(a)(1) is amended by:
■ a. Removing ''0A986'' and adding in its place ''0A505.c''; and
■ b. Removing ''0B986'' and adding in its place ''0B505.c''.

### PART 743—SPECIAL REPORTING AND NOTIFICATION

■ 15. The authority citation for 15 CFR part 743 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR,

2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR 16129; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 16. Section 743.4 is amended by adding paragraphs (c)(1)(i) and (c)(2)(i) and revising paragraph (h) to read as follows:

#### §743.4   Conventional arms reporting.

\*     \*     \*     \*     \*

(c) \* \* \*
(1) \* \* \*
(i) ECCN 0A501.a and .b.

\*     \*     \*     \*     \*

(2) \* \* \*
(i) ECCN 0A501.a and .b.

\*     \*     \*     \*     \*

(h) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel. (202) 482–0092, Fax: (202) 482–4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel. (202) 482–4188, Fax: (202) 482–4145.

### PART 744—CONTROL POLICY: END-USER AND END-USE BASED

■ 17. The authority citation for 15 CFR part 744 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of September 18, 2017, 82 FR 43825 (September 19, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018).

#### §744.9   [AMENDED]

■ 18. Section 744.9 is amended by removing ''0A987'' from paragraphs (a)(1) and (b) and adding in its place ''0A504''.

### PART 746—EMBARGOES AND OTHER SPECIAL CONTROLS

■ 19. The authority citation for 15 CFR part 746 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 287c; Sec 1503, Pub. L. 108–11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O.

12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007–7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

#### §746.3   [AMENDED]

■ 20. Section 746.3 is amended by removing ''0A986'' from paragraph (b)(2) and adding in its place ''0A505.c''.

#### §746.7   [AMENDED]

■ 21. Section 746.7 is amended in paragraph (a)(1) by:
■ a. Adding ''0A503'' immediately before ''0A980''; and
■ b. Removing ''0A985''.

### PART 748—APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

■ 22. The authority citation for 15 CFR part 748 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 23. Section 748.12 is amended by:
■ a. Revising the heading;
■ b. Adding introductory text;
■ c. Revising paragraphs (a) introductory text and (a)(1);
■ d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and
■ e. Adding paragraph (e).
The revisions and additions read as follows.

#### §748.12   Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in §748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that

WASHAR0002878

are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d).

\*　　\*　　\*　　\*　　\*

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

**Note 2 to paragraph (e).** Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.

**PART 758—EXPORT CLEARANCE REQUIREMENTS**

■ 24. The authority citation for part 758 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 25. Section 758.1 is amended as follows:

■ a. By revising paragraphs (b)(7), (8) and (9) and adding paragraph (b)(10);

■ b. By revising paragraph (c)(1); and

■ c. By adding paragraph (g)(4) to read as follows:

**§ 758.1   The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).**

\*　　\*　　\*　　\*　　\*

(b) \* \* \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

(10) For all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \* \* \*

(1) License Exception Baggage (BAG), except for exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, as set forth in § 740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

\*　　\*　　\*　　\*　　\*

(g) \* \* \*

(4) *Exports of Firearms and Related Items.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model number, caliber and serial number of the exported items.

\*　　\*　　\*　　\*　　\*

■ 26. Add § 758.10 to read as follows:

**§ 758.10   Entry clearance requirements for temporary imports.**

(a) *Scope.* This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502. Items that are temporarily exported under the EAR for permanent return to the United

States are outside of the scope of this section because the items are not considered temporary imports, but these items must have met the export clearance requirements specified in § 758.1 of the EAR. See paragraph (a)(2) of this section for permanent import requirements.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of the Port Directors of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

**Note 1 to paragraph (b)(1):** In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova,

Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide as requested by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR on the USMIL was temporarily imported. See also the additional requirements inspection in § 758.1(g)(4).

## PART 762—RECORDKEEPING

■ 27. The authority citation for part 762 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 28. Section 762.2 is amended by removing "; and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

### § 762.2  Records to be retained.

(a) * * *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported. The "exporter" or any other party to the transaction (see § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

* * * * *

■ 29. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

### § 762.3  Records exempt from recordkeeping requirements.

(a) * * *

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with

barrel length less than 18 inches controlled in 0A502;

* * * * *

## PART 772—DEFINITIONS OF TERMS

■ 30. The authority citation for part 772 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

### § 772.1  [AMENDED]

■ 31. In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c".

## PART 774—THE COMMERCE CONTROL LIST

■ 32. The authority citation for 15 CFR part 774 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 et seq.; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 33. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

## Supplement No. 1 to Part 774—The Commerce Control List

* * * * *

**0A018   Items on the Wassenaar Munitions List (see List of Items Controlled).**

### License Requirements

Reason for Control: NS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

LVS: $3,000 for 0A018.b, $1,500 for 0A018.c and .d
GBS: N/A
CIV: N/A

### List of Items Controlled

Related Controls: (1) See also 0A979, 0A988, and 22 CFR 121.1 Categories I(a), III(b–d), and X(a). (2) See ECCN 0A617.y.1 and .y.2 for items formerly controlled by ECCN 0A018.a. (3) See ECCN 1A613.c for military helmets providing less than NIJ Type IV

protection and ECCN 1A613.y.1 for conventional military steel helmets that, immediately prior to July 1, 2014 were classified under 0A018.d and 0A988. (4) See 22 CFR 121.1 Category X(a)(5) and (a)(6) for controls on other military helmets.
Related Definitions: N/A
Items:
  a. [RESERVED]
  b. "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130);

  ***Note to 0A018.b:*** 0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:
  a. Ammunition crimped without a projectile (blank star);
  b. Dummy ammunition with a pierced powder chamber;
  c. Other blank and dummy ammunition, not incorporating components designed for live ammunition.
  c. [RESERVED]
  d. [RESERVED]

■ 34. In Supplement No. 1 to part 774, Category, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501   Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

### License Requirements

Reason for Control: NS, RS, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y. | NS Column 1 |
| RS applies to entire entry except 0A501.y. | RS Column 1 |
| FC applies to entire entry except 0A501.y. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

LVS: $500 for 0A501.c, .d, and .x, $500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.
GBS: N/A
CIV: N/A

### Special Conditions for STA

STA: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls:* (1) Firearms that are fully automatic, and magazines with a capacity of 50 rounds or greater, are "subject to the ITAR." (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions:* N/A

*Items:*

a. Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)): Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d. Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

e. Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

y.1. Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.,* triggers, hammers, sears, disconnectors);"

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads; and

y.6. Bayonets.

***Technical Note 1 to 0A501:*** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

***Note 1 to 0A501:*** *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

**0A502   Shotguns; complete trigger mechanisms; magazines and magazine**

extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.

**License Requirements**

*Reason for Control:* RS, CC, FC, UN, AT, NS

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | RS Column 1 |
| FC applies to entire entry. | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user. | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user. | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement. | CC Column 3 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm). | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* This entry does not control combat shotguns and fully automatic shotguns. Those shotguns are "subject to the ITAR."

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A503   Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles;**

except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.

**License Requirements**

*Reason for Control:* CC, UN

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information) |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 For a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A504   Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i. | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, d, .e, .g and .i of this entry. | FC Column 1 |
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A

*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 μA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.
*Related Definitions:* N/A
*Items:*

  a. Telescopic sights.
  b. Holographic sights.
  c. Reflex or "red dot" sights.
  d. Reticle sights.
  e. Other sighting devices that contain optical elements.
  f. Laser aiming devices or laser illuminators "specially designed" for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

  **Note 1 to 0A504.f:** *0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

  g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e or .i.
  h. [Reserved]
  i. Riflescopes that were not "subject to the EAR" as of [DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

  **Note 2 to paragraph i:** *For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."*

**0A505   Ammunition as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x. | NS Column 1 |
| RS applies to 0A505.a and .x. | RS Column 1 |
| CC applies to 0A505.b. | CC Column 1 |
| FC applies to entire entry except 0A505.d. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d and .x. | AT Column 1 |
| AT applies to 0A505.c. | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons. The Commerce Country Chart is not designed to determine AT licensing requirements for this entry. See § 742.19 of the EAR for additional information |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $100 for items in 0A505.x
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.
*Related Definitions:* N/A
*Items:*

  a. Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.
  b. Buckshot (No. 4 .24" diameter and larger) shotgun shells.
  c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

  **Note 1 to 0A505.c:** *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

  d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.
  e. through w. [Reserved]
  x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

  **Note 2 to 0A505.x:** *The controls on "parts" and "components" in this entry include Berdan primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

  **Note 3 to 0A505.x:** *The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

■ 35. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

**0A602   Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls:* (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR." (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.
*Related Definitions:* N/A
*Items:*

  a. Guns and armament manufactured between 1890 and 1919.
  b. Military flame throwers with an effective range less than 20 meters.
  c. through w. [Reserved]
  x. "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

  **Note 1 to 0A602:** *"Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

  **Note 2 to 0A602:** *Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants designated EAR99.*

WASHAR0002882

**Supplement No. 1 to Part 774—[Amended]**

■ 36. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

■ 37. In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501   Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated in or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. Small arms chambering machines.
b. Small arms deep hole drilling machines and drills therefor.
c. Small arms rifling machines.
d. Small arms spill boring machines.
e. Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505   Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated in or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x. | NS Column 1 |
| RS applies to paragraphs .a and .x. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to paragraphs .a, .d and .x. | AT Column 1 |
| AT applies to paragraph .c. | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0B505.

List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w [Reserved]

x. "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

■ 38. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602   Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0B602.

List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602 or USML Category II:
a.1. Gun barrel rifling and broaching machines and tools therefor;
a.2. Gun barrel rifling machines;
a.3. Gun barrel trepanning machines;
a.4. Gun boring and turning machines;
a.5. Gun honing machines of 6 feet (183 cm) stroke or more;
a.6. Gun jump screw lathes;
a.7. Gun rifling machines; and
a. 8. Gun straightening presses.
b. Jigs and fixtures and other metalworking implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.
c. Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.
d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

**Supplement No. 1 to Part 774—[Amended]**

■ 39. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

■ 40. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501   "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR" (See 22 CFR 121.1, Category I).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

**0D505** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x. | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to "software" for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 41. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k). (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A
*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

■ 42. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E018 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."
*Related Definitions:* N/A
*Items:*
  a. "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.
  b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502** "Technology" "required" for the "development" or "production," of commodities controlled by 0A502.

**License Requirements**

*Reason for Control:* CC, UN

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See §746.1(b) of the EAR for UN controls |

WASHAR0002884

List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E504** "Technology" "required" for the "development," or "production" of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E505** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.

**License Requirements**

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505. | NS Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to entire entry except "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| CC applies to "technology" for the "development" or "production" of commodities in 0A505.b. | CC Column 1 |
| AT applies to "technology" for "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 43. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls:* Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."
*Related Definitions:* N/A
*Items:* "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**Supplement No. 1 to Part 774— [Amended]**

■ 44. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.

■ 45. In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982** "Technology" exclusively for the "development" or "production" of equipment controlled by 0A982 or 0A503.

**License Requirements**

*Reason for Control:* CC

| Control(s) |
|---|
| CC applies to "technology" for items controlled by 0A982 or 0A503. A license is required for ALL destinations, except Canada, regardless of end-use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

WASHAR0002885

**Supplement No. 1 to Part 774—[Amended]**

■ 46. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

■ 47. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and ''parts'' and ''components'' ''specially designed'' therefor, n.e.s.**

*License Requirements*

*Reason for Control:* CC

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

■ 48. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004   Hot ''isostatic presses'' having all of the characteristics described in the List of Items Controlled, and ''specially designed'' ''components'' and ''accessories'' therefor.**

*License Requirements*

*Reason for Control:* NS, MT NP, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 2 |
| MT applies to entire entry. | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa. | NP Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See ECCN *2D001* for software for items controlled under this entry. (2) See ECCNs *2E001* (''development''), *2E002* (''production''), and *2E101* (''use'') for technology for items controlled under this entry. (3) For ''specially designed'' dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009. (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, *2B104* and *2B204*. (5) Also see ECCNs *2B117* and *2B999.a*.
*Related Definitions:* N/A
*Items:*

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

***Technical Note:*** *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

■ 49. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018   Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are ''specially designed'' for the ''production'' of items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

■ 50. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018   ''Software'' for the ''development,'' ''production,'' or ''use'' of equipment controlled by 2B018.**

No software is currently controlled under this entry. See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

■ 51. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001   ''Technology'' according to the General Technology Note for the ''development'' of equipment or ''software'' controlled by 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

*License Requirements*

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to ''technology'' for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002. | NS Column 1 |
| MT applies to ''technology'' for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons. | MT Column 1 |
| NP applies to ''technology'' for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201 or 2D202 for NP reasons. | NP Column 1 |
| NP applies to ''technology'' for items controlled by 2A290, 2A291, or 2D290 for NP reasons. | NP Column 2 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* See also *2E101, 2E201,* and *2E301*
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.
   Note: *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

■ 52. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002  "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009. | NS Column 1 |

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons. | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons. | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

■ 53. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611   Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, MT, RS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738). |
|---|---|
| NS applies to entire entry except 7A611.y. | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c. | MT Column 1 |
| RS applies to entire entry except 7A611.y. | RS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry except 7A611.y. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $1,500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.
*Related Definitions:* N/A
*Items:*
   a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.
   b. to w. [RESERVED]
   x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:
   1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;
   2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102 or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]

Dated: May 4, 2018.

**Richard E. Ashooh,**

*Assistant Secretary for Export Administration.*

[FR Doc. 2018–10367 Filed 5–21–18; 8:45 am]

**BILLING CODE 3510–33–P**

## DEPARTMENT OF STATE

**22 CFR Parts 121, 123, 124, 126, and 129**

[Public Notice 10094]

**RIN 1400–AE30**

**International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).

**DATES:** The Department will accept comments on this proposed rule until July 9, 2018.

**ADDRESSES:** Interested parties may submit comments within 45 days of the date of publication by one of the following methods:

• *Email: DDTCPublicComments@ state.gov* with the subject line, "ITAR Amendment—Categories I, II, and III."

• *Internet:* At *www.regulations.gov,* search for this notice using Docket DOS–2017–0046.

Comments received after that date will be considered if feasible, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of confidentiality is asserted, because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at *www.pmddtc.state.gov.* Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov,* leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.

**FOR FURTHER INFORMATION CONTACT:** Robert Monjay, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–2817; email *DDTCPublicComments@state.gov.*

ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.,* "defense articles," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. The Department of Commerce is publishing a companion rule in this edition of the **Federal Register**.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the United States Munitions List under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1(b) of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the

U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule proposes adding a new paragraph (b)(2)(vii) to § 129.2 to update the enumerated list of actions that are not considered brokering. This change is a conforming change and is needed to address the movement of items from the USML to the CCL that will be subject to the brokering controls, to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport or retransfer of such items.

The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

**Revision of Category I**

This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all

WASHAR0002889

weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".

### Revision of Category II

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f),

engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (11).

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

### Revision of Category III

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

### Conforming ITAR Changes

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions at § 123.17(a) through (e), which describe the firearms exemptions, because the paragraphs will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, § 123.16(b)(6) will be revised to describe only the remaining exemption at § 123.17 (personal protective gear), and § 123.16(b)(7) will be reserved. Section 123.17 will be amended to remove paragraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of § 124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in § 126.1(s) will be revised to remove reference to the firearms exemption in § 123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are on the USMIL for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

### Request for Comments

The Department welcomes comments from the public and specifically requests input on the following matters:

(1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in its Munitions List Categories 1, 2 and 3 (WA–ML1, WA–ML2 and WA–ML3). Readers are asked to identify any potential gap in coverage

**24200**    **Federal Register** / Vol. 83, No. 101 / Thursday, May 24, 2018 / Proposed Rules

brought about by the changes for USML Categories I, II and III contained in this notice and the new Category 0, 0x5zz ECCNs published separately by the Department of Commerce when reviewed together.

(2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms, large guns, armaments, ordnance and ammunition. The public should provide any specific examples of firearms (or parts, components, accessories thereof), large guns, armaments, ordnance or ammunition whose jurisdiction is unclear based on this revision.

(3) The Department has, in the past, adopted a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL. The Department seeks to allow industry sufficient time to implement this rule, including time to make changes to IT systems, technology controls plans, and other business processes. The public should provide input on the time necessary to implement any final rule for these categories, as well as a description of any increased burden that, in the view of the commenter, would be imposed on businesses or individuals should this rule be adopted.

## Regulatory Analysis and Notices

### Administrative Procedure Act

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, the Department is publishing this proposed rule with a 45-day provision for public comment.

### Regulatory Flexibility Act

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

### Unfunded Mandates Reform Act of 1995

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

### Executive Orders 12372 and 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL. We request comment from the public on any impact that would be imposed on the public if this rule were adopted.

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this proposed rule would decrease the number of license applications

submitted to the Department under OMB Control No. 1405–0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department will be eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions will require an individual validated license. The Department of Commerce will be collecting the information necessary to process license applications under OMB Control No. 0694–0088. The Department of Commerce estimates that OMB Control No. 0694–0088 takes approximately 43.8 minutes for a manual or electronic submission. The Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection. The Department estimates a reduction in burden of 10,000 hours due to the proposed transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce will be 4,380 burden hours. Therefore, the net burden would be reduced by 5,620 hours. The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80. There may also be other State Department forms that will no longer need to be submitted and that may further reduce the burden hours for applicants. The Department is seeking comments on the reduction from the other forms, as referenced below.

In addition to the reduction in burden hours, there will be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other

related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to exporters under the EAR and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.

The Department welcomes comments from the public on the net reduction in burden described within this section, particularly if there are additional burden reductions that are not reflected here (please provide number of hours or cost) or if the estimates noted here appear otherwise inaccurate.

Estimated Cost Savings

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from Executive Order 13771 (82 FR 9339, February 3, 2017). Although the Department is of the opinion that this proposed rule is exempt from E.O. 13771 and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, this proposed rule is expected to be an E.O. 13771 deregulatory action. The Department has conducted this analysis in close consultation with the Department of Commerce. The total annual recurring dollar cost savings is estimated to be $1,376,281 for purposes of E.O. 13771 for the Department of State.

*Executive Order 12988*

The Department of State has reviewed this rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department of State has determined that this rulemaking will not have tribal implications, will not

impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

*Paperwork Reduction Act*

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

The Department of State believes there would be a reduction in burden for OMB Control No. 1405–0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data. This form is an application that, when completed and approved by Department of State, constitutes the official record and authorization for the commercial export of unclassified U.S. Munitions List articles and technical data, pursuant to the AECA and ITAR. For an analysis of the reduction in burden for OMB Control No. 1405–0003, see the above Section for E.O. 12866. The Department of State requests comments on the collection of information or potential reduction in burden be sent also to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for Department of State, at *OIRA_Submission@omb.eop.gov* or Attention: Desk Officer for Department of State, Office of Information and Regulatory Affairs of OMB, 725 17th St. NW, Washington, DC 20503.

List of Subjects in 22 CFR Parts 121, 123, 124, 126, and 129

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 121, 123, 124, 126, and 129 are proposed to be amended as follows:

PART 121—THE UNITED STATES MUNITIONS LIST

■ 1. The authority citation for part 121 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

§ 121.1   The United States Munitions List.

\*   \*   \*   \*   \*

Category I—Firearms and Related Articles

*(a) Firearms using caseless ammunition.

*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.*, Precision Guided Firearms (PGFs)), and specially designed parts and components therefor.

**Note to paragraph (c):** Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

*(e) Silencers, mufflers, and sound suppressors, and specially designed parts and components therefor.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm.

(3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Note 1 to Category I:** Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude: Any non-automatic or semi-

automatic firearms to .50 caliber (12.7 mm) inclusive; non-automatic shotguns; BB, pellet, and muzzle loading (*e.g.*, black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730 through 774).

**Note 2 to Category I:** The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant.

(2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

## Category II—Guns and Armament

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

*(1) Guns, howitzers, artillery, and cannons;

*(2) Mortars;

*(3) Recoilless rifles;

*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(5):** This paragraph does not control guns and armament greater than .50 caliber (12.7 mm) (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(5):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(5):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

**Note 1 to paragraph (a):** This paragraph does not include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; or black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602.

**Note 2 to paragraph (a):** Guns and armament when integrated into their carrier (*e.g.*, ships, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with a minimum effective range of 20 meters.

(c) [Reserved]

*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

**Note to paragraph (d):** Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.*, muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independently powered ammunition handling systems and platform interface components as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

**Note to paragraph (j)(9):** For weapons mounts specially designed for ground vehicles, *see* Category VII.

(10) Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(11) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(15) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

*(16) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see § 123.1(b) of this subchapter).

## Category III—Ammunition and Ordnance

*(a) Ammunition, as follows:

(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

(2) Ammunition preassembled into links or belts;

(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

(4) Caseless ammunition manufactured with smokeless powder;

**Note to paragraph (a)(4):** Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

(7) Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles;

(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(10):** This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (see § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(10):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(10):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

**Note to paragraph (d)(2):** This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (e.g., bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (e.g., fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (e.g., bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

**Note to paragraph (d)(10):** This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (see § 120.10 of this subchapter) and defense services (see § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.).

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (see § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see § 123.1(b) of this subchapter).

**Notes to Category III:** 1. This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

2. This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

3. Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

\*     \*     \*     \*     \*

## PART 123—LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

■ 3. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778,

2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112–55; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 4. Section 123.15 is amended by revising paragraph (a)(3) to read as follows:

§ 123.15   Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.

(a) * * *

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more.

* * * * *

■ 5. Section 123.16 is amended by revising paragraphs (b)(2) introductory text and (b)(6) and removing and reserving paragraph (b)(7) to read as follows:

§ 123.16   Exemptions of general applicability.

* * * * *

(b) * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

* * * * *

(6) For exemptions for personal protective gear, refer to § 123.17.

* * * * *

■ 6. Section 123.17 is amended by revising the section heading, removing and reserving paragraphs (a) through (e), and revising paragraph (j) to read as follows:

§ 123.17   Exemption for personal protective gear.

* * * * *

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

* * * * *

§ 123.18   [Removed and Reserved]

■ 7. Section 123.18 is removed and reserved.

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

■ 8. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 9. Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

§ 124.14   Exports to warehouses or distribution points outside the United States.

* * * * *

(c) * * *

(9) Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (e.g., cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

* * * * *

## PART 126—GENERAL POLICIES AND PROVISIONS

■ 10. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Section 7045, Pub. L. 112–74; Section 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 11. Section 126.1 is amended by revising paragraph(s) to read as follows:

§ 126.1   Prohibited exports, imports, and sales to or from certain countries.

* * * * *

(s) Zimbabwe. It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe,

except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

* * * * *

## PART 129—REGISTRATION AND LICENSING OF BROKERS

■ 12. The authority citation for part 129 continues to read as follows:

**Authority:** Section 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

■ 13. Section 129.1 is amended by revising paragraph (b) to read as follows:

§ 129.1   Purpose.

* * * * *

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

■ 14. Section 129.2 is amended by:

■ a. In paragraph (b)(2)(v), removing the word "or" at the end of the paragraph;

■ b. Removing the period at the end of paragraph (b)(2)(vi) and adding "; or" in its place; and

■ c. Adding paragraph (b)(2)(vii).

The addition reads as follows:

§ 129.2   Definitions.

* * * * *

(b) * * *

(2) * * *

(vii) Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter.

* * * * *

■ 15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i) to read as follows:

§ 129.4   Requirement for approval.

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (see § 120.44 of this subchapter, and § 129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (see 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of § 121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the

U.S. Munitions Import List (*see* 27 CFR 447.21);

*       *       *       *       *

■ 16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

**§ 129.6   Procedures for obtaining approval.**

*       *       *       *       *

(b) * * *

(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

*       *       *       *       *

[FR Doc. 2018–10366 Filed 5–21–18; 8:45 am]

**BILLING CODE 4710–25–P**

WASHAR0002896

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 12:47 PM |
| To: | Marquis, Matthew R <MarquisMR@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | RE: CPA Media Monitoring: Brady Campaign: What You Need to Know About the 3D Printing of Guns on Demand |

(Note incoming FOIA)

**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Wednesday, July 25, 2018 12:47 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: Brady Campaign: What You Need to Know About the 3D Printing of Guns on Demand



**What You Need to Know About the 3D Printing of Guns on Demand**
**By Jaime Bellemare**
**25 July 2018**

On August 1st the state of our nation's gun laws will be severely threatened by the 3D printing of firearms.

The fact that we've even come this far, is curious at best. For five years, the State Department's legal team has been fighting and winning against a self described "crypto-anarchist" and his company, Defense Distributed, which has sought to make blueprints for 3D printed guns available online.

Only recently did the State Departments settle this case, completely reversing their prior position, and giving Defense Distributed everything they could have possibly wanted. While Brady's legal team has filed Freedom of Information Act (FOIA) requests to find out how and why this decision was made, the self-proclaimed "crypto-anarchist" will move forward to publish the blueprints for anyone and everyone to use. The Brady Center, along with Everytown and Giffords, is urging a Texas federal court to consider just how dangerous this could be and will be filing legal action.

## 5 THINGS YOU NEED TO KNOW ABOUT 3D PRINTED GUNS

Anyone, anywhere can build a gun on demand with no background check or without going through a licensed gun dealer.

3D printed firearms are untraceable, making the jobs of law enforcement  much more difficult. These guns cannot be traced back to their producer or owner, making it possible to repeatedly violate gun manufacturing and sales restrictions on gun sales without fear of consequence.

3D guns are made almost completely of plastic -- meaning that conventional security methods like metal

detectors will be rendered ineffective.

Unlimited access online to blueprints for 3D printed guns and the potential export of untraceable firearms is a threat to national and international defense and  security.

3D gun blueprints are currently considered data that is governed by International Traffic in Arms Regulations (ITAR) and cannot be published without State Department authorization. The Trump Administration has proposed a new regulation to remove downloadable gun blueprints from this classification altogether, allowing anyone to post, repost, download, distribute and use 3D gun blueprints.

What can you do to stop this from becoming our new reality?

**Call Attorney General Jeff Sessions**

Jeff Sessions is responsible for representing the best interests of the United States in all legal matters. Call Sessions' office today and tell him to immediately take action and ensure that this settlement,allowing the public dissemination of information to make 3D guns, is stopped before it's too late.

The Department of Justice Public Switchboard is 202-514-2007. Make your voice heard today!

**Support Brady's Legal Team**

The Brady Center is working with other leading gun violence prevention organizations to take immediate action challenging the legality of making blueprints for 3D printed guns publicly accessible online. You can support this effort by making a donation to the Brady Center today.

Link: http://www.bradycampaign.org/blog/what-you-need-to-know-about-the-3d-printing-of-guns-on-demand

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:      *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

**From:** Strike, Andrew P <StrikeAP@state.gov>
**Sent:** Thursday, June 21, 2018 2:28 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: CPA Media Monitoring: Guns.com: Smith & Wesson: Export reform helps, but not a lot

███████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Thursday, June 21, 2018 2:14 PM
**To:** Strike, Andrew P <StrikeAP@state.gov>; PM-CPA <PM-CPA@state.gov>
**Subject:** RE: CPA Media Monitoring: Guns.com: Smith & Wesson: Export reform helps, but not a lot

████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Strike, Andrew P
**Sent:** Thursday, June 21, 2018 2:13 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Subject:** RE: CPA Media Monitoring: Guns.com: Smith & Wesson: Export reform helps, but not a lot

███████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Thursday, June 21, 2018 2:00 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: Guns.com: Smith & Wesson: Export reform helps, but not a lot



**Smith & Wesson: Export reform helps, but not a lot**
**By Christen Smith**
**21 June 2018**

Top executives for Smith & Wesson downplayed the impact of proposed export reform rules on earnings this week, telling investors eased regulations will pay off, though not by much.

WASHAR0002899

The new rules — which industry experts forecast will boost sales internationally — will eliminate expensive licensing fees currently barring many gun dealers from competing overseas. In the case of Smith & Wesson parent company American Outdoor Brands, the reforms would undo a regulatory hurtle forcing gun makers with more than $1 million worth of firearms to export first seek congressional approval.

Chief Financial Officer Jeffrey Buchanan told investors Wednesday he "wouldn't count it as a big mover for anything."

"I mean, it hasn't caused a problem for us before. Sometimes it makes you a little bit less competitive in your ability to react quickly versus a competitor that is out of the country," he said. "Of course, it so happens that a lot of our competitors … are in the United States. So, a lot of them have the same restrictions as we do."

U.S. gun manufacturers shipped 343,456 firearms overseas in 2015 — the most recent year for which data is available. Records from the Bureau of Alcohol, Tobacco, Firearms and Explosives indicate the total declined nearly 21 percent over 2014 — a 20-year high for the industry.

James Debney, American Outdoor Brands' chief executive officer, appeared more optimistic about the effect on the company's exports in a conference call with investors Wednesday.

"I mean certainly we're removed on administrative burden," he said. "We can be more nimble and more timely in our delivery. So I would say in the long-term that have to be favorable as we better service our partners on a global basis."

The gun maker's "challenging" fiscal year came to an end April 30 with overall net sales down nearly 33 percent to just under $607 million — and the next 12 months look worse, Debney said.

"We don't see that as a long term dynamic. We think the market will return to growth," he said. "But when you do come out of periods of very robust buying, and we've certainly seen that over the last few years, you can expect a correction. And that can take up to two years."

Link: http://www.guns.com/2018/06/21/smith-wesson-export-reform-helps-but-not-a-lot/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:      202.647.6968
e-mail:      *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official
UNCLASSIFIED**

WASHAR0002901

| **From:** | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| **Sent:** | Thursday, July 26, 2018 2:55 PM |
| **To:** | Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | RE: CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing The Age Of The Downloadable Gun |

████████████████████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Fabry, Steven F
**Sent:** Thursday, July 26, 2018 2:53 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'

████████████████████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Thursday, July 26, 2018 2:42 PM
**To:** Marquis, Matthew R; PM-DTCP-RMA; Legal-PM-DL
**Cc:** PM-CPA; PM-DDTC-Directors-DL; Miller, Michael F
**Subject:** RE: CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'

Flagging the attachment in Matt's email – a zip file constituting the filed injunction and related materials.  Exhibit B will be of particular interest to DTCP.

**Official - SBU**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Thursday, July 26, 2018 2:38 PM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'

**Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'**
**By Nick Wing**
**26 July 2018**

CPA Note: Legal filings attached as .zip file

The nation's leading gun safety groups are asking a judge to block an online company's plan to publish downloadable blueprints for 3D-printed plastic firearms, information that they say would open the door for people to secretly produce fully functional, untraceable weapons.

In a Thursday filing in the U.S. District Court for the District of Western Texas, the organizations questioned the federal government's recent decision to settle a lawsuit with Defense Distributed. The settlement allows the Texas-based digital firearms nonprofit company to post its controversial gun blueprints online, which it will begin doing on Aug. 1, according to the Defense Distributed website.

Defense Distributed celebrated the decision, saying it would soon bring upon the "age of the downloadable gun." But in a letter to the judge this week, gun safety groups called the agreement "troubling," "dangerous" and "potentially illegal," while claiming it could have a "significant and permanent impact" on national security and public safety. The three organizations — the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and Giffords Law Center to Prevent Gun Violence — are now seeking an emergency injunction to halt the publication of the blueprints. They want the court to have additional time to consider their concerns. A hearing is reportedly scheduled for Thursday afternoon.

In recent years, gun violence prevention advocates and lawmakers have raised fears about the rise of so-called "ghost guns" — homemade, often meticulously manufactured plastic or metal firearms made without serial numbers. As 3D printing technology becomes more widely accessible, they worry that this ghost gun ecosystem will only grow. And with advances in printing materials and an ever-expanding library of gun blueprints just a click away, they say the line between homemade firearms and professionally manufactured ones could become increasingly indistinct.

When police find guns at a crime scene, the Bureau of Alcohol, Tobacco, Firearms and Explosives can typically trace an attached serial number on the firearm back to a federally licensed dealer. This can help authorities identify suspects, crack down on bad actors and glean other vital information about how guns end up in the hands of criminals. But with ghost guns, there's no method of tracking and no way to deny a purchase by a prohibited individual because there's no point of sale.

Thursday's court filing request marks the latest chapter in a legal saga that began in 2013 when Defense Distributed founder and self-described anarchist Cody Wilson shot his way into headlines with a YouTube video. In the video, he shows off "the Liberator," a single-shot .380 caliber handgun made almost entirely of 3D-printed plastic.

A Liberator pistol appears on July 11, 2013 next to the 3D printer on which its components were made. The single-shot handgun was the first firearm made entirely with plastic components forged with a 3D printer and computer-aided design (CAD) files downloaded from the Internet.

The Liberator may look like a gun best suited for a Lego man, but it has since been shown to be able to fire a number of rounds without failing, so long as it's printed with a strong plastic. Months after Wilson released his video, Israeli reporters smuggled a weapon based on his design through a metal detector and into an event featuring Prime Minister Benjamin Netanyahu. Although the Liberator contains a small strip of metal — which Wilson included to make it compliant under a U.S. law banning undetectable firearms — the journalists were reportedly able to get it through unnoticed.

With media outlets around the world covering the Liberator, it quickly caught the government's attention. The State Department took action against Wilson in 2013, accusing him of violating arms export control laws by releasing "technical data" related to prohibited munitions. It demanded that he take down blueprints for the Liberator and nine other firearms posted on the Defense Distributed website. By the time Wilson complied, more than 100,000 people had already downloaded the files, ensuring that they'd live on forever in darker

WASHAR0002903

corners of the web.

In 2015, Wilson sued the State Department, claiming the motion against him had violated his First Amendment right to free speech. At first, Wilson appeared to be facing an uphill battle. Federal courts batted down his team's request for a preliminary injunction against the State Department in 2015. The case was eventually kicked up to the Supreme Court, where it was denied earlier this year. As recently as April, the government seemed prepared to see their defense through.

Then late last month, the feds changed course, entering into a settlement with Defense Distributed that said the company could post its gun blueprints online after all. The government also agreed to reimburse Defense Distributed for nearly $40,000 in legal fees.

In the settlement, lawyers for the Justice Department said that under a recent proposal to loosen foreign arms trafficking regulations, Wilson's "technical data" — in this case, computer-aided design models of firearms — would be exempted from stricter licensing requirements.

But gun safety groups have raised issue with that claim. Although the Trump administration published notice of the proposed rule change in May, the groups point out it hasn't officially gone into effect yet.

This discrepancy is an example of the administration "putting the cart before the horse," Avery Gardiner, co-president of the Brady Campaign, told HuffPost. She also raised broader questions about the nature of the settlement, saying the government had done "a complete about face." It didn't solicit input from any gun safety group before making the decision, Gardiner added, saying it has yet to offer a detailed explanation for what prompted the shift.

The State Department has said little publicly about the settlement, except to note that it was voluntary and agreed upon by both parties. Neither Defense Distributed nor the law firm representing the company immediately responded to HuffPost's request for comment.

Shortly after the settlement was announced, the Brady Campaign filed a Freedom of Information Act, hoping to get additional details about the reversal. But those documents likely won't be returned until after Defense Distributed reposts the blueprints online, at which point the gun safety groups say the potential damage would be "irreparable."

"Part of what we're asking the judge to do is to keep the status quo as it is until we can get more information about what caused the government to change its mind and to see if that's proper," said Gardiner.

"This isn't the way we're supposed to govern," she added. "We're supposed to govern by having open and transparent processes."

Ghost gun technology has evolved rapidly since the early days of Wilson's Liberator. Defense Distributed has already developed schematics for an AR-15 — or technically for each of the dozens of components needed to construct one of the semi-automatic rifles — which they intend to make available to the public. With these blueprints, anyone with a 3D printer and the ability to follow directions could build their own military-style rifle without anyone else's knowledge.

The surreptitiousness of DIY gunsmithing is a draw for some firearms enthusiasts. Defense Distributed has profited off and propelled the practice by selling a $1,500 "Ghost Gunner" milling machine that can be programmed to construct individual firearm components out of metal to be assembled by the user.

With conventional firearms already being so easy to get ahold of in the U.S., whether legally or illegally, concerns about 3D-printed ghost guns may not be at the forefront of many people's minds. 3D printers are still expensive, and models capable of printing a functional gun can range from several thousand dollars to more than $500,000. Although that may be a deterrent now, Wilson has said his ultimate vision is to develop

WASHAR0002904

blueprints that will deliver working firearms even on the cheapest 3D printers.

"Anywhere there's a computer and an Internet connection, there would be the promise of a gun," he told Forbes in 2012.

That prospect has raised alarm among gun safety groups and law enforcement alike. So far, these weapons rarely factor into crimes. Although, they have been used in a few deadly shootings, including one by a convicted felon in California who otherwise would have been barred from purchasing guns through legal channels.

Unfettered access to 3D-printed gun blueprints could also have much broader implications overseas, the gun safety groups say, where people could use them to circumvent tougher gun laws or establish another arms pipeline to criminals or terrorists.

Wilson meanwhile seems to be reveling in the idea that his campaign could disrupt efforts to regulate firearms in the U.S. and abroad. In a tweet after the announcement of the settlement this month, he appeared to celebrate the death of "American gun control."

Wilson later told Wired that he was on the verge of unleashing a "Cambrian explosion" of digital content related to firearms. He hoped it could extinguish the current youth-led movement for stronger gun laws that emerged in response to routine gun violence and high-profile mass shootings in places like Las Vegas or Parkland, Florida.

"All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable," Wilson said. "No amount of petitions or die-ins or anything else can change that."

Over the past few days, congressional lawmakers have called for hearings on 3D-printed guns, as well as new legislation to block the release of Wilson's blueprints. At a Senate hearing on Wednesday, Secretary of State Mike Pompeo said he'd "take a look" at his department's policy on sharing that sort of data.

But with Aug. 1 rapidly approaching, Gardiner said she's worried the time to act is running out.

"We need to block this settlement from going into effect so that Congress can hold hearings and do its job as a check on the executive branch," said Gardiner. "It's unlikely that this all gets figured out and resolved unless there's a delay of the settlement going into effect."

Link: https://www.huffingtonpost.com/entry/3d-printed-guns-lawsuit_us_5b589e43e4b0de86f4929ea8?qp

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

WASHAR0002905

**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Tuesday, July 31, 2018 8:21 AM |
| **To:** | Marquis, Matthew R <MarquisMR@state.gov>; PM-DAS's <PM-DASs@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov> |
| **Subject:** | RE: CPA Media Monitoring: Twitter: POTUS on 3D printed firearms |

+Others

**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Tuesday, July 31, 2018 8:20 AM
**To:** PM-DAS's <PM-DASs@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** CPA Media Monitoring: Twitter: POTUS on 3D printed firearms




**Donald J. Trump** ✅
@realDonaldTrump
 Follow ⌄

I am looking into 3-D Plastic Guns being sold to the public. Already spoke to NRA, doesn't seem to make much sense!

5:03 AM - 31 Jul 2018

**1,513** Retweets  **6,358** Likes   

💬 2.5K    🔁 1.5K    ♡ 6.4K

Link: https://twitter.com/realDonaldTrump/status/1024264286418489345

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:     202.647.6968
e-mail:     *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm/* |Twitter: *@StateDeptPM*

WASHAR0002907

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

WASHAR0002908

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Wednesday, July 25, 2018 10:45 AM |
| To: | Paul, Joshua M <PaulJM@state.gov> |
| Subject: | RE: CPA Media Monitoring: USA Today: Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1 |

Ah, you mean LPM, just seeing the message before this

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:40 AM
**To:** Marquis, Matthew R <MarquisMR@state.gov>
**Subject:** RE: CPA Media Monitoring: USA Today: Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1

PS – please forward to their distro all articles from past 3 days they've not been on.

**Official**
**UNCLASSIFIED**

**From:** Marquis, Matthew R
**Sent:** Wednesday, July 25, 2018 10:39 AM
**To:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** CPA Media Monitoring: USA Today: Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1


CPA MEDIA MONITORING

**Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1**
**By Josh Hafner**
**24 July 2018**

Americans will soon be able to make 3D-printed guns from their homes, widening the door to do-it-yourself versions of firearms.

The choices will include the AR-15, the gun of choice in American mass shootings. All 3D-printed guns will be untraceable, and since you can make them yourself, no background check is required.

A settlement earlier this year between the State Department and Texas-based Defense Distributed will let the nonprofit release blueprints for guns online starting Aug. 1, a development hailed by the group as the death of gun control in the United States.

"The age of the downloadable gun begins," Defense Distributed stated on its site. Its founder, Cody Wilson, tweeted a photograph of a grave marked "American gun control."

The plans being made freely available next month put firearms a few computer key clicks away from anyone with the right machine and materials. That reality has startled gun control advocates, who say it makes

untraceable firearms all the more available.

For Wilson, August marks the end of a years-long legal battle: He designed a 3D-printable plastic pistol, the "Liberator .380," in 2012 and put the plans online. It was downloaded more than 100,000 times before federal officials blocked his site, citing international export law.

A lawsuit from Wilson followed. The State Department settled in June.

The Second Amendment Foundation, a nonprofit that partnered with Wilson in the lawsuit, put out a statement calling the settlement "a devastating blow to the gun prohibition lobby."

Assembling guns at home isn't new. It is legal provided the made-at-home gun isn't sold. Defense Distributed already sells parts that help users build their own untraceable firearms, known as "ghost guns" for their lack of serial numbers.

"Legally manufacture unserialized rifles and pistols in the comfort and privacy of home," one product's description states.

David Chipman, who worked 25 years as an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, told Vice News that the homemade guns favored by hobbyists have since become popular with criminals.

"Criminals have started using ghost guns as a way to circumvent assault weapon regulations," said Chipman, now an adviser to the gun control advocacy group Giffords. "I imagine that people will also start printing guns to get around laws."

Gun plans previewed on Defense Distributed's website feature the Liberator pistol along with an AR-15 and a VZ-58, a Czechoslovakian assault rifle.

The printers needed to make the guns can cost from $5,000 to $600,000, according to Vice News. The quality of plastic matters, too: An early design printed by federal agents shattered after one shot. A second gun, made from a higher grade resin, stayed intact.

William Bones, the chief of police in Boise, Idaho, told the Idaho Statesman that law enforcement agencies have followed developments in 3D-printed guns for "quite a while now."

"Measures are needed to ensure these weapons are safely built and to prevent access by children or those prohibited from owning a firearm," Bones told the newspaper.

"Hopefully we see some safe and responsible legislation soon as well as manufacturers taking measure to prevent access which might lead to tragedy."

Link: https://www.usatoday.com/story/tech/nation-now/2018/07/23/3-d-printing-guns-downloadable-gun-legal-august-1/820032002/

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:       *MarquisMR@state.gov* | Web: *www.state.gov/t/pm* / |Twitter: *@StateDeptPM*

WASHAR0002910

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**


**Official**
**UNCLASSIFIED**

WASHAR0002911

| | |
|---|---|
| **From:** | Strike, Andrew P <StrikeAP@state.gov> |
| **Sent:** | Thursday, July 12, 2018 8:49 AM |
| **To:** | Dudding, Maria <DuddingM@state.gov>; Clay, Noel C <ClayNC2@state.gov>; ISN-Press-DL <ISN-Press-DL@state.gov>; PM-CPA <PM-CPA@state.gov> |
| **Subject:** | Re: Dallas Morning News request about settlement in Defense Distributed lawsuit |

This is our lane. We'll respond directly to the correspondent. Best,

_____

Andrew P. Strike
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State
Phone:        202-736-7804
BlackBerry: 202-701-5137
StrikeAP@state.gov

**From:** Dudding, Maria
**Sent:** Thursday, July 12, 2018 8:42 AM
**To:** Clay, Noel C; ISN-Press-DL; PM-CPA
**Subject:** RE: Dallas Morning News request about settlement in Defense Distributed lawsuit

Hi Noel,

Good morning!

I was told by our SMEs that this is more in the PM lane.

Dave and Andy, for you?

Maria

**From:** Clay, Noel C
**Sent:** Wednesday, July 11, 2018 9:54 PM
**To:** Dudding, Maria <DuddingM@state.gov>; ISN-Press-DL <ISN-Press-DL@state.gov>
**Subject:** RE: Dallas Morning News request about settlement in Defense Distributed lawsuit

Thanks.  I know it's come up about a year ago, but I'm not sure who owns it.

**Official**
**UNCLASSIFIED**

**From:** Dudding, Maria
**Sent:** Wednesday, July 11, 2018 9:52 PM
**To:** Clay, Noel C <ClayNC2@state.gov>; ISN-Press-DL <ISN-Press-DL@state.gov>

**Subject:** Re: Dallas Morning News request about settlement in Defense Distributed lawsuit

Noel, let me check with my guys.

Sent from my BlackBerry 10 smartphone.

**From:** Clay, Noel C
**Sent:** Wednesday, July 11, 2018 6:50 PM
**To:** ISN-Press-DL
**Subject:** FW: Dallas Morning News request about settlement in Defense Distributed lawsuit

ISN:

Is this in your corner?

Thanks,
Noel

**From:** Branham, Dana <dana.branham@dallasnews.com>
**Sent:** Wednesday, July 11, 2018 6:26 PM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Dallas Morning News request about settlement in Defense Distributed lawsuit

Good evening,

My name is Dana Branham, and I'm a reporter with the Dallas Morning News. I had been referred to the Department of State by the Department of Justice after I'd inquired about the settlement in a lawsuit regarding a Texas organization called Defense Distributed.

I'm hoping to learn why this case was settled, or if the department has any statement on what the implications of the settlement could mean in terms of people being able to share digital files for 3-D printed guns.

My deadline is tomorrow at noon, if that's helpful.

Thank you for your time,

Dana

--
Dana Branham
Breaking news reporter, Dallas Morning News
o: 214-977-8673
c: 979-324-7894

**Official**
**UNCLASSIFIED**

| **From:** | Abisellan, Eduardo <AbisellanE@state.gov> |
|---|---|
| **Sent:** | Thursday, July 26, 2018 8:09 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Tucker, Frances <TuckerF@state.gov> |
| **Cc:** | Miller, Michael F <Millermf@state.gov> |
| **Subject:** | RE: DD Settlement: Cong/Pub State of Play |

Thanks Josh, much appreciated. Vr/Ed

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:09 PM
**To:** Tucker, Frances <TuckerF@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>
**Subject:** FW: DD Settlement: Cong/Pub State of Play

Dear Maureen and Ed,

Sharing the below at Mike Miller's very good recommendation for your information.

Josh

**Official - SBU**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:01 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Carter, Rachel
<CarterR@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Hart, Robert L <HartRL@state.gov>; Litzenberger, Earle D (Lee)
<LitzenbergerED@state.gov>
**Subject:** DD Settlement: Cong/Pub State of Play

Dear AMB Kaidanow,

This email provides a summary of today's Congressional and public interest in the pending Defense Distributed settlement.

**Congressional**
- SEN Menendez raised the settlement in his opening statement at S's Hearing, and SEN Markey posed a question on it to S during that hearing.
  - CPA, DDTC and L/PM had fortunately cobbled together immediately before the Hearing a contingency bullet for S to use (attached). In the event, he told SEN Markey he'd "take a look at it". The Hearing remains ongoing at this hour.
- We have prepared a response to REP Engel's letter to S, which is on its way through you for clearance. We hope to provide the response in advance of tomorrow's signing of the Settlement letter.
- In addition, SEN Menendez issued a statement calling on S to "intervene and review" the settlement (he followed this up with a letter at 4.50pm), while Senators Nelson, Markey, Murphy, Blumenthal and Feinstein co-signed a letter on the topic to the Attorney General.
- We also continue to receive clarifying questions from SFRC and HFAC staff subsequent to yesterday's briefing.

**Public**
- Media continues to pick up on this story; highlights today include an entire 45-minute segment of NPR's On Point dedicated to the topic, as well as expanding international media coverage.
- We understand that DDTC has received a large volume of calls and emails from the public in addition to the more formal media inquiries that CPA has been dealing with, and in addition to the automated outreach DDTC has encountered.
- Gun Control NGOs including the Brady Campaign, Giffords, Everytown, and Moms Demand Action have been highlighting the issue on social media in advance of the injunction they intend to submit tomorrow, and a petition on Change.org has garnered almost 30,000 signatures, most of them today.
- A summary of today's press reporting on the topic is attached, and the Google Trends chart for worldwide searches on 3D guns is as follows:

WASHAR0002914

 Interest over time 



Thanks,

Josh

_____
**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:   202.647.7878 | 🖥 BlackBerry: 202.679.6724 | 🖨 Fax: 202.647.4055
✉ e-mail:   *PaulJM@State.Gov* | ✎ Web: *www.state.gov/t/pm/*

🐦 http://twitter.com/StateDeptPM

Stay connected with *State.gov*:

This message is *UNCLASSIFIED*, per E.O. 12958

**Official - SBU**
**UNCLASSIFIED**

WASHAR0002915

| | |
|---|---|
| **From:** | Carter, Rachel <CarterR@state.gov> |
| **Sent:** | Wednesday, July 25, 2018 5:52 PM |
| **To:** | Kaidanow, Tina S <KaidanowTS@state.gov> |
| **Cc:** | Chandler, Karen R <ChandlerKR@state.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | RE: Defense Distributed Email Campaign Directed at DDTC Response Team |

OK, the T weekly meeting is moving to the 10:30 am slot tomorrow.

**Official - SBU**
**UNCLASSIFIED**

**From:** Kaidanow, Tina S
**Sent:** Wednesday, July 25, 2018 5:48 PM
**To:** Carter, Rachel <CarterR@state.gov>
**Cc:** Chandler, Karen R <ChandlerKR@state.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Defense Distributed Email Campaign Directed at DDTC Response Team

Not particularly, though I can mention it tomorrow when I have my weekly meeting with T.  I asked Mike to give me a couple of talking points on the DD issue for that meeting.

**Official - SBU**
**UNCLASSIFIED**

**From:** Carter, Rachel
**Sent:** Wednesday, July 25, 2018 5:32 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>
**Cc:** Chandler, Karen R <ChandlerKR@state.gov>
**Subject:** FW: Defense Distributed Email Campaign Directed at DDTC Response Team

Ambassador,
See the updates from Tony Dearth/DDTC about the Defense Distributed directed email campaign affecting DDTC.  He recommends that PM inform T, as the same IRM entity investigating this issue also supports all of T's staff.

Do you want PM to notify T of this issue?  Karen and I can discuss the appropriate channel.

Thanks,
Rachel

**Official - SBU**
**UNCLASSIFIED**

**From:** Dearth, Anthony M
**Sent:** Wednesday, July 25, 2018 3:37 PM
**To:** Carter, Rachel <CarterR@state.gov>
**Subject:** RE: Defense Distributed Email Campaign Directed at DDTC Response Team

We do not need action from T, but since the entire T office is serviced by IRM/SES (for primary political staff – like the GOLD standard of service) it is likely her staff will find out about the problem.  Probably better she hears it from us first.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

**Official**
**UNCLASSIFIED**

---

**From:** Carter, Rachel
**Sent:** Wednesday, July 25, 2018 3:29 PM
**To:** Dearth, Anthony M <DearthAM@state.gov>
**Cc:** Chandler, Karen R <ChandlerKR@state.gov>
**Subject:** RE: Defense Distributed Email Campaign Directed at DDTC Response Team

Tony,
OK.  I will try to find time to speak with the Ambassador and see if she is OK with following IRM's recommendation to inform T.

What would T have the ability to do that we as a bureau would not, out of curiosity?

Thanks,
Rachel

**Official**
**UNCLASSIFIED**

---

**From:** Dearth, Anthony M
**Sent:** Wednesday, July 25, 2018 2:30 PM
**To:** Carter, Rachel <CarterR@state.gov>
**Subject:** FW: Defense Distributed Email Campaign Directed at DDTC Response Team

Rachel,

In our phone calls with IRM/CIO, they have assigned this action to IRM/SES and they asked if T had been informed.  I do not want to usurp TK's prerogative on what to up channel but if you can bend her ear it might be a good idea to let Maureen or someone on T staff know.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

**Official**
**UNCLASSIFIED**

---

**From:** Dearth, Anthony M

**Sent:** Wednesday, July 25, 2018 12:23 PM
**To:** Kaidanow, Tina S <KaidanowTS@state.gov>; Litzenberger, Earle D (Lee) <LitzenbergerED@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Carter, Rachel <CarterR@state.gov>; Wrege, Karen M <WregeKM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Willbrand, Ryan T <WillbrandRT@state.gov>
**Subject:** Defense Distributed Email Campaign Directed at DDTC Response Team

As an update to what I reported at the DAS Huddle, the CIRT action to block the domain name has now been countered by the creation of a new domain name so the emails have started again.  Further, the DDTC response team phones are blowing up and regular customers cannot get through.

Karen Wrege, who had a similar experience at the FCC on net neutrality, it assembling a working group to work with CIRT and others on how best to address the issue.

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836


**(SBU) Email Campaign Directed at DDTC Response Team**:  On Monday July 23, 2018 after 6:00 PM, the ddtcresponseteam@state.gov began receiving emails from the domain *everytown.org*. When the DDTC Response Team arrived on Tuesday morning, over 4,000 emails were received, and DDTC IT quickly notified IRM (#6228346), Spam@state.gov and CIRT. The emails contained the subject line "[*Name*] in [*5 digit number*]: please stop the release of downloadable guns" and had the same body of text

"Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

[*Name*] in [*5 digit number*]"

By 11:00 AM the DDTC Response Team had received over 45,000 emails. DDTC IT created a rule to delete all emails in the existing email box and any new emails containing the subject line "please stop the release of downloadable guns". The IRM firewall team and CIRT were able to completely block emails from the domain *everytown.org* being sent to ddtcresponseteam@state.gov on Tuesday July 24, 2018 around 5:00 PM. At that time there were over 52,800 emails. The spam emails continue to be blocked by IRM. However, these emails

WASHAR0002918

are no longer being received by the ddtcresponseteam@state.gov email box.

**Official**
**UNCLASSIFIED**

WASHAR0002919

| **From:** | Paul, Joshua M </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FE0AF1773ED642DF9120291EA0A8C588-PAUL, JOSHU> |
| **Sent:** | Friday, July 27, 2018 7:40 PM |
| **To:** | Nauert, Heather N <NauertHN@state.gov>; Greenan, Robert J <GreenanRJ@state.gov>; Strike, Andrew P <StrikeAP@state.gov>; PA Press Duty <PAPressDuty@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | Re: guns |

Josh
202 560 9947

---

**From:** Nauert, Heather N <NauertHN@state.gov>
**Date:** July 27, 2018 at 7:11:49 PM EDT
**To:** Greenan, Robert J <GreenanRJ@state.gov>, Strike, Andrew P <StrikeAP@state.gov>, PA Press Duty <PAPressDuty@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>
**Subject:** Re: guns

---

**From:** Greenan, Robert J <GreenanRJ@state.gov>
**Date:** July 27, 2018 at 6:53:37 PM EDT
**To:** Strike, Andrew P <StrikeAP@state.gov>, PA Press Duty <PAPressDuty@state.gov>
**Cc:** PM-CPA <PM-CPA@state.gov>, Nauert, Heather N <NauertHN@state.gov>
**Subject:** Re: guns

Thank you! Robert
Sent from my BlackBerry 10 smartphone.

**From:** Strike, Andrew P
**Sent:** Friday, July 27, 2018 5:24 PM
**To:** Greenan, Robert J; PA Press Duty
**Cc:** PM-CPA
**Subject:** RE: guns

Robert,