

**Official**
**UNCLASSIFIED**


**From:** McKeeby, David I
**Sent:** Thursday, July 26, 2018 4:14 PM
**To:** Greenan, Robert J <GreenanRJ@state.gov>; PM-CPA <PM-CPA@state.gov>; PA Press Duty <PAPressDuty@state.gov>
**Subject:** RE: guns

Best,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:       202.647.8757 | 🖨  BlackBerry:  202.550.3482 |
✉ e-mail:       *mckeebydi@state.gov* | ✎ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



_____

**From:** Greenan, Robert J
**Sent:** Thursday, July 26, 2018 3:46 PM
**To:** PM-CPA <PM-CPA@state.gov>; PA Press Duty <PAPressDuty@state.gov>
**Subject:** FW: guns

PM: Are you aware of this lawsuit? Have we updated lines on this issue? Thank you, Robert

**Official**
**UNCLASSIFIED**

_____

**From:** Lee, Matthew <MVLee@ap.org>

**Sent:** Thursday, July 26, 2018 3:31 PM
**To:** Greenan, Robert J <GreenanRJ@state.gov>
**Subject:** guns

A coalition of gun-control groups has filed an appeal in federal court seeking to block a recent Trump administration ruling that will allow the publication of blueprints to build a 3D-printed firearm.

The firearms are made of polymer that can't be flagged by metal detectors. They're also untraceable because the guns are homemade and don't have serial numbers.

The State Department ruled in late June that directions for building the weapons could be published. The decision resolved a long-lingering dispute with Cody Wilson. He owns a Texas-based company that specializes in "open source" firearm designs that can be made with a 3D printer.

On Thursday, gun-control groups asked a federal court for a temporary injunction to block the State Department decision from taking effect.

The information contained in this communication is intended for the use of the designated recipients named above. If the reader of this communication is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify The Associated Press immediately by telephone at +1-212-621-1500 and delete this email. Thank you.

WASHAR0002922

| From: | Giuliano, Lysa C <GiulianoLC@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 8:05 AM |
| To: | Wrege, Karen M <WregeKM@state.gov> |
| Cc: | Dearth, Anthony M <DearthAM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | RE: INC000006230597, INC000006228346 | INC000006230597 - follow-up |

████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Wrege, Karen M
**Sent:** Thursday, July 26, 2018 8:02 AM
**To:** Giuliano, Lysa C <GiulianoLC@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** RE: INC000006230597, INC000006228346 | INC000006230597 - follow-up

Hi Lysa,

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Best,
Karen

**From:** Giuliano, Lysa C
**Sent:** Thursday, July 26, 2018 7:47 AM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** FW: INC000006230597, INC000006228346 | INC000006230597 - follow-up

Any updates on the email storm?

**Official - SBU**
**UNCLASSIFIED**

**From:** CIRT
**Sent:** Thursday, July 26, 2018 4:27 AM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>; CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>; Automated Remedy Notification <AutomatedRemedyNotification@state.gov>
**Subject:** INC000006230597, INC000006228346 | INC000006230597 - follow-up

Colleague,

Thank you for reporting this event to CIRT; it has been assigned for analysis. CIRT will respond with findings as they become available.

Please "Reply All", making sure to include **"Automated Remedy Notification"** when responding to this email.
Thank you,
Cyber Incident Response Team (CIRT)
Office of Cyber Monitoring and Operations
DS/CTS/CMO/MIRD
United States Department of State
Phone: 301-985-8347
E-mail: CIRT@state.gov
~DRM/DS

**Official - SBU**
**UNCLASSIFIED**

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 3:15 PM
**To:** CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>
**Subject:** RE: INC000006228346 | INC000006230597 - follow-up

It has been brought to the attention that the emails generated from bounces.list.everytown.org were created from https://act.everytown.org/sign/stop-downloadable-guns/ from concerned citizens.

Therefore should these emails be bounced back or should they be quarantined? Or is there another option?

The call volume continues to increase, as do the new emails from different domains.
PM/DDTC is still seeking guidance at this time.

Thank you

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

Official - SBU (Sensitive-Law Enforcement)
UNCLASSIFIED

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 2:34 PM
**To:** CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>
**Subject:** RE: INC000006228346 | INC000006230597

Just to clarify, it seems that this is a coordinated email and phone campaign from concerned citizens.

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

Official - SBU (Sensitive-Law Enforcement)
UNCLASSIFIED

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 1:48 PM
**To:** CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>
**Subject:** RE: INC000006228346 | INC000006230597 Spam Campaign

PM /DDTC continues to receive spam emails.

The initial emails came from "bounces.list.everytown.org" and have subsided as of yesterday evening.
However, today PM/DDTC's Response team's call line (202) 663-1282 is being flooded with calls similar to the spam emails AND new emails are appearing with different subject lines and body text.

The bounces.list.everytown.org generated more than 52,000 emails to ddtcresponse@state.gov
There are more than 2,400 emails that have been received by ddtcresponse@state.gov from these new emails, and they continue.

PM/DDTC is requesting assistance. I have included copies of the new emails that are arriving.

Thank you

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1

P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

**Official - SBU (Sensitive-Law Enforcement)**
**UNCLASSIFIED**

**From:** CIRT
**Sent:** Wednesday, July 25, 2018 3:44 AM
**To:** Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT <CIRT@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Automated Remedy Notification <AutomatedRemedyNotification@state.gov>
**Subject:** INC000006228346 | INC000006230597, Security Question, Washington DC

Colleagues,

Thank you for reporting this event to CIRT.

CIRT has created ticket # INC000006228346 to track this event.

CIRT will respond with findings as they become available.

Please "Reply All", making sure to include "Automated Remedy Notification" and the CIRT ticket number when responding to this email.

Thank you,

Computer Incident Response Team (CIRT)
Office of Cyber Monitoring and Operations
CTS/CMO/MIRD/CIRT
United States Department of State
Phone: 301-985-8347
E-mail: CIRT@state.gov
~TW/CC

**Official - SBU (Sensitive-Law Enforcement)**
**UNCLASSIFIED**

**From:** Harvey, Arthur T
**Sent:** Tuesday, July 24, 2018 8:53 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Yinka, did the customer ever respond to your request for verification the emails from "bounces.list.everytown.org" have subsided?

V/r

Arthur Harvey, CISSP | Firewall Operations - Swing Shift Lead
Vanguard 2.2.1 | SAIC Team | Terra Cotta
Department of State | IRM/OPS/ENM/PSD
202.453.9730 (Office)
Location: SA-9 LL2 |2070
Email: Harveyat@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 4:21 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

I'm seeing messages from bounces@bounces.list.everytown.org to ddtcresponseteam@state.gov being dropped by the MTAs content filter.

WASHAR0002925



**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:58 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

They are still coming in

**Official**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 3:51 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

We've made adjustments to the block. Are they still coming in?

**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:45 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Attached are examples of how they are coming in

**Official**

WASHAR0002926

UNCLASSIFIED

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 3:37 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Are they coming from bounce@list.everytown.org?

**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:35 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Adeyinka Adebayo

Unfortunately, the emails are still coming in. I have added a rule to delete those emails with the subject line containing "please stop the release of downloadable guns". However, it is having a hard time keeping up.

Currently there are 50,000+ emails

Any assistance is greatly appreciated

Thank you

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

**Official**
UNCLASSIFIED

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 2:55 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>
**Subject:** INC000006228346

Mr. Pritchard,

bounce@list.everytown.org has been added to the email scanning appliance blacklist. Please verify you're no longer receiving email from that address. Thanks.

Adeyinka Adebayo | Firewall Engineer
Vanguard 2.2.1 Contract | SAIC Team | Terra Cotta Technologies.
Supporting U.S. Department of State | IRM/OPS/ENM/OPS
Desk: (202) 634-0270
Annex/location: SA-9 / NW4-133A| Email: adebayoao@state.gov

WASHAR0002927

| | |
|---|---|
| **From:** | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
| **Sent:** | Thursday, July 26, 2018 8:22 AM |
| **To:** | Wrege, Karen M <WregeKM@state.gov> |
| **Cc:** | Dearth, Anthony M <DearthAM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Miller, Michael F <Millermf@state.gov>; McKeeby, David I <McKeebyDI@state.gov> |
| **Subject:** | RE: INC000006230597, INC000006228346 | INC000006230597 - follow-up |

FWIW, this should be a good indicator of the ebb and flow.  Right now we're a little less interest than the same time yesterday.

https://trends.google.com/trends/explore?date=now%201-d&q=3d%20guns

Official
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Thursday, July 26, 2018 8:06 AM
**To:** Wrege, Karen M <WregeKM@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Miller, Michael F <Millermf@state.gov>; McKeeby, David I <McKeebyDI@state.gov>
**Subject:** RE: INC000006230597, INC000006228346 | INC000006230597 - follow-up

Minus non-PM

FWIW, I think this reflects daytime/nighttime cycles, and expect to see this bump up again during the day today, particularly if we see an injunction filed in Texas, or a Bill in Washington, DC – although if you see it is not reaching yesterday's levels, that would be good to know!

Thanks,

Josh

Official
UNCLASSIFIED

**From:** Wrege, Karen M
**Sent:** Thursday, July 26, 2018 8:02 AM
**To:** Giuliano, Lysa C <GiulianoLC@state.gov>
**Cc:** Dearth, Anthony M <DearthAM@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; Miller, Michael F <Millermf@state.gov>
**Subject:** RE: INC000006230597, INC000006228346 | INC000006230597 - follow-up

Hi Lysa

The number of emails coming in has gone down considerably (now in the hundreds). I reached out to L (Legal) this morning and our liaison's initial thinking is that we should not be blocking emails related to this issue.

I sent the attached email to Shana Rogers (our L liaison) and am waiting for an official answer.  If the answer is that we need to unblock the *everytown* domain and any other domains that the Firewall team blocked through their monitoring activities (that might be related to this issue) we need to be prepared to quarantine the incoming email traffic.

Let me know if you have any questions.

Best,
Karen

**From:** Giuliano, Lysa C
**Sent:** Thursday, July 26, 2018 7:47 AM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** FW: INC000006230597, INC000006228346 | INC000006230597 - follow-up

Any updates on the email storm?

Official - SBU
UNCLASSIFIED

**From:** CIRT
**Sent:** Thursday, July 26, 2018 4:27 AM
**To:** Pritchard, Edward W <PritchardEW@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>; CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>; Automated Remedy Notification <AutomatedRemedyNotification@state.gov>
**Subject:** INC000006230597, INC000006228346 | INC000006230597 - follow-up

Colleague,

Thank you for reporting this event to CIRT; it has been assigned for analysis. CIRT will respond with findings as they become available.

Please "Reply All", making sure to include **"Automated Remedy Notification"** when responding to this email.
Thank you,
Cyber Incident Response Team (CIRT)
Office of Cyber Monitoring and Operations
DS/CTS/CMO/MIRD
United States Department of State
Phone: 301-985-8347
E-mail: CIRT@state.gov
~DRM/DS

WASHAR0002928

Official - SBU
UNCLASSIFIED

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 3:15 PM
**To:** CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>;
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>
**Subject:** RE: INC000006228346 | INC000006230597 - follow-up

It has been brought to the attention that the emails generated from bounces.list.everytown.org were created from https://act.everytown.org/sign/stop-downloadable-guns/ from concerned citizens.

Therefore should these emails be bounced back or should they be quarantined? Or is there another option?

The call volume continues to increase, as do the new emails from different domains.
PM/DDTC is still seeking guidance at this time.

Thank you

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

---

Official - SBU (Sensitive-Law Enforcement)
UNCLASSIFIED

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 2:34 PM
**To:** CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>;
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>
**Subject:** RE: INC000006228346 | INC000006230597

Just to clarify, it seems that this is a coordinated email and phone campaign from concerned citizens.

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

---

Official - SBU (Sensitive-Law Enforcement)
UNCLASSIFIED

**From:** Pritchard, Edward W
**Sent:** Wednesday, July 25, 2018 1:48 PM
**To:** CIRT <CIRT@state.gov>; Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>;
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>; Herbert, Dion L <HerbertDL@state.gov>; Eickenberg, Robert G <EickenbergRG@state.gov>; Buchholz, Daniel O <BuchholzDO2@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Giuliano, Lysa C <GiulianoLC@state.gov>; Belcastro, Angelo <BelcastroA@state.gov>
**Subject:** RE: INC000006228346 | INC000006230597 Spam Campaign

WASHAR0002929

PM /DDTC continues to receive spam emails.

The initial emails came from "bounces.list.everytown.org" and have subsided as of yesterday evening.
However, today PM/DDTC's Response team's call line (202) 663-1282 is being flooded with calls similar to the spam emails AND new emails are appearing with different subject lines and body text.

The bounces.list.everytown.org generated more than 52,000 emails to ddtcresponse@state.gov
There are more than 2,400 emails that have been received by ddtcresponse@state.gov from these new emails, and they continue.

PM/DDTC is requesting assistance. I have included copies of the new emails that are arriving.

Thank you

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

**Official - SBU (Sensitive-Law Enforcement)**
**UNCLASSIFIED**

**From:** CIRT
**Sent:** Wednesday, July 25, 2018 3:44 AM
**To:** Harvey, Arthur T <HarveyAT@state.gov>; Adebayo, Adeyinka O <AdebayoAO@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>; CIRT <CIRT@state.gov>; CIRT Tier2 <CIRTTier2@state.gov>; FACC SWOs <FACCSWOs@state.gov>;
Automated Remedy Notification <AutomatedRemedyNotification@state.gov>
**Subject:** INC000006228346 | INC000006230597, Security Question, Washington DC

Colleagues,

Thank you for reporting this event to CIRT.

CIRT has created ticket # **INC000006228346** to track this event.

CIRT will respond with findings as they become available.

Please "Reply All", making sure to include "Automated Remedy Notification" and the CIRT ticket number when responding to this email.

Thank you,

Computer Incident Response Team (CIRT)
Office of Cyber Monitoring and Operations
CTS/CMO/MIRD/CIRT
United States Department of State
Phone: 301-985-8347
E-mail: CIRT@state.gov
¯TW/CC

**Official - SBU (Sensitive-Law Enforcement)**
**UNCLASSIFIED**

**From:** Harvey, Arthur T
**Sent:** Tuesday, July 24, 2018 8:53 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Yinka, did the customer ever respond to your request for verification the emails from "bounces.list.everytown.org" have subsided?

V/r

Arthur Harvey, CISSP | Firewall Operations - Swing Shift Lead
Vanguard 2.2.1 | SAIC Team | Terra Cotta
Department of State | IRM/OPS/ENM/PSD
202.453.9730 (Office)
Location: SA-9 LL2 |2070
Email: Harveyat@state.gov

**Official - SBU**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 4:21 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

I'm seeing messages from bounces@bounces.list.everytown.org to ddtcresponseteam@state.gov being dropped by the MTAs content filter.



**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:58 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

They are still coming in

**Official**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 3:51 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

We've made adjustments to the block. Are they still coming in?

**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:45 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

WASHAR0002931

Attached are examples of how they are coming in

**Official**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 3:37 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Are they coming from bounce@list.everytown.org?

**From:** Pritchard, Edward W
**Sent:** Tuesday, July 24, 2018 3:35 PM
**To:** Adebayo, Adeyinka O <AdebayoAO@state.gov>; CIRT <CIRT@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>; Wrege, Karen M <WregeKM@state.gov>
**Subject:** RE: INC000006228346

Adeyinka Adebayo

Unfortunately, the emails are still coming in. I have added a rule to delete those emails with the subject line containing "please stop the release of downloadable guns". However, it is having a hard time keeping up.

Currently there are 50,000+ emails

Any assistance is greatly appreciated

Thank you

**Edward Pritchard**
IT Program Manager
U.S. Department of State
PM/DDTC/DTCM
SA-1 Room # H1205-1
P (202) 663-2799
PritchardEW@state.gov



*For more information or guidance on USML export controls, please see the following link:*
www.pmddtc.state.gov

**Official**
**UNCLASSIFIED**

**From:** Adebayo, Adeyinka O
**Sent:** Tuesday, July 24, 2018 2:55 PM
**To:** Pritchard, Edward W <PritchardEW@state.gov>
**Cc:** Vanguard_PSD_Ops <Vanguard_PSD_Ops@state.gov>
**Subject:** INC000006228346

Mr. Pritchard,
            bounce@list.everytown.org has been added to the email scanning appliance blacklist. Please verify you're no longer receiving email from that address. Thanks.

Adeyinka Adebayo | Firewall Engineer
Vanguard 2.2.1 Contract | SAIC Team | Terra Cotta Technologies.
Supporting U.S. Department of State | IRM/OPS/ENM/OPS
Desk: (202) 634-0270
Annex/location: SA-9 / NW4-133A| Email: adebayoao@state.gov

WASHAR0002932

**From:** Clay, Noel C <ClayNC2@state.gov>
**Sent:** Tuesday, July 24, 2018 1:45 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; PM-CPA <PM-CPA@state.gov>
**Subject:** Re: media inquiry - Defense Distributed settlement



Sent from my BlackBerry 10 smartphone.

**From:** McKeeby, David I
**Sent:** Tuesday, July 24, 2018 1:43 PM
**To:** Clay, Noel C; PM-CPA
**Subject:** RE: media inquiry - Defense Distributed settlement

Best,
Dave

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.8757 | ▯   BlackBerry: 202.550.3482 |
✉ e-mail:      *mckeebydi@state.gov* | ✆ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**From:** Clay, Noel C
**Sent:** Tuesday, July 24, 2018 1:41 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; PM-CPA <PM-CPA@state.gov>
**Subject:** Re: media inquiry - Defense Distributed settlement

Sent from my BlackBerry 10 smartphone.

**From:** McKeeby, David I
**Sent:** Tuesday, July 24, 2018 1:38 PM
**To:** Clay, Noel C; PM-CPA
**Subject:** RE: media inquiry - Defense Distributed settlement

# # #

WASHAR0002933



\# \# \#

---

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:       202.647.8757 | 🖥   BlackBerry:  202.550.3482 |
✉ e-mail:       *mckeebydi@state.gov* | ✍  Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



---

**From:** Clay, Noel C
**Sent:** Tuesday, July 24, 2018 1:33 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Subject:** Fw: media inquiry - Defense Distributed settlement

PM:

WASHAR0002934

███████████████████████████

Noel

---

**From:** Estelita Hass Carazzai <estelita.hass@grupofolha.com.br>
**Sent:** Tuesday, July 24, 2018 10:34 AM
**To:** PA Press Duty
**Subject:** media inquiry - Defense Distributed settlement

Dear all, good morning!

Could you please send me the statement from the Department of State regarding the **recent settlement with Defense Distributed**? I am writing a piece about 3D firearms and it would be important to have it.

Thank you, and looking forward to your soonest reply!

Best regards,

**Estelita Hass Carazzai**
Folha de S.Paulo
Correspondent - Washington, DC
mobile +1 202-415-3637
twitter @estelitac
www.folha.com.br/internacional/

---

AVISO: A informação contida neste email, bem como em qualquer de seus anexos, é CONFIDENCIAL e destinada ao uso exclusivo do(s) destinatário(s) acima referido(s), podendo conter informações sigilosas e/ou legalmente protegidas. Caso você não seja o destinatário desta mensagem, informamos que qualquer divulgação, distribuição ou cópia deste email e/ou de qualquer de seus anexos é absolutamente proibida. Solicitamos que o remetente seja comunicado imediatamente, respondendo esta mensagem, e que o original desta mensagem e de seus anexos, bem como toda e qualquer cópia e/ou impressão realizada a partir destes, sejam permanentemente apagados e/ou destruídos. Informações adicionais sobre nossa empresa podem ser obtidas no site http://www.folha.uol.com.br/folha/conheca/ .

NOTICE: The information contained in this email and any attachments thereto is CONFIDENTIAL and is intended only for use by the recipient named herein and may contain legally privileged and/or secret information. If you are not the email's intended recipient, you are hereby notified that any dissemination, distribution or copy of this email, and/or any attachments thereto, is strictly prohibited. Please immediately notify the sender replying to the above mentioned email address, and permanently delete and/or destroy the original and any copy of this email and/or its attachments, as well as any printout thereof. Additional information about our company may be obtained through the site http://www1.folha.uol.com.br/folha/conheca/index-en.shtml .

| | |
|---|---|
| **From:** | Thompson, Nicole A. <ThompsonNA2@state.gov> |
| **Sent:** | Friday, July 20, 2018 4:58 PM |
| **To:** | McKeeby, David I <McKeebyDI@state.gov>; PM-CPA <PM-CPA@state.gov> |
| **Subject:** | RE: Media Inquiry from Fox News |

Ty!

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I
**Sent:** Friday, July 20, 2018 4:58 PM
**To:** Thompson, Nicole A. <ThompsonNA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Subject:** RE: Media Inquiry from Fox News

Thx – we got it.

Best,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:        202.647.8757 | 📱   BlackBerry:  202.550.3482 |
✉ e-mail:        _mckeebydi@state.gov_ | 🖱 Web: _www.state.gov/t/pm /_ |Twitter: _@StateDeptPM_

Stay connected with _State.gov_:



**From:** Thompson, Nicole A.
**Sent:** Friday, July 20, 2018 4:52 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Media Inquiry from Fox News

Hey PM,

Can you send James (below) your response on 3-D gun settlement?  If you want to keep it close hold, that's cool. If not, can you send me the electron copy for use this wknd?  No prob either way.

Thanks,
Nicole

**Official**
**UNCLASSIFIED**

**From:** Rogers, James <James.Rogers@FOXNEWS.COM>
**Sent:** Friday, July 20, 2018 4:09 PM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Media Inquiry from Fox News

Good afternoon,

Does the State Dept. have any statement on its recent settlement with Defense Distributed and the Second Amendment Foundation about downloadable blueprints for 3D-printed guns?

https://www.saf.org/doj-saf-reach-settlement-in-defense-distributed-lawsuit/

Also, does the State Dept. have any comment on this statement from Avery Gardiner, co-president of the Brady Center to Prevent Gun Violence, on the settlement:

"The government won three times in this case, but then suddenly decided to cave. During the Obama years, the government thought that 3D printed guns posed a serious threat to national security. I'm not aware of anything that has changed except who sits in the White House. Untraceable and undetectable guns that bypass our bipartisan background check system put us all at risk. The country deserves answers from the Trump Administration about why it thinks this is a good idea. Making it easier for dangerous people to get guns is reckless and stupid, and this is going to make Americans less safe."

Please feel free to give me a call if you want to discuss.

Best wishes,

James

James Rogers
SciTech Editor
Fox News
New York
Tel: 212 901 4506
@jamesjrogers


This message and its attachments may contain legally privileged or confidential information. It is intended solely for the named addressee. If you are not the addressee indicated in this message (or responsible for delivery of the message to the addressee), you may not copy or deliver this message or its attachments to anyone. Rather, you should permanently delete this message and its attachments and kindly notify the sender by reply e-mail. Any content of this message and its attachments that does not relate to the official business of Fox News or Fox Business must not be taken to have been sent or endorsed by either of them. No representation is made that this email or its attachments are without defect.

WASHAR0002937

| | |
|---|---|
| **From:** | McKeeby, David I <McKeebyDI@state.gov> |
| **Sent:** | Monday, July 23, 2018 6:00 PM |
| **To:** | Largey, Matthew W <mlargey@kut.org>; Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | Re: Media Request - Defense Distributed et al v. United States Department of State et al |

Matt:

Will give you a call tomorrow.

Best,
--D--

Sent from my BlackBerry 10 smartphone.

**From:** Largey, Matthew W
**Sent:** Monday, July 23, 2018 5:32 PM
**To:** McKeeby, David I; Paul, Joshua M
**Subject:** Media Request - Defense Distributed et al v. United States Department of State et al

Hello,
I'm a reporter at KUT, the NPR affiliate in Austin, Texas.
I'm working on a story about the settlement in the case Defense Distributed et al v. United States Department of State et al (case # 1:15-cv-00372 in the Western District of Texas), which allows Defense Distributed to publish downloadable blueprints for 3D printable firearms on the internet.

The DOJ declined to comment, but suggested I reach out to you.

I have a few questions about the government's case and would like to speak with someone either on the record or on background. My deadline is Wednesday at 3pm Central time.

Thank you,

Matt Largey, Managing Editor
KUT | Austin's NPR Station | KUT.org
O: 512.471.1062
M: 512.436.0637
T: @mattlargey

WASHAR0002938

| | |
|---|---|
| **From:** | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
| **Sent:** | Monday, July 23, 2018 10:14 AM |
| **To:** | 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov> |
| **Subject:** | RE: Monthly Arms Transfer - Reschedule |

Checking on this for you.

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Monday, July 23, 2018 10:09 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Thanks.  In the meantime, can PM provide us with the rationale as to why ITAR 126.2's conditions that this suspension is in the "security and foreign policy of the United States"?  It's not immediately obvious.

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Monday, July 23, 2018 9:45 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Hi David,

We are doing our best to line up briefers for tomorrow.  We will circle back.

Thanks,
Tamara

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Monday, July 23, 2018 9:23 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm meeting with the PM A/S nominee at 2 on Tuesday.  Can we do it before then?

**From:** Fite, David (Foreign Relations)
**Sent:** Friday, July 20, 2018 4:12 PM

**To:** 'Darrach, Tamara A' <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm nervous having the briefing on the 3D Gun Settlement Agreement postponed until Thursday, the day before State has to suspend the regulations to apparently allow the publication of the production technology to the rest of the world.   Can we have that briefing on Tuesday?

---

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, July 20, 2018 4:08 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Apologies everyone, we have to reschedule since Secretary Pompeo will be testifying on Wednesday.  Any chance you are available Thursday (7/26) at 10:00 am?

Thanks!
Tamara

---

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Friday, July 13, 2018 2:26 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Subject:** Monthly Arms Transfer

Good afternoon everyone,

Are you available for our monthly arms transfer briefing on July 25 at 10 am?  Let me know.

Thanks!
Tamara


**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

WASHAR0002940

| | |
|---|---|
| **From:** | Rice, Edmund <Edmund.Rice@mail.house.gov> |
| **Sent:** | Monday, July 23, 2018 1:28 PM |
| **To:** | Darrach, Tamara A <DarrachTA@state.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov> |
| **Cc:** | Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | RE: Monthly Arms Transfer - Reschedule |

Currently all three times work for me.

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Monday, July 23, 2018 1:25 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Hi everyone,

We are available tomorrow morning (7/24) at 9:30 am, 1:00 pm or 3:30 pm for an unclassified briefing.  Please let me know if a particular timeframe works best for you.

Thanks,
Tamara

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Monday, July 23, 2018 10:09 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Thanks.  In the meantime, can PM provide us with the rationale as to why ITAR 126.2's conditions that this suspension is in the "security and foreign policy of the United States"?  It's not immediately obvious.

---

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Monday, July 23, 2018 9:45 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

WASHAR0002941

Hi David,

We are doing our best to line up briefers for tomorrow.  We will circle back.

Thanks,
Tamara

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Monday, July 23, 2018 9:23 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm meeting with the PM A/S nominee at 2 on Tuesday.  Can we do it before then?

---

**From:** Fite, David (Foreign Relations)
**Sent:** Friday, July 20, 2018 4:12 PM
**To:** 'Darrach, Tamara A' <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm nervous having the briefing on the 3D Gun Settlement Agreement postponed until Thursday, the day before State has to suspend the regulations to apparently allow the publication of the production technology to the rest of the world.  Can we have that briefing on Tuesday?

---

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, July 20, 2018 4:08 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Apologies everyone, we have to reschedule since Secretary Pompeo will be testifying on Wednesday.  Any chance you are available Thursday (7/26) at 10:00 am?

Thanks!
Tamara

---

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Friday, July 13, 2018 2:26 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Subject:** Monthly Arms Transfer

Good afternoon everyone,

Are you available for our monthly arms transfer briefing on July 25 at 10 am?  Let me know.

Thanks!
Tamara

WASHAR0002942

**Tamara Darrach** | **Congressional Advisor** | **Bureau of Legislative Affairs** | **U.S. Department of State**

2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

WASHAR0002943

| From: | Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov> |
|-------|-----------------------------------------------------------------|
| Sent: | Monday, July 23, 2018 1:28 PM |
| To: | Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov> |
| Cc: | Paul, Joshua M <PaulJM@state.gov> |
| Subject: | RE: Monthly Arms Transfer - Reschedule |

Any of those work for me.

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Monday, July 23, 2018 1:25 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Hi everyone,

We are available tomorrow morning (7/24) at 9:30 am, 1:00 pm or 3:30 pm for an unclassified briefing.  Please let me know if a particular timeframe works best for you.

Thanks,
Tamara

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs |  U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Monday, July 23, 2018 10:09 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Thanks.  In the meantime, can PM provide us with the rationale as to why ITAR 126.2's conditions that this suspension is in the "security and foreign policy of the United States"?  It's not immediately obvious.

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Monday, July 23, 2018 9:45 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

WASHAR0002944

Hi David,

We are doing our best to line up briefers for tomorrow.  We will circle back.

Thanks,
Tamara

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Monday, July 23, 2018 9:23 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm meeting with the PM A/S nominee at 2 on Tuesday.  Can we do it before then?

---

**From:** Fite, David (Foreign Relations)
**Sent:** Friday, July 20, 2018 4:12 PM
**To:** 'Darrach, Tamara A' <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm nervous having the briefing on the 3D Gun Settlement Agreement postponed until Thursday, the day before State has to suspend the regulations to apparently allow the publication of the production technology to the rest of the world.   Can we have that briefing on Tuesday?

---

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, July 20, 2018 4:08 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Apologies everyone, we have to reschedule since Secretary Pompeo will be testifying on Wednesday.  Any chance you are available Thursday (7/26) at 10:00 am?

Thanks!
Tamara

---

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Friday, July 13, 2018 2:26 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Subject:** Monthly Arms Transfer

Good afternoon everyone,

Are you available for our monthly arms transfer briefing on July 25 at 10 am?  Let me know.

Thanks!
Tamara

WASHAR0002945

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs |  U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

WASHAR0002946

| | |
|---|---|
| **From:** | Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov> |
| **Sent:** | Monday, July 23, 2018 3:32 PM |
| **To:** | Darrach, Tamara A <DarrachTA@state.gov> |
| **Cc:** | Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | Re: Monthly Arms Transfer - Reschedule |

We can figure out a room in SFRC space.


Sent from my iPhone

On Jul 23, 2018, at 2:31 PM, Darrach, Tamara A <DarrachTA@state.gov> wrote:

> Great!  We will meet you at 1 pm tomorrow.  Can someone please help us with a room?
>
> Thanks!
> Tamara
>
>
> **From:** Darrach, Tamara A <DarrachTA@state.gov>
> **Sent:** Monday, July 23, 2018 1:25 PM
> **To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
> **Cc:** Paul, Joshua M <PaulJM@state.gov>
> **Subject:** RE: Monthly Arms Transfer - Reschedule
>
> Hi everyone,
>
> We are available tomorrow morning (7/24) at 9:30 am, 1:00 pm or 3:30 pm for an unclassified briefing. Please let me know if a particular timeframe works best for you.
>
> Thanks,
> Tamara
>
>
> **Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**
> 2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov
>
>
> **From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
> **Sent:** Monday, July 23, 2018 10:09 AM
> **To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
> **Cc:** Paul, Joshua M <PaulJM@state.gov>
> **Subject:** RE: Monthly Arms Transfer - Reschedule

WASHAR0002947

Thanks.  In the meantime, can PM provide us with the rationale as to why ITAR 126.2's conditions that this suspension is in the "security and foreign policy of the United States"?  It's not immediately obvious.

---

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Monday, July 23, 2018 9:45 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Hi David,

We are doing our best to line up briefers for tomorrow.  We will circle back.

Thanks,
Tamara

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Monday, July 23, 2018 9:23 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm meeting with the PM A/S nominee at 2 on Tuesday.  Can we do it before then?

---

**From:** Fite, David (Foreign Relations)
**Sent:** Friday, July 20, 2018 4:12 PM
**To:** 'Darrach, Tamara A' <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm nervous having the briefing on the 3D Gun Settlement Agreement postponed until Thursday, the day before State has to suspend the regulations to apparently allow the publication of the production technology to the rest of the world.   Can we have that briefing on Tuesday?

---

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, July 20, 2018 4:08 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Apologies everyone, we have to reschedule since Secretary Pompeo will be testifying on Wednesday.  Any chance you are available Thursday (7/26) at 10:00 am?

Thanks!
Tamara

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Friday, July 13, 2018 2:26 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Subject:** Monthly Arms Transfer

Good afternoon everyone,

Are you available for our monthly arms transfer briefing on July 25 at 10 am?  Let me know.

Thanks!
Tamara

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

| | |
|---|---|
| **From:** | Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov> |
| **Sent:** | Monday, July 23, 2018 4:46 PM |
| **To:** | Darrach, Tamara A <DarrachTA@state.gov> |
| **Cc:** | Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | Re: Monthly Arms Transfer - Reschedule |

We've reserved the conference room in Dirksen 423 for 1pm tomorrow.


Sent from my iPhone

On Jul 23, 2018, at 2:31 PM, Darrach, Tamara A <DarrachTA@state.gov> wrote:

> Great! We will meet you at 1 pm tomorrow. Can someone please help us with a room?
>
> Thanks!
> Tamara
>
>
> **From:** Darrach, Tamara A <DarrachTA@state.gov>
> **Sent:** Monday, July 23, 2018 1:25 PM
> **To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
> **Cc:** Paul, Joshua M <PaulJM@state.gov>
> **Subject:** RE: Monthly Arms Transfer - Reschedule
>
> Hi everyone,
>
> We are available tomorrow morning (7/24) at 9:30 am, 1:00 pm or 3:30 pm for an unclassified briefing. Please let me know if a particular timeframe works best for you.
>
> Thanks,
> Tamara
>
>
> **Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**
> 2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov
>
>
> **From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
> **Sent:** Monday, July 23, 2018 10:09 AM
> **To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
> **Cc:** Paul, Joshua M <PaulJM@state.gov>
> **Subject:** RE: Monthly Arms Transfer - Reschedule

WASHAR0002950

Thanks.  In the meantime, can PM provide us with the rationale as to why ITAR 126.2's conditions that this suspension is in the "security and foreign policy of the United States"?  It's not immediately obvious.

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Monday, July 23, 2018 9:45 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Cc:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Hi David,

We are doing our best to line up briefers for tomorrow.  We will circle back.

Thanks,
Tamara

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Monday, July 23, 2018 9:23 AM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm meeting with the PM A/S nominee at 2 on Tuesday.  Can we do it before then?

**From:** Fite, David (Foreign Relations)
**Sent:** Friday, July 20, 2018 4:12 PM
**To:** 'Darrach, Tamara A' <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm nervous having the briefing on the 3D Gun Settlement Agreement postponed until Thursday, the day before State has to suspend the regulations to apparently allow the publication of the production technology to the rest of the world.   Can we have that briefing on Tuesday?

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, July 20, 2018 4:08 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Apologies everyone, we have to reschedule since Secretary Pompeo will be testifying on Wednesday.  Any chance you are available Thursday (7/26) at 10:00 am?

Thanks!
Tamara

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Friday, July 13, 2018 2:26 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations)
<Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; McCormick, Jamie
<Jamie.McCormick@mail.house.gov>
**Subject:** Monthly Arms Transfer

Good afternoon everyone,

Are you available for our monthly arms transfer briefing on July 25 at 10 am?  Let me know.

Thanks!
Tamara


**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

| From: | Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov> |
|---|---|
| Sent: | Friday, July 20, 2018 4:16 PM |
| To: | Darrach, Tamara A <DarrachTA@state.gov>; 'McCormick, Jamie' <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; 'Rice, Edmund' <Edmund.Rice@mail.house.gov>; Paul, Joshua M <PaulJM@state.gov> |
| Subject: | RE: Monthly Arms Transfer - Reschedule |

+ Paul

**From:** Fite, David (Foreign Relations)
**Sent:** Friday, July 20, 2018 4:12 PM
**To:** 'Darrach, Tamara A' <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

I'm nervous having the briefing on the 3D Gun Settlement Agreement postponed until Thursday, the day before State has to suspend the regulations to apparently allow the publication of the production technology to the rest of the world.   Can we have that briefing on Tuesday?

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Friday, July 20, 2018 4:08 PM
**To:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>
**Subject:** RE: Monthly Arms Transfer - Reschedule

Apologies everyone, we have to reschedule since Secretary Pompeo will be testifying on Wednesday.  Any chance you are available Thursday (7/26) at 10:00 am?

Thanks!
Tamara

**From:** Darrach, Tamara A [mailto:DarrachTA@state.gov]
**Sent:** Friday, July 13, 2018 2:26 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Subject:** Monthly Arms Transfer

Good afternoon everyone,

Are you available for our monthly arms transfer briefing on July 25 at 10 am?  Let me know.

Thanks!
Tamara

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**
2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

| From: | McKeeby, David I <McKeebyDI@state.gov> |
|---|---|
| Sent: | Tuesday, July 17, 2018 4:57 PM |
| To: | Mason, Julia N <MasonJN@state.gov>; PM-CPA <PM-CPA@state.gov> |
| Subject: | RE: NBC News inquiry |

Sure thing --

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.8757 | 🖫   BlackBerry:  202.550.3482 |
✉ e-mail:     _mckeebydi@state.gov_ | ✌ Web: _www.state.gov/t/pm /_ |Twitter: _@StateDeptPM_

Stay connected with _State.gov_:



**From:** Mason, Julia N
**Sent:** Tuesday, July 17, 2018 4:56 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: NBC News inquiry

PM Colleagues, would you like to reach out to the reporter directly on this?

Thanks,
Julia

**Official - Transitory**
**UNCLASSIFIED**

**From:** Romero, Dennis (Contractor- NBCUniversal) <Dennis.Romero@nbcuni.com>
**Sent:** Tuesday, July 17, 2018 4:49 PM
**To:** Mason, Julia N <MasonJN@state.gov>; PA Press Duty <PAPressDuty@state.gov>
**Subject:** NBC News inquiry

Hi:

I'm working on a story about homemade "ghost guns" for NBCNews.com. Is it possible to get the Department of State's statement on this lawsuit settlement regarding firearm blueprints?

_In a statement, the State Department said the settlement with Mr. Wilson was voluntary and "entered into following negotiations," adding that "the court did not rule in favor of the plaintiffs in this case."_

https://www.nytimes.com/2018/07/13/business/downloadable-gun-allowed-alarming-activists.html

Thanks,

WASHAR0002954

Dennis Romero
NBC News Digital
Los Angeles Bureau
310-623-7097

WASHAR0002955

| | |
|---|---|
| **From:** | PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Sent:** | Thursday, July 26, 2018 8:35 AM |
| **To:** | DDTC Tasker DL <DDTCTaskerDL@state.gov> |
| **Cc:** | Miller, Michael F <Millermf@state.gov>; PM-CPA <PM-CPA@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov> |
| **Subject:** | RE: New PM tasker for Control Number: H20180726=000 -- Member: Menendez - 3D Printing of Firearms. |



**From:** PM-Staffers Mailbox
**Sent:** Thursday, July 26, 2018 8:30 AM
**To:** DDTC Tasker DL <DDTCTaskerDL@state.gov>
**Cc:** PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Miller, Michael F <Millermf@state.gov>; PM-CPA <PM-CPA@state.gov>
**Subject:** New PM tasker for Control Number: H20180726=000 -- Member: Menendez - 3D Printing of Firearms.

DDTC,

Please see new PM tasker for Control Number: H20180726=000 -- Member: Menendez - 3D Printing of Firearms.



Best,

Bill Hayes
PM/FO SharePoint
Staff Assistant
202-647-8089

**From:** H_CCU@state.gov <H_CCU@state.gov>
**Sent:** Thursday, July 26, 2018 7:57 AM
**To:** H_CCTasking-PM <H_CCTasking-PM@state.gov>
**Cc:** Darrach, Tamara A <DarrachTA@state.gov>; H_CCU <H_CCU@state.gov>
**Subject:** Control Number: H20180726=000 -- Member: Menendez, Robert -- Date Due: 7/31/2018

Congressional Correspondence - 2 day tasker

Control Number: **H20180726=000**
Date Due: **7/31/2018**
Actions:
 • Reply for signature by Mary K. Waters, Assistant Secretary, Legislative Affairs.
Member: Menendez, Robert
Subject: Writing regarding the Department's decision on the 3D printing of functional firearms that would result in the suspension of ITAR restrictions required by the Arms Export Control Act.
2 Day Tasker



| From: | McKeeby, David I <McKeebyDI@state.gov> |
|---|---|
| Sent: | Monday, July 16, 2018 8:57 AM |
| To: | Mason, Julia N <MasonJN@state.gov>; PM-CPA <PM-CPA@state.gov> |
| Subject: | RE: NowThis Inquiry: Case with Cody Wilson |

Got it – thanks.

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.8757 | 📱  BlackBerry:  202.550.3482 |
✉ e-mail:     **_mckeebydi@state.gov_** | 🖱 Web: **_www.state.gov/t/pm_** /|Twitter: **_@StateDeptPM_**

Stay connected with *State.gov*:



**From:** Mason, Julia N
**Sent:** Monday, July 16, 2018 8:54 AM
**To:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: NowThis Inquiry: Case with Cody Wilson

PM colleagues, would you like to follow-up with this reporter directly?

Thanks,
Julia

**From:** Kavish Harjai <kavish@nowthismedia.com>
**Sent:** Sunday, July 15, 2018 8:44 PM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** NowThis Inquiry: Case with Cody Wilson

Hi,

My name is Kavish and I'm a producer with NowThis.

I was wondering whether the State Dept. has a statement regarding its now settled case with Cody Wilson.

I'd appreciate a response by Monday, 3 PM EST.

Thank you for your cooperation.

Best,
**kavish harjai**
associate producer
NowThis Future
607-760-2637

**Official - Transitory**
**UNCLASSIFIED**

WASHAR0002959

| **From:** | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
| **Sent:** | Friday, July 27, 2018 12:10 PM |
| **To:** | Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| **Cc:** | Freeman, Jeremy B <FreemanJB@state.gov>; Miller, Michael F <Millermf@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Subject:** | RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits |

████████████████████████████████████████████████████

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Hart, Robert L
**Sent:** Friday, July 27, 2018 12:01 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Miller, Michael F <Millermf@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 11:59 AM
**To:** Rogers, Shana A <RogersSA2@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>; Miller, Michael F <Millermf@state.gov>; Fabry, Steven F <FabrySF@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

New Fite question ████████████████████████████████████████████

As a larger issue, can you provide to me a legal analysis of how ITAR 120.3(b) comports with the requirements of AECA Sec. 38?

Sec. 38 [22 U.S.C. 2778]. Control of Arms Exports and Imports.—(a)(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions

List.

**From:** Rogers, Shana A
**Sent:** Friday, July 27, 2018 11:35 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

**From:** Paul, Joshua M
**Sent:** Friday, July 27, 2018 11:24 AM
**To:** Rogers, Shana A; Hart, Robert L; Heidema, Sarah J
**Cc:** Freeman, Jeremy B
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

**From:** Rogers, Shana A
**Sent:** Thursday, July 26, 2018 2:11 PM
**To:** Hart, Robert L <HartRL@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

**From:** Rogers, Shana A
**Sent:** Wednesday, July 25, 2018 1:38 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Freeman, Jeremy B
**Subject:** FW: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High



Shana

**Official - SBU (Attorney Work Product, Attorney-Client Privilege, Deliberative Process)**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 12:29 PM
**To:** Hart, Robert L; Miller, Michael F; Heidema, Sarah J
**Cc:** Rogers, Shana A; Freeman, Jeremy B; Darrach, Tamara A
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits
**Importance:** High

**How long is "temporary" under ITAR 126.2?  Is there a minimum period of time, or is it completely at the discretion of the PM DAS?**

**Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.**

**Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.**

[black redaction box]

**In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.**

[black redaction box]

Official - Transitory
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:54 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

Fite just added the following, [black redaction box]

To put in the context of the settlement agreement: how long does the agreement, as a matter of law and strict interpretation, require the 126.2 suspension to remain in effect?  The antecedent phrase in the agreement states, "while the above-referenced rule is in development"; if State understands or interprets the referenced "rule" as the CAT I-III regulatory change in process (and is that correct), what interpretation is State using for what "while" means?  For the length of duration of the development of the CAT I-III rule – which presumably extends to the end of the formal 38(f) process?  Or could "while" mean "during", a period of time not necessarily terminating with the legal completion of the CAT I-III rule process?

Official - Transitory
UNCLASSIFIED

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 10:44 AM
**To:** Hart, Robert L <HartRL@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

[black redaction box]

Official - Transitory
UNCLASSIFIED

**From:** Hart, Robert L
**Sent:** Wednesday, July 25, 2018 10:42 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>

**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** RE: Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████████████████

Rob Hart
202.736.9221 | hartrl@state.gov

**Official - Transitory**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 10:29 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>
**Cc:** Rogers, Shana A <RogersSA2@state.gov>; Freeman, Jeremy B <FreemanJB@state.gov>
**Subject:** Proposed Hill responses: Defense items and technology vulnerable to Disclosure from Future Lawsuits

███████████████████████████████████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Wednesday, July 25, 2018 9:47 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** RE: Defense items and technology vulnerable to Disclosure from Future Lawsuits

In addition, please ask your counsel to send details on the cases he mentioned that are indicative of federal courts likely to find against the government.

██████████████████████████████████████████

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 9:15 AM
**To:** Miller, Michael F (Millermf@state.gov) <Millermf@state.gov>; Paul, Joshua M (PaulJM@state.gov) <PaulJM@state.gov>; 'Darrach, Tamara A' <DarrachTA@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Bartley, Megan (Foreign Relations) <Megan_Bartley@foreign.senate.gov>; Ricchetti, Daniel (Foreign Relations) <Daniel_Ricchetti@foreign.senate.gov>
**Subject:** Defense items and technology vulnerable to Disclosure from Future Lawsuits

How long is "temporary" under ITAR 126.2?  Is there a minimum period of time, or is it completely at the discretion of the PM DAS?

███████████████████████████████████████████████████████

Please provide us an illustrative list of the defense items and related controlled technology State was concerned would be subject to potentially future lawsuits requiring removal of controls for public sharing had there been an unfavorable ruling in the DD case.



Please also provide to us separately notional legislative language to remove or reduce the vulnerability of these items and technology from such disclosure.

| | |
|---|---|
| **From:** | Miller, Michael F <Millermf@state.gov> |
| **Sent:** | Wednesday, July 11, 2018 8:06 AM |
| **To:** | Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | RE: Public Comments on Cats I-III Rules |



**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 11, 2018 7:50 AM
**To:** Monjay, Robert <MonjayR@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 4:07 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

For anyone interested. https://www.regulations.gov/document?D=DOS-2017-0046-3131

Thanks
Rob

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M

**Sent:** Tuesday, July 10, 2018 2:19 PM
**To:** Monjay, Robert <MonjayR@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

Hi – a birdie tells me you should check the comments for one from a certain Mr. Robert Menendez and colleagues, submitted around 8pm last night.

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 2:03 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** Public Comments on Cats I-III Rules

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 3,250 total public comments. 3181 comments came in through regulations.gov and 69 comments came in via email.

We are reviewing the comments for duplicates and bulk submissions (form letters), which should reduce the number of unique comments that we need to address. More info to follow.
Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official**
**UNCLASSIFIED**

| **From:** | Dearth, Anthony M <DearthAM@state.gov> |
|---|---|
| **Sent:** | Tuesday, July 10, 2018 2:39 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov> |
| **Subject:** | RE: Public Comments on Cats I-III Rules |

<span style="background:black;color:black">██████████████████████████████</span>

v/r, Tony

Anthony M. Dearth
Chief of Staff
Directorate of Defense Trade Controls
Bureau of Political Military Affairs
United States Department of State
Office: 202-663-2836

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Tuesday, July 10, 2018 2:19 PM
**To:** Monjay, Robert <MonjayR@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** RE: Public Comments on Cats I-III Rules

<span style="background:black;color:black">███████████████████████████████████████████</span>

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 2:03 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** Public Comments on Cats I-III Rules

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 3,250 total public comments. 3181 comments came in through regulations.gov and 69 comments came in via email.

<span style="background:black;color:black">███████████████████████████████████████████</span>

Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official**
**UNCLASSIFIED**

| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| Sent: | Tuesday, July 10, 2018 2:19 PM |
| To: | Monjay, Robert <MonjayR@state.gov>; Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov> |
| Cc: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Subject: | RE: Public Comments on Cats I-III Rules |

███████████████████████████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 2:03 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** Public Comments on Cats I-III Rules

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 3,250 total public comments. 3181 comments came in through regulations.gov and 69 comments came in via email.

███████████████████████████████████████████████████████████

Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official**
**UNCLASSIFIED**

| From: | McKeeby, David I <McKeebyDI@state.gov> |
|---|---|
| Sent: | Tuesday, July 17, 2018 3:45 PM |
| To: | Cross-Durrant, Marlo S <Cross-DurrantMS@state.gov>; PM-CPA <PM-CPA@state.gov> |
| Subject: | RE: Questions on recent settlement with Defense Distributed |

Thanks, Marlo – we'll close the loop with Sherfinski.

Best,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:        202.647.8757 | 🖳  BlackBerry: 202.550.3482 |
✉ e-mail:        *mckeebydi@state.gov* | ✍ Web: *www.state.gov/t/pm /* | Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



---

**From:** Cross-Durrant, Marlo S
**Sent:** Tuesday, July 17, 2018 3:02 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Subject:** FW: Questions on recent settlement with Defense Distributed

Dear PM colleagues,
Please see below for press query from Washington Times.  Please let me know if you'd like to take care of this.

Thanks,
Marlo

**From:** David Sherfinski <dsherfinski@washingtontimes.com>
**Sent:** Tuesday, July 17, 2018 1:04 PM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Questions on recent settlement with Defense Distributed

Hello,

This is David Sherfinski with the Washington Times. I'm writing a story on this recent settlement between the administration and Defense Distributed and wanted to ask a few questions since it was negotiated by the State Department:

- Why did State choose to settle after years of litigation involving this case?

- What specifically did the administration win/gain by settling that it would not have otherwise?

WASHAR0002971

- How did the administration's recent moves on export control reform factor into the decision?

Anyway, please let me know what you can on these - thanks very much.

Sincerely,

David

--
David Sherfinski
The Washington Times
Cell: 860-810-5307
dsherfinski@washingtontimes.com

The information contained in this electronic transmission is intended for the exclusive use of the individuals to whom it is addressed and may contain information that is privileged and confidential, the disclosure of which is prohibited by law. If the reader of this transmission is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. In addition, any unauthorized copying, disclosure or distribution of the material in this e-mail and any attachments is strictly forbidden.

**Official**
**UNCLASSIFIED**

WASHAR0002972

| | |
|---|---|
| **From:** | Wilson, Karen L (OLA) <Karen.L.Wilson@usdoj.gov> |
| **Sent:** | Tuesday, July 24, 2018 12:07 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Goldschmidt, Lauren (OLA) <Lauren.Goldschmidt@usdoj.gov>; Darrach, Tamara A <DarrachTA@state.gov> |
| **Subject:** | RE: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns |

**[REDACTED]**

**Karen L Wilson**
**Attorney Advisor**
**Office of Legislative Affairs**
**U.S. Department of Justice**

**Direct: 202-616-0658**
**Fax: 202-514-9353**

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Tuesday, July 24, 2018 7:48 AM
**To:** Goldschmidt, Lauren (OLA) <lgoldschmidt@jmd.usdoj.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Wilson, Karen L (OLA) <kwilson@jmd.usdoj.gov>
**Subject:** RE: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

**[REDACTED]**

**Official**
**UNCLASSIFIED**

**From:** Goldschmidt, Lauren (OLA) <Lauren.Goldschmidt@usdoj.gov>
**Sent:** Monday, July 23, 2018 4:54 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Wilson, Karen L (OLA) <Karen.L.Wilson@usdoj.gov>
**Subject:** RE: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Hi Josh,

**[REDACTED]**

Thanks,
Lauren

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Monday, July 23, 2018 4:33 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Wilson, Karen L (OLA) <kwilson@jmd.usdoj.gov>
**Cc:** Goldschmidt, Lauren (OLA) <lgoldschmidt@jmd.usdoj.gov>
**Subject:** RE: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

WASHAR0002973

Thanks.  Among the questions we have received from the Committees staffs are:

- **What are the law enforcement and counter-terrorism implications of this change?**  Enabling the widespread acquisition of undetectable or largely-undetectable firearms would seem to be a bad idea, especially in protection of domestic and international airline flights from terrorist hijacking/attacks.  What changes will be required by TSA here and abroad to deal with this?

- Has TSA provided and opinions on the detectability of plastic firearms if packed in pieces?

[REDACTED]

Thanks,

Josh

**Official**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Monday, July 23, 2018 4:30 PM
**To:** Wilson, Karen L (OLA) <Karen.L.Wilson@usdoj.gov>
**Cc:** Goldschmidt, Lauren (OLA) <Lauren.Goldschmidt@usdoj.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

+Paul

**From:** Wilson, Karen L (OLA) <Karen.L.Wilson@usdoj.gov>
**Sent:** Monday, July 23, 2018 4:25 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** Goldschmidt, Lauren (OLA) <Lauren.Goldschmidt@usdoj.gov>
**Subject:** FW: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

[REDACTED]

**Karen L Wilson**
**Attorney Advisor**
**Office of Legislative Affairs**
**U.S. Department of Justice**

**Direct: 202-616-0658**
**Fax: 202-514-9353**

**From:** Darrach, Tamara A <DarrachTA@state.gov>
**Sent:** Monday, July 23, 2018 9:47 AM
**To:** Pings, Anne (OLA) <apings@jmd.usdoj.gov>
**Subject:** FW: Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Good morning Anne,

████████████████████████████████████████████████████████

Thanks!
Tamara

**Tamara Darrach | Congressional Advisor | Bureau of Legislative Affairs | U.S. Department of State**

2201 C St NW, Rm 7418 | (202) 647-8763 | DarrachTA@state.gov

---

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 4:35 PM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David <david_fite@foreign.senate.gov>; Oliver, Stacie <stacie_oliver@foreign.senate.gov>
**Subject:** Rep. Engel Letter to Sec. Pompeo on 3D Printed guns

Mike, et.al.:

I wanted you to be aware of the attached letter from Rep. Engel to Secretary Pompeo urging a delay of the implementation of the settlement in Defense Distributed v. U.S. State Department, given the significant security threat that would occur immediately upon release of the software. The letter also is being sent to H. Rep. Engel has directed that the letter be released to the public. As you are no doubt aware, the terms of the settlement are already being widely reported in the media this afternoon.

Ed

Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

| | |
|---|---|
| **From:** | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
| **Sent:** | Friday, July 20, 2018 3:27 PM |
| **To:** | 'Fite, David (Foreign Relations)' <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov> |
| **Cc:** | Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov> |
| **Subject:** | RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms |

---

I'll pass your request (and Stacie's questions) back.

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 3:20 PM
**To:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Paul, Joshua M <PaulJM@state.gov>
**Cc:** Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Will State be bringing TSA and Justice reps to the briefing?

**From:** Oliver, Stacie (Foreign Relations)
**Sent:** Friday, July 20, 2018 3:15 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Subject:** Re: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

If like to add two questions here - how are other countries handling this software issue? And, has TSA provided and opinions on the detectability of plastic firearms if packed in pieces?

Thanks!

Sent from my iPhone

On Jul 20, 2018, at 2:42 PM, Paul, Joshua M <PaulJM@state.gov> wrote:

> We're working on putting something together and I have noted both the timeline you have indicated, as well as the obvious importance you place on this matter (a perspective we of course share), to our team, and will get back to you as soon as I have any updates.
>
> Josh

WASHAR0002976

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 2:33 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

State apparently agreed to invoke the suspension under 126.2 by 7/27.  Will State be doing this on the 27th for before?  Will State do it before briefing us next week?

---

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 20, 2018 2:25 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

I will pass back these questions to our team, and we look forward to discussing them with you in person to the extent that they fall within the context of our responsibilities under the AECA.

**Official**
**UNCLASSIFIED**

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 2:10 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

But it's State's changes that are allowing this to be implemented right? And it's these changes that State will take, especially pursuant to the authority in 126.2, that will allow this information to be disseminated worldwide without a license, without penalty, right?

Do you mean to tell us this question did not arise or was not fully considered during the (presumably) interagency deliberation on the settlement agreement?  Or do you have answers to these questions, but State isn't willing to tell us?

Additionally, State is about take an action to suspend the application of ITAR restrictions on the publication of controlled information/technology on the Internet for a temporary period of time, BEFORE the reg change transferring the defense items that the information/tech pertains to becomes final.  And what if that reg change does not become final, or is different from the draft rule?  In that instance, State will have allowed the worldwide transfer of export-controlled information "in the interest of the security and foreign policy of the United States"?

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 20, 2018 2:01 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund
<Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A
<DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations)
<Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Hi David,

We would need to refer you to TSA or other law enforcement organizations on this question.  The DDTC
nexus on this issue was/is limited to our role in controlling exports of tech data, which is the only reason
we got involved in the first place.

Josh

**Official - SBU**
**UNCLASSIFIED**

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 1:38 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F
<Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations)
<Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Also, what are the law enforcement and counter-terrorism implications of this change?  Enabling the
widespread acquisition of undetectable or largely-undetectable firearms would seem to be a bad idea,
especially in protection of domestic and international airline flights from terrorist hijacking/attacks.  What
changes will be required by TSA here and abroad to deal with this?

---

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 20, 2018 11:42 AM
**To:** Rice, Edmund <Edmund.Rice@mail.house.gov>; Fite, David (Foreign Relations)
<David_Fite@foreign.senate.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A
<DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations)
<Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Understood, and that's helpful information.  We'll round back and be in touch.

**Official**
**UNCLASSIFIED**

---

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 11:32 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>;
Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations)

WASHAR0002978

<Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

A phone call would be only a first step for we four.  I expect that as news of this settlement spreads, there will be a requirement to brief a number of Congressional staff and then Members.

---

**From:** Paul, Joshua M <PaulJM@state.gov>
**Sent:** Friday, July 20, 2018 11:21 AM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

Hello,

We've actually been in the process of putting together a briefing for you on this – with the intent being to provide a phone call early next week.  Would that work?

Josh

**Official**
**UNCLASSIFIED**

---

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Friday, July 20, 2018 11:10 AM
**To:** 'Rice, Edmund' <Edmund.Rice@mail.house.gov>; Miller, Michael F <Millermf@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** RE: Request briefing on proposed ITAR change on 3-D printing software for plastic firearms

As well as State's view of State's legal liability to this suit in the first place.

---

**From:** Rice, Edmund <Edmund.Rice@mail.house.gov>
**Sent:** Friday, July 20, 2018 11:03 AM
**To:** Miller, Michael F <Millermf@state.gov>; Paul, Joshua <pauljm@state.gov>; Darrach, Tamara <darrachta@state.gov>
**Cc:** McCormick, Jamie <Jamie.McCormick@mail.house.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>
**Subject:** Request briefing on proposed ITAR change on 3-D printing software for plastic firearms
**Importance:** High

Mike, et.al.:

This is to request a briefing on the terms of the settlement (attached) that the State Department entered into June 29th regarding Defense Distributed et al v. United States Department of State et al, Western District of Texas, Civil Docket # 1:15-cv-00372-RP. This is the suit brought by several persons who want to make available online software for manufacture via 3-D printing of firearms, including plastic firearms.

In particular, item 1(b) indicates that State will amend the ITAR to remove the subject software from the USML by July 27th.   Several House Members have brought this matter to Rep. Engel's attention and I have been asked to look into this ASAP. I expect that Jamie, David and Stacie also would need to know about this.

Perhaps this could be covered at our July 25th arms transfer meeting.  One way or another, I need a briefing on this prior to July 27th.

Ed


Edmund B. Rice
Senior Professional Staff Member
Democratic Staff
House Foreign Affairs Committee
B-360 Rayburn House Office Bldg.
202-226-8467

WASHAR0002980

| From: | McKeeby, David I <McKeebyDI@state.gov> |
|---|---|
| **Sent:** | Tuesday, July 17, 2018 5:28 PM |
| **To:** | Thompson, Nicole A. <ThompsonNA2@state.gov>; PM-CPA <PM-CPA@state.gov> |
| **Cc:** | Loftus, Elizabeth <LoftusE@state.gov>; Kildow, Cassandra <KildowC@state.gov> |
| **Subject:** | RE: Request for Comment |

Got it –

Thx!
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:    202.647.8757 | 🖥 BlackBerry: 202.550.3482 |
✉ e-mail:    *mckeebydi@state.gov* | 🖱 Web: *www.state.gov/t/pm/* | Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



---

**From:** Thompson, Nicole A.
**Sent:** Tuesday, July 17, 2018 5:22 PM
**To:** McKeeby, David I <McKeebyDI@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** Loftus, Elizabeth <LoftusE@state.gov>; Kildow, Cassandra <KildowC@state.gov>
**Subject:** Re: Request for Comment

Thanks Dave.

We received one from NBC news too. Julia might have already fwded it to you.

---

**From:** McKeeby, David I
**Sent:** Tuesday, July 17, 2018 4:54 PM
**To:** Thompson, Nicole A.; PM-CPA
**Cc:** Loftus, Elizabeth; Kildow, Cassandra
**Subject:** RE: Request for Comment

Yes – we'll take it.

Best,
Dave

_____

**David I. McKeeby**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.8757 | ▣  BlackBerry: 202.550.3482 |

✉ e-mail:     *mckeebydi@state.gov* | ⬧ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**From:** Thompson, Nicole A.
**Sent:** Tuesday, July 17, 2018 4:54 PM
**To:** PM-CPA <PM-CPA@state.gov>
**Cc:** Loftus, Elizabeth <LoftusE@state.gov>; Kildow, Cassandra <KildowC@state.gov>
**Subject:** Fw: Request for Comment

Sorry about the delay in sending this, but is this PM's bailiwick?

Nicole

---

**From:** Thompson, Nicole A. <ThompsonNA2@state.gov>
**Sent:** Tuesday, July 17, 2018 3:29 PM
**To:** PA Press Duty
**Subject:** RE: Request for Comment

Got it.

**From:** Marrian Zhou <marrian.zhou@cbsinteractive.com>
**Sent:** Tuesday, July 17, 2018 3:29 PM
**To:** PA Press Duty <PAPressDuty@state.gov>
**Subject:** Request for Comment

Hello,

My name is Marrian Zhou and I'm a reporter for CNET. I'm writing about your settlement with Defense Distributed over publications regarding 3D printed plastic guns. Does it worry you that more people will get their hands on this design of an undetectable weapon? Do you have any comments?

Thanks.

Best,

Marrian Zhou
Staff Reporter at CNET
(212) 380-0283
www.cnet.com

**Official**
**UNCLASSIFIED**

| **From:** | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| **Sent:** | Friday, June 22, 2018 11:34 AM |
| **To:** | 'Jeff Abramson' <jeff@forumarmstrade.org> |
| **Cc:** | Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; PM-CPA <PM-CPA@state.gov>; Strike, Andrew P <StrikeAP@state.gov> |
| **Subject:** | RE: requesting meeting on firearms export regulation changes |

Thanks, Jeff.  The meeting will be in State Annex One (Columbia Plaza).  My colleague Andy Strike, cc'd, will escort you to the DDTC Conference Room.  Are you familiar with how to access the building?  If not, may I suggest you meet Andy at Casey's Coffee at 0845 and he can escort you from there.

Thanks,

Josh

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Wednesday, June 20, 2018 5:51 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** Re: requesting meeting on firearms export regulation changes

Josh-

Ah, sorry for the confusion. Please, let's keep the meeting on the 26th at 9AM and I'll keep my group to no more than four.

Separately, I'll reach out to Commerce for a meeting with them. If there is someone there you recommend I contact first, I'd welcome that suggestion.

Many thanks,

Jeff

On Wed, Jun 20, 2018 at 12:08 PM, Paul, Joshua M <PaulJM@state.gov> wrote:

Hi Jeff,

I may have misunderstood your earlier email – I'd been proceeding on the assumption this would be a relatively small conversation with our experts on this regulatory proposal; while we are seeking comments on the regulations via the usual Federal Register process, and are happy to discuss the proposal in small groups, we are not seeking at this point the broad engagement that we did with regards to the CAT Policy – which was conducted, you will recall, after the final policy had already been approved.  As such, this will be a working engagement with a couple of our SMEs from the Directorate of Defense Trade Controls, and we'd ask you to limit attendance to 3-4 folks.

If you'd like something more broad and high level (and including other agencies) we can explore setting that up, but we'll need more time to do so.

Thanks,

Josh

WASHAR0002983

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Wednesday, June 20, 2018 10:24 AM

**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** Re: requesting meeting on firearms export regulation changes

Josh,

Thanks. Let's please go with that plan, 9am at State. Colby and I are available then and I will reach out to colleagues to join in. Let me know when you need our list. If you could let us know who is available there (and possibly from Commerce and Defense) that would much appreciated.

More soon (sorry, am keeping my communications brief today from vacation),

Jeff

On Wed, Jun 20, 2018, 8:02 AM Paul, Joshua M <PaulJM@state.gov> wrote:

> Thanks for your invitation; it would be far more convenient for our team if we could host over here at State – but 9am would work.  Can we do that?
>
> Thanks,
>
> Josh
>
> **From:** Jeff Abramson <jeff@forumarmstrade.org>
> **Sent:** Tuesday, June 19, 2018 12:16 PM
> **To:** Paul, Joshua M <PaulJM@state.gov>
> **Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
> **Subject:** Re: requesting meeting on firearms export regulation changes
>
> Many thanks, Josh, for working to make this happen.
>
> I have a 10:30 meeting that morning at the Arms Control Association offices (1200 18th Street NW, Suite 1175). Might it be possible for me to host and for us to get started around 9:00 or 9:30? I know Rachel is on vacation next week, but hopefully Colby can join in. If that date and time works, I will reach out to a few experts to join us.
>
> Jeff
>
> On Tue, Jun 19, 2018 at 11:37 AM, Paul, Joshua M <PaulJM@state.gov> wrote:
>
>> Hi Jeff,
>>
>> Our folks who work on regulatory policy in the Directorate of Defense Trade Controls would be glad to meet with you.  Are you available next Tuesday morning, June 26th?
>>
>> Thanks,
>>
>> Josh

WASHAR0002984

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.7878 | 📄  BlackBerry: 202.679.6724 | 🖨  Fax: 202.647.4055
✉ e-mail:     _**PaulJM@State.Gov**_ | 🖱 Web: _**www.state.gov/t/pm /**_

http://twitter.com/StateDeptPM

Stay connected with _State.gov_:

This message is _**UNCLASSIFIED**_, per E.O. 12958


**Official
UNCLASSIFIED**

**Official
UNCLASSIFIED**

**Official
UNCLASSIFIED**

**Official
UNCLASSIFIED**

---

**From:** Chen, Rachael J
**Sent:** Sunday, June 17, 2018 8:51 PM
**To:** Jeff Abramson <jeff@forumarmstrade.org>; Cressey, Laura E <CresseyLE@state.gov>
**Cc:** Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** RE: requesting meeting on firearms export regulation changes

Hi Jeff,

Greetings from Singapore, where I've been helping out our particularly busy embassy for a few weeks.  I'll check in with my colleagues back in Washington to see if this would be feasible and circle back.

The office in PM that has the lead on this regulatory change is the Directorate of Defense Trade Controls, so after this message, I'll take Laura out of the chain—she's with RSAT, and not so focused on this change.

Best,
Rachael

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Friday, June 15, 2018 3:17 AM
**To:** Cressey, Laura E <CresseyLE@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>
**Subject:** requesting meeting on firearms export regulation changes

Director Cressey and Ms. Chen-

Thank you again for leading the US team (and organizing) the conversation last month on conventional arms transfer policy at the Stimson Center. As Rachel Stohl mentioned during that conversation, we would also welcome the chance to have a similar meeting to discuss the proposed new regulations regarding USML categories I to III. If it would be possible to do that in the next week or two, before the public comment period expires, that would be most helpful.

The Forum on the Arms Trade is maintaining a resource page (here) that provides links to the official documents and comment pages, media articles, and other resources. It won't be surprising that a number of us have concerns about the proposed regulations. We also have a number of questions and suggestions, and would welcome a cordial and frank conversation.

While I will be on vacation next week, I will follow emails on this and reply to assist in scheduling a meeting. Please do let me know what might be possible.

Many thanks in advance,

Jeff

--
**Jeff Abramson**
Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



**Official**
**UNCLASSIFIED**

--
**Jeff Abramson**
Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



WASHAR0002986

--
**Jeff Abramson**
Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215
Interested in supporting our work? Find out more here.



WASHAR0002987

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Thursday, June 21, 2018 8:08 AM |
| **To:** | Jeff Abramson <jeff@forumarmstrade.org>; eugene.cottilli@bis.doc.gov |
| **Cc:** | Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; PM-CPA <PM-CPA@state.gov> |
| **Subject:** | RE: requesting meeting on firearms export regulation changes |

Sure – I recommend reaching out to Eugene Cottilli in Commerce BIS, eugene.cottilli@bis.doc.gov

Thanks,

Josh

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Wednesday, June 20, 2018 5:51 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** Re: requesting meeting on firearms export regulation changes

Josh-

Ah, sorry for the confusion. Please, let's keep the meeting on the 26th at 9AM and I'll keep my group to no more than four.

Separately, I'll reach out to Commerce for a meeting with them. If there is someone there you recommend I contact first, I'd welcome that suggestion.

Many thanks,

Jeff

On Wed, Jun 20, 2018 at 12:08 PM, Paul, Joshua M <PaulJM@state.gov> wrote:

> Hi Jeff,
>
> I may have misunderstood your earlier email – I'd been proceeding on the assumption this would be a relatively small conversation with our experts on this regulatory proposal; while we are seeking comments on the regulations via the usual Federal Register process, and are happy to discuss the proposal in small groups, we are not seeking at this point the broad engagement that we did with regards to the CAT Policy – which was conducted, you will recall, after the final policy had already been approved.  As such, this will be a working engagement with a couple of our SMEs from the Directorate of Defense Trade Controls, and we'd ask you to limit attendance to 3-4 folks.
>
> If you'd like something more broad and high level (and including other agencies) we can explore setting that up, but we'll need more time to do so.
>
> Thanks,
>
> Josh
>
> **From:** Jeff Abramson <jeff@forumarmstrade.org>
> **Sent:** Wednesday, June 20, 2018 10:24 AM

WASHAR0002988

**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** Re: requesting meeting on firearms export regulation changes

Josh,

Thanks. Let's please go with that plan, 9am at State. Colby and I are available then and I will reach out to colleagues to join in. Let me know when you need our list. If you could let us know who is available there (and possibly from Commerce and Defense) that would much appreciated.

More soon (sorry, am keeping my communications brief today from vacation),

Jeff

On Wed, Jun 20, 2018, 8:02 AM Paul, Joshua M <PaulJM@state.gov> wrote:

> Thanks for your invitation; it would be far more convenient for our team if we could host over here at State – but 9am would work.  Can we do that?
>
> Thanks,
>
> Josh
>
> **From:** Jeff Abramson <jeff@forumarmstrade.org>
> **Sent:** Tuesday, June 19, 2018 12:16 PM
> **To:** Paul, Joshua M <PaulJM@state.gov>
> **Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
> **Subject:** Re: requesting meeting on firearms export regulation changes
>
> Many thanks, Josh, for working to make this happen.
>
> I have a 10:30 meeting that morning at the Arms Control Association offices (1200 18th Street NW, Suite 1175). Might it be possible for me to host and for us to get started around 9:00 or 9:30? I know Rachel is on vacation next week, but hopefully Colby can join in. If that date and time works, I will reach out to a few experts to join us.
>
> Jeff
>
> On Tue, Jun 19, 2018 at 11:37 AM, Paul, Joshua M <PaulJM@state.gov> wrote:
>
>> Hi Jeff,
>>
>> Our folks who work on regulatory policy in the Directorate of Defense Trade Controls would be glad to meet with you.  Are you available next Tuesday morning, June 26th?
>>
>> Thanks,
>>
>> Josh
>>
>> _____
>> **Josh Paul**
>> Director, Congressional & Public Affairs

WASHAR0002989

Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:          202.647.7878 | 🖥   BlackBerry: 202.679.6724 | 🖨   Fax: 202.647.4055
✉ e-mail:        *PaulJM@State.Gov* | ✎🖑   Web: *www.state.gov/t/pm /*

http://twitter.com/StateDeptPM

Stay connected with *State.gov*:

This message is **_UNCLASSIFIED_**, per E.O. 12958

**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

**From:** Chen, Rachael J
**Sent:** Sunday, June 17, 2018 8:51 PM
**To:** Jeff Abramson <jeff@forumarmstrade.org>; Cressey, Laura E <CresseyLE@state.gov>
**Cc:** Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** RE: requesting meeting on firearms export regulation changes

Hi Jeff,

Greetings from Singapore, where I've been helping out our particularly busy embassy for a few weeks. I'll check in with my colleagues back in Washington to see if this would be feasible and circle back.

The office in PM that has the lead on this regulatory change is the Directorate of Defense Trade Controls, so after this message, I'll take Laura out of the chain—she's with RSAT, and not so focused on this change.

Best,
Rachael

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Friday, June 15, 2018 3:17 AM
**To:** Cressey, Laura E <CresseyLE@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>
**Subject:** requesting meeting on firearms export regulation changes

Director Cressey and Ms. Chen-

Thank you again for leading the US team (and organizing) the conversation last month on conventional

arms transfer policy at the Stimson Center. As Rachel Stohl mentioned during that conversation, we would also welcome the chance to have a similar meeting to discuss the proposed new regulations regarding USML categories I to III. If it would be possible to do that in the next week or two, before the public comment period expires, that would be most helpful.

The Forum on the Arms Trade is maintaining a resource page (here) that provides links to the official documents and comment pages, media articles, and other resources. It won't be surprising that a number of us have concerns about the proposed regulations. We also have a number of questions and suggestions, and would welcome a cordial and frank conversation.

While I will be on vacation next week, I will follow emails on this and reply to assist in scheduling a meeting. Please do let me know what might be possible.

Many thanks in advance,

Jeff

--
**Jeff Abramson**
Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



**Official**
**UNCLASSIFIED**

--
**Jeff Abramson**
Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



--
**Jeff Abramson**

Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215
Interested in supporting our work? Find out more here.



WASHAR0002992

| | |
|---|---|
| **From:** | Jeff Abramson <jeff@forumarmstrade.org> |
| **Sent:** | Monday, June 18, 2018 2:38 PM |
| **To:** | Chen, Rachael J <ChenRJ@state.gov> |
| **Cc:** | Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov> |
| **Subject:** | Re: requesting meeting on firearms export regulation changes |

Thank you, Rachael. Would be very good if this would be possible. I appreciate your assistance from Singapore,

Jeff

On Sun, Jun 17, 2018 at 8:50 PM, Chen, Rachael J <ChenRJ@state.gov> wrote:

> Hi Jeff,
>
> Greetings from Singapore, where I've been helping out our particularly busy embassy for a few weeks.  I'll check in with my colleagues back in Washington to see if this would be feasible and circle back.
>
> The office in PM that has the lead on this regulatory change is the Directorate of Defense Trade Controls, so after this message, I'll take Laura out of the chain—she's with RSAT, and not so focused on this change.
>
> Best,
>
> Rachael
>
> **From:** Jeff Abramson <jeff@forumarmstrade.org>
> **Sent:** Friday, June 15, 2018 3:17 AM
> **To:** Cressey, Laura E <CresseyLE@state.gov>
> **Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>
> **Subject:** requesting meeting on firearms export regulation changes
>
> Director Cressey and Ms. Chen-
>
> Thank you again for leading the US team (and organizing) the conversation last month on conventional arms transfer policy at the Stimson Center. As Rachel Stohl mentioned during that conversation, we would also welcome the chance to have a similar meeting to discuss the proposed new regulations regarding USML categories I to III. If it would be possible to do that in the next week or two, before the public comment period expires, that would be most helpful.

The Forum on the Arms Trade is maintaining a resource page (here) that provides links to the official documents and comment pages, media articles, and other resources. It won't be surprising that a number of us have concerns about the proposed regulations. We also have a number of questions and suggestions, and would welcome a cordial and frank conversation.

While I will be on vacation next week, I will follow emails on this and reply to assist in scheduling a meeting. Please do let me know what might be possible.

Many thanks in advance,

Jeff

--

**Jeff Abramson**

Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



**Official**

**UNCLASSIFIED**

--

WASHAR0002994

**Jeff Abramson**
Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



WASHAR0002995

| From: | Christina Arabia <christina@ciponline.org> |
|---|---|
| Sent: | Wednesday, June 27, 2018 9:45 AM |
| To: | Strike, Andrew P <StrikeAP@state.gov> |
| Cc: | Jeff Abramson <jeff@forumarmstrade.org>; Paul, Joshua M <PaulJM@state.gov>; Chen, Rachael J <ChenRJ@state.gov>; PM-CPA <PM-CPA@state.gov>; M Schroeder <matt.schroeder@smallarmssurvey.org> |
| Subject: | Re: requesting meeting on firearms export regulation changes |

Hi Andy,

I also want to thank you for your help with setting up the meeting yesterday.

Best,

Christina

On Tue, Jun 26, 2018 at 3:08 PM, M Schroeder <matt.schroeder@smallarmssurvey.org> wrote:
    Yes, many thanks for your help with the meeting today, Andy.  Very appreciated.

    On 26 June 2018 at 13:01, Jeff Abramson <jeff@forumarmstrade.org> wrote:
        Thank you, Andy, and thanks everyone for helping to set up this meeting,

        Jeff

        On Tue, Jun 26, 2018 at 12:22 PM, Strike, Andrew P <StrikeAP@state.gov> wrote:

            Here are the DOC contacts, per request…


            Eugene Cottilli

            Press Officer

            Department of Commerce - Bureau of Industry and Security

            (202) 482-0099

            eugene.cottilli@bis.doc.gov


            Kimberly Ekmark

            Press Officer

            Department of Commerce Bureau of Industry and Security

            202-482-9020

            Kimberly.Ekmark@bis.doc.gov

WASHAR0002996

**Official**

**UNCLASSIFIED**

---

**From:** Strike, Andrew P
**Sent:** Monday, June 25, 2018 12:13 PM
**To:** 'Jeff Abramson' <jeff@forumarmstrade.org>; Paul, Joshua M <PaulJM@state.gov>; Christina Arabia <christina@ciponline.org>; Matt Schroeder <matt.schroeder@smallarmssurvey.org>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; PM-CPA <PM-CPA@state.gov>
**Subject:** RE: requesting meeting on firearms export regulation changes

See you folks then.  Let's all meet at Casey's at 0845 and go together through security.  Please bring a U.S. government ID for checkin purposes. Best,

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Monday, June 25, 2018 11:59 AM
**To:** Paul, Joshua M <PaulJM@state.gov>; Christina Arabia <christina@ciponline.org>; Matt Schroeder <matt.schroeder@smallarmssurvey.org>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; PM-CPA <PM-CPA@state.gov>; Strike, Andrew P <StrikeAP@state.gov>

**Subject:** Re: requesting meeting on firearms export regulation changes

Apologies for the slow reply. If we could meet at Casey's at 8:45, that would be great. I appreciate Andy coming out.

It will be me, Matt Schroeder (Small Arms Survey) and Christina Arabia (Security Assistance Monitor) joining in.

Thanks again in advance,

Jeff

On Fri, Jun 22, 2018 at 11:33 AM, Paul, Joshua M <PaulJM@state.gov> wrote:

> Thanks, Jeff.  The meeting will be in State Annex One (Columbia Plaza).  My colleague Andy Strike, cc'd, will escort you to the DDTC Conference Room.  Are you familiar with how to access the building?  If not, may I suggest you meet Andy at Casey's Coffee at 0845 and he can escort you from there.
>
>
> Thanks,
>
>
> Josh
>
>
> **From:** Jeff Abramson <jeff@forumarmstrade.org>
> **Sent:** Wednesday, June 20, 2018 5:51 PM
> **To:** Paul, Joshua M <PaulJM@state.gov>
> **Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; PM-CPA <PM-CPA@state.gov>
>
> **Subject:** Re: requesting meeting on firearms export regulation changes
>
>
> Josh-
>
>
> Ah, sorry for the confusion. Please, let's keep the meeting on the 26th at 9AM and I'll keep my group to no more than four.
>
>
> Separately, I'll reach out to Commerce for a meeting with them. If there is someone there you recommend I contact first, I'd welcome that suggestion.
>
>
> Many thanks,
>
>
> Jeff
>
>
> On Wed, Jun 20, 2018 at 12:08 PM, Paul, Joshua M <PaulJM@state.gov> wrote:
>
>> Hi Jeff,

WASHAR0002998

I may have misunderstood your earlier email – I'd been proceeding on the assumption this would be a relatively small conversation with our experts on this regulatory proposal; while we are seeking comments on the regulations via the usual Federal Register process, and are happy to discuss the proposal in small groups, we are not seeking at this point the broad engagement that we did with regards to the CAT Policy – which was conducted, you will recall, after the final policy had already been approved.  As such, this will be a working engagement with a couple of our SMEs from the Directorate of Defense Trade Controls, and we'd ask you to limit attendance to 3-4 folks.

If you'd like something more broad and high level (and including other agencies) we can explore setting that up, but we'll need more time to do so.

Thanks,

Josh

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Wednesday, June 20, 2018 10:24 AM

**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** Re: requesting meeting on firearms export regulation changes

Josh,

Thanks. Let's please go with that plan, 9am at State. Colby and I are available then and I will reach out to colleagues to join in. Let me know when you need our list. If you could let us know who is available there (and possibly from Commerce and Defense) that would much appreciated.

More soon (sorry, am keeping my communications brief today from vacation),

Jeff

WASHAR0002999

On Wed, Jun 20, 2018, 8:02 AM Paul, Joshua M <PaulJM@state.gov> wrote:

Thanks for your invitation; it would be far more convenient for our team if we could host over here at State – but 9am would work.  Can we do that?

Thanks,

Josh

**From:** Jeff Abramson <jeff@forumarmstrade.org>
**Sent:** Tuesday, June 19, 2018 12:16 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** Re: requesting meeting on firearms export regulation changes

Many thanks, Josh, for working to make this happen.

I have a 10:30 meeting that morning at the Arms Control Association offices (1200 18th Street NW, Suite 1175). Might it be possible for me to host and for us to get started around 9:00 or 9:30? I know Rachel is on vacation next week, but hopefully Colby can join in. If that date and time works, I will reach out to a few experts to join us.

Jeff

On Tue, Jun 19, 2018 at 11:37 AM, Paul, Joshua M <PaulJM@state.gov> wrote:

Hi Jeff,

Our folks who work on regulatory policy in the Directorate of Defense Trade Controls would be glad to meet with you.  Are you available next Tuesday morning, June 26th?

Thanks,

Josh

_____

**Josh Paul**

Director, Congressional & Public Affairs

Bureau of Political-Military Affairs (PM/CPA)

U.S. Department of State

☎ Phone:      202.647.7878 | 🖬   BlackBerry:  202.679.6724 | 🖶   Fax: 202.647.4055

✉   e-mail:      ***PaulJM@State.Gov*** | ✍   Web:  ***www.state.gov/t/pm /***

http://twitter.com/StateDeptPM

Stay connected with *State.gov*:

This message is ***UNCLASSIFIED***, per E.O. 12958

**Official**

**UNCLASSIFIED**

**Official**

**UNCLASSIFIED**

**Official**

**UNCLASSIFIED**


**Official**

**UNCLASSIFIED**


**Official**

**UNCLASSIFIED**

---

**From:** Chen, Rachael J
**Sent:** Sunday, June 17, 2018 8:51 PM
**To:** Jeff Abramson <jeff@forumarmstrade.org>; Cressey, Laura E <CresseyLE@state.gov>
**Cc:** Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>; PM-CPA <PM-CPA@state.gov>
**Subject:** RE: requesting meeting on firearms export regulation changes


Hi Jeff,


Greetings from Singapore, where I've been helping out our particularly busy embassy for a few weeks. I'll check in with my colleagues back in Washington to see if this would be feasible and circle back.


The office in PM that has the lead on this regulatory change is the Directorate of Defense Trade Controls, so after this message, I'll take Laura out of the chain—she's with RSAT, and not so focused on this change.


Best,

Rachael


**From:** Jeff Abramson <jeff@forumarmstrade.org>

WASHAR0003002

**Sent:** Friday, June 15, 2018 3:17 AM
**To:** Cressey, Laura E <CresseyLE@state.gov>
**Cc:** Chen, Rachael J <ChenRJ@state.gov>; Colby Goodman <colby@ciponline.org>; Rachel Stohl <rstohl@stimson.org>
**Subject:** requesting meeting on firearms export regulation changes


Director Cressey and Ms. Chen-


Thank you again for leading the US team (and organizing) the conversation last month on conventional arms transfer policy at the Stimson Center. As Rachel Stohl mentioned during that conversation, we would also welcome the chance to have a similar meeting to discuss the proposed new regulations regarding USML categories I to III. If it would be possible to do that in the next week or two, before the public comment period expires, that would be most helpful.


The Forum on the Arms Trade is maintaining a resource page (here) that provides links to the official documents and comment pages, media articles, and other resources. It won't be surprising that a number of us have concerns about the proposed regulations. We also have a number of questions and suggestions, and would welcome a cordial and frank conversation.


While I will be on vacation next week, I will follow emails on this and reply to assist in scheduling a meeting. Please do let me know what might be possible.


Many thanks in advance,


Jeff


--

**Jeff Abramson**

Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215


Interested in supporting our work? Find out more here.



**Official**

**UNCLASSIFIED**

--

**Jeff Abramson**

Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



--

**Jeff Abramson**

Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



--

**Jeff Abramson**

Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



--
**Jeff Abramson**
Forum on the Arms Trade | www.ForumArmsTrade.org | @ForumArmsTrade
(202) 780-6215

Interested in supporting our work? Find out more here.



--
**Matt Schroeder** | Senior Researcher
Small Arms Survey
**t:** +1 202 464 6010
**e:** matt.schroeder@smallarmssurvey.org

WASHAR0003005

--
Christina Arabia
Program and Research Associate
Security Assistance Monitor
Center for International Policy
2000 M Street NW, Suite 720
Washington, DC 20036
Tel: (202) 232-3317 ext. 112
Email: christina@ciponline.org
Website: securityassistance.org

WASHAR0003006

| From: | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
|---|---|
| Sent: | Wednesday, July 25, 2018 5:31 PM |
| To: | Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov> |
| Subject: | RE: Sen. Menendez Letter to Secretary Pompeo on 3D Guns Issue |

<div style="background:black; height:40px;"></div>

**Official**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 5:29 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: Sen. Menendez Letter to Secretary Pompeo on 3D Guns Issue

<div style="background:black; height:80px;"></div>

MM

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Wednesday, July 25, 2018 5:19 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>
**Subject:** RE: Sen. Menendez Letter to Secretary Pompeo on 3D Guns Issue

<div style="background:black; height:80px;"></div>

**Official**
**UNCLASSIFIED**

**From:** Miller, Michael F
**Sent:** Wednesday, July 25, 2018 5:17 PM
**To:** Heidema, Sarah J <HeidemaSJ@state.gov>; Paul, Joshua M <PaulJM@state.gov>
**Subject:** FW: Sen. Menendez Letter to Secretary Pompeo on 3D Guns Issue

<div style="background:black; height:80px;"></div>

**Official**
**UNCLASSIFIED**

**From:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:** Wednesday, July 25, 2018 4:49 PM
**To:** Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:** Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov) <edmund.rice@mail.house.gov>; Jamie.mccormick@mail.house.gov
**Subject:** Sen. Menendez Letter to Secretary Pompeo on 3D Guns Issue

FYI, if you haven't seen.

| **From:** | Paul, Joshua M </o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=fe0af1773ed642df9120291ea0a8c588-Paul, Joshu> |
| **Sent:** | Tuesday, July 24, 2018 7:48 AM |
| **To:** | Darrach, Tamara A <DarrachTA@state.gov> |
| **Subject:** | RE: SFRC/HFAC Brief on DD Settlement |

███████████████

**Official**
**UNCLASSIFIED**

**From:** Darrach, Tamara A
**Sent:** Monday, July 23, 2018 4:55 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Subject:** RE: SFRC/HFAC Brief on DD Settlement

████████████████████████████████████████

-----Original Appointment-----
**From:** Paul, Joshua M
**Sent:** Monday, July 23, 2018 4:54 PM
**To:** Heidema, Sarah J; Hart, Robert L; Freeman, Jeremy B; Rogers, Shana A; Darrach, Tamara A; Miller, Michael F
**Subject:** SFRC/HFAC Brief on DD Settlement
**When:** Tuesday, July 24, 2018 1:00 PM-2:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** 423 Senate Dirksen Office Building

Please allow time for travel on either end.

███████████████████████████████

| | |
|---|---|
| **From:** | Freeman, Jeremy B <FreemanJB@state.gov> |
| **Sent:** | Tuesday, July 24, 2018 12:12 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Hart, Robert L <HartRL@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; Darrach, Tamara A <DarrachTA@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | RE: SFRC/HFAC Brief on DD Settlement |

███████████████████████████████████████

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Tuesday, July 24, 2018 12:11 PM
**To:** Heidema, Sarah J; Hart, Robert L; Freeman, Jeremy B; Rogers, Shana A; Darrach, Tamara A; Miller, Michael F
**Subject:** RE: SFRC/HFAC Brief on DD Settlement

████████████████████████████████████████████████████

Josh

-----Original Appointment-----
**From:** Paul, Joshua M
**Sent:** Monday, July 23, 2018 1:30 PM
**To:** Paul, Joshua M; Heidema, Sarah J; Hart, Robert L; Freeman, Jeremy B; Rogers, Shana A; Darrach, Tamara A; Miller, Michael F
**Subject:** SFRC/HFAC Brief on DD Settlement
**When:** Tuesday, July 24, 2018 1:00 PM-2:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** 423 Senate Dirksen Office Building

Please allow time for travel on either end.

████████████████████████████████████

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | McCormick, Jamie <Jamie.McCormick@mail.house.gov> |
| **Sent:** | Friday, July 27, 2018 5:18 PM |
| **To:** | Paul, Joshua M <PaulJM@state.gov>; Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov> |
| **Cc:** | Darrach, Tamara A <DarrachTA@state.gov> |
| **Subject:** | RE: Voice Mails/Calls |

Thanks...

**From:** Paul, Joshua M [mailto:PaulJM@state.gov]
**Sent:** Friday, July 27, 2018 5:12 PM
**To:** Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>; Rice, Edmund <Edmund.Rice@mail.house.gov>; Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>; McCormick, Jamie <Jamie.McCormick@mail.house.gov>
**Cc:** Darrach, Tamara A <DarrachTA@state.gov>
**Subject:** Voice Mails/Calls

Dear Ed and Stacie, thank you for taking my calls just now.

Dear Jamie and David, I am writing to draw your attention to a voicemail I just left you both on the matter of Defense Distributed.

I am available on ███████████ if you have any follow up questions whether immediately, or over the course of the weekend.

Thanks,

Josh

---

**Josh Paul**
Director, Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:     202.647.7878 | 📱 BlackBerry: 202.679.6724 | 🖨 Fax: 202.647.4055
✉ e-mail:     *PaulJM@State.Gov* | ✍ Web: *www.state.gov/t/pm /*

🐦 http://twitter.com/StateDeptPM

Stay connected with *State.gov*:



This message is ***UNCLASSIFIED***, per E.O. 12958

**Official**
**UNCLASSIFIED**

**From:** McKeeby, David I <McKeebyDI@state.gov>
**Sent:** Monday, May 14, 2018 9:04 PM
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Strike, Andrew P <StrikeAP@state.gov>
**Subject:** Re: Wash Times: Trump administration moves to shift gun export approval from State to Commerce

Best,
--D--

Sent from my BlackBerry 10 smartphone.

**From:** Paul, Joshua M
**Sent:** Monday, May 14, 2018 7:49 PM
**To:** McKeeby, David I
**Cc:** Strike, Andrew P
**Subject:** Re: Wash Times: Trump administration moves to shift gun export approval from State to Commerce

**From:** McKeeby, David I <McKeebyDI@state.gov>
**Date:** May 14, 2018 at 7:40:07 PM EDT
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Strike, Andrew P <StrikeAP@state.gov>
**Subject:** Re: Wash Times: Trump administration moves to shift gun export approval from State to Commerce

Best,
--D--

Sent from my BlackBerry 10 smartphone.

**From:** Paul, Joshua M
**Sent:** Monday, May 14, 2018 7:32 PM
**To:** McKeeby, David I
**Cc:** Strike, Andrew P
**Subject:** Re: Wash Times: Trump administration moves to shift gun export approval from State to Commerce

WASHAR0003012

███████████████████████████████████

**From:** McKeeby, David I <McKeebyDI@state.gov>
**Date:** May 14, 2018 at 7:17:29 PM EDT
**To:** Paul, Joshua M <PaulJM@state.gov>
**Cc:** Strike, Andrew P <StrikeAP@state.gov>
**Subject:** Fw: Wash Times: Trump administration moves to shift gun export approval from State to Commerce

████████████████████████████████

--D--

Sent from my BlackBerry 10 smartphone.

**From:** PA Press Clips Mailbox <PAPressClips@state.gov>
**Sent:** Monday, May 14, 2018 6:26 PM
**To:** PA Monitoring Group
**Subject:** Wash Times: Trump administration moves to shift gun export approval from State to Commerce

Trump administration moves to shift gun export approval from State to Commerce
By Guy Taylor - The Washington Times - Updated: 6:10 p.m. on Monday, May 14, 2018
https://www.washingtontimes.com/news/2018/may/14/trump-administration-moves-shift-small-arms-gun-ex/

The Trump administration took a major formal step Monday toward officially shifting authority from the State Department to the Commerce Department over the approval of U.S. small arms exports, including semiautomatic rifles and weapons ranging in size up to .50 caliber.

In a closed-door briefing for lawmakers, State and Commerce officials outlined specifics of the shift long sought by small arms manufacturers as a way to cut red tape and boost exports — but decried by pro-regulation Democrats who warn the policy change could dissolve barriers designed to keep U.S.-made firearms from criminals and terrorists overseas.

While Congress could still block the initiative — Monday's briefing on Capitol Hill opened a public comment period that lasts for 45 days — administration officials are touting the policy as breakthrough for U.S. manufacturing and stress that key restrictions on exports to unsavory international buyers will remain in place.

What will change once the Commerce Department fully takes over as the point agency for licensing on small arms exports is that the "regulatory burden on the U.S. commercial firearms and ammunition industry" will be "significantly reduce[d]," says Principal Deputy Assistant Secretary of State Tina Kaidanow.

The shift will "promote American exports," Ms. Kaidanow told The Washington Times, asserting that officials are also "prioritizing national security controls and continuing our ability to restrict exports where human rights, illicit trafficking, and related issues may be of concern."

Currently, small arms export licensing is lumped under they same approval process as that for such major military weapons as advanced missile systems and tanks. Under the new policy, Commerce will be put in charge of overseeing exports of handguns, sporting rifles and such semiautomatic rifles as AR-15s, separating those personal protection and hunting firearms from the military-grade weaponry, which will still be governed by the State.

"One of the guideposts we used in writing the proposed policy change was to look at what's commercially available in sporting goods stores in the United States — products where the majority of the end users are not military," a senior

WASHAR0003013

Commerce Department official told The Times.

A senior State Department official explained that "firearms that put out one bullet per pull of the trigger are going to Commerce, while the more than one bullet per pull will stay with State on the U.S. Munitions List (USML) that controls the sale of American military equipment to foreign buyers."

The biggest firearms whose export will now be run out of Commerce are .50 caliber rifles. What will stay at State go are certain types of ammunition, specifically magazines that carry more than 50 rounds, any belt-fed bullets, tracers and "developmental" ammunition proprietary to major defense companies.

There will also be major license exceptions put in place for under Commerce, including exceptions for companies with contracts to manufacture and maintain small arms for certain foreign police departments or for NATO and other close allies.

The policy shift will also do away with certain registration fees. Under the current system, any individual or company that manufactures a firearm or small arm component — whether or not they export it — is required to register with the State Department and pay an annual fee that starts at $2,250 per year.

The fee, which small arm manufacturing advocates say is prohibitive to individual gunsmiths and to U.S.-based companies that manufacture parts for bigger firms focused on exporting, will no longer exist under the Commerce-run approval system.

"Basically, the way the old system is set up right now, we're treating a guy in his garage who assists a foreign client in the design of a basic firearm as if he's a major defense contractor," said one of the officials who spoke on condition of anonymity with The Times. "We're treating him the same as we're treating Boeing right now and its not rational."

Critics say that's a talking point traceable back to the gun lobby. But firearms industry advocates say the new policy is something that's been in the making for years because of a grassroots outcry from small arm manufactures who employ some 190,000 people across all 50 States.

Started with Obama

The policy shift began under President Obama, whose senior aides reportedly agreed that State shouldn't be so deeply involved in controlling exports of products already sold with limited regulation in U.S. stores.

Mr. Obama was seen to be on the cusp of pushing through the shift to Commerce in 2012, but stalled amid outcry over small arms proliferation following the mass shooting that left 20 children dead that year at Sandy Hook Elementary School in Newtown, Connecticut.

Now that the shift is finally happening, advocates say it could grow revenues for the firearms industry by some $340 million a year and boost export sales by up to 20 percent.

"It's a major improvement and something we've been chasing for a long time," said Larry Keane of the National Shooting Sports Foundation, the nation's leading firearms industry trade association.

"It's a chance to compete in the global market on a more level playing field," Mr. Keane told The Times. "American companies lose business opportunities because of the current license export control regime without any benefit to national security."

Concerns over national security

The issue of national security has hung in the backdrop as support for the policy shift gained steam.

WASHAR0003014

A GOP-led effort last year saw dozens of House members pen a letter to the Trump administration calling on the White House to get on with the shift to help a U.S. businesses "access new markets, create new jobs and hire hard-working Americans."

Five Democrats joined a similar letter sent last May to the State Department by 29 senators. Among the Democrats who signed were Amy Klobuchar of Minnesota, Joe Donnelly of Indiana, Heidi Heitkamp of North Dakota and Joe Manchin of West Virginia.

But a separate letter penned by Democrats Ben Cardin of Maryland, Dianne Feinstein of California and Patrick Leahy of Vermont argued a shift to Commerce will result "in less rigorous oversight" of gun exports and "be directly contrary to congressional intent of the 2002 Arms Export Control Act."

The Senators specifically argued that approval for the export of .50 caliber rifles and semi-automatic firearms should remain under the State Department's domain on grounds an expanding number of them on the global market may increase the risk of their falling into the wrong hands internationally.

The Arms Control Association (ACA), an advocacy group accused by some conservatives of pushing leftist gun-control agendas, has argued that Commerce control over such exports would be "less restrictive" in a way could "enable illegal procurement and diversion of reclassified weapons."

The ACA argues on its website that loosened export approval requirements, coupled with "confusion over regulations, may also make it harder to identify and prosecute arms smugglers and illegal exporters." The association maintains that the State Department, not Commerce, has "the proper mandate to take into account the impact of firearms transfers on terrorist activity, human rights norms and other considerations beyond commercial interests."

Cardin vows to fight it

Mr. Cardin took the argument further Monday, telling The Times he's spent years advising "both the Obama and Trump administrations against this type of transfer."

"Weakened Congressional oversight of international small arms and munitions sales is extremely hazardous to global security," the Maryland Democrat said. "Small arms and light weapons are among the most lethal weapons that we and other countries export...[and] are most likely to be used to commit atrocities and suppress human rights, either by individuals, non-state groups, or governmental security and para-military forces."

"This decision is also politically tone-deaf as our nation reckons with a gun violence epidemic," Mr. Cardin asserted. "As the public comment period begins today, I encourage the American people and relevant stakeholders to weigh in with the administration and speak out against the forces really driving this policy change – the gun lobby."

Advocates of the policy change, as well as Commerce and State Department officials downplayed Mr. Cardin's concerns. One senior Commerce official stressed in an interview with The Times that the State Department will remain involved in an inter-agency review process for any export applications pertaining to buyers in foreign countries deemed sensitive.

"There's very little that we would approve under Commerce that we would not approve today under the current State Department run system," the official said. "What we're trying to do is reduce the burden it takes to get that license. But we're still going to do that same national security, foreign policy, human rights review. Something that we would deny today should continue to be denied tomorrow."

Sen. Steve Daines, a Montana Republican who pushed for the shift to Commerce, told The Times his state's "world-class firearm and ammunition manufacturers should not be burdened by unnecessary regulations and costs."

Trump administration officials say they hope the shift can be finalized quickly following a 45-day comment period that began Monday. Once it has passed, Congress could try to overturn the policy, but would have to pass legislation to do so

WASHAR0003015

— something officials say is unlikely given the near unanimous support the shift among Republicans.

Mr. Daines, meanwhile, said he wishes even more red tape were being cut. "While this is a step in the right direction," he said, "more work remains to be done and I will continue pushing."

Trump administration officials are eager to take credit, asserting the new policy amounts to "common-sense reforms" that fit with the president's view that "economic security is national security."

"President Trump is following through on his commitment to reduce the regulatory burden on American employers, which will result in more jobs and a stronger economy," a senior White House official told The Times.

**Official**
**UNCLASSIFIED**

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Friday, July 27, 2018 4:02 PM |
| To: | Marquis, Matthew R <MarquisMR@state.gov>; PM-CPA <PM-CPA@state.gov> |
| Subject: | RE: Weekly Clips |

**Official**
**UNCLASSIFIED**

From: Marquis, Matthew R
Sent: Friday, July 27, 2018 2:53 PM
To: PM-CPA <PM-CPA@state.gov>
Subject: Weekly Clips

**PM NEWS CLIPS FOR July 23-27, 2018**

**Special Coverage: Defense Distributed**

- The Guardian, "DIY 3D-printed guns get go-ahead after Trump administration strikes court deal"
- New York Post, "Chuck Schumer warns of 3-D printed 'ghost guns'"
- My Statesman, "Editorial: Homemade 3-D printer guns should be regulated like any gun"
- The Sun, "WORLD WAR 3D How the rise of 'ghost guns' – which anyone can print in their own home – could flood Europe with lethal, undetectable weapons"
- Brady Campaign, "What You Need to Know About the 3D Printing of Guns on Demand"
- Giffords, "LEADING GUN SAFETY GROUPS TELL FEDERAL COURT THAT SETTLEMENT IN DOWNLOADABLE GUNS LAWSUIT IS DANGEROUS AND ILLEGAL"
- Senate Foreign Relations Committee, "MENENDEZ CALLS ON SECRETARY POMPEO TO STOP ONLINE POSTING OF DO-IT-YOURSELF, 3-D PRINTABLE GUN BLUEPRINTS"
- Prindlepost, "Debating the Permissibility of Printable Guns"
- Breitbart, "Government Admits AR-15s Are Not Weapons of War"
- USA Today, "Make an AR-15 at home: 3D printed 'downloadable guns' available Aug. 1"
- Everytown for Gun Safety, "The US Just Made It Legal For Anyone to Download And Print Their Own Gun. Yes, Really"
- 3D Print, "We Have to Take a Stand on 3D Printed Guns"
- KUT, "This Austinite Plans To Publish Designs Online For 3D-Printable Guns Next Week"
- CBS Philly, "New Jersey Attorney General Sends 'Cease And Desist' Letter To Halt Company's Publication Of 3D-Printed Gun Instructions"
- Truth About Guns, "The Defense Distributed Settlement Isn't a Done Deal...Here's What's Next"
- The Hill, "Anti-gun violence groups file to halt online posting of 3D-printed gun plans"
- Economist, "Soon anyone will be able to learn how to print 3D guns"
- Snopes, "Did the U.S. State Department legalize the publication of instructions for 3D-printed guns?"
- Washington Post, "I'm a sheriff. Don't flood the country with 3D-printed guns."
- Economist, "Why it is difficult to regulate 3D-printed guns"
- ABC News, "State Department defends allowing publication of blueprints to 3D print guns"
- CNN, "Pompeo commits to reviewing 3D-printed gun policy"

WASHAR0003018



WASHAR0003019



WASHAR0003020




**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:    202.647.6968
e-mail:   *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:

**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0003021

**From:**    Fite, David (Foreign Relations) <David_Fite@foreign.senate.gov>
**Sent:**    Wednesday, July 25, 2018 4:49 PM
**To:**      Darrach, Tamara A <DarrachTA@state.gov>; Paul, Joshua M <PaulJM@state.gov>;
             Faulkner, Charles S <FaulknerCS@state.gov>; Miller, Michael F <Millermf@state.gov>
**Cc:**      Oliver, Stacie (Foreign Relations) <Stacie_Oliver@foreign.senate.gov>;
             Edmund.Rice@mail.house.gov (edmund.rice@mail.house.gov);
             Jamie.mccormick@mail.house.gov
**Subject:** Sen. Menendez Letter to Secretary Pompeo on 3D Guns Issue
**Attach:**  7-25-18 Menendez letter to Pompeo re 3d guns.pdf

FYI, if you haven't seen.

BOB CORKER, TENNESSEE, CHAIRMAN

JAMES E. RISCH, IDAHO
MARCO RUBIO, FLORIDA
RON JOHNSON, WISCONSIN
JEFF FLAKE, ARIZONA
CORY GARDNER, COLORADO
TODD YOUNG, INDIANA
JOHN BARRASSO, WYOMING
JOHNNY ISAKSON, GEORGIA
RON JOHNSON, OHIO
RAND PAUL, KENTUCKY

ROBERT MENENDEZ, NEW JERSEY
BENJAMIN L. CARDIN, MARYLAND
JEANNE SHAHEEN, NEW HAMPSHIRE
CHRISTOPHER A. COONS, DELAWARE
TOM UDALL, NEW MEXICO
CHRISTOPHER MURPHY, CONNECTICUT
TIM KAINE, VIRGINIA
EDWARD J. MARKEY, MASSACHUSETTS
JEFF MERKLEY, OREGON
CORY A. BOOKER, NEW JERSEY

## United States Senate

COMMITTEE ON FOREIGN RELATIONS

WASHINGTON, DC 20510-6225

July 25, 2018

The Honorable Michael Pompeo
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Pompeo:

The Department of State is about to permit the public, worldwide release of dangerous information on the 3D printing of functional firearms that are undetectable by standard security measures. Such a release would allow any foreign or domestic person, including arms traffickers, terrorists, transnational criminals, and domestic abusers to effectively "download" a gun, making it much easier to evade security measures and obtain a weapon. This decision is not only alarming and irresponsible, but one that appears to evade statutory requirements and skirts an ongoing regulatory review process.

Recently, the Department settled a lawsuit by a U.S. firm seeking to post blueprints and other information on the Internet that would allow anyone with a 3D printer to create plastic firearms. Based on reports of the terms of the settlement, the Department has now agreed that the information can be exempt from the export licensing requirements of the International Trafficking in Arms Regulations (ITAR). Even more troubling, the Department also agreed to temporarily suspend the relevant ITAR restrictions to allow this otherwise prohibited dissemination.

Yet this "temporary" suspension will effectively allow a permanent and continuing export. Once posted on the Internet, these files will be shared, downloaded, and used to create firearms. As such, this action is tantamount to a permanent removal of an item from the United States Munitions List, but without the 30-day notice to the Senate Foreign Relations Committee and House Foreign Affairs Committee as required by the Arms Export Control Act.

It is hard to see how making it easier for criminal and terrorist organizations to obtain untraceable weapons is in the foreign policy and national security interests of the United States. This action by the State Department makes the work of U.S. and international law enforcement and counter-terrorism agencies—and the U.S. Transportation Security Agency—all the more difficult and heightens the risk to innocent Americans and others from terrorist and extremist attacks. Moreover, the domestic risk cannot be understated, especially with the high rates of gun violence in our schools, churches, clubs and public gathering places. The release of these blueprints permits anyone, even those banned from gun ownership due to a criminal

conviction, to build their own gun. These "ghost guns" also pose a problem for law enforcement as such firearms lack a serial number and are thus untraceable.

Given the far-reaching and dangerous consequences of this decision, I urge you to immediately review and reconsider the Department's position, and to ensure that this and any other decision regarding arms export control complies fully with the letter and spirit of the Arms Export Control Act. Further, any release should not occur until the Department, Congress, and the public have ample time to review the consequences of this action.

Sincerely,

Robert Menendez
Ranking Member

**Subject:**            SFRC/HFAC Brief on DD Settlement

**Location:**           Hill TBD

**Start:**              7/24/2018 1:00 PM

**End:**                7/24/2018 2:00 PM

**Show Time As:**       Tentative

**Recurrence:**         (none)

**Meeting Status:**     Not yet responded

**Organizer:**          Paul, Joshua M

**Required Attendees:**   Heidema, Sarah J; Hart, Robert L; Freeman, Jeremy B; Rogers, Shana A;
                          Darrach, Tamara A; Miller, Michael F

**Resources:**          Hill TBD

Please allow time for travel on either end.

# PUBLIC SUBMISSION

**As of:** November 29, 2018
**Tracking No.** 1k2-946o-2whj
**Comments Due:** July 09, 2018

**Docket:** DOS-2017-0046
Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III

**Comment On:** DOS-2017-0046-0001
International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III

**Document:** DOS-2017-0046-3131
Comment on DOS-2017-0046-0001

---

## Submitter Information

**Name:** Robert  Menendez

---

## General Comment

We support the Export Control Reform Initiative reforms that have been implemented to date. These changes have rationalized and streamlined a cumbersome and opaque U.S. Munitions List (USML) in ways that make it more useful for American exporters and make non-militarily-sensitive exports easier to process and more competitive internationally.

However, the Department of State has published draft regulations that would remove small arms, light weapons, and associated equipment and ammunition from Categories I, II, and III of the International Trafficking in Arms Regulations, to be subject instead to the Commerce Control List (CCL) of the Department of Commerce. This will result in less rigorous oversight of the export of these deadly weapons.

Small arms and associated ammunition are uniquely lethal; they are easily spread and easily modified, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more not less rigorous export controls and oversight. We strongly oppose any changes to Categories I, II, and III that do not adequately reflect the life-and-death impact such changes will have, including by maintaining congressional oversight over these sales before export. Specifically, combat rifles, including those commonly known as sniper rifles should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50) caliber. Semi-automatic firearms should also not be removed, and neither should related equipment or ammunition or associated manufacturing equipment, technology, or technical data.

The Arms Export Control Act (AECA) enables congressional review of exports of these articles to ensure that they comport with U.S. foreign policy goals and values. Congress took action in 2002 to ensure that the sale and export of these weapons would receive close scrutiny and oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL, as is being proposed, would be directly contrary to congressional intent, made clear in 2002, and would effectively eliminate congressional oversight of exports of these weapons.

Congressional oversight has proven important on multiple occasions. Over the last several years, the Executive branch has considered and proposed sales to countries and foreign entities that have engaged in human rights abuses and atrocities. In May 2017, for example, the Administration sought to sell semi-automatic pistols to the bodyguard unit of President Erdogan of Turkey, despite the fact that members of that unit had viciously attacked peaceful protestors near the Turkish Embassy in Washington, DC. The sale was only halted because congressional notification was required by law. In addition to the proposed Turkey sale, State proposed the export of 27,000 automatic rifles to the Philippine National Police in August 2016, some members of which have been credibly alleged to have committed extrajudicial killings as part of President Dutertes so-called war on drugs, which has targeted mostly low-level drug users.

The Departments of State and Commerce have noted that State will still review the sales for human rights concerns if licensing is moved to the CCL. However, as demonstrated by the above examples, State has at times fallen short of its responsibility to prioritize such concerns in its consideration of such sales. Therefore, while we oppose this transfer of licensing authority to the Department of Commerce, we will also seek to ensure that congressional oversight is maintained if the proposal is implemented.

SEN. ROBERT MENENDEZ
Ranking Member, Committee on Foreign Relations, U.S. Senate

BENJAMIN L. CARDIN
United States Senator

DIANNE FEINSTEIN
United States Senator

WASHAR0003027

| From: | Fabry, Steven F <FabrySF@state.gov> |
|---|---|
| Sent: | Wednesday, December 20, 2017 10:59 AM |
| To: | Rogers, Shana A <RogersSA2@state.gov>; Ricci, Anthony <RicciA@state.gov> |
| Subject: | Blog article on arms export controls |

In case of interest, from today's Justsecurity blog (original available here):

The Trump Administration's newly launched National Security Strategy will draw a lot of critiques of Trump's foreign policy worldview and prescriptions, but not of its implications for arms control or human rights. One important aspect of the 67-page strategy document that is unlikely to get the sustained attention it deserves is how the Trump administration's proposals to weaken arms export controls will lead to national and international insecurity, and contribute to violations of human rights and international humanitarian law.

The Trump administration's policy of increasing arms exports and its attempts to rewrite US arms export regulations and processes, are a scandal that has not received the attention it deserves in the present news cycle. Trump's National Security Strategy could result in the transfer of arms to autocratic regimes that use them to violate human rights, or the diversion of arms to actors that might use them against US security forces, or those of US allies. Individual sales proposals and policy reform proposals over the past year have been troubling enough, but the National Security Strategy confirms that these were not exceptions, but part of a broader policy of encouraging the export of US military equipment to strengthen the US defense industrial base, which does not give adequate consideration to potential impacts on human rights or national and international security.

In the first 11 months of 2017, the Trump administration notified Congress of arms transfers valued at $80.7 billion, which is almost double the amount the Obama administration sold in the same period in 2016 ($58.6b). This included approvals of arms transfers that the Obama administration had previously blocked on human rights grounds after much effort by advocacy groups such as Amnesty International and Human Rights Watch. Military aircraft and bombs have been sold to air forces

that face credible allegations of unnecessarily bombing civilians, including Saudi Arabia, Bahrain and Nigeria. The Trump administration has also proposed to or has already sold guns to countries with problematic human rights records including Mexico, Honduras, El Salvador, Turkey, the UAE, Bahrain, Saudi Arabia and the Philippines. Very few of these irresponsible arms deals have received widespread public attention or pushback. Given the Trump administration's stated National Security Strategy of encouraging arms exports and weakening export controls, these sales are likely to be the mere first rumblings of an avalanche of arms sales to rogue actors and human rights violators.

Too little attention has been focused on the Trump administration's review of US arms export controls, which is primarily focused on promoting the competitiveness of the US defense industry by "removing unreasonable constraints on the ability of [US] companies to compete," according to National Security Council (NSC) sources. Another justification for the review is to "strengthen the defense capabilities of US allies" which is driven by the desire to create "high-quality American jobs," although arms control advocates have shown that investments in defense creates less jobs than investments in health care, clean energy, education or even tax cuts. Although the NSC pays lip service to the importance of ensuring that arms export controls are not removed at the expense of US foreign policy interests, the review is clearly supported by lobbyists for the defense industry and gun manufacturers. Trump has also personally linked arms sales with trade imbalances, most recently signaling to Vietnam that he wants them to buy more US arms to reduce the US.-Vietnam trade deficit.

The Trump administration's review of US arms export controls includes proposals to weaken specific export controls over a diverse array of weaponry ranging from small arms to drones. In short, the Trump administration intends to change export regulations so that gun manufacturers can export without adequate background checks on the countries or security forces purchasing them, even as we mourn the victims of gun violence linked to the inadequacy of background checks here in the US.

WASHAR0003029

It has been reported that the Trump administration intends to shift some gun and small arms sales from the US Munitions List to the Commerce Control List soon, with reports indicating that the administration is close to finalizing proposed new rules. Although advocacy and reporting on this proposal have been hindered by a lack of transparency, this has not stopped a small group of dedicated arms control advocates from highlighting that the anticipated changes are likely to remove Congressional notification requirements for arms sales, remove State Department oversight that ensures these exports take into account national security, foreign policy and human rights considerations, and ultimately make it much easier for small arms manufacturers to obtain licenses to sell abroad, with less accountability if the guns end up in the wrong hands.

Of arguably greater concern than the rollbacks of individual export controls described above, the Trump administration has signaled its intent to revise the International Traffic in Arms Regulations (ITAR), the principal, overarching regulation governing arms exports. While public details remain scarce, pro-arms export officials from the NSC and State Department are emphasizing "export competitiveness" as the principal motive behind the review, a motive confirmed by the National Security Strategy. Arms control advocates are particularly concerned that the result of this rewrite could be that vetting criteria mandating consideration of human rights concerns will be eliminated and replaced with vetting criteria emphasizing the desirability of arms exports.

The consequences of poorly regulated arms flows are devastating, with tens of thousands of people dying each year due to the widespread availability of weapons on black markets. In Iraq alone, poorly regulated US arms transfers ended up providing ISIS with the weapons to commit mass atrocities in Iraq and Syria, while also supplying paramilitary militias with the weapons to abduct, "disappear," torture and execute thousands of mainly Sunni men and boys. US-made weapons are also being used to enforce the Saudi-led siege of Yemen, where thousands of civilians are being needlessly starved and bombed, in flagrant disregard of international and US arms export control law. The Trump administration should be

WASHAR0003030

fighting to end the bloodshed in Yemen and US complicity in human rights violations by threatening to end arms sales to members of the Saudi-led coalition, rather than threatening to weaken human rights provisions in the oversight of arms exports.

The People, the Congress, and the free press urgently need to pay attention to the Trump administration's irresponsible plans to increase arms transfers without attention to human rights, foreign policy or national security consequences, before more American weapons find their way into the hands of rogue actors who will use them against US and allied forces, or to violate human rights.

**Official - Transitory**
**UNCLASSIFIED**

WASHAR0003031

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL#**H2017** _1003=007_ ACTION BUREAU: _PM_

DATE: OCT 3 2017

## IPS:

___X___ SUBSTANTIVE

___X___ IMAGE ENTIRE DOCUMENT

## BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

____✓____ REPLY FOR SIGNATURE BY **Charles S. Faulkner, Bureau of Legislative Affairs**

_____ ADDRESS ENVELOPE TO DISTRICT OFFICE

_____ DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____ FYI ONLY/NO RESPONSE NECESSARY

_____ REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____ OTHER ACTION: _____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL OF ALL TRANSFERS OF ACTION****

Due Date _10/10/17_

ADDITIONAL INSTRUCTIONS:

_✗_ Multi-signer Letter: _GIANFORTE_

_____

___Please clear with NSC prior to submission to H

WASHAR0003032
EVEREST TASKER#

**FROM: Charles S. Faulkner (H)**
**Congressional Correspondence**
**Recommendation** OCT  3 2017

_____ **For Signature by Secretary**
**For draft by** _____ **Bureau**

_____ **For Signature by Charles S. Faulkner**
**For draft by** _____ **Bureau**

_X_ **Tasked to the** _PM_ **Bureau for**
**Signature by Charles S. Faulkner,**
**Bureau of Legislative Affairs**

_____ **Tasked to** _____ **Bureau for signature by**
**Post or Bureau**

_____ FYI Only—No Reply Necessary
For _____ Bureau

Special Actions:

_X_ Multi-signer letters GIANFORTE

_____ Special Clearances

_____ For S Staff Review (H Only)

_____ Everest Tasker# _____

WASHAR0003033

# Congress of the United States
## Washington, DC 20515

September 22, 2017

The Honorable Rex Tillerson
Secretary of State
U.S. Department of State
2201 C Street, NW
Washington, D.C. 20520

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, D.C. 20230

Dear Secretary Tillerson and Secretary Ross:

We are strong supporters of the Export Control Reform initiative (ECR) and respectfully urge you to complete it as soon as possible. Once finalized, it will save taxpayer dollars, create American jobs and strengthen our national security. The time to act is now for the completion of this critical initiative.

In 2009, a comprehensive review of the United States' export control system was undertaken with the goal of strengthening national security and the competitiveness of key domestic manufacturing and technology sectors. The review found that the current export control system is overly complicated and duplicative. This not only undermines the American economy, it also diminishes the ability of the United States government to focus its resources on the most critical national security priorities. Ultimately, the review led to the creation of ECR, which aimed to overhaul our nation's export control system.

A stated goal of ECR is, "Improving the long-term health and competitiveness of the U.S. industrial base, which includes maintaining and expanding jobs." While much of the work has been completed, there are still some important steps to take to ensure maximum efficiency. Categories one, two, and three of the United States Munitions List (USML) still need to be published as final rules. These three categories cover firearms, guns, and ammunition, which in turn affect the world-class firearm and ammunition manufacturers in Montana.

Thank you for your timely consideration of completing ECR. Finishing this much-needed reform will resolve unintended and unnecessary burdens currently placed on Montanan business and innovation, while also bolstering the security of the United States. We appreciate your efforts and look forward to seeing this commonsense initiative come to a prompt conclusion.

WASHAR0003034

Sincerely,

STEVE DAINES
United States Senator

GREG GIANFORTE
Member of Congress

WASHAR0003035

# DEPARTMENT OF STATE CONGRESSIONAL CORRESPONDENCE TASKER



IPS CONTROL#**H2017** D 9 26 = 003   ACTION BUREAU: _PM_

DATE: SEP 26 2017

# IPS:

___X_____SUBSTANTIVE

___X____IMAGE ENTIRE DOCUMENT

# BUREAU:

BUREAU ACTION REQUESTED: RESPOND TO CCU WITHIN **2** DAYS

___✗_____REPLY FOR SIGNATURE BY **Charles S. Faulkner, Bureau of Legislative Affairs**

_____ADDRESS ENVELOPE TO DISTRICT OFFICE

_____DIRECT REPLY TO CONSTITUENT BY OFFICE DIRECTOR WITH COPY TO CONGRESSIONAL OFFICE.  PHONE 7-1608 WHEN COMPLETED

_____FYI ONLY/NO RESPONSE NECESSARY

_____REPLY FOR SIGNATURE DIRECTLY BY BUREAU

_____OTHER ACTION:_____

FOR GUIDANCE/INFORMATION ON FORMATTING CONGRESSIONALS SEE:
*http://diplopedia.state.gov/index.php?title=Bureau of Legislative Affairs Reference Documents#Yellow Border*

****BUREAUS MUST MAKE TRANSFERS OF ACTION DIRECTLY WITH RECEIVING BUREAU'S FRONT OFFICE.   PLEASE NOTIFY CCU VIA UNCLASS EMAIL  OF ALL TRANSFERS OF ACTION****

**Due Date** _10/02/17_

ADDITIONAL INSTRUCTIONS:

_✗_**Multi-signer Letter:** _FEINSTEIN, LEAHY_

_____

___Please clear with NSC prior to submission to H

EVEREST TASKER#_____

WASHAR0003036

**FROM: Charles S. Faulkner (H)**

**Congressional Correspondence**

**Recommendation**   SEP 2 6 2017

\_\_\_\_\_ **For Signature by Secretary**
**For draft by \_\_\_\_\_ Bureau**

\_\_\_\_\_ **For Signature by Charles S. Faulkner**
**For draft by \_\_\_\_\_ Bureau**

~~\_\_\_\_\_~~ **Tasked to the** _PM_ **Bureau for**
**Signature by Charles S. Faulkner,**
**Bureau of Legislative Affairs**

\_\_\_\_\_ **Tasked to \_\_\_\_\_ Bureau for signature by**
**Post or Bureau**

\_\_\_\_\_ FYI Only—No Reply Necessary
For \_\_\_\_\_ Bureau

Special Actions:

~~\_\_\_\_~~ Multi-signer letters _FEINSTEIN, LEAHY_

\_\_\_\_\_ Special Clearances

\_\_\_\_\_ For S Staff Review (H Only)

\_\_\_\_\_ Everest Tasker# _____

WASHAR0003037

United States Senate

WASHINGTON, DC 20510

September 15, 2017

The Honorable Rex Tillerson
Secretary of State
U.S. Department of State
2201 C St. NW
Washington, DC 20520

Dear Secretary Tillerson:

We understand that the Department of State may soon seek to remove lethal small arms, light weapons, and associated equipment and ammunition from Categories I, II, and III of the International Trafficking in Arms Regulations, to be subject instead to the Commerce Control List (CCL) of the Department of Commerce, resulting in less rigorous oversight of related exports.

We support the Export Control Reform Initiative efforts to date. These changes have rationalized and streamlined a cumbersome and opaque U.S. Munitions List (USML) in ways that make it more useful for American exporters to understand and make non-militarily-sensitive exports easier and more competitive internationally.

However, we strongly urge that any changes made to Categories I, II, and III be undertaken with appropriate consideration to the life and death impact such changes will have, and only in consultation with Congress. As you are aware, combat firearms and ammunition are uniquely lethal; they are easily spread and easily modified, and are the primary means of injury, death, and destruction in civil and military conflicts throughout the world. As such, they should be subject to more – not less – rigorous export controls and oversight.

The Arms Export Control Act (AECA) enables congressional review of exports of lethal weapons to ensure that they comport with U.S. foreign policy goals and values. Congress took action in 2002 to ensure that the sale and export of these weapons would receive close scrutiny and oversight, including by amending the AECA to set a lower reporting threshold (from $14 million to $1 million) specifically for firearms on the USML. Moving such firearms from the USML to the CCL would be directly contrary to congressional intent, made clear in 2002, effectively eliminating congressional oversight of exports of these weapons.

Combat rifles, including those commonly known as "sniper rifles" should not be removed from the USML, nor should rifles of any type that are U.S. military-standard 5.56 (and especially .50 caliber). Semi-automatic firearms should also not be removed, and neither should related equipment or ammunition or associated manufacturing equipment, technology, or technical data.

Thank you for your attention to our concerns. We look forward to consulting with you on this matter.

Sincerely,

BENJAMIN L. CARDIN
United States Senator

DIANNE FEINSTEIN
United States Senator

PATRICK J. LEAHY
United States Senator

WASHAR0003039

| | |
|---|---|
| **From:** | Steve Baker <sbaker@thebakerfamily.org> |
| **Sent:** | Friday, May 18, 2018 6:34 AM |
| **To:** | DDTCPublicComments <DDTCPublicComments@state.gov> |
| **Subject:** | Re: ITAR Amendment – Categories I, II, and III |
| **Attach:** | The Hearing Protection Act and Silencers.pdf; Options to Reduce or Modify Firearms Regulations.pdf |

A few minor corrections to my email below.

1. A Special Occupational Taxpayer stamp is not required to manufacture or sell magazines over 50+ rounds nor is a FFL required as it is an accessory, not a firearm.  The SOT and FFL are required only for manufacturing or selling NFA firearms and suppressors.
2. By extrapolation, there are likely over one million suppressors (silencers) lawfully in civilian hands per the ATF's NFA registry database (the NFRTR).  The attached Washington Post article is focused on civilian use of firearms suppressors and their history in the US and in Europe.  It should further illuminate the fact that firearms suppressors are definitely "not inherently for military end use."  Their wide availability in civilian markets in European countries further negates any claim that suppressors somehow contain any critical military or intelligence advantaged technology that would justify continued inclusion on the USML.


On May 18, 2018, at 3:23 AM, Steve Baker <sbaker@thebakerfamily.org> wrote:

Suppressors and 50+ round magazines are not inherently for military end use and are commonly available in commercial retail gun stores that have paid the Special Occupational Tax Stamp.  These stores are common in the over 40 states that do not have Prohibition-era laws prohibiting silencers. It is unclear why the Department of State would remove semi-automatic firearms from the USML but retain the burdensome registration fee for companies that manufacture suppressors and high-capacity magazines - many of which DO NOT export any of their products. In aggregate, civilian sales of these items over the last couple of decades far outnumber contract sales of these accessories to the US military or the militaries of other countries.  In fact, most small companies that manufacture these items sell them exclusively into domestic markets for lawful use by private parties.  Sound suppressors are becoming widely accepted by civilian gun owners and despite the current $200 transfer tax and burdensome paperwork, they are in common use at rifle ranges in the above 40+ states.  They are also legal in a growing number of states for use in hunting since they reduce the likelihood of hearing loss in hunters and in their animal companions afield.

The decision to retain 50+ round magazines and sound suppressors on the USML seems to contradict the Department of State's stated goal to "revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."

President Trump has required federal agencies to take a long, hard look at the efficacy of their regulations and to take action to roll back or eliminate unnecessary or obsolete regulations.  To this end, the Bureau of Alcohol, Tobacco, Firearms and Explosives put forth a framework white paper for firearm deregulation options that the Bureau views as not compromising its public safety mission.  Part of the deregulation framework outlined in the ATF's white paper is a long overdue proposal relating to firearm suppressors -  removing them from the purview of the National Firearms Act and regulating their manufacture and transfer the same as ordinary Title I firearms under the 1968 Gun Control Act.  The following attached document is authored by Ronald Turk, Associate Deputy Director (Chief Operating Officer) Bureau of Alcohol, Tobacco, Firearms and

WASHAR0003040

Explosives (ATF).  For relevant input related to the proposed ITAR Amendment and firearms suppressors, refer to section 8 as it outlines the ATF's deregulation proposal to treat firearm sound suppressors (silencers) the same as ordinary Title I firearms - the same firearms that the ITAR Amendment proposes to transfer from the USML to the Department of Commerce EAR regime.

Steve Baker
Arvada, CO

WASHAR0003041

The Washington Post

**The Volokh Conspiracy** ● Analysis

# The Hearing Protection Act and 'silencers'

**By David Kopel**  June 19, 2017

Congress is considering the "Hearing Protection Act," which would change federal regulation of gun "silencers." Here's a guide to some of the basic facts and relevant laws on the subject.

*What is a "silencer"?* Properly speaking, the devices are called "suppressors" or "moderators," because guns that use them are still very loud, as will be detailed below. A sound suppressor is based on the principle you can see in a bathtub drain. Because water swirls when it goes down the drain, the rate of water flow is less than if the water just went straight down. The same principle can be applied to a gas. In a firearm, the bullet is propelled through the barrel and out the muzzle by expanding gas from burning gunpowder. As the gas exits the muzzle, it makes a very loud noise. If gas swirls on the way out, it exits more slowly. The slower exit reduces the noise of the gunshot.

Thus, a suppressor is a simple canister attached to the gun muzzle. Inside the canister are baffles, which make the gas swirl, producing less sound.

The first sound moderator came to market in 1909, under the name "Maxim Silencer." The name was marketing hyperbole, like calling a flannel shirt an "Arctic coat." The inventor, Hiram Percy Maxim, also applied his noise-moderating system to automobile mufflers and other machines whose gas emissions create noise. Today, the company Maxim Silencers does not make

WASHAR0003042

firearms silencers, but it does produce noise reducers for many other applications.

Noise reduction made shooting more pleasant in the short run, and protected hearing in the long run. President Theodore Roosevelt put a Maxim Silencer on his 1894 Winchester lever-action rifle.

*How much is the noise reduced?* By up to 30 decibels, depending on the type of gun, ammunition and suppressor. Currently, gun control lobbies are claiming that if "silencers" are available, people will not be able to hear a mass shooting that is going on nearby. To test the claim, let's consider last week's attack on Republicans who were practicing baseball in Alexandria.

The criminal used a SKS rifle, with 7.62mm ammunition. Without a suppressor, the sound of a shot from such a gun is 165 decibels. This is more than twice as loud as a jet take-off, if you are 25 meters from the jet. With a suppressor, the SKS would be about 140db. That's equivalent to being on an active aircraft carrier deck.

The would-be assassin also had a Smith & Wesson 9mm handgun. In handguns, 9mm is an intermediate caliber — smaller and quieter than larger calibers such as .44 or .45 (inches). Without a suppressor, the S&W handgun is about 157 to 160 db. With a suppressor, that handgun would be around 127 to 130 db. That's about the same as a jackhammer. Thus, the assertions that people will not be able to hear criminal gunfire are not well supported by physics, although the assertions are consistent with how "silencers" are portrayed in movies.

(The specific decibel levels for particular guns were supplied by Jeremy Mallette, director of social media for Silencer Shop, a company in Austin.)

*Advocacy for banning silencers.* In the early 20th century, the most influential advocate for banning many firearms and accessories was William T. Hornaday, director of the Bronx Zoo. Using the resources of the Bronx Zoo and others for conservation, Hornaday helped save the American bison from

WASHAR0003043

extinction.

Hornaday's 1913 book, "Our Vanishing Wildlife: Its Extermination and Preservation," warned that over-hunting was wiping out American wildlife. According to Hornaday, one problem was that modern guns were too accurate. Also, hunters now had better scopes and binoculars. In Wyoming, hunters were using silencers so one shot didn't frighten away other game.

Even worse, in Hornaday's view, was who was hunting. Namely, lower-class Americans and immigrants. He urged new laws to "prohibit the use of firearms by any naturalized alien from southern Europe until after a 10-years' residence in America." Wildlife was vanishing because "the Italians are spreading, spreading, spreading. If you are without them to-day, to-morrow they will be around you. Meet them at the threshold with drastic laws, thoroughly enforced."

In the South, Hornaday argued, the problem was hunting by "poor white trash" and blacks. In an earlier time, black Americans "were too poor to own guns." But "the time came when . . . single-shot breech-loading guns went down to five dollars a piece. The negro had money now, and the merchants . . . sold him the guns, a gun for every black idler, man and boy, in all the South." Hornaday favored an Alabama proposal for an annual tax of at least $5 a year on every firearm, to prevent poor people from owning inexpensive guns.

Hornaday argued that all pump-action guns should be banned, as should all semi-automatics and all "silencers." Some of Hornaday's proposals did become law, in attenuated form. For example, states did not ban hunting by immigrant citizens, but they did enact laws against hunting or firearms possession by legal resident aliens. North Carolina enacted a statute (later repealed) that required a license for purchasing a pump action gun. (These laws are described in my article in the Harvard Journal on Legislation, Background Checks for Firearms Sales and Loans: Law, History, and Policy.)

WASHAR0003044

*The National Firearms Act of 1934.* In 1934, Congress enacted the National Firearms Act, which used the tax power to set up a tax and registration system for certain arms and accessories. As enacted, the NFA applies to machine guns, short-barreled shotguns and rifles, "silencers," grenades, mortars and various other devices.

As introduced in Congress, the NFA also covered handguns, which prompted a tremendous debate. Once handguns were removed from the bill, the NFA passed with little opposition.

In the legislative history, there was no discussion of "silencers." We simply have no idea what (if anything) Congress thought it was doing about them. *See* Stephen P. Halbrook, Firearm Sound Moderators: Issues of Criminalization and the Second Amendment, 46 Cumberland Law Rev. 33 (2016).

Pursuant to the NFA, purchasing a suppressor today requires a $200 tax. Before a person takes possession of a suppressor, the suppressor must go through a months-long registration process with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

*The Gun Control Act of 1968.* As amended, the 1968 Act is the main federal law for ordinary firearms. For the GCA, suppressors are treated the same as ordinary firearms. Thus, the retail purchaser must fill out the dozens of questions in the four-page federal Form 4473, which includes questions about the purchaser's race, and whether the purchaser is Hispanic. A false answer on the 4473 is punishable by five years in federal prison. 18 U.S. Code 924(a)(1).

The Form 4473 functions as a registration system, since the dealer must retain the form. The dealer's registration forms may be examined by law enforcement officials in the course of criminal investigations or during regulatory compliance inspections. 18 U.S. Code 923(g).

Once the 4473 has been completed, the retailer contacts the FBI or a state

WASHAR0003045

counterpart by Internet or by telephone. The law enforcement agency conducts a background check by comparing the buyer's name to various lists of "prohibited persons." These include persons with felony convictions, domestic violence misdemeanors, illegal aliens, dishonorable discharges from the military, and so on.

Sometimes the "instant check" is completed in less than 20 minutes. Other times, the wait time to initiate the check can be hours or days. If the lawful buyer has the same name as a prohibited person, there may be delays of days or months.

To repeat: A suppressor purchaser must go through the same procedures as an ordinary firearms buyer (Gun Control Act) and the same procedures as a machine gun buyer (National Firearms Act).

This is an unusually stringent pair of systems. Most firearms accessories (e.g., scopes) have no special rules for purchase. The default rule is to have controls on the firearm, and not to bother with extra rules for accessories.

*State laws.* As long as a person complies with the NFA and the GCA, suppressor ownership is legal in almost all states. The exceptions are Hawaii, California, Illinois, New York, New Jersey, Delaware, Rhode Island and Massachusetts. In the 42 states where suppressors are legal, they are allowed for hunting in all but two (Connecticut and Vermont). (See this map from the American Suppressor Association.) The number of states that allow possession of suppressors, including for hunting, has grown in recent years, in part due to the lobbying of the NFA Freedom Alliance, a group that concentrates on items covered by the NFA.

*Why do people own suppressors?* There are three main reasons: reduction of noise pollution, hearing protection, and safety training. As for the first, hunting sometimes take place in state or national forests or other locations near where people live. During hunting season, nearby residents may be annoyed by the frequent sound of gunfire. Likewise, some people have built

WASHAR0003046

houses near established target ranges; when people at the range use suppressors, the ambient noise is reduced, although certainly not eliminated.

In the 1950s, many shooters did not use hearing protection. As people have become more health conscious, they have recognized that gunfire can damage the inner ear. Accordingly, use of hearing protection when shooting has become standard and is mandatory at public ranges. Earmuffs reduce the felt decibel level by about 20 to 30 decibels, depending on the model. Today, best practices are to supplement over-the-ear muffs with foam inserts into the ear. By themselves, ear plugs are usually not as effective as earmuffs, but they do provide some additional protection.

Suppressors reduce noise by about as much as earmuffs do. No one would ever suggest that a suppressor is an acceptable replacement for muffs, but suppressors are a very good supplement to reduce the sound the reaches the inner ear. Using a suppressor + earmuffs + ear plugs can reduce the perceived sound to around 100 decibels, the same as a power lawn mower.

Finally, firearms safety instructors often prefer that their students use suppressors. First of all, suppressors reduce overall noise, which makes it easier for students to hear the instructor. Second, some new shooters flinch because of the sharp noise of a gun when it is fired. A suppressor can prevent a flinch from developing and thus help students progress more quickly to proper and safe shooting form.

*How many people own suppressors?* As of November 2006, the number of suppressors in the ATF's registry was 150,364. By February 2016, the number had risen to 902,805. These numbers are not as precise as they might appear, since the ATF has acknowledged that its National Firearms Registration and Transfer Record registry (NFRTR) is riddled with errors; items that were properly registered with the ATF at some point may not appear on the current ATF registry. Regardless, there is no doubt that suppressors have become much more popular, especially with hunters, as CNN has reported.

WASHAR0003047

*What is the rate of crime with suppressors?* A study of federal prosecutions for 1995-2005 , using Westlaw and Lexis, found 153 total "silencer" prosecutions. "[M]ore than 80 percent of federal silencer charges are for non-violent, victimless crimes." Paul A. Clark, Criminal Use of Firearms Silencers, 8 Western Criminology Review 44 (2007). In other words, the possessor was a prohibited person (not allowed to possess firearms, ammunition or silencers), but the possessor was not misusing the item. In only 2 percent of the cases was the firearm discharged. The author noted that most prosecutions involved improvised, home-made silencers, rather than the commercially manufactured kind that can be purchased in gun stores. The article's analysis of California cases from 2000-2005 found similar results. Thus, the misuse rate for lawfully purchased suppressors appears to be very low.

*What are the laws in other countries?* American suppressor law is anomalous, because suppressors are accessories yet are treated the same as firearms (Gun Control Act). On top of that, they are also treated like machine guns (National Firearms Act). As Halbrook's article details, in European nations such as Finland, France, Germany, Italy and Britain, among others, an individual who is licensed to own a firearm is always allowed the appropriate suppressor. Many European guns are sold with suppressors already attached. The policy is that if a person is legally authorized to possess a firearm, then it is generally preferable for that firearm to have a suppressor.

*What is the Hearing Protection Act?* In the current Congress, the Hearing Protection Act (HPA) is H.R. 367 in the House (sponsored by Rep. Jeff Duncan, R-S.C.) and S, 59 in the Senate (sponsored by Sen. Mike Crapo, R-Idaho). The HPA retains all of the Gun Control Act's provisions on suppressors. In other words, purchasing a suppressor would continue to be subject to all the rules that apply to purchasing or possessing an ordinary firearm.

The HPA removes suppressors from the National Firearms Act, which means

WASHAR0003048

buyers would not have to pay a $200 tax and would not have to go through a months-long federal registration process.

The HPA does not preempt the laws in the states that prohibit suppressor possession. It does say that in states where suppressors are lawful, states may not impose additional registration requirements or special taxes.

💬 **173 Comments**

David Kopel is Research Director, Independence Institute, Denver; Associate Policy Analyst, Cato Institute, D.C; and Adjunct professor, Denver University, Sturm College of Law. He is author of 17 books and 100 scholarly journal articles. Kopel is an NRA-certified safety instructor. The Independence Institute has received NRA contributions.

## The story must be told.

Your subscription supports journalism that matters.

Try 1 month for $1

WASHAR0003049

# Federal Firearms Regulations

_____

## Options to Reduce or Modify Firearms Regulations



# White Paper
**(Not for public distribution)**


**Ronald Turk**
**Associate Deputy Director (Chief Operating Officer)**
**Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)**


20 Jan 2017

1

WASHAR0003050

*"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."*

Second Amendment to the United
States Constitution

## Executive Summary:

ATF is the only Federal law enforcement agency with a primary mission that directly involves an Amendment to the United States Constitution. Thus, our actions and policies are appropriately subjected to intense review and scrutiny. This paper serves to provide the new Administration and the Bureau multiple options to consider and discuss regarding firearms regulations specific to ATF. These general thoughts provide potential ways to reduce or modify regulations, or suggest changes that promote commerce and defend the Second Amendment without significant negative impact on ATF's mission to fight violent firearms crime and regulate the firearms industry. This white paper is intended to provide ideas and provoke conversation; it is not guidance or policy of any kind.

ATF's enforcement and regulatory efforts are focused on reducing violence and increasing public safety. Positive steps to further reduce gun violence through enforcement or regulation are extremely important but are not the focus of this paper.

## Points for Discussion:

1. **New Federal Firearms Licensees (FFL) Dealing Exclusively at Gun Shows (or internet):**
   For over two years representatives within the firearms licensing community have asked for clarification and/or a decision from ATF regarding new FFL applicants requesting to conduct business solely at gun shows. ATF has delayed a decision or guidance due to several concerns including what it means to be "engaged in the business" of selling firearms, and ATF's ability to have access to a dealer's records where they may not have routine business hours. ATF has already recognized FFL activities via the internet without a classic "storefront" and is considering whether to include gun show only activities in a similar manner. The marketplace has changed significantly in recent years, and ATF's guidance to FFLs on these issues has not kept pace with developments in commerce. Classic "brick and mortar" storefronts with an on-hand inventory and set "front-door" business hours often no longer apply in today's modern marketplace. A question remains as to whether ATF should consider simply changing past policy or initiate a lengthy regulation rule change process. There is ample room for immediate action on this issue. ATF can simply issue new guidance immediately and adjust past

2

WASHAR0003051

policy to allow for a business to obtain a license with the primary intention of selling firearms with the transfer occurring at a location other than the business's physical premises (whether at guns shows, over the internet, or elsewhere). This practice has in fact already been taking place, and ATF has provided guidance to FFLs allowing such activity with regards to internet only sales. Provided the business is established at a location in full compliance with state and local laws/ordinances and the business is reasonably inspectable by ATF at an established business location, limited or no actual sales out the business's front door should not be an issue.

If a formal regulation rule change is needed for long-term clarification, ATF can start that process while immediately issuing a policy change to the above practice which would have no negative impact to public safety. In fact, it would encourage more sales and business through a licensee, including background checks on sales at gun show events, and likely increase public safety. Several national gun show promoters prefer to have licensees at their shows, which also somewhat reduces the so-called "gun show loophole" concerns some have expressed about such venues.

ATF recently issued guidance regarding what it means to be "engaged in the business" and indicated that:

> *"A person can be engaged in the business of dealing in firearms regardless of the location in which firearm transactions are conducted. For example, a person can be engaged in the business of dealing in firearms even if the person only conducts firearm transactions at gun shows or through the internet."*

Thus, by establishing that persons can be required to obtain a license to sell only at gun shows, ATF must provide reasonable means for businesses to obtain a license. ATF can provide guidance to the public for gun show-only dealers similar that which was posted for internet-only firearms dealers. There is no apparent downside to such a proposal, and in fact public safety is enhanced.

2. **Armor Piercing Ammunition:** ATF has regulatory authority to classify what is and is not armor piercing (AP) ammunition. Several major ammunition manufacturing companies have had requests pending for years to produce AP ammunition (AP ammo or ammo) which is not intended for use in a handgun and potentially lawful under Federal law. In 2014, ATF proposed a framework that would have provided a transparent and fair review process for these applications, and would have resulted in the approval of many of the long-pending requests. The framework, however, also would have withdrawn the 5.56 "green tip" AP ammo exemption that has existed since 1986. The withdrawal of the exemption created controversy that ultimately stalled all AP ammo classification decisions. Since that time, ATF has been asked to hold off on any AP ammo

3

determinations.  Continued inaction on these requests poses significant litigation and reputational risks to ATF.  ATF can readily mitigate these risks by using the criteria established in the framework to process and approve many of the applications, while leaving the 5.56 "green tip" AP ammunition exemption intact.  Moving forward with approval of these applications is consistent with the statutory goal of protecting the public and law enforcement because, consistent with the statutory exemption, the projectiles involved are not associated with criminal use, but instead are clearly designed and intended for hunting and sporting purposes (the projectiles/calibers at issue will generally penetrate body armor regardless of whether AP-classified metals are used in the manufacturing process).  If decisional restrictions were removed, ATF could readily apply drafted standards for reviewing AP ammo requests while leaving the 5.56 "green tip" AP ammo exemption intact.  Many of the industries' pending requests could be decided in a timely manner, meeting both statutory requirements and safety concerns within the law.

3. **Re-importation of Certain Department of Defense Surplus Firearms from Foreign Countries:**  The State Department and ATF have worked over the past several years with the Administration on requests for the importation of U.S. origin military firearms, ammunition, and parts that were once sent overseas to support allies.  There are surplus rifles, pistols, ammunition, and other importable U.S. origin Curio and Relic (C&R) defense articles (including M1 Garand and Carbine rifles) and pistols (M1911) overseas awaiting importation authority.  There is no clear public safety reason why taxpayer-funded US-origin C&R defense articles should be denied re-importation to the American public, while many non-U.S.- origin C&R items are approved.  Additionally, these items do not represent any discernable public safety concern, as demand lies with collectors of vintage military firearms.  Importation and sale through licensed dealers would effectively regulate the lawful transfer of these firearms through a licensee and a background check.  Joint effort from the Administration, State Department, and ATF could easily reverse past decisions and allow for the safe and legal importation and sale of these historical and collectible items.  Many M1 Garand rifles have been approved for importation in the past, setting precedence for this to occur.  The more recent denials were in part due to perceived potential that they may be used in crimes, for which there is little, if any, evidence for such a concern.

4. **Title 18, United States Code (U.S.C.), Section 922(o):**  Current law precludes FFLs who are registered Special Occupational Taxpayers (FFL/SOT) from transferring machineguns manufactured post-1986 unless they are for export or for law enforcement/government use; and there is no provision for the transfer from one FFL/SOT to another.  This is somewhat detrimental to FFL/SOTs operating within the small, but useful, Department of Defense-supported industry and theatrical armorer community.  One option, if supported by the Department of Justice (DOJ), would be to re-institute ATF's ability to

4

WASHAR0003053

provide variances to licensees, as ATF has done in the past, that would adequately provide form transfers within defense industry FFLs and avoid a requirement to change the statute.  Use of variances in a consistent and fair process within the limited DoD-supported FFL/SOT community would be viewed favorably by the industry and have no impact on public safety.

5. **Firearm Arm or Stabilizing Brace:**  Manufacturers have produced an arm brace or stabilizing brace which is designed to strap a handgun to a forearm to allow a disabled shooter to fire the firearm.  ATF determined that the brace was not a stock, and therefore its attachment to a handgun did not constitute the making of a short-barreled rifle or "any other firearm" under the National Firearms Act (NFA).  (NFA classification subjects the product to a tax and registration requirement.)  In the determination letter, however, ATF indicated that if the brace was held to the shoulder and used as a stock, such use would constitute a "redesign" that would result in classification of the brace/handgun combination as an NFA firearm (i.e., the "use" would be a "redesign" and making of a short-barreled rifle).  ATF has not made another NFA determination where a shooter's use alone was deemed be a "redesign" of the product/firearm resulting in an NFA classification.  This ruling has caused confusion and concern among firearm manufacturers, dealers, and consumers about the extent to which unintended use of a product may be a basis for NFA classification.  To mitigate this confusion and concern, ATF could amend the determination letter to remove the language indicating that simple use of a product for a purpose other than intended by the manufacturer – without additional proof or redesign – may result in re-classification as an NFA weapon.  While many at ATF are concerned about manufacturing processes continuing to push the boundaries between a Gun Control Act (GCA) and an NFA firearm, ATF has a relatively consistent history of what crosses the line between GCA and NFA firearms with which to draw from, and still maintains the ability to exercise good judgement with future requests based upon the firearm's individual characteristics.

6. **Reissue a New Sporting Purpose Study:**  Since the sunset of the Assault Weapons ban in 2004, the use of AR-15s, AK-style, and similar rifles now commonly referred to as "modern sporting rifles" has increased exponentially in sport shooting.  These firearm types are now standard for hunting activities.  ATF could re-examine its almost 20-year-old study to bring it up to date with the sport shooting landscape of today, which is vastly different than what it was years ago.  Action shooting sports and organizations such as 3 Gun and the United States Practical Shooting Association (USPSA) have also drastically expanded in recent years.  Restriction on imports serves questionable public safety interests, as these rifles are already generally legally available for manufacture and ownership in the United States.  Low cost foreign made firearms are also still imported and converted into "non-sporting" configurations.  These restrictions have placed many limitations on importers, while at the same time imposing a heavy

WASHAR0003054

workload on ATF's Firearms and Ammunition Technology Division.  ATF's Imports Branch also possesses a list of firearms approved for import but has not made this list public.  Lists such as this can be made available to the public so that the importing community does not have to guess as to what the standard for importation is. Many concerns from the firearms industry could be re-examined through the publication of a new Sporting Purpose Study along with an updated Imports Branch Guide.

7.  **Creation of a Database of Agency Rulings:**  ATF lacks a consistent internal database to maintain and readily access private letters and ruling.  The public also has no direct access to public rulings in a manageable format.  The inability to access these rulings can create inconsistent agency interpretations of agency guidance.  ATF can create a retrievable database for internal use that includes access by the public for open rulings.

8.  **Silencers:**  Current Federal law requires ATF to regulate silencers under the NFA.  This requires a Federal tax payment of $200 for transfers, ATF approval, and entry of the silencer into a national NFA database.  In the past several years, opinions about silencers have changed across the United States.  Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized.  At present, 42 states generally allow silencers to be used for sporting purposes.  The wide acceptance of silencers and corresponding changes in state laws have created substantial demand across the country.  This surge in demand has caused ATF to have a significant backlog on silencer applications.  ATF's processing time is now approximately 8 months.  ATF has devoted substantial resources in attempts to reduce processing times, spending over $1 million annually in overtime and temporary duty expenses, and dedicating over 33 additional full-time and contract positions since 2011 to support NFA processing.  Despite these efforts, NFA processing times are widely viewed by applicants and the industry as far too long, resulting in numerous complaints to Congress.  Since silencers account for the vast majority of NFA applications, the most direct way to reduce processing times is to reduce the number of silencer applications.  In light of the expanding demand and acceptance of silencers, however, that volume is unlikely to diminish unless they are removed from the NFA.  While DOJ and ATF have historically not supported removal of items from the NFA, the change in public acceptance of silencers arguably indicates that the reason for their inclusion in the NFA is archaic and historical reluctance to removing them from the NFA should be reevaluated.  ATF's experience with the criminal use of silencers also supports reassessing their inclusion in the NFA.  On average in the past 10 years, ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions.  Moreover, consistent with this low number of prosecution referrals, silencers are very rarely used in criminal shootings.  Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not

6

be viewed as a threat to public safety necessitating NFA classification, and should be considered for reclassification under the GCA.

If such a change were to be considered, a revision in the definition of a silencer would be important. The current definition of a silencer extends to "any combination of [silencer] parts," as well as "any part intended only for use in" a silencer. Compared to the definition of a firearm, which specifies the frame or receiver is the key regulated part, any individual silencer part is generally regulated just as if it were a completed silencer. Revising the definition could eliminate many of the current issues encountered by silencer manufacturers and their parts suppliers. Specifically, clarifying when a part or combination of parts meets a minimum threshold requiring serialization would be useful.

9. **Firearms Industry Proposals to Allow for Interstate Sale of Firearms at Gun Shows:** 18 U.S.C. 923(j) and supporting regulations prohibit FFLs from conducting firearms sales outside the state in which they are licensed and reside. Many FFLs would like to be able to travel to other states to venues like a gun show and conduct business. ATF currently allows an FFL to travel to another state, display firearms for sale and take orders, but not to transfer firearms on-site (this must take place back at the FFL's business location in their home state, and only to a resident of their home state). Similarly, FFLs can transfer firearms out of state to another licensee under an "advance consignment" before the gun show to the out-of-state licensee in a somewhat convoluted process where the traveling/transferring FFL is no longer making the sale. ATF and DOJ have historically opposed removal of the statutory restriction on direct interstate firearm sales by FFLs. Further discussion would be beneficial. A change that could allow FFLs to operate at out-of-state gun shows (where also allowed by individual state laws) would have no detrimental effect on public safety and still provide ATF a means to trace firearms. It would also be viewed favorably by the broader firearms community. Since an FFL has a license, maintains records, and conducts background checks for sales, provided they are in compliance with State and local laws, there is no apparent harm or risk to public safety in allowing them to do so, but not for the current statute and interpretation requiring in-state only sales. Sales would be documented and traceable, and a background check would be completed.

10. **Destructive Devices:** The current definitions for destructive devices under both the NFA (26 U.S.C., 5845(f)) and the GCA (18 U.S.C., 921(a)(4)), and applicable controls, do not differentiate between destructive device launchers and destructive device munitions. Applicable regulatory and statutory controls under the GCA and NFA are focused on multi-use objects, such as typical long guns or machine guns, not single-use, expendable munitions which are also subject to the Safe Explosives Act. The customer base for destructive device munitions is very limited—the U.S. DoD, foreign governments as

WASHAR0003056

approved by the Directorate of Defense Trade Controls (DDTC) under current export policy, and small numbers of other destructive device launcher and/or munitions manufacturers for use in research, testing, or assistance in United States Government /foreign contract fulfillment.  In addition, the cost of munitions production runs, safety, and contract fulfillment requirements such as applicable DoD marking requirements necessitate, at a minimum, different standards for marking munitions than are possible for launchers.  This includes marking by lot numbers and having multiple dispositions against a single lot number.  There are several different ways to revise applicable controls to help solve these issues, as being currently discussed by ATF and destructive device munitions industry members.  ATF should continue to discuss these issues with leadership and the industry to explore changes that would be useful to the defense munitions industry and have discernable impact on public safety or ATF's ability to regulate them.

11. **Demand Letter 2 (DL 2):**  An ATF regulation currently provides that all FFLs that have had 10 or more guns with a time-to-crime of 3 years or less traced to them in the previous year must provide ATF with copies of limited information from used firearms they acquired in that previous year.  This equates to limited "used" or "gray market" gun information (no purchaser information is directly stored by ATF, only gun information) that can be used to expand the success rate of traces for secondary market firearms. This information can be useful to further crime gun trace capabilities by creating a pointer to allow for a more current firearms trace to a secondary purchaser.  ATF originally set the threshold for DL2 reporting at 25 firearms, but later reduced that number to 10 firearms.  ATF is currently re-examining the program and anticipates a change to the number (somewhere in the vicinity of 15 or more) based on trend and data analysis.  Some have argued that DL 2 creates a burden on firearms dealers to provide ATF information on used firearms that may become, but are not necessarily, crime guns.  An increase in the firearms requirement above 10 would likely have a positive impact on the firearms industry and still meet program objectives.  ATF should continue to examine data to determine where the appropriate number of firearms lies to best manage this program.

12. **Demand Letter 3 (DL 3):**  Via regulation ATF currently requires FFLs in several southwest border states to record and submit multiple sales records for certain semi-automatic rifles capable of shooting with a detached magazine (although not defined as such by law or regulation, this applies to the sale of more than one rifle commonly referred to as "modern sporting rifles," sold to the same person at the same time).  This requirement came into effect several years ago in an attempt to curb the flow of rifles from commerce to the criminal element via illegal firearms trafficking into Mexico and South America.  There are examples where this regulation has proven effective and may provide a deterrent effect.  Over the past 5 years, ATF has over 40,000 multiple sales

8

reports involving over 90,000 rifles; opened over 300 investigations, and recommended approximately 374 defendants for prosecution. DL 3 places some burden on the firearms industry via reporting requirements. The elimination of DL 3 could have a detrimental effect on ATF's criminal enforcement mission based on the numbers of investigations and defendants seen to date, but can be further discussed regarding utility and impact.

13. **Pending ATF Regulation Regarding FFL Records Retention (20 years):** ATF has a regulation pending at DOJ to increase the requirements for FFLs to retain records indefinitely. The current standard is 20 years, and records older than 20 years can be destroyed. The intent of the change from 20 years to indefinite retention is to provide access to records for firearms traces over longer periods of time. However, many argue that crime guns are not frequently recovered with times to crimes from purchases over 20 years old. Also, older firearms possessed by criminals frequently transfer hands several times and a trace will often not lead to the criminal after so much time has passed. ATF has averaged approximately 1,200 failed traces a year over the past 5 years due to records destruction, accounting for less than one half of one percent of traces conducted nationally each year. While such an extension is arguably a viable law enforcement intelligence tool, much of the firearms industry is opposed to such a change and a closer review of this proposal could be beneficial.

14. **Expanding Permissive Use of NICS Checks by FFL Holders:** Standard pre-employment background checks frequently do not reveal that a person is firearms-disabled. Other than requiring potential new-hires to purchase a firearm, licensees, in particular large retailers, are frequently unable to determine that an employee cannot be involved in firearms operations. Retailers would appreciate the ability to run a NICS check on current employees or potential new hires to ascertain whether they can legally fulfill their job requirements. A key aspect of this proposal is that it would be entirely elective; if the Federal Bureau of Investigation (FBI), ATF and others all concurred with this slight expansion of the use of NICS, there would be no mandate that licensees perform a NICS check on all employees. Keeping the expansion of the system limited to elective employee checks will prevent any significant increase in cost to the FBI or ATF (in terms of running background checks or expanding regulatory enforcement), while it will enable FFLs to increase their compliance with existing regulations and help ensure firearms-disabled personnel do not have easy access to firearms. Businesses could also be required to certify that permissive NICS checks were only used on impacted employees or face sanctions for misuse of the system.

15. <u>**Need for an ATF Confirmed Director:**</u> Since moving from the Department of Treasury to the DOJ in 2003, ATF has had only one Senate-confirmed Director. The agency needs a presidentially nominated, Senate-confirmed Director who has the support and backing

9

WASHAR0003058

of the Administration to lead ATF.  This will enable the agency to be fully in sync with leadership, and maximize the agency's potential regarding priorities, budgets, and support.

16. **Old Regulations Under Review for Possible Removal or Amendment:**  Below is a list of the firearms and explosives regulations that are currently under review.  They are likely no longer applicable (or portions of which are no longer applicable), and may be removed as part of a final rule to remove expired regulations. [1]

   a.  478.40 – Assault Weapons ban
   b.  478.40a – prohibition language for assault weapons
   c.  478.57(b) and (c) – assault weapons and large capacity magazines
   d.  478.92 (portions) – AP ammo and large capacity magazines
   e.  478.116 (portions) – importing large capacity magazines
   f.  478.119 – importing large capacity magazines and feeding devices (belts, drums, strips…)
   g.  478.132 – records keeping for large capacity feeding devices sold to law enforcement
   h.  478.153 – request for large capacity magazines and feeding devices for manufacturer testing
   i.  478.171 (portions) – exporting AP ammo and semi auto assault weapons
   j.  479.32(a) and (c) – reduced importer/manufacturer tax rate 1988; short taxable year standards
   k.  555.11 (portions) – obsolete dates; commerce in explosives
   l.  555.27 (portions) - obsolete dates; explosives background checks
   m.  555.33 (portions) - obsolete dates; licensees and permittees general explosives
   n.  555.41 (portions) - obsolete dates; licenses and permits general explosives
   o.  555.45 (portions) - obsolete dates;  licenses and permits general explosives
   p.  555.49 (portions) - obsolete dates; issuance of licenses and permits
   q.  555.51 (portions) - obsolete dates; duration of licenses and permits
   r.  555.57 (portions) - obsolete dates; change of control, RP's and employees
   s.  555.102 (portions) - obsolete dates; authorized operations by permittees
   t.  555.103 (portions) - obsolete dates; transactions between licensees and permittees
   u.  555.105 (portions) - obsolete dates; distribution to non licensees and non permittees
   v.  555.125 (portions) - obsolete dates; records maintained by permittees
   w.  555.126 (portions) - obsolete dates; transaction records
   x.  555.142 (portions) - obsolete dates; relief from disabilities
   y.  555.201 (portions) - obsolete dates; storage
   z.  555.224 (portions) - obsolete dates; table of distances

---

[1] This list was produced by ATF's Enforcement Programs and Services Directorate

WASHAR0003059

## Conclusions:

There are many regulatory changes or modifications that can be made by or through ATF that would have an immediate, positive impact on commerce and industry without significantly hindering ATFs mission or adversely affecting public safety.  There are also areas where adjustments to policy or processes could improve ATF operations.  Alleviating some of these concerns would continue to support ATF's relationships across the firearms and sporting industry, and allow ATF to further focus precious personnel and resources on the mission to combat gun violence.

In addition to these points of discussion, it is vital for ATF to find resources to refresh aging technology and systems that support law enforcement and the firearms industry.  Functionality at ATF's Martinsburg facility and other areas has been severely hampered by outdated technology and systems that negatively impact ATF's ability to provide services and information.

*Note:    The opinions expressed within this white paper are not those of the ATF; they are merely the ideas and opinions of this writer.  They are provided for internal use within ATF and DOJ and not intended to be public.  They are also general thoughts that cannot be taken as exacting language regarding policy or quotable specifics.  Additional specific details can be provided to further these general discussions.*

*The men and women of ATF are overwhelmingly a fantastic group of hard working civil servants who look to reduce violent crime and ensure public safety.  The focus on combating gun violence is key.  Fairly regulating the firearms and explosives industries is also important.  As the firearms conversations take place over the next few months and years, this paper is offered to provide informal insight on potential productive ways to limit regulation and continue to protect our Second Amendment freedoms, while focusing on ATF's mission to protect our nation.*

X
_____
Ronald Turk

11

WASHAR0003060

| | |
|---|---|
| **From:** | Kottmyer, Alice M <KottmyerAM@state.gov> |
| **Sent:** | Wednesday, July 11, 2018 9:01 AM |
| **To:** | Rogers, Shana A <RogersSA2@state.gov>; Fabry, Steven F <FabrySF@state.gov> |
| **Cc:** | Kottmyer, Alice M <KottmyerAM@state.gov> |
| **Subject:** | RE: Public Comments on Cats I-III Rules |



SBU
This email is UNCLASSIFIED.

**From:** Rogers, Shana A
**Sent:** Wednesday, July 11, 2018 8:52 AM
**To:** Kottmyer, Alice M; Fabry, Steven F
**Subject:** RE: Public Comments on Cats I-III Rules

**Official - SBU**
**UNCLASSIFIED**

**From:** Kottmyer, Alice M
**Sent:** Wednesday, July 11, 2018 7:50 AM
**To:** Rogers, Shana A; Fabry, Steven F
**Cc:** Kottmyer, Alice M
**Subject:** RE: Public Comments on Cats I-III Rules

This email is UNCLASSIFIED.

**From:** Rogers, Shana A
**Sent:** Wednesday, July 11, 2018 7:44 AM
**To:** Fabry, Steven F; Kottmyer, Alice M
**Subject:** FW: Public Comments on Cats I-III Rules

FYI.

**Official**
**UNCLASSIFIED**

**From:** Paul, Joshua M
**Sent:** Tuesday, July 10, 2018 2:19 PM
**To:** Monjay, Robert; Miller, Michael F; Heidema, Sarah J; Dearth, Anthony M; Hamilton, Catherine E; Shin, Jae E; Douville, Alex J; Rogers, Shana A; PM-CPA
**Cc:** PM-DTCP-RMA
**Subject:** RE: Public Comments on Cats I-III Rules

Hi – a birdie tells me you should check the comments for one from a certain Mr. Robert Menendez and colleagues, submitted around 8pm last night.

**Official**
**UNCLASSIFIED**

**From:** Monjay, Robert
**Sent:** Tuesday, July 10, 2018 2:03 PM
**To:** Miller, Michael F <Millermf@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Dearth, Anthony M <DearthAM@state.gov>; Hamilton, Catherine E <HamiltonCE@state.gov>; Shin, Jae E <ShinJE@state.gov>; Douville, Alex J <DouvilleAJ@state.gov>; Rogers, Shana A <RogersSA2@state.gov>; PM-CPA <PM-CPA@state.gov>
**Cc:** PM-DTCP-RMA <PM-DTCP-RMA@state.gov>
**Subject:** Public Comments on Cats I-III Rules

The public comments period on the Cat I-III (firearms) rule closed on July 9.

We received 3,250 total public comments. 3181 comments came in through regulations.gov and 69 comments came in via email.

We are reviewing the comments for duplicates and bulk submissions (form letters), which should reduce the number of unique comments that we need to address. More info to follow.
Thanks
Rob

*Robert J. Monjay*
*U.S. Department of State*
*Office of Defense Trade Controls Policy*
*Phone: 202.663.2817*
*Mobile: 202.294.2478*
*Email: MonjayR@state.gov*
*SIPR: MonjayR@state.sgov.gov*

**Official**
**UNCLASSIFIED**

| | |
|---|---|
| **From:** | Blaha, Charles O <BlahaCO@state.gov> |
| **Sent:** | Monday, April 16, 2018 9:17 AM |
| **To:** | Steffens, Jessica L <SteffensJL@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov> |
| **Cc:** | Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; McKay, Roland D <McKayRD@state.gov>; PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Chandler, Karen R <ChandlerKR@state.gov> |
| **Subject:** | RE: S letter to McMaster May 18 on USML Cats I, II, and III |
| **Attach:** | Approved AM to S and Signed ExecSec.pdf |

<div style="background:black"> </div>

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Saturday, April 14, 2018 1:48 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Blaha, Charles O <BlahaCO@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>
**Cc:** Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; McKay, Roland D <McKayRD@state.gov>; PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Chandler, Karen R <ChandlerKR@state.gov>
**Subject:** S letter to McMaster May 18 on USML Cats I, II, and III


FYSA


**Official - Transitory**
**UNCLASSIFIED**

REC1|APPROVE|5-18-2017



201703279
**United States Department of State**

*Washington, D.C.  20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                    March 30, 2017

**ACTION MEMO FOR THE SECRETARY**

FROM:     PM – Tina Kaidanow

SUBJECT:   (SBU) Publication of Rule Transitioning United States Munitions List
             Categories I-III

**Recommendation**
         (SBU) That you sign a letter to NSA McMaster requesting the NSC provide guidance to
the Departments of State and Commerce regarding proposed rules published in the *Federal
Register* transitioning items from United States Munitions List (USML) Categories I, II, and III
to the control of the Department of Commerce.  (Approve/Disapprove by 04/06/17)

**Background**

Attachments:
         Tab 1 – Proposed Correspondence
         Tab 2 – Background Information

<u>SENSITIVE BUT UNCLASSIFIED</u>

SENSITIVE BUT UNCLASSIFIED
-2-



WASHAR0003065



WASHAR0003066

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Monday, April 16, 2018 9:24 AM |
| **To:** | Blaha, Charles O <BlahaCO@state.gov>; Steffens, Jessica L <SteffensJL@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov> |
| **Cc:** | Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; McKay, Roland D <McKayRD@state.gov>; PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Chandler, Karen R <ChandlerKR@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Miller, Michael F <Millermf@state.gov> |
| **Subject:** | RE: S letter to McMaster May 18 on USML Cats I, II, and III |
| **Attach:** | Approved AM to S and Signed ExecSec.pdf |

██████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Blaha, Charles O
**Sent:** Monday, April 16, 2018 9:17 AM
**To:** Steffens, Jessica L <SteffensJL@state.gov>; Paul, Joshua M <PaulJM@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>
**Cc:** Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; McKay, Roland D <McKayRD@state.gov>; PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Chandler, Karen R <ChandlerKR@state.gov>
**Subject:** RE: S letter to McMaster May 18 on USML Cats I, II, and III

██████████████████████████

**Official - Transitory**
**UNCLASSIFIED**

**From:** Steffens, Jessica L
**Sent:** Saturday, April 14, 2018 1:48 PM
**To:** Paul, Joshua M <PaulJM@state.gov>; Blaha, Charles O <BlahaCO@state.gov>; Bhatt, Aakash <BhattAN@state.gov>; Koelling, Richard W <KoellingRW@state.gov>; Andrews, Cory <AndrewsC2@state.gov>; Fabry, Steven F <FabrySF@state.gov>; Wall, Amanda J <WallAJ@state.gov>; Jost, Aaron W <JostAW@state.gov>; Lai, Borchien <LaiB@state.gov>
**Cc:** Curran, Christopher P <CurranCP@state.gov>; Abisellan, Eduardo <AbisellanE@state.gov>; McKay, Roland D <McKayRD@state.gov>; PM-CPA <PM-CPA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov>; Faulkner, Charles S <FaulknerCS@state.gov>; PM-Staffers Mailbox <PM-StaffersMailbox@state.gov>; Chandler, Karen R <ChandlerKR@state.gov>
**Subject:** S letter to McMaster May 18 on USML Cats I, II, and III


FYSA


**Official - Transitory**
**UNCLASSIFIED**

| From: | Rajgopal, Pavan <RajgopalP@state.gov> |
|---|---|
| Sent: | Friday, September 30, 2016 9:34 AM |
| To: | PM-DTCP-Tasking-DL <PM-DTCP-Tasking-DL@state.gov>; PM-DTCC-Leads-DL <PM-DTCC-Leads-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Nilsson, Brian H <NilssonBH@state.gov>; Aguirre, Lisa V <AguirreLV@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| Subject: | CPA Media Monitoring: Before It's News: Exclusive: Firearms industry distances itself from Cody Wilson, 3D-printed guns |

# CPA MEDIA MONITORING

**Exclusive: Firearms industry distances itself from Cody Wilson, 3D-printed guns**
**Before It's News**
**September 29, 2016**

When the first 3D-printable pistol came on the scene more than three years ago, it shook the very foundation of the gun world and the federal regulatory structure attempting to keep a vice grip on the industry. Much like the internet itself worked to democratize the flow of information, Cody Wilson's "Liberator" pistol broke manufacturing chains and put an untraceable gun in the palm of the masses.

That presented a problem for the U.S. government, who saw each download of 3D printer blueprints for the single-shot pistol as the arming of a ghost militia. The file was accessed more than 100,000 times in two days before the State Department ordered it removed.

Two years later, Wilson and his company, Defense Distributed, sued the State Department with the help of the Second Amendment Foundation. Wilson recently lost that battle on appeal, when the 5th Circuit Court ruled 3D printing wasn't protected under the First Amendment.

The controversy surrounding Wilson and how he's handled his affairs may have caused a rift in relations between certain factions within the gun rights movement. An industry insider who spoke with Guns.com on the condition of anonymity said Wilson caused waves where they didn't need to be.

During the Second Amendment Foundation's annual gun rights policy conference in Tamp, Florida last weekend, Wilson revealed he was denied membership to the National Shooting Sports Foundation, the firearms industry's largest trade group, for reasons he is unsure of.

"We've been controversial for so long to the point it's normalized," Wilson told Guns.com in a recent interview. "Did Defense Distributed really do anything that is that controversial — especially within the firearms industry and the gun movement? No. They know who we are, they know who we represent. We're mainline people. We're represented by people like SAF in the courts. We represent your right to bear arms, we didn't do anything irresponsibly."

Wilson shared his rejection letter with Guns.com. It was addressed to Paloma Heindorff, Defense Distributed's director of development.

*Good afternoon Paloma,*

*To follow up on your phone message from Friday the 19th of August, Defense Distributed application was reviewed by NSSF staff including Steve Sanetti, Pres/CEO.  After reviewing the application and the NSSF*

*bylaws it was determined that Defense Distributed is not qualified for membership because it was felt that Defense Distributed would not "further the objectives of the Foundation in the promotion of the firearms, ammunition, hunting and shooting sports industry."*

*Bettyjane Swann*
*Director, Member Services*
*National Shooting Sports Foundation, Inc.*

Heindorff and Wilson told Guns.com that after several phone calls later, it was still unclear how their company wouldn't further the firearms industry.

"I promote industry," Wilson said. "There's totally not a case to make that we're not a part of the industry and we don't help the industry, so my suspicion is that it's something else. Anything else is irresponsible for me to surmise. … But I know that it's got to be a little bit more."

That reason certainly isn't because of the heat Wilson has brought to the industry in its suit against the State Department, the NSSF told Guns.com.

"NSSF's record of advocating for the protection of lawful commerce in firearms on behalf of companies large and small in the courts, legislatures and the media across the country is well recognized," NSSF spokesperson Michael Bazinet said in an email. "Defense Distributed's lawsuit had no bearing on NSSF's decision. Mr. Wilson's opinion is his own and we will not be engaging in a debate with him."

Nor would the group comment on why Defense Distributed wouldn't further the interests of the firearms industry. Wilson took a wild guess:

"I know that NSSF has led or has claimed to lead the Export Control Reform Initiative," Wilson said. "NSSF and NRA are part of a type of thinking which is about going along with, participating with, communicating with these agencies, these bodies, and we are actually suing these agencies and bodies."

In August, NSSF wrote a letter to the State Department opposing the Obama administration's blocking of the initiative, which the trade group argues would give U.S. firearms manufacturers a fair shot in the global marketplace, where competition is stymied by Cold War-era export controls.

"It could be that we just represent a new generation of thinking, which is like 'nah, nah, there's no time to even talk to these people,'" Wilson said. "Sue them when they're clearly violating your rights. Maybe they were just thinking, 'This just jeopardizes our relationships with people if we were clearly to give a platform to Defense Distributed.' Maybe. That's probably it, but I don't know."

**Original Article: http://beforeitsnews.com/alternative/2016/09/exclusive-firearms-industry-distances-itself-from-cody-wilson-3d-printed-guns-3418724.html**

_____
**Pavan Rajgopal**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.6968
✉ e-mail:      *RajgopalP@state.gov* | ⌁ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



This email is UNCLASSIFIED.

WASHAR0003070

| From: | Rajgopal, Pavan <RajgopalP@state.gov> |
|---|---|
| Sent: | Wednesday, September 28, 2016 9:27 AM |
| To: | PM-DTCC-Leads-DL <PM-DTCC-Leads-DL@state.gov>; PM-DTCP-Tasking-DL <PM-DTCP-Tasking-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Nilsson, Brian H <NilssonBH@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| Subject: | CPA Media Monitoring: Export Law Blog: If It Were Real, It Wouldn't Be "Deemed" |



**If It Were Real, It Wouldn't Be "Deemed"**
**Clif Burns**
**Export Law Blog**
**September 27, 2016**

The Fifth Circuit last week released its <u>opinion</u> in which it upheld the District Court in its decision not to grant a preliminary injunction to Defense Distributed, which sought to prevent the Directorate of Defense Trade Controls ("DDTC") from prohibiting Defense Distributed from putting on the Internet plans for printing guns with 3-D printers. The majority opinion was one that did not really reach the merits of the case or whether DDTC had the right to prohibit U.S. citizens from uploading gun plans to the Internet. Rather it turned on a procedural issue: whether Defense Distributed or DDTC would be hurt more by an injunction. The majority opinion weighed that balance in favor of DDTC, arguing that a preliminary injunction would result in untold millions of foreigners printing crappy plastic guns whereas not granting the injunction would just mean that Defense Distributed had to sit on its hands until trial.

The dissenting opinion of Judge Jones, however, dove straight into the merits, arguing that DDTC's theory of the case was fatally flawed because uploading things to the Internet is not an "export" within the meaning of the Arms Export Control Act. To summarize Judge Jones, "export" means sending stuff across a border for money. As a result, Defense Distributed could not be held to have engaged in an export as a result of "the domestic publication on the Internet, without charge and therefore without any 'trade,' of lawful, nonclassified, nonrestricted information."

Judge Jones does not stop at the notion of mere access as an export, but zeroes in on the "across borders" criterion to take dead aim against "deemed exports."

> Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful, non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Or, more succinctly, if it was a real export they wouldn't have to call it a "deemed" export.

Judge Jones's opinion is certainly grounded in common sense, something often lacking in export control. In the early days of my practice, I tried to explain to a former military officer who was CEO of a client that disclosing information to a foreign employee in the United States was an export. He paused for a moment and then, with the veins in his neck bulging and his cheeks flushed, he said "That is the dumbest [bad word] thing I've ever

heard come out of the mouth of a lawyer" and promptly invited me to leave his office immediately.  I still think his assessment of "deemed exports" was dead on.

**Original Article:** <u>http://www.exportlawblog.com/archives/8049</u>

---

**Pavan Rajgopal**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:       202.647.6968

✉ e-mail:      ___*RajgopalP@state.gov*___ | ✋ Web: ___*www.state.gov/t/pm /*___ |Twitter: ___*@StateDeptPM*___

Stay connected with *State.gov*:



This email is UNCLASSIFIED.

| | |
|---|---|
| **From:** | Rajgopal, Pavan <RajgopalP@state.gov> |
| **Sent:** | Friday, October 28, 2016 9:21 AM |
| **To:** | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Peartree, C Edward <PeartreeCE@state.gov>; PM-DTCC-Leads-DL <PM-DTCC-Leads-DL@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; Nilsson, Brian H <NilssonBH@state.gov> |
| **Subject:** | CPA Media Monitoring: WSJ: How to Make a Gun at Home |



**How to Make a Gun at Home**
**Ronald Bailey**
**Wall Street Journal**
**October 28, 2016**

Do you have a right to download and use the digital instructions to print out a gun? In September, a three-judge panel of the U.S. Court of Appeals for the Fifth Circuit ruled, 2 to 1, that you don't. The author of "Come and Take It," Cody Wilson, runs the nonprofit Defense Distributed, which was the losing plaintiff in that case. Mr. Wilson asserts that the printing instructions are protected by the First Amendment as free speech. In a sense, the court ruling is an answer to the author's challenge to "come and take it."

Mr. Wilson, while a law student at the University of Texas a few years ago, launched a crowdfunding campaign on the Indiegogo platform seeking $20,000 to buy a 3-D printer and to pay someone to design a printable gun. His book is a rollicking, almost stream-of-consciousness account of how he conceived of the idea of developing a digital blueprint for an actual working firearm.

What motivated him? "The system is surely ailing, and likely terminal, but is being a fly on that body worth much?," pondered political iconoclast Mr. Wilson in 2012. "What was a better way to fight the world itself? To go beyond good and evil?" His answer: "Sure, make the guns with a printer." Essentially, the goal of Defense Distributed is to enable citizens to manufacture guns in their own homes. And while Mr. Wilson's minor-league Hunter S. Thompson-style prose (combined with some jejune meditations on political philosophy) can be irritating, his zeal to fuse the First and Second Amendments is fascinating, and he seems to be a genius at publicity.

Mr. Wilson started his campaign to "keep power in the hands of the common man" by fax-blasting national gun-control groups with a page stating "IT'S OVER" and a footnote reading "Printablegun.com." Much of "Come and Take It" details the firestorm of media attention that followed. Wired magazine called him "one of the most dangerous men in the world"; others accused him of peddling "open source terrorism." Indiegogo canceled his crowdfunding campaign, so he set up a bitcoin account to receive donations. YouTube pulled his promotional video -- three times. Upon learning of his plans, Stratasys, the company from which he initially leased a 3-D printer, demanded he give it back. And the alarmed administrators of the Thingiverse website, which publishes user-created design files, pulled all gun-parts designs.

In response, Mr. Wilson and his colleagues at Defense Distributed created the Defcad website (a name sending up of the Defense Department's Defcon defense-readiness alert scale), onto which printable-gun designs could be uploaded. In 2013, Defense Distributed posted the digital files for printing its plastic handgun. Mr. Wilson named his creation "The Liberator" after the single-shot handguns that the Allies dreamed up to arm resistance fighters during World War II.

Gun-control proponents in Congress went ballistic. Rep. Steve Israel (D., N.Y.) held a news conference in

which he called for banning "wiki weapons" by renewing the Undetectable Firearms Act, which made it illegal to make or sell guns that can't be detected by walk-through metal detectors. James Burke, the police chief of Suffolk County, warned that 3-D printers could result in the proliferation of guns "in our children's bedrooms, in basements and in dorm rooms." In May 2013, Sen. Charles Schumer (D., N.Y.) joined the call for legislation outlawing printable guns, declaring that "a terrorist, someone who's mentally ill, a spousal abuser, a felon can essentially open a gun factory in their garage." That same month, Defense Distributed posted a notice on Defcad that the digital files for its "Liberator" plastic handgun design had been "removed from public access at the request of the US Department of Defense Trade Controls."

Just how could the federal agencies actually enforce such a ban? Put firmware locks on the printers? Ban digital file sharing? Require that manufacturers of 3-D printers install some kind of feature that prevents gun-part printing? As digital-rights activist Cory Doctorow, who is no fan of Mr. Wilson's, has observed: "Every one of those measures is a nonsense and worse: unworkable combinations of authoritarianism, censorship, and wishful thinking. Importantly, none of these would prevent people from manufacturing plastic guns. And all of these measures would grossly interfere with the lawful operation of 3D printers."

Federal cluelessness is highlighted in this book by a reprinted interview with the BBC, in which Mr. Wilson's explanation of how to print the gun is inkblot redacted at the demand of the U.S. State Department. Why the State Department, you may ask? As it happens, it was State, by challenging the posting of the printable-gun files as an arms-export violation, that initiated the lawsuit that has ended, for now, with the Fifth Circuit Court's ruling. After the decision, Mr. Wilson tweeted that he would be asking for an en banc hearing by the full Fifth Circuit.

Judge Edith Jones, in her powerful dissent, observed that "the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information." She further declared that "interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury." During a talk in 2013, Mr. Wilson declared that his digital gun-design project "is working so well because it confuses the stakes for free-speech liberals and command-and-control liberals. The files themselves are a powerful species of political speech. And how do we know they are political speech? Because the're being fought so strongly." Sadly, free-speech liberals seem mostly absent in this fight.

*Mr. Bailey is the science correspondent for Reason and the author of "The End of Doom: Environmental Renewal in the Twenty-First Century."*

**Original Article:** <u>http://www.wsj.com/articles/how-to-make-a-gun-at-home-1477610554</u>

**Pavan Rajgopal**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:      202.647.6968

✉ e-mail:      *RajgopalP@state.gov* | ✍ Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



This email is UNCLASSIFIED.

WASHAR0003074

WASHAR0003075

| | |
|---|---|
| **From:** | Tenny, Daniel (CIV) <Daniel.Tenny@usdoj.gov> |
| **Sent:** | Wednesday, September 21, 2016 9:25 AM |
| **To:** | Soskin, Eric (CIV) <Eric.Soskin@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Richter, Zachary (USATXW) <Zachary.C.Richter@usdoj.gov>; Rogers, Shana A <RogersSA2@state.gov>; Brill, Sophia (NSD) <Sophia.Brill@usdoj.gov>; Rozenshtein, Alan (NSD) <Alan.Rozenshtein@usdoj.gov>; Forrester, Nate (OLC) <Nate.Forrester@usdoj.gov>; Tutt, Andrew (OLC) <Andrew.Tutt@usdoj.gov>; Anderson, Melissa A. (ATF) <Melissa.A.Anderson@usdoj.gov>; Tarczynska, Dominika (USANYS) <Dominika.Tarczynska@usdoj.gov>; Smith, Jeffrey (NSD) <Jeffrey.Smith5@usdoj.gov> |
| **Cc:** | Raab, Michael (CIV) <Michael.Raab@usdoj.gov>; Brinkmann, Beth (CIV) <Beth.Brinkmann@usdoj.gov>; Letter, Douglas (CIV) <Douglas.Letter@usdoj.gov>; Allen, Katherine T. (CIV) <Katherine.T.Allen@usdoj.gov>; McIntosh, Scott (CIV) <Scott.McIntosh@usdoj.gov> |
| **Subject:** | Defense Distributed -- AFFIRMED |
| **Attach:** | defense distributed opinion.pdf |

---

The Fifth Circuit issued the attached opinion yesterday, affirming the district court's denial of a preliminary injunction in this case involving the application of the International Trafficking in Arms Regulations to computer code for 3-D printed firearms.  The majority did not reach the merits, but instead concluded that the district court had not abused its discretion in assessing the balance of equities and the public interest.  Judge Jones dissented.

Daniel

WASHAR0003076

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————

No. 15-50759

————————

United States Court of Appeals
Fifth Circuit

**FILED**

September 20, 2016

Lyle W. Cayce
Clerk

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED,

        Plaintiffs - Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His
Official Capacity as the Secretary of the Department of State;
DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State
Bureau of Political Military Affairs; KENNETH B. HANDELMAN,
Individually and in His Official Capacity as the Deputy Assistant Secretary
of State for Defense Trade Controls in the Bureau of Political-Military
Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity
as the Director of the Office of Defense Trade Controls Policy Division;
SARAH J. HEIDEMA, Individually and in Her Official Capacity as the
Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and in His Official Capacity as
the Senior Advisor, Office of Defense Trade Controls,

        Defendants - Appellees

————————————

Appeal from the United States District Court
for the Western District of Texas

————————————

Before DAVIS, JONES, and GRAVES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

    Plaintiffs-Appellants Defense Distributed and Second Amendment
Foundation, Inc. have sued Defendants-Appellees, the United States

WASHAR0003077

No. 15-50759

Department of State, the Secretary of State, the DDTC, and various agency employees (collectively, the "State Department"), seeking to enjoin enforcement of certain laws governing the export of unclassified technical data relating to prohibited munitions. Because the district court concluded that the public interest in national security outweighs Plaintiffs-Appellants' interest in protecting their constitutional rights, it denied a preliminary injunction, and they timely appealed. We conclude the district court did not abuse its discretion and therefore affirm.

## I.    Background

Defense Distributed is a nonprofit organization operated, in its own words, "for the purpose of promoting popular access to arms guaranteed by the United States Constitution" by "facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and by publishing and distributing such information and knowledge on the Internet at no cost to the public." Second Amendment Foundation, Inc. is a nonprofit devoted more generally to promoting Second Amendment rights.

Defense Distributed furthers its goals by creating computer files used to create weapons and weapon parts, including lower receivers for AR-15 rifles.[1] The lower receiver is the part of the firearm to which the other parts are attached. It is the only part of the rifle that is legally considered a firearm under federal law, and it ordinarily contains the serial number, which in part allows law enforcement to trace the weapon. Because the other gun parts, such as the barrel and magazine, are not legally considered firearms, they are not

---

[1] The district court capably summarized the facts in its memorandum opinion and order. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 686-88 (W.D. Tex. 2015). The facts set out in this opinion come largely from the district court's opinion and the parties' briefs.

WASHAR0003078

No. 15-50759

regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.

> Both technologies require some instruction set or "recipe"—in the case of 3D printers, computer aided design ("CAD") files, typically

3

WASHAR0003079

No. 15-50759

in .stl format; for CNC machines, text files setting out coordinates and functions to direct a drill.[2]

Defense Distributed's files allow virtually anyone with access to a 3D printer to produce, among other things, Defense Distributed's single-shot plastic pistol called the Liberator and a fully functional plastic AR-15 lower receiver. In addition to 3D printing files, Defense Distributed also sells its own desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower receivers. With CNC milling files supplied by Defense Distributed, Ghost Gunner operators are able to produce fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case. This case concerns Defense Distributed's desire to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol (the "Published Files"). On May 8, 2013, the State Department sent a letter to Defense Distributed requesting that it remove the files from the internet on the ground that sharing them in that manner violates certain laws. The district court summarized the relevant statutory and regulatory framework as follows:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including

---

[2] Plaintiffs-Appellants' Original Brief on Appeal.

4

WASHAR0003080

No. 15-50759

monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ——U.S. ——, 134 S. Ct. 365, 187 L. Ed. 2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*[3]

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals

---

[3] *See Def. Distributed v. U.S. Dep't of State,* 121 F. Supp. 3d 680, 687-88 (W.D. Tex. 2015).

WASHAR0003081

No. 15-50759

to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR-15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

## District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs-Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online.[4] They also claim violations of the Second and Fifth Amendments. Plaintiffs-Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval is

---

[4] The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR-15 lower receivers with it, as well as all 3D printing files used to produce prohibited weapons and weapon parts.

WASHAR0003082

No. 15-50759

needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

Plaintiffs-Appellants sought a preliminary injunction against the State Department, essentially seeking to have the district court suspend enforcement of ITAR's prepublication approval requirement pending final resolution of this case. The district court denied the preliminary injunction, and Plaintiffs-Appellants timely filed this appeal. We review the denial of a preliminary injunction for abuse of discretion, but we review any questions of law de novo.[5]

> To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[6]

We have long held that satisfying one requirement does not necessarily affect the analysis of the other requirements. In *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982), for example, the district court had denied a preliminary injunction solely because it found that the movant, Robbins & Myers, failed to satisfy the balance of harm requirement. On appeal, Robbins & Myers argued that it had clearly shown a substantial likelihood of success on the merits, and satisfying that requirement should give rise to a presumption of irreparable harm and a presumption that the balance of harm tipped in its favor. We disagreed:

---

[5] *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (footnotes omitted)

[6] *Id.*

WASHAR0003083

No. 15-50759

Because we dispose of this case on the balance of harm question, we need not decide and we express no views upon whether a presumption of irreparable injury as a matter of law is appropriate once a party demonstrates a substantial likelihood of success on the merits of an infringement claim. In other words, even assuming arguendo that Robbins & Myers has shown a substantial likelihood of success on the merits of its infringement claim and that irreparable injury should be presumed from such a showing (two issues not addressed by the district court in this case), we still uphold the district court's decision, which rested solely on the balance of harm factor. We agree that Robbins & Myers has failed to carry its burden of showing that the threatened harm to it from the advertisement outweighs the harm to Southern Monorail from the intercept. In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular. *See Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S. Ct. 3016, 65 L. Ed. 2d 1116 (1980) (district court obligated to weigh relative hardship to parties in relation to decision to grant or deny preliminary injunction, even when irreparable injury shown).[7]

The district court concluded that the preliminary injunction should be denied because Plaintiffs-Appellants failed to satisfy the balance of harm and public interest requirements, which do not concern the merits. (Assuming without deciding that Plaintiffs-Appellants have suffered the loss of First and Second Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time,

---

[7] *Id.* at 187-88.

WASHAR0003084

No. 15-50759

constitutes irreparable injury.[8]) In extensive dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs-Appellants failed to show a likelihood of success on the merits. Plaintiffs-Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs-Appellants continue to bear the burden of persuasion on appeal.

## Analysis

Because the district court held that Plaintiffs-Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs-Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs-Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs-Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

---

[8] *See Def. Distributed*, 121 F. Supp. 3d at 689 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

WASHAR0003085

No. 15-50759

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs-Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs-Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.

---

[9] *Id.* at 689.
[10] *Id.*

WASHAR0003086

No. 15-50759

Ct. 365, 172 L. Ed. 2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority—of the President and Congress in matters of foreign policy and export. *See Haig v. Agee,* 453 U.S. 280, 292, 101 S. Ct. 2766, 69 L. Ed. 2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink,* 315 U.S. 203, 222–23, 62 S. Ct. 552, 86 L. Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp [contrast] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.][11]

Plaintiffs-Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs-Appellants'

---

[11] *Id*. at 689-90.

WASHAR0003087

No. 15-50759

interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs-Appellants. We cannot say the district court abused its discretion on these facts.

Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs-Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs-Appellants argue that this result is absurd because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs-Appellants would allow them to share online not only the Published Files but also any new, previously unpublished files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs-Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR-15 lower receivers and additional 3D-printed weapons and weapon parts. Even if Plaintiffs-Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs-Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would function, in effect, as a

WASHAR0003088

No. 15-50759

permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs-Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

    In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs-Appellants' preliminary injunction based on their failure to carry their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs-Appellants have demonstrated a substantial likelihood of success on the merits.[12]

---

[12] The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs-Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."

    We note the following: (1) If Plaintiffs-Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that it would be legal. The question presented in this case is whether Plaintiffs-Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs-Appellants previously made available online. Plaintiffs-Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs-Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs-Appellants' strong First Amendment interest.

    As to the dissent's extensive discussion of Plaintiffs-Appellants' likelihood of success on the merits of the First Amendment issue, we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs-Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

WASHAR0003089

No. 15-50759

We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

## Conclusion

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

WASHAR0003090

No. 15-50759

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles." I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

## I.

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle-15 magazine,[1] and a handgun named "The Liberator." None of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions. In these respects the information was no different from technical data available through multiple Internet sources from widely diverse publishers. From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun. The Liberator technology

---

[1] The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR-15, a registered trademark of Colt's Inc. AR-15, Registration No. 0,825,581.

WASHAR0003091

No. 15-50759

drew considerable press attention[2] and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

> DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.
>
> Pursuant to §127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under §120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet. Because violations of the cited regulations carry severe civil and criminal penalties,[3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC. It took

---

[2] According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

[3] Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years. 28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

WASHAR0003092

No. 15-50759

the government entities two years to refuse to exempt most of the files from the licensing regime.

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint[4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information. There is also little certainty that the government will confine its censorship to Internet publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S. Ct. 2140 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–97 (5th Cir. 2012). Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled:    intermediate scrutiny is

---

[4] To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

17

WASHAR0003093

No. 15-50759

inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005)—the district court's balancing of harms went awry.[5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

---

[5] *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185–86. Second, "the district court denied the injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

18

WASHAR0003094

No. 15-50759

## II.

### A.    Regulatory Framework

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain."

19

WASHAR0003095

No. 15-50759

22 C.F.R. § 120.10(b). Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community." 22 C.F.R. § 120.11(a).[6]

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department. 22 C.F.R. § 127.1(a)(1). When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly, as, *inter alia*, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4).[7]

_____

[6] This provision only appears to permit dissemination of information *already* in the public domain. Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval. 80 Fed. Reg. at 31,528. The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit. *See id.*

[7] Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id.* § 120.17(a)(2); *see also* International Traffic in Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016). Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)." This, of course, is the open-ended definition of "export" urged by the State Department in this litigation. *See* International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015). The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place." 81 Fed. Reg. at 35,613.

WASHAR0003096

No. 15-50759

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)–(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the

WASHAR0003097

No. 15-50759

plaintiff's commodity jurisdiction applications. Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] . . . items as defense articles or defense services." 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1. [8]

Should the DDTC determine, as here, that technical data are subject to the ITAR, an "export" license is required before the information may be posted online. But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a)(1). There is a nominal 60-day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review. *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors. Previous prosecutions have targeted defendants, *e.g.*, who

---

[8] While 22 U.S.C. § 2778 (h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act. I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution. *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action . . . and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) (Agency "shenanigans" are "properly reviewable . . . under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

WASHAR0003098

No. 15-50759

attempted to deliver WMD materials to North Korea, who sought to distribute drone and missile schematics to China, and who attempted to license chemical purchasing software to companies owned by the Iranian government.[9] Defense Distributed agrees, moreover, that the Government may prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice. *See*, *e.g.*, *United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA. Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay. Moreover, technology has not stood still: design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials. *See*, *e.g.*, Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrintBoard.com (Nov. 23, 2015) (site visited 9/14/2016).

## B.    Discussion

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks

---

[9] *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO-RELATED CRIMINAL CASES *(January 2009 to the present: updated August 12, 2015)* 3, 11, 86 (2015), *available at* https://www.pmddtc.state.gov/compliance/ documents/OngoingExportCaseFactSheet.pdf.

23

WASHAR0003099

No. 15-50759

statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsam*, 163 F.3d 858, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987)); *Export*, *Black's Law Dictionary* (10th ed. 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country").

---

[10] For simplicity only, I do not here address plaintiffs' vagueness claim.

[11] It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227–28, 121 S. Ct. 2164, 2171–72 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

24

WASHAR0003100

No. 15-50759

As the court explained in *Ehsam*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id. See also Swan v. Finch Co. v. United States*, 190 U.S. 143, 145 (1903) (the "legal notion...of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another"). As against a claim that the rule of lenity should apply, the *Ehsam* court explicitly held that "export" is unambiguous. *Id. at* 859–60

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information.   "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (internal quotation omitted).  Pursuant to *Chevron,* where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781 (1984).  The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well.  Under

25

WASHAR0003101

No. 15-50759

the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data."  Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition:  "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of abroad."  There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful, non-classified technical data to foreign persons within the U.S.  The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable.  In terms of the regulations themselves, how this expansive definition of "export" interacts with the "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons.  The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable.  Even if these regulations are

26

WASHAR0003102

No. 15-50759

consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. *Cf. Bond*, 134 S. Ct. at 2090 ("[s]aying that a person 'used a chemical weapon conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.' " Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also id.* at 574–75 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance]. . . is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the

27

WASHAR0003103

No. 15-50759

request for administrative deference."). As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its constitutional significance, throughout the forty-year history of the AECA. It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2. The First Amendment—Content-based speech restriction.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter:" consequently, even a viewpoint neutral law can be content-based. *Id.* at 2230. "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting. As applied to the publication of Defense Distributed's files, this process is a content-based restriction on the petitioners' domestic speech "because of the topic discussed." *Reed*, 135 S. Ct. at 2227. Particularly relevant to this case is *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 27–28, 130 S. Ct. 2705, 2723–24 (2010),

28

WASHAR0003104

Case: 15-50759    Document: 00513686006    Page: 29    Date Filed: 09/20/2016
Case 2:20-cv-00111-RAJ    Document 107-6    Filed 09/23/20    Page 185 of 451

No. 15-50759

in which the Supreme Court held that as applied, a criminal statute forbidding the provision of material support and resources to designated terrorist organizations was content based and required strict scrutiny review. The Court there rejected the government's assertion that although the plaintiffs were going to provide legal training and political advocacy to Mideast terrorist organizations, the statute criminalized "conduct" and only incidentally affected "speech." Rejecting this incidental burden argument for intermediate scrutiny review, the Court stated the obvious: "[p]laintiffs want to speak to the PKK and the LTTE, and whether they may do so under §2239B depends on what they say:" if their speech concerns "specialized knowledge" it is barred, but it "if it imparts only general or unspecialized knowledge" it is permissible). *Humanitarian Law Proj.*, 130 S. Ct. at 2724.

The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir. 2001) (discussing level of scrutiny owed for "speech" in the form of a decryption computer program). There are CAD files on the Internet and designs, drawings, and technical information about myriad items—jewelry, kitchen supplies, model airplanes, or clothing, for example—that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation.[12]

---

[12] The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134–35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for

WASHAR0003105

No. 15-50759

The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [] interference with ingress or egress, [] visual clutter, or [] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters*. 485 U.S. 312, 321, 108 S. Ct. 1157, 1163–64 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners—foreign nationals—from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department:

---

attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S. Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, Mak's prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

WASHAR0003106

Case: 15-50759   Document: 00513686006   Page: 31   Date Filed: 09/20/2016
Case 2:20-cv-00111-RAJ   Document 107-6   Filed 09/23/20   Page 187 of 451

No. 15-50759

its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions. Second, CAD files do not "direct a computer" to do anything. As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials." The person must provide know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional. In effect, the "functionality" of CAD files differs only in degree from that of blueprints. Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here. *Corley,* 273 F.3d at 449–55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny. The district court erred in applying the lower intermediate scrutiny standard. I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML. The critical issue is instead whether the government's prepublication approval scheme is narrowly tailored to achieve that end. A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S. Ct. 501, 511 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case. To prevent foreign nationals from accessing

WASHAR0003107

No. 15-50759

technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC. No matter that citizens have no intention of assisting foreign enemies directly, communications about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech. This flies in the face of *Humanitarian Law Project.* Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations...[or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36–39, 130 S. Ct. at 2729–30. The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness.   First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain. This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage.  Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the government would not definitively answer whether the State Department would purport to regulate the posting of such

32

WASHAR0003108

Case: 15-50759     Document: 00513686006     Page: 33     Date Filed: 09/20/2016
Case 2:20-cv-00111-RAJ   Document 107-6   Filed 09/23/20   Page 189 of 451

No. 15-50759

unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones.[13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i) (technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude

---

[13] *See* Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones,* CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

WASHAR0003109

No. 15-50759

the Internet) before publication in the CNET article.  On the Government's
theory, journalists could be subject to the ITAR for posting articles online.

The State Department also asserts that, somehow, the information
published by Defense Distributed would have survived regulatory scrutiny
(query before or after submission to DDTC?) if the company had "verified the
citizenship of those interested in the files, or by any other means adequate to
ensure that the files are not disseminated to foreign nationals."  Government
brief at 20.  Whatever this means, it is a ludicrous attempt to narrow the ambit
of its regulation of Internet publications.  Everyone knows that personally
identifying information can be fabricated on electronic media.  Equally
troubling, if the State Department truly means what it says in brief about
screening out foreign nationals, then the "public domain" exception becomes
useless when applied to media like print publications and TV or to gatherings
open to the public.

In sum, it is not at all clear that the State Department has *any* concern
for the First Amendment rights of the American public and press.  Indeed, the
State Department turns freedom of speech on its head by asserting, "The
possibility that an Internet site could also be used to distribute the technical
data domestically does not alter the analysis...."  The Government bears the
burden to show that its regulation is narrowly tailored to suit a compelling
interest.  It is not the public's burden to prove their right to discuss lawful,
non-classified, non-restricted technical data.    As applied to Defense
Distributed's online publication, these overinclusive regulations cannot be
narrowly tailored and fail strict scrutiny.

3.  The First Amendment--Prior Restraint.

The Government's prepublication approval and licensing scheme also
fails to pass constitutional muster because it effects a prior restraint on speech.

34

WASHAR0003110

No. 15-50759

The classic description of a prior restraint is an "administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993)).    The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S. Ct. 596, 604 (1990). Generally, speech licensing schemes must avoid two pitfalls.    First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S. Ct. 2138, 2144 (1988)).    "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation.    *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S. Ct. 2395, 2402–03 (1992).

Second, content-based[14] prior restraints must contain adequate procedural protections.  The Supreme Court has requires three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress

---

[14] As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based.  Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland*.

WASHAR0003111

No. 15-50759

the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003) (citing *Friedman v. Maryland*, 380 U.S. 51, 58–59, 85 S. Ct. 734, 739 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S. Ct. 935, 938 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data.[15]

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's

---

[15] Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable.*" 22 C.F.R. § 126.7(a)(1) (emphasis added).

36

WASHAR0003112

## No. 15-50759

discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S. Ct. at 2150–51. Like the "illusory 'constraints'" in *Lakewood*, *id.* at 769, the ITAR prepublication review scheme offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770. *Cf. Humanitarian Law Project,* 130 S. Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45-day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly brief. *See Teitel Film Corp. v. Cusak,* 390 U.S. 139, 141, 88 S. Ct. 754, 756 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint

37

WASHAR0003113

No. 15-50759

scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D-4, LLC,* 541 U.S. 774, 781, 124 S. Ct. 2219, 2224 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas*, interpreting *Freedman*'s "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C.    The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case.    No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations.    Yet the Executive's mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights.    The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971) (reversing the grant of an injunction precluding the *New York Times* and the *Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945–1967); *id.* at 730 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

WASHAR0003114

No. 15-50759

the protection as to previous restraint is not absolutely unlimited.  But
the limitation has been recognized only in exceptional cases . . . .[n]o
one would question but that a government might prevent actual
obstruction to its recruiting service or the publication of sailing dates of
transports or the number and location of troops. On similar grounds,
the primary requirements of decency may be enforced against obscene
publications.  The security of the community life may be protected
against incitements to acts of violence and the overthrow by force of
orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S. Ct. 625, 631 (1931);
*cf. Haig v. Agee*, 453 U.S. 280, 306–08, 101 S. Ct. 2766, 2781–82 (1981) (holding
that the Secretary of State's revocation of Haig's passport did not violate First
Amendment rights because his actions exposing undercover CIA agents abroad
threatened national security).  No such exceptional circumstances have been
presented in this case.  Indeed, all that the majority can muster to support the
government's position here is that

> the State Department's stated interest in preventing foreign
> nationals—including manner of enemies of this country—from
> obtaining technical data on how to produce weapons and weapon
> parts is not merely tangentially related to national defense and
> national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else.[16]
With that kind of reasoning, the State Department could wholly eliminate the
"public domain" and "scholarly" exceptions to the ITAR and require pre-
publication approval of all USML-related technical data.  This is clearly not

---

[16] The State Department notes the fear that a single-shot pistol undetectable by metal-
sensitive devices could be used by terrorists.  The Liberator, however, requires a metal firing
pin.

WASHAR0003115

No. 15-50759

what the Supreme Court held in the *Pentagon Papers* or *Near* cases. *See generally* L.A. Powe, Jr., The H-Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms.[17]

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA. The State Department's sudden turnabout severely undercuts its argument that prepublication review and licensing for the publication of unclassified technical data is justified by pressing national security concerns. Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals. Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in

---

[17] The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States. Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project*) is dangerous and unprecedented.

40

No. 15-50759

libraries, and in magazines. The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face First Amendment problems because the government may rarely prevent the dissemination of truthful information.[18]

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996). Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States." *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is subject to doubt, based on

---

[18] DEPARTMENT OF JUSTICE, 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION 3, 5–7, 19–29 (1997).

WASHAR0003117

No. 15-50759

the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure). . . to a foreign person . . . in the United States or abroad." *Id.* § 120.17(a)(4).

<div align="center">***</div>

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights.    The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain."   It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists.   Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be implicated on the USML.    This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable. I earnestly hope that the district court, on remand, will take the foregoing discussion to heart and relieve Defense Distributed of this censorship.

WASHAR0003118



United States Department of State                Bureau of Politico-Military Affairs

# Defense Trade News

### The Bulletin of the Center for Defense Trade

**Volume 1, Number 2**   •   **Washington, D.C.**   •   **June 1990**

## Features

**Project Accelerate Institutionalized**
92% of Cases Issued or Staffed Within 10 days
**1**

**Workload Reductions Moving Forward**
Ten Initiatives Already in Testing Phase
**3**

**CJs Decontrolling Commodities**
87 Items So Far in 1990, 40 Days Average Time
**7**

**Minimizing "Returned Without Action" Cases**
A Six-Step Checklist for Avoiding RWAs
**10**

**China Defense Trade Policy**
An Overview After One Year
**11**

**55 Years of Defense Trade Controls**
Munitions List Controls Over the Years
**12**

**"Empowered Official" Guidelines**
**12**

## Departments

**Personnel Updates**
DTC Growth Continues
**13**

**Tips and Tidbits**
**15**

**Reader Questionnaire**
**17**

*Written and Edited by the Center for Defense Trade*

WASHAR0003119

**Secretary of State**
James A. Baker III

**Assistant Secretary
of State for
Politico-Military
Affairs**
Richard A. Clarke

**Director of the Center
for Defense Trade**
Charles A. Duelfer

**Executive Editor**
Richard A. Levy

**Managing Editor**
Marsha F. Filtrante

Defense Trade News (ISSN 1051-2845) is a quarterly publication of the Center for Defense Trade, Bureau of Politico-Military Affairs, U.S. Department of State. Its purpose is to provide the public, Congress, government agencies, and American industry with information on developments about defense trade policy, licensing practices, and compliance issues. The newsletter contents include official policy statements and other official documents. Special features, articles, and other supportive materials (such as maps, charts, graphs, tables, and photographs) provide additional information on current issues but should not necessarily be interpreted as official U.S. policy statements. The Secretary of State has determined that the publication of this periodical is necessary in the transaction of public business required by law of the Department.

**Subscription, Address Changes:** Firms registered with the Office of Defense Trade Controls automatically receive this publication at their registered address. Registrants must notify the Office of Defense Trade Controls in writing, citing the applicant code, whenever the mailing address changes (ITAR 122.4). The editorial staff maintains a separate list for other interested persons and organizations. Contact the Managing Editor, via mail or datafax, for addition to or address change for the editorial mailing list.

**Copyright:** Most of this publication's contents are in the public domain and not copyrighted. Those items may be reprinted; citing the source as Defense Trade News would be appreciated. Permission to reproduce all copyrighted material (including photographs) must be obtained from the original source.

**Limited Reprint Authorization:** All addressees that are registered with the Office of Defense Trade Controls may reproduce this entire publication (excluding postal mailing label) for distribution within their organizations. This permission is given to ensure proper distribution throughout companies with multiple locations or offices and to reduce mailing costs.

**Corrections, Contributions, and Correspondence to the Editor:** Address to Editor, Defense Trade News, PM/DTC, SA-6 Room 228, U.S. Department of State, Washington, D.C. 20522-0602. Sending a letter to the Editor constitutes consent for publication unless otherwise requested.

**Postmaster:** Send address changes to Defense Trade News, PM/DTC SA-6 Room 228, U.S. Department of State, Washington, D.C. 20522-0602

**Postage:** Third-class postage paid at Washington, D.C. 20522-0602.

## Contacting the Center for Defense Trade

**Office of Defense Trade Controls**　　　　　　　　　　**Office of Defense Trade Policy**

### Postal Mailing Address

PM/DTC SA-6 Room 228　　　　　　　　　　PM/DTP Room 7815
Office of Defense Trade Controls　　　　　　　　Office of Defense Trade Policy
Bureau of Politico-Military Affairs　　　　　　　Bureau of Politico-Military Affairs
U.S. Department of State　　　　　　　　　　U.S. Department of State
Washington, D.C. 20522-0602　　　　　　　　Washington, D.C. 20520-7815

### Express Mail and Courier Delivery Address

PM/DTC Room 228　　　　　　　　　　　　PM/DTP Room 7815
Office of Defense Trade Controls　　　　　　　　Office of Defense Trade Policy
Bureau of Politico-Military Affairs　　　　　　　Bureau of Politico-Military Affairs
U.S. Department of State　　　　　　　　　　U.S. Department of State
1701 N. Fort Myer Drive　　　　　　　　　　Washington, D.C. 20520-7815
Arlington, VA 22209-3113

### Telephone Numbers

General Information: (703) 875-6644　　　　　　General Information: (202) 647-4231
Commodity Jurisdiction Licensing Team: (703) 875-6644
License Status Inquiry: (703) 875-6652
Registration and Compliance Information: (703) 875-6650

### Facsimile Numbers

Arms Licensing Division: (703) 875-6647　　　　　PM/DTP: (202) 647-1346
Compliance Analysis Division: (703) 875-5663

WASHAR0003120

# PROJECT ACCELERATE INSTITUTIONALIZED
*92 Percent of Cases Issued or Staffed Within 10 Days*

In the March edition of Defense Trade News, the Office of Defense Trade Controls (DTC) made a commitment to move beyond its near-term Project Accelerate success of eliminating the December/January backlog by setting as its "long-term aim ... to begin institutionalizing a faster licensing process." We are proud to report that the long-term aim has rapidly become a reality.

**Setting a tough licensing turnaround target ...** By March 5, DTC had completed the first phase of Project Accelerate, eliminating the backlog of license applications while also handling the continuous flow of incoming cases. The office then began establishing internal licensing guidelines and control mechanisms aimed at creating a faster, more responsive licensing process.

For its most important guideline, the Controls Office borrowed from the Congress. In the Conference Report for the Foreign Relations Authorization Act, FY 90-91 (Public Law 101-246), Congress urged the old OMC to set as a target "by the end of FY 1990 being able to determine within 10 days of receipt of a license application whether that application will be referred to other agencies for review...."

Building on this recommendation, the Office of Defense Trade Controls in mid-March set as its goal to "initially review" at least 90 percent of all submissions to the office within 10 business days.

For a license application to meet this "initial review" target, one of two actions must be taken on it within 10 days of receipt: either it must be issued (i.e., decided upon and already mailed back to the applicant) or it must be staffed (i.e., referred to another policy office in State, to DTC's Compliance Division, or to a technical agency for review).

DTC sought to achieve this goal by September 1990. At the time, DTC estimated that exceeding 90 percent might not be possible given the small, yet certain, percentage of cases (such as those for the People's Republic of China) that require a lengthier DTC initial review for foreign policy reasons.

**... and meeting, indeed beating, the goal ahead of schedule.** By April, DTC had already exceeded this objective. In fact, the March statistics were cause for much celebration at the Center. In the second half of March, 87 percent of the cases received were initially reviewed within 10 days of receipt. For the 4,500+ licenses received in April, the 10-day turnaround rate was 91 percent. This figure reached 92 percent for the 4,700+ cases that arrived in May.

| Initial Review Statistics (Percent of Cases Issued or Staffed Within 10 Days of Receipt) | | |
|---|---|---|
| March | April | May |
| 87% | 91% | 92% |

**Sixty- six percent of all cases issued within a fortnight.** Broken down, the 92 percent turnaround figure means that roughly two-thirds, exactly 66 percent, of all of the May cases were in-processed by the DTC administrative staff, reviewed and issued by a DTC licensing officer, and then out-processed and mailed back to the applicant within just 10 days. Indeed, many of these issued cases were completed in fewer than 5 days.

The other 26 percent of May's mail handled within 2 weeks represents the cases that were in-processed, reviewed by a licensing officer, and out-processed for staffing. Thus, only 8

*Process of approval / review interest
is role of DTC ...*

*Have /Had more "dangerous" major
weapon systems been reported —*

WASHAR0003121

percent of the month's casework was not initially acted upon within a fortnight of receipt.

**Stopping delays on the 11th day.** DTC has established an internal control mechanism to ensure that the 8 percent that have not been issued or staffed within 10 days are not delayed any longer (unless appropriate). Specifically, the two Branch Chiefs in the Arms Licensing Division, Mal Zerden and Allan Suchinsky, each day check the status of all pending cases in their 11th day in DTC and move them along as appropriate.

**Preventing unnecessary staffing.** Each day, DTC Director Bill Robinson also checks all of the cases prepared for staffing the previous day to ensure that cases are not referred for review unnecessarily but truly need to be staffed for policy or technical-related reasons. Notably, 1990 staffing to date is running slightly higher than recent years' staffing levels primarily because industry is pursuing more complicated and sensitive sales.

**Enforcing a fast staffing process.** For the roughly one-fourth of DTC's license applications that DTC does need to refer to a policy office elsewhere in State or a technical office in another agency, DTC has established a mechanism for preventing these more difficult cases from getting bogged down.

Namely, DTC has brought on board a licensing officer, Rob Groesbeck, who will be tracking all cases more than 30 days old, ensuring that the staffing offices make prompt decisions. Groesbeck will also see that cases returned from staffing are handled expeditiously in final review in DTC.

**Ending typing delays.** For the nearly 15,000 cases typed each year, most of which are cases requiring a proviso letter attached to the approved license, DTC has also developed a typing tracking system. This system

ensures that cases are handled in chronological order, except for emergency cases, which receive top priority.

**Three-day typing turnaround.** Whereas in the past typing used to be backlogged with weeks worth of pending licenses, the average license in May was in and out of typing within 3 days. With the typing tracking system, DTC immediately knows when a typing backlog is developing. The office then quickly addresses the problem by reallocating personnel resources and using overtime.

**Raising the bar.** Having reached the 10-day initial review target for 90 percent of its cases, the Controls Office is now aiming to reach this target for 95 percent of all cases (assuming that less than 5 percent of its workload must be held longer for policy reasons). Similarly, through various mechanisms, the office is working to ensure that every step of the licensing process is working properly, both in terms of speed and substance. DTC is continuously devising new, tougher targets and mechanisms to track its performance and attain its aims. As stated in the March edition, we welcome industry input in this process.

**Filling the need.** Our bottom line objective remains unchanged: to provide faster, predictable export licensing while enforcing the necessary strict controls imposed by the USML. Such a licensing process permits U.S. defense industry to be more competitive in today's fast-moving, international business environment.

To achieve this, we are striving—at all levels throughout the office—to develop mechanisms for continuously improving the implementation of our statutory and regulatory responsibilities. In so doing, we are confident we will be able to provide the quality work that the nation demands and deserves in the regulation of defense trade. ∎

WASHAR0003122

# WORKLOAD REDUCTIONS MOVING FORWARD

*Ten Initiatives Already in Testing Phase*

Along with the effort to facilitate munitions export licensing through a responsive licensing process, the Center for Defense Trade is also working to facilitate licensing through workload reduction. At the direction of Deputy Secretary of State Eagleburger, the new Center began a workload reduction initiative immediately upon its creation in January.

**Ten initiatives already agreed on.** Initially, the workload reduction initiative focused on developing specific ideas. Center personnel worked closely with the Defense Technology Security Administration (DTSA) at the Department of Defense (DOD) in this effort. Much progress was made, and quite quickly.

Having developed a package of initiatives, the Center and DTSA began examining the feasibility of implementing these ideas to reduce and simplify licensing while retaining the required export controls. Of this package, 10 initiatives have been specifically defined. (Additional ideas are still being considered.)

**Two types of initiatives.** Broadly defined, the 10 workload reduction initiatives (with the exception of the group CJ) fall into two categories: those that will require specialized International Traffic in Arms Regulations (ITAR) exemptions and those that will ultimately require specialized DTC licenses. The following charts categorize the initiatives and provide a brief explanation of each, including its purpose, what it aims to replace (i.e., how it will reduce workload), and the anticipated requirements and restrictions for its application.

**Reducing workload for you and us.** Each of these initiatives will ultimately eliminate hundreds, and in some cases thousands, of DTC license applications. The specialized ITAR exemptions will do so by eliminating the need for DTC licenses altogether. The specialized DTC licenses will consolidate multiple, current transactions into one license. As they become instituted, the initiatives will thus reduce the licensing burden currently placed on both industry and the Controls Office.

**Looking for test cases.** The Center, working closely with the State Department Legal Adviser's Office and Customs officials, is now starting to test implementation mechanisms for these initiatives. To ensure that this process is effective, the Center will implement the initiatives incrementally.

As part of this program, the Center will use test cases to develop appropriate interagency procedures for these initiatives and work out the bugs that are certain to arise. If you believe you would benefit from one of the initiatives and are interested in submitting a test case, please contact Ken Chard at (202) 647-2558 or 4231. Chard would also welcome any comments and suggestions you might have.

**Note: Just testing.** All of these initiatives are still in the design and testing phase; not all may come to pass. Some aspects of the following charts, such as the "Self-Certification Form," are just conceptual at this stage. The Center will publish the initiatives, as they are finalized, in the *Federal Register* for public comment. ∎

WASHAR0003123

# Center for Defense Trade
# Workload Reduction Initiatives
## Specialized Exemptions

| Initiative | Purpose | Replaces | Requirements | Restrictions |
|---|---|---|---|---|
| Application Specific Integrated Circuits (ASICs) and Programmable Read-Only Memories (PROMs) | Eliminates licensing delays in providing ASICs and PROMs for NATO and other USG-approved weapons systems. Provides for entry of technical data and return to the foreign owner in another form or format, such as implementing foreign design instructions into a computer chip. | DSP-5 | • Submit "Self-Certification Form" and SED to Customs. • Send copy of design instructions directly to DTC. | NATO, Australia, or Japan only, except in support of other USG approval. Board-level chips to Missile Tech signatories only. Unclassified only; no encrypted or GAP chips. No U.S. content added |
| Temporary Export of Hardware and Media for Static Demonstration | Eliminates licensing delays for temporary exports of hardware and accompanying demonstration media for trade shows and "open houses." | DSP-73 | • Submit "Self-Certification Form" to Customs on export and reimport. | Static display only. No operational demonstrations. 180 days maximum duration. |
| Permanent Export of Hardware to USG Installations or for U.S. Projects Overseas | Eliminates licensing requirements for hardware exported to USG installations or for U.S. only projects. | DSP-5 & GBL | • Submit Letter of Authorization from cognizant authority in relevant Federal agency along with SED to Customs. | Exports to USG installations and U.S. only project. |
| Export, Temporary Import, or Temporary Export of Specialized Packing Cases | Eliminates licensing requirements for empty packing cases specially designated for defense articles. | DSP-5, DSP-73, & DSP-61 | • Submit "Self-Certification Form" to Customs and, in case of permanent export, SED. | Cases must be used pursuant to USG authorization. |

WASHAR0003124

# Center for Defense Trade
# Workload Reduction Initiatives
## Specialized Licenses

| Initiative | Purpose | Replaces | Requirements | Restrictions |
|---|---|---|---|---|
| Marketing Project License | Authorizes exporters to temporarily export specified defense articles, or information on services and technologies, to defined sales territories, to facilitate marketing demos. Valid indefinitely. | Many DSP-73's | • Must specially apply for Marketing Project License. When approved submit "Self-Certification Form" to Customs on temporary export and reimport. | Unclassified only. Valid only for authorized destinations. Upgrades subject to new authorization. |
| Exporter's Distribution License | Authorizes exporters to distribute specified quantities of approved hardware through identified intermediatries, to authorized destinations. | Many DSP-5's | • Must specially apply. Special submission and reporting requirements for NATO, Australia, and Japan country group. Other countries more stringent. Submit "Self-Certification Form" with SED to Customs. | Limited to approved hardware, quantities, intermediaries, and destinations. |
| Agreement Hardware License | Authorizes export, temporary import, and temporary export of hardware pursuant to MLA, TAA, and Distribution Agreements. | DSP-5's, DSP-73, DSP-61's | • You must specially request AG Hardware License as companion to an existing or new Agreement, identifying hardware to be shipped. Submit "Self-Certification Form" for temporary import or export, along with SED for final export, to Customs. | Limited to unclassified, approved hardware to authorized destinations through approved intermediaries. |
| Offshore Procurement Agreement | Permits the consolidation of all offshore procurement approvals under one document. | DSP-5's & DSP-73 | • Submit request identifying all RFP recipients, technical data, specialized hardware and materials. On approval submit "Self-Certification Form" and (when necessary) SED to Customs. | Limited to unclassified "build to print" manufacturing. |

WASHAR0003125

# Center for Defense Trade
# Workload Reduction Initiatives
## Specialized Licenses

| Initiative | Purpose | Replaces | Requirements | Restrictions |
|---|---|---|---|---|
| MLA Direct Export License | Authorizes U.S. companies holding Manufacturing License Agreements to export the same articles approved for sale under MLA to the same sales territories authorized on the MLA. | Many DSP-5's | • Must specially apply for MLA Direct Export License, specifying hardware, quantities, intermediatries, and end-users. On approval, submit "Self-Certification Form" and SED to Customs for exports. Annual reports to DTC. | Limited only to hardware approved on original MLA and for same destinations. Total value may not exceed actual or estimated value of MLA. |
| Class or Group Commodity Jurisdiction | Facilitates the simultaneous removal of related technologies and similar groups of commodities and components from the USML. | N/A | • Submit technical analysis paper listing all commodities derived from a particular technology or groups of related commodities, describing commercial provenance or application, and detailing technological history. | Must recommend which commodities should be removed and which should remain on USML based on ITAR criteria. |

WASHAR0003126

# CJs DECONTROLLING COMMODITIES
*87 Items So Far in 1990, 40 Days Average Time*

Upon its creation, the Center for Defense Trade set as a key objective using the Commodity Jurisdiction (CJ) procedure to remove as many commodities as appropriate from the U.S. Munitions List (USML). Center Director Charles A. Duelfer emphasized this aim in hearings before the Congress, as detailed in the March Defense Trade News.

**Keeping our promise.** As the March edition stated, "to encourage the submission of more CJ requests and expedite the handling of such requests, DTC has designated two licensing officers full-time as the CJ licensing team." The CJ team is fulfilling Duelfer's promise to the Congress "that as cases arrive, they will get quick attention and that any disagreements will be addressed in a timely fashion at the appropriate levels."

**A brief history.** The CJ procedure, as detailed in the March edition and portrayed in the following flowchart, began as an informal interagency procedure in the early 1960s. It was formalized in the ITAR in 1984, after an industry and interagency (State, Commerce, Defense, and Office of Management and Budget) review agreed upon the current process. The only change made since then was the addition in 1989 of two appeal steps within the Department of State before the final appeal to the President.

**Key features of the CJ process.** The CJ process is headed by the State Department, since a CJ determination is fundamentally a foreign policy/national security decision. The CJ determination decides which goods are mili-

tarily significant and thus—in each case—need to be controlled for export on foreign policy/national security grounds and under the strict USML export control regulations. Moreover, having a single bureaucratic head facilitates the decision-making process.

All CJ requests submitted to DTC are referred interagency, to both Commerce and the appropriate technical agency, for review. DTC's CJ decisions may be readily appealed both within the State Department hierarchy and to the President. Any U.S. citizen, company, or government agency may submit a CJ request; submission of a case does not in any way hinder DTC licensing of the commodity while under CJ review.

**An effective process for decontrolling items.** In the past 3 years alone, State has removed hundreds of items from coverage by the USML through the CJ process. As in recent years, State has determined in the vast majority of 1990 CJ cases to date that the commodities under review should be under the jurisdiction of Commerce's Commodity Control List (CCL)—not State's USML. Of the 143 CJ determinations DTC has made so far this year 87 cases, or 61 percent, were decided in favor of Commerce control.

**An efficient process, too.** CJ decisions are now being made faster than ever before. Whereas just last year, CJ cases were taking several months on average, the average time from receipt to completion of CJ requests submitted so far in 1990 is only 40 business days.

| Year | # of CJ Determinations | Percent Decided in Favor of Commerce Control | # of Items Moved to Commerce |
|------|------|------|------|
| 1988 | 217 | 69% | 149 |
| 1989 | 223 | 70% | 157 |
| 1990 (to date) | 143 | 61% | 87 |

WASHAR0003127

The vast majority of this time is spent in the interagency referral stage. Upon receipt of a CJ request, DTC ordinarily refers the CJ to the appropriate agencies within 4 days. Upon receipt of the other agencies' recommendations, DTC usually makes its final decision within 10 days.

**Prodding the interagency process.** To prevent CJs from getting bogged down in the interagency review stage, the CJ licensing team makes regular calls about slow cases. Center Director Duelfer also arranges interagency meetings to expedite decisions on delayed cases.

**Self-initiated CJs.** To facilitate the removal of commodities from the USML via the CJ process, DTC is self-initiating CJ requests on items it believes may be removed from the USML at this point in time. DTC has self-initiated 10 CJ cases in the past 3 months. The Center is also encouraging other agencies to do likewise.

**Helping us help you.** You can assist the CJ team in its work, and get CJ determinations

faster, by avoiding a few common problems in CJ submissions. First, clearly identify in the subject line of your letter the specific items being requested for adjudication. Second, provide adequate technical documentation to support claims made in enclosed brochures. Third, identify the specific modifications that make the product under review different from the original or similar products.

**Selected CJ Determinations.** To encourage more CJ submissions, and in response to numerous requests to publicize CJ decisions, we provide the chart (below) of selected 1990 CJs. The commodity descriptions are very general to ensure the confidentiality of all proprietary information related to these cases.

If you think you have an item similar to one of those listed as having been placed under Commerce control, please submit a CJ request (ITAR 120.5). Michael Van Atta or Gary Oncale of the CJ licensing team are available at (703) 875-6644 to answer any questions you may have. ■

## COMMODITY JURISDICTION DETERMINATIONS

| COMMODITY | JURISDICTION |
|---|---|
| Agricultural flame thrower | Commerce |
| Aircraft deicing system | Commerce |
| Automated bullet sizing and lubricating machine | State |
| Ceramic products | Commerce |
| When modified or formulated for military application | State |
| Channel Multiplier Plates and Intensifier Tubes for image enhancement | State |
| Chemical pesticides using 2% or less of chloropicrin | Commerce |
| Communications software not using DES | Commerce |
| Computers | Commerce |
| When ruggedized, or modified for military application | State |
| Electronic equipment or components hardened for space | State |
| Helicopters | Commerce |
| When modified to accept weapons or electronic equipment | State |

| COMMODITY | JURISDICTION |
|---|---|
| Imaging equipment | Commerce |
| When modified for military use | State |
| Partially assembled semiconductor devices | Commerce |
| Power amplifiers used by ground-based transmitters | State |
| Radio frequency detectors | Commerce |
| Silicone adhesives | Commerce |
| Smart Cards | State |
| Personalized and issued by financial institutions | Commerce |
| Software, Encryption Devices using DES | State |
| Not using DES | Commerce |
| Software for design analysis of military equipment | Commerce |
| Software for mapping | Commerce |
| Software programs used in damage assessment or modeling of building structural design | Commerce |
| Stratospheric balloons | Commerce |
| Two-way relief valves | Commerce |

WASHAR0003128



## Commodity Jurisdiction Procedure
### Request for Commodity Jurisdiction Determination

**Office of Defense Trade Controls
Department of State**

Referral

**Commerce**

**Technical Agency
usually Defense**

**Other Agency recommendations submitted to DTC
DTC determination/notification**

**1st Appeal
Deputy Assistant Secretary level
chaired by Director, Center for Defense
Trade**

**2nd Appeal
Undersecretary level
chaired by Undersecretary of State
for International Security Affairs**

**Final Appeal
Interagency to President**

WASHAR0003129

# MINIMIZING "RETURNED WITHOUT ACTION" CASES

*A Six-Step Checklist for Avoiding RWAs*

Everyone at the Office of Defense Trade Controls (DTC) is working to make the munitions export licensing process as fast and predictable as possible within the necessary confines imposed by the International Traffic in Arms Regulations. As part of this effort, DTC decided early on that making its operation as transparent as possible would benefit both industry and the Controls Office. Articles such as this one are written with this aim.

**The bad news: too many RWAs.** Roughly 5 percent of all submissions to DTC are returned without action (RWA) to the applicant with an accompanying explanation. The vast majority of RWAs are cases DTC was unable to review because the license application lacked specific required documentation. For DTC, this presents a frustrating source of licensing delays.

**The good news: most RWAs easily avoided.** To try to eliminate, or at least minimize, such RWAs, DTC has identified the most common deficiencies that result in RWA cases. Surprisingly, only six "sins of omission" account for some three-fourths of all returned applications.

**The six-step checklist.** The following list represents these six common causes of RWAs. Please help us minimize the number of RWA cases by using this checklist before sending license applications to DTC.

1. <u>Missing/Inadequate 126.13 Empowerment Letter:</u> All submissions to DTC must include an original 126.13 letter signed by a U.S. person who is an official empowered by the applicant. If the person signing the license application differs from the person signing the letter, the letter must also certify that the application signer is a U.S. person and empowered by the applicant. The applicant must accurately complete all required information. DTC must receive the original 126.13; copies are not acceptable.

2. <u>Missing Part 130 Letter:</u> Applications valued at or above $250,000 to foreign military forces or international organizations require a fee, commission, or political contribution letter.

3. <u>Missing Technical Data or Descriptive Literature:</u> The ITAR requires seven copies of either technical data or product descriptive literature. Many applicants include only one copy.

4. <u>Missing DSP-83:</u> This form must accompany any application for Significant Military Equipment (SME) and all classified transactions. Applicants must also submit the DSP-83 with firearm licenses for 50 or more handguns and/or 100 or more rifles. (**See** Tips and Tidbits, page 15, for more information on DSP-83s.)

5. <u>Inadequate Purchase Order/Letter of Intent/Signed Contract:</u> An order or letter of intent must accompany DSP-5s and DSP-85s, and it must correspond to the items listed in the commodity block of the application. The purchase order must clearly state both the specific ultimate end-user and the specific end-use of the equipment. Should the order not state the specific end-user/end use, a letter from the foreign customer must be submitted.

6. <u>Inadequate Identification of End-User:</u> The end-user cited in block 18 of the DSP-5 or block 21 of the DSP-85 must be clearly tied to the Purchase Order or Letter of Intent. Additional documents frequently link these crucial elements. ∎

WASHAR0003130

# CHINA DEFENSE TRADE POLICY

*An Overview After 1 Year*

The history of export sanctions to the People's Republic of China (P.R.C.) over the last year is quite complex. The Office of Defense Trade Controls (DTC) would thus like to clarify its policy for handling license applications for exports to China. This policy statement is intended to guide exporters of defense articles and services through applicable laws. This policy remains subject to change by events unfolding in China and elsewhere in the world.

**Presidential Sanctions.** Last June, the President responded to the crackdown on pro-democracy demonstrators in Tiananmen Square by ordering, among other things, a suspension of all weapons exports to the P.R.C. DTC immediately suspended all outstanding licenses and other approvals involving munitions exports to China.

In addition, DTC returned without action nearly 100 license applications then under review. Since then, DTC has lifted suspensions or granted licenses for about 20 exceptional cases. In each such case, the applicant specifically requested review for an exception. DTC found these cases involved items destined for a strictly civilian end use, with no chance of diversion to the military.

**Legislative Sanctions.** In December 1989 and February 1990, Congress passed legislation that had the effect of codifying some of the Presidential sanctions. The December legislation is the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990 (Public Law 101-162). This law prohibits the issuance of licenses for export of U.S. satellites for launch on Chinese launch vehicles. However, Congress authorized the President to waive the restriction if the chief executive reported

to Congress that China had executed certain political reforms or that the export was in the national interest. Shortly after the legislation was enacted, the President made the required national interest report with respect to the export of the AsiaSat and AUSSAT satellites.

The sanctions passed in February as part of the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991 (Public Law 101-246) extended the prohibition to all munitions export licenses. This law also provides for the same type of Presidential waiver as the December legislation. To date, the President has not exercised his waiver authority under this Act.

**Current Licensing Policy.** DTC accepts license applications for China that involve exports intended for a civilian end use. For DTC to process P.R.C. license requests, applicants should include the following documentation:

    1. A letter requesting an exception from the various restrictions on munitions exports. Applicants should list all reasons for the request. The applicant must verify and state clearly that only civilians will use the item and only for commercial purposes; and

    2. A completed Form DSP-83.

When DTC receives the proper documentation, a DTC licensing officer will forward the application to the proper agencies and offices for review. In addition to the normal foreign policy, national security, and technology transfer concerns, licensing officers will thoroughly examine the item's potential for diversion to military end use.

For additional information regarding P.R.C. trade policy, please call Paul Almeida in the Office of Defense Trade Policy at (202) 647-4231. ■

WASHAR0003131

# 55 YEARS OF DEFENSE TRADE CONTROLS

*Munitions List Controls Over The Years*

The history of U.S. defense trade controls goes back to public concern over profiteering from armaments in the 1930s and the desire to avoid entanglement in European conflicts. The controls regime has been subject to repeated modifications, but exhibits a surprising degree of institutional continuity.

**Increased volume and complexity of commercial defense trade.** The 1970s and 1980s produced considerable growth in U.S. commercial defense trade, despite a tightening of licensing and enforcement measures. This trade growth has meant a continuous increase in licensing burdens, despite periodic prunings of the International Traffic in Arms Regulations (ITAR), which regulate the licensing process. Moreover, the increasing importance of manufacturing license and technical assistance agreements has resulted in increasingly complex licensing arrangements.

**Office of Defense Trade Control's various legal mandates.**   The 1935 Neutrality Act empowered the Secretary of State to establish an Office of Arms and Munitions Controls, with authority to register and issue export licenses to all U.S. entities engaged in de-

fense-related trade. This authority was elaborated by the Mutual Security Act of 1954, the Arms Export Control Act (AECA) of 1976, and related executive orders.

**A changing ITAR.** ITAR evolution over the years reflects changes in technology and the composition of defense trade. Civil aircraft and avionics, for example, remained on the U.S. Munitions List (USML) until 1959, when they were placed under Commerce jurisdiction. Today only military and developmental aircraft, as well as inertial navigation systems, remain on the USML.

**Tightened controls.**   During the Carter and Reagan administrations, Congress strengthened munitions export controls in several respects. Through amendments to the AECA, the Department of State assumed the right of prior approval on contract proposals for the sale or production of "Significant Military Equipment" over $14 million. The Department also acquired broad discretionary authority to debar firms from engaging in defense trade. Although many of the most publicized coups of the U.S. Customs Service's Project Exodus involved arrests for diversion of dual-use exports, arrests and convictions for violations of the AECA and the ITAR also rose sharply in the 1980s. ■

# "EMPOWERED OFFICIAL" GUIDELINES

Part 120.1 (b) of the International Traffic in Arms Regulations (ITAR) requires that applications for licenses or other approvals submitted to the Office of Defense Trade Controls (DTC) by non-governmental entities must be signed by a "responsible official who is a U.S. person and who has been empowered by the registrant [applicant] to sign such documents"—generally referred to as an "empowered official."

In view of recent changes to the ITAR, the selection of individuals authorized to sign applications, certifications, statements, and other official correspondence for their companies is a matter of considerable importance and one that should not be taken lightly. The issue of who should be permitted to represent their companies in these matters has often been confusing, and in many instances not fully understood. In response to industry requests for a definition of what constitutes an "empowered official," DTC has developed the following guidelines.

WASHAR0003132

For purposes of the ITAR, an "empowered official" is an individual who is a U.S. person (120.23) and:

a.    Is directly employed by the applicant or its subsidiary in a position having the authority for policy and/or management within the applicant organization; and

b.    Is legally empowered in writing by the applicant to sign a license application or other request for approval on behalf of the applicant; and

c.    Is thoroughly informed and familiar with the provisions of the various export control statutes and regulations (including but not limited to the Arms Export Control Act (AECA), Export Administration Act (EAA), International Traffic in Arms Regulations (ITAR), and Export Administration Regulations (EAR)); and

d.    Understands the criminal liability, civil liability, and administrative penalties for violating the AECA and the ITAR; and

e.    Is knowledgeable about (1) the established procedures and practices of the Office of Defense Trade Controls, (2) the export and import regulations and procedures of the U.S. Customs Service, and (3) the export practices and procedures of the applicant; and

f.    Has the independent authority, before signing an application, to inquire into any aspect of a proposed export or temporary import transaction by the applicant involving defense articles or defense services, and to verify the legality of the transaction and the accuracy of the information required to be submitted to the U.S. Government; and

g.    Has the independent authority to refuse to sign any license application or other request for approval, without prejudice or other adverse recourse, having presented justification to the appropriate corporate official(s).

Applicants who have questions or unique circumstances in these matters should direct their queries to either Rose Biancaniello, Chief, Arms Licensing Division, or Clyde Bryant, Chief, Compliance Analysis Division. ■

# DEPARTMENTS

## PERSONNEL UPDATES

**DTC Growth Continues: More employees on board at DTC.** When the March edition went to press, the Office of Defense Trade Controls had added 12 new, full-time people to its staff, including seven licensing officers, two secretaries, two data entry contractors, and one Deputy Office Director. Since then, six more full-time employees have joined the ranks.

This second group comprises four licensing officers (Carol Basden, Peter Dade, Rob Groesbeck, and Nelson Hines), one compliance special agent (Michelle Becker), and one registration clerk (Susanne Mackie). In addition, six part-time clerk/typists have joined DTC, greatly boosting the office's capacity to handle the millions of sheets of paper and hundreds of thousands of phone calls DTC receives annually.

**Licensing staff more than doubled since January.** Since established January 8, DTC has seen substantial growth throughout the office. The most notable growth, however, has been in the Arms Licensing Division (ALD). In ALD, the working-level licensing staff has grown from nine licensing officers on January 8 to the current staff of 20.

**Personnel profiles.** As a regular feature in each newsletter, the Center profiles several employees. For this edition, we have selected three civilian licensing officers, three military licensing officers, and one registration clerk.

WASHAR0003133

**Carol B. Basden** arrived at the Center March 26 following a 5-year assignment in the Bureau of Export Administration at the Department of Commerce. At Commerce, Basden served as an export administration specialist and licensing officer, reviewing export applications for computers and related equipment. After spending the first 2 months at DTC rotating through the Licensing Division, Basden is now settling into her job as the licensing officer for specific Category VIII items. In this post, Basden will exercise licensing authority for helicopters, nonexpansive balloons, drones, cartridge-activated devices, and inertial navigation systems.

**Peter L. Dade** joined the Center June 4 to fill a licensing officer position. Dade previously spent 5 years in the Office of Freedom of Information as a paralegal specialist. His experience in Freedom of Information Act case processing, especially the extensive coordination with other bureaus and government agencies, will transfer directly to his new duties. After completing an initial familarization period, Dade is scheduled to handle Categories I, Firearms, and III, Ammunition and Ammunition Producing Equipment.

**Terry L. Davis** came to the Center March 15. He brings with him 9 years of experience as an analyst in Defense and International Affairs for the U.S. General Accounting Office (GAO). At GAO, Davis specialized in reviewing both Department of State programs and U.S. Navy tactical and strategic missile programs. He is also a 1988 graduate of the Naval War College. At DTC, Davis exercises licensing authority for two categories: Category IV, Launch Vehicles, Guided Missiles, Ballistic Missiles, Rockets, Torpedoes, Bombs, and Mines; and Category XIV, Chemical and Biological Agents.

**MAJ Mike Van Atta** reported to the Center February 23 after serving as an independent Army evaluator at the Operational Test and Evaluation Agency (OTEA). Van Atta has one of the broadest backgrounds possible for an Army officer. He served as an enlisted Marine during the Vietnam war, completed a bachelors degree after discharge, and received his commission in 1974. He has held both command and staff positions in Infantry, Armor, and Engineer units. He is also a qualified acquisition program manager and graduate of the Military Acquisition Manager's course. Van Atta possesses direct operator knowledge of most currently-fielded Army systems and is the Center's technical expert for such systems. He currently acts as half of the two-man Commodity Jurisdiction licensing team.

**MAJ Marsha F. Filtrante** came to the Center February 28 from a 4-year tour with the U.S. Army Aviation Systems Command (AVSCOM). There, she served in assistant program manager positions for both the UH-60 Black Hawk Office and the Light Helicopter Program (LHX). Filtrante served in the U.S. Navy from 1967-1970 and completed her bachelors degree prior to commissioning in 1976. She has direct experience in training centers, and positions in Transportation and Aviation units. Like Van Atta, Filtrante is a qualified acquisition program manager and graduate of the Military Acquisition Manager's course. A 1979 graduate of the Rotary Wing Officer Course, she is rated in UH-1H, CH-47 A-C, and OH-58 A-C military helicopters. At DTC, she currently works as a public affairs licensing officer, formulating ideas for Defense Trade News, as well as organizing, editing, and overseeing publication and distribution of the newsletter. Filtrante also provides DTC with in-house rotary wing technical expertise.

**LCDR Nelson R. Hines** reported to DTC March 27 as the last of six military officers detailed to the Center. His most recent assignment was as the combat systems officer onboard the USS King (DDG-41), a guided missile destroyer homeported at Norfolk, VA. During that tour, Hines qualified for command of surface ships at sea. Other tours include: weapons officer on the USS Edson

WASHAR0003134

(DD-946), main propulsion assistant onboard USS Dahlgren (DDG-43), and ordnance/fire control officer of the USS Estocin (FFG-15). During his 10 years of consecutive sea duty, he gained hands-on expertise in all facets of anti-air, anti-surface and anti-submarine warfare. LCDR Hines served in the U.S. Marine Corps 1970-1974, and completed his bachelors degree in 1977. He currently serves as a licensing officer, handling Technical Assistance Agreements (TAAs) and Manufacturing License Agreements (MLAs).

**Susanne Blanchette Mackie** started work at DTC May 7 as a registration clerk. A Bethesda, MD native, she is in her senior year as an undergraduate at George Washington University (GWU). She will be entering medical school at GWU in the fall of 1991. Mackie previously worked for the National Institute of Health (NIH). ■

# TIPS AND TIDBITS

### DSP-83 Requirements

An original, signed Nontransfer and Use Certificate, Form DSP-83 is required with submissions to DTC of DSP-5s, DSP-85s (permanent export), Agreements (AGs), and Advisory Opinions (GCs) for:

• unclassified Significant Military Equipment (SME) as defined in ITAR 120.19 (identified throughout the ITAR by an asterisk);
• any classified defense articles or technical data;
• transfer of technical assistance or manufacturing know-how, which relates to SME, classified technical data, or classified defense articles;
• permanent retention or retransfer of SME or classified articles, which were previously approved for export on a DSP-73, DSP-5, or an agreement.

In addition, a DSP-83 may be required at the discretion of a DTC licensing officer for the export of any other defense article or service. A DSP-83 may follow the initial submission to DTC if the applicant includes a statement outlining the reasons for separate DSP-83 submission, and the reason is acceptable to the licensing officer. When appropriate, DSP-83s should be signed by the foreign con-

signee, foreign end-user, or foreign government. In all cases, the DSP-83 must be signed on the reverse by the applicant.

### Mailing Point of Contact

Unfortunately, the Center for Defense Trade cannot afford to mail separate copies of Defense Trade News to different parts of the same company. Starting with the September issue, we will mail the newsletter to only the registered point of contact (POC) at each company, allowing this POC to determine distribution within the organization. Thank you in advance for your understanding and assistance.

### Clearing Academic Materials for Public Release

The Departments of State and Defense agreed in 1986 on procedures to publicly release ITAR-controlled technical data. The Office of Assistant Secretary of Defense, Public Affairs, Directorate for Freedom of Information and Security Review (DFOISR) will accept and review technical data that was generated under other than DOD

WASHAR0003135

contract. DFOISR will conduct those reviews and make its determinations in accordance with the same criteria applied to proposed public releases of technical data under Section 1217 of Public Law 98-94 and appropriate DOD directives.

U.S. persons who propose to present a paper or make an oral presentation that includes ITAR-controlled technical data, at either an open international society meeting abroad or at an open conference in the United States, should submit those papers/presentations to DFOISR.

If DFOISR approves the material for public release, DTC will consider the material to be exempt from licensing requirements pursuant to ITAR Section 125.4(b) (13). Submit formal requests and five legible copies of all materials to: OASD (PA)/DFOISR, Room 2C757, The Pentagon, Washington, D.C. 20301-1400.

## SSNs and DOBs

The Office of Defense Trade Controls has amended its instructions to those individuals, companies, or other legal persons registering with DTC as manufacturers or exporters of defense articles or services per ITAR Part 122.

Effective immediately, information in block 7 of the "Application for Registration" (Form DSP-9) should include the dates of birth and Social Security numbers of principal executive officers, partners, and owners in addition to their names, home addresses, positions, and whether or not the officer is a U.S. person as defined in 120.23.

**Note:** This applies only to new DSP-9 submissions; current registrants will supply this information during registration renewal.

## Offices of Defense Cooperation

If your company is contemplating entering into a joint venture with a foreign company, bidding on a foreign procurement, or doing any foreign defense business abroad, remember to consult the U.S. Embassy in that country first. The Offices of Defense Cooperation (ODC) and the economic and commercial officers in most embassies can provide information that could make your goal much easier to achieve. During a recent trip to Europe, Defense Trade Policy personnel found the ODCs and embassy officers ready, willing, and able to help you avoid pitfalls. Take advantage of these valuable resources.

## New DTC ZIP Code: 20522-0602

Please use ZIP code 20522-0602 when mailing to the Office of Defense Trade Controls (DTC). Using the new ZIP code allows faster sorting and automated handling by newly installed postal equipment. See the inside cover, for additional addresses and other information. ■

Department of State Publication 9783
Bureau of Politico-Military Affairs

*Released June 1990*

WASHAR0003136

# READER QUESTIONNAIRE

Dear Reader,

Please give us your opinion. We'd like to know if you find Defense Trade News interesting and informative. Complete this survey and return as soon as possible.

1. My interest in defense trade is: _____ manufacturing _____ exporting _____ attorney

   _____ embassy _____ customs _____ armed forces _____ other U.S. Government

   _____ consultant _____ other (specify) _____

2. How many articles do you read in each issue?

   _____ All _____ Almost All _____ More than Half _____ Less than Half _____ None

3. Rank the following article topics according to your interest:

   1 Much Interest  2 Some Interest  3 Slight Interest  4 No Interest

   _____ DEFENSE TRADE POLICY _____ TRADE LEGISLATION _____ CALENDAR OF EVENTS

   _____ CUSTOMS NEWS _____ PERSONNEL INFO _____ COMMODITY JURISDICTION

   _____ COMPLIANCE CASES/TIPS _____ LETTERS TO THE EDITOR _____ OTHER _____

   _____ DTC DEVELOPMENTS _____ WORKLOAD REDUCTION _____

   _____ LICENSING TIPS _____
                                                         (Specify)

4. Articles are generally: _____ too long _____ too short _____ about right

5. I have an article idea: _____

   _____

   _____

   _____

   _____

6. Rate Defense Trade News on each of the following categories:

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Your Overall Opinion | _____ | _____ | _____ | _____ |
| Writing Style/Reading Ease | _____ | _____ | _____ | _____ |
| Content | _____ | _____ | _____ | _____ |
| Appearance | _____ | _____ | _____ | _____ |
| Usefulness | _____ | _____ | _____ | _____ |

7. This is a quarterly publication (Mar, Jun, Sept, Dec).

   This is: _____ too frequent _____ about right _____ too infrequent

8. If Defense Trade News became available by subscription through the Government Printing Office, I would subscribe. _____ Yes _____ No

COMMENTS:

WASHAR0003137

Tape Edge before Mailing

Fold on line

FIRST
CLASS
POSTAL
STAMP

PM/DTC, SA-6, Room 228
ATTN: Defense Trade News
Office of Defense Trade Controls
Bureau of Politico-Military Affairs
U.S. Department of State
2201 C Street N.W.
Washington, D.C. 20522-0602

Tape Edge Before Mailing

WASHAR0003138

WASHAR0003139

WASHAR0003140

WASHAR0003141

DEFENSE TRADE NEWS
United States Department of State
Washington, D.C. 20522-0602

OFFICIAL BUSINESS

PENALTY FOR PRIVATE USE $300

Address Correction Requested

BULK RATE
POSTAGE & FEES PAID
U.S. Department of State
Permit No. G–130

| | |
|---|---|
| **From:** | Paul, Joshua M <PaulJM@state.gov> |
| **Sent:** | Wednesday, September 21, 2016 1:52 PM |
| **To:** | Rajgopal, Pavan <RajgopalP@state.gov>; Heidema, Sarah J <HeidemaSJ@state.gov>; Aguirre, Lisa V <AguirreLV@state.gov>; Monjay, Robert <MonjayR@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| **Cc:** | PM-CPA <PM-CPA@state.gov>; Nilsson, Brian H <NilssonBH@state.gov>; PM-DTCP-Tasking-DL <PM-DTCP-Tasking-DL@state.gov> |
| **Subject:** | RE: CPA Media Monitoring: Bloomberg: If Printing Guns Is Legal, So Is Publishing Plans |

+Others

This email is UNCLASSIFIED.

**From:** Rajgopal, Pavan
**Sent:** Wednesday, September 21, 2016 1:50 PM
**To:** Heidema, Sarah J; Aguirre, Lisa V; Monjay, Robert; Rogers, Shana A
**Cc:** PM-CPA; Nilsson, Brian H
**Subject:** CPA Media Monitoring: Bloomberg: If Printing Guns Is Legal, So Is Publishing Plans



**If Printing Guns Is Legal, So Is Publishing Plans**
**Noah Feldman**
**Bloomberg View**
**September 21, 2016**

Can the government block the online publication of files that let anyone make an assault rifle on a 3-D printer? In a defeat for free speech and a win for gun-control advocates, an appeals court has said yes. The court declined to suspend a State Department regulation that treats posting the files as a foreign export of munitions. Although the impulse to block the easy creation of untraceable weapons is admirable, the court got it wrong. The First Amendment can't tolerate a prohibition on publishing unclassified information -- even if the information is potentially harmful.

Defense Distributed is a nonprofit group devoted to "promoting popular access to arms guaranteed by the United States Constitution." It wants to distribute free online the computer-aided design and text files that would enable anyone with access to a 3-D printer or a computerized mill to make the crucial component of an AR-15 rifle, the semi-automatic version of the military's M16.

It's not a fantasy. Defense Distributed has already given away files that allow a user to print a single-shot pistol called the Liberator. And the lower receiver of an AR-15 -- the indispensable, regulated part of the gun that bears its serial number -- can be made totally functional in plastic. Thus, the CAD files would allow anyone with a 3-D printer to make an untraceable AR-15.

It's legal right now for Americans to 3-D print weapons, including the AR-15. And it would almost certainly be legal for Defense Distributed to hand out its files to Americans within the U.S. But the organization wants to post the files online for easier distribution.

WASHAR0003143

That brought the attention of the State Department, which is in charge of regulating U.S. arms sales abroad under the Arms Export Control Act. The department says the files are technical data relating to items on the U.S. Munitions List, which cannot be "exported" abroad in the form of online posting without the department's approval.

Defense Distributed sued, joined by the Second Amendment Foundation. It asked a federal district court to issue a preliminary injunction that would bar the State Department from enforcing its regulations against the posting of the files.

In essence, the gun-rights advocates say that the State Department regulations amount to what's called a "prior restraint" on speech -- a ban on talking before you've even said anything. Prior restraints are profoundly disfavored in First Amendment law as a barrier to the free flow of ideas.

The district court refused to issue the injunction -- and on Tuesday a divided panel of the U.S. Court of Appeals for the 5th Circuit issued an opinion upholding the district court's decision.

The appeals court's reasoning was basically that, at the preliminary injunction stage, a court needs to weigh the potential irreparable harm to the party seeking the injunction against the public interest on the other side. The panel concluded that the district court didn't abuse its discretion in concluding that the State Department's public interest in avoiding the export of technology for untraceable weapons is more important than the free-speech rights of Defense Distributed.

The court acknowledges that denial of First Amendment rights is usually such an important interest that it would trump almost any other. But it said "that is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security."

Weighing the relative interests, the panel then said that if Defense Distributed eventually wins its case, it will be able to post the files online having suffered only the temporary harm of delay. But it said the government's interest in preventing publication before an eventual judicial decision is greater, because once the files are available online, the cat can't be put back in the bag -- the information will be out there.

That sounds superficially convincing. But it really isn't. It's totally unreasonable that information that could be made legally available within the U.S. to American citizens can't be posted online because it counts as an "export" for purposes of regulation. Even if that were the meaning of the State Department regulation, it would violate the First Amendment as a content-based regulation on speech.

The government is allowed to prohibit speech on the basis of content only when there is a compelling government interest and the law is narrowly tailored to achieve it. Conceivably there might be a compelling interest in prohibiting the publication of some technical information that allows the creation of weapons, such as a recipe for building a nuclear bomb. But plenty of information about building serious weapons already exists in the world -- weapons as dangerous as an unregistered and untraceable AR-15.

What's more, Congress in its wisdom hasn't prohibited Americans from making their own AR-15 parts at home. The fact that the conduct is legal is an overwhelming reason to conclude that directions on how to do it can't be prohibited without violating freedom of speech.

Judge Edith Jones said as much in dissent. I don't agree with Jones, a Ronald Reagan appointee, that often, but when you're right, you're right. She pointed out that the panel never squarely addressed the question of Defense Distributed's likelihood of success on the merits in upcoming litigation.

When free-speech rights are in the balance, a long delay in publication is as good as the denial of the First Amendment. Defense Distributed has already been prohibited from speaking for three years.

WASHAR0003144

To be sure, I don't like what Defense Distributed is planning to say. Giving out the recipe for making untraceable weapons can't be good for the world. But not every potential wrong can be repaired by invoking national security and suppressing speech -- not so long as we have the First Amendment.

_____

**Pavan Rajgopal**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

☎ Phone:        202.647.6968

✉ e-mail:       ___*RajgopalP@state.gov*___ | ✍ Web: ___*www.state.gov/t/pm /*___ |Twitter: ___*@StateDeptPM*___

Stay connected with *State.gov*:



This email is UNCLASSIFIED.

| From: | Paul, Joshua M <PaulJM@state.gov> |
|---|---|
| Sent: | Friday, January 26, 2018 12:29 PM |
| To: | Marquis, Matthew R <MarquisMR@state.gov>; PM-DTCP-RMA <PM-DTCP-RMA@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; Miller, Michael F <Millermf@state.gov>; Rogers, Shana A <RogersSA2@state.gov> |
| Subject: | RE: CPA Media Monitoring: Guns America: Supreme Court Rejects 3-D Printed Gun Case |

+Shana

**From:** Marquis, Matthew R
**Sent:** Friday, January 26, 2018 12:28 PM
**To:** PM-DTCP-RMA
**Cc:** PM-CPA; Miller, Michael F
**Subject:** CPA Media Monitoring: Guns America: Supreme Court Rejects 3-D Printed Gun Case



**Supreme Court Rejects 3-D Printed Gun Case**
**By Jordan Michaels**
**25 January 2018**

The U.S. Supreme Court declined to hear a case earlier this month involving 3-D printed gun instructions that would have had far-reaching implications for both First and Second Amendment rights. The case will now be sent back to the Fifth Circuit Court to be heard on its merits.

In the case, Defense Distributed v. State, the State Department ordered a Texas-based non-profit called Defense Distributed to remove a file from its website that contained instructions for printing a .380-caliber single-shot pistol.

Defense Distributed and its owner, Cody Wilson, sued the State Department for what they said was a violation of the company's First and Second Amendment rights. The computer-aided design (CAD) file constitutes free speech, Wilson argued, and the manufacture of a pistol is protected by the 2008 Heller decision.

In their letter to Defense Distributed, the State Department claimed that the instructions could be "ITAR-controlled technical data" released "without the required prior authorization" from the State Department, according to a report from Reason.com. ITAR stands for "International Traffic in Arms Regulations," a set of policies that govern the import and export of munitions.

Whether CAD files fall under the State Department's jurisdiction or First Amendment protections would have profound implications for the future of 3-D printing technology.

Wilson's opponents worry that allowing the free promulgation of 3-D printed gun instructions will cause the widespread use of untraceable plastic guns by criminal elements. Plastic guns, while fragile, are also immune to metal detectors. The only security measures in place at many locations.

It may be too late, however. Defense Distributed's design files were downloaded over 100,000 times in the two days after it was posted. And the blueprints can still be found online. Even if posting gun-related CAD files becomes illegal, it may be impossible to regulate them effectively.

WASHAR0003146

While SCOTUS declined to hear this case, they'll likely be forced to rule on CAD files at some point in the future. Kelsey Wilbanks, a lawyer at the Virginia-based firm Smith Pachter McWhorter PLC, notes that if the Court designates CAD files as a form of speech, the government will be restricted in its ability to regulate their publication.

"Every 3-D-printable object in its CAD file form would be subject to constitutional scrutiny," she says. "Beyond guns, for instance, the U.S. Food and Drug Administration would be restricted in its ability to regulate CAD files for a pharmaceutical drugs or prosthetic body parts."

If, on the other hand, the Court does not designate CAD files as speech, those files could be regulated in the same manner as the object they digitally embody.

"In that event, operators might be reluctant to post certain CAD files for fear they could be considered weapons under ITAR, or even CAD files subject to other regulatory schemes," she said. "This could inhibit innovation and open sharing."

Link: https://www.gunsamerica.com/blog/supreme-court-rejects-3-d-printed-gun-case/

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:        *MarquisMR@state.gov* |   Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

| From: | Marquis, Matthew R <MarquisMR@state.gov> |
|---|---|
| Sent: | Thursday, July 26, 2018 2:38 PM |
| To: | PM-DTCP-RMA <PM-DTCP-RMA@state.gov>; Legal-PM-DL <Legal-PM-DL@state.gov> |
| Cc: | PM-CPA <PM-CPA@state.gov>; PM-DDTC-Directors-DL <PM-DDTC-Directors-DL@state.gov>; Miller, Michael F <Millermf@state.gov> |
| Subject: | CPA Media Monitoring: Huffington Post: Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun' |
| Attach: | Brady Motion to Intervene filing and NOA-20180726T183612Z-001.zip |



**Gun Safety Groups Race To Stop Company From Unleashing 'The Age Of The Downloadable Gun'**
**By Nick Wing**
**26 July 2018**

**CPA Note: Legal filings attached as .zip file**

The nation's leading gun safety groups are asking a judge to block an online company's plan to publish downloadable blueprints for 3D-printed plastic firearms, information that they say would open the door for people to secretly produce fully functional, untraceable weapons.

In a Thursday filing in the U.S. District Court for the District of Western Texas, the organizations questioned the federal government's recent decision to settle a lawsuit with Defense Distributed. The settlement allows the Texas-based digital firearms nonprofit company to post its controversial gun blueprints online, which it will begin doing on Aug. 1, according to the Defense Distributed website.

Defense Distributed celebrated the decision, saying it would soon bring upon the "age of the downloadable gun." But in a letter to the judge this week, gun safety groups called the agreement "troubling," "dangerous" and "potentially illegal," while claiming it could have a "significant and permanent impact" on national security and public safety. The three organizations — the Brady Center to Prevent Gun Violence, Everytown for Gun Safety and Giffords Law Center to Prevent Gun Violence — are now seeking an emergency injunction to halt the publication of the blueprints. They want the court to have additional time to consider their concerns. A hearing is reportedly scheduled for Thursday afternoon.

In recent years, gun violence prevention advocates and lawmakers have raised fears about the rise of so-called "ghost guns" — homemade, often meticulously manufactured plastic or metal firearms made without serial numbers. As 3D printing technology becomes more widely accessible, they worry that this ghost gun ecosystem will only grow. And with advances in printing materials and an ever-expanding library of gun blueprints just a click away, they say the line between homemade firearms and professionally manufactured ones could become increasingly indistinct.

When police find guns at a crime scene, the Bureau of Alcohol, Tobacco, Firearms and Explosives can typically trace an attached serial number on the firearm back to a federally licensed dealer. This can help authorities identify suspects, crack down on bad actors and glean other vital information about how guns end up in the hands of criminals. But with ghost guns, there's no method of tracking and no way to deny a purchase by a prohibited individual because there's no point of sale.

Thursday's court filing request marks the latest chapter in a legal saga that began in 2013 when Defense Distributed founder and self-described anarchist Cody Wilson shot his way into headlines with a YouTube

video. In the video, he shows off "the Liberator," a single-shot .380 caliber handgun made almost entirely of 3D-printed plastic.

A Liberator pistol appears on July 11, 2013 next to the 3D printer on which its components were made. The single-shot handgun was the first firearm made entirely with plastic components forged with a 3D printer and computer-aided design (CAD) files downloaded from the Internet.

The Liberator may look like a gun best suited for a Lego man, but it has since been shown to be able to fire a number of rounds without failing, so long as it's printed with a strong plastic. Months after Wilson released his video, Israeli reporters smuggled a weapon based on his design through a metal detector and into an event featuring Prime Minister Benjamin Netanyahu. Although the Liberator contains a small strip of metal — which Wilson included to make it compliant under a U.S. law banning undetectable firearms — the journalists were reportedly able to get it through unnoticed.

With media outlets around the world covering the Liberator, it quickly caught the government's attention. The State Department took action against Wilson in 2013, accusing him of violating arms export control laws by releasing "technical data" related to prohibited munitions. It demanded that he take down blueprints for the Liberator and nine other firearms posted on the Defense Distributed website. By the time Wilson complied, more than 100,000 people had already downloaded the files, ensuring that they'd live on forever in darker corners of the web.

In 2015, Wilson sued the State Department, claiming the motion against him had violated his First Amendment right to free speech. At first, Wilson appeared to be facing an uphill battle. Federal courts batted down his team's request for a preliminary injunction against the State Department in 2015. The case was eventually kicked up to the Supreme Court, where it was denied earlier this year. As recently as April, the government seemed prepared to see their defense through.

Then late last month, the feds changed course, entering into a settlement with Defense Distributed that said the company could post its gun blueprints online after all. The government also agreed to reimburse Defense Distributed for nearly $40,000 in legal fees.

In the settlement, lawyers for the Justice Department said that under a recent proposal to loosen foreign arms trafficking regulations, Wilson's "technical data" — in this case, computer-aided design models of firearms — would be exempted from stricter licensing requirements.

But gun safety groups have raised issue with that claim. Although the Trump administration published notice of the proposed rule change in May, the groups point out it hasn't officially gone into effect yet.

This discrepancy is an example of the administration "putting the cart before the horse," Avery Gardiner, co-president of the Brady Campaign, told HuffPost. She also raised broader questions about the nature of the settlement, saying the government had done "a complete about face." It didn't solicit input from any gun safety group before making the decision, Gardiner added, saying it has yet to offer a detailed explanation for what prompted the shift.

The State Department has said little publicly about the settlement, except to note that it was voluntary and agreed upon by both parties. Neither Defense Distributed nor the law firm representing the company immediately responded to HuffPost's request for comment.

Shortly after the settlement was announced, the Brady Campaign filed a Freedom of Information Act, hoping to get additional details about the reversal. But those documents likely won't be returned until after Defense Distributed reposts the blueprints online, at which point the gun safety groups say the potential damage would be "irreparable."

"Part of what we're asking the judge to do is to keep the status quo as it is until we can get more information

WASHAR0003149

about what caused the government to change its mind and to see if that's proper," said Gardiner.

"This isn't the way we're supposed to govern," she added. "We're supposed to govern by having open and transparent processes."

Ghost gun technology has evolved rapidly since the early days of Wilson's Liberator. Defense Distributed has already developed schematics for an AR-15 — or technically for each of the dozens of components needed to construct one of the semi-automatic rifles — which they intend to make available to the public. With these blueprints, anyone with a 3D printer and the ability to follow directions could build their own military-style rifle without anyone else's knowledge.

The surreptitiousness of DIY gunsmithing is a draw for some firearms enthusiasts. Defense Distributed has profited off and propelled the practice by selling a $1,500 "Ghost Gunner" milling machine that can be programmed to construct individual firearm components out of metal to be assembled by the user.

With conventional firearms already being so easy to get ahold of in the U.S., whether legally or illegally, concerns about 3D-printed ghost guns may not be at the forefront of many people's minds. 3D printers are still expensive, and models capable of printing a functional gun can range from several thousand dollars to more than $500,000. Although that may be a deterrent now, Wilson has said his ultimate vision is to develop blueprints that will deliver working firearms even on the cheapest 3D printers.

"Anywhere there's a computer and an Internet connection, there would be the promise of a gun," he told Forbes in 2012.

That prospect has raised alarm among gun safety groups and law enforcement alike. So far, these weapons rarely factor into crimes. Although, they have been used in a few deadly shootings, including one by a convicted felon in California who otherwise would have been barred from purchasing guns through legal channels.

Unfettered access to 3D-printed gun blueprints could also have much broader implications overseas, the gun safety groups say, where people could use them to circumvent tougher gun laws or establish another arms pipeline to criminals or terrorists.

Wilson meanwhile seems to be reveling in the idea that his campaign could disrupt efforts to regulate firearms in the U.S. and abroad. In a tweet after the announcement of the settlement this month, he appeared to celebrate the death of "American gun control."

Wilson later told Wired that he was on the verge of unleashing a "Cambrian explosion" of digital content related to firearms. He hoped it could extinguish the current youth-led movement for stronger gun laws that emerged in response to routine gun violence and high-profile mass shootings in places like Las Vegas or Parkland, Florida.

"All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable," Wilson said. "No amount of petitions or die-ins or anything else can change that."

Over the past few days, congressional lawmakers have called for hearings on 3D-printed guns, as well as new legislation to block the release of Wilson's blueprints. At a Senate hearing on Wednesday, Secretary of State Mike Pompeo said he'd "take a look" at his department's policy on sharing that sort of data.

But with Aug. 1 rapidly approaching, Gardiner said she's worried the time to act is running out.

"We need to block this settlement from going into effect so that Congress can hold hearings and do its job as a check on the executive branch," said Gardiner. "It's unlikely that this all gets figured out and resolved unless

WASHAR0003150

there's a delay of the settlement going into effect."

Link: https://www.huffingtonpost.com/entry/3d-printed-guns-lawsuit_us_5b589e43e4b0de86f4929ea8?qp

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:        202.647.6968
e-mail:       *MarquisMR@state.gov* |   Web:  *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING JOINT EMERGENCY MOTION FOR LEAVE TO
INTERVENE BY THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

The Court, having considered The Brady Campaign to Prevent Gun Violence, Everytown

for Gun Safety Fund Action, Inc., and Giffords' Joint Emergency Motion for Leave to Intervene

finds that Intervenor's motions should be GRANTED.

IT IS SO ORDERED that:

The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Fund Action,

Inc., and Giffords are Granted leave to intervene.

The Court Orders the clerk to file the original attachment, Complaint in Intervention.

_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

WASHAR0003152

# Exhibit B

WASHAR0003153

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED, SECOND<br>AMENDMENT FOUNDATION, INC., and<br>CONN WILLIAMSON,<br><br>    Plaintiffs,<br><br>BRADY CAMPAIGN TO PREVENT GUN<br>VIOLENCE, EVERYTOWN FOR GUN<br>SAFETY ACTION FUND, INC., and<br>GIFFORDS,<br><br>    Plaintiffs-Intervenors,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>STATE; MICHAEL R. POMPEO, in his<br>official capacity as Secretary of State;<br>DIRECTORATE OF DEFENSE TRADE<br>CONTROLS,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO: 1:15-cv-372-RP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT IN INTERVENTION**

WASHAR0003154

Plaintiffs-Intervenors Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety Action Fund, Inc., and Giffords (hereinafter "Intervenors") submit this Complaint in Intervention and allege, upon information and belief, the following:

## INTRODUCTION

1.      "At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability." Defendants' Motion to Dismiss Second Amended Complaint at 1, filed Apr. 6, 2018 (ECF No. 92) ("Motion to Dismiss").

2.      Defense Distributed develops Computer Aided Design ("CAD") files for the purpose of enabling anyone to automatically manufacture guns on 3-D printers. The company's stated objective is to ensure global, unrestricted access to firearms by postings its files online. Due to the Government's recent about-face in this case, Defense Distributed is set to do just that:



WASHAR0003155

3.      According to the Government's previous submissions to this Court, making

Defense Distributed's CAD files "available online through unrestricted access to the Internet

would provide any [terrorist organization] with defense articles, including firearms, at its

convenience, subject only to its access to a 3D printer, an item that is commercially available.

Terrorist groups and other actors could then potentially manufacture and use such weapons

against the United States or its allies." Declaration of Lisa V. Aguirre, ¶ 35(b), Exhibit A to

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015

(ECF Nos. 32, 32-1) ("Aguirre Decl.").

4.      As recently as April of this year, the Government stressed to this Court the

potentially devastating national security implications if Defense Distributed's files were made

available online.  The Government represented to this Court that the CAD files at issue "can

unquestionably facilitate the creation of defense articles abroad" and that "the Department of

State has consistently and reasonably concluded that it is not possible to meaningfully curtail the

overseas dissemination of arms if unfettered access to technical data essential to the production

of those arms is permitted." Motion to Dismiss at 3,7.

5.      However, mere weeks after the Government urged this Court to dismiss this

lawsuit citing the national security concerns raised by the possibility of foreign nationals or

terrorists acquiring the Plaintiffs' CAD files, they offered a settlement agreement to the Plaintiffs

(the "Settlement Agreement") which gave the Plaintiffs everything they asked for, and more.

6.      Pursuant to the terms of the Settlement Agreement, in exchange for dismissing the

lawsuit, the Government has agreed to: (i) draft and fully pursue a notice of rulemaking and a

final rule to remove the files at issue from the jurisdiction of the International Traffic in Arms

Regulations ("ITAR"); (ii) temporarily modify Category I of the United States Munitions List

WASHAR0003156

("USML") to exclude the files at issue from ITAR; (iii) issue a letter to the Plaintiffs that their files are exempt from ITAR; (iv) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue; and (v) pay the Plaintiffs almost $40,000.

7.      As a direct consequence of the Settlement Agreement, Defense Distributed has announced that it will relaunch its repository of files on August 1, 2018.  According to news reports, in addition to the older gun models, the Defense Distributed website will contain a repository of firearm blueprints for "more exotic DIY semi-automatic weapons." "The relaunched site will be open to user contribution, too; [founder Cody] Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable." According to Wilson: "What's about to happen is a Cambrian explosion of the digital content related to firearms." Wilson says: "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable . . . No amount of petitions or die-ins or anything else can change that."



WASHAR0003157

8.      The Government entered into the Settlement Agreement in contravention of the statutes and regulations which govern the export designation process. Among other things, upon information and belief, the State Department: (i) has not provided the relevant Congressional committees with the 30 days-notice to "temporarily" modify the munitions lists; (ii) has not received the concurrence of the Secretary of Defense to "temporarily" change the designation of the files at issues; and (iii) has not followed established commodity jurisdiction procedures before agreeing to temporarily exempt the CAD files at issue from ITAR.

9.      The "temporary modification" of USML Category I is especially troubling because it involves making Defense Distributed's files available on the internet, which largely overrides the later need to formally modify the relevant rules. Moreover, the Settlement Agreement covers not only the files that were developed by Defense Distributed at the beginning of this litigation, but also new files that have been developed since that time – which the Government has presumably not even seen.

10.      In addition, the Government has acted in an arbitrary and capricious manner, and has abused its discretion, by (i) failing to consider evidence relevant to ITAR jurisdiction over the CAD files; (ii) drastically changing long-established practice and policy without any explanation; and (iii) failing to study the national security implications of exempting the CAD files from ITAR. The Settlement Agreement does not make any reference whatsoever to a determination by the Government regarding the national security implications of the agreement.

11.      Tellingly, even the notices of proposed rules, which the Departments of State and Commerce published on May 24, 2018 to amend the ITAR, make no mention of the dangers posed by the files falling into the hands of terrorist organizations, insurgent groups, transnational organized criminal organizations, or states subject to the U.S. or U.N. arms embargoes.

WASHAR0003158

12. For all these reasons, and others detailed below, the Government Defendants have violated the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers. This complaint seeks to declare the Settlement Agreement invalid, and to enjoin the Plaintiffs and Government Defendants from giving effect to the agreement, to the extent it permits Defense Distributed to make its files available online.

## JURISDICTION AND VENUE

13. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 2201 and 2202.

14. Venue is premised on the principal place of business for Plaintiff Defense Distributed, which is located within the Western District of Texas.

## PARTIES

15. Plaintiff Defense Distributed is a Texas corporation, whose principal place of business is located in Austin, Texas. Defense Distributed develops CAD files to enable anyone to automatically manufacture firearms on 3-D printers. The company also manufactures and sells a "computer-controlled milling machine" called the "Ghost Gunner," which is "designed to allow its owner to carve gun parts out of [ ] aluminum." Defense Distributed is a party to the Settlement Agreement.

16. Defense Distributed was started by Cody Wilson, a self-proclaimed anarchist, who believes that "governments should live in fear of their citizenry." The company's objective is for everyone in the world to have access to guns and to make gun regulations impossible. After publicizing the Settlement Agreement, Wilson said that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun Control."

WASHAR0003159

17.     Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington.  It is a party to the Settlement Agreement.  In a press release announcing the settlement, SAF founder Alan M. Gottlieb declared it to be "a devastating blow to the gun prohibition lobby[.]"

18.     Upon information and belief, Conn Williamson is a natural person and a citizen of the United States and the State of Washington.  He is a party to the Settlement Agreement.

19.     Defendant the United States Department of State   ("State Department") is an executive agency of the United States government responsible for administering and enforcing the ITAR under the authority of the Arms Export Control Act ("AECA").   The State Department is a party to the Settlement Agreement in this case.

20.     Defendant Michael R. Pompeo is sued in his official capacity as the Secretary of State.  In this capacity, he is responsible for the operation and management of the United States Department of State, and this includes the operation and management of the Directorate of Defense Trade Controls ("DDTC") and administration and enforcement of the ITAR.   The Secretary of State is a party to the Settlement Agreement in this case.

21.     Defendant DDTC is a subordinate unit within the Department of State Bureau of Political and Military Affairs responsible for administering and enforcing the ITAR. The DDTC is a party to the Settlement Agreement in this case.

22.     Plaintiff-Intervenor the Brady Campaign to Prevent Gun Violence ("The Brady Campaign") is a nation-wide gun violence prevention organization with members spread across all fifty states and the District of Columbia, and established membership groups in Austin, TX and Houston, TX. The Brady Campaign is headquartered in Washington, DC and was founded in

WASHAR0003160

1974 as the National Council to Control Handguns. The Brady Campaign took its current name in 2001, in honor of former White House Press Secretary Jim Brady, who was shot during the assassination attempt on Ronald Reagan, and his wife Sarah Brady.

23.     The Brady Campaign seeks a safer future for every American where hundreds of gun injuries and deaths a day are no longer normal. It focuses on three impact-driven solutions to further its mission of reducing gun deaths: 1) Strengthening gun laws, with a particular focus on the national background check system; 2) reducing the flow of crime guns to urban communities most impacted by gun violence; and 3) meaningfully communicating to gun owners about the dangers of loaded, unlocked guns in the home. The Brady Campaign's sister organization, The Brady Center to Prevent Gun Violence, is a non-profit organization dedicated to reducing gun violence through education, research, and direct legal advocacy on behalf of victims and communities affected by gun violence.  It filed an amicus brief in this case on February 18, 2016. In addition, the Brady Campaign and Brady Center submitted comments to the proposed rule changes implicated in the Settlement Agreement. The Brady Campaign also filed a Freedom of Information Act request with the federal government immediately upon learning of the Settlement Agreement.

24.     Plaintiff-Intervenor Everytown for Gun Safety Action Fund, Inc. is a nation-wide gun violence prevention organization, with members spread across all fifty states.  Everytown is headquartered in New York, NY. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Connecticut.  Currently, the mayors of 8 Texas cities are part of the Mayors Against Illegal Guns

WASHAR0003161

Case 1:15-cv-00372-RP   Document 96-2   Filed 07/29/19   Page 10 of 29

coalition. Everytown and its members and supporters work in all 50 states and in Congress to support the passage and enforcement of gun safety laws that, among other things, help keep guns out of the hands of prohibited persons and other individuals with dangerous histories and help law enforcement apprehend and prosecute those who violate U.S. and state gun laws. Immediately upon learning of the Settlement Agreement in this case, Everytown submitted a federal Freedom of Information Act request seeking disclosure of documents pertaining to the settlement.

25. Plaintiff-Intervenor Giffords is a 501(c)(4) gun violence prevention organization founded by former Congresswoman Gabrielle Giffords and her husband, Captain Mark Kelly, a retired Navy combat veteran and NASA astronaut. Headquartered in Washington, D.C., Giffords researches, writes, and proposes policies that make Americans safer and mobilizes voters and lawmakers in support of safer gun laws. Its mission is to address the issue of gun violence in communities across the country, and to that end, Giffords works to affect legislation, shape the national dialogue, and reduce gun violence. Since its founding after the Sandy Hook Elementary School shooting in Newtown, Connecticut, Giffords has been involved in the passage of more than 200 new strong gun laws in 45 states and Washington, D.C.

26. Giffords and its sister 501(c)(3) organization, Giffords Law Center to Prevent Gun Violence, recently submitted public comments on the proposed rule changes by the State Department and Commerce Department that would deregulate the publication of computerized blueprints for the production 3D printed guns. In that comment, Giffords opined that the proposed changes "would represent a dramatic change in the regulatory structure governing firearm experts," and that they "may not adequately address our national security, foreign policy, international crime, or terrorism threats," and expressed concern that the changes "will result in

WASHAR0003162

an increase in the number of untraceable firearms in circulation." *See* Giffords comment re

Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), *available at*

http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf.

## FACTS

### The Statutory and Regulatory Framework

27.     The Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, authorizes the

President, "[i]n furtherance of world peace and the security and foreign policy of the United

States . . . to control the import and the export of defense articles and defense services."  22

U.S.C. § 2778(a)(1).  The purpose of the AECA is to reduce the international trade in arms and

avoid destabilizing effects abroad through arms exports.  22 U.S.C. § 2751.

28.     Under the AECA, "[t]he President is authorized to designate those items which

shall be considered as defense articles and defense services for the purposes of this section and to

promulgate regulations for the import and export of such articles and services." 22 U.S.C. §

2778(a)(1).  Items designated as defense articles or services constitute the United States

Munitions List ("USML").  *Id.* at § 2778(a)(1).  Category I of the USML lists articles, services,

and related technical data for "Firearms, Close Assault Weapons and Combat Shotguns."

29.     Among other things, Category I of the USML includes all firearms up to .50

caliber, and all technical data directly related to such firearms.  *See* 22 C.F.R. § 121.1(I)(a).

"Technical data" is information that "is required for the design, development, production,

manufacture, assembly, operation, repair, testing, maintenance or modification of defense

articles."  *Id.* § 120.10(a). Technical data includes information in the form of blueprints,

drawings, photographs, plans, instructions or documentation," and exempts information already

in the public domain, as defined in Section 120.11.  *Id.* § 120.10.

- 10

WASHAR0003163

30.     "[T]he 'technical data' provisions serve the purpose of limiting the export of detailed information needed to manufacture, maintain, or operate defense articles controlled on the USML. Such export limitations advance the purposes of the AECA by limiting the ability of foreign powers to design, develop, and produce defense articles in lieu of being able to obtain those articles directly. Absent the inclusion of technical data in the ITAR, the ITAR's limits on arms transfers would be of negligible practical effect because the ITAR would leave unregulated the exportation of the fundamental technology, know-how, blueprints, and other design information sufficient for foreign powers to construct, produce, manufacture, maintain, and operate the very same equipment regulated in its physical form by the ITAR." Aguirre Decl. ¶ 14.

31.     Pursuant to Executive Order 13637, the President has delegated his AECA authority to the State Department. In turn, the State Department has promulgated the ITAR, which is administered by the DDTC. *See* 22 C.F.R. §§ 120-130. Among other things, the DDTC is tasked with maintaining, reviewing and clarifying the USML.

32.     Pursuant to Executive Order 13637, §1(n), "[d]esignations including changes in designations, by the Secretary of items or categories that shall be considered as defense articles and defense services subject to export control under section 38 ( 22 U.S.C. 2778) shall have the concurrence of the Secretary of Defense."

33.     In addition, the Executive Branch must give notice to the International Relations Committee of the House of Representatives and to the Committee on Foreign Relations of the Senate at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1). Such notification must be made in accordance with the procedures applicable to reprogramming notifications under § 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. *Id.*

WASHAR0003164

34.      ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation.  However, it may do so only "in the interest of the security and foreign policy of the United States."  22 C.F.R. § 126.2.

35.      For situations where there is doubt that a particular item to be exported falls on the USML, ITAR contains a commodity jurisdiction "CJ" procedure.  22 C.F.R. § 120.4.  Upon written request, the DDTC will provide a determination as to whether a certain item, service, or data is within the scope of ITAR.  *Id.*

36.      The "CJ" determination "entails consultation among the Department of State, Defense, Commerce and other U.S. Government agencies and industry in appropriate cases."  *Id.* Assessments are made on a case-by-case basis, evaluating whether the article is covered by the USML, is functionally equivalent to an article on the USML, or has substantial military or intelligence application.  *Id.*  A determination made pursuant to the commodity jurisdiction process takes into account "(i) [t]he form and fit of the article; and (ii) [t]he function and performance capability of the article."  Aguirre Decl. ¶ 20.

37.      22 C.F.R. § 120.4(f) requires that "State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures.  State shall notify Defense and Commerce of the initiation and conclusion of each case."

**The Computer Files at Issue**

38.      In or around early May 2013, Defense Distributed posted a number of CAD Files on DefCad.org, a website it created to serve as an open-source repository for weapons designs, including data to automatically manufacture the "Liberator" pistol.  The Liberator is a plastic firearm which contains 6-oz piece of steel, which can be easily removed, enabling it to avoid detection in walk-through metal detectors.

- 12

WASHAR0003165

39.     These CAD files are "data files" that are "essentially blueprints that can be read by CAD software." Letter from Jahna M. Hartwig on behalf of Defense Distributed to the DDTC, dated June 21, 2013. They are "indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components." Motion to Dismiss at 1.

40.     On May 8, 2013, the Office of Defense Trade Controls Compliance, which is responsible for compliance with and civil enforcement of the AECA and ITAR, sent Defense Distributed a letter noting that "it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC."

41.     The letter explained that "disclosing (including oral or visual disclosure) or transferring foreign data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR." It requested that Defense Distributed remove ten specific CAD files from public access "immediately" and submit them for CJ determination. Defense Distributed filed a request for CJ determinations for these files on June 21, 2015.

42.     In January 2015, while consideration of Defense Distributed's original CAD file submission was ongoing, Defense Distributed submitted a CJ request for the "Ghost Gunner," an automated firearms metal milling machine. In April 2015, the DDTC determined that the Ghost Gunner was not subject to the jurisdiction of the State Department, but that the "project files and data files for producing a defense article on a 3D printer or similar device constituted technical data on that defense article that would be subject to ITAR regulation." Aguirre Decl. ¶ 28.

43.     The DDTC completed its review of Defense Distributed's original requests on June 4, 2015 and determined that six of the files were subject to ITAR control: (i) the Liberator

- 13 -

WASHAR0003166

pistol; (ii) the .22 caliber electric pistol; (iii) the 5.56/.223 muzzle brake; (iv) the Springfield XD-40 tactical slide assemble; (v) the sub-caliber insert; and (vi) the VZ-58 front sight.

44.　　In making its CJ determination, the DDTC noted that the CAD files at issue "can be used to 'automatically find, align, and mill' a defense article such as a firearm on a 3D printer or other manufacturing device. Manufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which merely *guides* the manufacture of a defense article and requires additional craftsmanship, know-how, tools, and materials." Aguirre Decl. ¶ 29(c).

**The Current Lawsuit**

45.　　The Plaintiffs filed this action in May 2015, alleging that the Government Defendants' actions violated the First, Second and Fifth Amendments. In addition, the Plaintiffs alleged that the Government Defendants had engaged in *ultra vires* conduct. Among other things, the Plaintiffs sought an injunction to prevent the Government Defendants and "all persons in active concert with them" from barring Defense Distributed's export of CAD files.

46.　　In response to the Plaintiffs' motion for a preliminary injunction, the Government Defendants argued, *inter alia,* that they were "particularly concerned that [the] proposed export of undetectable firearms technology could be used in an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or to compromise aviation security overseas in a manner specifically directed at U.S. persons." Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed June 10, 2015 (ECF No 32).

47.　　The Government Defendants argued that "[t]he CAD files are 'technical data' that are regulated by the ITAR because, absent such regulation, providing the CAD designs to a

- 14

WASHAR0003167

foreign person or foreign government would be equivalent to providing the defense article itself, enabling the complete circumvention of ITAR's export regulations." *Id.* at 7.

48.    Along with its opposition to Plaintiffs' preliminary injunction motion, the Government Defendants submitted an affidavit from Lisa V. Aguirre, the Director of the Office of Defense Trade Controls Management.  Among other things, Director Aguirre concluded that: (i) "[t]he 'Liberator' firearm included in DD's CAD designs presents a specific and unique risk to the national security and foreign policy interests of the United States"; (ii) making the CAD files available online would provide terrorist organizations with firearms, which could be used against the United States or its allies; and (iii) "[a]cess to weapons technology coupled with the uncontrolled ubiquitous means of productions . . . could contribute to armed conflict, terrorist or criminal acts, and seriously undermine global export control and non-proliferation regimes designed to prevent the dangerous and destabilizing spread and accumulation of weapons and related technologies." Aguirre Decl. ¶ 35.

49.    Accepting the Government's arguments, this Court denied the Plaintiffs' motion for a preliminary injunction, finding among other things that the public interest in national defense and national security outweighed any countervailing interests.  *Def. Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015).  This Court found that "[f]acilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict." *Id.* at 691 (internal quotations omitted).  In addition, this Court noted that the Plaintiffs had "not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

50.    On appeal, the Fifth Circuit upheld this Court's preliminary injunction ruling. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016).  In so doing, the

WASHAR0003168

Fifth Circuit focused on the national security implications and the permanent nature of the internet, explaining that:

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide . . . *Because those files would never go away*, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. *Thus, the national defense and national security interest would be harmed forever.*

*Id.* at 461 (emphasis added).

51.     On January 8, 2018, the Supreme Court denied the Plaintiffs' petition for a writ of certiorari. *Def. Distributed v. Dep't of State*, 138 S. Ct. 638 (2018).

52.     After the Supreme Court denied certiorari, this Court lifted the stay on proceedings and entered a scheduling order, pursuant to which the Plaintiffs filed a Second Amended Complaint on March 16, 2018. *See* ECF Nos. 77, 88 and 90.

53.     On April 6, 2018, the Government Defendants filed a motion to dismiss the complaint, arguing that the CAD files at issue "can unquestionably facilitate the creation of defense articles abroad" and that "the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted." Motion to Dismiss at 3,7.

54.     The Government Defendants explained to the Court that the files at issue "directly facilitate the manufacture of weapons" through "automated processes." *Id.* at 1, 9.

55.     The Government Defendants urged this Court to dismiss the Plaintiffs' lawsuit because:

> At issue in this litigation is the United States' ability to control the export of weapons – a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United

WASHAR0003169

States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability.

*Id.* at 1.

56.     Mere weeks after the Government stressed the critical national security reasons for prohibiting the export of Defense Distributed's automated blueprints, the parties informed the Court that they had "reached a tentative settlement agreement" in the matter, "subject to formal approval by Government officials with appropriate approval authority." Plaintiffs' Unopposed Motion to Stay Proceedings to Complete Settlement, filed Apr. 30, 2018 (ECF No. 93).

57.     According to news reports containing first-hand accounts from the plaintiffs, "the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted."  Andy Greenberg, "A Landmark Legal Shift Opens Pandora's Box for DIY Guns, Wired (July 10, 2018*), available at* https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/.

58.     On June 28, 2018, the parties filed a status report with the Court, indicating that they "expect to conclude the agreement and submit a stipulation for dismissal on or before August 4, 2018."  (ECF No. 95).

59.     As of the date of this filing, the parties have not yet filed a stipulation of dismissal with this Court.

**The Settlement Agreement**

60.     The Settlement Agreement was executed by both parties on June 29, 2018 and was made public on July 10, 2018 via a media blitz orchestrated by the Plaintiffs.

61.     What appears to be an accurate copy of the agreement is now available on the internet. *See* https://www.exportlawblog.com/docs/Defense%20Distributed%

- 17 -

WASHAR0003170

20Settlement%20Agreement.pdf. A copy of the posted agreement is provided with this Complaint as **Exhibit C.**

62. Pursuant to the Settlement Agreement, in consideration for the Plaintiffs' dismissing the action, the Government Defendants have agreed to:

a. "[C]ommit[ ] to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Registrar of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of this Action."

b. "[A]nnounc[e], while the above-referenced final rule is in development, [ ] a temporary modification consistent with the International Traffic in Arms Regulation (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018."

c. "[I]ssu[e] [ ] a letter to Plaintiffs on or before July 27, 2018 . . . advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e. unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13)."

d. "[A]cknowledg[e] and agree[ ] that the temporary modification of USML Category I permits any United States person . . . to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files."

e. Pay $39,581.00 to the Plaintiffs.

Settlement Agreement¶ 1(a)-(e).

63. Importantly, par. 1(a), (b) and (d) cover the broad category of files referred to as "the technical data that is the subject of this Action." This term is defined in the Settlement Agreement to include "Other Files," as long as those files "regard items exclusively: (a) in Category I(a) of the [USML], as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment." *Id.* ¶ 12.

- 18

WASHAR0003171

64.     "Other Files" are those that "Defense Distributed has and will continue to create and possess . . . that contain technical information, to include design drawings, rendered images, written manufacturing instructions[.]"  Second Amended Complaint, ¶ 44, filed Mar. 6, 2018 (ECF No. 90).  In other words, they are files that the Government has presumably not seen yet.

65.     Under the Settlement Agreement, the Department of Justice is prohibited from filing a stipulation of dismissal any earlier than five business days after announcement of the "temporary" modification to the USML Category I and issuance of a letter to Plaintiffs that their files are approved for public release in any form and exempt from ITAR.  Id. ¶ 2.  In other words, if the Parties hue to their planned schedule, the Government cannot file a dismissal with the Court until August 3, 2018.

66.     The Settlement Agreement does not indicate that any analysis, study or determination was made by the Government Defendants, in consultation with other agencies, before the Government Defendants agreed to remove the CAD Files from the USML Category I. In fact, the Settlement Agreement states that it "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

67.     Upon information and belief, neither the House Committee on Foreign Relations (formerly known as the International Relations of the House of Representatives), nor the Committee on Foreign Relations of the Senate received the required 30-days advance notice of the "temporary modifications" described in pars. 1(b) or (d) of the Settlement Agreement.

68.     In addition, there is no indication in the Settlement Agreement that the Secretary of Defense has concurred in the changes to designation agreed to in the Settlement Agreement, as required by Executive Order 13637.  There is also no indication that the Government

WASHAR0003172

Defendants have followed the established procedures for making a CJ determination before allowing Defense Distributed to export its data.

69.     Upon publicizing the Settlement Agreements, the Plaintiffs have repeatedly and adamantly made claims about the impact of the agreement on all gun violence prevention efforts. Among other things, Cody Wilson tweeted a photo of a tombstone announcing the death of "gun control," and stated that "[a]ll this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns . . .No amount of petitions or die-ins or anything else can change that."

***The Notices of Proposed Rulemaking***

70.     As promised, on May 24, 2018, the government published notices of proposed rulemaking by the State and Commerce Departments, which would remove Plaintiffs' CAD files from the USML Category I.  *See* International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and II, 83 Fed. Reg. 24,198 (May 24, 2018); Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML), 83 Fed. Reg. 24,166 (May 24, 2018).

71.     According to the Department of State's Notice of Proposed Rule, it "is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use."  According to the State Department, the articles that would be removed from the list "do not meet this standard."   For this reason, the notice proposes to remove all non-automatic firearms up to .50 caliber (and any related technical data) from the USML under the jurisdiction of the State Department, and move jurisdiction over these

WASHAR0003173

products over to the Commerce Department, which, due to its looser export controls,[1] do not typically take action to prohibit the publication of the data.

72.     The Department of Commerce's Proposed Rule, filed the same day, describes how its Export Administration Regulations ("EAR") will apply to items no longer controlled under the USML. Although the Department of Commerce would not comprehensively restrict the export of technology related to firearms, it would have authority to impose a restriction on a case-by-case basis if it determines the export would be contrary to the national security or foreign policy interests of the United States, the promotion of human rights, or regional stability. *See* 15 C.F.R. § 742.6.   But the Department of Commerce cannot restrict the export of technology already in the public domain, including through posting on publicly available sites on the Internet.   *See* 15 C.F.R. §§ 734.3(b)(3), 734.7(a)(4).   If the terms of the Settlement Agreement take effect and Defense Distributed makes its repository of files available online, the Department of Commerce will be unable to make an independent determination about whether national security or other concerns warrant restricting the unlimited dissemination of those files in accordance with the EAR.

73.     The public comment period for both notices concluded on July 9, 2018, the day before the Plaintiffs went public with the Settlement Agreement.

---

[1]     ITAR requires any exporter of items of the Munitions List to register with the State Department, *see* 22 C.F.R. 122.1(a), but Commerce Department regulations include no similar registration requirement.

WASHAR0003174

**CAUSES OF ACTION**

**COUNT I**
VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
*ULTRA VIRES* CONDUCT
(Against Plaintiffs[2] and Defendants)

74.        Intervenors repeat and reallege paragraphs 1-73.

75.        Under the Administrative Procedure Act ("APA"), a court must set "aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

76.        The Government Defendants' agreement to and execution of the Settlement Agreement constitutes a final agency action and is *ultra vires* conduct which should be set aside by the Court.

77.        The Government Defendants may only exercise the authority conferred to them by statute.  However, neither the AECA nor ITAR confer upon the Government Defendants the power to modify the USML Category I, temporarily or otherwise, without 30 days-notice to the relevant Congressional committees and without concurrence of the Defense Department.

78.        Here, upon information and belief, the Government Defendants did not provide advance notice of the proposed temporary removal to the House Committee on Foreign Affairs and to the Committee on Foreign Relations of the Senate, and did not receive the concurrence of the Secretary of Defense.

79.        According to Rep. Engel, Ranking Member of the House Committee on Foreign Affairs, notice of the terms of the settlement has not been provided by the President or the State Department.  *See* "Engel Decries State Department Policy to Allow 3-D Gun Printing," Press

---

[2]        For this, and all other counts in this Complaint in Intervention, the Intervenors name the Plaintiffs pursuant to Rule 19(a) of the Federal Rules of Civil Procedure for the limited purpose of ensuring that a full remedy may be ordered.

WASHAR0003175

Release (July 20, 2018), *available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

80.     The Government Defendants also lack statutory authority to determine that the Plaintiffs' CAD files should be removed from the Category I list without following the "established procedures" for commodity jurisdiction.  This is especially relevant here, because, in effect, the "temporary modifications" at issue will negate – in large part – the need for final rulemaking with respect to the data at issue, because once the data is on the internet, the damage to national security concerns will be irreparable.

81.     In addition, although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, it may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2.

82.     Here, the temporary modification agreed to by the Settlement Agreement is not in the interest of the security and foreign policy of the United States, and, upon information and belief, the Government Defendants have made no determination otherwise.

83.     In addition, the Government Defendants lack statutory authority to allow "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints. *See* Settlement Agreement, ¶ 1(d).

84.     Neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement.  However, the ordinary meaning of these terms implies that this provision purports to allow "any United States person" to manufacture, sell and possess firearms made from the files.  If so, this provision can be interpreted to violate numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by

WASHAR0003176

minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.). It also violates numerous analogous state criminal statutes.

85.     The Government Defendants do not have the statutory authority to amend, rescind or waive any portion of the Gun Control Act, or analogous state statutes.

86.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

## COUNT II
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – AGENCY ACTION NOT IN ACCORDANCE WITH LAW
(Against Plaintiffs and Government Defendants)

87.     Intervenors repeat and reallege paragraphs 1-86.

88.     Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

89.     As alleged above, upon information and belief, the Government Defendants did not give 30 days-notice to the required Congressional Committees or receive concurrence from the Secretary of Defense before agreeing, through the Settlement Agreement, to temporarily modify USML Category I to remove the data files at issue from ITAR regulation.  *See* Settlement Agreement, ¶¶1(b), (d).

90.     In addition, upon information and belief, the Government Defendants did not follow established procedures before granting the Plaintiffs an exception to ITAR jurisdiction.

91.     Furthermore, the Government Defendants cannot permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's

WASHAR0003177

automated blueprints, because "use" or "otherwise benefit" may be read to allow prohibited individuals to possess, manufacture or sell firearms made from the computer files at issue. *See* Settlement Agreement, ¶ 1(d); Gun Control Act, 18 U.S.C. 921 *et seq.*

92.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

### COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
### ARBITRARY AND CAPRICIOUS AGENCY ACTION
(Against Plaintiffs and Government Defendants)

93.     Intervenors repeat and reallege paragraphs 1-92.

94.     Under the APA, a court must set "aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

95.     A court may hold that an agency action is arbitrary and capricious when an agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.  In addition, an agency's departure from prior practice can serve as an additional basis for finding an agency's interpretation to be arbitrary and capricious.

96.     Here, upon information and belief, the Government Defendants have provided no explanation for their shift in policies, which they have repeatedly articulated to this Court. They have released no reports, no studies or analysis in connection with the Settlement Agreement to explain why the files at issue should be removed from ITAR regulation.  It appears that the

- 25 -

WASHAR0003178

Government Defendants have also entirely failed to consider or to acknowledge the serious national security concerns created by the export of the CAD files.

97.     In fact, according to par. 5 of the Settlement Agreement, the agreement "does not reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation."

98.     Here, the Government Defendants have agreed to (i) draft and fully pursue a notice of rulemaking and a final rule to remove the files at issue from ITAR regulation; (ii) temporarily modify the USML Category I list to exclude the files at issue from ITAR regulations; and (iii) permit "any United States person" to "use, reproduce or otherwise benefit" from the files at issue."

99.     These agency actions are arbitrary and capricious because the Government Defendants have not offered a reasoned explanation for ignoring or countermanding their earlier factual determinations or representations to this Court, the Fifth Circuit and the United States Supreme Court.  They are also arbitrary and capricious because they are contrary to the purposes of the AECA which requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms export.  *See*  22 U.S.C. § 2751.

100.    For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online.  Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed to make its files available online.

WASHAR0003179

## COUNT IV
## VIOLATION OF SEPARATION OF POWERS
(Against Plaintiffs and Government Defendants)

101.     Intervenors repeat and reallege paragraphs 1-100.

102.     The Constitution vests the power to legislate to Congress, not the Executive Branch

103.     Here, in the Settlement Agreement, the Government Defendants have agreed to temporarily modify the USML Category I to permit "any United States person" to "access, discuss, use, reproduce, or otherwise benefit" from Defense Distributed's automated blueprints.

104.     Because neither the terms "use" nor "otherwise benefit" are defined in the Settlement Agreement, this provision may be interpreted to allow "any United States person" to manufacture, sell and possess firearms made from the files. If so, this provision violates numerous provisions of the federal Gun Control Act, including 18 U.S.C. § 922(x)(2) (prohibitions on the possession of handguns by minors) and § 922(g) (prohibition on possession of firearms by felons, domestic abusers, etc.). As discussed above, the Government Defendants do not have the power to nullify or amend the provisions of the Gun Control Act.

105.     For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Intervenors are entitled to a declaration that the Settlement Agreement is unlawful, insofar as it purports to allow Defense Distributed to post its files online. Intervenors are also entitled to an injunction to prevent the Plaintiffs and Defendants from putting the Settlement Agreement into effect to the extent it purports to permit Defense Distributed the Plaintiffs to make its files available online.

WASHAR0003180

## REQUESTED RELIEF

WHEREFORE, Intervenors pray that this Court:

a)      Declare the Settlement Agreement unlawful to the extent it permits Defense Distributed to make its files available online;

b)      Enjoin the Plaintiffs and Defendants from putting any provision of the Settlement Agreement into effect to the extent that such permission purports to permit Defense Distributed to make its files available online;

c)      Enjoin the Plaintiffs from making their files available online; and

d)      Grant such other relief as the Court may deem just and proper.

Dated: July 25, 2018                    Respectfully Submitted,

                                        /s/ J. David Cabello
                                        BLANK ROME LLP
                                        J. David Cabello
                                        Texas Bar No. 03574500
                                        717 Texas Avenue
                                        Suite 1400
                                        Houston, TX 77002
                                        (713) 632-8696
                                        dcabello@blankrome.com

                                        John D. Kimball (pending pro hac vice)
                                        N.Y. Bar No. 1416031
                                        The Chrysler Building
                                        405 Lexington Ave.
                                        New York, NY 10174
                                        (212) 885-5000

WASHAR0003181

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX OF FACTS IN SUPPORT OF JOINT EMERGENCY
MOTION TO INTERVENE BY INTERVENORS
THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

Pursuant to Local Rule CV-7(d)(1), Proposed Intervenors submit this appendix of factual bases relied upon.

**A. The Proposed Intervenors**

Proposed Intervenors are all nonprofit organizations committed to eliminating gun violence through sensible gun control laws.[1]

**B. The Government's Restriction of Defense Distributed's Illegal Dissemination and Export of Weapons Under ITAR.**

This Court previously made preliminary findings which were approved by the Fifth Circuit.

Dkt. 43; *Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 460-61 (5th Cir. 2016).

---

[1] The Brady Campaign to Prevent Gun Violence develops and implements extensive public health and safety programs. It represents victims of gun violence in cases against irresponsible gun sellers and owners. Through its public health and safety programs, it inspires safer attitudes and behaviors around the existing guns in homes and communities nationwide and new gun purchases taking place every day.

Everytown and its members and supporters work in all 50 states and in Congress to support the passage and enforcement of gun safety laws that, among other things, help keep guns out of the hands of prohibited persons and other individuals with dangerous histories and help law enforcement apprehend and prosecute those who violate U.S. and state gun laws.

WASHAR0003182

A detailed factual background of this litigation has been fully briefed. *See* Dkt. 32, pp. 3-7; *see also* Dkt. 43, pp. 1-4. A short summary of the relevant facts and the procedural background of the case is provided here.

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The goal of the AECA is to ensure that articles used in warfare or terrorism are not exported from the United States to other countries, where they could be a threat to United States national security, foreign policy, or international stability. The President has delegated the authority to implement these regulations to the State Department, which promulgated ITAR to implement the regulations. *See* Executive Order 13637(n)(iii); 22 C.F.R. §§ 120-130. ITAR is administered by the State Department's Directorate of Defense Trade Controls ("DDTC"). *Id.*

The U.S. Munitions List ("USM"), part of the AECA, identifies materials that constitute "defense articles and defense services" under the AECA. 22 C.F.R. Part 121. Category 1 of the

---

Giffords is a 501(c)(4) gun violence prevention organization founded by former Congresswoman Gabrielle Giffords and her husband, Captain Mark Kelly, a retired Navy combat veteran and NASA astronaut. Headquartered in Washington, D.C., Giffords researches, writes, and proposes policies that make Americans safer and mobilizes voters and lawmakers in support of safer gun laws. Its mission is to address the issue of gun violence in communities across the country, and to that end, Giffords works to affect legislation, shape the national dialogue, and reduce gun violence. Since its founding after the Sandy Hook Elementary School shooting in Newtown, Connecticut, Giffords has been involved in the passage of more than 200 new strong gun laws in 45 states and Washington, D.C.

Giffords and its sister 501(c)(3) organization, Giffords Law Center to Prevent Gun Violence, recently submitted public comments on the proposed rule changes by the State Department and Commerce Department that would deregulate the publication of computerized blueprints for the production of 3D printed guns. In that comment, Giffords opined that the proposed changes "would represent a dramatic change in the regulatory structure governing firearm experts," and that they "may not adequately address our national security, foreign policy, international crime, or terrorism threats," and expressed concern that the changes "will result in an increase in the number of untraceable firearms in circulation." *See* Giffords comment re Docket Nos. DOS-2017-0046, BIS-2017-0004 (July 9, 2018), *available at* http://www.forumarmstrade.org/uploads/1/9/0/8/19082495/giffords_exports_letter_7-9-18.pdf.

2

WASHAR0003183

USML includes (1) all firearms up to .50 caliber, and (2) all technical data directly related to such firearms. *See* 22 C.F.R. § 121.1(1)(a). Technical data is information that "is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles." *Id.* § 120.10(a).

In 2012, Defense Distributed began exporting technical data related to firearms through the publication of Computer Aided Design ("CAD") files, without restriction, on the Internet. Dkt. 32, p. 1; Dkt. 8, pp. 5-6. These CAD files are essentially blueprints for the creation of guns and gun components via a three-dimensional ("3D") printer. Dkt. 32, p. 5. In May 2013, the DDTC advised Defense Distributed that its publication of CAD files without authorization from the DDTC potentially violated the ITAR, specifically because the CAD files were being made available outside the United States. Over the next two years, the DDTC conducted a commodity jurisdiction procedure ("CJ review") and concluded that several of the published CAD files were subject to regulation under ITAR because they were technical data under Category 1 of the USML. Dkt. 32, pp. 5-7. To make the CAD files available outside the United States, ITAR required Defense Distributed to seek preapproval of publication from the DDTC.

**C. The Current Litigation**

On May 6, 2015, plaintiffs initiated the present action, seeking a declaration that the DDTC's preapproval requirement for privately generated unclassified information was an unconstitutional *ultra vires* government action and violated the First, Second, and Fifth Amendments. Dkt. 1. Plaintiffs also sought to enjoin the DDTC from enforcing the prepublication approval requirement against them. *See* Dkt. 1, p. 14; *see generally* Dkt. 8. After a hearing, this Court denied plaintiffs request for preliminary injunction. Dkt. 43. The Fifth Circuit affirmed this

3

WASHAR0003184

Court's denial of preliminary injunction. *Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016). The Supreme Court denied writ of *certiorari*. Dkt. 76.

The parties continued litigating the merits of the case. However, on April 30, 2018, plaintiffs suddenly notified this Court that the parties had reached a tentative settlement agreement and requested a stay of the case, which was granted. Dkt. 93. On June 28, 2018, the parties informed the Court that the appropriate government actors had approved the parties' settlement agreement and that the parties would submit a stipulation of dismissal to the Court, on or before August 4, 2018. Dkt. 95.

### D. Motivation to Intervene.

1. The Settlement Agreement; an unjustified reversal of course.

Earlier this month, the Brady Campaign submitted a Freedom of Information Act request to the State Department to obtain a copy of the parties' Settlement Agreement. Proposed Intervenors received a full copy of the Settlement Agreement, which was posted on the internet on or around July 12, 2018. The Settlement Agreement contains several disturbing provisions that are an affront to the United States' system of governance and violate the APA. *See* Ex. 2. First, the Settlement Agreement contractually obligates the Government to revise ITAR to specifically exclude Defense Distributed's Ghost Gunner Files, CAD files, and Other Files[2] from the list of technical data in USML. Ex. A, p. 1, Section 1(a). In other words, the Government has promised a private party that it will use its executive power to amend federal regulations for the benefit of that specific party.

Second, the Government has contractually agreed to publicly announce a temporary modification of ITAR on the DDTC website. This temporary modification, which also exempts

---

[2] "Ghost Gunner Files," "CAD Files," and "Other Files" are defined to include the files the State Department determined were subject to ITAR. *See* Exhibit A, p.7; Dkt. 90, ¶¶ 36, 40, 44-45.

WASHAR0003185

Defense Distributed's files from regulation by ITAR, will be effective in the period prior to finalization of the revised ITAR provisions promised by the Government.

Finally, the Government has agreed to issue a letter, on or before July 27, 2018, authorizing Defense Distribution to begin the public release of its files, prior to dismissal of the suit. Notably, as drafted, the Settlement Agreement seeks to bypass any review, input, or approval by this Court as to the terms therein.

2. The threat to national security.

Defense Distributed's files are defense articles that will allow individuals across the globe to generate lethal firearms that are untraceable and that can be modified to be virtually undetectable in metal detectors. Dkt. 32, p. 8. This is particularly concerning to the State Department, because many foreign countries do not have sufficient security resources, and because this technology could be used by terrorist and guerrilla groups directing violence at the United States. *Id.* The State Department's recognition of the national security threat posed by the unrestricted publishing of these files is what caused the State Department to admonish Defense Distributed and conduct a review of these files beginning in 2013.

This Court is not a stranger to the national security issues raised by Defense Distributed's conduct. *See Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 691 (W.D. Tex. 2015) ("Defense Distributed admits its purpose is facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional printing of arms. Facilitating global access to firearms undoubtedly increases the possibility of outbreak or escalation of conflict.") (internal citations and quotations omitted). And the Fifth Circuit, affirming this court's denial of plaintiffs request for a preliminary injunction, recognized the irreparable harm US national security would suffer if plaintiffs continued publication of its files:

<center>5</center>

WASHAR0003186

> Even if Plaintiffs–Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and be freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs–Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. ***Because those files would never go away***, a preliminary injunction would function, in effect, as a permanent injunction as to all files released in the interim. ***Thus, the national defense and national security interest would be harmed forever***.

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 461 (5th Cir. 2016) (emphasis added).

Numerous media channels have recognized the implications of Defense Distributed's files. For example, Fox News stated that after Defense Distributed's first publication of files in 2013, the countries with the most downloads of those files were Spain, the United States, Brazil, and Germany, proving that the publication of these files will have an international effect.[3] Fox News also noted that the 3D printers required to create functional guns cost as little as $2,000 and will make gun control "practically impossible."[4]

---

[3] John R. Lott, *This marks the end of gun control*, FOX NEWS, (July 21, 2018), http://www.foxnews.com/opinion/2018/07/20/this-marks-end-gun-control.html.
[4] *Id.*

WASHAR0003187

Dated: July 25, 2018

Respectfully submitted,

*/s/* David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

*/s/ M'Liss Hindman*
M'Liss Hindman
Paralegal

WASHAR0003188

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**JOINT EMERGENCY MOTION FOR TEMPORARY RESTRAINING
ORDER AND FOR PRELIMINARY INJUNCTION BY PROPOSED INTERVENORS
THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC., AND GIFFORDS**

WASHAR0003189

Pursuant to Fed. R. Civ. P. 65 Proposed Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords ("Giffords"), (collectively "Proposed Intervenors") respectfully and urgently moves the Court to:

A. Enter a temporary restraining order enjoining Defendants from performing under the Settlement Agreement (**Exhibit A**) discussed below, as this would cause immediate and irreparable harm to United States national security directly affecting the safety of individual U.S. citizens;

B. Enter a temporary restraining order enjoining the Plaintiffs from publishing the Published Files, Ghost Gunner Files, CAD Files, and Other Files (the "Weapon Schematics"), as defined in the Settlement Agreement, in order to prevent the immediate and irreparable harm that would result from publishing these files;

C. Enter a preliminary injunction enjoining the parties from performing the settlement agreement; and

D. Grant such other and further relief as may be appropriate.

In support of their motion, Proposed Intervenors would respectfully show the Court as follows:

## INTRODUCTION AND BACKGROUND

The factual and procedural background of this case have been briefed in the Appendix to Proposed Intervenors' Joint Emergency Motion to Intervene, which was filed contemporaneously with this Motion.

WASHAR0003190

**LEGAL STANDARD FOR PRELIMINARY INJUNCTION AND TEMPORARY
RESTRAINING ORDER AND MOTION FOR SAME**

To establish the need for a temporary restraining order and preliminary injunction pursuant

FRCP 65, the movant has to show: (1) a substantial likelihood of success on the merits; (2) a

substantial threat of irreparable injury if the injunction is denied; (3) that the threatened injury

outweighs any prejudice the injunction might cause the defendant; and (4) that the injunction will

not disserve the public interest. *Janvey v. Alguire*, 628 F.3d 164, 174 (5th Cir. 2010).

**A. Proposed Intervenors are likely to succeed on the merits; the Proposed Intervenors
satisfy the requisite elements of a claim under the APA.**

To make out an APA violation, the Plaintiffs must show that rulemaking through the terms

of the settlement are arbitrary and capricious. 5 U.S.C.A. § 706(2)(A); *Taylor v. Fed. Aviation

Admin.*, No. 16-1302, 2018 WL 3320874 (D.C. Cir. July 6, 2018).   To obtain APA standing, a

party must show that its grievance falls within the zone of interests protected by the Arms Export

Control Act. In addition, the party will need to show that it would suffer an injury-in-fact to obtain

standing under Article III of the U.S. Constitution. See *Friends of the Earth, Inc. v. Laidlaw Envtl.

Servs., Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000).

1. The Proposed Intervenors have standing.

The APA allows a person adversely affected by an agency action, including new

rulemaking, to challenge that action. The court will set aside new regulations that are "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The APA provides a cause of action to "[a] person suffering legal wrong because of agency action,

or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . ."

5 U.S.C. § 702. Only final agency actions can be challenged. 5 U.S.C. § 704.

Proposed Intervenors are adversely affected by the temporary removal of small arms and

associated technology from the USML because (1) the removal will allow for the release of

3

WASHAR0003191

firearms technology by Defense Distributed that enable violations of state and federal law that impact public safety, (2) the safety and security of state residents is compromised by the proliferation of unregistered firearms within the state, and (3) the safety and security of state residents who travel abroad is compromised by the proliferation of small arms and associated technology to produce small arms in other countries. In addition, according to the Plaintiffs, implementation of the Settlement Agreement will directly undermine the work of Proposed Intervenors.

We understand that as matter of judicial self-governance, courts review prudential considerations with regard to standing to limit parties to those which are directly affected by an action. Prudential standing in an APA claim looks to whether "the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected by the statute in question." *Nat'l Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998). That is to say, the party's interest must have a "rough correspondence" with the purpose of the underlying statute. *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939 (9th Cir. 2013). Thus, at least to some degree, the interests of a party must line up with the purpose of the AECA.

In this regard, it is noteworthy that the "zone of interests" test is not meant to be "especially demanding." *Match-E-Be-Nash-She-Wish-Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). The test forecloses suit only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit." Hence, the zone of interest test only "requires some indicia – however slight – that the litigant before the court was intended to be protected, benefited or

4

WASHAR0003192

regulated by the statute under which suit is brought." *Public Citizen v. FTC*, 869 F.2d 1541, 1547 (D.C. Cir. 1989); see *Autolog Corp. v. Regan*, 731 F.2d 25, 29-30 (D.C. Cir. 1984) ("Courts should give broad compass to a statute's 'zone of interests' in recognition that this test was originally intended to expand the number of litigants able to assert their rights in court").

Here, the Proposed Intervenors clearly meet this test, as associations promoting gun safety laws to minimize violence and injuries with members who would be directly affected by release of this information in the United States and when traveling abroad. The Proposed Intervenors are vulnerable to the precise sort of harm that ITAR's assault on international terrorism is intended to shield.

2. The temporary removal of items from the USML through the settlement is arbitrary and capricious.

The Proposed Intervenors can satisfy the above-delineated requirements to state a claim under APA Section 7, because the consequences of allowing the Settlement Agreement to become effective include: (1) direct contradiction of the legislative intent underlying the AECA and amending the AECA to codify the then-existing classifications of items of on the USML, (2) State Department and other agencies' failure to study or otherwise consider the national security and international stability effects of these actions, in violation of the purpose of the AECA, (3) release of this information to the Internet as a result of the settlement before completing its APA rulemaking after receiving comments on the NPRM, and (4) inexplicable, unjustified reversal of the position of the U.S. Government with regard to the national security ramifications of allowing the online distribution of files to enable the 3-D printing by reference to the Weapons Schematics.

i.     Violation of AECA purpose.

The AECA requires the State Department to administer the AECA to reduce the international trade in arms and avoid destabilizing effects abroad through arms exports. 22 U.S.C.

5

§ 2751. Neither the settlement agreement nor the proposed rulemaking to finalize the reclassification of small arms technology off of the USML address how these rule changes will impact the international trade in arms or potentially destabilizing effects. This total lack of consideration of the central purpose of the AECA demonstrates that the government's action was ill-considered: "Deference is not owed when the agency has completely failed to address some factor of consideration of which was essential to [making an] informed decision." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) (internal quotation marks and citation omitted).

> ii.   Failure to study.

In previous rulemakings removing certain items from the USML, the Department of State undertook significant efforts to understand the ramifications to national security interests. For example, before removing certain Global Position System receivers from the USML, the State Department headed an interagency working group to review the regulation of commercial satellites and related technology and whether removal would jeopardize national security interests. Amendment to the ITAR, 57 Fed. Reg. 41,077 (Sept. 9, 1992). An agency's rulemaking is arbitrary and capricious if the agency cannot explain a connection between the logic of the rule and its purported factual basis. *See We Who Care, Inc. v. Sullivan*, 756 F. Supp. 42, 46-47 (D. Me. 1991) (finding that revised regulation establishing $1,500 as the maximum equity in an automobile that an individual could have to obtain benefits under the Aid to Families with Dependent Children program was arbitrary and capricious because the survey on which the change was based was unavailable and the agency was unable to provide basic information about how the survey was conducted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

WASHAR0003194

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

iii. <u>Failure to follow procedural requirements.</u>

The AECA requires the President to report to Congress at least 30 days in advance of removing an item from the USML. 22 U.S.C. § 2778(f)(1) ("The President may not remove any item from the Munitions List until 30 days after the date on which the President has provided notice of the proposed removal to the Committee on International Relations of the House of Representatives and to the Committee on Foreign Relations of the Senate in accordance with the procedures applicable to reprogramming notifications under section 634A(a) of the Foreign Assistance Act of 1961 [22 USCS § 2394-1]. Such notice shall describe the nature of any controls to be imposed on that item under any other provision of law."). According to Elliot Engel, Ranking Member of the House Committee on Foreign Affairs (formerly known as the Committee on International Relations), notice of the terms of the settlement has not been provided by the President or the State Department.

Although ITAR allows the Deputy Assistant Secretary for Defense Trade Controls to order the temporary modification of any ITAR regulation, they may do so only "in the interest of the security and foreign policy of the United States." 22 C.F.R. § 126.2. As Congressman Engel noted: "[i]t stretches credulity to believe that release of this information is in the U.S. interest." *Engel Decries State Department Policy to Allow 3-D Gun Printing*, Press Release (July 20, 2018),

7

WASHAR0003195

*available at* https://democrats-foreignaffairs.house.gov/news/press-releases/engel-decries-state-department-policy-allow-3-d-gun-printing.

Here, the release of the information as a result of the settlement, prior to the completion of the required APA rulemaking process, essentially circumvents the entire rulemaking process, without providing any justification for such action, and is thus clearly tantamount to arbitrary and capricious action in contravention of the APA.

Indeed, an agency's reversal of its position may be arbitrary and capricious if the agency offers no reasoned explanation for ignoring or countermanding its earlier factual findings. *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 141 (D.D.C. 2017). Where an agency makes a determination to remove a protection from a regulatory scheme, an adequate basis and explanation for that rescission is expected. *See* 15 U.S.C.A. §§ 1381 et seq., 1392(a), (b), (f)(1,3,4); 5 U.S.C.A. § 706; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856 (1983).

Here, the terms of the settlement directly contradict the arguments made by the U.S. Government parties in seeking to dismiss Defense Distributed's challenge.

    iv.    <u>The terms of the settlement are a final agency action.</u>

The APA authorizes judicial review of final agency actions. 5 U.S.C. § 704. Agency action is "final" if two conditions are met. First, the action must mark the end of the agency's decision-making process. Second, the action must be one by which "rights or obligations have been determined," or from "which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 247 (3d Cir.

WASHAR0003196

2011).[1] A settlement agreement can qualify as final agency action. *United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008).

The executive branch cannot hide behind Presidential powers to achieve a particular domestic objective. When it does so, the executive branch exceeds the statutory authority granted to it by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952) ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress -- it directs that a presidential policy be executed in a manner prescribed by the President."); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C. Cir. 1984) (en banc), vacated and remanded on other grounds, 471 U.S. 1113 (1985) ("The Court in Youngstown was therefore concerned with whether injunctive relief may appropriately issue to restrain the executive's unlawful action with respect to domestic affairs where the domestic problem might have a secondary effect on foreign affairs."); *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 296 (4th Cir. 2018) ("In sum, the President claims the authority to indefinitely set his own

---

[1] In *Minard*, an oil company obtained a preliminary injunction against implementation of a settlement agreement between the Forest Service and environmental groups. That settlement required the Forest Service to conduct an environmental analysis before issuing a "Notice to Proceed" ("NTP") to mineral rights owners in the Alleghany National Forest. An NTP is required to proceed with extraction activity. In implementing the settlement, the Forest Service placed a moratorium on issuance of NTPs. The Third Circuit found that the moratorium constituted a final agency action, while the settlement agreement itself was an "intermediate agency action", which, under the APA, is "subject to review on the review of the final agency action." *Id.* at 249, n. 7 (quoting 5 U.S.C. § 704). The Third Circuit found that the Forest Service had failed to abide by APA rulemaking requirements in implementing its new policy on issuing NTPs. *Id.* The Third Circuit upheld the district court's preliminary injunction: the district court's injunction enjoined the Forest Service from requiring the environmental analysis before issuing NTPs, ended the moratorium, and prevented further implementation of the settlement agreement. *See Minard Run Oil Co. v. United States Forest Serv.*, No. 09-125, 2009 U.S. Dist. LEXIS 116520 (W.D. Pa. Dec. 15, 2009). Here, the settlement action must be considered final agency action, because the settlement will have immediate and substantial effect through release of the information to the internet. As noted by the Fifth Circuit in affirming this Court's denial for a preliminary injunction, the files would be "freely available worldwide...Thus, the national defense and national security interest would be harmed forever."

9

WASHAR0003197

immigration and travel policies with respect to every foreign nation and class of immigrants, under any circumstances, exigent or not, that he sees fit. Such authority is dangerously similar to lawmaking and intrudes on Congress's plenary power over immigration").

**3. There is a threat of irreparable injury if the injunction is denied.**

The threat of irreparable injury to the United States and its citizens has been briefed in the Motion to Intervene and accompanying Appendix 1. If the Government is permitted to perform under the Settlement Agreement, despite the numerous and blatant APA violations in the Settlement Agreement, United States national security will suffer irreparable injury.

**4. The threatened injury outweighs any prejudice the injunction might cause the parties.**

This Court has already found that the Plaintiff's interest in protecting its constitutional rights does not outweigh "the public's keen interest in restricting the export of defense articles." *Defense Distributed v. United States Dep't of State*, 121 F. Supp. 3d 680, 690 (W.D. Tex. 2015).

**5. The injunction will not disserve the public interest.**

An injunction will not disserve the public interest. On the contrary, the primary aim of the injunction is to serve the public interest by enjoining plaintiffs and defendants from taking action that will irreparably harm the security of the United States and its citizens. *See id.* ("Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling 'export' of such materials stands in sharp contrast to Defendants' assertion of the public interest.").

## CONCLUSION

For these reasons, Proposed Intervenors respectfully request the Court grant a temporary restraining order and schedule a hearing concerning the motion for preliminary injunction.

10

WASHAR0003198

Dated:  July 25, 2018

Respectfully submitted,

_/s/ David Cabello_____
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending _pro hac vice_)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

_/s/ M'Liss Hindman_____
M'Liss Hindman
Paralegal

11

WASHAR0003199

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL., | § | |
| | § | |
| Defendants. | § | |

**INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC, AND GIFFORDS' NOTICE
OF APPEARANCE OF LEAD COUNSEL J. DAVID CABELLO**

Intervenors The Brady Campaign to Prevent Gun Violence, Everytown for Gun Safety

Action Fund, Inc., and Giffords (collectively "Intervenors") notify the Court that J. David Cabello

of Blank Rome, LLP, has entered this action as Lead Attorney on their behalf. In connection with

this notice, Mr. Cabello requests that all future pleadings and other papers filed under Fed. R. Civ.

P. 5 be served on him at the below address and contact information.

**J. David Cabello
Blank Rome LLP
717 Texas Avenue, Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com**

1

WASHAR0003200

July 25, 2018                                    Respectfully submitted,

                                                /s/ J. David Cabello
                                                J. David Cabello
                                                Attorney-in-Charge
                                                Texas State Bar No. 03574500
                                                Blank Rome LLP
                                                717 Texas Avenue
                                                Suite 1400
                                                Houston, TX 77002
                                                Telephone: (713) 228-6601
                                                Facsimile: (713) 228 6605
                                                E-mail: dcabello@blankrome.com

                                                John D. Kimball (pending *pro hac vice*)
                                                Blank Rome LLP
                                                N.Y. Bar No. 1416031
                                                The Chrysler Building
                                                405 Lexington Ave.
                                                New York, NY 10174
                                                (212) 885-5000

                                                **Attorneys for Intervenors**


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).


                                                /s/ M'Liss Hindman
                                                M'Liss Hindman
                                                Paralegal


2

WASHAR0003201

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**INTERVENORS' REQUEST FOR AN EMERGENCY HEARING FOR
TEMPORARY RESTRAINING ORDER**

Intervenors The Brady Campaign to Prevent Gun Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords, (collectively "Intervenors") file this Request for an Emergency Hearing on their Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). As fully briefed in the Motion for Temporary Restraining Order and Preliminary Injunction, time is of the essence. Plaintiffs will publish their Weapon Schematics as early as Friday July 27, 2018. Once these files are published on the Internet, United States national security and its citizens will be irreparably harmed. For this reason, Intervenors respectfully request this Court to grant an emergency hearing on **Thursday July 26, 2018**. For cause, Intervenors show the following:

1. As detailed in the Motion, Plaintiffs and Defendants (the Government) have entered into a Settlement Agreement. This Settlement Agreement permits Plaintiffs to publish, including on the Internet, files that can be used to print firearms and firearm components with a three-dimensional ("3D") printer.

2. The Government had previously deemed these files to fall within the scope of ITAR and, until very recently, vigorously defended its position against Plaintiffs. Now,

WASHAR0003202

the Government has entered into this Settlement Agreement. Several provisions of the Settlement Agreement violate the Administrative Procedure Act ("APA"). Intervenors can show a strong likelihood of success on the merits of claims of APA violations by the Government.

3. Publication of these files on the Internet will cause irreparable harm to the United States and its citizens, as it will allow the global community unfettered access to blueprints for the creation of untraceable and undetectable weapons, which will threaten the security of the United States and its citizens. Due to the nature of the modern Internet, once these files are publicly released, the damage cannot be undone. The balance of harm and the public interest favors granting a temporary restraining order and preliminary injunction.

Intervenors respectfully submit this request to set their Motion for an emergency hearing as requested herein, and for such and other relief as it may be entitled.

WASHAR0003203

Dated:  July 25, 2018

Respectfully submitted,

_/s/ David Cabello_____

J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending _pro hac vice_)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

_/s/ M'Liss Hindman_____

M'Liss Hindman
Paralegal

WASHAR0003204

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**JOINT EMERGENCY MOTION FOR LEAVE TO INTERVENE BY
INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

TO THE HONORABLE COURT:

Pursuant to Fed. R. Civ. P. 24, Intervenors The Brady Campaign to Prevent Gun

Violence ("Brady" or "Brady Campaign"), Everytown for Gun Safety Action Fund, Inc.

("Everytown") and Giffords ("Giffords"), (collectively "Proposed Intervenors") seek leave to

intervene in this litigation. In support, Proposed Intervenors file 1) a Memorandum of Law in

support of their request to intervene (**Exhibit A**), 2) a Complaint in Intervention (**Exhibit B**), and

3) an Appendix of Facts. Proposed Intervenors are contemporaneously filing a motion for

temporary restraining order and preliminary injunction and requesting a hearing for the same.

WASHAR0003205

Dated: July 25, 2018

Respectfully submitted,

/s/ David Cabello
J. David Cabello
Blank Rome LLP
Texas State Bar No. 03574500
717 Texas Avenue
Suite 1400
Houston, TX 77002
Telephone: (713) 228-6601
Facsimile: (713) 228 6605
E-mail: dcabello@blankrome.com

John D. Kimball (pending *pro hac vice*)
Blank Rome LLP
N.Y. Bar No. 1416031
The Chrysler Building
405 Lexington Ave.
New York, NY 10174
(212) 885-5000

**Attorneys for Proposed Intervenors**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).

/s/ M'Liss Hindman
M'Liss Hindman
Paralegal

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING REQUEST FOR AN EMERGENCY HEARING BY
INTERVENORS THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE,
EVERYTOWN FOR GUN SAFETY ACTION FUND, INC. AND GIFFORDS**

The Court, having considered Intervenors The Brady Campaign to Prevent Gun Violence,

Everytown for Gun Safety Action Fund, Inc., and Giffords' Emergency Motion for Hearing on

Temporary Restraining Order and Preliminary Injunction, finds that Intervenor's motions should

be GRANTED.

IT IS SO ORDERED that

The Court will hold a hearing on Intervenors' Motion for Preliminary Injunction and

Temporary Restraining Order on _____, July _____, 2018 at _____

a.m./p.m.

_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

WASHAR0003207

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED ET AL., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. NO. 1:15-CV-00372-RP |
| v. | § | JURY DEMANDED |
| | § | |
| UNITED STATES DEPT. OF STATE, ET AL, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] ORDER GRANTING JOINT EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER AND MOTION
FOR PRELIMINARY INJUNCTION**

The Court, having considered Intervenors The Brady Campaign to Prevent Gun Violence,

Everytown for Gun Safety Action Fund, Inc., and Giffords Joint Emergency Motion for

Temporary Restraining Order, and Motion for Preliminary Injunction, finds that Intervenors'

motions should be GRANTED.

IT IS SO ORDERED that

1. Until further order of this Court, pending hearing on Intervenors' motion for

   preliminary injunction, Plaintiffs are temporarily enjoined from publishing and/or

   exporting the Published Files, Ghost Gunner Files, CAD Files, and Other Files, as

   defined in the Settlement Agreement executed by the Plaintiffs and Defendants on

   June 29, 2018; and

2. Until further order of this Court, pending hearing on Intervenors' motion for

   preliminary injunction, Plaintiffs and Defendants are enjoined from performing under

   the Settlement Agreement.

WASHAR0003208

The Court shall hold a hearing on Intervenors' Motion for Preliminary Injunction on

_____, 20_____ at _____ a.m./p.m.


_____
Judge Robert L. Pitman
United States District Court
Western District of Texas

WASHAR0003209

# Exhibit A

WASHAR0003210

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DEFENSE DISTRIBUTED ET AL., | § |
| | § |
| Plaintiff, | § |
| | § C.A. NO. 1:15-CV-00372-RP |
| v. | § JURY DEMANDED |
| | § |
| UNITED STATES DEPT. OF STATE, ET AL, | § |
| | § |
| Defendants. | § |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT EMERGENCY
MOTION TO INTERVENE BY INTERVENORS THE BRADY CAMPAIGN
TO PREVENT GUN VIOLENCE, EVERYTOWN FOR GUN SAFETY
ACTION FUND, INC. AND GIFFORDS**

WASHAR0003211

TO THE HONORABLE COURT:

Pursuant to Fed. R. Civ. P. 24, The Brady Campaign to Prevent Gun Violence ("Brady"), Everytown for Gun Safety Action Fund, Inc. ("Everytown") and Giffords (collectively "Proposed Intervenors") respectfully and urgently move the Court to:

A.  Permit the Proposed Intervenors to intervene in this litigation and file the Complaint in Intervention annexed as **Exhibit B**;[1] and

B.  Grant such other and further relief as may be appropriate.

If the Court grants intervention, Proposed Intervenors also request by separate motion, filed contemporaneously with this motion, a temporary restraining order and preliminary injunction. Injunctive relief is necessary to prevent the irreparable harm to the security of the United States and its citizens that will result from the performance of the Settlement Agreement (attached as **Exhibit C**) and Defense Distributed's publication of Weapon Schematics on the Internet.

## BACKGROUND

This case began because the United States government correctly found that the publication on the internet of Defense Distributed's blueprints for the 3-D printing of certain weapons threatened national security. As stated by the Fifth Circuit:

> The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiff-Appellants very strong constitutional rights under these circumstances…[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security."

*Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016).

---

[1] If this Court determines that the Proposed Intervenors do not satisfy the test for intervention under Fed. R. Civ. P. 24, the Proposed Intervenors request leave to file the proposed complaint in intervention as a new, related action in this Court, and further request that the Court preserve the status quo pending such filing (which would similarly seek immediate injunctive relief).

2

WASHAR0003212

With no justification whatsoever and in violation of the Administrative Procedure Act ("APA") and the constitutionally-mandated Separation of Powers, the Government has capitulated to plaintiffs' position and agreed to completely abandon the numerous valid reasons it had asserted for blocking the export of Defense Distributed's plans. This Court previously found that the Government's position was likely to succeed. It is shocking, therefore, that the Government has abdicated the correct position it took concerning national security. The Settlement Agreement raises very serious national and international security concerns and would cause immediate and irreparable harm to the United States and its citizens and the global community.

Plaintiffs and the Government have agreed to settle all issues in this litigation by August 4, 2018. The terms of the Settlement Agreement allow Defense Distributed to publicly upload blueprints of firearms and firearm components to the Internet, so that any terrorist group or individual in the world with access to the Internet and a three-dimensional ("3D") printer can create guns and gun components, with modifications that make these weapons untraceable and undetectable. Specifically, the Settlement Agreement permits Defense Distribution to begin publishing these files on July 27, 2018, even though the parties are not set to enter a stipulation of dismissal until August 4, 2018.

Most alarmingly, the Government, which up until a few months ago was vigorously defending this suit and fighting to prevent Defense Distributed from publishing these files, has suddenly done a complete about-face and contractually obligated itself to exempt Defense Distributed's files from the International Traffic in Arms Regulations, 22 C.F.R Part 120 et seq. ("ITAR"), despite the State Department's official determination in 2015 that the disputed files are subject to ITAR. Due to the nature of the modern Internet, the harm from Defense Distributed's publication of these files is irreversible. A temporary restraining order and preliminary injunction

3

139718.00601/110549050v.6

WASHAR0003213

to enjoin Defense Distributed and the Government are not merely necessary forms of relief, but quite simply the *only* available forms of relief that will prevent these files from becoming publicly available worldwide and jeopardizing the national security of the United States and its citizens.

Proposed Intervenors are asking the Court to preserve the status quo and simply seek to continue down the sensible path that the Government, until recently, was advocating and this Court found was likely to succeed.

The procedural and factual record relied upon is attached as Appendix 1.

## POINT ONE
## INTERVENORS HAVE STANDING TO INTERVENE

### A. Standard for intervention.

FRCP 24 establishes the criteria for intervention, and is to be liberally construed. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (citing *Texas v. United States*, 805 F.3d 653, 656 (5th Cir. 2015)). Courts "should allow intervention when no one would be hurt and the greater justice could be attained." *Id.* Rule 24 establishes two kinds of intervention: intervention of right and permissive intervention. *See* FED. R. CIV. P. 24(a)-(b).

Federal Rule of Civil Procedure 24(a)(2) provides that, upon timely application, a party shall be permitted to intervene as a matter of right when the party:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a)(2).

Under this standard, four criteria must be satisfied to support intervention as of right: (1) the motion to intervene must be timely; (2) the applicant must have a cognizable interest in the action; (3) the applicant must be so situated that the disposition of the action may, as a practical

4

WASHAR0003214

matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit. *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015); FED. R. CIV. P. 24(a). "'Rule 24 is to be construed liberally . . . and doubts resolved in favor of the proposed intervenor.'" *See Poynor v. Chesapeake Energy Ltd. P'ship (In re Lease Oil Antitrust Litig.)*, 570 F.3d 244, 248 (5th Cir. 2009) (internal citations omitted). Proposed Intervenors satisfy these requirements and should be permitted to intervene.

    1.   <u>The Motion to Intervene is timely.</u>

Proposed Intervenors have taken prompt action to intervene and file this Motion shortly after acquiring the full text of the Settlement Agreement from the Internet on or about July 19, 2018. Proposed Intervenors had not intervened here previously because they agreed with the Government's position. The Fifth Circuit has held, as is the case here, that by filing of a motion to intervene, "less than one month after learning of their interest in [the] case, [movants] discharged their duty to act quickly." *See Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (quoting *Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977)).

With respect to the second factor, the Fifth Circuit has emphasized that the relevant prejudice is that created by the intervenor's *delay* in seeking to intervene after it learns of its interest, not prejudice to existing parties if intervention is allowed. *See Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 (5th Cir. 1992). As noted, the Proposed Intervenors did not unduly delay the filing of this Motion, and acted promptly after learning of its need to defend its interest in this matter. Prior to obtaining a copy of the Settlement Agreement, which revealed the parties current intentions, Proposed Intervenors were operating under the information and belief, supported by the Court docket and pleadings filed in this matter, that the Government defendants had been and were representing their interests and national security.

<div align="center">5</div>

139718.00601/110549050v.6

WASHAR0003215

Under the third factor, the Proposed Intervenors would be severely prejudiced and suffer irreparable harm if not allowed to intervene.  Importantly, once Defense Distributed weapon's data is released to the internet, the damage to national security will be irreversible.

Lastly, there are no unusual circumstances here which weigh against intervention.  Rather, the Government's sudden abandonment of its longstanding position and the national security issues that are at stake, are both unusual circumstances that weigh heavily in favor of intervention.

    2.   The Proposed Intervenors have a cognizable interest in the instant litigation.

The inquiry under the second requirement of Rule 24(a), "turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *See Texas*, 805 F.3d at 657 (5th Cir. 2015).   Accordingly, an interest that is "concrete, personalized, and legally protectable is sufficient to support intervention." *Id.* at 658.  Specifically, the Fifth Circuit has concluded that a party has "a legally protectable interest in the regulatory scheme" when the party or their membership are the "intended beneficiaries" of the policy under challenge." *See Wal-Mart*, 834 F.3d at 566-67 (5th Cir. 2016).  The Fifth Circuit has also held that "public spirited" civic organizations that successfully petition adoption of a law may intervene to vindicate their "particular interest" in protecting that law. *Id.* (citing *City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291, 294 (5th Cir. 2012)).  Proposed Intervenors meet this test.

The Plaintiffs have declared that because of the Settlement Agreement, the work that Proposed Intervenors are dedicated to will be imeasureably more difficult, if not impossible. Proposed Intervenors and their members work to pass and enforce gun safety laws in Congress and throughout the country.  Upon publication of the Settlement Agreement, Cody Wilson, the president of Defense Distributed announced that "common sense gun reforms" would no longer be possible and posted a picture of a tombstone in the ground, with the phrase "American Gun

139718.00601/110549050v.6

WASHAR0003216

Control." Plaintiff Second Amendment Foundation declared that that Settlement Agreement is a "a devastating blow to the gun prohibition lobby[.]" Proposed Intervenors have a concrete, personalized, and legally protectable interest in this litigation because the intent of the Plaintiffs, through the Settlement Agreement, is to make Proposed Intervenors' work untenable. As a result of the Settlement Agreement, Proposed Intervenors will be forced to expend additional resources to protect their respective missions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (where defendant's alleged conduct "perceptibly impaired" an organizational plaintiff's ability to carry out its mission and caused a "drain on the organization's resources – there can be no question that the organization has suffered the requisite injury in fact."); *Am. Civ. Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 788 (W.D Tex. 2015) ("An organization can demonstrate injury 'by [alleging] that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and perceptibly impaired the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'") (quoting *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010)). In this case, because Proposed Intervenors assert a "procedural interest" to protect their "concrete interest," they "can assert that right without meeting all the normal standards for redressbility and immediacy" required for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n. 7 (1992).

### 3. The Disposition of the action threatens to create a practical impediment to the Proposed Intervenors' ability to protect its members' interest.

Proposed Intervenors would be seriously prejudiced if this Motion is not granted, as the implementation of the Settlement Agreement would undermine their stated mission statements and seriously impact members' interest and safety. The release of Defense Distributed's weapon's data via the internet, once permitted, cannot be reversed, mitigated, or undone, and would cause direct, substantial, and irreversible harm to the Proposed Intervenors and its members.

7

139718.00601/110549050v.6

WASHAR0003217

As the Government has advocated throughout this matter, the dissemination of such information will negatively impact the national security of the United States and its citizens. Therefore, because Proposed Intervenors' and their members' interests would be practically impeded if the Settlement Agreement were implemented, Proposed Intervenors should be permitted to intervene at this juncture.

4. <u>No existing party adequately represents the Proposed Intervenors' interest.</u>

Clearly the Government no longer adequately represents the Proposed Intervenors' interest.

**B. Alternatively, permissive intervention is warranted under Rule 24(b).**

If this Court decides that Proposed Intervenors are not entitled to intervene as of right, they should be permitted to intervene under Rule 24(b). Under Rule 24(b)(1)(B), the Court may, in its discretion, permit intervention on a timely motion when the potential intervenor "has a claim or defense that shares with the main action a common question of law or fact." *See Graham v. Evangeline Par. Sch. Bd.*, 132 F. App'x 507, 511 (5th Cir. 2005). The "claim or defense" portion of Rule 24(b)(2) has been construed liberally by the Fifth Circuit. *See Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006). Moreover, "it is settled law in this circuit that permissive intervention is 'wholly discretionary with the [district] court.'" *See United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 416 (5th Cir. 1991) (internal citation omitted). Proposed Intervenors satisfy these factors, and this Court is within its discretion to permit them to intervene.

**C. Proposed Intervenor's are not required to establish independent standing to intervene.**

The Fifth Circuit has ruled that "Article III does not require intervenors to independently possess standing where the intervention is into a *subsisting* and *continuing* Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one

8

WASHAR0003218

subsisting party with standing to do so." *See Steward v. Abbott*, 189 F. Supp. 3d 620, 625 (W.D. Tex. 2016) (emphasis added) (internal citations omitted); *see also Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006); *Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998) (agreeing with "the better reasoning in cases which hold that Article III does not require intervenors to possess standing"). This Court has acknowledged it is "tasked with safeguarding separation of powers" and held that "[p]rovided that such a case or controversy exists, it is immaterial to the court's jurisdiction whether an intervening party, proceeding alone, could have satisfied the requirements of Article III." *Steward*, 189 F. Supp. 3d at 626 (W.D. Tex. 2016) (internal citation omitted). Accordingly, "[o]nce a valid Article III case-or-controversy is present, the court's jurisdiction vests," and "[t]he presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established." *See Ruiz*, 161 F.3d at 832 (5th Cir. 1998) (rejecting argument that intervenor required standing to invoke the court's jurisdiction to decide the merits of their claims, reasoning that "[t]he court's jurisdiction in [the] case ha[d] already been invoked by the original parties").[2]

---

[2] Even if this Court were to require Proposed Intervenors to prove independent standing to intervene, Proposed Intervenors are able to establish the necessary elements of injury, causation, and redressability. *See LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) ("The three well-known components of standing are injury in fact, causation, and redressability"). "For an issue to be ripe for adjudication, a plaintiff must show that he 'will sustain immediate injury" and "that such injury would be redressed by the relief requested,'" *See Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994) (*citing Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81, 98 S. Ct. 2620, 2635, 57 L. Ed. 2d 595 (1978)).

Here, as described above, the Proposed Intervenors would be immediately and irreparably injured by the implementation of the Settlement Agreement and the dissemination of Defense Distributed's weapons data via the internet, as once the information is released online, it cannot be reversed, nor can its potential effects be mitigated, or undone. *Def. Distributed*, 838 F.3d at 461 (5th Cir. 2016) (emphasis added). In spite of the Government's prior strong defense of this matter, the Settlement Agreement now abandons those same pressing national security concerns raised by the possibility of foreign nationals or terrorists acquiring Defense Distributed's weapons files. Accordingly, Proposed Intervenors' injury would be directly caused by the implementation of the recent Settlement Agreement reached by the parties. *Id.* at 431 (5th Cir. 2011) ("[t]he

9

WASHAR0003219

**CONCLUSION**

The Court should enter an order permitting Proposed Intervenors to file a Complaint in

Intervention.

---

causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable,'" to the parties and/or the conduct at issue); Dkt. 32-1.  Additionally, it is clear that the intervention and the requested injunction, if granted, will prevent the immediate and irreparable harm to the Proposed Intervenors, among others, caused by the possibly illegal implementation of the Settlement Agreement and the irreversible dissemination of Defense Distributed's blueprints for untraceable lethal weapons via the internet.  *Id.*

Proposed Intervenors may also establish associational standing to intervene on behalf of their individual members.  An organizational plaintiff may have Article III standing either in its own right, "if it meets the same standing test that applies to individuals[,]" or associational standing on behalf of its members, if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Steward*, 189 F. Supp. 3d at 630-31 (W.D. Tex. 2016) (internal citations omitted).  Here, Proposed Intervenors' members are American citizens and the intended beneficiaries of gun control and anti-terror laws enacted by this country.  By virtue of the Settlement Agreement, and the online publishing of Defense Distributed's weapons files, the security and safety of Proposed Intervenors' members is directly threatened.  As the Government has previously cited, Proposed Intervenors' members will be subjected to increase risk from terroristic and violent threats, at home, in public places, and while traveling abroad if Defense Distributed's data is released.  *See* Dkt. 32, 32-1. Second, the interests that Proposed Intervenors and their individual members seek to protect relate to the prevention of gun violence, which is germane to each organization's purpose, and which is essential to each of their individual members.  Finally, it is undisputed that the interests which Proposed Intervenors and their individual members seek to assert do not require direct participation by the individual members in the lawsuit.  The Government defendants have previously and adequately represented the individual members' interests in this litigation for over three (3) years without the members' direct participation in this case.  Proposed Intervenors will represent the interests of their individual members that have now been abandoned by the Government defendants by virtue of the Settlement Agreement.

10

WASHAR0003220

Dated:  July 25, 2018                    Respectfully submitted,


                                         */s/ David Cabello*
                                         J. David Cabello
                                         Blank Rome LLP
                                         Texas State Bar No. 03574500
                                         717 Texas Avenue
                                         Suite 1400
                                         Houston, TX 77002
                                         Telephone: (713) 228-6601
                                         Facsimile: (713) 228 6605
                                         E-mail: dcabello@blankrome.com

                                         John D. Kimball (pending *pro hac vice*)
                                         Blank Rome LLP
                                         N.Y. Bar No. 1416031
                                         The Chrysler Building
                                         405 Lexington Ave.
                                         New York, NY 10174
                                         (212) 885-5000

                                         **Attorneys for The Brady Campaign to
                                         Prevent Gun Violence, Everytown for Gun
                                         Safety Action Fund, Inc., and Giffords**


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on July 25, 2018, and was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(b)(1).


                                         */s/ M'Liss Hindman*
                                         M'Liss Hindman
                                         Paralegal

139718.00601/110549050v.6

WASHAR0003221

# Exhibit A

WASHAR0003222

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.     *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)     Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0003223

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0003224

counsel with all information necessary to effectuate this payment. The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

WASHAR0003225

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.    *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0003226

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0003227

8. *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

9. *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

10. *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

11. *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0003228

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12. *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

- The phrase "*Published Files*" means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

- The phrase "*Ghost Gunner Files*" means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

- The phrase "*CAD Files*" means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

- The phrase "*Other Files*" means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

- The phrase "*Military Equipment*" means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

- The phrase "*technical data that is the subject of the Action*" means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0003229

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0003230

# Exhibit C

WASHAR0003231

## SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

1.      *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

    (a)      Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the <u>Federal Register</u> of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

    (b)      Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International

WASHAR0003232

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

WASHAR0003233

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.  *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.  *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4. *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

WASHAR0003235

5.    *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.    *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.    *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

WASHAR0003236

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this
     Settlement Agreement with their counsel, who has explained these documents to them
     and that they understand all of the terms and conditions of this Settlement Agreement.
     Plaintiffs further acknowledge that they have read this Settlement Agreement, understand
     the contents thereof, and execute this Settlement Agreement of their own free act and
     deed. The undersigned represent that they are fully authorized to enter into this
     Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,
     each of which shall be deemed an original, and all of which together constitute one and
     the same instrument, and photographic copies of such signed counterparts may be used in
     lieu of the original.

10.  *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly
     drafted agreement and shall not be construed against any party as the drafter.

11.  *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax
     requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and
     Defendants agree that nothing in this Settlement Agreement waives or modifies federal,
     state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

WASHAR0003237

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this
Settlement Agreement without reliance on any representation by Defendants as to the
application of any such law.

12.    *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-    The phrase *"Published Files"* means the files described in paragraph 25 of
     Plaintiffs' Second Amended Complaint.
-    The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of
     Plaintiffs' Second Amended Complaint.
-    The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs'
     Second Amended Complaint.
-    The phrase *"Other Files"* means the files described in paragraphs 44-45 of
     Plaintiffs' Second Amended Complaint.
-    The phrase *"Military Equipment"* means (1) Drum and other magazines for
     firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds,
     regardless of jurisdiction of the firearm, and specially designed parts and
     components therefor; (2) Parts and components specially designed for conversion
     of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or
     attachments specially designed to automatically stabilize aim (other than gun
     rests) or for automatic targeting, and specially designed parts and components
     therefor.
-    The phrase *"technical data that is the subject of the Action"* means: (1) the
     Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other
     Files insofar as those files regard items exclusively: (a) in Category I(a) of the
     United States Munitions List (USML), as well as barrels and receivers covered by
     Category I(g) of the USML that are components of such items; or (b) items

7

WASHAR0003238

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

WASHAR0003239

| | |
|---|---|
| **From:** | Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov> |
| **Sent:** | Friday, March 16, 2018 1:54 PM |
| **To:** | Rogers, Shana A <RogersSA2@state.gov> |
| **Cc:** | Soskin, Eric (CIV) <Eric.Soskin@usdoj.gov> |
| **Subject:** | FW: Offer of Settlement |
| **Attach:** | Offer of Settlement.pdf |

Hi Shana,

█████████████████████████████████████████████

Thanks,
Stuart

**From:** Matthew Goldstein [mailto:matthew@goldsteinpllc.com]
**Sent:** Thursday, March 15, 2018 8:37 PM
**To:** Soskin, Eric (CIV) <ESoskin@civ.usdoj.gov>; Robinson, Stuart J. (CIV) <strobins@CIV.USDOJ.GOV>
**Cc:** Alan Gura <Alan@gurapllc.com>; Josh Blackman <joshblackman@gmail.com>; Bill Mateja <mateja@polsinelli.com>; David Morris <dmorris@fr.com>
**Subject:** Offer of Settlement

Eric and Stuart,

Pursuant to the deadline set forth in the Court's Scheduling Order, attached please find Plaintiffs' Offer of Settlement.

Thank you.

-Matt

Matthew A. Goldstein | Counsel
GOLDSTEIN PLLC
1875 Connecticut Ave NW, 10th Floor
Washington, D.C. 20009
C: 1.202.550.0040
www.GoldsteinPLLC.com

This message may contain information that is privileged and/or confidential. As such, it is solely intended for disclosure to the recipient named above. Access by anyone other than the intended recipient is unauthorized. If you have received this electronic transmission in error, please immediately reply that you have received the message and delete the message. Note that if you are not the intended recipient, any copying, disclosure, distribution, or other unauthorized use of the information contained in this message is prohibited and may be unlawful. If you are a client, do not forward this email to anyone. Doing so may waive the attorney-client privilege. Thank you.

**OFFER OF SETTLEMENT**

Case No. 15-CV-372-RP

Pursuant to the Court's March 12, 2018 Scheduling Order, Plaintiffs hereby submit this Offer of Settlement to the Defendants in the above-captioned matter, offering to settle this matter upon the following terms and conditions:

1. Defendants' stipulation to entry of an order by the Court in the above-captioned matter, and entry of a stipulated order by the Court, ordering that the Department of State and the Department of Justice shall not, directly or indirectly, under the Arms Export Control Act of 1976 or the International Traffic in Arms Regulations (ITAR), impose, enforce or otherwise attempt to maintain a prior restraint on public speech, to include public speech consisting of Internet publications of computer aided design files for the manufacture of firearms.

2. Defendants join Plaintiffs in filing a motion for entry of the stipulated order in which Defendants admit the allegations of Plaintiffs' Complaint, as amended, and in which Defendants expressly acknowledge that the Arms Export Control Act of 1976 and the ITAR do not require U.S. Government approval for publishing technical data on the Internet or for other public speech.

3. Defendants' posting of a letter at www.pmddtc.state.gov in a manner that is easily accessible to all members of the public with Internet access, that is addressed to the Defendants, issued on Department of State letterhead with the official agency seal, is signed and dated by the Secretary of State, and that contains the following official statement from the Secretary of State:

> Other than in its May 8, 2013 letter to Cody Wilson of Defense Distributed, the Department of State has never imposed a prior restraint on public speech under the Arms Export Control Act of 1976 or its implementing regulations under the International Traffic in Arms Regulations (ITAR).

> The Department of State, through its May 8, 2013 letter to Mr. Wilson, singled out and specifically targeted the speech by Mr. Wilson and Defense Distributed with a prior restraint based on the U.S. Government's disagreement with the content, to include certain messages, of that speech.

> The Department of State further acknowledges multiple instances of prior Department of Justice legal advice to the Department of State and legal opinions to the Department of State, to the White House, and to Congress in which the U.S. Government's own legal counsel warned that the Department of State's application of the ITAR to public speech would violate the United States Constitution.

WASHAR0003241

By this letter, the Department of State provides advance notice to the public that it will in no way seek to enforce a prior restraint under the Arms Export Control Act of 1976 or the ITAR or otherwise attempt to impose the ITAR on public speech.

Within 60 days, the Department of State will issue a final rule on the Federal Register repeating this policy. The final rule will rescind the supplementary information to 80 Fed. Reg. 31525 (June 3, 2015) in which the Department of State claimed there was an ITAR prior restraint on public speech and proposed to explicitly impose ITAR control over Internet postings of technical data and other public speech.

4. Defendants' issuance, within 60 days of Defendants' acceptance of this Offer of Settlement, of a final rule in the Federal Register with the following supplemental information and making the following ITAR amendment, without any editorial language or other qualification added by the Department of State:

SUPPLEMENTAL INFORMATION:

The Department of State revises the definition of "public domain" at § 120.11 of the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130) by adding a note to paragraph (a) and adding a new paragraph (b) in order to clearly confirm that the ITAR does not control public speech. The Department does not require authorization to release technical data into the public domain. The Arms Export Control Act of 1976 was never intended to control public speech, of any kind. Therefore, the Department will in no way seek to enforce a prior restraint under the Arms Export Control Act of 1976 or the ITAR. The Department hereby rescinds the supplementary information provided in its proposed rule under 80 Fed. Reg. 31525 (June 3, 2015), wherein the agency claimed that the ITAR controls public speech.

AMENDMENT (adding a new note to paragraph (a) and a new paragraph (b) to ITAR § 120.11):

Section 120.11 is revised to read as follows:

WASHAR0003242

### § 120.11  Public domain.

(a) Public domain means information which is published and which is generally accessible or available to the public:

(1) Through sales at newsstands and bookstores;

(2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3) Through second class mailing privileges granted by the U.S. Government;

(4) At libraries open to the public or from which the public can obtain documents;

(5) Through patents available at any patent office;

(6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also §125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

WASHAR0003243

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

**Note to paragraph (a):** This paragraph provides an exemplary list of public forums. They are provided as examples only and do not constitute an exhaustive list of public forums recognized under this subchapter.

(b) Unclassified technical data, to include software, may be posted to any public forum, to include the Internet, in any format, without prior approval from the Department of State or any other U.S. Government agency. This subchapter does not control publications of technical data into public forums or any other form of public speech, regardless of whether foreign persons will have access to the published information.

5. Defendants' agreement that they will never, in any way, attempt to narrow or alter the substance of the above amendment.

6. Defendants' acknowledgment and agreement that the terms and conditions above are made for the benefit of any member of the public, to include Defense Distributed's customers and Second Amendment Foundation's members, who are intended third-party beneficiaries of this Offer of Settlement and who shall have the individual and/or collective rights to enforce the terms and conditions of this Offer of Settlement.

7. Defendants' payment of all attorneys' fees and costs incurred by Cody Wilson and Defense Distributed in responding to the Department of State's May 8, 2013 letter, to include fees incurred in preparing and submitting ten commodity jurisdiction requests and the costs of multiple Department of State annual registration fees.

8. Defendants' payment of all attorneys' fees and costs incurred by the Plaintiffs in the above-captioned lawsuit.

This Offer of Settlement is made under Rule 408 of the Federal Rules of Evidence. Pursuant to the Court's Scheduling Order, it will remain open until March 30, 2018. If this offer is not accepted before that time, it shall be deemed withdrawn.

———————

WASHAR0003244

| | |
|---|---|
| **From:** | ████████████ <bounce@list.everytown.org> |
| **Sent:** | Tuesday, July 24, 2018 8:32 AM |
| **To:** | DDTC Response Team <DDTCResponseTeam@state.gov> |
| **Subject:** | Phil in 06040: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

████████████ in 06040

<http://track.sp.actionkit.com/q/cQJXxAZUJkM-cbEh2ochZQ~~/AAAAAQA~/RgRdOaFaPlcEd2F3ZEIKAAJaHFdbLXkxt1IaZGR0Y3Jlc3BvbNldGVhbUBzdGF0ZS5nb3ZYBAAAAFg~>

| | |
|---|---|
| **From:** |  -bounce@list.everytown.org> |
| **Sent:** | Tuesday, July 24, 2018 8:31 AM |
| **To:** | DDTC Response Team <DDTCResponseTeam@state.gov> |
| **Subject:** | Patti in 98003: please stop the release of downloadable guns |

Dear Secretary Pompeo,

Please stop the release of downloadable files that will allow people, including convicted felons and terrorists, to make untraceable guns on their 3D printers.

Do-it-yourself, downloadable guns are incredibly dangerous. The State Department is planning a special exemption letting the company Defense Distributed release schematics for these guns — information that would enable terrorists, convicted felons and domestic abusers to simply download files online and print their own illegal and untraceable guns. It's unconscionable to allow criminals to print untraceable guns on demand — and Defense Distributed says it will post its plans on August 1.

The State Department can act to prevent this deadly and dangerous outcome. It should not grant this special exemption to endanger the public — and instead should continue to block this deadly information from being published online.

Thank you,

n 98003

<http://track.sp.actionkit.com/q/QFEsuImQ64UELity0jLvVA~~/AAAAAQA~/RgRdOaEiPlcEd2F3ZEIKAAciHFdbjhUY1FIaZGR0Y3Jlc3BvbnNldGVhbUBzdGF0ZS5nb3ZYBAAAAI

| | |
|---|---|
| **From:** | Marquis, Matthew R <MarquisMR@state.gov> |
| **Sent:** | Friday, July 27, 2018 8:57 AM |
| **To:** | PM-CPA <PM-CPA@state.gov> |
| **Subject:** | PM/CPA DAILY BULLETIN – July 27, 2018 |
| **Attach:** | PM-CPA-DAILYBULLETIN27JULY2018.docx; Clips20180727.doc; Pan-Arab-07-27.docx; Briefing20180727.doc; 26_July_2018.docx; RRU 07-26 SR Trade.docx; RRU 07-26 SR SecState SFRC Testimony North Korea and Iran.docx; RRU 07-26 SR Russia.docx |

Good morning from Foggy Bottom. Here is your *PM/CPA Daily Bulletin* for July 27, 2018 brought to you by the Office of Congressional and Public Affairs, Bureau of Political-Military Affairs, U.S. Department of State.

- **Final Press Guidance Package**>> *attached*
- **Daily Bulletin in .DOCX format** >> *attached*
- **BONUS: Department of State News Briefing** >> *attached*
- **BONUS: Department of State News Clips** >> *attached*
- **BONUS: Pan-Arab Media Highlights** >> *attached*
- **BONUS: RRU Analysis North Korea**>> *attached*
- **BONUS: RRU Special Report Secretary Pompeo's SFRC Testimony: Russia, Crimea** >> *attached*
- **BONUS: RRU Special Report Secretary Pompeo's SFRC Testimony: North Korea & Iran** >> *attached*
- **BONUS: RRU Special Report Trade** >> *attached*

**PM-Related News**
**AF:**

AU military chiefs raise red flag on foreign military bases

Troops carry massive security operation in Mogadishu


**EAP:**

Remains of fallen American troops headed back from North Korea

The return of the Asia-Pacific Quad

South Korea scrambles jets to intercept Chinese warplane


**EUR:**

Washington ratchets up sanctions threats against Turkey

Bipartisan House duo introduces bill to stymie potential US NATO withdrawal

Russia has sent thousands of troops and weapons to its western border, near US military and NATO allies


**NEA:**

US and Turkish troops coordinate patrols in tense Manbij region of Syria

WASHAR0003247

Top Iranian general says his troops 'ready to confront' US

Houthi attack on Abu Dhabi airport? UAE denies

**SCA:**

India, US set to sign pact for secure military communications

US, India working 'hand in glove' to strengthen diplomatic, military relations ahead of '2+2' dialogue, says Washington

Pentagon: Coalition airstrikes in Afghanistan on record pace in '18

**WHA:**

United States, Canada studying options to replace Arctic early warning radars

Brazilian student gunned down in latest wave of violence in Nicaragua

**Commentary & Analysis:** While progress has been slow, there have been some seemingly positive developments in the situation on the Korean Peninsula. While Secretary of State Pompeo recently stated in a congressional testimony that the North was still producing nuclear material, progress is being made elsewhere as satellite images have shown the apparent dismantling of a key missile test site. In another positive sign of reducing tensions, South Korea recently announced that they were planning on reducing the number of troops stationed on the DMZ. In perhaps the most visible sign of progress North Korea began to fulfill a pledge reportedly made at the recent Singapore summit and started repatriating the remains of U.S. service-members killed during the Korean War.

**And Finally…** Spain has a storied naval history, starting with the legendary Spanish Armada, and the pride of Spain's current Navy are four brand new Submarines worth billions of dollars. The only problem is they don't have anywhere to put them. The S-80 submarines were built to replace Spain's aging Cold War subs, and nobody seemed to take into account that the new subs were significantly larger than the old ones. Because of this oversight, the submarine docks of the Spanish Navy are too small for the S-80 subs and will require significant and costly upgrades.

---

**Matthew Marquis**
Office of Congressional & Public Affairs
Bureau of Political-Military Affairs (PM/CPA)
U.S. Department of State

Phone:       202.647.6968
e-mail:       *MarquisMR@state.gov* |  Web: *www.state.gov/t/pm /* |Twitter: *@StateDeptPM*

Stay connected with *State.gov*:



**Official**
**UNCLASSIFIED**

**Official**
**UNCLASSIFIED**

WASHAR0003249

Good morning from Foggy Bottom. Here is your *PM/CPA Daily Bulletin* for July 27, 2018 brought to you by the Office of Congressional and Public Affairs, Bureau of Political-Military Affairs, U.S. Department of State.

- **Final Press Guidance Package**>> *attached*
- **Daily Bulletin in .DOCX format** >> *attached*
- **BONUS: Department of State News Briefing** >> *attached*
- **BONUS: Department of State News Clips** >> *attached*
- **BONUS: Pan-Arab Media Highlights** >> *attached*
- **BONUS: RRU Analysis North Korea**>> *attached*
- **BONUS: RRU Special Report Secretary Pompeo's SFRC Testimony: Russia, Crimea** >> *attached*
- **BONUS: RRU Special Report Secretary Pompeo's SFRC Testimony: North Korea & Iran** >> *attached*
- **BONUS: RRU Special Report Trade** >> *attached*

## PM-Related News

**AF:**

AU military chiefs raise red flag on foreign military bases

Troops carry massive security operation in Mogadishu

**EAP:**

Remains of fallen American troops headed back from North Korea

The return of the Asia-Pacific Quad

South Korea scrambles jets to intercept Chinese warplane

**EUR:**

Washington ratchets up sanctions threats against Turkey

Bipartisan House duo introduces bill to stymie potential US NATO withdrawal

Russia has sent thousands of troops and weapons to its western border, near US military and NATO allies

**NEA:**

US and Turkish troops coordinate patrols in tense Manbij region of Syria

Top Iranian general says his troops 'ready to confront' US

Houthi attack on Abu Dhabi airport? UAE denies


**SCA:**

India, US set to sign pact for secure military communications

US, India working 'hand in glove' to strengthen diplomatic, military relations ahead of '2+2' dialogue, says Washington

Pentagon: Coalition airstrikes in Afghanistan on record pace in '18


**WHA:**

United States, Canada studying options to replace Arctic early warning radars

Brazilian student gunned down in latest wave of violence in Nicaragua


**Commentary & Analysis:** While progress has been slow, there have been some seemingly positive developments in the situation on the Korean Peninsula. While Secretary of State Pompeo recently stated in a congressional testimony that the North was still producing nuclear material, progress is being made elsewhere as satellite images have shown the apparent dismantling of a key missile test site. In another positive sign of reducing tensions, South Korea recently announced that they were planning on reducing the number of troops stationed on the DMZ. In perhaps the most visible sign of progress North Korea began to fulfill a pledge reportedly made at the recent Singapore summit and started repatriating the remains of U.S. service-members killed during the Korean War.


**And Finally…** Spain has a storied naval history, starting with the legendary Spanish Armada, and the pride of Spain's current Navy are four brand new Submarines worth billions of dollars. The only problem is they don't have anywhere to put them. The S-80 submarines were built to replace Spain's aging Cold War subs, and nobody seemed to take into account that the new subs were significantly larger than the old ones. Because of this oversight, the submarine docks of the Spanish Navy are too small for the S-80 subs and will require significant and costly upgrades.



# STATE DEPARTMENT NEWS CLIPS

### FRIDAY, JULY 27, 2018 5:00 AM EDT

## TODAY'S EDITION

### Secretary of State

How Trump's Deal To Secure The Release Of A American Pastor Held In Turkey Fell Apart (Leonnig, Parker, Fahim, Deyoung, WP) ............................................. 4
Trump Threatens Turkey Sanctions Over Pastor As Ties Hit New Low (Epstein, BLOOM) ................................. 6
Help Is On The Way, At Last, For Religious Minorities In Iraq (Morello, WP) .......................................... 7
Despite Egypt's Dismal Human Rights Record, U.S. Restores Military Aid (Record, Aid, NYT) ...................... 8
Pence Unleashes On North Korean Abuses: 'Much Worse' Than China (Richardson, WT) ....................... 9

### Editorials & Op-Eds

The Trump Two-step Strikes Again (Zakaria, WP) ................ 11
The Big Lesson From Trump's Truce On Trade? Pushback Works. (WP) ..................................................... 12
Trump Is Using Tariffs To Advance A Radical Free-trade Agenda (Thiessen, WP) ................................. 12
Trump Has No Idea What His Tariffs Have Unleashed For Farmers (Leonard, NYT) ..................................... 13
Donald Trump Is Solving His Tariff Problems The Only Way He Knows How: Paying Them Off (Brandus, USAT) .......... 15
President Trump Should Stop His Trade War Before It Hurts Our Economy (Norquist, Sepp, Brandon, Chapman, McIntosh, Phillips, USAT) .................................. 15
Trump Bails Out Some, But Not All, The Victims Of His Trade War (LAT) ................................................ 16
Europeans Are Free Traders Now? That's Rich (Baltzan, LAT). 17
China Takes Its Political Censorship Global (Rogin, WP) ........ 18
When Trump Talks, The World Listens. Should It? (NYT).......... 19
Pakistan's Likely Next Leader Is A Taliban Sympathizer (WP) .. 20
For Imran Khan, Winning Was The Easy Part (Dhume, WSJ)... 21
Europe's Prisons Breed Terrorism. Can Anything Be Done? (WP) ..................................................... 21
This Is Not Your Grandfather's KGB (Ignatius, WP) .................. 22
Mexico And The Nicaraguan Quagmire (Castañeda, NYT) ...... 23
Why Trump Is Right About The E.U.'s Penalty Against Google (Stewart, NYT) .......................................... 24
His Pacific Island Was Swallowed By Rising Seas. So He Moved To A New One. (Cave, NYT) ..................... 26
I'm Stuck In Guantanamo. The World Has Forgotten Me (Rabbani, LAT) ........................................... 27
Did Israel Just Stop Trying To Be A Democracy? (Boehm, NYT) 28

### Trade

Trump Trade War: U.S. Stock Market Is Faring Better Than China's Since Dispute Began (Shell, USAT) .................... 30
China's Xi Says World Must 'Reject Protectionism Outright' (AP)31
China Plans Retaliation For Any Amount Of U.S. Tariffs (BLOOM) ........................................... 31
Amid Trade War, US And China Exchange Invectives At WTO (Keaten, AP) ........................................... 32
U.S. Downplays Hopes For China Deal Soon Amid EU, Nafta Progress (Mayeda, Leonard, Niquette, BLOOM) .............. 32
Chinese Factory Rushing To Make Trump's 2020 Banners In Fear Of Tariffs (Hayes, USAT) ............................. 33
Trump-Europe Trade Rift: What Was Settled, And What Wasn't? (Wiseman, AP) .................................. 34
Trump Declares Victory For Farmers In Trade Spat With EU (Scott, Pigman, AFP) ................................... 35
Trump Celebrates His Tariff Policies With Illinois Steelworkers Amid Complaints From Midwest Farmers (Stokols, LAT) . 36
Juncker's Trade Pitch To Trump: 'I Can Be Stupid, As Well' (Pop, Salama, WSJ) ................................. 38
In Tentative Deal With E.U., Trump Touts Parts Of Global Trade Deals He Once Rejected (Whalen, Paletta, WP) .............. 38
Europeans Are Skeptical Of Trade Truce With Trump (Ariès, McAuley, WP) ........................................... 39
Trump Says Europe Will Buy More American Gas. Is That Possible? (Reed, NYT) .................................. 40
Europe Averts A Trade War With Trump. But Can It Trust Him? (Erlanger, NYT) ........................................ 41
Trump's Trade Truce With Europe Has A Familiar Feel: It Mirrors Obama's Path (Swanson, Ewing, NYT) ................. 43
US-EU Trade Agreement Wins Cautious Welcome In Germany (AP) ..................................................... 45
France And Spain Want US Action On Steel, Aluminum Tariffs (AP) ..................................................... 45
Macron Says He Needs To See More Detail On Trump-Juncker Accord (Fouquet, Duarte, BLOOM) .......................... 46
Macron 'Not In Favour' Of Vast New US-EU Trade Deal (AFP). 46
Trump Administration Tries To Ease Republican Worries About Trade Fights (Hughes, Schlesinger, WSJ) ................... 47
Trump Wants Europe To Buy U.S. Gas—but Russia Is In His Way (McFarlane, Pancevski, Kantchev, WSJ) ................. 47
Wilbur Ross Says U.S. Investigation Of Auto Tariffs For Europe Will Go On Despite Deal (Boyer, WT) ..................... 47

Larry Kudlow: E.U. Now Backs Trump's Trade Fight With China (Miller, WT) .......................... 47
Industry Head: Tariffs Could Have Big Impact On US Energy (Anderson, AP) ........................... 48
Europe's Vow To Buy More U.S. Soy Won't Make Up For China Losses (Bjerga, Almeida, BLOOM) ................. 49
BRICS Nations Pledge Unity As Trade War Threatens (Debut, Gumede, AFP) ........................... 49
BRICS Want World To Play By WTO Rules As Trump Seeks More Duties (Monteiro, Tanas, Bax, BLOOM) ............ 50
Robert Lighthizer, Trade Rep.: U.S. Closing In On NAFTA Agreement, China A 'Longer-Term Problem' (Sherfinski, WT) ............................ 51
Trump Claims The U.S. Would Save Money Without Trade. That's Not What A Trade Deficit Represents. (Qiu, NYT) . 51

## Congressional Activity
Bipartisan Bill Would Prevent Trump From Exiting NATO Without Senate Consent (Demirjian, WP) ......................... 53

## Global Issues
Report: China, Russia And Iran Ramp Up Economic Spying On US (Riechmann, AP) ........................... 54
China, Russia, Iran Top Cyber Threats, U.S. Intelligence Finds (Strohm, BLOOM) .......................... 55
United Nations Leader Warns Of A Cash Shortage (Gladstone, NYT) .................................... 56
Guterres Raises Alarm Over UN Cash Crunch (AFP) ............... 56
Record Drop In Foreigners Buying U.S. Homes (Kusisto, WSJ) 57

## ISIS
IS Attack Devastates Community In Southern Syria (El Deeb, AP) .................................... 57
Death Toll In Devastating ISIS Attacks In Syria Climbs To 216 (Onyanga-Omara, USAT) ........................... 58
German IS Suspect Charged Over Torture, Killing Of Prisoners (AP) ..................................... 59

## Near East & North Africa
How One Minority Group Could Undermine Israel's New Jewish Identity Law (Tarnopolsky, LAT) ........................ 59
Army: Palestinian Stabs 3 Israelis In West Bank Home (AP) ..... 61
Knife Attack Kills One Israeli, Wounds Two Others In West Bank (AFP) .................................... 61
Some Syrian Refugees Oppose Russian Repatriation Push (AP) ..................................... 62
Death Notices For Syrian Prisoners Are Suddenly Piling Up. It's A Sign Assad Has Won The War. (Loveluck, Zakaria, WP) 63
Hundreds Died In Syrian Custody, Government Acknowledges (Hubbard, Shoumali, NYT) ........................... 64
Syria's Assad Says Next Priority Is Retaking Idlib: Russian Media (AFP) .................................... 66
Amid Trump Threats, Senior Iran General Says His Forces 'Ready To Confront' U.S. (Hjelmgaard, Jackson, USAT) .. 66
Iranian General Locks Horns With Trump, Escalating Threat-Filled Feud (Gladstone, NYT) ...................... 67

After Trump's Threat To Iran, White House Convenes A Policy Meeting (Gordon, Youssef, Nicholas, WSJ) ................ 68
Top Iranian General Warns Trump That War Would Unravel U.S. Power In Region (Cunningham, Fahim, WP) .......... 68
Top Iranian General Says His Troops 'Ready To Confront' US (AP) ..................................... 69
Senators Warn Europe Against Flouting US Iran Sanctions (Lee, AP) ..................................... 69
Dubai Police Recover Rare $20 Million Stolen Blue Diamond (AP) ..................................... 70
U.S. Allies Have Killed Thousands Of Yemeni Civilians From The Air. After 22 Died At A Wedding, One Village Asks, 'Why Us?' (Raghavan, WP) .......................... 70
Yemen Rebels Claim Strikes On Abu Dhabi Airport In UAE (AP) 72
Oil Prices Spike After Saudi Halts Shipments After Attack (Rising, WT) .................................... 73
Egypt President Ratifies Law Protecting Military Officers (AP) ... 73
800 Migrants Storm Fences To Enter Spanish Enclave In Africa (AP) ..................................... 74
Trump Administration Sets Sights On Libya's Oil Reserves In Behind-the-scenes Power Play (Boylan, WT) ............... 74
Hannibal Gadhafi Headlines Spark Speculation Over Fate Of Libyan Dictator's Children, Fortune (Boylan, WT) ............. 76
Lebanon's Cannabis Heartland, Bekaa, Hopes For Legalization (Mroue, AP) .................................... 77
Iraq Street Satirists Peddle Culture Change (Faraj, AFP) .......... 78

## Europe & Eurasia
Russia Promises To Investigate Prison Beating Seen On Video (Titova, AP) .................................... 79
Claire McCaskill, A Vulnerable Democrat Running For Reelection, Targeted In Hacking Attempt By Russian Spies (Nakashima, WP) ........................... 80
Russia Promises To End Prison Torture. U.N. Experts Are Unconvinced. (Cumming-Bruce, NYT) .................... 80
Russia Calls Woman Held In US As Agent 'Political Prisoner' (AP) ..................................... 81
Putin Says Russia Seeks More Cooperation With BRICS Nations (Tanas, BLOOM) ........................... 82
Rockefeller Heir Was Contact Of Alleged Russian Agent (Viswanatha, Bykowicz, WSJ) ........................ 82
Butina Sought A Secret Kremlin Line To The U.S. A Rockefeller May Have Helped (Mosendz, Farrell, Arkhipov, BLOOM). 82
Macron Dismisses Bodyguard Scandal As 'Storm In A Teacup' (Lee, AFP) .................................... 84
US To Hit NATO-ally Turkey Over Detained Pastor, Trump Says (George, Superville, AP) ........................ 85
Trump Threatens Sanctions Against Turkey Over Detained Pastor (Davis, NYT) ........................... 87
Trump Administration Threatens To Punish Turkey Unless It Frees Detained American Minister (Wilkinson, LAT) ......... 88
Trump Warns Turkey Of Sanctions Over Detention Of Pastor Andrew Brunson (Donati, WSJ) ........................ 89
Arson Linked To Deaths In Greek Town Built Like 'Fire Trap' (Kantouris, Gatopoulos, AP) ........................ 89

WASHAR0003253

'Serious' Signs Arson Started Deadly Greek Wildfire (Duperry, AFP)...................................................................... 90
Volunteers Rush To Help Greece Fire Victims (AFP)................. 91
As Anger Grows, Greek Government Announces Fire Aid (Stamouli, WSJ).................................................................. 92
Taxation Strangles Greece's Growth Prospects (Stamouli, WSJ) 92
Thousands Protest Disputed Judicial Reforms In Poland (AFP) 92
Poles Protest President's Approval Of Judiciary Changes (AP). 93
Algae Blooms Force Poland To Shut Down 50 Baltic Sea Beaches (AP)........................................................................ 93
Armenia Charges Ex-president With Vote Rigging (AFP) .......... 94
Ex-president Of Armenia Charged In Fatal Breakup Of Protest (AP)............................................................................. 94
EU Negotiator Rejects Key Element Of UK Govt Brexit Plan (AP)............................................................................. 94
UK Pauses Cooperating With US On Trial Of 'Beatles' Jihadis (Kirka, Ahmed, AP)........................................................ 95
Police Shut Gypsy Camp In Rome Despite EU Ruling (Somekh, AP)............................................................................. 95
Romanian Minister Says No Offense Meant In Auschwitz Comment (AP)............................................................... 96
U.K.'s Jewish Papers Denounce Labour Party As 'Existential Threat' (Castle, NYT)...................................................... 96
Wildfires, Drought Hit Sweden's Sami Reindeer Herders (Karlidag, AFP)............................................................. 97
Russian Dissidents Find Haven In Lithuania (Vitureau, AFP) .... 98

**East Asia & Pacific**
Taiwan Denounces China Moves To Limit Its Global Profile (AP)............................................................................. 99
China Seeks Economic Boost As Trade Spat Grows (Deng, WSJ).......................................................................... 100
U.S. Embassy Street In Beijing Is Rocked By Blast (Buckley, Ramzy, NYT)............................................................. 100
Small Bomb Set Off Outside US Embassy In Beijing (Onyanga-Omara, USAT)........................................................... 101
Explosion Near U.S. Embassy In Beijing (Chen, Dou, WSJ) ... 101
Hong Kong Radical Is Test Case In China's Bid To Limit Speech (Follain, Lung, BLOOM)...................................... 101
China Says It Isn't To Blame For Qualcomm Scrapping NXP Deal (King, BLOOM)...................................................... 102
Chinese Theft Continues In Cyberspace As New Threats Emerge, U.S. Intelligence Officials Warn (Harris, WP).... 103
Scuttled Qualcomm-NXP Deal Is A Win-Win For Beijing (Strumpf, WSJ)........................................................... 105
A #MeToo Reckoning In China's Workplace Amid Wave Of Accusations (Hernández, Zhao, NYT) ........................... 105
Remains Said To Be US War Dead Repatriated From North Korea (Young-Joon, Tong-Hyung, Baldor, AP) .............. 106
White House: US Plane Leaves North Korea With US War Remains (Maresca, USAT) ............................................ 107
The Latest: US Says Plane Leaves NKorea With War Remains (AP)........................................................................... 108
North Korea Returns Remains Of US War Dead (Chan-kyong, AFP)......................................................................... 108

Aircraft Carrying Remains Of US Korean War Dead Arrives In S. Korea (AFP) ............................................................. 109
Plane Said To Carry War Remains From North Korea Lands At U.S. Base (Press, POLITICO)........................................ 110
Remains Of 55 U.S. War Dead In North Korea Start Journey Home After 65 Years (Sang-Hun, NYT).......................... 110
U.S. Military Takes Possession Of Remains That North Korea Says Belong To Americans Who Died In The Korean War (Taylor, Lamothe, WP) .................................................. 111
Report: US Plane Leaves For NKorea To Pick Up US War Remains (Young-Joon, Tong-Hyung, AP) ...................... 112
First U.S. Troop Remains From North Korea Headed Home, White House Confirms (Wolfgang, WT)......................... 114
North Korea Marks War Anniversary As US Remains Flown Out (Berger, AFP)............................................................... 114
Duterte OKs Bill Creating Muslim Autonomous Region In South (Gomez, AP) .................................................................. 115
Duterte Signs Law Giving More Autonomy To Muslims In Southern Philippines (Villamor, NYT)............................... 116
Cambodia's Hun Sen Hails 'Elimination' Of Opposition At Mass Rally (Se, Freeman, AFP) .............................................. 117
Cambodian Leader Wraps Up Campaigning Blasting Boycott Calls (Harmer, AP) .......................................................... 118
Cambodia's Hun Sen Doesn't Get Pass From Washington (Hunt, WT) .................................................................... 119
A Day Before Laos Dam Failed, Builders Saw Trouble (Ives, NYT)......................................................................... 120
New Zealand Grants Domestic Violence Victims Paid Leave (Graham-McLay, NYT) .................................................. 121
Japan Executes 6 Members Of Cult Behind Sarin Attack (Chan, NYT)......................................................................... 122
Indonesia Graft Buster Returns To Work After Acid Attack (Karmini, AP) ............................................................... 123

**South & Central Asia**
Cricket Legend Imran Khan Claims Election Victory In Pakistan As Opponents Cry Foul (Bengali, LAT)........................... 123
Pakistan's New Leader Vows To Reset Relations With U.S. (Shah, Spindle, WSJ) ...................................................... 125
Khan Claims Win In Pakistan With Vows On Poverty, US Ties (Gannon, Ahmed, AP) ...................................................... 125
Imran Khan Declares Victory, But His Win Could Thrust Pakistan Into Turmoil (Constable, WP)............................ 126
The Rise, Fall And Rise Again Of Imran Khan, Pakistan's Next Leader (Gettleman, NYT) ...................................... 128
Pakistan's Khan Poses U.S., China Challenges (Pollard, Marlow, BLOOM)......................................................... 130
Pakistan's Imran Khan Declares Election Win For His Party (Gannon, Khan, WT) .................................................... 131
Outrage Grows Over Attacks On Muslim Cattle Traders In India (Sharma, AP) ............................................................... 132
Indian Firm Wants Ohio Aluminum Maker. Will Trump Approve? (Goel, NYT) ................................................................. 133
Cricket Star Imran Khan Wins In Pakistan But Needs Coalition (Gannon, Ahmed, AP) ...................................................... 134

WASHAR0003254

## Western Hemisphere

Bishops Bloodied, Churches Besieged In Nicaragua Crackdown (Sherman, AP) ........................................ 135

Masked Paramilitary Gunmen Enforce Tense Calm In Nicaragua (Johnson, MH) ................................. 137

Rights Group Updates Death Toll In Nicaragua Unrest To 448 (AP) ......................................................... 138

Nicaragua Rights Group Urges Ortega To Disband Paramilitaries (AFP) ............................................ 139

New To Haiti: Foster Care For The Nation's Parentless Kids (Crary, AP) ............................................... 139

Colombia's VP Assures The UN New President Backs Peace Deal (Lederer, AP).......................................... 142

Cabinet Minister, 3 Others Die In Paraguay Plane Crash (AP) 143

Paraguayan Minister, Deputy Die In Plane Crash: Rescuers (AFP) ............................................................ 143

Mexico's AMLO Asks For UN Help To Fight Corruption, Rights Abuses (AFP) ........................................ 143

Economists Say Currency Reform Is Urgently Needed In Cuba. But It's Expected To Generate Inflation And Layoffs, Which Are Not Politically Feasible During A Period When Voters Will Be Asked To Consider A New Constitution. | Miami Herald (Whitefield, MH) .......................................... 144

## Sub-Saharan Africa

As A Dam Rises In Ethiopia, Its Manager Is Found Dead (Walsh, Sengupta, Ahmed, NYT).................................. 144

Ethiopia's Premier To Woo Diaspora Investors As He Visits U.S. (Gebre, BLOOM) ................................ 146

Construction Manager Of Ethiopia's Nile River Dam Found Dead (Meseret, AP)................................... 146

Long Separated By War, Ethiopians And Eritreans Reunite (Stein, AFP) ............................................. 146

$40,000 A Car For Lawmakers Fuels Ire In War-Hit South Sudan (Francis, BLOOM).................................... 148

Zimbabwe Opposition Goes Where Followers Once Feared Death (Cohen, Latham, BLOOM) ...................... 148

Zimbabwe Election Seen As Critical Test For Nation Post-Mugabe (Foarde, WT) .................................. 149

Uganda Court Clears Way For Museveni To Run For Sixth Term (AFP) ................................................. 150

US Pressures Kabila To Step Aside In DR Congo Vote (AFP) 150

Mali Holds Key Polls Overshadowed By Jihadist Violence (Siuberski, AFP)................................................ 151

Mali: Jihadist Hotbed In Sahel (AFP) ........................................ 152

## Network TV News Coverage

ABC: Wildfires.............................................................. 153
ABC: Severe Weather.................................................. 153
ABC: Facebook-Stock Drops....................................... 154
ABC: Trump-Tariffs-Farmer Bailout............................. 154
ABC: CFO Of Trump Organization Subpoenaed.................... 155
ABC: Immigration-Reuniting Families. ......................... 155
ABC: House Republicans-Articles Of Impeachment-Rod Rosenstein.............................................................. 155
ABC: Florida-Family Speaks Out Against Stand Your Ground. 156
ABC: Law Enforcement Officers Killed......................... 156
ABC: Texas-Continuing Search For Cardiologist's Killer.......... 156
ABC: New Drug For Alzheimer's Patients..................... 156
ABC: Thailand-Soccer Team From Cave-Divers Speak Out.... 156
CBS: Wildfires............................................................. 156
CBS: Severe Weather.................................................. 157
CBS: Facebook-Stock Drops....................................... 157
CBS: Immigration-Reuniting Families. ......................... 157
CBS: Iowa-FBI Joins Search For Missing Student. .................. 158
CBS: Law Enforcement Officers Killed......................... 158
CBS: US-North Korea Relations-Missing Remains Returned. . 158
CBS: Turkey-American Christian Pastor Detained. ................. 159
CBS: 3D Printed Guns................................................. 159
CBS: Greece-Wildfire Linked To Arson........................ 159
CBS: France-Career Criminal Still On Run. .................. 159
CBS: Colombia-Drug Gang Puts Bounty On Police Dog......... 159
NBC: Facebook-Stock Drops....................................... 160
NBC: Facebook-Fake Profile Issues. .......................... 160
NBC: Wildfires............................................................ 160
NBC: Trump-Effects Of Tariffs.................................... 161
NBC: Beijing-Explosive At US Embassy. ..................... 161
NBC: Texas-Continuing Search For Cardiologist's Killer......... 161
NBC: US-Worst Maternal Maternity Rate In The Developed World.................................................................... 161
NBC: US-Worst Maternal Maternity Rate In The Developed World-Expert Comments......................................... 162
NBC: Iowa-FBI Joins Search For Missing Student. ................. 162
NBC: American Airlines-Carry On Bags...................... 162
NBC: Immigration-Reuniting Families. ......................... 162

## SECRETARY OF STATE

### How Trump's Deal To Secure The Release Of A American Pastor Held In Turkey Fell Apart (Leonnig, Parker, Fahim, Deyoung, WP)
Thursday, July 26, 2018
<u>Washington Post</u>

By Carol D. Leonnig, Ashley Parker, Kareem Fahim And Karen Deyoung

President Trump thought he had a deal.

His NATO meeting with Turkish President Recep Tayyip Erdogan earlier this month had ended with a smile, a fist-bump and what Trump thought was an agreement to free Andrew Brunson, the American pastor imprisoned in Turkey

WASHAR0003255

for the last two years on what the administration considered bogus terrorism charges.

The deal was a carom shot, personally sealed by Trump, to trade a Turkish citizen imprisoned on terrorism charges in Israel for Brunson's release. But it apparently fell apart on Wednesday, when a Turkish court, rather than sending the pastor home, ordered that he be transferred to house arrest while his trial continues.

Thursday morning, after a rancorous phone call with Erdogan, Trump struck back. The United States "will impose large sanctions" on Turkey, he tweeted. "This innocent man of faith should be released immediately."

Vice President Pence chimed in, saying in a speech at a religious conference that Turkey must free Brunson now "or be prepared to face the consequences." Secretary of State Mike Pompeo called his counterpart in Ankara.

The Turks, according to a Trump adviser, had cheated by "upping the ante" for Brunson. While the exact Turkish terms are unknown, Ankara has a long list of complaints, including the U.S. failure to extradite the Turkish citizen it considers responsible for a failed 2016 coup attempt, the U.S. investigation of a Turkish state-run bank for violating Iran sanctions, and attempts by Congress to prevent delivery of F-35 fighter jets that Turkey has already purchased.

Several U.S. officials and other people familiar with the situation insisted that there had been no misunderstanding of the terms of the deal.

"Turkey missed a real opportunity. Pastor Brunson is not a bargaining chip," said a White House official, who like others spoke on the condition of anonymity about what has quickly become a major diplomatic incident with potentially wide-ranging ramifications.

In addition to its NATO membership, Turkey is a key player in Syria and in the Middle East in general.

There was no immediate response from Erdogan. His spokesman, Ibrahim Kalin, said the administration's "threatening language" was "unacceptable."

"The United States must reconsider its approach and adopt a constructive position before inflicting further damage to its own interests and its alliance with Turkey," he said in a statement.

Foreign Minister Mevlut Cavusoglu was more blunt. "No one dictates to Turkey," he tweeted. "We will never tolerate threats from anybody." The government, he indicated, could not interfere with the courts and had to respect the "rule of law."

Trump considers himself his own best negotiator with world leaders, and has boasted of his ability to size up the person across the table, forge a personal bond, and strike the best deal. He often saunters into phone calls and meetings with foreign presidents and prime ministers, paying little attention to history, protocol and a pile of briefing papers prepared for him by his foreign policy experts.

The outcome of his recent sit-downs with North Korea's Kim Jong Un and Russian President Vladimir Putin remain up in the air. But Erdogan — a NATO ally whom Trump singled out for praise as he criticized other alliance members at the recent summit in Brussels — has clearly been a disappointment.

The fast unraveling of the situation this week followed a notable improvement in U.S. relations with Turkey after several years of dissonance. At a meeting in Washington last month, Pompeo and Cavusoglu finalized an agreement on one of the most serious and long-running disagreements between the two countries — the withdrawal of U.S.-allied Kurdish forces from part of Syria's border with Turkey. Turkey considers the Kurds, proxy forces in the U.S. fight against the Islamic State, to be terrorists.

Brunson, whose fate is of great importance to evangelical Christians who form a major part of the president's political base, was at the top of Trump's list during what was, to all appearances, a cordial meeting with Erdogan at the July 11-12 NATO summit.

A Christian missionary from North Carolina, Brunson, 50, had lived in Turkey for more than two decades when he was detained in October 2016. The indictment, based on evidence provided in part by three secret informants, accuses him of acting in coordination with the organization headed by alleged coup attempt mastermind Fethullah Gulen, a U.S. permanent resident living in Pennsylvania, as well as Turkey's outlawed Kurdistan Workers' Party, or PKK. It also accuses him of attempting to convert Kurds to Christianity.

The case quickly became a cause celebre in this country. Lawmakers last year who tried to insert a sanctions provision, tied to Brunson's release, to the omnibus spending bill, were persuaded by the White House to let its diplomatic efforts succeed.

Optimism was so high that Erdogan, after a reelection victory last month that increased presidential powers — and the need to improve Turkey's faltering economy — would be more willing to move on the issue. In late June, he left visiting U.S. senators Jeanne Shaheen (D-N.H.) and Lindsey O. Graham (R-S.C.) with the impression that relations were improving.

WASHAR0003256

On July 14, after traveling from the NATO gathering to his golf club in Scotland, Trump placed a call to Israeli Prime Minister Benjamin Netanyahu, about what the Israeli leader later called "security and diplomatic issues arising from regional developments, chiefmost among them, of course, Syria and Iran," according to Israeli media.

But the call also included a discussion of Turkey. Trump, according to a person familiar with the subsequent deal, asked his Israeli ally if he would release Ebru Ozkan, a 27-year-old Turkish woman who was detained in Israel on charges of acting as a smuggler for Hamas, the Palestinian group that the United States and Israel have labeled a terrorist organization.

Erdogan's government had expressed anger over Ozkan's June 11 arrest as she attempted to fly home from Israel's international airport in Tel Aviv. But the case was apparently considered weak by the Israeli court, which last week ordered her transferred to house arrest over the objections of prosecutors.

On July 15, the day after Trump and Netanyahu spoke, Ozkan was deported from Israel. Speaking to reporters on her arrival in Istanbul, she thanked Erdogan, who "was kind enough to be very interested in my case," she said. Israeli officials declined to comment on the arrangement.

On July 18, a Turkish court rejected appeals to release Brunson and set another court date for October. U.S. officials appeared taken aback, and Trump, on Twitter, called it a "total disgrace." But less than a week later, on Wednesday, the court convened again to order that the pastor be released from prison and placed under house arrest.

The U.S. response was mixed. Pompeo, on Twitter, called it a "welcome" development, but added it was "not enough."

Erdogan appeared to believe he was in the clear, telling Turkish media that Trump had told him, when they met in Brussels, that the F-35 deal would go through.

By Thursday morning, however, the administration's apparent puzzlement had turned to rage.

The angry outbursts by both sides raised questions about how the impasse would be resolved — and whether there was any way left for Erdogan to release Brunson without seeming to cave in to American demands.

"Pence and Trump have left him no graceful exit," said Soner Cagaptay, a Turkish American political scientist at the Washington Institute for Near East Policy, who said the feud amounted to the worst political crisis between Ankara and Washington in at least four decades.

But Gonul Tol, the director of the Center for Turkish Studies at the Middle East Institute in Washington, said that Erdogan could still let him go without facing any real backlash.

Erdogan's recent election victory had afforded him vast new powers and he "can pretty much do whatever he wants," Tol said, including release Brunson. "He doesn't even have to justify what he has done."

Fahim reported from Istanbul.

Back To Top

## Trump Threatens Turkey Sanctions Over Pastor As Ties Hit New Low (Epstein, BLOOM)
**Thursday, July 26, 2018**
Bloomberg News
By Jennifer Epstein

U.S. President Donald Trump said he will impose "large sanctions" on Turkey over the detention of an American pastor who's been accused of aiding a failed 2016 coup in the country, plunging relations between the two NATO allies to a new low.

Andrew Brunson, an evangelical minister, is "a great Christian, family man and wonderful human being," Trump said in a tweet Thursday. "He is suffering greatly. This innocent man of faith should be released immediately!"

The episode is the latest in a series of crises between the longtime allies. The U.S. slammed Turkey's plans to buy a missile defense system from Russia, which already has raised the threat of American sanctions. The countries have also clashed over the war in Syria, where Turkey has increasingly acted in concert with Russia and Iran. President Recep Tayyip Erdogan blames the U.S. for harboring the alleged mastermind behind the coup attempt.

The Turkish lira extended losses, leading declines among emerging market currencies.

Neither Trump nor the White House offered any specifics about the measures that the U.S. may take or how soon they may be imposed. Officials at the Turkish embassy in Washington didn't immediately comment.

Erdogan's government arrested Brunson in 2016 and indicted him last year on charges of espionage and attempting to overthrow the state. He was released after a year and a half in jail to house arrest on Wednesday.

Vice President Mike Pence, who said he spoke to Brunson on Wednesday, described the pastor's move to house arrest as "a welcome first step" but "not good enough."

Secretary of State Michael Pompeo also said Wednesday that the move to house arrest was insufficient. "We have seen

WASHAR0003257

no credible evidence against Mr. Brunson, and we call on Turkish authorities to resolve his case immediately in a transparent and fair manner," Pompeo said in a statement.

Trump had said last week on Twitter that Turkey's failure to release Brunson was a "total disgrace" and called on Erdogan to "do something to free this wonderful Christian husband & father."

Brunson's detention has come at a critical time in U.S.-Turkey relations. Erdogan has been infuriated by U.S. support for Kurdish rebels in Syria who he views as linked to domestic terror groups. And his decision to purchase a Russian missile system has raised questions about Turkey's role in the NATO alliance. Turkey has NATO's second-biggest military.

The missile system purchase and other tensions have also prompted some U.S. Lawmakers to call for a halt in sales of the F-35 jet to Turkey, even though several key parts of the fighter are made in Turkey. Defense Secretary Jim Mattis has opposed that effort, but the House-Senate conference report on the Pentagon's fiscal 2019 funding bill calls for sales to be delayed until a report on Turkey is completed by the Pentagon.

Turkey has also demanded the U.S. extradite Fethullah Gulen, a cleric and former Erdogan ally living in Pennsylvania, who the Turkish president blames for engineering the coup.

Trump and Erdogan, who last month won re-election in a vote that granted him broad new powers, were seen speaking at length during a gathering of NATO leaders in Brussels earlier this month.

— With assistance by Nick Wadhams, Margaret Talev, and Saleha Mohsin

Back To Top

## Help Is On The Way, At Last, For Religious Minorities In Iraq (Morello, WP)
Thursday, July 26, 2018
Washington Post
By Carol Morello

The United States will soon begin its first directly funded rebuilding projects for Iraqi Christian and Yazidi communities devastated by Islamic State militants, a U.S. official said Thursday.

Plans are being finalized for 10 modest reconstruction projects for Christian communities in the Nineveh Plains and for Yazidi villages around Sinjar in northern Iraq, said Mark Green, administrator of the United States Agency for International Development.

The long-delayed projects will focus on small infrastructure jobs to help restore water and electrical service in towns populated by religious minorities that were targeted by the Islamic State, which has lost most of the territory it once held in Iraq and Syria.

"They're individual projects that create the context for which people, if they so choose, can return to those communities, or not leave those communities," he said.

The Trump administration is steering humanitarian aid funding in Iraq to Christian and other religious minorities, directing to them more than a third of the money allocated for "stabilization" projects aimed at rebuilding areas liberated from the Islamic State. Previously, the money went through the U.N. Development Program.

The switch was heavily promoted by Vice President Pence, who has strong ties to Christian advocacy groups that argued that the UNDP was not doing enough to aid religious minorities on the verge of extinction from a region they have been rooted in for two millennia.

Last October, in a speech at a summit for the organization In Defense of Christians, Pence vowed that the administration would make a strategic shift away from funding "ineffective" U.N. programs and start sending aid directly to persecuted communities through USAID and faith-based partners.

Since then, the United States has redeployed $118 million in humanitarian and stabilization funds. Pence's dissatisfaction with what he considered the slow pace at which USAID was moving precipitated a shake-up in the agency's Iraq office, and a trip to Iraq by Green and other senior officials from the State Department and White House.

On Thursday, Secretary of State Mike Pompeo announced an additional $17 million for cleaning land mines in the Nineveh region of Iraq, which he pointedly noted would go to areas "with large populations of religious minorities who were subject to ISIS genocide," using a common acronym for the Islamic State.

The U.S. aid to religious minorities in Iraq was one of the centerpieces of a three-day conference held at the State Department this week to promote religious freedom. It attracted delegations from more than 80 countries, though many were led by ambassadors and other officials from embassies located in Washington. Pompeo said he will hold the event again next year.

Pence, who also addressed the crowd, said the administration will expand its efforts to help threatened religious communities.

He announced the establishment of a Genocide and Recovery Response Program to direct money to individuals

WASHAR0003258

and households that are trying to reestablish themselves after suffering atrocities. Although details are still being worked out, it has an initial planned budget of $10 million. It will first focus on Iraq but eventually expand to other countries.

According to a USAID official, the agency will allow genocide survivors to get medical care, replace damaged property and reestablish livelihoods through small businesses and farms.

No laws bar U.S. government agencies from funding religious groups.

Green said the aid for Iraq will not be used to rebuild churches or as donations to any sect, though faith-based organizations are among the groups that will be partners in the projects it funds.

"We are instead helping to restore geographic communities, as opposed to sectarian communities, which have been disproportionately hit, and also feel distant from recovery that's taking place out of Baghdad," he said. "These are communities that are caught between the Kurdish areas, and the more economically powerful areas emanating from Baghdad."

Frank Wolf, a former Republican congressman from Virginia, applauded the administration's efforts to provide aid to smaller communities as opposed to reconstruction in more populated areas that are the focus of UNDP projects.

"You go into villages that don't have K Street lobbyists to fill out their application forms," said Wolf, who traveled to Iraq last month with Green. "Their homes are destroyed. Their churches are destroyed. What the administration is doing for Christians, Yazidis and other religious minorities is very, very important."

Many Iraqis say that although the UNDP has met their survival needs, they need help moving on.

"The U.N. gave us very small things like blankets and food," said Mor Nicodemus, the archbishop of Mosul's Syriac Orthodox Church. "But they cannot rebuild our lives."

Some Yazidis fear they will be shortchanged from an administration that counts Christians among its staunchest supporters.

Abid Shamden, an Iraqi Yazidi who attended the religious conference at the State Department, said Yazidi communities are still difficult to reach because of land mines in the area. With both Kurdish and Iraqi government checkpoints, a two-hour trip to Mosul can take seven or eight hours, he said.

"If the United States spends money for minorities, it will be easier to spend it in Christian areas," said Shamden, who visited Sinjar less than two weeks ago.

"All we ask is to rebuild our towns," he added.

Green, who did not travel to Sinjar for security reasons but met with Yazidis in Christian areas, said he urged Kurdish and Iraqi leaders to ease up on the checkpoints along the roads from Sinjar. And he promised they will get a share of reconstruction aid that will allow returning Yazidis to earn a livelihood and educate their children.

"It's a land of pain," he said of Iraq. "It's very clear what the Yazidi have gone through is as disturbing as I can describe, and is ongoing. They have families that have been broken up and disappeared, as well as murder, rape and torture. We have and will continue to provide humanitarian assistance. And, as we have resources, we will continue to try to invest in projects that create this development context in which communities can be restored to some semblance of recovery."

<div align="right">Back To Top</div>

## Despite Egypt's Dismal Human Rights Record, U.S. Restores Military Aid (Record, Aid, NYT)
Friday, July 27, 2018
New York Times
By Despite Egypt's Dismal Human Rights Record, U.S. Restores Military Aid

CAIRO — Egypt's jail population has swelled. New prisoners include a Lebanese tourist who complained about Egypt on Facebook; a democracy activist who spoke out about sexual harassment; and a visiting grad student from an American university who was arrested as he researched the judiciary.

In Sinai, human rights activists say the army has demolished the houses of 3,000 families as part of operations against the Islamic State.

The State Department's take on Egypt's human rights progress? A thumbs up.

This week, Secretary of State Mike Pompeo lifted restrictions on $195 million in military aid that was frozen last year to protest Egypt's dire human rights record and its relationship with North Korea, a State Department official said. The aid had been reinstated in response to steps taken by Egypt on specific U.S. concerns, the official said, without specifying what they were.

Human rights groups slammed Mr. Pompeo's decision, saying he had squandered valuable leverage over President Abdel Fattah el-Sisi at a time when his human rights record seems to be only getting worse.

"Repression is breeding resentment, and in some cases radicalization," said Brian Dooley of Human Rights First, an American advocacy group. "That will ultimately further destabilize Egypt and undermine American interests."

WASHAR0003259

American officials say they withheld the $195 million in aid to press Egypt over a narrow set of issues. The Trump administration wants Mr. Sisi to overturn the 2013 conviction of 43 employees of international groups that promote democracy, including 17 American citizens.

And it wants Mr. Sisi to rescind a draconian law regulating aid agencies that he signed last year, which could make it virtually impossible for many international aid groups to work in Egypt.

But those demands were made in private, and experts said it was unclear how much the Egyptians had conceded. It seems probable that Mr. Sisi will seize on the resumption of aid as a validation of his actions so far, and perhaps will feel emboldened to step up his repression.

"It's highly debatable whether Egypt has fully met any one of those conditions," said Andrew Miller of the Project on Middle East Democracy. "But the Egyptians will present this decision as an American blessing of their policies."

The aid decision reflects the new tenor of American foreign policy under Mr. Pompeo and the national security adviser, John R. Bolton, who have shown a willingness to trade American leadership on human rights for an embrace of friendly autocrats like Mr. Sisi who share their hostility toward political Islam.

Mr. Sisi has long enjoyed a warm relationship with President Trump, who hailed the Egyptian leader as a "fantastic guy" and even publicly complimented his taste in shoes. But the Egyptian leader had a tougher time from the previous secretary of state, Rex W. Tillerson, who last August denied Egypt $96 million in aid and suspended $195 million.

Egyptian officials were shocked at the rebuke from the United States, which over the past 40 years has given Egypt $47 billion in military aid and $24 billion in economic assistance. Mr. Tillerson was said to be angry that Mr. Sisi had broken a private promise, made in Washington, that he would not sign the harsh law on aid agency regulations. In May 2017, Mr. Sisi went ahead and enacted the law anyway.

Mr. Tillerson also sought to press Egypt over its relationship with North Korea, which operates a large embassy in Cairo that it uses to carry out illicit arms sales across the Middle East, according to United Nations inspectors.

Mr. Sisi's government has partly addressed some American concerns. A retrial of the case involving the 43 foreign aid workers, many of whom were convicted in absentia, is scheduled to start this year. Egyptian media reports say that Mr. Sisi has forced North Korea to cut the number of diplomats stationed at its embassy in Cairo.

But such restrictions can be easily circumvented through the use of accounting measures, like counting diplomats as spouses, said Mr. Miller, the analyst, who worked on Egypt at the State Department until last year. "If past is prologue, we will see that as soon as the U.S. looks the other way, the Egyptians will start up their relationship with North Korea again," he said.

On most other fronts, things have gotten markedly worse in Egypt. Since Mr. Sisi's re-election in May, after a carefully managed vote, the president has redoubled his efforts to lock up even relatively mild critics.

Sami Anan, a former army chief who was thrown in jail when he dared to stand against Mr. Sisi for election in April, recently suffered a stroke that has incapacitated him, a close relative said in an interview.

His military captors denied requests for emergency surgery abroad, the relative said.

Shady el-Ghazaly Harb, a surgeon and activist who was imprisoned in May for critical comments he made against Mr. Sisi on social media, is being held in solitary confinement, his wife, Fatma Mourad, said in an interview. "Shady thinks that Sisi wants to punish him," she said.

Even tourists are not safe. This month a Lebanese woman, Mona el-Mazbouh, was arrested after releasing a 10-minute video in which she complained, in lurid terms, about being sexually harassed on the streets of Cairo. A court convicted her of spreading rumors and sentenced her to eight years in prison. An appeal is scheduled to be heard on July 29.

Critics say Egypt squanders much of the military aid it receives, splurging on expensive tanks and warplanes rather than on less glamorous, but more useful, counterinsurgency training for its army.

But others argue that full American engagement is essential to help Mr. Sisi combat the Islamist extremists based in Sinai who carried out numerous bombings of churches and mosques across Egypt last year.

"Egypt cannot be simply ignored by the United States," Samuel Tadros of the Hudson Institute's Center for Religious Freedom said at a congressional hearing this week.

"Abandonment is not a strategy nor will imaginary solutions of cutting U.S. aid result in Egypt's transformation into a liberal democracy," Mr. Tadros said.

Back To Top

# Pence Unleashes On North Korean Abuses: 'Much Worse' Than China (Richardson, WT)

**Thursday, July 26, 2018**
Washington Times

WASHAR0003260

By Bradford Richardson

There's no love lost between Vice President Mike Pence and North Korea.

Months after the communist regime denounced the vice president as a "political dummy," Mr. Pence shot back with blistering criticisms Thursday to close out the State Department's inaugural Ministerial to Advance Religious Freedom.

The vice president said the ongoing denuclearization negotiations should not overshadow North Korea's brutality toward its own people.

"While we all hope that relations between the United States and North Korea continue to improve, and we certainly hope that the threat posed by North Korea's nuclear and ballistic weapons program can be eliminated, there is no escaping the plain fact that North Korea's leadership has exacted unparalleled privation and cruelty upon its people for decades," he said.

The three-day religious freedom summit was convened by the State Department to highlight concrete ways that the international community can preempt religious persecution around the world.

More than 80 countries sent delegations to the ministerial, representing a diverse array of faith groups including Buddhists, Christians, Jews and Muslims.

North Korea wasn't the only human rights abuser on the vice president's hit list.

Mr. Pence said the Nicaraguan government is "virtually waging war on the Catholic Church"; Christians and other religious minorities are "routinely flogged, arrested, assaulted, and even killed" in Iran; and the Russians have "arrested and imprisoned" scores of Jehovah's Witnesses, essentially banning the group's adherents from practicing their faith.

The vice president also took Turkey to task for continuing to detain an American pastor who was caught up in the crackdown following the failed 2016 coup attempt. Mr. Pence said the Trump administration will impose economic sanctions on Turkey until Andrew Brunson is set free.

"And to President Erdogan and the Turkish government, I have a message on behalf of the President of the United States of America: Release Pastor Andrew Brunson now, or be prepared to face the consequences," Mr. Pence said. "If Turkey does not take immediate action to free this innocent man of faith and send him home to America, the United States will impose significant sanctions on Turkey until Pastor Andrew Brunson is free."

The vice president also had strong words for the Chinese government, pointing to Beijing's policy of sending Uyghur Muslims and other religious dissidents to "re-education camps, where they're forced to endure around-the-clock political indoctrination and to denounce their religious beliefs and cultural identity."

Yet for all of China's abuses, Mr. Pence said "their neighbor in North Korea is much worse." He went so far as to say that the persecution of Christians north of the DMZ has "no rival on the Earth."

"It is unforgiving, systematic, unyielding and often fatal," Mr. Pence said. "The mere possession of a Christian Bible is a capital offense. And those identified by the regime as Christians are regularly executed or condemned with their families to North Korea's gulags."

The vice president also accused the regime of using "torture, mass starvation, public executions, murders and even forced abortions" to maintain its grip on power. He said as many as 130,000 North Koreans are currently serving life sentences in "unimaginably brutal slave labor camps."

Mr. Pence's remarks come one day after the Senate Foreign Relations Committee grilled Secretary of State Mike Pompeo about the Trump administration's foreign policy.

At the hearing, Sen. Edward Markey, Massachusetts Democrat, said he feared the United States was being "taken for a ride" by North Korean leader Kim Jong Un in the denuclearization negotiations.

In his remarks Thursday at the ministerial, Mr. Pompeo said the religious freedom summit "truly reflects President Trump's ironclad commitment to protecting this important liberty" around the world.

"Millions of people of all faiths are suffering every day," he said. "But the Trump administration will not be silent. As part of that, the State Department will continue the good work it has already done for many years to ensure religious freedom."

Mr. Pompeo announced several steps that the State Department is taking right now to alleviate the suffering of persecuted faith groups.

The State Department will provide an additional $17 million in funding toward clearing landmines in the Ninevah region in Iraq, an area historically home to religious minorities.

Mr. Pompeo said the agency will release Thursday two documents, the Potomac Declaration and the Potomac Plan of Action, reasserting America's "unwavering commitment to promoting and defending religious freedom." Statements addressing human rights abuses in Burma, China and Iran will also be forthcoming, he said.

10

And the State Department plans to hold another religious freedom summit next year, Mr. Pompeo said, as well as regional follow-up conferences around the world to build on the ministerial's progress.

"The United States advances religious freedom in our foreign policy because it is not exclusively an American right," Mr. Pompeo said. "It is a God-given universal right bestowed on all of mankind."

Back To Top

# EDITORIALS & OP-EDS

## The Trump Two-step Strikes Again (Zakaria, WP)

**Thursday, July 26, 2018**
<u>Washington Post</u>
By Fareed Zakaria

Listen closely. That sound you heard at Wednesday's joint news conference between the presidents of the European Commission and the United States was Donald Trump backtracking once again. This has become a familiar routine. It goes something like this: Begin by hurling insults at the other side, some of which have a basis in reality but are mostly wild exaggerations. Threaten extreme consequences. Then meet with the other side, backpedal and triumphantly announce that you have saved the world from a crisis that your rhetoric and actions caused in the first place. Call it the Trump two-step.

Think about Trump's actions with regard to North Korea. He began by calling Kim Jong Un "a madman who doesn't mind starving or killing his people" and threatening "fire and fury . . . the likes of which this world has never seen before." He solved his own crisis by making unilateral concessions to Kim and gushing about how the North Korean people "love" their absolute dictator and how he, Trump, trusts him. The same pattern applies with the European Union, which he only recently described as "worse than our enemies." Now, he tells us, after meeting with European Commission President Jean-Claude Juncker, that the E.U. and America truly "love each other." Expect to hear a similar climb-down on China one of these days.

For Trump, there is no cost to this strategy, because his words are weightless. He starts with what he described in "The Art of the Deal" as "truthful hyperbole" (as opposed to the many outright falsehoods that he also tells) and then, when confronted, adjusts to something closer to reality.

There are those who assert that Trump's seemingly bizarre and unpredictable behavior is actually all part of a canny and wise strategy, that he is playing a kind of four-dimensional chess, operating in space-time. Well, if so, he is getting beaten badly here on Earth. In none of these situations has he actually been able to extract real concessions. His usual approach is to announce something vague, as with North Korea and the trade talks with Europe, or something already in place, such as NATO members' promise to spend 2 percent of their gross domestic product on defense by 2024, and claim it as a victory.

But there is a cost to this bluster and flip-flopping. Trump is creating a reputation for the United States as erratic, unpredictable, unreliable and fundamentally hostile to the global order. Leader after leader in Europe has made this clear. George Osborne told me that when he was Britain's finance minister, you knew "the United States president had your back." Neither Britain nor any other country can be sure of this anymore. As Donald Tusk, president of the European Council, put it, "With friends like that who needs enemies[?] . . . We [realize] that if you need a helping hand, you will find one at the end of your arm."

Economist Adam S. Posen argues that countries are now bypassing the United States and constructing a "post-American world economy." You can see this in the flurry of trade agreements that don't include the United States, from the Trans-Pacific Partnership, which was signed minus America, to the trade deal the E.U. just struck with Japan. Many others are in the works.

The most dramatic indication of the world sidestepping the United States, Posen says, is the decline in foreign investment. "It's fallen off a cliff," he told me. On average, net foreign investment into the United States has dropped by half since 2016. "The decline is all the more worrying," Posen writes in Foreign Affairs, "since many factors should have been pushing direct investment in the United States up this year. The massive fiscal stimulus passed by Congress should have increased [foreign investment] in three ways: by boosting spending, which increases U.S. growth prospects; by making the tax code more favorable to production in the United States; and by cutting the corporate tax rate."

Perhaps some of the decline in investment is part of a longer-term trend — other countries are growing faster than the United States. But for decades, that reality has been countered by another reality — that among the world's rich nations, the United States was unique in having good growth prospects coupled with stable, predictable, pro-market policies. Trump's attacks on trade and allies, his willingness to punish and reward individual companies, and his general unreliability all add up to a picture of policymaking that looks more like that of an erratic developing country run by a strongman. The difference is, America's strongman has the power to disrupt the entire global economy.

WASHAR0003262

Back To Top

## The Big Lesson From Trump's Truce On Trade? Pushback Works. (WP)

**Thursday, July 26, 2018**
<u>Washington Post</u>

Here is the lesson of President Trump's sudden decision Wednesday to call a truce in his trade war with the European Union: Pushback works.

As recently as Tuesday, Mr. Trump seemed committed to escalating the tariff war he started with Europe on June 1 by implementing steel and aluminum tariffs on that 28-nation confederation. The E.U. retaliated on June 22 with levies on iconic U.S. goods such as bourbon and Harley-Davidson motorcycles — and Mr. Trump raised the ante by threatening a 25 percent tariff on European auto imports. All the while, he pursued tariffs against other trading partners such as Canada, China and Mexico, which were striking back against U.S. agricultural and industrial goods produced in heartland states where Republican senators and members of Congress face difficult midterm elections. It did not help Mr. Trump's cause that U.S.-based auto manufacturers who would purportedly benefit from tariff protection did not want it — and said so loud and clear. The administration's proposal to hand farm country a $12 billion trade-war bailout also fell flat, with Republican senators chorusing their opposition.

With U.S. industry, U.S. agriculture, long-standing European trading partners and members of his own party all telling Mr. Trump to cool it, he did something he rarely does — listen. The "deal" the president trumpeted on Wednesday in the company of European Commission President Jean-Claude Juncker was his face-saving off-ramp. It amounts to little more than a mutual promise to talk about reducing trade barriers on both sides of the Atlantic, and to impose no new ones in the meantime. Tariffs on industrial goods other than autos would be targeted for elimination. Europe embellished it with a pledge to buy more American soybeans, thus offsetting China's tariffs on that product, and to import more U.S. natural gas in the distant future. Considering that the negotiating agenda Mr. Trump and Mr. Juncker sketched resembles the Transatlantic Trade and Investment Partnership that President Barack Obama tried to launch with Europe, you could almost say that all Mr. Trump has to show for his trade war with the European "foe" is a return to his predecessor's policy, plus some beans.

Still, this is a positive development, because a negotiated mutual opening of markets would benefit the U.S. economy, if indeed Mr. Trump's team can make it happen; because it avoids a worsening of global tensions; and, last but not least, because Mr. Trump did, however reluctantly, resist his worst instincts. We hope that some of the new pragmatism infuses talks on salvaging the free-trade agreement with Canada and Mexico.

Caveats apply: On May 20, Treasury Secretary Steven Mnuchin put a trade war with China "on hold," only to have the president resume it less than two weeks later. The same thing could happen with Europe. Also, before his deal with the E.U., Mr. Trump badly and possibly lastingly damaged international trade norms, especially by putting "national security" in play as a rationale for ordinary protectionism. This points to the lingering structural problem in U.S. trade policy: Congress's delegation of too much easily abused tariff-raising power to the president. Republican pushback will really have meaning when it produces legislation to take away some of the president's discretion in such matters.

Back To Top

## Trump Is Using Tariffs To Advance A Radical Free-trade Agenda (Thiessen, WP)

**Thursday, July 26, 2018**
<u>Washington Post</u>
By Marc A. Thiessen

Give President Trump credit. When he chastised NATO allies over their failure to spend adequately on our common defense, his critics said he was endangering the Atlantic alliance. Instead, his tough stance persuaded allies to spend billions more on defense, strengthening NATO instead.

Now, Trump is doing the same on trade. At the Group of Seven summit in Quebec, Trump was roundly criticized for publicly berating allies over their trade practices and provoking a needless trade war. Well, once again, it appears Trump is being proved right. On Wednesday, he and European Commission President Jean-Claude Juncker announced a cease-fire in their trade war and promised to seek the complete elimination of most trade barriers between the United States and the European Union. "We agreed today . . . to work together toward zero tariffs, zero non-tariff barriers, and zero subsidies on non-auto industrial goods," declared the two leaders in a joint statement.

Zero tariffs. Wednesday's breakthrough with the European Union shows that, contrary to what his critics allege, Trump is not a protectionist; rather, he is using tariffs as a tool to advance a radical free-trade agenda.

In a little-noticed interview with Fox News's Maria Bartiromo earlier this month, Trump revealed that during the G-7 summit he made a sweeping proposal. "I said, 'I have an idea, everybody. I'll guarantee you we'll do it immediately. Nobody pay any more tax, everybody take down your barriers. No barriers, no tax. Everybody, are you all set?' . . . You know what happened? Everybody said, 'Uh, can we get onto

WASHAR0003263

another subject?' " Trump offered to eliminate all trade barriers — and his supposedly pro-free-trade allies passed. Right before his meeting with Juncker this week, he repeated the offer, tweeting, "The European Union is coming to Washington tomorrow to negotiate a deal on Trade. I have an idea for them. Both the U.S. and the E.U. drop all Tariffs, Barriers and Subsidies!"

Trump knows that most of our trading partners don't really want free trade; they want managed trade, where they can get access to U.S. markets while protecting certain industries from U.S. competition. Trump's strategy to get them to drop these protectionist barriers is to impose crushing tariffs. At a rally earlier this week, Trump explained his strategy for getting to zero tariffs. "You know, other countries have tariffs on us. So, when I say, 'Well, I'm going to put tariffs on them,' they all start screaming, 'He's using tariffs,' " Trump said. "I said [to the European Union], 'You have to change.' They didn't want to change. I said, 'Okay. Good. We're going to tariff your cars.' . . . They said, 'When can we show up? When can we be there?' [Laughter.] 'Would tomorrow be okay?' Oh, folks, stick with us. Stick with us."

Now Trump's hard-line trade strategy is being vindicated. Not only is the E.U. negotiating zero tariffs, but also it agreed to immediately buy more American soybeans — which helps Trump in his trade battle with China. After Trump imposed tariffs on $34 billion worth of Chinese goods, China responded with retaliatory tariffs on U.S. products, including soybeans. Beijing knows that China is the single largest importer of U.S. soybeans, and that about 96 percent of U.S. soybeans are grown in 18 states — all but two of which voted for Trump in 2016. Their tariffs left soybean farmers none too happy with Trump and gave a political boost to vulnerable Senate Democrats in soy-producing farm states such as Heidi Heitkamp (N.D.), Joe Donnelly (Ind.) and Claire McCaskill (Mo.).

Now, Trump has enlisted the European Union to help U.S. soybean farmers to counteract the repercussions of Chinese tariffs, in addition to the $12 billion in aid he has promised for U.S. farmers. That's three-dimensional trade chess.

Earlier this week, Trump tweeted, "Tariffs are the greatest! Either a country which has treated the United States unfairly on Trade negotiates a fair deal, or it gets hit with Tariffs. It's as simple as that." Well, maybe it is and maybe it isn't. Trump is a long way from a final deal. And in trade, nothing is agreed to until everything is agreed to. But this is a surprisingly positive first step. If Trump succeeds in using trade wars to bring down European and Chinese trade barriers, he may end up being one of the greatest free-trade presidents in history.

Back To Top

## Trump Has No Idea What His Tariffs Have Unleashed For Farmers (Leonard, NYT)

**Thursday, July 26, 2018**
<u>New York Times</u>
By Robert Leonard

Mr. Leonard is the news director for the radio stations KNIA and KRLS.

KNOXVILLE, Iowa — Today President Trump is visiting Dubuque, Iowa, where every year at harvest time, millions of tons of grain come via rail and truck to be loaded onto barges on the Mississippi River and shipped to Mexico, China and much of the rest of the world. Harvest puts coin into the hands of farmers, and they and their communities — indeed all of America — profit. Not this year.

The president is here to trumpet a $12 billion plan to aid American farmers. Why do they need aid? For Iowans, it's because 33 percent of our economy is tied, directly or indirectly, to agriculture, and Mr. Trump recklessly opened trade wars that will hit "Trump country" — rural America — hardest and that have already brought an avalanche of losses. Indeed, the impact of his tariffs will probably be felt by family farms and the area for generations.

So perhaps visiting Dubuque is the least he could do.

The cost of being shut out of overseas markets for soybeans, beef, pork, chicken and more will be in the billions. Once those markets are gone, they will be difficult to recover. Commodity prices continue to drop, and good weather suggests an excellent crop is in the making, which will drive prices further down.

Brazil is ready to step in with increased soybean production, and China has already shifted its purchasing power there.

But the fallout will not just be tallied in statistics. In farm country, U.S.A., the Trump tariffs have poured gas on what has been a slow-burning conflagration.

Rural America is about to undergo a major demographic shift. President Trump didn't start it, but he has accelerated a crisis that might have taken a generation or two to play out. Now it might take only a few years.

Rural America is going to be hollowed out very quickly. Farms will become consolidated, and towns that are already in trouble will certainly die.

Iowa's farmers are aging, and younger farmers aren't replacing them proportionately. Sixty percent of Iowa farmland is owned by people 65 years or older, and 35 percent of farmland is owned by people 75 or older.

The Department of Agriculture conducts a Census of Agriculture every five years. The 2017 census isn't available

WASHAR0003264

yet, but the 2012 census shows the average age of the American farmer was 58.3 years. This isn't because young people in rural America don't want to farm; it's because, if it isn't already the family business, the costs are much too high to allow many of them to get into it.

A friend, a small-town Iowa banker who specializes in working with farmers, offered a local example. It's time for Mom and Dad to retire, get off the farm and move to town. Much of the time, if no heir is interested in continuing the operation, the farm is auctioned to the highest bidder.

This time, one son wanted to take over the farm. But there were other children entitled to their share, so the farm went up for auction.

But now they had to compete with larger farm operations. The son "did the best he could," said my friend, but a big operation "bid it up more than it was worth, some guy from out of town no one knew — probably from one of the big operations up north. The kid didn't have a chance. It was heartbreaking."

I use Iowa in my examples, but much of rural America will be affected in a similar way. In the worst possible outcome of this scenario, losses and farm consolidation accelerated by Mr. Trump's tariffs will make the devastating 1980s farm crisis look like a bump in the road as it drives a significant rural-to-city migration.

Smaller operations don't have the capital to weather a trade war and will be forced to sell, most likely to larger operations.

In my community, I learned this week that a hog operation I drive by every day is folding. The confinements are being dismantled, and anything portable can be found on Craigslist. A friend close to the family told me pork prices have been down for years, and with the tariffs it's just not worth it anymore.

Another casualty: our community banks. As farms get larger, farm loans are less likely to be local. A big operation with farms in dozens of counties that maybe even cross state lines probably won't use local banks for credit.

When our community banks are gone, one of the major economic engines of our small towns will be gone.

At a certain point, populations won't be enough to support rural hospitals and clinics, and they, too, will be gone. Rural hospitals are one of the major employers in the community. Even if you have a good manufacturing company in town, if you lose the hospital, they won't be able to attract the employees they need.

Those plants may be forced to leave as well — especially since the tariffs have hit them hard also. One friend who has a small manufacturing business says his costs have doubled since Mr. Trump announced tariffs on aluminum and steel, and that his business is down 40 percent.

Some of the farmers I speak with are unwavering in support of the president; they'd vote Republican even if Mr. Trump personally slapped the heck out of the preacher at the church potluck. But others are starting to recognize how the economic impact of the tariffs is hitting them personally. Iowa's congressional delegation, all Republican with the exception of Democrat Dave Loebsack in Iowa's Second Congressional District, have warned the administration. So has Iowa's Republican governor, Kim Reynolds.

This is why, earlier this summer, Vice President Mike Pence came to the Midwest for a reassuring visit and why Sonny Perdue, Mr. Trump's secretary of agriculture, offered his $12 billion band-aid of a handout Tuesday.

And it's why President Trump is here now, crowing of those billions. What farmers really want are the markets restored.

Farmers take out lines of credit in the spring — usually due the following Jan. 1 — to pay for seed and other input costs, and then pay the loans back after harvest. Like any other loan, there are consequences to not paying, including losing the farm. Farmers are going to know before the midterm elections if they are going to be able to pay back loans.

The larger farm operations and the larger agribusinesses will be hovering, looking for any weakness, and ready to purchase smaller farms. And rest assured, when the Trump payments are made to farmers, the larger operations will be the ones that gobble them up.

Mr. Perdue, and likely President Trump, know the $12 billion won't make a difference, even in the short term. Farmers and others in the industry know the offer is meaningless. But most rural Republicans aren't farmers, and many are Fox News devotees. So when they turn on Tucker Carlson or Sean Hannity, the hosts will likely extol the "virtues" of Mr. Trump's farm policies and tariffs rather than the reality of their failures.

The most poignant evidence of the depopulation of rural Iowa over the last three-quarters of a century is the lily. Drive any highway or rock road in the state about this time of year and you will see that about every half-mile, the ditches are full of beautiful orange lilies.

Behind the lilies are hundred-acre fields of corn or beans, and if you park your car and wander the field behind the lilies, you will invariably find nails, broken crockery and remnants of life where a farmhouse once stood. The lilies are all that's left of the dreams of the optimistic family that planted the lilies and made a farm and a life on the land generations ago, only to see it lost.

14

WASHAR0003265

The destruction of a way of life cuts as deep now as it did back then, especially when it comes from this president. The only thing he knows about food is that it always comes served to him on a silver, or maybe gold, platter.

Robert Leonard (@RobertLeonard) is the news director for the radio stations KNIA and KRLS.

<div align="right">Back To Top</div>

## Donald Trump Is Solving His Tariff Problems The Only Way He Knows How: Paying Them Off (Brandus, USAT)

**Thursday, July 26, 2018**
<u>USA Today</u>
By Paul Brandus

Let's get right to the point. With his proposed $12 billion bailout of America's farmers, Donald Trump is doing to them what he did to porn star "Stormy Daniels." The only difference: A lot more people are being paid off, and it is being done with our tax dollars.

But wait: There's more. Since even the White House now admits that the federal deficit is growing much faster than expected — it'll hit a cool $1 trillion next year — we'll have to borrow even more from foreigners, and that's likely to include China. So to square the circle here: Trump hits China with tariffs. The Chinese hit back. Our farmers get hurt. Trump proposes to pay off the farmers with money … borrowed from China.

Our annual deficits are piling up so fast, the national debt itself could hit $33 trillion in fiscal year 2028 — which begins in just nine years. Now Trump wants to add more in the form of bailouts for a bad policy? This is hardly, as he likes to describe himself, the work of a "stable genius." America isn't saving as much as it's spending

Trump keeps saying America can't be the world's piggy bank. My question is this: How can a country that has to borrow $1 trillion a year (about $1.9 million every minute of every hour of every day) from foreigners be the piggy bank? These Republican Tea Party/deficit hawks who seized control of Congress nearly a decade ago have done a heckuva job in restoring the fiscal discipline they promised, haven't they?

But I digress. As Trump's tariff war intensifies, who else could be bailed out with Chinese money? How about the thousands of American employees of Whirlpool?

When Trump announced tariffs on imported washing machines back in January, CEO Marc Bitzer told analysts, "This is, without any doubt, a positive catalyst for Whirlpool."

Oops.

The reality of higher tariffs on steel and aluminum has caught up with the appliance manufacturer. In a conference call with investment analysts Tuesday, Bitzer said steel prices are now 60% higher in America than the rest of the world. You know what happens to those higher costs? They're passed on to you. Think of all the things made of steel and aluminum: cars, soda cans, razor blades, cans of tuna fish ... the list is endless. That's how it works, folks: Trump rolls out tariffs — and eventually, you're stuck with the bill.Americans, not Trump, will pay for tariffs

You'll likely pay for Trump's tariffs in another way as well, in the form of a pinched 401(k) or IRA account. For example, the stock price of Alcoa, the aluminum giant, has collapsed about a third since April. Why should you care? Because chances are pretty good that the investment company managing your money owns millions of shares. Two of Alcoa's biggest owners, for example, include asset-management giants Vanguard and the American Funds.

Again, that's just one company. Whirlpool's down about 20% since Friday alone, and since peaking in January, both the S&P 500 and Dow Jones industrial average have declined, with the Dow off more than 5%.

If you're a Trump supporter, here's an honest question: Does 1) paying more for stuff while 2) taking an investment hit sound like winning?

In a Kansas City speech Tuesday, Trump pointed to the TV cameras and told his audience at a convention of the Veterans of Foreign Wars: "Don't believe the crap you see from these people." His supporters can call it "fake news" if they wish, but here on planet Earth, the reality is increasingly evident.

Just to show you how badly the president and his advisers have miscalculated here, Trump's hard-line trade chief Peter Navarro said, "I don't believe any country is going to retaliate for the simple reason that we are the most lucrative and biggest market in the world."

And Trump himself promised you that "trade wars are good, and easy to win."

How's all that working out?

Paul Brandus, founder and White House bureau chief of West Wing Reports, is the author of "Under This Roof: The White House and the Presidency" and a member of USA TODAY's Board of Contributors.

<div align="right">Back To Top</div>

## President Trump Should Stop His Trade War Before It Hurts Our Economy (Norquist, Sepp, Brandon, Chapman, McIntosh, Phillips, USAT)

<div align="center">15</div>

WASHAR0003266

Thursday, July 26, 2018
USA Today
By Grover Norquist, Pete Sepp, Adam Brandon, Tim Chapman, David McIntosh And Tim Phillips

Last year's Tax Cuts and Jobs Act was a huge victory for the U.S., and we applaud the Trump administration for this historic achievement. It has already begun to spur economic growth and help our entrepreneurs create new jobs. Likewise, efforts to pare back unnecessary, burdensome regulations have been a boon to American innovation and growth. Our organizations are proud to have worked alongside President Trump and his administration on these important pro-growth economic reforms, and we look forward to continuing this partnership going forward.

It is out of this mutual dedication to improving the future of America's economy that we are now deeply concerned about the administration's approach to trade and international commerce. We support negotiations to reduce foreign barriers, while at the same time keeping in mind that U.S. government-imposed restrictions act as a tax on American consumers, raise costs for our manufacturers and drive our jobs to other countries. As principled advocates for free markets, our organizations oppose tariffs, quotas and other impediments to the free flow of goods and services.Trade war hurts American businesses

We strongly support efforts to open up international markets to U.S. products, encourage other nations to reform their state-owned enterprises and urge our partners to reduce tariffs as much as possible. Nonetheless, the threat of tariffs or use of similar tactics should never carry with them the long-term intentional goal of reduced trade with our allies. Similarly, we oppose the use of trade policy to protect specific industries or companies at the expense of the larger economy. After all, it is American citizens and businesses who would ultimately pay the high costs caused by limitations on trade.

Like the president, we believe that increasing economic growth in America is of paramount importance. The best way to continue our current economic expansion is through free market policies like low, competitive taxes, light-touch regulation and international commerce free of government-imposed restrictions. Our strong trading partnerships across the globe make not only the American economy healthier, but improve the economic condition of our allies and promote peace.Free trade is mutually beneficial

Likewise, we share in and applaud President Trump's commitment to the American worker. They too are best served by a growing economy and the mutual gains that come from free trade. Our hard-working farmers are highly dependent on having access to international markets. And our manufacturing sector depends on the import of raw materials and intermediate goods. Businesses, workers and consumers all benefit from trade.

When it comes to reevaluating and renegotiating our trade pacts, we urge the president to expand international commerce and establish permanent deals that will allow businesses to make long-lasting investments in the American economy. The goal should be to tear down trade barriers, not erect new ones. The expansion of free trade yields mutual gains that benefit Americans and our trading partners.

We look forward to working with the Trump administration to expand free trade and continue our nation's long-standing commitment to this essential component of free-market economics. The growth and prosperity that will ensue would be yet another great achievement worthy of applause.

Grover Norquist is president of Americans for Tax Reform. Follow him on Twitter: @GroverNorquist. Pete Sepp is president of National Taxpayers Union. Adam Brandon is president of FreedomWorks. Follow him on Twitter: @adam_brandon. Tim Chapman is the executive director of Heritage Action for America. Follow him on Twitter: @TimChapman. David McIntosh is the president of Club for Growth. Follow him on Twitter: @DavidMMcintosh. Tim Phillips is president of Americans for Prosperity. Follow him on Twitter: @TimPhillipsAFP.

Back To Top

## Trump Bails Out Some, But Not All, The Victims Of His Trade War (LAT)
Thursday, July 26, 2018
Los Angeles Times

U.S. automakers breathed a bit easier Wednesday after President Trump and European Commission President Jean-Claude Juncker announced an agreement to shelve threatened U.S. tariffs on imported autos and retaliatory European tariffs on U.S. goods while the two sides negotiate lower trade barriers. And if the episode eventually produces a true free-trade agreement between Europe and the United States, it will be a win for businesses, workers and consumers on both sides of the Atlantic.

But it wouldn't validate the methods this president has been using to try to change our trading partners' practices. It's not just the bullying of U.S. allies and the blatant violations of existing trade deals that are troubling. It's his unilateral moves to launch, intensify and sustain these trade fights, picking winners and losers in the United States along the way, which betray a dangerously expansive and abusive view of executive power.

WASHAR0003267

Consider the steps the administration has taken, free of congressional review or intervention, to try to reduce China's enormous trade surplus with the United States.

First, it imposed 25% tariffs on $34 billion worth of Chinese industrial goods on July 6 as punishment for that country's "unreasonable or discriminatory" policies on technology and intellectual property. It has also teed up tariffs on an additional $16 billion in Chinese goods to dampen China's ambition to dominate important new technologies. But those are just the appetizers: Trump has threatened to impose tariffs on every Chinese item that Americans import.

China responded by slapping tariffs on an equal amount of U.S. goods, particularly farm products. Canada, Mexico, the European Union and other trading partners hit with Trump tariffs have done the same, targeting with especial vehemence U.S. producers in states that supported Trump, such as Midwestern farmers and manufacturers.

With blowback rising in this country, the administration sought to ease the pain of the retaliatory tariffs by dipping into taxpayers' pockets, again with no review or approval by Congress. On Tuesday the U.S. Department of Agriculture announced it was borrowing $12 billion from the Treasury to support some (but not all) of the farmers whose exports have stalled and prices have dropped in the face of Chinese tariffs. And just farmers — not, say, Mid-Continent Nail, the U.S. fastener manufacturer whose business has been racked by Trump's tariffs on imported steel. Even lawmakers who share Trump's "America First" view of trade should be outraged at the president using tax dollars to pick winners and losers.

As for Europe, it's worth remembering that the U.S. and the EU were negotiating a free-trade pact before Trump arrived and declared his distaste for multilateral deals. On Wednesday the negotiations seemed to be back on track with the same goals, albeit with far more drama. But trade relations with China and a rest of the world are still in turmoil. At some point soon, Congress needs to wake up and reclaim the authority it gave the White House over tariffs.

Back To Top

## Europeans Are Free Traders Now? That's Rich (Baltzan, LAT)
**Thursday, July 26, 2018**
Los Angeles Times
By Beth Baltzan

After President Trump met with European Commission President Jean-Claude Juncker on Wednesday, tensions between the two economic powerhouses abated, as the United States and the European Union announced an agreement to move forward on trade negotiations.

But all is not as it seems. The "deal," such as it is, is vintage EU: the agricultural sector is excluded, except for soybeans. This won't be good news for American farmers, who struggle to gain a foothold in a highly protected European market. The Obama administration refused to accept an agriculture carve-out when negotiating a trade agreement with the Europeans.

Our friends across the pond have deftly taken advantage of President Trump's rejection of the global status quo to cast themselves as defenders of free trade. But actions speak louder than words. As recently as the G-7 summit in June, the United States floated the idea that the members of the G-7 simply eliminate all their tariffs. The self-proclaimed free trader nations, including those from the EU, were caught with their tail between their legs.

We need real reform at the WTO, not surgical agreements here and there.

German Chancellor Angela Merkel, for example, faltered, saying that eliminating tariffs would require intense negotiations and "take a long time." In truth, every WTO member could simply take its tariff commitments and change all the positive numbers to zero.

That certainly puts Wednesday's announcement in context.

As current and former U.S. trade negotiators, including me, know all too well, the EU and others are no more free traders than is Trump. The Europeans like to protect their markets — like agriculture — they just don't like it when U.S. leaders protect ours. To be clear, in the aftermath of World War II, the United States created this asymmetrical system: We slashed our tariffs more than our trading partners did. The Europeans could charge up to 6% on primary aluminum imports, whereas the United States, for the most part, capped itself at zero.

In that regard, Europe's outrage at the president's imposition of a 10% tariff on aluminum is a bit rich. The WTO expressly authorizes members to protect their essential security interests. Steel and aluminum fall in that realm; it was an open secret on Capitol Hill that the Obama administration shared that view and considered invoking the same provision.

In response to Trump's action, the EU manipulated the rules to reject the U.S. national security claim and imposed counter-tariffs, bypassing WTO dispute settlement.

How is dodging the very rules of a structured system a defense of that system? It is not.

Amidst all this cynicism, all is not lost. A true champion of the system may finally have emerged: Norway. The Norwegians have chosen to do what champions of the system are supposed to do — forgo the instant gratification of retaliation

17

WASHAR0003268

and instead work through the dispute settlement system, however plodding it may be.

Some Europeans recognize the systemic imbalance. The political editor of the German newspaper Die Zeit acknowledged in a recent New York Times op-ed that "[the] Europeans have basically been free riders … spending almost nothing on defense, and instead building vast social welfare systems at home and robust, well-protected export industries abroad. Rather than lash back at Mr. Trump, they would do better to ask how we got to this place, and how to get out."

The point about vast social welfare systems is one that Democrats must bear in mind. It is Democrats, not Republicans, who have a proud tradition of fighting for a social safety net for dispossessed workers so that job losses, due to trade or otherwise, don't have to destroy lives.

Democrats will not reclaim the Midwest, which decided the 2016 election by less than 100,000 votes, by rejecting Trump's willingness to disturb the global trading system, by welcoming half-measures such as the one the Europeans pitched Wednesday, or by buying into the notion that the Trans-Pacific Partnership is a magic bullet. Remember that Trump borrowed critiques of TPP from Midwest Democrats, such as Sherrod Brown and Sandy Levin, not Republicans such as Mike Pence and Paul Ryan, who embraced the deal.

Democrats have long known that trade theory and trade reality are two different things, and that our trading system needs reform. Even the WTO director-general commented that the systemic "shake-up" is positive in many ways and encouraged member nations to use this as an opportunity to improve the multilateral trading system.

But we can't be fooled by the kinds of deals we saw Wednesday. We need real reform at the WTO, not surgical agreements here and there. Trump's presidency is at least in part the product of exasperated workers who've been left behind by globalization. If that fundamental unfairness isn't addressed, he won't be the last president elected on a platform of blowing up the system.

Beth Baltzan is a recent U.S. WTO litigator in the Executive Office of the President of the United States. From 2012 to 2016, she served as Democratic House Ways and Means trade counsel.

<u>Back To Top</u>

# China Takes Its Political Censorship Global (Rogin, WP)
**Thursday, July 26, 2018**
<u>Washington Post</u>
By Josh Rogin

The United States lost an important early skirmish this week over whether American companies must comply with the Chinese government's political demands. But the greater conflict is just beginning, which means the Trump administration must now prepare to help U.S. corporations fight Chinese coercion in future rounds.

After months of behind-the-scenes discussion, the three major U.S. air carriers — United, American and Delta — all partially caved to Beijing's order that they change their websites to portray Taiwan as part of the People's Republic of China. After the government of Xi Jinping threatened severe punishment, the White House called the demands "Orwellian nonsense." Yet many international airlines folded quickly. The U.S. airlines eventually devised a compromise: They removed the word "Taiwan" from their websites but didn't agree to describe Taiwan as part of China.

The dispute was a test case for Beijing's effort to export political repression and the international community's ability to resist. The partial U.S. capitulation constitutes a win for Beijing. But it ought to prove a pyrrhic victory.

Why does it matter? The Chinese Communist Party has been steadily increasing pressure on foreign companies to do its political bidding inside China and around the world. China punished Marriott after an employee liked a tweet from a pro-Tibet group; Marriott apologized profusely and fired the employee. Mercedes-Benz also acquiesced after Beijing complained about an Instagram post that quoted the Dalai Lama.

The Xi regime claims that any public speech criticizing Communist Party propaganda is a grave offense to 1.3 billion Chinese people. Never mind that Twitter and Instagram are blocked in China: Beijing is trying to enforce its political censorship outside its borders and online. That can't be tolerated. The whole world cannot become a "safe space" for Chinese sensitivities.

By accommodating China's political demands, even partially, airlines are abetting a false depiction of U.S. policy on Taiwan and playing into China's game, said Samantha Hoffman, visiting fellow at the Mercator Institute for China Studies.

"The Chinese Communist Party intends to shape how people and entities are willing to talk about China and Taiwan," she said. "The more unclear Taiwan's status becomes, the more the party's goal is incrementally achieved."

The Chinese government is also trying to expand its domestic "social credit system" to apply to foreign firms. It's Beijing's way of shaping international norms according to its criteria, Hoffman explained in a report for the Australian Strategic Policy Institute.

WASHAR0003269

"As businesses continue to comply, the acceptance of the CCP's claims will eventually become an automatic decision and hence a norm that interferes with the sovereignty of other nations," she wrote.

Quietly, U.S. airlines, their trade association and the administration heavily debated their response to the Taiwan edict. The administration attempted to raise the issue with the Xi government, but it refused to discuss it, two administration officials said. "They basically put their fingers in their ears," one said.

Several airline representatives privately told me the administration never offered any tangible protection, so they were obligated to defend shareholders' interests. Administration officials said the U.S. government wasn't prepared to escalate against Beijing, so they tacitly endorsed the compromise.

But the half-concession seems to have only emboldened Beijing. China's civil aviation authority called the U.S. airlines' actions incomplete and demanded total capitulation. Chinese officials are threatening to damage the airlines' business in China, in violation of international trade laws.

Publicly, the airlines said they were simply complying with the laws of countries in which they operate. That explanation would make sense if they changed their websites inside China only. United, which operates in Taiwan, is certainly violating Taiwan's laws. "Taiwan is Taiwan. It does not fall under the jurisdiction of China's government," the Taiwanese foreign ministry said in a statement.

The reality is American corporations can't be expected to be guided by purely moral considerations. And the U.S. government can't tell American companies what to do. That's an asymmetric advantage for Beijing.

So how can Western governments defend their private sectors from Chinese political pressure? That's the discussion Beijing has forced upon us. Governments should develop countermeasures that impose serious costs for coercive acts. Reciprocity for Chinese companies that want to operate abroad can be one tool.

There were some positive takeaways from this incident. The U.S. airlines and U.S. government eventually worked together. That's a model that other industries facing Chinese pressure can replicate. Beijing wants to divide and conquer. By uniting, setting clear principles and coordinating responses, foreign firms have greater power to fight back.

The Trump administration has properly called out China for its "Orwellian nonsense." Now we all must figure out how to prevent the world from succumbing to Beijing's Orwellian design.

Back To Top

## When Trump Talks, The World Listens. Should It? (NYT)

**Secretary of State Pompeo leaves unclear whether the president's foreign policy pronouncements are actual policy.**
**Thursday, July 26, 2018**
New York Times

The world expects the president to be America's foreign policy authority, and that what he says goes. Right?

Not so fast.

In a pattern that's familiar with this White House, what appear to be articulations of foreign policy by President Trump may not always be what they seem. That's the obvious conclusion to be drawn from Secretary of State Mike Pompeo's testimony on Wednesday before the Senate Foreign Relations Committee.

Mr. Trump has repeatedly expressed doubt about Moscow's election meddling, has failed to order any defense against future election hacking, has suggested Crimea should be a part of Russia, has impugned NATO and has ingratiated himself with President Vladimir Putin of Russia.

Mr. Pompeo, however, combatively insisted to the senators that Mr. Trump is "well aware" of the challenges that Russia poses, including its interference in American elections. He said strenuously that the United States is opposed to Russia's illegal annexation of Crimea, and that it considers NATO an "indispensable pillar of American national security."

A top Russian official said that at their meeting in Helsinki, Finland, Mr. Trump and Mr. Putin discussed a possible referendum to determine eastern Ukraine's future. A spokesman for the National Security Council later rejected such a referendum as having "no legitimacy."

Even actions that seem to be clear and direct may not be. This administration in recent months agreed to stiffer sanctions against Russia, even if it was only after Congress forced it to do so. It also expelled 60 Russian diplomats and closed the Russian consulate in Seattle. Mr. Trump denounced alleged Russian attacks on British soil but has delayed imposing sanctions, drawing fire from the Republican chairman of the House Foreign Affairs Committee. The Defense Department also announced last week that it was providing Ukraine with $200 million for security cooperation. But at the Senate hearing, Mr. Pompeo deflected a question on whether Ukraine-related sanctions on Russia would remain in place.

WASHAR0003270

It's somewhat encouraging that Mr. Pompeo, Defense Secretary Jim Mattis, other senior officials and some members of Congress are working to reassure allies and set the country back on a more stable foreign policy path. On Wednesday, Mr. Trump himself retreated a bit from the trade war that he initiated with the European Union when he agreed with Jean-Claude Juncker, president of the European Commission, to work toward lower tariffs and other trade barriers.

Yet no matter what Mr. Pompeo — or any other official — insists, Mr. Trump has a well-established record of undermining their pronouncements, and even his own, with a tweet. He could easily blow up the trade truce, for example.

The administration's dysfunction makes matters worse. According to Politico, Mr. Pompeo and Mr. Mattis have complained that John Bolton, the national security adviser, has oversimplified decision-making on foreign policy, cutting them out.

Deftly bobbing and weaving while answering questions, Mr. Pompeo insistedthat the senators shouldn't de-link Mr. Trump's statements and actions from administration policy statements and actions. "They're one and the same," he said.

But when Mr. Trump's words repeatedly repudiate what is supposed to be official policy, it sows confusion and undermines trust in officials like Mr. Pompeo who try to defend the president.

During the 2016 campaign, Mr. Trump made clear that, above all, he consults himself on foreign policy. As Rex Tillerson, his first secretary of state, remarked after Mr. Trump spoke sympathetically of neo-Nazis who marched in Charlottesville, Va.:"The president speaks for himself."

Mr. Pompeo finally conceded to the senators that "the president calls the ball" and that "his statements are, in fact, policy."

And that is why so many people cringe when Mr. Trump steps up to a microphone or reaches for his smartphone.

Back To Top

## Pakistan's Likely Next Leader Is A Taliban Sympathizer (WP)
Thursday, July 26, 2018
Washington Post

PAKISTAN'S PROBABLE incoming prime minister campaigned as a maverick challenging an entrenched and corrupt political elite. But Imran Khan, who on Thursday claimed victory in his country's parliamentary elections, is not exactly an outsider. He is indeed an enemy of the major political parties that have dominated Pakistani civilian politics for decades — but he is also the favorite of the Pakistani military, whose overweening power the mainstream parties have been trying to curb.

If Mr. Khan takes office, he will have the support of many Pakistanis who want to see reforms that distribute wealth more equally or that disempower the old political dynasties. But he will owe his position largely to the army and its powerful intelligence service, which helped him win so that they can more easily pursue their own interests — which include siphoning off the lion's share of the national budget, supporting the Taliban in neighboring Afghanistan and encouraging other extreme Islamist groups. That means Pakistan, which has been one of the most difficult countries for the United States to work with over the past two decades, is likely to become still more so.

Though no official results had been announced by late Thursday, those reported by local media were close to what the generals were seeking: a solid lead for Mr. Khan, but not enough of one to allow him to form a strong civilian government. The risk for the winners was a popular backlash. So overt and heavy-handed was the military's intervention in the election campaign, and so questionable the vote count, that some analysts predicted it could trigger sustained unrest. The former governing party of Nawaz Sharif, who was ousted from office by court order a year ago and imprisoned this month, said it would not accept the result.

During his time in office, Mr. Sharif challenged the military's control of foreign policy, including its insistence on permament hostility toward India and its sponsorship of terrorist organizations. His reward was to be singled out for prosecution on corruption charges. While he was probably guilty of amassing illicit wealth, the court judgments against him were orchestrated by the powerful Inter-Services Intelligence agency, according to one judge of the Islamabad High Court. According to numerous reports, the military also bribed or intimidated members of Mr. Sharif's party to switch their support to Mr. Khan and forced Pakistani media to tilt their coverage in favor of his campaign.

Mr. Khan, a former cricket star and playboy who now portrays himself as devoutly religious and a nationalist, seems to have few foreign policy views other than antipathy toward the United States and its war on terrorism; he has endorsed the Taliban cause in Afghanistan. That suits the generals, who, since the Trump administration's suspension of U.S. military aid, no longer much pretend to comply with U.S. demands to cease support for the group. Pakistan's de facto rulers now seem to believe that their backing from China, which is investing tens of billions of dollars in the country's infrastructure, gives them the freedom to pursue their baleful

WASHAR0003271

purposes more openly. Mr. Khan's election is evidence of their renewed ascendance.

Back To Top

## For Imran Khan, Winning Was The Easy Part (Dhume, WSJ)

**A flawed election and a divided populace augur poorly for stability in Pakistan.**
**Thursday, July 26, 2018**
<u>Wall Street Journal</u>
By Sadanand Dhume

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## Europe's Prisons Breed Terrorism. Can Anything Be Done? (WP)
**Thursday, July 26, 2018**
<u>Washington Post</u>

Want smart analysis of the most important news in your inbox every weekday along with other global reads, interesting ideas and opinions to know? Sign up for the Today's WorldView newsletter.

When Benjamin Herman went to prison for assault and robbery in 2003, he was a Catholic teen from the town of Rochefort. By the time he was given a two-day home leave this May, he was an avowed Islamist. Within hours of his temporary release, he murdered two female police officers and used their stolen weapons to kill a passing motorist.

Herman's transformation is not an anomaly. Europe's prisons have become a hotbed of Islamic radicalization, particularly as 1,500 Islamic State fighters have returned from the Middle East and faced prosecution. "Never have so many people been arrested on charges related to terrorism, and never have we seen so many of these guys in prison together," Thomas Renard, a Belgian terrorism expert and researcher at the Egmont Royal Institute for International Relations in Brussels, told my colleagues. "In bringing them together, we are facilitating their ability to recruit. And that is something that will stay with us for a long time."

Two of my colleagues, Souad Mekhennet and Joby Warrick, spent months visiting prisons across Europe to understand how people become radicalized — and what countries on the continent are trying to do to stop this from happening. Their article includes looks inside prison cells in Belgium and Germany, two countries that have adopted sharply divergent strategies. Today's WorldView spoke with Warrick about his and Mekhennet's reporting.

Today's WorldView: You write that prisons have become the latest battleground in the evolving fight against Islamist-inspired terrorism. Why are jails particularly conducive to radicalization?

Joby Warrick: Throughout the history of the modern Islamist movement, prisons have served as incubators for terrorist groups. Radicalized individuals, when cut off from family and other moderating influences and subjected to what they see as unjust punishment, often become more angry and more radical. Inside prisons, they find themselves surrounded by troubled young men who are looking for an identity and a cause. For extremists, prison becomes an opportunity to deepen their own ideological commitment while also helping to train and recruit the next generation.

French police officers stand in a street after a hostage-taking at a church near Rouen, France. (Pascal Rossignol/Reuters)

Radicalization is nothing new, and rehabilitation efforts have been going on for years. What's new or important about either subject in 2018?

JW: It's partly a matter of scale. The current population of inmates in Europe includes hundreds who traveled to Syria to fight for the Islamic State or al-Qaeda, or to be part of the caliphate. Many who returned home were immediately imprisoned, and there's a high risk that some of those will seek to recruit others, or try to carry out attacks after their release. In addition, the strain of Islamist ideology embraced by some of these returnees is more extreme and more violent, compared with what we've seen in the past.

In your story, you focus on prisons in Belgium and Germany. What does the problem look like in other parts of Europe?

JW: We focused on Belgium and Germany because both countries saw large numbers of their citizens travel to Syria and Iraq. Belgium, for example, had the highest number of Islamic State emigres per capita in Europe. But numerous other countries are grappling with the same problem and experimenting with different solutions. France, for example, has developed an intelligence service that works inside its prisons to try to penetrate and disrupt terrorist cells. Other countries are seeking to block would-be returnees from coming home at all. Each country is acutely aware of the potential political fallout if a former Islamic State member leaves prison and then commits a terrorist act.

How have European officials tried to fight radicalization?

JW: What we discovered is that countries don't have ready solutions, so they are inventing new approaches and methods for dealing with the problem in real time. Often, the solutions differ dramatically from one country or region to another.

WASHAR0003272

For example, Belgium has developed a program known as DeRadex, which isolates the most radicalized inmates from the rest of the prison population and allows them only limited contact with one another. Belgium's approach doesn't seek "deradicalization" per se — they argue that prisons aren't really equipped to change an individual's ideology and can only hope to discourage violence.

Germany, by contrast, rejects the idea of isolating inmates who embrace radical ideologies, opting instead for a program of intense monitoring and intervention to prevent radicalization from occurring. Officials in both countries say they don't yet have enough data to know which approaches truly work.

People take part in a rally in Turin's Palazzo di Citta in memory of the victims of bombings in Brussels in 2016. (Marco Bertorello/AFP/Getty Images)

Over the course of your reporting, you found that European officials had become much more aggressive about imprisoning people with links to terrorism. In the near future though, almost all of those men and women will be getting out of prison. If deradicalization tactics don't work, what are the biggest risks as those people are freed?

JW: That's what keeps European counterterrorism officials awake at night. Across Europe, there are about 1,500 returnees — women and children as well as men. Some are already back in their neighborhoods, and those who are in prison are serving sentences averaging between three and five years in cases where there is no hard evidence of violent behavior. Experts say there's a high likelihood that at least a few of those inmates will remain just as committed to the Islamic State and its ideals at the time of their release.

What stance have European politicians taken?

JW: European countries were profoundly shaken by the terrorist attacks of 2015 and 2016, and also by the refugee crisis. The political imperative to stop terrorism at all costs was behind many of the tough new laws passed by European parliaments over the last three years. They essentially ensure that anyone who joined the jihad in Iraq or Syria will be charged with a crime and placed in jail. Those laws are highly popular but do little to address the long-term challenge of radicalization that many of these countries face. The solution will involve years of investment in areas such as economic development and education — and so far no political consensus has emerged for those kinds of reforms.

CORRECTION: An earlier version of this story incorrectly identified Benjamin Herman's hometown.

Back To Top

## This Is Not Your Grandfather's KGB (Ignatius, WP)

**Thursday, July 26, 2018**
<u>Washington Post</u>
By David Ignatius

Looking at Russia's competing spy services, their overlapping operations against the United States and their sometimes careless tradecraft, some CIA veterans are wondering if the Russian spooks actually want to get caught.

The truth is, President Vladimir Putin probably doesn't mind that his intelligence activities are so blatant that they're a subject of daily public debate. His goal isn't to steal secrets but to destabilize America's political system. The more people obsess about the swarms of Russian spies, the better, from Putin's perspective.

"Russian intelligence activities over the past several years have become not only more energetic, but more eclectic," explained former CIA director John Brennan in an email. "It's a diverse, entrepreneurial and frequently competitive ecosystem. . . . Some of their work is really, really good, showing exquisite tradecraft. Other stuff, not so much."

Rolf Mowatt-Larssen, a former CIA Russia specialist, sees a generational change in Russian intelligence. "The price of the shift to a faster, quick-kill approach is an increase in sloppiness. Ill-advised decisions are common. There's less oversight by older, more experienced cadre."

The new freewheeling, anything-goes style is evident in Russia's 2016 assault on the U.S. political system. The Kremlin attacked from three directions: GRU military intelligence, the FSB security service and a social-media troll farm known as the Internet Research Agency, managed by one of Putin's oligarch pals.

The Russians floated their covert-action propaganda through Facebook, Twitter, WikiLeaks and other social media outlets. Who knows whether there was "collusion," but Russian officials maintained contact in 2016 with a string of Donald Trump associates, high and low, in ways the FBI couldn't miss. It was the opposite of a subtle campaign of manipulation. "Operation Chaos" might be a good name.

Moscow monitored public speeches, not dead drops. According to the Justice Department's July 13 indictment of 12 GRU operatives, the Russian conspirators began hacking Hillary Clinton's personal emails "after hours" on July 27, 2016. Earlier that day, Trump had proclaimed: "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing."

Putin was shaped by the KGB's rigid bureaucracy and tight secrecy. But as Russia's president, he has embraced a

WASHAR0003273

different operating model — looser, more fragmented, with different services competing for the leader's favor. The old KGB was broken into two pieces starting in 1991 — the SVR, which inherited the foreign spying mission that Putin had served, and the FSB, which took over domestic security.

The FSB has become increasingly involved in foreign operations and may now overshadow its twin, said Michael Sulick, a Russia expert and former CIA operations chief, in an interview. The FSB probably ran the "Cozy Bear" hack of the Democratic National Committee in 2015, and was indicted last year by the Justice Department for hacking 500 million Yahoo emails.

"To put it crudely, the FSB does the kinds of things everyone else thinks about doing but doesn't because they're too risky, too politically inflammatory, or too likely to backfire," wrote Mark Galeotti, an expert on Russian intelligence, last year in the Atlantic.

The GRU, traditionally the most adventurous wing of Russian intelligence, now appears to be resurgent after costly mistakes in the 2008 Georgia war. Ukraine has been "the perfect showcase" for the GRU's covert insurgency tactics, wrote Galeotti this month. He sees the GRU's hand in the 2014 annexation of Crimea and shoot-down of a Malaysia Airlines jetliner; the 2016 intervention in U.S. politics; and the attempted assassination this March in Britain of Russian defector Sergei Skripal.

The Skripal poisoning illustrates Russia's willingness to take risks and its lack of concern about getting caught. The Novichok nerve agent allegedly used could easily be traced to Russia.

An intriguing example of Russia's new generation of spycraft is the case of Maria Butina, who was indicted by the Justice Department this month on charges that she plotted a covert influence campaign that partly targeted the National Rifle Association. The indictment alleges that she was run secretly by a Russian official who had served in parliament and the Central Bank, and was bankrolled by a second Russian who was a billionaire oligarch.

When Butina was photographed near the U.S. Capitol on Inauguration Day, her alleged Russian handler messaged approvingly, "You're a daredevil girl," according to court papers. Three months later, when Butina's American contacts were outed in the media, her alleged handler wrote: "How are you faring there in the rays of the new fame? Are your admirers asking for your autographs yet?"

This is not your grandfather's KGB. Putin is running a multiplatform spy service for the Internet era — as quick, disposable and potentially devastating as a Snapchat image.

Back To Top

## Mexico And The Nicaraguan Quagmire (Castañeda, NYT)

Friday, July 27, 2018
<u>New York Times</u>
By Jorge G. Castañeda

Mr. Castañeda was foreign minister of Mexico from 2000 to 2003.

MEXICO CITY — More than 350 people, the majority of them students and protesters, have died since April in Nicaragua, where a broad social movement seeking the resignation of President Daniel Ortega was ignited by an aborted pension reform.

In a country of a little over six million inhabitants, the number of dead, jailed and missing is striking. Almost 40 years after Mr. Ortega and the Sandinista Front overthrew the corrupt and bloody Somoza dynasty that ruled Nicaragua for nearly half a century, students and activists are calling for the departure of what they consider an unforgivable historical repetition. "Ortega y Somoza, son la misma cosa" (Ortega and Somoza are the same thing) is their rallying cry.

Peasants, activists, the National Autonomous University, former and current opposition leaders have all come under attack; female protesters and even children have all become victims of Daniel Ortega's goon squads. The regime is rapidly becoming a dictatorship, something that the Latin American and international communities should do whatever they can to stop. No one wants another Venezuela in the region.

While the regional and international community was initially slow to react to the repression in Nicaragua, they have recently begun to take a more active role. The United Nations secretary general, António Guterres, issued a statement condemning the violence last week; the Organization of American States approved a resolution condemning the repression and calling for "timely, free and fair" presidential elections. An ad hoc group of nations from Latin America, including Argentina, Brazil and Mexico, had denounced the carnage in Managua and in the iconic city of Masaya, which harbored the most heroic resistance against Somoza back in the '70s.

A group of countries is working behind the scenes with the church and the business community — as well as with Washington — to broker a deal that calls for three key elements. First, an end to repression and the use of paramilitary or goon squads to beat up or murder students. Second, the resignation of Rosario Murillo, Mr. Ortega's wife, vice president and power behind the throne, and her promise not to run for president in the next elections. Third, internationally observed elections early next year, with the president bowing out beforehand. This mediation effort and

WASHAR0003274

the ensuing agreement may or not succeed, but at least an effort is underway to end the bloodshed.

Unlike the situation in Venezuela, which in addition to repression and other human rights violations has been experiencing a humanitarian, economic and migratory crisis for several years, the Nicaraguan conundrum might well be solved through regional and international cooperation. Venezuela has oil, Russian and Chinese support; Nicaragua has none of the above. But two significant obstacles stand in the way.

The first is the ongoing support by much of the Latin American left for the Ortega regime. Just last week, more than 430 participants at a Havana meeting of the São Paulo Forum — an annual meeting of leftist political parties and other organizations from Latin America and the Caribbean founded in 1990 — expressed solidarity with Mr. Ortega and condemned the "terrorist, coupist right groups" attempting to overthrow him with, of course, the support of United States imperialism. In addition to Cuba, the presidents of Venezuela, Bolivia and El Salvador attended the conference, along with Brazil's former president and representatives of potent left-of-center, pro-Ortega organizations from Colombia and Ecuador.

The Latin American left is no longer what it was barely half a decade ago, but it continues to be powerful, well-organized and well-connected. While little survives of the old Sandinista mystique in the Ortega clique today, it can still count on traditional international and regional support. This support was decisive in bringing him to power in 1979; it can be equally crucial in maintaining him there today.

The second obstacle is Mexico. The country played a critical role in 1979, leading the regional opposition to Somoza and the Carter administration's attempt to retain "somocismo sin Somoza." It subsequently supported the Sandinista regime, as well as a negotiated peace in Central America.

In 2000, Mexico abandoned its traditional anti-interventionist foreign policy and strongly emphasized the collective defense of human rights and democracy in the region. There was a short-lived and halfhearted attempt to return to obsolete stances between 2007 and 2015. Under the foreign minister, Luis Videgaray, the country has attributed far greater importance to universal values than to traditional introversion and isolationism.

Until July 1 of this year. On that date, Andrés Manuel López Obrador was elected president in a landslide victory that overturned Mexico's politics, but also, probably, its foreign policy. A broad coalition of left-of-center moderates, conservative evangelicals, hard-left radicals and traditional Mexican nationalists was swept to victory with 53 percent of the vote, 32 points above of the runner-up, Ricardo Anaya. One of their boilerplate stances was a new foreign policy for Mexico.

Among the points Mr. López Obrador has stressed is an uncompromising return to Mexico's traditional views on not getting involved in other nation's politics and not expressing opinions on the human rights situation in other countries. His foreign minister-to-be, Marcelo Ebrard, stated that simply discussing the Nicaraguan or Venezuelan cases at the O.A.S. was tantamount to interfering in these nations' internal affairs. The new government, which takes office on Dec. 1, would accordingly refrain from such initiatives. Mr. López Obrador sent the chairwoman of his party, Morena, to the Havana conference of the São Paulo Forum, whose final declaration she signed. Another of his envoys there made a strong speech of support for Latin American governments of the left, including Nicaragua's.

In other words, Mexico, the second-largest nation in the region, will no longer be part of the broad Latin American coalition seeking, unsuccessfully until now, a solution to the Venezuelan nightmare and to the Nicaraguan quagmire.

At best, from the perspective of human rights and collective defense of democracy, it will look homeward and inward and simply distance itself from any regional challenge. At worst, it will side with regimes such as the Nicaraguan and Venezuelan ones, evoking the principle of nonintervention but in fact sympathizing with them politically and ideologically.

If the current effort to find a solution in Nicaragua is to succeed, it must come to fruition before December, as long as the Peña Nieto administration is in office and active on this front. While Mr. López Obrador should condemn the bloodshed in Nicaragua and support President Enrique Peña Nieto's and the O.A.S.'s efforts to mediate a solution, and defend human rights in the region, he is unlikely to do so. After Dec. 1, don't count on Mexico.

Jorge G. Castañeda, Mexico's foreign minister from 2000 to 2003, is a professor at New York University and a contributing opinion writer.

Back To Top

## Why Trump Is Right About The E.U.'s Penalty Against Google (Stewart, NYT)
Friday, July 27, 2018
New York Times
By James B. Stewart

It didn't take long last week for President Trump to blast America's latest economic foe, the European Union, for imposing a $5.1 billion antitrust fine on Google's parent company.

WASHAR0003275

"I told you so!" Mr. Trump wrote on Twitter. Calling Google one of "our great companies," he asserted that the European Union "has truly taken advantage of the U.S., but not for long!"

Let's put aside the fact that Google controls more than 90 percent of the internet search market in most of the union's member states, according to the European Commission (compared with just 63.5 percent of the market in the United States). That makes it hard to argue that the Europeans have somehow "taken advantage" of Google.

But on the merits of the antitrust case, Mr. Trump has a point.

It's hard to find any antitrust expert, European or American, who has endorsed the logic or outcome of the ruling by the European Commission.

The commission, which is the union's executive arm and oversees its competition policy and antitrust law, found that Google had run afoul of those regulations in several respects.

But much of the decision involved Google's insistence that mobile phone manufacturers that use its Android operating system and want to preinstall the Google Play app store must also install a suite of Google apps, including the company's search engine, its Chrome browser and its mapping, calendar and photo programs.

The commission called this a classic "tying" arrangement, in which a company extends the market dominance it enjoys in one area (in this instance, the app store) to others, specifically the browser and search engine. (For some reason, the commission's logic did not extend to any other Google apps.)

"Google has used Android as a vehicle to cement the dominance of its search engine," Margrethe Vestager, Europe's antitrust chief, said in announcing the ruling.

The focus on tying arrangements is reminiscent of two famous Microsoft cases: one in the United States, in which the government accused the company of illegally tying its Internet Explorer browser to its dominant Windows operating system, the other in Europe, where Microsoft was found to have abused its Windows dominance by embedding its media player.

The outcomes in both cases are now widely viewed as irrelevant, since by the time they were decided, Explorer and Windows Media Player had been overwhelmed by technological change and competition — from Google, among others. Microsoft's share of the browser and media-player markets is insignificant today.

But even if the European Union's Microsoft precedent is viewed as sound, Google's competitive situation is different. "There's only a superficial resemblance to Microsoft," said

Pinar Akman, director of the Center for Business Law and Practice at the University of Leeds in England, who has received support from Google for some of her research.

Unlike adding a rival media player to the Windows operating system, which at the time was a slow and cumbersome process, adding rival apps to an Android-based phone can be done "in seconds," said Ms. Akman, an antitrust expert. "The commission put a lot of emphasis on the value of preinstallation. But just because an app is preinstalled doesn't mean consumers are going to use it. It's very easy to download a rival app."

Google's photo app, for example, has struggled to compete against Instagram and Snap, even though it comes preinstalled on Android-based phones as part of the Google suite.

Christopher L. Sagers, an antitrust professor at Cleveland-Marshall College of Law, agreed that if installing a rival app is as easy as Google claims, "it would make for a pretty solid argument that whatever dominance Google has retained in mobile search has nothing to do with anticompetitive conduct, and rather just reflects its superiority as a product."

Curiously, the commission's statement announcing the ruling did not address that issue. (A full written decision is not expected for months.) So I opened the Google Play store on my Android phone and searched for Bing, Microsoft's search engine. I was able to download it in seconds. Google suggested I "might also like" an array of other search options, including Firefox and DuckDuckGo, which were displayed on the same page and equally accessible with a touch of my finger.

Even though Google requires phone makers to use the full suite of Google apps if they want to install the Play store, there is nothing to prevent those companies from also preinstalling rival apps. "Why doesn't Microsoft just pay manufacturers to preinstall Bing?" Ms. Akman asked.

Apple, for one, makes Google the default search engine on the iPhone's Safari browser, even though Apple does not use either the Android operating system or the Play store. Oddly, the commission excluded Apple as a Google competitor, saying that because the company produced premium-price products, it did not constrain Google's ability to dominate the broader market.

"Can you imagine a U.S. court finding that Android and iOS don't compete?" said Professor Sagers, referring to Apple's operating system.

Samsung, too, preinstalls a range of rival apps in addition to the suite of Google products.

WASHAR0003276

The commission's stated mission is to protect European consumers by assuring them the benefits of competition. But the commission does not seem to have considered the possibility that Google's search engine and browser have achieved such high market share because consumers prefer them, or that consumers might also like having the apps already installed on their phones.

The commission argues that when a phone comes with a single search engine preinstalled, it confers an enormous competitive advantage on that product. To support the theory, the commission said that on phones using Windows operating systems, which come with Bing preinstalled, 75 percent of searches are conducted using that engine.

But Windows-based phones accounted for only 0.15 percent of the global market at the end of last year. That renders the data irrelevant, Ms. Akman said.

A closer analogy, though not one cited by the commission, can be found in Russia. Last April, Google reached a settlement with a rival search engine based there, Yandex, under which it agreed that phone makers could preinstall Yandex on Android devices and let consumers decide which app would be their default search engine.

At the time, Google and Yandex each had about 48 percent of the Russian search market. Since then, Yandex has increased its share to 51 percent; Google's has dropped to 45 percent.

Even if preinstallation offers Google an advantage over rival app producers, that does not mean it harms consumers or violates competition law. I, for one, like having the Google apps preinstalled on my phone, unlike most of the clutter imposed on me by my phone service provider, Verizon.

Google has said it will appeal the commission's decision. Given the commission's track record — it has rarely been reversed — the company would seem to face long odds. Still, the European Union's highest court sent a 2009 antitrust judgment against Intel back to a lower court for further review last year. The higher court's opinion clarified that the purpose of European antitrust law was not to protect inefficient competitors at the expense of consumers. That could give Google an opening.

Then again, the Trump factor must now be considered, especially since the president, after all but declaring economic war on Europe last week, seemed to declare a truce on Wednesday.

"I don't think the Google ruling is anti-American," Ms. Akman said. "There are plenty of rulings against European companies, too. It's just that the American tech companies have been so successful, and have achieved so much market power, that they're going to come under scrutiny."

Back To Top

## His Pacific Island Was Swallowed By Rising Seas. So He Moved To A New One. (Cave, NYT)
**Friday, July 27, 2018**
New York Times
**By Damien Cave**

MAKARU ISLAND, Solomon Islands — The first island David Tebaubau moved to 14 years ago has already disappeared, drowned by heaving currents and rising seas.

"It used to be right there," he told me, pointing east to what simply looked like more ocean. "We thought everything was going to be O.K., but it's getting very hard."

The spit of earth he currently occupies here in this remote stretch of the South Pacific is half the size it was when he arrived five years ago. At mid-tide, it's 24 steps across at its widest point, and 58 steps long (by my own walking count).

At high tide it's even smaller, a teardrop of sand and coral with just enough room for his family and a few tons of the seaweed they grow offshore.

It's that seaweed that keeps them here. The shallows near his island — and two others nearby that have also been settled by farming families — are perfect for a wiry breed that's exported across Asia. And Mr. Tebaubau, 50, a former mechanic with the calm voice and long beard of a sage, is especially adept at its cultivation.

His earnings have already sent his children to private school on a larger island. To the neighboring seaweed farmers, he is not just a recluse. He is The Seaweed King.

At least for as long as he has a kingdom.

All three of the sandy islands here are being swept away by powerful currents and a rising ocean caused by climate change. Precarious and precious, life here is lovely, tropical and calm, but also akin to living in a bathtub with warm water pouring in and no drain to let it out. Ever.

It's what you see in many parts of the Solomon Islands, a struggling, stunning country of around 900 islands and 570,000 people.

Scientists call it a global hot spot. The surrounding seas have risen about 7 to 10 millimeters per year since 1993, roughly three times today's global average — and what scientists expect across much of the Pacific by the second half of this century.

WASHAR0003277

Confronting such extremes, residents of many small villages on various islands have picked up and moved. Others, especially here on the three islands surrounded by lush seaweed, are doing everything they can to stay.

"People talk about these islands being vulnerable, and along with that they tend to treat the human beings as vulnerable, too," said Simon Albert, a researcher at the University of Queensland in Australia who has written several papers on adaptation to climate change in the Pacific. "But in my view, they're the opposite — they're strong and resilient."

Maybe they're a bit stubborn, too — but with cause.

The families here are the children and grandchildren of migrants resettled by the British in the 1950s after their islands elsewhere in the Pacific suffered from extreme drought.

They're not eager to move again.

"They call us crazy for staying, but we just survive, ourselves," said Andrew Nakuau, 55, a farmer and community leader on Beniamina, where about 60 people live crammed together on an island no more than a few hundred meters wide.

We were meeting at its center, in a small church at Beniamina's peak — shin-high from the sea. I could see Makaru a short boat ride away.

Small solar panels the size of a notebook shimmered on the roofs of the thatch-and-wooden homes clustered nearby. Washbins and buckets for rainwater, the only freshwater available, lined the island's pathways, thirsty for a storm.

I asked Mr. Nakuau what it felt like to be so disconnected from the causes of climate change, with its cars and coal, but so close to its effects.

He shrugged and walked me over to his own line of defense.

To the left of an outhouse dangling over teal blue water, which used to be land, he pointed to a pile of coral rising several feet from the sand. It was held in place with wooden beams.

"This is the second wall I've built," he said. "The first one was four years ago."

He has also added a second floor to his home.

When I saw a DVD player there, I asked if he had a favorite. "Rambo," he said.

A few hours later, low tide, and work, returned. Most of the young men from the islands could be seen out in the water, piling seaweed into dugout canoes, or tying seedlings to underwater ropes.

It was hot, equatorial hot, even in the water.

When a thunderstorm rolled in, the men quickly moved their catch under tarps to protect it.

Under one tent on Beniamina, nearly a dozen women were working together, laughing and chatting as the men carried seaweed in and children splashed nearby in the rain.

Asked about the toughest part of living on the island, the women struggled for answers.

"It's easier to get to know each other here," said Rakeua Angela, 58, a mother of six.

Rarely, all agreed, does anyone cause trouble. Even drinking alcohol is against the rules; 20 lashes on the rear-end is the punishment, last meted out about a year ago, Mr. Nakuau said, to eight boys and two girls caught in a not-so-distant corner of their very small island.

Cross-sea marriages are common (three of Mr. Tebaubau's children married into Beniamina families) and recreation is communal — bingo nights for women around once a week, birthdays celebrated by all and, at dusk on most days, volleyball and music on Beniamina.

The games are competitive, but joyful with a soundtrack moving from hip-hop to Abba. Watching the island's teenagers play during one particularly glorious evening, it was almost possible to believe that life here could continue forever, undisturbed.

Except that in the distance were the dead gray trees that used to be on land, and the dark blue waves, crashing on the reef.

None of the islanders, especially not the Seaweed King, seemed to notice. When we returned to Makaru, Mr. Tebaubau happily showed me his warehouse with the seaweed he planned to sell next.

"I don't intend to move," he said. "Here there's no boss, you're the boss."

His children were out. His own wall of coral stood tall. "We'll keep trying," he said, "trying to stand."

Except for a few growling dogs, he was completely alone, tilting at the windmill of rising seas.

<u>Back To Top</u>

# I'm Stuck In Guantanamo. The World Has Forgotten Me (Rabbani, LAT)
**Thursday, July 26, 2018**
<u>Los Angeles Times</u>
By Ahmed Rabbani

The world has forgotten me.

WASHAR0003278

Though I once had friends, now I have nobody. Though I once had a government, Pakistan has turned its back on me. Though I once was a human being, I have been reduced to a number (1461) and abandoned in a dark hole: the military prison at Guantanamo Bay.

I am officially a prisoner of war, though the only battle I ever fought back home, as a taxi driver in Karachi, was the rush hour traffic. I was mistaken for an extremist, captured by Gen. Pervez Musharraf's government and sold to the CIA for a bounty in 2002. I've now been detained at Guantanamo, without trial, for nearly 14 years.

President Trump's lawyers argued in court this month that I and other Guantanamo prisoners who have filed habeas corpus petitions could be held by the U.S. government for a hundred years, if that is how long the "conflict" lasts.

I have withstood a lot of torture.

We are said to be the most dangerous prisoners in the world. Yet in the years since this prison was opened, there have been no murders here, no escape attempts, no drugs. The only deaths have been those of the nine men who succumbed to health problems or took their own lives. The only alleged sexual abuse has been at the hands of American interrogators.

The Miami Herald reports that, to operate Guantanamo Bay prison, it costs $11 million per prisoner per year. That would be more than $30,000 a day just for me.

I have gone on hunger strikes many times to peacefully protest my imprisonment. I am back to not eating, but this time it's not a strike. I have chronic stomach problems so acute that I cannot consume hard food without vomiting blood. I am slowly disappearing, dropping a pound a week. I currently weigh 95 pounds.

I have asked for papaya and figs, as well as lamb, the only meat soft enough for my stomach to digest. Although a previous commander said I could have what I needed, I am not getting it.

For a while we had a physician whom we called Dr. Unfortunately. "Unfortunately you can't have this," he would say. "Unfortunately you can't have that."

Now we have Dr. Surprise. "They have approved your food, except the lamb," he said. "I am surprised you are not getting it."

Instead of giving me papaya and figs and lamb, the guards force-feed me cans of nutritional formula. They used to let us receive liquid food while watching television. Now they strap my hands and legs down in a restraint chair. (We call it the "torture chair.")

I have withstood a lot of torture. Before they brought me to Guantanamo, the Americans took me to a black site in Kabul known as the Dark Prison, where my hands were shackled overhead for days on end. Do you have any idea how painful that is, with your shoulders gradually dislocating? Maybe you read in the Senate Intelligence Committee's torture report about the prisoner who tried to cut off his own hand to end the pain. That was me.

Torture makes you go mad. Sometimes I catch myself going mad again now. Every time I am force-fed, every time I meet with my lawyer, every time I see a doctor, they use some kind of metal detector device to do a cavity search. They have never found anything in all these years. What I am meant to be hiding, I have no idea. It is pointless. But I have to wonder if the radiation it emits isn't my own private Hiroshima or Nagasaki — four, six, eight times a day. Maybe I am paranoid, but I feel that something bad is happening to me, deep inside.

When someone says, "Good morning," I do not respond anymore. There is no morning and no evening. There is only despair.

Ahmed Rabbani is a taxi driver from Karachi, Pakistan, who has been detained without trial at Guantanamo Bay for almost 14 years.

Back To Top

# Did Israel Just Stop Trying To Be A Democracy? (Boehm, NYT)
**Thursday, July 26, 2018**
New York Times
By Omri Boehm

Mr. Boehm is an Israeli philosopher.

Last week, Israel's government pushed through Parliament a new law calling Israel the "nation-state of the Jewish people." That statement may sound like a truism — and in some respects it is one — but the implications of it officially being made are monumental.

In 1948, the Declaration of Independence, the text that marks the founding of Israel, created a Jewish state that would ensure "complete equality of social and political rights to all its inhabitants irrespective of religion, race or sex." Since then, the question of how Israel could be both Jewish and democratic has been the object of fierce controversy.

The effort to guarantee equal rights for non-Jews has at times seemed like trying to square a circle. Last week, Israel gave up on even trying.

Prime Minister Benjamin Netanyahu claims that the new legislation simply "determined in law the founding principle of

WASHAR0003279

our existence." In fact, its primary function is to build a formal foundation for Israel's annexation of the West Bank — and for a Jewish state eventually to stretch over the whole of Palestine. Late last year, Mr. Netanyahu's hard-right Likud party had called for the "application of Israeli law and sovereignty in all liberated areas of settlement" in the West Bank.

Critics of last week's nation-state legislation say it flouts the 1948 Declaration of Independence, but matters are messier, and uglier, than that: The new law only exposes an old dirty truth, an unspoken quid pro quo dating back to the creation of modern Israel.

The Declaration based itself explicitly on a 1947 United Nations General Assembly resolution that called for the establishment of two states in Palestine: one Jewish, the other Palestinian. It recognized "the natural right of the Jewish people to be masters of their own fate, like all other nations, in their own sovereign state." It also declared "the establishment of a Jewish state in Eretz-Israel." This language — "like all other nations"; "in", not "over," the Holy Land — left open the possibility that Palestinians, too, could be masters of their own fate, also in Palestine.

But this implicit nod to Palestinian self-determination was driven by an overriding concern for Jewish interests, not Arab rights. In May 1948, there were about 600,000 Jews and some 1.2 million Arabs living within Palestine's borders. With Jews in the minority, the Jewishness of a democratic Israel could only be ensured if Palestinians had a chance at self-determination. In other words, Israel's foundational twin pledge (to be both Jewish and democratic) was hypocritical: Arabs would be equal (in rights) so long as Jews were superior (in numbers).

The system's original contradictions are now being laid bare. Of the more than 8.2 million people living in Israel's recognized borders today, roughly 73 percent are Jewish and 22 percent are Arab. But of the 11.8 million people who live in Israel and the West Bank, roughly 56 percent are Jewish and 40 percent are Arab. And as the prospect of a viable two-state solution has receded, so has Israel's promise that it would provide full equality to non-Jews.

In keeping with this evolution, last week's nation-state law says that, "The right to exercise national self-determination in the State of Israel is unique to the Jewish people." Its proponents insist that such pronouncements neither amend nor undermine the 1948 Declaration's commitments to equality because the legislation doesn't subordinate democratic rights to the protection of Jewish identity. This is a misleading claim: The nation-state law doesn't create any such hierarchy because it doesn't need to; other laws already do.

Notably, any person who "expressly or by implication" negates "the existence of the State of Israel as a Jewish and democratic state" already is prohibited from running for Parliament, known as the Knesset. Defending Israeli democracy through such a law arguably is a legitimate way to guard against extremists who want to destroy the system from within, by abusing its own rules. But defending the state's Jewishness in this manner runs roughshod over people's equal right to democratic representation. It implies that Israel's Jewish identity trumps its democratic character.

Last month, the Joint List, an alliance of mostly Arab-Israeli lawmakers, submitted to Parliament a bill called "Basic Law: The State of All of Its Citizens" that proposed redefining Israel from a Jewish state to a neutral republic. The Knesset didn't even vote on it, invoking a procedural rule to dismiss it outright as denying the country's Jewishness.

As Ahmad Tibi, an Arab-Israeli member of the Knesset quipped back in 2009, "This country is Jewish and democratic: Democratic toward Jews, and Jewish toward Arabs." The nation-state law has just made it more so.

In particular, the new law says that "the state views the development of Jewish settlement as a national value and will act to encourage and promote its establishment and consolidation." In the context of Israel's ongoing conflicts over demography and land, promoting Jewish settlement doesn't just mean favoring the interests of Jews; it also means undermining the interests of Arabs.

The cruel results of this strategy are well known from Israel's settlement project in the West Bank, but similar measures have also been implemented inside Israel proper. In the 1980s, numerous Jewish villages were established in the north of the country as part of a heavily funded effort to "Judaize the Galilee." (I grew up in one of them.) To set up these villages, the government confiscated the land of Arab Israelis and isolated their towns from one another. Their economic prospects waned; their national aspirations — such as for autonomy within Israel — were undermined. Last week's law will give these old methods a fresh boost, including before the Supreme Court, where they have been challenged in the past.

Israel's policy of promoting Jewish settlements has created de facto apartheid in the occupied territories of the West Bank. The nation-state law now formally endorses the use of similar apartheid methods within Israel's recognized borders. What was long suspected has finally been made brutally clear: Israel cannot be both a Jewish state and a liberal democracy.

Omri Boehm is an associate professor of philosophy at the New School for Social Research.

WASHAR0003280

Back To Top

# TRADE

## Trump Trade War: U.S. Stock Market Is Faring Better Than China's Since Dispute Began (Shell, USAT)

**Thursday, July 26, 2018**
USA Today
By Adam Shell

Economists say there are no winners in a trade war, and American farmers, appliance companies and automakers are proof that tariffs can inflict financial harm.

But if you're using the stock market as a measure of whose winning the trade dispute, the U.S. has a clear lead over China and its other trading partners.

While stock prices are just one way of gauging who's feeling more of the ill effects of tariffs, there's no disputing that shares of U.S. companies are performing better than China-based stocks and other foreign markets, says Alec Young, the New York-based managing director of global markets research for FTSE Russell.

"There's a lot of ways to judge this and I expect a lot of twists and turns, but if we just look through the lens of the market, we've seen much stronger U.S. stock performance," says Young.

The Standard & Poor's 500, a stock index filled with America's biggest companies that get more than 43 percent of their revenues from overseas sales, is up 6.5 percent this year through Wednesday's close. China's Shanghai composite is down more than 12 percent over the same period, and major stock indexes in Japan and Europe are down a little less than 1 percent.

The better performance of the closely watched U.S. stock index is good news for individual investors, as there is $3.4 trillion invested in index funds that track the S&P 500 in all sorts of accounts, ranging from 401(k)s and IRAs to mutual funds and exchange traded funds, according to S&P Dow Jones Indices. A 401(k) investor with a $100,000 investment in the large-company stock index at the start of 2018 was sitting on a gain of $6,500 through July 25, compared to a loss of roughly $12,000 for a Chinese investor that began the year with a similar-sized investment in the Shanghai composite.

So why are shares of U.S. companies holding up better, even though Kate Warne, investment strategist at St. Louis-based brokerage Edward Jones, says all markets have been "hampered" by tariffs and worries about the possibility of additional levies and more trade disruptions?

Reasons include:U.S. is negotiating from position of strength

The tariff dispute comes at a time when the U.S. economy is performing extremely well, Warne says. And that enables President Trump to negotiate a better deal from a position of strength.

Corporate profits are on track to grow by more than 20 percent for the second straight quarter, its best back-to-back performance since 2010. The U.S. jobless rate is at an 18-year low. And the economy is picking up, with economists forecasting second-quarter GDP growth of 4 percent, which would mark the fastest pace since 2014. China, as well as Europe and Japan, on the other hand, are experiencing slowing growth.

The U.S. economy is also benefiting from lower corporate tax bills and government spending.

"Stock markets are barometers of domestic conditions, and they show the short-term outlook for China isn't as positive as for the U.S.," Warne explains.

That's not to say individual U.S. companies won't experience a hit to profits from the tariffs.

General Motors, the nation's biggest automaker, for example, said Wednesday that higher commodity costs, mainly from steel, which has risen in price since the president announced a 25 percent tariff in March, took a $300 million bite out of its quarterly earnings. GM shares fell 4.6 percent, as the company cut its forecast for full-year profits due to rising costs.

Similarly, appliance maker Whirlpool said Tuesday that demand for its washing machines was "very soft" from April through June after it raised prices to cover higher costs related to "raw material inflation."

U.S. farmers have also taken a hit after China, which is the largest importer of U.S. soybeans, retaliated with tariffs on that crop.Investors bet on Trump deal-making

Despite fears that the trade dispute could spiral out of control, slowing global growth and dampening investor and business confidence, Wall Street pros still believe the president's use of tariffs as a negotiating tool will likely be a winner.

If Trump wins concessions from China or the European Union, it could prove bullish for stocks as trade terms improve for U.S. companies.

"Right or wrong, many investors still feel the U.S. has the upper hand in this battle, and will win in the end," says Randy Frederick, vice president of trading and derivatives at the

WASHAR0003281

Schwab Center for Financial Research.China has more to lose

Chinese exports to the U.S. measured in dollars outnumber incoming American goods to China by a 3 to 1 margin. Remember, nearly 70 percent of the U.S. economy is driven by domestic spending by consumers. China, which is running a $280 billion trade surplus with the U.S, according to data from financial firm Stifel, can't risk losing too much of its American business, Wall Street pros say.

"The U.S. is a customer of size with buying power that is hard to replace," says John Stoltzfus, chief investment strategist at Oppenheimer Asset Management.

And although tariffs could cause prices for consumer products ranging from cars to washing machines to rise, "the U.S. does not need China as much as China needs the U.S.," says Barry Bannister, head of institutional equity strategy at Stifel.

So far, there is "little evidence trade is having a negative impact on economic data," says Young of FTSE Russell, adding that the massive U.S. economy is more insulated from trade strife because growth comes from many sectors of the economy, including industries, such as health care, which are not as hard-hit by tariffs as are industrial companies.

<u>Back To Top</u>

## China's Xi Says World Must 'Reject Protectionism Outright' (AP)
Thursday, July 26, 2018
<u>Associated Press</u>

JOHANNESBURG (AP) — Chinese President Xi Jinping urged fellow leaders of the BRICS emerging economies to "reject protectionism outright" on Thursday during their annual summit in which the United States is being criticized for escalating tariffs on foreign goods.

Xi along with Russian President Vladimir Putin, Indian Prime Minister Narendra Modi, Brazilian President Michel Temer and South African President Cyril Ramaphosa clasped hands and posed for a group photograph on the second day of their meeting in Johannesburg.

The Trump administration's trade war with China, the world's second-largest economy, and other major trading partners has given focus to the summit to rally support for what Xi called "common prosperity."

The Chinese leader criticized the "escalation of protectionism and unilateralism" that he said has directly affected the development of emerging markets.

"We must unlock enormous potential for economic cooperation," he said, and fight back against protectionism by working through the United Nations, the Group of 20 nations and elsewhere.

The BRICS leaders later signed a declaration in which they agreed to strengthen economic and security cooperation, uphold "multilateralism" and work toward "a fairer international order."

"We call on all WTO members to abide by WTO rules," they said in a statement, referring to the World Trade Organization.

A day earlier at the summit, Xi said the world faces "a choice between cooperation and confrontation" amid the trade dispute with the United States in which he warned there would be no winner. U.S. President Donald Trump, meanwhile, accused China of "vicious" tactics on trade.

Putin, for his part, supported the idea of opening regional branches of the New Development Bank for BRICS. "We are negotiating with Brazil on this matter, starting from the fact that after the completion of the issue, the opening of the office in Russia will begin," he said.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

<u>Back To Top</u>

## China Plans Retaliation For Any Amount Of U.S. Tariffs (BLOOM)
Thursday, July 26, 2018
<u>Bloomberg News</u>

The Chinese government has a plan to retaliate against increases in U.S. tariffs regardless of the volume of goods targeted, according to an official in Beijing.

China is ready to respond to measures from U.S. President Donald Trump whether they involve $16 billion or $200 billion of Chinese imports, the official said Thursday, asking not to be identified.

The comments came as the world's two biggest economies are locked in a trade standoff after imposing tariffs on $34 billion of each other's goods earlier this month. Another $16 billion of trade is likely to be targeted soon.

The Office of the U.S. Trade Representative has identified an additional $200 billion of Chinese goods and Trump said he is "ready to go" with tariffs on as much as $500 billion, roughly the value of all China's annual exports to the U.S. He has also accused China of manipulating its currency during the yuan's monthlong losing streak.

China's Ministry of Commerce spokesman Gao Feng said Thursday that the two sides have had no contact about

WASHAR0003282

renewing talks and the U.S. is fueling tensions while putting all the blame on China.

— With assistance by Miao Han, and John Liu

Back To Top

## Amid Trade War, US And China Exchange Invectives At WTO (Keaten, AP)

Thursday, July 26, 2018
Associated Press
By Jamey Keaten

GENEVA (AP) — Ambassadors from the United States and China exchanged barbs at the World Trade Organization on Thursday over the countries' simmering trade dispute.

The showdown between Dennis Shea and Zhang Xiangchen came at a WTO meeting in Geneva on Thursday, as the two massive economies are embroiled in a trade war. The Trump administration is putting tariffs on billions worth of Chinese goods, and China is retaliating.

Shea lashed out at Beijing's claim that it supports open, transparent, inclusive and non-discriminatory trade. He said: "China's size magnifies the harm caused by its state-led, mercantilist approach to trade and investment, and this harm is growing every day and can no longer be tolerated."

Zhang replied that Shea had "made the air smell like gunpowder."

"We should thank Ambassador Shea, as he reminded us that we are now in an unprecedented crisis of the multilateral trading system," he said.

While noting issues of poverty in China, Shea rejected Chinese government claims that it remains a developing country given that it is the world's largest automotive market, oil importer, steel manufacturer and meat consumer. He insisted that the Chinese state retains control or strong influence over a wide array of businesses in China.

"We want to ensure that members truly understand that change is necessary if the WTO is to remain relevant to the international trading system," he said, insisting that China too must change to "fully and effectively embrace open, market-oriented policies like other WTO members."

The meeting was closed to reporters and the comments were made available to The Associated Press through their respective diplomatic missions.

Trump has repeatedly criticized the WTO as allegedly unfair to the U.S.

Zhang then all but accused the U.S. of being the bigger disrupter of trade with its tariffs on steel, aluminum and tens of billions of dollars' worth of Chinese goods.

"We have to be fully aware which country's trade measures are most disruptive," he said.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## U.S. Downplays Hopes For China Deal Soon Amid EU, Nafta Progress (Mayeda, Leonard, Niquette, BLOOM)

Thursday, July 26, 2018
Bloomberg News
By Andrew Mayeda , Jenny Leonard , And Mark Niquette

President Donald Trump's trade battle with China is showing no signs of letting up, even after he made peace with the European Union and signs mounted that a tentative deal on a new Nafta may be reached next month.

The pact with the EU to refrain from new tariffs, announced Wednesday, has Bank of America Corp. economists suggesting a possible turning point in the global trade war. To celebrate the breakthrough, Trump tweeted a photo of European Commission President Jean-Claude Juncker greeting him with a kiss on the cheek.

Meanwhile, relations between Washington and Beijing showed no signs of improvement Thursday as Trump's top trade negotiator played down the prospect of a quick compromise and a top Chinese trade official railed against U.S. trade strategy as "extortion." Those were the latest signs that common ground with China remains a major challenge. A negotiating framework with Beijing in May lasted just days before Trump called for deeper concessions.

"We clearly have a chronic problem with China," U.S. Trade Representative Robert Lighthizer said in Senate testimony, estimating that trade issues with Beijing will take years to resolve. He said the Trump administration believes it must push back against China because it uses "state capitalism" to take advantage of the openness of the U.S. economy, costing Americans jobs and wealth.

"Some issues will be dealt with in a short period of time," Lighthizer said. "Directionally, we're going to have a problem with China that's going to go on for years."

Related Story: Qualcomm Scraps NXP Deal Amid U.S.-China Trade Tensions

In the early stages of talks, it appeared that Beijing might mollify the president by pledging to buy more American soybeans and energy, as the Europeans did this week. But Lighthizer's remarks portray the trade dispute as a longer-term clash between radically different systems. If such a view

WASHAR0003283

prevails in coming months, it signals slimmer odds Trump can reach a deal with Chinese President Xi Jinping, who's shown little desire for abrupt economic strategy shifts.

In the most recent sign of the U.S. and China's frayed economic ties, Qualcomm Inc., based in San Diego, scrapped its $44 billion bid for rival chipmaker NXP Semiconductors NV after Chinese regulators failed to approve the largest-ever deal in the chip industry. Interviewed earlier Thursday on CNBC, Treasury Secretary Steven Mnuchin said he was "very disappointed" in China's decision.

The hearing gave both Democrats and Republicans a chance to criticize Trump's trade policies, highlight the pain on American farmers and businesses, and point out the lack of a timetable for resolving the disputes. China's authoritarian political system offers its officials the ability to wait out the U.S. on trade issues, said Senator Brian Schatz, a Democrat from Hawaii.

"How do we have leverage in a situation where they have unending patience and we have almost none?" he asked Lighthizer. "You don't pick stupid fights."

"If your conclusion is that China taking over all of our technology and the future of our children is a stupid fight, then you're right, we should capitulate," Lighthizer responded. "My view is that's how we got where we are."

The deal with the EU suggests Trump will take an even harder line with China, rather than backing down, said Dan DiMicco, a former steel-industry executive who advised Trump during the 2016 campaign.

"Trump is playing hardball," he said in an interview. "The president is going to build a coalition to deal with the real issue, which is China's mercantilism."Tariffs, Retaliation

The Trump administration this week held public hearings on its plan to target $16 billion in Chinese goods targeted with duties of 25 percent, which could be imposed after a comment period ends July 31. The administration imposed tariffs on $34 billion of products on July 6, after similar hearings in May.

The U.S. has also identified an additional $200 billion of goods slated for a 10 percent duty after China announced retaliatory levies, and Trump has said he's "ready to go" with tariffs on $500 billion in imports – roughly the annual value of all U.S. imports from China.

High-level talks between the U.S. and China are on hold, and neither side appears ready to dial down the rhetoric. "Holding our feet to the fire has never worked," China's ambassador to the World Trade Organization, Zhang Xiangchen, said Thursday in Geneva. "Extortion, distortion or demonization does no good to resolve the issues."

The U.S. deal with the EU is a "clear negative for China," said Alicia Garcia Herrero, chief Asia-Pacific economist at Natixis SA in Hong Kong.

"It means the EU is on the U.S. side," she said. "We should expect the EU to align to some of the protectionist measures taken by Trump on China."

Even as he criticized China, Lighthizer expressed optimism of a deal on a new North American Free Trade Agreement. The U.S. hopes to conclude an agreement-in-principle with Canada and Mexico in August, Lighthizer said. The Mexican peso rose following his comments.

— With assistance by Bryce Baschuk, and Enda Curran
Back To Top

## Chinese Factory Rushing To Make Trump's 2020 Banners In Fear Of Tariffs (Hayes, USAT)
**Thursday, July 26, 2018**
USA Today
By Christal Hayes

President Donald Trump's 2020 reelection banners are being made in haste at one Chinese flag factory as the fear of more tariffs loom.

Workers in Fuyang, China have been busy at work, leaning over sewing machine tables, hemming the edges of Trump's "Keep America Great!" banners and shipping them off. While the summer is usually the slow season at Jiahao Flag Co Ltd, the factory has packaged more than 90,000 of the iconic red, white and blue banners since March, according to Reuters.

Manager Yao Yuanyuan told the wire service that the increase is tied to the ongoing trade war with the U.S. Already, the U.S. has slapped tariffs on $34 billion worth of Chinese goods and last week, Trump signaled he could increase that to all $505 billion in goods that China imports.

"It's closely related," Yao told Reuters. "They are preparing in advance, they are taking advantage of the fact that the tariffs haven't gone up yet, with lower prices now."

While the banners are sold both within China and abroad, Yao said it unclear whether they are affiliated with Trump's campaign or the Republican party. Reuters reports the factory doesn't just make paraphernalia for the president but also sells American and rainbow flags.

Trump has taken a hard stance on trade, supporting U.S. made goods since he's taken office but ironically many items he's sold over the years through his multiple business ventures weren't American made, including Trump's vodka, shirts, ties, suits and eyeglasses.

WASHAR0003284

Items in his clothing line, hotels, home decoration line was made in countries including China, Mexico and Bangladesh.

Back To Top

## Trump-Europe Trade Rift: What Was Settled, And What Wasn't? (Wiseman, AP)

Thursday, July 26, 2018
Associated Press
By Paul Wiseman

WASHINGTON (AP) — To the relief of many, the United States and Europe have agreed to avert a trade war over autos and to work toward removing other barriers to trade.

Yet the truce reached Wednesday by President Donald Trump and European Commission President Jean-Claude Juncker after a White House meeting produced few details and no commitments. And it didn't begin to address other Trump-led trade conflicts, notably with China, that have already hurt many U.S. companies.

Still, the news that the United States was at least temporarily holding off on taxing imported cars, trucks and auto parts from the European Union calmed fears on both sides of the Atlantic. The easing of tensions was warmly embraced after a drumbeat of intensely belligerent rhetoric from both sides.

"It's not clear at this point where all this is going and how long it will last," Simon Lester, a trade specialist at the Cato Institute, wrote on the libertarian think tank's blog Thursday. "But one day of trade peace is nice after months of harsh rhetoric and escalating tariffs."

Here's a look at what Trump-Juncker meeting achieved — and what it didn't.

___

WHAT DID TRUMP AND JUNCKER AGREE TO?

Most important, they agreed to suspend a looming trade war over autos. Trump has threatened 20 percent to 25 percent tariffs on imported vehicles and auto parts, which he has labeled a threat to America's national security. The EU has been readying retaliatory taxes on U.S. products. Now, those tariffs are on hold as long as the U.S. and EU keep talking in good faith.

Trump had faced a backlash against his threatened auto tariffs on Capitol Hill, especially from lawmakers whose constituents would stand to suffer. Sens. Doug Jones, D-Ala., and Lamar Alexander, R-Tenn., introduced legislation that would delay the tariffs by requiring the independent International Trade Commission to first conduct a study of the auto industry.

The U.S. and EU also agreed to start talks intended to achieve "zero tariffs" and "zero subsidies" on non-automotive industrial goods. And the EU agreed to buy more U.S. soybeans and to build more terminals to import liquefied natural gas from the United States.

The two sides said they would seek to resolve a dispute over steel and aluminum. The U.S. has imposed tariffs on the metals, again justifying the action on national-security grounds. These tariffs — effectively a tax on imports — have hurt many American manufacturers that require imported steel and aluminum to build cars, boats, machines and many other goods. The EU has counterpunched with tariffs on U.S. products.

Wednesday's meeting raised at least the prospect that those tit-for-tat tariffs would be lifted. But it's hardly assured. No firm dates were set for future talks on the U.S. steel and aluminum tariffs. And Trump, who has frequently changed course for little apparent reason, could always decide that the tariffs should remain in effect after all.

___

IS THE AGREEMENT GETTING GOOD REVIEWS?

Most analysts were relieved that the U.S. and EU had pulled back from the brink of automotive tariffs. But most were also underwhelmed by the lack of detail or formal commitments.

If history is a guide, the U.S.-EU talks on freer trade could stall as the union's 28 member states register objections to specific market-opening proposals and U.S. companies start raising demands on the negotiators.

"These things become Christmas trees with everybody hanging things on them," said Philip Levy, a senior fellow at the Chicago Council on Global Affairs and a former White House trade adviser. Levy cautioned that it would be "wildly unrealistic" to expect a big breakthrough on U.S.-EU trade.

It's also possible that the mercurial Trump could grow impatient with progress and hit Europe with auto tariffs after all. In May, analysts recall, Treasury Secretary Steven Mnuchin announced a cease-fire in a trade war with China after Beijing — like the EU on Wednesday — had agreed to buy more U.S. soybeans and liquefied natural gas. The truce lasted just days. In the end, Trump, retreating in the face of criticism that he had gone soft on China, declared the hostilities back on again.

Moreover, even before Wednesday's agreement, the EU was likely to buy more U.S. soybeans. That's because China, by far the largest market for the crop, has imposed retaliatory tariffs on U.S. soybeans, causing sales to shrink. So the Chinese are buying up all the Brazilian and Argentinian soybeans they can in the interim, leading to expectations that

WASHAR0003285

the EU would buy more from the U.S. Still, the EU's purchases won't come close to making up for Beijing's cutback in purchases of U.S. soybeans.

—

WHERE DOES THIS LEAVE OTHER DISPUTES BETWEEN THE U.S. AND ITS TRADING PARTNERS?

The Trump-Juncker rapprochement did nothing to resolve America's conflicts with the rest of the world. Other trading partners — including Canada, Japan, Mexico and South Korea — still face the threat of auto tariffs, which could land as early as September. The reverberations would be enormous: The EU accounted for just 22 percent of U.S. auto imports last year; Canada and Mexico combined for 47 percent.

The U.S. steel and aluminum tariffs remain in place. And the United States is still locked in trade war with China. The Trump administration has imposed tariffs on $34 billion in Chinese goods in a dispute over Beijing's high-tech industrial policies and has threatened to eventually target $500 billion. China has struck back with duties on soybeans and pork, among other products, affecting Midwest farmers in a region that supported Trump in his 2016 campaign.

On Wednesday, Trump and Juncker raised the prospect of presenting a united front to China — demanding that Beijing curb overproduction, reduce subsidies for Chinese companies and act to protect foreign intellectual property.

"If the West is not nipping at each other, they can turn toward China," said Timothy Keeler, a lawyer and former chief of staff for the U.S. Trade Representative.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Trump Declares Victory For Farmers In Trade Spat With EU (Scott, Pigman, AFP)
**Thursday, July 26, 2018**
AFP
By Heather Scott, Alex Pigman

Washington (AFP) – President Donald Trump declared victory for American farmers Thursday after brokering a ceasefire in a trade dispute with the European Union, but it is unclear how soon it will bring relief to those hurt by tit-for-tat tariffs.

The White House painted the agreement as a vindication of the US president's bare-knuckle tactics, which Trump has deployed even against allies.

The details of the deal brokered with European Commission chief Jean-Claude Juncker on Wednesday remain unclear and subject to differing interpretations, but the EU did ward off a new round of US tariffs on autos and received a pledge to roll back duties on steel and aluminum.

In exchange, Trump said he won access for US soybean producers, and for American natural gas.

"We just opened up Europe for you farmers," he told supporters at a rally in the farm state of Iowa.

Punishing US metals tariffs angered Washington's major trading partners including the EU and sparked retaliation against important American exports, spooking global stock markets.

US Treasury Secretary Steven Mnuchin said the truce will "immediately resolve" tariffs and the EU retaliation at the center of the costly trade row.

"The first issue that we'll begin negotiating is... the issue on the steel and aluminum tariffs and retaliatory tariffs," Mnuchin said on CNBC.

Brussels had hit back at the US over the metals tariffs by imposing duties on more than $3 billion of US goods, including blue jeans, bourbon and motorcycles, as well as orange juice, rice and corn.

Mnuchin also confirmed that the US would not impose threatened auto tariffs – which would hurt dominant German carmakers – while negotiations are ongoing. That would head off the threat of another round of EU tariffs on $20 billion in US exports.

"Phase one will be to immediately resolve those issues so there will be no tariffs in either direction," Mnuchin said.

– 'Vindication' for Trump –

The US declared a resounding victory for Trump and his confrontational stance, as Washington appears to have conceded little in exchange.

"If we hadn't had steel and aluminum tariffs, we never would have gotten to the point we are now," Commerce Secretary Wilbur Ross told reporters. "This is a real vindication of the president's trade policy."

The United States and the EU account for about $1 trillion in transatlantic trade, and on Wednesday the leaders agreed to work towards eliminating all tariffs, trade barriers and subsidies.

Trump also said the EU made a commitment to buy more US soybeans and natural gas, but a European official disputed that characterization.

35

The joint statement said Brussels and Washington would "work to reduce barriers and increase trade" in a range of products including soybeans, and that the EU "wants to import more liquefied natural gas (LNG) from the United States."

But an EU official told reporters it will be up to the markets to decide whether to buy more US goods. "We are not going to turn into a Soviet-style economy."

European Central Bank chief Mario Draghi called the tentative truce a "good sign, because in a sense it shows that there is a willingness to discuss trade issues in a multilateral framework again."

He warned, however, it was too soon to "assess the actual content."

Germany unsurprisingly hailed the decision, given that its auto industry was the first in line to be punished by Trump's protectionist offensive.

But French President Emmanuel Macron expressed skepticism, saying a good trade negotiation "can only be done on a balanced, reciprocal basis, and in no case under any sort of threat."

US stocks closed the day mostly lower on Thursday, despite rallying after the announcement, as investors were cautious that the trade threat had fully receded.

Agricultural equipment makers Deere & Co. and Agco both advanced, but General Motors, Ford and Fiat Chrysler all fell. All three carmakers slashed profit forecasts in part due to higher supply costs due to US tariffs on steel and aluminum.

But European markets rallied, as French and German carmakers rebounded on news of their reprieve. BMW gained 4.4 percent, Daimler 2.8 percent and Volkswagen 4.0 percent in Frankfurt.

Ross said his department will continue its investigation into possible tariffs on imports of auto and auto parts and submit a report to Trump sometime next month.

However, it "may not be necessary" to impose the tariffs.

– Watching China currency movements –

Trump also won a commitment from Juncker to work together to reform the World Trade Organization to address some of his complaints about China on theft of US technology, the behavior of state-owned enterprises, and overcapacity in steel.

The Republican president has long complained that the WTO has been unfair to the United States, despite the fact the US has won most of the disputes against China and others.

Mnuchin said there were no new developments on the dispute with China, which has been the target of most of Trump's trade policies.

"I've made perfectly clear that any time China is willing to seriously negotiate – and we're talking about a commitment to reduce the bilateral trade deficit as well as to deal with technology issues – we're available any time," he said.

But he also cautioned that the US is watching China's currency movements for any sign Beijing is manipulating the yuan.

<u>Back To Top</u>

## Trump Celebrates His Tariff Policies With Illinois Steelworkers Amid Complaints From Midwest Farmers (Stokols, LAT)

**Thursday, July 26, 2018**
<u>Los Angeles Times</u>
By Eli Stokols

A day after announcing a truce in a brewing trade war with Europe, President Trump returned to his protectionist script during two stops across the Midwest on Thursday, touting the reopening of an Illinois steel mill as proof that his tariffs are helping workers.

Despite opposition from the region's farmers hurt by other nations' retaliatory tariffs on agricultural products — and from the farmers' Republican representatives in Congress — Trump urged patience first in Iowa, then in southern Illinois, and asserted that the healthy economy made this an opportune time to pick a fight on trade.

"This is the time to straighten out the worst trade deals ever made by any country in the history of earth. But now they're becoming good again," Trump told steelworkers at a United States Steel Corp. mill in Granite City, Ill.

He has reached no deals during his presidency, however, instead turning to tariffs against trading partners in recent months. Explaining his hard-line stance to the steelworkers, Trump said America had been "the big dumb piggy bank and everyone was robbing us blind."

"We lost our businesses and our jobs to other countries," he said. But now, Trump said, "We're fighting back and we're winning."

Trump's event captured the unpredictable swings that have marked his trade policy. The celebration of the reopening of two blast furnaces, which the steel company attributed to Trump's 25% tariffs on imported steel, came a day after the president held a Rose Garden ceremony with the European Commission president to announce a trade truce, including his concession to reconsider his steel and aluminum tariffs.

WASHAR0003287

Trade policy is again shaping up as a significant political issue heading into November's midterm election. Yet it seems to hinge on the mood swings of a president who's long been skeptical of the free trade principles that used to unite his party, and is willing to exercise executive authority in a protectionist way that recent predecessors rarely have.

Yet Trump now is confronting the predicted downsides of tariffs. Months after he targeted steel and aluminum imports and placed tariffs on $34 billion in Chinese goods, trading partners' retaliatory tariffs targeting U.S. agricultural products are threatening farmers, businesses and blue-collar workers in states that Trump won in 2016.

An NBC News/Wall Street Journal poll this week showed that most voters — by a 2-to-1 margin — believe the tariffs will be harmful to the economy.

Trump's Rose Garden news conference Wednesday seemed to be an effort to lower the rhetorical temperature on trade and allay American anxieties about additional economic fallout. And it marked another instance of the president claiming credit for having resolved a crisis mostly of his own making, when he simply was returning to the status quo and much work and negotiations lay ahead.

In Iowa, which along with Illinois is the nation's top soybean producer and bears the brunt of retaliatory tariffs, Trump spoke in glowing terms about the initial agreement with the European Union. He and European Commission President Jean-Claude Juncker agreed to start negotiations toward a U.S.- EU trade deal and avoid new tariffs in the meantime.

"Basically, we opened up Europe," the president said, exaggerating during a roundtable with political and business leaders in Peosta, an eastern Iowa town outside Dubuque. "You're not going to be too angry with Trump, I can tell you."

Seemingly trying to dissolve the anxiety among agricultural producers by declaring the situation fixed, Trump spoke of a bond between himself and the pork, corn and soybean producers, who are now increasingly unnerved by the prospect of retaliatory tariffs from other countries.

"The farmers love me. They voted for me. We won every one of the states," Trump said. He blamed other countries for imposing the retaliatory agricultural tariffs, saying, "It's not nice, what they're doing."

With a green-and-yellow "Make our farmers great again" ball cap near him on a table, Trump said he'd convinced Juncker to get EU countries to buy more soybeans from American farmers.

The EU had already been importing soybeans and liquid natural gas. Juncker's promise to push European countries to import more of both was presented as a concession, in exchange for Trump dialing back his threats of more tariffs, including on European autos, while both sides work toward a permanent trade deal.

Analysts had viewed Trump's more amiable tone on trade Wednesday as a tactical move to address mounting criticism in his own party. In quickly reverting to his populist message of economic nationalism, the president left little doubt about his true sentiments.

Coming just a day after Trump talked like a free trader, extolling the ideas of zero tariffs and zero trade barriers, his attacks on existing trade deals and trading relationships threw cold water on the notion that he wanted anything less than outright concessions from other countries.

Not many Europeans were holding out high hopes to begin with, said Fredrik Erixon, an economist and director of the European Center for International Political Economy, a think tank in Brussels. On Thursday, European leaders were debating whether Juncker's approach to Trump was too soft. The French government signaled its disappointment and preference for playing hardball with Trump.

Erixon reckoned that the temporary truce would buy Europe a little more time, but he wasn't optimistic that the talks with Trump would amount to much.

"There was a sigh of relief after the meeting yesterday," he said. "Now there's a big question mark: How on earth do you go from here into the future?"

Trump's Midwestern swing was mostly about easing worries and taking credit. At the steel plant, across the Mississippi River from St. Louis, Trump said that "to see an old, big monster plant like this reopening, that is an honor."

Underscoring that he sees groups like the steelworkers as his political base, Trump, the New York real estate mogul born to wealth, then told them, "I could be one of you. True. Looking around, all these good-looking people, it could be me."

Earlier, on the flight to Iowa, Commerce Secretary Wilbur Ross told reporters that the president's hard-line stance on trade had brought the EU to the negotiating table.

"If we hadn't had steel and aluminum tariffs, we never would have gotten to the point we are now," Ross said aboard Air Force One. "This is a real vindication of the president's trade policy."

That statement, however, was misleading at best. Before Trump took office, the U.S. and EU had been in tough but advanced trade negotiations after years of talks; his election, and general hostility to trade deals, effectively ended the effort.

WASHAR0003288

Ross said that the U.S. had not lifted the tariffs Trump imposed but had agreed to hold off on automotive tariffs while negotiations take place: "In terms of auto tariffs, we've been directed by the president to continue the investigation, get our material together, but not actually implement anything pending the outcome of the negotiation."

He said the report on auto tariffs would be submitted in August. Imposing them "may not be necessary," Ross said, but he added that in the meantime, "steel and aluminum tariffs stay in place."

Even so, Juncker said in the Rose Garden, with Trump beside him, that the president had agreed to reconsider those tariffs.

In more contradictory statements on trade this week, the president tweeted Tuesday morning that "Tariffs are the greatest!" Then, standing beside Juncker on Wednesday afternoon, he called for "zero tariffs" at some point.

Times staff writer Don Lee contributed to this report.

Back To Top

## Juncker's Trade Pitch To Trump: 'I Can Be Stupid, As Well' (Pop, Salama, WSJ)

How bravado, flip cards and a White House ally helped European official sell U.S. president on trade detente
Thursday, July 26, 2018
Wall Street Journal
By Valentina Pop And Vivian Salama

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## In Tentative Deal With E.U., Trump Touts Parts Of Global Trade Deals He Once Rejected (Whalen, Paletta, WP)

Thursday, July 26, 2018
Washington Post
By Jeanne Whalen And Damian Paletta

President Trump this week embraced components of global trade deals he has rejected in the past, in a preliminary agreement with the European Union, American and European trade experts and diplomats said Thursday.

Speaking to a crowd of steelworkers Thursday in Granite City, Ill., Trump touted a "historic agreement" with the European Union and said his administration's tough trade strategy is working and making up for unfair trade deals in the past. "This is the time to straighten out the worst trade deals ever made by any country on Earth ever in history," he said.

But the deals the administration has reached fall short of Trump's broad aim of rebalancing U.S. trade relations with the rest of the world — and in some instances adopt elements of past agreements the president is intent on breaking.

Trump's agreement this week with the European Union and a renegotiation earlier this year of a trade deal with South Korea bear similarities to deals that were in place or being negotiated before Trump took office, the analysts and diplomats said.

A key piece of the agreement Trump reached with European Commission President Jean-Claude Juncker to ease escalating trade tensions and forestall further tariffs called for both sides to "work together toward zero tariffs" on non-auto industrial goods, such as aircraft engines and turbines.

That was also a goal of the Transatlantic Trade and Investment Partnership, or TTIP, a proposed deal that the United States and the European Union were negotiating under the Obama administration and that subsequently withered.

"There does seem to be a lot of similarity in what Trump wants to achieve and what the TTIP tried to accomplish," said Eswar Prasad, professor of trade policy at Cornell University.

Wednesday's joint statement from Juncker and Trump also called for easing trade barriers in sectors such as pharmaceuticals and chemicals, aims that were part of the TTIP, said Anthony Gardner, who was U.S. ambassador to the European Union during the Obama administration.

The Trump administration's reworking of a trade deal with South Korea included some improvements for Washington, including a Korean agreement to restrict its steel exports to the United States, trade experts said.

But Jeff Moon, who was assistant U.S. trade representative to China during the Obama administration, said the new deal was largely similar to the previous one "because it wasn't that bad a deal."

During his hour-long speech at a U.S. Steel facility in Granite City, Trump gave a provocative, forceful defense of his approach to economic and foreign policy, arguing that his hardball tactics had worked with China, the European Union and North Korea.

It is a message the White House is trying to reinforce after many business leaders and Republicans in recent days expressed concern that Trump's trade agenda was starting to backfire.

Midway through the corporate earnings season, some of the country's largest companies have reported that they are feeling the pinch of the Trump administration's trade war.

WASHAR0003289

The executives, who lead companies across a broad array of industries, identified the tariffs — especially on aluminum and steel — as a potential drag on profits.

They said the import taxes could lead to higher prices for consumers and force companies to make major changes in production lines, including moving some operations out of China.

General Motors, Coca-Cola, Harley-Davidson and Brown-Forman have all warned that the tariffs could push them to increase prices.

Republicans also have raised concerns about Trump's trade strategy.

Rep. Garland "Andy" Barr (R-Ky.) said that although he is pleased with the E.U. agreement, he is concerned about the effects of the trade tensions on the bourbon industry and on car plants in his state.

"We appreciate the administration lowering the temperature with the E.U., but to my question about retaliatory tariffs on Kentucky bourbon exports, I don't have a solution yet for my bourbon industry," Barr said.

"I also stressed that there are a lot more jobs at Toyota Motor Manufacturing in Kentucky that are negatively impacted by these steel tariffs than there are at the aluminum smelters and the steel production facilities in Kentucky," he added.

Trump said that U.S. policy before he became president was "stupid" and that the economy during the Obama administration was "going to hell." At one point, he said countries used to look at the country as the "big, fat, sloppy United States."

The rosy picture Trump painted of his agenda was only a partial reflection of where things stand. He characterized the E.U. negotiations, which began in earnest Wednesday, as nearly completed, but many differences remain. And relations with China are still chilly and uncertain amid an escalation of tariffs.

In a room full of steelworkers in a revived steel town, those nuances weren't as important as the momentum Trump said he was fueling. U.S. Steel executives and employees are strong supporters of the tariffs Trump imposed on steel and aluminum imports this year.

Bob Edwards, 60, was rehired by the Granite City steel plant in January 2017 after having lost his job 11 months earlier.

"A regular paycheck and a booming economy — when you are doing something, you are not worried about everything else," said Edwards, whose ponytail was tucked under his orange hard hat. He said he's a strong union supporter and also a strong Trump supporter.

U.S. Steel's chief executive addressed the crowd of about 500 in the sweltering warehouse before Trump arrived, encouraging them to keep working together to help the company continue its growth. U.S. Steel's stock price has roughly doubled since Trump's election.

"We have a president who believes in you," David B. Burritt said. "He's fighting for us."

Speaking before the Senate Appropriations Committee on Thursday, U.S. Trade Representative Robert E. Lighthizer said negotiations to overhaul the North American Free Trade Agreement were proceeding at "an unprecedented speed."

Lighthizer, who also met Thursday with Ildefonso Guajardo Villarreal, Mexico's economic secretary, to discuss NAFTA negotiations, said he hoped to have an agreement in principle with Mexico soon.

"My hope is that we will before very long have a conclusion with respect to Mexico, and as a result of that, Canada will come in and begin to compromise. I don't believe they've compromised in the same way the United States has or the way Mexico has," he said. Canadian officials didn't immediately respond to a request for comment.

Luis de la Calle, a former undersecretary in Mexico's economic ministry, said the United States and Mexico have incentives to conclude the NAFTA talks soon.

"On the Mexican side, there is the incentive of the outgoing government to conclude that issue, and for the incoming government, to not have to deal with it," he said, referring to the presidential administration set to take office in December.

<u>Back To Top</u>

## Europeans Are Skeptical Of Trade Truce With Trump (Ariès, McAuley, WP)
**Thursday, July 26, 2018**
<u>Washington Post</u>
**By Quentin Ariès And James McAuley**

BRUSSELS — European officials are struggling to make sense of what seems a temporary trade war truce between President Trump and the European Union, following the visit of E.U. leaders to Washington this week.

Trump and Jean-Claude Juncker, the president of the European Commission, announced Wednesday that they had agreed to work toward resolving disputes over steel and aluminum tariffs, delay proposed car tariffs and talk about a bilateral trade deal.

"Objectively this a good news, that we avoided so far tariffs on cars," said a senior E.U. diplomat, who like many officials spoke on the condition of anonymity to discuss sensitive internal discussions.

WASHAR0003290

In capitals across Europe, a number of national officials echoed that sentiment, heralding the meeting as having prevented a trade war. German Finance Minister Peter Altmaier, for instance, called it a "breakthrough." But others were wary, wondering whether it's realistic to expect Europe to buy more soybeans from the United States, as Juncker signaled, or to become "a massive buyer" of U.S. liquefied natural gas, as Trump declared.

And to some European eyes, the more feasible parts of what Trump and Juncker discussed look a lot like the goals of what was known as the Transatlantic Trade and Investment Partnership, or TTIP, an initiative launched by President Barack Obama that aspired to free trade with Europe.

Wednesday's joint statement between Juncker and Trump included calls for easing trade barriers in sectors such as pharmaceuticals, chemicals, medical products and services — sectors that also were discussed within TTIP. Those negotiations have been mostly dormant since 2016, when they were sidetracked by Britain voting to leave the European Union and the United States electing Trump.

"TTIP was way too wide, and negotiations were stuck, as Americans were not keen to discuss greater access to their public procurements, while Europeans were reluctant on the U.S. importing more agricultural products," said a European Commission official.

According to another diplomat, some countries fear that communicating a revival of TTIP could anger voters. From the beginning, the E.U.-U.S. trade proposal triggered resistance from social and environmental activists. Reopening talks during a Trump presidency could backfire, as the next elections for the European Parliament are scheduled for May 2019.

With a White House that frequently changes course and on the spur of a moment, economic analysts hesitated to cast any definitive judgment on the Trump-Juncker detent.

"Is it actual, or is it just perfunctory?" said Maria Demertzis, the deputy director of Breugel, a Brussels-based think tank focusing on economic issues.

As far as soybean imports, prices from Argentina and Brazil tend to be a good deal lower than prices from the United States, according to an E.U. official.

U.S. prices have fallen somewhat in recent weeks, since China enacted its own set of soybean tariffs. But soybeans intended for Chinese markets can't necessarily be redirected to the European Union, which has stringent regulations on genetically modified foods.

According to a senior E.U. official, there have been no discussions about lifting those standards to purchase U.S.

soybeans. The same official said that agricultural products were outside the talks between Juncker and Trump, directly contradicting comments from Commerce Secretary Wilbur Ross, who said Tuesday that "all agricultural products are something that will be discussed."

"Ross can say what he wishes, but it does not correspond to the joint statement," the diplomat said.

A similar situation exists regarding liquefied natural gas, said a European diplomat working on trade issues. That provision probably was meant as a German concession to the White House, the diplomat said, given Trump's recent anger about the Nord Stream 2 pipeline deal, which will bring gas to Germany from Russia.

Nord Stream 2 hasn't been abandoned, though. And U.S. gas remains far more expensive because of shipping costs.

"The idea of significantly more LNG shipments to EU absurd," tweeted Anthony Gardner, a former U.S. ambassador to the European Union. "It is not price competitive with piped gas."

For some trade analysts, the concern was less about the particulars of the Trump-Juncker handshake this week than how Europe plans to deal with Trump, who only recently called the European Union a "trade foe."

"Let's go back a step," said Demertzis, the economic analyst. "What's the strategy here, to the extent that the E.U. has a strategy?"

She noted that the bloc has recently signed major trade deals with other partners, notably Japan. Meanwhile, it's contesting the Trump administration's steel and aluminum tariffs — which remain in effect — before the World Trade Organization, and it has pledged proportionality in retaliatory measures toward U.S. products.

"If you go and strike a deal with Mr. Trump, you have to think how that fits into the strategy," she said. "Striking a deal would do damage, in my view, to what you're trying to do on a broader level."

McAuley reported from Paris.

<div align="right">Back To Top</div>

## Trump Says Europe Will Buy More American Gas. Is That Possible? (Reed, NYT)
**Thursday, July 26, 2018**
New York Times
By Stanley Reed

When President Trump met with Jean-Claude Juncker, the president of the European Commission, at the White House, the two said they were entering a new phase in their relationship. Crucial to that will be natural gas.

WASHAR0003291

Demand for natural gas — a cleaner-burning fossil fuel than coal or oil — is rising worldwide, and the United States is a growing supplier of liquefied natural gas, or L.N.G. The European Union, meanwhile, wants to diversify its energy supply, which remains somewhat dependent on Russia, with which it has a difficult relationship.

Mr. Trump said on Wednesday that the 28-nation European Union would be "a massive buyer of L.N.G.," before adding, "We have plenty of it."

Any such shift won't happen overnight, though.

In simple terms: Europe's consumption of natural gas is increasing, and its domestic production is falling. Its imports have risen rapidly in recent years, and will most likely increase further in the future.

"The question is: Where will these increased imports come from?" said Marco Alverà, chief executive of SNAM, an Italian natural gas infrastructure company.

Many of the region's power plants are switching from being fired by coal, which has high levels of carbon emissions, to running on gas, which is significantly better for the environment (though not entirely clean).

But gas production in Europe is declining. One major reason is that the Dutch government ordered a sharp reduction of output at the enormous Groningen field, because of earthquakes caused by exploration there.

And some other sources may be near maximum capacity. Pipeline gas, the main source of Europe's gas imports, might have peaked, especially from sources like North Africa, analysts say.

L.N.G., a chilled form of natural gas sold by the United States that can be transported on ships to any place with a specific type of terminal, offers another option. Europe already has several such terminals in place — in fact, it is using less than half their available capacity.

To start, just having the possibility of importing large amounts of L.N.G. from the United States, or indeed elsewhere, eases the risk that Russia could apply a gas chokehold on Europe. (Germany, for example, imports around half of its natural gas from Russia.) Poland and Lithuania, which are especially wary of Moscow, have recently built L.N.G. receiving terminals for this reason.

Still, Europe's dependence on Russia is driven largely by one factor — Russian gas is cheap.

European gas prices are now largely determined by trading on financial markets, but they are often too low for American suppliers to compete. The cost of liquefying gas in the United States and transporting it to Europe doubles its price for American companies. So if they were to sell to customers in Europe at current prices, they would lose money.

By contrast, Russian gas sent by pipeline to Germany costs far less, allowing Russian companies to make large profits, according to Jonathan Stern, founder of the natural gas program at the Oxford Institute for Energy Studies.

There is also another benefit: Buying more gas from the United States could give Mr. Trump a reason to hold off on imposing costly tariffs on auto imports. Giles Farrer, an analyst at the energy consultancy Wood Mackenzie, points out that the president has tried to use gas to improve the United States' trade balance in talks with Europe and China.

Cost is a major factor.

Europe has pushed hard in the past two decades to create a freely traded market for natural gas, according to Mr. Alverà of SNAM. The region has, in essence, bet that a functioning market is the best route to easing dependence on any one source.

While American gas exports have grown rapidly, most shipments have gone to Asia and Latin America, where prices have been higher. Price differences mean American gas is usually attractive to European buyers only during cold snaps, when prices on the Continent rise. If a glut of L.N.G. emerges in the future, more of that gas from the United States may wind up in Europe, but that could mean American suppliers lose money, Mr. Stern said.

The United States became a natural gas exporter only recently, as large quantities of the fuel have become available from shale drilling. As a result, the country has yet to construct the export terminals necessary to sell its gas to customers further afield. The United States is expected to add substantially to this export capacity in the next few years, though.

"It makes a lot of sense for U.S. L.N.G. to fill the gap," said Oswald Clint, an analyst at Bernstein Research.

Back To Top

## Europe Averts A Trade War With Trump. But Can It Trust Him? (Erlanger, NYT)
**Thursday, July 26, 2018**
New York Times
By Steven Erlanger

BRUSSELS — When he arrived in the Oval Office for negotiations over their growing trade war, Jean-Claude Juncker, the president of the European Commission, brought a small gift for President Trump, a renowned admirer of military commanders. It was a photograph of the cemetery in Luxembourg where Gen. George S. Patton is buried.

WASHAR0003292

Mr. Juncker, a wily, if often maligned, former prime minister of tiny Luxembourg, added an inscription, alluding to the shared sacrifice of Americans and Europeans during World War II. "Dear Donald," it read. "Let us remember our common history."

Mr. Juncker left the Oval Office on Wednesday with a deal — or at least a truce — that for the moment has defused the Trump administration's growing trade war with Brussels, while bringing relief across Europe, especially in Germany. Yet if Europe's political and business leaders are cautiously optimistic that an economic crisis has been averted, they are also wary, given their history with Mr. Trump in the 18 months since he has taken office.

Even as Mr. Trump cast the meeting on Wednesday as a great success, and offered gratitude to Mr. Juncker, the question is whether the deal represents a meaningful improvement in the severely strained trans-Atlantic alliance, or is simply another example of the unpredictable approach of a president who has spent months mocking and undermining European leaders — even describing the European bloc as a "foe."

"The question is, how much do you give in to a bully?" asked Maria Demertzis, the deputy director of Bruegel, an economic research institute in Brussels. "This could just be perfunctory, and if it just stops extra tariffs, that's fine. But you can't really depend on Trump. His understanding of global trade is bilateral balance, which is as good as arbitrary, given global supply chains. And it depends on what side of the bed he wakes up on tomorrow."

For Mr. Juncker, the outcome was a triumph, even if he made concessions. The negotiations are also a reminder that Germany and its chancellor, Angela Merkel, still dominate the European Union. Mr. Trump's threat to impose large new unilateral tariffs on imported automobiles shook German business to the core — and it would also have had a large impact on the Czech Republic, Slovakia, Spain and other countries that are important suppliers and manufacturers to the German car industry.

Now the president has agreed to push that threat to the side as the two parties begin broader negotiations. The trade war erupted after Mr. Trump imposed tariffs on steel and aluminum, and the European Union responded with retaliatory tariffs on iconic American products like bluejeans, bourbon and Harley-Davidson motorcycles. Those tariffs will remain for now, but will be part of the negotiations.

"Juncker's achievement was to get Trump to say publicly that he would reconsider steel and aluminum tariffs and not impose car tariffs in return for a negotiation," said Guntram B. Wolff, director of Bruegel. "For the E.U., the gun is still loaded

but it's not pointed at our heads, so for us it's a good moment to negotiate."

Indeed, some analysts argued that the new negotiations effectively represent a resurrection, in some fashion, of the effort begun by former President Barack Obama — and halted by President Trump — for a free-trade pact with Europe, known then as the Trans-Atlantic Trade and Investment Partnership, or T.T.I.P. Together, the United States and the European Union comprise half of the global economy, and analysts were optimistic about the commitment by Mr. Trump and Mr. Juncker to work together to overhaul the World Trade Organization, especially given the rising power of China.

Focusing on the W.T.O. also better fits the European Union's overall strategy, which is to defend the multilateral world order of rules and law — rather than the kind of bilateral deal Mr. Juncker and Mr. Trump just discussed.

For Daniela Schwarzer, the director of the German Council on Foreign Relations, the mere fact that Mr. Trump negotiated directly with Mr. Juncker, as the head of the European Union institution in charge of trade, is vital.

"There was a real danger that the unified position of the E.U. could break open if Trump singled out industries and countries on tariffs," Ms. Schwarzer said. "Trade must remain an E.U. competence, otherwise the single market is meaningless."

Mr. Trump has angrily denounced America's trade deficit with the European Union, even as he has come under increasing domestic political pressure from farmers, businesses and the auto industry over his tariffs. On Wednesday, Mr. Juncker promised to increase purchases of American soybeans and American liquefied natural gas, or L.N.G. But Ms. Demertzis said it was less clear how quickly the Europeans could deliver on those promises — meaning that the immediate value for Mr. Trump may be political.

"Europe has decided to change its trade policies," said Fredrik Erixon, director of the European Center for International Political Economy, "which gives Trump something to sell to his political base."

Tellingly, Bruno Maçães, the former Portuguese secretary of state for European Affairs and the author of "The Dawn of Eurasia," points out that Brussels approved only last Friday some genetically modified American soybeans to be sold in the European Union, an old American demand that would have helped the Washington talks.

European officials said that their offer on soybeans was important for Mr. Trump and for the success of the meeting, given that roughly 30 percent of American soybean

WASHAR0003293

production has traditionally gone to China. "I thank you for that, Jean-Claude," Mr. Trump said, going off-script from an agreed statement.

European officials and analysts acknowledged that Mr. Trump's threat to impose tariffs on the auto industry was a powerful one that forced a European response, despite vows not to negotiate as long as the metal tariffs were in force. As for Mr. Juncker's claim that the suspension of that threat was "a major concession," Mr. Maçães was amused.

"So if I threaten to burn down a house unless the owner pays me, and refrain from doing it when he pays, there were concessions on both sides?" he asked.

Still, it was a great relief for Germany, whose foreign minister, Heiko Maas, welcomed the agreement to start talks. It shows, he said on Thursday, that "The answer to America First can only be: Europe United."

In a speech in Tokyo, Mr. Maas also called for a strategic partnership among like-minded middle powers, like Germany and Japan, to preserve the liberal world order against big predatory powers like China, Russia and now, presumably, the United States.

Indeed, European leaders now seem to have concluded that the only way to deal with Mr. Trump is to negotiate with him — a stance Mr. Juncker and other Europeans once rejected as inimical to the global system.

For Ms. Demertzis, there are dangers in this new tactic. Not only does it cut against Europe's stance as the great defender of the multilateral order, it also risks feeding the tiger, the unpredictable Mr. Trump.

"We haven't seen the end of this, that's for sure," she said. "The only thing that drives the message home in Washington is bad outcomes. The E.U. must stay the course and use proportional measures to whatever comes out of Washington and take the heat until the message gets home."

Milan Schreuer contributed reporting.

Back To Top

## Trump's Trade Truce With Europe Has A Familiar Feel: It Mirrors Obama's Path (Swanson, Ewing, NYT)

Thursday, July 26, 2018
New York Times
By Ana Swanson And Jack Ewing

When President Trump called a truce with the European Union over trade, the general outlines of his plan sounded familiar. It echoed earlier negotiations — the ones started under President Barack Obama and shelved by Mr. Trump last year.

Mr. Trump, in many ways, is taking credit for solving a crisis of his own making. After taking office, he criticized the deals of his predecessor and cut off trade talks with the European Union. He raised the stakes by imposing tariffs on steel and aluminum, prompting retaliatory measures by the European Union. Then he stoked the tensions by calling Europe a "foe."

Now, Mr. Trump, in hashing out an agreement on Wednesday with president of the European Commission, Jean-Claude Juncker, is declaring victory. He said the two sides would work to lower tariffs and other trade barriers. They would reduce bureaucratic roadblocks to industrial goods flowing across the Atlantic, while ending conflicting regulations for drugs and chemicals.

The United States was pursuing much the same under Mr. Obama through a deal called the Transatlantic Trade and Investment Partnership. And the collapse of the deal still smarts for large segments of American and European business who had fervently hoped to create a trans-Atlantic version of the North American Free Trade Agreement. The European Union has repeatedly told the Trump administration that it would be happy to revive trade talks.

"Most of the deal is stuff we were already on the verge of agreeing on in the T.T.I.P. negotiations, before that deal got deep-sixed after Trump's election," said Rufus Yerxa, the president of the National Foreign Trade Council, which represents exporters. "But at least the President is talking about more open trade instead of how great tariffs are."

Both European and American officials resisted comparisons to previous negotiations. But it was not immediately clear what would set the new talks apart from those carried out by the Obama administration, beyond their more limited scope. Unlike with the previous round of negotiations, European officials said that the agricultural sector would be excluded from a deal with the Trump administration.

Speaking from Air Force One on Thursday, the commerce secretary, Wilbur Ross, called the European Union's willingness to negotiate a "real vindication of the president's trade policy."

"If we hadn't had steel and aluminum tariffs, we never would have gotten to the point we are now," Mr. Ross said.

"The major progress today is that our American friends agreed not to increase tariffs on cars and other products during the negotiation, which is a major concession by the Americans, I have to say," Mr. Juncker told reporters after the meeting in Washington.

Mr. Trump's aggressive posture has helped him gain leverage on the trade front with countries like China. But his

WASHAR0003294

confrontational approach has also strained relations with vital allies like the European Union.

It is possible that Mr. Trump has changed the political calculus for Europeans. They are frightened by the prospect of escalating tariffs with their largest trading partner.

Penalties on foreign cars and auto parts were especially worrisome for Europe, where the industry is a big economic driver. Mr. Trump will postpone imposing them to see how the negotiations progress.

"The Europeans have to ask themselves, 'Do we want a trade war or a trade pact?'" said Gabriel Felbermayr, director of the ifo Center for International Economics in Munich. "Before it was a choice between a pact and the status quo."

Among European business leaders, there was cautious optimism that the meeting between Mr. Trump and Mr. Juncker could signal a return to the cooperative relationship that once prevailed between Europe and the United States.

"We would see this as a step in the right direction," said Susan Danger, chief executive of the American Chamber of Commerce to the European Union in Brussels. "Work on these areas first, build up trust, and then we work on progress toward other areas."

Whether the announcement turns into a signed trade deal is not exactly assured.

Europeans continue to question whether a president with an expressed fondness for tariffs is negotiating in good faith. Diplomats, officials and analysts in Europe worry that Mr. Trump could easily pivot back to the hostility he showed toward European leaders at the G7 summit meeting in Canada in June or the NATO summit meeting in Brussels this month.

"It buys time. Potentially it could be more," Jörg Krämer, chief economist at Commerzbank in Frankfurt, said of the agreement between Mr. Trump and Mr. Juncker. But Mr. Krämer added, "Trump is a protectionist, and we can't rule out this was just a tactical move."

Other portions of the plan lack detail or sound unrealistic. Although Mr. Trump said the European Union had promised to purchase more natural gas and soybeans, the market there is dominated by private companies. And the various national governments in the 28-member bloc may have a tough time influencing their purchases.

Mario Draghi, the president of the European Central Bank, was not ready to sound the all clear. He said Thursday that broad trade tensions remained a risk to the world economy.

"Uncertainties related to global factors, notably the threat of protectionism, remain prominent," he said at a news conference in Frankfurt.

The trade talks did not go smoothly under Mr. Obama, either.

Europe and the United States started their trade talks in 2013 in an effort to cut regulations as well as expand trade and investment. But the talks dragged on over divisions over pharmaceuticals, consumer safety and investment rules.

In Europe, the deal ran into resistance from critics who complained that the negotiations were held largely in secret. A big worry was that companies would exploit a trade pact to water down regulations on the environment and food safety.

Germans were among the most strident opponents of a trans-Atlantic trade deal, even though the country's auto industry was strongly in favor of removing tariffs. In 2016, thousands of people marched in Berlin to protest the proposed deal.

When Mr. Trump was elected, the negotiations fell apart.

One of the most toxic parts of the prior deal, an investment court that allows businesses to sue governments for unfair treatment, would likely not be part of future talks. Mr. Trump's advisers have criticized these courts and insisted on removing them from Nafta.

Opposition groups signaled on Thursday that they would keep a close eye on what emerges from this new attempt to dismantle trade barriers.

"Any trade talks between the world's two biggest economies must not start a race to the bottom, jeopardizing hard-won protections for labor rights, public health, sustainable agriculture and the environment," Shira Stanton, a trade policy strategist for Greenpeace, said in an emailed statement. "If the E.U. and U.S. try again to water down essential safeguards behind closed doors, they should expect the same public opposition."

Then there are the practical hurdles to negotiating a trade pact, a process that typically takes years.

To abide by World Trade Organization rules, any future pact would have to cover nearly all trade between the United States and the European Union, which makes it hard to exclude many sectors. Although Europeans have said agriculture will not be included in the talks, many other industries, from manufacturing to services, may fight back against efforts to slash the tariffs and regulations that protect them.

There may be ways to finesse those rules, which the Europeans are anxious not to openly flout. When Japan and the European Union signed a trade pact earlier this month,

WASHAR0003295

they phased in some provisions over 15 years to blunt the impact.

"If they want to do it, they can," said Mr. Felbermayr. "A trade war would be a lot worse than a free trade deal, and no one is going to object."

J

Back To Top

## US-EU Trade Agreement Wins Cautious Welcome In Germany (AP)
**Thursday, July 26, 2018**
<u>Associated Press</u>

BERLIN (AP) — Political and business leaders in Germany, Europe's biggest economy, on Thursday welcomed a deal to defuse trade tensions between the U.S. and the European Union, but relief was tempered with caution that details must still be firmed up.

At a meeting in Washington on Wednesday, President Donald Trump and European Commission President Jean-Claude Juncker pulled back from the brink of a trade war over autos and agreed to open talks to tear down trade barriers. But the agreement was vague and the coming negotiations with Europe are sure to be contentious.

The talk about cutting trade barriers "sends an important signal of detente," said Dieter Kempf, the head of the Federation of German Industries.

"The tariff spiral in trans-Atlantic trade appears to have been halted for now," he added. "But now deeds must follow words."

Foreign Minister Heiko Maas, who was on a visit to South Korea, celebrated the agreement as evidence that unity among the European Union's 28 members paid off. "We have seen that when Europe is united, our word counts," he said.

"America and Europe are not enemies," Maas said. "I hope that this realization will once again become what it was until recently at the White House: a matter of course."

He said that the results of the meeting in Washington were above expectations and "we will now have some time."

Juncker said the U.S. and the EU have agreed to hold off on new tariffs, suggesting that the United States will suspend plans to start taxing European auto imports — a move that would have marked a major escalation in trade tensions between the allies.

The head of the German Association of the Automotive Industry, Bernhard Mattes, said the agreement is "good news for business and consumers on both sides of the Atlantic."

"What has to be done now is to fill the agreement with life and quickly start negotiations," he added in a statement.

BusinessEurope, an umbrella organization of European business lobbies, declared that "reason has prevailed."

"The agenda for talks between the EU and the U.S. to de-escalate the current trade conflict is the right one," said its president, Pierre Gattaz, adding that "European business is ready to give its contribution in the discussions."

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## France And Spain Want US Action On Steel, Aluminum Tariffs (AP)
**Thursday, July 26, 2018**
<u>Associated Press</u>

MADRID (AP) — The leaders of France and Spain said they welcomed a trade truce between the United States and Europe called this week, but demanded action Thursday from their ally across the Atlantic to reduce tariffs and rejected negotiating a new trade agreement with the U.S.

"A good trade dialogue can only be based on a balanced, reciprocal basis, but never under any sort of threat," French President Emmanuel Macron said at a press conference with Spanish Prime Minister Pedro Sanchez in Madrid.

Macron added that he wanted to see "clear signals on steel and aluminum that are subject of illegal tariffs in the United States."

The U.S. has imposed tariffs on imports of the metals and threatened to put taxes of 20 to 25 percent on cars, trucks and auto parts imported from the EU, justifying the actions on national-security grounds.

The EU has imposed retaliatory taxes on American-made products.

But on Wednesday, U.S. President Donald Trump and European Commission President Jean-Claude Juncker agreed to engage in talks that would open markets. The EU also agreed to purchase more soybeans from the U.S. and to build more terminals for imported American liquefied natural gas.

Sanchez said neither France nor Spain were comfortable with the deal's potential to harm Europe's common agricultural policy and said they would seek clarification from Juncker, the European Union's chief trade negotiator.

WASHAR0003296

Macron said the deal eliminates "useless tension," but also warned that he was against launching negotiations on a vast U.S.-EU trade accord "because the context doesn't allow it."

The French president made his first official visit to Spain on Thursday. He and Sanchez have agreed to pursue a joint agenda on expanding the EU's membership and reaffirmed their shared views on mass migration from northern Africa to Europe.

But both leaders had to field questions about separate scandals that threaten to tarnish their public images.

Macron accused journalists of "stirring a storm in a glass" over his former security aide who was seen beating a protester in video footage published by Le Monde last week.

Prosecutors and French lawmakers have opened a judicial investigation of Alexandre Benalla's actions at the May 1 demonstration he attended with riot police he was supposed to be observing. Macron's office has been under attack for not disclosing the incident weeks ago and how Benalla was disciplined before his firing last week.

"Something grave has occurred which was met with an immediate and proportionate response from the Elysee Palace," Macron said in reference to the home of the French president's offices. He said he was awaiting a "profound and legal analysis" from the investigations.

Sanchez has faced sharp criticism from the political opposition after his government defended a trip the prime minister took with his wife on the official government jet last week to attend a music festival in the eastern region of Valencia.

The Spanish leader said the controversy was "artificial" and the government's security department requires the prime minister to travel by plane.

Macron was hosted for dinner by Spain's King Felipe VI and scheduled to go to Portugal on Friday to meet Prime Minister Antonio Costa and attend a debate on the future of Europe.

Macron and Costa will be later joined by Sanchez and European Commission officials for a mini-summit on energy policy in the region.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Macron Says He Needs To See More Detail On Trump-Juncker Accord (Fouquet, Duarte, BLOOM)

**Thursday, July 26, 2018**

Bloomberg News
By Helene Fouquet And Esteban Duarte

French President Emmanuel Macron said he will seek clarifications from the European Commission on elements of the trade agreement its leader, Jean-Claude Juncker, thrashed out with U.S. President Donald Trump this week.

"A good trade negotiation, as I have said before, can be only done on balanced and reciprocal basis and under no circumstances under threat," Macron said during a joint press conference in Madrid with Spanish Prime Minister Pedro Sanchez. "We have some questions that we will want to clarify in the coming days with our European partners."

Macron's reservations about the deal sealed Wednesday in Washington reflect concern that the accord may create imbalances among European countries, and Germany in particular. Sanchez matched his French counterpart's caution.

"The Spanish don't believe in unilateralism or that a specific economy imposes its policies and criteria in international trade," said Sanchez.

In return for a pledge by Trump to suspend the threat of an extra tariff on European Union car exports, Juncker reheated proposals to bolster transatlantic economic ties and buy more liquefied natural gas from the U.S. Such a move would ease Europe's reliance on Russian gas.

Macron said that agricultural products should be excluded from talks, citing European standards on food safety and environment that should not be abandoned in talks.

"This is the principle at the heart of the European sovereignty I am calling for," he said. The deal points to increased imports of U.S. soybeans.

He said that European firms should be given better access to public-sector tenders in the U.S. and called from Trump to make a gesture of goodwill over the "illegal tariffs" he's imposed on steel and aluminum.

"This must comes ahead of any concrete advances" on trade, he said.

Back To Top

## Macron 'Not In Favour' Of Vast New US-EU Trade Deal (AFP)

**Thursday, July 26, 2018**
AFP

Madrid (France) (AFP) – French President Emmanuel Macron said Thursday he viewed talks between US President Donald Trump and EU Commission chief Jean-Claude Juncker as "useful," but he was "not in favour" of a "vast new

WASHAR0003297

trade deal" between the European Union and the United States.

"European and France never wanted a trade war and the talks yesterday were therefore useful in as far as they helped scale back any unnecessary tension, and working to bring about an appeasement is useful," the French leader said after a meeting with Spanish Prime Minister Pedro Sanchez in Madrid.

"But a good trade discussion... can only be done on a balanced, reciprocal basis, and in no case under any sort of threat," Macron said.

"In this regard, we have a number of questions and concerns that we will clarify".

Macron said he was "not in favour of us launching a vast trade agreement, along the lines of the TTIP, because the current context does now allow for that," referring to a transatlantic free-trade deal which stalled two years ago.

And he reaffirmed his opposition to including agriculture in any such deal.

"I believe that no European standard should be suppressed or lowered in the areas of the environment, health or food, for example."

Macron went on to insist that "clear gestures are needed from the US, signs of de-escalation on steel and aluminium, on which the United States have imposed illegal taxes. That, for me, would constitute a prelude to making further concrete headway" on trade.

In the US on Wednesday, Trump and Juncker announced a plan to defuse a lingering trade row, that in effect saw Washington back off a threat of auto tariffs against Europe, at least for now.

Nevertheless, the details of the deal remained vague, with a statement mentioning that the transatlantic allies would "launch a new phase" in the relationship.

Spanish premier Sanchez, for his part, also said "we don't want any trade war" and said he was determined to "defend (the EU's) common agricultural policy".

Back To Top

## Trump Administration Tries To Ease Republican Worries About Trade Fights (Hughes, Schlesinger, WSJ)

**Truce with Europe is touted, but lawmakers push for accelerated efforts on other fronts**
Thursday, July 26, 2018
Wall Street Journal
By Siobhan Hughes And Jacob M. Schlesinger

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## Trump Wants Europe To Buy U.S. Gas—but Russia Is In His Way (McFarlane, Pancevski, Kantchev, WSJ)

Thursday, July 26, 2018
Wall Street Journal
By Sarah McFarlane, Bojan Pancevski And Georgi Kantchev

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## Wilbur Ross Says U.S. Investigation Of Auto Tariffs For Europe Will Go On Despite Deal (Boyer, WT)

Thursday, July 26, 2018
Washington Times
By Dave Boyer

Commerce Secretary Wilbur Ross said Thursday the administration's preparations for tariffs on European autos will continue despite President Trump's deal with European Union leaders to suspend any new tariffs.

"We've been directed by the president to continue the investigation, get our material together but not actually implement anything pending the outcome of the negotiations," Mr. Ross told reporters.

He said Commerce will submit its report on auto tariffs sometime in August, and imposing them "may not be necessary."

In the meantime, he said, "Steel and aluminum tariffs stay in place."

Mr. Trump announced with European Commission Jean-Claude Juncker Wednesday that both sides would hold off on any new tariffs and negotiate toward a "zero tariff" relationship. Mr. Juncker agreed that the European Union will purchase more U.S. soybeans and liquefied natural gas.

Mr. Ross credited steel and aluminum tariffs for the agreement.

"If we hadn't had steel and aluminum tariffs, we never would have gotten to the point we are now," he said. "This is a real vindication of the president's trade policy."

Back To Top

## Larry Kudlow: E.U. Now Backs Trump's Trade Fight With China (Miller, WT)

WASHAR0003298

Thursday, July 26, 2018
<u>Washington Times</u>
By S.A. Miller

President Trump's chief economic adviser said Thursday that European Union Commission President Jean Claude Juncker pledged to back the U.S. trade fight against China.

The commitment to take on China's trade abuses was made as part of the breakthrough zero-tariff deal struck this week by Mr. Trump and Mr. Juncker, said Larry Kudlow, director of the president's National Economic Council.

"The United States and the E.U. will be allies in the fight against China, which has broken the world trading system," Mr. Kudlow said on Fox Business Network's "Varney & Co."

He said that China attempted to enlist the E.U. to oppose Mr. Trump's get-tough trade policies but Mr. Juncker refused.

"Juncker made it very clear yesterday that he intended to help us [and] President Trump on the China problem," he said.

The agreement to negotiate zero tariffs, zero barriers and zero subsidies on non-auto industrial goods avoided a full-fledged trade war. Mr. Trump pushed the E.U. to the brink of a trade war to get an agreement to level the playing field for U.S.-E.U. commerce.

When Mr. Trump and Mr. Juncker announced the deal Wednesday they included a push for World Trade Organization reforms that could reign in China.

"The world trading system is broken with high tariffs and barriers and technological stealing and [intellectual property] theft," said Mr. Kudlow.

<div align="right">Back To Top</div>

## Industry Head: Tariffs Could Have Big Impact On US Energy (Anderson, AP)

Thursday, July 26, 2018
<u>Associated Press</u>
By James Anderson

DENVER (AP) — President Donald Trump's tariffs on European steel and Chinese goods pose a multi-billion-dollar threat to America's energy industry, though a truce between the United States and Europe offers hope that trade tensions eventually will de-escalate, the head of a prominent U.S. energy trade group said Thursday.

Jack Gerard, the outgoing president and CEO of the American Petroleum Institute, said 25 percent tariffs on European steel will significantly drive up the cost of specialized imports — especially from Germany — long used by U.S. energy firms to strengthen domestic oil and gas pipelines.

"We have companies that have announced multi-billion-dollar projects in this country that have already paid for the steel or have the steel under contract. Now it's being put on the water to come over here and — boom — the economics change by 25 percent," Gerard said in an interview. "It sends a chilling effect throughout the industry — particularly for the big players that use a lot of steel for a lot of infrastructure."

China has warned it may slap tariffs on growing U.S. crude oil and liquefied natural gas exports to retaliate for U.S. trade sanctions. The Trump administration imposed tariffs on $34 billion in Chinese goods in a dispute over high-tech industrial policies and has threatened to eventually target $500 billion.

China accounted for 20 percent of total U.S. crude exports and 15 percent of its liquefied natural gas exports in 2017, according to the U.S. Energy Information Administration.

Gerard said he hopes the trade truce reached Wednesday between Trump and European Commission President Jean-Claude Juncker is a harbinger of things to come. New trade agreements would validate Trump's repeated promises to deliver trade pacts more favorable to U.S. workers, Gerard said.

Gerard reiterated industry support for Trump administration moves to accelerate permitting for oil and gas drilling, promote offshore drilling and eliminate environmental regulations considered excessively burdensome by the industry.

He welcomed the April opening of a large LNG terminal in Maryland and advocated for another proposed terminal in Oregon that would tap reserves in the Rocky Mountain West for export to Asia.

Significant advances in hydraulic fracturing have produced the U.S. natural gas boom — one partly driven by Colorado, the nation's No. 5 natural gas producer and No. 7 producer of oil.

The state's $32 billion oil and gas industry, whose natural gas output has doubled since 2001, hosted an annual roundtable in which Gerard made his last public appearance as API head before stepping down to assume a leadership position with the Mormon Church in his native Utah.

He and Tracee Bentley, executive director of the Colorado Petroleum Council, attacked a citizens' campaign to ask Colorado voters whether to drastically limit future energy development on non-federal lands. A Boulder-based organization, Colorado Rising, is seeking enough voter signatures to place the initiative on the November ballot.

Two state analyses suggest the initiative would rule out 85 percent of non-federal land to development and drastically

WASHAR0003299

reduce property taxes paid by the industry. Those taxes totaled $470 million in fiscal year 2016-17.

It's the latest attempt to harness drilling along Colorado's metropolitan Denver area, whose rapid expansion over the past decade has led to housing and commercial development alongside once-isolated oil and gas fields. Previous efforts have failed, despite advocates' concerns about health and drilling rigs close to schools.

"We tend to be a breeding ground" for similar efforts, Bentley said, expressing hope that Coloradans would reject such an initiative.

In agreement were panelists David Bernhardt, deputy U.S. interior secretary, and former Interior Secretary Ken Salazar, who served under President Barack Obama. Both are native Coloradans.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Europe's Vow To Buy More U.S. Soy Won't Make Up For China Losses (Bjerga, Almeida, BLOOM)
**Thursday, July 26, 2018**
Bloomberg News
By Alan Bjerga And Isis Almeida

The promise President Donald Trump extracted from the European Union to buy more soybeans from U.S. farmers won't put much of a dent in the potential losses from a continuing trade war with China.

The EU is the second-biggest buyer of the U.S. oilseed. But that is a distant second to China, which bought $12.3 billion of the U.S. soy last year compared with the $1.6 billion exported to the EU. Losses in sales to China stemming from an escalating trade spat are causing political headaches for Trump and farm state Republicans in Congress that Europe won't be able to relieve.

Even if the EU bought soybeans exclusively from the U.S., it would add about 10 million tons of demand and offset only about 35 percent of the 27 million tons of demand lost from China if the Asian nation completely halted U.S. purchases, said Michael Magdovitz, an oilseeds analyst at Rabobank International.

Trump highlighted the promise of more EU soy buying as part of a deal that pulled the two trading partners back from the brink of a tit-for-tat tariff war.

"Soybeans is a big deal. And the European Union is going to start, almost immediately, to buy a lot of soybeans – they're a

tremendous market," Trump said Wednesday as he stood next to European Commission President Jean-Claude Juncker outside the White House.

EU purchases were bound to rise anyway because U.S. soybeans are trading at a discount relative to those from Brazil. That country's soybeans have become more expensive due to increased demand from China.

"EU processors have significantly increased their purchases of U.S. soybeans in recent months because of the massive price difference to South America," Magdovitz said.

Soybean futures in Chicago were up 4.5 cents to more than $8.80 a bushel in midday trading Thursday. Earlier in the day they touched $8.96 cents a bushel, the highest since July 9, which was shortly after China imposed duties on U.S. exports.

Farm and rural areas gave Trump crucial support in the 2016 presidential election and since China imposed tariffs on U.S. agricultural products, the president has repeatedly promised farmers they would come out better off. He's at an event Thursday in Iowa, the second biggest soybean producing state. The Trump administration this week announced a $12 billion assistance plan for farmers hit by tariffs.

Republicans are hoping the EU agreement helps offsets some of the potential political damage. House Agriculture Committee Chairman Michael Conaway, a Texas Republican, thanked the Trump administration on Wednesday "for having our farmers' and ranchers' backs, including today's announcement on expanded market access in Europe."

— With assistance by Dominic Carey

Back To Top

## BRICS Nations Pledge Unity As Trade War Threatens (Debut, Gumede, AFP)
**Thursday, July 26, 2018**
AFP
By Béatrice Debut, Michelle Gumede

Johannesburg (AFP) – Five of the biggest emerging economies on Thursday stood by the multilateral system and vowed to strengthen economic cooperation in the face of US tariff threats and unilateralism.

The heads of the BRICS group – Brazil, Russia, India, China and South Africa – met in Johannesburg for an annual summit dominated by the risk of a US-led trade war, although leaders did not publicly mention President Donald Trump by name.

"We express concern at the spill-over effects of macro-economic policy measures in some major advanced economies," they said in joint statement.

WASHAR0003300

"We recognise that the multilateral trading system is facing unprecedented challenges. We underscore the importance of an open world economy."

Trump has said he is ready to impose tariffs on all $500 billion (428 billion euros) of Chinese imports, complaining that China's trade surplus with the US is due to unfair currency manipulation.

Trump has already slapped levies on goods from China worth tens of billions of dollars, as well as tariffs on steel and aluminium from the EU, Canada and Mexico.

"We should stay committed to multilateralism," Chinese President Xi Jinping said on the second day of the talks.

"Closer economic cooperation for shared prosperity is the original purpose and priority of BRICS."

Russian President Vladimir Putin, who held a controversial meeting with Trump last week, echoed the calls for closer ties among BRICS members and for stronger trade within group.

"BRICS has a unique place in the global economy – this is the largest market in the world, the joint GDP is 42 percent of the global GDP and it keeps growing," Putin said.

"In 2017, the trade with our BRICS countries has grown 30 percent, and we are aiming at further developing this kind of partnership."

– US-EU truce? –

Turkish President Recep Tayyip Erdogan is also attending the summit as the current chair of the Organisation of Islamic Cooperation (OIC) and met with Putin on the sidelines Thursday.

"Our bilateral relations are improving certainly," the Kremlin cited Putin as saying, hailing the two countries' cooperation on Syria and in economic matters.

Erdogan in turn spoke about "rapidly developing bilateral relations", according to the Kremlin, which did not elaborate.

The BRICS group, comprising more than 40 percent of the global population, represents some of the biggest emerging economies, but it has struggled to find a unified voice.

Analysts say US trade policy could give the group renewed purpose.

In Washington, Trump and European Commission chief Jean-Claude Juncker announced an apparent truce in their trade war after White House talks on Wednesday.

The US and the EU will "immediately resolve" their dispute over US steel and aluminum tariffs and subsequent EU counter-measures, US Treasury Secretary Steven Mnuchin confirmed Thursday.

The dollar gained against the euro after the announcement, helping to boost eurozone equities.

The punishing US metals tariffs had angered Washington's major trading partners including the EU and sparked retaliation against important American exports, spooking global stock markets.

Xi arrived in South Africa for the BRICS summit after visiting Senegal and Rwanda as part of a whistlestop tour to cement relations with African allies.

On Friday, African leaders attending a "BRICS outreach" programme will include Paul Kagame of Rwanda, Joao Lourenco of Angola, Macky Sall of Senegal and Yoweri Museveni of Uganda.

Back To Top

## BRICS Want World To Play By WTO Rules As Trump Seeks More Duties (Monteiro, Tanas, Bax, BLOOM)

**Thursday, July 26, 2018**
Bloomberg News
**By Ana Monteiro , Olga Tanas , And Pauline Bax**

Brazil, Russia, India, China and South Africa want a rules-based multilateral trade system as embodied by the World Trade Organization to be central to global commerce as the BRICS block's biggest member faces billions of dollars of additional tariffs from the U.S.

"We recognize that the multilateral trading system is facing unprecedented challenges," the BRICS nations said Thursday in a declaration drawn up at their 10th annual summit held in Johannesburg. "We call on all WTO members to abide by WTO rules and honor their commitments."

Escalating trade tensions are threatening to derail a global upswing that's already losing momentum amid weaker-than-expected economic growth in Europe and Japan as financial markets seem complacent to the mounting risks, the International Monetary Fund warned July 16.

The U.S. and China clashed at a WTO meeting Thursday, with Washington demanding reforms to make the Asian nation's economy more responsive to market forces. The office of the U.S. Trade Representative is preparing levies on an additional $200 billion of Chinese goods and President Donald Trump said he is "ready to go" with tariffs on as much as $500 billion, roughly the value of all China's annual exports to the U.S. The two countries last month launched their initial salvos by imposing duties on $34 billion of each other's imports.

Unfair Treatment

WASHAR0003301

Trump said this month that the WTO treats the U.S. unfairly, responding to questions about reports he's considered withdrawing the U.S. from the organization. The American government wins most of the cases it initiates with the body.

Earlier at the summit, Chinese President Xi Jinping called on BRICS nations to reject protectionism "outright" and promote trade and investment liberalization. There are no winners in a trade war, he said.

"We must work together at the UN, Group of 20 and World Trade Organization to safeguard a rule-based multilateral trading regime," Xi said, adding disputes should be resolved through dialog.

Strengthening trade and investment ties with BRICS nations "is one of the priorities," Russian President Vladimir Putin said at the same event.

The BRICS countries agreed to strengthen their cooperation in energy, and want nations to fully implement the Paris Agreement on climate change.

The countries also reaffirmed a need for "comprehensive reform" of the United Nations and its Security Council to make it more representative and for more developing countries to be present, they said.

— With assistance by Amogelang Mbatha

Back To Top

## Robert Lighthizer, Trade Rep.: U.S. Closing In On NAFTA Agreement, China A 'Longer-Term Problem' (Sherfinski, WT)
**Thursday, July 26, 2018**
<u>Washington Times</u>
By David Sherfinski

Robert E. Lighthizer, the U.S. Trade Representative, on Thursday said it could take some time before the administration achieves its desired goals from an escalating standoff over tariffs with China.

Mr. Lighthizer did express hope that the U.S. is closing in on a deal to renegotiate the North American Free Trade Agreement (NAFTA), but said China is going to be a "longer-term problem."

"That isn't to say we're going to be in a trade war with China, in my judgment. But I think we have to change the dynamic," Mr. Lighthizer told lawmakers on Capitol Hill.

In response to what the Trump administration has slammed as trade abuses on the part of China, the administration has imposed or threatened to impose tariffs totaling a half-trillion dollars on Chinese goods.

China, in turn, has imposed its own new tariffs on U.S. goods such as milk, soybeans and automobiles.

"The tactics we see now … appear to have gotten China's attention, but more tariffs cannot be the ultimate answer," said Sen. Jerry Moran, Kansas Republican.

The U.S. Agriculture Department announced this week a $12 billion lifeline to farmers who are facing adverse consequences as a result of "trade damage from unjustified retaliation."

Mr. Lighthizer told members of the Senate Appropriations Committee the administration isn't contemplating a similar lifeline "at this time" for other small businesses being hurt by the retaliatory tariffs

On NAFTA, Mr. Lighthizer said the administration has been renegotiating the free-trade deal at "an unprecedented speed."

"Hopefully, we are in the finishing stages of achieving an agreement in principle that will benefit American workers, farmers, ranchers, and businesses," he said.

But the Trump administration has irked Canada, who along with Mexico and U.S. is party to NAFTA, by invoking national security reasons to impose tariffs on Canadian steel and aluminum.

Sen. Jack Reed, Rhode Island Democrat, asked Mr. Lighthizer if Canada is a national security threat to the U.S.

"Nobody is declaring war on Canada or saying they're an unfriendly neighbor," Mr. Lighthizer said, calling the country a "great ally."

"But if you decide that you need to protect an industry, you can't be a position where the protection is of no value," he said.

Mr. Lighthizer said he was meeting with Mexican officials Thursday about NAFTA, and that he hoped Canada would come in and compromise if the U.S. and Mexico managed to move the negotiations forward.

Back To Top

## Trump Claims The U.S. Would Save Money Without Trade. That's Not What A Trade Deficit Represents. (Qiu, NYT)
**Thursday, July 26, 2018**
<u>New York Times</u>
By Linda Qiu

Fact Check of the Day

WASHAR0003302

The president, in a speech in Illinois, escalated his misguided notion that a trade deficit means "lost" wealth into a claim an expert says "defies the most basic of economics."

what was said

"We lost $817 billion a year, over the last number of years in trade. In other words, if we didn't trade, we'd save a hell of a lot of money."

— President Trump, speaking in Granite City, Ill., on Thursday

the facts

Mr. Trump is exaggerating the United States' trade deficit with the rest of the world, and grossly mischaracterizing what a trade deficit represents.

Over all, the United States ran a trade deficit in goods of $807 billion in 2017 and a trade surplus in services of $255 billion, for a net trade deficit of $552 billion. Over the past decade, the United States hada goods deficit of $724 billion and a net deficit of $518 billion— below Mr. Trump's $817 billion figure.

What does this mean? Simply put, a trade deficit occurs when a country imports more goods and services than it exports to another. (It is also driven by a number of other economic factors like the growth rates of countries, the strength of their currencies and their savings and investment rates.)

The United States' $552 billion trade deficit does not mean it has lost its wealth to other countries — a notion that "defies the most basic of economics," said Scott Lincicome, a trade expert at the libertarian Cato Institute.

As The Upshot's Neil Irwin has explained:

"Imagine a world with only two countries, and only two products. One country makes cars; the other grows bananas.

People in CarNation want bananas, so they buy $1 million worth from people in BananaLand. Residents of BananaLand want cars, so they buy $2 million of them from CarNation.

That difference is the trade deficit: BananaLand has a $1 million trade deficit; CarNation has a $1 million trade surplus.

But this does not mean that BananaLand is 'losing' to CarNation. Cars are really useful, and BananaLanders got a lot of them in exchange for their money."

Extending Mr. Irwin's example, if BananaLand did not trade with CarNation, its citizens wouldn't be spending money on cars — "saving money" in a narrow sense — but they wouldn't have cars either.

In that same narrow sense, Mr. Trump is right that "without trade, we could have piles of money," Mr. Lincicome said. "But we'd have no food, clothing, housing, etc. So the money

would be worthless, unless you swam in it like Scrooge McDuck or something. Throughout history, autarky means poverty, not wealth."

Moreover, "when a country runs a trade deficit, there is a countervailing force," Mr. Irwin noted. The money that other countries gain through trade surpluses with the United States tends to return to this country, in the form of investment. "In effect, the flow of capital is the reverse of the flow of goods," he wrote.

Mr. Trump's suggestion of suspending trade with other countries to "save money" also contradicts statements his economic advisers and he himself have made extolling its virtues.

Expanding trade "has played an important role in the development of American prosperity" in the last century, according to the Office of the United States Trade Representative, which adds, "Trade remains an engine of growth for America."

The White House's economic report, which Mr. Trump signed in February, while arguing that trade has left some Americans worse off, acknowledged that "fair and reciprocal international trade as a whole leaves the U.S. better off in the aggregate."

Mr. Trump put it more plainly in a June interview: "I love trade."

Other claims

Mr. Trump also made several other inaccurate or misleading claims:

He falsely claimed United States Steel was opening seven new plants (it has not announced any, though it has restarted parts of a plant).

He falsely said, "I did win that women's vote" (he won an estimated 42 percent of women's votes).

He falsely claimed China's economy "flatlined for decades" before its entry into the World Trade Organization (the Chinese economy was growing before 2001).

He falsely claimed the United States is "rated No. 1 in the world for growth" (it's not).

He falsely claimed the United States "couldn't sell cars into" the European Union (it exports billions of dollars' worth of cars to the European Union).

He hyperbolically claimed military spending by NATO allies was "going down" before he raised the issue (spending has been rising since before Mr. Trump took office).

He misleadingly claimed President Barack Obama paid $1.8 billion to free hostages from Iran (the money was payment for a decades-old dispute).

WASHAR0003303

Sources: Scott Lincicome, The New York Times, the White House Economic Report, the Office of the United States Trade Representative, YouTube

Linda Qiu is a fact-check reporter, based in Washington. She came to the Times in 2017 from the fact-checking service PolitiFact. @ylindaqiu

Back To Top

# CONGRESSIONAL ACTIVITY

## Bipartisan Bill Would Prevent Trump From Exiting NATO Without Senate Consent (Demirjian, WP)
Friday, July 27, 2018
Washington Post
By Karoun Demirjian

A quartet of senators launched a new bipartisan effort Thursday to prevent President Trump from withdrawing the United States from NATO without the prior approval of the Senate, the latest effort to constrain the president from upending U.S. policy regarding Russia.

The bill would require the president to secure the support of two-thirds of the Senate — the same threshold required to enter into a treaty — before he could withdraw from the nearly 70-year-old alliance. It also authorizes the Senate's legal counsel to represent the body in any court cases needed to prevent a withdrawal from NATO without the Senate's approval.

The measure was drafted by Sens. Cory Gardner (R-Colo.) and Tim Kaine (D-Va.), both of whom sit on the Senate Foreign Relations Committee; Senate Armed Services Committee Chairman John McCain (R-Ariz.) and ranking Democrat Jack Reed (R.I.) have also signed on to the measure as leading co-sponsors.

"Regrettably, President Trump's mistreatment of our closest allies has raised doubts about America's commitment to the transatlantic alliance and the values of defense," McCain said in a statement. McCain, despite presently undergoing treatment for brain cancer, remains Congress's most respected statesman and has been a frequent critic of the president's stances regarding NATO and Russia.

"This legislation is urgently required to ensure that no president can withdraw the United States from NATO without the constitutionally required advice and consent of the Senate," he continued.

While Senate consent is required to enter into treaties, the Constitution is silent on the question of how the United States is supposed to exit a treaty. Article 13 of the NATO treaty

does address the question of when countries may exit — any country may leave the treaty one year after giving a "notice of denunciation" to the United States, which is then supposed to inform every other member — but it does not specify what national authority has the power to issue that notice of denunciation.

Trump has not publicly threatened to pull the U.S. from NATO, and at this month's summit in Brussels, he signed on to various efforts to counter the Kremlin and rededicate the U.S. to the organization's collective defense. But he has also repeatedly voiced doubts about the strategic importance of the organization, haranguing allies for not dedicating more funding ahead of schedule and even questioning its continued relevance, as he makes un-or-tho-dox overtures to improve relations with Russian President Vladi-mir Putin.

Last week, Trump even said on Twitter that a summit with Putin in Helsinki "may prove to be, in the long run, an even greater success" than his just-completed meetings with NATO allies.

The combination has proved troubling to more senators than just those who signed on to to the NATO bill unveiled Thursday. Earlier this week, Sens. Robert J. Menendez (N.J.), the top Democrat on the Foreign Relations Committee, and Lindsey O. Graham (R-S.C.) announced that they were working on a measure that would also require Senate approval for any bid to withdraw the U.S. from NATO, while also stepping up sanctions on Russian oligarchs and the country's energy, financial and cyber sectors.

The NATO-focused measures are only a subset of the bipartisan proposals lawmakers have unveiled in the wake of Trump's Helsinki summit with Putin, during which he suggested he might take the word of the Russian leader over the conclusions of his own intelligence community regarding Russian election interference and influence campaigns. Lawmakers are still trying to get the administration to tell them what transpired during the two-hour, one-on-one meeting that preceded that surprise announcement, and an ensuing series of attempted walk-backs as the administration tried to address Republican criticism labeling Trump's performance as everything from "shameful" to a "missed opportunity."

On Wednesday, members of the Senate Foreign Relations Committee grilled Secretary of State Mike Pompeo for details about the meeting, which he said he had been briefed on, and for an explanation as to why the White House appeared to be "making it up as they go" when it came to foreign policy, particularly concerning Russia.

"The administration tells us, 'Don't worry, be patient, there is a strategy here.' But from where we sit, it appears that in a

53

'ready, fire, aim' fashion, the White House is waking up every morning and making it up as they go," Sen. Bob Corker (R-Tenn.), the panel's chairman, told Pompeo, complaining that the president's actions "create tremendous distrust in our nation, among our allies, it's palpable."

"Is there a strategy to this?" Corker asked.

In the meantime, the House voted overwhelmingly Thursday to approve an annual defense authorization bill that reaffirmed the United States' commitment to NATO and to increasing the defensive capabilities of European allies. The Senate is expected to take up the measure late next week and send it to the president's desk.

Back To Top

# GLOBAL ISSUES

## Report: China, Russia And Iran Ramp Up Economic Spying On US (Riechmann, AP)
**Thursday, July 26, 2018**
Associated Press
By Deb Riechmann

WASHINGTON (AP) — A Chinese cyberespionage group called APT10 relentlessly attacks U.S. engineering, telecom and aerospace industries. Russian hackers last year compromised dozens of U.S. energy companies. Iranian hackers known as "Rocket Kitten" repeatedly target American defense companies in hopes of stealing information to boost Tehran's missile and space programs.

While Moscow's efforts to meddle in the 2016 U.S. presidential election are widely known, spy services from China, Russia and Iran, along with their proxy hackers, also are hard at work trying to steal trade secrets and proprietary information from the United States, according to a government report released Thursday. A classified version of the report was sent to Congress.

"Foreign economic and industrial espionage against the United States continues to represent a significant threat to America's prosperity, security and competitive advantage," the National Counterintelligence and Security Center said. "China, Russia and Iran stand out as three of the most capable and active cyber actors tied to economic espionage and the potential theft of U.S. trade secrets and proprietary information."

Cyberespionage is a relatively low-cost, high-yield way to access and acquire information from U.S. research institutions, universities and corporations, the report said. More vulnerabilities will emerge with the increase in cloud computing, artificial intelligence and the proliferation of vehicles, home appliances, medical devices and other items connected to the internet.

Cyberoperations are the preferred method for conducting economic espionage, the report said, but U.S. adversaries also acquire sensitive information by hiring sophisticated hackers, recruiting spies or gleaning material from foreign students studying at American universities.

Adversaries also are infiltrating computer networks of suppliers that serve large companies and then using that connection to worm their way up the chain into large corporate computer systems. Bill Evanina, the nation's top counterintelligence official and director of the center, told reporters at a briefing that business leaders need to investigate the security of computer systems used by companies that supply their air conditioning and heating, printers and copiers and the like.

"Our economic security is our national security," Evanina said "We cannot just get numb to our adversaries stealing our intellectual property."

The report listed two dozen technologies that have piqued the interest of foreign intelligence collectors. They include oil, gas and coal-bed methane gas energies; smart grids; solar and wind technologies; biopharmaceuticals and new vaccines and drugs; defensive marine systems and radar; hybrid and electric cars; pollution control; high-end computer numerically controlled machines, which are used to control factory tools and machines in manufacturing; space infrastructure and exploration technology; synthetic rubber; rare earth materials; quantum computing; and next generation broadband wireless communications networks.

Michael Moss, deputy director of the government's Cyber Threat Intelligence Integration Center, said incidents of economic espionage are growing rapidly. "The thing that continues to surprise me is how fast it continues to accelerate. It's getting faster and faster," he said.

China uses joint ventures to try to acquire technical know-how, the report said. It said Beijing seeks partnerships with U.S. government labs to learn about specific technology and information about running such facilities and uses front companies to hide the hand of the Chinese government and acquire technology under U.S. export controls.

The Trump administration has railed against China, imposed new tariffs and called for Beijing to end the theft of intellectual property from U.S. companies. The administration also wants China to curb policies that require American and other foreign businesses to hand over technology in exchange for access to the Chinese market.

WASHAR0003305

"If this threat is not addressed, it could erode America's long-term competitive economic advantage," the report said.

Economic espionage conducted by hackers linked to Russia is mostly aimed at finding ways to inflict damage on the United States, disrupt services or benefit its economic interests, according to the report.

"In support of that goal, Russian intelligence services have conducted sophisticated and large-scale hacking operations to collect sensitive U.S. business and technology information," the report said. It also said that Russian "military modernization efforts also likely will be a motivating factor for Russia to steal U.S intellectual property."

Iranian's operations have typically targeted adversaries in the Middle East, such as Israel and Saudi Arabia. But it also tries to infiltrate U.S. networks to acquire technologies to bolster economic growth, modernize its military and increase exports.

"The loss of sensitive information and technologies not only presents a significant threat to U.S. national security," the report said. "It also enables Tehran to develop advanced technologies to boost domestic economic growth, modernize its military forces and increase its foreign sales."

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## China, Russia, Iran Top Cyber Threats, U.S. Intelligence Finds (Strohm, BLOOM)

Friday, July 27, 2018
Bloomberg News
By Chris Strohm

China, Russia and Iran pose the biggest threats of computer attacks to spy on U.S. companies and steal their trade secrets, according to a report from the Office of the Director of National Intelligence.

The three countries have conducted sophisticated, large-scale hacking attacks across multiple U.S. industries, targeting the networks of technology and manufacturing contractors, defense contractors and utilities, according to the 20-page report compiled by office's National Counterintelligence and Security Center.

"Our economic security is our national security," William Evanina, director of the National Counterintelligence and Security Center, told reporters during a briefing Thursday. "We cannot just get numb to our adversaries stealing our intellectual property and trade secrets."

There's no sign the cyber thefts will stop.

"We anticipate that China, Russia, and Iran will remain aggressive and capable collectors of sensitive U.S. economic information and technologies, particularly in cyberspace," the intelligence center said. in the report "All will almost certainly continue to deploy significant resources and a wide array of tactics to acquire intellectual property and proprietary information."

A new threat is that hackers are infiltrating corporate networks while software code is being written, Evanina said. That lets the hackers insert malware into the code from the start that will stay as it's used by consumers and updated.

Russia

Russian government hackers compromised dozens of U.S energy companies in 2017, including their operational networks, according to the report.

"The threat to U.S. technology from Russia will continue over the coming years as Moscow attempts to bolster an economy struggling with endemic corruption, state control, and a loss of talent departing for jobs abroad," the counterintelligence center said.

China

Most Chinese cyberattacks against U.S. industry are focused on defense contractors and technology and communications companies "whose products and services support government and private sector networks worldwide," according to the report.

China reached an agreement with the U.S. in 2015 to stop conducting digital economic espionage. Attacks from China have lessened since then but still continue, the counterintelligence center said.

Iran

Iran is described as taking a noticeable turn in 2017 toward targeting U.S. networks, as it seeks to expand industries unrelated to oil.

"We believe that Iran will continue working to penetrate U.S. networks for economic or industrial espionage purposes," according to the report. "Iran's economy – still driven heavily by petroleum revenue – will depend on growth in non-oil industries, and we expect Iran will continue to exploit cyberspace to gain advantages in these industries."

Looking ahead, the counterintelligence office said software vulnerabilities will continue to let hackers insert malicious code into U.S. networks.

Additionally, new laws put in place by other countries might require U.S. companies to submit their software code for security reviews or store their data locally in the host country.

WASHAR0003306

"A range of other potentially disruptive threats warrant attention," the counterintelligence agency said. "Cyber threats will continue to evolve with technological advances in the global information environment."

Back To Top

## United Nations Leader Warns Of A Cash Shortage (Gladstone, NYT)
Thursday, July 26, 2018
New York Times
By Rick Gladstone

The secretary general of the United Nations said Thursday that its cash supply had been severely depleted because of what he described as delayed contributions by many member states, and he warned the organization's employees that they must find ways to cut expenses.

"Our cash flow has never been this low so early in the calendar year, and the broader trend is also concerning," Secretary General António Guterres said in an internal memorandum to employees shared with The New York Times. "We are running out of cash sooner and staying in the red longer."

According to a tally known as the "honor roll" on the United Nations website, 112 of the organization's 193 members have paid their annual assessments in full.

The United States, by far the biggest single contributor at 22 percent of the budget, has not yet paid, but diplomats said the Americans typically completed their payments toward the end of the year.

Mr. Guterres did not single out any particular country among the 81 that had not yet paid, and he acknowledged that countries followed different fiscal calendars.

Nonetheless, he said, "this new cash shortfall is unlike those we have experienced previously."

It is not unusual that so many members have yet to pay their assessments. By this time last year, 77 had not yet paid. In July 2016, 95 had not yet paid.

Assessments to fund the budget are based on a formula tied to each member's ability to pay, which takes into account national income, population and debt levels, among other factors. United Nations peacekeeping operations are funded by a budget that is calculated separately.

Under Article 19 of the United Nations Charter, if a member is in arrears in an amount that equals or exceeds the assessment due for the previous two years, that member could forfeit its General Assembly vote unless there are extenuating circumstances.

Currently five members are subject to Article 19: Comoros, Guinea-Bissau, São Tomé and Principe, Somalia and Libya. But only Libya has lost its vote.

Mr. Guterres said in the memorandum that he had appealed to those members who had not yet paid their annual assessments to do so "on time and in full," and that he had "highlighted the risk the current situation poses to the delivery of mandates and to the reputation of our organization."

He did not specify precisely how the organization would conserve its cash, but he said that "for our part, we will need to take measures to reduce expenses, with a focus on nonstaff costs."

As word of the memorandum quickly spread on Thursday, Mr. Guterres's aides sought to dispel any notion that the United Nations was in a dire fiscal emergency.

"We are not trying to alarm," Stéphane Dujarric, the secretary general's spokesman, told reporters at a daily briefing. He said Mr. Guterres's memo was a reminder to the member states that "we don't have the same flexibility as governments in terms of controlling income and the timing of income."

The reminder came against a backdrop of pressure on the United Nations to control its expenses, which has been led by the American ambassador, Nikki R. Haley.

After the budget committee of the General Assembly agreed last December to a $5.4 billion budget for 2018-2019, Ms. Haley took credit for a $285 million cut from the previous budget.

"The inefficiency and overspending of the United Nations are well known," she said at the time. "We will no longer let the generosity of the American people be taken advantage of or remain unchecked."

Back To Top

## Guterres Raises Alarm Over UN Cash Crunch (AFP)
Thursday, July 26, 2018
AFP

United Nations (United States) (AFP) – UN Secretary-General Antonio Guterres warned Thursday of a serious cash shortfall at the United Nations, telling staff in a message that cost-cutting measures are in store.

Guterres said the cash crunch was caused primarily by the failure of UN member states to pay their dues on time, adding that he had asked countries to quickly pay their share of the UN budget.

"Our cash flow has never been this low so early in the calendar year, and the broader trend is also concerning: we

WASHAR0003307

are running out of cash sooner and staying in the red longer," Guterres wrote in the message posted to the UN's internal communications website.

The UN chief said "we will need to take measures to reduce expenses, with a focus on non-staff costs" and added that he had tasked the UN management department to come up with ways to cut spending.

The General Assembly in December approved a $5.4 billion two-year budget for the United Nations, which is separate from the UN peacekeeping budget.

A total of 112 out of the 193 countries have paid their dues in full as of July, but this list did not include the United States, the UN's number one financial contributor.

The United States pays 22 percent of the UN budget, but the payment occurs later in the year, in line with its national budget cycle.

During last year's gathering of world leaders at the United Nations, President Donald Trump complained that the United States was shouldering too much of the cost of the world body.

UN spokesman Stephane Dujarric said "no one is withholding dues" from the United Nations but that the shortfall was bigger this year because of late payments.

Japan, China, Germany and France – which rank just behind the US in the list of top financial contributors to the United Nations – have all paid their dues.

At the end of June this year, the amount of money paid by member states was nearly $1.5 billion – some $200 million less than at the same time last year.

<div align="right">Back To Top</div>

## Record Drop In Foreigners Buying U.S. Homes (Kusisto, WSJ)

**Home purchases by overseas buyers have fallen 21%, dealing fresh blow to housing market**
**Thursday, July 26, 2018**
<u>Wall Street Journal</u>
By Laura Kusisto

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

<div align="right">Back To Top</div>

# ISIS

## IS Attack Devastates Community In Southern Syria (El Deeb, AP)
**Thursday, July 26, 2018**

<u>Associated Press</u>
By Sarah El Deeb

BEIRUT (AP) — Mourners in southern Syria attended mass funerals Thursday for least 216 people killed in coordinated attacks by Islamic State fighters on a usually peaceful city and surrounding countryside. In the worst violence to hit the area since the country's conflict began, the militants also reportedly abducted at least 18 people, activists said.

The simultaneous attacks on the city of Sweida and surrounding villages a day earlier evoked the dark days of Islamic State violence that beleaguered Syria and neighboring Iraq during the group's heyday in 2014 and 2015. The abduction of civilians — activists say at least 14 were women — also were reminiscent of the group's tactic of taking hostages and using women as sex slaves.

A mass funeral was held in the city of Sweida on Thursday where men gathered in a hall to pay their respects to the dead. The devastated city was covered in black and shops were closed during the day to mourn the mass deaths.

Until Wednesday, Sweida, home to a predominantly Druze community, had largely been spared the violence that has hit Syria since 2011.

As Syria's civil war took increasingly sectarian undertones, pitting the largely Sunni opposition against the predominantly Alawite ruling class, the Druze minority stayed largely on the sidelines. Community leaders in Sweida took a firm position against participating in the war, resisting enrolling their sons in the army to avoid revenge attacks. The Druze, followers of an esoteric offshoot of Islam, have kept their own local militias.

The attacks Wednesday rocked the community, sparking criticism of the government for failing to protect the minority group that has for years been spared the violence.

Diana Semaan, a Syria researcher at the rights group Amnesty International, said there were signs that no government troops or security were present to provide protection for the community when it came under attack. Despite the community's push-back against getting involved in the war, the government has an "obligation" to protect them, Semaan said.

"We call on all sides to prioritize the protection of civilians. This didn't happen (in Sweida)," she said. "No government troops were in site."

The rare attacks in Sweida came amid a government offensive elsewhere in the country's south. Syrian forces are battling an IS-linked group near the frontier with the Israeli-occupied Golan Heights and near the border with Jordan. The group also has a small presence on the eastern edge of

WASHAR0003308

Sweida province, and in the desert in adjacent Homs province.

The attacks shattered the peace of Sweida city, which has been a rare area spared much of the country's civil war violence. (SANA via AP)

The militants launched their offensive with a spate of suicide bombing attacks in the city of Sweida in the early hours of Wednesday, including one at a busy vegetable market that left a scene of devastation. The militants also swarmed several villages in the province's northeast, and in some cases, shot residents as they slept, according to activist-operated Facebook page Sweida News Network.

Hassan Omar, a government health official in Sweida province, said Thursday that at least 150 people were wounded in the attacks and that some were in critical condition.

SNN also shared the names of at least 18 people abducted from one village, Shabki, most of them women. Their fate remained unknown and it was not immediately clear if they were missing or abducted.

The Britain-based Syrian Observatory for Human Rights also reported the abduction, saying dozens were taken from their homes but details of the operation remained unclear. The Observatory put the death toll at 246, including 111 members of local militias who took up arms to fight the advancing militants. At least 135 civilians were among the killed, the Observatory said.

SNN said many of the dead were shot in the head as they slept.

The Observatory also reported bodies found killed inside homes.

Since their offensive in June, Syrian President Bashar Assad's forces have retaken territories controlled by the rebels along the Golan Heights frontier and are now fighting militants in the country's southern tip.

On Thursday afternoon, Syrian troops entered the town of Quneitra in the Golan Heights and reached the frontier with the Israeli-occupied part of the region, where the Syrian Central Military Media said they raised the Syrian flag.

The SCMM posted photographs from inside the town, where homes have been left badly damaged since wars with Israel decades ago.

Syrian state TV also reported that troops captured the nearby town of Sahem al-Golan later in the day.

IS has been largely defeated in Syria and Iraq, but still has pockets of territory it controls in eastern and southern Syria.

The extremist group boasted that its "soldiers" killed more than 100 people in Sweida.

In a statement posted on the group's social media channels, it said its militants carried out surprise attacks on government and security centers, sparking clashes with Syrian troops and allied militias. It mentioned nothing about attacking civilians in villages.

The Islamic State group posted no death toll for its own men in Wednesday's fighting. The Observatory said at least 56 militants were killed.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Death Toll In Devastating ISIS Attacks In Syria Climbs To 216 (Onyanga-Omara, USAT)
**Thursday, July 26, 2018**
<u>USA Today</u>
By Jane Onyanga-Omara

BEIRUT – The death toll from coordinated attacks by Islamic State fighters on a usually peaceful southern city and surrounding countryside has climbed to 216, a local health official said Thursday, in the worst violence to hit the area since the country's conflict began.

Mass funerals were held in the city of Sweida on Thursday, a day after the wave of attacks that began in the early hours of the mourning and lasted for hours. The city was the scene of several suicide bombings, including one at a busy vegetable market that left a scene of devastation and set in motion the coordinated assaults.

IS militants also attacked a number of villages in the northeast of the province, also called Sweida, where local militias and residents took up arms to fight the advancing militants.

The Britain-based Syrian Observatory for Human Rights put the death toll at 246, including 111 members of local militias who fought IS militants who swarmed their villages. At least 135 civilians were among the killed, the Observatory said.

Hassan Omar, a government health official in Sweida province, said on Thursday that at least 150 people were wounded in the attacks; some of them were in critical condition.

An activist-operated Facebook page called Sweida News Network said many of the killed were shot in the head. The SNN said the militants sneaked into the villages under the cover of darkness, shooting residents as they slept.

WASHAR0003309

The Observatory also reported bodies found killed inside homes and that the militants had also abducted some residents, their fate unknown.

The rare attacks in Sweida, populated mainly by Syria's minority Druze, came amid a government offensive elsewhere in the country's south. Government forces are battling an IS-linked group near the frontier with Israeli-occupied Golan Heights and near the border with Jordan. The group also has a small presence on the eastern edge of Sweida province, and in the desert in the adjacent Homs province.

Since their offensive in June, Syrian President Bashar Assad's forces have retaken territories controlled by the rebels along the Golan Heights frontier and are now fighting militants in the country's southern tip.

IS has been largely defeated in Syria and Iraq, but still has pockets of territory it controls in eastern and southern Syria.

The extremist group boasted that its "soldiers" killed more than 100 people in Sweida.

In a statement posted on the group's social media channels, it said its militants carried out surprise attacks on government and security centers, sparking clashes with Syrian troops and allied militias.

The Islamic State group posted no death toll for its own men in Wednesday's fighting.

*Back To Top*

## German IS Suspect Charged Over Torture, Killing Of Prisoners (AP)
**Thursday, July 26, 2018**
Associated Press

BERLIN (AP) — A German man has been charged with murder and committing a war crime for allegedly helping torture and kill prisoners as a member of the Islamic State group in Syria, German federal prosecutors said Thursday.

Prosecutors said the charges against the 27-year-old, who is already in prison for a previous conviction, were filed at the Duesseldorf state court earlier this month.

Nils D., whose surname wasn't provided in line with privacy rules, traveled to Syria in October in 2013 and returned to Germany about a year later. He was arrested in January 2015.

The suspect was sentenced in 2016 to 4 1/2 years in prison for membership in a foreign terrorist organization. He now faces a second trial for involvement in torturing prisoners at an IS prison in Manbij. Prosecutors say at least three prisoners died.

Separately, federal prosecutors announced the arrest of a 31-year-old German woman on suspicion of being a member of IS. Sabine Ulrike Sch., whose surname authorities also didn't divulge, was arrested Thursday in the Karlsruhe area.

She is alleged to have traveled to Syria in December 2013 where she married a high-ranking member of IS. The couple, who had at least two children, received $100 a month from the group, prosecutors said.

The suspect is alleged to have written a blog praising life in IS-controlled areas and declaring herself willing to commit a suicide attack. She also used a messaging service to promote IS.

Her husband was killed in late 2016, and Sch. was detained by Kurdish forces almost a year later along with other wives of IS members. She returned to Germany in April.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

*Back To Top*

# NEAR EAST & NORTH AFRICA

## How One Minority Group Could Undermine Israel's New Jewish Identity Law (Tarnopolsky, LAT)
**Thursday, July 26, 2018**
Los Angeles Times
By Noga Tarnopolsky

Barely a week after Israeli Prime Minister Benjamin Netanyahu won passage of a controversial measure underscoring his country's Jewish identity, the coalition that helped him pass the legislation by a narrow margin is starting to fray.

The law defines Israel as "the historic homeland of the Jewish people," who have "a singular right to national self-determination within it." It diminishes the status of Arabic, which previously had equal status with Hebrew as one of the country's two official languages but now has an undefined "special status."

The law also asserts that "the state sees the development of Jewish settlement as a national value and will act to encourage and promote its establishment and consolidation."

Although the law was initially applauded by most of Israel's right wing, that began to change when hard-line Education Minister Naftali Bennett said that "the manner in which the nation-state law was enacted was very damaging" to the country's Druze minority.

WASHAR0003310

On Thursday, a group of former military chiefs of staff and commanders of elite army units took a stand against the law, and Finance Minister Moshe Kahlon conceded: "We enacted the nation-state law in a rush. We were wrong and we need to fix it."

Here are some questions and answers about the law and the political fallout it is causing.

Why was the law passed?

The law's advocates say it ratifies Israel's raison d'etre as a Jewish state and as a place of refuge for Jews.

Avi Dichter, the bill's sponsor and chairman of parliament's Foreign Affairs and Defense Committee, explained: "With this law we determined the founding principle of our existence. Israel is the nation state of the Jewish people and respects the rights of all of its citizens."

Justice Minister Ayelet Shaked, another backer, said in a radio interview that the law "just states what we already know: Israel is the state of the Jews."

So why bother?

That's one of the questions being asked by the law's opponents — parties in the center and left of the political sphere who are Netanyahu's political foes. But their concerns go well beyond that. Netanyahu's attorney general cautioned that it could have negative "international repercussions" for the country. His concerns, among others, caused the bill's most contentious language to be dropped.

Ahmad Tibi, a veteran lawmaker representing the largely Arab Joint List party, accused Netanyahu of passing "an apartheid law."

The party's chairman, Ayman Odeh, said that "the state has declared that it does not want us here," adding that it had approved "a law of Jewish supremacy and told us that we will always be second-class citizens."

Many American Jewish organizations decried the law. The American Jewish Committee, among the most influential and mainstream of U.S. Jewish groups, said that it was "deeply disappointed" by the law's passage, and that it "puts at risk the commitment of Israel's founders to build a country that is both Jewish and democratic."

What has changed?

There has been an uprising within the Druze community, which comprises Arabic-language speakers who follow a monotheistic Middle Eastern religion and serve in the Israeli army.

The Druze, a minority within Israel's 20% Arab minority, number about 150,000 out of the nation's population of 8.5 million. They hold important political positions and are renowned for their loyalty for the state.

In the first legal challenge to the law, three Druze members of parliament filed a petition with Israel's Supreme Court on Sunday to strike down the law.

On Wednesday, more than 100 Druze reserve officers of the Israel Defense Forces, including several generals, announced the formation of a forum to fight the law.

"Having built this home together with Jews, the nation-state law excludes the Druze community from that home and leaves us outside," said Brig. Gen. Amal Asad.

Citing the allegiance of Druze soldiers even before the establishment of Israel in 1948, he said that "for some reason the Druze community has been left behind. I've served for this country in the IDF for 26 years, and I have the right to demand for it to be mine exactly as it is yours."

The forum has announced a protest rally to take place next weekend in Tel Aviv's Rabin Square.

The anger is not limited to military figures. Rafik Halabi, a news anchor-turned-mayor of Daliyat al Karmel, a Druze city in northern Israel, said the matter is existential. "This is the struggle for Israeliness. I am in favor of a state of Israel that treats equally each of its citizens. This is a discriminatory, harmful law that needs to be canceled."

How are Israelis reacting to their demands?

The strains in Netanyahu's coalition are showing. In recent years, the prime minister's right-wing Likud party, like the Republican Party in the United States, has been splintered by a tea party-like base that has pulled it significantly to the right and championed the nation-state law. But some within the coalition disagree with the law. Moshe Arens, a former defense and foreign minister and a Likud member, wrote that he hoped "the judges of the Supreme Court will acknowledge the injustice that the Jewish nation-state law has committed against Israel's Druze."

He added, however, that parliament — known as the Knesset — should admit it erred in passing the law. "It is the Knesset that has made the mistake and it is the Knesset that has to rectify it," he said.

Einat Wilf, a centrist former legislator, said the government failed to explain why, "despite no clear need," it rushed to pass the bill at 3 a.m. on the last day before the summer recess, "while suspiciously denying repeated requests from opposition to include clear civic equality provisions."

What now?

At the end of an emergency meeting Thursday that included four senior ministers and two Druze coalition lawmakers,

WASHAR0003311

Netanyahu declared that "the law will not be changed," but that he will "formulate a plan that expresses Israel's deep commitment to the Druze public."

This did not mollify the Knesset members who filed the Supreme Court appeal, who said it would not be withdrawn "until the injustice has been rectified."

Netanyahu scheduled another meeting Friday with Druze dignitaries, including the spiritual leader of the Israeli Druze, Sheik Muwafaq Tarif, and an upcoming round of calls to Druze army officers.

Meeting opposition leader Tzipi Livni on Thursday, Tarif said that Israel's Declaration of Independence, which guarantees equality for all citizens and has a quasi-constitutional status, "is the solution for everyone."

"We are proud of the state and we die on its behalf," Tarif said, referring to the hundreds of Druze who have died in battle. "Everybody is asking why this happened to us."

Tarnopolsky is a special correspondent.

Back To Top

## Army: Palestinian Stabs 3 Israelis In West Bank Home (AP)
**Thursday, July 26, 2018**
Associated Press

JERUSALEM (AP) — Israel's military says a Palestinian has wounded three Israelis in an attack in a settlement near Jerusalem.

The military said in a statement that "a terrorist carried out a stabbing attack" in the Israeli settlement of Adam in the West Bank on Thursday night and was later "neutralized." Some Israeli media said the attacker was armed with an ax and infiltrated a home and attacked three men.

Reports said one victim was wounded in the neck and the others in their upper body. They were evacuated to a hospital, where one victim was in critical condition.

A community official told Israeli media that residents heard the commotion and shot the attacker.

Over the last two years, Israelis faced a wave of Palestinian attacks, mostly stabbings, though the number has waned in recent months.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Knife Attack Kills One Israeli, Wounds Two Others In West Bank (AFP)

**Thursday, July 26, 2018**
AFP

Adam (Palestinian Territories) (AFP) – A knife attack by a Palestinian in a West Bank settlement on Thursday killed one Israeli and wounded two others, while the assailant was shot dead, authorities said.

The 17-year-old attacker entered the Adam settlement near Ramallah in the occupied West Bank on Thursday evening, Israeli army spokesman Jonathan Conricus said.

"A terrorist infiltrated into (the Adam settlement) and stabbed three civilians," the army said in a statement.

"The terrorist was shot and killed," it added.

One of the wounded, a 31-year-old, later died from his injuries after having arrived at hospital in critical condition, the hospital treating him announced.

A 58-year-old victim was said to be seriously wounded but stable. The third victim, who also shot the Palestinian, was slightly wounded in the leg.

Conricus said the attacker, from the Palestinian village of Kobar, had been shot by a civilian who was passing at the time and witnessed the incident.

The Palestinian managed to jump the fence of the settlement and stab two passersby, Israeli media reported.

Lone Palestinian attackers have carried out multiple deadly stabbings and car-rammings against Israelis in recent years.

The last stabbing attack in a West Bank settlement was in April 2018, when a Palestinian tried to stab an Israeli with a screwdriver near a petrol station in an industrial area connected to the Maale Adumim settlement east of Jerusalem.

– Gaza tensions –

Thursday's attack comes amid recurrent violence between the Israeli army and Palestinian groups in the besieged Gaza Strip, but the West Bank has remained relatively calm.

Earlier in the day, Palestinian Islamist movement Hamas, which rules Gaza, promised revenge after Israeli strikes on the coastal enclave killed three of its members.

Israel said the artillery fire late Wednesday was in retaliation for shots fired at troops along the border that injured one soldier.

"The enemy shall pay a high price in blood for the crime which it commits daily against the rights of our people and our fighters," said the al-Qassam Brigades, the armed wing of Hamas.

WASHAR0003312

The flare-up came five days after the United Nations and Egypt brokered a deal to halt a July 20 surge in violence that claimed the lives of four Palestinians and an Israeli soldier – the first killed in the area since the last war in Gaza in 2014.

On Tuesday, Israel partially reopened its only goods crossing with the Gaza Strip, after a two-week closure prompted by border tensions and incendiary kites had sparked fears of a severe fuel shortage in the blockaded Palestinian enclave.

Tensions along the Gaza border increased in late March when Palestinians launched a mass protest movement.

At least 149 Palestinians have been killed in Gaza by Israeli fire since March 30.

Israel says its blockade is necessary to keep Hamas from obtaining weapons or materials that could be used for military purposes.

But UN officials and rights groups have repeatedly called for the blockade to be lifted, citing worsening humanitarian conditions in the enclave, home to two million people.

Back To Top

## Some Syrian Refugees Oppose Russian Repatriation Push (AP)
**Thursday, July 26, 2018**
<u>Associated Press</u>

AMMAN, Jordan (AP) — Even as Russia pushes to repatriate Syrians who fled their country amid civil war, many of the refugees in Jordan said Thursday they will not return before the war has ended and their safety is assured.

Some Syrians interviewed in Amman also said they don't trust Russia as a mediator because it helped President Bashar Assad retake large swaths of territory from fighters who revolted against him.

"As a free, honest Syrian citizen, I consider Russia as a state occupying Syria," said Abdel-Nasser Abu Naboot, 40, who was at the U.N.'s refugee agency office to update his personal information with dozens of other Syrians. "Russia is not a negotiator ... it bombed us, children and charities."

His comments echoed that of many Syrians in Jordan and Lebanon concerned about a Russian initiative to return refugees to homes back in Syria without security assurances. The U.N. has also expressed concern about a premature return before the situation in Syria stabilizes and without guarantees for returning refugees.

Russia's special presidential envoy for Syria, Alexander Lavrentiev, acknowledged the concerns in comments to reporters in the Lebanese capital after meeting officials in Beirut and Amman on Thursday.

"There are a lot of issues dealing with this problem. It's a lack of confidence, a lack of trust, just a lack of financial assistance. But these questions can be solved," he said, adding that the Syrian government is willing to guarantee there will be no repression or measures against those who really want to return to civil life.

He said it was a "good sign" that hundreds of refugees in Lebanon were starting to return to Syria, describing it as "just the beginning."

"You know its just like a snowball which comes from the mountain, with every passing meter it becomes bigger and bigger," he said, speaking in English.

Many Syrians who fled war and repression are unwilling to return under Assad's rule without guarantees they won't be harassed, detained or imprisoned.

To return to his home in southern province of Daraa, Abu Naboot says he wants the goals of the Syrian "revolution," which began in 2011, to be achieved, including ending "oppression." He insisted that he "will not go to pre-2011 Syria."

Eager to show a normalizing situation in Syria, Russia has stepped up efforts to encourage regional host countries, including Jordan, Lebanon and Turkey, to facilitate the return of Syrian refugees. The move is seen as an attempt to assert Russia's successes in helping Assad retake most of the country from rebels after seven years of unrest.

The Russian initiative was proposed following the summit in Helsinki between U.S. President Donald Trump and Russian President Vladimir Putin, although it was not clear whether the U.S. supported the proposal.

Lavrentiev discussed the repatriation plans in Amman with Jordanian Foreign Minister Ayman Safadi.

"Jordan encourages the voluntarily return of Syrians to their homeland," Safadi said in a statement after the meeting, stressing the need to provide "security, political, social and economic grounds" to urge the Syrians to go back by themselves.

Lavrentiev later met with the Lebanese president and prime minister in Lebanon, where he said the refugee presence is a burden in many countries and it's time they returned home. He did not offer concrete proposals on how the repatriation would take place. Lebanon is home to about a million registered refugees and the cash-strapped government says it can no longer afford to host them. The Lebanese foreign minister has accused the U.N. refugee agency of discouraging refugees from returning, an accusation it rejects.

Jordan hosts 667,000 registered Syrian refugees, but the kingdom says the real number, including those

WASHAR0003313

undocumented, is almost double. Poor in natural resources and with a faltering economy, Amman says the refugees add an extra burden.

Ibrahim al-Khalaf, 31, a Syrian refugee from the northeast Syria governorate of al-Hasakah, says he doesn't feel it is safe to return.

"There is nothing clear, no protection program for the Syrians in Syria," he said as he waited with his wife and three children at the refugee agency's office to register a newborn. "I don't want to be separated from my family if I go back because of the military service."

Mohammad Hawari, a spokesman for the U.N.'s refugee agency, said his organization, while welcoming an end to the Syrian crisis, has a long list of conditions before encouraging refugees to return. UNHCR has insisted it will not allow Syrians to be forcibly returned.

"Before the high commissioner for refugees will facilitate the process of return, there are at least 21 conditions that must be made available, including safety and stability, exemption from conscription, and other things," he told The Associated Press.

———

Karam contributed reporting from Beirut.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Death Notices For Syrian Prisoners Are Suddenly Piling Up. It's A Sign Assad Has Won The War. (Loveluck, Zakaria, WP)
Wednesday, July 25, 2018
<u>Washington Post</u>
By Louisa Loveluck And Zakaria Zakaria

BEIRUT — The Syrian government has begun issuing death notices for political detainees at an unprecedented rate, according to groups that monitor the prisons, in an effort to resolve the fate of thousands of missing Syrians as the regime prevails in its civil war.

Since the spring, government registry offices have released hundreds of these notifications. Many of the notices report that prisoners have been dead since the early years of the conflict.

While officials have not publicly explained the increase, it could offer a rare window into the mind-set of Syrian leaders, who are notoriously hard to read, at a pivotal point in the war.

Human rights experts and other observers believe the disclosures reflect the growing confidence of President Bashar al-Assad's government as his forces overrun final pockets of rebel-held territory. Authorities no longer fear they will provoke fiercer resistance by revealing the multitude of deaths in regime custody, experts say.

They also suggest that Assad now feels secure enough that he is starting to close the book on the seven-year war, with the death notices signaling to Syrians that it is time to move on while underscoring in grim fashion that he is firmly in control.

The message is that "the war never happened, the regime is back in charge, and everything will be processed through the system," said Faysal Itani, a resident senior fellow with the Atlantic Council's Rafik Hariri Center for the Middle East. "I think the word that encapsulates this best is normalization — the Syrian version of it, at any rate."

The Syrian military, backed by Russian and Iran, has made dramatic gains in recent months, clearing some of the most stubborn pockets of opposition resistance and raising the national flag earlier this month above the southern town known as the uprising's birthplace. Aside from a couple of isolated rebel positions, only a single province remains in the hands of the resistance.

Since Syria's uprising began in 2011, more than 104,000 people have been detained or forcibly disappeared, according to the Syrian Network for Human Rights. As many as 90 percent are believed to have been held in government custody, across a network of prisons where torture, starvation and other forms of lethal neglect are systematically used to kill. The remaining 10 percent are thought to be held by rebel and other armed groups.

Lawyers familiar with the process said the Syrian Defense Ministry has sent the names of hundreds of detainees to civil registry offices across the country in recent months and instructed that these prisoners be registered as dead. The deaths have been registered across the provinces of Damascus, Homs, Hama and Latakia in recent weeks.

The civil registry offices issue notices that are essentially executive summaries listing few details about the deceased. Other death notices are issued by military hospitals, which release formal certificates and medical reports. These routinely list the cause of death as heart attack or stroke.

Sema Nassar, founder of Urnammu for Justice and Human Rights, which monitors Syrian prisons, said the group had documented more death notifications in recent months than in all previous years combined. The group's staff has identified more than 300 cases in which families received death notices during a 10-day period earlier this month, including 96 at a

WASHAR0003314

government office in the Damascus suburb of Darayya, where Syria's nonviolent protest movement began.

Separately, the Syrian Network for Human Rights said earlier this month it had documented 161 death notices nationwide since May, a figure it said is probably very conservative.

"Things are going better now for the regime. As the security emergency eases and the regime reconsolidates, the priority is to bring back some normalcy — some predictability and clarity — to people's lives," Itani said. ". . . The bureaucracy has to operate — I wouldn't underestimate how important that is."

Most documents reviewed by The Washington Post said the detainees had died between 2013 and 2015, with a lag of up to two years before military doctors signed and stamped an official certificate and medical report. Bodies have not been returned to family members, and burial locations are not shared.

Death notices issued in the central city of Hama state they were written in a Damascus military court at night. That timing suggests the prisoners were executed, according to groups monitoring Syria's detention network.

Former prisoners, some released from Sednaya military prison near Damascus as recently as May, described regular executions, physical abuse, the withholding of urgent medical care and rations so paltry that fellow cellmates died of starvation or malnutrition.

Accurate figures for the total number who have died in government custody are hard to come by, because of government secrecy and the reticence of many Syrians to publicize their family members' cases.

As part of a U.N.-sponsored peace process, officials from Turkey and, to a lesser extent, Russia, a key Assad ally, have been pressing the Syrian government to resolve the issue of missing political prisoners, according to opposition representatives at the talks and a Western diplomat.

"They want to close the detainees file, and the first stage is to tell all those families that their relatives have been dead a long time," said Nassar, of Urnammu. "In practice, this means dealing a hammer blow. People are learning that they held onto false hope for years."

Hassan, a software engineer from the central city of Homs, said his brother Bashir was arrested in the summer of 2014 as he walked to class. Friends later said plainclothes officers pulled him into a vehicle, and then he vanished.

"We knocked on every door. Sometimes there were rumors — someone has heard that he was in this prison or that prison. But there was nothing concrete," said Hassan, who asked that his family name be withheld for fear of reprisal.

"The only thing we knew for sure is that he was out there somewhere and in pain."

After a former detainee said he had seen Bashir in Sednaya prison, more than 100 miles away, Bashir's elderly mother began making monthly visits, leaving clothes and money at the gates for guards who assured her he would receive them.

She was folding fresh sweaters for her next trip one day in April when the phone rang with news that his death certificate was ready for collection. It reported that he had died of a heart attack.

"We found my mother sitting in between his clothes, just sobbing. She couldn't even stand," said Hassan. "We'd all had different feelings about whether he was dead, but she had always held the line. She used to tell us that we had to hope because hope was all we had."

Noura Ghazi, a lawyer whose husband, Bassel — a prominent pro-democracy activist — was executed in Syrian custody in 2015, said families of the deceased had the "right to know" the truth about how they perished.

"As families, we demand to know the causes of death of our loved ones and where they are buried. We will not accept the regime's cover for its brutal treatment of our loved ones by presenting fake causes," she said.

But others, fearing government retribution, said they would be grieving in silence. "Our son was the most precious thing in the world, and we lost him," said one woman, who spoke on the condition of anonymity. "The regime is back, and we're back to square one. If I speak out today, will I lose my husband tomorrow? Will they take me instead?"

"I used to think of my boy every night as I went to bed, imagining what he was doing, hoping he was fine," she added. "He was in a grave all that time."

Zakaria reported from Istanbul.

Back To Top

## Hundreds Died In Syrian Custody, Government Acknowledges (Hubbard, Shoumali, NYT)
**Friday, July 27, 2018**
<u>New York Times</u>
By Ben Hubbard And Karam Shoumali

BEIRUT, Lebanon — Seven years ago, Islam Dabbas, an engineering student, was thrown in prison for protesting against the Syrian government. His mother visited him twice, paying bribes to do so, but then the permissions stopped. She heard nothing of her son's fate ever since.

WASHAR0003315

Until last week, when a relative filed for a government registration document and was shocked to see that it gave Mr. Dabbas's date of death: Jan. 15, 2013.

"The news of his death devastated us, and we wish we had known then," said his sister, Heba, who lives in exile in Egypt. "Since his arrest, we have lived days of hope and days of despair as uncertainty consumed our minds."

In recent weeks, hundreds of Syrian families have suddenly learned that their missing relatives have been registered as dead by the government. Government officials have not commented publicly on the new information, said how many people it applied to, or explained how they died.

But the documents appear to be the first public acknowledgment by the government that hundreds if not thousands of prisoners died in state custody. Analysts believe the quiet changes in status show that President Bashar al-Assad is confident enough of winning the war and remaining in power that he can make that admission without fear of repercussion, prodding the families of the missing to confirm their worst fears and begin to piece their lives back together.

"The regime is closing one chapter and starting a new one," said Emile Hokayem, a Middle East analyst at the International Institute for Strategic Studies. "It is telling the rebels and the activists that this chapter is gone, that whatever hope in some surviving revolutionary spirit has been crushed."

In some towns, the government has posted names of the deceased so their relatives can get death certificates. In other cases, families have obtained documents that attest to their relatives' deaths. In some cases, security officers have informed families personally.

Many of the documents show that the deaths occurred years ago, in the early part of the uprising against Mr. Assad that evolved into a brutal civil war.

Since the conflict began seven years ago, tens of thousands of people have disappeared into government jails where torture and mistreatment, sometimes causing death, are rife, human rights groups say. The prisoners included rebels as well as political protesters, and their families were often left struggling to get information.

Rights groups see the new death notices as a tacit admission that many detainees died or were killed in government jails.

Mr. Assad has largely routed the rebels who sought to oust him and restored his control over much of the country. His government and its Russian and Iranian backers have tried to portray the war as nearing its end, and letting families know that their missing relatives are dead may also be a way of trying to get the country to move on.

A missing head of household leaves a Syrian family in bureaucratic limbo. Without his death certificate, for example, his widow cannot remarry and his offspring cannot sell property or handle inheritance issues.

But while acknowledging deaths may facilitate such transactions, many doubt that families will accept the news so easily if they hold the government responsible for their loved ones' deaths.

"It is difficult to move on when the people who are responsible for these mass disappearances are still there," said Sara Kayyali, a Syria researcher for Human Rights Watch. "You are looking the perpetrator in the face, and it is not something you can ignore for a very long time."

The documents offer no details about the deaths except a date. Many families still want to know how their loved ones died and where their bodies are.

Two brothers, Yahya and Muhammad Shurbaji, were arrested within a day of each other in September 2011, according to Muhammad's son, Obaida. But as the uprising evolved into war and their relatives fled elsewhere in Syria or abroad, they lost track of where the brothers were being held.

This month, relatives in Damascus, hearing that dates of death were starting to appear on registration papers for the missing, requested the documents for the brothers. They found that Yahya had died in January 2013 and Muhammad in December of the same year. No cause of death was given, and the family has no idea where their bodies are.

"The shock is indescribable," said Bayan, the men's sister, who lives in Leeds, England. "How cruel is it to kill people and deprive their families of seeing them for one last time, to deny the victims from saying goodbye to their families?"

It remains unclear how many detainees have been recently registered as dead. Many families in Syria are reluctant to discuss their cases for fear of retribution by the government.

The Syrian Network for Human Rights, an exile monitoring group that opposes the government, has confirmed 312 recent cases, said its director, Fadel Abdul Ghany.

That is a fraction of the more than 80,000 government detainees his group says it has confirmed, so he expects more names will come out over time.

He surmised that the information is coming out now because the government feels secure enough to let those who stood against it know that their relatives are dead, he said.

"The regime wants to say that you have to accept me as I am," Mr. Abdul Ghany said. "'I have won, and you can't do anything about it.'"

WASHAR0003316

The lack of information has left many families confused and wondering whether the documents are accurate.

Niraz Saied, a photographer who lived in a Palestinian refugee camp in Damascus and won an award from the United Nations in 2014 for his work documenting life there, has been missing since 2015.

As the war progressed, extremists gained power in the refugee camp where he lived and the government besieged it, spreading hunger among its residents.

In 2015, Mr. Saied paid a smuggler to get him out, but was arrested by the government before he could leave, his wife, Lamis AlKhateeb, said by phone this week from Germany.

His mother managed to visit him once the following year and found him skinny and weak, Ms. AlKhateeb said. That was the last time the family saw him.

This month, a security officer who knows the family told them that Mr. Saied was dead, but the family has yet to obtain a death certificate. If the notice was intended to help her, Ms. AlKhateeb took little solace.

"There is nothing harder than writing these words, but Niraz will not die in silence," she wrote on Facebook. "They killed my love, my husband."

Ben Hubbard reported from Beirut, and Karam Shoumali from Berlin. Hwaida Saad contributed reporting from Beirut.

Back To Top

## Syria's Assad Says Next Priority Is Retaking Idlib: Russian Media (AFP)
**Thursday, July 26, 2018**
AFP

Moscow (AFP) – Syrian President Bashar al-Assad told Russian media on Thursday his regime's next priority would be retaking Idlib province, currently dominated by rebels and jihadists.

"Now Idlib is our goal, but not just Idlib," Assad said of the northwestern province, in comments carried on Russian newswires.

"There are of course territories in the eastern part of Syria that are controlled by various groups... So we will be moving into all these regions," Assad added.

"The military – and it is at their discretion – will decide priorities and Idlib is one of these priorities," he said.

"Now we have liberated Ghouta, we will finish the liberation of the south-western part of Syria," Assad said.

Syrian government forces launched an offensive last month backed by Russian planes to retake the south of Syria, including Daraa and Quneitra provinces.

Russia, Turkey and Iran have held talks under the Astana peace process launched last year and agreed to create four "de-escalation" zones to pave the way for a nationwide ceasefire.

Idlib is part of one such zone. It borders Turkey to the northwest but is otherwise almost totally surrounded by regime territory, prompting fears the government would eventually attack it.

Idlib has received many rebels and their families evacuated from other regions under Russian-brokered "reconciliation deals" that then saw regime forces move in to take rebel-held areas.

According to the United Nations, Idlib's population today stands at 2.5 million – half of them displaced people.

In the same interview Assad said rescue workers from the White Helmets group would be killed if they did not turn themselves in.

"Either they can lay down their arms as part of an amnesty ongoing for four or five years, or they will be liquidated like any other terrorist," he said.

Israel on Sunday helped more than 400 people – opposition-linked White Helmets rescuers and their families – flee a pocket of southwest Syria as government forces bore down on them. But hundreds more remain trapped in the south, fearing reprisals from approaching regime troops. Damascus accuses the White Helmets of being a front for jihadists.

Assad also appealed for Syrian refugees, especially those who had their own businesses in the country, to return.

The war has killed more than 350,000 people since it began in 2011 with a brutal government crackdown on protesters.

Back To Top

## Amid Trump Threats, Senior Iran General Says His Forces 'Ready To Confront' U.S. (Hjelmgaard, Jackson, USAT)
**Thursday, July 26, 2018**
USA Today
By Kim Hjelmgaard And David Jackson

A senior Iranian general said Thursday that his forces are "ready to confront" the United States if President Donald Trump follows through on his warning that Iran will "suffer consequences" from threatening the U.S.

Gen. Qassem Soleimani, who heads the elite Quds Force of Iran's hard-line paramilitary Revolutionary Guard, called

WASHAR0003317

Trump a "gambler" and said: "You will start the war but we will end it." His comments were carried by the state-affiliated yjc.ir website and the semi-official Tasnim news agency following a speech in Iran's central city of Hamedan.

Trump ratcheted up tensions with Iran late Sunday night with a stark tweet written in all capital letters. "NEVER EVER THREATEN THE UNITED STATES AGAIN OR YOU WILL SUFFER CONSEQUENCES THE LIKE OF WHICH FEW THROUGHOUT HISTORY HAVE EVER SUFFERED BEFORE," Trump wrote.

Trump was responding to Iranian President Hassan Rouhani, who had said earlier that day that "American(s) must understand well that peace with Iran is the mother of all peace and war with Iran is the mother of all wars."

Rouhani had cautioned Trump to stop "playing with the lion's tail or else you will regret it." His comments came as Washington prepares to reimpose economic sanctions on Iran on August 6 after its withdrawal from the 2015 nuclear accord.

Thursday's reaction from Soleimani comes after Rouhani said Wednesday that there was no need for him to "respond to any nonsensical" remarks from Trump.

Soleimani said it was his duty as a soldier to reply to Trump's rhetoric. "We are near you, where you can't even imagine. We are ready," Soleimani said in his speech.

Since taking office, Trump has developed a reputation for firing off heated tweets that seem to escalate disputes with world leaders at odds with the U.S. However, following Sunday's warning, Trump suggested talks were an option.

"We're ready to make a real deal," he said.

In the wake of Trump's comments on Iran, foreign policy analysts said they were not sure if the president was deliberately seeking a confrontation with Iran or just trying to change the subject politically following fallout from last week's meeting with Russian President Vladimir Putin. Trump was widely criticized at home and abroad for failing to stand up to Russia's leader over allegation of his country's meddling in the U.S. election.

Back To Top

## Iranian General Locks Horns With Trump, Escalating Threat-Filled Feud (Gladstone, NYT)
Friday, July 27, 2018
New York Times
By Rick Gladstone

A powerful commander in Iran's Revolutionary Guards Corps escalated the invective duel with President Trump on Thursday, calling his threat against Iran's president "cabaret-style rhetoric" in remarks that political analysts called worrisome.

The commander, Maj. Gen. Qassim Suleimani, who wields enormous influence in Iran, may emerge as its future leader and is considered a terrorist mastermind by the United States. He said that Mr. Trump should pick a fight directly with him and not Iran's president, Hassan Rouhani.

In a Twitter message on Sunday posted in all-capital letters, Mr. Trump warned Mr. Rouhani that he would suffer "consequences the likes of which few throughout history have ever suffered before" if he threatened the United States.

Top aides to Mr. Rouhani dismissed Mr. Trump's warning, apparently viewing it as an attempt by the American president to replicate his strategy of threats against another adversary, North Korea.

But General Suleimani's public challenge to Mr. Trump appeared to signal that the Iranian hierarchy felt obliged to send a more assertive reply.

"It is beneath the dignity of our president to respond to you," General Suleimani said in a speech in western Iran reported by state-run media. "I, as a soldier, respond to you."

Directly addressing Mr. Trump, General Suleimani said: "You threaten us with an action that is 'unprecedented' in the world. This is cabaret-style rhetoric. Only a cabaret owner talks to the world this way."

Deriding what he described as the history of American military failures in Afghanistan, Iraq and elsewhere in the region, General Suleimani said Mr. Trump was in no position to issue threats to Iran.

"We are near you, where you can't even imagine," he said. "We are ready. We are the man of this arena."

While the possibility of a war between Iran and the United States is considered extremely low, political analysts worry that escalating threats could lead to something more serious.

General Suleimani's words and actions are closely scrutinized because he is regarded as one of Iran's most cunning and autonomous military figures, in charge of its intelligence gathering and covert military operations.

"His fire-breathing retort to Trump is important and worrisome," said Cliff Kupchan, chairman of the Eurasia Group, a political risk consultancy in Washington.

"Suleimani is directly mocking the U.S. president, and he lambastes U.S. policy," Mr. Kupchan said. "Suleimani is telling Trump to watch his words, reminding him that Iran has both power across the Middle East and potent capability for asymmetric warfare. That's an implicit threat against U.S. assets in the Middle East."

WASHAR0003318

A once-shadowy figure who now enjoys celebritylike status among the hard-line conservatives in Iran, General Suleimani leads the Islamic Revolutionary Guards Corps' Quds Force, a special forces unit responsible for Iranian operations outside Iran's borders. Quds is the Persian word for Jerusalem.

The general is known to have the personal backing of Iran's supreme leader, Ayatollah Ali Khamenei, and is believed to be the chief strategist behind Iran's military ventures and influence in Syria, Iraq and elsewhere in the region and beyond.

The United States has regarded General Suleimani as a vexing foe for many years. It accused him of plotting attacks on American soldiers in Iraq after the 2003 American-led invasion that toppled Saddam Hussein.

The Treasury Department placed him on a sanctions blacklist in 2011, accusing the commander of complicity in what American officials called a plot to kill the Saudi ambassador to Washington.

But the United States also has found itself in the awkward position of cooperating with General Suleimani in Iraq, where the Americans and Iranians have both worked to reverse gains made by the Islamic State.

He was in the northern Iraqi city of Tikrit in 2015, commanding Iraqi Shiite militias attempting to recapture it from Islamic State fighters before American warplanes belatedly joined that campaign.

<div align="right">Back To Top</div>

## After Trump's Threat To Iran, White House Convenes A Policy Meeting (Gordon, Youssef, Nicholas, WSJ)

**High-level gathering is just the third called by John Bolton since he became national security adviser**
Thursday, July 26, 2018
<u>Wall Street Journal</u>
By Michael R. Gordon, Nancy A. Youssef And Peter Nicholas

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

<div align="right">Back To Top</div>

## Top Iranian General Warns Trump That War Would Unravel U.S. Power In Region (Cunningham, Fahim, WP)

Thursday, July 26, 2018
<u>Washington Post</u>
By Erin Cunningham And Kareem Fahim

ISTANBUL — The powerful commander of Iran's special forces warned the United States on Thursday to halt threats of military action against Tehran, raising the stakes in an already fiery exchange between U.S. and Iranian leaders this week.

The combative message from Maj. Gen. Qasem Soleimani, chief of the Revolutionary Guard's elite Quds force, also suggested that Iran's leadership is willing to stoke tensions with the Trump administration as part of Tehran's efforts to project wider regional clout.

Soleimani said President Trump would regret waging a war that would "destroy all that he owns" — an apparent reference to U.S. influence in the region.

"You may begin the war, but it will be us who will end it," Soleimani said in a speech in the central city of Hamedan, Iran's Tasnim News Agency reported.

He also said that the Red Sea, a critical waterway linking the Suez Canal and the Indian Ocean basin, was "no longer secure" with U.S. military assets stationed in the area.

Iran has often denounced the U.S. military presence in the Persian Gulf, including the Navy's 5th Fleet headquarters in Bahrain. But Soleimani's reference to the Red Sea reflects an expanded regional reach for what Iran considers within its military sphere.

Soleimani — a shadowy commander who has waged proxy wars in Iraq and Syria, including against U.S. troops — stopped short of issuing concrete threats against U.S. forces.

But his remarks came just one day after Saudi Arabia announced it was suspending oil shipments in the Bab al-Mandeb Strait, which connects the Gulf of Aden to the Red Sea, because of what authorities said was a missile attack on two Saudi oil tankers by Iranian-allied rebels in Yemen.

The rebels claimed the attack on the Saudi oil tankers in the strait, but said the movement had targeted a Saudi warship called the Dammam, according to an article on the website of the rebel-run al-Masirah news channel.

The war in Yemen has been a theater for spiking tensions between Iran and the United States. The Trump administration and its ally Saudi Arabia have accused Iran of providing weapons, including ballistic missiles, and other support to the Houthis, a rebel group that seized control of Yemen's capital four years ago.

But the hostile words from one of Iran's most influential generals suggest heightened tensions and come amid a particularly sharp escalation in rhetoric on both sides.

This week, Trump and Iranian President Hassan Rouhani traded barbs that culminated in Trump firing off a

WASHAR0003319

tweetthreatening Iran with "CONSEQUENCES THE LIKES OF WHICH FEW THROUGHOUT HISTORY HAVE EVER SUFFERED BEFORE."

The Iranian commander "knows he has a range of indirect options to needle U.S. interests across the region," Tobias Schneider, a Middle East analyst at the Berlin-based Global Public Policy Institute, wrote Thursday on Twitter.

Soleimani's options, he said, include threatening U.S. forces in Iraq and Syria, stepping up missile attacks on Saudi cities and disrupting regional shipping lanes.

Iranian military officials have suggested recently that they could block the Strait of Hormuz, a choke point for a third of the world's oil shipments, should U.S. sanctions prevent Iran from exporting its own oil.

Iran-backed Houthi rebels in Yemen have also previously threatened to block the Bab al-Mandeb Strait in retaliation for Saudi-led military offensives.

One of the ships "sustained minimal damage," Aramco, the Saudi Arabian Oil Company, said in a statement.

The Saudi Energy Ministry said Thursday that the country was temporarily halting the shipments "until the situation becomes clearer" and maritime transit "is safe," according to a statement from the Saudi-led military coalition operating in Yemen.

Back To Top

## Top Iranian General Says His Troops 'Ready To Confront' US (AP)
Thursday, July 26, 2018
Associated Press

TEHRAN, Iran (AP) — A top Iranian general says his forces are ready if President Donald Trump follows through on his warning that Iran will "suffer consequences" if Tehran threatens the United States.

Iranian President Hassan Rouhani said Wednesday there was no need for him to "respond to any nonsensical comment" but Gen. Qassem Soleimani, who heads the elite Quds Force of Iran's hard-line paramilitary Revolutionary Guard said on Thursday it was his duty as a soldier to reply.

He was quoted by news website yjc.ir, affiliated with state-run television, as saying "we are ready to confront you."

Soleimani called Trump a "gambler" and says: "You will start the war but we will end it."

Following Sunday's warning tweet, Trump suggested Tuesday talks were an option, saying "we're ready to make a real deal."

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Senators Warn Europe Against Flouting US Iran Sanctions (Lee, AP)
Thursday, July 26, 2018
Associated Press
By Matthew Lee

WASHINGTON (AP) — A group of Republican senators on Thursday warned European nations not to try to flout U.S. sanctions on Iran that will soon be re-imposed after President Donald Trump withdrew from a landmark nuclear accord.

The 10 senators, all of whom opposed the 2015 agreement, said in a letter to the ambassadors of Britain, France and Germany that they would be "particularly troubled" by any efforts to evade or undermine the sanctions. They said attempts to do so could be met by congressional action. A first set of U.S. sanctions lifted by the Obama administration under the terms of the nuclear deal is to be restored on Aug. 4. A second set will be re-imposed on Nov. 4.

The senators, including outspoken Iran deal critics Ted Cruz of Texas, Marco Rubio of Florida and Tom Cotton of Arkansas, noted that the sanctions are matters of U.S. law and had been eased only because the previous administration had approved of the deal, which Trump pulled out of in May.

"We write to urge you to comply with all American sanctions but also to emphasize we would find it particularly troubling if you sought to evade or undermine American statutes," the senators wrote. "These laws were passed by Congress, signed by President Obama and will be enforced by President Trump."

"Any attempt to evade or subvert them could well prompt congressional action, in coordination with other elements of the U.S. government, to ensure their integrity," they said.

Britain, France and Germany — along with China, Russia, the European Union and Iran itself — were the other parties to the nuclear deal that was one of former President Barack Obama's signature foreign policy achievements. Trump campaigned against the agreement, which he has called the worst deal ever negotiated by the United States, and followed through on that pledge to the anger of the other parties who remain in it.

Some European officials, who believe the deal is vital for the security of the continent, have suggested trying to work around the re-imposed U.S. sanctions to preserve the deal. Those sanctions would penalize foreign governments or

WASHAR0003320

firms, including financial institutions, that do business with Iran.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Dubai Police Recover Rare $20 Million Stolen Blue Diamond (AP)

**Thursday, July 26, 2018**
Associated Press

DUBAI, United Arab Emirates (AP) — Dubai police say they've recovered a rare $20 million blue diamond that was stolen from a city company's vault and smuggled to Sri Lanka inside a pair of sneakers in a shoebox.

Police said Thursday a guard with the money transfer company secreted the diamond out of the vault on May 25 and passed it off to a relative who smuggled it out of the country.

After more than 100 interviews and the review of thousands of hours of CCTV footage — some showing the theft in progress — police say they were able to pinpoint the suspect.

Police say he was arrested elsewhere in the country but gave no other details.

It was not immediately clear how the diamond was recovered from Sri Lanka.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## U.S. Allies Have Killed Thousands Of Yemeni Civilians From The Air. After 22 Died At A Wedding, One Village Asks, 'Why Us?' (Raghavan, WP)

**Wednesday, July 25, 2018**
Washington Post
By Sudarsan Raghavan

The ground where the wedding tent once stood was covered with children's slippers, broken musical instruments, pieces of festive clothing and other detritus of destroyed lives. Teeth, still attached to the jawbone, lay near some tattered decorations.

"There is even some flesh left," said Elan Yahya, the bride's father, pointing at blackened shards hanging from a tree branch.

An airstrike hit the wedding in this remote mountain village on April 23, killing 22 civilians, including eight children, and injuring dozens, according to interviews with 17 villagers in late May. More than three years into Yemen's civil war, more than 16,000 civilians have been killed and injured, the vast majority by airstrikes, the U.N. human rights office estimates, adding that the figures are likely to be far higher.

The deaths are continuing unabated, with as many as hundreds of casualties per month, despite assurances by a U.S.-backed regional coalition of better protection of civilians amid mounting criticism within the United States and the international community.

Body parts are seen on the site of the explosion. (Lorenzo Tugnoli/for The Washington Post)

That coalition, led by Saudi Arabia and the United Arab Emirates, is backing Yemen's exiled government in its conflict against rebels known as the Houthis, who dominate the capital and the north. The United States is playing an essential role in the war, supporting the coalition with intelligence, refueling, technical assistance and billions of dollars in bombs and other weaponry.

The coalition is the only actor in the conflict that uses warplanes, mostly U.S.- and British-made fighter jets. The airstrikes have struck hospitals, schools, markets, motels, migrant boats, gas stations, even funeral gatherings, raising questions about the coalition's ability to abide by humanitarian laws that call for civilians to be safeguarded.

A month after the airstrike in Raqah, the destruction on the ground remained eerily preserved. The lives of the survivors, however, had been forever altered.

"We lost our minds that day," said Amna Yahya, the groom's mother. "I still can't comprehend what happened. Why us?"

U.S.-made munitions

The growing civilian casualties across Yemen have led to widespread denouncement of the U.S. role and calls in Congress to halt or regulate U.S. weapons sales to Saudi Arabia, a close U.S. ally in the Middle East. Despite the concern, President Trump announced $110 billion in new arms sales last year to the kingdom, weapons that most analysts expect will be used in Yemen.

In the hours following the airstrike in Raqah, local media published photos, provided by the Houthis, showing the bomb was a GBU-12 Paveway II precision-guided bomb, manufactured by Raytheon, the Massachusetts-based defense contractor, according to Bellingcat, an investigative website. The Washington Post could not independently verify whether the bomb was used in the attack.

WASHAR0003321

But visits to other bombed sites by Amnesty International and Human Rights Watch confirm that U.S.-made munitions, including banned cluster bombs and Paveway bombs, have been used in attacks that have killed and injured civilians. The Post saw remnants of U.S.-made bombs in the capital, Sanaa, and in the southwestern city of Taiz.

After the Senate narrowly approved a $510 million first installment of precision-guided munitions to Saudi Arabia in June 2017, the kingdom said it would launch a training program to reduce accidental targeting of civilians. But in the year after that announcement, civilian deaths were 7 percent higher than the year before, U.N. data shows. In April alone, there were 236 civilians killed and 238 injured — the deadliest month this year so far.

A U.N. report last month found that 1,316 Yemeni children were killed or injured last year and that more than half of the casualties resulted from airstrikes.

A Saudi government official disputed the U.N. figures and said the coalition is "implementing the highest standard measures to prevent civilian casualties," including "continuous training" of its staff and efforts to improve rules of engagement. The attack on Raqah was under internal investigation, said the official, who spoke on the condition of anonymity because of the issue's sensitivity.

Human rights activists welcome such efforts but say the coalition's probing of airstrikes' aftermath remains hollow. "There is no genuine follow-up on their international human rights obligations and their commitment to respecting humanitarian laws," said Rasha Mohamed, Yemen researcher for Amnesty International.

Raqah is a remote village in the Houthi-controlled province of Hajjah. (Lorenzo Tugnoli/for The Washington Post)

Raytheon spokesman Michael Doble said the company does not comment "on the military actions of our allies or customers." Its sales of munitions to Saudi Arabia, he said, were reviewed and approved by Congress, the Pentagon and the State Department, and so "reflect the foreign policy and national security interests of the United States government and are in compliance with U.S. law."

In a Senate Armed Services Committee hearing in March, Gen. Joseph Votel, the head of the Pentagon's Central Command, said the U.S. military does not track coalition missions using U.S.-refueled warplanes and cannot determine whether the aircraft or U.S. munitions were involved in airstrikes that have killed civilians.

Raqah is in a rugged region in the northern Yemeni province of Hajjah. The sprawling village of about 700 residents is about a three-hour drive from the provincial capital, a place so remote that to reach it requires crossing dry river beds and driving up goat paths.

The civil war that emerged from the political chaos following the 2011 Arab Spring revolts hardly touched the villagers, mostly farmers and herders. Many supported former president Ali Abdullah Saleh, who was ousted in 2012. But even after the Houthis swept into Sanaa and pushed out the internationally recognized government, the conflict did not come to their area, villagers said.

The groom, Yahya Jaffer, stands on the site of the attack. (Lorenzo Tugnoli/for The Washington Post)

The father of the bride, Elan Yahya, stands inside one of the buildings damaged by the explosion. (Lorenzo Tugnoli/for The Washington Post)

Mohammed Yahya, uncle of the groom, stands on the roof of one of the buildings damaged by the blast. (Lorenzo Tugnoli/for The Washington Post)

They said they would often see and hear warplanes and unmanned drones fly above their huts, but they never felt threatened. They had nothing to do, they said, with the Shiite Houthis or Iran, which is backing the rebels. The Sunni Muslim coalition entered the war to prevent Tehran from gaining a regional foothold through Yemen.

"There are no Houthis here," said Yahya Ahmed, a villager whose nephew was killed in the airstrike. "Did you see any checkpoints in our area?"

Across northern Yemen, rebel checkpoints are ubiquitous. But in and around Raqah, there were none. Nor were there visible signs of military activity. Villagers said that there were no military bases in the area and that none of their men were fighting with the rebels.

The only time they had seen rebels in recent memory was the morning after the airstrike, when some Houthi officials arrived to assess the damage.

"We refused to join the Houthis," said Mohammed Yahya, the groom's uncle. "One side says, 'God is great.' The other side says, 'God is great.' We don't know who is right."

'There was blood everywhere'

The wedding of Yahya Jaffer and his bride, Fatma, began auspiciously enough. They were both 20 years old, both from the al-Musabi tribe. Like their parents and grandparents, they were marrying within their community. They are cousins.

The families had spent much of their savings on the wedding. A large white tent was erected in front of their home. More than 150 guests drank soft drinks and water and feasted on lamb and other delicacies. A group of local folkloric dancers

WASHAR0003322

and musicians entertained, according to the recollections of villagers present at the event.

Kamel Yahya sits in the hut where the newlywed couple now live. Kamel's right arm and leg were injured in the attack. He says he has shrapnel that has not been removed. (Lorenzo Tugnoli/for The Washington Post)

Many villagers said they heard two planes circling above their homes throughout that day, as well as just before the attack.

"An hour later, one of them hit us," Amna Yahya said.

It was shortly after 10 p.m. By then, most parents and the elderly had left the wedding. The youths clapped to the rhythm of drums and lutes. Some sang, others chanted, as the dancers skipped and leaped in celebration. Then, a thunderous sound.

"I saw a flash of red, and I lost consciousness," Jaffer recalled. "When I woke up, I heard people screaming in pain. People had lost arms and legs. There was blood everywhere."

Those who could searched through the rubble for survivors, pulling them to safety. Others struggled to find the dead: Most were coated by ash or torn to pieces.

The only way Aitan Suwaed said he recognized his 17-year-old son, Hamdi, was "from his clothes, the parts that weren't burnt."

The 22 fatalities included 12 of the dancers, four musicians and six villagers, including one who played the lute. Most of the children killed were in the dance troupe.

The dancers all belonged to the Muhamasheen, Yemen's most marginalized ethnic group. Performing at weddings was among the few jobs they could find.

For 10 of them, only pieces of their bodies were found, so they are buried in two mass graves. "It's all my family," said Ahmed Rifaei, 37, a dancer who survived.

The living, too, are in bad shape.

Some of Raqah's residents have lost their hearing. Children have lost limbs, while others carry shrapnel inside their bodies. The nearest hospital is in the provincial capital, and most villagers cannot afford the three-hour journey.

Hamza Yahya, a member of the groom's family, stands near his damaged vehicle. He was injured in the explosion. (Lorenzo Tugnoli/for The Washington Post)

Yahya Ahmed not only lost his nephew. His wife, Noora, was four months pregnant. When she heard the bombing, she started screaming uncontrollably. The next morning, she had a miscarriage, he said.

Other women and children in the village report having nightmares where they relive the bombing. One woman was in such shock that she feared leaving her bed. Whenever she needed to go to the bathroom, her relatives carried her. Other villagers said they now sleep outside their houses at night out of concern that their homes would be targeted by airstrikes.

"What happened to us, happened to everyone in the village," said Amna Yahya. "Everyone is full of fear."

Many are also filled with anger, not just at the Saudi-led coalition, but at the United States. "If it wasn't for the American aircraft, Saudi Arabia would never strike Yemen," said Mohammed Yahya, the groom's uncle. "America gives them weapons, and the Saudis hit us."

Some villagers have fled to other areas rather than risk being targeted by another airstrike. But the vast majority don't have that option, including the bride and groom. With their family house destroyed, the couple live in their animal shed, next to cows and goats, their abode reeking of hay and animal urine. They are married in principle but not legally: They can no longer afford to pay for their wedding certificate. So it hasn't been signed by the local marriage official.

On a chair in the shed is the white traditional Yemeni robe that Jaffer wore at his wedding. It is now bloodstained. He has no intention of cleaning it.

"I will keep this to always remember what happened," he said.

Amna Yahya, the mother of the groom, works near the shack where her son now lives with his wife.

Back To Top

## Yemen Rebels Claim Strikes On Abu Dhabi Airport In UAE (AP)
**Thursday, July 26, 2018**
Associated Press

SANAA, Yemen (AP) — Yemen's Shiite rebels say they have launched "several strikes" targeting Abu Dhabi's international airport in the United Arab Emirates.

Thursday's announcement on Yemen's rebel-run Al-Masirah TV says the rebel "air force" targeted the airport using drones.

On Twitter, Abu Dhabi's airport said there was an "incident involving a supply vehicle in Terminal 1 airside area of the airport." It said the incident didn't affect airport operations.

The UAE is a key member of a Saudi-led coalition backing Yemen's internationally recognized government and fighting to defeat the Iran-aligned rebels, known as Houthis, since March 2015. The coalition has repeatedly accused Saudi rival Iran of arming the rebels, allegations the Houthis deny.

WASHAR0003323

On Wednesday, the Houthis attacked two Saudi oil tankers prompting Saudi Arabia's state-owned oil company to temporarily halt shipments.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Oil Prices Spike After Saudi Halts Shipments After Attack (Rising, AP)

Thursday, July 26, 2018
<u>Associated Press</u>
By David Rising

DUBAI, United Arab Emirates (AP) — Oil prices rose to a 10-day high Thursday after Saudi Arabia's state-owned oil company announced it was temporarily halting crude shipments through a strategic Red Sea shipping lane after Yemen's Shiite rebels attacked two tankers in the strait the previous day.

Futures for Brent crude, the international oil benchmark, hit $74.83 per barrel before falling back in later day trading to $73.99, up 6 cents.

The spike came after Saudi Aramco, the kingdom's oil giant, said it was stopping all oil shipments through the Bab El-Mandeb Strait, raising supply concerns.

Saudi Arabia, the world's largest oil exporter, typically transports its oil from fields clustered in the east of the country around the Arabian Peninsula, then north through the Bab El-Mandeb Strait, and through the Red Sea and Suez Canal before on to Europe through the Mediterranean.

It can bypass the strait by moving oil across the country by pipeline and then loading it on to tankers at the Red Sea port of Yanbu, though at reduced output.

Paul Sheldon, chief geopolitical adviser at S&P Global Platts Analytics, said the Saudi move will likely force tankers on a longer trip around Africa.

"It should boost Med barrels, and could eventually raise Brent and other grades due to the higher requirement for volumes at sea," he said in a statement.

Eastern Gulf nations like Kuwait, Qatar and the United Arab Emirates don't have that option, however, and it was not immediately clear how they would react to the attack on the Saudi ships.

The Houthis, who are fighting a Saudi-led coalition backing Yemen's internationally recognized government, attacked the 2-million-barrel capacity Saudi tankers on Wednesday, causing minimal damage to one.

The United Arab Emirates' minister of state for foreign affairs, Anwar Gargash, said on Twitter the attack showed the need to take back the key port of Hodeida.

"The targeted attack on the Saudi oil tankers in the Red Sea confirms the necessity to liberate Hodeida from Houthi militias," said Gargash, whose country is part of the Saudi-led coalition.

"This systematic attack is a terrorist act which shows the nature and aggression of the Houthis."

Saudi Aramco said Thursday there were no injuries or spills and that shutting the route was a precautionary measure.

"In the interest of the safety of ships and their crews and to avoid the risk of oil spill, Saudi Aramco has temporarily halted all oil shipments through Bab El-Mandeb Strait with immediate effect," it said. "The company is carefully assessing the situation and will take further action as prudence demands."

The Bab el-Mandeb strait, which connects the Gulf of Aden to the Red Sea is only about 30 kilometers, or 20 miles, wide between Yemen and Djibouti, leaving ships more vulnerable as they pass through.

Following the attack, the Saudi coalition said the rebels "had almost caused an environmental disaster," according to the state-run al-Ekhbariya TV channel.

Earlier, the rebel-run Al-Masirah TV said their "naval forces have targeted the Saudi Dammam battleship off the western coast."

It later said the "battleship" was targeted using a missile and that the rebels attacked another boat belonging to the coalition.

___

Associated Press writer David Koenig contributed to this report from Dallas.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Egypt President Ratifies Law Protecting Military Officers (AP)

Thursday, July 26, 2018
<u>Associated Press</u>

CAIRO (AP) — Egypt's President Abdel-Fattah el-Sissi on Thursday ratified a bill that could immunize senior military officers from future prosecution related to violence after the 2013 military overthrow of an elected but divisive Islamist president.

WASHAR0003324

The law, published in the official gazette Thursday, grants senior military officers selected by el-Sissi rewards including immunity from investigation for alleged offenses after the suspension of Egypt's former constitution in July 3, 2013 until parliament assumed its duties on Jan. 10, 2016.

Former president Mohammed Morsi was ousted on July 3, 2013.

Any legal action against the selected officers requires permission from the Supreme Council of the Armed Forces under the new law. They are also privileged with "special immunities" like those granted to diplomats.

General-turned-president el-Sissi led the military's overthrow of Morsi, who hailed from the now-outlawed Muslim Brotherhood group, following mass protests against his rule. Morsi's ouster was followed by a series of violent confrontations between security forces and Morsi's supporters, including one outside a military installation in Cairo in which dozens were killed.

On Aug. 14, 2013, security forces violently dispersed two Cairo encampments supporting Morsi. Hundreds were killed. Rights groups over the years have since denounced the encampments' violent dispersal. Human Rights Watch said the killings "likely amounted to crimes against humanity."

Since Morsi's overthrow, Egypt has launched a severe crackdown on Brotherhood members and supporters, arresting many and trying them on terrorism related charges. The Brotherhood was later designated a "terrorist organization."

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## 800 Migrants Storm Fences To Enter Spanish Enclave In Africa (AP)
**Thursday, July 26, 2018**
Associated Press

MADRID (AP) — Around 800 migrants stormed border fences separating Spain's North African enclave of Ceuta from Morocco to get into Europe, police said Thursday.

Spain's Civil Guard said 602 migrants made it onto Spanish soil in a massive assault on high, barbed-wire fences shortly after dawn.

Migrants cut holes in the fences and threw feces and quicklime, a skin irritant, at police officers trying to hold them back, the Civil Guard said in a statement.

They also threw stones at police vehicles, breaking windows, and hurled makeshift flamethrowers at police officers.

The police statement said 16 migrants were taken to the hospital, while five of 15 police hurt were also hospitalized.

The Spanish Red Cross said in a tweet that 132 migrants were hurt in the mass charge.

Sub-Saharan Africans living illegally in Morocco try to get to Europe each year by climbing rows of 6-meter (20-feet) high fences surrounding Ceuta and Melilla, Spain's other North African enclave. Those who make it across head for crowded, temporary migrant accommodation centers. They are eventually repatriated or let go.

Thursday's assault added to pressure on Spanish authorities from a recent wave of migration, with on average hundreds of migrants crossing the Mediterranean Sea on unsafe boats each day.

Spain's Maritime Rescue Service said it picked up 332 people in the Mediterranean on Thursday — 232 on 19 boats in the Strait and 100 in two boats further east. On Wednesday, it rescued 424 people.

The International Organization for Migration says so far this year more than 22,700 migrants have arrived in Spain — three times more than in the same period last year.

Almost 20,000 of them arrived by sea, as good weather allowed more crossings on the short route across the Strait of Gibraltar and a recent crackdown by Libyan authorities had led migrants to choose other routes.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Trump Administration Sets Sights On Libya's Oil Reserves In Behind-the-scenes Power Play (Boylan, WT)
**Thursday, July 26, 2018**
Washington Times
By Dan Boylan

Iran's loss may be Libya's gain. The prospect that U.S. sanctions will drastically curb Tehran's oil exports is feeding interest in Libya's oil reserves and has even sparked movement toward economic and political reform in one of the region's most unstable states.

As Libya endured yet another oil blockade, which pulled nearly 850,000 barrels per day from the world's markets, Trump administration officials worked behind the scenes over the past month to pressure key militia leaders, government

WASHAR0003325

officials and oil executives to cooperate or face dire consequences, multiple sources told The Washington Times.

State Department and White House officials declined to comment on specifics, underscoring the sensitivities required to execute a successful power play in Libya.

The country is plagued by Islamist radical threats and divided between rival governments in its eastern and western halves since the 2011 revolution and death of longtime strongman Moammar Gadhafi.

With the U.N. and European allies, the U.S. has pushed a deal to subject the Central Bank of Libya and the state oil company to a wide-ranging investigation into long-standing reports of corruption and misappropriation of oil revenue by radical Islamist factions and militia groups.

Regional analysts have welcomed the investigation as a glimmer of hope after a long record of failure and uncertainty for U.S. policy.

"The proposed Central Bank audit presents an opportunity to improve transparency and management of a critical economic institution," said Lydia Jabs of the U.S.-Libya Business Association.

International Crisis Group senior Libya analyst Claudia Gazzini voiced cautious optimism but warned that major questions remain about who will conduct the audit and how its findings are handled.

"The devil will be in the details," she said by phone from neighboring Tunisia. "But forging a real agreement for a genuine investigation, if properly managed, it could lead to a great opening-up."

Factional fighting

The factions that control Libya's west and east — one based in Tripoli and one in Tobruk — have battled for years for control of the largest oil reserves in Africa and 10th largest in the world.

On June 14, four ports in what is known as Libya's Oil Crescent in the east were seized from Gen. Khalifa Haftar, the strongman who controls the Libyan National Army and much of the eastern half of the country.

Called stubborn and at times self-serving, the 75-year-old Gen. Haftar falls in and out of favor in Washington, where he has become well-known since defecting to the U.S. from Gadhafi's army in the 1980s. Gen. Haftar returned to fight in the revolution in 2011 and later battled Benghazi's Islamist militias.

Gen. Haftar's troops soon recaptured the ports but refused to return them to the state-owned National Oil Corp., a move condemned by France, Italy, Britain and the U.S.

The Libyan standoff, combined with uncertainty over the future of Iran's energy markets after the U.S. pulled out of the 2015 nuclear deal, helped push U.S. gas prices by July 4 to their highest levels in four years.

The Libya 218 TV channel reported July 10 that President Trump sent a message to Gen. Haftar and the heads of the rival governing factions, Aqilah Saleh and Fayez Al-Sirraj, threatening them with major sanctions — and possible U.S. force — if they did not immediately restore Libyan oil to the world market.

The next day, July 11, Libyan media reported that the National Oil Corp. had control of the four Hafta ports and the blockade was over.

National Oil Corp. Chairman Mustafa Sanallah, whom analysts see as a reformer, said the incident illustrated that "a proper national debate on the fair distribution of oil revenues" was direly needed.

"The real solution is transparency" he said.

Shortly afterward, Ghassan Salame, the U.N. envoy to Libya, then secured support from the U.S. and European allies to launch an anti-corruption investigation that many in Libya see as key to restoring a semblance of efficient government in the chaotic post-Gadhafi era.

"If these matters are not expeditiously addressed, I fear the agreements made to resume the production of oil will not hold, and it will be difficult to advance the political process," Mr. Salame told the U.N. Security Council last week. "If there has been a silver lining in the events, it is that the various authorities in Libya now accept that they need to take action to protect the country's wealth."

Speaking on background for fear of reprisal in Libya, one official of a nongovernmental organization said Libyans were divided about the pressure the U.S. and outside players have applied, which ultimately could lead to greater transparency.

"Wrong reasons, good results," the source said. "Iran is the White House's priority, not Libya. [The U.S.] wants to make sure that there's a healthy supply of Libyan oil on the world market when the new Iran sanctions kick in so U.S. oil prices don't skyrocket."

Libya's oil industry drives 95 percent of the country's exports, and corruption is endemic. Last year, Transparency International ranked Libya 171st out of 180 nations in its annual Corruption Perceptions Index.

Human trafficking is another massive problem. Organized crime syndicates in the major Mediterranean ports use their oil smuggling routes to make Libya the prime departure point for moving economic refugees to Europe, fueling an immigration crisis that has badly divided the European Union.

75

According to the Office of the U.N. High Commissioner for Refugees, 124,711 people crossed from Libya to Europe from January 2017 to March 2018, and 4,578 refugees were declared dead or missing at sea last year.

Vincent Cochetel, the UNHCR special envoy for the Central Mediterranean, has called for "naming and shaming" traffickers and smugglers and freezing their assets.

In February, the U.S. Treasury's office of foreign assets control did just that, sanctioning six specific smugglers from Libya, Malta and Egypt in addition to 24 companies and seven vessels.

International investors have taken notice.

Last week, the Texas-based Guidry Group announced plans for a $1 billion redevelopment of a deep-water port near the strategic northeastern city of Susah, where tradition holds that Roman Gen. Marc Antony reportedly built Cleopatra a swimming pool.

Founder Michael Guidry said in a phone interview from Benghazi that he had been to Libya more than a dozen times since 2012, when he began pitching officials to rebuild the Susah port. The former specialist in kidnapping and ransom negotiations and security services said his firm has evolved into developing critical infrastructure for war-torn countries.

Despite the difficulties and dangers, Mr. Guidry said, the Susah port project has attracted serious American investors and the interests of a major global port operator.

"The Libyans told me they had a dream of building a deep-sea port," he said. "This is it. They have been through so much, they need their dreams to start becoming real."

Back To Top

## Hannibal Gadhafi Headlines Spark Speculation Over Fate Of Libyan Dictator's Children, Fortune (Boylan, WT)

Thursday, July 26, 2018
<u>Washington Times</u>
By Dan Boylan

It's the latest installment in a grim Libyan soap opera that might be called "All the Strongman's Children."

Hannibal Gadhafi made headlines across the Arabic media this month when Lebanese authorities blocked him from leaving jail there, reviving a long-running debate over the "mysterious fate" of the late Libyan dictator Moammar Gadhafi's many descendants and the family's legendary fortune.

The Libyan strongman, who dominated the North African nation for more than four decades, had eight children. Three

were killed by rebels during the 2011 revolution that ultimately cost Gadhafi his own life. The remaining five live scattered across the region in varying degrees of comfort, security and seclusion.

With international officials now aggressively pushing Libya to investigate massive corruption at state institutions, rumors are again circulating about the whereabouts of hidden Gadhafi assets — including cash, diamonds and gold — and who might have access to the wealth.

Some minor successes have been made. The United Nations, the U.S. government and some European countries have frozen assets connected to the clan, and South Africa returned almost $1 billion to Libya linked to the Gadhafi clan in 2013.

But a 299-page 2017 U.N. report said much of the money is still out there, albeit stashed away in far-flung corners of Africa.

There were reports of steel chests containing $560 million in $100 bills hidden in the capital of the landlocked West African country of Burkina Faso. Four banks in South Africa are said to still hold $20 billion, and warehouses and bunkers around Pretoria and Johannesburg hold even more cash, diamonds and gold bars.

The Panama Papers, documents leaked in 2016 that detailed extensive offshore money laundering activity among the global elite and public officials, referred to another $8 billion in a Kenyan bank.

Investigators have traced attempts by Libyan rebel groups to tap the cash to buy arms, but questions linger about the Gadhafi family's access.

Last week, the London-based Arabic newspaper Asharq Al-Awsat chronicled Hannibal Gadhafi's continued detention in Lebanon, where authorities have said he must remain until after the conclusion of an investigation into suspicions of his involvement in kidnapping and attempted murder.

Of Mr. Gadhafi's other living children, another son, al-Saadi, who was imprisoned in Niger, is now in a Tripoli jail facing trial on charges of kidnapping and financing armed groups.

The whereabouts of the onetime heir apparent, Saif al-Islam, is unknown, but rumors suggest that he might run in Libya's next presidential election.

Moammar Gadhafi's widow, Safia Farkash, returned to Libya in 2016 as part of a reunification drive. But his daughter, Aisha, a lawyer who once tried to defend former Iraqi leader Saddam Hussein, is reportedly living a life of luxury in the Persian Gulf country of Oman with brother Muhammad.

Back To Top

WASHAR0003327

## Lebanon's Cannabis Heartland, Bekaa, Hopes For Legalization (Mroue, AP)

Friday, July 27, 2018
<u>Associated Press</u>
By Bassem Mroue

YAMMOUNE, Lebanon (AP) — In the fields of this quiet village surrounded by mountains, men and women work clearing dirt and dry leaves from around cannabis plants, a major source of livelihoods in this impoverished corner of Lebanon,

The fertile Bekaa Valley in eastern Lebanon has long been notorious as one of the world's major narcotics-growing regions, producing some of the finest quality cannabis, mostly processed into hashish. Today, the country is the third biggest producer in the world after Morocco and Afghanistan, according to the U.N.

But the valley's residents have rarely felt the benefits. Now they are hoping their work will soon become legal after decades of crackdowns and raids.

This week, a draft bill was introduced in parliament that would allow cultivation and use of cannabis for medical purposes.

The idea has fueled dreams of Lebanon raking in hundreds of millions of dollars in sales and exports, a desperately needed source of income for a country weighed down by low growth, high unemployment and one of the heaviest debt burdens in the world.

The legal industry will also create jobs and bring order in the Bekaa, a region notorious for lawlessness, proponents say.

"I want to find a solution for what's going on," said legislator Antoine Habchi, who sent the bill to parliament. The aim is to "allow farmers to live with dignity."

Habchi, who hails from cannabis-growing part of the Bekaa region, said the bill would bring economic returns and would include provisions to prevent and treat addiction.

Under the bill, cultivation would be tightly controlled. Private pharmaceutical companies would provide seeds and seedlings to farmers and during harvest plants would be counted to make sure nothing had been diverted. The size of fields would be regulated.

It will likely take months for the bill to go through discussions before it can come to a vote. Parliament Speaker Nabih Berri last week informed U.S. ambassador Elizabeth Richard that the legislature was working on the draft bill. In the past, the United States has provided aid for counter-narcotics efforts in Lebanon, trying to stem the trade.

The move is not without controversy.

The northern parts of the Bekaa Valley where cannabis is widely grown is under the influence of the militant group Hezbollah, which opposes the use and production of all types of drugs. The group and its allies dominate parliament; it has not said whether it would try to stop the bill.

The United States has repeatedly accused Hezbollah of drug trafficking, charges that the group strongly denies.

Legalization seems to have gained traction in Lebanon after global consulting firm McKinsey & Co. included it among its suggestions in a government-commissioned study on ways to boost Lebanon's economy.

Still, economists are split on the benefits.

Louis Hobeika, an economist at Lebanon's Notre-Dame University, warned that cannabis profits won't go to state coffers or citizens but will be devoured by the widespread corruption among the ruling elite.

"This is a move that aims to finance the political mafia in Lebanon," he said.

Habchi disagrees, saying farmers and workers would finally have their rights in the trade. Traditionally, drug dealers benefit most, imposing a purchase price on farmers then selling the product for high higher prices.

The Bekaa became notorious for the drug trade during the 1975-1990 civil war, producing some $500 million a year in opium and cannabis. After the war, authorities launched crackdowns on the fields and encouraged alternative crops like potatoes, tomatoes and apples.

Cannabis planting bloomed once more after Syria's civil war erupted in 2011 and Lebanese authorities shifted attention to other security concerns.

Driving through villages in the Baalbek and Hermel regions in eastern Lebanon, cannabis can be seen planted on the side of roads and in gardens. At some cases, security force's checkpoints are only a few hundred meters (yards) away. There are more than 40,000 arrest warrants against locals in the Bekaa Valley, many drug-related.

Most often, authorities prefer to turn a blind eye.

Well armed residents are ready to fend off any force trying to destroy their fields. When security forces move in to destroy fields with bulldozers and trucks, they can come under barrages of automatic weapons fire or even rocket-propelled grenades.

On Monday, troops surrounded a compound in the village of Hamoudiyeh run by a notorious drug dealer, Ali Zeyd Ismail, who had dozens of warrants against him. An hours-long battle left eight people dead, including Ismail, who was known

WASHAR0003328

as Lebanon's Escobar after the late top Colombian drug trafficker Pablo Escobar.

Hashish is also smuggled out of the country. Hardly a week passes without authorities saying that they busted drugs at the airport or seaports.

Legalization could turn that into a legal export market. Several countries in Europe and South America, as well as Australia and Canada allow imports of medical cannabis. Canada and the Netherlands dominate exports. Several U.S. states allow medical or recreational cannabis, but importing is illegal.

In the Bekaa, farmers welcome legalization, saying it would bring badly needed jobs.

"Let them deal with it the way they deal with tobacco," said Mayez Shreif, referring to a state-run company that monopolizes tobacco purchases from farmers. He spoke one morning this week as he ate fruit and drank coffee in a garden near cannabis fields.

The 65-year-old Shreif has worked for decades at cannabis plantations in Yammoune. The area's dry weather, its elevation above sea level and its local springs come together to make some of the finest product in the world.

Residents have tried planting apples, tomatoes and potatoes, but most often lost money, he said. Growing potatoes costs 15 times as much as cannabis and earns far less. With cannabis, the farmer just puts seeds and water and it grows, he said.

In Yammoune, a Syrian who has worked for seven years in cannabis fields said his Lebanese boss pays him $500 a month, seven times the average salary in Syria. He asked that his name not be used for fear of reprisals from authorities.

"Hashish keeps me employed for much of the year," he said.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Iraq Street Satirists Peddle Culture Change (Faraj, AFP)
Friday, July 27, 2018
AFP
By Salam Faraj

Kut (Iraq) (AFP) – On a strip of pavement in the southern Iraqi city of Kut, a gaggle of amateur comedians pulls in the crowds every Friday – drawing chuckles, smiles and knowing nods.

With a rich repertoire of skits, Khaled al-Atbi and his peers poke fun at politicians more interested in lining their pockets than rebuilding a country devastated by decades of war.

"Theatre is a message," said the 42-year-old al-Atbi, director and actor in the seven-strong troupe.

"With our satire, we condemn... corruption, lack of public services and tribal activities," he said, citing those factors as central to discontent in Iraq.

Since the US-led ouster of dictator Saddam Hussein in 2003, Iraq has been plagued by graft and sectarian fighting, culminating in the Islamic State group seizing around a third of its territory in 2014.

As Iraq seeks to move beyond the brutal war that last year finally defeated the jihadists, al-Atbi is determined to embarrass officials who pocket bribes and hand out plum civil service jobs to relatives.

The father-of-two hopes his little troupe can help trigger a culture change, even as he juggles his satirical ventures with a full-time job as a policeman.

– Rubbish piles vanish –

In one sketch, al-Atbi plays a diligent official obliged to work with incompetent but politically connected colleagues.

The scene did not require much in terms of props – just a table and a few chairs, which were quickly encircled by rapt onlookers.

"Our audience is very receptive because they know what we are enacting exists in reality," said al-Atbi.

Less than two years after they began working the streets, the group's efforts have already brought about change, according to Kut residents.

"We can challenge leaders and solve social problems," said 48-year-old teacher Abu Ali, who never misses a Friday skit.

Where rubbish was once piled high, roads are now clean and refuse is collected regularly, Abu Ali added – thanks at least in part to pressure created by street plays.

But not everyone is a fan.

The group has attracted online trolls, and while street audiences are generally very supportive, hecklers make their presence felt.

"'You exaggerate!' 'Stop insulting the parties and leaders!'" are common refrains, al-Atbi shrugged.

– 'Breath of air' –

But the performers are not discouraged.

WASHAR0003329

Once a week, they set up on "Tigris Culture Street", among stalls of second-hand books lining the banks of the river running through the agricultural region.

The plays are the only "breath of air... for people of culture" in the area, said hairdresser Karim al-Bahadli.

"They express the feelings that are inside," said al-Bahadli – a must, he believes, for a turbulent country that is ranked by Transparency International as the world's 12th most corrupt.

Southern Iraq was the epicentre of protests in July against corruption and poor public services.

Iraq's state human rights commission said Monday at least 14 people were killed in the demonstrations, which spread from Basra to Baghdad, before waning under pressure from the security services.

For fans of al-Atbi and his troupe, laughter is something of a social safety valve.

They scored their "greatest success" with a series of skits in the lead-up to May 12 elections, said troupe member Jalal al-Chati, who works as a reporter.

No shade of political sentiment escapes the group's ridicule.

In one scene, the actors play two politicians – one a devout man offering voters access to the afterlife, the other promising to fend off government efforts to shut down shops selling alcohol.

To avoid sailing too close to the political wind, they use no names. But appreciative murmurs and giggles among the audience indicate they know exactly who is being mimicked.

Back To Top

# EUROPE & EURASIA

## Russia Promises To Investigate Prison Beating Seen On Video (Titova, AP)
Thursday, July 26, 2018
Associated Press
By Tanya Titova

MOSCOW (AP) — The 2017 beating of a Russian prisoner, seen in a shocking video released last week, is being investigated in detail, the head of Russia's delegation told the U.N. Committee Against Torture on Thursday.

Mikhail Galperin told a committee session in Geneva that Russia's firm response to the incident, which has sparked wide public concern, could discourage future abuses.

A video released last week by the Novaya Gazeta newspaper shows Evgeny Markov, an inmate at a prison in the Yaroslavl region, being beaten by men in guards' uniforms while lying handcuffed on a table. The shaky video is believed to have been taken by a guard's body camera.

Six guards have been ordered held in detention for two months while the 2017 beating is investigated and the prison's deputy chief is also being held.

Yet the lawyer who obtained the video has fled Russia because of concerns about her security.

"I don't plan to come back to Russia yet, because I want to see how this case will go," Irina Biryukova told The Associated Press on Wednesday.

The video showed more than 10 guards involved in the beating and Bitukova expressed concern that not all suspects had been arrested.

After the video was released, "I started receiving threats as personal messages," she said from an undisclosed location.

She said she was appalled by the video.

"When I opened the file for the first time, I could only watch the first 10 seconds without sound and didn't manage to watch anymore," said Biryukova, who works the Public Verdict Foundation human rights group. "Then we all watched it together and decided that it definitely needed to be published without sending it to the investigative authorities first, because that wouldn't yield any results."

Galperin, the Russian envoy to the UN torture committee, expressed "confidence that the investigation of this incident, bringing it to court and the severe punishment of those found guilty, without any consideration for rank and position, should become and I am sure will become, a clear signal about the inadmissibility of torture, the inadmissibility of violations of Russian law."

But activist Anastasia Garina of the Committee Against Torture said she doubted the case would bring about significant change in Russia.

"While attention is focused on this problem, something will happen ... and then everything will settle back down again," she said. "We won't just wake up one day in a different country just because this video was leaked."

___

Jim Heintz in Moscow contributed to this story.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

WASHAR0003330

## Claire McCaskill, A Vulnerable Democrat Running For Reelection, Targeted In Hacking Attempt By Russian Spies (Nakashima, WP)

Friday, July 27, 2018
<u>Washington Post</u>
By Ellen Nakashima

U.S. Sen. Claire McCaskill of Missouri, one of the most vulnerable Democrats running for reelection this year, was targeted by Russian government hackers who sought but failed to compromise her Senate computer network.

"Russia continues to engage in cyber warfare against our democracy," McCaskill said in a press release Thursday evening. "While this attack was not successful, it is outrageous that they think they can get away with this. I will not be intimidated. I've said it before and I will say it again, [Russian President Vladimir] Putin is a thug and a bully."

The hackers, who belong to Russia's military spy agency GRU, targeted two other candidates running in the midterms, according to a Microsoft executive, Tom Burt, who spoke at the Aspen Security Forum in Colorado last week. He did not identify the candidates. None were compromised, he said.

McCaskill issued the statement after the Daily Beast reported on the attempt. McCaskill, who is the ranking Democrat on the Homeland Security and Governmental Affairs Committee and also sits on the Armed Services Committee, has been critical of President Trump's statements that appear to discount the intelligence community's assessment that Russia used information warfare in an attempt to influence the 2016 election.

Just two weeks ago, the Justice Department announced the indictments of 12 GRU officers charged with hacking Democratic Party email networks and releasing stolen material in an effort to affect the election.

Top U.S. intelligence officials, including Director of National Intelligence Daniel Coats, have warned that they expected the Russians to try again this year.

"Russia has been the most aggressive foreign actor — no question," Coats said in recent remarks at the Hudson Institute. "And they continue their efforts to undermine our democracy."

At Aspen, Burt said the three candidates were targeted using spear-phishing, a common hacker technique to get targets to open emails that appear legitimate but in fact lure victims to click on malware-infested links or send them to websites that contain malware — in an effort to obtain users' log-in credentials and passwords. He said Microsoft discovered "a fake Microsoft domain" or website that the hackers had created to which spear-phish victims were directed.

"We took down that domain, and working with the government, actually were able to avoid anybody being infected by that particular attack," he said.

McCaskill is expected to face Josh Hawley, Missouri's attorney general and the leading GOP contender for the Senate seat, in November.

<div align="right">Back To Top</div>

## Russia Promises To End Prison Torture. U.N. Experts Are Unconvinced. (Cumming-Bruce, NYT)

Friday, July 27, 2018
<u>New York Times</u>
By Nick Cumming-Bruce

GENEVA — Russian officials on Thursday pledged to prosecute anyone implicated in a prisoner-abuse scandal, but they failed to convince United Nations human rights experts that their promises signaled a change in official attitudes on torture.

Russia's deputy justice minister, Mikhail Galperin, told the United Nations Committee Against Torture on Thursday that Russian authorities had arrested five prison guards who are suspected of torturing a prisoner in a penal colony northeast of Moscow in June 2017, and dismissed 17 officials.

The abuse was captured in a chilling 10-minute video filmed on a body camera and released online last week by Novaya Gazeta, an independent newspaper, showed uniformed guards holding down a naked, handcuffed prisoner, later identified as Yevgeny Makarov, while they ferociously beat his feet with truncheons and fists as he howled for them to stop.

Mr. Makarov's lawyer, Irina Biryukova, who released the video to the newspaper, subsequently fled the country with her family, saying she had received death threats.

As public outrage mounted in Russia over the events in the video, the powerful Investigative Committee and the federal penitentiary service announced this week that they had begun inquiries. And as Mr. Galperin addressed the committee on Thursday, Russian authorities announced the arrest of a sixth prison guard.

Mr. Galperin denied having any knowledge of what prompted Ms. Biryukova to leave the country, but he promised her full protection, including a personal security detail and help in changing her appearance, if she wanted it.

"The severe punishment of those responsible regardless of rank and position" will send a clear official signal that torture was unacceptable, Mr. Galperin said. He said the case also

WASHAR0003331

demonstrated the effectiveness of government efforts to install video cameras in prisons and interrogation rooms.

"Well, actually it doesn't," Jens Modvig, the committee's chairman, retorted.

It was a friend of one of the guards, not the authorities, who had handed over the video to the inmate's lawyer, Mr. Modvig pointed out, and faced with evidence of abuse, the authorities were supposed to act immediately. "That didn't happen so I disagree that it shows any kind of effectiveness," he added.

Mr. Makarov's case was not the only source of the committee's dissatisfaction with the performance of Mr. Galperin's delegation over a two-day hearing at the United Nations human rights office in Geneva.

"Torture is practiced widely" in Russia, Mr. Modvig said Wednesday in the opening session of the committee hearing, "but there is no rule ensuring that punishment for torture corresponds to the seriousness of the crime."

He pressed for details of the legal action taken by the Russian authorities against officials implicated in cases involving the use of torture, but Mr. Galperin's delegation provided no answers on Thursday.

"The conclusion here is that the Russian Federation is unable to explain how it prosecutes torture," Mr. Modvig said. "This is simply not good enough."

The committee also wanted details about what happened to Valery Pshenichny, a 56-year-old entrepreneur who was found hanging in his cell in a St. Petersburg prison in January. Mr. Pshenichny had accused a former business partner of stealing company money, but he then was charged with fraud related to a submarine contract.

The committee drew attention to an official medical report that found that Mr. Pshenichny had a broken spine and knife wounds and that he had been subjected to electric shocks and raped.

That case and others had given rise to speculation, "including in this committee," that Russian authorities were seeking to hide the harsh conditions in prisons, Mr. Modvig said.

The Russian delegation's responses did little to clarify the situation. "Causing a person to commit suicide is a crime in Russia," said a delegation member, Dmitri Dudukalov, a senior official in the Office of the Prosecutor General. But preliminary medical and criminal investigations had determined that there was no evidence of physical or sexual violence by third parties, he said.

It was possible that Mr. Pshenichny's neck had been broken by the weight of his body, Mr. Dudukalov suggested, but he added that the case was still under investigation.

The committee had even less success with its questions about the 2009 death of Sergei L. Magnitsky, the 39-year-old lawyer who exposed fraud by tax officials but died in pretrial custody in a Moscow prison after he was beaten and denied medical treatment.

His death still casts a shadow over America's relations with Russia. A campaign by Mr. Magnitsky's former boss, William F. Browder, an investor, led Congress to pass the 2012 Magnitsky Act, which established economic sanctions that have infuriated the Kremlin.

Russia's handling of Mr. Magnitsky's death was "exemplary of nonaction," Felice Gaer, an American member of the committee said, and she asked how the committee could have confidence that the Russian authorities would prosecute others accused of torture.

Mr. Galperin's delegation, however, would not be moved beyond the written replies it had submitted to the committee before the Geneva meeting.

A criminal investigation had looked into the possibility of "unlawful acts" committed against Mr. Magnitsky, including torture, Mr. Dudukalov from the Prosecutor General's office, said. "No evidence was found to support that hypothesis."

Correction: July 26, 2018

In an earlier version of this article, the surnames of a Russian inmate and his lawyer were misspelled in some instances. It is Yevgeny Makarov, not Marakov; and it is Irina Biryukova, not Biruyokova.

Back To Top

## Russia Calls Woman Held In US As Agent 'Political Prisoner' (AP)
Thursday, July 26, 2018
Associated Press

MOSCOW (AP) — Russia's Foreign Ministry says a woman who was detained in the United States on charges of being a Russian agent is a political prisoner and must be released promptly.

The Russian government previously objected to Maria Butina's arrest this month, but its characterization of her as a political prisoner on Thursday raises the level of complaint.

The 29-year-old Butina has been accused of working to infiltrate the National Rifle Association and other U.S. political organizations before and after President Donald Trump's election.

Foreign Ministry spokesman Artem Kozhin said at a briefing: "Her arrest is motivated solely by the motives of the U.S.

WASHAR0003332

domestic and foreign policy, and therefore she is a political prisoner."

The U.S. government has often criticized Russia for allegedly holding political prisoners.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Putin Says Russia Seeks More Cooperation With BRICS Nations (Tanas, BLOOM)
Thursday, July 26, 2018
Bloomberg News
By Olga Tanas

Russia is pushing for better business ties between counterparts in the informal BRICS club of nations, President Vladimir Putin said.

"Strengthening trade and investment ties with BRICS partners is one of the priorities," Putin said at the annual summit of the five-nation group in Johannesburg Thursday. The country's trade turnover with Russia, India, China and South Africa exceeded $102 billion last year and "we intend to do everything possible for further trade growth within BRICS," he said.

Putin's comments come against the backdrop of the trade war between the U.S. and China after President Donald Trump imposed billions of dollars of tariffs on goods from the Asian nation to retaliate for what he says are unfair practices that have resulted in a huge trade imbalance.

Chinese President Xi Jinping earlier called on the BRICS nations to reject protectionism and said there are no winners in a trade war. The combined gross domestic product of the five countries is more than 90 percent the size of U.S. output.

Russia supports the creation of regional branches for the BRICS New Development Bank, Putin said.

Back To Top

## Rockefeller Heir Was Contact Of Alleged Russian Agent (Viswanatha, Bykowicz, WSJ)
George O'Neill Jr., conservative columnist, is 'U.S. Person 2' in Maria Butina case
Thursday, July 26, 2018
Wall Street Journal
By Aruna Viswanatha And Julie Bykowicz

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## Butina Sought A Secret Kremlin Line To The U.S. A Rockefeller May Have Helped (Mosendz, Farrell, Arkhipov, BLOOM)
Thursday, July 26, 2018
Bloomberg News
By Polly Mosendz , Greg Farrell , And Ilya Arkhipov

A scion of the Rockefeller clan, George D. O'Neill Jr., was one of the U.S. conservatives who allegedly helped Mariia Butina's efforts to build a secret line of communication back to the Kremlin, judging by details in recent U.S. filings.

O'Neill, a 68-year-old sculptor and a rainmaker for conservatives since Pat Buchanan's 1992 presidential run, hosted a private dinner in Washington, D.C., for a delegation of Russian dignitaries in town for a National Prayer Breakfast in early February 2017, he has said publicly and to Bloomberg last year. There, just days after President Donald Trump's inauguration, the Russians met two Republican lawmakers and other conservative luminaries, he has said.

The dinner is referenced as well in a trip itinerary, given to Russian delegates traveling to Washington for the breakfast, which was reviewed by Bloomberg. Delegates also received a Russian-language rundown of the Americans they could expect to meet at the dinner. Amongst those listed in the document reviewed by Bloomberg were O'Neill and his wife; a Russian-speaking congressional aide; and a conservative operative they were told was an adviser to the new Trump administration.

The timing and details of that early 2017 gathering matches one of several dinners that U.S. prosecutors refer to in charges they recently unveiled against Butina, accusing her of failing to declare her efforts to advance Russia's interests in the U.S. Prosecutors identify the host only as U.S. Person 2. O'Neill didn't respond to requests to verify that he was that person. The Justice Department declined to comment.

In comments last year, O'Neill told Bloomberg that his pre-prayer breakfast gathering was meant to support constructive dialogue and combat Russophobia.

But at least some of the Russians who came to the dinner had a more corrosive agenda, U.S. national security prosecutors now say, and wittingly or not, O'Neill may have helped Butina pursue her goal of establishing a "back channel" between the Kremlin and top Republicans. Though not referenced in the Butina filings, there have been other discussions about setting up such back channels – involving, according to news reports, Michael Flynn and Jared Kushner in late 2016 and Trump supporter Erik Prince in early 2017. Kushner later disclosed the discussion, and Prince has denied wrongdoing.'VERY Influential'

WASHAR0003333

Alleging that Butina failed to disclose her efforts, the prosecutors have laid out a multiyear timeline culminating with the National Prayer Breakfast, the private dinner – and emails from Butina suggesting she'd realized some degree of success.

Before the prayer breakfast visit, Butina wrote in an email that the delegation of about a dozen Russians would include "VERY influential" people close to the Kremlin coming to establish a back channel of communications. They included a Russian close to President Vladimir Putin, who has been identified as Alexander Torshin. Afterward, according to another email cited by prosecutors, Butina wrote the person believed to be O'Neill to thank him for the "wonderful dinner." She added: "My dearest President has received 'the message' about your group initiatives and your constructive and kind attention to the Russians."

The specifics of those initiatives remain unclear. In federal court in Washington this week, prosecutors said additional details of the U.S. case against Butina shouldn't be made public in order to protect their continuing investigation. Butina's lawyer has dismissed prosecutors' claims, saying she's no Russian agent, just someone who was making friends.

In a letter to Bloomberg last year following initial reports about his event, O'Neill said he had hosted "a wonderful dinner" in February 2017 that was part of a series of gatherings "for American intellectuals in preparation for the time when Russians would feel more comfortable to participate in a dialog here."

"Any clear thinking person with a cursory understanding of history and foreign policy knows the obvious benefits of good relations between America and Russia on many levels," he wrote at the time. "One does not have to be a 'useful idiot' or a 'Putin stooge' to hold this view, nor does one have to approve of all of Russia's or Putin's actions, which can sometimes be problematic."Guest List

Additional details of the Russian delegation's visit to Washington at that time emerge in the previously unreported documents reviewed by Bloomberg. While in Washington, the Russian delegates were scheduled to attend the private Russia-U.S. dinner on Jan. 31 and the prayer breakfast, as well as a dinner with organizers of the prayer breakfast, according to an itinerary for the five-day trip that has Butina's name and telephone number at the bottom.

Russian invitees to the Jan. 31 dinner were also provided a list of a dozen Americans they could expect to meet there, complete with Russian-language biographical bullet points and color photos of most attendees. It's unclear who compiled the guest list.

O'Neill and his wife are listed first, followed by Representative Dana Rohrabacher of California, who, the presentation noted, supports Russia's annexation of Crimea. It closes with Paul Erickson, who is believed to be the U.S. Person 1 who appears throughout the Butina documents. Erickson is identified, in the Russian-language presentation, as a Trump administration adviser. It's unclear whether he had such a role. The White House didn't immediately comment.

Others on the list include Representative Thomas Massie, a Kentucky Republican ("in favor of Russian-American dialogue," the list noted), and Hollywood director Ronald Maxwell ("under consideration to lead the Culture Ministry under Donald Trump," "Dreams of making a film about Stalin-era repression").

Rohrabacher and O'Neill are part of a circle of friends from the Reagan White House, who also included Buchanan and the late ambassador Faith Whittlesey, the mother of O'Neill's ex-wife, according to Ken Grubbs, a Rohrabacher spokesman. Rohrabacher and O'Neill met just once regarding Russia, as far as the lawmaker could recall, and law enforcement officers haven't questioned Rohrabacher about the Butina matter, Grubbs said.

Massie and Maxwell didn't respond to requests for comment. Maxwell previously said Americans at the dinner urged their Russian guests to let the Kremlin know that Putin can help Trump by "being patient." Once Trump locked up some major domestic victories, Maxwell said in the interview, he'd be in a better position to do what he wants internationally. Erickson didn't respond to requests for comment.'Swimming Elephant Herd'

The Russian delegation's leader, according to the documents, was Torshin. While not identified by name in the U.S. filings, Torshin is widely reported to be the official who maintained close contact with Butina after she founded a gun rights group in 2013. Torshin, a central banker and former top Russian lawmaker who's now under U.S. sanctions, has previously been reported as having accompanied Butina to the early 2017 dinner and several other events with U.S. conservatives and gun-rights groups. He hasn't responded to requests for comment.

Butina focused on making inroads with the National Rifle Association and other conservative groups, prosecutors have said. Many of her introductions came through the person believed to be Erickson, who served on the board of the American Conservative Union.

While O'Neill doesn't have much of a reputation among gun-rights activists, he is an establishment conservative with a long and sometimes colorful history. The great-grandson of John D. Rockefeller Jr., he has sat on the boards of several

WASHAR0003334

non-profit groups and manufacturers. He's a sculptor with works including "Swimming Elephant Herd," which he gave to Britain's Prince Charles. His acrimonious divorce two decades ago was the subject of a feature in Vanity Fair.

Over the years he's bucked the Rockefeller family foundation's support of liberal causes. An early booster of Buchanan, he's donated to Massie and Rohrabacher. In October 2016, O'Neill gave $2,700 to Trump, according to public filings. O'Neill has long pressed for constructive dialogue with Russians, amid increasing tensions between the Obama White House and Putin, he said in March 2017 comments to Bloomberg. He has written multiple articles on the topic for the American Conservative, which is published by the American Ideas Institute, where he sits on the board of directors.'Friendship and Dialogue'

According to court filings, the person believed to be O'Neill began an effort to connect Butina to prominent conservatives in March 2016, as it became clear that Trump would become the Republican Party's presidential nominee.

At that time, according to court filings, Butina emailed the two Americans believed to be Erickson and O'Neill that she wanted to arrange a series of "friendship and dialogue" dinners in Washington and New York in late May 2016.

As Erickson came up with the guest lists, O'Neill secured the RSVPs. In one email, Butina praised the host: The person believed to be Torshin was "very much impressed by you and expresses his great appreciation for what you are doing to restore relations between the two countries. He also wants you to know that Russians will support the efforts from our side," she wrote.

Butina emailed him again a few days later, saying Torshin confirmed "his desire in our Russian-American project" and that a member of Putin's administration had expressed approval for "building this communication channel."

In September 2016, with the election less than two months away, Butina again emailed the two Americans to urge another "friendship and dialogue" dinner in Washington in early October. The dinner took place on October 4, after which Butina reported to Torshin that "American society is broken in relation to Russia."

On the same day as that dinner, with U.S. elections about a month away, the person believed to be Erickson emailed an acquaintance, according to prosecutors. He wrote that he had been involved "in securing a VERY private line of communication between the Kremlin and key [Republican] leaders" through what the court filing describes is a gun-rights organization widely believed to be the National Rifle Association. The NRA hasn't commented on the investigation.'Yes' From Putin's Side?

Back To Top

## Macron Dismisses Bodyguard Scandal As 'Storm In A Teacup' (Lee, AFP)
**Thursday, July 26, 2018**
AFP
By Katy Lee

Paris (AFP) – French President Emmanuel Macron on Thursday dismissed the scandal surrounding a top security aide who roughed up protesters as a "storm in a teacup", as furious criticism from his opponents showed no sign of abating.

The former bodyguard in question, Alexandre Benalla, denounced what he said was a "desire to get at the president" using the scandal, the most damaging since Macron took office over a year ago.

Benalla, who was filmed manhandling May Day demonstrators in Paris while wearing a police helmet and armband, admitted however that he had "made a mistake".

"I feel like I have done something really stupid," the 26-year-old told Le Monde newspaper.

Benalla was charged with assault and impersonating a police officer after videos emerged last week showing him hitting a protester and wrestling another to the ground during the May 1 demonstration.

Benalla, who has said he merely wanted to help police bring violent protesters under control, insisted he did not commit a crime.

"Had I not been employed by the presidency, I would do the same thing again," he told Le Monde, adding the police helmet he was filmed wearing was given to him for his security while attending the protest as an observer.

And late Thursday the Paris prosecutor announced the opening of a preliminary inquiry into violence against the police at the May Day demonstrations.

Revelations that top officials in Macron's office knew about the Benalla incident but did not report him to prosecutors have prompted accusations of an attempted cover-up, which the government denies.

Benalla was suspended for two weeks – supposedly without pay, although it emerged Wednesday that he continued to draw his salary – and stripped of some of his responsibilities. He was finally fired last week.

Macron on Thursday sought to downplay the affair.

"I've said what I had to say, which is that I think it's a storm in a teacup," he told AFP on a visit to the village of Campan in southwest France.

WASHAR0003335

Speaking in Madrid later Thursday, Macron again portrayed the matter as finished.

"Something very serious happened which gave rise to an immediate and proportionate response... (but) the press got carried away with it," he said after a meeting with Spanish Prime Minister Pedro Sanchez.

"I consider that the employees of the Elysee (presidential office) have done their job as they should," he added.

– 'Monarchical leanings' –

Christian Jacob of the rightwing Republicans, who like many opponents has charged Macron with displaying arrogance in his response, accused the president of "monarchical leanings".

"We're facing a very serious incident – the president must explain himself before the people, he cannot do it with the disdain and provocation with which he has done so thus far," Jacob told Franceinfo radio.

Later Thursday Jacob tabled a confidence motion against the government which will be debated in the French parliament on Tuesday – a largely symbolic move, however, since Macron's centrists hold a strong majority.

Opposition lawmakers have repeatedly called on Macron to address the nation over the affair.

After days of silence, he gave a defiant speech to members of his LREM party on Tuesday which appeared to take aim at parliament's relentless grilling of his aides over the scandal.

"The only person responsible for this affair is me," he said, while describing Benalla's actions as "a disappointment and a betrayal".

"If they're looking for someone to hold responsible, he's right in front of you. They can come and get me."

On Wednesday, he accused his opponents of "disproportionate actions", adding he remained proud to have hired former bouncer Benalla as he was a "devoted" employee who had "taken an unusual path" professionally.

– Snaps at media –

But questions from journalists about the scandal dubbed "Benallagate" persist and Macron on his visit earlier Thursday to the Haute Pyrenees region, chastised the media.

"You are very worked up about these subjects. I've been with the people for two hours. You are the only ones talking about it," Macron said.

In parliament two committees have been interrogating top Macron aides, with the president's chief of staff Alexis Kohler the latest to take the stand before the Senate on Thursday.

Kohler acknowledged that officials' initial decision to punish Benalla with a two-week suspension may "appear insufficient" but at the time it seemed "proportionate".

Macron's office director Patrick Strzoda told lawmakers Tuesday that he decided there were not enough elements to justify turning Benalla over to prosecutors, not least because no criminal complaint had been filed against him.

Macron's approval ratings, already low, appear to have taken a further hit from the scandal, with a record 60 percent reporting an unfavourable opinion of him in an Ipsos poll published Tuesday.

Along with Benalla, Vincent Crase, an LREM security agent who was also at the scene, has also been charged over the affair, as have three police officers accused of giving Benalla surveillance footage so he could mount a defence.

Back To Top

## US To Hit NATO-ally Turkey Over Detained Pastor, Trump Says (George, Superville, AP)
**Friday, July 27, 2018**
Associated Press
**By Susannah George And Darlene Superville**

WASHINGTON (AP) — President Donald Trump declared on Thursday the United States will impose sanctions on Turkey, a crucial NATO ally, in retaliation for the detention of an American pastor on terror and espionage charges.

Turkey's response was both harsh and dismissive, calling his words "unacceptable" and a "cheap threat."

Trump's promise of unspecified punishing action marks the latest deterioration in relations between Turkey and the U.S. as President Recep Tayyip Erdogan's powers expand two years after a failed coup against his government.

Trump also has praised his counterpart, saying Erdogan's leadership is "getting very high marks."

The U.S has long depended on a key air base in Turkey's south, most recently to launch airstrikes against the Islamic State group.

Pastor Andrew Craig Brunson was first detained by Turkish authorities in the aftermath of the failed 2016 coup. On Wednesday, he was let out of jail after 1 1/2 years, transferred to house arrest because of "health problems," according to Turkey's official Anadolu news agency.

Trump said that was insufficient.

"He is suffering greatly. This innocent man of faith should be released immediately!" Trump wrote on Twitter.

WASHAR0003336

Vice President Mike Pence is threatening NATO-ally Turkey with sanctions over a detained American pastor held on terror and espionage charges. (July 26)

The announcement of sanctions — though no details of how or when — came as the State Department was holding a three-day event promoting religious freedom. Brunson's case has become a cause for conservative Christians who form an important part of Trump's political base.

Turkey responded that Brunson's detention falls within the jurisdiction of its independent judiciary. "Rule of law is for everyone; no exception," said Foreign Minister Mevlut Cavusoglu, also via Twitter.

And an Erdogan spokesman warned the U.S. to "reconsider its approach and adopt a constructive position before inflicting further damage to its own interests and its alliance with Turkey."

Vice President Mike Pence announced the threat of action at the religious freedom conference, then Trump tweeted that his government "will impose large sanctions on Turkey for their long time detainment of Pastor Andrew Brunson."

Trump could impose certain sanctions unilaterally or try to act through Congress. Senators have previously taken steps toward blocking the sale of F-35 jets to Turkey, citing Brunson's detention as an instance of Erdogan's disregard for the rule of law.

White House spokesman Hogan Gidley declined Thursday to discuss the timing of a sanctions announcement or the decision-making process.

"The president was clear on Twitter today, as was the vice president, that they fully expect, the president expects and wants Pastor Brunson to be returned immediately to the United States and, if not, they can expect sanctions," Gidley said.

Brunson, 50, an evangelical Christian pastor originally from North Carolina, could face up to 35 years in prison if convicted of espionage and "committing crimes on behalf of terror groups without being a member," references to outlawed Kurdish militants and the network of a U.S-based Muslim cleric blamed for the failed coup attempt.

Brunson denies the charges.

"Brunson is an innocent man, there is no credible evidence against him," Pence said in his remarks Thursday.

Trump said on Twitter last week that the pastor's detention was "a total disgrace." One of Brunson's attorneys is Jay Sekulow, who also represents Trump in the federal Trump-Russia investigation.

Ties between NATO ally Turkey and the United States have been strained by other issues.

Turkey recently finalized a deal to purchase Russia's long-range S-400 missile defense system, refusing to back down despite strong opposition from the U.S. and other NATO members.

The U.S. and Turkey have also clashed over American backing of Kurdish fighters in Syria who Ankara considers "terrorists."

At the conference, Pence highlighted cases of what he said were religious repression in Nicaragua, Iran, North Korea, China and Myanmar. He also condemned Islamic State group violence toward religious minorities and what he described as rising anti-Semitism in Europe.

Secretary of State Mike Pompeo also spoke. He announced additional aid for a region of Iraq previously held by the Islamic State group. Pompeo said the U.S. would provide $17 million for de-mining efforts in Nineveh, an area of Iraq historically home to many of the country's religious minorities.

Erdogan has previously linked Brunson's return to the U.S. to the extradition of cleric Fethullah Gulen, the man Turkey's government holds responsible for the failed 2016 coup.

Gulen, who denies orchestrating the coup attempt, lives in Pennsylvania. Turkish requests for his arrest and extradition have not been granted.

More than 77,000 people have been arrested across Turkey since the government declared a state of emergency in the failed coup's aftermath. The crackdown has targeted journalists, activists and opposition figures.

Brunson has lived in Turkey for 23 years and served as pastor of Izmir Resurrection Church, a small Protestant congregation.

During a recent hearing, Brunson he rejected charges against him.

"I believe in and support Turkey's territorial integrity," he told the court. "I forgive those who lie and bear false witness against me."

Brunson's case has been adjourned until Oct. 12.

———

Associated Press writer Cinar Kiper in Istanbul contributed to this report.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

<u>Back To Top</u>

WASHAR0003337

# Trump Threatens Sanctions Against Turkey Over Detained Pastor (Davis, NYT)

**Thursday, July 26, 2018**
New York Times
By Julie Hirschfeld Davis

WASHINGTON — President Trump abruptly announced on Thursday that the United States would impose "large sanctions" on Turkey for detaining an American pastor accused of aiding a failed coup attempt there in 2016, escalating a bitter dispute among the two NATO allies.

Mr. Trump's declaration on Twitter appeared to be more of a muscular threat than an official statement of policy; the administration made no announcement of specific punitive measures against the Turkish government, and the White House declined to provide any details about the steps it was ready to take.

It came one day after Andrew Brunson, 50, an evangelical pastor who has been imprisoned in Turkey for 21 months, was moved from jail to house arrest because of health concerns.

Mr. Brunson is one of 20 Americans charged after the failed coup against President Recep Tayyip Erdogan of Turkey. His case has elevated tensions between the United States and Turkey even as Mr. Trump has sought warmer relations with Mr. Erdogan.

On Thursday, Mr. Trump ratcheted up the pressure for Mr. Brunson's immediate release, telling Mr. Erdogan in a private phone call that the pastor's continued imprisonment was unacceptable, according to a White House official who described the conversation on the condition of anonymity because he was not authorized to discuss it publicly.

And the president vowed on Twitter to impose substantial sanctions on Turkey for Mr. Brunson's detention.

It would be an extraordinary step to impose sanctions on a NATO ally, and the Turkish government responded defiantly.

"Noone dictates Turkey," Mevlut Cavusoglu, Turkey's foreign minister, wrote in a tweet. "We will never tolerate threats from anybody. Rule of law is for everyone; no exception."

The widening conflict highlighted how the Trump administration has been torn over Turkey.

Mr. Trump and Mike Pompeo, his secretary of state, have sought a closer rapport with Mr. Erdogan. But the Pentagon wants to preserve a close alliance with a Kurdish militia in northern Syria — one that the Turkish government regards as a terrorist group — to continue fighting the Islamic State.

Last month, a State Department official told Congress that plans by the Turkish government to acquire a Russian missile

defense system would damage United States-Turkish relations beyond repair. The Senate temporarily blocked the sale of American weapons to Turkey, including F-35 fighter jets, because of Mr. Brunson's imprisonment and Turkey's purchase of the Russian air defense system.

On Thursday, Mr. Erdogan met with President Vladimir V. Putin of Russia on the sidelines of a summit meeting in South Africa of the so-called BRICS countries of major emerging nations.

"Every kind of solidarity between Russia and us really makes some jealous," Mr. Erdogan said during a joint appearance with Mr. Putin before they met privately. He did not elaborate.

Mr. Brunson's case, and the efforts to free him, has become a flash point in the relationship between the United States and Turkey.

Vice President Mike Pence met with members of Mr. Brunson's family on Thursday at the State Department, where he demanded the pastor's swift release, "or be prepared to face the consequences."

"If Turkey does not take immediate action to free this innocent man of faith and send him home to America, the United States will impose significant sanctions on Turkey until Pastor Andrew Brunson is free," Mr. Pence said during a ministerial meeting on religious freedom.

Mr. Brunson, who has done missionary work in Turkey for the past 23 years, is on trial on charges of terrorism and espionage, and faces up to 35 years in prison if found guilty of having links to two designated terrorist organizations.

One is a movement led by the American-based cleric Fethullah Gulen, whom Turkey accuses of instigating the 2016 failed coup, and the other is the insurgent Kurdistan Workers' Party.

Mr. Erdogan has repeatedly requested the extradition of Mr. Gulen from the United States. The Turkish president has suggested that he would hand over Mr. Brunson if American officials agree to return Mr. Gulen to Turkey from the guarded estate in Pennsylvania where he currently lives.

On Thursday, Mr. Erdogan's spokesman criticized the United States for failing to target Mr. Gulen's organization, which Turkish officials refer to by the acronym FETO, for Fethullah Terror Group.

"The United States must reconsider its approach and adopt a constructive position before inflicting further damage to its own interests and its alliance with Turkey," the spokesman, Ibrahim Kalin, said in a statement.

WASHAR0003338

Congress has also worked to intensify pressure on Turkey to release Mr. Brunson and the other Americans being held by Mr. Erdogan's government.

The Senate Foreign Relations Committee approved legislation on Thursday that would direct American officials to reject international loans to Turkey until its government stops "arbitrarily" detaining United States citizens and embassy employees.

"We never wanted this bill to be necessary, but we warned the Turkish government that there would be consequences if it did not cease its unjust detention and harassment of U.S. citizens and locally employed embassy staff," Senator Bob Corker, Republican of Tennessee and the chairman of the committee, said in a statement.

Former officials said it was highly unlikely that the Trump administration would impose broad sanctions on the Turkish government or Mr. Erdogan, saying they could not recall a time when the United States had imposed such penalties on a longstanding ally that is a member of the North Atlantic Treaty Organization.

"In the scheme of Turkey, it's fairly crazy," said Richard Nephew, former principal deputy coordinator for sanctions policy at the State Department during the Obama administration. "It's not where we've had to go before."

But the administration could target individuals involved in Mr. Brunson's case through a law known as the Magnitsky Act, which authorizes sanctions on foreign government officials for human rights abuses, or takes other punitive measures such as applying visa restrictions to Turkish travelers.

The Treasury Department referred questions about the sanctions to the White House, which declined to preview any coming announcement.

Alan Rappeport contributed reporting.

Back To Top

## Trump Administration Threatens To Punish Turkey Unless It Frees Detained American Minister (Wilkinson, LAT)
**Thursday, July 26, 2018**
Los Angeles Times
By Tracy Wilkinson

At a conference Thursday affirming the U.S. commitment to global religious freedom, Vice President Mike Pence threatened economic sanctions against Turkey if its government fails to release an American minister being held there.

Pence denounced Turkey's 2-year-long imprisonment of Protestant minister Andrew Brunson and threatened to impose harsh economic sanctions on the government of President Recep Tayyip Erdogan if Brunson is not freed.

Brunson was released from Turkish prison this week but placed under house arrest. Turkey accuses him of having a role in a failed 2016 military coup that led to a government crackdown that has jailed thousands of people.

President Trump later echoed Pence on Twitter, saying Brunson was "a great Christian, family man and wonderful human being" who was "suffering greatly."

"This innocent man of faith should be released immediately!" Trump wrote.

Trump said his government would impose "large sanctions" on Turkey, but gave no time frame or other details.

Pence called the matter an example of the kind of religious intolerance that the U.S. wants to end.

"Those nations that reject religious freedom breed radicalism and resentment in their citizens," Pence said. "They sow the seeds of violence within their borders — violence that often spills over into their neighbors and across the world."

His comments came at a State Department conference on religious freedom, which has become the centerpiece of the Trump administration's focus on global human rights, sometimes to the exclusion of other areas, such as reproductive or gay and lesbian rights, critics say.

Citing what he called Trump's "unwavering commitment" to religious freedom, Secretary of State Michael R. Pompeo said the right to worship without persecution "is a fundamental American liberty" that the administration seeks to promote internationally.

"The United States advances religious freedom in our foreign policy because it is not exclusively an American right," Pompeo told the conference. "It is a God-given universal right bestowed on all mankind."

The three-day conference, held at the State Department with dozens of international delegations in attendance, wrapped up Thursday. State Department officials had repeatedly declined reporters' requests for a list of attendees until the final day. Though billed as a ministerial-level conference, many delegations were represented by ambassadors stationed in Washington.

Several sufferers of religious persecution, including a Yazidi woman who escaped capture by the militant group Islamic State, also attended and testified.

Among countries that Pompeo singled out for criticism was Myanmar, also known as Burma, where the military has committed what the State Department calls ethnic cleansing of thousands of Muslim Rohingya.

WASHAR0003339

He announced a State Department program that will bring to the United States foreigners "working on the front lines" of religious rights for workshops, training and other support.

Pence cited the repression of Tibetan Buddhists and Muslim Uighurs by China; North Korea's "unyielding, systematic and often fatal" abuse of Christians; attacks on Jews in Europe; and persecution of all faiths in Iraq and elsewhere by Islamic State.

Pence gave special attention to a newer problem: Nicaraguan President Daniel Ortega's deadly attacks on the Catholic Church in the Central American nation. More than 300 people have been killed in Ortega's crackdown on anti-government protests over the last several months.

Mick Mulvaney, director of the Office of Management and Budget, who spoke Wednesday, accused the Obama administration of using "our U.S. taxpayer dollars ... to discourage Christian values" by withholding financial assistance from countries that ban abortion or gay marriage. Human Rights Watch, among other groups, condemned Mulvaney's comments as a "false narrative" to promote the administration's conservative agenda.

Several conservative speakers suggested that laws that protect the rights of gays and lesbians impose unfair restrictions on practicing one's religion.

Those comments brought rebuke from several activists.

"You can never gain religious freedom by violating the religious and human rights of others," said the Rev. Patricia Ackerman, director of the Ethics of Reciprocity Project, which advocates on behalf of the gay community.

Other complained that by "doubling down" on religious freedom, the administration was neglecting other important human rights.

"How much room do you have to focus on other things," said Jeremy Kadden, senior international policy advocate for the Washington-based Human Rights Campaign.

Sam Brownback, the U.S. ambassador at large for international religious freedom, has said that the emphasis on ending religious persecution will impact a variety of human rights.

"This is a foundational human right," Brownback said last month when he announced plans for the conference. "You do religious freedom, and a whole series of better human rights come out of it."

Back To Top

## Trump Warns Turkey Of Sanctions Over Detention Of Pastor Andrew Brunson (Donati, WSJ)

**President made threat on Twitter a day after pastor was moved to house arrest**
**Thursday, July 26, 2018**
<u>Wall Street Journal</u>
By Jessica Donati

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## Arson Linked To Deaths In Greek Town Built Like 'Fire Trap' (Kantouris, Gatopoulos, AP)
**Thursday, July 26, 2018**
<u>Associated Press</u>
By Costas Kantouris And Derek Gatopoulos

ATHENS, Greece (AP) — Greek authorities said Thursday there were serious indications that a deadly wildfire that gutted a vacation resort near Athens was started deliberately, while experts warned that the devastated coastal town had been built like a "fire trap," with poor safety standards and few escape routes.

The death toll from Monday's blaze east of the Greek capital rose to 82 as rescuers and divers continued to search for more bodies in burnt-out homes and at sea, where hundreds fled to try to escape the inferno.

Public Order Minister Nikos Toskas said satellite image analysis of the deadly fire and a second blaze that broke out Monday on the other side of the city indicated both had been set in multiple places within a short time frame.

"We have serious indications and significant findings of criminal activity concerning arson," Toskas said. "We are troubled by many factors, and there have been physical findings that are the subject of an investigation."

He declined to provide more details.

U.S. military officials told The Associated Press Wednesday that they had been helping Greece gather images of the fire-ravaged areas with combat drones and Navy surveillance aircraft.

Fires near populated areas in Greece are often blamed on arsonists believed to be targeting forest land for development, but arrests are rare.

Most casualties were found at Mati, some 30 kilometers (18 miles) east of Athens, a small seaside resort filled with summer homes and apartments owned by retirees. A group of experts from the University of Athens' Faculty of Geology

WASHAR0003340

and Geo-environment said the layout of the resort had acted like a "fire trap" with access to the sea hampered by cliffs, and homes built in wooded areas with little provision for fire safety.

The study also noted that the resort had narrow roads, numerous dead-ends, and was poorly sign-posted, meaning visitors could not easily reach a nearby main road.

Messages of support continued to come in on social media and in letters to the Greek government. They included a letter from Britain's Queen Elizabeth and an Instagram post from Brazilian soccer legend Ronaldinho, showing him pictured in prayer with a comment in Greek that read: "I'm hurting for Greece and Athens. Courage Greek bothers, my thoughts and prayers are with you."

Authorities, meanwhile, were still struggling with the identification of charred bodies. Germany's federal criminal police said a team of its forensics specialists was in Greece to help authorities identify the dead. The team members have worked on major disasters, including the 2004 Asian tsunami and a 2002 mid-air collision of a Russian charter flight and a DHL cargo plane over southern Germany that killed 71 people.

At a morgue in Athens where identification efforts were centered, relatives were informed about the steps needed to match the bodies held there to a missing person, including providing DNA samples and dental records.

"The procedure is difficult, harder than that of other mass disasters which we have dealt with in the past as a forensics department," coroner Nikolaos Kalogrias said. "Here, the main cause of death was burning, in most cases the complete burning (of the body), so identification is very difficult."

Thanassis Moraitis went to the morgue searching for his 90-year-old mother.

He had tried to drive away with his mother, wife and 19-year-old son, but the fire was moving too fast. They had to abandon the car and started running to the beach and into the water. Moraitis suffered burns to his leg from the extreme heat; his mother didn't make it.

"In the sea, there was a rain of fire, there was smoke, there was a Force 12 wind," the 53-year-old Moraitis said, adding that boats rescued him, his wife and son after about three hours.

"I didn't even get a chance to say goodbye to my mother."

___

Associated Press writers Elena Becatoros, Thanassis Stavrakis and Menelaos Hadjicostis in Athens contributed to this report.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## 'Serious' Signs Arson Started Deadly Greek Wildfire (Duperry, AFP)

Thursday, July 26, 2018
AFP
By Odile Duperry

Athens (AFP) – Greece's government said on Thursday there were "serious" indications the fire in which most of the 82 people who perished in the country's worst ever wildfires died may have been started deliberately.

"A serious piece of information has led to us opening an investigation" into possible "criminal acts" behind the starting of the fire on Monday that ravaged the coastal region of Mati east of Athens, Deputy Citizen Protection Minister Nikos Toskas said.

He said authorities were also examining whether another fire, which broke out hours earlier on Monday near Kineta to the west of the Greek capital, was "intentionally" lit. No one died in the Kineta fire.

"There are testimonies but I cannot say anything more now," Toskas added at a news conference in Athens, which was attended by government spokesman Dimitris Tzanakopoulos and fire and police chiefs.

Toskas also stressed that "climate conditions were extreme due to climate change".

Officials citing information from satellite maps have said that 13 fires broke out at the same time across the region of Attica – which includes Athens – on Monday.

As family members helped to identified the bodies of the dead on Thursday, anger has mounted over how authorities could have let the disaster happen.

Government spokesman Tzanakopoulos sought to address the criticism, saying that "the evacuation of Mati was not possible because the phenomenon only lasted an hour and a half".

He added that the winds, which reached 120 kilometres (75 miles) an hour, were "the strongest recorded in the last eight years".

The government has also announced a raft of measures to compensate those affected by the fires.

WASHAR0003341

– Death toll rises –

An 82nd person was pronounced dead Thursday by a fire service spokeswoman, without specifying whether they were found by rescuers or died in hospital.

After waiting for rain to put out the fires, heavy downpours on Thursday afternoon caused flash floods that stranded dozens of motorists and damaged dozens of cars. But no-one was hurt in the flooding, authorities said.

The fires struck coastal villages popular with holidaymakers and burned with such ferocity that most people fled to the safety of the sea with just the clothes on their backs.

Survivors spoke of harrowing scenes including entire families burned alive in their homes.

"We were alone, there was nobody to help us. Everybody did what they thought they had to do to survive on their own," resident Evi Kavoura told AFP.

"I feel a pain in my heart, a very heavy load."

There was still no official word on the number of people missing after the catastrophe, but the death toll of 82 already makes this Europe's deadliest fire outbreak this century.

The fire service said firefighters were still searching for people reported missing by their relatives, while public ERT television said around 30 bodies had been formally identified.

A website set up by residents lists 27 people still unaccounted for, including nine-year-old twin girls.

– 'Greeks help each other' –

The swiftly moving flames on Monday evening overtook some terrified residents and tourists in their homes and others as they tried to flee in cars or on foot. AFP photographers saw the burnt bodies of people and dogs.

Some 187 people were hospitalised, with 71 still being treated as of Wednesday evening, including almost a dozen children, most of whom were in a "serious condition", the fire services said.

In addition to 10,000 euros to the immediate relatives of someone who died, the government said it would provide 5,000 euros per property affected.

It said that of the almost 2,500 homes surveyed by experts after the fire, almost half were now uninhabitable.

The widow of Greece's most renowned filmmaker Theo Angelopoulos said the late director's house and personal archives had been lost in the fire.

The disaster unleashed a wave of solidarity and many survivors were being looked after by voluntary organisations, who were providing them with accommodation, clothing and food.

Amid mountains of food and baby nappies in a gymnasium in Rafina, near Mati, one of the volunteers, Joanna Kefalidou, an English teacher on vacation, said: "We're Greeks and Greeks tend to come together in times of need and help each other as much as they can."

– 'Left to God's mercy' –

The government of Prime Minister Alexis Tsipras has announced a relief fund open to donations worth an initial 40 million ($47 million) euros to help affected areas.

But the measures did little to assuage anger over how such a disaster could happen just a few kilometres from Athens.

Defence Minister Panos Kammenos was heckled Thursday as he visited the scene of the fires.

"You left us to God's mercy, there's nothing left," shouted one resident.

But Kammenos went on the counter-attack, telling the BBC that illegal construction in the past was also to blame for the disaster.

The "majority" of houses on the coast had been built without the proper licences, he said.

"After this tragedy I think it is the moment to understand that it's dangerous for them and for their families to not follow the rules and the laws," the minister said.

The wildfires come as record temperatures in northern Europe have also seen blazes cause widespread damage in recent days.

<u>Back To Top</u>

## Volunteers Rush To Help Greece Fire Victims (AFP)
**Friday, July 27, 2018**
<u>AFP</u>

Rafina (Greece) (AFP) – Schools in the Greek port town of Rafina are unusually busy for summer – overflowing with donations and volunteers, showing the vast wellspring of local solidarity for victims of deadly fires.

"You see this girl? Her house burned down, and now she's here every day helping," said Anastasios Moustikadis, pointing to a teenager tidying bottles of water.

The 40-year-old, who organises donations at the primary school-turned-warehouse, himself lost one of his closest friends in the fires when they destroyed the neighbouring village of Mati.

WASHAR0003342

"I will go to his funeral Sunday, that's the only break I'll allow myself," said Moustikadis, as a batch of volunteers arrived to help distribute donations by car.

In the hours after Monday night's tragedy, when more than 80 people died – mostly suffocated by smoke or burned alive in the terrible blaze – a vast wave of solidarity swept the country.

"Mati looks like a war zone, it's unbelievable," said Zoi Pantelidou, 26, who has been volunteering at the town hall since Tuesday, coordinating volunteers and donations.

"I can't tell you exactly how many (volunteers) there are, the number grows every day," said Savvas Arapkilis, deputy mayor of the city.

On Thursday, dozens of people, mostly teenagers and young adults, queued patiently to register for volunteering duties.

"They are the children of the crisis, they know that we need solidarity and to work together," said Moustikadis.

– Volunteer nation –

Greece, hit by years of austerity and on the front lines of Europe's immigration crisis, has learned to rely on an organised civil society, in the face of underfunded public services stretched to breaking point.

Free dispensaries, citizen canteens and volunteer activities for refugees have flourished across the country.

The momentum after the fire has been such that Rafina's mayor Evangelos Bournous has had to appeal to citizens to stop sending food, saying they "cannot manage any more". Four municipal buildings are already overflowing with donations.

"Would you like some water," a teenager asks an elderly couple who are busy trying to clean up their charred house in Mati.

It's the third team to offer them water and food in less than a quarter of an hour.

"I take the water every time," said Sophia Tsaganou Profitou.

"It could be a month until they've restored the water," added the septuagenarian. The electricity is also cut.

Patrols by teams of volunteers has allowed them to discover critical humanitarian situations which could have escaped the authorities.

But sometimes, volunteers are patrolling an area where no residents are left. At burned houses, short notes have been scrawled outside: "We're fine" plus a mobile number at which they can be reached.

"What we're doing is just a drop in the ocean, but I couldn't continue my holiday as if nothing had happened," said 17-year-old Photini, wearing a paper mask to protect against the smell of smoke which still envelops the burned village.

Back To Top

## As Anger Grows, Greek Government Announces Fire Aid (Stamouli, WSJ)

**Death toll climbs to 83, as the number of missing remains unknown**
Thursday, July 26, 2018
Wall Street Journal
By Nektaria Stamouli

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## Taxation Strangles Greece's Growth Prospects (Stamouli, WSJ)

Thursday, July 26, 2018
Wall Street Journal
By Nektaria Stamouli

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## Thousands Protest Disputed Judicial Reforms In Poland (AFP)

Thursday, July 26, 2018
AFP

Warsaw (AFP) – Thousands of anti-government protesters hit streets across Poland on Thursday night to rally against a string of judicial reforms that the EU has dubbed a threat to judicial independence and the rule of law.

The demonstrations are the latest salvo in a bitter battle over sweeping judicial changes introduced by the right-wing Law and Justice (PiS) government.

They have led the EU to trigger unprecedented proceedings against Poland over "systemic threats" to the rule of law that could see its EU voting rights suspended.

Chanting "Shame!", "Free courts!" and "We'll defend democracy!", several thousand protesters rallied in front of the presidential palace in Warsaw just hours after PiS-allied President Andrzej Duda signed into law a controversial measure effectively allowing the government to pick the next Supreme Court chief justice.

Warsaw lawyer Bozena Rojek, 68, said she had returned to protest on the same street where she had rallied against the

WASHAR0003343

Communist Party's brutal 1981 martial law crackdown on the freedom-fighting Solidarity trade union.

"I fought for democracy so that there would be free courts, so that we live in a free country with the rule of law," she told AFP.

"Today everything's crumbling right before our eyes," Rojek added.

– Haunted by communism? –

The new law signed on Thursday by Duda is part of a string of PiS judicial reforms aimed at replacing judges all the way up to the Constitutional Tribunal and Supreme Court.

Brushing aside concerns about democratic standards, the PiS insists the reforms tackle corruption and overhaul a judicial system still haunted by Poland's communist era.

Around a third of the Supreme Court's 73 judges, including chief justice Malgorzata Gersdorf, have been forced to retire early under the PiS-authored law.

Rejecting it as breaching her constitutionally guaranteed six-year term that ends in 2020, Gersdorf has refused to go, winning widespread backing from fellow Supreme Court judges, Europe's top judicial and bar authorities and rights groups.

The law signed by Duda on Thursday is intended to speed her replacement by allowing the next chief justice to be chosen when 80 judges are appointed to the Supreme Court, down from 110, a near-full roster of its 120 justices.

The EU has also questioned the Supreme Court reforms as undermining judicial independence thus breaching Poland's obligations under EU law.

Warsaw has until early August to respond to the commission's formal announcement, the first stage of a procedure that could end up in the European Court of Justice, the bloc's top tribunal, where the law could be struck down.

Back To Top

## Poles Protest President's Approval Of Judiciary Changes (AP)
**Thursday, July 26, 2018**
<u>Associated Press</u>

WARSAW, Poland (AP) — Thousands of people in Warsaw and other cities in Poland are protesting against the latest moves by the ruling right-wing party aimed at helping it take control of the Supreme Court and other courts.

A crowd singing the national anthem and holding lights gathered late Thursday before the Presidential Palace in Warsaw to show their disapproval after President Andrzej Duda signed the latest legislation into law.

The legislation makes it easier to choose the Supreme Court's chief justice, a position that is currently at the center of a political battle. The ruling party has cut short the justice's current term, in apparent violation of the constitution.

Despite criticism at home and abroad, the ruling party's leader insists the changes will benefit the judiciary.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Algae Blooms Force Poland To Shut Down 50 Baltic Sea Beaches (AP)
**Thursday, July 26, 2018**
<u>Associated Press</u>

WARSAW, Poland (AP) — Thinking of a dip in the Baltic Sea to cool off from the unusually scorching European summer? It's too hot for that.

Authorities in Poland this week banned swimming at over 50 beaches along its Baltic coast, after hot weather led to the toxic growth of bacteria in the unusually warm sea. Baltic Sea water temperatures exceeded 23 degrees Celsius (73.4F) in some places Thursday.

Emergency water rescuers told vacationers on hot sandy beaches — from Swinoujscie in the west to Gdynia in the east — not to enter the sea, where thick green-brown cyanobacteria colonies have grown and pose a health threat.

Regional sanitation authorities have issued warnings that contact with the bacteria may cause allergies and rashes. Drinking contaminated water can also lead to serious digestive problems.

The Baltic Sea has not seen such intense growth of cyanobacteria for 12 years. It results from exceptionally high air temperatures of 34 degrees Celsius (93.2 degrees Fahrenheit) that have raised the temperatures of the usually cold Baltic.

A similar ban has been issued for some inland lakes and reservoirs, such as the Zegrze Resevoir near Warsaw.

In neighboring Germany, authorities issued a warning about the higher than usual growth of vibrio bacteria in the warm Baltic that can cause deadly illness in people with compromised immune systems. They said a 70-year-old man with a chronic illness died of vibrio infection over the weekend, and warned elderly people and those with chronic illnesses such as diabetes or HIV to avoid contact with the sea or brackish water.

WASHAR0003344

In Finland, the Loviisa nuclear power plant said in a statement it briefly reduced energy production in both its units Wednesday to prevent the Baltic Sea water that cools its infrastructure from getting too warm. It said there was no danger to people or the environment.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Armenia Charges Ex-president With Vote Rigging (AFP)
Thursday, July 26, 2018
AFP

Yerevan (AFP) – Armenia on Thursday charged former president Robert Kocharyan with rigging elections over a decade ago in favour of a political ally, in what investigators said amounted to a coup.

The ex-Soviet nation's new leader Nikol Pashinyan has launched a sweeping, anti-graft crackdown on former elites since he was brought to power in May on the back of popular protests.

The Armenian special investigation service said Kocharyan had been charged with "overthrowing Armenia's constitutional order".

Kocharyan, who is not currently in custody, could face up to 15 years behind bars if found guilty of tipping a 2008 vote in favour of his ally Serzh Sarkisian.

Supporters of the defeated opposition candidate Levon Ter-Petrosyan came out to protest after he denounced the vote as fraudulent.

Tensions erupted into violent clashes between riot police and Ter-Petrosyan's supporters, in which nine protesters and one officer were killed.

Pashinyan was arrested for organising the protests and sentenced to seven years in prison, but was released as part of an amnesty in 2011.

Sarkisian led the South Caucasus nation until April this year, when he was forced to resign because of mass protests against his rule. Pashinyan became his successor on a promise to stamp out graft.

A pro-Russian politician, Kocharyan served as Armenia's second post-Soviet president from 1998 to 2008.

His presidency saw the bloodiest event in Armenia's post-Soviet political history – the terrorist attack on the Armenian parliament in 1999.

Opposition parties have accused Kocharyan of organising the attack in which five gunmen killed his political foes, Prime Minister Vazgen Sargsyan and parliament speaker Karen Demirchyan.

Back To Top

## Ex-president Of Armenia Charged In Fatal Breakup Of Protest (AP)
Thursday, July 26, 2018
Associated Press

YEREVAN, Armenia (AP) — Former Armenian President Robert Kocharian has been charged in connection with the violent breakup of a 2008 protest in which at least eight people died.

Armenia's Special Investigative Service said Kocharian was charged on Thursday with breaching the country's constitutional order,

The demonstrators violently dispersed by soldiers and police were protesting alleged fraud in a presidential election held two weeks earlier. Term limits prevented Kocharian from running, but the candidate he supported — Serzh Sargsyan — was declared the winner despite complaints of vote-buying and ballot-stuffing.

Sargsyan held Armenia's presidency for 10 years before he transitioned to the office of prime minister this year under reforms that made the premiership more powerful. He stepped down after six days of massive protests over his appointment as prime minister.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## EU Negotiator Rejects Key Element Of UK Govt Brexit Plan (AP)
Thursday, July 26, 2018
Associated Press

BRUSSELS (AP) — The European Union's chief Brexit negotiator says the bloc never would allow a non-member to collect customs on its behalf, delivering a blow to the British government's post-Brexit plans.

Britain had proposed a system in which it would initially process EU customs duties on goods that come into the U.K. but are destined for another country.

The government presented the idea as part of its latest batch of proposals to untangle the blocked divorce negotiations between Britain and the EU.

WASHAR0003345

EU negotiator Michel Barnier met with his British counterpart, Dominic Raab, on Thursday.

Barnier say afterward: "The EU cannot and the EU will not delegate the application of its customs policy and rules...to a non-member who would not be subject to the EU's governance structures."

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## UK Pauses Cooperating With US On Trial Of 'Beatles' Jihadis (Kirka, Ahmed, AP)
Thursday, July 26, 2018
<u>Associated Press</u>
By Danica Kirka And Nishat Ahmed

LONDON (AP) — Britain's Home Office has temporarily suspended cooperating with U.S. authorities on the handover of two British jihadis allegedly linked to the Islamic State group until a judge reviews a decision that would allow the pair to be tried in the United States.

Defense lawyers wrote the government this week after leaked documents showed that British officials were willing to hand over El Shafee Elsheikh and Alexanda Kotey without assurances the men would not be subject to the death penalty if they were convicted in an American court.

"We have agreed to a short-term pause," the Home Office said in a statement Thursday. "The government remains committed to bringing these people to justice, and we are confident we have acted in full accordance of the law."

Elsheikh and Alexanda Kotey are suspected of being part of a notorious cell of British jihadis known for beheadings and barbaric treatment of hostages in Syria. The cell was nicknamed "The Beatles" because of their British accents. The British leader of the cell, Mohammed Emwazi, who was also known as "Jihadi John," was killed in a 2015 drone strike.

In 2014 and 2015, the group held more than 20 Western hostages in Syria and tortured many of them. It beheaded seven American, British and Japanese journalists and aid workers and a group of Syrian soldiers, boasting of the butchery in grisly videos.

Britain's The Daily Telegraph newspaper reported Monday that it had seen a letter from Home Secretary Sajid Javid to U.S. Attorney General Jeff Sessions about the two militants, who have been in custody in Kurdish-controlled northeastern Syria since they were captured earlier this year.

The government pause came after lawyers for Elsheikh demanded a judicial review of the decision to allow the men to be put on trial in the U.S.

Attorneys Gareth Peirce and Anne McMurdie said they wrote the government to outline why the decision was unlawful and "setting out an urgent timetable" for the case to be heard in court.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Police Shut Gypsy Camp In Rome Despite EU Ruling (Somekh, AP)
Thursday, July 26, 2018
<u>Associated Press</u>
By Simone Somekh

ROME (AP) — Police in Rome on Thursday cleared nearly 400 people, including dozens of children, from a shanty camp inhabited for years by members of the minority Roma community, despite a European Union court ruling halting demolition.

Residents stood outside the camp with mattresses and other belongings piled alongside vehicles, some protesting against the move with chants of "Racists!"

Some residents complained that police used force during the eviction. Police commander Antonio Di Maggio denied the claims.

Mayor Virginia Raggi wrote on Facebook that the shantytown, established in a former campground called Camping River on Rome's northern periphery, was closed for hygiene reasons. Parts of the camp had been without electricity and running water.

She said that the move was meant to provide greater protection to the Roma, especially minors, some of whom do not attend school.

"It is unacceptable to continue to finance places like this that create ghettos, and above all, where the living conditions don't protect the rights of children, women and men," Raggi wrote in a Facebook post.

The European Court of Human Rights on Tuesday asked Italian authorities to suspend action until Friday and outline plans to rehouse the community, following an appeal by three camp residents. But city officials said that they had long been working to relocate residents, and had delayed the planned closing by more than a year.

WASHAR0003346

City spokesman Gennaro Barbieri said only 100 had accepted authorities' offer to move into government reception centers over the last few years, with another 43 joining them on Thursday.

Raggi noted that some who were not Italian citizens had returned to their native Romania in recent months.

While many members of Italy's sizeable Roma community, also known as Gypsies, are of Italian nationality, many living in the camp were from Romania, Kosovo, Bosnia and Serbia. Italian authorities periodically clear out squatter camps like Camping River where many live on the outskirts of big cities.

Mikhaila Dobreska, who had been living in the camp, accused police of using unnecessary force.

"They forced us out," she said. "They pushed all the women."

Another woman, Gordana Khardzic, claimed police used pepper spray, hitting one woman in the eyes.

"They slapped a girl. My sister-in-law fainted," she said.

Di Maggio said the entire operation was filmed, and told reporters that police had organized the operation to allow residents to leave calmly.

Journalists were kept outside during the operation.

Private Italian TV La7 showed groups of men driving away from the camp, some saying they were headed to Romania, others saying they were going to look for the next place to squat — probably under a bridge.

But dozens remained outside the closed camp gates, protesting plans to rehouse them elsewhere in the city.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Romanian Minister Says No Offense Meant In Auschwitz Comment (AP)

**Thursday, July 26, 2018**
Associated Press

BUCHAREST, Romania (AP) — Romania's agriculture minister said Thursday he did not intend to offend Jews when he compared the incineration of pigs with swine fever to the Nazi concentration camp Auschwitz.

Petre Daea attempted to clarify remarks made in a televised interview this week in which he said the burning of thousands of sick pigs was "very hard work, it's like Auschwitz."

Daea said he respected "all members of the Jewish community," and was merely trying to highlight difficulties face by pig farmers who have to incinerate livestock.

Two opposition parties— the Liberal Party and the Save Romania Union — and others have called for Daea to resign.

Israel's embassy in Romania expressed "dismay and disappointment" over the remarks Thursday, saying the death of six million Jews in the Holocaust "should never be forgotten, trivialized or minimalized."

Romania's Anti-Discrimination Council said it would summon Daea to explain the comments.

The chairman of the ruling Social Democratic Party, Liviu Dragnea, apologized to the Jewish community, saying the Holocaust was "a tragedy that should never be repeated." He added that Daea had not meant to be offensive, and urged him to avoid expressions "which can deeply offend."

Romanian authorities have reported 400 separate outbreaks of African swine fever in the Danube Delta and near the Hungarian border.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## U.K.'s Jewish Papers Denounce Labour Party As 'Existential Threat' (Castle, NYT)

**Friday, July 27, 2018**
New York Times
By Stephen Castle

LONDON — Three Jewish newspapers in Britain charged on Thursday that a government led by the country's opposition leader, Jeremy Corbyn, would be an "existential threat" to their community — a coordinated attack that deepened a long-running crisis over accusations of anti-Semitism within his Labour Party.

In a move they described as unprecedented, The Jewish Chronicle, The Jewish News and The Jewish Telegraph all published the same scathing commentary on their front pages, under the headline "United We Stand." It protests Labour's decision to drop a passage about Israel from an internationally accepted definition of anti-Semitism that the party incorporated in its official code of conduct.

The Labour Party rejected the claims and said in a statement that it posed "no threat of any kind whatsoever to Jewish people," and was "committed to tackling and eradicating anti-Semitism in all its forms."

Yet for months Mr. Corbyn has been unable to close down a damaging dispute over allegations that, under his leadership, the party has failed to tackle anti-Semitism within its ranks. That has alienated lawmakers, faith leaders and parts of a

WASHAR0003347

Jewish community in Britain that once saw Labour as a natural political home.

In March, demonstrators gathered outside Parliament in a protest intended to show that Jews no longer felt welcome in the party. That followed the revelation that in 2012, Mr. Corbyn had endorsed a mural that was widely considered anti-Semitic — something for which he has since apologized.

The latest rift concerns the failure of the party's national executive committee, its governing body, to accept the full text of the working definition of anti-Semitism compiled by the International Holocaust Remembrance Alliance. While Labour has adopted the document's definition, it has not accepted all of the 11 illustrative examples accompanying it.

In particular it rejects one that defines "claiming that the existence of a state of Israel is a racist endeavor" as anti-Semitic. Labour's objection is that the definition could be used to restrict unfairly how Palestinians or their supporters may describe their plight.

Mr. Corbyn, who comes from the activist left wing of the Labour Party, has long been a supporter of Palestinian causes and a critic of many Israeli government policies, though he insists that he opposes all forms of bigotry, including anti-Semitism.

Tensions are running high among Labour lawmakers, who have clashed over the issue, culminating in a confrontation last week in which Margaret Hodge, a veteran lawmaker, reportedly swore at Mr. Corbyn and described him as an anti-Semite.

Ms. Hodge now faces disciplinary proceedings, though that prospect has only raised the temperature, and one member of Mr. Corbyn's shadow cabinet, Nia Griffith, said that penalizing Ms. Hodge would be "completely absurd."

Labour lawmakers are scheduled to vote in September on whether to adopt the remembrance alliance definition's full wording, following discussions at a meeting earlier this week.

In their joint article, the three newspapers argued that they were taking the collective stance "because of the existential threat to Jewish life in this country that would be posed by a Jeremy Corbyn-led government."

Under the adapted guidelines, they argued, a Labour Party member would be "free to claim Israel's existence is a racist endeavor and compare Israeli policies to those of Nazi Germany, unless 'intent' — whatever that means — can be proved." Labour made the omission, they added, to avoid the expulsion of "hundreds, if not thousands," of party members.

The article also targeted the Labour leader personally, arguing that "the stain and shame of anti-Semitism has

coursed through Her Majesty's Opposition since Jeremy Corbyn became leader in 2015."

Stephen Pollard, editor of The Jewish Chronicle, described the coordination between the papers as "entirely unprecedented," and said that it was "utter nonsense" to suggest that incorporation of the examples would inhibit criticism of Israeli policy toward the Palestinians.

"If this is how they treat an ethnic community in opposition, when things get tough in government, what possible confidence can anyone have that they will protect us?" Mr. Pollard said of Mr. Corbyn's party.

In its response, the Labour Party said that its code of conduct on anti-Semitism "adopts the I.H.R.A. definition and expands on and contextualizes its examples to produce robust, legally sound guidelines that a political party can apply to disciplinary cases."

"We have concerns about one half of one of the I.H.R.A.'s 11 examples, which could be used to deny Palestinians, including Palestinian citizens of Israel and their supporters, their rights and freedoms to describe the discrimination and injustices they face in the language they deem appropriate," it said.

Back To Top

## Wildfires, Drought Hit Sweden's Sami Reindeer Herders (Karlidag, AFP)
Friday, July 27, 2018
AFP
**By Ilgin Karlidag**

Stockholm (AFP) – Sweden's unprecedented drought and devastating wildfires are destroying vital grazing pastureland for indigenous Sami reindeer herders, whose livelihoods are already under attack from mining and logging as global warming changes the face of the Arctic.

"Our winter land is burning," says Jonas Kraik, a 54-year-old herder, whose Sami village with as many as 8,000 reindeer is a popular tourist destination in the central Swedish region of Jamtland.

Jamtland is one of the areas worst hit by the wildfires, and another herder, Edvin Ensberg, 43, said he has lost at least 6,000 hectares (15,000 acres) of grazing land for his reindeer.

"The fires are extremely worrying and we cannot measure the exact consequences as we can't see due to the smoke," he told AFP.

"I doubt there will be any pasture for the reindeer to graze on in the winter," he said.

WASHAR0003348

The Sami – formerly called Lapps – have lived in the northern parts of Sweden, Norway, Finland and Russia, for thousands of years. They are the only people authorised to herd reindeer in Sweden.

While there are no exact figures regarding the size of the Sami population, it is estimated at between 80,000 and 100,000, spread across the four countries.

Semi-domesticated reindeer can be found across the northernmost part of Europe, and are raised for their meat, pelts, and antlers.

Every autumn, the reindeer are taken to their winter pasture to graze in the plains.

– 'Burning all around me'-

Margret Fjellstrom, a reindeer owner in Dikanas, a mountainous village 800 kilometres (500 miles) north of the capital Stockholm, was lucky to be spared the fires, but said the drought is taking its toll on her animals.

"It's extremely dry in the mountains... the calves get dehydrated and too weak to follow their mothers when grazing," she said.

There has been practically no rainfall in Sweden since the beginning of May, aside from a few millimetres in mid-June.

The Nordic country, where summer temperatures are usually closer to 23 Celsius, is under-equipped to deal with this kind of natural catastrophe and asked for help from Italy, Germany, Norway, Denmark, Poland and France to extinguish the blazes.

Marcus Rensberg, 35, who owns 5,000 reindeer in a village called Alvdalen – meaning river valley – 300 kilometres northwest of Stockholm, volunteered to help authorities put out the fires as 4,000 hectares of his grazing land was wiped out.

"It could take up to 30 years for the grazing land to be completely restored," he told AFP over the phone, coughing due to the smoke.

"It's burning all around me," he said before abruptly hanging up.

– 'Very tough winter' –

According to the Sami Parliament, the representative body for the Sami people, Sweden has 4,600 reindeer owners for just over 250,000 animals.

The current drought and fires are merely the latest in a long list of challenges facing the herders, as their land is eaten up by the mining and logging industries, and encroached upon by wind turbines.

Climate change is also making it difficult for the reindeer to find the lichen that form an important part of their diet, forcing herders to resort to more costly fodder.

"We've had a very tough winter. It was hard for the reindeer to dig out their food in the snow," Fjellstrom said.

A member of the Sami parliament, Marita Stinnerbom, said that some 34 million kronor (3.0 million euros, $3.8 million) has been raised to pay for fodder following the previous winter.

Stinnerbom said the fires had to be extinguished before the exact damage could be determined and what measures should be taken to compensate the herders.

"The government is following the developments closely and is in contact with the relevant authorities," Tina Israelsson, a government spokeswoman, told AFP when asked about possible compensation.

Reindeer owner Marcus Rensberg said finding new grazing areas could prove difficult.

"The reindeer will go somewhere... I just don't know where that is," he said."

<u>Back To Top</u>

## Russian Dissidents Find Haven In Lithuania (Vitureau, AFP)
**Friday, July 27, 2018**
<u>AFP</u>
**By Marielle Vitureau**

Vilnius (AFP) – Journalist Yevgeny Titov, reporting from Crimea after Russia annexed the peninsula from Ukraine in 2014, understood the risk he was taking.

He is one of a growing number of Russians seeking asylum in Lithuania, a small staunchly pro-Western state that makes no secret of its wariness towards the Kremlin, its unwanted Soviet-era master.

"When I was reporting about the bridge being built (by Russia) to Crimea, my friends received an SMS saying that I had been murdered," Titov, 41, told AFP, speaking in the Lithuanian capital Vilnius.

Titov, working for the anti-Kremlin Novaya Gazeta daily in Moscow, received further death threats after exposing corruption surrounding the bridge project – prompting his move to Lithuania in 2016 on the advice of a friend.

Vilnius granted Titov political asylum in July.

More than 30 other Russian dissidents have also received asylum in the Baltic state, along with special protective status for family members, since 2014.

WASHAR0003349

Dozens more have sought refuge here, as well as in nearby Estonia and Latvia – which like Lithuania are EU and NATO members.

All three are former Soviet-ruled republics that are now among Moscow's most vocal critics.

Vsevolod Chernozub, 32, was among the first to arrive in December 2013.

One of the leaders of the anti-Kremlin Solidarnost party, Chernozub decided to leave Russia during a heavy-handed crackdown triggered by mass protests against Putin's inauguration for a third Kremlin term in May 2012.

The demonstrations quickly descended into clashes with police.

Criminal charges were brought against around 30 demonstrators, many of whom were sentenced to prison terms of up to four-and-a-half years.

– They 'feel safe' –

While he could have sought refuge elsewhere in the EU, Chernozub says he chose Vilnius for practical reasons, notably because of the ethnic Russian community that settled in Lithuania during nearly five decades of Soviet rule.

"Lithuania is a country where you can still speak Russian on a daily basis," he told AFP. "My wife was pregnant at the time and she wanted a Russian-speaking doctor," he noted.

The Baltic state has welcomed dissidents, while underscoring its support for opposition circles in Russia.

"One of the principles (of our relationship with Russia) is to support civil society there," Lithuanian Foreign Minister Linas Linkevicius told AFP.

"Lithuania is a place where they (Russians) can feel safe and we are proud of it," he said.

The foreign ministry has held an annual forum for Russian opposition circles since 2013, and former Russian chess world champion Garry Kasparov, an outspoken Kremlin critic, hosts human rights events in Vilnius.

With the backing of the Lithuanian parliament, Russian dissidents spearheaded a move in May to rename a square outside the Russian embassy after Boris Nemtsov, the Russian opposition politician gunned down near the Kremlin in February 2015 by unknown assailants.

Their activism in Lithuania has not gone unnoticed by Moscow, according to Titov.

"The Russia 24 propaganda channel aired several reports about our initiatives. They called us all kinds of names. That just means that what we're doing is important," he told AFP.

– 'Russia Tomorrow' –

Titov now works as a journalist for the Russian service of Delfi, a popular news website with branches in all three Baltic states.

Chernozub, meanwhile, has teamed up with several fellow Russians to create the "Russia Tomorrow" website, an ironic allusion to "RT" formerly known as "Russia Today", Moscow's state-funded international broadcaster.

The new dissidents make up a tiny part of Lithuania's ethnic Russian minority, where pro-Kremlin views prevail.

The community accounts for about six percent of the Baltic state's overall population of 2.9 million.

All three Baltic states were deeply rattled by its annexation of Crimea from Ukraine, which prompted NATO to quickly ramp up its presence along its eastern flank.

Chernozub warned that the open atmosphere that reigned briefly in Russia during the football World Cup tournament could soon give way to fresh crackdowns on the opposition.

"During the World Cup the situation was frozen, with few protests and few arrests, but now I don't know what will happen," Chernozub told AFP.

Back To Top

# EAST ASIA & PACIFIC

## Taiwan Denounces China Moves To Limit Its Global Profile (AP)
**Thursday, July 26, 2018**
Associated Press

TAIPEI, Taiwan (AP) — Taiwan on Thursday denounced China's latest moves to increase its global isolation, saying residents of the self-governing island would reject attempts to deny its existence.

China in recent days has forced international airlines to stop referring to Taiwan as a separate country on their websites. It also allegedly prompted the Asian Olympic Committee to withdraw the island's right to host a youth competition scheduled for next year in the central city of Taichung.

"These are attempts to destroy Taiwan's sovereignty, and erase it from the world map," Foreign Ministry spokesman Andrew Lee told reporters at a news conference.

"I believe that no Taiwanese people would accept such a thing," Lee said.

Beijing's action is aimed at increasing Taiwan's isolation and prodding it toward a political union with China. Taiwan is already excluded from the United Nations and other major

WASHAR0003350

international organizations, and China has been steadily poaching away the self-governing island's dwindling number of diplomatic partners.

Beijing has also stepped up its military threats by sending warplanes on patrols around the island and staging war games on its side of the Taiwan Strait.

It has also offered preferential terms for talented young people from the high-tech island to work in cities such as Shanghai and Beijing that offer much larger potential markets than those available in Taiwan.

China has taken an increasingly hard line since the election of Taiwanese President Tsai Ing-wen, who has refused to endorse Beijing's insistence that Taiwan is a part of China to be brought under its control eventually.

Tsai's office issued a statement Thursday criticizing the move to cancel the 2019 East Asian Youth Games in Taichung as "brazen and crude political meddling in sports."

"Taiwan condemns China's behavior in the strongest possible terms," the statement said.

———

Associated Press video journalist Johnson Lai in Taipei, Taiwan, contributed to this report.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## China Seeks Economic Boost As Trade Spat Grows (Deng, WSJ)

**Recent measures are directed at an economy that has seen growth slow, and come amid trade conflict with the U.S.**
**Thursday, July 26, 2018**
Wall Street Journal
By Chao Deng

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## U.S. Embassy Street In Beijing Is Rocked By Blast (Buckley, Ramzy, NYT)
**Friday, July 27, 2018**
New York Times
By Chris Buckley And Austin Ramzy

BEIJING — An explosion rocked the street outside the United States Embassy in Beijing on Thursday, rattling a diplomatically sensitive area in the Chinese capital.

Smoke filled the air on a street not far from where many Chinese citizens line up each day to apply for visas to the United States.

The blast happened around 1 p.m. and was heard from blocks away. The police said a man set off a device made from fireworks that injured his hand. The man, 26, was detained and sent to a hospital. His injuries were not life threatening and no one else was hurt, the police said.

"Other than the bomber, no other people were injured and there was no damage to embassy property," the embassy said in a security notice.

A visa agent who said he was about 30 feet away when the blast occurred said the source appeared to be an explosive device, set off by a man who had been trying to call attention to a human rights issue.

Later on Thursday, the Beijing police said that the man who detonated the explosives, identified only by the surname Jiang, had been suffering from hallucinations since 2016 and was diagnosed with a paranoid personality disorder. Investigators found a lighter, fragments of firecrackers and three unexploded firecrackers at the site of explosion, the police statement said. It did not say if the man would be arrested or confined for psychiatric treatment.

Earlier in the day, a woman who had also been protesting was arrested after dousing herself in gasoline, the agent said. It was not clear whether the two incidents were related.

Images shared on social media showed a large number of people looking toward the site of the explosion and gray smoke drifting over the street.

The street in front of the embassy, Tianze Road, which is also near the embassies of India and Israel, was closed for about an hour after the blast. Soon after the street reopened, a new line began to form outside the embassy compound.

The United States Embassy, in northeastern Beijing, is a well-protected compound. The facility opened in 2008 with a dedication ceremony attended by then-President George W. Bush. Security inside the visa area is strict, with no electronic devices or large bags allowed inside.

China has a longstanding system that allows people to petition the government over grievances. But many petitioners say they never receive justice, and are deterred by security officials and hired thugs who assault and detain them. Some, after years of fruitless petitioning, turn to violence.

In 2013 a man who had been paralyzed from the waist down from a beating by security officials set off an explosive device in Beijing Capital International Airport, injuring only himself. Documents that circulated online revealed his long struggle to

WASHAR0003351

receive compensation. "Almost without hope, petition road endless," he wrote.

A man who was reportedly angered by the lack of adequate redress for the demolition of his home set off three explosions outside government buildings in Jiangxi Province in 2011, killing himself and two others.

Chris Buckley and Sui-Lee Wee contributed reporting from Beijing. Zoe Mou and Katrina Northrop contributed research.

Back To Top

## Small Bomb Set Off Outside US Embassy In Beijing (Onyanga-Omara, USAT)
Thursday, July 26, 2018
USA Today
By Jane Onyanga-Omara

A man set off a small homemade bomb outside the U.S. Embassy in Beijing on Thursday, injuring only himself, Chinese police and U.S. officials said.

Photos posted on Twitter showed a large amount of smoke and what appeared to be police vehicles surrounding the building.

The Beijing Police Department identified the 26-year-old suspect only by his surname, Jiang, and said he was from Tongliao city in the Chinese region of Inner Mongolia.

Jiang was injured on the hand by the device, which was made from fireworks, when it exploded at about 1 p.m. local time, police said.

The motive isn't known and the investigation into the incident is continuing.

"There was one individual who detonated a bomb. Other than the bomber, there were no injuries. The local police responded," an embassy spokesperson said in a statement carried by CNN.

It came after reports of an explosion or fire outside the embassy, in the northeast of the Chinese capital.

Earlier Thursday, state media reported that a woman sprayed gasoline on herself in a suspected self-immolation attempt outside the embassy.

Global Times, the ruling Communist Party's newspaper, said police detained the woman and took her away at around 11 a.m. local time.

China and the U.S. are in the middle of a trade dispute, but America remains a hugely popular destination for travel, education and immigration for Chinese citizens.

Contributing: The Associated Press

Back To Top

## Explosion Near U.S. Embassy In Beijing (Chen, Dou, WSJ)
The man who detonated the device was injured, but no others were hurt in the incident
Thursday, July 26, 2018
Wall Street Journal
By Te-Ping Chen And Eva Dou

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## Hong Kong Radical Is Test Case In China's Bid To Limit Speech (Follain, Lung, BLOOM)
Thursday, July 26, 2018
Bloomberg News
By John Follain And Natalie Lung

Independence activist Andy Chan was minutes into an open-air debate in Hong Kong's Victoria Park when an opponent suggested his actions might be as dangerous as terrorism.

"Do you see any guns on me now?" Chan shot back, his arms spread wide. "You can search me."

The exchange on a sweltering Sunday afternoon, as hundreds of maids picnicked nearby, was just one volley in a debate that has gripped the former British colony for more than three years: How much should Hong Kong tolerate activists like Chan who seek the city's separation from China?

Earlier this month, Hong Kong's government threatened to ban Chan's pro-independence National Party, a move unprecedented since the city's return to Chinese rule in 1997. More moderate democracy advocates who disavow Chan's views fear the action could soften the ground for broader efforts to curb the freedoms that help multinational companies thrive in the global financial hub.

"China and the Hong Kong government are shrinking and shrinking the political space for freedom of expression," said Chris Ng of the Progressive Lawyers' Group. Ng said they were building a case to revive a national security law – known as Article 23 – that the government abandoned after half a million protesters flooded the streets in 2003.

While Hong Kong Chief Executive Carrie Lam has declined to commit to a time frame for advancing the legislation, Chinese authorities have expressed impatience with the inaction.

The proposed ban on the National Party, which could take effect as soon as Aug. 7, is the latest attempt to squelch a small but consequential independence movement that sprung up after mass "Occupy" protests in 2014 failed to win any democratic reforms. In 2016, the Chinese government

WASHAR0003352

reinterpreted local law to ban such activists from public office, and local officials earlier this year barred a legislative candidate from running because she supported "self-determination."

President Xi Jinping warned during a visit to Hong Kong last year that any challenge to China's rule was "an act that crosses the red line, and is absolutely impermissible." Lam struck a similar tone when asked about the ban Wednesday before beginning a four-day trip to Beijing: "Any speech or acts that advocate Hong Kong independence cannot be tolerated and would most certainly face suppression."

The lanky and soft-spoken Chan, 27, is among a generation of activists who emerged from the 2014 protests favoring a sharper break with China. Standing outside a McDonald's, Chan bought a megaphone and urged protesters to occupy roads, emulating the sit-ins that closed down three business districts.

"Halfway through Occupy, I realized that when we were asking for democracy from the Hong Kong government, we were actually asking or begging for democracy from the Beijing government," the business administration and engineering graduate said while sipping Earl Grey tea in an interview July 20. "I thought that if we break away from China, we would have democracy."

Others had the same idea. A patchwork of "localist" groups emerged across Hong Kong, some favoring a vote on the city's future, others backing a violent break if necessary. After members of one organization participated in a February 2016 riot that left scores of police officers injured, authorities vowed to crack down on the "radical separatists."

The next month, Chan launched a Facebook page with "30 to 50" members to start his Hong Kong National Party, evoking the Nationalist Party deposed by the Communists in the Chinese civil war. He was among the first candidates barred from running in local legislative elections on the grounds that his views violated the city's Basic Law, a mini-constitution that calls Hong Kong "an inalienable part of" China.

Now, the Hong Kong government is arguing that the National Party's mere existence "poses a real threat to national security." On July 17, two police officers presented Chan with a 700-page dossier recommending a ban. It was based on transcripts of his public remarks, photographs of him distributing leaflets and his contacts with Tibetan and Taiwanese activists.

The report accused the party of "school infiltration," "inciting hatred against mainland people" and being willing to "use any effective measures to achieve their goal, including use of force," according to a copy Chan posted on Facebook.

Security Secretary John Lee gave the party three weeks to respond.

"I did not form an army. I didn't do any real actions but speeches. So now they consider what I have said on the radio is evidence I damaged national security," Chan said. Asked whether he ruled out the use of violence, he said people "need to fight back" if China deployed the military against protesters, like it did in Tiananmen Square in 1989.

"I do not advocate violence," Chan said. "I do not advocate we attack people pro-actively."

Even Chan admits independence is a long-shot. The U.K., which quickly lost Hong Kong to the Japanese during World War II, deemed the colony unsustainable without Chinese support. The city gets most of its food and electricity from the mainland, which also represented about half of its global trade last year.

"Independence is a stupid idea – Hong Kong can't be a country because we don't have military strength or even water," said Gary Mak, 25, a multimedia entrepreneur who attended the park debate Sunday. "The National Party should be banned because it challenges the Basic Law."

To ban the group, Hong Kong authorities are relying on a colonial-era law originally intended to break up criminal gangs. Democracy advocates are concerned that authorities are singling out the more extreme members of their fractious coalition to break opposition to a potentially more powerful legal weapon – Article 23.

The Basic Law provision requires Hong Kong to "enact laws on its own" to prevent secession, sedition and subversion, as well as restrict the activities of foreign political organizations.

As he prepared his response to the government's letter, Chan said he suspected that others would be targeted after himself.

"Self-determination and then democracy and then freedom of speech," he said. "They are just moving the red line and they will deal with one enemy at a time."

— With assistance by David Tweed

Back To Top

## China Says It Isn't To Blame For Qualcomm Scrapping NXP Deal (King, BLOOM)
**Thursday, July 26, 2018**
Bloomberg News
By Ian King

China's regulators said it's unfortunate that Qualcomm Inc. decided to scrap its $44 billion bid to acquire rival chipmaker NXP Semiconductors NV, a surprise statement a day after

WASHAR0003353

the two companies abandoned their deal because they hadn't received regulatory approval by a deadline Wednesday.

China's State Administration for Market Regulation said its deadline for the current Qualcomm review is Aug. 15, with an extended deadline of Oct. 14. The statements appear to be aimed at shifting blame for the deal's failure to the companies, though Qualcomm and NXP said the reason was China's failure to give clearance more than 20 months after the deal's announcement.

The takeover fell apart amid escalating trade tensions between China and the U.S., with every other relevant jurisdiction in the world clearing the bid months ago. While China denied its decision had anything to do with the trade spat, Qualcomm Chief Executive Officer Steve Mollenkopf said "there were probably bigger forces at play here than just us."

Chinese regulators did say in their statement that they have given Qualcomm feedback on the proposed deal and that the company hadn't addressed its competition concerns. The agency also said it hopes to find solutions for the Qualcomm deal ahead of its deadlines. Chinese approval was needed because it's the world's single largest consumer of semiconductors and automobiles, markets in which both Qualcomm and NXP are important operators.

A Qualcomm spokesperson referred questions about the Chinese comments back to a statement made by the company earlier Thursday, which said the acquisition had been terminated.

The statement from the Chinese authorities represents yet another twist in a tortuous process. When the transaction was originally announced in October 2016, Qualcomm assured investors that approval would come by the end of 2017. The deal then became caught up in Broadcom Inc.'s hostile takeover attempt of Qualcomm and was targeted by activist investors who piled into NXP's stock, demanding a higher price.

To win over those investors and thwart Broadcom's approach, Qualcomm raised its offer price for NXP. In April, the two companies extended the agreement to Wednesday's deadline as Qualcomm worked out concessions with China. Final sign-off failed to materialize as a trade dispute swelled between the two countries, with U.S. President Donald Trump accusing the Asian nation of creating an unfair imbalance in trade between the world's two largest economies.

In an interview on CNBC earlier, Mollenkopf was asked why he didn't wait longer for China's approval.

"We thought it was important to bring certainty to the process, move on and really focus on the things that we said are going to drive value," he said.

— With assistance by Penny Peng

Back To Top

## Chinese Theft Continues In Cyberspace As New Threats Emerge, U.S. Intelligence Officials Warn (Harris, WP)

**Thursday, July 26, 2018**
Washington Post
By Shane Harris

China continues to steal intellectual property and trade secrets from U.S. companies for its own economic advancement and the development of its military but "at lower volumes" since the two countries forged an agreement in 2015 meant to curb the practice, according to a report published Thursday by American intelligence agencies.

The assessment, which also incorporates the findings of private sector security experts, comes amid roiling trade tension between the U.S. and China that has spawned dueling tariffs on billions of dollars worth of goods. It is unlikely to quell concerns from the White House that China continues to pose a significant threat to American companies.

The report shows that China mounts a multifaceted approach to stealing secrets, which include computer software source codes, chemical formulas, and technology that can be used in weapons systems. Though it relies on computer hacking, China also acquires technology and know-how through joint ventures and purchases of companies, academic and research partnerships, and front companies meant to "obscure the hand of the Chinese government" in order to acquire technologies governed by U.S. export controls, the report found.

The findings were published by the National Counterintelligence and Security Center, part of the Office of the Director of National Intelligence, which oversees all U.S. spy agencies.

In 2015, after the Obama administration threatened to impose sanctions on China, both countries agreed to refrain from conducting cyber operations for economic advancement. The deal was mostly one-sided, as the United States doesn't steal proprietary information and technology from other countries' for its own economic advancement, intelligence and security officials have said. (The U.S. does steal for political and strategic purposes.)

The report shows that while some progress has been made curbing Chinese economic espionage, its cyber operations continue and are focused on defense contractors or

WASHAR0003354

information technology and communications companies that provide products and services to support government and private sector information networks.

"We believe that China will continue to be a threat to U.S. proprietary technology and intellectual property through cyber-enabled means or other methods," according to the report. "If this threat is not addressed, it could erode America's long-term competitive economic advantage."

Intelligence officials are increasingly concerned about an emerging threat in which attackers target software manufacturers and distributors, rather than individual users. In these so-called "supply chain" attacks, software is manipulated — perhaps to install a backdoor for hackers to enter later — before it is installed or updated on a computer. The attacks can affect millions of people who download the software, often from sources they trust.

Recent evidence suggests the problem is pervasive and that companies are unprepared to manage it. Two-thirds of respondents in a survey commissioned this month by computer security company CrowdStrike said their organizations had experienced a supply-chain attack, with 90 percent of those incurring some financial cost.

The intelligence report called 2017 "a watershed in the reporting of software supply chain operations." Last year, seven "significant events" were publicly reported, compared to four between 2014 and 2016, the report found.

"Hackers are clearly targeting software supply chains to achieve a range of potential effects to include cyber espionage, organizational disruption, or demonstrable financial impact," the report said.

Among the most notable incidents cited by intelligence officials is one that affected a popular tool used to delete unwanted and potentially dangerous files from personal computers. More than one million computers downloaded an infected version of the program, CCleaner, which hackers then used to target technology companies, including Samsung, Sony and Intel, according to researchers.

Security analysts have found evidence they think links the attack to Chinese hackers, whom they believe broke into a British software maker to corrupt the popular CCleaner program.

Hackers also infiltrated software supply chains to conduct a devastating attack last year in Ukraine. The CIA has attributed that attack to Russian military hackers, who used a virus called NotPetya to delete information from computers used by banks, energy firms, senior government officials and an airport. The attack crippled Ukraine's financial system during a war with separatists loyal to Moscow.

The attack had significant financial costs to companies, including FedEx and Maersk, which each suffered $300 million in damages, the intelligence report said.

The report warns that new laws and inspection regimes in foreign countries pose a risk to American firms.

Last year, China began requiring foreign companies to submit communications technology to a government-administered national security review. Companies that operate in China also must store their data there, which exposes it to government influence, the report noted.

Russia also "has dramatically increased its demand for source code reviews for foreign technology being sold inside the country," the report said.

The report singles out Russia and Iran as malign actors intent on penetrating U.S. computer systems and critical infrastructure.

Russia aims to use cyber espionage "to bolster an economy struggling with endemic corruption, state control, and a loss of talent departing for jobs abroad," the report said. Russian hackers have stolen intellectual property from U.S. health care and technology companies, and last year compromised operational networks at energy companies, the report found.

Iran targets American firms as part of what the report calls "a subset" of offensive cyber operations mostly focused on Israel and Saudi Arabia.

For instance, an Iranian hacker group called Rocket Kitten "consistently targets U.S. defense firms, likely enabling Tehran to improve its already robust missile and space programs with proprietary and sensitive U.S. military technology," the report said. Iranians are also targeting aerospace and civil aviation firms, financial institutions, and energy sector companies.

To combat old and evolving threats, the U.S. government is taking a range of actions, including trying to collaborate more with business and computer security experts to stay abreast of threats and either stop them from happening or manage the fallout.

The report said that the U.S. will continue to use other countermeasures including attributing attacks to particular countries, diplomatic demarches, economic sanctions and law enforcement actions.

In recent years, the Justice Department has indicted foreign citizens for computer hacking. And while many of those accused aren't likely to see the inside of an American courtroom, some experts believe the legal actions have had a deterrent effect particularly in China, where the national government has come to realize that to be taken seriously as

WASHAR0003355

a world economic power, it has to curtail its aggressive economic espionage.

Back To Top

## Scuttled Qualcomm-NXP Deal Is A Win-Win For Beijing (Strumpf, WSJ)

**By failing to approve deal, Beijing slows Qualcomm's expansion, flexes trade-fight muscles**
**Thursday, July 26, 2018**
<u>Wall Street Journal</u>
By Dan Strumpf

Full-text stories from the Wall Street Journal are available to Journal subscribers by clicking the link.

Back To Top

## A #MeToo Reckoning In China's Workplace Amid Wave Of Accusations (Hernández, Zhao, NYT)
**Friday, July 27, 2018**
<u>New York Times</u>
By Javier C. Hernández And Iris Zhao

BEIJING — The women recount being forced into sex by bosses and trusted co-workers. They speak of being shunned by friends and discouraged by the authorities from pressing charges. They recall being told their lives would be ruined if they spoke up.

In gripping open letters posted on social media sites, more than a dozen Chinese women have come forward in recent days with accusations of sexual assault and harassment against prominent Chinese journalists, intellectuals and charity leaders.

The outpouring of allegations has been a focus of discussions on the internet in China and given momentum to the country's fledgling #MeToo movement, which has struggled amid government censorship and a male-dominated society that often shames victims of sexual assault.

Most of the accusations were published on Weibo, China's Twitter-like service, and have since circulated widely on a variety of social platforms.

While the letters, many of them anonymous, do not appear to have been part of a coordinated campaign, they offer a collective indictment of the patriarchal culture that pervades Chinese society.

In a letter published on Wednesday, a woman accuses a well-known Chinese intellectual, Zhang Wen, of raping her after a dinner party and telling her, "You can never shake off the fate of becoming my woman." Mr. Zhang said the sex was consensual.

In another letter published on Thursday, a former intern at CCTV, the state-owned broadcaster, says an anchor at the network, Zhu Jun, molested her in 2014 in his dressing room. When she went to the police, she says, the authorities suggested she should drop the case to avoid harming the "positive" image of Mr. Zhu and CCTV.

"This is the world we live in," she wrote, lamenting the prevalence of harassment.

Mr. Zhu, the CCTV anchor, could not be reached for comment. The former intern who accused him of molesting her in a dressing room, who published her letter anonymously, recounted the incident in a telephone interview on Thursday. She declined to be named, citing fears for her family's safety.

Activists for gender equality say they see the burst of accusations as a sign that China's #MeToo movement, which has so far been mostly limited to university campuses, is spreading to the workplace.

"It's only the beginning of 'Me Too' in China," said Li Tingting, an activist for gender equality. "The men-dominant structure is everywhere. The rape culture is still powerful."

Once a champion of gender equality, the Chinese government has greeted the #MeToo movement cautiously. Some officials are nervous about its foreign roots and see it as a force for disruption in a society that prizes stability.

The government has deployed censors to limit the movement's spread. As the letters by the women appeared this week on social media, censors went into action, banning the English #MeToo hashtag on social media sites and deleting some letters.

Still, the accusations have prompted vigorous online debate within China, with some posted comments applauding the women for coming forward and others accusing them of seeking fame.

Several of the men denied the accusations.

In a statement on Wednesday, Mr. Zhang, the intellectual, acknowledged having sex with the woman who wrote the letter, but he described it as consensual. Several other women, including the writer Jiang Fangzhou, have since accused him of harassment.

Mr. Zhang, who has worked at China Newsweek and written for international publications, said in the statement it was common for colleagues in the media industry to hug and kiss after drinking together.

The wave of allegations this week extended beyond the media industry to the nonprofit sphere.

WASHAR0003356

An advocate for hepatitis B patients, Lei Chuang, resigned on Monday from the charity he founded after a co-worker accused him of assaulting her after a hiking trip. Then, the environmentalist Feng Yongfeng resigned from his charity on Tuesday after being accused of harassing several women.

That the resignations came so swiftly was surprising in a country where accusations of abuse and harassment against women are often ignored and laws on rape and harassment are vague.

The #MeToo movement in China was initiated earlier this year on university campuses, as students circulated open letters decrying sexual misbehavior by professors and demanding better protections. There were some signs of success, with universities agreeing to do more to investigate cases of abuse and increase awareness about sexual harassment.

But the activism ran up against the country's strict limits on free speech. In April, students and professors denounced the leadership of Peking University for trying to stifle activism about sexual harassment.

Experts say it will be difficult for the #MeToo movement to take on government officials or prominent business executives, given the ruling Communist Party's tight control of civil society.

King-wa Fu, a media scholar at the University of Hong Kong, said officials most likely feared the power of the #MeToo movement to bring many people together to target "higher authorities" like corporations, universities and the government. Still, he said he was hopeful the movement could continue to have an impact in China.

"Censorship can only stop public discussion for awhile," Professor Fu said. "When something big happens again, it will come back."

Charlotte Pu contributed research.

Back To Top

## Remains Said To Be US War Dead Repatriated From North Korea (Young-Joon, Tong-Hyung, Baldor, AP)
Friday, July 27, 2018
Associated Press
By Ahn Young-Joon, Kim Tong-Hyung And Lolita Baldor

PYEONGTAEK, South Korea (AP) — North Korea on Friday returned the remains of what are believed to be U.S. servicemen killed during the Korean War, the White House said, with a U.S military plane making a rare trip into North Korea to retrieve 55 cases of remains.

The handover follows through on a promise North Korean leader Kim Jong Un made to President Trump when the leaders met in June and is the first tangible result from the much-hyped summit. Trump welcomed the repatriation and thanked Kim in a tweet.

The United Nations Command said 55 cases of remains were retrieved from North Korea. The White House earlier confirmed that a U.S. Air Force C-17 aircraft containing remains of fallen service members had departed Wonsan, a Northern coastal city, on its way to the Osan Air Base in Pyeongtaek, near the South Korean capital of Seoul. A formal repatriation ceremony will be held there Wednesday.

At the air base, U.S. servicemen and a military honor guard lined up on the tarmac to receive the remains, which were carried in boxes covered in blue U.N. flags.

About 7,700 U.S. soldiers are listed as missing from the 1950-53 Korean War, and 5,300 of the remains are believed to still be in North Korea. The war killed millions, including 36,000 American soldiers.

U.S. Forces Korea commander Gen. Vincent K. Brooks, in a statement from the U.N. Command, called the retrieval mission successful. "Now, we will prepare to honor our fallen before they continue on their journey home."

Following the honors ceremony on Wednesday, the remains will be flown to Hawaii for scientific testing. A series of forensic examinations will be done to determine if the remains are human and if the dead were American or allied troops killed in the conflict.

Trump late Thursday tweeted the repatriation was occurring and said, "After so many years, this will be a great moment for so many families. Thank you to Kim Jong Un."

Officials in North Korea had no comment on the handover on Friday, the 65th anniversary of the end of the Korean War, which the country celebrated as the day of "victory in the fatherland liberation war."

Despite soaring rhetoric about denuclearization before Kim and Trump met in Singapore, their summit ended with only a vague aspirational goal for a nuclear-free Korean Peninsula without describing when and how that would occur.

The repatriation of remains could be followed by stronger North Korean demands for fast-tracked discussions to formally end the war, which was stopped with an armistice and not a peace treaty. South Korea's Defense Ministry also said the North agreed to general-level military talks next week at a border village to discuss reducing tensions across the countries' heavily armed border.

The U.S. military last month said that 100 wooden "temporary transit cases" built in Seoul were sent to the Joint Security

WASHAR0003357

Area at the Korean border as part of preparations to receive and transport remains in a dignified manner. U.S. Forces Korea spokesman Col. Chad Carroll also said, at the time, that 158 metal transfer cases were sent to a U.S. air base and would be used to send the remains home.

The remains are believed to be some of the more than 200 that North Korea has held in storage for some time, and were likely recovered from land during farming or construction. The vast majority of the war dead, however, have yet to be located and retrieved from cemeteries and battlefields across the countryside.

Efforts to recover American war dead had been stalled for more than a decade because of a standoff over North Korea's nuclear program and a previous U.S. claim that security arrangements for its personnel working in the North were insufficient.

From 1996 to 2005, joint U.S.-North Korea military search teams conducted 33 recovery operations that collected 229 sets of American remains. The last time North Korea turned over remains was in 2007, when Bill Richardson, a former U.N. ambassador and New Mexico governor, secured the return of six sets.

The North marked Friday's anniversary with ceremonies at war-related memorials; the capital Pyongyang and other cities were decked out in national flags and bright red banners. For the first time since 2015, Kim Jong Un has announced a general amnesty will be granted for prisoners who have committed crimes against the state.

North Korea has held out the return of remains as a symbol of its goodwill and intention to improve ties with Washington. Officials have bristled, however, at criticism from the U.S. that it seeks to profit from the repatriations by demanding excessive fees for handling and transporting the remains.

Pyongyang has nevertheless expressed its willingness to allow the resumption of joint search missions in the country to retrieve more remains. Such missions had been held from 1996 until they were cancelled by President George W. Bush amid heightening tensions over the North's nuclear program in 2005.

Post Kim-Trump summit talks between U.S. Secretary of State Mike Pompeo and senior North Korean officials got off to a rocky start earlier this month, with the North accusing the Americans of making "unilateral and gangster-like" demands on denuclearization. The North also said U.S. officials came up with various "conditions and excuses" to backtrack on the issue of formally ending the war.

"The adoption of the declaration on the termination of war is the first and foremost process in the light of ending the extreme hostility and establishing new relations between the DPRK and the U.S.," the North's Korean Central News Agency said in a statement on Tuesday, referring to North Korea by its official name, the Democratic People's Republic of Korea. "Peace can come only after the declaration of the termination of war."

Pompeo said Wednesday that a great deal of work remains ahead of a North Korea denuclearization deal, but he dodged requests to identify a specific denuclearization timeline in testimony to members of the Senate Foreign Relations Committee.

Experts say a declaration to officially end the war, which could also involve Seoul and Beijing, would make it easier for Pyongyang to steer the discussions with Washington toward a peace treaty, diplomatic recognition, security assurance and economic benefits. Some analysts believe that North Korea would eventually demand that the United States withdraw or dramatically reduce the 28,500 troops it keeps in South Korea as a deterrent.

Washington has maintained Pyongyang wouldn't get sanctions relief and significant security and economic rewards unless it firmly commits to a process of completely and verifiably eliminating its nuclear weapons. There are lingering doubts on whether Kim would ever agree to fully relinquish his nukes, which he may see as a stronger guarantee of survival than whatever security assurance the United States could offer.

___

Kim reported from Seoul and Baldor from Washington. AP journalists Eric Talmadge in Pyongyang, North Korea, Kim Yong-ho in Pyeongtaek and Foster Klug in Seoul contributed to this report.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## White House: US Plane Leaves North Korea With US War Remains (Maresca, USAT)

Thursday, July 26, 2018
USA Today
By Thomas Maresca

SEOUL – A U.S. cargo plane carrying the remains of U.S. soldiers handed over by North Korea arrived at an American air force Base in South Korea on Friday morning, a step in fulfilling an agreement made between President Donald Trump and Kim Jong Un at their summit in Singapore last month.

WASHAR0003358

The plane, a U.S. Air Force C-17 Globemaster, transported the remains from Wonsan, North Korea to Osan Air Force Base, located some 40 miles south of Seoul. It was accompanied by service members from United Nations Command Korea and technical experts from the Defense POW/MIA Accounting Agency, the Hawaii-based government agency responsible for recovering missing personnel, according to a statement from the White House.

The United Nations Command confirmed there were 55 cases of remains returned on Friday.

The aircraft, flanked by two fighter jets, arrived at approximately 11:00 a.m. local time and was met by American service members and a military honor guard. A formal repatriation ceremony headed by General Vincent Brooks, commander of American forces in Korea, is scheduled to take place on August 1. The remains are then expected to be sent to the DPAA in Hawaii for forensic testing to verify they are the slain U.S. troops.

The move came on the 65th anniversary of the armistice agreement that ended fighting in the 1950-1953 Korean War.

"The United States owes a profound debt of gratitude to those American service members who gave their lives in service to their country and we are working diligently to bring them home," the White House said in a statement. "It is a solemn obligation of the United States Government to ensure that the remains are handled with dignity and properly accounted for so their families receive them in an honorable manner."

Trump also expressed his gratitude to Kim in a tweet, calling it "a great moment for so many families."

About 7,700 U.S. soldiers are listed as missing from the Korean War, and 5,300 of the remains are believed to still be in North Korea. The war killed millions, including 36,000 American soldiers.

Returning U.S. war remains was a rare tangible commitment Kim made during his meeting with Trump in Singapore, where they issued a vague aspirational goal for a nuclear-free Korean Peninsula without describing when and how that would occur.

Contributed: The Associated Press

Back To Top

## The Latest: US Says Plane Leaves NKorea With War Remains (AP)
Friday, July 27, 2018
Associated Press

PYEONGTAEK, South Korea (AP) — The Latest on U.S. war remains returned by North Korea (all times local):

11:05 a.m.

The White House says North Korea has turned over the potential remains of American service members who have been missing since the Korean war, following through on a promise made last month to President Donald Trump.

The White House says in a statement Thursday night that a U.S. Air Force plane containing remains of fallen service members has departed Wonsan, North Korea, and is en route to Osan Air Base in South Korea.

The transfer of remains represents one of the first tangible results of Trump's June 12 summit meeting with North Korean leader Kim Jong Un. It sets off a lengthy series of forensic examinations and tests to determine if the remains are human, and whether they are actually American or allied troops killed in the conflict.

—

10:30 a.m.

A U.S. military plane left from Osan Air Base for North Korea on Friday to pick up the remains of what are believed to be U.S. servicemen killed during the Korean War, South Korea's Yonhap news agency reported.

The U.S. military and South Korean government couldn't immediately confirm the report, which was based on an unnamed South Korean government source. But there were signs Friday morning of preparations to receive the remains at the base south of Seoul.

If a transfer takes place, Pyongyang will likely return about 55 sets of remains from the 1950-53 Korean War, a step meant to fulfill a commitment made by leader Kim Jong Un during his summit with President Donald Trump in June.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## North Korea Returns Remains Of US War Dead (Chan-kyong, AFP)
Friday, July 27, 2018
AFP
By Park Chan-kyong

Seoul (AFP) – A US military aircraft flew the remains of American servicemen out of North Korea on Friday, a move hailed by the White House as a "positive" step for the fragile detente between the two rivals.

The return of the remains – on the 65th anniversary of the end of the Korean War – marks the partial fulfilment of an agreement reached between US President Donald Trump

WASHAR0003359

and North Korean leader Kim Jong Un at their historic summit in Singapore last month.

"After so many years, this will be a great moment for so many families. Thank you to Kim Jong Un," Trump said in a tweet.

The White House said it was "encouraged" by the return of the remains and the "momentum for positive change".

"Today's actions represent a significant first step to recommence the repatriation of remains from North Korea and to resume field operations in North Korea to search for the estimated 5,300 Americans who have not yet returned home," it said.

After leaving the North Korean port city of Wonsan, the C-17 cargo plane landed at the Osan US Air Base in South Korea at around 0200 GMT, where live TV images showed American soldiers lined up for a ceremony.

The United Nations Command (UNC) in South Korea said 55 sets of remains were on board the plane.

"It was a successful mission following extensive coordination," General Vincent Brooks, commander of the UNC and United States Forces Korea, said in a statement.

"Now, we will prepare to honour our fallen before they continue on their journey home."

More than 35,000 Americans were killed on the Korean Peninsula during the war, out of which around 7,700 are still considered missing, including 5,300 in North Korea alone, according to the Pentagon.

Between 1990 and 2005, 229 sets of remains from the North were repatriated, but those operations were suspended when ties deteriorated over Pyongyang's nuclear weapons programme.

The remains flown to Osan on Friday are expected to be sent to Hawaii for forensic identification, following a formal repatriation ceremony next Wednesday.

– 'They'll milk this' –

Trump has hailed his summit agreement with Kim as effectively ending the North Korean nuclear threat, although it contained only an ill-defined commitment on Pyongyang's part to the "denuclearisation of the Korean peninsula" – a long way from the complete, verifiable and irreversible disarmament demanded by Washington.

The issue of repatriating remains of American war dead was seen as a far less contentious one, and the summit agreement specified the immediate return of those remains "already identified."

According to US officials, North Korea is estimated to have as many as 200 sets of remains ready for delivery.

Former New Mexico governor Bill Richardson, who has worked on repatriation issues and visited North Korea several times, warned that Pyongyang might hold up further repatriations in order to squeeze some cash out of the United States.

"They'll give a certain amount of remains for free right away," Richardson told the Washington Post. "But then they'll say, 'The next ones, we need to find them, locate them, restore them.' And then they'll start charging, and they'll milk this."

The initial repatriation provides the White House with a tangible result from the Singapore summit, which has otherwise failed to deliver on the denuclearisation expectations raised by the US president.

US Secretary of State Mike Pompeo was despatched to Pyongyang in early July to nail down the North's summit commitments – including returning the remains of US servicemen.

Pompeo described the talks as "constructive" but the North Korean foreign ministry condemned his "gangster-like" demands for rapid nuclear disarmament.

Back To Top

## Aircraft Carrying Remains Of US Korean War Dead Arrives In S. Korea (AFP)
**Friday, July 27, 2018**
AFP

Seoul (AFP) – A US military aircraft carrying the remains of US Korean War dead collected in North Korea arrived in the South on Friday, the 65th anniversary of the armistice that ended the fighting.

The return of the remains marks the partial fulfilment of an agreement reached between US President Donald Trump and North Korean leader Kim Jong Un at their historic summit in Singapore last month.

After leaving the North Korean port city of Wonsan, the C-17 cargo plane landed at the Osan US Air Base in South Korea at around 0200 GMT, where live TV images showed American soldiers lined up for a ceremony.

More than 35,000 Americans were killed on the Korean Peninsula during the war, out of which around 7,700 are still considered missing, including 5,300 in North Korea alone, according to the Pentagon.

"Today's actions represent a significant first step to recommence the repatriation of remains from North Korea and to resume field operations in North Korea to search for the estimated 5,300 Americans who have not yet returned home," the White House said in a statement.

WASHAR0003360

"We are encouraged by North Korea's actions and the momentum for positive change," the statement said, adding that a formal repatriation ceremony would be held at the Osan Air Base next week.

Between 1990 and 2005, 229 sets of remains from the North were repatriated, but those operations were suspended when ties deteriorated over Pyongyang's nuclear weapons programme.

The remains flown to Osan on Friday are expected to be sent to Hawaii for forensic identification.

Back To Top

## Plane Said To Carry War Remains From North Korea Lands At U.S. Base (Press, POLITICO)
**Thursday, July 26, 2018**
Politico
**By Associated Press**

A U.S. military plane has returned from North Korea and landed at Osan Air Base in South Korea after reportedly picking up the remains of what are believed to be U.S. servicemen killed during the Korean War.

An Associated Press journalist at the base outside the capital Seoul saw the plane land Friday local time.

Earlier, the White House said North Korea has turned over the potential remains of American service members who have been missing since the Korean war, following through on a promise made last month to President Donald Trump.

The White House said that a U.S. Air Force plane containing remains of fallen service members had departed Wonsan, North Korea, and was en route to Osan Air Base in South Korea.

The transfer of remains represents one of the first tangible results of Trump's June 12 summit meeting with North Korean leader Kim Jong Un. It sets off a lengthy series of forensic examinations and tests to determine if the remains are human, and whether they are actually American or allied troops killed in the conflict.

Details were still sketchy but reports said that Pyongyang would return about 55 sets of remains from the 1950-53 Korean War, a step meant to fulfill a commitment made by leader Kim Jong Un during his summit with President Donald Trump in June.

About 7,700 U.S. soldiers are listed as missing from the Korean War, and 5,300 of the remains are believed to still be in North Korea. The war killed millions, including 36,000 American soldiers.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Remains Of 55 U.S. War Dead In North Korea Start Journey Home After 65 Years (Sang-Hun, NYT)
**Friday, July 27, 2018**
New York Times
**By Choe Sang-Hun**

PYEONGTAEK, South Korea — Remains believed to be those of 55 American servicemen were flown out of North Korea on Friday, the first visible result of President Trump's efforts to bring the American war dead home 65 years after the end of combat in the Korean War.

"We are encouraged by North Korea's actions and the momentum for positive change," the White House said in announcing the handover.

An American Air Force C-17 Globemaster cargo plane carrying the remains landed later at Osan Air Base south of Seoul, the South Korean capital. Hundreds of American service members as well as a military honor guard lined up on the tarmac to mark the return of the fallen troops.

As the honor guard and the troops stood at attention, 55 small coffins containing the remains were individually carried out of the plane by dress-uniformed soldiers and loaded into six vans. Each of the boxes was wrapped with the United Nations flag, the flag that American troops fought under in the Korean War.

From Osan Air Base, the remains will be transferred to the Hawaii-based Defense POW/MIA Accounting Agency, where painstaking forensic work will be carried out to identify them. Remains that were returned in the past from North Korea were found to be mixed with those of unidentified individuals and even with animal bones.

After the return of the remains, President Trump thanked Kim Jong-un, North Korea's leader, who less than a year ago was threatening the United States with his "nuclear button."

The Korean War was halted with an armistice signed 65 years ago on Friday. But thousands of American troops killed in major battles in North Korea have not been returned because the war was never formally concluded with a peace treaty, and North Korea and the United States lack diplomatic ties.

The remains flown out on Friday were the first handed over since a joint effort by American military experts and North Korean workers between 1996 and 2005. The group

WASHAR0003361

collected the remains of what were believed to have been 220 American soldiers.

But since then the Pentagon's efforts to bring the American war dead home have been overshadowed by tensions over the North's nuclear weapons program.

A breakthrough came when Mr. Trump held a summit meeting with Mr. Kim in Singapore on June 12. Mr. Kim committed to work toward the denuclearization of the Korean Peninsula and promised to return the remains of American troops, starting with those already recovered and identified.

Mr. Trump claimed last month that the North Koreans had "already sent back, or are in the process of sending back, the remains of our great heroes." He also boasted that North Korea's nuclear crisis had been "largely solved." But the efforts to denuclearize North Korea and return the American remains have moved slower than Washington had hoped.

Secretary of State Mike Pompeo visited Pyongyang, the North Korean capital, this month to urge North Korea to go forward with Mr. Kim's commitments. North Korea soon accused the United States of making a "unilateral and gangster-like demand for denuclearization," while failing to offer corresponding American incentives to improve ties.

North Korea and the United States have yet to agree on a detailed road map on how to achieve what Mr. Kim and Mr. Trump both identified as their common goal: the "complete denuclearization of the Korean Peninsula" and the creation of a new bilateral relationship.

Still, during recent talks with American officials on the border between North and South Korea, the North reaffirmed its commitment to return some remains. Its officials also agreed to resume joint United States-North Korean searches at major battle sites in the North to recover more remains.

More than 36,000 American troops died in the Korean War. Of them, some 7,700 remain unaccounted for, including 5,300 believed to have died in the North.

Washington considers the return of the remains an important good-will gesture as it considers improving ties with North Korea should it denuclearize. North Korea has recently started dismantling a missile-engine test site, as Mr. Trump said Mr. Kim promised he would during their summit meeting.

Back To Top

## U.S. Military Takes Possession Of Remains That North Korea Says Belong To Americans Who Died In The Korean War (Taylor, Lamothe, WP)

Thursday, July 26, 2018
<u>Washington Post</u>

By Adam Taylor And Dan Lamothe

A U.S. Air Force plane carrying what are thought to be the remains of 55 Americans killed during the Korean War arrived at Osan Air Base in South Korea on Friday morning, the 65th anniversary of the armistice that ended the fighting.

The U.S. Air Force C-17 aircraft departed for the Kalma Airport in the North Korean city of Wonsan before 6 a.m. Friday. It returned about 11 a.m. local time, where it was greeted by a crowd of several thousand U.S. service members and their families — all American service members in South Korea had been invited to the event.

The exchange means that one part of the agreement reached between President Trump and North Korean leader Kim Jong Un in Singapore on June 12 has been partially fulfilled — albeit more slowly than many had anticipated.

"Today's actions represent a significant first step to recommence the repatriation of remains from North Korea and to resume field operations in North Korea to search for the estimated 5,300 Americans who have not yet returned home," White House press secretary Sarah Huckabee Sanders said in a statement Thursday night.

The remains are expected to remain at Osan for a few days for initial testing before a repatriation ceremony is held on Aug. 1 and they are sent on to Hawaii.

Yonhap News Agency reported Thursday that North Korea has accepted 100 wooden transit caskets that it plans to use to return the remains. The U.S. military command in South Korea moved the caskets into the demilitarized zone that splits the Korean Peninsula in late June.

Earlier Thursday, the expected recovery was greeted with cautious optimism by Rick Downes, executive director of a group of families whose loved ones never came home from the Korean War. They have watched discussions in recent weeks with a mixture of hope and cynicism, he said.

"These are poker chips, unfortunately," said Downes, who runs the Coalition of Families of Korean & Cold War POW/MIAs. "These guys, these missing men, are still serving. The war still goes on, and they are being negotiated and used as a bargaining tool."

A U.S. official told The Washington Post last week that North Korea has agreed to hand over about 55 sets of remains. Friday was suggested as a likely date for the repatriation because of its symbolic importance as the anniversary of the armistice, but the official cautioned that the date could change and that the number of remains would need to be checked after they are handed over.

Former New Mexico governor Bill Richardson, who has worked on repatriation issues and visited North Korea several

WASHAR0003362

times, said Thursday that he sees the potential recovery as a positive first step. But he warned that Pyongyang could stall in delivering other remains and attempt to use the issue as a way to make money.

"They'll give a certain amount of remains for free right away," Richardson predicted. "But then they'll say, 'The next ones, we need to find them, locate them, restore them.' And then they'll start charging, and they'll milk this."

Though the United States has a policy of refusing to pay for the repatriation of remains, in the past, it has agreed to provide some funding for expenses incurred by the North Koreans.

The Pentagon estimates that nearly 7,700 U.S. troops are unaccounted for from the war; among them are 5,300 believed to have been killed north of the 38th parallel, which largely coincides with the boundary between North and South Korea.

The North Korean government is believed to have somewhere between 120 and 200 sets of U.S. military remains in its possession and ready to deliver, but there are thousands more still in the North Korean countryside, said Mickey Bergman, vice president of the Richardson Center for Global Engagement that the former governor founded.

Some remains were buried by U.S. troops in cemeteries that were intended to be temporary until China's entry in the Korean War forced U.S. forces to withdraw farther south. Other remains are at sites where aircraft crashed or in unmarked graves, Bergman said.

"One of the things that is so important is for the American people to understand that this is just the beginning," he said. "This is going to take years. It's going to take interviews and sight surveys and teams on the ground. My fear is that we will get these remains and once again say 'Mission accomplished!' And it's not."

After the remains are returned, scientific testing will be needed to confirm that they belong to American soldiers from the Korean War. In the past, North Korea has been accused of deliberately including non-American bones — even animal bones — in a bid to fool U.S. authorities.

The remains will be sent to Hawaii, where the Defense POW/MIA Accounting Agency runs a laboratory at Joint Base Pearl Harbor-Hickam. The identification process there could take years, U.S. officials have said. It often includes a review of archival information that determines where certain U.S. troops were likely to have disappeared or been buried.

After the historic summit between the two leaders last month, Trump and Kim agreed to work together to recover U.S.

remains left in North Korea and to implement the "immediate repatriation of those already identified."

Only a few days after meeting Kim, Trump portrayed the return of the remains as something that had already happened. "We got back our great fallen heroes, the remains," he told a campaign rally in Minnesota. "In fact, today, already 200 have been sent back."

However, while the U.S. military had moved caskets into the Korean Peninsula's joint security area in anticipation, no remains had been sent back. Soon, negotiations were dragging out longer than many had expected.

"That it took this long to secure such low-hanging fruit is a bad sign that North Korea intends to lean on its traditional negotiating posture," Van Jackson, a former Pentagon official who teaches at Victoria University of Wellington in New Zealand, said of the prospective repatriation.

Secretary of State Mike Pompeo was expected to return with remains when he visited Pyongyang for an overnight stay July 6. But after his team was criticized by the North Korean Foreign Ministry, his visit only highlighted tensions between the United States and North Korea over the return of the remains and issues surrounding denuclearization.

On July 12, North Korean military officials left their U.S. counterparts waiting for hours at the joint security area before belatedly calling to request that they reschedule their prearranged meeting. Only after this meeting and subsequent ones was practical progress made.

One part of the holdup appeared to be North Korean requests for payment.

The last time North Korea's military returned likely remains of American troops was in 2005 amid escalating tensions with Pyongyang, when the United States halted a program that had been running since the 1990s.

In 2007, Richardson visited North Korea on a private mission that had the approval of the Bush administration. Richardson returned with the remains of six service members.

The return of the remains now would come after commercial satellite imagery appeared to show that North Korea had destroyed part of a satellite-testing facility that was part of the country's missile-development program. Trump, who told reporters in June that North Korea had agreed to destroy that facility, said Tuesday that the United States appreciated the move.

Back To Top

## Report: US Plane Leaves For NKorea To Pick Up US War Remains (Young-Joon, Tong-Hyung, AP)

WASHAR0003363

**Friday, July 27, 2018**
<u>Associated Press</u>
By Ahn Young-Joon And Kim Tong-Hyung

PYEONGTAEK, South Korea (AP) — A U.S. military plane left from Osan Air Base for North Korea on Friday to pick up the remains of what are believed to be U.S. servicemen killed during the Korean War, South Korea's Yonhap news agency reported.

The U.S. military and South Korean government couldn't immediately confirm the report, which was based on an unnamed South Korean government source. But there were signs Friday morning of preparations to receive the remains at the base south of Seoul.

If a transfer takes place, Pyongyang will likely return about 55 sets of remains from the 1950-53 Korean War, a step meant to fulfill a commitment made by leader Kim Jong Un during his summit with President Donald Trump in June.

About 7,700 U.S. soldiers are listed as missing from the Korean War, and 5,300 of the remains are believed to still be in North Korea. The war killed millions, including 36,000 American soldiers.

The remains would likely be flown out of an airport in the North Korean coastal city of Wonsan before returning to Osan. Officials in North Korea had no immediate comment on the possible return of the remains on Friday, the 65th anniversary of the end of the Korean War, which the country celebrates as the day of "victory in the fatherland liberation war."

Returning U.S. war remains was a rare tangible commitment Kim made during his meeting with Trump in Singapore, where the leaders issued a vague aspirational goal for a nuclear-free Korean Peninsula without describing when and how that would occur. Friday's repatriation could be followed by strengthened North Korean demands for fast-tracked discussions with the United States on reaching a declaration to formally end the war, which was stopped with an armistice and not a peace treaty.

Efforts to recover American war dead had been stalled for more than a decade because of a standoff over North Korea's nuclear program and a previous U.S. claim that security arrangements for its personnel working in the North were insufficient.

From 1996 to 2005, joint U.S.-North Korea military search teams conducted 33 recovery operations that collected 229 sets of American remains. The last time North Korea turned over remains was in 2007, when Bill Richardson, a former U.N. ambassador and New Mexico governor, secured the return of six sets.

The North marked Friday's anniversary with ceremonies at war-related memorials; the capital Pyongyang and other cities were decked out in national flags and bright red banners. For the first time since 2015, Kim Jong Un has announced a general amnesty will be granted for prisoners who have committed crimes against the state.

North Korea has held out the return of remains as a symbol of its goodwill and intention to improve ties with Washington. Officials have bristled, however, at criticism from the U.S. that it seeks to profit from the repatriations by demanding excessive fees for handling and transporting the remains.

Pyongyang has nevertheless expressed its willingness to allow the resumption of joint search missions in the country to retrieve more remains. Such missions had been held from 1996 until they were cancelled by President George W. Bush amid heightening tensions over the North's nuclear program in 2005.

Post Kim-Trump summit talks between U.S. Secretary of State Mike Pompeo and senior North Korean officials got off to a rocky start earlier this month, with the North accusing the Americans of making "unilateral and gangster-like" demands on denuclearization. The North also said U.S. officials came up with various "conditions and excuses" to backtrack on the issue of formally ending the war.

"The adoption of the declaration on the termination of war is the first and foremost process in the light of ending the extreme hostility and establishing new relations between the DPRK and the U.S.," the North's Korean Central News Agency said in a statement on Tuesday, referring to North Korea by its official name, the Democratic People's Republic of Korea. "Peace can come only after the declaration of the termination of war."

Pompeo said Wednesday that a great deal of work remains ahead of a North Korea denuclearization deal, but he dodged requests to identify a specific denuclearization timeline in testimony to members of the Senate Foreign Relations Committee.

Experts say a declaration to officially end the war, which could also involve Seoul and Beijing, would make it easier for Pyongyang to direct the discussions with Washington toward a peace treaty, diplomatic recognition, security assurance and economic benefits. Some analysts believe that North Korea would eventually demand that the United States withdraw or dramatically reduce the 28,500 troops it keeps in South Korea as a deterrent.

Washington has maintained Pyongyang wouldn't get sanctions relief and significant security and economic rewards unless it firmly commits to a process of completely and verifiably eliminating its nuclear weapons. There are

WASHAR0003364

lingering doubts on whether Kim would ever agree to fully relinquish his nukes, which he may see as a stronger guarantee of survival than whatever security assurance the United States could offer.

———

Kim reported from Seoul.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## First U.S. Troop Remains From North Korea Headed Home, White House Confirms (Wolfgang, WT)
**Thursday, July 26, 2018**
Washington Times
By Ben Wolfgang

U.S. aircraft on Thursday night flew to North Korea to begin retrieving the remains of American troops killed during the Korean war, the White House announced.

American planes retrieved the remains from Wonsan, North Korea, and will return them to Osan Air Base in South Korea. A formal repatriation ceremony will be held on August 1, the Trump administration said.

The White House cast the move as a significant step forward in U.S.-North Korean relations following last month's historic summit between President Trump and North Korean dictator Kim Jong-un.

"At their historic meeting in Singapore, President Donald J. Trump and Chairman Kim Jong Un took a bold first step to achieve the complete denuclearization of the Korean Peninsula, transform relations between the United States and North Korea, and establish enduring peace," White House press secretary Sarah Sanders said in a statement. "Today, the Chairman is fulfilling part of the commitment he made to the President to return our fallen American service members. We are encouraged by North Korea's actions and the momentum for positive change."

The move was first reported by South Korea-based Yonhap news agency.

It's unclear how many remains are being transported out of North Korea; the White House said an estimated 5,300 Americans have not yet been brought home.

"The United States owes a profound debt of gratitude to those American service members who gave their lives in service to their country and we are working diligently to bring them home," Ms. Sanders said. "It is a solemn obligation of the United States government to ensure that the remains are handled with dignity and properly accounted for so their families receive them in an honorable manner."

Earlier this week, Mr. Trump said the process of returning the remains was under way.

"As you may know, we're also working to bring back the remains of your brothers-in-arms who gave their lives in Korea. And I hope that, very soon, these fallen warriors will begin coming home to lay at rest in American soil. That's starting the process," the president said during a speech to a VFW convention in Kansas City.

Following the repatriation ceremony in South Korea, the remains are expected to transported to Hawaii for forensic identification, the Yonhap News Agency reported.

Back To Top

## North Korea Marks War Anniversary As US Remains Flown Out (Berger, AFP)
**Friday, July 27, 2018**
AFP
By Sebastien Berger

In mist-covered hills, North Korean soldiers, sailors and civilians gathered Friday at a heroes' cemetery to commemorate their brothers in arms on the anniversary of the end of the Korean War.

Hostilities between the US-led United Nations forces and the North Koreans and their Chinese allies ceased 65 years ago with an armistice rather than a peace treaty, leaving the peninsula technically still in a state of conflict.

The two sides had fought each other to a standstill, millions were dead and Korea was a divided, war-ravaged ruin but the North's self-proclaimed victory has long constituted a key plank of the Kim dynasty's right to rule.

Platoon by platoon, units gathered at the graveyard on the outskirts of Pyongyang dominated by a towering sculpture of a rifle muzzle and bayonet, and adorned with the medal of a Hero of the Democratic People's Republic of Korea, the North's official name.

They laid flowers before an oversized granite coffin, draped in a metal flag and topped with a submachine gun and cap.

An announcer intoned: "Let us bow before the martyrs who took part in the Great Fatherland Liberation War" – Pyongyang's name for the conflict – before the troops doffed caps and bowed.

According to official North Korean accounts, the first of the cemetery's occupants to die, Jang Thae Hwa, 22, blocked a

WASHAR0003365

pillbox opening with his chest one day after the North invaded the South in 1950 so that his unit could advance.

Pyongyang's histories say the last soldier killed in the conflict to be laid to rest at the site was Ri Hyon Jun, 20, a ground gunner who was made a Hero of the DPRK for shooting down four enemy aircraft, and died in a later engagement just five days before the fighting ended.

Ceremonies complete, the soldiers strolled between the rows of graves, arranged chronologically in order of time of death.

At the same time on the other side of the country, remains believed to be those of American servicemen killed in the war were being loaded onto a US aircraft for transportation to the South, in the first stage of their final journey home.

– 'Shining victory' –

Relations between nuclear-armed Pyongyang and Washington have undergone an astonishing turnaround in recent months.

After exchanging personal insults and threats of war last year as tensions mounted, the North's leader Kim Jong Un and US President Donald Trump shook hands at an unprecedented summit in Singapore last month.

The return of the US remains was part of their agreement.

But whether the North is willing to give up the nuclear arsenal which it has spent decades developing, and at a cost of multiple sets of UN Security Council sanctions, remains unclear.

In the Singapore statement Kim pledged to work towards denuclearisation of the Korean peninsula, a vague term open to interpretation on both sides, and there have been no subsequent confirmed moves by Pyongyang – which has condemned US demands for its unilateral disarmament as "gangster-like".

But it is looking to develop its impoverished economy and authorities are seeking to ensure that the newfound bonhomie endures.

Unlike previous commemorations, AFP was not allowed to interview attendees at the cemetery, or at Mansu hill, where attendees laid flowers before the giant statues of Kim's predecessors, his father and grandfather Kim Jong Il and Kim Il Sung that look out over Pyongyang.

Diplomats in the capital say that meetings with government officials are even harder to secure than usual.

And propaganda posters focus on the heroism of the North's troops, rather than condemning — or even naming — the enemy.

At a national conference of war veterans on Thursday, politburo presidium member Choe Ryong Hae focussed on the "shining victory of the Juche-oriented military idea, strategy and tactics and outstanding commanding art of Kim Il Sung".

This was in marked contrast to last year's anniversary, when state media repeatedly referred to "the US imperialist aggressors" and newspapers proclaimed that the North would inevitably triumph over its longstanding enemy.

"Still not coming to its senses, the US is persisting in the hopeless confrontation with the DPRK, plunging itself deeper into the abyss of ruin," read a commentary widely carried on July 27, 2017.

The following day Pyongyang carried out its second launch of a Hwasong-14 intercontinental ballistic missile.

Back To Top

## Duterte OKs Bill Creating Muslim Autonomous Region In South (Gomez, AP)
Friday, July 27, 2018
Associated Press
By Jim Gomez

MANILA, Philippines (AP) — Philippine President Rodrigo Duterte has signed legislation creating a new Muslim autonomous region aimed at settling nearly half a century of Muslim unrest in the south, where troops crushed an attempt last year by Islamic State group-linked militants to turn a city into a stronghold.

Presidential spokesman Harry Roque and another key aide, Bong Go, told reporters without elaborating late Thursday that Duterte signed the bill creating the region, to be called Bangsamoro. The autonomy deal, which has been negotiated for more than two decades under four presidents, was ratified earlier this week by both chambers of Congress.

"This is to announce that the president has just signed the BOL into law," Roque said in a cellphone message, referring to the Bangsamoro organic law.

It's the latest significant attempt by the government to end Muslim fighting that has left more than 120,000 people dead and hampered development in the country's most destitute regions. The deal was negotiated with the Moro Islamic Liberation Front, the largest Muslim rebel group in the south, although about half a dozen smaller IS-linked radical groups remain a threat in the region, the homeland of minority Muslims in the largely Roman Catholic nation.

Al Haj Murad Ebrahim, chairman of the Moro rebel front, told a news conference Tuesday that 30,000 to 40,000 armed fighters would be "decommissioned" if the autonomy deal is

WASHAR0003366

fully enforced. The disarming would be done in batches based on compliance with the accord, with the final 40 percent of the guerrillas turning over their weapons once there is full compliance.

Murad added that six of the largest guerrilla camps in the south were already being converted into "productive civilian communities" to help the insurgents return to normal life.

Murad appealed to the international community to contribute to a trust fund to be used to finance the insurgents' transition from decades of waging one of Asia's longest rebellions.

"We will decommission our forces, the entire forces," Murad said. He declined to immediately cite the number of weapons that "will be put beyond use."

The military has estimated the Moro rebel group's size at a much lower 11,000 fighters.

The Bangsamoro replaces an existing poverty- and conflict-wracked autonomous region and is to be larger, better-funded and more powerful. An annual grant, estimated at 60 billion to 70 billion pesos ($1.1 billion to $1.3 billion), is to be set aside to bolster development in the new region.

Murad's guerrilla force is the second in the south to drop a demand for a separate Muslim state in exchange for autonomy. The Moro National Liberation Front forged a 1996 peace deal with the government that led to the current five-province Muslim autonomous region, which has largely been regarded as a failure.

Western governments have welcomed the autonomy pacts. They worry that small numbers of Islamic State group-linked militants from the Middle East and Southeast Asia could forge an alliance with Filipino insurgents and turn the south into a breeding ground for extremists.

Murad said it's crucial for the peace agreement to be fully enforced, citing how earlier failed attempts prompted some guerrillas to break away and form more hard-line groups like the Abu Sayyaf, a brutal group listed by the United States and the Philippines as a terrorist organization.

Hundreds of militants, including those who broke off from Murad's force, were among black flag-waving fighters who swore allegiance to the Islamic State group and laid siege to the southern Islamic city of Marawi last year. Troops backed by U.S. and Australian surveillance aircraft routed the militants after five months of airstrikes and ground assaults that left more than 1,200 people, mostly Islamic fighters, dead and the mosque-studded city in ruins.

"We can roughly conclude that all these splinter groups are a result of the frustration with the peace process," Murad said.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Duterte Signs Law Giving More Autonomy To Muslims In Southern Philippines (Villamor, NYT)

**Thursday, July 26, 2018**
New York Times
By Felipe Villamor

MANILA — President Rodrigo Duterte of the Philippines has signed a landmark law aimed at giving expanded autonomy to Muslims in the south of the country, his spokesman said on Thursday, with the legislation expected to bring some measure of peace to a region choked by four decades of separatist violence.

The long-delayed law came four years after the government signed a peace deal with the separatist group, the Moro Islamic Liberation Front, which dropped its bid for full independence in return for the right to self-rule.

The front had fought a fierce uprising since 1978 that left about 120,000 people dead and pushed pockets of the deep south of the Philippines into a cycle of extreme poverty and violence.

The new legislation, called the Bangsamoro Organic Law, was supposed to have been passed early this week, but infighting among allies of Mr. Duterte in Congress delayed its passage. The president's spokesman, Harry Roque, said on Thursday that the presidential palace had now received a copy of the law.

"After much confusion, the president has signed into law the Bangsamoro Organic Law," Mr. Roque said in an interview.

The legislation mandates the expansion of an autonomous region that would be led initially by a "transitional authority" composed mostly of former fighters before eventually being governed by its own parliament.

The region is intended to supersede an earlier autonomous zone, composed of five provinces, that was considered to have benefited only a small number of Muslim families and that had been wracked by violence. The new area is expected to be larger and better funded.

Under the new plan, the government would retain police and military forces in the area, combatants would lay down their weapons in phases, and six of the guerrilla group's camps would be converted to "productive civilian communities," according to the leader of the Moro Islamic Liberation Front, Al Haj Murad Ebrahim.

WASHAR0003367

Mr. Murad said that the rebel group had 30,000 to 40,000 fighters and that those combatants would willingly give up their weapons, a first step toward reducing the proliferation of unlicensed firearms in the region.

The exact number of insurgents and the quantity of weapons they possess have been relayed to the army, Mr. Murad said. The military had long estimated that the front had around 10,000 fighters.

Mr. Murad said that the new law was expected to decrease extremism in the south because young Muslims would finally feel they were being given a voice and a fairer chance to succeed.

He said that the move would also make it harder for Islamic State-linked operatives to recruit disaffected youth in the region.

Last year, fighters from Southeast Asia and the Middle East helped a local faction of the Islamic State to take over the city of Marawi, leading to a five-month battle ending in October that left hundreds dead. The faction was composed mainly of fighters formerly allied with the Moro Islamic Liberation Front who had become frustrated with the peace process.

The Philippine military eventually took back Marawi with help from the United States and Australia, which provided surveillance and intelligence data.

Mr. Murad said, "We are quite confident that if there is a political settlement acceptable by majority of Bangsamoro Muslim people, splinter groups will gradually be carried into the mainstream."

"It is very difficult for them to exist minus the support of some people in the area," he said, adding: "If the people support the result of the peace process, there is no choice for these small groups except to join."

Rommel Banlaoi, a security analyst at the Philippine Institute for Peace, Violence and Terrorism Research, agreed that the new law could bring calm to the south by requiring the Moro Islamic Liberation Front "to stop fighting the Philippines through military struggle."

"But it will not automatically bring peace," Mr. Banlaoi said, stressing that the key to reducing the violence was making sure that the front followed through with its promise to disarm and decommission its thousands of combatants.

Referring to the law, he said, "The B.O.L. is not a magic pill that can give a solution to multifaceted problems of armed conflicts" in the region.

Back To Top

## Cambodia's Hun Sen Hails 'Elimination' Of Opposition At Mass Rally (Se, Freeman, AFP)

**Friday, July 27, 2018**
AFP
By Suy Se, Joe Freeman

Phnom Penh (AFP) – Cambodia's strongman ruler hailed Friday the success of efforts to "eliminate traitors" at a mass rally ahead of an election without a credible opposition that will leave the country as a virtual one-party state.

Tens of thousands of supporters decked in the ruling party's white and blue arrived from dawn in the centre of the capital, some on motorbikes and buses, in an impressive show of support for the Cambodia People's Party (CPP), which premier Hun Sen has led for 33 years.

But it will be the only political showing of significant scale ahead of Sunday's election after the only serious opposition was dissolved by the Supreme Court in November.

In typically bombastic comments, Hun Sen vowed victory on Sunday and took a swipe at his opponents, many of whom have been jailed, prodded into self-exile or have gone to ground inside the kingdom since the ruling.

"Recently we took legal action to eliminate traitors who attempted to topple the government," he said of the court ruling that disbanded the Cambodia National Rescue Party (CNRP).

"If we didn't eliminate them with an iron fist, maybe by now Cambodia would be in a situation of war."

A pillar of Hun Sen's appeal is that he has presided over peace and a level of prosperity since the early 1990s when Cambodia emerged from decades of war and the evisceration of the Khmer Rouge years.

"With the CPP we have growth, we have schools, peace... everything," said supporter Khun Bopha of a party that now presides over an economy chugging along at a growth rate of around six to seven percent.

"We will have a big win on July 29."

– 'Sham process' –

The Supreme Court knocked out the opposition after Hun Sen accused CNRP members of plotting against the government.

Rights groups, NGOs and the media were all swept up in the crackdown last year as Hun Sen quashed critical voices and challengers in the lead-up to the vote.

The opposition, many of whose key members live abroad for fear of prosecution, have urged supporters to boycott the poll

WASHAR0003368

in a "clean finger" campaign to refuse to be inked at polling stations on Sunday.

Election authorities have said calls to boycott are a "crime" and have already fined five former members of the opposition in northern Cambodia after accusing them of taking part in the anti-election campaign.

The United States and the European Union have pulled assistance and monitors after challenging the credibility of the election.

But staunch Cambodia ally China has stepped in to provide equipment.

Cambodia has held six elections – including the first UN-sponsored poll in 1993 – after the country of 15 million emerged from decades of civil war.

Hun Sen has cast himself as the saviour of the country from the ravages of the Khmer Rouge, even though he was a former member of the ultra-Maoist group.

Twenty parties are running in the election but many are new or of obscure origins and have been widely criticised for helping legitimise the ballot by taking part.

"Cambodia's election is a sham process that is designed to prolong Hun Sen's authoritarian rule and will plunge the country into further misery and repression," International Federation for Human Rights Secretary-General Debbie Stothard said in a statement Thursday.

Back To Top

## Cambodian Leader Wraps Up Campaigning Blasting Boycott Calls (Harmer, AP)
Friday, July 27, 2018
Associated Press
By Jerry Harmer

PHNOM PENH, Cambodia (AP) — Cambodian Prime Minister Hun Sen on Friday wrapped up campaigning for re-election by attacking an opposition call to boycott the polls and calling those who heed it "destroyers of democracy."

Some 8.3 million people are registered to vote in Sunday's general election to fill 125 seats in the National Assembly.

Hun Sen's Cambodian People's Party is expected to win easily after a court last year dissolved its only credible opponent, the Cambodia National Rescue Party, on charges that it conspired with the U.S. to overthrow the government.

Critics say the move was part of a long-planned strategy to remove all obstacles to Hun Sen continuing to rule the country he's dominated politically since first becoming prime minister in 1985.

In the last general election in 2013, the opposition CNRP came close to pulling off a surprise victory, winning 44 percent of the popular vote.

The poll is widely seen outside Cambodia as a sham. The United States and the European Union have declined to help fund it, though Japan has contributed.

The CNRP has advised Cambodians not to vote, a boycott the ruling party's leaders fear of heeded, would deeply embarrass them and badly undermine their victory.

Speaking in front of a large crowd — 150,000 strong, according to its organizers — Hun Sen said, "People who listen to the words of the country's betrayers, and don't vote, are the ones who destroy democracy in Cambodia.

"You will regret it. So I suggest all Khmer citizens think about that, because the majority of people will vote but the ones who don't vote, how will they live with those who do?"

He said peace and development were the priorities for his party.

Twenty parties in all are on Sunday's ballot, but apart from Hun Sen's CPP, most are small, under-resourced or almost completely unknown. Some are said to be proxies, set up by the ruling party to give the semblance of a contest.

Preliminary results are expected on Sunday night.

Hun Sen's party has been dominating Cambodia's political scene, but its election maneuvering has brought some sharp rejoinders from abroad.

The U.S. Congress this past week passed the Cambodia Democracy Act "to promote free and fair elections, political freedoms and human rights in Cambodia and impose sanctions on Hun Sen's inner circle."

The measure, which strongly condemns Hun Sen's regime, would bar individuals designated by President Donald Trump from entering the U.S. and blocks any assets or property they may possess. Its suggested list of those who should be sanctioned includes Hun Sen, several of his close family members, and about a dozen other top officials and military officers.

Cambodian officials and ruling party members rejected the measure as counterproductive interference into Cambodia's internal affairs.

Japan, traditionally more reluctant than Western nations to criticize Cambodia's government, announced this past week it would not be sending election monitors for Sunday's polls.Although there was no clear explanation for the decision, it is seen as a low-key but unexpected criticism of the election process.

WASHAR0003369

Hun Sen became prime minister in 1985 and has led Cambodia ever since with a combination of skill, guile and ruthlessness.

He is a former Khmer Rouge field commander. He defected to Vietnam during the disastrous rule of Pol Pot, later returning to help overthrow the regime.

Copyright 2018 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Back To Top

## Cambodia's Hun Sen Doesn't Get Pass From Washington (Hunt, WT)

Thursday, July 26, 2018
<u>Washington Times</u>
By Luke Hunt

There are still some bad memories and unsettled grudges in Washington dating back to the unceremonious end of the Vietnam War in 1975, and the man who has run Cambodia for more than 30 years is still feeling the heat.

Unlike other authoritarian leaders like the Philippines' Rodrigo Duterte, Egypt's Abdel-Fattah el-Sissi, or even the coup-installed Prime Minister Prayuth Chan-ocha in neighboring Thailand, Cambodian Prime Minister Hun Sen is not getting a fresh look from the Trump administration, which has kept up a harsh critique of democracy and civil liberties in the Southeast Asian nation even as Cambodian voters head to the polls Sunday.

Citing a lack of democracy, White House press secretary Sarah Huckabee Sanders announced earlier this year the U.S. was suspending some $8 million in aid for Cambodia.

Human rights groups are already condemning Sunday's poll and calling on the U.S. and other countries to take even tougher measures.

"The Cambodian government over the past year has systematically cracked down on independent and opposition voices to ensure that the ruling party faces no obstacles to total political control," said Brad Adams, Asia director at Human Rights Watch, in a statement. "Dissolving the main opposition party and banning many of its senior members from politics means this election cannot possibly reflect the will of the Cambodian people."

Unlike neighboring Vietnam, where changes in the Communist Party leadership have resulted in a far more developed relationship with the U.S., Cambodia is still viewed through an old-school Cold War prism. Mr. Hun Sen is widely seen as an embarrassing throwback, a Communist relic from a distant past.

"Regrettably, a nation that at one stage had appeared to have some hope of emerging out of decades of violence now appears to be reverting to an autocracy that is anything but benevolent," said Keith Loveard, a risk analyst with Jakarta-based Concord Securities.

Mr. Hun Sen, came to power in 1985 and is the world's longest-serving prime minister, has accused Washington and the opposition Cambodian National Rescue Party (CNRP) of fomenting a "color revolution," changes that were used to justify a crackdown on opposition parties and put opposition leader Kem Sokha in jail last November on charges of treason.

Mr. Kem Sokha's party was subsequently dissolved by the courts and CNRP politicians and supporters have fled overseas. Independent newspapers have been closed or sold to government-friendly interests, and about 30 radio frequencies shuttered and dissenters prosecuted.

The U.S. Embassy put out a sharp statement condemning the crackdown on the opposition and the jailing of Mr. Kem Sokha at the time.

"It is becoming increasingly evident to the world that the Cambodian government's restrictions on civil society, suppression of the press, and banning of more than 100 opposition leaders from political activities have significantly set back Cambodia's democratic development and placed its economic growth and international standing at risk," the embassy said.

Conservative ties

Mr. Hun Sen's many critics, including those in Washington, argue the crackdown has more to do with the opposition's shock electoral performance in 2013, when it went close to snatching an outright victory. The CNRP enjoyed strong support in Republican and conservative circles in the U.S., where its exiled former leader Sam Rainsy was a familiar figure at conservative think tanks like the Heritage Foundation and the International Republican Institute (IRI).

U.S. conservatives see Mr. Hun Sen's ruling Cambodian People's Party (CPP) "as the descendants of this legacy," said Sophal Ear, associate professor of diplomacy and world affairs at Occidental College in Los Angeles.

Rep. Ted Yoho, the Florida Republican who chairs the House Foreign Affairs subcommittee on Asia and the Pacific, introduced in May the Cambodia Democracy Act of 2018, accusing Mr. Hun Sen of "undermining democracy" ahead of the poll.

If passed by Congress and adopted by the Trump administration, the act would impose financial sanctions and travel bans on the prime minister and top aides. But analysts

WASHAR0003370

said this would have only a marginal impact given Cambodia's embrace of China in return for financial support worth many billions of dollars.

"None of this will phase Hun Sen," said Carl Thayer, emeritus professor at the University of New South Wales in Australia. "China's interests are best served by stability in Cambodia as well as a compliant regime in Phnom Penh."

Beijing, Mr. Thayer added, "will welcome" another win Sunday by Mr. Hun Sen and the CPP.

As a proxy for China, Cambodia has proved most effective in backing Beijing's maritime claims in the hotly disputed South China Sea, further angering Washington. An impasse over debts dating back to the Vietnam War have also soured relations between Washington and Phnom Penh.

"Human rights remains a disaster, Chinese investment is voracious and while there are increasing signs that the average Cambodian is dissatisfied with the situation — especially if he or she is being forced off their land," said Mr. Loveard. "There is no sign that the country is going to become a democratic poster child."

<u>Back To Top</u>

## A Day Before Laos Dam Failed, Builders Saw Trouble (Ives, NYT)

**Friday, July 27, 2018**
<u>New York Times</u>
By Mike Ives

ATTAPEU TOWN, Laos — The day before this week's catastrophic dam failure in Laos, the companies building the dam knew that it was deteriorating, and one of them saw a potential trouble sign three days in advance. Yet many people living downstream received no warning of the deadly flood that was about to sweep away villages, farms, livestock and people.

The companies said they had warned Laotian officials of the danger, and some villages were evacuated, but the dam's collapse killed at least 27 people — many more are still missing — and displaced at least 6,600 others in Laos. On Thursday, state media in Cambodia reported that as many as 25,000 more people in that country were being evacuated from the northern border province of Stung Treng, as the flood surge made its way south.

Now, as rescue workers scramble to find missing villagers and care for others in makeshift shelters, questions are mounting about the speed of the one-party state's response, the quality of the companies' work, and whether they could have done more to prevent the accident or alert people to the peril.

Xe-Pian Xe-Namnoy Power Company, a joint venture of two South Korean firms, one from Thailand and a state-owned Laotian firm, is building the hydroelectric project, which includes several dams.

The state-controlled Lao News Agency initially reported that 5 billion cubic meters of water had spilled over the dam, but later quietly revised that number downward to half a billion cubic meters, or roughly 17.7 billion cubic feet, of water. Even the lower volume would be enough to cover an area the size of Manhattan in water 28 feet deep.

Accounts given by the two South Korean companies differ in several details, and do not answer the crucial question: When did they know, or should they have known, that the dam might be headed toward collapse?

On Friday, engineers noticed a depression, or "settlement," about four inches deep in the center of the dam, Korea Western Power, one of the companies, said in a report to South Korea's Parliament.

A company official told lawmakers — one of whom released the report on Thursday — that such sinking was common with the kind of heavy rainfall the region was experiencing, so the engineers decided to monitor it rather than take action.

On Sunday, engineers found 10 "fractured settlements" on the top of the dam and set out to repair them, but they could not get the necessary repair equipment to the scene until Monday afternoon, when it was too late, the company's report said.

SK Engineering & Construction of South Korea, the main builder of the project, said on Thursday that it had discovered at 9 p.m. on Sunday that part of the dam's top was missing.

In a statement, the company said it had "immediately" reported the damage to the local authorities and evacuations of the nearest villages began, but it did not alert the provincial government until noon the next day that the dam might deteriorate further.

By 11 a.m. on Monday, Korea Western Power said, there was a depression more than three feet deep in the top of the dam.

On Monday, the joint venture sent a written notice to provincial officials, which has been seen by The New York Times, warning that Saddle Dam D was in a "very dangerous condition now due to heavy rainfall," and that villagers downstream should be told to "evacuate to high level position to avoid unfortunate accident by heavy water flow."

By Monday afternoon or early evening, the dam was crumbling further and water was pouring through. SK said it received the first report of a village flooding at 1:30 a.m. Tuesday.

120