Case No. 15-50759

# In the United States Court of Appeals for the Fifth Circuit

DEFENSE DISTRIBUTED;
SECOND AMENDMENT FOUNDATION, INCORPORATED,
Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,
Defendants-Appellees

Appeal from an Order of the United States District Court for the Western District of Texas, The Hon. Robert L. Pitman, District Judge (Dist. Ct. No. 1:15-CV-372-RP)

BRIEF FOR THE APPELLANTS

Matthew Goldstein
Matthew A. Goldstein, PLLC
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20009
202.550.0040/Fax 202.683.6679

Alan Gura
    Counsel of Record
Gura & Possessky, PLLC
916 Prince Street, Suite 7
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

December 10, 2015

Counsel for Appellants
(Additional Counsel Inside Cover)

Additional Counsel for Appellants

William B. Mateja
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
214.747.5070/Fax 214.747.2091

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

DOSWASHINGTONSUP00571

CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed, et al.* v. *U.S. Dep't of State, et al.*, No. 15-50759

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>Plaintiffs</u>:
Defense Distributed, Second Amendment Foundation, Inc.

<u>Defendants</u>:
U.S. Dep't of State, John F. Kerry, Directorate of Defense Trade Controls, Kenneth B. Handelman, C. Edward Peartree, Sarah J. Heidema, Glenn Smith

<u>Plaintiffs' Counsel</u>:
Alan Gura, Gura & Possessky, PLLC; Matthew A. Goldstein, Matthew A. Goldstein, PLLC; William B. Mateja, William T. "Tommy" Jacks, David Morris, Fish & Richardson P.C.; Josh Blackman

<u>Defendants' Counsel</u>:
Loretta Lynch, Michael S. Raab, Daniel Bentele Hahs Tenny, Eric J. Soskin, Stuart J. Robinson, Richard L. Durban, Benjamin C. Mizer, Anthony J. Coppolino, Zachary C. Richter, – U.S. Department of Justice

/s/ Alan Gura
Alan Gura
Counsel for Appellants

i

Statement Regarding Oral Argument

The case raises significant constitutional issues, some of which may be of first impression. Oral argument would likely be of significant assistance to the Court.

DOSWASHINGTONSUP00573

TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.      The Regulatory Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . 4

        a.    "Technical Data". . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        b.    "Export". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        c.    "Public Domain". . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.      The History of ITAR's Prior Restraint Application. . . . . . . 9

    3.      Three-dimensional Printing and Computer Numeric
           Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DOSWASHINGTONSUP00574

4.      Defendants' Imposition of a Prior Restraint Against
        Plaintiffs' Speech. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        a.      The Published Files. . . . . . . . . . . . . . . . . . . . . . . . . . 20

        b.      The "Ghost Gunner" Files. . . . . . . . . . . . . . . . . . . . 24

        c.      The CAD Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        d.      Prior Restraint on Other Files. . . . . . . . . . . . . . . . 26

        e.      The Prior Restraint's Impact. . . . . . . . . . . . . . . . . . 26

    5.      Relevant Procedural History. . . . . . . . . . . . . . . . . . . . . . . 28

    6.      The District Court's Decision. . . . . . . . . . . . . . . . . . . . . . . 28

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

I.      Plaintiffs Are Likely to Succeed on the Merits. . . . . . . . . . 35

    A.      Congress Never Authorized Defendants'
            Censorship of Privately-Generated,
            Unclassified Speech. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    B.      Defendants Are Violating Plaintiffs'
            First Amendment Rights. . . . . . . . . . . . . . . . . . . . . . . . . 43

        1.      Plaintiffs' Files Constitute Protected Speech. . . . . . 43

        2.      ITAR's Application to All Public, Unclassified
                Speech Containing Technical Data Is
                Unconstitutionally Overbroad. . . . . . . . . . . . . . . . . . 46

iv

3.      Defendants Impose an Unconstitutional
        Prior Restraint Against Plaintiffs' Lawful
        Public Speech. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        a.      Unbridled Discretion to Censor Speech. . . . . . . 50

        b.      Lengthy Delays and the Lack of Procedural
                Safeguards. . . . . . . . . . . . . . . . . . . . . . . . . . . 52

4.      Defendants' Speech Regulation of Plaintiffs' Speech
        Fails Any Level of First Amendment Scrutiny. . . . . . 55

C.   Defendants' Prior Restraint is Void for Vagueness. . . . . . . 60

D.   Defendants Are Violating Plaintiffs' Second Amendment
     Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

     1.      The Government Bears the Burden of Proving that
             Laws Burdening Second Amendment Rights Pass
             Heightened Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . 62

     2.      The Second Amendment Secures the Right to
             Produce Firearms, and to Exchange Technical
             Data Concerning Firearms. . . . . . . . . . . . . . . . . . 64

     3.      Defendants' Regulations Fail Any Level of Second
             Amendment Scrutiny. . . . . . . . . . . . . . . . . . . . . . . 67

II.    Defendants' Licensing Scheme Irreparably
       Harms Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

III.   The Balance of Equities Favors Granting Injunctive
       Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

IV.    The Public Interest Warrants Injunctive Relief. . . . . . . . 71

V.     No Bond or Other Security Is Required as a Condition
       of Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

v

DOSWASHINGTONSUP00576

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   72

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Addendum

DOSWASHINGTONSUP00577

# TABLE OF AUTHORITIES

Cases

*Asgeirsson* v. *Abbott*,
   696 F.3d 454 (5th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Ashcroft* v. *Free Speech Coalition*,
   535 U.S. 234 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Bernstein* v. *DOC*, No. C-95-0582-MHP,
   2004 U.S. Dist. LEXIS 6672 (N.D. Cal. Apr. 19, 2004). . . . . . . . . . . 14

*Bernstein* v. *U.S. Dep't of State*,
   922 F. Supp. 1426 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bernstein* v. *U.S. Dep't of State*,
   945 F. Supp. 1279 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . 13, 52, 53

*Bernstein* v. *U.S. Dep't of State*,
   974 F. Supp. 1288 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bernstein* v. *United States Dep't of Justice*,
   176 F.3d 1132 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 43

*Bond* v. *United States*,
   134 S. Ct. 2077 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Bowen* v. *Georgetown Univ. Hospital*,
   488 U.S. 204 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Cahaly* v. *Larosa*,
   796 F.3d 399 (4th Cir. 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Carey* v. *Pop. Servs. Int'l*,
   431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

DOSWASHINGTONSUP00578

*Catholic Leadership Coalition of Texas* v. *Reisman*,
   764 F.3d 409 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 49

*Chesapeake B & M, Inc.* v. *Harford County*,
   58 F.3d 1005 (4th Cir. 1995) (en banc). . . . . . . . . . . . . . . . . . . . . . 51

*Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Christensen* v. *Harris County*,
   529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Citizens United* v. *FEC*,
   558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*City of Lakewood* v. *Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Connally* v. *General Const. Co.*,
   269 U.S. 385 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Deerfield Med. Center* v. *City of Deerfield Beach*,
   661 F.2d 328 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*District of Columbia* v. *Heller*,
   554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 64, 70

*East Brooks Books, Inc.* v. *Shelby County*,
   588 F.3d 360 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Elrod* v. *Burns*,
   427 U.S. 347 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Ezell* v. *City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 70

DOSWASHINGTONSUP00579

*Fantasy Ranch, Inc.* v. *City of Arlington,*
    459 F.3d 546 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*FDA* v. *Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Florida Star* v. *B.J.F.,*
    491 U.S. 524 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Forsyth County* v. *Nationalist Movement,*
    505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Freedman* v. *Maryland,*
    380 U.S. 51 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 53, 55

*FW/PBS, Inc.* v. *Dallas,*
    493 U.S. 215 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Gibson* v. *Tex. Dep't of Ins.–Div. of Workers' Comp.,*
    700 F.3d 227 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Gonzales* v. *Oregon,*
    546 U.S. 243 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Gorin* v. *United States,*
    312 U.S. 19 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Grayned* v. *City of Rockford,*
    408 U.S. 104 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Herceg* v. *Hustler Magazine, Inc.,*
    814 F.2d 1017 (5th Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.,*
    174 F.3d 411 (4th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

DOSWASHINGTONSUP00580

*Holder* v. *Humanitarian Law Project*,
   561 U.S. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47

*Hynes* v. *Mayor & Council of Oradell*,
   425 U.S. 610 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*INS* v. *Chadha*,
   462 U.S. 919 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*INS* v. *St. Cyr*,
   533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Jackson Women's Health Org.* v. *Currier*,
   760 F.3d 448 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Junger* v. *Daily*,
   209 F.3d 481 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Kaepa, Inc.* v. *Achilles Corp.*,
   76 F.3d 624 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*King* v. *Burwell*,
   135 S. Ct. 2480 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 42

*Lake Eugenie Land & Dev., Inc.* v. *BP Exploration & Prod.*
   *(In re Deepwater Horizon)*, 732 F.3d 326 (5th Cir. 2013) . . . . . . . . . 34

*Louisiana Pub. Serv. Comm'n* v. *FCC*,
   476 U.S. 355 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Mance* v. *Holder*,
   74 F. Supp. 3d 795 (N.D. Tex. 2015). . . . . . . . . . . . . . . . . . . . . 67

*Marceaux* v. *Lafayette City-Parish Consol. Gov't*,
   731 F.3d 488 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 49

x

*Martin* v. *Harrington & Richardson, Inc.*,
  743 F.2d 1200 (7th Cir. 1984).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*McCullen* v. *Coakley*,
  134 S. Ct. 2518 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Michigan* v. *EPA*,
  268 F.3d 1075 (D.C. Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Miller* v. *California*,
  413 U.S. 15 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Murchison Capital Partners, L.P.* v. *Nuance Communs., Inc.*,
  No. 14-10819, 2015 U.S. App. LEXIS 14228
  (5th Cir. Aug. 11, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nat'l Endowment for the Arts* v. *Finley*,
  524 U.S. 569 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Nat'l Fed'n of Indep. Bus.* v. *Sebelius*,
  132 S. Ct. 2566 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms &
Explosives*,
  700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 63, 64, 68

*New York Times* v. *United States*,
  403 U.S. 713 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Norton* v. *City of Springfield*,
  612 Fed. Appx. 386 (7th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . 57

*Reed* v. *Town of Gilbert*,
  135 S. Ct. 2218 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-58

*Reliable Consultants, Inc.* v. *Earle*,
  517 F.3d 738 (5th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66

xi

DOSWASHINGTONSUP00582

*Richmond Newspapers* v. *Virginia,*
    448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Riley* v. *Nat'l Fed. of Blind of N.C.,*
    487 U.S. 781 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Shuttlesworth* v. *Birmingham,*
    394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Simon & Schuster, Inc.* v. *Members of the N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Skidmore* v. *Swift & Co.,*
    323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Speiser* v. *Randall,*
    357 U.S. 513 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States ex rel. Attorney Gen.* v. *Delaware & Hudson Co.,*
    213 U.S. 366 (1909). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States* v. *Alvarez,*
    132 S. Ct. 2537 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Brown,*
    218 F.3d 415 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States* v. *Chi Mak,*
    683 F.3d 1126 (9th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States* v. *Edler Industries,*
    579 F.2d 516 (9th Cir. 1978).. . . . . . . . . . . . . . . . . . . . 11, 12, 48

*United States* v. *Featherston,*
    461 F.2d 1119 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . 47

DOSWASHINGTONSUP00583

*United States* v. *Henry*,
    688 F.3d 637 (9th Cir. 2012)................................. 65

*United States* v. *Hsu*,
    364 F.3d 192 (4th Cir. 2004)................................ 62

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010). ................................ 68

*United States* v. *Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ............................... 68

*United States* v. *Mead Corp.*,
    533 U.S. 218 (2001). ................................... 40, 42

*United States* v. *Playboy Entm't Group*,
    529 U.S. 803 (2000) ....................................... 58

*United States* v. *Rehlander*,
    666 F.3d 45 (1st Cir. 2012)................................. 36

*United States* v. *Scruggs*,
    714 F.3d 258 (5th Cir. 2013) .............................. 46

*United States* v. *Stevens*,
    559 U.S. 460 (2010). ................................... 46, 55

*United States* v. *Wu*,
    711 F.3d 1 (1st Cir. 2013)................................. 62

*Universal City Studios, Inc.* v. *Corley*,
    273 F.3d 429 (2d Cir. 2001). .............................. 43

*Utility Air Regulatory Group* v. *EPA*,
    134 S. Ct. 2427 (2014). ................................... 42

xiii

DOSWASHINGTONSUP00584

*Whitman* v. *Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Winter* v. *Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Statutes and Rules

18 U.S.C. § 2339A(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 794(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

22 U.S.C. § 2278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 U.S.C. § 2278(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 39

22 U.S.C. § 2778(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 U.S.C. § 2778(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 U.S.C. § 2778(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

28 U.S.C. § 1292(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. § 120.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 52

22 C.F.R. § 120.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

22 C.F.R. § 120.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 52

DOSWASHINGTONSUP00585

22 C.F.R. § 120.10(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 C.F.R. § 120.10(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 23

22 C.F.R. § 120.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

22 C.F.R. § 120.11(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

22 C.F.R. § 120.11(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

22 C.F.R. § 120.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 120.17(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 38

22 C.F.R. § 120.41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 C.F.R. § 121.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 49, 52

22 C.F.R. § 127.1(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 128.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Fed. R. Evid. 201(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Other Authorities

49 Fed. Reg. 47,682 (Dec. 6, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 10

74 Fed. Reg. 63,497 (Dec. 3, 2009). . . . . . . . . . . . . . . . . . . . . . . . 32, 54

80 Fed. Reg. 31,525 (June 3, 2015). . . . . . . . . . . . . . . . . . . . . . . . 16, 17

DOSWASHINGTONSUP00586

Andy Greenberg, "3D-Printed Guns As Art: London Design
Museum Buys Two 'Liberator' Printed Pistols," *Forbes*,
(Sep. 15, 2013), www.forbes.com/sites/andygreenberg/
2013/ 09/15/3d-printed-guns-as-art-london-design-
museum-buys-two-liberator-printed-pistols (last visited
Dec. 7, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bureau of Alcohol, Tobacco, Firearms & Explosives,
*Top 10 Frequently Asked Firearms Questions
and Answers*, https://www.atf.gov/file/61721/
download (last visited Dec. 9, 2015). . . . . . . . . . . . . . . . . . . . . . . . 45

Chris Anderson, "The New MakerBot Replicator Might
Just Change Your World," *Wired* (Sep. 19, 2012),
http://www.wired.com/ 2012/09 /how-makerbots-
replicator2-will-launch-era-of-desktop-manufacturing/
all (last visited Dec. 3, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Eugene Volokh, *Crime-Facilitating Speech*,
57 Stan. L. Rev. 1095 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Eugene Volokh, *Freedom of Speech, Permissible
Tailoring and Transcending Strict Scrutiny*,
144 U. Pa. L. Rev. 2417 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Josh Blackman, *The 1st Amendment, 2nd Amendment,
and 3D Printed Guns*, 81 Tenn. L. Rev. 479 (2014). . . . . . . . . . . . . 66

Mark Wilson, "Artist Warps 3-D Printed Gun Blueprints,
Protests Gun Violence," *Fast Company* (April 15, 2014),
http://www.fastcodesign.com/3028300/infographic-
of-the-day/artist-warps-3-d-printed-gun-blueprints-
protests-gun-violence (last visited Dec. 7, 2015). . . . . . . . . . . . . . . 21

Norman J. Singer, SUTHERLAND ON STATUTORY CONSTRUCTION
(7th ed. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

DOSWASHINGTONSUP00587

Paola Antonelli, "Design and Violence Debate I: Open Source,"
    *MOMA* (March 27, 2014), http://designandviolence.
    moma.org/design-and-violence-debate-i-open-source
    (last visited Dec. 7, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls,*
    *and the Right to Build Self-Defense Weapons Under Heller*,
    42 Golden Gate U. L. Rev. 447 (2012). . . . . . . . . . . . . . . . . . . . . . 66

PM522 Washbear 3D Printed .22LR Revolver Files,
    http://www.jamesrpatrick.com/p/pm522-
    washbear-3d-printed-22lr-pistol.html
    (last visited Dec. 4, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rachel Donadio, "A History of the Now, Found in Politically
    Charged Objects," *New York Times* (July 6, 2014)
    http://www.nytimes.com/2014/07/07/arts/design/
    victoria-and-albert-museum-pushes-boundaries-of-
    collecting.html (last visited Dec. 7, 2015). . . . . . . . . . . . . . . . . . . 22

The Writings of Thomas Jefferson
    (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

"Final Commodity Jurisdiction Determinations," https://www.
    pmddtc.state.gov/commodity_jurisdiction/determination.
    html (last visited Dec. 7, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

DOSWASHINGTONSUP00588

APPELLANTS' BRIEF

## INTRODUCTION

The pen may be mightier than the sword, but it is not a sword. Nor
are blueprints, computer files, and other forms of expression about
guns the "functional equivalent" of guns. Nor should public speech
including unclassified "technical data" be the stuff of national security
controls merely because it might theoretically relate to military
articles.

And when Americans speak in public forums about unclassified
information that they have created, they are not "exporting" it overseas
just because a foreigner might overhear their conversation.

This is not merely Plaintiffs' position. For years, it was the position
of the Department of Justice, which repeatedly warned that the
International Traffic in Arms Regulations ("ITAR") could not be used as
a prior restraint against speech in public forums. Indeed, the State
Department has adopted Plaintiffs' position in litigating ITAR's limits
before federal courts.

But Defendant State Department officials now veer far from the
recognized path. Ignoring DOJ advice, these officials singled out one

1

speaker among many on the novel theory that its speech falls within ITAR's boundless definition of "technical data" and thus cannot be "exported"—that is, expressed in any manner potentially accessible to foreigners—without prior approval. And the Government's speech-licensing regime is expensive, slow, indeterminate, and bereft of judicial review.

We have thus reached the point where Americans cannot speak about "technical data," whatever that is, without ensuring that the theater, auditorium, trade show floor, television audience or street corner is free of "foreign persons." And because the Internet is available worldwide, Americans risk severe penalties when exchanging a broad array of information online, including the most basic information pertaining to Second Amendment-protected arms.

Congress never sanctioned this state of affairs, which is intolerable under established First, Second, and Fifth Amendment precedent. The District Court's denial of a preliminary injunction against this prior restraint should be reversed.

2

STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202. ROA.15. The district court denied Plaintiffs' motion for a preliminary injunction on August 4, 2015. ROA.703. Plaintiffs filed a timely notice of appeal on August 13, 2015. ROA.1045. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

STATEMENT OF ISSUES

1. Whether, in enacting the Arms Export Control Act of 1976 ("AECA"), 22 U.S.C. § 2278 *et seq*., Congress authorized the State Department to create and enforce a prior restraint against public speech potentially related to "defense articles."

2. Whether the Government violates the First Amendment by imposing a content-based prior restraint, lacking procedural safeguards, on public speech that potentially aids the manufacture of "defense articles."

3. Whether the Government violates the Second Amendment by barring the dissemination of information used in the manufacture or maintenance of arms that responsible, law-abiding Americans typically possess for traditional lawful purposes.

3

DOSWASHINGTONSUP00591

4   Whether the Government's use of ITAR as a prior restraint on

public speech violates the Fifth Amendment right to due process.

STATEMENT OF THE CASE

1.      *The Regulatory Scheme*

Congressional authorization for Defendants' trade regulation of

"defense articles" is found in 22 U.S.C. § 2278(a)(1):

> In furtherance of world peace and the security and foreign policy of
> the United States, the President is authorized to control the import
> and the export of defense articles and defense services . . . The
> President is authorized to designate those items which shall be
> considered as defense articles and defense services for the purposes
> of this section and to promulgate regulations for the import and
> export of such articles and services . . . The items so designated shall
> constitute the United States Munitions List.

The State Department's Directorate of Defense Trade Controls

("DDTC") seeks to fulfill this function by administering the ITAR

regime, which sets forth the "U.S. Munitions List" ("USML") of items—

including "technical data," 22 C.F.R. § 120.10—whose "export" requires

advance government authorization. 22 C.F.R. §§ 120.17, 127.1(a)(1).

Unauthorized exports are punishable by up to twenty years in prison,

fines of up to $1,000,000, and civil penalties up to $500,000. 22 U.S.C. §

2778(c), (e).

4

DOSWASHINGTONSUP00592

a.    *"Technical Data"*

The USML purports to cover twenty-one categories of "technical data," broadly defined to include information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10(a)(1). This includes "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles," *id.*, although it excludes, inter alia, "general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain . . . ." 22 C.F.R. § 120.10(b).

When referring to various types of "technical data," the USML utilizes open-ended terms, such as "military application," *see, e.g.,* 22 C.F.R. § 121.1, which is undefined; and/or "specially designed," whose definition exceeds 900 words, 22 C.F.R. § 120.41. Moreover, the USML's Category XXI is an open-ended catch-all provision, controlling "Articles, Technical Data, and Defense Services Not Otherwise Enumerated." 22 C.F.R. § 121.1 at USML paragraph XXI(a).

DOSWASHINGTONSUP00593

"[I]f doubt exists as to whether an article or service is covered by the U.S. Munitions List," prospective exporters can obtain a "commodity jurisdiction" determination from DDTC. 22 C.F.R. § 120.4(a). Over four thousand commodity jurisdiction requests have been submitted since 2010.[1] Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which persons must obtain prior approval before they can publish unclassified technical information subject to ITAR control, regardless of whether the information is privately created. However, neither the Code of Federal Regulations nor any other public law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations. Exacerbating this situation, DOPSR refuses to review information that it deems is not clearly subject to the ITAR without a formal commodity jurisdiction determination.

Obtaining a commodity jurisdiction determination can take a long time. Reportedly, nonpublic National Security Council ("NSC")

---

[1]"Final Commodity Jurisdiction Determinations," https://www.pmddtc.state.gov/commodity_jurisdiction/determination.html (last visited Dec. 7, 2015).

6

guidelines establish a sixty-day deadline for DDTC to render a
commodity jurisdiction determination. ROA.144. But Government
Accountability Office, Office of Inspector General and Defendant
DDTC's reports show that the NSC guidelines are routinely
disregarded, as commodity jurisdiction requests languish at DDTC
awaiting final determinations for well over a year or more. ROA.163-
68, 211-13, 221.

       b.   *"Export"*

"Export" is not defined by the AECA, but has been broadly defined
by Defendants to mean, inter alia, "[d]isclosing (including oral or visual
disclosure) or transferring technical data to a foreign person, whether
in the United States or abroad," 22 C.F.R. § 120.17(a)(4).

       c.   *"Public Domain"*

Public discourse contains a large, ever-expanding array of technical
information arguably subject to ITAR control. Simple Google, Amazon,
and Yahoo searches under terms such as "how to make a firearm"
reveal all manner of technical data published in books, journals, and
other mediums that might well fit within one or another USML
designation. As the Department of Justice once reported to Congress,

7

"anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for fabricating and using such a device" from "manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes." ROA.287. "Such information is also readily available to anyone with access to a home computer equipped with a modem." *Id.*

Yet Defendants now dispute whether ITAR permits people to *place* information into the public domain, or merely to access information already placed there by others. As noted *supra*, ITAR's "public domain" exclusion, 22 C.F.R. § 120.10(b), includes eight categories of "information which is published and which is generally accessible or available to the public," *id.* § 120.11(a), including information publicly released after obtaining "after approval by the cognizant U.S. government department or agency," *id.* § 120.11(a)(7). A reasonable person might therefore understand that one is free to publish "technical data" not developed under government contracts in one of the other approved "public domain" channels.

8

DOSWASHINGTONSUP00596

But that depends on what Defendants claim the meaning of "is" is. If "is," as first used in Section 120.11(a), relates only to information *already* found in a newspaper, library, trade show, etc., an individual would still require a license to "export" the information into these venues, which are accessible to foreign persons. As discussed *infra*, the Government has not always taken this restrictive position.

2.     *The History of ITAR's Prior Restraint Application*

Decades ago, an ITAR provision suggested that public speech about "technical data" required an export license, raising concerns about ITAR's application as a prior restraint. Specifically, in a much earlier iteration of ITAR, Footnote 3 to former Section 125.11 implied a prior restraint on all public speech that happened to fall within ITAR's meaning of "technical data":

> The burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication.

ROA.327.

Beginning in 1978, in response to concerns raised by this language, the Office of Legal Counsel issued a series of opinions advising

9

DOSWASHINGTONSUP00597

Congress, the White House, and the State Department that ITAR's use as a prior restraint on the dissemination of privately generated, unclassified information violates the First Amendment. ROA.226-323. And in 1980, Defendant DDTC's predecessor, the Department of State Office of Munitions Control, issued official guidance providing that "[a]pproval is not required for publication of data within the United States . . .  Footnote 3 to Section 125.11 does not establish a prepublication review requirement." ROA.332.

Finally, in 1984, the State Department removed Footnote 3 from ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984) ("Concerns were expressed, for example, on licensing requirements as they relate to the First Amendment to the Constitution. The revision seeks to reflect these concerns . . . .").

Two cases revealed and shaped the Government's evolving response to the question of ITAR's prior restraint application. In 1978, the Ninth Circuit overturned a conviction under the AECA's predecessor act, and the ITAR regulations then in effect, because the trial court rejected arguments that the technical data had non-military applications.

10

*United States* v. *Edler Industries*, 579 F.2d 516 (9th Cir. 1978). The act and its

> definition of technical data are susceptible of an overbroad interpretation. Their expansive language may be construed to restrict not only the export of arms and information directly leading to the production of articles on the Munitions List, but also the interchange of scientific and technical information that of itself is without any substantial military application.

*Id.* at 520. To avoid the constitutional problem, the court construed ITAR's reach narrowly, to "control the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise. So confined, the statute and regulations are not overbroad [or] an unconstitutional prior restraint on speech." *Id.* at 521.

> [T]echnical data must relate in a significant fashion to some item on the Munitions List. Moreover, adequate notice to the potential exporter requires that the relationship be clear . . . Presumably, Congress intended that the technical data subject to control would be directly relevant to the production of a specified article on the Munitions List, not simply vaguely useful for the manufacture of arms.

*Id.* at 520-21. "If the information could have both peaceful and military applications, as Edler contends that its technology does, the defendant must know or have reason to know that its information is intended for the prohibited use." *Id.* at 521 (citation omitted).

DOSWASHINGTONSUP00599

Following *Edler*, the Office of Legal Counsel warned the State Department of "serious constitutional questions" were ITAR applied to "transactions in which an 'exporter' who is not otherwise connected or concerned with any foreign enterprise transmits technical data knowing, or having reason to know, that the data may be taken abroad and used by someone there in the manufacture or use of arms." ROA.248.

> [T[he revised technical data provisions cannot constitutionally be applied to the dissemination of technical data by persons having no direct connection with foreign conduct in settings in which there is no more than belief or a reasonable basis for believing (1) that a foreign national may take the technical data abroad and (2) that the data could be used by someone there in the manufacture or use of items on the Munitions List.

ROA.255

"For obvious reasons, the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations." ROA.256; *see also* ROA.258 (1981 DOJ Memorandum to Commerce Department).

The Department of Justice reiterated these concerns in a 1997 report to Congress, counseling that prior restraints against Internet publication of information on bomb-making and use violated the First

DOSWASHINGTONSUP00600

Amendment, unless the publication was made "(i) with the intent that the information be used to facilitate criminal conduct, or (ii) with the knowledge that a particular recipient of the information intends to use it in furtherance of criminal activity." ROA.283.

But the Government's commitment to these principles would be tested by Dr. Daniel Bernstein, an academic who challenged ITAR's application against his cryptographic software. In Bernstein's case, the Northern District of California held that the source code for an ITAR-designated cryptographic program constituted protected First Amendment expression. *Bernstein* v. *U.S. Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) ("*Bernstein I*"). The court subsequently struck down ITAR's provisions relating to cryptographic speech. *Bernstein* v. *U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996) ("*Bernstein II*"). When the government shifted control over the code's export from the State Department to the Commerce Department, Bernstein amended his complaint to challenge the relevant Export Administration Regulations. The district court struck down these regulations as well. *Bernstein* v. *U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) ("*Bernstein III*").

DOSWASHINGTONSUP00601

A Ninth Circuit panel affirmed that decision, but the opinion was vacated when the full court granted rehearing en banc. *Bernstein* v. *United States Dep't of Justice*, 176 F.3d 1132 (9th Cir.) ("*Bernstein IV*"), *reh'g in banc granted,* 192 F.3d 1308 (9th Cir. 1999). Before the case could be reheard, however, the Government amended its regulations to exclude Bernstein's code from export controls, mooting the case. *See Bernstein* v. *DOC*, No. C-95-0582-MHP, 2004 U.S. Dist. LEXIS 6672, at *6 & n.2 (N.D. Cal. Apr. 19, 2004).

Plaintiffs' argument, *infra*, addresses the *Bernstein* opinions' reasoning. But for purposes of understanding this case's posture, and the evolution of the Government's positions, Plaintiffs respectfully request that the Court take judicial notice of the Government's litigating position in *Bernstein*, as reflected in the pleadings filed in that case, true and correct excerpts of which are attached in the addendum; *see* https://app.box.com/Bernstein for complete copies.[2]

---

[2] *See Murchison Capital Partners, L.P.* v. *Nuance Communs., Inc.*, No. 14-10819, 2015 U.S. App. LEXIS 14228, at *2 n.1 (5th Cir. Aug. 11, 2015) ("because they are public records, we also take judicial notice of court pleadings in other cases") (citations omitted); *id.* ("The court may take judicial notice at any stage of the proceeding") (quoting Fed. R. Evid. 201(d)).

14

In *Bernstein*, Defendant State Department argued that ITAR does *not* impose a prior restraint on public speech. William Lowell, then-Director of Defendant DDTC, declared that "the Department does not seek to regulate the <u>means</u> themselves by which information is placed in the public domain." (emphasis in original). Addendum ("Add.") 23. As the Government argued:

> In fact, the State Department does not seek to control the various means by which information is placed in the public domain. Lowell Decl. ¶ 22. The Department does not review scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries, or distributed at a conference or seminar in the United States. <u>Id</u>.

Add. 26; *see also* Add. 29 ("Moreover, the regulations are not applied to regulate the <u>means</u> by which such information is placed in the public domain.").

Defendants State Department and DDTC explained in *Bernstein* that ITAR's "public domain" provision "contains several specific exceptions as to what is controlled as technical that any ordinary person can understand--information in bookstores, newsstands, or disclosed at conferences." Add. 30. Forcefully rejecting the construction of ITAR's "public domain" provision in a manner enabling a prior

15

DOSWASHINGTONSUP00603

restraint on public speech, Defendants declared:

> Plaintiff sees a "Catch-22" "lurking" in the provision that, unless
> something is already published, it is subject to export controls. He
> would construe the definition to mean, in other words, that nothing
> can be published without the government's approval. Not only is this
> wrong as a factual matter, <u>see</u> Lowell Decl. ¶ 22, it is by far the most
> **<u>un-</u>**reasonable interpretation of the provision, one that people of
> ordinary intelligence are <u>least</u> likely to assume is the case.

*Id.* (emphasis in original).

But on June 3, 2015, following the filing of Plaintiffs' motion for

preliminary injunction, Defendants published a Federal Register notice

in which they propose to amend ITAR's "public domain" definition to

unambiguously impose a prior restraint and now claim: "[p]aragraph

(b) of the revised definition explicitly sets forth the Department's

requirement of authorization to release information into the 'public

domain.'" 80 Fed. Reg. 31,525, 31,528 (June 3, 2015).

And notwithstanding the DOJ warnings dating to 1978 and the 1984

amendments that removed former Footnote 3's prior restraint

implications, Defendants have now adopted the position that the

Government once claimed is both "wrong as a factual matter" and "by

far the most **<u>un-</u>**reasonable interpretation of the provision, one that

people of ordinary intelligence are <u>least</u> likely to assume is the case."

16

Add. 30. They now insist that ITAR has imposed a prior restraint all

along.

> The requirements of paragraph (b) are not new. Rather, they are a
> more explicit statement of the ITAR's requirement that one must
> seek and receive a license or other authorization from the
> Department or other cognizant U.S. government authority to release
> ITAR controlled "technical data," as defined in § 120.10. A release of
> "technical data" may occur by disseminating "technical data" at a
> public conference or trade show, publishing "technical data'" in a
> book or journal article, or posting "technical data" to the Internet.

*Id.* at 31,528. "Posting 'technical data' to the Internet without a

Department or other authorization is a violation of the ITAR even

absent specific knowledge that a foreign national will read [it]." *Id.* at

31,529.

3.      *Three-dimensional Printing and Computer Numeric Control*

Three-dimensional ("3D") printing technology allows a computer to

"print" a physical object (as opposed to a two-dimensional image on

paper). Today, 3D printers are sold at stores such as Home Depot and

Best Buy, and the instructions for printing everything from jewelry to

toys to car parts are shared and exchanged freely online at sites like

GrabCAD.com and Thingiverse.com. Computer numeric control

("CNC") milling, an older industrial technology, involves a computer

directing the operation of a drill upon an object. 3D printing is

17

"additive;" using raw materials, the printer constructs a new object.

CNC milling is "subtractive," carving something (more) useful from an

existing object.[3]

Both technologies require some instruction set or "recipe"—in the

case of 3D printers, computer aided design ("CAD") files, typically in .stl

format;[4] for CNC machines, text files setting out coordinates and

functions to direct a drill. ROA.976, ¶41. "A CAD file is a data set

defining the geometric representation of a bounded volume." ROA.975,

¶38.

> Viewed on a computer, [CAD files] display and project an image in
> three-dimensions, similar to a model sculpted out of clay. The files
> can be viewed and manipulated in various contexts without an
> intent to ever manufacture anything.

ROA.978, ¶44. Likewise, "CNC code is expressive in that it can be read

and edited by humans, who can also understand and adjust its

---

[3]Chris Anderson, "The New MakerBot Replicator Might Just Change Your World," *Wired* (Sep. 19, 2012), http://www.wired.com/2012/09 /how-makerbots-replicator2-will-launch-era-of-desktop-manufacturing/all (last visited Dec. 3, 2015).

[4]*Supra* n.3; ROA.960, ¶4; ROA.961, ¶5; ROA.975, ¶38. Many CAD programs used to design objects that would be printed utilize proprietary file formats. CAD files are thus typically converted into Standard Tesselation Language (.stl) format, which removes all model information except for surface geometry, and which 3D printers can recognize and process. ROA.961, ¶5.

DOSWASHINGTONSUP00606

output—i.e., what it will cause the mill to machine." ROA.976-77, ¶41.

The "expressive elements" of CAD and CNC files "are understandable

and, thus, editable by human beings to alter the physical

characteristics that affect the appearance and function of any item

created with the use of the files." ROA.978, ¶45.

4.     *Defendants' Imposition of a Prior Restraint Against*
       *Plaintiffs' Speech*

Plaintiff Defense Distributed was organized as a non-profit and is

operated for the purpose of promoting popular access to arms

guaranteed by the United States Constitution. It does so by facilitating

global access to, and the collaborative production of, information and

knowledge related to the 3D printing of arms; and by publishing and

distributing such information and knowledge on the Internet at no cost

to the public. ROA.13, ¶1; ROA.128, ¶2. Defense Distributed is

committed to making contributions to the body of free and public

knowledge.

Plaintiff Second Amendment Foundation, Inc. ("SAF"), a non-profit

membership organization, has over 650,000 members and supporters

nationwide. ROA.13-14, ¶2. SAF's purposes include promoting the

exercise of the right to keep and bear arms; and education, research,

DOSWASHINGTONSUP00607

publishing and legal action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control. *Id.*

SAF's members have a keen interest in accessing, studying, sharing, modifying, and learning from Defense Distributed's various files, as well as similar 3D printing files related to firearm that they or others have created. ROA.21, ¶38; ROA.135, ¶4; ROA.136, ¶5; ROA.137, ¶4; ROA.138, ¶5. In particular, SAF members are interested in using Defense Distributed's files, among others, to manufacture and maintain operable firearms for their personal, lawful use. ROA.659, ¶3; ROA.661, ¶4; ROA.664, ¶4. In furtherance of SAF's mission, and to serve its members and the public, SAF would publish and promote, on the Internet, the free distribution of Defense Distributed's various files, and allow its members and others to collaborate on their own open-source 3D printing firearm-related files using SAF's servers as a forum for Internet publication. ROA.134,  ¶4.

a.    *The Published Files*

Beginning in 2012, Defense Distributed privately generated, and posted on the Internet for free access by the public, technical

DOSWASHINGTONSUP00608

information about various gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named "The Liberator" (the "Published Files"). ROA.128, ¶3. At the time, there were no publicly known DDTC enforcement actions for the posting of files of any kind on the Internet. *Id.*

The Published Files were downloaded hundreds of thousands of times. ROA.129, ¶4. The Liberator files in particular generated national media attention, with coverage in Forbes, CNN, NBC News, the Wall Street Journal, and even an episode of The Colbert Report. *Id.* Apart from their functional aspects, the Published Files have also proven to have artistic and political utility. For example, one artist has repurposed the Liberator schematics to create a statement protesting gun violence.[5] London's Victoria & Albert Museum purchased two 3D printed Liberators to display during its ongoing Design Festival.[6] And

_____

[5]Mark Wilson, "Artist Warps 3-D Printed Gun Blueprints, Protests Gun Violence," *Fast Company* (April 15, 2014), http://www.fastcodesign. com/3028300/infographic-of-the-day/artist-warps-3-d-printed-gun- blueprints- protests-gun-violence (last visited Dec. 7, 2015).

[6]Andy Greenberg, "3D-Printed Guns As Art: London Design Museum Buys Two 'Liberator' Printed Pistols," *Forbes*, (Sep. 15, 2013), www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-as- art-london-design-museum-buys-two-liberator-printed-pistols (last

DOSWASHINGTONSUP00609

the Liberator prompted the Museum of Modern Art in New York to

host a debate concerning the intersection of design and violence.[7]

On May 8, 2013, Defendants warned Defense Distributed that

DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR . . . all such data should be removed from public access immediately.

ROA.129, ¶5; ROA.140-41.

At the time it posted the Published Files, Defense Distributed did

not know that the Defendants would demand to pre-approve its speech.

Defense Distributed believed, and continues to believe, that the United

States Constitution guarantees a right to share truthful speech—

especially speech concerning fundamental constitutional rights—in

---

visited Dec. 7, 2015); Rachel Donadio, "A History of the Now, Found in Politically Charged Objects," *New York Times* (July 6, 2014) http://www.nytimes.com/2014/07/07/arts/design/victoria-and-albert-museum-pushes-boundaries-of-collecting.html (last visited Dec. 7, 2015).

[7]Paola Antonelli, "Design and Violence Debate I: Open Source," *MOMA* (March 27, 2014), http://designandviolence.moma.org/design-and-violence-debate-i-open-source (last visited Dec. 7, 2015).

DOSWASHINGTONSUP00610

public forums. ROA.129, ¶6. Moreover, as noted *supra*, ITAR

specifically excludes from its coverage "technical data" appearing in the

"public domain," 22 C.F.R. § 120.10(b), the latter term appearing to

broadly encompass Defense Distributed's activities, which focus on

sharing free open-sourced files for collaborative design with the public.

*See* 22 C.F.R. § 120.11. Nevertheless, for fear of criminal and civil

enforcement, Defense Distributed promptly complied with Defendants'

demands and removed all of the Published Files from its servers.

ROA.129, ¶6.

Defendants further directed Defense Distributed to submit the

Published Files to DDTC for review using the "commodity jurisdiction"

procedure. ROA.129, ¶7; ROA.141. Defense Distributed complied with

Defendants' request and filed ten (10) commodity jurisdiction requests

covering the Published Files on June 21, 2013. ROA.129, ¶7;

ROA.335-86. Nearly two years later, on June 4, 2015—six  days before

the first responsive pleading was due in this case—Defendants

responded that six of the ten files, including the Liberator files, were

ITAR-controlled. ROA.500-01.

DOSWASHINGTONSUP00611

b.    *The "Ghost Gunner" Files*

On September 25, 2014, Defense Distributed requested DOPSR's

prepublication approval for public release of files containing technical

information on a machine, named the "Ghost Gunner," that can be used

to manufacture a variety of items, including gun parts (the "Ghost

Gunner Files"). ROA.130, ¶8; ROA.388-89.[8] On October 1, 2014,

DOPSR informed Defense Distributed this request for review was

refused because DOPSR was unsure whether the Ghost Gunner was

subject to ITAR. DOPSR further recommended that Defense

Distributed submit another commodity jurisdiction request to the

Defendants. ROA.130, ¶8; ROA.391-92.

Defense Distributed submitted another commodity jurisdiction

request on January 2, 2015, this time for the Ghost Gunner. ROA.130,

¶9; ROA.394-405. On April 15, 2015, Defendant DDTC determined that

the Ghost Gunner machine, user manual, and operating software are

---

[8]Any milling machine can be modified to mill components that are
unlawful to manufacture, just as any saw that may be purchased at a
hardware store can be used to unlawfully shorten a shotgun. However,
Ghost Gunner does not ship with the jigs and code to manufacture guns
that cannot lawfully be manufactured for personal use, such as
machine guns, and Defense Distributed has no intention of offering
such items for sale. ROA.130, n.1.

DOSWASHINGTONSUP00612

not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." ROA.130, ¶9; ROA.407-08.[9]

c.   *The CAD Files.*

Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain CAD files. ROA.130-31, ¶10; ROA.410-24. On December 31, 2014, nearly four months after the first such review request, DOPSR sent Defense Distributed two letters stating its refusal to review the CAD files. ROA.130-31, ¶10; ROA.426-31. The letters directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. *Id.* However, because this is not the DDTC division responsible for issuing licenses or other DDTC authorizations, on January 5, 2015, Defense Distributed

---

[9]A "lower receiver" is the functional, regulated and serialized part of an AR-platform rifle, to which other non-regulated components may be added (barrel, grip, etc.) to assemble a working firearm. Lower receivers that are no more than 80% finished are unregulated. These "80% lower receivers" are often lawfully finished—the task that the Ghost Gunner CNC machine aids in performing—before being lawfully assembled into customized rifles.

25

requested Defendants' guidance on how to obtain authorization from DDTC Compliance for release of the CAD files. ROA.131, ¶11; ROA.433-56. To date, Defendants have not responded to Defense Distributed's request for guidance. ROA.131, ¶11.

### d. *Prior Restraint on Other Files*

This case concerns more than CAD and CNC files. Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to open public forums on the Internet. Many of these files are described in the USML. ROA.131, ¶13. SAF and its members would likewise create and develop such files, that they would share and access on the Internet. ROA.133-34, ¶¶3, 4; ROA.135-36, ¶¶4, 5; ROA.137-38, ¶¶4, 5.

### e. *The Prior Restraint's Impact*

But for Defendants' imposition of a prior restraint on "technical data," Plaintiffs would freely distribute Defense Distributed's purportedly ITAR-controlled files, and other files relating to Second Amendment arms. Plaintiffs refrain from doing so because they

DOSWASHINGTONSUP00614

reasonably fear that Defendants would pursue criminal and civil
enforcement proceedings against them should they publish the files.
ROA.131-32, ¶14; ROA.134, ¶4; ROA.136, ¶5; ROA.138, ¶5.
Defendants' threats have thus silenced Plaintiffs; deprived Plaintiffs'
customers, members, visitors, and patrons of access to Plaintiffs'
speech; impeded their ability to likewise speak on the same subjects;
and infringed their right to keep and bear arms.

But while Defendants have imposed their prior restraint against
Defense Distributed, and while neither SAF nor at least some of its
members will risk violating ITAR, others have continued to freely
distribute Defense Distributed's files and similar gun-related "technical
data" on the Internet without any action by the Defendants. ROA.131,
¶12; *see, e.g.*, PM522 Washbear 3D Printed .22LR Revolver Files,
http://www.jamesrpatrick.com/p/pm522-washbear-3d-printed-22lr-
pistol.html (last visited Dec. 4, 2015) ("Feel free to distribute these files,
so long as attribution is given. Always obey all federal, state, and local
laws. Use this information at your own risk and responsibility.").[10]

---

[10]This revolver has received massive media attention, and has
been featured in countless technology blogs. Its CAD files are freely
available on the Internet.

DOSWASHINGTONSUP00615

5.     *Relevant Procedural History*

On May 6, 2015, Plaintiffs brought this action in the United States District Court for the Western District of Texas, seeking declaratory and injunctive relief from Defendants' prior restraint. Plaintiffs asserted that Defendants' prior restraint is ultra vires, and also violates their First, Second, and Fifth Amendment rights. Defense Distributed further sought compensatory, as well as punitive and exemplary damages from Defendants Handelman, Peartree, Heidema, and Smith. ROA.12-26.

Plaintiffs thereafter moved for a preliminary injunction. ROA.80. The district court heard argument on Plaintiffs' motion on July 6, 2015, ROA.8; ROA.854-939, and denied the motion on August 4, 2015, ROA.703. Plaintiffs timely appealed. ROA.1045.

6.     *The District Court's Decision*

The district court "ha[d] little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury." ROA.684. But it found that the importance of protecting constitutional rights is outweighed by national security concerns, suggesting that the Government's "authority . . . in matters of foreign policy and export"

28

are "largely immune" from judicial review. ROA.684-85 (quotations omitted). The court further held that because Defendants "clearly believe" that posting files to the Internet is an "export," Plaintiffs did not prove that allowing such posting serves the public interest. ROA.685.

Nonetheless, "in an abundance of caution," *id.*, the bulk of the court's opinion addressed whether Plaintiffs established a likelihood of success on the merits. The court's brief discussion of Plaintiffs' ultra vires claim apparently assumed, without discussion, the correctness of Defendants' contested view that Plaintiffs' speech constitutes an "export" of "defense articles." The court thus held that Defendants were authorized to bar such speech because it "facilitat[es] global access to firearms,"which the court further assumed, without discussion, "increase[s] the possibility of outbreak or escalation of conflict." ROA.686-87.

Turning to the First Amendment claim, the court admitted that "the precise technical nature of the computer files at issue is not wholly clear to the Court," but considered the files to be protected by the First Amendment because they "are intended to be used by others as a

29

baseline to be built upon, altered and otherwise utilized." ROA.688. But the court then held that while ITAR "unquestionably regulates speech concerning a specific topic," it "does not regulate disclosure of technical data based on the message it is communicating." ROA.691. The court thus "conclude[d] the regulation is content-neutral and thus subject to intermediate scrutiny." *Id.* (citation omitted).

Purportedly applying intermediate scrutiny, the court asserted that Defendants' prior restraint would survive because Plaintiffs have other means of distributing their speech domestically, ROA.693, presumably by screening listeners' citizenship. The court also apparently rejected Plaintiffs' argument that prohibiting Americans from communicating on the Internet, while allowing other forms of domestic speech, does not materially advance the goal of barring foreigners' access to that speech. ROA.693-94. And notwithstanding the Government's findings that commodity jurisdiction timelines are routinely ignored, the fact that Defense Distributed waited nearly two years to receive word on its commodity jurisdiction requests, and the undisputed lack of procedural safeguards in Defendants' licensing process, the court held that Plaintiffs "have available a process for determining whether the speech

DOSWASHINGTONSUP00618

they wish to engage in is subject to the licensing scheme of the ITAR regulations." ROA.694.

In doing so, the court appeared to conflate and confuse Defendants' licensing process with the commodity jurisdiction process. It cited ITAR Section 120.4(e),which was not specifically addressed in the Parties' briefs, and which does not have the meaning the court apparently ascribed it. More specifically, the court's August 4, 2015 Order states that "[t[he regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesing [sic] expedited processsing. [sic] 22 C.F.R. § 120.4(e) (setting deadlines)." ROA.694. But this "preliminary response" is merely an agency email acknowledging receipt of a commodity jurisdiction request and, while submitters can request expedited commodity jurisdiction determinations, final agency determinations take months and sometimes a year or more—a fact which is undisputed by the parties.

Further, while the Order states that a Presidential directive requires a license decision within 60 days of receipt, *id.*, the Federal Register notice implementing that requirement, as cited by the court, contains broad national security exceptions, which provide Defendants with

31

unbridled discretion to override the deadline "[w]hen a related export policy is under active review and pending final determination by the Department of State" and when "[t]he Department of Defense has not yet completed its review." 74 Fed. Reg. 63,497 (Dec. 3, 2009)

The court found that Defense Distributed's standing to assert a Second Amendment claim "is a very close question," but noted that the standing inquiry ceases if at least one plaintiff has standing. ROA.696, and found that SAF has standing to present a Second Amendment claim. ROA.697-98. Addressing the Second Amendment claim, the court was unsure whether the Second Amendment secures the right to manufacture guns, though it found the concept "appealing," presumed the right was implicated, and proceeded to a step-two Second Amendment inquiry. ROA.699. Purporting to apply intermediate scrutiny, the court perfunctorily upheld the scheme. ROA.700. Finally, the court held that ITAR does not violate the Fifth Amendment due to vagueness. ROA.702.

SUMMARY OF ARGUMENT

Plaintiffs are entitled to a preliminary injunction. Nothing in the AECA's text or history suggests that Congress had in mind an

DOSWASHINGTONSUP00620

overbroad, standardless, and indefinite prior restraint on public speech
bereft of procedural protection when it sought to control the export of
arms. The Office of Legal Counsel all-but established Plaintiffs'
likelihood of succeeding on their First Amendment claim when it first
warned the State Department to refrain from establishing precisely
this form of prior restraint in 1978. The DOJ issued similar warnings in
1981, 1984 and 1997, and nothing that has since transpired has
diminished the constitutional reality then-acknowledged by the
Government.

Judicial understanding of the Second Amendment is far less
developed than that of the First. But even so, Plaintiffs' Second
Amendment rights at-issue here should be acknowledged as deeply
rooted. However the Government might regulate the ancient practice of
making arms, it cannot be constitutional to bar Americans from
creating and disseminating  information necessary to the manufacture
and maintenance of basic arms whose possession the Second
Amendment secures. And the Fifth Amendment's Due Process Clause
cannot tolerate the Government's hopelessly vague definition of
"technical data" as applied to public speech.

33

There being no significant dispute as to the irreparable harm visited by this prior restraint, the balance of the equities, or the public interest in securing fundamental rights, the district court's decision should be reversed.

## STANDARD OF REVIEW

"For a denial of a preliminary injunction, a district court's findings of fact are subject to a clearly-erroneous standard of review, while conclusions of law are subject to broad review and will be reversed if incorrect.'" *Lake Eugenie Land & Dev., Inc.* v. *BP Exploration & Prod. (In re Deepwater Horizon)*, 732 F.3d 326, 332 (5th Cir. 2013) (quotation and internal punctuation omitted).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Each factor weighs heavily in Plaintiffs' favor.

34

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

    A.    CONGRESS NEVER AUTHORIZED DEFENDANTS' CENSORSHIP
        OF PRIVATELY-GENERATED, UNCLASSIFIED SPEECH.

Defendants have aggrandized for themselves nothing less than a power to censor privately-generated, unclassified "technical data" on the Internet. Their apparent syllogism holds: (1) the Internet is available worldwide, and is also available to foreign persons within the United States; (2) all speech posted to the Internet is thus deemed "exported;" (3) the "export" of "technical data" may be licensed and reviewed under ITAR; therefore (4) all "technical data" posted to the Internet is subject to ITAR controls and procedures. Q.E.D.

But "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King* v. *Burwell*, 135 S. Ct. 2480, 2495 (2015) (quoting *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (citations omitted). Before asking whether this breathtakingly expansive regulatory regime could possibly be constitutional, the Court should ask whether Congress granted Defendants such authority. "[N]ormally the Court will not decide a constitutional question if there is some other ground upon which to

35

DOSWASHINGTONSUP00623

dispose of the case." *Bond* v. *United States*, 134 S. Ct. 2077, 2087 (2014) (quotation and citations omitted). "Where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney Gen.* v. *Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) (citation omitted).

"[T]he fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another." 2A Norman J. Singer, Sutherland on Statutory Construction § 45.11, at 87 (7th ed. 2008) (collecting cases); see *United States* v. *Rehlander*, 666 F.3d 45, 49 (1st Cir. 2012) ("statutes are to be read to avoid serious constitutional doubts").

Accordingly, "[t]he question is not whether" an alternative statutory interpretation "is the most natural interpretation of the [law], but only whether it is a 'fairly possible' one. As we have explained, 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 132 S. Ct. 2566, 2594 (2012) (Roberts, C.J.) (quotations omitted).

36

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen* v. *Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988). This is "an inquiry familiar to the courts: interpreting a federal statute to determine whether executive action is authorized by, or otherwise consistent with, the enactment." *Gonzales* v. *Oregon*, 546 U.S. 243, 249 (2006). Agency action "is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review." *INS* v. *Chadha*, 462 U.S. 919, 953 n.16 (1983). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 374 (1986). Such authority "may not be lightly presumed." *Michigan* v. *EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001). And "when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *INS* v. *St. Cyr*, 533 U.S. 289, 299 (2001) (citation omitted).

The AECA supplies the only potential source of statutory authority for Defendants' conduct. To be sure, Plaintiffs do not suggest that

37

Defendants lack authority under the AECA to construct a narrowly-tailored regime regulating the export of certain technical data. Nor do Plaintiffs suggest that uploading files to the Internet cannot be viewed, in some sense, as an export. Defendants can bar individuals from emailing classified blueprints for secret weapons systems to a foreign agent or directly providing technical assistance to a foreign person on designing defense articles.

But that is a very far cry from supposing that the Cold War-era AECA authorizes the imposition of an indecipherable prior restraint against sharing *all* public speech containing "technical data" on the Internet. And Defendants' construction of the AECA contains no limiting principle, as such a broad grant of prior restraint authority would extend far beyond the Internet. Recall that Defendants have broadly defined "export" to encompass the act of "[d]isclosing (including oral or visual disclosure) . . . technical data to a foreign person . . . in the United States." 22 C.F.R. § 120.17(a)(4). Any other publication of "technical data," such as those appearing in countless scientific and academic publications, as well as on television and at the movies, would be subject to Defendants' prior restraint. No American could stand on a

38

DOSWASHINGTONSUP00626

street corner or public square of any town visited by foreign tourists and declaim "technical data" without being subject to Defendants' prior restraint.

This is doubtless not what Congress had in mind when it delegated authority to regulate the export of defense articles "[i]n furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). In 1978, not long after the AECA's enactment, the Justice Department doubted that the Act authorized a prior restraint against cryptographic speech listed in the USML, and warned, "It is by no means clear from the language or legislative history of either statute [AECA and ITAR] that Congress intended that the President regulate noncommercial dissemination of information, or considered the problems such regulation would engender." ROA.229.

> [W]e wish to emphasize our doubts that the executive branch may validly provide for licensing or prior approval of exports of cryptographic information without more explicit Congressional authorization. The scope of the existing delegation of authority from Congress to the President, as we note above, is somewhat unclear. Before imposing a prior restraint on exports of public cryptographic information, we believe that a more clear cut indication of Congressional judgment concerning the need for such a measure is in order . . . further Congressional authorization would obviously be necessary in order to extend governmental controls to domestic as well as foreign disclosures of public cryptographic information.

DOSWASHINGTONSUP00627

ROA.240 (citations omitted); *cf.* ROA.242 ("we are uncertain whether the present legislative authority for the technical data provisions of ITAR is adequate.")). This refreshingly-candid analysis supplies a rare example of the Executive Branch acknowledging meaningful limitations on its powers.

Defendants might claim that Congress's statute is purposefully vague and indeterminate, leaving to them the task of creating regulations governing the export of defense articles—a task clothed with a fair degree of judicial deference under the rule of *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). But *Chevron* deference applies only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States* v. *Mead Corp.*, 533 U.S. 218, 227-28 (2001). In other words, the agency action entitled to deference must involve the exercise of some delegated process. "[A]djudication or notice-and-comment rulemaking," for example, may carry the force of law. *Id.* at 228. But "[i]nterpretations such as those in opinion letters—like interpretations contained in

40

policy statements, agency manuals, and enforcement guidelines, all of

which lack the force of law—do not warrant *Chevron*-style deference."

*Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000) (citations

omitted).

Defendants' prior restraint scheme as enforced against Plaintiffs is

plainly not the product of their duly adopted rules. To the contrary, as

noted *supra*, First Amendment concerns prompted the State

Department to withdraw the only ITAR provision potentially

authorizing a prior restraint regime, four years after advising that the

offending provision "does not establish a prepublication review

requirement." ROA.332. The prior restraint scheme has only been

hinted at in Defendants' threatening letter to Defense Distributed.

"[I]nterpretations contained in formats such as opinion letters are

'entitled to respect' under our decision in *Skidmore* v. *Swift & Co.*, 323

U.S. 134, 140 (1944), but only to the extent that those interpretations

have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (parallel

and other citations omitted).

> The weight [accorded to an administrative] judgment in a particular
> case will depend upon the thoroughness evident in its consideration,
> the validity of its reasoning, its consistency with earlier and later

DOSWASHINGTONSUP00629

pronouncements, and all those factors which give it power to
persuade, if lacking power to control.

*Mead*, 533 U.S. at 228.

Defendants' prior restraint scheme plainly fails the *Skidmore* test.
There is no evidence that Defendants, unlike their predecessors and
the Department of Justice, ever properly considered the implications of
applying a prior restraint to all speech containing technical data that
might be accessed or overheard by a foreigner. The practice is also
starkly inconsistent with earlier pronouncements, wherein the
government took steps to clarify that export controls did *not* amount to
a prior restraint on public speech. Further, Defendants lack the
requisite interpretive authority and "expertise" to resolve this "major
question" of profound social, "economic and political significance"—the
unprecedented censorship of all manners of public speech on all areas
of public concern. *King*, 135 S. Ct. at 2489 (citing *Utility Air Regulatory
Group* v. *EPA*, 134 S. Ct. 2427 (2014)); *FDA* v. *Brown & Williamson
Tobacco Corp.*, 529 U.S. 120, 159 (2000).

Nor has this prior restraint been consistently applied. Defense
Distributed appears to be the scheme's *only* target. Other websites

42

containing ITAR technical data, including the type of CAD files at issue in this case, are apparently unimpeded. ROA.131, ¶12. Defendants' imposition of a prior restraint on unclassified and public speech containing "technical data" lie beyond the authority delegated to them by Congress.

B.     DEFENDANTS ARE VIOLATING PLAINTIFFS' FIRST AMENDMENT RIGHTS.

1.    *Plaintiffs' Files Constitute Protected Speech.*

"The First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller* v. *California*, 413 U.S. 15, 34 (1973). "[C]omputer code conveying information is 'speech' within the meaning of the First Amendment . . . ." *Universal City Studios, Inc.* v. *Corley*, 273 F.3d 429, 449-50 (2d Cir. 2001); *see also Junger* v. *Daily*, 209 F.3d 481, 485 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."); *Bernstein IV*, 176 F.3d at 1141 ("encryption software . . .

43

must be viewed as expressive for First Amendment purposes, and thus
is entitled to the protections of the prior restraint doctrine").

To be sure, Plaintiffs' speech might be used to facilitate crime,[11] but
that much is true of virtually all protected speech. "The prospect of
crime . . . by itself does not justify laws suppressing protected speech."
*Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 245 (2002).

> The constitutional protection accorded to the freedom of speech and
> of the press is not based on the naive belief that speech can do no
> harm but on the confidence that the benefits society reaps from the
> free flow and exchange of ideas outweigh the costs society endures
> by receiving reprehensible or dangerous ideas.

*Herceg* v. *Hustler Magazine, Inc.*, 814 F.2d 1017, 1019 (5th Cir. 1987).
Thus, while speech may be regulated for its hazardous aspects, "first
amendment protection is not eliminated simply because publication of
an idea creates a potential hazard." *Id.* at 1020. *See* Eugene Volokh,
*Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1103 (2005).

Furthermore, Defendants bear the burden of proving that Plaintiffs'
speech is somehow unprotected. *See Freedman* v. *Maryland*, 380 U.S.

---

[11]It is less obvious that Plaintiffs' files would be particularly useful
to foreign governments. A prior restraint is justified only where the
disclosure will "surely result in *direct, immediate, and irreparable
damage* to our Nation or its people." *New York Times* v. *United States*,
403 U.S. 713, 730 (1971) (Stewart, J., concurring) (emphasis added).

DOSWASHINGTONSUP00632

51, 58 (1965); *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958). This they cannot do. Plaintiffs' files do not fall into a category of protected speech, such as fraud or libel. *Cf. United States* v. *Alvarez*, 132 S. Ct. 2537, 2547 (2012). And Plaintiffs' collaboration with other Americans in public forums, that may incidentally be viewed by foreigners, cannot constitutionally amount to materially supporting criminal activity. *See Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 39 (2010) ("In particular, we in no way suggest that a regulation of *independent speech* would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations. We also do not suggest that Congress could extend the same prohibition on material support at issue here to *domestic organizations*.") (emphasis added).

Even were Plaintiffs' files purely functional and devoid of expressive content, Americans enjoy a fundamental right to possess the items described in and that can be created with the assistance of Plaintiffs' files, said items which are perfectly legal to possess under federal law. Bureau of Alcohol, Tobacco, Firearms & Explosives, *Top 10 Frequently*

DOSWASHINGTONSUP00633

*Asked Firearms Questions and Answers*, at 5 (Question 9), https://www.
atf.gov/file/61721/download (last visited Dec. 9, 2015).

>    2.    *ITAR's Application to All Public, Unclassified Speech*
>           *Containing Technical Data Is Unconstitutionally Overbroad.*

"A statute is overbroad if in banning unprotected speech, a
substantial amount of protected speech is prohibited or chilled in the
process." *United States* v. *Scruggs*, 714 F.3d 258, 267 (5th Cir. 2013)
(quotation omitted). A speech restriction is unconstitutional if "no set of
circumstances exists under which [the law] would be valid or . . . the
statute lacks any plainly legitimate sweep." *Catholic Leadership
Coalition of Texas* v. *Reisman*, 764 F.3d 409, 426 (5th Cir. 2014)
(quoting *United States* v. *Stevens*, 559 U.S. 460, 472 (2010)). A
restriction is also unconstitutionally overbroad if "a substantial
number of [the law's] applications are unconstitutional, judged in
relation to the statute's plainly legitimate sweep." *Id.* (quoting *Stevens*,
559 U.S. at 473).

Given Defendants' sweeping views of what constitutes an "export"—
virtually all speech in the presence of foreigners, including all Internet

DOSWASHINGTONSUP00634

speech—and their equally broad definition of "technical data," ITAR

cannot withstand constitutional scrutiny as a prior restraint.

The rare federal law that criminalizes speech typically require that

the targeted speech be made with intent or knowledge that the

information would be used to facilitate criminal conduct, or with

knowledge that a particular recipient of the information intends to use

it in the furtherance of criminal activity. The Espionage Act, for

example, only punishes those who seek to communicate "with intent or

reason to believe that [the information] is to be used to the injury of the

United States or to the advantage of a foreign nation." 18 U.S.C. §

794(a); see *Gorin* v. *United States*, 312 U.S. 19, 28 (1941) (upholding

Espionage Act's constitutionality owing to scienter requirement).

And it is not a crime to provide material support or resources to

terrorists, unless one "know[s] or intend[s] that they are to be used in

preparation for, or in carrying out, a violation" of various laws. 18

U.S.C. § 2339A(a); *see Holder*; *United States* v. *Featherston*, 461 F.2d

1119, 1121 (5th Cir. 1972) (upholding convictions for teaching the use

or making of explosives or incendiary devices, as statute "requires

those prosecuted to have acted with intent or knowledge that the

47

information disseminated would be used in the furtherance of a civil disorder.").

A scienter requirement should likewise limit ITAR's reach in restricting speech, as the Ninth Circuit held in *Edler*, *supra*, 579 F.2d 516, and as the Office of Legal Counsel once advocated, ROA.255; *see also* DOJ 1997 Report to Congress, ROA.309 ("the person who disseminates the information must either have the specific purpose of facilitating criminal conduct, or must have knowledge that a <u>particular</u> recipient intends to make improper use of the material."). But while it remains "obvious" that "the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations," ROA.256, the State Department's uncooperative posture makes judicial correction imperative.

Plaintiffs are not seeking to help foreigners build controlled weapons of war. Rather, they are merely communicating with their fellow Americans, through a website, information regarding simple arms of the kind in common use for traditional lawful purposes that are themselves constitutionally protected. If Defendants can prohibit this information, they can similarly prohibit public speech concerning

48

anything conceivably covered by the USML, and even discussions about articles not enumerated on the USML. *See, e.g.*, 22 C.F.R. § 121.1 at USML paragraph XXI ("Articles, Technical Data, and Defense Services Not Otherwise Enumerated"). There is simply no telling where Defendants' censorship might end, unless it ends here.

   3.  *Defendants Impose an Unconstitutional Prior Restraint Against Plaintiffs' Lawful Public Speech.*

"The classic prior restraint, of course, is an 'administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur.'" *Catholic Leadership Coalition*, 764 F.3d at 437 (quotation omitted). Prior restraints are, "in other words, laws which require a speaker 'to obtain prior approval for any expressive activities.'" *Gibson* v. *Tex. Dep't of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 235 (5th Cir. 2012) (quotation omitted). "Prior restraints face a well-established presumption against their constitutionality." *Marceaux* v. *Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013) (quotation omitted).

   In general, a prior restraint . . . will be upheld only if the government can establish that the activity restrained poses either a

49

clear and present danger or a serious and imminent threat to a
protected competing interest. The government must also establish
that the order has been narrowly drawn and is the least restrictive
means available.

*United States* v. *Brown*, 218 F.3d 415, 425 (5th Cir. 2000) (quotations
omitted).

"Constitutional invalidity of prior restraints may result from one or
both of 'two evils . . .: (1) the risk of censorship associated with the
vesting of unbridled discretion in government officials; and (2) 'the risk
of indefinitely suppressing permissible speech' when a licensing law
fails to provide for the prompt issuance of a license." *East Brooks Books,
Inc.* v. *Shelby County*, 588 F.3d 360, 369 (6th Cir. 2009) (quotation
omitted); *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 225-27 (1990)
(plurality opinion). Defendants' prior restraint inflicts both evils.

      a.     Unbridled Discretion to Censor Speech.

"Statutes or policies" affording government officials "unbridled
discretion" to determine "who may speak and who may not . . . are
unconstitutional." *City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S.
750, 763 (1988) (citations omitted). "[E]ven if the government may
constitutionally impose content-neutral prohibitions on a particular

DOSWASHINGTONSUP00638

manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." *Id.* at 763-64. Accordingly, standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 151 (1969). Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotation omitted). "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Chesapeake B & M, Inc.* v. *Harford County*, 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc).

ITAR does not meaningfully limit Defendants' discretion. Reasonable persons must guess at what "specially designed" or "military application" truly mean. Informed opinions guided by experienced counsel are no help, as DDTC's claims of what falls under USML Category XXI are unconstrained by any specified limits or precedent. If Defendants had any objective criteria for making these determinations, perhaps Defense Distributed's commodity jurisdiction requests would not have remained outstanding for nearly two years.

DOSWASHINGTONSUP00639

"'Technical data' is perhaps the most confusing category of items regulated by the ITAR since it is defined separately and in relation to defense articles, 22 C.F.R. § 120.10, but is also defined as a defense article when it is covered by the USML. *See* 22 C.F.R. § 120.6." *Bernstein I*, 945 F. Supp. at 1284.

Indeed, the regulations explicitly bar publication of a "Not Otherwise Enumerated" class of "technical data." 22 C.F.R. § 121.1 at USML paragraph XXI(b). An unenumerated prior restraint supplies the very definition of unbridled discretion.

Respectfully, "if doubt exists as to whether [speech] is covered by the U.S. Munitions List," the solution should not be found in Defendants' inscrutable and often interminable "commodity jurisdiction" procedures. 22 C.F.R. § 120.4(a). Rather, the solution is  to be found in a judicial declaration that ITAR's control of public speech does not conform to First Amendment requirements.

### b.   Lengthy Delays and the Lack of Procedural Safeguards.

"[T]he Supreme Court established three procedural safeguards to protect against the suppression of constitutionally protected speech by a censorship board." *Fantasy Ranch, Inc.* v. *City of Arlington*, 459 F.3d

DOSWASHINGTONSUP00640

546, 563 (5th Cir. 2006) (citing *Freedman*).

> First, any restraint before judicial review occurs can be imposed only
> for a specified brief period during which the status quo must be
> maintained; second, prompt judicial review of that decision must be
> available; and third, the censor must bear the burden of going to
> court to suppress the speech and must bear the burden of proof in
> court.

*Id.* (quotation omitted).

"The ITAR scheme, a paradigm of standardless discretion, fails on
every count." *Bernstein I*, 945 F. Supp. at 1289. The DOPSR review
process contains no publicly-known timelines in which the agency must
complete its review. Aggravating this situation, in cases where DOPSR
refuses to perform its review because of uncertain export control
jurisdiction, as noted above, the period of time it takes to obtain a
commodity jurisdiction request to enable DOPSR review can take
months to a year or more. Defense Distributed's ten commodity
jurisdiction requests regarding the previously Published Files were
pending at DDTC for nearly two years—a long time throughout which
Defense Distributed has been threatened with criminal enforcement
should it republish the files, four of which were eventually deemed to
be uncontrolled by ITAR.

DOSWASHINGTONSUP00641

And in cases where DOPSR refuses to allow publication and requires that a license be obtained from Defendants, nothing requires DDTC to issue a licensing decision within a specific and reasonable period of time. Relevant here, a "Policy on Review Time for License Applications" established under a 2008 National Security Decision Directive requires that DDTC "complete the review and adjudication of license applications within 60 days of receipt." *See* 74 Fed. Reg. 63,497 (Dec. 3, 2009). A two-month delay on the right to speak is per se unreasonable under the First Amendment. But even were a two-month delay constitutional, this policy contains broad "national security exceptions" allowing the government plenary authority to override the timeline. This exception effectively swallows the two month rule, as it applies where "[t]he Department of Defense has not yet completed its review" and "[w]hen a related export policy is under active review and pending final determination by the Department of State." *Id.* A prior restraint that "permits a delay without limits" is unconstitutional. *Riley* v. *Nat'l Fed. of Blind of N.C.*, 487 U.S. 781, 802 (1988).

"[O]nly a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure

DOSWASHINGTONSUP00642

requiring a judicial determination suffices to impose a valid final restraint." *Freedman*, 380 U.S. at 59. But judicial review of DDTC or DOPSR actions is non-existent. In fact, ITAR expressly provides that Defendants' licensing determinations are *not* subject to judicial review under the Administrative Procedures Act. 22 C.F.R. § 128.1. And the AECA provides that "[t]he designation . . . of items as defense articles or defense services for purposes of this section shall not be subject to judicial review." 22 U.S.C. § 2778(h). This insulation from judicial review is plainly unconstitutional under *Freedman* when ITAR censors public speech, without any procedural protections.

> 4. *Defendants' Speech Regulation of Plaintiffs' Speech Fails Any Level of First Amendment Scrutiny.*

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United* v. *FEC*, 558 U.S. 310, 340 (2010) (citations omitted). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Stevens*, 559 U.S. at 468 (quotation omitted).

55

DOSWASHINGTONSUP00643

But this is exactly what the Defendants have done—prohibited Plaintiffs' speech based on "its content." *Id.* This aptly describes Defendants' prior restraint. Plaintiffs are free to publish whatever they want, on the Internet or anywhere else, unless Defendants deem the content of Plaintiffs' speech to be ITAR-controlled.

The court below found that ITAR "unquestionably regulates speech concerning a specific topic." ROA.691. Yet, it nonetheless found that Defendants' prior restraint is not content-based, *id.*, relying on cases such as *Asgeirsson* v. *Abbott*, 696 F.3d 454 (5th Cir. 2012), which had held that "[c]ontent- neutrality has continued to be defined by the justification of the law or regulation." *Id.* at 460 (footnote omitted). But last term, the Supreme Court clarified that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) (quotation omitted). "[A] speech regulation targeted at a specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230 (quotation omitted).

56

Two other circuits have since recognized that *Reed* overruled their understandings of content-discrimination as requiring viewpoint-discrimination. *See Cahaly* v. *Larosa*, 796 F.3d 399, 405 (4th Cir. 2015); *Norton* v. *City of Springfield*, 612 Fed. Appx. 386, 387 (7th Cir. 2015). As the Seventh Circuit observed,

> The majority opinion in *Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification.

*Id.*

To be sure, the court below gave *Reed* a more limited reading. But Plaintiffs would not concede that Defendants' prior restraint is viewpoint-neutral—it applies, after all, to speech based on whether it promotes or advances the acquisition of arms, not merely to speech about arms.

In any event, this much is now clear: "the crucial first step in the content-neutrality analysis [is] determining whether the law is content neutral on its face." *Reed*, 135 S. Ct. at 2228. A speech restriction is "content based if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a

DOSWASHINGTONSUP00645

violation has occurred." *McCullen* v. *Coakley*, 134 S. Ct. 2518, 2531

(2014) (quotation omitted). Without question, Defendants' prior

restraint is based on the speech's content—only speech deemed to

contain "technical data" is subject to the pre-publication approval

requirement.

"Since [Defendants' practice] is a content-based speech restriction, it

can stand only if it satisfies strict scrutiny." *United States* v. *Playboy*

*Entm't Group*, 529 U.S. 803, 813 (2000) (citation omitted); *Reed*, 135 S.

Ct. at 2228. This much, it cannot do. While Defendants may have a

compelling interest in controlling the export of sensitive data related to

certain defense articles, the restriction is not narrowly tailored.

The Defendants' enforcement of ITAR fails under the narrow-

tailoring element of free speech analysis because it is simultaneously

overinclusive and underinclusive. *Simon & Schuster, Inc.* v. *Members of*

*the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120-21 (1991)

(invalidating law due to overinclusiveness); *Florida Star* v. *B.J.F.*, 491

U.S. 524, 540 (1989) (invalidating law due to underinclusiveness).

First, the Defendants' regime censors vastly more speech than needed

to advance the regulatory interest, and captures vastly more speech

58

than that intended for a foreign audience. Eugene Volokh, *Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny*, 144 U. Pa. L. Rev. 2417, 2422 (1997) ("If the government can serve the interest while burdening less speech, it should."). Second, the fact that *only* Plaintiff's speech has been targeted for enforcement—even while others have published the *exact* same files—suggests that Defendants are not evenly pursuing the purported compelling governmental interests. *Id.* at 2423 ("[A] law is not narrowly tailored if it fails to restrict a significant amount of speech that harms the government interest to about the same degree as does the restricted speech"). This combination of over-inclusiveness and under-inclusiveness is fatal for purposes of strict scrutiny.

The court below turned aside Plaintiffs' content-based First Amendment challenge in reliance on *United States* v. *Chi Mak*, 683 F.3d 1126 (9th Cir. 2012), which had affirmed a conviction for the sharing of stolen military secrets. But *Chi Mak* is wholly inapposite. Notably, Mak's First Amendment claims were raised initially on appeal, and were thus reviewed only for plain error. *Id.* at 1134. Moreover, Mak's China-bound CD containing encrypted "export-

59

controlled naval technology," *id.* at 1131, was not public speech, and

the defendant was not a public speaker. The *Chi Mak* court also

instructed the jury that the Government bore the burden of proving

that the contested technical data was not in the public domain, *id.* at

1132, not a difficult task considering the nature of the military secrets

there at issue.

In contrast,  the government seeks to improperly shift the burden to

Plaintiffs, who seek to publish information lawfully possessed by them

on the Internet. Far from questioning the scheme's application to the

theft of classified information as a matter of plain-error review,

Plaintiffs properly raised the same First Amendment problems that the

Government has warned against for decades.

C.    DEFENDANTS' PRIOR RESTRAINT IS VOID FOR VAGUENESS.

"It is a basic principle of due process that an enactment is void for

vagueness if its prohibitions are not clearly defined." *Grayned* v. *City of

Rockford*, 408 U.S. 104, 108 (1972). Vagueness doctrine applies with

particular force in review of laws dealing with speech. "[S]tricter

standards of permissible statutory vagueness may be applied to a

statute having a potentially inhibiting effect on speech; a man may the

DOSWASHINGTONSUP00648

less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Hynes* v. *Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976) (quotations omitted). "Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards.'" *Nat'l Endowment for the Arts* v. *Finley*, 524 U.S. 569, 588 (1998) (citation omitted).

Defendants' prepublication approval requirement is by no means self-evident to reasonable people reading the ITAR. If anything, ITAR's exclusion of information in the public domain suggests a variety of avenues by which people might avoid ITAR's strictures by publishing their information. The regulatory regime has even been amended to remove the suggestion of a pre-publication review requirement, the validity of which the Justice Department has repeatedly questioned. The existence of a catch-all provision, and the need to submit to the opaque commodity jurisdiction procedures, confirm that persons of "common intelligence must necessarily guess at [ITAR's] meaning and differ as to its application." *Connally* v. *General Const. Co.*, 269 U.S.

DOSWASHINGTONSUP00649

385, 391 (1926) (citations omitted). It thus "violates the first essential of due process of law." *Id.*[12]

D.    DEFENDANTS ARE VIOLATING PLAINTIFFS' SECOND AMENDMENT RIGHTS.

1.    *The Government Bears the Burden of Proving that Laws Burdening Second Amendment Rights Pass Heightened Scrutiny.*

The Second Amendment functions as a normal constitutional right. As the Supreme Court demonstrated, laws that conflict with the right's core guarantee will be struck down without employing any balancing test. *District of Columbia* v. *Heller*, 554 U.S. 570 (2008). In *Heller*, once it was determined that the Second Amendment secures a right to have handguns for self-defense, city ordinances banning handguns and the keeping of functional firearms simply could not survive. "The Court invalidated the laws because they violated the central right that the

---

[12]The district court endorsed two wholly inapposite cases to reject the vagueness challenge. ROA.701 (citing *United States* v. *Wu*, 711 F.3d 1 (1st Cir. 2013); *United States* v. *Hsu*, 364 F.3d 192 (4th Cir. 2004)). Neither case involved "technical data," speech, or the First Amendment. *See, e.g.*, *Hsu*, 364 F.3d at 196 ("Defendants do not maintain that the AECA or its implementing regulations implicate First Amendment freedoms"). Moreover, in both cases, the Government proved willful criminal violations, undermining any vagueness claims. *Id.* at 197; *Wu*, 711 F.3d at 15.

DOSWASHINGTONSUP00650

Second Amendment was intended to protect . . . .” *Nat'l Rifle Ass'n of*

*Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700

F.3d 185, 193 (5th Cir. 2012) (“*NRA*”). Other cases lend themselves to

different constitutional tests, *e.g.*, gun licensing laws affording

unbridled discretion could be viewed as prior restraints, and disarmed

individuals may raise as-applied challenges based on their personal

circumstances.

But in large part, when Second Amendment claims arise,

[a] two-step inquiry has emerged as the prevailing approach: the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment— that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). This Court follows the two-

step approach in appropriate cases, *id.*, and this case appears to be

well-suited to this approach.

“To determine whether a law impinges on the Second Amendment

right, we look to whether the law harmonizes with the historical

traditions associated with the Second Amendment guarantee.” *Id.*

(citations omitted). “If the challenged law burdens conduct that falls

DOSWASHINGTONSUP00651

outside the Second Amendment's scope, then the law passes

constitutional muster. If the law burdens conduct that falls within the

Second Amendment's scope, we then proceed to apply the appropriate

level of means-ends scrutiny." *Id.* at 195 (citations omitted).

"[T]he appropriate level of scrutiny depends on the nature of the

conduct being regulated and the degree to which the challenged law

burdens the right." *NRA*, 700 F.3d at 195 (citations omitted). Rational

basis review is unavailable. Means-ends scrutiny in Second

Amendment cases must always be heightened scrutiny—strict or

intermediate. *Id.*

> 2.   *The Second Amendment Secures the Right to Produce
>       Firearms, and to Exchange Technical Data Concerning
>       Firearms.*

The Second Amendment secures a right to possess firearms,

including handguns. *See Heller.* The Liberator may be manufactured

using technology unavailable in 1791, but that is true of most arms

today, and Defense Distributed's pistol is functionally indistinguishable

from the sorts of handguns Americans have used for over two centuries.

The Second Amendment also guarantees the right to other firearms

and firearm components burdened by the Government's restriction.

DOSWASHINGTONSUP00652

But there must be more. "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). Because there is a right to possess firearms, there is, necessarily, a right to acquire them. And the most basic means of acquiring something, is to make it. Surely, the Second Amendment secures the right to make the arms that might then be kept or carried. *Cf. Martin* v. *Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984) (adopting tort doctrines "which would in practice drive [handgun] manufacturers out of business, would produce a handgun ban by judicial fiat in the face of" a constitutional right to handgun possession."). If "restricting the ability to purchase an item is tantamount to restricting that item's use," *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (footnote omitted), the same must be said of restricting the ability to manufacture that item.[13]

---

[13]In *United States* v. *Henry*, 688 F.3d 637 (9th Cir. 2012), the Ninth Circuit rejected a Second Amendment claim to a homemade machine gun. Notably, the court did not address, let alone deny that the Second Amendment secures the right to make firearms. Rather, the court held that this particular type of firearm lies outside the Second

DOSWASHINGTONSUP00653

The fact that manufactured arms might cross the Nation's borders does not diminish the right to arms. "Our citizens have always been free to make, vend and export arms. It is the constant occupation and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph, ed., 1830). "With organized armories inaccessible to the frontier and low barriers to entering the trade in all regions, the [early American] public could reasonably have understood a right to acquire arms through self-production." Peter Jensen-Haxel, *3D Printers, Obsolete Firearm Supply Controls, and the Right to Build Self-Defense Weapons Under Heller*, 42 Golden Gate U. L. Rev. 447, 478 (2012); *see also* Josh Blackman, *The 1st Amendment, 2nd Amendment, and 3D Printed Guns*, 81 Tenn. L. Rev. 479, 491-499 (2014).

In keeping with the familiar rule "vendors and those in like positions . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function," *Carey* v. *Pop. Servs. Int'l*, 431 U.S. 678, 684 (1977) (quotation omitted); *Reliable Consultants*, 517

_____

Amendment's scope. Plaintiffs do not claim a right in any arms or arms components that would lack Second Amendment protection.

DOSWASHINGTONSUP00654

F.3d at 743, Plaintiffs are entitled to assert the Second Amendment rights of their customers and website visitors. "[O]perating a business that provides Second Amendment services is generally protected by the Second Amendment." *Mance* v. *Holder*, 74 F. Supp. 3d 795, 807 n.8 (N.D. Tex. 2015); *Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) ("Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban"). And as the district court found, ROA.696-98, SAF has associational standing to assert its members Second Amendment rights. *Mance*, 74 F. Supp. 3d at 802.

3.    *Defendants' Regulations Fail Any Level of Second Amendment Scrutiny.*

The prior restraint and prohibition of speech relating to the manufacture of firearms and related components is very much "a salient outlier in the historical landscape of gun control." *NRA*, 700 F.3d at 205. Never mind the Framing Era—nothing like this has existed in the United States until Defendants ordered the Liberator files taken down. As the record shows, ITAR was long ago amended specifically to remove the suggestion of such prior restraints. And while the Government's various opinions over the years have focused on the

67

scheme's First Amendment problems, the fact remains that this type of
regulation lies well outside American tradition and accepted legal
norms.

"A regulation that threatens a right at the core of the Second
Amendment—for example, the right of a law-abiding, responsible adult
to possess and use a handgun to defend his or her home and
family—triggers strict scrutiny." *NRA*, 700 F.3d at 195; *see also United
States* v. *Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume
that any law that would burden the 'fundamental,' core right of
self-defense in the home by a law-abiding citizen would be subject to
strict scrutiny"). Defendants' restrictions squarely fit this description,
though the outcome would be no different under intermediate scrutiny,
which "requires the government to demonstrate a 'reasonable fit'
between the challenged regulation and an 'important' government
objective," *NRA*, 700 F.3d at 195, and "may not burden more [conduct]
than is reasonably necessary," *United States* v. *Marzzarella*, 614 F.3d
85, 98 (3d Cir. 2010).

Again, Plaintiffs do not question that the Government has a
compelling interest in regulating arms exports. But this interest cannot

DOSWASHINGTONSUP00656

effectively override the traditional, centuries-old American craft of making arms of the kind to which individuals in this country enjoy a fundamental right. If allowing Americans to exchange information useful in the manufacture of Second Amendment arms carries some risk that the information might be gleaned by a foreign government, there are nonetheless real limits on the Government's ability to mitigate that (theoretical) harm. The later-enacted Second Amendment acts as a limitation on Congress's authority to regulate foreign commerce, and not the other way around.

\* \* \*

Plaintiffs are substantially likely to prevail on at least some if not all of their claims.

## II.     Defendants' Licensing Scheme Irreparably Harms Plaintiffs.

A finding that a constitutional right "'is either threatened or in fact being impaired'. . . mandates a finding of irreparable injury." *Deerfield Med. Center* v. *City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (quoting *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373-

DOSWASHINGTONSUP00657

74 (citations omitted). And no constitutional right is so directly linked to one's immediate physical well-being as is the right to keep and bear arms. The interest in self-defense is the "*central component* of the [Second Amendment] right itself," *Heller*, 554 U.S. at 599 (emphasis original). As the Seventh Circuit explained,

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages.

*Ezell*, 651 F.3d at 699 (citations and footnote omitted).

## III.   THE BALANCE OF EQUITIES FAVORS GRANTING INJUNCTIVE RELIEF.

While Plaintiffs suffer irreparable harm when their fundamental rights are violated, an injunction would not harm Defendants at all. First, it appears that Defendants have thus far targeted only Defense Distributed's website with a prior restraint on unclassified technical data. Defendants are not apparently taking action to control all technical data, or even just unclassified technical data relating to arms, present throughout the public domain. Indeed, Defendants are not even

70

moving against anyone else who published the Liberator files. And an injunction would not bar Defendants from restricting exports of the sort Congress intended to control under the AECA.

The equities especially favor permitting the continued dissemination of the already-published files. Where "publication has already begun and a substantial part of the threatened damage has already occurred," and "access to the documents by many unauthorized people is undeniable . . . the efficacy of equitable relief against these or other newspapers to avert anticipated damage is doubtful at best." *New York Times*, 403 U.S. at 733 (White, J., concurring).

IV.   THE PUBLIC INTEREST WARRANTS INJUNCTIVE RELIEF.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org.* v. *Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quotation omitted); *De Leon* v. *Perry*, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014).

V.   NO BOND OR OTHER SECURITY IS REQUIRED AS A CONDITION OF INJUNCTIVE RELIEF.

The security requirement of Fed. R. Civ. P. 65(c) may be dispensed with when there is no risk of financial harm to the enjoined party. "In

DOSWASHINGTONSUP00659

holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court 'may elect to require no security at all.'" *Kaepa, Inc.* v. *Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quotation and citations omitted). Even courts that view Rule 65(c) as mandatory are open to the idea of the mandatory bond being set at zero. *See Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). As an injunction would not financially harm Defendants, the Court should dispense with the bond requirement.

## CONCLUSION

The District Court's order should be reversed, and the case remanded with instructions to enter a preliminary injunction against ITAR's enforcement as a prior restraint.

Dated:   December 10, 2015                 Respectfully submitted,

/s/ Matthew Goldstein               /s/ Alan Gura
Matthew Goldstein                   Alan Gura
Matthew A. Goldstein, PLLC              Counsel of Record
1875 Connecticut Avenue, N.W.       GURA & POSSESSKY, PLLC
10th Floor                          916 Prince Street, Suite 7
Washington, DC 20009                Alexandria, VA 22314
202.550.0040/Fax 202.683.6679       703.835.9085/Fax 703.997.7665

72

/s/ William B. Mateja                     /s/ Josh Blackman

William B. Mateja                         Josh Blackman

FISH & RICHARDSON P.C.           1303 San Jacinto Street

1717 Main Street, Suite 5000       Houston, TX 77002

Dallas, TX 75201                      202.294.9003/713.646.1766

214.747.5070/Fax 214.747.2091

*Counsel for Appellants*

73

DOSWASHINGTONSUP00661

## CERTIFICATE OF SERVICE

On this, the 10th day of December, 2015, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on December 10, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 10th day of December, 2015.

/s/ Alan Gura_____
Alan Gura

DOSWASHINGTONSUP00662

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R.
   App. P. 32(a)(7)(B)(i) because this brief contains 13,693 words,
   excluding  the parts of the brief exempted by Fed. R. App. P.
   32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App.
   P. 32(a)(5) and the type style requirements of Fed. R. App. P.
   32(a)(6) because this brief has been prepared in a proportionately
   spaced typeface using WordPerfect X4 in 14 point Century
   Schoolbook font.


/s/ Alan Gura
Alan Gura
Attorney for Plaintiffs-Appellants
Dated: December 10, 2015

75

DOSWASHINGTONSUP00663

Addendum

DOSWASHINGTONSUP00664

# Addendum Table of Contents

22 U.S.C. § 2278(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

22 U.S.C. § 2278(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 U.S.C. § 2278(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22 U.S.C. § 2278(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. § 120.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22 C.F.R. § 120.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22 C.F.R. § 120.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

22 C.F.R. § 120.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

22 C.F.R. § 120.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

22 C.F.R. § 120.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

22 C.F.R. § 120.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22 C.F.R. § 120.41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

22 C.F.R. § 121.1, Category I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

22 C.F.R. § 121.1, Category XXI. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

22 C.F.R. § 127.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

22 C.F.R. § 128.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

DOSWASHINGTONSUP00665

Public Records:

Docket, *Bernstein* v. *U.S. Dep't of State*, N.D. Cal. C-95-0582-MHP

Excerpts, Second Decl. of Dr. William J. Lowell
(July 26, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Excerpts, Memorandum of Points & Authorities in Support of
Defendants' Motion for Summary Judgment (July 26, 1996). . . 25

Excerpts, Defendants' Opposition to Plaintiffs' Motion for
Summary Judgment (Aug. 30, 1996).. . . . . . . . . . . . . . . . . . . . . 28

DOSWASHINGTONSUP00666

TITLE 22—FOREIGN RELATIONS AND INTERCOURSE
CHAPTER 39—ARMS EXPORT CONTROL
SUBCHAPTER III—MILITARY EXPORT CONTROLS

## 22 U.S.C. § 2778 - Control of arms exports and imports

### § 2778(a)

a) Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; negotiations information

(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

(2) Decisions on issuing export licenses under this section shall take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

(3) In exercising the authorities conferred by this section, the President may require that any defense article or defense service be sold under this chapter as a condition of its eligibility for export, and may require that persons engaged in the negotiation for the export of defense articles and services keep the President fully and currently informed of the progress and future prospects of such negotiations.

### § 2778(c)

(c) Criminal violations; punishment

   Any person who willfully violates any provision of this section, section 2779 of this title, a treaty referred to in subsection (j)(1)(C)(i), or any rule or regulation issued under this section or section 2779 of this title, including any rule or regulation issued to implement or enforce a treaty referred to in subsection (j)(1)(C)(i) or an implementing arrangement pursuant to such treaty, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than 20 years, or both.

### § 2778(e)

(e) Enforcement powers of President

   In carrying out functions under this section with respect to the export of defense articles and defense services, including defense articles and defense services exported or imported pursuant to a treaty referred to in subsection (j)(1)(C)(i), the President is authorized to exercise the same powers concerning violations and enforcement which are conferred upon departments, agencies and officials by subsections (c), (d), (e), and (g) of section 11 of the Export Administration Act of 1979 [50 U.S.C. 4610(c), (d), (e), and (g)], and by subsections (a) and (c) of section 12 of such Act [50 U.S.C. 4614(a) and (c)], subject to the same terms and conditions as are applicable to such powers under such Act [50 U.S.C. 4601 et seq.], except that section 11(c)(2)(B) of such Act shall not apply, and instead, as prescribed in regulations issued under this section, the Secretary of State may assess civil penalties for violations of this chapter and regulations prescribed thereunder and further may commence a civil action to recover such civil penalties, and except further that the names of the countries and

the types and quantities of defense articles for which licenses are issued under this section shall not be withheld from public disclosure unless the President determines that the release of such information would be contrary to the national interest. Nothing in this subsection shall be construed as authorizing the withholding of information from the Congress. Notwithstanding section 11(c) of the Export Administration Act of 1979, the civil penalty for each violation involving controls imposed on the export of defense articles and defense services under this section may not exceed $500,000.

### § 2778(h)

(h) Judicial review of designation of items as defense articles or services

The designation by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), in regulations issued under this section, of items as defense articles or defense services for purposes of this section shall not be subject to judicial review.

DOSWASHINGTONSUP00669

TITLE 22—FOREIGN RELATIONS
CHAPTER I—DEPARTMENT OF STATE
SUBCHAPTER M—INTERNATIONAL TRAFFIC IN ARMS
REGULATIONS
PART 120—PURPOSE AND DEFINITIONS

## §120.2   Designation of defense articles and defense services.

The Arms Export Control Act (22 U.S.C. 2778(a) and 2794(7)) provides that the President shall designate the articles and services deemed to be defense articles and defense services for purposes of import or export controls. The President has delegated to the Secretary of State the authority to control the export and temporary import of defense articles and services. The items designated by the Secretary of State for purposes of export and temporary import control constitute the U.S. Munitions List specified in part 121 of this subchapter. Defense articles on the U.S. Munitions List specified in part 121 of this subchapter that are also subject to permanent import control by the Attorney General on the U.S. Munitions Import List enumerated in 27 CFR part 447 are subject to temporary import controls administered by the Secretary of State. Designations of defense articles and defense services are made by the Department of State with the concurrence of the Department of Defense. The scope of the U.S. Munitions List shall be changed only by amendments made pursuant to section 38 of the Arms Export Control Act (22 U.S.C. 2778). For a designation or determination on whether a particular item is enumerated on the U.S. Munitions List, see §120.4 of this subchapter.

## §120.3   Policy on designating or determining defense articles and services on the U.S. Munitions List.

(a) For purposes of this subchapter, a specific article or service may be designated a defense article (see §120.6 of this subchapter) or defense service (see §120.9 of this subchapter) if it:

(1) Meets the criteria of a defense article or defense service on the U.S. Munitions List; or

(2) Provides the equivalent performance capabilities of a defense article on the U.S. Munitions List.

(b) For purposes of this subchapter, a specific article or service shall be determined in the future as a defense article or defense service if it provides a critical military or intelligence advantage such that it warrants control under this subchapter.

Note to paragraphs (a) and (b): An article or service determined in the future pursuant to this subchapter as a defense article or defense service, but not currently on the U.S. Munitions List, will be placed in U.S. Munitions List Category XXI until the appropriate U.S. Munitions List category has been amended to provide the necessary entry.

(c) A specific article or service is not a defense article or defense service for purposes of this subchapter if it:

(1) Is determined to be under the jurisdiction of another department or agency of the U.S. Government (see §120.5 of this subchapter) pursuant to a commodity jurisdiction determination (see §120.4 of this subchapter) unless superseded by changes to the U.S. Munitions List or by a subsequent commodity jurisdiction determination; or

(2) Meets one of the criteria of §120.41(b) of this subchapter when the article is used in or with a defense article and specially designed is used as a control criteria (see §120.41 of this subchapter).

Note to §120.3: The intended use of the article or service after its export (i.e., for a military or civilian purpose), by itself, is not a

factor in determining whether the article or service is subject to the controls of this subchapter.

## §120.4   Commodity jurisdiction.

(a) The commodity jurisdiction procedure is used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List. It may also be used for consideration of a redesignation of an article or service currently covered by the U.S. Munitions List. The Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List. Upon electronic submission of a Commodity Jurisdiction (CJ) Determination Form (Form DS-4076), the Directorate of Defense Trade Controls shall provide a determination of whether a particular article or service is covered by the U.S. Munitions List. The determination, consistent with §§120.2, 120.3, and 120.4, entails consultation among the Departments of State, Defense, Commerce, and other U.S. Government agencies and industry in appropriate cases.

(b) Registration with the Directorate of Defense Trade Controls as defined in part 122 of this subchapter is not required prior to submission of a commodity jurisdiction request. If it is determined that the commodity is a defense article or defense service covered by the U.S. Munitions List, registration is required for exporters, manufacturers, and furnishers of such defense articles and defense services (see part 122 of this subchapter), as well as for brokers who are engaged in brokering activities related to such articles or services.

(c) Requests shall identify the article or service, and include a history of this product's design, development, and use. Brochures, specifications, and any other documentation related to the article or service should be submitted as electronic attachments per the instructions for Form DS-4076.

(d)

(1) [Reserved]

(2) A designation that an article or service meets the criteria of a defense article or defense service, or provides the equivalent performance capabilities of a defense article on the U.S. Munitions List set forth in this subchapter, is made on a case-by-case basis by the Department of State, taking into account:

(i) The form and fit of the article; and

(ii) The function and performance capability of the article.

(3) A designation that an article or service has a critical military or intelligence advantage such that it warrants control under this subchapter is made, on a case-by-case basis, by the Department of State, taking into account:

(i) The function and performance capability of the article; and

(ii) The nature of controls imposed by other nations on such items (including the Wassenaar Arrangement and other multilateral controls).

Note 1 to paragraph (d): The form of a commodity is defined by its configuration (including the geometrically measured configuration), material, and material properties that uniquely characterize it. The fit of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity. The function of a commodity is the action or actions it is designed to perform. Performance capability is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency).

Note 2 to paragraph (d): For software, the form means the design, logic flow, and algorithms. The fit is defined by its ability to interface or connect with a defense article. The function means the action or actions the software performs directly related to a defense article or as a standalone application.

Performance capability means the measure of the software's effectiveness to perform a designated function.

(e) The Directorate of Defense Trade Controls will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction. If after 45 days the Directorate of Defense Trade Controls has not provided a final commodity jurisdiction determination, the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing.

(f) State, Defense and Commerce will resolve commodity jurisdiction disputes in accordance with established procedures. State shall notify Defense and Commerce of the initiation and conclusion of each case.

(g) A person may appeal a commodity jurisdiction determination by submitting a written request for reconsideration to the Deputy Assistant Secretary of State for Defense Trade Controls. The Deputy Assistant Secretary's determination of the appeal will be provided, in writing, within 30 days of receipt of the appeal. If desired, an appeal of the Deputy Assistant Secretary's decision can then be made to the Assistant Secretary for Political-Military Affairs.

## §120.6   Defense article.

Defense article means any item or technical data designated in §121.1 of this subchapter. The policy described in §120.3 is applicable to designations of additional items. This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in §121.1 of this subchapter. It also includes forgings, castings, and other unfinished products, such as extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles. It does not include basic marketing information on function or purpose or general system descriptions.

## §120.10   Technical data.

(a) Technical data means, for purposes of this subchapter:

(1) Information, other than software as defined in §120.10(a)(4), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation.

(2) Classified information relating to defense articles and defense services on the U.S. Munitions List and 600-series items controlled by the Commerce Control List;

(3) Information covered by an invention secrecy order; or

(4) Software (see §120.45(f)) directly related to defense articles.

(b) The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in §120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter. It also does not include basic marketing information on function or purpose or general system descriptions of defense articles.

## §120.11   Public domain.

(a) Public domain means information which is published and which is generally accessible or available to the public:

(1) Through sales at newsstands and bookstores;

(2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3) Through second class mailing privileges granted by the U.S. Government;

(4) At libraries open to the public or from which the public can obtain documents;

(5) Through patents available at any patent office;

(6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also §125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

## §120.17   Export.

(a) Export means:

(1) Sending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data; or

(2) Transferring registration, control or ownership to a foreign person of any aircraft, vessel, or satellite covered by the U.S. Munitions List, whether in the United States or abroad; or

(3) Disclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government (e.g.,

diplomatic missions); or

(4) Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad; or

(5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.

(6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter. However, for certain limited purposes (see §126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services.

(b) [Reserved]

## §120.41  Specially designed.

(a) Except for commodities or software described in paragraph (b) of this section, a commodity or software (see §120.45(f)) is specially designed if it:

(1) As a result of development, has properties peculiarly responsible for achieving or exceeding the controlled performance levels, characteristics, or functions described in the relevant U.S. Munitions List paragraph; or

(2) Is a part (see §120.45 (d)), component (see §120.45(b)), accessory (see §120.45(c), attachment (see §120.45(c)), or software for use in or with a defense article.

(b) For purposes of this subchapter, a part, component, accessory, attachment, or software is not specially designed if it:

(1) Is subject to the EAR pursuant to a commodity jurisdiction determination;

(2) Is, regardless of form or fit, a fastener (e.g., screws, bolts, nuts, nut plates, studs, inserts, clips, rivets, pins), washer, spacer, insulator, grommet, bushing, spring, wire, or solder;

(3) Has the same function, performance capabilities, and the same or "equivalent" form and fit as a commodity or software used

in or with a commodity that:
  (i) Is or was in production (i.e., not in development); and
  (ii) Is not enumerated on the U.S. Munitions List;
  (4) Was or is being developed with knowledge that it is or would be for use in or with both defense articles enumerated on the U.S. Munitions List and also commodities not on the U.S. Munitions List; or
  (5) Was or is being developed as a general purpose commodity or software, i.e., with no knowledge for use in or with a particular commodity (e.g., a F/A-18 or HMMWV) or type of commodity (e.g., an aircraft or machine tool).

Note to paragraphs (a) and (b): The term "commodity" refers to any article, material, or supply, except technology/technical data or software.

Note to paragraph (a)(1): An example of a commodity that as a result of development has properties peculiarly responsible for achieving or exceeding the controlled performance levels, functions, or characteristics in a U.S. Munitions List category would be a swimmer delivery vehicle specially designed to dock with a submarine to provide submerged transport for swimmers or divers from submarines.

Note to paragraph (b): The term "enumerated" refers to any article on the U.S. Munitions List or the Commerce Control List and not in a "catch-all" control. A "catch-all" control is one that does not refer to specific types of parts, components, accessories, or attachments, but rather controls unspecified parts, components, accessories, or attachments only if they were specially designed for an enumerated item.

Note 1 to paragraph (b)(3): For the purpose of this definition, "production" means all production stages, such as product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance. This includes "serial production" where commodities have passed production readiness testing (i.e., an approved, standardized design ready for large

scale production) and have been or are being produced on an assembly line for multiple commodities using the approved, standardized design.

Note 2 to paragraph (b)(3): For the purpose of this definition, "development" is related to all stages prior to serial production, such as: design, design research, design analyses, design concepts, assembly and testing of prototypes, pilot production schemes, design data, process of transforming design data into a product, configuration design, integration design, layouts.

Note 3 to paragraph (b)(3): Commodities in "production" that are subsequently subject to "development" activities, such as those that would result in enhancements or improvements only in the reliability or maintainability of the commodity (e.g., an increased mean time between failure (MTBF)), including those pertaining to quality improvements, cost reductions, or feature enhancements, remain in "production." However, any new models or versions of such commodities developed from such efforts that change the basic performance or capability of the commodity are in "development" until and unless they enter into "production."

Note 4 to paragraph (b)(3): The form of a commodity is defined by its configuration (including the geometrically measured configuration), material, and material properties that uniquely characterize it. The fit of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity. The function of a commodity is the action or actions it is designed to perform. Performance capability is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency). For software, the form means the design, logic flow, and algorithms. The fit is defined by its ability to interface or connect with a defense article. The function means the action or actions the software performs directly related to a defense article or as a standalone application. Performance capability means the measure of the software's effectiveness to perform a designated function.

Note 5 to paragraph (b)(3): With respect to a commodity, "equivalent" means its form has been modified solely for fit purposes.

Note 1 to paragraphs (b)(4) and (5): For a defense article not to be specially designed on the basis of paragraph (b)(4) or (5) of this section, documents contemporaneous with its development, in their totality, must establish the elements of paragraph (b)(4) or (5). Such documents may include concept design information, marketing plans, declarations in patent applications, or contracts. Absent such documents, the commodity may not be excluded from being specially designed by either paragraph (b)(4) or (5).

Note 2 to paragraphs (b)(4) and (5): For the purpose of this definition, "knowledge" includes not only the positive knowledge a circumstance exists or is substantially certain to occur, but also an awareness of a high probability of its existence or future occurrence. Such awareness is inferred from evidence of the conscious disregard of facts known to a person and is also inferred from a person's willful avoidance of facts.

TITLE 22—FOREIGN RELATIONS
CHAPTER I—DEPARTMENT OF STATE
SUBCHAPTER M—INTERNATIONAL TRAFFIC IN ARMS
REGULATIONS
PART 121—THE UNITED STATES MUNITIONS LIST

## §121.1   The United States Munitions List

## Category I—Firearms, Close Assault Weapons and Combat Shotguns

*(a) Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

*(b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

*(c) Firearms or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

*(d) Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

*(e) Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

(f) Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)

*(g) Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

(h) Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

(i) Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j) The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2) A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

(3) A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4) A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5) A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

(6) A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

Note: This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items.

See the Export Administration Regulations (15 CFR parts 730-799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g., §§123.17, 123.18 and 125.4).

## Category XXI—Articles, Technical Data, and Defense Services Not Otherwise Enumerated

*(a) Any article not enumerated on the U.S. Munitions List may be included in this category until such time as the appropriate U.S. Munitions List category is amended. The decision on whether any article may be included in this category, and the designation of the defense article as not Significant Military Equipment (see §120.7 of this subchapter), shall be made by the Director, Office of Defense Trade Controls Policy.

(b) Technical data (see §120.10 of this subchapter) and defense services (see §120.9 of this subchapter) directly related to the defense articles covered in paragraph (a) of this category.

TITLE 22—FOREIGN RELATIONS
CHAPTER I—DEPARTMENT OF STATE
SUBCHAPTER M—INTERNATIONAL TRAFFIC IN ARMS
REGULATIONS
PART 127—VIOLATIONS AND PENALTIES

## §127.1   Violations.

(a) Without first obtaining the required license or other written approval from the Directorate of Defense Trade Controls, it is unlawful:

(1) To export or attempt to export from the United States any defense article or technical data or to furnish or attempt to furnish any defense service for which a license or written approval is required by this subchapter;

(2) To reexport or retransfer or attempt to reexport or retransfer any defense article, technical data, or defense service from one foreign end-user, end-use, or destination to another foreign end-user, end-use, or destination for which a license or written approval is required by this subchapter, including, as specified in §126.16(h) and §126.17(h) of this subchapter, any defense article, technical data, or defense service that was exported from the United States without a license pursuant to any exemption under this subchapter;

(3) To import or attempt to import any defense article whenever a license is required by this subchapter;

(4) To conspire to export, import, reexport, retransfer, furnish or cause to be exported, imported, reexported, retransferred or furnished, any defense article, technical data, or defense service for which a license or written approval is required by this subchapter; or

(5) To possess or attempt to possess any defense article with intent to export or transfer such defense article in violation of 22 U.S.C. 2778 and 2779, or any regulation, license, approval, or order issued thereunder.

(b) It is unlawful:

(1) To violate any of the terms or conditions of a license or approval granted pursuant to this subchapter, any exemption contained in this subchapter, or any rule or regulation contained in this subchapter;

(2) To engage in the business of brokering activities for which registration and a license or written approval is required by this subchapter without first registering or obtaining the required license or written approval from the Directorate of Defense Trade Controls. For the purposes of this subchapter, engaging in the business of brokering activities requires only one occasion of engaging in an activity as reflected in §129.2(b) of this subchapter.

(3) To engage in the United States in the business of either manufacturing or exporting defense articles or furnishing defense services without complying with the registration requirements. For the purposes of this subchapter, engaging in the business of manufacturing or exporting defense articles or furnishing defense services requires only one occasion of manufacturing or exporting a defense article or furnishing a defense service.

(c) Any person who is granted a license or other approval or acts pursuant to an exemption under this subchapter is responsible for the acts of employees, agents, brokers, and all authorized persons to whom possession of the defense article, which includes technical data, has been entrusted regarding the operation, use, possession, transportation, and handling of such defense article abroad. All persons abroad subject to U.S. jurisdiction who obtain custody of a defense article exported from the United States or produced under an agreement described in part 124 of this subchapter, and regardless of the number of intermediate transfers, are bound by the regulations of this subchapter in the same manner and to the same extent as the original owner or transferor.

(d) A person who is ineligible pursuant to §120.1(c)(2) of this subchapter, or a person with knowledge that another person is ineligible pursuant to §120.1(c)(2) of this subchapter, may not, directly or indirectly, in any manner or capacity, without prior disclosure of the facts to and written authorization from the

Directorate of Defense Trade Controls:

(1) Apply for, obtain, or use any export control document as defined in §127.2(b) for such ineligible person; or

(2) Order, buy, receive, use, sell, deliver, store, dispose of, forward, transport, finance, or otherwise service or participate in any manner in any transaction subject to this subchapter that may involve any defense article, which includes technical data, defense services, or brokering activities, where such ineligible person may obtain any benefit therefrom or have any direct or indirect interest therein.

(e) No person may knowingly or willfully attempt, solicit, cause, or aid, abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by, or the omission of any act required by 22 U.S.C. 2778, 22 U.S.C. 2779, or any regulation, license, approval, or order issued thereunder.

DOSWASHINGTONSUP00686

TITLE 22—FOREIGN RELATIONS
CHAPTER I—DEPARTMENT OF STATE
SUBCHAPTER M—INTERNATIONAL TRAFFIC IN ARMS
REGULATIONS
PART 128—ADMINISTRATIVE PROCEDURES

## §128.1 Exclusion of functions from the Administrative Procedure Act.

The Arms Export Control Act authorizes the President to control the import and export of defense articles and services in furtherance of world peace and the security and foreign policy of the United States. It authorizes the Secretary of State to make decisions on whether license applications or other written requests for approval shall be granted, or whether exemptions may be used. It also authorizes the Secretary of State to revoke, suspend or amend licenses or other written approvals whenever the Secretary deems such action to be advisable. The administration of the Arms Export Control Act is a foreign affairs function encompassed within the meaning of the military and foreign affairs exclusion of the Administrative Procedure Act and is thereby expressly exempt from various provisions of that Act. Because the exercising of the foreign affairs function, including the decisions required to implement the Arms Export Control Act, is highly discretionary, it is excluded from review under the Administrative Procedure Act.

ORIGINAL

1  FRANK W. HUNGER
   Assistant Attorney General
2  MICHAEL J. YAMAGUCHI
   United States Attorney
3  MARY BETH UITTI
   Assistant United States Attorney
4       450 Golden Gate Avenue
        San Francisco, California 94102
5       Telephone: (415) 436-7198
   VINCENT M. GARVEY
6  ANTHONY J. COPPOLINO
   Department of Justice
7  Civil Division, Room 1084
        901 E Street, N.W.
8       Washington, D.C.  20530
        Tel. (Voice): (202) 514-4782
9       (FAX):  (202) 616-8470 or 616-8460

**FILED**

**JUL 26 1996**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10  Attorneys for the Defendants

11

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE NORTHERN DISTRICT OF CALIFORNIA

14  DANIEL J. BERNSTEIN            )
                                   )  C 95-0582 MHP
15          Plaintiff,             )
                                   )
16  v.                             )
                                   )
17  UNITED STATES DEPARTMENT OF    )  **SECOND DECLARATION OF**
      STATE et al.,                )  **WILLIAM J. LOWELL**
18                                 )  **DEPARTMENT OF STATE**
            Defendants.            )  **OFFICE OF DEFENSE TRADE**
19                                 )  **CONTROLS**
    _____)

20

21      I, William J. Lowell, do hereby state and declare as follows:

22      1.  I am the Director of the Office of Defense Trade Controls

23  ("ODTC"), Bureau of Political-Military Affairs, United States

24  Department of State.  I have held this position since November 27,

25  1994.  I am the same William J. Lowell who submitted a declaration

26  to this Court filed on August 5, 1995, in connection with

27  defendants' motion to dismiss.  I submit this declaration in support

28  of defendants' motion for summary judgment.  This declaration will

    describe the State Department's actions in connection with the

public domain if it is made generally available to the public
"through unlimited distribution at a conference, meeting, seminar,
trade show or exhibition, generally accessible to the public, in the
United States" or "through fundamental research in science and
engineering at accredited institutions of higher learning in the
U.S. where the resulting information is ordinarily published and
shared broadly in the scientific community."  22 C.F.R.
§ 120.11(a)(6), (8).

22.  The regulatory exemptions set forth above describe
categories of information that are specifically excluded from the
technical data definition.  As the regulations provide, the State
Department does not seek to regulate information which is available
in the public domain through the various means set forth in the
regulations described above.  Moreover, the Department does not seek
to regulate the <u>means</u> themselves by which information is placed in
the public domain.  The Department does not review in advance
scientific information to determine whether it may be offered for
sale at newsstands and bookstores, through subscriptions, second-
class mail, or made available at libraries open to the public, or
distributed at a conference or seminar in the United States.  These
clear examples are included in the ITAR to enable individuals to
determine for themselves whether particular information is subject
to the regulations as technical data.  Indeed, individuals rarely --
if ever -- seek a determination from the Department as to whether
information is in the public domain, and the regulations are not
applied to establish a prepublication review requirement for the
general publication of scientific information in the United States.

DOSWASHINGTONSUP00689

Add.23

1     I declare under penalty of perjury that the foregoing is true

2  and correct.

3

4  DATE: _____7/25/96_____

5                                    WILLIAM J. LOWELL

17

DOSWASHINGTONSUP00690

Add.24

ORIGINAL

1  FRANK W. HUNGER
   Assistant Attorney General
2  MICHAEL J. YAMAGUCHI
   United States Attorney
3  MARY BETH UITTI
   Assistant United States Attorney
4       450 Golden Gate Avenue
        San Francisco, California 94102
5       Telephone: (415) 436-7198
   VINCENT M. GARVEY
6  ANTHONY J. COPPOLINO
   Department of Justice
7  Civil Division, Room 1084
        901 E Street, N.W.
8       Washington, D.C.  20530
        Tel. (Voice): (202) 514-4782
9            (FAX):   (202) 616-8470 or 616-8460

10 Attorneys for the Defendants

11

                FILED

              JUL 26 1996

           RICHARD W. WIEKING
         CLERK, U.S. DISTRICT COURT
       NORTHERN DISTRICT OF CALIFORNIA

12           IN THE UNITED STATES DISTRICT COURT

13        FOR THE NORTHERN DISTRICT OF CALIFORNIA

14 DANIEL J. BERNSTEIN,              )  C 95-0582 MHP
                                     )
15        Plaintiff,                 )  **MEMORANDUM OF POINTS**
                                     )  **AND AUTHORITIES IN**
16 v.                                )  **SUPPORT OF DEFENDANTS'**
                                     )  **MOTION FOR SUMMARY JUDGMENT.**
17 UNITED STATES DEPARTMENT OF       )
   STATE, et al.,                    )
18                                   )  Hearing: September 20, 1996
        Defendants.                  )  Time:    12:00 Noon
19 _____  )  Judge Marilyn Hall Patel

20

21

22

23

24

25

26

27

28

particular publication can be placed in the public domain. See Compl. ¶ 141, 156 (claiming information not already in the public domain can be placed there). This is not how the regulations are applied, nor a reasonable reading of the provisions at issue.

In fact, the State Department does not seek to control the various means by which information is placed in the public domain. Lowell Decl. ¶ 22. The Department does not review scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries, or distributed at a conference or seminar in the United States. Id.

> These clear examples are included in the ITAR to enable individuals to determine for themselves whether particular information is subject to regulation as technical data. Indeed, individuals rarely -- if ever -- seek a determination from the Department as to whether information is in the public domain, and the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States.

Id.

Similarly, the State Department does not try to substitute its judgment for that of a university or academic scholars as to whether certain ideas constitute general scientific of mathematical principles commonly taught in colleges and universities, 22 C.F.R. § 120.10(a)(5) or fundamental research in science at institutions of higher learning in the United States. Id. § 121.11(a)(8). Lowell Decl. ¶ 23.

> Rather, the specific mention of these exemptions in the ITAR is intended as an assurance to the academic community as to the general non-applicability of the ITAR to a university setting -- and not for the purpose of establishing a role for the Department in regulating scientific publication, academic exchanges of information, or fundamental research in the United States.

Id.

Dr. Bernstein's assertion that all scientific speech about cryptology is excluded from the definition of what could be in the public domain, Compl. ¶ 157, is belied by a wealth of academic exchanges and conferences that routinely occur in the field of cryptology. See Declaration of William P. Crowell of the National Security Agency, ¶¶ 22-32 and Tabs 1 to

- 8 -

newsletters setting forth information on the CJ procedures.  <u>See</u> Tab 2 to Lowell Declaration.

<u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment should be granted.

Respectfully Submitted,

FRANK W. HUNGER
Assistant Attorney General

MICHAEL J. YAMAGUCHI
United States Attorney

MARY BETH UITTI
Assistant United States Attorney
450 Golden Gate Avenue
San Francisco, California 94102
Telephone: (415) 436-7198

*by M.B.Uitti Per Telephone Authorization*

Anthony J. Coppolino
VINCENT M. GARVEY
ANTHONY J. COPPOLINO
Department of Justice
Civil Division, Room 1084
901 E Street, N.W.
Washington, D.C.  20530
Tel. (Voice): (202) 514-4782
(FAX): (202) 616-8470 or 616-8460

Attorneys for the Defendants

- 39 -

DOSWASHINGTONSUP00693

ORIGINAL

1  FRANK W. HUNGER
   Assistant Attorney General
2  MICHAEL J. YAMAGUCHI
   United States Attorney
3  MARY BETH UITTI
   Assistant United States Attorney
4      450 Golden Gate Avenue
       San Francisco, California 94102
5      Telephone: (415) 436-7198
   VINCENT M. GARVEY
6  ANTHONY J. COPPOLINO
   Department of Justice
7  Civil Division, Room 1084
       901 E Street, N.W.
8  Washington, D.C.  20530
       Tel. (Voice): (202) 514-4782
9      (FAX):   (202) 616-8470 or 616-8460

10 Attorneys for the Defendants

11

FILED

AUG 3 0 1996

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO HEADQUARTERS

15 DANIEL J. BERNSTEIN,              )   C 95-0582 MHP
                                     )
16          Plaintiff,               )   DEFENDANTS' OPPOSITION
                                     )   TO PLAINTIFF'S MOTION FOR
17 v.                                )   SUMMARY JUDGMENT AND IN
                                     )   FURTHER SUPPORT OF
18 UNITED STATES DEPARTMENT OF       )   DEFENDANTS' MOTION FOR
   STATE, et al.,                    )   SUMMARY JUDGMENT
19                                   )
          Defendants.                )   Hearing: September 20, 1996
20 _____)   Time:    12:00 Noon
                                         Judge Marilyn Hall Patel
21

22

23

24

25

26

27

28

DOSWASHINGTONSUP00694

Add.28

commonly taught in schools, colleges and universities or information that is in the public domain." 22 C.F.R. § 120.10(a)(5). Information in the "public domain" includes information publicly available through unlimited distribution at a conference in the United States generally accessible to the public, and through fundamental research in science and engineering at institutions of higher learning in the United States that is ordinarily published and shared broadly in the scientific community. 22 C.F.R. § 120.11(a)(6), (8).

Moreover, the regulations are not applied to regulate the means by which such information is placed in the public domain. Def. Mem. at 7-8; Lowell Decl. ¶ 22-23. Rather, consistent with Edler, ITAR controls on technical data are applied to regulate the export of non-public, proprietary or classified information sought to be disclosed to a foreign person or entity in connection with a defense service (technical assistance and training) or the development or maintenance of a defense article. Id. ¶ 26-27. This is the typical scenario in which parties seek to export technical data, not academics applying for a license to publish their ideas.[9]

For these reasons, plaintiff's claim that all disclosures of scientific information on cryptography in the United States constitutes an export of technical data, since inevitably a foreign person might receive it in class or through publication, is wrong. Even more so than the provisions at issue in Edler, the ITAR can readily be construed to carve out from regulation basic First Amendment activities.[10]

_____

[9] Plaintiff's contention that information exempt from technical data provisions through the public domain exception is nonetheless "recontrolled" as a "defense service," Pl. Mem. at 7, n.12, misses a key distinction which the court of appeals has twice recognized. Information in the public domain is not technical data subject to export controls. However, providing technical assistance to a foreign entity with the intent to aid, inter alia, the design, development, operation, or maintenance of a munition, even through the use of publicly available information, is conduct that the government can control consistent with the First Amendment. Edler, 570 F.2d at 522; United States v. Posey, 864 F.2d 1487, 1496-97 (9th Cir. 1989).

[10] Plaintiff's reliance on a 1981 memorandum from the Office of Legal Counsel of the Department of Justice ("OLC"), Pl. Mem. at 13, is misplaced. OLC's analysis was quite similar to the court's in Edler, which the State Department stated in 1984 it would

Defs' Opp. to Plf's Motion for
Summary Judgment and in Further
Support of Defs' Motion for Summary Judgment
DOJWASHINGTONSUP00695                                    9                            Add.29

in connection therewith (defense services). While such controls may be cross-referenced in the regulations, there are distinct regulatory provisions for each including, of most pertinence, a separate definition of technical data with its various exceptions.

>    3.    The Exemptions To The Definition Of Technical Data Are Not Vague.

Plaintiff challenges as vague the very exceptions that exclude a host of information from export controls. These exemptions are far from vague. Plaintiff claims first that the exception for "scientific, mathematical, and engineering principles commonly taught in schools, colleges and universities" is vague, based solely on the notion that one school might not teach what another does. Pl. Mem. at 35. This argument can be quickly passed over. The ITAR does not purport to require uniformity in what schools teach. The obvious purpose of the exception is to indicate that technical data does not include information exchanged in the common, everyday occurrence of a university lecture. The ITAR does not indicate that the government must pass judgment on what can or cannot be deemed a "common" academic principle, nor is it so applied. Lowell Decl. ¶ 23.

Plaintiff's attack on the "public domain" exemption is also meritless. That provision contains several specific exceptions as to what is controlled as technical that any ordinary person can understand -- information in bookstores, newsstands, or disclosed at conferences. Plaintiff sees a "Catch-22" "lurking" in the provision that, unless something is already published, it is subject to export controls. He would construe the definition to mean, in other words, that nothing can be published without the government's approval. Not only is this wrong as a factual matter, see Lowell Decl. ¶ 22, it is by far the most un-reasonable interpretation of the provision, one that people of ordinary intelligence are least likely to assume is the case.[32]

_____

[32] Plaintiff's discussion of the public domain provision is also highly confusing. He claims that "software" should be treated as in the public domain because that exception refers to "information," not "technical data." Pl. Mem. at 35-36. The public domain provision is a clear and express exception to the definition of "technical data." 22 C.F.R. § 120.10(a)(4) (technical data does "not include . . . information in the public

Defs' Opp. to Plf's Motion for
Summary Judgment and in Further
Support of Defs' Motion for Summary Judgment
DOSWASHINGTONSUP00696
C95 0562 MJH                                            25                                    Add.30

1   more than inform, but has a practical use -- in the case of Snuffle to provide for zero-delay

2   encrypted conversations.  Moreover, what plaintiff seeks to do is not merely "publish ideas"

3   but export, without limitation to anywhere in the world, a commodity that he and his

4   declarants have explained has a practical cryptographic function.  To describe this merely as

5   "publishing" an "idea" is disingenuous.  The government's action is fully consistent with how

6   Edler and several other courts, see Def. Mem. at 20, have upheld the application of export

7   controls to matters that have national security and foreign policy significance.

8                                    CONCLUSION

9        For the foregoing reasons, defendants' motion for summary judgment should be

10  granted, plaintiff's motion for summary judgment should be denied, and this action should be

11  dismissed with  prejudice.

12                          Respectfully Submitted,

13                          FRANK W. HUNGER
                            Assistant Attorney General
14
                            MICHAEL J. YAMAGUCHI
15                          United States Attorney

16                          MARY BETH UITTI
                            Assistant United States Attorney
17                          450 Golden Gate Avenue
                            San Francisco, California 94102
18                          Telephone: (415) 436-7198
                                                     by MB Uitti
19
                            _Anthony J. Coppolino_
20                          VINCENT M. GARVEY
                            ANTHONY J. COPPOLINO
21                          Department of Justice
                            Civil Division, Room 1084
22                          901 E Street, N.W.
                            Washington, D.C.  20530
23                          Tel. (Voice): (202) 514-4782
                            (FAX): (202) 616-8470 or 616-8460
24
                            Attorneys for the Defendants
25

26

27

28

Defs' Opp. to Plf's Motion for
Summary Judgment and in Further
Support of Defs' Motion for Summary Judgment        36              Add.31
DOJBOSTONSUP00697

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**


December 14, 2015


Mr. Alan Gura
Gura & Possessky, P.L.L.C.
916 Prince Street
Suite 7
Alexandria, VA 22314-0000


　　　No. 15-50759   Defense Distributed, et al v. U.S. Dept. of
　　　　　　　　　State, et al
　　　USDC No. 1:15-CV-372


Dear Mr. Gura,

The following pertains to your brief electronically filed on
December 10, 2015.

You must submit the seven (7) paper copies of your brief required
by 5ᵀᴴ CIR. R. 31.1 within five (5) days of the date of this notice
pursuant to 5th Cir. ECF Filing Standard E.1.

Failure to timely provide the appropriate number of copies may
result in the dismissal of your appeal pursuant to 5ᵀᴴ CIR. R. 42.3.


　　　　　　　　　　　Sincerely,

　　　　　　　　　　　LYLE W. CAYCE, Clerk

　　　　　　　　　　　By: _____
　　　　　　　　　　　Shawn D. Henderson, Deputy Clerk
　　　　　　　　　　　504-310-7668

cc:
　　　Mr. Joshua Michael Blackman
　　　Mr. Matthew Goldstein
　　　Mr. William Bryan Mateja
　　　Mr. Michael S. Raab
　　　Mr. Eric J. Soskin
　　　Mr. Daniel Bentele Hahs Tenny

Case No. 15-50759

# In the United States Court of Appeals for the Fifth Circuit

DEFENSE DISTRIBUTED;
SECOND AMENDMENT FOUNDATION, INCORPORATED,
Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official
Capacity as the Secretary of the Department of State; DIRECTORATE OF
DEFENSE TRADE CONTROLS, Department of State Bureau of Political
Military Affairs; KENNETH B. HANDELMAN, Individually and in His
Official Capacity as the Deputy Assistant Secretary of State for Defense
Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD
PEARTREE, Individually and in His Official Capacity as the Director of
the Office of Defense Trade Controls Policy Division; SARAH J.
HEIDEMA, Individually and in Her Official Capacity as the Division
Chief, Regulatory and Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and in His Official Capacity
as the Senior Advisor, Office of Defense Trade Controls,
Defendants-Appellees

Appeal from an Order of the United States District Court for the
Western District of Texas, The Hon. Robert L. Pitman, District Judge
(Dist. Ct. No. 1:15-CV-372-RP)

APPELLANTS' RECORD EXCERPTS

| | |
|---|---|
| Matthew Goldstein | Alan Gura |
| Matthew A. Goldstein, PLLC | Counsel of Record |
| 1875 Connecticut Avenue, N.W. | GURA & POSSESSKY, PLLC |
| 10th Floor | 916 Prince Street, Suite 7 |
| Washington, DC 20009 | Alexandria, VA 22314 |
| 202.550.0040/Fax 202.683.6679 | 703.835.9085/Fax 703.997.7665 |
| | |
| December 10, 2015 | Counsel for Appellants |

(Additional Counsel Inside Cover)

DOSWASHINGTONSUP00699

Additional Counsel for Appellants

William B. Mateja
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
214.747.5070/Fax 214.747.2091

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

DOSWASHINGTONSUP00700

TABLE OF CONTENTS

MANDATORY

Record Excerpt                                                                Tab

District Court Docket Sheet ....................................................... 1

District Court Order ................................................................. 2

Notice of Appeal ..................................................................... 3

OPTIONAL

Record Excerpt                                                                Tab

Excerpts from 1978 Dept. of Justice Memorandum to Dr. Press ........... 4

State Dept. Munitions Control Newsletter No. 80 .................................. 5

Excerpts from 1981 Dept. of Justice Memorandum to State Dept. ........ 6

Excerpt from 1981 Dept. of Justice Memorandum to Commerce Dept. . 7

Excerpt from 1984 Dept. of Justice Memorandum to State Dept. ......... 8

Excerpts from 1997 Dept. of Justice Report to Congress ...................... 9

2013 State Dept. Letter to Defense Distributed.................................... 10

Declaration of Cody Wilson .................................................... 11

Supplemental Declaration of Alan Gottlieb .......................................... 12

DOSWASHINGTONSUP00701

Supplemental Declaration of Conn Williamson .................................... 13

Supplemental Declaration of Peter Versnel ......................................... 14

\* \* \*

Certificate of Service

DOSWASHINGTONSUP00702

TAB 1

DOSWASHINGTONSUP00703

CLOSED,INTAPP,STAYED

# U.S. District Court [LIVE]
## Western District of Texas (Austin)
## CIVIL DOCKET FOR CASE #: 1:15-cv-00372-RP

Defense Distributed et al v. United States Department of State et al
Assigned to: Judge Robert Pitman
 Case in other court:   USCA 5th Circuit, 15-50759
Cause: 28:2201 Declaratory Judgment

Date Filed: 05/06/2015
Date Terminated: 10/01/2015
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Defense Distributed**                         represented by   **Alan Gura**
Gura & Possessky, PLLC
105 Oronoco Street
Suite 305
Alexandria, VA 22314
703-835-9085
Fax: 703-997-7665
Email: alan@gurapossessky.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David S. Morris**
Fish & Richardson, P.C.
111 Congress Avenue, Ste 810
Austin, TX 78701
512-226-8116
Fax: 512-320-8935
Email: dmorris@fr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Michael Blackman**
Josh Blackman LLC
1303 San Jacinto St.
Houston, TX 77002
202-294-9003
Fax: 713-646-1766
Email: joshblackman@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew A. Goldstein**
Matthew A. Goldstein, PLLC
1875 Connecticut Ave NW, 10th Floor
Washington, DC 20009
(202) 550-0040
Fax: 202-683-6679
Email: matthew@goldsteinpllc.com
*LEAD ATTORNEY*

RE 1

15-50759.1004

*ATTORNEY TO BE NOTICED*

**W. Thomas Jacks**
Fish & Richardson P.C.
111 Congress Avenue
Suite 810
Austin, TX 78701
(512) 472-5070
Fax: 512/320-8935
Email: jacks@fr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William B. Mateja**
Fish & Richardson
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070
Fax: (214) 747-2091
Email: mateja@fr.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Second Amendment Foundation, Inc.**            represented by   **Alan Gura**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David S. Morris**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Michael Blackman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W. Thomas Jacks**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William B. Mateja**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Department of State**            represented by   **Eric J. Soskin**
U.S. Department of Justice, Civil Division

20 Massachusetts Ave. NW, Room 7116
Washington, DC 20002
(202)353-0533
Email: eric.soskin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Justin Robinson**
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W.
Washington, DC 20530
202-514-9239
Email: stuart.j.robinson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Secretary of State John F. Kerry**               represented by    **Eric J. Soskin**
*in his official capacity as the Secretary of*                      (See above for address)
*the Department of State*                                           *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Stuart Justin Robinson**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Directorate of Defense Trade Controls**          represented by    **Eric J. Soskin**
*Department of State Bureau of Political*                           (See above for address)
*Military Affairs*                                                  *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Stuart Justin Robinson**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**Kenneth B. Handelman**                           represented by    **Eric J. Soskin**
*individually and in his official capacity as*                      (See above for address)
*the Deputy Assistant Secretary of State for*                       *LEAD ATTORNEY*
*Defense Trade Controls in the Bureau of*                           *ATTORNEY TO BE NOTICED*
*Political-Military Affairs*
                                                                    **Stuart Justin Robinson**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Zachary Carl Richter**
                                                                    United States Attorney's Office
                                                                    Western District of Texas

816 Congress Ave., Suite 1000
Austin, TX 78701
(512)370-1254
Fax: (202)916-5854
Email: Zachary.C.Richter@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Director C. Edward Peartree**                    represented by    **Eric J. Soskin**
*individually and in his official capacity as*                       (See above for address)
*the Director of the Office of Defense Trade*                        *LEAD ATTORNEY*
*Controls Policy Division*                                           *ATTORNEY TO BE NOTICED*

                                                                     **Stuart Justin Robinson**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Zachary Carl Richter**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Division Chief Sarah J. Heidema**               represented by    **Eric J. Soskin**
*individually and in her official capacity as*                      (See above for address)
*the Division Chief, Regulatory and*                                *LEAD ATTORNEY*
*Multilateral Affairs, Office of Defense*                           *ATTORNEY TO BE NOTICED*
*Trade Controls Policy*

                                                                     **Stuart Justin Robinson**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Zachary Carl Richter**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Senior Advisor Glenn Smith**                    represented by    **Eric J. Soskin**
*individually and in his official capacity as*                      (See above for address)
*the Senior Advisor, Office of Defense Trade*                       *LEAD ATTORNEY*
*Controls*                                                          *ATTORNEY TO BE NOTICED*

                                                                     **Stuart Justin Robinson**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Zachary Carl Richter**

RE 4

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/06/2015 | 1 | COMPLAINT (*1:15-cv-372*) ( Filing fee $ 400 receipt number 0542-7425618). No Summons requested at this time, filed by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Civil Cover Sheet)(Mateja, William) (Attachment 1 replaced on 10/9/2015 with flattened image) (os). (Entered: 05/06/2015) |
| 05/06/2015 | 2 | RULE 7 DISCLOSURE STATEMENT filed by Defense Distributed. (Mateja, William) (Entered: 05/06/2015) |
| 05/06/2015 | 3 | RULE 7 DISCLOSURE STATEMENT filed by Second Amendment Foundation, Inc.. (Mateja, William) (Entered: 05/06/2015) |
| 05/06/2015 | | Case Assigned to Judge Robert Pitman. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (afd) (Entered: 05/07/2015) |
| 05/06/2015 | | DEMAND for Trial by Jury by Defense Distributed. (afd) (Entered: 05/07/2015) |
| 05/07/2015 | 4 | Letters to Alan Gura, Matthew Goldstein and Josh BLackman re: Non-Admitted Status. (afd) (Entered: 05/07/2015) |
| 05/07/2015 | 5 | REQUEST FOR ISSUANCE OF SUMMONS by Defense Distributed, Second Amendment Foundation, Inc.. *OF U.S. DEPARTMENT OF STATE, JOHN F. KERRY, DIRECTORATE OF DEFENSE TRADE CONTROLS, KENNETH B. HANDELMAN, C. EDWARD PEARTREE, SARAH J. HEIDEMA, AND GLENN SMITH* (Mateja, William) (Entered: 05/07/2015) |
| 05/08/2015 | 6 | Summons Issued as to Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State.(dm) (Entered: 05/08/2015) |
| 05/11/2015 | 7 | MOTION for Preliminary Injunction by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Proposed Order)(Mateja, William) (Entered: 05/11/2015) |
| 05/11/2015 | 8 | Memorandum in Support, filed by Defense Distributed, Second Amendment Foundation, Inc., re 7 MOTION for Preliminary Injunction filed by Plaintiff Second Amendment Foundation, Inc., Plaintiff Defense Distributed *MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION* (Attachments: # 1 Appendix Part 1 of 6, # 2 Appendix Part 2 of 6, # 3 Appendix Part 3 of 6, # 4 Appendix Part 4 of 6, # 5 Appendix Part 5 of 6, # 6 Appendix Part 6 of 6)(Mateja, William) (Entered: 05/11/2015) |
| 05/11/2015 | 9 | Unopposed MOTION for Leave to Exceed Page Limitation *FOR THEIR BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION* by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Proposed Order)(Mateja, William) (Entered: 05/11/2015) |

| 05/12/2015 | | Text Order GRANTING 9 Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 05/12/2015) |
|---|---|---|
| 05/12/2015 | 10 | MOTION to Appear Pro Hac Vice by William B. Mateja *MOTION AND ORDER FOR ADMISSION PRO HAC VICE FOR ALAN GURA* ( Filing fee $ 100 receipt number 0542-7440640) by on behalf of Defense Distributed, Second Amendment Foundation, Inc.. (Mateja, William) (Entered: 05/12/2015) |
| 05/12/2015 | 11 | NOTICE *OF CERTIFICATE OF SERVICE* by Defense Distributed, Second Amendment Foundation, Inc. re 8 Memorandum in Support of Motion,, 6 Summons Issued as to USA, 1 Complaint, 7 MOTION for Preliminary Injunction , Order on Motion for Leave to File Excess Pages (Mateja, William) (Entered: 05/12/2015) |
| 05/13/2015 | 12 | ORDER GRANTING 10 Motion to Appear Pro Hac Vice as to Alan Gura. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Robert Pitman. (dm) (Entered: 05/13/2015) |
| 05/13/2015 | 13 | MOTION to Appear Pro Hac Vice by William B. Mateja *MOTION FOR ADMISSION PRO HAC VICE - MATTHEW GOLDSTEIN* ( Filing fee $ 100 receipt number 0542-7446350) by on behalf of Defense Distributed, Second Amendment Foundation, Inc.. (Mateja, William) (Entered: 05/13/2015) |
| 05/15/2015 | 14 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. Directorate of Defense Trade Controls served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 15 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. United States Department of State served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 16 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. John F. Kerry served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 17 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. Kenneth B. Handelman served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 18 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. Sarah J. Heidema served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 19 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. C. Edward Peartree served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 20 | SUMMONS Returned Executed by Defense Distributed, Second Amendment Foundation, Inc.. Glenn Smith served on 5/14/2015, answer due 7/13/2015. (Mateja, William) (Entered: 05/15/2015) |
| 05/15/2015 | 21 | ORDER Setting Hearing on 7 MOTION for Preliminary Injunction : Motion Hearing set for 7/6/2015 09:30 AM before Judge Robert Pitman,. Signed by Judge Robert Pitman. (dm) (Entered: 05/15/2015) |

| 05/18/2015 | 22 | Joint MOTION for Extension of Time to File Response/Reply by Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State. (Attachments: # 1 Proposed Order)(Robinson, Stuart) (Entered: 05/18/2015) |
| 05/19/2015 | | Text Order GRANTING 13 Motion to Appear Pro Hac Vice by atty Matthew Goldstein. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 05/19/2015) |
| 05/19/2015 | 23 | NOTICE of Attorney Appearance by Stuart Justin Robinson on behalf of Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State. Attorney Stuart Justin Robinson added to party Directorate of Defense Trade Controls(pty:dft), Attorney Stuart Justin Robinson added to party Kenneth B. Handelman(pty:dft), Attorney Stuart Justin Robinson added to party Sarah J. Heidema(pty:dft), Attorney Stuart Justin Robinson added to party John F. Kerry(pty:dft), Attorney Stuart Justin Robinson added to party C. Edward Peartree(pty:dft), Attorney Stuart Justin Robinson added to party Glenn Smith(pty:dft), Attorney Stuart Justin Robinson added to party United States Department of State(pty:dft) (Robinson, Stuart) (Entered: 05/19/2015) |
| 05/19/2015 | 24 | DEFICIENCY NOTICE: re 22 Joint MOTION for Extension of Time to File Response/Reply (dm) (Entered: 05/19/2015) |
| 05/19/2015 | 25 | DEFICIENCY NOTICE: re 23 Notice of Appearance. (dm) (Entered: 05/19/2015) |
| 05/19/2015 | 26 | CERTIFICATE OF SERVICE by Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State CORRECTED 25 Deficiency Notice (Robinson, Stuart) (Entered: 05/19/2015) |
| 05/19/2015 | 27 | ORDER GRANTING 22 Motion for Extension of Time to File Response. Signed by Judge Robert Pitman. (dm) (Entered: 05/19/2015) |
| 06/05/2015 | 28 | NOTICE of Supplemental Authority by Defense Distributed, Second Amendment Foundation, Inc. re 7 MOTION for Preliminary Injunction (Gura, Alan) (Entered: 06/05/2015) |
| 06/08/2015 | 29 | NOTICE RE: COMMODITY JURISDICTION RULINGS by Defense Distributed re 7 MOTION for Preliminary Injunction (Goldstein, Matthew) (Entered: 06/08/2015) |
| 06/08/2015 | 30 | NOTICE RE: DEFENDANTS RECENT PROPOSED RULES by Defense Distributed re 7 MOTION for Preliminary Injunction (Goldstein, Matthew) (Entered: 06/08/2015) |
| 06/09/2015 | 31 | NOTICE of Attorney Appearance by Eric J. Soskin on behalf of Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State (Soskin, Eric) (Entered: 06/09/2015) |
| 06/10/2015 | 32 | Memorandum in Opposition to Motion, filed by Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State, re 7 MOTION for |

| | | |
|---|---|---|
| | | Preliminary Injunction filed by Plaintiff Second Amendment Foundation, Inc., Plaintiff Defense Distributed (Attachments: # 1 Exhibit A - Declaration of Lisa Aguirre, # 2 Proposed Order)(Soskin, Eric) (Entered: 06/10/2015) |
| 06/17/2015 | 33 | Unopposed MOTION *for Leave for Counsel to Appear Telephonically at Preliminary Injunction Hearing* by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Proposed Order)(Mateja, William) (Entered: 06/17/2015) |
| 06/17/2015 | 34 | Unopposed MOTION for Leave to Exceed Page Limitation *FOR PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION* by Defense Distributed, Second Amendment Foundation, Inc.. (Attachments: # 1 Proposed Order)(Mateja, William) (Entered: 06/17/2015) |
| 06/18/2015 | | Text Order GRANTING 33 Motion for Leave for Counsel for Plaintiffs to Appear Telephonically at Preliminary Injunction Hearing entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 06/18/2015) |
| 06/18/2015 | | Text Order GRANTING 34 Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 06/18/2015) |
| 06/22/2015 | 35 | NOTICE of Attorney Appearance by Zachary Carl Richter on behalf of Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. Attorney Zachary Carl Richter added to party Kenneth B. Handelman(pty:dft), Attorney Zachary Carl Richter added to party Sarah J. Heidema(pty:dft), Attorney Zachary Carl Richter added to party C. Edward Peartree(pty:dft), Attorney Zachary Carl Richter added to party Glenn Smith(pty:dft) (Richter, Zachary) (Entered: 06/22/2015) |
| 06/24/2015 | 36 | Motion for leave to File Sealed Document (Attachments: # 1 Proposed Order, # 2 Sealed Document Exhibit 1-Supplemental Declaration of Cody Wilson) (Mateja, William) (Entered: 06/24/2015) |
| 06/24/2015 | 37 | REPLY to Response to Motion, filed by Defense Distributed, Second Amendment Foundation, Inc., re 7 MOTION for Preliminary Injunction filed by Plaintiff Second Amendment Foundation, Inc., Plaintiff Defense Distributed *MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION* (Attachments: # 1 Exhibit 1 - slipsheet for Sealed Exhibit, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Mateja, William) (Additional attachment(s) added on 7/1/2015: # 5 Sealed Declaration). (dm). (Entered: 06/24/2015) |
| 06/30/2015 | | Text Order GRANTING 36 Motion for Leave to File Sealed Document entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 06/30/2015) |
| 07/03/2015 | 38 | NOTICE *Regarding Under Seal Filing* by United States Department of State (Soskin, Eric) (Entered: 07/03/2015) |
| 07/06/2015 | 39 | Minute Entry for proceedings held before Judge Robert Pitman: Motion Hearing held on 7/6/2015 re 7 MOTION for Preliminary Injunction filed by Second Amendment Foundation, Inc., Defense Distributed (Minute entry documents are not available electronically.). (Court Reporter Joe Reynosa.)(dm) (Entered: 07/06/2015) |
| 07/07/2015 | 40 | |

| | | |
|---|---|---|
| | | NOTICE of Attorney Appearance by Joshua Michael Blackman on behalf of Defense Distributed, Second Amendment Foundation, Inc.. Attorney Joshua Michael Blackman added to party Defense Distributed(pty:pla), Attorney Joshua Michael Blackman added to party Second Amendment Foundation, Inc.(pty:pla) (Blackman, Joshua) (Entered: 07/07/2015) |
| 07/13/2015 | 41 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint by Directorate of Defense Trade Controls, Kenneth B. Handelman, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State. (Attachments: # 1 Proposed Order)(Soskin, Eric) (Entered: 07/13/2015) |
| 07/14/2015 | | Text Order GRANTING 41 Motion for Extension of Time to Answer entered by Judge Robert Pitman. Defendants' answer or responsive pleading is due within twenty-one days of the Court's ruling on Plaintiffs' motion for preliminary injuunction. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 07/14/2015) |
| 07/14/2015 | 42 | NOTICE *RE: GOVERNMENT'S STANDING CLAIMS* by Defense Distributed, Second Amendment Foundation, Inc. (Mateja, William) (Entered: 07/14/2015) |
| 08/04/2015 | 43 | ORDER DENYING 7 Motion for Preliminary Injunction. Signed by Judge Robert Pitman. (td) (Entered: 08/05/2015) |
| 08/13/2015 | 44 (p.1016) | Unopposed MOTION for Leave to Exceed Page Limitation by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Proposed Order, # 2 Individual Defendants' Motion To Dismiss)(Richter, Zachary) (Entered: 08/13/2015) |
| 08/13/2015 | 45 (p.1045) | Appeal of Order entered by District Judge 43 by Defense Distributed, Second Amendment Foundation, Inc..*denying motion for preliminary injunction* ( Filing fee $ 505 receipt number 0542-7697637) (Gura, Alan) (Entered: 08/13/2015) |
| 08/13/2015 | | NOTICE OF INTERLOCUTORY APPEAL as to 43 Order on Motion for Preliminary Injunction re: 45 (p.1045) Notice of Appeal (E-Filed) by Defense Distributed, Second Amendment Foundation, Inc.. Filing fee $ 505, receipt number 0542-7697637. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out Form DKT-13 (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (jk) (Entered: 08/14/2015) |
| 08/14/2015 | | Text Order GRANTING 44 (p.1016) Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 08/14/2015) |
| 08/14/2015 | 46 (p.1048) | MOTION to Dismiss by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (jk) (Entered: 08/14/2015) |
| 08/21/2015 | 47 (p.1073) | AMENDED COMPLAINT against All Defendants amending 1 Complaint., filed by Defense Distributed, Second Amendment Foundation, Inc..(Gura, Alan) (Entered: 08/21/2015) |
| 08/21/2015 | 49 | TRANSCRIPT REQUEST by Defense Distributed for dates of July 6, 2015. Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter: Joe Reynosa. (os) (Entered: 08/26/2015) |

DOSWASHINGTONSUP00712

| 08/24/2015 | 48 (p.1091) | ORDER DISMISSING without Prejudice Defendants' 46 (p.1048) Motion to Dismiss. Signed by Judge Robert Pitman. (klw) (Entered: 08/24/2015) |
|---|---|---|
| 08/31/2015 | 50 | Transcript filed of Proceedings held on July 6, 2015, Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter/Transcriber: Joe Reynosa, Telephone number: 210-244-5038. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 9/21/2015, Redacted Transcript Deadline set for 10/1/2015, Release of Transcript Restriction set for 11/30/2015, Appeal Record due by 9/15/2015, (Reynosa, Joe) (Entered: 08/31/2015) |
| 08/31/2015 | 51 (p.1092) | Unopposed MOTION *For Order Setting Time For The U.S. Government Defendants To Answer Or Otherwise Respond to Plaintiffs' First Amended Complaint* by Directorate of Defense Trade Controls, Sarah J. Heidema, John F. Kerry, C. Edward Peartree, Glenn Smith, United States Department of State. (Attachments: # 1 Proposed Order)(Soskin, Eric) (Entered: 08/31/2015) |
| 09/01/2015 | 52 (p.1098) | ORDER GRANTING 51 (p.1092) Motion to Set Time for U.S. Government Defendants to Answer First Amended Complaint. FURTHER ORDERED that the U.S. Government Defendants shall answer or otherwise respond to Plaintiffs' First Amended Complaint, ECF No. 47, no later than 21 days after a mandate issues from the United States Court of Appeals for the Fifth Circuit on Plaintiffs' pending interlocutory appeal. Signed by Judge Robert Pitman. (os) (Entered: 09/01/2015) |
| 09/01/2015 | 53 (p.1099) | Opposed MOTION for Extension of Time to File *Response To Amended Complaint* by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Proposed Order)(Richter, Zachary) (Entered: 09/01/2015) |
| 09/01/2015 | 54 (p.1103) | Memorandum in Opposition to Motion, filed by Defense Distributed, Second Amendment Foundation, Inc., re 53 (p.1099) Opposed MOTION for Extension of Time to File *Response To Amended Complaint* filed by Defendant Kenneth B. Handelman, Defendant Glenn Smith, Defendant Sarah J. Heidema, Defendant C. Edward Peartree (Attachments: # 1 Exhibit 1, # 2 Proposed Order)(Gura, Alan) (Entered: 09/01/2015) |
| 09/02/2015 | 55 (p.1117) | REPLY to Response to Motion, filed by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith, re 53 (p.1099) Opposed MOTION for Extension of Time to File *Response To Amended Complaint* filed by Defendant Kenneth B. Handelman, Defendant Glenn Smith, Defendant Sarah J. Heidema, Defendant C. Edward Peartree (Richter, Zachary) (Entered: 09/02/2015) |
| 09/02/2015 | 56 (p.1121) | ORDER GRANTING 53 (p.1099) Motion for Extension of Time to to Respond to Plaintiffs Amended Complaint. The Individual Defendants responsive pleading to Plaintiffs Amended Complaint is due on or before September 8, 2015. Any response Plaintiffs deem necessary to that pleading is due on or before October 16, 2015. Signed by Judge Robert Pitman. (os) (Entered: 09/02/2015) |
| 09/02/2015 | 57 | TRANSCRIPT REQUEST by Defense Distributed, Second Amendment Foundation, Inc. for dates of 7/6/15. Proceedings Transcribed: Preliminary Injuction Hearing. Court Reporter: Joe Reynosa. (os) (Entered: 09/02/2015) |
| 09/02/2015 | | |

| | 58 (p.1123) | AMENDED ORDER re 56 (p.1121) Order on Motion for Extension of Time to Respond to Plaintiffs Amended Complaint. The Individual Defendants responsive pleading to Plaintiffs Amended Complaint is due on or before September 14, 2015. Any response Plaintiffs deem necessary to that pleading is due on or before October 16, 2015. Signed by Judge Robert Pitman. (os) (Entered: 09/02/2015) |
|---|---|---|
| 09/09/2015 | 59 (p.1125) | NOTICE *(Vacation Letter)* by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith (Richter, Zachary) (Entered: 09/09/2015) |
| 09/14/2015 | 60 (p.1126) | Unopposed MOTION for Leave to Exceed Page Limitation by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Proposed Order)(Richter, Zachary) (Entered: 09/14/2015) |
| 09/14/2015 | 61 (p.1130) | MOTION to Dismiss by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Attachment A (Ex. 6 to Pls.' Mot. for Prelim. Inj.), # 2 Attachment B (Ex. 7 to Pls.' Mot. for Prelim. Inj.), # 3 Attachment C (Ex. 9 to Pls.' Mot. for Prelim. Inj.))(Richter, Zachary) (Entered: 09/14/2015) |
| 09/14/2015 | 62 (p.1205) | Unopposed MOTION for Extension of Time to File Response/Reply by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith. (Attachments: # 1 Proposed Order)(Richter, Zachary) (Entered: 09/14/2015) |
| 09/15/2015 | | Text Order GRANTING 60 (p.1126) Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 09/15/2015) |
| 09/15/2015 | | Text Order GRANTING 62 (p.1205) Motion for Extension of Time to File Response/Reply entered by Judge Robert Pitman. Any reply the Individual Defendants wish to file in support of their motion to dismiss shall be be filed on or before November 20, 2016. (This is a text-only entry generated by the court. There is no document associated with this entry.) (aemp) (Entered: 09/15/2015) |
| 09/22/2015 | 63 | MOTION to Stay Case by Defense Distributed. (Attachments: # 1 Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Goldstein, Matthew) (Entered: 09/22/2015) |
| 09/29/2015 | 64 | Response in Opposition to Motion, filed by Kenneth B. Handelman, Sarah J. Heidema, C. Edward Peartree, Glenn Smith, re 63 MOTION to Stay Case filed by Plaintiff Defense Distributed (Attachments: # 1 Proposed Order)(Richter, Zachary) (Entered: 09/29/2015) |
| 09/29/2015 | 65 | Response in Opposition to Motion, filed by Directorate of Defense Trade Controls, John F. Kerry, United States Department of State, re 63 MOTION to Stay Case filed by Plaintiff Defense Distributed (Attachments: # 1 Proposed Order)(Soskin, Eric) (Entered: 09/29/2015) |
| 10/01/2015 | 66 | ORDER GRANTING 63 Motion to Stay Proceedings Pending Appeal is hereby GRANTED and the above-styled action is ordered STAYED during the pendency of Plaintiffs interlocutory appeal. The District Clerks Office is directed to administratively close this case until the termination of the appeal proceedings. Signed by Judge Robert Pitman. (os) Modified on 10/15/2015 to add text (klw). (Entered: 10/01/2015) |
| 10/01/2015 | | Case Stayed pursuant to 66 Order. (os) (Entered: 10/01/2015) |

| 10/16/2015 | | Certification of the Electronic Record on Appeal has been accepted by the 5th Circuit re Notice of Appeal - Interlocutory,,. Attorneys are advised that they may now download the EROA from the Fifth Circuit CM/ECF site by following these instructions here (os) (Entered: 10/16/2015) |
|---|---|---|
| 11/05/2015 | 67 (p.1209) | Copy of ORDER of USCA regarding Sealed Documents ; re Notice of Appeal - Interlocutory. (os) (Entered: 11/06/2015) |

DOSWASHINGTONSUP00715

TAB 2

DOSWASHINGTONSUP00716

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | 1-15-CV-372  RP |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| STATE, ET AL., | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court are Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. #7), Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. #8) and the responsive pleadings thereto.  The Court conducted a hearing on the motion on July 6, 2015.  Having considered the motion, responsive pleadings, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs' motion for a preliminary injunction should be denied.  *See* FED. R. CIV. P. 65(b).

**I.  BACKGROUND**

Plaintiffs Defense Distributed and the Second Amendment Foundation ("SAF") bring this action against defendants the United States Department of State, Secretary of State John Kerry, the Directorate of Defense Trade Controls ("DDTC"), and employees of the DDTC  in their official and individual capacities, challenging implementation of regulations governing the "export" of "defense articles."

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services."  22 U.S.C. § 2778(a)(1).  The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations,

including monetary fines and imprisonment. *Id*. § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id*. § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id*.

According to Plaintiffs, Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, as well as generating revenue. Specifically, in December 2012 Defense Distributed made available for free on the Internet privately generated technical information regarding a number of gun-related

DOSWASHINGTONSUP00718

15-50759.680

items (the "Published Files"). (Compl. ¶¶ 22-24). Plaintiffs allege that, on May 8, 2013, Defendants

sent Defense Distributed a letter stating:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the [Munitions List]. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

(*Id*. ¶ 25).

Plaintiffs state they promptly removed the Published Files from the Internet. Further, per

instruction in the May 2013 letter, Plaintiffs submitted commodity jurisdiction requests covering the

Published Files on June 21, 2013. According to Plaintiffs, they have not received a response to

the requests from Defendants. (*Id*. ¶¶ 26-29).

Plaintiffs further allege that, on September 25, 2014, Defense Distributed sent a request

for prepublication approval for public release of files containing technical information on a machine

named the "Ghost Gunner" that can be used to manufacture a variety of items, including gun parts

(the "Ghost Gunner Files").[1] Following resubmission of the request, on April 13, 2015, DDTC

determined that the Ghost Gunner machine, including the software necessary to build and operate

the Ghost Gunner machine, is not subject to ITAR, but that "software, data files, project files,

coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are

subject to the jurisdiction of the Department of State in accordance with [ITAR]." (*Id*. ¶¶ 28-33).

In addition, Plaintiffs allege that since September 2, 2014, Defense Distributed has made

multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD")

files. In December 2014, DOPSR informed Defense Distributed that it refused to review the CAD

files. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement

---

[1] According to Plaintiffs, Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control. (Compl. ¶ 28).

DOSWASHINGTONSUP00719

15-50759.681

Case: 15-50759    Document: 00513302729    Page: 22    Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ    Document 107-22    Filed 09/23/20    Page 151 of 996
Case 1:15-cv-00372-RP    Document 43    Filed 08/04/15    Page 4 of 25

Division for further questions on public release of the CAD files.  Defense Distributed has sought additional guidance on the authorization process, but to date, Defendants have not responded.  (*Id.* ¶¶ 34-36).

Plaintiffs filed this action on April 29, 2015, raising five separate claims.  Specifically, Plaintiffs assert that the imposition by Defendants of a prepublication approval requirement for "technical data" related to "defense articles" constitutes: (1) an ultra vires government action; (2) a violation of their rights to free speech under the First Amendment; (3) a violation of their right to keep and bear arms under the Second Amendment; and (4) a violation of their right to due process of law under the Fifth Amendment.  Plaintiffs also contend the violations of their constitutional rights entitled them to monetary damages  under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Plaintiffs now seek a preliminary injunction enjoining the enforcement of any prepublication approval requirement against unclassified information under the ITAR, specifically including all files Defense Distributed has submitted for DOPSR review.  The parties have filed responsive pleadings.  The Court conducted a hearing on July 6, 2015 and the matter is now ripe for review.

## II.  STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.  *Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997).* The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest.  *See Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir. 1997); *Cherokee*

4

*Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir. 1994). To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). *See also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co.,* 760 F.2d 618, 621 (5th Cir. 1985).

### III.  ANALYSIS

Defendants maintain Plaintiffs have not established any of the four requirements necessary to merit grant of a preliminary injunction. Plaintiffs, of course, disagree. The Court will briefly address the parties' arguments concerning the final three requirements before turning to the core, and dispositive question, whether Plaintiffs have shown a likelihood of success on the merits of their claims.

**A. Injury and Balancing of Interests**

Defendants suggest Plaintiffs' contention that they face irreparable injury absent immediate relief is rebutted by their delay in filing this lawsuit. However, the Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). The Second Amendment protects "similarly intangible and unquantifiable interests" and a deprivation is thus considered irreparable. *Ezell v. City of Chicago*, 651 F.3d 684,

5

699 (7th Cir. 2011) ("for some kinds of constitutional violations, irreparable harm is presumed"). The Court thus has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury.

The Court has much more trouble concluding Plaintiffs have met their burden in regard to the final two prongs of the preliminary injunction inquiry. Those prongs require weighing of the respective interests of the parties and the public. Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest. In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public by limiting access of foreign nationals to "defense articles."

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations). They further assert that an injunction would not bar Defendants from controlling the export of classified information.

The Court finds neither assertion wholly convincing. While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest – and authority – of the President and Congress in matters of foreign policy and export. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) (matters relating to

6

DOSWASHINGTONSUP00722

conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink*, 315 U.S. 203, 222–23 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp constrast to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims

**B. Ultra Vires**

Plaintiffs first argue Defendants are acting beyond the scope of their authority in imposing a prepublication requirement on them under the AECA. A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit. *Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). The ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions," or "ultra vires his authority," and thus not

DOSWASHINGTONSUP00723

protected by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos*, 652 F.3d at 583. Rather, the complaint must allege facts sufficient to establish that the officer was acting "without any authority whatever," or without any "colorable basis for the exercise of authority." *Id*. (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)).

The statute at issue provides:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.

22 U.S.C. § 2778(a)(1). "Export" is defined, in pertinent part, as including "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs argue this definition falls outside Congressional intent in authorizing restriction of export of defense articles because, as interpreted by Defendants, it includes public speech within the United States.

Notably, Plaintiffs do not suggest Defendants lack authority under the AECA to regulate export of defense articles. Further, under the AECA, decisions are required to

> take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

22 U.S.C. § 2778(a)(2). Defense Distributed admits its purpose is "facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms." (Compl. ¶ 1) (emphasis added). Facilitating global access to firearms

8

DOSWASHINGTONSUP00724

undoubtedly "increase[s] the possibiliity of outbreak or escalation of conflict." Defense Distributed, by its own admission, engages in conduct which Congress authorized Defendants to regulate. Plaintiffs have not, therefore, shown Defendants are acting without any "colorable basis for the exercise of authority." Accordingly, they have not shown a likelihood of success on their ultra vires challenge.

## C. First Amendment

Plaintiffs next argue Defendants' interpretation of the AECA violates their First Amendment right to free speech. In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

As an initial matter, Defendants argue the computer files at issue do not constitute speech and thus no First Amendment protection is afforded. First Amendment protection is broad, covering "works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller v. California*, 413 U.S. 15, 34 (1973). *See also Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (video games' communication of ideas and social messages suffices to confer First Amendment protection). Defendants, however, maintain the computer files at the heart of this dispute do not warrant protection because they consist merely of directions to a computer. In support, they rely on a Second Circuit opinion which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are not constitutionally protected speech. *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111 (2nd Cir. 2000).

9

DOSWASHINGTONSUP00725

As Plaintiffs point out, one year later, the Second Circuit addressed the issue of whether computer code constitutes speech at some length in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001).[2]  The court made clear the fact that computer code is written in a language largely unintelligible to people was not dispositive, noting Sanskrit was similarly unintelligible to many, but a work written in that language would nonetheless be speech.  Ultimately, the court concluded "the fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment." *Id*. at 447 (discussing other examples of "instructions" which qualified as speech under First Amendment).  Similarly, the Sixth Circuit has found "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming . . . it is protected by the First Amendment," even though such code "has both an expressive feature and a functional feature." *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).

Although the precise technical nature of the computer files at issue is not wholly clear to the Court, Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as "open source."  That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized.  Thus, at least for the purpose of the preliminary injunction analysis, the Court will consder the files as subject to the protection of the First Amendment.

In challenging Defendants' conduct, Plaintiffs urge this Court to conclude the ITAR's imposition of a prepublication requirement constitutes an impermissible prior restraint.  Prior restraints "face a well-established presumption against their constitutionality." *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013). *See also Organization for*

---

[2]  Defendants are correct that the *Corley* court did not overrule the decision in *Vartuli*.  However, the *Corley* court itself distinguished the decision in *Vartuli* as limited, because it was based on the manner in which the code at issue was marketed.  That is, the defendants themselves marketed the software as intended to be used "mechanically" and "without the intercession of the mind or the will of the recipient."  *Corley*, 273 F.3d at 449 (quoting *Vartuli*, 228 F.3d at 111).  Plaintiffs here have not so marketed or described the files at issue.

DOSWASHINGTONSUP00726

15-50759.688

*a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("Any prior restraint on expression comes ... with a 'heavy presumption' against its constitutional validity"); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969) (noting "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional").  "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).

The "heavy presumption" against constitutional validity of prior restraint is not, however, "a standard of review, and judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014).  *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (order prohibiting dissemination of discovered information before trial "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny"); *Perry v. McDonald*, 280 F.3d 159, 171 (2nd Cir. 2001) (context in which prior restraint occurs affects level of scrutiny applied);, 192 F.3d 742, 749 (7th Cir. 1999) ("We note initially that the [plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test.").

No party suggests posting of information on the Internet for general free consumption is not a public forum.  The next inquiry is thus the applicable level of protection afforded to the files at issue.  Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information.  *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 213–14 (1997); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Content-based restrictions are examined under strict scrutiny, meaning they must be

11

narrowly drawn to effectuate a compelling state interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

Not surprisingly, the parties disagree as to whether the ITAR imposes content-based restrictions. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Plaintiffs here argue, because the regulations restrict speech concerning the entire topic of "defense articles" the regulation is content-based. "A regulation is not content-based, however, merely because the applicability of the regulation depends on the content of the speech." *Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012). Rather, determination of whether regulation of speech is content-based "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227. *See also Ward*, 491 U.S. at 791 (principal inquiry in determining content-neutrality, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys").

Employing this inquiry, the Supreme Court has found regulations to be content-neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." For example, the Supreme Court upheld a zoning ordinance that applied only to theaters showing sexually-explicit material, reasoning the regulation was content-neutral because it was not aimed at suppressing the erotic message of the speech but instead at the crime and lowered property values that tended to accompany such theaters. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48 (1986). The Supreme Court similarly upheld a statute establishing buffer zones only at clinics that performed abortions, concluding the statute did not draw content-based distinctions as enforcement authorities had no need to examine the content of any message conveyed and the stated purpose of the statute was public safety. *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (noting violation of statute depended not "on what they say," but "simply on where they say it"). The

12

DOSWASHINGTONSUP00728

Case: 15-50759     Document: 00513302729     Page: 31     Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 160 of 996
Case 1:15-cv-00372-RP   Document 43   Filed 08/04/15   Page 13 of 25

Fifth Circuit has likewise found regulations content-neutral, even where the regulation governed a specific topic of speech. *See Kagan v. City of New Orleans*, 753 F.3d 560, 562 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1403 (2015) (upholding regulation requiring license for a person to charge for tours to City's points of interest and historic sites, "for the purpose of explaining, describing or generally relating the facts of importance thereto," finding regulation "has no effect whatsoever on the content of what tour guides say"); *Asgeirsson*, 696 F.3d at 461 (holding Texas' Open Meeting Act, prohibiting governmental body from conducting closed meetings during which public business or public policy over which the governmental body has supervision or control is discussed, to be content-neutral, because closed meetings: (1) prevent transparency; (2) encourage fraud and corruption; and (3) foster mistrust in government).

The ITAR, on its face, clearly regulates disclosure of "technical data" relating to "defense articles." The ITAR thus unquestionably regulates speech concerning a specific topic. Plaintiffs suggest that is enough to render the regulation content-based, and thus invoke strict scrutiny. Plaintiffs' view, however, is contrary to law. The Fifth Circuit rejected a similar test, formulated as "[a] regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose," finding the proposed test was contrary to both Supreme Court and Fifth Circuit precedent. *Asgeirsson*, 696 F.3d at 460.

The ITAR does not regulate disclosure of technical data based on the message it is communicating. The fact that Plaintiffs are in favor of global access to firearms is not the basis for regulating the "export" of the computer files at issue. Rather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals, as set forth above. Accordingly, the Court concludes the regulation is content-neutral and thus subject to intermediate scrutiny. *See United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012) (finding the AECA and its implementing regulations are content-neutral).

The Supreme Court has used various terminology to describe the intermediate scrutiny

13

DOSWASHINGTONSUP00729

Case: 15-50759     Document: 00513302729     Page: 32     Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 161 of 996
Case 1:15-cv-00372-RP   Document 43   Filed 08/04/15   Page 14 of 25

standard. *Compare Ward*, 491 U.S. at 798 ("a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"), with *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require"), and *Turner*, 520 U.S. at 189 (regulation upheld under intermediate scrutiny if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests"). The Court will employ the Fifth Cicuit's most recent enunciation of the test, under which a court must sustain challenged regulations "if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012)

The Court has little trouble finding there is a substantial governmental interest in regulating the dissemination of military information. Plaintiffs do not suggest otherwise. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (noting all parties agreed government's interest in combating terrorism "is an urgent objective of the highest order"). Nor do Plaintiffs suggest the government's regulation is directed at suppressing free expression. Rather, they contend the regulations are not sufficiently tailored so as to only incidentally restrict their freedom of expression.

The only circuit to address whether the AECA and ITAR violate the First Amendment has concluded the regulatory scheme survives such a challenge. In so doing, the Ninth Circuit concluded the technical data regulations substantially advance the government's interest, unrelated to the suppression of expression, because the regulations provide clear procedures for seeking

14

DOSWASHINGTONSUP00730

necessary approval.  *Chi Mak*, 683 F.3d at 1135 (citing 22 C.F.R § 120.10(a) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary")).  The Ninth Circuit also concluded the regulations were not more burdensome than necessary, noting the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers."  *Id.* (citing *Humanitarian Law Project*, 561 U.S. at 29 (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests)).[3]

Plaintiffs' challenge here is based on their contention that Defendants have applied an overbroad interpretation of the term "export."  Specifically, Plaintiffs argue that viewing "export" as including public speech, including posting of information on the Internet, imposes a burden on expression which is greater than is essential to the furtherance of the government's interest in protecting defense articles.

But a prohibition on Internet posting does not impose an insurmountable burden on Plaintiffs' domestic communications.  This distinction is significant because the AECA and ITAR do not prohibit domestic communications.  As Defendants point out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.

Nor is the Court convinced by Plaintiffs' suggestion that the ban on Internet posting does not prevent dissemination of technical data outside national borders, and thus does not further the

---

[3]  The Ninth Circuit has also rejected a First Amendment challenge to the AECA's predecessor, the Mutual Security Act of 1954.  *See United States v. Edler Indus., Inc.*, 579 F.2d 516, 521 (9th Cir. 1978) (holding statute and regulations not overbroad in controlling conduct of assisting foreign enterprises to obtain military equipment and related technical expertise and licensing provisions of statute not an unconstitutional prior restraint on speech).

15

DOSWASHINGTONSUP00731

15-50759.693

government's interests under the AECA. The Ninth Circuit addressed and rejected a similar suggestion, namely that the only way the government can prevent technical data from being sent to foreign persons is to suppress the information domestically as well, explaining:

> This outcome would blur the fact that national security concerns may be more sharply implicated by the export abroad of military data than by the domestic disclosure of such data. Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security. It would hardly serve First Amendment values to compel the government to purge the public libraries of every scrap of data whose export abroad it deemed for security reasons necessary to prohibit.

*United States v. Posey*, 864 F.2d 1487, 1496-97 (9th Cir. 1989).

The Court also notes, as set forth above, that the ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls. *See* 22 C.F.R. § 120.4 (describing process). The regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesing expedited processsing. 22 C.F.R. § 120.4(e) (setting deadlines). Further, via Presidential directive, the DDTC is required to "complete the review and adjudication of license applications within 60 days of receipt." 74 Fed. Reg. 63497 (December 3, 2009). Plaintiffs thus have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations.

Accordingly, the Court concludes Plaintiffs have not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

**D. Second Amendment**

Plaintiffs also argue the ITAR regulatory scheme violates their rights under the Second Amendment. Defendants contend Plaintiffs cannot succeed on this claim, both because they lack standing to raise it, and because the claim fails on the merits. As standing is jurisdictional, the Court will turn to that issue first.

16

DOSWASHINGTONSUP00732

### a.  Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies.  *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980).  "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  This requirement, like other jurisdictional requirements, is not subject to waiver and demands strict compliance.  *Raines*, 521 U.S. at 819; *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996).  To meet the standing requirement a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Consol. Cos., Inc. v. Union Pacific R.R. Co.*, 499 F.3d 382, 385 (5th Cir. 2007); *Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n*, 274 F.3d 924, 929 (5th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.

Defendants correctly point out Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment.[4]  Plaintiffs maintain Defense Distributed nonetheless has standing because it is "entitled to assert the Second Amendment rights of [its] customers and website visitors."  (Plf. Brf. at 27).  A litigant is generally limited to asserting standing only on behalf of himself.  *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").  The

---

[4]  No party addressed whether a corporation such as Defense Distributed itself possesses Second Amendment rights.

DOSWASHINGTONSUP00733

Supreme Court has recognized a limited exception when the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue, the litigant has a "close" relationship with the third party on whose behalf the right is asserted and there is a "hindrance" to the third party's ability to protect his own interests. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

Plaintiffs argue they meet this test, asserting Defense Distributed acts as a "vendor" or in a like position by way of offering the computer files for download to visitors of its website. *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977) ("vendors and those in like positions . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function"); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (Supreme Court precedent holds providers of product have standing to attack ban on commercial transactions involving product). As an initial matter, it is not at all clear that distribution of information for free via the Internet constitutes a commercial transaction.[5] Moreover, Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests. In fact, the presence of SAF as a plaintiff suggests to the contrary. Thus, whether Defense Distributed has standing to assert a claim of a violation of the Second Amendment is a very close question.

Lack of standing by one plaintiff is not dispositive, however. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (court need not decide third-party standing question, "[f]or we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own"). And SAF's standing presents a much less difficult question. It asserts it has standing, as an association, to assert the rights of its members. *See Warth v.*

---

[5] Defense Distributed describes itself as organized and operated "for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution" through "facilitating global access to" information related to 3D printing of firearms, and specifically "to publish and distribute, *at no cost to the public*, such information and knowledge on the Internet in promotion of the public interest." (Compl. ¶ 1) (emphasis added).

DOSWASHINGTONSUP00734

*Seldin*, 422 U.S. 490, 511 (1975) ("[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members").  Associational standing requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required.  *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550-51 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  "The first prong requires that at least one member of the association have standing to sue in his or her own right."  *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012).

Defendants limit their challenge to SAF's standing solely to whether any of its members have standing to sue in their own right.  Specifically, Defendants contend SAF has merely asserted a conjectural injury, by suggesting its members would access computer files in the future.  In response, SAF has provided affidavit testimony from two of its members stating they would access the computer files at issue via the Defense Distributed website, study, learn from and share the files, but are unable to do so due to Defendants' interpretation of the ITAR regulatory scheme.  (Plf. Reply Exs. 3-4).  This testimony satisfies the "injury in fact" portion of the standing inquiry.

Defendants further contend any injury is not fairly traceable to their conduct.  They argue the ITAR does not prevent SAF members in the United States from acquiring the files directly from Defense Distributed.  But this argument goes to the burden imposed on SAF members, which is a question aimed at the merits of the claim, not standing.  *See Davis v. United States*, 131 S. Ct. 2419, 2434, n.10 (one must not "confus[e] weakness on the merits with absence of Article III standing").  In this case, the inability of SAF members to download the computer files at issue off the Internet is the injury in fact of the SAF members, and is clearly traceable to the conduct of Defendants.  The Court therefore finds SAF has standing to assert a claim of a violation of the Second Amendment.  *See Nat'l Rifle Ass'n*, 700 F.3d at 192 (NRA had standing, on behalf of its

19

15-50759.697

DOSWASHINGTONSUP00735

members under 21, to bring suit challenging laws prohibiting federal firearms licensees from selling handguns to 18-to-20-year-olds); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (SAF and Illinois Rifle Association had associational standing to challenge city ordinances requiring one hour of firing range training as prerequisite to lawful gun ownership and prohibiting all firing ranges in city)*; Mance v. Holder*, 2015 WL 567302, at *5 (N.D. Tex. Feb. 11, 2015) (non-profit organization dedicated to promoting Second Amendment rights had associational standing to bring action challenging federal regulatory regime as it relates to buying, selling, and transporting of handguns over state lines).

**b. Merits**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Fifth Circuit uses a two-step inquiry to address claims under the Second Amendment. The first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee. The second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Nat'l Rifle Ass'n*, 700 F.3d at 194.

In the first step, the court is to "look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller*, 554 U.S. at 577-628). Defendants argue at some length that restriction by a sovereign of export of firearms and other weapons has a lengthy historical tradition. Plaintiffs do not contest otherwise. Rather, Plaintiffs contend the conduct regulated here impinges on the ability to manufacture one's own

20

DOSWASHINGTONSUP00736

firearms, in this case, by way of 3D printing.

While the founding fathers did not have access to such technology,[6] Plaintiffs maintain the ability to manufacture guns falls within the right to keep and bear arms protected by the Second Amendment. Plaintiffs suggest, at the origins of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster their ability to "keep and bear arms." While Plaintffs' logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller*, the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the ITAR regulations constitute a burden on the core of the Second Amendment.

The Court will nonetheless presume a Second Amendment right is implicated and proceed with the second step of the inquiry, determining the appropriate level of scrutiny to apply. Plaintiffs assert strict scrutiny is proper here, relying on their contention that a core Second Amendment right is implicated. However, the appropriate level of scrutiny "depends on the nature of the conduct being regulated *and* the degree to which the challenged law burdens the right." *Nat'l Rifle Ass'n*, 700 F.3d at 195 (emphasis added).

The burden imposed here falls well short of that generally at issue in Second Amendment cases. SAF members are not prevented from "possess[ing] and us[ing] a handgun to defend his or her home and family." *Id*. at 195 (citations omitted). The Fifth Circuit's decision in *National Rifle Association* is instructive. At issue was a regulatory scheme which prohibited federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on

---

[6] Nonetheless, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.

DOSWASHINGTONSUP00737

commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing persons aged eighteen to twenty from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach. *Id*. at 205–07. In this case, SAF members are not prohibited from manufacturing their own firearms, nor are they prohibited from keeping and bearing other firearms. Most strikingly, SAF members in the United States are not prohibited from acquiring the computer files at issue directly from Defense Distributed. The Court thus concludes only intermediate scrutiny is warranted here. *See also Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347-48 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1365 (2014) (applying intermediate scrutiny to constitutional challenge to state statute prohibiting 18-20-year-olds from carrying handguns in public).

     As reviewed above, the regulatory scheme of the AECA and ITAR survives an intermediate level of scrutiny, as it advances a legitimate governmental interest in a not unduly burdensome fashion. *See also McCraw*, 719 F.3d at 348 (statute limiting under 21-year-olds from carrying handguns in public advances important government objective of advancing public safety by curbing violent crime); *Nat'l Rifle Ass'n*, 700 F.3d at 209 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted."). Accordingly, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits.

**E. Fifth Amendment**

     Plaintiffs finally argue the prior restraint scheme of the ITAR is void for vagueness and thus in violation of their right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Fifth Amendment prohibits the enforcement of vague criminal laws, but

22

DOSWASHINGTONSUP00738

the threshold for declaring a law void for vagueness is high.  "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."  *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963).  Rather, it is sufficient if a statute sets out an "ascertainable standard."  *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921).  A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).

Plaintiffs here assert broadly that ITAR is unconstitutionally vague because "persons of ordinary intelligence" must guess as to whether their speech would fall under its auspices.  As an initial matter, the Court notes at least two circuits have rejected due process challenges to the AECA and ITAR, and upheld criminal convictions for its violation.  *See Zhen Zhou Wu*, 711 F.3d at 13 (rejecting defendants' argument "that this carefully crafted regulatory scheme—which has remained in place for more than a quarter century—is unconstitutionally vague" as applied to them); *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004) (holding the AECA and its implementing regulations not unconstitutionally vague as applied to defendants).  Plaintiffs neither acknowledge those decisions nor explain how their rationale is inapplicable to their situation.

The Supreme Court has recently noted its precedent generally limits such challenges to "statutes that tied criminal culpability" to conduct which required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."  *Humanitarian Law Project*, 561 U.S. at 20 (quoting *Williams*, 553 U.S. at 306).  Plaintiffs' challenge here is additionally hampered because they have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague.

To the degree Plaintiffs contend "defense articles" is vague, as Defendants point out, the

23

term "defense articles" is specifically defined to include items on the Munitions List, which contains twenty-one categories of governed articles, as well as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" which additionally "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *See* 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10 (a) (defining technical data) & 121.1 (Munitions List). Although lengthy, the cited regulations do not themselves include subjective terms, but rather identify items with significant specificity. For example, the first category "Firearms, Close Assault Weapons and Combat Shotguns" includes eight subcategories such as "Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," as well as six interpretations of the terms. 22 C.F.R. § 121.1. The Court has little trouble finding these provisions survive a vagueness challenge.

The term "export" is also defined in the ITAR, although at lesser length. At issue here, "export" is defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs here admit they wish to post on the Internet, for free download, files which include directions for the 3D printing of firearms. Persons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the defintion of export.

Accordingly, the Court concludes Plaintiffs have not shown a likelihood of success on the merits of their claim under the Fifth Amendment.

DOSWASHINGTONSUP00740

15-50759.702

### IV.  CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. #7) is hereby **DENIED**.

**SIGNED** on August 4, 2015.

ROBERT L. PITMAN
UNITED STATES DISTRICT JUDGE

DOSWASHINGTONSUP00741

RE 37

15-50759.703

TAB 3

DOSWASHINGTONSUP00742

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372-RP |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

NOTICE OF APPEAL

PLEASE TAKE NOTICE that Plaintiffs Defense Distributed and Second Amendment

Foundation, Inc. hereby appeal to the United States Court of Appeals for the Fifth Circuit from the

Court's order entered August 5, 2015, denying their motion for a preliminary injunction [ECF 43].

Dated: August 13, 2015                    Respectfully submitted,

GURA & POSSESSKY, PLLC            FISH & RICHARDSON P.C.

*/s/ Alan Gura*                           */s/ William B. Mateja*
Alan Gura                                 William T. "Tommy" Jacks
Virginia Bar No. 68842*                   Texas State Bar No. 10452000
Gura & Possessky, PLLC                    William B. Mateja
105 Oronoco Street, Suite 305             Texas State Bar No. 13185350
Alexandria, Virginia 22314                David S. Morris
703.835.9085 / Fax 703.997.7665           Texas State Bar No. 24032877
alan@gurapossessky.com                    FISH & RICHARDSON P.C.
                                          One Congress Plaza, Suite 810
                                          111 Congress Avenue
Matthew Goldstein                         Austin, Texas 78701
D.C. Bar No. 975000*                      (512) 472-5070 (Telephone)
Matthew A. Goldstein, PLLC                (512) 320-8935 (Facsimile)
1012 14th Street NW, Suite 620            jacks@fr.com
Washington, DC 20005                      dmorris@fr.com
202.550.0040/Fax 202.683.6679            mateja@fr.com
matthew@goldsteinpllc.com

1

DOSWASHINGTONSUP00743

15-50759.1045

Case: 15-50759    Document: 00513302729    Page: 46    Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ    Document 107-22    Filed 09/23/20    Page 175 of 996

Case 1:15-cv-00372-RP    Document 45    Filed 08/13/15    Page 2 of 3

Josh Blackman
Virginia Bar No. 78292
1303 San Jacinto Street
Houston, Texas 77002
202.294.9003/Fax: 713.646.1766
joshblackman@gmail.com

*Admitted pro hac vice

DOSWASHINGTONSUP00744

15-50759.1046

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance

with Local Rule CV-5(a) on August 13, 2015, and was served on all counsel who are deemed to

have consented to electronic service. Local Rule CV-5(b)(1).


/s/ Alan Gura_____
Alan Gura

DOSWASHINGTONSUP00745

15-50759.1047

TAB 4

DOSWASHINGTONSUP00746

268

Ass't. Gen Attorney Lawful
Less'd'n Legal Counsel

**Department of Justice**
**Washington, D.C. 20530**

MEMORANDUM TO DR. FRANK PRESS
Science Advisor to the President

Re:  Constitutionality Under the First Amendment
     of ITAR Restrictions on Public Cryptography

     The purpose of this memorandum is to discuss the con-
stitutionality under the First Amendment of restrictions
imposed by the International Traffic in Arms Regulation
(ITAR), 22 C.F.R. § 121 et seq. (1977), the regulation imple-
menting § 38 of the Arms Export Control Act, 22 U.S.C.A.
§ 2778 (1977), on dissemination of cryptographic informa-
tion developed independent of government supervision or
support by scientists and mathematicians in the private
sector.1/ Our discussion is confined to the applicability
of the regulation to the speech elements of public cryptography,
and does not address the validity of the general regulatory
controls over exports of arms and related items.  We have
undertaken our review of the First Amendment issues raised
by the ITAR as an outgrowth of our role in implementing
Presidential Directive NSC-24.2/

1/ ·  The cryptographic research and development of scientists
       and mathematicians in the private sector is known as
"public cryptography."  As you know, the serious concern ex-
pressed by the academic community over government controls
of public cryptography, see, e.g., 197 Science 1345 (Sept.
30, 1977), led the Senate Select Committee on Intelligence
to conduct a recently concluded study of certain aspects of
the field.

2/    Our research into the First Amendment issues raised by
      government regulation of public cryptography led tan-
gentially into broader issues of governmental control over
dissemination of technical data.  Those questions are numerous,
complex, and deserving of extensive study, but are beyond
the scope of this memorandum.

DOSWASHINGTONSUP00747

277

340 U.S. 268 (1951); Kunz v. New York, 340 U.S. 290 (1951)
Hague v. C.I.O., 307 U.S. 496 (1939).15/

    Even if it is assumed that the government's interest
in regulating the flow of cryptographic information is
sufficient to justify some form of prior review process,
the existing ITAR provisions we think fall short of satis-
fying the strictures necessary to survive close scrutiny
under the First Amendment.  There are at least two funda-
mental flaws in the regulation as it is now drawn:  first,
the standards governing the issuance or denial of licenses
are not sufficiently precise to guard against arbitrary
and inconsistent administrative action; second, there is
no mechanism established to provide prompt judicial review
of State Department decisions barring disclosure.  See, e.g.,
Blount v. Rizzi, supra; Freedman v. Maryland, supra; Hague
v. C.I.O., supra.  The cases make clear that before any
restraint upon protected expression may become final it
must be subjected to prompt judicial review in a proceeding
in which the government will bear the burden of justifying
its decisions.  The burden of bringing a judicial proceed-
ing cannot be imposed upon those desiring export licenses
in these circumstances.  The ITAR as presently written fails
to contemplate this requirement.16/

---

15/  In Freedman, 380 U.S. at 58-59, the Court summarized
    the procedural protections necessary to sustain a scheme
of prior review:
    1.  A valid final restraint may be imposed only upon
a judicial determination;
    2.  The administrator of a licensing scheme must act
within a specified brief period of time;
    3.  The administrator must be required either to issue
a license or go to court to seek a restraint;
    4.  Any restraint imposed in advance of a final judicial
determination on the merits must be limited to preservation
of the status quo for the shortest period compatible with
sound judicial resolution;
    5.  The licensing scheme must assure a prompt final
judicial decision reviewing any interim and possibly erroneous
denial of a license.

16/  The government's argument to the Ninth Circuit in Edler,
    that the impact of the ITAR upon protected communications
is merely incidental, and that the ITAR should be viewed as
                (Cont. on p. 11)

- 10 -

App. 108
15-50759.235

DOSWASHINGTONSUP00748

278

     For these reasons it is our conclusion that the present
ITAR licensing scheme does not meet constitutional standards.
There remains the more difficult question whether a licens-
ing scheme covering either exports of or even purely domestic
publications of cryptographic information might be devised
consistent with the First Amendment.  Recent Supreme Court
decisions certainly suggest that the showing necessary to
sustain a prior restraint on protected expression is an
onerous one.  The Court held in the Pentagon Papers case
that the government's allegations of grave danger to the
national security provided an insufficient foundation for
enjoining disclosure by the Washington Post and the New
York Times of classified documents concerning United States
activities in Vietnam.  New York Times Co. v. United States,
supra.17/  The Court also invalidated prior restraints when
justified by such strong interests as the right to fair
trial, Nebraska Press Ass'n, supra, and the right of a
homeowner to privacy, Organization for a Better Austin v.
Keefe, supra.  Such decisions raise a question whether a

---

16/  (Cont.)
a regulation of conduct not speech, deserves note.  According
to that argument, the less rigorous constitutional standard
of United States v. O'Brien, 391 U.S. 367 (1968), would
govern the validity of the ITAR.  Although that may be true
with respect to certain portions of the ITAR, even a cursory
reading of the technical data provisions reveals that those
portions of the ITAR are directed at communication.  A more
stringent constitutional analysis than the O'Brien test is
therefore mandated.

17/  The Pentagon Papers case produced a total of ten opinions
    from the Court, a per curiam and nine separate opinions.
All but Justices Black and Douglas appeared willing to accept
prior restraints on the basis of danger to the national security
in some circumstances.  There was, however, no agreement among
the Justices on the appropriate standard.  Justice Brennan
stated his view that a prior restraint on publication was
justified only upon:

    "proof that publication must inevitably, directly,
    and immediately cause the occurrence of an event
    kindred to imperiling the safety of a transport
    already at sea. . . ."

                  (Cont. on p. 12)

- 11 -

Case: 15-50759     Document: 00513302729     Page: 52     Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 181 of 996

Case 1:15-cv-00372-RP   Document 8-2   Filed 05/11/15   Page 25 of 106

284

submission requirement any information, such as that which
is publicly available or which poses no substantial security
threat, that the government has no legitimate interest in
keeping secret.23/ Failure to draft provisions narrowly
might well invite overbreadth challenges for inclusion of
protected communication. See, e.g., NAACP v. Alabama, 357
U.S. 449 (1958). And a precisely drawn scheme is also
necessary to avoid objections of vagueness. See, e.g.,
Smith v. Goguen, 415 U.S. 566 (1974).24/

    In conclusion, it is our view that the existing provisions
of the ITAR are unconstitutional insofar as they establish
a prior restraint on disclosure of cryptographic ideas and
information developed by scientists and mathematicians in
the private sector. We believe, however, that a prepublica-
tion review requirement for cryptographic information might
meet First Amendment standards if it provided necessary
procedural safeguards and precisely drawn guidelines.

                        John M. Harmon
                   Assistant Attorney General
                    Office of Legal Counsel

---

23/  As we noted above, at n.4, supra, the present ITAR pro-
     visions attempt to exempt publicly available information.
But the scope of that exemption and the procedures for invok-
ing it, particularly with respect to oral communications,
are somewhat clear.

24/  Although we mention questions of overbreadth and vague-
     ness raised by the technical data provisions of the
ITAR previously in this memorandum, we have not attempted
to identify and analyze particular problems for several
reasons.  First, our opinion that a prior restraint on public
cryptography might survive First Amendment scrutiny is a
limited one and does not purport to apply to the many other
types of technical data covered by the ITAR.  Second, we
believe that public cryptography presents special considera-
tions warranting separate treatment from other forms of
technical data, and that a precise and narrow regulation
or statute limited to cryptography would be more likely to
receive considered judicial attention.  Finally, we are
uncertain whether the present legislative authority for the
technical data provisions of the ITAR is adequate.

                        - 17 -

App. 115

RE 44

TAB 5

DOSWASHINGTONSUP00751

**DEPARTMENT OF STATE**

Washir,  , D C  20520

## MUNITIONS CONTROL NEWSLETTER

NO. 80

2/80

CRYPTOGRAPHY/TECHNICAL DATA

Concern has been voiced that ITAR provisions relating to the export of technical data as applied to cryptologic equipment can be so broadly interpreted as to restrict scientific exchanges of basic mathematical and engineering research data. The Office of Munitions Control wishes to clarify the application of the technical data provisions of Section 121.01, Category XVIII, of the ITAR as applied to equipment found in Categories XI(c) and XIII(b) of the Munitions List.

Cryptologic technical data for which a license is required under Section 121.01, Category XVIII, is interpreted by this office with respect to information relating to Munitions List items in Categories XI(c) and XIII(b) to include only such information as is designed or intended to be used, or which reasonably could be expected to be given direct application, in the design, production, manufacture, repair, overhaul, processing, engineering, development, operation, maintenance or reconstruction of items in such categories. This interpretation includes, in addition to engineering and design data, information designed or reasonably expected to be used to make such equipment more effective, such as encoding or enciphering techniques and systems, and communications or signal security techniques and guidelines, as well as other cryptographic and cryptanalytic methods and procedures. It does not include general mathematical, engineering or statistical information, not purporting to have or reasonably expected to be given direct application to equipment in such categories. It does not include basic theoretical research data. It does, however, include algorithms and other procedures purporting to have advanced cryptologic application.

The public is reminded that professional and academic presentations and informal discussions, as well as demonstrations of equipment, constituting disclosure of cryptologic technical data to foreign nationals, are prohibited without the prior approval of this office. Approval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to section 125.11 does not establish a prepublication review requirement.

Case: 15-50759    Document: 00513302729    Page: 55    Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ    Document 107-22    Filed 09/23/20    Page 184 of 996
Case 1:15-cv-00372-RP    Document 8-3    Filed 05/11/15    Page 10 of 10

263

The interpretation set forth in this newsletter should
exclude from the licensing provisions of the ITAR most basic
scientific data and other theoretical research information,
except for information intended or reasonably expected to
have a direct cryptologic application.  Because of concerns
expressed to this office that licensing procedures for
proposed disclosures of cryptologic technical data contained
in professional and academic papers and oral presentations
could cause burdensome delays in exchanges with foreign
scientists, this office will expedite consideration as to
the application of ITAR to such disclosures.  If requested,
we will, on an expedited basis provide an opinion as to
whether any proposed disclosure, for other than commercial
purposes, of information relevant to cryptology, would
require licensing under the ITAR.


William B. Robinson, Director
Office of Munitions Control

Mr. INGRAM. The bottom line is that the regulations themselves have not been amended.

Mr. FOY. That is correct.

Mr. INGRAM. Let me call your attention to a letter of August 29, 1978, from your colleague, Larry Hammond, Deputy Assistant Attorney General, Office of Legal Counsel, to Col. Wayne Kay, Senior Policy Analyst, Office of Science and Technology Policy, Executive Office of the President.

The letter discusses the *Edler* case that you mentioned, which did present a first amendment challenge to the Munitions Control Act of 1954 and the ITAR. As Hammond notes, his letter to Kay is a followup to the Department's memorandum of 3 months previous to Dr. Press on public cryptography and the ITAR. Hammond goes on to conclude, at page 2 of his letter,

While the ninth circuit's decision in Edler is helpful in resolving first amendment issues with respect to blueprints and similar types of technical data used as a basis for producing military equipment, we do not believe that it either resolves the first amendment issues presented by restrictions on the export of cryptographic ideas or eliminates the need to reexamine the ITAR.

[The material follows:]

TAB 6

DOSWASHINGTONSUP00754

Case: 15-50759     Document: 00513302729     Page: 57     Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 186 of 996
Case 1:15-cv-00372-RP   Document 8-2   Filed 05/11/15   Page 27 of 106

# Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations

Proposed revision of the "technical data" provision of the International Traffic in Arms Regulations (ITAR) redefines and narrows the class of transactions that are subject to a licensing requirement under the Arms Export Control Act of 1976, in an attempt to avoid imposing a prior restraint on speech protected by the First Amendment; however, even as revised the ITAR can have a number of constitutionally impermissible applications.

The licensing requirement in the ITAR may constitutionally be applied to transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology; it may also be applied to transactions involving the dissemination of technical data for the purpose of promoting the sale of technical data or items on the Munitions List, since the prior restraint doctrine has only limited applicability to "commercial speech." However, insofar as it could be applied to persons who have no connection with any foreign enterprise, who disseminate technical data in circumstances in which there is no more than a belief or a reasonable basis for believing that the data might be taken abroad by foreign nationals and used there in the manufacture of arms, the licensing requirement is presumptively unconstitutional as a prior restraint on speech protected by the First Amendment.

It is not certain whether a court would find that the revised ITAR are so substantially overbroad as to be void and unenforceable in all their applications, or decide to save the regulations through a narrowing construction. The best legal solution is for the Department of State, not the courts, to narrow the ITAR so as to make it less likely that they will apply to protected speech in constitutionally impermissible circumstances.

July 1, 1981

## MEMORANDUM OPINION FOR THE OFFICE OF MUNITIONS CONTROL, DEPARTMENT OF STATE

The views of this Office have been requested concerning the constitutionality of a proposed revision of the "technical data" provisions of the International Traffic in Arms Regulations (ITAR). 45 Fed. Reg. 83,970 (December 19, 1980). On the basis of the analysis set forth below, we conclude that from a constitutional standpoint, the revised ITAR is a significant improvement over the prior version, but that even as revised, it can have a number of unconstitutional applications. We recommend that the proposed revision be modified to minimize or eliminate the number of impermissible applications. Our views are set forth in more detail below.

202

Case: 15-50759   Document: 00513302729   Page: 58   Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 187 of 996
Case 1:15-cv-00372-RP   Document 8-2   Filed 05/11/15   Page 31 of 106

purpose of assisting the foreign enterprise in the acquisition of use of technology; (2) transactions involving the dissemination of technical data for the purpose of promoting or proposing the sale of technical data of items on the Munitions List; and (3) transactions in which an "exporter" who is not otherwise connected or concerned with any foreign enterprise transmits technical data knowing, or having reason to know, that the data may be taken abroad and used by someone there in the manufacture or use of arms.

We have concluded that the application of the revised technical data provisions to transactions in the first two categories described above will not violate the First Amendment prohibition against prior restraint. However, the application of these provisions to transactions in the third category will raise serious constitutional questions. Our ultimate conclusions about the constitutionality of the technical data provisions are set forth, together with our recommendations for revision, in section III below.

(1) *Transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology.* At its core, the ITAR is designed to control United States firms and individuals who undertake to assist foreign enterprises in the acquisition and use of arms. The purpose of the technical data provisions is to extend that control to transactions in which assistance takes the form of technical advice. Perhaps the most common example of a transaction of that kind is a straightforward commercial arrangement in which an American firm agrees to provide technical information or advice to a foreign firm engaged in the manufacture of an item or items on the Munitions List.[3]

The leading case involving the constitutionality of the ITAR arose in precisely that context. *See United States* v. *Edler Industries, Inc.,* 579 F.2d 516 (9th Cir. 1978). In *Edler,* an American firm specializing in aerospace technology, Edler Industries, agreed to provide a French firm with technical assistance and data relating to a tape wrapping program. The Office of Munitions Control denied Edler's application for export licenses on the ground that exportation of the information in question would violate United States policy as established by the Act. During the pendency of the license applications, and after the denial, Edler proceeded to perform the contract and transmitted the information to the French firm. Edler was then prosecuted under the Act. Edler defended on the ground, among others, that the transmission of technical information under the contract with the French firm was constitutionally protected "speech" and that the government could not require such "speech" to be licensed in advance. The trial court rejected that contention and Edler was convicted.

---

[3] We can imagine more exotic examples that would proceed upon essentially the same legal footing, *e.g.,* a transaction in which an American agent (an "industrial spy") transmits sensitive technical information to his foreign principal.

DOSWASHINGTONSUP00756

App. 121
15-50759.248

Case: 15-50759      Document: 00513302729      Page: 59      Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 188 of 996
Case 1:15-cv-00372-RP   Document 8-2   Filed 05/11/15   Page 38 of 106

In accordance with these principles, we conclude that, in general, the revised technical data provisions cannot constitutionally be applied to the dissemination of technical data by persons having no direct connection with foreign conduct in settings in which there is no more than belief or a reasonable basis for believing (1) that a foreign national may take the technical data abroad and (2) that the data could be used by someone there in the manufacture or use of items on the Munitions List.[10] In the absence of special circumstances that would justify prior restraint, such speech is arguably protected and, as a general rule, cannot be subjected constitutionally to the revised licensing requirement.

### III. Conclusion and Recommendation

We have concluded that the revised technical data provisions can have constitutional and unconstitutional applications. As a matter of constitutional doctrine, that conclusion would require a court to consider whether the provisions are so substantially overbroad that they are void and unenforceable in all their applications. *See Broadrick* v. *Oklahoma,* 413 U.S. 601 (1973). For the present, however, we will forgo that inquiry in favor of three more pragmatic considerations.

First, *Edler* itself demonstrates that the problems presented by facial overbreadth do not necessarily prevent the enforcement of a licensing requirement in cases in which such a requirement can otherwise be constitutionally enforced. The *Edler* court saw its task as one of saving a necessary system of regulation, and it therefore chose to "construe" the statute and the applicable regulations narrowly to avoid the overbreadth problem and to preserve the possibility of enforcing the system against a criminal defendant (Edler) whose "speech" may not have been constitutionally protected. That approach was consistent with the approach that the Supreme Court itself has taken in some First Amendment cases. *See Civil Service Commission* v. *Letter Carriers,* 413 U.S. 548 (1972). It is an approach that may be taken when new cases arise under the revised technical data provisions.

Second, there is no absolute guarantee that other courts will be as concerned with saving the regulations as the *Edler* court was. The decision whether to enforce the overbreadth doctrine or to save the regulation through narrow "construction" is in part a matter of judicial discretion; and we cannot exclude the possibility that a court would

---

[10] As *Edler* suggests, a different conclusion may be appropriate if the data have only military applications, or if the defendant knows such an application is intended. Even in such contexts, however, there may be situations in which the First Amendment bars a prior restraint consider, for example, a lecture on technical data having exclusively military uses when nationals of American allies are in the audience We do not, however, conclude that the ITAR is unconstitutional with respect to all transactions falling within this category; we merely suggest it has a number of unconstitutional applications.

DOSWASHINGTONSUP00757

App. 128
15-50759.255

hold the technical data provisions substantially overbroad, and there-
fore void.

For obvious reasons, the best legal solution for the overbreadth
problem is for the Department of State, not the courts, to narrow the
regulations. In our judgment, the regulations should be narrowed to
make it less likely that they will apply, or be seen to apply, to pro-
tected speech falling within the general category described in part 3 of
section II above. We would respectfully recommend that an effort be
undertaken along that line.[11]

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[11] We also recommend the legislative changes referred to in note 7, *supra*.

214

TAB 7

DOSWASHINGTONSUP00759

# Constitutionality of Proposed Revisions of the Export Administration Regulations

Proposed revisions of the Export Administration Regulations dealing with the export of technical data to foreign nationals apply a prior restraint, in the form of a licensing requirement, to a wide variety of speech protected by the First Amendment. There is thus a considerable likelihood that in their current form the regulations would be invalidated as unconstitutionally overbroad. The regulations would also be vulnerable to constitutional attack on grounds of vagueness. If the regulations were cast not as a licensing scheme but as a form of subsequent punishment, they could cover a far broader range of conduct.

A licensing system is likely to be held constitutional only if it applies narrowly to exports which are likely to produce grave harm under the test set forth in *New York Times Co. v. United States*, 403, U.S. 713 (1971).

July 28, 1981

## MEMORANDUM OPINION FOR THE DIRECTOR, CAPITAL GOODS PRODUCTION MATERIALS DIVISION, DEPARTMENT OF COMMERCE

This will respond to your request for the views of this Office on the constitutional issues raised by your draft revision of Part 379 of the Export Administration Regulations. Those regulations clarify the circumstances in which a license is required for the export of technical data to foreign nationals. We believe that the regulations, as currently drafted, have a number of unconstitutional applications, and that they should therefore be substantially revised in order to meet the constitutional objections. In the discussion below, we offer a general statement of our reasoning, together with some suggestions for possible revision.

### I. Background

The general purpose of the regulations is to require a license before the "export" of "technical data," subject to two exceptions discussed below. Under the regulations, technical data is defined as "information and know-how of any kind that can be used, or adapted for use, in the design, production, manufacture, repair, overhaul, processing, engineering, development, operation, maintenance, or reconstruction of commodities." The term "commodity" encompasses a wide range of articles compiled on the Commodities Control List. Many of the articles fall generally in the broad category of "high technology" items, including,

230

DOSWASHINGTONSUP00760

TAB 8

DOSWASHINGTONSUP00761

Case: 15-50759    Document: 00513302729    Page: 64    Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ    Document 107-22    Filed 09/23/20    Page 193 of 996

Case 1:15-cv-00372-RP    Document 8-2    Filed 05/11/15    Page 47 of 106



**U.S. Department of Justice**
Office of Legal Counsel

Office of the
Deputy Assistant Attorney General

*Washington, D.C. 20530*

JUL 5 - 1984

MEMORANDUM FOR DAVIS R. ROBINSON
LEGAL ADVISER
DEPARTMENT OF STATE

Re:   Revised Proposed International Traffic in
      Arms Regulations (ITAR)

      This responds to a memorandum of June 5, 1984, from Mr.
Cummings of your Office, requesting the views of this Office
on a proposed revision of the International Traffic in Arms
Regulations (ITAR), recently prepared by the Department of
State (hereinafter "current draft").  This Office has previously
provided extensive comments on an earlier proposed revision
of the ITAR (hereinafter "prior draft"). 1/  See Memorandum for
William B. Robinson, Office of Munitions Control, Department
of State, from Theodore B. Olson, Assistant Attorney General,
Office of Legal Counsel (July 1, 1981) (hereinafter "1981 ITAR

_____

1/  This Office first addressed constitutional issues related
to the ITAR in 1978 in a memorandum for Dr. Frank Press, the
Science Adviser to President Carter.  That opinion considered
the constitutionality of the restrictions on the dissemination
of cryptographic information developed by scientists and
mathematicians in the private sector independent of government
supervision or support.  We concluded that the ITAR's prohibi-
tion of disclosure of these "public" cryptographic ideas and
information amounted to an unconstitutional prior restraint.
See Memorandum for Dr. Frank Press, Science Adviser to the
President, from John M. Harmon, Assistant Attorney General,
Office of Legal Counsel (May 11, 1978) (attached).

App. 137
15-50759.264

important to note that, in our judgment, the constitutional
principles upon which we relied remain intact. 3/

## III.  DISCUSSION

The current draft of the ITAR circulated by your Office
was apparently intended to remedy the constitutional defects

---

3/  In Metromedia, Inc. v. San Diego, 453 U.S. 490 (1981)
(plurality opinion), the Court considered a city ordinance
which permitted onsite commercial advertising but prohibited
offsite commercial advertising and noncommercial advertising
with limited exceptions.  The plurality opinion concluded that
the ordinance was constitutional as applied to commercial
speech because it satisfied the standards of Central Hudson
Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557
(1981), upon which we relied in our prior opinion.  The
substantial government interests in improved traffic safety
and appearance of the city were directly served by the ordi-
nance, which was no broader than necessary to accomplish those
ends.  (The ban was invalidated as applied to noncommercial
speech, however, because the Government's asserted interests
were insufficient to justify the ban, given that commercial
advertising was permitted.)  In Bolger v. Youngs Drug Products
Corp., 103 S. Ct. 2875 (1983), the Court struck down a federal
statute which prohibited unsolicited mailing of contraceptive
advertisements.  The Court held that the statute was an
unconstitutional restriction on commercial speech because the
Government's interests in shielding recipients from unwanted
mail which they might find offensive and aiding parents in
controlling the information which their children received
about birth control were insufficient to overcome the protec-
tion afforded to speech that was truthful and related to
activity protected from unwanted state interference and also
to important social issues.  City of Los Angeles v. Taxpayers
for Vincent, No. 82-975, 52 U.S.L.W. 4594 (U.S. May 15, 1984),
is a sort of sequel to Metromedia, although it is not a
commercial speech case.  In Taxpayers, the Court upheld a
city ordinance which prohibited the posting of signs on public
property.  The Court held that the content-neutral prohibition
was justified by the city's substantial esthetic interests,
even as applied to signs which carried political messages.
Of course, the ordinance was directed against—and prohibited
—only the use of the signs.  Speech itself was not regulated
and could be continued to be conveyed on public property by a
speaker or distributor of leaflets.

-4-

App. 140
15-50759.267

DOSWASHINGTONSUP00763

consent of the Office of Munitions Control.  Under this sub-
section, an exemption would be provided for full time, regular
employees of a single corporation or university to discuss
technical data among themselves.  What is not exempt, however,
without the prior written consent of the Office of Munitions
Control, is a disclosure of the information by an employee of
a corporation or university to a foreign national who is a
part-time or temporary employee of that corporation or univer-
sity; a full time employee of another corporation or univer-
sity; another professional person attending a conference or
a seminar at the corporation or university; a student; or a
friend.

     We recognize the attempt made to address the concerns
raised in our prior opinion, and, as we stated with regard to
the new exemptions provided in subsections (9) and (12), to the
extent that subsection (10) constricts the area of application
of the licensing requirement, the additional exemption reduces
the area of potential unconstitutional application of that
requirement.  We have identified, however, a number of circum-
stances in which the prior written consent of the Office of
Munitions Control would be required for disclosure of the
technical data.  As noted above, with regard to subsection
(11), which requires the written consent of that Office for
export of certain technical data pursuant to an arrangement
with the Department of Defense or NASA, we do not believe
that there is a constitutionally significant distinction
between the requirement of obtaining prior written consent
and obtaining a license.  See note 11, supra.  In some of
these circumstances, as well as others, we believe that the
ITAR may still be read to operate as a prior restraint on the
speech of "persons having no direct connection with foreign
conduct in settings in which there is no more than belief or
a reasonable basis for believing (1) that a foreign national
may take the technical data abroad and (2) that the data
could be used by someone there in the manufacture or use of
items on the Munitions List."  1981 ITAR Memorandum at 14.
As we concluded in that memorandum, "[i]n the absence of
special circumstances that would justify prior restraint,
such speech is arguably protected and, as a general rule,
cannot be subjected constitutionally to the . . . licensing
requirement."  Id.

     We are aware of the case law interpreting 22 U.S.C. § 2778,
the statutory authority for the ITAR, which requires a specific
intent willfully to export particular goods on the Munitions
List without a license.  See, e.g., United States v. Hernandez,
662 F.2d 289, 292 (5th Cir. 1981) ("statute's requirement of
willfulness connote[s] a voluntary and intentional violation

-13-

of a known legal duty," that is, "that the defendant knew that he was unlawfully exporting weapons on the Munitions List"); United States v. Beck, 615 F.2d 441, 449-50 (7th Cir. 1980) (conviction requires "proof that the defendants (1) exported or attempted to export (2) goods on the United States Munitions List (3) without first having obtained a license for the export (4) willfully"); and United States v. Wieschenberg, 604 F.2d 326, 331 (5th Cir. 1979) (to sustain a conviction for conspiracy to violate the statute, "government must prove that the defendants agreed to and specifically intended to export without a license particular property that is restricted by the Munitions List"). It may be that the standard of knowledge and intent that is imposed by these cases with regard to the export of defense articles might, as applied to technical data, be sufficient to broaden, in effect, the scope of the exemption under subsection (10) to the extent consistent with the constitutional standard articulated in our previous memorandum and reaffirmed here.

We remain of the opinion, however, that on their face, the ITAR still present some areas of potentially unconstitutional application, and, moreover, that we cannot be certain whether existing case law would be sufficient to narrow the range of application to a constitutionally sufficient extent. In any event, as we advised in our 1981 Memorandum with regard to the overbreadth present in the prior draft, we believe that "the best legal solution . . . is for the Department of State, not the courts, to narrow the regulations." See 1981 ITAR Memorandum at 15.


IV.    CONCLUSION

We have carefully examined the definitions of "export" and of "technical data," as well as the exemptions provided from the licensing requirement, under the current draft of the ITAR, and we believe that the scope of the exemptions is broader, and the coverage of the licensing requirement therefore narrower, in at least three specific areas of importance to private persons: exports by disclosures to certain employees of U.S. corporations overseas (subsection (9)); certain exports to Canada (subsection (12)); and exports by disclosure of technical data by U.S. corporations and academic institutions to foreign nationals who are their full time, regular employees, subject to certain conditions (subsection (10)). Notwithstanding these additional exemptions, however, we have identified certain areas which still appear to us to

-14-

App. 150
15-50759.277

DOSWASHINGTONSUP00765

present sensitive constitutional issues.  As we previously
recommended, this remaining overbreadth should be eliminated
by more narrowly drafted regulations.


Larry D. Simms
Deputy Assistant Attorney General
Office of Legal Counsel


Attachments:

Appendix of regulations
Memorandum of May 11, 1978, for Dr. Frank Press
Memorandum of July 28, 1981, for Henry D. Mitman

-15-

App. 151
15-50759.278

DOSWASHINGTONSUP00766

TAB 9

DOSWASHINGTONSUP00767

Case: 15-50759     Document: 00513302729     Page: 70     Date Filed: 12/10/2015

Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 199 of 996

Report on the Availability of Bombmaking Information   Case 1:15-cv-00372-RP   Document 8-2   Filed 05/11/15   Page 63 of 106     3/22/15, 8:24 PM

This web site was copied prior to January 20, 2005. It is now a Federal record managed by the National Archives and Records Administration. External links, forms, and search boxes may not function within this collection. Learn more.   [hide]



# 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION



PREPARED BY THE UNITED STATES DEPARTMENT OF JUSTICE
AS REQUIRED BY SECTION 709(a) IF THE
ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

SUBMITTED TO:

THE UNITED STATES HOUSE OF REPRESENTATIVES
AND THE UNITED STATES SENATE

APRIL 1997

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY

BACKGROUND

I.   THE PUBLIC AVAILABILITY OF INFORMATION ON THE MANUFACTURE
     OF BOMBS, DESTRUCTIVE DEVICES, AND WEAPONS OF MASS DESTRUCTION

     A.   Books, Pamphlets and Other Printed Material

     B.   The Internet

     C.   Summary

II.  THE EXTENT TO WHICH PUBLISHED BOMBMAKING INFORMATION HAS
     FACILITATED THE MANUFACTURE AND USE OF EXPLOSIVES IN ACTS OF
     TERRORISM AND OTHER CRIMINAL ACTIVITY

III. THE LIKELIHOOD THAT PUBLISHED BOMBMAKING INFORMATION WILL
     CONTINUE TO BE USED TO FACILITATE ACTS OF TERRORISM AND OTHER
     CRIMINAL ACTIVITY

http://webharvest.gov/peth04/20041026201550/http://www.usdoj.gov/criminal/cybercrime/bombmakinginfo.html

Page 1 of 44

App. 153

15-50759.280

DOSWASHINGTONSUP00768

RE 57

Case: 15-50759     Document: 00513302729     Page: 71     Date Filed: 12/10/2015

Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 200 of 996

Report on the Availability of Bomb-making Information     Case 1:15-cv-00372-RP   Document 8-2   Filed 05/11/15   Page 66 of 106     3/22/15, 8:24 PM

impermissibly restrict the wholly legitimate publication and teaching of such information, or otherwise violate the First Amendment.

The First Amendment would impose substantial constraints on any attempt to proscribe indiscriminately the dissemination of bombmaking information. The government generally may not, except in rare circumstances, punish persons either for advocating lawless action or for disseminating truthful information -- including information that would be dangerous if used -- that such persons have obtained lawfully. However, the constitutional analysis is quite different where the government punishes speech that is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit; such "speech acts" -- for instance, many cases of inchoate crimes such as aiding and abetting and conspiracy -- may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech.

Accordingly, we have concluded that Senator Feinstein's proposal can withstand constitutional muster in most, if not all, of its possible applications, if such legislation is slightly modified in several respects that we propose at the conclusion of this Report. As modified, the proposed legislation would be likely to maximize the ability of the Federal Government -- consistent with free speech protections -- to reach cases where an individual disseminates information on how to manufacture or use explosives or weapons of mass destruction either (i) with the intent that the information be used to facilitate criminal conduct, or (ii) with the knowledge that a particular recipient of the information intends to use it in furtherance of criminal activity.

## BACKGROUND

In order fully to understand the issues we have been asked to address, it is helpful first to describe the legislative proceedings that prompted enactment of section 709 of the AEDPA.

On May 11, 1995, less than one month after the Oklahoma City terrorist bombing, in testimony before the Subcommittee on Terrorism, Technology and Government Information of the Senate Judiciary Committee, Deputy Assistant Attorney General Robert Litt, of the Justice Department's Criminal Division, explained that "how to" guides for the manufacture of explosives are readily available on the Internet, in bookstores and even in public libraries[1]. To illustrate the point, he observed that, according to a news article, only hours after the Oklahoma City bombing, someone posted on the Internet directions -- including a diagram -- explaining how to construct a bomb of the type that was used in that tragic act of terrorism. Another Internet posting offered not only information concerning how to build bombs, but also instructions as to how the device used in the Oklahoma City bombing could have been improved.

Mr. Litt explained that "expansion of the scope of federal criminal laws dealing with the violent, terrorist activity will permit the Department of Justice to prosecute those who engage in efforts to assist violence and terrorism over the Internet." Mr. Litt observed, however, that despite the dangers posed by the dissemination of such information and the callous disregard of human life shown by those who are responsible for such action, the First Amendment imposes significant constraints on the ability of the federal government to proscribe and penalize such activity.

On June 5, 1995, Senator Feinstein proposed an amendment to a bill (S. 735) that later became the AEDPA. 141 Cong. Rec. S7682 (daily ed. June 5, 1995). The purpose of the amendment was to address the problem of the increasingly widespread "distribution of bombmaking information for criminal purposes." Id. Following some debate in the Senate, Senator Feinstein's amendment was slightly modified, and the full Senate unanimously approved it by voice vote. Id. at S7686. The Senate passed S. 735 on June 7, 1995. 141

Case: 15-50759    Document:    00513302729    Page: 72    Date Filed: 12/10/2015

Case 2:20-cv-00111-RAJ    Document 107-22    Filed 09/23/20    Page 201 of 996

Report on the Availability of BombmakingCase 1:15-cv-00372-RP    Document 8-2    Filed 05/11/15    Page 70 of 106    3/22/15, 8:24 PM

weapons.  For example, on August 28, 1996, one participant of a Usenet newsgroup inquired whether anyone had a recipe for C-4 and detonation techniques.  The following day, someone responded to the inquiry by posting a detailed formula, explaining that "[t]he production of C-4 is probably beyond what can [be] done in the kitchen, but here is something to get you started."   On August 16, 1996, another Usenet participant complained that he had "recently attempted to follow the recipe [for an explosive] posted earlier . . . and nearly blew my arms off!"  This prompted the following response:

> So what do you want, sympathy?  Let me clue you in here. Actually building any of this stuff is illegal, immoral,
> anti-social, and just plain wrong.  But then, so are a lot of other fun things.  The point is, if you do it, and you blow
> yourself up, it's your own fault.  So quit sniveling.  [N]ext time, don't cook at home.

**C.** <u>Summary</u>.  It is readily apparent from our cursory examination that anyone interested in manufacturing a bomb, dangerous weapon or weapon of mass destruction can easily obtain detailed instructions for fabricating and using such a device.  Available sources include not only publications from the so-called underground press but also manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes.  Such information is also readily available to anyone with access to a home computer equipped with a modem.

# II.
# THE EXTENT TO WHICH PUBLISHED BOMBMAKING INFORMATION
# HAS FACILITATED THE MANUFACTURE AND USE OF EXPLOSIVES
# IN ACTS OF TERRORISM AND OTHER CRIMINAL ACTIVITY

Recent law enforcement experience demonstrates that persons who attempt or plan acts of terrorism often possess literature that describes the construction of explosive devices and other weapons of mass destruction (including biological weapons).  Although in some cases there is no hard evidence demonstrating that such individuals actually employed such information in furtherance of their crimes, possession of such information often is strong circumstantial evidence from which such usage can be inferred.

During the execution of a search warrant at the Rex, Georgia residence of Walter Leroy Moody, Jr., the convicted bombing murderer of Judge Robert S. Vance and attorney Robert Robinson, investigators discovered a copy of the <u>Anarchist's Cookbook</u>.

In November 1995, Oklahoma residents Ray and Cecilia Lampley, along with one John "J.D." Baird, began construction of an ammonium nitrate bomb, utilizing a manual for the making of "Homemade C-4," a military plastic explosive.  The group intended to destroy either the Jewish Anti-Defamation League building in Houston, Texas, or the Southern Poverty Law Center in Birmingham, Alabama.  Following the recipe from the manual, the Lampleys "cooked" the ammonium nitrate, and obtained accelerants, such as nitromethane and powdered aluminum.  Additionally, Ray Lampley learned that he needed an initial detonating charge to properly detonate the "homemade C-4," and attempted to make a triacetone triperoxide detonator utilizing instructions from <u>Ragnar's Big Book of Explosives</u>.  When the three co-conspirators were arrested by the FBI, law enforcement agents recovered the <u>Anarchist's Cookbook and Homemade Weapons</u>, in addition to the "homemade C-4" text, from the Lampley residence.[8]

TAB 10

DOSWASHINGTONSUP00771

Case: 15-50759    Document: 00513302729    Page: 74    Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ    Document 107-22    Filed 09/23/20    Page 203 of 996

Case 1:15-cv-00372-RP    Document 8-1    Filed 05/11/15    Page 15 of 92



United States Department of State

*Bureau of Political-Military Affairs*
*Office of Defense Trade Controls Compliance*
*Washington, D.C. 20522-0112*

MAY 0 8 2013

In reply refer to

▆▆▆▆▆▆▆▆▆▆▆▆▆

Mr. Cody Wilson
Defense Distributed
▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Dear Mr. Wilson:

The Department of State, Bureau of Political Military Affairs, Office of Defense Trade Controls Compliance, Enforcement Division (DTCC/END) is responsible for compliance with and civil enforcement of the Arms Export Control Act (22 U.S.C. 2778) (AECA) and the AECA's implementing regulations, the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) (ITAR). The AECA and the ITAR impose certain requirements and restrictions on the transfer of, and access to, controlled defense articles and related technical data designated by the United States Munitions List (USML) (22 C.F.R. Part 121).

DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

Technical data regulated under the ITAR refers to information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles, including information in the form of blueprints, drawings, photographs, plans, instructions or documentation. For a complete definition of technical data, see § 120.10 of the ITAR. Pursuant to § 127.1 of the ITAR,

App. 13
15-50759.140

Case: 15-50759    Document: 00513302729    Page: 75    Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ    Document 107-22    Filed 09/23/20    Page 204 of 996

Case 1:15-cv-00372-RP    Document 8-1    Filed 05/11/15    Page 16 of 92
- 2 -

it is unlawful to export any defense article or technical data for which a license or
written approval is required without first obtaining the required authorization from the
DDTC. Please note that disclosing (including oral or visual disclosure) or transferring
technical data to a foreign person, whether in the United States or abroad, is considered
an export under § 120.17 of the ITAR.

The Department believes Defense Distributed may not have established the
proper jurisdiction of the subject technical data. To resolve this matter officially, we
request that Defense Distributed submit Commodity Jurisdiction (CJ) determination
requests for the following selection of data files available on DEFCAD.org, and any
other technical data for which Defense Distributed is unable to determine proper
jurisdiction:

1. Defense Distributed Liberator pistol
2. .22 electric
3. 125mm BK-14M high-explosive anti-tank warhead
4. 5.56/.223 muzzle brake
5. Springfield XD-40 tactical slide assembly
6. Sound Moderator – slip on
7. "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter
8. 12 gauge to .22 CB sub-caliber insert
9. Voltlock electronic black powder system
10. VZ-58 front sight.

DTCC/END requests that Defense Distributed submit its CJ requests within three
weeks of receipt of this letter and notify this office of the final CJ determinations. All
CJ requests must be submitted electronically through an online application using the
DS-4076 Commodity Jurisdiction Request Form. The form, guidance for submitting CJ
requests, and other relevant information such as a copy of the ITAR can be found on
DDTC's website at http://www.pmddtc.state.gov.

Until the Department provides Defense Distributed with final CJ determinations,
Defense Distributed should treat the above technical data as ITAR-controlled. This
means that all such data should be removed from public access immediately. Defense
Distributed should also review the remainder of the data made public on its website to

- 3 -

determine whether any additional data may be similarly controlled and proceed according to ITAR requirements.

Additionally, DTCC/END requests information about the procedures Defense Distributed follows to determine the classification of its technical data, to include the aforementioned technical data files. We ask that you provide your procedures for determining proper jurisdiction of technical data within 30 days of the date of this letter to Ms. Bridget Van Buren, Compliance Specialist, Enforcement Division, at the address below:

Office of Defense Trade Controls Compliance



We appreciate your full cooperation in this matter. Please note our reference number in any future correspondence.

Sincerely,

Glenn E. Smith
Chief, Enforcement Division

App. 15
15-50759.142

TAB 11

DOSWASHINGTONSUP00775

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and | § | Case No. 15-CV-372 |
| SECOND AMENDMENT FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

DECLARATION OF CODY WILSON

I, Cody Wilson, declare:

1.        I am a citizen of the United States and a resident of Texas.

2.        I co-founded and now lead Defense Distributed, a Texas non-profit corporation. Defense Distributed is organized and operated for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution through facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and to publish and distribute, at no cost to the public, such information and knowledge on the Internet in promotion of the public interest.

3.        Beginning in 2012, Defense Distributed privately generated, and posted on the Internet for free access by the public, technical information about various gun-related items, including a trigger guard, grips, two receivers, a magazine for AR-15 rifles, and a handgun named "The Liberator" (the "Published Files"). At the time it did so, there were no publicly known DDTC enforcement actions for the posting of files on the Internet.

App. 1
15-50759.128

4.      The Published Files were downloaded hundreds of thousands times. The Liberator files in particular generated national media attention, with coverage in Forbes, CNN, NBC News, the Wall Street Journal, and even an episode of The Colbert Report.

5.      In May 2013, Defense Distributed received a letter dated May 8, 2013, from Glenn Smith, Chief of Defendant DDTC's Enforcement Division. The letter warned:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR . . . all such data should be removed from public access immediately.

> Exhibit 1 is a true and correct copy of that letter.

6.      At the time it posted the Published Files, Defense Distributed did not know that the government would demand to pre-approve its speech. Defense Distributed believed, and continues to believe, that the United States Constitution guarantees a right to share truthful speech—especially speech concerning fundamental constitutional rights—in open forums. Nevertheless, for fear of criminal and civil enforcement, Defense Distributed promptly complied with Defendants' demands and removed all of the Published Files from its servers.

7.      Defendants' letter further directed Defense Distributed to submit the Published Files to DDTC for review using the "commodity jurisdiction" procedure. Defense Distributed complied with Defendants' request and filed ten (10) commodity jurisdiction requests covering the Published Files on June 21, 2013. Exhibit 13 is a true and correct copy of those requests (without attachments). Nearly two years later, Defendants have still not responded to the requests.

App. 2
15-50759.129

8.    On September 25, 2014, Defense Distributed requested DOPSR's prepublication approval for public release of files containing technical information on a milling machine, named the "Ghost Gunner," that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").[1] Exhibit 14 is a true and correct copy of that request (without attachments). On October 1, 2014, DOPSR informed Defense Distributed this request for review was refused because DOPSR was unsure whether the Ghost Gunner was subject to ITAR. DOPSR further recommended that Defense Distributed submit another commodity jurisdiction request to the Defendants. Exhibit 15 is a true and correct copy of DOPSR's October 1, 2014 correspondence to Defense Distributed.

9.    Defense Distributed submitted another commodity jurisdiction request for the Ghost Gunner to Defendants on January 2, 2015. Exhibit 16 is a true and correct copy of that request (without attachments). On April 15, 2015, Defendant DDTC determined that the Ghost Gunner machine, user manual, and operating software are not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." Exhibit 17 is a true and correct copy of DOPSR's April 15, 2015 correspondence to Defense Distributed.

10.    Since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. Exhibits 18 through 21 are true and correct copies of these requests (without attachments). On December 31,

---

[1]Any milling machine can be modified to mill components that are unlawful to manufacture, just as any saw that may be purchased at a hardware store can be used to unlawfully shorten a shotgun. However, Ghost Gunner does not ship with the jigs and code to

2014, nearly four months after the first such review request, DOPSR sent Defense Distributed two letters dated December 22, 2014, stating its refusal to review the CAD files. The letters directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. Exhibit 22 is a true and correct copy of DOPSR's December 31, 2014 correspondence to Defense Distributed.

11.     However, because this is not the DDTC division responsible for issuing licenses or other DDTC authorizations, on January 5, 2015, Defense Distributed requested Defendants' guidance on how to obtain authorization from DDTC Compliance for release of the CAD files. Exhibit 23 is a true and correct copy of that request (without attachments). To date, Defendants have not responded to Defense Distributed's request for guidance.

12.     Defense Distributed appears to be the ITAR prior restraint scheme's *only* target. Other websites containing similar firearm-related parts, such as GrabCAD.com, Weaponeer.com, Thingiverse.com, Ak-builder.com, AR15.com, Scribd.com, CNCguns.com, we are apparently unimpeded.

13.     Defense Distributed has and will continue to create and possess other files that contain technical information, to include design drawings, rendered images, written manufacturing instructions, and other technical information that Defense Distributed intends to post to open forums on the Internet. Many of these files are described in the USML.

14.     But for Defendants' impositions upon the distribution of the Published Files, Ghost Gunner Files, CAD Files, and Defense Distributed's other files (collectively, the "Subject Files"), Defense Distributed would freely distribute the Subject Files and other files relating to

---

manufacture machine guns, and Defense Distributed has no intention of offering such items for sale.

DOSWASHINGTONSUP00779

Case: 15-50759    Document: 00513302729    Page: 82    Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22    Filed 09/23/20   Page 211 of 996
Case 1:15-cv-00372-RP   Document 8-1   Filed 05/11/15   Page 7 of 92

Second Amendment arms. Defense Distributed refrains from distributing the Subject Files

because I fear that Defendants would pursue criminal and civil enforcement proceedings against

me and the company for doing so.

     I declare under penalty of perjury that the foregoing is true and correct.

This the 8th day of May, 2015.

Cody Wilson

DOSWASHINGTONSUP00780

Scanned by CamScanner

App. 5
15-50759.132

TAB 12

DOSWASHINGTONSUP00781

Case: 15-50759     Document: 00513302729     Page: 84     Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 213 of 996

Case 1:15-cv-00372-RP   Document 37-2   Filed 06/24/15   Page 2 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED and     §     Case No. 15-CV-372-RP
SECOND AMENDMENT FOUNDATION, INC.,     §
    §
         Plaintiffs,     §
    §
         v.     §
    §
U.S. DEPARTMENT OF STATE, et al.,     §
    §
         Defendants.     §
    §

### SUPPLEMENTAL DECLARATION OF ALAN GOTTLIEB

I, Alan Gottlieb, declare:

1.     I am a citizen of the United States and a resident of the state of Washington. I make this declaration as a supplement to the declaration I provided earlier for use in the above-referenced case. I make this declaration based on my personal knowledge and, if called upon to do so, could and would testify competently to the matters set forth below.

2.     I am the Executive Vice President of the Second Amendment Foundation, Inc. (SAF). SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including Texas. The purposes of SAF include education, research, publishing, and legal action focusing on the constitutional right to privately own and possess firearms, and the consequences of gun control.

3.     The issues raised by, and consequences of, Defendants' policies restricting the sharing of firearms-related files over the Internet are of great interest to SAF's constituency.

1

DOSWASHINGTONSUP00782

Were Defense Distributed not prohibited by Defendants from sharing on the Internet its files related to lawful firearms, countless law-abiding, responsible adult SAF members and supporters would access, study, share, modify, and learn from Defense Distributed's various files, and use them to build lawful firearms for self-defense and to keep such firearms operable for self-defense. They would also do this with similar firearms-related CAD files that they or others have created. But for the threats from Defendants of criminal and civil liability, SAF members would create and share CAD files relating to lawful firearms—again, in connection with the building of lawful firearms for self-defense and with maintaining lawful firearms operable for purposes of self-defense.

4.      In furtherance of SAF's mission, and to serve its members and the public, SAF would publish and promote, on the Internet, the free distribution of Defense Distributed's various files, and allow its members and others to upload their own firearm-related CAD files to SAF's servers for Internet publication, for purposes of the construction of lawful firearms for self-defense. SAF is presently refraining from doing so only owing to Defendants' interpretation of ITAR, including threats against Defense Distributed of potential criminal and civil liability.

5.      SAF is proud to bring this action on behalf of its members. Conn Williamson and Peter Versnel are two of the many members of SAF.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the _23ᴿᴰ_ day of June, 2015.

_Alan M. Gottlieb_
_____
Alan Gottlieb

DOSWASHINGTONSUP00783

TAB 13

DOSWASHINGTONSUP00784

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § | Case No. 15-CV-372-RP |
| Plaintiffs, | § § | |
| v. | § § | |
| U.S. DEPARTMENT OF STATE, et al., | § § | |
| Defendants. | § § § | |

**SUPPLEMENTAL DECLARATION OF CONN WILLIAMSON**

I, Conn Williamson, declare:

1.      I am a citizen of the United States and a resident of the State of Washington.  I make this declaration as a supplement to the declaration I provided earlier for use in the above-referenced case.  I make this declaration based on my personal knowledge and, if called upon to do so, could and would testify competently to the matters set forth below.

2.      I am a member of the Second Amendment Foundation (SAF).

3.      I am not prohibited from owning lawful firearms by any local, state, or federal law, regulation, or court order.

4.      But for the threats of criminal and civil liability made to Defense Distributed by the above-referenced Defendants, and those Defendants' related interpretation of ITAR, I would access online, study, share online, and learn from Defense Distributed's various firearms-related files, including files related to the Liberator handgun, as well as similar files related to firearms that Defense Distributed or others have created, for various purposes, including the manufacture and maintenance of lawful firearms that I would use for self-defense.  I would access these files

DOSWASHINGTONSUP00785

Case: 15-50759   Document: 00513302729   Page: 88   Date Filed: 12/10/2015
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 217 of 996

Case 1:15-cv-00372-RP   Document 37-3   Filed 06/24/15   Page 3 of 3

via the Defense Distributed web site and via the SAF web site and download them from those sites, when posted there.  I would also upload and share such files via the SAF web site, so that other United States citizens could download them and use them for constructing and maintaining lawful firearms for self-defense.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 24 day of June, 2015.

Conn Williamson

15-50759.662

DOSWASHINGTONSUP00786

TAB 14

DOSWASHINGTONSUP00787

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and SECOND AMENDMENT FOUNDATION, INC., | § § § | Case No. 15-CV-372-RP |
| Plaintiffs, | § § | |
| v. | § § | |
| U.S. DEPARTMENT OF STATE, et al., | § § | |
| Defendants. | § § § | |

**SUPPLEMENTAL DECLARATION OF PETER VERSNEL**

I, Peter Versnel, declare:

1.      I am a citizen of the United States and a resident of the State of Washington.  I make this declaration as a supplement to the declaration I provided earlier for use in the above-referenced case.  I make this declaration based on my personal knowledge and, if called upon to do so, could and would testify competently to the matters set forth below.

2.      I am a member of the Second Amendment Foundation (SAF).

3.      I am not prohibited from owning lawful firearms by any local, state, or federal law, regulation, or court order.

4.      But for the threats of criminal and civil liability made to Defense Distributed by the above-referenced Defendants, and those Defendants' related interpretation of ITAR, I would access online, study, share online, and learn from Defense Distributed's various firearms-related files, including files related to the Liberator handgun, as well as similar files related to firearms that Defense Distributed or others have created, for various purposes, including the manufacture and maintenance of lawful firearms that I would use for self-defense.  I would access these files

1

DOSWASHINGTONSUP00788

15-50759.664

via the Defense Distributed web site and via the SAF web site and download them from those sites, when posted there.  I would also upload and share such files via the SAF web site, so that other United States citizens could download them and use them for constructing and maintaining lawful firearms for self-defense.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the _13_ day of June, 2015.

_____
Peter Versnel

2

RE 73

15-50759.665

CERTIFICATE OF SERVICE

On this, the 10th day of December, 2015, I electronically filed the attached Record Excerpts with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on December 10, 2015.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 10th day of December, 2015.


/s/ Alan Gura
Alan Gura

DOSWASHINGTONSUP00790

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

December 14, 2015

Mr. Alan Gura
Gura & Possessky, P.L.L.C.
916 Prince Street
Suite 7
Alexandria, VA 22314-0000

    No. 15-50759    Defense Distributed, et al v. U.S. Dept. of
               State, et al
    USDC No. 1:15-CV-372

Dear Mr. Gura,

The following pertains to your record excerpts electronically
filed on December 10, 2015.

You must submit the four (4) paper copies of your record excerpts
required by 5ᵀᴴ Cɪʀ. R. 30.1.2 within five (5) days of the date of
this notice pursuant to 5th Cir. ECF Filing Standard E.1.   We
remind attorneys that the paper copies of record excerpts filed
with the court must contain physical tabs that extend beyond the
edge of the document to facilitate easy identification and review
of tabbed documents. See 5ᵀᴴ Cir. R.30.1.7(c).

Failure to timely provide the appropriate number of copies may
result in the dismissal of your appeal pursuant to 5ᵀᴴ Cɪʀ. R. 42.3.

                          Sincerely,

                          LYLE W. CAYCE, Clerk

                          By: _____
                          Shawn D. Henderson, Deputy Clerk
                          504-310-7668

cc:
    Mr. Joshua Michael Blackman
    Mr. Matthew Goldstein
    Mr. William Bryan Mateja
    Mr. Michael S. Raab
    Mr. Eric J. Soskin

Mr. Daniel Bentele Hahs Tenny

DOSWASHINGTONSUP00792

NO. 15-50759

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political- Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION
No. 1:15-cv-00372-RP, The Hon. Robert L. Pitman
United States District Court Judge

**AMICI CURIAE BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND THE THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRESSION IN SUPPORT OF APPELLANTS**

J. Joshua Wheeler
THOMAS JEFFERSON CENTER FOR THE
PROTECTION OF FREE EXPRESSION &
THE UNIVERSITY OF VIRGINIA SCHOOL OF LAW
FIRST AMENDMENT CLINIC
400 Worrell Drive
Charlottesville, VA 22911
Telephone: (434) 295–4784
jjw@tjcenter.org

Bruce D. Brown
  *Counsel of Record*
Gregg P. Leslie
Hannah Bloch-Wehba
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1250
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
bbrown@rcfp.org

i

# CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed, et al.* v. *U.S. Dep't of State, et al.*, No. 15-50759

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici* disclose that:

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

The Thomas Jefferson Center for the Protection of Free Expression is a nonprofit organization with no parent corporation and no stock.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiffs:
Defense Distributed, Second Amendment Foundation, Inc.

Defendants:
U.S. Dep't of State, John F. Kerry, Directorate of Defense Trade Controls, Kenneth B. Handelman, C. Edward Peartree, Sarah J. Heidema, Glenn Smith

Plaintiffs' Counsel:
Alan Gura, Gura & Possessky, PLLC; Matthew A. Goldstein, Matthew A. Goldstein, PLLC; William B. Mateja, William T. "Tommy" Jacks, David Morris, Fish & Richardson P.C.; Josh Blackman

Defendants' Counsel:

DOSWASHINGTONSUP00794

Loretta Lynch, Michael S. Raab, Daniel Bentele Hahs Tenny, Eric J. Soskin, Stuart J. Robinson, Richard L. Durban, Benjamin C. Mizer, Anthony J. Coppolino, Zachary C. Richter – U.S. Department of Justice

*Amici Curiae*: Reporters Committee for Freedom of the Press; Thomas Jefferson Center for the Protection of Free Expression

Counsel for *Amici*: Bruce D. Brown, Gregg P. Leslie, Hannah Bloch-Wehba – Reporters Committee for Freedom of the Press;  J. Joshua Wheeler – Thomas Jefferson Center for the Protection of Free Expression

> */s/ Bruce D. Brown*
> Bruce D. Brown
> REPORTERS COMMITTEE FOR
> FREEDOM OF THE PRESS
> 1156 15th Street NW, Suite 1250
> Washington, D.C. 20005
> Telephone:   (202) 795-9300
> Facsimile:    (202) 795-9310
> bbrown@rcfp.org

DOSWASHINGTONSUP00795

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ......................................................ii

TABLE OF AUTHORITIES ................................................................................ v

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................................. 1

SUMMARY OF ARGUMENT ........................................................................... 3

INTRODUCTION .............................................................................................. 5

ARGUMENT .................................................................................................... 6

   I.   The AECA and ITAR are content-based regulations of speech. ................... 6

   II.   The AECA and ITAR are unconstitutionally overbroad and vague. ............ 11

      A.   ITAR's sweeping definitions of "technical data" and "export" reach substantial amounts of protected expression and do not adequately describe the conduct proscribed by the regulations. .......................................................... 12

      B.   The broad restraints on "export" of "technical data" appear to apply to significant amounts of protected speech. ......................................................... 17

   III.  The AECA and ITAR provide the DDTC with unlimited, unreviewable discretion to enforce the law ................................................................................ 22

      A.   The definitions of "technical data" and "export" in the ITAR do not provide explicit enforcement standards to the DDTC. ................................... 24

      B.   The absence of judicial review exacerbates the ITAR's overbroad sweep by obscuring the distinction between "permissible" journalism and prohibited speech. ............................................................................................................ 26

CONCLUSION ................................................................................................ 28

CERTIFICATE OF COMPLIANCE .................................................................. 29

CERTIFICATE OF SERVICE ........................................................................... 30

DOSWASHINGTONSUP00796

# TABLE OF AUTHORITIES

C ASES

*Asgeirsson v. Abbott*,
  696 F.3d 454 (5th Cir. 2012) ................................................................. 8
*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ............................................................................. 23
*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ............................................................................. 18
*City of Houston v. Hill*,
  482 U.S. 451 (1987) ........................................................................ 12, 21
*Connally v. General Construction Co.*,
  269 U.S. 385 (1926) ............................................................................. 13
*Consolidated Edison Co. of N. Y. v. Public Serv. Comm'n of N. Y.*,
  447 U. S. 530 (1980) ............................................................................. 9
*Cramp v. Board of Public Instruction*,
  368 U.S. 278 (1961) ............................................................................. 23
*Dombrowski v. Pfister*,
  380 U.S. 479 (1965) ............................................................................. 21
*Erzonznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ............................................................................. 12
*Freedman v. Maryland*,
  380 U.S. 51 (1965) ............................................................................... 10
*Grayned v. City of Rockford*,
  408 U.S. 104 (1972). ....................................................................... 13, 16
*Hynes v. Mayor & Council of Oradell*,
  425 U.S. 610 (1976) ............................................................................. 13
*Kagan v. City of New Orleans, La.*,
  753 F.3d 560 (5th Cir. 2014) ................................................................ 8
*NAACP v. Button*,
  371 U.S. 415 (1963) .................................................................. 12, 17, 27
*National Endowment of the Arts v. Findley*,
  524 U.S. 569 (1998) ............................................................................. 23
*Reed v. Town of Gilbert, Ariz.*,
  135 S.Ct. 2218 (2015) ........................................................................ 3, 10
*Smith v. Daily Mail Pub. Co.*,
  443 U.S. 97 (1979) ........................................................................... 18, 22

DOSWASHINGTONSUP00797

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011) ....................................................................... 8

*Thomas v. Chicago Park Dist.*,
   534 U.S. 316 (2002) ......................................................................... 10

*United States ex rel. McGrath v. Microsemi Corp.*,
   No. CV-13-00854-PHX-DJH, 2015 WL 6121568 (D. Ariz. Sept. 30, 2015) ..... 26

*United States v. Chi Mak*,
   683 F.3d 1126 (9th Cir. 2012) .................................................. 9, 17, 27

*United States v. Hsu*,
   364 F.3d 192 (4th Cir. 2004) ............................................................ 17

*United States v. Huynh*,
   246 F.3d 734 (5th Cir. 2001) ............................................................ 14

*United States v. Roth*,
   628 F.3d 827 (6th Cir. 2011) ............................................................ 26

*United States v. Stevens*,
   559 U.S. 460 (2010) ......................................................................... 12

*United States v. Zhen Zhou Wu*,
   711 F.3d 1 (1st Cir. 2013) ........................................................... 15, 16

*Village of Hoffman Estates et al. v. The Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1989) ................................................................... 14, 23

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008) ......................................................................... 22

*Williams v. Rhodes*,
   393 U.S. 23 (1968) .......................................................................... 27

## STATUTES

Arms Export Control Act ("AECA"), Pub. L. 94-329, tit. II, 90 Stat. 729 (1976),
   22 U.S.C. § 2751 ...................................................................... passim

## OTHER AUTHORITIES

Bryan Schatz, *How US Cluster Bombs Banned by Most Countries Ended Up in
   Yemen*, Mother Jones (Jun. 9, 2015) ................................................... 24

Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*,
   CNET (Mar. 2, 2013). ................................................................ 17, 18

Exec. Order No. 11,958, 42 Fed. Reg. 4311 (Jan. 18, 1977). ................................... 5

Mukesh G. Harisinghani et al., *Noninvasive Detection of Clinically Occult Lymph-
   Node Metastases in Prostate Cancer*, 348 NEW ENG. J. MED. 2491 (2003) ....... 20

Proposed Charging Letter, Analytical Methods, Inc. (Dec. 19, 2008) ................... 10

DOSWASHINGTONSUP00798

R. Scott Kemp, *Is This Where North Korea Makes Its Centrifuges?*
  Arms Control Wonk (June 24, 2013) ................................................................ 18

Richard G. Stevens et al., *Body Iron Stores and the Risk of Cancer*,
  319 NEW ENG. J. MED. 1047 (1988). ............................................................... 20

## REGULATIONS

International Traffic in Arms Regulations, 22 C.F.R. pt. 120 ........................ passim

International Traffic in Arms, 80 Fed. Reg. 31,525 (proposed June 3, 2015) (to be
  codified at 22 C.F.R. pt. 120) .......................................................... 13, 15, 17, 21

United States Munitions List ("USML"), 22 C.F.R. § 121.1 .......................... passim

DOSWASHINGTONSUP00799

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

The Reporters Committee for Freedom of the Press and the Thomas
Jefferson Center for the Protection of Free Expression submit this *amici curiae*
brief in support of Petitioners-Appellants.

The Reporters Committee for Freedom of the Press is an unincorporated
nonprofit association of reporters and editors that works to safeguard the First
Amendment's guarantee of a free and unfettered press, and the public's right to be
informed, through the news media, about the government.  The Reporters
Committee has provided guidance and research in First Amendment and freedom
of information litigation since 1970.

The Thomas Jefferson Center for the Protection of Free Expression is a
nonprofit, nonpartisan organization located in Charlottesville, Virginia.  Founded
in 1990, the Center has as its sole mission the protection of free speech and press.
The Center has pursued that mission in various forms, including the filing of *amici
curiae* briefs in this and other federal courts, and in state courts around the country.

---

[1] Pursuant to Rule 29(c)(5) of the Federal Rules of Appellate Procedure, *amici* state
that no party's counsel authored this brief in whole or in part, and no party, party's
counsel, or any other person, other than the *amici curiae*, their members, or their
counsel, contributed money that was intended to fund preparing or submitting the
brief.  Pursuant to Rule 29(c)(4), all parties have consented to the filing of this
brief.

DOSWASHINGTONSUP00800

This case is of particular importance to *amici* because the district court below erred in holding that the Arms Export Control Act ("AECA"), Pub. L. 94-329, tit. II, 90 Stat. 729 (1976), 22 U.S.C. § 2751 et seq., and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120–130, do not violate the First Amendment.

DOSWASHINGTONSUP00801

## SUMMARY OF ARGUMENT

This case arises out of Plaintiffs' challenge to the constitutionality of the

International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120–130, which

purport to require Plaintiffs to obtain a license before publishing certain

information allegedly related to national defense on the Internet.  The Arms Export

Control Act ("AECA"), Pub. L. 94-329, tit. II, 90 Stat. 729 (1976), 22 U.S.C.

§ 2751 et seq., regulates the trade of "defense articles and defense services."  *Id.*

§ 2778(a)(1).  The Act's implementing regulations, the ITAR, include the United

States Munitions List ("USML"), 22 C.F.R. § 121.1, the list of all defense articles,

services, and related "technical data" whose "export" requires a license.  *See id.*

§ 121.1(b)(2) ("Most U.S. Munitions List categories contain an entry on technical

data . . . .").  The ITAR requires that a person who wishes to export "technical

data" first "obtain the approval of the Directorate of Defense Trade Controls," the

component of the Department of State that administers the regulations.  22 C.F.R.

§ 123.  Violation of the AECA is a criminal offense punishable by a fine up to $1

million, twenty years in prison, or both.  22 U.S.C. § 2778(c).

At issue in this case is the constitutionality of the licensing requirement for

exporting "technical data."  The decision below erroneously "conflates two distinct

but related limitations that the First Amendment places on government regulation

of speech," *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2230 (2015),

DOSWASHINGTONSUP00802

concluding that because the ITAR's ban on unlicensed export of "technical data" is a viewpoint-neutral speech restriction, it is content-neutral as well.  As the Supreme Court explained in *Town of Gilbert*, however, restrictions may be impermissibly content-based despite being viewpoint-neutral.  The decision below failed to account for this possibility and thus failed to impose the appropriate standard of scrutiny in analyzing the restrictions at issue here.

Second, the ITAR's restrictions on the "export" of "technical data" are both overbroad and vague.  The AECA and ITAR are overbroad because they burden significant amounts of speech protected by the First Amendment, including reporting and online journalism.  The ITAR's definitions of the terms "export" and "technical data" reach far beyond the ordinary meaning of those words, and unquestionably tread on lawful speech and publication acts.  The AECA and ITAR also allow the government practically unfettered discretion as to the scope of proscribed activity, and exempt government decision-making from judicial review.  Even on its own terms, the ITAR presents practically unlimited definitions of "technical data" and "export" that are incomprehensible to reasonable citizens.  As a result, the ITAR threatens to punish not only legitimate trade violations but substantial amounts of protected speech as well.

4

DOSWASHINGTONSUP00803

# **INTRODUCTION**

At issue in this case are a broad and sweeping set of regulations that purport to criminalize the dissemination of certain "technical data" without a license. Although the statute and regulations at issue in this case are meant to curb the unauthorized import and export of arms and other defense articles, they also restrict the dissemination of "related technical data" without a license. This restraint is an unlawful content-based speech restriction. *See infra* pp. 4–10.

Even more troubling, however, is the government's assertion of broad and sweeping authority to punish protected speech that happens to include "technical data." The overbroad and vague definitions of "export" and "technical data" appear to cover lawful publication of journalism on important matters of public interest, including reporting on the United States' drone programs, *see infra* p. 17, North Korean nuclear enrichment, *see infra* pp. 18–19, or even medical breakthroughs using iron powder, *see infra* p. 19. Although the Defendants have not sought to apply these regulations to journalists or reporters, the government appears to possess unfettered discretion under the regulations to do so. The absence of judicial review raises further concerns that an already overbroad regulatory regime may be applied to limit First Amendment-protected speech in an unlawful manner. *Amicus* writes to emphasize that the regulations at issue here deter protected speech on important matters of public concern.

DOSWASHINGTONSUP00804

## ARGUMENT

### I. The AECA and ITAR are content-based regulations of speech.

The Arms Export Control Act ("AECA") controls the "import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). Items designated as "defense articles and defense services" comprise the United States Munitions List (the "Munitions List"), a part of the International Traffic in Arms Regulations ("ITAR"), the implementing regulations for the AECA. The President has delegated his authority to designate "defense articles and services" to the State Department. Exec. Order No. 11,958, 42 Fed. Reg. 4311 (Jan. 18, 1977).

The Munitions List is a long list of "articles, services and related technical data," the export of which is proscribed without a license. 22 C.F.R. § 121.1. "Technical data" is information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles," specifically including "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10; *see also id.* at § 121.1(I)(i) (defining as "technical data" any data "directly related to the defense articles described in paragraphs (a) through (h) of this category," including data related to rifle scopes and "cylinders"); *id.* § 121.1(II)(k) (using a similar definition, which in Category II includes data concerning tooling and "diagnostic instrumentation").

6

It is undisputed that "technical data" can amount to protected speech. As a result, the court below was correct in finding that the ITAR "unquestionably regulates speech concerning a specific topic." ROA.691. Nonetheless, the court went on, "The ITAR does not regulate disclosure of technical data based on the *message* it is communicating." ROA.691. As a result, the court concluded that the ITAR is not content based because the regulations are "intended to satisfy a number of foreign policy and national defense goals." ROA.691.

The court's conclusion that a regulation is content neutral so long as it is not based on message has no foundation. "A speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2230 (2015). *Town of Gilbert* recognizes that laws that "single[] out specific subject matter for differential treatment," as ITAR does, are facially content based and subject to strict scrutiny. *Id.*

ITAR creates numerous distinctions on the basis of the content of protected speech. The regulations distinguish "technical" data from data that is presumably "nontechnical," and proscribe the unlicensed publication only of technical data "related" to designated defense articles. 22 C.F.R. § 121.1 ("Most U.S. Munitions List categories contain an entry on technical data . . . and defense services . . . related to the defense articles described in that U.S. Munitions List category."). As

DOSWASHINGTONSUP00806

in *Town of Gilbert*, the regulation at issue here singles out and distinguishes types of speech that are permissible from those that are not.  22 C.F.R. § 120.10 (distinguishing "technical data" from information "commonly taught" in institutions of learning, "information in the public domain," "basic marketing information," or "general system descriptions of defense articles") (*cf. Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663 (2011) (statutory exemption permitting "educational communications" but not marketing was facially content-based)).

ITAR is also fundamentally unlike content neutral regulatory schemes that the Fifth Circuit has previously upheld.  Last year, this Court upheld a provision of the New Orleans Code requiring a license for a person to charge for tours of City points of interest and historic sites, concluding that the licensing requirement "has no effect whatsoever on the content of what tour guides say." *Kagan v. City of New Orleans, La.*, 753 F.3d 560, 562 (5th Cir. 2014) *cert. denied*, 135 S.Ct. 1403 (2015).  In contrast, the regulations at issue here are explicitly designed to affect the content of speech that includes technical data.

Likewise, in 2012, this Court upheld provisions of the Texas Open Meetings Act that criminalized discussion of public matters by a quorum of public officials outside of an open meeting, finding that the statute was content neutral because its "purpose is to control the secondary effects of closed meetings." *Asgeirsson v. Abbott*, 696 F.3d 454, 461 (5th Cir. 2012).  This Court distinguished the Act,

DOSWASHINGTONSUP00807

which "is applicable only to private forums and is designed to *encourage* public

discussion," from content based regulations that discourage protected speech in

public forums. *Id.* (citing *Burson v. Freeman*, 504 U.S. 191 (1992)). In contrast,

the ITAR unquestionably applies to restrict speech on specific topics in public

forums, and operates to deter, not encourage, expression. *See* ROA.689

(acknowledging that the World Wide Web is a public forum). As a result,

although the ITAR is intended to address the export of defense articles and

services, its restrictions on "technical data" unquestionably have a substantial

effect on expression and speech as well.

     Likewise, this Court should reverse the District Court's conclusion that the

ITAR is content neutral because it "does not regulate disclosure of technical data

based on the *message* it is communicating." ROA.691. The District Court's

approach flouts the constitutional rule that "[t]he First Amendment's hostility to

content-based regulation extends not only to restrictions on particular viewpoints,

but also to prohibition of public discussion of an entire topic." *Consolidated

Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U. S. 530, 537 (1980).

Similarly, the Ninth Circuit's conclusion that the ITAR is content neutral because

it "defines the technical data based on its *function* and not its viewpoint"

contravenes the express holding in *Town of Gilbert*. *United States v. Chi Mak*, 683

F.3d 1126, 1135 (9th Cir. 2012). Nor can the regulations be saved by their

9

purported overall purpose: a government's purpose is not relevant to the

interpretation of a facially content-based regulation.  *Town of Gilbert*, 135 S.Ct. at

2228 ("That is why we have repeatedly considered whether a law is content neutral

on its face *before* turning to the law's justification or purpose.").

Finally, because the ITAR is a content-based regulation that requires

licensing, it is a classic prior restraint and requires adequate safeguards under

*Freedman v. Maryland*, 380 U.S. 51 (1965).  Content-based licensing requirements

such as the one at issue here must satisfy demanding requirements:

> (1) any restraint prior to judicial review can be imposed only for a
>
> specified brief period during which the status quo must be maintained;
>
> (2) expeditious judicial review of that decision must be available; and
>
> (3) the censor must bear the burden of going to court to suppress the
>
> speech and must bear the burden of proof once in court."

*Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002) (citing *Freedman*

*v. Maryland*, 380 U.S. at 58–60).

The ITAR cannot satisfy these requirements because it explicitly limits the

availability of judicial review.  Under the AECA and ITAR, the Directorate of

Defense Trade Controls ("DDTC"), a component of the State Department, has

discretion to treat nearly any piece of research as technical data, and these

decisions "shall not be subject to judicial review."  22 U.S.C. § 2778(h).

DOSWASHINGTONSUP00809

This unreviewable use of discretion allows the DDTC to treat many types of research as technical data subject to export controls. For example, the DDTC has brought enforcement actions against companies on the basis that physics modeling software is technical data, since it could possibly be used for weapons development. *See, e.g.*, Proposed Charging Letter, Analytical Methods, Inc. (Dec. 19, 2008), *available at* https://goo.gl/H7YpTs. Further, the DDTC considers technical data to include information about ammunition for any firearm up to and including .50 caliber—thus, ITAR bans the unlicensed dissemination even of information on bullets for a standard home-defense handgun. *See* 22 C.F.R. § 121.1(III)(e). ITAR also bans the publication of "technical data" about face paints, helmets, goggles, and visors. *See id.* § 121.1(X)(e). In short, the USML includes not only seemingly everything that could to any degree be connected with the military, but also any "technical data" about those same things.

## II. The AECA and ITAR are unconstitutionally overbroad and vague.

The AECA and ITAR are overbroad because they levy criminal and civil penalties upon the unlicensed "export" of "technical data" without adequately defining those terms to ensure that legitimate speech goes unpunished.

"The objectionable quality of vagueness and overbreadth does not depend upon the absence of fair notice to a criminally accused or upon unchanneled

DOSWASHINGTONSUP00810

delegation of legislative powers, but upon a danger of tolerating, in the area of

First Amendment freedoms, the existence of a penal statute susceptible of

sweeping and improper application." *NAACP v. Button*, 371 U.S. 415, 432–33

(1963). The AECA and ITAR present precisely this danger.

    A.    ITAR's sweeping definitions of "technical data" and "export"
reach substantial amounts of protected expression and do not
adequately describe the conduct proscribed by the regulations.

The AECA's criminalization of the unlicensed "export" of "technical data"

is unconstitutionally overbroad because the key terms "export" and "technical

data" reach significant amounts of protected speech.

To satisfy an overbreadth challenge, a plaintiff must show that the

challenged statute is not subject to a narrowing construction and has a real and

substantial deterrent effect on legitimate expression. *Erzonznik v. City of

Jacksonville*, 422 U.S. 205, 216 (1975); *see also United States v. Stevens*, 559 U.S.

460, 474 (2010) (stating that the first step of an overbreadth challenge is to

determine the scope of the law at issue). Criminal statutes, such as those at issue

here, "that make unlawful a substantial amount of constitutionally protected

conduct may be held facially invalid even if they also have a legitimate

application." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

A law is unconstitutionally vague if it does not "give the person of ordinary

intelligence a reasonable opportunity to know what is prohibited, so that he may

DOSWASHINGTONSUP00811

act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The

Supreme Court has held that "the general test of vagueness applies with particular

force in review of laws dealing with speech." *Hynes v. Mayor & Council of*

*Oradell*, 425 U.S. 610, 620 (1976). In *Hynes*, the Court reasoned that the

importance of the "free dissemination of ideas" was such that a heightened

standard for clarity was appropriate. *Id.*; *see also Connally v. General*

*Construction Co.*, 269 U.S. 385, 391 (1926) (noting that a statute is vague when

"men of common intelligence must necessarily guess at its meaning and differ as to

its applications").

The State Department, which implements ITAR, has interpreted the term

"export" broadly, to include publication on the Internet: "providing technical data

on a publicly accessible network, such as the Internet, is an export because of its

inherent accessibility to foreign powers." Defs.' Opp. to Pl.'s Mot. for Preliminary

Inj. at 3 n.2, 1:15-cv-00372-RP (June 10, 2015), ECF No. 132. As an initial

matter, it is evident that the term "export" touches on First Amendment freedoms.

DDTC has defined "export" to include "[d]isclosing (including oral or visual

disclosure) or transferring technical data to a foreign person, whether in the United

States or abroad." 22 C.F.R. § 120.17(a)(4). As applied to goods such as defense

articles, it is unambiguous that the word "export" "does not require proof that the

goods actually arrived in the foreign country." *See United States v. Huynh*, 246

DOSWASHINGTONSUP00812

F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country with the intent that they will join the commerce of that country, not when they arrive in that country.").  While the District Court concluded that "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that online publication "would fall within the definition of export," ROA.702, that definition strays considerably from the ordinary meaning of the word.

As a result, there is no question that the State Department has not offered a narrowing construction of "export" that would save the statute.  *See Village of Hoffman Estates et al. v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1989) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.").  Indeed, under proposed regulations, ITAR's definition of "export" would be expanded to expressly include "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)."  International Traffic in Arms, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015) (to be codified at 22 C.F.R. § 120.17(a)(7)).  According to the Department, this proposed definition "makes more explicit the existing control in (a)(4)."  *Id.* at 31,529.  In other words, the State Department already reads "export" expansively, and its proposed rules are intended merely to codify this.

DOSWASHINGTONSUP00813

The definition of "technical data" is similarly overbroad.  The DDTC

controls the export of technical data largely through its maintenance of the USML,

which describes what technology is subject to the AECA.  Though many of the

entries in the USML refer to actual military hardware, the Munitions List

consistently includes technical data "related to" those articles.  *See, e.g.*, 22 C.F.R.

§ 121.1(I)(i), (II)(k).  In addition to specifically enumerating various types of

technical data, the USML also broadly notes that technical data related to broad

categories of "defense articles" considered "significant military equipment"—

including explosives, propellants, and aircraft—are defense items themselves.  *See*

*id.* § 121.1(b).  Further, the USML also includes a catch-all provision allowing the

DDTC to include any article or technical data not otherwise listed which has

"substantial military applicability."  *Id.* § 121.1(XXI).  Still further, the USML is

not even an exhaustive list of export-controlled items but rather a "series of

categories describing the *kinds* of items that qualify as 'defense articles' requiring

export licenses."  *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir. 2013)

*cert. denied sub nom. Yufeng Wei v. United States*, 134 S. Ct. 365 (2013)

(emphasis added).

Indeed, the very terms designed to limit the scope of the ITAR's restraint on

publication of "technical data"—"required for the design, development,

production, manufacture, assembly, operation, repair, testing, maintenance or

15

modification of defense articles"—actually create an expansive definition that "sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments." *City of Rockford*, 408 U.S. at 113, 115 (upholding an antinoise ordinance because it "contains no broad invitation to subjective or discriminatory enforcement"); *see also Cox v. Louisiana*, 379 U.S. 536, 5512 (1965) (striking down a Louisiana criminalizing "breach of the peace". In its proposed rule, the Department of State notes, "'Required' is used in the definition of 'technical data' and has, to this point, been an undefined term in the ITAR." 80 Fed. Reg. at 31,527. The proposed new definition of "required" in the NPRM remains quite vague, and "explicitly includes information for meeting not only controlled performance levels, but also characteristics and functions." *Id.* As DDTC explains in relation to the example of controlled "bomber" aircraft," "The characteristic of the aircraft that is controlled is that it is a bomber, and therefore, any 'technical data' peculiar to making an aircraft a bomber is 'required.'" *Id.* This explanation hardly clarifies or limits the scope of the definition.

Moreover, while the District Court was correct that "at least two circuits have rejected due process challenges to the AECA and ITAR, and upheld criminal convictions for its violation," both of those circuits considered the vagueness of the statute as applied to export of defense articles, not technical data comprising speech. *See Zhen Zhou Wu*, 711 F.3d at 12 (denying vagueness challenge to ITAR

DOSWASHINGTONSUP00815

as applied to defendants convicted of unlicensed export of phase shifters); *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004) (denying vagueness challenge as applied to defendants convicted of conspiracy to violate ITAR by exporting encryption devices); *but see also Chi Mak*, 683 F.3d at 1135–36 (reviewing vagueness claim related to "technical data" provision for plain error).  In contrast, the "technical data" provision clearly implicates First Amendment rights, and courts cannot assume that the government will exercise its prosecutorial discretion with a careful eye toward not violating the First Amendment.  *NAACP v. Button*, 371 U.S. at 438 ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.").

On top of these definitions, ITAR offers exceptions for general scientific principles "commonly taught in schools, colleges, and universities or information in the public domain."  22 C.F.R. § 120.10(b).  The "public domain exception" covers research from accredited universities that is ordinarily published and shared in the field.  *Id.*; *id.* at § 120.11 (defining "public domain").  In proposed amendments to ITAR, the Department of State has recognized that the exception is "unnecessarily limiting in scope and insufficiently flexible with respect to the continually evolving array of media, whether physical or electronic, through which information may be disseminated."  80 Fed. Reg. 31527.

        B.     The broad restraints on "export" of "technical data" appear to apply to significant amounts of protected speech.

DOSWASHINGTONSUP00816

Under the ITAR, posting "technical data" to a domestic website, or

publishing the same information in a domestic publication, becomes an "export"

under the AECA whenever a foreign citizen reads that information. This definition

raises serious First Amendment concerns, as it suggests that publication of facts

lawfully obtained may be a violation of the ITAR. *See Bartnicki v. Vopper*, 532

U.S. 514, 528 (2001) ("[S]tate action to punish the publication of truthful

information seldom can satisfy constitutional standards."), *citing Smith v. Daily

Mail Pub. Co.*, 443 U.S. 97, 102 (1979).

For example, when an online news outlet publishes "technical data" which it

has "lawfully obtained," but which is not in the public domain, the capacious

definition of "export" suggests that publication is a violation of export controls. In

2013 technology reporters at CNET published an article relating to the Predator

drones used by the U.S. Military. Declan McCullagh, *DHS Built Domestic

Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013),

http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-

drones/. Although the Department of Homeland Security had offered a redacted

document listing performance requirements for unmanned surveillance drones in

response to a Freedom of Information Act request, the article included a link to an

"unredacted copy" of that same document that CNET had obtained lawfully. *Id.* If

the unredacted copy included "technical data," CNET's publication would appear

DOSWASHINGTONSUP00817

to constitute an ITAR violation.  At the same time, the technical specifications of the drone were central to the article, which considered whether the DHS was using or developing technology that would enable domestic surveillance.  *Id.*  Likewise, search engines, research databases, library catalogs, and other online resources that include links to "technical data" may "export" that information by making it available to users abroad.

Similarly, in 2013, the Arms Control Wonk blog published a post by R. Scott Kemp, Norman C. Rasmussen Assistant Professor of Nuclear Science and Engineering at the Massachusetts Institute of Technology, republishing photographs of Kim Jong-un's trip to a factory that may be used to manufacture centrifuges.  R. Scott Kemp, *Is This Where North Korea Makes Its Centrifuges?* Arms Control Wonk (June 24, 2013), *available at* www.armscontrolwonk.com/archive/206637/is-this-where-north-korea-makes-its-centrifuges/.  The post included photographs and discussion of flow-forming machines that are "the only way to manufacture the thin-walled P-2 centrifuge rotor on which the North Korean enrichment program is thought to be built."  *Id.* The post describes the flow-forming machine as "part of an assembly-line fabrication process for making thin-walled components" for centrifuges.  *Id.*

The plain text of the ITAR indicates that the information included in Professor Kemp's blog post, although general and speculative, may be "technical

DOSWASHINGTONSUP00818

data."  It is clear that the photographs in the post include information "required"

for the design, operation, or manufacture of a centrifuge, which is "specifically

designed or modified for use in the design, development, or fabrication of nuclear

weapons or nuclear explosive devices."  22 C.F.R. § 120.10 (defining "technical

data" as information "required for the design, development, production,

manufacture, assembly, operation, repair, testing, maintenance or modification of

defense articles," specifically including "blueprints, drawings, photographs, plans,

instructions or documentation"); *id.* § 121.1(XVI) ("Nuclear Weapons, Design and

Testing Related Items").  In this case, photographs of machines required for the

manufacture of centrifuges, although obtained from a publicly available source,

may not be within ITAR's "public domain exception" because they were

republished online from North Korean state media, not available "through sales at

newsstands and bookstores," through subscriptions, or through "second class

mailing privileges."  *Id.* § 120.11.

The State Department's construction of "technical data" discourages the

press from discussing matters of great public importance, even if unrelated to

defense.  For example, iron may be used to detect certain forms of cancer, whether

by utilizing it or by measuring it in the body.  *See, e.g.*, Mukesh G. Harisinghani et

al., *Noninvasive Detection of Clinically Occult Lymph-Node Metastases in*

*Prostate Cancer*, 348 NEW ENG. J. MED. 2491 (2003); Richard G. Stevens et al.,

DOSWASHINGTONSUP00819

*Body Iron Stores and the Risk of Cancer*, 319 NEW ENG. J. MED. 1047 (1988).  At

the same time, the USML includes "[i]ron powder . . . with a particle size of 3

micrometers or less produced by reduction of iron oxide with hydrogen."  22

C.F.R. § 121.1(V)(c)(4)(i)(B).  A journalist covering innovations in healthcare who

wants to report on unpublished research concerning iron powder's utility in cancer

treatment may be unable to do so under the ITAR.  And courts may not assume

that, should the reporter be prosecuted for this violation, her constitutional rights

would be properly vindicated in the course of her defense.  *See Dombrowski v.*

*Pfister*, 380 U.S. 479, 486 (1965) ("When the statutes also have an overbroad

sweep . . . the hazard of loss or substantial impairment of [First Amendment] rights

may be critical. . . .  The assumption that defense of a criminal prosecution will

generally assure ample vindication of constitutional rights is unfounded in such

cases.").

Indeed, the proposed changes to ITAR make clear that "the *further*

dissemination of 'technical data' or software that was made available to the public

without authorization is a violation of the ITAR if, and only if, it is done with

knowledge that the 'technical data' or software was made publicly available

without an authorization."  80 Fed. Reg. at 31,528 (emphasis added).  This

interpretation of ITAR touches on significant amounts of protected expression.

*Hill*, 482 U.S. at 459.  A regulation that criminalizes news coverage of facts that

DOSWASHINGTONSUP00820

are lawfully obtained but that comprise "technical data" runs counter to the First Amendment. *Cf. Daily Mail Pub. Co.*, 443 U.S. at 103 ("[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.").

That the plain language of ITAR's prohibition on unlicensed export of "technical data" would suppress speech like that in Professor Kemp's blog post illustrates the overbreadth problem that inheres in the ITAR. The sweeping definitions of the terms "export" and "technical data" are further amplified when the two are read together, creating a real and substantial deterrent effect on speech. The substantiality of a deterrent effect is judged by the number of unconstitutional applications in relation to the statute's "plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008); *see also United States v. Williams*, 553 U.S. 285, 292 (2008). This deterrence affects not only researchers and members of the defense community, but also the public more broadly, especially the press.

## III.     The AECA and ITAR provide the DDTC with unlimited, unreviewable discretion to enforce the law.

The district court also erred in determining that the ITAR and AECA are not impermissibly vague. Indeed, under this regulatory scheme, no reasonable citizen

DOSWASHINGTONSUP00821

could predict whether a particular piece of information regarding the design, operation, repair, or testing of "defense articles" is "required" for that task, and thus whether it is covered by the AECA and ITAR.

A statute may be vague if it gives too much discretion to the party that enforces it.  In *Cramp v. Board of Public Instruction*, the Supreme Court invalidated a Florida statute that required state employees to swear an oath that they had never supported the Communist Party.  368 U.S. 278, 279 (1961).  The Court explained that the oath was vague partly because it lacked any "terms susceptible of objective measurement." *Id.* at 286.  This deficiency provoked the Court to note that the oath allowed prosecution for "guiltless knowing behavior" at the decision of those "always ready to affix a Communist label upon those whose ideas they violently oppose." *Id.* at 287.  Because the statute could be used to prosecute guiltless behavior at the prosecutor's whim, it was unconstitutionally vague. *Id.*; *see also National Endowment of the Arts v. Findley*, 524 U.S. 569, 588 (1998) (finding that the First Amendment protects people from "arbitrary and discriminatory enforcement of vague standards"); *Baggett v. Bullitt*, 377 U.S. 360 (1964) (invalidating another oath statute on similar grounds).  The vagueness standard applies with particular force to statutes that affect First Amendment rights. *See Village of Hoffman Estates*, 455 U.S. at 498 (1982).

23

The AECA and ITAR are vague under both formulations of the standard.

As discussed above, the statutory terms "technical data" and "export" do not

adequately inform a citizen regarding what conduct they cover.  Because the

DDTC has effectively unlimited discretion in applying these terms to specific

conduct, the AECA and ITAR are unconstitutionally vague.

> A.     The definitions of "technical data" and "export" in the ITAR do
> not provide explicit enforcement standards to the DDTC.

The AECA and ITAR confer unbridled discretion on the DDTC to enforce

them.  Specifically, the DDTC has complete control over the USML.  "The

designation by the President (or by an official to whom the President's functions

under subsection (a) have been duly delegated), in regulations issued under this

section, of items as defense articles or defense services for purposes of this section

*shall not be subject to judicial review*."  22 U.S.C. § 2778(h) (emphasis added).

Nonetheless, the DDTC's unilateral and unreviewable discretion with regard

to the contents of the USML, and thus with regard to the content of the term

"technical data," means the AECA lacks explicit standards to govern the

proscribed conduct.

The AECA and ITAR are also vague with respect to the term "export"

because they give the DDTC unlimited discretion to decide what activities are

covered.  Although the definition of "export" facially covers any disclosure or

transfer of export-controlled information to a foreign person, in the instant case the

DOSWASHINGTONSUP00823

DDTC has interpreted this to include mere publication to the Internet.  If such publication is a fair interpretation of the AECA and ITAR, then almost any Internet posting is subject to government censorship.  Further, because the definition turns on whether the information is received by a "foreign person," even a purely domestic, traditional publication might qualify as an "export" if it is read by a foreign citizen on United States soil.  Given this construction of the term, the DDTC has virtually unlimited discretion to selectively pursue prosecutions under the AECA and ITAR for unlawful "export" of "technical data."

As long as the DDTC may treat any publication that could be read by a foreign citizen as an "export" under the statute, that agency has broad license to quash publications of all sorts.  For example, whether a journalist or other Internet user may post an article to a website discussing the moral, ethical, and legal implications of certain cluster bombs that purport to be 99 percent effective is unclear.  *See, e.g.*, Bryan Schatz, *How US Cluster Bombs Banned by Most Countries Ended Up in Yemen*, Mother Jones (Jun. 9, 2015), http://bit.ly/1QIYwS8 (describing the Textron CBU-105 Sensor Fuzed Weapon).  Under the AECA, the permissibility of publication would turn on whether the article is available to a foreign national.

Nor does the Government's suggestion that a publisher's liability can be limited by taking steps to locate users based on Internet Protocol addresses resolve

DOSWASHINGTONSUP00824

this issue. Defs.' Opp. to Pl.'s Mot. for Preliminary Inj. at 3 n.2, 1:15-cv-00372-

RP (June 10, 2015), ECF No. 132. Even if a journalist manages to ensure that her

publication is not available overseas, access by a foreign national on domestic soil

may still qualify as a violation of the statute. Although the DDTC has generally

not prosecuted such cases, nothing in the AECA or ITAR prevents it from doing

so. *Cf. United States v. Roth*, 628 F.3d 827, 830–32 (6th Cir. 2011) (affirming

professor's conviction of ITAR violations, partly on grounds that he allowed

graduate research assistants who were foreign nationals access to technical data);

*see also United States ex rel. McGrath v. Microsemi Corp.*, No. CV-13-00854-

PHX-DJH, 2015 WL 6121568, at *10–11, *40–43 (D. Ariz. Sept. 30, 2015)

(treating access to ITAR-controlled technical data by foreign employees as a

possible violation of ITAR, though the court ultimately held there was no violation

on the facts of the case). Consequently, journalists writing about technical aspects

of defense issues—or, given the instant case, even gun control—risk receiving a

cease and desist letter or criminal charges at the DDTC's sole discretion.

> B.   The absence of judicial review exacerbates the ITAR's overbroad
>      sweep by obscuring the distinction between "permissible"
>      journalism and prohibited speech.

Taken together, these broad definitions unquestionably reach protected

speech, but the AECA also provides that executive branch decisions to add or

remove an item from the USML "shall not be subject to judicial review." 22

DOSWASHINGTONSUP00825

U.S.C. § 2778(h).  The Ninth Circuit has held that this portion of the statute

provides the DDTC with the ability to decide whether documents are "technical

data" subject to export controls.  *United States v. Chi Mak*, 683 F.3d 1126, 1132

(9th Cir. 2012) (holding that the AECA "expressly prohibits judicial review" of

such decisions).

Partly as a result of the absence of judicial review, it is difficult to establish

bright lines between prohibited disclosures of "technical data," on the one hand,

and permissible journalistic coverage of scientific and technological issues, on the

other.  *See Button*, 371 U.S. at 438 (highlighting the importance of clarity in laws

affecting the First Amendment).  The absence of judicial review only exacerbates

the First Amendment problems, because the question of whether an online

publication constitutes protected speech or "technical data" is not one that may be

left to the executive branch to decide.  Infringements of First Amendment rights

are quintessentially judicial questions.  *See Williams v. Rhodes*, 393 U.S. 23, 40

(1968) (Douglas, J., concurring) ("First Amendment rights . . . have a well-

established claim to inclusion in justiciable, as distinguished from 'political,'

questions . . . .").  The statute's provision regarding the unreviewable authority to

designate "defense articles" therefore should not extend to the definition of

"technical data," which includes a significant amount of protected speech.

DOSWASHINGTONSUP00826

This confluence of the DDTC's unilateral and unreviewable discretion to establish sweeping export prohibitions, on one hand, and overly narrow exceptions to the AECA, on the other, means that the DDTC has an effective veto over online publication of any information it considers to be in some way defense related. This complete control and wide discretion present a real, substantial deterrent to those seeking to discuss or report on matters of technology.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this Court to reverse.

 */s/ Bruce D. Brown*
Bruce D. Brown
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1250
Washington, D.C. 20005

28

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-face and volume limitations set forth in Fed. R. of App. P. 32(a)(7)(B) as follows: The type face is fourteen-point Times New Roman font, and the word count is 6,147, excluding the portions of the brief exempted by Rule 32(a)(7)(B)(iii).

  */s/ Bruce D. Brown*
Bruce D. Brown
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1250
Washington, D.C. 20005

DOSWASHINGTONSUP00828

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2015, an electronic copy of the

foregoing brief was filed with the Clerk of Court for the United States Court of

Appeals for the Fifth Circuit using the Court's CM/ECF system and was served

electronically by the Notice of Docket Activity upon all parties in the case. I

certify that all participants in the case are CM/ECF users and that service will be

accomplished by the appellate CM/ECF system.

_/s/ Bruce D. Brown_
Bruce D. Brown
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1250
Washington, D.C. 20005

DOSWASHINGTONSUP00829

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

December 18, 2015

Mr. Bruce D. Brown
Reporters Committee for Freedom of the Press
1156 15th Street, N.W.
Suite 1250
Washington, DC 20005

     No. 15-50759   Defense Distributed, et al v. U.S. Dept. of
                     State, et al
     USDC No. 1:15-CV-372

Dear Mr. Brown,

The following pertains to your Amicus brief electronically filed
on December 17, 2015.

We filed your brief.  However, you must make the following
corrections within the next 14 days.

You need to correct or add:

Caption on the brief does not agree with the caption of the case
in compliance with FED R. APP. P. 32(a)(2)(C).  (See attachment)

Record References:  Every assertion in briefs regarding matter in
the record must be supported by a reference to the page number of
the original record, whether in paper or electronic form, where
the matter is found, using the record citation form as directed by
the Clerk of Court.  The use of "id" to cite to the record is
prohibited.  (See 5TH CIR. R. 28.2.2)

Once you have prepared your sufficient brief, you must email it
to: Shawn_Henderson@ca5.uscourts.gov for review.  If the brief is
in compliance, you will receive a notice of docket activity
advising you that the sufficient brief has been filed.

DOSWASHINGTONSUP00830

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Shawn D. Henderson, Deputy Clerk
504-310-7668

cc:
    Mr. Joshua Michael Blackman
    Mr. Matthew Goldstein
    Mr. Alan Gura
    Mr. William Bryan Mateja
    Mr. Michael S. Raab
    Mr. Eric J. Soskin
    Mr. Daniel Bentele Hahs Tenny

Caption on brief must exactly match our caption below:

---

**15-50759**

**DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,**

      **Plaintiffs - Appellants**

**v.**

**UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,**

      **Defendants - Appellees**

---

No. 15-50759

# In the
# United States Court of Appeals
# for the Fifth Circuit

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

PLAINTIFFS – APPELLANTS,

V.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

DEFENDANTS – APPELLEES.

On Appeal from the United States District Court
for the Western District of Texas

## Brief of the Cato Institute
## as *Amicus Curiae* in Support of Plaintiffs-Appellants

Ilya Shapiro
   *Counsel of Record*
Randal J. Meyer (admission pending)
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
(202) 842-0200
ishapiro@cato.org
rmeyer@cato.org

DOSWASHINGTONSUP00832

## Supplemental Certificate of Interested Persons

Case 15-50759, *Defense Distributed, et al., v. U.S. Dep't of State et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| Ilya Shapiro | Counsel to *amicus* |
| Randal J. Meyer | Counsel to *amicus* |
| Cato Institute | *Amicus curiae* |

*Amicus curiae* Cato Institute is a Kansas nonprofit corporation. It has no parent companies, subsidiaries, or affiliates. It does not issue shares to the public.

/s/ Ilya Shapiro

DOSWASHINGTONSUP00833

# Table of Contents

**Page**

Supplemental Certificate of Interested Persons ..................................... 1

Table of Contents ................................................................................. 2

Table of Authorities ............................................................................. 3

Interest and Independence of *Amicus Curiae* ....................................... 7

Summary of Argument .......................................................................... 8

Argument ............................................................................................. 9

  I.   Defense Distributed's Speech Does Not Lose First Amendment Protection Simply Because It Could Be Used Unlawfully ........... 9

     A. Defense Distributed's Files Constitute Protected Speech ........ 9

     B. Protected Speech Does Not Lose First Amendment Protection Simply Because It Could Be Used to Unlawful Ends ...... 12

  II.  The State Department's Categorical Ban on Distributing the CAD Files Via the Internet Is an Unlawful Prior Restraint on the Mass Dissemination of Protected Speech ............................. 24

     A. The Internet Is an Essential Method of Mass Dissemination, So a Prior Restraint on Its Use Is Suspect ................... 24

     B. Prior Restraint of the Mass Dissemination of Protected Speech Cannot Even Pass Rational Basis Review ............... 26

Conclusion ......................................................................................... 31

Certificate of Compliance .................................................................... 32

Certificate of Filing and Service .......................................................... 32

DOSWASHINGTONSUP00834

# Table of Authorities

## Cases

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002)....................................................................*passim*

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)................................................................22, 23, 30

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) (per curiam) ...................................9, 15, 18, 19, 23

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)...................................................................15, 26, 29

*Brown v. Entm't Merchants Ass'n*,
131 S. Ct. 2729 (2011)...........................................................................10

*Butler v. Michigan*,
352 U.S. 380 (1957)...................................................................*passim*

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942)...............................................................................23

*Cohen v. California*,
403 U.S. 15 (1971).................................................................................17

*Defense Distributed v. U.S. Dep't of State*, No. 1:15-CV-372 RP,
2015 WL 4658921 (W.D. Tex. Aug. 4, 2015) ...................................10, 26

*Hess v. Indiana*,
414 U.S. 105 (1973) (per curiam) .........................................................15

*Junger v. Daley*,
209 F.3d 481 (6th Cir. 2000)............................................................10, 12

3

*Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*,
360 U.S. 684 (1959) ................................................................ 30

*Miller v. California*,
413 U.S. 15 (1973) ................................................................. 23

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ......................................................... 20, 27

*New York Times Co. v. Unites States*,
376 U.S. 254 (1964) ............................................................... 19

*New York Times Co. v. Unites States*,
403 U.S. 713 (1971) (per curiam) .................................. 18, 19, 27-28, 30

*People v. Winters*,
294 N.Y. 545 (1945) ............................................................... 17

*Sable Communications of California, Inc. v. FCC*,
492 U.S. 115 (1989) ......................................................... 21, 22, 28

*Scales v. United States*,
367 U.S. 203 (1961) ............................................................... 21

*Schneider v. State*,
308 U.S. 147 (1939) ...................................................... 16, 25, 27, 30

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001) .................................................... 10

*Winters v. New York*,
333 U.S. 507 (1948) ............................................................... 17

## Statutes

18 U.S.C. § 2256(B), (D) (2000) ......................................... 14-15

DOSWASHINGTONSUP00836

22 U.S.C. §§ 2771-82 (2015) .................................................................. 8

22 U.S.C. § 2778(a)-(e) (2014) ............................................................. 30

Michigan Penal Code § 343 (1955)........................................................ 18

N.Y Penal Law § 1141(2) (McKinney's 1947) ........................................ 17

## Other Authorities

22 C.F.R. 120.1(a) (2015)...................................................................... 8

49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984) ......................................... 9

55 Cong. Rec. 2009 (1917) (remarks of Sen. Henry F. Ashurst) ........... 20

Aaron Mamiit, *3.2 Billion: Number Of People Using The Internet
   Today*, Tech Times (May 28 2015),
   http://www.techtimes.com/articles/55773/20150528/3-2-billion-
   number-of-people-using-the-internet-today.htm ................................. 24

Andy Greenberg, *3D-Printed Guns As Art: London Design Museum
   Buys Two 'Liberator' Printed Pistols*, Forbes (Sept. 15, 2013),
   http://www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-
   guns-as-art-london-design-museum-buys-two-liberator-printed-
   pistols .......................................................................................... 12, 22

Defendant's Opposition to Plaintiff's Motion For a Preliminary
   Injunction, Defense Distributed v. U.S. Dep't of State, No. 1:15-CV-
   372 RP, 2015 WL 4658921 (W.D. Tex. Aug. 4, 2015)........................... 13

D.J. Pangburn, *3D-Printed 'Liberator' Guns Become a Chandelier
   Sculpture*, The Creators Project (Aug. 6, 2015),
   http://thecreatorsproject.vice.com/blog/3d-printed-liberator-guns-
   become-a-chandelier-sculpture............................................................. 11

DOSWASHINGTONSUP00837

Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1096
(2005) ............................................................................. 13-14

*How Americans Get Their News*, American Press Inst., (Mar. 17,
2014), http://www.americanpressinstitute.org/publications/reports/
survey-research/how-americans-get-news ........................................... 25

*Internet 2012 in Numbers*, Pingdom.com (January 16, 2013),
http://royal.pingdom.com/2013/01/16/internet-2012-in-numbers ........ 24

*Internet Users*, Internet Live Statistics (last updated July 1, 2014),
http://www.internetlivestats.com/internet-users ................................. 24

Natasha Lennard. *The Pirate Bay Steps in to Distribute 3-D Gun
Designs*, Salon (May 10, 2013), http://www.salon.com/2013/05/10/
the_pirate_bay_steps_in_to_distribute_3d_gun_designs ................... 31

Scott J. Grunewald, *American Gun Show Uses Art and 3D Printing
to Start a Conversation about Guns*, 3D Print.com (Nov. 11, 2015),
http://3dprint.com/104975/american-gun-show-art ............................. 11

St. George Tucker, 2 Blackstone's Commentaries on the Laws of
England with Notes of Reference, to the Constitution and Laws, of
the Federal Government of the United States, and the
Commonwealth of Virginia (1803) ...................................................... 28

DOSWASHINGTONSUP00838

## Interest and Independence of *Amicus Curiae*

The Cato Institute is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to help restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and publishes the annual *Cato Supreme Court Review*.

This case concerns *amicus* because protecting the fundamental rights to freedom of expression and armed self-defense lies at the heart of Cato's mission. It is not for the State Department to abrogate lawful First Amendment speech as a vehicle for suppressing the disfavored exercise of Second Amendment rights.

No one other than the *amicus* and its counsel wrote this brief in whole or in part. The cost of its preparation was paid solely by *amicus*.

The parties have consented to the filing of this brief.

DOSWASHINGTONSUP00839

## SUMMARY OF ARGUMENT

Defense Distributed, a nonprofit organization that promotes popular access to constitutionally protected firearms, generates and disseminates information over the Internet for a variety of scientific, artistic, and political reasons. The State Department has required Defense Distributed to submit to a regulatory prior restraint on Internet distribution of certain CAD (Computer-Aided Drafting) files—complex three-dimensional printing files with no intellectual-property protection—even domestically, under the Arms Export Control Act (AECA) and International Trafficking in Arms Regulations (ITAR). *See generally* 22 U.S.C. §§ 2771-82 (2015); 22 C.F.R. 120.1(a) (2015).

But Defense Distributed's protected speech cannot be suppressed merely because the lawful CAD files may potentially be used for unlawful purposes by foreign third parties. Such a prior restraint cannot even pass rational basis review. This court should reverse the district court and grant a preliminary injunction.

DOSWASHINGTONSUP00840

## ARGUMENT

## I. DEFENSE DISTRIBUTED'S SPEECH DOES NOT LOSE FIRST AMENDMENT PROTECTION SIMPLY BECAUSE IT COULD BE USED UNLAWFULLY

The government concedes that Defense Distributed's files are protected speech under ITAR. *See* 49 *Fed. Reg.* 47,682, 47,683 (Dec. 6, 1984) (addressing congressional "[c]concerns" over "[ITAR] licensing requirements as they relate[] to the First Amendment," and noting that there is no "prepublication review requirement" under AECA or ITAR for technical information distributed domestically). Because foreign persons may *potentially* download the files and use them for *potentially* illegal ends, however, the State Department imposed a prior restraint against Defense Distributed's sharing of certain files with Americans. But the Supreme Court has made clear that speech does not lose First Amendment protection merely because it might be used to further criminal ends. *See generally, e.g.*, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002); *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

### A. Defense Distributed's Files Constitute Protected Speech

Defense Distributed is not in the business of distributing arms. What it distributes—as recognized by the court below—is computer code and other expressive files. Such code and files are speech for First

9

DOSWASHINGTONSUP00841

Amendment purposes. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 447 (2d Cir. 2001); *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000). The Supreme Court has also held that the First Amendment protects the expression rendered by videogame computer code. *See Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) ("Like the protected books, plays, and movies that preceded them, video game [code] communicate[s] ideas—and even social messages . . . through features distinctive to the medium . . . . That suffices to confer First Amendment protection."). When information is distributed in an open-source format, as Defense Distributed's is, it is a public work that users are encouraged to improve and modify. *Defense Distributed v. U.S. Dep't of State*, No. 1:15-CV-372 RP, 2015 WL 4658921, at *6 (W.D. Tex. Aug. 4, 2015) ("[T]he files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized.").

Taken as a whole, the files distributed by Defense Distributed have lead to significant political, scientific, and artistic expression, including driving the novel field of 3D-printed art. Computer code, including in the form of CAD files, is simply a medium through which expres-

DOSWASHINGTONSUP00842

sion occurs—and open-source code provides an open canvas for artists and technicians to improve upon.

Artists have even exhibited 3D-printed modifications of Defense Distributed's "Liberator" model, "attempting to start a conversation about the United States' obsession with guns, not by focusing on one side of the issue, but by bringing artists from both sides together and exposing the entirety of the complexity of the issue." Scott J. Grunewald, *American Gun Show Uses Art and 3D Printing to Start a Conversation about Guns*, 3D Print.com (Nov. 11, 2015), http://3dprint.com/104975/american-gun-show-art. At another show, one artist, Addie Wagenknecht, took 13 3D-printed Liberator models and "assemble[d] them into a striking sculpture [a chandelier] that is equal parts futuristic, menacing, and comically absurd." D.J. Pangburn, *3D-Printed 'Liberator' Guns Become a Chandelier Sculpture,* The Creators Project (Aug. 6, 2015), http://thecreatorsproject.vice.com/blog/3d-printed-liberator-guns-become-a-chandelier-sculpture.[1]

---

[1] In fact, Wagenknecht "didn't have a 3D printer so I had a friend print them for me in Germany" from a "torrent" of the CAD file (a special "mirrored" type of file that contains metadata but not content). *Id*. If the State Department's argument is correct, she thus unwittingly became an international arms trafficker.

DOSWASHINGTONSUP00843

Indeed, London's Victoria & Albert Museum of Art and Design purchased two Liberator pistols from Defense Distributed for a design festival. Andy Greenberg, *3D-Printed Guns As Art: London Design Museum Buys Two 'Liberator' Printed Pistols*, Forbes (Sept. 15, 2013), http://www.forbes.com/sites/andygreenberg/2013/09/15/3d-printed-guns-as-art-london-design-museum-buys-two-liberator-printed-pistols.   Cody Wilson, Defense Distributed's founder, told a reporter "that he's happy to see his 3D-printed gun recognized by the museum as the incendiary political symbol he's always intended it to be." *Id.*

As courts have properly recognized, computer code "has both an expressive feature and a functional feature." *Junger*, 209 F.3d at 485. Open-source CAD files, like the Liberator's, are a unique medium of expression and are integral to the development of the burgeoning field of 3D-design art, as well as 3D technical design itself. Accordingly, the open-source CAD files are protected speech.

## B. Protected Speech Does Not Lose First Amended Protection Simply Because It Could Be Used to Unlawful Ends

The government defends its prior restraint of domestic public speech on the Internet with the vague-at-best claim that Defense Distributed's files *could* produce weapons that *could* be used to commit

DOSWASHINGTONSUP00844

crimes *outside* the United States. Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction 10, *Defense Distributed*, 2015 WL 4658921 ("The unrestricted provision of such undetectable firearms by U.S. persons to individuals in other countries . . . presents a serious risk of acts of violence in those countries . . . [such as] an assassination, for the manufacture of spare parts by embargoed nations, terrorist groups, or guerilla groups, or to compromise aviation security . . . ."). Just because lawful computer code can be used in a potentially unlawful manner by foreign persons does not constitutionally permit the executive to impose a prior restraint on Americans' expression. *See, e.g.*, *Free Speech Coalition*, 535 U.S. at 245 ("The prospect of crime, however, by itself does not justify laws suppressing protected speech."); *see also* the slew of Supreme Court precedents discussed *infra* in this section.

"[R]estrictions on [lawful] . . . speech [that could potentially be used unlawfully] can't be easily justified under existing First Amendment doctrine." Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1096, 1105 (2005). Consider that "[a] textbook, magazine, Web site, or seminar describ[ing] how people can make bombs (conventional or nuclear), make guns, make drugs . . . painlessly and reliably commit su-

DOSWASHINGTONSUP00845

icide . . . pick locks . . . or more effectively resist arrest during civil diso-

bedience" has academic and scientific speech value, but could potential-

ly be used for unlawful conduct. *See id.* at 1097, 1111-14. Indeed,

> Books about explosives can teach students principles of
> chemistry, and can help engineers use explosives for lauda-
> ble purposes. Books that explain how to investigate arson,
> homicide, or poisoning can help detectives and would-be de-
> tectives, though they can also help criminals learn how to
> avoid detection.

*Id.* at 1112. And "[s]cientific research," like the computer science and

3D engineering research developed in modifying and examining open

source code for computer CAD files, "is generally thought to advance

more quickly when scientists and engineers are free to broadly discuss

their work." *Id.* To enact a prior restraint on all of these because of po-

tential and non-specific unlawful uses by foreign individuals is

"[s]urely . . . to burn the house to roast a pig." *Butler v. Michigan*, 352

U.S. 380, 383 (1957). Numerous Supreme Court cases have agreed, in-

cluding several *per curiam* opinions.

In *Free Speech Coalition*, for example, the Court struck down a

prior restraint on pornography that "appears to be" or "conveys the im-

pression" that the actors in the work are minors, whether or not those

actors were in fact consenting adults. 535 U.S. at 258; 18 U.S.C.

DOSWASHINGTONSUP00846

§ 2256(B), (D) (2000).   The government justified its prior restraint on the "ground that it may encourage pedophiles to engage in illegal conduct." *Free Speech Coalition*, 535 U.S. at 254. The Court struck down the ban in light of the fact that "[t]he harm does not necessarily follow from the speech, but depends on some unquantified potential for subsequent criminal acts," and that "the government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite time in the future.'" *Id.* at 250, 253 (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam) and citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam)).

As the *Free Speech Coalition* Court declared: "the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it," and that "[p]rotected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Id.* at 253, 255 (quoting and citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Similarly, Defense Distributed's speech is significantly attenuated from the potential harm and, accordingly, the government may not prohibit it.

15

DOSWASHINGTONSUP00847

The principle employed in *Free Speech Coalition* comes from a long line of Supreme Court precedent, dating back to the 1930s. In 1939, the Court addressed the question of municipal prior restraints on the distribution of handbills in public areas. Four municipalities argued that handbills could thus be restrained because of their potential to contribute to littering. *Schneider v. State*, 308 U.S. 147, 162 (1939) ("The motive of the legislation under attack . . . is held by the courts below to be the prevention of littering of the streets and, although the alleged offenders were not charged with themselves scattering paper in the streets, their convictions were sustained upon the theory that distribution by them encouraged or resulted in such littering."). The Court held that "the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it." *Id.* at 163. In other words, the Court stopped on First Amendment grounds the restriction of an essential method of mass dissemination of speech whose sole justification had been to prevent unlawful behavior.

In 1948, the Court faced an overbreadth challenge to New York's anti-crime literature law, a prior restraint that made it a misdemeanor

DOSWASHINGTONSUP00848

to publish media "'principally made up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime.'" *Winters v. New York*, 333 U.S. 507, 508 (1948) (quoting N.Y. Penal Law § 1141(2) (McKinney's 1947)). New York argued that crime literature could become "'vehicles for inciting violent and depraved crime'" at some future time among some indefinite individuals. *Id.* at 513 (quoting *People v. Winters*, 294 N.Y. 545, 550 (1945)).

The Court made short work of New York's argument, noting that "[w]hat is one man's amusement, teaches another doctrine . . . [the works at issue] are as much entitled to the protection of free speech as the best of literature." *Id.* at 510; *see also Cohen v. California*, 403 U.S. 15, 25 (1971) ("[I]t is nevertheless often true that one man's vulgarity is another's lyric."). The Court continued: "On its face, the subsection here involved violates the rule . . . that statutes which include prohibitions of acts fairly within the protection of a free press are void. It covers detective stories, treatises on crime, reports of battle carnage, et cetera." *Id.* at 512. Even an authoritative limiting construction by the New York Court of Appeals was not sufficient to save the statute from the overbreadth challenge. *Id.* at 514-516, 518-20.

17

In 1957, Justice Frankfurter wrote for the Court to strike down a Michigan ban on disseminating literature that could have a "potentially deleterious influence upon youth," such as "'tending to incite minors to violent or depraved or immoral acts.'" *Butler*, 352 U.S. at 381, 383 (quoting Michigan Penal Code § 343 (1955)). The legislation in that case was "not reasonably restricted to the evil with which it is said to deal." *Id.* at 383. It "arbitrarily curtails" the freedom of speech, something that "history has attested as the indispensable condition for the maintenance and progress of a free society." *Id.* at 384. Again the Court made clear that the mere potential for lawful speech to facilitate unlawful acts was an insufficient justification by itself for a prior restraint.

Two of the most important precedents in this line of cases followed: *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), and *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam). *Brandenburg* provides a baseline for judging statutes that prohibit protected speech because of the chance it could encourage crime. In that case, a Klansman was charged with violating Ohio's Criminal Syndicalism Statute for a political speech encouraging an armed march on Congress. *Brandenburg*, 395 U.S. at 444-47. The Court held that, unless

DOSWASHINGTONSUP00850

such encouragement is "inciting or producing imminent lawless action and is likely to incite or produce such action," it is protected by the First Amendment. *Id.* at 447.

In *New York Times*, the Court held that a prior restraint injunction was not justified on the printing of the then-classified Pentagon Papers by the *Times* and the *Washington Post*. *New York Times*, 403 U.S. at 714. Individual justices had much more to say about suppressing lawful speech to stop potential and non-specific unlawful uses. Justice Black, joined by Justice Douglas, wrote a concurrence to note that public discourse should be "uninhibited, robust, and wide-open." *Id.* at 724 (Black, J., concurring) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964)). Moreover, "[t]he word 'security' is a broad, vague generality" that cannot simply be used as a talismanic incantation to permit a prior restraint on speech. *Id.* at 719.

Justice Brennan noted that the "First Amendment tolerates absolutely no prior judicial restraints . . . predicated upon surmise or conjecture that untoward consequences may result." *Id.* at 725-26 (Brennan, J., concurring). Justice Stewart, joined by Justice White, evoked the *Brandenburg* majority when he noted that because he "cannot say that

19

disclosure of any of them will surely result in direct, immediate, and irreparable damage," the First Amendment protects the distribution of the then-classified information. *Id.* at 730 (Stewart, J., concurring). Justice White, joined in turn by Justice Stewart, contrasted the blanket prior restraint in the case with the criminal sanctions imposed by statutes that relate to imminently harmful information like "movements of the fleet, the troops, the aircraft, the location of powder factories, the location of defense works, and all that sort of thing." *Id.* at 734-35 (White, J., concurring) (quoting 55 Cong. Rec. 2009 (1917) (remarks of Sen. Henry F. Ashurst)). Accordingly, Justice White found that the prior restraint in that case could not pass constitutional muster because it was not sufficiently narrow to touch on those circumstances of actual imminent harm and there were sufficient criminal statutes to deter bad conduct. *See id.* at 735-40.

A decade later, the Court held that, despite the fact there were individual acts of violence involved in the political speech of the sevenyear boycott of white-owned businesses in Claiborne County, Mississippi, the boycott's overall speech was protected by the First Amendment. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982). While the

DOSWASHINGTONSUP00852

lawful speech tangentially encouraged unlawful acts by virtue of the tension created by the boycott itself, the speech was nevertheless protected. *Id.* at 933 ("The use of speeches, marches, and threats of social ostracism cannot provide the basis for a damages award. But violent conduct is beyond the pale of constitutional protection.") The Court took into account that "'blanket prohibition of association with a group having both legal and illegal aims' would present 'a real danger that legitimate political expression or association would be impaired.'" *Id.* at 919 (quoting *Scales v. United States*, 367 U.S. 203, 229 (1961)).

In 1989, the Court again protected lawful speech from indefinite and vague claims that it could be used for unlawful purposes. *Sable Communications of Calif., Inc. v. FCC*, 492 U.S. 115 (1989). In *Sable Communications*, a federal ban on obscene telephone communications via interstate commerce criminalized all commercial phone-sex lines. *Id.* at 123 (quoting 47 U.S.C § 223(b) (1988)). The reason for the blanket prior restraint was to "restrict access to minors" to phone-sex services. *Id.* at 122-23. In striking down the ban, the Court expressly relied on *Butler. See, e.g., id.* at 131 (quoting *Butler*, 352 U.S. at 383).

DOSWASHINGTONSUP00853

Similar to the restraint struck down in *Claiborne Hardware*, the Liberator files should not be subject to blanket prohibition of Internet dissemination, lest legitimate expression be chilled. *See* Greenberg, *3-D Printed Guns as Art*; *supra* Part I.A (noting artistic, scientific, and political uses of the computer-code speech). And similar to the restrictions in *Butler* and *Sable Communications*, the prior restraint on Americans' viewing Defense Distributed's files online impermissibly limits U.S. audiences to speech suitable for foreign audiences. *Cf. Sable*, 492 U.S. at 127 ("The Court found the law to be insufficiently tailored since it denied adults their free speech rights by allowing them to read only what was acceptable for children.") (quoting *Butler*, 352 U.S. at 380)); *Butler*, 352 U.S. at 383-84 ("The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual . . .").

The Court has even more recently reaffirmed the basic principle that lawful speech cannot be suppressed in order to prevent potential unlawful uses. In *Bartnicki v. Vopper*, the Court was "firmly convinced" that "a stranger's illegal conduct does not suffice to remove the First Amendment protection shield from speech." 532 U.S. 514, 518, 535

DOSWASHINGTONSUP00854

(2001); *see also id.* at 529-30 ("[I]t would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party."). *Bartnicki* asked whether the First Amendment protected a radio station from suit when it broadcasted the results of illegally intercepted communications. *Id.* at 519-20. The government's interest in allowing the private action against the publisher rested in discouraging illegal conduct such as eavesdropping. *See id.* at 521-24. Yet again, the interest in discouraging potential illegal conduct was not sufficient to warrant restricting protected First Amendment expression. Such an interest is likewise insufficient to restrain the distribution of open-source files.

In sum, while the government certainly has the power to constraint certain categories of speech, like obscenity and the urging of imminent violence, those categories are specific and narrowly drawn. *See generally Miller v. California*, 413 U.S. 15 (1973) (obscenity); *Brandenburg*, 395 U.S. at 444 (instigating violence); *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) (fighting words). Here the government has presented no evidence to demonstrate the instigation of imminent violence or invoke any other categorical prohibition.

DOSWASHINGTONSUP00855

## II.  THE STATE DEPARTMENT'S CATEGORICAL BAN ON DISTRIBUTING THE CAD FILES VIA THE INTERNET IS AN UNLAWFUL PRIOR RESTRAINT ON THE MASS DISSEMINATION OF PROTECTED SPEECH

The Internet is an essential method of mass dissemination beyond the scale of newspapers and television. A prior restraint on lawful speech uploaded online cannot even pass rational basis review when the harm of potential unlawful action is attenuated and non-specific.

### A. The Internet Is an Essential Method of Mass Speech Dissemination, So a Prior Restraint on Its Use Is Suspect

It has quickly become axiomatic that a prior restraint on Internet communications cuts off an incomparably important avenue for American expression. Consider the following data points, all of which have become quickly dated:

- The total number of Internet users worldwide has reached over 3.2 billion. Aaron Mamiit, *3.2 Billion: Number of People Using the Internet Today*, Tech Times (May 28, 2015), http://www.techtimes.com/articles/55773/20150528/3-2-billion-number-of-people-using-the-internet-today.htm.

- Of the total American population, 86.75 percent have Internet access, about 280 million users. *Internet Users*, Internet Live Statistics (last updated July 1, 2014), http://www.internetlivestats.com/internet-users.

- In 2012, there were 634 million websites, with 50 million new sites added per month. *Internet 2012 in Numbers*, Pingdom.com (January 16, 2013), http://royal.pingdom.com/2013/01/16/internet-2012-in-numbers.

24

- The U.S. hosted 43 percent of the top million websites that year. *Id.*

- Sixty-nine percent of Americans get news from the Internet. *How Americans Get Their News*, American Press Inst. (Mar. 17, 2014), www.americanpressinstitute.org/publications/ reports/survey-research/how-americans-get-news.

Suffice it to say, the Internet is a revolutionary means of mass communications, so speech restrictions must be drawn with surgical precision.

In striking down municipal ordinances prohibiting the distribution of handbills in *Schneider*, for example, the Supreme Court was not persuaded that laws should be upheld "because their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places." *Schneider*, 308 U.S. at 163. "[T]he streets," wrote the Court, "are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Id.* Meanwhile, pamphlets deserve special solicitude because they are "effective instruments in the dissemination of opinion." *Id.* at 164.

In the rare cases where the Court has upheld prior restraints, these restrictions were narrowly tailored rather than applied to broad

DOSWASHINGTONSUP00857

channels of speech dissemination. In *Broadrick v. Oklahoma*, for example, the Court sustained an Oklahoma law that "restricts the political activities of the State's classified civil servants in much the same manner that the Hatch Act proscribes partisan political activities of federal employees." 413 U.S. 601, 602 (1973). The statute focused on electioneering activities and not the "right as a citizen privately to express his opinion and to cast his vote," so the Court upheld the restriction because it "seeks to regulate political activity in an even-handed and neutral manner." *Id.* at 606, 616.

In other words, a blanket prior restraint on an important channel of mass dissemination like the Internet is highly suspect.

## B. Prior Restraint of the Mass Dissemination of Protected Speech Cannot Even Pass Rational Basis Review

Applying intermediate scrutiny, the court below found that Defense Distributed has "not shown a substantial likelihood of success on the merits of their claim under the First Amendment." *Defense Distributed*, 2015 WL 4658921, at *10. Even though "the AECA and ITAR do not prohibit domestic communications," under the ITAR, the dissemination of the open source CAD files is an "export" of technical arms information according to the government, and thus subject to prepublication

26

commodity jurisdiction review and prior restraint without agency approval. *See id.* Even if the government were correct in its view on what constitutes an "export," however, such a prior restraint on protected speech cannot even pass rational basis review.

As discussed more fully *supra* at I.B, the Supreme Court has overturned prior restraints similar to the one in this case. In *Schneider*, the Supreme Court disagreed with the court below that a prohibition on distributing handbills in public fora "does not transgress the bounds of reasonableness." 308 U.S. at 155. In *Butler*, the Court found that a prior restraint on adult-appropriate obscene literature in order to avoid potential unlawful use by minors was "[s]urely . . . to burn the house to roast the pig." 352 U.S. at 381-83.

A blanket prior restraint that sweeps in the online dissemination of protected public domestic speech lacks the "precision of regulation" sufficient to pass even rational basis review. *See Claiborne Hardware*, 458 U.S. at 916 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)); *Butler*, 352 U.S. at 381-83; *Schneider,* 308 U.S. at 155; *see also Free Speech Coalition*, 535 U.S. at 252 (affirming the same under heightened scrutiny). *New York Times* subsequently upheld the "heavy presump-

DOSWASHINGTONSUP00859

tion" against prior restraints on lawful speech has the potential for un-
lawful uses. *See New York Times Co.*, 403 U.S. at 731, 733 (White, J.,
concurring).[2] In several subsequent cases the Court made specific note
of its strong distaste for prior restraints. In *Sable Communications*, the
Court took its conclusion directly from *Butler* in striking down the fed-
eral phone-sex ban, referencing the rational basis standard: "As Justice
Frankfurter said in that case, '[s]urely, this is to burn the house to roast
the pig.' In our judgment, this case, like *Butler*, presents us with 'legis-
lation not reasonably restricted to the evil with which it is said to deal.'"
492 U.S. at 127 (quoting and citing *Butler*, 352 U.S. at 383). In *Free
Speech Coalition*, the Court again clarified that "[t]he evil in question

---

[2] A "heavy presumption" against prior restraints is as old as the nation itself:

> That where absolute freedom of discussion is prohibited, or restrained,
> responsibility vanishes. That any attempt to prohibit, or restrain that
> freedom, may well be construed to proceed from conscious guilt. That
> the people of America have always manifested a most jealous sensibil-
> ity, on the subject of this inestimable right, and have ever regarded it
> as a fundamental principle in their government, and carefully engraft-
> ed in the constitution.

St. George Tucker*, 2 Blackstone's Commentaries on the Laws of England with
Notes of Reference, to the Constitution and Laws, of the Federal Government of the
United States, and the Commonwealth of Virginia App. at Note G, 16-17. (1803); *see
also id.* at 17 (noting that even for proponents of the Alien and Sedition Acts of
1798, "[T]he liberty of the press consists not in a license for every man to publish
what he pleases . . . but in a permission to publish without previous restraint.").

DOSWASHINGTONSUP00860

depends upon the actor's unlawful conduct, conduct defined as criminal quite apart from any link to the speech in question. This established that the speech ban is not narrowly drawn." 535 U.S. at 252.

Even in cases approving of prior restraints, the Court is very careful to note the *extremely* narrow nature and impact of the holding. For example, in *Broadrick*, the Court upheld a prior restraint on election activities by civil servants. 413 U.S. 601. The Court there specifically noted that petitioner's activities (fundraising for their own superior at work) fell "squarely within the 'hard core' of the statute," and that the state regulator and attorney general had "construed 818's explicit approval of private political expression to include virtually any expression not within the context of active partisan political campaigning." *Id.* at 608, 617. Indeed, the Court pointed out that the prior restraint was not so broad as to cover "the wearing of political buttons or the use of bumper stickers"—thus substantially keeping open the marketplace of ideas. *See id.* at 618.

Moreover, blanket prior restraints like this one are typically appropriate only in the absence of a criminal statute. *See, e.g.*, *Free Speech Coalition*, 535 U.S. at 245 ("'Among free men, the deterrents ordinarily

DOSWASHINGTONSUP00861

to be applied to prevent crime are education and punishment for viola-
tions of the law, not abridgement of the rights of free speech.'") (quoting
*Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*, 360 U.S. 684,
689 (1959)); *Bartnicki*, 532 U.S. at 529 ("the normal method of deterring
unlawful conduct is to impose an appropriate sanction on the person
who engages in it. If the sanctions that presently attach to a viola-
tion . . . do not provide sufficient deterrence, perhaps those sanctions
should be made more severe.); *Schneider*, 308 U.S. at 162 ("There are
obvious methods of preventing littering. Amongst these is punishment
of those who actually throw paper on the streets."); *New York Times
Co.*, 403 U.S. at 734-40 (White, J., concurring). To justify a prior re-
straint, those criminal statutes must be shown to be incapable of pre-
venting the evil at which it is aimed.

Here, all of the potential harms that concern the government are
already criminalized. There is an applicable criminal law that targets
the foreign export of arms-constructing information, with penalties of
up to 20 years' imprisonment and a million dollar fine. 22 U.S.C. §
2778(a)-(e) (2014). To justify its prior restraint, the government must
show that it would be the only effective method to prevent such ex-

DOSWASHINGTONSUP00862

ports—as compared to the criminal statute and any narrower regulations. The government has not met and cannot meet that burden.[3]

## CONCLUSION

For the foregoing reasons, *amicus* urges the court to reverse the district court and grant the motion for a preliminary injunction.

Respectfully submitted,

/s/ Ilya Shapiro

Ilya Shapiro
   *Counsel of Record*
Randal J. Meyer (admission pending)
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
(202) 842-0200
ishapiro@cato.org
rmeyer@cato.org

---

[3] The government especially cannot meet this burden when an artist—decidedly not a sophisticated arms dealer—can evade the prior restraint by otherwise acquiring the file that is purportedly made unavailable and sending it to a foreign friend to 3D-print. *See supra* note 1 and accompanying text. The CAD files that Defense Distributed is restrained from distributing online are now widely available as downloadable torrent files. Natasha Lennard, *The Pirate Bay Steps in to Distribute 3-D Gun Designs*, Salon (May 10, 2013), http://www.salon.com/2013/05/10/the_pirate_bay_steps_in_to_distribute_3d_gun_designs.

DOSWASHINGTONSUP00863

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,975 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Word 2010 and uses a proportionally spaced typeface, Century Schoolbook, in 14-point type for body text and 12-point type for footnotes.

/s/ Ilya Shapiro

## Certificate of Filing and Service

On December 17, 2015, I filed this *Brief of the Cato Institute as Amicus Curiae* using the CM/ECF System, which will send a Notice of Filing to all counsel of record.

/s/ Ilya Shapiro

DOSWASHINGTONSUP00864

# United States Court of Appeals
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

December 18, 2015

Mr. Ilya Shapiro
Cato Institute
1000 Massachusetts Avenue, N.W.
Washington, DC 20001

        No. 15-50759    Defense Distributed, et al v. U.S. Dept. of
                        State, et al
        USDC No. 1:15-CV-372

Dear Mr. Shapiro,

The following pertains to your Amicus brief of the Cato Institute
electronically filed on December 17, 2015.

We filed your brief.  However, you must make the following
corrections within the next 14 days.

You need to correct or add:

Caption on the brief does not agree with the caption of the case
in compliance with Fed R. App. P. 32(a)(2)(C).  (See attachment)

You appearance will be removed from you brief event as it must be
electronically filed used the correct filing event.

You must electronically file a "Form for Appearance of Counsel"
within 14 days from this date.  You must name each party you
represent, see Fed R. App. P. 12(b) and 5th Cir. R. 12 & 46.3.  The
form is available from the Fifth Circuit's website,
www.ca5.uscourts.gov. If you fail to electronically file the form,
the brief will be stricken and returned unfiled.

Once you have prepared your sufficient brief, you must email it
to: Shawn_Henderson@ca5.uscourts.gov for review.  If the brief is
in compliance, you will receive a notice of docket activity
advising you that the sufficient brief has been filed.

Sincerely,

LYLE W. CAYCE, Clerk

By:
Shawn D. Henderson, Deputy Clerk
504-310-7668

cc:
 Mr. Joshua Michael Blackman
 Mr. Bruce D. Brown
 Mr. Matthew Goldstein
 Mr. Alan Gura
 Mr. William Bryan Mateja
 Mr. Michael S. Raab
 Mr. Eric J. Soskin
 Mr. Daniel Bentele Hahs Tenny

**Caption to Use:**

| 15-50759 |
|---|
| **DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,**<br><br>   **Plaintiffs - Appellants**<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,**<br><br>   **Defendants - Appellees** |

**No. 15-50759**

---

IN THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

---

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED

*Plaintiffs - Appellants*

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, in His
Official Capacity as the Secretary of the Department of State; DIRECTORATE OF
DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military
Affairs; KENNETH B. HANDELMAN, Individually and in his Official Capacity
as the Deputy Assistant Secretary of State for Defense Trade Controls in the
Bureau of Political-Military Affairs; C. EDWARD PEARTREE, individually and
in his Official Capacity as the Director of the Office of Defense Trade Controls
Policy Division; SARAH J. HEIDEMA, Individually a900nd in her Official
Capacity as the Division Chief, Regulatory and Multilateral Affairs; Office of
Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official
Capacity as the Senior Advisor, Office of Defense Trade Controls,

*Defendants – Appellees*

---

Appeal from the United States District Court
For the Western District of Texas, Austin Division
No. 15-cv-00372 (Hon. Robert Pitman)

---

**BRIEF OF REPRESENTATIVE THOMAS MASSIE AND CERTAIN
MEMBERS OF THE U.S. HOUSE OF REPRESENTATIVES AS AMICI
CURIAE IN SUPPORT OF APPELLANTS**

---

Raffi Melkonian
WRIGHT & CLOSE, LLP
One Riverway, Ste. 2200
Houston, Texas 77056
713-572-4321
713-572-4320 (fax)

DOSWASHINGTONSUP00867

## SUPPLEMENTAL CERTIFICATE
## OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, in addition to those listed in Appellants' brief, that have a financial interest in the outcome of this litigation. All amici are individuals.

DOSWASHINGTONSUP00868

# TABLE OF CONTENTS

Page

INTEREST OF AMICI ................................................................................7

PRELIMINARY STATEMENT AND SUMMARY OF
ARGUMENT ...............................................................................................8

I.  Congress did not delegate the power to ban the publication of
    lawful speech when it passed the Arms Export Control Act to
    regulate exports and imports of arms. ............................................10

    A.  An Administrative Agency has only the power granted to
        it by Congress. ........................................................................10

    B.  Congress did not grant the State Department authority to
        regulate domestic, public speech when it passed the
        AECA. ......................................................................................12

II. If the AECA has the effect the Government claims, then it
    would   exceed Congress' limited and enumerated powers. ........18

III. Interpreting the AECA in the way the State Department
     demands would chill technological innovation. ...........................22

CONCLUSION ..........................................................................................24

CERTIFICATE OF SERVICE .................................................................26

CERTIFICATE OF COMPLIANCE........................................................26

ECF CERTIFICATION ............................................................................27

DOSWASHINGTONSUP00869

# TABLE OF AUTHORITIES

Page

**Cases**

*Adams Fruit Co. v. Barrett*,
   494 U.S. 638 (1990) ...................................................................................11

*Bernstein v. U.S. Dep't of State*,
   922 F. Supp. 1426 (N.D. Cal. 1996) ...................................................16

*Bernstein v. U.S. Dep't of State*,
   945 F. Supp. 1279 (N.D. Cal. 1996) ...................................................17

*Bond v. United States*,
   131 S. Ct. 2355 (2011) ............................................................... 14, 21

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ...................................................................................16

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) ...................................................................................11

*Louisiana Public Serv. Comm'n v. FCC*,
   476 U.S 355 (1986) ...................................................................................11

*MCI Telecommc'ns Corp. v. AT&T Co.*,
   512 U.S. 218 (1994) ...................................................................................16

*National Federation of Independent Business v. Sebelius*,
   132 S. Ct. 2566 (2012) ...........................................................................19

*New York Times v. United States*,
   443 U.S. 713 (1971) ...................................................................................21

*New York v. United States*,
   505 U.S. 144 (1992) ...................................................................................21

*NFIB v. Sebelius*,
   132 S. Ct. 2566, 2646 (2012) ...............................................................20

4

*Samora v. United States*,
    406 F.2d 1095 (5th Cir. 1969)................................................................14

*Swan v. Finch Co. v. U.S.*,
    190 U.S. 143 (1903) .......................................................................13

*Texas Dep't of Housing and Community Affairs v. Inclusive*
    *Communities Project, Inc.*,
    135 S. Ct. 2507 (2015) ...................................................................11

*U.S. v. 1903 Obscene Magazines, Customs Seizure*,
    907 F.2d 1338 (2d Cir. 1990)..........................................................13

*U.S. v. Dien Duc Huynh*,
    246 F.3d 734 (5th Cir. 2001)...........................................................13

*U.S. v. Ehsan*,
    163 F.3d 855 (4th Cir. 1998) ..........................................................13

*U.S. v. Gregg*,
    829 F.2d 1430 (8th Cir. 1987) ........................................................14

*U.S. v. Lee*,
    183 F.3d 1029 (9th Cir. 1999) ........................................................14

*U.S. v. Mead Corp.*,
    533 U.S. 218 (2001) .......................................................................10

*U.S. v. Swarovski*,
    592 F.2d 131 (2d Cir. 1979)............................................................14

*United States v. Van Hee*,
    531 F.3d 352 6th Cir. 1976) ...........................................................15

*United States v. Clark*,
    435 F.3d 1100 (9th Cir. 2006)........................................................20

*United States v. Comstock*,
    130 S. Ct. 1949 (2010) ...................................................................19

*United States v. Edler Industries*,
    579 F.2d 516 (9th Cir. 1978)..........................................................15

DOSWASHINGTONSUP00871

*United States v. Morrison*, 529 U.S. 598 (2000) .....................................................19

*Whitman v. American Trucking Assns.,Inc.*, 531 U.S. 457, 468 (2001). .................11

**Statutes**

22 U.S.C. § 2751 ........................................................................................20

22 U.S.C. § 2778 ................................................................................. 12, 20

U.S. Const. Art. I §8 .......................................................................... 19, 20

DOSWASHINGTONSUP00872

## INTEREST OF AMICI

*Amici* are current Members of the House of Representatives whose names are listed in the Appendix. Members of Congress have a particular interest in seeing that federal statutes are properly interpreted and implemented. Moreover, Members of Congress are bound by oath to support and defend the Constitution. Thus, this Court's interpretation of the First, Second and Fifth Amendments—as well as this Court's decisions construing the reach of the foreign commerce clause—are at the core of Amici's duties and responsibilities.

Representative Thomas Massie, of Kentucky—an MIT-trained engineer and inventor—is a Member of the Committee on Science, Space & Technology. His views are particularly relevant because the State Department's improper and unconstitutional interpretation of federal law is likely to chill scientific and technological advancement in the United States.

No party or counsel for a party authored or paid for this brief in whole or in part, or made a monetary contribution to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

DOSWASHINGTONSUP00873

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

This case can be resolved, as Appellants state, on constitutional grounds. Appellees' decision to impose a prior restraint on the mere publication of unclassified public speech in the United States violates the First, Second, and Fifth Amendments to the United States Constitution, for all the reasons set forth in Appellants' brief. Amici would be entirely satisfied with such a ruling.

Amici—who are duty-bound to preserve and defend the Constitution and ensure the Executive's adherence to statute—write to emphasize two additional points. First, even if Congress was empowered to pass a statute regulating domestic, public, speech through the foreign commerce clause, which is doubtful, the AECA is *not* that statute. The State Department's expansive interpretation of the AECA to permit regulating the online publication of unclassified public speech departs entirely from the statutory text and is due no deference whatsoever. Indeed, the Department of Justice has long rejected the very reading the State Department adheres to now.

Second, it is doubtful that the AECA, which was promulgated by Congress under the foreign commerce clause to regulate foreign commerce, can constitutionally be applied to purely domestic publication. The federal government is a government of limited, enumerated powers, set within a federalist framework.

8

DOSWASHINGTONSUP00874

Appellees' conception of the AECA permits the foreign commerce clause to reach deep into the United States to regulate domestic public speech.

To be sure, Amici understand the State Department's duty to protect national security. That is a valid concern in this time of numerous foreign threats. But even if Appellants' speech constituted some kind of risk to national security, which Appellants amply demonstrate it does not, the solution to that problem is not to stretch the meaning of a clear statute to the breaking point or to violate the Constitution's limitations on federal power. Congress is the actor that can pass common sense legislation to foster the growth of an important technology while also protecting national security. The State Department should work with Congress to pass new legislation, if necessary, rather than unilaterally breaking the bounds of a Cold War-era statute.

Simply put, the State Department has violated Appellants' rights, and it has done so by trampling on the plain meaning of the AECA and on the wise restrictions imposed on the federal government by the Framers. The judgment below should be reversed.

DOSWASHINGTONSUP00875

# ARGUMENT

**I.    Congress did not delegate the power to ban the publication of lawful speech when it passed the Arms Export Control Act to regulate exports and imports of arms.**

Even assuming that Congress has the theoretical power to ban domestic speech through a law designed to control the import and export of defense articles—which it does not for the reasons set forth in Part II, *infra*—it has not done so. The State Department's interpretation of the Arms Export Control Act permitting such regulation through the International Traffic in Arms Regulations ("ITAR") is inconsistent with the text of the AECA, inconsistent with the AECA's legislative history and purpose, and is inconsistent with the way the Department of Justice itself has interpreted and litigated the AECA in the past. This is not a question of due deference to an administrative agency: the State Department's interpretation boldly (and impermissibly) departs from Congress's intent to the detriment of all Americans' First, Second, and Fifth Amendment rights. The district court adopted the Executive's argument wholesale in its judgment. It cannot be upheld.

**A.    An Administrative Agency has only the power granted to it by Congress.**

This case is not about deference to the State Department. It is about the very power of that agency to act in the way that it has, a core question of law entrusted to the courts. *See U.S. v. Mead Corp.*, 533 U.S. 218, 233 (2001) (question is

10

DOSWASHINGTONSUP00876

"beyond the *Chevron* pale"). The question here is whether Congress has delegated to the State Department the power to impose a ban against the otherwise lawful online publication of unclassified data. In the absence of such delegation, the State Department "literally has no power to act." *See Louisiana Public Serv. Comm'n v. FCC*, 476 U.S 355, 374 (1986).  Or, as the Supreme Court has explained, "[a] precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990). *See also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007) ("[T]he ultimate question is whether Congress would have intended, and expected, courts to treat an agency's rule, regulation or application of a statute, or other agency action as within, or outside, its delegation to the agency of 'gap-filling' authority."). Such power must be clearly granted. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms of ancillary provisions—it does not, one might say, hide elephants in mouse holes." *Whitman v. American Trucking Assns.,Inc.*, 531 U.S. 457, 468 (2001).

The proper form of analysis begins with the text of the statute, and asks whether the AECA permits the regulation of domestic public speech. *See Texas Dep't of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2516 (2015) (rejecting Solicitor General's reliance on *Chevron*

DOSWASHINGTONSUP00877

deference and instead deciding whether, "under a proper interpretation of the FHA, housing decisions with a disparate impact are prohibited").

## B.  Congress did not grant the State Department authority to regulate domestic, public speech when it passed the AECA.

As both the Government and the court below agree, the only source of congressional authority for Defendants' conduct is the AECA. But that statute says nothing about the regulation of domestic public speech. Rather, the statute authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States . . . to control the *import* and *export* of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services." 22 U.S.C. § 2778(a)(1).

This straightforward statutory language does not permit the State Department to ban the domestic publication of unclassified public speech through its current expansive interpretation of the word "export" and application of ITAR.

First, the State Department's actions clash directly with text of the AECA and particularly its exclusive application to "export" and "import." The word "export" in particular, which is the entire basis of the State Department's position, simply cannot be stretched to mean domestic publication with incidental receipt by foreign persons.  Dictionaries uniformly cabin exportation to "the sending of commodities out of a country," or a "severance of goods from [the] mass of things

12

belonging to [the] United States with [the] intention of uniting them to [the] mass of things belonging to some foreign country." *U.S. v. Ehsan*, 163 F.3d 855, 858 (4th Cir. 1998) (collecting dictionary definitions).   Common-law decisions too have observed that exportation "involves the transit of goods from one country to another for the purpose of trade." *Id.* This Court, for example, has held (albeit in the context of the arms embargo against Iran, not in an AECA case) that "exportation occurs when the goods are shipped to another country with the intent that they will join the commerce of that country." *U.S. v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001). And the Supreme Court, echoing the words of the Attorney General, has long ago held agreed that the "legal notion . . . of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country or another." *Swan v. Finch Co. v. U.S.*, 190 U.S. 143, 145 (1903); *see also U.S. v. 1903 Obscene Magazines, Customs Seizure*, 907 F.2d 1338, 1342 (2d Cir. 1990) (discussing long history of the word import, all of which define importation as "bringing an article into a country from the outside").

The State Department's rule, however, captures purely domestic discussions between Americans *in* America simply because those discussions were undertaken by means of the internet rather than on paper, or orally, or by any other method. To interpret "export" to mean "publish on the internet to the general public" simply

DOSWASHINGTONSUP00879

does not comport with the common meaning of the word. As the Supreme Court held in *Bond v. United States*, "[s]aying that a person 'used a chemical weapon' conveys a very different idea than saying the person 'used a chemical in a way that caused some harm." 134 S. Ct. 2077, 2090 (2014). Similarly, saying a person "exported" arms conveys a very different meaning than saying that they "published legal information in the United States that might be accessed by people outside the United States."

Moreover, the State Department's position clashes with courts' repeated holdings that the purpose of the AECA—the conduct of foreign commerce and foreign policy—is clear and easy to understand. As this Court long ago held, the Mutual Security Act of 1954, AECA's predecessor, was "directed to the conduct of international affairs." *See Samora v. United States*, 406 F.2d 1095 (5th Cir. 1969); *see also U.S. v. Lee*, 183 F.3d 1029 (9th Cir. 1999) ("The regulation at issue is directed to a relatively small group of sophisticated international businessmen"); *U.S. v. Gregg*, 829 F.2d 1430, 1437 (8th Cir. 1987) ("There is no unconstitutional vagueness [in the AECA]. It is as simple a matter as forbidding a passenger to ride on a train without a valid ticket"); *U.S. v. Swarovski*, 592 F.2d 131, 133 (2d Cir. 1979) ("We are dealing here with a regulation of limited scope aimed at a small and relatively sophisticated group of persons") (interpreting prior legislation). A statute that has an obvious purpose, and survived vagueness challenges precisely

DOSWASHINGTONSUP00880

because it was easy to understand and applied to easily ascertainable business activities, cannot be now interpreted to mean something entirely different simply because the State Department perceives a phantom threat of arms proliferation through 3D printing.

*United States v. Edler Industries*, 579 F.2d 516 (9th Cir. 1978), which the State Department insists justifies its position here, is far afield. In that case, there was no dispute whatsoever that the technical data at issue was *exported*. Defendants there provided (and admitted providing) direct technical assistance to foreign companies concerning technology used in missile manufacture. *Id.* at 518. The issue, rather, was to what extent the Mutual Security Act of 1954 could limit the export of non-classified materials with simultaneously military and civilian uses abroad. The *Edler* court construed ITAR's reach narrowly to "control the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise." *Id.* at 521. Similarly, the case on which the *Edler* court relied, *United States v. Van Hee*, 531 F.3d 352, 356 (6th Cir. 1976) involved the sale of plans to make amphibious military vehicles to Portugal—squarely in the heart of the AECA's and the Mutual Security Act's export restrictions. Congress does not delegate "decision[s] of . . . economic and political significance"—such as the applicability of a statute regulating the export of arms to foreigners to domestic speech—in "cryptic . . . fashion," *FDA v. Brown & Williamson Tobacco Corp.*,

DOSWASHINGTONSUP00881

529 U.S. 120, 160 (2000) or through "subtle device[s]," *MCI Telecommc'ns Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994).

The State Department's basic misconception in this case is betrayed by a hypothetical it used below. Adopting Appellants' theory, it warned, would allow scofflaws to skirt the AECA by "creating a digital model, sending that digital version abroad, and thereby enabling foreign recipients" to automatically create arms. This is fanciful. If a party intentionally created an automatically replicating model and purposefully sent it abroad in exchange for money, that might properly be captured by the AECA. What *actually* happened here is that an American organization published information in America, just as if it had put that information on television or in a book. That foreigners might look at it is irrelevant to a proper understanding of the State Department's power to ban it under the existing statute.

It is telling that the State Department's position today is starkly inconsistent with the Department of Justice's consistent public and litigation statements that the AECA and ITAR do not cover domestic speech. Appellants' brief describes these in full, *see, e.g.,* Appellants' Br. at 39, but they are worth repeating because the State Department's 180 degree pivot from its previous statements is so startling. The litigation position the Department of Justice took in *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426 (N.D. Cal. 1996) (*Bernstein I*) and *Bernstein v. U.S. Dep't*

16

DOSWASHINGTONSUP00882

*of State*, 945 F. Supp. 1279 (N.D. Cal. 1996) (*Bernstein II*) is particularly

probative. In those cases, as Appellants carefully detail, the State Department

affirmatively argued that it "does not seek to control the various means by which

information is placed in the public domain" or "review scientific information to

determine whether it may be offered for sale at newsstands and bookstores,

through subscriptions, second-class mail, or made available at libraries, or

distributed at a conference or seminar in the United States." (Appellants' Br. at

15). Yet, now, the State Department arrogates itself the power to deem all domestic

speech that might be taken abroad to be exports subject to prior restraints. This is

astonishing.[1]

   As Appellants also note, the Department of Justice has also consistently

warned that the AECA and ITAR do not give the State Department limitless

authority:

   •    On May 11, 1978, the Department of Justice issued a memorandum to
the White House, titled "Constitutionality under the First Amendment of ITAR
Restrictions on Public Cryptography." That memo made clear DOJ's "doubt" that

---

[1]    The State Department claimed, below, that the legislative history of the Arms Export
Control Act supports its reading of the statute because Congress expressed its view that
"arms transfers cannot become an automatic, unregulated process." *See* H.R. Rep. No. 94-
1144, at 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 1378, 1388. Putting aside the point, for
the moment, that an appeal to legislative history cannot alter the plain text of the statute,
nothing in that House Report supports the State Department's position. The cited section of
the House Report concerned Congress's role in deciding the propriety of future arms
transfers—"because of the importance which arms transfers have for our own national
security, such decisions should be understood by, and have the support of, the Congress and
the American people"—not the scope of the term "export" of the reach of the AECA into
domestic affairs.

DOSWASHINGTONSUP00883

Congress "intended that the President regulate noncommercial dissemination or information." *See* Letter from John M. Harmon, Assistant Attorney General at the Office of Legal Counsel for the Department of Justice, to Dr. Frank Press, Senior Advisor to the President, at p. 4, n. 7.

- On July 1, 1981, the Department of Justice issued another memorandum, this time to the State Department Office of Munitions Control, regarding concerns with the State Department proposed revisions to ITAR. OLC stated that, given the deep constitutional concerns and the overbreadth of ITAR given the statutory context, "the best legal solution is for the Department of State, not the courts, to narrow the ITAR so as to make it less likely that they will apply to protected speech in constitutionally impermissible circumstances." ROA.256.

- On July 1, 1981, the Department of Justice issued a memorandum noting its concern that ITAR could have "a number of unconstitutional applications." *See* Department of Justice, *Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations* (1981).

- In April 1997, DOJ issued a report discussing the availability of bombmaking information. This report made clear the real limits on the "publication of true, lawfully obtained information." *See* Department of Justice, *Report on the Availability of Bombmaking* (1997). (ROA.287)

The State Department has stretched the AECA beyond its breaking point because it fears new technology. It does not have the authority to make that decision absent new Congressional action permitting it to do so.

## II.     If the AECA has the effect the Government claims, then it would exceed Congress' limited and enumerated powers.

Even if the AECA can be read as authorizing the State Department to ban Appellants' speech, such action is unconstitutional absent a close nexus to foreign commerce. That is so under the First, Second, and Fifth Amendments, as set forth in the Appellants' brief; but it is also true because no enumerated power permits

18

Congress to pass legislation banning the domestic publication of information. The only constitutional basis for the AECA, the foreign commerce clause, does not and cannot reach entirely domestic activity.

The Federal government is a government of limited and enumerated powers. "With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate." *United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000). Because its powers are limited, Congress does not have the power to regulate domestic public speech unless a specific enumerated power so states. The police power "belongs to the States and the States alone." *United States v. Comstock*, 130 S. Ct. 1949, 1967 (2010) (Kennedy, J. concurring).

The determinative question, then, is to identify *which* enumerated power was exercised in enacting the AECA, and to determine whether that enumerated power permits Congress to regulate domestic public speech. *See, e.g., National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2577 (2012) ("If no enumerated power authorized Congress to pass a certain law, that law may not be enacted"); *Comstock*, 560 U.S. at 163 (Thomas, J., dissenting) (noting Government's failure to identify the "specific enumerated power or powers" that were the constitutional predicate for statute at issue).

DOSWASHINGTONSUP00885

The AECA's text and context give us the answer to the first of those questions. A statute's reference to foreign commerce triggers the foreign commerce clause, which gives Congress a broad grant of power to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. For example, the Ninth Circuit has held that a reference to the phrase "travels in foreign commerce" unequivocally invoked the foreign commerce clause. *See, e.g., United States v. Clark*, 435 F.3d 1100, 1114 (9th Cir. 2006). The text of the AECA, which authorizes the President to "control the *import* and *export* of defense articles and defense services," 22 U.S.C. § 2778, is a clear reference to foreign commerce. In addition, the structure of the statute supports its plain meaning. First, the AECA constitutes Chapter 39 of Title 22 ("*Foreign* Relations and Intercourse") and is codified at 22 U.S.C. § 2751. Moreover, the prefatory sections of the AECA found at 22 USC § 2751 make clear the goals that Congress had in seeking to control the export of weapons in service of foreign policy. Namely, the goals and purposes found therein relate exclusively to "world peace" and foreign policy. The AECA is thus grounded exclusively in Congress' foreign commerce power found in U.S. Const. Art. I §8.[2]

---

[2] The necessary and proper clause can provide no basis for the application of the AECA to domestic speech through the foreign commerce clause power. As a majority of the members of the Supreme Court have stated, "the Necessary and Proper Clause is exceeded not only when the congressional action directly violates the sovereignty of States but also when it violates the background principle of enumerated (and hence limited) federal power." *NFIB v. Sebelius*, 132 S. Ct. 2566, 2646 (2012) (joint dissent); *accord id.*, at 2592 (Roberts, C.J.)

DOSWASHINGTONSUP00886

Nor could it be otherwise. The Government itself concedes that the AECA does not reach domestic speech delivered person-to-person, or domestic speech published in a book or newspaper. That is because the Constitution does not create a national police power. The basic "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States . . . in part, [as] an end in itself, to ensure that States function as political entities in their own right." *Bond*, 131 S. Ct. at 2364. The Constitution also divides authority between federal and state governments for the protection of individuals." *New York v. United States*, 505 U.S. 144, 181 (1992). "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011). Imagine, for example, an American giving a speech that, if the contents were distributed abroad, could aid a foreign enemy. Congress could not ban such speech by prior restraint even if a foreign agent happened to be standing in the public square listening intently. *See, e.g., New York Times v. United States*, 443 U.S. 713, 735 (1971). Such action is beyond any conceivable domestic power granted to the Government by the Constitution other than the vague inherent powers the Supreme Court rejected in the Pentagon Papers case.

But, fundamentally, exactly that far-reaching power is the power the State

---

(noting that the necessary and proper clause is "narrow in scope" and operates to permit laws that are "incidental" to the exercise of enumerated powers).

DOSWASHINGTONSUP00887

Department claims here. The State Department's chosen interpretation of the AECA—that publishing information domestically on an open forum like the internet is the equivalent of exporting products—would capture almost any domestic publication of supposedly controlled information. Nor would simply limiting the rule to publication on the internet limit the intrusion on the Constitution in any serious way. The internet is today the pervasive and dominant way of communicating information. Just as the Supreme Court would not countenance speech restrictions that would violate the First Amendment if they were limited to the internet, so too this Court should not permit a violation of limited nature of the government simply because the government imposes an arbitrary limit on its unlawful actions.

## III. Interpreting the AECA in the way the State Department demands would chill technological innovation.

The United States should be a leader in 3D printing, a scientific innovation that has the potential to dramatically change the world and benefit the United States. In The Economist's words, 3D printing "may have as profound an impact on the world as the coming of the factory did. . . Just as nobody could have predicted the impact of the steam engine in 1750—or the printing press in 1450, or the transistor in 1950—it is impossible to foresee the long-term impact of 3D printing. But the technology is coming, and it is likely to disrupt every field it touches." Leaders, *Print me a Stradivarius*, THE ECONOMIST, February 2011.

DOSWASHINGTONSUP00888

3D printing is disruptive because it fundamentally changes how goods are manufactured. For example, rather than importing parts from far away, goods may be able to be custom-produced on-demand locally. Even if local production by 3D printing is initially more expensive, the elimination of shipping expenses will dramatically change how business is done. 3D printing also allows goods to be tailored to the consumer in a wide range of industries, from medicine to electronics. These advantages, among others, mean that the "factors that have made China the workshop of the world will lose much of their force" in a world in which 3D printing is at the fore. *See, e.g.*, Richard A. D'Aveni, HARVARD BUSINESS REVIEW, 3-D Printing Will Change the World, March 2013.  3D printing gives America the opportunity to revolutionize the way its businesses make and sell products domestically and abroad.

Chilling the speech of actors like Defense Distributed by imposing export controls on them that were never meant to apply domestically will slow innovation in the United States and leave the field to other countries. *See, e.g.,* Michael L. Smith, *The Second Amendment Implications of Regulating 3D Printed Firearms*, 31 SYRACUSE J. OF SCIENCE & TECH. L. REPORTER 60, 95 (2015) (recognizing that "laws that would criminalize the distribution of digital blueprints for firearms" might "unduly constrain technological development").  It is precisely the kind of experimentation and public discussion that Appellants foster that brings the most

23

DOSWASHINGTONSUP00889

unexpected and powerful developments in technology. The digital revolution was forged by individuals working in Silicon Valley garages, not governments.  And many innovations that are broadly applicable take root first in the context of arms. *See generally* STUART W. LESLIE, THE COLD WAR AND AMERICAN SCIENCE: THE MILITARY-INDUSTRIAL-ACADEMIC COMPLEX AT MIT AND STANFORD (1993) (explaining how military needs drove innovation in engineering and computing).

Given these powerful reasons to allow technological innovation in 3D printing to grow and flourish, the State Department's insistence that its idiosyncratic interpretation of the AECA should shut down scientific progress is inexplicable. If Appellants' speech is to be regulated—and in reality there is no basis for any such regulation—that work should be done by Congress, not by an administrative agency making it up as it goes along.

## CONCLUSION

For the foregoing reasons, the Court should adhere to the text of the AECA and the Constitution, and therefore reverse the district court's order and remand with instructions to enter a preliminary injunction against ITAR's enforcement as a prior restraint.

DOSWASHINGTONSUP00890

Respectfully Submitted,

*/s/ Raffi Melkonian*

Raffi Melkonian
State Bar No. 24090587
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
713-572-4321
713-572-4320 (fax)
melkonian@wrightclose.com

**Counsel for Amici Curiae**

DOSWASHINGTONSUP00891

# CERTIFICATE OF SERVICE

This is to certify that on December 17, 2015, a true and correct copy of the foregoing document was filed with the clerk of the court for the United States Court of Appeals for the Fifth Circuit, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means. I also certify that a true and correct copy of the foregoing document was served on opposing counsel by mail and e-mail.


*/s/ Raffi Melkonian*
Raffi Melkonian


# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,386 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2007 in Times New Roman (Scalable) 14 pt. for text and Times New Roman (Scalable) 12pt for footnotes.

*/s/ Raffi Melkonian*
Raffi Melkonian

DOSWASHINGTONSUP00892

## ECF CERTIFICATION

I hereby certify (i) the required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (ii) the electronic submission is an exact copy of any paper document submitted pursuant to 5th Cir. R. 25.2.1; (iii) the document has been scanned for viruses and is free of viruses; and (iv) the paper document will be maintained for three years after the mandate or order closing the case issues, pursuant to 5th Cir. R. 25.2.9.

*/s/ Raffi Melkonian*
Raffi Melkonian

DOSWASHINGTONSUP00893

# APPENDIX A
## LIST OF AMICUS CURIAE

Representative Thomas Massie (Kentucky)
Representative Brian Babin (Texas)
Representative K. Mike Conaway (Texas)
Representative Jeff Duncan (South Carolina)
Representative Blake Farenthold (Texas)
Representative John Fleming (Louisiana)
Representative Paul Gosar (Arizona)
Representative Walter Jones (North Carolina)
Representative Mike Kelly (Pennsylvania)
Representative Steve King (Iowa)
Representative Raúl Labrador (Idaho)
Representative Jeff Miller (Florida)
Representative Bill Posey (Florida)
Representative Todd Rokita (Indiana)
Representative Daniel Webster (Florida)

DOSWASHINGTONSUP00894

# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

December 18, 2015

Mr. Raffi Melkonian
Wright & Close, L.L.P.
1 Riverway
Houston, TX 77056

    No. 15-50759    Defense Distributed, et al v. U.S. Dept. of
                    State, et al
    USDC No. 1:15-CV-372

Dear Mr. Melkonian,

The following pertains to your Amicus brief electronically filed
on December 17, 2015.

You must submit the seven (7) paper copies of your brief required
by 5TH CIR. R. 31.1 within five (5) days of the date of this notice
pursuant to 5th Cir. ECF Filing Standard E.1.

You must electronically file a "Form for Appearance of Counsel"
within 14 days from this date.  You must name each party you
represent, see FED R. APP. P. 12(b) and 5TH CIR. R. 12 & 46.3.  The
form is available from the Fifth Circuit's website,
www.ca5.uscourts.gov.  If you fail to electronically file the form,
the brief will be stricken and returned unfiled.

                Sincerely,

                LYLE W. CAYCE, Clerk

                By: _____
                Shawn D. Henderson, Deputy Clerk
                504-310-7668

cc:
    Mr. Joshua Michael Blackman
    Mr. Bruce D. Brown
    Mr. Matthew Goldstein
    Mr. Alan Gura
    Mr. William Bryan Mateja
    Mr. Michael S. Raab

DOSWASHINGTONSUP00895

Mr. Ilya Shapiro
Mr. Eric J. Soskin
Mr. Daniel Bentele Hahs Tenny

DOSWASHINGTONSUP00896

Case No. 15-50759

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED,

*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official
Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE
TRADE CONTROLS, Department of State Bureau of Political Military Affairs;
KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy
Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-
Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as
the Director of the Office of Defense Trade Controls Policy Division; SARAH J.
HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory
and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH,
Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade
Controls,

*Defendants-Appellees.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION
IN CASE NO. 15-CV-00372, THE HONORABLE ROBERT PITMAN

---

## BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER FOUNDATION
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

---

Kit Walsh (CA SBN 303598)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
Fax: (415) 436-9993
kit@eff.org

December 17, 2015                    *Counsel for Amicus Curiae*

### SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amicus curiae* certifies that the following additional persons and entities have an interest in the outcome of this case.

1.  Electronic Frontier Foundation, *amicus curiae*. Electronic Frontier Foundation is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

2.  Kit Walsh, attorney for *amicus curiae*.

3.  Adam Schwartz, attorney for *amicus curiae*.


Dated:    December 17, 2015        /s/ Kit Walsh
                                   Kit Walsh

DOSWASHINGTONSUP00898

## **TABLE OF CONTENTS**

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ..........................i

INTEREST OF *AMICUS CURIAE* ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

ARGUMENT................................................................................... 3

    I.    The Government Has Imposed a Prepublication Review Regime for Technical Information with Military Applications. ............................ 3

    II.    ITAR Restricts Protected Speech, Including the Defense Distributed Files. ................................................................................ 6

        A.    Publishing Technical Information is Protected Speech. ............... 6

        B.    Computer-Readable Documentation and Designs, Like Those of Defense Distributed, Are Protected Speech. ................................ 9

        C.    First Amendment Protection is Not Diminished For Speech That is Accessible to Foreigners.......................................................... 12

    III.    ITAR's Prepublication Review of Technical Data Is an Unlawful Prior Restraint on Speech.................................................... 13

        A.    Speech-Licensing Regimes that Lack Procedural Safeguards are Invalid..................................................................................... 13

        B.    ITAR's Prepublication Review Scheme Lacks the Required Safeguards. ....................................................................... 16

        C.    The Government Incorrectly Argues that ITAR Prepublication Review is Not a Prior Restraint.................................................. 17

    IV.    The Government Cannot Show that the Speech Burdened by Prepublication Review Would Cause Direct, Immediate, and Irreparable Harm to National Security................................................ 19

    V.    ITAR'S Ban on Publications IS a Content-Based Regulation that Fails Strict Scrutiny..................................................................... 21

DOSWASHINGTONSUP00899

A.   ITAR Is a Content-Based Regulation of Speech. ....................... 21

B.   ITAR Does Not Satisfy Strict Scrutiny....................................... 24

    1.   Less-Restrictive Means Are Available to Address ITAR's
         Goals................................................................................... 25

    2.   Most Speech Burdened by ITAR Does Not Threaten Any
         Concrete Government Interest............................................ 28

    3.   Alternative Channels for Speech Do Not Justify the
         Restraint............................................................................ 29

VI.   The Prepublication Review Scheme Is Invalid Even Under the
      Reduced Scrutiny the Government Advocates. ................................ 30

CONCLUSION................................................................................................ 31

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION................................................................................................ 33

CERTIFICATE OF SERVICE ...................................................................... 34

DOSWASHINGTONSUP00900

## TABLE OF AUTHORITIES

### Cases

*Am. Booksellers Ass'n. v. Hudnut,*
  771 F.2d 323 (7th Cir. 1985) ............................................................... 8

*Ashcroft v. Free Speech Coal.,*
  535 U.S. 234 (2002) ............................................................................. 8

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) .......................................................................... 7, 8

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan,*
  773 F. Supp. 472 (D.D.C. 1991) ........................................................ 7

*Bernstein v. U.S. Dep't of State,*
  922 F. Supp. 1426 (N.D. Cal. 1996) ........................................... 11, 16

*Bernstein v. U.S. Dep't of State,*
  974 F. Supp. 1288 (N.D. Cal. 1997) ................................................. 14

*Boehner v. McDermott,*
  484 F.3d 573 (D.C. Cir. 2007) .......................................................... 27

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .............................................................................. 24

*Bullfrog Films, Inc. v. Wick,*
  646 F. Supp. 492 (C.D. Cal. 1986) ................................................... 12

*Bullfrog Films, Inc., v. Wick,*
  847 F.2d 502 (9th Cir. 1988) ............................................................ 12

*Burson v. Freeman,*
  504 U.S. 191 (1992) .......................................................................... 22

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) ..................................................................... 22, 23

*CBS Inc. v. Davis,*
  510 U.S. 1315 (1994) ........................................................................ 19

DOSWASHINGTONSUP00901

*Consolidated Edison Co. of N.Y. v. Public Service Comm'n of N.Y.*,
  447 U.S. 530 (1980) ........................................................................... 22

*Dambrot v. Cent. Mich. Univ.*,
  55 F.3d 1177 (6th Cir. 1995) ................................................................. 7

*Eu v. San Francisco County Democratic Cent. Committee*,
  489 U.S. 214 (1989) ........................................................................... 24

*FEC v. Mass. Citizens for Life, Inc.*,
  479 U.S. 238 (1986) ........................................................................... 24

*FEC v. Nat'l Conservative Political Action Comm.*,
  470 U.S. 480 (1985) ........................................................................... 24

*Fernandes v. Limmer*,
  663 F.2d 619 (5th Cir. 1981) ......................................................... 16, 20

*First Nat'l Bank v. Bellotti*,
  435 U.S. 765 (1978) ........................................................................... 24

*Florida Star v. B.J.F.*,
  491 U.S. 524 (1989) ..................................................................... 24, 28

*Forsyth County v. Nationalist Movement*,
  505 U.S. 123 (1992) ..................................................................... 22, 23

*Freedman v. Maryland*,
  380 U.S. 51 (1965) ..................................................................... *passim*

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ..................................................................... 13, 15

*Globe Newspaper Co. v. Superior Court for Norfolk*,
  457 U.S. 596 (1982) ........................................................................... 24

*Herceg v. Hustler Magazine, Inc.*,
  814 F.2d 1017 (5th Cir. 1987) ............................................................... 8

*Jean v. Mass. State Police*,
  492 F.3d 24 (1st Cir. 2007) ................................................................. 27

DOSWASHINGTONSUP00902

*Junger v. Daley*,
   209 F.3d 481 (6th Cir. 2000) ........................................................ 7, 11

*Kaplan v. California*,
   413 U.S. 115 (1973) ................................................................... 9

*Lakewood v. Plain Dealer Pub. Co.*,
   486 U.S. 750 (1988) ............................................................ *passim*

*Marks v. United States*,
   430 U.S. 188 (1977) ................................................................ 20

*McCullen v. Coakley*,
   134 S. Ct. 2518 (2014) ............................................................ 31

*Meyer v. Grant*,
   486 U.S. 414 (1988) ................................................................ 24

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
   460 U.S. 575 (1983) ................................................................ 23

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971) ............................................................ 19, 20

*Nat. Socialist Party of Am. v. Skokie*,
   432 U.S. 43 (1977) ................................................................ 15

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1975) .......................................................... 19, 20, 21

*R. A. V. v. City of St. Paul*,
   505 U.S. 377 (1992) ................................................................ 24

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015) ........................................................ 22, 23

*Reno v. ACLU*,
   521 U.S. 844 (1997) ........................................................ 24, 29, 30

*Riley v. Nat'l Fed'n of Blind of N.C., Inc.*,
   487 U.S. 781 (1988) ................................................................ 17

DOSWASHINGTONSUP00903

*Se. Promotions, Ltd. v. Conrad*,
   420 U.S. 546, 553 (1975) ................................................................. 13

*Shuttlesworth v. City of Birmingham, Ala.*,
   394 U.S. 147 (1969) ...................................................................... 14

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991) ................................................................ 22, 24

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011) ......................................................... 6, 7, 21

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 ................................................................................ 31

*U.S. v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000) ...................................................................... 24

*United States v. Chi Mak*,
   683 F.3d 1126 (9th Cir. 2012) ...................................................... 18

*United States v. Edler Indus., Inc.*,
   579 F.2d 516 (9th Cir. 1978) ........................................................ 18

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) .......................................................... 11

*Winter v. G.P. Putnam's Sons*,
   938 F.2d 1033 ............................................................................... 8

## Federal Regulations

22 C.F.R. § 120.10 ................................................................... 4, 6, 9

22 C.F.R. § 120.11 .............................................................. 18, 25, 26

22 C.F.R. § 120.17 ........................................................... 3, 6, 12, 30

22 C.F.R. § 120.4 ........................................................................... 5

22 C.F.R. § 121.1 ........................................................................... 4

22 C.F.R. § 123.1 ........................................................................... 5

DOSWASHINGTONSUP00904

22 C.F.R. § 126.7 .................................................................. 5, 16, 17, 23

22 C.F.R. § 127.1 ............................................................................. 3

22 C.F.R. § 128.1 ................................................................... 5, 17, 18

22 U.S.C. § 2778 ...................................................................... 3, 5, 18

## Legislative Materials

Undetectable Firearms Modernization Act, H.R. 3643, 113th Cong. (2013) ......... 27

Undetectable Firearms Reauthorization Act, S.1774, 113th Cong (2013). ............ 27

## Other Authorities

*Commodity Jurisdiction Final Determinations*, U.S. Dep't of State, Dir. of Def.
   Trade Controls .................................................................................... 4

*DOJ Memos on ITAR Prior Restraint*, Defense Trade Law Blog, July 9, 2015 .... 25

Elise Dalley, *Bypassing Geo-blocked Sites*, Choice, Aug. 13, 2014 ...................... 30

hroncok, *Statue of Liberty with Base Building*, Thingiverse (Mar. 25, 2013) ........ 10

Information Policy & Access Center, 2014 Digital Inclusion Survey (2015) ........ 26

Kasie Hunt & Carrie Dann, *Senate Extends Ban on Undetectable Guns But Nixes
   Tighter Restrictions*, NBC News, Dec. 9, 2013 .................................................. 27

Kathryn Zickuhr, et al., *Library Services in the Digital Age*, Pew Internet, Jan. 22,
   2013 ......................................................................................................... 26

Policy on Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3,
   2009) .................................................................................................... 5, 17

Slic3r Home Page ........................................................................................ 10

Solid Cube, http://cpansearch.perl.org/src/EWILHELM/CAD-Format-STL-
   v0.2.1/files/cube.stl. ............................................................................... 10

U.S. Dep't of State, *Munitions Control Newsletter* ................................................ 25

Wai Hon Wah, *Introduction to STL format*, (June 1999) ....................................... 10

DOSWASHINGTONSUP00905

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* is non-profit public interest organizations seeking to protect speech and innovation on the Internet.

The Electronic Frontier Foundation ("EFF") is a non-profit, member-supported civil liberties organization that works to protect free speech, innovation, and privacy in the online world. With more than 22,000 dues-paying members, EFF represents the interests of technology users in both court cases and broader policy debates regarding the application of law in the digital age. EFF actively encourages and challenges industry and government to support free expression, innovation, privacy, and openness in the information society. EFF frequently participates, either as counsel of record or amicus, in cases involving the First Amendment and new technologies.

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(c), EFF certifies that no person or entity, other than amicus, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. Both Plaintiffs-Appellants and Defendants-Appellees consent to the filing of this brief. In the interest of full disclosure: EFF previously counseled Defense Distributed in regard to its first set of commodity jurisdiction requests, relating to certain files at issue in this case identified in Appellants' brief as the "Published Files," but EFF has not represented any party in connection with this litigation.

DOSWASHINGTONSUP00906

## INTRODUCTION AND SUMMARY OF ARGUMENT

The First Amendment does not permit the government to presumptively criminalize online speech on a certain topic, and then decide on a case-by-case basis which speech to license, without any binding standards, fixed deadlines, or judicial review. Yet that is the regime advanced by the government in this case, criminalizing Americans who use the Internet to publish lawfully-obtained, nonclassified technical information relating to firearms and other technologies with military applications.

The licensing regime at issue in this case is a prior restraint that lacks the procedural safeguards required by the First Amendment to prevent discriminatory censorship decisions. It flies in the face of Supreme Court decisions that dictate how free speech interests are balanced with national security, such that speech is restrained only where absolutely necessary to prevent proven, immediate threats to concrete national security interests.

Beyond its flaws as a prior restraint, ITAR is a content-based regulation of speech that cannot survive strict scrutiny (or even the lesser scrutiny urged by the government) because it unnecessarily criminalizes a vast amount of protected speech that poses no risk to the putative goals of the regulatory regime. The regulation impermissibly sacrifices speech for the convenience of the government,

DOSWASHINGTONSUP00907

broadly criminalizing speech and putting the onus on speakers to seek leave to publish.

The Department of Justice warned the administrators of ITAR over thirty years ago that the First Amendment would not allow such a prepublication review regime. Yet, rather than developing appropriately-tailored regulations, the government has revived the overbroad scheme of prior restraint it once disavowed. The government will be unable to establish that this scheme is consistent with the First Amendment.

## **ARGUMENT**

## I. **The Government Has Imposed a Prepublication Review Regime for Technical Information with Military Applications.**

The International Traffic in Arms Regulations (ITAR) criminalize "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad" without a license. 22 C.F.R. §§ 120.17(a)(4), 127.1; 22 U.S.C. § 2778(c). Violations carry massive penalties: up to 20 years imprisonment and a $1,000,000 fine. 22 U.S.C. § 2778(c).

Because the government considers electronic publication to be an "export," it requires that Internet users submit publications for review by agency officials before they may electronically publish information that is considered "technical data." 22 C.F.R. § 127.1. Technical data includes "[i]nformation . . . which is required for the design, development, production, manufacture, assembly,

- 3 -

DOSWASHINGTONSUP00908

operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1). Technical data also includes software. § 120.10 (a)(4). "Defense articles" refers to a list of technologies designated at the discretion of the Department of State in consultation with the Department of Defense, listed at 22 C.F.R. § 121.1 (the "United States Munitions List" or USML). In addition to firearms, the USML includes a range of medical, chemical, electronic, and mechanical engineering categories, and the open-ended provision that "[a]ny article not enumerated on the U.S. Munitions List may be included in this category" by the Director of the Office of Defense Trade Controls Policy. Category XXI(a).

Those who desire to publish information relating to controlled technologies must determine whether a license is needed for their disclosure. The scope of the regulation is sufficiently ambiguous that nearly four thousand "commodity jurisdiction" requests have been made since 2010 to clarify whether a particular technology would require a license.[2] These determinations are made "on a case-by-case basis, taking into account" nonbinding considerations such as "the nature, function and capability" of the civil and military applications of items described in

---

[2] *Commodity Jurisdiction Final Determinations*, U.S. Dep't of State, Dir. of Def. Trade Controls, https://www.pmddtc.state.gov/commodity_jurisdiction/determination.html

DOSWASHINGTONSUP00909

the technical data. 22 C.F.R. § 120.4(d). There are no firm deadlines for a final determination or resolution of an administrative appeal. 22 C.F.R. §§ 120.4 (e), (g). The decision "shall not be subject to judicial review." 22 U.S.C. § 2778(h).

If the government decides that information is subject to ITAR, then the speaker must apply for a license to publish online. 22 C.F.R. § 123.1(a). No firm standards govern this process: "Any application for an export license or other approval under this subchapter may be disapproved . . . whenever: (1) The Department of State deems such action to be in furtherance of *world peace, the national security or the foreign policy* of the United States, *or is otherwise advisable*." 22 C.F.R. § 126.7(a) (emphasis added). While the President has imposed a 60-day deadline to adjudicate applications, broad and open-ended exceptions swallow the rule. Policy on Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3, 2009). Adjudication may be indefinitely delayed whenever "[t]he Department of Defense has not yet completed its review" or "a related export policy is under active review and pending final determination by the Department of State." *Id.* If a license is denied, an applicant may request reconsideration, but there is *no firm deadline* for action. *See* 22 C.F.R. § 126.7(c). There is also no opportunity for judicial review. 22 C.F.R. § 128.1.

DOSWASHINGTONSUP00910

II.   **ITAR Restricts Protected Speech, Including the Defense Distributed Files.**

A major constitutional problem with the ITAR scheme is that its definition of "export" prohibits general publication, public discussion, and scientific and academic exchange. *See* 22 C.F.R. § 120.17(a)(4). The government cannot censor these protected speech activities merely by relabeling them as the "conduct" of export. The regime is manifestly a direct regulation of expression, not mere conduct.

ITAR criminalizes the publication of "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" or software, when that information relates to any of the wide range of technologies on the United States Munitions List. 22 C.F.R. § 120.10(a). Like paper documentation and blueprints, the digital documentation and design files such as Computer-Aided Design (CAD) files are speech that benefits from the full protection of the First Amendment. The government will be unable to establish otherwise. *See Freedman v. Maryland,* 380 U.S. 51, 58 (1965) ("the burden of proving that the film is unprotected expression must rest on the censor").

A.   **Publishing Technical Information is Protected Speech.**

It is settled that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011) (collecting cases). As the Supreme Court has explained, "if the

DOSWASHINGTONSUP00911

acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation omitted). The expression of "'all ideas having even the slightest redeeming social importance,' including those concerning 'the advancement of truth, science, morality, and arts' have *the full protection* of the First Amendment." *Junger v. Daley*, 209 F.3d 481, 484 (6th Cir. 2000) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)) (emphasis added).

This protection encompasses factual information such as technical data: "the First Amendment protects scientific expression and debate just as it protects political and artistic expression." *Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991). "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell*, 131 S. Ct. at 2667. And "[t]he purpose of the free speech clause . . . is to protect the market in ideas, broadly understood as the public expression of ideas, narratives, concepts, imagery, opinions—scientific, political or aesthetic." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1188 (6th Cir. 1995) (alterations in original) (quoting *Swank v. Smart*, 898 F.2d 1247, 1250 (7th Cir. 1990)).

DOSWASHINGTONSUP00912

Even instructions on how to conduct potentially dangerous activities are protected speech. *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1019 (5th Cir. 1987). In *Herceg*, this Court held that the First Amendment shielded Hustler Magazine from liability for the death of a young man who engaged in "autoerotic asphyxiation" after reading how to do it in the magazine. *Id.* The Court explained that "first amendment protection is not eliminated simply because publication of an idea creates a potential hazard." *Id.* at 1020*; accord Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991) (publisher not liable for illness from eating mushrooms described in its *Encyclopedia of Mushrooms*).

The Supreme Court explained in *Bartnicki* that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." 532 U.S. at 529-30. After all, "[m]uch speech is dangerous. Chemists whose work might help someone build a bomb, political theorists whose papers might start political movements that lead to riots, speakers whose ideas attract violent protesters, all these and more leave loss in their wake." *Am. Booksellers Ass'n. v. Hudnut*, 771 F.2d 323, 333 (7th Cir. 1985), *aff'd mem.*, 475 U.S. 1001 (1986), *reh'g denied*, 475 U.S. 1132 (1986). Yet "[t]he prospect of crime…, by itself does not justify laws suppressing protected speech." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).

DOSWASHINGTONSUP00913

## B.    Computer-Readable Documentation and Designs, Like Those of Defense Distributed, Are Protected Speech.

Defense Distributed's design files exemplify the protected speech burdened by ITAR's ban on Internet publication. They are informational documents that directly communicate technical ideas such as the dimensions and specifications of objects. *See* ROA.335-36.

The files fall into two main categories: general documentation and Computer-Aided Design (CAD) files. ROA.335-36. The first category includes traditional media such as image files and Microsoft Word documents describing objects. *Id.* Visual and written descriptions are traditional formats for protected expression. *E.g.*, *Kaplan v. California*, 413 U.S. 115, 119–120 (1973) (explaining that photographs, like printed materials, are protected by the First Amendment). ITAR clearly burdens protected speech by prohibiting the disclosure of "blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

The other, equally-protected, category of documents at issue here consists of CAD files. *See* ROA.335-36 (describing four CAD file formats). CAD files are specifications describing the shape and sometimes the physical makeup of three-dimensional objects. A CAD file might describe a solid cube by specifying its corners as coordinates in three dimensions: (0, 0, 0); (0, 1, 0); (1, 1, 0); and so on.

DOSWASHINGTONSUP00914

In the common .stl CAD language, the definition of this "solid cube" would begin as follows and repeat until each facet of the shape is defined:[3]

> **solid cube**
>   **facet normal 0 0 0**
>     **outer loop**
>       **vertex 0 0 0**
>       **vertex 0 1 0**
>       **vertex 1 1 0**
>     **endloop**
>   **endfacet**

More elaborate .stl shapes, such as the Statue of Liberty[4] or a firearm, are described the same way: listing coordinates that define the object's surface.[5]

To create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head,[6] the 3D printer itself, and the necessary physical materials.

The government incorrectly argues that technical data files lose First Amendment protection because of their "function." Defs.' Opp'n Prelim. Inj. 16. However, "[t]he fact that a medium of expression has a functional capacity should

---

[3] *See* Solid Cube, http://cpansearch.perl.org/src/EWILHELM/CAD-Format-STL-v0.2.1/files/cube.stl.

[4] hroncok, *Statue of Liberty with Base Building*, Thingiverse (Mar. 25, 2013), http://www.thingiverse.com/thing:65869/#files.

[5] Wai Hon Wah, *Introduction to STL format*, (June 1999) http://download.novedge.com/Brands/FPS/Documents/Introduction_To_STL_File_Format.pdf

[6] Slic3r Home Page, http://slic3r.org/ (last visited Dec. 15, 2015) ("Slic3r is the tool you need to convert a digital 3D model into printing instructions for your 3D printer. It cuts the model into horizontal slices (layers), generates toolpaths to fill them and calculates the amount of material to be extruded.")

DOSWASHINGTONSUP00915

not preclude constitutional protection." *Junger v. Daley*, 209 F.3d 481, 484-85 (6th Cir. 2000) (discussing computer source code); *see Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435-36 (N.D. Cal. 1996) (same). Computer software consistently receives First Amendment protection because code, like a written musical score, "is an expressive means for the exchange of information and ideas." *Junger*, 209 F.3d at 485; *see Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) (decryption software). The functional consequences of speech are considered not as a bar to protection, but to whether a regulation burdening the speech is appropriately tailored. *Junger*, 209 F.3d at 485.

Further, ITAR does not restrict itself to executable computer software that some courts have described as "functional" (and which they have *protected* nonetheless). The design files at issue here, for example, are not "functional" software that can be "run," "launched," or "executed." They are storage files for text, images, and three-dimensional shapes, having "functional" consequences only after a third party interprets and implements them with software, hardware (such as a 3D printer), and raw materials. Even under the government's flawed view that "functionality" diminishes First Amendment protection, files here are, if anything, less "functional," and at least as protected, as the computer instructions for encrypting data at issue in *Bernstein* and *Junger* or the decryption instructions at issue in *Corley*.

DOSWASHINGTONSUP00916

## C.    First Amendment Protection is Not Diminished For Speech That is Accessible to Foreigners.

The Ninth Circuit, in *Bullfrog Films, Inc. v. Wick*, invalidated regulations regarding the export of educational, scientific, and cultural materials as being facially inconsistent with the First Amendment, overly broad, and vague. 847 F.2d 502, 509-14 (9th Cir. 1988). The court held that "the First Amendment protects communications with foreign audiences to the same extent as communication within our borders." *Id.* at 509 n.9, 511-512 (declining to revisit this "well-reasoned conclusion" of the district court, which further explained that "there is no 'sliding scale' of First Amendment protection under which the degree of scrutiny fluctuates in accordance with the degree to which the regulation touches on foreign affairs. Rather, the only permissible non-neutral inquiry into the content of the speech is whether the statements adversely affect foreign policy interests to such a degree that the speech is completely unprotected." *Bullfrog Films, Inc. v. Wick*, 646 F. Supp. 492, 502-04 (C.D. Cal. 1986)). Besides, ITAR burdens speech to a foreigner within the United States. 22 C.F.R. § 120.17(a)(4). With the rise of the Internet, it is all the more crucial that the free speech rights of Americans are not diminished merely because online speech is accessible to foreigners.

In sum, ITAR burdens protected speech, including the design files at issue in this case. Only under an appropriately-tailored regime with adequate First

- 12 -

Amendment safeguards could the government restrict the publication of such information.

## III. ITAR's Prepublication Review of Technical Data Is an Unlawful Prior Restraint on Speech.

### A. Speech-Licensing Regimes that Lack Procedural Safeguards are Invalid.

Licensing schemes that create a system of pre-publication review for protected speech are unconstitutional unless the review process is bounded by stringent procedural safeguards. *Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965). A scheme making the "freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion) (quoting *Shuttlesworth v. Birmingham*, 395 U.S. 147, 151 (1969)); *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Human nature creates an unacceptably high risk that excessive discretion will be used unconstitutionally, and such violations would be very difficult to prove on a case-by-case basis. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988). Furthermore, "[b]ecause the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of

DOSWASHINGTONSUP00918

government—to the constitutionally protected interests in free expression."
*Freedman*, 380 U.S. at 57-58.

A regulation "subjecting the exercise of First Amendment freedoms to the
prior restraint of a license, without narrow, objective, and definite standards to
guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of
Birmingham, Ala.*, 394 U.S. 147, 150-51 (1969); *accord Lakewood*, 486 U.S. at
770-72. The Supreme Court warned in *Lakewood*, where a license could be denied
for not being in the "public interest," that "[t]o allow these illusory 'constraints' to
constitute the standards necessary to bound a licensor's discretion renders the
guaranty against censorship little more than a high-sounding ideal." *Lakewood*,
486 U.S. at 769-70; *see also Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288,
1308 (N.D. Cal. 1997) (holding that "national security and foreign policy interests"
are "illusory constraints").

Speech licensing schemes are also invalid when they lack certain procedural
protections:

1) the licensing decision must be prompt;

2) there must be prompt judicial review; and

3) when a censor denies a license, it must go to court to obtain a valid gag
order and once there bears the burden to prove the gag is justified.
*See Freedman*, 380 U.S. at 58-60.

- 14 -

As the Supreme Court has explained, "because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." *Id.* at 58. "Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. . . . [T]he procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." *Id.* at 59. Even a court-ordered prior restraint on speech must be stayed if appellate review is not expedited. *Nat. Socialist Party of Am. v. Skokie*, 432 U.S. 43, 43-44 (1977) (per curiam). The Court has not specified precisely when a final judicial decision must come, but it must be faster than the four months for initial judicial review and six months for appellate review in *Freedman*, 380 U.S. at 55, 61. The regime it cited with approval required "a hearing one day after joinder of issue; the judge must hand down his decision within two days after." *Id.* at 60.

Even content-neutral licensing schemes are unconstitutional if they lack these safeguards. *Lakewood*, 486 U.S. at 763-64; *see FW/PBS*, 493 U.S. at 227 (plurality opinion) (city did not pass judgment on content of protected speech, but impermissibly had indefinite amount of time to issue license). Licensing schemes create a heightened risk of discriminatory application; the newsrack permitting

DOSWASHINGTONSUP00920

scheme in *Lakewood* was neither facially content-based nor justified in terms of

content, but it was still struck down because it could be applied discriminatorily.

*Lakewood*, 486 U.S. at 757-59.

## B. ITAR's Prepublication Review Scheme Lacks the Required Safeguards.

The prepublication review process lacks *every single one* of the required

safeguards. *See Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279, 1289 (N.D.

Cal. 1996) ("The ITAR scheme, a paradigm of standardless discretion, fails on

every count.").

First, the regulatory scheme fails to provide binding standards. A license

may be denied whenever the Department of State deems it "advisable." 22 C.F.R.

§ 126.7(a)(1). The regime is even more egregious than those that purport to be

bounded by "illusory constraints," *Lakewood*, 486 U.S. at 769, such as "national

security and foreign policy interests." *Bernstein*, 974 F. Supp. at 1307. It is even

more vague than the one rejected by this Court in *Fernandes v. Limmer*, where the

agency could refuse permission to speak "when there is good reason to believe that

the granting of the permit will result in a direct and immediate danger or hazard to

the public security, health, safety or welfare." 663 F.2d 619, 631 (5th Cir. 1981).

Rather than putting the public on notice of what is prohibited, ITAR's

prepublication review regime invites the public to ask on a case-by-case basis and

reserves the right to deny a license at the pleasure of the agency.

DOSWASHINGTONSUP00921

Second, the scheme does not guarantee prompt adjudication. There are no binding deadlines for adjudication of a commodity jurisdiction request, and while Presidential guidance requires that license applications be adjudicated within 60 days, the deadline is swallowed by broad exemptions and does not require that administrative appeals adhere to any deadline. Policy on Review Time for License Applications, 74 Fed. Reg. 63,497 (Dec. 3, 2009); *see* 22 C.F.R. § 126.7(c). Here, a commodity jurisdiction decision took nearly two years. App. Br. 23.

Third, the ITAR regime fails to provide for prompt judicial review of licensing determinations: because an ITAR determination "is highly discretionary, it is excluded from review under the Administrative Procedure Act." 22 C.F.R. § 128.1. The complete lack of judicial safeguards means that the ITAR speech-licensing scheme cannot satisfy *Freedman's* requirements that such a regime provide for prompt judicial review and "that the licensor will, within a specified brief period, either issue a license or go to court." *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 802 (1988) (*quoting Freedman,* 380 U.S. at 59). The executive branch may not create a speech-licensing regime independent of judicial checks and balances.

### C.   The Government Incorrectly Argues that ITAR Prepublication Review is Not a Prior Restraint.

The government attempts to characterize the prepublication review requirement as something other than a prior restraint. It relies on two Ninth Circuit

DOSWASHINGTONSUP00922

cases that considered the lawfulness of export controls. *United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012); *United States v. Edler Indus., Inc.*, 579 F.2d 516, 521 (9th Cir. 1978). Yet until very recently, the government had disavowed the prepublication review requirement, giving those panels no occasion to consider it. ROA.332 ("Approval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to Section 125.11 does not establish a prepublication review requirement."). The government also had not asserted that the "public domain" exception of § 120.11(a) excludes publication on the Internet, now the nation's dominant medium for speech. In *Chi Mak*, the court relied on that public domain exception to protect "the types of information that are subject to the highest levels of First Amendment protection." 683 F.3d at 1136. *Edler* also predated the provisions eliminating judicial review for ITAR and the bulk of Supreme Court caselaw elaborating *Freedman*. 22 C.F.R. § 128.1 (effective Sept. 17, 1996); 22 U.S.C. § 2778(h). Further, it adopted a narrowing construction that is not clearly reflected in the statute: rather than *Edler*'s specific knowledge requirement, the statute merely requires that violations be willful. *Compare* 22 U.S.C. § 2778(c) *with Edler*, 579 F.2d at 521.

Whatever an appropriately-tailored export control regime may be, it cannot involve, as here, a broad prior restraint against Internet publication, subject to unbounded agency discretion lacking any judicial review. The Court should

DOSWASHINGTONSUP00923

conclude on this basis alone that plaintiff-appellants are likely to prevail on their

First Amendment claim.

## IV.    The Government Cannot Show that the Speech Burdened by Prepublication Review Would Cause Direct, Immediate, and Irreparable Harm to National Security.

The Supreme Court has repeatedly held that prior restraints may be sustained

only in extraordinary circumstances: prior restraints must be strictly *necessary* to

further a governmental interest of the highest magnitude. *Nebraska Press Ass'n v.*

*Stuart*, 427 U.S. 539, 562 (1975); *accord CBS Inc. v. Davis*, 510 U.S. 1315, 1317

(1994) ("Even where questions of allegedly urgent national security or competing

constitutional interests are concerned . . . we have imposed this most extraordinary

remedy only where the evil that would result from the reportage is both great and

certain and cannot be mitigated by less intrusive measures.") (quotations and

citations omitted).

A prior restraint is considered justifiable only if: (1) the harm to the

governmental interest will definitely occur; (2) the harm will be irreparable; (3) no

alternative exists for preventing the harm; and (4) the prior restraint will actually

prevent the harm. *Nebraska Press*, 427 U.S. at 562.

This exacting scrutiny applies even if the asserted governmental interest is

national security. In the *Pentagon Papers* case, *N.Y. Times Co. v. United States*,

403 U.S. 713 (1971) (per curiam), the Supreme Court the government failed to

DOSWASHINGTONSUP00924

carry the "heavy burden of showing justification for the imposition of [] a restraint" against publishing a classified report on Vietnam. 403 U.S. at 714. The narrowest concurrence[7] rejected the prior restraint because the Justices "[could not] say that disclosure of any of [the documents] will surely result in direct, immediate, and irreparable damage to our Nation or its people." 403 U.S. at 730 (Stewart, J., concurring); *see Fernandes*, 663 F.2d at 631 (adopting "direct, immediate, and irreparable damage" standard of the Stewart concurrence).

ITAR's prepublication review scheme cannot satisfy these requirements. Here, prior restraint is imposed without any showing of harm, let alone the required showing that disclosure will "surely result" in "direct, immediate, and irreparable damage." *Pentagon Papers*, 403 U.S. at 730 (Stewart, J., concurring). A prior restraint that operates in the absence of proven harm fails the *Nebraska Press* requirements of "the requisite degree of certainty to justify the restraint," that there be no alternative measures, and that the restraint "effectively . . . operate to prevent the threatened danger." 427 U.S. at 569-70, 562.

The regime here also makes no effort to tailor restrictions to individual, case-by-case circumstances. The ban categorically forbids online speech about

---

[7] The "narrowest grounds" for concurring are regarded as the Court's holding. *See Marks v. United States*, 430 U.S. 188, 193 (1977).; *see also Fernandes v. Limmer*, 663 F.2d 619, 631 (5th Cir. 1981).

DOSWASHINGTONSUP00925

science and technologies that potentially implicate ITAR, whether or not specific

speech poses a particular risk.

The government merely argues that the designs here "could be used" to

create and use a weapon against U.S. interests. Defs.' Opp'n Prelim. Inj. 10. This

falls far short of the required showing under *Nebraska Press*. Even if the designs

did communicate information that "could be used" in a harmful way, the

government has not demonstrated that prior restraint is so strictly necessary to a

concrete, critical interest that the First Amendment will allow it.

## V.     ITAR'S Ban on Publications IS a Content-Based Regulation that Fails Strict Scrutiny.

Independent of its defects as a prior restraint, the prepublication review

scheme fails to satisfy the strict First Amendment scrutiny required of restrictions

on content. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011). Because the

government cannot show the regulations are narrowly tailored to advance a

compelling state interest, they cannot permissibly be enforced in the overbroad

manner it urges.

### A.     ITAR Is a Content-Based Regulation of Speech.

ITAR regulations are triggered by the topic of speech, namely the

communication of information about technologies governed by ITAR. The

Supreme Court recently reiterated that "defining regulated speech by particular

subject matter" is an "obvious" content-based regulation. *Reed v. Town of Gilbert*,

DOSWASHINGTONSUP00926

135 S. Ct. 2218, 2227 (2015). More "subtle" content-based distinctions involve "defining regulated speech by its *function or purpose*." *Id.* (emphasis added). And it has long been recognized that "the First Amendment's hostility to content based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic." *Burson v. Freeman*, 504 U.S. 191, 197 (1992); *accord Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (statute restricting speech about crime is content-based); *Consolidated Edison Co. of N.Y. v. Public Service Comm'n of N.Y.*, 447 U.S. 530, 537-38 (1980).

A regulation that involves a licensor in appraising facts, exercising judgment, and forming opinions is also a content-driven scheme. *See, e.g.*, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 135-36 (1992) (permit fee based on the capacity for a march to cause violence was content-based); *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940) (censor asked to determine whether a cause is "religious").

In ITAR's prepublication review scheme, regulation of speech is triggered when it describes covered subject matter. In both the commodity jurisdiction and licensing processes, the government analyzes the content of the particular speech to decide whether it discusses subject matter that should be controlled under ITAR, judge its communicative impact, and determine whether blocking the disclosure is

DOSWASHINGTONSUP00927

"in furtherance of world peace, the national security or the foreign policy of the United States, or is otherwise advisable." 22 C.F.R. § 126.7. Just like the regulators in *Forsyth County*, who evaluated the capacity of a message to lead to violence, ITAR regulators are engaged in the content-based regulation of speech when they make individualized censorship decisions.

The government argues that a "content-neutral purpose" underlies the regulations, but that is irrelevant here.[8] Defs.' Opp'n Prelim. Inj. 15-16. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 135 S. Ct. at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). The government here has chosen content-based *means* to achieve its purpose, requiring strict scrutiny. *See Lakewood*, 486 U.S. at 759 (striking down a newsrack ordinance because of censorial effects, without discussing governmental purpose for enacting the ordinance); *see also Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 592 (1983) (illicit legislative intent is not necessary for a First Amendment violation); *Cantwell*, 310 U.S. at 304-05 (assuming a proper purpose, "the question remains whether the method adopted by Connecticut to that end transgresses the liberty safeguarded by the Constitution").

---

[8] Besides, preventing the spread of information on certain topics is hardly "content-neutral."

## B.     ITAR Does Not Satisfy Strict Scrutiny.

The government bears the burden of showing that the regulations are necessary to serve a compelling state interest and are narrowly tailored to serve that interest. *U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). A regulation is not narrowly tailored if:

- it fails to advance the relevant interest,[9]

- it burdens substantially more speech than is necessary to vindicate the interest,[10]

- less-restrictive means were available to achieve the same ends,[11] or

- it is underinclusive and thus burdens speech without advancing the asserted interest.[12]

Just as "the Government may not reduce the adult population to only what is fit for children," *Reno v. ACLU*, 521 U.S. 844, 875 (1997), neither may it reduce the online speech of Americans to only what is fit for foreign consumption.

---

[9] *See, e.g.*, *Eu v. San Francisco County Democratic Cent. Committee*, 489 U.S. 214, 226, 228-29 (1989); *Meyer v. Grant*, 486 U.S. 414, 426 (1988); *Globe Newspaper Co. v. Superior Court for Norfolk*, 457 U.S. 596, 609-10 (1982); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 789-90 (1978); *Buckley v. Valeo*, 424 U.S. 1, 45-47, 53 (1976).

[10] *See, e.g.*, *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120-21 (1991); *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 500-01 (1985).

[11] *U.S. v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *R. A. V. v. City of St. Paul*, 505 U.S. 377, 395 (1992); *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986).

[12] *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

DOSWASHINGTONSUP00929

Banning Internet publication prevents valuable domestic debate and sharing of information, and represents a radical departure from traditional export controls.

### 1. Less-Restrictive Means Are Available to Address ITAR's Goals.

The history of ITAR further demonstrates that prepublication review is not necessary to achieve the government's goals. In 1980, the State Department responded to First Amendment concerns by repudiating the existence of a prepublication review requirement: "Approval is not required for publication of data within the United States as described in Section 125.11(a)(1). Footnote 3 to section 125.11 does not establish a prepublication review requirement."[13] The State Department revised the regulations several times to clarify that it was *not* purporting to impose an unconstitutional licensing regime, in response to concerns from the Department of Justice.[14]

ITAR has long recognized that it is inappropriate and unnecessary to constrain the publication of unclassified information into the public domain. *See* 22 C.F.R. § 120.11. Yet the government now takes the position that the Internet does not qualify as the "public domain." Defs.' Opp'n Prelim. Inj. 3 n.3.[15] The arbitrary

---

[13] U.S. Dep't of State, *Munitions Control Newsletter*, https://app.box.com/s/ohqvn3b6tawz9d65g12s3ri2gpxo8fdp.

[14] *DOJ Memos on ITAR Prior Restraint*, Defense Trade Law Blog, July 9, 2015, http://defensetradelaw.com/2015/07/09/doj-memos-on-itar-prior-restraint/.

[15] This position is contrary to the plain meaning of "public domain" and 22 C.F.R. § 120.11 (a)(4), which includes information available at public libraries. Among

- 25 -

DOSWASHINGTONSUP00930

distinction between electronic publication and other media is irrational and untenable. ITAR recognizes that the public domain includes information available "[a]t libraries open to the public or from which the public can obtain documents." 22 C.F.R. § 120.11(a)(4). ITAR also defines the public domain to include publications sold at newsstands and bookstores and subscriptions that "are available without restriction to any individual who desires to obtain or purchase the published information." *See* 22 C.F.R. §§ 120.11 (a)(1), (2). These media are freely available to foreign persons, and the exact same information could be published electronically or in print form. If these media need not be restricted to achieve the government's ends, the entire medium of Internet publication need not be presumptively off-limits for communication about defense-related technologies.

A substantial body of law provides alternative means for securing sensitive defense information, including the government clearance system and contractual restraints on disclosure. These approaches reflect the traditional First Amendment

---

public libraries, 99% have public Internet connections, averaging nineteen computers per location. Information Policy & Access Center, 2014 Digital Inclusion Survey (2015), http://digitalinclusion.umd.edu/sites/default/files/uploads/2014DigitalInclusionSurveyFinalRelease.pdf. Americans consider Internet access at public libraries to be just as important as providing access to books. Kathryn Zickuhr, et al., *Library Services in the Digital Age*, Pew Internet, Jan. 22, 2013, http://libraries.pewinternet.org/2013/01/22/part-4-what-people-want-from-their-libraries/. The exception for subscriptions also applies: an Internet user can subscribe to the content of any website (many websites make this effortless with "feeds"). *See* 22 C.F.R. § 120.11(a)(2).

DOSWASHINGTONSUP00931

distinction between restraints on disclosure of information that one has a duty to keep secret as a result of a sensitive position or agreement, as opposed to information one has independently discovered or generated. *See United States v. Aguilar*, 515 U.S. 593, 606 (1995) ("Government officials in sensitive confidential positions may have special duties of nondisclosure."). *Compare Boehner v. McDermott*, 484 F.3d 573, 579 (D.C. Cir. 2007) (en banc) (punishing disclosure of information obtained by defendant in his role as member of House Ethics Committee), *with Jean v. Mass. State Police*, 492 F.3d 24, 32 (1st Cir. 2007) (protecting similar disclosure, and noting that the court in *Boehner* would have done the same "if McDermott had been a private citizen, like Jean").

Similarly, Congress considered (and rejected) changes to the Undetectable Firearms Act that would have addressed the creation, transport, or sale of any 3D printed firearm that was not detectable by standard means.[16] This approach demonstrates that protected speech need not be burdened to vindicate a government interest in preventing the use of certain weaponry.

---

[16] Kasie Hunt & Carrie Dann, *Senate Extends Ban on Undetectable Guns But Nixes Tighter Restrictions*, NBC News, Dec. 9, 2013, http://www.nbcnews.com/news/other/senate-extends-ban-undetectable-guns-nixes-tighter-restrictions-f2D11717122; Undetectable Firearms Modernization Act, H.R. 3643, 113th Cong. (2013); Undetectable Firearms Reauthorization Act, S.1774, 113th Cong (2013).

DOSWASHINGTONSUP00932

### 2.    *Most Speech Burdened by ITAR Does Not Threaten Any Concrete Government Interest.*

The scope of ITAR's prohibition on speech could apply to members of the press republishing newsworthy technical data, professors educating the public on scientific and medical advances of public concern, enthusiasts sharing otherwise lawful information about firearms, domestic activists trading tips about how to treat tear gas or resist unlawful surveillance, and gun control opponents expressing a point about proliferation of weapons. Innocent online publication on certain topics is prohibited simply because a hostile foreign person could conceivably locate that information, use it to create something harmful, and use a harmful device against US interests. Speech cannot permissibly be repressed for such an attenuated and hypothetical government end.

Similarly, ITAR forbids the re-publication of information that is already available on the public Internet, because the government does not recognize the Internet as "public domain." Defs.' Opp'n Prelim. Inj. 3 n.3; *see* ROA.335-38. Banning this re-publication does not meaningfully advance any government interest: "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989).

DOSWASHINGTONSUP00933

### 3. *Alternative Channels for Speech Do Not Justify the Restraint.*

The government incorrectly asserts that the restraint on speech is justified because alternative channels of communication are left intact. Defs.' Opp'n Prelim. Inj. 22. However, supposed alternative channels cannot overcome the challenged program's content discrimination. As the Supreme Court explained in *Reno*:

> This argument is unpersuasive because the CDA regulates speech on the basis of its content. A "time, place, and manner" analysis is therefore inapplicable. … The Government's position is equivalent to arguing that a statute could ban leaflets on certain subjects as long as individuals are free to publish books. In invalidating a number of laws that banned leafletting on the streets regardless of their content--we explained that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

*Reno*, 521 U.S. at 879-80 (quoting *Schneider v. N.J. Twp. of Irvington*, 308 U.S. 147, 163 (1939).

Furthermore, even if there were no content discrimination here, there *are* no adequate alternative channels of communication. There is no medium of expression that is equivalent to Internet publication, enabling Americans to engage with strangers and colleagues who agree or vehemently disagree with their views in real time from thousands of miles away—yet is inaccessible to foreigners. *See Reno*, 521 U.S. at 868-69 (describing the "vast democratic forums of the Internet"). Even if online platforms restricted themselves to domestic access, a user still could not speak freely because the regulations prohibit disclosure to foreign persons *in*

- 29 -

*the United States.* 22 C.F.R. § 120.17(a)(4). It would also be a trivial matter for any person abroad to obtain the information using commonly-available "virtual private network" services that pipe traffic through a computer located in the US. This is an overwhelmingly common practice among those who are frustrated by geo-blocking of media content or location-based discrimination.[17] And regardless of the technology at issue, an overbroad regulation of speech simply cannot be justified by the theory that publishers could take on the burden of policing their readership to make sure they are not foreign; the Supreme Court explained in *Reno* the chilling effects that would result from such a regime. *Reno*, 521 U.S. at 865-67 (discussing access by minors).

The government will be unable to prove that the regulations at issue satisfy strict First Amendment scrutiny.

## VI.   The Prepublication Review Scheme Is Invalid Even Under the Reduced Scrutiny the Government Advocates.

Even if the prepublication review scheme were subject to intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664

---

[17] *See, e.g.*, Elise Dalley, *Bypassing Geo-blocked Sites*, Choice, Aug. 13, 2014, https://www.choice.com.au/electronics-and-technology/internet/internet-privacy-and-safety/articles/bypass-geo-blocking.

DOSWASHINGTONSUP00935

(1994). The regulation also may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 665.

> The tailoring requirement does not simply guard against an impermissible desire to censor. The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency.

*McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) (internal quotation omitted).

ITAR demonstrates exactly the preference for "mere convenience" that *McCullen* called out as impermissible. The overbreadth and poor tailoring discussed above are so egregious that the lesser standard of intermediate scrutiny cannot save the regime. The regulations sacrifice informed public debate and scientific learning, even where the disclosures at issue pose no threat to US interests. The government has done no more than "posit the existence of the disease sought to be cured" and assert that the regulations will cure it – not enough to carry its burden. *See Turner*, 512 U.S. at 664.

## CONCLUSION

For the foregoing reasons, plaintiff-appellants are likely to prevail on their First Amendment claim.

DOSWASHINGTONSUP00936

Dated: December 17, 2015          Respectfully submitted,

                                  By:  /s/ Kit Walsh
                                       Kit Walsh (CA SBN 303598)

                                       ELECTRONIC FRONTIER FOUNDATION
                                       815 Eddy Street
                                       San Francisco, CA 94109
                                       Tel: (415) 436-9333
                                       Fax: (415) 436-9993
                                       kit@eff.org

                                       *Counsel for Amicus Curiae*

DOSWASHINGTONSUP00937

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(C)

I hereby certify as follows:

1.    The foregoing Brief of *Amici Curiae* complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief is printed in proportionally spaced 14-point type, and there are 6,999 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)).

2.    The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 2011 in 14-point Times New Roman font.


Dated:  December 17, 2015              /s/ Kit Walsh
                                       Kit Walsh

DOSWASHINGTONSUP00938

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeal for the Fifth Circuit by using the appellate CM/ECF System on December 17, 2015. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  December 17, 2015                    /s/ Kit Walsh
                                             Kit Walsh

DOSWASHINGTONSUP00939

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

December 18, 2015

Mr. Kit Walsh
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109

    No. 15-50759    Defense Distributed, et al v. U.S. Dept. of
                    State, et al
    USDC No. 1:15-CV-372

Dear Mr. Walsh,

The following pertains to your Amicus brief for Electronic Frontier electronically filed on December 17, 2015.

You must submit the seven (7) paper copies of your brief required by 5ᵀᴴ Cɪʀ. R. 31.1 within five (5) days of the date of this notice pursuant to 5th Cir. ECF Filing Standard E.1.

You must electronically file a "Form for Appearance of Counsel" within 14 days from this date. You must name each party you represent, see Fᴇᴅ R. Aᴘᴘ. P. 12(b) and 5ᵀᴴ Cɪʀ. R. 12 & 46.3. The form is available from the Fifth Circuit's website, www.ca5.uscourts.gov. If you fail to electronically file the form, the brief will be stricken and returned unfiled.

                                Sincerely,

                                LYLE W. CAYCE, Clerk

                                By: _____
                                Shawn D. Henderson, Deputy Clerk
                                504-310-7668

cc:
        Mr. Joshua Michael Blackman
        Mr. Bruce D. Brown
        Mr. Matthew Goldstein
        Mr. Alan Gura
        Mr. David T. Hardy
        Mr. William Bryan Mateja

Mr. Raffi Melkonian
Mr. Leif A. Olson
Mr. Michael S. Raab
Mr. Ilya Shapiro
Mr. Eric J. Soskin
Mr. Daniel Bentele Hahs Tenny

DOSWASHINGTONSUP00941

No. 15-50759

## United States Court of Appeals
### for the Fifth Circuit

DEFENSE DISTRIBUTED and
SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellants,*

*~ versus ~*

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, in his official capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, individually and in his official capacity as Deputy Assistant Secretary of State for Defense Trade Controls Policy Division; SARAH J. HEIDEMA, individually and in her official capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; and GLEN SMITH, individually and in his official capacity as the Senior Advisor, Office of Defense Trade Controls,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas

**Brief of the Madison Society Foundation, Inc.,
as *Amicus Curiae* in Support of Plaintiffs-Appellants**

David T. Hardy
8987 E. Tanque Verde No. 265
Tucson, Arizona 85749
(520) 749-0241
dthardy@mindspring.com

Leif A. Olson
THE OLSON FIRM, PLLC
PMB 188
4830 Wilson Road, Suite 300
Humble, Texas 77396
(281) 849-8382
leif@olsonappeals.com

DOSWASHINGTONSUP00942

## Supplemental Certificate of Interested Persons

Case 15-50759, *Defense Distributed, et al., v. U.S. Dept. of State, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
| --- | --- |
| David T. Hardy | Counsel to *amicus* |
| Madison Society Foundation | Amicus curiae |
| Leif A. Olson | Lead counsel to *amicus* |

The Madison Society Foundation is a California nonprofit corporation. It has no parent companies, no subsidiaries, and no affiliates. It does not issue shares to the public.

/s/ Leif A. Olson

1

DOSWASHINGTONSUP00943

# Table of Contents

Supplemental Certificate of Interested Persons .................................... 1

Table of Authorities ............................................................................ 3

Interest and Independence of *Amicus Curiae* ........................................ 5

Argument: *The Second Amendment's right to keep and bear arms was premised on a society in which arms were created by individuals.* ................................................................................ 6

    A.  During the Framing, firearms were created by individuals, not manufactured by corporations. ................... 6

    B.  Many craftsmen sidelined as gunsmiths. .............................. 7

    C.  The Framers understood gunsmithing to be a personal activity by which each man could make his own gun. ............ 9

Conclusion ......................................................................................... 13

Certificate of Compliance ................................................................... 14

Certificate of Filing and Service ........................................................ 14

DOSWASHINGTONSUP00944

# Table of Authorities

## Statutes

1705 Va. Acts ch. 31
   3 Hening's Laws of Virginia 362 ......................................10

1775 Va. Acts Dec. Interreg. ch. 3
   9 Hening's Laws of Virginia 94.........................................10

Act of Jan. 25, 1758, ch. 18
   4 Acts and Resolves, Public and Private, of the
   Province of the Massachusetts Bay.............................11

Act of May 8, 1792, ch. 33
   1 Stat. 271 .........................................................................12

## Books

Gallay, Alan
   Colonial Wars of North America 1512–1763 (2015) ....11

Gill, Harold B.
   The Gunsmith in Colonial Virginia (1974)...............9, 11

Hounshell, David A.
   From the American System to Mass Production
   1800–1932 (1984)...........................................................12

Kauffman, Henry J.
   Early American Gunsmiths 1650–1850 (1952) ..............8, 9

DOSWASHINGTONSUP00945

**Other sources**

American National Standards Institute

*Voluntary Industry Performance Standards for Pressure and Velocity of Centrefire Rifle Sporting Ammunition for the Use of Commercial Manufacturers* (1992) ...................................................................... 13

Brumfield, Gary

*Rifle Barrel Making: The 18th Century Process*
flintriflesmith.com/toolsandtechniques/barrel_making.htm ........... 6

Eli Whitney Museum

*The Factory*
www.eliwhitney.org/7/museum/about-eli-whitney/factory .......... 12

Letter from Joseph Hewes to Samuel Johnston (Feb. 13, 1776)
*in* 10 Colonial Records of N.C. 447 (William L. Saunders, ed., 1890) ........................................................................ 10

DOSWASHINGTONSUP00946

## Interest and Independence of *Amicus Curiae*

The Madison Society Foundation is a not-for-profit 501(c)(3) corporation based in California. It promotes and preserves the purposes of the Constitution of the United States, in particular the right to keep and bear arms.

The Framers understood this right to encompass not just the ability to use arms, but the ability to construct them. The Foundation comes as a friend of the Court to explain how this understanding should inform the Court's analysis of the arms regulations challenged by the plaintiffs and how affirming those restrictions would diminish the rights protected by the First and Second Amendments.

No one other than the Foundation and its counsel wrote or paid for this brief or parts of it.

The parties consent to the Foundation's filing this brief.

DOSWASHINGTONSUP00947

**Argument:**

*The Second Amendment's right to keep and bear arms was premised on a society in which arms were created by individuals.*

## A.  During the Framing, firearms were created by individuals, not manufactured by corporations.

When the Second Amendment was framed, creation of firearms was very much a "home brew" operation. There were no firearms manufacturers as such; the field was dominated by individual blacksmiths who created firearms as part of their calling. The concept of "gun manufacturing" as a distinct form of industry did not originate until after the Framing, and it didn't take hold until well into the 19th century. Remington Arms, which boasts of being America's first gun manufacturer, was founded in 1816—in a blacksmith's shop. Colt, Winchester, and Smith & Wesson all were founded in the mid-1850s, long after the Framers were gone.[1]

Any blacksmith could create a firearm's barrel by hammering a heated sheet of iron around a round mandrel, welding the resulting seam, and reaming the inside to the desired diameter. Gary Brumfield, *Rifle Barrel Making: The 18th Century Process*, flintriflesmith.com/toolsandtechniques/barrel_making.htm. The gun's stock was carved from wood; the lock—the firing mechanism—was formed from iron,

---

[1]    *See* bit.ly/1lUdIUA (Remington); bit.ly/1k5k1CY (Colt); bit.ly/1RUQJVE (Winchester); bit.ly/1k5jPDH (Smith & Wesson) (each page last visited December 17, 2015).

DOSWASHINGTONSUP00948

purchased, or recycled from an older firearm. Anyone who cares to learn (and employ) the process can still do so today: Wallace Gusler, retired Master Gunsmith at Colonial Williamsburg, began as a sawmill worker and later turned to creating custom flintlock firearms. His workshop was made from a chicken coop. His primary tools were a blacksmith's forge and wood chisels. *See* Gary Brumfield, MUZZLE BLASTS, *Wallace Gusler, Master Gunsmith* (Jan. 2004) (available at flintriflesmith.com/WritingandResearch/Published/wallaceretires_mb.htm).

## B.    Many craftsmen sidelined as gunsmiths.

Contemporary newspaper advertisements and similar records make it clear that gunsmithing was most often a sideline of blacksmithing. But blacksmiths weren't a gunsmithing monopoly:

- Edward Annely of New York in 1748 advertised that he "engraves Coats of Arms on Plate, etc." and "likewise makes guns and pistols as any gentleman shall like…."

- Francis Brooks of Philadelphia in 1791 advertised himself as a "pistol maker" and seller of "Jewelry, Cutlery, and Hardware."

- Anthony Jankofsky of South Carolina in 1777 advertised that he "follows the different branches of a Locksmith, Gunsmith, and all sorts of Copper and Brass work; likewise all manner of iron work."

DOSWASHINGTONSUP00949

- Ralph Atmar of Charleston, a "Goldsmith and Engraver," advertised in 1800 that "[a]ny part of gun-work shall be finished, that he undertakes."

- Samuel Bonsall of South Carolina advertised himself in 1768 as a whitesmith[2] who also produced stove and kitchen grates, repaired clocks and house bells, and did "also Gunsmith's and Locksmith's work in general."

Henry J. Kauffman, EARLY AMERICAN GUNSMITHS 1650–1850 at 4–5, 10, 14, 55 (1952).

Gunsmithing was sufficiently small-scale that much more unusual combinations of crafts also appeared. For instance, besides their "Gun Work," the Geddy Brothers of Williamsburg in 1751 advertised their production of buckles, hinges, nails, house bells, sundials, surgical instruments—and hernia belts (in the vernacular of the time, "Rupture Bands of different Sorts"). *Id.* at 34. Even learned professionals maintained their skill at the craft: Ignatius Leitner in 1800 advertised a new office in Yorktown, Pennsylvania:

> Where he continues to draw deeds, mortgages, Power of Attorney, apprentice indentures, Bills, Notes, [E]state executor and administrators accounts.... N.B. He still continues and keeps hands at work in his former branches as making rifles, still cocks, casting rivets, gun mountings, etc. at the lowest prices.

*Id.* at 61.

---

[2]    A tinsmith.

DOSWASHINGTONSUP00950

The breadth of talents that could be applied to gunsmithing was reflected in the business of gunsmithing. Gunsmiths who received a large order, particularly a state contract for militia muskets, would often subcontract. Cabinet makers might be deputed to make stocks; cutlers, to make springs. Harold B. Gill, THE GUNSMITH IN COLONIAL VIRGINIA 21 (1974). Some smiths didn't care which tradesman, craftsman, or laborer was making the components as long as they came in: "Peter Brong, Gunsmith" advertised in 1801 that he would pay "20 shillings, cash, for every musket-barrel which is proven, and of the size directed by law, and 19 shillings, cash, for each good musket-lock." Kauffman at xvi.

## C.  The Framers understood gunsmithing to be a personal activity by which each man could make his own gun.

The small-scale nature of gunsmithing informed Revolution-era governments' analysis of Revolution-era problems. Joseph Hewes, a North Carolina delegate to the Continental Congress, worried over the British blockade's effect on the new nation's acquisition of guns and powder. Part of the solution he devised was to rely on the nature of contemporary gunsmithing:

> Americans ought to be more industrious in *making those articles at home*, every Family should make saltpeter, every Province have powder Mills and every body encourage the making of Arms.

DOSWASHINGTONSUP00951

Clayton Cramer, Firearms Ownership and Manufacturing in Early America 214 (2001) (*quoting* letter from Joseph Hewes to Samuel Johnston (Feb. 13, 1776), *in* 10 Colonial Records of N.C. 447 (William L. Saunders, ed., 1890)) (emphasis added).

Colonial-era statutes commonly recognized, just as Hewes did, that in time of need, virtually anyone who could work metal or wood could function as a gunsmith. In 1705, the Virginia General Assembly authorized officials to conscript "any smith, wheel-right, carpenter or other artificer whatsoever, which shall be thought usefull for the fixing of arms and making of carriages for great guns...." 1705 Va. Acts ch. 31, 3 Hening's Laws of Virginia 362, 363. At the outbreak of the Revolution, that same Assembly ordered its Committee of Safety to "contract, upon the best terms they can, with such gunsmiths, *or others*, as they may approve, for manufacturing or supplying such quantity of arms as they shall judge proper for the defence of this colony." 1775 Va. Acts Dec. Interreg. ch. 3, 9 Hening's Laws of Virginia 94 (emphasis added). The colony's government explicitly recognized that those who called themselves "gunsmiths" might not be able to supply enough arms; the contingency plan was to contract with "others"—anyone who could work on a firearm. And contract they did:

DOSWASHINGTONSUP00952

> With the beginning of the revolutionary war many local
> blacksmiths turned gunsmiths, and other gunsmiths came to
> Williamsburg to be employed in repairing and making arms
> in local shops. John Draper, a Williamsburg farrier, for ex-
> ample, repaired pistols for the state in 1776.

Gill at 21.

One side effect of the informal production of firearms was that there were no standardized calibers. The bore size of a firearm reflected whatever mandrel and reamer the maker had at hand, and he would commonly provide his purchaser with a bullet mold suited to his product. Alan Gallay, Colonial Wars of North America 1512–1763, at 786 (2015). ("Provincial soldiers carried a bewildering array of firearms…. The calibers of provincial firearms varied as much as the weapons themselves."). These variations created military- and militia-supply problems, which militia statutes dealt with by requiring militiamen to show up with their own ammunition. A Massachusetts statute is typical: militiamen were to show up with a powder-horn, one pound of powder, and "forty bullets fit for his gun." Act of Jan. 25, 1758, ch. 18, 4 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, at § 3.

In 1792, the First Congress attempted to phase in a national standard for militia muskets. Initially, every militiaman was to provide himself with "a good musket or firelock" and twenty-four bullets "suited to the bore" of his gun. But within five years, the those muskets were

11

to be "of bores sufficient for balls of the eighteenth part of a pound."[3] Act of May 8, 1792, ch. 33, 1 Stat. 271, 271–272, at § 1. There is no indication that the latter provision was ever enforced, or enforceable.

"Standard-issue" military arms were made in specified calibers, but they were otherwise created in this same informal manner. Congress in 1798 awarded contracts for weapons to 27 gunmakers, each of whom received a sample of the musket the government expected him to create. *See* Eli Whitney Museum, *The Factory*, www.eliwhitney.org/7/museum/about-eli-whitney/factory. Eli Whitney received a contract for 10,000 of those muskets and began to create the first American assembly line, using water-driven mills and standardized filing jigs. *Id.* True mass production of standard-issue muskets—where the parts from one manufacturer might be interchanged with those from another—wasn't achieved until 1850. David A. Hounshell, From the American System to Mass Production 1800–1932, at 3–4 (1984). That interchangeability, and the greater precision necessary to manufacture firearms that shot metallic cartridges,[4] combined to cause the decline of individually made firearms following the Civil War.

---

[3] Roughly 0.69 caliber. This would be compatible with French "Charleville" muskets, with which the American regular military was liberally supplied.

[4] As one example: with a metallic cartridge firearm, the "chamber," the part of the barrel that holds the cartridge when it is fired, must be built to tolerances measured in thousandths of an inch – hardly something a blacksmith could do. *See* Am. Natl. Stds. Inst., *Voluntary Indus. Performance Stds. for Pressure & Velocity of Centrefire Rifle Sporting Ammunition for the Use of Commercial Mfrs.*, at

12

DOSWASHINGTONSUP00954

## Conclusion

The Framing generation had no concept of mass production of arms or of a firearms market dominated by a few national companies. To them, firearms were hand-made by local blacksmiths and other craftsmen. Anyone competent with forge and hammer might make a barrel; anyone competent with chisels might make a gun stock. Far from being an oddity or eccentricity, individual and even homemade firearms—what a marketer today might call artisanal firearms—were the state of the art.

The Society offers this background to assist the Court with its interpretation of the scope of the right to bear arms, which the society suggests requires the Court to reverse and remand with instructions to enter a preliminary injunction barring the enforcement of the challenged regulations.

Respectfully submitted,

THE OLSON FIRM, PLLC

/s/ Leif A. Olson

Leif A. Olson
  Texas Bar No. 24032801
  leif@olsonappeals.com
PMB 188
4830 Wilson Road, Suite 300
Humble, Texas 77396

---

23–83, 85–90 (1992) (requiring chamber dimensions to be accurate to within at least 0.002 inches); *id.* at 84 (requiring accuracy within 0.004 inches).

13

DOSWASHINGTONSUP00955

(281) 849-8382

David T. Hardy
8987 E. Tanque Verde No. 265
Tucson, Arizona 85749
(520) 749-0241
dthardy@mindspring.com
***Counsel for amicus***

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Fed. R.
   App. P. 32(a)(7)(B) because, according to the word-count function
   of Word 2013, it contains 1,676 words, excluding the parts of the
   brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App.
   P. 32(a)(5) and the type style requirements of Fed. R. App. P.
   32(a)(6) because it was prepared using Word 2013 and uses propor-
   tionally spaced typefaces (Equity Text B, Equity Caps B, and Op-
   tima) in 14-point type for body text and 12-point type for footnotes.

/s/ Leif Olson

## Certificate of Filing and Service

On December 17, 2015, I served this *Brief of the Madison Society
Foundation, Inc., as Amicus Curiae in Support of Plaintiffs-Appellants*
upon all counsel of record through the Court's CM/ECF system.

/s/ Leif Olson

14

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

December 18, 2015

Mr. Leif A. Olson
Olson Firm, P.L.L.C.
4830 Wilson Road
Suite 300, PMB 188
Humble, TX 77396

     No. 15-50759   Defense Distributed, et al v. U.S. Dept. of
                    State, et al
     USDC No. 1:15-CV-372

Dear Mr. Olson,

The following pertains to your Amicus brief electronically filed
on December 17, 2015.

You must submit the seven (7) paper copies of your brief required
by 5ᵀᴴ CIR. R. 31.1 within five (5) days of the date of this notice
pursuant to 5th Cir. ECF Filing Standard E.1.

You must electronically file a "Form for Appearance of Counsel"
within 14 days from this date.  You must name each party you
represent, see FED R. APP. P. 12(b) and 5ᵀᴴ CIR. R. 12 & 46.3.  The
form  is  available  from  the  Fifth  Circuit's  website,
www.ca5.uscourts.gov.  If you fail to electronically file the form,
the brief will be stricken and returned unfiled.

                         Sincerely,

                         LYLE W. CAYCE, Clerk

                         By: _____
                         Shawn D. Henderson, Deputy Clerk
                         504-310-7668

cc:
     Mr. Joshua Michael Blackman
     Mr. Bruce D. Brown
     Mr. Matthew Goldstein
     Mr. Alan Gura
     Mr. David T. Hardy

DOSWASHINGTONSUP00957

Mr. William Bryan Mateja
Mr. Raffi Melkonian
Mr. Michael S. Raab
Mr. Ilya Shapiro
Mr. Eric J. Soskin
Mr. Daniel Bentele Hahs Tenny

DOSWASHINGTONSUP00958

NO.  15-50759

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————

IN THE MATTER OF
DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED

Plaintiffs – Appellants

v.

UNITED STATES DEPARTEMENT OF STATE; JOHN F. KERRY, in His Official
Capacity as the Secretary of the Department of State;
DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State
Bureau of Political Military Affairs; KENNETH B. HANDELMAN,
Individually and in His Official Capacity as the Deputy
Assistant Secretary of State for Defense Trade Controls in the
Bureau of Political-Military Affairs; C. EDWARD PEARTREE,
Individually and in His Official Capacity as the Director of the
Office of Defense Trade Controls Policy Division; SARAH J.
HEIDEMA, Individually and in Her Official Capacity as the
Division Chief, Regulatory and Multilateral Affairs, Office of
Defense Trade Controls Policy; GLENN SMITH, Individually and in
His Official Capacity as the Senior Advisor, Office of Defense
Trade Controls,

Defendants - Appellees

———————————————————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
No. 15-cv-00372 (Hon. Robert Pitman)

———————————————————————————————

**Brief of Texas Public Policy Foundation as Amicus Curiae in Support of Defense
Distributed**

———————————————————————————————

Counsel listed on inside cover

Exhibit A

ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
JOEL STONEDALE
Texas Bar No. 24079406
jstonedale@texaspolicy.com
Texas Public Policy Foundation
Center for the American Future
901 Congress Avenue
Austin, TX 78701
PHONE: (512) 472-2700
FAX: (512 472-2728
*Attorneys for Texas Public Policy Foundation, as Amicus Curiae for Defense
Distributors*

## CERTIFICATE OF INTERESTED PERSONS

Amicus Curiae certify that they are a non-profit 501(c)(3) organization.

Undersigned counsel of record certifies that no person or entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualifications or recusal.

Dated: December 18, 2015

_____
ROBERT HENNEKE

DOSWASHINGTONSUP00961

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ………………………………...…… i

TABLE OF CONTENTS …………………………………………………………...… ii

TABLE OF AUTHORITIES ……………………………………………...…… iv

STATEMENT OF AMICUS CURIAE ………………………………………….. vi

STATEMENT REGARDING ORAL ARGUMENT …………………...…… vii

INTRODUCTION …………………………………………………….…….. 1

ARGUMENT …………………………………………………………….…….. 1

I.    REGULATORY BACKGROUND …………………………….……………….. 1

II.    ITAR VIOLATES THE FIRST AMENDMENT ………………...………. 3

    A.    ITAR Is A Content-Based Restriction On Speech ………………...…… 4

        a.    The District Court Improperly Looked To The ITAR's Purpose To Determine Whether They Are Content-Based ……………………………………………… 4

        b.    Even If It Is Proper To Consider The ITAR's Purpose, Their Purpose Is To Restrict Information Because Of Its Content............................................................ 6

   B.    ITAR is an Unconstitutional Prior Restraint on Speech ………………............ 9

        a.    Open-Ended Licensing…………………………………………... 10

        b.    Lack of Procedural Safeguards ………………………….…... 11

III.    ISSUING THE TEMPORARY INJUNCTION WILL NOT HARM THE PUBLIC INTEREST …………………………………………………...… 13

IV.    CONCLUSION …………………………………………………...… 15

DOSWASHINGTONSUP00962

CERTIFICATE OF COMPLIANCE …………………………………....…….. 16

CERTIFICATE OF SERVICE ……………………………………………….. 17

DOSWASHINGTONSUP00963

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States*, 509 U.S. 544 (1993) …………………………………… 9

*Asgeirsson v. Abbott*, 696 F. 3d 454 (5th Cir. 2012) ………………….....………. 7, 8

*Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015) …………………..……………….. 7

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 US 750 (1988) …….. 10, 11

*Defense Distributed v. United States Dept. of State*, Dkt. No. 32
    at 10, 15-CV-372-RP (W.D. Tex. June 10, 2015) ...............4, 6, 8, 9, 12, 14

*Freedman v. Maryland*, 380 U.S. 51 (1965) ……………………………….….... 11

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) …………………………………….. 13

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ...……………… 11

*Kagan v. City of New Orleans*, 753 F.3d 560 (5th Cir. 2014) …………………. 7, 8

*Kunz v. New York*, 340 U.S. 290 (1951) …………………………….………… 11

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ……………………….…….... 3, 7

*New York Times v. United States*, 403 U.S. 713 (1971) ………………….12, 14, 15

*Norton v. City of Springfield*, 612 Fed. Appx. 386 (7th Cir. 2015) ……….…….. 7

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ……………………………...… 3

*Reed v. Town of Gilbert,* 135 S. Ct. 2218 (2015) ………………………..... 5, 6, 7, 9

*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41(1986) ………………..…….. 6, 7, 8

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969) ………………….…….. 11

DOSWASHINGTONSUP00964

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) ……………………………………….……… 3

*Southeastern Promotions, Ltd. v. Conrad*, 420 US 546 (1975) …………...……… 9

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) …………………….....… 6, 7

**Statutes**

22 C.F.R § 120.4 …………………………………….……………………….... 9

22 C.F.R. § 120.4(a) ..………………………………………………...……… 12

22 C.F.R. § 120.10(a)(1) ..………………………………………….…………2, 5

22 C.F.R. § 120.10(b) ..………………………………………………………… 5

22 C.F.R. § 120.10(d) ..………………………………………………………… 2

22 C.F.R. § 120.17(a)(4) …………………………………………….………… 1

22 C.F.R. § 121.1 …...……………………………………...…….. 2, 4, 5, 12

22 C.F.R. § 127.1 …………………..……………………………………… 1, 5

22 U.S.C. § 2778(c), (e) …………………………………………...…………… 2

22 U.S.C. § 2778(h) …..……………………………………………………… 12

**Other Authorities**

Forbes, "3D-Printed Gun's Blueprints Downloaded 100,000 Times In Two Days
    (With Some Help From Kim Dotcom),"
    http://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-
    blueprints-downloaded-100000-times-in-two-days-with-some-help-from-
    kim-dotcom/ (last visited December 9, 2015)……………………..……… 13

"Defiant Pirate Bay to continue hosting banned 3D printer gun designs,"
    https://www.rt.com/news/liberator-gun-defcad-pirate-bay-122/ (last visited
    December 9, 2015) …………………………………………...……..... 13

DOSWASHINGTONSUP00965

## STATEMENT OF AMICUS CURIAE

Pursuant to Fed. R. App. P. 29(c), this Brief is filed on behalf of the Texas Public Policy Foundation (Foundation), a Texas-based nonprofit policy organization. The Texas Public Policy Foundation's mission is to promote and defend liberty, personal responsibility, and free enterprise in Texas and the nation by educating and affecting policymakers and the Texas public policy debate with academically sound research and outreach.

The Texas Public Policy Foundation believes that freedom of speech is fundamental to its guiding principles of liberty, personal responsibility and free enterprise.

This Brief is filed in support of the Defense Distributed. The Foundation was not paid for its preparation and the Foundation did not pay another entity or attorney for doing so. The Foundation adopts by reference the Statement of the Case and Statement of the Issues by Plaintiffs and appreciates the opportunity to submit this Brief to the Court.

DOSWASHINGTONSUP00966

## STATEMENT REGARDING ORAL ARGUMENT

Amicus requests oral argument.

DOSWASHINGTONSUP00967

## INTRODUCTION

The Texas Public Policy Foundation urges the Court to reverse the decision below. The International Traffic in Arms Regulations (ITAR) should not and cannot be used to regulate unclassified, privately developed information. The State Department's broad assertion of authority to regulate any information that could potentially be used to create a weapon is both a content-based restriction on speech and an unconstitutional prior restraint. ITAR restricts the free flow of ideas, hindering technological development and chilling the freedom of expression. Furthermore, the files that are the subject of this suit are already available on the Internet. The district court was thus incorrect to find that enjoining the use of ITAR to prevent the files from being disseminated would harm the public interest. The court's order should therefore be reversed.

## ARGUMENT

## I.    REGULATORY BACKGROUND

ITAR criminalizes the "export"[1] of "technical data"[2] about "defense articles"[3] without authorization from the government. *See* 22 C.F.R. § 127.1. These terms are

_____

[1]    ITAR's definition of "export" includes putting the information on the Internet (since foreigners might access) it or even sharing it domestically with a foreign person. *See* 22 C.F.R. § 120.17(a)(4). (defining "export" to include ""Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad."). Given the breadth of the information considered "technical data" and "defense articles," ITAR criminalizes innocent discussions on technical topics in Internet forums or in person. If a model rocket hobbyist provides technical information on a forum on the Internet, and a State Department official believes that the information is required for production of an unmanned aerial vehicle, the hobbyist could

1

DOSWASHINGTONSUP00968

defined broadly enough to encompass everyday technology not typically thought of as posing a military danger. Though called the International Traffic in Arms Regulations, they regulate information that is wholly domestic and cannot be considered "arms."

Put together, these definitions cover so much speech that the State Department saw fit to exclude information "concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities…." 22 C.F.R. 120.10(d). That implies that the State Department thinks that such basic principles would be illegal to discuss online if they were not "general" or not commonly taught in schools. The ITAR's need to exclude math and physics from their restrictions on speech is perhaps the best demonstration of their

---

be incarcerated for 20 years. *See* 22 U.S.C. § 2778(c), (e). If a reporter publishes an article on a new technical development constituting "technical data," he too could be imprisoned.

[2]     The State Department's definition of "technical data," extends the already broad list of "defense articles" into common, nonmilitary items. It includes, "Information … required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10(a)(1). A great deal of nonmilitary information is required for the "production," of military equipment (to say nothing of "operation" and "development"). For example, the production of a tank requires information about how to improve the strength of steel. The production of a rifle requires knowledge of how to make a spring for the trigger. An improvement in making propellers for ships may be used for a battleship. Discussion of these nonmilitary subjects can land Americans in federal prison.

[3]     The list of items and technology considered "defense articles" are enumerated on the United States Munitions List (USML). The USML includes many military items, such as tanks, battleships and bombs, as well as "technical data" about them. 22 C.F.R. § 121.1 at Category IV-VII. But it also includes virtually every firearm imaginable—even single shot hunting or target rifles—as well as "technical data" about those firearms. *See Id.*, Category I at (a), (b), and (i). Only black powder muzzle-loaders and non-combat shotguns are excluded. Even more concerning, it contains an open-ended catchall provision, allowing the State Department to impose ITAR control over "Any article not enumerated on the U.S. Munitions List." *Id.,* Category XXI. Read literally, the Munitions List contains everything on it, and anything not on it that the State Department feels like regulating. In simpler terms, this could be expressed as "anything the State Department wants to regulate."

DOSWASHINGTONSUP00969

overbreadth and overinclusiveness. *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120-21 (1991) (invalidating law due to overinclusiveness).

## II.    ITAR VIOLATES THE FIRST AMENDMENT

The district court erred primarily because it failed to recognize that ITAR is a content-based restriction on speech. A speech restriction is "content based if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (quotation omitted). ITAR does just that. By regulating only speech that conveys "technical data" about "defense articles," the regulations' application directly depends on the content of the speech in question. Indeed, their explicit purpose is to suppress such speech in order to keep it out of the hands of foreign militaries.

As a content-based restriction, ITAR is presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). It can only withstand strict scrutiny if the government proves it is narrowly tailored to serve compelling government interests. *Id.* at 395. That Defendants cannot do. While restricting our enemies' access to military technology is certainly a compelling government interests, ITAR reaches far beyond actual defense articles into information about everyday items and single-shot pistols—guidance that would not aid even the most ill-equipped militants. Furthermore, much of the ITAR-controlled information is already on the Internet.

DOSWASHINGTONSUP00970

There can be no compelling government interest in restricting publication of technical information that is already publicly available. The regulations are therefore not narrowly tailored.

### A.     ITAR Is A Content-Based Restriction On Speech

ITAR only applies to "technical data" about "defense articles." If someone wants to post designs for a weapon not on the USML, such as a non-combat shotgun, they can. *See* 22 C.F.R. § 121.1 at Category I. If that same person wants to post designs for a single-shot pistol, they cannot. *See Id*. The difference in treatment is based on the information or message communicated: how to create a non-combat shotgun versus how to create a pistol. The District Court recognized that much. *Defense Distributed v. United States Dept. of State*, Dkt. No. 32 at 13 15-CV-372-RP (W.D. Tex. June 10, 2015) (noting that ITAR "unquestionably regulates speech concerning a specific topic"). But, it failed to recognize that government suppression of the pistol instructions but not the shotgun instructions—because of the content of the message conveyed—renders the regulation content-based.

The regulation is content-based for two separate reasons. First, the regulation is content based on its face because it treats information differently based on the message conveyed. Second, the government's purpose in regulating based on content is to suppress the information about "defense articles." Each of these flaws alone renders ITAR content-based.

DOSWASHINGTONSUP00971

### a.     The District Court Improperly Looked To ITAR's Purpose To Determine Whether They Are Content-Based

As clarified by the Supreme Court, "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[4] *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2227 (2015). Therefore, regulation is content-based if it is content-based on its face regardless of its purpose. *Id.* at 2228 (noting that "an innocuous justification cannot transform a facially content-based law into one that is content neutral").

ITAR is facially content-based because it applies only to speech about "technical data" or "defense articles" – both defined based on their content. *See* 22 C.F.R. § 127.1. Information is considered "technical data" if it is about an item listed on the USML but not if it is on another topic. *See* 22 C.F.R. § 120.10(a) (defining "technical data" as certain information relating to "defense articles"); 22 C.F.R. § 121.1 (USML, listing "defense articles"). A webpage disclosing designs for water tanks would not be covered, but a webpage disclosing designs for military tanks would be—because of the content of the webpage. Furthermore, there is an exception for certain "information concerning general scientific, mathematical, or engineering principles commonly taught in schools…." 22 C.F.R. § 120.10(b). Messages containing common engineering principles are excepted, but messages

---

[4]     The Court rejected the 9th Circuit's approach of looking to the purpose of the regulation, noting that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (internal citations omitted).

DOSWASHINGTONSUP00972

containing obscure engineering principles are not. That is also because of their content. ITAR's application to certain topics is sufficient to render it content-based. 135 S. Ct. at 2227 ("Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter…").

The district court noted that "on its face" ITAR "unquestionably regulates speech concerning a specific topic." *Defense Distributed v. United States Dept. of State*, Dkt. No. 32 at 13. However, it failed to see that fact as dispositive because it misread *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), in precisely the same way as the Ninth Circuit did in *Reed. Defense Distributed v. United States Dept. of State*, Dkt. No. 32 at 12. As the Court explained in *Reed*,

> The Court of Appeals and the United States misunderstand our decision in *Ward* as suggesting that a government's purpose is relevant even when a law is content based on its face. That is incorrect. *Ward had nothing to say about facially content-based restrictions* because it involved a facially content-neutral ban on the use, in a city-owned music venue, of sound amplification systems not provided by the city.

135 S. Ct. at 2228 (emphasis added). Accordingly, this Court should reverse the holding that ITAR is content-neutral.

### b.     Even If It Is Proper To Consider ITAR's Purpose, Its Purpose Is To Restrict Information Because Of Its Content

As explained above, the district court erred by looking to ITAR's purpose to determine whether it is content-based. It cited three cases to support its approach of looking to a regulation's purpose even when it is facially content-based: *Renton v.*

6

DOSWASHINGTONSUP00973

*Playtime Theatres, Inc.*, 475 U.S. 41(1986); *Asgeirsson v. Abbott*, 696 F. 3d 454 (5th Cir. 2012); and *Kagan v. City of New Orleans*, 753 F.3d 560 (5th Cir. 2014).[5] All three cases predate *Reed* and should no longer be followed to the extent they conflict with *Reed*'s express holding that facially content-based regulations must meet strict scrutiny regardless of their purpose.[6] However, even if the cases cited by the lower court are still good law, they do not counsel in favor of upholding ITAR because ITAR's purpose is to suppress the information contained in "technical data" about "defense articles" because of its content.

All three cases cited by the district court inquire whether the government's interest in regulating speech is due to the message it contains. In *Renton*, the Court upheld a zoning ordinance that only applied to theaters showing sexually explicit material. But it did so because the ordinance was aimed at reducing so-called "secondary effects," such as crime and lowered property values that accompany such theaters rather than suppressing the message conveyed by sexually explicit material. *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986). Similarly, this Court held in *Asgeirsson* that the Texas Open Meetings Act (TOMA) was content-neutral because the purpose was to facilitate transparency by requiring

---

[5]     The district court also cited *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) and *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), but the Court looked to the regulations' purpose in those cases because the regulations were facially content-neutral. They are therefore consistent with *Reed*'s holding.

[6]     Other circuits have recognized that *Reed* rejected previous precedents concerning content discrimination. *See Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015); *Norton v. City of Springfield*, 612 Fed. Appx. 386, 387 (7th Cir. 2015).

DOSWASHINGTONSUP00974

a quorum of a governing body to discuss policy only at public meetings. *See* 696 F. 3d 454 at 461. *Asgeirsson* stressed that the purpose of TOMA was unrelated to the suppression of messages expressed at closed meetings, just as the lower property values and crime at issue in *Renton* were not a result of the sexually explicit messages.[7] *Id.* at 461-62. Thus, even if these cases are still good law, the Fifth Circuit's test of regulatory purpose is whether the harm from the regulated activity is a result of the content of the message.

Likewise in *Kagan,* this Court upheld a licensing regime for tour guides, again finding that the regime had no relationship to regulating messages because it had no effect whatsoever on what a tour guide could say. *See Kagan v. City of New Orleans*, 753 F.3d 560 at 562. All the examples of cases finding a facially content-based regulation to be content-neutral did so because the harm from the speech was not a result of its content.

Not so with ITAR. The government seeks to regulate the dissemination of "technical data" because it considers that information harmful. *Defense Distributed v. United States Dept. of State*, Dkt. No. 32 at 10, 15-CV-372-RP (W.D. Tex. June

---

[7]    "This situation is analogous to *Playtime Theatres,* in which only adult movie theaters attracted crime and lowered property values — but not because the ideas or messages expressed in adult movies caused crime… Here, government is not made less transparent because of the message of private speech about public policy: Transparency is furthered by allowing the public to have access to government decisionmaking. This is true whether those decisions are made by cogent empirical arguments or coin-flips. The private speech itself makes the government less transparent regardless of its message. The statute is therefore content-neutral." *Id.* at 461-62.

DOSWASHINGTONSUP00975

10, 2015). ITAR's purpose and effect is to suppress information because of its content. It is therefore content-based even if *Reed* does not apply.

## B.    ITAR is an Unconstitutional Prior Restraint on Speech

In addition to being a content-based restriction, ITAR constitutes an unconstitutional prior restraint. The State Department's solution to the broad and blurry scope of its regulations is to require government approval before speech can be put on the Internet. 22 C.F.R § 120.4. Instead of providing clear limits to the information that may not be discussed, the Department relies on the "commodity jurisdiction" regime, in which it grants permission to speak "if doubt exists." *Id*. That is not a solution but rather a prior restraint on speech—perhaps the most clearly unconstitutional of all speech regulations. *Southeastern Promotions, Ltd. v. Conrad*, 420 US 546, 558-59 (1975) ("The presumption against prior restraints is heavier— and the degree of protection broader—than that against limits on expression imposed by criminal penalties… a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.").

The term "prior restraint" is used "to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). The commodity jurisdiction procedure does just that by requiring an advance license to post information on the Internet.

9

DOSWASHINGTONSUP00976

Due to the lack of clear standards in its definitions of "defense articles" and "technical data," citizens must often first submit their proposed speech for a "determination" of whether the information is subject to the State Department's license requirements for public speech. After the State Department claims the speech is subject to the ITAR in a final commodity jurisdiction determination, the citizens must then apply for a license to speak under an entirely separate Department of State process. As the instant case demonstrates, the commodity jurisdiction process can take years for a State Department determination of whether the speech requires a license (as even the State Department has difficulty applying its own standards). Thereafter, citizens, like Defense Distributed, must then still apply for the license to speak, which can take several months or more to obtain under another State Department process that does not contain any true deadline. In the meantime, the free flow of ideas and research are halted. While the commodity jurisdiction procedure may be constitutional when determining whether objects and weapons may be exported, it is not constitutional when determining whether speech may be posted on the Internet.

### a.     Open-ended licensing

Open-ended licensing for speech is not permitted under the First Amendment. The Supreme Court has continuously held that "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of*

DOSWASHINGTONSUP00977

*Lakewood v. Plain Dealer Publishing Co.*, 486 US 750, 757 (1988). The government "cannot vest restraining control over the right to speak … in an administrative official where there are no appropriate standards to guide his action." *Kunz v. New York*, 340 U.S. 290, 295 (1951). Accordingly, standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969). Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotation omitted). Given that the literal definitions of "technical data" and "defense article" are so broad that they cover instructions on making steal or boat propellers, the open-ended commodity jurisdiction procedure does not satisfy these requirements and may therefore not be applied to speech.

### b.     Lack of procedural safeguards

The commodity jurisdiction procedure is independently unconstitutional because it lacks procedural safeguards against abuses of discretion. The following procedural safeguards are required of even content-neutral prior restraints:

- The burden of proving the speech may be regulated must rest on the censor;

- The determination must be prompt; and

- Judicial review must be available for all permit denials. *Freedman v. Maryland*, 380 U.S. 51, 58 (1965) ("Only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression.").

11

None of these procedural safeguards are available here. The State Department requires individuals to apply for permission to speak "if doubt exists" as to whether their speech falls under ITAR. 22 C.F.R. § 120.4(a). The determination can take years. For example, the State Department only ruled on the Defense Distributed's commodity jurisdiction request after being sued in this case, which was almost two years after the requests were first submitted.[8] *Defense Distributed v. United States Dept. of State*, Dkt. No. 29, 15-CV-372-RP (W.D. Tex. June 8, 2015). And finally, the underlying statute purports to make the "designation…of items as defense articles" unreviewable in court. 22 U.S.C. 2778(h).

The broad prohibition on prior restraints is no less applicable in the area of national security. In *New York Times v. United States*, 403 U.S. 713 (1971), the Supreme Court rejected the government's authority to stop the publication of the Pentagon Papers—classified information pertaining to American military activities in the then-ongoing Vietnam War. In the face of that decision, the State Department cannot claim to have the authority to license the discussion of basic firearms, engineering principles, or springs online—even if it would help prevent the Islamic State from obtaining the latest in American deer rifle technology. 22 C.F.R. § 121.1 Category I at (a) and (i). The district court's order should therefore be reversed.

---

[8]    In this matter, it is likely Defense Distributed would have never received a final commodity jurisdiction, no less an opportunity to then apply for a license to speak, without the filing of this case.

DOSWASHINGTONSUP00979

## III.   ISSUING THE TEMPORARY INJUNCITON WILL NOT HARM THE PUBLIC INTEREST

This is the unusual case in which there is no harm to grant Defense Distributed's request for temporary injunction because the designs at issue are already available on the Internet. Defense Distributed's designs were downloaded more than 100,000 times before they were removed following the State Department's threatened prosecution.[9] The CAD files are now widely available on the Internet, including on distributed file-sharing networks such as the Pirate Bay, which are outside the reach of the State Department.[10] Therefore, ITAR's enforcement can do nothing to keep the designs out of the hands of foreign militaries. They are already available to anyone who wants them. Further, that the State Department has not threatened prosecution of anyone else who is distributing the files suggests that this prior restraint also fails due to underinclusiveness. *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (invalidating law due to underinclusiveness).

The district court was therefore incorrect to rule in the Defendants' favor on the third and fourth prongs of the preliminary injunction inquiry because of "the

---

[9]   Forbes, "3D-Printed Gun's Blueprints Downloaded 100,000 Times In Two Days (With Some Help From Kim Dotcom)," http://www.forbes.com/sites/andygreenberg/2013/05/08/3d-printed-guns-blueprints-downloaded-100000-times-in-two-days-with-some-help-from-kim-dotcom/ (last visited December 9, 2015).

[10]   "Defiant Pirate Bay to continue hosting banned 3D printer gun designs," https://www.rt.com/news/liberator-gun-defcad-pirate-bay-122/ (last visited December 9, 2015).

13

public's keen interest in restricting the export of defense articles." *Defense Distributed v. United States Dept. of State*, Dkt. No. 29 at 6. At least with respect to Plaintiffs' as-applied challenge, that interest would not be affected by granting the injunction.

As for Plaintiffs' facial challenge against ITAR's enforcement as a prior restraint more generally, the Court should consider the availability of so much other ITAR-controlled information when evaluating assertions of harm. As Justice White pointed out in the context of denying the government's request to stop publication of the Pentagon Papers,

> Normally, publication will occur and the damage be done before the Government has either opportunity or grounds for suppression. So here, publication has already begun and a substantial part of the threatened damage has already occurred. The fact of a massive breakdown in security is known, access to the documents by many unauthorized people is undeniable, and the efficacy of equitable relief against these or other newspapers to avert anticipated damage is doubtful at best.

*New York Times Co. v. United States*, 403 US 713, 733 (1971) (White, J., concurring). Note also the contrast between the harm asserted in connection with the Pentagon Papers and that in the instant case. In *New York Times* the government south to stop publication of classified information about the then-ongoing Vietnam War, asserting that its publication could jeopardize the war effort. Here, the government seeks to stop the publication of unclassified information that can already downloaded by anyone on Earth with a computer. And the information

14

merely discloses how to make firearms that have many ready substitutes online. The

Court in *New York Times* held that the First Amendment could not tolerate such a

prior restraint. This Court should have an easier time doing the same.

## <u>CONCLUSION</u>

The Court should reverse and remand to the district court with instruction to

issue the preliminary injunction.

Respectfully Submitted,

_____

ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
JOEL STONEDALE
Texas Bar No. 24079406
jstonedale@texaspolicy.com
Texas Public Policy Foundation
Center for the American Future
901 Congress Avenue
Austin, TX 78701
PHONE: (512) 472-2700
FAX: (512 472-2728
*Attorneys for Texas Public
Policy Foundation, as Amicus
Curiae for Defense Distributors*

15

DOSWASHINGTONSUP00982

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,857 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

3. All required privacy redactions have been made.

4. The ECF submission is an exact copy of the hard copy submissions, and

5. The digital submission has been scanned for viruses with the most recent version Apple OS X Yosemite and according to that program, is free of viruses.

Dated: December 18, 2015

_____

ROBERT HENNEKE

16

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for this Fifth Circuit by using the appellate CM/ECF system in NO. 15-50759 on December 18, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 18, 2015          _____

                                  ROBERT HENNEKE

DOSWASHINGTONSUP00984

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

December 23, 2015

Mr. Robert E. Henneke
Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78101

    No. 15-50759    Defense Distributed, et al v. U.S. Dept. of
                       State, et al
    USDC No. 1:15-CV-372

Dear Mr. Henneke,

The following pertains to your amicus brief electronically filed
on December 23, 2015.

You must submit the seven (7) paper copies of your brief required
by 5TH CIR. R. 31.1 within five (5) days of the date of this notice
pursuant to 5th Cir. ECF Filing Standard E.1.

                          Sincerely,

                          LYLE W. CAYCE, Clerk

                          By: _____
                          Shawn D. Henderson, Deputy Clerk
                          504-310-7668

cc:
    Mr. Joshua Michael Blackman
    Mr. Bruce D. Brown
    Mr. Matthew Goldstein
    Mr. Alan Gura
    Mr. David T. Hardy
    Mr. William Bryan Mateja
    Mr. Raffi Melkonian
    Mr. Leif A. Olson
    Mr. Michael S. Raab
    Mr. Ilya Shapiro
    Mr. Eric J. Soskin
    Mr. Joel Stonedale
    Mr. Daniel Bentele Hahs Tenny

DOSWASHINGTONSUP00985

Mr. Kit Walsh

DOSWASHINGTONSUP00986

No. 15-50759

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

Defendants-Appellees

---

On Appeal from the United States District Court
for the Western District of Texas

---

## BRIEF FOR FEDERAL APPELLEES

---

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney General*

RICHARD L. DURBIN, JR.
*United States Attorney*

MICHAEL S. RAAB
DANIEL TENNY
*Attorneys, Appellate Staff*
*Civil Division, Room 7215*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1838*

# CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed v. U.S. Department of State*, No. 15-50759.

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the

outcome of this case. These representations are made in order that the judges of this

court may evaluate possible disqualification or recusal.

Plaintiffs-appellants:

    Defense Distributed
    Second Amendment Foundation, Inc.

Defendants-appellees:

    United States Department of State
    John F. Kerry, Secretary of State
    Directorate of Defense Trade Controls
    Kenneth B. Handelman, Deputy Assistant Secretary of State (individual
       capacity only)
    Brian H. Nilsson, Deputy Assistant Secretary of State (official capacity only)[1]
    C. Edward Peartree, Director, Office of Defense Trade Controls Policy
       Division
    Sarah J. Heidema, Division Chief, Regulatory and Multilateral Affairs, Office of
       Defense Trade Controls Policy
    Glenn Smith, Senior Advisor, Office of Defense Trade Controls

Counsel:

For plaintiffs-appellants:

    Alan Gura, Gura & Possessky, PLLC

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d) and Federal Rule of
Appellate Procedure 43(c)(2), Mr. Nilsson has been automatically substituted for his
predecessor for purposes of the official-capacity claims.

Matthew A. Goldstein, Matthew A. Goldstein, PLLC
William B. Mateja, Fish & Richardson P.C.
William T. "Tommy" Jacks, Fish & Richardson P.C.
David Morris, Fish & Richardson P.C.
Josh Blackman

For defendants-appellees:

Benjamin C. Mizer, U.S. Department of Justice
Richard L. Durbin, Jr., U.S. Department of Justice
Anthony J. Coppolino, U.S. Department of Justice
Stuart J. Robinson, U.S. Department of Justice
Zachary C. Richter, U.S. Department of Justice
Eric J. Soskin, U.S. Department of Justice
Michael S. Raab, U.S. Department of Justice
Daniel Tenny, U.S. Department of Justice

*s/ Daniel Tenny*
Daniel Tenny

DOSWASHINGTONSUP00989

### STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests the opportunity to present oral argument to defend the agency's application of the Arms Export Control Act and implementing regulations.

DOSWASHINGTONSUP00990

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................... 1

STATEMENT OF JURISDICTION ..................................................... 2

STATEMENT OF THE ISSUE .............................................................. 2

STATEMENT OF THE CASE ............................................................... 3

    A.    Statutory Background .............................................................. 3

    B.    Factual Background.................................................................. 5

    C.    Prior Proceedings ................................................................... 8

SUMMARY OF ARGUMENT ............................................................ 13

STANDARD OF REVIEW.................................................................. 16

ARGUMENT ......................................................................................... 16

I.    Government officials did not act ultra vires........................... 16

II.    The application of the regulations in this case is fully consistent with the Constitution. ....................................... 21

    A.    The regulations permissibly address the distribution and production of firearms, and any effect on protected speech is fully justified.......................................................... 21

        1.    The regulations serve the government's legitimate interest in regulating the dissemination of arms and technical data. ......... 21

        2.    Plaintiffs' position cannot be reconciled with the approach taken by other courts of appeals. .................................... 25

        3.    Plaintiffs' contrary arguments fail to address the basis for applying the regulations in this case. ............................. 28

DOSWASHINGTONSUP00991

B.      The regulations do not present the concerns associated with prior restraints on core expression.........................................................................32

C.      The regulations provide clear definitions and are not impermissibly subjective.................................................................................35

D.      The regulations do not violate the Second Amendment.........................38

III.    The district court did not abuse its discretion in concluding that the remaining factors counsel against issuance of a preliminary injunction. ...........40

CONCLUSION ...................................................................................................41

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

DOSWASHINGTONSUP00992

# TABLE OF AUTHORITIES

**Cases:**                                                                        **Page(s):**

*Anderson v. Jackson,*
   556 F.3d 351 (5th Cir. 2009) ........................................................... 16

*Catholic Leadership Coal. of Tex. v. Reisman,*
   764 F.3d 409 (5th Cir. 2014) ....................................................32, 33

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ........................................................................ 19

*City of Lakewood v. Plain Dealer Publ'g Co.,*
   486 U.S. 750 (1988) ........................................................................ 33

*City of Renton v. Playtime Theatres, Inc.,*
   475 U.S. 41 (1986) .......................................................................... 29

*Commodity Futures Trading Comm'n v. Vartuli,*
   228 F.3d 94 (2d Cir. 2000) .......................................................26, 27

*Danos v. Jones,*
   652 F.3d 577 (5th Cir. 2011) ....................................................10, 16

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ........................................................................ 39

*Forsyth Cty. v. Nationalist Movement,*
   505 U.S. 123 (1992) ........................................................................ 34

*Hazelwood Sch. Dist. v. Kuhlmeier,*
   484 U.S. 260 (1988) ........................................................................ 33

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ......................................................................24, 37

*Junger v. Daley,*
   209 F.3d 481 (6th Cir. 2000) ........................................................... 21

vi

*Milwaukee Police Ass'n v. Jones*,
    192 F.3d 742 (7th Cir. 1999) ................................................... 33

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
    700 F.3d 185 (5th Cir. 2012) ................................................... 39

*Near v. Minnesota ex rel. Olson*,
    283 U.S. 697 (1931) ................................................................ 34

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) ................................................................ 34

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ....................................................... 28, 29

*United States v. Armstrong*,
    517 U.S. 456 (1996) ................................................................ 38

*United States v. Edler Indus., Inc.*,
    579 F.2d 516 (9th Cir. 1978) ....................................... 19, 20, 25, 26

*United States v. Mak*,
    683 F.3d 1126 (9th Cir. 2012) ..................................... 11, 25, 34

*United States v. O'Brien*,
    391 U.S. 367 (1968) ........................................................... 22, 29

*United States v. Posey*,
    864 F.2d 1487 (9th Cir. 1989) ............................................ 25, 26

*United States v. Williams*,
    553 U.S. 285 (2008) ...................................................... 31, 32, 37

*United States v. Wu*,
    711 F.3d 1 (1st Cir. 2013) ...................................................... 35

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ..................................... 21, 22, 27, 28

DOSWASHINGTONSUP00994

**Statutes:**

Arms Export Control Act:

    22 U.S.C. § 2751 *et seq.* ............................................................ 3

    22 U.S.C. § 2778(a)(1) ...........................................3, 16, 17, 25

    22 U.S.C. § 2778(a)(2) ...................................................... 3, 34

    22 U.S.C. § 2778(b)(2) .................................................3, 17, 18

    22 U.S.C. § 2778(c) ................................................................. 3

    22 U.S.C. § 2778(e) ................................................................. 3

    22 U.S.C. § 2778(h) .......................................................... 3, 19

Undectable Firearms Act of 1988,

    18 U.S.C. § 922(p) .................................................................. 6

18 U.S.C. § 2339B(a)(1) ............................................................ 24

28 U.S.C. § 1292(a)(1) ............................................................... 2

28 U.S.C. § 1331 ....................................................................... 2

50 U.S.C. § 4610(c) .................................................................. 3

**Regulations:**

Administration of Reformed Export Controls,

    Exec. Order No. 13,637, 3 C.F.R. 223 (2014) ...................... 4, 17

International Traffic in Arms Regulations:

    22 C.F.R. §§ 120-130 ............................................................. 4

    22 C.F.R. § 120.4(a) ............................................................... 5

    22 C.F.R. § 120.4(g) ............................................................... 5

    22 C.F.R. § 120.6 ............................................................17, 25

    22 C.F.R. § 120.10 ................................................................ 25

    22 C.F.R. § 120.10(a) ........................................................ 4, 17

    22 C.F.R. § 120.10(a)(1) ...............................................4, 8, 36

    22 C.F.R. § 120.10(b) .................................................5, 18, 28

    22 C.F.R. § 120.11 ................................................................ 36

    22 C.F.R. § 120.11(a) .................................................5, 28, 34

    22 C.F.R. § 120.17(a)(4) .............................................5, 12, 36

    22 C.F.R. § 120.45(f) .............................................................. 4

DOSWASHINGTONSUP00995

United States Munitions List:

    22 C.F.R. § 121.1, Category I, item (a) ...................................................17, 36

    22 C.F.R. § 121.1, Category I, item (i) ...................................................4, 17


**Rule:**

Fed. R. App. P. 4(a)(1)(B) .....................................................................................2


**Other Authority:**

Constitutionality of the Proposed Revision of the International Traffic in Arms

    Regulations, 5 Op. O.L.C. 202 (1981)....................................................29, 30

DOSWASHINGTONSUP00996

# INTRODUCTION

This case concerns the export of computer files that enable anyone with a 3-D printer or related device to produce an operable firearm. The firearms that are created are of particular concern because they need not include any metal to function, and thus can be made immune to detection by conventional security measures such as metal detectors. The availability of such firearms to foreign nationals, particularly if the availability of such firearms were attributable to the United States, could raise significant foreign policy and national security concerns.

Congress has granted broad authority to the President, delegated as relevant here to the Department of State, to impose export controls applicable to the dissemination of firearms and other "defense articles" to foreign nationals in furtherance of the security and foreign policy interest of the United States. In particular, Congress directed that the export of defense articles was prohibited unless the exporter obtained a license or other form of authorization from the federal government. Duly promulgated regulations have defined the category of items whose export requires a license to include not only arms themselves, but also certain "technical data" that are not in the public domain and that are necessary for the production of listed items.

Plaintiffs contend that the State Department acted beyond its authority, and contrary to the Constitution, when it concluded that distribution of the computer files at issue here to foreign nationals through an unrestricted Internet site would

constitute an export requiring a license. The district court properly rejected plaintiffs'

position, which would render the federal government powerless to prevent the

dissemination of undetectable firearms to foreign nationals, so long as the necessary

files were distributed on the Internet rather than through other means.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. The

district court denied plaintiffs' motion for a preliminary injunction on August 4, 2015.

Order [ROA.679]. Plaintiffs timely appealed on August 13, 2015. Notice of Appeal

[ROA.1045]; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28

U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Plaintiff Defense Distributed wishes to post computer files on the Internet that

enable a 3-D printer or related device, at the push of a button, to produce

components of an operable firearm. The question presented is whether the State

Department had no colorable basis for its actions, or acted contrary to the

Constitution, when it concluded that providing such files to foreign nationals over the

Internet requires an export license under the Arms Export Control Act and

implementing regulations.

DOSWASHINGTONSUP00998

# STATEMENT OF THE CASE

## A.    Statutory Background

The Arms Export Control Act, 22 U.S.C. § 2751 *et seq.*, authorizes the
President, "[i]n furtherance of world peace and the security and foreign policy of the
United States," to "control the import and the export of defense articles and defense
services." *Id.* § 2778(a)(1).  "[T]he President is authorized . . . to promulgate
regulations for the import and export of such services," and to designate items as
defense articles and defense services by placing them on the "United States Munitions
List." *Id.*  Designations under the regulations of "items as defense articles or defense
services . . . shall not be subject to judicial review." *Id.* § 2778(h).

With certain exceptions not relevant here, "no defense articles or defense
services . . . may be exported or imported without a license for such export or
import." 22 U.S.C. § 2778(b)(2).  "Decisions on issuing export licenses . . . shall take
into account whether the export of an article would contribute to an arms race, aid in
the development of weapons of mass destruction, support international terrorism,
increase the possibility of an outbreak or escalation of conflict, or prejudice the
development of bilateral or multilateral arms control or nonproliferation agreements
or other arrangements." *Id.* § 2778(a)(2).

A violation of the statutes or implementing regulations can result in civil
penalties.  22 U.S.C. § 2778(e); 50 U.S.C. § 4610(c).  A willful violation is a criminal
offense.  22 U.S.C. § 2778(c).

3

The President has delegated the authority conferred by this statute, as relevant here, to the Secretary of State (though the concurrence of the Secretary of Defense is required as to the designation of items as defense articles and defense services). *See* Administration of Reformed Export Controls, Exec. Order No. 13,637, § 1(n), 3 C.F.R. 223, 224 (2014). Under that delegated authority, the Department of State has promulgated the International Traffic in Arms Regulations, 22 C.F.R. §§ 120-130, which are administered by the Department's Directorate of Defense Trade Controls. Those regulations set out the U.S. Munitions List that defines items as defense articles and defense services, and also set out the requirements and procedures for determining whether particular items satisfy the regulatory definitions and, if so, whether a license should be issued to permit their export.

In addition to arms themselves, the U.S. Munitions List includes "[t]echnical data . . . directly related" to items on the list. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" is defined to include, among other things, "[i]nformation . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles," including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *Id.* § 120.10(a)(1).[2]

---

[2] A separate definition applies to "software." *See* 22 C.F.R. §§ 120.10(a), 120.45(f). This case concerns data files that are not classified as software.

DOSWASHINGTONSUP01000

The definition of technical data "does not include information concerning
general scientific, mathematical, or engineering principles commonly taught in
schools, colleges, and universities," nor does it include "information in the public
domain." 22 C.F.R. § 120.10(b).  Information in the "public domain," in turn, is
defined as information "which is published and which is generally accessible or
available to the public" in any of a number of forms and locations.  *Id.* § 120.11(a).
The regulations define the "export" of technical data to include "[d]isclosing
(including oral or visual disclosure) or transferring technical data to a foreign person,
whether in the United States or abroad."  *Id.* § 120.17(a)(4).

Under the "commodity jurisdiction procedure," on request, "the Directorate of
Defense Trade Controls shall provide a determination of whether a particular article
or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a).  Commodity-
jurisdiction decisions are subject to an appeal procedure.  *Id.* § 120.4(g).

## B.     Factual Background

The particular items at issue in this case are computer files that are used for the
three-dimensional "printing" (or the related process of "milling") of firearms and
firearm components.  The computer files enable someone who has a piece of
hardware known as a "3-D printer" (or a related device in the context of milling) to
click a button and have the printer create, out of raw materials, a firearm or parts of a
firearm.  Because the resulting firearm may be made of a material other than metal, it
"can be produced in a way as to be both fully operable and virtually undetectable by

5

conventional security measures such as metal detectors." Aguirre Decl. ¶ 35(a)

[ROA.570]. The "design includes insertion of a six-ounce piece of metal to make it

detectable by metal detectors" and thus compliant with the Undetectable Firearms

Act of 1988, 18 U.S.C. § 922(p), but "this metal content can be removed without

rendering [the firearm] inoperable." Aguirre Decl. ¶ 35(a) n.6 [ROA.571].

The present dispute arose when the State Department sent a letter to Defense

Distributed identifying as potentially subject to the International Traffic in Arms

Regulations some computer files that had been posted on the Internet. The

Directorate identified ten particular data files that instructed 3-D printers to create

particular items. *See* Letter to Cody Wilson 2 [ROA.581]. The letter stated that the

Directorate was reviewing the files and had yet to determine whether they were

subject to the regulations. *Id.* at 1-2 [ROA.580-81]. Accordingly, the Directorate

requested that Defense Distributed submit commodity-jurisdiction requests for the

ten files. *Id.* at 2 [ROA.581]. The letter stated that until the commodity-jurisdiction

determination had been made, "Defense Distributed should treat" the data as

controlled by the regulations, which "means that all such data should be removed

from public access immediately." *Id.* [ROA.581].

In June 2013, Defense Distributed submitted a commodity-jurisdiction request

covering the ten items identified in the letter. *See* Commodity Jurisdiction Request

(June 21, 2013) [ROA.335]. Before receiving a final determination on that request,

Defense Distributed submitted an additional request for the "Ghost Gunner"

6

machine, which Defense Distributed described as "an inexpensive machine with more than enough accuracy to manufacture firearms."  Commodity Jurisdiction Request 2 (Jan. 2, 2015) [ROA.395].  According to Defense Distributed, the Ghost Gunner machine "was designed, developed, and manufactured by Defense Distributed to automatically manufacture publicly available designs with nearly zero user interaction."  *Id.* at 1 [ROA.394].  The machine is capable of manufacturing both "parts to firearms controlled under the U.S. Munitions List" and other "items that are not controlled under the [Munitions List]."  *Id.* [ROA.394].

Analyzing the requests required the State Department to "better understand additive manufacturing and 3D printing hardware and technology and its evolution and diffusion."  Aguirre Decl. ¶ 27 [ROA.566].  In April 2015, the Department completed its review of the Ghost Gunner application, and in June 2015, the Department completed its review of the original request.  *Id.* ¶ 28 [ROA.566-67].

The government concluded that the Ghost Gunner machine itself was not subject to the State Department's jurisdiction, although "technical data for producing a defense article" using the machine are subject to the Department's jurisdiction. Commodity Jurisdiction Determination (Apr. 15, 2015) [ROA.407].  As to the original request, the government determined that six of the ten files were subject to State Department jurisdiction.  Commodity Jurisdiction Determination 2 (June 4, 2015) [ROA.501].  The other four files were not subject to the Department's jurisdiction. *Id.* at 1 [ROA.500].

7

The determination that certain computer files were subject to the Department's jurisdiction was based on "several factors." Aguirre Decl. ¶ 29 [ROA.567]. First, the "central function" of the files "appears to be to enable the manufacture of end-items that are . . . defense articles" governed by the regulations. *Id.* [ROA.567]. Second, because the process is automated, "[m]anufacture of a defense article in this way requires considerably less know-how than manufacture in reliance on conventional technical data, which . . . requires additional craftsmanship, know-how, tools, and materials." *Id.* [ROA.567]. Third, the functionality provided by the files at issue constituted "a meaningful step beyond previous, public-domain material." *Id.* [ROA.567-68]. Finally, the files fall within the plain text of the regulations, which include in the definition of "defense articles" those "'blueprints, drawings, photographs, plans, instructions or documentation' that can be used to automatically manufacture defense articles." *Id.* [ROA.568] (quoting 22 C.F.R. § 120.10(a)(1)).

## C.    Prior Proceedings

Plaintiffs are Defense Distributed (the putative distributor of the computer files discussed above) and the Second Amendment Foundation, some of whose members claim that they wish to access the computer files published by Defense Distributed. After receiving the commodity-jurisdiction determination for the Ghost Gunner machine, but before receiving the determination for the ten 3-D printing files, plaintiffs instituted this action in federal district court, asserting claims against the relevant government agencies, government officials in their official capacities, and

8

government officials in their individual capacities. *See generally* Compl. [ROA.12].

Plaintiffs asserted that the government was acting ultra vires, that the government's

actions violated the First, Second, and Fifth Amendments to the U.S. Constitution,

and that the individual defendants were liable for damages because they engaged in

practices that were contrary to clearly established law. *See id.* ¶¶ 41-59 [ROA.21-24].[3]

As relevant here, plaintiffs sought a preliminary injunction that would have

prevented the government from "enforcing any prepublication approval requirement

against unclassified information under the International Traffic in Arms Regulations,"

including any requirement applicable either to the files that Defense Distributed had

submitted for commodity-jurisdiction review or to any other files that Defense

Distributed might create in the future. Proposed Order [ROA.82]. While the motion

was pending, the government responded to the pending commodity-jurisdiction

request as discussed above.

The district court denied the requested injunction. The court first observed

that while plaintiffs had asserted that they suffered irreparable injury in the form of a

deprivation of constitutional rights, a determination whether a preliminary injunction

is warranted also requires "weighing . . . the respective interests of the parties and the

public." Order 6 [ROA.684]. In particular, plaintiffs "fail[ed] to consider the public's

---

[3] This brief is filed on behalf of the government agencies and the official-capacity defendants only; claims for damages against the individual-capacity defendants are still pending in the district court.

DOSWASHINGTONSUP01005

keen interest in restricting the export of defense articles," and "the interest—and

authority—of the President and Congress in matters of foreign policy and export."

*Id.* [ROA.684]. The court concluded that plaintiffs had not "met their burden as to

the final two prongs necessary for granting . . . a preliminary injunction." *Id.* at 7

[ROA.685]. But "in an abundance of caution," the court also addressed plaintiffs'

likelihood of success on the merits. *Id.* [ROA.685].

The court concluded that plaintiffs' motion was lacking in that respect as well.

The court observed that plaintiffs had acknowledged that the State Department has

"authority . . . to regulate export of defense articles." Order 8 [ROA.686]. In

addition, "Defense Distributed admits its purpose is 'facilitating *global* access to, and

the collaborative production of, information and knowledge related to the three-

dimensional ("3D") printing of arms.'" *Id.* [ROA.686] (quoting Compl. ¶ 1

[ROA.13]). Defense Distributed thus "engages in conduct which Congress

authorized Defendants to regulate," and plaintiffs therefore had not demonstrated a

likelihood of success on their claim that the government was acting ultra vires, which

would require a showing that the government "was acting 'without any authority

whatever,' or without any 'colorable basis for the exercise of authority.'" *Id.* at 8-9

[ROA.686-87] (quoting *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011)).

Turning to the First Amendment claim, the district court assumed, for

purposes of the preliminary-injunction analysis, that computer files were speech

subject to First Amendment protection. Order 10 [ROA.688]. The court observed

DOSWASHINGTONSUP01006

that the regulations do "not regulate disclosure of technical data based on the message it is communicating." *Id.* at 13 [ROA.691]. Instead, the regulation "is intended to satisfy a number of foreign policy and national defense goals." *Id.* [ROA.691]. The court thus concluded that the regulations were subject to intermediate scrutiny. *Id.* [ROA.691].

The court noted that plaintiffs do not dispute that "there is a substantial governmental interest in regulating the dissemination of military information." Order 14 [ROA.692]. The court agreed with the Ninth Circuit's conclusion that the regulations substantially advance that interest by "provid[ing] clear procedures for seeking necessary approval." *Id.* at 14-15 [ROA.692-93] (citing *United States v. Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012)).

The court rejected plaintiffs' assertion that the regulations pose an impermissible burden on their domestic communication, noting that plaintiffs remain "free to disseminate the computer files at issue domestically in public or private forums." Order 15 [ROA.693]. And the court concluded that it was reasonable for the government to distinguish between domestic and foreign dissemination, noting that exports plainly pose greater national-security concerns. *Id.* at 15-16 [ROA.693-94].

As to plaintiffs' Second Amendment claim, the court concluded that the Second Amendment Foundation had standing on behalf of its members. Order 18 [ROA.696]. The court rejected the Second Amendment claim on the merits,

11

DOSWASHINGTONSUP01007

however.  The court reasoned that an individual who has more difficulty obtaining

access to the computer files is "not prevented from possessing and using a handgun

to defend his or her home and family."  Order 21 [ROA.699] (brackets and internal

quotation marks omitted).  To the contrary, the regulations do not prohibit Second

Amendment Foundation members "from manufacturing their own firearms, . . . from

keeping and bearing other firearms," or, if they are in the United States, "from

acquiring the computer files at issue directly from Defense Distributed."  *Id.* at 22

[ROA.700].  Given this limited burden on Second Amendment rights and the

legitimate governmental interest served, the court concluded that the regulations

satisfied intermediate scrutiny.  *Id.* [ROA.700].

Finally, the district court rejected plaintiffs' Fifth Amendment claim, which

asserted that the regulations were unconstitutionally vague.  The court noted that

plaintiffs "have not made precisely clear which portion of the [regulatory] language

they believe is unconstitutionally vague."  Order 23 [ROA.701].  The court explained

that the term "defense articles" is defined with great specificity in the regulations.  *Id.*

at 23-24 [ROA.701-02].  The term "export" is also defined, "although at lesser

length," and specifically includes "'[d]isclosing (including oral or visual disclosure) or

transferring technical data to a foreign person, whether in the United States or

abroad.'"  *Id.* at 24 [ROA.702] (quoting 22 C.F.R. § 120.17(a)(4) (alteration in

original).  That definition would put a person of ordinary intelligence on notice that

plaintiffs' conduct would be covered by the regulations.  *Id.* [ROA.702].

DOSWASHINGTONSUP01008

## SUMMARY OF ARGUMENT

Congress and the Executive Branch have concluded that the export of defense

articles, including firearms and firearm components, requires diligence and oversight

to ensure that they are not used in ways inimical to the national security and foreign

policy interests of the United States.  As a consequence, a license or other form of

authorization is required to export these items.  The computer data files at issue here,

if made available publicly without restriction, would allow anyone with a 3-D printer

(or related device) to create, at the touch of a button, parts and components for an

operational firearm that is untraceable and undetectable by metal detectors.  Because

such printers are readily available, allowing the distribution of the computer files at

issue here is tantamount to permitting the dissemination of the firearms themselves.

The export of the files thus requires a license.  The licensing requirement contains no

exception for cases in which the distribution of files to foreign nationals occurs by

placing the files on an unrestricted Internet site, from which a foreign national

downloads them.

Plaintiffs mistakenly assert that the State Department acted ultra vires in

reaching these conclusions, which would require a showing that the Department had

no colorable basis for its actions.  As the district court recognized, the Arms Export

Control Act creates an export licensing regime, and provides broad discretion to

identify the items that will require an export license.  Plaintiffs properly concede that

certain forms of "technical data" are properly subject to the licensing scheme, and

DOSWASHINGTONSUP01009

that posting information on the Internet can be characterized as an "export." These concessions are fatal to their assertion that the Department had no colorable basis for its actions.

Plaintiffs' constitutional claims are likewise without merit. Plaintiffs' First Amendment argument misunderstands the nature of the licensing scheme and ignores the context of the Department's actions here. The licensing scheme does not target plaintiffs' ability to express ideas, but rather applies here only because the computer files at issue direct a computer to produce firearm components. Advancing the government's interest in preventing the export of defense articles is fully consistent with the First Amendment under any plausibly relevant standard. The district court's rejection of plaintiffs' First Amendment claim accords with decisions of the Ninth Circuit upholding export controls, and with decisions of the Second Circuit upholding other regulations related to computer files.

Plaintiffs' contrary argument is largely premised on hypotheticals not presented here concerning the dissemination of scientific ideas in academic fora or the distribution of information unrelated to firearms. The regulations contain broad exceptions designed to allow scientific discourse, although those exceptions are not implicated here because of the nature of the files and the mode of dissemination. This case relates to the export of computer files that direct a computer, without human intervention, to create components of an operable firearm. The regulations are plainly valid as applied to actions that make such files available to foreign

14

nationals, and plaintiffs' arguments about whether and how the regulations would apply in other circumstances are beside the point.

Plaintiffs' suggestions that the statute is impermissibly vague, or that it confers undue discretion on the State Department, similarly misunderstand the issues before the Court. The regulations describe in plain and objective terms the items that are subject to the licensing scheme. As the district court observed, plaintiffs have identified no ambiguous or subjective terms in the regulations that were applied in this case. Plaintiffs' general objections about potential applications in other contexts have no relevance here.

Plaintiffs' reliance on the Second Amendment is misplaced. The only limitation at issue here concerns the placement of certain computer data files on an unrestricted Internet site. Nothing in the statute or regulations prevents American citizens on U.S. soil from obtaining the files directly from Defense Distributed, much less from obtaining a firearm from other sources or from possessing a firearm for self-defense. Plaintiffs do not assert otherwise. And even if the Second Amendment were implicated, the government interests that are advanced by the export licensing scheme amply justify any limited intrusion on the ability to procure firearms within the United States.

Finally, the district court properly concluded that a preliminary injunction would not be in the public interest because the licensing scheme serves important government interests that outweigh any harm to plaintiffs. Plaintiffs' assertion of an

DOSWASHINGTONSUP01011

abstract interest in vindicating constitutional rights does not demonstrate that the district court erred in this regard. The district court properly denied plaintiffs' motion for a preliminary injunction.

## STANDARD OF REVIEW

This Court reviews the grant or denial of a preliminary injunction for abuse of discretion, and will "reverse the denial of a preliminary injunction" "[o]nly under extraordinary circumstances." *Anderson v. Jackson*, 556 F.3d 351, 355-56 (5th Cir. 2009) (quotation marks omitted).

## ARGUMENT

### I.     Government officials did not act ultra vires.

Plaintiffs argue that the Department of State acted ultra vires when it required Defense Distributed to obtain a license before uploading to an unrestricted Internet site computer files that allow export-controlled firearm components to be created at the touch of a button. As the district court explained, to establish that the government was acting ultra vires, plaintiffs must "establish that the officer was acting 'without any authority whatever,' or without any 'colorable basis for the exercise of authority.'" Order 8 [ROA.686] (quoting *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011)). Plaintiffs cannot come close to meeting this standard.

The Arms Export Control Act authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States," to "control the import and the export of defense articles and defense services." 22 U.S.C.

16

§ 2778(a)(1).  As particularly relevant here, the statute contemplates the promulgation of regulations designating particular items as "defense articles and defense services," *id.*, and prohibits the exportation of such articles and services without a license or other authorization, *id.* § 2778(b)(2).  These powers have been delegated, as relevant here, to the Department of State.  *See* Administration of Reformed Export Controls, Exec. Order No. 13,637, § 1(n), 3 C.F.R. 223-224 (2014).

The computer files at issue fall squarely within controlling regulations that have been duly promulgated under that authority.  The files, which provide the data necessary for a 3-D printer or related device to produce a firearm or firearm component, relate to the creation of firearms that appear on the U.S. Munitions List.  *See* 22 C.F.R. § 121.1, Category I, item (a).  Items on the U.S. Munitions List are defined by the regulations to be "defense articles."  *Id.* § 120.6.  And in addition to including the firearms and firearm components themselves as "defense articles," the Munitions List explicitly includes "[t]echnical data" relating to items on the list.  *Id.* § 121.1, Category I, item (i).  Plaintiffs properly concede that the statute authorizes the regulations to extend not only to the export of physical firearms, but also to "the export of certain technical data."  Appellants' Br. 38.

The regulations define "[t]echnical data" to include "[i]nformation . . . which is required for the . . . production . . . of defense articles."  22 C.F.R. § 120.10(a).  Computer files that are needed to produce a firearm with a 3-D printer or related

17

device plainly fall within that definition. Plaintiffs offer no textual argument to the contrary.

There is an exception to the definition of "technical data" for materials in the "public domain." 22 C.F.R. § 120.10(b). Analyzing this exception required a factual analysis of the files at issue here and the materials that had already been placed in the public domain. After conducting that analysis, the agency concluded that the files at issue here constituted "a meaningful step beyond previous, public-domain material." Aguirre Decl. ¶ 29 [ROA.567-68]. The exception thus does not apply, and the files at issue are "defense articles."

Because the computer files at issue here constitute "defense articles" under governing regulations, the statute states that they may not be "exported . . . without a license for such export." 22 U.S.C. § 2778(b)(2). The agency reasonably concluded that sharing files with foreign nationals over the Internet constituted an "export." There can be no serious dispute that sending technical data to a foreign national by physically transporting a disk would constitute an export. And plaintiffs concede that the government "can bar individuals from . . . directly providing technical assistance to a foreign person on designing defense articles." Appellants' Br. 38. The agency was not compelled to distinguish between these scenarios and transmitting defense articles to foreign nationals over the Internet. Such a conclusion would create a loophole in the regulatory scheme by allowing technical data to be transferred to foreign nationals merely by placing it on an Internet site that they could access.

18

Plaintiffs properly do not "suggest that uploading files to the Internet cannot be viewed, in some sense, as an export." *Id.*

Unable to establish that the agency acted without any colorable basis in this case, plaintiffs complain generally that the regulations sweep too broadly. Plaintiffs' general critiques of hypothetical applications of the regulations provide no basis for concluding that the agency acted ultra vires in this case.

Moreover, plaintiffs' general complaints misunderstand the statutory and regulatory scheme and the nature of the limitations at issue here. Plaintiffs appear to suggest that the definition of "technical data" is too broad. But that term was defined in duly promulgated regulations designating certain technical data as "defense article[s]" subject to export controls, and Congress has specified that "[t]he designation . . . in regulations . . . of items as defense articles . . . shall not be subject to judicial review," 22 U.S.C. § 2778(h). Even if the regulations were subject to judicial review, they would be subject to deference under basic administrative-law principles set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837 (1984).

In any event, plaintiffs identify no flaw in the regulatory definition. As the Ninth Circuit has explained, "[t]he authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment." *United States v. Edler Indus., Inc.*, 579 F.2d 516, 520 (9th Cir.

19

1978).  The wisdom of those regulations is illustrated by this case, in which plaintiffs assert that the government is powerless to prevent them from sharing with foreign nationals computer files that allow firearm components to be manufactured at the touch of a button.

Plaintiffs do not seriously suggest that the statute and regulations permit them to transfer technical data to foreign nationals.  Instead, they focus on their asserted desire to share the files with fellow Americans.  But the regulations at issue do not prohibit Defense Distributed from sharing technical data with fellow U.S. citizens on American soil.  So far as the State Department is concerned, Defense Distributed may transfer such files, including by making the files available for U.S. citizens to download on the Internet.  This may be accomplished by verifying the citizenship status of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals.

What Defense Distributed may not do is make defense articles available to foreign nationals.  Placing technical data on an unrestricted Internet site makes the data available for download around the world, and the State Department therefore warned Defense Distributed that the company could be liable under the regulations if it maintained the technical data on such a site.  The possibility that an Internet site could also be used to distribute the technical data domestically does not alter the analysis, any more than an email to a foreign national would become immune from export regulations if U.S. citizens were also copied on the email.

20

II.    **The application of the regulations in this case is fully consistent with the Constitution.**

A.    **The regulations permissibly address the distribution and production of firearms, and any effect on protected speech is fully justified.**

As discussed above, this case concerns a set of regulations designed to address the exportation of weapons. Most directly, the regulations prohibit the exportation of firearms without obtaining a license or other authorization. But technological advances permit firearms to be disseminated by distributing computer files that direct 3-D printers or related devices to produce firearm components. Imposing a licensing requirement on the dissemination of firearms to foreign nationals by this mechanism does not violate the First Amendment. The regulations at issue here address the exportation and overseas production of firearms, and do not constitute an effort to regulate the marketplace of ideas.

1.    **The regulations serve the government's legitimate interest in regulating the dissemination of arms and technical data.**

Plaintiffs contend that "[c]omputer code conveying information is 'speech' within the meaning of the First Amendment." Appellants' Br. 43 (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449-50 (2d Cir. 2001)). Even if plaintiffs are correct that computer code can serve as "an expressive means for the exchange of information and ideas about computer programming," *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000), that potential exchange of ideas is not the basis for the

21

government regulation here.  While computer programs can in some cases be read by human beings (such as other computer programmers) and thus convey information, the computer files at issue are subject to regulation because they facilitate automated manufacture of a defense article.  The State Department is concerned here with the use of the data files at issue by machines, not with their ability to express a message to humans.  Although a person must direct a machine to read the files, "this momentary intercession of human action does not diminish the nonspeech component of [computer] code." *Corley*, 273 F.3d at 450.

The Supreme "Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).  Here, there can be no serious dispute that the government has an important interest in preventing regulated entities from evading the prohibition on exporting firearms by providing the means for the same firearms to be produced abroad.

"The United States and other countries rely on international arms embargoes, export controls, and other measures to restrict the availability of defense articles sought by terrorist organizations."  Aguirre Decl. ¶ 35(b) [ROA.571].  The availability on the Internet of the computer files at issue here would "provide any such organization with defense articles, including firearms, at its convenience, subject only to its access to a 3D printer, an item that is widely commercially available." *Id.*

22

[ROA.571].  Providing "unrestricted access" to the computer files at issue here "would likewise provide access to the firearms components and replacement parts to armed insurgent groups, transnational organized criminal organizations, and states subject to U.S. or UN arms embargoes." *Id.* ¶ 35(c) [ROA.571].  In addition, "[m]any countries, including important U.S. allies, have more restrictive firearms laws than the United States and have identified [the files at issue here] as a threat to domestic firearms laws." *Id.* ¶ 35(d) [ROA.572].  The exports at issue here "would undercut the domestic laws of these nations . . . and thereby damage U.S. foreign relations with those countries and foreign policy interests." *Id.* [ROA.572].

The firearms that would be produced by the files at issue here are of particular concern because they "can be produced in a way as to be both fully operable and virtually undetectable by conventional security measures such as metal detectors." Aguirre Decl. ¶ 35(a) [ROA.570].  If such a firearm were produced and "then used to commit an act of terrorism, piracy, assassination, or other serious crime," the United States could be held accountable, causing "serious and long-lasting harm to the foreign policy and national security interests of the United States." *Id.* [ROA.571].

Congress and the Executive Branch thus have ample justification for imposing controls on exports of defense articles in general and the computer files at issue here in particular.  These interests are more than sufficient to justify any incidental effects the regulations may have on the expression of ideas.

DOSWASHINGTONSUP01019

The government's interests here would suffice to justify the regulations even if a more demanding standard were thought to apply.  In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups.  *Humanitarian Law Project*, 561 U.S. at 8.  The Court recognized that the particular activities in which the plaintiffs in that case wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had no non-expressive component.  *Id.* at 28.  But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups."  *Id.* at 30.

The Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs," and the Court thus gave deference to the government's determinations about the likely consequences of allowing the material support at issue.  *Humanitarian Law Project*, 561 U.S. at 33-34. The Court concluded that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not."  *Id.* at 35.

24

DOSWASHINGTONSUP01020

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1).  In longstanding regulations, the Department of State has consistently and reasonably concluded that the overseas dissemination of arms cannot meaningfully be curtailed if unfettered access to technical data essential to the production of arms is not similarly subject to the export licensing scheme.  *See* 22 C.F.R. §§ 120.6, 120.10.  Plaintiffs provide no basis for this Court to disturb those conclusions in these sensitive areas.

### 2.     Plaintiffs' position cannot be reconciled with the approach taken by other courts of appeals.

The Ninth Circuit has "repeatedly upheld the constitutionality of the [Arms Export Control Act], and its predecessor, the Mutual Security Act (MSA), under the First Amendment." *United States v. Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012).  That court has properly recognized "the Government's strong interest in controlling 'the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise.'" *Id.* at 1135-36 (quoting *United States v. Edler Indus., Inc.*, 579 F.2d 516, 520-21 (9th Cir. 1978)).  "[E]ven assuming that the First Amendment offers some protection to the dissemination of technical data," the Ninth Circuit recognized that "the government has a strong interest in regulating the export of military information." *United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989).  "Technical

25

data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security." *Id.* at 1497.

Plaintiffs misunderstand the Ninth Circuit's reasoning when they rely on a limiting construction adopted by that court. *See* Appellants' Br. 48. The Ninth Circuit has held that when "information could have both peaceful and military applications, . . . the defendant must know or have reason to know that its information is intended for the prohibited use." *Edler*, 579 F.2d at 521. That limitation, even if it is properly read into one or more of the enforcement provisions applicable today, has no application here: the files at issue here plainly are useful only for the creation of firearms, and are plainly intended for that use. *See, e.g.*, Appellants' Br. 19 ("Plaintiff Defense Distributed . . . is operated for the purpose of promoting popular access to arms . . . ."). What is relevant here is not the Ninth Circuit's construction of the regulations in a respect that is not at issue here, but rather that court's conclusion that the regulations withstand First Amendment scrutiny.

This case resembles *Commodity Futures Trading Commission v. Vartuli*, 228 F.3d 94 (2d Cir. 2000), where the Second Circuit rejected a First Amendment challenge to a prohibition on distributing software that provided automated investment advice without first registering with the Commodity Futures Trading Commission. The court emphasized that the software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell. *Id.* at 111. The court observed that "[n]one of the reasons for which speech is

26

thought to require protection above and beyond that accorded to non-speech behavior—the pursuit of truth, the accommodation among interests, the achievement of social stability, the exposure and deterrence of abuses of authority, personal autonomy and personality development, or the functioning of a democracy—is implicated" by a system that "did not materially differ from . . . electronically triggered trades." *Id.* (citation omitted).

The court's analysis was not altered by the possibility that some recipients of the software "doubtless used it as no more than a provider of information and advice." *Vartuli*, 228 F.3d at 111-12. Even if communications to those customers constituted "'speech,' and protected speech at that," that would not affect the court's analysis because the company "was properly required to register for its non-speech activities, such as the sale of [the software] as the automatic system for currency trading it was intended to be." *Id.* at 112. The possibility that the company "engaged in protected speech does not make the requirement that it register to carry on its non-speech business any the less constitutionally permissible." *Id.*

In *Universal City Studios, Inc. v. Corley*, similarly, the Second Circuit upheld an injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs. The court recognized that computer software has both a functional and an informative component, but observed that the injunction "target[ed] only the nonspeech component." *Corley*, 273

27

F.3d at 454.  Here, similarly, the regulations target trafficking in arms, and are not aimed at restricting free expression.

> ### 3.     Plaintiffs' contrary arguments fail to address the basis for applying the regulations in this case.

Unable to seriously dispute the government's legitimate interest in preventing the dissemination of firearms overseas, plaintiffs seek to characterize their conduct in different terms.  Plaintiffs assert that they seek to communicate "information regarding simple arms of the kind in common use for traditional lawful purposes." Appellants' Br. 48.  Much "information regarding simple arms" would fall within the regulations' exception for "information in the public domain."  22 C.F.R. §§ 120.10(b), 120.11(a).  The files at issue here, however, have novel functionality: they enable a 3-D printer or related device, at the push of a button, to create an article that appears on the U.S. Munitions List.  *See* Aguirre Decl. ¶ 29 [ROA.567-68].

This case is therefore quite unlike *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015). There, the Supreme Court considered an ordinance that prohibited the display of signs based on the expressive content of those signs.  In particular, the ordinance generally imposed a permitting requirement on outdoor signs, but exempted signs that "convey[ed] the message of directing the public to church or some other 'qualifying event,'" signs that were "'designed to influence the outcome of an election,'" and signs that "'communicat[ed] a message or ideas' that do not fit within" certain other specified categories.  *Id.* at 2227 (quoting ordinance).  Because the restrictions

DOSWASHINGTONSUP01024

"depend[ed] entirely on the communicative content of the sign," the Court concluded

that the ordinance was a content-based restriction on speech, regardless of the

government's justifications for enacting it.  *Id.*  The Court in *Reed* did not overrule by

implication cases in which the government regulation was premised not on the

communicative content of a particular action, but on other factors.  *See O'Brien*, 391

U.S. at 376; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49 (1986) (upholding

"zoning ordinance[] designed to combat the undesirable secondary effects" of

"businesses that purvey sexually explicit materials").

Similarly, plaintiffs seek to assume away the consequences of their actions

when they insist that they "are not seeking to help foreigners build controlled

weapons of war," but rather "are merely communicating with their fellow

Americans."  Appellants' Br. 48.  To the extent that plaintiffs are actually

communicating with their fellow Americans within the United States, the regulations

have no application.  But to the extent that plaintiffs make defense articles available to

foreign nationals, the regulations apply.  The United States is not powerless to prevent

its citizens from facilitating the production of arms by foreign nationals even if the

conduct at issue is principally intended for a different audience.

Plaintiffs do not advance their argument by citing an opinion from the Office

of Legal Counsel in the Department of Justice.  *See* Constitutionality of the Proposed

Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202 (1981)

[ROA.244].  In that opinion, the Department of Justice cited the government's

DOSWASHINGTONSUP01025

"compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." *Id.* at 208 [ROA.250].

Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." 5 Op. O.L.C. at 212 [ROA.254].

This case does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used, automatically, to generate firearms or firearm components that are on the U.S. Munitions List.

Plaintiffs' reliance on other statements by the government in contexts far removed from this case is likewise misplaced. Plaintiffs refer, for example, to the sharing in academic settings of information about cryptography. *See* Department of State, Munitions Control Newsletter (Feb. 1980) [ROA.332] (discussing "scientific exchanges of basic mathematical and engineering research data" related to cryptography); Lowell 2d Decl., *Bernstein v. U.S. Dep't of State*, No. 95-0582 (N.D. Cal.

30

July 26, 1996) (Appellants' Br. Add. 22).  Plaintiffs also refer to a Department of

Justice report about the publication within the United States, in a variety of settings,

of information about making bombs.  *See* Department of Justice, 1997 Report on the

Availability of Bombmaking Information [ROA.280].  Those discussions have no

evident bearing on this case, which involves a prohibition on making available to

foreign nationals computer files that facilitate the automated production of firearms.

And the United States has never taken the position, urged here by plaintiffs, that

dissemination on the Internet is categorically excluded from regulation.  *See, e.g.*, Defs.'

Opp'n to Pl.'s Mot. for Summ. J. 28-29, *Bernstein v. U.S. Dep't of State*, No. 95-0582

(N.D. Cal. Aug. 30, 1996)[4] (arguing that "plaintiff's contention that distribution

through the Internet would not implicate the notion of an export is highly suspect"

and noting "the obvious concern that posting software without regard to whether it

can be distributed to international destinations would circumvent" the export

licensing regulations (citation omitted)).

The hypothetical application of the regulations to conduct not at issue here

would be relevant only to a claim that the regulations are facially overbroad.

"Invalidation for overbreadth is strong medicine that is not to be casually employed."

*United States v. Williams*, 553 U.S. 285, 293 (2008) (internal quotation marks omitted).

In particular, the Supreme Court has "vigorously enforced the requirement that a

---

[4] *Available at* https://app.box.com/Bernstein (*see* Appellants' Br. 14).

DOSWASHINGTONSUP01027

statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292 (emphasis in original).

Plaintiffs make no effort to compare the regulations' legitimate applications to the hypotheticals that they posit. Any such comparison would demonstrate the regulations' facial constitutionality. As discussed above, the regulations operate to prevent the exportation of weapons and of information that is not in the public domain and is necessary to produce weapons. For the reasons given above, the ordinary operation of these regulations does not offend the First Amendment.

Plaintiffs highlight the lack of any limiting principle to their argument by suggesting that the computer files have "artistic and political utility" because they have been "repurposed" by artists. Appellants' Br. 21. Actual firearms and weapons of mass destruction could be "repurposed" to make political statements or to create art, but that does not diminish the government's ability to regulate those items based on their non-expressive characteristics.

### B.    The regulations do not present the concerns associated with prior restraints on core expression.

Plaintiffs' repeated references to the regulations as a "prior restraint" do not advance their argument. As the district court explained, this Court has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." Order 11 [ROA.689] (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example,

32

DOSWASHINGTONSUP01028

while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), *cited in Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.*

By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of censorship." *City of Lakewood*, 486 U.S. at 760-61. The provisions at issue here fall squarely in this category. The Arms Export Control Act and implementing regulations are part of a regulatory scheme designed to curtail the

DOSWASHINGTONSUP01029

spread of defense articles to foreign nationals.  Far from being aimed at restricting

expression, the regulations "specifically carve out exceptions to the law for the types

of information that are subject to the highest levels of First Amendment protection,

for example, published scholarly works." *Mak*, 683 F.3d at 1136 (citing 22 C.F.R.

§ 120.11(a)).

As discussed above, while the distribution of computer files could, in some

circumstances, be done for expressive purposes, it nonetheless stands in obvious

contrast to activities such as parading, posting signs, distributing handbills, or

publishing newspapers, which are always (or almost always) done for expressive

purposes.  Cases involving restrictions on those activities are inapposite here.  *See, e.g.,*

*New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon

Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931)

(publication of charges of official misconduct in newspaper); *Forsyth Cnty. v. Nationalist*

*Movement*, 505 U.S. 123 (1992) (permit for protest march).

In addition, plaintiffs are mistaken in arguing that the State Department's

processing times render the scheme an impermissible prior restraint.  *See* Appellants'

Br. 52-55.  Plaintiffs have not sought a license in this case and present only general

arguments about the pace of licensing decisions, without any concrete factual context.

Moreover, on its face, the licensing determination appropriately involves

considerations of numerous difficult questions of national security or foreign policy.

*See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article

34

would contribute to an arms race, aid in the development of weapons of mass

destruction, support international terrorism, increase the possibility of an outbreak or

escalation of conflict, or prejudice the development of bilateral or multilateral arms

control or nonproliferation agreements or other arrangements."). Given the stakes

and the complexity of the issues involved, there is no basis for plaintiffs' apparent

view that such determinations must be made hastily.

There is no legal obligation to obtain a commodity-jurisdiction determination

before exporting items or data that are not subject to the regulations. As a technical

matter, the availability of such determinations thus does not impose a prior restraint.

And as a practical matter, such determinations will be sought (and may be time

consuming) only in difficult cases that require extensive review.

### C. The regulations provide clear definitions and are not impermissibly subjective.

Plaintiffs mistakenly suggest that the regulations are void for vagueness under

the Fifth Amendment's Due Process Clause, Appellants' Br. 60-62, or that they confer

inordinate discretion on government officials, *id.* at 50-52. The regulations contain

precise and specific definitions. *See generally United States v. Wu*, 711 F.3d 1, 13 (1st Cir.

2013) ("To be within the reach of the Munitions List at all, an item must qualify as a

'defense article,' a term defined by the [regulations] with considerable specificity.").

Those definitions are designed not to provide authority to exercise subjective

DOSWASHINGTONSUP01031

judgments about political or scientific speech, but rather to limit the foreign

dissemination of firearms and other weapons of war.

As relevant here, the regulations apply specifically to firearms up to .50 caliber,

22 C.F.R. § 121.1, Category I, item (a), and to "[i]nformation . . . which is required for

the . . . production . . . of" such firearms, *id.* § 120.10(a)(1). The regulations contain

an exemption for information that is in the "[p]ublic domain," as that term is defined

in the regulations. *Id.* § 120.11. And the regulations define "export" to include

"[d]isclosing (including oral or visual disclosure) or transferring technical data to a

foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4).

These regulations are clear and specific, and do not provide an open-ended

invitation to make subjective judgments about the value of speech or to censor based

on disagreement with a message. Plaintiffs identify no statutory or regulatory terms

applicable here that give rise to subjective judgments. *See* Order 23 [ROA.701]

(noting that plaintiffs "have not made precisely clear which portion of the [regulatory]

language they believe is unconstitutionally vague"). Instead, they point to terms with

no evident bearing on this case, asserting that "[r]easonable persons must guess at

what 'specially designed' or 'military application' truly mean," and alluding to

"Category XXI" of the U.S. Munitions List. Appellants' Br. 51. Although plaintiffs

provide no explanation of why those terms, in context, are vague, for present

purposes it suffices to point out that none of these regulatory terms or categories is

relevant here. The Supreme Court has made clear that "a plaintiff whose speech is

36

clearly proscribed cannot raise a successful vagueness claim under the Due Process
Clause of the Fifth Amendment for lack of notice." *Humanitarian Law Project*, 561 U.S.
at 20. And as discussed above, plaintiffs have not come close to establishing that any
applications of disparate parts of the regulations call for the "strong medicine" of
overbreadth under the First Amendment. *See supra* pp. 31-32.

Plaintiffs' argument that the regulations were unclear as applied in this case
arises from their observation that it took two years to process Defense Distributed's
commodity-jurisdiction requests. The fact that it took time to analyze the appropriate
application of the regulations in a new factual scenario does not render the regulations
vague. Even if Defense Distributed's request presented a close case under the
regulations, that would still not pose a constitutional problem. To the contrary, the
Supreme Court has made clear that although "[c]lose cases can be imagined under
virtually any statute," "[w]hat renders a statute vague is not the possibility that it will
sometimes be difficult to determine whether the incriminating fact it establishes has
been proved; but rather the indeterminacy of precisely what that fact is." *Williams*,
553 U.S. at 306. The Court has thus "struck down statutes that tied criminal
culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly
subjective judgments without statutory definitions, narrowing context, or settled legal
meanings." *Id.* at 306. The regulations here contain no such terms. *See also*
*Humanitarian Law Project*, 561 U.S. at 20-21 (upholding statute that "does not
require . . . untethered, subjective judgments").

DOSWASHINGTONSUP01033

Plaintiffs' suggestion that the regulatory scheme is impermissibly underinclusive is also wide of the mark. Plaintiffs contend that Defense Distributed was singled out by the Department of State because plaintiffs are unaware of similar actions taken against other entities. Appellants' Br. 59. Plaintiffs offer no authority in support of their apparent view that a regulatory scheme is unconstitutional unless enforcement action is taken in every case. A claim that the regulations were inadequately enforced would amount, at most, to a selective-prosecution claim (though Defense Distributed has not been prosecuted), and plaintiffs make no effort to satisfy the standard applicable to such claims, which the Supreme Court has "taken great pains to explain . . . is a demanding one." *United States v. Armstrong*, 517 U.S. 456, 463 (1996); *see also id.* at 464 ("In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion." (internal quotation marks omitted)).

### D.     The regulations do not violate the Second Amendment.

Plaintiffs' argument that the regulations violate the Second Amendment is without merit. The regulations at issue here do not meaningfully burden anyone's Second Amendment rights. Law-abiding, responsible American citizens can "acquir[e] the computer files at issue directly from Defense Distributed" and make firearms using a 3-D printer, and the regulations place no limitation whatsoever on the ability to obtain firearms from other sources or to possess them, in the home or

DOSWASHINGTONSUP01034

anywhere else.  Order 22 [ROA.700].  While plaintiffs' declarants state that they would like to access Defense Distributed's files on the Internet, they do not allege that the regulations prevent them from exercising their right to keep or bear arms.  *See generally* Gottlieb Decl. [ROA.658]; Williamson Decl. [ROA.661]; Versnel Decl. [ROA.664]. The district court properly explained that "[t]he burden imposed here falls well short of that generally at issue in Second Amendment cases."  *Id.* at 21 [ROA.699].

There is thus no basis for plaintiffs' assertion that anyone's Second Amendment rights are affected by the regulations at issue here.  But at an absolute minimum, the regulations survive any plausibly relevant standard of Second Amendment scrutiny.

As the district court explained, the validity of the provisions at issue here follows from this Court's analysis of statutes that prohibit the commercial sale of arms to individuals between the ages of 18 and 21.  Order 21-22 [ROA.699-700] (citing *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012)).  This Court held that those statutes "do not severely burden the Second Amendment rights" of those individuals, and "do not strike the core of the Second Amendment because they do not prevent 18-to-20-year-olds from possessing and using handguns 'in defense of hearth and home.'"  *Id.* at 206 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).  The Court thus upheld the statutes as a reasonable effort to "manage an important public safety problem."  *Id.* at 207.

DOSWASHINGTONSUP01035

Here, as discussed above, the regulations do not prevent anyone from possessing and using handguns or any other weapon.  And "[p]laintiffs do not question that the Government has a compelling interest in regulating arms exports."  Appellants' Br. 68.  Any limited imposition on the ability to keep and bear arms is more than justified by the national security and foreign affairs interests discussed above.

## III.   The district court did not abuse its discretion in concluding that the remaining factors counsel against issuance of a preliminary injunction.

The district court explained that plaintiffs' submission on the balance of harms and the public interest "fail[ed] to consider the public's keen interest in restricting the export of defense articles."  Order 6 [ROA.684].  Plaintiffs cannot demonstrate that the district court's holding was an abuse of discretion.

Plaintiffs seek a broad injunction against application of the regulations to any "unclassified information," including not only the files that have already been determined to be subject to the regulations but also to "all other files Defense Distributed has and will continue to create that contain technical information."  Proposed Order 1 [ROA.82].  As discussed above, the government has a compelling interest in maintaining an export licensing scheme for files that have been determined to be subject to export controls, and for future files that might be subject to such controls.

40

Plaintiffs, on the other hand, have not attempted to demonstrate that they would be unable to distribute their files to U.S. citizens in this country through means other than providing access worldwide on the Internet.  Rather, their asserted interest consists entirely of the abstract proposition that harm to a constitutional right amounts to irreparable harm.  *See* Appellants' Br. 69-71.  While the district court accepted that proposition, it properly went on to analyze the practical considerations at stake.  *See* Order 6-7 [ROA.684-85].  The district court's denial of a preliminary injunction should be affirmed on this basis as well.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

BENJAMIN C. MIZER
   *Principal Deputy Assistant Attorney*
      *General*

RICHARD L. DURBIN, JR.
   *United States Attorney*

MICHAEL S. RAAB

   *s/ Daniel Tenny*
DANIEL TENNY
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7215*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, D.C. 20530*
   *(202) 514-1838*
   *daniel.tenny@usdoj.gov*

FEBRUARY 2016

41

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2016, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the Fifth

Circuit by using the appellate CM/ECF system.  Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Daniel Tenny*
Daniel Tenny

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule

of Appellate Procedure 32(a).  This brief contains 9,832 words.


*s/ Daniel Tenny*
Daniel Tenny

DOSWASHINGTONSUP01039

**ADDENDUM**

DOSWASHINGTONSUP01040

# TABLE OF CONTENTS

22 U.S.C. § 2778 (excerpts) ............................................................. A1

22 C.F.R. § 120.6 ............................................................................ A3

22 C.F.R. § 120.10 .......................................................................... A4

22 C.F.R. § 120.11 .......................................................................... A5

22 C.F.R. § 120.17 .......................................................................... A6

22 C.F.R. § 121.1 (excerpts) .......................................................... A7

DOSWASHINGTONSUP01041

22 U.S.C. § 2778

§ 2778. Control of arms exports and imports

(a) Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; negotiations information

(1) In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

(2) Decisions on issuing export licenses under this section shall take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

(3) In exercising the authorities conferred by this section, the President may require that any defense article or defense service be sold under this chapter as a condition of its eligibility for export, and may require that persons engaged in the negotiation for the export of defense articles and services keep the President fully and currently informed of the progress and future prospects of such negotiations.

(b) Registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and defense services

. . .

(2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter, except that no license shall be required for exports or imports made by or for an agency of the United States Government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.

. . .

A1

(h) Judicial review of designation of items as defense articles or services

The designation by the President (or by an official to whom the President's functions under subsection (a) of this section have been duly delegated), in regulations issued under this section, of items as defense articles or defense services for purposes of this section shall not be subject to judicial review.

DOSWASHINGTONSUP01043

**22 C.F.R. § 120.6**

**§ 120.6.  Defense article.**

Defense article means any item or technical data designated in § 121.1 of this subchapter. The policy described in § 120.3 is applicable to designations of additional items.  This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in § 121.1 of this subchapter.  It also includes forgings, castings, and other unfinished products, such as extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles.  It does not include basic marketing information on function or purpose or general system descriptions.

DOSWASHINGTONSUP01044

**22 C.F.R. § 120.10**

**§ 120.10.  Technical data.**

(a) Technical data means, for purposes of this subchapter:

(1) Information, other than software as defined in § 120.10(a)(4), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles.  This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation.

(2) Classified information relating to defense articles and defense services on the U.S. Munitions List and 600–series items controlled by the Commerce Control List;

(3) Information covered by an invention secrecy order; or

(4) Software (see § 120.45(f)) directly related to defense articles.

(b) The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in § 120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter.  It also does not include basic marketing information on function or purpose or general system descriptions of defense articles.

A4

## 22 C.F.R. § 120.11

### § 120.11.  Public domain.

(a) Public domain means information which is published and which is generally accessible or available to the public:

(1) Through sales at newsstands and bookstores;

(2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3) Through second class mailing privileges granted by the U.S. Government;

(4) At libraries open to the public or from which the public can obtain documents;

(5) Through patents available at any patent office;

(6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also § 125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community.  Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

DOSWASHINGTONSUP01046

**22 C.F.R. § 120.17**

**§ 120.17.  Export.**

(a) Export means:

(1) Sending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data; or

(2) Transferring registration, control or ownership to a foreign person of any aircraft, vessel, or satellite covered by the U.S. Munitions List, whether in the United States or abroad; or

(3) Disclosing (including oral or visual disclosure) or transferring in the United States any defense article to an embassy, any agency or subdivision of a foreign government (e.g., diplomatic missions); or

(4) Disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad; or

(5) Performing a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.

(6) A launch vehicle or payload shall not, by reason of the launching of such vehicle, be considered an export for purposes of this subchapter.  However, for certain limited purposes (see § 126.1 of this subchapter), the controls of this subchapter may apply to any sale, transfer or proposal to sell or transfer defense articles or defense services.

(b) [Reserved]

A6

**22 C.F.R. § 121.1**

## § 121.1.  The United States Munitions List

(a) The following articles, services, and related technical data are designated as defense articles and defense services pursuant to sections 38 and 47(7) of the Arms Export Control Act.  Changes in designations will be published in the Federal Register.  Information and clarifications on whether specific items are defense articles and services under this subchapter may appear periodically through the Internet Web site of the Directorate of Defense Trade Controls.

. . .

Category I—Firearms, Close Assault Weapons and Combat Shotguns

*(a) Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

*(b) Fully automatic firearms to .50 caliber inclusive (12.7 mm).

. . .

(i) Technical data (as defined in § 120.10 of this subchapter) and defense services (as defined in § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category.  Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

A7

DOSWASHINGTONSUP01048

# *United States Court of Appeals*

## FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

February 17, 2016

Mr. Daniel Bentele Hahs Tenny
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Room 7215
Washington, DC 20530

No. 15-50759   Defense Distributed, et al v. U.S. Dept. of
               State, et al
USDC No. 1:15-CV-372

Dear Mr. Tenny,

The following pertains to your brief electronically filed on
February 11, 2016.

You must submit the 7 paper copies of your brief required by 5ᵀᴴ
CIR. R. 31.1 within 5 days of the date of this notice pursuant to
5th Cir. ECF Filing Standard E.1.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Shawn D. Henderson, Deputy Clerk
504-310-7668

cc:
    Mr. Joshua Michael Blackman
    Mr. Bruce D. Brown
    Mr. Matthew Goldstein
    Mr. Alan Gura
    Mr. David T. Hardy
    Mr. Robert E. Henneke
    Mr. William Bryan Mateja
    Mr. Raffi Melkonian
    Mr. Randal John Meyer
    Mr. Leif A. Olson
    Mr. Michael S. Raab
    Mr. Ilya Shapiro

Mr. Joel Stonedale
Mr. Kit Walsh

DOSWASHINGTONSUP01050

# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 15-50759

DEFENSE DISTRIBUTED; SECOND AMENDMENT
FOUNDATION, INCORPORATED,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His
Official Capacity as the Secretary of the Department of State; DIRECTORATE
OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political
Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official
Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in
the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually
and in His Official Capacity as the Director of the Office of Defense Trade
Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official
Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of
Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official
Capacity as the Senior Advisor, Office of Defense Trade Controls,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (HON. ROBERT L. PITMAN)

## BRIEF FOR *AMICUS CURIAE*
## THE BRADY CENTER TO PREVENT GUN VIOLENCE
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

*Of Counsel:*
JOHN D. KIMBALL
MARTIN S. KREZALEK
NICHOLAS R. TAMBONE

BLANK ROME LLP
*Attorneys for Amicus Curiae*
405 Lexington Avenue
New York, New York 10174
(212) 885-5000

DOSWASHINGTONSUP01051

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed, et al. v. U.S. Department of State, et al.*
No. 15-50759

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. The Brady Center to Prevent Gun Violence, *Amicus Curiae* in Support of Defendants-Appellees.  The Brady Center to Prevent Gun Violence is a 501(c)(3) non-profit corporation. It has no parent corporation, no publicly held corporation holds ten percent or more of its stock, nor has it issued shares or debt securities to the public.

2. John D. Kimball, Esq., counsel for *Amicus Curiae,* the Brady Center to Prevent Gun Violence.

3. Martin S. Krezalek, Esq., counsel for *Amicus Curiae,* the Brady Center to Prevent Gun Violence.

i

4. Nicholas R. Tambone, counsel for *Amicus Curiae,* the Brady

Center to Prevent Gun Violence.

February 18, 2016                    Respectfully submitted,


                                     /s/ John D. Kimball
                                     John D. Kimball
                                     Attorney of Record for
                                     The Brady Center
                                     to Prevent Gun Violence

ii

DOSWASHINGTONSUP01053

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ............................................................ 1

INTRODUCTION .................................................................................... 3

ARGUMENT ......................................................................................... 6

I.    The Second Amendment does not protect an individual's
right to manufacture firearms or to disseminate technical
data about firearms. ..................................................................... 6

    A.    The Second Amendment's guarantee does not extend
beyond the possession of a handgun in the home for
self-defense by law-abiding citizens. ...................................... 7

    B.    Fifth Circuit Analytical Framework. ..................................... 10

    C.    Under *Heller* and *NRA*, both the manufacture of
firearms and the dissemination of technical data about
firearms fall outside the scope of the Second
Amendment. ........................................................................ 11

    D.    Even if the manufacture of firearms or the
dissemination of technical data about firearms fell
within the scope of the Second Amendment, only
intermediate scrutiny is warranted. ...................................... 15

    E.    The 3D-printed firearms at issue in this case are
neither in "common use" nor "typically possessed by
law-abiding citizens," and are not entitled to Second
Amendment protection. ........................................................ 17

II.   Reversal of the District Court would have dangerous
implications in the United States and abroad. ............................. 20

    A.    Illegal firearm exports from the United States facilitate
drug trafficking and other criminal activity. ......................... 21

        1.    Untraceable firearms hamper efforts to
combat gun trafficking. ................................................ 23

iii

2.  Allowing the foreign dissemination of 3D-printer firearm files would exacerbate this problem...................................................... 24

B.  3D firearm printing would have dangerous consequences on counter-terrorism. .................................... 27

1.  Terrorism and firearms. ..................................... 28

2.  Reversing the District Court would put airport and hotel security at great risk. .............. 30

C.  Reversing the District Court could negatively impact United States foreign relations............................................ 34

CONCLUSION ................................................................................. 36

CERTIFICATE OF COMPLIANCE......................................................... 37

CERTIFICATE OF SERVICE................................................................. 38

iv

DOSWASHINGTONSUP01055

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Def. Distributed v. U.S. Dep't of State,*
    No. 1-15-CV-372 RP, 2015 WL 4658921
    (W.D. Tex. Aug. 4, 2015) ............................................................ 14, 15

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................. *passim*

*Friedman v. City of Highland Park, Illinois,*
    784 F.3d 406 (7th Cir. 2015),
    *cert. denied*, 136 S. Ct. 447 (2015) ................................................ 9, 19

*Muscarello v. United States,*
    524 U.S. 125 (1998) ........................................................................ 8

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ........................................................ 17, 18

*National Rifle Association v. Bureau of Alcohol, Tobacco,*
    *Firearms, and Explosives,*
    700 F.3d 185 (5th Cir. 2012) .......................................................... 10

*United States v. Fincher,*
    538 F.3d 868 (8th Cir. 2008) .......................................................... 13

*United States v. Mazzarella,*
    614 F.3d 85 (3d Cir. 2010) ............................................................. 13

*United States v. Sprague,*
    282 U.S. 716 (1931) ........................................................................ 7

## Statutes and Constitution

U.S. Const. amend. II ................................................................. *passim*

18 U.S.C. § 922 ............................................................................ 13

v

26 U.S.C. § 5822 ................................................................... 14

26 U.S.C. § 5841 ................................................................... 13

Gun Control Act of 1968 ........................................... 13, 24, 29

National Firearms Act of 1934 .............................................. 13

Omnibus Crime Control and Safe Streets Act of 1968 ........ 10, 11, 13, 15

Undetectable Firearms Act ................................................... 30

## Other Authorities

Agencies, *International hotels draw elites and terror threat*,
THE ECONOMIC TIMES, Dec. 1, 2008 ...................................... 33

Aliza Chasan, *Undercover Homeland Security agent slips
through TSA security with fake bomb*, DAILY NEWS,
June 2, 2015 ......................................................................... 31

Andy Greenberg, *I Made an Untraceable AR-15 'Ghost Gun'
in My Office—And It Was Easy* ............................................ 26

Andy Greenberg, *Meet The "Liberator": Test-Firing The
World's First Fully 3D-Printed Gun*, Forbes, May 5, 2013 ............... 31

Billy Hallowell, *Do You Know About Japan's Highly-
Restrictive Gun Laws? 'The Polar Opposite' of America's
Second Amendment*, THE BLAZE, Jan. 28, 2013 ................................. 34

ATF, Office of Strategic Intelligence and Information,
Firearms Tracing System (Caribbean and Central
America), March 10, 2015 ..................................................... 23

CBS News, Security Tight As Mumbai Hotels Reopen, Dec.
20, 2008 (available at
http://www.cbsnews.com/news/security-tight-as-mumbai-
hotels-reopen/) ..................................................................... 33

Claire Ricke, *TSA failed to catch man with loaded gun on
airplane*, KXAN, Nov. 16, 2015 ......................................... 31

DOSWASHINGTONSUP01057

CNN Library, *Mumbai Terror Attacks Fast Facts*,
Nov. 4, 2015 .................................................................... 32

Dara Kerr, *"Ghost Gunner" lets people make untraceable,
homemade guns* .............................................................. 25

Gethin Chamberlain, *Mumbai terror attacks: Nightmare in
the lap of luxury*, THE GUARDIAN, Nov. 29, 2008 .......................... 32, 33

*Guns and Terror*, BRADY CENTER TO PREVENT GUN VIOLENCE
(2001)................................................................... 28, 29, 30

Heidi Milkert, *Hong Kong Terrorists Caught With 3D
Printer, Perhaps Looking to Modify Airsoft Guns* .............................. 35

Hong Kong Police Force - Advice for Tourists. Police.gov.hk.
(available at
http://www.police.gov.hk/ppp_en/04_crime_matters/cpa/cp
a_at_01.html) ..................................................................... 34

*Hotels in Mumbai, India, rethink security after terror attack*,
FM Link, Jan. 5, 2009......................................................... 33

Jack Anderson, Dale Van Atta, *Qaddafi Buying Austrian
Plastic Pistols*, THE WASHINGTON POST, Jan 15, 1986 ....................... 30

Justin Fishel, Pierre Thomas, Mike Levine, Jack Date,
*EXCLUSIVE: Undercover DHS Tests Find Security
Failures at US Airports*, ABC NEWS, June 2, 2015........................... 31

Keith Bradsher, *Analysts Say It Will Be Difficult to Shield
Luxury Hotels From Terrorist Attacks*, N.Y. TIMES, Nov.
30, 2008 ...................................................................... 33

Matt Warman, *US demands removal of 3D printed gun
templates*, THE TELEGRAPH, May 10, 2013 ......................................27

Simon Murphy and Russell Myers, *How Mail On Sunday
"printed" first plastic gun in UK using a 3D printer- and
then took it on board Eurostar without being stopped in
security scandal*, DAILY MAIL, May 11, 2013................................. 27, 28

DOSWASHINGTONSUP01058

Staff, *Japanese Man Arrested For Possessing Guns Made By 3D Printer*, REUTERS May 8, 2014 ...................................................... 34

U.S. Government Accountability Office, *FIREARMS TRAFFICKING: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain* ......................................... 21, 24, 25

Violence Policy Center Research Report, *GUN-RUNNING NATION: How Foreign-Made Assault Weapons are Trafficked from the United States to Mexico and What to Do About It*, July 2015 ...................................................... 22

DOSWASHINGTONSUP01059

## INTEREST OF *AMICUS CURIAE*[1]

The Brady Center to Prevent Gun Violence is a non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Its membership includes individuals who are concerned with, and are affected by, the public health and safety issues stemming from gun violence.

The Brady Center has a substantial interest in ensuring that the Second Amendment is not misinterpreted as a barrier to strong and effective government action to prevent gun violence. Accordingly, the Brady Center submits this *Amicus Curiae* brief in support of the State Department's position that the regulations at issue in this case do not burden anyone's Second Amendment rights. The Brady Center further respectfully submits that the State Department acted within its authority in concluding that the actions of Appellants in providing its data files on the internet to foreign persons requires an export license.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), counsel for *Amicus Curiae* The Brady Center to Prevent Gun Violence represents that no counsel for a party authored the brief in whole or in part, and that no person or entity, other than the Brady Center to Prevent Gun Violence or its counsel, made a monetary contribution to the preparation or submission of this *amicus* brief.

1

Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving the constitutionality and interpretation of gun laws, including *District of Columbia v. Heller*, 554 U.S. 570 (2008), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Abramski v. United States*, 134 S. Ct. 2259 (2014), and *National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*").

All parties have consented to the filing of this brief.

2

DOSWASHINGTONSUP01061

# INTRODUCTION

The International Traffic in Arms Regulations ("ITAR") were promulgated to control the transfer of defense articles abroad or to foreign persons.  That is precisely what the State Department is doing by applying the ITAR to regulate the internet publishing of files that are essential to the creation of firearms (and firearm components) through the 3D printing process—*i.e.*, the functional equivalent of exporting firearms.  Consistent with its mandate to control weapons exports, the State Department's concern is limited to averting the dissemination of Appellants' electronic files overseas.  The ITAR's export licensing provisions are applicable because if made widely available on the internet, the subject files would be disclosed without limitation to any foreign person with internet access.

Seeking to cloak their boundary-less publishing of do-it-yourself weapons blueprints with First and Second Amendment protection, Appellants essentially ask this Court to block the State Department from doing its job in enforcing defense trade control regulations in the era of the internet and 3D printing.

3

DOSWASHINGTONSUP01062

Not only is Appellants' position reckless and hazardous to the safety of Americans at home and abroad, it is inconsistent with the U.S. Constitution.  The Second Amendment does not protect the export of firearms or their functional equivalent.  Furthermore, Appellants greatly overstate the purported Second Amendment rights at-issue.

With no basis, Appellants claim that it cannot be constitutional to bar Americans from creating and disseminating information necessary to the manufacture and maintenance of firearms.  In fact, as set forth below, the Second Amendment cannot be reasonably interpreted to provide a right to manufacture or produce firearms, or to disseminate to foreign persons on the internet, technical data that could be used to produce firearms.  And even if it could, the regulations at issue would at best warrant intermediate scrutiny.  Since the U.S. government's objective in regulating the export of firearms and technical data that could be used to create firearms outside U.S. borders is plainly important to national security and foreign relations, the provisions survive a challenge under that standard.

Reversal of the District Court would have dangerous implications in the U.S. and abroad.  It would make it easy for foreign drug

4

trafficking and criminal cartels to obtain untraceable firearms. This would undermine the government's efforts to disrupt gun trafficking to Mexico and Latin America and would reverse the hard-won recent successes made on that front by U.S. and Mexican authorities. A reversal would also have a devastating impact on counter-terrorism efforts. The global free flow of 3D-printed functional plastic firearms that can evade detection by metal detectors would invite terrorist infiltration of relatively secure locations. This would risk the lives of countless Americans who travel by air and international rail, and those who stay at luxury hotels overseas.

Finally, allowing Appellants to freely publish files used for printing 3D firearms would allow citizens of important U.S. allies to evade their countries' well-cultivated gun control structures. This could cause significant harm to U.S. foreign policy interests.

For all of these reasons, the District Court's decision denying Appellants a preliminary injunction should be affirmed.

DOSWASHINGTONSUP01064

# ARGUMENT

## I.   The Second Amendment does not protect an individual's right to manufacture firearms or to disseminate technical data about firearms.

Appellants' argument that their Second Amendment rights have been violated is simply incorrect.  In fact, the regulations at issue do not violate the Second Amendment.

Appellants contend the Second Amendment secures the right to produce firearms and exchange technical data concerning firearms. (Appellants' Br. at 64).  The State Department, however, does not seek to regulate either of these activities through the ITAR; rather, the regulations at issue concern the *export* of technical data related to defense articles. (Appellees' Br. at 13).  The Second Amendment plainly does not protect the export of defense articles, including computer data files that would allow anyone with a 3D printer to create the parts and components of an operational firearm.

But even if the "production" of firearms or the "exchange" of technical data about firearms were somehow affected by the regulations at issue, neither the plain language of the Second Amendment, nor U.S. Supreme Court jurisprudence, supports Appellants' contention that

6

DOSWASHINGTONSUP01065

those activities are protected by the Second Amendment.

## A. The Second Amendment's guarantee does not extend beyond the possession of a handgun in the home for self-defense by law-abiding citizens.

In the seminal case of *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court considered the constitutionality of the District of Columbia's prohibition on the possession of handguns in the home, and ultimately struck down the ban as unconstitutional. The court rejected an argument that the Second Amendment only guarantees a right to keep and bear arms for members of a "militia."

Justice Scalia noted that, in interpreting the text of the Second Amendment[2]:

> [W]e are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." . . . Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.

*Id.* at 576-77 (quoting *United States v. Sprague*, 282 U.S. 716, 731

---

[2] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

7

(1931)).

Applying this principle, the Court examined each clause of the Amendment.  In considering the text "keep and bear Arms," which the Court characterized as the "substance of the right [guaranteed by the Second Amendment]" (*id.* at 581), the Court addressed the words "keep" and "bear" individually.

As to the phrase "keep Arms," the Court held: "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* at 582. The Court stated that at the time the Second Amendment was drafted, "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else.*" *Id.* at 583 (emphasis in original).

As to the phrase "bear Arms," the Court held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'"  *Id.* at 584.  Citing its decision in *Muscarello v. United States*, 524 U.S. 125 (1998), which analyzed the meaning of "carries a firearm" in a federal criminal statute, the Court acknowledged that the natural meaning of "bear arms" meant to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for

8

offensive or defensive action in a case of conflict with another person."

*Heller*, 554 U.S. at 584.

Having concluded that the core Second Amendment guarantee provided an individual right to "possess" a firearm, and to "carry" a firearm, for "defense of hearth and home," the Court struck down the District of Columbia's ban on handgun possession as an impermissible infringement on the core Second Amendment right. *Id.* at 629, 635 ("[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."). The Court's holding appears to be limited to possession of a handgun for self-defense purposes; indeed, the Court recently denied certiorari in *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015), where the Seventh Circuit held that a categorical ban on "assault weapons" and large capacity magazines fell outside the scope of the Second Amendment because the ordinance "leaves residents with many self-defense options," including handguns. *Id.* at 411.

DOSWASHINGTONSUP01068

## B.    Fifth Circuit Analytical Framework.

In *National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*"), this Court upheld provisions of the Omnibus Crime Control and Safe Streets Act of 1968 that placed restrictions on firearm purchases by 18-to-20-year-olds.   In so doing, the Court adopted a two-step framework for analyzing a Second Amendment claim.

First, the Court must analyze "whether the conduct at issue falls within the scope of the Second Amendment right. . . . To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 194.  "If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster. . . . If the law burdens conduct that falls within the Second Amendment's scope, [the Court] then proceed[s] to apply the appropriate level of means-ends scrutiny." *Id.* at 195.  The Court also held that "a longstanding, presumptively lawful regulatory measure . . . would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at

10

DOSWASHINGTONSUP01069

step one of our framework." *Id.* at 196.

Second, if the conduct at issue falls within the scope of the Second Amendment, the Court must determine whether to apply strict or intermediate scrutiny. *Id.* at 195. Strict scrutiny is appropriate where the conduct threatens a "core" Second Amendment right—that is, "the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family." *Id.* Conduct that does not affect the core Second Amendment concern of self-defense within the home only warrants intermediate scrutiny. *Id.* Under intermediate scrutiny, the government need only "demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective.'" *Id.*

## C. Under *Heller* and *NRA*, both the manufacture of firearms and the dissemination of technical data about firearms fall outside the scope of the Second Amendment.

Considering "the normal and ordinary" meaning of the words "keep and bear" in the Second Amendment text, and excluding a "secret or technical meaning" of the text as Justice Scalia instructed in *Heller*, it is apparent that the Second Amendment does not provide a right to "manufacture," "make," or "produce" a firearm, or to "exchange," "transfer," or "disseminate" technical data about firearms—let alone

11

"export" the functional equivalent of a firearm.  Thus, the Court need

not even reach the second step of the *NRA* framework, because the

conduct challenged by Appellants falls outside the scope of the Second

Amendment under a plain language analysis.

The "right secured by the Second Amendment is not unlimited."

*Heller*, 554 U.S. at 626.  If anything, a regulation affecting the export of

firearms or technical data that could be used to produce firearms (or

firearm components) is a "longstanding, presumptively lawful

regulatory measure" that easily passes constitutional muster.

> From Blackstone through the 19th century cases,
> commentators and courts routinely explained
> that the right was not a right to keep and carry
> any weapon whatsoever in any manner
> whatsoever and for whatever purpose. For
> example, the majority of the 19th-century courts
> to consider the question held that prohibitions on
> carrying concealed weapons were lawful under
> the Second Amendment or state
> analogues . . . . [N]othing in our opinion should be
> taken to cast doubt on longstanding prohibitions
> on the possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of
> firearms in sensitive places such as schools and
> government buildings, or *laws imposing
> conditions and qualifications on the commercial
> sale of arms.*

*Id.* at 626-27 (emphasis added).

12

Both the commercial sale and the manufacture of firearms have a longstanding history of regulation in the United States. For instance, the Omnibus Crime Control and Safe Streets Act of 1968, provisions of which were upheld as constitutional by this Court in *NRA*, prohibits a person from "engag[ing] in the business of importing, manufacturing, or dealing in firearms," unless a person is a "licensed importer, licensed manufacturer, or licensed dealer." 18 U.S.C. § 922(a)(1)(A).[3]

The National Firearms Act of 1934, as amended by the Gun Control Act of 1968, requires that "[e]ach manufacturer, importer, and maker [of firearms] shall register each firearm he manufactures, imports, or makes." 26 U.S.C. § 5841(b). The Act also provides:

---

[3] *See United States v. Mazzarella*, 614 F.3d 85, 94-95, 98-99 (3d Cir. 2010) (affirming defendant's conviction under 18 U.S.C. § 922(k) for possession of a handgun with an obliterated serial number, and holding that "there is no categorical [Second Amendment] protection for unmarked firearms," that there is "no compelling reason why a law-abiding citizen would prefer an unmarked firearm," and that Section 922(k) passed both intermediate and strict scrutiny, in part because the statute "reaches only conduct creating a substantial risk of rendering a firearm untraceable," and "does not limit the possession of any class of firearms"); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (holding that defendant's possession of a machine gun and a short-barreled shotgun are not protected by the Second Amendment, and noting that defendant "has not directly attacked the federal registration requirements on firearms, and we doubt that any such attack would succeed in light of *Heller*").

13

> No person shall make a firearm unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

26 U.S.C. § 5822.

Appellants ignore these longstanding regulatory measures, and contend that "[b]ecause there is a right to possess firearms, there is, necessarily, a right to acquire them." (Appellants' Br. at 65.)  As the District Court noted, Plaintiffs cite no authority for this claim. *Def. Distributed v. U.S. Dep't of State*, No. 1-15-CV-372 RP, 2015 WL 4658921, at *13 (W.D. Tex. Aug. 4, 2015).  If accepted, Appellants' contention that the manufacture of firearms somehow falls within the scope of the Second Amendment would eviscerate the longstanding

14

regulatory scheme requiring the registration of firearms, and for firearms manufacturers to apply for, and receive, a license to conduct the business of manufacturing arms. Indeed, Appellants' goal of spreading the availability of computer files capable of producing 3D-printed firearms would undermine the important objectives of the Omnibus Crime Control and Safe Streets Act, the National Firearms Act, and the Gun Control Act.

**D. Even if the manufacture of firearms or the dissemination of technical data about firearms fell within the scope of the Second Amendment, only intermediate scrutiny is warranted.**

Although the District Court was "reluctant" to find that the conduct regulated by the ITAR fell within the scope of the Second Amendment, it proceeded to conduct an analysis under the second prong of *NRA*. *Defense Distributed*, 2015 WL 4658921, at *13. As discussed above, this Court need not adopt the cautious approach of the District Court because the regulations at issue here plainly fall outside the scope of the Second Amendment. But even if the Court applies the second prong of *NRA*, because the manufacture of firearms or the dissemination of technical data does not impinge on the core Second Amendment concern of self-defense within the home, any regulations

15

DOSWASHINGTONSUP01074

affecting such conduct only warrants intermediate scrutiny.  Indeed, the District Court applied intermediate scrutiny, correctly noting that "[t]he burden imposed here falls well short of that generally at issue in Second Amendment cases."  *Id.*  As set forth below, the challenged provisions of the ITAR easily survive an intermediate scrutiny challenge.

First, the Government has an important objective in regulating the export of firearms and technical data about firearms outside U.S. borders, both for national security and for foreign affairs purposes. As addressed in further detail below, the use of 3D printers to manufacture 3D-printed firearms poses a grave threat to American security both within the U.S. and abroad.  Also, the unregulated export of firearms and, as relevant here, computer files used for the 3D printing of firearms, may result in diplomatic consequences if the exported firearms are used in furtherance of criminal activity or terrorism in foreign nations.

Second, the ITAR is a reasonable fit to accomplish the Government's important objective.  The ITAR is focused only on the export of defense articles and technical data related to defense articles.

16

DOSWASHINGTONSUP01075

The ITAR does not prohibit Appellants from purchasing firearms from a licensed manufacturer or vendor for legitimate self-defense purposes.

**E. The 3D-printed firearms at issue in this case are neither in "common use" nor "typically possessed by law-abiding citizens," and are not entitled to Second Amendment protection.**

Regulations affecting the 3D-printed firearms that can be manufactured using Appellants' "technical data" also pass constitutional muster because 3D-printed firearms are not entitled to Second Amendment protection. In *Heller*, the U.S. Supreme Court held that the Second Amendment only protects "the sorts of weapons" that are "in common use" (*Heller*, 554 U.S. at 627) and weapons that are "typically possessed by law-abiding citizens for lawful purposes" (*id.* at 625). S*ee N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015). Because 3D-printed firearms are neither in common use nor typically possessed by law-abiding citizens for lawful purposes, 3D-printed firearms are not entitled to Second Amendment protection.

In *N.Y. State Rifle and Pistol Association*, the Second Circuit considered a challenge to restrictions on the possession of "assault weapons" in Connecticut and New York enacted following the December 14, 2012 mass murder of twenty first-graders and six adults at Sandy

DOSWASHINGTONSUP01076

Hook Elementary School in Newtown, Connecticut. The threshold question addressed by the Second Circuit was whether the "assault weapons" at issue were in common use and typically possessed by law-abiding citizens. *Id.* at 254-55.

First, the court concluded that assault weapons are in common use because the record showed that Americans owned "millions" of assault weapons impacted by the regulation, even though the assault weapons were not as commonly used as the handguns at issue in *Heller*. *Id.* at 255.

Second, the court considered whether the assault weapons at issue were typically possessed by law-abiding citizens for lawful purposes. The court noted that even if assault weapons are used disproportionately in gun crimes, the same could be said for the handguns addressed in *Heller*. The court held that the court must consider whether a weapon is "dangerous and unusual in the hands of law-abiding civilians." *Id.* at 256. The court also held that in the absence of clearer guidance from the Supreme Court, the court would assume that the assault weapons were typically possessed by law-abiding citizens for lawful purposes. *Id.* at 257.

DOSWASHINGTONSUP01077

Ultimately, the Second Circuit adopted virtually the same two-part test that this Court set forth in *NRA*, applied intermediate scrutiny, and upheld nearly all aspects of the laws at issue. *Cf.* Friedman, 784 F.3d 406 (upholding categorical ban on assault weapons).

Unlike the assault weapons addressed in *N.Y. State Rifle and Pistol Association*, 3D-printed firearms are neither in common use, nor typically possessed by law-abiding citizens for lawful purposes. Unlike assault weapons, of which there are "millions" in the United States, 3D-printed firearms are not commonly used by the American public. And as addressed in Point II below, the greatest potential use for 3D-printed firearms—which can be virtually undetectable—is to aid criminal and terrorist activities, not lawful purposes such as self-defense or hunting. Even among law-abiding citizens, 3D-printed firearms are undisputedly "unusual"—and if 3D-printed firearms are made widely available to criminals and terrorists, 3D-printed firearms will also pose a grave danger to the public.

In sum, there is no Second Amendment right either to exchange technical data concerning firearms or to manufacture firearms—and

19

there certainly is no Second Amendment right to export firearms or technical data about firearms. And, 3D-printed firearms are not entitled to any Second Amendment protection because they are neither "in common use" nor "typically possessed by law-abiding citizens." To the extent that the regulations at issue burden Appellants' Second Amendment rights, as the District Court correctly held, only intermediate scrutiny is warranted, and the regulations at issue easily survive intermediate scrutiny.

## II. Reversal of the District Court would have dangerous implications in the United States and abroad.

Hanging in the balance of Appellants' challenge to the laws and regulations comprising the U.S.'s system of weapons export controls is the safety of Americans at home and overseas.

By the authority delegated to it by the President, the State Department has promulgated the ITAR to ensure that articles useful for warfare or terrorism are not exported to foreign persons, governments, and criminal or terrorist organizations to further global violence, or threaten U.S. national security. Applying the ITAR to prohibit Appellants from disseminating the subject 3D printer design files outside of the U.S. is wholly consistent with the State

20

Department's mandate to prevent the export of dangerous weapons.  If Appellants are successful in upending the restrictions on the export of files used for the 3D printer-creation of guns and gun components, they will compromise U.S. national security and frustrate the State Department's interest in protecting countless Americans living or travelling internationally from terrorist attacks.  What is more, a reversal of the District Court's reasoned decision will have damaging implications on U.S. efforts to combat gun running to drug trafficking organizations, and will negatively impact American foreign policy.

## A.   Illegal firearm exports from the United States facilitate drug trafficking and other criminal activity.

The steady flow of firearms from the U.S. to Mexico allows Mexican drug trafficking organizations ("DTO") to traffic billions of dollars' worth of narcotics into the U.S. and furthers their other criminal activities, including human trafficking, kidnapping, money laundering, extortion, bribery, and racketeering.  *See* U.S. Government Accountability Office, *FIREARMS TRAFFICKING: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain*, GAO-16-223: Published: Jan 11,

21

2016 (hereinafter "GAO January 2016 Report") at 3.[4]

In fact, the majority of firearms recovered by authorities in Mexico are U.S.-sourced. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") traced more than 73,000 of the guns seized in Mexico from 2009 to 2014 to the U.S. *See* GAO January 2016 Report at 8; *see also* Washington Office on Latin America (WOLA) Violence Policy Center Research Report, *GUN-RUNNING NATION: How Foreign-Made Assault Weapons are Trafficked from the United States to Mexico and What to Do About It*, July 2015 (hereinafter "WOLA Report").[5] Mexican DTOs look to the U.S. for militarized firearms ranging from high-capacity semiautomatic pistols, to assault rifles, assault pistols, and long-range armor-piercing sniper rifles. *See* WOLA Report at 5. While Mexico maintains strict restrictions on firearm sale and possession, weak U.S. firearm laws allow DTOs to use straw purchasers to avoid background checks, or purchase firearms at gun shows or through private sellers, where background checks are not required under federal law. *Id.*

---

[4] Available at http://www.gao.gov/assets/680/674570.pdf.
[5] Available at
http://www.wola.org/sites/default/files/Gun_Running_Nation.pdf.

22

In addition to Mexico, illegal U.S. firearms trafficking also feeds crime in Latin America and the Caribbean.  Recent ATF trace data for several Caribbean and Central American countries similarly confirms a high (albeit varying) percentage of U.S.-sourced firearms.  For example: 97.9 percent of firearms recovered in the Bahamas; 40.3 percent of firearms recovered in the Dominican Republic; 49.3 percent of firearms recovered in El Salvador; and 46 percent of firearms recovered in Honduras, were U.S. sourced.  *See* ATF, Office of Strategic Intelligence and Information, Firearms Tracing System (Caribbean and Central America), March 10, 2015.[6]

### 1.   Untraceable firearms hamper efforts to combat gun trafficking.

Given the manifest links between illegal firearms and international drug trade and other crime-related violence, U.S. authorities have been expending significant resources to combat gun trafficking from the U.S. to Mexico and Latin America.

---

[6] Available at https://www.atf.gov/resource-center/docs/centralamerica-cy2014pdf/download and https://www.atf.gov/resource-center/docs/caribbeancy14152492pdf/download.

DOSWASHINGTONSUP01082

However, complicating law enforcement officials' efforts to control trafficking is the recent phenomenon of weapons being transported to Mexico in parts to be later assembled into finished firearms. *See* GAO January 2016 Report at 16. All the more problematic for counter-trafficking purposes is the fact that a majority of gun components can actually be purchased (and exported) legally, and the only part that needs to be illegally transported to Mexico is the lower receiver.[7]

While the full extent of firearm parts trafficking has not yet been documented, recent seizures of firearms parts, firearms made with unmarked parts, and equipment used to assemble or manufacture firearms in Mexico suggest an emerging reliance by DTOs on this source of weapons. *See id.* at 20.

###   2.   Allowing the foreign dissemination of 3D-printer firearm files would exacerbate this problem

The appeal of trafficking in firearm parts—and by extension, any other export method that would circumvent firearm export controls—is

---

[7] Aside from the lower receiver, which carries the gun's serial number and is legally considered a firearm, other firearm parts are not by definition "firearms" under U.S. law, transfers of those items are not regulated by the Gun Control Act of 1968[7] ("GCA"), or any other laws governing the transfer of firearms. *See* GAO January 2016 Report at 17.

DOSWASHINGTONSUP01083

obvious. Since parts are much harder for authorities to track and/or intercept, the gun parts loopholes have provided DTOs with an abundant supply source of easy-to-ship untraceable firearms. *See id*. at 19.

Because reversing the District Court's reasoned decision would result in the free flow of 3D printed gun components, including the lower receiver, a reversal would make it even easier for DTOs to obtain untraceable firearms. Such a result could severely undermine the U.S. and Mexican authorities' efforts to disrupt the gun supply that is vital to the DTOs' criminal enterprises.

In particular, Appellants' "Ghost Gunner" files allow users to streamline the making of metal lower receivers for AR-15 semi-automatic rifles, one of the most deadly guns on the market—and one used in several recent mass shootings in the U.S. *See* Dara Kerr, *"Ghost Gunner" lets people make untraceable, homemade guns*, CNET, Oct. 1, 2014. The Ghost Gunner machine, coupled with the unrestricted freedom to download files needed for producing lower receivers, would make untraceable semiautomatic rifles available to just about anyone, anywhere.

25

Indeed, Andy Greenberg, a senior writer at the online technology news website Wired, and self-described man of "virtually no technical understanding of firearms and a Cro-Magnon man's mastery of power tools," painstakingly demonstrated how the Ghost Gunner machine and corresponding technical data allowed him to make a fully metal, functional, and accurate AR-15 for just over $2200.  Andy Greenberg, *I Made an Untraceable AR-15 'Ghost Gun' in My Office—And It Was Easy*, Wired, June 3, 2015.[8]  As $1500 of this figure was the one-time-cost of the Ghost Gunner machine, Greenberg essentially illustrated the ease of setting up a small operation capable of producing AR-15's for under $800.

The implications are ominous for those at the forefront of the battle against international criminal cartels.  Allowing cash-rich DTOs unimpeded access to the Ghost Gunner files—and to the advanced 3D print firearm technology that the future undoubtedly holds—is a disastrous proposition.

---

[8] Available at http://www.wired.com/2015/06/i-made-an-untraceable-ar-15-ghost-gun/.

26

DOSWASHINGTONSUP01085

## B.    3D firearm printing would have dangerous consequences on counter-terrorism.

The U.S. relies on its firearm export regulations to restrict the availability of weapons sought by terrorist organizations.    (See Appellees' Br. at 22).

The proliferation of 3D printed functional firearms made almost entirely of plastics increases the risk of breaches of secure locations. Appellants' "Liberator" files produce "a plastic handgun that could escape detection by conventional airport security. . . ." *See* Matt Warman, *US demands removal of 3D printed gun templates*, THE TELEGRAPH, May 10, 2013.  In May of 2013, two reporters from the U.K.'s Daily Mail proved the point by smuggling the Liberator onto a packed weekend rush-hour Eurostar train from London to Paris.  *See* Simon Murphy and Russell Myers, *How Mail On Sunday "printed" first plastic gun in UK using a 3D printer- and then took it on board Eurostar without being stopped in security scandal*, DAILY MAIL, May 11, 2013.[9]   The reporters easily passed through strict "airport-style

---

[9] Available at http://www.dailymail.co.uk/news/article-2323158/How-Mail-On-Sunday-printed-plastic-gun-UK--took-board-Eurostar-stopped-security-scandal.html.

27

security" to carry the gun onto the train. *See id*. Terrorists likely took note.

### 1.    Terrorism and firearms.

The Eurostar anecdote underscores the significance of the ITAR to the global war against terrorism.

> The gun is part of the essential tool kit of domestic and foreign terrorists alike. Guns are used to commit terrorist acts, and guns are used by terrorists to resist law enforcement efforts at apprehension and arrest

Loren Burger and Dennis Henigan, *Guns and Terror*, Brady Center to Prevent Gun Violence (2001) (hereinafter "Guns and Terror Report")[10] at 3.

Firearm attacks have long been part of the terrorist playbook. In 2001—before the prospect of 3D firearm printing appeared on anyone's radar—the Brady Center advocated for stronger gun laws, and better enforcement of existing gun laws, as part of the nations' homeland security program. *See* Guns and Terror Report at 4. Among other things, Brady detailed how terrorists of various ilk had taken advantage of the U.S.'s lack of universal gun laws to exploit federal

---

[10] Available at http://www.bradycampaign.org/sites/default/files/gunsandterror.pdf.

DOSWASHINGTONSUP01087

loopholes (and certain states' lax controls) to obtain firearms that were used in multiple deadly attacks. *Inter alia*, the report cited a loophole in the GCA, which effectively allowed terrorists to mail-order "gun kits," with no background checks resulting in homemade untraceable guns.[11] In one notable incident, in March of 1994, Rashid Baz, a 28-year-old Lebanese immigrant, opened fire on a van full of Orthodox Jewish students crossing the Brooklyn Bridge in New York, killing a 16-year old boy and wounding another. Guns and Terror Report at 27. One of the guns used by Baz was an assault pistol that he purchased in parts and assembled from a mail order kit manufactured and marketed by a Tennessee company. *Id*. at 28. The kit was legally purchased over the phone with no questions asked, no waiting period, and no background checks to weed out prohibited purchasers. *Id*.

---

[11] The loophole was rooted in the GCA's under-inclusive definition of "firearm," the term that triggers the application of federal gun laws and regulations governing the manufacture and sale of guns. The federal government's reading of the definition of "firearm" made it possible to legally sell all the parts to a gun together in a "parts kit" and not be selling a "firearm" as long as the seller left out of the kit the part of the gun housing the firing mechanism (*i.e.*, the receiver). Guns and Terror Report at 27.

29

In urging Congress to close the loophole that allowed gun makers to evade federal regulation and sell untraceable assault weapon kits that terrorists and other criminals can purchase by mail and assemble at home, Brady cited the Brooklyn Bridge attack in arguing that "[a]n assault weapon without a serial number [was] a terrorist's dream." *Id.* at 31. Those who do not learn history are doomed to repeat it. Enabling terrorists (including radicalized terrorists like Baz who are already in the U.S.) to print their own untraceable assault weapons and undetectable plastic guns at home is *a fortiori* a "terrorist's dream."

### 2. Reversing the District Court would put airport and hotel security at great risk.

Following the initial publishing of the Liberator files, New York Congressman Steve Israel pushed for a modernization of the Undetectable Firearms Act[12] to cover 3D printed receivers and magazines by requiring that any firearm have at least one major component that was detectable by typical metal detectors.

---

[12] The UFA was passed in part in response to reports that then Libyan dictator Muammar Qaddafi was in the process of buying more than 100 plastic handguns that would be difficult for airport security to detect. Jack Anderson, Dale Van Atta, *Qaddafi Buying Austrian Plastic Pistols*, THE WASHINGTON POST, Jan 15, 1986.

DOSWASHINGTONSUP01089

Representative Israel recognized the self-evident implications of unfettered 3D firearm printing:

> Security checkpoints, background checks and gun regulations will do little good if criminals can print their own plastic firearms at home and bring those firearms through metal detectors with no one the wiser.

Andy Greenberg, *Meet The "Liberator": Test-Firing The World's First Fully 3D-Printed Gun*, Forbes, May 5, 2013. More than ever, this dire warning should be heeded to protect Americans abroad from terrorist attacks with undetectable firearms.

To be sure, there have been alarming instances of airport security lapses.[13] But despite sporadic failings at security checkpoints, since the

---

[13] *See. e.g.*, Claire Ricke, *TSA failed to catch man with loaded gun on airplane*, KXAN, Nov. 16, 2015 (available at http://kxan.com/2015/11/16/tsa-failed-to-catch-man-with-loaded-gun-on-airplane/); Aliza Chasan, *Undercover Homeland Security agent slips through TSA security with fake bomb*, DAILY NEWS, June 2, 2015 (available at http://www.nydailynews.com/news/national/tsa-fails-tests-lets-bombs-article-1.2242674); Justin Fishel, Pierre Thomas, Mike Levine, Jack Date, *EXCLUSIVE: Undercover DHS Tests Find Security Failures at US Airports*, ABC NEWS, June 2, 2015 (explaining that in tests conducted by the US Department of Homeland Security, teams working undercover were able to sneak weapons through TSA security checkpoints sneak banned items such as fake explosives and other weapons in 67 out of 70 tests) (available at http://abcnews.go.com/ABCNews/exclusive-undercover-dhs-tests-find-

DOSWASHINGTONSUP01090

September 11 attack no terrorist has succeeded in bringing a loaded gun on a plane for use in an attack. Widely available blueprints for printing plastic handguns would jeopardize the safeguards behind this datum. The interest of travel safety thus strongly counsels against a reversal of the District Court's decision.

Further, the threat posed by undetectable guns is not limited to undetectable firearms passing through train and airport security. Metal detectors also protect Americans staying in many international hotels. In November 2008, ten Pakistani men associated with the terror group Lashkar-e-Tayyiba stormed several buildings in Mumbai, India—including the Oberoi and Taj Mahal Palace hotels often frequented by Western business travelers—killing 164 people. CNN Library, *Mumbai Terror Attacks Fast Facts*, Nov. 4, 2015.[14] The killers carried out their massacre with AK-47 rifles, pistols and hand-grenades. Gethin Chamberlain, *Mumbai terror attacks: Nightmare in the lap of luxury*, THE GUARDIAN, Nov. 29, 2008. Survivors of the massacre said the gunmen were particularly interested in British and American guests,

---

widespread-security-failures/story?id=31434881).

[14] Available at http://www.cnn.com/2013/09/18/world/asia/mumbai-terror-attacks/.

DOSWASHINGTONSUP01091

singling them out as targets and ignoring other nationalities. *Id.* As conventional firearms played a major role in the attack—and since the gunmen reportedly slipped into the Taj Mahal Palace through a back entrance that did not have metal detectors[15]—many major hotels in Mumbai subsequently installed metal detectors to protect against similar attacks. *Hotels in Mumbai, India, rethink security after terror attack*, FM Link, Jan. 5, 2009.[16]

Even before the Mumbai siege (because of previous terrorist attacks) luxury hotels in several destinations—including the Jakarta Indonesia Grant Hyatt and the Cairo Egypt Marriot—had already been relying on metal detectors to protect their guests. *See* Keith Bradsher, *Analysts Say It Will Be Difficult to Shield Luxury Hotels From Terrorist Attacks*, N.Y. TIMES, Nov. 30, 2008; Agencies, *International hotels draw elites and terror threat*, THE ECONOMIC TIMES, Dec. 1, 2008.

Each of these hotels' security schemes—along with the lives of the hotels' patrons—would be put at risk by allowing Appellants to publish

---

[15] CBS News, Security Tight As Mumbai Hotels Reopen, Dec. 20, 2008 (available at http://www.cbsnews.com/news/security-tight-as-mumbai-hotels-reopen/)

[16] Available at http://fmlink.com/articles/hotels-in-mumbai-india-rethink-security-after-terror-attack/.

33

DOSWASHINGTONSUP01092

data files for plastic firearms that would escape detection by metal detectors. This further counsels against a reversal of the District Court's decision.

## C. Reversing the District Court could negatively impact United States foreign relations.

Finally, the publishing of 3D printable gun files online will allow citizens of important U.S. allies to evade their countries' gun controls. Indeed, it has already happened in Japan—a country that credits its extremely low crime rate to its restrictive gun policies. *See* Billy Hallowell, *Do You Know About Japan's Highly-Restrictive Gun Laws? 'The Polar Opposite' of America's Second Amendment*, THE BLAZE, Jan. 28, 2013. In April 2014, Police in Tokyo found five plastic guns made by a 3D printer at the home of a 27 year old Japanese man. Two of the handguns were later proved capable of killing or wounding people. Staff, *Japanese Man Arrested For Possessing Guns Made By 3D Printer*, REUTERS May 8, 2014. Similarly, a year later in Hong Kong, which also has strict gun controls,[17] police raided a group of nine individuals

---

[17] *See* Hong Kong Police Force - Advice for Tourists. Police.gov.hk. (available at http://www.police.gov.hk/ppp_en/04_crime_matters/cpa/cpa_at_01.html).

DOSWASHINGTONSUP01093

conspiring to attack government buildings ahead of a historic vote. Heidi Milkert, *Hong Kong Terrorists Caught With 3D Printer, Perhaps Looking to Modify Airsoft Guns*, 3D Print.com, June 26, 2015.[18]  Among the items recovered in the raid were explosives, masks, several airsoft rifles, and a desktop 3D printer—suggesting that the group intended to modify the airsoft rifles to make them lethal by using components fabricated on the 3D printer.  *Id.*

The Japan and Hong Kong examples demonstrate how the unconstrained publishing of Appellants' subject files would make U.S. weapons export to Asia as easy as export to Mexico and Latin America. This could have adverse effects on American foreign relations.  (See Appellees' Br. at 23).  The State Department has an interest in enforcing its regulations to ensure that the U.S. does not become the global provider of weaponry that other nations' laws have, to date, successfully prevented from terrorizing their citizens.

---

[18] Available at http://3dprint.com/76737/3d-printer-terrorists/.

DOSWASHINGTONSUP01094

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

Dated:   February 18, 2016          Respectfully submitted,


                                    /s/ John D. Kimball
                                    John D. Kimball
                                    Martin S. Krezalek
                                    Nicholas R. Tambone
                                    BLANK ROME LLP
                                    The Chrysler Building
                                    405 Lexington Avenue
                                    New York, NY 10174
                                    (212) 885-5000

                                    *Attorneys for Amicus Curiae*
                                    *Brady Center to Prevent Gun Violence*

DOSWASHINGTONSUP01095

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2013 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

I also certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 29.3, Federal Rule of Appellate Procedure 29(d), and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,603 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(a)(7(B)(iii), according to the count of Microsoft Word.

Dated:  February 18, 2016

/s/ John D. Kimball
John D. Kimball

DOSWASHINGTONSUP01096

## CERTIFICATE OF SERVICE

I certify that on February 18, 2016, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated:  February 18, 2016

/s/ John D. Kimball

John D. Kimball

DOSWASHINGTONSUP01097

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

February 18, 2016

Mr. John Devereux Kimball
Blank Rome, L.L.P.
405 Lexington Avenue
Chrysler Building
New York, NY 10174

        No. 15-50759   Defense Distributed, et al v. U.S. Dept. of
                       State, et al
        USDC No. 1:15-CV-372

Dear Mr. Kimball,

The following pertains to your Amicus brief electronically filed
on February 18, 2016.

You must submit the 7 paper copies of your brief required by 5TH
CIR. R. 31.1 within 5 days of the date of this notice pursuant to
5th Cir. ECF Filing Standard E.1.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By:_____
                        Shawn D. Henderson, Deputy Clerk
                        504-310-7668

cc:
        Mr. Joshua Michael Blackman
        Mr. Bruce D. Brown
        Mr. Matthew Goldstein
        Mr. Alan Gura
        Mr. David T. Hardy
        Mr. Robert E. Henneke
        Mr. William Bryan Mateja
        Mr. Raffi Melkonian
        Mr. Randal John Meyer
        Mr. Leif A. Olson
        Mr. Michael S. Raab
        Mr. Ilya Shapiro

Mr. Joel Stonedale
Mr. Daniel Bentele Hahs Tenny
Mr. Kit Walsh

DOSWASHINGTONSUP01099

Case No. 15-50759

# In the United States Court of Appeals for the Fifth Circuit

DEFENSE DISTRIBUTED;
SECOND AMENDMENT FOUNDATION, INCORPORATED,
Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,
Defendants-Appellees

Appeal from an Order of the United States District Court for the Western District of Texas, The Hon. Robert L. Pitman, District Judge
(Dist. Ct. No. 1:15-CV-372-RP)

REPLY BRIEF FOR THE APPELLANTS

Matthew Goldstein
MATTHEW A. GOLDSTEIN, PLLC
1875 Connecticut Avenue, N.W.
10th Floor
Washington, DC 20009
202.550.0040/Fax 202.683.6679

Alan Gura
    Counsel of Record
GURA & POSSESSKY, PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085/703.997.7665

February 29, 2016

    Counsel for Appellants
(Additional Counsel Inside Cover)

DOSWASHINGTONSUP01100

Additional Counsel for Appellants

William B. Mateja
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, TX 75201
214.397.0030/Fax 214.397.0033

William T. "Tommy" Jacks
David S. Morris
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
512.472.5070/Fax 512.320.8935

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed, et al.* v. *U.S. Dep't of State, et al.*, No. 15-50759

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiffs:
Defense Distributed, Second Amendment Foundation, Inc.

Defendants:
U.S. Dep't of State, John F. Kerry, Directorate of Defense Trade Controls, Kenneth B. Handelman, Brian H. Nilsson, C. Edward Peartree, Sarah J. Heidema, Glenn Smith

Plaintiffs' Counsel:
Alan Gura, Gura & Possessky, PLLC; Matthew A. Goldstein, Matthew A. Goldstein, PLLC; William B. Mateja, Polsinelli P.C.; William T. "Tommy" Jacks, David Morris, Fish & Richardson P.C.; Josh Blackman

Defendants' Counsel:
Loretta Lynch, Michael S. Raab, Daniel Bentele Hahs Tenny, Eric J. Soskin, Stuart J. Robinson, Richard L. Durban, Benjamin C. Mizer, Anthony J. Coppolino, Zachary C. Richter, – U.S. Department of Justice

Amici Curiae for Plaintiffs-Appellants
Representative Thomas Massie (Kentucky)
Representative Brian Babin (Texas)
Representative K. Mike Conaway (Texas)

i

Representative Jeff Duncan (South Carolina)
Representative Blake Farenthold (Texas)
Representative John Fleming (Louisiana)
Representative Paul Gosar (Arizona)
Representative Walter Jones (North Carolina)
Representative Mike Kelly (Pennsylvania)
Representative Steve King (Iowa)
Representative Raúl Labrador (Idaho)
Representative Jeff Miller (Florida)
Representative Bill Posey (Florida)
Representative Todd Rokita (Indiana)
Representative Daniel Webster (Florida)
Cato Institute
Electronic Frontier Foundation
Madison Society Foundation, Inc.
Reporters Committee for Freedom of the Press
Texas Public Policy Foundation
Thomas Jefferson Center for the Protection of Free Expression

<u>Counsel for Amici Members of Congress</u>
Raffi Melkonian, Wright & Close, LLP

<u>Counsel for Amicus Curiae Cato Institute</u>
Ilya Shapiro, Randal J. Meyer

<u>Counsel for Amicus Curiae Electronic Frontier Foundation</u>
Kit Walsh, Adam Schwartz

<u>Counsel for Amicus Madison Society Foundation, Inc.</u>
David T. Hardy; Leif A. Olson, The Olson Firm, PLLC

<u>Counsel for Amicus Curiae Reporters Committee</u>:
Bruce D. Brown, Gregg P. Leslie, Hannah Bloch-Wehba

<u>Counsel for Amicus Curiae Texas Public Policy Foundation</u>
Robert Henneke
Joel Stonedale

DOSWASHINGTONSUP01103

<u>Counsel for Amicus Curiae Thomas Jefferson Center</u>
J. Joshua Wheeler

<u>Amicus Curiae for Defendants-Appellees</u>
Brady Center to Prevent Gun Violence

<u>Counsel for Amicus Curiae Brady Center</u>:
John D. Kimball, Martin S. Krezalek, Nicholas R. Tambone, Blank
Rome LLP


/s/ Alan Gura
Alan Gura
Counsel for Appellants

iii

DOSWASHINGTONSUP01104

TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

I.      Defendants Fail to Establish Any Congressional
        Authority for Their Imposition of a Prior Restraint. . . . . . .  3

II.     Defendants Cannot Reconcile Inconsistent
        Government Positions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

III.    Defendants' Content-Based Restrictions Violate
        the First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    A.      Plaintiffs' Files Constitute Protected,
            Expressive Speech.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    B.      Defendants' Prior Restraint Is Plainly Content-Based. . . .  17

    C.      Defendants' Prior Restraint Fails Heightened Scrutiny. . .  20

    D.      The First Amendment Does Not Permit the
            Criminalization of Protected Public Speech Absent
            A Specific Criminal Intent. . . . . . . . . . . . . . . . . . . . . . . .  25

IV.     Defendants' Restrictions on the Manufacturing
        of Firearms Violate the Second Amendment. . . . . . . . . . . .  28

V.      Defendants' Prior Restraint Violates the
        Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

DOSWASHINGTONSUP01105

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

DOSWASHINGTONSUP01106

# TABLE OF AUTHORITIES

Cases

*Bond* v. *United States*,
    134 S. Ct. 2077 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

*Christensen* v. *Harris County*,
    529 U.S. 576 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*City of Los Angeles* v. *Alameda Books, Inc.*,
    535 U.S. 525 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*City of Renton* v. *Playtime Theatres, Inc.*,
    475 U.S. 41 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

*Commodity Futures Trading Comm'n* v. *Vartuli*,
    228 F.3d 94 (2nd Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Consumer Prod. Safety Comm'n* v. *GTE Sylvania, Inc.*,
    447 U.S. 102 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*FDIC* v. *Meyer*,
    510 U.S. 471 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Holder* v. *Humanitarian Law Project*,
    561 U.S. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

vi

*INS* v. *St. Cyr*,
    533 U.S. 289 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Karn* v. *U.S. Dep't of State*,
    925 F. Supp. 1 (D.D.C. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mance* v. *Holder*,
    74 F. Supp. 3d 795 (N.D. Tex. 2015). . . . . . . . . . . . . . . . . . . . . . 29

*New Orleans Depot Servs., Inc.* v. *Director,*
    *Office of Worker's Compensation Programs*,
    718 F.3d 384 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Reed* v. *Town of Gilbert*,
    135 S. Ct. 2218 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-20

*Reid* v. *Covert*,
    354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Reno* v. *American Civil Liberties Union*,
    521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Silvester* v. *Harris*,
    41 F. Supp. 3d 927 (E.D. Cal. 2014). . . . . . . . . . . . . . . . . . . . . . 31

*Simon & Schuster, Inc.* v. *Members of New York State*
    *Crime Victims Bd.*, 502 U.S. 105 (1991) . . . . . . . . . . . . . . . . . . . . 20

*Skidmore* v. *Swift & Co.*,
    323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Swan & Finch Co.* v. *United States*,
    190 U.S. 143 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

vii

*United States* v. *Edler Industries*,
   579 F.2d 516 (9th Cir. 1978).. . . . . . . . . . . . . . . . . . . . . 9, 25, 27, 28

*United States* v. *Ehsan*,
   163 F.3d 855 (4th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States* v. *Huynh*,
   246 F.3d 734 (5th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States* v. *Lee*,
   183 F.3d 1029 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Marzzarella*,
   614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *O'Brien*,
   391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Pulungan*,
   569 F.3d 326 (7th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *Swarovski*,
   592 F.2d 131 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Wu*,
   711 F.3d 1 (1st Cir. 2013). . . . . . . . . . . . . . . . . . . . . . 12, 36, 37


Statutes and Rules

15 C.F.R. Parts 730-774 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15 C.F.R. § 734.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15 C.F.R. § 746.1(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 922(p). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 32

DOSWASHINGTONSUP01109

22 C.F.R. § 120.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

22 U.S.C. § 2778(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12


Other Authorities

49 Fed. Reg. 47,682 (Dec. 6, 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Black's Law Dictionary (10th ed. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Br. Amicus Curiae for the United States,
    *Reed* v. *Town of Gilbert*, No. 13-502. . . . . . . . . . . . . . . . . . . . . . . . . . 19

H. Rpt. 96-1540 (Dec. 22, 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Letter of Sen. Daines, et al., to Sec. Kerry & Dep. Ass't
    Sec. Dearth, Aug. 3, 2015, available at
    https://www.daines.senate.gov/imo/media/
    doc/ITAR%20 Amendment--Revisions%20
    to%20Definitions;%20Data%20Transmission
    %20and%20Storage.pdf (last visited Feb. 27, 2016) . . . . . . . . . . . . . 4

Letter of Sens. Johnson & Grassley to Sec. Kerry,
    July 16, 2015, available at http://www.
    grassley.senate .gov/sites/default/files/judiciary
    /upload/2015-07-16%20CEG%20%2B%20
    RHJ%20to%20State%20Deparment%20%28
    ITAR%29.pdf (last visited Feb. 27, 2016). . . . . . . . . . . . . . . . . . . . . . 4

Petition for Certiorari,
    *District of Columbia* v. *Heller,* No. 07-290. . . . . . . . . . . . . . . . . . . . . 30

"How to Unblock US Websites Using DNS Proxy,"
    https://www.smartdnsproxy.com/page/how-
    to-unblock-us- websites-using-dns-proxy.
    aspx#.VtJrm-a37PY (last visited Feb. 27, 2016). . . . . . . . . . . . . . . . 22

DOSWASHINGTONSUP01110

Appellants' Reply Brief

Introduction

The Government does not restrict Plaintiffs' speech because it hypothetically relates to undetectable arms.[1] The Government restricts Plaintiffs' speech, along with a vast amount of other protected scientific and technical expression, for falling under a bottomless and murky definition of arms-related "technical data."

There is a world of difference between exporting physical objects, and disseminating knowledge online about physical objects. And the concept of scienter, which Defendants would here abolish, reflects the common-sense distinction between public speech, and the more nefarious-sounding "providing [] files to foreign nationals over the Internet," Appellees' Br. 2. The unavoidable reality that foreign persons access our public discourse, a public good, does not convert every expression of knowledge into a controllable act of potential espionage.

---

[1] Indeed, the Government concedes that as designed, the Liberator is detectable. ROA.571. Its metal firing pin, and unmistakable gun shape, would render a Liberator detectable even without its prescribed metallic insert. The end-product of a Ghost Gunner milling file is a detectible, metal rifle receiver.

1

Were this dispute merely about guns, especially guns alleged to be undetectable, Defendants' sudden effort to add to ITAR the prior restraint that they already claim here to exist would not have drawn opposition from such diverse commentators as GE, IBM, public universities, ITAR compliance attorneys, and even former State Department employees. ROA.728-29, 739, 765, 773, 796-98, 817, 825. The Association of American Universities, Association of Public and Land-grant Universities, and Council on Government Relations did not "urge DDTC to withdraw [the prior restraint proposal] or substantially limit its scope," ROA.765, out of concern for the right to bear arms.

Indeed, the (theoretical) undetectable firearms about which Defendants complain are already unlawful to manufacture per 18 U.S.C. § 922(p), a law implicating neither the First nor Fifth Amendments, and which is consistent with the Second Amendment. What Congress did not and could not authorize is a prior-restraint scheme so broad and malleable that it can be invoked in service of domestic law enforcement policy agendas under the guise of conducting foreign relations. This dangerous scheme should be enjoined.

DOSWASHINGTONSUP01112

Argument

I. Defendants Fail to Establish Any Congressional Authority for Their Imposition of a Prior Restraint.

In 1978, referencing ITAR's potential as a prior restraint, the Office of Legal Counsel "believe[d] that a more clear cut indication of Congressional judgment concerning the need for such a measure is in order." ROA.240. Nearly forty years later, Defendants offer no Congressional findings, hearing testimony, or any other legislative record upon which this Court can conclude that Congress ever intended to regulate public speech under the AECA.

But that is not to say that Congress has remained silent. In 1980, a House Subcommittee directed the State Department to address the constitutional objections identified in the 1978 DOJ memorandum. ROA.925.[2] Amici Members of Congress explain at length how Defendants' interpretation boldly and impermissibly departs from Congressional intent. *See* Br. Amicus Curiae of Representative Thomas Massie, et al. ("Congressional Amici") 10. Amici Representatives add that no enumerated power permits banning domestic publication of

---

[2]H. Rpt. 96-1540, at 119 (Dec. 22, 1980), available at http://tinyurl.com/CongressHearing (last visited Feb. 29, 2016).

DOSWASHINGTONSUP01113

information. *Id.* 18-22. For good measure, thirty senators have opposed Defendants' proposed codification of their prior restraint.[3]

Instead of providing any evidence of Congressional authorization for their prior restraint, Defendants rely on (1) a broad statement of authority to control exports of technical data; (2) their belief that publishing technical data on the Internet is an "export"; and (3) alleged deference under *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984). Each of these arguments fails.

First, Plaintiffs do not dispute that Defendants have the authority to license disclosures of technical data in non-public settings, disclosures of classified information, and direct assistance to foreign nationals with respect to defense articles.[4] But Defendants' power to control arms

---

[3]Letter of Sen. Daines, et al., to Sec. Kerry & Dep. Ass't Sec. Dearth, Aug. 3, 2015, available at https://www.daines.senate.gov/imo/media/doc/ITAR%20Amendment--Revisions%20to%20Definitions; %20Data%20Transmission%20and%20Storage.pdf (last visited Feb. 27, 2016) (28 Senators); Letter of Sens. Johnson & Grassley to Sec. Kerry, July 16, 2015, available at http://www.grassley.senate.gov/sites/default/files/judiciary/upload/2015-07-16%20CEG%20%2B%20RHJ%20to%20 State%20Deparment%20%28ITAR%29.pdf (last visited Feb. 27, 2016).

[4]The term "technical data" does not appear in the AECA. However, Defendants include the term in their definition of "Defense Articles" in the ITAR. *See* 22 C.F.R. § 120.6.

4

DOSWASHINGTONSUP01114

exports is not unlimited. They cannot take *any* action, no matter how broad or severe, merely because it might have the ancillary or incidental effect of impacting the arms trade. This case does not concern plans to illicitly aid some foreign actor, but an astonishing governmental effort to restrict public speech not directed at a specific person. Before addressing the difficult constitutional questions raised by Defendants' conduct, it is indeed fair to ask—as OLC once did—whether in enacting the AECA, Congress authorized the Defendants to impose a prior restraint against public speech.

"We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). There is zero evidence that Congress shared Defendants' views of what it means to "export" something. "Export" being undefined in the AECA, this Court must "construe [that] statutory term in accordance with its ordinary or natural meaning." *FDIC* v. *Meyer*, 510 U.S. 471, 476 (1994); *New Orleans Depot Servs., Inc.* v. *Director, Office of Worker's Compensation Programs*, 718 F.3d 384, 391 (5th Cir. 2013).

5

Defendants argue that an "export" includes public speech in the United States, not directed at a particular person, that a foreign person may see or overhear. But no person who is not a defendant in this lawsuit would ever ordinarily think that he or she is "exporting" information by speaking or publishing in a setting that might be frequented by foreigners. Defendants' definition is far afield from the plain, well-accepted, and common understanding of "export."

"'Export' is . . . a clear term" whose "ordinary meaning is manifest." *United States* v. *Ehsan*, 163 F.3d 855, 858 (4th Cir. 1998). "[A]ll [definitions of export] make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id.* (collecting definitions). "Exportation occurs when the goods are shipped to another country with the intent that they will join the commerce of that country." *United States* v. *Huynh*, 246 F.3d 734, 741 (5th Cir. 2001); *Swan & Finch Co.* v. *United States*, 190 U.S. 143, 145 (1903); *see also* Congressional Amici 12-14; Black's Law Dictionary 700 (10th ed. 2014) (defining "export," both as noun and verb, as connected to a goods, merchandise, and/or a commodity).

6

Defendants' peculiar interpretation of "export" is also so counterintuitive that it would lead to (yet more) absurd results. Consider Defendants' interpretation in light of various United States embargoes on the "export" of commercial technology controlled under the Department of Commerce Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774.[5] For Cuba, the embargo extends to almost all exports of any technical information, regardless of enumeration on a control list, unless an exception applies. 15 C.F.R. § 746.1(a)(1). While the Commerce Department presently heeds a 1984 DOJ opinion not to impose a prior restraint on public speech under the EAR (ROA.260-262), it may change its position if Defendants prevail, resulting in a complete online ban of Commerce-regulated technical information—because Cuba has Internet access, as do Cubans located in various other countries.

Nor do Defendants address the canon of constitutional deference, which requires this Court to avoid unorthodox applications of common terms in a manner that creates constitutional questions—unless there

---

[5]Both the EAR and ITAR definitions of "export" include oral and visual disclosures to foreign persons in the U.S. or abroad. *See* 15 C.F.R. § 734.2(b) and 22 C.F.R. § 120.17.

7

DOSWASHINGTONSUP01117

is an express indication that Congress intended such a result. *INS* v. *St. Cyr*, 533 U.S. 289, 299 (2001).

To be sure, Congress knows how to act decisively in this area. Recently introduced House Resolution 376 would prohibit, inter alia, the distribution, marketing, and advertising of certain firearm parts in "any medium of electronic communications." While Plaintiffs question the validity of such a measure, it exemplifies the clear statement of Congressional intent and legislative process required to authorize a prior restraint on public speech. Additionally, as amicus observed, "Congress considered (and rejected) changes to the Undetectable Firearms Act that would have addressed the creation, transport, or sale of any 3D printed firearm that was not detectable by standard means." Br. Amicus Curiae of Electronic Frontier Foundation ("EFF Br.") 27. That Congress rejected a statute that would have directly addressed the supposed problem that Defendants' statutory construction only obliquely reaches casts further doubt that Defendants' actions are authorized.

Defendants' *Chevron* deference argument likewise fails. Their prior restraint cannot carry the force of law because it is not the result of

8

duly promulgated regulations. The only relevant regulation carrying the force of law was the State Department's 1984 Federal Register notice that removed Footnote 3 from the ITAR, expressly stating the agency's intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984). In contrast, Defendants' interpretation is only set forth in their letter to Defense Distributed, filings in this case, and as supplementary information in proposed rulemaking issued after this case was filed. Such informal interpretations do not carry the force of law and are only entitled to the deference established in *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944)—which defers to agency interpretations only to the extent that they have the "power to persuade." *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000). If Defendants had a responsive argument under *Skidmore* and *Christensen*, they should have briefed it.

The complete absence of a scienter requirement from Defendants' scheme provides yet another reason to find this prior restraint ultra vires, as a scienter requirement has long been understood to limit the AECA's reach. *United States* v. *Edler Industries*, 579 F.2d 516 (9th Cir. 1978). Accordingly, the Department of Justice has repeatedly

9

acknowledged that a prior restraint cannot apply to the dissemination of technical data by persons having no direct connection with foreign conduct, in settings in which there is no more than belief or a reasonable basis for believing (1) that a foreign national may take the technical data abroad and (2) that the data could be used by someone there in the manufacture or use of items on the Munitions List. ROA.255 (1981 DOJ memo), 276 (1984 DOJ memo); *see also* ROA.309 (1997 DOJ report to Congress, warning that "serious constitutional questions" would arise if the Government prohibited publication by person who merely "has reason to know that some unidentified, unspecified recipient thereof will use the information for an unlawful purpose, or if such an outcome is the 'natural consequence' of publication of the information.").

Scienter is a basic element of due process, not "a loophole." Appellees' Br. 18. Publishing information into the public domain, as a means of intentionally transmitting it to a foreign government, would still be unlawful. *Cf.* ROA.310 (1997 DOJ Report to Congress, explaining how scienter requirement restricts particular transactions without impeding general publications). But Americans cannot be

10

silenced merely because their scientific and technical expression might have value to other governments.

Finally, Defendants misconstrue the essential nature of Plaintiffs' claims by suggesting that 22 U.S.C. § 2778(h) bars judicial review of State Department determinations that files are ITAR technical data. Appellees' Br. 19. First, whether the subject files actually contain "technical data" is not the issue. Plaintiffs are challenging a prior restraint on the publication of technical data, which is not implicated by Section 2778(h). And Plaintiffs were not required to make any application under the prior restraint system in order to challenge it. "The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 756 (1988) (quotation omitted). "As the ordinance [providing for unbridled licensing discretion] is void on its face, it was not necessary for appellant to seek a permit under it." *Id.* (quotation omitted).

Even were this challenge somehow construed as a constitutional challenge to Defendants' decision that the files are technical data,

DOSWASHINGTONSUP01121

Section 2778(h) "cannot bar a constitutional attack." *Karn* v. *U.S. Dep't of State*, 925 F. Supp. 1, 13 (D.D.C. 1996). Section 2778(h) also does not apply to *ex post facto* agency decisions, *United States* v. *Wu*, 711 F.3d 1, 17 (1st Cir. 2013), and does not prohibit challenges to determinations that particular information is subject to the ITAR because "[o]nly material 'in regulations' is covered by that statute" and such individualized determinations are not specifically set forth in the AECA. *United States* v. *Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009).

Defendants' prior-restraint scheme is ultra vires.

## II.    DEFENDANTS CANNOT RECONCILE INCONSISTENT GOVERNMENT POSITIONS.

Defendants claim that the Government's myriad, long-held positions precluding their prior-restraint scheme are all distinguishable; limited to cryptography, academic settings, dinner party discussions; or otherwise have no relevance to CAD files. Appellees' Br. 29-31. However, neither the 1981 nor 1984 DOJ memoranda, the 1997 DOJ Report to Congress, or relevant statements in *Bernstein* are so limited. In fact, the 1981 DOJ memorandum specifically references information related to "arms" throughout (ROA.244, 248, 250, 252, 254) as well as

12

public information on firearms not in excess of .50 caliber. ROA.245-246. And in *Bernstein*, the State Department unconditionally stated, "the Department does not seek to regulate the <u>means</u> themselves by which information is placed in the public domain." Appellants' Add. 23, 26. Although one of the Government's *Bernstein* pleadings identifies certain types of information as examples (i.e., "Information in the 'public domain' includes…"), it does not limit the Government's position to those types of information. *Id.* at 29. Nor do Defendants offer an argument as to *why* their "technical data" must be excluded from the Government's historic position regarding prior restraints.

Setting aside for now (see *infra*) Defendants' misleading suggestion that CAD files have the exclusive function of "facilitat[ing] the automated production of firearms," Appellees' Br. 31, Defendants' claim that the prior government positions are irrelevant because these did not concern CAD files also ignores the fact that this case involves design drawings, rendered images, and other technical information on firearms that are not CAD files. ROA.131 ¶13.

Even if CAD files could automatically produce a firearm (they cannot), such files are not singled out for special treatment in the DOJ

13

opinions, *Bernstein*, or in ITAR's definition of "public domain." And while 3D printing might not have existed in 1978, gunsmithing surely did—as did "technical data" that foreigners might have found useful in producing firearms, which was not exempted from DOJ's prior-restraint concerns. Moreover, Defendants' prior restraint applies to publications of any information subject to the ITAR, regardless of where described on the USML. As such, reason dictates that each of the prior government positions would apply to any publication of information subject to the ITAR, regardless of where the information might be found on the USML.

Defendants are far from the first government officials to have contemplated ITAR's application as a prior restraint. They are, however, the first to disregard repeated DOJ warnings not to impose the prior restraint.

III.   DEFENDANTS' CONTENT-BASED RESTRICTIONS VIOLATE THE FIRST AMENDMENT.

A.       Plaintiffs' Files Constitute Protected, Expressive Speech.

As a threshold matter, Defendants' case hinges on the mistaken implication that this dispute concerns only CAD files, and the false assertion that the CAD files are executable, in that they can create a

14

functional firearm with a "push" or "click" of a button." *See, e.g.,*
Appellees' Br. 14 ("This case relates to the export of computer files that
direct a computer, *without human intervention*, to create components of
an operable firearm.") (emphasis added). For these assertions,
Defendants rely exclusively on the lay declaration of Lisa Aguirre,[6] not
a word of which explains *how* the CAD files can be used to create a
functional firearm, let alone how CAD files can be transformed into a
gun with the "click" of a button "without human intervention."

This is a fantastical description of the technology, lacking any
support in the record. CAD files do not "direct a computer" to do
anything. "[T]o create a physical object based on a CAD file, a third
party must supply additional software to read these files and translate
them into the motions of a 3D print head, the 3D printer itself, and the
necessary physical materials." EFF Br. 10. Beyond printing the
components, the process for creating a Liberator "requires additional
craftsmanship, know-how, tools, and materials." ROA.960-996 at ¶¶ 37-
45. For example, parts of the Liberator must be treated with acetone

---

[6]Aguirre's declaration appears without a curriculum vitae or any
indication of her qualifications.

DOSWASHINGTONSUP01125

vapor to render them functional. ROA.972, ¶¶ 22-25. Just as
Defendants failed to introduce *any* evidence to explain their view of 3D
printing, they failed to dispute (other than by unfounded post-hoc
assertions) Plaintiffs' description of the Liberator creation process.

Quite simply, Defendants' claim that "allowing the distribution of
the computer files at issue here is *tantamount* to permitting the
dissemination of the firearms themselves," Appellees' Br. 13, is
unfounded. The files are not automatically transmogrified into a
firearm; data is not "tantamount" to the actual gun. Unlike, for
example, software-generated currency trading instructions telling users
that they "must 'follow the signals with no second guessing,"
*Commodity Futures Trading Comm'n* v. *Vartuli,* 228 F.3d 94, 111 (2nd
Cir. 2000), Plaintiffs' open source files invite the user's mind to
intercede, modify and customize the code and any related construction
of a gun or gun part. More fundamentally, even were Plaintiffs' files
"functional," they would still be expressive in that they convey
information as between, and are understandable by, humans. *See*
ROA.335-36. And this case involves more than CAD (and CNC) files.
ROA.20-21, ¶¶37, 38; 131, ¶13, 133-34, ¶¶3, 4; ROA.135-36, ¶¶4, 5;

DOSWASHINGTONSUP01126

ROA.137-38, ¶¶4, 5. Plaintiffs challenge Defendants' prior restraint as applied to design drawings, rendered images, written manufacturing instructions, and other technical information.

B.      Defendants' Prior Restraint Is Plainly Content-Based.

Notwithstanding their steadfast insistence that ITAR is content-neutral, Defendants admit that they impose their prior restraint based on the content of Plaintiffs' speech. *See, e.g.*, Appellants' Br. 17 (claiming ITAR control because the files "relate to the creation of firearms that appear on the U.S. Munitions List."). Defendants' commodity jurisdiction process further evidences how their prior restraint is content-based, because it requires an in-depth case-by-case review of content to determine whether ITAR, and hence, the prior restraint applies. See 22 C.F.R. § 120.4.

There is no escaping the fact that such "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) (quotation omitted). And "a speech regulation targeted at a specific subject matter is content based even if

17

DOSWASHINGTONSUP01127

it does not discriminate among viewpoints within that subject matter."
*Id.* at 2230 (quotation omitted).

Notwithstanding *Reed*'s clear application to this case, Defendants
cling to the notion that screening speech for arms-related "technical
data" is content-neutral, invoking *United States* v. *O'Brien*, 391 U.S.
367 (1968) and *City of Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41
(1986). But neither doctrine aids this effort.

*O'Brien* is plainly inapplicable, as this case presents no "non-speech"
conduct. Plaintiffs are not burning a draft card, or dancing, or
partaking of any allegedly expressive physical acts. Defendants may
conflate "exporting firearms" with "providing the means for" their
production abroad, Appellees' Br. 22, but the only "means" here is
knowledge, which is "provided" by the simple act of speaking. Of course,
at some level, speaking and writing are physical activities, requiring
the movement of lips and hands. But uploading files to the Internet is
no more "conduct" than is the act of typing a novel.

Defendants' *Renton* argument fares no better. *Renton* held that the
government could single-out theaters based on their programming
content and still be thought of as neutrally-regulating only for so-called

18

"secondary effects." *Renton* would appear to have been overruled by

*Reed*, and indeed, the Government unsuccessfully argued in *Reed* that

*Renton* called for the application of intermediate scrutiny in that case.

Br. Amicus Curiae for the United States, *Reed* v. *Town of Gilbert*, No.

13-502, at 18-20.[7] But there is no need to go that far. Assuming *Renton*

survived *Reed*, it is simply inapposite because *Renton*'s "secondary

effects" doctrine addresses just that—secondary effects—while

Defendants' complaint with Plaintiffs' speech relates to its primary

effects.

Justice Kennedy's controlling opinion in *City of Los Angeles* v.

*Alameda Books, Inc.*, 535 U.S. 525 (2002), helpfully explained the

difference between "primary" and "secondary" effects of speech:

> Speech can produce tangible consequences: It can change minds. It
> can prompt actions. These primary effects signify the power and the
> necessity of free speech. Speech can also cause secondary effects,
> however, unrelated to the impact of the speech on its audience. A
> newspaper factory may cause pollution, and a billboard may obstruct
> a view. These secondary consequences are not always immune from
> regulation by zoning laws even though they are produced by speech.

---

[7]Available at http://www.americanbar.org/content/dam/aba/
publications/supreme_court_preview/BriefsV4/13-502_pet_amcu_usa.a
uthcheckdam.pdf

19

*Id.* at 444 (Kennedy, J., concurring).[8] The making of guns using knowledge gleaned from Plaintiffs' speech is a primary effect of that speech—it is a "prompted action" demonstrating the speech's "power," and not one "unrelated to the impact of the speech on its audience."

The Government acts in a content-neutral fashion when it targets secondary, not primary effects. Dubbing every targeted primary effect a "secondary effect" would enable the Government to eliminate strict scrutiny for content-based restrictions altogether. *Simon & Schuster, Inc.* v. *Members of New York State Crime Victims Bd.*, 502 U.S. 105, 120 (1991) ("the Board has taken the *effect* of the statute and posited that effect as the State's interest. If accepted, this sort of circular defense can sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored."). Notably, that was not the Supreme Court's approach in *Reed*.

C.     Defendants' Prior Restraint Fails Heightened Scrutiny.

There is no point belaboring the argument for strict scrutiny, but Defendants' prior restraint would fail any level of heightened review.

––––––––––––––––––––

[8]The difference helps explain why *Renton* has apparently not been applied beyond the adult speech arena.

20

DOSWASHINGTONSUP01130

Plaintiffs have never asserted "that a regulatory scheme is unconstitutional unless enforcement action is taken in every case," Appellees' Br. 38, and this lawsuit contains no selective prosecution claims. Plaintiffs have, however, stressed that underinclusiveness is a feature of means-ends scrutiny, both because it tends to show poor constitutional "fit," and because it belies the Defendants' claims that they are truly concerned about foreign powers accessing American citizens' 3D printing files.

The Government's ability to selectively target disfavored speakers is also a chief evil of arbitrary prior restraints. Tellingly, Defendants neither suggest that they will shut down any of the other numerous websites hosting firearm printing files (including Defense Distributed's files),[9] nor do they deny politically targeting Defense Distributed.

Defendants' ever-evolving explanation of why this prior restraint does not, in fact, prohibit vast amounts of online and other public

---

[9]See e.g., www.jamesrpatrick.com; www.cncguns.com; www.optimusdefense.com; www.biggerhammer.net; www.yeggi.com; www.grabcad.com; www.turbosquid.com/3d-models/free-printing-3d-model/761509; https://grabcad.com/library/liberator-pistol-38-1; *see also* Google searches for "3D AR-15 CAD Lower." Many sites also offer instruction on making more traditional, non-3D printed guns. *See, e.g.,* www.wikihow.com/Make-a-Real-Gun

DOSWASHINGTONSUP01131

speech confirms its broad scope. Below, they suggested that Plaintiffs merely filter access to their websites to domestic IP addresses. ROA.523, n.4. However, as any unintentional disclosure to a foreign person is a strict liability offense under ITAR, relying on IP address filtering to keep oneself on the right side of the law is hardly prudent. IP addresses can be faked ("spoofed") quite easily, allowing foreign nationals to access files on the Internet domestically or abroad at Plaintiffs' peril.[10] And, even were Plaintiffs somehow able to limit access to domestic IP addresses, there is no way to stop a foreign person from looking at (or using) a U.S.-based internet connection. Every embassy in Washington is just steps away from free, domestic IP WiFi.[11]

Defendants' brief here does not invoke IP filtering, suggesting only that Defense Distributed "mak[e] the files available for U.S. citizens to

---

[10]It doesn't take James Bond's "Q" to access geographically restricted websites. Applications for defeating "geo-blocking" are readily found on the Internet. *See, e.g.*, "How to Unblock US Websites Using DNS Proxy," https://www.smartdnsproxy.com/page/how-to-unblock-us-websites-using-dns-proxy.aspx#.VtJrm-a37PY (last visited Feb. 27, 2016).

[11]Defendants below also suggested that Plaintiffs could personally deliver or mail "technical data" CDs to verified citizens, ROA.897, l. 10-14, a woefully obsolete, ineffective mode of communication.

DOSWASHINGTONSUP01132

download on the Internet . . . by verifying the citizenship status of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Appellees' Br. 20. But they do not explain how this is supposed to happen. Or why Americans are not free to disseminate their own "technical data" in any public forum without verifying each attendee's nationality.

Critically, the State Department has never before—including in its latest proposed notice for rulemaking—offered citizen-verification-filtering as an acceptable method to publish files to the Internet (much less a safe harbor). For its part, Defense Distributed repeatedly sought guidance on ITAR compliance to no avail. ROA.335-39, 394-401, 433-35. In any event, it is not Plaintiffs' burden to ensure that prohibited persons will not come into contact with their speech. *Reno* v. *American Civil Liberties Union*, 521 U.S. 844, 865-67 (1997) (discussing access by minors); EFF Br. 30.

While the impact of Defendants' prior restraint is broad and severe, the justifications for it remain unpersuasive. Public speech containing "technical data" is not a new phenomenon, and our nation has gotten along well enough for many years without an ITAR-inflicted prior

DOSWASHINGTONSUP01133

restraint. And Americans' scientific and technical output has long been susceptible of being employed by bad actors throughout the world. All information, not just that related to arms, might be helpful to villains. Terrorist groups dependent on oil revenues, for example, might find useful all manner of Americans' speech concerning geology or petroleum engineering. But this is not enough to justify a prior restraint.

Even less persuasive are Defendants' arguments alleging that Plaintiffs' public speech could "damage U.S. foreign relations with" other nations. Appellees' Br. at 23. Other nations, claim Defendants, might be offended if Americans don't watch what they say about gun-making—a traditional American pursuit secured by our Bill of Rights—as such information might destabilize their regimes. Since when are Americans silenced to please foreign leaders? Had Chinese authorities, offended by Americans' online discussion of uncomfortable issues (Tiananmen Square massacre, conquest of Tibet, repression of the Falun Gong, etc.), threatened negative consequences for our relations with that highly consequential nation, would that justify a prior restraint? Respectfully, the President's role in foreign relations in

24

no way enhances his executive power, and does not allow him to violate clearly established constitutional rights. "[N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." *Reid* v. *Covert*, 354 U.S. 1, 16 (1957) (plurality); *Bond* v. *United States*, 134 S. Ct. 2077, 2101 (2014) (Scalia, J., concurring) ("We would not give the Government' support of the *Holland* principle the time of day were we confronted with 'treaty-implementing' legislation that abrogated the freedom of speech or some other constitutionally protected individual right.").

D.     The First Amendment Does Not Permit the Criminalization of Protected Public Speech Absent a Specific Criminal Intent.

As Plaintiffs have shown, courts and government officials have long recognized that the First Amendment demands a scienter requirement if public speech were to be criminalized. *See, e.g., Edler, supra*; ROA.255, 309.

Undaunted, Defendants insist that there is no distinction between generalized public speech that *might* assist foreign powers, and a direct effort to provide such illicit aid. For this proposition, Defendants look to

25

support in *Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010),

which upheld a restriction on the provision of aid to terrorist groups in

the form of speech. Defendants should have looked elsewhere.

Reviewing the law there at issue, the Supreme Court noted that "most

importantly, Congress has avoided any restriction on independent

advocacy, or indeed any activities not directed to, coordinated with, or

controlled by foreign terrorist groups." *Id.* at 5-6. Upholding the

Government's ability to bar assistance to terrorist groups, the Court

offered this important qualification:

> In particular, we in no way suggest that a regulation of independent
> speech would pass constitutional muster, even if the Government
> were to show that such speech benefits foreign terrorist
> organizations.

*Id.* at 39. Even if Plaintiffs' "independent speech," not directed to,

coordinated with or controlled by foreign agents, were to somehow be

beneficial to such foreign agents, it could not be so restricted.[12]

_____

[12]The government cites Defense Distributed's mission statement,
which includes "facilitating global access" to certain files as evidence of
plaintiffs' intent. Appellees' Br. 10. This argument proves too much.
Defense Distributed has no specific intent to share their files with any
specific foreign nationals, let alone for any subversive purpose, but
makes the files available on the Internet for collaboration and as a
mode of political expression.

26

Equally wrong, but also unsettling, is Defendants' attempt to distinguish *Edler*'s imposition of a scienter requirement on the grounds that firearms are inherently illicit. Quoting the Ninth Circuit's observation that when "information could have both peaceful and military applications, . . . the defendant must know or have reason to know that its information is intended for the prohibited use," *Edler*, 579 F.2d at 521, Defendants offer that this "limitation . . . has no application here," because "the files at issue here plainly are useful only for the creation of firearms, and are plainly intended for that use." Appellees' Br. 26. However, there is nothing inherently illegal about manufacturing a firearm for personal use and Americans lawfully keep and use firearms for non-military applications, including self-defense, hunting, and sport, none of which are "prohibited." Certainly, it cannot be assumed that Plaintiffs, by publicly sharing gunsmithing knowledge, evince any particular intent to assist in the foreign production of controlled munitions.

Further, Defendants ignore the qualifying language of Edler that follows the language upon which they rely, which confines application of ITAR to "control the conduct of assisting foreign enterprises to obtain

27

military equipment and related technical expertise." *Edler*, 579 F.2d at 521. As noted above, the DOJ has repeatedly acknowledged this requirement— i.e., that a prior restraint on public speech cannot apply to the mere dissemination of ITAR technical data by persons having no direct connection with foreign conduct.

IV.   DEFENDANTS' RESTRICTIONS ON THE MANUFACTURING OF FIREARMS VIOLATE THE SECOND AMENDMENT.

Unlike amicus curiae Brady Center, Defendants wisely do not waste time denying the obvious Second Amendment right to make arms. Brady's hyper-literal reading of the Second Amendment's operative clause, by which the Amendment secures only the "keeping" and "bearing" of arms and nothing else, is specious. Plaintiffs have offered more than enough support for the traditional right to make the arms whose keeping and bearing the Second Amendment protects, and amicus curiae Madison Society Foundation, whose brief Brady ignores, painstakingly surveys the history underlying this specific aspect of the right to keep and bear arms. America may have been a largely agrarian society in 1791, but Americans' "arms" did not grow on trees. They were made by private citizens.

DOSWASHINGTONSUP01138

The "creation of firearms was very much a 'home brew' operation."
Br. Amicus Curiae for Madison Society Foundation 5. Because there
were no stores to acquire guns, the right to keep and bear arms was
intrinsically linked to homemade weapons, custom designed for an
individual's specific needs. "Colonial-era statutes commonly recognized
. . . that in time of need, virtually anyone who could work metal or
wood could function as a gunsmith." *Id.* at 10. During the
Revolutionary War, "many local blacksmiths turned [into] gunsmiths."
*Id.* Even after gun manufactures entered the marketplace around the
Civil War, Americans continued to craft their own guns. This long-
standing practice establishes the foundation for the constitutional right
not just to buy a gun in a store, but to make one's own arms.[13]

Instead of challenging this history head-on, Defendants claim that
they can restrict gun-making speech because Plaintiffs would still have
access to *other* guns. Washington, D.C. attempted this argument,

------

[13]Brady's theory that would bootstrap the presumptive validity of
*longstanding* commercial restrictions on the sale of arms, into
authorization for the complete prohibition on the acquisition of arms,
has been rejected. *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d
Cir. 2010); *Mance* v. *Holder*, 74 F. Supp. 3d 795, 807 n.8 (N.D. Tex.
2015).

DOSWASHINGTONSUP01139

reasoning that it could ban too-dangerous handguns because it

tolerated some long guns. The D.C. Circuit dismissed the argument as

"frivolous." *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir.

2007), *aff'd sub nom District of Columbia* v. *Heller*, 554 U.S. 570 (2008).

> It could be similarly contended that all firearms may be banned so
> long as sabers were permitted. Once it is determined—as we have
> done—that handguns are 'Arms' referred to in the Second
> Amendment, it is not open to the District to ban them.

*Id.* (citation omitted).

Undeterred, District of Columbia officials presented the Supreme

Court with the following question on certiorari: "Whether the Second

Amendment forbids the District of Columbia from banning private

possession of handguns while allowing possession of rifles and

shotguns." Petition for Certiorari, *District of Columbia* v. *Heller,* No.

07-290. Heller successfully challenged this question as not accurately

reflecting the issues in the case, and the Supreme Court adopted a very

different "Question Presented" along the lines Heller proposed, namely,

whether the city's laws violated the Second Amendment.

On the merits, the Supreme Court rejected the alternative arms

argument.

DOSWASHINGTONSUP01140

It is no answer to say . . . that it is permissible to ban the possession
of handguns so long as the possession of other firearms (*i.e.*, long
guns) is allowed. It is enough to note, as we have observed, that the
American people have considered the handgun to be the
quintessential self-defense weapon.

*Heller*, 554 U.S. at 629.

Similarly, the right to have a handgun is not diminished by the fact

that one keeps, or has access to, *other* handguns. Just as the First

Amendment does not allow the rationing of books or deities, the Second

Amendment, without more, does not permit the rationing of handguns.

*Cf. Silvester* v. *Harris*, 41 F. Supp. 3d 927, 962 n.33 (E.D. Cal. 2014).

Nor does it matter that 3D printing technology is in its infancy, and

that printed guns may not yet be common. Few firearms today are

made using 1791 technology, but handguns, however they might be

manufactured, and whatever technological advances they contain, have

served the same essential function since before the Second

Amendment's ratification. The "common use" test allows for innovation.

It is not circular, protecting only those arms that have attained

common usage before they could be banned by Brady's government

allies. Rather, it reflects expectations of what arms might be in

common use for traditional lawful purposes. Handguns were not in

31

common lawful use in the Washington, D.C. of 2008, but the Court could look to American experience and expectations and strike down Washington's handgun ban.

Brady correctly notes that some courts have gone beyond common use, and applied various balancing tests to sanction the prohibition of arms of the kind in common use for traditional lawful purposes. Those courts erred. *Heller* plainly stands for the proposition that if an arm passes the common use test, it cannot be banned. The Court employed no balancing test to see if handguns were too dangerous to allow notwithstanding their common use status. But even so, this case does not address any particular arm, but rather the knowledge and means of making arms. The Government already requires that guns contain a minimum detectable metal content. 18 U.S.C. § 922(p). If it wished to regulate some other aspects of 3D printed guns, *e.g.*, by requiring their serialization or licensing their manufacture, that would be another story. But restricting the dissemination of practical gunsmithing knowledge that citizens would apply in the traditional making of arms plainly violates the Second Amendment.

DOSWASHINGTONSUP01142

V.     DEFENDANTS' PRIOR RESTRAINT VIOLATES THE FIFTH AMENDMENT.

The DOPSR review process is a black box. The law does not establish a timeline, standard of review, or appeals process—and Defendants do not dispute this. Under the auspices of broad national security exceptions, Defendants acknowledge that they can override DDTC's license processing deadlines. There is also no dispute that ITAR prohibits judicial review of license determinations.

Acknowledging that no mechanism exists to challenge these stealth proceedings, Defendants now claim for the first time on appeal that Defense Distributed has not sought a license and "presents only general arguments about the pace of licensing decisions, without any factual context." Appellees' Br. 34. This is flatly contradicted by the record. Defense Distributed submitted multiple requests for DOPSR prepublication approval. ROA.130-31, ¶¶8, 10; ROA.410-24. DOPSR refused to consider one request without a commodity jurisdiction determination. After sitting on other requests for months, DOPSR refused to issue a decision, directing plaintiff to the DDTC Compliance and Enforcement Division for guidance. ROA.130-31, ¶10; ROA.426-31. Determined to explore every avenue to a license, Defense Distributed

33

wrote to Defendants for guidance, but Defendants never responded. ROA.131, ¶ 11; ROA.433-456.

Defendants also did not address government reports indicating that commodity jurisdiction determinations languish at DDTC for half a year or more awaiting final determinations. ROA.163-68, 211-13, 221. Instead, they try to divorce the time involved in obtaining a commodity jurisdiction determination from their licensing scheme—claiming that there is no legal obligation to submit a commodity jurisdiction request. Appellees' Br. 35. But Defendants ad hoc licensing regime requires a commodity jurisdiction determination in two principal ways—with the practical effect of extending the time for license determinations by several months to a year or more.

First, the government effectively requires a commodity jurisdiction request before it will even consider certain license requests—as evidenced in this case, when DOPSR refused to consider Defense Distributed's request for prepublication approval without a preliminary commodity jurisdiction determination. ROA.130, ¶8; ROA.391-92. Second, it is often impossible to determine whether a license is required without submitting a commodity jurisdiction request because the scope

34

of information on firearms subject to ITAR control is unclear. For instance, a search of the State Department commodity jurisdiction determination webpage[14] under the words "firearm," "picatinny," "magazine" or "grip" reveals how Defendants' decisions on whether such items and associated information are subject to the USML vary considerably. Complicating matters further, there are no publicly stated reasons for inclusion or exclusion. It is against this uncertain regulatory background, punishable by up 20 years in prison, that Defense Distributed and SAF's members must decide whether to submit a commodity jurisdiction request or assume the risk of their own interpretations.

Defendants argue that Plaintiffs' speech is clearly described on the USML. Appellees' Br. 35-37. Were it so clear, it would not have taken two years and a federal lawsuit to unlodge a commodity jurisdiction ruling relating to this speech. And it is not at all clear that ITAR contains a prior restraint. ITAR makes no mention of public speech, and Defendants fail to explain how members of the public, the vast

---

[14]*See* www.pmddtc.state.gov/commodity_jurisdiction/ determinationAll.html

DOSWASHINGTONSUP01145

majority of which are not involved in international trade, would have any reason to suspect Defendants' unorthodox interpretations of the terms "export" and "public domain." To the contrary, as noted above, Defendants have in the past said there was no prior restraint, have never enforced the prior restraint, and even ITAR compliance attorneys and other sophisticated industry members disagree with Defendants' claim that the ITAR applies to public speech—largely because any hint of a prior restraint was removed in 1984 to avoid First Amendment concerns. Aggravating this situation, Defendants can subject anything to their prior restraint, without notice, under USML Category XXI—a secret list held only in their hip pocket.[15]

Defendants' reliance on *Wu*, *supra*, 711 F.3d 1, is misplaced. Wu did not involve Defendants' prior restraint on technical data. Moreover, the defendant in *Wu* was an international businesswoman that the court held to a higher degree of sophistication than the general public. *Id.* at

---

[15]Defendants do not post commodity jurisdiction determinations for Category XXI and, according to them, the only way to know if Category XXI applies is through a commodity jurisdiction determination or an official letter from Defendant Peartree. *See* www.pmddtc.state.gov/licensing/documents/WebNotice_CatXXI.pdf

36

DOSWASHINGTONSUP01146

14. Ironically, the fact the court in *Wu* felt the need to draw such a distinction provides further support for Plaintiffs' void for vagueness claim because it illustrates how courts do not ascribe any particular knowledge of the ITAR to members of the public who have no connection to international trade. *See also United States* v. *Lee*, 183 F.3d 1029, 1032 (9th Cir. 1999) ("The regulation at issue is directed to a relatively small group of sophisticated international businessmen"); *United States* v. *Swarovski*, 592 F.2d 131, 133 (2d Cir. 1979) ("We are dealing here with a regulation of limited scope aimed at a small and relatively sophisticated group of persons.").

CONCLUSION

A preliminary injunction against ITAR's enforcement as a prior restraint is warranted.

Dated:   February 29, 2016          Respectfully submitted,

/s/ Matthew Goldstein               /s/ Alan Gura
Matthew Goldstein                   Alan Gura
Matthew A. Goldstein, PLLC             Counsel of Record
1875 Connecticut Avenue, N.W.       GURA & POSSESSKY, PLLC
10th Floor                          916 Prince Street, Suite 107
Washington, DC 20009                Alexandria, VA 22314
202.550.0040/Fax 202.683.6679       703.835.9085/Fax 703.997.7665

37

/s/ William B. Mateja

William B. Mateja
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, TX 75201
214.397.0030/Fax 214.397.0033

/s/ David S. Morris

William T. "Tommy" Jacks
David S. Morris
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
512.472.5070/Fax 512.320.8935

/s/ Josh Blackman

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

*Counsel for Appellants*

38

DOSWASHINGTONSUP01148

## CERTIFICATE OF SERVICE

On this, the 29th day of February, 2016, I electronically filed the attached Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users who will be served by the CM/ECF system on February 29, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 29th day of February, 2016.


/s/ Alan Gura
Alan Gura

39

DOSWASHINGTONSUP01149

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 6,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using WordPerfect X4 in 14 point Century Schoolbook font.

/s/ Alan Gura
Alan Gura
Attorney for Plaintiffs-Appellants
Dated: February 29, 2016

40

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

March 01, 2016

Mr. Alan Gura
Gura & Possessky, P.L.L.C.
916 Prince Street
Suite 7
Alexandria, VA 22314-0000

     No. 15-50759   Defense Distributed, et al v. U.S. Dept. of
                    State, et al
     USDC No. 1:15-CV-372

Dear Mr. Gura,

The following pertains to your reply brief electronically filed on
February 29, 2016.

You must submit the 7 paper copies of your brief required by 5ᵀᴴ
CIR. R. 31.1 within 5 days of the date of this notice pursuant to
5th Cir. ECF Filing Standard E.1.

Failure to timely provide the appropriate number of copies may
result in the dismissal of your appeal pursuant to 5ᵀᴴ CIR. R. 42.3.

You must electronically file a "Form for Appearance of Counsel"
within 14 days from this date.  You must name each party you
represent, see FED R. APP. P. 12(b) and 5ᵀᴴ CIR. R. 12 & 46.3.  The
form is available from the Fifth Circuit's website,
www.ca5.uscourts.gov.  If you fail to electronically file the form,
the brief will be stricken and returned unfiled.

                         Sincerely,

                         LYLE W. CAYCE, Clerk

                         By: _____
                         Shawn D. Henderson, Deputy Clerk
                         504-310-7668

cc:
     Mr. Joshua Michael Blackman
     Mr. Bruce D. Brown

```
Mr. Matthew Goldstein
Mr. David T. Hardy
Mr. Robert E. Henneke
Mr. John Devereux Kimball
Mr. Martin Simon Krezalek
Mr. Raffi Melkonian
Mr. Randal John Meyer
Mr. David Scott Morris
Mr. Leif A. Olson
Mr. Michael S. Raab
Mr. Ilya Shapiro
Mr. Joel Stonedale
Mr. Daniel Bentele Hahs Tenny
Mr. Kit Walsh
```

**P.S. Mr. David Morris:** Since you signed the brief, you must electronically file a "Form for Appearance of Counsel" within 14 days from this date. You must name each party you represent, see FED R. APP. P. 12(b) and 5TH CIR. R. 12 & 46.3. The form is available from the Fifth Circuit's website, www.ca5.uscourts.gov. If you fail to electronically file the form, the brief will be stricken and returned unfiled.

DOSWASHINGTONSUP01152

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

──────────

No. 15-50759

──────────

United States Court of Appeals
Fifth Circuit

**FILED**

September 20, 2016

Lyle W. Cayce
Clerk

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED,

        Plaintiffs - Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His
Official Capacity as the Secretary of the Department of State;
DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State
Bureau of Political Military Affairs; KENNETH B. HANDELMAN,
Individually and in His Official Capacity as the Deputy Assistant Secretary
of State for Defense Trade Controls in the Bureau of Political-Military
Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity
as the Director of the Office of Defense Trade Controls Policy Division;
SARAH J. HEIDEMA, Individually and in Her Official Capacity as the
Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and in His Official Capacity as
the Senior Advisor, Office of Defense Trade Controls,

        Defendants - Appellees

──────────

Appeal from the United States District Court
for the Western District of Texas

──────────

Before DAVIS, JONES, and GRAVES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

       Plaintiffs-Appellants Defense Distributed and Second Amendment
Foundation, Inc. have sued Defendants-Appellees, the United States

DOSWASHINGTONSUP01153

No. 15-50759

Department of State, the Secretary of State, the DDTC, and various agency employees (collectively, the "State Department"), seeking to enjoin enforcement of certain laws governing the export of unclassified technical data relating to prohibited munitions. Because the district court concluded that the public interest in national security outweighs Plaintiffs-Appellants' interest in protecting their constitutional rights, it denied a preliminary injunction, and they timely appealed. We conclude the district court did not abuse its discretion and therefore affirm.

## I.   Background

Defense Distributed is a nonprofit organization operated, in its own words, "for the purpose of promoting popular access to arms guaranteed by the United States Constitution" by "facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms; and by publishing and distributing such information and knowledge on the Internet at no cost to the public." Second Amendment Foundation, Inc. is a nonprofit devoted more generally to promoting Second Amendment rights.

Defense Distributed furthers its goals by creating computer files used to create weapons and weapon parts, including lower receivers for AR-15 rifles.[1] The lower receiver is the part of the firearm to which the other parts are attached. It is the only part of the rifle that is legally considered a firearm under federal law, and it ordinarily contains the serial number, which in part allows law enforcement to trace the weapon. Because the other gun parts, such as the barrel and magazine, are not legally considered firearms, they are not

---

[1] The district court capably summarized the facts in its memorandum opinion and order. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 686-88 (W.D. Tex. 2015). The facts set out in this opinion come largely from the district court's opinion and the parties' briefs.

DOSWASHINGTONSUP01154

No. 15-50759

regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.

> Both technologies require some instruction set or "recipe"—in the case of 3D printers, computer aided design ("CAD") files, typically

3

DOSWASHINGTONSUP01155

No. 15-50759

in .stl format; for CNC machines, text files setting out coordinates
and functions to direct a drill.[2]

Defense Distributed's files allow virtually anyone with access to a 3D
printer to produce, among other things, Defense Distributed's single-shot
plastic pistol called the Liberator and a fully functional plastic AR-15 lower
receiver. In addition to 3D printing files, Defense Distributed also sells its own
desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower
receivers. With CNC milling files supplied by Defense Distributed, Ghost
Gunner operators are able to produce fully functional, unserialized, and
untraceable metal AR-15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will
remain legal for United States citizens regardless of the outcome of this case.
This case concerns Defense Distributed's desire to share all of its 3D printing
and CNC milling files online, available without cost to anyone located
anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download
by anyone in the world, a number of computer files, including those for the
Liberator pistol (the "Published Files"). On May 8, 2013, the State Department
sent a letter to Defense Distributed requesting that it remove the files from the
internet on the ground that sharing them in that manner violates certain laws.
The district court summarized the relevant statutory and regulatory
framework as follows:

> Under the Arms Export Control Act ("AECA"), "the President is
> authorized to control the import and the export of defense articles
> and defense services" and to "promulgate regulations for the
> import and export of such articles and services." 22 U.S.C. §
> 2778(a)(1). The AECA imposes both civil and criminal penalties for
> violation of its provisions and implementing regulations, including

---

[2] Plaintiffs-Appellants' Original Brief on Appeal.

4

No. 15-50759

monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ——U.S. ——, 134 S. Ct. 365, 187 L. Ed. 2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*[3]

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals

---

[3] *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687-88 (W.D. Tex. 2015).

DOSWASHINGTONSUP01157

No. 15-50759

to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR-15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

## District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs-Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online.[4] They also claim violations of the Second and Fifth Amendments. Plaintiffs-Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval is

---

[4] The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR-15 lower receivers with it, as well as all 3D printing files used to produce prohibited weapons and weapon parts.

DOSWASHINGTONSUP01158

No. 15-50759

needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

Plaintiffs-Appellants sought a preliminary injunction against the State Department, essentially seeking to have the district court suspend enforcement of ITAR's prepublication approval requirement pending final resolution of this case. The district court denied the preliminary injunction, and Plaintiffs-Appellants timely filed this appeal. We review the denial of a preliminary injunction for abuse of discretion, but we review any questions of law de novo.[5]

> To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[6]

We have long held that satisfying one requirement does not necessarily affect the analysis of the other requirements. In *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982), for example, the district court had denied a preliminary injunction solely because it found that the movant, Robbins & Myers, failed to satisfy the balance of harm requirement. On appeal, Robbins & Myers argued that it had clearly shown a substantial likelihood of success on the merits, and satisfying that requirement should give rise to a presumption of irreparable harm and a presumption that the balance of harm tipped in its favor. We disagreed:

---

[5] *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (footnotes omitted)

[6] *Id.*

7

No. 15-50759

Because we dispose of this case on the balance of harm question, we need not decide and we express no views upon whether a presumption of irreparable injury as a matter of law is appropriate once a party demonstrates a substantial likelihood of success on the merits of an infringement claim. In other words, even assuming arguendo that Robbins & Myers has shown a substantial likelihood of success on the merits of its infringement claim and that irreparable injury should be presumed from such a showing (two issues not addressed by the district court in this case), we still uphold the district court's decision, which rested solely on the balance of harm factor. We agree that Robbins & Myers has failed to carry its burden of showing that the threatened harm to it from the advertisement outweighs the harm to Southern Monorail from the intercept. In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular. *See Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S. Ct. 3016, 65 L. Ed. 2d 1116 (1980) (district court obligated to weigh relative hardship to parties in relation to decision to grant or deny preliminary injunction, even when irreparable injury shown).[7]

The district court concluded that the preliminary injunction should be denied because Plaintiffs-Appellants failed to satisfy the balance of harm and public interest requirements, which do not concern the merits. (Assuming without deciding that Plaintiffs-Appellants have suffered the loss of First and Second Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time,

---

[7] *Id.* at 187-88.

DOSWASHINGTONSUP01160

No. 15-50759

constitutes irreparable injury.[8]) In extensive dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs-Appellants failed to show a likelihood of success on the merits. Plaintiffs-Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs-Appellants continue to bear the burden of persuasion on appeal.

## Analysis

Because the district court held that Plaintiffs-Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs-Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs-Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs-Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

---

[8] *See Def. Distributed*, 121 F. Supp. 3d at 689 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

9

No. 15-50759

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs-Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs-Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.

---

[9] *Id*. at 689.
[10] *Id*.

10

DOSWASHINGTONSUP01162

No. 15-50759

Ct. 365, 172 L. Ed. 2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority—of the President and Congress in matters of foreign policy and export. *See Haig v. Agee,* 453 U.S. 280, 292, 101 S. Ct. 2766, 69 L. Ed. 2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink,* 315 U.S. 203, 222–23, 62 S. Ct. 552, 86 L. Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp [contrast] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.][11]

Plaintiffs-Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs-Appellants'

---

[11] *Id.* at 689-90.

DOSWASHINGTONSUP01163

No. 15-50759

interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs-Appellants. We cannot say the district court abused its discretion on these facts.

Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs-Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs-Appellants argue that this result is absurd because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs-Appellants would allow them to share online not only the Published Files but also any new, previously unpublished files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs-Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR-15 lower receivers and additional 3D-printed weapons and weapon parts. Even if Plaintiffs-Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs-Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would function, in effect, as a

12

No. 15-50759

permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs-Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs-Appellants' preliminary injunction based on their failure to carry their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs-Appellants have demonstrated a substantial likelihood of success on the merits.[12]

---

[12] The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs-Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."

We note the following: (1) If Plaintiffs-Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that it would be legal. The question presented in this case is whether Plaintiffs-Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs-Appellants previously made available online. Plaintiffs-Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs-Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs-Appellants' strong First Amendment interest.

As to the dissent's extensive discussion of Plaintiffs-Appellants' likelihood of success on the merits of the First Amendment issue, we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs-Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

13

No. 15-50759

We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

## Conclusion

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

DOSWASHINGTONSUP01166

No. 15-50759

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles."  I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

## I.

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle-15 magazine,[1] and a handgun named "The Liberator."  None of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions.  In these respects the information was no different from technical data available through multiple Internet sources from widely diverse publishers.  From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun.  The Liberator technology

---

[1] The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR-15, a registered trademark of Colt's Inc. AR-15, Registration No. 0,825,581.

15

No. 15-50759

drew considerable press attention[2] and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

> DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

> Pursuant to §127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under §120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet. Because violations of the cited regulations carry severe civil and criminal penalties,[3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC. It took

---

[2] According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

[3] Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years. 28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

16

DOSWASHINGTONSUP01168

No. 15-50759

the government entities two years to refuse to exempt most of the files from the licensing regime.

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint[4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information. There is also little certainty that the government will confine its censorship to Internet publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S. Ct. 2140 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–97 (5th Cir. 2012). Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled: intermediate scrutiny is

_____

[4] To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

DOSWASHINGTONSUP01169

No. 15-50759

inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005)—the district court's balancing of harms went awry.[5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

---

[5] *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185–86. Second, "the district court denied the injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

18

No. 15-50759

## II.

## A.    Regulatory Framework

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain."

DOSWASHINGTONSUP01171

No. 15-50759

22 C.F.R. § 120.10(b).  Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community."  22 C.F.R. § 120.11(a). [6]

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department.  22 C.F.R. § 127.1(a)(1).  When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly, as, *inter alia*, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad."  22 C.F.R. § 120.17(a)(4). [7]

---

[6] This provision only appears to permit dissemination of information *already* in the public domain.  Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval.  80 Fed. Reg. at 31,528.  The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit.  *See id.*

[7] Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States."  *Id.* § 120.17(a)(2); *see also* International Traffic in Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016).  Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)."  This, of course, is the open-ended definition of "export" urged by the State Department in this litigation.  *See* International Traffic in Arms:  Revisions to Definitions of Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015).  The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place."  81 Fed. Reg. at 35,613.

DOSWASHINGTONSUP01172

No. 15-50759

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)–(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the

DOSWASHINGTONSUP01173

No. 15-50759

plaintiff's commodity jurisdiction applications.  Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] . . . items as defense articles or defense services."  22 U.S.C. § 2778(h); 22 C.F.R. § 128.1. [8]

Should the DDTC determine, as here, that technical data are subject to the ITAR,  an "export" license is required before the information may be posted online.  But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable."  22 C.F.R. § 126.7(a)(1).  There is a nominal 60-day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review.  *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors.  Previous prosecutions have targeted defendants, *e.g.*, who

---

[8] While 22 U.S.C. § 2778 (h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act.  I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution.  *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action . . . and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) (Agency "shenanigans" are "properly reviewable . . . under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

22

No. 15-50759

attempted to deliver WMD materials to North Korea, who sought to distribute drone and missile schematics to China, and who attempted to license chemical purchasing software to companies owned by the Iranian government.[9]  Defense Distributed agrees, moreover, that the Government may prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice.  *See*, *e.g.*, *United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA.  Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay.  Moreover, technology has not stood still:  design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials.  *See*, *e.g.*, Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrintBoard.com (Nov. 23, 2015) (site visited 9/14/2016).

## B.  Discussion

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks

---

[9] *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO-RELATED CRIMINAL CASES *(January 2009 to the present: updated August 12, 2015)* 3, 11, 86 (2015), *available at* https://www.pmddtc.state.gov/compliance/ documents/OngoingExportCaseFactSheet.pdf.

DOSWASHINGTONSUP01175

No. 15-50759

statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsam*, 163 F.3d 858, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987)); *Export, Black's Law Dictionary* (10th ed. 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country").

---

[10] For simplicity only, I do not here address plaintiffs' vagueness claim.

[11] It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227–28, 121 S. Ct. 2164, 2171–72 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

DOSWASHINGTONSUP01176

No. 15-50759

As the court explained in *Ehsam*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id. See also Swan v. Finch Co. v. United States*, 190 U.S. 143, 145 (1903) (the "legal notion…of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another"). As against a claim that the rule of lenity should apply, the *Ehsam* court explicitly held that "export" is unambiguous. *Id. at* 859–60

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (internal quotation omitted). Pursuant to *Chevron,* where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781 (1984). The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well. Under

25

No. 15-50759

the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data." Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful, non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable. In terms of the regulations themselves, how this expansive definition of "export" interacts with the "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons. The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable. Even if these regulations are

26

DOSWASHINGTONSUP01178

No. 15-50759

consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. *Cf. Bond*, 134 S. Ct. at 2090 ("[s]aying that a person 'used a chemical weapon conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.' " Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also id.* at 574–75 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance]. . . is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the

27

No. 15-50759

request for administrative deference.").  As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its constitutional significance, throughout the forty-year history of the AECA.  It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2.  The First Amendment—Content-based speech restriction.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).  "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Id.* at 2227.  "A speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter:"  consequently, even a viewpoint neutral law can be content-based.  *Id.* at 2230.  "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based."  *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting.  As applied to the publication of Defense Distributed's files, this process is a content-based restriction on the petitioners' domestic speech "because of the topic discussed."  *Reed*, 135 S. Ct. at 2227.  Particularly relevant to this case is *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 27–28, 130 S. Ct. 2705, 2723–24 (2010),

28

No. 15-50759

in which the Supreme Court held that as applied, a criminal statute forbidding the provision of material support and resources to designated terrorist organizations was content based and required strict scrutiny review. The Court there rejected the government's assertion that although the plaintiffs were going to provide legal training and political advocacy to Mideast terrorist organizations, the statute criminalized "conduct" and only incidentally affected "speech." Rejecting this incidental burden argument for intermediate scrutiny review, the Court stated the obvious: "[p]laintiffs want to speak to the PKK and the LTTE, and whether they may do so under §2239B depends on what they say:" if their speech concerns "specialized knowledge" it is barred, but it "if it imparts only general or unspecialized knowledge" it is permissible). *Humanitarian Law Proj.*, 130 S. Ct. at 2724.

The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir. 2001) (discussing level of scrutiny owed for "speech" in the form of a decryption computer program). There are CAD files on the Internet and designs, drawings, and technical information about myriad items—jewelry, kitchen supplies, model airplanes, or clothing, for example—that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation.[12]

---

[12] The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134–35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for

29

No. 15-50759

The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [] interference with ingress or egress, [] visual clutter, or [] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters*. 485 U.S. 312, 321, 108 S. Ct. 1157, 1163–64 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners—foreign nationals—from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department:

---

attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S. Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, Mak's prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

DOSWASHINGTONSUP01182

No. 15-50759

its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions. Second, CAD files do not "direct a computer" to do anything. As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials." The person must provide know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional. In effect, the "functionality" of CAD files differs only in degree from that of blueprints. Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here. *Corley,* 273 F.3d at 449–55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny. The district court erred in applying the lower intermediate scrutiny standard. I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML. The critical issue is instead whether the government's prepublication approval scheme is narrowly tailored to achieve that end. A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S. Ct. 501, 511 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case. To prevent foreign nationals from accessing

31

No. 15-50759

technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC.  No matter that citizens have no intention of assisting foreign enemies directly, communications about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech.  This flies in the face of *Humanitarian Law Project*.  Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations…[or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36–39, 130 S. Ct. at 2729–30. The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness.  First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain.  This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage.  Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the government would not definitively answer whether the State Department would purport to regulate the posting of such

32

No. 15-50759

unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones.[13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i) (technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude

---

[13] *See* Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

DOSWASHINGTONSUP01185

No. 15-50759

the Internet) before publication in the CNET article. On the Government's theory, journalists could be subject to the ITAR for posting articles online.

The State Department also asserts that, somehow, the information published by Defense Distributed would have survived regulatory scrutiny (query before or after submission to DDTC?) if the company had "verified the citizenship of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Government brief at 20. Whatever this means, it is a ludicrous attempt to narrow the ambit of its regulation of Internet publications. Everyone knows that personally identifying information can be fabricated on electronic media. Equally troubling, if the State Department truly means what it says in brief about screening out foreign nationals, then the "public domain" exception becomes useless when applied to media like print publications and TV or to gatherings open to the public.

In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press. Indeed, the State Department turns freedom of speech on its head by asserting, "The possibility that an Internet site could also be used to distribute the technical data domestically does not alter the analysis...." The Government bears the burden to show that its regulation is narrowly tailored to suit a compelling interest. It is not the public's burden to prove their right to discuss lawful, non-classified, non-restricted technical data. As applied to Defense Distributed's online publication, these overinclusive regulations cannot be narrowly tailored and fail strict scrutiny.

3. The First Amendment--Prior Restraint.

The Government's prepublication approval and licensing scheme also fails to pass constitutional muster because it effects a prior restraint on speech.

34

No. 15-50759

The classic description of a prior restraint is an "administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993)). The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S. Ct. 596, 604 (1990). Generally, speech licensing schemes must avoid two pitfalls. First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S. Ct. 2138, 2144 (1988)). "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S. Ct. 2395, 2402–03 (1992).

Second, content-based[14] prior restraints must contain adequate procedural protections. The Supreme Court has requires three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress

---

[14] As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based. Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland*.

35

DOSWASHINGTONSUP01187

No. 15-50759

the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003) (citing *Friedman v. Maryland*, 380 U.S. 51, 58–59, 85 S. Ct. 734, 739 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S. Ct. 935, 938 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data.[15]

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's

---

[15] Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable.*" 22 C.F.R. § 126.7(a)(1) (emphasis added).

DOSWASHINGTONSUP01188

No. 15-50759

discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S. Ct. at 2150–51. Like the "illusory 'constraints'" in *Lakewood*, *id.* at 769, the ITAR prepublication review scheme offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770. *Cf. Humanitarian Law Project,* 130 S. Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45-day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly brief. *See Teitel Film Corp. v. Cusak,* 390 U.S. 139, 141, 88 S. Ct. 754, 756 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint

37

DOSWASHINGTONSUP01189

No. 15-50759

scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D-4, LLC,* 541 U.S. 774, 781, 124 S. Ct. 2219, 2224 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas*, interpreting *Freedman*'s "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C.    The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case. No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations. Yet the Executive's mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights. The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971) (reversing the grant of an injunction precluding the *New York Times* and the *Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945–1967); *id.* at 730 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

38

DOSWASHINGTONSUP01190

No. 15-50759

> the protection as to previous restraint is not absolutely unlimited.  But
> the limitation has been recognized only in exceptional cases . . . .[n]o
> one would question but that a government might prevent actual
> obstruction to its recruiting service or the publication of sailing dates of
> transports or the number and location of troops. On similar grounds,
> the primary requirements of decency may be enforced against obscene
> publications.  The security of the community life may be protected
> against incitements to acts of violence and the overthrow by force of
> orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S. Ct. 625, 631 (1931);
*cf. Haig v. Agee*, 453 U.S. 280, 306–08, 101 S. Ct. 2766, 2781–82 (1981) (holding
that the Secretary of State's revocation of Haig's passport did not violate First
Amendment rights because his actions exposing undercover CIA agents abroad
threatened national security).  No such exceptional circumstances have been
presented in this case.   Indeed, all that the majority can muster to support the
government's position here is that

> the State Department's stated interest in preventing foreign
> nationals—including manner of enemies of this country—from
> obtaining technical data on how to produce weapons and weapon
> parts is not merely tangentially related to national defense and
> national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else.[16]
With that kind of reasoning, the State Department could wholly eliminate the
"public domain" and "scholarly" exceptions to the ITAR and require pre-
publication approval of all USML-related technical data.  This is clearly not

---

[16] The State Department notes the fear that a single-shot pistol undetectable by metal-
sensitive devices could be used by terrorists.  The Liberator, however, requires a metal firing
pin.

DOSWASHINGTONSUP01191

No. 15-50759

what the Supreme Court held in the *Pentagon Papers* or *Near* cases.  *See generally* L.A. Powe, Jr., The H-Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms.[17]

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA.  The State Department's sudden turnabout severely undercuts its argument that prepublication review and licensing for the publication of unclassified technical data is justified by pressing national security concerns.  Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals.  Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in

---

[17] The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States.  Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project*) is dangerous and unprecedented.

40

No. 15-50759

libraries, and in magazines.   The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face First Amendment problems because the government may rarely prevent the dissemination of truthful information.[18]

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996).  Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States."  *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is subject to doubt, based on

---

[18] DEPARTMENT OF JUSTICE, 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION 3, 5–7, 19–29 (1997).

DOSWASHINGTONSUP01193

No. 15-50759

the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure). . . to a foreign person . . . in the United States or abroad." *Id.* § 120.17(a)(4).

***

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights. The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain." It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists. Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be implicated on the USML. This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable. I earnestly hope that the district court, on remand, will take the foregoing discussion to heart and relieve Defense Distributed of this censorship.

42

DOSWASHINGTONSUP01194

Case No. 15-50759

# In the United States Court of Appeals
# for the Fifth Circuit

DEFENSE DISTRIBUTED;
SECOND AMENDMENT FOUNDATION, INCORPORATED,
Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official
Capacity as the Secretary of the Department of State; DIRECTORATE OF
DEFENSE TRADE CONTROLS, Department of State Bureau of Political
Military Affairs; KENNETH B. HANDELMAN, Individually and in His
Official Capacity as the Deputy Assistant Secretary of State for Defense
Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD
PEARTREE, Individually and in His Official Capacity as the Director of
the Office of Defense Trade Controls Policy Division; SARAH J.
HEIDEMA, Individually and in Her Official Capacity as the Division
Chief, Regulatory and Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and in His Official Capacity
as the Senior Advisor, Office of Defense Trade Controls,
Defendants-Appellees

Appeal from an Order of the United States District Court for the
Western District of Texas, The Hon. Robert L. Pitman, District Judge
(Dist. Ct. No. 1:15-CV-372-RP)

APPELLANTS' PETITION FOR REHEARING EN BANC

Matthew Goldstein                    Alan Gura
MATTHEW A. GOLDSTEIN, PLLC              Counsel of Record
1875 Connecticut Avenue, N.W.        GURA PLLC
10th Floor                           916 Prince Street, Suite 107
Washington, DC 20009                 Alexandria, VA 22314
202.550.0040/Fax 202.683.6679        703.835.9085/703.997.7665


November 4, 2016                      Counsel for Appellants
(Additional Counsel Inside Cover)

DOSWASHINGTONSUP01195

Additional Counsel for Appellants

William B. Mateja
POLSINELLI P.C.
2950 N. Harwood, Suite 2100
Dallas, TX 75201
214.397.0030/Fax 214.397.0033

William T. "Tommy" Jacks
David S. Morris
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
512.472.5070/Fax 512.320.8935

Josh Blackman
1303 San Jacinto Street
Houston, TX 77002
202.294.9003/Fax 713.646.1766

DOSWASHINGTONSUP01196

CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed, et al.* v. *U.S. Dep't of State, et al.*, No. 15-50759

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiffs:
Defense Distributed, Second Amendment Foundation, Inc.

Defendants:
U.S. Dep't of State, John F. Kerry, Directorate of Defense Trade Controls, Kenneth B. Handelman, Brian H. Nilsson, C. Edward Peartree, Sarah J. Heidema, Glenn Smith

Plaintiffs' Counsel:
Alan Gura, Gura PLLC; Matthew A. Goldstein, Matthew A. Goldstein, PLLC; William B. Mateja, Polsinelli P.C.; William T. "Tommy" Jacks, David Morris, Fish & Richardson P.C.; Josh Blackman

Defendants' Counsel:
Loretta Lynch, Michael S. Raab, Daniel Bentele Hahs Tenny, Eric J. Soskin, Stuart J. Robinson, Richard L. Durban, Benjamin C. Mizer, Anthony J. Coppolino, Zachary C. Richter, – U.S. Department of Justice

Amici Curiae for Plaintiffs-Appellants
Representative Thomas Massie (Kentucky)
Representative Brian Babin (Texas)
Representative K. Mike Conaway (Texas)

i

Representative Jeff Duncan (South Carolina)
Representative Blake Farenthold (Texas)
Representative John Fleming (Louisiana)
Representative Paul Gosar (Arizona)
Representative Walter Jones (North Carolina)
Representative Mike Kelly (Pennsylvania)
Representative Steve King (Iowa)
Representative Raúl Labrador (Idaho)
Representative Jeff Miller (Florida)
Representative Bill Posey (Florida)
Representative Todd Rokita (Indiana)
Representative Daniel Webster (Florida)
Cato Institute
Electronic Frontier Foundation
Madison Society Foundation, Inc.
Reporters Committee for Freedom of the Press
Texas Public Policy Foundation
Thomas Jefferson Center for the Protection of Free Expression

Counsel for Amici Members of Congress
Raffi Melkonian, Wright & Close, LLP

Counsel for Amicus Curiae Cato Institute
Ilya Shapiro, Randal J. Meyer

Counsel for Amicus Curiae Electronic Frontier Foundation
Kit Walsh, Adam Schwartz

Counsel for Amicus Madison Society Foundation, Inc.
David T. Hardy; Leif A. Olson, The Olson Firm, PLLC

Counsel for Amicus Curiae Reporters Committee:
Bruce D. Brown, Gregg P. Leslie, Hannah Bloch-Wehba

Counsel for Amicus Curiae Texas Public Policy Foundation
Robert Henneke
Joel Stonedale

DOSWASHINGTONSUP01198

<u>Counsel for Amicus Curiae Thomas Jefferson Center</u>
J. Joshua Wheeler

<u>Amicus Curiae for Defendants-Appellees</u>
Brady Center to Prevent Gun Violence

<u>Counsel for Amicus Curiae Brady Center</u>:
John D. Kimball, Martin S. Krezalek, Nicholas R. Tambone, Blank
Rome LLP


/s/ Alan Gura
Alan Gura
Counsel for Appellants

iii

DOSWASHINGTONSUP01199

STATEMENT PURSUANT TO FED. R. APP. P. 35(B)(1)

Never before has a federal appellate court declined to enjoin a content-based prior restraint on speech while refusing to consider the merits of a First Amendment challenge.

Plaintiffs-Appellants, Defense Distributed and Second Amendment Foundation, Inc., respectfully request en banc rehearing. The panel majority's novel decision contradicts a long line of established Supreme Court and circuit precedents governing constitutional claims and injunctive relief—including decisions of this and *all* other regional federal circuit courts of appeal. To read the opinion is to establish the necessity of en banc review, which is essential to maintain decisional uniformity and to consider questions of exceptional importance.

1. Courts adjudicating motions to enjoin unconstitutional actions must weigh the familiar preliminary injunction standards set out in *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008): the plaintiff's likelihood of success on the merits, irreparable harm, balance of the equities, and the public interest. Courts are required to consider the first prong, *Sole* v. *Wyner*, 551 U.S. 74, 84 (2007); *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004), which "is arguably the most important."

DOSWASHINGTONSUP01200

*Tesfamichael* v. *Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005); *cf. Laclede Gas Co.* v. *St. Charles County*, 713 F.3d 413, 419-20 (8th Cir. 2013).

If a court refuses to consider a plaintiff's likelihood of success on the merits, it perforce cannot fully assess irreparable harm, nor can it balance the equities. Nor can a court that ignores the merits of a constitutional case comprehend (let alone determine) the public interest, which by definition cannot contradict the Constitution itself.

Accordingly, ten circuits stress the primacy of *Winter*'s first prong in the First Amendment context. *See Sindicato Puertorriqueño de Trabajadores* v. *Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012); *N.Y. Progress & Prot. PAC* v. *Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Stilp* v. *Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs.* v. *Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Liberty Coins, LLC* v. *Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *ACLU of Illinois* v. *Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *Child Evangelism Fellowship of Minn.* v. *Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012); *Verlo* v. *Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott* v. *Roberts*, 612 F.3d 1279, 1297 (11th Cir.

v

2010); *Pursuing America's Greatness* v. *FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Another circuit views the merits prong as potentially decisive in the First Amendment context. *Dish Network Corp.* v. FCC, 653 F.3d 771, 776 (9th Cir. 2011).

The majority's decision, affirming the denial of a preliminary injunction against a censorial prior restraint without regard to the merits, conflicts with *Winter*, *Sole*, *Ashcroft*, and *Tesfamichel*, which mandate a merits analysis; and with the above-cited decisions of *all other regional circuits* holding the merits prong indispensable or potentially dispositive in First Amendment cases.

2. The majority's remarkable holding that the Government may serve the public interest by violating the Constitution conflicts with *Jackson Women's Health Org.* v. *Currier*, 760 F.3d 448 (5th Cir. 2014); *Opulent Life Church* v. *City of Holly Springs Miss.*, 697 F.3d 279 (5th Cir. 2012); *Ingebretsen ex rel. Ingebretsen* v. *Jackson Pub. Sch. Dist.*, 88 F.3d 274 (5th Cir. 1996); *Liberty Coins*, supra, 748 F.3d 682; *Awad* v. *Ziriax*, 670 F.3d 1111 (10th Cir. 2012); and *Pursuing America's Greatness*, supra, 831 F.3d 500, among other opinions.

DOSWASHINGTONSUP01202

TABLE OF CONTENTS

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Statement Pursuant to Fed. R. App. P. 35(b)(1). . . . . . . . . . . . . . . . .  iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vii

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ix

Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

The Course of Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

     1. *The Regulatory Scheme.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

     2. *The Scheme's Application Against Plaintiffs.* . . . . . . . . . . . . . . .  7

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

     I.   THE PANEL MAJORITY'S REFUSAL TO CONSIDER PLAINTIFFS'
          LIKELIHOOD OF SUCCESS ON THE MERITS, IN DECLINING TO
          PRELIMINARILY ENJOIN A CONTENT-BASED PRIOR RESTRAINT,
          CONFLICTS WITH SUPREME COURT PRECEDENT AND THE
          PRECEDENT OF ALL OTHER REGIONAL CIRCUITS. . . . . . . . . . . . .  8

     II.  THE PANEL MAJORITY'S HOLDING THAT CONSTITUTIONAL
          VIOLATIONS MAY SERVE THE PUBLIC INTEREST, DIRECTLY
          CONFLICTING WITH THIS COURT'S PRECEDENT AND THE
          PRECEDENT OF AT LEAST FOUR OTHER COURTS, SHOULD NOT
          EVADE REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

DOSWASHINGTONSUP01203

III.  The Panel Majority Opinion Renders the Court
      A Censor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Appendix:  Panel Opinion

DOSWASHINGTONSUP01204

# TABLE OF AUTHORITIES

## Cases

*ACLU of Illinois* v. *Alvarez,*
    679 F.3d 583 (7th Cir. 2012)............................... v, 10

*Ashcroft* v. *ACLU,*
    542 U.S. 656 (2004). ................................ iv, vi, 8

*AT&T* v. *Winback & Conserve Program,*
    42 F.3d 1421 (3d Cir. 1994). ................................ 11

*Awad* v. *Ziriax,*
    670 F.3d 1111 (10th Cir. 2012)........................... vi, 14

*Child Evangelism Fellowship of Minn.* v. *Minneapolis Special
    Sch. Dist. No. 1,* 690 F.3d 996 (8th Cir. 2012)................ v, 11

*Dish Network Corp.* v. FCC,
    653 F.3d 771 (9th Cir. 2011)............................ vi, 12

*Gordon* v. *Holder,*
    721 F.3d 638 (D.C. Cir. 2013)............................... 14

*Ingebretsen ex rel. Ingebretsen* v. *Jackson Pub. Sch. Dist.,*
    88 F.3d 274 (5th Cir. 1996)............................ vi, 14

*Jackson Women's Health Org.* v. *Currier,*
    760 F.3d 448 (5th Cir. 2014) ............................ vi, 14

*Joelner* v. *Village of Wash. Park,*
    378 F.3d 613 (7th Cir. 2004) ............................... 10

*Laclede Gas Co.* v. *St. Charles County,*
    713 F.3d 413 (8th Cir. 2013) ................................ v

DOSWASHINGTONSUP01205

*Liberty Coins, LLC* v. *Goodman*,
    748 F.3d 682 (6th Cir. 2014)..................... v, vi, 9, 10, 14

*N.Y. Progress & Prot. PAC* v. *Walsh*,
    733 F.3d 483 (2d Cir. 2013). .............................. v, 9

*Nken* v. *Holder*,
    556 U.S. 418 (2009) ....................................... 12

*Opulent Life Church* v. *City of Holly Springs Miss.*,
    697 F.3d 279 (5th Cir. 2012)............................. vi, 14

*Pashby* v. *Delia*,
    709 F.3d 307 (4th Cir. 2013)............................... 11

*Planned Parenthood Ass'n of Utah* v. *Herbert*,
    828 F.3d 1245 (10th Cir. 2016)......................... 12, 14

*Pursuing America's Greatness* v. *FEC*,
    831 F.3d 500 (D.C. Cir. 2016)....................... vi, 10, 14

*Reliable Consultants* v. *Earle*,
    517 F.3d 738 (5th Cir. 2008)............................... 15

*Scott* v. *Roberts*,
    612 F.3d 1279 (11th Cir. 2010) ..................... v, vi, 11-14

*Sindicato Puertorriqueño de Trabajadores* v. *Fortuño*,
    699 F.3d 1 (1st Cir. 2012)................................. v, 9

*Sole* v. *Wyner*,
    551 U.S. 74 (2007). .................................. iv, vi, 8

*Southern Monorail Co.* v. *Robbins & Myers, Inc.*,
    666 F.2d 185 (5th Cir. Unit B 1982). ................... 12, 13

DOSWASHINGTONSUP01206

*Stilp* v. *Contino*,
   613 F.3d 405 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . v, 9, 11

*Tesfamichael* v. *Gonzales*,
   411 F.3d 169 (5th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . v, vi, 9

*United States* v. *Edler Industries*,
   579 F.2d 516 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Verlo* v. *Martinez*,
   820 F.3d 1113 (10th Cir. 2016).. . . . . . . . . . . . . . . . . . . . . . . . . v, 10

*Winter* v. *Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-vi, 9, 10

*WV Ass'n of Club Owners & Fraternal Servs.* v. *Musgrave*,
   553 F.3d 292 (4th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . v, 11

Statutes and Rules

22 C.F.R. § 120.10(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. § 120.17(a)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. § 120.17(a)(4).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22 C.F.R. § 126.7(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

22 U.S.C. § 2278(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

28 U.S.C. § 2778(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

DOSWASHINGTONSUP01207

## Other Authorities

49 Fed. Reg. 47,682 (Dec. 6, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

80 Fed. Reg. 31,525 (June 3, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

81 Fed. Reg. 36,791 (June 8, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

DOSWASHINGTONSUP01208

ISSUES PRESENTED

1. When plaintiffs seek to enjoin a content-based prior restraint on speech, may the Court refuse to determine (let alone weigh) the plaintiffs' likelihood of success on the merits, and deny the injunction solely based upon the Government's assertion of harm?

2. May violating the Constitution serve the public interest?

INTRODUCTION

The Government bars Plaintiffs from posting their own, privately-generated, unclassified speech on the Internet. Because foreigners can read the Internet, the Government claims that to speak on the Internet is to "export" speech. And because Plaintiffs' speech relates to guns, it's deemed to be an arms export requiring a license.

Citing the importance of "national security," the panel majority refused injunctive relief while affirmatively blinding itself to the merits of Plaintiffs' claims. That refusal requires rehearing en banc. Given the strength of Plaintiffs' claims, including the presumptive invalidity of content-based prior restraints on speech; the presumed irreparable harm; and the public interest, Plaintiffs submit that an injunction would issue were their claims heard as precedent requires.

1

DOSWASHINGTONSUP01209

THE COURSE OF PROCEEDINGS

On May 6, 2015, Plaintiffs brought this action in the United States District Court for the Western District of Texas, asserting that the prior restraint at issue is ultra vires, and also violates their First, Second, and Fifth Amendment rights. The District Court denied Plaintiffs' motion for a preliminary injunction on August 4, 2015. ROA.703.

A divided panel of this Court affirmed. "Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement." Op. at 9.

> Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security.

Op. at 10. The majority did not describe this "very strong public interest," beyond reciting that the Government has "stated [an] interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts." *Id*. The majority thus "affirm[ed] the district court's denial and decline[d] to reach the question of whether Plaintiffs-Appellants have demonstrated a substantial likelihood of success on the merits." Op. at 13 (footnote omitted).

2

Judge Jones wrote 27 pages dissenting "from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand." Op. at 15 (Jones, J., dissenting).

FACTUAL BACKGROUND

1. *The Regulatory Scheme*

"In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles . . . ." 22 U.S.C. § 2278(a)(1). Per the International Traffic in Arms Regulations ("ITAR"), "defense articles" are not just physical items, but also "technical data," which includes "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles." 22 C.F.R. § 120.10(a).

"Export" is statutorily undefined. Prior to September 1, 2016, Defendants defined "export" to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Today "export" means "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id.* § 120.17(a)(2). But

3

Defendants continue to claim that speaking to an audience that includes foreigners, or publishing information on the Internet (which foreigners may access), is "exporting" subject to ITAR licensing.

"Technical data" is plainly speech, and it often relates to many applications. Computer science tutorials may advance civilian as well as military purposes. Drone blueprints might assist wedding photography as much as battlefield management. Gun designs may be as useful to civilian gunsmiths and shooters as they are to soldiers.

Accordingly, for nearly forty years, the Executive Branch had warned that using ITAR as a prior restraint on the dissemination of privately generated, unclassified information violates the First Amendment. ROA.226-323. In 1980, defendant Directorate of Defense Trade Controls' ("DDTC") predecessor, the Office of Munitions Control, advised that "[a]pproval is not required for publication of data within the United States . . . [ITAR] does not establish a prepublication review requirement." ROA.332. And in 1984, the State Department removed an ITAR provision that some thought might impose a prior restraint on speech, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984).

4

DOSWASHINGTONSUP01212

Litigation shaped the Government's position. In 1978, the Ninth Circuit overturned a conviction under Section 2278's predecessor and ITAR, because the trial court rejected arguments that the technical data had non-military applications. This constitutional defect could, however, be avoided by reading ITAR to contain a scienter requirement. "If the information could have both peaceful and military applications, as [defendant] contends that its technology does, the defendant *must know or have reason to know* that its information is intended for the prohibited use." *United States* v. *Edler Industries*, 579 F.2d 516, 521 (9th Cir. 1978) (citation omitted) (emphasis added).

Following *Edler*, the Office of Legal Counsel warned the State Department that enforcing ITAR absent a scienter requirement would raise "serious constitutional questions." ROA.248. "For obvious reasons, the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations." ROA.256; *see also* ROA.258-62 (1981 DOJ Memorandum to Commerce Department). The Department of Justice reiterated these concerns in a 1997 report to Congress. ROA.280-323. In subsequent litigation, defendant DDTC took the position that it does *not* regulate the means

5

DOSWASHINGTONSUP01213

by which scientific and technical information enters the public domain, forcefully rejecting claims that ITAR functioned as a prior restraint on public speech. See Addendum to Appellants' Br., at 23, 26, 29-30.

Yet a week before opposing Plaintiffs' preliminary injunction motion, Defendants proposed to amend ITAR to "explicitly set[] forth the Department's requirement of authorization to release information into the 'public domain.'" 80 Fed. Reg. 31,525, 31,528 (June 3, 2015). "A release of 'technical data' may occur by disseminating 'technical data' at a public conference or trade show, publishing 'technical data' in a book or journal article, or posting 'technical data' to the Internet." *Id.* "Posting 'technical data' to the Internet without a Department or other authorization is a violation of the ITAR even absent specific knowledge that a foreign national will read [it]." *Id.* at 31,529. Though the Interim Final Rule omitted this language, 81 Fed. Reg. 35,611 (June 3, 2016), Defendants maintain and defend their prior restraint against Plaintiffs.

A full explication of ITAR's licensing mechanisms is beyond the scope of this pleading, but two points are essential here. First, Defendants have unbridled discretion to deny a license. *See* 22 C.F.R. § 126.7(a)(1) (license may be denied if DDTC "deems such action to be in

6

furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable*") (emphasis added). Second, ITAR lacks any of the procedural safeguards required of content-based prior restraints: (1) a short, defined duration of restraint preceding (2) prompt judicial review, where (3) the censor bears the burden of initiating review and justifying the censorship. See Op. at 35-37 (Jones, J., dissenting). The maximum civil penalty for an unlicensed publication of ITAR-controlled speech is now $1,094,010. 81 Fed. Reg. 36,791 (June 8, 2016). Criminal violations may carry a 20 year sentence. 28 U.S.C. § 2778(c).

2.   *The Scheme's Application Against Plaintiffs*

Defense Distributed generated, and posted on the Internet for free public access, technical information about various gun-related items and a handgun called "The Liberator." ROA.128, ¶3. These Computer Aided Design files, which are utilized in the 3D printing process, were downloaded hundreds of thousands of times. ROA.129, ¶4. But on May 8, 2013, Defendants warned Defense Distributed that this publication potentially violated ITAR and declared that "all such data should be removed from public access immediately." ROA.129, ¶5; ROA.140-41.

7

DOSWASHINGTONSUP01215

Defense Distributed promptly complied, ROA.129, ¶6, and sought a determination of whether ten of its files were subject to ITAR. Nearly two years later, Defendants decided that six of the files were controlled. ROA.500-01. Defense Distributed also sells a machine, the "Ghost Gunner," which mills useful rifle receivers. Defendants subjected several of the machine's files to ITAR. ROA.130, ¶9; ROA.407-08.

ARGUMENT

I. THE PANEL MAJORITY'S REFUSAL TO CONSIDER PLAINTIFFS' LIKELIHOOD OF SUCCESS ON THE MERITS, IN DECLINING TO PRELIMINARILY ENJOIN A CONTENT-BASED PRIOR RESTRAINT, CONFLICTS WITH SUPREME COURT PRECEDENT AND THE PRECEDENT OF ALL OTHER REGIONAL CIRCUITS.

Careful review of the majority's novel methodology would be warranted even absent the acknowledged "importance of the issues presented," Op. at 14, which are self-evident on these facts.

"In deciding whether to grant a preliminary injunction, a district court *must* consider whether the plaintiffs have demonstrated that they are likely to prevail on the merits." *Ashcroft*, 542 U.S. at 666 (emphasis added); *Sole*, 551 U.S. at 84. This is only logical. If the court has no idea whether or which of the plaintiffs' claims are valid, it cannot assess the harm, balance the equities, or grasp the public interest. In this Court,

8

DOSWASHINGTONSUP01216

the merits prong "is arguably the most important." *Tesfamichael*, 411

F.3d at 176. But it is enough that the Supreme Court mandates this

threshold inquiry, necessary for *Winter*'s faithful application.

The Federal Circuit may not have addressed the issue owing to its

limited jurisdiction, but *all* other regional federal circuits stress the

point when injunctions are sought to preserve free speech.

> In the First Amendment context, the likelihood of success on the
> merits is the linchpin of the preliminary injunction analysis . . . [it
> is] incumbent upon the district court to engage with the merits
> before moving on to the remaining prongs of its analysis.

*Sindicato Puertorriqueño de Trabajadores*, 699 F.3d at 10-11 (First

Circuit). "Consideration of the merits is virtually indispensable in the

First Amendment context, where the likelihood of success on the merits

is the dominant, if not dispositive factor." *N.Y. Progress*, 743 F.3d at

488 (Second Circuit). When "suppression of speech in violation of the

First Amendment [is alleged], we focus our attention on the first factor,

i.e., whether [plaintiff] is likely to succeed on the merits of his

constitutional claim." *Stilp*, 613 F.3d at 409 (Third Circuit).

"In the context of a First Amendment claim, the balancing of these

factors is skewed toward an emphasis on the first factor." *Liberty Coins*,

DOSWASHINGTONSUP01217

748 F.3d at 690 (Sixth Circuit). "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Id.* (quotation omitted); *see also ACLU of Illinois*, 679 F.3d at 589-590 (same) (Seventh Circuit); *Pursuing America's Greatness*, 831 F.3d at 511 (same) (D.C. Circuit); *Verlo*, 820 F.3d at 1126 (same, "because of the seminal importance of the interests at stake") (Tenth Circuit). "[I]t is *sometimes* necessary to inquire beyond the merits." *Joelner* v. *Village of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) (emphasis added).

In First Amendment cases, courts ascribe the merits prong decisive or strongly persuasive value because as goes the merits question, so, nearly often or always, go the other interrelated *Winter* prongs.

> [B]ecause the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is, and will be in this case, whether the statute at issue is likely to be found constitutional.

*Liberty Coins*, 748 F.3d at 690 (quotation omitted). As "irreparable harm is 'inseparably linked' to the likelihood of success on the merits of

10

plaintiff's First Amendment claim," the Fourth Circuit "focus[es] our review on the merits of Plaintiff's First Amendment claim." *WV Ass'n*, 553 F.3d at 298. That court further holds that in appropriate cases, the likelihood of success on the merits can also "satisf[y] the public interest prong." *Pashby* v. *Delia*, 709 F.3d 307, 330 (4th Cir. 2013).

In the Eighth Circuit, a "likely First Amendment violation further means that the public interest and the balance of harm . . . favor granting the injunction." *Child Evangelism*, 690 F.3d at 1004. The Third Circuit accepted a defendant's concession "that, if we find that [plaintiff] is likely to succeed on the merits, the other requirements for a preliminary injunction are satisfied." *Stilp*, 613 F.3d at 409. "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T* v. *Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

The Eleventh Circuit holds that owing to "the severity of burdens on speech" and the fact that "the public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law," a First Amendment plaintiff "is entitled to relief if his claim is likely to

11

succeed." *Scott*, 612 F.3d at 1297 (citations omitted); *Planned Parenthood Ass'n of Utah* v. *Herbert*, 828 F.3d 1245, 1265-66 (10th Cir. 2016). In the Ninth Circuit, "a First Amendment claim 'certainly raises the specter' of irreparable harm and public interest considerations," even if "proving the likelihood of such a claim is not enough to satisfy *Winter*." *Dish Network*, 653 F.3d at 776 (quotation omitted).

Without acknowledging the overwhelming weight of contrary precedent, the panel majority rested its discordant decision on an old trademark case cited neither by the District Court nor Defendants, *Southern Monorail Co.* v. *Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982). That case refused to presume irreparable harm even were the plaintiff likely to prevail, contrary to the practice in constitutional cases, where irreparable harm is presumed (as the majority acknowledged, Op. at 8-9 & n.8), and upheld the denial of an injunction solely on a balancing of the equities.

But this is not a trademark case. Where the Government is the defendant, the balance of harms and public interest prongs are merged. *Nken* v. *Holder*, 556 U.S. 418, 435 (2009) (stay context). The Government exists to serve the public interest—and the highest public

12

DOSWASHINGTONSUP01220

interest is ensuring fidelity to the Constitution. "[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law." *Scott*, 613 F.3d at 1297 (citation omitted).

*Southern Monorail* has never been applied in the constitutional context, nor should it have been applied here.

## II.   THE PANEL MAJORITY'S HOLDING THAT CONSTITUTIONAL VIOLATIONS MAY SERVE THE PUBLIC INTEREST, DIRECTLY CONFLICTING WITH THIS COURT'S PRECEDENT AND THE PRECEDENT OF AT LEAST FOUR OTHER COURTS, SHOULD NOT EVADE REVIEW.

Popular lore holds constitutional rights as "technicalities" that merely frustrate hard-nosed law enforcement efforts to protect the public. Although American courts do not usually share the sentiment, the panel majority adopted it. Accordingly, notwithstanding the page limits in effect here, this passage warrants a double-take:

> Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security.

Op. at 10. Would the public interest elevate the police's "asserted" crime-fighting interests over the Fourth Amendment? After all, more Americans are harmed by domestic criminals wielding factory-produced guns than by imaginary foreigners carrying 3D-printed guns.

13

This Court's precedent rejects the majority's view. "[I]t is *always* in the public interest to prevent the violation of a party's constitutional rights." *Jackson*, 760 F.3d at 458 n.9 (quoting *Awad*, 670 F.3d at 1132) (Tenth Circuit)) (emphasis added); *accord Planned Parenthood of Utah*, 828 F.3d at 1266. "Always." Not "usually, unless the Government asserts an interest," but "always." This proposition is "obvious." *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). "[I]t may be assumed that the Constitution is the ultimate expression of the public interest." *Id.* (quotation omitted).

Three circuits have employed an absolute public interest standard in free speech cases. "[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing America's Greatness*, 831 F.3d at 511; *Liberty Coins*, 748 F.3d at 690; *Scott*, 612 F.3d at 1297.

In the free speech context, this Court has styled the rule in the double-negative. "[W]here a law violates the First Amendment 'the public interest [is] not disserved by an injunction preventing its implementation.'" *Opulent Life Church*, 697 F.3d at 298 (quoting *Ingebretsen*, 88 F.3d at 280). Given the obviousness of *Jackson*'s

14

DOSWASHINGTONSUP01222

unambiguous holding, a blunter restatement of the concept as applied to the First Amendment should not be required. But it is.

III.   THE PANEL MAJORITY OPINION RENDERS THE COURT A CENSOR.

The majority's unbalanced analysis has the effect of placing the Court in the Government's censorial position. Suppose that Saudi Arabia refused the United States essential military cooperation, so long as Saudi citizens could access Americans' online files related to the 3D printing of the devices secured in *Reliable Consultants* v. *Earle*, 517 F.3d 738 (5th Cir. 2008). Would "national security" justify the State Department in ordering Americans to take down their web sites?

Americans reading the panel opinion may wonder whether the content of their speech determines whether this Court would hear the merits of their First Amendment claims. The majority's merits-free, First Amendment-free approach must apply to everyone, or to no one.

CONCLUSION

If the Court is unprepared to do away with preliminary injunctions to secure the right of free speech, it should conform its decisional law to the Supreme Court's requirements and adopt the standards applied in the other circuits. Rehearing en banc should be granted.

15

Dated:  November 4, 2016                    Respectfully submitted,

/s/ Matthew Goldstein                        /s/ Alan Gura
Matthew Goldstein                            Alan Gura
Matthew A. Goldstein, PLLC                       Counsel of Record
1875 Connecticut Avenue, N.W.                GURA PLLC
10th Floor                                   916 Prince Street, Suite 107
Washington, DC 20009                         Alexandria, VA 22314
202.550.0040/Fax 202.683.6679               703.835.9085/Fax 703.997.7665


/s/ William B. Mateja                        /s/ Josh Blackman
William B. Mateja                            Josh Blackman
POLSINELLI P.C.                              1303 San Jacinto Street
2950 N. Harwood, Suite 2100                  Houston, TX 77002
Dallas, TX 75201                             202.294.9003/Fax 713.646.1766
214.397.0030/Fax 214.397.0033


/s/ David S. Morris
William T. "Tommy" Jacks
David S. Morris
FISH & RICHARDSON P.C.
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
512.472.5070/Fax 512.320.8935


Counsel for Appellants


16

DOSWASHINGTONSUP01224

## CERTIFICATE OF SERVICE

On November 4, 2016, I electronically filed the attached Petition for Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in this appeal are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated:November 4, 2016          /s/ Alan Gura
                                Alan Gura

17

DOSWASHINGTONSUP01225

APPENDIX

DOSWASHINGTONSUP01226

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 15-50759

————

United States Court of Appeals
Fifth Circuit

**FILED**

September 20, 2016

Lyle W. Cayce
Clerk

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

        Plaintiffs - Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

        Defendants - Appellees

————

Appeal from the United States District Court
for the Western District of Texas

————

Before DAVIS, JONES, and GRAVES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

        Plaintiffs-Appellants Defense Distributed and Second Amendment Foundation, Inc. have sued Defendants-Appellees, the United States

DOSWASHINGTONSUP01227

No. 15-50759

Department of State, the Secretary of State, the DDTC, and various agency
employees (collectively, the "State Department"), seeking to enjoin
enforcement of certain laws governing the export of unclassified technical data
relating to prohibited munitions. Because the district court concluded that the
public interest in national security outweighs Plaintiffs-Appellants' interest in
protecting their constitutional rights, it denied a preliminary injunction, and
they timely appealed. We conclude the district court did not abuse its discretion
and therefore affirm.

## I.    Background

Defense Distributed is a nonprofit organization operated, in its own
words, "for the purpose of promoting popular access to arms guaranteed by the
United States Constitution" by "facilitating global access to, and the
collaborative production of, information and knowledge related to the 3D
printing of arms; and by publishing and distributing such information and
knowledge on the Internet at no cost to the public." Second Amendment
Foundation, Inc. is a nonprofit devoted more generally to promoting Second
Amendment rights.

Defense Distributed furthers its goals by creating computer files used to
create weapons and weapon parts, including lower receivers for AR-15 rifles.[1]
The lower receiver is the part of the firearm to which the other parts are
attached. It is the only part of the rifle that is legally considered a firearm
under federal law, and it ordinarily contains the serial number, which in part
allows law enforcement to trace the weapon. Because the other gun parts, such
as the barrel and magazine, are not legally considered firearms, they are not

---

[1] The district court capably summarized the facts in its memorandum opinion and
order. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 686-88 (W.D. Tex.
2015). The facts set out in this opinion come largely from the district court's opinion and the
parties' briefs.

2

No. 15-50759

regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.
>
> Both technologies require some instruction set or "recipe"—in the case of 3D printers, computer aided design ("CAD") files, typically

3

DOSWASHINGTONSUP01229

No. 15-50759

in .stl format; for CNC machines, text files setting out coordinates and functions to direct a drill.[2]

Defense Distributed's files allow virtually anyone with access to a 3D printer to produce, among other things, Defense Distributed's single-shot plastic pistol called the Liberator and a fully functional plastic AR-15 lower receiver. In addition to 3D printing files, Defense Distributed also sells its own desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower receivers. With CNC milling files supplied by Defense Distributed, Ghost Gunner operators are able to produce fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case. This case concerns Defense Distributed's desire to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol (the "Published Files"). On May 8, 2013, the State Department sent a letter to Defense Distributed requesting that it remove the files from the internet on the ground that sharing them in that manner violates certain laws. The district court summarized the relevant statutory and regulatory framework as follows:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including

[2] Plaintiffs-Appellants' Original Brief on Appeal.

4

DOSWASHINGTONSUP01230

No. 15-50759

monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu,* 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States,* ——U.S. ——, 134 S. Ct. 365, 187 L. Ed. 2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan,* 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*[3]

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals

---

[3] *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687-88 (W.D. Tex. 2015).

DOSWASHINGTONSUP01231

No. 15-50759

to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR-15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

## District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs-Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online.[4] They also claim violations of the Second and Fifth Amendments. Plaintiffs-Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval is

---

[4] The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR-15 lower receivers with it, as well as all 3D printing files used to produce prohibited weapons and weapon parts.

6

No. 15-50759

needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

Plaintiffs-Appellants sought a preliminary injunction against the State Department, essentially seeking to have the district court suspend enforcement of ITAR's prepublication approval requirement pending final resolution of this case. The district court denied the preliminary injunction, and Plaintiffs-Appellants timely filed this appeal. We review the denial of a preliminary injunction for abuse of discretion, but we review any questions of law de novo.[5]

> To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[6]

We have long held that satisfying one requirement does not necessarily affect the analysis of the other requirements. In *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. Unit B 1982), for example, the district court had denied a preliminary injunction solely because it found that the movant, Robbins & Myers, failed to satisfy the balance of harm requirement. On appeal, Robbins & Myers argued that it had clearly shown a substantial likelihood of success on the merits, and satisfying that requirement should give rise to a presumption of irreparable harm and a presumption that the balance of harm tipped in its favor. We disagreed:

---

[5] *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (footnotes omitted)

[6] *Id.*

7

No. 15-50759

Because we dispose of this case on the balance of harm question, we need not decide and we express no views upon whether a presumption of irreparable injury as a matter of law is appropriate once a party demonstrates a substantial likelihood of success on the merits of an infringement claim. In other words, even assuming arguendo that Robbins & Myers has shown a substantial likelihood of success on the merits of its infringement claim and that irreparable injury should be presumed from such a showing (two issues not addressed by the district court in this case), we still uphold the district court's decision, which rested solely on the balance of harm factor. We agree that Robbins & Myers has failed to carry its burden of showing that the threatened harm to it from the advertisement outweighs the harm to Southern Monorail from the intercept. In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular. *See Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S. Ct. 3016, 65 L. Ed. 2d 1116 (1980) (district court obligated to weigh relative hardship to parties in relation to decision to grant or deny preliminary injunction, even when irreparable injury shown).[7]

The district court concluded that the preliminary injunction should be denied because Plaintiffs-Appellants failed to satisfy the balance of harm and public interest requirements, which do not concern the merits. (Assuming without deciding that Plaintiffs-Appellants have suffered the loss of First and Second Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time,

---

[7] *Id.* at 187-88.

DOSWASHINGTONSUP01234

No. 15-50759

constitutes irreparable injury.[8]) In extensive dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs-Appellants failed to show a likelihood of success on the merits. Plaintiffs-Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs-Appellants continue to bear the burden of persuasion on appeal.

## Analysis

Because the district court held that Plaintiffs-Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs-Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs-Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs-Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

---

[8] *See Def. Distributed*, 121 F. Supp. 3d at 689 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

9

No. 15-50759

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs-Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs-Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24–25, 129 S.

---

[9] *Id.* at 689.
[10] *Id.*

DOSWASHINGTONSUP01236

No. 15-50759

Ct. 365, 172 L. Ed. 2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper,* 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest—and authority—of the President and Congress in matters of foreign policy and export. *See Haig v. Agee,* 453 U.S. 280, 292, 101 S. Ct. 2766, 69 L. Ed. 2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink,* 315 U.S. 203, 222–23, 62 S. Ct. 552, 86 L. Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp [contrast] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.][11]

Plaintiffs-Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs-Appellants'

---

[11] *Id*. at 689-90.

DOSWASHINGTONSUP01237

No. 15-50759

interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs-Appellants. We cannot say the district court abused its discretion on these facts.

Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs-Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs-Appellants argue that this result is absurd because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs-Appellants would allow them to share online not only the Published Files but also any new, previously unpublished files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs-Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR-15 lower receivers and additional 3D-printed weapons and weapon parts. Even if Plaintiffs-Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would remain online essentially forever, hosted by foreign websites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs-Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would function, in effect, as a

12

DOSWASHINGTONSUP01238

No. 15-50759

permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs-Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs-Appellants' preliminary injunction based on their failure to carry their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs-Appellants have demonstrated a substantial likelihood of success on the merits.[12]

---

[12] The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs-Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."

We note the following: (1) If Plaintiffs-Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that it would be legal. The question presented in this case is whether Plaintiffs-Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs-Appellants previously made available online. Plaintiffs-Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs-Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs-Appellants' strong First Amendment interest.

As to the dissent's extensive discussion of Plaintiffs-Appellants' likelihood of success on the merits of the First Amendment issue, we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs-Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

13

No. 15-50759

We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

## Conclusion

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

DOSWASHINGTONSUP01240

No. 15-50759

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles." I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

## I.

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle-15 magazine,[1] and a handgun named "The Liberator." None of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions. In these respects the information was no different from technical data available through multiple Internet sources from widely diverse publishers. From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun. The Liberator technology

---

[1] The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR-15, a registered trademark of Colt's Inc. AR-15, Registration No. 0,825,581.

DOSWASHINGTONSUP01241

No. 15-50759

drew considerable press attention[2] and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

> DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.
>
> Pursuant to §127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under §120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet. Because violations of the cited regulations carry severe civil and criminal penalties,[3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC. It took

---

[2] According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

[3] Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years. 28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

16

DOSWASHINGTONSUP01242

No. 15-50759

the government entities two years to refuse to exempt most of the files from the licensing regime.

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint[4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information. There is also little certainty that the government will confine its censorship to Internet publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S. Ct. 2140 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–97 (5th Cir. 2012). Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled: intermediate scrutiny is

---

[4] To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

17

DOSWASHINGTONSUP01243

No. 15-50759

inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005)—the district court's balancing of harms went awry.[5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

---

[5] *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185–86. Second, "the district court denied the injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

18

DOSWASHINGTONSUP01244

No. 15-50759

## II.

### A.    Regulatory Framework

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain."

19

DOSWASHINGTONSUP01245

No. 15-50759

22 C.F.R. § 120.10(b).  Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community."  22 C.F.R. § 120.11(a).[6]

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department.  22 C.F.R. § 127.1(a)(1).  When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly, as, *inter alia*, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad."  22 C.F.R. § 120.17(a)(4).[7]

---

[6] This provision only appears to permit dissemination of information *already* in the public domain.  Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval.  80 Fed. Reg. at 31,528.  The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit.  *See id.*

[7] Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id.* § 120.17(a)(2); *see also* International Traffic in Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016).  Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)."  This, of course, is the open-ended definition of "export" urged by the State Department in this litigation.  *See* International Traffic in Arms:  Revisions to Definitions of Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015).  The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place." 81 Fed. Reg. at 35,613.

DOSWASHINGTONSUP01246

No. 15-50759

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)–(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the

21

DOSWASHINGTONSUP01247

No. 15-50759

plaintiff's commodity jurisdiction applications. Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] . . . items as defense articles or defense services." 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1. [8]

Should the DDTC determine, as here, that technical data are subject to the ITAR, an "export" license is required before the information may be posted online. But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a)(1). There is a nominal 60-day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review. *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors. Previous prosecutions have targeted defendants, *e.g.*, who

---

[8] While 22 U.S.C. § 2778 (h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act. I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution. *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action . . . and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) (Agency "shenanigans" are "properly reviewable . . . under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

22

DOSWASHINGTONSUP01248

No. 15-50759

attempted to deliver WMD materials to North Korea, who sought to distribute drone and missile schematics to China, and who attempted to license chemical purchasing software to companies owned by the Iranian government.[9]  Defense Distributed agrees, moreover, that the Government may prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice.  *See*, *e.g.*, *United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA.  Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay.  Moreover, technology has not stood still:  design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials.  *See*, *e.g.*, Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrintBoard.com (Nov. 23, 2015) (site visited 9/14/2016).

## B.    Discussion

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks

---

[9] *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO-RELATED CRIMINAL CASES *(January 2009 to the present: updated August 12, 2015)* 3, 11, 86 (2015), *available at* https://www.pmddtc.state.gov/compliance/ documents/OngoingExportCaseFactSheet.pdf.

23

No. 15-50759

statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsam*, 163 F.3d 858, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987)); *Export, Black's Law Dictionary* (10th ed. 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country").

---

[10] For simplicity only, I do not here address plaintiffs' vagueness claim.

[11] It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227–28, 121 S. Ct. 2164, 2171–72 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

24

DOSWASHINGTONSUP01250

No. 15-50759

As the court explained in *Ehsam*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id. See also Swan v. Finch Co. v. United States*, 190 U.S. 143, 145 (1903) (the "legal notion...of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another"). As against a claim that the rule of lenity should apply, the *Ehsam* court explicitly held that "export" is unambiguous. *Id. at* 859–60

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (internal quotation omitted). Pursuant to *Chevron,* where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S. Ct. 2778, 2781 (1984). The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well. Under

25

No. 15-50759

the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data." Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful, non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable. In terms of the regulations themselves, how this expansive definition of "export" interacts with the "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons. The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable. Even if these regulations are

26

DOSWASHINGTONSUP01252

No. 15-50759

consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. *Cf. Bond*, 134 S. Ct. at 2090 ("[s]aying that a person 'used a chemical weapon conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.' " Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also id.* at 574–75 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance]. . . is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the

27

DOSWASHINGTONSUP01253

No. 15-50759

request for administrative deference."). As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its constitutional significance, throughout the forty-year history of the AECA. It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2. The First Amendment—Content-based speech restriction.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter;" consequently, even a viewpoint neutral law can be content-based. *Id.* at 2230. "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting. As applied to the publication of Defense Distributed's files, this process is a content-based restriction on the petitioners' domestic speech "because of the topic discussed." *Reed*, 135 S. Ct. at 2227. Particularly relevant to this case is *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 27–28, 130 S. Ct. 2705, 2723–24 (2010),

28

No. 15-50759

in which the Supreme Court held that as applied, a criminal statute forbidding the provision of material support and resources to designated terrorist organizations was content based and required strict scrutiny review. The Court there rejected the government's assertion that although the plaintiffs were going to provide legal training and political advocacy to Mideast terrorist organizations, the statute criminalized "conduct" and only incidentally affected "speech." Rejecting this incidental burden argument for intermediate scrutiny review, the Court stated the obvious: "[p]laintiffs want to speak to the PKK and the LTTE, and whether they may do so under §2239B depends on what they say:" if their speech concerns "specialized knowledge" it is barred, but it "if it imparts only general or unspecialized knowledge" it is permissible). *Humanitarian Law Proj.*, 130 S. Ct. at 2724.

The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir. 2001) (discussing level of scrutiny owed for "speech" in the form of a decryption computer program). There are CAD files on the Internet and designs, drawings, and technical information about myriad items—jewelry, kitchen supplies, model airplanes, or clothing, for example—that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation.[12]

---

[12] The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134–35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for

29

No. 15-50759

The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [] interference with ingress or egress, [] visual clutter, or [] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters*. 485 U.S. 312, 321, 108 S. Ct. 1157, 1163–64 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners—foreign nationals—from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department:

---

attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S. Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, Mak's prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

30

DOSWASHINGTONSUP01256

No. 15-50759

its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions. Second, CAD files do not "direct a computer" to do anything. As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials." The person must provide know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional. In effect, the "functionality" of CAD files differs only in degree from that of blueprints. Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here. *Corley,* 273 F.3d at 449–55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny. The district court erred in applying the lower intermediate scrutiny standard. I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML. The critical issue is instead whether the government's prepublication approval scheme is narrowly tailored to achieve that end. A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S. Ct. 501, 511 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case. To prevent foreign nationals from accessing

31

DOSWASHINGTONSUP01257

No. 15-50759

technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC. No matter that citizens have no intention of assisting foreign enemies directly, communications about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech. This flies in the face of *Humanitarian Law Project*. Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations…[or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36–39, 130 S. Ct. at 2729–30. The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness. First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain. This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage. Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the government would not definitively answer whether the State Department would purport to regulate the posting of such

32

DOSWASHINGTONSUP01258

No. 15-50759

unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones.[13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i) (technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude

---

[13] *See* Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

DOSWASHINGTONSUP01259

Case: 15-50759     Document: 00513636006     Page: 64     Date Filed: 09/00/2016
Case 2:20-cv-00111-RAJ   Document 107-22   Filed 09/23/20   Page 691 of 996

No. 15-50759

the Internet) before publication in the CNET article. On the Government's theory, journalists could be subject to the ITAR for posting articles online.

The State Department also asserts that, somehow, the information published by Defense Distributed would have survived regulatory scrutiny (query before or after submission to DDTC?) if the company had "verified the citizenship of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Government brief at 20. Whatever this means, it is a ludicrous attempt to narrow the ambit of its regulation of Internet publications. Everyone knows that personally identifying information can be fabricated on electronic media. Equally troubling, if the State Department truly means what it says in brief about screening out foreign nationals, then the "public domain" exception becomes useless when applied to media like print publications and TV or to gatherings open to the public.

In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press. Indeed, the State Department turns freedom of speech on its head by asserting, "The possibility that an Internet site could also be used to distribute the technical data domestically does not alter the analysis...." The Government bears the burden to show that its regulation is narrowly tailored to suit a compelling interest. It is not the public's burden to prove their right to discuss lawful, non-classified, non-restricted technical data. As applied to Defense Distributed's online publication, these overinclusive regulations cannot be narrowly tailored and fail strict scrutiny.

3. The First Amendment--Prior Restraint.

The Government's prepublication approval and licensing scheme also fails to pass constitutional muster because it effects a prior restraint on speech.

DOSWASHINGTONSUP01260

No. 15-50759

The classic description of a prior restraint is an "administrative [or] judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993)). The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S. Ct. 596, 604 (1990). Generally, speech licensing schemes must avoid two pitfalls. First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S. Ct. 2138, 2144 (1988)). "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S. Ct. 2395, 2402–03 (1992).

Second, content-based[14] prior restraints must contain adequate procedural protections. The Supreme Court has requires three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress

---

[14] As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based. Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland*.

35

No. 15-50759

the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003) (citing *Friedman v. Maryland*, 380 U.S. 51, 58–59, 85 S. Ct. 734, 739 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S. Ct. 935, 938 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data.[15]

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's

---

[15] Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable.*" 22 C.F.R. § 126.7(a)(1) (emphasis added).

DOSWASHINGTONSUP01262

No. 15-50759

discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S. Ct. at 2150–51. Like the "illusory 'constraints'" in *Lakewood*, *id.* at 769, the ITAR prepublication review scheme offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770. *Cf. Humanitarian Law Project,* 130 S. Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45-day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly brief. *See Teitel Film Corp. v. Cusak,* 390 U.S. 139, 141, 88 S. Ct. 754, 756 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint

37

No. 15-50759

scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D-4, LLC,* 541 U.S. 774, 781, 124 S. Ct. 2219, 2224 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas*, interpreting *Freedman*'s "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C.    The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case.    No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations.    Yet the Executive's mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights.    The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971) (reversing the grant of an injunction precluding the *New York Times* and the *Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945–1967); *id.* at 730 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

38

DOSWASHINGTONSUP01264

No. 15-50759

the protection as to previous restraint is not absolutely unlimited.  But the limitation has been recognized only in exceptional cases . . . .[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications.  The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S. Ct. 625, 631 (1931); *cf. Haig v. Agee*, 453 U.S. 280, 306–08, 101 S. Ct. 2766, 2781–82 (1981) (holding that the Secretary of State's revocation of Haig's passport did not violate First Amendment rights because his actions exposing undercover CIA agents abroad threatened national security).  No such exceptional circumstances have been presented in this case.   Indeed, all that the majority can muster to support the government's position here is that

> the State Department's stated interest in preventing foreign nationals—including manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else.[16] With that kind of reasoning, the State Department could wholly eliminate the "public domain" and "scholarly" exceptions to the ITAR and require pre-publication approval of all USML-related technical data.  This is clearly not

---

[16] The State Department notes the fear that a single-shot pistol undetectable by metal-sensitive devices could be used by terrorists.  The Liberator, however, requires a metal firing pin.

39

No. 15-50759

what the Supreme Court held in the *Pentagon Papers* or *Near* cases. *See generally* L.A. Powe, Jr., The H-Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms.[17]

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA. The State Department's sudden turnabout severely undercuts its argument that prepublication review and licensing for the publication of unclassified technical data is justified by pressing national security concerns. Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals. Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in

---

[17] The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States. Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project*) is dangerous and unprecedented.

40

No. 15-50759

libraries, and in magazines. The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face First Amendment problems because the government may rarely prevent the dissemination of truthful information.[18]

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996). Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States." *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is subject to doubt, based on

---

[18] DEPARTMENT OF JUSTICE, 1997 REPORT ON THE AVAILABILITY OF BOMBMAKING INFORMATION 3, 5–7, 19–29 (1997).

41

No. 15-50759

the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure). . . to a foreign person . . . in the United States or abroad." *Id.* § 120.17(a)(4).

***

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights.   The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain."  It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists.  Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be implicated on the USML.   This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable. I earnestly hope that the district court, on remand, will take the foregoing discussion to heart and relieve Defense Distributed of this censorship.

DOSWASHINGTONSUP01268

No. 15-50759

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

Defendants-Appellees

On Appeal from the United States District Court
for the Western District of Texas

## OPPOSITION TO PETITION FOR REHEARING EN BANC

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney General*

RICHARD L. DURBIN, JR.
*United States Attorney*

MICHAEL S. RAAB
DANIEL TENNY
*Attorneys, Appellate Staff*
*Civil Division, Room 7215*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1838*

## CERTIFICATE OF INTERESTED PERSONS

*Defense Distributed v. U.S. Department of State*, No. 15-50759.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiffs-appellants:

Defense Distributed
Second Amendment Foundation, Inc.

Defendants-appellees:

United States Department of State
John F. Kerry, Secretary of State
Directorate of Defense Trade Controls
Kenneth B. Handelman, Deputy Assistant Secretary of State (individual capacity only)
Brian H. Nilsson, Deputy Assistant Secretary of State (official capacity only)[*]
C. Edward Peartree, Director, Office of Defense Trade Controls Policy
Sarah J. Heidema, Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy
Glenn Smith, Senior Advisor, Office of Defense Trade Controls

Amici for Plaintiffs-Appellants:

Representative Thomas Massie (Kentucky)
Representative Brian Babin (Texas)
Representative K. Mike Conaway (Texas)
Representative Jeff Duncan (South Carolina)

---

[*] Pursuant to Federal Rule of Civil Procedure 25(d) and Federal Rule of Appellate Procedure 43(c)(2), Mr. Nilsson has been automatically substituted for his predecessor for purposes of the official-capacity claims.

Representative Blake Farenthold (Texas)
Representative John Fleming (Louisiana)
Representative Paul Gosar (Arizona)
Representative Walter Jones (North Carolina)
Representative Mike Kelly (Pennsylvania)
Representative Steve King (Iowa)
Representative Raúl Labrador (Idaho)
Representative Jeff Miller (Florida)
Representative Bill Posey (Florida)
Representative Todd Rokita (Indiana)
Representative Daniel Webster (Florida)
Cato Institute
Electronic Frontier Foundation
Madison Society Foundation, Inc.
Reporters Committee for Freedom of the Press
Texas Public Policy Foundation
Thomas Jefferson Center for the Protection of Free Expression

Amicus for defendants-appellees:

Brady Center to Prevent Gun Violence

Counsel:

For plaintiffs-appellants:

Alan Gura, Gura & Possessky, PLLC
Matthew A. Goldstein, Matthew A. Goldstein, PLLC
William B. Mateja, Fish & Richardson P.C.
William T. "Tommy" Jacks, Fish & Richardson P.C.
David Morris, Fish & Richardson P.C.
Josh Blackman

For defendants-appellees:

Benjamin C. Mizer, U.S. Department of Justice
Richard L. Durbin, Jr., U.S. Department of Justice
Anthony J. Coppolino, U.S. Department of Justice
Stuart J. Robinson, U.S. Department of Justice
Zachary C. Richter, U.S. Department of Justice
Eric J. Soskin, U.S. Department of Justice

ii

DOSWASHINGTONSUP01271

Michael S. Raab, U.S. Department of Justice
Daniel Tenny, U.S. Department of Justice

For amici Members of Congress:

Raffi Melkonian, Wright & Close, LLP

For amicus Cato Institute:

Ilya Shapiro
Randal J. Meyer

For amicus Electronic Frontier Foundation:

Kit Walsh

For amicus Madison Society Foundation, Inc.:

David T. Hardy
Leif A. Olson, The Olson Firm, PLLC

For amicus Reporters Committee:

Bruce D. Brown
Gregg P. Leslie
Hannah Bloch-Wehba

For amicus Texas Public Policy Foundation:

Robert Henneke
Joel Stonedale

For amicus Thomas Jefferson Center:

J. Joshua Wheeler

DOSWASHINGTONSUP01272

For amicus Brady Center:

    John D. Kimball, Blank Rome LLP
    Martin S. Krezalek, Blank Rome LLP
    Nicholas R. Tambone, Blank Rome LLP

                                             *s/ Daniel Tenny*
                                             Daniel Tenny

DOSWASHINGTONSUP01273

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................... 1

STATEMENT ......................................................................................................... 2

ARGUMENT .......................................................................................................... 8

    A.    Plaintiffs cannot establish that they are entitled to a preliminary
injunction......................................................................................... 8

    B.    The panel was not compelled to determine the likelihood of
success on the merits .................................................................... 11

CONCLUSION ................................................................................................... 15

CERTIFICATE OF SERVICE

DOSWASHINGTONSUP01274

# TABLE OF AUTHORITIES

**Cases:**                                                                                      **Page(s):**

*American Civil Liberties Union v. Clapper,*
   804 F.3d 617 (2d Cir. 2015) ........................................................................ 13

*Gordon v. Holder,*
   721 F.3d 638 (D.C. Cir. 2013) ..................................................................... 13

*Jackson Women's Health Org. v. Currier,*
   760 F.3d 448 (5th Cir. 2014) ................................................................. 10, 13

*Nken v. Holder,*
   556 U.S. 418 (2009) .............................................................................. 10, 11

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.,*
   418 F.3d 535 (5th Cir. 2005) ........................................................................ 8

*Pearson v. Callahan,*
   555 U.S. 223 (2009) .................................................................................... 12

*PDK Labs. Inc. v. U.S. Drug Enforcement Admin.,*
   362 F.3d 786 (D.C. Cir. 2004) ..................................................................... 12

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) .................................................................................... 12

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................................................ 11

**Statutes:**

Arms Export Control Act, 22 U.S.C. § 2751 *et seq.* ........................................... 2

22 U.S.C. § 2778(a)(1) ........................................................................................ 2

22 U.S.C. § 2778(a)(2) ........................................................................................ 2

22 U.S.C. § 2778(b)(2) ........................................................................................ 3

DOSWASHINGTONSUP01275

**Regulations:**

International Traffic in Arms Regulations, 22 C.F.R. §§ 120-130 .................................. 3

22 C.F.R. § 120.4(a) ............................................................................ 4

22 C.F.R. § 120.4(g) ............................................................................ 4

22 C.F.R. § 120.6 ................................................................................ 3

22 C.F.R. § 120.10(a) .......................................................................... 3

22 C.F.R. § 120.10(a)(1) ..................................................................... 3

22 C.F.R. § 120.10(b) .......................................................................... 3

22 C.F.R. § 120.11(a) .......................................................................... 3

22 C.F.R. § 120.17(a)(1)-(2) ................................................................ 4

22 C.F.R. § 121.1, Category I, item (i) ................................................. 3

**Other Authorities:**

Constitutionality of the Proposed Revision of the International Traffic
in Arms Regulations, 5 Op. O.L.C. 202 (1981) ................................. 4

81 Fed. Reg. 35,611 (June 3, 2016) ..................................................... 4

DOSWASHINGTONSUP01276

# INTRODUCTION

This case concerns the online distribution to foreign nationals of computer files that enable anyone with a 3-D printer or related device to produce an operable firearm. The files allow the "largely automated" creation of plastic firearms that can be immune to detection by conventional security measures such as metal detectors, as well as "fully functional, unserialized, and untraceable metal AR-15 lower receivers." Op. 4.

The State Department concluded that its International Traffic in Arms Regulations prohibit the distribution of certain of these files to foreign nationals over the Internet. In this litigation, plaintiff Defense Distributed challenges that determination, asserting a constitutional right "to share all of its . . . files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions." Op. 4. Given the clear and legitimate governmental interest in preventing the spread of firearms worldwide, the panel majority properly concluded that the district court did not abuse its discretion in declining to issue a preliminary injunction against the application of the regulations.

In their rehearing petition, plaintiffs do not dispute the legitimacy or strength of the government's interest, and properly do not contend that the factual conclusions of the panel majority are erroneous or warrant en banc review. Instead, plaintiffs suggest that the panel majority erred by resolving this appeal on the narrow ground that the district court did not abuse its discretion in concluding that the balance of

harms and the public interest counsel against granting a preliminary injunction, and

that this Court instead was compelled to resolve the constitutional questions

presented in this case. The panel majority acted well within its discretion when it

declined to decide an unnecessary constitutional question. No further review is

warranted.

## STATEMENT

1. The Arms Export Control Act, 22 U.S.C. § 2751 *et seq.*, authorizes the

President, "[i]n furtherance of world peace and the security and foreign policy of the

United States," to "control the import and the export of defense articles and defense

services." *Id.* § 2778(a)(1). "[T]he President is authorized . . . to promulgate

regulations for the import and export of such services," and to designate items as

defense articles and defense services by placing them on the "United States Munitions

List." *Id.* With certain exceptions not relevant here, "no defense articles or defense

services . . . may be exported or imported without a license for such export or

import." *Id.* § 2778(b)(2). "Decisions on issuing export licenses . . . shall take into

account whether the export of an article would contribute to an arms race, aid in the

development of weapons of mass destruction, support international terrorism,

increase the possibility of an outbreak or escalation of conflict, or prejudice the

development of bilateral or multilateral arms control or nonproliferation agreements

or other arrangements." *Id.* § 2778(a)(2).

DOSWASHINGTONSUP01278

To implement this statute, the Department of State has promulgated the International Traffic in Arms Regulations. 22 C.F.R. §§ 120-130. Those regulations set out the U.S. Munitions List that defines items as defense articles and defense services. They also set out the requirements and procedures for determining whether particular items satisfy the regulatory definitions and, if so, whether a license should be issued to permit their export.

In addition to arms themselves, the U.S. Munitions List includes "[t]echnical data" related to items on the list. 22 C.F.R. § 120.6; *id.* § 121.1, Category I, item (i). "Technical data" includes, among other things, "[i]nformation . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles," including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *Id.* § 120.10(a)(1).[1] The definition of technical data "does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities," nor does it include "information in the public domain." 22 C.F.R. § 120.10(b). Information in the "public domain," in turn, is defined as information "which is published and which is generally accessible or available to the public" in any of a number of forms and locations. *Id.* § 120.11(a).

---

[1] A separate definition applies to "software." *See* 22 C.F.R. §§ 120.10(a), 120.45(f). This case concerns data files that are not classified as software.

3

DOSWASHINGTONSUP01279

Under the "commodity jurisdiction procedure," on request, the State Department provides "a determination of whether a particular article or service is covered by the U.S. Munitions List." 22 C.F.R. § 120.4(a). Commodity-jurisdiction decisions are subject to an appeal procedure. *Id.* § 120.4(g).

The regulations define the "export" of technical data to include sharing such data with a foreign person, within the United States or abroad. 22 C.F.R. § 120.17(a)(1)-(2).[2] The government has thus long prohibited the dissemination of sensitive, but unclassified, information that is essential to the production of munitions.[3]

2. The particular items at issue in this case are computer files that are used for the three-dimensional "printing" (or the related process of "milling") of firearms and firearm components. The computer files enable someone who has a piece of hardware known as a "3-D printer" (or a related device in the context of milling) to

---

[2] Regulations on this topic were altered and recodified in various respects effective September 1, 2016, but the regulations have restricted transfers of technical data to foreign persons throughout the course of this litigation. *See* Interim Final Rule, 81 Fed. Reg. 35,611 (June 3, 2016).

[3] Although plaintiffs suggest that the Executive Branch has expressed concerns about the constitutionality of the regulations, those concerns related to genuine scientific exchanges. *See, e.g.*, Department of State, Munitions Control Newsletter (Feb. 1980) [ROA.332] (discussing "scientific exchanges of basic mathematical and engineering research data" related to cryptography); Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 212 (1981) [ROA.254] (discussing "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest").

4

DOSWASHINGTONSUP01280

click a button and have the printer create, out of raw materials, a firearm or parts of a firearm. The files "allow virtually anyone with access to a 3D printer to produce, among other things," a "single-shot plastic pistol" and "fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion." Op. 4.

The present dispute arose when the State Department sent a letter to Defense Distributed (the putative distributor of the computer files discussed above) identifying as potentially subject to the International Traffic in Arms Regulations some computer files that had been posted on the Internet. At the State Department's request, Defense Distributed submitted a commodity-jurisdiction request for these files and, subsequently, for other files of a similar nature. The State Department ultimately concluded that some, but not all, of the computer files at issue were subject to State Department jurisdiction. *See* Commodity Jurisdiction Determination (June 4, 2015) [ROA.500]. The agency's determination relied on the fact that the files in question had the functional capability to facilitate the manufacture of defense articles in a manner that was not previously available. Aguirre Decl. ¶ 29 [ROA.567-68].

3. In this lawsuit, Defense Distributed and the Second Amendment Foundation asserted that the government was acting ultra vires, that the government's actions violated the First, Second, and Fifth Amendments to the U.S. Constitution, and that the individual defendants were liable for damages because they engaged in practices that were contrary to clearly established law. *See* Compl. ¶¶ 41-59 [ROA.21-

DOSWASHINGTONSUP01281

24].[4]  As relevant here, plaintiffs sought a preliminary injunction that would have
prevented the government from enforcing the International Traffic in Arms
Regulations as to either the files that Defense Distributed had submitted for
commodity-jurisdiction review or any other files that Defense Distributed might
create in the future.  Proposed Order [ROA.82].

The district court denied the requested injunction.  The court observed that
while plaintiffs had asserted that they suffered irreparable injury in the form of a
deprivation of constitutional rights, a determination whether a preliminary injunction
is warranted also requires "weighing . . . the respective interests of the parties and the
public."  Order 6 [ROA.684].  Here, plaintiffs "fail[ed] to consider the public's keen
interest in restricting the export of defense articles," and "the interest—and
authority—of the President and Congress in matters of foreign policy and export."
*Id.* [ROA.684].  The court concluded that plaintiffs had not "met their burden as to
the final two prongs necessary for granting . . . a preliminary injunction."  *Id.* at 7
[ROA.685].  But "in an abundance of caution," the court also addressed plaintiffs'
likelihood of success on the merits, and ultimately concluded that their motion was
lacking in that respect as well.  *Id.* at 7-9 [ROA.685-87].

---

[4] This appeal involves only claims against the government agencies and the
official-capacity defendants, and this brief is filed on their behalf only.  Claims for
damages against the individual-capacity defendants are still pending in the district
court.

DOSWASHINGTONSUP01282

4. This Court affirmed the denial of the preliminary injunction. The panel majority agreed with the district court that plaintiffs "failed to give *any* weight to the public interest in national defense and national security." Op. 9 (emphasis in original). While "[o]rdinarily, of course, the protection of constitutional rights would be the highest public interest at issue in a case," here, "the State Department has asserted a very strong public interest in national defense and national security." *Id.* at 10 (emphasis omitted). "[T]he State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest." *Id.*

The Court observed that if a preliminary injunction were granted, plaintiffs "would legally be permitted to post on the internet as many . . . files as they wish," including files "for producing AR-15 lower receivers and additional 3D-printed weapons and weapon parts." Op. 12. The harm caused by such posting would be permanent: even if plaintiffs did not ultimately prevail, "the files posted in the interim would remain online essentially forever." *Id.* This concern "is not a far-fetched hypothetical," as the files initially posted by plaintiffs are still available on foreign websites, and plaintiffs "have indicated they will share additional, previously unreleased files as soon as they are permitted to do so." *Id.* Because those files, once released, would remain available forever, "the national defense and national security

7

DOSWASHINGTONSUP01283

interest would be harmed forever." *Id.* at 12-13. Any harm to plaintiffs' interests

from the denial of a preliminary injunction, in contrast, would be temporary. *Id.*

Judge Jones dissented, stating that she would have concluded that plaintiffs had

a likelihood of success on the merits of their First Amendment claim.

## ARGUMENT

### A.    Plaintiffs cannot establish that they are entitled to a preliminary injunction.

The district court applied the familiar four-factor test for assessing whether a

preliminary injunction should be entered, assessing (1) whether plaintiffs have a

substantial likelihood of success on the merits; (2) whether plaintiffs would suffer

irreparable harm in the absence of an injunction; (3) whether plaintiffs' threatened

injury outweighs the threatened harm to the government; and (4) whether granting a

preliminary injunction would disserve the public interest. *See PCI Transp., Inc. v. Fort*

*Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). The district court concluded

that if plaintiffs' First Amendment claim were meritorious, they would have

established that they would suffer irreparable harm, but the court determined that the

harm to plaintiffs would not outweigh the harm to the government from a preliminary

injunction, and a preliminary injunction would not be in the public interest. The

district court then determined that plaintiffs did not have a likelihood of success on

the merits in any event.

DOSWASHINGTONSUP01284

In affirming the district court's judgment, this Court likewise adhered to the longstanding four-part test for determining whether a preliminary injunction is warranted. This Court agreed with the district court that the balance of harms and the public interest favored the government and that a preliminary injunction was therefore not warranted, regardless of whether plaintiffs could establish a likelihood of success on the merits (and thereby establish irreparable harm in the form of a deprivation of constitutional rights).

This Court's analysis was correct. The government plainly has a legitimate interest in preventing the dissemination of computer files that would allow the overseas production of "fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion." Op. 4. This Court properly concluded that the government's stated interest in this case "lies squarely within" the government's interest in "national defense and national security." *Id.* at 10.

On the other side of the ledger, plaintiffs' rehearing petition does not attempt to identify any practical problems that would arise from awaiting final resolution of the litigation before posting more files on the Internet. Instead, they rest solely on the abstract proposition that the curtailment of constitutional rights constitutes irreparable harm. In the absence of a showing by plaintiffs that some concrete, practical harm would befall them in the absence of a preliminary injunction, plaintiffs have no basis for suggesting that the district court abused its discretion when it determined that the balance of harms did not favor the plaintiffs. Moreover, plaintiffs

9

do not dispute that they remain free to share their files domestically with fellow Americans and to engage in scientific and technical discussions about 3-D printing.

Plaintiffs emphasize that their constitutional claim, if ultimately vindicated, would support their claim of irreparable harm. But neither the district court nor this Court suggested otherwise. *See* Op. 8-9 (noting that district court had properly held that plaintiffs would satisfy irreparable-harm requirement if their constitutional rights were violated). "The district court's decision was based not on discounting Plaintiffs-Appellants' interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs-Appellants." *Id.* at 11-12.

Plaintiffs misinterpret the recognition by this Court and others that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quotation marks omitted). The fact that there is a public interest supporting plaintiffs does not mean that there are no countervailing public interests, or that the fourth preliminary-injunction factor always favors the plaintiff. In the context of assessing the propriety of stays of deportation, the Supreme Court has recognized that "[o]f course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). But the Court noted that there would also be countervailing factors relevant to the public interest, such that a court is required to assess the public interest

10

DOSWASHINGTONSUP01286

in each individual case, rather than merely presuming that it favors the party seeking the stay.  *See id.*

Here, the panel properly performed a case-specific analysis of the balance of harms, and concluded that the district court did not abuse its discretion.  No further review of that fact-specific determination is warranted.  Rather, the case should proceed to judgment in the district court, and the constitutional question can be resolved, if necessary, on a full record.

**B.     The panel was not compelled to determine the likelihood of success on the merits.**

Plaintiffs do not even attempt to demonstrate in their petition that the balance of harms would favor them if they were able to establish a likelihood on the merits, or that they have a likelihood of success on the merits in this case (much less to establish that either question warrants review by the full Court at this time).  Instead, they assert that the full Court should rehear this case merely because the panel declined to resolve whether plaintiffs were likely to succeed on the merits.

Plaintiffs rightly appear to stop short of insisting that a finding that they had a likelihood of success on the merits would, in itself, entitle them to a preliminary injunction.  The Supreme Court has made clear that "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).  There is nothing novel about the proposition that courts are "not mechanically obligated to

11

grant an injunction for every violation of law"; to the contrary, factors other than likelihood of success on the merits are "commonplace considerations," and evaluating those factors is "a practice with a background of several hundred years of history." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (quotation marks omitted).

Thus, plaintiffs cannot establish that assessment of likelihood of success on the merits, even if resolved favorably to them, would alter the outcome of this appeal. For the reasons given above, the panel properly concluded that plaintiffs were not entitled to a preliminary injunction.  Having reached that conclusion, the panel reasonably declined to issue an unnecessary constitutional ruling, instead leaving it to the district court to resolve the merits of the case on a more complete record. Plaintiffs' suggestion that the panel was compelled to resolve the constitutional issue cannot be reconciled with "the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  *Pearson v. Callahan*, 555 U.S. 223, 241 (2009) (quotation marks and ellipsis omitted); *see also PDK Labs. Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment) (noting "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more").

Plaintiffs turn this principle on its head by insisting on a categorical rule that, regardless of the circumstances, a court must resolve the likelihood of success on the merits in every First Amendment case involving review of a motion for a preliminary

DOSWASHINGTONSUP01288

injunction.  Plaintiffs highlight the breadth of their proposed methodological requirement by relying on cases involving other constitutional rights, thus apparently suggesting that likelihood of success on the merits must be assessed in every constitutional case on any subject.  *See* Pet. 14 (citing *Jackson Women's Health Org.*, 760 F.3d at 458 & n.9 (Fourteenth Amendment); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (Fifth Amendment)).  Courts have authority to exercise their equitable discretion as appropriate in each individual case, and there is no basis for establishing a broad rule cabining that discretion in large categories of cases.  In some circumstances, as here, declining to resolve a constitutional issue is the prudent course, and plaintiffs provide no justification for depriving courts of that discretion, much less for review by the full Court on this subject.  *See American Civil Liberties Union v. Clapper*, 804 F.3d 617, 626 (2d Cir. 2015) (denying a preliminary injunction while declining to "resolv[e] momentous Constitutional issues").

Plaintiffs correctly observe that in many instances the likelihood of success on the merits in First Amendment cases turns out to be dispositive, or to inform the analysis of the other preliminary-injunction factors.  The panel majority did not suggest otherwise; to the contrary, it explicitly acknowledged that "[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case."  Op. 10 (emphasis in original).  The Court merely acknowledged that the government's interest in this case was different from the interest asserted in other First Amendment cases.  Plaintiffs offer no response.

13

DOSWASHINGTONSUP01289

Instead of grappling with this Court's analysis of the circumstances presented here, plaintiffs seek to analogize this case to other types of First Amendment cases in which the government's interest was essentially the flip side of plaintiffs' First Amendment interest: an interest in preventing a particular form of expression in which the plaintiff sought to engage. Even if likelihood of success on the merits would turn out to be the pivotal question in many such cases, in this case, the government's interest has little if anything to do with the suppression of expression or with a concern that a person will hear plaintiffs' message. Rather, the government's concern relates to the *functional* nature of the data files at issue. Plaintiffs do not dispute that dissemination of their data files on the Internet allows foreign nationals to create "fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion." Op. 4. The government has a legitimate interest in preventing that automated production.

While the government has argued that, for this reason among others, the government's actions in this case do not contravene the First Amendment, for present purposes it suffices that the government has articulated a legitimate interest relevant to the preliminary-injunction analysis, which the district court and this Court were entitled to credit. And as this Court pointed out, plaintiffs "failed to give *any* weight to the public interest in national defense and national security." Op. 9 (emphasis in original). Plaintiffs have no basis for asking the full Court to set aside the balancing conducted by the district court and by this Court.

14

DOSWASHINGTONSUP01290

## CONCLUSION

For the foregoing reasons, the rehearing petition should be denied.

Respectfully submitted,

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney*
*General*

RICHARD L. DURBIN, JR.
*United States Attorney*

MICHAEL S. RAAB

*s/ Daniel Tenny*
DANIEL TENNY
*Attorneys, Appellate Staff*
*Civil Division, Room 7215*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, D.C. 20530*
*(202) 514-1838*
*daniel.tenny@usdoj.gov*

NOVEMBER 2016

15

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2016, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Daniel Tenny*
Daniel Tenny

DOSWASHINGTONSUP01292

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

No. 15-50759

---

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION,
INCORPORATED,

        Plaintiffs - Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His
Official Capacity as the Secretary of the Department of State;
DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State
Bureau of Political Military Affairs; KENNETH B. HANDELMAN,
Individually and in His Official Capacity as the Deputy Assistant Secretary
of State for Defense Trade Controls in the Bureau of Political-Military
Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity
as the Director of the Office of Defense Trade Controls Policy Division;
SARAH J. HEIDEMA, Individually and in Her Official Capacity as the
Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade
Controls Policy; GLENN SMITH, Individually and in His Official Capacity as
the Senior Advisor, Office of Defense Trade Controls,

        Defendants - Appellees

---

Appeal from the United States District Court
for the Western District of Texas

---

ON PETITION FOR REHEARING EN BANC

(Opinion 09/20/2016, 838 F.3d 451)

No. 15-50759

Before DAVIS, JONES, and GRAVES, Circuit Judges.

The Court having been polled at the request of one of its members, and a majority of the judges who are in regular service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED.  In the en banc poll, five judges voted in favor of rehearing (Judges Jones, Smith, Clement, Owen and Elrod) and nine judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Dennis, Prado, Southwick, Haynes, Graves, Higginson and Costa).

ENTERED FOR THE COURT:

/s/ W. Eugene Davis

W. EUGENE DAVIS
UNITED STATES CIRCUIT JUDGE

DOSWASHINGTONSUP01294

No. 15-50759

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, and CLEMENT, Circuit Judges, dissenting from the denial of rehearing *en banc*:

The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint. Judge Jones's cogent panel dissent thoroughly explores the flaws in the panel opinion. I write here to highlight three errors that warrant *en banc* review. First, the panel opinion fails to review the likelihood of success on the merits—which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm. Accordingly, I respectfully dissent from the denial of *en banc* review in this case.

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). In the context of a party seeking a preliminary injunction, we have stressed the importance of determining the likelihood of success on the merits—calling it "arguably the most important factor." *Tesfamichael v. Gonzalez*, 411 F.3d 169, 176 (5th Cir. 2005). Accordingly, ten of our sister circuits have held that the likelihood of success on the merits is a crucial, indispensable inquiry in the First Amendment context. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012); *Child Evangelism Fellowship of Minn. v.*

3

Case: 15-50759     Document: 00513913565     Page: 4     Date Filed: 03/15/2017
Case 2:20-cv-00111-RAJ     Document 107-22     Filed 09/23/20     Page 727 of 996

No. 15-50759

*Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Strikingly, however, the panel opinion entirely fails to address the likelihood of success on the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*.

Moreover, the panel opinion's failure to address the likelihood of success on the merits infects its public interest analysis. A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The panel opinion's failure to address the likelihood of success on the merits denies Defense Distributed a meaningful review of the public interest factor.

The panel opinion's public interest analysis is also flawed because it relies on a mere assertion of a national security interest. *Defense Dist'd v. U.S. Dep't of State*, No. 15-50759, slip op. at 10 (5th Cir. 2016) (noting that the Government "*asserted* a very strong public interest in national defense and national security." (emphasis added)). Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the

DOSWASHINGTONSUP01296

imposition of such a restraint." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citations omitted). To justify a prior restraint, we have held that the Government must show that the "expression sought to be restrained surely will result in direct, immediate, and irreparable damage." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) (*en banc*); *see also N.Y. Times*, 403 U.S. at 730 (Stewart, J., concurring). The Supreme Court has articulated similar requirements: there must be a "requisite degree of certainty [of danger] to justify restraint," there must be no "alternative measures" available, and the restraint must "effectively . . . operate to prevent the threatened danger." *Nebraska Press*, 427 U.S. at 562, 565, 569–70. The Government contends that the gun designs at issue could potentially threaten national security. However, this speculation falls far short of the required showing under *Bernard* and *Nebraska Press*, showing neither the immediacy of the danger nor the necessity of the prior restraint. Allowing such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

The panel opinion's flawed analysis in turn infects its evaluation of irreparable harm. The panel opinion justifies the prior restraint on speech because any harm to Defense Distributed would be "temporary." But irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Even if the panel opinion's "temporary harm" theory were valid, the deprivation here has been anything but short. Instead, as Judge Jones's panel dissent notes, because of the lack of a preliminary

DOSWASHINGTONSUP01297

No. 15-50759

injunction, Defense Distributed has been effectively muzzled for over three years. *Defense Dist'd*, slip op. at 17 (Jones, J., dissenting).

We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times*, 403 U.S. at 719 (Black, J., concurring). Unfortunately, that is exactly what the panel opinion has done. Accordingly, I respectfully dissent from the denial of rehearing *en banc*.

DOSWASHINGTONSUP01298

No. 17-_____

===============================================================

In The

# Supreme Court of the United States

————— ◆ —————

DEFENSE DISTRIBUTED, ET AL.,

*Petitioners,*

v.

UNITED STATES DEPARTMENT OF STATE, ET AL.,

*Respondents.*

————— ◆ —————

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Fifth Circuit**

————— ◆ —————

**PETITION FOR A WRIT OF CERTIORARI**

————— ◆ —————

MATTHEW GOLDSTEIN
MATTHEW A. GOLDSTEIN, PLLC
1875 Connecticut Ave., N.W.
10th Floor
Washington, D.C. 20009
202.550.0040

WILLIAM B. MATEJA
POLSINELLI PC
2950 N. Harwood,
   Suite 2100
Dallas, TX 75201
214.397.0030


August 2017

ALAN GURA
   *Counsel of Record*
GURA PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085
alan@gurapllc.com

JOSH BLACKMAN
1303 San Jacinto Street
Houston, TX 77002
202.294.9003

DAVID S. MORRIS
FISH & RICHARDSON P.C.
111 Congress Ave., Suite 810
Austin, TX 78701
512.472.5070

===============================================================

DOSWASHINGTONSUP01299

i

## QUESTIONS PRESENTED

Petitioners sought to enjoin the government's demand that they obtain an arms-export license prior to publishing otherwise lawful speech whenever that speech is published in a manner accessible by foreigners.

This Court instructs that judges must consider the plaintiff's likelihood of success in weighing a preliminary injunction. Ten circuits agree that a First Amendment plaintiff's likelihood of success on the merits is an essential, often dispositive preliminary injunction factor. But a divided Fifth Circuit panel below expressly declined to consider the merits of Petitioners' claims, and sustained the content-based prior restraint only upon the assertion of a regulatory interest. Additionally, five circuits agree that enforcing the Constitution's requirements is in the public interest. But the majority below held that enforcing constitutional requirements may not serve the public interest as much as the government's application of a content-based prior restraint. The questions presented are:

1.  Whether a court weighing a preliminary injunction must consider a First Amendment plaintiff's likelihood of success on the merits.

2.  Whether it is always in the public interest to follow constitutional requirements.

3.  Whether the Arms Export Control Act of 1976, 22 U.S.C. § 2278, et seq., and its implementing International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, may be applied as a prior restraint on public speech.

ii

## RULE 29.6 DISCLOSURE STATEMENT

No parent or publicly owned corporation owns 10% or more of the stock in Defense Distributed or Second Amendment Foundation, Inc.

## LIST OF PARTIES

The petitioners are Defense Distributed and Second Amendment Foundation, Inc., who are plaintiffs and appellants below.

Respondents are the United States Department of State; Rex Tillerson, in his official capacity as Secretary of the Department of State; Directorate of Defense Trade Controls; Brian Nilsson, in his official capacity as Deputy Assistant Secretary of State for Defense Trade Controls; Kenneth B. Handelman, individually; C. Edward Peartree, individually and in his official capacity as the Director of the Office of Defense Trade Controls Policy Division; Sarah J. Heidema, individually and in her official capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; and Glenn Smith, individually and in his official capacity as the Senior Advisor, Office of Defense Trade Controls. All respondents are defendants and appellees below.[1]

-----

[1]   Rex Tillerson has substituted for John Kerry as Secretary of State, and Brian Nilsson has substituted for Kenneth B. Handelman as Deputy Assistant Secretary of State for Defense Trade Controls.

DOSWASHINGTONSUP01301

iii

## TABLE OF CONTENTS

Page

QUESTION PRESENTED.................................  i

RULE 29.6 DISCLOSURE STATEMENT ...........  ii

LIST OF PARTIES ..............................................  ii

TABLE OF AUTHORITIES................................  vi

INTRODUCTION ................................................  1

OPINIONS AND ORDERS BELOW....................  3

JURISDICTION....................................................  3

CONSTITUTIONAL AND STATUTORY
    PROVISIONS INVOLVED ..............................  4

STATEMENT........................................................  4

    A.   Statutory and Regulatory Scheme ............  4

    B.   The Government Applies the Regulations
        as a Content-Based Prior Restraint on
        Speech.........................................................  7

    C.   District Court Proceedings ........................  13

    D.   The Panel Majority's Opinion....................  15

    E.   Judge Jones's Panel Dissent......................  16

    F.   Judge Elrod's Dissent From Denial Of Re-
        hearing.......................................................  22

DOSWASHINGTONSUP01302

iv

TABLE OF CONTENTS—Continued

Page

REASONS FOR GRANTING THE PETITION.....   25

   I.   The Lower Court's Refusal to Address Petitioners' Likelihood of Success in Vindicating First Amendment Rights Directly Contradicts This Court's Precedent, and Conflicts with the Precedent of Ten Circuits ...........................................................   25

  II.   The Lower Court's Holding that It May Not Be in the Public Interest to Enforce the Constitution Conflicts with the Precedent of Five Circuits and Raises Issues of Exceptional Significance ...........................   30

 III.   The Lower Court's Constructive Approval of a Content-Based Prior Restraint, Under the Artifice of Treating Any Speech that Foreigners Might Hear or Read as an "Export," Calls for This Court's Review ..........   32

 IV.   The Erroneous Decision Below Destabilizes the Law and Raises Serious Questions About the Judiciary's Mission ..........   34

  V.   This Case Presents an Excellent Vehicle For Resolving the Issues Presented ..........   37

CONCLUSION.....................................................   41

APPENDIX

APPENDIX A—Court of Appeals Opinion filed September 20, 2016..................................................1a

APPENDIX B—District Court Order filed August 4, 2015 ........................................................56a

v

TABLE OF CONTENTS—Continued

Page

APPENDIX C—Court of Appeals Denial of Re-
  hearing filed March 15, 2017 ...............................91a

APPENDIX D—Constitutional  and  Statutory
  Provisions Involved ...............................................98a

APPENDIX E—Letter from Respondent Nilsson
  to William O. Wade, June 12, 2017 ....................116a

DOSWASHINGTONSUP01304

vi

## TABLE OF AUTHORITIES

Page

### Cases

*Ashcroft* v. *ACLU*, 542 U.S. 656 (2004).......................25

*Awad* v. *Ziriax*, 670 F.3d 1111 (10th Cir. 2012) .........31

*Boumediene* v. *Bush*, 553 U.S. 723 (2008) .................30

*Child Evangelism Fellowship of Minn.* v. *Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996 (8th Cir. 2012)..........................................................28

*Dish Network Corp.* v. *FCC*, 653 F.3d 771 (9th Cir. 2011) ..................................................................29

*Expressions Hair Design* v. *Schneiderman*, 137 S. Ct. 1144 (2017).....................................................40

*Gordon* v. *Holder*, 721 F.3d 638 (D.C. Cir. 2013)........31

*Higher Soc'y of Ind.* v. *Tippecanoe Cty.*, 858 F.3d 1113 (7th Cir. 2017)..................................................28

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010)..............................................................................21

*Int'l Refugee Assistance Project* v. *Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc)...........................36

*Joelner* v. *Village of Wash. Park*, 378 F.3d 613 (7th Cir. 2004)..........................................................28

*Korte* v. *Sibelius*, 735 F.3d 654 (7th Cir. 2013)...........32

*Liberty Coins, LLC* v. *Goodman*, 748 F.3d 682 (6th Cir. 2014).............................................27, 28, 31

*N.Y. Progress & Prot. PAC* v. *Walsh*, 733 F.3d 483 (2d Cir. 2013)....................................................26, 38

DOSWASHINGTONSUP01305

TABLE OF AUTHORITIES—Continued

Page

*New York Times Co.* v. *United States*, 403 U.S.
713 (1971) .................................................24, 31, 32

*Packingham* v. *North Carolina*, 137 S. Ct. 1730
(2017) ....................................................................33

*Pashby* v. *Delia*, 709 F.3d 307 (4th Cir. 2013).............27

*Planned Parenthood Ass'n of Utah* v. *Herbert*,
828 F.3d 1245 (10th Cir. 2016)..........................29, 31

*Pursuing America's Greatness* v. *FEC*, 831 F.3d
500 (D.C. Cir. 2016) ...........................................28, 31

*Reed* v. *Town of Gilbert*, 135 S. Ct. 2218 (2015) .........20

*Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738
(5th Cir. 2008)........................................................35

*Schlesinger* v. *Reservists Comm. to Stop the War*,
418 U.S. 208 (1974) ...........................................38, 39

*Schweiker* v. *Hansen*, 450 U.S. 785 (1981).................40

*Scott* v. *Roberts*, 612 F.3d 1279 (11th Cir. 2010) ....29, 32

*Sindicato Puertorriqueño de Trabajadores* v.
*Fortuño*, 699 F.3d 1 (1st Cir. 2012) ........................26

*Smith* v. *Allwright*, 321 U.S. 649 (1944)....................36

*Sole* v. *Wyner*, 551 U.S. 74 (2007)...............................25

*Southern Monorail Co.* v. *Robbins & Myers, Inc.*,
666 F.2d 185 (5th Cir. Unit B 1982).................29, 30

*Stagg P.C.* v. *United States Dep't of State*, 673
Fed. Appx. 93 (2d Cir. 2016) (summary order).......37

*Stagg P.C.* v. *United States Dep't of State*, 158
F. Supp. 3d 203 (S.D.N.Y. 2016) ..............................38

DOSWASHINGTONSUP01306

viii

## TABLE OF AUTHORITIES—Continued

Page

*Stilp* v. *Contino*, 613 F.3d 405 (3d Cir. 2010)........26, 27

*United States* v. *Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978).....................................................9

*United States* v. *O'Brien*, 391 U.S. 367 (1968)............36

*United States* v. *Windsor*, 133 S. Ct. 2675 (2013) ......38

*Verlo* v. *Martinez*, 820 F.3d 1113 (10th Cir. 2016)...................................................................28

*Vivid Entm't, LLC* v. *Fielding*, 774 F.3d 566 (9th Cir. 2014) ...............................................................29

*Wayte* v. *United States*, 470 U.S. 598 (1985)...............36

*WV Ass'n of Club Owners & Fraternal Servs., Inc.* v. *Musgrave*, 553 F.3d 292 (4th Cir. 2009) .......27

*Ziglar* v. *Abbasi*, 137 S. Ct. 1843 (2017)....................36

## Constitution

U.S. Const. amend. I ...........................................*passim*

## Statutes, Regulations, and Rules

22 U.S.C. § 2278(a)(1) ..................................................4

22 U.S.C. § 2778(c) .......................................................4

22 U.S.C. § 2778(e) .......................................................4

28 U.S.C. § 1254(1)........................................................4

28 U.S.C. § 1331 .........................................................13

28 U.S.C. § 1343 .........................................................13

22 C.F.R. Parts 120-130 ................................................4

DOSWASHINGTONSUP01307

ix

TABLE OF AUTHORITIES—Continued

Page

22 C.F.R. § 120.10 ...................................................4, 5

22 C.F.R. § 120.10(b) ...............................................7

22 C.F.R. § 120.11(a) ...............................................7

22 C.F.R. § 120.11(a)(7) ...........................................7

22 C.F.R. § 120.17(a)(2) ...........................................5

22 C.F.R. § 120.17(a)(4) (2013) ...................................5

22 C.F.R. § 120.4(a) ................................................6

22 C.F.R. § 120.41 ..................................................5

22 C.F.R. § 121.1 ...................................................5

22 C.F.R. § 126.7(a)(1) ............................................6

22 C.F.R. § 126.7(b) ...............................................7

22 C.F.R. § 128.1 ...................................................7

Sup. Ct. R. 10(a) ..............................................25, 26

OTHER AUTHORITIES

49 Fed. Reg. 47,682 (Dec. 6, 1984) ...............................8

80 Fed. Reg. 31,525 (June 3, 2015) ..........................12, 33

82 Fed. Reg. 3,168 (Jan. 11, 2017) ...............................4

"Final Commodity Jurisdiction Determinations,"
    https://www.pmddtc.state.gov/commodity_
    jurisdiction/determination.html (last visited
    July 28, 2017) ...............................................6

1

No. 17-_____

_____◆_____

In The

# Supreme Court of the United States

_____◆_____

DEFENSE DISTRIBUTED, ET AL.,

*Petitioners,*

v.

UNITED STATES DEPARTMENT OF STATE, ET AL.,

*Respondents.*

_____◆_____

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Fifth Circuit**

_____◆_____

**PETITION FOR A WRIT OF CERTIORARI**

Defense Distributed and Second Amendment Foundation, Inc., respectfully petition this Court to review the judgment of the United States Court of Appeals for the Fifth Circuit in this case below.

_____◆_____

## INTRODUCTION

Is the Constitution's implementation in the public interest? When deciding whether to enjoin a content-based prior restraint on speech, must federal courts assess the merits of the First Amendment claim?

2

Until the decision below, these were not controversial questions. The Constitution, amendments and all, is the Nation's highest law. And without examining a claim's merits, judges are in no position to balance the equities, assess irreparable harm, or determine what outcome serves the public interest.

Yet without meaningfully responding to pointed dissents at the panel and en banc rehearing stages, the court below refused to examine the merits of Petitioners' motion to preliminarily enjoin a content-based prior restraint on speech. It simply declared that the government's asserted interests outweighed the interest in securing constitutional rights, the enforcement of which may not serve the public interest.

This decision raises the specter of summary reversal. As this Court has instructed, considering the merits of preliminary injunction motions is not optional. Of all contexts, the merits cannot be optional in First Amendment cases. It should ordinarily go without saying—and so it must now be said—that federal courts cannot dismiss the Constitution's primacy in our legal system. Nor can judges decide that some speakers will have their claims addressed on the merits, while rubber-stamping the denial of disfavored claims based only on the government's mere assertion of a regulatory interest. The government can be relied upon to assert the necessity of every prior restraint. The public must be able to rely on the courts to test these assertions for constitutional compliance.

3

Apart from conflicting with this Court's instructions, the decision below conflicts with the precedents of ten circuits that affirm the protection of First Amendment rights via preliminary injunction, and five circuits that hold the Constitution to be in the public interest per se. The context of this startling departure from judicial norms is itself noteworthy: the Executive Branch's abrupt reversal of nearly forty years of policy against imposing arms-control regulations as a prior restraint on Americans' public speech.

The danger posed to First Amendment rights by the decision below is plain enough. But there is no reason to suppose the mischief would remain so confined. The decision below warrants this Court's review.

————◆————

## OPINIONS AND ORDERS BELOW

The Fifth Circuit's opinion (App., *infra*, 1a-55a) is reported at 838 F.3d 451. The Fifth Circuit's order denying rehearing en banc, including Judge Elrod's dissent from that order (App., *infra*, 91a-97a), is unreported, and appears at 2017 WL 1032309, 2017 U.S. App. LEXIS 4587. The district court's opinion (App., *infra*, 56a-90a) is reported at 121 F. Supp. 3d 680.

————◆————

## JURISDICTION

The court of appeals entered its judgment on September 20, 2016. Petitioners timely filed a petition for

4

rehearing en banc, which a divided court of appeals denied on March 15, 2017. On April 26, 2017, Justice Thomas extended the time for filing this petition to and including August 2, 2017. The Court has jurisdiction under 28 U.S.C. § 1254(1).

————————◆————————

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The First Amendment, and relevant provisions of the Arms Export Control Act of 1976 and its implementing International Traffic in Arms Regulations, are reproduced at App. 98a-115a.

————————◆————————

## STATEMENT

### A.  Statutory and Regulatory Scheme

1.  "In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services. . . ." 22 U.S.C. § 2278(a)(1). This act is implemented through the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, which contain the "United States Munitions List" ("USML")—the items controlled as "defense articles" and "defense services." 22 C.F.R. § 121.1. Unauthorized exports are punishable by up to twenty years in prison, fines of up to $1,000,000, and civil penalties up to $1,111,908. 22 U.S.C. §§ 2278(c) and (e); 82 Fed. Reg. 3,168, 3,169 (Jan. 11, 2017).

5

The USML includes "technical data" such as "information in the form of blueprints, drawings, photographs, plans, instructions or documentation" and "software" "directly related to defense articles," although it excludes "general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain. . . ." 22 C.F.R. § 120.10.

Congress has not defined "export" within this statutory scheme. Respondents define "export" to include "[r]eleasing or otherwise transferring technical data to a foreign person in the United States (a 'deemed export')." *Id.* § 120.17(a)(2). At the time of the events giving rise to this case, Respondents defined "export" as "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." *Id.* § 120.17(a)(4) (2013); App. 27a.

Figuring out whether one's information is controlled can be complicated. The USML utilizes terms such as "military application," *id.* § 121.1, which is undefined and "specially designed," whose definition exceeds 900 words, *id.* § 120.41; and concludes with an open-ended catch-all provision encompassing "Articles, Technical Data, and Defense Services Not Otherwise Enumerated," *id.* § 121.1 at USML Category XXI.

"[I]f doubt exists as to whether an article or service is covered by the U.S. Munitions List," respondent Directorate of Defense Trade Controls ("DDTC") may provide a "commodity jurisdiction" determination. *Id.*

6

§ 120.4(a). Over four thousand commodity jurisdiction requests have been submitted since 2010.[1] Nonpublic National Security Council guidelines establish a sixty-day deadline for DDTC to render a commodity jurisdiction determination. R.144.[2] But reports by the Government Accountability Office, Office of Inspector General and DDTC show that these guidelines are routinely disregarded, as requests often await final determinations for well over a year. R.163-68, 211-13, 221.

If information qualifies as "technical data," people must obtain approval from the Department of Defense Office of Prepublication and Security Review ("DOPSR") or another cognizant government agency before publishing it. However, no rule or law establishes a timeline for decision, standard of review, or an appeals process for DOPSR public release determinations.

An ITAR export license application "may be disapproved, and any license or other approval or exemption granted . . . may be revoked, suspended, or amended without prior notice whenever . . . [t]he Department of State deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable*." 22 C.F.R. § 126.7(a)(1) (emphasis added). "The reasons for the

---

[1] "Final Commodity Jurisdiction Determinations," https://www.pmddtc.state.gov/commodity_jurisdiction/determination.html (last visited July 28, 2017).

[2] Citations to "R.p" refer to pages of the Fifth Circuit record on appeal.

DOSWASHINGTONSUP01314

action will be stated as specifically as security and foreign policy considerations permit." *Id.* § 126.7(b). Decisions to grant, revoke, suspend, or amend a license are not subject to judicial review under the Administrative Procedure Act. *Id.* § 128.1.

## B.   The Government Applies the Regulations as a Content-Based Prior Restraint on Speech

1.   Americans speak and publish an ever-expanding array of technical information arguably subject to ITAR control. As the Department of Justice reported to Congress, "manuals written for legitimate purposes, such as military, agricultural, industrial and engineering purposes" can easily assist the pursuit of unlawful ends. R.287. "Such information is also readily available to anyone with access to a home computer equipped with a modem." *Id.* ITAR's "public domain" exclusion, 22 C.F.R. § 120.10(b), includes eight categories of "information which is published and which is generally accessible or available to the public." *Id.* § 120.11(a).

This exclusion leaves unaddressed the question of how information created by a speaker or author typically *enters* the public domain in the first instance. To be sure, one class of information ITAR deems to be in the public domain is information publicly released "after approval by the cognizant U.S. government department or agency." *Id.* § 120.11(a)(7). Otherwise, under Respondents' view, Americans are at risk of unlawfully "exporting" "technical data" whenever speaking or publishing scientific or technical information in venues open to foreigners.

DOSWASHINGTONSUP01315

8

2. This has not always been the case. Decades ago, footnote 3 to former ITAR Section 125.11 implied a prior restraint on all public speech that happened to fall within ITAR's definition of "technical data":

> The burden for obtaining appropriate U.S. Government approval for the publication of technical data falling within the definition in § 125.01, including such data as may be developed under other than U.S. Government contract, is on the person or company seeking publication.

R.327.

Beginning in 1978, in response to concerns raised by this language, the Office of Legal Counsel ("OLC") issued a series of opinions advising Congress, the White House, and the State Department that ITAR's use as a prior restraint on the dissemination of privately generated, unclassified information violates the First Amendment. R.226-323. And in 1980, respondent DDTC's predecessor agency issued official guidance providing that "[a]pproval is not required for publication of data within the United States . . . Footnote 3 to Section 125.11 does not establish a prepublication review requirement." R.332.

Finally, in 1984, the State Department removed Footnote 3 from ITAR, expressly stating its intent to address First Amendment concerns. *See* 49 Fed. Reg. 47,682, 47,683 (Dec. 6, 1984) ("Concerns were expressed, for example, on licensing requirements as

they relate to the First Amendment to the Constitution. The revision seeks to reflect these concerns. . . .").

By then, the problem of using ITAR as a prior restraint on speech had reached the Ninth Circuit, which avoided the First Amendment problem by reading a scienter requirement into the regulatory scheme. "If the information could have both peaceful and military applications . . . the defendant must know or have reason to know that its information is intended for the prohibited use." *United States* v. *Edler Industries, Inc.*, 579 F.2d 516, 521 (9th Cir. 1978) (citation omitted). "So confined, the statute and regulations are not overbroad. For the same reasons the licensing provisions of the Act are not an unconstitutional prior restraint on speech." *Id.*

Following *Edler*, OLC warned the State Department of "serious constitutional questions" were ITAR applied to the transmission of "technical data" absent scienter. R.248. "For obvious reasons, the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations." R.256.

The Department of Justice reiterated these concerns to Congress, counseling that prior restraints against Internet publication of potentially dangerous information is unconstitutional absent scienter. R.283. Consistent with these concerns, the State Department had previously represented to federal courts that it does not regulate the placement of scientific and technical information into the public domain. See C.A. Pl. Addendum 23, 26, 29-30. In fact, the State Department

conceded that reading ITAR as a prior restraint "is by far the most ***un***-reasonable interpretation of the provision, one that people of ordinary intelligence are *least* likely to assume is the case." *Id.* at 30.

3.   Beginning in 2012, petitioner Defense Distributed published on the Internet various computer-aided design ("CAD") files related to the lawful production of firearms and firearm components. "A CAD file is a data set defining the geometric representation of a bounded volume." R.975, ¶ 38. "Viewed on a computer, [CAD files] display and project an image in three-dimensions, similar to a model sculpted out of clay. The files can be viewed and manipulated in various contexts without an intent to ever manufacture anything." R.978, ¶ 44. As such, the files have proven artistic and political utility. C.A. Br. 21-22.

Three-dimensional printers may also read CAD files as blueprints for producing the objects described by the files. The files are not themselves executable, and the production process requires human intervention and guidance. R.975-76, ¶ 39. But the files do enable a person, using a machine, to make a described object.

Defense Distributed's files were downloaded hundreds of thousands of times. R.129, ¶ 4. But in May 2013, Respondents ordered that "all such data should be removed from public access immediately," because the files might constitute ITAR-controlled technical data. R.129, ¶ 5; 140-42. Respondents further directed Defense Distributed to seek a "commodity jurisdiction" determination as to whether the files are controlled. R.129, ¶ 7; 141.

Defense Distributed complied. It took its files down from the Internet, and on June 21, 2013, filed ten commodity jurisdiction requests covering the published files. R.129, ¶ 7; 335-86. Nearly two years later—after Petitioners filed this lawsuit—Respondents determined that six of the ten files were ITAR-controlled. *Id.* at 500-01. Despite Defense Distributed's request, Respondents failed to provide guidance as to the commodity jurisdiction review process for other CAD files. R.131, ¶ 11; 433-56.

Defense Distributed also sells a machine, the "Ghost Gunner," which can be used to mill various objects, including lawful firearm parts. The machine uses computer numeric control ("CNC") technology, which reads data files to direct a drill. As with CAD files, "CNC code is expressive in that it can be read and edited by humans, who can also understand and adjust its output—i.e., what it will cause the mill to machine." R.976-77, ¶ 41. Upon Defense Distributed's commodity jurisdiction request, Respondents determined that the machine's project files—the CNC instructions for milling particular items—are controlled. R.130, ¶ 9; 407-08.

Defense Distributed also has other files described in the USML that it intends to publish. R.103; 131, ¶ 13; 1082, ¶ 37.

4.   After Petitioners brought this action challenging ITAR's use as a prior restraint, Respondents proposed to amend ITAR's "public domain" definition to unambiguously impose a prior restraint: "the revised

12

definition explicitly sets forth the Department's requirement of authorization to release information into the 'public domain.'" 80 Fed. Reg. 31,525, 31,528 (June 3, 2015). Respondents now insist that ITAR has imposed a prior restraint all along:

> The requirements . . . are not new. Rather, they are a more explicit statement of the ITAR's requirement that one must seek and receive a license or other authorization from the Department or other cognizant U.S. government authority to release ITAR controlled "technical data," as defined in § 120.10.

*Id.* at 31,528.

Under Respondents' view, Americans risk significant penalties for speaking or publishing scientific or technical information—"releas[ing] 'technical data'"—"by disseminating 'technical data' at a public conference or trade show, publishing 'technical data' in a book or journal article, or posting 'technical data' to the Internet." *Id.* "Posting 'technical data' to the Internet without a Department or other authorization is a violation of the ITAR even absent specific knowledge that a foreign national will read [it]." *Id.* at 31,529.

Respondents' proposed codification of ITAR as a content-based prior restraint on speech drew over 9,000 comments. Most commentators opposed the proposal, including technology industry leaders (*e.g.*, IBM, GE), former State Department employees, the Association of American Universities, the Association of Public and Land-grant Universities, and the Council on

DOSWASHINGTONSUP01320

13

Government Relations. R.728-29, 739, 765, 773, 796-98, 817, 825. While the proposed codification has not yet been adopted, it reflects Respondents' position that codification would be merely a formality.

## C.   District Court Proceedings

Petitioners sought to preliminarily enjoin ITAR's implementation as a content-based prior restraint, alleging that this use of ITAR is ultra vires, and violates the First, Second, and Fifth Amendments. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.

The district court "ha[d] little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury." App. 63a. But it found that the importance of protecting constitutional rights is outweighed by national security concerns, suggesting that the government's "authority . . . in matters of foreign policy and export" are "largely immune" from judicial review. App. 64a (quotations omitted). The court further held that because Respondents "clearly believe" that posting files to the Internet is an "export," Petitioners did not prove that allowing such posting serves the public interest. App. 65a.

"Nonetheless, in an abundance of caution," *id.*, the district court addressed Petitioners' likelihood of success on the merits. Although it concluded that Respondents are authorized to bar speech as an "export," App. 67a, the court considered the files to be protected by the First Amendment, App. 70a. But it then held

DOSWASHINGTONSUP01321

14

that while ITAR "unquestionably regulates speech concerning a specific topic," it "does not regulate disclosure of technical data based on the message it is communicating." App. 74a. The court thus "conclude[d] the regulation is content-neutral and thus subject to intermediate scrutiny." *Id.* (citation omitted).

Applying intermediate scrutiny, the court asserted that Respondents' prior restraint would survive because Petitioners have other means of distributing their speech domestically, App. 77a, presumably by screening listeners' citizenship. The court also apparently rejected Petitioners' argument that prohibiting Americans from communicating on the Internet, while allowing other forms of domestic speech, does not materially advance the goal of barring foreigners' access to that speech. App. 77a-78a.

And notwithstanding the government's findings that commodity jurisdiction timelines are routinely ignored, the fact that Defense Distributed waited nearly two years to receive a response to its commodity jurisdiction requests concerning the censored files, and the undisputed lack of procedural safeguards in Respondents' licensing process, the court held that Petitioners "have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations." App. 78a. The district court also found that Respondents would likely defeat the Second Amendment claim at step two of an intermediate scrutiny analysis, App. 8a, and that ITAR likely does not violate the Fifth Amendment due to vagueness, App. 90a.

## D.  The Panel Majority's Opinion

A divided Fifth Circuit panel affirmed. The majority began by stating that it would affirm denial of the preliminary injunction on a balancing of interests—but without examining Petitioners' claims. "[W]e decline to address the merits requirement." App. 12a. After asserting that Petitioners "failed to give *any* weight to the public interest in national defense and national security," App. 13a,[3] the majority declared that as far as the public interest is concerned, the government's security concerns might well override the Constitution:

> Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security.

App. 13a.

The majority did not question the district court's finding, App. 64a, that the public interest in security outweighed the public interest in exercising constitutional rights. At most, the majority offered only that "both public interests asserted here are strong." App.

---

[3] It is unclear whether the majority claimed that Petitioners denied the existence of a regulatory interest. Petitioners did not. See, *e.g.*, R.862-63 ("We happily concede that the Government has an interest . . . the Government has an interest in controlling the export of technical data."); see also R.105, 117-18, 122, 936; C.A. Br. at 38, 58, 68-69.

16a. The majority thus "[found] it most helpful to focus on the balance of harm requirement. . . ." *Id.* Petitioners had argued that lifting the prior restraint would not harm the public, in part because their files continue to be made available by others on the Internet. But the majority found this to be an argument in favor of denying preliminary injunctive relief, as any newly-created file would likewise become and remain widely available even were a permanent injunction later denied. App. 16a-17a.

The majority clarified that it would affirm the denial of a preliminary injunction on "the balance of harm and the public interest," but "decline to reach the question of whether [Petitioners] have demonstrated a substantial likelihood of success on the merits." App. 18a. Reiterating that "we take no position" with the dissent's "extensive discussion" of the First Amendment merits, the majority offered, "[e]ven a First Amendment violation does not necessarily trump the government's interest in national defense." App. 18a-19a n.12.

## E.   Judge Jones's Panel Dissent

1.   Judge Jones dissented from the panel majority's "failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand." App. 20a.

The dissent emphasized the common nature of Petitioners' speech. "This case poses starkly the question of the national government's power to impose a prior

restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the 'export' of 'defense articles.'" *Id*. While CAD files could be used in printing firearms,

> [n]one of the published information was illegal, classified for national security purposes, or subject to contractual or other distribution restrictions. In these respects the information was no different from technical data available through multiple Internet sources from widely diverse publishers.

App. 20a-21a.

The dissent also found troubling the government's departure from decades of policy disclaiming ITAR's use as a prior restraint, and the new prior restraint's expansive scope. "In a nearly forty-year history of munitions 'export' controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet," App. 22a, adding that there is "little certainty that the government will confine its censorship to Internet publication," App. 23a. "Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar non-classified information." *Id*.

Judge Jones chided the majority for "overlook[ing]" the serious threat to free speech "with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary

Executive Branch pronouncements." App.23a. "This preliminary injunction request deserved our utmost care and attention." *Id.* While Judge Jones focused her discussion on the merits of the First Amendment claim, she found "non-frivolous" Petitioners' claims "premised on ultra vires, the Second Amendment and procedural due process." App. 23a n.4

Judge Jones noted that "[i]nterference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury," App. 23a (citations omitted), and that "Defense Distributed has been denied publication rights for over three years," App. 24a. She then found it "a mystery" why the majority was "unwilling to correct" the district court's "obvious error" in applying only intermediate scrutiny to the content-based prior restraint at issue. *Id.* That error had "fatally affected [the district court's] approach to the remaining prongs of the test for preliminary injunctive relief." *Id.*

> Without a proper assessment of plaintiff's likelihood of success on the merits—arguably the most important of the four factors necessary to grant a preliminary injunction—the district court's balancing of harms went awry. We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

*Id.* (citation and footnote omitted).

"Since the majority are close to missing in action, and for the benefit of the district court on remand,"

DOSWASHINGTONSUP01326

Judge Jones proceeded to explain why the State Department's conduct "appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint." App. 25a.

2.  a.  The dissent held that whether Congress's use of "export" extends to domestic censorship of the Internet "is at least doubtful," and that "construing the State Department's regulations for such a purpose renders them incoherent and unreasonable." App. 32a. The ordinary meaning of "export," a statutorily undefined but unambiguous term, would "normally resolve the case" at *Chevron* step one. App. 34a. "For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well." *Id.*

"There is embedded ambiguity, and disturbing breadth," in the State Department's claimed prior restraint, such that "[t]he regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of 'export.'" App. 34a-35a. The dissent's examination of Respondents' regulatory interpretation invoked the terms "unreasonable," "*ipse dixit*," "incoherent," and "irrational and absurd." App. 35a. "The root of the problem is that the State Department's litigating position puts more weight on 'export' than any reasonable construction of the statute will bear." App. 36a.

b.  Turning to the First Amendment, Judge Jones noted the process Respondents apply "is a

content-based restriction on the petitioners' domestic speech 'because of the topic discussed.'" App. 38a (quoting *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)). "The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment." *Id.* (citation omitted). "Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require prepublication approval or licensing. This is pure content-based regulation." App. 39a (footnote omitted).

The dissent rejected the claim that the regulation is aimed at secondary effects, App. 40a, and likewise found the claim that the prior restraint is not content-based because it targets "'functional'" speech "flawed factually and legally," *id.* Applying strict scrutiny, the dissent credited the government's compelling interest in arms control, but found the prior restraint "significantly overinclusive." App. 41a (internal quotation marks omitted). "In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press." App. 44a.

c. Judge Jones also faulted Respondents for imposing an unconstitutional content-based prior restraint on speech. "To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural

protections." App. 47a. The "regulations' virtually un-bounded coverage . . . combined with the State Department's deliberate ambiguity in what constitutes the 'public domain,' renders application of ITAR regulations anything but 'narrow, objective, and definite.'" *Id.*

"Just as troubling is the stark lack of the three required procedural protections in prior restraint cases." App. 48a. "[T]he alleged 45-day regulatory deadline for [commodity jurisdiction] determinations seems to be disregarded in practice," as Defense Distributed had to wait nearly two years for a response. *Id.* "Further, the prescribed time limit for licensing decisions, 60 days, is not particularly brief." *Id.* "The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet." *Id.* (citations omitted). And absent judicial review, the government could not bear its burden to seek it. *Id.*

d.   Finally, the dissent rejected the majority's balancing paradigm. "[T]he Executive's mere incantation of 'national security' and 'foreign affairs' interests do not suffice to override constitutional rights." App. 49a. "Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project*) is dangerous and unprecedented." App. 52a n.17 (referencing *Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010)).

DOSWASHINGTONSUP01329

22

Indeed, Judge Jones doubted the government's "sincerity . . . based on the determined ambiguity of its litigating position," questioning how Respondents could simultaneously claim national security concerns over Petitioners' speech while suggesting it can be "freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and at libraries"—so long as no foreigner accesses it. App. 53a-54a. "After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been 'exported' just like the Internet posts. . . ." App. 54a.

"[T]he majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights." *Id.* While "[t]oday's target is unclassified, lawful technical data about guns . . . [t]omorrow's targets may be drones, cybersecurity, or robotic devices. . . . This abdication of our decisionmaking responsibility toward the First Freedom is highly regrettable." *Id.*

## F.  Judge Elrod's Dissent From Denial Of Rehearing

The Fifth Circuit voted 9-5 against rehearing the case en banc. App. 92a. Judge Elrod dissented, joined by three of her colleagues.

DOSWASHINGTONSUP01330

"The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint." App. 93a. Agreeing with "Judge Jones's cogent panel dissent," Judge Elrod wrote "to highlight three errors that warrant *en banc* review." *Id.*

> First, the panel opinion fails to review the likelihood of success on the merits—which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm.

*Id.*

"Strikingly . . . the panel opinion entirely fails to address the likelihood of success on the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*." App. 94a. "A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights." *Id.* (citations omitted).

"[T]he mere assertion of a national security interest" is also insufficient. App. 95a. "Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the

First Amendment. . . ." *Id.* (citing *New York Times Co.* v. *United States*, 403 U.S. 713, 714 (1971)).

> Allowing such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

App. 96a. Judge Elrod also took issue with the panel majority's minimization of Defense Distributed's harm as "temporary," as even short deprivations of First Amendment rights are understood to impose irreparable harm. *Id.*

> We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." Unfortunately, that is exactly what the panel opinion has done.

App. 96a-97a (quoting *New York Times*, 403 U.S. at 719 (Black, J., concurring)).

———————◆———————

### REASONS FOR GRANTING THE PETITION

**I.   The Lower Court's Refusal to Address Petitioners' Likelihood of Success in Vindicating First Amendment Rights Directly Contradicts This Court's Precedent, and Conflicts with the Precedent of Ten Circuits.**

The refusal to consider the merits of a preliminary injunction motion that seeks to secure First Amendment rights provides a definitive example of a decision that "has so far departed from the accepted and usual course of judicial proceedings . . . as to call for an exercise of this Court's supervisory power." Sup. Ct. R. 10(a).

This Court's precedents are unambiguous. "In deciding whether to grant a preliminary injunction, a district court *must* consider whether the plaintiffs have demonstrated that they are likely to prevail on the merits." *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004) (citation omitted) (emphasis added); see also *Sole* v. *Wyner*, 551 U.S. 74, 84 (2007).

There is nothing optional about the word "must." Nor can there be any doubt as to the wisdom of this Court's mandate to examine a claim's merits when parties seek preliminary injunctions. Courts that refuse to consider a plaintiff's likelihood of success on the merits perforce cannot fully assess irreparable harm; nor can they balance the equities, which would be unknown. Nor can courts that ignore the merits of a constitutional case comprehend (let alone determine)

DOSWASHINGTONSUP01333

the public interest, which by definition cannot contradict the Constitution itself.

Not surprisingly, because the court below "has so far departed from the accepted and usual course of judicial proceedings," it has also "entered a decision in conflict with the decision of another United States court of appeals on the same important matter." Sup. Ct. R. 10(a). Indeed, on this crucial point, the court below stands in conflict with no fewer than ten circuits, which hold that the merits prong is not merely critical, but often dispositive.

> In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis . . . [it is] incumbent upon the district court to engage with the merits before moving on to the remaining prongs of its analysis.

*Sindicato Puertorriqueño de Trabajadores* v. *Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012). "Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not dispositive factor." *N.Y. Progress & Prot. PAC* v. *Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

When "suppression of speech in violation of the First Amendment [is alleged], we focus our attention on the first factor, i.e., whether [plaintiff] is likely to succeed on the merits of his constitutional claim." *Stilp* v. *Contino*, 613 F.3d 405, 409 (3d Cir. 2010). In *Stilp*, the Third Circuit accepted a defendant's concession

27

"that, if we find that [plaintiff] is likely to succeed on the merits, the other requirements for a preliminary injunction are satisfied." *Id.* As "irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim," the Fourth Circuit "focus[es] [its] review on the merits of Plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc.* v. *Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). Likelihood of success on the merits may, where appropriate, "satisf[y] the public interest prong." *Pashby* v. *Delia*, 709 F.3d 307, 330 (4th Cir. 2013).

"In the context of a First Amendment claim, the balancing of these [four required] factors is skewed toward an emphasis on the first factor," which "often will be the determinative factor." *Liberty Coins, LLC* v. *Goodman*, 748 F.3d 682, 690 (6th Cir. 2014) (quotations omitted).

> In cases implicating the First Amendment, the other three factors often hinge on this first factor. The determination of where the public interest lies is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights. Similarly, because the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the

DOSWASHINGTONSUP01335

crucial inquiry often is . . . whether the stat-
ute at issue is likely to be found constitu-
tional.

*Id.* (internal quotation marks and punctuation omit-
ted).

The Seventh Circuit agrees that "[i]n First
Amendment cases, the likelihood of success on the mer-
its will often be the determinative factor." *Higher Soc'y
of Ind.* v. *Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir.
2017) (quotations omitted); *id.* ("So the analysis begins
and ends with the likelihood of success on the merits
of the First Amendment claim") (internal quotation
marks and punctuation omitted). "[I]t is *sometimes*
necessary to inquire beyond the merits." *Joelner* v. *Vil-
lage of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)
(emphasis added).

The Eighth Circuit is in accord. A "likely First
Amendment violation further means that the public
interest and the balance of harms (including irrepara-
ble harm to [plaintiff]) favor granting the injunction."
*Child Evangelism Fellowship of Minn.* v. *Minneapolis
Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir.
2012) (citation omitted).

The Tenth and D.C. Circuits agree that the merits
prong will "often be the determinative factor" in First
Amendment preliminary injunction cases. *Verlo* v.
*Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (inter-
nal quotation marks omitted) (noting "the seminal im-
portance of the interests at stake"); *Pursuing America's
Greatness* v. *FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016);

see also *Planned Parenthood Ass'n of Utah* v. *Herbert*, 828 F.3d 1245, 1265-66 (10th Cir. 2016) (likelihood of success establishes public interest in enjoining unconstitutional conduct).

The Eleventh Circuit goes one step further. Owing to "the severity of burdens on speech" and the fact that "the public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law," a First Amendment plaintiff "is entitled to relief if his claim is likely to succeed." *Scott* v. *Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) (citations omitted).

The en banc dissenters, who noted that the preceding ten circuits would not countenance the panel majority's approach, App. 93a, might have added the Ninth Circuit's output to this parade of conflicting precedent. "[A] First Amendment claim 'certainly raises the specter' of irreparable harm and public interest considerations," even if "proving the likelihood of such a claim" is by itself insufficient to obtain an injunction. *Dish Network Corp.* v. *FCC*, 653 F.3d 771, 776 (9th Cir. 2011) (internal quotation marks omitted). Accordingly, the Ninth Circuit requires the merits analysis that it acknowledges could tilt the irreparable harm and public interest assessments. *Vivid Entm't, LLC* v. *Fielding*, 774 F.3d 566, 577 (9th Cir. 2014).

Without acknowledging the overwhelming weight of contrary precedent, the panel majority rested its discordant decision on an old trademark case cited neither by the District Court nor Respondents, *Southern Monorail Co.* v. *Robbins & Myers, Inc.*, 666 F.2d 185

(5th Cir. Unit B 1982). The *Southern Monorail* court had refused to presume irreparable harm even were the plaintiff likely to prevail, contrary to the practice in constitutional cases where irreparable harm is presumed, and upheld the denial of an injunction solely on a balancing of the equities.

That very thin reed cannot bear the weight of the majority's departure from judicial norms. A federal appellate court's refusal to analyze the merits of a significant First Amendment challenge to a content-based prior restraint, in direct contravention of this Court's precedent and in irreconcilable conflict with the precedent of ten other circuits, calls out for review.

## II. The Lower Court's Holding that It May Not Be in the Public Interest to Enforce the Constitution Conflicts with the Precedent of Five Circuits and Raises Issues of Exceptional Significance.

The lower court offered that "[o]rdinarily . . . the protection of constitutional rights *would* be the highest public interest." App. 13a. But "[t]hat is not necessarily true here," because "the State Department has *asserted* a very strong interest in national defense and national security." *Id.* (emphasis added).

There is no conflict between the public interest and the Constitution. "Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene* v. *Bush*, 553

31

U.S. 723, 798 (2008). If Petitioners' speech truly threatened national security, if it would "surely result in direct, immediate, and irreparable damage to our Nation or its people," *New York Times*, 403 U.S. at 730 (Stewart, J., concurring), the government would have a compelling interest to sustain the censorship's constitutionality. But how could a court know this, absent the merits inquiry that the majority refused to undertake? Because the State Department "asserted" so? If the first prong weighed against Petitioners, Respondents would have less reason to worry under the fourth.

But once constitutional rights are at stake, at least five circuits would not consider other public interests. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad* v. *Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (internal quotation marks omitted); *accord Planned Parenthood of Utah*, 828 F.3d at 1266.

That "enforcement of an unconstitutional law is always contrary to the public interest" is "obvious." *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (citations omitted). "[I]t may be assumed that the Constitution is the ultimate expression of the public interest." *Id.* (internal quotation marks omitted). The D.C. Circuit has no trouble applying this rule to secure First Amendment rights. "[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing America's Greatness*, 831 F.3d at 511. The Sixth, Seventh, and Eleventh Circuits agree. *Liberty Coins*, 748

F.3d at 690; *Korte* v. *Sibelius*, 735 F.3d 654, 666 (7th Cir. 2013); *Scott*, 612 F.3d at 1297.

The prevailing standard holds that it is "always" in the public interest to enforce the Constitution. Not "probably," not "maybe," not "usually, unless the government asserts an interest," but "always." As Judge Elrod offered in dissent, "there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment." App. 95a.

National uniformity may at times be undesirable or elusive. With respect to the Constitution's relevance, it should be restored.

## III.   The Lower Court's Constructive Approval of a Content-Based Prior Restraint, Under the Artifice of Treating Any Speech that Foreigners Might Hear or Read as an "Export," Calls for This Court's Review.

The Pentagon Papers were, without question, militarily and diplomatically sensitive. Many foreigners could purchase an American newspaper. Yet the preceding four decades of First Amendment doctrine could scarcely be imagined had this Court approved of censoring the *New York Times*'s Vietnam War coverage for lack of an export license. Should the government have argued that the prior restraint against the *Times* was acceptable because the newspaper did not restrict its distribution to American citizens?

Plain meaning has never supported Respondents' usage of "export" as a synonym for "speak" or "publish." The majority erred in deferring to the government's novel redefinition. And while Petitioners' speech relates to recent technology, the First Amendment concepts here are timeless. The Internet, and 3D printing, did not exist during the many years when the Executive Branch warned repeatedly that ITAR's use as a prior restraint on speech was unconstitutional, and the State Department disclaimed any such application. Today, "cyberspace" provides "the most important places (in a spatial sense) for the exchange of views." *Packingham* v. *North Carolina*, 137 S. Ct. 1730, 1735 (2017). Courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id.*

Yet the majority below went much farther than even that. The content-based prior restraint to which the panel majority turned a blind eye constrains Petitioners' speech generally and everywhere. Judge Jones noted that the prior restraint covers meetings, trade shows, and even library books. App. 54a. Respondents' proposed codification of their current practice confirms that anyone wishing to express scientific or technical information in a "public conference or trade show . . . a book or journal article [or on] the Internet" risks committing an export violation. 80 Fed. Reg. 31,525, 31,528.

The scope and depth of Respondents' content-based prior restraint are severe. The decision below "degrades First Amendment protections and implicitly

34

sanctions the State Department's tenuous and aggressive invasion of citizens' rights"—and there is no telling where this adventure will end. App. 54a. This censorship program appears destined for this Court's review. Given the law's skepticism of content-based prior restraints, and the severe harms involved, the Court should address the matter now.

## IV. The Erroneous Decision Below Destabilizes the Law and Raises Serious Questions About the Judiciary's Mission.

The decision below has unsettled the established norms for adjudicating preliminary injunction requests. Gone is this Court's careful balancing test, with its reliance on the merits. In its place, a wholly arbitrary system: The court will consider the merits, when it wishes to do so. Whether the merits might reveal a constitutional violation is less important, because the court will enforce the Constitution only when it seems to be a good idea. What are courts, attorneys, and the public to make of this innovation?

Critics of this or that opinion often allege that a court has followed an extra-constitutional agenda. For a court to declare that it has done just that—in ignoring a content-based prior restraint no less—raises basic questions about the judiciary's function. The public is left with no way of knowing when a judge would declare some interest more important than the Constitution, or even bother hearing the merits of plainly significant pleas to enjoin unconstitutional conduct.

DOSWASHINGTONSUP01342

35

Absent a merits inquiry, a court balancing the unknown equities is reduced, as was the majority below, to declaring whether an abstract interest in constitutional rights is more or less important than an equally abstract government interest. And if the court then decides, as did the majority below, that *security > freedom*, that ends the matter. The logic is inescapable; where applied, it bars any injunctive relief.

Yet courts would be hard-pressed to approach *all* proposed free speech injunctions in this manner. For example, the lower court holds that the Due Process Clause secures a right to sex toys. *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008). Suppose that Saudi Arabia refused the United States essential military cooperation, so long as Saudi citizens could access Americans' online files aiding such devices' design and manufacture. Would the court below simply declare that "national security" justifies the State Department in ordering Americans to take down their web sites hosting such files, nevermind the merits of their First Amendment claims or the public's interest in the Constitution itself?

Or is it just that Petitioners, their speech, and their interests found the court's disfavor? Whose speech gets the familiar four-prong treatment, and whose gets the new rubber stamp? The majority did not explain. What remains is the unavoidable suspicion that the majority blinded itself to the merits because it feared, as Judge Jones's unchallenged dissent laid out, that Petitioners would prevail. But as this Court warned, "national-security concerns must not

DOSWASHINGTONSUP01343

become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins." *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1862 (2017) (internal quotation marks omitted).

Alas, the tickets punched below—allowing courts to disregard the constitutional merits of injunction requests and find public interests greater than the Constitution itself—are far too judge-empowering to remain "restricted . . . good for this day and this train only." *Smith* v. *Allwright*, 321 U.S. 649, 669 (1944) (Roberts, J., dissenting). Nor will the damage remain confined to the First Amendment. Dissenting from a judgment affirming an injunction against President Trump's executive order regarding immigration, some cited this case for the proposition that "although the public interest generally favors the protection of constitutional rights, that interest must sometimes yield to the public interest in national security. . . ." *Int'l Refugee Assistance Project* v. *Trump*, 857 F.3d 554, 657 (4th Cir. 2017) (en banc) (Shedd, J., dissenting), *cert. granted*, 137 S. Ct. 2080 (2017).

Confusing the matter, the *IRAP* dissent explained that "constitutional protections of any sort have little meaning" absent national security. *Id.* (quoting *Wayte* v. *United States*, 470 U.S. 598, 612 (1985)). But *Wayte*'s language merely recognized national defense as a legitimate interest under the second prong of *United States* v. *O'Brien*, 391 U.S. 367, 377 (1968). Nobody questioned that here. And this Court has never come close to suggesting that national security overrides the public interest in the Constitution itself.

## V.   This Case Presents an Excellent Vehicle For Resolving the Issues Presented.

This dispute comes before the Court on clear splits of circuit authority, and a comprehensive and robust record. The case has faced the rigor of a strongly-divided panel and rehearing process. Nor is there a question of a ripe case or controversy—Respondents have gagged Defense Distributed and declared its speech unfit for general publication.

Petitioners are constrained to note that this case is not only an excellent vehicle in its own right, but better suited for resolution than other efforts at attacking Respondents' prior restraint. Nearly three months after the district court's decision below, an attorney representing his own professional corporation (acting, essentially, in pro se) brought suit arguing that Respondents' practice precludes him from using unspecified "technical data" in his marketing presentations. In an unpublished summary order, the Second Circuit affirmed the denial of the law firm's motion for preliminary injunction. *Stagg P.C.* v. *United States Dep't of State*, 673 Fed. Appx. 93 (2d Cir. 2016) (summary order), *cert. petition pending*, No. 17-94 (filed July 17, 2017).

The district court, and the Second Circuit, both had difficulty with the law firm's refusal to identify the technical data it proposed to release. Absent that information, the courts "assume[d] the worst case scenario" and fully credited the government's concerns. *Id.* at

38

95.[4] Additionally, the law firm's reticence "depriv[ed] the DDTC of the opportunity to end this controversy by confirming its suspicion the materials" are not controlled. *Stagg P.C.* v. *United States Dep't of State*, 158 F. Supp. 3d 203, 208 (S.D.N.Y. 2016) (footnote omitted).

Obviously, these problems are not present here. The only appellate judges who reached the merits—based on the extensive record—easily concluded that an injunction should issue. Moreover, while Petitioners appreciate that others are impacted by the prior restraint, "prudential considerations demand that the Court insist upon that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *United States* v. *Windsor*, 133 S. Ct. 2675, 2687 (2013) (internal quotation marks omitted). Unlike Stagg, Petitioners bring the "[c]oncrete injury" that "adds the essential dimension of specificity to the dispute." *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (1974).

> This personal stake is what the Court has consistently held enables a complainant authoritatively to present to a court a complete perspective upon the adverse consequences flowing from the specific set of facts undergirding his grievance. Such authoritative presentations are an integral part of the judicial process, for a court must rely on the

_____

[4] Contrary to Stagg's petition, the courts assessed the merits of his claim as best they could. The Second Circuit would not have followed the approach below here. See *N.Y. Progress*, 733 F.3d at 488.

DOSWASHINGTONSUP01346

parties' treatment of the facts and claims be-
fore it to develop its rules of law.

*Id*. at 221.

Notwithstanding Petitioners' on-going, particular-
ized injury, Stagg theorizes that his inchoate dispute is
a better vehicle for addressing Respondents' prior re-
straint. See Petition for Certiorari, No. 17-94 at 36-37.
But Stagg's petition fails to disclose that he is no
stranger to *this* case. When Respondents threatened
Defense Distributed, the organization turned to its
then-counsel, Williams Mullen—where Stagg worked
as an attorney for Defense Distributed regarding the
issue. Defense Distributed disapproves of the adverse
position its former attorney now takes against it re-
specting the same matter. The conflict is reason
enough to deny Stagg's petition, if it is not withdrawn.

Stagg's attacks on his former client's case are also,
at best, misleading. First, as Judge Jones's dissent and
Respondents' regulations make clear, the issue is not
limited to the Internet—although, as *Packingham*
demonstrates, that would offer reason enough to re-
view the case were it so. Second, regardless of "Con-
gress's understanding," Stagg Pet. at 37, Respondents
are not about to allow Petitioners to speak. While a
task force is "considering the possibility" of excluding
"most commercial firearms and related activities from
the ITAR," App. 117a, that theoretical exclusion would
not protect Petitioners' plainly non-commercial speech.
The potential—always present—that the government
might voluntarily cease censoring applies equally to

40

Stagg, and it is no reason to leave the matter in the government's hands.

Finally, the notion that a lawyer's marketing presentations are "pure speech," but Internet publishing isn't, Stagg Pet. at 37, is incoherent. Stagg's marketing might well rely upon his former client's censored files to test the prior restraint, but Stagg's First Amendment claim cannot be "stronger" than or "superior" to that of his former client. *Id.*

This case presents the Court with multiple avenues of redressing the errors below. Judge Jones's exhaustive dissent, if not the panel majority, engaged the parties' specific and well-defined controversy on the merits, affording this Court a basis to decide the critical question of whether this particular content-based prior restraint is constitutional. But the magnitude of the lower court's errors in refusing to consider the merits prong, and elevating unexamined assertions of governmental interest over the Constitution itself, suggests the possibility of summary reversal. Even were the First Amendment's application here in doubt, the law of preliminary injunctions "is settled and stable, the facts are not in dispute, and the decision below is clearly in error." *Schweiker* v. *Hansen*, 450 U.S. 785, 791 (1981) (Marshall, J., dissenting).

This case merits a decision that adheres to this Court's established preliminary injunction framework. Whether that decision is made here, or whether it should come, in the first instance, from a court "of first view," *Expressions Hair Design* v. *Schneiderman*, 137

S. Ct. 1144, 1151 (2017) (internal quotation marks omitted), certiorari is appropriate.

——————◆——————

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

MATTHEW GOLDSTEIN
MATTHEW A. GOLDSTEIN, PLLC
1875 Connecticut Ave., N.W.
10th Floor
Washington, D.C. 20009
202.550.0040

WILLIAM B. MATEJA
POLSINELLI PC
2950 N. Harwood,
  Suite 2100
Dallas, TX 75201
214.397.0030

ALAN GURA
  *Counsel of Record*
GURA PLLC
916 Prince Street, Suite 107
Alexandria, VA 22314
703.835.9085
alan@gurapllc.com

JOSH BLACKMAN
1303 San Jacinto Street
Houston, TX 77002
202.294.9003

DAVID S. MORRIS
FISH & RICHARDSON P.C.
111 Congress Ave., Suite 810
Austin, TX 78701
512.472.5070

August 2017

DOSWASHINGTONSUP01349

1a

## APPENDIX A

### IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

———————————

No. 15-50759

———————————

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

     Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

     Defendants-Appellees

DOSWASHINGTONSUP01350

2a

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

(Filed Sep. 20, 2016)

Before DAVIS, JONES, and GRAVES, Circuit
Judges.

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs-Appellants Defense Distributed and Sec-
ond Amendment Foundation, Inc. have sued Defendants-
Appellees, the United States Department of State, the
Secretary of State, the DDTC, and various agency em-
ployees (collectively, the "State Department"), seeking
to enjoin enforcement of certain laws governing the ex-
port of unclassified technical data relating to prohib-
ited munitions. Because the district court concluded
that the public interest in national security outweighs
Plaintiffs-Appellants' interest in protecting their con-
stitutional rights, it denied a preliminary injunction,
and they timely appealed. We conclude the district
court did not abuse its discretion and therefore affirm.

## I.  Background

Defense Distributed is a nonprofit organization
operated, in its own words, "for the purpose of promot-
ing popular access to arms guaranteed by the United
States Constitution" by "facilitating global access to,
and the collaborative production of, information and

DOSWASHINGTONSUP01351

3a

knowledge related to the 3D printing of arms; and by publishing and distributing such information and knowledge on the Internet at no cost to the public." Second Amendment Foundation, Inc. is a nonprofit devoted more generally to promoting Second Amendment rights.

Defense Distributed furthers its goals by creating computer files used to create weapons and weapon parts, including lower receivers for AR-15 rifles.[1] The lower receiver is the part of the firearm to which the other parts are attached. It is the only part of the rifle that is legally considered a firearm under federal law, and it ordinarily contains the serial number, which in part allows law enforcement to trace the weapon. Because the other gun parts, such as the barrel and magazine, are not legally considered firearms, they are not regulated as such. Consequently, the purchase of a lower receiver is restricted and may require a background check or registration, while the other parts ordinarily may be purchased anonymously.

The law provides a loophole, however: anyone may make his or her own unserialized, untraceable lower receiver for personal use, though it is illegal to transfer such weapons in any way. Typically, this involves starting with an "80% lower receiver," which is simply an unfinished piece of metal that looks quite a bit like a

---

[1] The district court capably summarized the facts in its memorandum opinion and order. *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 686-88 (W.D. Tex. 2015). The facts set out in this opinion come largely from the district court's opinion and the parties' briefs.

4a

lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver. Typically this would involve using jigs (milling patterns), a drill press, other tools, and some degree of machining expertise to carefully complete the lower receiver. The result, combined with the other, unregulated gun parts, is an unserialized, untraceable rifle.

Defense Distributed's innovation was to create computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment. Defense Distributed has explained the technologies as follows:

> Three-dimensional ("3D") printing technology allows a computer to "print" a physical object (as opposed to a two-dimensional image on paper). Today, 3D printers are sold at stores such as Home Depot and Best Buy, and the instructions for printing everything from jewelry to toys to car parts are shared and exchanged freely online at sites like GrabCAD.com and Thingiverse.com. Computer numeric control ("CNC") milling, an older industrial technology, involves a computer directing the operation of a drill upon an object. 3D printing is "additive;" using raw materials, the printer constructs a new object. CNC milling is "subtractive," carving something (more) useful from an existing object.

> Both technologies require some instruction set or "recipe" – in the case of 3D printers,

DOSWASHINGTONSUP01353

5a

computer aided design ("CAD") files, typically in .stl format; for CNC machines, text files setting out coordinates and functions to direct a drill.[2]

Defense Distributed's files allow virtually anyone with access to a 3D printer to produce, among other things, Defense Distributed's single-shot plastic pistol called the Liberator and a fully functional plastic AR-15 lower receiver. In addition to 3D printing files, Defense Distributed also sells its own desktop CNC mill marketed as the Ghost Gunner, as well as metal 80% lower receivers. With CNC milling files supplied by Defense Distributed, Ghost Gunner operators are able to produce fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion.

Everything discussed above is legal for United States citizens and will remain legal for United States citizens regardless of the outcome of this case. This case concerns Defense Distributed's desire to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions.

Beginning in 2012, Defense Distributed posted online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol (the "Published Files"). On May 8, 2013, the State Department sent a letter to Defense Distributed requesting that it remove the files from the internet on

_____

[2]  Plaintiffs-Appellants' Original Brief on Appeal.

DOSWASHINGTONSUP01354

the ground that sharing them in that manner violates certain laws. The district court summarized the relevant statutory and regulatory framework as follows:

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC [Directorate of Defense Trade Controls] and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2778(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied sub nom. Yufeng Wei v. United States*, ___ U.S. ___, 134 S. Ct. 365, 187 L. Ed. 2d 160 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an

DOSWASHINGTONSUP01355

7a

effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*[3]

In short, the State Department contended: (1) the Published Files were potentially related to ITAR-controlled "technical data" relating to items on the USML; (2) posting ITAR-controlled files on the internet for foreign nationals to download constitutes "export"; and (3) Defense Distributed therefore must obtain prior approval from the State Department before "exporting" those files. Defense Distributed complied with the State Department's request by taking

---

[3] *See Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 687-88 (W.D. Tex. 2015).

8a

down the Published Files and seeking commodity jurisdiction requests for them. It did eventually obtain approval to post some of the non-regulated files, but *all* of the Published Files continue to be shared online on third party sites like The Pirate Bay.

Since then, Defense Distributed has not posted any new files online. Instead, it is seeking prior approval from the State Department and/or DDTC before doing so, and it has not obtained such approval. The new files Defense Distributed seeks to share online include the CNC milling files required to produce an AR-15 lower receiver with the Ghost Gunner and various other 3D printed weapons or weapon parts.

### District Court Proceedings

In the meantime, Defense Distributed and Second Amendment Foundation, Inc., sued the State Department, seeking to enjoin them from enforcing the regulations discussed above. Plaintiffs-Appellants argue that the State Department's interpretation of the AECA, through the ITAR regulations, constitutes an unconstitutional prior restraint on protected First Amendment speech, to wit, the 3D printing and CNC milling files they seek to place online.[4] They also claim violations of the Second and Fifth Amendments.

———

[4] The State Department does not restrict the export of the Ghost Gunner machine itself or the user manual, only the specific CNC milling files used to produce the AR-15 lower receivers with it, as well as all 3D printing files used to produce prohibited weapons and weapon parts.

DOSWASHINGTONSUP01357

9a

Plaintiffs-Appellants' challenges to the regulatory scheme are both facial and as applied, and they ultimately seek a declaration that no prepublication approval is needed for privately generated unclassified information, whether or not that data may constitute "technical data" relating to items on the USML.

Plaintiffs-Appellants sought a preliminary injunction against the State Department, essentially seeking to have the district court suspend enforcement of ITAR's prepublication approval requirement pending final resolution of this case. The district court denied the preliminary injunction, and Plaintiffs-Appellants timely filed this appeal. We review the denial of a preliminary injunction for abuse of discretion, but we review any questions of law de novo.[5]

> To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the

_____

[5] *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005) (footnotes omitted)

DOSWASHINGTONSUP01358

10a

burden of persuasion' on all four require-
ments."[6]

We have long held that satisfying one requirement
does not necessarily affect the analysis of the other re-
quirements. In *Southern Monorail Co. v. Robbins &
Myers, Inc*., 666 F.2d 185 (5th Cir. Unit B 1982), for ex-
ample, the district court had denied a preliminary
injunction solely because it found that the movant,
Robbins & Myers, failed to satisfy the balance of harm
requirement. On appeal, Robbins & Myers argued that
it had clearly shown a substantial likelihood of success
on the merits, and satisfying that requirement should
give rise to a presumption of irreparable harm and a
presumption that the balance of harm tipped in its fa-
vor. We disagreed:

> Because we dispose of this case on the balance
> of harm question, we need not decide and we
> express no views upon whether a presumption
> of irreparable injury as a matter of law is ap-
> propriate once a party demonstrates a sub-
> stantial likelihood of success on the merits of
> an infringement claim. In other words, even
> assuming arguendo that Robbins & Myers
> has shown a substantial likelihood of success
> on the merits of its infringement claim and
> that irreparable injury should be presumed
> from such a showing (two issues not ad-
> dressed by the district court in this case), we
> still uphold the district court's decision, which
> rested solely on the balance of harm factor. We
> agree that Robbins & Myers has failed to

---

[6] *Id*.

DOSWASHINGTONSUP01359

11a

carry its burden of showing that the threatened harm to it from the advertisement outweighs the harm to Southern Monorail from the intercept. In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular. *See Ideal Industries, Inc. v. Gardner Bender, Inc*., 612 F.2d 1018, 1026 (7th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S. Ct. 3016, 65 L. Ed. 2d 1116 (1980) (district court obligated to weigh relative hardship to parties in relation to decision to grant or deny preliminary injunction, even when irreparable injury shown).[7]

The district court concluded that the preliminary injunction should be denied because Plaintiffs-Appellants failed to satisfy the balance of harm and public interest requirements, which do not concern the merits. (Assuming without deciding that Plaintiffs-Appellants have suffered the loss of First and Second Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time, constitutes irreparable

---

[7] *Id*. at 187-88.

DOSWASHINGTONSUP01360

12a

injury.[8]) In extensive dicta comprising nearly two-thirds of its memorandum opinion, the district court also concluded that Plaintiffs-Appellants failed to show a likelihood of success on the merits. Plaintiffs-Appellants timely appealed, asserting essentially the same arguments on appeal. Plaintiffs-Appellants continue to bear the burden of persuasion on appeal.

## Analysis

Because the district court held that Plaintiffs-Appellants only satisfied the irreparable harm requirement, they may obtain relief on appeal only if they show that the district court abused its discretion on all three of the other requirements. The district court denied the preliminary injunction based on its finding that Plaintiffs-Appellants failed to meet the two non-merits requirements by showing that (a) the threatened injury to them outweighs the threatened harm to the State Department, and (b) granting the preliminary injunction will not disserve the public interest. The court only addressed the likelihood of success on the merits as an additional reason for denying the injunction. Because we conclude the district court did not abuse its discretion on its non-merits findings, we decline to address the merits requirement.

---

[8] *See Def. Distributed*, 121 F. Supp. 3d at 689 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)).

DOSWASHINGTONSUP01361

13a

The crux of the district court's decision is essentially its finding that the government's exceptionally strong interest in national defense and national security outweighs Plaintiffs-Appellants' very strong constitutional rights under these circumstances. Before the district court, as on appeal, Plaintiffs-Appellants failed to give *any* weight to the public interest in national defense and national security, as the district court noted:

> Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n. 9 (5th Cir. 2014) (district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations).[9]

Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. That is not necessarily true here, however, because the State Department has asserted a very strong public interest in national defense and national security. Indeed, the State Department's stated interest in preventing foreign nationals – including all manner of enemies of this country – from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national

---

[9] *Id*. at 689.

DOSWASHINGTONSUP01362

14a

defense and national security; it lies squarely within that interest.

In the State Department's interpretation, its ITAR regulations directly flow from the AECA and are the only thing preventing Defense Distributed from "exporting" to foreign nationals (by posting online) prohibited technical data pertaining to items on the USML. Plaintiffs-Appellants disagree with the State Department's interpretation, but that question goes to the merits.

Because Plaintiffs-Appellants' interest in their constitutional rights and the State Department's interest in national defense and national security are both public interests, the district court observed that "[i]n this case, the inquiry [on these two requirements] essentially collapses."[10] It reasoned:

> While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest – and authority – of

_____

[10] *Id.*

DOSWASHINGTONSUP01363

the President and Congress in matters of foreign policy and export. *See Haig v. Agee*, 453 U.S. 280, 292, 101 S. Ct. 2766, 69 L. Ed. 2d 640 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink*, 315 U.S. 203, 222-23, 62 S. Ct. 552, 86 L. Ed. 796 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp [contrast] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in

an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims[.][11]

Plaintiffs-Appellants suggest the district court disregarded their paramount interest in protecting their constitutional rights. That is not so. The district court's decision was based not on discounting Plaintiffs-Appellants' interest but rather on finding that the public interest in national defense and national security is stronger here, and the harm to the government is greater than the harm to Plaintiffs-Appellants. We cannot say the district court abused its discretion on these facts.

Because both public interests asserted here are strong, we find it most helpful to focus on the balance of harm requirement, which looks to the relative harm to both parties if the injunction is granted or denied. If we affirm the district court's denial, but Plaintiffs-Appellants eventually prove they are entitled to a permanent injunction, their constitutional rights will have been violated in the meantime, but only temporarily. Plaintiffs-Appellants argue that this result is absurd because the Published Files are already available through third party websites such as the Pirate Bay, but granting the preliminary injunction sought by Plaintiffs-Appellants would allow them to share online not only the Published Files but also any new,

_____

[11] *Id*. at 689-90.

DOSWASHINGTONSUP01365

previously unpublished files. That leads us to the other side of the balance of harm inquiry.

If we reverse the district court's denial and instead grant the preliminary injunction, Plaintiffs-Appellants would legally be permitted to post on the internet as many 3D printing and CNC milling files as they wish, including the Ghost Gunner CNC milling files for producing AR-15 lower receivers and additional 3D-printed weapons and weapon parts. Even if Plaintiffs-Appellants eventually fail to obtain a permanent injunction, the files posted in the interim would re-main online essentially forever, hosted by foreign web-sites such as the Pirate Bay and freely available worldwide. That is not a far-fetched hypothetical: the initial Published Files are still available on such sites, and Plaintiffs-Appellants have indicated they will share additional, previously unreleased files as soon as they are permitted to do so. Because those files would never go away, a preliminary injunction would func-tion, in effect, as a permanent injunction as to all files released in the interim. Thus, the national defense and national security interest would be harmed forever. The fact that national security might be permanently harmed while Plaintiffs-Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.

In sum, we conclude that the district court did not abuse its discretion in denying Plaintiffs-Appellants' preliminary injunction based on their failure to carry

DOSWASHINGTONSUP01366

their burden of persuasion on two of the three non-merits requirements for preliminary injunctive relief, namely the balance of harm and the public interest. We therefore affirm the district court's denial and decline to reach the question of whether Plaintiffs-Appellants have demonstrated a substantial likelihood of success on the merits.[12]

_____

[12] The dissent disagrees with this opinion's conclusion that the balance of harm and public interest factors favor the State Department such that Plaintiffs-Appellants' likelihood of success on the merits could not change the outcome. The dissent argues that we "should have held that the domestic internet publication" of the technical data at issue presents no "immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms."

We note the following: (1) If Plaintiffs-Appellants' publication on the Internet were truly domestic, i.e., limited to United States citizens, there is no question that it would be legal. The question presented in this case is whether Plaintiffs-Appellants may place such files on the Internet for unrestricted worldwide download. (2) This case does not concern only the files that Plaintiffs-Appellants previously made available online. Plaintiffs-Appellants have indicated their intent to make many more files available for download as soon as they are legally allowed to do so. Thus, the bulk of the potential harm has not yet been done but could be if Plaintiffs-Appellants obtain a preliminary injunction that is later determined to have been erroneously granted. (3) The world may be "awash with small arms," but it is not yet awash with the ability to make untraceable firearms anywhere with virtually no technical skill. For these reasons and the ones we set out above, we remain convinced that the potential permanent harm to the State Department's strong national security interest outweighs the potential temporary harm to Plaintiffs-Appellants' strong First Amendment interest.

As to the dissent's extensive discussion of Plaintiffs-Appellants' likelihood of success on the merits of the First Amendment issue,

19a

We are mindful of the fact that the parties and the amici curiae in this case focused on the merits, and understandably so. This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether the ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits.

On remand, the district court eventually will have to address the merits, and it will be able to do so with the benefit of a more fully developed record. The amicus briefs submitted in this case were very helpful and almost all supported Plaintiffs-Appellants' general position. Given the importance of the issues presented, we may only hope that amici continue to provide input into the broader implications of this dispute.

---

we take no position. Even a First Amendment violation does not necessarily trump the government's interest in national defense. We simply hold that Plaintiffs-Appellants have not carried their burden on two of the four requirements for a preliminary injunction: the balance of harm and the public interest.

DOSWASHINGTONSUP01368

20a

## Conclusion

For the reasons set out above, we conclude that the district court did not abuse its discretion by denying the preliminary injunction on the non-merits requirements. AFFIRMED.

——————

JONES, Circuit Judge, dissenting:

This case poses starkly the question of the national government's power to impose a prior restraint on the publication of lawful, unclassified, not-otherwise-restricted technical data to the Internet under the guise of regulating the "export" of "defense articles." I dissent from this court's failure to treat the issues raised before us with the seriousness that direct abridgements of free speech demand.

## I.

From late 2012 to early 2013, plaintiff Defense Distributed posted on the Internet, free of charge, technical information including computer assisted design files (CAD files) about gun-related items including a trigger guard, two receivers, an ArmaLite Rifle-15 magazine,[1] and a handgun named "The Liberator." None of the published information was illegal, classified for national security purposes, or subject to

————————

[1] The ArmaLite Rifle, design 15 is rifle platform commonly abbreviated AR-15, a registered trademark of Colt's Inc. AR-15, Registration No. 0,825,581.

DOSWASHINGTONSUP01369

21a

contractual or other distribution restrictions. In these respects the information was no different from technical data available through multiple Internet sources from widely diverse publishers. From scientific discussions to popular mechanical publications to personal blog sites, information about lethal devices of all sorts, or modifications to commercially manufactured firearms and explosives, is readily available on the Internet.

What distinguished Defense Distributed's information at that time, however, was its computer files designed for 3D printer technology that could be used to "print" parts and manufacture, with the proper equipment and know-how, a largely plastic single-shot handgun. The Liberator technology drew considerable press attention[2] and the relevant files were downloaded "hundreds of thousands of times." In May 2013, Defense Distributed received a warning letter from the U.S. State Department stating in pertinent part:

> DDTC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the USML. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of

---

[2] According to Defense Distributed, the Liberator files were covered, inter alia, by Forbes, CNN, NBC News, and the Wall Street Journal.

22a

Defense Trade Controls (DDTC), a violation of the ITAR.

Pursuant to § 127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under § 120.17 of the ITAR.

The letter then advised Defense Distributed that it must "remove [its information] from public access" immediately, pending its prompt request for and receipt of approval from DDTC.

In a nearly forty-year history of munitions "export" controls, the State Department had never sought enforcement against the posting of any kind of files on the Internet. Because violations of the cited regulations carry severe civil and criminal penalties,[3] Defense Distributed had no practical choice but to remove the information and seek approval to publish from DDTC. It took the government entities two years to refuse to exempt most of the files from the licensing regime.

---

[3] Fines may exceed a million dollars and imprisonment, for violations premised on specific intent to violate, up to twenty years. 28 U.S.C. § 2778(c); *United States v. Covarrubias*, 94 F.3d 172 (5th Cir. 1996).

DOSWASHINGTONSUP01371

23a

Defense Distributed filed suit in federal court to vindicate, inter alia, its First Amendment right to publish without prior restraint[4] and sought the customary relief of a temporary injunction to renew publication. This appeal stems from the district court's denial of relief. Undoubtedly, the denial of a temporary injunction in this case will encourage the State Department to threaten and harass publishers of similar nonclassified information. There is also little certainty that the government will confine its censorship to Internet publication. Yet my colleagues in the majority seem deaf to this imminent threat to protected speech. More precisely, they are willing to overlook it with a rote incantation of national security, an incantation belied by the facts here and nearly forty years of contrary Executive Branch pronouncements.

This preliminary injunction request deserved our utmost care and attention. Interference with First Amendment rights for any period of time, even for short periods, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S. Ct. 2140 (1971)); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295-97 (5th Cir.

---

[4] To simplify discussion, I refer to Defense Distributed as the plaintiff, but it is joined in litigation by the Second Amendment Foundation, and its arguments are adopted and extended by numerous amici curiae. Believing that the deprivation of a merits opinion is most critical to Defense Distributed's First Amendment claim, I do not discuss the plaintiffs' other non-frivolous claims premised on ultra vires, the Second Amendment and procedural due process.

DOSWASHINGTONSUP01372

24a

2012). Defense Distributed has been denied publication rights for over three years. The district court, moreover, clearly erred in gauging the level of constitutional protection to which this speech is entitled: intermediate scrutiny is inappropriate for the content-based restriction at issue here. (Why the majority is unwilling to correct this obvious error for the sake of the lower court's getting it right on remand is a mystery).

The district court's mischaracterization of the standard of scrutiny fatally affected its approach to the remaining prongs of the test for preliminary injunctive relief. Without a proper assessment of plaintiff's likelihood of success on the merits – arguably the most important of the four factors necessary to grant a preliminary injunction, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005) – the district court's balancing of harms went awry.[5] We should have had a panel discussion about the government's right to censor Defense Distributed's speech.

---

[5] *See Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."). *Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185 (5th Cir. 1982), is the only case relied upon by the majority for the proposition that we may dispense with addressing the likelihood of success on the merits if we conclude that the parties have not satisfied one of the other elements of the test for granting a preliminary injunction. That case is distinguishable. First, *Southern Monorail* was a private action concerning trademark infringement, not a case involving a claim of the invasion of constitutional rights by the federal government. *See id.* at 185-86. Second, "the district court denied the

25a

Since the majority are close to missing in action, and for the benefit of the district court on remand, I will explain why I conclude that the State Department's application of its "export" control regulations to this domestic Internet posting appears to violate the governing statute, represents an irrational interpretation of the regulations, and violates the First Amendment as a content-based regulation and a prior restraint.

## II.

## A.  Regulatory Framework

The Arms Export Control Act of 1976 ("AECA") authorizes the President to "control the import and the export of defense articles and defense services." 22 U.S.C. § 2778(a)(1). The President "is authorized to designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." *Id.* "The items so designated shall constitute the United States Munitions List." *Id.* The statute does not define "export," but "defense items" includes defense articles, defense services "and related technical data." 22 U.S.C. § 2778(j)(4)(A).

———————

injunction *solely* on the basis of the third factor, concerning the balance of harm." *Id.* at 186 (emphasis added). In this case, by contrast, the district court addressed each of the preliminary injunction factors, thus allowing us to consider its resolution of each factor.

DOSWASHINGTONSUP01374

26a

In response to this directive, the State Department promulgated the International Traffic in Arms Regulations ("ITAR"), which contain the United States Munitions List ("USML"). 22 C.F.R. § 121.1. The USML enumerates a vast array of weaponry, ammunition, and military equipment including, for present purposes, "firearms," defined as "[n]onautomatic and semi-automatic firearms to caliber .50 inclusive," 22 C.F.R. § 121.1, Category I, item (a).

The USML also broadly designates "technical data" relating to firearms as subject to the ITAR. 22 C.F.R. § 121.1, Category I, item (i). "Technical data" encompass any information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

Notably excepted from "technical data" is information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain." 22 C.F.R. § 120.10(b). Further, the "public domain" covers "information which is published and which is generally accessible or available to the public" through newsstands, bookstores, public libraries, conferences, meetings, seminars, trade shows, and "fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published

27a

and shared broadly in the scientific community." 22 C.F.R. § 120.11(a).[6]

Under the ITAR it is unlawful to "export or attempt to export from the United States any defense article or technical data" without first obtaining a license or written approval from the Directorate of Defense Trade Controls ("DDTC"), a division of the State Department. 22 C.F.R. § 127.1(a)(1). When Defense Distributed published technical data on the Internet, the State Department defined "export" broadly, as, *inter alia*, "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4).[7]

─────────

[6] This provision only appears to permit dissemination of information *already* in the public domain. Indeed, the State Department has explicitly taken the position in this litigation and in a June 2015 Notice of Proposed Rulemaking that an individual wishing to place technical data in the public domain must obtain State Department approval. 80 Fed. Reg. at 31,528. The State Department has proposed, but has not yet adopted, a rule to make this distinction more explicit. *See id*.

[7] Effective September 1, 2016, however, the State Department has amended that provision, now defining an export as, "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." *Id.* § 120.17(a)(2); *see also* International Traffic in Arms: Revisions to Definition of Export and Related Definitions, 81 Fed. Reg. 35,611, 35,616 (June 3, 2016). Moreover, in June 2015, the State Department issued a Notice of Proposed Rulemaking, which proposed adding to the term "export" "[m]aking technical data available via a publicly available network (*e.g.*, the Internet)." This, of course, is the open-ended definition of "export" urged by the State Department in this litigation. *See* International Traffic in Arms: Revisions to Definitions of

DOSWASHINGTONSUP01376

28a

In order to resolve doubts about whether an "export" is covered by ITAR, parties may request a "commodity jurisdiction" determination from the DDTC, which will determine each request on a "case-by-case basis," 22 C.F.R. § 120.4(a), taking into account "the form and fit of the article; and [t]he function and performance capability of the article." 22 C.F.R. § 120.4 (d)(2)(i)-(ii).

The commodity jurisdiction process could, in theory, be avoided if the particular export is exempt from the DDTC process. 22 C.F.R. § 125.4. As relevant here, "[t]echnical data approved for public release (i.e., unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review" is exempt from the DDTC approval process. 22 C.F.R. § 125.4(b)(13). Under this rubric, the Defense Office of Prepublication and Security Review ("DOPSR"), housed in the Department of Defense's Defense Technical Information Center, "is responsible for managing the Department of Defense security review program, [and] reviewing written materials both for public and controlled release." Defense Office of Prepublication and Security Review (DOPSR), EXECUTIVE SERVS. DIRECTORATE ONLINE, http://www.dtic.mil/whs/esd/osr/ (last visited Aug. 22, 2016). The plaintiff's experience suggests

_____

Defense Services, Technical Data, and Public Domain, 80 Fed. Reg. 31,525, 31,535 (proposed June 3, 2015). The Notice advised that the State Department intends to address that definition in a separate rulemaking and for now allows the "existing ITAR controls [to] remain in place." 81 Fed. Reg. at 35,613.

DOSWASHINGTONSUP01377

that, in practice, DOPSR will not act on requests for exemptions concerning items not clearly subject to the ITAR until DDTC issues a commodity jurisdiction determination.

The DDTC is required to provide a final commodity jurisdiction determination within 45 days of a commodity jurisdiction request, but if it is not then resolved, an applicant may request expedited processing. 22 C.F.R. § 120.4(e). The DDTC has been criticized by the Government Accountability Office and the Office of Inspector General for routinely failing to meet deadlines. In this case, it took nearly two years for DDTC to rule on the plaintiff's commodity jurisdiction applications. Although an applicant may appeal an unfavorable commodity jurisdiction determination within the State Department, *Id.* § 120.4(g), Congress has excluded from judicial review the agency's discretionary decisions in "designat[ing] . . . items as defense articles or defense services." 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1.[8]

---

[8] While 22 U.S.C. § 2778(h) withholds judicial review as noted, 22 C.F.R. § 128.1 purports more broadly to preclude judicial review over the Executive's implementation of the AECA under the Administrative Procedure Act. I would construe these provisions narrowly to avoid difficult questions that might arise were the Government to take the position that these provisions prevent judicial review for all claims, including those founded on the Constitution. *See Kirby Corp v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997) ("There is a strong presumption that Congress intends there to be judicial review of administrative agency action . . . and the government bears a 'heavy burden' when arguing that Congress meant to withdraw all judicial review."); *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) ("If the wording of a preclusion

Should the DDTC determine, as here, that technical data are subject to the ITAR, an "export" license is required before the information may be posted online. But the license may be denied whenever the State Department "deems such action to be in furtherance of world peace, the national security of the United States, or is otherwise advisable." 22 C.F.R. § 126.7(a)(1). There is a nominal 60-day deadline for a licensing decision, which is riddled with exceptions, and denial of an export license is expressly exempt from judicial review. *See* 22 C.F.R. § 128.1.

I would hardly deny that the Department of Justice has good grounds for prosecuting attempts to export weapons and military technology illegally to foreign actors. Previous prosecutions have targeted defendants, *e.g.*, who attempted to deliver WMD materials to North Korea, who sought to distribute drone and missile schematics to China, and who attempted to license chemical purchasing software to companies owned by the Iranian government.[9] Defense Distributed agrees, moreover, that the Government may

---

clause is less than absolute, the presumption of judicial review also favors a particular *category* of plaintiffs' claims."); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) (Agency "shenanigans" are "properly reviewable . . . under the Administrative Procedure Act, which enables reviewing courts to set aside agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious.") (internal quotations omitted).

[9] *See* DEPARTMENT OF JUSTICE, SUMMARY OF MAJOR U.S. EXPORT ENFORCEMENT, ECONOMIC ESPIONAGE, TRADE SECRET AND EMBARGO-RELATED CRIMINAL CASES (*January 2009 to the present: updated August 12, 2015*) 3, 11, 86 (2015), *available at* https://

DOSWASHINGTONSUP01379

31a

prosecute individuals who email classified technical data to foreign individuals or directly assist foreign actors with technical military advice. *See*, *e.g.*, *United States v. Edler Industries, Inc.*, 579 F.2d 516 (9th Cir. 1978), construing prior version of AECA. Yet, as plaintiff points out, at the time that DDTC stifled Defense Distributed's online posting, there were no publicly known enforcement actions in which the State Department purported to require export licenses or prior approval for the domestic posting of lawful, unclassified, not-otherwise-restricted information on the Internet.

While Defense Distributed has been mired in this thicket of regulation, the CAD files that it published continue to be available to the international public to this day on websites such as the Pirate Bay. Moreover, technology has not stood still: design files are now available on the Internet for six- and eight-shot handguns that can be produced with 3D printing largely out of plastic materials. *See*, *e.g.*, Scott J. Grunewald, "The World's First Fully Printed Revolver is Here", 3DPrint-Board.com (Nov. 23, 2015) (site visited 9/14/2016).

## B. Discussion

As applied to Defense Distributed's publication of technical data, the State Department's prepublication approval and license scheme lacks statutory and regulatory authorization and invades the plaintiff's First Amendment rights because it is both a content-based

———————
www.pmddtc.state.gov/compliance/documents/OngoingExportCase FactSheet.pdf.

DOSWASHINGTONSUP01380

32a

regulation that fails strict scrutiny and an unconstitutional prior restraint on protected speech.[10]

### 1. The Statute and its Regulatory Interpretation.

Whether AECA itself, concerned with the "export" of defense article related technical data, authorizes prepublication censorship of domestic publications on the Internet is at least doubtful. Further, construing the State Department's regulations for such a purpose renders them incoherent and unreasonable.

It is necessary first to analyze the statute under which the State Department presumed to enact its regulations and, under the first prong of *Chevron* analysis, what the statute means.[11] The term "export" is not defined in the AECA, is not a term of legal art, and is not ambiguous. Under standard canons of statutory construction, "export" should bear its most common meaning. According to dictionaries, the verb "export" means "to ship (commodities) to other countries or places for sale, exchange, etc." *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998) (citing *The Random House Dictionary of the English Language* 682 (2d ed.1987));

---

[10] For simplicity only, I do not here address plaintiffs' vagueness claim.

[11] It is hard to say whether the State Department's interpretation of AECA should be analyzed under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781 (1984) or *United States v. Mead Corp.*, 533 U.S. 218, 227-28, 121 S. Ct. 2164, 2171-72 (2001). I refer to *Chevron* analysis *arguendo* because it captures both the statute and the reasonableness of the regulations.

DOSWASHINGTONSUP01381

*Export*, Black's Law Dictionary (10th ed. 2014) ("To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 741 (5th Cir. 2001) ("Exportation occurs when the goods are shipped to another country"). As the court explained in *Ehsan*, which interpreted a Presidential proclamation banning "exportation" of goods or technology to Iran, "[t]hese definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade." *Id. See also Swan v. Finch Co. v. United States*, 190 U.S. 143, 145 (1903) (the "legal notion . . . of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to things belonging to some foreign country or another"). As against a claim that the rule of lenity should apply, the *Ehsam* court explicitly held that "export" is unambiguous. *Id. at* 859-60

Given this construction of "export" by a fellow circuit court, we have no reason to hold that Congress deviated from the term's plain meaning, particularly so significantly as to encompass the domestic publication on the Internet, without charge and therefore without any "trade," of lawful, nonclassified, nonrestricted information. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes." *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (internal quotation omitted).

DOSWASHINGTONSUP01382

34a

Pursuant to *Chevron*, where the meaning of a statute is plain, a federal agency has no warrant to act beyond the authority delegated by Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781 (1984). The State Department's briefing makes no effort to address the statutory language, which must be read in light of established case law and the term's ordinary meaning and the rule of constitutional avoidance.

This determination of the meaning of "export" under *Chevron* step one would normally resolve the case. For the sake of argument, however, it is also clear that the State Department regulations fail the second step as well. Under the second step of *Chevron* analysis, they may be upheld only if they represent a "reasonable" construction of the statute. *Chevron*, 467 U.S. at 844, 104 S. Ct. at 2782. Defense Distributed and its amici challenge the regulations' interpretation of "export" and the "public domain" exception to the definition of "technical data." Although the majority opinion adopts the State Department's litigating position that "export" refers only to publication on the Internet, where the information will inevitably be accessible to foreign actors, the warning letter to Defense Distributed cited the exact, far broader regulatory definition: "export" means "disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States of [sic] abroad." There is embedded ambiguity, and disturbing breadth, in the State Department's discretion to prevent the dissemination (without an "export" license) of lawful,

DOSWASHINGTONSUP01383

non-classified technical data to foreign persons within the U.S. The regulation on its face, as applied to Defense Distributed, goes far beyond the proper statutory definition of "export."

Even if "export" in AECA could bear a more capacious interpretation, applying the State Department's regulatory interpretation to the non-transactional publication of Defense Distributed's files on the Internet is unreasonable. In terms of the regulations themselves, how this expansive definition of "export" interacts with the "public domain" exception is unclear at best. If any dissemination of information bearing on USML technical data to foreign persons within the U.S. is potentially an "export," then facilitating domestic publication of such information free of charge can never satisfy the "public domain" exception because newspapers, libraries, magazines, conferences, etc. may all be accessed by foreign persons. The State Department's *ipse dixit* that "export" is consistent with its own "public domain" regulation is incoherent and unreasonable. Even if these regulations are consistent, however, attempting to exclude the Internet from the "public domain," whose definition does not currently refer to the Internet, is irrational and absurd. The Internet has become the quintessential "public domain." The State Department cannot have it both ways, broadly defining "export" to cover non-transactional publication within the U.S. while solely and arbitrarily excluding from the "public domain" exception the Internet publication of Defense Distributed's technical data.

36a

The root of the problem is that the State Department's litigating position and its regulations put more weight on "export" than any reasonable construction of the statute will bear. "Export" and "publication" are functionally different concepts. *Cf. Bond*, 134 S. Ct. at 2090 ("[s]aying that a person 'used a chemical weapon' conveys a very different idea than saying the person 'used a chemical in a way that caused some harm.'" Not only does the State Department fail to justify according its interpretation *Chevron* deference, but the doctrine of constitutional avoidance establishes that *Chevron* deference would be inappropriate anyway. That doctrine provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also id.* at 574-75 (stating that although the agency interpretation at issue "would normally be entitled to deference," "[a]nother rule of statutory construction [constitutional avoidance] . . . is pertinent here"); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) ("We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference."). As the following constitutional discussion shows, the Executive Branch has consistently recognized the conceptual difference between "export" and "publication", and its

37a

constitutional significance, throughout the forty-year history of the AECA. It is only the novel threatened enforcement in this case that brings to the fore the serious problems of censorship that courts are bound to address.

2. The First Amendment – Content-based speech restriction.

"Content-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "A speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter:" consequently, even a viewpoint neutral law can be content-based. *Id.* at 2230. "Strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Id.* at 2228.

The prepublication review scheme at issue here would require government approval and/or licensing of any domestic publication on the Internet of lawful, non-classified "technical information" related to "firearms" solely because a foreign national might view the posting. As applied to the publication of Defense

38a

Distributed's files, this process is a content-based restriction on the petitioners' domestic speech "because of the topic discussed." *Reed*, 135 S. Ct. at 2227. Particularly relevant to this case is *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 27-28, 130 S. Ct. 2705, 2723-24 (2010), in which the Supreme Court held that as applied, a criminal statute forbidding the provision of material support and resources to designated terrorist organizations was content based and required strict scrutiny review. The Court there rejected the government's assertion that although the plaintiffs were going to provide legal training and political advocacy to Mideast terrorist organizations, the statute criminalized "conduct" and only incidentally affected "speech." Rejecting this incidental burden argument for intermediate scrutiny review, the Court stated the obvious: "[p]laintiffs want to speak to the PKK and the LTTE, and whether they may do so under § 2239B depends on what they say:" if their speech concerns "specialized knowledge" it is barred, but it [sic] "if it imparts only general or unspecialized knowledge" it is permissible). *Humanitarian Law Proj.*, 130 S. Ct. at 2724.

The State Department barely disputes that computer-related files and other technical data are speech protected by the First Amendment. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445-49 (2d Cir. 2001) (discussing level of scrutiny owed for "speech" in the form of a decryption computer program). There are CAD files on the Internet and designs, drawings, and technical information about myriad items – jewelry, kitchen supplies, model airplanes, or clothing, for

DOSWASHINGTONSUP01387

39a

example – that are of no interest to the State Department. Only because Defense Distributed posted technical data referring to firearms covered generically by the USML does the government purport to require pre-publication approval or licensing. This is pure content-based regulation.[12]

The Government's argument that its regulatory scheme is content-neutral because it is focused on curbing harmful secondary effects rather than Defense Distributed's primary speech is unpersuasive. The Supreme Court explained this distinction in *Boos v. Barry*, which overturned an ordinance restricting criticism of foreign governments near their embassies

---

[12] The Ninth Circuit held in *United States v. Mak* that "the AECA and its implementing regulations are content-neutral" because "[t]he purpose of the AECA does not rest upon disagreement with the message conveyed," and because "ITAR defines the technical data based on its *function* and not its viewpoint." 683 F.3d 1126, 1134-35 (9th Cir. 2012). *Mak* is distinguishable for a number of reasons. First, the defendant was prosecuted for attempting to export to the People's Republic of China sensitive submarine technology loaded on unauthorized CDs and was arrested when he was carrying them aboard an international flight. Second, *Mak* was decided before *Reed* where the Supreme Court counseled that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." 135 S. Ct. at 2230. Third, even if the case is analyzed as a content-based restriction, Mak's prosecution falls comfortably within the traditional understanding of "export." The government's heightened interest in national security is evident, and the Court required the government to prove beyond a reasonable doubt that the technical information he was carrying was not in the public domain.

DOSWASHINGTONSUP01388

40a

because it "focus[es] on the direct impact of speech on its audience." Secondary effects of speech, as the Court understood, include "congestion, [] interference with ingress or egress, [] visual clutter, or [] the need to protect the security of embassies", which are the kind of regulations that underlie *Renton v. Playtime Theaters*. 485 U.S. 312, 321, 108 S. Ct. 1157, 1163-64 (1988). Similarly, the regulation of speech here is focused on the "direct impact of speech on its audience" because the government seeks to prevent certain listeners – foreign nationals – from using the speech about firearms to create guns.

The State Department also asserts that the ITAR regulatory scheme is not content-based because the information here at issue is "functional," that is, that downloading the Defense Distributed files directly enables the creation of 3D printed gun and gun components "at the push of a button." This argument is flawed factually and legally. First, more than CAD (or CNC) files are involved in the information sought to be regulated by the State Department: its warning letter to Defense Distributed identified both "files" and "technical data," which include design drawings, rendered images, and written manufacturing instructions. Second, CAD files do not "direct a computer" to do anything. As the amicus Electronic Frontier Foundation explains, "[T]o create a physical object based on a CAD file, a third party must supply additional software to read these files and translate them into the motions of a 3D print head, the 3D printer itself, and the necessary physical materials." The person must provide

DOSWASHINGTONSUP01389

know-how, tools and materials to assemble the printed components, *e.g.* treating some parts of the Liberator with acetone to render them functional. In effect, the "functionality" of CAD files differs only in degree from that of blueprints. Legally, this argument is an attempt to fit within the *Corley* case, referenced above, which concerned a computer program that by itself provided a "key" to open otherwise copyright-restricted online materials; those facts are far afield from the technical data speech at issue here. *Corley*, 273 F.3d at 449-55.

Because the regulation of Defense Distributed's speech is content-based, it is necessary to apply strict scrutiny. The district court erred in applying the lower intermediate scrutiny standard. I would not dispute that the government has a compelling interest in enforcing the AECA to regulate the export of arms and technical data governed by the USML. The critical issue is instead whether the government's prepublication approval scheme is narrowly tailored to achieve that end. A regulation is not narrowly tailored if it is "significantly overinclusive." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121, 112 S. Ct. 501, 511 (1991).

"[S]ignificantly overinclusive," however, aptly describes the Government's breathtaking assertion of prepublication review and licensing authority as applied in this case. To prevent foreign nationals from accessing technical data relating to USML-covered firearms, the government seeks to require all domestic posting on the Internet of "technical data" to be pre-approved or licensed by the DDTC. No matter that

DOSWASHINGTONSUP01390

42a

citizens have no intention of assisting foreign enemies directly, communications about firearms on webpages or blogs must be subject to prior approval on the theory that a foreign national *might* come across the speech. This flies in the face of *Humanitarian Law Project*. Although a statute prohibiting the provision of "material support and resources" to designated terrorist groups did not violate First Amendment rights where plaintiffs intended to *directly* assist specific terrorist organizations, the Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations . . . [or] that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. at 36-39, 130 S. Ct. at 2729-30. The State Department's ITAR regulations, as sought to be applied here, plainly sweep in and would control a vast amount of perfectly lawful speech.

Two exceptions to the regulations do not eliminate the problem of overinclusiveness. First, general scientific, mechanical, or engineering principles taught in schools is deemed exempt from ITAR as information in the public domain. This exception does not, however, appear to save from potential regulation and licensing the amateur gunsmith or hobby shooter who discusses technical information about the construction of firearms on an Internet webpage. Any information so shared is not necessarily "general scientific, mechanical, or engineering principles taught in schools." Underscoring this problem, at oral argument the

government would not definitively answer whether the State Department would purport to regulate the posting of such unclassified technical data that appeared in library books or magazines like Popular Mechanics.

Second, the State Department has taken the position in this litigation that the "public domain" exception applies only to information *already* in the public domain. Its interpretation of the technical data regulations would permit the DDTC to stifle online discussion of any innovations related to USML-covered firearms because new information would, by definition, not be in the public domain already. Amicus Reporters Committee for Freedom of the Press and the Thomas Jefferson Center for the Protection of Free Expression correctly expresses fear about journalists' ability to report, without DDTC approval, on the latest technological innovations related to any items covered by the USML.

Lest this concern of overinclusiveness be perceived as hyperbole, consider that in 2013, CNET published an article containing an unredacted copy of a document detailing performance requirements for unmanned U.S. military surveillance drones.[13] Should CNET have applied for approval or a license from the DDTC prior to publication? The State Department's interpretation of the regulations could lead to that conclusion. See 22 C.F.R. § 121.1, Category VIII, item (i)

_____

[13] *See* Declan McCullagh, *DHS Built Domestic Surveillance Tech into Predator Drones*, CNET (Mar. 2, 2013, 11:30 AM), http://www.cnet.com/news/dhs-built-domestic-surveillance-tech-into-predator-drones/.

44a

(technical data related to aircraft and related articles). The USML-related technical discussed there (1) were "exported" because of their availability to foreign persons by publication on the Internet, and (2) the "public domain" exception would be of no avail since the information had not been in the public domain (narrowly defined to exclude the Internet) before publication in the CNET article. On the Government's theory, journalists could be subject to the ITAR for posting articles online.

The State Department also asserts that, somehow, the information published by Defense Distributed would have survived regulatory scrutiny (query before or after submission to DDTC?) if the company had "verified the citizenship of those interested in the files, or by any other means adequate to ensure that the files are not disseminated to foreign nationals." Government brief at 20. Whatever this means, it is a ludicrous attempt to narrow the ambit of its regulation of Internet publications. Everyone knows that personally identifying information can be fabricated on electronic media. Equally troubling, if the State Department truly means what it says in brief about screening out foreign nationals, then the "public domain" exception becomes useless when applied to media like print publications and TV or to gatherings open to the public.

In sum, it is not at all clear that the State Department has *any* concern for the First Amendment rights of the American public and press. Indeed, the State Department turns freedom of speech on its head by asserting, "The possibility that an Internet site could also

be used to distribute the technical data domestically does not alter the analysis. . . ." The Government bears the burden to show that its regulation is narrowly tailored to suit a compelling interest. It is not the public's burden to prove their right to discuss lawful, non-classified, non-restricted technical data. As applied to Defense Distributed's online publication, these over-inclusive regulations cannot be narrowly tailored and fail strict scrutiny.

### 3.   The First Amendment – Prior Restraint.

The Government's prepublication approval and licensing scheme also fails to pass constitutional muster because it effects a prior restraint on speech. The classic description of a prior restraint is an "administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Catholic Leadership Coalition of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993)). The State Department's prepublication review scheme easily fits the mold.

Though not unconstitutional *per se*, any system of prior restraint bears a heavy presumption of unconstitutionality. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S. Ct. 596, 604 (1990). Generally, speech licensing schemes must avoid two pitfalls. First the licensors must not exercise excessive discretion. *Catholic Leadership Coalition*, 764 F.3d at 437 (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108

DOSWASHINGTONSUP01394

S. Ct. 2138, 2144 (1988)). "[N]arrowly drawn, reasonable and definite standards" should guide the licensor in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the regulation. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133, 112 S. Ct. 2395, 2402-03 (1992).

Second, content-based[14] prior restraints must contain adequate procedural protections. The Supreme Court has requires [sic] three procedural safeguards against suppression of protected speech by a censorship board: (1) any restraint before judicial review occurs can be imposed for only a specified brief period of time during which the status quo is maintained; (2) prompt judicial review of a decision must be available; and (3) the censor must bear the burdens of going to court and providing the basis to suppress the speech. *N.W. Enters. v. City of Houston*, 352 F.3d 162, 193-94 (5th Cir. 2003) (citing *Freedman v. Maryland*, 380 U.S. 51, 58-59, 85 S. Ct. 734, 739 (1965)). In sum, a court reviewing a system of prior restraint should examine "both the law's procedural guarantees and the discretion given to law enforcement officials." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006); *see also East Brooks Books, Inc. v. Shelby*

---

[14] As described above, the ITAR regulation of posting to the Internet technical data related to USML-covered firearms is content-based. Thus, it is subject to the procedural requirements set forth in *Freedman v. Maryland*.

*Cty.*, 588 F.3d 360, 369 (6th Cir. 2009); *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002).

To the extent it embraces publication of non-classified, non-transactional, lawful technical data on the Internet, the Government's scheme vests broad, unbridled discretion to make licensing decisions and lacks the requisite procedural protections. First, as explained above, the "export" regulations' virtually unbounded coverage of USML-related technical data posted to the Internet, combined with the State Department's deliberate ambiguity in what constitutes the "public domain," renders application of ITAR regulations anything but "narrow, objective, and definite." The stated standards do not guide the licensors to prevent unconstitutional prior restraints. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S. Ct. 935, 938 (1969). The State Department's brief actually touts the case-by-case nature of the determination whether to prevent Internet publication of technical data.[15]

In *City of Lakewood v. Plain Dealer Publishing Co.*, for example, the Supreme Court held that a city ordinance insufficiently tailored the Mayor's discretion to issue newspaper rack permits because "the ordinance itself contains no explicit limits on the mayor's discretion" and "nothing in the law as written requires the mayor to do more than make the statement 'it is

---

[15] Compounding confusion, the ITAR grant broad discretion to DDTC to deny an export license if it "deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, *or is otherwise advisable*." 22 C.F.R. § 126.7(a)(1) (emphasis added).

not in the public interest' when denying a permit application." 486 U.S. at 769, 108 S. Ct. at 2150-51. Like the "illusory 'constraints'" in *Lakewood*, *id.* at 769, the ITAR prepublication review scheme offers nothing but regulatory (or prosecutorial) discretion, as applied to the technical data at issue here, in lieu of objective standards. Reliance on the censor's good faith alone, however, "is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770. *Cf. Humanitarian Law Project*, 130 S. Ct. at 2728 (listing numerous ways in which Congress had exhibited sensitivity to First Amendment concerns by limiting and clarifying a statute's application and "avoid[ing] any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

Just as troubling is the stark lack of the three required procedural protections in prior restraint cases. Where a commodity jurisdiction application is necessary, the alleged 45-day regulatory deadline for such determinations seems to be disregarded in practice; nearly two years elapsed between Defense Distributed's initial request and a response from the DDTC. Further, the prescribed time limit on licensing decisions, 60 days, is not particularly brief. *See Teitel Film Corp. v. Cusack*, 390 U.S. 139, 141, 88 S. Ct. 754, 756 (1968).

More fundamentally, Congress has withheld judicial review of the State Department's designation of items as defense articles or services. *See* 22 U.S.C. § 2778(h); 22 C.F.R. § 128.1 (precluding judicial view of

the Executive's implementation of the AECA under the APA). The withholding of judicial review alone should be fatal to the constitutionality of this prior restraint scheme insofar as it involves the publication of unclassified, lawful technical data to the Internet. *See City of Littleton, Colo. v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 781, 124 S. Ct. 2219, 2224 (2004) (noting that the Court's decision in *FW/PBS, Inc. v. City of Dallas*, interpreting *Freedman*'s "judicial review" safeguard, requires "a prompt judicial decision," as well as prompt access to the courts). And where judicial review is thwarted, it can hardly be said that DDTC, as the would-be censor, can bear its burden to go to court and support its actions.

## C.  The Government's Interest, Balancing the Interests

A brief discussion is necessary on the balancing of interests as it should have been done in light of the facts of this case. No one doubts the federal government's paramount duty to protect the security of our nation or the Executive Branch's expertise in matters of foreign relations. Yet the Executive's mere incantation of "national security" and "foreign affairs" interests do not suffice to override constitutional rights. The Supreme Court has long declined to permit the unsupported invocation of "national security" to cloud the First Amendment implications of prior restraints. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141 (1971) (reversing the grant of an injunction precluding the *New York Times* and the

DOSWASHINGTONSUP01398

*Washington Post* from publishing the Pentagon Papers, a classified study of United States involvement in Vietnam from 1945-1967); *id.* at 730 (Stewart, J., concurring) (noting that because he cannot say that disclosure of the Pentagon Papers "will surely result in direct, immediate, and irreparable damage to our Nation or its people," publication may not be enjoined consonant with the First Amendment). Indeed, only the most exceptional and immediate of national security concerns allow a prior restraint on speech to remain in place:

> the protection as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases. . . . [n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government.

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716, 51 S. Ct. 625, 631 (1931); *cf. Haig v. Agee*, 453 U.S. 280, 306-08, 101 S. Ct. 2766, 2781-82 (1981) (holding that the Secretary of State's revocation of Haig's passport did not violate First Amendment rights because his actions exposing undercover CIA agents abroad threatened national security). No such exceptional circumstances have been presented in this case. Indeed,

DOSWASHINGTONSUP01399

all that the majority can muster to support the government's position here is that

> the State Department's stated interest in preventing foreign nationals – including manner of enemies of this country – from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest.

Neither the district court nor the State Department offers anything else.[16] With that kind of reasoning, the State Department could wholly eliminate the "public domain" and "scholarly" exceptions to the ITAR and require prepublication approval of all USML-related technical data. This is clearly not what the Supreme Court held in the *Pentagon Papers* or *Near* cases. *See generally* L.A. Powe, Jr., The H-Bomb Injunction, 61 U.Colo.L.Rev. 55 (1990).

Without any evidence to the contrary, the court should have held that the domestic Internet publication of CAD files and other technical data for a 3D printer-enabled making of gun parts and the Liberator pistol presents no immediate danger to national security, especially in light of the fact that many of these files are now widely available over the Internet and that the world is awash with small arms.[17]

---

[16] The State Department notes the fear that a single-shot pistol undetectable by metal-sensitive devices could be used by terrorists. The Liberator, however, requires a metal firing pin.

[17] The Government also vaguely asserts that imposing a prior restraint upon the domestic publication of the technical data

Further, the government's pro-censorship position in this case contradicts the express position held within the Executive Branch for the nearly forty-year existence of the AECA. The State Department's sudden turnabout severely undercuts its argument that pre-publication review and licensing for the publication of unclassified technical data is justified by pressing national security concerns. Indeed, in the late 1970s and early 1980s, at the height of the Cold War, the Department of Justice's Office of Legal Counsel repeatedly offered written advice that a prepublication review process would raise significant constitutional questions and would likely constitute an impermissible prior restraint, particularly when applied to unclassified technical data disseminated by individuals who do not possess specific intent to deliver it to particular foreign nationals. Further, in a 1997 "Report on the Availability of Bombmaking Information," the Department of Justice observed the widespread availability of bombmaking instructions on the Internet, in libraries, and in magazines. The Department of Justice then argued against government censorship, concluding that despite the distinct possibility that third parties can use bombmaking instructions to engage in illegal conduct, a statute "proscrib[ing] indiscriminately the dissemination of bombmaking information" would face

_____

here is justified to protect foreign relations with other countries that have more restrictive firearms laws than the United States. Inflicting domestic speech censorship in pursuit of globalist foreign relations concerns (absent specific findings and prohibitions as in *Humanitarian Law Project*) is dangerous and unprecedented.

First Amendment problems because the government may rarely prevent the dissemination of truthful information.[18]

With respect to the ITAR's regulation of "technical data," DDTC's director has taken the position in litigation that the State Department "does not seek to regulate the *means* themselves by which information is placed in the public domain" and "does not review in advance scientific information to determine whether it may be offered for sale at newsstands and bookstores, through subscriptions, second-class mail, or made available at libraries open to the public, or distributed at a conference or seminar in the United States." Second Declaration of William J. Lowell Department of State Office of Defense Trade Controls at 11, *Bernstein v. U.S. Dep't of State*, 945 F. Supp. 1279 (N.D. Cal. 1996). Moreover, he added, "the regulations are not applied to establish a prepublication review requirement for the general publication of scientific information in the United States." *Id.*

Finally, the State Department's invocation of unspecified national security concerns flatly contradicts its contention that while Defense Distributed's very same technical data cannot be published on the Internet, they may be freely circulated within the U.S. at conferences, meetings, trade shows, in domestic print publications and in libraries. (Of course, as above noted, the Government's sincerity on this point is

---

[18] Department of Justice, 1997 Report on the Availability of Bombmaking Information 3, 5-7, 19-29 (1997).

54a

subject to doubt, based on the determined ambiguity of its litigating position.) After all, if a foreign national were to attend a meeting or trade show, or visit the library and read a book with such information in it, under the Government's theory, the technical data would have been "exported" just like the Internet posts, because it was "[d]isclos[ed] (including oral or visual disclosure) . . . to a foreign person . . . in the United States or abroad." *Id.* § 120.17(a)(4).

*** 

By refusing to address the plaintiffs' likelihood of success on the merits and relying solely on the Government's vague invocation of national security interests, the majority leave in place a preliminary injunction that degrades First Amendment protections and implicitly sanctions the State Department's tenuous and aggressive invasion of citizens' rights. The majority's non-decision here encourages case-by-case adjudication of prepublication review "requests" by the State Department that will chill the free exchange of ideas about whatever USML-related technical data the government chooses to call "novel," "functional," or "not within the public domain." It will foster further standardless exercises of discretion by DDTC censors.

Today's target is unclassified, lawful technical data about guns, which will impair discussion about a large swath of unclassified information about firearms and inhibit amateur gunsmiths as well as journalists. Tomorrow's targets may be drones, cybersecurity, or robotic devices, technical data for all of which may be

55a

implicated on the USML. This abdication of our deci-
sionmaking responsibility toward the First Freedom is
highly regrettable. I earnestly hope that the district
court, on remand, will take the foregoing discussion to
heart and relieve Defense Distributed of this censor-
ship.

———————————————————

DOSWASHINGTONSUP01404

56a

## APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, ET AL., | § § § | |
| Plaintiffs, | § | |
| V. | § | 1-15-CV-372 RP |
| UNITED STATES DEPARTMENT OF STATE, ET AL., | § § § § | |
| Defendants. | § § | |

## <u>ORDER</u>

(Filed Aug. 4, 2015)

Before the Court are Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. #7), Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, filed May 11, 2015 (Clerk's Dkt. #8) and the responsive pleadings thereto. The Court conducted a hearing on the motion on July 6, 2015. Having considered the motion, responsive pleadings, record in the case, and the applicable law, the Court is of the opinion that Plaintiffs' motion for a preliminary injunction should be denied. *See* FED. R. CIV. P. 65(b).

DOSWASHINGTONSUP01405

# I.   BACKGROUND

Plaintiffs Defense Distributed and the Second Amendment Foundation ("SAF") bring this action against defendants the United States Department of State, Secretary of State John Kerry, the Directorate of Defense Trade Controls ("DDTC"), and employees of the DDTC in their official and individual capacities, challenging implementation of regulations governing the "export" of "defense articles."

Under the Arms Export Control Act ("AECA"), "the President is authorized to control the import and the export of defense articles and defense services" and to "promulgate regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The AECA imposes both civil and criminal penalties for violation of its provisions and implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e). The President has delegated his authority to promulgate implementing regulations to the Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"), are in turn administered by the DDTC and its employees. 22 C.F.R. 120.1(a).

The AECA directs that the "defense articles" designated under its terms constitute the United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a compendium of specific controlled items," rather it is a "series of categories describing the kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12 (1st Cir.) *cert. denied*

DOSWASHINGTONSUP01406

58a

*sub nom. Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). Put another way, the Munitions List contains "attributes rather than names." *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (explaining "an effort to enumerate each item would be futile," as market is constantly changing). The term "defense articles" also specifically includes "technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in" the Munitions List. 22 C.F.R. § 120.6

A party unsure about whether a particular item is a "defense article" covered by the Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. § 120.4 (describing process). The regulations state the DDTC "will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing." *Id.*

According to Plaintiffs, Defense Distributed publishes files on the Internet as a means of fulfilling its primary missions to promote the right to keep and bear arms and to educate the public, as well as generating revenue. Specifically, in December 2012 Defense Distributed made available for free on the Internet privately generated technical information regarding a number of gun-related items (the "Published Files"). (Compl. ¶¶ 22-24). Plaintiffs allege that, on May 8,

59a

2013, Defendants sent Defense Distributed a letter stating:

> DTCC/END is conducting a review of technical data made publicly available by Defense Distributed through its 3D printing website, DEFCAD.org, the majority of which appear to be related to items in Category I of the [Munitions List]. Defense Distributed may have released ITAR-controlled technical data without the required prior authorization from the Directorate of Defense Trade Controls (DDTC), a violation of the ITAR.

(*Id.* ¶ 25).

Plaintiffs state they promptly removed the Published Files from the Internet. Further, per instruction in the May 2013 letter, Plaintiffs submitted commodity jurisdiction requests covering the Published Files on June 21, 2013. According to Plaintiffs, they have not received a response to the requests from Defendants. (*Id.* ¶¶ 26-29).

Plaintiffs further allege that, on September 25, 2014, Defense Distributed sent a request for prepublication approval for public release of files containing technical information on a machine named the "Ghost Gunner" that can be used to manufacture a variety of items, including gun parts (the "Ghost Gunner Files").[1]

_____

[1] According to Plaintiffs, Defendants identify the Department of Defense Office of Prepublication Review and Security ("DOPSR") as the government agency from which private persons must obtain prior approval for publication of privately generated technical information subject to ITAR control. (Compl. ¶ 28).

Following resubmission of the request, on April 13, 2015, DDTC determined that the Ghost Gunner machine, including the software necessary to build and operate the Ghost Gunner machine, is not subject to ITAR, but that "software, data files, project files, coding, and models for producing a defense article, to include 80% AR-15 lower receivers, are subject to the jurisdiction of the Department of State in accordance with [ITAR]." (*Id.* ¶¶ 28-33). In addition, Plaintiffs allege that since September 2, 2014, Defense Distributed has made multiple requests to DOPSR for prepublication review of certain computer-aided design ("CAD") files. In December 2014, DOPSR informed Defense Distributed that it refused to review the CAD files. The DOPSR letter directed Defense Distributed to the DDTC Compliance and Enforcement Division for further questions on public release of the CAD files. Defense Distributed has sought additional guidance on the authorization process, but to date, Defendants have not responded. (*Id.* ¶¶ 34-36).

Plaintiffs filed this action on April 29, 2015, raising five separate claims. Specifically, Plaintiffs assert that the imposition by Defendants of a prepublication approval requirement for "technical data" related to "defense articles" constitutes: (1) an ultra vires government action; (2) a violation of their rights to free speech under the First Amendment; (3) a violation of their right to keep and bear arms under the Second Amendment; and (4) a violation of their right to due process of law under the Fifth Amendment. Plaintiffs also

contend the violations of their constitutional rights entitled them to monetary damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiffs now seek a preliminary injunction enjoining the enforcement of any prepublication approval requirement against unclassified information under the ITAR, specifically including all files Defense Distributed has submitted for DOPSR review. The parties have filed responsive pleadings. The Court conducted a hearing on July 6, 2015 and the matter is now ripe for review.

## II.   STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales*, 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 325 (5th Cir. 1997); *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is

62a

entitled to summary judgment." *Daniels Health Sciences, L.L.C.* v. *Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). *See also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (same, citing Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11a Federal Practice & Procedure § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## III.  ANALYSIS

Defendants maintain Plaintiffs have not established any of the four requirements necessary to merit grant of a preliminary injunction. Plaintiffs, of course, disagree. The Court will briefly address the parties' arguments concerning the final three requirements before turning to the core, and dispositive question, whether Plaintiffs have shown a likelihood of success on the merits of their claims [sic].

### A.  Injury and Balancing of Interests

Defendants suggest Plaintiffs' contention that they face irreparable injuy [sic] absent immediate relief is rebutted by their delay in filing this lawsuit. However, the Supreme Court has stated that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

63a

*Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (the "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). The Second Amendment protects "similarly intangible and unquantifiable interests" and a deprivation is thus considered irreparable. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("for some kinds of constitutional violations, irreparable harm is presumed"). The Court thus has little trouble concluding Plaintiffs have shown they face a substantial threat of irreparable injury.

The Court has much more trouble concluding Plaintiffs have met their burden in regard to the final two prongs of the preliminary injunction inquiry. Those prongs require weighing of the respective interests of the parties and the public. Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest. In this case, the inquiry essentially collapses because the interests asserted by Defendants are in the form of protecting the public by limiting access of foreign nationals to "defense articles."

Plaintiffs rather summarily assert the balance of interests tilts in their favor because "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014)

(district court did not abuse its discretion in finding injunction would not disserve public interest because it will prevent constitutional deprivations). They further assert that an injunction would not bar Defendants from controlling the export of classified information.

The Court finds neither assertion wholly convincing. While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008) (discussing failure of district court to consider injunction's adverse impact on public interest in national defense); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 826 (2nd Cir. 2015) (characterizing maintenance of national security as "public interest of the highest order"). It also fails to account for the interest – and authority – of the President and Congress in matters of foreign policy and export. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) (matters relating to conduct of foreign relations "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *United States v. Pink*, 315 U.S. 203, 222-23 (1942) (conduct of foreign relations "is committed by the Constitution to the political departments of the Federal Government"); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011) (matters implicating foreign relations and military affairs generally beyond authority of court's adjudicative powers).

DOSWASHINGTONSUP01413

65a

As to Plaintiff's second contention, that an injunction would not bar Defendants from controlling the export of classified information, it is significant that Plaintiffs maintain the posting of files on the Internet for free download does not constitute "export" for the purposes of the AECA and ITAR. But Defendants clearly believe to the contrary. Thus, Plaintiffs' contention that the grant of an injunction permitting them to post files that Defendants contend are governed by the AECA and ITAR would not bar Defendants from controlling "export" of such materials stand in sharp constrast [sic] to Defendants' assertion of the public interest. The Court thus does not believe Plaintiffs have met their burden as to the final two prongs necessary for granting Plaintiffs a preliminary injunction. Nonetheless, in an abundance of caution, the Court will turn to the core of Plaintiffs' motion for a preliminary injunction, whether they have shown a likelihood of success on their claims

## B. Ultra Vires

Plaintiffs first argue Defendants are acting beyond the scope of their authority in imposing a prepublication requirement on them under the AECA. A federal court has no subject matter jurisdiction over claims against the United States unless the government waives its sovereign immunity and consents to suit. *Danos v. Jones*, 652 F.3d 577, 581 (5th Cir. 2011) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). The ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute,

DOSWASHINGTONSUP01414

his actions beyond those limitations are considered individual and not sovereign actions," or "ultra vires his authority," and thus not protected by sovereign immunity. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). To fall within the ultra vires exception to sovereign or governmental immunity, a plaintiff must "do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos*, 652 F.3d at 583. Rather, the complaint must allege facts sufficient to establish that the officer was acting "without any authority whatever," or without any "colorable basis for the exercise of authority." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)).

The statute at issue provides:

In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services.

22 U.S.C. § 2778(a)(1). "Export" is defined, in pertinent part, as including "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign

DOSWASHINGTONSUP01415

67a

person whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs argue this definition falls outside Congressional intent in authorizing restriction of export of defense articles because, as interpreted by Defendants, it includes public speech within the United States.

Notably, Plaintiffs do not suggest Defendants lack authority under the AECA to regulate export of defense articles. Further, under the AECA, decisions are required to

> take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

22 U.S.C. § 2778(a)(2). Defense Distributed admits its purpose is "facilitating *global* access to, and the collaborative production of, information and knowledge related to the three-dimensional ("3D") printing of arms." (Compl. ¶ 1) (emphasis added). Facilitating global access to firearms undoubtedly "increase[s] the possibiliity of outbreak or escalation of conflict." Defense Distributed, by its own admission, engages in conduct which Congress authorized Defendants to regulate. Plaintiffs have not, therefore, shown Defendants are acting without any "colorable basis for the exercise of authority." Accordingly, they have not shown a likelihood of success on their ultra vires challenge.

DOSWASHINGTONSUP01416

## C. First Amendment

Plaintiffs next argue Defendants' interpretation of the AECA violates their First Amendment right to free speech. In addressing First Amendment claims, the first step is to determine whether the claim involves protected speech, the second step is to identify the nature of the forum, and the third step is to assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

As an initial matter, Defendants argue the computer files at issue do not constitute speech and thus no First Amendment protection is afforded. First Amendment protection is broad, covering "works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller v. California*, 413 U.S. 15, 34 (1973). *See also Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (video games' communication of ideas and social messages suffices to confer First Amendment protection). Defendants, however, maintain the computer files at the heart of this dispute do not warrant protection because they consist merely of directions to a computer. In support, they rely on a Second Circuit opinion which held that computer instructions that "induce action without the intercession of the mind or the will of the recipient" are

DOSWASHINGTONSUP01417

69a

not constitutionally protected speech. *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 111 (2nd Cir. 2000).

As Plaintiffs point out, one year later, the Second Circuit addressed the issue of whether computer code constitutes speech at some length in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir. 2001).[2] The court made clear the fact that computer code is written in a language largely unintelligible to people was not dispositive, noting Sanskrit was similarly unintelligible to many, but a work written in that language would nonethless [sic] be speech. Ultimately, the court concluded "the fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information, and it is the conveying of information that renders instructions 'speech' for purposes of the First Amendment." *Id.* at 447 (discussing other examples of "instructions" which qualified as speech under First Amendment). Similarly, the Sixth Circuit has found "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming . . . it is protected by the First

---

[2] Defendants are correct that the *Corley* court did not overrule the decision in *Vartuli.* However, the *Corley* court itself distinguished the decision in *Vartuli* as limited, because it was based on the manner in which the code at issue was marketed. That is, the defendants themselves marketed the software as intended to be used "mechanically" and "without the intercession of the mind or the will of the recipient." *Corley*, 273 F.3d at 449 (quoting *Vartuli*, 228 F.3d at 111). Plaintiffs here have not so marketed or described the files at issue.

Amendment," even though such code "has both an expressive feature and a functional feature." *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).

Although the precise technical nature of the computer files at issue is not wholly clear to the Court, Plaintiffs made clear at the hearing that Defense Distributed is interested in distributing the files as "open source." That is, the files are intended to be used by others as a baseline to be built upon, altered and otherwise utilized. Thus, at least for the purpose of the preliminary injunction analysis, the Court will consder [sic] the files as subject to the protection of the First Amendment.

In challenging Defendants' conduct, Plaintiffs urge this Court to conclude the ITAR's imposition of a prepublication requirement constitutes an impermissible prior restraint. Prior restraints "face a well-established presumption against their constitutionality." *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013). *See also Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("Any prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity"); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969) (noting "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional"). "[A] system of prior restraint avoids constitutional infirmity only if it takes

DOSWASHINGTONSUP01419

place under procedural safeguards designed to obviate the dangers of a censorship system." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).

The "heavy presumption" against constitutional validity of prior restraint is not, however, "a standard of review, and judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014). *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (order prohibiting dissemination of discovered information before trial "is not the kind of classic prior restraint that requires exacting First Amendment scrutiny"); *Perry v. McDonald*, 280 F.3d 159, 171 (2nd Cir. 2001) (context in which prior restraint occurs affects level of scrutiny applied);, 192 F.3d 742, 749 (7th Cir. 1999) ("We note initially that the [plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test.").

No party suggests posting of information on the Internet for general free consumption is not a public forum. The next inquiry is thus the applicable level of protection afforded to the files at issue. Content-neutral restrictions on speech are examined under intermediate scrutiny, meaning they are permissible so long as they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the information. *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 213-14 (1997);

72a

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Content-based restrictions are examined under strict scrutiny, meaning they must be narrowly drawn to effectuate a compelling state interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

Not surprisingly, the parties disagree as to whether the ITAR imposes content-based restrictions. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Plaintiffs here argue, because the regulations restrict speech concerning the entire topic of "defense articles" the regulation is content-based. "A regulation is not content-based, however, merely because the applicability of the regulation depends on the content of the speech." *Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012). Rather, determination of whether regulation of speech is content-based "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227. *See also Ward*, 491 U.S. at 791 (principal inquiry in determining content-neutrality, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys").

Employing this inquiry, the Supreme Court has found regulations to be content-neutral where the regulations are aimed not at suppressing a message, but at other "secondary effects." For example, the Supreme Court upheld a zoning ordinance that applied only to theaters showing sexually-explicit material, reasoning

73a

the regulation was content-neutral because it was not aimed at suppressing the erotic message of the speech but instead at the crime and lowered property values that tended to accompany such theaters. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986). The Supreme Court similarly upheld a statute establishing buffer zones only at clinics that performed abortions, concluding the statute did not draw content-based distinctions as enforcement authorities had no need to examine the content of any message conveyed and the stated purpose of the statute was public safety. *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (noting violation of statute depended not "on what they say," but "simply on where they say it"). The Fifth Circuit has likewise found regulations content-neutral, even where the regulation governed a specific topic of speech. *See Kagan v. City of New Orleans*, 753 F.3d 560, 562 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1403 (2015) (upholding regulation requiring license for a person to charge for tours to City's points of interest and historic sites, "for the purpose of explaining, describing or generally relating the facts of importance thereto," finding regulation "has no effect whatsoever on the content of what tour guides say"); *Asgeirsson*, 696 F.3d at 461 (holding Texas' Open Meeting Act, prohibiting governmental body from conducting closed meetings during which public business or public policy over which the governmental body has supervision or control is discussed, to be content-neutral, because closed meetings: (1) prevent transparency; (2) encourage fraud and corruption; and (3) foster mistrust in government).

The ITAR, on its face, clearly regulates disclosure of "technical data" relating to "defense articles." The ITAR thus unquestionably regulates speech concerning a specific topic. Plaintiffs suggest that is enough to render the regulation content-based, and thus invoke strict scrutiny. Plaintiffs' view, however, is contrary to law. The Fifth Circuit rejected a similar test, formulated as "[a] regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose," finding the proposed test was contrary to both Supreme Court and Fifth Circuit precedent. *Asgeirsson*, 696 F.3d at 460.

The ITAR does not regulate disclosure of technical data based on the message it is communicating. The fact that Plaintiffs are in favor of global access to firearms is not the basis for regulating the "export" of the computer files at issue. Rather, the export regulation imposed by the AECA is intended to satisfy a number of foreign policy and national defense goals, as set forth above. Accordingly, the Court concludes the regulation is content-neutral and thus subject to intermediate scrutiny. *See United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012) (finding the AECA and its implementing regulations are content-neutral).

The Supreme Court has used various terminology to describe the intermediate scrutiny standard. *Compare Ward*, 491 U.S. at 798 ("a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so"), with

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding "since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require"), and *Turner*, 520 U.S. at 189 (regulation upheld under intermediate scrutiny if it "further[s] an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions d[o] not burden substantially more speech than is necessary to further those interests"). The Court will employ the Fifth Circuit's most recent enunciation of the test, under which a court must sustain challenged regulations "if they further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012)

The Court has little trouble finding there is a substantial governmental interest in regulating the dissemination of military information. Plaintiffs do not suggest otherwise. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (noting all parties agreed government's interest in combating terrorism "is an urgent objective of the highest order"). Nor do Plaintiffs suggest the government's regulation is directed at suppressing free expression. Rather, they contend the regulations are not sufficiently tailored so as to only incidentally restrict their freedom of expression. The

only circuit to address whether the AECA and ITAR violate the First Amendment has concluded the regulatory scheme survives such a challenge. In so doing, the Ninth Circuit concluded the technical data regulations substantially advance the government's interest, unrelated to the suppression of expression, because the regulations provide clear procedures for seeking necessary approval. *Chi Mak*, 683 F.3d at 1135 (citing 22 C.F.R § 120.10(a) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary")). The Ninth Circuit also concluded the regulations were not more burdensome than necessary, noting the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Id.* (citing *Humanitarian Law Project*, 561 U.S. at 29 (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests)).[3]

---

[3] The Ninth Circuit has also rejected a First Amendment challenge to the AECA's predecessor, the Mutual Security Act of 1954. *See United States v. Edler Indus., Inc.*, 579 F.2d 516, 521 (9th Cir. 1978) (holding statute and regulations not overbroad in controlling conduct of assisting foreign enterprises to obtain military equipment and related technical expertise and licensing provisions of statute not an unconstitutional prior restraint on speech).

Plaintiffs' challenge here is based on their contention that Defendants have applied an overbroad interpretation of the term "export." Specifically, Plaintiffs argue that viewing "export" as including public speech, including posting of information on the Internet, imposes a burden on expression which is greater than is essential to the furtherance of the government's interest in protecting defense articles.

But a prohibition on Internet posting does not impose an insurmountable burden on Plaintiffs' domestic communications. This distinction is significant because the AECA and ITAR do not prohibit domestic communications. As Defendants point out, Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally.

Nor is the Court convinced by Plaintiffs' suggestion that the ban on Internet posting does not prevent dissemination of technical data outside national borders, and thus does not further the government's interests under the AECA. The Ninth Circuit addressed and rejected a similar suggestion, namely that the only way the government can prevent technical data from being sent to foreign persons is to suppress the information domestically as well, explaining:

> This outcome would blur the fact that national security concerns may be more sharply implicated by the export abroad of military

78a

data than by the domestic disclosure of such data. Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security. It would hardly serve First Amendment values to compel the government to purge the public libraries of every scrap of data whose export abroad it deemed for security reasons necessary to prohibit.

*United States v. Posey*, 864 F.2d 1487, 1496-97 (9th Cir. 1989).

The Court also notes, as set forth above, that the ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls. *See* 22 C.F.R. § 120.4 (describing process). The regulations include a ten day deadline for providing a preliminary response, as well as a provision for requesing [sic] expedited processsing [sic]. 22 C.F.R. § 120.4(e) (setting deadlines). Further, via Presidential directive, the DDTC is required to "complete the review and adjudication of license applications within 60 days of receipt." 74 Fed. Reg. 63497 (December 3, 2009). Plaintiffs thus have available a process for determining whether the speech they wish to engage in is subject to the licensing scheme of the ITAR regulations.

Accordingly, the Court concludes Plaintiffs have not shown a substantial likelihood of success on the merits of their claim under the First Amendment.

## D. Second Amendment

Plaintiffs also argue the ITAR regulatory scheme violates their rights under the Second Amendment. Defendants contend Plaintiffs cannot succeed on this claim, both because they lack standing to raise it, and because the claim fails on the merits. As standing is jurisdictional, the Court will turn to that issue first.

### a. Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980). "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). This requirement, like other jurisdictional requirements, is not subject to waiver and demands strict compliance. *Raines*, 521 U.S. at 819; *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996). To meet the standing requirement a plaintiff must show (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Consol. Cos., Inc. v. Union Pacific R.R. Co.*, 499 F.3d 382, 385 (5th Cir. 2007); *Fla. Dep't of Ins. v. Chase Bank of Tex.*

DOSWASHINGTONSUP01428

*Nat'l Ass'n*, 274 F.3d 924, 929 (5th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Defendants correctly point out Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment.[4] Plaintiffs maintain Defense Distributed nonetheless has standing because it is "entitled to assert the Second Amendment rights of [its] customers and website visitors." (Plf. Brf. at 27). A litigant is generally limited to asserting standing only on behalf of himself. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). The Supreme Court has recognized a limited exception when the litigant seeking third-party standing has suffered an "injury in fact" giving him a "sufficiently concrete interest" in the outcome of the issue, the litigant has a "close" relationship with the third party on whose behalf the right is asserted and there is a "hindrance" to the third party's ability to protect his own interests. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

Plaintiffs argue they meet this test, asserting Defense Distributed acts as a "vendor" or in a like position

---

[4] No party addressed whether a corporation such as Defense Distributed itself possesses Second Amendment rights.

81a

by way of offering the computer files for download to visitors of its website. *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977) ("vendors and those in like positions . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function"); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (Supreme Court precedent holds providers of product have standing to attack ban on commercial transactions involving product). As an initial matter, it is not at all clear that distribution of information for free via the Internet constitutes a commercial transaction.[5] Moreover, Plaintiffs do not explain how visitors to Defense Distributed's website are hindered in their ability to protect their own interests. In fact, the presence of SAF as a plaintiff suggests to the contrary. Thus, whether Defense Distributed has standing to assert a claim of a violation of the Second Amendment is a very close question.

Lack of standing by one plaintiff is not dispositive, however. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (court need not decide third-party standing question, "[f]or we

---

[5] Defense Distributed describes itself as organized and operated "for the purpose of defending the civil liberty of popular access to arms guaranteed by the United States Constitution" through "facilitating global access to" information related to 3D printing of firearms, and specifically "to publish and distribute, *at no cost to the public*, such information and knowledge on the Internet in promotion of the public interest." (Compl. ¶ 1) (emphasis added).

82a

have at least one individual plaintiff who has demonstrated standing to assert these rights as his own"). And SAF's standing presents a much less difficult question. It asserts it has standing, as an association, to assert the rights of its members. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members"). Associational standing requires showing: (1) the association's members have standing to sue in their own right; (2) the interests at issue are germane to the association's purpose; and (3) the participation of individual members in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550-51 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). "The first prong requires that at least one member of the association have standing to sue in his or her own right." *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012).

Defendants limit their challenge to SAF's standing solely to whether any of its members have standing to sue in their own right. Specifically, Defendants contend SAF has merely asserted a conjectural injury, by suggesting its members would access computer files in the future. In response, SAF has provided affidavit testimony from two of its members stating they would access the computer files at issue via the Defense Distributed website, study, learn from and share the files, but are unable to do so due to Defendants' interpretation of the ITAR regulatory scheme. (Plf. Reply

Exs. 3-4). This testimony satisfies the "injury in fact" portion of the standing inquiry.

Defendants further contend any injury is not fairly traceable to their conduct. They argue the ITAR does not prevent SAF members in the United States from acquiring the files directly from Defense Distributed. But this argument goes to the burden imposed on SAF members, which is a question aimed at the merits of the claim, not standing. *See Davis v. United States*, 131 S. Ct. 2419, 2434, n.10 (one must not "confus[e] weakness on the merits with absence of Article III standing"). In this case, the inability of SAF members to download the computer files at issue off the Internet is the injury in fact of the SAF members, and is clearly traceable to the conduct of Defendants. The Court therefore finds SAF has standing to assert a claim of a violation of the Second Amendment. *See Nat'l Rifle Ass'n*, 700 F.3d at 192 (NRA had standing, on behalf of its members under 21, to bring suit challenging laws prohibiting federal firearms licensees from selling handguns to 18-to-20-year-olds); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (SAF and Illinois Rifle Association had associational standing to challenge city ordinances requiring one hour of firing range training as prerequisite to lawful gun ownership and prohibiting all firing ranges in city); *Mance v. Holder*, 2015 WL 567302, at *5 (N.D. Tex. Feb. 11, 2015) (non-profit organization dedicated to promoting Second Amendment rights had associational standing to bring

DOSWASHINGTONSUP01432

action challenging federal regulatory regime as it relates to buying, selling, and transporting of handguns over state lines).

### b. Merits

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The Fifth Circuit uses a two-step inquiry to address claims under the Second Amendment. The first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment – that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee. The second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. *Nat'l Rifle Ass'n*, 700 F.3d at 194.

In the first step, the court is to "look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller*, 554 U.S. at 577-628). Defendants argue at some length that restriction by a sovereign of export of firearms and other weapons has a lengthy historical tradition. Plaintiffs do not contest otherwise. Rather, Plaintiffs contend the conduct regulated here impinges

on the ability to manufacture one's own firearms, in this case, by way of 3D printing.

While the founding fathers did not have access to such technology,[6] Plaintiffs maintain the ability to manufacture guns falls within the right to keep and bear arms protected by the Second Amendment. Plaintiffs suggest, at the origins of the United States, blacksmithing and forging would have provided citizens with the ability to create their own firearms, and thus bolster their ability to "keep and bear arms." While Plaintffs' [sic] logic is appealing, Plaintiffs do not cite any authority for this proposition, nor has the Court located any. The Court further finds telling that in the Supreme Court's exhaustive historical analysis set forth in *Heller*, the discussion of the meaning of "keep and bear arms" did not touch in any way on an individual's right to manufacture or create those arms. The Court is thus reluctant to find the ITAR regulations constitute a burden on the core of the Second Amendment.

The Court will nonetheless presume a Second Amendment right is implicated and proceed with the second step of the inquiry, determining the appropriate level of scrutiny to apply. Plaintiffs assert strict scrutiny is proper here, relying on their contention that a core Second Amendment right is implicated. However,

---

[6] Nonetheless, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.

the appropriate level of scrutiny "depends on the nature of the conduct being regulated *and* the degree to which the challenged law burdens the right." *Nat'l Rifle Ass'n*, 700 F.3d at 195 (emphasis added).

The burden imposed here falls well short of that generally at issue in Second Amendment cases. SAF members are not prevented from "possess[ing] and us[ing] a handgun to defend his or her home and family." *Id.* at 195 (citations omitted). The Fifth Circuit's decision in *National Rifle Association* is instructive. At issue was a regulatory scheme which prohibited federally licensed firearms dealers from selling handguns to persons under the age of twenty-one. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing persons aged eighteen to twenty from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach. *Id.* at 205-07. In this case, SAF members are not prohibited from manufacturing their own firearms, nor are they prohibited from keeping and bearing other firearms. Most strikingly, SAF members in the United States are not prohibited from acquiring the computer files at issue directly from Defense Distributed. The Court thus concludes only intermediate scrutiny is warranted here. *See also Nat'l Rifle Ass'n of Am., Inc.*

87a

*v. McCraw*, 719 F.3d 338, 347-48 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1365 (2014) (applying intermediate scrutiny to constitutional challenge to state statute prohibiting 18-20-year-olds from carrying handguns in public).

As reviewed above, the regulatory scheme of the AECA and ITAR survives an intermediate level of scrutiny, as it advances a legitimate governmental interest in a not unduly burdensome fashion. *See also McCraw*, 719 F.3d at 348 (statute limiting under 21-year-olds from carrying handguns in public advances important government objective of advancing public safety by curbing violent crime); *Nat'l Rifle Ass'n*, 700 F.3d at 209 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted."). Accordingly, the Court finds Plaintiffs have not shown a substantial likelihood of success on the merits.

### E.  Fifth Amendment

Plaintiffs finally argue the prior restraint scheme of the ITAR is void for vagueness and thus in violation of their right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court

DOSWASHINGTONSUP01436

to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Plaintiffs here assert broadly that ITAR is unconstitutionally vague because "persons of ordinary intelligence" must guess as to whether their speech would fall under its auspices. As an initial matter, the Court notes at least two circuits have rejected due process challenges [sic] to the AECA and ITAR, and upheld criminal convictions for its violation. *See Zhen Zhou Wu*, 711 F.3d at 13 (rejecting defendants' argument "that this carefully crafted regulatory scheme – which has remained in place for more than a quarter century – is unconstitutionally vague" as applied to them); *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004) (holding the AECA and its implementing regulations not unconstitutionally vague as applied to defendants). Plaintiffs neither acknowledge those decisions nor explain how their rationale is inapplicable to their situation.

89a

The Supreme Court has recently noted its precedent generally limits such challenges to "statutes that tied criminal culpability" to conduct which required "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Humanitarian Law Project*, 561 U.S. at 20 (quoting *Williams*, 553 U.S. at 306). Plaintiffs' challenge here is additionally hampered because they have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague.

To the degree Plaintiffs contend "defense articles" is vague, as Defendants point out, the term "defense articles" is specifically defined to include items on the Munitions List, which contains twenty-one categories of governed articles, as well as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" which additionally "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." *See* 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10 (a) (defining technical data) & 121.1 (Munitions List). Although lengthy, the cited regulations do not themselves include subjective terms, but rather identify items with significant specificity. For example, the first category "Firearms, Close Assault Weapons and Combat Shotguns" includes eight subcategories such as "Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm)," as well as six interpretations of the terms. 22 C.F.R.

DOSWASHINGTONSUP01438

§ 121.1. The Court has little trouble finding these provisions survive a vagueness challenge.

The term "export" is also defined in the ITAR, although at lesser length. At issue here, "export" is defined to include "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17(a)(4). Plaintiffs here admit they wish to post on the Internet, for free download, files which include directions for the 3D printing of firearms. Persons of ordinary intelligence are clearly put on notice by the language of the regulations that such a posting would fall within the defintion [sic] of export.

Accordingly, the Court concludes Plaintiffs have not shown a likelihood of success on the merits of their claim under the Fifth Amendment.

## IV.  CONCLUSION

Plaintiffs' Motion for Preliminary Injunction (Clerk's Dkt. #7) is hereby **DENIED**.

**SIGNED** on August 4, 2015.

/s/ Robert Pitman
ROBERT L. PITMAN
UNITED STATES
DISTRICT JUDGE

DOSWASHINGTONSUP01439

91a

# APPENDIX C

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

————————

No. 15-50759

————————

DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INCORPORATED,

Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF STATE; JOHN F. KERRY, In His Official Capacity as the Secretary of the Department of State; DIRECTORATE OF DEFENSE TRADE CONTROLS, Department of State Bureau of Political Military Affairs; KENNETH B. HANDELMAN, Individually and in His Official Capacity as the Deputy Assistant Secretary of State for Defense Trade Controls in the Bureau of Political-Military Affairs; C. EDWARD PEARTREE, Individually and in His Official Capacity as the Director of the Office of Defense Trade Controls Policy Division; SARAH J. HEIDEMA, Individually and in Her Official Capacity as the Division Chief, Regulatory and Multilateral Affairs, Office of Defense Trade Controls Policy; GLENN SMITH, Individually and in His Official Capacity as the Senior Advisor, Office of Defense Trade Controls,

Defendants-Appellees

DOSWASHINGTONSUP01440

—————————————

Appeal from the United States District Court
for the Western District of Texas

—————————————

<u>ON PETITION FOR REHEARING EN BANC</u>

(Opinion 09/20/2016, 838 F.3d 451)

(Filed Mar. 15, 2017)

Before DAVIS, JONES, and GRAVES, Circuit Judges.

The Court having been polled at the request of one of its members, and a majority of the judges who are in regular service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), the Petition for Rehearing En Banc is DENIED. In the en banc poll, five judges voted in favor of rehearing (Judges Jones, Smith, Clement, Owen and Elrod) and nine judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Dennis, Prado, Southwick, Haynes, Graves, Higginson and Costa).

ENTERED FOR THE COURT:

<u>/s/ W. Eugene Davis</u>

W. EUGENE DAVIS
UNITED STATES CIRCUIT JUDGE

—————

93a

JENNIFER WALKER ELROD, Circuit Judge, joined by JONES, SMITH, and CLEMENT, Circuit Judges, dissenting from the denial of rehearing *en banc*:

The panel opinion's flawed preliminary injunction analysis permits perhaps the most egregious deprivation of First Amendment rights possible: a content-based prior restraint. Judge Jones's cogent panel dissent thoroughly explores the flaws in the panel opinion. I write here to highlight three errors that warrant *en banc* review. First, the panel opinion fails to review the likelihood of success on the merits – which ten of our sister circuits agree is an essential inquiry in a First Amendment preliminary injunction case. Second, the panel opinion accepts that a mere assertion of a national security interest is a sufficient justification for a prior restraint on speech. Third, the panel opinion conducts a fundamentally flawed analysis of irreparable harm. Accordingly, I respectfully dissent from the denial of *en banc* review in this case.

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). In the context of a party seeking a preliminary injunction, we have stressed the importance of determining the likelihood of success on the merits – calling it "arguably the most important factor." *Tesfamichael v. Gonzalez*, 411 F.3d 169, 176 (5th Cir. 2005). Accordingly, ten of our sister circuits have held that the likelihood of success on the merits is a crucial, indispensable inquiry in the First Amendment context. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*,

DOSWASHINGTONSUP01442

699 F.3d 1, 10 (1st Cir. 2012); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Strikingly, however, the panel opinion entirely fails to address the likelihood of success on the merits, and in so doing creates a circuit split. This error alone merits rehearing *en banc*.

Moreover, the panel opinion's failure to address the likelihood of success on the merits infects its public interest analysis. A court that ignores the merits of a constitutional claim cannot meaningfully analyze the public interest, which, by definition, favors the vigorous protection of First Amendment rights. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The panel opinion's failure to address the likelihood of success on the merits denies

Defense Distributed a meaningful review of the public interest factor.

The panel opinion's public interest analysis is also flawed because it relies on a mere assertion of a national security interest. *Defense Dist'd v. U.S. Dep't of State*, No. 15-50759, slip op. at 10 (5th Cir. 2016) (noting that the Government "*asserted* a very strong public interest in national defense and national security." (emphasis added)). Certainly there is a strong public interest in national security. But there is a paramount public interest in the exercise of constitutional rights, particularly those guaranteed by the First Amendment: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citations omitted). To justify a prior restraint, we have held that the Government must show that the "expression sought to be restrained surely will result in direct, immediate, and irreparable damage." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980) *(en banc)*; *see also N.Y. Times*, 403 U.S. at 730 (Stewart, J., concurring). The Supreme Court has articulated similar requirements: there must be a "requisite degree of certainty [of danger] to justify restraint," there must be no "alternative measures" available, and the restraint must "effectively . . . operate to prevent the threatened danger." *Nebraska Press*, 427 U.S. at 562, 565, 569-70. The Government contends that the gun designs at issue could

potentially threaten national security. However, this speculation falls far short of the required showing under *Bernard* and *Nebraska Press*, showing neither the immediacy of the danger nor the necessity of the prior restraint. Allowing such a paltry assertion of national security interests to justify a grave deprivation of First Amendment rights treats the words "national security" as a magic spell, the mere invocation of which makes free speech instantly disappear.

The panel opinion's flawed analysis in turn infects its evaluation of irreparable harm. The panel opinion justifies the prior restraint on speech because any harm to Defense Distributed would be "temporary." But irreparable harm occurs whenever a constitutional right is deprived, even for a short period of time. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Even if the panel opinion's "temporary harm" theory were valid, the deprivation here has been anything but short. Instead, as Judge Jones's panel dissent notes, because of the lack of a preliminary injunction, Defense Distributed has been effectively muzzled for over three years. *Defense Dist'd*, slip op. at 17 (Jones, J., dissenting).

We have been warned that the "word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times*, 403 U.S. at 719 (Black, J., concurring). Unfortunately, that is exactly

DOSWASHINGTONSUP01445

97a

what the panel opinion has done. Accordingly, I respectfully dissent from the denial of rehearing *en banc*.

———————————————

DOSWASHINGTONSUP01446

## APPENDIX D

**U.S. Const. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

—————

**22 U.S.C. § 2278   Control of arms exports and imports**

**(a)   Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; negotiations information**

(1)   In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

\*       \*       \*

### (c)  Criminal violations; punishment

Any person who willfully violates any provision of this section, section 2779 of this title, a treaty referred to in subsection (j)(1)(C)(i), or any rule or regulation issued under this section or section 2779 of this title, including any rule or regulation issued to implement or enforce a treaty referred to in subsection (j)(1)(C)(i) or an implementing arrangement pursuant to such treaty, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than 20 years, or both.

\*       \*       \*

### (e)  Enforcement powers of President

In carrying out functions under this section with respect to the export of defense articles and defense services, including defense articles and defense services exported or imported pursuant to a treaty referred to in subsection (j)(1)(C)(i), the President is authorized to exercise the same powers concerning violations and enforcement which are conferred upon departments, agencies and officials by subsections (c), (d), (e), and (g) of section 11 of the Export Administration Act of 1979 [50 U.S.C. 4610(c), (d), (e), and (g)], and by subsections (a) and (c) of section 12 of such Act [50

U.S.C. 4614(a) and (c)], subject to the same terms and conditions as are applicable to such powers under such Act [50 U.S.C. 4601 et seq.], except that section 11(c)(2)(B) of such Act shall not apply, and instead, as prescribed in regulations issued under this section, the Secretary of State may assess civil penalties for violations of this chapter and regulations prescribed thereunder and further may commence a civil action to recover such civil penalties, and except further that the names of the countries and the types and quantities of defense articles for which licenses are issued under this section shall not be withheld from public disclosure unless the President determines that the release of such information would be contrary to the national interest. Nothing in this subsection shall be construed as authorizing the withholding of information from the Congress. Notwithstanding section 11(c) of the Export Administration Act of 1979, the civil penalty for each violation involving controls imposed on the export of defense articles and defense services under this section may not exceed $500,000.

*      *      *

**(h)   Judicial review of designation of items as defense articles or services**

The designation by the President (or by an official to whom the President's functions under subsection (a) have been duly delegated), in regulations issued under this section, of items as defense articles or defense

101a

services for purposes of this section shall not be subject to judicial review.

*        *        *

―――――

## 22 C.F.R. § 120.2   Designation of defense articles and defense services

The Arms Export Control Act (22 U.S.C. 2778(a) and 2794(7)) provides that the President shall designate the articles and services deemed to be defense articles and defense services for purposes of import or export controls. The President has delegated to the Secretary of State the authority to control the export and temporary import of defense articles and services. The items designated by the Secretary of State for purposes of export and temporary import control constitute the U.S. Munitions List specified in part 121 of this subchapter. Defense articles on the U.S. Munitions List specified in part 121 of this subchapter that are also subject to permanent import control by the Attorney General on the U.S. Munitions Import List enumerated in 27 CFR part 447 are subject to temporary import controls administered by the Secretary of State. Designations of defense articles and defense services are made by the Department of State with the concurrence of the Department of Defense. The scope of the U.S. Munitions List shall be changed only by amendments made pursuant to section 38 of the Arms Export Control Act (22 U.S.C. 2778). For a designation or

determination on whether a particular item is enumerated on the U.S. Munitions List, see §120.4 of this subchapter.

————

## 22 C.F.R. § 120.3   Policy on designating or determining defense articles and services on the U.S. Munitions List

(a)   For purposes of this subchapter, a specific article or service may be designated a defense article (see §120.6 of this subchapter) or defense service (see §120.9 of this subchapter) if it:

(1)   Meets the criteria of a defense article or defense service on the U.S. Munitions List; or

(2)   Provides the equivalent performance capabilities of a defense article on the U.S. Munitions List.

(b)   For purposes of this subchapter, a specific article or service shall be determined in the future as a defense article or defense service if it provides a critical military or intelligence advantage such that it warrants control under this subchapter.

NOTE TO PARAGRAPHS (a) AND (b): An article or service determined in the future pursuant to this subchapter as a defense article or defense service, but not currently on the U.S. Munitions List, will be placed in U.S. Munitions List Category XXI until the appropriate U.S. Munitions List category has been amended to provide the necessary entry.

DOSWASHINGTONSUP01451

(c)   A specific article or service is not a defense article or defense service for purposes of this subchapter if it:

(1)   Is determined to be under the jurisdiction of another department or agency of the U.S. Government (see §120.5 of this subchapter) pursuant to a commodity jurisdiction determination (see §120.4 of this subchapter) unless superseded by changes to the U.S. Munitions List or by a subsequent commodity jurisdiction determination; or

(2)   Meets one of the criteria of §120.41(b) of this subchapter when the article is used in or with a defense article and specially designed is used as a control criteria (see §120.41 of this subchapter).

NOTE TO §120.3: The intended use of the article or service after its export (i.e., for a military or civilian purpose), by itself, is not a factor in determining whether the article or service is subject to the controls of this subchapter.

———

## 22 C.F.R. § 120.4   Commodity jurisdiction

(a)   The commodity jurisdiction procedure is used with the U.S. Government if doubt exists as to whether an article or service is covered by the U.S. Munitions List. It may also be used for consideration of a redesignation of an article or service currently covered by the U.S. Munitions List. The Department must provide notice to Congress at least 30 days before any item is removed from the U.S. Munitions List. Upon electronic

submission of a Commodity Jurisdiction (CJ) Determination Form (Form DS-4076), the Directorate of Defense Trade Controls shall provide a determination of whether a particular article or service is covered by the U.S. Munitions List. The determination, consistent with §§120.2, 120.3, and 120.4, entails consultation among the Departments of State, Defense, Commerce, and other U.S. Government agencies and industry in appropriate cases.

*    *    *

(e)   The Directorate of Defense Trade Controls will provide a preliminary response within 10 working days of receipt of a complete request for commodity jurisdiction. If after 45 days the Directorate of Defense Trade Controls has not provided a final commodity jurisdiction determination, the applicant may request in writing to the Director, Office of Defense Trade Controls Policy that this determination be given expedited processing.

*    *    *

———

## 22 C.F.R. § 120.6   Defense article

*Defense article* means any item or technical data designated in §121.1 of this subchapter. The policy described in §120.3 is applicable to designations of additional items. This term includes technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly relating to items designated in §121.1 of this subchapter. It

105a

also includes forgings, castings, and other unfinished products, such as extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by mechanical properties, material composition, geometry, or function as defense articles. It does not include basic marketing information on function or purpose or general system descriptions.

—————

## 22 C.F.R. § 120.10   Technical data

(a)   Technical data means, for purposes of this subchapter:

(1)   Information, other than software as defined in §120.10(a)(4), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation.

(2)   Classified information relating to defense articles and defense services on the U.S. Munitions List and 600-series items controlled by the Commerce Control List;

(3)   Information covered by an invention secrecy order; or

(4)   Software (see §120.45(f)) directly related to defense articles.

DOSWASHINGTONSUP01454

(b)   The definition in paragraph (a) of this section does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities, or information in the public domain as defined in §120.11 of this subchapter or telemetry data as defined in note 3 to Category XV(f) of part 121 of this subchapter. It also does not include basic marketing information on function or purpose or general system descriptions of defense articles.

———

## 22 C.F.R. § 120.11   Public domain

(a)   Public domain means information which is published and which is generally accessible or available to the public:

(1)   Through sales at newsstands and bookstores;

(2)   Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3)   Through second class mailing privileges granted by the U.S. Government;

(4)   At libraries open to the public or from which the public can obtain documents;

(5)   Through patents available at any patent office;

107a

(6)   Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7)   Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also §125.4(b)(13) of this subchapter);

(8)   Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i)   The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

108a

(ii)   The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

\*       \*       \*

———

**22 C.F.R. § 120.17   Export**

(a)   Except as set forth in §126.16 or §126.17, export means:

(1)   An actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner;

(2)   Releasing or otherwise transferring technical data to a foreign person in the United States (a "deemed export");

\*       \*       \*

(b)   Any release in the United States of technical data to a foreign person is deemed to be an export to all countries in which the foreign person has held or holds citizenship or holds permanent residency.

———

DOSWASHINGTONSUP01457

**22 C.F.R. § 121.1   The United States Munitions List**

         \*        \*        \*

**Category I – Firearms, Close Assault Weapons and Combat Shotguns**

    \*(a)   Nonautomatic and semi-automatic firearms to caliber .50 inclusive (12.7 mm).

    \*(b)   Fully automatic firearms to .50 caliber inclusive (12.7 mm).

    \*(c)   Firearms or other weapons (e.g. insurgency-counterinsurgency, close assault weapons systems) having a special military application regardless of caliber.

    \*(d)   Combat shotguns. This includes any shotgun with a barrel length less than 18 inches.

    \*(e)   Silencers, mufflers, sound and flash suppressors for the articles in (a) through (d) of this category and their specifically designed, modified or adapted components and parts.

    (f)   Riflescopes manufactured to military specifications (See category XII(c) for controls on night sighting devices.)

    \*(g)   Barrels, cylinders, receivers (frames) or complete breech mechanisms for the articles in paragraphs (a) through (d) of this category.

    (h)   Components, parts, accessories and attachments for the articles in paragraphs (a) through (g) of this category.

(i)   Technical data (as defined in §120.10 of this subchapter) and defense services (as defined in §120.9 of this subchapter) directly related to the defense articles described in paragraphs (a) through (h) of this category. Technical data directly related to the manufacture or production of any defense articles described elsewhere in this category that are designated as Significant Military Equipment (SME) shall itself be designated SME.

(j)   The following interpretations explain and amplify the terms used in this category and throughout this subchapter:

(1)   A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the action of an explosive or which may be readily converted to do so.

(2)   A rifle is a shoulder firearm which can discharge a bullet through a rifled barrel 16 inches or longer.

(3)   A carbine is a lightweight shoulder firearm with a barrel under 16 inches in length.

(4)   A pistol is a hand-operated firearm having a chamber integral with or permanently aligned with the bore.

(5)   A revolver is a hand-operated firearm with a revolving cylinder containing chambers for individual cartridges.

111a

(6)   A submachine gun, "machine pistol" or "machine gun" is a firearm originally designed to fire, or capable of being fired, fully automatically by a single pull of the trigger.

NOTE: This coverage by the U.S. Munitions List in paragraphs (a) through (i) of this category excludes any non-combat shotgun with a barrel length of 18 inches or longer, BB, pellet, and muzzle loading (black powder) firearms. This category does not cover riflescopes and sighting devices that are not manufactured to military specifications. It also excludes accessories and attachments (e.g., belts, slings, after market rubber grips, cleaning kits) for firearms that do not enhance the usefulness, effectiveness, or capabilities of the firearm, components and parts. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730-799). In addition, license exemptions for the items in this category are available in various parts of this subchapter (e.g., §§123.17, 123.18 and 125.4).

\*      \*      \*

## Category XXI – Articles, Technical Data, and Defense Services Not Otherwise Enumerated

\*(a)   Any article not enumerated on the U.S. Munitions List may be included in this category until such time as the appropriate U.S. Munitions List category is amended. The decision on whether any article may be included in this category, and the designation of the defense article as not Significant Military Equipment

DOSWASHINGTONSUP01460

112a

(*see* §120.7 of this subchapter), shall be made by the Director, Office of Defense Trade Controls Policy.

(b)   Technical data (*see* §120.10 of this subchapter) and defense services (*see* §120.9 of this subchapter) directly related to the defense articles covered in paragraph (a) of this category.

———

## 22 C.F.R. § 126.7   Denial, revocation, suspension, or amendment of licenses and other approvals

(a)   *Policy*. Licenses or approvals shall be denied or revoked whenever required by any statute of the United States (see §§ 127.7 and 127.11 of this subchapter). Any application for an export license or other approval under this subchapter may be disapproved, and any license or other approval or exemption granted under this subchapter may be revoked, suspended, or amended without prior notice whenever:

(1)   The Department of State deems such action to be in furtherance of world peace, the national security or the foreign policy of the United States, or is otherwise advisable; or

\*      \*      \*

(b)   *Notification*. The Directorate of Defense Trade Controls will notify applicants or licensees or other appropriate United States persons, of actions taken pursuant to paragraph (a) of this section. The

113a

reasons for the action will be stated as specifically as security and foreign policy considerations permit.

\*       \*       \*

———

**22 C.F.R. § 127.1(a)(1)   Violations**

(a)   Without first obtaining the required license or other written approval from the Directorate of Defense Trade Controls, it is unlawful:

(1)   To export or attempt to export from the United States any defense article or technical data or to furnish or attempt to furnish any defense service for which a license or written approval is required by this subchapter;

\*       \*       \*

———

**22 C.F.R. §127.3   Penalties for violations.**

Any person who willfully:

(a)   Violates any provision of §38 or §39 of the Arms Export Control Act (22 U.S.C. 2778 and 2779) or any rule or regulation issued under either §38 or §39 of the Act, or any undertaking specifically required by part 124 of this subchapter; or

(b)   In a registration, license application, or report required by §38 or §39 of the Arms Export Control Act (22 U.S.C. 2778 and 2779) or by any rule or regulation issued under either section, makes any untrue

114a

statement of a material fact or omits a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be subject to a fine or imprisonment, or both, as prescribed by 22 U.S.C. 2778(c).

———

## 22 C.F.R. § 127.10   Civil penalty

(a)

(1)   The Assistant Secretary of State for Political-Military Affairs is authorized to impose a civil penalty, as follows:

(i)   For each violation of 22 U.S.C. 2778, an amount not to exceed $1,111,908;

(ii)   For each violation of 22 U.S.C. 2779a, an amount not to exceed $808,458; and

(iii)   For each violation of 22 U.S.C. 2780, an amount not to exceed $962,295.

(2)   The civil penalty may be either in addition to, or in lieu of, any other liability or penalty which may be imposed.

\*       \*       \*

———

## 22 C.F.R. § 128.1   Exclusion of functions from the Administrative Procedure Act

The Arms Export Control Act authorizes the President to control the import and export of defense articles and services in furtherance of world peace and the

115a

security and foreign policy of the United States. It authorizes the Secretary of State to make decisions on whether license applications or other written requests for approval shall be granted, or whether exemptions may be used. It also authorizes the Secretary of State to revoke, suspend or amend licenses or other written approvals whenever the Secretary deems such action to be advisable. The administration of the Arms Export Control Act is a foreign affairs function encompassed within the meaning of the military and foreign affairs exclusion of the Administrative Procedure Act and is thereby expressly exempt from various provisions of that Act. Because the exercising of the foreign affairs function, including the decisions required to implement the Arms Export Control Act, is highly discretionary, it is excluded from review under the Administrative Procedure Act.

———————————————

116a

## APPENDIX E

[LOGO]   **United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20520-0112*

JUN 12 2017

Mr. William O. Wade
Chair, Defense Trade Advisory Group
Vice President, International Licensing & Compliance
L-3 Communications
201 12th St., Suite 800
Arlington, VA 22202

Dear Mr. Wade:

Since the last Defense Trade Advisory Group (DTAG) plenary meeting in March 2017, the Directorate of Defense Trade Controls (DDTC) has determined that it can benefit from input from the various working groups of the DTAG on the issues addressed in the attached.

The DTAG should be prepared to present its recommendations at one of the next two DTAG plenary sessions, which will be provisionally scheduled in early September and early December. Please provide the DTAG recommendation for which topics should be presented in which upcoming plenary so DDTC can plan accordingly.

As we did in advance of the March meeting, we would be pleased to meet with you to walk through each of the topics in the attached.

117a

Sincerely,

/s/ Brian H. Nilsson
    Brian H. Nilsson
    Deputy Assistant Secretary
     of State for Defense Trade
     Controls
    Designated Federal Official

1 Attachment – DDTC Issued DTAG Tasks (June 2017)

_____

**DDTC Issued DTAG Tasks (June 2017)**

\*     \*     \*

## 3. <u>Definition of Manufacturing (post-revision of firearms rule)</u>

**Tasking:** Considering the possibility of revisions of Cats I-III and removal of most commercial firearms and related activities from the ITAR, DDTC requests DTAG to review and provide feedback to accurately and effectively define "manufacturing" (and distinguish from other related activities like assembly, integration, installment, various services) for remaining defense articles and services.

\*     \*     \*

DOSWASHINGTONSUP01466

**No. 17-190**

# In the Supreme Court of the United States

---

DEFENSE DISTRIBUTED, ET AL., PETITIONERS

*v.*

DEPARTMENT OF STATE, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

---

**BRIEF FOR THE RESPONDENTS IN OPPOSITION**

---

JEFFREY B. WALL
  *Principal Deputy Solicitor
  General
  Counsel of Record*
BRETT A. SHUMATE
  *Deputy Assistant Attorney
  General*
MICHAEL S. RAAB
DANIEL TENNY
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

DOSWASHINGTONSUP01467

## QUESTION PRESENTED

The Arms Export Control Act, 22 U.S.C. 2751 *et seq.*, generally prohibits the exportation of "defense articles or defense services designated by the President" without a license issued in accordance with federal regulations. 22 U.S.C. 2778(a)(1) and (b)(2). The Department of State's International Traffic in Arms Regulations (Regulations), 22 C.F.R. Pts. 120-130, designate covered defense articles and defense services, including certain "[t]echnical data" that are "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles" and that are not in the "public domain." 22 C.F.R. 120.10(a)(1) and (b); see 22 C.F.R. 120.6, 121.1. Petitioners filed suit challenging the application of the Regulations' provisions governing exportation of such technical data to the online distribution to foreign nationals of computer files that enable anyone with a 3-D printer or computer-controlled drill for milling metal objects to produce operable, unregistered, untraceable firearms and firearm parts. The district court denied the injunction on the ground that the balance of equities and the public interest weighed against injunctive relief. The court of appeals affirmed on the same basis. The question presented is as follows:

Whether the court of appeals erred in concluding that the district court did not abuse its discretion by denying a preliminary injunction against enforcement of the Regulations' provisions governing exportation of technical data—including data used to produce unregistered, untraceable firearms and firearm parts—based on the district court's determination that the balance of equities and the public interest weighed against the requested relief.

(I)

## TABLE OF CONTENTS

Page

Opinions below ............................................................. 1
Jurisdiction ................................................................... 1
Statement ..................................................................... 2
Argument...................................................................... 12
Conclusion ................................................................... 23

## TABLE OF AUTHORITIES

Cases:

*Child Evangelism Fellowship of Minn.* v.
   *Minneapolis Special Sch. Dist. No. 1*,
   690 F.3d 996 (8th Cir. 2012) ............................... 19
*D.U.* v. *Rhoades*, 825 F.3d 331 (7th Cir. 2016).................... 19
*Elrod* v. *Burns*, 427 U.S. 347 (1976) ............................... 8, 16
*Expressions Hair Design* v. *Schneiderman*,
   137 S. Ct. 1144 (2017) ........................................ 22
*Liberty Coins, LLC* v. *Goodman*, 748 F.3d 682
   (6th Cir. 2014), cert. denied, 135 S. Ct. 950 (2015) .......... 19
*New York ex rel. Schneiderman* v. *Actavis PLC*,
   787 F.3d 638 (2d Cir.), cert. denied,
   136 S. Ct. 581 (2015) ......................................... 19
*Nken* v. *Holder*, 556 U.S. 418 (2009)............................. 12, 18
*PDK Labs. Inc.* v. *United States Drug Enforcement*
   *Admin.*, 362 F.3d 786 (D.C. Cir. 2004) ........................... 16
*Pearson* v. *Callahan*, 555 U.S. 223 (2009)......................... 16
*Pursuing Am.'s Greatness* v. *Federal Election*
   *Comm'n*, 831 F.3d 500 (D.C. Cir. 2016)........................... 19
*Scott* v. *Roberts*, 612 F.3d 1279 (11th Cir. 2010)................ 19
*Sindicato Puertorriqueño de Trabajadores* v.
   *Fortuño*, 699 F.3d 1 (1st Cir. 2012)...................... 19, 20, 21

(III)

IV

Cases—Continued:                                        Page

*Stagg P.C.* v. *United States Dep't of State*,
    673 Fed. Appx. 93 (2d Cir. 2016), petition for
    cert. pending, No. 17-94 (filed July 17, 2017)............. 19, 20

*Stilp* v. *Contino*, 613 F.3d 405 (3d Cir. 2010)...................... 19

*Verlo* v. *Martinez*, 820 F.3d 1113 (10th Cir. 2016) ............ 19

*Vivid Entm't, LLC* v. *Fielding*, 774 F.3d 566
    (9th Cir. 2014)...................................................................... 19

*WV Ass'n of Club Owners & Fraternal Servs., Inc.* v.
    *Musgrave*, 553 F.3d 292 (4th Cir. 2009) ......................... 19

*Weinberger* v. *Romero-Barcelo*, 456 U.S. 305 (1982)..... 13, 19

*Winter* v. *Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................12, 13, 15, 18, 19

Constitution, statutes, and regulations:

U.S. Const.:
    Amend. I................................................................ *passim*
    Amend. II ......................................................................8
    Amend. V......................................................................8
Arms Export Control Act, 22 U.S.C. 2751 *et seq.*................2
    22 U.S.C. 2778(a)(1).....................................................2
    22 U.S.C. 2778(a)(2) .....................................................2
    22 U.S.C. 2778(b)(2) .....................................................2
Exec. Order No. 11,958, § 1(*l*)(1), 3 C.F.R. 80 (1978) .........2
Exec. Order No. 13,637, § 1(n)(i), 3 C.F.R. 225 (2014).......2
22 C.F.R.:
    Pts. 120-130 .................................................................3
    Pt. 120:
        Section 120.4(a) ...................................................5
        Section 120.4(g) ...................................................5
        Section 120.6.........................................................3
        Section 120.10(a) ..................................................3

DOSWASHINGTONSUP01470

V

Regulations—Continued:                                                    Page

        Section 120.10(a)(1) .................................................. 3
        Section 120.10(b) ...................................................... 3
        Section 120.11(a) ....................................................... 4
        Section 120.17(a)(2) .................................................. 4
        Section 120.17(a)(4) (2015) .................................... 4
        Section 120.45(f) ....................................................... 3
    Pt. 121:
        Section 121.1 .............................................................. 3
        Section 121.1, Category I, (i) ................................. 3

Miscellaneous:

    80 Fed. Reg. 31,525 (June 3, 2015) ........................................ 4
    81 Fed. Reg. 35,611 (June 3, 2016) ........................................ 4
    81 Fed. Reg. 62,004 (Sept. 8, 2016) ...................................... 4
    Office of Information & Regulatory Affairs,
        Office of Mgmt. & Budget, Exec. Office of the
        President, Update 2017, *Unified Agenda of*
        *Federal Regulatory & Deregulatory Actions:*
        RIN 0694-AF47, https://www.reginfo.gov/
            public/do/eAgendaViewRule?pubId=201704
            &RIN=0694-AF47 (last visited Nov. 7, 2017) ........ 11
        RIN 1400-AE30, https://www.reginfo.gov/
            public/do/eAgendaViewRule?pubId=201704
            &RIN=1400-AE30 (last visited Nov. 7, 2017) ........ 11

DOSWASHINGTONSUP01471

# In the Supreme Court of the United States

————

No. 17-190

DEFENSE DISTRIBUTED, ET AL., PETITIONERS

*v.*

DEPARTMENT OF STATE, ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE FIFTH CIRCUIT*

————

**BRIEF FOR THE RESPONDENTS IN OPPOSITION**

————

## OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-55a) is reported at 838 F.3d 451. The order of the district court (Pet. App. 56a-90a) is reported at 121 F. Supp. 3d 680.

## JURISDICTION

The judgment of the court of appeals was entered on September 20, 2016. A petition for rehearing was denied on March 15, 2017 (Pet. App. 91a-97a). On April 26, 2017, Justice Thomas extended the time within which to file a petition for a writ of certiorari to and including August 2, 2017, and the petition was filed on that date. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

(1)

2

**STATEMENT**

1. a. The Arms Export Control Act (AECA or Act), 22 U.S.C. 2751 *et seq.*, authorizes the President, "[i]n furtherance of world peace and the security and foreign policy of the United States," to "control the import and the export of defense articles and defense services" and "to promulgate regulations for the import and export of such articles and services." 22 U.S.C. 2778(a)(1). The Act further authorizes the President to "designate those items which shall be considered as defense articles and defense services" for this purpose by placing them on the "United States Munitions List," and it generally prohibits "export[ing] or import[ing]" such "defense articles or defense services designated by the President * * * without a license for such export or import, issued in accordance with [the Act] and regulations issued under [it]." 22 U.S.C. 2778(a)(1) and (b)(2). The Act directs that

> [d]ecisions on issuing export licenses * * * shall take into account whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements.

22 U.S.C. 2778(a)(2).

b. The President has delegated to the Secretary of State his authority under the AECA to designate covered defense articles and defense services (with the concurrence of the Secretary of Defense) and to issue regulations regarding exportation of such articles and services. See Exec. Order No. 13,637, § 1(n)(i), 3 C.F.R. 225 (2014); Exec. Order No. 11,958, § 1(*l*)(1), 3 C.F.R. 80 (1978). Exercising that authority, the Department of

DOSWASHINGTONSUP01473

3

State has promulgated the International Traffic in Arms Regulations (Regulations), 22 C.F.R. Pts. 120-130, which set out the U.S. Munitions List that defines items as defense articles and defense services. The Munitions List includes a wide range of military items that constitute defense articles, such as missiles, warships, tanks, bombers, and fighter planes, as well as firearms and certain firearm components, among many others. 22 C.F.R. 121.1.

In addition to such munitions themselves, the Munitions List designates as defense articles "technical data" that are related to other items on the list. 22 C.F.R. 120.6; see, *e.g.*, 22 C.F.R. 121.1, Category I, (i). The term "[t]echnical data" includes, among other things, "[i]nformation * * * which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles," including "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. 120.10(a)(1).[1]

The definition of technical data "does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities," nor does it include "information in the public domain." 22 C.F.R. 120.10(b). Information in the "[p]ublic domain," in turn, is defined as information "which is published and which is generally accessible or available to the public" in any of a number

---

[1] A separate definition of technical data applies to "software." See 22 C.F.R. 120.10(a), 120.45(f). This case concerns data files that are not classified as software.

DOSWASHINGTONSUP01474

4

of forms and locations.  22 C.F.R. 120.11(a).[2]  The Regulations define the "export" of technical data to include (*inter alia*) disclosing such data to a foreign person in the United States.  22 C.F.R. 120.17(a)(2).[3]

The Regulations also set out the requirements and procedures for determining whether particular items satisfy the regulatory definitions of defense articles or services and, if so, whether a license should be issued to

---

[2]  In June 2015, while this litigation was pending, the Department of State issued a notice of proposed rulemaking that proposed (*inter alia*) to amend the definition of "public domain" to clarify that technical data are not in the public domain if they were made available without appropriate authorization from the relevant government entity.  80 Fed. Reg. 31,525, 31,527-31,528, 31,535 (June 3, 2015).  As the preamble to the proposed rule explained, this understanding is "not new" but is merely "a more explicit statement of the [Regulations'] requirement that one must seek and receive a license or other authorization from the Department or other cognizant U.S. government authority to release [Regulations-]controlled 'technical data.'"  *Id.* at 31,528.  The preamble also stated that dissemination of technical data that were made available without appropriate federal authorization is a violation of the Regulations "if, and only if, it is done with knowledge that the 'technical data'" were "made publicly available without" such authorization.  *Ibid.*; see *id.* at 31,538.  The Department received comments on the proposed rule but has not yet issued a final rule regarding the definition of "public domain."  See 81 Fed. Reg. 62,004, 62,007 (Sept. 8, 2016) (adopting final rules regarding other aspects of the proposed rule but deferring action on definition of this and other terms to future proceedings).

[3]  In June 2016, the Department of State promulgated an interim final rule modifying the Regulations' definition of "export," which took effect September 1, 2016.  See 81 Fed. Reg. 35,611, 35,611 (June 3, 2016) (interim final rule), as amended, 81 Fed. Reg. 62,004 (final rule).  That amendment does not materially affect the issues presented here; both before and after that amendment, the Regulations' definition of "export" encompassed disclosure of technical data to a foreign person in the United States.  Compare 22 C.F.R. 120.17(a)(2) (2017), with 22 C.F.R. 120.17(a)(4) (2015).

DOSWASHINGTONSUP01475

5

permit their export.  Under the "commodity jurisdiction procedure," the Department of State provides, on request, "a determination of whether a particular article or service is covered by the U.S. Munitions List." 22 C.F.R. 120.4(a).  Commodity-jurisdiction decisions are subject to an appeal procedure.  22 C.F.R. 120.4(g).

2.  Petitioner Defense Distributed is a nonprofit organization that seeks to "promot[e] popular access to arms" by "facilitating global access to, and the collaborative production of, information and knowledge related to the 3D printing of arms," and by "publishing and distributing such information and knowledge on the Internet."  Pet. App. 2a-3a.  Defense Distributed "create[s] computer files to allow people to easily produce their own weapons and weapon parts using relatively affordable and readily available equipment," employing either "[t]hree-dimensional ('3-D') printing" or "[c]omputer numeric control ('CNC') milling."  *Id.* at 4a (citation and internal quotation marks omitted).  As Defense Distributed described those technologies to the lower courts, "[t]hree-dimensional ('3-D') printing technology allows a computer to 'print' a physical object" in three dimensions—including "everything from jewelry to toys to car parts."  *Ibid.* (citation and internal quotation marks omitted).  CNC milling is a similar but "older industrial technology," which "involves a computer directing the operation of a drill upon an object."  *Ibid.* (citation and internal quotation marks omitted).  Both technologies require a set of instructions, contained in a computer file, that direct the 3-D printer or CNC mill to create the desired object.  *Id.* at 4a-5a.

Defense Distributed offers files for both technologies.  Pet. App. 5a.  Its 3-D printing files "allow virtually anyone with access to a 3D printer to produce" both

6

firearms and firearm components. *Ibid.* For example, Defense Distributed offers files to 3-D print a "single-shot plastic pistol called the Liberator," as well as "lower receivers" for AR-15 rifles. *Ibid.* "The lower receiver is the part of the firearm to which the other parts are attached" and "is the only part of the rifle that is legally considered a firearm under federal law." *Id.* at 3a. A lower receiver "ordinarily contains the serial number" of a firearm, "which in part allows law enforcement to trace the weapon," and "the purchase of a lower receiver is restricted and may require a background check or registration." *Ibid.* Defense Distributed's 3-D printing files allow users to create "a fully functional plastic AR-15 lower receiver." *Id.* at 5a. Defense Distributed also sells a "desktop CNC mill" (the "Ghost Gunner"); "[w]ith CNC milling files supplied by Defense Distributed," users of the Ghost Gunner can "produce fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion." *Ibid.*

Defense Distributed "desire[s] to share all of its 3D printing and CNC milling files online, available without cost to anyone located anywhere in the world, free of regulatory restrictions." Pet. App. 5a. In 2012, it began "post[ing] online, for free download by anyone in the world, a number of computer files, including those for the Liberator pistol." *Ibid.* In May 2013, the Department of State sent a letter to Defense Distributed requesting that those files be removed. *Id.* at 5a-6a. The Department of State explained that the posted files potentially included technical data relating to weapons on the Munitions List covered by the Regulations and that posting the files online "for foreign nationals to down-

7

load constitutes 'export.'" *Id.* at 7a.  It accordingly directed Defense Distributed to obtain prior approval for posting the files, in accordance with the Regulations. *Ibid.*

Defense Distributed removed the files and submitted commodity-jurisdiction requests for approval to post them.  Pet. App. 7a-8a.  It ultimately received approval for some files, but not others.  *Id.* at 8a.  Defense Distributed itself has not posted new files online since, but has requested Department of State guidance on how to obtain authorization to do so—"includ[ing] the CNC milling files required to produce an AR-15 lower receiver" and "various other 3D printed weapons or weapon parts."  *Ibid.*  The files Defense Distributed had previously posted online, however, "continue to be shared online on third party sites," including one called "The Pirate Bay."  *Ibid.*

3. Defense Distributed—joined by the Second Amendment Foundation, Inc., a nonprofit organization that "promote[s] Second Amendment rights," Pet. App. 3a (collectively petitioners)—commenced this lawsuit against the Department of State and various of its components and officials, alleging (as relevant here) that the Regulations violate the First Amendment.  *Id.* at 8a-9a.  Petitioners brought both "facial and as applied" challenges, contending that the Regulations' requirement of prepublication approval for privately generated unclassified data constitutes an impermissible prior restraint.  *Ibid.*  They sought a preliminary injunction "essentially seeking to have the district court suspend enforcement of [the Regulations'] prepublication approval

DOSWASHINGTONSUP01478

8

requirement pending the final resolution of this case."
*Id.* at 9a.[4]

The district court denied the preliminary injunction.
Pet. App. 56a-90a. Applying the traditional four-factor
test for preliminary injunctions, the court determined
that petitioners "face a substantial threat of irreparable
injury" because "the 'loss of First Amendment free-
doms'" itself necessarily "'constitutes irreparable in-
jury.'" *Id.* at 62a-63a (quoting *Elrod* v. *Burns*, 427 U.S.
347, 373 (1976) (opinion of Brennan, J.)). The court
held, however, that petitioners had not "met their bur-
den as to the" third and fourth factors—the balance of
equities and the public interest—which merge here be-
cause the government's stated interest is "protecting
the public by limiting access of foreign nationals to 'de-
fense articles.'" *Id.* at 63a, 65a.

As the district court explained, although there is a
"public interest in protection of constitutional rights,"
petitioners "fail[ed] to consider the public's keen inter-
est in restricting the export of defense articles." Pet.
App. 64a. They also "fail[ed] to account for the inter-
est—and authority—of the President and Congress in
matters of foreign policy and export." *Ibid.* The court
thus concluded that preliminary injunctive relief was
unwarranted, irrespective of the merits of petitioners'
First Amendment claim. *Id.* at 65a. "Nonetheless, in
an abundance of caution," the court discussed the mer-
its in what the court of appeals understood to be "dicta"
and concluded that petitioners also "ha[d] not shown a
substantial likelihood of success" on their First Amend-
ment claim. *Id.* at 12a, 65a, 78a; see *id.* at 68a-78a.

---

[4] Petitioners also asserted violations of the Second and Fifth
Amendments. Pet. App. 8a. Those claims are not at issue here.

9

4. The court of appeals affirmed. Pet. App. 12a-20a.[5]

a. The court of appeals held that the district court did not abuse its discretion in denying the preliminary injunction based on its finding that petitioners had not carried their burden on "two of the three non-merits requirements," *i.e.*, "the balance of harm and the public interest." Pet. App. 17a-18a; see *id.* at 12a. Petitioners, the court noted, failed both in the district court and on appeal "to give *any* weight to the public interest in national defense and national security." *Id.* at 13a. Although recognizing that "[o]rdinarily" protecting constitutional rights "*would* be the highest public interest," the court explained that "the State Department has asserted a very strong public interest in national defense and national security." *Ibid.* That "stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest." *Id.* at 13a-14a.

The court of appeals held that the district court did not abuse its discretion in concluding that "the public interest in national defense and national security is stronger here" than petitioners' asserted interests. Pet. App. 16a. As the court of appeals explained, if a preliminary injunction were granted, petitioners "would legally be permitted to post on the [I]nternet as many * * * files as they wish," including files "for producing AR-15 lower receivers and additional 3D-printed

---

[5] The appeal and this petition involve only claims against the government agencies and the official-capacity defendants, and this brief is filed on their behalf only. Claims for damages against the individual-capacity defendants are still pending in the district court.

10

weapons and weapon parts." *Id.* at 17a.  The harm
caused by such posting, the court continued, would be
permanent:  even if petitioners did not ultimately pre-
vail, "the files posted in the interim would remain online
essentially forever."  *Ibid.*   This concern, the court
noted, "is not a far-fetched hypothetical"; the files ini-
tially posted by Defense Distributed remained available
on foreign websites, and it "ha[d] indicated they will
share additional, previously unreleased files as soon as
they are permitted to do so." *Ibid.*  Because those files,
once released, would remain available indefinitely, "the
national defense and national security interest would be
harmed forever." *Ibid.*  By contrast, if the denial of the
preliminary injunction were affirmed and if petitioners
eventually prevail on the merits, the harm to them
would be only temporary.  *Id.* at 16a-17a.

Because it held that "the district court did not abuse
its discretion in denying [the] preliminary injunction
based on their failure to carry their burden of persua-
sion on two of the three non-merits requirements for
preliminary injunctive relief," the court of appeals "de-
cline[d] to reach" the merits of petitioners' First
Amendment claim. Pet. App. 17a-18a; see *id.* at 18a-19a
& n.12.  It noted that "the district court eventually will
have to address the merits, and it will be able to do so
with the benefit of a more fully developed record." *Id.*
at 19a.

b. Judge Jones dissented. Pet. App. 20a-55a. In her
view, publishing technical data on the Internet cannot
constitute the "export" of that data, regardless of
whether it is accessed by foreign nationals. *Id.* at 33a.
Judge Jones also disagreed with the majority's failure
to address the merits. *Id.* at 54a. She would have held
that the Regulations' licensing scheme violates the

DOSWASHINGTONSUP01481

11

First Amendment and that the balance of harms tips in petitioners' favor, and would have reversed the district court. *Id.* at 37a-49a.

5. The court of appeals denied petitioners' request for rehearing en banc. Pet. App. 91a-92a. Judge Elrod, joined by Judges Jones, Smith, and Clement, filed an opinion dissenting from the denial of rehearing. *Id.* at 93a-97a. In the dissenting judges' view, the panel erred by declining to address the merits and had misapplied the public-interest and irreparable-harm factors of the preliminary-injunction standard to these facts. *Ibid.*[6]

---

[6] This Office has been informed by the Department of State that it is currently developing a proposed rule that would remove certain items—including certain commercially available firearms and ammunition—from the Munitions List; such items would remain subject to regulation under the Commerce Control List of the Bureau of Industry and Security in the Department of Commerce. The Department of Commerce is concurrently developing a proposed rule specifying how such items removed from the Munitions List would be regulated under the Commerce Control List. The draft proposed rules are undergoing review and have not yet been published in the Federal Register. See Office of Information & Regulatory Affairs, Office of Mgmt. & Budget, Exec. Office of the President, Update 2017, *Unified Agenda of Federal Regulatory & Deregulatory Actions*, RIN 1400-AE30, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId= 201704&RIN=1400-AE30 (Department of State); *id.* RIN 0694-AF47, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId= 201704&RIN=0694-AF47 (Department of Commerce). If the proposed rules are adopted as final rules, to the extent technical data petitioners wishe to export concern items that would be removed from the Munitions List, they may have the effect of eliminating or substantially modifying the particular prepublication-approval requirements that petitioners challenge here.

12

### ARGUMENT

Petitioners contend (Pet. 25-32) that the court of appeals erred in affirming the denial of a preliminary injunction without addressing the merits and that its decision implicates a disagreement among the courts of appeals. The court of appeals correctly held, however, that the district court did not abuse its discretion by denying an injunction based on its determination that the balance of equities and the public interest weighed against the requested interim relief independently of the merits. That holding does not conflict with any decision of this Court or another court of appeals. Further review is not warranted.

1. The court of appeals correctly determined that the district court did not abuse its discretion in denying the preliminary injunction petitioners requested.

a. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Instead, it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

This Court has made clear that, even if a plaintiff establishes irreparable injury and a likelihood of success on the merits, a preliminary injunction is inappropriate if the plaintiff's irreparable injury "is outweighed" by the balance of equities and the public interest, *Winter*, 555 U.S. at 23—factors that "merge when the Government is the opposing party," *Nken* v. *Holder*, 556 U.S.

DOSWASHINGTONSUP01483

13

418, 435 (2009). In *Winter*, the lower courts had concluded that the plaintiffs were likely to succeed on the merits in challenging the Navy's use of certain sonar technology in training exercises and that they suffered irreparable injury, and the courts entered a preliminary injunction. 555 U.S. at 17-20, 23-24. This Court reversed, concluding that, even if petitioners were likely to succeed on the merits and had shown irreparable harm, the public interest and balance of equities weighed decisively against injunctive relief. See *id.* at 23-31.

As the Court explained, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32. Independently of the merits, "the balance of equities and consideration of the public interest * * * are pertinent in assessing the propriety of any injunctive relief." *Ibid.* Applying that principle, the Court declined to "address the lower courts' holding" regarding the merits because it determined that, "even if plaintiffs have shown irreparable injury from the Navy's training exercises, any such injury is outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors." *Id.* at 23-24. "A proper consideration of these factors alone," the Court held, "requires denial of the requested injunctive relief." *Id.* at 23; accord, *e.g.*, *Weinberger* v. *Romero-Barcelo*, 456 U.S. 305, 313 (1982) (courts are "not mechanically obligated to grant an injunction for every violation of law," and evaluating "commonplace considerations" beyond the merits is "'a practice with a background of several hundred years of history'" (citation omitted)).

DOSWASHINGTONSUP01484

14

b. The lower courts correctly applied those settled principles here.  The district court determined that, although petitioners faced irreparable harm based on the alleged violation of their First Amendment rights, they had not "met their burden as to the final two prongs"—the balance of equities and the public interest.  Pet. App. 65a; see *id.* at 62a-65a.  Petitioners "fail[ed] to consider the public's keen interest in restricting the export of defense articles" and the "interest—and authority—of the President and Congress in matters of foreign policy and export."  *Id.* at 64a.  The files that petitioner Defense Distributed seeks to export would allow the overseas production of (*inter alia*) "fully functional, unserialized, and untraceable metal AR-15 lower receivers in a largely automated fashion."  *Id.* at 5a.  The Department of State demonstrated in a detailed declaration that grave harm to national security and foreign affairs would arise if, for example, computer files originating in the United States provided such firearms components or replacement parts to transnational criminal organizations, and allowed foreign nationals to circumvent the firearms laws of our allies.  C.A. ROA 571-572 (Aguirre Decl. ¶ 35).  As the court of appeals observed, "[t]he district court's decision was based not on discounting [petitioners'] interest but rather on finding that the public interest in national defense and national security is stronger here."  Pet. App. 16a.

Nor did the lower courts accord dispositive weight to "abstract" assertions of national-security interests, as petitioners suggest.  Pet. 35.  The court of appeals determined that "the State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapon parts is

15

not merely tangentially related to national defense and security," but "lies squarely within that interest." Pet. App. 14a.  The court of appeals correctly determined that the district court did not abuse its discretion in finding that those significant public and governmental interests outweighed petitioners' claimed injury. *Id.* at 16a-17a.  In any event, any asserted error in the lower courts' factbound analysis of the equities here would not warrant this Court's review.

c. Petitioners contend (Pet. 25-30) that the lower courts nevertheless were required to evaluate the merits of the underlying First Amendment claim and that the court of appeals erred by affirming the denial of the preliminary injunction without doing so.  Petitioners are mistaken.

As *Winter* illustrates, a court is not required in all instances to evaluate the underlying merits in ruling on a request for a preliminary injunction if the other factors weigh decisively against relief.  555 U.S. at 23-26. The Court in *Winter* expressly declined to "address" the merits of the plaintiffs' claims because the Court concluded that a preliminary injunction was inappropriate on other grounds.  *Id.* at 23-24.  Like the lower courts here, the Court in *Winter* held that, even assuming petitioners were likely to prevail on the merits and had suffered "irreparable injury," that "injury [was] outweighed by the public interest and the [government's] interest," *i.e.*, the balancing of equities.  *Id.* at 23; see *id.* at 23-26.  An analysis of the merits was unnecessary because a preliminary injunction would have been improper in any event.

Petitioners suggest (Pet. 25-30) that analysis of the merits is necessary here because petitioners alleged a First Amendment violation.  The constitutional nature

16

of their claim, however, only further confirms that the course the lower courts adopted was appropriate. By reserving judgment on petitioner's likelihood of succeeding on the merits of its First Amendment claim and resolving the preliminary-injunction motion on other grounds, the court of appeals adhered to the "older, wiser judicial counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Pearson* v. *Callahan*, 555 U.S. 223, 241 (2009) (citations and internal quotation marks omitted); see *PDK Labs. Inc.* v. *United States Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (noting "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more").

Petitioners assert (Pet. 27-28) that analysis of the merits is necessary in First Amendment cases because it affects the other three preliminary-injunction factors. Whatever bearing a court's analysis of the merits may have on particular factors in certain circumstances, however, it does not follow that resolving the merits is always required. To be sure, as the court of appeals noted, Pet. App. 11a-12a & n.8, Members of this Court have observed that likelihood of success in First Amendment cases affects analysis of irreparable harm because "[t]he loss of First Amendment freedoms" itself "constitutes irreparable injury." *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) (opinion of Brennan, J.). But the district court here, applying that presumption, stated that petitioner faced irreparable harm, Pet. App. 62a-63a, and the court of appeals did not revisit that conclusion, see *id.* at 11a-12a, 17a-18a. Thus, assuming that a likelihood of success on the merits on a First

DOSWASHINGTONSUP01487

17

Amendment claim would typically also suffice to show irreparable harm, in this case there was no need to address the merits to determine irreparable harm.

Moreover, even if assessing irreparable harm might be thought to require determining (rather than assuming) the likelihood of success on the merits in certain circumstances, analysis of the merits may still be unnecessary if the remaining factors weigh against injunctive relief.  That is precisely what the court of appeals determined here.  Before discussing the merits in what the court of appeals regarded as "dicta," Pet. App. 12a, the district court had determined that, "[a]ssuming without deciding that [petitioners] have suffered the loss of First * * * Amendment freedoms, they have satisfied the irreparable harm requirement because any such loss, however intangible or limited in time, constitutes irreparable injury," *id.* at 11a-12a; see *id.* at 62a-63a. The court of appeals did not question that assumption. It stated, moreover, that, "[o]rdinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case." *Id.* at 13a.  The court of appeals merely concluded that the government had a particularly strong interest in this case, which petitioners had not rebutted, and that the district court did not abuse its discretion in concluding that the government's interest outweighed petitioners' interest.  *Id.* at 13a-18a.

Petitioners further contend (Pet. 27-28) that the balance-of-equities and public-interest factors themselves cannot be assessed independently of the merits in First Amendment cases.  Petitioners' contention cannot be reconciled with this Court's precedent.  That the government and the public have an interest in avoiding vi-

DOSWASHINGTONSUP01488

18

olations of the Constitution does not mean that injunctive relief is warranted automatically whenever a plaintiff shows a likelihood of success on the merits. As this Court has explained in the context of stays of removal orders, "[o]f course there is a public interest in preventing aliens from being wrongfully removed." *Nken*, 556 U.S. at 436. "But that is no basis for the blithe assertion of an 'absence of any injury to the public interest' when a stay is granted." *Ibid.* (citation omitted). The government—and thus the public, see *id.* at 435—also frequently has countervailing interests that courts must consider and weigh. See *id.* at 436 (in the removal context, "[t]here is always a public interest in prompt execution of removal orders," because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [federal law] establishe[s], and permits and prolongs a continuing violation of United States law" (brackets and internal quotation marks omitted)). So too, in the First Amendment context, even if irreparable harm is established or assumed, courts must balance that harm against the injury to the government and the public in each individual case before issuing an injunction.

Petitioners' contrary position would eviscerate the well-settled preliminary-injunction standard as applied in First Amendment cases. Their approach would mean that, once a plaintiff shows a likelihood of success on the merits, the remaining three factors—irreparable harm, balance of equities, and public interest—are necessarily satisfied as well. That approach would replace *Winter*'s familiar four-factor test, see 555 U.S. at 20, with a single inquiry into the merits of a plaintiff's First Amendment claim. And it would contravene this Court's teaching that injunctive relief "does not follow from success on

19

the merits as a matter of course." *Id.* at 32; accord *Romero-Barcelo*, 456 U.S. at 313.

2. Petitioners err in contending (Pet. 26-32) that the decision below implicates a lower-court conflict. The courts of appeals generally agree on the standard a plaintiff must satisfy to obtain a preliminary injunction, which places the burden on the movant to demonstrate that each factor supports relief. See *Sindicato Puertorriqueño de Trabajadores* v. *Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam); *New York ex rel. Schneiderman* v. *Actavis PLC*, 787 F.3d 638, 650 (2d Cir.), cert. denied, 136 S. Ct. 581 (2015); *Stilp* v. *Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *WV Ass'n of Club Owners & Fraternal Servs., Inc.* v. *Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); Pet. App. 9a-10a; *Liberty Coins, LLC* v. *Goodman*, 748 F.3d 682, 689-690 (6th Cir. 2014), cert. denied, 135 S. Ct. 950 (2015); *D.U.* v. *Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016); *Child Evangelism Fellowship of Minn.* v. *Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *Vivid Entm't, LLC* v. *Fielding*, 774 F.3d 566, 577 (9th Cir. 2014); *Verlo* v. *Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Scott* v. *Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010); *Pursuing Am.'s Greatness* v. *Federal Election Comm'n*, 831 F.3d 500, 505 (D.C. Cir. 2016).

To the government's knowledge, the only other court of appeals to address the application of that standard in the context of a First Amendment challenge to the International Traffic in Arms Regulations reached the same conclusion as the court of appeals here. In *Stagg P.C.* v. *United States Department of State*, 673 Fed. Appx. 93 (2d Cir. 2016), petition for cert. pending, No. 17-94 (filed July 17, 2017), the court of appeals affirmed

DOSWASHINGTONSUP01490

20

the denial of a preliminary injunction barring enforce-
ment of the Regulations on First Amendment grounds.
See *id.* at 95-97.  Like the court of appeals here, the Sec-
ond Circuit in *Stagg* concluded that the district court
did not abuse its discretion in denying injunctive relief
based on the plaintiff's failure to carry its burden of
persuasion with respect to the balance of harm and the
public interest, making analysis of the merits unneces-
sary.  See *ibid.*

Petitioners point (Pet. 26-29) to language in lower-
court rulings emphasizing the importance of the likeli-
hood-of-success analysis in First Amendment cases in
assessing other stay factors—particularly irreparable
injury.  The district court stated that petitioners had
demonstrated irreparable injury based on the First
Amendment nature of its claim, Pet. App. 62a-63a, and
the court of appeals did not disagree, see *id.* at 11a-12a
& n.8.  The court of appeals further noted that, "[o]rdi-
narily," petitioners' claimed First Amendment injuries
would be paramount, but in the equitable balance in
these circumstances they were simply outweighed.  *Id.*
at 13a.  Petitioners identify no case holding that analysis
of the merits of a First Amendment challenge is neces-
sary even if a court concludes that the balance of equi-
ties and the public interest would weigh against injunc-
tive relief for independent reasons in any event.

Petitioners cite (Pet. 26) one case, *Sindicato Puer-
torriqueño*, *supra*, in which a court of appeals reversed
a district-court ruling for failing to address the merits.
The circumstances the First Circuit confronted in that
case, however, differed critically from those here.  In
*Sindicato Puertorriqueño*, a labor union challenged a
campaign-finance law as a violation of the First Amend-

DOSWASHINGTONSUP01491

ment.  699 F.3d at 6-7.  The district court denied an in-
junction without addressing the merits, finding that the
plaintiffs had not demonstrated irreparable injury, and
it found that the balance of equities and public interest
weighed against relief with "little explanation of what
harm the public would suffer." *Id.* at 7.  The First Cir-
cuit reversed, holding (as relevant) that, because "irrep-
arable injury is presumed upon a determination that the
movants are likely to prevail on their First Amendment
claim," it was "incumbent upon the district court to en-
gage with the merits." *Id.* at 11.  It further explained
that the district court's only "stated reason" for not ad-
dressing the merits—the need for a more complete rec-
ord and further factual development—was unfounded
given the nature of the plaintiffs' challenge. *Ibid.*

The First Circuit's decision does not conflict with the
decisions below.  The district court here—applying the
same presumption the First Circuit endorsed—stated
that petitioners demonstrated irreparable harm, Pet.
App. 62a-63a, and the court of appeals did not revisit
that determination, see *id.* 11a-12a, 17a-18a.  A central
reason that the First Circuit held that analysis of the
merits was needed in *Sindicato Puertorriqueño* is
therefore inapposite.  Moreover, in contrast to the dis-
trict court's cursory analysis of the remaining stay fac-
tors in *Sindicato Puertorriqueño*, 699 F.3d at 7, the dis-
trict court and the court of appeals here each addressed
the balance-of-equities and public-interest factors in de-
tail.  Pet. App. 13a-18a, 63a-65a.  Further review is not
warranted.

3.  Petitioners briefly address (Pet. 32-34, 40-41) the
merits of their underlying First Amendment challenge
and suggest that this Court grant review to address that

22

issue.  That issue does not independently warrant certiorari because, as the court of appeals held, even if petitioners were likely to succeed on the merits, that would not affect the outcome.  The court of appeals declined to reach the merits precisely because it would not change the bottom-line conclusion that the district court did not abuse its discretion in denying the preliminary injunction.  Pet. App. 12a, 18a-19a.  Petitioners also assert no lower-court conflict on this issue.

In any event, the absence of any ruling from the court of appeals on what it described as "novel legal questions" involving the merits makes the case a poor vehicle for deciding those questions here.  Pet. App. 19a.  As this Court has observed, it is "'a court of review, not of first view,'" and it ordinarily "declin[es] to consider * * * in the first instance" issues not adjudicated by the court below.  *Expressions Hair Design* v. *Schneiderman*, 137 S. Ct. 1144, 1151 (2017) (citation omitted) (declining to address whether regulation of speech "survived First Amendment scrutiny" because lower court had not address the issue).  It should adhere to that course here.

23

**CONCLUSION**

The petition for a writ of certiorari should be denied.

Respectfully submitted.

> JEFFREY B. WALL
>    *Principal Deputy Solicitor*
>     *General*\*
> BRETT A. SHUMATE
>    *Deputy Assistant Attorney*
>     *General*\*
> MICHAEL S. RAAB
> DANIEL TENNY
>    *Attorneys*

NOVEMBER 2017

---

\* The Solicitor General and the Acting Assistant Attorney General are recused in this case.

DOSWASHINGTONSUP01494

## DEPARTMENT OF STATE

**22 CFR Parts 121, 123, 124, 126, and 129**

[Public Notice 10094]

RIN 1400–AE30

**International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III**

**AGENCY:** Department of State.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).

**DATES:** The Department will accept comments on this proposed rule until July 9, 2018.

**ADDRESSES:** Interested parties may submit comments within 45 days of the date of publication by one of the following methods:

• *Email: DDTCPublicComments@ state.gov* with the subject line, "ITAR Amendment—Categories I, II, and III."

• *Internet:* At *www.regulations.gov,* search for this notice using Docket DOS–2017–0046.

Comments received after that date will be considered if feasible, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of confidentiality is asserted, because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at *www.pmddtc.state.gov.* Parties who wish to comment anonymously may do so by submitting their comments via *www.regulations.gov,* leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.

**FOR FURTHER INFORMATION CONTACT:** Robert Monjay, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663–2817; email *DDTCPublicComments@state.gov.*

ATTN: Regulatory Change, USML Categories I, II, and III.

**SUPPLEMENTARY INFORMATION:** The Directorate of Defense Trade Controls (DDTC), U.S. Department of State, administers the International Traffic in Arms Regulations (ITAR) (22 CFR parts 120 through 130). The items subject to the jurisdiction of the ITAR, *i.e.,* "defense articles," are identified on the ITAR's U.S. Munitions List (USML) (22 CFR 121.1). With few exceptions, items not subject to the export control jurisdiction of the ITAR are subject to the jurisdiction of the Export Administration Regulations (EAR, 15 CFR parts 730 through 774, which includes the Commerce Control List (CCL) in Supplement No. 1 to part 774), administered by the Bureau of Industry and Security (BIS), U.S. Department of Commerce. Both the ITAR and the EAR impose license requirements on exports and reexports. The Department of Commerce is publishing a companion rule in this edition of the **Federal Register**.

Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import are part of the United States Munitions List under the AECA. All references to the USML in this rule, however, are to the list of AECA defense articles that are controlled for purposes of export or temporary import pursuant to the ITAR, and not to the list of AECA defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. References to the USMIL are to the list of AECA defense articles controlled by ATF for purposes of permanent import.

Section 38(b)(1)(A)(ii) of the AECA, requires, with limited exceptions, registration of persons who engage in the business of brokering activities with respect to the manufacture, export, import, or transfer of any defense article or defense service designated by the President as such under section 38(a)(1) and licensing for such activities. Through Executive Order 13637, the President delegated the responsibility for registration and licensing of brokering activities to the Department of State with respect to defense articles or defense services controlled either for purposes of export by the Department of State or for purposes of permanent import by ATF. Section 129.1(b) of the ITAR states this requirement. As such, all defense articles described in the USMIL or the USML are subject to the brokering controls administered by the

U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA for purposes of permanent import or brokering controls for any brokering activity, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. This rule proposes adding a new paragraph (b)(2)(vii) to § 129.2 to update the enumerated list of actions that are not considered brokering. This change is a conforming change and is needed to address the movement of items from the USML to the CCL that will be subject to the brokering controls, to ensure that the U.S. government does not impose a double licensing requirement on the export, reexport or retransfer of such items.

The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

**Revision of Category I**

This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all

weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I *and* are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".

**Revision of Category II**

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f),

engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (11).

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II *and* are described in the purchase documentation submitted with the application.

**Revision of Category III**

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III *and* are described in the purchase documentation submitted with the application.

**Conforming ITAR Changes**

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions in § 123.17(a) through (e), which describe the firearms exemptions, because the paragraphs will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, § 123.16(b)(6) will be revised to describe only the remaining exemption at § 123.17 (personal protective gear), and § 123.16(b)(7) will be reserved. Section 123.17 will be amended to remove paragraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of § 124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in § 126.1(s) will be revised to remove reference to the firearms exemption in § 123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are on the USMIL for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

**Request for Comments**

The Department welcomes comments from the public and specifically requests input on the following matters:

(1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in its Munitions List Categories 1, 2 and 3 (WA–ML1, WA–ML2 and WA–ML3). Readers are asked to identify any potential gap in coverage

brought about by the changes for USML Categories I, II and III contained in this notice and the new Category 0, 0x5zz ECCNs published separately by the Department of Commerce when reviewed together.

(2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms, large guns, armaments, ordnance and ammunition. The public should provide any specific examples of firearms (or parts, components, accessories thereof), large guns, armaments, ordnance or ammunition whose jurisdiction is unclear based on this revision.

(3) The Department has, in the past, adopted a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL. The Department seeks to allow industry sufficient time to implement this rule, including time to make changes to IT systems, technology controls plans, and other business processes. The public should provide input on the time necessary to implement any final rule for these categories, as well as a description of any increased burden that, in the view of the commenter, would be imposed on businesses or individuals should this rule be adopted.

## Regulatory Analysis and Notices

### Administrative Procedure Act

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from sections 553 (rulemaking) and 554 (adjudications) of the Administrative Procedure Act (APA). Although the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of the APA and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, the Department is publishing this proposed rule with a 45-day provision for public comment.

### Regulatory Flexibility Act

Since the Department is of the opinion that this proposed rule is exempt from the rulemaking provisions of 5 U.S.C. 553, it does not require analysis under the Regulatory Flexibility Act.

### Unfunded Mandates Reform Act of 1995

This proposed amendment does not involve a mandate that will result in the expenditure by State, local, and tribal governments, in the aggregate, or by the

private sector, of $100 million or more in any year and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rulemaking has been found not to be a major rule within the meaning of the Small Business Regulatory Enforcement Fairness Act of 1996.

### Executive Orders 12372 and 13132

This rulemaking will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rulemaking does not have sufficient federalism implications to require consultations or warrant the preparation of a federalism summary impact statement. The regulations implementing Executive Order 12372 regarding intergovernmental consultation on Federal programs and activities do not apply to this rulemaking.

### Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributed impacts, and equity). The Department believes that the benefits of this rulemaking largely outweigh any costs, in that many items currently controlled on the more-restrictive USML are being moved to the CCL. We request comment from the public on any impact that would be imposed on the public if this rule were adopted.

Executive Order 13563 emphasizes the importance of considering both benefits and costs, both qualitative and quantitative, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

The Department believes the effect of this proposed rule would decrease the number of license applications

submitted to the Department under OMB Control No. 1405–0003 by approximately 10,000 annually, for which the average burden estimates are one hour per form, which results in a burden reduction of 10,000 hours per year.

The Department of Commerce estimates that 4,000 of the 10,000 licenses that were required by the Department will be eligible for license exceptions or otherwise not require a separate license under the EAR. The Department of Commerce estimates that 6,000 transactions will require an individual validated license. The Department of Commerce will be collecting the information necessary to process license applications under OMB Control No. 0694–0088. The Department of Commerce estimates that OMB Control No. 0694–0088 takes approximately 43.8 minutes for a manual or electronic submission. The Department of Commerce estimates that the 6,000 licenses constitute a burden of 4,380 hours for this collection. The Department estimates a reduction in burden of 10,000 hours due to the proposed transition of these items to the Department of Commerce. The Department of Commerce estimates that the burden of submitting license applications for these items to the Department of Commerce will be 4,380 burden hours. Therefore, the net burden would be reduced by 5,620 hours. The Department estimates that the burden hour cost for completing a license application is $44.94 per hour. Therefore, the estimated net reduction of 5,620 burden hours per year is estimated to result in annual burden hour cost reduction of $252,562.80. There may also be other State Department forms that will no longer need to be submitted and that may further reduce the burden hours for applicants. The Department is seeking comments on the reduction from the other forms, as referenced below.

In addition to the reduction in burden hours, there will be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other

related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to exporters under the EAR and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications. Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department and there is no fee charged by the Department of Commerce to apply for a license.

The Department welcomes comments from the public on the net reduction in burden described within this section, particularly if there are additional burden reductions that are not reflected here (please provide number of hours or cost) or if the estimates noted here appear otherwise inaccurate.

Estimated Cost Savings

The Department of State is of the opinion that controlling the import and export of defense articles and services is a foreign affairs function of the United States government and that rules implementing this function are exempt from Executive Order 13771 (82 FR 9339, February 3, 2017). Although the Department is of the opinion that this proposed rule is exempt from E.O. 13771 and without prejudice to its determination that controlling the import and export of defense services is a foreign affairs function, this proposed rule is expected to be an E.O. 13771 deregulatory action. The Department has conducted this analysis in close consultation with the Department of Commerce. The total annual recurring dollar cost savings is estimated to be $1,376,281 for purposes of E.O. 13771 for the Department of State.

*Executive Order 12988*

The Department of State has reviewed this rulemaking in light of sections 3(a) and 3(b)(2) of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

*Executive Order 13175*

The Department of State has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not preempt tribal law. Accordingly, Executive Order 13175 does not apply to this rulemaking.

*Paperwork Reduction Act*

Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

The Department of State believes there would be a reduction in burden for OMB Control No. 1405–0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data. This form is an application that, when completed and approved by Department of State, constitutes the official record and authorization for the commercial export of unclassified U.S. Munitions List articles and technical data, pursuant to the AECA and ITAR. For an analysis of the reduction in burden for OMB Control No. 1405–0003, see the above Section for E.O. 12866. The Department of State requests comments on the collection of information or potential reduction in burden be sent also to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for Department of State, at *OIRA_Submission@omb.eop.gov* or Attention: Desk Officer for Department of State, Office of Information and Regulatory Affairs of OMB, 725 17th St. NW, Washington, DC 20503.

List of Subjects in 22 CFR Parts 121, 123, 124, 126, and 129

Arms and munitions, Exports.

Accordingly, for the reasons set forth above, title 22, chapter I, subchapter M, parts 121, 123, 124, 126, and 129 are proposed to be amended as follows:

PART 121—THE UNITED STATES MUNITIONS LIST

■ 1. The authority citation for part 121 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; Pub. L. 105–261, 112 Stat. 1920; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 2. Section 121.1 is amended by revising U.S. Munitions List Categories I, II, and III to read as follows:

**§ 121.1   The United States Munitions List.**

\*   \*   \*   \*   \*

Category I—Firearms and Related Articles

\*(a) Firearms using caseless ammunition.

\*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

\*(c) Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (*e.g.,* Precision Guided Firearms (PGFs)), and specially designed parts and components therefor.

**Note to paragraph (c):** Integration does not include only attaching to the firearm or rail.

\*(d) Fully automatic shotguns regardless of gauge.

\*(e) Silencers, mufflers, and sound suppressors, and specially designed parts and components therefor.

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears specially designed for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

(1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor;

(2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm.

(3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

(i) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of this category and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(j)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Note 1 to Category I:** Paragraphs (a), (b), (d), (e), (g), (h), and (i) of this category exclude: Any non-automatic or semi-

automatic firearms to .50 caliber (12.7 mm) inclusive; non-automatic shotguns; BB, pellet, and muzzle loading (*e.g.,* black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of this category that are common to non-automatic firearms and shotguns. The Department of Commerce regulates the export of such items. See the Export Administration Regulations (15 CFR parts 730 through 774).

**Note 2 to Category I:** The following interpretations explain and amplify the terms used in this category:

(1) A firearm is a weapon not over .50 caliber (12.7 mm) which is designed to expel a projectile by the deflagration of propellant.

(2) A fully automatic firearm or shotgun is any firearm or shotgun which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

(3) Caseless ammunition is firearm ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

## Category II—Guns and Armament

(a) Guns and armament greater than .50 caliber (12.7 mm), as follows:

\*(1) Guns, howitzers, artillery, and cannons;

\*(2) Mortars;

\*(3) Recoilless rifles;

\*(4) Grenade launchers; or

(5) Developmental guns and armament greater than .50 caliber (12.7 mm) funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(5):** This paragraph does *not* control guns and armament greater than .50 caliber (12.7 mm) (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(5):** Note 1 does *not* apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(5):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

**Note 1 to paragraph (a):** This paragraph does *not* include: Non-automatic and non-semi-automatic rifles, carbines, and pistols between .50 (12.7 mm) and .72 caliber (18.288 mm) that are controlled on the CCL under ECCN 0A501; shotguns controlled on the CCL under ECCN 0A502; or black powder guns and armaments manufactured between 1890 and 1919 controlled on the CCL under ECCN 0A602.

**Note 2 to paragraph (a):** Guns and armament when integrated into their carrier (*e.g.,* ships, ground vehicles, or aircraft) are controlled in the category associated with the carrier. Self-propelled guns and armament are controlled in USML Category VII. Towed guns and armament and stand-alone guns and armament are controlled under this category.

(b) Flame throwers with a minimum effective range of 20 meters.

(c) [Reserved]

\*(d) Kinetic energy weapon systems specially designed for destruction or rendering mission-abort of a target.

**Note to paragraph (d):** Kinetic energy weapons systems include but are not limited to launch systems and subsystems capable of accelerating masses larger than 0.1g to velocities in excess of 1.6 km/s, in single or rapid fire modes, using methods such as: Electromagnetic, electrothermal, plasma, light gas, or chemical. This does not include launch systems and subsystems used for research and testing facilities subject to the EAR, which are controlled on the CCL under ECCN 2B232.

(e) Signature reduction devices specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category (*e.g.,* muzzle flash suppression devices).

(f)–(i) [Reserved]

(j) Parts, components, accessories, and attachments, as follows:

(1) Gun barrels, rails, tubes, and receivers specially designed for the weapons controlled in paragraphs (a) and (d) of this category;

(2) Sights specially designed to orient indirect fire weapons;

(3) Breech blocks for the weapons controlled in paragraphs (a) and (d) of this category;

(4) Firing mechanisms for the weapons controlled in paragraphs (a) and (d) of this category and specially designed parts and components therefor;

(5) Systems for firing superposed or stacked ammunition and specially designed parts and components therefor;

(6) Servo-electronic and hydraulic elevation adjustment mechanisms;

(7) Muzzle brakes;

(8) Bore evacuators;

(9) Independently powered ammunition handling systems and platform interface components as follows:

(i) Mounts;

(ii) Carriages;

(iii) Gun pallets;

(iv) Hydro-pneumatic equilibration cylinders; or

(v) Hydro-pneumatic systems capable of scavenging recoil energy to power howitzer functions;

**Note to paragraph (j)(9):** For weapons mounts specially designed for ground vehicles, *see* Category VII.

(10) Recoil systems to mitigate the shock associated with the firing process of guns integrated into air platforms and specially designed parts and components therefor;

(11) Independent ammunition handling systems for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(12) Ammunition containers/drums, ammunition chutes, ammunition conveyor elements, and ammunition container/drum entrance and exit units, specially designed for the guns and armament controlled in paragraphs (a), (b), and (d) of this category;

(13) Aircraft/gun interface units to support gun systems with a designed rate of fire greater than 100 rounds per minute and specially designed parts and components therefor;

(14) Prime power generation, energy storage, thermal management, conditioning, switching, and fuel-handling equipment, and the electrical interfaces between the gun power supply and other turret electric drive components specially designed for kinetic weapons controlled in paragraph (d) of this category;

(15) Kinetic energy weapon target acquisition, tracking fire control, and damage assessment systems and specially designed parts and components therefor; or

\*(16) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(k) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles described in paragraphs (a), (b), (d), (e), and (j) of this category and classified technical data directly related to items controlled in ECCNs 0A602, 0B602, 0D602, and 0E602 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.)

(l)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

## Category III—Ammunition and Ordnance

\*(a) Ammunition, as follows:

(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

(2) Ammunition preassembled into links or belts;

(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

(4) Caseless ammunition manufactured with smokeless powder;

**Note to paragraph (a)(4):** Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

(7) Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles;

(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(10):** This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (*see* § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(10):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(10):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive;

**Note to paragraph (d)(2):** This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (*e.g.,* bird bombs, whistlers, crackers).

(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (*e.g.,* fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (*e.g.,* bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types;

**Note to paragraph (d)(10):** This paragraph does not control caps or primers of any type in use prior to 1890.

(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

\*(15) Any part, component, accessory, attachment, equipment, or system that:

(i) Is classified;

(ii) Contains classified software; or

(iii) Is being developed using classified information.

''Classified'' means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (*see* § 120.10 of this subchapter) and defense services (*see* § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (*See* § 125.4 of this subchapter for exemptions.).

(f)–(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (*see* § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (*see* § 123.1(b) of this subchapter).

**Notes to Category III:** 1. This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.

2. This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.

3. Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

\*        \*        \*        \*        \*

## PART 123—LICENSES FOR THE EXPORT OF DEFENSE ARTICLES

■ 3. The authority citation for part 123 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778,

2797); 22 U.S.C. 2753; 22 U.S.C. 2651a; 22 U.S.C. 2776; Pub. L. 105–261, 112 Stat. 1920; Sec 1205(a), Pub. L. 107–228; Sec. 520, Pub. L. 112–55; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 4. Section 123.15 is amended by revising paragraph (a)(3) to read as follows:

### § 123.15   Congressional certification pursuant to Section 36(c) of the Arms Export Control Act.

(a) * * *

(3) A license for export of defense articles controlled under Category I paragraphs (a) through (g) of the United States Munitions List, § 121.1 of this subchapter, in an amount of $1,000,000 or more.

\*       \*       \*       \*       \*

■ 5. Section 123.16 is amended by revising paragraphs (b)(2) introductory text and (b)(6) and removing and reserving paragraph (b)(7) to read as follows:

### § 123.16   Exemptions of general applicability.

\*       \*       \*       \*       \*

(b) * * *

(2) Port Directors of U.S. Customs and Border Protection shall permit the export of parts or components without a license when the total value does not exceed $500 in a single transaction and:

\*       \*       \*       \*       \*

(6) For exemptions for personal protective gear, refer to § 123.17.

\*       \*       \*       \*       \*

■ 6. Section 123.17 is amended by revising the section heading, removing and reserving paragraphs (a) through (e), and revising paragraph (j) to read as follows:

### § 123.17   Exemption for personal protective gear.

\*       \*       \*       \*       \*

(j) If the articles temporarily exported pursuant to paragraphs (f) through (i) of this section are not returned to the United States, a detailed report must be submitted to the Office of Defense Trade Controls Compliance in accordance with the requirements of § 127.12(c)(2) of this subchapter.

\*       \*       \*       \*       \*

### § 123.18   [Removed and Reserved]

■ 7. Section 123.18 is removed and reserved.

## PART 124—AGREEMENTS, OFF-SHORE PROCUREMENT, AND OTHER DEFENSE SERVICES

■ 8. The authority citation for part 124 continues to read as follows:

**Authority:** Secs. 2, 38, and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2797); 22 U.S.C. 2651a; 22 U.S.C. 2776; Section 1514, Pub. L. 105–261; Pub. L. 111–266; Section 1261, Pub. L. 112–239; E.O. 13637, 78 FR 16129.

■ 9. Section 124.14 is amended by revising paragraph (c)(9) to read as follows:

### § 124.14   Exports to warehouses or distribution points outside the United States.

\*       \*       \*       \*       \*

(c) * * *

(9) Unless the articles covered by the agreement are in fact intended to be distributed to private persons or entities (*e.g.,* cryptographic devices and software for financial and business applications), the following clause must be included in all warehousing and distribution agreements: "Sales or other transfers of the licensed article shall be limited to governments of the countries in the distribution territory and to private entities seeking to procure the licensed article pursuant to a contract with a government within the distribution territory, unless the prior written approval of the U.S. Department of State is obtained."

\*       \*       \*       \*       \*

## PART 126—GENERAL POLICIES AND PROVISIONS

■ 10. The authority citation for part 126 continues to read as follows:

**Authority:** Secs. 2, 38, 40, 42 and 71, Pub. L. 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778, 2780, 2791 and 2797); 22 U.S.C. 2651a; 22 U.S.C. 287c; E.O. 12918, 59 FR 28205; 3 CFR, 1994 Comp., p. 899; Sec. 1225, Pub. L. 108–375; Sec. 7089, Pub. L. 111–117; Pub. L. 111–266; Section 7045, Pub. L. 112–74; Section 7046, Pub. L. 112–74; E.O. 13637, 78 FR 16129.

■ 11. Section 126.1 is amended by revising paragraph(s) to read as follows:

### § 126.1   Prohibited exports, imports, and sales to or from certain countries.

\*       \*       \*       \*       \*

(s) *Zimbabwe.* It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Zimbabwe,

except that a license or other approval may be issued, on a case-by-case basis, for the temporary export of firearms and ammunition for personal use by individuals (not for resale or retransfer, including to the Government of Zimbabwe).

\*       \*       \*       \*       \*

## PART 129—REGISTRATION AND LICENSING OF BROKERS

■ 12. The authority citation for part 129 continues to read as follows:

**Authority:** Section 38, Pub. L. 104–164, 110 Stat. 1437, (22 U.S.C. 2778); E.O. 13637, 78 FR 16129.

■ 13. Section 129.1 is amended by revising paragraph (b) to read as follows:

### § 129.1   Purpose.

\*       \*       \*       \*       \*

(b) All brokering activities identified in this subchapter apply equally to those defense articles and defense services designated in § 121.1 of this subchapter and those items designated in 27 CFR 447.21 (U.S. Munitions Import List).

■ 14. Section 129.2 is amended by:
■ a. In paragraph (b)(2)(v), removing the word "or" at the end of the paragraph;
■ b. Removing the period at the end of paragraph (b)(2)(vi) and adding '; or" in its place; and
■ c. Adding paragraph (b)(2)(vii).

The addition reads as follows:

### § 129.2   Definitions.

\*       \*       \*       \*       \*

(b) * * *
(2) * * *

(vii) Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter.

\*       \*       \*       \*       \*

■ 15. Section 129.4 is amended by revising paragraphs (a)(1) and (a)(2)(i) to read as follows:

### § 129.4   Requirement for approval.

(a) * * *

(1) Any foreign defense article or defense service enumerated in part 121 of this subchapter (*see* § 120.44 of this subchapter, and § 129.5 for exemptions) and those foreign origin items on the U.S. Munitions Import List (*see* 27 CFR 447.21); or

(2) * * *

(i) Firearms and other weapons of a nature described by Category I(a) through (d), Category II(a) and (d), and Category III(a) of § 121.1 of this subchapter or Category I(a) through (c), Category II(a), and Category III(a) of the U.S. Munitions Import List (*see* 27 CFR 447.21);

* * * * *

■ 16. Section 129.6 is amended by revising paragraph (b)(3)(i) to read as follows:

**§ 129.6   Procedures for obtaining approval.**

* * * * *

(b) * * *

(3) * * *

(i) The U.S. Munitions List (*see* § 121.1 of this subchapter) or U.S. Munitions Import List (*see* 27 CFR 447.21) category and sub-category for each article;

* * * * *

[FR Doc. 2018–10366 Filed 5–21–18; 8:45 am]

**BILLING CODE 4710–25–P**

DOSWASHINGTONSUP01502

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

**15 CFR Parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772, and 774**

**[Docket No. 111227796–5786–01]**

**RIN 0694–AF47**

### Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

**AGENCY:** Bureau of Industry and Security, Department of Commerce.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns and Armament; and Category III—Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.

**DATES:** Comments must be received by July 9, 2018.

**ADDRESSES:** You may submit comments by any of the following methods:
• Submit comments via Federal eRulemaking Portal: *http://www.regulations.gov*. You can find this proposed rule by searching on its regulations.gov docket number, which is BIS–2017–0004.
• By mail or delivery to Regulatory Policy Division, U.S. Department of Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington, DC 20230. Refer to RIN 0694–AF47.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482–1641 or email *steven.clagett@bis.doc.gov*.

**SUPPLEMENTARY INFORMATION:**

### Background

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I—Firearms, Close Assault Weapons and Combat Shotguns; Category II—Guns

and Armament; and Category III—Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR). This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments. The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a

letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: Howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non-military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items. BIS would require licenses to export, or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada. As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule.

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in

Arms Regulations (ITAR), 22 CFR parts 120 through 130, and not to the list of defense articles on the United States Munitions Import List (USMIL) that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purposes of permanent import under its regulations at 27 CFR part 447. Pursuant to section 38(a)(1) of the Arms Export Control Act (AECA), all defense articles controlled for export or import, or that are subject to brokering controls, are part of the USML under the AECA. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the AECA, 22 U.S.C. 2778 *et seq.,* for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items. After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available. Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR. There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

An additional justification for the change in the jurisdictional status of the items described in this rule is that the current ITAR controls burden U.S. industry without any proportionate benefits to United States national

security or foreign policy objectives. Similar to the challenges faced by other industries, the firearms trade has been negatively affected by the incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content. Currently, under the ITAR, any part, component, accessory or attachment for any of the firearms described in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated into foreign-made items or reexported to any third country. Under the EAR, the *de minimis* provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may not be subject to the EAR, provided the U.S.-origin items meet the applicable *de minimis* level for the country of reexport. Similarly, a technical drawing of such part, component, accessory or attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person concerning those items, such as the application of protective coatings. Moreover, a U.S. person engaged in manufacturing or exporting these items or providing related defense services must register with the State Department under the ITAR. Thus, even if a U.S. company can manufacture or service these items at a lower cost in the United States as compared to the cost for a U.S. or foreign company to manufacture or service the items outside of the United States, the ITAR's restrictions may render the items unattractive or uncompetitive for foreign manufacturers. The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR." (*See* part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology." While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (*i.e.,* unlimited distribution), the operation and maintenance information included in

that published operation and maintenance manual would no longer be "subject to the EAR." (*See* §§ 734.3(b) and 734.7(a).) Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR. (*See* § 734.3(b)(3)(v).)

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA. The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML. The report must "describe the nature of any controls to be imposed on that item under any other provision of law." 22 U.S.C. 2778(f)(1).

This Commerce proposed rule is being published simultaneously with a Department of State proposed rule. Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML. The Department of State proposed rule would revise Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML so that they describe in positive terms the defense articles that should remain on the USML. The Department of Commerce rule would add to the CCL items that the President determines no longer warrant control under the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL. This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether the public find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. The public is invited to comment on the appropriateness of these license requirements and licensing policies. The public is also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

**Detailed Description of Changes Proposed by This Rule**

**Creation of New ECCNs**

This proposed rule would create 17 new ECCNs to control items proposed for removal from the USML. A discussion of each new ECCN and the controls that would apply to items under that ECCN follows below.

*New ECCN 0A501: Firearms and Related Commodities*

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and "parts" and "components:"

—Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);

—Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);

—Detachable magazines with a capacity of greater than 16 rounds but less than 50 rounds that are "specially designed" for the firearms listed above;

—Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and

—Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components," and buttstocks that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, or disconnectors) if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) as specified in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control "parts" or "components."

This proposed rule would add a technical note to ECCN 0A501 stating that "parts" and "components" include "parts" and "components" that are common to firearms described in ECCN 0A501 and to firearms "subject to the ITAR."

It also would add a second note to ECCN 0A501 to state that certain firearms and similar items are EAR99, *i.e.,* subject to the EAR but not on the CCL. Those items are: Antique firearms (*i.e.,* those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

In addition, for purposes of new ECCN 0A501 and the rest of the new ECCNs described below, items previously determined to be "subject to the EAR" under a commodity jurisdiction determination issued by the U.S. Department of State that were designated as EAR99 would generally not be classified in any of the new ECCNs that would be created with this proposed rule. To be consistent with Supplement No. 1 to Part 736, General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determination) and the paragraph (b)(1) release from "specially designed." As a conforming change, this proposed rule would revise paragraph (e)(3) of General Order No. 5 to add a reference to "0x5zz" (to account for new ECCNs 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502 below). The "600 series" and 9x515 (spacecraft and related items) are already included in paragraph (e)(3), and those references remain unchanged.

*New ECCN 0A502: Shotguns and Certain Related Commodities*

New ECCN 0A502 would control both the shotguns currently on the USML that are to be added to the CCL (barrel length less than 18 inches) and the shotguns and the enumerated "parts" and "components" currently controlled in ECCN 0A984 (barrel length 18 inches or greater). Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of Firearms Convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and end user) and United Nations (UN) reasons. Shotguns with a barrel length less than 18 inches would be controlled under NS Column 1, CC Column 1, FC, UN and AT Column 1 plus regional stability (RS Column 1), consistent with their current control on the USML. The shotguns controlled in 0A502 currently controlled in ECCN 0A984 would not be controlled for national security reasons because they are not on the WAML.

*New ECCN 0A503: Discharge Type Arms, and Certain Other Commodities*

This rule would replace existing ECCN 0A985 with a new ECCN 0A503. The rule would add "non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and 'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML. Renumbering this ECCN would cause entries controlling firearms and related items to be placed in close proximity to each other, which would make it easier for readers to identify items on the CCL.

*New ECCN 0A504: Optical Sighting Devices and Certain Related Commodities*

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms. The reasons for control table, which currently states, *inter alia,* that the Firearms Convention (FC) reason for control applies to "optical sights for firearms," would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices. In addition, BIS would add an RS control for certain riflescopes. These riflescopes would be identified in their own paragraph in the ECCN under 0A504.i. The riflescopes in this paragraph would be limited to those "specially designed" for use in firearms that are "subject to the ITAR." An exclusion would be included in the criteria of this paragraph to ensure less sensitive riflescopes that would be moved from ECCN 0A987 to 0A504 on the effective date of a final rule, that currently are not RS controlled under the EAR, would not be controlled under this paragraph. This rule would also add a note to this paragraph (i) to specify that paragraph (a)(1) of the definition of "specially designed" is what would be used to determine whether a riflescope is "specially designed" for purposes of this paragraph.

This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the

FC reason for control. The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

*New ECCN 0A505: Ammunition and Certain Related Commodities*

New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), Firearms Convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms that would be classified under proposed ECCN 0A501, and for most "parts" and "components" of such ammunition. Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included. This proposed rule would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells. Buckshot shotgun shells would be subject to the CC Column 1, FC Column 1 and UN reasons for control. Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control. Only "parts" and "components" would be eligible for License Exception LVS. Ammunition for larger caliber weapons such as howitzers, artillery, cannon, mortars, and recoilless rifles would remain in USML Category III. Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III. Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations and anti-terrorism reasons only. Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes. Possession of this ammunition does not confer a military advantage on the United States. This rule proposes adding three notes to clarify the scope of "parts" and "components" for

ammunition classified under ECCN 0A505. Note 1 to 0A505.c would clarify the relationship between ECCNs 0A505 and 1A984 for shotgun shells, stating that shotgun shells that contain only chemical irritants would be controlled under 1A984 and not 0A505. Separately, Note 2 to 0A505.x would include an illustrative list of the controls on "parts" and "components" in this entry, such as Berdan and boxer primers. Note 3 to 0A505.x would clarify that the controls in ECCN 0A505 include "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

*New ECCN 0A602: Guns and Armament*

New ECCN 0A602 would impose national security (NS Column 1), regional security (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters. It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML. Note 2 to 0A602 confirms that black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are designated EAR99. Inclusion of these guns and armament on the CCL is appropriate because they do not confer a significant military or intelligence advantage on the United States. The guns controlled in this ECCN are between 98 and 127 years old. The parts, components, accessories and attachments controlled in this ECCN include some that are for modern artillery. Modern artillery will remain on the USML, along with the most sensitive "parts," "components," "accessories" and "attachments" for these USML items. This proposed rule adds a note to clarify that "parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are not subject to the EAR. The USML Order of Review and CCL Order of Review already provide guidance for making such a jurisdictional and classification determination, but to highlight that these "parts," "components," "accessories" and "attachments" are not classified under paragraph (x) of 0A602, this rule proposes adding a note.

*New ECCN 0B501: Test, Inspection and Production Equipment for Firearms*

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated in ECCN 0A501 or USML Category I." This new ECCN would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items. The four specific types of machinery are: Small arms chambering machines, small arms deep hole drilling machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures and other tooling "specially designed" for the "production" of items in the State Department proposed rule for USML Category I or ECCN 0A501.

The NS and RS reasons for control do not apply to equipment for the "development" or "production" of commodities in ECCN 0A501.y because those reasons for control do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501. In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or "accessories" of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e. Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability (RS) reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the item is exported or reexported in considering whether to approve a license.

*New ECCN 0B505: Test, Inspection and Production Equipment for Ammunition*

New ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" "parts" and "components" therefor, that are "specially designed" for the "production" of ammunition other than for the ammunition specified in 0A505.b, .c or .d (certain shotgun shells with buckshot and without buckshot and certain blank ammunition). Equipment for manufacturing shotgun shells that do not contain buckshot would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986. ECCN 0B505 would not include equipment for the hand loading of cartridges and shotgun shells, so this rule specifies this in the heading.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes. Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602: Test, Inspection and Production Equipment for Certain Guns and Armament*

New ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated or otherwise described in ECCN 0A602.a or USML Category II. ECCN 0B602 would control eight specific types of equipment that currently are listed in paragraphs .e through .l of ECCN 2B018. Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor; Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses. ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and

fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II). Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

*New ECCN 0D501: Software for Firearms and Certain Related Commodities*

New ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or equipment under 0B501 except those commodities classified under 0A501.y. "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505: Software for Ammunition and Certain Related Commodities*

New ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and "specially designed" parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism

controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602: Software for Guns and Armament and Certain Related Items*

New ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

*New ECCN 0E501: Technology for Firearms and Certain Related Items*

New ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" "required" for the "development" and "production" of firearms other than shotguns. This new ECCN also would apply the anti-terrorism and United Nations reasons for control to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms. Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502: Technology for Shotguns*

New ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" "required" for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" "required" for the "development" or "production" of shotguns in ECCN 0E984. The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length. BIS believes that "technology" related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based

solely on the barrel length of the shotgun would likely be ineffective.

*New ECCN 0E504: Technology for Certain Optical Sighting Devices*

New ECCN 0E504 would replace existing ECCN 0E987, which controls "technology" "required" for the "development," or "production" of certain commodities controlled by 0A504. The new ECCN number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other. New ECCN 0E504 would also impose a United Nations (UN) control on the entire entry.

*New ECCN 0E505: Technology for Ammunition and Related Items*

New ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and "parts" and "components); 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505. "Technology" for the "development" or "production" of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons. United Nations and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for that ammunition and "technology" for "software" for that ammunition. Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

*New ECCN 0E602: Technology for Guns and Armament, Including Technology for Test, Inspection and Production Equipment and Software for Guns and Armament*

New ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or

refurbishing of commodities controlled by ECCNs 0A602 or 0B602, or "software" controlled by 0D602.

**Revisions to Seven ECCNs**

To conform to new *Federal Register Drafting Handbook* requirements, the amendatory instructions in this proposed rule would set forth the entire text of the seven ECCNs to be revised. To help the public understand what specific parts of the ECCNs would be different, the narrative below describes the amendments in detail.

*Revision to ECCN 0A018*

With the proposed removal of ECCN 0A984 and the addition of 0A502 described above, this proposed rule would make the conforming change of removing and reserving 0A018.c since all the items classified in 0A018.c would be classified under other entries on the CCL. This change includes the removal of the note to 0A018.c.

*Revision to ECCN 0E982*

ECCN 0E982 controls "technology" exclusively for the "development" or "production" of equipment controlled by ECCN 0A982 or 0A985. This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revision to ECCN 1A984*

To clarify an existing agency practice of controlling shotguns shells that contain only chemical irritants under 1A984, this proposed rule would revise the heading of 1A984. As described above, the same type of clarification would be made to ECCN 0A505.c under new Note 1 to paragraph (c). BIS considers these to be conforming changes to the removal of ECCN 0A986 and the addition of ECCN 0A505.c in this proposed rule.

*Revisions to ECCN 2B004*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B602 and 0B606. This rule would make no substantive changes to ECCN 2B004.

*Revisions to ECCN 2B018*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN 0B602. It would remove paragraph .n, because the commodities listed in that paragraph

would be controlled under either ECCNs 0B501 or 0B602 or under existing ECCN 0B606 in this proposed rule. It would remove paragraphs .a through .d, .m and .s, because the commodities listed in those paragraphs would be controlled in ECCN 0B606. It would remove paragraphs .o, .p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN 0B501. The commodities described in the MT control in ECCN 2B018 currently listed as MT are controlled elsewhere in the EAR, so no additional changes are needed to add these commodities to other ECCNs.

*Revisions to ECCN 2D018*

Currently ECCN 2D018 controls software for the "development," "production" or "use" of equipment controlled by ECCN 2B018. As a conforming change, this rule would replace the control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

*Revisions to ECCN 7A611*

As a conforming change, this rule would remove the reference to 0A987 in the Related Controls paragraph (2) and add in its place 0A504.

**Removal of Nine ECCNs**

*Removal of ECCN 0A918*

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons. This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control. Bayonets and the "technology" to produce them are available in many countries. Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective. Therefore, for these reasons, this proposed rule does not retain a regional stability (RS column 2) control on bayonets because it is no longer warranted.

*Removal of ECCN 0A984*

This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either proposed ECCN 0A502 or 0A505. As conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1) and in ECCN 0A018.

*Removal of ECCN 0A985*

This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by proposed ECCN 0A503. As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A503 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0A982.

*Removal of ECCN 0A986*

This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by proposed 0A505.c, including less than lethal rounds. As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505, as appropriate in §§ 742.17(f); 742.19(a)(1); 746.3(b)(2) and 748.12(a)(1).

*Removal of ECCN 0A987*

This proposed rule would remove ECCN 0A987 because proposed ECCN 0A504 would control all commodities currently controlled by ECCN 0A987. As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504, as appropriate in §§ 740.16(b)(2)(iv); 742.7(a)(1); 742.17(f); 744.9(a)(1) and (b); and 748.12(a)(1); and in ECCN 7A611.

*Removal of ECCN 0B986*

This proposed rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in proposed ECCN 0B505.c. As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

*Removal of ECCN 0E918*

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons. Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

*Removal of ECCN 0E984*

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and buckshot shotgun shells, because such "technology" would be controlled under proposed ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun

shells). As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

*Removal of ECCN 0E987*

This proposed rule would remove ECCN 0E987 because proposed ECCN 0E504 would control all "technology" currently controlled by ECCN 0E987. As conforming change, references to ECCN 0E987 would be replaced with references to ECCN 0E504, as appropriate in §§ 740.20(b)(2)(ii) and 742.7(a)(1).

**Conforming Change to General Order No. 5**

This proposed rule would amend General Order No. 5, paragraph (e)(3) (Prior commodity jurisdiction determinations), in Supplement No. 1 to part 736, to add a reference in two places to the new 0x5zz ECCNs that would be created by this rule. This change to paragraph (e)(3) is a conforming change and is needed because paragraph (e)(3) now only references the "600 series" and 9x515 ECCNs. 0x5zz ECCNs would include new ECCN 0A501, 0A502, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E502, 0E505. Paragraph (e)(2) is important because, for example, it ensures that items previously determined to be "subject to the EAR" and designated EAR99, would not be classified in a new ECCN being created to control items moved from the USML to the CCL, unless specifically enumerated by BIS in an amendment to the CCL. For example, most swivels and scope mounts for firearms have previously been determined through the CJ and classification process to not be "subject to the ITAR" and designated as EAR99. The classification of such "parts" would not be changed, provided the "part" was not subsequently changed, which would require a separate jurisdiction and classification analysis.

**Revisions to Regional Stability Licensing Policy for Firearms and Ammunition That Would Be Added to the EAR**

This proposed rule would apply the regional stability licensing policy set forth in § 742.6(b)(1)(i) of the EAR to the items controlled for regional stability reasons in ECCNs 0A501, 0A505, 0B501, 0B505, 0A504, 0D501, 0D505, 0E501, 0E504 and 0E505. That policy, which also applies to "600 series" and 9x515 items is case-by-case review "to determine whether the transaction is contrary to the national security or foreign policy interests of the United

States, including the foreign policy interest of promoting the observance of human rights throughout the world." This proposed rule would also revise the regional stability licensing policy set forth in the last sentence of paragraph (b)(1)(i) that is specific to the People's Republic of China for 9x515 items. This proposed rule would add ECCNs 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 to this sentence to specify that these firearms and related items will be subject to a policy of denial when destined to the People's Republic of China or a country listed in Country Group E:1. Lastly, this proposed rule would add a sentence to the end of paragraph (b)(1)(i) to make it explicit that applications for exports and reexports of ECCN 0A501, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items would be subject to a policy of denial when there is reason to believe the transaction involves certain parties of concern. In addition, transactions involving criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries would be subject to a policy of denial.

**Availability of License Exceptions**

Many of the items in the new "600 series" ECCNs generally would be eligible for the same license exceptions and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs. BIS intends that those restrictions be no more restrictive than the ITAR license exemption restrictions that currently apply to those items.

For the ECCNs currently on the CCL that would be renumbered and placed in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL, these existing firearms-related items would continue to be eligible for the same EAR license exceptions, as they were prior to publication of this rule, unless otherwise restricted under § 740.2, if the requirements of the license exceptions are met.

*License Exception: Shipments of Limited Value (LVS)*

Under this proposed rule, complete firearms controlled under ECCN 0A501 would not be eligible for License Exception LVS, 15 CFR 740.3. Firearms "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, other than receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with

a limit of $500 on net value per shipment. In addition, receivers (frames), and complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them. BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR 123.17(a)). This LVS proposal would be less restrictive than the current ITAR provision in two respects. First, the value limit per shipment would be $500 compared to $100 in the ITAR. Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value. BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current prices. In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary Imports, Exports, Reexports, and Transfers (In-Country) (TMP)*

This proposed rule would amend the regulations at § 740.9 to state that

License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740). License Exception TMP would also not be available to export or reexport some firearms and ammunition shipped from or manufactured in the Russia (Russian Federation), Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. In addition, this proposed rule would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 that was shipped from or manufactured in Country Group D:5. It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 that is shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by proposed 0A501 that is also excluded under Annex A in Supplement No. 4 to part 740 (the prohibition would not apply to such firearms), and any shotgun with a barrel length less than 18 inches controlled under 0A502 that was shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. These prohibitions would apply to temporary exports of firearms from the United States, and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR). Consistent with the ITAR requirements previously applicable to temporary exports of the firearms covered by this rule (see 22 CFR 123.17(c), 123.22), exporters would continue to be required to file Electronic Export Information (EEI) to the Automated Export System (AES) for transactions involving such firearms that are authorized pursuant to License Exception TMP (*See* § 758.1(a)(10) of the EAR).

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or

ultimately destined for certain proscribed or restricted countries. Certain information as described below would also be collected by CBP on behalf of BIS and done under existing or new Commerce paperwork collections. The proposed rule would also make eligibility to export under License Exception TMP for ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 subject to the following conditions:

Upon the entry portion of a temporary import, the temporary importer would be required to provide the required statement to U.S. Customs and Border Protection (CBP), as proposed in paragraph (b)(5)(iv)(A).

The temporary importer would be required to include on the invoice or other appropriate import-related documentation (or electronic equivalents) provided to CBP a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, caliber, quantity, and U.S. dollar value, as proposed in paragraph (b)(5)(iv)(B).

If the firearms are temporarily imported for a trade show, exhibition, demonstration, or testing, the temporary importer must provide to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States, as proposed in paragraph (b)(5)(iv)(C).

At the time of export, the temporary importer or its agent as proposed in paragraph (b)(5)(v) would be required to provide the temporary import documentation (*i.e.,* the invoice used at the time of entry for the temporary importation or other appropriate temporary import-related documentation (or electronic equivalents)) related to paragraph (b)(5)(iv)(B) to CBP. This information would be used by CBP to confirm that such firearms were in fact temporarily imported under the EAR for subsequent export under License Exception TMP.

The proposed rule would include a note to License Exception TMP to direct temporary importers and exporters to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS.

*License Exception: Governments, International Organizations, International Inspections Under the Chemical Weapons Convention, and the International Space Station (GOV)*

This proposed rule would revise the regulations at § 740.11 to limit the applicability of License Exception GOV for firearms, "parts" and "components" controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S. government agencies and official and personal use by U.S. government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This proposed authorization under License Exception GOV would treat 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV. It would not impose certain restrictions that are imposed by the current ITAR license exemption. The ITAR exemption authorizes exports of only non-automatic firearms and "parts" and "components." License Exception GOV would authorize non-automatic and semi-automatic firearms and "parts" and "components."

The ITAR exemption (22 CFR 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country. The exporter must present a copy of the written statement to the CBP Port Director. License Exception GOV would impose none of the foregoing limitations. BIS believes that the limitations are unnecessary. The EAR control exports for national security and foreign policy reasons. BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States. Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States. Export license

requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b)—to, for or on behalf of the U.S. Government (including contractors, government employees, their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO. However, this rule would add some additional restrictions for E:1 and E:2 countries. This proposed rule would exclude the use of License Exception GOV for any item listed in a 0x5zz ECCN for E:1 countries, unless authorized under paragraph (b)(2)(i) or (ii) when the items are solely for U.S. government official use. In addition, to better ensure compliance with section 6(j) of the EAA and address concerns with certain end users and uses in Country Group E:1 and E:2 countries, this proposed rule would add a new Note 1 to paragraph (b)(2), which would restrict the use of License Exception GOV for E:1 and E:2 countries for multilaterally controlled items and anti-terrorism (AT) controlled items when destined to certain end users or end uses of concern.

*License Exception: Baggage (BAG)*

This proposed rule would revise License Exception BAG, § 740.14, to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms controlled by proposed ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under ECCN 0A505.a for personal use while abroad. This proposed change to License Exception BAG would be made to be consistent with 22 CFR 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms. Consistent with the ITAR requirements previously applicable to temporary exports of the firearms and associated ammunition covered by this rule, BIS is proposing to modify § 758.1 of the EAR to make clear that exporters would continue to be required to file Electronic Export Enforcement (EEI) to the Automated Export System (AES) for transactions involving such firearms and associated ammunition that are otherwise authorized pursuant to License Exception BAG. BIS is aware that U.S. Customs and Border Protection (CBP)

has temporarily suspended the requirement to file EEI to the AES for personally-owned firearms and ammunition that are "subject to the ITAR" being exported under 22 CFR 123.17(c), due to operational challenges related to implementation. *See* the following CBP website page for additional information: *https:// help.cbp.gov/app/answers/detail/a_id/ 323/~/traveling-outside-of-the-u.s.--- temporarily-taking-a-firearm%2C- rifle%2C-gun%2C*. BIS is proposing in this rule to ensure consistency with the current ITAR filing requirements and any measures that are being used at this time to track such temporary exports of personally-owned firearms and ammunition. Whether and how BIS includes this requirement in a final rule would be based on whether CBP is able to update its processes, and other agencies as needed, to allow for individuals to easily file EEI in AES by the time a final rule is published. If CBP is not able to do so, then the final rule may direct exporters to continue to use CBP's existing process, which is the use of the CBP Certification of Registration Form 4457, until a workable solution is developed or CBP suggests an alternative simplified solution for gathering such information for temporary exports of personally-owned firearms and ammunition. BIS will also take into consideration any public comments submitted on this aspect of the proposed rule regarding imposing an EEI filing requirement in AES, as well as comments on the current practice of using the CBP Form 4457, as well as any other suggestions on alternative approaches for tracking such information.

Though BIS does not require prior authorization to use License Exception BAG, in order to facilitate the physical movement and subsequent importation of firearms authorized under this license exception, this information would need to be collected by CBP by requiring EEI filing in AES.

Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, "parts," "components," "accessories," "attachments," and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms. Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: *http://www.cbp.gov/xp/ cgov/toolbox/ports/*.

This proposed rule also would revise License Exception BAG to allow nonresident aliens leaving the United States to take firearms, "accessories," "attachments," "components," "parts," and ammunition controlled by ECCN 0A501 or 0A505 that they lawfully brought into the United States. This change would be consistent with 22 CFR 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States. This proposed rule would not make changes to the availability of License Exception BAG for shotguns and shotgun shells authorized under paragraph (e)(1) or (2).

As a clarification to License Exception BAG, this proposed rule would add two sentences to the introductory text of paragraph (b)(4) to highlight the special provisions that apply in paragraph (e) for firearms and ammunition and in paragraph (h) for personal protective equipment under ECCN 1A613.c or .d. These two sentences would not change the existing requirement and have been included to assist the public in better identifying these special provisions.

*License Exception STA*

This proposed rule would revise the regulations at § 740.20 to make firearms controlled under ECCN 0A501 and most "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501 ineligible for License Exception STA. Only those "parts," "components," "accessories," and "attachments" that are controlled under paragraph .x (*i.e.,* those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed either on the CCL or USML) are eligible for export under License Exception STA. Items controlled under ECCNs 0A502 and 0A503 are also excluded from STA eligibility.

This proposed rule would exempt gun "parts," "components," "accessories" and "attachments" controlled under ECCN 0A501.x; test, inspection and production equipment and "parts," "components," "accessories" and "attachments" in ECCN 0B501; "software" in 0D501; and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth in § 740.20(b)(3)(ii) that applies to "600 series" items. That end-use limitation is intended to ensure that the military-related items controlled by most 600 series ECCNs are ultimately used by appropriate agencies of the governments of certain U.S allies or multilateral export control regime

members. Because the aforementioned exempted items are not of a military nature, the limitation is not necessary. As a conforming change, this proposed rule also would remove ECCNs 0A985 and 0E987 in paragraph (b)(2)(ii) and add in their place 0A503 and 0E504. This change does not change the availability of License Exception STA, but simply reflects the fact that these items would now be controlled under ECCNs 0A503 and 0E504 and the License Exception STA exclusion would continue to apply to them.

**Support Documentation for Firearms, Parts, Components, Accessories, and Attachments Controlled by ECCN 0A501**

This proposed rule would require that for commodities controlled by ECCN 0A501 exported or reexported transactions for which a license would be required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit would be a record that must be kept by the exporter or reexporter as required by part 762 of the EAR. The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented. Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement. To implement this change, this proposed rule would revise § 748.12 to include the commodities controlled under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505 (except 0A505.d) within the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**Licenses for Firearms and Ammunition Would Be Limited to the Authorized End Use and End Users**

Consistent with other BIS licenses, including "600 series" and 9x515 items, licenses for firearms and ammunition that move from the USML to the CCL would be limited to the authorized end use and end users specified on the license and supporting documentation submitted as part of the license application. This means any change in the authorized end use or end user for a licensed transaction would require a BIS authorization. This existing

requirement of BIS licenses is specified in § 750.7(a) and on the boiler plate text included on all BIS licenses. These requirements would also be applied to firearms and ammunition licenses. A change in end use or end user, including a change of authorized end use or end user within a single foreign country for a firearm or ammunition authorized under a BIS license, would require a BIS authorization. BIS does not propose any changes in this rule to these well-established and understood requirements on using BIS licenses. Applicants for firearms and ammunition licenses are also advised that BIS would continue to exercise its authority, as specified in § 748.11 in the Note 2 to paragraph (a), on a case-by-case basis to require a Statement by Ultimate Consignee and Purchaser as warranted.

The exporter, reexporter or transferor using a BIS license, including for firearms and ammunition licenses, would also be required pursuant to § 750.7(a) to inform the other parties identified on the license, such as the ultimate consignees and end users of the license's scope and of the specific conditions applicable to them. As an additional safeguard for firearms and ammunition licenses, BIS would when warranted include a license condition that would require the exporter, reexporter or transferor to receive from the other parties identified on the license a confirmation in writing that those other parties had received and agreed to the terms and conditions of the license. For example, the condition may state "Prior to using this license, the exporter (reexporter or transferor) and other parties to the license must agree to the conditions in writing and the exporter (reexporter or transferor) must keep this on file with their other records." The documents described in this paragraph would be required to be kept for EAR recordkeeping purposes under part 762 of the EAR.

**Conventional Arms Reporting for Certain Exports of ECCN 0A501.a and .b Commodities**

In § 743.4 (Conventional arms reporting), this rule would revise paragraphs (c)(1)(i) and (c)(2)(i) to add ECCN 0A501.a and .b as commodities that would require Wassenaar Arrangement reporting and United Nations reporting under this conventional arms reporting section of the EAR. This requirement would assist the United States Government to meet its multilateral commitments for the special reporting requirements for exports of certain items listed on the Wassenaar Arrangement Munitions List and the UN Register of Conventional

Arms when these items are authorized for export under License Exceptions LVS, TMP, RPL, STA, or GOV (see part 740 of the EAR) or the Validated End User authorization (see § 748.15 of the EAR) and for United Nations reporting. License Exceptions LVS and STA are identified in § 743.4(b)(1), but because ECCN 0A501.a and .b commodities are not eligible for those two license exceptions, the reporting requirements under § 743.4(c)(1)(i) and (c)(2)(i) would be limited to exports authorized License Exceptions TMP, GOV and RPL or the Validated End User authorization. This rule also adds contact information for these reports.

### Changes to Export Clearance Requirements for Firearms Being Moved to the CCL

In part 758 (Export Clearance Requirements), this rule would make certain changes to clarify that a filing of Electronic Export Information (EEI) to the Automated Export System (AES) would be required for exports of the firearms transferred from the USML pursuant to this rule regardless of value or destination, including exports to Canada. As noted above, this requirement will also apply, as is presently the case under the ITAR, for temporary exports of such items pursuant to License Exception TMP or BAG.

In addition, this rule proposes to expand the data elements required as part of an AES filing for these items to include serial numbers, make, model and caliber. This requirement would ensure law enforcement officials are able to effectively verify that firearms exports are properly authorized and in conformance with all applicable regulations, including those associated with the temporary export and subsequent return of controlled firearms and unused ammunition. Similar to the description above regarding whether BIS would publish an EEI filing requirement in AES for personally-owned firearms and ammunition exported under License Exception BAG in the final rule, these expanded data elements required as part of an AES filing would be included in the final rule if CBP has made such data easily enterable in AES. If the necessary changes were not made by the time the final rule was to be published, CBP may continue to rely on CBP Form 4457 as described above.

### Entry Clearance Requirements for Temporary Imports

Temporary imports are transactions that involve both the temporary entry of an item into the U.S. from a foreign country and the subsequent export of that item from the U.S. To preserve the treatment of temporary import transactions for items in this rule that transfer from the USML in the ITAR to become subject to the EAR, BIS would need to create a process under the EAR to impose entry clearance requirements for temporary imports of such items based on BIS's authorities over U.S. exports.

Therefore, BIS proposes a temporary imports entry clearance requirement by adding new § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the USML in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export. BIS would not impose a license requirement for such imports, but this information would be necessary to facilitate the export after a temporary import. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR.

BIS is particularly interested in receiving comments on these temporary import provisions in § 758.10 and the subsequent export under paragraph (b)(5) of License Exception TMP. A license requirement is not being proposed for these temporary imports, but BIS is proposing an entry clearance requirement whereby, as described above, the exporter at the time of import would need to make a legal representation to the U.S. Government under the EAR that the item was being temporarily imported into the United States for subsequent export under paragraph (b)(5) of License Exception TMP. BIS also welcomes comments on whether there are advantages to how the ITAR regulates temporary imports of USMIL items that should be incorporated into the Commerce final rule.

### Changes to EAR Recordkeeping Requirements for Firearms Being Moved to the CCL

In part 762 (Recordkeeping), this rule would make two changes to the recordkeeping requirements under the EAR. These changes would specify that certain records, that are already created and kept in the normal course of business, must be kept by the "exporter" or any other party to the transaction (see § 758.3 of the EAR), that creates or receives such records.

Specifically, in § 762.2 (Records to be retained), this rule would redesignate

paragraph (a)(11) as (a)(12) and add a new paragraph (a)(11) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. The "exporter" or any other "party to the transaction" that creates or receives such records would be the person responsible for retaining this record.

In § 762.3 (Records exempt from recordkeeping requirements), this rule would narrow the scope of an exemption from the EAR recordkeeping requirements for warranty certificates. This rule would narrow this exclusion to specify the exclusion from the recordkeeping requirements does not apply (meaning the record would need to be kept under the recordkeeping requirements) for warranty certificates for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502, when the certificate issued is for an address located outside the United States. This would be an expansion of the EAR recordkeeping requirements, but because warranty certificates are already created and kept as part of normal business recordkeeping purposes, this expansion is not anticipated to create any new or increased burden under the EAR, because it is a document that is created in the normal course of business and are records that should be easily accessible. These recordkeeping requirements would assist the United States Government because this information is important to have access to for law enforcement concerns for these types of items.

The public may submit comments on whether they agree with this BIS determination that these changes described above to the EAR recordkeeping requirements would not result in increased burdens under the EAR.

### Alignment With the Wassenaar Arrangement Munitions List

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML. USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML. USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

Rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production

equipment, ''software'' and ''technology'' for munitions list items in categories ML 18, ML 21 and ML 22, respectively, this rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), ''software'' (0D501, 0D602 and 0D505) and ''technology'' (0E501, 0E602 and 0E505). BIS believes that including the ECCNs for test, inspection and production equipment, ''software,'' and ''technology'' in the same category as the items to which they relate results in an easier way to understand the CCL than using separate categories.

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

## Appropriate Delayed Effective Date for a Final Rule

BIS also invites comments from the public on the appropriate delayed effective date needed to prepare for the changes included in this proposed rule if published in final form. A 180-day delayed effective date was used for many of the other rules that moved items from the USML to the CCL, but certain rules included shorter delayed effective dates. BIS requests the public to provide comments on whether 180-delayed effective date is warranted, or if some shorter period, such as 90-day delated effective date is warranted for this proposed rule if published in final form.

## Request for Comments

All comments on this proposed rule must be in writing and submitted via the Federal rulemaking portal *www.regulations.gov* or by mail or delivery to the address identified in the addresses section of this proposed rule. All comments (including any personal identifiable information) would be available for public inspection and copying. Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

## Export Administration Act

Although the Export Administration Act of 1979 expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of August 15, 2017, 82 FR 39005 (August 16, 2017), has continued the Export Administration Regulations in effect under the International Emergency Economic Powers Act. BIS continues to carry out the provisions of the Export Administration Act of 1979, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222, as amended by Executive Order 13637.

## Executive Order Requirements

Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated a ''significant regulatory action,'' although not economically significant, under section 3(f) of Executive Order 12866. Although the items identified in this proposed rule have been determined to no longer warrant ITAR control by the President, the proliferation of such items has been identified as a threat to domestic and international security if not classified and controlled at the appropriate level under the EAR. Commerce estimates that the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the number of license applications to be submitted to BIS by approximately 30,000 annually.

This proposed rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

To control these items under the EAR that no longer warrant ITAR control, appropriate controls on the CCL needed to be included in the Department of Commerce proposed rule. This includes creating new ECCNs and revising certain existing ECCNs, as well as making other changes to the EAR to control items that would be moved from these three USML categories to the CCL once the section 38(f) notification process is completed and a final rule is published and becomes effective. Adding new controls and other requirements to the EAR imposes regulatory burdens on exporters and some other parties involved with those items, but compared to the burdens these exporters and other parties faced under the ITAR, these regulatory burdens, including financial costs, would be reduced significantly. The EAR is a more flexible regulatory structure whereby the items can still be controlled appropriately, but in a much more efficient way that would significantly reduce the burdens on exporters and other parties compared to the regulatory burdens they faced when the item were ''subject to the ITAR.'' Deregulatory does not mean a decontrol of these items.

For those items in USML Categories I, II and III that would move by this rule to the CCL, BIS would be collecting the necessary information using the form associated with OMB Control No. 0694–0088. BIS estimates that this form takes approximately 43.8 minutes for a manual or electronic submission. Using the State Department's estimate that 10,000 applicants annually would move from the USML to the CCL and BIS's estimate that 6,000 of the 10,000 applicants would require licenses under the EAR, that constitutes a burden of 4,380 hours for this collection under the EAR. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden is reduced by 5,620 hours. The other 4,000 applicants may use license exceptions under the EAR or the ''no license required'' designation, so these applicants would not be required to submit license applications under the EAR.

In addition to the reduced burden hours of 5,620 hours, there would also be direct cost savings to the State Department that would result from the 10,000 license applications no longer being required under the ITAR once these items are moved to the EAR. The Department of State charges a registration fee to apply for a license under the ITAR. Pursuant to the AECA, ITAR, and associated delegations of authority, every person who engages in the business of brokering activities, manufacturing, exporting, or temporarily importing any defense articles or defense services must register with the Department of State and pay a registration fee. The Department of State adopted the current fee schedule to align the registration fees with the cost of licensing, compliance and other related activities. The Department of Commerce would incur additional costs to administer these controls and process license applications. However, the Department of Commerce does not charge a registration fee to apply for a license under the EAR, and we are unable to estimate the increase in costs to the Department of Commerce to process the new license applications.

Therefore, we are unable to provide an estimate of the net change in resource costs to the government from moving these items from the ITAR to the EAR. It is the case, however, that the movement of these items from the ITAR would result in a permanent and recurring direct transfer of $2,500,000 per year from the government to the exporting public, less the increased cost to taxpayers, because they would no longer pay fees to the State Department for licenses and there is no fee charged by the Department of Commerce to apply for a license.

*Estimated Cost Savings*

For purposes of E.O. 13771 of January 30, 2017 (82 FR 9339), the Department of State and Department of Commerce proposed rules are expected to be "net deregulatory actions." The Department of Commerce has conducted this analysis in close consultation with the Department of State, because of how closely linked the two proposed rules are for the regulated public and the burdens imposed under the U.S. export control system.

E.O. 13771 and guidance provided to the agencies on interpreting the intended scope of the E.O. do not use the term "net deregulatory action," but rather refer to deregulatory actions. As outlined above, the Departments of State and Commerce proposed rules are closely linked and are best viewed as a consolidated regulatory action although being implemented by two different agencies. Also, as noted above, items may not be subject to both sets of regulations. Therefore, the movement of a substantial number of items from the USML determined to no longer warrant ITAR control to the CCL would result in a significant reduction of regulatory burden for exporters and other persons involved with such items that were previously "subject to the ITAR."

The Departments of State and Commerce for purposes of E.O. 13771 have agreed to equally share the cost burden reductions that would result from the publication of these two integral regulatory actions. The Department of State would receive 50% and the Department of Commerce would receive 50% for purposes of calculating the deregulatory benefit of these two integral regulatory actions.

*Under this agreed formulation, the burden reductions will be calculated as follows:*

For purposes of the Department of Commerce, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings of [1] $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of Commerce.

For purposes of the Department of State, the "net deregulatory actions" would result in a permanent and recurring cost savings of $1,250,000 per year, and a reduction in burden hours by 2,810 hours. The reduction in burden hours by 2,810 would result in an additional cost savings of $126,281 to the exporting public. Therefore, the total dollar cost savings would be $1,376,281 for purposes of E.O. 13771 for the Department of State.

The Department of Commerce welcomes comments from the public on the analysis under E.O. 13771 described here. Comments from companies that would no longer need to register with the Department of State because the company only deals with items under USML Category I, II, and/or III that would move to the CCL would be particularly helpful for the Department of Commerce and Department of State to receive. Comments are also encouraged on any of the other collections that may be relevant for the items that would move from the USML to the CCL. In particular, data on Department of State forms that would no longer need to be submitted would be helpful to receive.

**Paperwork Reduction Act Requirements**

Notwithstanding any other provision of law, no person may be required to respond to or be subject to a penalty for failure to comply with a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number.

This proposed regulation involves four collections currently approved by OMB under these BIS collections and control numbers: Simplified Network Application Processing System (control number 0694–0088), which includes, among other things, license applications; License Exceptions and Exclusions (control number 0694–0137); Import Certificates and End-User Certificates (control number 0694–0093); Five Year Records Retention Period (control number 0694–0096); and the U.S. Census Bureau collection for the Automated Export System (AES) Program (control number 0607–0152).

This proposed rule would affect the information collection, under control number 0694–0088, associated with the multi-purpose application for export licenses. This collection carries a burden estimate of 43.8 minutes for a manual or electronic submission for a burden of 31,833 hours. BIS believes that the combined effect of all rules to be published adding items removed from the ITAR to the EAR that would increase the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 21,900 (30,000 transactions at 43.8 minutes each) under this control number. For those items in USML Categories I, II and III that would move by this rule to the CCL, the State Department estimates that 10,000 applicants annually will move from the USML to the CCL. BIS estimates that 6,000 of the 10,000 applicants would require licenses under the EAR, resulting in a burden of 4,380 hours under this control number. Those companies are currently using the State Department's forms associated with OMB Control No. 1405–0003 for which the burden estimate is 1 hour per submission, which for 10,000 applications results in a burden of 10,000 hours. Thus, subtracting the BIS burden hours of 4,380 from the State Department burden hours of 10,000, the burden would be reduced by 5,620 hours. (*See* the description above for the E.O. 13771 analysis for additional information on the cost benefit savings and designation of the two rules as "net deregulatory actions".)

This proposed rule would also affect the information collection under control number 0694–0137, addressing the use of license exceptions and exclusions. Some parts and components formerly on the USML, and "software" and "technology" for firearms and their parts and components formerly on the USML, would become eligible for License Exception STA under this proposed rule. Additionally, test, inspection and production equipment and "software" and "technology" related to those firearms and "parts" may become eligible for License Exception STA. BIS believes that the increased use of License Exception STA resulting from the combined effect of all rules to be published adding items removed from the ITAR to the EAR would increase the burden associated with control number 0694–0137 by about 23,858 hours (20,450 transactions at 1 hour and 10 minutes each).

---

[1] The Department of Commerce used the Department of State's estimate that the burden hour cost for completing a license application is $44.94 per hour. Multiplied by the estimated burden hour savings of 2,810 equals a cost savings to the public of $126,281.

BIS expects that this increase in burden as a result of the increased use of License Exception STA would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR. This proposed rule addresses controls on firearms and "parts," production equipment and "parts" and related "software" and "technology" and specifically non-automatic and semi-automatic firearms and their "parts" and "parts," "components," "attachments," and "accessories" that are used in both semi-automatic and fully automatic firearms. BIS has made this determination on the basis that with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, and requires a specific State Department authorization for most exports of firearms used for hunting and recreational purposes and exports of "parts," "components," "attachments," and "accessories" that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies and also requires State Department authorization for the exports necessary to produce "parts" and "components" for defense articles in the inventories of the United States and its NATO and other close allies. However, under the EAR, as specified in this proposed rule, a number of low-level parts would be eligible for export under License Exception STA and would therefore not require a license to such destinations.

This proposed rule would also affect the information collection under control number 0694–0096, for the five-year recordkeeping retention because of two changes this rule would make to part 762 of the EAR. This rule would add a new paragraph (a)(55) to specify the following information must be kept as an EAR record: Serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502. This rule would also require warranty certificates for these items to be retained for EAR recordkeeping. However, because these records are already created and kept as part of normal business recordkeeping, this expansion is not anticipated to create any new or increased burden under the EAR.

Even in situations in which a license would be required under the EAR, the burden would likely be reduced compared to a license requirement under the ITAR. In particular, license applications for exports of "technology" controlled by ECCN 0E501 would likely be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.,* Manufacturing License Agreements and Technical Assistance Agreements (as a result of the differences in the scope of the ITAR's and the EAR's technology controls).

This proposed rule would affect the information collection under control number 0694–0093, import certificates and end-user certificates because of the changes included in this proposed rule. First, this regulation would require that for shipments requiring a license of firearms, "parts," "components," "accessories," and "attachments" controlled under ECCN 0A501, the exporter obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement. BIS expects that this requirement would result in no change in the burden under control number 0694–0093. Second, this proposed rule also would require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection. As the State Department also requires that persons temporarily exporting firearms, parts and components declare the items to CBP, BIS does not expect that the requirement in this proposed rule would result in a change in burden under control number 0694–0093.

Third, this proposed rule would affect the information collection under control number 0694–0093 by creating a new temporary import entry clearance requirement by adding § 758.10. This new section would be limited to items in this rule that are both "subject to the EAR" and on the United States Munitions List (USML) in 27 CFR 447.21. To allow such items to temporarily enter the U.S., this rule proposes a process to collect identifying information for the sole purpose of tracking items being temporarily imported for subsequent export under License Exception TMP. BIS would not impose a license requirement for such imports, but collecting this information would be necessary to facilitate the export after a temporary import. The temporary import entry clearance requirement in § 758.10 would also conform to the requirement in License Exception TMP under § 740.9(b)(5), so providing this information to CBP at the entry after a temporary import would facilitate the export phase of a temporary import under License Exception TMP. At the time of entry for a temporary import, the importer would need to provide a statement to CBP indicating that this shipment was being temporarily imported in accordance with the EAR for subsequent export in accordance with and under the authority of License Exception TMP. The entry clearance requirement would be an EAR requirement and any false representation made under the new § 758.10 would be a violation of the EAR. The importer would also need to provide CBP an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the items being imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value. If imported for a trade show, exhibition, demonstration, or testing, the temporary importer would need to provide CBP with the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are temporarily in the United States. Lastly, at the time of exportation, as requested by CBP, the exporter, or an agent acting on his or her behalf, would have to provide the entry document number or a copy of the CBP document under which the "item" "subject to the EAR" on the USMIL was temporarily imported under this proposed entry clearance requirement. As the State Department also requires that persons temporarily importing items in this rule provide the same type of information to CBP, BIS expects that the requirement in this proposed rule would result in a change in burden under control number 0694–0093, but because of the decrease under the burden imposed under the State collection the burden on the public will not change.

This proposed rule would also affect the information collection under control number 0607–0152, for filing EEI in AES because of one change this rule would make to part 758 of the EAR. Under new paragraph (b)(10), EEI would be required for all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada. Exports of these USML firearms and ammunition prior to

moving to the CCL required filing EEI in AES for all items "subject to the ITAR," so the burden in this collection would not change for the exporter. For some exporters, however, there may be an EEI filing requirement that would otherwise not have existed, such as for the export of a firearm that would be controlled under ECCN 0A501.a authorized under License Exception BAG or the export of certain firearms or ammunition to Canada.

The proposed rule would include a requirement that, for all exports of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing requirements, the exporter provide to CBP the serial number, make, model, and caliber for each firearm being exported. The Department of Commerce is carrying over the existing CBP filing requirements for items transferred from the USML to the CCL. The Department of Homeland Security currently is collecting these data elements for firearms "subject to the ITAR" under OMB Control Number 1651–0010 (CBP Form 4457, Certificate of Registration for Personal Effects Taken Abroad). There is no change to the information being collected or to the burden hours as a result of this rule. Separate from this rule, CBP will update the information collection to reflect the use of AES or some other simplified electronic alternative to CBP Form 4457.

Any comments regarding the collection of information associated with this proposed rule, including suggestions for reducing the burden, may be sent to Jasmeet K. Seehra, Office of Management and Budget (OMB), by email to *Jasmeet_K._Seehra@ omb.eop.gov,* or by fax to (202) 395– 7285.

**Administrative Procedure Act and Regulatory Flexibility Act Requirements**

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.,* generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the proposed rule would not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a proposed rule would not have a significant impact on a

substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis. Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule would not have a significant impact on a substantial number of small entities.

*Number of Small Entities*

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses. Although BIS is unable to estimate the exact number of small entities that would be affected by this proposed rule, it acknowledges that this proposed rule would affect some unknown number.

*Economic Impact*

This proposed rule and the companion State rule would assist in making the United States Munitions List (22 CFR part 121) (USML) into a more "positive" list, *i.e.,* a list that does not use generic, catch-all controls on any "part," "component," "accessory," "attachment," or "end item" that was in any way specifically modified for a defense article, regardless of the article's military or intelligence significance or non-military applications. At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the Commerce Control List (CCL). Such items, along with certain military items that currently are on the CCL, would be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs. In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs. This proposed rule addresses USML Category I, II and III articles that would be removed from the USML and added to the CCL.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns," consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, software, and technology. Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms. However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR. Department of State officials have informed BIS that license applications for such parts and

components are a high percentage of the license applications for USML articles reviewed by that department. Such parts and components are more likely to be produced by small businesses than are complete firearms.

Category II of the USML, entitled "Guns and Armament," encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, software and technology. Modern large guns would remain on the USML. Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL. Unless specified elsewhere on the CCL or the USML, "parts," "components," "accessories," "attachments," production equipment, "software" and "technology" for large guns would be controlled on the CCL.

Category III of the USML, entitled "Ammunition/Ordnance," encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The proposed rule also applies to "parts," "components," production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this proposed rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this proposed rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this proposed rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this proposed

rule would benefit from the elimination of some license requirements implemented by this proposed rule. Six types of "parts" and "components," identified in ECCN 0A501.y, would be designated immediately as "parts" and "components" that, even if "specially designed" for a military use or a Category I firearm, have little or no military significance. These "parts" and "components," which under the ITAR require a license to nearly all destinations would, under the EAR, require a license to Cuba, Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with "parts" and "components" that would be placed on the CCL by this proposed rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments valued at $500 or less, "parts" and "components" being exported for use as replacement parts, and temporary exports. Similarly, exports and reexports of Category II firearms "parts," "components," "accessories," and "attachments" that would be placed on the CCL by this proposed rule would become eligible for those license exceptions, although the value limit would be $3,000. Category III ammunition placed on the CCL by this proposed rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved to the CCL, the number of destinations for which a license is required would remain largely unchanged. However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application. There is no such requirement under the CCL licensing procedure. This difference gives the CCL applicant at least two advantages. First, the applicant has a way of determining whether the U.S. Government would authorize the transaction before it enters into potentially lengthy, complex and expensive sales presentations or contract negotiations. Under the USML licensing procedure, the applicant would need to caveat all sales presentations with a reference to the need for government approval and

would more likely have to engage in substantial effort and expense with the risk that the government might reject the application. Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract. It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this proposed rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR. This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms. Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year. There are no registration or application processing fees for applications to export items currently listed on the CCL. Once the items that are the subject to this proposed rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State could find their registration fees reduced if the number of USML licenses those entities need declines. If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

Finally, *de minimis* treatment under the EAR would become available for all items that this proposed rule would transfer from the USML to the CCL. Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product. This proposed rule would apply that same principle to "600 series" items only if the foreign-made item is being exported to a country that is subject to a United States arms embargo. In all other cases, foreign-made products that incorporate items that this proposed rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent. Because including small amounts of U.S.-origin content would not subject foreign-made products to the

EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin "parts" and "components," a development that potentially would mean greater sales for U.S. suppliers, including small entities.

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat. However, BIS believes that the increased burden imposed by those actions would be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

BIS is unable to determine the precise number of small entities that would be affected by this proposed rule. Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this proposed rule would be offset by a reduction in the number of items that would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin "parts" and "components," which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content. For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this proposed rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

**List of Subjects**

*15 CFR Parts 736 and 772*

Exports.

*15 CFR Parts 740 and 748*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 742*

Exports, Terrorism.

*15 CFR Part 743*

Administrative practice and procedure, Reporting and recordkeeping requirements.

*15 CFR Part 744*

Exports, Reporting and recordkeeping requirements, Terrorism.

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements.

*15 CFR Part 758*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements.

*15 CFR Part 762*

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, parts 736, 740, 742, 743, 744, 746, 748, 758, 762, 772 and 774 of the Export Administration Regulations (15 CFR parts 730–774) are proposed to be amended as follows:

## PART 736—GENERAL PROHIBITIONS

■ 1. The authority citation for 15 CFR part 736 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 2151 note; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13020, 61 FR 54079, 3 CFR, 1996 Comp., p. 219; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p. 168; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 2. Supplement No. 1 to part 736 is amended by revising paragraph (e)(3) to read as follows:

**Supplement No. 1 to Part 736—General Orders**

\* \* \* \* \*

(e) \* \* \*

(3) *Prior commodity jurisdiction determinations.* If the U.S. State Department has previously determined that an item is not subject to the jurisdiction of the ITAR and the item was not listed in a then existing "018" series ECCN (for purposes of the "600 series" ECCNs, or the 0x5zz ECCNs) or in a then existing ECCN 9A004.b or related software or technology ECCN (for purposes of the 9x515 ECCNs), then the item is per se not within the scope of a "600 series" ECCN, a 0x5zz ECCN, or a 9x515 ECCN. If the item was not listed elsewhere on the CCL at the time of such determination (*i.e.,* the item was designated EAR99), the item shall remain designated as EAR99 unless specifically enumerated by BIS or DDTC in an amendment to the CCL or to the USML, respectively.

\* \* \* \* \*

## PART 740—LICENSE EXCEPTIONS

■ 3. The authority citation for 15 CFR part 740 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 7201 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 4. Section 740.9 is amended by:
■ a. Adding five sentences at the end of paragraph (a) introductory text;
■ b. Adding one sentence at the end of paragraph (b)(1) introductory text;
■ c. Adding paragraph (b)(5); and
■ d. Redesignating notes 1 through 3 to paragraph (b) as notes 2 through 4 to paragraph (b);

The additions read as follows:

### § 740.9 Temporary imports, exports, reexports, and transfers (in-country) (TMP).

\* \* \* \* \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part), or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan. The only provisions of this paragraph (a) that are eligible for use to export such items are paragraph (a)(5) of this section ("Exhibition and demonstration") and paragraph (a)(6) of this section ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in § 758.1(b)(10) and (g)(4) of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model, and caliber of each firearm being exported by filing these data elements in an EEI filing in AES. In accordance with the exclusions in License Exception TMP under paragraph (b)(5), the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan (except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured

in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under paragraph (b)(5).

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \* No provision of paragraph (b) of this section, other than paragraph (b)(3), (4), or (5), may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\* \* \* \* \*

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, except for any firearm model controlled by 0A501 that is specified under Annex A in Supplement No. 4 to part 740; and

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.,* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan;

(iv) When the firearms entered the U.S. as a temporary import, the temporary importer or its agent:

(A) Provided the following statement to U.S. Customs and Border Protection: "This shipment will be exported in accordance with and under the authority of License Exemption TMP (15 CFR 740.9(b)(5))";

(B) Provided to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(C) Provided (if temporarily imported for a trade show, exhibition,

demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v) In addition to the export clearance requirements of part 758 of the EAR, the exporter or its agent must provide the import documentation related to paragraph (b)(5)(iv)(B) of this section to U.S. Customs and Border Protection at the time of export.

***Note 1 to paragraph (b)(5):*** *In addition to complying with all applicable EAR requirements for the export of commodities described in paragraph (b)(5), exporters and temporary importers should contact U.S. Customs and Border Protection (CBP) at the port of temporary import or export, or at the CBP website, for the proper procedures for temporarily importing or exporting firearms controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502, including regarding how to provide any data or documentation required by BIS.*

\*     \*     \*     \*     \*

■ 5. Section 740.11 is amended by:
■ a. Adding a sentence at the end of the introductory text;
■ b. Adding Note 2 to paragraph (b)(2); and
■ c. Redesignating note 1 to paragraph (c)(1) as note 3 to paragraph (c)(1) and notes 1 and 2 to paragraph (e) as notes 4 and 5 to paragraph (e).

The additions read as follows:

### §740.11   Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

\*   \*   \* Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) of this section. Any item listed in a 0x5zz ECCN for export, reexport, or transfer (in-country) to an E:1 country are eligible only for transactions described in paragraphs (b)(2)(i) and (ii) solely for U.S. government official use of this section.

\*     \*     \*     \*     \*

***Note 2 to paragraph (b)(2):*** *Items controlled for NS, MT, CB, NP, FC or AT reasons may not be exported, reexported, or transferred (in-country) to, or for the use of military, police, intelligence entities, or other sensitive end-users of a government in a Country Group E:1, or E:2 country.*

\*     \*     \*     \*     \*

■ 6. Section 740.14 is amended by revising paragraph (b)(4), revising the heading to paragraph (e), and by adding paragraphs (e)(3) and (4) to read as follows:

### §740.14   Baggage (BAG).

\*     \*     \*     \*     \*

(b) \*   \*   \*

(4) *Tools of trade.* Usual and reasonable kinds and quantities of tools, instruments, or equipment and their containers and also technology for use in the trade, occupation, employment, vocation, or hobby of the traveler or members of the household who are traveling or moving. For special provisions regarding firearms and ammunition, see paragraph (e) of this section. For special provisions regarding encryption commodities and software subject to EI controls, see paragraph (f) of this section. For a special provision that specifies restrictions regarding the export or reexport of technology under this paragraph (b)(4), see paragraph (g) of this section. For special provisions regarding personal protective equipment under ECCN 1A613.c or .d, see paragraph (h) of this section.

\*     \*     \*     \*     \*

(e) *Special provisions for firearms and ammunition.* \*   \*   \*

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505.a, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii) "Parts," "components," "accessories," and "attachments" exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control. Accordingly, except as provided in paragraph (e)(4) of this section, firearms, "parts," "components," "accessories," "attachments," and ammunition, may not be exported permanently under this License Exception. All firearms, "parts," "components," "accessories," or "attachments" controlled under ECCN 0A501 and all unused ammunition controlled under ECCN 0A505.a exported under this License Exception must be returned to the United States.

(v) Travelers leaving the United States temporarily are required to declare the firearms, "parts," "components," "accessories," "attachments," and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonresident alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the provisions of Department of Justice Regulations at 27 CFR 478.115(d).

\*     \*     \*     \*     \*

### §740.16   [Amended]

■ 7. Section 740.16 is amended by removing "0A987" from paragraph (b)(2)(iv) and adding in its place "0A504".

■ 8. Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

### §740.20   License Exception Strategic Trade Authorization (STA).

\*     \*     \*     \*     \*

(b) \*   \*   \*
(2) \*   \*   \*

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A981; 0A982; 0A983; 0A503, 0E504, 0E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

\*     \*     \*     \*     \*

■ 9. Add Supplement No. 4 to part 740 to read as follows:

### Supplement No. 4 to Part 740—Annex A Firearm Models

(a) *Pistols/revolvers.*
(1) German Model P08 Pistol = SMCR.
(2) IZH 34M, .22 Target pistol.
(3) IZH 35M, .22 caliber Target pistol.
(4) Mauser Model 1896 pistol = SMCR.
(5) MC–57–1 pistol.
(6) MC–1–5 pistol.
(7) Polish Vis Model 35 pistol = SMCR.
(8) Soviet Nagant revolver = SMCR.
(9) TOZ 35, .22 caliber Target pistol.
(10) MTs 440.
(11) MTs 57–1.
(12) MTs 59–1.
(13) MTs 1–5.
(14) TOZ–35M (starter pistol).
(15) Biathlon–7K.
(b) *Rifles.*
(1) BARS–4 Bolt Action carbine.

(2) Biathlon target rifle, .22.

(3) British Enfield rifle = SMCR.

(4) CM2, .22 target rifle (also known as SM2, .22).

(5) German model 98K = SMCR.

(6) German model G41 = SMCR.

(7) German model G43 = SMCR.

(8) IZH–94.

(9) LOS–7, bolt action.

(10) MC–7–07.

(11) MC–18–3.

(12) MC–19–07.

(13) MC–105–01.

(14) MC–112–02.

(15) MC–113–02.

(16) MC–115–1.

(17) MC–125/127.

(18) MC–126.

(19) MC–128.

(20) Saiga.

(21) Soviet Model 38 carbine = SMCR.

(22) Soviet Model 44 carbine–SMCR.

(23) Soviet Model 91/30 rifle = SMCR.

(24) TOZ 18, .22 bolt action.

(25) TOZ 55.

(26) TOZ 78.

(27) Ural Target, .22lr.

(28) VEPR rifle.

(29) Winchester Model 1895, Russian Model rifle = SMCR.

(30) Sever—double barrel.

(31) IZH18MH single barrel break action.

(32) MP–251 over/under rifle.

(33) MP–221 double barrel rifle.

(34) MP–141K.

(35) MP–161K.

(36) MTs 116–1.

(37) MTs 116M.

(38) MTs 112–02.

(39) MTs 115–1.

(40) MTs 113–02.

(41) MTs 105–01.

(42) MTs 105–05.

(43) MTs 7–17 combination gun.

(44) MTs 7–12–07 rifle/shotgun.

(45) MTs 7–07.

(46) MTs 109–07 rifle.

(47) MTs 109–07 rifle.

(48) MTs 106–07 combination.

(49) MTs 19–97.

(50) MTs 19–09.

(51) MTs 18–3M.

(52) MTs 125.

(53) MTs 126.

(54) MTs 127.

(55) Berkut–2.

(56) Berkut–2M1.

(57) Berkut–3.

(58) Berkut–2–1.

(59) Berkut–2M2.

(60) Berkut–3–1.

(61) Ots–25.

(62) MTs 20–07.

(63) LOS–7–1.

(64) LOS–7–2.

(65) LOS–9–1.

(66) Sobol (Sable).

(67) Rekord.

(68) Bars—4–1.

(69) Saiga.

(70) Saiga–M.

(71) Saiga–308.

(72) Saiga–308–1.

(73) Saiga–308–2.

(74) Saiga–9.

(75) Korshun.

(76) Ural–5–1.

(77) Ural 6–1.

(78) Ural–6–2.

(79) SM–2.

(80) Biatlon–7–3.

(81) Biatlon–7–4.

(82) Rekord–1.

(83) Rekord–2.

(84) Rekord–CISM.

(85) Rekord–1–308.

(86) Rekord–2–308.

(87) Rekord–1–308–CISM.

(88) VEPR.

(89) VEPR Super.

(90) VEPR Pioner.

(91) VEPR Safari.

(92) TOZ 109.

(93) KO 44–1.

(94) TOZ 78–01.

(95) KO 44.

(96) TOZ 99.

(97) TOZ 99–01.

(98) TOZ 55–01 Zubr.

(99) TOZ 55–2 Zubr.

(100) TOZ 120 Zubr.

(101) MTs 111.

(102) MTs 109.

(103) TOZ 122.

(104) TOZ 125.

(105) TOZ 28.

(106) TOZ 300.

## PART 742—CONTROL POLICY—CCL BASED CONTROLS

■ 10. The authority citation for part 742 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; Sec. 1503, Pub. L. 108–11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017).

■ 11. Section 742.6 is amended by revising the first and sixth sentences of paragraph (b)(1)(i) and adding a seventh sentence at the end of paragraph (b)(1)(i) to read as follows:

### § 742.6   Regional stability.

\*      \*      \*      \*      \*

(b) \*  \*  \*

(1) \*  \*  \*

(i) Applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0A504, 0D505, 0E501, 0E504, and 0E505 items; 9x515 items and "600 series" items and will be reviewed on a case-by-case basis to determine whether the transaction is contrary to the national security or foreign policy interests of the United States, including the foreign policy interest of promoting the observance of human rights throughout the world. \*  \*  \* When destined to the People's Republic of China or a country listed in Country Group E:1 in supplement no. 1 to part 740 of the EAR, items classified under ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 or any 9x515 ECCN will be subject to a policy of denial. In addition, applications for exports and reexports of ECCN 0A501, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, 0E504, and 0E505 items; when there is reason to believe the transaction involves criminal organizations, rebel groups, street gangs, or other similar groups or individuals, that may be disruptive to regional stability, including within individual countries, will be subject to a policy of denial.

\*      \*      \*      \*      \*

■ 12. Section 742.7 is amended by revising paragraphs (a)(1) through (4) and (c) to read as follows:

### § 742.7   Crime control and detection.

(a) \*  \*  \*

(1) Crime control and detection instruments and equipment and related "technology" and "software" identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section. A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR). Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979, 0E502, 0E505 ("technology" for "development" or for "production" of buckshot shotgun shells controlled under ECCN 0A505.b), 1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2) Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License

Requirements'' section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3) Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the ''License Requirements'' section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4) Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982. Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*    \*    \*    \*    \*

(c) *Contract sanctity.* Contract sanctity date: August 22, 2000. Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 774 of the EAR).

\*    \*    \*    \*    \*

■ 13. Section 742.17 is amended by:
■ a. Revising the first sentence of paragraph (a); and
■ b. Revising paragraph (f) to read as follows:

### §742.17   Exports of firearms to OAS member countries.

(a) *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries. \*   \*   \*

\*    \*    \*    \*    \*

(f) *Items/Commodities.* Items requiring a license under this section are ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f), and 0A505 (except 0A505.d). (See Supplement No. 1 to part 774 of the EAR).

\*    \*    \*    \*    \*

### §742.19   [AMENDED]

■ 14. Section 742.19(a)(1) is amended by:
■ a. Removing ''0A986'' and adding in its place ''0A505.c''; and
■ b. Removing ''0B986'' and adding in its place ''0B505.c''.

### PART 743—SPECIAL REPORTING AND NOTIFICATION

■ 15. The authority citation for 15 CFR part 743 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR,

2001 Comp., p. 783; E.O. 13637, 78 FR 16129, 3 CFR, 2014 Comp., p. 223; 78 FR 16129; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 16. Section 743.4 is amended by adding paragraphs (c)(1)(i) and (c)(2)(i) and revising paragraph (h) to read as follows:

### §743.4   Conventional arms reporting.

\*    \*    \*    \*    \*

(c) \*   \*   \*
(1) \*   \*   \*
(i) ECCN 0A501.a and .b.

\*    \*    \*    \*    \*

(2) \*   \*   \*
(i) ECCN 0A501.a and .b.

\*    \*    \*    \*    \*

(h) *Contacts.* General information concerning the Wassenaar Arrangement and reporting obligations thereof is available from the Office of National Security and Technology Transfer Controls, Tel. (202) 482–0092, Fax: (202) 482–4094. Information concerning the reporting requirements for items identified in paragraphs (c)(1) and (2) of this section is available from the Office of Nonproliferation and Treaty Compliance (NPTC), Tel. (202) 482–4188, Fax: (202) 482–4145.

### PART 744—CONTROL POLICY: END-USER AND END-USE BASED

■ 17. The authority citation for 15 CFR part 744 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59009, 3 CFR, 1994 Comp., p. 950; E.O. 12947, 60 FR 5079, 3 CFR, 1995 Comp., p. 356; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13099, 63 FR 45167, 3 CFR, 1998 Comp., p. 208; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13224, 66 FR 49079, 3 CFR, 2001 Comp., p. 786; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017); Notice of September 18, 2017, 82 FR 43825 (September 19, 2017); Notice of November 6, 2017, 82 FR 51971 (November 8, 2017); Notice of January 17, 2018, 83 FR 2731 (January 18, 2018).

### §744.9   [AMENDED]

■ 18. Section 744.9 is amended by removing ''0A987'' from paragraphs (a)(1) and (b) and adding in its place ''0A504''.

### PART 746—EMBARGOES AND OTHER SPECIAL CONTROLS

■ 19. The authority citation for 15 CFR part 746 is revised to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 287c; Sec 1503, Pub. L. 108–11, 117 Stat. 559; 22 U.S.C. 6004; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; E.O.

12854, 58 FR 36587, 3 CFR, 1993 Comp., p. 614; E.O. 12918, 59 FR 28205, 3 CFR, 1994 Comp., p. 899; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; E.O. 13338, 69 FR 26751, 3 CFR, 2004 Comp., p 168; Presidential Determination 2003–23, 68 FR 26459, 3 CFR, 2004 Comp., p. 320; Presidential Determination 2007–7, 72 FR 1899, 3 CFR, 2006 Comp., p. 325; Notice of May 9, 2017, 82 FR 21909 (May 10, 2017); Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

### §746.3   [AMENDED]

■ 20. Section 746.3 is amended by removing ''0A986'' from paragraph (b)(2) and adding in its place ''0A505.c''.

### §746.7   [AMENDED]

■ 21. Section 746.7 is amended in paragraph (a)(1) by:
■ a. Adding ''0A503'' immediately before ''0A980''; and
■ b. Removing ''0A985''.

### PART 748—APPLICATIONS (CLASSIFICATION, ADVISORY, AND LICENSE) AND DOCUMENTATION

■ 22. The authority citation for 15 CFR part 748 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 23. Section 748.12 is amended by:
■ a. Revising the heading;
■ b. Adding introductory text;
■ c. Revising paragraphs (a) introductory text and (a)(1)(i);
■ d. Redesignating the note to paragraph (c)(8) as note 1 to paragraph (c)(8); and
■ e. Adding paragraph (e).
The revisions and additions read as follows:

### §748.12   Firearms import certificate or import permit.

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.* Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that

are destined for member countries of the OAS. This requirement is consistent with the OAS Model Regulations described in § 742.17 of the EAR.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d).

\*    \*    \*    \*    \*

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

(2) The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraphs (a) thorough (d) of this section and has, in fact, complied with that requirement.

(3)(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on any license application for ECCN 0A501 or 0A505 commodities.

**Note 2 to paragraph (e).** *Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) of this section because that statement is not issued by a government.*

**PART 758—EXPORT CLEARANCE REQUIREMENTS**

■ 24. The authority citation for part 758 continues to read as follows:

**Authority:** 50 U.S.C. 4601 *et seq.;* 50 U.S.C. 1701 *et seq.;* E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 25. Section 758.1 is amended as follows:
■ a. By revising paragraphs (b)(7), (8) and (9) and adding paragraph (b)(10);
■ b. By revising paragraph (c)(1); and

■ c. By adding paragraph (g)(4) to read as follows:

**§ 758.1   The Electronic Export Enforcement (EEI) filing to the Automated Export System (AES).**

\*    \*    \*    \*    \*

(b) \*    \*    \*

(7) For all items exported under authorization Validated End-User (VEU);

(8) For all exports of tangible items subject to the EAR where parties to the transaction, as described in § 748.5(d) through (f) of the EAR, are listed on the Unverified List (Supplement No. 6 to part 744 of the EAR), regardless of value or destination;

(9) For items that fall under ECCNs that list CC Column 1 and 3 and RS Column 2 (see Supplement No. 1 to part 738 of the EAR) as reasons for control and such items are for export, regardless of value, to India; or

(10) For all exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505 except for .c, regardless of value or destination, including exports to Canada.

(c) \*    \*    \*

(1) License Exception Baggage (BAG), except for exports of items controlled under ECCNs 0A501.a or .b, shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, or ammunition controlled under ECCN 0A505, as set forth in § 740.14 of the EAR. See 15 CFR 30.37(x) of the FTR;

\*    \*    \*    \*    \*

(g) \*    \*    \*

(4) *Exports of Firearms and Related Items.* For any export of items controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502, in addition to any other required data for the associated EEI filing, you must report the manufacturer, model number, caliber and serial number of the exported items.

\*    \*    \*    \*    \*

■ 26. Add § 758.10 to read as follows:

**§ 758.10   Entry clearance requirements for temporary imports.**

(a) *Scope.* This section specifies the temporary import entry clearance requirements for firearms "subject to the EAR" that are on the United States Munitions Import List (USMIL, 27 CFR 447.21). These firearms are controlled in ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502. Items that are temporarily exported under the EAR for permanent return to the United

States are outside of the scope of this section because the items are not considered temporary imports, but these items must have met the export clearance requirements specified in § 758.1 of the EAR. See paragraph (a)(2) of this section for permanent import requirements.

(1) An authorization under the EAR is *not* required for the temporary import of "items" that are "subject to the EAR," including for "items" "subject to the EAR" that are on the USMIL. Temporary imports of firearms described in this section must meet the entry clearance requirements specified in paragraph (b) of this section.

(2) Permanent imports are regulated by the Attorney General under the direction of the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (see 27 CFR parts 447, 478, 479, and 555).

(b) *EAR procedures for temporary imports and subsequent exports.* To the satisfaction of the Port Directors of U.S. Customs and Border Protection, the temporary importer must comply with the following procedures:

(1) At the time of entry into the U.S. of the temporary import:

(i) Provide the following statement to U.S. Customs and Border Protection: "This shipment is being temporarily imported in accordance with the EAR. This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR 740.9(b)(5));"

(ii) Provide to U.S. Customs and Border Protection an invoice or other appropriate import-related documentation (or electronic equivalents) that includes a complete list and description of the firearms being temporarily imported, including their model, make, caliber, serial numbers, quantity, and U.S. dollar value; and

(iii) Provide (if temporarily imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

**Note 1 to paragraph (b)(1):** *In accordance with the exclusions in License Exception TMP under § 740.9(b)(5) of the EAR, the entry clearance requirements in § 758.1(b)(10) do not permit the temporary import of firearms controlled in ECCN 0A501.a or .b that are shipped from or manufactured in a Country Group D:5 country; or that are shipped from or manufactured in Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova,*

Turkmenistan, Ukraine, or Uzbekistan, (except for any firearm model controlled by proposed 0A501 that is specified under Annex A in Supplement No. 4 to part 740, or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are shipped from or manufactured in a Country Group D:5 country, or from Russia, Georgia, Kazakhstan, Kyrgyzstan, Moldova, Turkmenistan, Ukraine, or Uzbekistan, because of the exclusions in License Exception TMP under § 740.9(b)(5).

(2) At the time of export, in accordance with the U.S. Customs and Border Protection procedures, the eligible exporter, or an agent acting on the filer's behalf, must as required under § 758.1(b)(10) of the EAR file the export information with CBP by filing EEI in AES, noting the applicable EAR authorization as the authority for the export, and provide as requested by CBP, the entry document number or a copy of the CBP document under which the "item" subject to the EAR" on the USMIL was temporarily imported. See also the additional requirements inspection in § 758.1(g)(4).

## PART 762—RECORDKEEPING

■ 27. The authority citation for part 762 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 28. Section 762.2 is amended by removing "; and," at the end of paragraph (a)(10), redesignating paragraph (a)(11) as paragraph (a)(12), and adding a new paragraph (a)(11) to read as follows:

**§ 762.2   Records to be retained.**

(a) * * *

(11) The serial number, make, model, and caliber for any firearm controlled in ECCN 0A501.a and for shotguns with barrel length less than 18 inches controlled in 0A502 that have been exported. The "exporter" or any other party to the transaction (see § 758.3 of the EAR), that creates or receives such records is a person responsible for retaining this record; and

*    *    *    *    *

■ 29. Section 762.3 is amended by revising paragraph (a)(5) to read as follows:

**§ 762.3   Records exempt from recordkeeping requirements.**

(a) * * *

(5) Warranty certificate, except for a warranty certificate issued for an address located outside the United States for any firearm controlled in ECCN 0A501.a and for shotguns with

barrel length less than 18 inches controlled in 0A502;

*    *    *    *    *

## PART 772—DEFINITIONS OF TERMS

■ 30. The authority citation for part 772 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

**§ 772.1   [AMENDED]**

■ 31. In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c".

## PART 774—THE COMMERCE CONTROL LIST

■ 32. The authority citation for 15 CFR part 774 continues to read as follows:

**Authority:** 50 U.S.C. 4601 et seq.; 50 U.S.C. 1701 et seq.; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 et seq.; 22 U.S.C. 6004; 42 U.S.C. 2139a; 15 U.S.C. 1824a; 50 U.S.C. 4305; 22 U.S.C. 7201 et seq.; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 15, 2017, 82 FR 39005 (August 16, 2017).

■ 33. In Supplement No. 1 to part 774, Category 0, revise Export Control Classification Number (ECCN) 0A018 to read as follows:

## Supplement No. 1 to Part 774—The Commerce Control List

*    *    *    *    *

**0A018   Items on the Wassenaar Munitions List (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $3,000 for 0A018.b, $1,500 for 0A018.c and .d
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See also 0A979, 0A988, and 22 CFR 121.1 Categories I(a), III(b–d), and X(a). (2) See ECCN 0A617.y.1 and .y.2 for items formerly controlled by ECCN 0A018.a. (3) See ECCN 1A613.c for military helmets providing less than NIJ Type IV

protection and ECCN 1A613.y.1 for conventional military steel helmets that, immediately prior to July 1, 2014 were classified under ECCN 0A018. (4) See 22 CFR 121.1 Category X(a)(5) and (a)(6) for controls on other military helmets.
*Related Definitions:* N/A
*Items:*
a. [RESERVED]
b. "Specially designed" components and parts for ammunition, except cartridge cases, powder bags, bullets, jackets, cores, shells, projectiles, boosters, fuses and components, primers, and other detonating devices and ammunition belting and linking machines (all of which are "subject to the ITAR"). (See 22 CFR parts 120 through 130);

***Note to 0A018.b:*** *0A018.b does not apply to "components" "specially designed" for blank or dummy ammunition as follows:*
*a. Ammunition crimped without a projectile (blank star);*
*b. Dummy ammunition with a pierced powder chamber;*
*c. Other blank and dummy ammunition, not incorporating components designed for live ammunition.*
c. [RESERVED]
d. [RESERVED]

■ 34. In Supplement No. 1 to part 774, Category, add, between entries for ECCNs 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504, and 0A505 to read as follows:

**0A501   Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

**License Requirements**

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y. | NS Column 1 |
| RS applies to entire entry except 0A501.y. | RS Column 1 |
| FC applies to entire entry except 0A501.y. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $500 for 0A501.c, .d, and .x, $500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

**List of Items Controlled**

*Related Controls:* (1) Firearms that are fully automatic, and magazines with a capacity of 50 rounds or greater, are "subject to the ITAR." (2) See ECCN 0A502 for shotguns and their "parts" and "components" that are subject to the EAR. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Related Definitions:* N/A

*Items:*

a. Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b. Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c. The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)): Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips that contain fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors) and buttstocks that contain fire control "parts" or "components."

d. Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a or .b of this entry.

e. Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a or .b of this entry.

f. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific "parts", "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

y.1. Stocks or grips, that do not contain any fire control "parts" or "components" (*e.g.*, triggers, hammers, sears, disconnectors);"

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads; and

y.6. Bayonets.

***Technical Note 1 to 0A501:*** *The controls on "parts" and "components" in ECCN 0A501 include those "parts" and "components" that are common to firearms described in ECCN 0A501 and to those firearms "subject to the ITAR."*

***Note 1 to 0A501:*** *Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

**0A502   Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control:* RS, CC, FC, UN, AT, NS

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| NS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | NS Column 1 |
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm). | RS Column 1 |
| FC applies to entire entry. | FC Column 1 |
| CC applies to shotguns with a barrel length less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user. | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of end user. | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement. | CC Column 3 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm). | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* This entry does not control combat shotguns and fully automatic shotguns. Those shotguns are "subject to the ITAR."

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A503   Discharge type arms; non-lethal or less-lethal grenades and projectiles, and "specially designed" "parts" and "components" of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; and "specially designed" "parts" and "components," n.e.s.**

**License Requirements**

*Reason for Control:* CC, UN

| Control(s) | Country chart (see supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information) |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 For a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions:* N/A

*Items:* The list of items controlled is contained in the ECCN heading.

**0A504   Optical sighting devices for firearms (including shotguns controlled by 0A502); and "components" as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* FC, RS, CC, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to paragraph .i. | RS Column 1 |
| FC applies to paragraphs .a, .b, .c, .d, .e, .g and .i of this entry. | FC Column 1 |
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A

*CIV:* N/A

## List of Items Controlled

*Related Controls:* (1) See USML Category XII(c) for sighting devices using second generation image intensifier tubes having luminous sensitivity greater than 350 µA/lm, or third generation or higher image intensifier tubes, that are "subject to the ITAR." (2) See USML Category XII(b) for laser aiming or laser illumination systems "subject to the ITAR." (3) Section 744.9 of the EAR imposes a license requirement on certain commodities described in 0A504 if being exported, reexported, or transferred (in-country) for use by a military end-user or for incorporation into an item controlled by ECCN 0A919.

*Related Definitions:* N/A

*Items:*

a. Telescopic sights.

b. Holographic sights.

c. Reflex or "red dot" sights.

d. Reticle sights.

e. Other sighting devices that contain optical elements.

f. Laser aiming devices or laser illuminators "specially designed" for use on firearms, and having an operational wavelength exceeding 400 nm but not exceeding 710 nm.

**Note 1 to 0A504.f:** *0A504.f does not control laser boresighting devices that must be placed in the bore or chamber to provide a reference for aligning the firearms sights.*

g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs .a, .b, .c, .d, .e or .i.

h. [Reserved]

i. Riflescopes that were not "subject to the EAR" as of [DATE ONE DAY PRIOR TO THE EFFECTIVE DATE OF THE FINAL RULE] and are "specially designed" for use in firearms that are "subject to the ITAR."

**Note 2 to paragraph i:** *For purpose of the application of "specially designed" for the riflescopes controlled under 0A504.i, paragraph (a)(1) of the definition of "specially designed" in § 772.1 of the EAR is what is used to determine whether the riflescope is "specially designed."*

## 0A505   Ammunition as follows (see List of Items Controlled).

## License Requirements

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x. | NS Column 1 |
| RS applies to 0A505.a and .x. | RS Column 1 |
| CC applies to 0A505.b. | CC Column 1 |
| FC applies to entire entry except 0A505.d. | FC Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to 0A505.a, .d and .x. | AT Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to 0A505.c. | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons. The Commerce Country Chart is not designed to determine AT licensing requirements for this entry. See § 742.19 of the EAR for additional information |

## List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $100 for items in 0A505.x

*GBS:* N/A

*CIV:* N/A

## Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

## List of Items Controlled

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions:* N/A

*Items:*

a. Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.

b. Buckshot (No. 4 .24" diameter and larger) shotgun shells.

c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

**Note 1 to 0A505.c:** *Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.*

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

**Note 2 to 0A505.x:** *The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

**Note 3 to 0A505.x:** *The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

■ 35. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0A521 and 0A604, an entry for ECCN 0A602 to read as follows:

## 0A602   Guns and Armament as follows (see List of Items Controlled).

## License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

## List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

## Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

## List of Items Controlled

*Related Controls:* (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR." (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A

*Items:*

a. Guns and armament manufactured between 1890 and 1919.

b. Military flame throwers with an effective range less than 20 meters.

c. through w. [Reserved]

x. "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

**Note 1 to 0A602:** *"Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph.*

**Note 2 to 0A602:** *Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants designated EAR99.*

## Supplement No. 1 to Part 774—[Amended]

■ 36. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0A918, 0A984, 0A985, 0A986, and 0A987.

■ 37. In Supplement No. 1 to part 774, Category 0, add, before the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501   Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated in or otherwise described in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry except equipment for ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

### List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. Small arms chambering machines.
b. Small arms deep hole drilling machines and drills therefor.
c. Small arms rifling machines.
d. Small arms spill boring machines.
e. Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505   Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows (see List of Items Controlled).**

### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to paragraphs .a and .x. | NS Column 1 |
| RS applies to paragraphs .a and .x. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to paragraphs .a, .d and .x. | AT Column 1 |
| AT applies to paragraph .c. | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0B505.

### List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c.

d. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w [Reserved]

x. "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

■ 38. In Supplement No. 1 to part 774, Category 0, add, between entries for ECCNs 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602   Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
| --- | --- |
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See §746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

### List Based License Exceptions (See Part 740 for a Description of All License Exceptions)

*LVS:* $3,000
*GBS:* N/A
*CIV:* N/A

### Special Conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§740.20(c)(2) of the EAR) may not be used for any item in 0B602.

### List of Items Controlled

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*

a. The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602.a or USML Category II:

a.1. Gun barrel rifling and broaching machines and tools therefor;
a.2. Gun barrel rifling machines;
a.3. Gun barrel trepanning machines;
a.4. Gun boring and turning machines;
a.5. Gun honing machines of 6 feet (183 cm) stroke or more;
a.6. Gun jump screw lathes;
a.7. Gun rifling machines; and
a. 8. Gun straightening presses.

b. Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

c. Other tooling and equipment, "specially designed" for the "production" of items in ECCN 0A602 or USML Category II.

d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

## Supplement No. 1 to Part 774—[Amended]

■ 39. In Supplement No. 1 to part 774, Category 0, remove ECCN 0B986.

■ 40. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501 and 0D505 to read as follows:

**0D501   "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

### License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category I is "subject to the ITAR" (See 22 CFR 121.1, Category I).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

**0D505** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | NS Column 1 |
| RS applies to "software" for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to "software" for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls:* "Software" required for and directly related to articles enumerated in USML Category III is "subject to the ITAR" (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 41. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0D521 and 0D604, an entry for ECCN 0D602 to read as follows:

**0D602** "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k). (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A
*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.

■ 42. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E018 and 0E521, entries for ECCNs 0E501, 0E502, 0E504, and 0E505 to read as follows:

**0E501** "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 1 |
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."
*Related Definitions:* N/A
Items:
  a. "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.
  b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502** "Technology" "required" for the "development" or "production," of commodities controlled by 0A502.

**License Requirements**

*Reason for Control:* CC, UN

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E504** ''Technology'' ''required'' for the ''development,'' or ''production'' of commodities controlled by 0A504 that incorporate a focal plane array or image intensifier tube.

**License Requirements**

*Reason for Control:* RS, UN, AT

| Controls | Country chart (see Supp. No. 1 part 738) |
|---|---|
| RS applies to entire entry. | RS Column 1 |
| UN applies to entire entry. | See § 746.1(b) of the EAR for UN controls |
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**0E505** ''Technology'' ''required'' for the ''development,'' ''production,'' operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.

**License Requirements**

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to ''technology'' for ''development,'' ''production,'' operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for ''software'' for that equipment and those commodities in 0D505. | NS Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| RS applies to entire entry except ''technology'' for ''development,'' ''production,'' operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for ''software'' for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| CC applies to ''technology'' for the ''development'' or ''production'' of commodities in 0A505.b. | CC Column 1 |
| AT applies to ''technology'' for ''development,'' ''production,'' operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any ''technology'' in 0E505.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are ''subject to the ITAR'' (See 22 CFR 121.1, Category III).
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in this ECCN heading.

■ 43. In Supplement No. 1 to part 774, Category 0, add, between the entries for ECCNs 0E521 and 0E604, an entry for ECCN 0E602:

**0E602** ''Technology'' ''required'' for the ''development,'' ''production,'' operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or ''software'' controlled by 0D602 as follows (see List of Items Controlled).

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| | Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|---|
| | NS applies to entire entry. | NS Column 1 |
| | RS applies to entire entry. | RS Column 1 |
| | UN applies to entire entry. | See § 746.1 of the EAR for UN controls |
| | AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

**List of Items Controlled**

*Related Controls:* Technical data directly related to articles enumerated in USML Category II are ''subject to the ITAR.''
*Related Definitions:* N/A
*Items:* ''Technology'' ''required'' for the ''development,'' ''production,'' operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or ''software'' controlled by ECCN 0D602.

**Supplement No. 1 to Part 774— [Amended]**

■ 44. In Supplement No. 1 to part 774, Category 0, remove ECCN 0E918.
■ 45. In Supplement No. 1 to part 774, Category 0, revise ECCN 0E982 to read as follows.

**0E982** ''Technology'' exclusively for the ''development'' or ''production'' of equipment controlled by 0A982 or 0A503.

**License Requirements**

*Reason for Control:* CC

| | Control(s) |
|---|---|
| | CC applies to ''technology'' for items controlled by 0A982 or 0A503. A license is required for ALL destinations, except Canada, regardless of end-use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

**Supplement No. 1 to Part 774— [Amended]**

■ 46. In Supplement No. 1 to part 774, Category 0, remove ECCNs 0E984 and 0E987.

■ 47. In Supplement No. 1 to part 774, Category 1, revise ECCN 1A984 to read as follows:

**1A984   Chemical agents, including tear gas formulation containing 1 percent or less of orthochlorobenzalmalononitrile (CS), or 1 percent or less of chloroacetophenone (CN), except in individual containers with a net weight of 20 grams or less; liquid pepper except when packaged in individual containers with a net weight of 3 ounces (85.05 grams) or less; smoke bombs; non-irritant smoke flares, canisters, grenades and charges; and other pyrotechnic articles (excluding shotgun shells, unless the shotgun shells contain only chemical irritants) having dual military and commercial use, and "parts" and "components" "specially designed" therefor, n.e.s.**

**License Requirements**

*Reason for Control:* CC

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | CC Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.

■ 48. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B004 to read as follows:

**2B004   Hot "isostatic presses" having all of the characteristics described in the List of Items Controlled, and "specially designed" "components" and "accessories" therefor.**

**License Requirements**

*Reason for Control:* NS, MT NP, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry. | NS Column 2 |
| MT applies to entire entry. | MT Column 1 |
| NP applies to entire entry, except 2B004.b.3 and presses with maximum working pressures below 69 MPa. | NP Column 1 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| AT applies to entire entry. | AT Column 1 |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls:* (1) See ECCN *2D001* for software for items controlled under this entry. (2) See ECCNs *2E001* ("development"), *2E002* ("production"), and *2E101* ("use") for technology for items controlled under this entry. (3) For "specially designed" dies, molds and tooling, see ECCNs 1B003, 0B501, 0B602, 0B606, 9B004, and 9B009. (4) For additional controls on dies, molds and tooling, see ECCNs 1B101.d, *2B104* and *2B204*. (5) Also see ECCNs *2B117* and *2B999.a*.
*Related Definitions:* N/A
*Items:*

a. A controlled thermal environment within the closed cavity and possessing a chamber cavity with an inside diameter of 406 mm or more; *and*

b. Having any of the following:

b.1. A maximum working pressure exceeding 207 MPa;

b.2. A controlled thermal environment exceeding 1,773 K (1,500 °C); *or*

b.3. A facility for hydrocarbon impregnation and removal of resultant gaseous degradation products.

***Technical Note:*** *The inside chamber dimension is that of the chamber in which both the working temperature and the working pressure are achieved and does not include fixtures. That dimension will be the smaller of either the inside diameter of the pressure chamber or the inside diameter of the insulated furnace chamber, depending on which of the two chambers is located inside the other.*

■ 49. In Supplement No. 1 to part 774, Category 2, revise ECCN 2B018 to read as follows:

**2B018   Equipment on the Wassenaar Arrangement Munitions List.**

No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

■ 50. In Supplement No. 1 to part 774, Category 2, revise ECCN 2D018 to read as follows:

**2D018   "Software" for the "development," "production," or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry. See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

■ 51. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E001 to read as follows:

**2E001   "Technology" according to the General Technology Note for the "development" of equipment or "software" controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999), or 2D (except 2D983, 2D984, 2D991, 2D992, or 2D994).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for items controlled by 2A001, 2B001 to 2B009, 2D001 or 2D002. | NS Column 1 |
| MT applies to "technology" for items controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, 2B119 to 2B122, 2D001, or 2D101 for MT reasons. | MT Column 1 |
| NP applies to "technology" for items controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233, 2D001, 2D002, 2D101, 2D201 or 2D202 for NP reasons. | NP Column 1 |
| NP applies to "technology" for items controlled by 2A290, 2A291, or 2D290 for NP reasons. | NP Column 2 |

| Control(s) | Country chart (see Supp. No. 1 to part 738) |
|---|---|
| CB applies to "technology" for equipment controlled by 2B350 to 2B352, valves controlled by 2A226 having the characteristics of those controlled by 2B350.g, and software controlled by 2D351. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "development" of "software" specified in the License Exception STA paragraph in the License Exception section of ECCN 2D001 or for the "development" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* See also *2E101, 2E201,* and *2E301*
*Related Definitions:* N/A
*Items:* The list of items controlled is contained in the ECCN heading.
   **Note:** *ECCN 2E001 includes "technology" for the integration of probe systems into coordinate measurement machines specified by 2B006.a.*

■ 52. In Supplement No. 1 to part 774, Category 2, revise ECCN 2E002 to read as follows:

**2E002    "Technology" according to the General Technology Note for the "production" of equipment controlled by 2A (except 2A983, 2A984, 2A991, or 2A994), or 2B (except 2B991, 2B993, 2B996, 2B997, 2B998, or 2B999).**

**License Requirements**

*Reason for Control:* NS, MT, NP, CB, AT

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for equipment controlled by 2A001, 2B001 to 2B009. | NS Column 1 |

| Control(s) | Country chart ≤(see Supp. No. 1 to part 738) |
|---|---|
| MT applies to "technology" for equipment controlled by 2B004, 2B009, 2B104, 2B105, 2B109, 2B116, 2B117, or 2B119 to 2B122 for MT reasons. | MT Column 1 |
| NP applies to "technology" for equipment controlled by 2A225, 2A226, 2B001, 2B004, 2B006, 2B007, 2B009, 2B104, 2B109, 2B116, 2B201, 2B204, 2B206, 2B207, 2B209, 2B225 to 2B233 for NP reasons. | NP Column 1 |
| NP applies to "technology" for equipment controlled by 2A290 or 2A291 for NP reasons. | NP Column 2 |
| CB applies to "technology" for equipment controlled by 2B350 to 2B352 and for valves controlled by 2A226 having the characteristics of those controlled by 2B350.g. | CB Column 2 |
| AT applies to entire entry. | AT Column 1 |

**Reporting Requirements**

See § 743.1 of the EAR for reporting requirements for exports under License Exceptions, and Validated End-User authorizations.

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*CIV:* N/A
*TSR:* Yes, except N/A for MT

**Special Conditions for STA**

*STA:* License Exception STA may not be used to ship or transmit "technology" according to the General Technology Note for the "production" of equipment as follows: ECCN 2B001 entire entry; or "Numerically controlled" or manual machine tools as specified in 2B003 to any of the destinations listed in Country Group A:6 (See Supplement No.1 to part 740 of the EAR).

**List of Items Controlled**

*Related Controls:* N/A
*Related Definitions:* N/A
Items: The list of items controlled is contained in the ECCN heading.

■ 53. In Supplement No. 1 to part 774, Category 7, revise ECCN 7A611 to read as follows:

**7A611    Military fire control, laser, imaging, and guidance equipment, as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, MT, RS, AT, UN

| Control(s) | Country chart (see Supp. No. 1 to part 738). |
|---|---|
| NS applies to entire entry except 7A611.y. | NS Column 1 |
| MT applies to commodities in 7A611.a that meet or exceed the parameters in 7A103.b or .c. | MT Column 1 |
| RS applies to entire entry except 7A611.y. | RS Column 1 |
| AT applies to entire entry. | AT Column 1 |
| UN applies to entire entry except 7A611.y. | See § 746.1(b) of the EAR for UN controls |

**List Based License Exceptions (See Part 740 for a Description of All License Exceptions)**

*LVS:* $1,500
*GBS:* N/A
*CIV:* N/A

**Special Conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 7A611.

**List of Items Controlled**

*Related Controls:* (1) Military fire control, laser, imaging, and guidance equipment that are enumerated in USML Category XII, and technical data (including software) directly related thereto, are subject to the ITAR. (2) See Related Controls in ECCNs 0A504, 2A984, 6A002, 6A003, 6A004, 6A005, 6A007, 6A008, 6A107, 7A001, 7A002, 7A003, 7A005, 7A101, 7A102, and 7A103. (3) See ECCN 3A611 and USML Category XI for controls on countermeasure equipment. (4) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S. origin "600 series" controlled content.
*Related Definitions:* N/A
*Items:*
   a. Guidance or navigation systems, not elsewhere specified on the USML, that are "specially designed" for a defense article on the USML or for a 600 series item.
   b. to w. [RESERVED]
   x. "Parts," "components," "accessories," and "attachments," including accelerometers, gyros, angular rate sensors, gravity meters (gravimeters), and inertial measurement units (IMUs), that are "specially designed" for defense articles controlled by USML Category XII or items controlled by 7A611, and that are NOT:
   1. Enumerated or controlled in the USML or elsewhere within ECCN 7A611;
   2. Described in ECCNs 6A007, 6A107, 7A001, 7A002, 7A003, 7A101, 7A102 or 7A103; or

3. Elsewhere specified in ECCN 7A611.y or 3A611.y.

y. Specific "parts," "components," "accessories," and "attachments" "specially designed" for a commodity subject to control in this ECCN or a defense article in Category XII and not elsewhere specified on the USML or in the CCL, as follows, and "parts," "components," "accessories," and "attachments" "specially designed" therefor:

y.1 [RESERVED]

Dated: May 4, 2018.

**Richard E. Ashooh,**
*Assistant Secretary for Export Administration.*

[FR Doc. 2018–10367 Filed 5–21–18; 8:45 am]

**BILLING CODE 3510–33–P**

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
     Plaintiffs,

v.                                                                    No. 1:15-cv-372-RP

U.S. DEPARTMENT OF STATE, et al.,
     Defendants.

---

## <u>DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................................1

ARGUMENT.......................................................................................................................2

I.    Plaintiffs' First Amendment Claims Should Be Dismissed.................................................2

    A.    The First Amendment Does Not Apply To The Export Of CAD Files That Function To Automatically Create A Firearm Or Its Components ............................................................................................2

    B.    If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny. ...............................................................................5

    C.    ITAR's Export Controls Are Not Unconstitutionally Overbroad.................................8

    D.    ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.....................10

II.    Plaintiffs' Second Amendment Claims Should Be Dismissed. ...........................................13

    A.    Plaintiffs Lack Standing to Bring a Second Amendment Challenge.............................13

        1.    Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.................................................................14

        2.    SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any Second Amendment Injury is Not Traceable to Defendants' Acts...............................................15

    B.    Plaintiffs' Second Amendment Challenge Fails on the Merits.....................................16

III.    Plaintiffs' Other Claims Should Also Be Dismissed on the Merits. ...........................................19

CONCLUSION..................................................................................................................20

i

DOSWASHINGTONSUP01534

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ...........................................................................15

*Bernstein v. U.S. Dep't. of Justice*,
  192 F.3d 1308 (9th Cir. 1999) ...........................................................................4

*Bernstein v. U.S. Dep't. of Justice*,
  176 F.3d 1132 (9th Cir. 1999) ...........................................................................4

*Bonds v. Tandy*,
  457 F.3d 409 (5th Cir. 2006) ..........................................................................14

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) .....................................................................................8, 9

*Brockett v. Spokane Arcades*,
  472 U.S. 491 (1985) .........................................................................................9

*Brown v. Entm't Merchs. Ass'n*,
  564 U.S. 786 (2011) .......................................................................................17

*Brown v. Livingston*,
  524 F. Appx. 111 (5th Cir. 2013) ...................................................................15

*Bullfrog Films v. Wick*,
  646 F. Supp. 492 (C.D. Cal. 1986) ..................................................................4

*Capital Cities/ABC, Inc. v. Brady*,
  740 F. Supp. 1007 (S.D.N.Y. 1990) ..............................................................11

*Catholic Leadership Coal. of Tex. v. Reisman*,
  764 F.3d 409 (5th Cir. 2014) .........................................................................10

*CFTC v. Vartuli*,
  228 F.3d 94 (2d Cir. 2000) ..........................................................................3, 4

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988) ...........................................................................10, 11, 12

*City of Littleton v. Z.J. Gifts D-4*,
  541 U.S. 774 (2004) .................................................................................11, 12

DOSWASHINGTONSUP01535

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ...........................................................................3

*Def. Distributed v. Dep't of State*,
121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD I*") ..................................*passim*

*Def. Distributed v. Dep't of State*,
838 F.3d 451 (5th Cir. 2016) ("*DD II*"),
rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017),
*certiorari* denied, 138 S. Ct. 638 (2018) ...........................................*passim*

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ......................................................................................16

*Equal Rights Ctr. v. Post Properties, Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ....................................................................16

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ...................................................................13, 14

*Fontenot v. McCraw*,
777 F.3d 741 (5th Cir. 2015) .........................................................................14

*Forsyth Cnty. v. Nationalist Movement*,
505 U.S. 123 (1992) ......................................................................................11

*Freedman v. State of Md.*,
380 U.S. 51 (1965) ........................................................................................11

*FW/PBS v. City of Dallas*,
493 U.S. 215 (1990) ......................................................................................14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ......................................................................................10

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ....................................................................................4, 5, 6

*Hotze v. Burwell*,
784 F.3d 984 (5th Cir. 2015) .........................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ........................................................................................3

*Junger v. Daley*,
209 F.3d 481 (6th Cir. 2000) ...........................................................................5

DOSWASHINGTONSUP01536

*Karn v. U.S. Dept. of State,*
  925 F.Supp. 1 (D.D.C. 1996) .................................................................................10

*Laker Airways, Ltd. v. Pan Am. World Airways, Inc.,*
  604 F. Supp. 280 (D.D.C. 1984) ...............................................................................4

*Lewis v. Casey,*
  518 U.S. 343 (1996) ................................................................................................14

*Mance v. Sessions,*
  880 F.3d 183 (5th Cir. 2018) ..........................................................................*passim*

*Matal v. Tam,*
  137 S. Ct. 1744 (2017)...............................................................................................6

*Mather v. Central Pac. Bank,*
  2014 WL 5580963 (D. Haw. 2014) .........................................................................15

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
  466 U.S. 789 (1984) ..................................................................................................9

*Milwaukee Police Ass'n v. Jones,*
  192 F.3d 742 (7th Cir. 1999) ...................................................................................10

*Miss. State Democratic Party v. Barbour,*
  529 F.3d 538 (5th Cir. 2008) ...................................................................................14

*N.Y. State Club Ass'n v. City of New York,*
  487 U.S. 1 (1988) ......................................................................................................8

*Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives,*
  700 F.3d 185 (5th Cir. 2012) .........................................................................15, 16, 17

*Near v. Minnesota ex rel. Olson,*
  283 U.S. 697 (1931) .........................................................................................11, 12

*New York Times Co. v. United States,*
  403 U.S. 713 (1971) ................................................................................................11

*Oller v. Roussel,*
  609 F. App'x 770 (5th Cir. 2015) .............................................................................12

*Petro-Chem Processing v. EPA,*
  866 F.2d 433 (D.C. Cir. 1989) .................................................................................16

*Prometheus Radio Project v. FCC,*
  373 F.3d 372 (3d Cir. 2004) ................................................................................8, 18

iv

*Pub. Citizen, Inc. v. Bomer*,
   274 F.3d 212 (5th Cir. 2001) ................................................................................. 14, 15

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015) ........................................................................................... 5, 6

*S. Utah Wild. Alliance v. Palma*,
   2011 WL 2565198 (D. Utah 2011) ...........................................................................15

*Sec'y of State of Md. v. Munson*,
   467 U.S. 947 (1984) ..................................................................................................9

*Second Amendment Arms v. City of Chicago*,
   135 F. Supp. 3d 743 (N.D. Ill. 2015) .......................................................................14

*Shelby Cty. v. Holder*,
   133 S. Ct. 2612 (2013) .............................................................................................17

*Se. Promotions v. Conrad*,
   420 U.S. 546 (1975) ................................................................................................12

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .............................................................................................14

*Stagg P.C. v. U.S. Dep't of State*,
   158 F. Supp. 3d 203 (S.D.N.Y. 2016),
   *aff'd*, 673 F. App'x 93 (2d Cir. 2016),
   *cert. denied*, 138 S. Ct. 721 (2018) ...................................................................... 6, 9

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ........................................................................13, 14, 17

*Texas v. Johnson*,
   491 U.S. 397 (1989) ..................................................................................................2

*U.nited States v. Hicks*,
   980 F.2d 963 (5th Cir. 1992) ................................................................................. 8, 9

*United States v. Hsu*,
   364 F.3d 192 (4th Cir. 2004) ...................................................................................20

*United States v. Chi Mak*,
   683 F.3d 1126 (9th Cir. 2012) ...........................................................................*passim*

*United States v. Edler Indus., Inc.*,
   579 F.2d 516 (9th Cir. 1978) ............................................................................... 6, 11

DOSWASHINGTONSUP01538

*United States v. Martinez,*
   904 F.2d 601 (11th Cir. 1990) ................................................................................7

*United States v. Posey,*
   864 F.2d 1487 (9th Cir. 1989) ...............................................................................6

*United States v. Williams,*
   553 U.S. 285 (2008) ...........................................................................................20

*United States v. Zhen Zhou Wu,*
   711 F.3d 1 (1st Cir. 2013),
   *cert. denied sub nom., Yufeng Wei v. United States,* 134 S. Ct. 365 (2013) ............................ 2, 20

*Universal City Studios, Inc. v. Corley,*
   273 F.3d 429 (2d Cir. 2001) ..................................................................................4

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.,*
   454 U.S. 464 (1982) ...........................................................................................16

*Virginia v. Hicks,*
   539 U.S. 113 (2003) .............................................................................................9

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013) ......................................................................... 3, 4, 9

*Warth v. Seldin,*
   422 U.S. 490 (1975) .............................................................................................8

*Williams-Yulee v. Florida Bar,*
   135 S. Ct. 1656 (2015) .........................................................................................8

## STATUTES

18 U.S.C. § 2339B ...................................................................................................5

22 U.S.C. § 2778 ..............................................................................................*passim*

## REGULATIONS

22 C.F.R. § 120.1 *et seq.*...........................................................................................2

22 C.F.R. § 120.4 ................................................................................................ 2, 8

22 C.F.R. § 120.6 ...........................................................................................2, 7, 20

22 C.F.R. § 120.10 ..........................................................................................*passim*

DOSWASHINGTONSUP01539

22 C.F.R. § 120.11 .................................................................................................. 7, 11

22 C.F.R. § 120.17 .................................................................................................. 19

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 4

**OTHER AUTHORITIES**

*Black's Law Dictionary* (10th ed. 2014) ..................................................................... 8

Constitutionality of the Proposed Revision of the International
  Traffic in Arms Regulations,
        5 Op. O.L.C. 202 (1981)…………………………………………………………13

DOSWASHINGTONSUP01540

WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEFENSE DISTRIBUTED, et al.,
    Plaintiffs,

v.

U.S. DEPARTMENT OF STATE, et al.,
    Defendants.

§
§
§
§
§
§
§
§
§
§

No. 1:15-cv-372-RP

## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

At issue in this litigation is the United States' ability to control the export of weapons—a system of laws and regulations that seeks to ensure that articles useful for warfare or terrorism are not shipped from the United States to other countries (or otherwise provided to foreigners) without authorization, where, beyond the reach of U.S. law, they could be used to threaten U.S. national security, U.S. foreign policy interests, or international peace and stability. Plaintiffs challenge restrictions on the export of Computer Aided Design ("CAD") files and other, related files, that are indispensable to a three-dimensional ("3-D") printing process used to create firearms and their components. There is no dispute that the Government does not restrict Plaintiffs from disseminating such files domestically to U.S. persons or from using such files to make or acquire firearms in the United States. Nonetheless, Plaintiffs seek to bar the Government from preventing the *export* of these design files, which can be easily used overseas to make firearms that are subject to U.S. export controls. Plaintiffs' characterization of such an export as the mere "publication" of information is wrong—these files unquestionably direct the functioning of a 3-D printer, cause it to manufacture firearms, or otherwise enable the creation of such firearms by those abroad. Whatever informational value there may be in the process by which 3-D printing occurs, the CAD files are also functional, directly facilitate the manufacture of weapons, and may properly be regulated for export. As set forth below, Plaintiffs' Second Amended Complaint should be dismissed.

## BACKGROUND

In the spring of 2015, Plaintiffs filed their initial Complaint in this action and moved for a preliminary injunction. *See* ECF Nos. 1, 7. On August 4, 2015, this Court entered an Order denying Plaintiffs' motion. *See Def. Distributed v. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) ("*DD*

1

*I*"). Appellate review confirmed the Court's Order, *see Def. Distributed v. Dep't of State*, 838 F.3d 451

(5th Cir. 2016) ("*DD II*"), rehearing *en banc* denied, 865 F.3d 211 (5th Cir. 2017), *certiorari* denied, 138

S. Ct. 638, after which proceedings resumed in this Court. On March 16, 2018, Plaintiffs filed the

Second Amended Complaint ("SAC"). *See* ECF No. 90.

In its August 4, 2015 Order, the Court set forth an account of the statutory and regulatory

provisions that are the target of Plaintiffs' challenge:

> Under the Arms Export Control Act ("AECA"), "the President is authorized to control
> the import and the export of defense articles and defense services" and to "promulgate
> regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1).
> The AECA imposes both civil and criminal penalties for violation of its provisions and
> implementing regulations, including monetary fines and imprisonment. *Id.* § 2278(c) & (e).
> The President has delegated his authority to promulgate implementing regulations to the
> Secretary of State. Those regulations, the International Traffic in Arms Regulation ("ITAR"),
> are in turn administered by the [Directorate of Defense Trade Controls ("DDTC")] and its
> employees. 22 C.F.R. 120.1(a).
>
> The AECA directs that the "defense articles" designated under its terms constitute the
> United States "Munitions List." 22 U.S.C. § 2278(a)(1). The Munitions List "is not a
> compendium of specific controlled items," rather it is a "series of categories describing the
> kinds of items" qualifying as "defense articles." *United States v. Zhen Zhou Wu*, 711 F.3d 1, 12
> (1st Cir.) *cert. denied sub nom.*, *Yufeng Wei v. United States*, 134 S. Ct. 365 (2013). . . . The term
> "defense articles" also specifically includes "technical data recorded or stored in any physical
> form, models, mockups or other items that reveal technical data directly relating to items
> designated in" the Munitions List. 22 C.F.R. § 120.6.
>
> A party unsure about whether a particular item is a "defense article" covered by the
> Munitions List may file a "commodity jurisdiction" request with the DDTC. *See* 22 C.F.R. §
> 120.4 (describing process). The regulations state the DDTC "will provide a preliminary
> response within 10 working days of receipt of a complete request for commodity jurisdiction
> ['CJ']." *Id.* § 120.4(e). If a final determination is not provided after 45 days, "the applicant
> may request in writing to the Director, Office of Defense Trade Controls Policy that this
> determination be given expedited processing." *Id.*

*DD I* at 686-87.[1]  This regulatory framework remains in place. *See* 22 C.F.R. 120.1 *et seq.*

## ARGUMENT

**I.      Plaintiffs' First Amendment Claims Should Be Dismissed.**

    A.  The First Amendment Does Not Apply To The Export Of CAD Files That Function
        To Automatically Create A Firearm Or Its Components.

The First Amendment does not encompass all types of conduct. *Texas v. Johnson*, 491 U.S.

---

[1] Unless otherwise stated, all internal citations and quotation marks have been omitted in this brief.

DOSWASHINGTONSUP01542

397, 404 (1989). At a minimum, conduct must be sufficiently expressive and communicative to other persons to qualify for protection under the First Amendment. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995); *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013) ("[N]on-expressive conduct does not acquire First Amendment protection whenever it is combined with another activity that involves protected speech."). "To determine whether particular conduct possesses sufficient communicative elements to be embraced by the First Amendment, courts look to whether the conduct shows an intent to convey a particular message and whether the likelihood was great that the message would be understood by those who viewed it." *Steen*, 732 F.3d at 388.

Plaintiffs cannot carry their burden to prove that the First Amendment applies to their technical data for the manufacture of firearms and their components. As an initial matter, the relevant ITAR provisions govern the export of defense articles and defense services, including related technical data. As applied to Plaintiffs' CAD files, the regulations are properly focused on restricting an export that can unquestionably facilitate the creation of defense articles abroad. Indeed, the CJ requests Defense Distributed submitted to DDTC illustrate that the mere publication of ideas is not at issue.[2] The CJ requests make clear the CAD files are functional: "essentially blueprints that can be read by CAD software," ECF No. 8-2, Pl. Br. at App. 208,[3] to generate firearms, firearms components, or other defense articles "automatically." *Id.* at 267. Further, in its CJ requests, Defense Distributed itself described its role solely in terms of nonexpressive conduct: "Although DD converted this information into CAD file format, DD does not believe that it created any new technical data for the production of the gun."[4] *Id.* at 211. Plaintiffs' own description

---

[2] "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).
[3] Defendants determined that only the CAD files, and not Defense Distributed's related files (such as "read-me" text files), fell within ITAR's commodity jurisdiction. Ex. A, attached hereto.
[4] Defendants recognize that, in its Order denying Plaintiffs' preliminary injunction motion, the Court concluded that "the files [are] subject to the protection of the First Amendment," at least "for the purpose of the preliminary injunction analysis," relying on representations "Plaintiffs made . . . at the hearing that Defense Distributed is interested in distributing the files as 'open source.'" *DD I*, 121 F. Supp. 3d at 692. The Court's provisional conclusion at the PI stage may be revisited, however, and as set forth below, even under that view Plaintiffs' claims should be dismissed. Notwithstanding the notice the Court provided that this allegation is important, Plaintiffs make no

3

of the items thus removes their conduct from the purview of the First Amendment. *See CFTC v. Vartuli*, 228 F.3d 94, 111 (2d Cir. 2000) (rejecting First Amendment challenge to prohibition on distributing software, and emphasizing that software provided "automatic" advice and, rather than educating the consumer, provided explicit instructions about whether to buy or sell); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001) (upholding injunction prohibiting the Internet posting of computer software that facilitated the unlawful reproduction of movies stored on DVDs, because the injunction "target[ed] only the nonspeech component" of the software). Nor have Plaintiffs adequately alleged that the intended export of CAD files "shows an intent to convey a particular message" or that "the likelihood was great that the message would be understood by those who viewed it." *See Steen*, 732 F.3d at 388. Moreover, Plaintiffs do not even allege that they have undertaken any effort to engage in purely domestic distribution of their CAD files, whether on the Internet or otherwise, suggesting their true interests lie in export, not expression. These deficiencies, coupled with the First Amendment's limited application abroad, *e.g.*, *Laker Airways v. Pan Am. World Airways*, 604 F. Supp. 280 (D.D.C. 1984); *Bullfrog Films v. Wick*, 646 F. Supp. 492, 502 (C.D. Cal. 1986), warrant dismissal of Plaintiffs' First Amendment claim pursuant to Rule 12(b)(6).[5]

To be sure, the SAC does reference a Ninth Circuit case, *Bernstein v. U.S. Dep't of Justice*, SAC ¶¶ 21, 28, which extended First Amendment protections to computer source code on the theory that it can be read and understood by humans and, unless subsequently compiled, could not directly control the functioning of a computer. *See* 176 F.3d 1132, 1139-43 (9th Cir. 1999). The opinion in that case, however, was subsequently withdrawn and rehearing granted, suggesting the Court should be cautious before relying on it. *See Bernstein v. U.S. Dep't. of Justice*, 192 F.3d 1308 (9th Cir. 1999). And even assuming, *arguendo*, that the Ninth Circuit's conclusion were correct as to the source code of software—a conclusion with which Defendants disagree—the CAD files here do not merely cause a computer to function generally, but provide specific direction to a machine in furtherance of

mention in the SAC of their alleged "open source" intention or any other stated intent for "the files . . . to be used by others as a baseline" for discussion. *Compare id.* at *with* SAC, ECF No. 90 (lacking any reference to "open source" distribution).

[5] Should the Court conclude, as Defendants contend, that Plaintiffs' exports are not sufficiently expressive, the appropriate standard of review would be rational-basis scrutiny, which ITAR plainly satisfies. *See Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (a statute that "regulate[s] conduct alone and do[es] not implicate the First Amendment" should receive rational-basis scrutiny).

4

manufacturing firearms and defense articles.[6]

B.  <u>If the First Amendment Applies, This Regulation Survives First Amendment Scrutiny.</u>

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," which includes laws that "defin[e] regulated speech by particular subject matter . . . [or] by its function or purpose." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). As a result, the Court should assess whether application of the ITAR "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 2231.

The Supreme Court's analysis in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*") illustrates why application of the ITAR to Defense Distributed's would-be export of 3-D printing information is permissible. There, the Supreme Court upheld a restriction on providing "material support or resources to a foreign terrorist organization," 18 U.S.C. § 2339B(a)(1), as applied to a group that sought to "facilitate only the lawful, nonviolent purposes" of certain foreign groups. *HLP*, 561 U.S. at 8. The Court recognized that the particular activities in which the plaintiffs wished to engage—legal training and political advocacy—"consist[ed] of communicating a message" and thus, unlike the computer files at issue here, had an expressive component. *See id.* at 28. But the Court nonetheless upheld the statute against a First Amendment challenge, concluding that Congress had permissibly determined that even support for peaceable, lawful conduct "can further terrorism by foreign groups." *Id.* at 30.

In considering the First Amendment challenge in *HLP*, the Court emphasized that the issues presented "implicate[d] sensitive and weighty interests of national security and foreign affairs." *Id.* at 33-45; *see also id.* at 28 ("Everyone agrees that the Government's interest in combating terrorism is an urgent objective of the highest order."). Giving deference to the Government's determinations of the likely consequences of allowing the material support at issue, the Court also concluded that the statute was narrowly tailored to achieve those important interests. *See id.* at 33-37. In doing so, the

---

[6] As this Court noted, the Sixth Circuit in *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) similarly "found . . . 'computer source code is . . . protected by the First Amendment.'" *DD I* at 692 (quoting *Junger*). Like *Bernstein*, however, the precedential value of this opinion is nil in light of the dismissal with prejudice agreed to by plaintiff in that case on remand. *See Junger v. Dep't of Commerce*, No. 96-cv-1723-JG, Dkt. No. 123 (N.D. Oh. Nov. 16, 2000).

DOSWASHINGTONSUP01545

Court explained that "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine United States foreign policy, and those that will not." *Id.* at 35. Thus, where "sensitive interests in national security and foreign affairs [are] at stake," *id.* at 36, courts applying First Amendment scrutiny must give "significant weight" to the "political branches['] . . . determination" of what is "necessary."[7]

Here, Congress and the Executive Branch have concluded that restrictions on the export of arms are essential to the promotion of "world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Courts have likewise recognized "the Government's important interest in regulating the international dissemination of military information." *United States v. Chi Mak*, 683 F.3d 1126, 1135 (9th Cir. 2012); *see also United States v. Posey*, 864 F.2d 1487, 1496 (9th Cir. 1989) (citing *United States v. Edler Indus., Inc.* 579 F.2d 516, 520 (9th Cir. 1978)). Indeed, on appeal from this Court's denial of Plaintiffs' motion for a preliminary injunction, the Fifth Circuit explained that "the State Department's stated interest in preventing foreign nationals— including all manner of enemies of this country—from obtaining technical data on how to produce weapons and weapons parts" constitutes "a very strong public interest in national defense and national security." *DD II*, 838 F.3d at 458; *accord Posey*, 864 F.2d at 1497 ("Technical data that is relatively harmless and even socially valuable when available domestically may, when sent abroad, pose unique threats to national security."); *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 210-11 (S.D.N.Y.), *aff'd*, 673 F. App'x 93 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 721 (2018) (holding that injunction barring enforcement of the ITAR's licensing provisions "would have very serious adverse impacts on the national security of the United States"; among the "parade of horribles" would be the release of "digital plans for 3D-printable plastic firearms").

Plaintiffs do not contest this point, either in their SAC or elsewhere. *See* Pls'. Mem. in

---

[7] Although Defendants previously briefed this case as one involving a "content-neutral" Regulation to which "intermediate scrutiny" would apply, *see* Defs.' Opp. to Pls.' Mot. for a PI at 15-18, ECF No. 32, and the Court adopted this reasoning, *see DD I*, 121 F. Supp. 3d at 694, the Supreme Court has made clear that "laws that, though facially content neutral . . . cannot be justified without reference to the content of the regulated speech . . . must also satisfy strict scrutiny." *Reed*, 135 S. Ct. at 2227. *Matal v. Tam*, 137 S. Ct. 1744, 1765-66 (2017) ("laws 'targeted at specific subject matter'" are to be treated "as content based discrimination") (citing *Reed*); *see also DD II*, 838 F.3d at 468-69 (Jones, J., dissenting).

6

Support of PI at 28, ECF No. 8 (acknowledging that "Plaintiffs do not question that the Government has a compelling interest in regulating the exportation of arms"). That concession, coupled with the deference owed by this Court to national security and foreign policy judgments of the Executive Branch, *e.g., HLP*, 561 U.S. at 35; *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990), leaves no doubt as to the importance of the Government's interests in this case.

The ITAR's licensing requirements are also narrowly tailored to achieve the Government's compelling interests. In longstanding regulations, the Department of State has consistently and reasonably concluded that it is not possible to meaningfully curtail the overseas dissemination of arms if unfettered access to technical data essential to the production of those arms is permitted. *See* 22 C.F.R. §§ 120.6, 120.10; *see also Chi Mak*, 683 F.3d at 1135 ("The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment."). Nevertheless, the statutory and regulatory scheme confirms that the Government "has been conscious of its own responsibility to consider how its actions may implicate constitutional concerns." *HLP*, 561 U.S. at 35; *see* SAC ¶ 20 (recognizing Government's efforts "to address First Amendment concerns").

For example, the "ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers." *Chi Mak*, 683 F.3d at 1135 (citing *HLP*, 561 U.S. at 35-36). The regulations also exclude from the definition of "technical data" "basic marketing information on function or purpose or general system descriptions of defense articles." 22 C.F.R. 120.10(b). Also excluded is information within the public domain, *id.*, broadly defined as "information which is published and which is generally accessible or available to the public," *inter alia*, "[t]hrough sales at newsstands and bookstores," "[a]t libraries open to the public or from which the public can obtain documents," and "[t]hrough unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States," *id.* § 120.11. And of course, the AECA and ITAR restrict only the export of technical data: "Plaintiffs are free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to

DOSWASHINGTONSUP01547

disseminate the information internationally." *DD I* at 695 (rejecting argument that Defendants' interpretation of "export" was overbroad); *see also id.* at 696 ("ITAR provides a method through the commodity jurisdiction request process for determining whether information is subject to its export controls") (citing 22 C.F.R. § 120.4). *Cf. U.S. v. Hicks*, 980 F.2d 963, 970-72 (5th Cir. 1992) (holding statute prohibiting intimidation of flight crew withstood First Amendment strict scrutiny because, as here, the statute "does not cast a sweeping net at amorphous categories of speech"; "the operative term in the instant case[] ["intimidate" in *Hicks*, as "export" here] is a word that is not simply associated with a type of speech, but includes conduct as well"; and "encompasses only a relatively narrow range of speech").

To be sure, a dissent from the Fifth Circuit's opinion in *DD II* rejected this analysis, concluding that the application of the ITAR here could not survive strict scrutiny. But that opinion incorrectly analyzed the question of "overinclusive[ness]," resting its conclusion on a purported distinction between an "export" and "domestic posting on the Internet." *See DD II*, 838 F.3d at 470-71 (Jones, J., dissenting). But "[b]y nature, the Internet is uniform everywhere. Its content is not dependent on geographic or metropolitan boundaries." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 469 (3d Cir. 2004) (Scirica, C.J., concurring in part and dissenting in part). Overinclusiveness can be measured only with respect to available, less-restrictive alternatives, *see Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1671 (2015), and because the Internet has no dividing lines, the ITAR's regulation of the export of technical data must encompass all such postings to achieve its ends.[8]

C.  ITAR's Export Controls Are Not Unconstitutionally Overbroad.

Plaintiffs also raise an "overbreadth" challenge to the ITAR's regulation of technical data. *See* SAC ¶ 55. Overbreadth is an exception to the prudential standing requirement that a plaintiff may only "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In circumstances where a regulation is alleged to be so broad that it is incapable of any permissible application, courts may allow a party to bring a facial challenge to a statute because it threatens

---

[8] Nor is it the case that defining "export" to include the transfer abroad of information is improper, as the Fifth Circuit dissent suggests in reliance on, *inter alia*, dictionary definitions of "the verb 'export.'" *DD II*, 838 F.3d at 466-67. But the <u>noun</u> "export" is defined as "[a] product <u>or service</u> created in one country and transported to another." *Export* (noun form), *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

DOSWASHINGTONSUP01548

others not before the court. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1987); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Overbreadth is "strong medicine" to be used "sparingly and only as a last resort," *Broadrick*, 413 U.S. at 613, and a plaintiff must show that the alleged "overbreadth of a statute [is] not only [] real, but substantial . . . judged in relation to the statute's plainly legitimate sweep," *id.* at 615; *see also Steen*, 732 F.3d at 387 (describing this test for First Amendment facial challenges as "daunting").

First, Plaintiffs' overbreadth claim fails because, for the reasons described above, the AECA and ITAR are not directed at speech, but rather to the export of defense articles and related technical data, 22 U.S.C. 2778(a)(1); 22 C.F.R § 120.1. *See Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech"); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984). Further, "[c]ourts need not entertain an overbreadth challenge 'where the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish.'" *Hicks*, 980 F.2d at 969 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). Thus, no overbreadth challenge is "appropriate if the first amendment rights asserted" on behalf of third parties are "essentially coterminous" with those asserted by the plaintiffs themselves. *Id.* And an overbreadth challenge should not properly lie if the regulations have been applied permissibly to Plaintiffs. *See Sec'y of State of Md. v. Munson*, 467 U.S. 947, 958 (1984). Here, because Defense Distributed's explicit purpose is international in nature—to promote "global access to . . . 3D[] printing of arms," SAC ¶ 1— the ITAR is being applied directly in its intended manner.

Additionally, Plaintiffs' overbreadth claim fails on the merits. The ITAR's export controls on technical data have a substantially permissible purpose. Specifically, these regulations prevent the circumvention of export controls on munitions by proscribing the export of instructions, blueprints, or—as in the instant case—the automated processes to produce such munitions. *See Stagg PC*, 158 F. Supp. 3d at 210-11; *Chi Mak*, 683 F.3d at 1135. Further, Plaintiffs have nowhere alleged that the regulations have been applied in a substantial number of impermissible ways. To the contrary, they plead that "[a]t the time Defense Distributed posted the Published Files, there was no publicly

DOSWASHINGTONSUP01549

known case of Defendants enforcing a prepublication approval requirement under the ITAR." SAC ¶ 27. Plaintiffs' theory also ignores that the regulations do not extend to domestic distribution of technical data to U.S. persons and carve out a wide exemption for "public domain" data that helps ensure their reach is appropriately limited. *See* 22 C.F.R. § 120.10(b)(5). Accordingly, Plaintiffs' overbreadth claim is without merit. *See Chi Mak*, 683 F. 3d at 1136 (rejecting overbreadth challenge); *Karn v. Dep't of State*, 925 F. Supp. at 13 (D.D.C. 1996) ("plaintiff's overbreadth concerns [about the ITAR's 'technical data' provision] are not genuine").

D.  ITAR's Export Controls Are Not An Unconstitutional Prior Restraint.

Plaintiffs' repeated references to the regulations as a "prior restraint," *e.g.*, SAC ¶¶ 17-22, 40-45, 54-57, do not advance their First Amendment claim. As this Court previously explained, the Fifth Circuit has recognized that "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *DD I*, 121 F Supp. 3d at 692 (quoting *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014)). For example, while a prior restraint involving "a facially content-based restriction on political speech in a public forum" is subject to strict scrutiny, "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), cited in *Catholic Leadership Coal.*, 764 F.3d at 438.

The licensing scheme at issue here could not plausibly give rise to the sort of censorship that has caused courts to invalidate prior restraints on news publications or public rallies. Heightened concerns about prior restraints arise when "a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). For such concerns to arise, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship risks." *Id.* By contrast, "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken[] carry with them little danger of

DOSWASHINGTONSUP01550

censorship." *Id.* at 760-61. The provisions at issue fall squarely in this latter category. The AECA and ITAR are part of a scheme designed to curtail the spread of defense articles to foreign nationals, in this case, CAD files that directly facilitate the 3-D printing of firearms. Far from being aimed at restricting expression, the regulations "specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works." *Chi Mak*, 683 F.3d at 1136; *see* 22 C.F.R. § 120.11(a).

While computer files could, in some circumstances, be distributed for expressive purposes, it nonetheless stands in obvious contrast to activities such as parading, posting signs, distributing handbills, or publishing newspapers, which are always (or almost always) done for expressive purposes. Cases involving restrictions on those activities are inapposite here. *See, e.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971) (publication of Pentagon Papers in the newspaper); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (publication of charges of official misconduct in newspaper); *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) (permit for protest march). Thus, Plaintiffs' attempt to shoehorn the AECA and ITAR into the classic prior restraint framework is unpersuasive. *Chi Mak*, 683 F.3d at 1136 (rejecting similar prior restraint argument); *see also Edler Indus.*, 579 F.2d at 521 (same). *Cf. Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013 (S.D.N.Y. 1990) (upholding against First Amendment challenge licensing strictures for international television broadcasts without concluding such a licensing system constituted a prior restraint).

The ITAR's focus on the activity of exporting also mitigates two of the principal concerns raised by classic prior restraint on expression. First, "[b]ecause the censor's business is to censor," when the government establishes a censorship board like that in *Freedman* and requires it to determine whether a film is "moral and proper," it is likely that the institutional bias of the censors will lead to the suppression of speech that should be permitted. *Freedman v. Md.*, 380 U.S. 51, 52, 57 (1965). In contrast, "laws of general application that are not aimed at conduct commonly associated with expression" do not raise the same concerns about censorship because it will only be a "rare occasion [when] an opportunity for censorship will exist." *Lakewood*, 486 U.S. at 760-61. Second, laws directing determinations about, e.g., "moral" expression raise concern about whether such discretion is unreviewable. *See City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 782-83 (2004)

DOSWASHINGTONSUP01551

(upholding licensing scheme that relied on less-subjective criteria than *Freedman*). But where the statute in question regulates general conduct, these concerns are mitigated because "application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision." *Lakewood*, 486 U.S. at 761. Here, regulation of the export of 3-D printing files in furtherance of national security and foreign policy does not focus on the content of expression, moral or otherwise. Nor have Plaintiffs sufficiently alleged that licensing applications are denied at a rate demonstrating an "institutional bias of a censor" here. *See id.*[9]

In addition, Plaintiffs are mistaken in suggesting that the State Department's processing times render the scheme an impermissible prior restraint. *See* SAC ¶¶ 40-43. To begin with, that argument depends on the incorrect conclusion that the licensing scheme is a classic prior restraint subject to *Freedman*'s rigorous procedural requirements. Moreover, on its face, the licensing determination appropriately involves considerations of numerous difficult questions of national security or foreign policy. *See* 22 U.S.C. § 2778(a)(2) (requiring consideration of "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of an outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements."). Given the stakes and the complexity of the issues involved, there is no basis for Plaintiffs' apparent view that such determinations must be made hastily. Further, there is no legal obligation to obtain a CJ determination before exporting items or data that are not subject to the regulations. As a technical matter, the availability of such determinations thus does not impose a prior restraint. As a practical matter, such determinations will be sought (and may be time consuming) only in difficult cases that require extensive review. And to reiterate, no license, and therefore no determination, is required for domestic distribution to U.S. persons. *Cf. Oller v. Roussel*, 609 F. App'x 770, 774 (5th Cir. 2015) ("To the extent [plaintiff's] First Amendment claims

---

[9] While prior restraints are disfavored in substantial part because it is presumed that after-the-fact punishment is available in the absence of a prior restraint, *see Near v. Minn.*, 283 U.S. 697, 718-19 (1931); *Se. Proms. v. Conrad*, 420 U.S. 546, 558-59 (1975), here, such after-the-fact punishment cannot suffice because of the possible irreversible harm to national security and foreign policy that could not be remedied by later punishment. *See Chi Mak*, 683 F.3d at 1136 ("national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure").

12

arise from a 'prior restraint' on his speech, we find that he fails to show evidence that Defendants have prohibited him from stating his beliefs or censored his speech [given] . . . [t]hat Defendants have allowed Oller to use his textbook as secondary material, discuss his views during class, and publish and speak about his views outside the classroom.").

Finally, Plaintiffs cannot advance their argument by relying on opinions from the Office of Legal Counsel ("OLC") in the Justice Department. SAC ¶ 18. These opinions necessarily analyzed the issues at a relatively high level of generality, and do not address the particular application or circumstances presented here. For example, in one opinion the Justice Department cited the Government's "compelling interest in suppressing the development and use of sensitive technologies abroad," and concluded that the provision of "technical advice" was "an integral part of conduct that the government has a compelling interest in suppressing by appropriate means." Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations, 5 Op. O.L.C. 202, 208 (1981), ECF No. 8-2, App. 123. Written in 1981, the opinion understandably did not analyze the First Amendment implications of the dissemination of computer files on the Internet. Instead, the examples of applications that would raise constitutional concern involved "communications of unclassified information by a technical lecturer at a university" or "the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest." *Id.* at 212 (App. 127). This case, however, does not involve university lectures or discussions of matters of theoretical interest at a dinner party. Rather, the regulation's application in this case involves the dissemination of computer files to foreign nationals that can be used to automatically generate firearms, parts, or components that are on the U.S. Munitions List.

Plaintiffs have therefore failed to state a claim for relief under the First Amendment.

## II. Plaintiffs' Second Amendment Claims Should Be Dismissed.

A. Plaintiffs Lack Standing to Bring a Second Amendment Challenge.

Plaintiffs' Second Amendment claims are based on two collateral constitutional guarantees Defendants allegedly infringe: "the right to acquire arms, and the right to make arms." SAC ¶ 59; *see Ezell v. City of Chi.*, 651 F.3d 864, 704 (7th Cir. 2011); *Teixeira v. Cty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Yet the SAC is deficient in allegations of injury to support these claims,

DOSWASHINGTONSUP01553

notwithstanding the principle that "if the plaintiff does not carry his burden 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute,' then dismissal for lack of standing is appropriate." *Hotze v. Burwell*, 784 F.3d 984, 993 (5th Cir. 2015) (quoting *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990)); *see Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ("at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating" standing").[10]

    1. <u>Defense Distributed Has Not Suffered a Harm to Second Amendment Interests.</u>

    To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008). The SAC alleges no injury to Defense Distributed associated with any Second Amendment claims: Plaintiffs have not set forth any facts describing how Defense Distributed is limited in its "right to acquire arms" or its "right to make arms." As the Court recognized in the context of Plaintiffs' equally-deficient original Complaint, "Defense Distributed is in full possession of the computer files at issue and thus cannot argue it is being prevented from exercising its rights under the Second Amendment." *DD I* at 696-97. Nor should Defense Distributed be permitted to assert Second Amendment claims on behalf of would-be downloaders of its files: although courts have recognized a right to "firearms retailers to sue on behalf of their potential customers," *Second Amendment Arms v. City of Chi.*, 135 F. Supp. 3d 743, 751 (N.D. Ill. 2015), such standing has not been recognized for a non-profit entity making its services available for free. *See, e.g., id.* (would-be firearms retailer); *Teixeira*, 873 F.3d at 677 (same); *Ezell*, 651 F.3d 704.

    Defense Distributed would also fail to meet the generally-applicable test for standing on behalf of a third-party: it has not, nor could it plausibly, allege the existence of "a close relation" with unnamed, likely-anonymous, and non-paying website visitors, nor has it identified any obstacle to those visitors asserting their own Second Amendment interests. *See Bonds v. Tandy*, 457 F.3d 409, 416 n.11 (5th Cir. 2006) (requiring these elements for a third-party standing claim). Defense Distributed has therefore failed to set forth specific facts indicating that its Second Amendment

---

[10] In reviewing a motion to dismiss for lack of standing, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).

DOSWASHINGTONSUP01554

rights have been injured in fact.  *See Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

    2.   SAF and Conn Williamson Have Failed to Plead Sufficient Allegations of Injury and Any <u>Second Amendment Injury is Not Traceable to Defendants' Acts.</u>

Associational standing is available for Second Amendment claims under the same standards as for other claims, *see Nat'l Rifle Ass'n of America v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) ("*NRA*"), but this requires that the organization demonstrate that "its members would otherwise have standing to sue in their own right,"[11] including by pleading that they have suffered a concrete, specific injury sufficient to confer Article III standing. *Id.*

Here, SAF and Mr. Williamson have failed to sufficiently plead an injury. Even if their alleged "keen interest" in Defense Distributed's files and vague claim that they would "access" such files, SAC ¶ 45, were sufficient to demonstrate a First Amendment injury, their further suggestion that, after doing so, they would "use the files for . . . the manufacture of firearms . . . that they would keep operable and use for self-defense" is a "hypothetical and conjectural" allegation about the usage of these files that is insufficient to satisfy the obligation to plead injury. *Compare Brown v. Livingston*, 524 F. App'x. 111, 114-15 (5th Cir. 2013). It is true that this Court previously held that Mr. Williamson, and by implication, SAF as an organization, <u>had</u> demonstrated injury. *See DD I* at 698. But the Court recognized this standard had been met not by the original Complaint, but by supplementary "affidavit testimony." *Id.* Plaintiffs have added a bare sentence of conclusory allegations to reinforce the pleaded allegations in the SAC. *Compare* SAC at ¶ 45 *with* Compl., ECF No. 1 at ¶ 38. Thus, because Plaintiffs have now been on notice that their pleadings are defective as to standing and have failed to cure this defect through two amended complaints, the Court should dismiss the Second Amendment claims for failure to allege a sufficient injury. *See Mather v. Cent. Pac. Bank*, 2014 WL 5580963 at *3 (D. Haw. 2014) (dismissal after "failure to cure the defects identified" as to standing); *cf. S. Utah Wild. All. v. Palma*, 2011 WL 2565198 (D. Utah 2011) (similar).

Further, given the passage of nearly three years since the filing of those affidavits, the Court

---

[11] Associational standing also requires that a plaintiff organization establish that "the interests it seeks to protect are germane to the organization's purpose; and [that] . . . the participation of individual members" in the lawsuit is not required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).  Defendants are not aware of any reason to believe that the Second Amendment Foundation's purpose is not "germane" to the Second Amendment interests at issue here or that participation of SAF's members would be required in this action.

DOSWASHINGTONSUP01555

should not continue to credit the injuries alleged therein as ongoing. *Cf. Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141 (D.C. Cir. 2011) (questioning validity of claims of injury based on lapse of time between complaint and affidavit). To the extent Mr. Williamson or SAF's other members seek to acquire and make arms based on Defense Distributed's 3-D printing files, they have had ample opportunity to seek access to those files via offline means, given that the ITAR governs only exports and would not limit the ability of Defense Distributed or SAF to provide 3-D printing files directly to Americans within United States borders. For similar reasons, the evident lack of action on the part of SAF and Mr. Williamson to obtain the files they insist are needed to exercise their Second Amendment rights should be treated as "incurred voluntarily," and thus, no longer "fairly can be traced to the challenged action." *See Petro-Chem Processing v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United*, 454 U.S. 464, 472 (1982)).

   B.   <u>Plaintiffs' Second Amendment Challenge Fails on the Merits.</u>

   In *Mance v. Sessions*, the Fifth Circuit set forth the governing approach for Second Amendment analysis of regulations that restrict the access of prospective firearms owners and users to firearms protected by the Second Amendment. *See* 880 F.3d 183 (5th Cir. 2018). Applying the analysis set forth in *Mance* here establishes that Defendants may, consistent with the Second Amendment, limit the international distribution of electronic files which enable the 3-D printing of firearms. Thus, even if the Court concludes that one or more Plaintiffs have standing to assert a Second Amendment claim, that claim should be dismissed.

   The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Conducting an "extensive analysis of the historical context of the Second Amendment, the Court concluded 'that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right' to keep and bear arms . . . [for which] self-defense . . . was the central component." *Mance*, 880 F.3d at 187 (quoting *Heller*, 554 U.S. at 592, 599). To determine whether a federal statute is consonant with this right, the Fifth Circuit requires a "two-step approach. . . . [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment . . . ; the second step is . . . to determine whether the law survives the proper level of scrutiny." *NRA*, 700

16

F.3d 194. Here, just as pleading deficiencies leave doubt as to Plaintiffs' standing, they leave unclear the extent of the "encroach[ment] on the core of the Second Amendment." *Id.* at 195. Although the "core Second Amendment right . . . wouldn't mean much without the ability to acquire arms," *Teixeira*, 873 F.3d at 677, including through their manufacture, the pleadings do not establish the extent to which that core is infringed here.

Under these circumstances, the Fifth Circuit's approach in *Mance* may guide the Court's inquiry. There, the Fifth Circuit first addressed whether "the laws and regulations at issue withstand strict scrutiny," before examining whether "the strict, rather than intermediate, standard of scrutiny is applicable," and the same approach is permissible here. *Mance*, 880 F.3d at 188; *see id.* at 196 (Owen, J., concurring) ("it is prudent first to apply strict scrutiny," and, if the Court concludes that the challenged law "satisfies that heightened standard, it is unnecessary to resolve whether strict scrutiny is *required*"). For a firearms restriction to satisfy strict scrutiny, "the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of the constitutional right must be actually necessary to the solution.'" *Mance*, 880 F.3d at 188 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)).

Applying this standard, the Fifth Circuit in *Mance* reversed and vacated a district court decision enjoining the enforcement of two federal statutory provisions and a regulation that "generally prohibit the direct sale of a handgun by a federally licensed firearms dealer (FFL) to a person who is not a resident of the state in which the FFL is located." *Mance*, 880 F.3d at 185. Emphasizing that "current burdens on constitutional rights 'must be justified by current needs,'" the Fifth Circuit first assessed the nature of the government interest served by the restrictions, and recognized that "there is a compelling government interest in preventing circumvention of the handgun laws of various states." *Id.* at 189-90 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2619 (2013)). Likewise here, there is an equally compelling interest in preventing the circumvention of laws restricting the export of firearms, particularly to hostile foreign state and non-state adversaries.

As noted above, Plaintiffs have previously conceded the compelling nature of the interest in regulating the export of arms, and that interest encompasses the export of the 3-D printing files at issue here. For this reason, Congress did not limit the scope of the AECA merely to the regulation

DOSWASHINGTONSUP01557

of exports of physical weapons like firearms or bombs, but recognized that the transfer of ideas, expertise, and knowledge beyond the borders of the United States can be just as inimical to the national interest as the transfer of objects: hence the inclusion of "defense services," alongside "defense articles" in the AECA's coverage. 22 U.S.C. § 2778(a)(1).

As explained above, the ITAR restrictions here are narrowly tailored to this concededly compelling interest. *See* Part I.B, *supra*. Defense Distributed explicitly promotes "global" use of its ideas, SAC ¶ 1, so the compelling interest in limiting the transfer of arms abroad requires that the ITAR be applied to Defense Distributed. And, applying the approach the Fifth Circuit employed in *Mance* where "[a]ll concede[d] there is a compelling government interest," a review of the available alternatives shows none that would effectively protect the interests at issue. *See* 880 F.3d at 190-92.

The claims set forth in the SAC suggest two alternatives by which Defendants could act to reduce the alleged burden on the Second Amendment rights of SAF, Mr. Williamson, and others. As with the alternatives considered in *Mance*, however, neither would effectively satisfy Defendants' interest in preventing persons from circumventing export controls for munitions technology. First, Plaintiffs, like the Fifth Circuit dissent described above, *see DD II*, 838 F.3d at 470-71, suggest that the distribution of technical data over the Internet could be exempted from ITAR's export controls. But the Internet does not have separate parts, "domestic" and "foreign." *Prometheus Radio*, 373 F.3d at 469. If Mr. Williamson and SAF could access Defense Distributed's "files on the Internet," so too could innumerable foreign persons or entities, and thus, the United States' efforts to regulate the export of firearms and of firearms technical data would alike be rendered nullities.[12] The other alternative suggested by Plaintiffs' pleadings is for Defendants to permit Defense Distributed to place its files into the public domain, in which case they would not be subject to ITAR's restrictions

---

[12] The Government previously stated that there may be means of limiting access to files posted on the Internet to assure that such postings are distributed only domestically. *See* 7/6/2015 Tr. at 32-34, ECF No. 50. But in its narrow-tailoring analysis in *Mance*, the Fifth Circuit made clear that it is "unrealistic to expect" that a compelling public interest can be protected by "expecting . . . each of [hundreds of thousands of private parties to] become, and remain knowledgeable about" a wide variety of subjects necessary to protect the public interest. *See Mance*, 880 F.3d at 190. In *Mance*, that subject was "the handgun laws of the 50 states and the District of Columbia." *Id.* Here, that subject would be the means of identifying U.S. persons who are the residents of the 50 states and D.C., a comparable subject, and the means of falsely identifying one's self over the Internet as a U.S. person, a subject area that is likely to be intricately complex and ever-changing.

DOSWASHINGTONSUP01558

on the export of technical data. *See* 22 C.F.R. § 120.10. Yet this would be even less effective at protecting the public interest in export control as the 3-D printing plans for firearms—and thus, the ability to make export-controlled firearms—could then be taken abroad using all sorts of means, not just by transmission over the Internet. Given that the available alternatives clearly would be ineffective at preventing the broad circumvention of export controls for munitions technology, and that the ITAR is narrowly constructed to regulate only the transfer abroad of arms or the equivalent,[13] the Court should find the challenged restriction to be narrowly tailored to a compelling interest, and therefore, permitted by the Second Amendment. *See Mance*, 880 F.3d at 192. And for the same reasons, the challenged restriction would also satisfy intermediate scrutiny. *See id.* at 196.

## III.   Plaintiffs' Other Claims Should Also Be Dismissed on the Merits.

The SAC contains two additional claims, each of which the Court analyzed in depth in its Order denying Plaintiffs' 2015 motion for a preliminary injunction. First, Plaintiffs seek to enjoin application of the ITAR to Defense Distributed as an *ultra vires* action by the State Department. Second, Plaintiffs assert that the ITAR's limits on the export of technical data are unconstitutionally vague. The Court should now apply its prior analysis to dismiss these claims.

Plaintiffs first allege that application of the ITAR is *ultra vires* in light of a "1985 ITAR amendment." SAC ¶ 52; *see id.* ¶ 17 (describing this amendment as having removed "Footnote 3 to former ITAR Section 125.11"). This Court previously found there was no "likelihood of success" as to this claim, given that the AECA authorizes the regulation of exports and that Defense Distributed's stated purpose of "facilitating global access to firearms" falls squarely within the conduct Congress has authorized the ITAR to regulate. *See DD I* at 690-91. The Court should apply this analysis and dismiss the *ultra vires* claim. Further, even beyond the Court's prior analysis, Plaintiffs' allegation that a licensing requirement for exports of technical data exceeds the "authority conferred by Congress," *id.* ¶ 52, is inconsistent with the plain text of the AECA. Section 2778 authorizes regulation of "technical data," and it provides for "export licenses" to be required,

---

[13] *See* 22 C.F.R. § 120.17(a), supplying relevant definitions of exports, including § 120.17(a)(1) ("[s]ending or taking a defense article out of the United States in any manner"); § 120.17(a)(2) ("transferring technical data to a foreign person in the United States); § 120.17(a)(4), "transferring a defense article to an embassy . . . in the United States").

DOSWASHINGTONSUP01559

explicitly recognizing "technical data" as within the scope of the licensing requirement. 22 U.S.C. §§ 2778(b)(2); 2778(f)(2)(A). In short, Defendants' actions could only be *ultra vires* by exceeding constitutional limitations, not statutory limits.[14]

Plaintiffs' final claim is that the ITAR's regulation of the export of technical data is unconstitutionally vague under the Due Process Clause of the Fifth Amendment. SAC ¶¶ 63-65. As the Court previously observed, this challenge is "hampered because [Plaintiffs] have not made precisely clear which portion of the ITAR language they believe is unconstitutionally vague," ECF No. 43 at 23, a shortcoming Plaintiffs have not rectified in the SAC. *Compare* SAC ¶¶ 11-15 *with* Compl. ¶¶ 12-15. As the Court recognized, "persons of ordinary intelligence are clearly put on notice by the language of the regulations" that "post[ing], on the Internet, . . . directions for the 3D printing of firearms" falls within the scope of the ITAR. *DD I* at 700-01 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statutory term is vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement")). The ITAR's "carefully crafted regulatory scheme," *Zhen Zhou Wu*, 711 F.3d at 13, which defines the terms "defense articles" and "technical data" at length, provides fair notice and is not susceptible to a vagueness challenge. *See DD I* at 701 (describing 22 C.F.R. §§ 120.6 (defining "defense articles"), 120.10(a) (defining technical data) & 121.1 (Munitions List)). Equally, the term "export" is explicitly defined to include "[a]n actual shipment or transmission out of the United States," or "a release in the United States of technical data to a foreign person." 22 C.F.R. § 120.17. For this reason, this Court found no likelihood of success as to Plaintiffs' vagueness challenge, and this Court should now dismiss consistent with its previous analysis. *See DD I* at 700-01 (citing *Zhen Zhou Wu*, 711 F.3d at 13; *U.S. v. Hsu*, 364 F.3d 192 (4th Cir. 2004)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed.

---

[14] Indeed, Plaintiffs acknowledge that the 1985 amendment, on which their *ultra vires* claim hinges, *see* SAC ¶ 52, was enacted not because of limitations imposed by the Congress in the AECA, but "to address First Amendment concerns." *Id.* ¶ 20. This further confirms that no *ultra vires* claim survives dismissal of the constitutional claims.

DOSWASHINGTONSUP01560

Dated: April 6, 2018         Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ ERIC J. SOSKIN*
ERIC J. SOSKIN
Pennsylvania Bar No. 200663
STUART J. ROBINSON
California Bar No. 267183
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7116
Washington, DC 20530
Phone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

*Attorneys for U.S. Government Defendants*

DOSWASHINGTONSUP01561

**CERTIFICATE OF SERVICE**

I certify that on April 6, 2018, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will send notification to

Alan Gura, alan@gurapllc.com
William B. Mateja, mateja@polsinelli.com
William T. "Tommy" Jacks, jacks@fr.com
David S. Morris, dmorris@fr.com
Matthew A. Goldstein, matthew@goldsteinpllc.com
Joshua M. Blackman, joshblackman@gmail.com
*Attorneys for Plaintiffs*

*/s/ Eric J. Soskin*
ERIC J. SOSKIN
Senior Trial Counsel

DOSWASHINGTONSUP01562

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, et al., | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:15-cv-372-RP |
| | § | |
| U.S. DEPARTMENT OF STATE, et al., | § | |
|     Defendants. | § | |

# EXHIBIT A



**United States Department of State**

*Bureau of Political-Military Affairs*
*Directorate of Defense Trade Controls*

*Washington, D.C. 20522-0112*

In Reply refer to
DDTC Cases CJ 651-13 through 660-13

JUN 0 4 2015

YOUR SUBMISSION DATED: June 21, 2013

COMMODITY JURISDICTION DETERMINATIONS FOR: **Liberator Pistol Data Files, .22 Electric Data Files, 125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File, 5.56/.223 Muzzle Brake Data Files, Springfield XD-40 Tactical Slide Assembly Data Files, Sound Moderator - Slip On Data File, "The Dirty Diane" Oil Filter Silencer Adapter Data File, 12 Gauge to .22 CB Sub-Caliber Insert Data Files, Voltlock Electronic Black Powder System Data Files, and VZ-58 Front Sight Data Files**

The data described in your submission are Computer Aided Design (CAD) data files that can be used in a 3D printer to produce physical models of the associated item.

A technical review of your commodity jurisdiction (CJ) request has been concluded by requisite agencies of the United States Government. The findings of that technical review are:

The Department of State has determined that the **125 mm BK-14M High Explosive Anti-Tank Warhead Model Data File, Sound Moderator - Slip On Data File, and "The Dirty Diane" Oil Filter Silencer Adapter Data File are not subject to the jurisdiction of the Department of State.** The Department of Commerce (DOC) advises that these items are classified as EAR99. Please consult the DOC Office of Exporter Services at (202) 482-4811 to satisfy applicable requirements prior to export.

The Department of State has determined that the **Voltlock Electronic Black Powder System Data Files are not subject to the jurisdiction of the**

Continued on Page Two

Cody R. Wilson
Defense Distributed
711 W. 32nd Street, Apt. 115
Austin, TX 78705
crw@defdist.org

DOSWASHINGTONSUP01564

Page Two

In Reply refer to
DDTC Cases CJ 651-13 through 660-13

**Department of State.** However, export may require authorization from the Department of Commerce (DOC). Please consult the DOC Office of Exporter Services at (202) 482-4811 to make a Classification Request (CCATS) and satisfy other applicable requirements prior to export.

The Department of State has determined that the **Liberator Pistol Data Files, .22 Electric Data Files, 5.56/.223 Muzzle Brake Data Files, Springfield XD-40 Tactical Slide Assembly Data Files, 12 Gauge to .22 CB Sub-Caliber Insert Data Files (except for "read me" text file), and VZ-58 Front Sight Data Files are subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR 120 through 130).** They are designated as technical data under Category I(i) of the United States Munitions List (USML) pursuant to §120.10 of the ITAR. A license or other approval is required pursuant to the ITAR prior to any export or temporary import.

Should you not concur with this determination and have additional facts not included in the original submission, you may submit a new CJ request. If you do not concur with this determination and have no additional facts to present, then you may request that this determination be reviewed by the Deputy Assistant Secretary of State for Defense Trade Controls.

Should you require further assistance on this matter, please contact Sam Harmon at (202) 663-2811 or HarmonSC@state.gov.

Sincerely,

C. Edward Peartree
Director
Office of Defense Trade Controls Policy

Cc: Matthew A. Goldstein
1012 14th Street, NW, Suite 620
Washington, DC 20005
matthew@goldsteinpllc.com