**ACTION MEMORANDUM**

**TO:**  Mira R. Ricardel
Under Secretary for Industry and Security

**FROM:**  Richard E. Ashooh
Assistant Secretary for Export Administration

**SUBJECT:**  UPDATE - Transfer of Firearms/Ammunition from the International Traffic in
Arms Regulations to the Export Administration Regulations

**Action Requested**

- Review and clear the attached information memorandum to the Secretary.

**Background**

- The Bureau of Industry and Security (BIS) and the Department of State recently
  forwarded to OMB  proposed rules most small arms (except, fully automatic and
  selective fire weapons) and related ammunition from the State Department's International
  Traffic in Arms Regulations' (ITAR) control to Commerce's Export Administration
  Regulations' control.

BIS Executive Secretariat Clearance:

_____     _____

Joanna M. Lewis                          Date

Attachment     (1) Memorandum to Secretary Ross

**UNDER SECRETARY FOR INDUSTRY AND SECURITY DECISION PAGE**

Transfer of Firearms/Ammunition from the International Traffic in Arms Regulations to the Export Administration Regulations

_ I approve.

_____ I do not approve.

_____ I approve as amended.

_____ I would like to discuss the issue.

**INFORMATION MEMORANDUM FOR THE SECRETARY**

**FROM:**    Mira R. Ricardel

**ISSUE:**    UPDATE Memo re: Transfer of Firearms/Ammunition from the International Traffic in Arms Regulations to the Export Administration Regulations

**CONTEXT & PURPOSE**

This memo is to update you on the transfer of firearms and ammunition from the U.S. Munitions List to the Commerce Control list. You received a memo on this issue previously and this update reflects recent key actions.

**Summary**

The Departments of Commerce and State recently forwarded to the Office of Management and Budget (OMB) their proposed rules which would transfer export control authority over most small arms (except fully automatic and selective fire weapons) and related ammunition from the State Department's International Traffic in Arms Regulations (ITAR) to Commerce's Export Administration Regulations. This is the first concrete, public step taken on an issue that was initiated under the last administration.

**Background**

Under the last administration, an effort was undertaken to rationalize the U.S. export control system by changing the jurisdiction of thousands of military items, mostly parts and components that do not provide a critical military or intelligence capability. These items were transferred from the International Traffic in Arms Regulations (ITAR), administered by the State Department, to the Export Administration Regulations (EAR), administered by the Commerce Department. The items transferred to Commerce are controlled for export under the more flexible procedures of the EAR. The only portions of the U.S. Munitions List (part 121 of the ITAR) that were not completed were Categories I, II and III - firearms, guns and ammunition, respectively. Though there was interagency agreement to make these changes, the last administration chose not to proceed due to political sensitivities. The proposed regulations would transfer to Commerce the licensing of almost all firearms (rifles, pistols, revolvers etc.), parts and components, accessories and ammunition available in the most well stocked firearms or sporting goods store. The major exceptions are fully automatic and selective fire weapons, weapons for caseless ammunitions, silencers and certain high capacity (50 rounds or greater) magazines. These would remain under State/ITAR jurisdiction. Commerce already has licensing jurisdiction for most shotguns and shotgun shells as well as optical sighting devices.



It is estimated that these changes could result in up to 10,000 additional licenses for Commerce to review. It is anticipated that the simpler and less costly licensing process afforded by Commerce export licenses will have a net positive impact on U.S. manufacturing and sales in this market segment. This regulatory action has been highly anticipated by industry, Congress and the media, and has been the subject of several major media news articles.

**Status**
On September 26th, the Departments of State and Commerce submitted to OMB their respective version of the proposed rules which would implement the transfer of authority. The rules are compliant with Executive Order 13771 "Reducing Regulation and Controlling Regulatory Costs". As the rules are now undergoing internal review by OMB, no public discussion of the specifics of the proposals is permitted.

**Next Steps**

**Prepared by**: Steve Clagett, Director, Nuclear and Missile Technology Controls Division, Office of Nonproliferation and Treaty Compliance, x1641.

**ACTION MEMORANDUM**

**TO:**       Mira R. Ricardel
             Under Secretary for Industry and Security

**FROM:**   Richard E. Ashooh
             Assistant Secretary for Export Administration

**SUBJECT:**  UPDATE - Transfer of Firearms/Ammunition from the International Traffic in
             Arms Regulations to the Export Administration Regulations

**Action Requested**

- Review and clear the attached information memorandum to the Secretary.

**Background**

- The Bureau of Industry and Security (BIS) and the Department of State recently
  forwarded to OMB proposed rules for most small arms (except, fully automatic and
  selective fire weapons) and related ammunition from the State Department's International
  Traffic in Arms Regulations' (ITAR) control to Commerce's Export Administration
  Regulations' control.

BIS Executive Secretariat Clearance:

_____   _____

Joanna M. Lewis             Date

Attachment     (1) Memorandum to Secretary Ross

**UNDER SECRETARY FOR INDUSTRY AND SECURITY DECISION PAGE**

Transfer of Firearms/Ammunition from the International Traffic in Arms Regulations to the Export Administration Regulations

_ I approve.

_____ I do not approve.

_____ I approve as amended.

_____ I would like to discuss the issue.

**INFORMATION MEMORANDUM FOR THE SECRETARY**

**FROM:**     Mira R. Ricardel

**ISSUE:**     UPDATE Memo re: Transfer of Firearms/Ammunition from the International
Traffic in Arms Regulations to the Export Administration Regulations

**CONTEXT & PURPOSE**

This memo is to update you on the transfer of firearms and ammunition from the U.S. Munitions
List to the Commerce Control list. You received a memo on this issue previously and this update
reflects recent key actions.

**Summary**
The Departments of Commerce and State recently forwarded to the Office of Management and
Budget (OMB) their proposed rules which would transfer export control authority over most
small arms (except fully automatic and selective fire weapons) and related ammunition from the
State Department's International Traffic in Arms Regulations (ITAR) to Commerce's Export
Administration Regulations. This is the first concrete, public step taken on an issue that was
initiated under the last administration.

**Background**

Under the last administration, an effort was undertaken to rationalize the U.S. export control
system by changing the jurisdiction of thousands of military items, mostly parts and components
that do not provide a critical military or intelligence capability.  These items were transferred
from the International Traffic in Arms Regulations (ITAR), administered by the State
Department, to the Export Administration Regulations (EAR), administered by the Commerce
Department.  The items transferred to Commerce are controlled for export under the more
flexible procedures of the EAR.  The only portions of the U.S. Munitions List (part 121 of the
ITAR) that were not completed were Categories I, II and III - firearms, guns and ammunition,
respectively.  Though there was interagency agreement to make these changes, the last
administration chose not to proceed due to political sensitivities.  The proposed regulations
would transfer to Commerce the licensing of almost all firearms (rifles, pistols, revolvers etc.),
parts and components, accessories and ammunition available in the most well stocked firearms or
sporting goods store.  The major exceptions are fully automatic and selective fire weapons,
weapons for caseless ammunitions, silencers and certain high capacity (50 rounds or greater)
magazines.  These would remain under State/ITAR jurisdiction.  Commerce already has
licensing jurisdiction for most shotguns and shotgun shells as well as optical sighting devices.



It is estimated that these changes could result in up to 6,000 additional licenses for Commerce to review. It is anticipated that the simpler and less costly licensing process afforded by Commerce export licenses will have a net positive impact on U.S. manufacturing and sales in this market segment. This regulatory action has been highly anticipated by industry, Congress and the media, and has been the subject of several major media news articles.

**Status**

On September 26th, the Departments of State and Commerce submitted to OMB their respective version of the proposed rules which would implement the transfer of authority. The rules are compliant with Executive Order 13771 "Reducing Regulation and Controlling Regulatory Costs". As the rules are now undergoing internal review by OMB, no public discussion of the specifics of the proposals is permitted.

**Next Steps**

OMB has directed the agencies reviewing the Commerce and State proposed rules to provide comments and/or clearance by October 11, 2017. OMB may take up to 90 days to review the rules, although they have indicated to Commerce and State that they do not believe it will take that long. Once OMB clears the rule for publication, Commerce and State will sign the respective rules for publication in the Federal Register. The rules will include a 45-day comment period.

Once finalized, BIS will engage in an active outreach program with the impacted industry to facilitate understanding and compliance with the rules changes.

**Prepared by**: Steve Clagett, Director, Nuclear and Missile Technology Controls Division, Office of Nonproliferation and Treaty Compliance, x1641.

**ACTION MEMORANDUM**

**TO:**         Mira R. Ricardel
                     Under Secretary for Industry and Security

**FROM:**      Richard E. Ashooh
                     Assistant Secretary for Export Administration

**SUBJECT:**   Transfer of Firearms/Ammunition from the International Traffic in Arms
                     Regulations to the Export Administration Regulations

**Action Requested**

- Review and clear the attached information memorandum to the Secretary.

**Background**

- The Bureau of Industry and Security (BIS) is prepared to publish its regulations transferring most small arms (except, fully automatic and selective fire weapons) and related ammunition from the State Department's International Traffic in Arms Regulations' (ITAR) control to Commerce's Export Administration Regulations' control.

BIS Executive Secretariat Clearance:

_____    _____

Joanna M. Lewis                   Date

Attachment     (1) Memorandum to Secretary Ross

**UNDER SECRETARY FOR INDUSTRY AND SECURITY DECISION PAGE**

Transfer of Firearms/Ammunition from the International Traffic in Arms Regulations to the Export Administration Regulations

_ I approve.

_____ I do not approve.

_____ I approve as amended.

_____ I would like to discuss the issue.

**INFORMATION MEMORANDUM FOR THE SECRETARY**

**FROM:** Mira R. Ricardel

**ISSUE:** Transfer of Firearms/Ammunition from the International Traffic in Arms Regulations to the Export Administration Regulations

**CONTEXT & PURPOSE**

This memo is to update you on the transfer of export authority over firearms and ammunition from the U.S. Munitions List to the Commerce Control list.

**Background**

Under the last administration, an effort was undertaken to rationalize the U.S. export control system by changing the jurisdiction of thousands of military items that do not provide a critical military or intelligence capability. These items were transferred from the International Traffic in Arms Regulations (ITAR), administered by the State Department, to the Export Administration Regulations (EAR), administered by the Commerce Department. The items transferred to Commerce are controlled for export under the more flexible procedures of the EAR. The only portions of the U.S. Munitions List (part 121 of the ITAR) that were not completed were Categories I, II and III - firearms, guns and ammunition, respectively. Though there was interagency agreement to make these changes, the last administration chose not to proceed due to political sensitivities. The proposed regulations would transfer to Commerce the licensing of almost all firearms (rifles, pistols, revolvers etc.), parts and components, accessories and ammunition available in the most well stocked firearms or sporting goods store. The major exceptions are fully automatic and selective fire weapons, weapons for caseless ammunitions, silencers and certain high capacity (50 rounds or greater) magazines. These would remain under State/ITAR jurisdiction. Commerce already has licensing jurisdiction for most shotguns and shotgun shells as well as optical sighting devices.

It is estimated that these changes could result in up to 10,000 additional licenses for Commerce to review. It is anticipated that the simpler and less costly licensing process afforded by Commerce export licenses will have a net positive impact on U.S. manufacturing and sales in this market segment. This regulatory action is highly anticipated by industry, Congress, and the media.

**Status**
Commerce and State are required to publish separate but compatible rules to implement this change. Commerce is preparing to submit its rule to OMB as soon as tomorrow.

**Prepared by**: Steve Clagett, Director, Nuclear and Missile Technology Controls Division, Office of Nonproliferation and Treaty Compliance, x1641.

## FACT SHEET
*Revising Categories I, II and III*

### WHAT CHANGES WILL OCCUR?

The Administration proposes to transfer control of certain firearms from the State Department's United States Munitions List (USML) to the Commerce Department Control List, culminating an effort that began in 2011 during the Obama administration. These changes will significantly reduce the burden on the U.S. firearms and ammunition industry, promote American exports, and clarify the regulatory requirements for independent gunsmiths, while continuing to restrict sales where human rights or diversion are of concern. All of the items currently controlled for export by the State Department that are determined to no longer warrant ITAR control under USML Categories I, II and III will be controlled under the Commerce Control List (CCL). To accommodate the new items, the Commerce Department will create new entries on the CCL in the 500 and 600 series. Items that still warrant ITAR control, such as suppressors, will be retained on the USML.

### WHAT ITEMS ARE INCLUDED?

The items are mostly firearms that are widely available for commercial sale as well as ammunition, accessories and components that are compatible with those items. The Commerce and State rules will improve clarity by creating a bright line for exporters on which items are controlled by the Commerce Department and those controlled by the State Department. The State rule will establish the bright jurisdictional line and the Commerce rule will ensure clear and appropriate controls are in place under the EAR for the items no longer warranting ITAR control.

### WILL THIS REMOVE EXPORT CONTROLS ON SOME FIREARMS?

No. The U.S. Government is not removing export authorization requirements for any firearms or ammunition. All of the items currently controlled for export by the State Department will continue to be controlled on the CCL. Proposed licenses for firearms exports will continue to undergo a rigorous review not only by the Commerce Department, but also by the Departments of State and Defense, and by other agencies as appropriate, to ensure that sales are prohibited where human rights considerations or diversion to adversaries are of concern.

### HOW WILL COMMERCE PREVENT HUMAN RIGHTS VIOLATIONS AND DIVERSION?

The Commerce Department currently administers a robust export control regime that restricts technologies or other items that could undermine U.S. national security and foreign policy goals. This robust export control regime includes imposing restrictive requirements or outright prohibitions on proscribed persons (*e.g.*, foreign terrorist organization and other parties involved in activities that are contrary to U.S. national security and foreign policy interests) from receiving items that are subject to the EAR. This system places strict limits on items that could enable attacks to our cyber networks, promote proliferation of weapons of mass destruction and other threats. Applying this proven system to firearms is sensible policy.



The Bureau of Industry and Security also has decades of experience with imposing appropriate controls on shotguns with barrel length 18 inches (45.72 cm) or over, and for other items such as discharge type arms and devices to administer electric shock. These decades of experience include ensuring that exports and reexports of such items are consistent with U.S. multilateral commitments, such as those under the Firearms Convention and protect U.S. national security and foreign policy interests.

The Bureau of Industry and Security's Office of Export Enforcement vigorously enforces export controls and works with other law enforcement agencies in the U.S. and abroad to find and prosecute violators. Office of Export Enforcement investigations have resulted in violators being subject to significant monetary fines and lengthy jail terms and have played an indespensible role in helping the United States Government to disrupt and shut down networks used to develop improvised explosive devices (IEDs) and other activities counter to U.S. national security and foreign policy interests. Longstanding end-use monitoring efforts, including a thorough review of potential end-users, are intended to prevent those engaged in human rights abuses and diversion from acquiring these or other weapons. Such enforcement tools would become available for firearms that transfer to the Commerce Department.

HOW WILL THIS CHANGE OCCUR?

The Departments of Commerce and State intend to publish rules seeking public comment on the proposed changes. Both proposed rules are currently undergoing review and coordination through the Office of Management and Budget.

**DP**

**Assistant Secretary Rich Ashooh Media Call on Firearms Export Regulations**

- Thank you, Assistant Secretary Cooper, and thanks to you all for joining us today.

- The action we are announcing today is the culmination of an effort that encompasses two presidential administrations, an extensive interagency regulatory process, significant Congressional interaction, and robust public input. I'd like to take this opportunity to thank the hardworking employees of the Departments of State and Commerce who were so deeply involved in this rulemaking.

- These rules are the product of a larger effort since 2010 to modernize and rationalize U.S. export control regulations to create a simpler and more robust system that eases industry compliance, improves enforceability, and better protects America's most sensitive technologies.

- The Administration is publishing these rules after an extensive multiyear interagency review process by the Departments of State, Commerce, Defense, Homeland Security, and Justice, which included evaluating responsive comments received on the proposed rules.

- These changes will significantly reduce the regulatory burden on the U.S. commercial firearms and ammunition industry, promote American exports, and clarify the regulatory requirements for independent gunsmiths, which will enable the U.S. government to better prioritize national security controls and continuing our ability to restrict exports where human rights, illicit trafficking, and related issues may be of concern.

- I would like to stress: these changes WILL NOT decontrol exports of any firearms or ammunition. The export of items that transfer from the U.S. Department of State's U.S. Munitions List (USML) in the International Traffic in Arms Regulations (ITAR), to the Department of Commerce's Commerce Control List (CCL) in its Export Administration Regulations (EAR) will continue to require U.S. Government authorization, including an interagency review involving the Departments of State and Defense of every license. The U.S. Government would continue to consider the risk of human rights abuses and illicit diversion associated with such exports.

- This rulemaking WILL NOT have any impact on the ability of American citizens in the United States to exercise their second amendment rights. These proposed changes relate only to the export and temporary importation of some types of firearms and ammunition.

U.S. DEPARTMENT OF STATE
Office of the Spokesperson

For Immediate Release                                      [DATE], 2017

**Fact Sheet: Revisions to Categories I, II and III of the U.S. Munitions List**

On [Date] the Departments of State and Commerce published interim final rules in the Federal Register that amend Categories I, II and III of the U.S. Munitions List (USML, ITAR 126.1), effective 180 days from the date of publication. Under the Arms Export Control Act, the State Department determines what commodities are controlled for export by the USML. These changes will significantly reduce the burden on the U.S. firearms and ammunition industry, promote American exports, and clarify the regulatory requirements for independent gunsmiths, while continuing to restrict sales where human rights or misdirection are of concern. The changes made under these regulations include:

- USML Category I: This rule revises USML Category I, covering firearms and related articles, to control only weapons that are uniquely military or that are not otherwise widely available for commercial sale. In particular, control of the export of non automatic and semi automatic firearms to caliber .50 (12.7mm) inclusive (and all of the parts, components, accessories, and attachments specially designed for those articles), which are controlled by the State Department, will be subject to the new 500 series controls in Category 0 of the Commerce Control List, published separately by the Department of Commerce.

- USML Category II: This rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles. While high caliber weaponry such as self propelled guns and howitzers will remain controlled by State, certain parts and components for these systems, such as engines, will shift to Commerce control.

- USML Category III: This rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

The Administration welcomes comments on these changes, which reduce red tape for a key part of our nation's defense industrial base while continuing to prioritize national security controls.

For further information, please contact the [ HYPERLINK "http://www.state.gov/t/pm/" ], Office of Congressional and Public Affairs at [ HYPERLINK "mailto:PM_CPA@state.gov" ] and follow us on Twitter @StateDeptPM.

# # #

Drafted:     Josh Paul, PM/CPA, 7 7878

Approved:    PM A A/S AMB Tina Kaidanow

Cleared:     PM/FO:          DAS Nilsson
             DTCP:           EPeartree       ()
             ISN/SCO:        MDudding        ()
             ISN:            AGanzer         ()
             L/PM:           SRogers         ()
             T:              EAbisellan      ()
             P:              SHiggins
             D:              CCurran
             S/P:            ROutzen

             Commerce/BIS:   ECottilli
             Defense/DTSA:   VBlake          ()
             Justice/ATF:    LBurton
             NSC:            PPeterson

**Billing Code: 3510-33-P**

**DEPARTMENT OF COMMERCE**

**Bureau of Industry and Security**

**15 CFR Parts 740, 742, 746, 748, 758, 762, 772 and 774**

**[Docket No.]**

**RIN 0694-AF47**

**Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML).**

**AGENCY:  Bureau of Industry and Security, Department of Commerce.**

**ACTION:  Proposed rule.**

**SUMMARY:**

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I    Firearms, Close Assault Weapons and Combat Shotguns; Category II    Guns and Armament; and Category III Ammunition/Ordnance would be controlled under the Commerce Control List (CCL).  This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II and III of the USML to describe more precisely the articles warranting continued control on that list.

The revisions proposed in this rule are part of Commerce's retrospective plan under Executive Order 13563 completed in August 2011.  Commerce's full plan can be accessed at: [ HYPERLINK "http://open.commerce.gov/news/2011/08/23/commerce-plan-retrospective-analysis-existing-rules" ].

**DATES:** Comments must be received by [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

[ PAGE  \* MERGEFORMAT ]

**ADDRESSES:** Submit comments via Federal eRulemaking Portal: [ HYPERLINK "http://www.regulations.gov" ]. You can find this proposed rule by searching on its regulations.gov docket number, which is BIS-2012-0025.

**FOR FURTHER INFORMATION CONTACT:** Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641 or e-mail [ HYPERLINK "mailto:steven.clagett@bis.doc.gov" ].

**SUPPLEMENTARY INFORMATION:**

**Background**

This is the last in the initial series of planned proposed rules describing how various types of articles the President determines, as part of the Administration's Export Control Reform Initiative, no longer warrant Unites States Munitions List (USML) control, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR). This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Categories I, II, and III to describe more precisely items warranting continued control on that list.

The revisions proposed in this rule are part of Commerce's retrospective plan under EO 13563 completed in August 2011. Commerce's full plan can be accessed at: [ HYPERLINK "http://open.commerce.gov/news/2011/08/23/commerce-plan-retrospective-analysis-existing-rules" ].

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the proposed amendments. The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) proposed in this rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items. BIS encourages the public to comment on whether the proposed rule describes items that are not widely available in commercial outlets or does not describe items that are.

As part of the Export Control Reform Initiative, BIS has created ECCNs to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

[ PAGE \* MERGEFORMAT ]

Items that are currently controlled in Category II of the USML would be controlled in four new "600 series" ECCNs. These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in § 738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles. Placement of the items currently in Category II into the 600 series is consistent with the practice followed throughout the Export Control Reform Initiative of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non-military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

Although the firearms and other items described in this proposed rule are widely used for sporting applications, BIS is not proposing their "de-control." Thus, for example, licenses will still be required to export to any country (except Canada) a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule. Rather, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs on the U.S. firearms industry while allowing the U.S. Government to control firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule.

All references to the USML in this rule are to the list of defense articles that are controlled for purposes of export, temporary import, or brokering pursuant to the International Traffic in Arms Regulations (ITAR), 22 C.F.R. Parts 120-130, while references to the United States Munitions Import List (USMIL) are to the list of defense articles that are controlled by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for purpose of permanent import under its regulations at 27 CFR Part 447. All defense articles described in the USMIL or the USML are subject to the brokering controls administered by the U.S. Department of State in part 129 of the ITAR. The transfer of defense articles from the ITAR's USML to the EAR's CCL for purposes of export controls does not affect the list of defense articles controlled on the USMIL under the Arms Export Control Act (AECA), 22 U.S.C. 2778 *et seq.* for purposes of permanent import or brokering controls.

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items. After review, the Defense

DOC_0000348

Department concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from technology that is widely available. Moreover, they have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR. There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in this proposed new ECCN for sale to the general public. Firearms available through these retail outlets include .22 caliber rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their accessories and attachments.

An additional justification for the proposed change in the jurisdictional status of the items described in this rule is that the current ITAR controls are harmful to U.S. industry without any proportionate benefits to United States national security or foreign policy objectives. Similar to the challenges faced by other industries, the firearms trade has been negatively affected by the incentives the ITAR creates to avoid U.S.-origin content. Under the ITAR, any part, component, accessory, or attachment for any of the firearms described in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated into foreign-made items or reexported to any third country. Similarly, a technical drawing of such part, component, accessory or attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person concerning those items, such as the application of protective coatings. Moreover, a U.S. person engaged in manufacturing or exporting these items or providing related defense services must register with the State Department under the ITAR. Thus, even if a U.S. company can manufacture or service these items at a lower cost in the United States, it may not be competitive with foreign manufacturers or service providers because of such restrictions

Pursuant to section 38(f) of the AECA, the President shall review the USML "to determine what items, if any, no longer warrant export controls under" the AECA. The President must report the results of the review to Congress and wait 30 days before removing any such items from the USML. The report must "describe the nature of any controls to be imposed on that item under any other provision of law." 22 U.S.C. § 2778(f)(1).

This is one of two proposed rules that are being published simultaneously by the Departments of Commerce and State. Collectively, the rules address defense articles currently controlled under Categories I (Firearms, Close Assault Weapons and Combat Shotguns), II (Guns and Armament), and III (Ammunition/Ordnance) of the USML.

In addition, this rule would clarify the scope of some ECCNs currently on the CCL and would renumber some ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items. BIS is interested in comments as to whether readers find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. Readers are invited to comment on the appropriateness of these license requirements and licensing policies.

[ PAGE \* MERGEFORMAT ]

**Detailed Description of Changes Proposed by This Rule**

**Creation of new ECCNs.**

This proposed rule would create 16 new ECCNs to control items proposed for removal from the USML. A discussion of each ECCN and the controls that would apply to items under that ECCN follows below.

*New ECCN 0A501: Firearms and related items.*

New ECCN 0A501 would apply national security (NS Column 1), regional stability (RS Column 1), firearms convention (FC Column 1), United Nations (UN), and anti-terrorism (AT Column 1) reasons for control to the following firearms, the following enumerated parts and components and to "specially designed" "parts," "components," "accessories" and "attachments" for those firearms and parts and components:

- Non-automatic and semi-automatic firearms (other than shotguns) with a caliber of less than or equal to .50 inches (12.7 mm);

- Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols with a caliber greater than .50 inches (12.7 mm) but not greater than .72 inches (18.0 mm);

- Detachable magazines with a capacity of greater than 16 rounds "specially designed" for the firearms listed above;

- Receivers (frames) and complete breech mechanisms, including castings, forgings, or stampings thereof, "specially designed" for the firearms listed above; and

- Barrels, cylinders, barrel extensions, mounting blocks (trunnions), bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips, and buttstocks that contain fire control parts if "specially designed" for the firearms listed above or for firearms listed in USML Category I (unless the part or component itself is listed in USML Category I(g) or (h) as proposed in the Department of State proposed rule entitled "Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Categories I, II, and III," also published in this issue).

ECCN 0A501.y would be subject only to anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would cover such items as scope mounts or accessory rails, iron sights, sling swivels, butt plates, recoil pads, bayonets, and stocks or grips that do not contain any fire control parts.

A note to ECCN 0A501 would state that certain firearms and similar items are EAR99, *i.e.*, subject to the EAR but not on the CCL. Those items are: Antique firearms (*i.e.*, those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles.

DOC_0000350

Another note to ECCN 0A501 would make clear that the ECCN 0A501 does not control "accessories" and "attachments" (e.g., belts, slings, cleaning kits) and detachable magazines or magazine parts not specifically identified in paragraph .e or paragraph .y.

*New ECCN 0A502.*

Proposed ECCN 0A502 would control both the shotguns currently on the USML that are proposed to be added to the CCL (barrel length less than 18 inches) and the shotguns and parts currently controlled in ECCN 0A984 (barrel length 18 inches or greater). Shotguns currently controlled in ECCN 0A984 would retain their current reasons for control of firearms convention (FC), crime control (CC Column 1, 2 or 3 depending on barrel length and end user) and United Nations (UN). Shotguns with a barrel length less than 18 inches would be controlled CC Column 1, FC, UN and AT Column 1 plus regional stability (RS Column 1), consistent with their current control on the USML. The shotguns controlled in 0A502 would not be controlled for national security reasons because they are not on the WAML.

*New ECCN 0A503.*

This rule would replace existing ECCN 0A985 with a new ECCN 0A503. The rule would add "grenade launchers 'specially designed' for non-lethal or less-lethal grenades (e.g., chemical irritant, beanbag rounds) non-lethal or less-lethal grenades and projectiles and 'specially designed' 'parts' and 'components' of those projectiles" to the description of controlled items in the header of ECCN 0A985 to make clear that such launchers and projectiles are classified in that ECCN 0A503 and not classified under ECCN 0A602 or on the USML. Renumbering this ECCN would cause it to be placed closer to the entries controlling firearms. BIS expects that this renumbering would make it easier for readers to identify items on the CCL by placing similar or related items in closer proximity to each other.

*New ECCN 0A504.*

New ECCN 0A504 would replace existing ECCN 0A987, which controls optical sighting devices for firearms. The reasons for control table, which currently states, *inter alia*, that the Firearms Convention (FC) reason for control applies to "optical sights for firearms, would be revised to state specifically that the FC reason for control applies to all paragraphs in the ECCN except the one that controls laser pointing devices. This change would make clear, consistent with BIS's existing interpretation, that such devices are not optical sights and are not subject to the FC reason for control. The new number is intended to make identifying items on the CCL easier by grouping similar or related items closer to each other.

*New ECCN 0A505.*

New ECCN 0A505 would impose national security (NS Column 1), regional stability (RS Column 1), firearms convention (FC), United Nations (UN), and anti-terrorism (AT Column 1) controls on ammunition not enumerated on the USML, for firearms classified under proposed ECCN 0A501, and for most parts and components of such ammunition. Such ammunition would be for small arms, in most cases, firearms of caliber not exceeding 0.50 inches, although some ammunition for firearms of caliber up to 0.72 inches would be included. This proposed rule

DOC_0000351

would retain the CCL reasons for control currently found in ECCNs 0A984 and 0A986 for shotgun shells. Buckshot shotgun shells would be subject to the CC Column 1, FC and UN reasons for control. Other shotgun shells would be subject to the FC, UN and AT (North Korea only) reasons for control. Only parts and components would be eligible for License Exception LVS. Ammunition for larger caliber weapons such as mortars, howitzers, and cannon would remain in USML Category III. Ammunition that has little or no civil use or that is inherently military such as ammunition that is preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile also would remain in USML Category III. Possession of the ammunition that would be added to the CCL by this rule does not provide a critical military advantage to the United States. Blank ammunition for firearms controlled by proposed ECCN 0A501 and not enumerated in Category III of the USML would be controlled for United Nations and anti-terrorism reasons only. Consolidating all ammunition on the CCL into one ECCN would simplify use of the CCL.

Inclusion of this ammunition on the CCL is appropriate because such ammunition is available from a number of countries, some of which are not close allies of the United States or members of multilateral export control regimes. Possession of this ammunition does not confer a military advantage on the United States.

### *New ECCN 0A602.*

Proposed ECCN 0A602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) controls on guns and armament manufactured between 1890 and 1919 and for military flame throwers with an effective range less than 20 meters. It would impose those same reasons for control on parts and components for those commodities and for defense articles in USML Category II if such parts or components are not specified elsewhere on the CCL or USML. A note to 0A602 confirms that black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are EAR99 items. Inclusion of these guns and armament on the CCL is appropriate because they do not confer a significant military or intelligence advantage on the United States. The guns controlled in this ECCN are between 95 and 115 years old. The parts, components, accessories and attachments controlled in this ECCN include some that are for modern artillery. However, many nations possess and produce modern artillery. Possession of modern artillery does not confer a significant military or intelligence advantage on the United States.

### *New ECCN 0B501: Test, inspection and production equipment for firearms.*

New ECCN 0B501 would cover "Test, inspection and production 'equipment' and related commodities for the 'development' or 'production' of commodities enumerated in ECCN 0A501 or USML Category I." This new ECCN would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to four specific types of machinery and to one class of items. The four specific types of machinery are: small arms chambering machines, small arms deep hole drilling

DOC_0000352

machines and drills therefor, small arms rifling machines, and small arms spill boring machines. The class of items covers dies, fixtures and other tooling "specially designed" for the production of items in proposed USML Category I or ECCN 0A501. The NS and RS reasons for control do not apply to equipment for the development or production of commodities in ECCN 0A501.y because those reasons for control apply do not apply to the commodities in ECCN 0A501.y themselves.

The first four specific items noted above currently are listed in ECCN 2B018, paragraphs .o, .p, .q, and .r and would be listed in paragraphs .a, .b, .c and .d of ECCN 0B501. In addition, the class of items in new 0B501 that is currently included within ECCN 2B018, paragraph .n (jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of firearms, ordnance, and other stores and appliances for land, sea or aerial warfare) would, if applicable to firearms controlled in 0A501, be subsumed in paragraph .e. Jigs, fixtures and metal working implements currently in 2B018 that are applicable to larger guns would be controlled in ECCN 0B602 and are discussed below.

Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve a license.

*New ECCN 0B505.*

Proposed ECCN 0B505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III, and "specially designed" parts and components therefor, that are "specially designed" for the "production" of ammunition other than shotgun shells and certain blank ammunition. Equipment for manufacturing shotgun shells that do not contain buckshot and equipment for hand loading cartridge and shotgun shells would be controlled for the AT (North Korea only) and UN reasons for control, which are the reasons for control that currently apply to this equipment in ECCN 0B986.

The equipment controlled in ECCN 0B505 is used to produce conventional ammunition and is similar to equipment that is in operation in a number of countries, some of which are not allies of the United States or members of multinational export control regimes. Possession of such equipment does not confer a significant military advantage on the United States, and thus its inclusion on the CCL is appropriate.

*New ECCN 0B602.*

Proposed ECCN 0B602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on test, inspection and production equipment enumerated for commodities enumerated in ECCN 0A602 or USML Category II. ECCN 0B602 would control eight specific types of equipment that

currently are listed in paragraphs .e through .l of ECCN 2B018. Those eight specific types of equipment are: Gun barrel rifling and broaching machines and tools therefor; Gun barrel rifling machines; Gun barrel trepanning machines; Gun boring and turning machines; Gun honing machines of 6 feet (183 cm) stroke or more; Gun jump screw lathes; Gun rifling machines; and Gun straightening presses. ECCN 0B602 also would control one class of equipment that is included within ECCN 2B018 paragraph .n (jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II). Moving these items from 2B018 to 0B501 would retain the national security (NS Column 1), anti-terrorism (AT Column 1) and United Nations (UN) reasons for control and would raise the regional stability reason for control from RS Column 2 to RS Column 1. This would cause no change in destination-based license requirements, but would allow consideration of whether the export or reexport could contribute to instability in any region, not just the region to which the items is exported or reexported in considering whether to approve or reject a license application.

Additionally, ECCN 0B602 would control any other tooling and equipment that is "specially designed" for the production of items in ECCN 0A602 or USML Category II along with test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

*New ECCN 0D501.*

Proposed ECCN 0D501 would apply national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls to "software" "specially designed" for the "development," "production," operation or maintenance of all commodities classified under ECCNs 0A501 or 0B501 except those classified under 0A501.y. "Software" for ECCN 0A501.y would be controlled only for United Nations and anti-terrorism reasons to match the reason for control that applies to commodities classified under that paragraph.

*New ECCN 0D505.*

Proposed ECCN 0D505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A505.a and .x (rifle, pistol, carbine and revolver ammunition and parts and components therefor) or 0B505.a and .x. However, only United Nations and anti-terrorism controls would apply to "software" for the blank ammunition in ECCN 0A505.d.

*New ECCN 0D602.*

Proposed ECCN 0D602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by ECCNs 0A602 or 0B602.

DOC_0000354

*New ECCN 0E501.*

Proposed ECCN 0E501 would apply the national security (NS Column 1), regional stability (RS Column 1), United Nations (UN) and anti-terrorism (AT Column 1) reasons for control to "technology" for the "development" and "production" of firearms other than shotguns. This new ECCN also would apply the anti-terrorism and United Nations reasons for control to "technology" for the operation, installation, maintenance, repair, overhaul or refurbishing of such firearms. Controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the development, production, operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States.

*New ECCN 0E502.*

Proposed ECCN 0E502 would apply the crime control (CC Column 1) and United Nations (UN) reasons for control to "technology" required for the development or production of shotguns that would be controlled in new ECCN 0A502. Crime control and United Nations are the reasons for control currently imposed on "technology" required for the development or production of shotguns in ECCN 0E984. The only difference between shotguns currently on the CCL and those that would be added by this proposed rule is barrel length. BIS believes that technology related to shotguns does not vary significantly based on the barrel length of the shotgun. Attempts to apply different reasons for control or to control different types of technology based solely on the barrel length of the shotgun would likely be ineffective.


*New ECCN 0E505.*

Proposed ECCN 0E505 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.a and .x (rifle and pistol ammunition and parts and components); 0B505 equipment for those commodities; and "software" for that equipment and those commodities controlled by 0D505. Technology for the development or production of buckshot shotgun shells would be controlled for crime control (CC Column 1) and UN reasons. United Nations and anti-terrorism (AT Column 1) controls would apply to "technology" for the blank ammunition (controlled in 0A505.d) for firearms controlled in ECCN 0A501 and to "technology" for that ammunition and "technology" for "software" for that ammunition. Inclusion of this "technology" on the CCL is appropriate because, like the ammunition and production equipment addressed by this rule, it is widely available, including in countries that are not allies of the United States or members of multilateral export control regimes and thus confers no military advantage on the United States.

*New ECCN 0E602.*

Proposed ECCN 0E602 would impose national security (NS Column 1), regional stability (RS Column 1), United Nations (UN), and anti-terrorism (AT Column 1) controls on "technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by ECCNs 0A602 or 0B602, or "software" controlled by 0D602.

**Revisions to five ECCNs.**

*Revision to ECCN 0A918:  Bayonets.*

ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism, and United Nations reasons.  This proposed rule would remove bayonets from ECCN 0A918 and add them to the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control.  Bayonets and the "technology" to produce them are available in many countries.  Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective.

*Revision to ECCN 0E982.*

ECCN 0E982 controls "technology" exclusively for the development or production of equipment controlled by ECCN 0A982 or 0A985.  This rule would replace "0A985," which applies to discharge type arms and some other crime control equipment, with 0A503 to conform to the replacement of ECCN 0A985 with new ECCN 0A503 proposed elsewhere in this rule.

*Revisions to ECCN 2B018.*

This proposed rule would remove and reserve paragraphs .e, .f, .g, .h, .i, .j, and .l from ECCN 2B018 because the commodities listed in those paragraphs would be listed in ECCN 0B602.  It would remove paragraph .n, because the commodities listed in that paragraph would be controlled under either ECCN proposed ECCNs 0B501 or 0B602 or under existing ECCN 0B606.  It would remove paragraphs .o, .p, .q, and .r because the commodities listed in those paragraphs would be controlled in ECCN 0B501.

*Revisions to ECCN 2B004.*

As a conforming change, this rule would replace the reference to ECCN 2B018 in the related controls paragraph of ECCN 2B004 with references to ECCNs 0B501, 0B502 and 0B606.  This rule proposes no substantive changes to ECCN 2B004.

*Revisions to ECCN 2D018.*

Currently ECCN 2D018 controls software for the "development," "production" or "use" of equipment controlled by ECCN 2B018.  As a conforming change, this rule would replace the control text of ECCN 2D018 with a statement referring readers to ECCNs 0D501, 0D602 and 0D606.

**Removal of eight ECCNs.**

*Removal of ECCN 0A918.*

    ECCN 0A918 controls "bayonets" for regional stability, anti-terrorism and United Nations reasons. They are the last remaining commodity controlled by that ECCN, the others having been removed by previous Export Control Reform rules. This proposed rule would control bayonets under the .y paragraph of proposed ECCN 0A501, where they would be subject to United Nations and anti-terrorism (AT column 1) reasons for control. Bayonets and the "technology" to produce them are available in many countries. Possession of bayonets does not confer a significant military advantage on the United States and attempting to restrict their availability by requiring a license for export to most destinations is unlikely to be effective.

*Removal of ECCN 0A984.*

    This proposed rule would remove ECCN 0A984 because all of the commodities that it currently controls would be controlled by either ECCN 0A502 or 0A505. As conforming changes, references to ECCN 0A984 would be replaced with references to ECCN 0A502 or 0A505 or both, as appropriate in §§ 742.7(a)(1), (2) and (3); 742.17(f) and 748.12(a)(1).

*Removal of ECCN 0A985.*

    This proposed rule would remove ECCN 0A985 because all of the commodities that it currently controls would be controlled by ECCN 0A503. As conforming changes, references to ECCN 0A985 would be replaced with references to ECCN 0A504 in §§ 740.20(b)(2); 742.7(a)(4) and (c); 746.7(a) and ECCN 0E982.

*Removal of ECCN 0A986.*

    This proposed rule would remove ECCN 0A986 because all of the commodities that it currently controls would be controlled by 0A505.c. As conforming changes, references to ECCN 0A986 would be replaced with references to ECCN 0A505.c in §§ 742.17(f); 742.19(a)(1); 746.3(b)(2) and 748.12(a)(1)

*Removal of ECCN 0A987.*

    This proposed rule would remove ECCN 0A987 because new ECCN 0A504 would control all commodities currently controlled by ECCN 0A987. As conforming changes, references to ECCN 0A987 would be replaced with references to ECCN 0A504 in §§ 742.7(a)(1); 742.17(f) and 748.12(a)(1).

*Removal of ECCN 0B986.*

    This rule would remove ECCN 0B986 because all of the commodities that it controls would be controlled in ECCN 0B505.c. As conforming changes, references to ECCN 0B986 would be replaced with references to 0B505.c in §§ 742.19(a) and 772.1, definition of specially designed Note 1.

*Removal of ECCN 0E918.*

DOC_0000357

This proposed rule would remove ECCN 0E918, which controls "technology" for the "development," "production," or "use" of bayonets for regional stability, United Nations, and anti-terrorism reasons. Because "technology" for the "development," "production," or "use" of bayonets is widely known, any attempt to limit its dissemination through export license requirements is unlikely to be effective.

*Removal of ECCN 0E984.*

This proposed rule would remove ECCN 0E984, which controls "technology" for the development of shotguns and buckshot shotgun shells, because such "technology" would be controlled under ECCN 0E502 (shotguns) or 0E505 (buckshot shotgun shells). As a conforming change, this proposed rule would replace a reference to ECCN 0E984 in § 742.7(a) with references to ECCNs 0E502 and 0E505.

**Availability of License Exceptions.**

Many of the items in the new "600 series" ECCNs generally would be eligible for the same license exceptions as other "600 series" ECCNs and subject to the same restrictions on use of license exceptions as other "600 series" ECCNs. BIS intends that those restrictions be no more restrictive than the ITAR license exemption restrictions that currently apply to those items.

*License Exception: Shipments of limited value (LVS).*

Under this proposed rule complete firearms controlled under ECCN 0A501 would not be eligible for License Exception LVS. Firearms parts, components, accessories, and attachments controlled under ECCN 0A501, other than receivers (frames), complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS, with limit of $500 on net value per shipment. In addition, receivers (frames), complete breech mechanisms, including castings, forgings or stampings thereof, would be eligible for License Exception LVS if the ultimate destination is Canada. These limits would be stated in the License Exceptions paragraph of ECCN 0A501, and no revisions to the text of the license exception itself would be needed to implement them. BIS believes that this provision is generally consistent with the license exemption for limited value shipments of firearms in the ITAR (22 CFR § 123.17(a)). This LVS proposal would be less restrictive than the current ITAR provision in two respects. First, the value limit per shipment would be $500 compared to $100 in the ITAR. Second, the LVS proposal would allow exports of receivers and complete breech mechanisms to Canada whereas § 123.17(a) does not. However, the $500 LVS limit is based on the actual selling price or fair market value, whereas the ITAR $100 limit is based on "wholesale" value. BIS believes that the LVS value standard is more precise and easier to apply than the ITAR standard and is more in keeping with current prices. In addition, with respect to Canada, an LVS limit of $500 per shipment is needed to comply with the Section 517 of the Commerce, Justice, Science, and Related Agencies Appropriations Act of 2015, which prohibits expending any appropriated funds to require licenses for the export of certain non-automatic firearms parts, components, accessories and attachments to Canada when valued at under $500.

Guns and armament and related items controlled under ECCN 0A602 would be eligible for License Exception LVS, with a limit of $500 net value per shipment.

DOC_0000358

Ammunition controlled under ECCN 0A505 would not be eligible for License Exception LVS; however, ammunition parts and components would be eligible with a limit of $100 net value per shipment.

Test, inspection and production equipment controlled under ECCNs 0B501, 0B602 and 0B505 for firearms, guns and armament and ammunition/ordnance would be eligible for License Exception LVS with a limit of $3,000 net value per shipment, which is consistent with LVS eligibility for most 600 series ECCNs.

*License Exception: Temporary exports, imports and reexports (TMP).*

License Exception TMP would not be available to export or reexport the items that are the subject of this rule to destinations in Country Group D:5 (*See* Supplement No. 1 to part 740) or Russia. In addition, this proposed rule would prohibit the use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A984 that was shipped from or manufactured in Country Group D:5 or Russia. It also would prohibit use of License Exception TMP to export or reexport any item controlled by proposed ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under 0A984 that was manufactured in Russia. These prohibitions would apply both to temporary exports of firearms from the United States and the export of firearms temporarily in the United States.

This proposed rule would limit temporary exports of firearms controlled under ECCN 0A501 and any shotgun with a barrel length less than 18 inches controlled under ECCN 0A502 pursuant to License Exception TMP to exhibition and demonstration (§ 740.9(a)(5) of the EAR) and inspection, test, calibration, and repair (§ 740.9(a)(6) of the EAR).

The proposed rule would also authorize the use of License Exception TMP for the export of ECCN 0A501 firearms temporarily in the United States for a period of not more than one year subject to the requirement that the firearms not be imported from or ultimately destined for certain proscribed countries. The proposed rule also would make eligibility to export under License Exception TMP subject to the following conditions:

(1) Upon temporary import, the importer must file and annotate the applicable U.S. Customs and Border Protection (CBP) document or electronic equivalent.

(2) The importer must include on the invoice or other appropriate import-related documentation (e.g., designated electronic equivalent) a complete list and description of the 0A501 firearms being imported, including their serial numbers, model, make, quantity, and U.S. dollar value.

(3) If the firearms are imported for a trade show, exhibition, demonstration, or testing, the importer must present to CBP the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

DOC_0000359

(4) At the time of export, the exporter must provide the CBP Port Director with the documentation filed upon temporary import and include the serial number, make, model, and caliber for each firearm being exported.

*License Exception: Governments, international organizations, international inspections under the Chemical Weapons Convention, and the International Space Station (GOV).*

This proposed rule would limit the applicability of License Exception GOV for firearms, parts and components controlled by ECCN 0A501 and ammunition controlled by 0A505 to exports, reexports and transfers for official use by U.S government agencies and official and personal use by U.S. government employees (and the immediate families and household employees of those government employees) (§ 740.11(b)(2)(i) and (ii) of the EAR). This proposed authorization under License Exception GOV would treat 0A501 firearms in the same manner that other items that are subject to the EAR may be exported to U.S. government employees under License Exception GOV. It would not impose certain restrictions that are imposed by the current ITAR license exemption. The ITAR exemption authorizes exports of only non-automatic firearms and parts and components. License Exception GOV would authorize non-automatic and semi-automatic firearms and parts and components.

The ITAR exemption (22 CFR § 123.18) authorizes shipments consigned to and for the use of servicemen's clubs, and for service members or civilian employees if the firearms are for personal use and the shipment is accompanied by a written authorization from the commanding officer concerned. The ITAR exemption also authorizes exports to other U.S. government employees for personal use if the chief of the U.S. diplomatic mission in the country of destination has approved in writing to the Department of State the specific types and qualities of firearms into that country. The exporter must present a copy of the written statement to the CBP Port Director. License Exception GOV would impose none of the foregoing limitations. BIS believes that the limitations are unnecessary. The EAR control exports for national security and foreign policy reasons. BIS believes that the restrictions imposed in the ITAR exemption primarily pertain to concerns over the security of U.S. government personnel and property located outside the United States. Those concerns may be addressed more appropriately through policies and procedures implemented by the U.S. government agencies whose personnel and properties are located outside the United States. Export license requirements are not needed to implement such policies.

All other items that are the subject of this rule would be subject to the limits on use of License Exception GOV that apply to 600 series items generally, *i.e.*, § 740.11(b)   to, for or on behalf of the U.S. Government (including contractors, government employees their families and household employees) or § 740.11(c) to a government in Country Group A:1 cooperating governments or an agency of NATO.

*License Exception:  Baggage (BAG).*

This proposed rule would revise License Exception BAG to allow United States citizens and permanent resident aliens leaving the United States temporarily to take up to three firearms

DOC_0000360

controlled by ECCN 0A501 and up to 1,000 rounds of ammunition for such firearms controlled under proposed ECCN 0A505.a for personal use while abroad. This proposed change to License Exception BAG would be made to be consistent with 22 CFR § 123.17(c), which authorizes U.S. persons to take up to three non-automatic firearms and up to 1,000 cartridges therefor abroad for personal use. This proposed amendment to License Exception BAG would apply to both non-automatic and semi-automatic firearms.

Travelers leaving the United States temporarily would be required to declare the 0A501 and 0A505 items to a CBP officer prior to departure from the United States and present the firearms, parts, components, accessories, attachments, and ammunition they are exporting to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG, that the exporter is compliant with its terms. Should exporters desire to contact CBP prior to departure, contact information and a list of U.S. air, land and sea ports of entry can be found at: [ HYPERLINK "http://www.cbp.gov/xp/cgov/toolbox/ports/" ].

This proposed rule also would revise License Exception BAG to allow other persons leaving the United States to take firearms, accessories, attachments, components, parts, and ammunition controlled by ECCN 0A501.a or 0A505 that they lawfully brought into the United States. This change would be consistent with 22 CFR § 123.17(d), which authorizes foreign persons leaving the United States to take firearms and ammunition controlled under Category I(a) of the USML (both non-automatic and semi-automatic) that they lawfully brought into the United States.


*License Exception STA.*

Under this proposed rule, firearms controlled under ECCN 0A501 and most parts, components, accessories, and attachments controlled under ECCN 0A501 would not be eligible for License Exception STA. Only those parts, components, accessories, and attachments that are controlled under paragraph .x (*i.e.*, those "specially designed" for 0A501 or ITAR-controlled firearms that are not specifically listed either on the CCL or USML) are eligible for export under License Exception STA.

This proposed rule would exempt gun parts, components, accessories and attachments controlled under ECCN 0A501.x; test, inspection and production equipment and parts, components, accessories and attachments in ECCN 0B501; "software" in 0D501; and "technology" in ECCN 0E501 from the License Exception STA end-use limitation set forth in § 740.20(b)(3)(ii) that applies to "600 series" items. That end-use limitation is intended to ensure that the military-related items controlled by most 600 series ECCNs are ultimately used by appropriate agencies of the governments of certain U.S allies or multilateral export control regime members. Because the 0A501 firearms and their related "software" and "technology" are not of a military nature, the limitation is not appropriate.

**Support documentation for firearms, parts, components, accessories, and attachments controlled by ECCN 0A501.**

This proposed rule would require that for commodities controlled by ECCN 0A501 for transactions where a license is required, the exporter or reexporter must obtain, prior to submitting an application, an import permit (or copy thereof) if the importing country requires such permits for import of firearms. That import permit would be a record that must be kept by the exporter or reexporter as required by Part 762 of the EAR. The purpose of this requirement is to assure foreign governments that their regulations concerning the importation of firearms are not circumvented. Obtaining an import certificate or equivalent official document issued by member states of the Organization of American States meets this requirement. This proposed rule would revise § 748.17 to include ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) and 0A505.(except 0A505.d) as the list of commodities that are subject to the requirement and would add a new paragraph (e) requiring that import certificates or permits be obtained from countries other than OAS member states if those states require such a certificate or permit.

**New export clearance requirement.**

Consistent with the 2009 National Southwest Border Counternarcotics Strategy calling for an export requirement to capture serial numbers for firearms exported from the United States, this proposed rule would modify § 758.7 to include a requirement that, for all exports of end items controlled under ECCN 0A501.a or b (end item firearms) or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 that are authorized by a license or by License Exception TMP, in addition to any other requirements, the exporter provide to the CBP Port Director the serial number, make, model, and caliber for each firearm being exported. This requirement will better enable law enforcement officials to verify that firearms exports are properly authorized and in conformance with all applicable regulations.

**Request for Comments.**

All comments must be in writing and submitted via the Federal rulemaking portal www.regulations.gov. All comments (including any personal identifiable information) will be available for public inspection and copying. Anyone wishing to comment anonymously may do so by leaving the fields for information that would identify the commenter blank.

*Alignment with the Wassenaar Arrangement Munitions List.*

This rule maintains the alignment with respect to firearms, guns and armament, and ammunition that exists between the USML and the WAML. USML Category I firearms that would be added to the CCL under ECCN 0A501 are controlled under category ML1 of the WAML. USML Category II guns and armament that would be added to the CCL under 0A602 are controlled under WAML category ML2.

This rule follows the existing CCL numbering pattern for test, inspection and production equipment (0B501, 0B602 and 0B505), "software" (0D501, 0D602 and 0D505) and "technology" (0E501, 0E602 and 0E505) rather than strictly following the Wassenaar Arrangement Munitions List pattern of placing production equipment, "software" and "technology" for munitions list items in categories ML 18, ML 21 and ML 22, respectively. BIS believes that including the ECCNs for test, inspection and production equipment, "software",

DOC_0000362

and "technology" in the same category as the items to which they relate results in an easier way to understand than CCL than using separate categories.

BIS believes that the controls in proposed ECCNs 0A501, 0A602 and 0A505 are consistent with controls imposed by the Wassenaar Arrangement.

**Export Administration Act**

Although the Export Administration Act expired on August 20, 2001, the President, through Executive Order 13222 of August 17, 2001, 3 CFR, 2001 Comp., p. 783 (2002), as amended by Executive Order 13637 of March 8, 2013, 78 FR 16129 (March 13, 2013) and as extended by the Notice of Notice of August 7, 2015, 80 FR 48233 (August 11, 2015), has continued the Export Administration Regulations in effect under the International Emergency Economic Powers Act (50 U.S.C. 1701). BIS continues to carry out the provisions of the Export Administration Act, as appropriate and to the extent permitted by law, pursuant to Executive Order 13222 as amended by Executive Order 13637.

**Rulemaking requirements.**

1. Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distribute impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action," although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget (OMB).

2. Notwithstanding any other provision of law, no person is required to respond to, nor is subject to a penalty for failure to comply with, a collection of information, subject to the requirements of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*) (PRA), unless that collection of information displays a currently valid OMB control number. This proposed rule would affect three approved BIS collections: Simplified Network Application Processing System (control number 0694-0088), which includes, among other things, license applications; License Exceptions and Exclusions (control number 0694-0137); and Import Certificates and End-User Certificates (control number 0694-0093).

BIS believes that the combined effect of all rules to be published adding items to the EAR that would be removed from the ITAR as part of the administration's Export Control Reform Initiative would increase the number of license applications to be submitted by approximately 30,000 annually, resulting in an increase in burden hours of 8,500 (30,000 transactions at 17 minutes each) under control number 0694-0088.

Some parts formerly on the USML, and "software" and "technology" for firearms and their parts formerly on the USML, would become eligible for License Exception STA under this rule. Test, inspection and production equipment and "software" and "technology" related to those firearms and parts may become eligible for License Exception STA. BIS believes that the

DOC_0000363

increased use of License Exception STA resulting from the combined effect of all rules to be published adding items to the EAR that would be removed from the ITAR as part of the administration's Export Control Reform Initiative would increase the burden associated with control number 0694 0137 by about 23,858 hours (20,450 transactions @ 1 hour and 10 minutes each).

BIS expects that this increase in burden would be more than offset by a reduction in burden hours associated with approved collections related to the ITAR. This proposed rule addresses controls on firearms and parts, production equipment and parts and related software and technology. The two largest impacts of the proposed rule are likely to apply to (1) exporters of non-automatic and semi-automatic firearms and their parts and (2) exporters of parts, components, attachments, and accessories that are used in both semi-automatic and fully automatic firearms. This is because fully automatic firearms and parts that are used only in fully automatic firearms will remain on the USML, but non-automatic and semi-automatic firearms, as well as their parts, components, attachments, and accessories that are used in both semi-automatic and fully automatic firearms would be controlled under the EAR. Because, with few exceptions, the ITAR allows exemptions from license requirements only for exports to Canada, most exports of firearms used for hunting and recreational purposes and exports of parts, components, attachments, and accessories that are common to military fully automatic firearms and their semi-automatic civilian counterparts, even when destined to NATO and other close allies, require specific State Department authorization. In addition, the exports necessary to produce parts and components for defense articles in the inventories of the United States and its NATO and other close allies require State Department authorizations. Under the EAR, as proposed, a number of low-level parts would not require a license to such destinations.

Even in situations in which a license would be required under the EAR, the burden is likely to be reduced compared to the license requirement of the ITAR. In particular, license applications for exports of "technology" controlled by ECCN 0E501 are likely to be less complex and burdensome than the authorizations required to export ITAR-controlled technology, *i.e.*, Manufacturing License Agreements and Technical Assistance Agreements.

This proposed rule would require that for shipments requiring a license of firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, the applicant obtain a copy of the import certificate or permit if the importing country requires one for importing firearms. License applications for which an import or end-user certificate is already required under § 748.12 of the EAR would not be subject to this new requirement. BIS expects that this requirement will result in no change in the burden under control number 0694-0093. This proposed rule also would require that prior to departure, travelers leaving the United States and intending to temporarily export firearms, parts, and components controlled under ECCN 0A501 under License Exception BAG declare the firearms and parts to a CBP officer and present the firearms and parts to the CBP officer for inspection.

This proposed rule also would require, as a condition of using License Exception TMP to export firearms temporarily in the United States, that, at the time of import, the importer submit Customs form 3461, 7512, 7501, 7523 or 3311 or an electronic equivalent annotated to read: "This shipment will be exported in accordance with and under the authority of License Exception

DOC_0000364

TMP (15 CFR § 740.9(b)(5)).” OMB has approved those forms under the following control numbers.

- Form 3461, control number 1651-0024, annual burden hours 2,714,456

- Form 7512, control number 1651-0003, annual burden hours   896,400

- Form 7501, control number 1651-0022, annual burden hours 6,893,209

- Form 7523, control number 1651-0013, annual burden hours      8,247

- Form 3311, control number 1651-0011, annual burden hours     42,000

After consultation with the Department of Homeland Security (DHS), which is responsible for obtaining OMB approval for these collections, BIS believes that the requirements of this proposed rule would not materially affect the burdens imposed by these collections.

This proposed rule would further require, as a condition of using License Exception TMP to export firearms temporarily in the United States, that at the time of import the importer included on the invoice or other appropriate import-related documentation (or electronic equivalents) a complete list and description of the firearms being imported, including their model, make, serial numbers, quantity, and U.S. dollar value; and, if the import is for a trade show, exhibition, demonstration, or testing, present to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States. At the time of export, the exporter would have to provide to U.S. Customs and Border Protection copies of all of the documents described above as being required for use of License Exception TMP to export firearms temporarily in the United States, with the exception of the relevant invitation. These requirements would be a new collection of information, subject to the Paperwork Reduction Act, that has not been approved by OMB. BIS will not implement any of these requirements in a final rule unless the necessary collection of information is approved by OMB. BIS invites comments on the feasibility and likely burden on the public of these requirements.

This proposed rule would include a requirement that, for all exports of end items controlled under ECCN 0A501 under a license or license exception TMP, in addition to any other requirements, the exporter provide to the CBP Port Director the serial number, make, model, and caliber for each firearm being exported. This requirement would be a new collection of information, subject to the Paperwork Reduction Act, that has not been approved by OMB. BIS will not implement this requirement in a final rule unless the necessary collection of information is approved by OMB. BIS invites comments on the feasibility and likely burden on the public of this requirement.

3. This rule does not contain policies with Federalism implications as that term is defined under E.O. 13132.

[ PAGE  \* MERGEFORMAT ]

4. The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), 5 U.S.C. 601 *et seq.*, generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to the notice and comment rulemaking requirements under the Administrative Procedure Act (5 U.S.C. 553) or any other statute, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. Under section 605(b) of the RFA, however, if the head of an agency certifies that a rule will not have a significant impact on a substantial number of small entities, the statute does not require the agency to prepare a regulatory flexibility analysis. Pursuant to section 605(b), the Chief Counsel for Regulation, Department of Commerce, submitted a memorandum to the Chief Counsel for Advocacy, Small Business Administration, certifying that this proposed rule will not have a significant impact on a substantial number of small entities.

*Number of Small Entities.*

The Bureau of Industry and Security (BIS) does not collect data on the size of entities that apply for and are issued export licenses. Although BIS is unable to estimate the exact number of small entities that would be affected by this rule, it acknowledges that this rule would affect some unknown number.

*Economic Impact*

This proposed rule is part of the Administration's Export Control Reform Initiative. Under that initiative, the United States Munitions List (22 CFR part 121) (USML) would be revised to be a "positive" list, *i.e.*, a list that does not use generic, catch-all controls on any part, component, accessory, attachment, or end item that was in any way specifically modified for a defense article, regardless of the article's military or intelligence significance or non-military applications. At the same time, articles that are determined no longer to warrant control on the USML would become controlled on the Commerce Control List (CCL). Such items, along with certain military items that currently are on the CCL, will be identified in specific Export Control Classification Numbers (ECCNs) known as the "600 series" ECCNs. In addition, some items currently on the CCL would move from existing ECCNs to the new "600 series" ECCNs. This rule addresses USML Category I, II and III articles that would be removed from the USML.

Category I of the USML, entitled "Firearms, Close Assault Weapons and Combat Shotguns" consists of small arms (typically up to a caliber of 0.50 inches) and related parts, components, accessories, attachments, production equipment, "software", and technology. Fully automatic firearms would remain on the USML as would parts and components that are used only in fully automatic firearms. However, non-automatic and semi-automatic firearms, their parts and components and the parts and components common to them and to fully automatic firearms would become subject to the EAR. Department of State officials have informed BIS that license applications for such parts and components are a high percentage of the license applications for USML articles reviewed by that department. Such parts and components are more likely to be produced by small businesses than are complete firearms.

DOC_0000366

Category II of the USML, entitled "Guns and Armament" encompasses large guns (caliber over 0.50 inches) such as howitzers, mortars, cannon and recoilless rifles along with related parts, components, accessories, attachments, production equipment, "software" and technology. Modern large guns would remain on the USML. Guns and armament manufactured between 1890 and 1919 would be controlled on the CCL. Unless specified elsewhere on the CCL or the USML, parts, components, accessories, attachments, production equipment, "software" and "technology" for large guns would be controlled on the CCL.

Category III of the USML entitled "Ammunition/Ordnance" encompasses ammunition for a wide variety of firearms that may have military, law enforcement or civilian applications. Ammunition that has only or primarily military applications would remain on the USML as would parts, production equipment, "software" and "technology" therefor. Ammunition for firearms that have primarily civilian and sporting application and ammunition that is used in civilian, law enforcement and military small arms would move to the CCL. In most instances, these firearms have a caliber of 0.50 inches or less although ammunition for manual firearms with a caliber up to 0.72 inches is included. The rule also applies to parts, components, production equipment, and "technology" related to that ammunition.

Changing the jurisdictional status of the articles described in this rule would reduce the burden on small entities (and other entities as well) through elimination of some license requirements, simpler license application procedures, and reduced (or eliminated) registration fees. In addition, small entities would be able to take advantage of *de minimis* treatment under the EAR for all items that this rule would transfer from the USML to the CCL, provided those items meet the applicable *de minimis* threshold level. In practice, the greatest impact of this rule on small entities would likely be reduced administrative costs and reduced delay for exports of items that are now on the USML but would become subject to the EAR.

Small entities (and other entities as well) that are affected by this rule would benefit from the elimination of some license requirements implemented by this rule. Six types of parts and components, identified in ECCN 0A501.y, would be designated immediately as parts and components that, even if specially designed for a military use or a Category I firearm, have little or no military significance. These parts and components, which under the ITAR require a license to nearly all destinations would, under the EAR, require a license to Iran, Sudan, North Korea, Syria and the People's Republic of China as well as to destinations subject to United Nations arms embargoes.

Furthermore, many exports and reexports of Category I firearms along with parts that would be placed on the CCL by this rule, would become eligible for license exceptions that apply to shipments to United States government agencies, shipments valued at $500 or less, parts and components being exported for use as replacement parts, and temporary exports. Similarly exports and reexports of Category II firearms parts, components, accessories, and attachments that would be placed on the CCL by this rule would become eligible for those license exceptions, although the value limit would $3,000. Category III ammunition placed on the CCL by this rule would also become eligible with a value limit of $100.

Even for exports and reexports in which a license would be required, the process would be simpler and less costly under the EAR. When a USML Category I, II, or III article is moved

DOC_0000367

to the CCL, the number of destinations for which a license is required would remain unchanged. However, the burden on the license applicant would decrease because the licensing procedure for CCL items is simpler and more flexible than the licensing procedure for USML defense articles.

Under the USML licensing procedure, an applicant must include a purchase order or contract with its application. There is no such requirement under the CCL licensing procedure. This difference gives the CCL applicant at least two advantages. First, the applicant has a way of determining whether the U.S. Government will authorize the transaction before it enters into potentially lengthy, complex and expensive sales presentations or contract negotiations. Under the USML licensing procedure, the applicant will need to caveat all sales presentations with a reference to the need for government approval and will more likely have to engage in substantial effort and expense with the risk that the government might reject the application. Second, a CCL license applicant need not limit its application to the quantity or value of one purchase order or contract. It may apply for a license to cover all of its expected exports or reexports to a particular consignee over the life of a license, reducing the total number of licenses for which the applicant must apply.

In addition, many applicants exporting or reexporting items that this rule would transfer from the USML to the CCL would realize cost savings through the elimination of some or all registration fees currently assessed under the ITAR. This is particularly relevant to small- and medium-sized companies that manufacture or export parts and components for Category I firearms.

Registration fees for manufacturers and exporters of articles on the USML start at $2,250 per year, increase to $2,750 for organizations applying for one to ten licenses per year and further increase to $2,750 plus $250 per license application (subject to a maximum of three percent of total application value) for those who need to apply for more than ten licenses per year. There are no registration or application processing fees for applications to export items currently listed on the CCL. Once the items that are the subject to this rulemaking are removed from the USML and added to the CCL, entities currently applying for licenses from the Department of State would find their registration fees reduced if the number of USML licenses those entities need declines. If an entity's entire product line is moved to the CCL, then its ITAR registration and registration fee requirement would be eliminated.

Finally, *de minimis* treatment under the EAR would become available for all items that this rule would transfer from the USML to the CCL. Items subject to the ITAR remain subject to the ITAR when they are incorporated abroad into a foreign-made product regardless of the percentage of U.S. content in that foreign-made product. This proposed rule would apply that same principle to "600 series" items only if the foreign made item is being exported to a country that is subject to a United States arms embargo. In all other cases, foreign-made products that incorporate items that this rule would move to the CCL would be subject to the EAR only if their total controlled U.S.-origin content exceeded 25 percent. Because including small amounts of U.S.-origin content would not subject foreign-made products to the EAR, foreign manufacturers would have less incentive to avoid such U.S.-origin parts and components, a development that potentially would mean greater sales for U.S. suppliers, including small entities.

DOC_0000368

For items currently on the CCL that would be moved from existing ECCNs to the new "600 series," license exception availability would be narrowed somewhat. However, BIS believes that increased burden imposed by those actions will be offset substantially by the reduction in burden attributable to the moving of items from the USML to CCL and the compliance benefits associated with the consolidation of all WAML items subject to the EAR in one series of ECCNs.

*Conclusion*

BIS is unable to determine the precise number of small entities that would be affected by this rule. Based on the facts and conclusions set forth above, BIS believes that any burdens imposed by this rule would be offset by the a reduction in the number of items that would require a license, simpler export license applications, reduced or eliminated registration fees, and application of a *de minimis* threshold for foreign-made items incorporating U.S.-origin parts and components, which would reduce the incentive for foreign buyers to design out or avoid U.S.-origin content. For these reasons, the Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this rule, if adopted in final form, would not have a significant economic impact on a substantial number of small entities.

**List of Subjects**

*15 CFR Parts 740, 748 and 758*

Administrative practice and procedure, Exports, Reporting and recordkeeping requirements

*15 CFR Part 742*

Exports, Terrorism

*15 CFR Part 762*

Administrative practice and procedure, Business and industry, Confidential business information, Exports, Reporting, and Recordkeeping requirements

*15 CFR Part 772*

Exports

*15 CFR Parts 746 and 774*

Exports, Reporting and recordkeeping requirements

For the reasons stated in the preamble, parts 740, 742, 746, 748, 758, 762, and 774 of the Export Administration Regulations (15 CFR parts 730-774) are proposed to be amended as follows:

**PART 740 – [AMENDED]**

DOC_0000369

1. The authority citation for 15 CFR part 740 continues to read as follows:

**Authority:** 50 U.S.C. app. 2401 *et seq.*; 50 U.S.C. 1701 *et seq.*; 22 U.S.C. 7201 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 7, 2015, 80 FR 48233 (August 11, 2015).

2. Section 740.9 is amended by adding:

a. Four sentences at the end of paragraph (a) introductory text;

b. One sentence at the end of paragraph (b), introductory text; and

c. Paragraph (b)(5) to read as follows:

**§ 740.9 Temporary imports, exports, and reexports (TMP).**

\* \* \* \* \*

(a) \* \* \* This paragraph (a) does not authorize any export of a commodity controlled under ECCNs 0A501.a or .b, or shotguns with a barrel length less than 18 inches controlled under ECCN 0A502 to, or any export of such an item that was imported into the United States from, a country in Country Group D:5 (Supplement No. 1 of this part). The only provisions of this paragraph (a) that are eligible for use to export such items are § 740.9(a)(5) ("Exhibition and demonstration") and § 740.9(a)(6) ("Inspection, test, calibration, and repair"). In addition, this paragraph (a) may not be used to export more than 75 firearms per shipment. In accordance with the requirements in of § 758.7 of the EAR, the exporter or its agent must provide documentation that includes the serial number, make, model and caliber of each firearm being exported to the Customs and Border Protection Port Director at the time of export.

\* \* \*

(b) \* \* \* No provision of paragraph (b), other than (b)(3), (b)(4), or (b)(5), may be used to export firearms controlled by ECCN 0A501.a, .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502.

\* \* \*

DOC_0000370

(5) *Exports of firearms and certain shotguns temporarily in the United States.* This paragraph (b)(5) authorizes the export of no more than 75 end item firearms per shipment controlled by ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled in ECCN 0A502 that are temporarily in the United States for a period not exceeding one year, provided that:

(i) The firearms were not shipped from or manufactured in a U.S. arms embargoed country, *i.e.*, destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR;

(ii) The firearms were not shipped from or manufactured in Russia;

(iii) The firearms are not ultimately destined to a U.S. arms embargoed country, *i.e.* destination listed in Country Group D:5 in Supplement No. 1 to part 740 of the EAR, or to Russia; and

(iv) When the firearms were imported, the importer or its agent:

(A) Filed and annotated the applicable U.S. Customs and Border Protection document (e.g., Form CF 3461, 7512, 7501, 7523 or 3311 or an electronic equivalent) to read: "This shipment will be exported in accordance with and under the authority of License Exception TMP (15 CFR § 740.9(b)(5))";

(B) Included on the invoice or other appropriate import-related documentation (or electronic equivalents) a complete list and description of the firearms being imported, including their model, make, serial numbers, quantity, and U.S. dollar value; and

(C) Presented (if imported for a trade show, exhibition, demonstration, or testing) to U.S. Customs and Border Protection the relevant invitation or registration documentation for the event and an accompanying letter that details the arrangements to maintain effective control of the firearms while they are in the United States.

(v)  In addition to the requirements of part 758 of the EAR, the exporter or its agent must provide the documentation related to this paragraph (b)(5)(iv)(B) to U.S. Customs and Border Protection at the time of export.

*  *  *  *  *

3.  Section 740.11 is amended by adding a sentence at the end of the introductory text to read as follows:

## § 740.11 Governments, international organizations, international inspections, under the Chemical Weapons Convention, and the International Space Station (GOV).

*  *  *  Commodities listed in ECCN 0A501 are eligible only for transactions described in paragraphs (b)(2)(i) and (b)(2)(ii) of this section.  *  *  *  *  *

4. Section 740.14 is amended by revising the heading to paragraph (e) and by adding paragraphs (e)(3) and (e)(4) to read as follows:

## § 740.14 Baggage (BAG)

*  *  *  *  *

(e) *Special provisions for firearms and ammunition.*

*  *  *

(3) A United States citizen or a permanent resident alien leaving the United States may export under this License Exception firearms, parts, components, accessories, or attachments controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505, subject to the following limitations:

(i) Not more than three firearms and 1,000 rounds of ammunition may be taken on any one trip.

(ii)  Parts, components, accessories, and attachments exported pursuant to this paragraph must be of a kind and limited to quantities that are reasonable for the activities described in paragraph (e)(3)(iv) of this section or that are necessary for routine maintenance of the firearms being exported.

(iii) The commodities must be with the person's baggage.

(iv) The commodities must be for the person's exclusive use and not for resale or other transfer of ownership or control.  Accordingly, except as provided in paragraph (e)(4) of this section, firearms, parts, components, accessories, attachments, and ammunition, may not be exported permanently under this License Exception.  All commodities exported under this License Exception must be returned to the United States.

[ PAGE  \* MERGEFORMAT ]

(v)   Travelers leaving the United States temporarily are required to declare the firearms, parts, components, accessories, attachments, and ammunition being exported under this license exception to a Customs and Border Protection (CBP) officer prior to departure from the United States and present such items to the CBP officer for inspection, confirming that the authority for the export is License Exception BAG and that the exporter is compliant with its terms.

(4) A nonresident alien leaving the United States may export or reexport under this License Exception only such firearms controlled under ECCN 0A501 and ammunition controlled under ECCN 0A505 as he or she brought into the United States under the provisions of Department of Justice Regulations at 27 CFR § 478.115(d).

*   *   *   *   *

5.  Section 740.20 is amended by revising paragraph (b)(2)(ii) to read as follows:

**§ 740.20 License Exception Strategic Trade Authorization (STA).**

*   *   *   *   *

(b)  *   *   *   *

(2) *   *   *

(ii) License Exception STA may not be used for:

(A) Any item controlled in ECCNs 0A501.a, .b, .c, .d, or .e; 0A504; 0A981; 0A982; 0A983; 0A5030E982; or

(B) Shotguns with barrel length less than 18 inches controlled in 0A502.

*   *   *   *   *


**PART 742 – [AMENDED]**

6.  The authority citation for part 742 continues to read as follows:

**Authority:** 50 U.S.C. app. 2401 *et seq.;* 50 U.S.C. 1701 *et seq.;* 22 U.S.C. 3201 *et seq.;* 42 U.S.C. 2139a; 22 U.S.C. 7201 *et seq.;* 22 U.S.C. 7210; Sec. 1503, Pub. L. 108 11, 117 Stat. 559; E.O. 12058, 43 FR 20947, 3 CFR, 1978 Comp., p. 179; E.O. 12851, 58 FR 33181, 3 CFR, 1993 Comp., p. 608; E.O. 12938, 59 FR 59099, 3 CFR, 1994 Comp., p. 950; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Presidential Determination 2003 23 of May 7, 2003, 68 FR 26459, May 16, 2003; Notice of November 7, 2014, 79 FR 67035 (November 12, 2014); Notice of August 7, 2015, 80 FR 48233 (August 11, 2015).

**Section 742.7   [Amended]**

7.  Section 742.7 is amended by revising paragraphs (a)(1), (a)(2), (a)(3), (a)(4) and (c) to read as follows:

## § 742.7 Crime control and detection.

\*   \*   \*

(1)  Crime control and detection instruments and equipment and related technology and software identified in the appropriate ECCNs on the CCL under CC Column 1 in the Country Chart column of the "License Requirements" section.  A license is required to countries listed in CC Column 1 (Supplement No. 1 to part 738 of the EAR).  Items affected by this requirement are identified on the CCL under the following ECCNs: 0A502, 0A504, 0A505.b, 0A978, 0A979 0E502, 0E505 (technology for development for production of buckshot shotgun shells controlled under ECCN 0A505.b),  1A984, 1A985, 3A980, 3A981, 3D980, 3E980, 4A003 (for fingerprint computers only), 4A980, 4D001 (for fingerprint computers only), 4D980, 4E001 (for fingerprint computers only), 4E980, 6A002 (for police-model infrared viewers only), 6E001 (for police-model infrared viewers only), 6E002 (for police-model infrared viewers only), and 9A980.

(2)  Shotguns with a barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 2 in the Country Chart column of the "License Requirements" section regardless of end-user to countries listed in CC Column 2 (Supplement No. 1 to part 738 of the EAR).

(3)  Shotguns with barrel length greater than or equal to 24 inches, identified in ECCN 0A502 on the CCL under CC Column 3 in the Country Chart column of the "License Requirements" section only if for sale or resale to police or law enforcement entities in countries listed in CC Column 3 (Supplement No. 1 to part 738 of the EAR).

(4)  Certain crime control items require a license to all destinations, except Canada. These items are identified under ECCNs 0A982, 0A503, and 0E982.  Controls for these items appear in each ECCN; a column specific to these controls does not appear in the Country Chart (Supplement No. 1 to part 738 of the EAR).

\*   \*   \*   \*   \*

(c)  *Contract sanctity.*  Contract sanctity date: August 22, 2000.  Contract sanctity applies only to items controlled under ECCNs 0A982, 0A503 and 0E982 destined for countries not listed in CC Column 1 of the Country Chart (Supplement No. 1 to part 738 of the EAR).

[ PAGE  \* MERGEFORMAT ]

\* \* \* \* \*

8. Section 742.17 is amended by revising:

a. The first sentence of paragraph (a) and

b. Paragraph (f) to read as follows:

**§ 742.17 Exports of firearms to OAS member countries.**

(a) *License requirements.* BIS maintains a licensing system for the export of firearms and related items to all OAS member countries.  \*  \*  \*

   \* \* \* \* \*

(f) *Items/Commodities.*.  Items requiring a license under this section are ECCNs 0A501 semi-automatic and non-automatic rifles, carbines, revolvers and pistols, 0A502 (shotguns and related parts and components), 0A505 except 0A505.d (ammunition and specially designed parts and components) and 0A504 except 0A504.f (optical sighting devices).  (See Supplement No. 1 to Part 774 of the EAR).

\* \* \* \* \*

**Section 742.19 [Amended]**

9. Section 742.19(a)(1) is amended by:
a. Removing "0A986" and adding in its place "0A505.c"; and
b. Removing "0B986" and adding in its place "0B505.c".

**Section 746.3    [Amended]**

10.  Section 746.3 is amended by removing "0A986" from paragraph (b)(2) and adding in its place "0A505.c".

 **Section 746.7    [Amended]**
11.  Section 746.7 is amended in paragraph (a)(1) by:
a. Adding "0A504," in numerical order to the list of ECCNs; and
b. Removing "0A985".

**PART 748    [AMENDED]**

12.  The authority citation for 15 CFR part 748 continues to read as follows:

DOC_0000375

**Authority:** 50 U.S.C. app. 2401 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 7, 2015, 80 FR 48233 (August 11, 2015).

13. Section 748.12 is amended by:

a. Revising the heading;

b. Adding introductory text to the section;

c. Revising paragraph (a), introductory text;

d. Revising paragraph (a)(1); and

e. Adding paragraph (e) to read as follows.

**§ 748.12 Firearms import certificate or import permit.**

License applications for certain firearms and related commodities require support documents in accordance with this section. For destinations that are members of the Organization of American States (OAS), an FC Import Certificate or equivalent official document is required in accordance with paragraphs (a) through (d) of this section. For other destinations that require a firearms import or permit, the firearms import certificate or permit is required in accordance with paragraphs (e) through (g) of this section.

(a) *Requirement to obtain document for OAS member states.*

Unless an exception in § 748.9(c) applies, an FC Import Certificate is required for license applications for firearms and related commodities, regardless of value, that are destined for member countries of the (OAS). This requirement is consistent with the OAS Model Regulations described in § 742.17.

(1) *Items subject to requirement.* Firearms and related commodities are those commodities controlled for "FC Column 1" reasons under ECCNs 0A501 (except 0A501.y), 0A502, 0A504 (except 0A504.f) or 0A505 (except 0A505.d)

*   *   *   *   *

(e) *Requirement to obtain an import certificate or permit for other than OAS member states.* If the country to which firearms, parts, components, accessories, and attachments controlled under ECCN 0A501, or ammunition controlled under ECCN 0A505, are being exported or reexported requires that a government-issued certificate or permit be obtained prior to importing the commodity, the exporter or reexporter must obtain and retain on file the original or a copy of that certificate or permit before applying for an export or reexport license unless:

(1) A license is not required for the export or reexport; or

[ PAGE \* MERGEFORMAT ]

DOC_0000376

(2)  The exporter is required to obtain an import or end-user certificate or other equivalent official document pursuant to paragraph (a) thorough (d) of this section and has, in fact, complied with that requirement.

*Note to paragraph (e).*  Obtaining a BIS Statement by Ultimate Consignee and Purchaser pursuant to § 748.11 of the EAR does not exempt the exporter or reexporter from the requirement to obtain a certification pursuant to paragraph (a) because that statement is not issued by a government.

(3)  *License application procedure.*

(i) The number or other identifying information of the import certificate or permit must be stated on the license application.

(ii) If the country to which the commodities are being exported does not require an import certificate or permit for firearms imports, that fact must be noted on the any license application for ECCN 0A501 or 0A505 commodities.

## PART 758 – [AMENDED]

14.   The authority citation for 15 CFR part 758 continues to read as follows:

**Authority:** 50 U.S.C. app. 2401 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 7, 2015, 80 FR 48233 (August 11, 2015).

15.   Section 758.7 is amended by adding a paragraph (b)(2)(iii) to read as follows:

## § 758.7 Authority of the Office of Export Enforcement, the Bureau of Industry and Security, Customs offices and Postmasters in clearing shipments.

*   *   *   *   *

(b)  *   *   *

(2)  *   *   *

(iii) *Firearms controlled by ECCN 0A501.a, .b and certain shotguns.*  Exporters of firearms controlled by ECCN 0A501.a or .b or shotguns with a barrel length less than 18 inches controlled under 0A502 or their agents must provide documentation that includes the serial number, make, model and caliber of each firearm being exported under a license or License Exception TMP to the Customs and Border Protection Port Director at the time of export.

*   *   *   *   *

## PART 762 – [AMENDED]

16.   The authority citations paragraph for part 762 continues to read as follows:

DOC_0000377

**Authority:** 50 U.S.C. app. 2401 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 7, 2015, 80 FR 48233 (August 11, 2015).

17.  Section 762.2 is revised by adding a new paragraph (b)(54) to read as follows:

## § 762.2 Records to be retained.

\*  \*  \*  \*  \*

(b) \*  \*  \*

\* \* \* \* \*

(54)  § 740.9(b)(5) ECCN 0A501.a or .b firearms exported under License Exception TMP.

## PART 772 – [AMENDED]

18.  The authority citation for part 772 continues to read as follows:

**Authority:** 50 U.S.C. app. 2401 *et seq.*; 50 U.S.C. 1701 *et seq.*; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 7, 2015, 80 FR 48233 (August 11, 2015).

## Section 772.1   [Amended]

19.  In § 772.1, in the definition of "specially designed," Note 1 is amended by removing "0B986" and adding in its place "0B505.c".**PART 774 - [AMENDED]**

20. The authority citation for 15 CFR part 774 continues to read as follows:

**Authority:** 50 U.S.C. app. 2401 *et seq.*; 50 U.S.C. 1701 *et seq.*; 10 U.S.C. 7420; 10 U.S.C. 7430(e); 22 U.S.C. 287c, 22 U.S.C. 3201 *et seq.*; 22 U.S.C. 6004; 30 U.S.C. 185(s), 185(u); 42 U.S.C. 2139a; 42 U.S.C. 6212; 43 U.S.C. 1354; 15 U.S.C. 1824a; 50 U.S.C. app. 5; 22 U.S.C. 7201 *et seq.*; 22 U.S.C. 7210; E.O. 13026, 61 FR 58767, 3 CFR, 1996 Comp., p. 228; E.O. 13222, 66 FR 44025, 3 CFR, 2001 Comp., p. 783; Notice of August 7, 2015, 80 FR 48233 (August 11, 2015).

21.  In Supplement No. 1 to Part 774, the Commerce Control List, add, between entries for Export Control Classification Numbers (ECCNs) 0A018 and 0A521, entries for ECCNs 0A501, 0A502, 0A503, 0A504 and 0A505 to read as follows:

## Supplement No. 1 to Part 774   The Commerce Control List

\*  \*  \*  \*  \*

DOC_0000378

**0A501 Firearms (except 0A502 shotguns) and related commodities as follows (see List of Items controlled).**

License Requirements

*Reason for Control:* NS, RS, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except 0A501.y | NS Column 1 |
| RS applies to entire entry except 0A501.y | RS Column 1 |
| FC applies to entire entry except 0A501.y | FC Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500 for 0A501.c, .d, and .x.

$500 for 0A501.c, .d, .e, and .x if the ultimate destination is Canada.

*GBS:* N/A

*CIV:* N/A

Special conditions for STA

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in this entry.

List of Items Controlled

*Related Controls:* (1) Firearms that are fully automatic are "subject to the ITAR." (2) See ECCN 0A502 for shotguns and their parts and components that are subject to the EAR. (3) See ECCN 0A504 and USML Category XII for controls on optical sighting devices.

*Items:*

a.      Non-automatic and semi-automatic firearms of caliber less than or equal to .50 inches (12.7 mm).

b.      Non-automatic and non-semi-automatic rifles, carbines, revolvers or pistols of caliber greater than .50 inches (12.7 mm) but less than or equal to .72 inches (18.0 mm).

c.      The following types of "parts" and "components" if "specially designed" for a commodity controlled by paragraph .a or .b of this entry, or USML Category I (unless listed in USML Category I(g) or (h)):  barrels, cylinders, barrel extensions, mounting blocks (trunnions),

[ PAGE \* MERGEFORMAT ]

bolts, bolt carriers, operating rods, gas pistons, trigger housings, triggers, hammers, sears, disconnectors, pistol grips and buttstocks that contain fire control parts.

d.      Detachable magazines with a capacity of greater than 16 rounds "specially designed" for a commodity controlled by paragraph .a, or .b of this entry.

e.      Receivers (frames) and complete breech mechanisms, including castings, forgings or stampings thereof, "specially designed" for a commodity by controlled by paragraph .a  or .b of his entry.

f. through w. [Reserved]

x. "Parts," "components,"  "accessories" and "attachments" that are "specially designed" for a commodity classified under paragraphs .a through .c of this entry or the USML and not elsewhere specified on the USML or CCL.

y. Specific "parts," "components," "accessories" and "attachments" "specially designed" for a commodity subject to control in this ECCN or common to a defense article in USML Category I and not elsewhere specified in the USML or CCL.

y.1. Stocks or grips, that do not contain any fire control parts;

y.2. Scope mounts or accessory rails;

y.3. Iron sights;

y.4. Sling swivels;

y.5. Butt plates or recoil pads; and

y.6. Bayonets.

**Technical note:**  The controls on parts and components in ECCN 0A501 include those parts and components that are common to firearms described in ECCN 0A501 and to those firearms subject to the ITAR.

*Note 1:  Antique firearms (i.e., those manufactured before 1890) and reproductions thereof, muzzle loading black powder firearms except those designs based on centerfire weapons of a post 1937 design, BB guns, pellet rifles, paint ball, and all other air rifles are EAR99 commodities.*

*Note 2:  This entry does not control "accessories" and "attachments" (e.g., belts, slings, cleaning kits) and detachable magazines or magazine parts not specifically identified in paragraph .e or paragraph .y.*

DOC_0000380

**0A502 Shotguns; complete trigger mechanisms; magazines and magazine extension tubes; complete breech mechanisms; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use.**

**License Requirements**

*Reason for Control:*   RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| RS applies to shotguns with a barrel length less than 18 inches (45.72 cm) | RS Column 1 |
| FC applies to entire entry | FC Column 1 |
| CC applies to shotguns with a barrel length  less than 24 in. (60.96 cm) and shotgun "components" controlled by this entry regardless of end user | CC Column 1 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm), regardless of  end user | CC Column 2 |
| CC applies to shotguns with a barrel length greater than or equal to 24 in. (60.96 cm) if for sale or resale to police or law enforcement | CC Column 3 |
| UN applies to entire entry | See § 746.1(b) for UN controls |
| AT applies to shotguns with a barrel length less than 18 inches (45.72 cm) | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:*   N/A
*GBS:*   N/A
*CIV:*   N/A

**List of Items Controlled**

*Related Controls*:  This entry does not control combat shotguns and fully automatic shotguns. Those shotguns are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

DOC_0000381

**0A503 Discharge type arms; grenade launchers "specially designed" for non-lethal or less-lethal grenades (*e.g.*, chemical irritant, beanbag rounds); non-lethal or less-lethal grenades and projectiles, and 'specially designed' 'parts' and 'components' of those projectiles; and devices to administer electric shock, for example, stun guns, shock batons, shock shields, electric cattle prods, immobilization guns and projectiles; except equipment used exclusively to treat or tranquilize animals, and except arms designed solely for signal, flare, or saluting use; "specially designed" "parts" and "components," n.e.s.**

**License Requirements**

*Reason for Control:* CC, UN

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| CC applies to entire entry. | A license is required for ALL destinations, except Canada, regardless of end use. Accordingly, a column specific to this control does not appear on the Commerce Country Chart. (See part 742 of the EAR for additional information.) |
| UN applies to entire entry | See § 746.1(b) for UN controls |

*LVS:* N/A
*GBS:* N/A
*CIV:* N/A

**List of Items Controlled**

*Related Controls*: Law enforcement restraint devices that administer an electric shock are controlled under ECCN 0A982. Electronic devices that monitor and report a person's location to enforce restrictions on movement for law enforcement or penal reasons are controlled under ECCN 3A981.

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

**0A504 Optical sighting devices for firearms (including shotguns controlled by 0A505); and "components" as follows (see List of Items Controlled).**
**License Requirements**
*Reason for Control: FC, CC, UN*

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| FC applies to paragraphs .a, .b, .c, d, .e and .g of this entry | FC Column 1. |

DOC_0000382

| | |
|---|---|
| CC applies to entire entry | CC Column 1. |
| UN applies to entire entry | See §746.1(b) for UN controls. |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**
*LVS:* N/A
*GBS:* N/A
*CIV:* N/A
**List of Items Controlled**
*Related Controls:* N/A
*Related Definitions:* N/A
*Items:*
a. Telescopic sights.
b. Holographic sights.
c. Reflex or "red dot" sights.
d. Reticle sights.
e. Other sighting devices that contain optical elements.
f. Laser pointing devices designed for use on firearms.
g. Lenses, other optical elements and adjustment mechanisms for articles in paragraphs a, b, c, d or e.

**0A505  Ammunition as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, CC, FC, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to 0A505.a and .x | NS Column 1 |
| RS applies to 0A505.a and .x | RS Column 1 |
| CC applies to 0A505.b | CC Column 1 |
| FC applies to entire entry except 0A505.d | FC Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to  0A505.a, .d  and .x | AT Column 1 |
| AT applies to 0A505.c | A license is required for items controlled by paragraph .c of this entry to North Korea for anti-terrorism reasons.  The Commerce Country Chart is not designed to determine AT licensing requirements for this entry.  See §742.19 of the EAR for additional information. |

[ PAGE \* MERGEFORMAT ]

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**
*LVS:* $100 for items in 0A505.x
*GBS:* N/A
*CIV:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A505.

**List of Items Controlled**

*Related Controls:* (1) Ammunition for modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles as well as inherently military ammunition types such as ammunition preassembled into links or belts, caseless ammunition, tracer ammunition, ammunition with a depleted uranium projectile or a projectile with a hardened tip or core and ammunition with an explosive projectile are "subject to the ITAR." (2) Percussion caps, and lead balls and bullets, for use with muzzle-loading firearms are EAR99 items.

*Related Definitions:* N/A

*Items:*
a. Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b .c or .d of this entry or in USML Category III.

b. Buckshot shotgun shells.

c. Shotgun shells that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III

e. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

*Note 1: The controls on parts and components in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.*

DOC_0000384

*Note 2:   The controls on parts and components in this entry include those parts and components that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.*

22.  In Supplement No. 1 to Part 774, the Commerce Control List, add, between entries for Export Control Classification Numbers (ECCNs) 0A521 and 0A604, an entry for ECCNs 0A602 to read as follows:

**0A602  Guns and Armament as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $500

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA:*  Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0A602.

**List of Items Controlled**

*Related Controls:* (1) Modern heavy weapons such as howitzers, artillery, cannon, mortars and recoilless rifles are "subject to the ITAR."  (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

[ PAGE  \* MERGEFORMAT ]

(3) 37mm grenade launchers "specially designed" for non-lethal grenades (e.g., tear gas, beanbag rounds) are controlled in ECCN 0A504.

*Items*:

a.      Guns and armament manufactured between 1890 and 1919.

b.      Military flame throwers with an effective range less than 20 meters.

c. through w.    [Reserved]

x.      "Parts," and "components," that are "specially designed" for a commodity subject to control in paragraphs .a or .b of this ECCN or a defense article in USML Category II and not elsewhere specified on the USML or the CCL.

*Note 1:   Forgings, castings, and other unfinished products, such as extrusions and machined bodies, that have reached a stage in manufacturing where they are clearly identifiable by material composition, geometry, or function as commodities controlled by ECCN 0A602.x are controlled by ECCN 0A602.x.*

*Note 2:   "Parts," "components," "accessories" and "attachments" specified in USML subcategory II(j) are subject to the controls of that paragraph*

*Note 3:   Black powder guns and armament manufactured in or prior to 1890 and replicas thereof designed for use with black powder propellants are EAR99 items.*

**ECCN 0A918    [Removed]**

23.  In Supplement No. 1 to Part 774, the Commerce Control List, remove ECCN 0A918.

**ECCN 0A984    [Removed]**

24.  In Supplement No. 1 to part 774, remove ECCN 0A984.

**ECCN 0A985    [Removed]**

25.  In Supplement No. 1 to part 774, remove ECCN 0A985.

**ECCN 0A986    [Removed]**

26.  In Supplement No. 1 to part 774, remove ECCN 0A986.

**ECCN 0A987    [Removed]**

DOC_0000386

27. In Supplement No. 1 to Part 774, the Commerce Control List, remove ECCN 0A987.

28. In Supplement No. 1 to Part 774, the Commerce Control List, Category 0, add, between the header that reads: "B. 'Test', 'Inspection' and 'Production Equipment' and the entry for ECCN 0B521, entries for ECCNs 0B501 and 0B505 to read as follows:

**0B501 Test, inspection, and production "equipment" and related commodities for the "development" or "production" of commodities enumerated or otherwise described in in ECCN 0A501 or USML Category I as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except equipment for ECCN 0A501.y | NS Column 1 |
| RS applies to entire entry except equipment for ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any item in this entry.

List of Items Controlled

*Related Controls:* N/A

*Related Definitions:* N/A

[ PAGE  \* MERGEFORMAT ]

*Items:*

a. Small arms chambering machines;

b. Small arms deep hole drilling machines and drills therefor;

c. Small arms rifling machines;

d. Small arms spill boring machines;

e. Dies, fixtures, and other tooling "specially designed" for the "production" of the items controlled in 0A501.a through .x. or USML Category I.

**0B505 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to paragraphs .a and .x | NS Column 1 |
| RS applies to paragraphs .a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to paragraphs .a, .d and .x | AT Column 1 |
| AT applies to paragraph .c | A license is required for export or reexport of these items to North Korea for anti-terrorism reasons. |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000
*GBS:* N/A
*CIV:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B505.

**List of Items Controlled**

[ PAGE \* MERGEFORMAT ]

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

a.     Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505 .a or .x or USML Category III.

b.     Equipment specially designed for the production of commodities in ECCN 0A505.b

c.     Equipment specially designed for the production of commodities in ECCN 0A505.c

d.     Equipment specially designed for the production of commodities in ECCN 0A505.d

e. through .w    [Reserved]

x.     "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

29.  In Supplement No. 1 to Part 774, the Commerce Control List, add, between entries for Export Control Classification Numbers (ECCNs) 0B521 and 0B604, an entry for ECCN 0B602 to read as follows:

**0B602 Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A602 or USML Category II as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*LVS:* $3000

*GBS:* N/A

*CIV:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0B602.

**List of Items Controlled**

*Related Controls:* N/A

*Related Definitions:* N/A

*Items:*

a. The following commodities if "specially designed" for the "development" or "production" of commodities enumerated in ECCN 0A602 or USML Category II:

a.1. Gun barrel rifling and broaching machines and tools therefor;

a.2. Gun barrel rifling machines;

a.3. Gun barrel trepanning machines;

a.4. Gun boring and turning machines;

a.5. Gun honing machines of 6 feet (183 cm) stroke or more;

a.6. Gun jump screw lathes;

a.7. Gun rifling machines; and

a. 8. Gun straightening presses.

b. Jigs and fixtures and other metal-working implements or accessories of the kinds exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II;

c. Other tooling and equipment, "specially designed" for the production of items in ECCN 0A602 or USML Category II;

d. Test and evaluation equipment and test models, including diagnostic instrumentation and physical test models, "specially designed" for items in ECCN 0A602 or USML Category II.

DOC_0000390

30. In Supplement No. 1 to Part 774, the Commerce Control List, add, between the entries for ECCNs 0D001 and 0D521, entries for ECCNs 0D501, 0D505 and 0D602 to read as follows:

**0D501 "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A501 or 0B501.**

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | NS Column 1 |
| RS applies to entire entry except "software" for commodities in ECCN 0A501.y or equipment in ECCN 0B501 for commodities in ECCN 0A501.y | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D501.

**List of Items Controlled**

*Related Controls*: "Software" required for and directly related to articles enumerated in USML Category I is subject to the ITAR (See 22 CFR §121.1, Category I).

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in this ECCN heading.

**0D505 "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.**

[ PAGE \* MERGEFORMAT ]

**License Requirements**

*Reason for Control*: NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to software for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a .and .x | NS Column 1 |
| RS applies to software for commodities in ECCN 0A505.a and .x and equipment in ECCN 0B505.a and .x | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to software for commodities in ECCN 0A505.a, .d or .x and equipment in ECCN 0B505.a, .d or .x | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "software" in 0D505.

**List of Items Controlled**

*Related Controls*: "Software" required for and directly related to articles enumerated in USML Category III is subject to the ITAR (See 22 CFR § 121.1, Category III).

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in this ECCN heading.

**0D602 "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A602 or 0B602 as follows (see List of Items Controlled).**

**License Requirements**

DOC_0000392

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A

*TSR:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0D602.

**List of Items Controlled**

*Related Controls:* (1) "Software" required for and directly related to articles enumerated in USML Category II is controlled under USML Category II(k). (2) See ECCN 0A919 for foreign-made "military commodities" that incorporate more than a *de minimis* amount of U.S.-origin "600 series" items.

*Related Definitions:* N/A

*Items:* "Software" "specially designed" for the "development," "production," operation, or maintenance of commodities controlled by ECCN 0A602 and ECCN 0B602.


31. In Supplement No. 1 to Part 774, the Commerce Control List, add, between the entries for ECCNs 0E018 and 0E521, entries for ECCNs 0E501, 0E502, and 0E505 to read as follows:


**0E501 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A501 or 0B501 as follows (see List of Items Controlled).**

**License Requirements**

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|

DOC_0000393

| NS applies to entire entry | NS Column 1 |
|---|---|
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used to ship any "technology" in ECCN 0E501.

**List of Items Controlled**

*Related Controls*: Technical data required for and directly related to articles enumerated in USML Category I are "subject to the ITAR."

*Related Definitions*: N/A

*Items*:

a. "Technology" "required" for the "development," or "production" of commodities controlled by ECCN 0A501 (other than 0A501.y).

b. "Technology" "required" for the operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A501 (other than 0A501.y) or 0B501.

**0E502 Technology" "required" for the "development" or "production," of commodities controlled by 0A502.**

**License Requirements**

*Reason for Control*: CC, UN

| Controls | Country Chart (See Supp. No. 1 part 738) |
|---|---|
| CC applies to entire entry | CC Column 1 |
| UN applies to entire entry | See § 746.1(b) for UN controls |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

DOC_0000394

*CIV:*  N/A

*TSR:*  N/A

## List of Items Controlled

*Related Controls*: N/A

*Related Definitions*: N/A

*Items*:

The list of items controlled is contained in the ECCN heading.

## 0E505 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.

## License Requirements

*Reason for Control:* NS, RS, UN, CC, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to "technology" for development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505; and for "software" for that equipment and those commodities in 0D505. | NS Column 1 |
| RS applies to entire entry except "technology" for development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a and .x; for equipment for those commodities in 0B505 and for "software" for those commodities and that equipment in 0D505. | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| CC applies to technology for the "development" or "production" of | CC Column 1 |

DOC_0000395

| | |
|---|---|
| commodities in 0A505.b | |
| AT applies to technology for development," "production," operation, installation, maintenance, repair, overhaul or refurbishing commodities in 0A505.a, .d and .x | AT Column 1 |

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV:* N/A

*TSR:* N/A

**Special conditions for STA**

*STA:* Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any "technology" in 0E505.

**List of Items Controlled**

*Related Controls:* Technical data required for and directly related to articles enumerated in USML Category III are subject to the ITAR (See 22 CFR § 121.1, Category III).

*Related Definitions:* N/A

*Items:*

The list of items controlled is contained in this ECCN heading.

32. In Supplement No. 1 to Part 774, the Commerce Control List, add, between the entries for ECCNs 0E521 and 0E606 an entry for ECCN 0E602:


**0E602 "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A602 or 0B602, or "software" controlled by 0D602 as follows (see List of Items Controlled).**

License Requirements

*Reason for Control:* NS, RS, UN, AT

| Control(s) | Country Chart (See Supp. No. 1 to part 738) |
|---|---|
| NS applies to entire entry | NS Column 1 |
| RS applies to entire entry | RS Column 1 |
| UN applies to entire entry | See § 746.1 for UN controls |
| AT applies to entire entry | AT Column 1 |

[ PAGE \\* MERGEFORMAT ]

**List Based License Exceptions (See Part 740 for a description of all license exceptions)**

*CIV*: N/A

*TSR*: N/A

**Special conditions for STA**

*STA*: Paragraph (c)(2) of License Exception STA (§ 740.20(c)(2) of the EAR) may not be used for any item in 0E602.

List of Items Controlled

*Related Controls*: Technical data directly related to articles enumerated in USML Category II are "subject to the ITAR."

*Related Definitions*: N/A

*Items*: "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, or overhaul of commodities controlled by ECCN 0A602 or 0B602, or "software" controlled by ECCN 0D602.

**ECCN 0E918 – [REMOVED]**

33. In Supplement No. 1 to Part 774, the Commerce Control List, remove the entire entry for ECCN 0E918.

**[ECCN 0E982 – revised]**

34. In Supplement No. 1 to Part 774, the Commerce Control List, ECCN 0E982 is revised by removing "0A985" from the headed and the "Control(s)" paragraph and adding in its place "0A503".

**ECCN 0E984 – [REMOVED]**

35. In Supplement No. 1 to Part 774, the Commerce Control List, remove the entry for ECCN 0E984.

36. In Supplement No. 1 to Part 774, Category 2 Materials Processing, Product Group B, revise ECCN 2B018 to read as follows:

DOC_0000397

**2B018 Equipment on the Wassenaar Munitions List.**

No commodities currently are controlled by this entry. Commodities formerly controlled by paragraphs .a through .d, .m and .s of this entry are controlled in ECCN 0B606. Commodities formerly controlled by paragraphs .e through .l of this entry are controlled by ECCN 0B602. Commodities formerly controlled by paragraphs .o through .r of this entry are controlled by ECCN 0B501. Commodities formerly controlled by paragraph .n of this entry are controlled in ECCN 0B501 if they are "specially designed" for the "production" of the items controlled in ECCN 0A501.a through .x or USML Category I and controlled in ECCN 0B602 if they are of the kind exclusively designed for use in the manufacture of items in ECCN 0A602 or USML Category II.

**ECCN 2B004    [Amended]**

37. In Supplement No. 1 to Part 774, Category 2 Materials Processing, Product Group B amend ECCN 2B004 by removing "2B018" from the related controls paragraph and adding in its place "0B501, 0B606, 0B606".

38. In Supplement No. 1 to Part 774, Category 2 Materials Processing, Product Group D revise ECCN 2D018 to read as follows:

**2D018 "Software" for the "development", "production", or "use" of equipment controlled by 2B018.**

No software is currently controlled under this entry. See ECCNs 0D501, 0D602 and 0D606 for software formerly controlled under this entry.

39. In Supplement No. 1 to Part 774, Category 2, Materials Processing, Product Group E, amend ECCN 2E001 by removing "2B018" and the comma that follows it from the Control(s) table.

40. In Supplement No. 1 to Part 774, Category 2, Materials Processing, Product Group E, amend ECCN 2E002 by removing "2B018" and the comma that follows it from the Control(s) table.

DATED:

Kevin J. Wolf

Assistant Secretary for Export Administration

[ PAGE  \* MERGEFORMAT ]

**From:** Jim Bartlett, Law Office of James E. Bartlett III, pllc [████@fullcirclecompliance.eu]
**Sent:** 5/10/2018 8:00:18 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0510 Tuesday "Daily Bugle"



## Thursday, 10 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. President Continues National Emergency with Respect to Syrian Government

2. State Imposes Nonproliferation Measures Against Foreign Entities and Persons, Including a Ban on U.S. Government Procurement

3. USTR Announces New 4-Year Charter Term, Welcomes Nominations for ITACs

### OTHER GOVERNMENT SOURCES

4. Items Scheduled for Publication in Future Federal Register Editions

5. Commerce/BIS: (No new postings.)

6. DHS/ICE Removes Italian National Convicted of Weapons Trafficking

7. State/DDTC Recognizes and Honors Foreign Government Classification Markings

8. Canada Global Affairs Releases Excerpts from Foreign Affairs Minister's Speech Concerning Arms Export Controls

9. German BAFA Plans to Extend 4 General Licenses

10. UK EJCU Updates Guide on Exporting to Iran Following U.S. Withdrawal from Iran Nuclear Deal

### NEWS

11. American Shipper: "Compliance 360: Minding Export Control Reform"

12. Ars Technica: "The Trump Administration Just Forced Smartphone Maker ZTE to Shut Down"

13. C4ISRNET: "In the Future, Iran Could 3D-Print its Way Around Sanctions"

14.   DDTC's Mike Miller Announces Expected ITAR Changes

15.   The Guardian: "How Trump's Iran Deal Exit Could Hit Aviation, Oil and Car Industries"

16.   Reuters: "U.S. Sanctions Iranians Days after Trump Withdraws from Nuclear Deal"

17.   ST&R Trade Report: "Import and Export Restrictions on Synthetic Opioid Continued"

COMMENTARY

18.   The Export Compliance Journal: "The Curious (Export Violation) Case of ZTE"

19.   J. Creek: "Steel and Aluminum Tariff Exemptions Extended... For Now"

20.   S. Kao, H. Keerikatte & S. Oliai: "Impact of U.S. Withdrawal from Iran Nuclear Deal"

21.   T.R. McVey: "FLIR's ITAR Penalty Case Provides Valuable Compliance Lessons"

EX/IM TRAINING EVENTS & CONFERENCES

22.   ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 12-13 Sep in Annapolis, MD

EDITOR'S NOTES

23.   Bartlett's Unfamiliar Quotations

24.   Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (5 Apr 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

25.   Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

## 1. President Continues National Emergency with Respect to Syrian Government

(Source: Federal Register, 10 May 2018.)

83 FR 21839-21840: Continuation of the National Emergency with Respect to the Actions of the Government of Syria

On May 11, 2004, pursuant to his authority under the International Emergency Economic Powers Act, 50 U.S.C. 1701-1706, and the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003, Public Law 108-175, the President issued Executive Order 13338, in which he declared a national emergency with respect to the actions of the Government of Syria. To deal with this national emergency, Executive Order 13338 authorized the blocking of property of certain persons and prohibited the exportation or reexportation of certain goods to Syria. The national emergency was modified in scope and relied upon for additional steps taken in Executive Order 13399 of April 25, 2006, Executive Order 13460 of February 13, 2008, Executive Order 13572 of April 29, 2011, Executive Order 13573 of May 18, 2011, Executive Order 13582 of August 17, 2011, Executive Order 13606 of April 22, 2012, and Executive Order 13608 of May 1, 2012.

The President took these actions to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States constituted by the actions of the Government of Syria in supporting terrorism, maintaining its then-existing occupation of Lebanon, pursuing weapons of mass destruction and missile programs, and undermining United States and international efforts with respect to the stabilization and reconstruction of Iraq.

The regime's brutality and repression of the Syrian people, who have been calling for freedom and a representative government, not only endangers the Syrian people themselves, but also generates instability throughout the region. The Syrian regime's actions and policies, including with respect to chemical weapons, supporting terrorist organizations, and obstructing the Lebanese government's ability to function effectively, continue to foster the rise of extremism and sectarianism and pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. As a result, the national emergency declared on May 11, 2004, and the measures to deal with that emergency adopted on that date in Executive Order 13338; on April 25, 2006, in Executive Order 13399; on February 13, 2008, in Executive Order 13460; on April 29, 2011, in Executive Order 13572; on May 18, 2011, in Executive Order 13573; on August 17, 2011, in Executive Order 13582; on April 22, 2012, in Executive Order 13606; and on May 1, 2012, in Executive Order 13608, must continue in effect beyond May 11, 2018. Therefore, in accordance with section 202(d) of the National Emergencies Act, 50 U.S.C. 1622(d), I am continuing for 1 year the national emergency declared with respect to the actions of the Government of Syria.

In addition, the United States condemns the Assad regime's use of brutal violence and human rights abuses and calls on the Assad regime to stop its violence against the Syrian people, uphold the Cessation of Hostilities, enable the delivery of humanitarian assistance, and allow a political transition in Syria that will forge a credible path to a future of greater freedom, democracy, opportunity, and justice.

The United States will consider changes in the composition, policies, and actions of the Government of Syria in determining whether to continue or terminate this national emergency in the future.

This notice shall be published in the Federal Register and transmitted to the Congress.

  [Presidential Signature.]
THE WHITE HOUSE, May 9, 2018.

back to top

* * * * * * * * * * * * * * * * * * * * *

## 2. State Imposes Nonproliferation Measures Against Foreign Entities and Persons, Including a Ban on U.S. Government Procurement

(Source: Federal Register, 10 May 2018.) [Excerpts.]

83 FR 21812-21813: Imposition of Nonproliferation Measures Against Foreign Persons, Including a Ban on U.S. Government Procurement

* AGENCY: Bureau of International Security and Nonproliferation, Department of State.

* ACTION: Notice.

* SUMMARY: A determination has been made that a number of foreign persons have engaged in activities that warrant the imposition of measures pursuant to Section 3 of the Iran, North Korea, and Syria Nonproliferation Act. The Act provides for penalties on foreign entities and individuals for the transfer to or acquisition from Iran since January 1, 1999; the transfer to or acquisition from Syria since January 1, 2005; or the transfer to or acquisition from North Korea since January 1, 2006, of goods, services, or technology controlled under multilateral control lists (Missile Technology Control Regime, Australia Group, Chemical Weapons Convention, Nuclear Suppliers Group, Wassenaar Arrangement) or otherwise having the potential to make a material contribution to the development of weapons of mass destruction (WMD) or cruise or ballistic missile systems. The latter category includes items of the same kind as those on multilateral lists but falling below the control list parameters when it is determined that such items have the potential of making a material contribution to WMD or cruise or ballistic missile systems, items on U.S. national control lists for WMD/missile reasons that are not on multilateral lists, and other items with the potential of making such a material contribution when added through case-by-case decisions.

* DATES: April 30, 2018. ...

* SUPPLEMENTARY INFORMATION: On April 30, 2018 the U.S. Government applied the measures authorized in Section 3 of the Iran, North Korea, and Syria Nonproliferation Act (Pub. L. 109-353) against the following foreign persons identified in the report submitted pursuant to Section 2(a) of the Act:

- Abascience Tech Co., Ltd. (China) and any successor, sub-unit, or subsidiary thereof;
- Easy Fashion Metal Products Trade Company [aka Easyfashion Industries] (China) and any successor, sub-unit, or subsidiary thereof;
- Emily Liu (Chinese individual);
- Karl Lee [aka Li Fangwei] (Chinese individual);
- Raybeam Optronics Co., Ltd (China) and any successor, sub-unit, or subsidiary thereof;
- Shanghai Rotech Pharmaceutical Engineering Company (China) and any successor, sub-unit, or subsidiary thereof;
- Sinotech (Dalian) Carbon and Graphite Corporation (SCGC) (China) and any successor, sub-unit, or subsidiary thereof;
- Sunway Tech Co., Ltd (China) and any successor, sub-unit, or subsidiary thereof;
- T-Rubber Co. Ltd (China) and any successor, sub-unit, or subsidiary thereof;
- Sakr Factory for Developmental Industries (Egypt) and any successor, sub-unit, or subsidiary thereof;
- Mojtaba Ghasemi (Iranian individual);
- Islamic Revolutionary Guard Corps Qods Force (IRGC QF) (Iran) and any successor, sub-unit, or subsidiary thereof;
- Pars Aviation Service Company (PASC) (Iran) and any successor, sub-unit, or subsidiary thereof;
- Defense Industries Organization (DIO) (Iran) and any successor, sub-unit, or subsidiary thereof;
- Saeng Pil Trading Corporation (SPTC) (North Korea) and any successor, sub-unit, or subsidiary thereof;
- Second Economic Committee (SEC) Korea Ryonbong General Corporation (North Korea) and any successor, sub-unit, or subsidiary thereof;
- 183rd Guard Air Defense Missile Regiment (Russia) and any successor, sub-unit, or subsidiary thereof;
- Instrument Design Bureau (KBP) Tula (Russia) and any successor, sub-unit, or subsidiary thereof;
- Gatchina Surface-to-Air Missile Training Center (Russia) and any successor, sub-unit, or subsidiary thereof;
- Russian General Staff Main Intelligence Directorate (GRU) (Russia) and any successor, sub-unit, or subsidiary thereof;
- 18th Central Scientific Research Institute (18th TsNII) Scientific Research Center (NITs) (Kursk) (Russia) and any successor, sub-unit, or subsidiary thereof;
- Russian Research and Production Concern (BARL) and any successor, sub-unit, or subsidiary thereof;
- Scientific Studies and Research Center (SSRC) (Syria) and any successor, sub-unit, or subsidiary thereof;
- Lebanese Hizballah (Syria) and any successor, sub-unit, or subsidiary thereof;

- Megatrade (Syria) and any successor, sub-unit, or subsidiary thereof;
- Syrian Air Force (Syria) and any successor, sub-unit, or subsidiary thereof;
- Seden Denizcilik Hizmeleri Sanayi de Ticaret Limited (Turkey) and any successor, sub-unit, or subsidiary thereof; and
- Yona Star International (United Arab Emirates) and any successor, sub-unit, or subsidiary thereof.

Accordingly, pursuant to Section 3 of the Act, the following measures are imposed on these persons:

(1) No department or agency of the United States Government may procure or enter into any contract for the procurement of any goods, technology, or services from these foreign persons, except to the extent that the Secretary of State otherwise may determine;

(2) No department or agency of the United States Government may provide any assistance to these foreign persons, and these persons shall not be eligible to participate in any assistance program of the United States Government, except to the extent that the Secretary of State otherwise may determine;

(3) No United States Government sales to these foreign persons of any item on the United States Munitions List are permitted, and all sales to these persons of any defense articles, defense services, or design and construction services under the Arms Export Control Act are terminated; and

(4) No new individual licenses shall be granted for the transfer to these foreign persons of items the export of which is controlled under the Export Administration Act of 1979 or the Export Administration Regulations, and any existing such licenses are suspended.

These measures shall be implemented by the responsible departments and agencies of the United States Government and will remain in place for two years from the effective date, except to the extent that the Secretary of State may subsequently determine otherwise.

Christopher A. Ford, Assistant Secretary of State for International Security and Nonproliferation.

back to top

* * * * * * * * * * * * * * * * * * * *

## 3. USTR Announces New 4-Year Charter Term, Welcomes Nominations for ITACs
(Source: Federal Register, 10 May 2018.) [Excerpts.]

83 FR 21813-21815: Notice of Continuation and Request for Nominations for the Industry Trade Advisory Committees

* AGENCY: Office of the United States Trade Representative (USTR).
* ACTION: Notice and request for applications.

* SUMMARY: The United States Trade Representative (Trade Representative) and the Secretary of Commerce (Secretary) have established a new four-year charter term ending in February 2022, and are accepting applications from qualified individuals interested in serving as a member of an Industry Trade Advisory Committee (ITAC). The ITACs provide detailed policy and technical advice, information, and recommendations to the Secretary and the Trade Representative regarding trade barriers, negotiation of trade agreements, and implementation of existing trade agreements affecting industry sectors, and perform other advisory functions relevant to U.S. trade policy matters. There currently are opportunities for membership on each ITAC and we will accept nominations throughout the charter term.
* DATES: We will accept nominations for membership on the ITACs throughout the four-year charter term. ...

* SUPPLEMENTARY INFORMATION: ... The ITACs provide detailed policy and technical advice, information, and recommendations to the Secretary and the Trade Representative on trade policy matters including: (1) Negotiating objectives and bargaining positions before entering into trade agreements; (2) the impact of the implementation of trade agreements on the relevant sector; (3) matters concerning the operation of any trade agreement once entered into; and (4) other matters arising in connection with the development, implementation, and administration of the trade policy of the United States. The nonpartisan, industry input provided by the ITACs is important in developing unified trade policy objectives and positions when the United States negotiates and implements trade agreements.

The ITACs address market-access problems, trade barriers, tariffs, discriminatory foreign procurement practices, and information, marketing, and advocacy needs of their industry sector. Eleven ITACs (ITACS 1-11) provide advice and information on issues that affect specific sectors of U.S. industry. Three ITACs (ITACs 12-14) focus on crosscutting functional issues that affect all industry sectors and include specifically appointed members along with non-voting members from the industry specific ITACs to represent a broad range of industry perspectives. The ITACs may address other trade policy issues, e.g., government procurement and subsidies, in ad hoc working groups. ...

[T]he Secretary and the Trade Representative have established new four-year charter terms for the following ITACs, that began on February 14, 2018 and will end on February 14, 2022.

ITAC 1 Aerospace Equipment
ITAC 2 Automotive Equipment and Capital Goods
ITAC 3 Chemicals, Pharmaceuticals, Health/Science Products and Services
ITAC 4 Consumer Goods
ITAC 5 Forest Products, Building Materials, Construction and Nonferrous Metals
ITAC 6 Energy and Energy Services
ITAC 7 Steel
ITAC 8 Digital Economy
ITAC 9 Small and Minority Business
ITAC 10 Services
ITAC 11 Textiles and Clothing
ITAC 12 Customs Matters and Trade Facilitation

ITAC 13 Intellectual Property Rights
ITAC 14 Standards and Technical Trade Barriers ...

Gregory Walters, Assistant United States Trade Representative for
Intergovernmental Affairs and Public Engagement, Office of the United States
Trade Representative.

back to top

* * * * * * * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 4. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* President; ADMINISTRATIVE ORDERS; Central African Republic;
Continuation of National Emergency (Notice of May 10, 2018) [Publication
Date: 11 May 2018.]

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 5.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * * * *

## 6.
## DHS/ICE Removes Italian National Convicted of Weapons Trafficking
(Source: DHS/ICE, 10 May 2018.)

An Italian national, and member of the Italian military, convicted of weapons
trafficking was returned to his home country Tuesday by U.S. Immigration
and Customs Enforcement's (ICE) Enforcement and Removal Operations
(ERO) deportation officers. This is following a joint investigation by U.S.
Immigration and Customs Enforcement (ICE) Homeland Security
Investigations (HSI) in New York and the Department of Defense, Defense
Criminal Investigative Service, Northeast Field Office (DCIS) which led to a
guilty plea and subsequent sentencing.

ERO deportation officers escorted Giovanni Zannoni, 35, who was removed
from the United States via a commercial flight. Zannoni was transferred into
the custody of Italian law enforcement authorities upon arrival in Milan.

In May 2017, Zannoni, entered the United States under the Visa Waiver Program (VWP) with authorization to remain in the United States until August 2017. One day after his entry, Zannoni was arrested by HSI and charged in U.S. District Court-Eastern District of New York (EDNY) with weapons trafficking. On Sept. 22, 2017, Zannoni was convicted in EDNY of a violation of the Arms Export Control Act and sentenced to 11 months imprisonment. Additionally, he agreed to forfeit $436,673, gun parts, and night vision and thermal imaging devices. Zannoni was transferred to ICE custody in April 2018, while the agency finalized his return.

According to court records, between June 2013 and May 2017, Zannoni illegally exported and attempted to export night vision goggles and assault rifle components designated as defense articles on the United States Munitions List. The United States Department of State requires a license for the export of sensitive night vision equipment and assault rifle components, and has placed restrictions on the export of items that it has determined could make a significant contribution to the military potential and weapons proliferation of other nations and that could be detrimental to the foreign policy and national security of the United States.

back to top

* * * * * * * * * * * * * * * * * * * *

## 7.
State/DDTC Recognizes and Honors Foreign Government Classification Markings
(Source: State/DDTC, 10 May 2018.)

According to the current *Foreign Affairs Manual*, the U.S. Department of State recognizes and honors all foreign government classification markings. All documents submitted to DDTC with foreign government classification markings should be treated as classified material and be transmitted in the same manner as U.S.-origin classified documents.

Pursuant to guidance by the Bureau of Diplomatic Security, as of February 3, 2005, DDTC will treat all documents marked "UK-Restricted" as Sensitive-But-Unclassified (SBU).

back to top

* * * * * * * * * * * * * * * * * * * *

## 8.
Canada Global Affairs Releases Excerpts from Foreign Affairs Minister's Speech Concerning Arms Export Controls
(Source: Canada Global Affairs, 7 May 2018.)

Excerpt from the Speech by the Honourable Chrystia Freeland, Minister of Foreign Affairs, to the Standing Committee on Foreign Affairs and International Development on February 8, 2018:

Last summer, we became aware of media reports of the possible misuse of Canadian-made vehicles in security operations in Saudi Arabia's Eastern Province.

At that time, I asked officials at Global Affairs Canada to conduct a full and thorough investigation of these reports.

Today, I can confirm that officials at Global Affairs Canada found no conclusive evidence that Canadian-made vehicles were used in human rights violations. That was the independent, objective opinion of our public service and the advice given to me as minister.

This experience did, however, cause me to pause and reexamine Canada's export permit system.

My conclusion was that Canada can do better.

Canada is not alone in the world in taking stock of how we allow and monitor the export of arms, and of the considerations that go into those decisions. I have spoken with my counterparts in Germany, Sweden and The Netherlands, for example, whose countries have all recently-in one way or another-questioned how arms are exported.

I am proud of the important commitment that our government made with Bill C-47, which would amend the Export and Import Permits Act to allow Canada to accede to the Arms Trade Treaty [ATT]. This is the first treaty to tackle the illicit trade in conventional weapons, and it sets an essential standard for the international community.

It is long overdue that Canada joins many of our NATO and G7 partners by acceding to the ATT.

We have heard support for the Arms Trade Treaty from civil society, from NGOs, and from Canadians. We also heard the clear desire to do better. We need to be ambitious and strengthen Bill C-47.

We had originally planned to place the criteria by which exports are judged, including human rights, into regulation. But we heard from committee members and civil society that they would like to see the Arms Trade Treaty criteria placed directly into legislation. This would include the consideration of peace and security, human rights and gender-based violence. I can say today that this is something we would welcome.

Going further than that, our government is today announcing its support for the inclusion of a substantial risk clause in the law.

Such a clause would mean that our government, and indeed future governments, would not allow the export of a controlled good if there were a substantial risk that it could be used to commit human rights violations.

A substantial risk clause would mean that Global Affairs Canada would need to ensure-before the export of controlled goods-that we have a high level of confidence that controlled exports will not be used to commit human rights abuses.

This is a significant decision. It will mean changes in how Canada regulates selling weapons. This is the right thing to do. Canadians fundamentally care about human rights for all, and Canadians rightly expect that exports are not used to violate human rights...

These two amendments will also provide clarity to industry, by laying out the government's, and Canadians', expectations for our export

control process. We will work with Canadian industry to continue to
provide it with appropriate guidance.

- Link: <u>Speech by the Honourable Chrystia Freeland, Minister of Foreign Affairs, to</u>
<u>the Standing Committee on Foreign Affairs and International Development.</u> A copy of
the document, redacted in accordance with the provisions of the Canada Evidence
Act, is available at the link below. The document, classified as "secret" is now
considered "unclassified with redactions".
- Link: <u>Memo</u> (in PDF).

<u>back to top</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9.
## German BAFA Plans to Extend 4 General Licenses
(Source: <u>German BAFA,</u> 10 May 2018.)

The German Federal Office for Economic Affairs and Export Control (BAFA)
plans to extend General Licenses No. 18, No. 19, No. 23, No. 25, and No. 27
until 30 March 2019 due to a continuing coordination process.

Read the BAFA update (in German) <u>here.</u>

<u>back to top</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10.
## UK EJCU Updates Guide on Exporting to Iran Following U.S.
## Withdrawal from Iran Nuclear Deal
(Source: <u>UK DIT/EJCU,</u> 8 May 2018.)

The Export Control Joint Unit (EJCU) of the UK Department of International
Trade (DIT) has updated its guide on exporting to Iran to include information
about the U.S. withdrawal from the Iran Nuclear Deal. The guide
(available <u>here)</u> contains information on:

- Iran export overview
- preparing to do business in Iran
- Iranian economy and doing business in Iran
- opportunities for UK businesses in Iran
- challenges and risks of doing business in Iran
- starting-up in Iran
- legal system in Iran
- banking and finance in Iran
- tax and customs considerations in Iran
- entry requirements for doing business in Iran
- contacts in Iran

<u>back to top</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. American Shipper: "Compliance 360: Minding Export Control Reform"

(Source: American Shipper, 8 May 2018.) [Excerpts.]

*The Trump administration may not trumpet it, but U.S. export control reform continues unabated and exporters should stay tuned. ...*

The State Department seeks to publish changes this year to the USML categories VI (surface vessels of war and special naval equipment); VII (ground vehicles); XII (fire control, range finder, optical and guidance and control equipment); and XX (submersible vessels and related articles), the official said.

The State and Commerce departments also have submitted to the White House Office of Management and Budget (OMB) proposed rules to shift items to the Commerce Control List (CCL) from the three USML categories that the previous administration didn't touch - categories I (firearms, close assault weapons and combat shotguns), II (guns and armament), and III (ammunition/ordnance). ...

OMB completed its review of those proposed rules on April 11, but they have not yet been signed off for publication, the [State Department] spokesperson said. ...

*[Editor's Note: due to copyright restrictions, we are not authorized to include the entire item. To read the remaining sections, please lick on the source link below the item title.]*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12.
## Ars Technica: "The Trump Administration Just Forced Smartphone Maker ZTE to Shut Down"
(Source: Ars Technica, 9 May 2018.)

*ZTE apparently couldn't continue without Qualcomm chips and Android software.*

One of the leading Chinese smartphone makers, ZTE, is shutting down global operations in the face of crippling sanctions levied by the US government. ZTE is China's number-two smartphone maker, and as recently as last year it was the number-four smartphone vendor in the US.

"The major operating activities of the Company have ceased," ZTE wrote (PDF) in a Wednesday announcement to stock market traders in Hong Kong.

ZTE's business became untenable after a US government order banned American companies from exporting technology to the Chinese smartphone maker. ZTE is heavily dependent on US-made components, especially Qualcomm chips and Google's Android software stack.

Last year, ZTE admitted to an elaborate multi-year scheme to sell US-made technology to Iran and North Korea in violation of US sanctions laws. ZTE paid $890 million in penalties and said it was in the process of disciplining dozens of senior company officials who had orchestrated a scheme to violate US sanctions laws.

But last month the Trump administration accused ZTE of continuing to lie to the US government even after last year's guilty plea. The company told the US government that the guilty executives had received letters of reprimand and had had their 2016 bonuses reduced. But the US now says that was a lie-many of the employees received full bonuses, and they didn't receive letters of reprimand until early 2018-after the US government challenged ZTE on the issue.

In the April 15 order activating the export ban against ZTE, US Commerce Department official Richard Majauskas wrote that ZTE had demonstrated a "pattern of deception, false statements, and repeated violations." A July 2017 letter to US officials was "brimming with false statements," he said.

Since 2011, Majauskas argued, ZTE had "employed multiple strategies in an attempt to conceal and obscure the true nature and extent of the company's role" in transactions that moved US-made technology to Iran and North Korea. "As a result of the conspiracy, ZTE was able to obtain hundreds of millions of dollars in contracts with and sales from Iranian entities to ship routers, microprocessors, and servers" that were subject to US export restrictions.

So on April 15, the US Commerce Department invoked the nuclear option, banning US companies from doing business with ZTE.

Unfortunately for ZTE, US-made hardware and software are a huge part of ZTE's products. According to Reuters, at least 25 percent of the components in ZTE's phones came from US companies. ZTE makes heavy use of Qualcomm chips for its smartphones and other products.

Even worse, the export ban included Google's suite of standard Android apps. While the Android operating system itself is open source, Google has maintained control over apps like Google Maps and, most importantly, the Play Store. Outside of China, it's difficult to sell an Android phone without access to Google's app store.

Now it appears that ZTE is on the verge of going out of business altogether. ZTE says it is "actively communicating with the relevant US government departments" to negotiate a reversal of the export ban. But it's hard to imagine the Trump administration reversing course at this point. And ZTE would need to redesign many of its products from scratch to manufacture them without US-made chips or software.

ZTE's demise is the latest sign of a deepening trade rift between the United States and China, with information technology being a particular flashpoint. China's other leading smartphone maker, Huawei, has struggled to make deals with US wireless carriers due to pressure from US regulators worried about national security. And in the last year, the Trump administration has blocked at least two deals that would have put US semiconductor firms under the control of Chinese companies.

Chinese President Xi Jinping has responded by calling on China to become more self-sufficient in information technology.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 13.
## C4ISRNET: "In the Future, Iran Could 3D-Print its Way Around Sanctions"
(Source: C4ISRNET, 9 May 2018.)

Reverse engineering airplane replacement parts is a tricky task, especially when the parts themselves are in short supply and the cost of error is a plane crashing. Which is part of what makes sanctions on airplanes, and repair parts, so damaging: there just aren't that many ways around not having the right parts. Or at least, there weren't, but 3D printing changes that whole picture. A new RAND study on the way additive manufacturing, better known as 3D printing, could create new security threats details everything from printed grenades to lost job security. Nested in the report is one risk with a more immediate impact: 3D printing as a way for nations to get around the ramifications of sanctions.

Take, for example, the case of commercial aircraft in Iran. As part of the Joint Comprehensive Plan of Action, or the Iran Deal, the United States agreed to lift sanctions on commercial aircraft and aircraft parts. With sanctions lifted, the Iran was set to buy or lease almost 120 new Boeing aircraft, which the airline boasted as a move that would finally bring the average age of planes in its fleet down below 20 years. With the Trump administration withdrawing from the deal, those plane orders are unlikely to go through, and the airline will have to rely on an aging fleet of craft, with whatever spare parts it has on hand to keep them in the air.

By the middle of this century, 3D printing could make nations like Iran self-sufficient when it comes to maintaining fleets of foreign-built aircraft. From RAND:

[The] 2015 Joint Comprehensive Plan of Action nuclear agreement between the United States and Iran specified various forms of sanctions relief for Iran. The January 2017 delivery of an Airbus A321 was particularly noteworthy: It was Iran's first new Western-made aircraft in several decades, representing a new day for a domestic airline that had become infamous for its crashes as the aging fleet struggled to fly using only "smuggled or improvised parts." In the future, such challenges could be overcome more easily using [additive manufacturing]. And while [additive manufacturing] might reduce the number of accidents, that benefit comes at the cost of weakening the effectiveness of sanctions, which represent a basic tool for managing geopolitical challenges.

For sanctioned nations (and, in this case, the passengers on airlines operated by those nations), 3D printing can be a lifesaving tool. In so doing, it absolutely undermines the coercive power of sanctions regimes. Files for parts are much easier to transmit across borders and around controls than parts or part-making equipment itself. And while smuggling industrial plans is as old as the industrial revolution itself, export controls on intellectual property and industrial design are in place to make it extremely difficult. Tools like 3D printing undercut that power, using the interconnectedness of the web as a route around 20th century controls.

  "With access to printers, raw materials, and designs," the RAND paper continues, "a state could more easily weather the hardship of such restrictions."

back to top

* * * * * * * * * * * * * * * * * * * *

## 14.
## DDTC's Mike Miller Announces Expected ITAR Changes
(Source: Editor, 10 May 2018.)

In today's public meeting of the Defense Trade Advisory Group (DTAG) in Washington, DC, Michael Miller, Asst. Sec. of State for Defense Trade and Director, Directorate of Defense Trade Controls (DDTC) told attendees that the following changes to the ITAR are expected:

  - USML Categories I, II, and III "in the not too distant future."

  - USML Categories VI, VII, XII, and XX by the end of this year.

  - Comments will be sought soon on proposed changes to USML Categories V, X, and XI.

  - ITAR section 126.4 exemption for shipments by and for U.S. Government agencies to be amended to include permanent transfers in addition to the current temporary transfers.

Mr. Miller also solicited feedback from users of DDTC's redesigned website that was launched 30 April 2018, and on the proposed DS-7787: Disclosure of Violations of the Arms Export Control Act form to allow Industry personnel to submit Disclosures directly through DDTC's Defense Export Compliance and Control System (DECCS).  Comments should be submitted to DDTCResponseTeam@state.gov.

Also presented at the DTAG meeting were the results of the DTAG working groups that proposed amendments to the ITAR.  The presentation materials from those groups will be posted on DDTC's DTAG website at a later date.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15.
## The Guardian: "How Trump's Iran Deal Exit Could Hit Aviation, Oil, and Car Industries"
(Source: The Guardian, 9 May 2018.) [Excerpts.]

Billions of dollars of deals signed by international companies with Iran are under threat after the US president, Donald Trump, announced he was pulling out of a "rotten" nuclear deal with Tehran.

Iran's agreement in 2015 to curb its nuclear ambitions led to the US easing crippling sanctions, in a rapprochement in which big firms seized an opportunity to invest in a global top-30 economy with a population of about 80 million.

Within a year, landmark deals were being signed in sectors including oil and gas, aviation and the automotive industry, with firms in France, the UK and Germany among the quickest to invest. ...

A new regime of sanctions means restrictions are expected on many things, from exports of US machine parts to loans made in dollars.

Companies with any exposure to Iran will also have to tread very carefully or face the prospect of huge fines. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. Reuters: "U.S. Sanctions Iranians Days after Trump Withdraws from Nuclear Deal"
(Source: Reuters, 10 May 2018.)

The U.S. Treasury imposed fresh sanctions on Thursday against six people it linked to the Iranian Revolutionary Guard's elite Qods Force and three Iranian entities, just days after President Donald Trump withdrew from the Iran nuclear deal.

The six individuals and three entities were sanctioned under U.S. regulations targeting specially designated global terrorist suspects and Iranian financial activity, the Treasury Department said in a statement on its website.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DOC_0000981

## 17. ST&R Trade Report: "Import and Export Restrictions on Synthetic Opioid Continued"
(Source: Sandler, Travis & Rosenberg Trade Report, 10 May 2018.)

The Drug Enforcement Administration has extended for one year the temporary placement into schedule I of the Controlled Substances Act the synthetic opioid N-[1-[2-hydroxy-2-(thiophen-2-yl)ethyl]piperidin-4-yl]-Nphenylpropionamide, also known as N-[1-[2-hydroxy-2-(2-thienyl)ethyl]-4-piperidinyl]-N-phenylpropanamide (beta-hydroxythiofentanyl), and its isomers, esters, ethers, salts, and salts of isomers, esters and ethers.

As a result, effective through May 12, 2019, beta-hydroxythiofentanyl will remain subject to the regulatory controls and administrative, civil, and criminal sanctions applicable to the manufacture, distribution, reverse distribution, importation, exportation, research, conduct of instructional activities and chemical analysis, and possession of schedule I controlled substances.

The DEA has also issued a proposed rule that would permanently place this product into schedule I. Comments are due by June 14.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

MORE INFORMATION AVAILABLE HERE

## COMMENTARY

## 18. The Export Compliance Journal: "The Curious (Export Violation) Case of ZTE"
(Source: The Export Compliance Journal, 9 May 2018.)

On April 16, 2018, the US Department of Commerce's Bureau of Industry and Security (BIS) announced that they were re-imposing a denial of export privileges against Chinese tech giant, ZTE.

The news follows a previous action from 2017 where ZTE (aka Zhongxing Telecommunications Equipment Corporation) pled guilty to charges of conspiring to violate U.S. sanctions surrounding the shipment of U.S. origin goods to Iran and North Korea from 2010 to 2016. In that case, ZTE admitted to knowingly thwarting the law by intentionally disguising shipments.

They were ultimately charged with violating U.S. sanctions, obstruction of justice, and making "a materially false statement." The result was a USD $1.19 billion fine-the single largest export violation in history. [FN/1]

The U.S. government ultimately lessened the financial penalty by $300 million, and suspended the seven-year trade debarment, so long as the offending employees were punished (among other stipulations).

And that should have been the end of it.

*Out of the Export Sanctions Frying Pan...*

Except that it was not. Incredibly, ZTE recently fell afoul of the law again. Instead of reprimanding those involved with the initial illegal conduct, they were paid full bonuses. [FN/2] Upon discovery, the U.S. Department of Commerce responded by re-imposing the seven-year export ban that forbids U.S. companies from engaging in business with ZTE.

The ensuing fallout for ZTE has been severe. Following the April 16 announcement, the company's shares were suspended from trading in Hong Kong and Shenzen, and the debarment, the company says, could "threaten its very survival." [FN/3]

Also impacting ZTE is a warning from the U.K.'s National Cyber Security Center to phone carriers against using ZTE equipment, citing threats to national security. [FN/4]

*The Story Continues*

What will ultimately happen to ZTE remains unclear, for the story is still unfolding-due, in part, by the Trump administration's ongoing trade negotiations with China. [FN/5] But regardless of ZTE's ultimate fate, there's a lesson to be learned over and above not willfully breaking U.S. export laws:

If caught, be sure to live up to the agreement made with the U.S. government to ensure those who broke the law are punished. If corrective measures have also been mandated, make sure they're implemented swiftly and to the letter.

Or maybe just don't break the law in the first place.

-------------
[FN1] US hits major Chinese tech firm with export ban. CNN Money. Available here. Accessed May 7, 2018.

[FN2] Secretary Ross Announces Activation of ZTE Denial Order in Response to Repeated False Statements to the U.S. Government. US Department of Commerce. Available here. Accessed May 7, 2018.

[FN3] China's ZTE slams U.S. ban, says company's survival at risk. Reuters. Available here. Accessed May 7, 2018.

[FN4] China's ZTE 'poses risk to UK security'. BBC News. Available here. Accessed May 7, 2018.

[FN5] China's ZTE to US: Let us buy American technology again. CNN Tech. Available here. Accessed May 7, 2018.

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 19. J. Creek: "Steel and Aluminum Tariff Exemptions Extended... For Now"
(Source: Torres Law PLLC, 7 May 2018.)

* Jonathan Creek, Associate, Torres Law PLLC.

On April 30, 2018, President Trump announced that he was extending exemptions for the steel and aluminum tariffs. [FN1] President Trump announced the 25% tariff on steel and the 10% tariff on aluminum in his original Presidential Proclamations on March 8. On March 22, President Trump announced he was granting temporary exemptions to Argentina, Australia, Brazil, Canada, Mexico, South Korea, and the EU, which would last until May 1, 2018. The exemptions would become permanent if the countries could agree with the U.S. on alternative means to address the national security threat posed by the imports of steel and aluminum. South Korea and the U.S. were the first to come to an agreement. [FN2] In the April 30 Presidential Proclamations, President Trump announced that the U.S. has an agreement in principle with Argentina, Australia, and Brazil. Because of these agreements, these three countries will be granted permanent exemptions from the steel and aluminum tariffs. These agreements are not finalized, and the terms of the agreements are not known yet. However, President Trump said he would consider re-imposing tariffs on these countries if the agreements were not finalized shortly.

Additionally, President Trump announced that discussions with Canada, Mexico, and the EU are currently ongoing. Because the discussions are ongoing, President Trump announced that he would be extending the exemptions for these countries from May 1 to June 1, 2018. Unless the countries are able to agree to satisfactory alternative means to address the threat to national security posed by imports of steel and aluminum from these countries, then the tariffs will become effective on June 1. The tariffs already apply to all non-exempted countries.

In addition to the country specific exemptions, companies can now apply for product specific exclusions. To date, there are approximately 130 filed aluminum exclusion requests, and 1,300 filed steel exclusion requests. Currently, exclusion requests focus on insufficient or no supply in the U.S. Many comments argue that there are little to no companies in the U.S. who are still producing some of these affected products. Additionally, companies have also made a variety of policy arguments such as negative environmental effects. Individuals or organizations who wish to file an exclusion for an affected product should do so as soon as possible. [FN/3]

--------

[FN/1] Whitehouse.gov, Proclamations, Presidential Proclamation Adjusting Imports of Steel into the United States, available here (last visited May 1, 2018); Whitehouse.gov, Proclamations, Presidential Proclamation Adjusting Imports of Aluminum into the United States, available here (last visited May 1, 2018).

[FN/2] For more information, please see our previous article *Tariff Updates: New Exemptions, Deals Made to Avoid Tariffs, and New China Tariffs Incoming.*

[FN/3] Product exclusions can be filed at regulations.gov. Exclusions for aluminum products are filed under docket number BIS-2018-0002. Exclusions for steel products are filed under docket number BIS-2018-0006.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 20. S. Kao, H. Keerikatte & S. Oliai: "Impact of U.S. Withdrawal from Iran Nuclear Deal"
(Source: S. Kao, Deloitte Tax@Hand, 9 May 2018.)

* Authors: Suzanne Kao, Export Controls & Sanctions Lead, Global Trade Advisory, Deloitte Tax LLP, skao@deloitte.com; Holland Keerikatte, hkeerikatte@deloitte.com; Sarah Oliai, soliai@deloitte.com.

On May 8, 2018, US President Trump announced his intent to withdraw from the Iran Nuclear Deal (i.e. the Joint Comprehensive Plan of Action or JCPOA). The JCPOA is the international agreement reached in 2015 between China, France, Germany, Russia, the UK, the US, the High Representative of the EU and Iran that is targeted at limiting Iran's nuclear program. The JCPOA structured certain economic and sanctions relief for Iran in exchange for limitations to Iran's nuclear program. The Administration's announcement comes in advance of its May 12, 2018 deadline to waive certain provisions affecting foreign financial institutions and countries purchasing oil from Iran; this waiver and others were required to fulfill US obligations under the JCPOA.

### Sanctions relief to Iran provided under JCPOA

The JCPOA seeks to limit Iran's nuclear program to peaceful purposes through restrictions, monitoring, and incentivizing compliance by using sanctions relief. Key aspects of the JCPOA restrict Iran's nuclear program in many ways, including prohibitions on weaponization activities, research, and development; restrictions on acquisition, enrichment, and stockpiling of

plutonium and uranium; multifaceted restrictions on specific facilities and centrifuge manufacturing; and continuous access to facilities and monitoring by the International Atomic Energy Agency (IAEA).

In exchange, the EU member states and the US agreed to provide sanctions relief in specific economic sectors, including nuclear-related sanctions, energy sectors, and financial and banking measures. Most of the US sanctions relief under the JCPOA impacts foreign subsidiaries of US companies. Key sanctions relief measures directly affecting US entities also include US specific licensing for commercial passenger aircraft and related parts. US sanctions related to Iran's ballistic missile program, human rights violations and terrorism, however, fall outside the scope of the JCPOA.

*Impact on US businesses*

The withdrawal from the JCPOA and the re-imposition of nuclear-related sanctions ends US sanctions relief under the JCPOA. The US Department of the Treasury's Office of Foreign Assets Control (OFAC) released new FAQs to assist with the withdrawal from the JCPOA. The FAQs state that there will be 90 and 180-day periods during which businesses and individuals engaging in activities pursuant to the US JCPOA sanctions relief can wind down those activities. OFAC cautions that these activities should be concluded by August 6, 2018, or November 4, 2018, as applicable, to avoid US sanctions violations and enforcement actions. The sanctions that were re-imposed impact both US and non-US entities and individuals and affect the myriad sectors that were subject to JCPOA relief, including finance/banking, energy, shipping, automotive, civil aviation, metals and software. Imports of certain Iranian-origin items also will be prohibited. Additionally, OFAC anticipates revoking certain specific licenses that have been issued.

US businesses and their foreign branches and subsidiaries should begin winding down and have contingency plans in place for any operations that may be affected by the re-imposition of US sanctions. For US persons and US-owned or US-controlled foreign entities, OFAC will also replace General License H, General License I, and the general licenses under the Iranian Transactions and Sanctions Regulations (ITSR, at 31 C.F.R. §§ 560.534 and 560.535) with narrower authorizations for winding down activities previously allowed under these authorities. Over the next several months and by the end of the wind-down period, OFAC will announce additional persons and entities that will be added to its Specially Designated Nationals sanctions list, impacting blocking actions and other restrictions relating to these individuals and entities.

OFAC also clarifies in its FAQs that non-US, non-Iranian persons may receive payment for goods or services or may receive repayment of loans or credits extended, under certain conditions. These conditions include that the goods or services were provided before the end of the applicable wind-down period, or loans and credits extended before the end of the wind-down period, and as agreed to prior to May 8, 2018, following US sanctions in effect at the time. All payments must be consistent with US sanctions. Companies with any activities pursuant to OFAC General Licenses H, I, or any other US JCPOA-

related sanctions relief should carefully examine their operations and sanctions compliance controls.

*Impact in the EU*

The EU stated on May 5, 2018 that it remains committed to continued implementation of the JCPOA and will continue to follow the terms of the JCPOA, maintaining its sanctions relief under the agreement provided that Iran adheres to its commitments. This may result in potentially conflicting compliance obligations between the EU and US sanctions programs regarding Iran. As the EU and US positions on Iran policy and sanctions diverge with additional developments, companies also should consider potentially conflicting regulatory obligations in all jurisdictions in which they operate.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

21.
T.R. McVey: "FLIR's ITAR Penalty Case Provides Valuable Compliance Lessons"
(Source: JDSupra, 4 May 2018.)

\* Author: Thomas B. McVey, Esq., Williams Mullen, tmcvey@williamsmullen.com, (202) 293-8118.

On April 25, 2018 the Directorate of Defense Trade Controls ("DDTC") announced another major enforcement case for violations of the International Traffic in Arms Regulations ("ITAR"). The case, involving FLIR Systems, Inc. ("Respondent"), involved a wide range of alleged violations and resulted in a $30,000,000 civil penalty. [FN/1] This case is a sobering reminder of DDTC's serious commitment to investigate ITAR violations and provides an important compliance lesson for U.S. and foreign companies.

The Respondent is a manufacturer of advanced sensors used to protect borders, gather intelligence and protect critical infrastructure. DDTC alleged that the Respondent engaged in multiple violations of the Arms Export Control Act ("AECA") and ITAR Part 127 including:

- Failure to apply for and manage export licenses;
- Failure to comply with terms, conditions and provisos of licenses;
- Poor management of use of license exemptions;
- Inaccurate or incomplete shipping documents;
- Improper actions at trade shows;
- Failure to obtain Non-transfer and Use Certificates;
- Failure to properly decrement or report quantities of items shipped;
- Failure to properly record shipments;
- Failure to return items to the U.S. under temporary export licenses;
- Failure to file reports of payments of contributions, fees and sales commissions as required under 22 CFR Part 130;
- Multiple recordkeeping violations.

DDTC also identified significant alleged violations by the Company for permitting certain of its employees who are foreign or dual nationals to have access to ITAR-controlled technical data stored in the Company's computer system. DDTC alleged that the Company failed to have adequate controls in the data system to prevent foreign national employees from accessing controlled files through their use of the system. In addition, DDTC stated that the Respondent failed to collect citizenship information necessary to determine licensing requirements for its foreign-person employees, including employees holding nationalities from more than one country.

DDTC identified a number of aggravating factors including significant compliance program deficiencies and "deficient ITAR expertise and senior leadership oversight." As part of the proceedings, the Respondent entered an agreement with DDTC to toll the statute of limitations.

As referenced above, as part of the settlement the Respondent agreed to $30 million in civil fines and remedial compliance measures - of this amount $15 million will be suspended on the condition that the Respondent applies the suspended amount to pay for remedial compliance measures. The Respondent also agreed to appoint a "special compliance officer" to monitor ITAR compliance for a minimum of three years in consultation with DDTC. In addition, the Consent Agreement requires the Respondent to adopt policies and procedures to address the following:

- Identification and classification of defense articles and defense services;
- Identification of technical data and marking thereof;
- Maintenance and protection of and access to technical data on computer networks or other electronic methods of storage and transfer;
- Ensuring physical security of facilities where ITAR-regulated activity occurs;
- Screening and control of persons who are not authorized for access to ITAR-controlled defense articles and defense services;
- Obtaining, managing, and complying with the scope of ITAR authorizations, particularly for business development;
- Maintaining appropriate records;
- Company logistics department responsible for exporting, reexporting, or retransferring defense articles;
- Employment and management of foreign persons, to include dual national/third country nationals, who may be engaged in ITAR-regulated activity, or have access to ITAR-regulated technical data;
- Compliance with ITAR Part 130;
- Procurement, to include using known and unknown U.S. suppliers with foreign manufacturing facilities;
- Incorporating AECA and ITAR compliance into management business plans at the senior executive level;
- Using overseas representatives who will be involved with temporary exports;
- Preventing, detecting, and reporting AECA and ITAR violations;
- Submitting voluntary disclosures to the State Department

- Meeting and maintaining adequate AECA and ITAR compliance staffing levels at all divisions and facilities that involve ITAR-regulated activities.

The Consent Agreement provides significant details regarding the requirement for the appointment of a Special Compliance Officer ("SCO") to oversee the adoption of remedial measures and future ITAR compliance. The SCO's responsibilities include:(i) monitoring the Respondent's adoption of enhanced policies and procedures; (ii) implementation of the enhanced compliance measures required in the Consent Agreement; and (iii) reporting to DDTC and the Respondent's CEO on the status of the compliance activities.

The Respondent was also required to adopt an "automated export compliance system" as part of the remedial measures. The Consent Agreement provided the following description of the automated compliance system:

This system shall track the decision process from the initiation to conclusion of a request for export, reexport or retransfer authorization. The automated export compliance system shall improve Respondent's ability to oversee and monitor export, reexport, or retransfer activity. This system shall also cover the initial identification of all technical data and technical assistance in any form proposed to be disclosed to any foreign-persons and shall be accessible to DDTC upon request. Respondent shall ensure the use of a means of alerting users to the AECA and ITAR requirements on electronic transmissions of ITAR-controlled technical data. In order to prevent unintentional or accidental transmissions to unauthorized recipients, Respondent shall also provide training to all employees to ensure that any type of electronic transmissions of ITAR-controlled technical data are sent in accordance with Respondent's export compliance policies and procedures.[FN/2]

The respondent was also required to submit to two compliance audits during the term of the Consent Agreement.

This case is an important reminder to U.S. companies of the importance of following basic principles of ITAR compliance in their day-to-day business activities. The basic "blocking and tackling" in ITAR-compliance, of course, includes conducting classifications of the company's products and services, obtaining requisite licenses and TAA's, protection of controlled technical data, complying with terms and conditions of authorizations, proper use of license exemptions, proper license administration, denied party screening, employee training and compliance with ITAR recordkeeping requirements. Adopting an ITAR compliance program can assist in reducing violations and provide a basis for reducing penalties if violations do occur.

This case confirms that what may initially appear to be mere "routine" ITAR violations can turn out to be a $30 million problem very quickly.

Relevant documents:
- Proposed Charging Letter
- Consent Agreement
- Order

---------

[FN/1] Of this amount $15 million will be suspended on the condition that the Respondent applies the suspended amount to pay for self-initiated remedial compliance measures.
[FN/2] Consent Agreement p. 11.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

## 22. ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 12-13 Sep in Annapolis, MD
(Source: S. Palmer, spalmer@exportcompliancesolutions.com.)

* What: Seminar Level I: ITAR/EAR Boot Camp, Annapolis, MD
* When: September 12-13, 2018
* Where: Chart House Restaurant on Spa Creek
* Sponsor: Export Compliance Solutions (ECS)
* ECS Speaker Panel: Suzanne Palmer, Mal Zerden
* Register: Here or by calling 866-238-4018 or e-mail
spalmer@exportcompliancesolutions.com.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 23. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Ariel Durant** (Ariel Durant (10 May 1898 - 25 Oct 1981; was a Russian-born American researcher and writer and the coauthor of *The Story of Civilization* with her husband Will Durant.
 - *"A great civilization is not conquered from without until it has destroyed itself from within."*
 - *"The conservative who resists change is as valuable as the radical who proposes it."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 24. Are Your Copies of Regulations Up to Date?
(Source: Editor)

DOC_0000990

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
 - Last Amendment: 5 Apr 2018: 83 FR 14580-14583: Reclassification of Targets for the Production of Tritium and Related Development and Production Technology Initially Classified Under the 0Y521 Series [Imposes License Requirements on Transfers of Specified Target Assemblies and Components for the Production of Tritium, and Related "Development" and "Production" Technology.]

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
 - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
 - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
 - HTS codes that are not valid for AES are available here.
 - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and

employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 4 May 2018: Harmonized System Update 1807, containing 289 ABI records and 60 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆

## 25. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check

the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle*" of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ████████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance [_____@fullcirclecompliance.eu]
**Sent:** 5/15/2018 6:51:43 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0515 Tuesday "Daily Bugle"



## Tuesday, 15 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. President Continues National Emergency with Respect to Yemen

2. Commerce Initiates Investigation under Section 232 of the Trade Expansion Act

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions

4. Commerce/BIS Publishes Proposed Rule Concerning Shift of USML Cats I, II, and III to EAR/CCL

5. State/DDTC Publishes Notice Concerning Proposed Shift of ITAR/USML Cats I, II, and III to EAR/CCL

6. EU Amends Restrictive Measures Concerning Libya

7. UK Government Posts Guidance Concerning Iran

8. Singapore Customs Announces Joint-Customs-CA Seminar on 21 May 2018

### NEWS

9. Deutsche Welle: "German Arms Firm H&K's Ex-Staff on Trial over Mexico Gun Deal"

10. Reuters: "U.S. Imposes Sanctions Against Iran Central Bank Governor, Iraq-Based Bank"

11. The Washington Times: "Trump Administration Moves to Shift Small Arms Gun Export Approval from State Department to Commerce"

### COMMENTARY

12.    D.M. Edelman: "Trump Cancels Iran Deal: Can Your Company Still Do Business?"

13.    G. Husisian: "The Twelve Compliance Steps Every Multinational Corporation Should Undertake in Light of Recent Trump Administration Enforcement Activity" (Part I of IV)

14.    O. Coulon, G. Kreijen & B. Gevers: "While EU Countries Reaffirm their Commitment to the JCPOA, EU Companies Brace for Impact"

15.    Gary Stanley's EC Tip of the Day

**EX/IM TRAINING EVENTS & CONFERENCES**

16.    ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 10-11 Jul in Long Beach, CA

**EDITOR'S NOTES**

17.    Bartlett's Unfamiliar Quotations

18.    Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (5 Apr 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

19.    Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

ITEMS FROM TODAY'S FEDERAL REGISTER

1. President Continues National Emergency with Respect to Yemen
(Source: Federal Register, 15 May 2018.)

83 FR 22582: Continuation of the National Emergency with Respect to Yemen

On May 16, 2012, by Executive Order 13611, the President declared a national emergency pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701-1706) to deal with the unusual and extraordinary threat to the national security and foreign policy of the United States constituted by the actions and policies of certain former members of the Government of Yemen and others that threaten Yemen's peace, security, and stability. These actions include obstructing the political process in Yemen and blocking implementation of the agreement of November 23, 2011, be- tween the Government of Yemen and those in opposition to it, which provided for a peaceful transition of power that meets the legitimate demands and aspirations of the Yemeni people.

The actions and policies of certain former members of the Government of Yemen and others in threatening Yemen's peace, security, and stability continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States. For this reason, the national emergency declared on May 16, 2012, to deal with that threat must continue in effect beyond May 16, 2018. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency declared in Executive Order 13611.

This notice shall be published in the Federal Register and transmitted to the Congress.

[Presidential Signature.]

THE WHITE HOUSE, May 14, 2018.

back to top

* * * * * * * * * * * * * * * * * * * *

## 2. Commerce Initiates Investigation under Section 232 of the Trade Expansion Act
(Source: Federal Register, 15 May 2018.) [Excerpts.]

83 FR 22441: Submission for OMB Review; Comment Request

The Department of Commerce will submit to the Office of Management and Budget (OMB) for clearance the following proposal for collection of information under the provisions of the Paperwork Reduction Act (44 U.S.C. Chapter 35).
  - Agency: Bureau of Industry and Security.
  - Title: Request for Investigation under Section 232 of the Trade Expansion Act.
  - Form Number(s): N/A.
  - OMB Control Number: 0694-0120.
  - Type of Review: Regular submission. ...

- Needs and Uses: Upon request, BIS will initiate an investigation to determine the effects of imports of specific commodities on the national security, and within 270 days BIS will report to the President the findings and a recommendation for action or in-action. Within 90 days after receiving the report, the President shall determine whether to concur or not concur with the findings and recommendations. No later than 30 days after a decision, the determination will be published in the Federal Register and reported to Congress. The purpose of this collection is to account for the public burden associated with the surveys distributed to determine the effect of imports of specific commodities on the national security. ...

Sheleen Dumas, Departmental Lead PRA Officer, Office of the Chief Information Officer.

back to top

* * * * * * * * * * * * * * * * * * * * *

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Treasury; NOTICES; List of Countries Requiring Cooperation with International Boycott [Publication Date: 16 May 2018.]

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 4. Commerce/BIS Publishes Proposed Rule Concerning Shift of USML Categories I, II, and III to CCL
(Source: Commerce/BIS, 15 May 2018.) [Excerpts.]

This proposed rule [available in PDF here] describes how articles the U.S. President determines no longer warrant control under United States Munitions List (USML) Category I - Firearms, Close Assault Weapons and Combat Shotguns; Category II - Guns and Armament; and Category III - Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. ...

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600

series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non-military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not de-regulate the transferred items. BIS would require licenses to export or reexport to any country a firearm or other weapon currently on the USML that would be added to the CCL by this proposed rule. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada.

As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule. ...

back to top

## 5.

## State/DDTC Publishes Notice Concerning Proposed Shift of USML Categories I, II, and III to CCL
(Source: State/DDTC, 15 May 2018.)

The Department of State proposes to amend the International Traffic in Arms Regulations to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR). See Cat I-III Combined PR - FRN FINAL.PDF

The Department of Commerce proposes to amend the Export Administration Regulations to describe how the items that transfer to the EAR will be controlled. See 05.4.18 Signed Commerce firearms proposed rule for sending to OFR for publication.

*[Editor's Note: this notice is published simultaneously with the BIS notice, included in today's Daily Bugle, item #4 above.]*

DOC_0001041

back to top

☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆

## 6.
## EU Amends Restrictive Measures Concerning Libya
(Source: Official Journal of the European Union, 15 May 2018.)

### Regulations

* Commission Implementing Regulation (EU) 2018/711 of 14 May 2018
amending Council Regulation (EU) 2016/44 concerning restrictive measures
in view of the situation in Libya

### Decisions

* Council Implementing Decision (CFSP) 2018/713 of 14 May 2018
implementing Decision (CFSP) 2015/1333 concerning restrictive measures in
view of the situation in Libya

back to top

☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆ ☆

## 7.
## UK Government Posts Guidance Concerning Iran
(Source: UK DIT/EJCU, 15 May 2018.) [Excerpts.]

The Export Control Joint Unit (EJCU) of the UK Department of International
Trade (DIT) has published the following guidance on its website:

On 8 May 2018 the President of the United States confirmed that the US will
begin the process of re-imposing all US sanctions previously waived under
the Joint Comprehensive Plan of Action (JCPoA). Read more about this
development.

The UK government fully supports expanding our trade relationship with Iran
and encourages UK businesses to take advantage of the commercial
opportunities that will arise. Department for International Trade (DIT) is in
Tehran to support bilateral trade and investment. However, some sanctions
remain in place so UK businesses should continue to ensure they are
compliant with all sanctions regimes.

On 14 July 2015, the E3+3 (UK, France, Germany, Russia, China and USA)
the EU and Iran reached a comprehensive agreement on Iran's nuclear
program. This concluded over a decade of negotiations between the
international community and Iran. Through the successful implementation of
this deal, Iran can demonstrate its commitment to an exclusively peaceful
nuclear program. Most financial and economic sanctions against Iran have
now been lifted, following the International Atomic Energy Agency's
verification that Iran had completed all necessary steps to reach

Implementation Day (16 January 2016). Read the full text of the agreement and annexes. ...

The UK government fully supports expanding our trade relationship with Iran. Iran has now received extensive economic and financial sanctions relief and will be able to trade more freely with the rest of the world. We want to help British businesses take advantage of the opportunities that economic re-engagement with Iran will bring.

UK Export Finance (UKEF), the UK's export credit agency, has reintroduced cover in to support UK companies competing for business in Iran. Cover is now available on a case-by-case basis in Pounds Sterling and Euros. Within this, and in recognition of the UK's place as a global center of excellence for financial and professional services, UKEF will make available an initial £50 million facility guaranteeing payments to UK professional advisory service providers advising the Government of Iran. UKEF will also consider applications for direct lending from purchasers of British exports to Iran. Find out more about UKEF's cover for Iran here.

DIT will be engaging with UK businesses to provide support and assistance to help ensure UK business benefits from opportunities as they arise. UKTI based both in the UK and in the British Embassy in Tehran will play an important role in supporting trade and investment between our 2 countries.

Although most economic and financial sanctions have now been lifted, some sanctions will remain in place and are not affected by the deal. In particular sanctions related to human rights, proliferation and Iran's support for terrorism remain in place. You will wish to consider in particular, if you are dealing with a designated person or entity, whether a certain trade product or material is restricted, and how and to whom payments will be made. UK companies will also want to consider whether their proposed activity is subject to US sanctions. It is important to ensure appropriate due diligence measures are undertaken before engaging in any activity. Iran will remain a difficult place to do business so if in doubt you should seek legal advice.

*More Information on Doing Business with Iran*

 - For more information on Doing Business with Iran see our Guide to Doing Business with Iran and FAQs
 - Find out more about UKEF's country cover for Iran here.
 - The EU has published an information note on the EU Sanctions to be lifted under the JCPoA and it is available on the Europa website.
 - The US Office of Financial Asset Control has issued guidance on Iran and it is available on the US Department of the Treasury website.
 - The Export Control Organization has issued Notice to Exporters 2016/05 on this development.

*Prohibited Activities*

The following activities remain banned under the proliferation-related sanctions:

- sale, supply, transfer or export to Iran, of all military goods and technology as listed in the UK Military List
- sale, supply, transfer or export of missile-related goods and technology as listed in Annex III of Council Regulation (EU) 267/2012
- provision of technical assistance, brokering services and financial assistance related to the above
- import from Iran of military and missile-related goods and technology
- investment in Iranian enterprises engaged in manufacture of military goods, and a ban on investment by an Iranian person in a commercial activity related to production or use of missile-related goods

The following is prohibited under the sanctions imposed in view of the human rights situation in Iran as set out in Council Regulation (EU) 264/2012:

- sale, supply, transfer or export of equipment which might be used for internal repression as listed in Annex III of Council Regulation (EU) 264/2012
- provision of technical assistance, brokering services and financial assistance related to the above.

In addition, restrictive measures remain in place against individuals and entities who remain listed in Council Regulation 267/2012 and in Council Regulation 264/2012, as well as under EU terrorism and other EU sanctions regimes.

UK businesses should ensure they are compliant with all remaining sanctions regimes. It is important to conduct due diligence and ensure compliance with sanctions regimes before signing business contracts, as with any market.

*Activities that Require a License*

The following activities require a license under the proliferation-related sanctions:

- sale, supply, transfer or export of nuclear-related items as listed in Annex I of the Regulation
- provision of technical assistance, brokering services and financial assistance related to items listed in Annex I of the Regulation
- investment by an Iranian person, entity or body in a commercial activity related to uranium mining or the manufacture of items listed in Annex I of the Regulation

These nuclear-related activities can only be authorized if they have been approved in advance by the UN Security Council through the newly-established Procurement Channel. UK persons wishing to supply these goods or services to Iran, or to accept an investment by an Iranian person, must seek a license from the Export Control Organization (ECO) in the Department of DIT. The ECO will consider the application and where appropriate seek the required authorization from the UN. The ECO has published detailed guidance on the Procurement Channel.

A license is also required for:

  - sale, supply, transfer or export of nuclear-related items as listed in Annex II of the Regulation
  - provision of technical assistance, brokering services and financial assistance related to items listed in Annex II of the Regulation
  - investment by an Iranian person, entity or body in a commercial activity related to the items listed in Annex II of the Regulation

These items are not subject to the Procurement Channel process.
Sanctions imposed in view of the human rights situation in Iran are set out in Council Regulation (EU) 264/2012. The following requires a license:

  - sale, supply, transfer or export of equipment which might be used for the monitoring or interception of internet or telephone communications as listed in Annex IV of the Regulation
  - provision of technical assistance, brokering services and financial assistance related to items listed in Annex IV of the Regulation
  - provision of telecommunication or internet monitoring or interception services of any kind to, or for the direct or indirect benefit of, Iran's government, public bodies, corporations and agencies or any person or entity acting on their behalf or at their direction

Financial sanctions may still be relevant to your transaction, including interaction with those persons and entities that remain designated. It is your responsibility to ensure you comply with financial sanctions. For more information see the HM Treasury guidance relating to nuclear proliferation and human rights violations and please refer to the Treasury's consolidated list which includes all Iranian individuals and entities listed under EU and UK sanctions regimes (including those listed for Counter Terrorism purposes or under the Syria regime).
  - Financial sanctions, Consolidated List

*End-use Controls*

If your items are not listed specifically as a result of specific sanctions regulations, you may still need a license under so-called 'end-use controls'. This aspect of export controls covers licensing of items that might potentially be used in a Weapons of Mass Destruction (WMD) program or military goods. These controls are outlined in Article 4 of Council Regulation 428/2009 (the EU Dual-Use Regulation) and in the Export Control Order 2008.

For more information on end-use controls, see the guide on WMD End-Use Control and Military End-Use Control.

If you have any concerns about exporting to an end-user in Iran, you should consider seeking advice from the ECO End-User Advice Service. ...

back to top

※ ※ ※ ‡ ※ ※ ※ ※ ※ ※ ‡ ‡ ※ ※ ※ ※ ※ ‡ ※ ※

DOC_0001045

## 8.
## Singapore Customs Announces Joint-Customs-CA Seminar on 21 May 2018
(Source: Singapore Customs, Notice No. 07/2018, 9 May 2018.)

As part of its ongoing efforts to share Customs requirements with the business community, Singapore Customs together with some Competent Authorities (CA) will be organizing a Joint-Customs-CA Seminar on 21 May 2018.

The details of the program are available here.

back to top

* * * * * * * * * * * * * * * * * * * * *

## NEWS

## 9.
## Deutsche Welle: "German Arms Firm H&K's Ex-Staff on Trial over Mexico Gun Deal"
(Source: Deutsche Welle, 15 May 2018.) [Excerpts.]

Six ex-employees of Heckler & Koch have gone on trial in Stuttgart for selling assault rifles to Mexico. Activists held a vigil for victims of those believed to be killed by the German gun-maker's arms outside the court.

It took eight years for the proceedings to make it this far, but on Tuesday the German state's case against the country's most infamous gun-maker - which also supplies small arms to many NATO countries - was finally brought to trial.

Six former employees of Heckler & Koch stood accused of violating Germany's War Weapons Control Act and its Foreign Trade Act by selling thousands of G36 assault rifles to Mexico - while knowing full well that they would be used in four violence-ridden Mexican states. ...

  "This is the biggest small arms trial this country has ever seen - this is a huge success, because this shadowy arms export approval system will be made public," [attorney Holger] Rothbauer said. "But pawn sacrifices are being made - and why? Because the system only wants one part to be put in the dock: namely the representatives of the arms industry, and not the political representatives, and not the representatives of the export control authorities." ...

back to top

* * * * * * * * * * * * * * * * * * * *

DOC_0001046

## 10.

Reuters: "U.S. Imposes Sanctions Against Iran Central Bank Governor, Iraq-Based Bank"
(Source: Reuters, 15 May 2018.) [Excerpts.]

The United States on Tuesday imposed sanctions on Iran's central bank governor, Valiollah Seif, and Iraq-based Al-Bilad Islamic Bank for "moving millions of dollars" for Iran's elite Revolutionary Guard Corps, as Washington seeks to cut off funding for what it says is Iran's malign activities in the Middle East. ...

The United States classifies Lebanon's Shi'ite Muslim movement Hezbollah, which is backed by Iran, as a terrorist group. ...

The U.S. Treasury also blacklisted Ali Tarzali, assistant director of the international department of Iran's central bank, and the chairman of Al-Bilad Islamic Bank, Aras Habib.

The department said the sanctions against Seif and Tarzali would not immediately affect central bank transactions. It said, however, sanctions being reimposed under the nuclear deal would affect certain U.S. dollar transactions by the central bank starting on Aug. 7, 2018.

Last week, two days after U.S. President Donald Trump withdrew from the 2015 Iran nuclear deal, the U.S. Treasury imposed sanctions against six individuals and three companies it said were funneling millions of dollars to the IRGC-QF.

The IRGC is by far Iran's most powerful security entity and has control over large stakes in Iran's economy and huge influence in its political system. The Quds Force is an elite unit in charge of the IRGC' overseas operations.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11.

The Washington Times: "Trump Administration Moves to Shift Small Arms Gun Export Approval from State Department to Commerce"
(Source: The Washington Times, 14 May 2018.) [Excerpts.]

The Trump administration took a major formal step Monday toward officially shifting authority from the State Department to the Commerce Department over the approval of U.S. small arms exports, including semiautomatic rifles and weapons ranging in size up to .50 caliber.

In a closed-door briefing for lawmakers, State and Commerce officials outlined specifics of the shift long sought by small arms manufacturers as a way to cut red tape and boost exports - but decried by pro-regulation

Democrats who warn the policy change could dissolve barriers designed to keep U.S.-made firearms from criminals and terrorists overseas.

While Congress could still block the initiative - Monday's briefing on Capitol Hill sets in motion a public comment period that lasts for 45 days - administration officials are touting the policy as breakthrough for U.S. manufacturing and stress that key restrictions on exports to unsavory international buyers will remain in place. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

MORE INFORMATION AVAILABLE HERE

## COMMENTARY

## 12. D.M. Edelman: "Trump Cancels Iran Deal: Can Your Company Still Do Business?"
(Source: Export Compliance Matters, 14 May 2018.)

* Author: Doreen M. Edelman, Esq., Baker Donelson LLP, 202-508-3460, dedelman@bakerdonelson.com.

On May 8, President Trump announced that the U.S. will withdraw from the Iran nuclear deal, formally known as the Joint Comprehensive Plan of Action (JCPOA), and reimpose the strict economic sanctions program that was in place prior to the landmark 2015 agreement. The U.S. Treasury Department's Office of Foreign Assets Control issued a Frequently Asked Questions document in coordination with the announcement to assist with the implementation of the Iran sanctions program. Here is the bottom line so far.

Following a wind-down period, all U.S. nuclear-related sanctions that were lifted to effectuate JCPOA sanctions relief will be reimposed. Certain sanctions are subject to a 90-day wind-down period that will be formally reimposed on

August 6, and the rest are subject to a 180-day wind-down period ending on November 4. On November 5, General License H, which allows U.S.-owned or U.S.-controlled foreign companies to do business in Iran, will be gone. The most significant sanctions to be reimposed are "secondary sanctions," which place strict limits on foreign companies doing business with Iran.

As a result of the reimposition of secondary sanctions, foreign entities, even those not owned or controlled by U.S. parties, will have to decide whether they want to do business with Iran or the U.S. Specifically, foreign entities will not be able to do business in Iranian rials and do business with or through the U.S. banking system. Such businesses could also be added to the Specially Designated Nationals and Blocked Persons lists.

Other specific provisions that will be rolled back and directly affect U.S. entities concern the sale of airplanes and parts, Iranian carpets and foodstuffs, and certain financial transactions that were permitted under the Iranian Transactions and Sanctions Regulations (ITSR). These provisions are subject to the 90-day wind-down period. As an ongoing reminder, none of these changes affect the ITSR's general prohibition against U.S. persons doing business with Iran. This means the prohibitions on sales to Iran that existed before the JCPOA still exist. No U.S. parties can sell any products to Iran unless specifically authorized. This means no paperclips, coffee mugs, etc., can be sent to Iran unless the transaction is covered by a license. The President also reimposed sanctions on Iranian government trade in gold and precious metals, the purchase of U.S. dollar banknotes, and the direct and indirect sale of certain metals and software, as well as sanctions involving Iran's automotive, port, shipbuilding, petroleum, banking and energy sectors, and the issuance of Iranian sovereign debt.

U.S. and foreign entities must quickly evaluate all current and future business and investments in and with Iranian entities and determine if there are any exceptions to divesting of all Iranian business activities. Moreover, any facilitation of Iranian activities must also be considered. These changes are new, and there may be additional guidance provided for foreign entities to apply for additional exemptions or waivers. European Union (E.U.) leaders have already said they plan to press the U.S. government for potential carve-outs to the sanctions for European companies. However, as of today, the Administration wants all global businesses to decide whether they will do business with the U.S. or do business with Iran. Regulatory compliance obligations may become even trickier if the E.U. implements a protected harbor or blocking regulation for European companies doing business with Iran. It will be critical to follow the implementation of the Iranian sanctions program as well as the E.U.'s diplomatic efforts and response during the wind-down period over the course of the coming months.

back to top

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

13. G. Husisian: "The Twelve Compliance Steps Every Multinational Corporation Should Undertake in Light of

# Recent Trump Administration Enforcement Activity" (Part I of IV)

(Source: Foley & Lardner LLP, 14 May 2018.)

\* Gregory Husisian, Esq., ghusisian@foley.com, Foley & Lardner LLP, Washington DC.

*[Editor's Note: due to space limitations, this article has been divided into four parts. We will post one part each day, from Tuesday, 15 May until Friday, 18 May 2018.]*

Over the last month, regulators with the Trump administration sent a loud message to companies subject to U.S. jurisdiction: Enforcement of laws governing international activities is alive and well and the laws will continue to be enforced with vigor. Companies that are subject to U.S. jurisdiction - whether because they are located within the United States or otherwise subject to U.S. jurisdiction (such as through the use of U.S.-origin goods or the use of the U.S. financial system) - need to evaluate whether their compliance measures are sufficient to detect and halt potential violations of U.S. international regulations, including the Foreign Corrupt Practices Act (FCPA), U.S. export control regulations (the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulations (EAR), the economic sanctions regulations maintained by the Office of Foreign Assets Control (OFAC), and the various anti-money laundering laws.

As recent enforcement activity under the Trump administration illustrates, enforcement of this suite of international regulatory laws is alive and well. In light of these developments, this Client Alert summarizes the most recent enforcement activity, as well as the steps that companies subject to U.S. jurisdiction can take to identify and mitigate the risk of costly enforcement actions under these regulatory regimes.

### Recent Enforcement Activity Shows U.S. Government Willingness to Impose Record Penalties for Violations of International Regulations

Under the Obama administration, enforcement of the FCPA, export controls, economic sanctions, AML, and FCPA regulations was steady and strong. Although the numbers varied year by year - mostly due to timing issues related to when large matters were settled - it was not uncommon to see large enforcement settlement that surpassed the $100 million level.

Any thought that the Trump administration might take a more lenient approach toward these international regulations has been laid to rest by the strong record of enforcement under the current administration, as underscored by two recent enforcement actions.

First, Panasonic agreed to pay $280 million to resolve FCPA offenses for payments to consultants of its U.S. inflight entertainment unit in the Middle East and Asia, including the payment of $143 million in disgorgement to the Securities and Exchange Commission. In both cases, the resolutions were related to activities of Panasonic's U.S.-based subsidiary, Panasonic Avionics Corporation. According to the U.S. government, senior management of

Panasonic Avionics established a bribery scheme to pay a Middle Eastern government official more than $900,000 for a "purported consulting position, which required little to no work," allowing Panasonic Avionics to help gain over $700 million in business from a state-owned airline. The U.S. government further stated that Panasonic Avionics concealed the payment "through a third-party vendor that provided unrelated services" to Panasonic Avionics and then allegedly falsely recorded these (and other) payments in its books and records. Other payments related to Asian sales.

The Department of Justice (DOJ) gave Panasonic Avionics a 20 percent discount off the low end of the U.S. Sentencing Guidelines fine range because of the cooperation of the company and what the DOJ characterized as strong remediation efforts, including the severing of several senior executives who were either involved in or aware of the misconduct by Panasonic Avionics or Panasonic. Nonetheless, because the remediation efforts only recently had been instated, the deferred prosecution agreement provides for a two-year independent monitor, followed by an additional year of self-reporting.

Independently, the Department of Commerce's Bureau of Industry and Security (BIS) took the unusual step of suspending an export control settlement deal with Chinese telecom equipment maker ZTE Corporation, while at the same time revoking the export privileges of the company. ZTE Corporation was operating under a settlement of claims that it had violated U.S. export control and economic sanctions regulations by engaging in 251 transactions with persons in Iran or with the Iranian government. These transactions had last year resulted in the largest-ever export controls penalty - nearly $1.2 billion, with $300 million of it being suspended during a seven-year probationary period. As a result of the export ban, the ability of ZTE to export any goods or technical data from its 14 offices and six research centers in the United States will be virtually eliminated until March 13, 2025, thereby endangering the ability of ZTE to take a leading role in the rollout of next-generation 5G wireless technology.

These settlement actions illustrate the ability of U.S. regulators to discover and punish violations of U.S. international regulations, as well as the willingness of the Trump administration to impose groundbreaking penalties. In light of the aggressive enforcement mentality of the U.S. government, this Client Alert presents a series of steps that companies subject to U.S. jurisdiction can take to help identify and manage their international regulatory risk. Careful consideration of each step will take the company from identifying the risks, through examining any deficiencies in dealing with those risks, to the goal of compliance as informed by appropriate procedures, internal controls, and training. For any company that has not gone through such an exercise in the last few years, systematically working through the 12 steps is likely to lead to a significant payoff for ameliorating the organization's risk profile through an effective compliance system.

### *A Twelve-Step Program for International Compliance*

As illustrated by the record export controls penalty against ZTE (almost $1.2 billion, followed by a denial of export privileges) and the Panasonic FCPA

settlements, the risk of severe enforcement actions under the Trump administration for violations of international regulations continues to be high. Yet many multinational companies find themselves in a quandary regarding how best to implement their international regulatory risk management. They may well know they face heightened risk but are not clear regarding the best way to proceed. This section of the Client Alert summarizes the typical steps that most multinational companies should consider when evaluating their international regulatory risk management procedures and internal controls. Through careful implementation of these measures, most multinational organizations should be able to implement the kinds of compliance that U.S. regulators would consider to be industry best practices.

*Step 1: Secure Buy-In at the Top*

Many companies looking to implement an international regulatory compliance program start by drafting a written compliance policy. But long before it comes time to draft the policy, a well-thought-out compliance strategy will look to put in place the underpinnings of the compliance program. Chief among these is the need for consistent management support for compliance initiatives.

Although the phrase "tone at the top" encapsulates management support, the concept requires more than just support from the CEO and other top management officials. When properly executed, the idea of tone at the top is a pyramid, with the concept of "doing the right thing" and respect for compliance flowing down from the CEO to personnel at all levels. Senior management ensures it is known that compliance has full support at the top, and that compliance has the resources to function properly, while also trying to ensure that respect for compliance with legal and company mandates flows through the company.

Management support is especially important for companies with international operations. The connection between the sales and operational activities of international subsidiaries, on the one hand, and regulatory risk management and adhering to the requirements of U.S. law, on the other, can appear tenuous when viewed by far-flung actors. The reality, however, is these far-off operations often represent the highest regulatory risk. This may mean that the organization must pay special attention to these foreign subsidiaries so it can reinforce the compliance message and its importance to the overall organization.

In establishing the tone at the top, senior management must understand the importance of a consistent and reinforced message. Too often, the role of senior management seems confined to issuing "the compliance letter" (i.e., a letter from the CEO stating that compliance is important). Thereafter, the topic is put on the back burner and left to the legal or compliance department to implement, often with inadequate resources to back up the compliance mission.

While there is nothing wrong with issuing such a letter, the compliance message should be reinforced so it becomes part of the internal DNA of the

corporation. The importance of compliance to the company cannot be communicated by a one-time effort; rather, it should be a part of the day-to-day management of the organization.

With that goal in mind, senior management should take advantage of "non-training" training opportunities, such as integrating mentions of compliance missteps or accomplishments into quarterly calls, including compliance topics in sales meetings, and mentioning the topic frequently in company newsletters. Further, when teachable moments occur, such as compliance missteps by competitors, it is a good idea to bring this to the attention of relevant personnel, such as through a mass email from a senior manager or the general counsel's office.

Senior management must set a strong example. It should be common knowledge that compliance rules apply across the entire organization, including for senior personnel; that the company promptly follows up on credible red flags; and that the company is willing to walk away from business that requires stepping too close to the risk threshold. People throughout the organization, whether in the United States or elsewhere, should realize there are consequences for compliance missteps. Through these means, senior management can communicate its respect for compliance throughout the organization.

back to top

＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊

## 14. O. Coulon, G. Kreijen & B. Gevers: "While EU Countries Reaffirm their Commitment to the JCPOA, EU Companies Brace for Impact"
(Source: World Trade Controls, 15 May 2018.)

* Authors: Olivier Coulon, Esq., Olivier.Coulon@loyensloeff.com; Gerard Kreijen, Esq., Gerard.Kreijen@loyensloeff.com; and Bert Gevers, Esq., bert.gevers@loyensloeff.com. All of Loyens & Loeff, Brussels, Amsterdam, and Brussels, respectively.

Although expected, President Trump's decision to pull the US out of the JCPOA has triggered swift and concerned reactions from Europe. Despite the EU's reaffirmed commitment to the JCPOA, it is yet unclear whether - and how - the Agreement will survive.

In a joint statement released on 8 May, France, the UK, and Germany expressed regret and concern about President Trump's decision, and urged "all sides to remain committed to [the JCPOA] full implementation." They called on the US "to ensure that the structures of the Joint Comprehensive Plan of Action (JCPOA) can remain intact, and to avoid taking action which obstructs its full implementation by all other parties to the deal."

*Impact in the EU*

Since the lifting of the US secondary sanctions following Implementation Day, EU companies have invested significantly in Iran. Close to €11 billion of goods were exported to Iran in 2017 - a 66% increase compared to 2015 -, and many contracts and deals were signed, notably by French and German entities.

The transport sector made a giant leap between 2015 and 2017. Iran became Renault's 8th market with more than 160 000 cars sold in 2017, while PSA's sales in Iran grew to 443 000 units. IranAir has also placed an order for €17.5 billion with Airbus, while Siemens was due to deliver locomotives.

The re-imposition of the sanctions is expected - and indeed seems designed - to have a deterring impact on European companies, as maintaining business relationships with Iran - especially with SDN (re-)listed persons and entities - may well lead to being targeted by secondary sanctions.

*Re-Imposition of the Secondary Sanctions*

Secondary sanctions are designed to deter non-US companies from doing business with sanctioned persons, by isolating them from the US financial system and making them unpalatable as business partners for US companies.

The secondary sanctions, for which waivers were lifted on 8 May, will be progressively re-instated, as President Trump's decision provides for two wind-down periods:

 - A 90-day period, ending on 6 August 2018, encompassing sanctions which are not covered by the 180-day period. These notably include transactions in the automotive sector, precious metals and raw materials.
 - A 180-day period, ending on 4 November 2018, relating inter alia to sanctions in the financial and insurance industries, but particularly in the energy and shipping sectors.

It should however be noted that some secondary sanctions remained in place since JCPOA's Implementation in 2016. These sanctions prohibit for example EU companies to engage in significant transactions on behalf of, or for the benefit of any SDN or any company 50% by such person. They also prohibit transacting with the Iran Revolutionary Guard Corps (IRGC) or any of its officials, agents or affiliates. The past few years have taught us that this prohibition can be challenging as the IRGC is sometimes heavily involved in certain industry sectors.

*What Can the EU Do About This?*

The EU countries' commitment to keeping the JCPOA alive is likely not to be enough, considering the significant chilling effect of the US secondary sanctions. Measures will have to be taken to give the EU companies a certain level of comfort and certainty in their relationship with Iran - if possible.

Amongst the available measures, the European Union could adopt a blocking statute, as it has already done in the past through the adoption of Council

Regulation (EC) n°2271/96 of 22 November 1996 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom, to address both the Helms-Burton and d'Amato-Kennedy provisions. It may be questionable, however, whether adopting new blocking regulations would be an effective tool, as EU companies will still be fully exposed to the enforcement of secondary sanctions in the US.

France and Italy have also reportedly been working on providing all-euro denominated transaction systems, allowing one to by-pass the US financial system.

The EU may likewise try to negotiate with the US specific exemptions covering targeted sectors (such as the energy or automotive industry), allowing EU companies to maintain business relationships with Iran.

Yet, these instruments take time to design and implement. Considering the 90-day deadline, one can question whether any sort of solution will be reached before 6 August. This circumstance is only likely to reinforce the deterring effect of the revamped US sanctions.

One option for the EU to preserve its interests may be to rely on the US desire to reach a stricter and more global deal, covering not only the nuclear aspects, but also other topics such as the development of ballistic missiles. The negotiation of such a new agreement, which would necessarily require the EU as a signing party and which, reportedly was within reach before President Trump decided to walk out, may now well constitute the EU's best bargaining tool for avoiding the imposition of secondary sanctions or obtaining an exemption those sanctions.

It remains to be seen, however, whether it would be realistic for the EU to pursue such an option. Various US sources have made it quite clear that the re-institution of US sanctions is also aimed at 'encouraging' non-US companies to stay out of Iran and to get out if they are already there. It is difficult to see how the US could reconcile this with providing EU companies leeway to do business with Iran. The question for the US, it seems, is whether the economic isolation of Iran outweighs hammering out a more encompassing and stricter sanctions regime.

Meanwhile 'non-US' companies in active in Iran trade should start their assessment whether their activities will become subject to the newly reinstated secondary sanctions. If this is the case, they should carefully evaluate their risks and liabilities and where necessary start with the wind down process.

back to top

* * * * * * * * * * * * * * * * * * * *

## 15. Gary Stanley's EC Tip of the Day
(Source: Defense and Export-Import Update, 14 May 2018. Available by subscription from gstanley@glstrade.com.)

* Author: Gary Stanley, Esq., Global Legal Services, PC, (202) 352-3059, gstanley@glstrade.com.

ITAR § 124.1(A) provides that its requirements apply whether or not technical data is to be disclosed or used in the performance of the defense services described in ITAR § 120.9(a) (e.g., all the information relied upon by the U.S. person in performing the defense service is in the public domain or is otherwise exempt from ITAR licensing requirements pursuant to ITAR §125.4.

back to top

* * * * * * * * * * * * * * * * * * * *

## 16. ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 10-11 Jul in Long Beach, CA
(Source: S. Palmer, spalmer@exportcompliancesolutions.com.)

* What: ITAR/EAR Boot Camp (Seminar Level I), Long Beach, CA
* When: July 10-11, 2018
* Where: Hilton Long Beach
* Sponsor: Export Compliance Solutions (ECS)
* ECS Speaker Panel: Suzanne Palmer, Mal Zerden
* Register: Here or by calling 866-238-4018 or e-mail spalmer@exportcompliancesolutions.com.

back to top

* * * * * * * * * * * * * * * * * * * *

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Clifton Paul "Kip" Fadiman** (15 May 1904 - 20 Jun 1999; was an American intellectual, author, editor, radio and television personality. He began his work with the radio, and switched to television later in his career.)
  - *"For most men life is a search for the proper manila envelope in which to get themselves filed."*

* **L. Frank Baum** (Lyman Frank Baum; 15 May 15, 1856 - 6 May 1919; was an American author chiefly famous for his children's books, particularly The

Wonderful Wizard of Oz and its sequels. He wrote a total of 14 novels in the Oz series, plus 41 other novels, 83 short stories, over 200 poems, and at least 42 scripts.
 - *"I can't give you a brain, but I can give you a diploma."*

back to top

*\* \*\* \* \* \*\* \*\* \*\* \* \* \* \*\* \*\* \* \* \*\* \**

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
 - Last Amendment: 5 Apr 2018: 83 FR 14580-14583: Reclassification of Targets for the Production of Tritium and Related Development and Production Technology Initially Classified Under the 0Y521 Series [Imposes License Requirements on Transfers of Specified Target Assemblies and Components for the Production of Tritium, and Related "Development" and "Production" Technology.]

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
 - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30

- Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
   - HTS codes that are not valid for AES are available here.
   - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
   - Last Amendment: 4 May 2018: Harmonized System Update 1807, containing 289 ABI records and 60 harmonized tariff records.
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
   - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
   - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * * *

## 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ▮▮▮▮▮@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ████████ @fullcirclecompliance.eu]
**Sent:** 5/16/2018 7:25:58 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0516 Wednesday "Daily Bugle"



## Wednesday, 16 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Treasury Posts List of Countries Requiring Cooperation with an International Boycott

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions

3. Commerce/BIS: (No new postings.)

4. DHS/CBP Announces ACE Certification Scheduled Maintenance for Tonight

5. DHS/CBP Posts Revised External ACE Entry Summary Business Process Document

6. Justice: "Port St. Lucie Resident Pleads Guilty to International Firearms Trafficking"

7. State/DDTC: (No new postings.)

8. EU Amends Restrictive Measures Concerning North Korea

### NEWS

9. Ammoland: "Trump State Department Looks to Streamline Firearms Exports & Open U.S. Markets"

10. Fox6Now: "Milwaukee Man in U.S. on Non-Immigrant Visa Accused of Trying to Ship 26 Guns to People's Republic of China"

11. Reuters: "U.S. Lawmakers Push Back on Trump Talk of Helping China's ZTE"

12. ST&R Trade Report: "Export Ban on Chinese Telecom Company Could be Short-Lived"

13.   G. Husisian: "The Twelve Compliance Steps Every Multinational Corporation Should Undertake in Light of Recent Trump Administration Enforcement Activity" (Part II of IV)

14.   M. Volkov: "Dun and Bradstreet Pays $9 Million for FCPA Violations in China"

15.   Gary Stanley's EC Tip of the Day

16.   R.C. Burns: "Export Control Reform Finally Announced for Guns and Ammo"

17.   Bartlett's Unfamiliar Quotations

18.   Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (5 Apr 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

19.   Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

ITEMS FROM TODAY'S FEDERAL REGISTER

1. Treasury Posts List of Countries Requiring Cooperation with an International Boycott
(Source: Federal Register, 16 May 2018.)

83 FR 22751-22752: List of Countries Requiring Cooperation with an International Boycott
   In accordance with section 999(a)(3) of the Internal Revenue Code of 1986, the Department of the Treasury is publishing a current list of countries

which require or may require participation in, or cooperation with, an international boycott (within the meaning of section 999(b)(3) of the Internal Revenue Code of 1986).

 On the basis of the best information currently available to the Department of the Treasury, the following countries require or may require participation in, or cooperation with, an international boycott (within the meaning of section 999(b)(3) of the Internal Revenue Code of 1986).

- Iraq
- Kuwait
- Lebanon
- Libya
- Qatar
- Saudi Arabia
- Syria
- United Arab Emirates
- Yemen

 Dated: May 4, 2018.
Douglas Poms, International Tax Counsel (Tax Policy).

back to top

* * * * * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Industry and Security Bureau; RULES; Revisions to the Unverified List [Publication Date: 17 May 2018.]

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 3. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 4. DHS/CBP Announces ACE Certification Scheduled Maintenance for Tonight
(Source: CSMS #18-000344, 16 May 2018.)

There will be ACE CERTIFICATION Scheduled Maintenance this evening, Wednesday, May 16, 2018 from 1700 ET to 2000 ET for ACE Infrastructure maintenance.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. DHS/CBP Posts Revised External ACE Entry Summary Business Process Document
(Source: CSMS #18-000345, 16 May 2018.)

A revised version of the External ACE Entry Summary Business Process document has been posted on cbp.gov and can be accessed here.

This version of the document was released Monday May 11, 2018, and includes numerous edits based on feedback from a working group that was primarily comprised of Trade Leadership Council members. The edits to the document include, but are not limited to, a completely rewritten section 6 (Single Transaction Bonds), a revised section 10 (Temporary Import Bonds) with a breach of bond subsection, a revised section 11 (Post Summary Corrections), an updated section 19 (ACE Reports), etc.

All ACE Entry Summary Business Process document related questions, comments, and suggestions should be emailed to acebusinessrules@cbp.dhs.gov.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. Justice: "Port St. Lucie Resident Pleads Guilty to International Firearms Trafficking"
(Source: Justice, 15 May 2018.) [Excerpts.]

A Port St. Lucie resident pled guilty today to unlawfully exporting firearms, firearm accessories, and ammunition from South Florida to Rio de Janeiro, Brazil. ...

Frederik Barbieri, 46, of Port St. Lucie, Florida, pled guilty to one count of conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371, and one count of unlicensed exportation of defense articles, in violation of Title 22, United States Code, Section 2778. Barbieri faces a possible maximum statutory sentence of 25 years in prison. Barbieri is scheduled to be sentenced on July 19, 2018, at 9:30 a.m., by United States District Court Judge Federico A Moreno.

According to stipulated facts filed in court, from May of 2013 through February of 2018, Barbieri conspired with others to: possess firearms with obliterated serial numbers; deliver packages containing those firearms to contract carriers for international shipment without providing notice that the

packages contained firearms; and smuggle firearms, firearm accessories, and ammunition from the United States to Rio de Janeiro, Brazil.

During this period, a shipment sent by Barbieri was intercepted in Rio de Janeiro by Brazilian law enforcement and found to contain approximately thirty AR-15 and AK-47 rifles and firearm magazines, all concealed in four 38-gallon Rheem water heaters. The water heaters were hollowed out and loaded with the contraband, and the serial numbers on each of the firearms had been obliterated. The same day that Brazilian authorities intercepted his shipment, Barbieri called and requested that the freight forwarder destroy the related paperwork.

Documentation provided by the freight forwarder revealed Barbieri's historical shipments. In addition to shipping the four Rheem water heaters in which he concealed approximately thirty rifles, Barbieri also shipped to Brazil an additional 120 Rheem water heaters, as well as 520 electric motors and 15 air conditioning units, from May of 2013 to May of 2017, using that freight forwarder. These items are all consistent with objects used to conceal the illegal international shipment of firearms and ammunition.

In February 2018, federal agents executed a warrant to search a storage unit rented by Barbieri in Vero Beach, Florida. In the storage unit, law enforcement discovered 52 rifles, 49 of which were wrapped for shipment with obliterated serial numbers. In addition, law enforcement discovered dozens of high capacity firearm magazines, over 2,000 rounds of ammunition, and packaging materials. Barbieri was arrested the following day.

It is illegal for civilians to possess firearms in Brazil. According to Brazilian law enforcement, AK and AR rifles have a black-market value of approximately $15,000 to $20,000 in the black-market. The retail cost of those firearms in the United States is approximately $700 to $1,000.

Neither Barbeiri, nor any of his coconspirators, obtained a license or written approval from the United States Department of State to export any defense articles. Non-automatic firearms, firearm accessories, and ammunition are articles designated as "defense articles," pursuant to federal regulations. ...

Related court documents and information may be found on the website of the District Court for the Southern District of Florida at www.flsd.uscourts.gov or on http://pacer.flsd.uscourts.gov.

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 7. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 8. EU Amends Restrictive Measures Concerning North Korea

(Source: <u>Official Journal of the European Union,</u> 16 May 2018.)

*Regulations:*
* <u>Council Implementing Regulation (EU) 2018/714</u> of 14 May 2018
implementing Regulation (EU) 2017/1509 concerning restrictive measures
against the Democratic People's Republic of Korea

*Decisions:*
* <u>Council Decision (CFSP) 2018/715</u> of 14 May 2018 amending Decision
(CFSP) 2016/849 concerning restrictive measures against the Democratic
People's Republic of Korea

back to top

* * * * * * * * * * * * * * * * * * * *

## 9. Ammoland: "Trump State Department Looks to Streamline Firearms Exports & Open U.S. Markets"
(Source: <u>Ammoland,</u> 15 May 2018.) [Excerpts.]

The Trump state department is making headway to transfer authority from
the State Department to the Commerce Department over the approval of
U.S. small arms exports. All in an effort to open U.S. firearms manufacturing
to international customers.

Currently, U.S. firearms and ammunition manufacturers faced a competitive
disadvantage in the global marketplace due to inefficient Cold War-era export
controls and held over Obama administration era directives. ...

The proposed rules affect far-reaching changes in the way the U.S.
Government controls the export of non-automatic and semi-automatic
firearms, as well as their components and the ammunition they use.

Most significant changes that will be affected by the new rules include:
•       Non-automatic and semi-automatic firearms that are currently controlled under
Categories I or II of the ITAR will be controlled under the Export Administration
Regulations (EAR). The same will apply to components for these firearms and the
ammunition they use.
•       Automatic firearms and their principal components will **remain** in ITAR
Category I, as well as firearms designed to fire caseless ammunition and certain other
firearms and firearms systems.
•       Ammunition that is belted or linked (i.e., for automatic firearms) will remain
in USML Category III. Ammunition for non-automatic and semi-automatic will move
to the EAR.
•       All the items moving from the ITAR to the EAR will continue to be subject to
licensing requirements but under the EAR, not the ITAR. The EAR rules will

contain *"license exceptions"* that will permit certain components and other items to be exported without a license, but there will be a "worldwide licensing requirement" for complete firearms.

• Services (known as "defense services" under the ITAR) relating to non-automatic and semi-automatic firearms and the other items that move to the EAR will no longer be export-controlled.

• Silencers and components will still be under ITAR.

• Manufacturers, exporters, gunsmiths, and others who are currently required to register under the ITAR and pay a $2,250 registration fee but who have no involvement with the items that remain on the U.S.M.L. will no longer be required to register with DDTC or pay an annual fee. There is no registration fee under the EAR and no fee for an export license (in contrast to the $250/license fee under the ITAR. . . . .

back to top

☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀

## 10. Fox6Now: "Milwaukee Man in Us on Non-Immigrant Visa Accused of Trying to Ship 26 Guns to People's Republic of China"
(Source: Fox6Now, 15 May 2018.)

A Milwaukee man, admitted to the United States under a non-immigrant visa, has been federally indicted, accused of attempting to ship guns to the People's Republic of China.

Zimo Sheng faces two counts - violation of the "Arms Export Control Act" and "possession of a firearm by an alien in the United States under a non-immigrant visa."

Federal court documents accused Sheng of "knowingly and willfully attempting to export from the U.S. to the People's Republic of China a defense article (the complete upper assembly for a Glock 43 pistol), designated as a defense article on the US Munitions List, without having first obtained from the State Department a license for such export or written authorization for such export," and "knowingly possessing 26 firearms and approximately 16,553 rounds of ammunition transported in interstate commerce."

back to top

☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀ ☀

## 11. Reuters: "U.S. Lawmakers Push Back on Trump Talk of Helping China's ZTE"
(Source: Reuters, 15 May 2018.) [Excerpts.]

U.S. lawmakers on Tuesday rejected any plan by President Donald Trump to ease restrictions on China's ZTE Corp, calling the telecommunications firm a

DOC_0001067

security threat and vowing not to abandon legislation clamping down on the company.

Trump on Monday had defended his decision to revisit penalties on ZTE for flouting U.S. sanctions on trade with Iran, in part by saying it was reflective of the larger trade deal the United States is negotiating with China. ...

back to top

∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗

## 12. ST&R Trade Report: "Export Ban on Chinese Telecom Company Could be Short-Lived"
(Source: Sandler, Travis & Rosenberg Trade Report, 16 May 2018.)

In an unusual move that elicited bipartisan criticism, President Trump said he is directing the Commerce Department to help a Chinese company recently hit with a seven-year export ban "get back into business, fast." The DOC imposed the ban against Zhongxing Telecommunications Equipment Corporation April 16 after determining that ZTE had made false statements regarding the steps it took to discipline employees involved in a scheme to illicitly reexport controlled items to Iran. Commerce Secretary Wilbur Ross said the DOC will now consider "alternative remedies to the one that we had originally put forward."

After the ban was imposed ZTE announced that it would cease major operations and subsequently asked the DOC to suspend the ban. That was also one of the requests China reportedly made of the U.S. during recent bilateral trade talks in Beijing.

In separate tweets Trump indicated that the ban would cause the loss of "too many jobs in China" and would also negatively affect the U.S. suppliers from which ZTE purchases a "big percentage of individual parts" for its products. He also indicated that easing the ban could be used as leverage in "the larger trade deal we are negotiating with China." Those negotiations will continue this week when Vice Premier Liu He visits Washington.

According to press reports, however, any deal could be modest in nature. The White House is said to be pursuing an agreement that would ease the ZTE ban in return for China lowering import duties on U.S. farm goods that were increased in response to U.S. tariff increases on steel and aluminum. It does not appear that any of the demands on an extensive list the U.S. submitted to China a few weeks ago would be resolved by this agreement. On the other hand, a *Politico* article noted that Treasury Secretary Steve Mnuchin, "who has become Trump's point person in the talks, may view a cumulative number of smaller deals that accomplish some of the bigger asks the U.S. laid out ... as representing systemic reform."

Trump's reversal on ZTE was explained as "part of a very complex relationship the U.S. has with China" by a White House spokesman but was met with opposition by members of Congress on both sides of the aisle. Rep.

Adam Schiff, D-Calif., said Trump "should care more about national security than Chinese jobs." Senate Minority Leader Chuck Schumer, D-N.Y., said the U.S. should be "taking tough action against actors like ZTE" but that "before it's even implemented, the president backs off." Sen. Marco Rubio, R-Fla., said he hoped Trump's decision does not signal the beginning of a trend. Responding via Twitter, Trump said, "Be cool, it will all work out!"

back to top

* * * * * * * * * * * * * * * * * * * *

## 13. G. Husisian: "The Twelve Compliance Steps Every Multinational Corporation Should Undertake in Light of Recent Trump Administration Enforcement Activity" (Part II of IV)

(Source: Foley & Lardner LLP, 14 May 2018.)

* Gregory Husisian, Esq., ghusisian@foley.com, Foley & Lardner LLP, Washington DC.

*[Editor's Note: due to space limitations, this article has been divided into four parts. We will post one part every day, from Tuesday, 15 May until Friday, 18 May 2018.]*

### Step 2: Perform a Risk Assessment

The second step for most organizations is to perform a risk assessment. A risk assessment is a survey of the company's operations to determine the exposure of the organization to various forms of regulatory risk, considering both the likelihood and the severity of possible violations and the current enforcement priorities of the relevant authority.

The importance of the risk assessment lies in the recognition that it is not possible to eliminate all regulatory risk. Since organizations need to minimize the risk of violations, while coping with the reality that they have limited resources to put into risk mitigation, they need guidelines for allocating their scarce compliance resources. The risk assessment provides this guidance by assembling data needed to create an organization-wide risk profile.

Compliance at international organizations should be tailored to the organization, taking into account all factors that bear on the risk profile of the organization. Items to consider include U.S. government enforcement priorities, prior compliance issues within the organization, risks and trends in the industry (including whether the U.S. government seems to be targeting the industry for a given legal regime), and recent changes in the scope of

operations of the organization. Such changes are frequent sources of weakness if they are not mirrored by changes in compliance oversight.

A typical way for companies to proceed with a risk assessment is to survey business units that represent areas of high regulatory risk. Questions for an anti-corruption survey, for example, might examine whether the relevant stakeholders often deal with state-owned enterprises, whether they have frequent interactions with government regulators, whether there is significant entertaining of non-U.S. persons, whether the organization does significant business in countries known to have a reputation for corruption, and whether the company does significant business in the United Kingdom (which can draw the UK Bribery Act into play). For export controls, the relevant topics to explore would include whether the organization deals with controlled items or controlled technologies; whether the company deals with items on the U.S. Munitions List (USML) or modifies commercial items for military use or to meet military specifications; whether the company has recently conducted a classification review; the degree to which non-U.S. nationals potentially have access to controlled technical data; whether the organization sells products that rely on encryption; and whether there are sales to known diversion points (the Middle East, Mexico, Russia, Pakistan, and so forth). For economic sanctions, relevant topics to cover would include whether there are sales by non-U.S. subsidiaries to sanctioned countries or specially designated nationals, whether there are sales to known diversion points, and whether the organization as a whole maintains adequate screening for SDNs (Specially Designated Nationals, or persons who have been sanctioned under U.S. law as being off-limits for business transactions and financial dealings). Finally, an anti-boycott risk assessment would examine the extent of dealings with Middle Eastern countries and with firms operating out of that region.

One thing to remember is that the conduct of a risk assessment can lead to the discovery of potential regulatory violations. The company accordingly should have the risk assessment process conducted in a way that stresses confidentiality. If possible, it also is preferable that the risk assessment be overseen by an attorney. This is so the exercise can be conducted under the rubric of attorney-client privilege. Doing so could be important if the investigation uncovers evidence of apparent violations.

Once the risk assessment is complete, the results should be carefully evaluated to determine where the areas of greatest compliance concern lie. The results can be distilled down to a company-wide risk profile, which can guide the allocation of compliance resources. The results can then be used for such useful exercises as determining which areas merit the greatest attention, which areas likely need additional internal controls, whether there are patterns of deficient compliance (based on geography, product lines, subsidiaries/divisions, etc.), and whether the basic knowledge of the relevant legal requirements appears to be in place. By formalizing the results in a risk profile, the corporation can determine the appropriate way to manage the identified risk.

*Step 3: Survey Current Controls*

Step 3 involves surveying current compliance procedures and internal controls. Most larger multinational corporations already have some kind of compliance procedures in place, whether in a formal compliance program or at least ethics provisions in the code of conduct. In determining how to proceed, these procedures are the best starting point. The company should assess the current compliance program to see if its compliance measures and internal controls line up with its risk profile.

The evaluation should consider whether the plan properly covers the following aspects of the company's risk model:

  - Does the plan reflect all of the circumstances that may put the organization at risk of a violation? Is it based upon a realistic risk assessment that is up to date and consistent with the company's current circumstances?
  - Does the program cover all aspects of the business that operate or sell overseas?
  - Does the plan extend to any business units that might have dealings with non-U.S. officials, whether in a procurement, regulatory, or other role?
  - Does the plan include model procedures and training for non-U.S. consultants and business partners with whom the organization does business?
  - Does the compliance program reflect the nature of the firm's foreign business operations and the extent to which they are subject to government control or influence?
  - Does the compliance program contain adequate procedures to ensure that the firm can monitor disbursements and reimbursements?
  - Does the plan contain adequate internal controls to help buttress the compliance procedures?
  - Does the plan compare well with codes of ethics and compliance policies used by comparable businesses in the industry and in the countries where the firm operates?

In making these determinations, the company should consider the company's general risk profile, not just those related to the specific legal regime. Problems in multiple areas may indicate a careless corporate culture toward compliance issues.

Another key issue that should be covered in the compliance survey is whether the program covers the identified outside actors who can expose the organization to the risk of a regulatory violation. The U.S. government considers all affiliates, joint ventures, agents, distributors, suppliers, subcontractors, and other third parties to be extensions of the organization. [FN/1] The organization should evaluate whether the controls and compliance procedures extend appropriately to any person or entity with which it is affiliated and whether that entity may cause third-party liability.

Where anti-corruption is concerned, organizations operating abroad need to assess whether the current plan adequately covers the regulatory risk posed by resellers, vendors, consultants/agents, sales representatives, joint venture partners, freight companies, customs brokers, and any other third party that could be viewed as being a source of bribes while representing the interests

or carrying on the business of the U.S.-based company. Where exports and sanctions are concerned, the organization must consider not only its own affiliates (joint ventures, agents, distributors, and so forth), but also the risk profile raised by its own customers who might be diversion risk points. Where anti-boycott is concerned, the organization should consider whether it has agents who might be viewed as providing information on behalf of the organization, and therefore might provide boycott-related information to countries cooperating with the Arab League boycott of Israel.

*Step 4: Identify Available Resources*

Compliance is an exercise in identifying and managing risk. Appropriate risk management requires matching compliance promises and expectations to the available resources, and vice versa.

After the compliance procedures have been identified and catalogued, a key next step is to ensure that the organization has not fallen into the classic compliance trap of over-promising and under-delivering. It is a classic mistake, from a risk-management standpoint, to impose compliance requirements and then fail to implement them. Yet this is often what many organizations do, either due to institutional drift or a lack of resources to implement the promised compliance tasks.

No compliance initiatives will work without adequate support. This issue is covered in the McNulty Memorandum. As the McNulty Memorandum states:

> Prosecutors should ... attempt to determine whether a corporation's compliance program is merely a "paper program" or whether it was designed and implemented in an effective manner. In addition, prosecutors should determine whether the corporation has provided for a staff sufficient to audit, document, analyze, and utilize the results of the corporation's compliance efforts.

Once the company has identified the risk and necessary controls relating to those risks, it should develop a realistic sense of the cost of a program and the resources needed to run it. Senior management should sign off on the budgeting, with the understanding that the company will need to invest time and resources to maintain the program on an ongoing basis.

Without proper resources, a corporation risks certain failure. Compliance can be expensive, so a company should decide at the outset that it will budget adequate funds and employ sufficient resources to follow through on its compliance initiatives. In determining whether sufficient resources are available, the company needs to consider that success in compliance efforts takes a commitment of both tangible company resources (hiring people and spending money on due diligence) and intangible ones (setting aside employee time for training). The resource identification should take a candid look at whether the company is adequately funding current compliance efforts. If the company has put in place a program that demands substantial due diligence of every foreign agent hired, for example, but has not adequately funded such activities, then the company should view this as a

compliance failure. Viewed in an enforcement context, the corporation would look like it has failed to meet its own compliance standards. [FN/2]

In the international realm, some of the most common areas where compliance resources tend to lag include:

  - **Anti-corruption**. Promises of systematic due diligence for vetting agents, distributors, joint ventures, and other third-party entities; adequate oversight of the activities of third-party intermediaries; resources to conduct compliance audits; adequate training of overseas actors.
  - **Economic Sanctions**. Resources for systematically checking the SDN and other blocked lists; allocating adequate resources for "know your customer" diligence; adequate training of overseas actors; failure to reflect new rules regarding what subsidiaries of U.S. companies can and cannot do.
  - **Export Controls**. Inadequate classification of controlled items and technical data; failure to implement "know your customer" guidelines for end-use and end-user controls; failure to take into account potential diversion risks; failure to check the SDN and other blocked lists.
  - **Anti-boycott**. Resources for reviewing contracts, purchase orders, letters of credit, certificates of origin, bills of lading, and other commercial documents.

To avoid these and other promise-resource mismatches, the organization should, with a clear and open mind, compare its identified risk profile with the inventory of current policies and internal controls, to determine whether there are any gaps between the two. Once such gaps are identified, the organization can, using normal risk-based principles, determine the best order and way to remedy the resource misallocation, whether by reallocating existing compliance resources, finding new sources of funding, or readjusting the compliance procedures.

Another key funding mistake in the international realm is failing to allocate sufficient resources to local compliance oversight. This topic is covered in Step number 5.

-----------

[FN/1] For example, in the settlement of the ENI FCPA investigation, the SEC premised its claims, in part, on its view that ENI had "failed to ensure that Snamprogetti [a subsidiary] conducted due diligence on agents hired through joint ventures in which Snamprogetti participated." Securities and Exchange Commission v. ENI, Civ. Action No. 4:10-cv-2414 (Jul. 7, 2010), available here. It is true that in this particular case, the subsidiary was covered by ENI's FCPA compliance procedures. Nonetheless, this case underscores the view of the U.S. government that it is the responsibility of companies to ensure that close affiliates, including joint venture partners, are taking actions to ensure there is reasonable due diligence for anyone acting on behalf of the affiliated companies.

[FN/2] In the Siemens case, the DOJ alleged that Siemens provided only limited internal audit resources to support its compliance efforts in comparison to the breadth of the company's operations. See United States v. Siemens Aktiengesellschaft, No. 08-CR-367 (D.D.C., Dec. 12, 2008) (information at paragraph 135), available here.

## 14. M. Volkov: "Dun and Bradstreet Pays $9 Million for FCPA Violations in China"

(Source: Volkov Law Group Blog, 9 May 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

After a lengthy investigation, Dun and Bradstreet (D&B) settled an FCPA enforcement action with the Securities and Exchange Commission for $9 million (available here). At the same time, the Justice Department issued a declination letter, representing the first written declination under its new Corporate FCPA Enforcement Policy (available here).

D&B's FCPA violations in China represent the perfect trifecta of risks and violations facing companies in China. The D&B case provides important reminders on the risks of joint ventures in China; the dangers of third parties; and the importance of pre-acquisition due diligence. In the end, D&B agreed to books and records and internal controls violations.

D&B operated two subsidiaries in China: Shanghai Huaxia Dun & Bradstreet Business Information Consulting Co. ("HDBC"); and Shanghai Roadway D&B Marketing Services ("Roadway"). HDBC was a joint venture, owned 51 percent by D&B's Chinese subsidiary and 49 percent by Huaxia International Credit Consulting Co. HDBC and Roadway made improper payments to Chinese government officials. These unlawful payments were inaccurately maintained in D&B's books and records.

The HDBC joint venture was created in 2006. D&B joined with Huaxia because of Huaxia's "government connections." D&B's due diligence review of Huaxia prior to the joint venture confirmed that Huaxia obtained critical business information from the Chinese government by directly bribing government officials. Despite knowing this information, D&B failed to impose appropriate controls and mitigation strategies to prevent these illegal payments.

After the joint venture was created, D&B managers forced Huaxia to cease making direct payments to government officials for access to important information. Eventually, D&B permitted the HDBC joint venture to make improper payments through third-party representatives.

In 2009, D&B acquired 90 percent of Roadway, a leading provider of direct marketing services. Roadway's operations raised significant risks of violating Chinese data privacy laws that restricted acquisition of personal information from government officials. After the acquisition, Roadway violated this privacy law.

In pre-acquisition due diligence, D&B learned that Roadway awarded rebates/commissions to sales representatives that were partially shared with customers of Roadway's services. D&B made no attempt to confirm these arrangements and to learn whether some of the customers were state-owned entities.

After the acquisition, Roadway continued to rely on agents to acquire business data which was used to market its marketing of direct sales services. D&B never audited these sources of information to determine whether bribes were paid to acquire this information.

In September 2012, the Chinese government charged Roadway and five individuals with data privacy criminal violations. Roadway eventually paid a fine of $160,000 and five individuals were convicted of criminal violations.

D&B eventually learned that Roadway made illegal payments, directly and through third parties, to business decision makers, some of which were state-owned businesses, to purchase Roadway services. These payments were inaccurately recorded in Roadway's books and records as promotional expenses.

D&B's initial disclosure to the SEC and DOJ occurred after Chinese authorities raided Roadway in 2012.

D&B's remedial efforts were extensive, including closing the Roadway subsidiary and discontinuing HDBC's illegal activities. D&B terminated a number of employees and disciplined senior executives responsible for oversight of the Chinese operations. D&B also doubled the size of its compliance and audit staffs; hired legal and compliance employees in China; and enhanced its anti-corruption policies and related procedures.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. Gary Stanley's EC Tip of the Day

(Source: Defense and Export-Import Update; 15 May 2018. Available by subscription from gstanley@glstrade.com.)

\* Author: Gary Stanley, Esq., Global Legal Services, PC, (202) 352-3059, gstanley@glstrade.com.

For DSP licenses, a license holder seeking a reconsideration and/or clarification of a proviso must submit a replacement (new) DSP authorization. In the purpose block, the applicant should identify the submission as a "Proviso Reconsideration of [license number]". There must be no other changes to the license application and this must be stated in the purpose block. The applicant must also restate the original purpose description as this is a replacement authorization. As support documentation, the applicant must submit a letter explaining the request as noted below under Letter of Explanation and a copy of the associated DSP license and provisos. The application must include the original support documentation. If the subject

provisos will remain as written, the applicant will receive a Return Without Action (RWA) of the replacement authorization. If the subject provisos are deleted and/or modified, the precedent authorization will be revoked and replaced by the replacement submission.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. R.C. Burns: "Export Control Reform Finally Announced for Guns and Ammo"

(Source: Export Law Blog, 15 May 2018. Reprinted by permission.)

\* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Wash DC, Clif.Burns@bryancave.com, 202-508-6067).

The Directorate of Defense Trade Controls and the Bureau of Industry and Security today *[ed. yesterday]* announced the proposed rules for the long-awaited export control reform of Categories I, II and III of the United States Munitions List. The proposed rules for DDTC are here; the proposed rules for BIS are here.

Under the proposed rules, the only items remaining in Category I will be firearms that fire caseless ammunition, are fully automatic, or are specially designed to integrate fire control, automatic tracking, or automatic firing. Other small arms that were once in Category I will be moved to 0A501 and 0A502. Small arms that are on Category I of the USMIL will still be subject to the brokering rules of the ITAR even if they have been moved to 0A501 or oA502.

These new proposed ECCNs will be controlled by, among others, RS1 and FC meaning that licenses will be required for all destinations. (RS1 captures every country but Canada and FC captures Canada). The BIS proposed rules also exclude the use of most license exceptions so that the new regime will closely parallel the available exemptions that were available under the ITAR. So the result of the transition of these items from the USML to the CCL will mostly be a change in the agency with licensing authority.

There are a few significant changes, however, worth noting. First, the proposed rules would eliminate a particular bugbear of mine relating to the classification of rifle scopes. Currently, rifle scopes are ITAR if they are "manufactured to military specifications," whatever that means. Foreign manufacturers of rifle scopes routinely decline to state whether their scopes are Category I(f) or 0A987 and do not provide enough information to decide whether a particular scope is manufactured to military specifications. Under the proposed rules, a scope is on the USML only if it has night vision or infrared capabilities that would cause it to be captured under Category XII. Everything else is now 0A987.

Second, these new rules will reverse the questionable position that DDTC has taken in the Defense Distributed case. In that case, DDTC argued that

DOC_0001076

posting 3D gun plans on the Internet is an export of controlled technical date on Category I firearms to every foreign person with access to the Internet. BIS has a somewhat different take on posting things to the Internet. Here's what the proposed BIS rules say:

> The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR." (See part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology." While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR."

Part 734 makes clear that publication of technology on the Internet is not an export of that technology to the rest of the world; rather it is a release of that technology from export controls.

Third, the new rules will eliminate the issue as to whether firearms training is a defense service that cannot be provided by a U.S. person to a foreign individual without a license. Both the existing and latest proposed DDTC rule defining defense services would require a license to provide basic firearms training to a foreign individual. (The latest proposed rule permits basic training but only if there is an approved license to export the firearm to that individual.) The BIS analysis of this is somewhat different. The BIS notice of proposed rulemaking somewhat wryly states:

> The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

In fact, of course, under the proposed rules training a foreign individual in firearms use would require a license only if it involved a control of technology covered by proposed ECCNs 0E501 or 0E502. However, neither ECCN covers information related to the use of 0A501 or 0A502 firearms. As a result, firearms training that would have required a license under the old rules will not require a license if the new rules are adopted.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 17. Bartlett's Unfamiliar Quotations

(Source: Editor)

* **Douglas Southall Freeman** (16 May 1886 - 13 June 1953; was an American historian, biographer, newspaper editor, and author. He is best known for his multi-volume biographies of Robert E. Lee and George Washington, for which he was awarded two Pulitzer Prizes.)
  - *"Time alone is irreplaceable. Waste it not."*

back to top

꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰ ꙰

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 5 Apr 2018: 83 FR 14580-14583: Reclassification of Targets for the Production of Tritium and Related Development and Production Technology Initially Classified Under the 0Y521 Series [Imposes License Requirements on Transfers of Specified Target Assemblies and Components for the Production of Tritium, and Related "Development" and "Production" Technology.]

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 4 May 2018: Harmonized System Update 1807, containing 289 ABI records and 60 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
  to receive your discount code.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

| From: | Gary Stanley [████████@glstrade.com] |
| Sent: | 5/16/2018 9:44:38 PM |
| To: | Mira Ricardel [Mira.Ricardel@bis.doc.gov] |
| Subject: | Defense and Export-Import Update (May 16, 2018) |

**Dear All,**

**Good Day!**

*Gary Stanley's EC Tip of the Day:* **Items subject to temporary CCL controls are classified under the ECCN 0Y521 series (*i.e.*, 0A521, 0B521, 0C521, 0D521, and 0E521) pursuant to § 742.6(a)(7) of the EAR while a determination is made as to whether classification under a revised or new ECCN, or an EAR99 designation, is appropriate.**

**Today's Items:**

1. **Turkish Banker Sentenced to 32 Months for Conspiring to Violate U.S. Sanctions Against Iran and Other Offenses**

2. **Treasury and the Terrorist Financing and Targeting Center Partner Together to Sanction Hizballah's Senior Leadership**

3. **Treasury Publishes List of Countries Requiring Cooperation with an International Boycott**

4. **Treasury Launches Survey of Foreign Ownership of U.S. Securities**

5. **Global Affairs Canada Amends Sanctions against Libya**

6. **WTO News**

7. **U.S. Government Contracting**

8. **U.S. Customs and U.S. Census/AES Updates**

9. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**

**Other Headlines**

10. **Trump State Department Looks to Stream Line Firearms Exports & Open US Markets**

11. **U.S. Has Spent $2.8 Trillion on Terrorism Fight, Study Finds**

12. **How Rusal Escaped the Noose of U.S. Sanctions**

13. **Europe Adopts Defiant Stance in Attempt to Save Iran Nuclear Deal**

14. **European Firms Start Pulling Back from Iran**

15. **Export Finance Won't Save Iran Business: French Official**

16. **Trump's Goal for Nafta Rewrite Looks Unattainable in 2018**

17. **France Says Will Respect WTO Decision on Airbus Aid**

18. **Businesses Race to Washington to Sway Trump on China Tariffs**

19. **On Trade, the U.S. and China Consider the Unthinkable: Breaking Up**

20. **'Rules of Origin' Risk Tripping Up Trade Post-Brexit**

21. **Air Force Electronic Warfare Push Gains Steam; C-5 Gets 3-D Printed Door Handles**

22. **Host of Israeli Weapons Look Likely for US Sales: Iron Dome to Iron Fist**

23. **The Pentagon's CMO Has a Plan to Get More Money for Warfighters**

24. **Navy Looks Outside Budget to Help Build New Boomers**

25. **Companies Find Value in Combining Compliance, Sustainability**

26. **Opinion: Europe's Data Protection Law Is a Big, Confusing Mess**

**Upcoming Export Control and Other Trade Compliance Conferences**

## 1. Turkish Banker Sentenced to 32 Months for Conspiring to Violate U.S. Sanctions Against Iran and Other Offenses

The U.S. Department of Justice (DOJ) has announced that Mehmet Hakan Atilla, 47, a resident and citizen of Turkey, has been sentenced to 32 months for his participation in a scheme to violate U.S. economic sanctions imposed on the Islamic Republic of Iran involving billions of dollars' worth of Iranian oil proceeds held at Atilla's employer (Turkish Bank-1). On Jan. 3, after a five-week jury trial, Atilla was convicted of conspiring with others to use the U.S. financial system to conduct transactions on behalf of the government of Iran and other Iranian entities, which were barred by U.S. sanctions, and to defraud U.S. financial institutions by concealing these transactions' true nature. Atilla and others conspired to provide access to restricted oil revenues through international financial networks, including U.S. financial institutions, to the government of Iran, Iranian entities, and entities identified by the Department of the Treasury Office of Foreign Assets Control as Specially Designated Nationals (SDNs). They did so by, among other things, using Turkish Bank-1, at which Atilla served as Deputy General Manager of International Banking, to engage in transactions involving billions of dollars' worth of petroleum revenues held by the Central Bank of Iran and the National Iranian Oil Company. In particular, they facilitated and protected Turkish Bank-1 customer, international gold trader Reza Zarrab's, ability to supply currency and gold to, and facilitate international financial transactions for, the Government of Iran, Iranian entities, and SDNs using Turkish Bank-1. Many of those financial transactions involved unwitting U.S. financial institutions, in violation of U.S. sanctions against Iran. The elaborate scheme established by Atilla and others also shielded Turkish Bank-1 from U.S. sanctions. Atilla in particular lied to and deceived U.S. Treasury officials about Turkish Bank-1's activities and its purported compliance efforts in order to avoid subjecting the bank to U.S. sanctions. Additionally, Atilla, Zarrab and others conspired to create and use false and fraudulent documents to disguise prohibited transactions for Iran and make those transactions falsely appear as transactions involving food, thus falling within humanitarian exceptions to the sanctions regime. As a result of this scheme, Atilla and his co-conspirators induced U.S. banks unknowingly to process international financial transactions in violation of the IEEPA, and to launder through the U.S. financial system funds promoting the scheme.

## 2. Treasury and the Terrorist Financing and Targeting Center Partner Together to Sanction Hizballah's Senior Leadership

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) in partnership with the Kingdom of Saudi Arabia, the co-chair of the Terrorist Financing Targeting Center (TFTC), and the other TFTC member states – the Kingdom of Bahrain, the State of Kuwait, the Sultanate of Oman, the State of Qatar, and the United Arab Emirates

(UAE) – has designated members of Hizballah's Shura Council, the primary decision-making body of Hizballah. Specifically, OFAC, together with Gulf partners, designated Hasan Nasrallah, the Secretary General of Hizballah. OFAC and the TFTC nations further designated Naim Qasim, Muhammad Yazbak, Husayn Al- Khalil, and Ibrahim al-Amin al-Sayyid pursuant to Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism. In addition, TFTC Member States also designated the following key Hizballah-affiliated individuals and entities: Talal Hamiyah, Ali Youssef Charara, Spectrum Group, Hasan Ebrahimi, Maher Trading, Hashem Safieddine, Adham Tabaja, Al-Inmaa Group, and Al-Inmaa Engineering and Contracting, all of whom were previously designated by the United States. This is the second TFTC designation action since the center was announced on May 21, 2017. The TFTC facilitates coordinated disruptive actions, sharing of financial intelligence information, and member state capacity-building to target terrorist financing networks and related activities that pose national security threats to TFTC members. Click here for further indentifying information on these sanctioned persons.

## 3. Treasury Publishes List of Countries Requiring Cooperation with an International Boycott

(83 Fed. Reg. 22751) - In accordance with section 999(a)(3) of the Internal Revenue Code of 1986, the U.S. Department of the Treasury is publishing a current list of countries which require or may require participation in, or cooperation with, an international boycott (within the meaning of section 999(b)(3) of the Internal Revenue Code of 1986). On the basis of the best information currently available to the Department of the Treasury, the following countries require or may require participation in, or cooperation with, an international boycott (within the meaning of section 999(b)(3) of the Internal Revenue Code of 1986):

- Iraq
- Kuwait
- Lebanon
- Libya
- Qatar
- Saudi Arabia
- Syria
- United Arab Emirates
- Yemen

## 4. Treasury Launches Survey of Foreign Ownership of U.S. Securities

(83 Fed. Reg. 22752) - By this Notice and in accordance with the Code of Federal Regulations, the Department of the Treasury is informing the public that it is conducting a mandatory survey of foreign ownership of U.S. securities as of June 30, 2018. This mandatory survey is conducted under the authority of the International Investment and Trade in Services Survey Act. This Notice constitutes legal notification to all United States persons (defined in this Federal Register Notice) who meet the reporting requirements set forth in this Notice that they must respond to, and comply with, this survey. Additional copies of the reporting forms SHLA (2018) and instructions may be printed from the

Internet here. Data should be submitted to the Federal Reserve Bank of New York, acting as fiscal agent for the Department of the Treasury, by August 31, 2018.

## 5. Global Affairs Canada Amends Sanctions against Libya

The Canadian Government's Global Affairs Canada has amended its regulations implementing the United Nations resolutions on Libya.

## 6. WTO News

• KOREA INITIATES WTO DISPUTE COMPLAINTS AGAINST US SAFEGUARD DUTIES ON WASHERS, SOLAR CELLS: Korea has requested WTO dispute consultations with the United States regarding US safeguard duties imposed on imports of large residential washers and crystalline silicon photovoltaic products. The requests were circulated to WTO members on 16 May.

• APPELLATE BODY ISSUES REPORT REGARDING EU SUBSIDY DUTIES ON PET FROM PAKISTAN: On 16 May the WTO Appellate Body issued its report in the case ""European Union - Countervailing Duties on Certain Polyethylene Terephthalate from Pakistan" (DS486)

• MEMBERS SHOW SUSTAINED ENGAGEMENT IN BELARUS ACCESSION PROCESS: At the 10th meeting of the Working Party on the Accession of Belarus held on 15 May, WTO members stressed their commitment to working towards the country's WTO accession and urged Minsk to take appropriate policy decisions in order to make a decisive push forward. The meeting was the third since the resumption of the Working Party work in January 2017.

## 7. U.S. Government Contracting

• DoD, GSA & NASA/Federal Acquisition Regulation (FAR): OMB Information Collection Submission - Claims and Appeals - Deadline for Public Comment: July 16, 2018

## 8. U.S. Customs and U.S. Census/AES Updates

• U.S. Customs - CSMS #18-000344 Title: ACE CERTIFICATION Scheduled Maintenance, Wed. May 16, 2018 @ 1700 ET to 2000 ET

• U.S. Customs - CSMS #18-000345 Title: External ACE Entry Summary Business Process document version 9.0 – 05/11/2018

• U.S. Customs - CBP Reminds Boaters Arriving to the U.S. in Pennsylvania, New Jersey or Delaware of Federal Reporting Requirements

• U.S. Customs - Customs Bulletin and Decisions - Vol. 52, May 16, 2018, No. 20
Index
General Notices
U.S. Court of International Trade Slip Opinions

## 9. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

• Commerce/E&C - Certain Quartz Surface Products from the People's Republic of China: Initiation of Less-ThanFair-Value Investigation

• Commerce/E&C - Certain Quartz Surface Products from the People's Republic of China: Initiation of Countervailing Duty Investigation

• USITC - Certain Non-Volatile Memory Devices and Products Containing the Same: Notice of Request for Statement on the Public Interest

**Other Headlines**

## 10. Trump State Department Looks to Stream Line Firearms Exports & Open US Markets

Ammoland.com, May 15 - The Trump state department is making headway to transfer authority from the State Department to the Commerce Department over the approval of U.S. small arms exports. All in an effort to open U.S. firearms manufacturing to international customers. Currently, U.S. firearms and ammunition manufacturers faced a competitive disadvantage in the global marketplace due to inefficient Cold War-era export controls and held over Obama administration era directives. As many of our industry readers will confirm the current red tape burden under the State Department has prevented many opportunities for American firearm manufacturers to compete overseas. The logical step, of moving authority to the Commerce Department and treating gun makers as standard business exports, has been long sought by small arms manufacturers as a way to boost sales and employ even more Americans. As expected mainstream media news outlets have spun the improvements as the "runaway arms trading." With claims that American made guns would go straight to terrorist and evil dictators, and human rights will be cast aside. Never mentioning that the right to keep and bear arms is a human right, that the rest of the world should enjoy with well made American guns.

## 11. U.S. Has Spent $2.8 Trillion on Terrorism Fight, Study Finds

Wall Street Journal.com, May 16 - The U.S. has spent as much as $2.8 trillion on the fight against terrorism since the Sept. 11, 2001, terrorist attacks, according to a study published Wednesday. The report from the Washington-based Stimson Center think tank said the figure included spending on the wars in Afghanistan, Iraq and Syria, in addition to homeland-security efforts and overseas programs. Spending on counterterrorism reached a peak of $260 billion in 2008, accounting for more than a fifth of the government's discretionary budget. The report said the U.S. lacked a system for accounting for spending on counterterrorism and that loopholes have increasingly allowed billions to be spent on items that shouldn't qualify for emergency funding. [**Editor's Note:** Click here for a copy of this Stimson Center report.]

## 12. How Rusal Escaped the Noose of U.S. Sanctions

Reuters.com, May 15 - They were supposed to be the toughest sanctions the United States had ever imposed on a Russian oligarch. Seventeen days later, Washington watered them down. On April 23, the U.S. Treasury eased restrictions on billionaire Oleg Deripaska's aluminum company Rusal. Instead of barring Rusal from international markets, which is what the United States originally intended to do, the Treasury suggested it might lift the sanctions altogether. Washington's change of course says a lot about the leverage held by the supply chain of a widely-used commodity such as aluminum. It also suggests the Trump administration is hard-pressed as it juggles international economic battles it has opened on various fronts, including with China and Iran.

## 13. Europe Adopts Defiant Stance in Attempt to Save Iran Nuclear Deal

Washington Post.com, May 15 - The European Union's chief diplomat took a defiant stance Tuesday after meeting with Iran's foreign minister and other top European diplomats to try to salvage the Iran nuclear deal following President Trump's decision to withdraw the United States. Federica Mogherini, who negotiated the deal on behalf of the European Union, listed a string of proposals that taken together may not be enough to convince Iran's leaders to hold to the deal but probably will be seen in Washington as a raised fist against U.S. policy. . . . Comparing the 2015 nuclear agreement to "a relative in intensive care," Mogherini said ideas under consideration include plans to deepen Europe's economic relationship with Iran, shield banking transactions with Tehran, keep purchasing Iranian oil and gas, and use E.U. financing for investments there.

## 14. European Firms Start Pulling Back from Iran

Wall Street Journal.com, May 16 - European firms have started pulling back investment and abandoning commitments in Iran, responding to a decision last week to reimpose broad American sanctionson Tehran by year end. Total SA, a French oil giant, said Wednesday it had halted work on an Iranian natural-gas project and warned it may have to pull out altogether from its plan to invest $1 billion in the field. Some shippers of Iranian oil have said they are ceasing to facilitate such trades because of the new sanctions. Insurance companies are studying whether they may have to reduce or stop their underwriting on the Islamic Republic's shipments. Iran, which is the world's fifth-largest oil exporter and the holder of the second-largest gas reserves in the world, was seen as a huge investment opportunity for companies operating in the industry. But last week, the U.S. said it would pull out of a deal that lifted sanctions on Iran in exchange for Tehran curbing its nuclear ambitions.

## 15. Export Finance Won't Save Iran Business: French Official

Reuters.com, May 15 - Euro-denominated financing set up by European countries to trade with Iran will not be enough to sustain economic ties with Tehran in the face of U.S. sanctions, an adviser to the French president said on Tuesday. Following Washington's withdrawal from the Iran nuclear agreement last week, Europe needs a "more global approach to reinforce our legal arsenal" and defend companies doing business with countries under unilateral U.S. sanctions, the Elysee official said during a briefing for reporters in Paris. Business leaders met French officials on Tuesday as President Emmanuel Macron's government presses Washington for waivers covering companies such as Airbus (AIR.PA), Sanofi (SASY.PA), Renault (RENA.PA) and PSA Group (PEUP.PA). Many have reinvested in

Iran since the 2015 accord, which suspended sanctions in return for curbs on Tehran's nuclear programs.

## 16. Trump's Goal for Nafta Rewrite Looks Unattainable in 2018

Wall Street Journal.com, May 15 - President Donald Trump's plans to rewrite the North American Free Trade Agreement this year looked unattainable Tuesday after negotiators appeared too far apart to strike a deal before a deadline this week. U.S. House Speaker Paul Ryan had set this Thursday as an informal deadline if the administration were to push a pact through the Republican-controlled Congress before a new slate of lawmakers arrives in Washington next year, possibly led by Democrats. The U.S. and Mexican governments had hoped to reach at least the general terms of an agreement this week to allow enough time for legislative approval before year's end. Negotiators had sought to avoid complications stemming from July 1 presidential and congressional elections in Mexico and U.S. congressional midterm elections in November. Canada, by contrast, faces little pressure to rush.

## 17. France Says Will Respect WTO Decision on Airbus Aid

Reuters.com, May 15 - Fran ce will respect its international commitments to comply with a World Trade Organisation ruling on Tuesday against European Union subsidies to Airbus, the French government said. The World Trade Organisation said the EU had failed to remove support for the world's largest airliner, the A380, and Europe's newest long-haul plane, the A350, causing losses for U.S. rival Boeing and U.S. aerospace workers. "With the European Commission and out of respect for international trade rules, France confirms its intention to respect its international commitments by soon adopting new compliance measures," the foreign, finance and transport ministers said in a joint statement.

## 18. Businesses Race to Washington to Sway Trump on China Tariffs

New York Times.com, May 15 - Mary Buchzeiger describes herself as a proud Republican who was drawn to President Trump's business-friendly philosophy. But the president's plan to impose sweeping tariffs on $50 billion of products from China now threatens to cripple an automotive supply business in Michigan that her father began and that she has spent years building. "I'm angry, I'm frustrated, and honestly, I'm scared," Ms. Buchzeiger said on Tuesday morning, as she joined dozens of other vulnerable entrepreneurs, as well as supporters of the Trump administration's trade agenda, at a public hearing about the tariffs. "Scared that my president is about to make a terrible mistake." Over the next three days, business owners, trade groups and other industry representatives will testify before United States trade officials about the administration's plan to impose tariffs on more than 1,300 Chinese imports, including flat-screen TVs, steel and medical devices, and as it threatens levies on an additional $100 billion of Chinese goods.

## 19. On Trade, the U.S. and China Consider the Unthinkable: Breaking Up

New York Times.com, May 16 - The economic relationship between China and the United States has defined the modern era. It helped lift hundreds of millions of people in China out of poverty. It gave affordable iPhones and other gadgets to American consumers, handed big profits to American companies and delivered 1.3 billion hungry customers to American

farmers. Now some people in both countries want to tear it apart. As a top Chinese economic policymaker meets with the Trump administration this week in hopes of heading off a potential trade war, some officials in both countries are planning for a time when the world's two biggest economies do not need each other quite so much any more. They are seeking nothing less than a fundamental rethinking of a trade relationship that encompasses more than $700 billion in goods and services that flow between the countries every year.

## 20. 'Rules of Origin' Risk Tripping Up Trade Post-Brexit

Wall Street Journal.com, May 16 - At a Ford Motor Co. plant near London, workers manufacture cylinder blocks, crankshafts and other components for Ranger pickup trucks that are sold to buyers across the European Union. The finished vehicles don't roll out of a factory in the U.K. or anywhere else in the EU. The components made in Britain are sent to South Africa, where the trucks are put together and shipped back thousands of miles to European dealers. This continent-spanning assembly line highlights what executives and trade experts say will be one of Brexit's challenges: Rules of origin in trade with the EU. The rules are used by customs authorities to establish where a product came from in order to waive or levy a tariff. For vehicles, smartphones and other products that include raw materials and manufactured components from around the world, making that determination can be fiendishly complex. And thousands of British businesses will have to grapple with the complexities in the coming years.

## 21. Air Force Electronic Warfare Push Gains Steam; C-5 Gets 3-D Printed Door Handles

Breaking Defense.com, May 15 - We will probably never know much about it, but the Air Force's top Electronic Warfare task force has completed its first scrub and should report to top service leaders in the next month or so. The woman who leads the Air Force's effort, Gen. Ellen Pawlikowski, started the Strategic Development Planning Experimentation unit to find gaps in the service's capabilities. Once the gap is found, the service creates an Enterprise Capability Collaboration Team (ECCT) to examine the best ways to fill it. The EW ECCT was stood up last year. While most of what it's doing is classified, we know that cyber, which had been deemed outside its purview, is now a solid part of the work. General P., who led Space and Missile Systems Center and is now head of Air Force Materiel Command, told me at a Defense Writers Group breakfast that "an update" on the ECCT will be given to the "four stars" soon.

## 22. Host of Israeli Weapons Look Likely for US Sales: Iron Dome to Iron Fist

Breaking Defense.com, May 16 - As the US tightens its terms for financing the Israeli military, one of America's closest allies is beginning to sell its weapons to the US, instead of the other way around. Just last week, US-based Orbital ATK and Israel's IMI Systems announced a teaming agreement to supply a version of IMI's 500-lb Multi-Purpose Rigid Bomb (MPR 500) family of munitions for the US Air Force. "We are hopeful that this relationship will lead to future product enhancements and additional opportunities for Orbital ATK and IMI Systems to collaborate," said Pat Nolan, vice president and general manager of missile products at Orbital's Defense Systems Group. The MPR-500 is used on several different Israeli fighter aircraft. In conjunction with GPS or laser guidance, it's designed to improve strikes in dense urban environments and in close proximity to friendly forces, while

reducing collateral damage and risk to non-combatants. The new bomb is designed to penetrate multiple floors and detonating its fragmenting high-explosive warhead inside buildings, destroying hidden targets. That allows planners to target a specific floor, while leaving the rest of a building relatively safe.

## 23. The Pentagon's CMO Has a Plan to Get More Money for Warfighters

DefenseNews.com, May 16 - How much money is locked inside the five-sided box? It's a question Pentagon leadership, outside advocates and members of Congress have been hammering on for years. With about one-sixth of federal spending going to national security, the thinking goes, there must be dollars floating around inside the Pentagon somewhere which could be put to better use. John "Jay" Gibson II, the first man to sit in the role of Chief Management Officer for the Department of Defense, agrees, and in a May 1 interview with Defense News, he laid out how he hopes to take that funding and reinvest it directly into the so-called pointy end of the spear. Gibson has set himself the challenge of trying to reform nine key focus areas – information technology, human resources, community services, contracts, real property, testing and evaluation, medical services, logistics and supply, and financial management. It's a wide range of issues to tackle, and Gibson is upfront about the fact it's not something that can be handled from his office alone. Instead, he wants to empower individuals already in the system to identify potential improvements and begin working on them.

## 24. Navy Looks Outside Budget to Help Build New Boomers

Breaking Defense.com, May 16 - he Navy is finally getting the funding it has sought to push production of its next-generation Columbia-class ballistic missile submarine. But in a move that has raised some eyebrows, hundreds of millions of dollars for the program are not coming from the Navy budget, a situation that could become the new normal amid continuing budget uncertainty. Navy leadership has said the Columbia program, which will include 12 nuclear-powered boats to replace the aging Ohio-class SSBNs currently in service, is one of their top priorities to stay ahead of Russian and Chinese sub-building booms, and grow the overall attack sub fleet from the current 52 to 66 by the 2040s. But money is a major problem. With a host of expensive of modernization priorities like building multiple attacks submarines per year, getting the first four Ford-class carriers out of the shipyards, and buying more F-35s, the Navy is looking for help.

## 25. Companies Find Value in Combining Compliance, Sustainability

Wall Street Journal.com, May 15 - An emerging trend among some big corporations is the melding of their risk and compliance functions with their environmental, social, governance and human-rights programs. Companies embracing these changes include Barrick Gold Corp., which is bringing together its corruption, human rights and compliance programs; Novartis AG, which is combining its risk management and compliance programs; and both Lockheed Martin Corp. and AstraZeneca PLC, which are melding their compliance and sustainability functions. The change comes as part of a growing recognition among multinationals that protecting their organization's reputation and mitigating its risks requires a more coordinated and integrated response, said Alison Taylor, managing director at BSR, a global nonprofit sustainability organization.

## 26. Opinion: Europe's Data Protection Law Is a Big, Confusing Mess

New York Times.com, May 15 - There is a growing realization that our data is under attack. . . . And on May 25, the European Union will bring into force the most sweeping regulation ever of what can be done with people's data. This law, the General Data Protection Regulation, will give citizens greater control over their data while requiring those who process personal data in the European Union or about its citizens to take responsibility for its protection. The G.D.P.R. will give Europeans the right to data portability (allowing people, for example, to take their data from one social network to another) and the right not to be subject to decisions based on automated data processing (prohibiting, for example, the use of an algorithm to reject applicants for jobs or loans). Advocates seem to believe that the new law could replace a corporate-controlled internet with a digital democracy. There's just one problem: No one understands the G.D.P.R.

## Upcoming Export Control and Other Trade Compliance Conferences

**May 18 - Massachusetts Export Center - Managing Export Operations & Compliance - 9:00 AM to 12:00 PM EDT - Fall River, Massachusetts - UMass Dartmouth Center for Innovation & Entrepreneurship, 151 Martine Street**

**May 22 - U.S. Dept. of Commerce/Foreign-Trade Zones Board - FTZ Grantee Training - Portland, Oregon - - DoubleTree by Hilton - Portland Hotel**

**May 23 - U.S. Dept. of Commerce/Census Bureau - World Trade Month "Go Global" Webinar Series: Prepare to Ship - Free - 2:00 - 3:00 PM EDT**

**May 22-23 - U.S. Dept. of Commerce/U.S. Commercial Service, District Export Council of South Florida, and Univ. of Miami Center for International Business Education and Research - Export Compliance Seminar and Workshop - Miami - University of Miami Business School, Storer Auditorium**

**May 23-24 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Northern Ohio District Export Council - Complying with U.S. Export Controls - Independence, Ohio - Crown Plaza Cleveland South Hotel, 5300 Rockside Road**

**May 23-24 - C5 Group - 12th Annual Exporters' Forum on Global Economic Sanctions - Berlin - Steigenberger Hotel Am Kanzleramt Berlin**

**May 23-24 - American Conference Institute - Anti-Corruption Brazil - São Paulo - InterContinental São Paulo**

**May 29-31 - American Conference Institute - Hong Kong Summit on Economic Sanctions Compliance and Enforcement - Hong Kong - Venue TBA**

**May 30 - U.S. Dept. of Commerce/Census Bureau - World Trade Month "Go Global" Webinar Series: Manage Challenges - Free - 2:00 - 3:00 PM EDT**

**June 4-8 - American University Washington College of Law - U.S. and International Anti-Corruption Law Certificate Program - Washington, DC - American University Washington College of Law**

**June 5 - Strong & Herd - ITAR & EAR from a UK Perspective: Advanced - London - 45 Moorfields, 8th Floor Tenter House -** *Gary Stanley, Editor of Defense and Export-Import update, will conduct this all-day workshop.*

**June 5 - U.S. Dept. of Commerce/Small Business Development Center - AES/ACE Export Compliance Seminar - Houston - Bank of America Financial Center, 2302 Fannin Street, Suite 200**

**June 5-6 - American Conference Institute - 11th China Forum on Anti-Corruption - Shanghai - The Langham Hotel**

**June 5-6 - American Conference Institute - EAR Boot Camp - Chicago - The Metropolitan Hotel**

**June 6-7 - April 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Trade Development Alliance of Greater Seattle - Complying with U.S. Export Controls - Seattle - Lynnwood Embassy Suites Hotel, 20610 44th Avenue West, Lynnwood, Washington 98036**

**June 6-7 - NielsonSmith - US Trade Controls Compliance in Europe 2018 - Munich - Le Meridien Hotel -** *Gary Stanley, Editor of Defense and Export-Import Update, will give an update on ITAR, EAR, CFIUS, and other U.S. trade compliance developments.*

**June 6-8 - American Association of Exporters & Importers (AAEI) - 97th Annual AAEI Conference & Expo - Baltimore - Baltimore Marriott Waterfront Hotel**

**June 7 - American Conference Institute - ITAR Boot Camp - Chicago - The Metropolitan Hotel**

**June 7 - U.S. Dept. of Commerce/Small Business Development Center - AES/ACE Export Compliance Seminar - Dallas - Renaissance Dallas Hotel**

**June 8 - Society for International Affairs - 2018 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential**

**June 11 - Chatham House - Competition Policy 2018 - London**

**June 12 - U.S. Dept. of Commerce/U.S. Census Bureau & NCBFAA Educational Institute - Exporting Mechanics Webinar Series: Duty Drawback and Refunds - Online via Webinar - 1:00 - 2:00 PM EST**

**June 12-13 - C5 Group - 2nd Trade Compliance Nordics - Stockholm**

**June 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Houston District Export Council - Complying with U.S. Export Controls - Houston, Texas - Norris Conference Center, 816 Town & Country Blvd., Suite 210**

**June 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Houston District Export Council - Technology and Software Controls - Houston, Texas - Norris Conference Center, 816 Town & Country Blvd., Suite 210**

**June 14 - Massachusetts Export Center - Export Regulatory Compliance Update - 10:00 AM to 4:30 PM - Boston, Massachusetts - Foley Hoag Law Offices, Seaport West, 155 Seaport Boulevard**

**June 14 - National Defense Industries Association/Women in Defense - 2018 Women in Defense National Conference - Washington, DC - Washington Marriott Wardman Parkh**

**June 14 - Women in Defense - 2018 Women in Defense National Conference - Washington, DC - Washington Marriott Wardman Park hotel**

**June 17-19 - International Compliance Professionals Association (ICPA) - 2018 ICPA European Conference - Amsterdam - Holiday Inn Amsterdam**

**June 18-19 - American Conference Institute - 12th Advanced Forum on FCPA & Anti-Corruption for the Life Sciences Industry - New York - Park Lane Hotel**

**June 19-20 - American Conference Institute - 9th Advanced Forum on DCAA & DCMA Cost, Pricing, Compliance & Audits - Arlington, Virginia - Westin Crystal City**

**June 26-27 - American Conference Institute - 9th Midwest Anti-Corruption Compliance Forum - Chicago - The Blackstone Hotel**

**June 27-28 - C5 Group - 12th International Conference on Anti-Corruption London - London - Venue TBA**

**July 16-18 - Society for International Affairs - 2018 Summer Basics Conference - Washington, DC - Gaylord National Resort & Convention Center**

**July 25-26 - American Conference Institute - 9th Global Forum on Anti-Corruption Compliance in High Risk Markets - Washington, DC - Venue TBA**

**Sept. 5 - IDEEA, Inc. - ComDef 2018 - Washington, DC - National Press Club -** *Gary Stanley, Editor of Defense and Export-Import Update, will again moderate the panel "Export Control Update" at this annual conference for the defense industry.*

**Sept. 13-17 - International Compliance Professionals Association (ICPA) -2018 ICPA@SEA - Galveston, TX to Cozumel**

**Sept. 19-20 - SMi Group - Defence Exports 2018 - Rome - Crowne Plaza Rome St. Peter's Hotel & Spa -** *Gary Stanley, Editor of Defense and Export-Import Update, is proud to be once again chairing this event and conducting a related Sept. 18 workshop on "Jurisdiction, Classification, and Licensing: How to Police Your U.S. Suppliers"*

**Oct. 16-18 - Partnerships International, inc. - "Partnering for Compliance™" West 2018 - Fort Worth - Dallas-Fort Worth Marriott South Airport Hotel**

**Oct. 21-23 - International Compliance Professionals Association (ICPA) - 2018 ICPA Fall Conference - Grapevine, TX - Embassy Suites DFW Airport North**

**Nov. 8-9 - International Compliance Professionals Association (ICPA) - 2018 Annual Conference - Shanghai - Four Seasons Hotel**

**Nov. 27-30 - American Conference Institute - 35th International Conference on the Foreign Corrupt Practices Act - Washington, DC - Gaylord Natonal Resort & Convention Center**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to ████████@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. ████████
Fax ████████
Mobile ████████
E-mail ████████@glstrade.com

**From:** Jim Bartlett, Full Circle Compliance ▮▮▮@fullcirclecompliance.eu]
**Sent:** 5/17/2018 7:41:22 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0517 Thursday "Daily Bugle"



## Thursday, 17 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

**ITEMS FROM FEDERAL REGISTER**

1. Commerce/BIS Amends EAR, Adds Thirty-Three Persons to Unverified List

**OTHER GOVERNMENT SOURCES**

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. DHS/CBP Updates ACE CATAIR Appendix PGA
5. Justice: "Turkish Banker Sentenced to 32 Months for Conspiring to Violate U.S. Sanctions Against Iran and Other Offenses"
6. State/DDTC: (No new postings.)
7. EU Takes Reactionary Measures Following U.S. Tariff Increase on Imports of Certain Steel and Aluminum Products

**NEWS**

8. NPR: "Companies Face A Tough Choice After Trump Pulls Out of Iran Nuclear Deal"
9. Reuters: "EU to Start Iran Sanctions Blocking Law Process on Friday"
10. WorldECR News Alert 17 May 2018

**COMMENTARY**

11. D.M. Edelman: "New Export Rules for Firearms and Ammunition - Opening the Door for More Commercial Sales"

12.   G. Husisian: "The Twelve Compliance Steps Every Multinational Corporation Should Undertake in Light of Recent Trump Administration Enforcement Activity" (Part III of IV)

13.   M. Volkov: "Corporate Attitudes: When Speak Up Means Keep Quiet"

14.   Gary Stanley's EC Tip of the Day

15.   R.C. Burns: "DDTC's Buzzer Beater to Save Brokering Authority over Firearms Misses the Hoop"

**EX/IM TRAINING EVENTS & CONFERENCES**

16.   ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 12-13 Sep in Annapolis, MD

**EDITOR'S NOTES**

17.   Bartlett's Unfamiliar Quotations

18.   Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (17 May 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

19.   Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. Commerce/BIS Amends EAR, Adds Thirty-Three Persons to Unverified List
(Source: Federal Register, 17 May 2018.) [Excerpts.]

83 FR 22842-22846: Revisions to the Unverified List (UVL)
* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule.
* SUMMARY: The Bureau of Industry and Security (BIS) is amending the Export Administration Regulations (EAR) by adding thirty-three (33) persons to the Unverified List ("UVL") and adding an additional address for one (1) person currently listed on the UVL. The thirty-three persons are being added to the UVL on the basis that BIS could not verify their bona fides because an end-use check could not be completed satisfactorily for reasons outside the U.S. Government's control. A new address is added for one person as BIS has determined that this person is receiving exports from the United States at an additional address.
* DATES: This rule is effective May 17, 2018.
* FOR FURTHER INFORMATION CONTACT: Kevin Kurland, Director, Office of Enforcement Analysis, Bureau of Industry and Security, Department of Commerce, Phone: (202) 482-4255 or by email at UVLRequest@bis.doc.gov.
* SUPPLEMENTARY INFORMATION: ...

This rule adds thirty-three (33) persons to the UVL by amending Supplement No. 6 to Part 744 of the EAR to include their names and addresses. BIS adds these persons in accordance with the criteria for revising the UVL set forth in Sec. 744.15(c) of the EAR. The new entries consist of eleven persons located in China, twelve in Russia, five in the United Arab Emirates, two in Canada, and one person located in each of the following countries: Estonia, Finland, and Pakistan. Each listing is grouped within the UVL by country with each party's name(s) listed in alphabetical order under the country; each entry includes available alias(es) and address(es), as well as the Federal Register citation and the date the person was added to the UVL. The UVL is included in the Consolidated Screening List, available at www.export.gov.

This rule also adds one additional address for one person currently listed on the UVL, Ling Ao Electronic Technology Co. Ltd, a.k.a. Voyage Technology (HK) Co., Ltd., a.k.a. Xuan Qi Technology Co. Ltd., as BIS has determined that this person is receiving exports from the United States at an additional address. ...

Dated: May 12, 2018.
Richard E. Ashooh, Assistant Secretary for Export Administration.

back to top

* * * * * * * * * * * * * * * * * * * *

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Treasury; Foreign Assets Control Office; NOTICES; Blocking or Unblocking of Persons and Properties [Publication Date: 18 May 2018.]

* U.S. Customs and Border Protection; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Application for Foreign-Trade Zone Admission and/or Status Designation, and Application for Foreign-Trade Zone Activity Permit [Publication Date: 18 May 2018.]

back to top

* * * * * * * * * * * * * * * * * * * *

## 3. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * * *

## 4. DHS/CBP Updates ACE CATAIR Appendix PGA
(Source: CSMS #18-000347, 17 May 2018.)

The Appendix PGA has been updated. For PG10 commodity Qualifier Code, added "X" to the "Commodity - Animal" list for US Fish and Wildlife. In the PG26 Unit of Measure, added 'IN' to the FDA base unit list.

Please visit go here for more information.

back to top

* * * * * * * * * * * * * * * * * * * *

## 5. Justice: "Turkish Banker Sentenced to 32 Months for Conspiring to Violate U.S. Sanctions Against Iran and Other Offenses"
(Source: Justice, 16 May 2018.) [Excerpts.]

Mehmet Hakan Atilla, 47, a resident and citizen of Turkey, was sentenced today to 32 months for his participation in a scheme to violate U.S. economic sanctions imposed on the Islamic Republic of Iran involving billions of dollars' worth of Iranian oil proceeds held at Atilla's employer (Turkish Bank-1). On Jan. 3, after a five-week jury trial, Atilla was convicted of conspiring with others to use the U.S. financial system to conduct transactions on behalf of the government of Iran and other Iranian entities, which were barred by U.S. sanctions, and to defraud U.S. financial institutions by concealing these transactions' true nature. ...

Atilla and others conspired to provide access to restricted oil revenues through international financial networks, including U.S. financial institutions, to the government of Iran, Iranian entities, and entities identified by the Department of the Treasury Office of Foreign Assets Control as Specially Designated Nationals (SDNs). They did so by, among other things, using Turkish Bank-1, at which Atilla served as Deputy General Manager of International Banking, to engage in transactions involving billions of dollars'

worth of petroleum revenues held by the Central Bank of Iran and the National Iranian Oil Company. In particular, they facilitated and protected Turkish Bank-1 customer, international gold trader Reza Zarrab's, ability to supply currency and gold to, and facilitate international financial transactions for, the Government of Iran, Iranian entities, and SDNs using Turkish Bank-1. Many of those financial transactions involved unwitting U.S. financial institutions, in violation of U.S. sanctions against Iran. The elaborate scheme established by Atilla and others also shielded Turkish Bank-1 from U.S. sanctions.

Atilla in particular lied to and deceived U.S. Treasury officials about Turkish Bank-1's activities and its purported compliance efforts in order to avoid subjecting the bank to U.S. sanctions. Additionally, Atilla, Zarrab and others conspired to create and use false and fraudulent documents to disguise prohibited transactions for Iran and make those transactions falsely appear as transactions involving food, thus falling within humanitarian exceptions to the sanctions regime. As a result of this scheme, Atilla and his co-conspirators induced U.S. banks unknowingly to process international financial transactions in violation of the IEEPA, and to launder through the U.S. financial system funds promoting the scheme.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 7. EU Takes Reactionary Measures Following U.S. Tariff Increase on Imports of Certain Steel and Aluminum Products
(Source: Official Journal of the European Union, 17 May 2018.)

*Regulations:*
* Commission Implementing Regulation (EU) 2018/724 of 16 May 2018 on certain commercial policy measures concerning certain products originating in the United States of America

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## NEWS

## 8. NPR: "Companies Face A Tough Choice After Trump Pulls Out of Iran Nuclear Deal"
(Source: Federal Register, 16 May 2018.) [Excerpts.]

The 2015 nuclear deal with Iran was heralded as the reopening of the country's battered economy, and big foreign companies such as Airbus, Siemens and Samsung rushed to take advantage of the opportunity.

Now that President Trump has effectively closed the door again, those same companies have to choose between remaining in Iran and staying on the good side of the U.S. government.

The risks they run are sizable. Over the weekend, National Security Adviser John Bolton told CNN's *State of the Union* that the U.S. was willing to impose sanctions on foreign companies that continue to do business in Iran. ...

European officials have insisted that the Iran deal is very much alive and say pushing back against Washington's threats is a matter of protecting their sovereignty. ...

As a practical matter, however, Washington has a powerful weapon to punish foreign companies that won't toe the line: It can bar them from ever doing business in the United States.

The European airplane company Airbus, for instance, has a contract to provide some 100 aircraft to Iran Air, which is operating with an aging fleet of planes.

Because the U.S. is the source of many of the parts used in Airbus planes, being barred from the American market would be almost impossibly disruptive.

"They would have to strip out all the U.S. components in their airplanes. I don't know whether that's technically possible, but I think it would be very, very difficult," says Danforth Newcomb, a sanctions lawyer at Shearman & Sterling.

More important, Washington could bar foreign companies from the U.S. market, which is still the largest in the world. That's something very few multinational firms want to see happen.

"Faced with the decision to risk what is in almost all cases major business in the U.S., as opposed to a little bit of business in Iran, I would imagine most companies would probably decide not to continue their Iranian business connections," Wolfgang Ischinger, former German ambassador to Washington, told NPR's *Morning Edition* on Tuesday.

"The European economies and Asian economies have a lot more trade with the United States. So, ultimately, they cannot completely ignore U.S. demands," says Nader Habibi, a professor of the economics of the Middle East at Brandeis University.

DOC_0001099

In fact, a lot of companies began turning their backs on Iran when Trump was elected, and that's one reason why Iran's much-touted economic revival has proven to be a disappointment within the country, Habibi says. ...

Meanwhile, most American firms have steered clear of the Iranian market from the beginning. The 2015 nuclear deal lifted sanctions for foreign companies, but U.S. firms, with a few exceptions, were always barred from doing business in Iran.

Whether the U.S. government would really follow through on its threat to punish Asian and European companies doing business in Iran is unclear. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. Reuters: "EU to Start Iran Sanctions Blocking Law Process on Friday"
(Source: Reuters, 17 May 2018.)

The European Commission will launch on Friday the process of activating a law that bans European companies from complying with U.S. sanctions against Iran and does not recognize any court rulings that enforce American penalties.

  "As the European Commission we have the duty to protect European companies. We now need to act and this is why we are launching the process of to activate the 'blocking statute' from 1996. We will do that tomorrow morning at 1030," European Commission President Jean-Claude Juncker said.

  "We also decided to allow the European Investment Bank to facilitate European companies' investment in Iran. The Commission itself will maintain its cooperation will Iran," Juncker told a news conference after a meeting of EU leaders.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. WorldECR News Alert 17 May 2018
(Source: WorldECR, 17 May 2018.)

  (1) JCPOA countries meet against background of US secondary sanctions threat
  (2) OFAC issues general licences for dealing with sanctioned Russian companies
  (3) OFSI publishes new guidance for import/export sector
  (4) US imposes sanctions on Iran/UAE currency exchange network
  (5) EU sanctions five involved in Russian elections in Crimea/Sevastopol

*[Editor's Note: Click here to find information on how to subscribe to WorldECR, the journal of export controls and sanctions.]*

back to top



Are You Keeping Up to Date with the Latest Regulations?

**Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.**

MORE INFORMATION AVAILABLE HERE

COMMENTARY

## 11. D.M. Edelman: "New Export Rules for Firearms and Ammunition - Opening the Door for More Commercial Sales"
(Source: Export Compliance Matters, 17 May 2018.)

\* Author: Doreen M. Edelman, Esq., Baker Donelson LLP, 202-508-3460, dedelman@bakerdonelson.com.

On May 14, the Department of Commerce's Bureau of Industry and Security (BIS) in conjunction with the Department of State's Directorate of Defense Trade Controls (DDTC) issued newly proposed rules regarding export classifications of firearms, guns, ammunition and related articles. BIS and DDTC determined that certain articles previously controlled by the U.S. Munitions List (USML) and regulated under the International Traffic in Arms Regulations (ITAR) should be transferred to the Commerce Control List (CCL) and regulated by the Export Administration Regulations (EAR). The stated goals of the proposed rules are to reduce procedural burdens and costs of export compliance on the U.S. firearms industry, while allowing the Commerce and State Departments to more efficiently enforce their relevant export controls.

The BIS proposal describes certain articles determined to no longer warrant control under the USML in Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance), that would be transferred to control under the

CCL. BIS and DDTC concluded that these articles were either not inherently for military use or do not warrant the obligations imposed under the ITAR. In addition, articles subject to the transfer were determined to not provide a critical military advantage to the U.S., are not the types of weapons that are almost exclusively available from the U.S., and are manufactured from technology that is widely available.

The scope of the items subject to change are mostly commercial items widely available in retail outlets, and were described as having commercial and other non-military characteristics that distinguish them from articles subject to control under the ITAR. For example, the proposal would transfer all non-automatic and semi-automatic firearms, as well as their parts and components, from the USML to the CCL. However, the USML will continue to control fully automatic firearms and their parts and components, including guns up to .50-caliber, as well as firearms that fire caseless ammunition. In addition, silencers, mufflers, and sound suppressors will still be subject to the USML.

The BIS proposal would create 17 new Export Control Classification Numbers (ECCNs) to control the items proposed for removal from the USML, and would further revise seven existing ECCNs and remove nine ECCNs to help make it easier to identify and classify your articles for export. It is important to note that the articles moved to the CCL are not being "de-controlled," and BIS would still require a license to export/reexport the articles subject to the new ECCNs. While the proposed rules will contain license exceptions that will permit certain components and other items to be exported without a license, exports of complete firearms will still require licensing under the EAR.

The DDTC's proposed rule revises Categories I, II, and III of the USML to more precisely describe the articles warranting control on that list, limiting their scope to defense articles that provide the U.S. a critical military or intelligence advantage or are inherently for a military end use. The proposed rules establish bright lines to help exporters distinguish between USML- and CCL-controlled articles. The proposed rules are expected to soon be published in the Federal Register, at which point they will be subject to a 45-day public comment period. The full Commerce proposal is available here, and the State Department proposal is available here.

Bottom line- Manufacturers, brokers, and exporters of these items and components will need to document any classification changes and should have compliance procedures to correctly classify each product. Your checklist could start with an ITAR decision tree and then proceed to the 600 series or other ECCN and then complete your EAR licensing determination. Don't forget restricted party and OFAC compliance requirements. Yes, this may mean more work to do but you only have to perform the classification analysis once and it offers new exporting opportunities. Keep your documentation of your review for at least 5 years. These changes also trigger new training requirements.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. G. Husisian: "The Twelve Compliance Steps Every Multinational Corporation Should Undertake in Light of Recent Trump Administration Enforcement Activity" (Part III of IV)

(Source: Foley & Lardner LLP, 14 May 2018.)

* Gregory Husisian, Esq., ghusisian@foley.com, Foley & Lardner LLP, Washington DC.

*[Editor's Note: due to space limitations, this article has been divided into four parts. We will post one part every day, from Tuesday, 15 May until Friday, 18 May 2018.]*

### Step 5: Assess Local Oversight

One of the key compliance considerations for organizations that operate in multiple countries is how the organization will oversee compliance outside the United States. The state of compliance, as envisioned at corporate headquarters, and the actual state of compliance, as implemented in the field, far too often diverge. This natural tendency is exacerbated when the organization operates in numerous countries, which makes Step 5 a key stop on the path to effective international compliance.

It often is a mistake to assume compliance can be managed solely from a central location. While compliance initiatives can originate from a central legal or compliance department, and often are best managed in a centralized fashion, implementation and oversight often require on-the-ground attention. It accordingly is often necessary to set up a compliance infrastructure that includes compliance liaisons.

Establishing compliance liaisons has several advantages. First, managing full compliance centrally is difficult. There are just too many things to take care of (conducting training, monitoring red flags, conducting investigations, and so forth). Second, local personnel often have a better understanding of the regional or local environment and culture. Third, by being closer to operations, local personnel often are in a better position to identify and monitor red flags. Fourth, language issues often make local compliance issues a better direct interface for local employees. For all these reasons, it is a good idea to have compliance liaisons in place, at least where the organization is dealing with substantial, non-U.S. operations.

In assessing the adequacy of local oversight, it is necessary to consider areas of risk that may lie outside the organization. Relevant considerations include the state of oversight for non-entity risk points, including foreign subsidiaries, joint ventures, agents, distributors, consultants, and others. The review should be multifaceted and include a review of relevant contractual arrangements (to ensure the appropriate compliance-related provisions are in place), review of compliance certifications and updates to same, and consideration of any known red flags that have arisen regarding these third-entity risk points.

At most organizations, there are a variety of good options for compliance liaisons. Relevant local actors, who often are already in place and who can be harnessed for compliance oversight, include divisional or regional HR personnel, in-house attorneys, and auditors. If the compliance need is great enough, the organization can hire a new person dedicated solely to compliance. What is essential is that the compliance liaison be someone who is independent of business pressures. It should be someone who has the respect of local business people and who has the institutional authority and independence to follow up on potential compliance lapses, regardless of who is involved.

One item that should be assessed is the completeness of the local compliance oversight. The assessment should cover both the impact of U.S. and non-U.S. laws. However, the oversight is locally managed, the organization should consider both the operation of extraterritorial U.S. laws and such local laws as local work rules, data protection and privacy laws (particularly in the European Union), competition laws, and laws regarding labor rights. The aim is to have local oversight of all potential sources of significant regulatory risk, regardless of the governmental entity imposing the underlying legal obligations.

*Step 6: Create a Written Compliance Policy*

It is an unfortunate fact that Step 6 - the drafting of the compliance manual - is often Step 1 for many companies. As shown, however, there is considerable groundwork to cover before the organization should begin the actual drafting of the compliance manual. The goal is not just to have a written compliance policy; it is to have an effective policy that, through tailoring to the risk profile, operational needs, and culture, represents a workable compliance solution for the organization.

Although the actual contents of the compliance program should be tailored to the organization, usually the written program will include:

  - **A Written Policy Statement**. A policy statement is just as the name implies. It succinctly sets out the company's commitment to comply with the law. The organization should draft the policy statement in clear, straightforward language, and should state that it is the responsibility of each employee to abide by the company's compliance policies.
  - **A Written Compliance Program**. One of the most important elements of a good compliance program is a well-constructed written manual. The written manual should accurately summarize the regulations, using plain language that employees without legal training can readily follow. Many companies require that their employees sign certifications stating they have read the program and understand their compliance responsibilities, that they understand the law and the company's compliance procedures, and that they have communicated to the compliance department any information regarding any potential violations of the law or company policy. These certifications serve the purpose of reminding personnel about the legal standards and the company's compliance policies. They represent useful evidence of the

importance of compliance in any enforcement action, and could become important if a disgruntled employee blows the whistle regarding information or actions he previously certified he did not know about.

- **Supplemental Materials**. Depending on the risk-informed view of the area, it may be appropriate to distribute supplemental compliance materials to individuals either at high risk of potential violations or who need specialized training to oversee or comply with the relevant legal regime. All of the major international compliance areas (anticorruption, export controls, economic sanctions, international antitrust, anti-money laundering, and even anti-boycott) may warrant this treatment, depending upon the company's risk profile. Items to include in such materials include in-depth lists of red flags (along the lines of those found in the Appendices to this International Compliance Guide), lists of sample contractual language to use when hiring third-party intermediaries, in-depth summaries of the relevant legal requirements, frequently asked questions, descriptions of compliance missteps that have occurred at the organization (including how they were handled), and other compliance-related materials. Such in-depth compliance resources should be distributed as needed, rather than to the organization as a whole.

- **Internal Controls**. Any internal controls that are implemented to help serve compliance goals should be memorialized. This topic is covered in Step 7.

Companies should give careful thought as well to the length of the written program. Some companies undermine the effectiveness of their program by establishing a drawn-out policy that covers every nuance in applying the law. This is a mistake, because employees will ignore a long and cumbersome compliance program. Instead of taking this approach, the program should focus on providing key points from the regulations, informed by useful examples relevant to the company and its industry. The goal is not to turn the workforce into law professors who fully understand every nuance of the law; rather, it is to give people enough knowledge, so they can recognize a potential problem and notify the appropriate compliance personnel of the potential issue. If desired, supplemental guidance can be distributed to persons most likely to need more detailed compliance information on a need-to-know basis.

### Step 7: Establish Internal Controls

Although internal controls are one of the three pillars of compliance (along with the written policy and training), they often are neglected. This neglect can be costly. Internal controls often are one of the main mechanisms by which the compliance policy is implemented. They accordingly merit as much attention as the written compliance policy.

The purpose of internal controls is both to provide procedures that implement the dictates of the compliance program and to create a self-reinforcing cycle of compliance improvement. Compliance policies set the standard, while internal controls implement and reinforce that standard. Through this mechanism, it is possible to enhance compliance in a positive fashion and to strengthen it over time.

In creating internal controls, it often is possible to harness existing processes. A good example of this lies in the anti-corruption realm. It is common for companies to take existing internal controls, such as those governing disbursements and reimbursements, and graft on procedures intended to track potential payments to foreign officials and personnel who work at state-owned companies. Similarly, some companies use customer-intake and credit-check procedures as mechanisms to screen new customers against OFAC and EU lists of blocked persons. Doing so minimizes the time necessary to implement a functioning set of internal controls and the effort needed to oversee its operation.

Some specific internal controls that multinational corporations should consider involve the following high-risk international areas:

  - **FCPA**. Using existing disbursement and reimbursement policies to ensure notification to compliance personnel of potentially troublesome payments; creating special trigger mechanisms for entertaining foreign officials (including people who work for state-owned entities), and gifts, meals, entertainment, and travel expenses that exceed pre-defined limits.
  - **Export Controls and Sanctions**. Creating internal controls to ensure routine scanning of Specially-Designated Nationals (SDNs and Denied Persons) for all new customers, and the entire customer list and transaction parties on a pre-determined basis; establishing internal controls regarding placing appropriate export control notices on outbound electronic paperwork and shipping documents; developing controls to ensure accurate reporting of information for the Automated Export System and communication of information regarding same to any Customs broker or freight forwarder involved; implementing controls to automatically flag any transactions involving controlled items or defense articles; mandating controls designed to restrict access of non-U.S. nationals to controlled technical data, wherever it may be found at the company.
  - **Anti-boycott**. Designing controls to ensure that relevant front-line personnel, whether personnel involved in the contracting, procurement, accounting, or line of credit functions, or other functions that are likely to encounter boycott-related activity, monitor and report boycott-related requests; implementing controls designed to ensure that all contracts have superseding language stating the company's policy of rejecting any requests to participate in the Arab League boycott of Israel.

*Step 8: Training, Training, Training*

The importance of training as the foundation of compliance is widely acknowledged. Even the Sentencing Guidelines, which concisely focus on the basics of an effective compliance program, call out training for special attention. The Sentencing Guidelines commentary states that the "organization shall take reasonable steps to communicate periodically and in a practical manner its standards and procedures, and other aspects of the compliance and ethics program, to the [relevant] individuals...by conducting effective training programs and otherwise disseminating information appropriate to such individuals' respective roles and responsibilities." [FN/3]

The basic task of training is to ensure, in conjunction with a well-written compliance program and appropriate internal controls, that employees and agents have sufficient knowledge to recognize red flags and other problematic situations, and understand what they need to do to comply. The goal is not to create legal experts all across the company; rather, it is to sensitize people to the law, so they know when to seek counsel from the appropriate compliance or legal personnel.

The importance of conducting training appropriately is magnified in the international realm. Besides the normal problem of adequately communicating the compliance requirements, the training often will need to address local practices and different cultural norms that may prove contrary to the compliance needs of the organization. Equally important is finding the best way to stress the importance of compliance with U.S. law, which may seem to many foreign nationals to be of limited concern because they are outside U.S. territory. Language difficulties, too, complicate things, making it essential to consider presenting compliance materials and training in languages other than English.

Training should occur for all new employees and annually for appropriate longtime employees. [FN/4] Because no firm's work force is static, the program should include automatic steps to ensure compliance materials are distributed to personnel at the time of hire or when personnel are transferred or promoted into relevant positions that require training. The same is true whenever the company is making acquisitions, setting up new agent relationships, bringing on new distributors, or establishing joint ventures.

When preparing training materials, companies typically use a mix of written and training materials that summarize the law, frequently asked questions and answers about the law, training slides, and prepared oral presentations (which are best given in an interactive presentation with audience feedback and participation). The program should use real-world examples whenever possible, such as case studies drawn from actual problems confronted by the company in the past. The educational material should also reiterate the importance of compliance to the company's culture, and provide other useful information, such as recent enforcement actions against similarly situated companies.

Companies also should consider how they can use technology to enhance their compliance programs, including using intranets. Best uses of intranets for compliance include: posting basic training online; publishing the company's compliance program; providing plain-language summaries of applicable laws; providing real-world examples and frequently asked questions; consolidating and presenting model contract provisions; quickly disseminating updates to the compliance program; establishing links to allow ready reporting of potential problems; and informing employees regarding how the company has resolved tricky issues it has encountered. The company can use its intranet as a mechanism to identify problems quickly, to report potential issues, and to coordinate all of the company's compliance initiatives. Using these tools can make compliance an ongoing process and give new

employees ready access to company procedures at the outset of their employment.

Another growing best practice is using automated training software. This software communicates compliance information and can be used to test the user's knowledge of both the substantive laws and the company's compliance procedures. Companies can place automated training software on the intranet and make completion of the training a required task for employees, allowing the company to develop a set of standards that employees must meet in a variety of substantive areas, such as export controls and sanctions compliance.

The company should maintain an attendance log to track all compliance training. Each employee should sign an acknowledgment form showing he or she has reviewed the compliance materials and understands his or her responsibility to comply with the company's program.

-----------

[FN/3] U.S. Sentencing Guidelines Manual § 8B2.1(b)(4). The individuals in subdivision B are "members of the governing authority, high-level personnel, substantial authority personnel, the organization's employees and, as appropriate, the organization's agents." U.S. Sentencing Guidelines Manual § 8B2(1)(b)(4)(B).

[FN/4] See, e.g., Hollis v. City of Buffalo, 28 F. Supp. 2d 812, 821 (W.D.N.Y. 1998) (rejecting a company defense based on good faith compliance efforts, due to failure of company to conduct ongoing education or to recirculate compliance materials).

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. M. Volkov: "Corporate Attitudes: When Speak Up Means Keep Quiet"

(Source: Volkov Law Group Blog, 16 May 2018.) Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

As parents we all have been through the following scenario - we encourage our children to communicate and voice their concerns and to learn to articulate, reason and understand perspectives. So, our kids start to speak up and we listen, patiently, but at some point, our patience wears thin, and we are not as interested or willing to listen. Our children begin to question our commitment to speak up and listening.

This lesson applies with equal force in the corporate context. It is unfortunate but true that a company's expressed commitment to addressing employee concerns can be tested and eventually limited by its own actions and disregard of employee concerns.

I have witnessed this phenomenon. An employee will raise a concern directly with a company's audit committee chair, and the audit committee initiates its

response procedures. A designated contact person reaches out to the employee, assures the employee that the company will investigate the matter, and requests relevant information from the employee.

At this preliminary stage, the employee is exhilarated that he/she will be heard and provides detailed information to the designated audit committee contact. After reviewing the information, the contact reaches out to the employee to schedule a meeting.

The employee trusts the company's system and is convinced that he/she is being heard. The employee meets with the audit committee chair and continues to provide information concerning his/her issue of concern. The employee is satisfied that the concern will be addressed.

It is here where the positive interactions often break down. How?

Two common scenarios occur.

First, the audit committee representative goes dark - no contact, no feedback, and no communication. The employee follows up and still hears nothing but crickets from the audit committee designate. What happened?

Second, the audit committee designate sends an email to the employee requesting specific answers to a series of follow up questions. Unfortunately, the questions are drafted in a manner to reflect an inherent bias against the employee's specific concerns. The questions reflect a desire to tilt the inquiry in the company's favor. The employee fears, at this point, that his/her concerns were not heard but more importantly that the system is "rigged" against the employee. The employee loses trust in the system and will look for alternatives. What happened?

Both of these scenarios reflect a common problem. A company's expressed desire to listen is not backed up by a real commitment to listen, reflect, analyze and resolve. The company has no real commitment to objectivity - instead, the company has committed to one thing only - to go through the motions to defuse employee concerns without maintaining its credibility to listening and responding appropriately to the employee's concern.

Many companies operate at this level and are reluctant to acknowledge employee concerns' and the need to make changes. A culture that ignores its employees is just as likely to ignore its partners, its customers, its shareholders and other key stakeholders. It is a disease that can infect other areas of corporate operations and eventually undermine a company's ability to inspire trust and integrity.

We all know about the importance of active listening. It is an art and skill that successful individuals are able to employ in their careers and life relationships. A company, like any individual, has to commit to active listening - meaning understanding the employee's concern, considering the employee's point from the employee's perspective and responding with a positive and open attitude. When a company is able to implement such a

perspective, employees will trust the system and raise additional concerns, many of which may be valuable and lead to significant improvements.

When a company encourages employees to raise concerns and then fails to follow through, the company has not only lost an opportunity to hear and implement meaningful changes, but the company actively harms its employees by destroying any chance of trust that may occur in the process. Companies have to inject mindfulness into the process for listening and responding to employee concerns. Perhaps companies should consider the lessons learned from parenting when we were children communicating to our parents or better yet, when we were parents and listening to our children.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14. Gary Stanley's EC Tip of the Day
(Source: Defense and Export-Import Update; 16 May 2018. Available by subscription from gstanley@glstrade.com.)

\* Author: Gary Stanley, Esq., Global Legal Services, PC, (202) 352-3059, gstanley@glstrade.com.

Items subject to temporary CCL controls are classified under the ECCN 0Y521 series (i.e., 0A521, 0B521, 0C521, 0D521, and 0E521) pursuant to § 742.6(a)(7) of the EAR while a determination is made as to whether classification under a revised or new ECCN, or an EAR99 designation, is appropriate.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. R.C. Burns: "DDTC's Buzzer Beater to Save Brokering Authority over Firearms Misses the Hoop"
(Source: Export Law Blog, 16 May 2018. Reprinted by permission.)

\* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Wash DC, Clif.Burns@bryancave.com, 202-508-6067).

As noted in my post yesterday *(ed. 15 May 2018, included in the 16 May 2018 Daily Bugle)* on the proposed rules to transition certain Category I, II and III items from the United States Munitions List to the Commerce Control List, DDTC attempted to preserve its brokering authority over the transferred firearms and related items by amending the brokering rules to contain items both on the United States Munitions List ("USML") and the United States Munitions Import List ("USMIL"). An alert reader pointed out, quite correctly, that this clever regulatory sleight-of-hand was, ahem, not authorized by the Brokering Amendment to the Arms Control Export Act. 22 U.S.C. § 2278(b)(1)(A)(ii).

The Brokering Amendment provides authority to DDTC to register brokers and license brokering transactions. The problem is that it authorizes this only with respect to items on the USML. It makes no reference to the USMIL and provides no authority to regulate brokers of, and brokering transactions related to, items on the USMIL.

Section 2278(b)(1)(A)(ii)(I) provides the statutory mandate and authority to require registration of brokers:

> As prescribed in regulations issued under this section, every person (other than an officer or employee of the United States Government acting in official capacity) who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of **any defense article or defense service designated by the President under subsection (a)(1)**, or in the business of brokering activities with respect to the manufacture, export, import, or transfer of **any foreign defense article or defense service (as defined in subclause (IV))**, shall register with the United States Government agency charged with the administration of this section.

Subclause III requires licensing for "brokering activities described in [the above-cited] subclause (I)".

The relevant language here then is "any defense article ... designated by the President under subsection (a)(1)" and "any foreign defense article ... as defined in subclause (IV)". Both of these are, it turns out, references only to items on the USML

Subsection (a)(1), which gives the President the authority to designate defense articles subject to export controls, says this in the last sentence of the subsection:

> The items so designated shall constitute the United States Munitions List.

Subclause IV only references the USML in its definition of "foreign defense article":

> For purposes of this clause, the term "foreign defense article or defense service" includes any non-United States defense article or defense service of a nature described on the United States Munitions List regardless of whether such article or service is of United States origin.

Not surprisingly, DDTC's discussion of these proposed rules fails to mention this little problem in relying on the Brokering Amendment or where it believes it can otherwise find statutory authority to extend its brokering rules to items on the USMIL.

**UPDATE:** I just got off the phone with a spokesperson from DDTC who explained the agency's theory as to how they could exert brokering authority over USMIL items. According to the spokesperson, section 2278(a)(1) gives the President the authority to "control the import and export of defense articles" and to "to designate those items which shall be considered as

defense articles." The USMIL and the USML are, thus, separate subsets of the broader "statutory" USML referenced in subsection (a)(1). The USMIL administered by ATF lists those items subject to controls on permanent imports. The USML administered by DDTC lists items subject to controls on exports and temporary imports. While this argument is at least plausible, it does require taking the facially counter-intuitive position that the USMIL is really the USML and that the USML in the ITAR is not really the entire USML.

back to top

* * * * * * * * * * * * * * * * * * * *

## 16. ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 12-13 Sep in Annapolis, MD
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com.)

* What: Seminar Level I: ITAR/EAR Boot Camp, Annapolis, MD
* When: September 12-13, 2018
* Where: Chart House Restaurant on Spa Creek
* Sponsor: Export Compliance Solutions (ECS)
* ECS Speaker Panel: Suzanne Palmer, Mal Zerden
* Register: Here or by calling 866-238-4018 or e-mail spalmer@exportcompliancesolutions.com.

back to top

* * * * * * * * * * * * * * * * * * * *

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Henri Barbusse** (17 May 1873 - 30 Aug 1935; was a French novelist and a member of the French Communist Party. He was a lifelong friend of Albert Einstein.)
  - *"Two armies that fight each other is like one large army that commits suicide."*

back to top

* * * * * * * * * * * * * * * * * * * *

## 18. Are Your Copies of Regulations Up to Date?

(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
 - Last Amendment: 17 May 2018: 83 FR 22842-22846: Revisions to the Unverified List (UVL)

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
 - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
 - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
 - HTS codes that are not valid for AES are available here.
 - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* <u>HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA)</u>, 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)

  - Last Amendment: 4 May 2018: <u>Harmonized System Update 1807</u>, containing 289 ABI records and 60 harmonized tariff records.

  - HTS codes for AES are available <u>here.</u>

  - HTS codes that are not valid for AES are available <u>here.</u>

* <u>INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.

  - Last Amendment: 14 Feb 2018: <u>83 FR 6457-6458</u>: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]

  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website.</u> BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published <u>here.</u>

back to top

* * * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White

House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free. Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

DOC_0001115

Forward this email | Update Profile | About our service provider

Sent by ████████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ▮▮▮@fullcirclecompliance.eu]
**Sent:** 5/21/2018 10:28:15 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0521 Monday "Daily Bugle"



## Monday, 21 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions

2. Commerce/BIS: (No new postings.)

3. Commerce/Census: "Tips on How to Resolve AES Fatal Errors"

4. DHS/CBP Deploys AES Commodity and Export Manifest Certification

5. DHS/CBP Posts Notice on Submitting Imports of Products Excluded from Duties on Imports of Steel or Aluminum

6. State/DDTC Posts Name and Address Changes for Two Entities

7. President Posts Executive Order Prohibiting Certain Additional Transactions with Respect to Venezuela

### NEWS

8. CNBC: "Mnuchin Declares US-China Trade War 'on Hold' as Talks Progress

9. Courthouse News: "11th Circuit Asked to Void Sentence in Weapons Conspiracy Case"

10. Reuters: "U.S. Toughens Stance on Iran, Lists Sweeping Demands"

### COMMENTARY

11. Export Compliance Journal: "Export Compliance Due Diligence with Corporate Acquisitions"

12.  M. Volkov: "Episode 39: Tom Fox's New Book – The Complete Compliance Handbook"

EX/IM MOVERS & SHAKERS

13.  Monday List of Ex/Im Job Openings: 133 Jobs Posted This Week, Including 11 New Jobs

EX/IM TRAINING EVENTS & CONFERENCES

14.  FCC Presents "Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR", 12 Jun in Bruchem, the Netherlands

EDITOR'S NOTES

15.  Bartlett's Unfamiliar Quotations

16.  Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (17 May 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

17.  Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

٭٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭ ٭

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Industry and Security Bureau; PROPOSED RULES; Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List [Publication Date: 24 May 2018.]

* State; PROPOSED RULES; International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III [Publication Date: 24 May 2018.]

*[Editor's Note: Both item above were already included in the 15 May 2018 Daily Bugle, item 4 and 5.]*

* Treasury; Foreign Assets Control Office; NOTICES; Blocking or Unblocking of Persons and Properties [Publication Date: 22 May 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2.
Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. Commerce/Census: "Tips on How to Resolve AES Fatal Errors"
(Source: census@subscriptions.census.gov, 21 May 2018.)

When a shipment is filed to the AES, a system response message is generated and indicates whether the shipment has been accepted or rejected. If the shipment is accepted, the AES filer receives an Internal Transaction Number (ITN) as confirmation. However, if the shipment is rejected, a Fatal Error notification is received.

To help you resolve AES Fatal Errors, here are some tips on how to correct the most frequent errors that were generated in AES for this month.

*Fatal Error Response Code: 643*
  - Narrative: Quantity 2 Must Be Greater Than Zero
  - Reason: The Schedule B/HTS number reported requires a second Quantity to be reported and the Quantity 2 is missing or reported as zero.

- Resolution: Quantity 2 must be greater than zero.
Verify the Quantity 2, correct the shipment and resubmit.

*Fatal Error Response Code: 649*
- Narrative: Quantity 1 Cannot Exceed Shipping Weight
- Reason: Shipping Weight is reported in kilograms. When the Unit of Measure 1 requires kilograms, the first net quantity (Quantity 1) cannot exceed the Shipping Weight. Ensure the Shipping Weight includes the weight of the packaging materials.
- Resolution: The first net quantity (Quantity 1) in kilograms cannot exceed the Shipping Weight in kilograms. Verify the Quantity 1 and Shipping Weight, correct the shipment and resubmit.

For a complete list of Fatal Error Response Codes, their reasons, and resolutions, see Appendix A - Commodity Filing Response Messages.

It is important that AES filers correct Fatal Errors as soon as they are received in order to comply with the Foreign Trade Regulations. These errors must be corrected prior to export for shipments filed predeparture and as soon as possible for shipments filed postdeparture but not later than five calendar days after departure.

For further information or questions, contact the U.S. Census Bureau's Data Collection Branch.

- Telephone: (800) 549-0595, select option 1 for AES
- Email: askaes@census.gov
- Online: www.census.gov/trade
- Blog: blogs.census.gov/globalreach

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. DHS/CBP Deploys AES Commodity and Export Manifest Certification

(Source: CSMS #18-000354, 21 May 2018.)

CBP has deployed to the certification environment the following changes for AES Commodity and Export Manifest filings.

*Export Manifest Pilot:*
- Generate 8Z message to house bill issuer when master bill is deleted
- Generate 69/55/54 messages Export Manifest Air/Ocean
- Fix response notification service for 1Y messages and RC messages for Ocean

*AES Commodity Filing:*
- Fix 97H/97R response messages to include severity code

If you would like to test please contact your client representative for instructions.

* * * * * * * * * * * * * * * * * *

## 5. DHS/CBP Posts Notice on Submitting Imports of Products Excluded from Duties on Imports of Steel or Aluminum
(Source: CSMS #18-000352, 21 May 2018.)

On March 19, 2018, the Department of Commerce (DOC) published in the Federal Register (FR) the process for parties to submit requests for exclusions from Presidential Proclamations 9704 and 9705 on Adjusting Imports of Steel and Aluminum into the United States under section 232 of the Trade Expansion Act of 1962. See 83 FR 12106.

The functionality described below for the Importer Additional Declaration Field will be available in the Automated Commercial Environment (ACE) as of June 1, 2018. For any exclusions approved by DOC prior to June 1, 2018, importers may submit a Post Summary Correction (PSC) on or after June 1, 2018 to request a refund on applicable previous imports of excluded products, as described in the additional information section below.

INSTRUCTIONS FOR FILING PRODUCT EXCLUSION NUMBERS

Instructions on submitting entries to CBP of steel and aluminum products granted exclusions by DOC from the Presidential Proclamations are as follows:

Importers and filers importing products granted an exclusion should submit the product exclusion number based on the last six digits of the product exclusion docket number at Regulations.gov. The product exclusion number should be submitted in the Importer Additional Declaration Field (54 record) of the entry summary data, based on the following format:

- For excluded steel mill articles = STLXXXXXX
- For excluded aluminum articles = ALUXXXXXX

XXXXXX represent the last six digits of the Regulations.gov docket number; do not include spaces or special characters, such as hyphens.

Example: If a steel exclusion is granted under product exclusion docket number BIS-2018-0009-9002, the importer/filer should submit the exclusion number STL099002 (i.e. STL plus the last six digits of the docket number).

Please refer to the Importer's Additional Declaration Detail (Input 54-Record) of the CBP and Trade Automated Interfaces Requirements (CATAIR) Manual for further guidance. The CATAIR document can be found here.

Only products from importer(s) designated in the product exclusion approved by the DOC are eligible for the exclusion from the Section 232 measures.

Steel importers are reminded to submit mill certificates with their import data as required by 19 CFR 141.89

Do not submit the corresponding Chapter 99 HTS number for the Section 232 duties when the product exclusion number is submitted.

ADDITIONAL INFORMATION

Exclusions granted by DOC are retroactive on imports to the date the request for exclusion was posted for public comment at Regulations.gov.

To request an administrative refund for previous imports of excluded products granted by DOC, importers may file a PSC and provide the product exclusion number in the Importer Additional Declaration Field.

Once products are excluded from the Section 232 measures, importers may claim Generalized System of Preferences (GSP) or African Growth and Opportunity Act (AGOA) duty preferences on GSP and AGOA-eligible goods. If importers did not receive GSP or AGOA duty preferences on previous imports, and those imports are now covered by a retroactive exclusion, importers may request a refund of the duties subject to GSP or AGOA preferences through a PSC.

If the entry has already liquidated, importers may protest the liquidation.

For more information about submitting Post Summary Corrections, see Section 11 of the ACE Entry Summary Business Process. The ACE Entry Summary Business Process Document can be found here.

For more information, please refer to the March 19, 2018 FR notice on requesting product exclusions. Questions related to Section 232 entry filing requirements should be emailed to traderemedy@cbp.dhs.gov. Questions from the importing community concerning ACE rejections should be referred to their Client Representative.

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 6. State/DDTC Posts Name and Address Changes for Two Entities
(Source: State/DDTC)

* Oculus Info Inc. Changes Name to Uncharted Software Inc.
* Quyntess BV Changes Address

back to top

* * * * * * * * * * * * * * * * * * * * *

## 7. President Posts Executive Order Prohibiting Certain Additional Transactions with Respect to Venezuela

(Source:The White House, 21 May 2018.)

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.), and section 301 of title 3, United States Code, I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015, and relied upon for additional steps taken in Executive Order 13808 of August 24, 2017 and Executive Order 13827 of March 19, 2018, particularly in light of the recent activities of the Maduro regime, including endemic economic mismanagement and public corruption at the expense of the Venezuelan people and their prosperity, and ongoing repression of the political opposition; attempts to undermine democratic order by holding snap elections that are neither free nor fair; and the regime's responsibility for the deepening humanitarian and public health crisis in Venezuela, hereby order as follows:

Section 1.
(a) All transactions related to, provision of financing for, and other dealings in the following by a United States person or within the United States are prohibited:

(i) the purchase of any debt owed to the Government of Venezuela, including accounts receivable;

(ii) any debt owed to the Government of Venezuela that is pledged as collateral after the effective date of this order, including accounts receivable; and

(iii) the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the effective date of this order.

Sec. 2.
(a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 3. For the purposes of this order:
(a) The term "person" means an individual or entity;

(b) The term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches of such entities), or any person within the United States; and

(d) the term "Government of Venezuela" means the Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela.

Sec. 4. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including promulgating rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order. The Secretary of the Treasury may, consistent with applicable law, re-delegate any of these functions to other officers and executive departments and agencies of the United States Government. All agencies of the United States Government shall take all appropriate measures within their authority to carry out the provisions of this order.

Sec. 5. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Sec. 6. This order is effective at 12:30 p.m. eastern daylight time on May 21, 2018.

back to top

* * * * * * * * * * * * * * * * * *

## NEWS

## 8. CNBC: "Mnuchin Declares US-China Trade War 'on Hold' as Talks Progress
(Source: CNBC, 20 May 2018.) [Excerpts.]

The U.S. trade war with China is "on hold" after the world's largest economies agreed to drop their tariff threats while they work on a wider trade agreement, U.S. Treasury Secretary Steven Mnuchin said on Sunday.

Mnuchin and U.S. President Donald Trump's top economic adviser, Larry Kudlow, said the agreement reached by Chinese and American negotiators on Saturday set up a framework for addressing trade imbalances in the future.

"We are putting the trade war on hold. Right now, we have agreed to put the tariffs on hold while we try to execute the framework," Mnuchin said in a television interview on "Fox News Sunday."

On Saturday, Beijing and Washington said they would keep talking about measures under which China would import more energy and agricultural

DOC_0001890

commodities from the United States to close the $335 billion annual U.S. goods and services trade deficit with China.

During an initial round of talks this month in Beijing, Washington demanded that China reduce its trade surplus by $200 billion. No dollar figure was cited in the countries' joint statement on Saturday. ...

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 9. Courthouse News: "11th Circuit Asked to Void Sentence in Weapons Conspiracy Case"
(Source: Courthouse News, 18 May 2018.)

The attorney for a Chinese woman convicted of trying to send a $50 million missile-firing drone and jet fighter engines to China, asked the 11th Circuit on Friday to overturn her conviction claiming that there is no substantial evidence to incriminate her.

Wenxia Man, a Chinese immigrant who settled in California, was sentenced in 2016 to more than four years in prison after being found guilty of conspiracy and of engaging in illegal brokering activities.

The U.S. requires a license for the exportation of arms, munitions, and other implements of war and defense to foreign countries. In 1989, the U.S. entered an embargo against China that prohibits the export of any defense article and weapons to that nation.

According to court documents, Man acted as a broker to negotiate and arrange the sale of defense articles and technical data from March 2011 until about June 2013 without obtaining a license or approval from the U.S. Department of State.

Man, a San Diego resident, purportedly worked with Chinese national Xinsheng Zhang, who she referred to as a "technology spy" and was connected to the Chinese military to copy items obtained from other countries.

The indictment said that Man and Zhang solicited price quotations for jet fighter engines, drones and technical data for each of the defense articles from persons that they believed were vendors of military equipment in the United States.

Man and Zhang discussed with these vendors that the military equipment would be shipped through third countries in order to avoid the arms embargo against China, the indictment says.

On Friday, attorney Kevin Schreiner asked the three-judge panel to revoke the conviction because there is "insufficient evidence" that indicates that his client committed a violation of the Arms Export Control Act.

DOC_0001891

He claimed that Man had no criminal background, and that there was no indication that she was involved in any illegal activity

"The government did not show sufficient evidence of conspiracy," Schreiner said.

U.S. Attorney Ben Greenberg, who appeared on behalf of the United States, said that there was a clear conspiracy between Man and Zhang.

Greenberg argued that the many emails and phone calls that Man had with an undercover agent from the Department of Homeland Security, who was posing as a U.S. arms supplier, clearly show that she was trying to import weapons to China.

"The fact that they kept changing the agreement doesn't change the fact that it was a conspiracy," Greenberg said.

Schreiner countered by saying that Man and Zhang agreed to negotiate an agreement that never became effective.

"Zhang followed a typical pattern where he would inquire about jet engines and weapons, but there was never an agreement between him and Man," Schreiner said.

But, "they got to an agreement together," U.S. Circuit Judge William Pryor said. "Man was aware that the proposals were illegal," he added.

Schreiner argued that Zhang was never satisfied with Man's offers, and that there was never any evidence to show that they got to an agreement.

According to South Florida's Sun Sentinel newspaper, during Man's trial U.S. District Judge Beth Bloom ordered her to receive mental health treatment during and after her imprisonment of four years and two months.

However, even though there was evidence that Man had mental health issues, the judge did not believe that it played an important role in her crime, the SuSentinel reported.

The panel did not say when a final decision would be made on the case.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. Reuters: "U.S. Toughens Stance on Iran, Lists Sweeping Demands"
(Source: Reuters, 21 May 2018.) [Excerpts.]

The United States on Monday demanded Iran make sweeping changes - from dropping its nuclear program to pulling out of the Syrian civil war - or face severe economic sanctions as the Trump administration hardened its approach to Tehran.

Iran dismissed Washington's ultimatum and one senior Iranian official said it showed the United States is seeking "regime change" in Iran.

Weeks after President Donald Trump pulled out of an international nuclear deal with Iran, his administration threatened to impose "the strongest sanctions in history," and vowed to "crush" Iranian operatives abroad, setting Washington and Tehran further on a course of confrontation.

U.S. Secretary of State Mike Pompeo demanded sweeping changes that would force Iran effectively to reverse the recent spread of its military and political influence through the Middle East to the shores of the Mediterranean Sea.

  "The sting of sanctions will only grow more painful if the regime does not change course from the unacceptable and unproductive path it has chosen for itself and the people of Iran," Pompeo said in his first major speech since becoming secretary of state.

  "These will be the strongest sanctions in history by the time we are done," he added. ...

NAMING NAMES

Pompeo said if Iran made major changes, the United States was prepared to ease sanctions, re-establish full diplomatic and commercial relations and support the country's re-integration into the international economic system. ...

back to top

* * * * * * * * * * * * * * * * * * * *

## 11. Export Compliance Journal: "Export Compliance Due Diligence with Corporate Acquisitions"
(Source: ECustoms, 16 May 2018.)

*Whether diversifying or sharpening focus, in the normal course of business companies decide to buy other companies.*

The emphasis in that decision will have been in the areas of sales performance, product appeal, and market penetration. All well and good, but in defense trade acquisitions there are additional legal responsibilities and liabilities involved-those surrounding export control compliance.

The responsibility for compliance with U.S. regulations raises many questions and considerations that need to be answered, both before and after an acquisition is made. As well as its products and infrastructure, any ITAR or EAR violations, settlements, penalties, disclosures, and enforcement actions, such as they might be, are acquired in the purchase.

These considerations are not trivial, and are as much a part of the viability of the deal as products and profitability. Many questions are raised. What export controls have been applicable for the company? Has the company been compliant with these controls? Is the company registered with the Department of Defense Trade Controls? If they are not registered, how has its ITAR export compliance been managed?

*Key question to ask: where does a company fall on the export compliance spectrum?*

A presentation at SIA Spring 2018 clarified many of the questions and concerns involved. If the company being acquired has been managing an effective compliance program, with a formalized export control policy, sound export control procedures, license management, documentation, and reporting, then all involved will already be seeing eye-to-eye. If the target has not been getting licenses for its USML or CCL exports-or, depending on the rigor of its policies, even if it has-then the process of acquisition can or will include a mass of voluntary self-disclosures and possible penalties for violations. Has the company been screening for restricted parties? Is it already subject to an enforcement action or current monetary penalties?

If the company making the purchase is asking these questions, that recommends that it operates a robust compliance regime itself and will be integrating the company being purchased into its own programs to ensure compliance success. Any existing required notices and authorization transfers have to be handled and, on review of the target company's history, the necessary voluntary self-disclosures have to be filed.

*Getting to the "root" of potential export violations*

Voluntary self-disclosure analysis has to be a 'root cause' analysis. In other words, *"Get the facts. Calibrate the root cause."* There are guidelines for Voluntary Self-Disclosure in ITAR §127.12-who is involved? What happened and why? How was the violation discovered? What remedial measures will be taken?

Root cause analysis means getting down to what really drove the error to occur, rather than only the casual effects seen. The effort is not one of "putting out fires." It is peeling back the layers of symptoms to reveal the true problem. Examples of root causes for violations are failure to screen

parties against restricted lists, poor recordkeeping, lack of training, failure to notify involved parties, failure to comply with license conditions, and so forth. For any violation that is discovered, there will be both mitigating circumstances and aggravating circumstances to detail, corrective actions to document, and sustainment activities to recommend.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. M. Volkov: "Episode 39: Tom Fox's New Book - The Complete Compliance Handbook"
(Source: Volkov Law Group Blog, 20 May 2018. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

Tom Fox is a thought leader for the ethics and compliance profession. He is a prolific writer who has produced a steady body of work - podcasts, books, blogs, articles - to advance the compliance function. He is knowledgeable, practical and insightful on how to implement and maintain an effective compliance program.

Tom has just released a new and important book - *The Complete Compliance Handbook*. His latest book is the culmination of years of writing, insights and leadership.

In this episode, Mike Volkov interviews Tom about his new book, his perspective on the compliance function and the insights he has gained over the years.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM MOVERS & SHAKERS

## 13. Monday List of Ex/Im Job Openings; 133 Jobs Posted This Week, Including 11 New Jobs
(Source: Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

\* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

"#" New or amended listing this week

* ACCO Brands; Lake Zurich, IL; Foreign Trade Zone Specialist;
* Aerovironment; Simi Valley, CA; Trade Compliance Specialist II; Job ID: 18-017
* Aerovironment; Simi Valley, CA; Trade Compliance Director; Job ID: 18-018
* AJC Logistics; Atlanta, GA; NVOCC Export Specialist;
* AMD; Austin, TX; Manager, Import/Export;
* Arent Fox LLP; Washington, D.C.; International Trade Associate;
* Arent Fox LLP; Los Angeles, CA; International Trade Associate;
* BAE Systems; Los Angeles, CA; Program Manager, International and Offset; Requisition ID: 33778BR
* BAE Systems; Huntsville, AL; Facility Security Officer, Security Manager; Requisition ID: 36821BR
* BAE Systems; Burlington, MA; Facility Security Officer ("FSO"); Requisition ID: 35499BR
* BAE Systems; Rockville, MD; Compliance Specialist Senior; Requisition ID: 35809 BR
* BAE Systems; Sterling, VA; Compliance Specialist Senior; Requisition ID: 36370BR
* Boeing; Zoushan, China; Trade Compliance Manager;
* Boeing; Mesa, AR; Trade Control Specialist;
* Boeing; Ridley Park, PA; Trade Control Specialist;
* Boeing; Dallas, TX; Sr. Export Regulatory & Compliance Specialist III - Licensing Liaison;
* BMW North America; Woodcliff Lake, NJ; Senior Analyst, Trade Compliance; Requisition ID: 170004RD
* Buehler; Lake Bluff, IL; Manager, Compliance and Logistics; Requisition ID: 2018-004
* Danaher Science and Technology; United States; Senior Global Trade Compliance Manager; Job ID: COR000942
* DHL; Newark, NJ; Director, Export Control & Compliance - USA; Requisition ID: ref57592
* DynCorp International; Tampa, FL; Foreign Disclosure Officer; Requisition ID: PR1701977
* Eaton; Syracuse, NY; Global Logistics Manager; Requisition ID: 036620
* Eaton; Shanghai Shi, China; Global Ethics and Compliance Director, APAC; Requisition ID: 039260
* Elbit Systems of America; Fort Worth, TX or Merrimack, NH; Trade Compliance Manager; 2018-5916
* Elbit Systems of America; Fort Worth, TX or Merrimack, NH; Trade Compliance Officer; 2018-5917
* EoTech Technologies; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* Erickson, Inc.; Central Point, OR; Import Specialist; Requisition ID: 756803
* Esterline; Hong Kong; Regional ITC Manager;
* Esterline; Singapore; Regional ITC Manager;
* Expeditors; Sunnyvale, CA; Customs Compliance Supervisor;
* Expeditors; Krefeld, Germany; Clerk Import / Export ;
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk;
* Expeditors; Dusseldorf, Germany; Clerk, Airfreight Import;

* Export Solutions Inc.; Melbourne FL; Trade Compliance Specialist; info@exportsolutionsinc.com
* EY; Belgium; Senior Consultant, Global Trade; Requisition ID: BEL000PT
* FLIR; Arlington, VA; Senior Director, Global Export Licensing;
* FLIR; Billerica, MA; US Customs Analyst;
* FLIR; Meer, Belgium; GTC EMEA Customs Analyst;
* FLIR; Irving, CA; Sr. Manager Export Compliance;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Traffic;
* FLIR; Wilsonville, OR; Global Trade Compliance Analyst, Traffic;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Elkridge, MD; Global Trade Compliance Analyst, Traffic;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Licensing;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Licensing;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Technology;
* Floor and Decor; Smyrna, GA; Customs Compliance Manager;
* Full Circle Compliance; Bruchem, Netherlands; Legal Analyst, Manager;
* FusionStorm; Newark, CA; Trade Compliance Specialist; Requisition ID: 2018-2350
* General Dynamics; Fairfax, VA; Export Policy Analyst; Job ID: 2018-36089
* General Dynamics; Falls Church, VA; Director, Trade Compliance; Job ID: 2018-1122
* GHY International; Pembina, ND (or remote); Ocean & Air Import Coordinator;
* Gilead Sciences; Foster City, CA; Manager, Global Trade Compliance; R0001742
* Harris Corporation; Beaverton, OR; Manager, International Government Relations;
* Henderson Group Unlimited; Inc; Washington, DC; Process Improvement Mgr;
* Henderson Group Unlimited; Inc; Washington, DC; Defense Control Analyst;
* Henkel Corp.; Rocky Hill, CT; Global Trade Defense Information Manager; Requisition ID: 180002QT
* Henkel Corp.; Rocky Hill, CT; Senior Global Trade Manager; Requisition ID: 18000307
# Huntington Ingalls Industries; Virginia Beach, VA; AMSEC-Import/Export Administrator 2; Requisition ID: 23979BR
* Hussman; Bridgeton, MO; Trade Compliance Specialist;
* Infineon Technologies; Munich, Germany; Experte Export Control (w/m); Requisition ID: 22825
* Infineon Technologies; Melaka, Malaysia; Export Control Executive; Requisition ID: 26833
* Infineon Technologies; Porto (Maia) Portugal; Trade Compliance Administrator; Requisition ID: 25550
* Infineon Technologies; Milpitas, CA; Export Compliance Specialist; Requisition ID: 26988
* Infineon Technologies; El Segundo, CA; Export Compliance Specialist; Requisition ID: 26826
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official / Deputy Facility Security Officer;

* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official;
* Johns Hopkins University; Baltimore, MD; Assistant Director, Export Control and Facility Security;
* Lam Research Corp.; Singapore; Foreign Trade Analyst 3;
* Lam Research Corp.; Fremont, CA; Foreign Trade Intern;
* Lam Research Corp.; Shanghai, China; Foreign Trade (FT) Analyst;
* Lam Research Corp.; Fremont, CA; Foreign Trade Data Analyst;
* Leonardo DRS; Arlington, VA; Senior Customs & Trade Compliance Manager; Requisition ID: 87488
* Leonardo DRS; St. Louis; Trade Compliance Specialist; Requisition ID: 88127, or contact brandy.mormino@drs.com
# Lockheed Martin; Fort Worth, TX; Import Export Compliance Coordinator; Job ID: 397600BR
# Lockheed Martin; Fort Worth, TX; Export and Import Compliance Investigations Lead; Job ID: 427872BR
# Lockheed Martin; Fort Worth, TX; Licensing Integration and Support; Job ID: 433056BR
# Lockheed Martin; Fort Worth, TX; Regulatory Compliance Analyst Senior; Job ID: 433405BR
# Lockheed Martin; Orlando, FL; International Licensing Analyst Sr; Job ID: 424151BR
# Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415717BR
# Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415708BR
* Luminar Technologies; Orlando, FL; Import/Export Trade Compliance Specialist;
* L-3 ALST; Orlando, FL; Contracts Manager / Empowered Official; Requisition ID: 093069
* L-3 Warrior Sensor Systems; Londonderry, NH; Purchasing & Compliance Manager; Requisition ID:096596
* L-3 Warrior Sensor Systems; Middle East; International Business Development Manager - Middle East Region; Requisition ID: 093343
* L-3; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* L-3; Grand Rapids, MI; Sr. Trade Compliance Administrator; Requisition ID: 097197
* L-3; Arlington, TX; Compliance Manager; Requisition ID: 098246
* Mattson Technology; Fremont, California; Import/Export Compliance Analyst;
* Maersk/DAMCO; Agent de transit IMPORT - EXPORT; Job Ref.: DC-164022
* Mattson Technology; Fremont, California; Import/Export Compliance Analyst;
* Medtronic; Heerlen, The Netherlands; Trade Compliance Analyst; Requisition ID: 16000DYY
* Medtronic; Wash DC; Global Trade Lawyer; stacy.m.johnson@medtronic.com; Requisition ID: 170002ON
* Meggit; Akron, OH; Manager, Trade Compliance;
* Meggit; Los Angeles, CA; Trade Compliance Officer;
* Meggit; Miami, FL; Trade Compliance Officer;
* Meggit; Tucson, AZ; Trade Compliance Specialist;
* Mitchell Martin, Inc.; Dallas, Texas; Export Regulatory Trade Compliance Specialist; Requisition ID: 104405

\# Moog; East Aurora, NY; Manager, Group Trade Compliance Manager ; Amy Hanavan, ahanavan@moog.com; Requisition ID: 182102

\* MTS Systems; Eden Prairie, MN; Global Trade Compliance Manager; Requisition ID: 37841

\* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID:17022803

\* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022805

\* Office of the Director of National Intelligence; McLean, VA; Associate General Counsel;

\# Oracle; Unspecified, United States; Customs Compliance Specialist; Requisition ID: 18000H0N

\# Oracle; Hong Kong; Compliance Counsel; Requisition ID: 17001HWJ

\* Orbital ATK, Inc.; Dulles, VA; Principal Import/Export Analyst; Job ID: JAY20182304-45242.

\* Pentair; Illinois, USA; Import/Export Compliance Specialist; Requisition ID: 115774

\* Pentair; Illinois, USA; Import/Export Compliance Specialist; Requisition ID: 115926

\* PerkinElmer, Inc.; Shelton, CT; Systems Analyst, Trade Compliance Solutions;

\* Raytheon Company; McKinney, TX; Global Trade Licensing Analyst;

\* REDCOM Laboratories; Victor NY; Director of Trade Compliance; Contact Chad Boehly

\* Rolls-Royce; Indianapolis, IN;Export Control Specialist; Req ID: JR6025484

\* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR

\* SABIC; Houston, TX; Senior Analyst, International Trade Compliance; Requisition ID 8655; OR Contact: Jason Washington

\* SABIC; Houston, TX; Senior Analyst, Trade Compliance; Requisition ID: 8644BR

\* Spirent; San Jose, CA; Global Trade Compliance Specialist; Requisition ID: 4088

\* Teledyne Benthos; Falmouth, MA; Export Compliance Manager

\* TLR; San Fransisco, CA; Import CSR ; Requisition ID: 1040

\* Trek; Waterloo, WI; Global Trade & Logistics Specialist;

\* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance IT Systems & Integration Mgr.; Requisition ID: 62310BR

\* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance (ITC) Specialist; Requisition ID: 49375BR

\* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Manager; Requisition ID: 62176BR

\* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Authorizations Manager; Requisition ID: 63222BR

\* United Technologies - Pratt & Whitney, East Hartford, CT; International Trade Compliance Technology Senior Manager; Requisition ID: 55944BR

\* United Technologies Corp, Pratt & Whitney; East Hartford, CT; ITC & ACE Compliance Program Manager, ASC; Requisition ID: 58388BR

* Varian; Belgium, Switzerland, Netherlands, or UK; EMEIA Trade Lead - Senior Manager Trade Compliance; Requisition ID: 12301BR; Contact Gavin Tickner at Gavin.Tickner@varian.com
* Varian; Paolo Alto, CA; Senior Trade Compliance Analyst; Requisition ID: 12735BR; Contact Uyen Tran at Uyen.Tran@varian.com
* Vigilant; Negotiable Location, USA; Global Trade Compliance Analyst;
* Virgin Galactic; Las Cruces, NM; Export Compliance Officer; Requisition ID: 2018-3558
* Williams International; Pontiac, MI; Trade Compliance Specialist; Requisition ID: 17-0275
* Xylem, Inc.; Remote, United States; Manager, Global Ethics & Compliance;
* Xylem, Inc; Morton Grove, IL; Trade Compliance Specialist;

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

14.
FCC Presents "Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR", 12 Jun in Bruchem, the Netherlands
(Source: Full Circle Compliance)

* What: Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR
* When: 12 Jun 2018, 10 AM - 4 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* FCC Speaker Panel: Mike Farrell and Ghislaine Gillessen
* Inquiries: Here or by e-mail events@fullcirclecompliance.eu

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

15. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Alexander Pope** (21 May 1688 - 30 May 1744) was an 18th-century English poet. He is best known for his satirical verse, his translation of Homer and for his use of the heroic couplet. He is the second-most frequently quoted writer in The Oxford Dictionary of Quotations after Shakespeare.)

- *"Be not the first by whom the new are tried, Nor yet the last to lay the old aside."*
- *"Beauties in vain their pretty eyes may roll; charms strike the sight, but merit wins the soul."*

**Monday is Punday.**

* My girlfriend told me she was leaving me because I keep pretending to be a Transformer. I said, "No, wait! I can change!"
* Did you hear about the guy whose whole left side was cut off? He's all right now.
* Yesterday I accidentally swallowed some food coloring. The doctor says I'm OK, but I feel like I've dyed a little inside.

back to top

* * * * * * * * * * * * * * * * * *

## 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 17 May 2018: 83 FR 22842-22846: Revisions to the Unverified List (UVL)

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders

- Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 4 May 2018: Harmonized System Update 1807, containing 289 ABI records and 60 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * * * * *

17. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle
Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by:
Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and
Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im
Daily Update is emailed every business day to approximately 8,000 readers
of changes to defense and high-tech trade laws and regulations. We check
the following sources daily: Federal Register, Congressional Record,
Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF,
DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White
House, and similar websites of Australia, Canada, U.K., and other countries
and international organizations.  Due to space limitations, we do not post
Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or
export-controlled information. All items are obtained from public sources or
are published with permission of private contributors, and may be freely
circulated without further permission, provided attribution is given to "*The
Export/Import Daily Bugle* of (date)". Any further use of contributors'
material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or
expert advice.  Consult your own legal counsel or compliance specialists
before taking actions based upon news items or opinions from this or other
unofficial sources.  If any U.S. federal tax issue is discussed in this
communication, it was not intended or written by the author or sender for tax
or legal advice, and cannot be used for the purpose of avoiding penalties
under the Internal Revenue Code or promoting, marketing, or recommending
to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing
the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present
is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected

The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by █████████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ▓▓▓@fullcirclecompliance.eu]
**Sent:** 5/22/2018 8:25:21 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0522 Tuesday "Daily Bugle"



## THE DAILY BUGLE

### Tuesday, 22 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DHS/CBP Updates CATAIR Appendix PGA
4. DHS/CBP Updates AESTIR Appendix Q
5. State/DDTC: (No new postings.)
6. Treasury/OFAC Posts Ukraine-/Russia-related General Licenses, and Updates FAQs
7. UK Updates Four Sanctions Guidance Documents
8. Singapore Customs Posts Circular No 04/2018 Concerning STCCED 2018
9. Singapore Customs Posts Circular No 05/2018 Concerning SLSFTA

### NEWS

10. ST&R Trade Report: "New Tariffs on China 'On Hold' After Progress in Trade Talks"

### COMMENTARY

11. American Action Forum: CFIUS, Export Controls, and National Security
12. L. Luo: "Brief Analysis of the U.S. Long Arm Jurisdiction in Export Control"

13.  S.M. Wise: "DDTC and BIS Propose New Rules to Continue Export Control Reform Initiative"

14.  Gary Stanley's EC Tip of the Day

**EX/IM TRAINING EVENTS & CONFERENCES**

15.  ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 10-11 Jul in Long Beach, CA

16.  ECTI Presents "Welcome to the Club: An Overview of India's Dual-Use and Defense Export Control Systems," Webinar on 13 June

**EDITOR'S NOTES**

17.  Bartlett's Unfamiliar Quotations

18.  Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (17 May 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

19.  Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * *

# 1. Items Scheduled for Publication in Future Federal Register Editions

(Source: Federal Register)

\* Commerce; Industry and Security Bureau; NOTICES; Reporting for Calendar Year 2017 on Offsets Agreements Related to Sales of Defense Articles or Defense Services to Foreign Countries or Foreign Firms [Publication Date: 23 May 2018.]

\* State; NOTICES; Designations as Global Terrorists [Publication Date: 23 May 2018.]:
  - Adnan Abu Walid al-Sahrawi, aka Abu Walid al Sahrawi, aka Adnan Abu Walid al-Sahraoui, aka Adnan Abu Waleed al-Sahrawi, aka Lehbib Ould Ali Ould Said Ould Joumani
  - ISIS in the Greater Sahara

\* State; NOTICES; Determinations under the Arms Control Act [Publication Date: 23 May 2018.]

\* Treasury; Foreign Assets Control Office; NOTICES; Blocking or Unblocking of Persons and Properties [Publication Date: 23 May 2018.]

**Scheduled for Publication Later This Week:**

\* Commerce; Industry and Security Bureau; PROPOSED RULES; Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List [Publication Date: 24 May 2018.]

\* State; PROPOSED RULES; International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III [Publication Date: 24 May 2018.]

*[Editor's Note: Both items above were already included in the 15 May 2018 Daily Bugle, item 4 and 5.]*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 2.
Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 3. DHS/CBP Updates CATAIR Appendix PGA
(Source: CSMS# 18-000353, 21 May 2018.)

The Appendix PGA document has been updated to include the change of 'IN' added to the FDA base unit, as per the change log.

Please visit this link below for more information.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 4. DHS/CBP Updates AESTIR Appendix Q
(Source: CSMS #18-000355, 22 May 2018.)

At the request of the National Marine Fishery Service (NMFS), CBP has made the following update to AESTIR Appendix Q - PGA Record Formats.

 - AESTIR Appendix Q PGA Record Formats - the wording to clarify the eBCD number requirement.
 - And in NM9, the re-export number is for HMS program.
 - Also deactivated rules 67S and 67T for the validation of re-export number formats.

The above changes are also listed in the Summary of Changes to AESTIR.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 6. Treasury/OFAC Posts Ukraine-/Russia-related General Licenses, and Updates FAQs
(Source: Treasury/OFAC, 22 May 2018.)

Today, the Department of the Treasury's Office of Foreign Assets Control (OFAC) is issuing Ukraine-/Russia-related General License 15. General License 15 authorizes U.S. persons to engage in specified transactions related to winding down or maintaining business with GAZ Group and its subsidiaries until October 23, 2018. OFAC is also issuing Ukraine-/Russia-related General License 12C, which replaces and supersedes General License 12B in its entirety. General License 12C permits originating and intermediary U.S. financial institutions to process funds transfers that they would otherwise block to an account held by a blocked U.S. person at a U.S. financial institution. In addition, General License 12C clarifies that U.S. financial institutions can release such funds for authorized maintenance and wind-down purposes. OFAC is also publishing six new Frequently Asked Questions (FAQs) and revisions to existing FAQs about these general licenses.

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 7. UK Updates Four Sanctions Guidance Documents
(Source: Gov.UK, 21 May 2018.)

The UK Government's Office of Financial Sanctions Implementation has updated the following guidance documents:

- Financial sanctions targets: list of all asset freeze targets
- Financial sanctions targets: format guide
- Ukraine: list of persons subject to restrictive measures in view of Russia's actions destabilizing the situation in Ukraine
- Monetary penalties for breaches of financial sanctions: guidance

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 8. Singapore Customs Posts Circular No 04/2018 Concerning STCCED 2018
(Source: Singapore Customs, 22 May 2018.) [Excerpts.]

With effect from 24 June 2018, the Singapore Trade Classification, Customs and Excise Duties (STCCED) 2018 will replace the current 2012 version.

The STCCED 2018 incorporates the ASEAN Harmonised Tariff Nomenclature (AHTN) 2017. You may visit our website at www.customs.gov.sg > Businesses > Harmonised System (HS) Classification of Goods > Resources to view and download the STCCED 2018.

Arising from the AHTN 2017 review and among the many changes, we would like to highlight two key changes. Specific HS codes have been created for the following vehicles and they will be non-dutiable.

(a) Go-karts
(b) Golf cars
(c) Pocketmotorcycles
(d) Powered kick scooters
(e) Mobilityscooters
(f) All-Terrain Vehicles (ATV)
(g) Self-balancingcycles
(h) Electric bicycles
(i) Vehicles specially designed for travelling on snow

A review was done on Chapter 98 to streamline and rationalise the use of HS codes in the Chapter. Please see Annex A for the changes.

With the implementation of AHTN 2017, new permit applications must be submitted using AHTN 2017 HS codes. For permits previously approved before the implementation date using AHTN 2012 HS codes:

(a) Amendments of these permits must be submitted using AHTN2017 codes;
(b) Cancellations of these permits are allowed if the permit has not expired or used for cargo clearance; and
(c) Refunds applications are allowed.

A list of Frequently Asked Questions (FAQs) is provided in Annex B for your reference. If you need further clarification, please submit a feedback via www.customs.gov.sg/feedback or email your enquiries to customs_classification@customs.gov.sg. ...

back to top

## 9. Singapore Customs Posts Circular No 05/2018 Concerning SLSFTA

(Source: Singapore Customs, 22 May 2018.)

The SLSFTA has come into force on 1 May 2018. This circular outlines the salient points of the Rules of Origin requirements and operational procedures for exports of Singapore-originating goods claiming preferential tariff treatment in the Democratic Socialist Republic of Sri Lanka ("Sri Lanka").

From 1 May 2018 onwards, Sri Lanka is granting preferential tariff treatment under the SLSFTA for some items initially and is planning to extend preferential tariff treatment to all items agreed under the SLSFTA by 1 July 2018. Manufacturers and Traders are therefore required to refer to Gazette No. 2069-19 Revenue Protection Order No. 04-2018 issued by Sri Lanka's Ministry of Finance to obtain the appropriate preferential tariff rate for the import of Singapore-originating goods into Sri Lanka offered from 1 May 2018 till 30 June 2018. The full tariff obligations and the legal text of the SLSFTA are available via Enterprise Singapore's website.

*Rules of Origin for Originating Goods*

Your goods may qualify for preferential tariff treatment for importation into Sri Lanka if they fulfill the following Rules of Origin:

| Rules of Origin under the SLSFTA | |
|---|---|
| Goods Wholly Obtained or Produced | Goods wholly obtained or produced in Singapore as specified in Article 4 of Protocol 1 of the SLSFTA |

| Goods Not Wholly Obtained or Produced | Goods manufactured in Singapore and satisfies requirements under Article 5 of Protocol 1 of the SLSFTA |
|---|---|

*Accumulation*

Sri Lanka and Singapore are treated as a single production area. This means that any goods or materials that originated from Sri Lanka will be deemed to have originated from Singapore, and vice versa, provided the goods or materials satisfy the origin requirements under the SLSFTA and are supported by a Preferential Certificate of Origin (PCO) by the supplier. Documentation Procedures

To enable your importers in Sri Lanka to claim preferential tariff treatment under the agreement, the Singapore exporter shall apply for the PCO and Export Permit from Singapore Customs when exporting the goods.

*For New Manufacturers*

For Manufacturers who are not registered with Singapore Customs, please follow the documentation procedures found on the Singapore Customs' website at http://www.customs.gov.sg > Businesses > Exporting Goods > Certificates of Origin.

*For Registered Manufacturers with Singapore Customs*

For Manufacturers who are registered with Singapore Customs, please note the following:

  (a) Manufacturers with new product lines are required to register the new products with the Tariffs and Trade Services Branch (TTSB) of Singapore Customs regardless if you were previously registered; and
  (b) Manufacturers are required to submit a Manufacturing Cost Statement (MCS) under the SLSFTA for goods to be exported to Sri Lanka to receive a PCO and claim preferential tariff treatment in Sri Lanka.

*For Traders and Declaring Agents*

For Exporters and Declaring Agents, please note the following when applying for a PCO for export to Sri Lanka via TradeNet:

  (a) Please select Certificate Type "18" when applying for the PCO; and
  (b) In addition to the normal requirements, please declare the corresponding 6-digit HS Code of your product and its origin criterion found in the "Verification of Cost Statement" letter in the "Certificate Item Description" field as part of your consignment details in the PCO.

For full details on how to apply for a PCO under the SLSFTA, please refer to Annex A and B for the format and explanatory notes of the PCO respectively and the "Handbook on the Application Procedures for a Certificate of Origin

via TradeNet", which may be downloaded from the Singapore Customs Website at http://www.customs.gov.sg > Businesses > Exporting Goods > Certificates of Origin > Step 3: Apply for Certificate of Origin via TradeNet > Handbook.

*Retention of Documents*

For post-verification checks, documents relating to the production and export shipments accompanied by the PCO should be kept for no less than 3 years from the date on which the PCO was issued.

*Clarification*

Please refer to the Frequently Asked Questions (FAQ) on the Rules of Origin under the SLSFTA in Annex C for more details. Alternatively, you may send your enquiries to customs_roo@customs.gov.sg for further clarifications on the contents of this circular.

For other clarifications on the SLSFTA, you may email Enterprise Singapore at enquiry@enterprisesg.gov.sg.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## NEWS

## 10. ST&R Trade Report: "New Tariffs on China 'On Hold' After Progress in Trade Talks"
(Source: Sandler, Travis & Rosenberg Trade Report, 22 May 2018.)

The Trump administration is "putting the trade war [with China] on hold" after the two sides agreed on a framework for progress on trade issues during talks held May 17-18 in Washington, D.C., according to Treasury Secretary Steve Mnuchin. Specifically, the White House will suspend plans to levy an additional 25 percent tariff on $50 billion worth of imports from China in response to a Section 301 investigation concluding that Beijing is coercing U.S. companies into transferring their technology and intellectual property to Chinese enterprises. Those tariffs would have affected more than 1,300 products and could have been imposed as early as May 23.

According to a joint statement, China agreed to "significantly increase purchases of United States goods and services" to help reduce its trade surplus in goods with the U.S., which has been a prime focus for President Trump. Administration officials had previously pressed China to reduce this surplus by $200 billion by the end of 2020, but the statement did not refer to any specific figures.

DOC_0001912

Instead, the statement indicated that there was mutual agreement on securing "meaningful increases" in U.S. agriculture and energy exports to China, with a U.S. team slated to visit China to work out the details. However, the two sides were only able to agree on the need to "create favorable conditions to increase trade" in manufactured goods and services, with no indication of how that will be pursued.

On other long-standing trade irritants, the statement said the two sides agreed to (a) strengthen cooperation on intellectual property protections, with China pledging to advance relevant amendments to its laws and regulations in this area, and (b) encourage two-way investment and strive to create a fair, level playing field for competition.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

COMMENTARY

## 11. American Action Forum: CFIUS, Export Controls, and National Security
(Source: American Action Forum, 21 May 2018.)

### *Introduction*

Spurred by the rising presence of China as a foreign investor in United States firms, there is a renewed debate about how to better protect U.S. national security interests in business transactions between U.S. and foreign companies. Chinese investment in U.S. technology draws particular attention, sparking considerable interest in potential changes to the process by which these transactions are reviewed. Ideas for reform have centered around two current mechanisms for addressing these challenges: The Committee on Foreign Investment in the United States (CFIUS) and U.S. export control laws.

To reform CFIUS, Congressman Robert Pittenger and Senator John Cornyn introduced the Foreign Investment Risk Review Modernization Act (FIRRMA). Among its other provisions, the original bill would have empowered CFIUS for the first time to review outbound investment in addition to inbound investment. However, this language was recently eliminated in both the House and Senate bills after critics argued that outbound investment should be subject to traditional export controls and not CFIUS.

The House Financial Services Committee further altered FIRRMA by including the Export Control Reform Act (ECRA) in its text. The ECRA is a separate piece of legislation introduced by Congressman Ed Royce to expand the U.S. export control regime. Given these changes and the overall reform effort

underway, it is important to understand the distinction between CFIUS and export controls as well as the purpose and abilities of each.

*What is CFIUS?*

CFIUS is an interagency committee headed by the Secretary of Treasury that is tasked with reviewing foreign mergers, acquisitions, and other foreign investments through the lens of preserving national security. That is, CFIUS is focused on transactions. The committee is made up of the heads of eight government agencies, including the Departments of Justice, Homeland Security, Defense, and Commerce. Specifically, CFIUS is authorized to review "covered transactions" - any transaction between U.S. and foreign companies that results in foreign ownership.

Before a merger takes place that would result in foreign ownership, U.S. companies have the option to voluntarily submit the transaction to CFIUS for review. CFIUS then considers multiple factors that can impact U.S. national security, including the transaction's effect on U.S. technological leadership, the ability of domestic industry to meet national defense requirements, and whether it is a foreign government-controlled transaction. If CFIUS finds that the transaction poses a credible risk to national security, it can recommend to the president that it be blocked. It can also impose conditions that must be met before the merger or acquisition can go through to mitigate national security risks. If U.S. companies do not voluntarily submit their transactions for review, CFIUS has the authority to review covered transactions at a later date, sometimes years later, to ensure they do not threaten national security.

*What Are Export Controls?*

Export controls are used to regulate the export of goods, services, technology, and software with the purpose of safeguarding U.S. national security and promoting foreign policy objectives abroad. In contrast to CFIUS, export controls center on technologies and not specific transactions. It is a multifaceted system governed by the Departments of Commerce, State, Treasury, Defense, and other agencies. These laws control the export of multiple types of products that could threaten national security, regardless of whether the exporting company is foreign-controlled.

In practice, export controls regulate outbound products based both on their end uses and their destinations. With regard to end uses, there are three main types of exports that are controlled: military equipment, commercial items that have possible dual uses as military equipment, and items that can be used in the development of nuclear, chemical, or biological weapons. Controls are also used to restrict exports in adherence to international arms embargoes or to countries of general concern, namely those on which the United States has imposed sanctions.

The majority of exports that fall under these controls are identified by either the Department of Commerce or the State Department. The Department of Commerce determines which products fall under the Commerce Control List (CCL), which regulates dual-use items such as chemicals, electronics, and

computers. The State Department keeps the U.S. Munitions List (USML), which controls the export of defense articles, services, and related technologies. Examples of exports on the USML include firearms, missiles, nuclear technology, and other substances that can be weaponized. In most cases, businesses that wish to export products under either of these lists must first obtain licenses from the government.

If exporters do not adhere to export control laws, they can face civil penalties of up to $500,000 per violation for defense articles and up to $250,000 per violation for dual-use items. Additionally, criminal violations may result in fines of $1,000,000 and a 20-year prison sentence.

### The Current Landscape

As China increases its investment footprint in the United States, Congress continues to debate ways to prevent intellectual property theft and forced technology transfer - the practice of mandating that U.S. firms share their technology with Chinese firms in order to gain market access. Concerns are especially prevalent over technology transfers that occur as a result of joint ventures between U.S. and Chinese firms.

FIRRMA attempted to address this concern by mandating that CFIUS review technology transfers as a result of joint ventures between U.S. and foreign companies. This was a substantial shift from CFIUS's original role of reviewing inbound foreign investment and sparked significant debate, especially among individuals arguing that the existing export control regime was better suited to protect against an outbound sharing of intellectual property. With the provision now removed, there is growing consensus around FIRRMA as a way to increase national security protections for the United States.

At the same time, ECRA was added to FIRRMA in the House of Representatives. This would expand the definition of "technology" subject to export control laws, increasing the number and types of exports that fall under export control regulations. It would also expand export controls to cover foreign-made items in the United States that are re-exported and "foundational information" or "know how" related to the creation of technology. Notably, ECRA would for the first time subject the transfer of technology between two companies in the United States to export controls, as long as one company is majority foreign owned.

### Conclusion

CFIUS and export controls are two unique tools at the United States' disposal to help evaluate foreign transactions and technology transfer based on potential national security impact. Reforms to each are currently being considered, and thoughtful changes have been made to increase the likelihood that reform efforts are successful.

back to top

* * * * * * * * * * * * * * * * * * * *

## 12. L. Luo: "Brief Analysis of the U.S. Long Arm Jurisdiction in Export Control"

(Source: King & Wood Mallesons, 3 May 2018.)

* Author: Laura Luo, Partner, Laura.Luo@us.kwm.com, King & Wood Mallesons, New York.

Recently, a major Chinese technology firm has fallen into troubled waters with the U.S. Department of Commerce due to violations of U.S. economic sanctions against certain foreign nations. As a result, the U.S. levied severe penalties against the Chinese company, including a ban on export sales by American companies for seven years. Previous violations of U.S. export control law by the same company led to over $1 billion in fines.

This begs the question as to how a Chinese company would be subject to U.S. regulations in the first place. In fact, many U.S. domestic laws regulate foreign companies through the exercise of so-called long-arm jurisdiction. Such jurisdiction is often found when a foreign company establishes certain direct or indirect operational, contractual or commercial contact with the U.S. In a 2014 case, a U.S. federal appellate court went so far as to imputing U.S. activities conducted by a U.S. company to its Chinese parent company in order to find jurisdiction over the Chinese parent company. Thus, it is important to understand the major areas of laws and circumstances under which it may be subject to U.S. long-arm jurisdiction as non-compliance of such laws often result in severe commercial consequences.

To "mark" these areas of potential land mines, we are putting out a series of introductory articles that highlights certain areas with high compliance risks facing Chinese companies doing business with the United States or putting its products into the "stream of commerce" in the U.S. Our introduction will initially cover areas such as export control, national security review on foreign investment in the U.S., anti-money laundering, and anti-corruption.

### Export Control

Given the significant impact that violations (even inadvertent ones) of U.S. export controls may have on Chinese companies, those looking to purchase goods from American entities must be cognizant of the nuances of U.S. law and maintain a rigorous export control compliance program.

#### Extraterritorial Reach of U.S. Export Control Law

The Export Administration Act (the "EAA") and its implementing regulations, the Export Administration Regulations (the "EAR"), govern the export of most commercial products, including dual-use products (i.e., those that have both commercial and military functions). The U.S. Department of Commerce's Bureau of Industry and Security (the "BIS") is responsible for the administration and enforcement of the EAR. Unlike other U.S. laws which define the U.S. government's extraterritorial reach with respect to parties,

the EAA focuses on the product being exported and looks at its "nationality" to determine whether a foreign company is subject to the EAR.

Under the EAR, companies purchasing any of the following exports must comply with its provisions:

  - Any item in the U.S. (including those in a U.S. Foreign-Trade Zone and those moving through the U.S. from one foreign country to another);
  - Any U.S.-origin item wherever located;
  - Any foreign-made commodity that incorporates certain U.S.-origin commodities or that is bundled or commingled with certain U.S.-origin software;
  - Certain foreign-made products (including processes and services) produced directly by the use of U.S.-origin technology or software; and
  - Certain commodities produced in any plant or major component of a plant outside the U.S. that is a direct product of U.S.-origin technology or software.

Chinese companies should note that compliance with Chinese law or the laws of other foreign countries does not relieve them of the obligation to comply with the EAA and EAR.

*Activities Prohibited under the EAR*

If a company purchases a product covered by the EAR, that company is generally prohibited from engaging in any of the following activities without first obtaining a license or license exception from BIS (if applicable):

  - Exporting and re-exporting controlled items to certain listed countries (as determined based on the item being exported);
  - Re-exporting and exporting from abroad foreign-made items incorporating more than a de minimis amount of controlled U.S. content;
  - Re-exporting and exporting from abroad foreign-produced direct products of U.S. technology and software;
  - Engaging in actions prohibited by a denial order issued by BIS;
  - Exporting or re-exporting any item to prohibited end-users or for prohibited end-uses;
  - Exporting or re-exporting any item to embargoed nations;
Supporting certain weapons proliferation activities (if said company is a U.S. person);
  - Exporting or re-exporting an item through, or transiting such through, certain listed countries;
  - Violating any terms or conditions of a license, license exception, or order issued under the EAR; and
  - Knowingly proceeding with transactions that will cause, or has caused, a violation of the EAR.

Companies should note that BIS generally prohibits all import and export transactions involving sanctioned countries (i.e., Cuba, Iran, North Korea, Sudan, and Syria) without license authorization.
In the event that a company becomes aware of possible violations of the EAR, that company should report such violations to the BIS, as voluntary