self-disclosure is a mitigating factor in determining what sanctions may be imposed.

*Why the EAR Matter*

Failure to comply with the EAA and the EAR may result in significant administrative and criminal penalties for a Chinese company.

Administrative sanctions may include (a) civil monetary penalties for each violation of (i) up to $125,000 in non-egregious cases resulting from voluntary self-disclosure, (ii) up to $250,000 in non-egregious cases which BIS becomes aware of through means other than voluntary self-disclosure, (iii) at least $125,000 in egregious cases resulting from voluntary self-disclosure, and (iv) at least $250,000 in egregious cases which BIS becomes aware of through means other than voluntary self-disclosure; and (b) denial of export privileges.

Criminal penalties shall be imposed on parties who knowingly violate or conspire to, or attempt to violate, the EAR, and may include fines of up to $1 million per violation and/or imprisonment (with respect to individuals).

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. S.M. Wise: "DDTC and BIS Propose New Rules to Continue Export Control Reform Initiative"
(Source: Trade and Manufacturing Monitor, 21 May 2018.)

* Author: Scott M. Wise, Associate, swise@kelleydrye.com, Kelley Drye & Warren LLP, Washington DC.

As part of the ongoing Export Control Reform initiative, the Directorate of Defense Trade Controls ("DDTC") and Bureau of Industry and Security ("BIS") has issued proposed rules that would move certain items currently controlled on the International Traffic in Arms Regulations ("ITAR") to the Export Administration Regulations ("EAR"). The proposed rules would move some items currently controlled under Categories I, II, and III of the U.S. Munitions List ("USML"), including certain firearms, guns and armament, and ammunition/ordnance to new Export Control Classification Numbers ("ECCNs") on the EAR. After their publication in the Federal Register, there will be a 45-day comment period during which the agencies will accept public comments.

Specifically, the proposed rule targets for a move to the EAR products that are not inherently military, or do not possess characteristics that provide a military advantage to the U.S. These rules, once finalized, would reduce the compliance burden on exporters in the industry. However, the proposed rules do not represent a wholesale deregulation of the industry, as many items would remain highly controlled under the EAR's "600-series" and other

ECCNs, and would still require licenses to many destinations. Affected parties should carefully review the proposed rules and take the opportunity to comment on the proposed reforms.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14. Gary Stanley's EC Tip of the Day
(Source: Defense and Export-Import Update; 21 May 2018. Available by subscription from gstanley@glstrade.com.)

\* Author: Gary Stanley, Esq., Global Legal Services, PC, (202) 352-3059, gstanley@glstrade.com.

ITAR § 120.17(a)(4) provides that an export occurs through "releasing or otherwise transferring a defense article to an embassy or to any of its agencies or subdivisions, such as a diplomatic mission or consulate, in the United States."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

## 15. ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 10-11 Jul in Long Beach, CA
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com.)

\* What: ITAR/EAR Boot Camp (Seminar Level I), Long Beach, CA
\* When: July 10-11, 2018
\* Where: Hilton Long Beach
\* Sponsor: Export Compliance Solutions (ECS)
\* ECS Speaker Panel: Suzanne Palmer, Mal Zerden
\* Register: Here or by calling 866-238-4018 or e-mail spalmer@exportcompliancesolutions.com.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. ECTI Presents "Welcome to the Club: An Overview of India's Dual-Use and Defense Export Control Systems," Webinar on 13 June
(Source: Danielle Hatch, danielle@learnexportcompliance.com)

\* What: Welcome to the Club: An Overview of India's Dual-Use and Defense Export Control Systems

DOC_0001919

* When: June 13, 2018; 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Ryan Lynch Cathie
* Register: Here or Danielle Hatch, 540-433-3977,
danielle@learnexportcompliance.com.

back to top

* * * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Arthur Conan Doyle** (Sir Arthur Ignatius Conan Doyle KStJ DL; 22 May
1859 - 7 Jul 1930; was a British writer best known for his detective fiction
featuring the character Sherlock Holmes. Originally a physician, in 1887 he
published *A Study in Scarlet*, the first of four novels about Holmes and Dr.
Watson. In addition, Doyle wrote over fifty short stories featuring the famous
detective.)
  - *"Mediocrity knows nothing higher than itself, but talent instantly
recognizes genius."*
  - *"It is an old maxim of mine that when you have excluded the impossible,
whatever remains, however improbable, must be the truth."*

back to top

* * * * * * * * * * * * * * * * * * * *

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the
U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the
Federal Register. The latest amendments to applicable regulations are listed
below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms,
Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns,
Destructive Devices and Certain Other Firearms; Background Checks for
Responsible Persons of a Trust or Legal Entity With Respect To Making or
Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No.
18-04; Definition of Importer Security Filing Importer (ISF Importer)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
 - Last Amendment: 17 May 2018: 83 FR 22842-22846: Revisions to the Unverified List (UVL)

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
 - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
 - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
 - HTS codes that are not valid for AES are available here.
 - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
 - Last Amendment: 4 May 2018: Harmonized System Update 1807, containing 289 ABI records and 60 harmonized tariff records.
 - HTS codes for AES are available here.
 - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
 - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
 - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories,

case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * * * *

## 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties

under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ▮▮▮▮▮@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance [blank]@fullcirclecompliance.eu]
**Sent:** 5/23/2018 6:49:28 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0523 Wednesday "Daily Bugle"



## THE DAILY BUGLE

### Wednesday, 23 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Reminds U.S. Firms of Requirement to Annually Report Defense Offset Agreements
2. State Releases Determinations under the Arms Export Control Act

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS: (No new postings.)
5. State/DDTC: (No new postings.)

### NEWS

6. American Shipper: "EU, India File Retaliatory Tariffs on U.S. Goods"
7. Expeditors News: "China to Amend Advance Cargo Manifest Information Requirements Effective 1 Jun"
8. Handelsblatt Global: "German Banks Stand by Iran Despite 'Strongest Sanctions in History'"
9. ST&R Trade Report: "Export Procedures, ITDS, Food Facilities, Seafood Trade Among Topics of Upcoming Rules"
10. Techrunch: "U.S. and China Reportedly Working on a Deal to Save ZTE"
11. Washington Examiner: Senators Warn Trump: Don't Give China 'Access to U.S.-Made Military Technologies'"
12. The Washington Post: "China's ZTE Has Long Been on Washington's Radar, For Quite a Few Reasons. Here's the Story"

COMMENTARY

13.    J. Schmidt, A. Gutermuth & S. Jungermann: "UK Mergers, Military, and Technology"

14.    K.C. Georgi: "CBP Issues Instructions for Steel and Aluminum Products Granted Section 232 Exclusions"

15.    L. Luo: "Minefields in the U.S. Export Control System" (Part I of II)

EX/IM TRAINING EVENTS & CONFERENCES

16.    ECTI Presents "Export Controls 101: Starting at the Beginning," Webinar on 19 Jun

17.    The Massachusetts Export Center Presents: "Export Regulatory Compliance Update", 14 Jun in Boston

EDITOR'S NOTES

18.    Bartlett's Unfamiliar Quotations

19.    Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (17 May 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

20.    Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. Commerce/BIS Reminds U.S. Firms of Requirement to Annually Report Defense Offset Agreements

(Source: Commerce/BIS, 23 May 2018.) [Excerpts.]

83 FR 23885: Reporting for Calendar Year 2017 on Offsets Agreements Related to Sales of Defense Articles or Defense Services to Foreign Countries or Foreign Firms

* AGENCY: Bureau of Industry and Security, Department of Commerce.
* ACTION: Notice; annual reporting requirements.
* SUMMARY: This notice is to remind the public that U.S. firms are required to report annually to the Department of Commerce (Commerce) information on contracts for the sale of defense articles or defense services to foreign countries or foreign firms that are subject to offsets agreements exceeding $5,000,000 in value. U.S. firms are also required to report annually to Commerce information on offsets transactions completed in performance of existing offsets commitments for which offsets credit of $250,000 or more has been claimed from the foreign representative. This year, such reports must include relevant information from calendar year 2017 and must be submitted to Commerce no later than **June 15, 2018**. ...
* SUPPLEMENTARY INFORMATION: ... Section 723(a)(1) of the Defense Production Act of 1950, as amended (DPA) (50 U.S.C. 4568 (2015)) requires the President to submit an annual report to Congress on the impact of offsets on the U.S. defense industrial base. Section 723(a)(2) directs the Secretary of Commerce (Secretary) to prepare the President's report and to develop and administer the regulations necessary to collect offsets data from U.S. defense exporters.

 The authorities of the Secretary regarding offsets have been delegated to the Under Secretary of Commerce for Industry and Security. The regulations associated with offsets reporting are set forth in part 701 of title 15 of the Code of Federal Regulations (Offsets Regulations). Offsets are compensation practices required as a condition of purchase in either government-to-government or commercial sales of defense articles and/or defense services, as defined by the Arms Export Control Act (22 U.S.C. 2778) and the International Traffic in Arms Regulations (22 CFR 120-130). Offsets are also applicable to certain items controlled on the Commerce Control list (CCL) and with an Export Control Classification Number (ECCN) including the numeral ``6'' as its third character. The CCL is found in Supplement No. 1 to part 774 of the Export Administration Regulations.

 An example of an offset is as follows: A company that is selling a fleet of military aircraft to a foreign government may agree to offset the cost of the aircraft by providing training assistance to plant managers in the purchasing country. Although this distorts the true price of the aircraft, the foreign government may require this sort of extra compensation as a condition of awarding the contract to purchase the aircraft. As described in the Offsets Regulations, U.S. firms are required to report information on contracts for the sale of defense articles or defense services to foreign countries or foreign firms that are subject to offsets agreements exceeding $5,000,000 in value. U.S. firms are also required to report annually information on offsets transactions completed in performance of existing offsets commitments for which offsets credit of $250,000 or more has been claimed from the foreign representative.

Commerce's annual report to Congress includes an aggregated summary of the data reported by industry in accordance with the offsets regulation and the DPA (50 U.S.C. 4568 (2015)). As provided by section 723(c) of the DPA, BIS will not publicly disclose individual firm information it receives through offsets reporting unless the firm furnishing the information specifically authorizes public disclosure. The information collected is sorted and organized into an aggregate report of national offsets data, and therefore does not identify company-specific information.

To enable BIS to prepare the next annual offset report reflecting calendar year 2017 data, affected U.S. firms must submit required information on offsets agreements and offsets transactions from calendar year 2017 to BIS no later than June 15, 2018.

Dated: May 18, 2018.
Richard E. Ashooh, Assistant Secretary for Export Administration.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. State Releases Determinations under the Arms Export Control Act
(Source: Federal Register, 23 May 2018.)

83 FR 23988: Determination and Certification Under Section 40A of the Arms Export Control Act

Pursuant to section 40A of the Arms Export Control Act (22 U.S.C. 2781), and Executive Order 13637, as amended, I hereby determine and certify to the Congress that the following countries are not cooperating fully with United States antiterrorism efforts: Eritrea, Iran, Democratic People's Republic of Korea (DPRK, or North Korea), Syria, and Venezuela.

This determination and certification shall be transmitted to the Congress and published in the Federal Register.

Dated: May 5, 2018.
Michael Pompeo, Secretary of State.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* President; EXECUTIVE ORDERS; Venezuela; Prohibiting Additional Transactions (EO 13835) [Publication Date: 24 May 2018.]

* Commerce; Industry and Security Bureau; PROPOSED RULES; Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control under the United States Munitions List [Publication Date: 24 May 2018.]

* State; PROPOSED RULES; International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III [Publication Date: 24 May 2018.]

*[Editor's Note: The Commerce and State notices were included in the 15 May 2018 Daily Bugle, items #4 and #5, respectively.]*

back to top

* * * * * * * * * * * * * * * * * * *

4.
Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

5.
State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * *

NEWS

6.
American Shipper: "EU, India File Retaliatory Tariffs on U.S. Goods"
(Source: American Shipper, 22 May 2018.) [Excerpts.]

The planned tariffs on more than $7 billion in exports from the United States are in response to recently announced U.S. duties on steel and aluminum.

The European Union and India have filed separate lists of planned tariffs with the World Trade Organization that would target more than $7 billion in annual exports from the United States.

The move is a direct response to recently announced of 25 percent and 10 percent, respectively, on U.S. imports of steel and aluminum, as both the EU

and India seek to recoup the expected revenue that will be lost upon imposition of those tariffs by the United States.

The EU, which has been outspoken in its opposition to the U.S. tariffs since President Donald Trump announced them in early March, said the U.S. measures would affect at least $7.2 billion in imports of steel and aluminum products from the bloc into the United States and, therefore, would constitute an addition $1.6 million in duties based on 2017 figures. ...

back to top

＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊

## 7. Expeditors News: "China to Amend Advance Cargo Manifest Information Requirements Effective 1 Jun"
(Source: Expeditors News, 22 May 2018.)

On 1 June 2018, the General Administration of Customs of the People's Republic of China ("GACC") will amend its advance cargo information requirements for imports and exports according to GACC Announcement No. 56.

The notice requires additional data elements to be communicated related to Inbound and Outbound Transportation by Air and Sea. The purpose of this announcement per the GACC is to "enhance the control over inbound/outbound vessels, aircrafts and the goods thereon by means of data declaration...."

Some of the additional data elements required are:

 - Consignor Contact Number
 - Consignor Specific Contact Name
 - Consignor Enterprise Registration Code or Unified Social Credit Code
 - Consignee Contact Number
 - Consignee Specific Contact Name
 - Consignee Enterprise Registration Code or Unified Social Credit Code
 - Notifier Contact Number (if consignee is TO ORDER)
 - Notifier Specific Contact Name (if consignee is TO ORDER)
 - Notifier Registration Code or Unified Social Credit Code (if consignee is TO ORDER)
 - Complete and accurate brief description of goods
 - Manifest data must be transmitted to the GACC prior to arrival or departure within the timeframes prescribed per mode of transportation.

The notice may be found here in Chinese. An English translation may be found here.

back to top

＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊

## 8. Handelsblatt Global: "German Banks Stand by Iran Despite 'Strongest Sanctions in History'"
(Source: Handelsblatt Global, 22 May 2018.)

Six small credit unions in southern Germany are still processing payments to Iran, undaunted by the wrath of Trump.

While Germany's big banks are studiously avoiding Iran-related deals for fear of US reprisals, six credit unions, or *Volksbanken*, from southern Germany are appear unafraid and are continuing to provide trade finance.

Patrizia Melfi, head of the International Competence Center, which was set up by the banks to handle foreign business, said the supervisory board "gave us the green light on Thursday." Days later, the US' Secretary of State Mike Pompeo threatened to impose "the strongest sanctions in history" after the United States pulled out of the 2015 nuclear deal this month.

Despite Washington's hard line on Tehran, the center will keep handling transactions for companies that export goods and services to Iran. Their affairs will likely continue unimpeded until early August, when the United States' new rules come into effect. For now, the US has yet to enact legally-binding sanctions.

Basically, as long as companies and banks stick to the requirements and regulations of the current export controls of the EU and the US, nothing can happen to them, Ms. Melfi said. She added it was essential "to be well informed and conduct detailed checks of the companies' deals." ...

back to top

❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄

## 9. ST&R Trade Report: "Export Procedures, ITDS, Food Facilities, Seafood Trade Among Topics of Upcoming Rules"
(Source: Sandler, Travis & Rosenberg Trade Report, 23 May 2018.)

New rules on seafood trade as well as proposed and final rules on topics such as the International Trade Data System, export procedures, and food facility registration are among the regulations set forth in the semiannual regulatory agendas recently issued by a number of federal agencies. These online resources list the following regulations affecting international trade that could be issued within the next year, with the expected timeframes indicated in parentheses.

*Upcoming Regulations*

- a State Department final rule clarifying when exports may be made to or on behalf of a U.S. government agency without a license and expanding this exemption to allow for permanent exports (May 2018; previously December 2017) ...

- a State Department final rule clarifying the requirements for the licensing and registration of U.S. persons providing defense services while in the employ of foreign persons (December 2018) ...

- a proposed rule from the Justice Department's Bureau of Alcohol, Tobacco, Firearms, and Explosives to replace the term "specifically designed" with the term "specially designed" in 27 CFR Part 447 to make terminology consistent between the U.S. Munitions Import List, the International Traffic in Arms Regulations, and the Commerce Control List (December 2018; previously September) ...

*Completed Rulemakings*

- a State Department final rule adding South Sudan to the regulations on prohibited exports, imports, and sales to and from certain countries

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 10. Techrunch: "U.S. and China Reportedly Working on a Deal to Save ZTE"
(Source: Techrunch, 22 May 2018.) [Excerpts.]

The United States and China are said to be working on a deal that would keep ZTE from going out of business. According to the Wall Street Journal, the two countries have agreed on a "broad outline" of a deal to settle a trade dispute sparked when the Commerce Department banned American companies from selling to ZTE for seven years after it violated sanctions against Iran and North Korea.

If the deal goes through, the U.S. would lift the ban. In return, ZTE would have to make major leadership changes and also potentially face heavy fines. The deal would enable its business to survive, however, since many of its most important suppliers, including Qualcomm, are American and the ban has the potential to cause irreversible damage to its business. ZTE is also the fourth-largest vendor of mobile phones in the U.S.

As part of the deal, China reportedly offered to remove tariffs that impact billions of dollars in U.S. farm products, though one of the WSJ's sources said "the White House was meticulous in affirming that the case is a law enforcement matter and not a bargaining chip in negotiations." ...

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 11. Washington Examiner: Senators Warn Trump: Don't Give China 'Access to U.S.-Made Military Technologies'"
(Source: Washington Examiner, 22 May 2018.) [Excerpts.]

China must not be granted "access to U.S.-made military technologies and advanced dual-use technologies" in exchange for better trade relations, more than two dozen senators warned President Trump's economic team.

"We strongly support these critical negotiations to rebalance the U.S.-China economic relationship, but U.S. national security must remain the paramount consideration," Senate Majority Whip John Cornyn, R-Texas, and Florida Republican Sen. Marco Rubio wrote in a letter signed by 25 other lawmakers. "Therefore, we strongly urge you to reject any proposal by China to loosen existing restrictions on the export or other transfer of these sensitive U.S. technologies."

"Any such move would bolster China's aggressive military modernization and significantly undermine long-term U.S. national security interests," the lawmakers continued. ...

Trump's team is split between free-trade advocates and protectionists. The free-traders, led by Treasury Secretary Steven Mnuchin, reportedly have considered making it easier for Chinese companies to purchase "militarily sensitive products," according to the New York Times. ...

back to top

* * * * * * * * * * * * * * * * * * * * *

## 12.
### The Washington Post: "China's ZTE Has Long Been on Washington's Radar, For Quite a Few Reasons. Here's the Story"
(Source: The Washington Post, 22 May 2018.) [Excerpts.]

What is ZTE, and what's the backstory on this Chinese telecom infrastructure and cellphone company? On May 13, President Trump tweeted that he was at work with China's leader to save ZTE jobs.

A day later, amid criticism over why Chinese jobs were a priority during trade and investment negotiations with China, Trump tweeted: "ZTE, the large Chinese phone company, buys a big percentage of individual parts from U.S. companies. This is also reflective of the larger trade deal we are negotiating with China and my personal relationship with President Xi."

Republicans and Democrats continued to question Trump's actions, and much of the discussion has blended two separate - but related - struggles ZTE has experienced with the U.S. government. ...

ZTE has long drawn scrutiny in Washington as a possible partner of Chinese intelligence or military agencies. U.S. officials believe ZTE products could help Chinese authorities gather information or interfere with U.S. networks. ...

back to top

* * * * * * * * * * * * * * * * * * *

## 13. J. Schmidt, A. Gutermuth & S. Jungermann: "UK Mergers, Military, and Technology"
(Source: Arnold & Porter, 17 May 2018.)

* Authors: John Schmidt, Esq., john.schmidt@arnoldporter.com; Axel Gutermuth, Esq., axel.gutermuth@arnoldporter.com; and Sebastian Jungermann, Esq., sebastian.jungermann@arnoldporter.com. All of Arnold & Porter, London, Brussels, and Frankfurt, respectively.

The UK's merger control regime is changing as of 11 June 2018 in industries that are sensitive to national security concerns. The main aim is to allow political intervention in even very small acquisitions by non-UK companies where there might be a concern around non-UK ownership and use of such technology.

Two statutory instruments were made yesterday introducing lower thresholds to capture smaller transactions in three areas of heightened national interest: (1) military or dual use products subject to export control (2) quantum technology and (3) computing processing units (hardware and software). For such deals the target's turnover of £1 million is sufficient to trigger CMA jurisdiction or, alternatively, the share of supply test of 25 percent can be met by the target alone without the need for an increment.

Filings in those sectors will remain voluntary and there is no waiting period before completion, unless the CMA imposes interim hold separate obligations pending any investigation. The main aim of the lower thresholds is to allow the Secretary of State to intervene in cases of national (security) interest where the company is acquired by non-UK entities. Links to the two statutory instruments are provided here and here.

In parallel, the German and Austrian competition authorities are consulting on draft Guidelines on the new lower transaction thresholds. The authorities there seem to be targeting particularly big data, digital and pharma and biotech companies as well as medical engineering. Partners John Schmidt in London Axel Gutermuth in Brussels and Sebastian Jungermann in Frankfurt can give you more details on this.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14.
## K.C. Georgi: "CBP Issues Instructions for Steel and Aluminum Products Granted Section 232 Exclusions"

(Source: Author, 22 May 2018.)

* Authors: Kay C. Georgi, Esq., kaygeorgi@arentfox.com, Arent Fox LLP.

On March 8, 2018, President Trump formally announced and signed the proclamations to impose tariffs on steel and aluminum imports pursuant to Section 232 of the US Trade Expansion Act of 1962. In those Proclamations, the President indicated that a process would be established by the Department of Commerce (DOC), whereby requests for product exclusions from the Section 232 duties could be requested.

On March 19, 2018, the DOC published in the Federal Register (FR) the process for parties to submit requests for exclusions from Presidential Proclamations 9704 and 9705 on Adjusting Imports of Steel and Aluminum into the United States under section 232 of the Trade Expansion Act of 1962. See 83 FR 12106. In that FR notice, the DOC also provided that the effective date of any exclusion requests that were granted would be the date on which the request was posted by the DOC for public comment. As of May 18, 2018, over 3,700 requests for steel product exclusions, and over almost 300 requests for aluminum product exclusions, have been posted, with more being added on a daily basis.

Although the DOC has not yet issued any product exclusions, Customs and Border Protection (CBP) issued a notice on May 21, 2018, providing guidance on the manner in which imports whose exclusion requests are approved by the DOC should be entered in order to avoid the Section 232 duties. See CSMS #18-000352. This notice provides the following key points:

*General Process for Imports Subject to Exclusions*

 - The process to claim exclusions will be available starting **June 1**.
o          Prior to that, one must make a post summary correction (PSC) to apply the exemption.
 - Importers and filers importing products granted an exclusion should submit the product exclusion number based on the last six digits of the product exclusion docket number (e.g., BIS-XXXX-XXXX-XXXX) found in the steel and aluminum exclusion request docket folders.
 - The product exclusion number should be submitted in the Importer Additional Declaration Field (54 record) of the entry summary data, based on the following format, where "XXXXXX" represents the last six digits of the BIS docket number (see links above):
o          For excluded steel mill articles = STLXXXXXX
o          For excluded aluminum articles = ALUXXXXXX
*Note: Do not include spaces or special characters, such as hyphens.* For example, according to CBP, exclusion number BIS-2018-0009-9002 should be submitted as "STL099002."
 - Only products from importer(s) designated in the product exclusion approved by the DOC are eligible for the exclusion from the Section 232 measures.

o          Steel importers are reminded to submit mill certificates with their import data as required by 19 CFR 141.89.
  - Do not submit the corresponding Chapter 99 HTS number for the Section 232 duties when the product exclusion number is submitted.

*Additional Information*

  - **Effective Date of Exclusions:** Exclusions granted by DOC are retroactive on imports to the *date the request for exclusion was posted for public comment.*
  - **Refund Requests:** To request an administrative refund for previous imports of excluded products granted by DOC, importers may file a PSC and provide the product exclusion number in the Importer Additional Declaration Field.
  - **GSP and AGOA-eligible Goods:** Once products are excluded from the Section 232 measures, importers may claim Generalized System of Preferences (GSP) or African Growth and Opportunity Act (AGOA) duty preferences on GSP and AGOA-eligible goods.
o          If importers did not receive GSP or AGOA duty preferences on previous imports, and those imports are now covered by a retroactive exclusion, importers may request a refund of the duties subject to GSP or AGOA preferences through a PSC.

For further information on the product exclusion process, please see our earlier alert.

back to top

* * * * * * * * * * * * * * * * * * * *

## 15. L. Luo: "Minefields in the U.S. Export Control System" (Part I of II)

(Source: King & Wood Mallesons, 14 May 2018.)

* Author: Laura Luo, Partner, Laura.Luo@us.kwm.com, King & Wood Mallesons, New York.

*[Editor's Note: due to space limitations, this item has been divided into two parts. The parts will be published in the Daily Bugle of Wednesday, 23 May 2018, and Thursday, 24 May 2018, respectively.]*

On 15 April 2018, the U.S. Department of Commerce's Bureau of Industry and Security (BIS) issued a denial order against a Chinese telecommunications company (hereinafter referred to as "Company Z"), and added the company to the "Denied Persons List." The case of Company Z's violation of U.S. export control, which has lasted for years, again came into the spotlight and raised public concern over the U.S. export control system in China.

The Export Administration Act (hereinafter referred to as "EAA") came into force in 1979. Since then, the U.S. has adopted the most rigorous export control system in the world. Meanwhile, for a long time, many Chinese

enterprises lacked awareness of the U.S. export control system, which made them key subjects of U.S. export control investigations. In the United States, China became the second target country of criminal investigation on export control as early as in 2014, just after Iran. [FN/1] In view of this, the Customs and Trade Compliance Team of King & Wood Mallesons (hereinafter referred to as "KWM") will enumerate key issues in the U.S. export control system that concern Chinese enterprises based on the in-effect statutes of U.S. export control and published PRC-related cases. As the first of a series of articles, we will review the "minefields" in U.S. export control frequently encountered by PRC enterprises.

### *"Minefields" Detection*

**Minefield One**: Export Control Applies to the Activities Beyond Actual Export
**Who Stepped into the Minefield:** Mr. Ho

*Case Introduction*

On April of 2016, U.S. Ministry of Justice accused an American citizen, Mr. Ho conspired to engage or participate in the development or production of special nuclear material in China, without specific authorization to do so from the U.S. Secretary of Energy, as required by law. It was claimed that Ho identified, recruited and executed contracts with U.S.-based experts from the civil nuclear industry who provided technical assistance related to the development and production of special nuclear material for a PRC company in China. Ho and the PRC Company also facilitated the travel to China and payments to the U.S.-based experts in exchange for their services. Ho was convicted guilty in violation of the relevant export control acts and statutes and was sentenced 24 months in prison and one year of supervised release eventually. [FN/2]

*Comments*

Pursuant to the Export Administration Regulation (hereinafter referred to as "EAR"), any U.S. origin items (including goods, software and technology), engaged in the activities of export, re-export (transmit U.S. origin items from one foreign country to another foreign country without U.S.) or transfer (transmit U.S. origin items within the same foreign country), shall subject to EAR. [FN/3] Moreover, in different from the common understanding on the definition of export that an export shall have an actual shipment out of the country, the definition of export is much wider subject to EAR. Other than the actual shipment or transmission of goods or technologies out of U.S., the sending information or even temporary transit will be deemed as export, re-export or transfer of U.S. items and such activities shall be subject to EAR. The following activities will be deemed as export, re-export or transfer under EAR, and was required to apply for a validated license in advance:

(1) Actual shipment or transmission of goods or technologies;
(2) Release information of controlled items to abroad through phone call;
(3) Release information of controlled items to abroad through email;

(4) Release information of controlled items to abroad through providing access authority of Cloud software or FTP;

(5) Providing technical drawings of the controlled items to abroad;

(6) Sending or taking information of controlled items to abroad

(7) Providing encryption source code and objective source code of controlled items to abroad;

(8) Providing proprietary courses regarding controlled items to abroad; and

(9) Under special circumstances (i.e. special controls of Cuba), temporary sojourn of the vessel and aircraft and in-transit shipments and items to be unladen from vessels or aircraft.

In practice, many Chinese enterprises just consider about the export issues on actual shipment or transmission of goods and technology, while overlook the fact that information release to abroad of controlled items is also deemed as export activities subject to EAR. In consideration of that it is one of the main causes for Chinese enterprise to be punished under EAR; we understand it is a main "Minefield" in U.S. export control.

> **Minefield Two:** Export Control Applies to the Transmission and Release of Controlled Items to Foreign Persons within the United States
> **Who Stepped into the Minefield:** Company M

*Case Introduction*

On September of 2005, Company M, which is located in California, released controlled technology for the development of electronic components classified as ECCN 3A001, to a Chinese national employee without the required BIS license. This case resulted from an investigation conducted by OEE, and on October 3, 2008, Company M agreed to pay a $192,000 civil penalty. [FN/5]

*Comments*

Pursuant to the relevant regulations of EAR, other than the cross-border shipment, transmission and information release, releasing or otherwise transferring the controlled items to a foreign person in U.S. is also deemed to be an export to a foreign country and may subject to the license requirement under EAR. [FN/5] Pursuant to the regulations of EAR, any foreign natural person within U.S. who is not a lawful permanent resident of U.S. or any other protected individual (in general as political asylum) shall be defined as foreign person. [FN/6] In common, the following activities will be defined as deemed export:

(1) Releasing information, materials, encryption source code and objective source code of controlled items to foreign employees

(2) Providing access or authorization of controlled items to foreign employees;

(3) Providing proprietary causes to foreign employees or non-U.S. citizens which may result in the release of information of controlled items;

(4) Releasing information of controlled items to overseas personnel who came to U.S. on business trip;

(5) Transferring the registration, control or ownership of certain controlled items to non-U.S. citizens in U.S.

Subject to the statistics of BIS, more than 60% export license application for deemed export occasion are issued to Chinese citizens or Chinese organizations which locate in the U.S. In other word, to Chinese enterprises, their business activities in U.S., such as the interpersonal communication with U.S. affiliates, certain investment and acquisition activities or employ a non-U.S. citizen technical personnel who used to work in the U.S., etc., may trap into the minefield of "deemed export", any carelessness will result a smash crisis.

> **Minefield Three:** Export Control Applies to Non-Listed Items
> **Who Stepped into the Minefield:** A Construction Co., Ltd (Hereinafter referred to as "Company A"), B Paint Trading Co., Ltd (Hereinafter referred to as "Company B")

*Case Introduction*

In 2006, Company A was involved in a Nuclear Power Construction Project in Pakistan ("Pakistan Project"). In this regard, Company A entered into a contract with Company B to procure non-special controlled item (EAR 99), epoxy coating from U.S. for use in construction Pakistan Project Construction. Since Pakistan Project is a project of the Pakistan Atomic Energy Commission ("PAEC"), while PAEC and its subordinate nuclear reactors are on BIS's Entity List. U.S.-origin epoxy coatings are not permitted to be exported, re-exported, or transferred for use in the construction of Pakistan Project without an export license from BIS. However, Company A and Company B colluded to circumvent the license requirement by means of procuring the epoxy coatings through a third party distributor, then transfer to Company A for Pakistan Project-use purpose. In December 2010, Company B in together with its U.S. parent company pleaded guilty and paid 3.75 million USD in criminal and civil fines. Thereafter, on December 3, 2012, Company A entered into a settlement agreement with BIS and a plea agreement with DOJ, which required Company A to pay 3 million USD in criminal and civil fines, implement an export control compliance program, and accept a five-year probationary period. In exchange, BIS would not put Company A into the entity list. The case is believed to be the first time that a Chinese company has pleaded guilty to violating U.S. export control laws.

*Comments*

Pursuant to EAR and its enclosed Commerce Control List (CCL), U.S. have classified all the U.S. items by ECCN code, which consists of 5 characters. The types of control of certain items could be determined by cross-checking on CCL and the Commerce Country Chart (CCC). In general, non-sensitive items (EAR 99) do not require a validated license, i.e., such items could export directly under the general license by declaring the general license information during export declaration. However, subject to EAR, the key concern of U.S. export control is dependent upon the knowledge of the end-use and end-user relating to a transaction of certain U.S. items, which is

called Catch-All Rules. [FN/7] Even though there is no special requirement on the items, a special license may still be required for the export, re-export or transfer of the items, provided that a risk of proliferation exists on the end-user or end-use. Recently, BIS releases three lists to identify the end-user reasonable believed to be involved a risk of proliferation and sets up different control requirement separately:

| Denied Persons List | Unverified List | Entity List |
|---|---|---|
| Any activities regarding export, re-export or transfer overseas of any U.S. items with such person and entities listed in the list are prohibited. | The export, re-export or transfer overseas with person and entities listed thereof shall enjoy license exception and before proceeding with any export, re-export or transfers, the listed entities must issue a written statement which shall be made in accordance with EAR. | No export, re-export , or transfer items to the listed entities without a license from BIS is permitted. |

Furthermore, in the event any circumstance of "red flags" [FN/8] as listed in EAR occurred in the transactions of non-listed U.S. items with non-listed entities, such as : the client is reluctant to offer information about the end-user, the client has little or no business background, the shipping route is abnormal for the product and destination etc., BIS requires the enterprise to fulfil the responsibilities of end-user and end-use verification, inquire BIS and apply for validated license if it is necessary.

Moreover, it shall be noted that U.S. items defined by EAR is not just the items located within U.S., such as:
 (1) U.S. origin items located out of U.S.;
 (2) Foreign-made commodities that incorporate controlled U.S. origin commodities in quantities exceeding the de minims levels (based on the characteristics and categories of the commodities, there are three de minims Rules, 0%, 10% and 25%);
 (3) Foreign-made direct products of U.S. origin technology or software;
 (4) Certain activities of U.S. persons related to the proliferation of nuclear explosive devices, no matter such items are origin from U.S.;

For Chinese enterprises, misjudgment on whether the business activities shall apply for an export license becomes the main cause for being punished by U.S. export control regulations, especially in the following circumstances:
 (1) Negligence on the confirmation of end-user and end-use of non-listed items for re-export or transfer in-country;
 (2) Erroneous understanding on the definition of U.S. items, misjudging some PRC origin commodities don't need to subject to the U.S. export control system;

Such erroneous judgement could be entitled as the biggest minefield for Chinese enterprise.

**Minefield Four**: Assistance from Non-U.S. Entity on Transaction Shall Applies to U.S. Export Control and Sanction Management
**Who Stepped into the Minefield**: Bank K

*Case Introduction*

On 31 July 2012, the Office of Foreign Assets Control ("OFAC") announced the imposition of sanctions against Bank K under the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (CISADA), claiming that Bank K provided hundreds of millions of dollars' worth of financial services to Iran banks, including holding accounts, making transfers, and paying their letters of credit. OFAC bared Bank K from directly accessing the U.S. financial system, and financial institutions may not open correspondent or payable-through accounts for Bank K in the United States. The other Chinese bank had to cease their business operation with Bank K to avoid being sanctioned by U.S. [FN/9]

*Comments*

In general, the main enforcement organizations of U.S. export control are BIS, which is responsible of controlling the export of dual-item and civil items, and Directorate of Defense Trade Controls ("DDTC"), which is responsible of controlling military items, on the export activities by U.S. persons and non-U.S. persons. The definition of U.S. persons generally includes the following:

  (1) Any individual in the U.S.;
  (2) Any individual who is a citizen of U.S., no matter where he is located;
  (3) Any permanent resident alien of U.S., or a protected individual of U.S.;
  (4) Any U.S. enterprises and their foreign branches;
  (5) Any foreign enterprises which are controlled de facto by U.S. citizens or U.S. enterprises.

Pursuant to the relevant regulations of BIS and DDTC, U.S. persons are not allowed to engage in any activities may violating the export control regulations, while the non-U.S. persons are not allowed to provide facilitation or take advantage of U.S. persons to engage in any activities may violating the export control regulations directly. Otherwise, apart from being punished by BIS and DDTC accordingly, the violators will be subject to OFAC's sanctions in further. However, since the adoption of CISADA in 2010, OFAC is eligible to implement a long-arm jurisdiction to the activities of violation of U.S. controls and sanction measures on Iran conducted by non-U.S. persons and without the jurisdiction of U.S., which is known as secondary sanction. OFAC could implement the sanctions as follow once the violation of U.S. sanction and export control by non-U.S. persons is detected:

  (1) Freezing or confiscation property in U.S.;
  (2) Prohibited from entering of U.S.;
  (3) Access denied of U.S. financial service system;
  (4) Deprivation of the qualification of signing contract with U.S. government;
  (5) Criminal Charges.

In the most recent sanction cases on North Korea Sanctions [FN/10], the secondary sanction methods have been expanded to the sanction against North Korea in further.

For Chinese enterprises, especially for the I/E agencies and financial institutions, it is not a good sign that OFAC is tending to expand the application scope of secondary sanction. A newly "Minefield" is laid in the middle of the trade route between Chinese enterprises and regions which are sanctioned by U.S.

-----------
[FN/1] See here.
[FN/2] See here.
[FN/3] See here.
[FN/4] See here.
[FN/5] 15 C.F.R. Part 734
[FN/6] 15 C.F.R. Part 734.2
[FN/7] 15 C.F.R. Part 732, supplement No.3
[FN/8] 15 C.F.R. Part 732, supplement No.3
[FN/9] See here.
[FN/10] See here.

back to top

* * * * * * * * * * * * * * * * * * *

## EX/IM TRAINING EVENTS & CONFERENCES

## 16. ECTI Presents "Export Controls 101: Starting at the Beginning," Webinar on 19 Jun
(Source: Danielle Hatch, danielle@learnexportcompliance.com.)

* What: Export Controls 101: Starting at the Beginning
* When: June 19, 2018; 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Felice Laird
* Register: Here or Danielle Hatch, call 540-433-3977, or email danielle@learnexportcompliance.com.

back to top

* * * * * * * * * * * * * * * * * * *

## 17. The Massachusetts Export Center Presents: "Export Regulatory Compliance Update", 14 Jun in Boston
(Source: Kathleen Newell, kathleen.newell@massexport.org.)

* What: <u>Export Regulatory Compliance Update</u> - Featuring Deputy Assistant Secretary of Commerce for Export Administration, Matt Borman.
* When: Thursday, 14 June 2018; 9:00 a.m. - 4:30 p.m.
* Where: 155 Seaport Blvd., Boston, MA
* Contact: Kathleen Newell, 617-973-8664
* Register: <u>Click here</u> for additional information and registration

back to top

* * * * * * * * * * * * * * * * * * * * * *

EDITOR'S NOTES

## 18. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Thomas Hood** (23 May 1799 - 3 May 1845; was an English poet, author, and humorist, best known for poems such as *"The Bridge of Sighs"* and *"The Song of the Shirt"*. William Michael Rossetti in 1903 called him "the finest English poet" between the generations of Shelley and Tennyson.)
  - *"Lives of great men oft remind us as we o'er their pages turn, That we too may leave behind us - Letters that we ought to burn."*

back to top

* * * * * * * * * * * * * * * * * * * * *

## 19. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* <u>ATF ARMS IMPORT REGULATIONS</u>: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: <u>81 FR 2657-2723</u>: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* <u>CUSTOMS REGULATIONS</u>: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Apr 2018: <u>83 FR 15736-15740</u>: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* <u>DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM)</u>: DoD 5220.22-M
  - Last Amendment: 18 May 2016: <u>Change 2</u>: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment

with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 17 May 2018: 83 FR 22842-22846: Revisions to the Unverified List (UVL)

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 4 May 2018: Harmonized System Update 1807, containing 289 ABI records and 60 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website.

BAFTR subscribers receive a 25% discount on subscriptions to the BITAR,
please contact us
to receive your discount code.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 20. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle
Top Stories" published here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by:
Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and
Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im
Daily Update is emailed every business day to approximately 8,000 readers
of changes to defense and high-tech trade laws and regulations. We check
the following sources daily: Federal Register, Congressional Record,
Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF,
DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White
House, and similar websites of Australia, Canada, U.K., and other countries
and international organizations.  Due to space limitations, we do not post
Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or
export-controlled information. All items are obtained from public sources or
are published with permission of private contributors, and may be freely
circulated without further permission, provided attribution is given to "*The
Export/Import Daily Bugle* of (date)". Any further use of contributors'
material, however, must comply with applicable copyright laws.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or
expert advice.  Consult your own legal counsel or compliance specialists
before taking actions based upon news items or opinions from this or other
unofficial sources.  If any U.S. federal tax issue is discussed in this
communication, it was not intended or written by the author or sender for tax
or legal advice, and cannot be used for the purpose of avoiding penalties
under the Internal Revenue Code or promoting, marketing, or recommending
to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing
the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ▮▮▮▮▮@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ▮▮▮▮@fullcirclecompliance.eu]
**Sent:** 5/24/2018 7:10:44 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0524 Thursday "Daily Bugle"



## Thursday, 24 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates. **[Caveat: Please see the GDPR privacy notice at Items #17 and #23 below to ensure that you continue receive the Daily Bugle.]**

### ITEMS FROM FEDERAL REGISTER

1.   President Prohibits Certain Additional Transactions with Respect to Venezuela

2.   Commerce/BIS Seeks Comments on Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the USML

3.   State Seeks Comments on Proposed USML Categories I, II, and III Revisions

### OTHER GOVERNMENT SOURCES

4.   Items Scheduled for Publication in Future Federal Register Editions

5.   Commerce/BIS Publishes Speeches Delivered at 2018 Annual Conference on Export Controls and Policy

6.   DHS/CBP Releases Notice Concerning Entry Summary Changes

7.   DoD/DSS Knowledge Center PCL inquiries Closed on 31 May, Open on 25 May

8.   State/DDTC: (No new postings.)

9.   UK OFSI Releases Guidance Concerning Breaches of Financial Sanctions

### NEWS

10.   American Shipper: "CBP Exploring 'Known Shipper' E-Commerce Concept"

11.   BBC News: "Iran Nuclear Deal: Khamenei Lists Demands for European Powers"

12.   The New York Times: "A Bid to Increase Gun Exports, Stalled After Sandy Hook, Moves Ahead"

13. Reuters: "Ukraine Adds Russian Tycoons and News Agency RIA to Sanctions List"

14. Reuters: "U.S. Targets Airlines in Latest Iran Sanctions Move"

15. ST&R Trade Report: "ACE Enhancements Include De Minimis, Importer ID, CEEs, Broker Permits"

16. WorldECR News Alert 24 May 2018

**COMMENTARY**

17. International Trade Compliance Update: "EU Blocking Regulation"

18. J. Reeves & K. Heubert: "A Primer on the Export Administration Regulations"

19. L. Luo: "Minefields in the U.S. Export Control System" (Part II of II)

20. Gary Stanley's EC Tip of the Day

**EX/IM TRAINING EVENTS & CONFERENCES**

21. ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 12-13 Sep in Annapolis, MD

**EDITOR'S NOTES**

22. Bartlett's Unfamiliar Quotations

23. The Daily Bugle Updates Privacy Policy to Comply with EU's GDPR

24. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (17 May 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

25. Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

DOC_0001947

## 1. President Prohibits Certain Additional Transactions with Respect to Venezuela
(Source: Federal Register, 24 May 2018.)

83 FR 24001-24002: Prohibiting Certain Additional Transactions with Respect to Venezuela

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.), and section 301 of title 3, United States Code, I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015, and relied upon for additional steps taken in Executive Order 13808 of August 24, 2017 and Executive Order 13827 of March 19, 2018, particularly in light of the recent activities of the Maduro regime, including endemic economic mismanagement and public corruption at the expense of the Venezuelan people and their prosperity, and ongoing repression of the political opposition; attempts to undermine democratic order by holding snap elections that are neither free nor fair; and the regime's responsibility for the deepening humanitarian and public health crisis in Venezuela, hereby order as follows:

Section 1.
  (a) All transactions related to, provision of financing for, and other dealings in the following by a United States person or within the United States are prohibited:

> (i) the purchase of any debt owed to the Government of Venezuela, including accounts receivable;
> (ii) any debt owed to the Government of Venezuela that is pledged as collateral after the effective date of this order, including accounts receivable; and
> (iii) the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest.

  (b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the effective date of this order.

Sec. 2.
  (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.
  (b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 3. For the purposes of this order:

(a) The term "person" means an individual or entity;

(b) The term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches of such entities), or any person within the United States; and

(d) the term "Government of Venezuela" means the Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela.

Sec. 4. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including promulgating rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order. The Secretary of the Treasury may, consistent with applicable law, re-delegate any of these functions to other officers and executive departments and agencies of the United States Government. All agencies of the United States Government shall take all appropriate measures within their authority to carry out the provisions of this order.

Sec. 5. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Sec. 6. This order is effective at 12:30 p.m. eastern daylight time on May 21, 2018.

(Presidential Sig.)
THE WHITE HOUSE,
May 21, 2018.

back to top

* * * * * * * * * * * * * * * * * * *

## 2. Commerce/BIS Seeks Comments on Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the USML

(Source: Federal Register, 24 May 2018.) [Excerpts.]

83 FR 24166-24195: Control of Firearms, Guns, Ammunition and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List (USML)

* AGENCY: Bureau of Industry and Security, Department of Commerce.
* ACTION: Proposed rule.

* SUMMARY: This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I--Firearms, Close Assault Weapons and Combat Shotguns; Category II--Guns and Armament; and Category III--Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list.
* DATES: Comments must be received by **July 9, 2018**.
* ADDRESSES: You may submit comments by any of the following methods:
    - Submit comments via Federal eRulemaking
Portal: http://www.regulations.gov. You canfind this proposed rule by searching on its regulations.gov docket number, which is BIS-2017-0004.
    - By mail or delivery to Regulatory Policy Division, Bureau of Industry and Security, U.S. Department of Commerce, Room 2099B, 14th Street and Pennsylvania Avenue NW, Washington, DC 20230. Refer to RIN 0694-AF47.
* FOR FURTHER INFORMATION CONTACT: Steven Clagett, Office of Nonproliferation Controls and Treaty Compliance, Nuclear and Missile Technology Controls Division, tel. (202) 482-1641 or email steven.clagett@bis.doc.gov.
* SUPPLEMENTARY INFORMATION: ...

The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments. The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items. ...

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non- military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

This proposed rule does not deregulate the transferred items. BIS would require licenses to export, or reexport to any country a firearm or other

weapon currently on the USML that would be added to the CCL by this proposed rule. BIS would also require licenses for the export or reexport of guns and armament that would be controlled under new ECCN 0A602, such as guns and armaments manufactured between 1890 and 1919 to all destinations except Canada. As compared to decontrolling firearms and other items, in publishing this proposed rule, BIS, working with the Departments of Defense and State, is trying to reduce the procedural burdens and costs of export compliance on the U.S. firearms industry while allowing the U.S. Government to enforce export controls for firearms appropriately and to make better use of its export control resources. BIS encourages comments from the public on this aspect of the proposed rule. ...

BIS believes the control of these firearms under the EAR is justified because the firearms described in this proposed rule are either not inherently military or do not warrant the obligations that are imposed under the ITAR pertaining to such items. After review, the Defense Department, in conjunction with the Departments of State and Commerce, concluded that the firearms in this proposed rule also do not provide a critical military or intelligence advantage to the United States, are not the types of weapons that are almost exclusively available from the United States, and are manufactured from "technology" that is widely available. Moreover, the firearms have commercial and other non-military characteristics that distinguish them from other articles controlled under the ITAR. There is a significant worldwide market for firearms in connection with civil and recreational activities such as hunting, marksmanship, competitive shooting, and other non-military activities. Because of the popularity of shooting sports in the United States, for example, many large chain retailers carry a wide inventory of the firearms described in the new ECCNs for sale to the general public. Firearms available through U.S. retail outlets include rim fire rifles, pistols, modern sporting rifles, shotguns, and large caliber bolt action rifles, as well as their "parts," "components," "accessories" and "attachments."

An additional justification for the change in the jurisdictional status of the items described in this rule is that the current ITAR controls burden U.S. industry without any proportionate benefits to United States national security or foreign policy objectives. Similar to the challenges faced by other industries, the firearms trade has been negatively affected by the incentives the ITAR creates for foreign manufacturers to avoid U.S.-origin content. Currently, under the ITAR, any part, component, accessory, or attachment for any of the firearms described in this proposed rule remains ITAR controlled, regardless of its significance, when incorporated into foreign-made items or reexported to any third country. Under the EAR, the de minimis provisions may, in certain cases, mean a foreign item that incorporates U.S.-origin content may not be subject to the EAR, provided the U.S.-origin items meet the applicable de minimis level for the country of reexport. Similarly, a technical drawing of such part, component, accessory or attachment is ITAR controlled, as is the provision of a "defense service" to a foreign person concerning those items, such as the application of protective coatings. Moreover, a U.S. person engaged in manufacturing or exporting these items or providing related defense services must register with the State Department under the ITAR. Thus, even if a U.S. company can manufacture or service these items at a lower cost in the United States as compared to the cost for a U.S. or foreign company to manufacture or service the items outside of the

United States, the ITAR's restrictions may render the items unattractive or uncompetitive for foreign manufacturers. The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR.

The EAR also includes well-established and well understood criteria for excluding certain information from the scope of what is "subject to the EAR." (See part 734 of the EAR.) Items that would move to the CCL would be subject to existing EAR concepts of jurisdiction and controls related to "development" and "production," as well operation, installation, and maintenance "technology." While controlling such "technology," as well as other "technology" is important, the EAR includes criteria in part 734 that would exclude certain information and software from control. For example, if a gun manufacturer posts a firearm's operation and maintenance manual on the internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR." (See Sec. Sec. 734.3(b) and 734.7(a).) Non-proprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR. (See Sec. 734.3(b)(3)(v).) ...

In addition, this rule would clarify the scope of some ECCNs currently on the CCL. This rule would also renumber these ECCNs to place certain firearms-related items currently on the CCL in closer proximity to the firearms-related items that would be removed from the USML and added to the CCL to make it easier to identify and classify such items.

BIS is interested in comments in response to this proposed rule as to whether the public find this reorganization helpful. In some instances, the juxtapositions resulting from this reorganization highlight different license requirements and licensing policies for various firearms and related items. The public is invited to comment on the appropriateness of these license requirements and licensing policies. The public is also encouraged to comment on whether or not the proposed rule describes items that are not widely available in commercial outlets.

Detailed Description of Changes Proposed by This Rule ...

Dated: May 4, 2018.
Richard E. Ashooh, Assistant Secretary for Export Administration.

back to top

* * * * * * * * * * * * * * * * * * *

## 3. State Seeks Comments on Proposed USML Categories I, II, and III Revisions

(Source: Federal Register, 24 May 2018.) [Excerpts.]

83 FR 24198-24205: International Traffic in Arms Regulations: U.S. Munitions List Categories I, II, and III
* AGENCY: Department of State.
* ACTION: Proposed rule.

* SUMMARY: The Department of State (the Department) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR).
* DATES: The Department will accept comments on this proposed rule until **July 9, 2018**.
* ADDRESSES: Interested parties may submit comments within 45 days of the date of publication by one of the following methods:
    - Email: DDTCPublicComments@state.gov with the subject line, "ITAR Amendment--Categories I, II, and III."
    - Internet: At www.regulations.gov, search for this notice using Docket DOS-2017-0046.
    Comments received after that date will be considered if feasible, but consideration cannot be assured. Those submitting comments should not include any personally identifying information they do not desire to be made public or information for which a claim of confidentiality is asserted, because those comments and/or transmittal emails will be made available for public inspection and copying after the close of the comment period via the Directorate of Defense Trade Controls website at www.pmddtc.state.gov. Parties who wish to comment anonymously may do so by submitting their comments via www.regulations.gov, leaving the fields that would identify the commenter blank and including no identifying information in the comment itself.
* FOR FURTHER INFORMATION CONTACT: Robert Monjay, Office of Defense Trade Controls Policy, Department of State, telephone (202) 663-2817; email DDTCPublicComments@state.gov. ATTN: Regulatory Change, USML Categories I, II, and III.
* SUPPLEMENTARY INFORMATION: ...

    The Department of State is engaged in an effort to revise the U.S. Munitions List so that its scope is limited to those defense articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. The articles now controlled by USML Categories I, II, and III that would be removed from the USML under this proposed rule do not meet this standard, including many items which are widely available in retail outlets in the United States and abroad.

*Revision of Category I*

    This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501,

0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I and are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".

*Revision of Category II*

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f), engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (11).

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II and are described in the purchase documentation submitted with the application.

*Revision of Category III*

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III and are described in the purchase documentation submitted with the application.

*Conforming ITAR Changes*

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions at Sec. 123.17(a) through (e), which describe the firearms exemptions, because the paragraphs will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, Sec. 123.16(b)(6) will be revised to describe only the remaining exemption at Sec. 123.17 (personal protective gear), and Sec. 123.16(b)(7) will be reserved. Section 123.17 will be amended to remove paragraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of Sec. 124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in Sec. 126.1(s) will be revised to remove reference to the firearms exemption in Sec. 123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are on the USMIL for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations.

*Request for Comments*

The Department welcomes comments from the public and specifically requests input on the following matters:

(1) A key goal of this rulemaking is to ensure the USML and the CCL together control all the items that meet Wassenaar Arrangement commitments embodied in its Munitions List Categories 1, 2 and 3 (WA-ML1, WA-ML2 and WA-ML3). Readers are asked to identify any potential gap in coverage brought about by the changes for USML Categories I, II and III contained in this notice and the new Category 0, 0x5zz ECCNs published separately by the Department of Commerce when reviewed together.

(2) The Department seeks to establish clear distinctions between the USML and the CCL for the control of firearms, large guns, armaments, ordnance and ammunition. The public should provide any specific examples of firearms (or parts, components, accessories thereof), large guns, armaments, ordnance or ammunition whose jurisdiction is unclear based on this revision.

(3) The Department has, in the past, adopted a delayed effective date of 180 days for rules revising entire categories of the USML and moving items to the CCL. The Department seeks to allow industry sufficient time to implement this rule, including time to make changes to IT systems, technology controls plans, and other business processes. The public should provide input on the time necessary to implement any final rule for these categories, as well as a description of any increased burden that, in the view of the commenter, would be imposed on businesses or individuals should this rule be adopted. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 4. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* DHS/CBP; NOTICES: Agency Information Collection Activities; Proposals, Submissions, and Approvals:
 - Application for Allowance in Duties; and
 - Petition for Remission or Mitigation of Forfeitures and Penalties Incurred [Publication Dates: 24 May 2018.]

* ITA; NOTICES; Generalized System of Preferences: Possible Modifications, 2017 Review [Publication Date: 24 May 2018.]

* Treasury/OFAC; NOTICES; Blocking or Unblocking of Persons and Properties [Publication Date: 24 May 2018.]

back to top

* * * * * * * * * * * * * * * * * * * *

## 5. Commerce/BIS Publishes Speeches Delivered at 2018 Annual Conference on Export Controls and Policy
(Source: Commerce/BIS, 15 May 2018.)

BIS has posted on its website the following remarks delivered at its 2018 Annual Conference on Export Controls and Policy in Washington, DC, on 14-15 May 2018:

 - Remarks of Assistant Secretary for Export Administration Richard Ashooh, 15 May 2018
 - Remarks of the Secretary of Commerce Wilbur Ross, 14 May 2018

back to top

* * * * * * * * * * * * * * * * * * * *

## 6.
## DHS/CBP Releases Notice Concerning Entry Summary Changes
(Source: CSMS# 18-000358, 23 May 2018.)

CBP plans to deploy Entry Summary changes to CERT for Tariff Rate Adjustment validations (see CSMS Message #: 18-000349) on 5/24/2018, with the new functionality being available for testing by 10:00 AM ET on 5/24/2018.

back to top

* * * * * * * * * * * * * * * * * * * *

## 7.
## DoD/DSS Knowledge Center PCL inquiries Closed on 31 May, Open on 25 May
(Source: DoD/DSS, 23 May 2018.)

Personnel Security (PCL) inquiries (option #2) to include e-QIP authentication resets of the DSS Knowledge Center will not be closed on Friday, 25 May. The

DSS Knowledge Center will be closed Thursday, 31 May, from 8 a.m. to noon, for the purpose conducting internal training to deliver the highest quality customer service to Industry and Government callers. Normal operations for PCL and e-QIP inquiries will resume at 12:01 p.m. on 31 May.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9.
## UK OFSI Releases Guidance Concerning Breaches of Financial Sanctions
(Source: UK OFSI, 22 May 2018.) [Excerpts.]

If you suspect that a breach of financial sanctions has occurred, you need to contact the Office of Financial Sanctions Implementation (OFSI) at the earliest opportunity.

You are legally obliged to report to OFSI if, as a relevant institution, business or profession, you know or suspect that a breach of financial sanctions has occurred, that a person is a designated person, or you hold frozen assets and that knowledge or suspicion came to you while conducting your business. You must contact OFSI at the earliest opportunity.

EU regulations require individuals, entities and bodies to supply OFSI as soon as practicable with any information that would 'facilitate compliance' with the regulations. Any information provided will only be used for the purposes for which it was provided or received. This requirement applies to natural and legal persons, entities and bodies in the UK or under UK jurisdiction.

UK regulations, which enforce EU regulations, set out additional specific reporting obligations for a 'relevant institution' and a 'relevant business or profession'. All relevant institutions, businesses and professions are required, under UK law, to report information about designated persons, frozen assets or suspected breaches to OFSI if the information on which the knowledge or suspicion is based came to it in the course of carrying on its business. These reports are essential to help OFSI detect and address illegal activity. ...

The guidance is available here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10.
## American Shipper: "CBP Exploring 'Known Shipper' E-Commerce Concept"
(Source: American Shipper, 23 May 2018.) [Excerpts.]

*Commissioner Kevin McAleenan said officials are looking to balance trade enforcement and trade facilitation by incentivizing private-sector partnerships.*

U.S. Customs and Border Protection (CBP) is exploring a sort of "known shipper" approach for according trade-processing benefits to e-commerce "partners in compliance" as well as for holding transacting parties accountable for low-value shipment violations, CBP Commissioner Kevin McAleenan said Tuesday during the U.S. Chamber of Commerce's Sixth Annual Global Supply Chain Summit.

  "We want to explore trade benefit incentives in the e-commerce marketplace, not unlike the voluntary Customs-Trade Partnership Against Terrorism [CTPAT] approach," he said. "That way, we can focus on non-compliant trade while offering processing benefits to compliant importers. This kind of known shipper program could be a win-win for CBP and stakeholders in the e-commerce arena." ...

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 11.
## BBC News: "Iran Nuclear Deal: Khamenei Lists Demands for European Powers"
(Source: BBC News, 23 May 2018.) [Excerpts.]

Iran's Supreme Leader Ali Khamenei has set out several conditions for staying in the nuclear deal with world powers. ...

U.S. President Donald Trump has said he is withdrawing from the deal, and on Monday Secretary of State Mike Pompeo said sanctions lifted after the 2015 deal would be re-imposed. ...

The UK, France and Germany, meanwhile, have been trying to keep the deal alive, and Iran says it will restart its nuclear program unless its concerns are met.

*What Are Ayatollah Khamenei's Main Conditions?*

  - European powers should protect Iranian oil sales from the US sanctions and continue buying Iranian crude
  - European banks should safeguard trade with Iran

- The UK, France and Germany should pledge not to seek negotiations on Iran's ballistic missile program and regional activities, both demanded by Washington ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. The New York Times: "A Bid to Increase Gun Exports, Stalled After Sandy Hook, Moves Ahead"
(Source: The New York Times, 23 May 2018.) [Excerpts.]

The Trump administration wants to streamline the process for exporting American firearms, a change sought for years by domestic gun companies as a way to increase sales.

A proposed rule expected to be published in the Federal Register on Thursday would transfer jurisdiction of consumer gun exports from the State Department, where the licensing process is expensive and extensive, to the Commerce Department, which has a simpler application process.

Publication of the rule kicks off a 45-day comment period, after which departments including State and Commerce will review corrections and suggestions and then send a revised draft to Congress before final publication.

Gun industry groups said that the shift, which was first conceived during the Obama administration but halted after the Sandy Hook school shooting in 2012, would pare down a bureaucratic process that currently discourages American firearms companies from sending their products abroad. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. Reuters: "Ukraine Adds Russian Tycoons and News Agency RIA to Sanctions List"
(Source: Reuters, 24 May 2018.) [Excerpts.]

Ukraine has put Russian businessman Oleg Deripaska, whose company Rusal owns a large alumina plant in the country, and other prominent Russians on an expanded sanctions list, a document on the president's website showed on Thursday.

It was not clear what effect the blacklisting would have as many Russian companies have already sought to wind up their Ukraine-linked activities due to earlier sanctions.

But restrictions on Deripaska could affect the operations of the Mykolaiv plant in southern Ukraine, which is the second-largest alumina asset of his aluminum business Rusal. ...

Kiev first implemented sanctions against hundreds of Russian companies and entities after Moscow's annexation of Crimea in 2014 and over its support for a pro-Russian separatist uprising in eastern Ukraine.

Earlier in May it expanded these restrictions to mirror those of the United States, which blacklisted officials and businesspeople around President Vladimir Putin in April. This was one of Washington's most aggressive moves to punish Moscow for its alleged meddling in the 2016 U.S. election and other "malign activity".

Ukraine's updated list was published online on Thursday, confirming sanctions on Deripaska as well as on other Russian tycoons such as Viktor Vekselberg, owner of Renova holding group, and Alexei Miller, the CEO of Russia's gas exporter Gazprom.

The additions to the list also include the Ukraine operations of Russian state news agency RIA Novosti. ...

back to top

※※※※※※※※※※※※※※※※※※※

## 14. Reuters: "U.S. Targets Airlines in Latest Iran Sanctions Move"

(Source: Reuters, 24 May 2018.)

The United States on Thursday imposed sanctions on several Iranian and Turkish companies and a number of aircraft in a move targeting four Iranian airlines.

The companies targeted were linked to Mahan Air and Meraj Air, the U.S. Treasury Department said in a statement. It also said it was targeting a number of their aircraft, as well as aircraft from Caspian Airlines and Pouya Air.

The United States said the airlines had ferried weapons, fighters and money to proxies in Syria and Lebanon. Washington also threatened sanctions against those granting landing rights and providing services to the aircraft.

  "The deceptive practices these airlines employ to illegally obtain services and U.S. goods is yet another example of the duplicitous ways in which the Iranian regime has operated," U.S. Treasury Secretary Steven Mnuchin said in a statement.

The airlines were not immediately available for comment.

Washington also targeted three individuals, one from Turkey and two from Iran, who it said were linked to the airlines and aviation firms.

The sanctions were the latest in the United States' efforts to economically strangle Iran with the hopes of blocking the country's efforts to develop nuclear weapons.

Earlier this month, the United States withdrew from a 2015 nuclear accord that had lifted sanctions on Iran in exchange for curbs to its nuclear program, dismaying U.S. allies who want to preserve it.

The United Nations' International Atomic Energy Agency has said that Iran is compliant with the deal, but U.S. President Donald Trump said the entire accord is flawed because restrictions lapse over time and it does not address Iran's ballistic missile program or Tehran's role in regional conflicts.

On Tuesday, the United States imposed sanctions on five Iranians it said had provided Yemen's Houthi movement with weaponry and expertise to launch missiles at cities and oil infrastructure in Saudi Arabia.

Iran's supreme leader has laid out a number of conditions for Tehran to stay in the deal, and senior officials from the countries still in it - China, France, Germany, Iran, Russia and the United Kingdom - are meeting in Vienna on Friday to discuss the next steps.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. ST&R Trade Report: "ACE Enhancements Include De Minimis, Importer ID, CEEs, Broker Permits"
(Source: Sandler, Travis & Rosenberg Trade Report, 24 May 2018.)
[Excerpts.]

Enhancements to the Automated Commercial Environment for de minimis shipments, the importer ID form, foreign-trade zone entries, Centers of Excellence and Expertise, and customs broker national permits are among those that U.S. Customs and Border Protection anticipates making in fiscal year 2018 thanks to a congressional appropriation of $30 million. CBP states that a development and deployment schedule will be released later and that it will engage the trade community to refine trade-facing technical requirements and implementation plans.

**Section 321 Entries**. Under section 321 of the Trade Facilitation and Trade Enforcement Act, the maximum value of goods that can be imported free of duty and tax by one person on one day (the so-called de minimis value) was increased from $200 to $800 as of February 2016. CBP currently clears such goods off the manifest but is working to automate data collection on these shipments, which would create an additional pathway to clearance via development of an entry type 86 for ABI submission. This filing option will be optional for all filers but required for entries with partner government agency data.

**Importer ID Input Record**. CBP Form 5106 collects data used to establish bond coverage, release and entry of goods, liquidation, and the issuance of bills and refunds. CBP states that automating and updating the data elements captured in ACE for this form will (a) enable the collection of more detailed importer information to support more advanced risk analysis, (b) further improve revenue functions, and (c) provide for more streamlined processing for importers, brokers, sureties, and others through the ability to create, edit, and update importer information.

**FTZs**. The current process provides an electronic document to request the entry of cargo into a foreign-trade zone and electronic messaging when a cargo exam is required and goods have been authorized for a permit to transfer into an FTZ. The e214 redesign will enable the submission of PGA data simultaneously with the e214 via the PGA message set or the document image system when reporting FTZ admissions.

**CEEs**. CBP will create unique identifiers for its ten Centers of Excellence and Expertise that will be added to all post-release workflow in ACE. CBP states that designating the CEE code in entry summary, reconciliation, and protest transaction submissions will aid the transition to account-based processing.

**Broker National Permits**. In line with a forthcoming proposed rule that will update the customs broker regulations in 19 CFR 111, ACE will be enhanced to transition all brokers to a single national permit and eliminate multiple district permits and waivers. Brokers will be able to conduct entry via remote location filing at any port nationwide and will no longer have to pay the initial $100 permit fee and the annual $141.70 permit user fee per local permit.

**Truck Processing**. CBP will deploy drive-through multi-energy portal imaging systems to the Laredo World Trade Bridge and the Brownsville Veterans Bridge and allow non-intrusive inspections, which currently occur at secondary, to take place in pre-primary. CBP states that these capabilities are essential components of the cargo "model port" project for which initial pilots are slated this summer.

**GSP**. This enhancement will address mandatory updates related to the renewal of the Generalized System of Preferences and allow quicker payment of retroactive refunds when GSP expires and is later reinstated.

**Manifest**. CBP states that collecting shipper phone numbers as an optional data element on the manifest will help improve and strengthen the targeting of e-commerce shipments.

**Vessel Management**. This enhancement will allow for electronic receipts for vessel entry fees and the addition of an online payment option for vessel agents and owner operators.

back to top

* * * * * * * * * * * * * * * * * * * *

16. WorldECR News Alert 24 May 2018

DOC_0001963

(Source: WorldECR, 24 May 2018.)

(1) EU to use Blocking Regulation in response to US withdrawal from the JCPOA
(2) Russian parliament considers counter-sanctions bills
(3) US strengthens sanctions on Venezuela
(4) Japan's METI revises its End User List
(5) OFSI updates its monetary penalty guidance and compliance reporting form

*[Editor's Note: Click here to find information on how to subscribe to WorldECR, the journal of export controls and sanctions.]*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

## 17. International Trade Compliance Update: "EU Blocking Regulation"
(Source: International Trade Compliance Update, 22 May 2018.)

The European Commission has started the process by which it would add U.S. sanctions measures on Iran to the so-called Blocking Regulation (formerly Regulation 2271/96). This is in direct response to the U.S. President's withdrawal of his waiver relating to the JCPOA. The effect of the withdrawal was to reintroduce US sanctions that were in force prior to the JCPOA. U.S. sanctions on Iran not only impact US companies and persons, but can, in certain circumstances be applied to non-U.S. persons. The most important extension of U.S. jurisdiction relates to non-U.S. subsidiaries of U.S. companies. However, the U.S. also has powers to place so-called "secondary sanctions" on non-U.S. persons. These can be placed on any person (i.e., including non-US persons acting wholly outside U.S. jurisdiction) engaging in certain "sanctionable activities," as defined by the relevant U.S. laws and regulations. These "sanctionable activities" are detailed in OFAC's recent FAQ document available here. The U.S. Government has a considerable degree of discretion in determining whether to impose "secondary sanctions" on non-U.S. persons engaging in these "sanctionable activities," and this will likely depend in part on the nature and scope of the activities, the parties involved, etc.

Most countries, and all the other signatories of the JCPOA (UK, Russia, China, France and Iran) plus Germany have reaffirmed their adherence to the JCPOA.

**What does the Blocking Regulation do?**

The Blocking Regulation has four main elements.

First, it requires any EU person to notify the Commission of any effects on the economic and/or financial interests of that person caused by a measure blocked in the Annex.

Second, no judgment of a court or tribunal, and no decision of an administrative authority located outside the EU that gives effect, directly or indirectly, to the measure in the Annex, or to actions based thereon or resulting there from, shall be recognized or be enforceable in the EU in any manner. This is the main blocking measure.

Third, no EU person shall comply, whether directly or through a subsidiary or other intermediary person, actively or by deliberate omission, with any requirement or prohibition, including requests of foreign courts, based on or resulting, directly or indirectly, from the measures specified in the Annex or from actions based thereon or resulting therefrom. EU persons may be authorized, in accordance with the procedures provided in Articles 7 and 8, to comply fully or partially to the extent that non-compliance would seriously damage their interests or those of the Community.

Finally, an EU person shall be entitled to recover any damages, including legal costs, caused to that person by the application of the measures specified in the Annex or by actions based thereon or resulting therefrom. This is sometimes referred as the "clawback" measure.

### What is the process now being undertaken?

Based on a 2014 amendment to Regulation 2271/96, the Commission now has power, delegated to it from the Council, to add measures to the Annex of 2271/96. The process by which it is to do this is as follows:

As soon as it adopts a delegated act, the Commission notifies it to the European Parliament and to the Council. That delegated act can only enter into force only if:

 - no objection has been expressed either by the European Parliament or the Council within a period of two months of notification of that act to the European Parliament and to the Council; or
 - before the expiry of that period, the European Parliament and the Council have both informed the Commission that they will not object.

The two-month period shall be extended by four months at the initiative of the European Parliament or of the Council.

We assume that the Commission has notified the Parliament and Council of the measures to be added to the Annex, and unless either party objects, or both agree to the proposal sooner, the additions will take effect after 2 months

### What is the practical implication of the Blocking Regulation?

The reinvigoration of the Blocking Regulation is an unwelcome development as it is intended to put EU businesses between a rock and hard place. Unfortunately, the U.S. rock is far more compelling than the EU hard place, and very few EU businesses will rely on the Blocking Regulation to guarantee their ability to keep doing business in the U.S. and Iran.

The Blocking Regulation was of very little use in curtailing U.S. policy on Cuba, and almost certainly will not curtail U.S. policy on Iran. The U.S. financial system is now so important to global and EU businesses that it cannot easily be avoided. Even during the U.S. adherence to the JCPOA, all Western banks were reluctant to do business with Iran, because of the risks posed under U.S. law. This reluctance has now turned into positive dislike.

As noted above, the U.S. is also stressing the possibility of secondary sanctions, which in principle force non-U.S. businesses to choose between doing business in the U.S. and doing business in Iran. The revivification of the Blocking Regulation will not affect that choice.

back to top

꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳ ꙳

## 18. J. Reeves & K. Heubert: "A Primer on the Export Administration Regulations"
(Source: Reeves & Dola LLP Alert, 23 May 2018. Available via jreeves@reevesdola.com.)

* Authors: Johanna Reeves, Esq., jreeves@reevesdola.com, 202-715-994; and Katherine Heubert, Esq., 202-715-9940, kheubert@reevesdola.com. Both of Reeves & Dola LLP.

On May 14, 2018, the U.S. Department of State posted on its website proposed rules to transition most firearms and ammunition off the International Traffic in Arms Regulations (ITAR) control list, known as the U.S. Munitions List (USML), over to the U.S. Department of Commerce's export control list, known as the Commerce Control List (CCL). The reason for the change is to revise the scope of the ITAR to control only those articles that provide the United States with a critical military or intelligence advantage or, in the case of weapons, are inherently for military end use. Such items will remain on the USML, while items no longer warranting control under the ITAR will be transitioned to the CCL and be subject to the licensing provisions of the Export Administration Act (EAR), administered and enforced by the U.S. Department of Commerce, Bureau of Industry and Security (BIS).

In anticipation of the official publication of the proposed rules, scheduled for May 24, 2018, we thought it advisable to offer an overview of the EAR. Once the rules publish on May 24, we will circulate an in-depth 3-part review of the proposed amendments to the ITAR and to the EAR and the potential impacts on industry.

DOC_0001966

The following overview of the EAR is intentionally broad, and is intended to serve only as a backdrop to the proposed rules to transition most firearms and ammunition, along with certain parts, components, attachments and accessories, from ITAR controls to EAR controls.

### *Scope of Controls - Subject to the EAR*

*Items - the Commerce Control List*

While the Department of State controls over exports, reexports, and temporary imports are confined to "defense articles" and "defense services" listed on the USML, the Department of Commerce controls over exports and reexports are much broader. The EAR, found in 15 C.F.R. Pts. 730-780, control the export and reexport of "items" (commodities, software, and technology, each term separately defined in the EAR) and certain activities that are NOT exclusively controlled for export or reexport by another agency of the U.S. government which regulates exports or reexports for national security or foreign policy purposes, such as the U.S. Department of State.

Items subject to the EAR consist of the items listed on the CCL in Part 774 of the EAR, and all other items that meet the definition of "subject to the EAR" in section 734.3. The CCL is made up of ten Categories that are further broken into Export Control Classification Numbers (ECCNs). An ECCN is an alpha-numeric code that describes an item or types of items and shows the controls on that item and available license exceptions. The ECCN is not a Harmonized Tariff Schedule (HTS) number, and is not a Schedule B number. To determine whether an item requires an export license from BIS, the exporter must know how the item is classified on the CCL.

As noted above, the CCL is divided into 10 categories, with each category subdivided into five groups, designated by the letters A through E as follows: (A) Equipment, assemblies and components; (B) Test, inspection and production equipment; (C) Materials; (D) Software; and (E) Technology. Within each group is where you will find the ECCNs that enumerate the items that are controlled on the CCL. The firearms and ammunition currently classified on the USML in Categories I, II and III that have been selected to transition to the EAR will be enumerated in new ECCNs created under Category 0 (nuclear materials, facilities and equipment, and miscellaneous items) and product groups A, B, D and E. We will review the proposed rules and the new ECCNs in detail in our forthcoming alerts.

Items subject to the EAR which are not listed on the CCL are generally designated as "EAR99." Often, items classified as EAR99 do not require an export license, but EAR99 is a classification, not a license exemption! Further, EAR99 does not automatically mean that no license is required. If the export violates any of the general prohibitions listed in EAR section 736.2, such as prohibited end-user, end-use, or sanctioned or embargoed country, a license is required.

The above discussion relates only to the question of what is subject to the EAR. Being subject to the EAR does not automatically mean a license is

required for an export or reexport. This is a separate analysis that we will examine below.

*Parts and Components - De Minimis*

Foreign-made commodities that incorporate controlled U.S.-origin commodities may also be subject to the EAR if they have de minimis level of U.S. content. What constitutes the de minimis level depends on the commodity and the destination country for the reexport, and may range from no de minimis levels (for items subject to higher controls), to 10% or 25% de minimis. The rules for calculating de minimis levels are found in section 734.4 of the EAR.

*Technology*

The EAR defines "technology" as "information necessary for the "development," "production," "use," operation, installation, maintenance, repair, overhaul, or refurbishing (or other terms specified in ECCNs on the CCL that control "technology") of an item. Each of the quoted terms are defined in Part 772 of the EAR.

EAR controls over "technology" are more narrowly focused than the ITAR controls over technical data, and apply in limited contexts. To determine whether the technology for an ECCN is also enumerated on the CCL, the corresponding "E" ECCN for the platform should be reviewed. For example, in the proposed rules for firearms currently in USML CAt. I, there will be a new ECCN 0E501 that controls technology for firearms and certain related items. However, the technology controlled would be that which is required for the "development" and "production" of firearms other than shotguns. This new ECCN also would apply the anti-terrorism and United Nations reasons for control (see below) to "technology" "required" for the operation, installation, maintenance, repair, or overhaul of such firearms. As the proposed Commerce rule explains, "controlling this "technology" under the EAR rather than the ITAR is appropriate because the "technology" for the "development," "production," operation, installation, maintenance, repair, and overhaul of the firearms to be described in 0A501 is widely available throughout the world and its possession does not confer a significant military or intelligence advantage on the United States."

It is important to point out that the EAR's carve-out from controls for published works or information in the public domain is much broader in scope compared to the ITAR carve-out for public domain. In section 734.7, "published" technology or software is carved out from EAR controls "when it has been made available to the public without restrictions upon its further dissemination...." For example, subscriptions available without restriction, libraries or other public collections open to the public and from which the public can obtain tangible or intangible documents, unlimited distributions at a conference, seminar, trade, show, or exhibition generally accessible to the public, public/unlimited distribution in any form, **including posting on the Internet on sites available to the public**. Many may rejoice over this, as the ITAR still does not recognize the Internet as being in the "public domain."

As further illustration of technology not controlled under the EAR, the BIS proposed rule cites the example of a gun manufacturer posting a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination. According to the proposed rule explanation, such operation and maintenance information included in that published manual would no longer be "subject to the EAR." Nonproprietary system descriptions, including for firearms and related items, are another example of information that would not be subject to the EAR.

### Reasons for Control

The reasons for control for exports under the EAR include the following:

- CB (Chemical & Biological Weapons)
- NP (Nuclear Proliferation)
- NS (National Security)
- MT (Missile Technology)
- RS (Regional Stability)
- CC (Crime Control)
- AT (Anti-Terrorism)
- UN (United Nations)
- EI (Encryption Item)
- CW (Chemical Weapons Convention)

The specific reasons for control for a particular item is identified within each specific ECCN. Unlike the blanket ITAR requirement for a license to anywhere in the world, BIS license requirements are unique to each individual ECCN. Whether a license is required for a particular export will depend on the destination country.

### Licensing Under the EAR

Each ECCN is made up of four sections: a **heading**(description of the items controlled), the **license requirements**(including all possible reasons for control, such as AT, UN, NS, CC, and RS) the available **license exceptions**, and **list of items controlled**.

To determine the export and reexport license requirements for most items on the CCL, you must identify the reasons for control in the relevant ECCN and consult the Commerce Country Chart in Supp. No. 1 to Part 738 to see whether the applicable reasons for control are checked for the specific country. If so, then a license is required unless a license exception applies. Whether a license exception is available will depend on the ECCN and the Country Groups in Supplement No. 1 to Pt. 740.

Unlike the ITAR, the EAR does not require registration of exporters (so no registration fee), and there are no fees to apply for licenses through the SNAP-R. In addition, unlike the ITAR, the EAR does not include a concept of

"defense services," so there is no registration or licensing for the provision of defense services like there is under the ITAR.

The process for establishing a SNAP-R account is relatively easy, and no digital signature certificate is required. Further, unlike the ITAR, which contains several license forms depending on the transaction, the EAR prescribes one single form for each type of export (permanent, retransfer, reexport).

*Covering Items Subject to the EAR on DDTC Licenses*

With the rewrite of Categories I, II, and III, DDTC will add a "Paragraph (x)" to each of the revised categories. This paragraph has been added to all other USML Categories as they have gone through the rewrite process, and allows for the export of items subject to the EAR under ITAR licenses so long as the conditions of paragraph (x) are met (see ITAR §§ 120.5(b) and 126.6(c)). These conditions include:

  (1) An ITAR license may only include items subject to the EAR that are for use in or with the listed defense articles;
  (2) The purchase documentation must specify both the defense articles with the items subject to the EAR (no separate purchase orders breaking out the defense articles from the EAR items);
  (3) The exporter must ship the EAR items together with the ITAR articles; and
  (4) Items subject to the EAR that are included on an ITAR license do not lose their jurisdictional status as EAR-controlled items and remain subject to the EAR for any subsequent transactions.

In light of the last requirement, it is incumbent on the U.S. exporter to properly educate its customers and end-users when using an ITAR license for both defense articles and EAR items to be used in or with the defense articles. In the event the end-user need reexport approval, the approval must come from BIS for items subject to the EAR, not DDTC.

Below is a reference chart comparing some aspects of the EAR to the ITAR.

| | ITAR | EAR |
|---|---|---|
| **Statutory Authority** | Arms Export Control Act | Export Administration Act of 1979 50 USC 4601 4623 [lapsed] |
| **Federal Agency** | U.S. Department of State, Directorate of Defense Trade Controls | U.S. Department of Commerce, Bureau of Industry and Security |
| **Citation** | 22 C.F.R. Pts. 120 130 | 15 C.F.R. Pts. 730 774 |
| **What is Covered** | Export, reexport, and temporary import of "defense articles" and "defense services" | Items subject to the EAR |

| Control List | U.S. Munitions List 22 C.F.R. 121.1 | Commerce Control List 15 C.F.R. Pt. 774 |
|---|---|---|
| **Registration Required?** | Yes   manufacturers, exporters, temporary importers, and brokers of defense articles and defense services. Annual fees apply. Manufacturers of defense articles must register regardless of export activity. | No |
| **License Portal** | D Trade | SNAP R |
| **Fee for Licenses** | Yes   rolled into registration fee | No |
| **Types of Licenses/ Authorization** | Several types/forms permanent export, temporary export, temporary import, agreements, brokering | One form for export, Reexport, In Country Transfer |
| **Brokering?** | Yes   22 C.F.R. Pt. 129 | No   but see proposed rules for Cats. I III |
| **Technology Controls** | Yes   "technical data" licensing and "defense services" licensing | Yes, but not as broad as ITAR; EAR controls only transmission of technology, so no EAR concept of defense service |

This overview of the EAR is the first installment of a four-part series on the proposed rules to transition firearms and ammunition from the USML to the CCL. Our next alert will examine the transition of certain firearms and their parts, components, accessories and attachments from USML Cat. I items to the CCL. Please stay tuned.

back to top

* * * * * * * * * * * * * * * * * *


## 19. L. Luo: "Minefields in the U.S. Export Control System" (Part II of II)
(Source: King & Wood Mallesons, 14 May 2018.)

* Author: Laura Luo, Partner, Laura.Luo@us.kwm.com, King & Wood Mallesons, New York.

*[Editor's Note: due to space limitations, this item has been divided into two parts.  Part 1 was published in the Daily Bugle of Wednesday, 23 May 2018.]*

On 15 April 2018, the U.S. Department of Commerce's Bureau of Industry and Security (BIS) issued a denial order against a Chinese telecommunications company (hereinafter referred to as "Company Z"), and added the company to the "Denied Persons List." The case of Company Z's violation of U.S. export control, which has lasted for years, again came into the spotlight and raised public concern over the U.S. export control system in China.

The Export Administration Act (hereinafter referred to as "EAA") came into force in 1979. Since then, the U.S. has adopted the most rigorous export control system in the world. Meanwhile, for a long time, many Chinese enterprises lacked awareness of the U.S. export control system, which made them key subjects of U.S. export control investigations. In the United States, China became the second target country of criminal investigation on export control as early as in 2014, just after Iran. [FN/1] In view of this, the Customs and Trade Compliance Team of King & Wood Mallesons (hereinafter referred to as "KWM") will enumerate key issues in the U.S. export control system that concern Chinese enterprises based on the in-effect statutes of U.S. export control and published PRC-related cases. As the first of a series of articles, we will review the "minefields" in U.S. export control frequently encountered by PRC enterprises. ...

### *How to Cross the "Minefield"*

In front of the rigorous export control system of U.S. and the multitudinous risks from it, we suggest that Chinese enterprises could take the following three solutions to cross the minefields:

*Plan A: Clearing the Minefield in Advance --- Establishing a Comprehensive Export Control Compliance System*

Subject to the strict U.S. export control system, the tricks for circumvention always invite humiliation to itself. In order to mitigate the risks, the best approach is to improve the internal export control regulatory system and operate it effectively. In general, a comprehensive export control regulatory system shall cover the following aspects:

| Know your products | Know your activities | Know your Customer |
|---|---|---|
| judge whether your products are U.S. items; Judge whether your products are listed control items; | Judge whether your activity is export, deemed export activity; judge whether your activity is re export or transfer in country activity; Judge whether your activity is assistance to client's export | Judge whether your client is sanctioned or controlled; Judge whether the destinations of the commodity is a sanction area; Judge whether the end use of the commodities is controlled |

In the event the enterprise is not able to make such judgement, or the circumstance is in emergency, pursuant to the relevant regulation of EAR [FN/11], the enterprise may communicate with BIS to seek for supports and guidance from U.S. authorities.

*Plan B: Self-Rescue After Stepping Into the Minefield --- Voluntary Disclosure*

Once the enterprise realizes the risk of violation of U.S. export control occurs, don't be flustered. Pursuant to the relevant regulation of EAR, BIS encourages voluntary disclosure of violations. [FN/12]

Typically, the exporters shall submit an initial notification to OEE prior to OEE discovers such violation facts. Within 180 days of the initial notification date, the export shall submit a narrative account to OEE. After received the narrative account, OEE will exercise its discretion based on the disclosed facts on the following issues:

(1) Whether the disclosed the activities violate the EAR;
(2) Whether the disclosed parties have adopted corrective measures.

In most cases, OEE will only issue a warning letter, especially for negligence violations and mild compliance defects without of aggravating circumstance, such as intentionally violation. According to the statistics of BIS, in fiscal year 2015, BIS accepted 382 voluntary disclosure reports, while only less than 1% of them were settled by administrative punishment. [FN/13] Even if the administrative punishment is inflicted, the voluntary disclosed exporter still could enjoy a 50% reduction of punishment on fines granted by OEE in general. Under some circumstances, fines and other administrative punishments during the probationary period will be further reduced or suspended in consideration of the voluntary disclosure.

*Plan C: A Shortcut for Escaping the Minefields --- VEU Program*

In 2007, BIS established the "Authorization Validated End-User" (VEU) program for China and India companies in particular. The authorized VEU in China are permitted to accept certain controlled items from U.S. by means of export, re-export and transfer without a license. Pursuant to the relevant regulations of EAR, [FN/14] any entity in China or India may apply for VEU status, but the applicant shall satisfy the following criteria:

(1) Having a comprehensive internal export control system;
(2) Having a strict management of the operation place of controlled items;
(3) Complying with the record-keeping requirement set forth in EAR;
(4) The controlled items shall only for self-use purpose;
(5) The re-export or transfer of controlled items shall be approved by BIS.

As of now, there are 11 authorized VEU enterprises in China. [FN/15]

Although authorized VEU enterprises may face some restriction in daily operation, such as items controlled by MT and CC reason are not allowed to export under VEU, the import-controlled item shall be used in certain eligible place, etc., it is still a fast pass for Chinese enterprises to cross the minefield of U.S. export control system comparing with the heavy work on application, verification and assessment for export control license application to other enterprises.

### Conclusion

Indeed, the export control system is an important tool for the United States to implement its global strategy and it bothers a large number of Chinese enterprises participating in International trade and foreign investment. But on the other hand, it is also a touchstone for Chinese enterprises to enhance

their awareness of trade compliance. In June 2017, MOFCOM issued an exposure draft of the Export Control Law of PRC, wherein many principles that have been implemented in the U.S. for years were introduced into China for the first time such as catch-all rules, country assessment chart, control list management and end-user verification, etc. A perfect statutory system of export control will undoubtedly be a major driving force for China to initiative the Belt and Road strategy, and enterprises with a competitive trade compliance system have a head start in this new era.

-----------
  [FN/1] See here. ...
  [FN/11] 15 C.F.R. Part 748.3.
  [FN/12] 15 C.F.R. Part 764.5(a).
  [FN/13] "An introduction to the Consequences of Violating US Export Control Law".
  [FN/14] 15 C.F.R. Part 748.15.
  [FN/15] See here.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 20. Gary Stanley's EC Tip of the Day
(Source: Defense and Export-Import Update; 23 May 2018. Available by subscription from gstanley@glstrade.com.)

* Author: Gary Stanley, Esq., Global Legal Services, PC, (202) 352-3059, gstanley@glstrade.com.

ITAR § 125.5(c) provides that a license is not required for the disclosure to a foreign person of unclassified technical data during the course of a plant visit (either classified or unclassified) approved by the Directorate of Defense Trade Controls or a cognizant U.S. Government agency provided the technical data does not contain information in excess of that approved for disclosure. This exemption does not apply to technical data which could be used for design, development, production or manufacture of a defense article.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## EX/IM TRAINING EVENTS & CONFERENCES

## 21. ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 12-13 Sep in Annapolis, MD
(Source: S. Palmer, spalmer@exportcompliancesolutions.com.)

* What: Seminar Level I: ITAR/EAR Boot Camp, Annapolis, MD
* When: 12-13 September 2018
* Where: Chart House Restaurant on Spa Creek

* Sponsor: Export Compliance Solutions (ECS)
* ECS Speaker Panel:  Suzanne Palmer, Mal Zerden
* Register: Here or by calling 866-238-4018 or e-mail
spalmer@exportcompliancesolutions.com.

back to top

* * * * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 22. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Benjamin N. Cardozo** (Benjamin Nathan Cardozo; 24 May 1870 - 9 Jul
1938; was an American lawyer and jurist who served as an Associate Justice
of the Supreme Court of the United States. Cardozo is remembered for his
significant influence on the development of American common law in the 20th
century, in addition to his philosophy and vivid prose style.  At age 15,
Cardozo entered Columbia University, where he was elected to Phi Beta
Kappa, and then went on to Columbia Law School in 1889. When Cardozo
entered Columbia Law School, the program was only two years long; in the
midst of his studies, however, the faculty voted to extend the program to
three years. Cardozo declined to stay for an extra year, and thus left law
school without a law degree.)
 - *"The Constitution overrides a statute, but a statute, if consistent with the
Constitution, overrides the law of judges. In this sense, judge-made law is
secondary and subordinate to the law that is made by legislators."*
 - *"There are vogues and fashions in jurisprudence as in literature and art
and dress."*

back to top

* * * * * * * * * * * * * * * * * * * * *

## 23. The Daily Bugle Updates Privacy Policy to Comply with
EU's GDPR
(Source: Editor, 24 May 2018.)

On Friday, 25 May 2018, EU Council Regulation 2016/679, the EU General
Data Protection Regulation ("GDPR"), will come into effect.  This
Regulation requires new rules concerning the processing of personal
information of natural persons within the European Union ("EU").

To comply with the GDPR, Full Circle Compliance ("FCC") has updated and
extended its Editorial Policy and Privacy Policy. Our updated policies outline
what data we use and for what purpose. We encourage you to take a look at
our updated Editorial Policy and Privacy Policy.

DOC_0001975

The GDPR requires us to receive your permission to subscribe to or continue to receive the Daily Bugle. If you have not yet given us your permission to use your personal information to provide you with mailings from FCC, you will be notified by email from FCC with an option to continue to receive the Daily Bugle by giving FCC explicit permission to use your personal information. Unless we receive your explicit permission, we will need to delete your personal data and remove your personal information from our subscriber list. You will then no longer receive the Daily Bugle.

You may ask FCC to remove your personal information at any time by sending an email to email to GDPR@fullcirclecompliance.eu, which will remove you from the Daily Bugle subscribers list.

back to top

* * * * * * * * * * * * * * * * * * * *

## 24. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 17 May 2018: 83 FR 22842-22846: Revisions to the Unverified List (UVL)

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 4 May 2018: Harmonized System Update 1807, containing 289 ABI records and 60 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR*
("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 25. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free. Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

**From:** Gary Stanley [▮▮▮▮@glstrade.com]
**Sent:** 5/25/2018 3:12:45 AM
**To:** John Sonderman [John.Sonderman@bis.doc.gov]
**Subject:** Defense and Export-Import Update (May 24, 2018)

**Dear All,**

**Good Day!**

***Gary Stanley's EC Tip of the Day:*** **ITAR § 123.26 provides that any person engaging in any export, reexport, transfer, or retransfer of a defense article or defense service pursuant to an exemption must maintain records of each such export, reexport, transfer, or retransfer. The records shall, to the extent applicable to the transaction and consistent with the requirements of IAR § 123.22 of this subchapter, include the following information: A description of the defense article, including technical data, or defense service; the name and address of the end-user and other available contact information (*e.g.*, telephone number and electronic mail address); the name of the natural person responsible for the transaction; the stated end-use of the defense article or defense service; the date of the transaction; the Electronic Export Information (EEI) Internal Transaction Number (ITN); and the method of transmission. The person using or acting in reliance upon the exemption shall also comply with any additional recordkeeping requirements enumerated in the text of the regulations concerning such exemption (*e.g.*, requirements specific to the Defense Trade Cooperation Treaties in ITAR §§ 126.16 and 126.17.**

**Today's Items:**

1. **State and Commerce Publish Previously Announced Proposed Changes on Firearms, Guns, Ammunition, and Related Articles**
2. **OFAC Targets Procurement Networks and 31 Aircraft Associated with Mahan Air and Other Designated Iranian Airlines**
3. **White House Publishes Executive Order Prohibiting Additional Transactions with Venezuela**
4. **UK Sanctions and Anti-Money Laundering Act 2018 Comes Law**
5. **DoD/DSS Announce Upcoming Release of DSS DSS Assessments and Authorization Process Manual (DAAPM) 1.3**
6. **State Dept. to Hold Public Meeting on on Micro, Small and Medium- Sized Enterprises (MSMEs) in Advance of the United Nations Commission on International Trade Law (UNCITRAL) Commission Session for 2018**
7. **WTO News**
8. **U.S. Customs and U.S. Census/AES Updates**
9. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes**
10. **GAO Reports, Testimony, and Correspondence of Interest**

**Other Headlines**

11. **U.S. Bill Would Force Tech Companies to Disclose Foreign Software Probes**
12. **U.S. Launches Auto Import Probe, China Says Will Defend Interests**

13. **Trump Identifies His Trade Weapon of Choice, to the Dismay of Congress**

14. **India Takes U.S. Steel Tariffs Complaint to the WTO**

15. **A Bid to Increase Gun Exports, Stalled After Sandy Hook, Moves Ahead**

16. **Pentagon Moving to Expedite Weapons Exports to Allied Nations**

17. **U.S. Senate Defense Bill Would Bar Turkey from Buying F-35 Jets**

18. **Is the US Out as Turkey's Top Western Arms Dealer?**

19. **Man Accused of Smuggling Grenade Launcher in Federal Custody**

20. **Canada Blocks Chinese Takeover of Aecon on National Security Grounds**

21. **NASA Chief Lays Out Lunar-Exploration Plans, Commits to Climate-Change Research**

22. **New Policy Directive Implements Commercial Space Regulatory Reforms**

23. **House Passes $717 Billion Defense Bill**

24. **Nafta Talks Stalled on U.S. Demands**

25. **GDPR Takes Effect on Friday—Here's What to Expect**

26. **Army AMC Head Wants to Stop Buying Ships**

27. **Air Force to Boost Rapid Prototyping Funding for Space Systems**

28. **Navy, Boeing Tout Block III Super Hornet as Partner for F-35**

29. **SEAL Teams Need Better Communications, Battery Tech**

30. **New Reconnaissance Tools Needed to Assist Special Operators, Partners**

**Upcoming Export Control and Other Trade Compliance Conferences**

## 1. State and Commerce Publish Previously Announced Proposed Changes on Firearms, Guns, Ammunition, and Related Articles

(83 Fed. Reg. 24198) - The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) proposes to amend the International Traffic in Arms Regulations (ITAR) to revise Categories I (firearms, close assault weapons and combat shotguns), II (guns and armament) and III (ammunition and ordnance) of the U.S. Munitions List (USML) to describe more precisely the articles warranting export and temporary import control on the USML. Items removed from the USML would become subject to the Export Administration Regulations (EAR). Interested persons have until July 9, 2018, to submit their comments.

(83 Fed. Reg. 24166) - The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has proposed changes to the EAR to address how articles the President determines no longer warrant control under United States Munitions List (USML) Category I – Firearms, Close Assault Weapons and Combat Shotguns; Category II – Guns and Armament; and Category III – Ammunition/Ordnance would be controlled under the Commerce Control List (CCL). This proposed rule is being published simultaneously with a proposed rule by the Department of State that would revise Categories I, II, and III of the USML to describe more precisely the articles warranting continued control on that list. Interested persons have until July 9, 2018, to submit comments.

## 2. OFAC Targets Procurement Networks and 31 Aircraft Associated with Mahan Air and Other Designated Iranian Airlines

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has designated nine individuals and entities procuring export-controlled, U.S.-origin goods for sanctioned Iranian airlines. They were designated as Specially Designated Global Terrorists (SDGTs) pursuant to Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism. OFAC also identified 31 aircraft in which entities previously designated under E.O. 13224 have an interest. In particular, OFAC alerts the aviation community to the sanctions risk for those maintaining commercial relationships with Mahan Air and other designated Iranian airlines, including Caspian Air, Meraj Air, and Pouya Air. Persons operating in the civil aviation industry should implement appropriate controls to ensure compliance with their legal requirements. Potentially sanctionable activities include, but are not limited to: procurement of aircraft parts and equipment, maintenance contracts, airline ground services and catering, interline transfer and codeshare agreements, general sales agent services, ticketing services and sales, marketing services, cargo cooperation agreements, cargo sales agent services and agreements, and freight forwarding services and agreements. Click here for further information identifying the sanctioned individuals, entities, and aircraft.

## 3. White House Publishes Executive Order Prohibiting Additional Transactions with Venezuela

(83 Fed. Reg. 24001) - As reported earlier in Item 3 of the May 21 edition of *Defense and Export-Import Update*, President Trump has issued a new Executive Order prohibiting certain additional transactions with respect to Venezuela. All transactions related to, provision of financing for, and other dealings in the following by a United States person or within the United States are prohibited:

• The purchase of any debt owed to the Government of Venezuela, including accounts receivable;

• Any debt owed to the Government of Venezuela that is pledged as collateral after the effective date of this order, including accounts receivable; and

• The sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest.

## 4. UK Sanctions and Anti-Money Laundering Act 2018 Comes Law

The U.K. Sanctions and Anti-Money Laundering Act of 2018 has received royal assent and has thus become law. Click here for its legislative history.

## 5. DoD/DSS Announce Upcoming Release of DSS DSS Assessments and Authorization Process Manual (DAAPM) 1.3

The NISP Authorization Office (NAO) within the U.S. Department of Defense's Defense Security Service has announced the upcoming release of the DSS Assessments and

Authorization Process Manual (DAAPM) 1.3 in its continuing effort to provide users with the most up-to-date requirements of the Risk Management Framework (RMF) process. This version update revolves around two specific areas of interest and goes into effect on June 4, 2018. Version 1.3 supersedes all previous versions of the DAAPM. First area of interest is the inclusion of a recommended 90-day submission period for RMF packages. This change is located at the beginning of Section 6, which has been renamed to "Assessment and Authorization Implementation Guidance." The rationale for the change is to ensure that both Industry and DSS allow time to sufficiently work the packages before and after submission. Next area of interest is defining who (cleared Industry or DSS) has responsibility for each step of the process. Contained in Section 6 is a walk-through of each RMF step with tasks and who is responsible for those tasks. In summary, Industry is responsible for Step 1, Step 2, Step 3, the first part of Step 4 and the first part of Step 6. DSS is responsible for the second part of Step 4, Step 5 and the second part of Step 6. Additionally, the flowchart in Section 5 is updated to reflect ownership of each step. Finally, the Concurrence Form has been eliminated. The intent of these updates is to eliminate confusion.

## 6. State Dept. to Hold Public Meeting on on Micro, Small and Medium- Sized Enterprises (MSMEs) in Advance of the United Nations Commission on International Trade Law (UNCITRAL) Commission Session for 2018

(83 Fed. Reg. 24145) - The U.S. Departmento of State's Office of the Assistant Legal Adviser for Private International Law has announced that the Advisory Committee on Private International Law (ACPIL) will hold a public meeting via teleconference to discuss several matters relating to small and medium-sized enterprises (MSMEs) in advance of the United Nations Commission on International Trade Law (UNCITRAL) Commission Session for 2018. The ACPIL public meeting will take place on Tuesday, June 12, 2018, from 10 AM to 12:00 PM EDT via teleconference. Public Those planning to participate should email pil@state.gov to obtain the call-in number. The UNCITRAL Commission Session, which will be held June 25 through July 13, will, among other things, finalize and adopt a Legislative Guide on Key Principles of a Business Registry (A/CN.9/940) and an instrument on Reducing the Legal Obstacles Faced by MSMEs (A/CN.9/941). Additionally, the Commission will consider a proposal by the Government of Italy on possible future work by UNCITRAL on alternative forms of organization to corporate like models (contractual networks) (A/CN.9/ 954). The Commission documents will be available here.

## 7. WTO News

• DG AZEVÊDO IN PAPUA NEW GUINEA: 'WTO GIVES SMALLER ECONOMIES THE PLATFORM TO SUCCEED': Director-General Roberto Azevêdo visited Port Moresby, Papua New Guinea, on 24 May, meeting with Minister Rimbink Pato to discuss how trade can continue to serve the country in the years to come. The Director-General noted the importance of the WTO in giving smaller economies like Papua New Guinea the support and the platform they need to succeed in global markets. They discussed the role of trade in relation to recovery from natural disasters, the sustainability of oceans, and building a more inclusive global economy. The Director-General welcomed Papua New Guinea's ratification of the Trade Facilitation Agreement, which could potentially cut trade costs for the country by up to 13.9 per cent. While in Port Moresby, DG Azevêdo also spoke at the launch of a new APEC discussion series at the University of Papua New Guinea. His speech is available below.

## 8. U.S. Customs and U.S. Census/AES Updates

• U.S. Customs - Notice of Issuance of Final Determination Concerning Country of Origin of Fleetcam Vehicle Cameras - CBP has issued a final determination concerning the country of origin of a vehicle digital video camera known as the FleetCam™. Based upon the facts presented, CBP has concluded that the processing in the United States does not substantially transform the imported digital video cameras for purposes of U.S. Government procurement.

• U.S. Customs - CSMS #18-000359 Title: Updated Truck Manifest Implementation Guides supporting In-bond Reg changes

• U.S. Customs - CSMS #18-000360 Title: Upcoming ACE Enhancements Announced

• U.S. Customs - CSMS #18-000361 Title: HTS Query

• U.S. Customs - CSMS #18-000362 Title: FDA End-Dating CDER Product Codes and New CDER Product Codes

• U.S. Customs - AES Letter of Intent

• U.S. Customs - Customs Bulletin and Decisions
Index
General Notices
U.S. Court of International Trade Slip Opinions

• U.S. Census - Preliminary April steel imports were $3.1 billion (3.4 million metric tons) compared to the preliminary March totals of $2.8 billion (3.0 million metric tons).

## 9. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

• USITC - Certain Amorphous Metal and Products Containing Same: Amending the Complaint and Notice of Investigation

## 10. GAO Reports, Testimony, and Correspondence of Interest

• DEFENSE INFRASTRUCTURE: DOD Needs to Improve the Accuracy of Its Excess Capacity Estimates GAO-18-230: Published: May 24, 2018. Publicly Released: May 24, 2018.

• DOD MAJOR AUTOMATED INFORMATION SYSTEMS: Adherence to Best Practices Is Needed to Better Manage and Oversee Business Programs GAO-18-326: Published: May 24, 2018. Publicly Released: May 24, 2018.

- SMALL UNMANNED AIRCRAFT SYSTEMS: FAA Should Improve Its Management of Safety Risks GAO-18-110: Published: May 24, 2018. Publicly Released: May 24, 2018.

- WARFIGHTER SUPPORT: An Assessment of DOD Documents Used in Previous Efforts to Rebalance to the Pacific GAO-18-192: Published: May 24, 2018. Publicly Released: May 24, 2018.

## Other Headlines

### 11. U.S. Bill Would Force Tech Companies to Disclose Foreign Software Probes

Reuters.com, May 24 - U.S. tech companies would be forced to disclose if they allowed American adversaries, like Russia and China, to examine the inner workings of software sold to the U.S. military under proposed legislation, Senate staff told Reuters on Thursday. The bill, approved by the Senate Armed Services Committee on Thursday, comes after a year-long Reuters investigation found software makers allowed a Russian defense agency to hunt for vulnerabilities in software that was already deeply embedded in some of the most sensitive parts of the U.S. government, including the Pentagon, the Federal Bureau of Investigation and intelligence agencies. Security experts say allowing Russian authorities to conduct the reviews of internal software instructions — known as source code — could help Russia find vulnerabilities and more easily attack key systems that protect the United States.

### 12. U.S. Launches Auto Import Probe, China Says Will Defend Interests

Reuters.com, May 23 - The Trump administration has launched a national security investigation into car and truck imports that could lead to new U.S. tariffs similar to those imposed on imported steel and aluminum in March. The national security probe under Section 232 of the Trade Expansion Act of 1962 would investigate whether vehicle and parts imports were threatening the industry's health and ability to research and develop new, advanced technologies, the Commerce Department said on Wednesday. "There is evidence suggesting that, for decades, imports from abroad have eroded our domestic auto industry," Commerce Secretary Wilbur Ross said in a statement, promising a "thorough, fair and transparent investigation."

### 13. Trump Identifies His Trade Weapon of Choice, to the Dismay of Congress

Wall Street Journal.com, May 24 - President Donald Trump's use of a national security law to threaten tariffs on imported cars drew widespread criticism Thursday, including sharp rebukes from senior members of his own Republican Party. Lawmakers, the auto industry and foreign trade partners were among those lambasting Mr. Trump's move Wednesday to order a review of imported vehicles and auto parts under Section 232 of the Trade Expansion Act, the same law Mr. Trump used to impose tariffs on imported steel and aluminum in March. "The president needs to use the national security waiver in ways that I think visibly meet the test," said Sen. Roy Blunt (R., Mo.). "I didn't think aluminum and steel met the test. I certainly don't think automobiles I meet the test."

## 14. India Takes U.S. Steel Tariffs Complaint to the WTO

Reuters.com, May 23 - India has launched a complaint against the United States to challenge U.S. President Donald Trump's tariffs on steel and aluminum, a filing published by the World Trade Organization showed on Wednesday. Indian officials told Reuters last month that their government would open a WTO dispute if the country's firms were not granted an exemption. Trump imposed the tariffs in March, levying 25 percent on steel imports and 10 percent on aluminum. He said they were justified by national security concerns and therefore outside the WTO's remit. India, China, Russia, Japan, Turkey and the European Union have all dismissed that claim, regarding the U.S. tariffs as "safeguards" under the WTO rules, entitling them to a combined $3.5 billion in annual compensation.

## 15. A Bid to Increase Gun Exports, Stalled After Sandy Hook, Moves Ahead

New York Times.com, May 23 - The Trump administration wants to streamline the process for exporting American firearms, a change sought for years by domestic gun companies as a way to increase sales. A proposed rule expected to be published in the Federal Register on Thursday would transfer jurisdiction of consumer gun exports from the State Department, where the licensing process is expensive and extensive, to the Commerce Department, which has a simpler application process. Publication of the rule kicks off a 45-day comment period, after which departments including State and Commerce will review corrections and suggestions and then send a revised draft to Congress before final publication. Gun industry groups said that the shift, which was first conceived during the Obama administration but halted after the Sandy Hook school shooting in 2012, would pare down a bureaucratic process that currently discourages American firearms companies from sending their products abroad.

## 16. Pentagon Moving to Expedite Weapons Exports to Allied Nations

National Defense Magazine.org, May 23 - The Defense Department is implementing a series of initiatives aimed at expediting weapons sales to foreign partners, said the undersecretary of defense for acquisition and sustainment May 23. One of the Pentagon's top priorities is to better streamline the foreign military sales process, said Ellen Lord during remarks at the National Defense Industrial Association's Special Operations Forces Industry Conference in Tampa, Florida. Lord's office wants to "promote allied readiness by enhancing military capacity through targeting improvements in foreign military sales," she said. The effort aligns with Secretary of Defense Jim Mattis' push to strengthen alliances and partnerships, she said. "History is very clear — nations with strong allies thrive while those without them decline," Lord said. "Interoperability underpins this line of effort as it is a priority for operational concepts, modular force elements, communications, information sharing and weapon systems."

## 17. U.S. Senate Defense Bill Would Bar Turkey from Buying F-35 Jets

Reuters.com, May 24 - A U.S. Senate committee passed its version of a $716 billion defense policy bill on Thursday, including a measure to prevent Turkey from purchasing Lockheed Martin F-35 Joint Strike Fighter jets. The amendment to the National Defense Authorization Act, or NDAA, from Democratic Senator Jeanne Shaheen and Republican Senator Thom

Tillis, would remove Turkey from the F-35 program over its detention of U.S. citizen Andrew Brunson, Shaheen's office said. Brunson, a Christian pastor who could be jailed for up to 35 years, denied terrorism and spying charges in a Turkish court this month. He has been in pre-trial detention since 2016. It also faults NATO ally Turkey for its agreement with Russia in December to buy S-400 surface-to-air missile batteries. Ankara wants the system to boost its defense capabilities amid threats from Kurdish and Islamist militants at home and conflicts across its borders in Syria and Iraq.

## 18. Is the US Out as Turkey's Top Western Arms Dealer?

DefenseNews.com, May 24 - Britain may replace the U.S. as Turkey's major Western weapons supplier, as the two European nations are set to take a "strategic" turn in an already growing defense relationship. Turkey and Britain have been negotiating a comprehensive trade agreement in anticipation for the latter's exit from the European Union. According to a British diplomat in Ankara, the two NATO allies agree on the importance of "doing the maximum in their capacity in the field of defense." "Both partners have a long-term, strategic view of their cooperation on defense technologies," he said. A Turkish presidential aide said both countries agree "a significant part of the [post-Brexit] trade deal will involve defense technologies and cooperation on several systems." Defense cooperation was a major part of government-to-government talks during Turkish President Recep Tayyip Erdogan's state visit to London on May 15. Turkey's top procurement officer, Ismail Demir, was, among other senior officials, in Erdogan's delegation.

## 19. Man Accused of Smuggling Grenade Launcher in Federal Custody

The Monitor.com, May 24 - A man attempting to smuggle a grenade launcher into Mexico made his initial appearance in federal court Tuesday. Miguel Angel Gutierrez stood before U.S. Magistrate Judge Peter E. Ormsby on Tuesday morning in connection with an attempt to smuggle a grenade launcher barrel into Mexico the day before. U.S. Customs and Border Protection officers arrested Gutierrez Monday in connection with a firearms trafficking investigation conducted by agents with the U.S. Department of Homeland Security Investigations. Earlier this month HSI agents, as part of ongoing investigation, seized a M203 launcher barrel from an unnamed individual in Brownsville who told agents that the barrel was supposed to be smuggled into Mexico. According to the complaint, the man, who is not identified in the complaint, told agents that the barrel was supposed to be smuggled into Mexico.

## 20. Canada Blocks Chinese Takeover of Aecon on National Security Grounds

Reuters.com, May 23 - Canada has blocked a proposed C$1.51 billion ($1.18 billion) takeover of construction company Aecon (ARE.TO) by a Chinese state builder on national security grounds, underscoring rising wariness of Chinese firms buying up assets in Western countries. Aecon's takeover by overseas investment and financing arm of China Communications Construction Co Ltd. was scheduled to close in February. But this was delayed after Canada extended a national security review. . . . The Canadian government has now ordered CCCC International Holding Ltd not to implement the proposed investment to protect national security, Canadian Innovation Minister Navdeep Bains said in a statement on Wednesday.

## 21. NASA Chief Lays Out Lunar-Exploration Plans, Commits to Climate-Change Research

Wall Street Journal.com, May 23 - NASA chief James Bridenstine unequivocally told a Senate panel that human activity is the primary cause of climate change, reversing his earlier skepticism, and sketched out a five-year, $52-billion lunar-exploration program. In his first testimony on Capitol Hill following a lengthy confirmation process during which critics attacked him for controversial environmental positions, Mr. Bridenstine on Wednesday received bipartisan support for many policy priorities. Under his direction, the National Aeronautics and Space Administration seeks to pursue various private-public partnerships to develop a family of spacecraft intended to return astronauts to the Moon by the early 2020s. . . . Mr. Bridenstine also reiterated that by 2023, the U.S. will launch the first proposed building blocks of a government-funded "gateway" for exploring deeper into the solar system. More than previous NASA spending blueprints, the current plan aims to better coordinate human and robotic missions to develop technologies needed to eventually reach Mars. And the agency foresees extended stays by astronauts on the lunar surface as vital steps toward that ultimate goal.

## 22. New Policy Directive Implements Commercial Space Regulatory Reforms

SpaceNews.com, May 24 - A new policy President Trump will sign May 24 will implement a series of regulatory reforms to support commercial space recommended by the National Space Council earlier this year. Space Policy Directive (SPD) 2, to be signed by the president at the White House, includes several sections to carry out streamlining of launch and remote sensing regulations, creation of a "one-stop-shopping" office for commercial space, and reviews of radiofrequency and export control policy. Scott Pace, executive secretary of the National Space Council, told reporters on a conference call May 24 that the policy is intended to carry out recommendations enacted by the council at its most recent public meeting Feb. 21. "SPD-2 directs new policy with regards to commercial space regulations," he said. "The United States is the greatest spacefaring nation on the planet. President Trump recognizes space is crucial to our security, economy and international leadership."

## 23. House Passes $717 Billion Defense Bill

Wall Street Journal.com, May 24 - The House on Thursday passed a $717 billion defense-policy bill that would give the military a 2.6% pay increase, the largest in nine years. The bipartisan 351-66 vote sends the measure to the Senate, where a panel completed a companion measure in a closed-door session on Wednesday. The annual measure sets policies and a budget outline for the Pentagon that are funded by a subsequent appropriations bill that typically follows its parameters fairly closely. The military received a significant budget increase under the terms of a bipartisan pact passed earlier this year that the Pentagon's many allies in Washington promise will address shortfalls in military readiness, such as pilot training, maintenance of equipment and procurement of new weapons systems.

## 24. Nafta Talks Stalled on U.S. Demands

Wall Street Journal.com, May 23 - Talks to renegotiate the North American Free Trade Agreement have reached a stalemate, with Mexico and the U.S. hardening their positions and both sides accusing one another of intransigence and inconsistency. Mexico and the U.S. have clashed in recent weeks over U.S. demands for tighter automobile manufacturing rules and over the so-called America First provisions that President Donald Trump wants to put in any new deal in a bid to bring manufacturing jobs back to the U.S. These include removing the international arbitration panels that currently resolve commercial disputes and creating a sunset clause that would end the deal every five years unless explicitly renewed. Both Mexico and Canada have described those measures as unacceptable.

## 25. GDPR Takes Effect on Friday—Here's What to Expect

Wall Street Journal.com, May 24 - On Friday, European Union privacy cops will start enforcing the new privacy law called GDPR, or the General Data Protection Regulation. Here are answers to some common questions about the deadline: What is actually happening on Friday? Following a two-year grace period after the law was enacted in 2016, data-protection authorities in EU member countries will start enforcing the new law. Privacy lawyers expect regulators to scrutinize worst offenders first, showing off the law's teeth with the easiest-to-prove violations. Small mom-and-pop shops that hold little data—and that might have discovered only last month that the law applied to them—are likely to get more time. "The approach of this office will also be in areas of greatest risk," said Dale Sunderland, deputy commissioner for Ireland's Data Protection Commissioner.

## 26. Army AMC Head Wants to Stop Buying Ships

Breaking Defense.com, May 24 - Gen. Gus Perna, head of Army Materiel Command, is a brave man. He came to Pacific Command's AOR and announced he wants the Army to stop building the transport ships and so-called watercraft that could be crucial to any conflict in the Indo-Pacific region. "I was in a meeting yesterday and I hit the mike and said, 'I think it's time for the Army to get out of the boat business," Perna said at AUSA's LANPAC conference, filled with representatives of 26 allies and partners from Australia to Vanuatu, many of whom would depend on those ships to carry essential supplies around the region in time of war. "We should not produce the next ship and eliminate the next capability. That is heresy, especially here out in the Pacific. Trust me, nobody hit the mike and said, 'Brilliant." Why would the Army want to do this? It's simple really: to help pay for the six top modernization priorities. The first one Perna mentioned, the one clearly at the top of the list, was Future Vertical Lift. "It's about what do we need and when do we need it," he said.

## 27. Air Force to Boost Rapid Prototyping Funding for Space Systems

National Defense Magazine.org, May 24 - Air Force leaders have signed off on a major increase in funding for the Space Enterprise Consortium, which speeds up the acquisition of new space technologies. The push to more rapidly acquire capabilities is happening as Pentagon officials have come to view space as a warfighting domain on part with air, land and sea. The consortium was created last year to better leverage innovation by nontraditional companies and other organizations that don't want to deal with the Defense Department's acquisition bureaucracy and traditional regulations. It is being organized by the Advanced Technology Institute. It uses other transaction authority contracts, which allows small businesses and non-traditional contractors to develop prototypes without adhering to the cumbersome Federal Acquisition Regulation. Congress recently modified the

contracting vehicle to allow companies to go directly under contract after the prototyping phase is completed. It allows the contracting agencies to acquire new technology more quickly by making an end run around the FAR.

## 28. Navy, Boeing Tout Block III Super Hornet as Partner for F-35

Breaking Defense.com, May 23 - The Navy is upgrading its Super Hornet fighters with new sensors and networks so they can collaborate in combat with the F-35. Over the 2019-2024 budget plan, the service plans to pay Boeing to build 116 new Block III Super Hornets and convert many of its nearly 500 existing Super Hornets to Block II standard. Once touted by President Trump himself as an alternative to the F-35, the souped-up Super Hornet is now firmly established as its partner. Here's how that partnership might work in wartime, as depicted by Navy and Boeing officials in briefings for the press this morning. First, stealthy F-35Cs scout ahead into hostile airspace and spot enemy stealth fighters in flight. They report over the Link-16 network back to an E-2D Hawkeye command plane circling far in the rear, out of range of enemy anti-aircraft fire, and under the protection of EA-18G Growler radar-jamming planes. The E-2D transmits the data over the higher-bandwidth TTNT network to F/A-18 Super Hornets, red icons popping up on the Block III's improved cockpit displays. While the hostiles are hard to pinpoint on radar, many Block III Hornets have advanced Infra-Red Search & Track sensors that can pick up their engine heat. Two ISRT-equipped Hornets intercept from different angles to triangulate their targets precisely, sharing data over TTNT, then open fire.

## 29. SEAL Teams Need Better Communications, Battery Tech

National Defense Magazine.org, May 24 - Special Operations Command is looking for a slew of new maritime technologies that will give operators — including SEALs — a tactical edge during dangerous missions, officials said May 23. "Power and energy is the one [area] that I think is probably the biggest need common across all the platforms," John Bailey, chief engineer at Special Operations Command's program executive office for maritime, told National Defense. The office — which oversees the procurement of Navy SEAL equipment and special operator watercraft among other maritime platforms — is engaged and committed to finding a safe, high-energy battery or other technology solution that can effectively power up many of the devices and equipment under its portfolio, he said at the National Defense Industrial Association's Special Operations Forces Industry Conference in Tampa, Florida. Lithium-ion batteries, which can sometimes present safety challenges, are usually not allowed on submarines. Special ops divers are often transported on such vessels, requiring alternative power sources, he said during remarks at the conference.

## 30. New Reconnaissance Tools Needed to Assist Special Operators, Partners

National Defense Magazine.org, May 24 - Special Operations Command requires new tools to help commandos sift through the vast amount of information they come across in the field, officials said May 24. "We are getting so much information that we can't go through it all," said Glen Cullen, program manager for sensitive site exploitation within the program executive office for special reconnaissance, surveillance and exploitation. That includes everything from physical documents to digital media. "We need to have it triaged. … We need to be able to identify what's important from massive volumes of information," he said during a session at the National Defense Industrial Association's annual Special Operations

Forces Industry Conference in Tampa, Florida. Capability needs include artificial intelligence, data analytics, machine learning and systems that can help operators "get the gist" of a document without having to conduct a full translation, he said. "Our guys are operating worldwide, working in a country [where they] may not know the language," Cullen said. "You get a document, ... it's got some key words in it and you're wondering, 'Hey, is this some high school kid's chemistry homework, or is it a formula to make a bomb?'"

## Upcoming Export Control and Other Trade Compliance Conferences

**June 4-8 - American University Washington College of Law - U.S. and International Anti-Corruption Law Certificate Program - Washington, DC - American University Washington College of Law**

**June 5 - Strong & Herd - ITAR & EAR from a UK Perspective: Advanced - London - 45 Moorfields, 8th Floor Tenter House -** *Gary Stanley, Editor of Defense and Export-Import update, will conduct this all-day workshop.*

**June 5 - U.S. Dept. of Commerce/Small Business Development Center - AES/ACE Export Compliance Seminar - Houston - Bank of America Financial Center, 2302 Fannin Street, Suite 200**

**June 5-6 - American Conference Institute - 11th China Forum on Anti-Corruption - Shanghai - The Langham Hotel**

**June 5-6 - American Conference Institute - EAR Boot Camp - Chicago - The Metropolitan Hotel**

**June 6-7 - April 11-12 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Trade Development Alliance of Greater Seattle - Complying with U.S. Export Controls - Seattle - Lynnwood Embassy Suites Hotel, 20610 44th Avenue West, Lynnwood, Washington 98036**

**June 6-7 - NielsonSmith - US Trade Controls Compliance in Europe 2018 - Munich - Le Meridien Hotel -** *Gary Stanley, Editor of Defense and Export-Import Update, will give an update on ITAR, EAR, CFIUS, and other U.S. trade compliance developments.*

**June 6-8 - American Association of Exporters & Importers (AAEI) - 97th Annual AAEI Conference & Expo - Baltimore - Baltimore Marriott Waterfront Hotel**

**June 7 - American Conference Institute - ITAR Boot Camp - Chicago - The Metropolitan Hotel**

**June 7 - U.S. Dept. of Commerce/Small Business Development Center - AES/ACE Export Compliance Seminar - Dallas - Renaissance Dallas Hotel**

**June 8 - Society for International Affairs - 2018 Spring Golf Outing - Upper Marlboro, Maryland - Lake Presidential**

**June 11 - Chatham House - Competition Policy 2018 - London**

**June 12 - U.S. Dept. of Commerce/U.S. Census Bureau & NCBFAA Educational Institute - Exporting Mechanics Webinar Series: Duty Drawback and Refunds - Online via Webinar - 1:00 - 2:00 PM EST**

**June 12-13 - C5 Group - 2nd Trade Compliance Nordics - Stockholm**

**June 12-13 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Houston District Export Council - Complying with U.S. Export Controls - Houston, Texas - Norris Conference Center, 816 Town & Country Blvd., Suite 210**

**June 14 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Houston District Export Council - Technology and Software Controls - Houston, Texas - Norris Conference Center, 816 Town & Country Blvd., Suite 210**

**June 14 - Massachusetts Export Center - Export Regulatory Compliance Update - 10:00 AM to 4:30 PM - Boston, Massachusetts - Foley Hoag Law Offices, Seaport West, 155 Seaport Boulevard**

**June 14 - National Defense Industries Association/Women in Defense - 2018 Women in Defense National Conference - Washington, DC - Washington Marriott Wardman Parkh**

**June 14 - Women in Defense - 2018 Women in Defense National Conference - Washington, DC - Washington Marriott Wardman Park hotel**

**June 17-19 - International Compliance Professionals Association (ICPA) - 2018 ICPA European Conference - Amsterdam - Holiday Inn Amsterdam**

**June 18-19 - American Conference Institute - 12th Advanced Forum on FCPA & Anti-Corruption for the Life Sciences Industry - New York - Park Lane Hotel**

**June 19-20 - American Conference Institute - 9th Advanced Forum on DCAA & DCMA Cost, Pricing, Compliance & Audits - Arlington, Virginia - Westin Crystal City**

**June 26-27 - American Conference Institute - 9th Midwest Anti-Corruption Compliance Forum - Chicago - The Blackstone Hotel**

**June 27-28 - C5 Group - 12th International Conference on Anti-Corruption London - London - Venue TBA**

**June 28 - Massachusetts Export Center - International Letters of Credit Webinar - 11:00 AM to 12:30 PM EDT**

**July 16-18 - Society for International Affairs - 2018 Summer Basics Conference - Washington, DC - Gaylord National Resort & Convention Center**

**July 25-26 - American Conference Institute - 9th Global Forum on Anti-Corruption Compliance in High Risk Markets - Washington, DC - Venue TBA**

**Sept. 5 - IDEEA, Inc. - ComDef 2018 - Washington, DC - National Press Club - *Gary Stanley, Editor of Defense and Export-Import Update, will again moderate the panel "Export Control Update" at this annual conference for the defense industry.***

**Sept. 13-17 - International Compliance Professionals Association (ICPA) -2018 ICPA@SEA - Galveston, TX to Cozumel**

**Sept. 19-20 - SMi Group - Defence Exports 2018 - Rome - Crowne Plaza Rome St. Peter's Hotel & Spa - *Gary Stanley, Editor of Defense and Export-Import Update, is proud to be once again chairing this event and conducting a related Sept. 18 workshop on "Jurisdiction, Classification, and Licensing: How to Police Your U.S. Suppliers"***

**Oct. 16-18 - Partnerships International, inc. - "Partnering for Compliance™" West 2018 - Fort Worth - Dallas-Fort Worth Marriott South Airport Hotel**

**Oct. 21-23 - International Compliance Professionals Association (ICPA) - 2018 ICPA Fall Conference - Grapevine, TX - Embassy Suites DFW Airport North**

**Nov. 8-9 - International Compliance Professionals Association (ICPA) - 2018 Annual Conference - Shanghai - Four Seasons Hotel**

**Nov. 27-30 - American Conference Institute - 35th International Conference on the Foreign Corrupt Practices Act - Washington, DC - Gaylord Natonal Resort & Convention Center**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to gstanley@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel.
Fax
Mobile
E-mail ████████ @glstrade.com

**From:** Jim Bartlett, Full Circle Compliance ▓▓▓▓@fullcirclecompliance.eu]
**Sent:** 5/31/2018 7:40:00 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0531 Thursday "Daily Bugle"



## Thursday, 31 May 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS: RPTAC to Meet on 12 Jun in Wash DC
2. State Renews DTAG Charter

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS: (No new postings.)
5. State/DDTC: (No new postings.)
6. Treasury/OFAC Posts Ukraine-/Russia-Related General License 13B
7. President Approves Section 232 Tariff Modifications
8. EU Posts Implementation Regulation Concerning the Combined Nomenclature

### NEWS

9. The Daily Beast: "He Said He Was Just a Plasma Scientist. They Said He Was a Chinese Spy" (Part 3 of 3)
10. The Guardian: "US Hits Allies with Steel Tariffs to Spark Trade War with EU, Canada and Mexico"
11. Reuters: "Japan Says it Has Detected Apparent Chinese Ship Breaking North Korea Sanctions"

### COMMENTARY

12. J. Pangaro: "Industry Insider: My Bill of Lading Does What?
13. M. Volkov: "Compliance and the Reckoning"

14.   R. Phipps: "Smoking Hot: Proposed Changes to USML Categories I, II, and III"

EX/IM TRAINING EVENTS & CONFERENCES

15.   ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 12-13 Sep in Annapolis, MD

**EDITOR'S NOTES**

16.   Bartlett's Unfamiliar Quotations

17.   Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (17 May 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (4 May 2018), ITAR (14 Feb 2018)

18.   Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. Commerce/BIS: RPTAC to Meet on 12 Jun in Wash DC
(Source: Federal Register, 31 May 2018.) [Excerpts.]

83 FR 24971-24972: Regulations and Procedures Technical Advisory Committee; Notice of Partially Closed Meeting
  The Regulations and Procedures Technical Advisory Committee (RPTAC) will meet June 12, 2018, 9:00 a.m., Room 3884, in the Herbert C. Hoover Building, 14th Street between Constitution and Pennsylvania Avenues NW, Washington, DC. The Committee advises the Office of the Assistant Secretary for Export Administration on implementation of the Export Administration

Regulations (EAR) and provides for continuing review to update the EAR as needed.

**Agenda**

*Public Session*
  (1) Opening remarks by the Chairman
  (2) Opening remarks by the Bureau of Industry and Security
  (3) Presentation of papers or comments by the Public
  (4) Export Enforcement update
  (5) Regulations update
  (6) Working group reports
  (7) Automated Export System update

*Closed Session*
  (8) Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 Sec. Sec. 10(a)(1) and 10(a)(3).

  The open session will be accessible via teleconference to 25 participants on a first come, first serve basis. To join the conference, submit inquiries to Ms. Yvette Springer at Yvette.Springer@bis.doc.gov no later than June 5, 2018.
...
  For more information, call Yvette Springer at (202) 482-2813.

Yvette Springer, Committee Liaison Officer.

back to top

* * * * * * * * * * * * * * * * * * * *

## 2. State Renews DTAG Charter
(Source: Federal Register, 31 May 2018.)

83 FR 25102: Renewal of Defense Trade Advisory Group Charter
* AGENCY: Department of State.
* ACTION: Notice.
* SUMMARY: The Department of State announces the renewal of the Charter for the Defense Trade Advisory Group (DTAG). The DTAG advises the Department on its support for and regulation of defense trade to help ensure the foreign policy and national security of the United States continue to be protected and advanced, while helping to reduce unnecessary impediments to legitimate exports in order to support the defense requirements of U.S. friends and allies. It is the only Department of State advisory committee that addresses defense trade related topics. The DTAG will remain in existence for two years after the filing date of the Charter unless terminated sooner.
* FOR FURTHER INFORMATION CONTACT: Mr. Anthony Dearth, Alternate Designated Federal Officer, Defense Trade Advisory Group, Directorate of Defense Trade Controls, Department of State, Washington, DC 20520, telephone: (202) 663-2836 or email DearthAM@state.gov.
* SUPPLEMENTARY INFORMATION: The DTAG is authorized by 22 U.S.C. 2651a and 2656 and the Federal Advisory Committee Act, 5 U.S.C. Appendix.

Anthony Dearth, Alternate Designated Federal Officer, Defense Trade Advisory Group, Department of State.

back to top

* * * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* State; NOTICES; Designations as Global Terrorists: Al-Nusrah Front [Publication Date: 1 June 2018.]

back to top

* * * * * * * * * * * * * * * * * * *

## 4. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * *

## 6. Treasury/OFAC Posts Ukraine-/Russia-Related General License 13B
(Source: Treasury/OFAC, 31 May 2018.)

Today, the Department of the Treasury's Office of Foreign Assets Control (OFAC) is issuing Ukraine-/Russia-related General License 13B, which replaces and supersedes General License 13A in its entirety. General License 13B extends the expiration date of the general license to 12:01 a.m. August 5, 2018.

back to top

* * * * * * * * * * * * * * * * * * *

## 7. President Approves Section 232 Tariff Modifications
(Source: The White House, 31 May 2018.)

Today, President Donald J. Trump signed two proclamations (found here and here), which note that measures are in place to address the impairment to the national security threatened by imports of steel and aluminum from Argentina, Brazil, and Australia.

At this time, similar measures are not in place with respect to steel or aluminum imports from Mexico, Canada, or the European Union. Therefore, as of June 1, 2018, tariffs will no longer be suspended for steel or aluminum imports from those countries. The Administration will continue discussions with them and remains open to discussions with other countries.

The Section 232 steel and aluminum tariffs have already had major, positive effects on steel and aluminum workers and jobs and will continue to do so long into the future. At the same time, the Trump Administration's actions underscore its commitment to good-faith negotiations with our allies to enhance our national security while supporting American workers.

The Administration will continue to monitor steel and aluminum imports and adjust the measures in effect as necessary to protect the national security of the United States.

back to top

* * * * * * * * * * * * * * * * * * * *

## 8. EU Posts Implementation Regulation Concerning the Combined Nomenclature
(Source: Official Journal of the European Union, 31 May 2018.)

*Regulations*
* Commission Implementing Regulation (EU) 2018/787 of 25 May 2018 concerning the classification of certain goods in the Combined Nomenclature (CN)

back to top

* * * * * * * * * * * * * * * * * * *

NEWS

## 9. The Daily Beast: "He Said He Was Just a Plasma Scientist. They Said He Was a Chinese Spy" (Part 3 of 3)
(Source: The Daily Beast, 27 May 2018.) [Excerpts.]

... Daniel Max Sherman was a student of Roth's at UT before going into business with him. Now 47 and living in Chattanooga, Sherman exudes an unmistakable cynicism about the world.

Born in rural Dayton, Tennessee, to a mom who had turned 18 only a few days earlier, Sherman never met his father. He got his contact info a while back, but never actually got in touch.

"I grew up with a long list of stepfathers, most of them with military backgrounds," Sherman explained. "The first father I remember was a drill sergeant for the Army and he was not a nice man."

Sherman, who is speaking publicly about the case for the first time, left home during his senior year of high school, primarily to escape his mother's third husband, an alcoholic Marine Corps drill instructor. Sherman's grandmother managed to cobble together enough money for him to attend UT, and one of his high school teachers gave him a few hundred bucks for textbooks.

Sherman was the director of plasma sciences at a small, publicly traded company in Knoxville called Atmospheric Glow Technologies (AGT). Roth was a minority partner. Located in a commercial park 20 minutes west of downtown Knoxville, the offices are less than a 10-minute drive from Reece Roth's home.

AGT was spun off from UT to develop commercial applications for Roth's plasma actuator design. In fact, Sherman, who co-owns the patent, says the actuator "in this particular form was a design that resulted during my Master's in 1995. At that time, Dr. Roth was my advisor." Roth reportedly offered to let Sherman take full credit, but Sherman, Roth, and a third collaborator are listed as co-inventors.

AGT existed with two basic funding mechanisms, Sherman explained. One followed the traditional commercial model, raising money from outside investors. The other came from the federal government. Sherman was the one who wrote the bulk of those proposals, generating most of the initial ideas after which he said other people's names would inevitably also be "slapped on."

Still, the question remains: Why would Roth risk his reputation, his career, and his freedom just to hire a couple of foreign graduate research assistants? Is it really that hard to find competent American Ph.D. candidates?

"Dr. Roth's lab was constantly filled with foreign nationals," said Sherman. "His book had been translated into foreign languages and they respected him and most Americans couldn't stand working for him, he was such an ass."

Dan Golden, author of *Spy Schools: How the CIA, FBI, and Foreign Intelligence Secretly Exploit America's Universities*, was the first person to interview Roth when he went to prison in 2012 and has written about the case extensively.

"I think it flattered his vanity to have students who had admired him from afar and who could remind him about what a major figure he was in China, because he's not a man without ego," Golden told The Daily Beast. "So, that's the specific reason. More broadly, there's a plethora of foreign graduate

students in American science departments." (He also points out the ironic disconnect between UT's vigilance in turning in Roth while at the same time seeming less alert to the myriad issues posed by hosting a Confucius Institute on campus.)

It was Sherman who ultimately acquiesced to Roth's demand that Xin Dai, his Chinese student, be hired onto the drone project. However, he insisted that all restricted material be kept away from Dai and handled by an American student, Truman Bonds. A noble concept, but one that unfortunately did not work in practice, according to Sherman.

As Dai neared graduation and Roth announced that he wanted Nourgostar to take his place, Sherman finally put his foot down.

  "It had been made clear to me that it really wouldn't be a good idea," said Sherman. "As one of [my former colleagues] at Oak Ridge [National Laboratory] explained to me, 'Daniel, I can't send this pen to Iran.'"

When Sherman told Roth he would do whatever it took to block the hire, Roth sought support from the university's supervisor of faculty research contracts. She advised Roth to speak to the school's newly-hired export control officer, who was more than a little alarmed not only by the notion of hiring an Iranian national for a project that was very obviously subject to serious regulations, but also that a Chinese national had already spent a year illegally working on the project without anyone knowing it. Roth left for China, the export control officer called authorities, and that's when everything began to collapse.

According to most everyone involved, Roth ignored multiple warnings from various people about his hiring of foreign students, insisting all the while that the university's non-discrimination policy overrode federal export law.

During the trial, Roth flatly refused to consider negotiating a plea bargain, insisting he had done nothing wrong. The jury obviously thought otherwise, finding that Roth acted with the requisite intent.

  "The greatest damage, my friends would say, is that by the time I left prison, I had turned my back on invention"

Backed into a corner, Sherman agreed to plead guilty to one count of conspiracy to violate the Arms Export Control Act. The judge sentenced him to 14 months. He did his time as inmate #32207-074 at a federal prison camp in Florence, Colorado, alongside former Enron CFO Andy Fastow, who worked in the barbershop.

Sherman says he took the deal in hopes that he could "put this shitstorm behind me and try to eventually rebuild a life, which I haven't."

  "What does a felon do when they get out of jail?" he says when asked if he still practices physics. "They do construction. I do remodeling and construction, that pays the majority of my bills."

Xin Dai got his Ph.D. in electrical engineering in 2006, and now works as a patent lawyer in Palo Alto. He did not respond to multiple requests for comment. Sirous Nourgostar is working as a researcher in the University of Wisconsin Madison's Department of Nuclear Engineering. Truman Bonds is the president of a firm in Knoxville, which is successfully commercializing a carbon fiber oxidation project Sherman says he started back at Atmospheric Glow. Reached by email, Bonds declined to comment.

Atmospheric Glow was charged as a company, and pleaded guilty to 10 counts of conspiracy. On April 1, 2008, the firm declared bankruptcy. A few months later, AGT's assets were sold off to a Connecticut firm for $125,000 cash, plus $200,000 in stock.

In the end, Sherman fell just short of earning his doctorate. Once the federal investigation began, the Air Force stopped communicating with the AGT team. When the Ph.D. committee realized there would be no way for Sherman to publish his results, they told him it wasn't worth going any further.

 "The greatest damage, my friends would say, is that by the time I left prison, I had turned my back on invention," Sherman said. "I found a wealthy philanthropist here in town who wanted me to take on a high-tech project kind of as a hobby, and I did that for a little while until he passed away, and I haven't done science since."

Both Sherman and Roth speak about their plasma research with noticeable pride, although they both say it has largely disappeared.

 "I will tell you that all the inventions that we came up with, to this day are still not being discussed in the public literature," said Sherman. "The technology could literally be 100 times more electrically efficient and 10 times stronger, but no one talks about it."

 "The technology in the U.S. has not advanced nearly as quickly and over as broad a range as I think it should have," said Roth, who lists a number of civilian uses that haven't yet been fully explored, including sterilization and decontamination in the medical and agricultural fields.

 "At the time I was jailed, there were a bunch of tests showing that plasma actuators could reduce the drag on [wind turbine blades] up to 30 percent," Roth explained. "In aerodynamic terms, that's a big decrease in drag. Over the last 50 years, they've been spending millions to get the drag on airfoils down just a few percent at a time."

On the other hand, Tom McLaughlin of the Air Force Academy says Roth's technology, which he describes not as a brand-new discovery, but a clever "tool" based on the dielectric barrier discharge plasma first reported by Ernst Werner von Siemens in 1857, had already reached what he considers to be its practical limits, at least for his purposes.

"It was difficult to make it work at aerodynamic speeds of interest to us," McLaughlin told The Daily Beast. "It would at very low speeds but the faster you got, the less effective it became. I don't think the case led to the demise of the technology, we played out the technology and found it wasn't doing everything we thought it would."

Dan Golden appreciates the fact that Dai and Nourgostar have stayed to make lives in America, saying that this is precisely the point that people often overlook when they talk about the danger of espionage at U.S. universities: The great majority of Chinese (and other) students who come to the States and earn their Ph.D.s stay for at least five years after getting their doctorate. Some stay a lot longer than that, said Golden, meaning their inventions stay here, too.

"If you cut off China, you lose the benefit of all the research they do when they're here. If we can reduce the espionage and theft done by a small minority, we could get the benefit of the majority, who don't."

The experience has obviously left an indelible impression on Roth, whose wife Helen watches TV in the other room as he recounts events more than a decade in the past like they happened yesterday.

Today, Roth's life tends toward the ludditistic. He has a cell phone, but if he wants to put something in writing, he sends a letter. He has refused to get online since leaving prison for fear of "the potential misrepresentation of any kind of message they happen to come up with through these dragnets that they perform on people's correspondence."

Roth views his case as having been "politically motivated," and doesn't think investigators had the necessary level of scientific sophistication to fully grasp the nuances involved. If they had, he doesn't believe he ever would have been hauled into court in the first place.

"Some of those prosecutors were involved in pursuing people who were producing bootleg liquor and that was the kind of prosecution that they seemed to go after," Roth says. "I think they attribute China's technical success to their stealing our technology, when in fact the Chinese are perfectly capable of developing and originating their own."

*[Parts 1 and 2 of this article were published in the Daily Bugle of Monday and Tuesday, respectively.]*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. The Guardian: "US Hits Allies with Steel Tariffs to Spark Trade War with EU, Canada and Mexico"
(Source: The Guardian, 31 May 2018.) [Excerpts.]

A full-scale trade war between Washington and Brussels is looming after the US announced that it was imposing tariffs on imported steel and aluminum from the EU.

The president of the European commission, Jean-Claude Juncker, promised swift retaliation after the US commerce secretary, Wilbur Ross, said EU companies would face a 25% duty on steel and a 10% duty on aluminum from midnight on Thursday.

Europe, along with Canada and Mexico, had been granted a temporary reprieve from the tariffs after they were unveiled by Donald Trump two months ago.

But Ross said insufficient progress had been made in talks with three of the US's traditional allies to reduce America's trade deficit and that the waiver was being lifted.

The move - which comes at a time when Trump is also threatening protectionist action against China - triggered an immediate response from Brussels.

Juncker called the US move "unjustified" and said that the EU had no choice but to hit back with tariffs on US goods and a case at the World Trade Organization in Geneva.

  "We will defend the Union's interests, in full compliance with international trade law," he added. Brussels has already announced that it would target Levi's jeans, Harley Davidson motorbikes and bourbon whiskey.

Britain, which has hopes of agreeing a trade liberalization deal with the US after Brexit, expressed alarm at Ross's announcement.

  "We are deeply disappointed that the US has decided to apply tariffs to steel and aluminum imports from the EU on national security grounds," a government spokesman said.

  "The UK and other European Union countries are close allies of the US and should be permanently and fully exempted from the American measures on steel and aluminum." ...

back to top

* * * * * * * * * * * * * * * * * * * * *

11. Reuters: "Japan Says it Has Detected Apparent Chinese Ship Breaking North Korea Sanctions"
(Source: Reuters, 29 May 2018.)

Japan on Tuesday said it had detected what appeared to be a Chinese-flagged vessel, 350 km (218 miles) off Shanghai, conducting illegal transfers to a North Korean ship.

DOC_0002007

"Following a comprehensive assessment, the government of Japan strongly suspects that they conducted ship-to-ship transfers banned by UNSCR," Japan's Ministry of Foreign Affairs said in a press release, referring to U.N. Security Council resolutions.

A Japanese P-3 maritime patrol plane detected the vessels, which lay alongside each other connected by hoses, on May 19, with one of the ships flying what seemed like a Chinese flag, it said.

China has repeatedly said it is fully enforcing U.N. sanctions against North Korea and it would punish any Chinese company breaking them.

Japan's decision to voice its suspicion comes as North Korean leader Kim Jong Un and U.S. President Donald Trump prepared for what may be a breakthrough summit as early as next month.

Japan is urging the United States and other countries to stick to a strict imposition of U.N. sanctions on North Korea until it abandons the development of nuclear weapons and ballistic missiles.

In April, the U.N. Security Council blacklisted dozens of ships and shipping companies over oil and coal smuggling by North Korea, including five based in China. The vessels are subject to a global port ban and must be deregistered.

back to top

* * * * * * * * * * * * * * * * * * * *

COMMENTARY

## 12. J. Pangaro: "Industry Insider: My Bill of Lading Does What?

(Source: American Shipper, 29 May 2018.) [Excerpts.]

* Author: Joe Pangaro, Trial Attorney, Duane Morris, jjpangaro@duanemorris.com.

*Supply chain professionals would be wise to examine their bills of lading carefully as fine print like a forum selection clause can have a big impact in dispute resolution, according to attorney Joe Pangaro.*

Anyone who works in the transportation, shipping or logistics sectors knows how even the small details - sometimes especially the small details - can have a major impact on supply chains.

I will never forget an interaction I saw when I worked as a supply chain analyst some years ago. A supervisor came up to the newest member of our team and informed him that instead of shipping a 40-foot container full of chemicals to the Netherlands, he had actually shipped it to the Netherlands Antilles, more than 4,000 miles away.

The new team member's exasperated reaction was priceless: "How many Netherlands can there possibly be?" ...

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 13. M. Volkov: "Compliance and the Reckoning"
(Source: Volkov Law Group Blog, 30 May 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

The compliance profession cannot rest on its achievements and become complacent. There are two significant events that are on the horizon and inevitably will occur.

Compliance professionals have grown in number and in influence. At the same time, compliance professionals are enjoying unprecedented independence and authority. As the compliance profession rises, however, so will accountability - fair or unfair, it is soon about to hit.

Companies that invest in compliance programs continue to suffer from a narrow understanding of compliance. I recently listened to a CEO speak to her compliance department and she emphasized over and over how important it is for the company to stay "compliant." The CEO missed the mark - compliance has a broader function; compliance is not measured by whether or not the organization violates a law, regulation or its code of conduct.

When a company suffers a serious violation and enforcement action, everyone can expect the CEO and the board to turn to the CCO and ask, "what happened?" The CEO's question will suggest that somehow the compliance program did not work, or that the CCO failed to do his or her job.

For the CCO, it is important to remember that when living on a pedestal, there is only way off the pedestal and that is down. Many in the corporate governance world - directors and CEOs - are under the mistaken belief that investing in a world-class ethics and compliance program prevents the occurrence of misconduct. Unfortunately, the world does not work that way, and the sooner CCOs prepare for this event, the better.

The compliance profession's accountability (whether fair or not) will extend into the political sphere as well. In response to the rampant corporate fraud in the early 2000s, Congress enacted Sarbanes-Oxley and transformed the auditing profession. Congress returned to reform the financial industry after

the economic recession hit in 2008, and Dodd-Frank brought us SEC whistleblowers and major financial reforms.

Whenever the next financial bump in the road occurs, guess who will be the new savior? Yes, the compliance profession. Building on all of the standards, guidelines, and enforcement direction on compliance programs, Congress will enact and prescribe comprehensive ethics and compliance program requirements for companies. Congress will reach out to the most available solution, grab onto a few experts and start drafting legislative requirements for compliance.

Companies will be mandated to invest in compliance program requirements. Companies that fail to implement mandated compliance will be punished, and directors and senior executives will be required to certify under penalty of criminal prosecution as to the effectiveness and adequacy of a company's compliance program. The seeds for all these ideas are being planted by prosecutors, regulators and politicians.

I am not trying to scare anyone - the compliance profession has overcome many more difficult challenges. After all, the compliance profession brings creativity, integrity and commitment to the task.

The two challenges, however, are distinct. CCOs have to spend more time training and explaining compliance functions to corporate boards and senior leadership. Education is critical in this area. Board members and CEOs think they understand compliance but in fact most have a very rudimentary understanding of a compliance program. In those cases where the board has a member with compliance expertise, the situation is different - the board member can help the other board members to understand how to conduct oversight and to monitor a compliance program. Such a knowledge base is invaluable and makes the CCOs job that much easier.

The compliance profession faces an even more daunting challenge when seeking to educate Congress on the compliance function. Congressional staff are not known for engaging in a deep dive on such subjects, especially given the press of business and other topics. Congress will rely on a small cadre of experts to help them develop legislation and such drafting will inevitably raise concerns. In the end, the compliance profession will need to develop a broader policy presence on Capitol Hill - it will eventually happen, and the sooner the better.

back to top

❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄ ❄

## 14. R. Phipps: "Smoking Hot: Proposed Changes to USML Categories I, II, and III"
(Source: CTP Compliance Solutions, 15 May 2018.)

* Author: Rick Phipps, Director, CTP Compliance Solutions, rphipps@ctp-inc.com.

On top of the background buzz regarding the ZTE zigzag, the latest shoe has dropped in the ongoing export control reforms. Three shoes actually, since we can now read about the proposed move of certain items controlled in Categories I, II, and III on the U.S. Munitions List (USML) over to the Commerce Control List (CCL). Long awaited by U.S. gun and ammunition manufacturers and exporters, these proposed rules describe how articles the President determines no longer warrant control under USML would be controlled on the CCL and by the Export Administration Regulations (EAR) and describe more precisely articles warranting export and temporary import control on the USML.

As part of export control reforms under the Obama administration, the executive branch completed transfers of items in the following categories from the USML to the CCL and created Category XIX (gas turbine engines):

- Category IV (launch vehicles, guided and ballistic missiles, rockets, torpedoes, bombs, and mines);
- Category V (explosives and energetic materials, propellants, incendiary agents, and their constituents);
- Category VI (surface vessels of war and special naval equipment);
- Category VII (ground vehicles);
- Category VIII (aircraft and related articles);
- Category IX (military training equipment and training);
- Category X (personal protective equipment);
- Category XI (military electronics);
- Category XII (fire control, laser, imaging, and guidance equipment);
- Category XIII (materials and miscellaneous articles);
- Category XIV (toxicological agents, including chemical agents, biological agents, and associated equipment);
- Category XV (spacecraft and related articles);
- Category XVI (nuclear weapons related articles);
- Category XVIII (directed energy weapons); and
- Category XX (submersible vessels and related articles).

Left remaining were changes to Categories I-III (firearms, close assault weapons and combat shotguns, guns and armament, and ammunition/ordnance).

Under the proposed rules published by BIS and the State Department, a number of new ECCNs are created to address transferred items and the relevant USML categories are revised to describe more precisely the articles warranting continued control on the USML. The interagency review process focused on identifying items that were either (i) inherently military and otherwise warranted control on the USML, or (ii) if of a type common to non-military firearms applications, possessed parameters or characteristics that provide a critical military or intelligence advantage to the U.S., and are almost exclusively available from the U.S. If one or both points were met, the article remained on the USML.  Essentially, commercial items widely available for purchase and less sensitive military items were transferred in the

proposed rules. Links to the proposed rules are as follows: State Department and Commerce Department.

There will be a 45-day period following publication in the Federal Register in which the agencies will accept comments regarding the proposed rules. Exporters and manufacturers of articles currently controlled under USML Categories I-III should review the proposed rules to consider how they may be impacted. Comments may be submitted via the Federal eRulemaking Portal: http://www.regulations.gov or via email to DDTCPublicComments@state.gov with the subject line, "ITAR Amendment - Categories I, II, and III."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

## 15. ECS Presents "ITAR/EAR Boot Camp (Seminar Level I)" on 12-13 Sep in Annapolis, MD
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com.)

* What: Seminar Level I: ITAR/EAR Boot Camp, Annapolis, MD
* When: September 12-13, 2018
* Where: Chart House Restaurant on Spa Creek
* Sponsor: Export Compliance Solutions (ECS)
* ECS Speaker Panel: Suzanne Palmer, Mal Zerden
* Register: Here or by calling 866-238-4018 or e-mail spalmer@exportcompliancesolutions.com.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 16. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Niccolo Machiavelli** (Niccolò di Bernardo dei Machiavelli; 3 May 1469 - 21 Jun 1527, was an Italian diplomat, politician, historian, philosopher, humanist, and writer of the Renaissance period. He wrote comedies, carnival songs, and poetry. He wrote his most well-known work *The Prince (Il Principe)* in 1513. "Machiavellian" is widely used as a negative term to characterize unscrupulous politicians of the sort Machiavelli described most

famously in *The Prince*, describing immoral behavior, such as dishonesty and the killing of innocents, as being normal and effective in politics.)
- *"There is nothing more difficult to take in hand, more perilous to conduct, or more uncertain in its success, than to take the lead in the introduction of a new order of things."*
- *"When you disarm the people, you commence to offend them and show that you distrust them either through cowardice or lack of confidence, and both of these opinions generate hatred.*

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 17. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 17 May 2018: 83 FR 22842-22846: Revisions to the Unverified List (UVL)

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30

- Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
- HTS codes that are not valid for AES are available here.
- The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
- Last Amendment: 4 May 2018: Harmonized System Update 1807, containing 289 ABI records and 60 harmonized tariff records.
- HTS codes for AES are available here.
- HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
- Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
- The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 18. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ▓▓▓▓▓▓▓@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ("FCC") ████@fullcirclecompliance.eu]
**Sent:** 6/1/2018 9:01:07 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0601 Friday "Daily Bugle"



## Friday, 1 June 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DHS/CBP Releases Harmonized System Update 1808
4. DHS/CBP Updates on Additional Duty on Imports of Steel and Aluminum Articles under Section 232
5. State/DDTC Posts Notice Concerning Tier 1 Registrants

### NEWS

6. Computer World: "Security Researchers Call for Changes to Australian Defense Exports Regime"
7. Defense News: "Two Key Industry Groups Hope Now is the Time to Push a Major Change to the Defense Export Process"
8. Salon: "U.S. Gun Industry Wants a Bigger Piece of the World's Arms Trade"
9. ST&R Trade Report: "Dates and Deadlines: Valuation, GSP Reviews, Classification, Export Forms"

### COMMENTARY

10. M. Volkov: "DOJ Charges Two Additional Individuals in FCPA Rolls Royce Case"
11. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Changes to Export Controls in May 2018"

12. R.K. Huffman, K.J. Wolf & N.G. Kohne: "White Paper: Recent Department of Defense Guidance on Cybersecurity Requirements and Related Export Control Issues"

EX/IM TRAINING EVENTS & CONFERENCES

13. FCC Presents "Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR", 12 Jun in Bruchem, the Netherlands

14. List of Approaching Events - 11 New Events Listed

EDITOR'S NOTES

15. Bartlett's Unfamiliar Quotations

16. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (17 May 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (1 Jun 2018), ITAR (14 Feb 2018)

17. Weekly Highlights of the Daily Bugle Top Stories



Are you Keeping Up to Date with the Latest Regulations?

The BITAR and BAFTR will keep you updated on the latest ITAR and FTR amendments.

MORE INFORMATION AVAILABLE HERE

ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * * * * * *

OTHER GOVERNMENT SOURCES

# 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS; RULES; Implementation of the February 2017 Australia Group Intersessional Decisions and the June 2017 AG Plenary Understandings; Addition of India to the AG; Correction [Publication Date: 4 Apr 2018.]

back to top

* * * * * * * * * * * * * * * * * * * *

# 2. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * * *

# 3. DHS/CBP Releases Harmonized System Update 1808
(Source: CSMS# 18-000373, 1 Jun 2018.) [Excerpts.]

Harmonized System Update (HSU) 1808 was created on May 31, 2018 and contains 11,876 ABI records and 2,228 harmonized tariff records.

This update includes modifications made as a result of two Presidential Proclamations, issued May 31st, amending Section 232 tariffs on steel and aluminum imports. These changes are effective on June 1, 2018.

The Presidential Proclamation on Steel may be found here. The Presidential Proclamation on Aluminum may be found here. These above adjustments can also be found within the 2018 USHTS, Revision 5 using this link.

In addition, on December 22, 2017, the President signed into law the Tax Cuts and Jobs Act (Public Law 115-97), which mandated modification to the Internal Revenue Code of 1986 (IRC). Regulations related to alcohol administered by TTB are included, and the ACE HTS has been updated to reflect these

changes. While we expect further guidance to be issued soon, the legislation can be found here.

In support of the PGA Message Set functionality, Participating Government Agency (PGA) indicators were updated as well.

Finally, adjustments required by the verification of the 2018 Harmonized Tariff Schedule (HTS) are also included.

The modified records are currently available to all ABI participants and can be retrieved electronically via the procedures indicated in the CATAIR. For further information about this process, please contact your client representative. ...

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

## 4. DHS/CBP Updates on Additional Duty on Imports of Steel and Aluminum Articles under Section 232
(Source: CSMS #18-000372, 31 May 2018.)

BACKGROUND:

On March 8, 2018, the President issued Proclamations 9704 and 9705 on Adjusting Imports of Steel and Aluminum into the United States, under Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862), providing for additional import duties for steel mill and aluminum articles, effective March 23, 2018. See the Federal Register, 83 FR 11619 and 83 FR 11625, March 15, 2018. On March 22, 2018, the President issued Proclamations on Adjusting Imports of Steel and Aluminum into the United States. See the Federal Register, 83 FR 13355 and 83 FR 13361, March 28, 2018. On April 30, 2018, the President issued Proclamations 9739 and 9740 on Adjusting Imports of Steel and Aluminum into the United States. See the Federal Register, 83 FR 20683 and 83 FR 20677, May 7, 2018. On May 31, 2018, the President issued Proclamations on Adjusting Imports of Steel and Aluminum into the United States.

These duty requirements are effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on March 23, 2018.

COMMODITY: Steel mill and aluminum articles, as specified in the Presidential Proclamations.

COUNTRIES COVERED BY SECTION 232 IMPORT DUTIES:
Please note that the Section 232 measures are based on the country of origin, not the country of export.

*Steel:*
- As of June 1, 2018: All countries of origin except Argentina, Australia, Brazil, and South Korea.

*Aluminum:*
- As of June 1, 2018: All countries of origin except Argentina and Australia.

COUNTRIES COVERED BY SECTION 232 ABSOLUTE QUOTAS:

*Steel:*
- As of June 1, 2018: Argentina, Brazil, and South Korea.

*Aluminum:*
- As of June 1, 2018: Argentina.

For both steel and aluminum, imports of United States origin are not covered by the Section 232 measures.

*FILING INSTRUCTIONS:*

SECTION 232 IMPORT DUTIES: Use non-quota entry type codes.

UPDATE: As of June 1, 2018, for all imports of aluminum from South Korea, importers should also use non-quota entry type codes.

*Steel Products*

In addition to reporting the regular Chapters 72 & 73 of the Harmonized Tariff Schedule (HTS) classification for the imported merchandise, importers shall report the following HTS classification for imported merchandise subject to the additional duty:

> 9903.80.01 (25 percent ad valorem additional duty for steel mill products)

*Aluminum Products*

In addition to reporting the regular Chapter 76 of the HTS classification for the imported merchandise, importers shall report the following HTS classification for imported merchandise subject to the additional duty:

> 9903.85.01 (10 percent ad valorem additional duty for aluminum products)

SECTION 232 ABSOLUTE QUOTAS: Use quota entry type codes (entry types 02, 06, 07, 12, 23, 32, 38, or 52). For further guidance, see CBP quota bulletins.

*Generalized System of Preferences (GSP) and African Growth and Opportunity Act (AGOA)*

GSP and AGOA-eligible goods that are subject to Section 232 duties or quotas may not receive GSP or AGOA duty preference in accordance with 19 USC 2463(b)(2).

On imports subject to Section 232 duties or quotas (including imports from Argentina and Brazil), in addition to any applicable Section 232 duties, importers should pay the normal trade relations (column 1) duty rates and not submit the GSP Special Program Indicator (SPI) "A" or the AGOA SPI "D"

* FOR FURTHER INFORMATION: For more information, please refer to the Presidential Proclamations on Adjusting Imports of Steel and Aluminum into the United States, Federal Register, 83 FR 11619 and 83 FR 11625, March 15, 2018; the March 22, 2018 Presidential Proclamations on Adjusting Imports of Steel and Aluminum into the United States. 83 FR 13355 and 83 FR 13361, March 28, 2018; and the April 30, 2018 Proclamations on Adjusting Imports of

Steel and Aluminum into the United States. 83 FR 20683 and 83 FR 20677, May 7, 2018; and the May 31, 2018, Proclamations on Adjusting Imports of Steel and Aluminum into the United States.

Also see Frequently Asked Questions here.

Questions related to Section 232 entry filing requirements should be emailed to traderemedy@cbp.dhs.gov. Questions from the importing community concerning ACE rejections should be referred to their Client Representative.

* Related: 18-000352, 18-000317, 18-000296

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 5. State/DDTC Posts Notice Concerning Tier 1 Registrants
(Source: State/DDTC, 31 May 2018.)

DDTC has determined that a system issue prevented registration reminder letters for Tier 1 registrants with expirations of May 31, 2018 and June 30, 2018 from being sent out at least 60 days prior to expiration.  The issue has been resolved.  To ensure registrants are not adversely affected, DDTC has temporarily extended May 31, 2018, expirations to July 31, 2018, and June 30, 2018, expirations to August 31, 2018.  Please note that registration submissions still need to be made at least 30 days in advance of the expiration of the temporary extension to ensure a lapse in registration does not occur.  Properly renewed registrations affected by this issue will reflect either a May and June 2019 expiration, unless a lapse occurs.  Questions regarding registration status as a result of this issue should be directed to the DDTC Response Team.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## NEWS

## 6.
Computer World: "Security Researchers Call for Changes to Australian Defense Exports Regime"
(Source: Computer World, 1 Jun 2018.)

*Defense Trade Controls Act restrictions on cryptography research could make Australia less secure, researchers argue.*

A group of information security researchers has called for changes to Australia's Defense Trade Controls Act. The group argues that the current DTCA regime can act as a barrier to cryptography research.

The government has commissioned Dr. Vivienne Thom to conduct a review of the DTCA, which imposes penalties for the unauthorized export and in some cases publication of certain types of technology - including so-called "dual-use" technologies.

The DTCA is Australia's implementation of the 42-nation Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies. ...

[Australia's Defense Strategic Goods List (DSGL)] has some exemptions relating to technology that is already "in the public domain", "basic scientific research", and the minimum information necessary for applying for a patent. ...

However, a group of researchers has called for a broadening of the exemption on "basic research" to "fundamental research". ...

back to top

✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸ ✸

## 7.

### Defense News: "Two Key Industry Groups Hope Now is the Time to Push a Major Change to the Defense Export Process" (Source: Defense News, 1 June 2018.)

With the Trump administration making it clear that American defense sales abroad are a fundamental part of its economic and security plans, two key industry trade groups are hoping now is the time to push through a major change to the defense export process.

The Aerospace Industries Association this week delivered a letter to Secretary of State Mike Pompeo calling for the creation of a national security cooperation strategy that would increase both transparency and speed to the military export system.

The 21-page AIA letter with 11 broad recommendations for how the Trump administration should handle defense exports to grow the industrial base, has been endorsed by the National Defense Industrial Association, America's other major defense industry trade group.

The push for a national Security Cooperation Strategy started under Fanning's predecessor, David Melcher. But AIA is hoping to get fresh energy behind that push during the current review period for the new arms control export rules proposed by the administration.

The association isn't "advocating to getting to 'yes' faster; we're advocating for

getting to the right answer faster, whether it is 'yes' or 'no,'" Eric Fanning, AIA's CEO, told reporters this week.

"This was something that frustrated me when I was in government," added Fanning, who served as both Secretary of the Army and Acting Secretary of the Air Force during the Obama administration. "If the answer is 'no.' it's helpful to get to it quickly so we're not frustrating allies and partners."

AIA's goal is twofold. First, to create a strategy guiding America's goals with foreign weapon sales, which would be informed by the National Security Strategy and National Defense Strategy. While not wanting to commit to a format, Fanning said he could envision a largely classified report that would lay out where America needs more capability and how allies could fill it.

As an example, he held up the ever-present need for more lift capability in Africa. If the U.S. knows it needs that capability, having a strategy would allow Washington to guide partners in Africa towards procuring lift capabilities over other items they may request instead.

While acknowledging that domestic desires don't match up with what the U.S. thinks countries need, Fanning argued that having a cohesive strategy involving State, Commerce and the Pentagon would allow a clear voice that could impact those decisions.

"Saying 'no, you can't have X' is different from saying 'you can't have X, but you could have Y,'" Fanning said. "If we can paint a picture of how them increasing certain capabilities does help them because it helps the broader effort, I think it helps us make our case."

Remy Nathan, AIA's vice president of international affairs, added that having a strategy could also allow the U.S. to guide partners on how best to improve in order to be cleared for the system they truly desire. If a nation can't be sold a system because of industrial security concerns, for example, a broad strategy would allow the entirety of the U.S. government to give clarity on how to improve that.

*Point Person Needed*

The second half of the strategy would involve a point person, or at least office, who has oversight on the entire weapon exports process.

Right now, various offices at DoD, State, and Commerce all have a piece of defense exports, and there is no single person who is the export czar, for lack of a better term. Appointing such a person, or creating a board of some kind, would allow direct oversight and make sure individual cases are not getting caught in the gears of the system.

"This issue here isn't that the system is broken. It's that its burdened," said Nathan.

Fanning again stressed this isn't about turning all cases that are denied into American defense sales, but rather about making sure that everyone involved finds out what the status of their request is. An ally shouldn't have to wait months and months to get a no answer, which would lead to confusion and frustration, industry has argued.

The letter from AIA is neutral on where that office or individual could reside, although given the interagency nature of the process, it may make sense to be tied into the White House staff itself.

Regardless of where it lives, however, the point person would be needed to ensure the security cooperation strategy is being carried out, Fanning said.

"By design or by accident, things get stuck a lot, and if someone is at least monitoring it we can push it along and get it through the system," he noted.

back to top

* * * * * * * * * * * * * * * * * * * *

## 8.
## Salon: "U.S. Gun Industry Wants a Bigger Piece of the World's Arms Trade"
(Source: Salon, 1 Jun 2018.) [Excerpts.]

... The weapons covered by a proposed rule, which would transfer authority to license U.S. gun manufacturer sales overseas from the State Department to the Commerce Department, include assault-style rifles, high-capacity pistols and armor-piercing sniper rifles.

"Sound policy would not make it easier for U.S. gun manufacturers who made the assault weapons used in the mass shootings at Sandy Hook, Pulse nightclub, Las Vegas, and Parkland to sell them to international buyers," said Kristen Rand, legislative director at the Violence Policy Center.

The rule would also end the practice of notifying Congress of commercial arms sales above $1 million. Congressional outrage blocked the sale of assault rifles to Philippines police in 2016 and blocked the sale of arms to the Turkish president's security guards in 2017. ...

back to top

* * * * * * * * * * * * * * * * * * * *

## 9.
## ST&R Trade Report: "Dates and Deadlines: Valuation, GSP Reviews, Classification, Export Forms"
(Source: Sandler, Travis & Rosenberg Trade Report, 1 June 2018.) [Excerpts.]

Following are highlights of regulatory effective dates and deadlines and federal agency meetings coming up in the next week.

- 4 Jun: deadline for comments to FTZ Board on production request from aircraft engine part facility
- 4 Jun: deadline for comments to FTZ Board on production requests for optical cable, PTFE facilities
- 5 Jun: deadline for comments to BIS on form BIS-711, Statement by Ultimate Consignee and Purchaser
- 5 Jun: deadline for comments to USTR on GSP reviews of three countries ...
- 8 Jun: deadline for applications for USDA export assistance funding programs ...
- 8 Jun: deadline for comments to CBP on proposed revocation or modification of classification rulings

back to top

* * * * * * * * * * * * * * * * * * *

COMMENTARY

## 10.
## M. Volkov: "DOJ Charges Two Additional Individuals in FCPA Rolls Royce Case"
(Source: Volkov Law Group Blog, 31 May 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

The Justice Department added to its roster of criminal FCPA defendants. Going back to 2017, it is clear that the Yates Memorandum requirements have resulted in an increase in criminal FCPA prosecutions.

Last week, the Justice Department unsealed a superseding indictment adding two individuals to the Rolls Royce criminal FCPA case in Ohio. The criminal investigation centers on bribes to a Kazakh official to win a $145 million contract to supply equipment and services for the construction of a gas pipeline from Kazakhstan to China.

The two individuals added to the criminal indictment were employees of an international engineering consulting firm: Azat Martirossian, an Armenian citizen, and Vitaly Leshkov, a Russian citizen, were charged with one count of FCPA conspiracy to launder money and 10 counts of money laundering. They were joined with a pending criminal case against Peter Contoguris, a Greek citizen, who was charged in an earlier version of the indictment with one count of FCPA conspiracy, seven counts of violating the FCPA, and three counts of money laundering. All three defendants have not been apprehended and reside outside the United States.

DOC_0002026

In January 2017, Rolls Royce settled an FCPA enforcement action by paying $170 million out of a global settlement of $800 million, which included the United Kingdom and Brazil. Rolls Royce entered into a deferred prosecution agreement.

In October 2017, the Justice Department returned a criminal indictment charging five individuals with criminal FCPA violations and money laundering charges. Four of those defendants plead guilty. Contoguris was one of the five defendants originally charged in the indictment. The four defendants who plead guilty are: James Finley, a UK citizen, and former Rolls Royce senior executive; Keith Barnett, a US citizen and former Rolls Royce manager; Aloysius Johanne Jozef Zuurhout, a Netherlands citizen and former Rolls Royce sales employee; and Andreas Kohler, an Austrian citizen, former managing director at Technical Advisor, an international engineering and consulting firm.

According to the indictment, Contoguris was the founder and CEO of Gravitas & CIE International Ltd. with the co-defendants conspired to bribe foreign officials to direct business to Rolls-Royce Energy Systems, Inc, a US subsidiary.

Azat Martirossian and Vitaly Leshkov were employees of Technical Advisor, an international consulting firm, where Rolls-Royce paid kickbacks to Technical Advisor employees and bribes to at least one foreign official in Kazakhstan. The illegal payments were disguised as commissions to Contoguris' company, Gravitas, in exchange for helping Rollys Royce win contracts with Asia Gas Pipeline LLP (AGP).

AGP was created to build a gas pipeline between Central Asia and China. Technical Advisor was retained by AGP to provide independent engineering and consulting services. AGP awarded the $145 million contract to Rolls Royce in November 2009. Rolls Royce, in turn, made commission payments to Contoguris' company, Gravitas, and Contoguris then passed a portion of the payments to Technical Advisor employees, including Leshkov and Martirossian, knowing that a portion of the money would be given to a Kazakh government official from KazMunayGas Natiuonal Company.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11.
## R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Changes to Export Controls in May 2018"
(Source: Thomsen and Burke LLP, 31 May 2018. Available by subscription via maher@t-b.com.) [Excerpts.]

\* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

This memo summarizes the regulatory, legislative, enforcement and personnel developments with respect to U.S. and multilateral export controls during the month of May 2018. ...

## REGULATORY UPDATES

### *Update on Iran Sanctions and the JCPOA*

Earlier this month, the President announced his decision to cease the United States' participation in the Joint Comprehensive Plan of Action (JCPOA), and to begin re-imposing the U.S. nuclear-related sanctions that were lifted to effectuate the JCPOA sanctions relief, following a wind-down period. In conjunction with this announcement, the President issued a National Security Presidential Memorandum (NSPM) directing the U.S. Department of the Treasury and other Departments and Agencies to take the actions necessary to implement his decision.

If you recall, the JCPOA implementation in January 2016 lifted selective nuclear-related secondary sanctions, financial and banking related sanctions, as well as sanctions related to insurance, Iran's energy and petrochemicals sectors, Iran's shipping and shipbuilding sectors, gold and other precious metals, and Iran's automotive sectors.

According to OFAC's Press Release, Departments and Agencies will begin the process of implementing 90-day and 180-day wind-down periods for activities involving Iran that were consistent with the U.S. sanctions relief specified in the JCPOA. To effectuate the wind-down periods, today the State Department issued the necessary statutory sanctions waivers to provide for a wind-down period and plans to take appropriate action to keep such waivers in place for the duration of the relevant wind-down periods. As soon as is administratively feasible, OFAC expects to revoke, or amend, as appropriate, general and specific licenses issued in connection with the JCPOA. At that time, OFAC will issue new authorizations to allow the wind down of transactions and activities that were authorized pursuant to the revoked or amended general and specific licenses.

**At the end of the 90-day and 180-day wind-down periods, the applicable sanctions will come back into full effect.**

OFAC also published FAQs today covering the re-imposition of the secondary sanctions. We have extracted some of the FAQs that may be of interest to you:

*3.2. As of May 8, 2018, do secondary sanctions attach to the persons that were removed from the SDN List and/or other OFAC sanctions lists on Implementation Day?*

*No. However, no later than November 5, 2018, OFAC will re-impose, as appropriate, the sanctions that applied to persons removed from the SDN List and/or other lists maintained by OFAC on January 16, 2016. Depending on the authority or authorities pursuant to which these actions to re-list are taken, there may be secondary sanctions exposure for parties that engage in certain*

*activities with these persons after their re-listing. Persons subject to secondary sanctions will have a notation of "Additional Sanctions Information - Subject to Secondary Sanctions" in their SDN List entry. Transactions conducted during the wind-down periods involving persons removed from the SDN List on January 16, 2016 could be sanctionable to the extent they are outside the scope of the wind-down waivers issued by the State Department or involve persons on the SDN List or conduct described in JCPOA FAQ A.3.ii-iii. OFAC recommends that a person conducting activities in Iran or with Iranian persons during the wind-down periods exercise due diligence sufficient to ensure that it is not knowingly engaging in transactions with persons on the SDN List or in activities that would be sanctionable under authorities targeting Iran's malign activities.*

*The United States has and continues to enforce multiple authorities that target a range of Iranian malign activity outside of Iran's nuclear program, including Iran's support for terrorism, ballistic missile program, human rights abuses, and destabilizing activity in the region. Treasury will continue to target aggressively anyone who engages in such sanctionable activity, regardless of whether the individual or entity was removed from the SDN List on Implementation Day. [05-08-2018]*

*4.4. Is General License H (GL H) still in effect during the wind-down period?*

*OFAC intends to revoke GL H, which authorized U.S.-owned or -controlled foreign entities to engage in certain activities involving Iran, as soon as is administratively feasible. OFAC also expects to issue a revised authorization for the wind down of activities involving Iran authorized pursuant to GL H. The wind-down of those activities authorized pursuant to GL H must be completed by November 4, 2018. Notice of the revocation of GL H and the issuance of the wind-down authorization will be published in the Federal Register.*

This means that foreign subsidiaries of U.S. companies would no longer be able to rely on the authorizations under the general license once the wind down period has concluded.

A complete list of the FAQs can be found on OFAC's website.

### **BIS and DDTC publish proposed rules to amend Categories I, II and III of the USML**

This proposed rule describes how articles the President determines no longer warrant control under United States Munitions List (USML) Category I-- Firearms, Close Assault Weapons and Combat Shotguns; Category II--Guns and Armament; and Category III--Ammunition/Ordnance, would be controlled on the Commerce Control List (CCL) and by the Export Administration Regulations (EAR). This proposed rule is being published in conjunction with a proposed rule from the Department of State, Directorate of Defense Trade Controls, which would amend the list of articles controlled by USML Category I (Firearms, Close Assault Weapons and Combat Shotguns), Category II (Guns and Armament), and Category III (Ammunition/Ordnance) of the USML to describe more precisely items warranting continued control on that list.

The changes described in the proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments. The review was focused on identifying the types of articles that are now controlled on the USML that are either (i) inherently military and otherwise warrant control on the USML or (ii) if of a type common to non-military firearms applications, possess parameters or characteristics that provide a critical military or intelligence advantage to the United States, and are almost exclusively available from the United States. If an article satisfies one or both of those criteria, the article remains on the USML. If an article does not satisfy either criterion, it has been identified in the new Export Control Classification Numbers (ECCNs) included in this proposed rule. Thus, the scope of the items described in this proposed rule is essentially commercial items widely available in retail outlets and less sensitive military items.

BIS has created ECCNs, referred to as the "600 series," to control items that would be removed from the USML and controlled under the CCL, or items from the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (Wassenaar Arrangement Munitions List or WAML) that are already controlled elsewhere on the CCL.

These ECCNs are referred to as the "600 series" because the third character in each of the new ECCNs is "6." The first two characters of the "600 series" ECCNs serve the same function as any other ECCN as described in §738.2 of the EAR. The first character is a digit in the range 0 through 9 that identifies the Category on the CCL in which the ECCN is located. The second character is a letter in the range A through E that identifies the product group within a CCL Category. With few exceptions, the final two characters identify the WAML category that covers items that are the same or similar to items in a particular "600 series" ECCN. Category II of the USML and category ML2 of the WAML cover large caliber guns and other military weapons such as: Howitzers, cannon, mortars, anti-tank weapons, projectile launchers, military flame throwers and recoilless rifles.

In this proposed rule, items that are currently controlled in Category II of the USML would be controlled on the CCL under four new "600 series" ECCNs. Placement of the items currently in USML Category II into the CCL's 600 series would be consistent with existing BIS practice of using 600 series ECCNs to control items of a military nature.

Items currently controlled in Categories I and III of the USML would be controlled in new ECCNs in which the third character is a "5." These items are not appropriate for 600 series control because, for the most part, they have civil, recreational, law enforcement, or other non- military applications. As with 600 series ECCNs, the first character would represent the CCL category, the second character would represent the product group, and the final two characters would represent the WAML category that covers items that are the same or similar to items in the ECCN.

DDTC's proposed rule detailed the specific changes to the ITAR, including:

*Revision of Category I*

This proposed rule revises USML Category I, covering firearms and related articles, to control only defense articles that are inherently military or that are not otherwise widely available for commercial sale. In particular, the revised category will not include non-automatic and semi-automatic firearms to caliber .50 (12.7mm) inclusive, currently controlled under paragraph (a), and all of the parts, components, accessories, and attachments specially designed for those articles. Such items will be subject to the new controls in Export Control Classification Numbers 0A501, 0A502, 0A503, 0A504, 0A505, 0B501, 0B505, 0D501, 0D505, 0E501, and 0E502. Such controls in Category 0 of the CCL will be published in a separate rule by the Department of Commerce.

Paragraph (a) of USML Category I will cover firearms that fire caseless ammunition. Paragraph (b) will continue to cover fully automatic firearms to caliber .50 (12.7mm) inclusive. Paragraph (c) will cover firearms specially designed to integrate fire control, automatic tracking, or automatic firing systems, and all weapons previously described in paragraph (c) that remain on the USML will be covered by paragraph (a), (b) or (c) of this category or by Category II. Paragraph (d) will cover fully automatic shotguns. Paragraph (e) will continue to cover silencers, mufflers, sound suppressors, and specially designed parts and components; flash suppressors will be subject to the EAR. Paragraph (f) will be reserved, as riflescopes and other firearms sighting devices may be controlled in USML Category XII if they have night vison or infrared capabilities, and other riflescopes will be subject to the EAR. Paragraph (g) will continue to cover barrels, receivers (frames), bolts, bolt carriers, slides, or sears, specially designed for the firearms in Category I. Paragraph (h) will cover high capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm, and accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting. Paragraph (i) will continue to cover the technical data and defense services.

A new (x) paragraph will be added to USML Category I, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category I and are described in the purchase documentation submitted with the license application.

The note to Category I will be retained, with conforming revisions. A new second note will be added to clarify the terms "firearm," "fully automatic," and "caseless ammunition".
*Revision of Category II*

This proposed rule revises USML Category II, covering guns and armament, establishing a bright line between the USML and the CCL for the control of these articles.

Most significantly, paragraph (j), controlling parts and components, will be revised to enumerate the articles controlled therein.

Paragraph (a) will be revised to enumerate the articles controlled in that paragraph. The articles currently covered in paragraph (c) (apparatus and devices for launching or delivering ordnance) still warranting control on the ITAR will be included in new paragraph (a)(4). A new paragraph (a)(5) will be added for developmental guns and armaments funded by the Department of Defense and the specially designed parts and components of those developmental guns and armaments. The articles currently controlled in paragraph (f), engines for self-propelled guns and howitzers in paragraph (a), will be on the CCL in ECCN 0A606. Tooling and equipment for the production of articles controlled in USML Category II, currently in paragraph (g), will be on the CCL in ECCN 0B602. Test and evaluation equipment, currently in paragraph (h), will be on the CCL in ECCN 0B602. Certain autoloading systems controlled in paragraph (i) will be moved to paragraphs (j)(9) and (11).

A new (x) paragraph will be added to USML Category II, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category II and are described in the purchase documentation submitted with the application.

*Revision of Category III*

This proposed rule revises USML Category III, covering ammunition and ordnance, to establish a bright line between the USML and the CCL for the control of these articles and to be consistent with the changes to Category I.

Most significantly, paragraphs (a) and (d) will be revised to remove broad catch-alls and enumerate the articles to be controlled therein. For example, paragraph (a), which controls ammunition for articles in USML Categories I and II, will be revised to specifically list the ammunition that it controls. A new paragraph (a)(10) will be added for developmental ammunition funded by the Department of Defense and the parts and components specially designed for such developmental ammunition. Ammunition not enumerated in paragraph (a) will be subject to the EAR. Likewise, revised paragraph (d), which controls parts and components, will enumerate the articles it controls; those articles not identified but currently captured via the catch-all will be subject to the EAR.

Additionally, paragraph (c), which controls production equipment and tooling, will be removed and placed into reserve. The articles currently covered by this paragraph will be subject to the EAR.

A new (x) paragraph will be added to USML Category III, allowing ITAR licensing for commodities, software, and technology subject to the EAR, provided those commodities, software, and technology are to be used in or with defense articles controlled in USML Category III and are described in the purchase documentation submitted with the application.

*Conforming ITAR Changes*

Additionally, conforming changes will be made to several sections of the ITAR that refer to the current controls in USML Category I(a). These sections will be amended because they all refer to firearms that will be controlled on the CCL. Section 123.16(b)(2) will be revised to remove reference to the firearms exemptions at §123.17(a) through (e), which describe the firearms exemptions, because the paragraphs will be removed as a consequence of the control of non-automatic and semi-automatic firearms on the CCL. For the same reason, §123.16(b)(6) will be revised to describe only the remaining exemption at §123.17 (personal protective gear), and §123.16(b)(7) will be reserved. §123.17 will be amended to remove paragraphs (a) through (e), consistent with changes made to the USML. Section 123.18, as it describes exemptions for firearms that will be controlled for export by the Department of Commerce, will be removed and placed into reserve. Revision of §124.14(c)(9) will remove the example of "sporting firearms for commercial resale." The policy guidance on Zimbabwe in §126.1(s) will be revised to remove reference to the firearms exemption in §123.17.

Section 129.1(b) of the ITAR will be revised to clarify that the regulations on brokering activities in part 129 apply to those defense articles and defense services designated as such on the USML and those items described on the USMIL (27 CFR 447.21). Section 129.4 of the ITAR will also be revised to clarify brokering requirements for items on the USMIL that are subject to the brokering requirements of the AECA. The items that will move to the CCL for export control purposes, yet are in the USMIL for permanent import purposes, remain subject to the brokering requirements of part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer. The revisions also clarify that foreign defense articles that are on the USMIL require brokering authorizations. ...

### President Prohibits Certain Additional Transactions with Respect to Venezuela

The President issued an Executive Order this month prohibiting additional transactions with respect to the Government of Venezuela, in light of the recent activities of the Maduro regime, including endemic economic mismanagement and public corruption at the expense of the Venezuelan people and their prosperity, and ongoing repression of the political opposition; attempts to undermine democratic order by holding snap elections that are neither free nor fair; and the regime's responsibility for the deepening humanitarian and public health crisis in Venezuela. These prohibitions include:

All transactions related to, provision of financing for, and other dealings in the following by a United States person or within the United States are prohibited:

(1) the purchase of any debt owed to the Government of Venezuela, including accounts receivable;
(2) any debt owed to the Government of Venezuela that is pledged as collateral after the effective date of this order, including accounts receivable; and

(3) the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest.

## ENFORCEMENT ACTIONS

### Florida Resident Pleads Guilty to International Firearms Trafficking

A Port St. Lucie resident pled guilty this month to unlawfully exporting firearms, firearm accessories, and ammunition from South Florida to Rio de Janeiro, Brazil. Frederik Barbieri of Port St. Lucie, Florida pled guilty to one count of conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371, and one count of unlicensed exportation of defense articles, in violation of Title 22, United States Code, Section 2778. Barbieri faces a possible maximum statutory sentence of 25 years in prison.

According to stipulated facts filed in court, from May of 2013 through February of 2018, Barbieri conspired with others to: possess firearms with obliterated serial numbers; deliver packages containing those firearms to contract carriers for international shipment without providing notice that the packages contained firearms; and smuggle firearms, firearm accessories, and ammunition from the United States to Rio de Janeiro, Brazil.

During this period, a shipment sent by Barbieri was intercepted in Rio de Janeiro by Brazilian law enforcement and found to contain approximately thirty AR-15 and AK-47 rifles and firearm magazines, all concealed in four 38-gallon Rheem water heaters. The water heaters were hollowed out and loaded with the contraband, and the serial numbers on each of the firearms had been obliterated. The same day that Brazilian authorities intercepted his shipment, Barbieri called and requested that the freight forwarder destroy the related paperwork.

Documentation provided by the freight forwarder revealed Barbieri's historical shipments. In addition to shipping the four Rheem water heaters in which he concealed approximately thirty rifles, Barbieri also shipped to Brazil an additional 120 Rheem water heaters, as well as 520 electric motors and 15 air conditioning units, from May of 2013 to May of 2017, using that freight forwarder. These items are all consistent with objects used to conceal the illegal international shipment of firearms and ammunition.

In February 2018, federal agents executed a warrant to search a storage unit rented by Barbieri in Vero Beach, Florida. In the storage unit, law enforcement discovered 52 rifles, 49 of which were wrapped for shipment with obliterated serial numbers. In addition, law enforcement discovered dozens of high capacity firearm magazines, over 2,000 rounds of ammunition, and packaging materials. Barbieri was arrested the following day.

It is illegal for civilians to possess firearms in Brazil. According to Brazilian law enforcement, AK and AR rifles have a black market value of approximately

$15,000 to $20,000 in the black market. The retail cost of those firearms in the United States is approximately $700 to $1,000.

Neither Barbeiri, nor any of his coconspirators, obtained a license or written approval from the United States Department of State to export any defense articles. Non-automatic firearms, firearm accessories, and ammunition are articles designated as "defense articles," pursuant to federal regulations.

### Turkish Banker Sentenced to 32 Months for Conspiring to Violate U.S. Sanctions Against Iran and Other Offenses

Mehmet Hakan Atilla, a resident and citizen of Turkey, was sentenced this month to 32 months for his participation in a scheme to violate U.S. economic sanctions imposed on the Islamic Republic of Iran involving billions of dollars' worth of Iranian oil proceeds held at Atilla's employer (Turkish Bank-1). On Jan. 3, after a five-week jury trial, Atilla was convicted of conspiring with others to use the U.S. financial system to conduct transactions on behalf of the government of Iran and other Iranian entities, which were barred by U.S. sanctions, and to defraud U.S. financial institutions by concealing these transactions' true nature.

Beginning in or about 1979, the president, pursuant to the International Emergency Economic Powers Act (IEEPA), has repeatedly found that the actions and policies of the government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and has declared a national emergency to deal with the threat. In accordance with these presidential declarations, the United States has instituted a host of economic sanctions against Iran and Iranian entities. This sanctions regime, among other things, prohibits financial transactions involving the United States or U.S. persons that were intended directly or indirectly for the government of Iran or Iranian entities. Other U.S. sanctions in effect during this case's relevant time period also required foreign financial institutions to restrict the use of Iranian oil proceeds, if those foreign banks wished to continue to do business with the U.S. financial system.

Atilla and others conspired to provide access to restricted oil revenues through international financial networks, including U.S. financial institutions, to the government of Iran, Iranian entities, and entities identified by the Department of the Treasury Office of Foreign Assets Control as Specially Designated Nationals (SDNs). They did so by, among other things, using Turkish Bank-1, at which Atilla served as Deputy General Manager of International Banking, to engage in transactions involving billions of dollars' worth of petroleum revenues held by the Central Bank of Iran and the National Iranian Oil Company. In particular, they facilitated and protected Turkish Bank-1 customer, international gold trader Reza Zarrab's, ability to supply currency and gold to, and facilitate international financial transactions for, the Government of Iran, Iranian entities, and SDNs using Turkish Bank-1. Many of those financial transactions involved unwitting U.S. financial institutions, in violation of U.S. sanctions against Iran. The elaborate scheme established by Atilla and others also shielded Turkish Bank-1 from U.S. sanctions.

Atilla in particular lied to and deceived U.S. Treasury officials about Turkish Bank-1's activities and its purported compliance efforts in order to avoid subjecting the bank to U.S. sanctions. Additionally, Atilla, Zarrab and others conspired to create and use false and fraudulent documents to disguise prohibited transactions for Iran and make those transactions falsely appear as transactions involving food, thus falling within humanitarian exceptions to the sanctions regime. As a result of this scheme, Atilla and his co-conspirators induced U.S. banks unknowingly to process international financial transactions in violation of the IEEPA, and to launder through the U.S. financial system funds promoting the scheme.

back to top

✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧

## 12.
R.K. Huffman, K.J. Wolf & N.G. Kohne: "White Paper: Recent Department of Defense Guidance on Cybersecurity Requirements and Related Export Control Issues"
(Source: Akin Gump Strauss Hauer & Feld LLP, 31 May 2018)

* Authors: Robert K. Huffman, Esq., rhuffman@akingump.com, +1 202-887-4530; Kevin J. Wolf, Esq., kwolf@akingump.com, +1 202-887-4051; and Natasha G. Kohne, Esq., nkohne@akingump.com, +1 415-765-9505. All of Akin Gump Strauss Hauer & Feld LLP.

The U.S. Department of Defense (DoD) recently issued two sets of guidance regarding Defense Federal Acquisition Regulation Supplement (DFARS) Clause 252.204-7012, "Safeguarding Covered Defense Information and Cyber Incident Reporting." The most recent set was attached to an April 24, 2018, notice and request for comment titled "DoD Guidance for Reviewing System Security Plans and the NIST SP 800-171 Security Requirements Not Yet Implemented." 83 Fed. Reg. 17,807. The second set consists of updated Frequently Asked Questions that DoD issued on April 2, 2018. This white paper examines the impact of these guidance documents on the role of contractor System Security Plans and Plans of Action and Milestones in source selection and contract performance, the proper interpretation of particular National Institute of Standards and Technology Special Publication 800-171 requirements, and the potential impact of DFARS Clause 252.204-7012 with respect to safeguarding and reporting requirements on export-controlled information resident in contractor information systems.

To access the white paper outlining more information, please click here.

back to top

✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧ ✧



Full Circle Compliance Presents

# Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

EX/IM TRAINING EVENTS & CONFERENCES

## 13. FCC Presents "Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR", 12 Jun in Bruchem, the Netherlands
(Source: Editor)

* What: Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR
* When: 12 Jun 2018, 10 AM – 4 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* FCC Speaker Panel: Mike Farrell and Ghislaine Gillessen
* Register: at the Full Circle Compliance website or e-mail events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 14. List of Approaching Events - 11 New Events Listed
(Sources: Editor and Event Sponsors)

Published every Friday or last publication day of the week, our overview of Approaching Events is organized to list continuously available training, training events, seminars & conferences, and webinars.

Please, submit your event announcement to John Bartlett, Events & Jobs Editor (email: jwbartlett@fullcirclecompliance.eu), composed in the below format:

    # DATE: LOCATION; "EVENT TITLE"; EVENT SPONSOR; WEBLINK;
    CONTACT DETAILS (email and/or phone number)

"#" = New or updated listing

### Continuously Available Training

* E-Seminars: "US Export Controls" / "Defense Trade Controls"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* Webinar: "Company-Wide US Export Controls Awareness Program"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* E-Seminars: "ITAR/EAR Awareness"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com
*Online: "Simplified Network Application Process Redesign (SNAP-R)"; Commerce/BIS; 202-482-2227
* E-Seminars: "Webinars On-Demand Library"; Sandler, Travis & Rosenberg, P.A.
* Online: "International Trade Webinars"; Global Training Center
* Online: "On-Demand Webinars"; "General Training"; Center for Development of Security Excellence; Defense Security Service (DSS)
* Online: "ACE Reports Training and User Guide"; DHS/CBP
* Online: "Increase Your International Sales - Webinar Archive"; U.S. Commercial Service
* Web Form: "Compliance Snapshot Assessment"; Commonwealth Trading Partners (CTP)
* Online: "Customs Broker Exam Prep Course"; The Exam Center

### Seminars and Conferences

* Jun 4-5: Washington, D.C.; "The WorldECR Export Controls and Sanctions Forum 2018"; World ECR
* Jun 4-7: San Diego, CA; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; jessica@learnexportcompliance.com; 540-433-3977
* Jun 5: London, UK; "ITAR & EAR from a UK Perspective - Advanced"; Strong and Herd
* Jun 5-6: Chicago, IL; "EAR Boot Camp"; American Conference Institute
* Jun 7: Chicago, IL; "ITAR Boot Camp"; American Conference Institute
* Jun 6-7: Seattle, WA; "Complying with US Export Controls"; Bureau of Industry and Security
* Jun 6-7: Munich, Germany; "US Trade Controls Compliance in Europe"; NielsonSmith
* Jun 6-7: Munich, Germany; "Pharma Patent Term Extensions"; C5 Group
* Jun 6-8: Baltimore, MD; "97th Annual AAEI Conference and Expo"; American Association of Importers and Exporters

* Jun 7: Chicago, IL; "ITAR Boot Camp"; American Conference Institute
* Jun 8: Stafford, VA; "Spring Golf Outing"; Society for International Affairs;
* Jun 11-14: Wash DC; "EAR/OFAC/ITAR Commercial and Military Export Controls/How US Controls Impact Non-US Companies, Affiliates and Transactions, PLUS Other Country Controls Comparison to US (EU & Canada)"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Jun 12: Bruchem, Netherlans; "Summer Course U.S. Export Controls;" Full Circle Compliance
* Jun 12-13: Houston, TX; "Complying with US Export Controls"; Bureau of Industry and Security (BIS)
* Jun 12-13: Stockholm, Sweden; "Trade Compliance Nordics"; C5 Group
* Jun 13: San Diego, CA; "Made in America, Buy America, or Buy American: Qualify your Goods and Increase Sales"; Global Trade Academy
* Jun 13: Derby, UK; "Intermediate Seminar"; UK Department for International Trade
* Jun 14: Houston, TX; "Technology and Software Controls"; Bureau of Industry and Security (BIS)
* Jun 14: Boston, MA; "Export Regulatory Compliance Update"; Massachusetts Export Center
* Jun 14: Derby, UK; "Beginner's Workshop"; UK Department for International Trade
* Jun 14: Washington, D.C.; "2018 Women In Defense National Conference" Women in Defense / NDIA
* Jun 14: Derby, UK; "Licenses Workshop"; UK Department for International Trade
* Jun 14: Derby, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Jun 17-19: Amsterdam, Netherlands; "2018 ICPA European Conference"; International Compliance Professionals Association
* Jun 18: Los Angeles, CA; "Certified Classification Specialist (CCLS)"; Global Trade Academy
# Jun 18-21: East Rutherford, NJ; "Certified Authorised Economic Operator Specialist"; Global Trade Academy
* Jun 19-20: New York, NY; "12th Advanced Forum on FCPA & Anti-Corruption for the Life Sciences Industry"; C5 Group
* Jun 20-21: McLean, VA; "ITAR Fundamentals"; FD Associates
# Jun 26-27: Tysons Corner, VA; "Conducting an Internal Audit for Your Import and Export Transactions"; Global Trade Academy
* Jun 27: London, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Jun 27-28: London, UK; "12th Annual Conference on Anti-Corruption"; C5
* Jun 28: London, UK; "Making Better License Applications"; UK Department for International Trade
* Jun 28-29: London, UK; "The WorldECR Export Controls & Sanctions Forum 2018"; World ECR
* Jul 2-6: Paris, France; "Training On ISO 19600 & ISO 37001 In Paris
* Jul 4: Cambridge, UK; "Intermediate Seminar"; UK Department for International Trade
* Jul 5: Cambridge, UK; "Beginner's Workshop"; UK Department for International Trade

* Jul 5: Cambridge, UK; "Licenses Workshop"; UK Department for International Trade
* Jul 5: Cambridge, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Jul 10: Chicago, IL; "Duty Drawback Specialist - Certification"; Global Trade Academy
* Jul 10-11: Columbia, SC; "Complying with US Export Controls"; Bureau of Industry and Security
# Jul 10-11: Long Beach, CA; "ITAR/EAR Boot Camp: Achieving ITAR/EAR Compliance"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com; 866-238-4018
* July 10-12: Chicago, IL; "Duty Drawback Specialist - Certification"; Amber Road
* Jul 11-14: Laredo, Texas; "Best Customs Broker Exam Course"; GRVR Attorneys
* Jul 16-18: National Harbor, Maryland; "2018 Summer Basics Conference"; Society for International Affairs
* Jul 17: Los Angeles, CA; "Advanced Classification of Plastics and Rubber"; Global Trade Academy
* Jul 19: McLean, VA; "ITAR for the Empowered Official"; FD Associates
* Jul 19-20: Torrance, CA; "Customs Compliance For Import Personnel"; Foreign Trade Association
# July 25-26: Seattle WA; "2018 Pacific Northwest Export Controls Conference;" Dept. of Commerce/U.S. Commercial Service, Dept. of Homeland Security/Homeland Security Investigations, Seattle University, Dorsey & Whitney LLP
* Aug 1-3: Washington, D.C.; "NSSF and Fair Trade Import/Export Conference"; NSSF
* Aug 6: Detroit, MI; "Export Compliance and Controls"; Global Trade Academy
# Aug 7: Detroit, MI; "Export Controls Specialist - Certification"; Global Trade Academy
* Aug 7-9: Detroit, MI; "Export Controls Specialist - Certification"; Global Trade Academy
* Aug 14-15: Milpitas, CA; "Complying with US Export Controls"; Bureau of Industry and Security
* Aug 16: Milpitas, CA; "Encryption Controls"; Bureau of Industry and Security
# September 11-13: Annapolis, MD; "Defense Industry Experts and ITAR/EAR Boot Camp"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com; 866-238-4018
* Sep 12-13: Springfield, RI; "Complying with US Export Controls"; Bureau of Industry and Security
* Sep 13-17: Galveston, TX (Cruise); "ICPA @ SEA!"; International Compliance Professionals Association (ICPA)
* Sep 16-19: Atlanta, GA; "2018 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 17: Los Angeles, CA; "Import Compliance"; Global Trade Academy
* Sep 17-20: Columbus, OH; "University Export Controls Seminar at The Ohio State University in Columbus"; Export Compliance Training Institute (ECTI); jessica@learnexportcompliance.com; 540-433-3977

* Sep 17-21: Los Angeles, CA; "Import 5-Day Boot Camp"; Global Trade Academy
* Sep 18: San Diego, CA; "12th CompTIA Global Trade Compliance Best Practices Conference"; CompTIA
* Sep 18: Los Angeles, CA; "Tariff Classification for Importers and Exporters"; Global Trade Academy
* Sep 19: Washington, D.C.; " DDTC In-House Seminar"; Department of State (Registration: Aug 10 - Aug 31; first come, first served)
* Sep 19: Los Angeles, CA; "NAFTA and Trade Agreements"; Global Trade Academy
* Sep 19-20: Rome, Italy; "Defense Exports 2018"; SMi
# Sep 19-20: Los Angeles, CA; "Complying With U.S. Export Controls"; BIS
* Sep 20: Los Angeles, CA; "Country and Rules of Origin"; Global Trade Academy
* Sep 21: Los Angeles, CA; "Customs Valuation - The Essentials"; Global Trade Academy
* Sep 21-24: Detroit, Michigan; "Best Customs Broker Exam Course"; GRVR Attorneys
* Sep 26: McLean, VA; "EAR Basics"; FD Associates
* Sep 26: Oxford, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 27: Oxford, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Oct 1-4: Austin, TX; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 15-18: Amsterdam, NL; "US Export Controls on Non-US Transactions - EAR, ITAR, OFAC Regulations Impact for EU, NL, UK & other Non-US Companies"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
# Oct 15-19: Chicago, IL; "Certified Classification Specialist"; Global Trade Academy
* Oct 16-18: Dallas, TX; "Partnering for Compliance West Export/Import Control Training and Education Program"; Partnering for Compliance
* Oct 18-19: McLean, VA; "ITAR Fundamentals"; FD Associates
* Oct 19: Dallas TX; "Customs/Import Boot Camp"; Partnering for Compliance
* Oct 21-23: Grapevine, TX; "2018 Fall Conference"; ICPA
* Oct 22-26: Dallas, Texas; "Best Customs Broker Exam Course"; GRVR Attorneys
* Oct 22-23: Arlington, VA; "2018 Fall Advanced Conference"; Society for International Affairs (SIA)
* Oct 24: Leeds, UK; "Intermediate Seminar"; UK Department for International Trade
* Oct 25: Leeds, UK; "Beginner's Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Licenses Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade

* Oct 29 - Nov 1: Phoenix, AZ; ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
# Oct 29: Seattle, WA; "Export Compliance & Controls 101"; Global Trade Academy
* Oct 30 - Nov 1: Seattle, WA; "Export Controls Specialist - Certification"; Global Trade Academy
* Nov 6: Detroit, MI; "Classification: How to Classify Parts"; Global Trade Academy
* Nov 7-9: London, UK; "TRACE European Forum, 2018"; TRACE Anti-Bribery Compliance Solutions
* Nov 7-9: Detroit, MI; "Advanced Classification for Machinery & Electronics"; Global Trade Academy
* Nov 12-15: Washington, D.C.; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Nov 13: Tysons Corner, VA; "Made in America, Buy America, or Buy American: Qualify your Goods and Increase Sales"; Global Trade Academy
* Nov 14: Manchester, UK; "Intermediate Seminar"; UK Department for International Trade
* Nov 14-15: London, UK; "Economic Sanctions & Financial Crime"; C5 Group
* Nov 15: Manchester, UK; "Beginner's Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Licenses Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Nov 15: McLean, VA; "ITAR For the Empowered Official"; FD Associates
* Nov 27: Houston, TX; "Duty Drawback Specialist - Certification"; Global Trade Academy
* Dec 3-7: Tysons Corner, VA; "Certified Classification Specialist"; Global Trade Academy
* Dec 4-5: London, UK; "11th Advanced Conference on Customs Compliance held in Partnership with HMRC"; C5 Group
* Dec 4-5: Frankfurt, Germany; "US Defence Contracting and DFARS Compliance in Europe;" C5 Group
* Dec 5: London, UK; "Intermediate Seminar"; UK Department for International Trade
* Dec 5: London, UK; "Beginner's Workshop"; UK Department for International Trade
* Dec 6: London, UK; "Licenses Workshop"; UK Department for International Trade
* Dec 6: London, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Dec 6: London, UK; "International Documentation and Customs Compliance"; Institute of Export and International Trade
* Dec 6: Manchester, UK; "Introduction to Export Controls and Licenses";
* Dec 10-13: Miami, FL; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Dec 11: Manchester, UK; "International Documentation and Customs Compliance"; Institute of Export and International Trade

2019

* Jan 6-7: Long Beach, CA; "Fundamentals of FTZ Seminar";
* May 5-7: Savannah, GA; "2019 Spring Seminar"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 8-11: Chicago, IL; "2019 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)

### *Webinars*

* Jun 4: Commodity Webinar; "June Series: Wafers, Transformers, and PCBAs"; National Commodity Specialist Division (NCSD)
* Jun 5: Commodity Webinar; "June Series: Alcoholic Beverages"; National Commodity Specialist Division (NCSD)
# Jun 5: Webinar; "Will Blockchain Technology Revolutionize Global Trade?"; Amber Road
* Jun 6: Commodity Webinar; "June Series: Self-Adhesives of Heading 3919"; National Commodity Specialist Division (NCSD)
* Jun 7: Webinar; "Resource Guide on Trade Actions"; NAFTZ
* Jun 7: Webinar; "The Essentials and Challenges of Exporting Firearms and Ammunition"; ECTI; 540-433-3977
* Jun 12: Commodity Webinar; "June Series: Glass Containers: Headings 7010 and 7013"; National Commodity Specialist Division (NCSD)
* Jun 12: Webinar; "Duty Drawback and Refunds"; U.S. Commercial Service
* Jun 13: Webinar; "Welcome to the Club: An Overview of India's Dual-Use and Defense Export Control Systems"; ECTI
* Jun 13: Commodity Webinar; "June Series: Ornaments, Boxes, and Furniture of Heading 4420"; National Commodity Specialist Division (NCSD)
* Jun 13: "Wednesday Webinar: How to Prepare for the ATF Compliance Audit"; Reeves & Dola LLP
# Jun 13: Webinar; "Export Controls in the Cloud"; Shipman and Goodwin
* Jun 14: Commodity Webinar; "June Series: Medical Instruments and Appliances"; National Commodity Specialist Division (NCSD)
* Jun 18: Commodity Webinar; "June Series: Heating and Cooling Treatment Facilities"; National Commodity Specialist Division (NCSD)
* Jun 19: Commodity Webinar; "June Series: Sanitary Ware of Iron or Steel"; National Commodity Specialist Division (NCSD)
* Jun 19: Webinar; "Export 101: Starting at the Beginning"; ECTI
* Jun 20: Commodity Webinar; "June Series: Polymer Basics"; National Commodity Specialist Division (NCSD)
* Jun 21: Commodity Webinar; "June Series: Antidumping on Diamond Sawblades"; National Commodity Specialist Division (NCSD)
* Jun 25: Commodity Webinar; "June Series: Gloves"; National Commodity Specialist Division (NCSD)
* Jun 26: Commodity Webinar; "June Series: Bed Linens"; National Commodity Specialist Division (NCSD)
* Jun 27: Commodity Webinar; "June Series: Fundamentals of Footwear"; National Commodity Specialist Division (NCSD)
* Jul 7: Commodity Webinar; "July Series: What's a Toy?"; National Commodity Specialist Division (NCSD)
* Jul 10: Commodity Webinar; "July Series: Food Incorporating Alcohol"; National Commodity Specialist Division (NCSD)

* Jul 11: "Wednesday Webinar: Sales and Marketing Activities and Export Controls"; Reeves & Dola LLP
* Jul 12: Commodity Webinar; "July Series: Understanding Types of Woven Fabric"; National Commodity Specialist Division (NCSD)
* Jul 16: Commodity Webinar; "July Series: Electromechanical Domestic Appliances"; National Commodity Specialist Division (NCSD)
* Jul 17: Commodity Webinar; "July Series: Other Articles of Steel"; National Commodity Specialist Division (NCSD)
* Jul 19: Commodity Webinar; "July Series: Tubes and Pipes of Iron or Steel"; National Commodity Specialist Division (NCSD)

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## EDITOR'S NOTES

## 15. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Thomas Huxley** (Thomas Henry Huxley; 4 May 1825 - 29 Jun 1895, was an English biologist specializing in comparative anatomy. He is known as "Darwin's Bulldog" for his advocacy of Charles Darwin's theory of evolution.)
 - *"Try to learn something about everything and everything about something."*
 - *"If you cannot do brain work without stimulants, you had better turn to hand work -- it is an indication on Nature's part that she did not mean you to be a head worker."*

* **Leon Rene Yankwich** (1888 - 1975, was a United States federal judge.
 - *"More people commit suicide with a fork than a gun."*

### Friday Funnies

Tom, a baseball player, was at the hospital visiting his teammate Larry, who had been in an auto accident, and was dying. Tom asked, "Larry, if there is baseball in heaven, will you come back and tell me?" Larry nodded yes just as he passed away. That night while Tom was sleeping, he heard Larry's voice from above, saying "Tom, can you hear me?" "Yes! Is that you Larry?" asked Tom. Larry replied, "Yes. I'm in heaven. I have good news and bad news, Tom. The good news is that that -- yes, there is baseball in heaven, but the bad news is that you're scheduled to pitch on Tuesday."

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

## 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
 - Last Amendment(s): 17 May 2018: 83 FR 22842-22846: Revisions to the Unverified List (UVL)

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
 - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
 - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
 - HTS codes that are not valid for AES are available here.
 - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 1 Jun 2018: Harmonized System Update 1808, containing 11,876 ABI records and 2,228 harmonized tariff records
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * * *

## 17. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space

limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free. Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ████ @fullcirdecompliance.eu]
**Sent:** 6/4/2018 6:59:58 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0604 Monday "Daily Bugle"



## THE DAILY BUGLE

### Monday, 4 June 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.    Commerce/BIS Amends EAR, Correction Concerning ECCN 1C350

### OTHER GOVERNMENT SOURCES

2.    Items Scheduled for Publication in Future Federal Register Editions

3.    Commerce/BIS: (No new postings.)

4.    Commerce/Census: "Accessing AESDirect in the Automated Commercial Environment"

5.    State/DDTC: (No new postings.)

6.    Canada/Finance Seeks Comments on Intent to Impose Countermeasures Action Against the U.S. in Response to Tariffs on Canadian Steel and Aluminum Products

7.    Japan METI Launches E-learning Program in Academic and Research Institutes in the Field of Security Export Control

### NEWS

8.    ST&R Trade Report: "EU, Canada, Mexico Poised to Retaliate Against U.S. Following Rescission of Steel/Aluminum Tariff Exemptions"

### COMMENTARY

9.    The Export Compliance Journal: "Moving to EAR License Exceptions after ECR"

10.   J. Reeves & K. Heubert: "U.S. Departments of State and Commerce Propose Rules to Transition Firearms and Ammunition from the USML to the CCL"

11.   M. Volkov: "Episode 41 - Compliance and Technology"

## EX/IM MOVERS & SHAKERS

12. Monday List of Ex/Im Job Openings: 161 Jobs Posted This Week, Including 18 New Jobs

## EX/IM TRAINING EVENTS & CONFERENCES

13. FCC Presents "Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR", 12 Jun in Bruchem, the Netherlands

## EDITOR'S NOTES

14. Bartlett's Unfamiliar Quotations

15. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Apr 2018), DOD/NISPOM (18 May 2016), EAR (4 Jun 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (1 Jun 2018), ITAR (14 Feb 2018)

16. Weekly Highlights of the Daily Bugle Top Stories



Full Circle Compliance Presents

Summer Course U.S. Export Controls: ITAR & EAR

12 June 2018, Landgoed Groenhoven, Bruchem, NL

## ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. Commerce/BIS Amends EAR, Correction Concerning ECCN 1C350

(Source: Federal Register, 4 June 2018.) [Excerpts.]

83 FR 25559-25561: Implementation of the February 2017 Australia Group (AG) Intersessional Decisions and the June 2017 AG Plenary Understandings; Addition of India to the AG; Correction

* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule; correction.
* SUMMARY: The Bureau of Industry and Security (BIS) publishes this final rule to make certain conforming changes based on the revisions to Export

Control Classification Number (ECCN) 1C350 on the Commerce Control List (CCL) contained in a final rule published on April 2, 2018. That final rule amended the Export Administration Regulations (EAR) to implement the recommendations presented at the February 2017 Australia Group (AG) Intersessional Implementation Meeting, and later adopted pursuant to the AG silent approval procedure, and the recommendations made at the June 2017 AG Plenary Implementation Meeting and adopted by the AG Plenary. Among other changes, the April 2, 2018, final rule amended ECCN 1C350 by renumbering paragraphs .b through .d in alphabetical order. Following the publication of that rule, however, certain references to ECCN 1C350.c and 1C350.d in the description of items eligible under the validated end-user authorization (VEU) provisions of the EAR no longer identified the correct subparagraphs in ECCN 1C350 because the rule inadvertently failed to update the references to ECCN 1C350.c and 1C350.d in the description of eligible items for three of the validated end-users identified in Supplement No. 7 to part 748 (Authorization Validated End-User (VEU)) of the EAR. This final rule amends the VEU provisions to provide the correct references to eligible items in ECCN 1C350 for three validated end-users.

* DATES: This rule is **effective June 4, 2018**.
* FOR FURTHER INFORMATION CONTACT: Chair, End-User Review Committee, Office of the Assistant Secretary, Export Administration, Bureau of Industry and Security, U.S. Department of Commerce, Phone: 202-482-5991; Email: ERC@bis.doc.gov.
* SUPPLEMENTARY INFORMATION: ...

The amendments to the April 2, 2018, final rule included revisions to Export Control Classification Number (ECCN) 1C350, among which were the renumbering of certain items listed in paragraph .b, .c, or .d of this ECCN. However, that final rule inadvertently omitted updates to the references to ECCN 1C350.c and 1C350.d in the description of eligible items for three of the validated end-users identified in Supplement No. 7 to part 748 (Authorization Validated End-User (VEU)) of the EAR. Consequently, these descriptions no longer identified the correct subparagraphs for eligible items in ECCN 1C350. This final rule amends the references to ECCN 1C350 in Supplement No. 7 to part 748 to identify the correct subparagraphs for eligible items in ECCN 1C350, consistent with the amendments to ECCN 1C350 contained in the April 2, 2018, final rule.

Specifically, this final rule amends Supplement No. 7 to part 748 to correctly identify which items in ECCN 1C350 are eligible for each of the following validated end-users: (1) The description of eligible ECCN 1C350 items in the entry for "CSMC Technologies Corporation" is revised to reference 1C350.c.4 (Phosphorus oxychloride, C.A.S. #10025-87-3) and 1C350.c.12 (Trimethyl phosphite, C.A.S. #121-45-9); (2) the description of eligible ECCN 1C350 items in the entry for "Samsung China Semiconductor Co. Ltd." is revised to reference 1C350.c.4 and 1C350.d.10 (Hydrogen fluoride, C.A.S. #7664-39-3); and (3) the description of eligible ECCN 1C350 items in the entry for "Shanghai Huahong Grace Semiconductor Manufacturing Corporation" is revised to reference 1C350.c.4 and 1C350.d.10. These conforming amendments do not change the scope of eligible items for any of the three validated end-users indicated above--they merely update the ECCN references in Supplement No. 7 to part 748 to correctly identify which ECCN 1C350 items are eligible for each of these validated end-users. Because this

rule does not add or remove any validated end-users or revise the scope of eligible items, the citation for this rule is not indicated in the "Federal Register Citation" column of Supplement No. 7. ...

  Dated: May 29, 2018.
Karen H. Nies-Vogel, Director, Office of Exporter Services.

back to top

* * * * * * * * * * * * * * * * * * * * *

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Bureau of Industry and Security; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals [Publication Date: 5 June 2018.]:
  - Licensing Responsibilities and Enforcement
  - Request for the Appointment of a Technical Advisory Committee

* Justice; Alcohol, Tobacco, Firearms, and Explosives Bureau; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals [Publication Date: 5 June 2018.]:
  - Licensed Firearms Manufacturers Records of Production, Disposition, and Supporting Data
  - Records of Acquisition and Disposition, Registered Importers of Arms, Ammunition & Implements of War on the U.S. Munitions Import List
  - Report of Firearms Transactions - Demand 2

* President; PROCLAMATIONS; Trade [Publication Date: 5 June 2018.]:
  - Aluminum; Adjusting Imports Into the U.S. (Proc. 9758)
  - Steel; Adjusting Imports Into the U.S. (Proc. 9759)

*[Editor's Note: Both items were already mentioned in the Thursday, 31 May 2018, Daily Bugle, item #7.]*

* U.S. Customs and Border Protection; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Ship's Store Declaration [Publication Date: 5 June 2018.]

back to top

* * * * * * * * * * * * * * * * * * *

## 3.
Commerce/BIS: (No new postings.)

＊＊＋＋＋＊＊＊＋＋＊＋＊＊＊＊＋＋＊＊

## 4. Commerce/Census: "Accessing AESDirect in the Automated Commercial Environment"
(Source: Global Reach Blog, 4 June 2018.)

The AESDirect application transitioned into the Automated Commercial Environment (ACE) single window in 2016. Below are step-by-step instructions to help new users access ACE AESDirect to file their export shipments for the first time:

*(1)  After you have successfully established an ACE Exporter Account, log in to ACE using your web browser at <https://ace.cbp.dhs.gov/>. (We recommend you use Internet Explorer.)*

*(2)  After logging into the ACE Portal, you will be in the **Home** screen.*

From the ACE main menu, select the **Accounts** tab. In the **Task Selector** panel, located under the **Accounts** tab, select the **Exporter View** from the drop-down menu and click **GO**.

**Note**: No matter the filer's role in the export transaction, it is required to select **Exporter**.



*(3)  Below the **Task Selector**, under **Select Task**, select **Submit AESDirect Filings**.*

**Note**: Please disable or turn off your browser's pop-up blocker in order to access the ACE AESDirect filing portal.



*(4) Navigate to the **Shipment Manager**.*

After you have accepted the Certification Statements (they appear the first time you log in), the system will redirect you to the **Shipment Manager**. The **Shipment Manager** is the first screen in ACE AESDirect and it will show all of the high-level information on previously submitted shipments.



*(5) Select the **Create Export Filing** button.*

This button will take you to the Electronic Export Information (EEI) page to begin filing a shipment. You will be required to complete all mandatory fields (red asterisks) to file your EEI. The system will prompt you to provide information in conditional fields (blue diamonds) when necessary.



If the Automated Export System accepts your export filing, and there are no errors, you will receive an Internal Transaction Number as your proof of filing.

For a detailed walkthrough of a filing in ACE AESDirect, you may use the Sample Shipment Document located at our ACE AESDirect Resources Page, or a recorded ACE AESDirect demonstration webinar located at our Outreach, Education and Training Site. For more information, please contact the Data Collection Branch at 800-549-0595, option 1 or email askaes@census.gov.

back to top

∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗ ∗

5.

State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

*. *# *# *# *# *#. *. *. *# *# *# *# *. *. *# *# *# *# *#

## 6. Canada/Finance Seeks Comments on Intent to Impose Countermeasures Action Against the U.S. in Response to Tariffs on Canadian Steel and Aluminum Products
(Source: Department of Finance Canada, 31 May 2018.)

### Background

On May 31, 2018, the United States (U.S.) announced the imposition of tariffs on imports of certain steel and aluminum products from Canada (at the rates of 25% and 10%, respectively).

In response to these measures, Canada intends to impose surtaxes or similar trade-restrictive countermeasures against up to C$16.6 billion in imports of steel, aluminum, and other products from the U.S., representing the value of 2017 Canadian exports affected by the U.S. measures. The Government is also considering whether additional measures may be required.

### Scope of countermeasures

The products subject to countermeasures will be drawn from those listed in Tables 1 and 2 here. Goods selected from Table 1 will be subject to a 25 per cent surtax or similar trade-restrictive measures. Goods selected from Table 2 will be subject to a 10 per cent surtax or similar trade-restrictive measures. These countermeasures will only apply to goods originating from the U.S., which shall be considered as those goods eligible to be marked as a good of the U.S. in accordance with the *Determination of Country of Origin for the Purposes of Marking Goods (NAFTA Countries) Regulations.*

These countermeasures will take effect on July 1, 2018 and will remain in place until the U.S. eliminates its trade-restrictive measures against Canada. The countermeasures will not apply to U.S. goods that are in transit to Canada on the day on which these countermeasures come into force.

The list of products outlined at the heading, subheading or tariff item level in Tables 1 and 2 should be read in conjunction with the Schedule to Canada's *Customs Tariff.*

### Comments

Written comments should be provided no later than **June 15, 2018**. Submissions, at a minimum, should include the following information:

(1) Canadian company/industry association name, address, telephone number, and contact person.

(2) Relevant eight-digit tariff item(s) and description of the goods of particular interest.

(3) Reasons for the expressed support for, or concern with, the proposed countermeasures, including detailed information substantiating any expected beneficial or adverse impact.

(4) If concern is expressed with respect to the proposed countermeasures for one or more eight-digit tariff item(s), please provide views on ways to alleviate such concerns.

(5) Please identify if information provided in the submissions is commercially sensitive.

*Address for comments*

Comments and general inquiries should be sent to the following address: International Trade Policy Division (U.S. 232 Retaliation Consultations), Department of Finance, James Michael Flaherty Building, 14th Floor, 90 Elgin Street, Ottawa, Ontario K1A 0G5, 613-369-4024 (fax), (email).

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 7. Japan METI Launches E-learning Program in Academic and Research Institutes in the Field of Security Export Control
(Source: METI, 29 May 2018.)

The Ministry of Economy, Trade and Industry (METI) developed an e-learning program in academic and research institutes aiming at providing an opportunity for them to learn about security export control for technology transfers pursuant to the Foreign Exchange and Foreign Trade Act (Act No. 228 of 1949; hereinafter referred to as the "Act").

METI hereby announces the launch of the program both in Japanese and English on its website.

*Background*

Under international security trade control frameworks, Japan and other major countries have been collaboratively taking strict control of transactions of goods and technologies which can be used for creating weapons or for other military purposes in order to prevent countries of concern from threatening global security and terrorists from accessing such products and technologies. METI, the Ministry of Education, Culture, Sports, Science and Technology (MEXT) and other ministries and agencies share the recognition that universities and research institutes engaging in advanced research and development should initiate effective security export control schemes in the same manner as export businesses. Under this recognition, METI, in cooperation with MEXT and other relevant entities, has been holding explanatory meetings and raising awareness of security export control among such universities and institutes.

With the recent increase in security concerns over the outflow of sensitive technologies to foreign countries along with the acceleration of globalization, which includes cross-border human resource exchanges and joint research with foreign countries, universities and research institutes should observe the Compliance Requirements for Exporters that stipulates regulations that such entities are required to adhere to, and must institute sufficiently strict controls of sensitive technologies.

Such universities and research institutes are required to educate front-line teaching staff and researchers in the field of education and research regarding the Act and also are required to secure their organizations by putting necessary procedures into practice.

*Outline of the e-learning program*

Aiming to provide teaching staff and researchers with opportunities to learn about related systems under the Act and matters that they are required to control the various situations that may occur during the course of research activities, the e-learning program provides five theme-based educational videos both in Japanese and English:

[i] need for export control security;
[ii] summary of export control security systems;
[iii] case-by-case points of concern: part I (issues in conducting daily research activities); and
[iv] case-by-case points of concern: part II (issues in hosting overseas students and researchers and in conducting joint research).

- Access to the e-learning program

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

NEWS

## 8. ST&R Trade Report: "EU, Canada, Mexico Poised to Retaliate Against U.S. Following Rescission of Steel/Aluminum Tariff Exemptions"
(Source: Sandler, Travis & Rosenberg Trade Report, 4 June 2018.)

The U.S. rescinded June 1 the exemptions it had temporarily provided to the European Union, Canada, and Mexico from the additional import duties on steel and aluminum that were imposed as of March 23. As a result, these trading partners have threatened to retaliate against a broad range of U.S. products within the next few weeks.

The EU has vowed to impose an additional 25 percent duty beginning June 20 and until the U.S. lifts its tariffs against EU steel and aluminum products on hundreds of U.S. goods, including, among others, various apparel, textile, and footwear items, agricultural products, orange juice, bourbon whiskey, tobacco products, cosmetic products, steel and aluminum products, playing cards, sailboats, and motorcycles. The EU has also set forth a second group of products on which duties could be increased by up to 50 percent in March 2021 if the U.S. has not rescinded its steel and aluminum tariffs by then.

In a May 31 statement, Mexico's Ministry of Economy said it will impose countermeasures against various U.S. products, such as flat steel (hot and cold foil, including coated and various tubes), lamps, pork legs and shoulders, sausages and food preparations, apples, grapes, blueberries, and various cheeses, among others.

Meanwhile, Canada has announced its intention to impose effective from July 1 an additional duty of 10 percent or 25 percent on C$16.6 billion (about US$12.8 billion) worth of U.S. goods. Products under consideration for these measures include various food and agricultural products such as cucumbers, yogurt, roasted coffee, maple sugar and syrup, strawberry jam, chocolate, orange juice, mustard, and tomato ketchup and other tomato sauces, steel and aluminum products, whiskies, cosmetic and personal care products, dishwashing detergents, candles, plastic tableware and kitchenware, plywood, insecticides, handkerchiefs and toilet paper, mattresses and other bedding articles, playing cards, pens and markers, refrigerator-freezers, washing machines, water heaters, and boats. Comments on the proposed measures are due by June 15.

back to top

* * * * * * * * * * * * * * * * * * * * *

## 9. The Export Compliance Journal: "Moving to EAR License Exceptions after ECR"
(Source: The Export Compliance Journal, 1 June 2018.)

For exporters of United States Munitions List (USML) goods, technologies, and services, the License Exemptions in the International Traffic in Arms Regulations (ITAR) are engrained, a way of life.

One of the disruptions to familiar procedures for defense-related companies with items reclassified to the Commerce Control List (CCL) under Export Control Reform (ECR) is the corresponding switch to using (and therefore learning) the Export Administration Regulations (EAR) License Exceptions that might apply. For CCL 600 Series and 9X515, ITAR Exemptions are no longer in the picture.

A presentation at SIA Spring 2018 highlighted some commonly-used EAR Exceptions for 600 Series and 9X515-these being TMP (740.9), RPL (740.10), GOV (740.11), and STA (740.20).

### Temporary Imports, Exports, Reexports, and Transfers (In-Country) Exception

*Temporary Imports, Exports, Reexports, and Transfers (In-Country) Exception* (TMP) authorizes various temporary exports and reexports, including 'tools of the trade' and items for exhibition or demonstration; exports and reexports of items temporarily in the United States, including personal protective equipment; and exports and reexports of beta test software. Related to TMP, the *Servicing and Replacement of Parts and Equipment Exceptions* (RPL) specifically authorizes "exports and reexports associated with one-for-one replacement of parts, components, accessories, and attachments."

RPL also authorizes exports and reexports of certain items currently subject to the EAR "to or for, or to replace, a defense article described in an [ITAR] export or reexport authorization" (although does not authorize the export or reexport of defense articles subject to the ITAR). The main change from the ITAR with the use of these is that the EAR does not control temporary imports into the United States, therefore an authorization or license exception is not required for 600 Series and 9X515 items coming into the U.S. for repair or for trade shows. [FN/1]

### Governments, International Organizations, International Inspections Under the Chemical Weapons Convention, and the International Space Station

Exception GOV represents *Governments, International Organizations, International Inspections Under the Chemical Weapons Convention, and the International Space Station*, and authorizes exports and reexports for international nuclear safeguards; U.S. government agencies or personnel; agencies of cooperating governments; international inspections under the Chemical Weapons Convention; and the International Space Station. In effect, GOV authorizes exports for the agencies and the personnel of the U.S. government, including contractor support personnel, and also certain exports for cooperating governments, which are not found in ITAR Exemptions.

### License Exception Strategic Trade Authorization

STA is the *License Exception Strategic Trade Authorization*, created under Export Control Reform. STA authorizes "exports, reexports, and transfers (in-country), including releases within a single country of software source code and technology to foreign nationals, in lieu of a license that would otherwise be required pursuant to part 742 of the EAR." Therefor this exception is, in practice, an alternative to a license for applicable 600 Series and 9X515 items. STA eligibility is limited to the thirty-six Country Group A:5 countries and U.S. government end-use. There are a number of requirements to meet, and as well each STA-eligible ECCN contains a statement of "Special

Conditions for STA" in the License Exceptions section. Similar to Commerce license requirements, a Prior Consignee Statement (PCS) is needed for prior authorization, with notifications to BIS of ECCNs and ultimate end-user and shipment information, also written notifications to the consignee of STA shipments. Which means that STA entails similar up-front work to a license, but with the benefits of faster approvals, that it covers technology, permits retransfers and reexports, and a single PCS can be used for multiple shipments.

As with a license, the key to smooth passage is ensuring that complete and full documentation is provided to the agency when submitting for review, including a statement of how the prior verification check was performed, and if any 600 series items are for Major Defense Equipment. BIS offers an online STA tool to help you here.

Best practice for the use of BIS License Exceptions is to study and keep informed of the EAR regulations, the same expertise that you have with ITAR. For STA especially, consult with a BIS field office to create a checklist of requirements, then document your steps, be thorough, reply to questions from the agency promptly, and don't use an Exception if you don't have a license requirement for the item.

------
  [FN/1] More information about the Licenses and related-regulations referenced in this article can be found here.

back to top

* * * * * * * * * * * * * * * * * * * *

## 10. J. Reeves & K. Heubert: "U.S. Departments of State and Commerce Propose Rules to Transition Firearms and Ammunition from the USML to the CCL"
(Source: Reeves & Dola LLP Alert, 1 June 2018. Available via jreeves@reevesdola.com.)

* Authors: Johanna Reeves, Esq., jreeves@reevesdola.com, 202-715-994; and Katherine Heubert, Esq., 202-715-9940, kheubert@reevesdola.com. Both of Reeves & Dola LLP.

*[Editor's Note: Part 1 was included in the Daily Bugle of 24 May 2018.]*

On May 24, 2018, the U.S. Departments of State and Commerce officially published proposed rules to transition most firearms and ammunition away from the export controls of the Department of State's International Traffic in Arms Regulations (ITAR) over to the controls of the Department of Commerce's Export Administration Regulations (EAR). In this alert, the second of four installments, we will examine the proposed revisions to the ITAR control list, the U.S. Munitions List (USML) Category I, and the Department of Commerce's proposed companion rule amending the Commerce Control List (CCL).

Both the State and Commerce Departments are seeking written comments on the proposed rules, which will be accepted until July 9, 2018. We strongly encourage industry to take time to carefully review the revised categories and provide actionable commentary to the proposed rules. This is a critical opportunity for industry to provide comments that would assist the government in reducing jurisdictional ambiguities and clarifying the articles that will remain subject to the ITAR. The specific instructions for submitting comments are included in each proposed rule.

### *Proposed Transitions from USML Cat. I to CCL*

Title for this category will change from "Firearms, Close Assault Weapons and Combat Shotguns" to "**Firearms and Related Articles**."

<u>Articles Removed from USML Cat. I</u> - State's rule proposes to transition away from the USML non-automatic and semi-automatic firearms up to and including .50 caliber currently controlled under paragraph (a), as well as all parts, components, accessories and attachments specially designed for those firearms. These items will be subject to the EAR under newly created "500 series" Export Control Classification Numbers (ECCNs).

Commerce originally created the "500 series" as part of "Export Control Reform" under the Obama Administration to control items that had been from the USML or certain items on the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual Use Goods and Technologies Munitions List (the "Wassenaar List" or WAML). Compared to the "600 series" ECCNs, which control items of a military nature removed from the USML, the "500 series" contain items not appropriate for the 600 series control because they have predominant civil, recreational, law enforcement, or other non-military applications.

To capture the firearms and ammunition in USML Cats. I-III that will transition to the CCL, Commerce proposes in its companion rule to create a total of 17 new ECCNs. For the firearms, parts, components, accessories and attachments that will transition from USML Cat. I, the proposed new ECCNs are:

- 0A501 (Firearms and related commodities)
- 0A502 (Shotguns and certain related commodities)
- 0A504 (Optical sighting devices and certain related commodities)
- 0E501 (Technology for firearms and certain related items)
- 0E502 (Technology for shotguns)
- 0E504 (Technology for certain optical sighting devices)

<u>Articles Still Controlled Under USML Cat. I</u> - items that would remain under Category I are positively listed as follows, including the corresponding paragraph (Significant Military Equipment (SME) is designated with an asterisk (*)):

*(a) Firearms using caseless ammunition.

*(b) Fully automatic firearms to .50 caliber (12.7 mm) inclusive.

*(c) Firearms **specially designed** [emphasis added] to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms (PGFs)), and specially designed parts and components therefor.

Note to paragraph (c): Integration does not include only attaching to the firearm or rail.

*(d) Fully automatic shotguns regardless of gauge.

*(e) Silencers, mufflers, and sound suppressors, and **specially designed** [emphasis added] parts and components therefor (flash suppressors move to CCL).

(f) [Reserved]

(g) Barrels, receivers (frames), bolts, bolt carriers, slides, or sears **specially designed** [emphasis added] for the articles in paragraphs (a), (b), and (d) of this category.

(h) Parts, components, accessories, and attachments, as follows:

  (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and **specially designed** [emphasis added] parts and components therefor;
  (2) Parts and components **specially designed for conversion of a semiautomatic firearm to a fully automatic firearm**[emphasis added].
  (3) Accessories or attachments **specially designed to automatically stabilize aim** (other than gun rests) **or for automatic targeting, and specially designed parts and components therefor** [emphasis added].

Technical Data and Defense Services - paragraph (i) specifies "technical data," as defined in ITAR §120.10, and "defense services," as defined in ITAR §120.9, directly related to the defense articles described in paragraphs (a), (b), (d), (e), (g), and (h) of Cat. I, and classified technical data directly related to items controlled in ECCNs 0A501, 0B501, 0D501, and 0E501 and defense services using the classified technical data. Exemptions will continue to be covered in ITAR §125.4.

Revised USML Cat. I will also include several notes to explain what items are excluded by the category (non-automatic and semi-automatic firearms up to and including .50 caliber; non-automatic shotguns; BB, pellet, and muzzle loading (e.g., black powder) firearms; and parts, components, accessories, and attachments of firearms and shotguns in paragraphs (a), (b), (d), and (g) of Cat. I that are common to non-automatic firearms and shotguns) and what is meant by firearm, fully automatic firearm or shotgun, or caseless ammunition.

The proposed rule also adds a new paragraph (x) to Cats. I, II and III to allow for ITAR licensing of commodities, software and technology subject to the EAR, which paragraph has already been added to all of the other USML categories that have gone through the rewrite process. It is important to note that paragraph (x) is only available if those items EAR items are to be used in or with defense articles controlled in USML Cat. I, and the items are described in the purchase documentation submitted with the ITAR license application. Further, it is important to understand that such EAR items, even if included on an ITAR export license under USML Cat. I(x), would remain subject to the controls of the EAR, despite the appearance of the ITAR license. Use of paragraph(x) is a licensing convenience only; it does not change the jurisdictional status of an item. Consequently, it will be incumbent on the U.S. exporter to properly educate its customers on the proper licensing authority, especially for reexport and retransfer requests.

### CCL Controls

A key fact in the proposed rules is that the transition from USML to CCL will NOT result in a decontrol of firearms or ammunition. Firearms transitioning from the USML to CCL will be subject to controls under National Security (NS), Regional Stability (RS), Crime Control and Detection (CC), Firearms Convention (FC), United Nations Sanctions (UN) and Anti-Terrorism (AT). Indeed, the proposed rules make it abundantly clear that BIS will require licenses to export or reexport to ANY country firearms or other weapons that transitions from the USML to the CCL.

License exceptions, such as limited value shipments (LVS), government (GOV), baggage (BAG) and strategic trade authorization (STA) will be very limited for small arms formerly on the USML, so industry should carefully review the ECCNs in the proposed rule to see what license exceptions are available for each ECCN and the limitations.

Each new ECCN will be made up of technically specific subparagraphs in an enumerated "List of Items Controlled." For example, the list of items controlled under ECCN 0A501 is comprised of paragraphs .a - .w, which identify the items classified under the particular paragraph. The ECCN also includes .x and .y paragraphs for parts and components. The .x paragraph operates like a catch-all, as it lists specially designed parts and components that are not controlled elsewhere. Conversely, the .y paragraph lists only those parts, components, accessories, and attachments that are controlled only for UN and AT reasons. Such items may be exported to nearly all destinations without a license. The parts and components captured by the .x paragraph, on the other hand, are subject to NS, RS, FC, UN, and AT and will likely require a license for most destinations.

It will be incumbent on the exporter (or temporary importer) to review every firearm and firearm part, component, accessory, and attachment in which it deals so as to determine the new classification once the rules become final. The specific license requirements, and the applicability of license exceptions, as well as any end-use or end-user restrictions, will depend on the specific subparagraph classification of the governing ECCN.

### Specially Designed

A critical concept in the proposed revisions to the control lists is the term "Specially Designed." This term has been reviewed, criticized, discussed, and analyzed in depth since it was first incorporated into the ITAR and the EAR in the initial implementation rules for Export Control Reform, which DDTC and BIS published in the Federal Register on April 16, 2013.

This term is NOT up for public comment at the present time, but to understand the proposed revisions to the USML and CCL control lists for firearms and ammunition, it is imperative to comprehend the term. Both the ITAR and EAR use the term, "Specially Designed" to remove the catch-all controls currently present in the USML Cats. I-III and to designate what parts, components, accessories and attachments are subject to either the ITAR or the EAR. We have highlighted the proposed use of "specially designed" in USML Cat. I in the list above.

It is important to note that the "specially designed" analysis is not applicable to the entire USML Category, as it can be used only if it is specified within a particular paragraph. As the revisions to Cat. I are intended to make the list a positive list and include only those articles that warrant control under the ITAR for the reasons stated previously, there should be a bright line between those articles subject to the ITAR and those subject to the EAR. Industry therefore must carefully review the full definition of "Specially Designed" and the application to the proposed revisions of Cat. I and provide comments that would assist the government in reducing jurisdictional ambiguities and clarifying the articles subject to the ITAR.

Industry should also review the ITAR order of review outlined in 22 C.F.R. § 121.1(b)), and the Order of Review Decision Tool available on DDTC's website. BIS also provides an Order of Review Decision Tool on its website.

Industry should be forewarned not to underestimate the time intensive process of classifying the parts, components, attachments and accessories for firearms under the proposed rules. A critical component is the specially designed analysis, which itself is complex and difficult to understand immediately. It would be foolish to skip over classification, as license requirements, applicability of license exceptions, and restrictions are dependent on the classification, down to the specific ECCN paragraph. Further, export license applications will require identification of the specific subparagraph of control as well. The days of simply identifying "paragraph (h)" for any and all parts and components are quickly coming to an end.

### Brokering

In addition to the proposed revisions to the USML Cats. I-III, DDTC's proposed rule identifies several "conforming changes" in other parts of the ITAR to remove references to firearms that will be controlled on the CCL. One such revision is to section 129.1 to clarify that regulations on brokering

activities apply to defense articles and defense services designated on the USML as well as items described on the U.S. Munitions Import List (USMIL) for permanent import controls. The USMIL is promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) pursuant to the permanent import provisions of the Arms Export Control Act. ATF's regulations are in 27 C.F.R. Pt. 447, and the USMIL is in 27 C.F.R. § 447.21.

According to DDTC, "the items that will move to the CCL for export control purposes, yet are on the USMIL for permanent import purposes, remain subject to the brokering requirements of [ITAR] part 129 with respect to all brokering activities, including facilitation in their manufacture, export, permanent import, transfer, reexport, or retransfer." 83 Fed. Reg. at 24199 (May 24, 2018). Approaching this from the catch and release analysis that has permeated export control reform, this is the "catch." The proposed revision in section 129.2, however, adds the following release in a new paragraph (vii) for activities that are NOT considered brokering activities:

"Activities by persons to facilitate the export, reexport, or transfer of an item subject to the EAR that has been approved pursuant to a license or license exception under the EAR or a license or other approval under this subchapter."

As written, this language is very broad because the clause "that has been approved" does not limit past approvals to the person engaging in the subject activities. Further, the past approvals may be from either an EAR or an ITAR authorization.

### *Electronic Export Information Filings to Automated Export System*

A critical change in the proposed rules lies within the Department of Commerce proposed rule relating to the Electronic Export Information (EEI) filings to Automated Export System (AES). According to the proposed rule, AES filings would be required for exports of all firearms transitioned to the CCL from the USML, regardless of value or destination. This requirement would also extend to temporary exports under license exceptions TMP or BAG.

In addition, the rule proposes to expand the required data elements of AES filings to include serial numbers, make, model, and caliber for such firearms. Industry should carefully evaluate the impact this requirement will have on operations and include in comments to the proposed rules.

### *Temporary Imports*

The proposed Commerce rules set out a new process in 15 C.F.R. 758.10 for temporary imports of items subject to both the EAR and the USMIL. The process would impose entry clearance requirements for firearms temporarily imported into the United States for a period *not to exceed 1 year*, and then would require the use of the TMP license exception for the return export.

For the inbound transaction, U.S. Customs and Border Protection would be charged with collecting identifying information necessary to track the items temporarily imported, such as the list of firearms with serial numbers, model, make, quantity, and value, as well as other import and supporting documents. For the export, a license would not be required, but CBP would match the export to the information received upon entry. Firearms may not be imported from or ultimately destined to certain proscribed or restricted countries, and the proposed rule includes language that would instruct importers to contact CBP at the port of import or export for the proper procedures to provide any data or documentation required by BIS. Commerce is seeking comment from industry on this proposed new process.

This brings to a close this second installment of our four-part series on the proposed rules transitioning firearms and ammunition from the USML to the CCL. In our next two alerts we will examine the proposed revisions to USML Cats. II and III and the new EAR controls.

back to top

* * * * * * * * * * * * * * * * * * * *

## 11. M. Volkov: "Episode 41 - Compliance and Technology"
(Source: Volkov Law Group Blog, 3 June 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

Compliance professionals are learning about new technologies that are quickly evolving to aid the compliance function. We hear regularly about the promise of artificial intelligence and block chain technology. These new developments will have a significant impact on compliance. But for now there are other areas where technology can help compliance programs today, including automation, data collection and analytics and monitoring capabilities.

In this episode, Michael Volkov discusses the technology horizon and practical steps that can be taken today to leverage compliance program activities using technology.

back to top

* * * * * * * * * * * * * * * * * * * *

## EX/IM MOVERS & SHAKERS

## 12. Monday List of Ex/Im Job Openings; 161 Jobs Posted This Week, Including 18 New Jobs
(Source: Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

   "#" New or amended listing this week

* ACCO Brands; Lake Zurich, IL; Foreign Trade Zone Specialist;
* Aerovironment; Simi Valley, CA; Trade Compliance Specialist II; Job ID: 18-017
* Aerovironment; Simi Valley, CA; Trade Compliance Director; Job ID: 18-018
* AJC Logistics; Atlanta, GA; NVOCC Export Specialist;
* AMD; Austin, TX; Manager, Import/Export; Requisition ID: 24061
* Arent Fox LLP; Washington, D.C.; International Trade Associate;
* Arent Fox LLP; Los Angeles, CA; International Trade Associate;
* AutoNation; Fort Lauderdale, FL; Trade Compliance Manager;
* BAE Systems; Los Angeles, CA; Program Manager, International and Offset; Requisition ID: 33778BR
* BAE Systems; Huntsville, AL; Facility Security Officer, Security Manager; Requisition ID: 36821BR
* BAE Systems; Burlington, MA; Facility Security Officer ("FSO"); Requisition ID: 35499BR
* BAE Systems; Rockville, MD; Compliance Specialist Senior; Requisition ID: 35809 BR
* BAE Systems; Sterling, VA; Compliance Specialist Senior; Requisition ID: 36370BR
* BAE Systems; Greenlawn, NY; International Trade Compliance Analyst I; Requisition ID: 38433BR
* BAE Systems; San Diego, CA; International Trade Compliance Analyst II; Requisition ID: 38548BR
* Boeing; Zoushan, China; Trade Compliance Manager;
* Boeing; Mesa, AR; Trade Control Specialist;
* Boeing; Ridley Park, PA;  Trade Control Specialist;
* Boeing; Dallas, TX; Sr. Export Regulatory & Compliance Specialist III - Licensing Liaison;
* BMW North America; Woodcliff Lake, NJ; Senior Analyst, Trade Compliance; Requisition ID: 170004RD
* Brownells, Inc.; Grinnell, IA; International Trade Compliance Manager II;
* Brownells, Inc.; Grinnell, IA; Product Classification Specialist I;
* Buehler; Lake Bluff, IL; Manager, Compliance and Logistics; Requisition ID: 2018-004
* Cree, Inc.; Durham, NC; Export Compliance Specialist; Contact asignorelli@cree.com; Requisition ID: 2018-6300
* Danaher Science and Technology; United States; Senior Global Trade Compliance Manager; Job ID: COR000942
* DHL; Newark, NJ; Director, Export Control & Compliance - USA; Requisition ID: ref57592
* DynCorp International; Tampa, FL; Foreign Disclosure Officer; Requisition ID: PR1701977

* Eaton; Syracuse, NY; Global Logistics Manager; Requisition ID: 036620
* Eaton; Shanghai Shi, China; Global Ethics and Compliance Director, APAC; Requisition ID: 039260
* Elbit Systems of America; Fort Worth, TX or Merrimack, NH; Trade Compliance Manager; 2018-5916
* Elbit Systems of America; Fort Worth, TX or Merrimack, NH; Trade Compliance Officer; 2018-5917
* EoTech Technologies; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* Erickson, Inc.; Central Point, OR; Import Specialist; Requisition ID: 756803
* Esterline; Hong Kong; Regional ITC Manager;
* Esterline; Singapore; Regional ITC Manager;
* Expeditors; Sunnyvale, CA; Customs Compliance Supervisor;
* Expeditors; Krefeld, Germany; Clerk Import / Export ;
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk;
* Expeditors; Dusseldorf, Germany; Clerk, Airfreight Import;
* Export Solutions Inc.; Melbourne FL; Trade Compliance Specialist; info@exportsolutionsinc.com
* EY; Belgium; Senior Consultant, Global Trade; Requisition ID: BEL000PT
# Flash Global; Mountain Lakes, NJ; Import Export Services Manager;
* FLIR; Arlington, VA; Senior Director, Global Export Licensing;
* FLIR; Billerica, MA; US Customs Analyst;
* FLIR; Meer, Belgium; GTC EMEA Customs Analyst;
* FLIR; Irving, CA; Sr. Manager Export Compliance;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Traffic;
* FLIR; Wilsonville, OR; Global Trade Compliance Analyst, Traffic;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Elkridge, MD; Global Trade Compliance Analyst, Traffic;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Licensing;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Licensing;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Technology;
* Floor and Decor; Smyrna, GA; Customs Compliance Manager;
* Full Circle Compliance; Bruchem, Netherlands; Legal Analyst, Manager;
* FusionStorm; Newark, CA; Trade Compliance Specialist; Requisition ID: 2018-2350
# General Atomics; San Diego, CA; Director, Compliance; Requisition ID: 18549BR
# General Atomics; San Diego, CA; Government Regulatory Compliance Specialist; Requisition ID: 18686BR
# General Atomics; San Diego, CA; Import/Export Trade Compliance Administrator - Licensing; Requisition ID: 17968BR
# General Atomics; San Diego, CA; Senior Director of Import/Export Compliance; Requisition ID: 13892BR
# General Atomics; San Diego, CA; Internal Auditor - Senior; Requisition ID: 17524BR
* General Dynamics; Fairfax, VA; Export Policy Analyst; Job ID: 2018-36089
* General Dynamics; Falls Church, VA; Director, Trade Compliance; Job ID: 2018-1122
* GHY International; Pembina, ND (or remote); Ocean & Air Import Coordinator;

* Gilead Sciences; Foster City, CA; Manager, Global Trade Compliance; R0001742
* Harris Corporation; Beaverton, OR; Manager, International Government Relations;
# Harris Corporation; Palm Bay, FL; Technical Trade Compliance Engineer; Contact Laura Solomon; Requisition ID: ES20171511-22019
# Harris Corporation; Clifton, NJ; Technical Trade Compliance Engineer;
* Henderson Group Unlimited; Inc; Washington, DC; Process Improvement Mgr;
* Henderson Group Unlimited; Inc; Washington, DC; Defense Control Analyst;
* Henkel Corp.; Rocky Hill, CT; Global Trade Defense Information Manager; Requisition ID: 180002QT
* Henkel Corp.; Rocky Hill, CT; Senior Global Trade Manager; Requisition ID: 18000307
* Huntington Ingalls Industries; Virginia Beach, VA; AMSEC-Import/Export Administrator 2; Requisition ID: 23979BR
* Hussman; Bridgeton, MO; Trade Compliance Specialist;
* Infineon Technologies; Munich, Germany; Experte Export Control (w/m); Requisition ID: 22825
* Infineon Technologies; Melaka, Malaysia; Export Control Executive; Requisition ID: 26833
* Infineon Technologies; Porto (Maia) Portugal; Trade Compliance Administrator; Requisition ID: 25550
* Infineon Technologies; Milpitas, CA; Export Compliance Specialist; Requisition ID: 26988
* Infineon Technologies; El Segundo, CA; Export Compliance Specialist; Requisition ID: 26826
# Intel; Amsterdam, Netherlands; Trade Specialist; Requisition ID: JR0056336
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official / Deputy Facility Security Officer;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official;
* Johns Hopkins University; Baltimore, MD; Assistant Director, Export Control and Facility Security;
* Johnson Controls; Milwaukee, WI; Trade Compliance Analyst; Requisition ID: WD30047348124
* Johnson Controls; Lithia Springs; Trade Compliance Specialist I; Requisition ID: WD30047947142
* Lam Research Corp.; Singapore; Foreign Trade Analyst 3;
* Lam Research Corp.; Fremont, CA; Foreign Trade Intern;
* Lam Research Corp.; Shanghai, China; Foreign Trade (FT) Analyst;
* Lam Research Corp.; Fremont, CA; Foreign Trade Data Analyst;
* Leonardo DRS; Arlington, VA; Senior Customs & Trade Compliance Manager; Requisition ID: 87488
* Leonardo DRS; St. Louis; Trade Compliance Specialist; Requisition ID: 88127, or contact brandy.mormino@drs.com
# Lincoln Electric; Cleveland, OH; Trade Compliance Manager;
* Lockheed Martin; Manassass, VA; International Licensing; Requisition ID: 423306BR

* Lockheed Martin; Fort Worth, TX; Import Export Compliance Coordinator; Job ID: 397600BR
* Lockheed Martin; Fort Worth, TX; Export and Import Compliance Investigations Lead; Job ID: 427872BR
* Lockheed Martin; Fort Worth, TX; Licensing Integration and Support; Job ID: 433056BR
* Lockheed Martin; Fort Worth, TX; Regulatory Compliance Analyst Senior; Job ID: 433405BR
* Lockheed Martin; Orlando, FL; Senior International Licensing Analyst; Requisition ID: 434225BR
* Lockheed Martin; Orlando, FL; International Licensing Analyst Sr; Job ID: 424151BR
* Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415717BR
* Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415708BR
* Luminar Technologies; Orlando, FL; Import/Export Trade Compliance Specialist;
* L-3 ALST; Orlando, FL; Contracts Manager / Empowered Official; Requisition ID: 093069
* L-3 Warrior Sensor Systems; Londonderry, NH; Purchasing & Compliance Manager; Requisition ID:096596
* L-3 Warrior Sensor Systems; Middle East; International Business Development Manager - Middle East Region; Requisition ID: 093343
* L-3; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* L-3; Grand Rapids, MI; Sr. Trade Compliance Administrator; Requisition ID: 097197
* L-3; Arlington, TX; Compliance Manager; Requisition ID: 098246
* Mattson Technology; Fremont, California; Import/Export Compliance Analyst;
* Maersk/DAMCO; Agent de transit IMPORT - EXPORT; Job Ref.: DC-164022
* Mattson Technology; Fremont, California; Import/Export Compliance Analyst;
* Medtronic; Heerlen, The Netherlands; Trade Compliance Analyst; Requisition ID: 16000DYY
* Medtronic; Wash DC; Global Trade Lawyer; stacy.m.johnson@medtronic.com; Requisition ID: 170002ON
* Meggit; Akron, OH; Manager, Trade Compliance;
* Meggit; Los Angeles, CA; Trade Compliance Officer;
* Meggit; Miami, FL; Trade Compliance Officer;
* Meggit; Tucson, AZ; Trade Compliance Specialist;
* Mitchell Martin, Inc.; Dallas, Texas; Export Regulatory Trade Compliance Specialist; Requisition ID: 104405
* Moog; East Aurora, NY; Manager, Group Trade Compliance Manager ; Amy Hanavan, ahanavan@moog.com; Requisition ID: 182102
* MTS Systems; Eden Prairie, MN; Global Trade Compliance Manager; Requisition ID: 37841
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID:17022803
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022805
* Office of the Director of National Intelligence; McLean, VA; Associate General Counsel;

* Oracle; Unspecified, United States; Customs Compliance Specialist; Requisition ID: 18000H0N
* Oracle; Hong Kong; Compliance Counsel; Requisition ID: 17001HWJ
* Orbital ATK, Inc.; Dulles, VA; Principal Import/Export Analyst; Job ID: JAY20182304-45242.
* Pentair; Illinois, USA; Import/Export Compliance Specialist; Requisition ID: 115774
* Pentair; Illinois, USA; Import/Export Compliance Specialist; Requisition ID: 115926
* PerkinElmer, Inc.; Shelton, CT; Systems Analyst, Trade Compliance Solutions;
# Raytheon Company; El Segundo, CA; Global Trade Licensing Analyst; Requisition ID: 114977BR
# Raytheon Company; El Segundo, CA; Global Trade Licensing Analyst; Requisition ID: 115189BR
# Raytheon Company; El Segundo, CA; Sr. Export Licensing And Compliance Specialist; Requisition ID: 114077BR
# Raytheon Company; Plano, TX; Import Control & Compliance Advisor; Requisition ID: 111596BR
# Raytheon Company; Tucson, AZ; Export Licensing And Compliance Specialist; Requisition ID: 114936BR
# Raytheon Company; Tewksbury, MA; Senior Trade Compliance Counsel; Requisition ID: 113063BR
* Rolls-Royce; Indianapolis, IN;Export Control Specialist; Req ID: JR6025484
* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* SABIC; Houston, TX; Senior Analyst, International Trade Compliance; Requisition ID 8655; OR Contact: Jason Washington
* SABIC; Houston, TX; Senior Analyst, Trade Compliance; Requisition ID: 8644BR
* Spirent; San Jose, CA; Global Trade Compliance Specialist; Requisition ID: 4088
* Teledyne Benthos; Falmouth, MA; Export Compliance Manager
# Teledyne Scientific & Imaging; Montgomeryville, PA; Contracts & Trade Compliance Administrator; Requisition ID: 6470
* TLR; San Fransisco, CA; Import CSR ; Requisition ID: 1040
* Trek; Waterloo, WI; Global Trade & Logistics Specialist;
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance IT Systems & Integration Mgr.; Requisition ID: 62310BR
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Manager; Requisition ID: 62176BR
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Authorizations Manager; Requisition ID: 63222BR
* United Technologies - Pratt & Whitney, East Hartford, CT; International Trade Compliance Technology Senior Manager; Requisition ID: 55944BR
* Varian; Belgium, Switzerland, Netherlands, or UK; EMEIA Trade Lead - Senior Manager Trade Compliance; Requisition ID: 12301BR; Contact Gavin Tickner at Gavin.Tickner@varian.com
* Varian; Paolo Alto, CA; Senior Trade Compliance Analyst; Requisition ID: 12735BR; Contact Uyen Tran at Uyen.Tran@varian.com

* Vigilant; Negotiable Location, USA; Global Trade Compliance Analyst;
* Virgin Galactic; Las Cruces, NM; Export Compliance Officer; Requisition ID: 2018-3558
* Williams International; Pontiac, MI; Trade Compliance Specialist; Requisition ID: 17-0275
# Wurth Industry of North America; Indianapolis, IN; International Trade Compliance Officer - Classification;
* Xylem, Inc.; Remote, United States; Manager, Global Ethics & Compliance;
* Xylem, Inc; Morton Grove, IL; Trade Compliance Specialist;
* YETI; Austin, TX; Global Trade Compliance Manager;
* Zebra Technologies; Bourne End, UK; Trade Compliance Manager, NALA; Requisition ID: 46144
* Zebra Technologies; Lincolnshire, IL; Holtsville, NY; Mcallen, TX; Miramar, FL; Agoura Hills, CA; Trade Compliance Manager, EMEA; Requisition ID: 46146

back to top

* * * * * * * * * * * * * * * * * * * * *

## EX/IM TRAINING EVENTS & CONFERENCES

13.
FCC Presents "Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR", 12 Jun in Bruchem, the Netherlands
(Source: Editor)

* What: Summer Course U.S. Export Controls: An Introduction to the ITAR & EAR
* When: 12 Jun 2018, 10 AM - 4 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* FCC Instructors: Mike Farrell and Ghislaine Gillessen
* Inquiries: Here or by e-mail events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

14. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Jacques Roumain** (4 Jun 1907 - 18 Aug 1944) was a Haitian writer, politician, and advocate of Marxism. He is considered one of the most prominent figures in Haitian literature.)
  - *"You cannot eat a cluster of grapes at once, but it is very easy if you eat them one by one."*

* **George III** (George William Frederick; 4 Jun 1738 - 29 Jan 1820; was King of the United Kingdom of Great Britain and Ireland.)
  - *"A traitor is everyone who does not agree with me."*

### **Monday is pun day:**
* Reading while sunbathing makes you well-red.
* When two egotists meet, it's an I for an I.
* Alarms: What an octopus is.

back to top

✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻

## 15. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Apr 2018: 83 FR 15736-15740: CBP Decision No. 18-04; Definition of Importer Security Filing Importer (ISF Importer)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 4 Jun 2018: 83 FR 25559-25561: Implementation of the February 2017 Australia Group (AG) Intersessional Decisions and the June 2017 AG Plenary Understandings; Addition of India to the AG; Correction

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 1 Jun 2018: Harmonized System Update 1808, containing 11,876 ABI records and 2,228 harmonized tariff records
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * * *

## 16. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

| **From:** | Jim Bartlett, Full Circle Compliance ▮▮▮▮▮@fullcirclecompliance.eu] |
|---|---|
| **Sent:** | 6/12/2018 7:07:36 PM |
| **To:** | Abraham, Liz (Federal) [LAbraham@doc.gov] |
| **Subject:** | 18-0612 Tuesday "Daily Bugle" |



## Tuesday, 12 June 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.   President Continues National Emergency With Respect to Belarus

2.   DHS/CBP Implements Mandatory Air Cargo Advance Screening, Program

3.   State Seeks Comments on DSP-5, DSP-61, DSP-85, DSP-73, DSP-6, DSP-62, DSP-74, and DSP-83

### OTHER GOVERNMENT SOURCES

4.   Items Scheduled for Publication in Future Federal Register Editions

5.   Commerce/BIS Announces ZTE Settlement

6.   State/DDTC: (No new postings.)

7.   UK Introduces New Merger and Takeover Rules

### NEWS

8.   Fortune: "Senate Moves to Block Trump's Settlement with China's ZTE, a 'Personal Favor' to President Xi Jinping"

9.   The Gazette: "Federal Appeals Court Upholds 3 Family Members' Convictions for Smuggling Guns to Lebanon"

10.  Guns.com: "Proposed Export Reform Will Boost International Gun Sales, Industry Expects"

11.  International Financial Law Review: "Asian Businesses Face Export Control, Sanction Compliance Headaches"

12.  South China Morning Post: "ZTE to Replace Board, Fire Senior Management Under U.S. Deal"

## COMMENTARY

13. T.B. McVey, C.R. Webb & C.E. James, Jr.: "Export Control Amendments Proposed for Commercial Firearms, Ammunition and Related Products"

14. Xiaomeng Lu: "What Chinese Companies Can Learn From ZTE's Mistakes"

## EDITOR'S NOTES

15. Bartlett's Unfamiliar Quotations

16. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

17. Weekly Highlights of the Daily Bugle Top Stories



**WORD ONLY**

**Are you Keeping Up to Date with the Latest Regulations?**

The BITAR and BAFTR will keep you updated on the latest ITAR and FTR amendments.

**MORE INFORMATION AVAILABLE HERE**

## ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. President Continues National Emergency With Respect to Belarus

(Source: Federal Register, 12 Jun 2018.) [Excerpts.]

83 FR 27287: Notice of June 8, 2018: Continuation of the National Emergency with Respect to the Actions and Policies of Certain Members of the Government of Belarus and Other Persons to Undermine Democratic Processes or Institutions of Belarus

On June 16, 2006, by Executive Order 13405, the President declared a national emergency pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701-1706) to deal with the unusual and extraordinary threat to the national security and foreign policy of the United States constituted by the actions and policies of certain members of the Government

of Belarus and other persons to undermine Belarus's democratic processes or institutions, manifested in the fundamentally undemocratic March 2006 elections; to commit human rights abuses related to political repression, including detentions and disappearances; and to engage in public corruption, including by diverting or misusing Belarusian public assets or by misusing public authority.

The actions and policies of certain members of the Government of Belarus and other persons continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States. For this reason, the national emergency declared on June 16, 2006, and the measures adopted on that date to deal with that emergency, must continue in effect beyond June 16, 2018. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency declared in Executive Order 13405. ...

 [Presidential Signature.]

THE WHITE HOUSE,
June 8, 2018.

back to top

* * * * * * * * * * * * * * * * * * * *

## 2. DHS/CBP Implements Mandatory Air Cargo Advance Screening, Program
(Source: Federal Register, 12 Jun 2018.) [Excerpts.]

83 FR 27380-27407: Air Cargo Advance Screening (ACAS); Final Rule

* AGENCY: U.S. Customs and Border Protection, DHS.
* ACTION: Interim final rule; request for comments.
* SUMMARY: To address ongoing aviation security threats, U.S. Customs and Border Protection (CBP) is amending its regulations pertaining to the submission of advance air cargo data to implement a mandatory Air Cargo Advance Screening (ACAS) program for any inbound aircraft required to make entry under the CBP regulations that will have commercial cargo aboard. The ACAS program requires the inbound carrier or other eligible party to electronically transmit specified advance cargo data (ACAS data) to CBP for air cargo transported onboard U.S.-bound aircraft as early as practicable, but no later than prior to loading of the cargo onto the aircraft. The ACAS program enhances the security of the aircraft and passengers on U.S.-bound flights by enabling CBP to perform targeted risk assessments on the air cargo prior to the aircraft's departure for the United States. These risk assessments will identify and prevent high-risk air cargo from being loaded on the aircraft that could pose a risk to the aircraft during flight.
* DATES:

 - Effective date: **This interim final rule is effective June 12, 2018**.
 - Comment date: Comments must be received by August 13, 2018. ...
* SUPPLEMENTARY INFORMATION: ...

I. Public Participation ...
II. Executive Summary ...
III. Background and Purpose ...
    A. Current Regulatory Requirements ...
        1. CBP Regulatory Requirements ...
        2. TSA Requirements ...
    B. Air Cargo Security Risks ...
    C. ACAS Pilot ...
IV. Mandatory ACAS Program ...
    A. New 19 CFR 122.48b, Air Cargo Advance Screening (ACAS) ...
    B. Eligible ACAS Filers ...
    C. Time Frame for Filing ACAS Data ...
    D. ACAS Data ...
        1. ACAS Data Definitions ...
        2. Mandatory ACAS Data ...
        3. Conditional ACAS Data: Master Air Waybill Number ...
        4. Optional ACAS Data ...
    E. Filing and Updating the ACAS Data ...
    F. ACAS Referrals ...
    G. Do-Not-Load (DNL) Instructions ...
    H. Responsibilities of ACAS Filers ...
        1. Responsibility To Provide Accurate and Timely Data ...
        2. Responsibility To Resolve ACAS Referrals ...
        3. Responsibility To Address Do-Not-Load (DNL) Instructions ...
    I. Amendments to Bond Conditions ...
    J. Amendments to 19 CFR 122.48a ...
        1. Flight Departure Message (FDM) ...
        2. Other Amendments to 19 CFR 122.48a ...
    K. Flexible Enforcement ...

Dated: June 4, 2018.
Kirstjen M. Nielsen, Secretary.

back to top

* * * * * * * * * * * * * * * * * * * *

## 3. State Seeks Comments on DSP-5, DSP-61, DSP-85, DSP-73, DSP-6, DSP-62, DSP-74, and DSP-83

(Source: Federal Register, 12 Jun 2018.) [Excerpts.]

83 FR 27362-27364: 30-Day Notice of Proposed Information Collection: Six DDTC Information Collections

* ACTION: Notice of request for public comments.
* SUMMARY: The Department of State has submitted the information collection described below to the Office of Management and Budget (OMB) for approval. In accordance with the Paperwork Reduction Act of 1995 we are requesting comments on this collection from all interested individuals and

organizations. The purpose of this Notice is to allow 30 days for public comment.

\* DATES: Submit comments directly to the Office of Management and Budget (OMB) up to July 12, 2018. ...

\* FOR FURTHER INFORMATION CONTACT: Direct requests for additional information regarding the collection listed in this notice, including requests for copies of the proposed collection instrument and supporting documents, to Andrea Battista, SA-1, 12th Floor, Directorate of Defense Trade Controls, Bureau of Political Military Affairs, U.S. Department of State, Washington, DC 20522-0112, via phone at (202) 663- 3136, or via email at battistaal@state.gov.

\* SUPPLEMENTARY INFORMATION:

- Title of Information Collection: Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data.
 - OMB Control Number: 1405-0003.
 - Type of Request: Extension of a Currently Approved Collection.
 - Originating Office: Bureau of Political-Military Affairs, Directorate of Defense Trade Controls, PM/DDTC.
 - Form Number: DSP-5. ...
 - Obligation to Respond: Required to Obtain or Retain a Benefit.

- Title of Information Collection: Application/License for Temporary Import of Unclassified Defense Articles.
 - OMB Control Number: 1405-0013.
 - Type of Request: Extension of Currently Approved Collection.
 - Originating Office: Bureau of Political-Military Affairs, Directorate of Defense Trade Controls, PM/DDTC.
 - Form Number: DSP-61. ...
 - Obligation to Respond: Required in Order to Obtain or Retain Benefits.

- Title of Information Collection: Application/License for Permanent/Temporary Export or Temporary Import of Classified Defense Articles and Related Classified Technical Data.
 - OMB Control Number: 1405-0022.
 - Type of Request: Extension of Currently Approved Collection.
 - Originating Office: Bureau of Political-Military Affairs, Directorate of Defense Trade Controls, PM/DDTC.
 - Form Number: DSP-85. ...
 - Obligation to Respond: Required in Order to Obtain or Retain Benefits.

- Title of Information Collection: Application/License for Temporary Export of Unclassified Defense Articles.
 - OMB Control Number: 1405-0023.
 - Type of Request: Extension of Currently Approved Collection.
 - Originating Office: Bureau of Political-Military Affairs, Directorate of Defense Trade Controls, PM/DDTC.
 - Form Number: DSP-73. ...
 - Obligation to Respond: Required in Order to Obtain or Retain Benefits.

- Title of Information Collection: Application for Amendment to License for Export or Import of Classified or Unclassified Defense Articles and Related Classified Technical Data.
- OMB Control Number: 1405-0092.
- Type of Request: Extension of Currently Approved Collection.
- Originating Office: Bureau of Political-Military Affairs, Directorate of Defense Trade Controls, PM/DDTC.
- Form Number: DSP-6; DSP-62; DSP-74. ...
- Obligation to Respond: Required in Order to Obtain or Retain Benefits.

- Title of Information Collection: Nontransfer and Use Certificate.
- OMB Control Number: 1405-0021.
- Type of Request: Extension of Currently Approved Collection.
- Originating Office: Bureau of Political-Military Affairs, Directorate of Defense Trade Controls, PM/DDTC.
- Form Number: DSP-83.
- Obligation to Respond: Required in Order to Obtain or Retain Benefits. ...

*Abstract of Proposed Collections*

The export, temporary import, and brokering of defense articles, including technical data, and defense services are authorized by The Department of State, Directorate of Defense Trade Controls (DDTC) in accordance with the International Traffic in Arms Regulations ("ITAR," 22 CFR parts 120-130) and section 38 of the Arms Export Control Act. Those who manufacture, broker, export, or temporarily import defense articles, including technical data, or defense services must register with the Department of State and obtain a decision from the Department as to whether it is in the interests of U.S. foreign policy and national security to approve covered transactions. Also, registered brokers must submit annual reports regarding all brokering activity that was transacted, and registered manufacturers and exporter must maintain records of defense trade activities for five years.

1405-0003, Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data: In accordance with part 123 of the ITAR, any person who intends to permanently export unclassified defense articles or unclassified technical data must obtain authorization from DDTC prior to export. "Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data" (Form DSP-5) is the licensing vehicle typically used to obtain permission for the permanent export of unclassified defense articles, including unclassified technical data, enumerated on the USML. This form is an application that, when approved by PM/DDTC, Department of State, constitutes the official record and authorization for the permanent commercial export of unclassified U.S. Munitions List articles, pursuant to the Arms Export Control Act and the International Traffic in Arms Regulations.

1405-0013, Application/License for Temporary Import of Unclassified Defense Articles: In accordance with part 123 of the ITAR, any person who intends to temporarily import unclassified defense articles must obtain DDTC authorization prior to import. "Application/License for Temporary Import of Unclassified Defense Articles" (Form DSP-61) is the licensing vehicle typically used to obtain permission for the temporary import of unclassified defense

articles covered by USML. This form is an application that, when approved by PM/DDTC, Department of State, constitutes the official record and authorization for the temporary commercial import of unclassified U.S. Munitions List articles, pursuant to the Arms Export Control Act and the International Traffic in Arms Regulations.

1405-0022, Application/License for Permanent/Temporary Export or Temporary Import of Classified Defense Articles and Related Classified Technical Data: In accordance with part 123 of the ITAR, any person who intends to permanently export, temporarily export, or temporarily import classified defense articles, including classified technical data must first obtain DDTC authorization. "Application/License for Permanent/Temporary Export or Temporary Import of Classified Defense Articles and Related Classified Technical Data" (Form DSP-85) is used to obtain permission for the permanent export, temporary export, or temporary import of classified defense articles, including classified technical data, covered by the USML. This form is an application that, when approved by PM/DDTC, Department of State, constitutes the official record and authorization for all classified commercial defense trade transactions, pursuant to the Arms Export Control Act and the International Traffic in Arms Regulations.

1405-0023, Application/License for Temporary Export of Unclassified Defense Articles: In accordance with part 123 of the ITAR, any person who intends to temporarily export unclassified defense articles must obtain DDTC authorization prior to export. "Application/License for Temporary Export of Unclassified Defense Articles" (Form DSP-73) is the licensing vehicle typically used to obtain permission for the temporary export of unclassified defense articles covered by the USML. This form is an application that, when approved by PM/DDTC, Department of State, constitutes the official record and authorization for the temporary commercial export of unclassified U.S. Munitions List articles, pursuant to the Arms Export Control Act and the International Traffic in Arms Regulations.

1405-0092, Application for Amendment to License for Export or Import of Classified or Unclassified Defense Articles and Related Classified Technical Data: In accordance with part 123 of the ITAR, any person who intends to permanently export, temporarily import, or temporarily export unclassified or classified defense articles or related technical data must obtain DDTC authorization. "Application for Amendment to License for Export or Import of Classified or Unclassified Defense Articles and Related Classified Technical Data" is used to obtain permission for certain changes to previously approved licenses. This form is an application that, when +approved by PM/DDTC, Department of State, constitutes the official record and authorization for all requests to amend existing defense trade authorizations made pursuant to the Arms Export Control Act and the International Traffic in Arms Regulations.

1405-0021, Nontransfer and Use Certificate: Pursuant to Sec. 123.10 of the ITAR, a completed Nontransfer and Use Certificate" (Form DSP-83) must accompany an export license application to export significant military equipment and classified articles and technical data. Pursuant to Sec. 124.10 of the ITAR, a completed "Nontransfer and Use Certificate" must be submitted with any request for a manufacturing license agreement or technical assistance agreement that relates to significant military equipment or classified defense articles and technical data. The foreign consignee (if

applicable), foreign end-user, and applicant execute this form. By signing the certificate the foreign end-user certifies that they will not, except as specifically authorized by prior written approval of the Department of State, re-export, resell or otherwise dispose of the defense articles enumerated in the application (1) outside the foreign country named as the country of ultimate destination; or (2) to any other person. With respect to agreements that involve classified articles or classified technical data, an authorized representative of the foreign government must also sign the form.

Methodology: This information collection may be sent to the Directorate of Defense Trade Controls via the following methods: Electronically or mail.

Anthony M. Dearth, Directorate of Defense Trade Controls, Bureau of Political-Military Affairs, U.S. Department of State.

back to top

* * * * * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 4. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * * * * * *

## 5. Commerce/BIS Announces ZTE Settlement
(Source: Commerce/BIS, 12 Jun 2018.) [Summary.]

* Respondent: Zhongxing Telecommunications Equipment Corporation and ZTE Kangxun Telecommunications Ltd. of Shenzen and Hi-New Shenzen, China, respectively.
* Charges: On 6 March 2018, ZTE notified BIS that it had made false statements in two letters it sent to BIS regarding the discipline of ZTE employees involved in the violations that led to the March 2017 Settlement Agreement and 23 March 2017 order.
* Penalties:
  - Civil Penalty of $1,761,000,000 and placement of ZTE on the Denied Parties List ("DPL"). **BIS will remove ZTE from the DPL Denied Persons List after ZTE makes the required payment and deposit into escrow.**
  - Within 30 days of the date of the order, BIS will select and ZTE shall retain at its expense an independent Special Compliance Coordinator ("SCC") to coordinate, monitor, assess, and report on compliance by ZTE and its subsidiaries and affiliates worldwide.
  - ZTE must also:

-- Complete and submit nine audit reports of its compliance with U.S. export control laws;
-- Ensure that all records required to be kept or retained under the Regulations are stored in or fully accessible from the United States;
-- Publish on its website all Export Control Classification Numbers as necessary to determine applicable requirements;
-- Hold two public symposia in China regarding compliance with applicable U.S. export control regulations.
* Debarred: 10 years from the date of this order, unless ZTE completes the full and timely payment as described above.
* Date of Order: 7 Jun 2018.

*[The Draft Charging Letter, Superseding Settlement Agreement, and Superseding Order are available HERE. See also the related 7 June press release from the Department of Commerce, available HERE.]*

back to top

* * * * * * * * * * * * * * * * * * * * * * *

6.
State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * * * * *

7. UK Introduces New Merger and Takeover Rules
(Source: UK ECJU, Notice to Exporters 2018/13, 12 Jun 2018.) [Excerpts.]

The UK Export Control Joint Unit (ECJU) announced that the UK government has strengthened its ability to scrutinize mergers and takeovers with relation to possible national security concerns through new rules that came into force on 11 June 2018.

These rules follow the publication of the 'National Security and Infrastructure Investment Review' Green Paper in October 2017. This review set out proposals to close gaps in our current framework in the short term, and proposals for a more comprehensive regime over the longer term.

The government has now responded to the consultation on the short-term proposals and secondary legislation came into force on 11 June 2018.

The new regulations amend the threshold tests for businesses in the military, dual-use, computing hardware and quantum technology sectors that are most likely to have implications for our security. Businesses that develop or produce goods on certain of the Strategic Export Control Lists will be covered by the amended thresholds.

Today's changes allow ministers to intervene for public interest reasons when the target business's UK turnover is more than £1 million, down from £70 million under the previous rules, and remove the requirement that a merger

or takeover in these sectors lead to an increase in the parties' combined share of supply of relevant goods or services before the Government is able to intervene.

*Action for Exporters*

Ensure your company is familiar with the legislation amending the share of supply test and turnover threshold and accompanying guidance. ...

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 8. Fortune: "Senate Moves to Block Trump's Settlement with China's ZTE, a 'Personal Favor' to President Xi Jinping"
(Source: Fortune, 12 Jun 2018.) [Excerpts.]

The Senate has adopted a measure to block a deal between the Trump administration and Chinese telecommunications company ZTE.

The motion was adopted late Monday night, only hours after the deal became public and less than a week after it was signed. The announced settlement would allow the company to resume buying parts and selling products in the U.S. after having been banned by the U.S. Commerce Department in April for breaking the U.S. embargo against Iran.

The Senate added the block to the National Defense Authorization Act, a must-pass piece of legislation. It would block the deal by retroactively reinstating financial penalties and upholding the ban on ZTE selling products to the U.S. government. The Senate's action is based on national security fears over ZTE's products. The intelligence community suspects the company's devices are mechanisms for espionage that can be remotely tracked and used to steal intellectual property. ...

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 9. The Gazette: "Federal Appeals Court Upholds 3 Family Members' Convictions for Smuggling Guns to Lebanon"
(Source: The Gazette, 11 Jun 2018.)

*Appeal for fourth family member remains pending*

A federal appeals court Monday upheld convictions of three Cedar Rapids family members for smuggling 252 guns among skid loaders bound for Lebanon in 2014 and 2015.

U. S. Court of Appeals for the 8th Circuit affirmed sentences for Ali Al Herz, his brother Bassem Herz and Herz's wife, Sarah Zeaiter, for their part of smuggling guns from Cedar Rapids to Lebanon in shipping containers. The three pleaded, along with Al Herz's son, Adam Al Herz, 25, in 2016.

Adam Al Herz's appeal was filed later and is pending.

 - Ali Al Herz, 53, pleaded guilty to being a prohibited person in possession of firearms, firearms conspiracy, conspiracy to commit money laundering and violation of the Arms Export Control Act, meaning he didn't have a license to export firearms. He was sentenced to 27 years.

 - Bassem Herz, 33, pleaded guilty to firearms conspiracy, conspiracy to commit money laundering and violation of the Arms Export Control Act, which is not having a license to export firearms. He was sentenced to eight years

 - Sarah Zeaiter, 26, pleaded guilty of one count each to firearms conspiracy, conspiracy to commit money laundering and violation of the Arms Export Control Act. She was sentenced to seven years.

 - Adam Al Herz, 23, pleaded guilty to firearms conspiracy, conspiracy to commit money laundering and violation of the Arms Export Control Act - that he didn't have a license to export firearms. He was sentenced to 20 years.

Ali Al Herz argued U.S. District Senior Judge Linda Reade, who was chief judge at the time, should not have imposed an enhancement regarding the number of guns. According to evidence, he told investigators there was an estimated 227 firearms in the March and August 2014 and May 2015 shipments, but he argued that didn't distinguish between ones he purchased and what others purchased and shipped. The appeals court found he was accountable for at least 200 guns.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. Guns.com: "Proposed Export Reform Will Boost International Gun Sales, Industry Expects"
(Source: Guns.com, 12 Jun 2018.) [Excerpts.]

Firearm industry experts believe the proposed export reform will boost international gun sales. ...

The Directorate of Defense Trade Controls unveiled the long-awaited ITAR changes last month, shifting oversight of commercial arms sales to the Commerce Department and its Export Administration Regulations (EAR).

The rule change would give American manufacturers more leeway to sell guns internationally. Lawrence Keane, senior vice president for the National Shooting Sports Foundation, said in September relaxed restrictions would boost annual gun sales by as much as 20 percent. ...

The proposal removes non-automatic and semi-automatic firearms from ITAR categories I and II. Corresponding parts and ammunition will no longer remain in category III. Firearms dealers large and small would no longer pay a $2,250 ITAR registration fee or a $250 licensing fee.

Instead, the products will transfer to the EAR and undergo far less scrutiny. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. International Financial Law Review: "Asian Businesses Face Export Control, Sanction Compliance Headaches"
(Source: International Financial Law Review, 11 Jun 2018.) [Excerpts; subscription required.]

Asian businesses, especially Chinese companies, are facing increasing pressure as the U.S. increasingly resorts to export control and sanction regulations as a foreign policy tool.

The issue was recently amplified by the ZTE case which has been heavily criticized by market participants globally. Due to breaching terms of an existing sanctions settlement with the U.S., ZTE was initially banned from purchasing components central to its business from US partners for seven years. The ban has now been lifted after ZTE signed an agreement with the US to pay $1.4 billion to settle the case.

According to panelists at the recent Asialaw In-House Counsel Summit in Hong Kong, what Asian corporates are finding most challenging is tracking channel partners with little to no resources on export controls and the technical difficulty of knowing the percentage of U.S. content across complex product lifecycles when there are large volumes of products. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. South China Morning Post: "ZTE to Replace Board, Fire Senior Management Under U.S. Deal"
(Source: South China Morning Post, 12 Jun 2018.) [Excerpts.]

ZTE Corp. has agreed to pay an additional US$1 billion in civil penalties to the U.S. Department of Commerce and put US$400 million in escrow to settle its violation of export controls that threatened to put it out of business.

The Shenzhen-based telecommunications company, which had to shut down major operations after the U.S. banned it from buying American parts, will also employ a special compliance coordinator (SCC) and a team of assistants at its expense for a period of 10 years, according to a detailed settlement agreement on the U.S. Commerce Department's website.

The entire boards of directors of ZTE Corp. and ZTE Kangxun will be replaced within 30 days of the agreement dated June 7, and all members of senior leadership at or above the senior vice-president level and employees responsible for the export violations will be terminated. ...

As part of the agreement, ZTE will also hold two public symposiums in China within four years regarding compliance with the regulations, focused on best compliance practices for Chinese companies. ...

back to top

* * * * * * * * * * * * * * * * * *

COMMENTARY

## 13. T.B. McVey, C.R. Webb & C.E. James, Jr.: "Export Control Amendments Proposed for Commercial Firearms, Ammunition and Related Products"
(Source: Williams Mullen, 11 Jun 2018.)

* Author: Thomas B. McVey, Esq., tmcvey@williamsmullen.com; Camden R. Webb, Esq., crwebb@williamsmullen.com; and Charles E. "Chuck" James, Jr., Esq., cjames@williamsmullen.com. All of Williams Mullen.

On May 24, 2018 the State and Commerce Departments issued proposed regulations regarding the transfer of export jurisdiction for commercial firearms and ammunition from the International Traffic in Arms Regulations ("ITAR") to the Export Administration Regulations ("EAR").
[FN/1] Specifically, the proposals would amend Categories I, II and III of the U.S. Munitions List ("USML") to remove certain commercial firearms products, ammunition, and certain parts, components, accessories and attachments and transfer these items to the Commerce Control List ("CCL") under the EAR. This is the first step in the long-awaited process under export control reform to transfer firearms products that no longer warrant control as military products from ITAR to the less restrictive EAR. This is welcome news to our clients and many in the firearms and firearms accessory market. The following is a summary of a number of the proposed changes and the impact on companies dealing in these products.

At the outset, it should be recognized that these are proposed amendments - they are not the final versions of the regulations. State and Commerce have provided these in proposed form and are requesting comments from interested parties during a 45-day comment period. Upon the receipt of comments, the agencies may make further modifications to the proposals and must still issue final regulations. Consequently, companies should be alert to any additional changes and not act on the proposed regulations until they become final. Nevertheless, companies can become engaged in the process now by submitting comments with recommendations for further revisions and

DOC_0002104

begin planning for the transition to the new regulatory program. Many industry groups and advocacy organizations are encouraging their members to offer comments in support of the proposed regulations.

*Amendments Under ITAR.* Under the proposed State Department rule, USML Category I, covering firearms and related articles, will be amended to remove non-automatic and semi-automatic firearms up to caliber .50 (12.7 mm) inclusive and certain parts, components, accessories and attachments "specially designed" for such articles. The goal of such amendments is to remove common items like modern sporting rifles while continuing to control under ITAR "only defense articles that are inherently military or that are not otherwise widely available for commercial sale." [FN/2] Such products would be transferred to be controlled under the EAR (discussed further below). Certain products, however, would continue to remain on USML Category I and subject to ITAR that fit within the above parameters, including the following:

- Firearms that fire caseless ammunition;
- Fully automatic firearms to caliber .50 inclusive;
- Firearms specially designed to integrate fire control, automatic tracking and automatic firing systems;
- Fully automatic shotguns;
- Silencers, mufflers, sound suppressors, and specially designed parts and components;
- Barrels, receivers (frames), bolts, bolt carriers, slides, and sears, specially designed for the firearms in Category I;
- High capacity (greater than 50 rounds) magazines, and parts and components to convert a semi-automatic firearm into a fully automatic firearm; and
- Accessories and attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting.

Category II, covering guns and armaments, would be amended to specifically list the items subject to controls and to establish a "bright line" between the USML and the CCL for the control of these items. Items removed and transferred to the CCL include engines for self-propelled guns and howitzers, [FN/3] tooling and equipment for the production of articles controlled in USML Category II [FN/4] and certain test and evaluation equipment. [FN/5] Items specifically remaining on the USML and subject to ITAR would include certain apparatus and devices for launching or delivering ordnance, [FN/6] certain autoloading systems currently controlled under USML Category II paragraph (i), developmental guns and armaments funded by the Department of Defense [FN/7] and specially designed parts and components of such developmental products.

Category III, covering ammunition and ordinance, would be amended to be consistent with Category I, including the removal of ammunition for small arms that were transferred out of Category I. Category III would also be amended to remove the broad "catch-alls" previously covered and to specifically enumerate the remaining items to be controlled.

*New Controls Under the EAR*. Items removed from the USML as described above would be transferred to be controlled under the EAR which is administered by the Bureau of Industry and Security ("BIS") within the Commerce Department. As part of this transfer, BIS has established 17 new export control classification numbers ("ECCN's") on the CCL to control items that were removed from the USML.

Items covered by these ECCN's will continue to be subject to significant export restrictions. For example, these items will require export licenses for exports, reexports and in-country transfers. In addition, certain "technology" related to the transferred firearms, ammunition and related products will be controlled on the CCL - in many cases licenses will be required for the transfer of controlled technology out of the U.S. and the transfer or disclosure of controlled technology to foreign persons in the U.S. Certain license exceptions would also be available for the transferred items (although the license exceptions under the EAR frequently differ from the license exemptions under ITAR). As with ITAR licenses issued by DDTC, items exported under a license would only be authorized for the end user and end use specified on the license - any reexports or in-country transfers of such items beyond such authority will require specific additional license authorization from BIS.

*Continued ITAR Controls On Brokering of Commercial Firearms*. Notwithstanding the changes described above, commercial firearms and ammunition would continue to be covered under the ITAR brokering requirements. Specifically, the State Department proposed rule states that products listed on the U.S. Munitions Import List (used by the Bureau of Alcohol, Tobacco, Firearms and Explosives for administering controls on the permanent import of firearms products) will continue to be subject to the ITAR brokering requirements set forth in 22 CFR Part 129. Category I(a) of the USMIL includes nonautomatic and semiautomatic firearms, to caliber .50 inclusive, and USMIL Category III(a) includes ammunition for such products. Thus, despite the broad changes to USML Categories I and III under the proposed amendments, parties will still be subject to ITAR regulation for brokering and "facilitation" in the sale of commercial firearms products, including requirements for registration, obtaining advanced authorizations for certain transactions, reporting, recordkeeping and restrictions on brokering transactions involving the "proscribed" countries identified in 22 CFR §126.1.

*Impact on Firearms Companies*. The proposed changes will most likely affect many companies in the firearms industry in a number of ways including:

- *Export Classifications*. Companies will review the export jurisdiction and classification of their products to determine if they have been transferred to BIS jurisdiction and, if so, to determine the correct ECCN's for their products. This will apply to firearms, ammunition, parts, components, accessories and attachments.
- *Licenses For Products, Technology and Software.* As referenced above, companies will still be required to obtain export licenses for exports, reexports and in-country transfers for controlled products, technologies and

software. However, in many cases these will be from a different licensing agency under different licensing procedures. Consequently, many companies will be amending their export compliance procedures to conform to these new requirements.

- *Registration.* There is no requirement for companies to register under the EAR, as exists under ITAR. Of course, if companies still engage in activities regulated under ITAR (such as brokering commercial firearms products or the sale of items remaining in USML Categories I, II and III), they will be required to maintain their DDTC registration.

- *Defense Services.* There are reduced controls on performing services under the EAR as compared with those under ITAR. [FN/8]

- *Temporary Imports.* The EAR does not contain controls on the temporary import of items subject to the EAR as required under ITAR.

- *Reports for Payments of Fees, Commissions and Political Contributions.* The EAR does not require exporters to file reports on the payment of political contributions, fees and commissions as under ITAR Part 130.

- *Items Still Regulated Under ITAR.* For items that remain listed on the USML after the amendments, such items will still be subject to ITAR and the requirements thereunder.

*Status of Amendments.* As stated above, the amendments described in this alert are proposed changes only and not final amendments. Parties have until July 9, 2018 to submit comments to State and Commerce on the proposed regulations. Companies are encouraged to review the proposals carefully to assess how they will apply to their businesses as there is still opportunity to propose further amendments. Officials at DDTC and BIS typically review the comments carefully and often adopt changes recommended by commenters.

While the transfer of commercial firearms products from ITAR to EAR controls is not yet concluded, the process has begun. This is the time for companies to become engaged - in reviewing, commenting on and planning ahead for these changes.

---------

[FN/1] The proposed State Department rule is available here, and the proposed Commerce Department rule is available here.

[FN/2] See State proposed rule p. 24,198.

[FN/3] To be transferred to the CCL under ECCN 0A606.

[FN/4] To be transferred to the CCL under ECCN 0B602

[FN/5] To be transferred to the CCL under ECCN 0B602.

[FN/6] To be included in a new USML paragraph (a)(4).

[FN/7] To be included in new USML paragraph (a)(5).

[FN/8] The performance of services is addressed in the EAR in 15 CFR §744.6(a)(1)(ii) and §744.6(a)(2). In addition, the BIS proposed rule states as follows regarding defense services: "The EAR does not include a concept of "defense services," and the "technology" related controls are more narrowly focused and apply in limited contexts as compared to the ITAR." See BIS proposed rule at p. 24,167.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DOC_0002107

## 14. Xiaomeng Lu: "What Chinese Companies Can Learn From ZTE's Mistakes"
(Source: The Diplomat, 12 Jun 2018.)

\* Author: Xiaomeng Lu is Access Partnership's International Public Policy Manager and China practice lead.

Starting in 2010, Chinese telecommunications equipment company ZTE violated the U.S. embargo against Iran in order to sell export-controlled technology to Iranian entities. During the course of the U.S. government investigation, ZTE engaged in evasive conduct designed to prevent investigators from detecting their violations. This unprecedented scheme led to a record-high penalty of $1.19 billion. At the time ZTE fully admitted its wrongdoing and promised to bring the company's practice in compliance with U.S. law. However, only a year later, ZTE was found issuing misleading statements and again violating U.S. sanctions during the probationary period under the 2017 Settlement Agreement.

This time around, the U.S. government placed an export ban on ZTE, cutting the company off from all of its U.S. suppliers for seven years, effectively putting the business on the brink of collapse. This ban was lifted a few days ago, after ZTE agreed to pay another $1 billion fine and let the United States install a compliance team within the company - a deal struck by U.S. and Chinese officials in the midst of intense trade negotiations.
Reportedly ZTE's top management had an internal debate back in 2012 over how to respond to the U.S. investigation. The executives were divided into two groups: one that wanted to resist investigators and another that wanted to comply. The dark side prevailed, and ZTE chose to resist the investigation, with severe consequences.

Maybe it is time for some telecom executives in China to watch more Marvel Comics-based movies, and pay particular attention to the often quoted (including by the U.S. Supreme Court) Spider Man saying: "With great power comes great responsibility." While not as powerful as GE or Amazon, ZTE is China's second largest telecommunications manufacturer and has 80,000 employees to be responsible for.

A person's behavioral problems may reveal deeper issues in his or her family; similarly, ZTE's case reveals some structural issues within the Chinese tech environment. In the Chinese government-enterprise relationship, corporations often play the role of children, while the government wants to act like parents. Like a stereotypical overbearing parent, the Chinese government has been trying to bring up successful kids by giving them the most materialistic help, ranging from subsidies and R&D funding to preferential treatment in government procurement projects. A parent's measure of success is healthy kids doing well in school; the Chinese government is looking for a company to increase its revenue stream, market share, and physical presence. However, over time this parenting model often produces spoiled grown-ups who lack a moral compass and social awareness. When the coddled young adult takes a serious, criminal misstep, and gets

arrested, the helicopter parent over-steps again to bail out the offspring at all cost.

Hopefully last week's parental rescue is a wake-up call not only to ZTE, but to other mature and growing Chinese tech companies. It is time for Chinese firms to learn how to become independent, responsible multinational corporate adults. Family education is a big part of who you are, but peer-learning in school is equally important. Look no further than cases like Microsoft's data privacy lawsuit against the U.S. government, or Apple's encryption dispute with the FBI - questioning and challenging the "parents" (*i.e.*, the host government) is the first step in becoming a full-fledged adult.

In addition to becoming independent from the government, Chinese tech companies may consider taking the following steps to become globally-respected players.

**(1) List on a U.S. stock exchange:** Companies have to meet the minimum entry listing requirements in order to be traded on the New York Stock Exchange or NASDAQ. Once a company registers with the Securities and Exchange Commission (SEC) and publicly places securities in the United States, it would be responsible to outside stakeholders and subject to additional disclosure requirements. This process provides a training course for Chinese companies to learn about stakeholder management and improve transparency. As Beijing encourages Chinese tech companies to return to the domestic stock market, it is also establishing the Chinese Depository Receipt mechanism to allow internet giants listed overseas, such as Baidu, Alibaba, Tencent, and JD.com, to raise funds in the domestic Chinese capital market in parallel with their existing public offering abroad.

**(2) Adopt an open communication style:** Like many Silicon Valley start-ups, Chinese tech companies are run by introverted engineers. The *Economist* once called Huawei's CEO, Ren Zhengfei, "the most reclusive boss in the technology industry." Despite having been in the middle of the export control scandal for over a year now, ZTE's leadership hasn't spoken to any non-Chinese media about the controversy. Last Friday, after closing the second settlement deal, ZTE's CEO finally penned an apology letter, saying, "I would like to apologize to all employees, customers, shareholders, and partners."

However, by American standards, a global technology company's CEO is expected to confront issues, explain corporate strategy, and make human connections with investors and customers. Conversely, a CEO's silence will send the message to the public that he or she has something to hide. For example, Facebook is also facing an uphill battle in the wake of its privacy scandal. Though its CEO Mark Zuckerberg is a coder, not a communicator, by training, he took a more open approach and testified in front of the U.S. Congress and the EU Parliament. Through the course of Zuckerberg's 10 hour testimony in Washington, DC Facebook's stock price climbed up more than 5 percent. Taking note of Zuckerberg's experience, ZTE's CEO may want to consider an interview with tech journalist Kara Swisher, who previously

grilled Bill Gates and Steve Jobs on stage, to redeem the company's corporate image.

**(3) Respect the rule of law and understand the political environment:** Many "Doing business in China 101" guidebooks lecture American business people on the need to learn about China's history and its culture. The same advice is applicable to Chinese businesses in the United States. It is important to respect the long-established norms that honor laws, regulations, and other legally binding obligations in the United States.

In addition, the bilateral relationship between the U.S. and China is increasingly confrontational given the growing sense of competition between the two countries. Both presidents have blended national security with economic security - indicating a worsening investment environment for foreign investors in both countries. It is advisable for Chinese companies to take this political risk into consideration and avoid projects involved with sensitive security elements.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 15. Bartlett's Unfamiliar Quotations
(Source: Editor)

**\*Harriet Martineau** (12 Jun 1802 - 27 Jun 1876; was a British social theorist and Whig writer, often cited as the first female sociologist. Martineau wrote many books and a multitude of essays from a sociological, holistic, religious, domestic, and perhaps most controversially, feminine perspective; she also translated various works by Auguste Comte. She earned enough to support herself entirely by her writing, a rare feat for a woman in the Victorian era.)
 - *"You had better live your best and act your best and think your best today; for today is the sure preparation for tomorrow and all the other tomorrows that follow."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS); Final Rule

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
 - Last Amendment: 6 June 2018: 83 FR 26204-26205: Unverified List (UVL); Correction

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
 - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
 - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
 - HTS codes that are not valid for AES are available here.
 - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
 - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.

- HTS codes for AES are available here.
- HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
- Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
- The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * * *

## 17. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely

circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free. Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ▮▮▮▮@fullcirclecompliance.eu]
**Sent:** 6/14/2018 6:56:07 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0614 Thursday "Daily Bugle"



# THE DAILY BUGLE

## Thursday, 14 June 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Justice/ATF Seeks Comments on Form ATF F 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. State/DDTC: (No new postings.)
5. EU Adopts Comprehensive Approach to Scourge of Illicit Weapons

### NEWS

6. Daily Mail: "British Former Rolls-Royce Engineer is Arrested under the Official Secrets Act after 'Chinese Plot to Steal Secrets of RAF's £100m F-35b Stealth Fighter Jet'"
7. Expeditors News: "DHS Announces Updated 'Northern Border Strategy'"
8. Global Trade News: "U.S. to Publish List of Chinese Goods under Section 301 Investigation"
9. Reuters: "Senate, White House Gear up for Battle over China's ZTE"
10. WorldECR News Alert, 14 June 2018

### COMMENTARY

11.     J.C. Poling, T.R. Savio & C.C. Davis: "Commerce Department Signs New Agreement with ZTE Lifting Denial Order in Exchange for Unprecedented Additional Penalties and Compliance Measures"

12.     J. Reeves & K. Heubert: "U.S. Departments of State and Commerce Propose Rules to Transition Firearms and Ammunition from U.S. Munitions List to Commerce Control List" (Part 4 of 4)

13.     M. Volkov: "Hallelujah: OFAC Announces First Enforcement Action in 2018 Against Ericsson, Inc."

**EDITOR'S NOTES**

14.     Bartlett's Unfamiliar Quotations

15.     Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

16.     Weekly Highlights of the Daily Bugle Top Stories



FULL CIRCLE
Compliance

*The World Leading Experts in International Trade Compliance*

www.fullcirclecompliance.eu

**ITEMS FROM TODAY'S FEDERAL REGISTER**

## 1. Justice/ATF Seeks Comments on Form ATF F 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers

(Source: Federal Register, 14 June 2018.) [Excerpts.]

83 FR 27799: Agency Information Collection Activities; Proposed eCollection eComments Requested; Report of Multiple Sale or Other Disposition of Pistols and Revolvers--ATF F 3310.4

* AGENCY: Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Justice.

* ACTION: 30-Day notice. ...

* DATES: Comments are encouraged and will be accepted for an additional 30 days until July 16, 2018.

* FOR FURTHER INFORMATION CONTACT: If you have additional comments, particularly with respect to the estimated public burden or associated response time, have suggestions, need a copy of the proposed information collection instrument with instructions, or desire any other additional information, please contact Ed Stely, Branch Chief, Tracing Operations and Records Management Branch, National Tracing Center Division either by mail at 244 Needy Road, Martinsburg, WV 25405, by email at Edward.Stely@atf.gov, or by telephone at 304-260-1515. Written comments and/or suggestions can also be directed to the Office of Management and Budget, Office of Information and Regulatory Affairs, Attention Department of Justice Desk Officer, Washington, DC 20503 or sent to OIRA_submissions@omb.eop.gov.

* SUPPLEMENTARY INFORMATION: ...

  - The Title of the Form/Collection: Report of Multiple Sale or Other Disposition of Pistols and Revolvers.

  - Form number: ATF F 3310.4.

  - Component: Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Department of Justice. ...

  - Abstract: This information collection documents certain sales or other dispositions of handguns for law enforcement purposes, and determines if the buyer is involved in an unlawful activity, or is a person prohibited by law from obtaining firearms. ...

  If additional information is required contact: Melody Braswell, Department Clearance Officer, United States Department of Justice, Justice Management Division, Policy and Planning Staff, Two Constitution Square, 145 N Street NE, 3E.405A, Washington, DC 20530.

  Dated: June 11, 2018.
Melody Braswell, Department Clearance Officer for PRA, U.S. Department of Justice.

back to top

* * * * * * * * * * * * * * * * * * * *

OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Defense; RULES; Federal Acquisition Regulations: Violations of Arms Control Treaties or Agreements with the United States [Publication Date: 15 June 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. EU Adopts Comprehensive Approach to Scourge of Illicit Weapons
(Source: EU External Action, 13 June 2018.)

Illicit weapons are a threat to us all. They contribute to terrorism and organised crime within the EU. They also undermine the EU's development and humanitarian efforts in parts of our neighbourhood and Africa. EU High Representative Federica Mogherini and the European Commission today adopted a joint proposal for a comprehensive EU Strategy against illicit firearms, small arms and light weapons (SALW).

Powerful, military-grade firearms in the hands of terrorists, criminals and other unauthorised actors pose a serious threat to our security. Illicit firearms have been used in several terrorist attacks in Europe. In the EU's neighbourhood many conflicts are fuelled by the proliferation of illicit weapons. These conflicts cause significant suffering for the populations concerned. A total of almost 800 million people are estimated to be deprived of sufficient food due to armed conflict.

The proposal, or "Joint Communication", tabled today sets out clear objectives and concrete measures to tackle the problem. It recognises the many actors, issues and cross-border dimensions that play a role in the context of illicit arms trade and therefore recommends a full set of action points to tackle the issue from all sides in a comprehensive way.

A multitude of different stakeholders need to be considered and involved such as police, customs, border guards, armed forces, export control bodies,

manufacturers or judicial authorities. Addressing the trade of illicit arms effectively means that all of these need to exchange information and cooperate closely. Also, the issues do not just concern individual countries but all relevant countries as a group. Trade in illicit arms is indeed often transnational in nature with national, regional and global dimensions. It needs to be tackled at all of these levels. In addition, it is crucial that measures address all phases in the life cycle of firearms: manufacture, trade, export, stockpiling and disposal.

Against this background, the Joint Communication constitutes an important step forward. It proposes a set of objectives and actions for an EU Strategy against illicit firearms, small arms, light weapons and their ammunition. Once adopted by the EU Member States, the new strategy will replace an earlier but in many aspects by now outdated EU Strategy of 2005. The EU Strategy will be closely connected with the United Nations Programme of Action against the illicit trade in small arms and light weapons that will be discussed in New York in the last two weeks of June 2018.

The initiative to counter illicit arms is one element in the EU's toolbox to tackle today's complex security challenges. High Representative Mogherini presented in 2016 an overarching EU Global Strategy for Foreign and Security Policy that foresees an integrated and joined-up approach across internal and external policy dimensions, between Member States and EU Institutions as well as with regional and international institutions. Since then, a multitude of different initiatives in the areas of security and defence have been launched, including enhanced cooperation with NATO and the beefing-up of EU autonomous security and defence capabilities.

back to top

* * * * * * * * * * * * * * * * * * * * *

6. Daily Mail: "British Former Rolls-Royce Engineer is Arrested under the Official Secrets Act after 'Chinese Plot to Steal Secrets of RAF's £100m F-35b Stealth Fighter Jet'" (Source: Daily Mail, 14 Jun 2018.) [Excerpts.]

A former Rolls-Royce engineer has been arrested in connection with a suspected Chinese plot to steal the secrets of the new £100million RAF stealth fighter jet, it was claimed last night.

Ex-Chief Combustion Technologist Bryn Jones was held after MI5 was informed classified defense information may have been passed to Beijing.

Counter-terror police swooped in on the 73-year-old's Derbyshire home in an 'ultra-discreet' operation on Tuesday.

Mr. Jones was questioned and held on suspicion of breaching the Official Secrets Act, according to The Sun.

Crimes relating to national security can carry a maximum sentence of 14 years.

Mr. Jones, a married father-of-five, describes himself as a 'visiting professor' in 'gas turbine combustion' at the Aeronautical University of Xian, central China.

It is understood the Met probe centers on fears over Rolls-Royce's top-secret work on the state-of-the-art F-35B.  Offices at a West Midlands firm linked to Mr. Jones were also searched by forensics.

It is understood that he denies any wrongdoing. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. Expeditors News: "DHS Announces Updated 'Northern Border Strategy'"
(Source: Expeditors News, 13 June 2018.)

On 12 June 2018, the U.S. Department of Homeland Security (DHS) published an updated "Northern Border Strategy," designed to establish a "clear vision and concrete actions" to improve DHS's efforts in safeguarding the U.S.-Canada border.

The Northern Border Strategy is intended to:

  - "Enhance border security operations through better information sharing, improved domain awareness, and integrated operations";
  - "Facilitate and safeguard lawful trade and travel by enhancing rapid inspection and screening, enforcing a fair-trade environment, and bolstering border infrastructure"; and
  - "Promote cross-border resilience by supporting response and recovery capabilities between federal, state, local, tribal, and Canadian partners."

The DHS press release may be found here.

The Northern Border Strategy may be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Global Trade News: "U.S. to Publish List of Chinese Goods under Section 301 Investigation"
(Source: Integration Point Blog, 14 June 2018.)

This Friday on June 15, the United States is expected to release the final list of Chinese products that will be affected by a 25% tariff increase. It will most likely reflect the original announcement by the USTR with some tailoring and modifications. At that point, the tariffs would be ready for activation, but ultimately, President Trump will decide whether to impose them.

*A brief timeline*

- August 2017. Under Section 301 of the Trade Act of 1974, President Trump asked the United States Trade Representative (USTR) to investigate China's unfair trade practices, focusing on intellectual property rights.
- March 2018. The USTR released its report on China, stating that the country was conducting unfair trade practices related to technology transfer, intellectual property, and innovation. The U.S. responded by announcing new rules on investment and initiating a case at the World Trade Organization (WTO) against China's licensing practices, now case DS542.
- April 2018. There was a flurry of escalating activity regarding tariff increases. After the U.S. announced additional tariffs on steel and aluminum (separately under the Section 232 investigation), China imposed tariffs on $3 billion in U.S. imports. The USTR immediately returned the action with a proposed 25% tariff increase on $50 billion in Chinese goods. The next day, China announced the same. China also initiated a case with the WTO over U.S. Section 301 tariffs, now case DS542.
- May 2018. Both sides agreed to temporarily put the trade war "on hold." China agreed to significantly increase purchases of U.S. goods and services, thereby reducing the trade deficit. Later in the month, the U.S. surprised international groups by announcing that it would move ahead with the 25% tariffs on $50 billion in Chinese goods. China responded that if the U.S. launched the tariffs or other sanctions, "then all the economic and trade benefits negotiated by both sides [would] not take effect."
- June 2018. The U.S. announced that it would impose tariffs on $50 billion in Chinese goods once the final list of covered imports was published on June 15.

*Preparing for change*

As import tariffs rise around the world, many companies are pursuing new technology to optimize savings and gain efficiency in their global operations, all while achieving complete visibility into the impact of tariff changes. Implementing a global trade management (GTM) solution can help companies improve compliance, increase supply chain speed, and protect their bottom line.

You can read more about the Section 301 investigation and U.S.-China trade relations on CNN, South China Morning Post, Global Trade Magazine, and the Peterson Institute for International Economics.

back to top

※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※ ※

DOC_0002146

## 9. Reuters: "Senate, White House Gear up for Battle over China's ZTE"
(Source: Reuters, 13 June 2018.) [Excerpts.]

Legislation to block the Trump administration's agreement allowing China's ZTE Corp to resume business with American suppliers could be killed in the U.S. Congress in the coming weeks, lawmakers and aides said on Wednesday.

The U.S. Senate is due to vote within days on the measure as part of the National Defense Authorization Act, or NDAA, a defense policy bill Congress passes every year. The White House strongly opposes the ZTE measure.

If it passes, the House of Representatives and Senate must negotiate a final version of the NDAA. The ZTE provision, which is not included in the House version of the defense bill, could be stripped out during those negotiations.

Mac Thornberry, the Republican chairman of the House Armed Services Committee, said he would oppose anything in the NDAA not germane to the Defense Department if it threatened to delay swift passage of the $716 billion bill, which governs everything from military pay raises to aircraft and ship purchases, military aid and other national security policies.

He said that process could be completed by the end of July. ...

back to top

* * * * * * * * * * * * * * * * * * * *

## 10. WorldECR News Alert, 14 June 2018
(Source: WorldECR, 14 June 2018.)

 (1) Trump and Kim Jong-un sign historic commitment to denuclearisation
 (2) Penalty! Nike refuses to supply Iranian football team on eve of World Cup
 (3) EU Member States push back on human rights-related tech export controls
 (4) OFAC reaches settlement with Ericsson for breach of Sudan sanctions
 (5) UK issues Notice to Exporters on new national security-related M&A rules

*[Editor's Note: Click here to find information on how to subscribe to WorldECR, the journal of export controls and sanctions.]*

back to top

* * * * * * * * * * * * * * * * * * * *

COMMENTARY

## 11. J.C. Poling, T.R. Savio & C.C. Davis: "Commerce Department Signs New Agreement with ZTE Lifting Denial Order in Exchange for Unprecedented Additional Penalties and Compliance Measures"

(Source: Akin Gump Strauss Hauer & Feld, 12 Jun 2018.)

* Authors: Jonathan C. Poling, Esq., jpoling@akingump.com; Tatman R. Savio, Esq., tatman.savio@akingump.com; and Christian C. Davis, Esq. chdavis@akingump.com. All of Akin Gump Strauss Hauer & Feld, Washington DC and Hong Kong, respectively.

*Key Points*

- Yesterday [11 May], BIS published a superseding settlement agreement with ZTE, levying the largest-ever monetary penalty by BIS against a non-U.S. company and imposing significant additional compliance measures in exchange for lifting the Denial Order previously activated by BIS on April 15, 2018.

- The earlier Denial Order prohibited ZTE from directly or indirectly participating in any way in any transaction involving any commodity, software or technology subject to the EAR or exported from the United States in response to false statements that ZTE made to BIS in the course of settlement negotiations in 2016 for prior violations of U.S. export control and sanctions laws.

- The superseding settlement agreement with ZTE is conditioned on ZTE's payment of an additional $1 billion in fines and placement of $400 million in an escrow account in a U.S. bank approved by BIS. ZTE must also implement additional compliance measures, including retaining a team of special compliance officers answerable to BIS and replacing its entire board of directors and senior leadership for both ZTE companies designated in the April 15 Denial Order.

- Per the FAQs issued by BIS in connection with the superseding settlement agreement, the Denial Order will not be lifted until ZTE has paid the fines required by the agreement; BIS will make an announcement when ZTE has been removed from the Denied Persons List and the April 15 Denial Order has been lifted.

*Background*

On Thursday, June 7, 2018, U.S. Secretary of Commerce Wilbur Ross announced that the administration had reached a "definitive agreement" with Chinese telecommunications and information technology company Zhongxing Telecommunications Equipment Corporation, of Shenzhen, China ("ZTE Corporation"), to modify and replace the U.S. Department of Commerce (DOC) current Denial Order. The current Denial Order activated by the DOC's Bureau of Industry and Security (BIS) on April 15, 2018 (the "April 15 Denial Order"), against ZTE Corporation and ZTE Kangxun Telecommunications Ltd. ("ZTE Kangxun") (collectively, "ZTE") broadly barred ZTE from the U.S. supply chain for a period of seven years in response to ZTE's failure to comply with agreed terms related to ZTE's prior illegal sales to Iran and North Korea.

As we recently reported, Secretary Ross activated the previously suspended Denial Order on April 15, 2018, based on a determination that ZTE made false statements to BIS in the course of settlement negotiations in 2016 and during its probationary period in 2017. At the time of the settlement, ZTE paid $892 million in penalties, and committed to dismissing four senior employees and disciplining 35 others for their conduct related to the prior sanctions violations. Instead, ZTE rewarded staff and senior management involved in the illicit conduct with bonuses. Upon identification of this breach of agreed terms, BIS activated the Denial Order that was initially suspended as a part of the 2017 settlement and that in turn, placed ZTE on the BIS Denied Persons List, broadly prohibiting any person from engaging with ZTE in export-related functions and transactions.

*June 7, 2018, Superseding Settlement Agreement*

The new agreement described by Secretary Ross and formally entered into by BIS and ZTE on June 7, 2018 (and published on June 11, 2018), confirms that BIS will levy its largest-ever monetary penalty against a non-U.S. company and will impose unprecedented compliance requirements. Under the new agreement, ZTE must pay an additional $1 billion in fines and separately place $400 million in an escrow account before BIS will remove ZTE from its Denied Persons List and lift the April 15 Denial Order. These penalties are separate and in addition to the $892 million that ZTE paid under the March 2017 settlement, bringing the already record penalties to a new record of $2.29 billion.

In addition, once payment is received, BIS will lift the Denial Order under the condition that ZTE completes certain additional requirements, including the following key actions:

 - retain a team of special compliance officers, selected by and answerable to BIS, for a period of 10 years, and implement a comprehensive export control compliance program
 - complete and submit nine audit reports of its compliance with U.S. export control laws, with respect to all exports, reexports or transfers (in-country) that are subject to the Export Administration Regulations (EAR)
 - replace the entire board of directors and senior leadership at or above the senior vice president level for both ZTE entities and prohibit the rehire of those employees by ZTE and any of its subsidiaries and affiliates
 - publish on its website the EAR classification and all Export Control Classification Numbers (ECCN) of all items that ZTE or its affiliates sell, supply, produce, manufacture, assemble, export, reexport or transfer (in-country), including *de minimis* calculations relating to items that include U.S.-origin content cooperate fully with U.S. government investigations pertaining to ZTE's historical conduct or potential violations of U.S. export control laws during the probationary period.

In the course of the past several weeks, ZTE has already replaced several top executives-signaling that the company is eager to take the steps necessary to lift the current ban as quickly as possible.

*June 11, 2018, Frequently Asked Questions (FAQs)*

On June 11, 2018, BIS published several FAQs clarifying that ZTE remains on the Denied Persons List and that the April 15 Denial Order remains in effect until such time as ZTE pays the aforementioned civil penalty and places the $400 million into escrow. BIS also confirmed that the agency will make an announcement when the April 15 Denial Order is lifted.

The FAQs also reiterate that the lifting of the April 15 Denial Order will not relieve persons of obligations under part 744 of the EAR. In addition, the FAQs note that BIS continues to review §764.3(a)(2) waiver requests relative to the April 15 Denial Order and that, while the lifting of the Denial Order will render such requests moot, "any violations of the April 15, 2018 Order while it remains in effect would not be mooted or absolved even if that Order is later lifted."

*Congressional Action*

The U.S. Congress is currently reviewing how and whether to respond to the Trump administration's deal with ZTE including legislation to block the lifting of the current Denial Order. Specifically, on June 7, the U.S. Senate announced a bipartisan amendment to the National Defense Authorization Act (NDAA) that would retroactively prohibit the executive branch from modifying existing civil penalties (including Denial Orders). We will continue to monitor and report on these and related developments as they emerge.

*Conclusion*

The nature of the most recent ZTE penalties continues to demonstrate the robust use of administrative authorities, such as the Denial Order, as powerful tools to drive compliance with U.S. export controls, economic sanctions and settlements with regulatory authorities. The superseding settlement further shows the significant consequences that can occur to companies that violate the terms of settlement agreement with civil agencies, including for the most senior management and boards of companies.

back to top

* * * * * * * * * * * * * * * * * * *

12. J. Reeves & K. Heubert: "U.S. Departments of State and Commerce Propose Rules to Transition Firearms and Ammunition from U.S. Munitions List to Commerce Control List" (Part 4 of 4)
(Source: Reeves & Dola LLP Alert, 13 June 2018. Available via jreeves@reevesdola.com.)

* Authors: Johanna Reeves, Esq., jreeves@reevesdola.com, 202-715-994; and Katherine Heubert, Esq., 202-715-9940, kheubert@reevesdola.com. Both of Reeves & Dola LLP.

*[Editor's Note: Part 1 was included in the Daily Bugle of 24 May 2018; Part 2 was included in the Daily Bugle of 4 June 2018; Part 3 was included in the Daily Bugle of 8 June 2018.]*

This alert is our final installment in our four-part series dedicated to the proposed State and Commerce rules to revise U.S. export controls over firearms and ammunition. The proposed rules, published simultaneously in the Federal Register on May 24, 2018, describe in detail the transition of most firearms and ammunition from the license requirements of the U.S. Department of State's *International Traffic in Arms Regulations* (ITAR) to the U.S. Department of Commerce's *Export Administration Regulations* (EAR). The Department of State proposed rule, along with instructions on how to submit comments, is accessible here. The Department of Commerce's companion publication is accessible here, and includes comment instructions as well.

In our previous alert, we reviewed the State Department, Directorate of Defense Trade Controls' (DDTC's) proposed revisions to U.S. Munitions List (USML) Category II (Guns and Armament) and the Commerce Department, Bureau of Industry and Security's (BIS's) companion proposed rules to revise the EAR.

In today's alert, we review the proposed revisions to USML Category III (Ammunition/Ordnance) and BIS's companion proposed revisions.

## **Proposed Transitions from USML Cat. III to CCL**

As we have seen with the other USML categories, DDTC proposes to revise USML Cat. III to establish a clear distinction between the USML and the Commerce Control List (CCL). Currently, Category III is written very broadly to include ammunition and ordnance for the articles in Categories I and II, plus production and tooling equipment and components, parts, accessories, attachments and associated equipment specifically designed or modified for the articles in Category III. The rewrite would eliminate the broad catch-all entries and list only the specific ammunition controlled, consistent with the changes to Category I. All articles currently captured in Category III not listed in the rewrite will be subject to the EAR. Notably, this will include the production equipment and tooling.

Items removed from the USML Cat. III to the CCL would be transitioned to one of the new "500 series" Export Control Classification Numbers (ECCNs) below. We include the reasons for control and list-based exceptions for each new ECCN.

0A505 - Ammunition as follows:
> a. Ammunition for firearms controlled by ECCN 0A501 and not enumerated in paragraph .b, .c or .d of this entry or in USML Category III.
>
> b. Buckshot (No. 4 .24" diameter and larger) shotgun shells.

c. Shotgun shells (including less than lethal rounds) that do not contain buckshot; and "specially designed" "parts" and "components" of shotgun shells.

**Note 1 to 0A505.c:** Shotgun shells that contain only chemical irritants are controlled under ECCN 1A984.

d. Blank ammunition for firearms controlled by ECCN 0A501 and not enumerated in USML Category III.

e. through w. [Reserved]

x. "Parts" and "components" that are "specially designed" for a commodity subject to control in this ECCN or a defense article in USML Category III and not elsewhere specified on the USML, the CCL or paragraph .d of this entry.

**Note 2 to 0A505.x:** The controls on "parts" and "components" in this entry include Berdan and boxer primers, metallic cartridge cases, and standard metallic projectiles such as full metal jacket, lead core, and copper projectiles.

**Note 3 to 0A505.x:** The controls on "parts" and "components" in this entry include those "parts" and "components" that are common to ammunition and ordnance described in this entry and to those enumerated in USML Category III.

**Reasons for control:** National Security (NS), Regional Security (RS), Crime Control (CC), Firearms Convention (FC), United Nations (UN), and Anti-Terrorism (AT). How each is applied to the items controlled is listed in the ECCN.

**List-based exceptions:**
Limited Value Shipments (LVS) - $100 for items in 0A505.x
Shipments to Country Group B (GBS) - N/A
Civil End-Users (CIV) - N/A

**0B505 - Test, inspection, and production "equipment" and related commodities "specially designed" for the "development" or "production" of commodities enumerated or otherwise described in ECCN 0A505 or USML Category III, except equipment for the hand loading of cartridges and shotgun shells, as follows:**
a. Tooling, templates, jigs, mandrels, molds, dies, fixtures, alignment mechanisms, and test equipment, not enumerated in USML Category III that are "specially designed" for the "production" of commodities controlled by ECCN 0A505.a or .x or USML Category III.

b. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.b.

c. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.c. d. Equipment "specially designed" for the "production" of commodities in ECCN 0A505.d.

e. through .w [Reserved]

x. "Parts" and "components" "specially designed" for a commodity subject to control in paragraph .a of this entry.

**Reasons for control:** NS, RS, UN, and AT (please see the ECCN for how the controls are applied).

**List-based exceptions:**
LVS - $3,000
GBS - N/A
CIV - N/A

**0D505 - "Software" "specially designed" for the "development," "production," operation or maintenance of commodities controlled by 0A505 or 0B505.**
Items: The list of items controlled is contained in the ECCN heading.

**Reasons for control:** NS, RS, UN, and AT (please see the ECCN for how the controls are applied).

**List-based exceptions:**
CIV - N/A
Technology & Software under Restriction (TSR) - N/A

**0E505 - "Technology" "required" for the "development," "production," operation, installation, maintenance, repair, overhaul or refurbishing of commodities controlled by 0A505.**
*Items:* The list of items controlled is contained in the ECCN heading.

**Reasons for control:** NS, RS, UN, CC, and AT (please see the ECCN for how the controls are applied).

**List-based exceptions:**
CIV - N/A
TSR - N/A

In addition to the above, the ability to use the license exception, Strategic Trade Authorization (STA), is limited. Please also see <u>Part 740 in the EAR (15 C.F.R. Pt. 740)</u> for more information on license exceptions and restrictions.

**Items to be Removed From USML Cat. III** - below is a table showing the items that would be transitioned from USML Cat. III to the new ECCNs described above.

| **Item** | **Current Classification** | **Proposed Classification** |
|---|---|---|
| Ammunition for firearms transitioning from USML Cat. I | USML Cat. III(a) | ECCN 0A505 |
| Tooling & equipment for production | USML Cat. III(c) | ECCN 0B505 |

| Parts and components | USML Cat. III(d) | USML Cat. III (d) - specially designed list, or ECCN 0A505 |

**Articles Still Controlled Under USML Cat. III** - items that would remain under USML Cat. III would be positively listed as follows, including the corresponding paragraph (Significant Military Equipment (SME) is designated with an asterisk (*)). For ease of review, we have highlighted the main paragraphs in bold and blue.

**\*(a) Ammunition, as follows:**

(1) Ammunition that incorporates a projectile controlled in paragraph (d)(1) or (3) of this category;

(2) Ammunition preassembled into links or belts;

(3) Shotgun ammunition that incorporates a projectile controlled in paragraph (d)(2) of this category;

(4) Caseless ammunition manufactured with smokeless powder;

**Note to paragraph (a)(4):** Caseless ammunition is ammunition without a cartridge case that holds the primer, propellant, and projectile together as a unit.

(5) Ammunition, except shotgun ammunition, based on non-metallic cases, or non-metallic cases that have only a metallic base, which result in a total cartridge mass 80% or less than the mass of a brass- or steel-cased cartridge that provides comparable ballistic performance;

(6) Ammunition employing pyrotechnic material in the projectile base and any ammunition employing a projectile that incorporates tracer materials of any type having peak radiance above 710 nm and designed to be observed primarily with night vision optical systems;

(7) Ammunition for fully automatic firearms or guns that fire superposed or stacked projectiles;

(8) Electromagnetic armament projectiles or billets for weapons with a design muzzle energy exceeding 5 MJ;

(9) Ammunition, not specified above, for the guns and armaments controlled in Category II; or

(10) Developmental ammunition funded by the Department of Defense and specially designed parts and components therefor.

**Note 1 to paragraph (a)(10):** This paragraph does not control ammunition (a) in production, (b) determined to be subject to the EAR via a commodity jurisdiction determination (see § 120.4 of this subchapter), or (c) identified in the relevant Department of Defense contract or other funding authorization as being developed for both civil and military applications.

**Note 2 to paragraph (a)(10):** Note 1 does not apply to defense articles enumerated on the U.S. Munitions List, whether in production or development.

**Note 3 to paragraph (a)(10):** This provision is applicable to those contracts or other funding authorizations that are dated (one year after publication of the final rule), or later.

(b) Ammunition/ordnance handling equipment specially designed for the articles controlled in this category, as follows:

(1) Belting, linking, and de-linking equipment; or

(2) Fuze setting devices.

(c) [Reserved]

(d) Parts and components for the articles in this category, as follows:

(1) Projectiles that use pyrotechnic tracer materials that incorporate any material having peak radiance above 710 nm or are incendiary, explosive, steel tipped, or contain a core or solid projectile produced from one or a combination of the following: tungsten, steel, or beryllium copper alloys;

(2) Shotgun projectiles that are flechettes, incendiary, tracer, or explosive; Note to paragraph (d)(2): This paragraph does not include explosive projectiles specially designed to produce noise for scaring birds or other pests (e.g., bird bombs, whistlers, crackers).
(3) Projectiles of any caliber produced from depleted uranium;

(4) Projectiles not specified above, guided or unguided, for the items controlled in USML Category II, and specially designed parts and components therefor (e.g., fuzes, rotating bands, cases, liners, fins, boosters);

(5) Canisters or sub-munitions (e.g., bomblets or minelets), and specially designed parts and components therefor, for the guns or armament controlled in USML Category II;

(6) Hardened cores, regardless of caliber, produced from one or a combination of the following: tungsten, steel, or beryllium copper alloy;

(7) Cartridge cases, powder bags, or combustible cases for the items controlled in USML Category II;

(8) Non-metallic cases, including cases that have only a metallic base, for the ammunition controlled in paragraph (a)(5) of this category;

(9) Cartridge links and belts for fully automatic firearms and guns controlled in USML Categories I or II;

(10) Primers other than Boxer, Berdan, or shotshell types; Note to paragraph (d)(10): This paragraph does not control caps or primers of any type in use prior to 1890.