(11) Safing, arming, and fuzing components (to include target detection and proximity sensing devices) for the ammunition in this category and specially designed parts therefor;

(12) Guidance and control components for the ammunition in this category and specially designed parts therefor;

(13) Terminal seeker assemblies for the ammunition in this category and specially designed parts and components therefor;

(14) Illuminating flares or target practice projectiles for the ammunition controlled in paragraph (a)(9) of this category; or

*(15) Any part, component, accessory, attachment, equipment, or system that: (i) Is classified; (ii) Contains classified software; or (iii) Is being developed using classified information.

"Classified" means classified pursuant to Executive Order 13526, or predecessor order, and a security classification guide developed pursuant thereto or equivalent, or to the corresponding classification rules of another government or intergovernmental organization.

(e) Technical data (see § 120.10 of this subchapter) and defense services (see § 120.9 of this subchapter) directly related to the defense articles enumerated in paragraphs (a), (b), and (d) of this category and classified technical data directly related to items controlled in ECCNs 0A505, 0B505, 0D505, and 0E505 and defense services using the classified technical data. (See § 125.4 of this subchapter for exemptions.).

(f)-(w) [Reserved]

(x) Commodities, software, and technology subject to the EAR (see § 120.42 of this subchapter) used in or with defense articles.

**Note to paragraph (x):** Use of this paragraph is limited to license applications for defense articles where the purchase documentation includes commodities, software, or technology subject to the EAR (see § 123.1(b) of this subchapter).

**Notes to Category III:**
(1) This category does not control ammunition crimped without a projectile (blank star) and dummy ammunition with a pierced powder chamber.
(2) This category does not control cartridge and shell casings that, prior to export, have been rendered useless beyond the possibility of restoration for use as a cartridge or shell casing by means of heating, flame treatment, mangling, crushing, cutting, or popping.
(3) Grenades containing non-lethal or less lethal projectiles are under the jurisdiction of the Department of Commerce.

## Closing Thoughts

The rewrite of USML Categories I, II, and III is long overdue, though its implementation will not come without challenges for industry. While there

are many positives that will come out of this effort, including the lack of registration or licensing fees at the Department of Commerce and arguably a more flexible licensing structure, there will be a learning curve as companies begin to operate under a largely new set of regulations (the EAR).

When the revised USML Categories become final, industry will need to undergo a review and reclassification of all inventory, including software and technical data, and will need to update internal processes, procedures, and systems to implement the changes. Training of both employees and customers (both foreign and domestic) will need to occur to ensure that the new requirements are understood and followed. While the Department of Commerce may have more flexible licensing requirements, you will need to understand the constraints of those requirements in order to take advantage of the new licensing structure.

As we have noted previously, both the State and Commerce Departments will be accepting written comments on the revised Categories until July 9, 2018. We strongly encourage industry to take time to carefully review the revised categories and provide actionable commentary to the proposed rules. This is a critical opportunity for industry to provide comments that would assist the government in reducing jurisdictional ambiguities and clarifying the articles that will remain subject to the ITAR. The specific instructions for submitting comments are included in each proposed rule.

Although this alert is the final installment of this particular series, we doubt it will be our last word on the topic! Stay tuned. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. M. Volkov: "Hallelujah: OFAC Announces First Enforcement Action in 2018 Against Ericsson, Inc."
(Source: Volkov Law Group Blog, 14 June 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

I will admit it - I changed this posting from its original draft. I intended to write about the absence of any OFAC enforcement actions for 2018. I went to double-check the OFAC enforcement website (here), and lo and behold, OFAC snuck its first enforcement action of 2018 - dated June 6, 2018 against Ericsson, Inc. for $145,983.

Before the Ericsson enforcement action, OFAC had been surprisingly silent in 2018. If you look back at prior years, OFAC has not been as inactive as 2018.

Maybe there is a logical explanation for OFAC's enforcement silence. OFAC has been issuing a flurry of new sanctions rules and changes to existing programs.

Let's look at OFAC's To-Do List:

  (1) Iran Sanctions: On May 8, 2018, the President announced his decision to cease the United States' participation in the Joint Comprehensive Plan of Action (JCPOA), and to begin re-imposing the U.S. nuclear-related sanctions that were lifted to effectuate the JCPOA sanctions relief, following a wind-down period.

  (2) Ukraine-Russia Sanctions: On April 6, 2018, OFAC added seven Russian oligarchs and 12 companies they own or control, 17 senior Russian government officials, and a state-owned Russian weapons trading company and its subsidiary, a Russian bank, to the SDN list.

  (3) Countering America's Adversaries Through Sanctions Act ("CAATSA"): On August 2, 2017, the President signed CAATSA requiring OFAC to implement changes to its Iran, Russia and North Korea Sanctions Programs.

In light of these activities, OFAC's delay in enforcement actions appears to be more than justified.

In its first enforcement action announced on June 6, 2018, Ericsson agreed to pay $145,893 for violations of the Sudan Sanctions Program. The Sudan Sanctions Program was relaxed significantly in 2017. Nonetheless, Ericsson's conduct occurred in 2011 and 2012 when the Sudan Sanctions Program was restrictive.

On September 22, 2011, Ericsson signed a letter of intent with a subsidiary of a Sudanese telecommunications company to provide equipment and services to upgrade and expand telecommunications coverage in Sudan. Ericsson enlisted the assistance of a third-party contractor to assist in the installation of a satellite hub. Two Ericsson employees and the contractor agreed among themselves to avoid writing in any emails that the contract involved Sudan. To remedy an overheating problem with the equipment, the Ericsson employees consulted with another Ericsson official, who requested that they avoid using any emails disclosing the connection of the project to Sudan for fear of violating the law and Ericsson's sanctions compliance policy.

The two Ericsson employees and the subcontractor agreed to purchase a new satellite facility from a US supplier. The Ericsson employees discussed the proposed transaction with Ericsson's compliance department and were informed that such a purchase and delivery would violate Ericsson's sanctions compliance policy and was prohibited. Despite being told not to conduct the transaction, the employees moved forward with the transaction and listed the delivery point as Botswana. The employees arranged for transshipment of the satellite to Sudan through Switzerland and Lebanon.

Interestingly, OFAC added a significant paragraph at the end of the enforcement action:

> This enforcement action highlights the importance of empowering compliance personnel to prevent transactions prohibited by U.S. economic and trade sanctions. Entities should ensure their sanctions compliance teams are

adequately staffed, receive sufficient technology and other resources, and are delegated appropriate authority to ensure compliance efforts meet an entity's risk profile. Sanctions compliance personnel should be equipped with the tools necessary to review, assess, and proactively address sanctions-related issues that arise with ongoing or prospective transactions, customers, or counter-parties.

These words are an important reminder to everyone about the obligation to design and implement an effective sanctions compliance program with an independent and empowered CCO and supported with adequate resources.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 14. Bartlett's Unfamiliar Quotations
(Source: Editor)

\* **Harriet Beecher Stowe** (Harriet Elisabeth Beecher Stowe; 14 Jun 1811 - 1 Jul 1896; was an American abolitionist and author. She is best known for her novel, *Uncle Tom's Cabin* (1852), which depicts the harsh conditions for enslaved African Americans. Stowe wrote 30 books, including novels, three travel memoirs, and collections of articles and letters.)
   - *"When you get into a tight place and everything goes against you, till it seems as though you could not hang on a minute longer, never give up then, for that is just the place and time that the tide will turn."*
   - *"So much has been said and sung of beautiful young girls, why doesn't somebody wake up to the beauty of old women?"*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

\* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
   - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

\* <u>CUSTOMS REGULATIONS</u>: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: <u>83 FR 27380-27407</u>: Air Cargo Advance Screening (ACAS); Final Rule

\* <u>DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM)</u>: DoD 5220.22-M
  - Last Amendment: 18 May 2016: <u>Change 2</u>: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary <u>here</u>.)

\* <u>EXPORT ADMINISTRATION REGULATIONS (EAR)</u>: 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 6 June 2018: <u>83 FR 26204-26205</u>: Unverified List (UVL); Correction

\* <u>FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR)</u>: 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 19 Mar 2018: <u>83 FR 11876-11881</u>: Inflation Adjustment of Civil Monetary Penalties

\* <u>FOREIGN TRADE REGULATIONS (FTR)</u>: 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: <u>3 FR 17749-17751</u>: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available <u>here</u>.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance <u>website</u>.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at <u>www.FullCircleCompiance.eu</u>.

\* <u>HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA)</u>, 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: <u>Harmonized System Update 1809</u>, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available <u>here</u>.
  - HTS codes that are not valid for AES are available <u>here</u>.

\* <u>INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.

- Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]

  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *

## 16. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or

expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance ▮▮▮@fullcirclecompliance.eu]
**Sent**: 6/18/2018 8:38:58 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 18-0618 Monday "Daily Bugle"



## Monday, 18 June 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions

2. Commerce/BIS: "Fuyi Sun of Philipsburg, PA, Denied Export Privileges for a Period of 10 Years"

3. DoD/DSCA Posts Policy Memo 18-30

4. GAO Ex/Im Reports and Testimonies of Interest

5. State/DDTC Announces Registration Period for In-House Seminar on 19 Sep

6. EU Amends Certain Specific Economic and Financial Restrictions Concerning Iraq

7. EU Extends Sanctions Against Russia For A Year in Response to "Illegal Annexation of Crimea and Sevastopol"

8. Dutch Government Releases English Guidelines and FAQs Concerning Internal Compliance Programs

### NEWS

9. Defense News: "Germany Bolsters Prospects for Military Exports"

10. Foreign Policy: "OFAC Off"

11. ST&R Trade Report: "China to Levy Retaliatory Tariffs on U.S. Goods"

12. WAMU.org: "As Vote on ZTE Sanctions Looms, Some U.S. Lawmakers Focus On A Bigger Chinese Telecom"

## COMMENTARY

13. B. Leeds: "The Final Stage of Export Control Reform - Revisions to USML Categories I-III"

14. J. Bozman, Z. Mears & S.B. Cassidy: "Senate Armed Services Committee Proposes Expansive but Unclear Software Review Provisions"

15. R.C. Burns: "Justice Limits What Lawyers Can Say to OFAC without Registering as a Foreign Agent"

## EX/IM MOVERS & SHAKERS

16. Monday List of Ex/Im Job Openings: 189 Jobs Posted This Week, Including 6 New Jobs

## EDITOR'S NOTES

17. Bartlett's Unfamiliar Quotations

18. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (19 Mar 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

19. Weekly Highlights of the Daily Bugle Top Stories



**WORD ONLY**

Are You Keeping Up to Date with the Latest Regulations?

**Bartlett's Annotated ITAR** will keep you updated on the latest ITAR amendments.

**MORE INFORMATION AVAILABLE HERE**

## ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Treasury/OFAC; RULES; Rough Diamonds Control Regulations [Publication Date: 19 Jun 2018.]

back to top

* * * * * * * * * * * * * * * * * *

## 2. Commerce/BIS: "Fuyi Sun of Philipsburg, PA, Denied Export Privileges for a Period of 10 Years"
(Source: Commerce/BIS, 18 Jun 2018.) [Summary.]

* Respondent: Fuyi Sun a/k/a Frank Sun of Philipsburg, PA
* Charges: knowingly and willfully attempting to export and causing to be exported from the U.S. to China Toray type M60JB-300 carbon fiber, without the required U.S. Department of Commerce licenses.
* Penalty: Denial of export privileges for a period of 10 years from the date of Sun's conviction.
* Date of Order: 13 Jun 2018.

back to top

* * * * * * * * * * * * * * * * * *

## 3. DoD/DSCA Posts Policy Memo 18-30
(Source: DoD/DSCA, 18 Jun 2018.)

* DSCA Policy Memo 18-30 Security Assistance Management Manual (SAMM), Administrative Changes.

back to top

* * * * * * * * * * * * * * * * * *

## 4. GAO Ex/Im Reports and Testimonies of Interest
(Source: GAO Reports and Testimonies, 18 Jun 2018.)

* The Administration's 2015 Plan and 2017 Update for Nuclear Proliferation Verification and Monitoring Generally Did Not Address Reporting Requirements. GAO-18-505R: Published: Jun 18, 2018. Publicly Released: Jun 18, 2018. Full report available here.

back to top

* * * * * * * * * * * * * * * * * *

## 5. State/DDTC Announces Registration Period for In-House Seminar on 19 Sep
(Source: State/DDTC, 18 Jun 2018.)

Registration for The Directorate of Defense Trade Controls (DDTC) In-House Seminar for Wednesday, September 19th, 2018 opens August 10th and closes August 31st. Attendees will be identified on a first-come, first-serve basis. Preference will be given to new registrants and small-businesses. A completed registration form must be sent to the DDTC In-House Seminar email, as an attachment, DDTCInHouseSeminars@state.gov. For more information, please visit the DDTC Outreach Programs page and click the "In-House Seminars" tab.

back to top

* * * * * * * * * * * * * * * * *

## 6. EU Amends Certain Specific Economic and Financial Restrictions Concerning Iraq
(Source: Official Journal of the European Union, 18 Jun 2018.)

*Regulations*
* Commission Implementing Regulation (EU) 2018/875 of 15 June 2018 amending Council Regulation (EC) No 1210/2003 concerning certain specific restrictions on economic and financial relations with Iraq

back to top

* * * * * * * * * * * * * * * * *

## 7. EU Extends Sanctions Against Russia For A Year in Response to "Illegal Annexation of Crimea and Sevastopol"
(Source: European Council, 18 Jun 2018.)

On 18 June 2018, the EU Council extended the restrictive measures in response to the illegal annexation of Crimea and Sevastopol by Russia until 23 June 2019.

The measures apply to EU persons and EU based companies. They are limited to the territory of Crimea and Sevastopol. The sanctions include prohibitions on:

  - imports of products originating in Crimea or Sevastopol into the EU;
  - investment in Crimea or Sevastopol, meaning that no Europeans nor EU-based companies can buy real estate or entities in Crimea, finance Crimean companies or supply related services;
  - tourism services in Crimea or Sevastopol, in particular, European cruise ships cannot call at ports in the Crimean peninsula, except in case of emergency;
  - exports of certain goods and technologies to Crimean companies or for use in Crimea in the transport, telecommunications and energy sectors and related to the prospection, exploration and production of oil, gas and mineral

resources. Technical assistance, brokering, construction or engineering services related to infrastructure in these sectors must not be provided either.

As stated in the declaration by the High Representative for Foreign Affairs and Security Policy on behalf of the EU on 16 March 2018, the EU remains firmly committed to Ukraine's sovereignty and territorial integrity. Four years on from the illegal annexation of the Autonomous Republic of Crimea and the city of Sevastopol by the Russian Federation, the EU reiterated that it does not recognize and continues to condemn this violation of international law.

- Overview of EU restrictive measures in response to the crisis in Ukraine
- Factsheet EU-Ukraine relations (EEAS)
- Visit the meeting page

back to top

* * * * * * * * * * * * * * * * * *

## 8. Dutch Government Releases English Guidelines and FAQs Concerning Internal Compliance Programs
(Source: Dutch Ministry of Foreign Affairs, 4 Jun 2018.)

This document (in English) contains guidelines for businesses and was drawn up by the Ministry of Foreign Affairs in close collaboration with the Central Office for Import and Export (CDIU). It serves as a guide for implementing an Internal Compliance Program (ICP) that sets out responsibilities for compliance with the applicable legal requirements. This document is primarily intended for exporters of strategic and sanctioned goods. It also provides useful pointers for exporters of strategic technology.

To read the related FAQs, click here.

back to top

* * * * * * * * * * * * * * * * * *

NEWS

## 9. Defense News: "Germany Bolsters Prospects for Military Exports"
(Source: Defense News, 16 Jun 2018.) [Excerpts.]

The outlook for German foreign arms sales has strengthened, with the government coalition led by Chancellor Angela Merkel pushing to focus on allies in Europe.

  "Germany clearly in their coalition paper indicated they wanted a more European approach," said Frank Haun, co-chairman of KNDS, the joint

venture between KMW and Nexter. Haun spoke to Defense News at the Eurosatory trade show for land weapons.

"This is the right path. This means they will find a solution." Haun is also CEO of Krauss-Maffei Wegmann. Stephane Mayer, CEO of Nexter, is the co-chairman at KNDS.

"The principle is Germany is on the move," Haun said. "It is not a block. It is a process and it takes time."

Arms export is a highly sensitive topic in Germany, with strong debate over the use of German weapons by client nations such as Turkey and Saudi Arabia, respectively heavily engaged in Syria and Yemen. A sought-after alignment of French and German arm export policy is key to KNDS. The partner companies, Krauss-Maffei Wegmann and Nexter, have long competed with each other, but now they seek to work cooperatively to snag opportunities in the world market.

There is little public controversy in France on arms export, on which successive governments publish an annual report to parliament, giving details of the deals won in the previous year. French media have asked the Armed Forces Ministry when this year's report will be released. Clearance of foreign arms deals lies in political hands and once policy is set, then companies can pursue their target markets.

"We are not in charge of external policy of our two countries," said Mayer. "However, we wish that they find an agreement, to make things clear from the beginning on how to export the systems."

If there is political clearance for sales limited to the European market, then KNDS could focus its efforts. That includes building new factories in Europe, Mayer said. The European market for main battle tanks is worth an estimated €80 billion (U.S. $93 billion) based on an estimated park of 8,000 tanks, worth €10 million per unit, Haun said. ...

Germany ranks among the top arms sellers, along with Britain and France. The U.S. and Russia lead the rankings. Both French and German governments insist they exercise strict control over the sale of weapons abroad.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. Foreign Policy: "OFAC Off"
(Source: Foreign Policy, 15 Jun 2018.) [Excerpts.]

... Just a few days after U.S. President Donald Trump's withdrawal from the Iran nuclear deal, France's economy minister, Bruno Le Maire, gave several interviews in which he stressed that European leaders would be asking themselves, "What can we do to give Europe more financial tools allowing it to be independent from the United States?" Le Maire specifically pointed to

the U.S. Treasury's fearsome Office of Foreign Assets Control (OFAC), which administers and enforces economic and trade sanctions and has levied billions of dollars' worth of fines on companies such as BNP Paribas, Standard Chartered Bank, and the Chinese telecommunications company ZTE. He wondered aloud, "Why don't we create the same type of agency in Europe, capable of following the activities of foreign companies and checking if they are respecting European decisions?"

The comment seemed flippant, an economy minister's way of expressing frustration, and was not viewed as a policy that Europe was about to seriously consider. Yet, a few weeks later, European leaders are still scrambling to implement concrete measures to salvage the Iran nuclear deal, whether by sustaining oil purchases from Iran, instructing the European Investment Bank to make financing available for projects in Iran, or attempting to help multinationals and small and medium-sized enterprises maintain their Iran operations. But consultations with government officials, business leaders, and technical experts make it clear that pursuing individual measures in isolation will be insufficient to mitigate the chilling effect of secondary sanctions imposed by the United States on companies which had sought commercial links with Iran. Europe needs a holistic and institutionalized strategy to push back and achieve two crucial goals. ...

The office in charge of European sanctions policy is buried within the hierarchy of the European External Action Service ... EU-OFAC could serve the same licensing purpose for a wider scope of business in Iran, reviewing and certifying due diligence just as export control authorities have done in the past. These licenses could be linked to additional measures, such as a compensation scheme (another idea floated by Le Maire) to offset penalties in the case of an inadvertent U.S. sanctions violation. For example, if a European company structures itself to conduct compliant business with Iran and seeks certification from EU-OFAC of its due diligence, but nevertheless ends up being penalized by the United States for unknowingly working with an SDN entity, the company could seek mediation from EU-OFAC with regard to enforcement action by U.S. authorities, as well as compensation from the European Union for any eventual penalty. Moreover, EU-OFAC could also offer companies assistance in seeking waivers or licenses from the U.S. government.

There are also complementary steps that can be taken by the private sector, with the support of EU-OFAC. In Germany, a small group of credit unions have established an "international competence center" to pool resources and centralize expertise on Iran-related transactions. In a recent interview, Patrizia Melfi, the center's director, said that the banks' supervisory board had given a green light to continue work with Iran despite the U.S. withdrawal from the Iran deal. In Melfi's assessment, the imperative is "to be well informed and conduct detailed checks of the companies' deals." If these steps are taken and European entities comply with the current export controls in both Europe and the United States, Melfi said, then they won't face any consequences.

back to top

## 11. ST&R Trade Report: "China to Levy Retaliatory Tariffs on U.S. Goods"
(Source: Sandler, Travis & Rosenberg Trade Report, 18 Jun 2018.)

China's Ministry of Finance announced June 15 that it will respond in kind to the U.S. Section 301 tariffs announced the same day (see related article this issue).

First, beginning July 6 China will impose an additional 25 percent tariff on 545 U.S. goods with an import value of approximately $US 34 billion. Affected products (click here for the full list in Chinese) include agricultural goods and automobiles.

Next, on a date to be determined, China will levy an additional 25 percent tariff on 114 other U.S. goods (click here for the full list in Chinese), including chemical products, medical equipment, and energy products such as coal, crude oil, and gas.

President Trump said if China goes forward with these or other retaliatory measures (e.g., non-tariff barriers or punitive actions against U.S. exporters or U.S. companies operating in China) the U.S. will pursue further tariffs against China.

back to top

## 12. WAMU.org: "As Vote on ZTE Sanctions Looms, Some U.S. Lawmakers Focus On A Bigger Chinese Telecom"
(Source: WAMU.org, 15 Jun 2018.) [Excerpts.]

The U.S. Senate is set to vote as early as next week on whether to reinstate crippling trade sanctions against Chinese telecommunications company ZTE. With that move in sight, a number of U.S. senators are taking aim at a much bigger Chinese target: Huawei - the world's third-largest seller of smartphones, behind Samsung and Apple.

Top U.S. security officials have warned for years that Huawei could pose a security risk to America by using its technology to spy on behalf of the Chinese government. Huawei has consistently denied that it gives intelligence to Chinese authorities, though many U.S. senators remain unconvinced.

Huawei is a massive company compared to ZTE. Huawei reported more than $90 billion in revenue in 2017 - five times the amount ZTE brought in. About one in eight smartphones sold worldwide in the first quarter of 2018 were Huawei phones, according to the market analysis firm IDC. ...

back to top

## COMMENTARY

## 13. B. Leeds: "The Final Stage of Export Control Reform - Revisions to USML Categories I-III"
(Source: Braumiller Law Group PLLC, 15 Jun 2018.)

\* Author: Bruce Leeds, Braumiller Law Group, Senior of Counsel.

Export Control Reform has been underway since 2009.  The process has been to revise the U.S. Munitions List (USML) categories one by one with the goal of better defining what is controlled under the International Traffic in Arms Regulations (ITAR) and transferring jurisdiction of articles - particularly at the part and component level - to the Export Administration Regulations (EAR).  Of the 21 categories in the USML, only Categories I-III had not been revised.  Now, it has happened.  On May 24, 2018 the Departments of State and Commerce published proposed revisions to these categories in the Federal Register.

USML Cat. I covers firearms; Cat. II covers guns and armaments; and Cat. III covers ammunition.  The revisions to these categories have been affected by the Second Amendment controversies and navigating a course to acceptable revisions has been difficult.

These revisions are important because they affect the export of firearms, parts, and ammunition, but also who must register with the Directorate of Defense Trade Controls (DDTC).  Not only must exporters of articles described on the USML register with DDTC and pay an annual fee, but also companies that manufacture firearms, parts, and ammunition must register, even if they do not export.

The current text of categories I-III is broad and captures many articles bringing them under ITAR controls.  The proposed revisions of these categories would drastically change this.  The intention of the proposed revisions is to remove non-automatic and sporting firearms and associated ammunition from the USML, and transfer controls to newly created provisions in the Commerce Control List (CCL) in the EAR.  ITAR controls would remain for military and automatic firearms and ammunition specifically used in these weapons.

Some of the proposed revisions to Cat. I include the following:
  - Removal of non-automatic firearms up to .50 caliber;
  - Removal of parts, components and accessories for these firearms;
  - Inclusion of firearms that fire caseless ammunition in Cat. I;
  - Inclusion of automatic firearms of up to .50 caliber in the category;

- Firearms specially designed to integrate fire control, automatic tracking or automatic firing systems would remain the Cat. I;
- Silencers, mufflers and sound suppressors would remain in Cat. I, but flash suppressors are transferred to the CCL;
- Magazines containing 50 or more rounds and components to convert a semi-automatic to an automatic firearm (both which have been in the news in recent times) would also be included in Cat. I.

Cat. II covers cannons and howitzers and thus is more specifically military in nature (and less controversial). However, the proposed revisions would remove such items as engines for self-propelled guns and howitzers and associated tooling and equipment from the category, and transfer controls for such articles to the CCL.

Cat. III which covers ammunition is proposed to be amended to make it consistent with the changes to Cat. I. The category will also be revised to remove some broad "catch-alls" and more clearly define what is controlled in the category.

The CCL would be amended to provide new 600-series provisions in Category 0 to capture the firearms, guns, ammunition and associated articles no longer controlled under the ITAR. This means that exporters of firearms, guns, ammunition, and associated parts, components, accessories and technical data would need to first determine which regulations (ITAR or EAR) control their products. If no longer controlled under the ITAR they would need to review the 600-series provisions in the CCL to determine whether their products are controlled there and, if so, whether they require a license, or if a license exception is available.

If a U.S. company's firearms, guns, or ammunition are no longer controlled by the ITAR there would be no requirement to register with DDTC, or pay an annual fee, as the EAR has no registration requirement. Of course, there may be a certain degree of gray area in determining whether articles are controlled under the ITAR or EAR. A prudent company may want to obtain a commodity jurisdiction determination to find which regulations apply to its exports.

The proposed revisions to the ITAR include the subcategory (X) provision found in other revised categories. That provision allows exporters of articles subject to the EAR to apply for a license from DDTC if those articles are to be used in or with articles subject to the ITAR.

Bear in mind that everything described here is a proposal subject to public comments. Parties wishing to comment on the proposed amendments, or make recommendations, may submit comments or recommendations by email or through www.regulations.gov by July 9, 2018. After close of the comment period the agencies will review the comments and recommendations and consider revisions to the proposed changes to the ITAR and EAR. After that they could either publish another proposed rule, or a final rule, containing the finalized regulations and an implementation date.

Like the proposed changes to Cats. I-III.  Don't like the changes?  Read, review and submit your thoughts!

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14. J. Bozman, Z. Mears & S.B. Cassidy: "Senate Armed Services Committee Proposes Expansive but Unclear Software Review Provisions"
(Source: Covington & Burling LLP, 15 Jun 2018.)

\* Authors: Jeff Bozman; Zachary Mears; and Susan B. Cassidy. All of Covington & Burling LLP.

As the Senate approaches the end of its debate on the National Defense Authorization Act for Fiscal Year 2019, provisions of the bill regarding access to and review of information technology code deserve close attention.  These sections, if enacted, would significantly impact Department of Defense contractors and also would affect matters associated with investments subject to review by U.S. national security agencies.

As drafted, the provisions could expose current and prospective contractors to intrusive scrutiny and significant risks.  They lack clarity on key definitions, leaving the precise scope of those risks unclear.  We summarize major issues and concerns below.  We expect these provisions to receive scrutiny during the House-Senate conference on the NDAA over the summer.

*Synopsis of the Proposed Legislation*

Three sections of the Senate's version of the NDAA, which passed the Senate Armed Services Committee in May, would establish new rules designed to mitigate "risks posed by providers of information technology with obligations to foreign governments."  Those risks involve the access that foreign governments may have to code in products or services that are offered to the Department of Defense.  The provisions also impose new disclosure requirements on the efforts of a prospective vendor to obtain a license under the Export Administration Regulations ("EAR") or the International Traffic in Arms Regulation ("ITAR").

The pending legislation would require proactive disclosure of those matters, and would impose an ongoing duty to supplement those disclosures during the period of performance on the contract.  The Secretary of Defense would be authorized to assess and mitigate any resulting national security risks through contractual provisions or other performance requirements.

The bill directs the Secretary to create a "prioritized list of countries of concern regarding cybersecurity," using factors designed to assess those countries' capabilities, intentions, and past practice with respect to U.S. and "coalition forces."  It would also require the Secretary to develop a "third-party testing standard" for commercially available off-the-shelf ("COTS")

DOC_0002257

items "to use when dealing with foreign governments." Finally, the bill would require the Secretary to consolidate the disclosures in a master registry and make the information available to "any agency conducting a procurement pursuant to the Federal Acquisition Regulations or the Defense Federal Acquisition Regulations."

*Definition Issues and Coverage Concerns*

The scope of the legislation is broad, and coverage is not clearly defined. The disclosure requirements apply to any "product, service, or system relating to information or operational technology, cybersecurity, an industrial control system, a weapons system, or computer antivirus" offered to the Department.

One subset of disclosure obligations applies to "custom-developed" products, systems, or services. Any person offering such products, services, or systems must disclose "[w]hether the person has allowed a foreign government to **review or access** the code of a product, system, or service **custom-developed** for the Department, or is under **any obligation** to allow a **foreign person or government** to review or access **the code** of a product, system, or service custom-developed for the Department **as a condition of entering into an agreement** for sale or other transaction with a foreign government or with a foreign person on behalf of such a government."

The bolded terms all raise questions. The bill does not define "custom-developed," which is not a recognized term of art in procurement law. A broad interpretation could, for instance, sweep in a commercial item where the manufacturer made only a minor modification for the Department. Presumably, if a product was custom-developed for the Department, any necessary restrictions on sharing the source code would have been imposed contractually on the manufacturer. If such a limitation was not imposed at the time of the contract, it is not clear that the government should impose new restrictions post-agreement.

The concept of "review or access" is also open to interpretation. For example, if a company keeps full custody of the code but allows a customer, including a foreign government, to have an authorized representative inspect the code under the company's control, it is not clear that such an arrangement would constitute a materially risky "review," let alone "access." That structure would not involve a company relinquishing control of the code, and it might not be sufficient to allow the customer/government to identify vulnerabilities. Furthermore, a "review" that entails only an analysis of results of testing conducted by the company or an agreed-upon third party would be even farther removed from the risk, but could still be considered a "review" by a foreign government under the text of the bill. It is unclear if the only code at issue is the code associated with a government-specific modification, or also the underlying commercial item product (*i.e.,* background vs. foreground intellectual property).

The term "foreign person" also invites questions about scope. It could include employees of companies that create the product, if those employees are citizens of another country. It could also include resident aliens, or dual citizens. The structure of the bill implies that the term "foreign" would be interpreted broadly; unlike other sections of the bill that focus on the prioritized list of "countries of concern," this section has no such limitation.

With respect to the "countries of concern," a broader disclosure obligation applies to any goods or services, not just those "custom-developed" for the Department. Under the terms of that section of the bill, offerors must disclose whether they have allowed a listed government to access source code. While the language addressing "access or review" of source code is limited to high-risk foreign governments identified by the prioritized list, a broader prohibition applies as to products where the seller is "under any obligation" to allow any foreign person or government to review or access the product or service as a condition to entering an agreement with a foreign government or person on behalf of such a government. "Obligation" is not defined and could be interpreted more broadly than just contractual obligations. Whether contractual or not, in some instances, software products need to be modified to interface with a customer's information systems. It is unclear whether access just to the modifications to the code that may be necessary to accomplish this interface with a foreign commercial customer's systems would trigger a disclosure requirement.

Consequently, those disclosure obligations apply to any product, service, or system, and to a broad universe of "foreign" interests.

*Opacity of Procedures to Mitigate Risks*

Definitional issues also arise in the context of the mitigation provisions. For instance, the language allows the Secretary to determine whether the disclosure reveals "a risk to the **national security infrastructure** or **data of the United States**, or any national security system under the control of the Department" and then "take such measures as the Secretary considers appropriate to mitigate such risks." Neither legislative text nor industry-wide common understanding explain what comprises "national security infrastructure" or "data of the United States." The latter term could mean proprietary data of the U.S. government, or *any* data residing in the United States.

The legislation leaves practical implementation questions unaddressed. There is no timeframe or clear trigger for initial disclosure, nor discussion of procedures for mitigation. If the disclosure is made after contract award, the legislation could arguably give the government grounds for termination.

Other key operational questions include the following:

   - If mitigation is to be imposed pre-award in a competitive procurement, can the Secretary allow one offeror to add such mitigation to its proposal without opening discussions with all offerors?

- Would that mitigation be reported in the "registry" along with the other disclosure elements?
- Could mitigation include outright exclusion? If so, what is the process for aggrieved offerors to contest that exclusion, if not the normal bid protest channels?
- Once a product is identified as a risk, is it excluded from future Department of Defense procurements, or is this determination done on a procurement-by-procurement basis? What procedural safeguards would be established to address this limit on competition?

The pending legislation also fails to identify which agency within the Department would develop and enforce these conditions. It could be left to the discretion of each service or component, or a central agency could manage the process on behalf of the entire Department. In that case, likely candidates would be the Defense Security Service, the Chief Information Officer, or the National Security Agency.

*Export Control and Third-Party Testing Questions*

The lack of precision raises other questions in the provisions on export controls and the standards to be used with third-party testing. The bill appears to provide the Department with nearly unfettered discretion to prohibit exports of certain technology, products, or services beyond any controls imposed by the ITAR. Even the issue of what is covered is left to the discretion of the Department. The consequences of the resulting EAR/ITAR-related disclosures are also unclear. Offerors are required to disclose whether they hold or have applied for any licenses, and that data will presumably be considered by the Secretary. However, there is no indication as to how the Department will use that information to determine whether it will use the product, service, or system.

The third-party testing standard also raises a number of operational questions, and the accompanying Committee Report language offers few indicators of congressional intent. If the purpose is to direct the Department to develop the standard that COTS companies can use to deal with foreign governments, it is an open question whether the U.S. government would then apply that standard to its own testing. The provisions also offer no resolution if a disconnect arises between U.S. government requirements the standard developed by the Department pursuant to this third-party testing provision.

back to top

* * * * * * * * * * * * * * * * * *

## 15. R.C. Burns: "Justice Limits What Lawyers Can Say to OFAC without Registering as a Foreign Agent"
(Source: Export Law Blog, 15 Jun 2018. Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Wash DC, Clif.Burns@bryancave.com, 202-508-6067).

Now that the Department of Justice ("DOJ") has started more actively prosecuting FARA violations, it decided to upload to its website a bunch of advisory opinions that apparently had been languishing in a file cabinet somewhere in the depths of Main Justice. Whether or not this is good news remains to be seen, but at least one of the advisory opinions given to a law firm handling a matter before the Office of Foreign Assets Control ("OFAC") is more than a little troubling.

The advisory opinion responded to a request by an unnamed law firm that was representing an unnamed foreign company and an unnamed foreign individual in connection with the potential designation and blocking of the company and individual by OFAC. The opinion notes, rightly, that a law firm acting on behalf of a foreign company or a foreign individual would be an "agent of a foreign principal" (or as some newspaper reporters like to say, a "spy") under section 1(c) of the Foreign Agents Registration Act of 1938, 22 U.S.C. § 611(c) and would be required to register under that act unless an exemption applies.

The discussion in the opinion then turns to the exemption in section 613(g) for "persons qualified to practice law." That exemption expressly excludes, as the advisory opinion notes,

> attempts to influence or persuade agency personnel or officials other than in the course of judicial proceedings, criminal or civil law enforcement inquiries, investigations, or proceedings, or agency proceedings required by statute or regulation to be conducted on the record.

The advisory opinion notes the further qualifications on this exclusion contained in section 5.306 of the FARA regulations, which limits such exclusion of activity outside the described proceedings to "*only* such attempts to influence or persuade with reference to formulating, adopting, or changing the domestic or foreign policies of the United States." (Emphasis added.)

Now the ordinary, indeed the only, reading of this is that contacts with agencies outside of the proceedings, inquiries and investigations described in the exemption require registration only if they are designed to influence formulating, adopting or changing the domestic or foreign policies of the United States. But that's not how DOJ reads it. Instead, the opinion states that attempts to influence policy will require registration *even if* those attempts occur during the types proceedings described in the exemption.

> [T]he two primary activities you described in your letter, first [US law firm]'s representation with respect to any investigation or enforcement proceedings undertaken by the Department of Justice or another U.S. government agency involving [foreign person] or [foreign bank], and second, [US law firm]'s December 8, 2017, request to OFAC on behalf of [foreign person] and [foreign bank], that OFAC stay designation of [US law firm]'s clients until [US law firm] could present facts to OFAC, fall within the definitions set out within Section [61]3(g) FARA and its implementing regulations. In particular, the limited scope of [US law firm]'s December 8, 2017, letter to OFAC, appears to stop short of an attempt to influence OFAC's policies regarding its sanctions regime beyond its specific application to [US law firm]'s representation of [foreign

person and foreign bank]. If at any point in the future, [US law firm] engages in a discussion or exchange with OFAC that implicates wider policy or political considerations, then it would not be able to avail itself of the exemption and could be required to register.

It is significant here that DOJ starts by saying explicitly that the activities before OFAC by the law firm on behalf of the foreign company and individual are the types proceedings covered by the exemption for lawyers set forth in section 613(g). Even so, it applies the restriction on attempts to influence policy even though section 5.306 only refers to lawyers contacts with agencies outside of the types of proceedings described in section 613(g). It isn't hard to see the difficulty here. If a law firm argues that its client has not violated any rules that require designation by OFAC, no FARA registration is required. But if the law firm argues, as might often be the case, that even if the client has violated those rules there are policy reasons that the agency should consider in exercising its administrative discretion not to designate the client, FARA registration is required. Even if that is what the act and the regulations say (and they do not), that would be stupid policy. Oops. Wait, do I have to register now?

My guess is that the law firm had an entirely different concern than whatever it was that caused DOJ to jump down the rabbit hole of limiting policy arguments. Although DOJ readily conceded that the proceeding in front of OFAC was one of the types of proceedings described in section 613(g), that really is a rather difficult question. The language in 613(g) could be read to cover agency proceedings only if they are required to be "on the record."

Nothing in the International Emergency Economic Powers Act or OFAC regulations require the determination to designate a foreign company or individual to be conducted "on the record." Not even the rules in section 501.807 for setting aside a designation require these proceedings to be "on the record." This is probably what prompted the law firm's inquiry in the first place since it was attempting to influence the agency's determination to designate its clients. a proceeding that was not arguably required to be "on the record."  It seems DOJ here says, albeit indirectly, that the proceedings to designate were one of the type of proceedings described in the exemption for lawyers representing foreign clients and that, by implication, the exemption for lawyers covers agency proceedings that are not on the record.  But having said that, DOJ went on and, in violation of both the statute and the rules, imposed a troublesome limitation on what lawyers can do in those proceedings without registering as a foreign agent.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

EX/IM MOVERS & SHAKERS

## 16. Monday List of Ex/Im Job Openings; 189 Jobs Posted This Week, Including 6 New Jobs
(Source: Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

   "#" New or amended listing this week

* ACCO Brands; Lake Zurich, IL; Foreign Trade Zone Specialist;
* Aerovironment; Simi Valley, CA; Trade Compliance Specialist II; Job ID: 18-017
* Agility; Atlanta, GA; Export Compliance Administrator;
* Agility; Queens, NY; Air Export Coordinator;
* Agility; Bensenville, IL; Air Export Coordinator;
* Agility; Carson, CA; Ocean Export Coordinator;
* Agility; Houston, TX; Air Freight Export Coordinator;
* Agility; Houston, TX; Ocean Export Coordinator;
* Agility; Doral, FL; Air Export Coordinator;
* Agility; Boston, MA; Air Export Coordinator;
* Agility; Boston, MA; Ocean Export Coordinator;
* Agility; Bensenville, IL; Ocean Export Coordinator;
* Agility; Basel, Switzerland; International Exhibition Coordinator;
* Agility; Genf, Switzerland; Ocean Freight Coordinator;
* Agility; Genf, Switzerland; Ocean Freight Coordinator;
* Agility; Coppel, TX; Air Import Coordinator;
* Agility; Carson, CA; Air Import Coordinator;
* Agility; Bensenville, IL; Air Import Coordinator;
* Agility; Queens, NY; Air Import Coordinator;
* Agility; Atlanta, GA; Air Import Coordinator;
* Agility; Doral, FL; Air Import Coordinator;
* Agility; Burlingame, CA; Ocean Import Coordinator;
* Agility; Carson, CA; Ocean Import Coordinator;
* Agility; East Boston, MA; Entry Writer/Import Coordinator;
* Agility; Bensenville, IL; Entry Writer Coordinator;
* Agility; Carson, CA; Entry Writer Coordinator;
* Agility; Dallas, TX; Air Import Supervisor;
* Agility; Montreal, Canada; Customs Manager;
* Agility; Montreal, Canada; Customs Manager;
* Agility; Montreal, Canada; Customs Supervisor;
* AMD; Austin, TX; Manager, Import/Export; Requisition ID: 24061
* Arent Fox LLP; Washington, D.C.; International Trade Associate;
* Arent Fox LLP; Los Angeles, CA; International Trade Associate;
* Arm, Ltd.; Cambridge, UK; UK Trade Compliance Manager; Requisition ID: 13650
* Arrow; Shanghai, China; Compliance Manager;
* Arrow; Shenzhen, Guangdong, China; Junior GTMC Officer;

* Arrow; Neu-Isenburg, Germany; Sachbearbeiter Export / Global Trade Management & Compliance Officer (m/f) - befristet;
* Arrow; Houten, Netherlands; Junior Officer Global Trade Management and Compliance - EMEA;
* Arrow; Pheonix, AZ; Senior Officer Global Trade Management & Compliance;
* Arrow; Centennial, CO; Senior Officer Global Trade Management & Compliance;
* Arrow; Reno, NV; Senior Officer Global Trade Management & Compliance;
* Arrow; Pheonix, AZ; Global Trade Management & Compliance Officer;
* Arrow; Centennial, CO; Global Trade Management & Compliance Officer;
* Arrow; Reno, NV; Global Trade Management & Compliance Officer;
* AutoNation; Fort Lauderdale, FL; Trade Compliance Manager;
* BAE Systems; Los Angeles, CA; Program Manager, International and Offset; Requisition ID: 33778BR
* BAE Systems; Huntsville, AL; Facility Security Officer, Security Manager; Requisition ID: 36821BR
* BAE Systems; Burlington, MA; Facility Security Officer ("FSO"); Requisition ID: 35499BR
* BAE Systems; Rockville, MD; Compliance Specialist Senior; Requisition ID: 35809BR
* BAE Systems; Sterling, VA; Compliance Specialist Senior; Requisition ID: 36370BR
* BAE Systems; Greenlawn, NY; International Trade Compliance Analyst I; Requisition ID: 38433BR
* BAE Systems; San Diego, CA; International Trade Compliance Analyst II; Requisition ID: 38548BR
* Boeing; Zoushan, China; Trade Compliance Manager;
* Boeing; Dallas, TX; Sr. Export Regulatory & Compliance Specialist III - Licensing Liaison;
* BMW North America; Woodcliff Lake, NJ; Senior Analyst, Trade Compliance; Requisition ID: 170004RD
* Brownells, Inc.; Grinnell, IA; International Trade Compliance Manager II;
* Brownells, Inc.; Grinnell, IA; Product Classification Specialist I;
* Buehler; Lake Bluff, IL; Manager, Compliance and Logistics; Requisition ID: 2018-004
* Cree, Inc.; Durham, NC; Export Compliance Specialist; Contact asignorelli@cree.com; Requisition ID: 2018-6300
* Danaher Science and Technology; Nijmegen, Netherlands; Import Specialist - Senior Analyst II Supply Chain & Logistics; Job ID: BEC009349
* DynCorp International; Tampa, FL; Foreign Disclosure Officer; Requisition ID: PR1701977
* Eaton; Syracuse, NY; Global Logistics Manager; Requisition ID: 036620
* Eaton; Shanghai Shi, China; Global Ethics and Compliance Director, APAC; Requisition ID: 039260
* Elbit Systems of America; Fort Worth, TX or Merrimack, NH; Trade Compliance Manager; 2018-5916
# Eli Lilly and Co.; Indianapolis, IN; Import/Export Trade Associate;
# Ensign-Bickford Aerospace & Defense Co.; Moorpark, CA; Import/Export Specialist; Missy Clark; maclark@eba-d.com
* EoTech Technologies; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* Erickson, Inc.; Central Point, OR; Import Specialist; Requisition ID: 756803

* Expeditors; Krefeld, Germany; Clerk Import / Export;
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk;
* Expeditors; Dusseldorf, Germany; Clerk, Airfreight Import;
* Export Solutions Inc.; Melbourne FL; Trade Compliance Specialist;
info@exportsolutionsinc.com
* EY; Belgium; Senior Consultant, Global Trade; Requisition ID: BEL000PT
* Flash Global; Mountain Lakes, NJ; Import Export Services Manager;
* FLIR; Arlington, VA; Senior Director, Global Export Licensing;
* FLIR; Billerica, MA; US Customs Analyst;
* FLIR; Meer, Belgium; GTC EMEA Customs Analyst;
* FLIR; Irving, CA; Sr. Manager Export Compliance;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Licensing;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Licensing;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Technology;
* Full Circle Compliance; Bruchem, Netherlands; Legal Analyst, Manager;
* General Atomics; San Diego, CA; Director, Compliance; Requisition ID:
18549BR
* General Atomics; San Diego, CA; Government Regulatory Compliance
Specialist; Requisition ID: 18686BR
* General Atomics; San Diego, CA; Import/Export Trade Compliance
Administrator - Licensing; Requisition ID: 17968BR
* General Atomics; San Diego, CA; Senior Director of Import/Export
Compliance; Requisition ID: 13892BR
* General Atomics; San Diego, CA; Internal Auditor - Senior; Requisition
ID: 17524BR
* General Dynamics; Fairfax, VA; Export Policy Analyst; Job ID: 2018-36089
* General Dynamics; Falls Church, VA; Director, Trade Compliance; Job ID:
2018-1122
* GHY International; Pembina, ND (or remote); Ocean & Air Import
Coordinator;
* Harris Corporation; Beaverton, OR; Manager, International Government
Relations;
* Harris Corporation; Palm Bay, FL; Technical Trade Compliance Engineer;
Contact Laura Solomon; Requisition ID: ES20171511-22019
* Harris Corporation; Clifton, NJ; Technical Trade Compliance Engineer;
* Henderson Group Unlimited; Inc; Washington, DC; Process Improvement
Mgr;
* Henderson Group Unlimited; Inc; Washington, DC; Defense Control
Analyst;
* Henkel Corp.; Rocky Hill, CT; Global Trade Defense Information Manager;
Requisition ID: 180002QT
* Henkel Corp.; Rocky Hill, CT; Senior Global Trade Manager; Requisition
ID: 18000307
* Huntington Ingalls Industries; Virginia Beach, VA; AMSEC-Import/Export
Administrator 2; Requisition ID: 23979BR
* Hussman; Bridgeton, MO; Trade Compliance Specialist;
* Infineon Technologies; Munich, Germany; Experte Export Control (w/m);
Requisition ID: 22825
* Infineon Technologies; Melaka, Malaysia; Export Control Executive;
Requisition ID: 26833

* Infineon Technologies; Porto (Maia) Portugal; Trade Compliance Administrator; Requisition ID: 25550
* Infineon Technologies; Milpitas, CA; Export Compliance Specialist; Requisition ID: 26988
* Infineon Technologies; El Segundo, CA; Export Compliance Specialist; Requisition ID: 26826
* Intel; Amsterdam, Netherlands; Trade Specialist; Requisition ID: JR0056336
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official / Deputy Facility Security Officer;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official;
* Johns Hopkins University; Baltimore, MD; Assistant Director, Export Control and Facility Security;
* Johnson Controls; Milwaukee, WI; Trade Compliance Analyst; Requisition ID: WD30047348124
* Johnson Controls; Lithia Springs; Trade Compliance Specialist I; Requisition ID: WD30047947142
* Lam Research Corp.; Fremont, CA; Foreign Trade Intern;
* Lam Research Corp.; Shanghai, China; Foreign Trade (FT) Analyst;
* Lam Research Corp.; Fremont, CA; Foreign Trade Data Analyst;
* Leonardo DRS; Arlington, VA; Senior Customs & Trade Compliance Manager; Requisition ID: 87488
* Leonardo DRS; St. Louis; Trade Compliance Specialist; Requisition ID: 88127, or contact brandy.mormino@drs.com
* Lincoln Electric; Cleveland, OH; Trade Compliance Manager;
* Lockheed Martin; Manassass, VA; International Licensing; Requisition ID: 423306BR
* Lockheed Martin; Fort Worth, TX; Import Export Compliance Coordinator; Job ID: 397600BR
* Lockheed Martin; Fort Worth, TX; Export and Import Compliance Investigations Lead; Job ID: 427872BR
* Lockheed Martin; Fort Worth, TX; Licensing Integration and Support; Job ID: 433056BR
* Lockheed Martin; Fort Worth, TX; Regulatory Compliance Analyst Senior; Job ID: 433405BR
* Lockheed Martin; Orlando, FL; Senior International Licensing Analyst; Requisition ID: 434225BR
* Lockheed Martin; Orlando, FL; International Licensing Analyst Sr; Job ID: 424151BR
* Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415717BR
* Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415708BR
* Luminar Technologies; Orlando, FL; Import/Export Trade Compliance Specialist;
* L-3 ALST; Orlando, FL; Contracts Manager / Empowered Official; Requisition ID: 093069
* L-3 Warrior Sensor Systems; Londonderry, NH; Purchasing & Compliance Manager; Requisition ID:096596
* L-3 Warrior Sensor Systems; Middle East; International Business Development Manager - Middle East Region; Requisition ID: 093343
* L-3; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335

* L-3; Grand Rapids, MI; Sr. Trade Compliance Administrator; Requisition ID: 097197
* L-3; Arlington, TX; Compliance Manager; Requisition ID: 098246
* Mattson Technology; Fremont, California; Import/Export Compliance Analyst;
* Maersk/DAMCO; Agent de transit IMPORT - EXPORT; Job Ref.: DC-164022
* Mattson Technology; Fremont, California; Import/Export Compliance Analyst;
* Medtronic; Heerlen, The Netherlands; Trade Compliance Analyst; Requisition ID: 16000DYY
* Medtronic; Wash DC; Global Trade Lawyer; stacy.m.johnson@medtronic.com; Requisition ID: 170002ON
* Meggit; Akron, OH; Manager, Trade Compliance;
* Meggit; Los Angeles, CA; Trade Compliance Officer;
* Mitchell Martin, Inc.; Dallas, Texas; Export Regulatory Trade Compliance Specialist; Requisition ID: 104405
* Moog; East Aurora, NY; Manager, Group Trade Compliance Manager; Amy Hanavan, ahanavan@moog.com; Requisition ID: 182102
* MTS Systems; Eden Prairie, MN; Global Trade Compliance Manager; Requisition ID: 37841
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID:17022803
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022805
* Office of the Director of National Intelligence; McLean, VA; Associate General Counsel;
* Oracle; Unspecified, United States; Customs Compliance Specialist; Requisition ID: 18000H0N
* Orbital ATK, Inc.; Dulles, VA; Principal Import/Export Analyst; Job ID: JAY20182304-45242.
# Oshkosh Corporation; Greenville, WI; Global Trade Compliance Analyst; Requisition ID: 182405
* PerkinElmer, Inc.; Shelton, CT; Systems Analyst, Trade Compliance Solutions;
* Raytheon Company; El Segundo, CA; Global Trade Licensing Analyst; Requisition ID: 114977BR
* Raytheon Company; El Segundo, CA; Global Trade Licensing Analyst; Requisition ID: 115189BR
* Raytheon Company; El Segundo, CA; Sr. Export Licensing And Compliance Specialist; Requisition ID: 114077BR
* Raytheon Company; Plano, TX; Import Control & Compliance Advisor; Requisition ID: 111596BR
* Raytheon Company; Tucson, AZ; Export Licensing And Compliance Specialist; Requisition ID: 114936BR
* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* SABIC; Houston, TX; Senior Analyst, International Trade Compliance; Requisition ID 8655; OR Contact: Jason Washington
* The Safariland Group; Jacksonville, FL; Counsel (International Trade Compliance);
* The Safariland Group; Jacksonville, FL; Sr. Export Compliance Specialist;

* Spirent; San Jose, CA; Global Trade Compliance Specialist; Requisition ID: 4088
* Tech Data Corporation; Miami, FL; Sr. Regulatory Compliance Analyst;
* Tech Data Corporation; Clearwater, FL; Sr. Regulatory Compliance Analyst;
* Tech Data Corporation; Groveport, OH; Sr. Regulatory Compliance Analyst;
* Tech Data Corporation; Duluth, GA; Sr. Regulatory Compliance Analyst;
* Tech Data Corporation; Miami, FL; Regulatory Compliance Manager;
* Tech Data Corporation; Clearwater, FL; Regulatory Compliance Manager;
* Tech Data Corporation; Groveport, OH; Regulatory Compliance Manager;
* Tech Data Corporation; Duluth, GA; Regulatory Compliance Manager;
* Teledyne Benthos; Falmouth, MA; Export Compliance Manager
* Teledyne Scientific & Imaging; Montgomeryville, PA; Contracts & Trade Compliance Administrator; Requisition ID: 6470
# Teva Pharmaceuticals; North Wales, PA; Senior Analyst, Customs & Trade Compliance;
* TLR; San Fransisco, CA; Import CSR ; Requisition ID: 1040
* Trek; Waterloo, WI; Global Trade & Logistics Specialist;
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance IT Systems & Integration Mgr.; Requisition ID: 62310BR
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Manager; Requisition ID: 62176BR
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Authorizations Manager; Requisition ID: 63222BR
# United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Technology Senior Manager; Requisition ID: 55944BR
# United Technologies Corp, Pratt & Whitney; East Hartford, CT; ITC & ACE Compliance Program Manager, ASC; Requisition ID: 58388BR
* Varian; Belgium, Switzerland, Netherlands, or UK; EMEIA Trade Lead - Senior Manager Trade Compliance; Requisition ID: 12301BR; Contact Gavin Tickner at Gavin.Tickner@varian.com
* Varian; Paolo Alto, CA; Senior Trade Compliance Analyst; Requisition ID: 12735BR; Contact Uyen Tran at Uyen.Tran@varian.com
* Vigilant; Negotiable Location, USA; Global Trade Compliance Analyst;
* Virgin Galactic; Las Cruces, NM; Export Compliance Officer; Requisition ID: 2018-3558
* Williams International; Pontiac, MI; Trade Compliance Specialist; Requisition ID: 17-0275
* Wurth Industry of North America; Indianapolis, IN; International Trade Compliance Officer - Classification;
* Xylem, Inc.; Remote, United States; Manager, Global Ethics & Compliance;
* Xylem, Inc; Morton Grove, IL; Trade Compliance Specialist;
* YETI; Austin, TX; Global Trade Compliance Manager;
* Zebra Technologies; Bourne End, UK; Trade Compliance Manager, NALA; Requisition ID: 46144
* Zebra Technologies; Lincolnshire, IL; Holtsville, NY; Mcallen, TX; Miramar, FL; Agoura Hills, CA; Trade Compliance Manager, EMEA; Requisition ID: 46146

back to top

* * * * * * * * * * * * * * * * * *

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Socrates** (c.470 - 399 BC; was a classical Greek (Athenian) philosopher credited as one of the founders of Western philosophy, and as being the first moral philosopher of the Western ethical tradition of thought.  An enigmatic figure, he made no writings, and is known chiefly through the accounts of classical writers writing after his lifetime, particularly his students Plato and Xenophon.)
  - *"By all means, marry.  If you get a good wife, you'll be happy.  If you get a bad one, you'll become a philosopher."* (Socrates's wife, Xanthippe, was reputed to be a most troublesome woman.)

back to top

* * * * * * * * * * * * * * * * *

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 6 June 2018: 83 FR 26204-26205: Unverified List (UVL); Correction

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 19 Mar 2018: 83 FR 11876-11881: Inflation Adjustment of Civil Monetary Penalties

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

19. Weekly Highlights of the Daily Bugle Top Stories

(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top



Stay Connected

The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

| | |
|---|---|
| **From:** | Susan Kramer [Susan.Kramer@bis.doc.gov] |
| **Sent:** | 6/19/2018 7:09:55 PM |
| **To:** | EA [EA@bis.doc.gov]; Audra Griner [Audra.Griner@bis.doc.gov]; Dawnielle Battle [Dawnielle.Battle@bis.doc.gov]; Tyra Norfleet [Tyra.Norfleet@bis.doc.gov]; Alberto Wilson -CTR [Alberto.Wilson@bis.doc.gov]; Kirsten Mortimer [Kirsten.Mortimer@bis.doc.gov] |
| **Subject:** | BIS Training - Firearms Proposed Rule |
| **Location:** | HCHB 6087B |
| **Start:** | 6/27/2018 6:00:00 PM |
| **End:** | 6/27/2018 7:00:00 PM |
| **Show Time As:** | Tentative |
| **Required Attendees:** | EA; Audra Griner; Dawnielle Battle; Tyra Norfleet; Alberto Wilson -CTR; Kirsten Mortimer |

Please join us for an informative training on the new rule that proposes moving items from the U.S. Munitions List (USML) Categories I, II, and III to the Commerce Control List (CCL).    In this session, Steve Clagett, Director of the Nuclear Missile Controls Division, and Tim Mooney, Sr. Export Policy Analyst in the Regulatory Policy Division, will give an overview of the criteria used to move commercial items widely available in retail outlets and less sensitive military items from the USML to the CCL.    They will also discuss the 17 new ECCNs proposed for the CCL, the proposed revisions to the Regional Stability (RS) controls, and license exceptions for the new ECCNs.    There will be two sessions on Tuesday, June 26 at 2 p.m. and Wednesday, June 27 at 2 p.m. in HCHB 6087B with conference calling and VTC available for field staff (see below).    Please note that this training opportunity is open to BIS staff only.

Conference Calls:

██████████████

Participant code is ████████

The VTC dial string is one of the following:

████████████████████
████████████████████

**Hi Bill,**

**I wanted to confirm that we did receive you your comments on the Cat I-III firearms proposed rule.**

**I added those to the regulations.gov docket number for you.**

**Thank you for taking the time to review the rules and submit the comments.**

**Tim**

**Tim Mooney**
**Senior Export Policy Analyst**
**Regulatory Policy Division**
**Bureau of Industry and Security**


**From:** William Root <                        >
**Sent:** Monday, June 11, 2018 8:21 PM
**To:** Matthew Borman <Matthew.Borman@bis.doc.gov>; Steven Clagett <Steven.Clagett@bis.doc.gov>; Sharron Cook <Sharron.Cook@bis.doc.gov>; Hillary Hess <Hillary.Hess@bis.doc.gov>
**Subject:** Comments on May 24 I.II,III Proposed Transfers

Hi,

Attached are the comments I sent a few minutes ago. I did not follow the BIS instructions because I was unable to find an email address to use for such lengthy comments.

If any of you believe I should send this to another email address, please let me know.

Thanks, Bill

| **From:** | Susan Kramer [Susan.Kramer@bis.doc.gov] |
| **Sent:** | 6/25/2018 7:32:54 PM |
| **To:** | EA [EA@bis.doc.gov]; Audra Griner [Audra.Griner@bis.doc.gov]; Dawnielle Battle [Dawnielle.Battle@bis.doc.gov]; Tyra Norfleet [Tyra.Norfleet@bis.doc.gov]; Alberto Wilson -CTR [Alberto.Wilson@bis.doc.gov]; Kirsten Mortimer [Kirsten.Mortimer@bis.doc.gov] |
| **CC:** | Tracy Patts [Tracy.Patts@bis.doc.gov]; Dawn Kawasaki [Dawn.Kawasaki@bis.doc.gov]; Sheila Quarterman [Sheila.Quarterman@bis.doc.gov]; Nancy Kook [Nancy.Kook@bis.doc.gov]; Brent Webster [Brent.Webster@bis.doc.gov]; Dimitri Smith [Dimitri.Smith@bis.doc.gov]; Kimberly Orr [Kimberly.Orr@bis.doc.gov]; Thomas Andrukonis [Thomas.Andrukonis@bis.doc.gov]; Timothy Mooney [Timothy.Mooney@bis.doc.gov]; Dara Sanders [Dara.Sanders@bis.doc.gov]; Thomas Langhorne [Thomas.Langhorne@bis.doc.gov]; Katharine Huang [Katherine.Huang@bis.doc.gov]; Ronald Rolfe [Ronald.Rolfe@bis.doc.gov]; Rebecca Joyce [Rebecca.Joyce@bis.doc.gov]; Mark Crace [Mark.Crace@bis.doc.gov]; Michael Pender [Michael.Pender@bis.doc.gov]; Ashley Conboy [Ashley.Conboy@bis.doc.gov]; Richard Sylvestri [Richard.Sylvestri@bis.doc.gov]; Steven Schrader [Steven.Schrader@bis.doc.gov]; Elan Mitchell-Gee [Elan.Mitchell-Gee@bis.doc.gov]; EE [EE@bis.doc.gov]; Michael Burnett [Michael.Burnett@bis.doc.gov]; Joel Christy [Joel.Christy@bis.doc.gov]; Steven Fisher [Steven.Fisher@bis.doc.gov]; Gordon Pomeroy [Gordon.Pomeroy@bis.doc.gov]; Ariel Leinwand [Ariel.Leinwand@bis.doc.gov]; Scott Douglas [Scott.Douglas@bis.doc.gov]; Robert Cunniff [Robert.Cunniff@bis.doc.gov]; Leslie Bayless [Leslie.Bayless@bis.doc.gov]; Paul Puletz [Paul.Puletz@bis.doc.gov]; Lucy Genidy [Lucy.Genidy@bis.doc.gov]; Robert Luzzi [Robert.Luzzi@bis.doc.gov]; Tooba Awan [Tooba.Awan@bis.doc.gov]; Michael Conditt [Michael.Conditt@bis.doc.gov]; Edward Hayden [Edward.Hayden@bis.doc.gov]; Courtney Rauch [Courtney.Rauch@bis.doc.gov]; Richard Weir [Richard.Weir@bis.doc.gov]; Robert C. Hamlett [Robert.Hamlett@bis.doc.gov]; Erin Zaborowski [Erin.Zaborowski@bis.doc.gov]; Naomi Morrow [Naomi.Morrow@bis.doc.gov]; Jonathan Carson [Jonathan.Carson@bis.doc.gov]; James Fuller [James.Fuller@bis.doc.gov]; Colby Swift [Colby.Swift@bis.doc.gov]; Janice Manzano [Janice.Manzano@bis.doc.gov]; Steven Stoddard [Steven.Stoddard@bis.doc.gov]; Kylie Gaskins [Kylie.Gaskins@bis.doc.gov]; Michael Bloomfield [Michael.Bloomfield@bis.doc.gov]; OEE_SAC_NewYork [OEE_SAC_NewYork@bis.doc.gov]; Willie Lo [Willie.Lo@bis.doc.gov] |

| **Subject:** | Reminder Firearms Training & Slides |
| **Attachments:** | 2018-6-26 and 6-27 BIS presentation for Commerce Cat I to III firearms proposed rule.pptx; 83 FR 24166 Commerce Cat I-III firearms proposed rule 5-24-18.pdf |
| **Location:** | HCHB 6087B |

| **Start:** | 6/26/2018 6:00:00 PM |
| **End:** | 6/26/2018 7:00:00 PM |
| **Show Time As:** | Tentative |

| **Required Attendees:** | EA; Audra Griner; Dawnielle Battle; Tyra Norfleet; Alberto Wilson -CTR; Kirsten Mortimer |
| **Optional Attendees:** | Tracy Patts; Dawn Kawasaki; Sheila Quarterman; Nancy Kook; Brent Webster; Dimitri Smith; Kimberly Orr; Thomas Andrukonis; Timothy Mooney; Dara Sanders; Thomas Langhorne; Katharine Huang; Ronald Rolfe; Rebecca Joyce; Mark Crace; Michael Pender; Ashley Conboy; Richard Sylvestri; Steven Schrader; Elan Mitchell-Gee; EE; Michael Burnett; Joel Christy; Steven Fisher; Gordon Pomeroy; Ariel Leinwand; Scott Douglas; Robert Cunniff; Leslie Bayless; Paul Puletz; Lucy Genidy; Robert Luzzi; Tooba Awan; Michael Conditt; Edward Hayden; Courtney Rauch; Richard Weir; Robert C. Hamlett; Erin Zaborowski; Naomi Morrow; Jonathan Carson; James Fuller; Colby Swift; Janice Manzano; Steven Stoddard; Kylie Gaskins; Michael Bloomfield; OEE_SAC_NewYork; Willie Lo |

Please join us tomorrow.    The presentation slides, and the proposed rule, are attached.

2018-6-26 and
6-27 BIS present…



83 FR 24166
Commerce Cat I-...

Please join us for an informative training on the new rule that proposes moving items from the U.S. Munitions List (USML) Categories I, II, and III to the Commerce Control List (CCL).    In this session, Steve Clagett, Director of the Nuclear Missile Controls Division, and Tim Mooney, Sr. Export Policy Analyst in the Regulatory Policy Division, will give an overview of the criteria used to move commercial items widely available in retail outlets and less sensitive military items from the USML to the CCL.    They will also discuss the 17 new ECCNs proposed for the CCL, the proposed revisions to the Regional Stability (RS) controls, and license exceptions for the new ECCNs.    There will be two sessions on Tuesday, June 26 at 2 p.m. and Wednesday, June 27 at 2 p.m. in HCHB 6087B with conference calling and VTC available for field staff (see below).    Please note that this training opportunity is open to BIS staff only.


Conference Calls:
███████████████
Participant code is ████████

The VTC dial string is one of the following:
███████████████████████

**From:** Timothy Mooney [Timothy.Mooney@bis.doc.gov]
**Sent:** 6/26/2018 12:31:25 PM
**To:** Susan Kramer [Susan.Kramer@bis.doc.gov]; EA [EA@bis.doc.gov]; Audra Griner [Audra.Griner@bis.doc.gov]; Dawnielle Battle [Dawnielle.Battle@bis.doc.gov]; Tyra Norfleet [Tyra.Norfleet@bis.doc.gov]; Alberto Wilson -CTR [Alberto.Wilson@bis.doc.gov]; Kirsten Mortimer [Kirsten.Mortimer@bis.doc.gov]
**CC:** Tracy Patts [Tracy.Patts@bis.doc.gov]; Dawn Kawasaki [Dawn.Kawasaki@bis.doc.gov]; Sheila Quarterman [Sheila.Quarterman@bis.doc.gov]; Nancy Kook [Nancy.Kook@bis.doc.gov]; Brent Webster [Brent.Webster@bis.doc.gov]; Dimitri Smith [Dimitri.Smith@bis.doc.gov]; Kimberly Orr [Kimberly.Orr@bis.doc.gov]; Thomas Andrukonis [Thomas.Andrukonis@bis.doc.gov]; Dara Sanders [Dara.Sanders@bis.doc.gov]; Thomas Langhorne [Thomas.Langhorne@bis.doc.gov]; Katharine Huang [Katharine.Huang@bis.doc.gov]; Ronald Rolfe [Ronald.Rolfe@bis.doc.gov]; Rebecca Joyce [Rebecca.Joyce@bis.doc.gov]; Mark Crace [Mark.Crace@bis.doc.gov]; Michael Pender [Michael.Pender@bis.doc.gov]; Ashley Conboy [Ashley.Conboy@bis.doc.gov]; Richard Sylvestri [Richard.Sylvestri@bis.doc.gov]; Steven Schrader [Steven.Schrader@bis.doc.gov]; Elan Mitchell-Gee [Elan.Mitchell-Gee@bis.doc.gov]; EE [EE@bis.doc.gov]; Michael Burnett [Michael.Burnett@bis.doc.gov]; Joel Christy [Joel.Christy@bis.doc.gov]; Steven Fisher [Steven.Fisher@bis.doc.gov]; Gordon Pomeroy [Gordon.Pomeroy@bis.doc.gov]; Ariel Leinwand [Ariel.Leinwand@bis.doc.gov]; Scott Douglas [Scott.Douglas@bis.doc.gov]; Robert Cunniff [Robert.Cunniff@bis.doc.gov]; Leslie Bayless [Leslie.Bayless@bis.doc.gov]; Paul Puletz [Paul.Puletz@bis.doc.gov]; Lucy Genidy [Lucy.Genidy@bis.doc.gov]; Robert Luzzi [Robert.Luzzi@bis.doc.gov]; Tooba Awan [Tooba.Awan@bis.doc.gov]; Michael Conditt [Michael.Conditt@bis.doc.gov]; Edward Hayden [Edward.Hayden@bis.doc.gov]; Courtney Rauch [Courtney.Rauch@bis.doc.gov]; Richard Weir [Richard.Weir@bis.doc.gov]; Robert C. Hamlett [Robert.Hamlett@bis.doc.gov]; Erin Zaborowski [Erin.Zaborowski@bis.doc.gov]; Naomi Morrow [Naomi.Morrow@bis.doc.gov]; Jonathan Carson [Jonathan.Carson@bis.doc.gov]; James Fuller [James.Fuller@bis.doc.gov]; Colby Swift [Colby.Swift@bis.doc.gov]; Janice Manzano [Janice.Manzano@bis.doc.gov]; Steven Stoddard [Steven.Stoddard@bis.doc.gov]; Kylie Gaskins [Kylie.Gaskins@bis.doc.gov]; Michael Bloomfield [Michael.Bloomfield@bis.doc.gov]; OEE_SAC_NewYork [OEE_SAC_NewYork@bis.doc.gov]; Willie Lo [Willie.Lo@bis.doc.gov]
**Subject:** RE: Reminder Firearms Training & Slides
**Attachments:** Updated 2018-6-26 and 6-27 BIS presentation for Commerce Cat I to III firearms proposed rule.pptx

We made some tweaks to the slides from yesterday that were sent around.

The attached slide presentation is what we will use for today and tomorrow's session.



Updated 2018-6-26 and 6-27 BIS pre...

-----Original Appointment-----
**From:** Susan Kramer
**Sent:** Monday, June 25, 2018 3:33 PM
**To:** EA; Audra Griner; Dawnielle Battle; Tyra Norfleet; Alberto Wilson -CTR; Kirsten Mortimer
**Cc:** Tracy Patts; Dawn Kawasaki; Sheila Quarterman; Nancy Kook; Brent Webster; Dimitri Smith; Kimberly Orr; Thomas Andrukonis; Timothy Mooney; Dara Sanders; Thomas Langhorne; Katharine Huang; Ronald Rolfe; Rebecca Joyce; Mark Crace; Michael Pender; Ashley Conboy; Richard Sylvestri; Steven Schrader; Elan Mitchell-Gee; EE; Michael Burnett; Joel Christy; Steven Fisher; Gordon Pomeroy; Ariel Leinwand; Scott Douglas; Robert Cunniff; Leslie Bayless; Paul Puletz; Lucy Genidy; Robert Luzzi; Tooba Awan; Michael Conditt; Edward Hayden; Courtney Rauch; Richard Weir; Robert C. Hamlett; Erin Zaborowski; Naomi Morrow; Jonathan Carson; James Fuller; Colby Swift; Janice Manzano; Steven Stoddard; Kylie Gaskins; Michael Bloomfield; OEE_SAC_NewYork; Willie Lo
**Subject:** Reminder Firearms Training & Slides

**When:** Tuesday, June 26, 2018 2:00 PM-3:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** HCHB 6087B


Please join us tomorrow.    The presentation slides, and the proposed rule, are attached.
   << File: 2018-6-26 and 6-27 BIS presentation for Commerce Cat I to III firearms proposed rule.pptx >>
   << File: 83 FR 24166 Commerce Cat I-III firearms proposed rule 5-24-18.pdf >>
Please join us for an informative training on the new rule that proposes moving items from the U.S. Munitions List
(USML) Categories I, II, and III to the Commerce Control List (CCL).    In this session, Steve Clagett, Director of the Nuclear
Missile Controls Division, and Tim Mooney, Sr. Export Policy Analyst in the Regulatory Policy Division, will give an
overview of the criteria used to move commercial items widely available in retail outlets and less sensitive military items
from the USML to the CCL.    They will also discuss the 17 new ECCNs proposed for the CCL, the proposed revisions to
the Regional Stability (RS) controls, and license exceptions for the new ECCNs.    There will be two sessions on Tuesday,
June 26 at 2 p.m. and Wednesday, June 27 at 2 p.m. in HCHB 6087B with conference calling and VTC available for field
staff (see below).    Please note that this training opportunity is open to BIS staff only.


Conference Calls:
███████████████
Participant code is ████████

The VTC dial string is one of the following:
████████████████████████████
████████████████████████████

**Sent:** 6/26/2018 12:53:06 PM
**To:** Timothy Mooney [Timothy.Mooney@bis.doc.gov]
**Subject:** RE: Reminder Firearms Training & Slides

thanks

-----Original Message-----
From: Timothy Mooney
Sent: Tuesday, June 26, 2018 8:31 AM
To: Susan Kramer; EA; Audra Griner; Dawnielle Battle; Tyra Norfleet; Alberto Wilson -CTR; Kirsten Mortimer
Cc: Tracy Patts; Dawn Kawasaki; Sheila Quarterman; Nancy Kook; Brent Webster; Dimitri Smith; Kimberly Orr; Thomas Andrukonis; Dara Sanders; Thomas Langhorne; Katharine Huang; Ronald Rolfe; Rebecca Joyce; Mark Crace; Michael Pender; Ashley Conboy; Richard Sylvestri; Steven Schrader; Elan Mitchell-Gee; EE; Michael Burnett; Joel Christy; Steven Fisher; Gordon Pomeroy; Ariel Leinwand; Scott Douglas; Robert Cunniff; Leslie Bayless; Paul Puletz; Lucy Genidy; Robert Luzzi; Tooba Awan; Michael Conditt; Edward Hayden; Courtney Rauch; Richard Weir; Robert C. Hamlett; Erin Zaborowski; Naomi Morrow; Jonathan Carson; James Fuller; Colby Swift; Janice Manzano; Steven Stoddard; Kylie Gaskins; Michael Bloomfield; OEE_SAC_NewYork; Willie Lo
Subject: RE: Reminder Firearms Training & Slides

We made some tweaks to the slides from yesterday that were sent around.

The attached slide presentation is what we will use for today and tomorrow's session.


-----Original Appointment-----
From: Susan Kramer
Sent: Monday, June 25, 2018 3:33 PM
To: EA; Audra Griner; Dawnielle Battle; Tyra Norfleet; Alberto Wilson -CTR; Kirsten Mortimer
Cc: Tracy Patts; Dawn Kawasaki; Sheila Quarterman; Nancy Kook; Brent Webster; Dimitri Smith; Kimberly Orr; Thomas Andrukonis; Timothy Mooney; Dara Sanders; Thomas Langhorne; Katharine Huang; Ronald Rolfe; Rebecca Joyce; Mark Crace; Michael Pender; Ashley Conboy; Richard Sylvestri; Steven Schrader; Elan Mitchell-Gee; EE; Michael Burnett; Joel Christy; Steven Fisher; Gordon Pomeroy; Ariel Leinwand; Scott Douglas; Robert Cunniff; Leslie Bayless; Paul Puletz; Lucy Genidy; Robert Luzzi; Tooba Awan; Michael Conditt; Edward Hayden; Courtney Rauch; Richard Weir; Robert C. Hamlett; Erin Zaborowski; Naomi Morrow; Jonathan Carson; James Fuller; Colby Swift; Janice Manzano; Steven Stoddard; Kylie Gaskins; Michael Bloomfield; OEE_SAC_NewYork; Willie Lo
Subject: Reminder Firearms Training & Slides
When: Tuesday, June 26, 2018 2:00 PM-3:00 PM (UTC-05:00) Eastern Time (US & Canada).
Where: HCHB 6087B


Please join us tomorrow.  The presentation slides, and the proposed rule, are attached.
 << File: 2018-6-26 and 6-27 BIS presentation for Commerce Cat I to III firearms proposed rule.pptx >>
 << File: 83 FR 24166 Commerce Cat I-III firearms proposed rule 5-24-18.pdf >>
Please join us for an informative training on the new rule that proposes moving items from the U.S. Munitions List (USML) Categories I, II, and III to the Commerce Control List (CCL).  In this session, Steve Clagett, Director of the Nuclear Missile Controls Division, and Tim Mooney, Sr. Export Policy Analyst in the Regulatory Policy Division, will give an overview of the criteria used to move commercial items widely available in retail outlets and less sensitive military items from the USML to the CCL. They will also discuss the 17 new ECCNs proposed for the CCL, the proposed revisions to the Regional Stability (RS) controls, and license exceptions for the new ECCNs.  There will be two sessions on Tuesday, June 26 at 2 p.m. and Wednesday, June 27 at 2 p.m. in HCHB 6087B with conference calling and VTC available for field staff (see below).  Please note that this training opportunity is open to BIS staff only.


Conference Calls:

Participant code is ███████

The VTC dial string is one of the following:

████████████████████████████
████████████████████████████

**From**: Donna Ganoe [Donna.Ganoe@bis.doc.gov]
**Sent**: 7/11/2018 3:29:08 PM
**Subject**: BIS NewsClips July 11, 2018

1.  Senate to vote Wednesday on authority over 232 tariffs | Inside Trade | July 11, 2018
2.  Switzerland initiates WTO case against U.S. over Section 232 tariffs | Inside Trade | July 11, 2018
3.  Borusan Mannesmann's 232 exclusions denied | by Dom Yanchunas | AmericanMetalMarket | July 10, 2018
4.  Australia prepares to ban Huawei from 5G project over security fears | by Colin Packham | Reuters | July 11, 2018
5.  All About the U.S. Sanctions Aimed at Putin's Russia | by Henry Meyer and Laurence Arnold | Bloomberg | July 11, 2018
6.  Iran Sanctions Are Different This Time | by Nick Cunningham | OilPrice.com | July 09, 2018
7.  OFAC eases sanctions on Sudan; terrorism concerns persist | by Joe Mont | Compliance Week | July 10, 2018
8.  Trade War With China Exposes U.S. Mineral Import Problem | by Jude Clements | Forbes | July 11, 2018
9.  A Landmark Legal Shift Opens Pandora's Box for DIY Guns | by And Greenberg | Wired | July 10, 2018
10.  A Tech Guru Captivated Canada. Then He Fled to China | by Dan Levin| The New York Times | July 11, 2018
-------------------------------------

**1.    Senate to vote Wednesday on authority over 232 tariffs | Inside Trade | July 11, 2018**

https://insidetrade.com/trade/senate-vote-wednesday-authority-over-232-tariffs

The Senate on Wednesday will vote on a motion to instruct its energy and water appropriations bill conferees to include in the legislation language that would give Congress some authority it has delegated to the president to implement tariffs under Section 232 of the Trade Expansion Act of 1962.

The vote will be the first for the Senate; previous attempts by Sen. Bob Corker (R-TN) and some of his colleagues to move a bill to give Congress the final say over Section 232 tariffs were rebuffed.

The vote, however, will not be on Corker's bill itself. Instead, the Senate will consider instructions to include language in the 2019 Energy and Water, Legislative Branch and Military Construction and Veterans Affairs Appropriations Act that would provide "a role for Congress in making a determination under Section 232 of the Trade Expansion Act of 1962."

Sources described the language the Senate will vote on as significantly pared down from Corker's original proposal.

A former leadership staffer said that while the vote could be considered symbolic, "symbolic votes can have value in an environment where substance is largely devalued."

An industry source, however, told Inside U.S. Trade that the vote should not be considered symbolic because it would mark the first time that Congress might "take a stand" against tariffs imposed by President Trump.

Sen. Jeff Flake (R-AZ) tweeted as much on Tuesday evening.

"FINALLY, Senate will push back on the President's abuse of Section 232 to impose tariffs," he wrote on Twitter. "We will vote Wednesday on a 'Motion to Instruct,' a first step toward reasserting Congress's constitutional role on tariffs."


**2.    Switzerland initiates WTO case against U.S. over Section 232 tariffs | Inside Trade | July 11, 2018**

https://insidetrade.com/trade/switzerland-initiates-wto-case-against-us-over-section-232-tariffs

Switzerland is joining a host of other WTO members in launching dispute settlement proceedings against the U.S. in response to the Trump administration's Section 232 tariffs on steel and aluminum.

On Monday, the Swiss government formally requested consultations with the U.S. over the steel and aluminum duties.

"From Switzerland's point of view, the additional duties, which according to the U.S. have been introduced to protect national security, are unjustified," the Swiss government said in a July 10 statement. "Switzerland first intervened with the U.S. in March and also submitted a formal request to the U.S. Administration for a country-specific exemption from these import duties."

Switzerland's request was denied, leading it to seek redress at the WTO.

The Swiss have not imposed retaliatory tariffs on the U.S., nor did the Swiss statement invoke the Safeguards Agreement. The European Union and others have repeatedly claimed the U.S. metal tariffs are safeguards under the guise of national security, a point contested by the U.S.

### 3. Borusan Mannesmann's 232 exclusions denied | by Dom Yanchunas | AmericanMetalMarket | July 10, 2018

http://www.amm.com/Article/3819634/Steel/Borusan-Mannesmanns-232-exclusions-denied.html

NEW YORK — The US Commerce Department has denied all 19 of Borusan Mannesmann Pipe US' requests for Section 232 tariff exclusions that the company previously said would enable an expansion of operations at its mill in Baytown, Texas.

The company was seeking exemptions for imports of various sizes of oil country tubular goods from its parent company in Turkey, according to the department's docket.

The Texas facility's finishing capacity exceeds its production capacity, and part of the company's business model has been to import green tube from Turkey in order to provide a full range of size combinations to its US customers. Winning Section 232 exclusions would have helped the mill remain "economically viable" while it invested as much as $75 million toward becoming a fully domestic producer.

Company executives are "reviewing all of our options" after getting the bad news, Borusan Mannesmann Pipe US chief executive officer Joel Johnson said.

"Our company and our dedicated employees are very disappointed that the government did not accept our unique short-term application for a 232 steel tariff exemption in exchange for a significant financial investment and expansion in our Baytown, Texas, facility that would have created about 170 new well-paying jobs in the critical energy sector," Johnson told American Metal Market via email on Tuesday July 10.

The requested quantities in the exemptions would have totaled 65,000 tonnes of tubing and 70,000 tons of casing over a two-year period.

American Metal Market's pricing assessment for US domestic welded high-collapse P110 casing stands at $1,600-1,700 per ton fob mill, up 33.3% from $1,200-1,275 per ton at the start of this year.

### 4. Australia prepares to ban Huawei from 5G project over security fears | by Colin Packham | Reuters | July 11, 2018

https://www.reuters.com/article/us-australia-china-huawei-tech/australia-prepares-to-ban-huawei-from-5g-project-over-security-fears-idUSKBN1K111O

SYDNEY (Reuters) - Australia is preparing to ban Huawei Technologies Co Ltd from supplying equipment for its planned 5G broadband network after its intelligence agencies raised concerns that Beijing could force the Chinese telco to hand over sensitive data, two sources said.

Western intelligence agencies have for years raised concerns about Huawei's ties to the Chinese government and the possibility that its equipment could be used for espionage. But there has never been any public evidence to support those suspicions.

Huawei, the world's largest maker of telecommunications network gear and the No. 3 smartphone supplier, has promised that Canberra will have complete oversight of 5G network equipment, which could include base stations, towers and radio transmission equipment.

That sort of oversight model has been accepted by other countries - notably the U.K., where a special laboratory staffed with government intelligence officials reviews all Huawei products.

Other Western countries, including the New Zealand, Canada and Germany, also say they have sufficient safeguards for assuring that Huawei equipment does not contain "back doors" or other mechanisms for secretly monitoring or collecting information.

But Australian intelligence agencies have told lawmakers that oversight will not allay their concerns, two political sources who have been briefed on the matter told Reuters.

"It is a Chinese company, and under Communist law they have to work for their intelligence agencies if requested," said one of the government sources. "There aren't many other companies around the world that have their own political committees."

Both sources declined to be identified because they were not authorized to speak to the media.

Huawei has already been mostly shut out of the giant U.S. market over national security concerns. Its business serving small, rural telecom operators is now at risk after new attacks on the company in recent weeks by some U.S. lawmakers. The move to ban Huawei in Australia comes as tensions mount over China's growing power and ambitions in the region.

Relations between the two countries are at an all-time low after Prime Minister Malcolm Turnbull last year accused Beijing of meddling in Canberra's affairs, and China responded by slowing some Australian imports.

Australia's 5G service will require a dense network of towers that would then be leased to mobile providers such as Telstra Corp (TLS.AX).

Mobile carriers typically have access to sensitive personal information, such as internet search history or emails. But in Australia and most other countries, there are strict laws governing when and how they can do so.

Australia's intelligence agencies fear that if mobile operators rely on Huawei's equipment, the Chinese company could develop a means of collecting data or even undermining the stability of the network. Chinese law requires organizations and citizens to support, assist and cooperate with intelligence work.

Huawei Australia's chairman, John Lord, said that law does not apply to its operations outside of China.

"That law has no legitimacy outside of China," Lord said. "Within that country, any information coming through us and any equipment we put into their national infrastructure is safe to the best of our ability, and it's secure."

AMERICAN INFLUENCE

In 2012, Australia banned Huawei from supplying equipment to the country's National Broadband Network, which has been hampered by technological failures. Australia believes that the 5G network, which will provide mobile internet speeds 50 to 100 times faster than current technology, will be the cornerstone for future innovations such as driverless cars. That makes it crucial to keep the network secure.

Turnbull in February received briefings from the U.S. National Security Agency and Department of Homeland Security on the threat from Huawei, one source familiar with the meeting told Reuters.

"The U.K. and New Zealand, they have decided that the risk of Huawei is worth it for the benefits of the network. For the Australian Security and Intelligence Organisation (ASIO) and the U.S., it is not worth the risk," a second political source said.

AUSTRALIA-CHINA TENSIONS

Although Australia's intelligence agencies are unwavering in their advice, Turnbull has yet to formally sign off on the Huawei ban.

One of the sources familiar with the process said the government is "in no great rush to confirm the ban." "It is going to highlight the anxiety that Australian lawmakers have about the rise of China, and it is not going to do any good for the Australian-China relationship," said Adam Ni, visiting fellow in the Strategic and Defence Studies Centre at the Australian National University.

Despite the trade pressure, Turnbull can ill afford to overrule the country's security authorities amid a rise of Chinese hawks within Australia's government. In rare public testimony, Australian Security Intelligence Organisation director general Duncan Lewis this year warned that foreign espionage, interference or sabotage could inflict "catastrophic harm" on the nation's interests - remarks that were widely considered a thinly veiled reference to China. The warning spurred a backbench lawmaker, who sits on the country's important parliamentary Intelligence and Security Committee, on June 18 to urge Turnbull to reject Huawei, a source familiar with the details of the party-room meeting of the ruling government told Reuters.

Turnbull did not directly address the comment, the source said, leaving his own party uncertain of his leanings.

In legislation seen as aimed at China, Australia will soon require lobbyists to declare connections to foreign governments.

Canberra has also called for increased international aid to the Pacific to counter what it says is Beijing's attempt to exert greater influence.

**5.   All About the U.S. Sanctions Aimed at Putin's Russia | by Henry Meyer and Laurence Arnold | Bloomberg | July 11, 2018**

https://www.bloomberg.com/news/articles/2018-07-11/all-about-the-u-s-sanctions-aimed-at-putin-s-russia-quicktake

As U.S. President Donald Trump pursues his goal of improving relations with Russia, sanctions could be a stumbling block. Since 2014, the U.S. has imposed travel bans, asset freezes and finance and trade restrictions against hundreds of Russian individuals and companies, part of a multinational effort to punish President Vladimir Putin's government for (allegedly) making trouble beyond its borders and online. The U.S. Congress went so far as to limit Trump's power to ease sanctions on his own. Sanctions may be the elephant in the room when Trump and Putin meet on July 16 in Helsinki, Finland.

1. What U.S. sanctions are in place against Russia?

Almost 700 Russian people and companies are under U.S. sanctions. Individuals face limits on their travel and freezes on at least some of their assets, while some top Russian state banks and companies, including oil and gas giants, are effectively barred from getting financing through U.S. banks and markets. They include billionaires such as Oleg Deripaska and Viktor Vekselberg; close political allies of Putin including his former chief of staff, Sergei Ivanov, and

Dmitry Rogozin, a deputy prime minister from 2011 to 2018; and corporate titans such as Rosneft PJSC, Gazprom PJSC, Sberbank PJSC and VTB Group.

2. Why were the sanctions imposed?

Most were imposed by executive order of Trump's predecessor, Barack Obama, starting in 2014 after Russia annexed the Ukrainian peninsula of Crimea and supported a separatist uprising in eastern Ukraine. More were added after U.S. intelligence agencies concluded that Moscow interfered in the 2016 presidential election, won by Trump. The latest, in response to Russia's "malign activity around the globe," hit strongest against Deripaska's United Co. Rusal, limiting its access to the $140 billion global aluminum industry.

3. Where does Trump stand?

As a candidate in 2016, Trump was asked if he might recognize Crimea as Russian territory and lift U.S. sanctions. He replied, "We'll be looking at that. Yeah, we'll be looking." That led Congress, as part of a 2017 package of expanded sanctions, to codify them into a law specifying that it could vote to block any move by Trump (or a future president) to loosen them. Trump called the legislation "seriously flawed" but signed it into law anyway -- prompting Russian Prime Minister Dmitry Medvedev to predict the sanctions "will remain in effect for decades unless a miracle happens." In April, the U.S. enacted sanctions that sent the ruble tumbling and roiled metals markets, leading Trump to boast, "Nobody has been tougher on Russia than I have." But two weeks later, after U.S. Ambassador to the United Nations Nikki Haley declared that new sanctions were forthcoming in response to Russia's support of the Syrian government, Trump stepped in to squash the idea.

4. So what's there for Trump and Putin to discuss?

Maybe not much regarding sanctions. Russian officials say they won't bring up the issue at the summit. But they are hoping for a breakthrough in the two countries' strained ties that would have the potential to lead to some de-escalation of punitive measures. The two leaders may also discuss the situation in war-torn southwestern Syria, where U.S. ally Israel has expressed concern about a potential presence of Iranian or Iranian-backed troops.

5. What's been the impact of the sanctions?

They've curtailed investment and Russian access to technology, hitting economic growth. Over the medium-term they could cut the size of the economy by almost a tenth, according to the International Monetary Fund. Russian markets took a hit after the latest April sanctions. While Russian stocks are now trading above levels just before then, due to the recovery in oil prices, the ruble remains about 7 percent weaker. There also is collateral damage, felt outside Russia.

6. What sort of collateral damage?

The April sanctions targeting Rusal initially disrupted the global supply chain for aluminum and sent prices soaring by 30 percent. That affected, among others, soda-can makers, the world's biggest miners and big banks that finance the global aluminum trade. Repercussions from sanctions have also been felt in the European Union. The Trump administration has threatened to sanction German and other European companies involved in Nord Stream 2, a planned natural gas pipeline under the Baltic Sea to Germany. Congress gave the Trump administration the right to target foreign investment in new Russian energy export pipelines.

7. Who else has sanctions on Russia?

The EU slapped sanctions on Russia's financial, energy and defense sectors in a bid -- unsuccessful so far -- to push Putin into a more conciliatory stance regarding the conflict in Ukraine. On July 5, the EU extended those sanctions for another six months. Other Western powers have adopted similar measures.

6. **Iran Sanctions Are Different This Time | by Nick Cunningham | OilPrice.com | July 09, 2018**

The Trump administration is trying to replicate the Obama-era strategy of shutting in Iranian oil exports as a way to pressure the regime into making a series of concessions. But there are several reasons why Trump may not succeed.

It isn't that Trump's sanctions won't be as effective, despite the refusal of the rest of the international coalition to go along with Washington's isolation campaign. In fact, even though the EU, in particular, is hoping to shield Iran from the wrath of the U.S. Treasury, international companies are packing up and leaving Iran and refiners around the globe are starting to cut their oil imports from Iran. So, yes, there is every reason to believe that the sanctions will have real bite.

The main problem that could frustrate the Trump administration is the oil market, which is in a very different place than it was in 2012-2015. The oil market is tighter than it has been in years, which could ultimately force the U.S. to go easier on Iran than it would like.

A cursory glance at oil prices for the period in which the Obama administration pushed sanctions on Iran shows elevated prices, which would lead one into thinking that the Obama administration also had to contend with a tight oil market. Brent crude routinely topped $100 per barrel during a time in which Iran saw around 1 million barrels per day of exports disrupted.

Brent is now significantly lower than that, so Trump should have no problem cutting Iranian supply off once again, right? Not so fast.

President Obama had the fortune of an exploding U.S. shale sector. It probably wasn't obvious to the Obama administration what was unfolding in North Dakota and Texas when sanctions on Iran really started to hurt in 2012. U.S. oil production skyrocketed between 2012 and 2014, rising by over 3 mb/d, which more than compensated for the 1 mb/d of lost Iranian supply.

To be sure, the Trump administration is also presiding over a shale boom. U.S. production is up about 1.6 mb/d since Trump took office, and output in 2018 has increased by around 400,000 bpd year-to-date. However, the problem for Trump is that Permian bottlenecks could mean that additional growth slows to a crawl, at least for the next year or so. That means that as the U.S. begins to cut into Iranian supply, U.S. shale drillers will not be able to compensate for the losses.

It isn't just about U.S. supply versus Iranian supply though. The broader market is trending in a much tighter direction than it was back then, despite the difference in prices. Outages in Venezuela, Libya and Angola have tightened the market much faster than expected. More importantly, at least in the case of Venezuela, the losses are set to deepen.

Then, of course, there is the decline of inventories, which has picked up pace this year. OPEC+ has spent a year and a half trying to get inventories back to the five-year average, an objective that was achieved earlier this year. But now, because the current supply/demand balance reflects a deficit, inventories are set to continue to decline.

"The previous sanctions episode was only possible, in our view, because U.S. shale production was growing at a very fast clip and Libyan output came back to the market to replace some of the missing Iran barrels," Bank of America Merrill Lynch wrote in a research note. "Plus, other OPEC members were still running with some spare capacity and global oil demand was rather sluggish. In contrast, we now project global oil supply and demand balances to remain in a structural deficit for most of the next six quarters.

The upshot is that even though Obama slapped sanctions on Iran when oil prices were high, he had a series of tailwinds at his back that Trump will not enjoy. The oil market is tight and any effort to shut in Iranian supply will exacerbate the situation.

Moreover, the Obama administration took a careful and deliberate approach to sanctions, precisely because it wanted to avoid pushing up prices. U.S. politicians are always highly concerned about the political damage of high gasoline

prices, which is a big reason why the Obama administration offered some pretty reasonable waivers to multiple countries that bought Iranian oil. The rule of thumb was that if a country cut imports from Iran by 20 percent, that was pretty good, and they received leniency from Washington on the rest.

The Trump administration instead has vowed some sort of "zero tolerance" policy, hoping to shut in as much Iranian supply as possible. The U.S. State Department said it would not be inclined to grant any waivers. Those comments alone sent oil prices shooting up in June.

But, the Trump administration might be forced into backing down if prices spike too high. Bank of America Merrill Lynch says that "a complete cutoff of Iran exports would be very hard to manage and likely result in an oil price spike above $120/bbl."

John Kemp of Reuters summed it up earlier this month: "The White House can drive Iran's oil exports to zero, or it can have moderate U.S. gasoline prices, but it probably cannot have both."

## 7.   OFAC eases sanctions on Sudan; terrorism concerns persist | by Joe Mont | Compliance Week | July 10, 2018

https://www.complianceweek.com/blogs/the-filing-cabinet/ofac-eases-sanctions-on-sudan-terrorism-concerns-persist#.W0YPb8IpBEY

Picking up where President Obama left off, the Trump administration has dropped most sanctions targeting Sudan. The country was also removed from the list of nations targeted by the White House's controversial travel ban.

Late last month, the U.S. Treasury Department's Office of Foreign Assets Control announced the longstanding policy change with a Final Rule that was later published in the Federal Register. On July 1, OFAC officially removed Sudanese sanctions from the Code of Federal Regulations.

As a prelude to the U.S. decision, Sudan, long-accused of facilitating terrorism, cut business ties to North Korea. Sudan, divided by a long and bloody civil war, had been a buyer of missiles and other weaponry from Pyongyang.

Other demands by the United States were that the country take steps to address terrorism and human rights abuses connected to the ongoing civil war in South Sudan and atrocities in its Darfur region that were the initial catalyst for sanctions.

In November 1997, President Clinton issued Executive Order 13067, "Blocking Sudanese Government Property and Prohibiting Transactions with Sudan." It declared a national emergency to deal with the "unusual and extraordinary threat to the national security and foreign policy of the U.S. posed by the policies and actions of the Government of Sudan."

The order prohibited U.S. imports and exports of goods, technology, or services. Also prohibited were financing contracts supporting an industrial, commercial, public utility, or governmental project by a U.S. person or entity. Loans to the government of Sudan and the transportation of cargo to or from the country were similarly blocked.

In January 2017, President Obama issued Executive Order 13761, "Recognizing Positive Actions by the Government of Sudan and Providing for the Revocation of Certain Sudan-Related Sanctions." In it, he noted "Sudan's positive actions over the prior six months," including "a marked reduction in offensive military activity, a pledge to maintain a cessation of hostilities in conflict areas, and steps toward the improvement of humanitarian access throughout Sudan. The White House also noted improving cooperation with the United States on "addressing regional conflicts and the threat of terrorism."

The revocation of sanctions, which started with the Executive Order, came to a conclusion, after an extension, with the Trump administration's recent OFAC edict.

U.S. persons and non-U.S. persons will still need to obtain any licenses required by the Department of Commerce's Bureau of Industry and Security (BIS) to export or reexport to Sudan commodities, software, and technology that are on the Commerce Control List. An OFAC license is still required for certain exports and reexports to Sudan of agricultural commodities, medicine, and medical devices as a result of Sudan's continued (and being negotiated) inclusion on the State Sponsors of Terrorism List.

## 8.  Trade War With China Exposes U.S. Mineral Import Problem | by Jude Clements | Forbes | July 11,  2018

https://www.forbes.com/sites/judeclemente/2018/07/11/trade-war-with-china-exposes-u-s-mineral-import-problem/#5d6418ce2104

On July 6, additional Chinese tariffs came on nearly $35 billion of U.S. products in retaliation to U.S. tariffs on an equal value of Chinese exports. Indeed, a heightening trade war with China is once again exposing a very dangerous energy and national security vulnerability for the U.S.: the need to import high levels of critically important minerals. In fact, of the 90 mineral commodities that our U.S. Geological Survey tracks, we are more than 50% import reliant for 50 of them and 100% import reliant for 20, including very important rare earth elements. This 250% increase in 60 years shows how badly our mineral supply chain needs rebuilt.

This import dependency is a massive hole in the U.S. energy security apparatus that needs plugged immediately. From the lithium-ion batteries used for electric vehicles, computers, and cell phones to building solar panels and wind turbines, such resources are essential to our current and future energy systems. We've been spending $7-8 billion a year on imported minerals, and future expenses can only go higher as their strategic value widens. "U.S. energy security begins at home."

And you guessed it: China has actually become our largest supplier. Not necessarily producing loads at home, China's trick is to control the supply chains of increasingly essential minerals - more strategic thinking by a 5,000 year-old civilization, I'd argue is best symbolized by The Great Wall itself.

For example, consider China's grip on the lithium needed for batteries. A single Chinese company, Tianqi Lithium, now has "effective control over nearly half the current global production of lithium." Next comes cobalt, "a key ingredient used in the lithium-ion batteries that continue to proliferate across a variety of markets." Although DR Congo extracts over 60% of the world's cobalt (illegally using child labor), "China, despite having no cobalt resources of its own, is responsible for 80% of the world's cobalt chemical production."

Indeed, "There's a Global Race to Control Batteries—and China Is Winning," investing in resource-rich, waiting-to-be-devleoped Africa in particular. A $60 billion infusion alone to help expand the the African continent's "economic capacity." Just another example of how The Party bases friends on their ability to provide.

And we know that China's strategic resource thinking centers on stockpiling as many of the world riches as possible. In 2012, the Obama administration filed a case with the World Trade Organization against China's hoarding of rare earths, which ultimately led China to drop export quotas in 2015. Again, given "Trump Says Tariffs on Chinese Goods Could Exceed $500B," China has all the cards to restrict supply once again. The Party knows it has the option to wait, either capitalizing now or in the future.

But perhaps worse than hampering our energy transition, the U.S. import reliance on these increasingly strategic resources is also a clear national security threat. The Department of Defense uses 750,000 tons of minerals each year and more and more of them are coming from foreign nations. Unsurprisingly, the only U.S. rare earth mine Mountain Pass in California, went bankrupt in 2015 and was bought by a Chinese-led consortium last year.

China, of course, currently produces more than 90% of the world's supply of rare earth materials and obviously prioritizes its own domestic customers. Defense wise, rare earths are vital to the sophisticated technologies that our Military increasingly depends on to keep us safe, such as missile guidance and control systems, disk drive motors, lasers, satellite communications, radar, night vision googles, armored vehicles, and other essential equipment.

This is really scare stuff: the ability to hoard these rare earths explains "How China can win a trade war in 1 move."

Our heavy import dependence is a great vulnerability of our own making: the USGS reports that we have $6-7 trillion in minerals reserves. Simply put, our mine permitting process is broken. It can take over a decade for approvals, or five times longer than it takes in Australia or Canada, where environmental standards are just as high.

The U.S. shale oil and natural gas revolution since 2008 demonstrates how quickly we can grab control of our own natural resource future, with our goal for policies to support constantly evolving technologies. There's no reason why our mineral supply system shouldn't be allowed to follow suit.

Fortunately, the Trump administration seeks to change our surging import reliance on these materials, signing an executive order to expand critical minerals production. And as summed up by retired U.S. Army Brig. Gen. John Adams, now under consideration for possible "inclusion in the National Defense Authorization Act is an amendment from Rep. Mark Amodei, R-Nev., that would bring commonsense reform to mine permitting....With national security at risk, the time for action is now."

### 9.   A Landmark Legal Shift Opens Pandora's Box for DIY Guns | by And Greenberg | Wired | July 10, 2018

https://www.wired.com/story/a-landmark-legal-shift-opens-pandoras-box-for-diy-guns/

Cody Wilson makes digital files that let anyone 3-D print untraceable guns. The government tried to stop him. He sued—and won.

Five years ago, 25-year-old radical libertarian Cody Wilson stood on a remote central Texas gun range and pulled the trigger on the world's first fully 3-D-printed gun. When, to his relief, his plastic invention fired a .380-caliber bullet into a berm of dirt without jamming or exploding in his hands, he drove back to Austin and uploaded the blueprints for the pistol to his website, Defcad.com.

He'd launched the site months earlier along with an anarchist video manifesto, declaring that gun control would never be the same in an era when anyone can download and print their own firearm with a few clicks. In the days after that first test-firing, his gun was downloaded more than 100,000 times. Wilson made the decision to go all in on the project, dropping out of law school at the University of Texas, as if to confirm his belief that technology supersedes law.

The law caught up. Less than a week later, Wilson received a letter from the US State Department demanding that he take down his printable-gun blueprints or face prosecution for violating federal export controls. Under an obscure set of US regulations known as the International Trade in Arms Regulations (ITAR), Wilson was accused of exporting weapons without a license, just as if he'd shipped his plastic gun to Mexico rather than put a digital version of it on the internet. He took Defcad.com offline, but his lawyer warned him that he still potentially faced millions of dollars in fines and years in prison simply for having made the file available to overseas downloaders for a few days. "I thought my life was over," Wilson says.
Instead, Wilson has spent the last years on an unlikely project for an anarchist: Not simply defying or skirting the law but taking it to court and changing it. In doing so, he has now not only defeated a legal threat to his own highly controversial gunsmithing project. He may have also unlocked a new era of digital DIY gunmaking that further undermines gun control across the United States and the world—another step toward Wilson's imagined future where anyone can make a deadly weapon at home with no government oversight.

Two months ago, the Department of Justice quietly offered Wilson a settlement to end a lawsuit he and a group of co-plaintiffs have pursued since 2015 against the United States government. Wilson and his team of lawyers focused their legal argument on a free speech claim: They pointed out that by forbidding Wilson from posting his 3-D-printable data, the State Department was not only violating his right to bear arms but his right to freely share information. By blurring the line between a gun and a digital file, Wilson had also successfully blurred the lines between the Second Amendment and the First.

"If code is speech, the constitutional contradictions are evident," Wilson explained to WIRED when he first launched the lawsuit in 2015. "So what if this code is a gun?"

The Department of Justice's surprising settlement, confirmed in court documents earlier this month, essentially surrenders to that argument. It promises to change the export control rules surrounding any firearm below .50 caliber—with a few exceptions like fully automatic weapons and rare gun designs that use caseless ammunition—and move their regulation to the Commerce Department, which won't try to police technical data about the guns posted on the public internet. In the meantime, it gives Wilson a unique license to publish data about those weapons anywhere he chooses.

"I consider it a truly grand thing," Wilson says. "It will be an irrevocable part of political life that guns are downloadable, and we helped to do that."

Now Wilson is making up for lost time. Later this month, he and the nonprofit he founded, Defense Distributed, are relaunching their website Defcad.com as a repository of firearm blueprints they've been privately creating and collecting, from the original one-shot 3-D-printable pistol he fired in 2013 to AR-15 frames and more exotic DIY semi-automatic weapons. The relaunched site will be open to user contributions, too; Wilson hopes it will soon serve as a searchable, user-generated database of practically any firearm imaginable.

All of that will be available to anyone anywhere in the world with an uncensored internet connection, to download, alter, remix, and fabricate into lethal weapons with tools like 3-D printers and computer-controlled milling machines. "We're doing the encyclopedic work of collecting this data and putting it into the commons," Wilson says. "What's about to happen is a Cambrian explosion of the digital content related to firearms." He intends that database, and the inexorable evolution of homemade weapons it helps make possible, to serve as a kind of bulwark against all future gun control, demonstrating its futility by making access to weapons as ubiquitous as the internet.

Of course, that mission seemed more relevant when Wilson first began dreaming it up, before a political party with no will to rein in America's gun death epidemic held control of Congress, the White House, and likely soon the Supreme Court. But Wilson still sees Defcad as an answer to the resurgent gun control movement that has emerged in the wake of the Parkland, Florida, high school shooting that left 17 students dead in February.

The potential for his new site, if it functions as Wilson hopes, would also go well beyond even the average Trump supporter's taste in gun rights. The culture of homemade, unregulated guns it fosters could make firearms available to even those people who practically every American agrees shouldn't possess them: felons, minors, and the mentally ill. The result could be more cases like that of John Zawahiri, an emotionally disturbed 25-year-old who went on a shooting spree in Santa Monica, California, with a homemade AR-15 in 2015, killing five people, or Kevin Neal, a Northern California man who killed five people with AR-15-style rifles—some of which were homemade—last November.

"This should alarm everyone," says Po Murray, chairwoman of Newtown Action Alliance, a Connecticut-focused gun control group created in the wake of the mass shooting at Sandy Hook Elementary School in 2013. "We're passing laws in Connecticut and other states to make sure these weapons of war aren't getting into the hands of dangerous people. They're working in the opposite direction."

When reporters and critics have repeatedly pointed out those potential consequences of Wilson's work over the last five years, he has argued that he's not seeking to arm criminals or the insane or to cause the deaths of innocents. But nor is he moved enough by those possibilities to give up what he hopes could be, in a new era of digital fabrication, the winning move in the battle over access to guns.

With his new legal victory and the Pandora's box of DIY weapons it opens, Wilson says he's finally fulfilling that mission. "All this Parkland stuff, the students, all these dreams of 'common sense gun reforms'? No. The internet will serve guns, the gun is downloadable." Wilson says now. "No amount of petitions or die-ins or anything else can change that."

Defense Distributed operates out of an unadorned building in a north Austin industrial park, behind two black-mirrored doors marked only with the circled letters "DD" scrawled by someone's finger in the dust. In the machine shop inside, amid piles of aluminum shavings, a linebacker-sized, friendly engineer named Jeff Winkleman is walking me through the painstaking process of turning a gun into a collection of numbers.

Winkleman has placed the lower receiver of an AR-15, the component that serves as the core frame of the rifle, on a granite table that's been calibrated to be perfectly flat to one ten-thousandth of an inch. Then he places a Mitutoyo height gauge—a thin metal probe that slides up and down on a tall metal stand and measures vertical distances—next to it, poking one edge of the frame with its probe to get a baseline reading of its position. "This is where we get down to the nitty gritty," Winkleman says. "Or, as we call it, the gnat's ass."

Winkleman then slowly rotates the guage's rotary handle to move its probe down to the edge of a tiny hole on the side of the gun's frame. After a couple careful taps, the tool's display reads 0.4775 inches. He has just measured a single line—one of the countless dimensions that define the shape of any of the dozens of component of an AR-15—with four decimal places of accuracy. Winkleman's job at Defense Distributed now is to repeat that process again and again, integrating that number, along with every measurement of every nook, cranny, surface, hole, lip, and ridge of a rifle, into a CAD model he's assembling on a computer behind him, and then to repeat that obsessively comprehensive model-building for as many guns as possible.

That a digital fabrication company has opted for this absurdly manual process might seem counterintuitive. But Winkleman insists that the analog measurements, while infinitely slower than modern tools like laser scanners, produce a far more accurate model—a kind of gold master for any future replications or alterations of that weapon. "We're trying to set a precedent here," Winkelman says. "When we say something is true, you absolutely know it's true." One room over, Wilson shows me the most impressive new toy in the group's digitization toolkit, one that arrived just three days earlier: A room-sized analog artifact known as an optical comparator. The device, which he bought used for $32,000, resembles a kind of massive cartoon X-ray scanner.

Wilson places the body of an AR-9 rifle on a pedestal on the right side of the machine. Two mercury lamps project neon green beams of light onto the frame from either side. A lens behind it bends that light within the machine and then projects it onto a 30-inch screen at up to 100X magnification. From that screen's mercury glow, the operator can map out points to calculate the gun's geometry with microscopic fidelity. Wilson flips through higher magnification lenses, then focuses on a series of tiny ridges of the frame until the remnants of their machining look like the brush strokes of Chinese calligraphy. "Zoom in, zoom in, enhance" Wilson jokes.

Turning physical guns into digital files, instead of vice-versa, is a new trick for Defense Distributed. While Wilson's organization first gained notoriety for its invention of the first 3-D printable gun, what it called the Liberator, it has since largely moved past 3-D printing. Most of the company's operations are now focused on its core business: making and selling a consumer-grade computer-controlled milling machine known as the Ghost Gunner, designed to allow its owner to carve gun parts out of far more durable aluminum. In the largest room of Defense Distributed's headquarters, half a dozen millennial staffers with beards and close-cropped hair—all resembling Cody Wilson, in other words—are busy building those mills in an assembly line, each machine capable of skirting all federal gun control to churn out untraceable metal glocks and semiautomatic rifles en masse.

For now, those mills produce only a few different gun frames for firearms, including the AR-15 and 1911 handguns. But Defense Distributed's engineers imagine a future where their milling machine and other digital fabrication tools—such as consumer-grade aluminum-sintering 3-D printers that can print objects in metal—can make practically any digital gun component materialize in someone's garage.

In the meantime, selling Ghost Gunners has been a lucrative business. Defense Distributed has sold roughly 6,000 of the desktop devices to DIY gun enthusiasts across the country, mostly for $1,675 each, netting millions in profit. The company employs 15 people and is already outgrowing its North Austin headquarters. But Wilson says he's never been interested in money or building a startup for its own sake. He now claims that the entire venture was created with a singular goal: to raise enough money to wage his legal war against the US State Department.

After his lawyers originally told him in 2013 that his case against the government was hopeless, Wilson fired them and hired two new ones with expertise in export control and both Second and First-Amendment law. Matthew Goldstein, Wilson's lawyer who is focused on ITAR, says he was immediately convinced of the merits of Wilson's position. "This is the case you'd bring out in a law school course as an unconstitutional law," Goldstein says. "It ticks all the check boxes of what violates the First Amendment."

When Wilson's company teamed up with the Second Amendment Foundation and brought their lawsuit to a Texas District court in 2015, they were supported by a collection of amicus briefs from a shockingly broad coalition: Arguments in their favor were submitted by not only the libertarian Cato Institute, the gun-rights-focused Madison Society, and 15 Republican members of Congress but also the Electronic Frontier Foundation and the Reporters Committee for Freedom of the Press.

When the judge in the case nonetheless rejected Defense Distributed's request for a preliminary injunction that would have immediately allowed it to continue publishing gun files, the company appealed, and lost. But as the case proceeded toward a ruling on Defense Distributed's first amendment argument, the government surprised the plaintiffs by suddenly offering them a settlement with essentially everything they wanted. It even pays back $40,000 of their court costs and paperwork fees. (Wilson says that's still only about 10 percent of the $400,000 that the plaintiffs spent.)

Goldstein says the settlement may have had as much to do with ITAR reforms begun during the Obama administration as with the gun-friendly Trump administration that took over the case. But he doesn't rule out that a new regime may have helped tip the balance in the plaintiffs' favor. "There's different management at the helm of this agency," Goldstein says. "You can draw your own conclusions." Both the Department of Justice and the State Department declined to comment on the outcome of the case.

With the rule change their win entails, Defense Distributed has removed a legal threat to not only its project but an entire online community of DIY gunmakers. Sites like GrabCAD and FossCad already host hundreds of gun designs, from Defense Distributed's Liberator pistol to printable revolvers and even semiautomatic weapons. "There's a lot of satisfaction in doing things yourself, and it's also a way of expressing support for the Second Amendment," explains one prolific Fosscad contributor, a West Virginian serial inventor of 3-D-printable semiautomatics who goes by the pseudonym Derwood. "I'm a conservative. I support all the amendments."

But until now, Derwood and practically every other participant on those platforms risked prosecution for violating export controls, whether they knew it or not. Though enforcement has been rare against anyone less vocal and visible than Wilson, many online gunsmiths have nonetheless obscured their identities for that reason. With the more open and intentional database of gun files that Defcad represents, Wilson believes he can create a collection of files that's both more comprehensive and more refined, with higher accuracy, more detailed models for every component, giving machinists all the data they need to make or remix them. "This is the stuff that's necessary for the creative work to come," Wilson says.

In all of this, Wilson sees history repeating itself: He points to the so-called Crypto Wars of the 1990s. After programmer Phillip Zimmermann in 1991 released PGP, the world's first free encryption program that anyone could use to thwart surveillance. he too was threatened with an indictment for violating export restrictions. Encryption software was, at the time, treated as a munition and placed on the same prohibited export control list as guns and missiles. Only after a fellow cryptographer, Daniel Bernstein, sued the government with the same free-speech argument Wilson would use 20 years later did the government drop its investigation of Zimmermann and spare him from prison.

"This is a specter of the old thing again," Wilson says. "What we were actually fighting about in court was a core crypto-war problem." And following that analogy, Wilson argues, his legal win means gun blueprints can now spread as widely as encryption has since that earlier legal fight: After all, encryption has now grown from an underground curiosity to a commodity integrated into apps, browsers, and websites running on billions of computers and phones across the globe. But Zimmermann takes issue with the analogy—on ethical if not legal grounds. This time, he points out, the First Amendment–protected data that was legally treated as a weapon actually is a weapon. "Encryption is a defense technology with humanitarian uses," Zimmermann says. "Guns are only used for killing."

"Arguing that they're the same because they're both made of bits isn't quite persuasive for me," Zimmermann says. "Bits can kill."

After a tour of the machine shop, Wilson leads me away from the industrial roar of its milling machines, out the building's black-mirrored-glass doors and through a grassy patch to its back entrance. Inside is a far quieter scene: A large, high-ceilinged, dimly fluorescent-lit warehouse space filled with half a dozen rows of gray metal shelves, mostly covered in a seemingly random collection of books, from The Decline and Fall of the Roman Empire to Hunger Games. He proudly points out that it includes the entire catalog of Penguin Classics and the entire Criterion Collection, close to 900 Blu-rays. This, he tells me, will be the library.

And why is Defense Distributed building a library? Wilson, who cites Baudrillard, Foucault, or Nietzsche at least once in practically any conversation, certainly doesn't mind the patina of erudition it lends to what is essentially a modern-day gun-running operation. But as usual, he has an ulterior motive: If he can get this room certified as an actual, official public library, he'll unlock another giant collection of existing firearm data. The US military maintains records of thousands of the specs for thousands of firearms in technical manuals, stored on reels and reels of microfiche cassettes. But only federally approved libraries can access them. By building a library, complete with an actual microfiche viewer in one corner, Wilson is angling to access the US military's entire public archive of gun data, which he eventually hopes to digitize and include on Defcad.com, too.

"Ninety percent of the technical data is already out there. This is a huge part of our overall digital intake strategy," Wilson says. "Hipsters will come here and check out movies, independent of its actual purpose, which is a stargate for absorbing ancient army technical materials."

Browsing that movie collection, I nearly trip over something large and hard. I look down and find a granite tombstone with the words AMERICAN GUN CONTROL engraved on it. Wilson explains he has a plan to embed it in the dirt under a tree outside when he gets around to it. "It's maybe a little on the nose, but I think you get where I'm going with it," he says.

Wilson's library will serve a more straightforward purpose, too: In one corner stands a server rack that will host Defcad's website and backend database. He doesn't trust any hosting company to hold his controversial files. And he likes the optics of storing his crown jewels in a library, should any reversal of his legal fortunes result in a raid. "If you want to come get it, you have to attack a library," he says.

On that subject, he has something else to show me. Wilson pulls out a small embroidered badge. It depicts a red, dismembered arm on a white background. The arm's hand grips a curved sword, with blood dripping from it. The symbol, Wilson explains, once flew on a flag above the Goliad Fort in South Texas. In Texas' revolution against Mexico in the 1830s, Goliad's fort was taken by the Mexican government and became the site of a massacre of 400 American prisoners of war, one that's far less widely remembered than the Alamo.

Wilson recently ordered a full-size flag with the sword-wielding bloody arm. He wants to make it a new symbol for his group. His interest in the icon, he explains, dates back to the 2016 election, when he was convinced Hillary Clinton was set to become the president and lead a massive crackdown on firearms.

If that happened, as Wilson tells it, he was ready to launch his Defcad repository, regardless of the outcome of his lawsuit, and then defend it in an armed standoff. "I'd call a militia out to defend the server, Bundy-style," Wilson says calmly, in the first overt mention of planned armed violence I've ever heard him make. "Our only option was to build an infrastructure where we had one final suicidal mission, where we dumped everything into the internet," Wilson says. "Goliad became an inspirational thing for me."

Now, of course, everything has changed. But Wilson says the Goliad flag still resonates with him. And what does that bloody arm symbol mean to him now, in the era where Donald Trump is president and the law has surrendered to his

will? Wilson declines to say, explaining that he would rather leave the mystery of its abstraction intact and open to interpretation.

But it doesn't take a degree in semiotics to see how the Goliad flag suits Defense Distributed. It reads like the logical escalation of the NRA's "cold dead hands" slogan of the last century. In fact, it may be the perfect symbol not just for Defense Distributed's mission but for the country that produced it, where firearms result in tens of thousands of deaths a year—vastly more than any other developed nation in the world—yet groups like Wilson's continue to make more progress in undermining gun control than lawmakers do in advancing it. It's a flag that represents the essence of violent extremist ideology: An arm that, long after blood is spilled, refuses to let go. Instead, it only tightens it grip on its weapon, as a matter of principle, forever.

**10.   A Tech Guru Captivated Canada. Then He Fled to China | by Dan Levin| The New York Times | July 11, 2018**

https://www.nytimes.com/2018/07/10/business/istuary-sun-yian-canada-china.html

VANCOUVER, British Columbia — Sun Yian was living the Canadian dream.

The Chinese immigrant found fortune harnessing Canadian talent to develop cutting-edge technology, everything from semiconductors to facial recognition, to take back to China. His company grew to more than 1,500 employees across China and North America, and was lauded by Canadian officials as a model for unlocking the Chinese market to create homegrown prosperity.

Then Mr. Sun stopped paying his Canadian workers and fled to China. Left behind are lawsuits from angry investors and Canadian employees who are wondering whether their work could be used to help China's growing domestic surveillance state.
Canada has long benefited from close business ties to China, and lawmakers have courted the country as a new market for Canadian companies as well as a source of investment. Now, Mr. Sun's story is fueling calls for heightened skepticism of Chinese money.

"Canadian officials have to some degree been blinded by China's incredible economic growth and waves of capital spreading worldwide," said Michael Byers, a professor of global politics and international law at the University of British Columbia in Vancouver. "They're certainly naïve to China's approach to acquiring high tech from other countries, and they haven't pushed hard on getting answers before allowing deals to go through."

In March 2017, the government of Prime Minister Justin Trudeau approved the sale of a Montreal laser company to a firm partly owned by the Chinese government, despite objections from security officials in the previous Canadian government. In June 2017, Canada waived a security review for a Chinese takeover of Norsat International, a Vancouver high-tech company that provided satellite technology to the United States military.

Mr. Sun's company, Istuary Innovation Group, initially appeared to represent the positives of Chinese investment. His company brought jobs and high-tech business to Vancouver. But a review of the company's finances and interviews with former employees reveal a murky web of financial and previously undisclosed ties to the Chinese government.

Mr. Sun, 45, who goes by the name Ethan, founded Istuary in 2013 in a Vancouver Starbucks, just as the Canadian government was welcoming greater Chinese investment. At its peak, the technology incubator and venture fund occupied two floors of a downtown Vancouver office building, where engineers toiled on semiconductors, robotics, big data analytics and facial recognition. By 2017, Istuary had 24 offices in places around the world, including Beijing, Shanghai, Los Angeles and Toronto.
The company's growth helped give Mr. Sun access to Canada's political elite, relationships that were nurtured through political donations and corporate sponsorships. Photos he posted online show him smiling with Mr. Trudeau during a trade mission in China. Government officials in British Columbia praised Mr. Sun for creating Canadian jobs.

DOC_0002443

A Vancouver government agency signed a contract with Chinese industrial parks to expand Istuary's operations. Istuary joined publicly funded Canadian organizations to do research. Canada's immigration ministry approved the company for a federal start-up visa program that lets foreign entrepreneurs obtain permanent residency.

"The government gave us really good support," Mr. Sun told a Canadian business conference in 2015, according to a video of his speech posted online.

Yet some of Istuary's work provoked concern among employees.

Eric Hsu, 39, an American data scientist hired by Istuary's Vancouver office in 2016, said he worked on artificial intelligence capable of recognizing a person's face across multiple surveillance feeds or detecting specific human behavior, like fighting. "A lot of these security applications were both humanitarian and ethically troubling," he said in an interview. "Chinese clients had lots of ideas for ways they would use our applications. Some of those raised red flags."
An Istuary customer presentation reviewed by The New York Times highlighted the services its technology could offer in Chinese cities. They included the ability to recognize faces through security cameras and run them through databases, as well as track people's personal relationships. It also highlighted other services, like tracking crowds and land records.

Mr. Hsu said he attended trade shows in China where Mr. Sun pitched Istuary's artificial intelligence technology to potential customers interested in products designed to prevent prisoner suicides or for detecting criminal activity.

Human rights groups say Chinese authorities have been zealously using big data collection, A.I. and facial-recognition technology to upgrade Beijing's mass surveillance efforts.

Mr. Sun enjoyed ties to the Chinese government that his Canadian workers and investors say he did not disclose.

Kuang'en Network Technologies, a cybersecurity company he founded in Beijing in 2014, specialized in industrial control systems for some of China's biggest state-owned enterprises.

State Grid, China's national power distributor, said it banned Kuang'en, among other companies, in 2016 from bidding on public contracts because of collusion, without offering details. But that year, Kuang'en formed a joint venture with another cybersecurity firm, BeijingVRV, whose powerful Chinese government clients include the National People's Congress, the finance and foreign ministries, military contractors and public security agencies.

According to corporate documents and Mr. Sun's employees in China, Istuary and Kuang'en shared funding, workers, technology, office space and shareholders, including Mr. Sun's wife, Hu Yulan.

Former Istuary employees in Vancouver said the company's collapse began last spring with a series of missed payrolls and final paychecks in May 2017. Many stayed at their jobs anyway.

"Sun kept giving us false hopes," said Manivannan Gajendran, who led an Istuary quality testing team in Vancouver. He said he took out a $15,000 line of credit to cover his daily expenses while he waited for money that never came.

By then, Mr. Sun had gone back to China. In August, Istuary investors in British Columbia sued Mr. Sun and his wife, accusing the couple of illegally using funds to purchase two multimillion-dollar homes in Vancouver.

Canada's immigration ministry suspended Istuary from the start-up visa program after learning of the allegations. In an email, a ministry spokeswoman said it had gathered information on Istuary after the company was recommended by an industry association, and "found no reason to reject the designation recommendation at that time."

Mr. Sun did not respond to interview requests made through his Vancouver lawyer. But he denied the allegations in a letter posted on Istuary's now-defunct website in October. "We are NOT a Ponzi scheme," he wrote.

A British Columbia provincial employment department has since ordered Istuary to pay around $2.2 million in unpaid wages to more than 150 employees and has begun collection proceedings in order to seize Mr. Sun's residential properties, a spokeswoman from the province's labor ministry said in an email.

The fallout, and Mr. Sun's broken promises, soon reached the company's operations in China. According to Laura Fan, an Istuary employee in Guangdong Province, Mr. Sun claimed the company's cash crunch was because of poor management and Chinese regulatory changes. He also blamed Chinese investors and their "political mission" for pressuring him into striking deals with American chip companies, she said.

In December, Istuary and Kuang'en's offices began closing across China, without employees being paid for months of work. "These people never got any of their salaries," Ms. Fan said.

Just before Christmas, former employees said, two people from a Chinese technology firm that had invested in Kuang'en camped out in the Beijing office, hoping to catch Mr. Sun. A few weeks later, debt collectors locked the doors with a heavy chain. On a recent visit to the shuttered office, trash covered a rickety cot and chairs visible in the entryway.

Someone had scrawled a large handwritten message across the glass doors: "The fraudster network fakes bankruptcy, maliciously owes salaries and cons its employees."

Underneath was an ultimatum: "Pay us the money and we'll unlock the place."

Juecheng Zhao contributed research from Beijing, and Cao Li from Hong Kong.

Donna

Donna D. Ganoe
Executive Assistant to the
Acting Under Secretary for Industry and Security
Tel: 202-482-1455 | Direct Tel: 202-482-3281

**From**:     Karen NiesVogel [/O=CAIM/OU=EXCHANGE ADMINISTRATIVE GROUP
                (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KAREN H. NIESVOGEL]
**Sent**:     7/12/2018 2:12:42 PM
**To**:     Lisa Williams [Lisa.Williams@bis.doc.gov]
**Subject**:     RE: BIS Outreach Support - Import/Export Conference

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**From:** Lisa Williams
**Sent:** Thursday, July 12, 2018 10:06 AM
**To:** Karen NiesVogel <Karen.NiesVogel@bis.doc.gov>
**Subject:** RE: BIS Outreach Support - Import/Export Conference

Karen,
███████████████████████████Thanks!

**From:** Karen NiesVogel
**Sent:** Thursday, July 12, 2018 9:55 AM
**To:** Lisa Williams <Lisa.Williams@bis.doc.gov>
**Subject:** RE: BIS Outreach Support - Import/Export Conference

███████thanks!

**From:** Lisa Williams
**Sent:** Thursday, July 12, 2018 8:54 AM
**To:** Karen NiesVogel <Karen.NiesVogel@bis.doc.gov>
**Subject:** RE: BIS Outreach Support - Import/Export Conference

Good Morning,



# Referral

# Referral

# Referral

# Referral

# Referral

# Referral

# Referral

**From:** Jim Bartlett, Full Circle Compliance ▮▮▮▮@fullcirclecompliance.eu]
**Sent:** 7/12/2018 6:54:34 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0712 Thursday "Daily Bugle"



## Thursday, 12 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. State Department Settles Defense Distributed's 3-D Printer Gun Lawsuit
4. State/DDTC: (No new postings.)
5. EU Amends Restrictive Measures Concerning Iraq

### NEWS

6. Reuters: "China's ZTE Clears Hurdle to Lifting U.S. Ban"

### COMMENTARY

7. B. Doherty: "The Government Will Allow Cody Wilson's Defense Distributed to Distribute Gun-Making Software"
8. Global Trade News: "Weise Wednesday: Growing Friction Between the United States and Its Key Trading Partners"
9. Orchid Advisors: "Export Control Reform and the Ammunition Industry"
10. R.C. Burns: "Aspirin and Terrorism in Sudan"

### EX/IM TRAINING EVENTS & CONFERENCES

11. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective ", 2 Oct in Bruchem, the Netherlands

**EDITOR'S NOTES**

12. Bartlett's Unfamiliar Quotations

13. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

14. Weekly Highlights of the Daily Bugle Top Stories



**ITEMS FROM TODAY'S FEDERAL REGISTER**

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * * * *

**OTHER GOVERNMENT SOURCES**

# 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * *

# 2. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * *

# 3. State Department Settles Defense Distributed's 3-D Printer Gun Lawsuit
(Source: Matthew A. Goldstein, counsel, Snell & Wilmer LLP, 520-882-1248, mgoldstein@swlaw.com) [Excerpts.]

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson, represented by attorney Matthew A. Goldstein, agreed with defendants employed by U.S. Department of State to settle claims against defendants in the case *Defense Distributed, et al. v. Dep't of State, et al.*, in return for payment of $39,581.00 and numerous administrative actions described in the below excerpts of the Settlement Agreement.  A copy of the full settlement agreement is available from Mr. Goldstein or may be viewed HERE.

**SETTLEMENT AGREEMENT**

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy (collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D. Tex.) (the "Action") without the need for further litigation and without any admission of liability, hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions described in the case captioned, and any and all other claims, complaints, or issues that have been or could have been asserted by Plaintiffs against Defendants in accordance with the following terms and conditions:

  (1) *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the Action with prejudice as described in paragraph 2, below,

Defendants agree to the following, in accordance with the definitions set forth in paragraph 12, below:

(a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

(b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the International Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d) Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e) Payment in the amount of $39,581.00. This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants' counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

(2) *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B). Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph

1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

(3) *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

(4) *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial. Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

(5) *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement of Plaintiffs and Defendants entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced. Plaintiffs acknowledge and agree that no promise or representation not contained in this Settlement Agreement has been made to them and they acknowledge and represent that this Settlement Agreement contains the entire understanding between Plaintiffs and Defendants and contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein. Nor does the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of the Action, and to resolve the Action without the time and expense of further litigation.

(6) *Amendments:* This Settlement Agreement cannot be modified or amended except by an instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof be waived other than by a written waiver, signed by the Parties.

(7) *Binding Successors*: This Settlement Agreement shall be binding upon and inure to the benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors, assigns and personal representatives, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties.

(8) *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this Settlement Agreement with their counsel, who has explained these documents to them and that they understand all of the terms and conditions of this Settlement Agreement. Plaintiffs further acknowledge that they have read this Settlement Agreement, understand the contents thereof, and execute this Settlement Agreement of their own free act and deed. The undersigned represent that they are fully authorized to enter into this Settlement Agreement.

(9) *Execution:* This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument, and photographic copies of such signed counterparts may be used in lieu of the original.

(10) *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly drafted agreement and shall not be construed against any party as the drafter.

(11) *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and Defendants agree that nothing in this Settlement Agreement waives or modifies federal, state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

(12) *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows: ...

back to top

* * * * * * * * * * * * * * * * * *

# 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *

# 5. EU Amends Restrictive Measures Concerning Iraq
(Source: Official Journal of the European Union, 12 July 2018.)

*Regulations:*

* Commission Implementing Regulation (EU) 2018/979 of 11 July 2018 amending Council Regulation (EC) No 1210/2003 concerning certain specific restrictions on economic and financial relations with Iraq

back to top

* * * * * * * * * * * * * * * * * *

## NEWS

## 6. Reuters: "China's ZTE Clears Hurdle to Lifting U.S. Ban"
(Source: Reuters, 11 July 2018.) [Excerpts.]

The United States said on Wednesday that it signed an agreement with ZTE Corp that paves the way for the Chinese tech company to resume operations after a nearly three-month ban on doing business with American suppliers.

The ban on China's No. 2 telecommunications equipment maker will be removed once the company deposits $400 million in an escrow account, the U.S. Commerce Department said in a statement announcing that an escrow agreement had been signed.

The ban, which was imposed in April and caused ZTE to cease major operations, has been a source of friction between Washington and Beijing, which are engaged in an escalating trade dispute. ...

The escrow agreement is part of a $1.4 billion settlement ZTE reached with the Commerce Department last month to regain access to U.S. suppliers, whose components it relies on for its smartphones and networking gear.

The ban was imposed after ZTE broke an agreement reached after ZTE pleaded guilty in U.S. federal court last year for illegally shipping U.S. goods and technology to Iran, in violation of U.S. sanctions.

The new settlement includes a $1 billion penalty that ZTE paid to the U.S. Treasury last month and the $400 million in the escrow account that the United States could seize if ZTE violates the latest settlement. The $1 billion penalty is in addition to nearly $900 million ZTE paid last year.

Once the ban is lifted, ZTE, which employs around 80,000 people, is expected to restart major operations. The reprieve for ZTE coincides with a new Trump administration threat of 10 percent tariffs on $200 billion of Chinese goods. ...

Members of the U.S. Senate last month urged Trump to reconsider the settlement, saying that ZTE posed "a significant threat" to national security.

The Senate paved the way for a showdown with Trump over the issue last month, when it passed an annual defense policy bill including an

amendment attempting to reverse the deal. The measure could still be killed when Senate and House of Representatives meet in the coming weeks to forge a compromise version of the bill.

back to top

* * * * * * * * * * * * * * * * * *

## 7. B. Doherty: "The Government Will Allow Cody Wilson's Defense Distributed to Distribute Gun-Making Software"
(Source: Reason, 10 July 2018.)

* Author: Brian Doherty, Senior Editor, Reason Magazine
bdoherty@reason.com.

The Justice Department has reached a settlement with the Second Amendment Foundation and Defense Distributed, a collective that organizes, promotes, and distributes technologies to help home gun-makers. Under the agreement, which resolved a suit filed by the two groups in 2015, Americans may "access, discuss, use, reproduce or otherwise benefit from the technical data" that the government had previously ordered Defense Distributed to cease distributing.

Before this, the feds had insisted that Defense Distributed's gun-making files violate the munitions export rules embedded in the International Traffic in Arms Regulations (ITAR). Defense Distributed's suit claimed that this was was "censorship of Plaintiffs' speech," since the files in question consist of computer code and thus counted as expression. It also argued that "the ad hoc, informal and arbitrary manner in which that scheme is applied, violate the First, Second, and Fifth Amendments." (The Second because the information in the computer files implicates weapons possession rights.)

In what is a very unusual move in ITAR actions, the government will pay more than $39,000 of the plaintiffs' legal and administrative fees. Cody Wilson, chieftain of Defense Distributed, tells *Wired* that this is only about 10 percent of what they've spent.

That *Wired* story is mostly devoted to scaring the reader about what a world in which people are freer to use computer files to make weapons at home might mean. Wilson is open that as far as he's concerned, he's killed the cause of gun control by popularizing the home construction of weapons via computer instructions.

*Wired* also speculates that the settlement is some sign of a Trump administration bending over backwards to satisfy a Second Amendment constituency. Alan Gura, one of the lawyers on the plaintiffs' side-and the

attorney who won both 2008's _Heller case_ and 2010's _McDonald_, two major Supreme Court victories for gun rights-disagrees, noting the administration's record in other ongoing Second Amendment cases.

"This administration maintained the Obama DOJ's cert petition in _Binderup_ (denied 7-2), and has consistently opposed all other as-applied Second Amendment challenges, including _Kanter_ (they won, Kanter appealed), _Hatfield_ (they lost and just appealed), _Medina_ (they won and Medina, repped by me on appeal, appealed, argument 9/11), and _Reyes_ (being litigated now...)," Gura says in an email today. "They have also continued defending the appeal in _Mance_ [regarding gun purchases across state lines]-they had over a year to change their mind, see the light, and admit that the district court was right, but they stuck to their appeal which unfortunately they won, and are defending against the currently-pending en banc petition. There are other cases they defend, some of course less meritorious, but any notion that Trump is pro-gun and having DOJ roll over would be fantasy."

The more likely factor behind the settlement, Gura believes, is that the government "realized that not a single 5th Circuit judge offered that they were likely to succeed on the merits. To the contrary, the centerpiece of their victory was that they could somehow avoid the merits. When they could avoid the merits no longer, suddenly the national security threat faded away."

In a press release, the Second Amendment Foundation notes its favorite aspect of the settlement:

> Significantly, the government expressly acknowledges that non-automatic firearms up to .50-caliber-including modern semi-auto sporting rifles such as the popular AR-15 and similar firearms-are not inherently military.
>
> "Not only is this a First Amendment victory for free speech, it also is a devastating blow to the gun prohibition lobby," noted SAF founder and Executive Vice President Alan M. Gottlieb. "For years, anti-gunners have contended that modern semi-automatic sport-utility rifles are so-called 'weapons of war,' and with this settlement, the government has acknowledged they are nothing of the sort.
>
> "Under this settlement," he continued, "the government will draft and pursue regulatory amendments that eliminate ITAR control over the technical information at the center of this case. They will transfer export jurisdiction to the Commerce Department, which does not impose prior restraint on public speech. That will allow Defense Distributed and SAF to publish information about 3-D technology."

Since this is a settlement and not a victory on the merits in court, the government is still officially insisting their actions did not violate any rights. But an optimistic Gura thinks the "courts might remember this episode the next time the government offers up a spurious national security claim."

The government says the removal of these legal restrictions will be announced by July 27 on the Director of Defense Trade Controls' website. In return for that action the plaintiffs agree to drop the lawsuit.

A ReasonTV interview with Wilson from February.

back to top

* * * * * * * * * * * * * * * * * *


## 8. Global Trade News: "Weise Wednesday: Growing Friction Between the United States and Its Key Trading Partners"
(Source: Integration Point Blog, 11 July 2018.)

Welcome to Weise Wednesday! Twice a month we will share a brief Q&A with the former U.S. Commissioner of Customs, Mr. George Weise. If you have questions, we encourage you to send them to AskGeorge@IntegrationPoint.com.

**Q. Can you fill us in on developments in the trade arena resulting from recent U.S. trade initiatives?**
A. Recent developments on the global trade front have led to growing friction between the U.S. and many of its key trading partners.

*Section 301 tariffs on China*

On July 6, 2018, the 25% additional tariff the United States threatened to impose on a wide range of Chinese imports went into effect. On the same day, China implemented a retaliatory tariff of 25% on a number of U.S. imports. President Trump responded to this action by ordering the U.S. Trade Representative to identify 200 billion dollars of additional Chinese imports for potential counter retaliation as a result of the Chinese action. It seems that the trade war is on.

*Section 232 action on steel and aluminum*

You will recall that on March 11, 2018, the President issued a proclamation imposing a 25% additional tariff on designated steel products and 10% additional tariff on designated aluminum products. Temporary exemptions were provided for certain countries while bilateral negotiations took place. On May 31, 2018, those exemptions expired for the European Union (EU), Canada, and Mexico, and the additional tariffs for steel and aluminum from those countries went into effect. All three have now implemented retaliatory tariffs against the U.S., as has Turkey. Complaints have also been lodged against the U.S. actions at the World Trade Organization (WTO) by several countries, including the EU and Norway.

The EU also recently voted to launch a so-called safeguards investigation to determine if injury is resulting from steel imports flooding into the EU that would have been shipped to the U.S. had the U.S. not imposed the additional tariffs. The investigation is expected to take about nine months.

An affirmative ruling could result in additional tariffs and/or quotas on steel products entering the EU. While the investigation is ongoing, international trade rules allow the EU to impose "provisional safeguard" tariffs for up to 200 days, if it concludes that increased imports have caused or may cause serious injury to its steel sector.

*Section 232 action on automobiles*

As reported in an earlier Weise Wednesday, President Trump initiated a new investigation on May 23, 2018, to determine if automobile imports are threatening the national security of the U.S. An affirmative finding could result in additional duties and/or quotas on imported automobiles. A public hearing on this matter will be held on July 19-20. It has been reported that the investigation is moving swiftly and could be completed as early as August of this year.

*Conclusion*

All of these developments have made it extremely challenging to be engaged in global trade today and created a great deal of uncertainty as to what the future holds for global traders. A recent press report even suggests that President Trump is looking at possible draft legislation to circumvent WTO rules and facilitate the imposition of higher tariffs on U.S. imports. Such a move would be quite controversial, however, and would require congressional action. **Global traders need to continue to stay actively engaged in monitoring new developments like these and continue to make your views known to government decision makers.**

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. Orchid Advisors: "Export Control Reform and the Ammunition Industry"
(Source: Orchid Advisors, 10 July 2018.)

When Export Control Reform (ECR) takes effect in 2019, sporting ammunition will accompany non-automatic and semi-automatic firearms on their journey from the International Traffic in Arms Regulations' (ITAR) to the Export Administration Regulations (EAR). Ammunition that is primarily non-military in nature will be classified under Export Control Classification Number (ECCN) 0A505 of the Commerce Control List (CCL), rather than Category III of the United States Munitions List (U.S.M.L.).

What will that change mean for exporters of ammunition (other than the need to learn new acronyms)?

Two consequences of ECR for ammunition exporters stand out. First, U.S. exporters of sporting ammunition will be able to ship to 34 countries without a license. That's the good news. The second major consequence, the not-so-good news, is that determining which ammunition is controlled by the EAR

and which by the ITAR will involve some analysis and may sometimes require an official government determination.

*Ship ammunition and components to 34 countries without a license!*

Exporters of ammunition that migrates from the ITAR to the EAR will enjoy one big benefit that exporters of firearms will not. Ammunition exporters <u>will not need any export license at all</u> to export ammunition or components to the following countries:

| | | | | |
|---|---|---|---|---|
| Australia | Estonia | Ireland | Netherlands | Slovenia |
| Austria | Finland | Italy | New Zealand | Spain |
| Belgium | France | Japan | Norway | Sweden |
| Bulgaria | Germany | South Korea | Poland | Switzerland |
| Croatia | Greece | Latvia | Portugal | Turkey |
| Czech Republic | Hungary | Lithuania | Romania | United Kingdom |
| Denmark | Iceland | Luxembourg | Slovakia | |

In contrast, exporters of firearms will require an export license for exports to all countries. Exports of firearm components will generally require an export license, too, with exceptions for low value shipments ($500 of less) of most parts and a few other exceptions.

So, how is it that ammunition will be exempted from licensing for these 34 countries, but firearms will not? Just as the ITAR contain certain limited exemptions from licensing requirements, the EAR contain what the EAR refer to as "exceptions" to licensing requirements. EAR exceptions are different from ITAR exemptions so one of the headaches associated with transitioning from the ITAR to the EAR will be learning how EAR exceptions affect exports that otherwise would require a license.

The affect that the Strategic Trade Authorization (STA) exception has on licensing requirements for ammunition and components demonstrates that it will often be worthwhile to endure the headaches. The STA exception is quite complex, with many limitations and conditions, but what it does is carve out a list of countries with respect to which the otherwise applicable requirement for a license does not apply. The countries listed above are referred to in the EAR (along with Canada and Argentina) as "Country Group A-5."

Exporters of ammunition and ammunition components who rely on the STA exception to export product to these destinations without licenses are required to comply with detailed conditions with respect to which there will be a one-time learning curve, but it will be worth it. The ability to export without a license is a big deal.

License exception STA can be found in §740.20 of the EAR. The most important conditions are contained in subsections §740.20 (c) and (d). All applicable conditions and limitations must be complied with to use this license exception.

Some readers may be wondering why Canada is not on the list. Canada and Argentina actually are included in Country Group A-5 but license exception STA cannot be used for exports of ammunition and components to those countries because Canada and Argentina are parties, as is the United States, to a treaty among members of the Organization of American States that requires an export license. That treaty takes precedence over exception STA.

*Determining whether ammunition is controlled by the ITAR or EAR may not always be easy*

To take advantage of license exception STA and the other benefits of the EAR export-control regime, exporters will first have to be sure the ammunition they plan to export has in fact migrated from the ITAR to the EAR.

That may take some work.

One benefit of today's rules is that classifying ammunition for export control purposes is easy. Virtually all ammunition up to .50 caliber is controlled under Category III (a) of the U.S.M.L. and ammunition components are in Category III (d).

Under Export Control Reform, the Government has endeavored to distinguish between ammunition that "has little or no civil use or that is inherently military," on the one hand, and ammunition that, on the other hand, "does not confer a military advantage on the United States" because it is widely available in the international market to both friendly and unfriendly countries. The result is a new, long list of characteristics that cause ammunition to remain on the ITAR and a second long list of ammunition components that remain on the ITAR. All other ammunition and components move by default to the EAR.

As will be the case for manufacturers and exporters of firearms, Export Control Reform will require that those who manufacture or export ammunition or components review their product lists carefully to determine whether any of their products will remain on the ITAR and, if so, their proper classification within the revised U.S.M.L. Category III. Items that are not covered by the revised U.S.M.L. Category III will fall into new ECCN 0A505, except for some items that will continue not to be controlled, as discussed later.

Going forward, after the effective date of ECR, ammunition manufacturers and exporters will want to be sure that all new ammunition and components they make or export are added to the product matrix and properly classified. It will not be possible to complete export documents properly without proper

classification, nor will it be possible to use the STA exception without knowing for sure that the items in question are in fact in ECCN 0A505 rather than U.S.M.L. Category III.

*Other consequences of ECR for manufacturers and exporters of ammunition and components*

Manufacturers and exporters of ammunition and components that move to the EAR will enjoy, in addition to access to license exception STA, certain benefits of ECR we discussed previously in our previous post *How to Make International Sales Happen Faster under Export Control Reform*. In other words, (i) receipt of customer purchase orders will not be a precondition to applying for export licenses, (ii) other license supporting documents under the ITAR will no longer be needed (although exporters will need to be in possession of the customer's import permit when an import permit is required by the destination country), and (iii) blanket licenses that authorize the maximum, but not the precise, quantity to be exported will be permitted for ammunition exports as for firearms.

On the negative side, the license exception for low-value shipments of ammunition components to countries not in Country Group A-5 will max out at $100 per shipment, as opposed to the new $500 exception that will apply to nearly all firearms components. There will be no exception for complete ammunition (as opposed to components), which rules out the possibility of small international retail sales of ammunition.

Shotgun ammunition and certain components, which are already on the EAR, will be classified together with ammunition for non-automatic and semi-automatic firearms, but will for the most part remain unchanged.

We have noted one other change that we have not had time to fully analyze as of the date of this piece. Under the ITAR, "muzzle loading (black powder) firearms" are expressly excluded from U.S.M.L. Category I and ammunition for muzzle loading firearms is therefore excluded from U.S.M.L. Category III. The muzzle loader exclusion under the new rules is narrower. Note 1 to proposed new ECCN for non-automatic and semi-automatic firearms, ECCN 0A501, affirms that muzzle loading black powder firearms are excluded, *"except those designs based on centerfire weapons of a post 1937 design (emphasis added)"*. What that means is that ammunition "specially designed" for muzzle loading firearms based on centerfire weapons of a post 1937 design will be subject to the controls of the EAR in ECCN 0A505.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


# 10. R.C. Burns: "Aspirin and Terrorism in Sudan"
(Source: Export Law Blog, 11 July 2018. Reprinted by permission.)

\* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Wash DC, Clif.Burns@bryancave.com, 202-508-6067).

DOC_0002659

In October 2017, OFAC started down the long and winding road of eliminating the sanctions on Sudan. As we noted in a post then, OFAC - rather oddly - did not just get rid of the Sudanese Sanctions Regulations but simply made effective section 538.540(a) which was a general license to do everything prohibited by the SSR. It also made effective section 538.540(b), which was a general license to export agricultural commodities, medicine and medical devices for one-year after signing a contract for the export of such goods.

Finally, a few days ago on June 29, OFAC took the momentous step of repealing the Sudan Sanctions Regulations in their entirety. Nothing in the Federal Register notice repealing the SSR indicates what had occurred since October 2017 that meant now - as opposed to last October - was a propitious time to repeal the SSR. But, as they say, better late than never.

In addition, the latest Federal Register notice moved the general license in section 538.540(b) for agricultural commodities, medicine and medical devices from the now defunct SSR to section 596.506 of the Terrorism List Governments Sanctions Regulations. This, of course, results in an odd situation where, due to the repeal of the SSR, you can send any and all EAR99 items to Sudan without needing to comply with a general license but aspirin requires you to comply with the terms of a general license.

This is the result of section 906(a)(1) of the Trade Sanctions Reform and Export Enhancement Act of 2000 ("TSRA") which says that agricultural commodities, medicine and medical devices could only be exported to state sponsors of terrorism pursuant to a 1-year license. Of course, there is no way that Congress intended to impose more stringent controls on aspirin and tongue depressors than other EAR99 items like shoes (which can be made into bombs) and razor blades. The idea of TSRA was that where the President had comprehensively sanctioned a country, broader humanitarian reason would prohibit him or her from restricting exports of aspirin, tongue depressors and apples to the country. If the country was a state sponsor of terrorism then a license would be required. But there is no indication that Congress meant for section 906 to apply the license requirement to food and medicine when all other sanctions had been lifted. Not even Congress, well, not even most of Congress could imagine that aspirin is more useful to terrorists than shoes and razor blades.

back to top

�881 �880 �880 �880 �880 �880 �880 �880 �880 �880

EX/IM TRAINING EVENTS & CONFERENCES

## 11. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective ", 2 Oct in Bruchem, the Netherlands

(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 12. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Henry David Thoreau** (12 Jul 1817 - 6 May 1862; was an American essayist, poet, philosopher, abolitionist, naturalist, tax resister, development critic, surveyor, and historian. A leading transcendentalist, Thoreau is best known for his book *Walden,* a reflection upon simple living in natural surroundings, and his essay "Civil Disobedience" (originally published as "Resistance to Civil Government"), an argument for disobedience to an unjust state.)
  - *"None are so old as those who have outlived enthusiasm."*
  - *"Simplify, simplify."*

back to top

* * * * * * * * * * * * * * * * * * *

## 13. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* <u>ATF ARMS IMPORT REGULATIONS</u>: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: <u>81 FR 2657-2723</u>: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* <u>CUSTOMS REGULATIONS</u>: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: <u>83 FR 27380-27407</u>: Air Cargo Advance Screening (ACAS)

* <u>DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM)</u>: DoD 5220.22-M
  - Last Amendment: 18 May 2016: <u>Change 2</u>: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary <u>here</u>.)

* <u>EXPORT ADMINISTRATION REGULATIONS (EAR)</u>: 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 6 June 2018: <u>83 FR 26204-26205</u>: Unverified List (UVL); Correction

* <u>FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR)</u>: 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: <u>83 FR 30541-30548</u>: Global Magnitsky Sanctions Regulations; and <u>83 FR 30539-30541</u>: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* <u>FOREIGN TRADE REGULATIONS (FTR)</u>: 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: <u>3 FR 17749-17751</u>: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available <u>here</u>.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance <u>website</u>.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at <u>www.FullCircleCompiance.eu</u>.

* <u>HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA)</u>, 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)

DOC_0002662

- Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
   - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
   - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * *


## 14. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * *


## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ████████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance [█████@fullcirclecompliance.eu]
**Sent:** 7/16/2018 9:05:22 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0716 Monday "Daily Bugle"



## Monday, 16 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce Cancels 2nd Day of Public Hearing on Section 232 Investigation of Imports of Automobiles
2. DHS/CBP: COAC to Meet on 1 Aug via Webinar

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS: (No new postings.)
5. State/DDTC: (No new postings.)
6. Hong Kong Suspends all E-Services on 20 Jul

### NEWS

7. BBC: "Iran Nuclear Deal: US Rejects EU Plea for Sanctions Exemption"
8. Expeditors News: "Israeli Customs Releases New Optional Method to Provide an Invoice Declaration"
9. Reuters: "Mnuchin Says U.S. Will Consider Some Waivers on Iran Sanctions"
10. The Washington Free Beacon: "State Department Gives Up Case Against 3D Printed Gun Pioneer"

### COMMENTARY

11. J. Helder, C. Klaui & D. Lund: "EU Trade Update: Trade Aspects of the July 2018 U.K. Government White Paper on the Future U.K. EU Relationship"
12. M. Volkov: "Episode 47 - Cybersecurity Threats and Compliance"

## EX/IM MOVERS & SHAKERS

13.    Monday List of Ex/Im Job Openings: 180 Jobs Posted This Week, Including 9 New Jobs

## EX/IM TRAINING EVENTS & CONFERENCES

14.    ECTI Presents United States Export Control (ITAR/EAR/OFAC) Seminar Training Focusing on Issues Relevant to Universities, Research Labs & Other Institutions of Higher Learning in Columbus, OH

15.    Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands

## EDITOR'S NOTES

16.    Bartlett's Unfamiliar Quotations

17.    Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

18.    Weekly Highlights of the Daily Bugle Top Stories



Awareness Course U.S. Export Control
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands
FULL CIRCLE

## ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. Commerce Cancels 2nd Day of Public Hearing on Section 232 Investigation of Imports of Automobiles
(Source: Federal Register, 16 July 2018.) [Excerpts.]

83 FR 32833: Public Hearing on Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts; Change of Date for the Public Hearing
* AGENCY: U.S. Department of Commerce.
* ACTION: Change of date for public hearing.
* SUMMARY: The Department of Commerce is cancelling one of the days of the two-day public hearing associated with the notice of request for public comments and public hearing that appeared in the Federal Register on May 30, 2018. In the notice, the Department encouraged interested public participants to participate in a hearing for the investigation assist the Department in determining whether imports of automobiles, including cars, SUVs, vans and light trucks, and automotive parts threaten to impair the national security and in recommending remedies if such a threat is found to exist. The hearing was originally scheduled for July 19 and 20. Only 45 requests to testify were received. Because these requests can all be accommodated on a single day, the second day of the hearing originally scheduled for July 20 is cancelled. The hearing will be held on July 19 only. The hearing will begin at 8:30 a.m. and will end at 5:30 p.m. The location of the hearing remains unchanged.
* DATES: The public hearing will be held on July 19, 2018, beginning at 8:30 a.m. local time and concluding at 5:30 p.m. local time.
* ADDRESSES: The public hearing will be held at 1401 Constitution Avenue NW, Washington DC, 20230.
* FOR FURTHER INFORMATION CONTACT: Sahra Park-Su, U.S. Department of Commerce (202) 482-2811. For more information about the section 232 program, including the regulations and the text of previous investigations, see www.bis.doc.gov/232.
* SUPPLEMENTARY INFORMATION:
The hearing is open to the general public and seating is on a first-come-first served basis. We anticipate a high volume of interest and encourage all members of public wishing to attend, to arrive early and be prepared to go through a security screening. You must present a valid form of identification such as a driver's license, passport, or state issued ID. ...

   Dated: July 11, 2018.
Earl Comstock, Director, Office of Policy and Strategic Planning, U.S. Department of Commerce.

back to top

* * * * * * * * * * * * * * * * * *


# 2. DHS/CBP: COAC to Meet on 1 Aug via Webinar
(Source: Federal Register, 16 July 2018.) [Excerpts.]

83 FR 32885-32886: Commercial Customs Operations Advisory Committee (COAC)
* AGENCY: U.S. Customs and Border Protection (CBP), Department of Homeland Security (DHS).
* ACTION: Committee management; notice of Federal Advisory Committee meeting.

DOC_0002682

\* SUMMARY: The Commercial Customs Operations Advisory Committee (COAC) will hold its public meeting on Wednesday, August 1, 2018 via webinar. The meeting will be open to the public.

\* DATES: The COAC will meet on Wednesday, August 1, 2018 from 1:00 p.m. to 4:00 p.m. EST. Please note that the meeting may close early if the committee has completed its business.

\* ADDRESSES: The meeting will be held via webinar. The webinar link and conference phone number will be provided to all registrants by 5:00 p.m. on July 31, 2018. For information on services for individuals with disabilities or to request special assistance at the meeting, contact Ms. Florence Constant-Gibson, Office of Trade Relations, U.S. Customs & Border Protection, at (202) 344-1440 as soon as possible. ...

\* FOR FURTHER INFORMATION CONTACT: Ms. Florence Constant-Gibson, Office of Trade Relations, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW, Room 3.5A, Washington, DC 20229; telephone (202) 344-1440; facsimile (202) 325-4290; or Mr. Bradley Hayes, Executive Director, Office of Trade Relations and Designated Federal Officer for COAC at (202) 344-1440.

\* SUPPLEMENTARY INFORMATION: ...

*Agenda*

The Designated Federal Officer will introduce the newly appointed, re-appointed, and alternate COAC members. The COAC will also hear from the following subcommittees on the topics listed below and then will review, deliberate, provide observations, and formulate recommendations on how to proceed:

(1) The Exports Subcommittee will discuss a path forward for its work and the work of the Export Manifest Working Group for the 15th Term COAC. There will also be an update on the automated export manifest pilots, and on progress in implementing a post-departure filing pilot as part of the ocean pilot.

(2) The Trusted Trader Subcommittee will present an update from the C-TPAT Minimum Security Criteria Working Group on its recommendation regarding CBP's plans to roll out new C-TPAT criteria. The subcommittee will also provide an update on the progress on the Trusted Trader Strategy and the formation of a new Trade Compliance Working Group.

(3) The Trade Modernization Subcommittee will discuss the progress of the Regulatory Reform Working Group's efforts to identify and prioritize areas of regulations administered by CBP which can be reformed and the Foreign Trade Zone Regulations Working Group. In addition, the subcommittee will discuss the progress being made in the E-Commerce Working Group.

(4) The Trade Enforcement and Revenue Collection (TERC) Subcommittee will provide updates from the Anti-Dumping/Countervailing Duties (AD/CVD), Bond, Forced Labor and Intellectual Property Rights Working Groups and will also speak to the lessons learned from the risk-based bonding tabletop exercise.

Meeting materials will be available by July 31, 2018 here.

Dated: July 11, 2018.

Bradley F. Hayes, Executive Director, Office of Trade Relations.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* Trade Representative, Office of United States; NOTICES; Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation [Publication Date: 17 July 2018.]

\* U.S. Customs and Border Protection; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals [Publication Date: 17 July 2018.]:
  - General Declaration
  - Transfer of Cargo to a Container Station

\* U.S. Customs and Border Protection; NOTICES; Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties [Publication Date: 17 July 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. Hong Kong Suspends all E-Services on 20 Jul
(Source: Hong Kong Trade and Industry Department, 16 July 2018.)

All e-services of our website will be suspended from 18:30 to 23:00 on 20 July 2018 (Friday) due to system maintenance.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. BBC: "Iran Nuclear Deal: US Rejects EU Plea for Sanctions Exemption"
(Source: BBC, 16 July 2018) [Excerpts.]

The US has rejected pleas from the EU to grant exemptions to European firms from the sanctions on Iran that will start to be reinstated next month.

Secretary of State Mike Pompeo and Treasury Secretary Steven Mnuchin wrote in a letter that they wanted to exert "unprecedented" pressure on Tehran.

Waivers will only be given on national security or humanitarian grounds.

President Donald Trump ordered that the sanctions be re-imposed in May after abandoning a nuclear deal with Iran.

The UK, France and Germany - which were also parties to the 2015 accord, along with Russia and China - pledged to continue abiding by their commitments.

They said they would work on measures to counter the effects of the sanctions, but major European companies like Peugeot and Total have since cut back their involvement in Iran in order not to risk their business prospects in the US.

Iran has said it will stay in the deal if it still receives the economic benefits. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Expeditors News: "Israeli Customs Releases New Optional Method to Provide an Invoice Declaration"
(Source: Expeditors News, 13 July 2018.)

Israeli Customs has released an alternative method of issuing a declaration of origin newly titled "Invoice Declaration."
Israeli Customs has outlined several conditions for its use:

* The document is on letterhead of the exporter or manufacturer.
* The document should include the logo of the exporter or manufacturer, and identify details of the exporter or manufacturer, including the address and the date of issue of the document.

* The document should be prepared and issued only by the United States manufacturer or exporter.
* The document should include the title "Invoice Declaration."
* The following information should appear in the rows following the title of the document:
    - The sales invoice number.
    - Date of issue of the invoice.
    - Where the invoice was issued.
* In cases where the goods are transferred to distribution centers in the U.S. or in an intermediate country and the transaction invoice is issued by a U.S. company or a company based in the third country, the "other commercial document" should be issued by the U.S. company only. The document should specify the list of the original goods entitled to customs preference.
* The "Other commercial document" should include an invoice declaration as stated in Appendix A and B to this directive, with all required details.

The Israeli Customs press release may be found here.  The U.S. Customs and Border Protection announcement may be found here.

back to top

* * * * * * * * * * * * * * * * * * *

# 9. Reuters: "Mnuchin Says U.S. Will Consider Some Waivers on Iran Sanctions"
(Source: Reuters, 16 July 2018.)

The United States wants to avoid disrupting global oil markets as it reimposes sanctions against Tehran and in certain cases will consider waivers for countries which need more time to wind down their oil imports from Iran, U.S. Treasury Secretary Steven Mnuchin said.

  "We want people to reduce oil purchases to zero, but in certain cases if people can't do that overnight, we'll consider exceptions," Mnuchin told reporters on Friday, clarifying some U.S. officials' comments that there would be no exemptions. Mnuchin's comments were embargoed for release on Monday.

Mnuchin was talking to reporters en route from Mexico where he was part of a high-level U.S. delegation led by Secretary of State Mike Pompeo to meet Mexico's next president, Andres Manuel Lopez Obrador.

The Trump administration is pushing countries to cut all imports of Iranian oil from November when the United States reimposes sanctions against Tehran, after Trump withdrew from the 2015 nuclear deal agreed between Iran and six major powers, against the advice of allies in Europe and elsewhere.

Mnuchin said he would meet with counterparts from developed and developing countries on the sidelines of a G20 finance ministers' meeting in

Buenos Aires on July 19-22. U.S. sanctions against Iran are likely to be raised in his talks.

Pompeo, also speaking to reporters on Friday, said he had discussed U.S. plans to reimpose sanctions on Iran with "all but one" country. He did not name the country he had not yet consulted.

"What they've asked us to do is review how we get there and the timeline for that," he said, "and so I'm very confident they understand."

Iranian President Hassan Rouhani, speaking in remarks carried live on state television on Saturday, said Washington was more isolated than ever over sanctions against Iran, even among its allies.

His comments appeared to be trying to ease popular concerns fueled by Trump's decision to withdraw from the deal with Iran on its nuclear program.

The likely return of U.S. economic sanctions has triggered a rapid fall of Iran's currency and protests by bazaar traders usually loyal to the Islamist rulers.

Trump has said he asked Saudi Arabia to raise oil production if needed to ensure global oil supplies and the country has 2 million barrels per day of spare capacity.

The Organization of the Petroleum Exporting Countries agreed with Russia and other oil-producing allies on June 23 to raise output from July, with Saudi Arabia pledging a "measurable" supply boost, but giving no specific numbers.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. The Washington Free Beacon: "State Department Gives Up Case Against 3D Printed Gun Pioneer"
(Source: The Washington Free Beacon, 15 July 2018.)

The Department of State settled with the Second Amendment Foundation, Cody Wilson, and his company Defense Distributed on Wednesday, dropping claims that posting firearms designs on the internet violated an arms export law.

In the settlement, the State Department has agreed to waive prior restraint, which was imposed in 2013 against the plaintiffs, allowing Wilson and Defense Distributed to begin posting gun designs on the internet again. They also agreed to pay for what plaintiffs described as a "significant portion" of their attorney's fees. Defense Distributed will also be refunded the $10,000 in registration fees it had paid to the State Department.

In an interview with the *Washington Free Beacon*, Wilson said he believes the settlement was inevitable because he believes the State Department had a bad case.

"I think by the end DOJ realized they don't actually want to argue with this because it's such a stinker from a First Amendment point of view," Wilson told the *Free Beacon*. "So, I really think they needed to get out from under it and they already had the export control reform so they literally offered me a modification of the ITAR. They literally rewrite the ITAR for Defense Distributed in an anticipation of the change in the rules. Who knows when that happens, like a year from now. I don't know. All this suggests they really needed to run away from it because we took it down to the mat."

Wilson said his company is planning to launch Defcad.com as a new resource for posting and sharing gun designs.

"Basically, because of the settlement, if you submit to me and we post through Defcad by these new rules in the ITAR, that information becomes public domain and so it becomes for all time," Wilson said. "So let's say Oprah gets elected in 2020 or whatever, and decides 'you know what this sucks, I'm not gonna do this anymore,' well, whatever got posted in the meantime on Defcad that's for all time, that's good, that's in the commons and nobody can come back and get that. And that's a very interesting thing that I don't think people understand yet."

He said that while he first gained notoriety over his innovative work with 3D-printed firearms and the State Department actions were in response to that, the settlement will allow people to share far more than designs intended for 3D-printers.

"People don't get what you mean when you say 3D," Wilson said. "We ain't just talking about 3D printers and liberator pistols. We're talking about all the engineered drawings, cad drawings, everything related to technical data of all the guns we know and care about. And, of course, the new things. The things we haven't seen yet."

Defcad, Wilson hopes, will become a hub for gun designers as well as hobbyists.

"We'll try to build a resource for our culture, our industry," he said. "Maybe it would help new companies form faster and other people collaborate together better. Because there's not really a standardized place right now."

He said the settlement will breathe new life into the online gun-rights community.

"The biggest takeaway is that this really is an opportunity for the Second Amendment to have new life on the Internet," Wilson told the *Free Beacon*. "It's not really about 3D printing. 3D printing's a good handle, but in essence that venture we had with 3D printing gave us access to a monopoly power to put all the data related to all guns on the Internet. It's a beautiful

expansion. I would think it's actually difficult to overstate how important it might be to our movement."

Alan Gottlieb, Second Amendment Foundation founder, said the settlement was as much a win for the First Amendment as the Second.

  "Not only is this a First Amendment victory for free speech, it also is a devastating blow to the gun prohibition lobby," he said in a statement. "For years, anti-gunners have contended that modern semiautomatic sport-utility rifles are so-called 'weapons of war,' and with this settlement, the government has acknowledged they are nothing of the sort."

Wilson said he expected the State Department's admission that AR-15s and other semiautomatic-only firearms are not inherently military weapons would be used in future litigation against bans on so-called assault weapons and other firearms.

  "You've got the federal government being like literally for purposes of regulating weapons of war-the AR-15 is not a weapon of war," Wilson said. "You can take that to the bank. And I expect people will."

He said that while Brett Kavanaugh's nomination to the Supreme Court may lead to future legal victories for the gun-rights movement, the settlement between his company and the State Department is a reason for gun-rights advocates to be happy right now.

  "This stuff here is good Second Amendment news right now, not stuff you have to wait for two years from now," Wilson said.

back to top

* * * * * * * * * * * * * * * * * *

COMMENTARY

## 11. J. Helder, C. Klaui & D. Lund: "EU Trade Update: Trade Aspects of the July 2018 U.K. Government White Paper on the Future U.K. EU Relationship"
(Source: Akin Gump Strauss Hauer & Feld LLP, 16 July 2018.)

* Authors: Jasper Helder, Esq., jasper.helder@akingump.com, +44 20-7661-5308; Chiara Klaui, Esq., chiara.klaui@akingump.com, +44 20-7661-5342; and Daniel Lund, Esq., daniel.lund@akingump.com, +44 20-7012-9653. All of Akin Gump Strauss Hauer & Feld LLP.

**Key Points**

* The White Paper sets out in detail the shape and scope of the U.K.'s desired future "association" relationship with the EU post Brexit. The U.K. government hopes that it will accelerate negotiations with the EU with a view to agreeing the substantive elements of a "future framework" alongside the withdrawal formalities by the end of 2018.

* The White Paper is wide-ranging and covers the potential for a future economic partnership, and a defence and security partnership, as well as measures designed to ensure appropriate democratic accountability through joint institutional arrangements.

* In particular, the White Paper sets out how the U.K. government seeks to achieve frictionless trade in goods between the U.K. and the EU-despite the U.K. existing outside of the Customs Union and the Single Market.


## A Free Trade Area for Goods

The United Kingdom (U.K.) government takes the view that, to achieve a Brexit that respects the outcome of the 2016 referendum, the U.K. must leave both the EU Single Market and the EU Customs Union. However, the U.K. government aims to reduce the damage that this is likely to cause businesses by entering into a "deep and comprehensive" economic partnership with the European Union (EU). At the heart of the U.K. government's proposal is the creation of a free trade area for goods. The stated purpose of the free trade area is to "avoid friction at the border [between the UK and EU] and ensure that both sides meet their commitments to Northern Ireland and Ireland through the overall future relationship."

The cornerstone of the U.K. government's free trade area is the implementation of a Facilitated Customs Arrangement (FCA). The U.K. government hopes that the FCA will enable near frictionless trade with the EU by essentially mirroring the existing mechanisms of the Customs Union through a duty-remittance scheme and adherence to a common rulebook. However, by remaining formally outside of the Customs Union, the U.K. would not be bound by the EU's Common Commercial Policy, and, as such, would be free to enter into new trade agreements with third countries (to the extent that such agreements are compatible with its proposed commitments with the EU).

In terms of timing, the White Paper notes that the FCA would receive a "phased" implementation. The U.K. has committed to remaining in the Customs Union during the transition period, which is scheduled to end in December 2020. As such, it leaves open the possibility that the U.K. may continue to stay within the Customs Union beyond December 2020 to introduce the FCA in a gradual manner, to the extent that the U.K. and EU are not ready by January 2021.

*The Introduction of a Duty Remittance Mechanism*

In terms of mechanics, the U.K. would apply the EU's duties and trade policy measures for all goods landing in the U.K. but destined for the EU. Where

goods land and are destined for the U.K., then the U.K. will apply its own duties and trade policy measures (to the extent that they differ). The EU would not, however, be expected to apply U.K. duties and trade policy measures at its borders. The U.K. has instead proposed that the U.K. duties be settled as part of a wider duty-remittance mechanism. The U.K. concludes that, because all goods entering the EU via the U.K. should have complied with EU customs processes and duty measures, there would be no need to introduce formal customs processes between the U.K. and the EU (notably rules of origin requirements).

The White Paper provides a worked example on how the U.K. government intends for importers to settle any duties owed at the point that goods enter the U.K. The example states that, when the goods' destination can be "robustly" demonstrated by a "trusted trader," the importer will pay the duty amount that corresponds to that destination. In contrast, where the goods' destination cannot be ascertained, then the importer must pay the higher of the U.K. or EU duty and seek reimbursement (if the goods' destination were to a lower-duty jurisdiction).

The example, while brief, raises a number of issues. First, it fails to clarify what "robust" evidence "trusted traders" would need to provide with respect to validating the final destination of a consignment. In addition, it raises the question as to whether importers that are not "trusted traders" but otherwise provide "robust" evidence will always be required to declare the higher duty rate. The White Paper also states that the U.K. and EU should "agree a new trusted trader scheme to allow firms to pay the correct tariff at the UK border." This calls into question how pre-existing schemes, notably Authorised Economic Operator (for which the White Paper proposes mutual recognition), will exist alongside any new requirements. For materials imported and subsequently processed in the U.K., the U.K. government proposes repayment as soon as possible, (e.g., at the point where the materials have been substantially transformed into U.K. goods). The U.K. government points to the pan-Euro-Mediterranean trade agreement as an example for rules of origin.

More broadly, the proposal is likely to place several new compliance burdens on U.K. businesses. For example, importers often do not know the final destination of their goods upon initial entry into the EU, but now will be required to do so. Moreover, in instances where U.K. businesses seek to obtain a refund due to paying additional duty (because, for example, they cannot assert the final destination of their goods at import), such businesses would be required to track the goods and evidence their consumption within the EU.

*A Common Rulebook for Trade in Goods*

The U.K. government has conceded that, to maximize the possibility for frictionless trade in goods post Brexit, it will need to maintain a common rulebook relating to all rules necessary to facilitate such trade at the U.K.-EU border (e.g., product conformity legislation). In reality, the U.K. government appears to have accepted that this will require it to continue to implement

certain EU legislation beyond the U.K.'s departure date, with the White Paper citing the Union Customs Code as one piece of EU legislation to which the U.K. would continue to adhere.

As part of this, the U.K. government has requested participation in all EU technical committees and regulatory agencies relating to legislation that forms part of the common rulebook (such as the European Medicines Agency and the European Chemicals Agency). The U.K. government asserts that participation in these committees and agencies should mean, for example, that manufacturers have to undergo only one conformity assessment in either the U.K. or EU in order to place a product on both markets.

The U.K. acknowledges, however, that it would not have voting rights in such committees and agencies. This raises the question as to how much influence the U.K. will continue to have over EU legislation that will directly impact the manufacturing requirements and product standards to which U.K. businesses must adhere. To this end, the U.K. government has proposed a series of institutional provisions designed to ensure that there are sufficient checks and balances in place to mitigate the risk that a change in EU legislation (that forms part of the common rulebook) does not adversely harm U.K. interests. If any such measure were to enter into force, then the U.K. government states that it would reserve the right not to implement ultimately (but acknowledges that this could have an adverse impact on the wider relationship). The White Paper also proposes an independent arbitration panel, including sectoral technical experts, to resolve disputes on regulation and could refer questions related to the common rule book to the European Court of Justice.

## EU Response

The EU's initial reaction to the U.K. government's White Paper has been one of guarded optimism, perhaps due to the fact that it envisages a closer relationship between the U.K. and the EU than what has previously been suggested by the U.K. The EU has, however, previously stated that it would not entertain a "single market" for goods, since it deems this to be "cherry-picking." Moreover, when the U.K. government first raised the idea of a customs partnership between the U.K. and the EU earlier this year, the EU raised a number of substantive concerns regarding its viability, notably that the arrangement would be a target for customs and value added tax fraud. This is no doubt exacerbated by the fact that the European Commission launched a £2.4 billion claim against the U.K. in March 2018 for unpaid customs duties relating to fraudulent Chinese imports. The U.K. government acknowledges that the mechanics of the proposed free trade area would require vigorous surveillance and enforcement; however, the White Paper does not provide any detail on how this would be achieved.

If, therefore, the U.K. government's latest proposals as set out in the White Paper fail to gain traction with the EU, then this is likely to make the U.K. government's current leadership more unstable and a "no deal" situation more of a possibility.  As such, it is critical that businesses plan accordingly.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. M. Volkov: "Episode 47 - Cybersecurity Threats and Compliance"

(Source: Volkov Law Group Blog, 15 July 2018. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

Companies face evolving and significant cyber risks. The FBI estimates that ransomware will generate at least $1 billion for criminals. Businesses stand to lose at least $400 billion each year from hacks. The cyber defense, forensics and insurance industry will be worth nearly $200 billion by the end of this decade. Each year there is an average of 1.5 million cyber attacks, or approximately 4000 per day.

In this episode, Michael Volkov discusses cybersecurity threats and compliance strategies to mitigate such risks.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM MOVERS & SHAKERS

## 13. Monday List of Ex/Im Job Openings; 180 Jobs Posted This Week, Including 9 New Jobs

(Source: Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

\* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

  "#" New or amended listing this week

\* Aerojet Rocketdyne; Huntsville, AL; International Trade and Compliance Specialist;
\* Aerojet Rocketdyne; Camden, AR; International Trade and Compliance Specialist;
\* Agility; Atlanta, GA; Export Compliance Administrator;
\* Agility; Houston, TX; Air Freight Export Coordinator;
\* Agility; Boston, MA; Air Export Coordinator;
\* Agility; Boston, MA; Ocean Export Coordinator;
\* Agility; Bensenville, IL; Ocean Export Coordinator;
\* Agility; Basel, Switzerland; International Exhibition Coordinator;

* Agility; Genf, Switzerland; Ocean Freight Coordinator;
* Agility; Coppel, TX; Air Import Coordinator;
* Agility; Burlingame, CA; Ocean Import Coordinator;
* Agility; East Boston, MA; Entry Writer/Import Coordinator;
* Agility; Dallas, TX; Air Import Supervisor;
# Albemarle Corporation; Baton Rouge, LA; Logistics Specialist - Trade Compliance and Marine Specialist;
# Amazon; Seattle, WA; Head, Global Trade and Product Compliance;
# Amazon; Seattle, WA; Global Trade Compliance Analyst;
* Arconic; Torrance, CA; Global Trade Compliance Manager - Import;
* Arent Fox LLP; Washington, D.C.; International Trade Associate;
* Arent Fox LLP; Los Angeles, CA; International Trade Associate;
* Arm, Ltd.; Cambridge, UK; UK Trade Compliance Manager; Requisition ID: 13650
* Arrow; Shanghai, China; Compliance Manager;
* Arrow; Neu-Isenburg, Germany; Sachbearbeiter Export / Global Trade Management & Compliance Officer (m/f) - befristet;
* Arrow; Houten, Netherlands; Junior Officer Global Trade Management and Compliance - EMEA;
# Augusta Westland; Philadelphia, PA; Import Export Specialist;
* AutoNation; Fort Lauderdale, FL; Trade Compliance Manager;
* BAE Systems; Los Angeles, CA; Program Manager, International and Offset
; Requisition ID: 33778BR
* BAE Systems; Rockville, MD; Compliance Specialist Senior; Requisition ID: 35809BR
* BAE Systems; Sterling, VA; Compliance Specialist Senior; Requisition ID: 36370BR
* BAE Systems; Greenlawn, NY; International Trade Compliance Analyst I; Requisition ID: 38433BR
* Boeing; Zoushan, China; Trade Compliance Manager;
* Cree, Inc.; Durham, NC; Export Compliance Specialist; Contact asignorelli@cree.com; Requisition ID: 2018-6300
* Curtiss-Wright; Chanhassen, MN; Logistics & Compliance Specialist; Requisition ID: 2835
# Dorman Products; Colmar, PA; Global Trade Compliance Specialist;
* DynCorp International; Tampa, FL; Foreign Disclosure Officer; Requisition ID: PR1701977
* Eaton; Syracuse, NY; Global Logistics Manager; Requisition ID: 036620
* Eaton; Shanghai Shi, China; Global Ethics and Compliance Director, APAC; Requisition ID: 039260
 * Edmonds Enterprise Services, Inc.; Washington, D.C.; Compliance Specialist; Department of State; tmarshall@edmondses.com; (703) 778-7070
* Elbit Systems of America; Fort Worth, TX or Merrimack, NH; Trade Compliance Manager; 2018-5916
* Eli Lilly and Co.; Indianapolis, IN; Import/Export Trade Associate;
* Ensign-Bickford Aerospace & Defense Co.; Moorpark, CA; Import/Export Specialist; Missy Clark; maclark@eba-d.com
* EoTech Technologies; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335

* Expeditors; Krefeld, Germany; Clerk Import / Export;
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk;
* Expeditors; Dusseldorf, Germany; Clerk, Airfreight Import;
* Export Solutions Inc.; Melbourne FL; Trade Compliance Specialist;
info@exportsolutionsinc.com
# Flash Global; Mountain Lakes, NJ; Import and Export Specialist;
* FLIR; Arlington, VA; Senior Director, Global Export Licensing;
* FLIR; Billerica, MA; US Customs Analyst;
* FLIR; Meer, Belgium; GTC EMEA Customs Analyst;
* FLIR; Irving, CA; Sr. Manager Export Compliance;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Licensing;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Licensing;
* Full Circle Compliance; Bruchem, Netherlands; Legal Analyst, Manager;
* General Atomics; San Diego, CA; Director, Compliance; Requisition ID:
18549BR
* General Atomics; San Diego, CA; Government Regulatory Compliance
Specialist; Requisition ID: 18686BR
* General Atomics; San Diego, CA; Import/Export Trade Compliance
Administrator - Licensing; Requisition ID: 17968BR
* General Atomics; San Diego, CA; Senior Director of Import/Export
Compliance; Requisition ID: 13892BR
* General Atomics; San Diego, CA; Internal Auditor - Senior; Requisition
ID: 17524BR
* General Dynamics; Falls Church, VA; Director, Trade Compliance; Job ID:
2018-1122
* GHY International; Pembina, ND (or remote); Ocean & Air Import
Coordinator;
* Google; Mountain View, CA; Ethics and Compliance Associate Counsel,
Export Control;
* Harris Corporation; Palm Bay, FL; Technical Trade Compliance Engineer;
Contact Laura Solomon; Requisition ID: ES20171511-22019
* Harris Corporation; Clifton, NJ; Technical Trade Compliance Engineer;
* Harris Corporation; Van Nuys, CA; Trade Compliance Senior Specialist;
Requisition ID: ES20180706-25145
* Henderson Group Unlimited; Inc; Washington, DC; Process Improvement
Mgr;
* Henderson Group Unlimited; Inc; Washington, DC; Defense Control
Analyst;
* Henkel Corp.; Rocky Hill, CT; Global Trade Defense Information Manager;
Requisition ID: 180002QT
* Henkel Corp.; Rocky Hill, CT; Senior Global Trade Manager; Requisition
ID: 18000307
* Hussman; Bridgeton, MO; Trade Compliance Specialist;
* Infineon Technologies; Melaka, Malaysia; Export Control Executive;
Requisition ID: 26833
* Infineon Technologies; Porto (Maia) Portugal; Trade Compliance
Administrator; Requisition ID: 25550
* Infineon Technologies; Milpitas, CA; Export Compliance Specialist;
Requisition ID: 26988

DOC_0002695

* Infineon Technologies; El Segundo, CA; Export Compliance Specialist; Requisition ID: 26826
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official / Deputy Facility Security Officer;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official;
# Interra International; Atlanta, GA; Global Logistics Specialist;
* Johns Hopkins University; Baltimore, MD; Assistant Director, Export Control and Facility Security;
* Johnson Controls; Milwaukee, WI; Trade Compliance Analyst; Requisition ID: WD30047348124
* Johnson Controls; Lithia Springs; Trade Compliance Specialist I; Requisition ID: WD30047947142
* Komatsu; Milwaukee, WI; Senior International Trade Compliance Analyst; Requisition ID: 12728
* Lam Research Corp.; Fremont, CA; Foreign Trade Intern;
* Lam Research Corp.; Shanghai, China; Foreign Trade (FT) Analyst;
* Lam Research Corp.; Fremont, CA; Foreign Trade Data Analyst;
* Leonardo DRS; Arlington, VA; Senior Customs & Trade Compliance Manager; Requisition ID: 87488
* Leonardo DRS; St. Louis; Trade Compliance Specialist; Requisition ID: 88127, or contact brandy.mormino@drs.com
* Lincoln Electric; Cleveland, OH; Trade Compliance Manager;
* Lockheed Martin; Manassass, VA; International Licensing; Requisition ID: 423306BR
* Lockheed Martin; Fort Worth, TX; Import Export Compliance Coordinator; Job ID: 397600BR
* Lockheed Martin; Fort Worth, TX; Export and Import Compliance Investigations Lead; Job ID: 427872BR
* Lockheed Martin; Fort Worth, TX; Licensing Integration and Support; Job ID: 433056BR
* Lockheed Martin; Fort Worth, TX; Regulatory Compliance Analyst Senior; Job ID: 433405BR
* Lockheed Martin; Orlando, FL; Senior International Licensing Analyst; Requisition ID: 434225BR
* Lockheed Martin; Orlando, FL; International Licensing Analyst Sr; Job ID: 424151BR
* Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415717BR
* Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415708BR
* Luminar Technologies; Orlando, FL; Import/Export Trade Compliance Specialist;
* L-3 ALST; Orlando, FL; Contracts Manager / Empowered Official; Requisition ID: 093069
* L-3 Warrior Sensor Systems; Londonderry, NH; Purchasing & Compliance Manager; Requisition ID:096596
* L-3 Warrior Sensor Systems; Middle East; International Business Development Manager - Middle East Region; Requisition ID: 093343
* L-3; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* L-3; Grand Rapids, MI; Sr. Trade Compliance Administrator; Requisition ID: 097197
* L-3; Arlington, TX; Compliance Manager; Requisition ID: 098246

* Mattson Technology; Fremont, California; Import/Export Compliance Analyst;
* Maersk/DAMCO; Agent de transit IMPORT - EXPORT; Job Ref.: DC-164022
* Mattson Technology; Fremont, California; Import/Export Compliance Analyst;
* Medtronic; Heerlen, The Netherlands; Trade Compliance Analyst; Requisition ID: 16000DYY
* Medtronic; Wash DC; Global Trade Lawyer; stacy.m.johnson@medtronic.com; Requisition ID: 170002ON
* Meggit; Akron, OH; Manager, Trade Compliance;
* Meggit; Los Angeles, CA; Trade Compliance Officer;
* Mercury Systems; Andover, MA; International Trade Compliance Director; Requisition ID: 18-165
* Mitchell Martin, Inc.; Dallas, Texas; Export Regulatory Trade Compliance Specialist; Requisition ID: 104405
* Moog; East Aurora, NY; Manager, Group Trade Compliance Manager; Amy Hanavan,  ahanavan@moog.com; Requisition ID: 182102
* Muscogee International, LLC; Washington, D.C.; DDTC Compliance Specialist II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Registration Analyst III; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Policy Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Records Auditor; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Contract Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk Lead; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support I; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support III; Apply HERE or contact their recruiting team.
* MTS Systems; Eden Prairie, MN; Global Trade Compliance Manager; Requisition ID: 37841
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 18010381
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022803
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022805
* Northrop Grumman; McLean, VA; International Trade Compliance Analyst 3; Requisition ID: 18012973
* Northrop Grumman; Herndon, VA; International Trade Compliance Analyst 3; Requisition ID: 18007859
* Northrop Grumman; San Diego, CA; International Trade Compliance Analyst 2; Requisition ID: 18012561

* Northrop Grumman; Redondo Beach, CA; or Rancho Bernardo, CA; or Melbourne, FL; or Falls Church, VA; Sr. Manager, International Trade Compliance; Requisition ID: 18012105; Contact Fred Czarske at 310.332.7606, fred.czarske@ngc.com.
# OCR Services, Inc.; Rockville, MD; Business Analyst, Global Trade Compliance;
* Office of the Director of National Intelligence; McLean, VA; Associate General Counsel;
* Oracle; Unspecified, United States; Customs Compliance Specialist; Requisition ID: 18000H0N
* Oshkosh Corporation; Greenville, WI; Global Trade Compliance Analyst; Requisition ID: 182405
* PerkinElmer, Inc.; Shelton, CT; Systems Analyst, Trade Compliance Solutions;
* PerkinElmer, Inc.; Shelton, CT; International Trade Compliance Analyst - Export Coordinator; Requisition ID: JR-001256
* PerkinElmer, Inc.; Hopkinton, CT; International Trade Compliance Analyst - Export Coordinator; Requisition ID: JR-001256
* PerkinElmer, Inc.; Singapore; ITC Specialist; Requisition ID: JR-003936
* Raytheon; El Segundo, CA; Global Trade Licensing Analyst; Requisition ID: 114977BR
* Raytheon; El Segundo, CA; Global Trade Licensing Analyst; Requisition ID: 115189BR
* Raytheon; El Segundo, CA; Sr. Export Licensing And Compliance Specialist; Requisition ID: 114077BR
* Raytheon; Tucson, AZ; Export Licensing And Compliance Specialist; Requisition ID: 114936BR
* Raytheon; El Segundo, CA; Senior Principle, Global Trade Licensing; Requisition ID: 117232BR
* Raytheon; El Segundo, CA; Manager III, Global Trade Licensing; Requisition ID: 117235BR
* Raytheon; El Segundo, CA; Fullerton, CA; Goleta, CA; Aberdeen, MD; Plano, TX; McKinney, TX; Principal Analyst, Global Trade Licensing; Requisition ID: 117247BR
* Raytheon; El Segundo, CA; Aberdeen, MD; McKinney, TX; Global Trade Licensing Analyst; Requisition ID: 116976BR
* Raytheon; El Segundo, CA; Ft. Wayne, IN; Aberdeen, MD; Global Trade Licensing Analyst; Requisition ID: 118159BR
* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* SABIC; Houston, TX; Senior Analyst, International Trade Compliance; Requisition ID 8655; OR Contact: Jason Washington
* The Safariland Group; Jacksonville, FL; Counsel (International Trade Compliance);
* The Safariland Group; Jacksonville, FL; Sr. Export Compliance Specialist;
* Stockholm International Peace Research Institute (SIPRI); Solna, Sweden; Senior Researcher on Dual Use and Arms Trade Controls;
* Spirent; San Jose, CA; Global Trade Compliance Specialist; Requisition ID: 4088
* Tech Data Corporation; Miami, FL; Sr. Regulatory Compliance Analyst;

* Tech Data Corporation; Clearwater, FL; Sr. Regulatory Compliance Analyst;
* Tech Data Corporation; Groveport, OH; Sr. Regulatory Compliance Analyst;
* Tech Data Corporation; Duluth, GA; Sr. Regulatory Compliance Analyst;
* Tech Data Corporation; Miami, FL; Regulatory Compliance Manager;
* Tech Data Corporation; Clearwater, FL; Regulatory Compliance Manager;
* Tech Data Corporation; Groveport, OH; Regulatory Compliance Manager;
* Tech Data Corporation; Duluth, GA; Regulatory Compliance Manager;
* Teledyne Benthos; Falmouth, MA; Export Compliance Manager
* Teledyne Scientific & Imaging; Montgomeryville, PA; Contracts & Trade Compliance Administrator; Requisition ID: 6470
* Teva Pharmaceuticals; North Wales, PA; Senior Analyst, Customs & Trade Compliance;
* TLR; San Fransisco, CA; Import CSR ; Requisition ID: 1040
* Trek; Waterloo, WI; Global Trade & Logistics Specialist;
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Manager; Requisition ID: 62176BR
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Authorizations Manager; Requisition ID: 63222BR
* United Technologies Corp, Pratt & Whitney; East Hartford, CT; ITC & ACE Compliance Program Manager, ASC; Requisition ID: 58388BR
* Varian; Belgium, Switzerland, Netherlands, or UK; EMEIA Trade Lead - Senior Manager Trade Compliance; Requisition ID: 12301BR; Contact Gavin Tickner at Gavin.Tickner@varian.com
* Varian; Paolo Alto, CA; Senior Trade Compliance Analyst; Requisition ID: 12735BR; Contact Uyen Tran at Uyen.Tran@varian.com
* Vigilant; Negotiable Location, USA; Global Trade Compliance Analyst;
* Vigilant; Negotiable Location, USA; Global Trade Account Manager;
* Vigilant; Budapest, Hungary; Jr. Compliance Analyst;
* Virgin Galactic; Las Cruces, NM; Export Compliance Officer; Requisition ID: 2018-3558
# Weyerhaeuser; Seattle, WA; Export Documentation Specialist / Global Trade Specialist;
* Williams International; Pontiac, MI; Trade Compliance Specialist; Requisition ID: 17-0275
* Wurth Industry of North America; Indianapolis, IN; International Trade Compliance Officer - Classification;
* Xylem, Inc.; Remote, United States; Manager, Global Ethics & Compliance;
* Xylem, Inc; Morton Grove, IL; Trade Compliance Specialist;
* YETI; Austin, TX; Global Trade Compliance Manager;
# Zagg Corp.; Midvale, UT; Global Trade Compliance Specialist;
* Zebra Technologies; Bourne End, UK; Trade Compliance Manager, NALA; Requisition ID: 46144
* Zebra Technologies; Lincolnshire, IL; Holtsville, NY; Mcallen, TX; Miramar, FL; Agoura Hills, CA; Trade Compliance Manager, EMEA; Requisition ID: 46146

back to top

* * * * * * * * * * * * * * * * * *

## 14. ECTI Presents United States Export Control (ITAR/EAR/OFAC) Seminar Training Focusing on Issues Relevant to Universities, Research Labs & Other Institutions of Higher Learning in Columbus, OH
(Source: Jill Kincaid; jill@learnexportcompliance.com)

* What: University Export Controls (ITAR/EAR/OFAC) Seminar in Columbus, OH
* When: September 17-20, 2018
* Where: Columbus, OH: The Blackwell Inn on the campus of The Ohio State University
* Sponsors: Export Compliance Training Institute (ECTI), Visual Compliance, Amber Road
* ECTI Speaker Panel: John Black, Scott Gearity, & Melissa Proctor, with special presentations by Kevin Wolf (Akin Gump), James Bartlett (Full Circle Compliance), Felice Laird (Export Strategies), Jeanette Miller (OFAC), Jessa Albertson & Emily Schriver & Jen Yucel (Ohio State University), Allen DiPalma (Univ. of Pittsburgh), Mary Beran (Georgia Tech), Missy Peloso (Univ. of Penn.) and others
* Register: Here, or Jessica Lemon, 540-433-3977, jessica@learnexportcompliance.com.

back to top

* * * * * * * * * * * * * * * * * *

## 15. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective ", 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands

* Sponsor: <u>Full Circle Compliance</u> (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: <u>HERE</u> or via <u>events@fullcirclecompliance.eu</u>

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Thomas Bulfinch** (15 Jul 1796 - 27 May 1867; was an American writer born in Newton, Massachusetts, best known for the book *Bulfinch's Mythology*, the standard for over a century and still in print 163 years after the first edition was published.)
 - *"Without a knowledge of mythology much of the elegant literature of our own language cannot be understood and appreciated."*

* **Mary Baker Eddy** (16 July 1821 - 3 Dec 1910; established the Church of Christ, Scientist, as a Christian denomination and worldwide movement of spiritual healers. She wrote and published the movement's textbook, *Science and Health with Key to the Scriptures* and 15 other books. In 1908, at the age of 87, she founded *The Christian Science Monitor,* a global newspaper that has won seven Pulitzer Prizes.)
 - *"Jealousy is the grave of affection."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 17. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* <u>ATF ARMS IMPORT REGULATIONS</u>: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: <u>81 FR 2657-2723</u>: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* <u>CUSTOMS REGULATIONS</u>: 19 CFR, Ch. 1, Pts. 0-199

- Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 6 June 2018: 83 FR 26204-26205: Unverified List (UVL); Correction

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.

- Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *

## 18. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update*

(*"Daily Bugle"*), please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance [█████@fullcirclecompliance.eu]
**Sent:** 7/17/2018 7:32:33 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0717 Tuesday "Daily Bugle"



## Tuesday, 17 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.  DHS/CBP Seeks Comments on Form 7507, General Declaration
2.  DHS/CBP Seeks Comments on Transfer of Cargo to a Container Station
3.  DHS/CBP Posts Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties
4.  USTR Seeks Comments on Proposed Section 301 Action Concerning China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

### OTHER GOVERNMENT SOURCES

5.  Items Scheduled for Publication in Future Federal Register Editions
6.  Commerce/BIS: (No new postings.)
7.  DoD/DSS Posts Notice on Hierarchy Change Request Form
8.  State/DDTC Posts FAQ Concerning Public Domain Definition
9.  EU Adopts Restrictive Measures in View of the Situation in the Maldives
10. EU Imposes Additional Restrictive Measures Against ISIL and Al-Qaeda
11. UK ECJU Posts Licensing Data for January to March 2018

### NEWS

12. Defense News: "Trump Advances 'Buy American' Arms Sales Plans"
13. Epoch Times: "Chinese National Pleads Guilty to Stealing US Military Technology"

14.   ST&R Trade Report: "U.S., UK Anticipate Post-Brexit FTA"

COMMENTARY

15.   M. Volkov: "Four Current FCPA Enforcement Trends"
16.   R.L. Magielnicki, R. Whitten & M. Levarlet: "Reform of Foreign Investment in the U.S.: France and Other Allied Countries Might be Exempt"
17.   R.C. Burns: "Chronicle of a Death Foretold"

EX/IM TRAINING EVENTS & CONFERENCES

18.   Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands

EDITOR'S NOTES

19.   Bartlett's Unfamiliar Quotations
20.   Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
21.   Weekly Highlights of the Daily Bugle Top Stories



Awareness Course U.S. Export Control
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands
FULL CIRCLE

ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. DHS/CBP Seeks Comments on Form 7507, General Declaration

(Source: Federal Register, 17 July 2018.) [Excerpts.]

83 FR 33234-33235: Agency Information Collection Activities: General Declaration

* AGENCY: U.S. Customs and Border Protection (CBP), Department of Homeland Security.
* ACTION: 60-Day notice and request for comments; extension of an existing collection of information. ...
* DATES: Comments are encouraged and will be accepted (no later than September 17, 2018) to be assured of consideration. ...
* FOR FURTHER INFORMATION CONTACT: Requests for additional PRA information should be directed to Seth Renkema, Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection, Office of Trade, Regulations and Rulings, 90 K Street NE, 10th Floor, Washington, DC 20229-1177, Telephone number (202) 325-0056 or via email CBP_PRA@cbp.dhs.gov. Please note that the contact information provided here is solely for questions regarding this notice. Individuals seeking information about other CBP programs should contact the CBP National Customer Service Center at 877-227-5511, (TTY) 1-800-877-8339, or CBP website.
* SUPPLEMENTARY INFORMATION: ...
  - Title: General Declaration (Outward/Inward) Agriculture, Customs, Immigration, and Public Health.
  - OMB Number: 1651-0002.
  - Form Number: Form 7507.
  - Action: CBP proposes to extend the expiration date of this information collection with no change to the burden hours. There is no change to the information collected or CBP Form 7507. ...
  - Abstract: An aircraft commander or agent must file CBP Form 7507, General Declaration (Outward/Inward) Agriculture, Customs, Immigration, and Public Health at the time of arrival for all aircraft required to enter pursuant to 19 CFR 122.41 and at the time of clearance for all aircraft departing to a foreign area with commercial airport cargo pursuant to 19 CFR 122.72. This form is used to document clearance and inspections by appropriate regulatory agency staffs. CBP Form 7507 collects information about the flight routing, the number of passengers embarking and disembarking, the number of crew members, a declaration of health for the persons on board, and details about disinfecting and sanitizing treatments during the flight. This form also includes a declaration attesting to the accuracy, completeness, and truthfulness of all statements contained in the form and in any document attached to the form.
  CBP Form 7507 is authorized by 42 U.S.C 268, 19 U.S.C. 1431, 1433, and 1644a; and provided for by 19 CFR 122.43, 122.52, 122.54, 122.73, 122.144, 42 CFR 71.21 and 71.32. This form is accessible here. ...

  Dated: July 12, 2018.
Seth D. Renkema, Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.

* * * * * * * * * * * * * * * * * *

## 2. DHS/CBP Seeks Comments on Transfer of Cargo to a Container Station
(Source: Federal Register, 17 July 2018.) [Excerpts.]

83 FR Agency Information Collection Activities: Transfer of Cargo to a Container Station
* AGENCY: U.S. Customs and Border Protection (CBP), Department of Homeland Security.
* ACTION: 60-Day notice and request for comments; extension of an existing collection of information. ...
* FOR FURTHER INFORMATION CONTACT: Requests for additional PRA information should be directed to Seth Renkema, Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection, Office of Trade, Regulations and Rulings, 90 K Street NE, 10th Floor, Washington, DC 20229-1177, Telephone number (202) 325-0056 or via email CBP_PRA@cbp.dhs.gov. Please note that the contact information provided here is solely for questions regarding this notice. Individuals seeking information about other CBP programs should contact the CBP National Customer Service Center at 877-227-5511, (TTY) 1-800-877-8339, or CBP website.
* SUPPLEMENTARY INFORMATION: ...
  - Title: Transfer of Cargo to a Container Station.
  - OMB Number: 1651-0096.
  - Current Actions: CBP proposes to extend the expiration date of this information collection with no change to the burden hours or to the information collected. ...
  - Abstract: Before the filing of an entry of merchandise for the purpose of breaking bulk and redelivering cargo, containerized cargo may be moved from the place of unlading to a designated container station or may be received directly at the container station from a bonded carrier after transportation in-bond in accordance with 19 CFR 19.41. This also applies to loose cargo as part of containerized cargo. In accordance with 19 CFR 19.42, the container station operator may make a request for the transfer of a container to the station by submitting to CBP an abstract of the manifest for the transferred containers including the bill of lading number, marks, numbers, description of the contents and consignee. ...

  Dated: July 12, 2018.
Seth D. Renkema, Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.

* * * * * * * * * * * * * * * * * *

## 3. DHS/CBP Posts Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties

(Source: Federal Register, 17 July 2018.) [Excerpts.]

83 FR 33232-33233: Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties
* AGENCY: U.S. Customs and Border Protection, Department of Homeland Security.
* ACTION: General notice.
* SUMMARY: This notice advises the public that the quarterly Internal Revenue Service interest rates used to calculate interest on overdue accounts (underpayments) and refunds (overpayments) of customs duties will remain the same from the previous quarter. For the calendar quarter beginning July 1, 2018, the interest rates for overpayments will be 4 percent for corporations and 5 percent for non-corporations, and the interest rate for underpayments will be 5 percent for both corporations and non-corporations. This notice is published for the convenience of the importing public and U.S. Customs and Border Protection personnel.
* DATES: The rates announced in this notice are applicable as of July 1, 2018.
* FOR FURTHER INFORMATION CONTACT: Shawn Kaus, Revenue Division, Collection Refunds & Analysis Branch, 6650 Telecom Drive, Suite #100, Indianapolis, Indiana 46278; telephone (317) 614-4485.
* SUPPLEMENTARY INFORMATION:
   In Revenue Ruling 2018-18, the IRS determined the rates of interest for the calendar quarter beginning July 1, 2018, and ending on September 30, 2018. The interest rate paid to the Treasury for underpayments will be the Federal short-term rate (2%) plus three percentage points (3%) for a total of five percent (5%) for both corporations and non-corporations. For corporate overpayments, the rate is the Federal short-term rate (2%) plus two percentage points (2%) for a total of four percent (4%). For overpayments made by non-corporations, the rate is the Federal short-term rate (2%) plus three percentage points (3%) for a total of five percent (5%). These interest rates used to calculate interest on overdue accounts (underpayments) and refunds (overpayments) of customs duties are the same from the previous quarter. These interest rates are subject to change for the calendar quarter beginning October 1, 2018, and ending December 31, 2018.
   For the convenience of the importing public and U.S. Customs and Border Protection personnel the following list of IRS interest rates used, covering the period from July of 1974 to date, to calculate interest on overdue accounts and refunds of customs duties, is published in summary format. ...

   Dated: July 11, 2018.
Samuel D. Grable, Assistant Commissioner and Chief Financial Officer, Office of Finance.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 4. USTR Seeks Comments on Proposed Section 301 Action Concerning China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

(Source: Federal Register, 17 July 2018.) [Excerpts.]

83 FR 33608-33728: Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

* AGENCY: Office of the United States Trade Representative.
* ACTION: Request for comments and notice of public hearing.
* SUMMARY: On June 20, 2018 (83 FR 28710), the U.S. Trade Representative (Trade Representative) provided notice of an initial action in the Section 301 investigation of the acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation. The initial action was the imposition of an additional 25 percent ad valorem duty on products of China with an annual trade value of approximately $34 billion, effective July 6, 2018. The June 20 notice also sought public comment on another proposed action, in the form of an additional 25 percent ad valorem duty on products of China with an annual trade value of approximately $16 billion. The public comment process in connection with the proposed additional action is ongoing. On July 6, 2018, China responded to the initial action by imposing increased duties on goods of the United States. In light of China's decision to respond to the investigation by imposing duties on U.S. goods, the Trade Representative proposes a modification of the action taken in this investigation. The proposed modification is to maintain the original $34 billion action and the proposed $16 billion action, and to take further action in the form of an additional 10 percent ad valorem duty on products of China with an annual trade value of approximately $200 billion. The products subject to this proposed supplemental action are classified in the HTSUS subheadings set out in the Annex to this notice. The Office of the U.S. Trade Representative (USTR) is seeking public comment and will hold a public hearing regarding this proposed modification of the action in the investigation.
* DATES: To be assured of consideration, you must submit comments and responses in accordance with the following schedule:
  - July 27, 2018: Due date for filing requests to appear and a summary of expected testimony at the public hearing, and for filing pre-hearing submissions.
  - August 17, 2018: Due date for submission of written comments.
  - August 20-23, 2018: The Section 301 Committee will convene a public hearing in the main hearing room of the U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436 beginning at 9:30 a.m.
  - August 30, 2018: Due date for submission of post-hearing rebuttal comments.
* ADDRESSES: USTR strongly prefers electronic submissions made through the Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments in sections D and F below. The docket number is USTR-2018-0026.

* FOR FURTHER INFORMATION CONTACT: For questions about the ongoing investigation or proposed action, contact Arthur Tsao, Assistant General Counsel, or Justin Hoffmann, Director of Industrial Goods, at (202) 395-5725. For questions on customs classification of products identified in the Annex to this notice, contact Traderemedy@cbp.dhs.gov.

* SUPPLEMENTARY INFORMATION: ...

USTR requests comments with respect to any aspect of the proposed supplemental action, including:

  - The specific tariff subheadings to be subject to increased duties, including whether the subheadings listed in the Annex should be retained or removed, or whether subheadings not currently on the list should be added.

  - The level of the increase, if any, in the rate of duty.

  - The appropriate aggregate level of trade to be covered by additional duties.

  - In commenting on the inclusion or removal of particular tariff subheadings listed in the Annex, USTR requests that commenters address specifically whether imposing increased duties on a particular product would be practicable or effective to obtain the elimination of China's acts, policies, and practices, and whether maintaining or imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests, including small- or medium-size businesses and consumers. ...

  Robert E. Lighthizer, United States Trade Representative. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

OTHER GOVERNMENT SOURCES

## 5. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

[No items of interest noted today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. DoD/DSS Posts Notice on Hierarchy Change Request Form
(Source: DoD/DSS, 17 July 2018.)

The Personnel Security Management Office for Industry has provided a direct link to download the Hierarchy Change Request (HCR) form, which can be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. State/DDTC Posts FAQ Concerning Public Domain Definition
(Source: State/DDTC, 17 July 2018.)

*Q: I found some information in a book at a library and I think it might be technical data. Do I need authorization from DDTC to republish this information?*

A:No. Information that is available in printed books, newspapers, journals, and magazines that you can buy in a physical bookstore or newsstand, check out from a public library, or receive in the mail through a subscription or 2nd class U.S. mail does not need any approval from DDTC for republication. The Department is providing this guidance to clarify the preamble of the June 3, 2015 Notice of Proposed Rulemaking (80 FR 31525) International Traffic in Arms: Revisions to Definitions of Defense Services, Technical Data, and Public Domain; Definition of Product of Fundamental Research; Electronic Transmission and Storage of Technical Data; and Related Definitions (Proposed Rule). The Department received public comments and other feedback from the public that raised questions about whether it was necessary to obtain the Department's approval prior to republishing information found in books and academic journals.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. EU Adopts Restrictive Measures in View of the Situation in the Maldives
(Source: Official Journal of the European Union, 17 July 2018.)

*Regulations:*
\* Council Regulation (EU) 2018/1001 of 16 July 2018 concerning restrictive measures in view of the situation in the Republic of Maldives

*Decisions:*
\* Council Decision (CFSP) 2018/1006 of 16 July 2018 concerning restrictive measures in view of the situation in the Republic of Maldives

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. EU Imposes Additional Restrictive Measures Against ISIL and Al-Qaeda

(Source: Official Journal of the European Union, 16 July 2018.)

*Regulations:*
* Council Implementing Regulation (EU) 2018/999 of 16 July 2018
implementing Regulation (EU) 2016/1686 imposing additional restrictive
measures directed against ISIL (Da'esh) and Al-Qaeda and natural and legal
persons, entities or bodies associated with them.

*Decisions:*
* Council Decision (CFSP) 2018/1000 of 16 July 2018 amending Decision
(CFSP) 2016/1693 concerning restrictive measures against ISIL (Da'esh)
and Al-Qaeda and persons, groups, undertakings and entities associated
with them.

back to top

* * * * * * * * * * * * * * * * * *

## 11. UK ECJU Posts Licensing Data for January to March 2018
(Source: UK ECJU, 17 July 2018.)

The added licensing data for January to March 2018 can be found here.

back to top

* * * * * * * * * * * * * * * * * *

NEWS

## 12. Defense News: "Trump Advances 'Buy American' Arms Sales Plans"
(Source: Defense News, 17 July 2018.)

U.S. President Donald Trump has approved the State Department's
implementation plan for the administration's "Buy American" push for
boosting weapons exports that emphasizes the U.S. economy, the State
Department announced Monday.

The Trump administration is undertaking an effort to support U.S. defense
trade overseas to strengthen security partnerships, encourage
interoperability, and protect American economic security and jobs, said the
State Department's Tina Kaidanow, who was in London leading the U.S.
delegation at the Farnborough Airshow.

  "The point is that it is exactly reflected in a place like Farnborough, where
we are supporting U.S. economic security, and we are also achieving a
number of national security goals in conjunction with our important partners

and allies overseas," the principal deputy assistant secretary of state for political-military affairs said in a call with reporters.

The implementation plan for the rule changes, announced in April, are in part meant to reverse the perception that the State Department is a frequent site of logjams in the Foreign Military Sales process.

Officially called the Conventional Arms Transfer policy, it's intended to help private U.S. defense firms directly sell some types of weapons and unmanned drones to allies without the firms having to go through the U.S. government.

Since April, the U.S. government has been working on implementation plans with industry, which hailed Monday's move.

Aerospace Industries Association CEO Eric Fanning said its recommendations for a strategic focus, whole-of-government coordination and enhanced accountability feature prominently in the implementation plan.

"It is absolutely essential for our government and our industry to get to the right answers on defense trade with our allies sooner so that we can continue to 'outpartner' our adversaries," Fanning said. "Going forward, we commit to expanding our already robust dialogue and partnership with the government's security cooperation enterprise to sustain and grow the competitiveness of U.S. defense exports."

The U.S. already leads the world in arms transfers. In 2017, the State Department approved $42 billion in government-to-government sales; and so far this year, 2018 is on track to beat last year at $46 billion.

The State Department, under its plans outlined Monday, would help allies to identify critical capability requirements and employ a whole-of-government effort to expedite transfers.

In February, Kaidanow led a large U.S. delegation to Asia's largest air show to pitch U.S. arms sales as China's military footprint and political influence are surging. What's spelled out in State's plans is competition with adversaries by "providing allies and partners with alternatives to foreign defense articles in order to maintain U.S. influence in key regions."

The plans also call for State to work with the defense industry to build exportability into its designs and development efforts, expanding support for non-program-of-record systems, and by incentivizing increased production capacity and timely delivery.

The State Department would tweak relevant rules, like the International Traffic in Arms Regulations framework; expand and enhance government advocacy and trade promotion in support of the American defense industry; and avoid offsets that imperil domestic jobs or reduce America's technological edge.

The implementation plan may finally give the Defense Department and military services some much-needed direction on how to better align itself for arms deals.

The Air Force was standing by to hear from the White House - through the Defense Department - on how to move forward, its undersecretary, Matt Donovan, told Defense News on the sidelines of Farnborough.

"We are waiting for implementation guidance from the White House," he said Monday morning, just a couple hours before news hit of the approved plan. The Pentagon "and folks like [Under Secretary of Acquisition and Sustainment] Ellen Lord are getting ready to posture us for when that implementation guidance comes out. But as of right now, we're still waiting."

back to top

* * * * * * * * * * * * * * * * * *

## 13. Epoch Times: "Chinese National Pleads Guilty to Stealing US Military Technology"
(Source: Epoch Times, 16 July 2018.)

*[Editor's Note: Cathy Chen was already arrested 23 May 2017, as we reported in the Wednesday 24 May 2017, Daily Bugle, item #6.]*

A Chinese national living in California recently pleaded guilty to stealing U.S. military technology on behalf of the Chinese regime.

Between 2013 and 2015, Cathy Chen, whose Chinese name is Chen Si, sent "advanced radar, military-grade communications jammers, low-noise amplifiers, and Ka-band space communications" to China via Hong Kong, without seeking approval from the U.S. Department of Commerce, according to a July 12 report by Orange County Weekly, a California newspaper, citing federal prosecutors. Products with sensitive technology are under export control and require special permission to ship overseas.

Chen, who used multiple aliases since arriving in the United States in 2007, was able to obtain the technology through her role providing accounting services for aerospace companies, including U.S. defense contractors.

She falsified immigration papers in order to continue staying in the country. In 2012, she married a Chinese man who graduated from a Communist Party military training school in China.

Chen's father also has ties to the military, according to OC Weekly.

After obtaining the military equipment, Chen conspired with several companies based in Shenzhen in southern China to conceal the true

destination and user of the equipment. The companies include Chen Archangel Systems Space, Century Electronic International Co., and Star Aero Investment Ltd.

Federal agents obtained records showing that Chen used a disposable cell phone to reach a Chinese contact, who instructed her to, when asked, insist that the technology would not leave the United States.

She received more than $200,000 in payments for making the shipments.

Chen faces a maximum of 50 years in prison and penalties up to $1.75 million. Her sentence will be announced on Oct. 1.
A number of Chinese nationals have been caught by U.S. authorities stealing military technology in order to support the Chinese regime's attempts to catch up with U.S. military.

In September 2017, Yiheng Percival Zhang, a Chinese professor teaching biological systems engineering at Virginia Tech, was charged with conspiring to defraud the federal government. His research involved the U.S. Army, air forces, and the National Defense University.

Two Chinese nationals were charged with economic espionage and theft of trade secrets in 2015, after they conspired to steal source code and other key military technology from their American employers, Avago Technologies in Colorado and Skyworks Solutions in Massachusetts.

back to top

* * * * * * * * * * * * * * * * * *

## 14. ST&R Trade Report: "U.S., UK Anticipate Post-Brexit FTA"
(Source: Sandler, Travis & Rosenberg Trade Report, 17 July 2018.)

The leaders of the U.S. and the United Kingdom said after a July 13 meeting that their countries plan to pursue a bilateral free trade agreement once the UK formally leaves the European Union in March 2019. Lower-level officials met recently to discuss specific trade-related items that could factor into future FTA talks.

Prime Minister Theresa May said she and President Trump agreed to pursue an "ambitious" FTA that will build on the UK's independent trade policy, reduce tariffs, deliver "a gold standard" in financial services cooperation, and "seize the opportunity of new technology." Trump said his goal is for the two partners to trade without any restrictions, which could "double, triple, quadruple" the current level of two-way trade.

May denied reports that her most recent plan for withdrawing the UK from the EU would limit London's ability to negotiate FTAs with other countries. She asserted that once Brexit is complete the UK will no longer be in the EU customs union and will therefore have an independent trade policy, which it

will use to "do a trade deal" with the U.S. and other countries. Although he reportedly said a day earlier that May's plan "will probably kill" chances for a U.S.-UK FTA, Trump said after talks with May that he has no preference for what the UK-EU relationship ultimately looks like and is only concerned that the UK is "going to be able to trade with the United States."

Ahead of the two leaders' meeting the U.S.-UK Trade and Investment Working Group met in London July 10-11. According to a press release from the Office of the U.S. Trade Representative, this group is working to provide commercial continuity for businesses, workers, and consumers as the UK leaves the EU and to lay the groundwork for a potential future FTA. Toward that end last week's meeting covered topics such as industrial and agricultural goods, services and investment, digital trade, intellectual property rights, regulatory issues, and small and medium-sized enterprises.

back to top

* * * * * * * * * * * * * * * * * *

## COMMENTARY

## 15. M. Volkov: "Four Current FCPA Enforcement Trends"
(Source: Volkov Law Group Blog, 16 July 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

There are two distinct themes in FCPA enforcement - the first is consistency, i.e., that some enforcement actions are relatively consistent across the board and, in the last five to ten years, the FCPA caseload has been fairly steady; the second is variability, meaning that new policies have an impact on FCPA enforcement. Some minor and some major. All of this may be another in my series of profound grasps of the obvious.

While many have criticized the Justice Department and the SEC over their FCPA enforcement practices, a closer look shows that the most significant impact continues to be allocation of resources. DOJ and the SEC have devoted significant resources to increase the number of attorneys assigned to the DOJ's FCPA Unit and the SEC's FCPA Unit, including leveraging of attorneys in US Attorney's Offices and SEC attorneys in SEC field offices. The dedication of three FBI squads has an impact as well.

When the government allocates personnel, the attorneys and agents are expected to perform - to open investigations and prosecute cases. Case numbers ebb and flow each year, some years have more and some lower. Significantly, the number of cases brought each calendar year really does not reflect the amount of work completed by DOJ and the SEC - the

investigations continue at their own pace and re not tied to any calendar year requirements (except when we observed completion of a number of cases at end of Obama Administration).

To make myself clear, there has been no significant change in FCPA enforcement during the Trump Administration or, to say it another way, resources always reflects policy. The current Administration is no different than any other when it comes to FCPA enforcement. If changes were to occur, the Administration would have to reallocate resources or make a significant policy shift which no one expects to occur. So, call it what you will, FCPA enforcement is here to stay for the foreseeable future.

A second observation relates to the assignment of corporate monitors in FCPA cases. In 2016, FCPA enforcement hit a highwater mark and assigned corporate monitors in eight separate cases. This year, we have only had one corporate monitor assigned which was in the Panasonic enforcement action. To replace this requirement, DOJ and the SEC have pushed specific periodic review and reporting requirements. Whether this is a good or a bad idea depends on how much scrutiny DOJ and the SEC devote to review of the report. If such reports are not carefully reviewed and questioned, the self-reporting requirement is unlikely to have any significant impact; on the other hand, if DOJ reviews and questions the company's report, DOJ and the SEC can advance corporate accountability.

Another important area is the impact of the Yates Memorandum. There is no question that DOJ's commitment to the yates Memorandum has increased overall its enforcement against individual actors, particularly in the auto safety and emissions fraud prosecutions. In the FCPA enforcement area, we have seen a "new" trend in the use of non-FCPA charges, such as money laundering, against recipients of foreign bribes. As for "traditional" FCPA prosecutions of individuals, so far, six individuals have been charged in 2018.

Finally (and perhaps most significantly), DOJ and the SEC have raised their expectations with regard to corporate remediation efforts as part of an overall FCPA settlement. DOJ and the SEC hold companies accountable for imposing strict and aggressive discipline of officers and employees responsible for misconduct, stretching to supervisors who failed to hold employees accountable or who otherwise failed to investigate potential misconduct by staff members. Companies have to exercise a robust disciplinary response, including senior officers, or face the prospect of negligible credit for remediation. Even those companies that have designed and implemented effective ethics and compliance programs may earn negligible credit if they do not exact proper disciplinary actions against employees who engage in misconduct.

back to top

* * * * * * * * * * * * * * * * * *

## 16. R.L. Magielnicki, R. Whitten & M. Levarlet: "Reform of Foreign Investment in the U.S.: France and Other Allied Countries Might be Exempt"
(Source: Sheppard Mullin LLP, 13 July 2018.)

* Authors: Robert L. Magielnicki, Esq., rmagielnicki@sheppardmullin.com, +1 202-747-1910; Reid Whitten, Esq., rwhitten@sheppardmullin.com, +44 203.178.7831; Malika Levarlet, Esq., mlevarlet@sheppardmullin.com, +1 202-747-2182. All of Sheppard Mullin LLP.

The U.S. House of Representatives passed a bill on Tuesday, July 10, expanding and increasing the powers of the Committee on Foreign Investment in the United States (CFIUS). The bill is called the Foreign Investment Risk Review Modernization Act (FIRRMA).

The 400-2 passage in the House shows an overwhelming bipartisan momentum behind FIRRMA and signals that the bill is likely to be on the President's desk for signature as soon as the House and Senate reconcile their versions. The timing of the actions is not coincidental. It appears that the Trump Administration has decided to let Congress take the lead on increasing scrutiny of foreign investments.

We have reported on the proposed content of FIRRMA (here and here), and the list of the bill's main points have been recited throughout the law-blogging world. However, now that the bill is on the brink of passage, we believe it is worth examining three key elements that will have significant impact on foreign investors and U.S. companies.

*Exemptions from the CFIUS Process*

It will come as good news for certain investors that the bill may make it easier for numerous U.S.-allied countries including France to invest in the United States. The draft bill authorizes CFIUS to exempt from its review transactions in which all foreign persons involved are from a country identified by the Committee (i) as having processes which effectively safeguard national security interests the country shares with the U.S.; (ii) is a NATO member country or is a major non-NATO ally; or (iii) as adhering to nonproliferation control regimes. That likely creates a list of candidates for exemption to include:

  - The NATO Countries;
  - Australia;
  - New Zealand;
  - South Korea;
  - Japan; and
  - The Philippines

Investments from that group of countries comprise the majority of foreign direct investment in the United States, particularly as we understand that Chinese investment in the United States has dropped 90%.

*Expansion of Covered Transactions*

FIRRMA will significantly expand CFIUS's authority to review inbound foreign investments, particularly in technology, even where those investments do not result in control of the U.S. company by a foreign entity. The definition of "covered transactions," that is, transactions which CFIUS has jurisdiction to review, would be expanded to include any investment (other than a passive investment) by a foreign person in any U.S. critical technology company or U.S. critical infrastructure company, regardless of whether such investment would result in foreign control. It also would include the purchase or lease of real estate located at a land, air or maritime port, or that is in close proximity to a military installation or other sensitive government facility.

*Enhanced Export Controls*

Beyond the changes to CFIUS's mandate, FIRRMA would also require the update and enhancement of U.S. controls on exporting leading-edge technologies. Currently, U.S. export controls lag behind emerging technology. Much of the straight-from-science-fiction developments coming out of Silicon Valley and elsewhere are simply not contemplated by the years-old regulations.

FIRRMA would require a group of executive agencies, led by the Secretary of Commerce, to identify "emerging and foundational technologies" that "are essential to the national security of the United States." The bills do not specifically list technologies to target, but we can expect that robotics, autonomous vehicles, and artificial intelligence will be at the top of the list. None of those technologies are specifically controlled under current U.S. export regulations.

While the expansion of CFIUS powers would likely be implemented fairly directly through regulation, FIRRMA's export control changes would be promulgated through changes to the Export Administration Regulations already in place. Because the export control changes would require changing or adding to complex and nuanced rules, as well as years of established practice by exporters, it is possible, even likely, that changes by that route may take years to take any major effect.

*The Takeaway*

A wide variety of companies will be affected by FIRRMA. U.S. companies developing new technology or exporting controlled items, and non-U.S. companies considering investments in the United States will need to make planning adjustments based on the changes we see coming out of Congress this Summer.

back to top

* * * * * * * * * * * * * * * * *

# 17. R.C. Burns: "Chronicle of a Death Foretold"
(Source: Export Law Blog, 17 July 2018. Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Wash DC, Clif.Burns@bryancave.com, 202-508-6067).

Of course, the Interwebs are all abuzz with the news that the Directorate of Defense Trade Controls ("DDTC") settled the Defense Distributed case as if that were somehow remarkable. Of course, it was about as remarkable as 100-degree days in DC in August or the All-Star Game being a pointless, mind-numbing bore. DDTC's position in this case was on life support, if not already dead, since last May when DDTC and BIS finally announced export control reform which would result in the transfer of most firearms and related technical data, including the types of firearms described in the 3-D printing plans at issue in the case, from the jurisdiction of DDTC to that of the Bureau of Industry and Security ("BIS").

It is no secret that BIS and DDTC have radically different ideas about the consequences of putting something of the Internet. As far as DDTC is concerned, putting anything of the Internet is an export of that item to every foreign country with access to the Internet, i.e., everywhere but the outer reaches of Mongolia. BIS, on the other hand, takes the position that publication on the Internet means that an item is no longer subject to export controls. As BIS said in its proposed notice of rulemaking:

> [I]f a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR."

So once the Category I transition is complete, the fat tenor has sung and the game is over.

DDTC, of course, could have waited until the last notes of Nessun Dorma, but instead agreed to move ahead. To do that before the transition of the firearms in question to BIS was complete, there are several housekeeping matters that the settlement agreement needed to address. First, DDTC agreed to continue with the announced proposed rules and to adopt a final rule that would remove the plans at issue from Category I of the USML. Second, DDTC would announce a temporary modification of the rules to exempt the plans prior to the transition from the USML to the Commerce Control List becoming effective. Third, DDTC agreed to issue a letter saying that the plans had been approved for public release - something not really necessary in light of the temporary modification of the rules to exempt the plans. Fourth, an acknowledgment that the letter permitted people to do whatever they wanted with those plans - again something not really necessary in light of the temporary modification and the letter itself.

What comes as a surprise to me was not that DDTC dropped the case, or that it did so before the guns at issue were removed from the USML, but that it agreed to fork over $39,581 to the plaintiffs. Granted that's not a huge sum. Still, DDTC has not conceded that its position that putting USML technical data on the Internet is an export is wrong. Indeed, that will continue to be the case for items remaining on the USML. Well, I guess lawyers have to eat too.

back to top

* * * * * * * * * * * * * * * * * *

## EX/IM TRAINING EVENTS & CONFERENCES

## 18. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective ", 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 19. Bartlett's Unfamiliar Quotations
(Source: Editor)

\* **Isaac Watts** (17 Jul 1674 - 25 Nov 1748; was an English Christian minister (Congregational), hymn writer, theologian, and logician. He was a prolific and popular hymn writer and is credited with some 750 hymns, including *Joy to the World, O God Our Help in Ages Past,* and *When I Survey the Wondrous Cross*.  Watts is recognized as the "Godfather of English Hymnody;" many of his hymns remain in use today and have been translated into numerous languages.)
  - *"Learning to trust is one of life's most difficult tasks."*

back to top

* * * * * * * * * * * * * * * * * *


## 20. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

\* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

\* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 6 June 2018: 83 FR 26204-26205: Unverified List (UVL); Correction

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
   - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
   - HTS codes that are not valid for AES are available here.
   - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
   - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
   - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
   - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * *


## 21. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

**From**: Donna Ganoe [Donna.Ganoe@bis.doc.gov]
**Sent**: 7/18/2018 12:58:41 PM
**Subject**: BIS NewsClips July 18, 2018

1. **Unshackled ZTE Needs Weeks to Get Business on Track, Sources Say | Bloomberg News | July 17, 2018**
2. **Chronicle of a Death Foretold | posted by Clif Burns | ExportLaw Blog | July 16, 2018**
3. **Trump's ear-splitting wake-up call on tariffs: 26,000 exemption requests | by Daniel Strauss | Washington Examiner | July 17, 2018**
4. **Trump Administration Denies Pipeline Company Tariff Exemption | by Rebecca Elliott | WSJ | July 16, 2018**
5. **Steel Tariff Exemption Rejections Frustrating Members, Say API Execs | by Charlie Passut | NGI | July 17, 2018**

* * * * * * * * * * * *

1. **Unshackled ZTE Needs Weeks to Get Business on Track, Sources Say | Bloomberg News | July 17, 2018**

https://www.bloomberg.com/news/articles/2018-07-17/unshackled-zte-is-said-to-need-weeks-to-get-business-on-track

· The company is said to have difficulties re-hiring thousands

ZTE Corp. will take several weeks to get its business back on track after gaining its freedom from a game-ending U.S. technology ban, people familiar with the matter said.

The Chinese telecommunications equipment maker is dealing with a worker shortage as it awaits shipments of key components from U.S. suppliers like Qualcomm Inc., the people said, asking not to be identified discussing internal matters. That's hindering its ability to get plants up to full speed and ZTE may not hit peak capacity until August, the people said.

Washington lifted its moratorium on ZTE's purchases of U.S. technology on the weekend, resolving a months-long moratorium that choked off crucial components the Shenzhen-based company needs to make networking gear and smartphones. Investors have reacted with relief by sending its shares up more than 20 percent while China is said to be pushing local carriers to consider boosting orders.

While the U.S. ban was in place, the company shut down its major operations. Now that it has been cleared to resume business, ZTE is trying to mobilize workers but is having trouble convincing the thousands who hail from distant provinces to return to the fold, the people familiar said. Comprising as much as three-quarters of its factory force, they'd long scattered from ZTE's base to return to their hometowns and can't be recalled on short notice, the people said.

Compounding the issue, ZTE pays its laborers, often sourced from third-party agencies, less than other major employers in the region. The Chinese firm recently offered 13 yuan ($1.95) an hour to prospective assemblers, according to a recruitment notice obtained by Bloomberg. That compares with the 21 yuan proffered by Foxconn Technology Group, Apple Inc.'s main manufacturer, according to the same notice.

ZTE declined to comment about problems securing workers and the time it will take to get operations up to speed.

**How ZTE Ended Up in Middle of U.S.-China Trade War: QuickTake**

While facilities in Shenzhen and the central Chinese city of Changsha began running Sunday, they remain well below optimum capacity, the people said. Some assembly lines had fewer than half the workers they needed as of Monday to function at top speed, though engineers are prepping to open more lines as employees come in. As recruitment continues, the labor shortage is expected to ease, the people said.

Meanwhile, ZTE's sales teams in Europe, Southeast Asia and Latin America have begun reaching out to existing and potential clients, one of the people said. The company is concerned about losing business: it's already said to have lost a 600 million-euro ($700 million) contract to supply wireless equipment to Wind Tre SpA, to Ericsson AB.

ZTE, which breached trade sanctions to Iran and then lied about it, won its reprieve by paying $1.4 billion in penalties, changing its entire board and appointing a new chairman. It also agreed to allow U.S. compliance monitors. The company estimates its losses at $1.3 billion in the first half alone.

In the longer term, the new management faces the challenge of rebuilding trust with phone companies and corporate customers -- particularly abroad. The government has sent notices encouraging China's three telecom carriers to consider awarding more deals to ZTE, one of the people familiar said.

China's Ministry of Industry and Information Technology didn't immediately respond to a faxed request for comment.

China Mobile Ltd., the largest, granted at least 70 percent of a broadband construction deal to ZTE on Monday, according to a notice on its website. The much-needed deal will generate about 487 million yuan in revenue for ZTE, which competes with larger cross-town rival Huawei Technologies Co.

Then there's the issue of talent recruitment beyond factory workers, one of the people said, in part because it's proven difficult to convince people of ZTE's prospects given the damage dealt by the U.S. action. The company however remains active in recruiting new graduates, one of the people said.


2. **Chronicle of a Death Foretold | posted by Clif Burns | ExportLaw Blog | July 16, 2018**

https://www.exportlawblog.com/archives/9207

Of course, the Interwebs are all abuzz with the news that the Directorate of Defense Trade Controls ("DDTC") settled the Defense Distributed case as if that were somehow remarkable. Of course, it was about as remarkable as 100 degree days in DC in August or the All Star Game being a pointless, mind-numbing bore. DDTC's position in this case was on life support, if not already dead, since last May when DDTC and BIS finally announced export control reform which would result in the transfer of most firearms and related technical data, including the types of firearms described in the 3-D printing plans at issue in the case, from the jurisdiction of DDTC to that of the Bureau of Industry and Security ("BIS").

It is no secret that BIS and DDTC have radically different ideas about the consequences of putting something of the Internet. As far as DDTC is concerned, putting anything of the Internet is an export of that item to every foreign country with access to the Internet, i.e., everywhere but the outer reaches of Mongolia. BIS, on the other hand, takes the position that publication on the Internet means that an item is no longer subject to export controls. As BIS said in its proposed notice of rulemaking:

[I]f a gun manufacturer posts a firearm's operation and maintenance manual on the Internet, making it publicly available to anyone interested in accessing it and without restrictions on further dissemination (i.e., unlimited distribution), the operation and maintenance information included in that published operation and maintenance manual would no longer be "subject to the EAR."
So once the Category I transition is complete, the fat tenor has sung and the game is over.

DDTC, of course, could have waited until the last notes of Nessun Dorma, but instead agreed to move ahead. To do that before the transition of the firearms in question to BIS was complete, there are several housekeeping matters that the settlement agreement needed to address. First, DDTC agreed to continue with the announced proposed rules and to adopt a final rule that would remove the plans at issue from Category I of the USML. Second, DDTC would announce a temporary modification of the rules to exempt the plans prior to the transition from the USML to the Commerce Control List becoming effective. Third, DDTC agreed to issue a letter saying that the plans had been approved for public release — something not really necessary in light of the temporary modification of the rules to exempt the plans. Fourth, an

acknowledgment that the letter permitted people to do whatever they wanted with those plans — again something not really necessary in light of the temporary modification and the letter itself.

What comes as a surprise to me was not that DDTC dropped the case, or that it did so before the guns at issue were removed from the USML, but that it agreed to fork over $39,581 to the plaintiffs. Granted that's not a huge sum. Still, DDTC has not conceded that its position that putting USML technical data on the Internet is an export is wrong. Indeed, that will continue to be the case for items remaining on the USML. Well, I guess lawyers have to eat too.

### 3.  Trump's ear-splitting wake-up call on tariffs: 26,000 exemption requests | by Daniel Strauss | Washington Examiner | July 17, 2018

https://www.washingtonexaminer.com/business/trumps-ear-splitting-wake-up-call-on-tariffs-26-000-exemption-requests

Almost four months after President Trump rattled Corporate America with stiff steel and aluminum tariffs, the Commerce Department has received a total of 26,403 exemption requests, more than four times as many as expected.

As of July 8, it has made final decisions on just 133 of the petitions, which seek waivers for supplies not readily available in U.S. markets and for which rising costs might threaten profits and even force small companies out of business.

"We continue to process the exclusion requests as they come in and will publish the department's decision within the 90 days after a request is posted for public comment," a Commerce spokesperson said in an email. Secretary Wilbur Ross has said the exemptions will be applied retroactively, meaning if a company receives an exclusion, any tariffs it paid after filing an objection will be refunded.

The secretary defended the duties, which have been widely criticized by economists, business leaders and global trading partners, to the Senate Finance Committee in late June. Members expressed concern that an understaffed Commerce Department would be unable to effectively process all of the requests, a problem Ross blamed in part on the delay in Congressional funding to hire extra staff to help process them.

The majority of requests filled have been for steel products, on which Commerce requires individual submissions for every grade, size and type of steel. After exemption requests have been filed and processed, they must be posted to the Federal Register for a 30-day public comment period before the request can be approved by the Commerce Department. According to the Bureau of Industry and Security, after the public comment period, an additional 60 days are needed to fully review a request.

President Trump imposed the tariffs of 25 percent on steel and 10 percent on aluminum under national security grounds permitted by Section 232 of the Trade Expansion Act of 1962. The move was questioned by lawmakers from his own party and scoffed at by longtime U.S. allies such as Canada, Europe and Mexico, all of which have retaliated.

The U.S. Trade Representative responded by challenge punitive duties from China, Canada, Mexico, Turkey and the European Union before the World Trade Organization.

"The actions taken by the president are wholly legitimate and fully justified as a matter of U.S. law and international trade rules," U.S. Trade Representative Robert Lighthizer said in a statement. "Instead of working with us to address a common problem, some of our trading partners have elected to respond with retaliatory tariffs designed to punish American workers, farmers and companies. "

### 4.  Trump Administration Denies Pipeline Company Tariff Exemption | by Rebecca Elliott | WSJ | July 16, 2018

https://www.wsj.com/articles/trump-administration-denies-pipeline-company-tariff-exemption-1531789351

Plains All American had sought exclusion from the steel tariff President Donald Trump announced in March

The U.S. Commerce Department has denied what appears to have been the first request by a pipeline company to be exempted from the Trump administration's 25% tariff on imported steel pipe.

The denial of the request by Plains All American Pipeline LP, disclosed in a regulatory filing, indicates that pipeline companies, several of which have sought similar exemptions, may soon face increased materials costs.

A Plains All American subsidiary asked in April that a specialized pipe it planned to use in a proposed West Texas pipeline be excluded from the steel tariff President Donald Trump announced in March. The project, known as Cactus II, is slated to run from the Permian Basin, America's hottest oil field, to Corpus Christi beginning late next year.

"The product referenced in the above-captioned exclusion request is produced in the United States in a sufficient and reasonably available amount and of a satisfactory quality," the Commerce Department's Bureau of Industry and Security wrote Friday.

Plains said Monday that it was "disappointed" by the decision but intended to move forward with the project as planned. It criticized the exemption-application process, calling it opaque and flawed.
"Collecting a tariff on steel pipe orders for projects like this constitutes a tax on the construction of critical U.S. energy infrastructure, which is a significant unintended consequence of current trade policy and risks U.S. energy security and American jobs," the company wrote in a statement.

The company had said in its exclusion request that no U.S. companies were capable of manufacturing the kind of pipe it ordered from Greece in December.

Plains also warned of possible construction delays in the "hypothetical scenario" in which a U.S. company were able to manufacture the pipe.

"If a purchase order was issued today, the mill would not likely be able to meet the pipeline system's completion targets," James Ferrell, a Plains vice president, wrote in the application.

The Commerce Department hasn't yet ruled on similar requests made by Kinder Morgan Inc., the Williams Co s. or a pipeline unit of Royal Dutch Shell PLC.

Materials usually are the second-costliest part of pipeline projects, after labor, according to energy analytics company LawIQ.


5.    **Steel Tariff Exemption Rejections Frustrating Members, Say API Execs | by Charlie Passut | NGI | July 17, 2018**

http://www.naturalgasintel.com/articles/115085-steel-tariff-exemption-rejections-frustrating-members-says-api-execs

Officials with the American Petroleum Institute (API) said their member companies have been frustrated with the process the Trump administration established for requesting an exemption to tariffs on imported steel, with several petitions already rejected on vague grounds.

Last March, the Department of Commerce outlined a procedure for the oil and natural gas industry to request an exemption from the 25% tariff on steel imports that took effect on March 8. The industry and its allies argue that specialty steel products used in pipelines and at liquefied natural gas (LNG) export facilities meet the criteria for an exemption because there is an insufficient supply of comparable products from domestic steel manufacturers.

According to API, its member companies have so far submitted more than 80 petitions for an exemption. Of those, Commerce's Bureau of Industry and Security (BIS) has ruled on just 17 petitions -- granting eight and denying nine.

"We've had member companies have some of their petitions approved, and those some companies have had some of their petitions denied," API's Aaron Padilla, senior adviser for international policy, told NGI on Monday. "They're still working to discern the difference and distinction that Commerce has drawn between petitions for very similar products from the same supplier and the same country."

Padilla said in some cases, API members have laid both approved and rejected petitions side-by-side and found few differences. The BIS has given a "very limited explanation" for why it rejected the petitions.

"The reason that's been given has been that there was insufficient information provided, that it was not a complete submission," Padilla said. Separate reviews by both API and member companies have shown that "it's not clear" where the insufficiencies lie. The companies "are individually in the process" of contacting Commerce and the BIS for clarifications.

The White House said the tariffs are justified on national security grounds, citing Section 232 of the 1962 Trade Expansion Act and Section 301 of the Trade Act of 1974. Last week, the administration unveiled a list of $200 billion in Chinese-made products that could be subject to a new 10% tariff. The list included LNG and offshore oil and natural gas drilling and production platforms. Beijing vowed to immediately retaliate, should the new tariff take effect in late August or early September.

API's Chris Kelley, director of federal relations, said he thought the widening trade wars with China, Canada, Mexico and the European Union, would continue.

"They're putting a lot of companies through a lot of problems, heartache and paperwork," Kelley said. "It seems to be a very arbitrary process that the Department of Commerce is instituting."

Kelley said it appeared unlikely that the White House had instituted the tariffs simply as a way to gain leverage over America's trading partners and get better trade deals. "I couldn't imagine why they would go through with the rulemaking process, the country exemption process and the product exclusion process, which are very burdensome, complicated and challenging for companies to go through, if they weren't serious about it. We haven't seen any indication that they're going to let up on these particular issues. This seems like a trend that will continue."

Padilla added that the domestic steel industry is not on the same side as the oil and gas industry over the tariffs.

"The petitions are the clearest cut examples of specialty steel products that our member companies cannot source from U.S. manufacturers," Padilla said. "Yet many of those petitions are still attracting objections from U.S. steel manufacturers, who are stating that they can manufacture a product that's close enough in the specifications that our member companies require.

"That would indicate that there's probably not going to be a common understanding of what is procurable domestically versus what is only procurable from outside the United States. On some products where U.S. manufacturers have objected, they have a different point of view than our member companies."

**Plains Says Rejection 'Unjust'**

According to BIS records, Plains All American Pipeline LP's request for a tariff exemption was denied on Monday. Plains requested an exemption in advance of building the Cactus II Pipeline, a $1.1 billion project designed to connect the Permian Basin in West Texas to the Corpus Christi area in South Texas with a takeaway capacity of 585,000 b/d.

Plains' filing showed that it had previously contracted Greece's Corinth Pipeworks Pipe Industry SA for 26-inch outside diameter (OD) high frequency welded (HFW) pipe needed for the project. Plains said Corinth was "one of only three mills

in the world" capable of producing the pipe, and the other two mills are in China and Japan. "There is no production of such pipe within the U.S.," Plains said.

"Even in the hypothetical scenario that a domestic mill was able to technically manufacture 26-inch OD HFW pipe, if a purchase order was issued today, the mill would not likely be able to meet the pipeline system's completion targets, particularly given that the first delivery…is required in June 2018," Plains said. "Furthermore, the foregoing statement does not even take into consideration a mill's current delivery commitments for previously placed orders. Months of advanced planning are needed in such large construction projects."

BIS records show that Berg Steel Pipe Corp., which is based in Panama City, FL, had objected to the request. Berg said while no domestic steel manufacturer could produce 26-inch OD HFW pipe, there were many domestic sources for an alternative product: double submerged arc welded pipe, in both longitudinally welded and helically welded forms.

Plains called the rejection "unjust" because it had ordered the steel in late 2017, before the tariffs were enacted. The company said it would review its options to challenge the decision, adding that the project would "move forward as planned."
"Collecting a tariff on steel pipe orders for projects like this constitutes a tax on the construction of critical U.S. energy infrastructure, which is a significant unintended consequence of current trade policy and risks U.S. energy security and American jobs," a Plains spokesperson told NGI on Tuesday. "The steel tariff exclusion request review process is flawed and does not allow for an applicant to effectively engage in the review process."

The review process, according to Plains, "is opaque to applicants and appears to rely on comments that are not required to be substantiated, and on a review of undisclosed data by staff without meaningful interaction with the applicants. The process is further complicated by more than 10,000 exclusion requests and associated documents needing attention in a limited window of time. This process must be improved to best serve the interests of our country."

API Executive Vice President Marty Durbin said the decision by BIS "ignores the legitimate and critical needs of the natural gas and oil industry for global sourcing of specialty steel products essential to delivering energy to the American families.
"The administration's decision-making is not serving the interests of energy consumers and American businesses, as these tariffs are expected to increase the cost of sourcing steel for the oil and natural gas companies which in turn could increase the cost of energy to consumers. This is not the way to achieve the administration's commendable goal of U.S. energy dominance."

| **From**: | Timothy Mooney |
| **Sent**: | 7/18/2018 5:10:28 PM |
| **To**: | Sharron Cook [Sharron.Cook@bis.doc.gov] |
| **Subject**: | RE: Article on 3D printing of guns |

I saw that.  Thanks, Sharron.

Tim

**From:** Sharron Cook
**Sent:** Wednesday, July 18, 2018 1:09 PM
**To:** Hillary Hess <Hillary.Hess@bis.doc.gov>; Willard Fisher <Willard.Fisher@bis.doc.gov>; Sheila Quarterman <Sheila.Quarterman@bis.doc.gov>; Nancy Kook <Nancy.Kook@bis.doc.gov>; Timothy Mooney <Timothy.Mooney@bis.doc.gov>; Susan Kramer <Susan.Kramer@bis.doc.gov>; Mark Crace <Mark.Crace@bis.doc.gov>
**Subject:** Article on 3D printing of guns

https://www.washingtonpost.com/news/post-nation/wp/2018/07/18/meet-the-man-who-wants-to-bring-on-the-age-of-downloadable-guns-and-may-have-already-succeeded/?utm_term=.bc24c2dea162

**From**: Jim Bartlett, Full Circle Compliance [███████@fullcirclecompliance.eu]
**Sent**: 7/18/2018 6:31:30 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 18-0718 Wednesday "Daily Bugle"



### Wednesday, 18 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DHS/CBP Releases Notice Concerning Section 232 Product Exclusion ID Test Data
4. DHS/CBP Updates Drawback CATAIR and Error Dictionary
5. State/DDTC: (No new postings.)
6. EU Amends North Korea Sanctions, Imposes Provisional Safeguard Measures Concerning Certain Steel Imports

### NEWS

7. Big Think: "You Can Legally Download 3D-Printed Gun Designs Starting August 1st"
8. Global Trade News: "EU and Japan Sign Historic Free Trade Deal"
9. The Independent: "Government Should Look to Block Arms Sales to Countries Accused of Rights Abuses, Influential Group Of MPs Says"
10. Reuters: "Exclusive: Philippines Could Breach U.S. Sanctions If Russia Arms Deal Proceeds"
11. ST&R Trade Report: "Canada Accepting Requests to Avoid Retaliatory Duties on U.S. Goods"

### EX/IM TRAINING EVENTS & CONFERENCES

12. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands

EDITOR'S NOTES

13. Bartlett's Unfamiliar Quotations

14. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

15. Weekly Highlights of the Daily Bugle Top Stories



Awareness Course U.S. Export Control
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands

FULL CIRCLE

ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * *

OTHER GOVERNMENT SOURCES

# 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Treasury/OFAC; NOTICES; Blocking or Unblocking of Persons and Properties [Publication Date: 19 Jul 2018.]

back to top

* * * * * * * * * * * * * * * * * *

# 2. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * *

# 3. DHS/CBP Releases Notice Concerning Section 232 Product Exclusion ID Test Data
(Source: CSMS #18-000439, 18 Jul 2018.)

In support of the trade's ability to test Product Exclusions related to Section 232, CBP has created the following test data that may be used in the ACE Certification environment. Please note that the Product Exclusion data will be validated against the Effective Dates, HTS, and COO combinations provided in the attached table.

- Attachment

back to top

* * * * * * * * * * * * * * * * * *

# 4. DHS/CBP Updates Drawback CATAIR and Error Dictionary
(Source: CSMS# 18-000438, 18 Jul 2018.)

An updated Drawback CATAIR is now posted with a corrected Table of Changes.

The updated Drawback CATAIR can be found here. Additionally, an updated Drawback Error dictionary was posted and that can be found here.

back to top

* * * * * * * * * * * * * * * * * *

# 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *

## 6. EU Amends North Korea Sanctions, Imposes Provisional Safeguard Measures Concerning Certain Steel Imports
(Source: Official Journal of the European Union, 17 Jul 2018.)

*Regulations*
* Council Implementing Regulation (EU) 2018/1009 of 17 July 2018 implementing Regulation (EU) 2017/1509 concerning restrictive measures against the Democratic People's Republic of Korea
* Commission Implementing Regulation (EU) 2018/1013 of 17 July 2018 imposing provisional safeguard measures with regard to imports of certain steel products

*Decisions*
* Council Implementing Decision (CFSP) 2018/1016 of 17 July 2018 implementing Decision (CFSP) 2016/849 concerning restrictive measures against the Democratic People's Republic of Korea

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**NEWS**

## 7. Big Think: "You Can Legally Download 3D-Printed Gun Designs Starting August 1st"
(Source: Big Think, 18 Jul 2018.) [Excerpts.]

The State Department has reached a settlement with Defense Distributed, which publishes downloadable schematics for 3D-printed guns, in a landmark decision that will enable the controversial organization to publish CAD files of firearms on its DEFCADwebsite.

Starting August 1, 2018, anyone in the world with a 3D printer, some raw materials and an open internet connection will be able to produce their own gun, including classic firearms like the AR-10 and Beretta M9, as well as the Liberator, the world's first 3D-printed gun.

The Ghost Gunner, Defense Distributed's PC-connected milling machine manufactured that can carve holes in unfinished gun parts, will also become legal on August 1. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Global Trade News: "EU and Japan Sign Historic Free Trade Deal"
(Source: Integration Point Blog, 17 Jul 2018.) [Excerpts.]

Today the European Union and Japan signed an ambitious Economic Partnership Agreement (EPA) that constitutes "a strong message against protectionism." The trade agreement is the largest ever negotiated by the EU and encompasses a market of more than 600 million people. ...

The deal eliminates 99% of the tariffs on Japanese goods sold to the EU. Similarly, about 94% of the tariffs on European exports to Japan will be lifted, rising to 99% in the future. All in all, these tariffs are estimated to cost businesses in the EU and Japan nearly $1.17 billion annually.

The next step is for both parliaments to ratify the agreement. The EU and Japan hope to ratify the agreement and bring it into force by March 2019, which is when the United Kingdom makes it exit from the EU.

To learn more about the EU-Japan Economic Partnership Agreement, visit European Commission, USA Today, and Nikkei Asian Review.

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 9. The Independent: "Government Should Look to Block Arms Sales to Countries Accused of Rights Abuses, Influential Group Of MPs Says"
(Source: The Independent, 18 Jul 2018.) [Excerpts.]

The [UK] government should tighten restrictions on the sale of UK arms to countries accused of human rights abuses, an influential committee of MPs has said.

The Committee on Arms Export Controls (CAEC) said ministers' default position should be to block the sale of weapons to countries that have not signed an international arms trade treaty and those on a Foreign Office human rights blacklist.

It also called on the government to start monitoring where UK arms are being deployed, in order to ensure British weapons are not being used in attacks on civilians or other human rights abuses.

Critics say the failure to monitor the end destination of British-made weapons allows manufacturers to deny culpability for how their products are used.

The committee also warned that ministers have not clarified how Brexit will affect the regulation of arms sales. ...

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 10. Reuters: "Exclusive: Philippines Could Breach U.S. Sanctions If Russia Arms Deal Proceeds"
(Source: Reuters, 18 Jul 2018.) [Excerpts.]

The Philippines is at risk of breaching sanctions imposed by the United States if it proceeds with the purchase of grenade launchers from a blacklisted Russian firm, a deal that could test its longtime security alliance with Washington.

A senior Philippine general familiar with the deal said Manila had agreed in October last year to a 400 million peso ($7.48 million) purchase of 750 RPG-7B rocket propelled grenade launchers from Russia's state-owned Rosoboronexport, but the transfer had yet to be completed.

U.S. sanctions were imposed last year against any country trading with Russia's defense and intelligence sectors. ...

Russia has donated assault rifles and trucks to the Philippines but the grenade launchers would be Manila's first purchase of Russian weapons. The Philippines has long relied on the United States as its main source of military hardware and support.

If it goes ahead, the deal could add strain to a nearly 70-year-old security alliance that Washington has described as "ironclad", despite Philippine President Rodrigo Duterte's disdain for the relationship with the former colonial power. ...

A U.S. State Department official said foreign governments and private sector entities had been put on notice that "significant transactions with any of the 39 listed entities will result in sanctions". Rosoboronexport was blacklisted in April.

American allies who buy weapons and equipment from Russia, the world's second-largest arms exporter, would also be penalized and could see the transfer of those arms disrupted.

The State Department official declined to say what specific sanctions the U.S. could impose on the Philippines if it goes ahead with the deal with Rosoboronexport, while a spokesman for the Treasury Department said it "does not telegraph sanctions or comment on prospective actions." ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## 11. ST&R Trade Report: "Canada Accepting Requests to Avoid Retaliatory Duties on U.S. Goods"
(Source: Sandler, Travis & Rosenberg Trade Report, 18 Jul 2018.)

DOC_0002768

The Canadian government is accepting requests for remission of the tariffs imposed on U.S. goods as of July 1 in retaliation for the Trump administration's duty hike on steel and aluminum products.

Canada's tariffs include an additional 25 percent duty on steel products classified under various subheadings in Chapter 72 and an additional 10 percent duty on aluminum products as well as other goods such as food products, mattresses, lawn mowers, dishwashers, boats, and various consumer goods. These measures are being imposed in retaliation for, and will remain in place until the elimination of, the higher duties the U.S. imposed June 1 on steel and aluminum products from Canada citing national security concerns.

The Canadian government states that it will consider requests for remission of the additional tariffs (i.e., relief from payment or refund of payments made) only in the following circumstances: (1) to address situations of short supply in the domestic market, either on a national or regional basis; (2) where there are contractual requirements, existing prior to May 31, 2018, for Canadian businesses to use U.S. steel or aluminum in their products or projects; and (3) to address, on a case-by-case basis, other exceptional circumstances that could have severe adverse impacts on the Canadian economy.

Requests must include a substantial amount of information concerning the requesting company, subject goods, import volumes and values, and tariff effects. Requests will go through a detailed review process and the government has set no deadlines for making decisions. Only companies registered in Canada may submit remission requests.

Aside from requesting remissions, companies can use other methods to lower or avoid the Canadian retaliatory tariffs on their products, parts, or SKUs, including reclassification or tariff engineering.

back to top

* * * * * * * * * * * * * * * * * * *

EX/IM TRAINING EVENTS & CONFERENCES

## 12. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective ", 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations

outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 13. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **William Makepeace Thackeray** (18 Jul 1811 - 24 Dec 1863; was a British novelist and author. He is known for his satirical works, particularly *Vanity Fair*, a panoramic portrait of English society.)
   - *"A good laugh is sunshine in the house."*
   - *"The two most engaging powers of an author are to make new things familiar, familiar things new."*

back to top

* * * * * * * * * * * * * * * * * *

## 14. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
   - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199

- Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
   - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
   - Last Amendment: 6 June 2018: 83 FR 26204-26205: Unverified List (UVL); Correction

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
   - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
   - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
   - HTS codes that are not valid for AES are available here.
   - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
   - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.

- Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
- The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * *

## 15. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update*

*("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

**Sent**: 7/18/2018 8:28:55 PM
**To**: Nancy Kook [Nancy.Kook@bis.doc.gov]
**Subject**: article on the 3D printing

Nancy,

http://www.thetruthaboutguns.com/2018/07/daniel-zimmerman/saf-dept-of-justice-settle-defense-distributed-first-amendment-lawsuit/

The articles being posted today overstate what actually occurred in the settlement.

The pull back in the settlement was for the firearms that are not military that would move to the CCL.

The articles from today make it sound like the pullback was broader than it was. For firearms that will be retained on the ITAR, the ITAR rules have not changed.

The article misses that important nuance. Under the EAR, the technical data will be treated the same as any other technical information and if someone takes steps to make it publicly available, then it is no longer subject to the EAR.

Tim

**From:** Jim Bartlett, Full Circle Compliance [████@fullcirclecompliance.eu]
**Sent:** 7/19/2018 6:42:42 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0719 Thursday "Daily Bugle"



## Thursday, 19 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DoD/DSCA Releases Policy Memo Concerning Information on MIDS
4. Justice: "Connecticut Business Owners Who Profited from Unlawful Exports to Pakistan Are Sentenced"
5. OMB/OIRA Reviews of Proposed Ex/Im Regulations
6. State/DDTC: (No new postings.)
7. Treasury/OFAC Issues Venezuela General License 5, Publishes Venezuela-related FAQs
8. U.S. and the Netherlands Sign Defense Agreement

### NEWS

9. Bloomberg: "Trump's Tariffs Spark Outcry from Companies Denied Relief"
10. Financial Review: "Universities Label Defense Proposals 'Extraordinary and Excessive'"
11. The Guardian: "UK Stance on Arms Exports Protects Corrupt Practices, Experts Claim"
12. Jane's 360: "Australia Calls for Greater Powers to Control Defense Exports"

13.     Reuters: "Exclusive: U.S. Offers India Armed Version of Guardian Drone - Sources"

COMMENTARY

14.     J. Reeves & K. Heubert: Analysis of Settlement Agreement Reached In 3D Gun Printing Case

15.     M. Volkov: "The Risk of Employee Misconduct"

16.     R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Options for Addressing the new U.S. Tariffs on Chinese-Origin Items"

**EX/IM TRAINING EVENTS & CONFERENCES**

17.     Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands

**EDITOR'S NOTES**

18.     Bartlett's Unfamiliar Quotations

19.     Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

20.     Weekly Highlights of the Daily Bugle Top Stories



Awareness Course U.S. Export Control
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands

FULL CIRCLE

**ITEMS FROM TODAY'S FEDERAL REGISTER**

[No items of interest noted today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* DHS/CBP; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Customs Declaration [Publication Date: 20 Jul 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. DoD/DSCA Releases Policy Memo Concerning Information on MIDS
(Source: DoD/DSCA, 19 Jul 2018.)

\* DSCA Policy Memo 18-13 Information on Multifunctional Information Distribution System has been posted.

DSCA Policy 18-13 - Supersedes DSCA Policy Memo 12-07 by providing updated information and guidance on the Multifunctional Information Distribution System (MIDS).

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. Justice: "Connecticut Business Owners Who Profited from Unlawful Exports to Pakistan Are Sentenced"
(Source: Justice, 18 Jul 2018.) [Excerpts.]

John H. Durham, United States Attorney for the District of Connecticut, announced that a father and son were sentenced today in Bridgeport federal court for profiting from unlawful exports to Pakistan.  U.S. District Judge Stefan R. Underhill sentenced both MUHAMMAD ISMAIL, 67, of Meriden, and

KAMRAN KHAN, 38, of Hamden, to 18 months imprisonment followed by three years of supervised release.

According to court documents and statements made in court, from at least 2012 to October 2013, Muhammad Ismail, and his two sons, Kamran and Imran Khan, were engaged in a scheme to purchase goods that were controlled under the Export Administration Regulations ("EAR") and to export those goods without a license to Pakistan, in violation of the EAR. Through companies conducting business as Brush Locker Tools, Kauser Enterprises-USA and Kauser Enterprises-Pakistan, the three defendants received orders from a Pakistani company that procured materials and equipment for the Pakistani military, requesting them to procure specific products that were subject to the EAR. When U.S. manufacturers asked about the end-user for a product, the defendants either informed the manufacturer that the product would remain in the U.S. or completed an end-user certification indicating that the product would not be exported.

After the products were purchased, they were shipped by the manufacturer to the defendants in Connecticut. The products were then shipped to Pakistan on behalf of either the Pakistan Atomic Energy Commission ("PAEC"), the Pakistan Space & Upper Atmosphere Research Commission ("SUPARCO"), or the National Institute of Lasers & Optronics ("NILOP"), all of which were listed on the U.S. Department of Commerce Entity List. The defendants never obtained a license to export any item to the designated entities even though they knew that a license was required prior to export. The defendants received the proceeds for the sale of export-controlled items through wire transactions from Value Additions' Pakistan-based bank account to a U.S. bank account that the defendants controlled.

On March 5, 2018, Muhammad Ismail and Kamran Khan each pleaded guilty to one count of international money laundering, for causing funds to be transferred from Pakistan to the U.S. in connection with the export control violations. In pleading guilty, Ismail and Kamran Khan specifically admitted that, between January and July 2013, they procured, received and exported to SUPARCO, without a license to do so, certain bagging film that is used for advanced composite fabrication and other high temperature applications where dimensional stability, adherence to sealant tapes and uniform film gage are essential. The proceeds for the sale of the bagging film was wired from Pakistan to the defendants in the U.S.

Ismail and Kamran Khan are both citizens of Pakistan and lawful permanent residents of the U.S.

On June 1, 2017, Imran Khan, of North Haven, pleaded guilty to one count of violating the International Emergency Economic Powers Act. In pleading guilty, KHAN specifically admitted that, between August 2012 and January 2013, he procured, received and exported to PAEC an Alpha Duo Spectrometer without a license to do so. He is released on a $100,000 bond pending sentencing. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. OMB/OIRA Reviews of Proposed Ex/Im Regulations
(Source: OMB/OIRA, 19 Jul 2018.)

\* Wassenaar Arrangement 2017 Plenary Agreements Implementation; India
- AGENCY: DOC-BIS
- STAGE: Final Rule
- RECEIVED DATE: 9 Jul 2018.
- RIN: 0694-AH44
- STATUS: Pending Review

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. Treasury/OFAC Issues Venezuela General License 5, Publishes Venezuela-related FAQs
(Source: Treasury/OFAC, 19 Jul 2018.)

Today, the Department of the Treasury's Office of Foreign Assets Control (OFAC) is issuing Venezuela General License 5. General License 5 authorizes U.S. persons to engage in all transactions related to, the provision of financing for, and other dealings in the Petroleos de Venezuela SA 2020 8.5 Percent Bond that would be prohibited by Subsection 1(a)(iii) of Executive Order 13835 of May 21, 2018 ("Prohibiting Certain Additional Transactions With Respect to Venezuela") (E.O. 13835).

OFAC is also publishing two new Frequently Asked Questions (FAQs). One explains why OFAC is issuing General License 5. The other answers the question of whether E.O. 13835 prohibits a U.S. person with a legal judgment against the Government of Venezuela from attaching and executing against Venezuelan government assets.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. U.S. and the Netherlands Sign Defense Agreement
(Source: U.S. Embassy and Consulate in the Netherlands, 2 Jul 2018.)

Ambassadors Pete Hoekstra and Henne Schuwer signed a Chapeau Agreement Establishing a Framework for bilateral Defense Cooperation Activities. With this agreement, the Netherlands and the United States

strengthen cooperation between the two countries on military equipment and operations.

The agreement involves exchanging military personnel, such as pilots, liaison officers, and technicians, as well as exchanging information about new technological systems. This is especially important in large-material projects, such as the replacement of helicopters (Chinook and Apache), the purchase of unmanned aircraft (Reaper), or the exchange of information during replacements of submarines and frigates. Both countries also agreed to cooperate further in missile defense.

The U.S. and the Netherlands already work intensively together in defense. With this new treaty, this cooperation is strengthened in these areas. The signing of the treaty coincides with Prime Minister Rutte's meeting with President Donald Trump.

back to top

* * * * * * * * * * * * * * * * * *

## NEWS

## 9. Bloomberg: "Trump's Tariffs Spark Outcry from Companies Denied Relief"
(Source: Bloomberg, 17 Jul 2018.) [Excerpts.]

Todd Adams won what he thought was a career-defining order last summer for his small, family-owned stainless steel manufacturer. Now, he's paid "several hundred thousand dollars" from President Donald Trump's tariffs that have cut deeply into that sale.

Adams is vice president of Stainless Imports Inc. and president of Sanitube LLC in Lakeland, Florida, one of the more than 40 initial U.S. companies whose requests for exemptions from tariffs on steel and aluminum imports were denied by the Trump administration. Adams was told his application was rejected for being incomplete, but he said he had to wait almost three weeks for an answer about what was wrong and still has questions about his denial.

While more than 30 companies have had their requests for relief from the duties granted so far, some businesses that were rejected say they weren't given adequate consideration after other companies objected. ...

back to top

* * * * * * * * * * * * * * * * * *

## 10. Financial Review: "Universities Label Defense Proposals 'Extraordinary and Excessive'"

(Source: Financial Review, 19 Jul 2018.) [Excerpts.]

[Australian] Universities have stepped up their criticism of Defense Department proposals that would give the government unprecedented control over international research partnerships, claiming they would destroy Australia's reputation, threaten new investment and introduce onerous regulation for foreign-born researchers.

The proposals, which were announced in a last-minute submission from the department to a review of the Defence Trade Controls Act, blindsided universities and research institutes.

They would allow the department to control the supply of any technology - not just those deemed sensitive or strategic - to research partners and give it new powers to carry out search and seizure operations without a warrant. ...

The move to increase oversight of these research partnerships is the latest in a series of government initiatives to strengthen its national security controls and comes amid increasing concern over the sharing of research between Australian and Chinese universities on technology that could potentially be used for military purposes, such as super-computing or artificial intelligence. ...

back to top

* * * * * * * * * * * * * * * * * *

## 11. The Guardian: "UK Stance on Arms Exports Protects Corrupt Practices, Experts Claim"
(Source: The Guardian, 19 Jul 2018.) [Excerpts.]

Government accused of allowing arms industry to act with impunity, damaging development efforts and fueling conflict

The British government's role in arms exports has come under scrutiny amid accusations that the trade's corrupt practices are being deliberately protected to benefit the economy.

Andrew Feinstein, CEO of Corruption Watch, an arms control watchdog, said the government's approach was not only deeply damaging to Britain's global development efforts but also fuelled world conflicts.

At the launch of Corruption Watch's latest report, entitled *The Anglo-Italian Job*, Labour MP Lloyd Russell-Moyles, a member of the committee on arms export control (CAEC), joined a panel of experts in calling for the government to reduce secrecy around its arms deals and promote transparency in policies geared towards reducing corruption and global conflict. ...

The report focuses on a number of cases involving alleged corrupt payments by UK arms manufacturers to intermediaries with the aim of securing contracts in the developing world. The countries involved include Yemen, Indonesia, Nigeria and India. ...

back to top

* * * * * * * * * * * * * * * * * * *


## 12. Jane's 360: "Australia Calls for Greater Powers to Control Defense Exports"
(Source: Jane's 360, 18 Jul 2018.) [Excerpts; subscription required.]

*Key Points*

  - Australia's Department of Defense has said expanded export controls are required in the face of the country's changing security landscape
  - A DoD submission to a review of the 2012 DCT Act calls for the introduction of a 'risk-targeted approach' to allow the government more flexibility in controlling transfers of technologies

The Australian Department of Defense (DoD) has called for greater powers to control the export of military and dual-use technologies.

In a recent submission to a review of the Australian Defense Trade Controls Act 2012 (DCT Act), the DoD said the legislation requires amendment in the face of the country's changing security landscape. ...

back to top

* * * * * * * * * * * * * * * * * * *


## 13. Reuters: "Exclusive: U.S. Offers India Armed Version of Guardian Drone - Sources"
(Source: Reuters, 18 Jul 2018.) [Excerpts.]

The United States has offered India the armed version of Guardian drones that were originally authorized for sale as unarmed for surveillance purposes, a senior US official and an industry source told Reuters.

If the deal comes to fruition, it would be the first time Washington has sold a large armed drone to a country outside the NATO alliance.

It would also be the first high-tech unmanned aircraft in the region, where tensions between India and Pakistan run high.

In April, President Donald Trump's administration rolled out a long-awaited overhaul of U.S. arms-export policy aimed at expanding sales to allies, saying it would bolster the American defense industry and create jobs at home.

The plan included a new drone export policy that allowed lethal drones that can fire missiles, and surveillance drones of all sizes, to be more widely available to allies. ...

U.S. drone manufacturers, facing growing competition overseas, especially from Chinese and Israeli rivals which often sell under lighter restrictions, have lobbied hard for the changes in U.S export rules.

Among the changes will be a more lenient application by the U.S. government of an arms export principle known as "presumption of denial." This has impeded many drone deals by automatically denying approval unless a compelling security reason is given together with strict buyer agreements to use the weapons in accordance with international law.

A second U.S. official said the new policy would "change our calculus" by easing those restrictions on whether to allow any given sale.

The MTCR - a 1987 missile-control pact signed by the United States and 34 other countries - will still require strict export controls on Predator-type drones, which it classifies as Category 1, those with a payload of over 1,100 pounds (500 kg).

However, the Trump administration is seeking to renegotiate the MTCR accord to eventually make it easier to export the larger armed drones. ...

back to top

* * * * * * * * * * * * * * * * * *

## COMMENTARY

## 14. J. Reeves & K. Heubert: Analysis of Settlement Agreement Reached In 3D Gun Printing Case
(Source: Reeves & Dola LLP Alert, 18 Jul 2018. Available via jreeves@reevesdola.com.)

* Authors: Johanna Reeves, Esq., jreeves@reevesdola.com, 202-715-994; and Katherine Heubert, Esq., 202-715-9940, kheubert@reevesdola.com. Both of Reeves & Dola LLP.

Last week, news broke that a settlement agreement had been reached in the Defense Distributed v. United States Department of State case. Several news articles reported the outcome as a major victory to First and Second Amendment advocates, as well as a "stunning shift" in State Department policy in how it applies export controls to information available on the Internet. This is an important case, and we examine the potential implications of the Settlement Agreement, especially in how the State

Department treats certain information made openly available on the Internet.

*Background*

In December 2012, Defense Distributed posted certain three-dimensional ("3D") printing files on its website, DEFCAD.org, for a number of firearm-related items, including "Ghost Gunner" files, and certain CAD files (the "Published Files"). Some of the Published Files included downloadable instructions to produce a fully functional firearm on a 3D printer. In May 2013, Defense Distributed received a letter from the U.S. Department of State, Directorate of Defense Trade Controls (DDTC), directing the company remove the Published Files from its website. DDTC is the federal agency responsible for compliance and enforcement of the Arms Export Control Act (22 USC 2778) and the implementing regulations known as the *International Traffic in Arms Regulations* (ITAR), published in 22 C.F.R. Pts. 120-130. In its letter, DDTC explained the Published Files may constitute ITAR-controlled "technical data" related to firearms and if so, the act of making the Published Files widely available on the Internet constituted an export of technical data without the required prior authorization from DDTC.

For those unfamiliar with the ITAR, controlled "technical data" includes information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of "defense articles," and includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation (ITAR section 120.10). Currently, almost all firearms up to and including .50, as well as parts, components, attachments and accessories for said firearms are captured by the ITAR's U.S. Munitions List (USML) under Category I. The only exceptions to this broad coverage are so-called "noncombat shotguns" with barrels 18 inches or longer, BB, pellet, and muzzle loading firearms, as well as attachments or accessories that do not enhance the usefulness, effectiveness, or capabilities of the firearm, component and parts. Such items are controlled under the Department of Commerce export controls, known as the *Export Administration Regulations* (EAR).

DDTC explained in its letter to Defense Distributed, "[p]ursuant to 127.1 of the ITAR, it is unlawful to export any defense article or technical data for which a license or written approval is required without first obtaining the required authorization from the DDTC. Please note that disclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad, is considered an export under 120.17 of the ITAR." To resolve the matter "officially," DDTC requested Defense Distributed submit a Commodity Jurisdiction (CJ) request for the following data files:

  - Defense Distributed Liberator pistol
  - .22 electric
  - 125mm BK-14M high-explosive anti-tank warhead
  - 5.56/.223 muzzle brake
  - Springfield XD-40 tactical slide assembly

- Sound Moderator - slip on
- "The Dirty Diane" 1/2-28 to 3/4-16 STP S3600 oil filter silencer adapter
- 12 gauge to .22 CB sub-caliber insert
- Voltlock electronic black powder system
- VZ-58 sight

A copy of the DDTC letter is available in a 2013 Forbes article (ast visited on Jul. 18, 2018).

In compliance with the DDTC letter, Defense Distributed removed the Published Files from its website and in June 2013, submitted a CJ request. Almost two years later, with no response to the CJ request and an unsuccessful attempt to obtain public release approval from the Department of Defense Office of Prepublication Review and Security for the subject files, Defense Distributed along with the Second Amendment Foundation ("SAF"), sued DDTC in the Western District of Texas, alleging the ITAR prior approval requirement for posting technical data on the Internet was an unconstitutional prior restraint on protected First Amendment speech, along with other constitutional violations under the Second and Fifth Amendments.

While the case was pending, the Plaintiffs filed a motion with the court seeking a preliminary injunction against DDTC, wherein the court would suspend enforcement of the ITAR prepublication approval requirement pending final resolution of the underlying case. The District Court denied the motion, holding the national security interests of the United States outweighed the potential harm to Defense Distributed. Defense Distributed and SAF appealed the decision to the U.S. Court of Appeals for the Fifth Circuit, which affirmed the District Court decision, noting, however, that its decision was limited and did not address the merits:

  "*This case presents a number of novel legal questions, including whether the 3D printing and/or CNC milling files at issue here may constitute protected speech under the First Amendment, the level of scrutiny applicable to the statutory and regulatory scheme here, whether posting files online for unrestricted download may constitute "export," and whether ITAR regulations establish an impermissible prior restraint scheme. These are difficult questions, and we take no position on the ultimate outcome other than to agree with the district court that it is not yet time to address the merits. On remand, the district court will eventually have to address the merits, and it will be able to do so with the benefit of a more fully developed record.*" Defense Distributed v. U.S. Department of State, 838 F.3d 451, 464 (5th Cir. 2016).

Defense Distributed then petitioned the U.S. Supreme Court for writ of certiorari, which the Court denied on January 8, 2018. On June 29, 2018, the parties executed the Settlement Agreement, resolving all claims in the case. We reviewed the text of the Settlement Agreement circulated in *The Daily Bugle*, a free export/import daily newsletter from Full Circle Compliance, on July 12, 2018.

*The Settlement Agreement*

In the Settlement Agreement, the parties agree to resolve all issues, including any issues "that could have been asserted" by Defense Distributed without further litigation, and without any admission of liability on either side. The Settlement Agreement goes on to stipulate in Paragraph 4 that it shall not be construed as an admission by DDTC of the veracity or validity of any of Defense Distributed's allegations. Further, the Settlement Agreement does not hold any precedent, as the parties are explicitly prohibited from using it as evidence and from referring to the Settlement Agreement in any way in proceedings that may be needed to enforce it.

In consideration of Plaintiffs' agreement to dismiss its claims against DDTC with prejudice, DDTC agreed to five requirements:

**(1) DDTC's commitment to draft and fully pursue, to the extent authorized by law, a proposed and final rule revising U.S. Munitions List (USML) Category I to exclude "the technical data that is the subject of the Action."** (Settlement Ag., para. 1(a)).

It should be noted that by the time the Settlement Agreement was signed on June 29, 2018, DDTC had already published more than a month prior in 83 Fed. Reg. 24198 (May 24, 2018) its proposed rule to transition most firearms and ammunition, along with certain parts, components, attachments, and accessories, away from ITAR controls over to EAR controls. For more information on the State and Commerce companion proposed rules, please refer to our alerts of June 1, 8, and 13.

**(2) While the above-referenced final rule is in development, DDTC will publish on its website an announcement by July 27, 2018, of a temporary modification, consistent with ITAR section 126.2, to exclude "the technical data that is the subject of the Action."** (Settlement Ag., para. 1(b)).

Section 126.2 permits the Deputy Assistant Secretary for Defense Trade Controls to order the temporary suspension or modification of any or all regulations in the ITAR in the interest of the security and foreign policy of the United States.

**(3) DDTC will issue a letter a letter to Defense Distributed by July 27, 2018, advising that the Published Files are approved for public release in any form and are exempt from export licensing requirements of the ITAR because the files satisfy the criteria of ITAR section 125.4(b)(13).** (Settlement Ag., para. 1(c)).

Section 125.4 in the ITAR lists various exports of technical data that do not require approval from DDTC. Paragraph (b)(13), cited in this particular consideration, covers "[t]echnical data approved for public release (i.e. unlimited distribution) by the cognizant U.S. Government department or agency or Office of Freedom of Information and Security Review. This exemption is applicable to information approved by the cognizant U.S. Government department or agency for public release in any form. It does

not require that the information be published in order to qualify for the exemption."

**(4) DDTC acknowledges and agrees that the temporary modification of USML Category I [per Consideration #2 above] permits any U.S. person, including Defense Distributed customers and SAF members, to access, discuss, use, reproduce, or otherwise benefit from the "technical data that is the subject of the Action."...** (Settlement Ag., para. 1(d)).

**(5) Payment of $39,581.00 to Plaintiffs. "This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement."** (Settlement Ag., para. 1(e)).

*Analysis of Settlement*

What impact will the Settlement Agreement have on industry, if any? Strikingly, the Settlement Agreement does very little to advance the argument that the ITAR's prior restraints on publication are a violation of the First Amendment or any other constitutional rights. Indeed, as the Settlement Agreement makes very clear, the parties stipulate that DDTC's entering into the agreement is in no way an acknowledgment of the validity or veracity of those arguments. Further, all conditions are silent on the constitutional rights issues raised in the case - the Settlement Agreement addresses only the manner in which DDTC will authorize Defense Distributed to release just the Published Files, nothing more.

While DDTC agreed to "draft and fully pursue" the proposed rulemaking to revise USML Category I, in the interim, the temporary amendment to USML Category I will exclude ONLY the "technical data that is subject of the Action." The "technical data that is subject of the Action" is not a limitless bucket containing all ITAR-controlled technical data pertaining to firearms. Rather, the Settlement Agreement defines the words, "technical data that is subject of the Action" specifically to mean only the following: "(1) the Published Files; (2) the Ghost Gunner files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the [USML], as well as barrels and receivers covered by Category I(g) of the USML that are components of such items, or (b) items covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment [as defined in the Settlement Agreement]."

DDTC did not agree to amend the USML to exclude all similar technical data or related hardware, or make any other revisions to Category I, much less any other USML Category. In fact, DDTC agreed to revise the USML Category I "to the extent authorized by law (including the Administrative procedures Act)" to exclude only "technical data that is subject of the action." A cynic could say that's quite a caveat.

It is also important to note that nowhere in the Settlement Agreement does DDTC indicate the Published Files are not considered ITAR-controlled

technical data. In fact, the agreement to utilize the powers of § 126.2 to exclude the Published Files from the ITAR by using the §125.4(b)(13) public release process clearly supports the argument that DDTC still considers the files to be technical data. If the information was not technical data, then there would be no need to go through these regulatory hoops to authorize its release. Simply put, DDTC did not ever move from its position that the Published Files were technical data, and the Settlement Agreement does more to underscore this position than to prove otherwise.

This, coupled with the clear language of the Settlement Agreement that this document cannot be used as precedent in further cases, means the release from ITAR controls applies <u>only</u> to the "technical data that is subject of the Action," as defined in the Settlement Agreement. Other individuals or companies with similar Technical Data should not rely on the fact that Defense Distributed was authorized to release the Published Files as a blanket permission to do the same. To be sure, it seems one must still seek authorization from DDTC or public release approval from another cognizant U.S. Government agency before publishing similar Technical Data to the Internet.

As for the arguable coincidence of this Settlement Agreement and the timing of the publication of the proposed revisions to USML Category I, II, and III, one could speculate the Settlement Agreement was the catalyst for DDTC finally publishing the revisions - the case forced DDTC's hand as it were. However, one could also argue that DDTC simply agreed to do what it was already planning to do as the revisions were, by then, drafted and through the internal review process, thereby losing nothing yet gaining a great deal by settling a lawsuit that could have ultimately decided the interplay between the First Amendment and the ITAR. And, as a result, the ITAR prior approval requirements remain in place and intact, and persons seeking to publish technical data to the Internet must first obtain DDTC approval to do so.

*Closing Thoughts*

The only guaranty in court is that there are no guarantees. There was a lot riding on this case, for both sides. This was apparent in the number of amicus ("friend of the court") briefs weighing in on the potential implications for the constitutional freedoms guaranteed under the First and Second Amendments, gun rights, gun control, world peace and national security interests. Arguably, neither side could afford a negative court decision on the merits of the case. However, with the Settlement Agreement, it appears that both sides won. Defense Distributed is able to reinstate its <u>DEFCAD.org</u> website at the end of this month without having to wait until 2019 when the proposed transition rules will become final, presumably, and DDTC has not done anything to change its approach to ITAR licensing controls over technical data, including the requirement for approval for public release prior to posting such information on the Internet.

<u>back to top</u>

* * * * * * * * * * * * * * * * * *

# 15. M. Volkov: "The Risk of Employee Misconduct"
(Source: Volkov Law Group Blog, 18 Jul 2018. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

Companies are hyper-focused on third-party risks, especially when it comes to anti-corruption risks. And for good reason - a large percentage of FCPA enforcement actions involve illegal use of third parties to carry out illegal bribery schemes. In this era of third-party risk management, however, companies may be missing a more significant risk - employee misconduct.

In the global economy, companies face a number of serious risks - cybersecurity threats, foreign bribes, conflicts of interest, employee fraud and other employee risks of illegal conduct. Interestingly, when it comes to cyber-security risks, including theft of intellectual property, customer data, financial information and other valuable corporate data, companies face a significant threat from "insiders," or to put it another way, from their employees. Nearly half of all cybersecurity incidents involve an internal actor, half of whom intentionally gain access to valuable corporate information, and half of whom unintentionally compromise valuable corporate information.

Overall, employee misconduct continues to hover around one-in-three or 33 percent of employees observe misconduct each year. The rates of observed employee misconduct is highest in Brazil, India, and Russia.

In stark contrast to third parties, companies exercise control and responsibility for their employees. If a company suffers significant employee misconduct, there is a reason - a company has to maintain a culture of trust and integrity, filter that culture throughout the organization, and make it clear that employees should not cut corners or engage in misconduct to improve the bottom line. A company that is a slave to its quarterly reporting is bound to encourage, at least implicitly, employee misconduct and shady activities to advance the company's all might quarterly financial results.

Once you recognize the control and responsibility a company has to minimize employee misconduct, the company has to mitigate such risks through a robust code of conduct, compliance communications and conduct from top level officials, and a consistent reporting and internal investigation function that includes positive incentives and strict disciplinary actions against violators.

A key to employee risk mitigation is to understand the risk of an employee group and tailor communications and training to that risk. An example illustrates how such an approach should work. A foreign-based sales staff is under pressure to meet target incentive requirements. In carrying out their jobs, they face significant anti-corruption risks when interacting with foreign officials, bidding on foreign government tenders, and acting to meet their

incentive targets.  A basic risk assessment of these employees will confirm that they pose serious and significant risks of misconduct.

Sales incentives, while a significant factor, cannot be the sole explanation for an employee to engage in foreign bribery.  Of course, structuring sales incentives to reward group performance rather than individual performance may mitigate such risks and increase cooperation and joint sales efforts.

There is more to the equation - an employee's supervisor, if committed to anti-corruption compliance, can exercise significant oversight of the employee's activities and observe signs of misconduct - inexplicable or unjustified expense reports, unusual financial transactions, changes in tendering activities, including access to government tender specifications.

A tailored training message to these high-risk employees is important as well to emphasize the risks they face, the controls that are in place to detect and investigate potential misconduct, and the company's overall commitment to ethical behavior rather than short-term financial gain.  A bland, legal FCPA discussion will have little to no impact on employee behavior and conduct - instead a fulsome message capturing all of the elements of risk mitigation - culture, discipline, positive incentives, and promoting sustainable growth - will reduce misconduct and promote ethical behavior by sales employees operating in high-risk markets.

back to top

✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻ ✻

## 16. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Options for Addressing the new U.S. Tariffs on Chinese-Origin Items"
(Source: Thomsen and Burke LLP, 18 Jul 2018. Available by subscription via maher@t-b.com.)

* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

Over the last several months, the Office of the United States Trade Representative (USTR) has announced multiple rounds of new import tariffs on Chinese-origin items pursuant to a Section 301 action. These tariffs impact a wide range of goods and are at different places in their implementation. We have provided below a summary of the different tariff actions and some potential options available to reduce the impact.

**Round 1**
· 25% ad valorem duty
· Impacted items in Annex B to 83 FR 28710
· Became effective July 6, 2018
· Stakeholders can now request that specific products be exempted.  See 83 FR 32181

**Round 2**
  - 25% ad valorem duty
  - Impacted items in Annex C to 83 FR 28710
  - Proposed tariffs to become effective ~ August 2018
  - Jul. 23: Due date to submit written comments

**Round 3**
  - 10% ad valorem duty
  - Impacted items in 83 FR 55608
  - Proposed tariffs to become effective ~ September 2018
  - Jul. 27: Due date to request to appear at a public hearing and provide comments
  - Aug. 17: Due date to submit written comments

Companies impacted by these new tariffs have several options to help reduce the impact, including:

  - Adjust supply chain operations such that the items are substantially transformed in a country other than China, prior to their import into the United States.
  - Import sub-assemblies, rather than finished products, if those sub-assemblies have an HTS classification not impacted by the new tariffs. Perform final assembly in the United States after importation.
  - For Round 1 tariffs that are already in effect, submit a request to the USTR that particular products be excluded from the tariffs. The deadline to submit an exclusion request is October 9, 2018. In making its determination, the USTR may consider: (1) Whether the product is available from a source outside of China, (2) Whether additional duties would cause severe economic harm to requester or other U.S. sources, and (3) Whether the particular product is important or related to Chinese industrial programs, including "Made in China 2025."
  - For Round 2 and Round 3 proposed tariffs, submit comments to the USTR requesting that particular HTS codes be removed from the final list. The deadlines are July 23 and August 17, respectively.
  - For products that are imported into the United States for future export, utilize a bonded warehouse or a drawback program.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**EX/IM TRAINING EVENTS & CONFERENCES**

## 17. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands

(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * *

## 18. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Edgar Degas** (born Hilaire-Germain-Edgar De Gas; 19 Jul 1834 - 27 Sep 1917; was a French artist famous for his paintings, sculptures, prints, and drawings. He is especially identified with the subject of dance; more than half of his works depict dancers. He is regarded as one of the founders of Impressionism, although he rejected the term, preferring to be called a realist.)
  - *"Everyone has talent at twenty-five. The difficulty is to have it at fifty."*

back to top

* * * * * * * * * * * * * * * * *

## 19. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

\* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

\* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 6 June 2018: 83 FR 26204-26205: Unverified List (UVL); Correction

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)

- Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
   - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
   - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *


## 20. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *


## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance [____]@fullcirclecompliance.eu]
**Sent**: 7/23/2018 6:33:41 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 18-0723 Monday "Daily Bugle"



## Monday, 23 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. President Continues National Emergency with Respect to Transnational Criminal Organizations
2. Commerce/BIS Announces MPETAC Meeting on 7 Aug in Washington DC
3. ITA Seeks Comments on CS Form ITA-4096P

### OTHER GOVERNMENT SOURCES

4. Items Scheduled for Publication in Future Federal Register Editions
5. Commerce/BIS: (No new postings.)
6. State/DDTC: (No new postings.)
7. Treasury/OFAC Publishes North Korea Supply Chain Advisory
8. EU Amends Restrictive Measures Concerning ISIL (Da'esh) and Al-Qaida
9. UK Government Publishes Export Control (Burma Sanctions) Order 2018

### NEWS

10. Android Headlines: "ZTE in the Clear: Threatening Measure Removed from Defense Bill"
11. Barath Shakti: "India Planning to Ease Defense Exports"
12. Defense News: "America's Largest Business Lobby Endorses Trump's Arms Export Plan"
13. DefenseWorld.net: "France To Set Up Foreign Military Sales Program"
14. The Hill: "Dem Lawmaker Calls on Pompeo To Keep Export Restrictions On 3D Gun-Printing Software"

15. Reuters: "Exclusive: U.S. Open to Lifting Sanctions Off Aluminum Giant Rusal - Mnuchin"

16. ST&R Trade Report: "Lawmakers Press CBP to Issue Updated Drawback Regulations"

## COMMENTARY

17. The Firearm Blog: "ITAR and USML: What Is It and Why Should You Care?"

18. T. McBride: "Swedish Telecom Company Pays Penalty for Sanctions Violation"

19. T.G. Ficaretta: "Regulation of Bump Stocks: ATF Prepares to Issue Final Rule"

## EX/IM MOVERS & SHAKERS

20. Monday List of Ex/Im Job Openings: 176 Jobs Posted This Week, Including 48 New Jobs

## EX/IM TRAINING EVENTS & CONFERENCES

21. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands

## EDITOR'S NOTES

22. Bartlett's Unfamiliar Quotations

23. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

24. Weekly Highlights of the Daily Bugle Top Stories



Awareness Course U.S. Export Control
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands

FULL CIRCLE

# 1. President Continues National Emergency with Respect to Transnational Criminal Organizations
(Source: Federal Register, 23 Jul 2018.) [Excerpts.]

83 FR 34931: Continuation of the National Emergency With Respect to Transnational Criminal Organizations

On July 24, 2011, by Executive Order 13581, the President declared a national emergency with respect to transnational criminal organizations pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701-1706) to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States constituted by the activities of significant transnational criminal organizations.

The activities of significant transnational criminal organizations have reached such scope and gravity that they threaten the stability of international political and economic systems. Such organizations are increasingly sophisticated and dangerous to the United States; they are increasingly entrenched in the operations of foreign governments and the international financial system, thereby weakening democratic institutions, degrading the rule of law, and undermining economic markets. These organizations facilitate and aggravate violent civil conflicts and increasingly facilitate the activities of other dangerous persons.

The activities of significant transnational criminal organizations continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. For this reason, the national emergency declared in Executive Order 13581 of July 24, 2011, and the measures adopted on that date to deal with that emergency, must continue in effect beyond July 24, 2018. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency with respect to transnational criminal organizations declared in Executive Order 13581. ...

  [Presidential Signature.]

THE WHITE HOUSE, July 20, 2018.

back to top

* * * * * * * * * * * * * * * * * *


# 2. Commerce/BIS Announces MPETAC Meeting on 7 Aug in Washington DC
(Source: Federal Register, 23 Jul 2018.) [Excerpts.]

83 FR 34826: Notice of Partially Closed Meeting: Materials Processing Equipment Technical Advisory Committee

The Materials Processing Equipment Technical Advisory Committee (MPETAC) will meet on August 7, 2018, 9:00 a.m., Room 3884, in the Herbert C. Hoover Building, 14th Street between Pennsylvania and Constitution Avenues, NW, Washington, DC. The Committee advises the Office of the Assistant Secretary for Export Administration with respect to technical questions that affect the level of export controls applicable to materials processing equipment and related technology.

*Agenda -- Open Session*

  (1) Opening remarks and introductions.
  (2) Discussions on results from last, and proposals from last Wassenaar meeting.
  (3) Report on proposed and recently issued changes to the Export Administration Regulations.
  (4) TAC Membership.
  (5) Proposed Cyber Rule circulated 6/12/18.
  (6) TAC Meeting Attendance.
  (7) Coordinate TAC Project-Draft Announcement.
  (8) Industry 4.0 and New Technologies.

*Agenda -- Closed Session*

  (9) Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 §§10(a)(1) and 10(a)(3).

The open session will be accessible via teleconference to 20 participants on a first come, first serve basis. To join the conference, submit inquiries to Ms. Joanna Lewis at Joanna.Lewis@bis.doc.gov, no later than July 31, 2018.
  A limited number of seats will be available for the public session. Reservations are not accepted. To the extent that time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate the distribution of public presentation materials to the Committee members, the Committee suggests that presenters forward the public presentation materials prior to the meeting to Ms. Lewis via email. ...

Joanna Lewis, Committee Liaison Officer.

back to top

* * * * * * * * * * * * * * * * * *

## 3. ITA Seeks Comments on CS Form ITA-4096P
(Source: Federal Register, 23 Jul 2018.) [Excerpts.]

83 FR 34827: Submission for OMB Review; Comment Request

The Department of Commerce will submit to the Office of Management and Budget (OMB) for clearance the following proposal for collection of information under the provisions of the Paperwork Reduction Act (44 U.S.C. Chapter 35).
Agency: International Trade Administration, Commerce.

  - Title: Domestic and International Client Export Services and Customized Forms.
  - OMB Control Number: 0625-0143.
  - Form Number(s): ITA-4096P.
  - Type of Request: Renewal submission. ...
  - Needs and Uses: The International Trade Administration's (ITA) U.S. Commercial Service (CS) is mandated by Congress to broaden and deepen the U.S. exporter base. The CS accomplishes this by providing counseling, programs and services to help U.S. organizations export and conduct business in overseas markets. This information collection package enables the CS to provide appropriate export services to U.S. exporters and international buyers. ...
  The forms ask U.S. exporters standard questions about their company details, export experience, information about the products or services they wish to export and exporting goals. A few questions are tailored to a specific program type and will vary slightly with each program. CS staff use this information to gain an understanding of client's needs and objectives so that they can provide appropriate and effective export assistance tailored to an exporter's particular requirements. ...

This information collection request may be viewed at reginfo.gov. Follow the instructions to view Department of Commerce collections currently under review by OMB.
  Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to OIRA_Submission@omb.eop.gov or fax to (202) 395-5806.

Sheleen Dumas, Department Lead PRA Officer, Office of the Chief Information Officer.

back to top

* * * * * * * * * * * * * * * * * *

OTHER GOVERNMENT SOURCES

4. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* DHS/CBP; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Entry/Immediate Delivery Application and ACE Cargo Release [Publication Date: 23 Jul 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7.
## Treasury/OFAC Publishes North Korea Supply Chain Advisory
(Source: Treasury/OFAC, 23 Jul 2018.)

The U.S. Department of State, with the U.S. Department of the Treasury and the U.S. Department of Homeland Security, is issuing this advisory to highlight the sanctions evasion tactics used by North Korea that could expose businesses - including manufacturers, buyers, and service providers - to sanctions compliance risks under U.S. or United Nations sanctions authorities.  This advisory also assists businesses in complying with the requirements under Title III, the Korean Interdiction and Modernization of Sanctions Act of the Countering America's Adversaries Through Sanctions Act (CAATSA).

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. EU Amends Restrictive Measures Concerning ISIL (Da'esh) and Al-Qaida
(Source: Official Journal of the European Union, 23 Jul 2018.)

*Regulations*
\* Commission Implementing Regulation (EU) 2018/1033 of 20 July 2018 amending for the 288th time Council Regulation (EC) No 881/2002 imposing certain specific restrictive measures directed against certain persons and entities associated with the ISIL (Da'esh) and Al-Qaida organizations

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. UK Government Publishes Export Control (Burma Sanctions) Order 2018
(Source: Legislation.gov.uk, 23 Jul 2018.)

The Export Control (Burma Sanctions) Order 2018 (SI 2018/871), made on 13 July 2018, laid before Parliament on 19 July 2018, and entering into force on 13 August 2018, is available here. An explanatory memorandum is available here.

The Export Control (Burma Sanctions) Order makes provision in connection with the trade restrictions against Burma specified in Council Regulation (EU) 401/2013 and revokes and replaces the Export Control (Burma Sanctions) Order 2013. The Order deals with licenses, information powers, offences and penalties in connection with the sanctions regime affecting Burma/Myanmar. It follows the EU-wide trade restrictions set out in Council Regulation (EU) 2018/647 of April.

Council Regulation (EU) 2018/647 was adopted by the EU Council in response to widespread, systematic, and grave human rights violations committed by the Burmese military and security forces and involved imposition of sanctions prohibiting the export to Burma of, amongst other things, dual-use goods, technology, software, and the provision of telecommunications, internet monitoring or interception services to Burma.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NEWS

## 10.
## Android Headlines: "ZTE in the Clear: Threatening Measure Removed from Defense Bill"
(Source: Android Headlines, 20 Jul 2018.) [Excerpts.]

ZTE is seemingly in the clear in regards to the possibility of the Commerce Department's crippling denial order being reinstated by Capitol Hill shortly after being revoked as stateside lawmakers removed a threatening measure from this year's iteration of the United States defense bill, Reuters reports, citing a person close to the Congress. The Senate previously approved the amendment with a supermajority vote, aiming to inhibit President Trump's ability to oppose the reversal on the matter should the Congress move forward with the idea of enacting additional punishment for the Chinese firm for violating trade sanctions placed on Iran and North Korea, then violating the settlement meant to conclude the first instance of transgressions. ...

back to top

## 11.
## Barath Shakti: "India Planning to Ease Defense Exports"
(Source: Barath Shakti, 23 Jul 2018.) [Excerpts.]

The Indian Ministry of Defense (MoD) has proposed a new scheme similar to the FMS (Foreign Military Sales) followed by the United States in facilitating sale of Indian military equipment to friendly countries. The plan, tentatively named Foreign Military Assistance is proposed to be administered by the MoD after taking inputs from the Ministry of External Affairs (MEA).

The U.S. uses FMS program as a form of security assistance authorized by the Arms Export Control Act (AECA), and a fundamental tool of U.S. foreign policy.

A draft, currently under consultation stage between the MoD and MEA, proposes to ease the process of supplying defense equipment to strategic partners and optimize the outcomes from the current practice of just extending a line of credit to friendly countries to buy defense equipment from India and leaving the decision to shortlist and choose the platforms and navigate the complex processes in India to the recipient country alone. Often, the countries that want to utilize the generous loan offered by India find themselves battling roadblocks because of a rule that says they need to make a 'price discovery' in the Indian market and find their way through complicated bureaucratic processes before concluding a deal. ...

Currently, India has granted around 1.5 billion dollars as line of credit to friendly foreign countries ranging from Afghanistan to Vietnam, to enable them to purchase defense equipment from India. The list of countries also includes Bangladesh and Myanmar just to name two others.

Separately, the MoD is in the process of setting up a specific export promotion/ facilitation body with participation from industry representatives. According to a MOD document, "the body could be in the form of a society or a not for profit company under the Companies Act. The role of the body would be to render advice to government on various export related issues, coordinate all export facilitation schemes of the government, increase awareness amongst the industry about various export facilitation measures and promotion of exports through specific marketing efforts in targeted countries." ...

back to top

## 12.
## Defense News: "America's Largest Business Lobby Endorses Trump's Arms Export Plan"

(Source: Defense News, 21 Jul 2018.)

America's largest business lobby is hailing the Trump administration's plans to boost American weapons exports.

"The U.S. Chamber of Commerce Defense and Aerospace Export Council (DAEC) welcomes the State Department's announcement regarding the approved implementation plan for the Conventional Arms Transfer (CAT) Policy," council President Keith Webster said in a statement Friday.

The U.S. State Department this week announced its planned process to implement the Conventional Arms Transfer policy, which adds economic security as a factor when the government considers whether to approve arms exports. It intends for the executive branch to advocate strongly on behalf of companies exporting defense items.

Webster, who was President Barack Obama's last director of international cooperation at the Pentagon, called the policy "a major first step toward improving government decision processes and policies." Aerospace and defense firms rely on innovation and U.S. government support to compete on a global scale, he noted.

The export council last month offered some 30 recommendations on how to hardwire economic security and defense-industrial base considerations into the government's international arms sale decisions.

"We appreciate the administration's outreach throughout this process and are pleased to see DAEC priorities in the plan, including policy changes that will improve bid timeliness while reducing costs to industries, place emphasis on economic considerations in the federal transfer decision process, and expand trade promotion," Webster said.

The policy has attracted pushback from arms control advocates who say it risks fueling conflicts around the world and aiding regimes that do not respect human rights.

"If the administration is serious about claims that these changes make for responsible policy, it should add much greater transparency into the arms transfer and monitoring process," Forum on the Arms Trade's founder and coordinator, Jeff Abramson, wrote last month.

The U.S. leads the world in arms transfers, with $47 billion expected so far this year, whereas the State Department approved $42 billion in government-to-government sales for all of 2017.

"Defense exports are good for our national security, they're good for our foreign policy. And they're good for our economic security. And as the administration and our leadership has said, economic security is national security," Lt. Gen. Charles Hooper, head of the Defense Security Cooperation Agency, said during the Farnborough International Airshow on July 18.

* * * * * * * * * * * * * * * * * *

## 13.
## DefenseWorld.net: "France To Set Up Foreign Military Sales Program"
(Source: DefenseWorld.net, 9 Jul 2018.) [Excerpts.]

France plans to set up its own version of the Foreign Military Sales (FMS) program under which it will offer weapons in the international market on country-to-country basis.

The French Directorate General of Armament, the Directorate of Legal Affairs, and the EMA (Military Staff, Ed) together have set up the new form of 'state-to-state' contract with allied countries in the framework of strategic projects. The Defense Minister Florence Parly lauded the three organizations for their contribution during her speech at Balard, La Tribune reported last Thursday.

The French State will sign contract and act as an intermediary between the buyer countries and the French industrialists. They will buy the military equipment from the French defense groups on behalf of the buyer country. The state will also offer guarantee to the client country. ...

The FMS arms export policy will help to consolidate France's position on the international scene to guarantee its strategic autonomy and also strengthen the credibility of the armed forces. As part of an economic, industrial, operational and diplomatic logic, it also contributes to the financial sustainability of France's defense policy and the development of a good level of interoperability of French military capabilities, the news report stated.

back to top

* * * * * * * * * * * * * * * * *

## 14. The Hill: "Dem Lawmaker Calls on Pompeo To Keep Export Restrictions On 3D Gun-Printing Software"
(Source: The Hill, 20 Jul 2018.) [Excerpts.]

A Democratic lawmaker sent a letter to Secretary of State Mike Pompeo on Friday urging the Trump administration to halt the planned relaxation of export controls surrounding software for 3D printing machines containing designs for handguns.

Rep. Eliot Engel (D-N.Y.) told Pompeo that the decision would lead to the "unrestricted manufacture of firearms" around the world without the Trump administration taking action to block the move.

"There are several disturbing aspects of the Department's action. Foremost is the likelihood that weapons will become available to anyone with a laptop and a 3D printer," Engel wrote.

"With these stealthy weapons in the hands of terrorists, lone wolf killers, or mentally unstable individuals, it will become virtually impossible to protect anyone from gun violence," he added. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. Reuters: "Exclusive: U.S. Open to Lifting Sanctions Off Aluminum Giant Rusal - Mnuchin"
(Source: Reuters, 21 Jul 2018.) [Excerpts.]

The U.S. Treasury is open to removing Russian aluminum producer Rusal from a U.S. sanctions list, Treasury Secretary Steven Mnuchin said on Friday, adding the objective was "not to put Rusal out of business."

Mnuchin's comment was the latest indication the Trump administration was trying to aid sanctions-hit Rusal, which has taken a series of steps to try to appease the U.S. government and get the restrictions lifted.

The U.S. Treasury in April imposed sanctions against billionaire Oleg Deripaska and the eight companies in which he is a large shareholder, including Rusal, in response to what it called "malign activities" by Russia. But the sanctions caused havoc in the global aluminum market, prompting several countries and companies to successfully lobby Treasury for a softening of the terms on Rusal.

"The company has approached us on certain de-listing issues (from the Specially Designated Nationals List)," Mnuchin said in an interview with Reuters in São Paulo ahead of G20 finance meetings this weekend in Argentina.

"I'm not going to go into the exact specifics of what those proposals are and where we stand on them, but, yes, if we can find an acceptable solution, that is our objective," Mnuchin said.

"Our objective is not to put Rusal out of business," he added, acknowledging that Rusal was important to the global aluminum market. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. ST&R Trade Report: "Lawmakers Press CBP to Issue Updated Drawback Regulations"
(Source: Sandler, Travis & Rosenberg Trade Report, 23 Jul 2018.)

House Ways and Means Committee Chairman Kevin Brady, R-Texas, and Trade Subcommittee Chairman Dave Reichert, R-Wash., are calling on the Trump administration to issue regulations implementing the duty drawback provisions of the Trade Facilitation and Trade Enforcement Act "without further delay."

Drawback is the refund of up to 99 percent of certain duties, internal revenue taxes, and fees collected on imports once either the imported substituted product or the article that has been manufactured from that product has been exported or destroyed. TFTEA made numerous changes to simplify the drawback law, including standardizing the time frames for filing claims and modernizing recordkeeping requirements. TFTEA also allows substitution drawback claims based on goods within the same eight-digit HTSUS number as well as claims against imports and exports that are within five years of the date of the claim.

However, U.S. Customs and Border Protection has asserted that it cannot provide accelerated payment of drawback claims under the TFTEA changes (which essentially nullifies their benefit) until calculation provisions under the implementing regulations become final. TFTEA required U.S. Customs and Border Protection to issue those regulations by Feb. 24 but the rules have been held up in interagency review.

In June the Court of International Trade declined a request to order CBP to pay accelerated drawback, and in a July 19 letter Brady and Reichert said CBP's continuing refusal to do so "has greatly complicated drawback claims." As a result, they agreed with the CIT that the administration should issue regulations for important pieces of the package that satisfy the TFTEA mandate, such as those addressing the calculation methodology. This should be done via an interim final rule, they said, so that U.S. manufacturers can fully utilize the duty drawback program without further delay.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

## 17. The Firearm Blog: "ITAR and USML: What Is It and Why Should You Care?"
(Source: The Firearm Blog, 23 Jul 2018.) [Excerpts.]

If you've purchased weapon lights, lasers, body armor, night vision or other "specialty equipment" related to the firearms industry, the term *ITAR Restricted* may have made an appearance on your documentation or on product websites.

The International Traffic In Arms Regulations or ITAR and the categories outlined in the United States Munitions List or USML is a way to prevent certain technologies from ending up in enemy hands and used against U.S. or Allied Forces. Zero arguments there.

The problem is that ITAR and the USML Categories are a complex set of regulations that can be unclear to even the most active export businesses and organizations. So how does ITAR effect you as an individual? Let's attempt to boil it down.

### *ITAR& USML: What Is It and Why Should You Care?*

***First things first:*** *I am not a lawyer or an export compliance specialist. Do not attempt to use this basic writeup as guidance for adherence of the laws surrounding ITAR restricted information.The basics:*

### *(1) What is an export?*

In simple terms, anything leaving the U.S. or an outbound crossing of a U.S. border (or a functional equivalent of the border) is an export. Obviously, a U.S. business who sells tortilla chips to international customers is engaged in the business of exporting.

Less obviously, you as an individual traveler who decides to leave the U.S. for France with an IR capable flashlight, for example, is also exporting an item, even if you intend or returning to the U.S. with the IR flashlight.  For the most part, items that travel with you abroad are relatively benign and will not require a Customs Declaration. However, items that are ITAR Restricted require an export license or cannot leave our borders. ...

YOU are responsible for following all the export laws and regulations.

### *(2) International Shipping*

Yes, you as an individual are exporting when you ship an item outside of the United States. This means that if you are selling items on online forums or marketplaces like eBay, you are responsible for following all the export laws and regulations for that particular item. ...

### *(3) Non-U.S. Citizens/Foreign Nationals*

When it comes to ITAR controlled items, the mere fact of handing something to a foreign national could be a violation. Following the law means knowing your equipment and knowing the citizenship status of the person you are handing it to. ...

### *(4) Documentation, User Manuals and Technical Materials*

Not only is the item you own or use ITAR controlled, but the documentation and technical specifications could also be ITAR controlled. This includes posting information online. ...

### (5) What items are ITAR & USML controlled?

As technology changes, so do the laws and regulations surrounding ITAR. So what items/articles are ITAR controlled? Great question. Your owners manual or documentation should inform you of any regulations or restrictions including ITAR. But updated lists of items on the USML can be found in the Code Of Federal Regulations.

### ITAR & USML Wrap Up

When in doubt, ask the manufacturer before selling, transferring, shipping or traveling with a potentially ITAR controlled item. Yes, the waters are murky, but like your own safety and security, you are responsible for following the law. The federal penalties for ITAR violations are stiff but even worse is the potential for sharing advanced technology with our enemies that could be used against U.S. Soldiers or our Allies.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 18. T. McBride: "Swedish Telecom Company Pays Penalty for Sanctions Violation"
(Source: Bass, Berry & Sims PLC, 19 Jul 2018.)

\* Author: Thad McBride, Esq., tmcbride@bassberry.com, Bass, Berry & Sims PLC, Washington DC.

*Key Points*

  - Ericsson Caused Violation by Having U.S. Party Ship Equipment to Sudan
  - U.S. Employee Facilitated Sudan Business
  - OFAC Expects Parties Conducting International Business to Have Robust Compliance Processes

In June 2018, the U.S. Treasury Department, Office of Foreign Assets Control (OFAC) announced that Ericsson, a Swedish telecommunications company, agreed to pay approximately $145,000 for violating U.S. sanctions on Sudan. Among other things, this is one of the few OFAC enforcement actions explicitly premised on a non-U.S. actor causing a U.S. company to violate U.S. sanctions.

*Non-U.S. Companies Can Violate Sanctions If They Cause a Violation*

According to OFAC, the violations involved Ericsson, AB (EAB), which is based in Sweden, causing a U.S. seller of a satellite hub to export that hub from the United States to Sudan. Interestingly, in connection with EAB's purchase of the satellite hub, an EAB employee communicated about the matter with Ericsson's compliance department. In those communications,

the EAB employee was informed that the purchase of the satellite would violate Ericsson's sanctions compliance policy.

Yet the EAB employee proceeded with the acquisition, with support from an Ericsson employee in the United States. OFAC asserted that the two Ericsson employees agreed to identify "Botswana" as the destination of the satellite hub. The EAB employee then structured the acquisition so that the satellite hub was shipped through several other countries, including with help from a third party in Lebanon, before eventually arriving in Sudan.

*U.S. Employee Facilitated Transaction by Supporting the Sudan Business*

It appears that, when the Ericsson U.S. employee was first contacted by his counterparts at EAB, he informed them that he could not be involved in any Sudan business. But subsequently, he did assist his EAB counterparts by providing technical guidance related to the Sudan project. (The U.S. employee sent one e-mail related to Sudan in which "East Africa" was listed as the subject of the e-mail.) The U.S. employee also met in person with an EAB employee to discuss the project.

There is no indication that the U.S. employee had any role in purchasing or shipping the satellite hub to Sudan. Nonetheless, by providing guidance and advice about the Sudan project, the U.S. employee facilitated that project and thereby violated U.S. sanctions on Sudan. Like other U.S. sanctions programs, under U.S. sanctions on Sudan, U.S. persons were prohibited from indirectly supporting (or facilitating) a project in Sudan that the U.S. person could not engage in directly.

*Conduct Occurred Well Before Recent Lifting of U.S. Sanctions on Sudan*

As we have discussed in prior blog posts (see this January 2018 blog post), it typically takes a long time for OFAC to impose penalties for sanctions violations. The conduct at issue in the Ericsson matter occurred in 2011 and 2012. Ericsson tolled the statute of limitations during OFAC's investigation of the matter.

In fact, by the time Ericsson agreed to settle the matter, U.S. sanctions on Sudan had been lifted. However, the U.S. government does maintain export controls on Sudan under the Export Administration Regulations. As a result, an export license is needed to export most U.S.-origin items to Sudan, even though economic sanctions have been lifted.

This illustrates one of the practical challenges for U.S. companies considering business in Sudan. Discussions about that business and even the provision of business services are generally permitted without a license. Actual exports of products still usually require a license. So Sudan is not entirely open for business from a U.S. perspective.

*Compliance Is Complicated, Appropriate Resources Are Needed*

The compliance narrative in this matter is jumbled. As detailed above, the Ericsson compliance department advised the EAB employee - correctly - about the potential liability associated with Sudan business. The U.S. employee of Ericsson originally responded to requests related to Sudan by stating his inability to work on a Sudan project. Yet both the EAB employee and the Ericsson U.S. employee proceeded with the Sudan business.

This seems on its face like a situation in which company employees went rogue. Notably, the company disclosed the violation to OFAC, which is one reason that OFAC imposed a penalty well below the statutory maximum amount (roughly $360,000).

Yet in imposing any penalty, OFAC indicates that Ericsson could have done better. In particular, in the press release related to the matter, OFAC states the following:

This enforcement action highlights the importance of empowering compliance personnel to prevent transactions prohibited by U.S. economic and trade sanctions. Entities should ensure their sanctions compliance teams are adequately staffed, receive sufficient technology and other resources, and are delegated appropriate authority to ensure compliance efforts meet an entity's risk profile.

back to top

* * * * * * * * * * * * * * * * * *


## 19. T.G. Ficaretta: "Regulation of Bump Stocks: ATF Prepares to Issue Final Rule"
(Source: Ficaretta Legal Services LLC, 23 Jul 2018.)

* Author: Teresa G. Ficaretta, Esq., teresa@ficarettalegal.com, 301-353-3558; Ficaretta Legal Services, LLC.

On March 29, 2018, the Department of Justice published in the Federal Register a notice of proposed rulemaking that would clarify the Administration's position that "bump fire" stocks are "machineguns" regulated under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"). The comment period for the proposal closed on June 27, 2018. This bulletin provides an update on the progress made by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in reviewing the comments and the process for issuing a final rule.

*Summary of Bump Stock Proposal*

The FLS Bulletin dated March 26, 2018, provides a thorough summary of the proposals in the notice of proposed rulemaking ("NPRM"). Briefly, the NPRM outlines the October 1, 2017, shooting in Las Vegas, Nevada, in which the shooter used AR-type rifles with attached bump-stock-type devices. The notice states that the devices were readily available in the commercial marketplace through online sales directly from the manufacturer and

through multiple retailers.  To address this threat to public safety, the NPRM proposes amending the definition of "machinegun" in regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 to add the following language:

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger.  The term "machinegun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

The NPRM would overrule prior inconsistent ATF classifications of bump-stock-type devices so that all qualifying devices would be regulated as machineguns.  Because machineguns manufactured after 1986 may not be lawfully possessed by persons other than law enforcement and the military, once the final rule is effective all bump-stock-type devices in the hands of consumers would be contraband.  The NPRM states that consumers would have the option of destroying the devices or delivering or mailing them to the nearest ATF office.  Any such devices manufactured or imported after the effective date of the final rule must be marked, registered, transferred pursuant to ATF approval, and distributed only to law enforcement and the military.

*Comments on the Proposed Rule*

During the comment period ATF received over 180,000 comments.  The regulations.gov website indicates that 130,766 comments were submitted through the rulemaking portal.  The remainder of the comments were submitted to ATF via fax, mail, or other delivery. Comments were submitted by members of the firearms industry, industry trade groups, special interest groups, law firms, Members of Congress, veterans, victims of firearms violence, and consumers.  ATF officials advise that comments supporting the proposal to ban bump-stock-type devices outnumber the comments opposing the proposal.

Comments supporting the regulation of bump-stock-type devices state the following reasons:

  - The devices present a threat to public safety;
  - Lives would be saved if the devices are banned;
  - There is no need for consumers to have the devices because they do not improve the accuracy of firearms or provide enhancements relating to sporting use;
  - The devices are military in nature and should not be allowed for civilians; and
  - The devices allow people to circumvent the ban on civilian possession of machineguns.

Comments opposing a ban on bump-stock-type devices fall within the following general categories:

  - The devices are only accessories and should not be regulated as machineguns;
  - ATF was correct in its prior (non-machinegun) classifications of the devices and should stick with those rather than bowing to political pressure;
  - ATF has no legal authority to regulate the devices under the current statutory definition of "machinegun";
  - Attempts to regulate bump-stock-type devices as machineguns are unconstitutional; and
  - Rather than banning the devices through regulations, Congress should enact legislation.

*Process for Issuing Final Rule*

The Administrative Procedure Act, 5 U.S.C. § 551 et seq., requires federal agencies to publish in the Federal Register a general notice of proposed rulemaking and give interested persons an opportunity to submit comments thereon.  Agencies must consider and address all comments in the final rule. Even if the comments are primarily negative, agencies are free to adopt the proposals in the NPRM as long as the final rule addresses the comments and articulates a rational basis for the proposals adopted.

ATF officials advise they have detailed additional employees to the Office of Regulatory Affairs to assist in reviewing the comments.  The agency hopes to complete their review and forward a draft final rule to the Department of Justice within the near future.  Review at Justice is likely to take several months, then the final rule will be submitted to the Office of Management and Budget for review.

Pursuant to an Executive Order issued in 1993, the Office of Management and Budget has 90 days to review a final rule.  The 90-day time period may be extended once for an additional 30-day period. Once OMB approves the final rule, it will be published in the Federal Register.  The Administrative Procedure Act requires that the final rule be published not less than 30 days before its effective date, unless the agency articulates "good cause" for making it effective sooner.  If ATF publishes a final rule banning bump-stock-type devices and requiring consumers to destroy them, the agency may delay the effective date beyond 30 days.  This would afford possessors more time to comply with the destroy or surrender
requirements.  Consumers who continue to possess unregistered bump-stock-type devices after the effective date will risk criminal prosecution and/or seizure and forfeiture of the devices.

*Litigation Challenging the Final Rule*

Another provision of the Administrative Procedure Act (5 U.S.C. 706) sets forth the scope of judicial review when aggrieved parties file suit challenging an agency's final rule. The statute allows a reviewing court to set aside a

final rule if it is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or in excess of statutory authority.

There are rumors in the firearms community of interest in filing suit challenging a final rule banning bump-stock-type devices. Domestic manufacturers of the devices would have an interest in challenging a ban because of the economic impact. Consumers who currently possess the devices and are required to destroy them or face criminal prosecution would also have standing to file suit. Finally, firearms industry groups and special interest groups representing sportsmen could participate in litigation challenging a regulation banning the devices.

Reviewing courts applying the arbitrary and capricious standard generally give significant deference to federal agencies. Federal courts will set aside a regulation only if there is a clear error of judgment, the agency failed to adequately explain its decision, or the decision clearly exceeds the scope of the statute. Plaintiffs challenging a bump-stock ban will likely have an uphill battle. Nonetheless, litigation challenging the regulation could result in a preliminary injunction that maintains the status quo and restrains ATF from implementing the regulation pending judicial review. If so, the Administration would be prevented from banning the devices until a court rules on the merits of the case.

*Conclusion*

The Department of Justice and ATF have expended considerable effort in rulemaking that will likely result in banning bump-stock-type devices. Once the final rule is effective, manufacturers of the devices may be driven out of business, as there is little or no interest in such devices by the military and law enforcement. Consumers who currently possess the devices will be required to destroy or surrender them by a specified date or risk criminal prosecution. The final rule will result in a significant economic impact on these parties. The benefit, according to the Department of Justice, is enhanced public safety.

back to top

* * * * * * * * * * * * * * * * * * *

## 20. Monday List of Ex/Im Job Openings; 176 Jobs Posted This Week, Including 48 New Jobs
(Source: Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

   "#" New or amended listing this week

* Aerojet Rocketdyne; Huntsville, AL; International Trade and Compliance Specialist;
* Aerojet Rocketdyne; Camden, AR; International Trade and Compliance Specialist;
# Agility; Atlanta, GA; Air Export Coordinator;
# Agility; Atlanta, GA; Warehouse Associate - Import/Export team
# Agility; Atlanta, GA; Ocean Import Coordinator
* Agility; Bensenville, IL; Ocean Export Coordinator;
* Agility; Basel, Switzerland; International Exhibition Coordinator;
* Agility; Burlingame, CA; Ocean Import Coordinator;
# Agility; East Boston, MA; Customs/Entry Writer Coordinator
# Agility; Houston, TX; Air Freight Export Account Executive
# Agility; Houston, TX; Ocean Export Coordinator
# Agility; Queens, NY; Air Export Coordinator;
# Agility; Queens, NY; Air Export Coordinator;
* Albemarle Corporation; Baton Rouge, LA; Logistics Specialist - Trade Compliance and Marine Specialist;
* Amazon; Seattle, WA; Head, Global Trade and Product Compliance;
* Amazon; Seattle, WA;  Global Trade Compliance Analyst;
# Amazon; Seattle, WA; US Export Compliance PM;
# Arm, Ltd.; Cambridge, UK; Compliance Programme Manager - Legal Group; Requisition ID: 13401
* Arrow; Shanghai, China; Compliance Manager;
* Arrow; Neu-Isenburg, Germany; Sachbearbeiter Export / Global Trade Management & Compliance Officer (m/f) - befristet;
* Arrow; Houten, Netherlands; Junior Officer Global Trade Management and Compliance - EMEA;
* Augusta Westland; Philadelphia, PA; Import Export Specialist; Requisition ID: 1518
* BAE Systems; Rockville, MD; Compliance Specialist Senior; Requisition ID: 35809BR
* BAE Systems; Sterling, VA; Compliance Specialist Senior; Requisition ID: 36370BR
* Boeing; Zoushan, China; Trade Compliance Manager;
* Cree, Inc.; Durham, NC; Export Compliance Specialist; Contact asignorelli@cree.com; Requisition ID: 2018-6300
* Curtiss-Wright; Chanhassen, MN; Logistics & Compliance Specialist; Requisition ID: 2835
* Dorman Products; Colmar, PA; Global Trade Compliance Specialist;
* DynCorp International; Tampa, FL; Foreign Disclosure Officer; Requisition ID: PR1701977
# Eaton; Hungary; Manager Global Trade Management EMEA - Imports (in any EMEA location); Requisition ID: 052687
# Eaton; Multiple Locations: Cleveland, Ohio; Moon Township, Pennsylvania; Eden Prairie, Minnesota; Peachtree City, Georgia; Galesburg,

Michigan; Manager, Supply Chain Governance, Risk & Compliance; Requisition ID: 054321
# Eaton; Reynosa, Mexico; Trade Compliance Specialist; Requisition ID: 054044
* Eaton; Syracuse, NY; Global Logistics Manager; Requisition ID: 036620
* Edmonds Enterprise Services, Inc.; Washington, D.C.; Compliance Specialist; Department of State; tmarshall@edmondses.com; (703) 778-7070
# Elbit Systems of America; Fort Worth, TX; Trade Compliance Officer; 2018-5917
* Eli Lilly and Co.; Indianapolis, IN; Import/Export Trade Associate
* Ensign-Bickford Aerospace & Defense Co.; Moorpark, CA; Import/Export Specialist; Missy Clark; maclark@eba-d.com
* EoTech Technologies; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
# Expeditors; Amsterdam, Netherlands; Regional Compliance SME (Subject-Matter expert) Supervisor On-site;
# Expeditors; Bangkok, Thailand; Regional Trade Compliance Manager - Indochina & Philippines;
* Expeditors; Krefeld, Germany; Clerk Import / Export;
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk;
# Expeditors; Bedfont, United Kingdom; District Trade Compliance Manager;
# Expeditors; Detroit, MI; US Export Compliance Consultant;
# Expeditors; Dublin, IE; Consultant - Customs and Trade Compliance;
* Expeditors; Dusseldorf, Germany; Clerk, Airfreight Import;
# Expeditors; Frankfurt, Germany; Consultant - Customs and Trade Compliance (m/w), unbefristet und in Vollzeit
;
* Expeditors; Krefeld, Germany; Clerk, Airfreight Import;
# Expeditors; Plainfield, IN; District Trade Compliance Manager;
# Expeditors; Seattle, WA; Supervisor - IS Development, Customs & Compliance;
# Expeditors; Sunnyvale, CA, USA; Customs Compliance Coordinator;
# Expeditors; Sunnyvale, CA, USA; Customs Compliance Specialist;
# Expeditors; Stockholm, SE; District Trade Compliance Manager;
* Export Solutions Inc.; Melbourne FL; Trade Compliance Specialist; info@exportsolutionsinc.com
* Flash Global; Mountain Lakes, NJ; Import and Export Specialist;
* FLIR; Arlington, VA; Senior Director, Global Export Licensing;
* FLIR; Billerica, MA; US Customs Analyst;
# FLIR; Elkridge, MD; Global Trade Compliance, Traffic Analyst OTS;
# FLIR; Elkridge, MD; Global Trade Compliance Traffic Analyst Detection;
* FLIR; Meer, Belgium; GTC EMEA Customs Analyst;
* FLIR; Irving, CA; Sr. Manager Export Compliance;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Licensing;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Licensing;
* Full Circle Compliance; Bruchem, Netherlands; Legal Analyst, Manager;
* General Atomics; San Diego, CA; Director, Compliance; Requisition ID: 18549BR

\* General Atomics; San Diego, CA; Government Regulatory Compliance Specialist; Requisition ID: 18686BR
\* General Atomics; San Diego, CA; Import/Export Trade Compliance Administrator - Licensing; Requisition ID: 17968BR
\* General Atomics; San Diego, CA; Senior Director of Import/Export Compliance; Requisition ID: 13892BR
\* General Atomics; San Diego, CA; Internal Auditor - Senior; Requisition ID: 17524BR
\* General Dynamics; Falls Church, VA; Director, Trade Compliance; Job ID: 2018-1122
\* GHY International; Pembina, ND (or remote); Ocean & Air Import Coordinator;
\* Google; Mountain View, CA; Ethics and Compliance Associate Counsel, Export Control;
\* Harris Corporation; Palm Bay, FL; Technical Trade Compliance Engineer; Contact Laura Solomon; Requisition ID: ES20171511-22019
\* Harris Corporation; Clifton, NJ; Technical Trade Compliance Engineer;
\* Harris Corporation; Van Nuys, CA; Trade Compliance Senior Specialist; Requisition ID: ES20180706-25145
\* Henderson Group Unlimited; Inc; Washington, DC; Process Improvement Mgr;
\* Henderson Group Unlimited; Inc; Washington, DC; Defense Control Analyst;
\* Henkel Corp.; Rocky Hill, CT; Global Trade Defense Information Manager; Requisition ID: 180002QT
\* Henkel Corp.; Rocky Hill, CT; Senior Global Trade Manager; Requisition ID: 18000307
# Honeywell International Inc.; Sunnyvale, CA or Lincolnshire, IL; Sr. Import/Export Analyst; HRD32371
\* Hussman; Bridgeton, MO; Trade Compliance Specialist;
\* Infineon Technologies; El Segundo, CA;  Export Compliance Specialist; Requisition ID: 26826\* Infineon Technologies; Milpitas, CA; Export Compliance Specialist; Requisition ID: 26988
# Infineon Technologies; Munich, Germany; Manager Export Control;
# Infineon Technologies; Munich, Germany; Specialist Export Control;
\* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official / Deputy Facility Security Officer;
\* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official;
\* Interra International; Atlanta, GA; Global Logistics Specialist;
# Johnson Controls; Boca Raton, FL; Licensing Coordinator; Requisition ID: WD30047852135
# Johnson Controls; Boca Raton, FL; Licensing Coordinator; Rquisition ID: WD30047853135
# Johnson Controls; Milwaukee, WI; Trade Compliance Analyst; Requisition ID: WD30047348124
# Johnson Controls; Tamaulipas, Matamoros, Mexico; Trade Compliance Specialist; Requisition ID: EB00064420180
\* Komatsu; Milwaukee, WI; Senior International Trade Compliance Analyst; Requisition ID: 12728
\* Lam Research Corp.; Shanghai, China; Foreign Trade (FT) Analyst;

* Leonardo DRS; Arlington, VA; Senior Customs & Trade Compliance Manager; Requisition ID: 87488
* Leonardo DRS; St. Louis; Trade Compliance Specialist; Requisition ID: 88127, or contact brandy.mormino@drs.com
* Lincoln Electric; Cleveland, OH; Trade Compliance Manager;
# Lockheed Martin; Arlington, VA; Senior International Licensing Analyst; ID: 438635BR
# Lockheed Martin; Arlington, VA; International Trade Compliance Senior Analyst; ID: 433621BR
# Lockheed Martin; Arlington, VA; International Trade Compliance Engineer; ID: 439787BR
* Lockheed Martin; Fort Worth, TX; Export and Import Compliance Investigations Lead; Job ID: 427872BR
* Lockheed Martin; Fort Worth, TX; Regulatory Compliance Analyst Senior; Job ID: 433405BR
* Lockheed Martin; Orlando, FL; Senior International Licensing Analyst; Requisition ID: 434225BR
* Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415717BR
* Lockheed Martin; Oswego, NY; Licensing Analyst; Job ID: 415708BR
* Luminar Technologies; Orlando, FL; Import/Export Trade Compliance Specialist;
* L-3 Warrior Sensor Systems; Londonderry, NH; Purchasing & Compliance Manager; Requisition ID:096596
* L-3 Warrior Sensor Systems; Middle East; International Business Development Manager - Middle East Region; Requisition ID: 093343
* L-3; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* L-3; Grand Rapids, MI; Sr. Trade Compliance Administrator; Requisition ID: 097197
* Maersk/DAMCO; Agent de transit IMPORT - EXPORT; Job Ref.: DC-164022
* Medtronic; Heerlen, The Netherlands; Trade Compliance Analyst; Requisition ID: 16000DYY
* Medtronic; Wash DC; Global Trade Lawyer; stacy.m.johnson@medtronic.com; Requisition ID: 170002ON
# Meggit; Rockmart, GA; Trade Compliance Coordinator;
# Meggit; Maidenhead, Berkshire, UK; Trade Compliance Manager;
* Mercury Systems; Andover, MA; International Trade Compliance Director; Requisition ID: 18-165
* Mitchell Martin, Inc.; Dallas, Texas; Export Regulatory Trade Compliance Specialist; Requisition ID: 104405
* Muscogee International, LLC; Washington, D.C.; DDTC Compliance Specialist II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Policy Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Records Auditor; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Contract Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk Lead; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk; Apply HERE or contact their recruiting team.

* Muscogee International, LLC; Washington, D.C.; DDTC Office Support I; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support III; Apply HERE or contact their recruiting team.
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 18010381
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022803
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022805
* Northrop Grumman; McLean, VA; International Trade Compliance Analyst 3; Requisition ID: 18012973
* Northrop Grumman; Herndon, VA; International Trade Compliance Analyst 3; Requisition ID: 18007859
* Northrop Grumman; San Diego, CA; International Trade Compliance Analyst 2; Requisition ID: 18012561
* Northrop Grumman; Redondo Beach, CA; or Rancho Bernardo, CA; or Melbourne, FL; or Falls Church, VA; Sr. Manager, International Trade Compliance; Requisition ID: 18012105; Contact Fred Czarske at 310.332.7606, fred.czarske@ngc.com.
* OCR Services, Inc.; Rockville, MD; Business Analyst, Global Trade Compliance;
* Office of the Director of National Intelligence; McLean, VA; Associate General Counsel;
# Optics 1; Bedford NH, Senior Trade Compliance Administrator
* Oracle; Unspecified, United States; Customs Compliance Specialist; Requisition ID: 18000H0N
# Oshkosh Corporation; Greenville, WI; Ethics and Compliance Analyst; ID: 174025;
* Oshkosh Corporation; Greenville, WI; Global Trade Compliance Analyst; Requisition ID: 182405
# Oshkosh Corporation; Greenville, WI; Senior Global Trade Compliance Analyst - Licensing; ID: 183273
* PerkinElmer, Inc.; Shelton, CT; Systems Analyst, Trade Compliance Solutions;
* PerkinElmer, Inc.; Shelton, CT; International Trade Compliance Analyst - Export Coordinator; Requisition ID: JR-001256
* PerkinElmer, Inc.; Hopkinton, CT; International Trade Compliance Analyst - Export Coordinator; Requisition ID: JR-001256
* PerkinElmer, Inc.; Singapore; ITC Specialist; Requisition ID: JR-003936
# Raytheon; Billerica, MA; Mgr I Export-Import Control; Requisition ID: 118298BR
* Raytheon; El Segundo, CA; Global Trade Licensing Analyst; Requisition ID: 115189BR
* Raytheon; Tucson, AZ; Export Licensing And Compliance Specialist; Requisition ID: 114936BR
* Raytheon; El Segundo, CA; Senior Principle, Global Trade Licensing; Requisition ID: 117232BR

* Raytheon; El Segundo, CA; Manager III, Global Trade Licensing; Requisition ID: 117235BR
* Raytheon; El Segundo, CA; Fullerton, CA; Goleta, CA; Aberdeen, MD; Plano, TX; McKinney, TX; Principal Analyst, Global Trade Licensing; Requisition ID: 117247BR
# Raytheon; Tuscon, AZ; Principal Analyst Export Licensing And Compliance; Requisition ID:112176BR
# Raytheon; Woburn, MA; Global Trade Export Licensing & Compliance Advisor; Requisition ID:117939BR
# Raytheon; Woburn, MA; Supply Chain Compliance Advisor; Requisition ID:115557BR
* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* The Safariland Group; Jacksonville, FL; Counsel (International Trade Compliance);
* The Safariland Group; Jacksonville, FL; Sr. Export Compliance Specialist;
* Stockholm International Peace Research Institute (SIPRI); Solna, Sweden; Senior Researcher on Dual Use and Arms Trade Controls;
* Spirent; San Jose, CA; Global Trade Compliance Specialist; Requisition ID: 4088
* Tech Data Corporation; Miami, FL; Regulatory Compliance Manager;
* Tech Data Corporation; Clearwater, FL; Regulatory Compliance Manager;
* Tech Data Corporation; Groveport, OH; Regulatory Compliance Manager;
* Tech Data Corporation; Duluth, GA; Regulatory Compliance Manager;
* Teva Pharmaceuticals; North Wales, PA; Senior Analyst, Customs & Trade Compliance;
* TLR; San Fransisco, CA; Import CSR ; Requisition ID: 1040
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Manager; Requisition ID: 62176BR
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Authorizations Manager; Requisition ID: 63222BR
* Varian; Paolo Alto, CA; Senior Trade Compliance Analyst; Requisition ID: 12735BR; Contact Uyen Tran at Uyen.Tran@varian.com;
# Varian; Paolo Alto, CA; Trade Compliance Analyst; Requisition ID: 13097BR;
* Vigilant; Negotiable Location, USA; Global Trade Compliance Analyst;
* Vigilant; Negotiable Location, USA; Global Trade Account Manager;
* Virgin Galactic; Las Cruces, NM; Export Compliance Officer; Requisition ID: 2018-3558
* Wurth Industry of North America; Indianapolis, IN; International Trade Compliance Officer - Classification
# Xylem, Inc.; Bangalore, Karnataka, India; Third Party Contract & Compliance Coordinator;
* Xylem, Inc; Morton Grove, IL; Trade Compliance Specialist
# Xylem, Inc.; Pewaukee, WI; Logistics Manager/Trade Compliance;
* YETI; Austin, TX; Global Trade Compliance Manager
* Zagg Corp.; Midvale, UT; Global Trade Compliance Specialist

back to top

* * * * * * * * * * * * * * * * * *

## 21. Full Circle Compliance Presents "Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective", 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR from a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * *

## 22. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Rose Kennedy** (Rose Elizabeth Fitzgerald Kennedy, Countess Kennedy; 22 Jul 1890 - 22 Jan 1995; was an American philanthropist, socialite, and the matriarch of the Kennedy family.  HER nine children included President John F. Kennedy, Senator Robert F. Kennedy, and longtime Senator Ted Kennedy.)
  - *"I'm like old wine. They don't bring me out very often - but I'm well preserved."*

back to top

* * * * * * * * * * * * * * * * * *

## 23. Are Your Copies of Regulations Up to Date?

(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* <u>ATF ARMS IMPORT REGULATIONS</u>: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: <u>81 FR 2657-2723</u>: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* <u>CUSTOMS REGULATIONS</u>: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: <u>83 FR 27380-27407</u>: Air Cargo Advance Screening (ACAS)

* <u>DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM)</u>: DoD 5220.22-M
  - Last Amendment: 18 May 2016: <u>Change 2</u>: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary <u>here</u>.)

* <u>EXPORT ADMINISTRATION REGULATIONS (EAR)</u>: 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendment: 6 June 2018: <u>83 FR 26204-26205</u>: Unverified List (UVL); Correction

* <u>FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR)</u>: 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: <u>83 FR 30541-30548</u>: Global Magnitsky Sanctions Regulations; and <u>83 FR 30539-30541</u>: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* <u>FOREIGN TRADE REGULATIONS (FTR)</u>: 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: <u>3 FR 17749-17751</u>: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available <u>here</u>.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance <u>website</u>.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and

employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *


## 24. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *


## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check

the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance ("FCC") ██████@fullcirclecompliance.eu]
**Sent**: 7/24/2018 9:21:34 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 18-0724 Tuesday "Daily Bugle"



## Tuesday, 24 July 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.   DHS/CBP Welcomes Industry Feedback Regarding Entry/Immediate Delivery Application and ACE Cargo Release

### OTHER GOVERNMENT SOURCES

2.   Items Scheduled for Publication in Future Federal Register Editions

3.   Commerce/BIS Publishes FAQs Concerning Product Exclusions for Section 232 Steel and Aluminum Tariffs

4.   DHS/CBP Announces Next Customs Broker Exam on 24 Oct

5.   DHS/CBP Releases Updated Drawback Trade Issue Tracker Document

6.   State/DDTC: (No new postings.)

7.   UK ECJU Updates 12 OGELs to Clarify Security Provisions

8.   UK Government Releases Strategic Export Controls Annual Report 2017

### NEWS

9.   BBC: "UK Criticizes Security of Huawei Products"

10.   Expeditors News: "Canada Implements Change to Earliest Time Frames for Release of Imported Goods"

11.   Fox News: "This Marks the End Of Gun Control"

12.   The Jerusalem Post: "Exclusive: German Intelligence Contradicts Merkel On Iran's Nuclear Drive"

13.   ST&R Trade Report: "Companies Dealing with Specified Products and Countries Advised of NK Sanctions Risk"

**COMMENTARY**

14. K. King, S. MacMichael & R. Ross: "Export Control Reminder: Semi-Annual Encryption Reporting Deadline: 1 Aug 2018"
15. M. Volkov: "Iran Sanctions and Third Party Risk"

**EDITOR'S NOTES**

16. Bartlett's Unfamiliar Quotations
17. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Jun 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)
18. Weekly Highlights of the Daily Bugle Top Stories



Awareness Course U.S. Export Controls
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands
FULL CIRCLE

## ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. DHS/CBP Welcomes Industry Feedback Regarding Entry/Immediate Delivery Application and ACE Cargo Release
(Source: Federal Register, 24 Jul 2018.) [Excerpts.]

83 FR 35018-35019: Agency Information Collection Activities: Entry/Immediate Delivery Application and ACE Cargo Release

* AGENCY: U.S. Customs and Border Protection (CBP), Department of Homeland Security.

* ACTION: 30-Day notice and request for comments; extension of an existing collection of information.

* SUMMARY: The Department of Homeland Security, U.S. Customs and Border Protection will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995 (PRA). The information collection is published in the Federal Register to obtain comments from the public and affected agencies. Comments are encouraged and will be accepted (no later than August 23, 2018) to be assured of consideration.

* ADDRESSES: Interested persons are invited to submit written comments on this proposed information collection to the Office of Information and Regulatory Affairs, Office of Management and Budget. Comments should be addressed to the OMB Desk Officer for Customs and Border Protection, Department of Homeland Security, and sent via electronic mail to dhsdeskofficer@omb.eop.gov.

* FOR FURTHER INFORMATION CONTACT: Requests for additional PRA information should be directed to Seth Renkema, Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection, Office of Trade, Regulations and Rulings, 90 K Street NE, 10th Floor, Washington, DC 20229-1177, Telephone number (202) 325-0056 or via email CBP_PRA@cbp.dhs.gov. Please note that the contact information provided here is solely for questions regarding this notice. Individuals seeking information about other CBP programs should contact the CBP National Customer Service Center at 877-227-5511, (TTY) 1-800-877-8339, or CBP website at https://www.cbp.gov/.

* SUPPLEMENTARY INFORMATION: CBP invites the general public and other Federal agencies to comment on the proposed and/or continuing information collections pursuant to the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.). This proposed information collection was previously published in the Federal Register (83 FR 16895) on April 17, 2018, allowing for a 60-day comment period. This notice allows for an additional 30 days for public comments. This process is conducted in accordance with 5 CFR 1320.8. Written comments and suggestions from the public and affected agencies should address one or more of the following four points: (1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) suggestions to enhance the quality, utility, and clarity of the information to be collected; and (4) suggestions to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses. The comments that are submitted will be summarized and included in the request for approval. All comments will become a matter of public record.

*Overview of This Information Collection*

  - Title: Entry/Immediate Delivery Application and ACE Cargo Release.
  - OMB Number: 1651-0024.
  - Form Number: 3461 and 3461 ALT.

- Current Actions: This submission is being made to extend the expiration date with no change in the data collected. There is an increase to the annual burden hours based on updated agency estimates. CBP previously submitted a 60 day Federal Register Notice with a change for this OMB control number. That change was an error and has been corrected. There is no change in the data collected under this submission.

- Type of Review: Extension (without change).

- Abstract: All items imported into the United States are subject to examination before entering the commerce of the United States. There are two procedures available to effect the release of imported merchandise, including "entry" pursuant to 19 U.S.C. 1484, and "immediate delivery" pursuant to 19 U.S.C. 1448(b). Under both procedures, CBP Forms 3461, Entry/Immediate Delivery, and 3461 ALT are the source documents in the packages presented to Customs and Border Protection (CBP). The information collected on CBP Forms 3461 and 3461 ALT allow CBP officers to verify that the information regarding the consignee and shipment is correct and that a bond is on file with CBP. CBP also uses these forms to close out the manifest and to establish the obligation to pay estimated duties in the time period prescribed by law or regulation. CBP Form 3461 is also a delivery authorization document and is given to the importing carrier to authorize the release of the merchandise.

CBP Forms 3461 and 3461 ALT are provided for by 19 CFR 141 and 142. These forms and instructions for Form 3461 are accessible HERE.

ACE Cargo Release is a program for ACE entry summary filers in which importers or brokers may file Simplified Entry data in lieu of filing the CBP Form 3461. This data consists of 12 required elements: Importer of record; buyer name and address; buyer employer identification number (consignee number), seller name and address; manufacturer/supplier name and address; Harmonized Tariff Schedule 10-digit number; country of origin; bill of lading; house air waybill number; bill of lading issuer code; entry number; entry type; and estimated shipment value. Three optional data elements are the container stuffing location; consolidator name and address, and ship to party name and address. The data collected under the ACE Cargo Release program is intended to reduce transaction costs, expedite cargo release, and enhance cargo security. ACE Cargo Release filing minimizes the redundancy of data submitted by the filer to CBP through receiving carrier data from the carrier. This design allows the participants to file earlier in the transportation flow. Guidance on using ACE Cargo Release may be found HERE. ...

Dated: July 19, 2018.
Seth D. Renkema, Branch Chief, Economic Impact Analysis Branch, U.S. Customs and Border Protection.

back to top

* * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES