Guttenberg and others worry easy access to plastic guns is a public-safety issue and would sidestep current regulations, providing criminals and terrorists with "guns that can't be flagged by metal detectors, don't have serial numbers to trace and don't require the usual background checks."

The settlement agreement allowed Defense Distributed to freely publish its gun designs, but according to Ferguson's office, the agreement, which wasn't made public until July 10, was done "in an arbitrary and capricious" fashion by the Trump administration and violates the Administrative Procedure Act.

  "There is no indication in the settlement agreement or elsewhere that any analysis, study, or determination was made by the government defendants in consultation with other agencies," says the release from the Attorney General's Office.

The multistate lawsuit alleges that the settlement between Wilson, his company and the Trump administration did not get the approval of the Department of Defense, and didn't give Congress 30 days notice before agreeing to allow Defense Distributed to begin publishing 3D gun files, by creating a special exemption for Wilson's company in the ITAR.

The lawsuit also says the settlement infringes on states' rights to regulate firearms, therefore violating the 10th Amendment.

In a tweet Tuesday morning, Trump said he is "looking into" his administration's decision to clear the way for Wilson's actions. "Already spoke to NRA, doesn't seem to make much sense!" he tweeted.

However, it was not immediately clear what Trump is prepared to do. He has been a staunch supporter of gun rights and has repeatedly said that he is the best friend of the National Rifle Association, which contributed about $30 million to his presidential campaign.

On Capitol Hill Tuesday morning, Senate Democrats declared that Trump would be responsible for any injuries or deaths resulting from untraceable 3-D plastic guns, and called on him to reverse the policy immediately.

"It's his doing, it's his responsibility and the blood is going to be on his hands," said Sen. Richard Blumenthal, D-Connecticut. "He can tweet from now until the end of his administration but the hard reality is that he can stop needless death and injury in America."

Wilson has maintained that this is a First Amendment case, claiming that the government's attempts to block the publication of the information on the web amounts to prior restraint barred by Supreme Court precedent. Wilson's attorney, Josh Blackman, compared the state government's attempts to block his client's website to the Pentagon Papers case, in which the Nixon administration unsuccessfully tried to stop the New York Times and The Washington Post from publishing the contents of a leaked Vietnam War report.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**COMMENTARY**

## 16. M. Volkov: "White Collar Criminals and Sending a Message to Deter Misconduct (Part II of III)"
(Source: Volkov Law Group Blog, 1 Aug 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

*[Editor's Note: Part I in this series was included in yesterday's, 31 July 2018, Daily Bugle.  Part III in this series will be included as soon as it is available.]*

When Judge Denny Chin sentenced Bernie Madoff, perhaps the most notorious white-collar criminal, Judge Chin imposed a sentence of 150 years, the maximum possible under the law. Madoff was 71 years old.  His Ponzi scheme resulted in the loss of $64.8 billion.

While Judge Chin may have imposed a lesser sentence without altering the fact that Madoff will die while incarcerated, Judge Chin specifically cited the need to send a message and deter future white-collar criminals. Judge Chin called Madoff's fraud "extraordinary evil," "unprecedented", and  "staggering." Judge Chin also noted that he had not received one letter from family or friends attesting to Madoff's good deeds or positive contributions to society.

Judges face real challenges when sentencing white-collar criminals.  In most cases, there is some evidence of positive behavior by a white-collar defendant that may justify mercy.  As a general matter, however, deterrence has value in the sentencing process because it ensures that a judge does not give into a claim of rehabilitation or that the defendant "has seen the light," and is contrite.

White collar criminals are typically older and better educated with a higher percentage of white males than the overall federal prison population.  While the offenses are non-violent, the impact on victims can be devastating.  For the offenders themselves, a criminal conviction can also have significant collateral consequences due to loss of employment and professional licenses.  In truth, however, white-collar offenses are nothing more than varieties of theft.  In many cases, the offenders understand they have violated the law (although they may rationalize their own intent and understanding of the law and their conduct) and the impact of their criminal conduct on victims.  Fraudsters, however, can easily repeat their criminal

activities and carry out their crimes using different fraud schemes. The old adage usually applies - "once a fraudster, always a fraudster."

Some also claim that recidivism rates understate the actual rate at which white-collar criminals engage in fraud. White collar crimes are hard to detect, investigate and prosecute because they involve analysis of financial records and regulatory schemes.

There is a common view that white-collar crime is increasing while the rate of prosecution is decreasing. The number of federal fraud case has declined in recent years. Moreover, there appears to be a real lack of prosecution of senior executives who may have been involved in serious criminal activity.

In this context, deterrence is an important objective to benefit law-abiding society by preventing future misconduct. Economists often translate the world into a cost-benefit analysis to predict future decision-making and conduct. From this perspective, deterrence occurs when the benefits of criminal conduct exceed the possible sanction - in other words, if the likelihood of detection and punishment increases, the amount of criminal conduct will decrease. If there is a low probability of being caught, deterrence has little value.

An interesting question is whether stiff corporate punishment through large fines actually deters misconduct. At a minimum, however, large fines probably incentivize companies to invest in corporate compliance programs as a means to avoid significant criminal and/or civil penalties.

In other words, companies that invest millions in corporate compliance may avoid multi-million dollar fines by implementing an effective ethics and compliance program. Such a linkage depends on whether corporate leaders at one company take note of penalties imposed against other companies and view themselves as comparable to the offending company. The connection is even more remote when one acknowledges that directors and officers do not pay criminal or civil penalties; rather current shareholders bear the brunt of the punishment, and such misconduct usually occurred years in the corporate past.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 17. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Changes to Export Controls in July 2018"
(Source: Thomsen and Burke LLP, 31 Jul 2018. Available by subscription via maher@t-b.com.) [Excerpts.]

\* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

This memo summarizes the regulatory and enforcement developments with respect to U.S. and multilateral export controls during the month of July 2018. Changes to the regulations published in the Federal Register are explained at greater length in the Regulatory Summary, as is our custom. We have also included a reminder to exporters that License Exception ENC reports are due to the Commerce Department's Bureau of Industry and Security (BIS) and the National Security Agency (NSA) no later than August 1, 2018.

## REGULATORY UPDATES

### *BIS has lifted the Denial Order placed on ZTE*

On July 13, 2018, the Bureau of Industry and Security (BIS) lifted its Denial Order on ZTE Corporation and ZTE Kangxun. Effective immediately, these parties are now eligible to receive US-origin goods and services.

ZTE Parsian (Iran) and Beijing 8-Star International Co. (China) remain restricted parties.

This Denial Order lifting is pursuant to a settlement agreement reached by BIS and ZTE, where ZTE agreed, among other things, to pay a $1 billion civil penalty for export control-related violations, deposit $400,000 in escrow, retain a team of special compliance coordinators, and completely replace its Board of Directors and senior leadership.

Web Links:

- <u>BIS Announcement Lifting Denial Order</u>
- <u>Official July 13, 2018 BIS Order</u>

### *License Exception ENC Encryption Reporting Deadline - August 1, 2018*

A reminder to exporters that License Exception ENC reports are due to the Commerce Department's Bureau of Industry and Security (BIS) and the National Security Agency (NSA) no later than **August 1, 2018**.

Your License Exception ENC Report for applicable encryption commodities, software, components and technology includes encryption items classified in accordance with Sections 740.17(b)(2) and 740.17(b)(3)(iii) of the EAR, exported between January 1 and June 30, 2018 .

This semi-annual report must be received by BIS and the ENC Encryption Request Coordinator at NSA no later than August 1, 2018 .

*Example Reportable Activity:*

- Exports of "Restricted" network infrastructure equipment
- Sharing source code classified under ECCN 5D002 with foreign parties

- Sharing ECCN 5E002 technology with foreign development or manufacturing partners

*BIS Online Information:*

BIS has published some information on its website on how to file the semi-annual encryption report. They also highlighted some common reporting exclusions, such as:

  - Encryption commodities or software with a symmetric key length not exceeding 64 bits.
  - Encryption items exported (or reexported from Canada) via free and anonymous download.
  - Encryption items from or to a U.S. bank, financial institution or its subsidiaries, affiliates, customers or contractors for banking or financial operations.
  - Foreign products developed by bundling or compiling of source code.

Additional reporting information can also be found in Section 740.17(e) of the EAR.

Please let us know if you need assistance with preparing the reports.

### *OFAC Issues Updates and Guidance On North Korea Sanctions*

The U.S. Department of State, with the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) and the U.S. Department of Homeland Security's (DHS) Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE), is issuing this advisory to highlight sanctions evasions tactics used by North Korea that could expose businesses - including manufacturers, buyers, and service providers - to sanctions compliance risks under U.S. and/or United Nations sanctions authorities. This advisory also assists businesses in complying with the requirements under Title III, the Korean Interdiction and Modernization of Sanctions Act of the Countering America's Adversaries Through Sanctions Act (CAATSA). Businesses should be aware of deceptive practices employed by North Korea in order to implement effective due diligence policies, procedures, and internal controls to ensure compliance with applicable legal requirements across their entire supply chains.

The Guidance:

  (1) Clarifies that the US is not seeking to disrupt the efforts of North Korean refugees and asylum seekers and says that if North Koreans gain another citizenship they are no longer considered North Korean for purposes of US sanctions, in particular, Title III, the Korean Interdiction and Modernization of Sanctions Act of the Countering America's Adversaries through Sanctions Act;
  (2) Provides a list of industries and countries in which North Korean laborers working on behalf of the North Korean Government were present in 2017-18 (at page 3). While the list of countries is long, it at least narrows

somewhat the supply chain sourcing concerns to certain parts of Asia, Africa, and the Middle East;

(3) Provides in Annex 3 a sectoral breakdown of where North Korean laborers are working on behalf of the North Korean Government overseas by sector. While Annex 3 states that it is NOT a comprehensive list of all countries, jurisdictions and industries, it is helpful in highlighting some higher risk jurisdictions by sector. For example, the Information Technology sector is warned about Angola, Bangladesh, China, Laos, Nigeria, Uganda, and Vietnam; and

(4) Provides in Annex 2 a list of joint ventures that have operated or are currently operating in North Korea established prior to 2016, organized by industry sector. Again, this is not a comprehensive list, nor is it an SDN or blocked parties list, but it is a list that companies evaluating suppliers in Asia and China in particular may wish to check as they evaluate potential suppliers.

The full document can be found on OFAC's website.

### *Options for Addressing the new US Tariffs on Chinese-Origin Items*

Over the last several months, the Office of the United States Trade Representative (USTR) has announced multiple rounds of new import tariffs on Chinese-origin items pursuant to a Section 301 action. These tariffs impact a wide range of goods and are at different places in their implementation. We have provided below a summary of the different tariff actions and some potential options available to reduce the impact.

Round 1

- 25% ad valorem duty
- Impacted items in Annex B to 83 FR 28710
- Became effective July 6, 2018
- Stakeholders can now request that specific products be exempted. See 83 FR 32181

Round 2

- 25% ad valorem duty
- Impacted items in Annex C to 83 FR 28710
- Proposed tariffs to become effective ~ August 2018

Round 3

- 10% ad valorem duty
- Impacted items in 83 FR 55608
- Proposed tariffs to become effective ~ September 2018
- Aug. 17: Due date to submit written comments

Companies impacted by these new tariffs have several options to help reduce the impact, including:

- Adjust supply chain operations such that the items are substantially transformed in a country other than China, prior to their import into the United States.

- Import sub-assemblies, rather than finished products, if those sub-assemblies have an HTS classification not impacted by the new tariffs. Perform final assembly in the United States after importation.

- For Round 1 tariffs that are already in effect, submit a request to the USTR that particular products be excluded from the tariffs. The deadline to submit an exclusion request is October 9, 2018. In making its determination, the USTR may consider: (1) Whether the product is available from a source outside of China, (2) Whether additional duties would cause severe economic harm to requester or other U.S. sources, and (3) Whether the particular product is important or related to Chinese industrial programs, including "Made in China 2025."

- For Round 3 proposed tariffs, submit comments to the USTR requesting that particular HTS codes be removed from the final list. The deadline is August 17th.

- For products that are imported into the United States for future export, utilize a bonded warehouse or a drawback program.

## ENFORCEMENT ACTIONS

### *Connecticut Business Owners Who Profited from Unlawful Exports to Pakistan Are Sentenced*

Father and son, Muhammad and Ismail and Kamran Khan were sentenced this month to 18 months imprisonment followed by three years of supervised release. According to court documents and statements made in court, from at least 2012 to October 2013, Muhammad Ismail, and his two sons, Kamran and Imran Khan, were engaged in a scheme to purchase goods that were controlled under the Export Administration Regulations and to export those goods without a license to Pakistan, in violation of the EAR. Through companies conducting business as Brush Locker Tools, Kauser Enterprises-USA and Kauser Enterprises-Pakistan, the three defendants received orders from a Pakistani company that procured materials and equipment for the Pakistani military, requesting them to procure specific products that were subject to the EAR. When U.S. manufacturers asked about the end-user for a product, the defendants either informed the manufacturer that the product would remain in the U.S. or completed an end-user certification indicating that the product would not be exported.

After the products were purchased, they were shipped by the manufacturer to the defendants in Connecticut. The products were then shipped to Pakistan on behalf of either the Pakistan Atomic Energy Commission ("PAEC"), the Pakistan Space & Upper Atmosphere Research Commission ("SUPARCO"), or the National Institute of Lasers & Optronics ("NILOP"), all of which were listed on the U.S. Department of Commerce Entity List. The defendants never obtained a license to export any item to the designated entities even though they knew that a license was required prior to export. The defendants received the proceeds for the sale of export-controlled items

through wire transactions from Value Additions' Pakistan-based bank account to a U.S. bank account that the defendants controlled.

On March 5, 2018, Muhammad Ismail and Kamran Khan each pleaded guilty to one count of international money laundering, for causing funds to be transferred from Pakistan to the U.S. in connection with the export control violations. In pleading guilty, Ismail and Kamran Khan specifically admitted that, between January and July 2013, they procured, received and exported to SUPARCO, without a license to do so, certain bagging film that is used for advanced composite fabrication and other high temperature applications where dimensional stability, adherence to sealant tapes and uniform film gage are essential. The proceeds for the sale of the bagging film was wired from Pakistan to the defendants in the U.S.

Ismail and Kamran Khan are both citizens of Pakistan and lawful permanent residents of the U.S.

back to top

* * * * * * * * * * * * * * * * *


## 18. R.C. Burns: "Federal Court Incorrectly Says DDTC Jumped the Gun on Gun Printing Plans"
(Source: Export Law Blog, 1 Aug 2018. Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Wash DC, Clif.Burns@bryancave.com, 202-508-6067).

Just hours before Defense Distributed, pursuant to a Settlement Agreement with the Department of State's Directorate of Defense Trade Controls, planned to upload plans to allow all who can afford a 3-D printer to make their own plastic guns, a federal district court in Seattle entered a preliminary injunction prohibiting the uploading of those plans.   The preliminary injunction was entered at the request of attorneys general from eight states and the District of Columbia.   In entering the preliminary injunction, the court stated that the plaintiffs were likely to prevail on the merits for two reasons - both, frankly, fairly questionable.

The first reason the court thought that plaintiffs would likely prevail is that, in the court's view, the Settlement Agreement effectively removed items from the United States Munitions List ("USML") without the prior thirty-day notice to Congress as required by section 38(f) of the Arms Export Control Act, 22 U.S.C. § 2278(f).  As you probably recall, DDTC and BIS so far have only issued proposed rules.   As noted early on in the export control process, State and Commerce indicated that they would provide the section 38(f) notices to Congress 30 days prior to publishing the final rule. At this point, only the proposed rules have been issued and the comment period ended on July 9, so it is likely that no section 38(f) notices have been sent to Congress as the court states. Certainly they would not have been sent thirty days before the execution of the Settlement Agreement on June 29 as the Court said should have been done.

The problem with this argument is that the Settlement Agreement did not remove Category I (or any other) items from the USML. The Settlement Agreement is quite clear that DDTC was not removing anything from the list but, rather, was granting an exemption under ITAR section 125.4(b)(13). Under that section, an export of technical data does not require a license if that data has been "approved for public release" by DDTC. All that DDTC did in the Settlement Agreement was approve public release of specified Defense Distributed plans making their export eligible for the exemption in section 125.4(b)(13). Nothing has been removed from the USML by the Settlement Agreement, and, thus, no section 38(f) notice was required as a result of the Settlement Agreement.

The other reason relied on by the district court in temporarily blocking the Settlement Agreement was the requirement in Executive Order 11958 that any removal of any item from the USML by DDTC would need the concurrence of the Department of Defense. The court stated:

> When the President delegated his authority under the AECA to the Secretary of State, he also imposed a requirement that any changes in designations of defense articles and defense services subject to export control had to have the concurrence of the Secretary of Defense. There is no indication that the federal government followed the prescribed procedures.

Apparently, the district court had not bothered to read the initial notice from the Department of Commerce on the proposed removal of Category I firearms from the United States Munitions List to the Commerce Control List. That notice clearly states:

> The changes described in this proposed rule and in the State Department's companion proposed rule on Categories I, II, and III of the USML are based on a review of those categories by the Department of Defense, which worked with the Departments of State and Commerce in preparing the amendments.

Oops. So even if the Settlement Agreement effectively removed certain Article I items from the USML, which it did not, the DOD had already agreed to that prior to the publication of the initial notices proposing removal of those items.

back to top

* * * * * * * * * * * * * * * * * *

## 19. ECTI Presents "Understanding the Tariff Wars: Developing Strategies to Overcome International Supply Chain Disruptions" Webinar, 12 Sep
(Source: Danielle Hatch, danielle@learnexportcompliance.com)

* What: Understanding the Tariff Wars: Developing Strategies to Overcome International Supply Chain Disruptions
* When: September 12, 2018; 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Melissa Proctor
* Register: Here or Danielle Hatch, 540-433-3977, danielle@learnexportcompliance.com.

back to top

* * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 20. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Herman Melville** (1 Aug 1819 - 28 Sep 1891; was an American novelist, short story writer, and poet of the American Renaissance period. His best known works include *Typee* (1846), a romantic account of his experiences in Polynesian life, and his whaling novel *Moby-Dick* (1851). His work was almost forgotten during the 30 years of his life.)
  - *"It is better to fail in originality than to succeed in imitation."*
  - *"There is something wrong about the man who wants help. There is somewhere a deep defect, a want, in brief, a need, a crying need, somewhere about that man."*

back to top

* * * * * * * * * * * * * * * * * *

## 21. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199

- Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
   - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
   - Last Amendment: 1 Aug 2018: 83 FR 37423-37433: Addition of Certain Entities; and Modification of Entry on the Entity List [Addition of 44 Entities in China to Entity List, Modification of 1 Entry in China.]

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
   - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
   - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
   - HTS codes that are not valid for AES are available here.
   - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
   - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
   - HTS codes for AES are available here.
   - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.

- Last Amendment: 14 Feb 2018: <u>83 FR 6457-6458</u>: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

## 22. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update*

*("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

\* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

\* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

\* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ("FCC") ▓▓▓▓@fullcirclecompliance.eu]
**Sent:** 8/3/2018 8:35:20 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0803 Friday "Daily Bugle"



## Friday, 3 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Amends EAR, Increases Restrictions on Exports to South Sudan
2. Commerce/BIS Amends EAR, Eases Restrictions on Exports to India

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions
4. Commerce/BIS: (No new postings.)
5. State/DDTC Announces Start of Registration Period for In-House Seminar

### NEWS

6. American Shipper: "Shippers' Law: When the Cargo is a Cat"
7. Defense Connect: "Review of the Australian Defense Trade Controls Act Roundtables This Month"
8. NU.nl: "Dutch Public Prosecution Office: 'It is a Crime to Develop 3D Weapons in the Netherlands'"
9. The Washington Times: "Judge's Order Backfires as Activists Rush to Share 3-D gun Designs"

### COMMENTARY

10. G.R. Tuttle III: "USTR Announces Potential Increase on List 3 Tariffs from 10% to 25%"
11. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Congress Passes the National Defense Authorization Act"

### EX/IM TRAINING EVENTS & CONFERENCES

12.    FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands

13.    List of Approaching Events: 12 New Events Posted This Week

**EDITOR'S NOTES**

14.    Bartlett's Unfamiliar Quotations

15.    Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

16.    Weekly Highlights of the Daily Bugle Top Stories



WORD ONLY

ARTLETT'S ATED ITAR™ HE ITAR

FULL CIRCLE

Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

**MORE INFORMATION AVAILABLE HERE**

**ITEMS FROM TODAY'S FEDERAL REGISTER**

## 1. Commerce/BIS Amends EAR, Increases Restrictions on Exports to South Sudan
(Source: Federal Register, 3 Aug 2018.) [Excerpts.]

83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations

* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule.
* SUMMARY: In this rule, the Bureau of Industry and Security (BIS) is amending the Export Administration Regulations (EAR) to conform to the Department of State's (State) amendment of February 14, 2018 to the International Traffic in Arms Regulations (ITAR) that placed restrictions on

exports of defense articles (and defense services) to the Republic of South Sudan (South Sudan). The State action reflected a policy determination by the Secretary of State that it was in the best interests of U.S. foreign policy to impose such restrictions.

Consistent with the State action, in this amendment, BIS is updating the EAR to restrict the export and reexport of certain items on the Commerce Control List to South Sudan. Pursuant to established procedure, BIS adds South Sudan to the list of U.S. embargoed countries under the EAR, a list drawn from the list of arms embargoes in the ITAR and State Federal Register notices, and adopts a restrictive license application review policy consistent with State's review policy set forth in the ITAR.

* DATES: This rule is **effective August 3, 2018**. ...

* SUPPLEMENTARY INFORMATION: ... In a rule effective July 9, 2011, the date the United States granted formal recognition to South Sudan, BIS amended the EAR to add the new country to the Commerce Country Chart set forth in Supplement No. 1 to part 740 and imposed controls on exports and reexports of items subject to the EAR to the destination. See 76 FR 41046 (July 13, 2011). In that rule, BIS added South Sudan to Country Group B in Supplement No. 1 to Part 740 (Country Groups), a grouping that rendered the country eligible for certain License Exceptions not available to countries in Country Groups D or E.

In this rule, BIS amends Supplement No.1 to Part 740 (Country Groups) of the EAR to place South Sudan in Country Group D:5-U.S. Embargoed Countries-to conform with a final rule published by State that revised ITAR §126.1 (Prohibited exports, imports, and sales to or from certain countries) by adding South Sudan in new paragraph (w). See 83 FR 6457 (February 14, 2018). The ITAR amendment reflected a determination by the Secretary of State that it was in the best interests of U.S. foreign policy to impose such restrictions in order to reflect the U.S. government's opposition to the trade of arms to South Sudan and its contribution to the conflict and humanitarian crisis in that country, promote the cessation of hostilities, and to reinforce a unified international response by aligning the United States with existing European Union restrictions on certain exports to South Sudan. As a consequence of the ITAR amendment, a policy of denial applies to applications for licenses or other approvals for the export of defense articles and defense services destined for South Sudan. A license or other approval may be issued on a case-by-case basis for six enumerated categories of defense articles and defense services, as set forth in ITAR §126.1(w) (South Sudan).

BIS primarily implements such controls through Country Group D:5. Countries listed in Country Group D:5 are subject to additional restrictions in the EAR, including on de minimis U.S. content, license exception availability, and licensing policy for certain items. License applications for the export or reexport of items classified under 9x515 or "600 series" Export Control Classification Numbers to countries in Country Group D:5 are reviewed consistent with the policies in §126.1 of the ITAR, as provided in paragraph (b)(1)(ii) of §742.4 (National security) and paragraph (b)(1) of §742.6 (Regional stability) of the EAR.

The list of "United States arms embargoed" countries is intended to mirror ITAR §126.1's list of countries subject to U.S. arms embargoes and track Federal Register notices published by State. BIS amends the list of Country Group D:5 countries as needed to conform to amendments to ITAR §126.1

that State publishes, including additions or deletions of countries subject to United States arms embargoes. See footnote one to Country Group D:5. In implementing United States embargoes in the EAR, BIS is adopting the policies for each country listed in section 126.1 of the ITAR. See 78 FR 22660, 22675 (April 16, 2013).

Consistent with new §126.1(w) (South Sudan) of the ITAR, the BIS licensing policy for the export and reexport of 9x515 and "600 series" items on the Commerce Control List, Supp. No. 1 to part 774, destined for South Sudan is a policy of denial that recognizes six categories of case-by-case approval. See ITAR §126.1(w)(1)-(6), which describes these categories in detail.

*Specific Amendment Implementing Revisions To Export and Reexport License Requirements for South Sudan Under the EAR*

PART 740 OF THE EAR

BIS amends Supplement No. 1 to Part 740 of the EAR to place "South Sudan, The Republic of", in alphabetical order, in Country Group D:5. ...

Dated: July 26, 2018.

Richard E. Ashooh, Assistant Secretary for Export Administration.

back to top

* * * * * * * * * * * * * * * * * *

# 2. Commerce/BIS Amends EAR, Eases Restrictions on Exports to India
(Source: Federal Register, 3 Aug 2018.) [Excerpts.]

83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* AGENCY: Bureau of Industry and Security, Commerce.
* ACTION: Final rule.
* SUMMARY: In this rule, the Bureau of Industry and Security (BIS) amends the Export Administration Regulations (EAR) to formally recognize and implement India's membership in the Wassenaar Arrangement (Wassenaar or WA). Further, BIS removes India from Country Group A:6 and places it in Country Group A:5. This action befits India's status as a Major Defense Partner and recognizes the country's membership in three of the four export control regimes: Missile Technology Control Regime (MTCR), WA and Australia Group (AG). This rule is another in the series of rules that implement reforms to which the United States and India mutually agreed to promote global nonproliferation, expand high technology cooperation and trade, and ultimately facilitate India's full membership in the four multilateral export control regimes (Nuclear Suppliers Group, MTCR, WA, and AG). This rule also makes conforming amendments.
* DATES: This rule is **effective August 3, 2018**. ...

& SUPPLEMENTARY INFORMATION: ... The United States and India continue their commitment to work together to strengthen the global nonproliferation and export control framework and further transform bilateral export control cooperation to recognize the full potential of the global strategic partnership between the two countries. This commitment has been realized in the two countries' mutually agreed upon steps to expand cooperation in civil space, defense, and other high-technology sectors and the complementary steps of the United States to remove India defense and space-related entities from the Entity List, realign India in U.S. export control regulations, and support India's membership in the four multilateral export control regimes (Nuclear Suppliers Group, Missile Technology Control Regime, Wassenaar Arrangement and Australia Group).

To date, with the effective support of the United States, India has been admitted to three of the four multilateral export control regimes: Missile Technology Control Regime (MTCR) on June 27, 2016, the Wassenaar Arrangement (Wassenaar or WA) on December 7, 2017 and the Australia Group (AG) on January 19, 2018. These memberships, important to the two countries' global strategic partnership, are enhanced by the United States' recognition of India as a Major Defense Partner in the India-U.S. Joint Statement of June 7, 2016, entitled, "The United States and India: Enduring Global Partners in the 21st Century." This recognition facilitates and supports India's military modernization efforts with the United States as a reliable provider of advanced defense articles.

Therefore, in this rule, the Bureau of Industry and Security (BIS), formally recognizes under the Export Administration Regulations (EAR) India's membership in the WA multilateral export control regimes and revises the EAR accordingly. Further, in this rule, BIS adds India to Country Group A:1 in Supplement No. 1 to Part 740 (Country Groups) of the EAR to implement under the EAR India's status as a member of the WA. In addition, to export control-related benefits for India as a result of prior amendments to the EAR in furtherance of the U.S.-India global strategic partnership, BIS places India in Country Group A:5, which provides the benefit of greater availability of License Exception Strategic Trade Authorization (STA) for exports and reexports to, and transfers within India under the EAR.

Countries listed in Country Group A:5 are countries included in STA §740.20(c)(1), which authorizes exports, reexports and in-country transfers that are subject to multiple reasons for control. With this rule, India becomes the 37th country to join Country Group A:5.

*Specific EAR Amendments Recognizing and Implementing India's Membership in Wassenaar and Adding India to Country Group A:5*

PART 738
BIS amends Supplement No. 1 to Part 738, Commerce Country Chart, by removing the license requirements for National Security Column 2 (NS2) reasons. Accordingly, this rule removes the "X" in NS Column 2 for India.

PART 740
BIS amends Supplement No. 1 to Part 740 to add, in alphabetical order, India to Country Groups A:1 and A:5.

CONFORMING AMENDMENTS

PART 738

Consistent with India's new multilateral export control regime status, this rule also removes the first sentence of footnote 7 to the Commerce Country Chart in Supplement No. 1 to Part 738, related to India. This amendment removes the requirement that exporters file in the Automated Export System when items controlled for Crime Control Columns 1 and 3 reasons, and Regional Stability Column 2 reasons were destined to India. As a conforming change, this rule removes the word "Also" from the second sentence of footnote 7 and capitalizes the "n" in "note" since it begins the sentence.

Also, as a conforming change in Part 738, BIS amends paragraph (b)(3) of §738.4, related to a sample analysis using the Commerce Control List and Country Chart to determine when a license is required, to remove the name "India" and replace it with the name "Chad." The sample analysis used India as an example of a country with NS Column 2 controls. That reason for control no longer applies to India but currently applies to Chad.

PART 740

In adding India to Country Group A:5, BIS removes India from Country Group A:6 to avoid creating conflicting eligibility criteria for STA provisions.

PART 743

As a member of Wassenaar, India now is subject to reporting requirements for items controlled under Wassenaar, as set forth in Part 743, Special Reporting and Notification. Specifically, India is added, in alphabetical order, to Supplement No. 1 to Part 743, Wassenaar Arrangement Participating States.

PART 758

Also, consistent with India's achievements and status as a Major Defense Partner, BIS removes the requirement that exporters file certain Electronic Export Information in AES as set forth in §758.1(b)(9). Specifically, this amendment removes the requirement that exporters file in AES when items controlled for CC Columns 1 and 3 reasons and RS Column 2 reasons are destined to India. This reporting requirement had been instituted when the license requirement for such items was removed (see U.S.-India Bilateral Understanding: Additional Revisions to the U.S. Export and Reexport Controls Under the Export Administration Regulations; January 23, 2015; 80 FR 3463). BIS has determined that this reporting requirement is no longer necessary.

PART 772

In this rule, BIS also adds India, in alphabetical order, to the list of countries under the term Australia Group in §772.1, Definitions of terms as used in the Export Administration Regulations (EAR). This updates the definition consistent with formal recognition of India's membership in the AG in a BIS final rule, entitled "Implementation of the February 2017 Australia Group (AG) Intersessional Decisions and June 2017 Plenary Understandings; Addition of India to the AG" (83 FR 13849, April 2, 2018) ...

Dated: July 31, 2018.

Richard E. Ashooh, Assistant Secretary for Export Administration.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* State; NOTICES; Specially Designated Global Terrorists:
Abdul Rehman al-Dakhil, aka Dilshad Ahmad, aka Danish Dilshad, aka
Amantullah Ali, etc. [Publication Date: 6 Aug 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. State/DDTC Announces Start of Registration Period for In-House Seminar
(Source: State/DDTC, 3 Aug 2018.)

Registration for The Directorate of Defense Trade Controls (DDTC) In-House Seminar for Wednesday, September 19th, 2018 opens August 10th and closes August 31st. Attendees will be identified on a first-come, first-serve basis. Preference will be given to new registrants and small-businesses. A completed registration form must be sent to the DDTC In-House Seminar email, as an attachment, DDTCInHouseSeminars@state.gov.

For more information, please visit the DDTC Outreach Programs page and click the "In-House Seminars" tab.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NEWS

6.

## American Shipper: "Shippers' Law: When the Cargo is a Cat"
(Source: American Shipper, 1 Aug 2018.)

The plaintiff in this case purchased an exotic Savannah kitten from a breeder in Florida for $2,300. The buyer, a woman in New York, planned to exhibit the animal, a cross between a domestic cat and an African serval, in cat shows.

The breeder delivered the kitten to Delta Air Lines for transport to New York's LaGuardia Airport.

The buyer said that the day after the cat arrived, she noticed it was in distress. She took it to a veterinarian, who diagnosed it with a broken hip. Veterinary bills amounted to more than $7,000.

The plaintiff sued Delta in New York Supreme Court, Queens County. (In New York state's judiciary, Supreme courts are trial courts for civil matters, the appellate divisions of the Supreme courts hear appeals and the state's highest court is called the Court of Appeals.)

Attorney Kenneth Nankin of the New York law firm Nankin & Verma noted in his firm's blog that the plaintiff alleged causes of action "for negligence/recklessness, trespass to chattels/conversion, bailment and economic damages."

Delta moved for partial summary judgment, arguing that as a matter of federal common law, any liability it may have be limited to $50 pursuant the air waybill's conditions of contra, and Nankin noted, "Delta contended that the liability limit applied even though the plaintiff was the consignee, not the shipper.

"The trial court refused to enforce the liability limit and denied Delta's motion. The court ruled that the limit was not enforceable because the cargo was not 'an inanimate object' and thus should be treated differently from 'ordinary bulk objects,' concluding that Delta had a 'heightened duty of care,'" Nankin said.

The trial judge stated, "The defendant airline wants it both ways: 'We will be paid to take care of your kitten as long as we transport it, but we are absolving ourselves from any negligence in doing so.'"

The trial court's decision was reversed on appeal. (Lentini v. Delta Air Lines Inc. NY App. Div. 2nd Dept. No. 17-00759. March 14.)

The appellate division explained that both before and after the Airline Deregulation Act of 1978 (ADA), "actions against interstate carriers for lost or damaged shipments have been governed by federal common law." It said the ADA contains both a "pre-emption clause" and "saving clause," which when read together, prohibit states from imposing their own substantive standards with respect to rates, routes or services.

As a result, "actions for loss or damage to interstate air shipments are governed by federal common law.

"The air waybill forms the basic contract between a shipper and an air carrier," the court said. "In order to enforce a limited-liability provision contained in an air waybill, a carrier must demonstrate that its contract satisfies the released-valuation doctrine.

"Under the released-valuation doctrine, the shipper 'is deemed to have released the carrier from liability beyond a stated amount' in exchange for a low shipping rate," it said.

A shipper is bound by the limited-liability provision if it has reasonable notice of the rate structure and is given a fair opportunity to pay a higher rate in order to obtain greater protection.

In this instance, the air waybill signed by the plaintiff's shipper demonstrated that the shipper did not declare a value for the kitten and no additional coverage was purchased. The plaintiff "failed to raise a triable issue of fact as to whether she was not given the opportunity to purchase additional coverage."

René Myatt, the attorney for the plaintiff, said her client decided not to further appeal the decision, but noted small shippers are unlikely to be aware of the limitation, which may appear on the back of a waybill, or know that they could pay a higher rate for increased coverage.

From a legal point of view, "there is no question that animals are property. They are treated as cargo," said John Stoesser, director of Wichert Insurance's IDEAL Agriculture & Marine program.

While standard liability limits for domestic shipments appear on the air waybill, he noted that international air shipments are covered by the Montreal Convention, which limits claims to 19 "special drawing rights" (between $26 and $27) per kilo.

However, shippers can purchase mortality insurance to protect themselves if an animal dies or must be destroyed.

The market for insuring animals is well developed, he said, and he has insured everything from research animals at universities to the giant pandas at Zoo Atlanta. He also has insured dogs trained for security, to sniff for bombs or explosives or for search and rescue. The dog may be a mutt, but it might have $10,000 or $20,000 worth of training.

But Stoesser said the biggest market for animal insurance overall is "in commercial animal agriculture. Pigs and cows are everybody's bread and butter, with some poultry thrown in."

The value of a single shipment can be substantial, he explained. "The landed value of a pig shipped by air, good breeding stock to China, is a couple thousand dollars a head. You can get 1,000 of them onto an airplane, on a 747, so that's $2 million."

Generally speaking, he said animal insurance is mortality insurance and does not cover an animal that is injured. For example, he recently insured a bull that was shipped to Thailand for herd improvement. The bull had a severe leg injury and was not able to mount, but because the animal was still alive, not suffering and destroyed, there was no claim.

This is even true of most racehorse insurance policies, he said. Over his 49 years in the business, Stoesser said he has seen specialty insurers try to offer policies for injured animals, but pointed out that companies have not figured out how to make money from such products.

An exception is equine insurance. Stoesser said major equine insurers will include some coverage for emergency colic surgery, although he said it may not pay for the full cost of the horse if it becomes ill.

For export animals, he said there are extensions to policies that will cover the value of an animal if it fails a particular disease test, is put into quarantine and still fails upon retesting and must be euthanized.

back to top

* * * * * * * * * * * * * * * * * * *

DOC_0003100

# 7.
## Defense Connect: "Review of the Australian Defense Trade Controls Act Roundtables This Month"
(Source: <u>Defense Connect</u>, 1 Aug 2018.)

The review into Defense Trade Controls Act is hosting a series of roundtables to discuss the progress and submissions of the review

As part of the review of the Defense Trade Controls Act announced by Minister for Defense Marise Payne in April, Dr Vivienne Thom AM will facilitate a series of roundtables to discuss the process, feedback and next steps of the review process.

Defense administers controls on the export of military and dual-use goods and technologies through four key pieces of legislation. The Defense Trade Controls Act 2012 provides the legislative basis for the controls of the intangible supply, publication and brokering of defense and strategic goods and technology.

The act was enacted in 2012 to strengthen Australia's existing export controls and to align them with international best practice. The act underwent amendments in 2015 following extensive stakeholder consultation. One such amendment included the addition of a mechanism to provide for review of the operation of the act after two years of the offence provisions being commenced, which occurred on 2 April 2016.

**Aim**: The aim of the review is to evaluate the operation of the DTC Act and deliver recommendations that ensure the act is an effective component of Australia's export control regime that appropriately addresses current and future national security requirements.

The review will also aim to ensure the act provides appropriate levels of regulation and security for controlled technologies, aligns with international best practice for export controls, and is not unnecessarily restricting trade, research and international collaboration.

While submissions closed 31 May 2018, Defense aims to continue working closely with the stakeholders as they establish internal compliance arrangements, by providing implementation support through outreach and engagement sessions.

**Scope**: The act is required to be reviewed after two years and is being carried out by Dr Thom, the former inspector-general of intelligence and security and a former deputy Commonwealth ombudsman overseeing law enforcement, immigration, taxation and defense agencies.

The review is mandated by section 74B of the act:

  (1) The minister must cause a review of the operation of this act (other than parts three and four) to be undertaken as soon as possible after the second

anniversary of the commencement of section 10 of this act and afterwards at intervals of not longer than five years.

(2) The persons undertaking the review must give the minister a written report of the review.

(3) The minister must cause a copy of the report of the review to be tabled in each house of the Parliament within 15 sitting days of that house after the report is given to the minister.

The review is limited to the operation of the act but subsection 74B(1) specifically excludes parts three and four - that relate to the Defense Trade Cooperation Treaty between Australia and the US - from scope of the review.

The review will examine all other parts of the act to provide evidence-based, practical recommendations for improvements to the act and supporting policy. In particular, the review will consider:

  - Whether the act is fit for purpose;
  - Whether there are any gaps in the act's controls;
  - Whether any unintended consequences are resulting from the act's controls; and
  - Any other matters considered relevant.

Roundtable discussions for the review of the Defense Trade Controls Act 2012 are being held on the following dates:

  - Sydney - Monday 6 August;
  - Brisbane - Tuesday 7 August;
  - Melbourne - Monday 13 August;
  - Perth - Wednesday 22 August;
  - Adelaide - Thursday 23 August; and
  - Canberra - Tuesday 28 August.

More information on the review process is available here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. NU.nl: "Dutch Public Prosecution Office: 'It is a Crime to Develop 3D Weapons in the Netherlands'"
(Source: NU.nl, 2 Aug 2018.) [Excerpts; translated by editor.]

It is a crime in the Netherlands to make plastic weapons with a 3D printer. The provision of blueprints for this type of weapon can also be punishable. This is what the Public Prosecution Office ("*Openbaar Ministerie*") said in connection with the case involving an American company that wanted to publish blueprints for 3D-printed weapons online. ...

On Wednesday this week, a judge in the U.S. forbade the publication of the blueprints by Defense Distributed because the 3D-printed firearms "could cause irreparable damage to civilians". ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. The Washington Times: "Judge's Order Backfires as Activists Rush to Share 3-D gun Designs"

(Source: The Washington Times, 1 Aug 2018.)) [Excerpts.]

A judge's attempt to halt the spread of blueprints for 3D-printed guns backfired Wednesday as the plans spread across the internet, posted and shared by people who said they were determined to strike a blow for free speech, to protect gun rights, or just to thumb their nose at the government.

Activists took to Twitter and Facebook to share links where the plans could be found on file-sharing services or sites on the dark web.  One website, CodeIsFreeSpeech.com, posted eight sets of files and reported more than 100,000 hits and nearly 1.5 terabytes of data downloaded by 6 a.m. Wednesday.  "Just in the past 48 hours, I would be shocked if hundreds of thousands of people don't possess these files," said Brandon Combs, president of the Firearms Policy Coalition, which posted the data to CodeIsFreeSpeech.

In a flurry of legal activity late Tuesday, a judge ordered the federal government to reverse itself and reimpose Obama-era export restrictions that limited the availability of the files. That order was aimed at stopping Defense Distributed, a Texas-based organization, from posting blueprints to its website, DEFCAD.com.

Cody Wilson, the site's founder, complied, but much of the rest of the internet stepped in to fill the void. "Do your human duty and share," said one Twitter user who linked to the files on a file-sharing site.  "You can't stop the flow of information," tweeted another user, duudl3, who created a mirror site to host the files Mr. Wilson disabled.

Mr. Combs and duudl3 each said his bandwidth use shot off the charts with the number of downloads. "I've seen this stuff all over, and I suspect by the end of the next couple of days there's just going to be a saturation. They're not going to be able to do anything about it," Mr. Combs told The Washington Times.

The technology of 3D printing and plans would allow people with access to the right machinery and materials to manufacture a working, untraceable firearm in secret. The concept has existed for decades but has just recently begun to reach the mainstream, plowing new ground in the debate over gun rights and government regulations.

Some security specialists worry that the guns could circumvent metal detectors and become a tool for terrorists. Gun control activists say people banned from buying guns, such as felons and domestic abusers, also would be able to cheat the law by printing weapons at home.  Defense Distributed and like-minded groups counter that they are releasing information protected by free speech, not engaging in firearms transactions.

They also say the plans have been available for years online and there is little the government can - or should - do. Further, the possession of undetectable

guns has been illegal for decades and most blueprints for 3D guns, including those of Defense Distributed, use at least some metal parts to comply with that law.

Mr. Wilson's attorneys filed court papers showing a number of other locations where blueprints for at least one home-manufactured firearm were available in 2007, a decade before Defense Distributed's planned broad release this week. . . .

Washington Attorney General Bob Ferguson, who led the lawsuit, said those still sharing the blueprints online are breaking federal export laws. "Anyone who posts downloadable guns to the internet is violating federal law. It is the federal government's job to enforce those laws, and I urge it to enforce them aggressively as to these prohibited items," he said. . . .

Mr. Combs posted plans for eight firearms assemblies to his website. He said it was too early to say which one was proving most popular and that many users appeared to be downloading all of the files. He said people are sending him new designs. "Cody was the pioneer, and all credit goes to him and Defense Distributed," Mr. Combs said. "I just wanted to give the government another target, if that's what they want to do."

Government officials seem conflicted on what to do. Since 2013, the State Department claimed the blueprints violated export rules, making weapons of war available to foreign actors. Mr. Wilson sued, and after a years-long battle the Justice and State departments reversed and reached a settlement to allow Defense Distributed to move ahead with plans to post the blueprints.

The White House suggested Wednesday that Mr. Trump was blindsided by that decision. "The Department of Justice made a deal without the president's approval on those regards," White House press secretary Sarah Huckabee Sanders said. "The president's glad this effort was delayed to give more time to review the issue, and this administration supports the decades-old legislation already on the books that prohibits the ownership of a wholly plastic gun."

Still, it's not clear what the government can do at this point. State Department officials said their only role was to prohibit export of the blueprints outside the U.S. "The department has no role in domestic gun control policies and the broader question of this technology's potential," a spokesperson said. . . .

Nonetheless, lawmakers on Capitol Hill - mostly Democrats, but some Republicans - are demanding that Mr. Trump do something. Sen. Edward J. Markey, Massachusetts Democrat, said he would try to block the confirmation of a key State Department official until the government returns to the Obama-era export policy. The nominee, R. Clarke Cooper, has been tapped to be assistant secretary for political-military affairs, which would oversee the export rules in question. "Until the president agrees to reverse this policy and prohibit the online publication of these dangerous blueprints, a decision that is entirely within his authority, I intend to place a hold on your nomination," Mr. Markey told Mr. Cooper. . . .

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

## 10. G.R. Tuttle III: "USTR Announces Potential Increase on List 3 Tariffs from 10% to 25%"
(Source: Tuttle Law Newsletter, 2 Aug 2018. Available via email address below.)

\* Author: George R. Tuttle III, Esq., geo@tuttlelaw.com, (415) 986-8780. Attorney with Law Offices of George R. Tuttle in the San Francisco Bay Area.

On August 1, 2018 the USTR announced it is considering increasing the proposed tariffs on List 3 from 10% to 25%. Published in the July 17, 2018 Federal Register (83 FR 33608 of July 17, 2018) List 3 identified $200 billion worth of Chinese goods imported into the U.S., compromising approximately 6,013 items.

Because of this potential change, the parties wishing to present at the August 20-23 hearings will have until August 13, 2018 to submit hearing requests. The due date for submission of all written comments, including rebuttal comments, is now September 5, 2018.

US Trade Representative Robert Lighthizer stated that the President has directed him to consider increasing the proposed level of additional duty from 10% to 25%. Mr. Lighthizer added that "the increase in the possible rate of the additional duty is intended to provide the Administration with additional options to encourage China to change its harmful policies and behavior and adopt policies that will lead to fairer markets and prosperity for all of our citizens."

To submit comments and request to present testimony at the public hearing, submissions are to be made through the Federal eRulemaking Portal: http://www.regulations.gov. The docket number is USTR-2018-0026.

Comments are to include:

  - The specific tariff subheadings to be subject to increased duties, including whether the subheadings listed in the Annex should be retained or removed, or whether subheadings not currently on the list should be added.
  - The level of the increase, if any, in the rate of duty.
  - The appropriate aggregate level of trade to be covered by additional duties.

In commenting on the inclusion or removal of particular tariff subheadings listed in the Annex, the USTR requests that commenters address specifically

whether imposing increased duties on a particular product would be practicable or effective to obtain the elimination of China's acts, policies, and practices, and whether maintaining or imposing additional duties on a particular product would cause disproportionate economic harm to U.S. interests, including small- or medium-size businesses and consumers.

**Written submissions** can also be made through www.regulations.gov at docket USTR-2018-0026. Comments can be made in the "comment now!" field or by uploading an attached Microsoft Word (.doc) or searchable Adobe Acrobat (.pdf) file. File names should reflect the name of the person/entity submitting the document. Any attachments, exhibits, or annexes should be part of the attachment.

Business confidential documents may be submitted. The file name must begin "BC" and the name of the person or entity making the submission should follow. Any page containing confidential information must be clearly marked "BUSINESS CONFIDENTIAL." In requesting business confidential treatment, the submitter must certify in writing that disclosure of such information would endanger trade secrets or profitability, and that the information would not customarily be released to the public. The public version of the document must have a file name beginning with "P" and be followed by the name of the person or entity making the submission.

The USTR will post submissions in the docket for public inspection, except those requesting business confidential treatment. Submissions can be viewed at here by entering USTR-2018-0026 in the search field.

*Section 301 Time Line*

| Annex A (List 1) | Date | www.Regulations.gov Docket # |
|---|---|---|
| Request to appear | 23-Apr-18 | USTR-2018-0005 |
| Comments on specific subheadings due | 11-May-18 | USTR-2018-0005 |
| Hearing on List 1 (Annex A) products | 15-May-18 | USTR-2018-0005 |
| Post-hearing rebutal comments due | 22-May-18 | USTR-2018-0005 |
| 25% duty effective on List 1 products | 6-Jul-18 | |
| Procedures & forms to request exclusions | Ongoing | USTR-2018-0005 Exclusion Form |
| Deadline to request exclusions | 9-Oct-18 | |

| List 2 / Annex B | Date | www.Regulations.gov Docket # |
|---|---|---|
| Comments on specific subheadings due | 23-Jul-18 | USTR-2018-0018 |
| Deadline to request to appear at hearing | 29-Jun-18 | USTR-2018-0018 |
| Pre-hearing submissions due | 29-Jun-18 | USTR-2018-0018 |
| Hearing on List 2 products | 24-Jul-18 | USTR-2018-0018 |
| Post-hearing rebuttal comments due | 31-Jul-18 | USTR-2018-0018 |
| 25% duty effective on List 2 products | TBA | |
| Procedures to request exclusion | TBA | TBA |
| Deadline to request exclusions | TBA | TBA |

| List 3 / Annex C | Date *NEW* | www.Regulations.gov Docket # |
|---|---|---|
| Deadline for filing requests to appear at hearing and summary of expected testimony | * 13-Aug-18 * | USTR-2018-0026 |
| Due date for submission of written comments | * 5-Sept-18 * | USTR-2018-0026 |
| Hearing on List 3 products | August 20-23, 2018 | |
| Post-hearing rebuttal comments due | * 5-Sept-18 * | USTR-2018-0026 |
| Duty effective on List 3 products | TBA | |
| Procedures to request exclusion | TBA | TBA |
| Deadline to request exclusions | TBA | TBA |

Official notification of the extension dates will be published in the Federal Register shortly.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Congress Passes the National Defense Authorization Act"

(Source: Thomsen and Burke LLP, 2 Aug 2018. Available by subscription via maher@t-b.com.)

* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

Yesterday, the Senate overwhelmingly passed the John S. McCain National Defense Authorization Act (NDAA) for Fiscal Year 2019 (H.R. 5515). The bill has been sent to the President and he is expected to sign it.

The bill strengthens the Committee on Foreign Investment in the United States (CFIUS), which reviews proposed investments to weigh whether they threaten national security. It includes export control reform provisions requiring Commerce to establish export controls on emerging and foundation technologies, which are sensitive technologies not currently captured by export controls. Finally, the bill includes a government wide ban on procuring equipment or services from the Chinese telecommunications firms ZTE and Huawei. However, it does not include a provision to reinstate sanctions against ZTE and undo a deal the company recently cut with the Commerce Department. More details below:

*Export Control Reform*

The Export Controls Act of 2018 [Sections 1741-1768 of the NDAA] provides permanent statutory authority for the existing Export Administration Regulations (EAR). The EAR has been operating under emergency authority of the International Emergency Economic Powers Act (IEEPA) for many years, ever since the Export Administration Act of 1979 lapsed. This new authority also adds several noteworthy changes:

  - New export controls on "emerging and foundational technologies", which are not specifically identified in the legislation. Presumably, these could be items and technology that are currently classified as EAR99. [Section 1758]
  - Commerce will revise the duties of the Emerging Technology and Research Advisory Committee to help identify "emerging and foundational technologies" that may be developed over a period of 5 or 10 years. [Section 1758]
  - License applications are now required to be reviewed for impact on the US defense industrial base. Transactions that would have a "significant negative impact" on that defense industrial base can be denied. [Section 1756]
  - New requirement for the government to publish export license details for licenses involving certain terrorism-supporting countries. [Section 1754]
  - Maximum civil penalties per violation have been increased slightly to the greater of $300,000 or twice the value of the transaction. [Section 1760]

The identification of "emerging and foundational technologies" is going to be an important part of this legislation. The general requirements in the current legislation are that the technologies "are essential to the national security of the United States" and shall take into account:

- the development of emerging and foundational technologies in foreign countries;
- the effect export controls imposed pursuant to this section may have on the development of such technologies in the United States; and
- the effectiveness of export controls imposed pursuant to this section on limiting the proliferation of emerging and foundational technologies to foreign countries.

*CFIUS Reform*

Congress agreed on its final version of the Foreign Investment Risk Review Modernization Act (FIRRMA) [Sections 1701-1728 of the NDAA], which provides the first update to the Committee on Foreign Investment in the United States (CFIUS) statute in several years. FIRRMA updates and expands CFIUS's review process in many ways, by:

- Increasing the types of transactions subject to CFIUS's jurisdiction: CFIUS currently only reviews mergers, acquisitions, or takeovers that could result in a takeover of a US business by a foreign person. FIRRMA now expands the purview of CFIUS by adding new types of "covered transactions," including "other investments involving critical infrastructure, critical technologies, or sensitive data." [Section 1706]
- Extending the CFIUS review timeframes: FIRRMA lengthens the time period of the CFIUS process to 45 days, with a 15-day period extension for extraordinary circumstances, and limits timing for the pre-review process. [Section 1709]
- Making certain notifications mandatory: These include transactions involving an investment that results in the acquisition, directly or indirectly, of a "substantial interest" in a US business involved in critical infrastructure, critical technology, or sensitive data by a foreign person in which a foreign government has, directly or indirectly, a "substantial interest." [Section 1706]
- Establishing a process for potentially expedited review and approval of certain transactions: FIRRMA also offers a potential path for some transactions to receive approval on an expedited basis following a shortened notification. [Section 1706]

FIRRMA also allows CFIUS to impose filing fees, which are up to 1% of the transaction value or $300,000. [Section 1723]

*Huawei and ZTE Implications*

Finally, Section 899 of the NDAA also places a government procurement ban on certain telecommunications equipment made by ZTE and Huawei, as well as related services. However, it does not include a provision to reinstate sanctions against ZTE and undo a deal the company recently cut with the Commerce Department.

back to top

* * * * * * * * * * * * * * * * * *



Awareness Course U.S. Export Controls
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands
FULL CIRCLE

## 12. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices.  The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via  events@fullcirclecompliance.eu

back to top

* * * * * * * * * * * * * * * * * * * * *

# 13. List of Approaching Events: 12 New Events Posted This Week

(Sources: Editor and Event Sponsors)

Published every Friday or last publication day of the week, our overview of Approaching Events is organized to list continuously available training, training events, seminars & conferences, and webinars.

Please, submit your event announcement to John Bartlett, Events & Jobs Editor (email: jwbartlett@fullcirclecompliance.eu), composed in the below format:

> \# DATE: LOCATION; "EVENT TITLE"; EVENT SPONSOR; WEBLINK; CONTACT DETAILS (email and/or phone number)

"#" = New or updated listing

## *Continuously Available Training*

* E-Seminars: "US Export Controls" / "Defense Trade Controls"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* Webinar: "Company-Wide US Export Controls Awareness Program"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* E-Seminars: "ITAR/EAR Awareness"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com
* Online: "Simplified Network Application Process Redesign (SNAP-R)"; Commerce/BIS; 202-482-2227
* E-Seminars: "Webinars On-Demand Library"; Sandler, Travis & Rosenberg, P.A.
* Online: "International Trade Webinars"; Global Training Center
* Online: "On-Demand Webinars"; "General Training"; Center for Development of Security Excellence; Defense Security Service (DSS)
* Online: "ACE Reports Training and User Guide"; DHS/CBP
* Online: "Increase Your International Sales - Webinar Archive"; U.S. Commercial Service
* Web Form: "Compliance Snapshot Assessment"; Commonwealth Trading Partners (CTP)
* Online: "Customs Broker Exam Prep Course"; The Exam Center

## *Seminars and Conferences*

* Aug 6: Detroit, MI; "Export Compliance and Controls"; Global Trade Academy
* Aug 7: Detroit, MI; "Export Controls Specialist - Certification"; Global Trade Academy
* Aug 7-9: Detroit, MI; "Export Controls Specialist - Certification"; Global Trade Academy
* Aug 7: Orlando, FL; "Import Documentation and Procedures Seminar"; International Business Training

* Aug 8: Orlando, FL; "Export Documentation and Procedures Seminar";
International Business Training
* Aug 14-15: Milpitas, CA; "Complying with US Export Controls"; Bureau of
Industry and Security
* Aug 14-15: Atlanta, GA; "2018 Trade Symposium"; U.S. Customs and
Border Protection
* Aug 15: Minneapolis, MN; "Export Documentation and Procedures Seminar";
International Business Training
* Aug 16: Indianapolis, IN; "Export Documentation and Procedures Seminar";
International Business Training
* Aug 16: Milpitas, CA; "Encryption Controls"; Bureau of Industry and Security
* Aug 16: Minneapolis, MN; "Incoterms 2010: Terms of Sale Seminar";
International Business Training
* Aug 17: Indianapolis, IL; "Incoterms 2010: Terms of Sale Seminar";
International Business Training
* Aug 20: Cincinnati, OH; "Export Documentation and Procedures Seminar";
International Business Training
* Aug 21: Leeds, UK; "Understanding Exporting"; Chamber International
* Aug 22: London, UK; "Advanced Exporting"; UK Institute of Export and
International Trade
* Aug 22: Minneapolis, MN; "Import Documentation and Procedures Seminar";
International Business Training
* Aug 23: Cincinnati, OH; "Import Documentation and Procedures Seminar";
International Business Training
* Aug 24: Houston, TX; "Export Documentation and Procedures Seminar";
International Business Training
* Aug 29: Leeds, UK; "Understanding Incoterms"; Chamber International
* Sep 3: Edinburgh, UK; "Intermediate Seminar"; UK Department for
International Trade
* Sep 4: Edinburgh, UK; "Beginner's Workshop"; UK Department for
International Trade
* Sep 4: Edinburgh, UK; "Control List Classification - Combined Dual Use and
Military"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Licenses Workshop"; UK Department for
International Trade
* Sep 4: Leeds, UK; "Methods of Payment & Letters of Credit"; Chamber
International
* Sep 4: London, UK; "An Introduction to Exporting"; UK Institute of Export
and International Trade
* Sep 5: Aberdeen, UK; "Beginner's Workshop"; UK Department for
International Trade
* Sep 5: Aberdeen, UK; "Intermediate Seminar"; UK Department for
International Trade
* Sep 6: Aberdeen, UK; "Licenses Workshop"; UK Department for
International Trade
* Sep 11-13: Annapolis, MD; "Defense Industry Experts and ITAR/EAR Boot
Camp"; Export Compliance Solutions;
spalmer@exportcompliancesolutions.com; 866-238-4018
* Sep 11-13: Detroit, MI; "Export Controls Specialist Certification"; Global Trade
Academy

* Sep 11: Leeds, UK; "Export Documentation and Export Procedures"; Chamber International
* Sep 12: Buffalo, NY; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 12-13: Springfield, RI; "Complying with US Export Controls"; Bureau of Industry and Security
* Sep 12-19: Chicago, IL; "Import 5-Day Boot Camp"; Global Trade Academy
* Sep 13: Buffalo, NY; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 13: Frankfurt, Germany; "BAFA/U.S. Export Control Seminar 2018";
* Sep 13-17: Galveston, TX (Cruise); "ICPA @ SEA!"; International Compliance Professionals Association (ICPA)
* Sep 16-19: Atlanta, GA; "2018 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 17: Los Angeles, CA; "Import Compliance"; Global Trade Academy
* Sep 17-20: Columbus, OH; "University Export Controls Seminar at The Ohio State University in Columbus"; Export Compliance Training Institute (ECTI); jessica@learnexportcompliance.com; 540-433-3977
* Sep 17-21: Los Angeles, CA; "Import 5-Day Boot Camp"; Global Trade Academy
* Sep 18: Anaheim, CA; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 18: Los Angeles, CA; "Tariff Classification for Importers and Exporters"; Global Trade Academy
* Sep 18-19: London, UK; "Decoding Trade Controls, Sanctions And Regulations On Dual-Use Goods"; KNect365
* Sep 18: San Diego, CA; "12th Annual CompTIA Global Trade Compliance Best Practices Conference"; CompTIA
* Sep 19: Washington, D.C.; "DDTC In-House Seminar"; Department of State (Registration: Aug 10 - Aug 31; first come, first served)
* Sep 19: Los Angeles, CA; "NAFTA and Trade Agreements"; Global Trade Academy
* Sep 19-20: Rome, Italy; "Defense Exports 2018"; SMi
* Sep 19-20: Los Angeles, CA; "Complying With U.S. Export Controls"; BIS
* Sep 20: Pittsburgh, PA; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 20: Los Angeles, CA; "Country and Rules of Origin"; Global Trade Academy
* Sep 21: Los Angeles, CA; "Customs Valuation - The Essentials"; Global Trade Academy
* Sep 21: Pittsburgh, PA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Sep 21-24: Detroit, Michigan; "Best Customs Broker Exam Course"; GRVR Attorneys
* Sep 24: Seligenstadt, Germany; "Follow-Up Fachtagung"; FALEX
* Sep 25-26; Chicago, IL; "Financial Crime Executive Roundtable"; American Conference Institute
* Sep 25: Kansas City, MO; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 25: Leeds, UK; "Understanding Exporting & Incoterms"; Chamber International

* Sep 25-26: San Francisco, CA; "11th West Coast Conference on FCPA Enforcement and Compliance"; American Conference Institute
* Sep 25-26: Toronto, Canada; "4th Forum on Economic Sanctions and Compliance Enforcement"; C5 Group
* Sep 26: Kansas City, MO; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 26: McLean, VA; "EAR Basics"; FD Associates
* Sep 26: Oxford, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 27: Oxford, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 28: Anaheim, CA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 1-4: Austin, TX; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 2: Bruchem, Netherlands; "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective"; Full Circle Compliance
* Oct 2: Leeds, UK; "Export Documentation"; Chamber International
# Oct 2: Manchester, UK; "E-Z CERT: How To Process Your Export Documentation Online" Greater Manchester Chamber of Commerce
* Oct 5: Boston, MA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 5: Boston, MA; " Incoterms: A Strategic Approach"; International Business Training
* Oct 9: New Orleans, LA; "Import Documentation and Procedures Seminar"; International Business Training
# Oct 10: Manchester, UK; "Export Documentation Training Course" Greater Manchester Chamber of Commerce
* Oct 11: New Orleans, LA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 11: Rotterdam, NL; "Trade Compliance Congres;" SDU, Customs Knowledge, and EvoFenedex
* Oct 12: New Orleans, LA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 15-18: Amsterdam, NL; "US Export Controls on Non-US Transactions - EAR, ITAR, OFAC Regulations Impact for EU, NL, UK & other Non-US Companies"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 15-19: Chicago, IL; "Certified Classification Specialist"; Global Trade Academy
* Oct 16-18: Dallas, TX; "Partnering for Compliance West Export/Import Control Training and Education Program"; Partnering for Compliance
# Oct 17: Manchester, UK; "Understanding Tariff Codes" Greater Manchester Chamber of Commerce
# October 17-18; Miami/Fort Lauderdale, FL; "11th Maritime Forwarding, Freight Logistics & Global Chain Supply Workshop"; ABS Consulting; albert@abs-consulting.net; 954 218-5285
* Oct 18-19: McLean, VA; "ITAR Fundamentals"; FD Associates

* Oct 19: Dallas TX; "Customs/Import Boot Camp"; Partnering for Compliance
* Oct 21-23: Grapevine, TX; "2018 Fall Conference"; International Compliance Professionals Association (ICPA)
* Oct 22-26: Dallas, Texas; "Best Customs Broker Exam Course"; GRVR Attorneys
* Oct 22-23: Arlington, VA; "2018 Fall Advanced Conference"; Society for International Affairs (SIA)
* Oct 24: Leeds, UK; "Intermediate Seminar"; UK Department for International Trade
* Oct 25: Leeds, UK; "Beginner's Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Licenses Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Oct 26: Louisville, KY; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 26: Milwaukee, WI; "Incoterms: A Strategic Approach"; International Business Training
* Oct 29 - Nov 1: Phoenix, AZ; ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 29: Seattle, WA; "Export Compliance & Controls 101"; Global Trade Academy
* Oct 30 - Nov 1: Seattle, WA; "Export Controls Specialist - Certification"; Global Trade Academy
* Oct 31 - Nov 1: Singapore; "7th Asia Summit on Anti-Corruption"; American Conference Institute
* Nov 6: Detroit, MI; "Classification: How to Classify Parts"; Global Trade Academy
* Nov 7: Detroit, MI; "Advanced Classification of Machinery and Electronics"; Global Trade Academy
# Nov 7: Manchester, UK; "Understanding Incoterms" Greater Manchester Chamber of Commerce
* Nov 7-9: London, UK; "TRACE European Forum, 2018"; TRACE Anti-Bribery Compliance Solutions
* Nov 7-9: Detroit, MI; "Advanced Classification for Machinery & Electronics"; Global Trade Academy
* Nov 8-9: Shanghai, China; "ICPA China Conference"; International Compliance Professionals Association
* Nov 12-15: Washington, D.C.; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Nov 13: Tysons Corner, VA; "Made in America, Buy America, or Buy American: Qualify your Goods and Increase Sales"; Global Trade Academy
* Nov 14: Manchester, UK; "Intermediate Seminar"; UK Department for International Trade
* Nov 15: Manchester, UK; "Beginner's Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Licenses Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade

* Nov 15: McLean, VA; "ITAR For the Empowered Official"; FD Associates
* Nov 16, San Diego, CA; "Incoterms 2010: Terms of Sale Seminar";
International Business Training
# Nov 20: Manchester, UK; "How to Claim Duty Relief on Export and Import
Processes" Greater Manchester Chamber of Commerce
# Nov 21: Manchester, UK; "Introduction to Exporting" Greater Manchester
Chamber of Commerce
* Nov 27: Houston, TX; "Duty Drawback Specialist - Certification"; Global
Trade Academy
* Dec 3-7: Tysons Corner, VA; "Certified Classification Specialist"; Global
Trade Academy
* Dec 4-5: London, UK; "11th Advanced Conference on Customs Compliance
held in Partnership with HMRC"; C5 Group
* Dec 4-5: Frankfurt, Germany; "US Defence Contracting and DFARS
Compliance in Europe;" C5 Group
* Dec 5: London, UK; "Intermediate Seminar"; UK Department for
International Trade
* Dec 6: London, UK; "Beginner's Workshop"; UK Department for International
Trad
* Dec 6: London, UK; "Licenses Workshop"; UK Department for International
Trade
* Dec 6: London, UK; "Control List Classification - Combined Dual Use and
Military"; UK Department for International Trade
* Dec 6: London, UK; "International Documentation and Customs
Compliance"; Institute of Export and International Trade
* Dec 6: Manchester, UK; "Export Documentation Training Course;" Greater
Manchester Chamber of Commerce
* Dec 6: Manchester, UK; "Introduction to Export Controls and Licenses";
* Dec 10-13: Miami, FL; "ITAR Defense Trade Controls / EAR Export Controls
Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Dec 14: Philadelphia, PA; "Incoterms 2010: Terms of Sale Seminar";
International Business Training

2019

* Jan 6-7: Long Beach, CA; "Fundamentals of FTZ Seminar";
# January 21-24, 2019: San Diego, CA; "ITAR Defense Trade Controls / EAR
Export Controls Seminar"; ECTI, 540-433-3977
* Feb 12-13: Washington, D.C.; "2019 Legislative Summit"; National Association
of Foreign Trade Zones (NAFTZ)
* May 5-7: Savannah, GA; "2019 Spring Seminar"; National Association of
Foreign Trade Zones (NAFTZ)
* Sep 8-11: Chicago, IL; "2019 Annual Conference and Exposition"; National
Association of Foreign Trade Zones (NAFTZ)

**Webinars**

* Aug 8: Webinar; "Incoterms 2010: Terms of Sale"; International Business
Training
* Aug 9: Webinar; "Export Compliance Essentials for Shipping"; ECTI; 540-
433-3977

* Aug 23: Webinar; "Social Media for Trade and Logistics Professionals";
Foreign Trade Association
* Aug 27: Webinar; "Import Documentation and Procedures"; International
Business Training
# Sep 6: Webinar; "University Export Controls Program: Strength in
Numbers"; ECTI; 540-433-3977
# Sep 11: Webinar; "BIS License Application 748P: How to Prepare It and How
to Ensure Best Possible Approval Time"; ECTI; 540-433-3977
# Sep 12: Webinar; "Understanding the Tariff Wars: Developing Strategies to
Overcome International Supply Chain Disruptions"; ECTI; 540-433-3977
* Sep 19: Webinar; "International Logistics"; International Business Training
* Sep 24: Webinar; "Tariff Classification: Using the Harmonized Tariff
Schedule"; International Business Training
* Sep 25: Webinar; "NAFTA Rules of Origin"; International Business Training
# Sep 26: Webinar; "US Antiboycott Regulations: Clarified &
Demystified"; ECTI; 540-433-3977
* Oct 15: Webinar; "Incoterms 2010: Terms of Sale"; International Business
Training
* Nov 14: Webinar; "An Export Commodity Classification Number - ECCN";
Foreign Trade Association
* Dec 3: Webinar; "Tariff Classification: Using the Harmonized Tariff
Schedule"; International Business Training
* Dec 4: Webinar; "NAFTA Rules of Origin"; International Business Training
* Dec 5: Webinar; "Import Documentation and Procedures"; International
Business Training
* Dec 11: Webinar; "Incoterms 2010: Terms of Sale"; International Business
Training
* Dec 20: Webinar; "International Logistics"; International Business Training

back to top

* * * * * * * * * * * * * * * * * *

EDITOR'S NOTES

## 14. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Leo Durocher** (Leo Ernest Durocher; 27 July 1905 - 7 Oct 1991; nicknamed
"Leo the Lip", was an American professional baseball player, manager and
coach. He played in Major League Baseball as an infielder. Upon his
retirement, he ranked fifth all-time among managers with 2,009 career
victories, second only to John McGraw in National League history.)
  - *How you play the game is for college ball. When you're playing for money,
winning is the only thing that matters.*

back to top

* * * * * * * * * * * * * * * * * *

## 15. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips,

Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *


# 16. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * * *




EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ▮▮▮▮▮▮@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ("FCC") ▓▓▓▓ @fullcirclecompliance.eu]
**Sent:** 8/7/2018 6:21:09 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0807 Tuesday "Daily Bugle"



## Tuesday, 7 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. USTR Extends Deadline for Comments On Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. State/DDTC: (No new postings.)
5. EU Implements Updated Blocking Statute In Response to U.S. Sanctions on Iran

### NEWS

6. Defense Web: "France Looking To Circumvent U.S. Components In Scalp Missile"
7. The Hill: "How 3D Guns Became A Free Speech Issue"
8. Reuters: "Trump Says Firms Doing Business In Iran To Be Barred From U.S. As Sanctions Hit"
9. ST&R Trade Report: "USTR to Review Turkey's GSP Eligibility in Response to Retaliatory Tariffs"

### COMMENTARY

10. M. Lester: "Updated EU Blocking Statute Into Force on 7 Aug"
11. M. Volkov: "The Revolution of Blockchain and Compliance (Part I of II)"

### EDITOR'S NOTES

12. Bartlett's Unfamiliar Quotations

13.   Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

14.   Weekly Highlights of the Daily Bugle Top Stories



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

**MORE INFORMATION AVAILABLE HERE**

## ITEMS FROM TODAY'S FEDERAL REGISTER

## 1. USTR Extends Deadline for Comments on Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation
(Source: Federal Register, 7 Aug 2018.) [Excerpts.]

83 FR 38760-38761: Extension of Public Comment Period Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation

* AGENCY: Office of the United States Trade Representative.
* ACTION: Extension of public comment period.
* SUMMARY: In a notice published on July 17, 2018 (83 FR 33608), the U.S. Trade Representative (Trade Representative) proposed a modification of the action taken in this investigation in the form of an additional 10 percent ad valorem duty on products of China with an annual trade value of approximately $200 billion. The July 17th notice sought public comment and provided notice of a public hearing regarding this proposed modification of the action in the investigation. On August 1, 2018, the Trade Representative announced that the President had directed the Trade Representative to consider raising the level of the additional duty in the proposed supplemental

action from 10 percent to 25 percent. In light of this possible increase in the rate of additional duty, the Trade Representative is extending certain comment periods set out in the July 17th notice.

* DATES: To be assured of consideration, you must submit comments and responses in accordance with the following schedule:

  - August 13, 2018: The due date for filing requests to appear and a summary of expected testimony at the public hearing and for filing pre-hearing submissions is extended from July 27 to August 13, 2018.

  - September 6, 2018: The due date for submission of written comments is extended from August 17 to September 6, 2018.

  - August 20-23, 2018: The scheduled start date of the Section 301 hearing (August 20) has not changed. The Section 301 Committee may extend the length of the hearing depending on the number of additional interested persons who request to appear. The Section 301 Committee will convene the public hearing in the main hearing room of the U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436 beginning at 9:30 a.m. on August 20, 2018.

  - September 6, 2018: The due date for submission of post-hearing rebuttal comments is extended from August 30 to September 6, 2018.

* ADDRESSES: USTR strongly prefers electronic submissions made through the Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments in sections E and F of the July 17th notice. The docket number--USTR-2018-0026--has not changed. ...

* SUPPLEMENTARY INFORMATION: ... In the July 17th notice, the Trade Representative proposed modifying the action in this investigation by maintaining the original $34 billion action and the proposed $16 billion action, and by taking a further, supplemental action. In particular, the Trade Representative proposed a supplemental action of an additional 10 percent ad valorem duty on products of China covered in a list of 6,031 tariff subheadings in the Annex to the July 17th notice.

  On August 1, 2018, the Trade Representative announced that the President directed the Trade Representative to consider increasing the proposed level of the additional duty from 10 percent to 25 percent. This additional 25 percent duty would be applied to the proposed list of products in the Annex to the July 17th notice. The possible increase in the proposed rate of the additional duty is intended to provide the Administration with additional options to obtain the elimination of the acts, policies, and practices covered in the investigation. ...

Robert E. Lighthizer, United States Trade Representative.

back to top

* * * * * * * * * * * * * * * * * * *

OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions

(Source: Federal Register)

* Commerce/BIS; NOTICES; Recruitment of Private-Sector Members: Emerging Technology Technical Advisory Committee [Publication Date: 8 Aug 2018.]

back to top

* * * * * * * * * * * * * * * * * * * *

# 3.
# Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

# 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * *

# 5. EU Implements Updated Blocking Statute In Response to U.S. Sanctions on Iran
(Source: Editor, and Official Journal of the European Union, 7 Aug 2018.)

Today, the EU's updated Blocking Statute enters into force to mitigate the impact of U.S. sanctions on the interests of EU companies doing legitimate business in Iran.

What that means:
  (1) The EU aims to sustain the trade and economic relations between the EU and Iran.
  (2) The Blocking Statute allows EU operators to recover damages arising from US extraterritorial sanctions from the persons causing them and nullifies the effect in the EU of any foreign court rulings based on them.
  (3) To help EU companies with the implementation of the updated Blocking Statute the Commission published a Guidance note to facilitate understanding of the relevant legal acts.

To read the related press release, see the Daily Bugle of Monday, 6 August 2018, item #6.

*Regulations*
* Commission Delegated Regulation (EU) 2018/1100 of 6 June 2018 amending the Annex to Council Regulation (EC) No 2271/96 protecting against the effects of extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom
* Commission Implementing Regulation (EU) 2018/1101 of 3 August 2018 laying down the criteria for the application of the second paragraph of Article 5

of Council Regulation (EC) No 2271/96 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom

*Decisions*
* Commission Delegated Decision (EU) 2018/1102 of 6 June 2018 amending Annex III to Decision No 466/2014/EU of the European Parliament and of the Council granting an EU guarantee to the European Investment Bank against losses under financing operations supporting investment projects outside the Union, as regards Iran

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NEWS

6.
## Defense Web: "France Looking To Circumvent U.S. Components In Scalp Missile"
(Source: Defense Web, 7 Aug 2018.) [Excerpts.]

France is looking for a way around the United States' blocking of Scalp cruise missile technology for Egypt, and is exploring the possibility of replacing American components with alternatives so it can deliver the missiles as well as additional Rafale fighters to Egypt.

French Defense Minister Florence Parly recently said in the country's National Assembly that the decision by the United States to use the International Trade in Arms Regulation (ITAR) agreement to block the sale of Scalp missiles to Egypt could be circumvented if domestically-built parts are used instead.

  "In this case, we will not be able to lift the US opposition to the sale of Scalp missiles. The only thing we can do is for MBDA [which makes the missiles] to make some investment in research and development to be able to manufacture similar components that are not covered by ITAR," Parly said last month. "We can do it for the Egyptian Scalp/Rafale in so far as the new missile can be built with a reasonable delay, though the customer might find this delay a bit too long."

  "It is true that we depend on this [US International Traffic in Arms Regulations] mechanism: We are at the mercy of the Americans when our equipment is concerned," she said. Because the United States will not lift its opposition to the sale of Scalp missiles, France has had to come up with alternatives.

Egypt has ordered 24 Rafale jets from France, and is looking to acquire 12 more, but only if it can buy Scalp missiles for them.

It appears earlier reports that the impasse with the United States had been resolved, were premature. La Tribune reported that French President Emmanual Macron broached the Scalp issue during his visit to the United States in April. The newspaper in July reported that licenses had been granted to export components used in the missiles to Egypt while France is also in the process of finding alternative components for the missile that are ITAR-free.

In February it emerged that a plan to acquire 12 Rafales stalled after the United States refused to sell the manufacturer key components of the SCALP missile. The planned Egyptian acquisition of 12 Rafale fighter aircraft has been in the making since November 2017. It was billed to be a follow-up sale to a February 2015 agreement for an Egyptian acquisition of 24 Rafale fighter jets.

The new Egyptian defense minister Mohamed Ahmed Zaki Mohamed visited France in July, with Egypt expressing interest in acquiring 30 Patroller unmanned aerial vehicles and Cougar helicopters for the navy. Egypt was also interested in acquiring two additional Gowind corvettes but apparently negotiations are stalled over pricing and is now looking at German warships.

Forecast International notes that the deepening Egyptian-French relationship comes as the volume of U.S. sales to Egypt has waned after the US put a temporary hold on military sales and assistance to Egypt. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7.
## The Hill: "How 3D Guns Became A Free Speech Issue"
(Source: The Hill, 7 Aug 2018.) [Excerpts.]

In 2012, Defense Distributed, a non-profit organization, began posting online free downloads of computer files -- codes -- that would enable users to easily produce their own firearms and firearm components with 3D printers. In May 2013, the State Department informed Defense Distributed that sharing these files in this particular manner violated provisions of the Arms Export Control Act.

And just like that, 3D-printed guns became a free-speech issue wrapped up in all the societal trappings of a Second Amendment debate.

In short, the underlying dispute was one of interpretation: Were the codes for 3D-printed guns "technical data" for purposes of the United States Munitions List, and did making them available for international download constitute "exportation" of that regulated technical data? Defense Distributed argued that the codes weren't regulated technical data, and that even if they were, the prohibition on publishing them was an unconstitutional prior restraint on speech. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Reuters: "Trump Says Firms Doing Business In Iran To Be Barred From U.S. As Sanctions Hit"

(Source: Reuters, 7 Aug 2018.) [Excerpt.]

Firms doing business with Iran will be barred from the United States, President Donald Trump said on Tuesday, as new U.S. sanctions took effect in spite of pleas from Washington's allies.

Iran dismissed a last-minute offer from the Trump administration for talks, saying it could not negotiate while Washington had reneged on a 2015 deal to lift sanctions in return for curbs on Iran's nuclear program.

Trump decided this year to pull out of the agreement, ignoring pleas from the other world powers that had co-sponsored the deal, including Washington's main European allies Britain, France and Germany, as well as Russia and China.

European countries, hoping to persuade Tehran to continue to respect the deal, have promised to try to lessen the blow of sanctions and to urge their firms not to pull out. But that has proven difficult: European companies have quit Iran, arguing that they cannot risk their U.S. business.

"These are the most biting sanctions ever imposed, and in November they ratchet up to yet another level. Anyone doing business with Iran will NOT be doing business with the United States. I am asking for WORLD PEACE, nothing less!" Trump tweeted on Tuesday. ...

*Remove the Knife*

Washington accepts that Iran has complied with the terms of the 2015 deal reached under Trump's predecessor Barack Obama, but says the agreement is flawed because it is not strenuous enough. Iran says it will continue to abide by the deal for now, if other countries can help protect it from the economic impact of Washington's decision to pull out.

Tuesday's sanctions target Iran's purchases of U.S. dollars, metals trading, coal, industrial software and auto sector. Global oil prices rose on Tuesday on concern sanctions could cut world supply, although the toughest measures targetting Iran's oil exports do not take effect for four more months. ...

"It is a reality check that this is happening and that Iran's oil exports will be hurt when the oil sanctions hit it in November," chief commodities analyst at Commerzbank Bjarne Schieldrop said.

In a speech hours before the sanctions were due to take effect, Iran's President Hassan Rouhani rejected negotiations as long as Washington was no longer complying with the deal.

"If you stab someone with a knife and then you say you want talks, then the first thing you have to do is remove the knife," Rouhani said in a speech broadcast live on state television.

"We are always in favor of diplomacy and talks...But talks need honesty," Rouhani said. ...

Britain, France, Germany and the EU as a bloc said in a joint statement on Monday: "We deeply regret the reimposition of sanctions by the U.S." ...

Few American companies do much business in Iran so the impact of sanctions mainly stems from Washington's ability to block European and Asian firms from trading there.

Among large European companies that have suspended plans to invest in Iran are France's oil major Total and its big carmakers PSA and Renault.

"We have ceased our already restricted activities in Iran in accordance with the applicable sanctions", said German car and truck manufacturer Daimler.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. ST&R Trade Report: "USTR to Review Turkey's GSP Eligibility in Response to Retaliatory Tariffs"
(Source: Sandler, Travis & Rosenberg Trade Report, 7 Aug 2018.)

USTR has launched a review of the eligibility of Turkey to participate in the Generalized System of Preferences based on concerns related to its compliance with the GSP market access criterion. This criterion, one of 15 defined by Congress in the statute authorizing the GSP program, covers the extent to which beneficiary countries have assured the U.S. reasonable and equitable access to their markets.

Specifically, USTR believes that Turkey's imposition of additional tariffs on $1.78 billion worth of U.S. imports in response to the United States' additional tariffs on imports of steel and aluminum products may violate the GSP's market access criterion. Deputy U.S. Trade Representative Jerry Gerrish expressed hope that "Turkey will work with us to address the concerns that led to this new review of their duty-free access to the United States." USTR notes that a public hearing and comment period for this review will be announced in an upcoming Federal Register notice.

The U.S. imported $1.66 billion from Turkey under the GSP program last year, representing 17.7 percent of total U.S. imports from that country. The leading GSP import categories were vehicles and vehicle parts, jewelry and precious metals, and stone articles.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



Awareness Course U.S. Export Controls
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands

FULL CIRCLE

## 10. M. Lester: "Updated EU Blocking Statute Into Force on 7 Aug"
(Source: European Sanctions Blog, 6 Aug 2018.)

* Author: Maya Lester, Esq., Brick Court Chambers, maya.lester@brickcourt.co.uk, +44 20 7379 3550.

The European Commission announced today that the updated EU Blocking Statute (see previous blog) will enter into force on 7 August 2018 (tomorrow), in response to the re-imposition of US sanctions on Iran. They have also issued a document explaining its effect (EU Commission Q&As) which states that:

  (1) The Blocking Statute aims at countering the effects of US sanctions on EU economic operators engaging in lawful activity with third countries.
  (2) It applies with regard to specific legislation listed in its Annex. It forbids EU residents and companies from complying with the listed legislation unless they are exceptionally authorized to do so by the Commission, allows EU operators to recover damages arising from that legislation from the persons or entities causing them, and nullifies the effect in the EU of any foreign court rulings based on it.

(3) EU operators should inform the European Commission - within 30 days since they obtain the information - of any events arising from listed extra-territorial legislation that would affect their economic or financial interests.

(4) EU operators can recover "any damages, including legal costs, caused by the application of the laws specified in its Annex or by actions based thereon or resulting therefrom" from "the natural or legal person or any other entity causing the damages or from any person acting on its behalf or intermediary". The action can be brought before the courts of the Member States and the recovery can take the form of seizure and sale of the assets of the person causing the damage, its representatives or intermediaries.

(5) Implementation of the Blocking Statute, including deciding on effective, proportionate and dissuasive penalties for possible breaches is the competence of Member States. It is also for Member States to enforce those penalties.

(6) The European Commission gathers information from EU operators on possible cases of application of the listed extra-territorial legislation, liaises with national authorities from EU Member states concerning such cases in their jurisdiction and receives notification from and shares information with Member States on measures taken under the Blocking Statute and other relevant aspects.

(7) The Commission can also, in exceptional cases, authorize an EU operator to fully or partially comply with the listed extra-territorial legislation if non-compliance would seriously jeopardies the interests of the operator or of the European Union. The Implementing Regulation containing the criteria on the basis of which the Commission will assess such requests for authorization will also be published tomorrow.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. M. Volkov: "The Revolution of Blockchain and Compliance (Part I of II)"
(Source: Volkov Law Group Blog, 6 Aug 2018. Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

I am not one to engage in hyperbole.  But when it comes to blockchain technology and the implications for our economy, this is going to be the real deal.  In the world of ethics and compliance, blockchain has many possible applications that could easily transform compliance capabilities.

To show my age, let's go back into time and remember when we all were buying personal computers - not laptops, but personal computers.  Bill Gates, the head of Microsoft, predicted that computing power would eventually move from laptops to the Internet and mobile devices.  In our short lifetime, we have witnessed the transformation of the computer industry from clunky personal computers in our home to cloud computing and rapid-fire access on our mobile phones.

I would suggest that the advent of blockchain will be just as revolutionary a new technology.  Our economy is built on intermediaries that perform a variety

of functions that can be replaced through peer-to-peer trustless systems.  As blockchain grows, the role and need for intermediaries will decline.

We often hear the term these days - disruptive economies.  Marketplace innovation occurs so rapidly that we no longer characterize technologies as mature or maturing - new technologies disrupt to the point of making "old" technologies archaic in short periods of time.

In the compliance space, we hear often hear about "regtech," meaning a new technology that solves regulatory and compliance requirements for financial businesses operating in digital markets.  Consumers have become digitally savvy and now demand rapid new technologies in the financial space.  Regtech has developed to meet the need for compliance while offering innovative products to these savvy consumers.

Financial businesses are under pressure to onboard a customer quickly, screen them and their transactions for AML compliance and satisfy the need for customers to engage in markets without any significant delay.  Financial firms are embracing a number of new technologies to meet consumer demand - data analytics, cloud computing, machine learning and blockchain.

Blockchain's potential, however, is not limited to the financial industry.  To the contrary, blockchain will revolutionize ethics and compliance programs.

Let's start with a basic understanding of distributed ledger technologies ("DLT").

A distributed ledger is a database that is shared among multiple sites, locations and institutions. A DLT can be restricted to intra-company locations or it can be permissioned as needed to include business partners (e.g. accounting firm).  Those permissioned to access the blockchain can search the database, examine specific transactions, and "add" to the blockchain by making a new entry.  A user, however, cannot amend, delete or otherwise modify an existing blockchain database.  Every participant has access to an identical copy of the DLT. When a new transaction is added, everyone verifies the transaction, reaches a consensus, and then the blockchain is amended with the new transaction.  It is a shared ledger that is immutable and accessible to all users on a real-time basis.

The real-world application of blockchain will increase efficiency and accuracy of an infinite number of functions.  Blockchain can automate processes that often take days or weeks.  Blockchain automates and verifies trust - there is no need for a third-party intermediary who has to conduct transactions (e.g. banks, accountants, auditors).  The distributed ledger provides access to all transactions and therefore is trustworthy. Transactions can be completed quickly and with lower costs.  All permitted users wherever located will gain access to the same data.

As a consequence, data can be recorded and made available in near real-time.  An authorized user will not have to undergo verification his or her identity because the individual's information will already exist in an encrypted,

secure tamper-resistant database. The bottom line is that a blockchain database will be immutable, immediate and transparent.

back to top

* * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 12. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **James Branch Cabell** (1879 - 1958; was an American author of fantasy fiction and *belles lettres*. Cabell was well regarded by his contemporaries, including H.L. Mencken, Edmund Wilson, and Sinclair Lewis.)
 - *"There is not any memory with less satisfaction than the memory of some temptation we resisted."*

* **Francois de La Rochefoucauld** (1613 - 1680; was a noted French author.)
 - *Good advice is something a man gives when he is too old to set a bad example.*

back to top

* * * * * * * * * * * * * * * * * *

## 13. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with

Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA.")
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]

- The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * *

## 14. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before

taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ████████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ("FCC") ███████@fullcirclecompliance.eu]
**Sent:** 8/8/2018 6:37:34 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0808 Wednesday "Daily Bugle"



### Wednesday, 8 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

#### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Seeks New ETTAC Candidates

#### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. DHS/CBP Posts Reminder on CBP Client Representatives Webinar for ABI Brokers and Importer Self-Filers
5. DHS/CBP Voids Inactive Importer of Record Numbers
6. State/DDTC: (No new postings.)
7. USTR Finalizes Second Tranche of Tariffs on Chinese Products in Response to China's Unfair Trade Practices
8. Singapore Customs Publishes Circular Concerning Licensed and Zero-GST Warehouses

#### NEWS

9. Defense News: "Trump's Arms Sales Nominee Bogged down by 3-D Gun Debate"
10. Reuters: "China, Germany Defend Business with Iran in Face of U.S. Threats"
11. Voice of America News: "New U.S. Slap Against China: Tighter Curbs on Tech Investment"

#### COMMENTARY

12. Global Trade News: "Weise Wednesday: Trade Tensions and Tariffs Remain High"
13. M. Volkov: "Real-World Applications of Blockchain to Compliance (Part II of II)"

14.    Torres Trade Law: "Latest Developments Regarding Tariffs on China"

EX/IM TRAINING EVENTS & CONFERENCES

15.    CompTIA Presents "12th Annual CompTIA Global Trade Compliance Best Practices Conference" on 18 Sep in San Diego, CA

EDITOR'S NOTES

16.    Bartlett's Unfamiliar Quotations

17.    Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

18.    Weekly Highlights of the Daily Bugle Top Stories



FULL CIRCLE
C O M P L I A N C E

The World Leading Experts in International Trade Compliance
www.fullcirclecompliance.eu

ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. Commerce/BIS Seeks New ETTAC Candidates
(Source: Federal Register, 8 Aug 2018.)

83 FR 39054: Emerging Technology Technical Advisory Committee (ETTAC); Notice of Recruitment of Private-Sector Members

The Bureau of Industry and Security (BIS) is announcing a recruitment for new candidates to serve on the Emerging Technology Technical Advisory Committee (ETTAC) to advise the Department of Commerce and other agency officials on emerging technologies with potential dual-use applications. This advice will include:

(a) The identification of such technologies as early as possible in their developmental stages both within the United States and abroad;
(b) assessing and providing information on emerging technologies, potential "chokepoint technologies" (for example, technologies that, if developed by an adversary prior to development by the United States, could present grave threats to United States national and/or economic security) and trends in technologies of particular interest to BIS;
(c) assessing the potential impact of the Export Administration Regulations (EAR) on research activities, including technical and policy issues relating to controls under the EAR, revisions of the Commerce Control List, including proposed revisions of multilateral controls in which the United States participates, and the issuance of regulations; and
(d) any other matters relating to actions designed to carry out the policy set forth in Section 3(2)(A) of the Export Administration Act of 1979 as well as the directives contained in Section 1758 of H.R. 5515, the John S. McCain National Defense Authorization Act for Fiscal Year 2019.

In its work, the Committee will be forward leaning--focusing both on the current state of emerging technologies and projecting their likely effects five to ten years in the future on national security, the U.S. defense industrial base, and the overall health and competitiveness of the U.S. economy.

The ETTAC will consist of experts drawn from academia, industry, federal laboratories, and pertinent U.S. Government departments and agencies who are engaged in developing and producing cutting edge technology in areas key to maintaining a U.S. forward leaning presence in the world economy. ETTAC members are appointed by the Secretary of Commerce and serve terms of two years, and may not serve more than four consecutive years. The membership term limit reflects the Department's commitment to attaining balance and diversity. As a general rule members will be highly ranked, accomplished and recognized leaders, engineers, and scientists working in their disciplines as researchers and/or program managers. All members must be able to qualify for a Secret security clearance or a security clearance at a level sufficient to perform their work for the committee. The ETTAC will also reach out to other government and non-government experts to ensure a broad and thorough review of the issues. The ETTAC meets approximately four times per year. Members of the Committee will not be compensated for their services.

To respond to this recruitment notice, please send a copy of your resume to Ms. Yvette Springer at Yvette.Springer@bis.doc.gov.
Deadline: This Notice of Recruitment will close 30 days from its date of publication in the Federal Register.

Yvette Springer, Committee Liaison Officer.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* State; NOTICES; Meetings; Defense Trade Advisory Group [Publication Date: 9 August 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. DHS/CBP Posts Reminder on CBP Client Representatives Webinar for ABI Brokers and Importer Self-Filers
(Source: CSMS #18-000473, 8 Aug 2018.)

The CBP Trade Transformation Office, Client Representative Division, is transitioning to a new model for how we assign broker and importer self-filers to client representatives. If you are a broker or importer who uses a software vendor or service center to file your customs ABI data, please join us for the following session for more details. Please note that the webinar does not apply to filers who program their own ABI software.

  - Wednesday, August 8, 2:00 - 3:00 PM ET
  - https://cbp.adobeconnect.com/acewebinar/ (Please note the updated link)
  - Call-In Information: +1 (877) 336-1828, Access Code: 612 4214
  - If the above line is full, please use the following: +1 (877) 336-1829, Access Code: 849 5832

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. DHS/CBP Voids Inactive Importer of Record Numbers
(Source: CSMS# 18-000472, 7 Aug 2018.)

This message is a reminder to the trade community that, in accordance with 19 CFR 24.5(e), CBP will void any importer identification number in the Automated Commercial Environment (ACE) that is deemed to be inactive, *i.e.,* not used for a period of one year and does not have an outstanding transaction to which it must be associated.

Additional information, including the process by which a voided importer of record may be reinstated, can be found here.

Should you have questions, please contact CBP's Office of Trade, Commercial Operations, Revenue and Entry (CORE) Division at otentrysummary@cbp.dhs.gov.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. USTR Finalizes Second Tranche of Tariffs on Chinese Products in Response to China's Unfair Trade Practices
(Source: USTR, 7 Aug 2018.)

The Office of the United States Trade Representative (USTR) released a list of approximately $16 billion worth of imports from China that will be subject to a 25 percent additional tariff as part of the U.S. response to China's unfair trade practices related to the forced transfer of American technology and intellectual property. This second tranche of additional tariffs under Section 301 follows the first tranche of tariffs on approximately $34 billion of imports from China, which went into effect on July 6.

The list contains 279 of the original 284 tariff lines that were on a proposed list announced on June 15. Changes to the proposed list were made after USTR and the interagency Section 301 Committee sought and received written comments and testimony during a two-day public hearing last month. Customs and Border Protection will begin to collect the additional duties on the Chinese imports on August 23.

In March 2018, USTR released the findings of its exhaustive Section 301 investigation that found China's acts, policies and practices related to technology transfer, intellectual property and innovation are unreasonable and discriminatory and burden U.S. commerce.

Specifically, the Section 301 investigation revealed:

  - China uses joint venture requirements, foreign investment restrictions, and administrative review and licensing processes to require or pressure technology transfer from U.S. companies.

- China deprives U.S. companies of the ability to set market-based terms in licensing and other technology-related negotiations.
- China directs and unfairly facilitates the systematic investment in, and acquisition of, U.S. companies and assets to generate large-scale technology transfer.
- China conducts and supports cyber intrusions into U.S. commercial computer networks to gain unauthorized access to commercially valuable business information.

A formal notice of the $16 billion tariff action will be published shortly in the Federal Register. As in the case of the first tranche of additional tariffs, the notice will announce a process by which interested persons may request the exclusion of particular products covered by a tariff line subject to the additional duties.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Singapore Customs Publishes Circular Concerning Licensed and Zero-GST Warehouses
(Source: Singapore Customs, Circular No. 07/2018, 8 Aug 2018.)

Singapore Customs noted a significant number of incidents where goods which have been stored in the Licensed and Zero-GST warehouses have been removed and exported without a Customs permit. This is not allowed as the requisite permits must be declared prior to the removal of the goods from the Licensed and Zero-GST warehouses.

On this note, Singapore Customs would like to remind all Licensed and Zero-GST Warehouse operators, traders and Declaring Agents (DAs) that it is your responsibility to ensure that the requisite Customs permit is declared prior to the removal of goods from Licensed or Zero-GST warehouses. Removing goods from Licensed or Zero-GST warehouse without a proper Customs permit is an offence which is punishable under the Customs and Goods and Services Tax (GST) Acts. Duty and GST may also be recovered for goods which have been illegally removed from the Licensed and Zero- GST warehouses without a proper customs permit.

Singapore Customs would also like to remind DAs to ensure that all information declared in TradeNet® permits are true and accurate. For more information, please visit the Singapore Customs website at www.customs.gov.sg.

Wan Boon Oon, Head Company Compliance for Director-General of Customs Singapore Customs

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. Defense News: "Trump's Arms Sales Nominee Bogged down by 3-D Gun Debate"
(Source: Defense News, 7 Aug 2018.) [Excerpts.]

A State Department nomination that should have been a victory lap for the Trump administration's efforts to boost U.S. arms sales abroad instead has become caught up in a separate domestic controversy, likely for weeks to come.

Massachusetts Democratic Sen. Ed Markey has a "hold" on R. Clarke Cooper, who is nominated as the next assistant secretary of state for political-military affairs, until the Trump administration reverses a decision to permit an organization from posting blueprints online for 3D-printed guns.

Cooper would oversee State's Directorate of Defense Trade Controls, which is at the center of legal action over the gun blueprints. Mainly, Cooper would be charged with linking the Defense Department with the State Department in areas such as international security, military operations and defense strategy. (Though industry watchers have dinged State for a 30 percent vacancy rate at the directorate.)

Undersecretary for Arms Control and International Security Andrea Thompson, a former national security advisor to Vice President Mike Pence, was named in April and other political appointees at the assistant secretary tier have been seated in recent weeks. Cooper would replace Tina Kaidanow, a career foreign service officer and the acting assistant secretary for political-military affairs. ...

back to top

* * * * * * * * * * * * * * * * *

## 10. Reuters: "China, Germany Defend Business with Iran in Face of U.S. Threats"
(Source: Reuters) [Excerpts.]

China and Germany defended their business ties with Iran on Wednesday in the face of President Donald Trump's warning that any companies trading with the Islamic Republic would be barred from the United States.

The comments from Beijing and Berlin signaled growing anger from partners of the United States, which reimposed strict sanctions against Iran on Tuesday, over its threat to penalize businesses from third countries that continue to operate there. ...

The German government said U.S. sanctions against Iran that have an extra-territorial effect violate international law, and Germany expects Washington to consider European interests when coming up with such sanctions.

The reimposition of U.S. sanctions followed Trump's decision earlier this year to pull out of a 2015 deal to lift the punitive measures in return for curbs on Iran's nuclear program designed to prevent it from building an atomic bomb.

Tuesday's sanctions target Iran's purchases of U.S. dollars, metals trading, coal, industrial software and the auto sector. ...

Trump tweeted on Tuesday: "These are the most biting sanctions ever imposed, and in November they ratchet up to yet another level. Anyone doing business with Iran will NOT be doing business with the United States. I am asking for WORLD PEACE, nothing less!"

EUROPEANS WITHDRAW

European countries, hoping to persuade Tehran to continue to respect the deal, have promised to try to lessen the blow of sanctions and to urge their firms not to pull out. But that has proved difficult: European companies have quit Iran, arguing that they cannot risk their U.S. business. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. Voice of America News: "New U.S. Slap Against China: Tighter Curbs on Tech Investment"
(Source: Voice of America News, 7 Aug 2018.)

Already threatened by escalating U.S. taxes on its goods, China is about to find it much harder to invest in U.S. companies or to buy American technology in such cutting-edge areas as robotics, artificial intelligence and virtual reality.

President Donald Trump is expected as early as this week to sign legislation to tighten the U.S. government's scrutiny of foreign investments and exports of sensitive technology.

The law, which Congress passed in a rare show of unity among Republicans and Democrats, doesn't single out China. But there's no doubt the intended target is Beijing. The Trump administration has accused China of using predatory tactics to steal American technology.

  "As a policy signal, it speaks with a very loud voice," said Harry Clark, head of the international trade practice at the law firm Orrick. "Leading decision makers and Congress are very concerned about technology transfer to China." ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



Awareness Course U.S. Export Controls
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands
FULL CIRCLE

## 12. Global Trade News: "Weise Wednesday: Trade Tensions and Tariffs Remain High"
(Source: Integration Point Blog, 8 Aug 2018.)

Welcome to Weise Wednesday! Twice a month we will share a brief Q&A with the former U.S. Commissioner of Customs, Mr. George Weise. If you have questions, we encourage you to send them to AskGeorge@IntegrationPoint.com.

**Q. Can you update us on recent developments on the trade front?**

A. There have been several new developments relating to United States trade actions discussed in past Weise Wednesdays.

*Section 301 tariffs on China*

First of all, the trade tensions between the U.S. and China over the punitive tariffs imposed by the U.S. continue to mount. As previously discussed, the U.S. imposed an additional 25% tariff on $34 billion worth of Chinese imports on July 7 and was in the process of extending the tariff to an additional $16 billion of Chinese products. China retaliated immediately by imposing a 25% tariff on $34 billion of U.S. goods and threatened to match the U.S. if it implemented the tariffs on the additional $16 billion of Chinese goods.

In July, President Trump responded to the Chinese actions by directing the U.S. Trade Representative (USTR) to develop a new list of Chinese imported products worth $200 billion that would be subject to an additional 10% tariff.

USTR was going through the public comment process on that list of products, when late last week, the President directed USTR to consider raising the proposed 10% additional tariff to 25%. A public hearing on the proposed tariff increases will be held in Washington on August 20-23.

China immediately responded by threatening to impose increased tariffs on $60 billion of U.S. imports if the U.S. follows through and implements the new wave of tariff increases.

These actions have created a great deal of stress on global traders and the bilateral trade relationship between the two parties. The U.S. continues to hope that a bilateral trade deal can be reached between the parties to address the fundamental intellectual property rights complaints made by the U.S. in the Section 301 investigation and reduce the significant trade surplus in goods that China has with the U.S. Meanwhile, the trade war continues.

*Section 232 action on steel and aluminum*

In past Weise Wednesdays, I have discussed the U.S. initiative imposing a 25% additional tariff on designated steel products and 10% additional tariff on designated aluminum products. I have also laid out the retaliatory tariffs that have been imposed by a number of countries, including the European Union (EU), Canada and Mexico, adversely impacted by those tariffs. Several countries have also launched formal complaints against the U.S. action at the World Trade Organization (WTO).

With the exception of the trade arrangement between the EU and the U.S. discussed below, not much has changed on this front in recent weeks, and global traders have been forced to deal with the increasing costs of additional tariffs. Negotiations continue to take place between the U.S. and its impacted trading partners to reach bilateral agreements to resolve the underlying issues and remove the additional tariffs. Hopefully, those negotiations will be successful. Meanwhile, trade tensions remain high between the U.S. and its trading partners.

*The EU-U.S. trade "deal"*

On a positive note, after hours of discussion on July 25, President Trump and EU Commission President Jean-Claude Juncker announced in a joint press conference that they had struck a trade "deal." Both sides agreed to "work together toward zero tariffs, zero non-tariff trade barriers, and zero subsidies on non-auto industrial goods."

The EU pledged to increase its purchases of U.S. soy beans and natural gas. The parties also agreed to work together to reform the WTO and address unfair trading practices. Negotiations to address these and other issues are expected to begin immediately, and both parties pledged to refrain from imposing new tariffs and reassessing existing tariffs on steel and aluminum while the negotiations continue.

This is a very positive development in the bilateral relationship between the two parties and seems to have tremendous potential benefit to global traders if the negotiations are successful. We will all need to stay tuned for further developments as the negotiations proceed.

*Section 232 action on automobiles*

As reported in an earlier Weise Wednesday, President Trump initiated a new investigation on May 23 to determine if automobile imports are threatening the national security of the U.S. The investigation is still ongoing. An affirmative finding could result in additional duties and/or quotas on imported automobiles and parts.

As the investigation proceeds, several of our trading partners are gearing up to prepare for the potential consequences of the U.S. imposing new tariffs on imported automobiles and auto parts. Last week trade officials from Canada, Mexico, Japan, South Korea, and the EU met in Geneva to strategize on a coordinated response to such an action by the U.S. The parties are expected to continue their discussion in the coming weeks and months. Again, stay tuned for further developments.

*Conclusion*

These continue to be challenging and uncertain times for global traders. Global traders need to stay actively engaged in monitoring new developments like these and continue to make their views known to government decision makers.

back to top

* * * * * * * * * * * * * * * * * *

## 13. M. Volkov: "Real-World Applications of Blockchain to Compliance (Part II of II)"
(Source: Volkov Law Group Blog. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

*[Editor's Note: Part I was published in yesterday's Daily Bugle.]*

The financial industry has embraced the future of blockchain technology. And for good reason. As a regulated industry that is required to provide regulators with large amounts of financial data, blockchain can make that process pain-free.

Financial institutions have to collect, organize and deliver large amounts of risk data to federal regulators. Much of the information has been stored in "older" information technology systems and/or siloed in different systems. Some of the process may be automated and some manual. Regulators do not have the ability to manage these datasets and focus their review in an efficient manner, impeding their oversight and surveillance efforts.

Blockchain can solve this problem - financial institutions could share their data with regulators and eliminate the need for regulators to reconcile and aggregate the data themselves. The blockchain consists of a documented and immutable audit trail. Every bank and regulator would save on costs and time.

Let's consider for a moment the impact that blockchain could have on due diligence and vendor onboarding. Personal information could be verified and then stored on blockchain. Such information could be subject to screening and then the results maintained on the shared ledger. Once completed, the company would be able to rely on the existing due diligence in the database and then update it as needed for the benefit of all users. Vendor onboarding would be conducted in the same way with a transparent and easy process. Any repetitive task would be replaced by universal access of relevant information to all authorized users.

Blockchain has specific benefits in managing a company's supply chain. A distributed ledger can track items as part of a supply chain, follow the exact path of the item, and provide real-time monitoring of supply chain events.

Another aspect of blockchain holds real promise for compliance. Given real-time recordkeeping, blockchain has the ability to embed rules into its database that can be used to monitor transactions and create real-time alerts. With "smart contracts," the blockchain includes rules that produce a trigger or alert for certain items. As a consequence, the compliance and audit functions can monitor transactions as they occur and receive alerts on a real-time basis. The implications of this for compliance and audit is significant.

Blockchain has the potential to reduce delays from satisfying compliance requirements. A proposed transaction involving a suspected sanctioned individual could be stopped and an alert created to report the transaction. Similarly, a proposed transaction with a third-party who has not completed due diligence could be stopped and appropriate parties notified of the proposed transaction. In both these cases, compliance could quickly intervene and make sure that the transaction is permitted or that it is blocked.

On the financial side, real-time audits and rules can quickly identify anomalies. Internal auditors will have a more efficient way to identify potential fraud and investigate a series of transactions using rules-based surveillance techniques.

To be sure, compliance and audit will have to develop and implement the rules, and they will have to be subject to modification as needed. Access to the rules will be restricted.

I do not mean to suggest that blockchain as a technology is ready to go. There are a lot of issues that are still being addressed, such as the scale of blockchain, the management of access and sharing of ledgers among entities, and potential security concerns. These issues can be solves, and given the potential benefits on the other side of the ledger, blockchain is poised to bring immediate and significant benefits to compliance.

back to top

## 14. Torres Trade Law: "Latest Developments Regarding Tariffs on China"
(Source: Torres Trade Alert, 8 Aug 2018.)

On August 7, 2018, the United States Trade Representative ("USTR") announced it had finalized a list of $16 billion worth of imports from China that will be subject to a 25% additional tariff. [FN/1] These tariffs are in addition to the previously implemented tariffs on $34 billion worth of imports from China,[FN/2] as well as the proposed tariffs on $200 billion more imports from China. All rounds of tariffs have been aimed at stopping China's unfair trade practices related to the forced transfer of American technology and intellectual property.

The announcement came as a bit of a surprise to some due to the USTR's quick turnaround for publishing the final list of products in spite of the large number of public comments received. The list changed very little from the original proposed list and now includes 279 tariff lines, down from the 284 tariff lines that were originally proposed. The updated list comes following a period of public comments, as well as a public hearing in which several parties testified.

Importantly, these additional duties will take effect on August 23, 2018. The USTR will release a Federal Register notice in the next few days which will include the requirements for filing exclusion requests for particular products.

-------------
   [FN/1] Office of the United States Trade Representative, *USTR Finalizes Second Tranche of Tariffs on Chinese Products in Response to China's Unfair Trade Practices,* https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/august/ustr-finalizes-second-tranche (last visited August 7, 2018).
   [FN/2] For more information on the $34 billion of tariffs, please see our previous article, *Tariffs: The Never-Ending Saga*. Available here: http://www.torrestradelaw.com/posts/Tariffs%3A-The-Never-Ending-Saga/150.

back to top

* * * * * * * * * * * * * * * * * *

## EX/IM TRAINING EVENTS & CONFERENCES

## 15. CompTIA Presents "12th Annual CompTIA Global Trade Compliance Best Practices Conference" on 18 Sep in San Diego, CA
(Source: CompTIA)

* What: 12th Annual CompTIA Global Trade Compliance Best Practices
Conference
* When: Tuesday, September 18, 2018
* Where: Qualcomm, 10155 Pacific Heights Boulevard, San Diego, California
92121
* Sponsor: CompTIA
* Contact: Ken Montgomery, kmontgomery@comptia.org
* Information & Registration: HERE.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 16. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Lord John Russell** (John Russell, 1st Earl Russell, KG, GCMG, PC, FRS (18
Aug 1792 - 28 May 1878; known by his courtesy title Lord John Russell before
1861, was a leading Whig and Liberal politician who served as Prime Minister
of the United Kingdom on two occasions during the early Victorian era.)
  - *"A proverb is the wisdom of many and the wit of one."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 17. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the
U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the
Federal Register.  The latest amendments to applicable regulations are listed
below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms,
Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns,
Destructive Devices and Certain Other Firearms; Background Checks for
Responsible Persons of a Trust or Legal Entity With Respect To Making or
Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance
Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL
(NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat

program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]

DOC_0003192

- The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * *

## 18. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws. If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert

advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ▮▮▮▮▮▮@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ("FCC") ███████@fullcirclecompliance.eu]
**Sent:** 8/9/2018 7:04:20 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0809 Thursday "Daily Bugle"



## Thursday, 9 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.    State: DTAG to Meet on 25 Oct in Wash DC

### OTHER GOVERNMENT SOURCES

2.    Items Scheduled for Publication in Future Federal Register Editions

3.    Commerce/BIS: (No new postings.)

4.    DoD/DSCA Releases Policy Memo Concerning NC Charge Revision for F-35 A/B/C Aircraft and Engines

5.    State Imposes Chemical and Biological Weapons Control and Warfare Elimination Act Sanctions on Russia

6.    State/DDTC: (No new postings.)

7.    India DGFT Posts Updated Rates for Certain HS Codes under MEIS

### NEWS

8.    Business Insider UK: "Trump Gives European Countries 'The Willies' About Buying U.S. Weapons, But He's Not Their Only Concern"

9.    CNN: "Trump Administration Slaps More Sanctions on Russia After Skripal Poisonings"

10.    Defense News: "How Should One Grade Trump's Export Reform Policy?"

11.    Expeditors News: "China Implements Changes to Customs Declaration Forms and Filling Rules"

### COMMENTARY

12.    G.R. Tuttle III: "And Here It Is - The Final List 2"

13.  K. Brockman: "3D-Printable Guns and Why Export Controls on Technical Data Matter"

14.  K.C. Georgi, M.M. Hassoun & R.K. Alberda: "President Trump Re-Imposes First Wave of Sanctions Against Iran and EU Expands Blocking Regulation to Cover US Secondary Sanctions Legislation on Iran"

15.  R.C. Burns: "Sanctions in Name Only Imposed on Russia for Nerve Gas Attack"

**EX/IM TRAINING EVENTS & CONFERENCES**

16.  ECTI Presents "United States Export Control (EAR/OFAC/ITAR) Seminar" in Amsterdam, 15-18 Oct

**EDITOR'S NOTES**

17.  Bartlett's Unfamiliar Quotations

18.  Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (8 Jun 2018), ITAR (14 Feb 2018)

19.  Weekly Highlights of the Daily Bugle Top Stories



Awareness Course U.S. Export Controls
ITAR & EAR from a Non-U.S. Perspective
Tuesday, 2 October 2018, Landgoed Groenhoven, Bruchem, the Netherlands
FULL CIRCLE

**ITEMS FROM TODAY'S FEDERAL REGISTER**

## 1. State: DTAG to Meet on 25 Oct in Wash DC
(Source: Federal Register, 9 Aug 2018.)

83 FR 39492-39493: Defense Trade Advisory Group; Notice of Open Meeting

The Defense Trade Advisory Group ("DTAG") will meet in open session from 1:00 p.m. until 5:00 p.m. on Thursday, October 25, 2018 at 1777 F Street NW, Washington, DC 20006. Entry and registration will begin at 12:30 p.m. The membership of this advisory committee consists of private sector defense trade representatives, appointed by the Assistant Secretary of State for Political-Military Affairs, who advise the Department on policies, regulations, and technical issues affecting defense trade. The purpose of the meeting will be to discuss current defense trade issues and topics for further study. The following agenda topics will be discussed and final reports presented:

(1) Oversight of technical data under the ITAR and NISPOM;
(2) Challenges regulated entities face in advising the Department of ownership changes that implicate existing licenses and foreign persons, and processes the Department may implement to facilitate the provisions of this information;
(3) Possible schedule for future ongoing periodic review of USML categories;
(4) Developing a definition for common carrier; and
(5) Issues that exist with licensing of defense articles, including intelligence related products, related technical data, and defense services to the "Five Eyes" countries of the U.S., UK, Australia, Canada and New Zealand.

Members of the public may attend this open session and will be permitted to participate in the question and answer discussion period following the formal DTAG presentation on each agenda topic in accordance with the Chair's instructions. Members of the public may also, if they wish, submit a brief statement (less than 3 pages) to the committee in writing for inclusion in the public minutes of the meeting. As seating is limited to 125 persons, each member of the public that wishes to attend this plenary session must provide: His/her name and contact information such as email address and/ or phone number and any request for reasonable accommodation to the DTAG Alternate Designated Federal Officer (DFO), Anthony Dearth, via email at DTAG@state.gov by COB Monday, October 8, 2018. If notified after this date, the Department might be unable to accommodate requests due to requirements at the meeting location. One of the following forms of valid photo identification will be required for admission to the meeting: U.S. driver's license, passport, U.S. Government ID or other valid photo ID.
* FOR FURTHER INFORMATION CONTACT: Ms. Barbara Eisenbeiss, PM/DDTC, SA-1, 12th Floor, Directorate of Defense Trade Controls, Bureau of Political-Military Affairs, U.S. Department of State, Washington, DC 20522-0112; telephone (202) 663-2835 or email DTAG@state.gov.

Anthony M. Dearth, Alternate Designated Federal Officer, Defense Trade Advisory Group, Department of State.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* DHS/CBP; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Free Trade Agreements [Publication Date: 10 Aug 2018.]

back to top

* * * * * * * * * * * * * * * * * * *

## 3.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

## 4. DoD/DSCA Releases Policy Memo Concerning NC Charge Revision for F-35 A/B/C Aircraft and Engines
(Source: DoD/DSCA, 9 Aug 2018.)

\* DSCA Policy Memo 18-39 Nonrecurring Cost (NC) Charge Revision for Joint Strike Fighter (JSF), F-35 A/B/C Aircraft and Engines has been posted. This memo updates Appendix 1 - USML VIII - Aircraft and Associated Equipment.

back to top

* * * * * * * * * * * * * * * * * * *

## 5. State Imposes Chemical and Biological Weapons Control and Warfare Elimination Act Sanctions on Russia
(Source: State, 8 Aug 2018.)

Following the use of a "Novichok" nerve agent in an attempt to assassinate UK citizen Sergei Skripal and his daughter Yulia Skripal, the United States, on August 6, 2018, determined under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (CBW Act) that the Government of the Russian Federation has used chemical or biological weapons in violation of international law or has used lethal chemical or biological weapons against its own nationals.

Following a 15-day Congressional notification period, these sanctions will take effect upon publication of a notice in the Federal Register, expected on or around August 22, 2018.

back to top

* * * * * * * * * * * * * * * * * * *

## 6. State/DDTC: (No new postings.)

(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. India DGFT Posts Updated Rates for Certain HS Codes under MEIS
(Source: India Directorate General of Foreign Trade (DGFT), 9 Aug 2018.)

The updated rates for the HS codes in Appendix 3B, Table 2 under the Merchandise Exports from India Scheme ("MEIS") can be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NEWS

## 8. Business Insider UK: "Trump Gives European Countries 'The Willies' About Buying U.S. Weapons, But He's Not Their Only Concern"
(Source: Business Insider UK, 9 Aug 2018.) [Excerpts.]

President Donald Trump's broadsides against NATO are stoking resentment among the US's European allies. ...

Trump's actions have helped build "a narrative in Europe where European leadership says, 'We do need to spend more money on defense. We do need to build up our military capability because we feel we can't depend on the United States,'" said Jim Townsend, [adjunct senior fellow in the Transatlantic Security Program at the Center for a New American Security] who also worked in foreign military sales at the U.S. Defense Security Cooperation Agency. ...

Other decisions by the U.S have led some in Europe to believe they need a non-U.S. avenue through which to develop their defense industries.

In France - one of the biggest arms exporters in the world - frustration has grown over the US withholding clearance for the sale of the Scalp cruise missile, which includes U.S.-made components. The U.S.-made parts are critical for the long-range weapon, and Washington's decision not to authorize the transfer upended a deal for France to sell Rafale fighter jets to Egypt.

The ability to block the sale came through the International Traffic in Arms Regulations, an export-control regulation overseen by the U.S. government.

In response, French officials have said they're looking for a way around ITAR - and to gain more autonomy.

"It is true that we depend on this (US International Traffic in Arms Regulations) mechanism: We are at the mercy of the Americans when our equipment is concerned," French Armed Forces Minister Florence Parly told legislators in early July, according to Defense News. ...

"Those kind of things - the F-35 to Turkey, the U.S. under ITAR, the U.S. saying to the French, 'Sorry, we're not going to let you export to Egypt,' and then all this stuff with Trump - all of that is doing nothing but increasing the motivation within Europe to build up their own military capabilities, based on their own industries, and screw the U.S.," said Townsend, referring to a move by Congress that would withhold the transfer of F-35 fighter jets to Turkey. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9.
## CNN: "Trump Administration Slaps More Sanctions on Russia After Skripal Poisonings"
(Source: CNN, 9 Aug 2018.) [Excerpts.]

The Trump administration will impose more sanctions on Russia under a chemical and biological warfare law following the poisoning of a former Russian agent and his daughter in the UK earlier this year, the State Department announced Wednesday.

In a statement Wednesday, State Department spokeswoman Heather Nauert said the US had made this decision on Monday, and accused Russia of violating international law. The statement anticipated the sanctions would go into effect around Aug. 22 in line with the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991. ...

The State Department notified Congress on Wednesday of the first of two potential tranches of sanctions required under the 1991 law. Unless Russia takes certain steps, a second set of penalties -- more stringent than this first round -- must follow, according to the law. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10.
## Defense News: "How Should One Grade Trump's Export Reform Policy?"
(Source: Defense News, 8 Aug 2018.)

An increase in defense exports will be key for judging the effectiveness of President Donald Trump's efforts to make the arms sales process more efficient, but that shouldn't be the only measure of success, said a panel of U.S. government officials, arms control advocates and industry on Aug. 8.

Last month, the president signed off on an implementation plan for the new Conventional Arms Transfer policy, which is aimed at cutting down the red tape associated with the foreign military sales process.

To do that, the U.S. government must move to a more proactive posture, working with Congress and industry to make sure that its export processes are as efficient as possible, said Tina Kaidanow, the State Department's acting assistant secretary of state for political-military affairs, at the Center for Strategic and International Studies.

What all this really ultimately means and what the imitative makes clear is that under this administration, there will be no more active advocate for U.S. sales than the U.S. government itself," she said.

One of the most important metrics, and one that Trump himself will be watching, is whether arms sales continue to grow, said Alex Gray, special assistant to the president for the defense industrial base at the White House Office of Trade and Manufacturing Policy.

  "He would like to see sales that meet the requirements that are laid out in this policy, that are evaluated with all the criteria that the State Department and the interagency deem appropriate. And he would like to see an increase in our defense exports," he said during the panel discussion at CSIS. "He has been a vigorous advocate of doing that."

The president may be able to claim a short term victory this year, as the United States is poised to beat its record for government-to-government arms sales. Lt. Gen. Charles Hooper, head of the Defense Security Cooperation Agency, told Defense News in July. He said that the U.S. has signed $46.9 billion worth of sales in the first half of fiscal year 2018 - putting it near FY2015's record of $47 billion.

In FY17, the State Department approved $41.9 billion in sales.

Others on the panel said the measure of success needs to be more nuanced than simply looking at the sales statistics.

While boosting the number and value of FMS cases is crucial, the State and Defense departments see that as secondary in importance is making sure that U.S. allies and partners have the technologies they need to be interoperable with the United States, said Laura Cressey, the State Department's deputy director for regional security and arms transfers.

  "We want to make sure that our partners and allies are more capable and able to work with us when we need them to, to be more able to effectively defend themselves," she said. "It's hard to quantify that, and that can be very squishy [...] but it's something that we do need to do."

Cressey also repeated at multiple points during the panel that the State Department wants to continue engaging with industry and other stakeholders to ensure it is making progress.

Last week, for example, was the first meeting of an interagency working group looking at offset policies around the globe.

"In our first meeting, we said one of the first things we wanted to do is reach back out to industry and through the [industry advocacy] associations to find out what is the perception of offsets, what is the perception out there of what the US government should be doing as its offset policy?" she said. "What are the countries out there where offset policies are perceived to be really incredibly onerous, such that our companies cannot effectively compete?"

It's hard to judge whether a new export policy is successful after just a couple months, said Jeff Abramson, a senior fellow at the Arms Control Association. But it's important to evaluate the right metrics, and that should include looking at how foreign nations are using those new weapons and whether U.S. efforts to decrease civilian casualties - for instance - are working.

Abramson argued that the current administration may be over-prioritizing the economic benefits of selling American-made weapons at the expense of human rights considerations.

"We have this sort of belief that if we're partnered with a country, we're going to have control over what they do, but oftentimes, that isn't the case," he said. "I would argue that the Saudis have not been good actors, however much influence we try to have on them, as they are reacting to the situation in Yemen."

Dak Hardwick, assistant vice president for international affairs at the Aerospace Industries Association, ultimately took an optimistic view of the new arms transfer policies.

"Where does all of this lead, ultimately? This is a very competitive market," he said. Foreign countries are looking to take market share away from American companies, but they're also trying to decrease American influence.

"The race we are actually running is a race for global influence," he said. "The question that we have [...] is who is going to make the rules for global influence over the next 50 years? And as an industry, as a country and as a government, we feel like the United States is poised to continue to set the standard to make the rules for the next 50 years."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

11.
Expeditors News: "China Implements Changes to Customs Declaration Forms and Filling Rules"
(Source: Expeditors News, 8 Aug 2018.)

On August 1, 2018, the General Administration of Customs of China (GACC) implemented two previously announced changes to the import and export customs declaration forms, and their filing rules.

The two announcements focused on the filing rules and declaration templates. Some of the critical changes to the requirements include:

   - Changing the HTS code from 10-digits to 13-digits, to fulfill a requirement by the China Inspection and Quarantine (CIQ) division;
   - A reduction in declaration lines per page from 8 to 6 to accommodate the declaration orientation;
   - A requirement for shipping marks and container loading information;
   - A requirement for packing details on the declaration;
   - The addition of an overseas consignee/consignor field.

The official announcements from China Customs may be found here:

- GACC Announcement No. 60 of 2018 Amending the Regulations for the Customs Import and Export Declaration Filing Rules and Requirements
- GACC Announcement No. 61 of 2018 Amending the Customs Declaration Template for Import and Export Goods.

back to top

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊



The World Leading Experts in International Trade Compliance

www.fullcirclecompliance.eu

COMMENTARY

## 12.
## G.R. Tuttle III: "And Here It Is - The Final List 2"
(Source: Tuttle Law Newsletter, 8 Aug 2018.)

\* Author: George R. Tuttle III, Esq., Law Offices of George R. Tuttle, geo@tuttlelaw.com, +1 415-986-8780

On August 7, 2018, the USTR released the 2nd list of HTS numbers to be subject to the additional Section 301 25% sanctions. This list compromises approximately $16 billion worth of imports from China and contains 279 of the original 284 tariff lines. List 2 duty rates will go into effect on **August 23, 2018**. A formal notice will be published shortly in the Federal Register and will announce the process by which interested parties may request an exclusion.

*Update for List 3*

There is a change of date for submission of comments and rebuttal comments. These are now due on September 6, 2018 (83 FR 38760 of August 7, 2018).

*Section 232 Sanction Exclusion Requests*

Section 232 sanction exclusion requests can still be submitted at www.regulations.gov, BIS-2018-002 (aluminum) and BIS-2018-006 (Steel).

*List 1/Annex A*

List 1/Annex A exclusion requests can be submitted up to October 9, 2018 at www.regulations.gov, USTR-2018-0025. You can review our previous newsletters on these lists and submission dates at our publications page.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. K. Brockman: "3D-Printable Guns and Why Export Controls on Technical Data Matter"
(Source: SIPRI, 1 Aug 2018. Reprinted with permission.)

\* Author: Kolja Brockmann, Research Assistant in the Stockholm International Peace Research Institute (SIPRI) Dual-Use and Arms Trade Control program.

*New developments in the 3D-printable gun case have revived the debate on the dangers of 3D-printing of firearms and the sharing of their electronic blueprints online. While these developments may only have a limited immediate impact on the proliferation of small arms, this approach has the potential to undermine controls on 3D printing and export controls on technical data more broadly.*

In 2013, Cody Wilson, an American law student and gun rights activist and his non-profit firm 'Defense Distributed', developed and tested the first 3D-

printable gun. The so-called 'Liberator' gun, is made entirely from 3D-printable plastic, a bullet and a nail. When Defense Distributed published the computer-aided design (CAD) files online for anyone to download, the US Department of State ordered the firm to take the files off its website. They argued that making such files available constitutes an export of technical data required for the production or manufacture of an export controlled item on the United States Munitions List (USML). After complying with the order and multiple unsuccessful attempts to obtain the required license, Wilson and other gun-rights advocates sued the Department of State for violating their freedom of speech and right to bear arms under the first and second amendments to the US constitution. In a move that surprised many export control experts, the US Government settled the case in June. The Department of State committed to introduce legislation to amend the existing regulations, while in the meantime enacting a temporary amendment that allows Wilson to publish the files in question without further restraints and to make a payment of nearly US $40 000 to the plaintiffs.

## Background to Export Controls

In general, the manufacturing of small arms for personal use is legal in the United States. However, the export of firearms requires registration with the Department of State and an export license under the International Traffic in Arms Regulation (ITAR). This licensing requirement applies to assembled guns, key parts like the lower receiver, as well as to the technical data required to develop, produce, operate or repair an item that is described in the USML.

The USML is based on the Munitions List of the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies, an international regime that prescribes the military items to be covered by export controls in all participating states. Controls on technology have been a central part of export controls dating back to the cold war export control arrangements. Today's Munitions List (ML) of the Wassenaar Arrangement covers technology that is required, among others, for the development, production, operation or repair of an item on the list.  As the 3D-printable guns in question fall under Category I of the USML, the digital build files Defense Distributed wishes to share on its website are covered as technical data required for the production or manufacture of controlled defense articles.

Enforcing controls on intangible transfers of technology, such as the sending of digital files via e-mail or the sharing of data using cloud computing services, is inherently difficult. Making such technical data available for anyone to access and potentially download, including to persons in a different country-rather than actively transferring them-is also covered by export controls. While there has been some debate on the complexity and significance of the technical data necessary to justify the application of controls, CAD files or other digital blueprints that clearly enable the 3D printing of a controlled item have been covered by existing controls.

*The Settlement*

Many news articles have characterized the settlement as a 'loss' for the US government or as a 'win' for the free speech argument brought by Wilson and the other plaintiffs. However, the settlement includes no admission of guilt and at this point it is unclear why the US government decided to settle the case.

Under the settlement agreement, the Directorate of Defense Trade Controls (DDTC), the responsible directorate at the Department of State, commits to propose a draft for a new rule and 'fully pursue' a final rule 'revising USML Category I to exclude the technical data that is subject of the action'. While this suggests that the government pursues a permanent change of this regulation in the future, the settlement also included provisions with a more immediate effect. The Department of State approved the immediate public release of the specific technical data subject to the case using a license exemption and later published an announcement on the DDTC website on 27 July, issuing a temporary modification of USML Category I that excludes the technical data subject to the settlement from controls until a final rule is developed. Wilson in turn announced that he will again make the technical data for several small arms and components thereof available in a database from 1 August, also allowing others to upload their own files. Despite this announcement, Defense Distributed has already started to make some of their files available several days prior to 1 August.

Several gun-control activists and groups, as well as a number of US politicians and Attorneys General have initiated legal actions and legislative initiatives since the settlement was made public in July. A federal judge first dismissed the request submitted collectively by gun-control groups to intervene and stop the provisions of the settlement from coming into effect. Several Attorneys General from US states and cities have issued cease and desist orders directing Wilson to block access to the website for their constituents, first resulting in the website being blocked for users in Pennsylvania. On 31 July, a Washington district judge issued a temporary restraining order against the Department of State, stopping it from implementing the modification of USML Category I until a hearing set for 10 August, forcing Wilson to once again take down the files. While the legal battle over the distribution in the US therefore seems to be far from over, it is worth considering what the developments in this case mean for the control of small arms more generally.

*Implications For Small Arms Control*

The potential impact on small arms proliferation depends on how these developments change the current situation and which factors may mitigate its impact. First, although they were no longer hosted in Wilson's database any more, the build files for the Liberator were still available online. When the files were originally posted in 2013 they were downloaded over 100 000 times. After they were removed from the website they continued to be available on many illegal file-sharing websites. Despite their availability, no game-changing developments in the illicit small arms market, terrorist acquisitions, uses in assassinations or for the circumvention of metal-detector controls have been observed.

Second, there is still a lack of capabilities, especially of polymer-based 3D-printed small arms or key parts such as receivers or pressure bearing components. The limited durability of the Liberator only enables it to fire a very small number of shots before components need to exchanged. In addition, the poor handling combined with reliability and safety issues provide an abundance of reason for an actor to choose another option.

Third, the costs of obtaining printers that work with high-quality materials remains high and both the production costs and efforts involved likely still do not provide an adequate substitute for black market acquisitions. Furthermore, illicit small arms in circulation are often neither marked, nor serialized and are thus similarly 'untraceable' as 3D-printed guns. New ways of regulating the sale and serialization of 3D-printed guns should nevertheless be developed.

Finally, the often-cited advantages regarding undetectability only apply for small arms made entirely from plastic and walk-through metal detectors. They do not apply to common X-ray scanners and both ammunitions and necessary metal components make detection more likely. While the availability of 3D-printed gun files may thus only have a limited immediate impact on the proliferation of small arms, it should be considered which implications this approach may have for controls on 3D printing and the control of technical data more broadly, both legally and in terms of the signal it sends.

*Controls On 3d Printing and Sharing Of Technical Data*

The broader question underlying the case is on the approach to controls on the distribution of technical data for controlled items, the regulation of which forms one of the key aspects of controls on 3D printing and export controls more generally. Controls on 3D printing currently have three main elements: (*a*) controls on 3D printers, (*b*) controls on materials for 3D printing, and (*c*) controls on technical data for the production or manufacture of controlled items using 3D printing. 3D printers are inherently dual-use (usable both for civilian and military purposes) and are rarely covered by controls. Even if controls on a wider range of printers were to be developed, these would not be able to cover the capability range required for small arms production without creating major adverse effects on the growing 3D printing industry. New controls would most likely use performance parameters that only apply to a very limited range of high-performance printers, designed for other purposes than small arms production. Access to 3D printing is expected to increase significantly, both in terms of lower prices of printers and increasing capabilities of 3D printing services, further limiting their controllability. The materials used to 3D print small arms are also not covered by current controls and find a wide range of civilian applications. The combination of the limited risks that they pose and the possible adverse effects will likely preclude the introduction of controls.

Export controls on the technical data required for the development, production, operation or repair of a controlled item to date provided the main regulatory measure on 3D printing. From an export controls perspective, the removal of such controls on technical data is a worrying development. While the impact may remain low in the area of small arms, if such rulings were to be extended to other areas, such as missile and aerospace technology, the

impact could potentially be much more significant. Therefore, retaining controls on electronic transfers and sharing of technical data is an important part of export controls in a broader sense and especially in the context of increasing 3D printing and additive manufacturing capabilities.

back to top

* * * * * * * * * * * * * * * * * *

14.
K.C. Georgi, M.M. Hassoun & R.K. Alberda: "President Trump Re-Imposes First Wave of Sanctions Against Iran and EU Expands Blocking Regulation to Cover US Secondary Sanctions Legislation on Iran"
(Source: Arent Fox LLP, 8 Aug 2018.)

* Authors: Kay C. Georgi, Esq., kay.georgi@arentfox.com, +1 202-857-6293; Marwa M. Hassoun, Esq., marwa.hassoun@arentfox.com, +1 213-443-7645; and Regan K. Alberda, Esq., regan.alberda@arentfox.com, +1 202-775-5771.  All of Arent Fox LLP.

The President issued an Executive Order on August 6, 2018, "Reimposing Certain Sanctions With Respect to Iran" (the New Iran EO), which re-imposes relevant provisions of five Iran sanctions EOs (EOs 13574, 13590, 13622, and 13645). Additionally, the New Iran EO implements provisions in two former EOs (EOs 13716 and 13628) and revokes those EOs.

Additionally, the New Iran EO implements provisions in two former EOs (EOs 13716 and 13628) and revokes those EOs.
**August 6, 2018** marked the end of the 90-day wind-down period following the President's decision to end the United States' participation in the Joint Comprehensive Plan of Action (JCPOA). Effective **August 7, 2018,** the US government can re-impose secondary sanctions that had been suspended under the Iran nuclear deal on persons who engage in specified transactions involving any of the following sectors/activities:

* The purchase or acquisition of US dollar banknotes by the Government of Iran;
* Iran's trade in gold or precious metals;
* The direct or indirect sale, supply, or transfer to or from Iran of graphite, raw, or semi-finished metals such as aluminum and steel, coal, and software for integrating industrial processes;
* Significant transactions related to the purchase or sale of Iranian rials, or the maintenance of significant funds or accounts outside the territory of Iran denominated in the Iranian rial;
* The purchase, subscription to, or facilitation of the issuance of Iranian sovereign debt; and
* Iran's automotive sector.

Following the end of the 90-day wind-down period on August 6, 2018, the US government is also revoking the below JCPOA-related authorizations under US primary sanctions regarding Iran:

* The importation into the United States of Iranian-origin carpets and foodstuffs and certain related financial transactions pursuant to general licenses under the Iranian Transactions and Sanctions Regulations;
* Activities undertaken pursuant to specific licenses issued in connection with the Statement of Licensing Policy for Activities Related to the Export or Re-export to Iran of Commercial Passenger Aircraft and Related Parts and Services (JCPOA SLP); and
* Activities undertaken pursuant to General License I relating to contingent contracts for activities eligible for authorization under the JCPOA SLP.

The remaining secondary sanctions can be re-imposed on **November 5, 2018,** following the end of the 180-day wind down period on **November 4, 2018,** on persons who engage in specified transactions involving any of the following sectors/activities:

* Iran's port operators, and shipping and shipbuilding sectors, including on the Islamic Republic of Iran Shipping Lines, South Shipping Line Iran, or their affiliates;
* Petroleum-related transactions with, among others, the National Iranian Oil Company, Naftiran Intertrade Company, and National Iranian Tanker Company, including the purchase of petroleum, petroleum products, or petrochemical products from Iran;
* Transactions by foreign financial institutions with the Central Bank of Iran and designated Iranian financial institutions under Section 1245 of the National Defense Authorization Act for Fiscal Year 2012;
* The provision of specialized financial messaging services to the Central Bank of Iran and Iranian financial institutions described in Section 104(c)(2)(E)(ii) of the Comprehensive Iran Sanctions and Divestment Act of 2010;
* The provision of underwriting services, insurance, or reinsurance; and
* Iran's energy sector, including a variety of separate specific activities related to the petroleum and petrochemical industries under the Iran Sanctions Act as amended.

Additionally, on or by **November 5, 2018**:

* The US government will revoke the General License H wind-down authorization that had allowed US-owned or-controlled foreign entities to wind down certain activities with the Government of Iran or persons subject to the jurisdiction of the Government of Iran that were previously authorized by General License H; and
* The US government can re-impose, as appropriate, the sanctions that applied to persons removed from the List of Specially Designated Nationals and Blocked Persons (SDN List) and/or other lists maintained by the U.S. government on January 16, 2016.

OFAC's FAQs about the re-imposition of Iran sanctions can be found on OFAC's website.

One question that OFAC answers in its updated FAQs (FAQ 601) is whether the New Iran EO expands the scope of sanctions that were in effect prior to January 16, 2016 (Implementation Day of the JCPOA), and the answer is:
- Yes. The New Iran EO broadens the scope of the sanctions that were in effect prior to January 16, 2016 and provides for greater consistency in the administration of Iran-related sanctions provisions.

OFAC provides a list of added measures, but they are largely in the nature of tweaking the authorities for providing new blocking sanctions and slightly expanding the sanctions that can be imposed for activities involving petroleum and petrochemical sectors in Iran. More specifically, according to OFAC, the new Iran EO:

* Provides new authority for: (i) blocking sanctions on persons who provide material support for, or goods and services in support of, persons blocked for various already existing sanction activities, such as being part of the energy, shipping, or shipbuilding sectors of Iran; (ii) correspondent and payable-through account sanctions on foreign financial institutions determined to have knowingly conducted or facilitated any significant financial transaction on behalf of the persons blocked under the new authorities;

* Expands the menu of sanctions available to impose on persons determined to have engaged in certain significant transactions relating to petroleum, petroleum products, or petrochemicals from Iran by authorizing the imposition of:
  - Visa restrictions on corporate officers, principals, or controlling shareholders of a sanctioned person;
  - Additional sanctions on principal executive officers of a sanctioned person; and
  - Prohibitions on US persons investing in or purchasing significant amounts of equity or debt instruments of a sanctioned person.

* Expands the prohibition on US-owned or -controlled foreign entities by prohibiting transactions with persons blocked for:
  - Providing material support for, or goods and services in support of, Iranian persons on the SDN List and certain other designated persons; or
  - Being part of the energy, shipping, or shipbuilding sectors of Iran or a port operator in Iran or knowingly providing significant support to certain other persons blocked or on the SDN List.

Since these last activities were already prohibited under Section 218 of the Iran Threat Reduction and Syria Human Rights Act of 2012 and OFAC's implementing regulations, it is unclear whether in fact this last is a true expansion or an adjustment of authority.

*EU Reaction - Amendment of Blocking Regulation*

As anticipated, the EU reacted by publishing, and thereby bringing into effect, an amendment to the Annex to Council Regulation No 2271/96 protecting

against the effects of extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom.

The revised Annex increases the number of laws subject to the blocking regulations, including, notably:

* The energy sanctions contained in the Iran Sanctions Act of 1996 as amended;
* The Iran Freedom and Counter-Proliferation Act of 2012;
* The National Defense Authorization Act for Fiscal Year 2012;
* The Iran Threat Reduction and Syria Human Rights Act of 2012; and
* The Iranian Transactions and Sanctions Regulations.

According to the guidance published by the EU, the Blocking Statute:

* Prohibits EU operators from complying with the listed extra-territorial legislation, or any decision, ruling or award based thereon, given that the EU does not recognize its applicability to/effects towards EU operators (Article 5, paragraph 1);
* Requires EU operators to inform the European Commission within 30 days of any events arising from listed extra-territorial legislation or actions based thereon or resulting thereof, that affect, directly or indirectly, their economic or financial interests;
* Nullifies the effect in the EU of any foreign decision, including court rulings or arbitration awards, based on the listed extra-territorial legislation or the acts and provisions adopted pursuant to them (Article 4);
* Allows EU operators to recover damages arising from the application of the listed extra-territorial legislation from the natural or legal persons or entities causing them (Article 6). Damages are defined as 'any damages, including legal costs, caused by the application of the laws specified in its Annex or by actions based thereon or resulting therefrom'; and
* Allows EU operators to request an authorization to comply with the listed extra-territorial legislation, if not doing so would cause serious harm to their interests or the interests of the EU (Article 5, paragraph 2).

The Blocking Regulation applies to the EU subsidiaries of US companies, thereby placing them in a potentially difficult position. Moreover, the EU Guidance specifically states that EU operators cannot, consistent with the EU Blocking Regulations, request licenses from the United States unless they request the European Commission to authorize them to apply for such a license. At the same time, the EU Guidance specifically notes that EU companies remain free to do or not to do business with Cuba and Iran, provided such business decisions are not forced on the EU companies by the listed US legislation.

back to top

* * * * * * * * * * * * * * * * * *

15.

DOC_0003354

# R.C. Burns: "Sanctions in Name Only Imposed on Russia for Nerve Gas Attack"

(Source: Export Law Blog, 8 Aug 2018. Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Washington DC, Clif.Burns@bryancave.com, 202-508-6067.

According to a State Department press release released 8 Aug 2018, the United States has made a determination that Russia used novichok, a chemical warfare agent, in an attack on British soil and, as a result, the US will impose sanctions on Russia under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (the "CBWC Act"), 22 U.S.C. § 5601 et seq. The text of these sanctions was not released. Instead, the text will be in a Federal Register notice expected to be published on or around August 22. The sanctions will be effective as of the date of the publication of that notice.

Because these sanctions are being imposed under the CBWC Act, we can already get a good idea of what these sanctions will be. The Act contemplates sanctions being imposed in two stages. The first stage, described in section 5605(a), sets forth the following sanctions, all of which are required to be imposed upon the offending country:

  - Termination of all foreign assistance
  - Termination of all arms sales
  - Termination of all foreign military financing
  - Denial of U.S. government credit or assistance
  - Termination of all exports of items controlled on the Commerce Control List for NS reasons

To be honest, none of these sanctions will have any significant impact on Russia. Arms sales to Russia have been prohibited for some time now. The country chart already has Russia controlled for both columns of NS controls. Of course, you could say that the new sanctions will mean that NS items will not be considered for licenses under any circumstances. But I don't think licenses to export NS items to Russia are being readily granted now. The second stage, if it happens, would take place on November 8 of this year unless the President determines that Russia is no longer using chemical or biological weapons. If that determination is not made, the President is required to impose three sanctions from a set of six possible sanctions. Those six possible sanctions are:

  - Opposing multilateral bank financial assistance to Russia
  - Prohibition of U.S. bank loans to the government of Russia
  - Prohibition of all exports of all U.S. goods and technology to Russia
  - Downgrading or suspending diplomatic relations with Russia
  - Termination of all service to and from the United States by Russian airlines

Whether the President will make the findings necessary to impose this second stage and which three of the six will be imposed is anyone's guess,

although I suspect that most people likely have a pretty good guess.   The upcoming Federal Register notice will probably not even address the second stage sanctions.   If the United States does in fact impose the three second stage sanctions, the best guess is probably that he will impose the least restrictive of those, i.e., opposing multilateral bank loans, prohibiting U.S. bank loans, and expelling a few more diplomats.

back to top

* * * * * * * * * * * * * * * * * * *

## EX/IM TRAINING EVENTS & CONFERENCES

## 16. ECTI Presents "United States Export Control (EAR/OFAC/ITAR) Seminar" in Amsterdam, 15-18 Oct
(Source: Jill Kincaid; jill@learnexportcompliance.com.)

* What: United States Export Control (ITAR/EAR/OFAC) Seminar Series in Amsterdam, NL (for EU, NL and other non-US Companies)
* When:
 - ITAR Seminar: October 15-16, 2018;
 - EAR/OFAC Seminar: October 17-18, 2018
* Where: Park Plaza Victoria Amsterdam, Damrak 1-5, 1012 Lg, Amsterdam, Netherlands
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker Panel: Scott Gearity, Greg Creeser, Marc Binder, Melissa Proctor and Stephan Müller
* Register: Here, or Jessica Lemon, 540-433-3977, jessica@learnexportcompliance.com

back to top

* * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Izaak Walton** (1593-1683; was an English writer and fishing enthusiast. Best known as the author of *The Compleat Angler*, he also wrote a number of short biographies that have been collected under the title of Walton's Lives. The Izaak Walton League is an American environmental organization founded by a group of sportsmen who wished to protect fishing opportunities for future generations.)
   - *"Good company in a journey makes the way seem shorter."*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

\* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

\* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.

- The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 8 Jun 2018: Harmonized System Update 1809, containing 901 ABI records and 192 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * *

# 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

Stay Connected



**The Daily Bugle | www.FullCircleCompliance.us**

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu



# NATIONAL SHOOTING SPORTS FOUNDATION, INC.

Headquarters: 11 Mile Hill Road, Newtown, CT 06470-2359

400 N. Capitol Street NW, Suite 490, Washington, D.C. 20001

202-220-1340 ext. 249   lkeane@nssf.org

**Lawrence G. Keane**
SVP Gov't & Public Affairs
Assistant Secretary & General Counsel

September 25, 2017

Karen H. Nies-Vogel
Director, Office of Exporter Services
Bureau of Industry and Security, HCHB 2099b U.S. Department of Commerce 14th Street &
Pennsylvania Ave., N.W.
Washington, DC 20230

Dear Ms. Neis-Vogel:

It was a pleasure meeting with you last week to discuss how the National Shooting Sports Foundation (NSSF), as the trade association for the firearms, ammunition, hunting and shootings sports industry, can proactively work with BIS to streamline the transition of USML Category I, II and III items to the CCL. NSSF has been a strong proponent of this welcome regulatory change under the Export Control Reform (ECR) initiative. We are eager to begin working with your team to get the word out to our industry members.

During our meeting, Under Secretary Ricardel mentioned that you are currently working on the 2018 outreach plan. As discussed, we would like to formally invite BIS Outreach to have a presence at the 2018 Sporting, Hunting and Outdoor Trade (SHOT®) Show. The SHOT Show is owned and sponsored by the NSSF. It is for the trade only, with annual attendance of about 65,000 members of the shooting, hunting and outdoor trade and commercial buyers and sellers.

As we do with other federal agencies that regulate our industry, NSSF would provide BIS booth space during the four days of the show beginning on Tuesday, January 23 and ending on Friday, January 26, 2018. The venue is the Sands Expo in Las Vegas. We feel this is an excellent opportunity for BIS Outreach to begin providing information to our industry members in preparation for the transition of our products to BIS oversight. Since our industry has been ITAR-centric, there are many companies with little to no experience with BIS, or how the EAR and CCL work. If the rules have been published for the SHOT Show, there will be a significant amount of interest by attendees wishing to speak to your staff and learn about BIS' regulatory system. Even if the proposed rules have not been published before the show begins in January, we believe strongly that having BIS Outreach at the show would still be very worthwhile to open the dialogue with industry. NSSF would work to inform attendees of BIS Outreach's presence at the show.

In addition to have a booth at the SHOT Show, we would also extend an invitation to BIS Outreach to make a presentation at the NSSF Import/Export Committee which meet on Tuesday, January 23rd at 8:00 a.m. The IM/EX committee, which is chaired by Kim Pritula, is comprised of large NSSF member companies that comprise a large percentage of our industry's commercial export of USML Cats I, II and III products which will be transitioning to BIS from DDTC.

DOC_0003685

We are currently in the final planning stages of the show. We would appreciate it if you could confirm to whether BIS Outreach is able to come to a) staff a booth at the SHOT Show and b) make a presentation to the NSSF Import/Export Committee.

Thank you for your consideration, and we look forward to working together with you and your team in the coming year.

Sincerely,

Lawrence G. Keane

**From:**   Jim Bartlett, Full Circle Compliance [█████@fullcirclecompliance.eu]
**Sent:**   8/16/2018 6:07:50 PM
**To:**     Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0816 Thursday "Daily Bugle"



## Thursday, 16 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1.   Items Scheduled for Publication in Future Federal Register Editions
2.   Commerce/BIS: (No new postings.)
3.   State/DDTC: (No new postings.)

### NEWS

4.   Bloomberg: "Trump Asks Judge Not to Block Access to 3-D Gun Instructions"
5.   Ekathimerini.com: "American Hellenic Institute Says U.S. Ban on Arms Sales to Cyprus 'Unlawful'"
6.   ST&R Trade Report: "Section 301 Tariff Exemption for U.S. Goods Returned Narrowed Significantly"

### EX/IM TRAINING EVENTS & CONFERENCES

7.   ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep

### EDITOR'S NOTES

8.   Bartlett's Unfamiliar Quotations
9.   Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Aug 2018),

FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)

10.     Weekly Highlights of the Daily Bugle Top Stories



## ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

\* State; NOTICES; Designation as a Foreign Terrorist Organization:
  - Abu Sayyaf Group (and Other Aliases); and
  - Boko Haram (and Other Aliases) [Publication Dates: 17 Aug 2018.]

\* State; NOTICES; Designation as a Specially Designated Global Terrorist:

- Qassim Abdullah Ali Ahmed, aka Qassim al-Muamen, aka Qassim Al Muamen, aka Qassim Abdullah Ali, aka Qassim Abdullah [Publication Date: 17 Aug 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2.

## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3.

## State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NEWS

## 4.

## Bloomberg: "Trump Asks Judge Not to Block Access to 3-D Gun Instructions"
(Source: Bloomberg, 16 Aug 2018.) [Excerpts.]

The Trump administration on Wednesday urged a federal judge not to stand in the way of public access to blueprints for making guns using 3-D printers.

Arguing there's no legal basis for the State Department to block availability of the instructions on the internet, and no need for such regulation, the government's position would allow people to make plastic guns at home, bypassing stores and rules and background checks.

Nineteen states and the District of Columbia are suing the administration, arguing the downloadable firearms will be untraceable and easily available to criminals and terrorists.

The State Department said the states "misunderstand" limits on its authority to prevent the harm they warn against. Unless the technology or weapons at issue pose a threat to national security by falling into the hands of foreigners, the government argued, it's up to other federal agencies and states to regulate them. ...

* * * * * * * * * * * * * * * * * *

## 5.
## Ekathimerini.com: "American Hellenic Institute Says U.S. Ban on Arms Sales to Cyprus 'Unlawful'"
(Source: Ekathimerini.com, 16 Aug 2018.) [Excerpts.]

The U.S. prohibition on sales of defense and military technology to Cyprus is "unlawful" and can be removed without the need for legislation, a Greek American lobby group has said.

"We contend the State Department has the legal authority to remedy what has been, for years, an unlawful prohibition on arms transfers to the Republic of Cyprus," American Hellenic Institute (AHI) president Nick Larigakis said.

"We urge the State Department to exercise the requisite political will to get this done. It is in the best interests of the United States for the Republic of Cyprus to look to the United States, and not any other nation, to procure its defense materials," he added.

His comments came as the AHI announced the publication of a five-page briefing on the International Traffic in Arms Regulations (ITAR), under which the US has banned the sales of US defense articles and services to Cyprus since 1985. ...

The AHI said that in discussions with State Department officials in June, it had submitted a memorandum on the issue. The officials forwarded the memorandum to the appropriate office for review. The AHI has raised the issue in follow-up meetings with the State Department.

The briefing describes the ITAR, analyzes why the prohibition on Cyprus is unlawful, explains how the State Department itself can remove Cyprus from the application of the ITAR prohibition, and concludes that legislation is not necessary.

* * * * * * * * * * * * * * * * * *

## 6.
## ST&R Trade Report: "Section 301 Tariff Exemption for U.S. Goods Returned Narrowed Significantly"
(Source: Sandler, Travis & Rosenberg Trade Report, 16 Aug 2018.)

Effective Aug. 23, the use of a provision allowing goods assembled abroad from U.S. components to avoid the additional 25 percent tariff imposed on imports from China will be narrowed significantly. This action will affect

the $34 billion worth of Chinese products already subject to the tariff (possibly retroactive to July 6) and the $16 billion worth of such goods that will be subject to the tariff as of Aug. 23. However, there are still ways affected companies can reduce or avoid this tariff.

HTSUS 9802.00.80 provides duty-free treatment for imports of goods assembled abroad in whole or in part of U.S. components that (a) are exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity, and (c) have not been subject to operations other than those considered incidental to assembly. Until now goods imported from China and meeting the terms of this provision have been fully exempt from the tariffs referenced above, which were announced after a Section 301 investigation determined that China's acts, policies, and practices related to technology transfer, intellectual property, and innovation are unreasonable and discriminatory.

However, the Office of the U.S. Trade Representative has now issued a notice amending the HTSUS provisions implementing the Section 301 tariff (HTSUS 9903.88.01 and 9903.88.02) to specify that for goods imported under HTSUS 9802.00.80 the tariff will apply to the value of the article less the value of any U.S. components incorporated into the article. Similarly, for goods imported from China under HTSUS 9802.00.40, 9802.00.50, and 9802.60, the additional tariff will be assessed on the value of repairs, alterations, or processing performed abroad but not the underlying U.S. good or material.

Despite USTR's action, there are still ways companies can lower their exposure to the Section 301 tariff. For example, USTR plans to soon announce a process for requesting the exclusion of products on the $16 billion list from the tariff, and a similar process is already in place for goods on the $34 billion list. Other options include tariff engineering to permit reclassification, supply chain modification, and qualification under other HTSUS Chapter 98 provisions.

back to top

* * * * * * * * * * * * * * * * * *

## 7. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com)

* What: The ECS ITAR/EAR Symposium & Boot Camp, Annapolis, MD
* When: September 11-13, 2018
* Where: Chart House Restaurant on Spa Creek
* Sponsor: Export Compliance Solutions & Consulting (ECS)

* ECS Speaker Panel:  Timothy Mooney, Commerce/BIS; Matt Doyle, Lockheed; Matt McGrath, McGrath Law, Scott Jackson, Curtiss-Wright, Suzanne Palmer & Mal Zerden.
* Register here for the three-day event or by calling 866-238-4018 or e-mail spalmer@exportcompliancesolutions.com

back to top

* * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 8. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Francis Darwin** (Sir Francis Darwin; 16 Aug. 1848 - 19 Sep. 1925; was a son of the British naturalist and scientist Charles Darwin. He, like his father, was a botanist.)
  - *"In science, the credit goes to the one who convinces the world, not to whom the idea first occurs."*

* **Michael Friedman** (born April 2, 1947) is an American philosopher of science, best known for his work on scientific explanation, philosophy of physics and Immanuel Kant. Friedman has also done important historical work on figures in Continental philosophy such as Martin Heidegger and Ernst Cassirer.)
  - *"The scientific name for an animal that doesn't either run from or fight its enemies is lunch."*

back to top

* * * * * * * * * * * * * * * * * * *

## 9. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199

- Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* <u>INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: <u>83 FR 6457-6458</u>: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please <u>contact us</u>
to receive your discount code.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

## 10. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors'

material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ("FCC") [REDACTED]@fullcirclecompliance.eu]
**Sent:** 8/17/2018 6:46:58 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-08017 Friday "Daily Bugle"



## Friday, 17 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. [No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. DoD/DSCA Updates SAMM with Clerical and Administrative Changes
4. State/DDTC: (No new postings.)
5. EU Commission Releases Recommendation Related to Identification of Conflict-Affected and High-Risk Areas and Other Supply Chain Risks

### NEWS

6. Al Jazeera: "Turkey Doubles Tariffs on Some U.S. Goods Amid Rising Tensions"
7. Reuters: "U.S. Imposes Sanctions on Myanmar Military Over Rohingya Crackdown"
8. Schenker: "GRI Notice for Far-East to USA & Canada"
9. ST&R Trade Report: "Dates and Deadlines: Tariffs, Origin Ruling, AGOA, CBP Forms, Shipping Rules"
10. The Wall Street Journal: "Law Formalizes Export Control Rules"
11. The Washington Free Beacon: "Justice Dept. Says State AGs Misunderstand Cody Wilson Settlement"

### COMMENTARY

12.    The Export Compliance Journal: "Where Denied Parties and Address Screening Intersect"

13.    R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "State Department to Impose New Russia Sanctions"

14.    R.C. Burns: "To File or Not to File, That Is the $300,000 Question"

**EX/IM TRAINING EVENTS & CONFERENCES**

15.    FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands

16.    List of Approaching Events: 6 New Events Posted This Week

**EDITOR'S NOTES**

17.    Bartlett's Unfamiliar Quotations

18.    Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)

19.    Weekly Highlights of the Daily Bugle Top Stories



FULL CIRCLE

Awareness Course U.S. Export Controls

ITAR & EAR from a Non-U.S. Perspective

Tuesday, 2 October 2018, 9.30 am - 5.00 pm
Landgoed Groenhoven, Bruchem, The Netherlands

**ITEMS FROM TODAY'S FEDERAL REGISTER**

[No items of interest noted today.]

back to top

```
* * * * * * * * * * * * * * * * * *
```

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS; NOTICES; Denial of Export Privileges: Alex Bryukho
[Included in the Daily Bugle of 15 Aug 2018; publication Date: 20 Aug 2018.]

back to top

```
* * * * * * * * * * * * * * * * * *
```

## 2.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

```
* * * * * * * * * * * * * * * * * *
```

## 3. DoD/DSCA Updates SAMM with Clerical and Administrative Changes
(Source: DoD/DSCA, 17 Aug 2018.)

* DSCA Policy Memo 18-40 Security Assistance Management Manual (SAMM), Administrative Changes has been posted.

This memo updates Section C2.1.5.6.4 and Table C11.T6, EDA Legislation Summary.

back to top

```
* * * * * * * * * * * * * * * * * *
```

## 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

```
* * * * * * * * * * * * * * * * * *
```

## 5. EU Commission Releases Recommendation Related to Identification of Conflict-Affected and High-Risk Areas and Other Supply Chain Risks
(Source: Official Journal of the European Union, 17 Aug 2018.)

*Recommendations*

* Commission Recommendation (EU) 2018/1149 of 10 August 2018 on non-binding guidelines for the identification of conflict-affected and high-risk areas and other supply chain risks under Regulation (EU) 2017/821 of the European Parliament and of the Council

*[Editor's Note: Regulation (EU) 2017/821 of the European Parliament and of the Council of 17 May 2017 laying down supply chain due diligence obligations for Union importers of tin, tantalum and tungsten, their ores, and gold originating from conflict-affected and high-risk areas.]*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NEWS

## 6.
## Al Jazeera: "Turkey Doubles Tariffs on Some U.S. Goods Amid Rising Tensions"
(Source: Al Jazeera, 15 Aug 2018.)

*Cars, tobacco, and alcohol hit with new tariffs in response to what vice president calls "U.S. attacks" on the economy.*

Turkey doubled tariffs on some imports from the United States - such as passenger cars, alcohol and tobacco - in what it said was retaliation for "deliberate attacks" on its economy.

The development on Wednesday comes amid escalating tensions between Turkey and the US, its NATO ally.

A decree published in Turkey's official gazette and signed by Turkish President Recep Tayyip Erdogan doubled the tariffs on passenger cars to 120 percent, on alcoholic drinks to 140 percent, and on tobacco to 60 percent.

Tariffs were also doubled on goods such as cosmetics, rice, and coal. ...

Erdogan said on Tuesday his country would boycott all American-made electronic products, including U.S.-made iPhones. ...

The crisis came days after U.S. President Donald Trump announced a doubling of steel and aluminum tariffs on Turkey, as Washington pushes Ankara to release Evangelical Christian pastor Andrew Brunson, who is being held on terrorism charges for nearly two years.

A Turkish court on Wednesday rejected an appeal for Brunson's release.

Earlier this month, Erdogan ordered the assets of two U.S. officials frozen in retaliation for sanctions imposed on Turkey's justice and interior ministers over the U.S. pastor's detention. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7.
## Reuters: "U.S. Imposes Sanctions on Myanmar Military Over Rohingya Crackdown"
(Source: Reuters, 17 Aug 2018.) [Excerpts.]

The United States on Friday imposed sanctions on four Myanmar military and police commanders and two army units for involvement in what it called "ethnic cleansing" and other human rights abuses against the country's Rohingya Muslims, the Treasury Department said.

The sanctions marked the toughest U.S. action so far in response to Myanmar's crackdown on the Rohingya minority, which started last year and has driven more than 700,000 people into neighboring Bangladesh and left thousands of dead behind.

But the Trump administration did not target the highest levels of the Myanmar military and also stopped short of calling the anti-Rohingya campaign crimes against humanity or genocide, which has been the subject of debate within the U.S. government.

The measures were announced as Secretary of State Mike Pompeo, according to U.S. officials, prepares to release the findings of an intensive U.S. investigation of alleged atrocities by Myanmar authorities against the Rohingya. ...

In November, following the lead of the United Nations and the European Union, then-Secretary of State Rex Tillerson declared that the Rohingya crisis constituted "ethnic cleansing," a designation that increased pressure on its civilian leader, Nobel peace laureate Aung San Suu Kyi. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8.
## Schenker: "GRI Notice for Far-East to USA & Canada"
(Source: Schenker Inc., 16 Aug 2018.)

Following announcements are issued by major Steamship Lines, here are the intended NEW General Rate Increase (GRI) effective September 15, 2018, for Eastbound cargo from Far East and Indian Sub-Continent origins to destinations in Canada and USA with details as follows:
  - USD 900 per 20' standard container

- USD 1000 per 40' standard container (40' x 8'6")
- USD 1125 per 40' high cube container (40' x 9'6")
- USD 1266 per 45' container
- LCL: US$20.00 per w/m. Min US$20.00

back to top

* * * * * * * * * * * * * * * * * * *

## 9. ST&R Trade Report: "Dates and Deadlines: Tariffs, Origin Ruling, AGOA, CBP Forms, Shipping Rules"
(Source: Sandler, Travis & Rosenberg Trade Report, 17 Aug 2018.)

  Aug. 20 - deadline for comments to FTZ Board on requests for production authority, subzone expansion
  Aug. 20 - USTR hearing on proposal to impose 10 percent tariff on $200 billion in Chinese goods
  Aug. 20 - deadline to seek judicial review of CBP origin ruling on insufflation tubing
  Aug. 22 - effective date of FMC final rule revising regulations on negotiated rate/service arrangements
  Aug. 23 - deadline for comments on annual AGOA eligibility review
  Aug. 23 - deadline for comments to CBP on entry/ID application, ACE cargo release
  Aug. 23 - effective date of additional tariffs on Chinese products
  Aug. 23 - effective date of revision to Section 301 tariff exemption for U.S. goods returned
  Aug. 24 - effective date of DOE final rule to expedite small-scale natural gas exports
  Aug. 24 - deadline for comments to FTZ Board on proposed expansion of Hawaii zone

back to top

* * * * * * * * * * * * * * * * * * *

## 10. The Wall Street Journal: "Law Formalizes Export Control Rules"
(Source: The Wall Street Journal, 17 Aug 2018.) [Excerpts.]

*Commerce Department to use new tools, such as undercover agents and wiretaps, to conduct investigations*

The U.S. Commerce Department has statutory authority for the first time in nearly 25 years to control certain exports, and it will lead a regular, ongoing interagency review of new technology to assess whether the U.S. should restrict its export.

The Export Control Act, signed into law this week by President Trump as part of an annual national defense policy legislation, codified existing rules authorizing the Commerce Department's role in controlling certain exports involving sensitive technology. The authorization process underpinning the

rules was handled via executive order subject to an annual renewal since 1994, when the last export-controls legislation expired. ...

Attorneys practicing in the area said that though the law didn't create new rules, it put the export-control regime on sound footing by providing a statutory basis for the existing ones. ...

back to top

* * * * * * * * * * * * * * * * * *

## 11. The Washington Free Beacon: "Justice Dept. Says State AGs Misunderstand Cody Wilson Settlement"
(Source: The Washington Free Beacon, 16 Aug 2018.)

The Department of Justice announced on Thursday that it filed a brief in opposition to a preliminary injunction against a State Department agreement with 3D-printed gun pioneer Cody Wilson. The injunction was requested by a group of state attorneys general in federal court.

In the brief, DOJ accused the Attorney Generals (AGs) of misunderstanding the issue at hand in the settlement. It further claimed that the AGs want the Department of State to exceed the authority granted to them under current law. DOJ said the case was not about the legality of 3D-printed firearms but, rather, about the potential export of technical firearms data to foreign nationals.

   "This case is not about the regulation of U.S. persons who wish to utilize a 3D printer to manufacture their own small-caliber firearms," DOJ said in the brief. "Rather, this case concerns the Department of State's delegated authority to control the export of defense articles and services, or technical data related thereto, that raise military or intelligence concerns. The Department is tasked with determining what technology and weaponry provides a critical military or intelligence advantage such that it should not be shipped without restriction from the United States to other countries (or otherwise provided to foreigners), where, beyond the reach of U.S. law, it could be used to threaten U.S. national security, foreign policy, or international peace and stability. Domestic activities that do not involve providing access to foreign persons, by contrast, are left to other federal agencies-and the states-to regulate."

In 2013, the State Department sent a letter to Cody Wilson claiming his publishing of designs for a single-shot 3D-printed firearm known as The Liberator and other firearms or firearms accessories without first obtaining approval from them could be considered an unauthorized export of firearms to foreign nationals that might result in potentially unlimited fines and jail time. Wilson took all gun-related design files down from his website as a result-though the files have remained freely available on dozens of other websites since then. He then joined with the Second Amendment Foundation to sue the State Department claiming it was infringing upon his First Amendment and Second Amendment rights.

On July 15, 2018, Wilson and the Second Amendment Foundation announced that the State Department had given up their claim against the publishing of the gun designs and settled with them. The State Department later told reporters they had settled because of advice from the Department of Justice that they would eventually lose the case.

 "This has obviously gone through a legal process," Heather Nauert, State Department spokesperson, told reporters during a briefing. "The Department of Justice was advising the State Department on this entire legal matter. The Department of Justice suggested that the State Department and the U.S. government settle this case, and so that is what was done. We were informed that we would've lost this case in court, or would have likely lost this case in court based on First Amendment grounds. We took the advice of the Department of Justice, and here we are right now."

Gun-control activists were alarmed by the decision to settle the case and allow Wilson to publish the designs. Though efforts by leading gun-control groups to stop the settlement in court failed, eight state AGs were able to get U.S. District Court judge Robert S. Lasnik to grant a temporary restraining order against the State Department to prevent enforcement of the deal. This week's filing by the DOJ is in response to the state AGs' request that the temporary restraining order be turned into a preliminary injunction.

The DOJ said that the argument employed by the state AGs in their request addresses concerns beyond what the State Department has the power to regulate.

 "Plaintiffs misunderstand the fundamental limit on the State Department's authority," DOJ said in the brief. "According to Plaintiffs, the Government's export-related determinations-specifically with respect to the export of technical data developed by Defense Distributed-have jeopardized their ability to protect the safety and health of their residents."

DOJ said the AGs are concerned with potential crimes committed by those in the United States if the files published by Wilson were to be downloaded by criminals in their states. However, DOJ said, the State Department's power to regulate the export of firearms does not allow it to ban the publication of information in the United States out of fear that domestic criminals may misuse it.

 "The domestic harms about which Plaintiffs are allegedly concerned are not properly regulated by the Department under current law," the DOJ said in the brief. "Plaintiffs' allegations of harm are not reasonably attributable to the Department's regulation of exports, but rather focus on the possibility that third parties will commit violations of the Undetectable Firearms Act or other relevant laws that are not at issue in this case."

The DOJ did reiterate that the manufacture or possession of completely plastic firearms that can pass through a metal detector or airport X-ray machine undetected is already illegal under federal law. Attorney General Jeff Sessions

said the DOJ would continue to enforce the Undetectable Firearms Act even though it is not at issue in the case.

"Under federal law, it is illegal to manufacture or possess plastic firearms that are undetectable. Violation of this law is punishable by up to five years in prison," Sessions said in a statement. "Such firearms present a significant risk to public safety, and the Department of Justice will use every available tool to vigorously enforce this prohibition. We will work with federal, state and local law enforcement to identify any possible cases for prosecution. We will not stand for the evasion, especially the flaunting, of current law and will take action to ensure that individuals who violate the law by making plastic firearms and rendering them undetectable, will be prosecuted to the fullest extent."

Cody Wilson's Liberator design, which has been at the center of the case and the media firestorm surrounding it, utilizes a metal firing pin and is intended to include a metal plate which make it unlikely to evade a metal detector.

The DOJ said it did not believe the state AGs' argument met the standard necessary to grant a preliminary injunction against the State Department's settlement with Cody Wilson and characterized doing so as being akin to the court substituting its own judgement for that of the executive branch.

"Plaintiffs have failed to demonstrate that the facts and law clearly favor their position with respect to the merits of their claims, or that it is in the public interest for the Court to second-guess the national security determinations of the Executive Branch," the DOJ said in the brief.

back to top

* * * * * * * * * * * * * * * * * * *

## 12.
## The Export Compliance Journal: "Where Denied Parties and Address Screening Intersect"
(Source: The Export Compliance Journal, 2 Aug 2018.)

Restricted party screening is more than just about screening for names of individuals and companies that appear on denied parties watch lists maintained by governments and other official organizations.

When looked at in its entirety, the screening process represents a mosaic of sanctions, debarments, and embargoes in addition to denied persons. The reasons for these debarments can be for any variety of reasons based on the regulations that apply. These include not only export violations, but also financial, criminal, regulatory, or healthcare violations.

As discussed in previous Trade Compliance 101 articles, looking for a name or company is critically important in the due diligence process, and everyone in the organization should be on the lookout to prevent violations. However, there should be another step in the process: Address screening, or address search.

  **"But wait,"** you say, **"you cannot debar a street, many businesses could operate there!"**

True, but address screening isn't the same as a name or company, where you are looking to match specifically against that entity. Address screening is about verification; it is about preventing or further mitigating the chance of doing business with a debarred party.

### So I have the address, now what?

The best way to mitigate risk is to have an effective compliance solution, and use a reliable source for addresses of the businesses and persons you are screening.

Matching an address for a restricted party, particularly when you do not have a match against the company you entered, could have implications in your overall ability to do business with that company. Is it a coincidence that the address is the same, or appears the same? Are they a subsidiary of the debarred party? What, if any, sanctions or embargoes apply?

It is always possible that the location contains multiple unrelated businesses, and that further review of the addresses and analysis will reveal that there is no connection between your potential customer and the one listed as debarred at that location. You are going to want to be able to prove that though, and have the details showing that you were fully aware of the situation.

### So is the main concern that debarred companies with change their names?

That is one concern, as highlighted in this case, which details Chinese company, ZTE Corporation's, efforts to deceive US suppliers using subsidiaries to facilitate shipments to Iran. Even after publicly admitting to the scheme and claiming to cease operations in Iran, ZTE had simply renamed its Iranian subsidiary, according to the findings.

It appears to have taken several years before the US government authorities caught wind of the practice, but the new subsidiary name was ultimately added to the BIS Entity List.

### Are there other concerns?

There have also been cases where exports or shipping has occurred due to inaccuracy, or possible fraud, related to addresses. Often, it is difficult to determine where the failure actually occurred-was the address incorrect

intentionally? Was it a long address that did not follow a conventional format that was difficult to search?

Take a look at North Korea's efforts to avoid the sanctions against that country. Fake addresses are at the core of this entire process. After all, you may be able to debar a named company, even if it is fake, or a real address where the fake company was located. But what about a fake address? If the address is truly forged, and exists in no physical location, that information should be easy enough to unearth. But what if a fake businesses claims to be operating at a real address that doesn't belong to them. Should the location of a neighborhood corner grocer be debarred by the authorities because some phony bank claims the location is theirs?

### *So what do we do?*

The best course of action is simply due diligence, using a denied party screening tool that includes an address-only search function. You could also do it manually-using search engines, maps, and news articles-but this type of page-by-page verification tends to be time-consuming and a waste of precious work resources.

And, of course, document what you're doing and the review you've performed. Unlike the unwitting companies in 2006, who could claim ignorance in order to mitigate the issue, government authorities have long since moved past allowing ignorance as a defense.

Regardless of the overall method, or methods, used, creating a standardized process to verify the location of your business parties will usually lead you down the right path.

### *A Glossary of Ideas In This Article*

  **- Address screening or checking:** Address screening usually refers to the actual process of screening an address (without an individual or organization) against the various restricted party lists. Address checking can either be done through an automated tool, or via a manual process of viewing the location of the party being screened.
  **- Verification:** Verification, when used in the context of Restricted Party Screening, refers to the overall process of ensuring that the data is correct, that details about the party to be screened are true. Verification can take on different forms, from conducting a general web search to ensure that the business name given matches the official one, to checking that addresses are real and accurate.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 13. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "State Department to Impose New Russia Sanctions"
(Source: Thomsen and Burke LLP, 17 Aug 2018. Available by subscription via maher@t-b.com.)

* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

On August 8, 2018, the Department of State announced plans to impose Chemical and Biological Weapons Control and Warfare Elimination Act sanctions on Russia ("CBW Act"). The sanctions are in response to a determination by the U.S. government that the Russian government used "Novichok", a nerve agent, in an attempt to assassinate UK citizen Sergei Skripal and his daughter Yulia Skripa.

The sanctions under the CBW act are implemented in two phases. The State Department has sent a notification to Congress and the first round of sanctions will be imposed after a 15-day review period. We expect that a Federal Register notice will be published on about August 22nd, implementing the initial sanctions. These sanctions will be:

  - a prohibition of exports of national security-sensitive goods and technology,
  - the termination of foreign assistance,
  - suspension of sales of defense articles or services, and
  - the denial of credit or other financial assistance by the US government.

Based on the State Department's background briefing, we believe that the prohibition on the export of national security-sensitive goods and technology applies to items requiring an export license to Russia and not to items eligible for export under a license exception. From the background briefing:

> We notified Congress today that pursuant to this act we intend to impose sanctions against the Russian Federation in a number of respects, the most significant of which is the imposition of a presumption of denial for all national security sensitive goods or technologies that are controlled by the Department of Commerce pursuant to the Export Administration Regulations. These goods are currently subject to a license - a case-by-case license determination, but we are - henceforth, when these sanctions go into effect, we will be presumptively denying such applications.

The second phase of the sanctions will be implemented on approximately November 8th. The second phase will be imposed if the executive branch cannot certify that Russia: (a) is no longer using chemical or biological weapons, (2) has provided reasonable assurances that it will not in the future use such weapons, and (3) that on-site inspections or other reliable means can be used to verify compliance. Under the CBW Act, the President must impose 3 of the following 6 sanctions:

  - Further export restrictions including a prohibition on exports to Russia of all other goods and technology (excluding food and other agricultural commodities and products).
  - Import restrictions on articles that are the growth, product, or manufacture of Russia.

- Prohibiting U.S. banks from making any loan or providing any credit to the government of Russia, except for loans or credits for the purpose of purchasing food or other agricultural commodities or products.
- Downgrading or suspending diplomatic relations between the United States and the government of Russia.
- Suspending air carriers owned by the government of Russia from transporting to or from the United States and terminating any air service agreement between the United States and Russia (with an exception for emergencies.

The State Department noted that it was looking at carve outs and waivers for the second phase of sanctions. The carve outs will be a policy of case by case licensing, rather than a presumption of denial for licenses for:

- the provision of foreign assistance to Russia and to the Russian people,
- the safety of commercial passenger aviation,
- space flight activities,
- purely commercial end users for civilian end uses, and
- exports to wholly-owned subsidiaries of U.S. companies and other foreign companies in Russia.

It is likely that if the President must impose the second set of sanctions, he will impose the least restrictive ones: opposing multilateral bank loans, prohibiting U.S. bank loans, and downgrading diplomatic relations.

back to top

* * * * * * * * * * * * * * * * * *

## 14.
## R.C. Burns: "To File or Not to File, That Is the $300,000 Question"
(Source: Export Law Blog, 16 Aug 2018. Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Washington DC, Clif.Burns@bryancave.com, 202-508-6067).

The Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), just signed into law as part of the John McCain National Defense Authorization Act of 2018 ("NDAA"), will change significantly the way in which the Committee on Foreign Investment in the United States ("CFIUS") reviews foreign investments. It expands the definition of transactions covered by the process, makes the review process mandatory for certain of these transactions, and imposes a filing fee equal to the lesser of $300,000 or one percent of the value of the transaction.

Before FIRRMA, the definition of a "covered transaction" set forth in section 721(a)(3) of the Defense Production Act was "any merger, acquisition, or takeover ... by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States." The new law expands this definition to cover certain real estate transactions. In

addition, a covered transaction now includes certain investments, even if they do not result in foreign control, in U.S. businesses that are involved with "critical infrastructure," that have "critical technologies," or that maintain or collect sensitive personal data on U.S. citizens.

The real estate transactions that are covered are those that are part of an air or maritime port or are in close proximity to a military installation and that could result in an opportunity for foreign surveillance of that military installation. Exempted from these covered real estate transactions are purchases of single housing units or transactions in urbanized areas as defined by the Census Bureau.

The investments in critical infrastructure, critical technology companies, or companies with sensitive personal data that are covered are those that will give the foreign entity access to "material non-public technical information." Additionally, these investments will be covered transactions if they will give the foreign entity membership on the board of directors, observer rights or nomination rights. Finally, a non-controlling investment transaction will be a covered transaction if it gives the foreign entity any involvement, other than through voting of shares, in "substantive decision-making" involving sensitive personal data, critical technologies or critical infrastructure.

Of particular interest to readers of this blog is the definition of critical technologies which includes most, but not all, items that are subject to export controls. All items on the United States Munitions List are critical technologies. Most items on the Commerce Control List are critical technologies with the exception of items that are only controlled for anti-terrorism (AT), Firearms Convention (FC), crime control (CC) or encryption (EI). So, companies that make handcuffs (ECCN 0A982) are fair targets for foreign acquisition without CFIUS review but those that make triethanolamine (ECCN 1C350.c.10) for shampoo and cosmetics are not. Critical technologies will also include "emerging and foundational technologies," which is a new and yet unpopulated category of export-controlled items described in the Export Control Reform Act of 2018, which was also enacted as part of the NDAA.

FIRRMA creates a new filing called a "declaration" (as opposed to a "notice," the term both before and after the new legislation for the voluntary filing that commences CFIUS review). The declaration, which is not subject to the $300,000 or 1% fee, is meant to be a short document and no more than 5 pages. And although declarations can be voluntarily filed, they will be mandatory where "a foreign government has, directly or indirectly, a substantial interest" in a covered transaction. Any party required to file the mandatory declaration may, at its own option, file a regular, and longer, notice of the transaction instead. Prior to FIRRMA, involvement by a foreign government would force a 45-day CFIUS investigation after the initial 30-day review period but would not require any mandatory filings.

In response to the declaration, CFIUS may require the filing of the regular written notice (which will require the payment of the new $300,000 or 1% fee), may initiate a unilateral investigation, or may inform the parties that no further review is required. It may also state that it cannot make any decision

based on the declaration and merely advise the parties of their right to file the standard written notice. Rather perplexingly, the new law states that CFIUS "may not require a declaration to be submitted ... with respect to a covered transaction more than 45 days before the completion of the transaction." Given that one response to the declaration is the initiation of the normal CFIUS process, which can given the statutory time frame take more than 45 days, it is not clear what this time limit means or how it is enforced.

The time frame for the review process has also been changed by the new legislation. Before the new law, the CFIUS process consisted of a 30-day review process, an optional 45-day investigation after the review, and then 15 days for the President to act after the investigation process was completed. The new law extends the initial review period to 45 days.

During the consideration of the bill in the House and the Senate, the two chambers took different approaches to the issue of "countries of concern," largely in response to concerns about Chinese investment resulting in China pilfering U.S. technology. The House took a naughty list approach, calling out China, Russia, and Venezuela by name, while the Senate took the nice list approach, putting NATO countries and major non-NATO allies, among others, on the nice list. The new law takes the Senate nice list approach, but give CFIUS the authority to decide, based on national security considerations, which countries are on the nice list. The effect of this determination is that non-controlling investments in real estate or involving critical infrastructure, critical technologies or sensitive personal data by companies from countries on the nice list would not be covered transactions.

back to top

* * * * * * * * * * * * * * * * * * * *



Are You Keeping Up to Date with the Latest Regulations?

Bartlett's Annotated ITAR will keep you updated on the latest ITAR amendments.

MORE INFORMATION AVAILABLE HERE

EX/IM TRAINING EVENTS & CONFERENCES

## 15. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu.

*Register today and get a 10% Early Bird discount on the course fee!*

back to top

* * * * * * * * * * * * * * * * * * * * *

## 16. List of Approaching Events: 6 New Events Posted This Week
(Sources: Editor and Event Sponsors)

Published every Friday or last publication day of the week, our overview of Approaching Events is organized to list continuously available training, training events, seminars & conferences, and webinars.

Please, submit your event announcement to Alexander Witt, Events & Jobs Editor (email: awitt@fullcirclecompliance.eu), composed in the below format:

> # DATE: LOCATION; "EVENT TITLE"; EVENT SPONSOR; WEBLINK; CONTACT DETAILS (email and/or phone number)

"#" = New or updated listing

### Continuously Available Training

* E-Seminars: "US Export Controls" / "Defense Trade Controls"; Export Compliance Training Institute; danielle@learnexportcompliance.com
* Webinar: "Company-Wide US Export Controls Awareness Program"; Export Compliance Training Institute; danielle@learnexportcompliance.com

* E-Seminars: "ITAR/EAR Awareness"; Export Compliance Solutions; spalmer@exportcompliancesolutions.com
* Online: "Simplified Network Application Process Redesign (SNAP-R)"; Commerce/BIS; 202-482-2227
* E-Seminars: "Webinars On-Demand Library"; Sandler, Travis & Rosenberg, P.A.
* Online: "International Trade Webinars"; Global Training Center
* Online: "On-Demand Webinars"; "General Training"; Center for Development of Security Excellence; Defense Security Service (DSS)
* Online: "ACE Reports Training and User Guide"; DHS/CBP
* Online: "Increase Your International Sales - Webinar Archive"; U.S. Commercial Service
* Web Form: "Compliance Snapshot Assessment"; Commonwealth Trading Partners (CTP)
* Online: "Customs Broker Exam Prep Course"; The Exam Center

### Seminars and Conferences

* Aug 20: Cincinnati, OH; "Export Documentation and Procedures Seminar"; International Business Training
* Aug 21: Leeds, UK; "Understanding Exporting"; Chamber International
* Aug 22: London, UK; "Advanced Exporting"; UK Institute of Export and International Trade
* Aug 22: Minneapolis, MN; "Import Documentation and Procedures Seminar"; International Business Training
* Aug 23: Cincinnati, OH; "Import Documentation and Procedures Seminar"; International Business Training
* Aug 24: Houston, TX; "Export Documentation and Procedures Seminar"; International Business Training
* Aug 24 - 27: New York, NY; "Best Customs Broker Exam Course"; GRVR Attorneys
* Aug 29: Leeds, UK; "Understanding Incoterms"; Chamber International
* Sep 3: Edinburgh, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 4: Leeds, UK; "Methods of Payment & Letters of Credit"; Chamber International
* Sep 4: London, UK; "An Introduction to Exporting"; UK Institute of Export and International Trade
* Sep 5: Aberdeen, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 5: Aberdeen, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 6: Aberdeen, UK; "Licenses Workshop"; UK Department for International Trade

\# Sep 11-13: Annapolis, MD; "ITAR/EAR Symposium & Boot Camp Global Trade Academy"; Export Compliance Solutions (ECS)
\* Sep 11-13: Detroit, MI; "Export Controls Specialist Certification"; Global Trade Academy
\* Sep 11: Leeds, UK; "Export Documentation and Export Procedures"; Chamber International
\* Sep 12: Buffalo, NY; "Export Documentation and Procedures Seminar"; International Business Training
\# Sep 12: Melbourne, Australia; Defence Export Controls Outreach; Australian Department of Defense
\* Sep 12-13: Springfield, RI; "Complying with US Export Controls"; Bureau of Industry and Security
\* Sep 12-19: Chicago, IL; "Import 5-Day Boot Camp"; Global Trade Academy
\* Sep 13: Buffalo, NY; "Import Documentation and Procedures Seminar"; International Business Training
\* Sep 13: Frankfurt, Germany; "BAFA/U.S. Export Control Seminar 2018";
\* Sep 13-17: Galveston, TX (Cruise); "ICPA @ SEA!"; International Compliance Professionals Association (ICPA)
\* Sep 16-19: Atlanta, GA; "2018 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)
\* Sep 17: Los Angeles, CA; "Import Compliance"; Global Trade Academy
\* Sep 17-20: Columbus, OH; "University Export Controls Seminar at The Ohio State University in Columbus"; Export Compliance Training Institute (ECTI); jessica@learnexportcompliance.com; 540-433-3977
\* Sep 17-21: Los Angeles, CA; "Import 5-Day Boot Camp"; Global Trade Academy
\* Sep 18: Anaheim, CA; "Import Documentation and Procedures Seminar"; International Business Training
\* Sep 18: Kontich, Belgium; "Export Controls Master Class"; Customs4Trade
\* Sep 18: Los Angeles, CA; "Tariff Classification for Importers and Exporters"; Global Trade Academy
\* Sep 18-19: London, UK; "Decoding Trade Controls, Sanctions And Regulations On Dual-Use Goods"; KNect365
\* Sep 18: San Diego, CA; "12th Annual CompTIA Global Trade Compliance Best Practices Conference"; CompTIA
\* Sep 19: Washington, D.C.; "DDTC In-House Seminar"; Department of State (Registration: Aug 10 - Aug 31; first come, first served)
\* Sep 19: Los Angeles, CA; "NAFTA and Trade Agreements"; Global Trade Academy
\* Sep 19-20: Rome, Italy; "Defense Exports 2018"; SMi
\* Sep 19-20: Los Angeles, CA; "Complying With U.S. Export Controls"; BIS
\* Sep 20: Pittsburgh, PA; "Export Documentation and Procedures Seminar"; International Business Training
\* Sep 20: Los Angeles, CA; "Country and Rules of Origin"; Global Trade Academy
\* Sep 21: Los Angeles, CA; "Customs Valuation - The Essentials"; Global Trade Academy
\* Sep 21: Pittsburgh, PA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
\* Sep 21-24: Detroit, Michigan; "Best Customs Broker Exam Course"; GRVR Attorneys

* Sep 24: Seligenstadt, Germany; "Follow-Up Fachtagung"; FALEX
* Sep 25-26; Chicago, IL; "Financial Crime Executive Roundtable"; American Conference Institute
* Sep 25: Kansas City, MO; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 25: Leeds, UK; "Understanding Exporting & Incoterms"; Chamber International
* Sep 25-26: San Francisco, CA; "11th West Coast Conference on FCPA Enforcement and Compliance"; American Conference Institute
* Sep 25-26: Toronto, Canada; "4th Forum on Economic Sanctions and Compliance Enforcement"; C5 Group
* Sep 26: Kansas City, MO; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 26: McLean, VA; "EAR Basics"; FD Associates
* Sep 26: Oxford, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 27: Oxford, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 28: Anaheim, CA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 1-4: Austin, TX; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 2: Bruchem, Netherlands; "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective"; Full Circle Compliance
* Oct 2: Leeds, UK; "Export Documentation"; Chamber International
* Oct 2: Manchester, UK; "E-Z CERT: How To Process Your Export Documentation Online" Greater Manchester Chamber of Commerce
* Oct 5: Boston, MA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 5: Boston, MA; " Incoterms: A Strategic Approach"; International Business Training
* Oct 9: New Orleans, LA; "Import Documentation and Procedures Seminar"; International Business Training
* Oct 10: Manchester, UK; "Export Documentation Training Course"; Greater Manchester Chamber of Commerce
* Oct 10: New Orleans, LA; "Tariff Classification Seminar"; Global Learning Centre
* Oct 11: New Orleans, LA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 11: Rotterdam, NL; "Trade Compliance Congres"; SDU, Customs Knowledge, and EvoFenedex
* Oct 12: New Orleans, LA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 15-18: Amsterdam, NL; "US Export Controls on Non-US Transactions - EAR, ITAR, OFAC Regulations Impact for EU, NL, UK & other Non-US Companies"; ECTI; jessica@learnexportcompliance.com; 540-433-3977

* Oct 15-19: Chicago, IL; "Certified Classification Specialist"; Global Trade Academy
* Oct 16-18: Dallas, TX; "Partnering for Compliance West Export/Import Control Training and Education Program"; Partnering for Compliance
* Oct 16: Kontich, Belgium; "Export Control Compliance Basics"; Customs4Trade
* Oct 17: Manchester, UK; "Understanding Tariff Codes" Greater Manchester Chamber of Commerce
* October 17-18: Miami/Fort Lauderdale, FL; "11th Maritime Forwarding, Freight Logistics & Global Chain Supply Workshop"; ABS Consulting; albert@abs-consulting.net; 954 218-5285
* Oct 18-19: McLean, VA; "ITAR Fundamentals"; FD Associates
* Oct 19: Dallas TX; "Customs/Import Boot Camp"; Partnering for Compliance
* Oct 21-23: Grapevine, TX; "2018 Fall Conference"; International Compliance Professionals Association (ICPA)
* Oct 22-26: Dallas, Texas; "Best Customs Broker Exam Course"; GRVR Attorneys
* Oct 22-23: Arlington, VA; "2018 Fall Advanced Conference"; Society for International Affairs (SIA)
# Oct 23: Adelaide, Australia; Defence Export Controls Outreach; Australian Department of Defense
* Oct 23: Kontich, Belgium; "Export Control Compliance Basics"; Customs4Trade
* Oct 24: Leeds, UK; "Intermediate Seminar"; UK Department for International Trade
* Oct 25: Leeds, UK; "Beginner's Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Licenses Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Oct 26: Louisville, KY; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 26: Milwaukee, WI; "Incoterms: A Strategic Approach"; International Business Training
* Oct 29 - Nov 1: Phoenix, AZ; ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 29: Seattle, WA; "Export Compliance & Controls 101"; Global Trade Academy
* Oct 30 - Nov 1: Seattle, WA; "Export Controls Specialist - Certification"; Global Trade Academy
* Oct 30: Singapore; "4th Asia Summit on Economic Sanctions"; American Conference Institute
* Oct 31 - Nov 1: Singapore; " 7th Asia Summit on Anti-Corruption"; American Conference Institute
* Nov 6: Detroit, MI; "Classification: How to Classify Parts"; Global Trade Academy
* Nov 7: Detroit, MI; "Advanced Classification of Machinery and Electronics"; Global Trade Academy
* Nov 7: Manchester, UK; "Understanding Incoterms" Greater Manchester Chamber of Commerce

DOC_0003905

* Nov 7-9: London, UK; "TRACE European Forum, 2018"; TRACE Anti-Bribery Compliance Solutions
* Nov 7-9: Detroit, MI; "Advanced Classification for Machinery & Electronics"; Global Trade Academy
* Nov 8-9: Shanghai, China; "ICPA China Conference"; International Compliance Professionals Association
* Nov 12-15: Washington, D.C.; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Nov 13: Tysons Corner, VA; "Made in America, Buy America, or Buy American: Qualify your Goods and Increase Sales"; Global Trade Academy
* Nov 14: Manchester, UK; "Intermediate Seminar"; UK Department for International Trade
* Nov 15: Manchester, UK; "Beginner's Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Licenses Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Nov 15: McLean, VA; "ITAR For the Empowered Official"; FD Associates
* Nov 16, San Diego, CA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Nov 20: Manchester, UK; "How to Claim Duty Relief on Export and Import Processes" Greater Manchester Chamber of Commerce
# Nov 20: Sydney, Australia; Defence Export Controls Outreach; Australian Department of Defense;
* Nov 21: Manchester, UK; "Introduction to Exporting" Greater Manchester Chamber of Commerce
* Nov 27: Houston, TX; "Duty Drawback Specialist - Certification"; Global Trade Academy
* Dec 3-7: Tysons Corner, VA; "Certified Classification Specialist"; Global Trade Academy
* Dec 4-5: London, UK; "11th Advanced Conference on Customs Compliance held in Partnership with HMRC"; C5 Group
* Dec 4-5: Frankfurt, Germany; "US Defence Contracting and DFARS Compliance in Europe;" C5 Group
* Dec 5: London, UK; "Intermediate Seminar"; UK Department for International Trade
* Dec 6: London, UK; "Beginner's Workshop"; UK Department for International Trad
* Dec 6: London, UK; "Licenses Workshop"; UK Department for International Trade
* Dec 6: London, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Dec 6: London, UK; "International Documentation and Customs Compliance"; Institute of Export and International Trade
* Dec 6: Manchester, UK; "Export Documentation Training Course;" Greater Manchester Chamber of Commerce
* Dec 6: Manchester, UK; "Introduction to Export Controls and Licenses";
* Dec 10-13: Miami, FL; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977

* Dec 14: Philadelphia, PA; "Incoterms 2010: Terms of Sale Seminar";
International Business Training
2019

* Jan 6-7: Long Beach, CA; "Fundamentals of FTZ Seminar";
* Jan 21-24, 2019: San Diego, CA; "ITAR Defense Trade Controls / EAR Export
Controls Seminar"; ECTI; 540-433-3977
# Feb 6-7: Orlando, FL; "Boot Camp: Achieving ITAR/EAR Compliance"; Export
Compliance Solutions (ECS)
* Feb 12-13: Washington, D.C.; "2019 Legislative Summit"; National Association
of Foreign Trade Zones (NAFTZ)
# Mar 26-27: Scottsdale, AZ; "Seminar Level II: Managing ITAR/EAR
Complexities"; Export Compliance Solutions
* May 5-7: Savannah, GA; "2019 Spring Seminar"; National Association of
Foreign Trade Zones (NAFTZ)
* Sep 8-11: Chicago, IL; "2019 Annual Conference and Exposition"; National
Association of Foreign Trade Zones (NAFTZ)

### Webinars

* Aug 23: Webinar; "Social Media for Trade and Logistics Professionals";
Foreign Trade Association
* Aug 27: Webinar; "Import Documentation and Procedures"; International
Business Training
* Sep 6: Webinar; "University Export Controls Program: Strength in
Numbers"; ECTI; 540-433-3977
* Sep 11: Webinar; "BIS License Application 748P: How to Prepare It and How
to Ensure Best Possible Approval Time"; ECTI; 540-433-3977
* Sep 12: Webinar; "Understanding the Tariff Wars: Developing Strategies to
Overcome International Supply Chain Disruptions"; ECTI; 540-433-3977
* Sep 19: Webinar; "International Logistics"; International Business Training
* Sep 24: Webinar; "Tariff Classification: Using the Harmonized Tariff
Schedule"; International Business Training
* Sep 25: Webinar; "NAFTA Rules of Origin"; International Business Training
* Sep 26: Webinar; "US Antiboycott Regulations: Clarified &
Demystified"; ECTI; 540-433-3977
* Oct 15: Webinar; "Incoterms 2010: Terms of Sale"; International Business
Training
* Nov 14: Webinar; "An Export Commodity Classification Number - ECCN";
Foreign Trade Association
* Dec 3: Webinar; "Tariff Classification: Using the Harmonized Tariff
Schedule"; International Business Training
* Dec 4: Webinar; "NAFTA Rules of Origin"; International Business Training
* Dec 5: Webinar; "Import Documentation and Procedures"; International
Business Training
* Dec 11: Webinar; "Incoterms 2010: Terms of Sale"; International Business
Training
* Dec 20: Webinar; "International Logistics"; International Business Training

back to top

* * * * * * * * * * * * * * * * * *

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Henry Drummond** (17 Aug. 1851 - 11 March 1897; was a Scottish evangelist, biologist, writer and lecturer.)
 - *"Unless a man undertakes more than he possibly can do, he will never do all he can do."*

**Friday Funnies:**

- All I ask is a chance to prove that money can't make me happy.
- Is it just my imagination, or do buffalo wings taste like chicken?
- One nice thing about egotists: They don't talk about other people.
- What was the greatest thing *before* sliced bread?
- Two can live as cheaply as one, for half as long.
- It's not an optical illusion. It just looks like one.
- Is there another word for synonym?
- Is Marx's tomb a communist plot?
- They told me I was gullible ... and I believed them!

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.

- Last Amendment: 14 Feb 2018: <u>83 FR 6457-6458</u>: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
- The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * * *

## 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, John Bartlett. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions <u>here</u>.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance [████@fullcirclecompliance.eu]
**Sent:** 8/22/2018 6:34:30 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0822 Wednesday "Daily Bugle"



## Wednesday, 22 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1.    Items Scheduled for Publication in Future Federal Register Editions
2.    Commerce/BIS: (No new postings.)
3.    Commerce/Census: "Tips on How to Resolve AES Fatal Errors"
4.    DHS/CBP Announces Monthly Trade Drawback Calls
5.    State/DDTC: (No new postings.)
6.    UK ECJU Announces Cyber Export Control Seminar

### NEWS

7.    112 UA: "Ukrainian to Be Judged for Attempt to Illegally Export Military Goods to France"
8.    Expeditors News: "WCO Releases 2018 Edition of the WCO AEO Compendium"
9.    The Spokesman: "Judge to Congress, Executive Branch: Face Up to Problems Of 3-D Printed Guns"

### COMMENTARY

10.    A. Capobianco, B. Curran & A. Dukic: "Export Control Reform 2.0"
11.    M. Gajewski Barnhill: "Ninety-Day Wind Down Period Expires; First Wave of U.S. Secondary Sanctions Against Iran Re-Imposed"
12.    M. Volkov: "CFIUS Review: An Increasing Risk (Part I of II)"

13.     CompTIA Presents "12th Annual CompTIA Global Trade Compliance Best Practices Conference" on 18 Sep in San Diego, CA

14.     FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands

**EDITOR'S NOTES**

15.     Bartlett's Unfamiliar Quotations

16.     Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)

17.     Weekly Highlights of the Daily Bugle Top Stories



[No items of interest noted today.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Bureau of Industry and Security; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Procedures for Submitting Request for Objections from the Section 232 National Security Adjustments of Imports of Aluminum and Steel [Publication Date: 23 August 2018.]

* Commerce; Bureau of Industry and Security; NOTICES; Meetings; Materials Technical Advisory Committee [Publication Date: 23 August 2018.]

* Treasury; Foreign Assets Control Office; NOTICES; Blocking or Unblocking of Persons and Properties [Publication Date: 23 August 2018.]

back to top

* * * * * * * * * * * * * * * * * * *

## 2. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

## 3. Commerce/Census: "Tips on How to Resolve AES Fatal Errors"
(Source: census@subscriptions.census.gov, 22 Aug 2018.)

When a shipment is filed to the AES, a system response message is generated and indicates whether the shipment has been accepted or rejected. If the shipment is accepted, the AES filer receives an Internal Transaction Number (ITN) as confirmation. However, if the shipment is rejected, a Fatal Error notification is received.

To help you resolve AES Fatal Errors, here are some tips on how to correct the most frequent errors that were generated in AES for this month.

*Fatal Error Response Code: 170*

  - Narrative: Air Waybill Format: NNN-NNNNNNNN
  - Reason: The Transportation Reference Number reported for this Air shipment was not in the correct format.
  - Resolution: A number identifying the carrier's master air waybill may be declared on an air shipment. When reported, a master air waybill number must be reported in the following format: 'NNN-NNNNNNNN' (where 'N' = a

numeric value). Verify the Transportation Reference Number, correct the shipment and resubmit.

*Fatal Error Response Code: 331*

  - Narrative: Ultimate Consignee Country Unknown
  - Reason: The Ultimate Consignee Country code reported is not valid in AES.
  - Resolution: The Ultimate Consignee Country code must be a valid ISO Country code found in Appendix C - ISO Country Codes. Verify the Ultimate Consignee Country code, correct the shipment and resubmit.

For a complete list of Fatal Error Response Codes, their reasons, and resolutions, see Appendix A - Commodity Filing Response Messages.

It is important that AES filers correct Fatal Errors as soon as they are received in order to comply with the Foreign Trade Regulations. These errors must be corrected prior to export for shipments filed predeparture and as soon as possible for shipments filed postdeparture but not later than five calendar days after departure.

For further information or questions, contact the U.S. Census Bureau's Data Collection Branch.

  - Telephone: (800) 549-0595, select option 1 for AES
  - Email: askaes@census.gov
  - Online: www.census.gov/trade
  - Blog: blogs.census.gov/globalreach

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 4. DHS/CBP Announces Monthly Trade Drawback Calls
(Source: CSMS #18-000494, 22 Aug 2018.)

The U.S. Customs and Border Protection Trade Policy & Programs Office is scheduling a series of Monthly Trade Drawback Calls to address questions related to the filing of drawback claims pursuant to the Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA).

The calls will take place on the last Wednesday of each month, August 29th to February 27th from 1:00 pm - 2:00 pm Eastern Time.

Call Information: 1- 877-873-8017 Code - 6215791

For questions concerning drawback functionality, contact Randy.mitchell@cbp.dhs.gov

For questions regarding monthly call logistics, contact frank.j.korpusik@cbp.dhs.gov

back to top

* * * * * * * * * * * * * * * * * *

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * *

## 6. UK ECJU Announces Cyber Export Control Seminar
(Source: UK ECJU, Notice to Exporters 2018/20, 21 Aug 2018.) [Excerpts.]

The next cyber export control seminar from the Export Control Joint Unit (ECJU) and national cyber security centre (NCSC) will take place on 21 November 2018 at the Park Plaza Westminster Bridge hotel, London.

The UK Export Control Joint Unit (ECJU) plans to include explanations on the following topics:

  - Category 5 part II 'information security' controls and decontrols based on the Wassenaar Arrangement;
  - Category 5 part I surveillance;
  - Category 4 intrusion aspects;
  - Forthcoming and recent changes to the controls; and
  - Transfer and storage of technology/software overseas (sometimes referred to as 'cloud computing'). ...

To register for this event, please complete the event registration form attached to the latest export control training bulletin. ...

back to top

* * * * * * * * * * * * * * * * *

## NEWS

## 7. 112 UA: "Ukrainian to Be Judged for Attempt to Illegally Export Military Goods to France"
(Source: 112 UA, 21 Aug 2018.) [Excerpts.]

In the Lviv region, a woman will be judged for the attempt of the illegal export of the military goods from Ukraine as Lviv Prosecutor's Office reported.

The indictment against the citizen of Kyiv region was sent to Yavorivsky district court for the consideration of the case.

It was established during the pretrial investigation that in February 2018, a Ukrainian attempted to export the night vision attachments PDS-1 for the use as a part of the night vision device of the ground artillery, night observation devices NNO-21 and theodolite RT to France for the private gain.

The mentioned goods were confiscated at the checkpoint "Krakovets".

The prosecutor's office finished the pretrial investigation due to the violation of the order of the international pass of the goods subjected to be under export control.

The suspect can be fined or arrested up to three years. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Expeditors News: "WCO Releases 2018 Edition of the WCO AEO Compendium"
(Source: Expeditors News, 21 Aug 2018.)

The World Customs Organization (WCO) recently released the 2018 Edition of the WCO Compendium of Authorized Economic Operator (AEO) Programs, based on data available as of July 2018. The AEO Compendium provides insight into the types of supply chain Security and Customs Compliance programs that are currently available, and those that are in development globally.

The 2018 Edition of the AEO Compendium identifies:
  - 77 operational AEO programs and 17 AEO programs that are to be initiated;
  - 57 concluded Mutual Recognition Agreements (MRAs) and 35 MRAs that are being negotiated;
  - 4 pluri-lateral MRAs that are being negotiated;
  - 31 operational customs Compliance programs and 2 customs compliance programs that are to be launched.

In addition, the Compendium includes an overview of respective AEO program accreditation procedures and benefits.

The Compendium may be found here. Additional instruments and guidelines to the WCO's AEO program may be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 9. The Spokesman: "Judge to Congress, Executive Branch: Face Up to Problems Of 3-D Printed Guns"
(Source: The Spokesman, 21 Aug 2018.) [Excerpts.]

Joel Williamson and other employees at Defense Distributed create a Ghost Gunner 2 machine, a desktop milling machine designed to construct firearm parts, in Austin, Texas, on Tuesday, Aug. 7, 2018. Cody Wilson, the founder of Defense Distributed, has been in a long legal dispute regarding his ability to post the instructions to create 3-D printed firearms on his website.

"Congress and the Trump administration need to face up to the potential problems of guns that can be created by 3-D printers from files off the internet," a federal judge said Tuesday.

U.S. District Judge Robert Lasnik had tough questions for the Justice Department attorney who tried to defend a recent change in the Arms Export Control Act that would allow files to be posted on the internet by their creator, saying the undetectable and untraceable guns mean the United States "could end up with other 9-11 situations." ...

back to top

* * * * * * * * * * * * * * * * * *

## COMMENTARY

## 10. A. Capobianco, B. Curran & A. Dukic: "Export Control Reform 2.0"
(Source: Hogan Lovells, 21 Aug 2018.)

* Authors: Anthony V. Capobianco, Esq.; Brian P. Curran, Esq.; and Z. Aleksandar Dukic, Esq. All of Hogan Lovells. Contact details available here.

*With a focus on advanced technologies, U.S. Congress mandates permanent statutory basis for U.S. export control regime.*

After nearly 20 years of promulgation by executive orders, bipartisan export control reform legislation has re-established a permanent statutory basis for the control of commercial and dual-use items licensed by the Department of Commerce (DOC). The Export Control Reform Act of 2018 (ECRA) is part of the Fiscal Year 2019 National Defense Authorization Act (NDAA), which was signed into law by the president on 13 August 2018. Senator John Cornyn, the bill's sponsor in the Senate, stated that the ECRA's language "maintains the changes to export control laws which address concerns about the transfer of technology through joint ventures . . . and . . . strengthens enforcement of export controls."

The ECRA repeals most of the Export Administration Act of 1979 (EAA), which lapsed in 2001, and provides a permanent statutory basis for the Export Administration Regulations (EAR). The EAR regulate the export, re-export, and in-country transfer of most commercial and dual-use items.

Since the EAA lapsed, the EAR have been kept in effect through a series of executive orders under the International Emergency Economic Powers Act.

Specifically, the ECRA expands the ways in which items subject to export controls are identified, which will enable additional restrictions on emerging and foundational technologies essential to U.S. national security, such as potentially artificial intelligence, robotics, and other technology. The ECRA also requires a review of existing licensing requirements for countries subject to a comprehensive arms embargo and requires the DOC to consider the impacts of export licensing on the U.S. defense industrial base.

*Establishment Of Interagency Process To Identify Emerging And Foundational Technologies*

In one of its most significant changes, the ECRA establishes a regular, ongoing interagency process intended to "identify emerging and foundational technologies" that:
  i) "are essential to the national security of the United States"; and
  ii) do not include critical technologies described in the Defense Production Act of 1950, as amended by section 1703 of the NDAA.

These "emerging and foundational" technologies are not defined in the text of the ECRA and must be identified by an interagency process.

Critically, the interagency process will review publicly available information, classified information, information from advisory committees, and information provided by the Committee on Foreign Investment in the United States (CFIUS), which reviews certain acquisitions of U.S. businesses by foreign investors for national security risks. Importantly, the CFIUS's jurisdiction recently expanded to cover a broader range of transactions, including certain minority investments. For more information, please see our client alerts on the recent expansion of the CFIUS's jurisdiction, available here and here.

In its identification of these emerging and foundational technologies, the interagency process established by the ECRA must take into account:
  (i) the development of emerging and foundational technologies in foreign countries;
  (ii) the effect export controls may have on the development of such technologies in the United States; and
  (iii) the effectiveness of export controls on limiting the proliferation of emerging and foundational technologies to foreign countries.

The process includes a notice and comment period for input on the inclusion of the items as emerging and foundational technologies.

Relatedly, once the interagency process has identified these emerging and foundational technologies, the ECRA authorizes the Secretary of Commerce to establish controls (including interim controls) under the EAR on the export, re-export, or in-country transfer of such technologies, including informing a person that a license is required for export of such technology or

by publishing additional regulations. Although the Secretary of Commerce has discretion as to the level of control applied to such technologies, the ECRA mandates that, at minimum, the Secretary of Commerce require a license for the export, re-export, or in-country transfer of emerging and foundational technology identified through the process described above or in a country subject to an embargo, including an arms embargo, imposed by the United States. Countries such as China and Venezuela, among others, are subject to arms embargoes by the United States.

This process is intended to enable the U.S. government to identify and control sensitive and innovative U.S. technologies, possibly restricting outbound transfers of certain technologies that the interagency process deems important for commercial and economic security. Given the discretion granted to the executive branch to define and control the transfer of "emerging and foundational technologies," the legislation is also a leap into the unknown regarding new restrictions on the ability of U.S. companies to transfer key technologies to overseas joint ventures or through licensing agreements with foreign customers and business partners.

*Mandated Review Of Export Controls On Countries Subject To Arms Embargoes*

The ECRA also mandates a review by the Departments of Commerce, State, Defense, and Energy and other federal agencies of licensing requirements for exports, re-exports, and in-country transfers of items to countries subject to a comprehensive U.S. arms embargo, including of

  - the scope of controls that apply to exports, re-exports, and in-country transfers for military end uses and military end users in countries subject to a comprehensive U.S. arms embargo and countries subject to a United Nations (U.N.) arms embargo; and
  - entries on the Commerce Control List (CCL) that are not subject to a license requirement for the export, re-export, or in-country transfer of items to countries subject to a comprehensive U.S. arms embargo.

The Secretary of Commerce will have no more than 270 days after the enactment of the ECRA (13 August 2018) to implement the results of this review, and this process could result in more export control restrictions related to countries subject to arms embargoes.

*Review Of Impacts Of Export Licensing On U.S. Defense Industrial Base*

Additionally, the ECRA mandates that the Secretary of Commerce establish a procedure to license or otherwise authorize exports, re-exports, and in-country transfers. The procedure must ensure that license applications and requests for authorization are considered, appropriate federal agencies participate, and that licensing decisions are made in an expeditious manner, with transparency to applicants on the status of the application and the reason for denying any license or request for authorization.

Moreover, the Secretary of Commerce must assess the impact of a proposed export of an item on the U.S. defense industrial base and must deny any application for a license or a request for authorization of any export that would have a significant negative impact on such defense industrial base. The ECRA defines a significant negative impact on the U.S. defense industrial base as

  - a reduction in the availability of an item produced in the United States that is likely to be acquired by the Department of Defense (DOD) or other federal department or agency for the advancement of U.S. national security or for the production of an item in the United States for the DOD or other agency for the advancement of U.S. national security;
  - a reduction in the production in the United States of an item that is the result of research and development carried out, or funded by, the DOD or other federal department or agency to advance the national security of the United States, or a federally-funded research and development center; or
  - a reduction in the employment of U.S. persons whose knowledge and skills are necessary for the continued production in the United States of an item that is likely to be acquired by the DOD or other federal department or agency for the advancement of U.S. national security.

*Effective Period And Recommendations*

The ECRA does not establish a blanket effective date for its various provisions. Rather, the ECRA extends export controls, licenses, authorizations, and other administrative actions in effect 13 August 2018 until they are modified, superseded, set aside, or revoked under the authority granted by the ECRA. Further, as noted above, the ECRA does not define "emerging and foundational technologies." Instead, the identification by the interagency process will result in a notice and comment period.

As such, we recommend that companies:
  (i) carefully monitor the items that are identified by the interagency process as "emerging and foundational,"
  (ii) consider participating in the comment process if any items dealt with by the company are identified as "emerging and foundational," and
  (iii) monitor the implementation of undefined aspects of the ECRA.

As this export licensing regime could hit certain industries harder than others, it will be important for companies to track and submit comments on the administration's efforts to identify and control the export of these technologies. The administration and Congress have highlighted links between U.S. national security and emerging technologies, which include the semiconductor, robotics, artificial intelligence, nanotechnology, and biotechnology sectors, among others. In particular, startup companies that traditionally are not used to dealing with items subject to export controls and are interested in investments from foreign sources should especially pay close attention.

back to top

* * * * * * * * * * * * * * * * *

DOC_0003925

## 11. M. Gajewski Barnhill: "Ninety-Day Wind Down Period Expires; First Wave of U.S. Secondary Sanctions Against Iran Re-Imposed"
(Source: World Trade Controls Blog, 21 Aug 2018.)

* Author: Megan A. Gajewski Barnhill, Esq., Bryan Cave, megan.gajewskibarnhill@bryancave.com, +1 202-508-6302.

As reported in our earlier post, as part of the US Government's announcement that the United States was exiting the Joint Comprehensive Plan of Action ("JCPOA"), the US set out separate 90-day and 180-day time frames for the wind down of activities consistent with the sanctions relief in the JCPOA, following which the secondary sanctions lifted pursuant to the JCPOA would be re-imposed.  The first of these time frames - 90 days after the May 8 announcement - expired on August 6, 2018.

In connection with the expiration of the initial wind down period, President Trump issued Executive Order 13846, effective as of August 7, 2018, which re-imposes sanctions that were revoked in connection with the implementation of the JCPOA.  As of August 7, the following sanctions were re-imposed:

  - Sanctions on the purchase or acquisition of US dollar banknotes by the Government of Iran;
  - Sanctions on Iran's trade in gold or precious metals;
  - Sanctions on the direct or indirect sale, supply, or transfer to or from Iran of graphite, raw, or semi-finished metals such as aluminum and steel, coal, and software for integrating industrial processes;
  - Sanctions on significant transactions related to the purchase or sale of Iranian rials, or the maintenance of significant funds or accounts outside the territory of Iran denominated in the Iranian rial;
  - Sanctions on the purchase, subscription to, or facilitation of the issuance of Iranian sovereign debt; and
Sanctions on Iran's automotive sector.

As of August 7, 2018, non-US persons engaging in these types of activities are at risk of the imposition of secondary sanctions by the US government.

Secondary sanctions do not apply to all activities by non-US persons involving Iran.  For example, non-US, non-Iranian persons may collect payment owed for goods or services fully provided or delivered prior to August 6, 2018, pursuant to a written contract or agreement entered into prior to May 8, 2018.  In addition, the authorizations allowing for the sale of agricultural commodities, food, medical devices, and medicine remain in effect.

Further, the US government has indicated that transactions by non-US persons related to the export of consumer goods to Iran that are not targeted by US sanctions and do not involve persons on the SDN List, US persons or the US financial system would not give rise to the imposition of

secondary sanctions.  The extent to which a particular transaction by a non-US person will give rise to US secondary sanctions risks will depend on the particulars of the transaction.

back to top

* * * * * * * * * * * * * * * * *

## 12. M. Volkov: "CFIUS Review: An Increasing Risk (Part I of II)"
(Source: Volkov Law Group Blog, 22 Aug 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

Washington, D.C. is more than just the nation's capital. Companies have to pay attention and develop contacts and relationships in Washington, D.C. given the importance of federal agencies, Congress and of course, the White House.  I often inform clients that Washington, D.C. provides a second round of due process for disputes that may occur in domestic or foreign markets.

One of the more important institutions in Washington, D.C. is the Committee on Foreign Investment in the United States ("CFIUS"), which is an inter-agency committee of the US Government that reviews foreign investments for national security implications. CFIUS is a part of the US Department of Treasury.  It is chaired by the Treasury Department and includes 16 members, including representatives from the Defense, State, Homeland Security and Commerce departments.  CFIUS was established in 1988 by an executive order.

CFIUS' role was recently expanded by bi-partisan legislation passed by Congress and approved by the president as part of the National Defense Authorization Act.  I will examine these changes in tomorrow's posting.

CFIUS scrutiny has been increasing, and with the current administration's focus on global trade and promoting US interests to the detriment of foreign trade partners, CFIUS is expected to play a great role.

CFIUS has taken on greater importance with increased foreign investment in the United States.  CFIUS has considerable power and has exercised it in several high-profile situations.  It is authorized to block deals or insist on modifications to mitigate national security risks.

In January 2018, CFIUS blocked the acquisition of Moneygram, a US money-transfer firm, by Ant Financial, an online payments company, affiliated with Alibaba, the Chinese e-commerce giant.  In 2017, CFIUS blocked the takeover of Lattice Semiconductor by a group of Chinese investors.

CFIUS also intervened in the attempted takeover of Qualcomm by Broadcom based on concerns that Broadcom would obtain control of Qualcomm's 5G

technology. Broadcom is not a Chinese company but CFIUS was concerned that its relationship with third-party entities, including Huawei, the Chinese telecom giant could raise national security issues. Additionally, CFIUS was concerned that Broadcom is a private-equity owned company and may cut-back on investment in Qualcomm's 5G technology and associated research and development.  Interestingly, CFIUS intervened in the Qualcomm-Broadcom deal before a final deal occurred.

Qualcomm sought CFIUS intervention as a way to derail Broadcom's attempted takeover. In the end, Qualcomm was able to block Broadcom's attempted takeover.

In many situations, CFIUS negotiates mitigating conditions to perceived national security risks. Mitigation measures can include assurance letters between CFIUS and the parties, complex agreements with operational restrictions or even restructuring parts of the transaction itself. These restrictions are usually designed to limit access to facilities or information to US citizens; ensure that US citizens handle certain functions; create governance mechanisms to require US citizens to make certain decisions; impose auditing requirements and guidelines for handling future government contracts, customer information and other sensitive information; and providing government access to review business decisions and object to such decisions because of national security concerns.

back to top

* * * * * * * * * * * * * * * * * *

## EX/IM TRAINING EVENTS & CONFERENCES

## 13. CompTIA Presents "12th Annual CompTIA Global Trade Compliance Best Practices Conference" on 18 Sep in San Diego, CA
(Source: CompTIA)

* What: 12th Annual CompTIA Global Trade Compliance Best Practices Conference
* When: Tuesday, September 18, 2018
* Where: Qualcomm, 10155 Pacific Heights Boulevard, San Diego, California 92121
* Sponsor: CompTIA
* Contact: Ken Montgomery, kmontgomery@comptia.org
* Information & Registration: HERE.

back to top

* * * * * * * * * * * * * * * * * *

## 14. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

*Register today and get a 10% Early Bird discount on the course fee!*

back to top

* * * * * * * * * * * * * * * * * * *

## 15. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Charles Fillmore** (Charles Sherlock Fillmore; 22 Aug 1854 - 5 Jul 1948; founded the religious denomination Unity in 1889. He became known as an American mystic for his contributions to spiritualist interpretations of biblical Scripture.)
   - *"We increase whatever we praise. The whole creation responds to praise, and is glad."*

back to top

* * * * * * * * * * * * * * * * * * *

## 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register. The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website. BITAR subscribers are entitled to a 25% discount

on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *


## 17. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *


## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the

following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions <u>here</u>.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance <u>website</u>.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available <u>HERE</u>.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top


## Stay Connected




The Daily Bugle | <u>www.FullCircleCompliance.us</u>

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance [█████@fullcirclecompliance.eu]
**Sent:** 8/23/2018 7:58:13 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0823 Thursday "Daily Bugle"



## Thursday, 23 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS: Materials Technical Advisory Committee to Meet on 6 Sep in Washington, DC

2. Commerce/BIS Seeks Comments on Procedures for Submitting Request for Objections from the Section 232 National Security Adjustments of Imports of Aluminum and Steel

### OTHER GOVERNMENT SOURCES

3. Items Scheduled for Publication in Future Federal Register Editions

4. Commerce/BIS: (No new postings.)

5. DHS/CBP Posts Update on Section 301 Trade Remedies Assessed on China, Drawback Claims

6. DHS/CBP Posts Update on Client Representative Restructuring

7. Justice: "Canadian Sentenced to 3+ Years in Prison for Conspiracy to Export Restricted Goods and Technology to Iran"

8. State/DDTC: (No new postings.)

9. UK/DIT Amends Export Control Order

10. UK ECJU Posts "No Deal" Technical Notice on Export Control Regulation

### NEWS

11. American Shipper: "Quicker Rulings Mulled as Part of CTPAT"

12. The Daily World: "Judge to Congress, Executive Branch: Face up to Problems of 3-D Printed Guns"

## COMMENTARY

13.  Global Trade News: "Weise Wednesday: Where Are We with NAFTA Renegotiations?"

14.  M. Volkov: "DOJ Expands FCPA Corporate Enforcement Policy"

15.  T. Townsend & J. Butcaris: "Recent Rule Reduces Export License Requirements for India"

16.  R.C. Burns: "The Export Control Reform Act: Long on Control, Short on Reform"

## EX/IM TRAINING EVENTS & CONFERENCES

17.  ECS Presents "Seminar Level II: Managing ITAR/EAR Complexities" in Scottsdale, AZ on 26-27 Mar 2019

18.  FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands

## EDITOR'S NOTES

19.  Bartlett's Unfamiliar Quotations

20.  Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)

21.  Weekly Highlights of the Daily Bugle Top Stories



FULL CIRCLE

Awareness Course U.S. Export Controls

ITAR & EAR from a Non-U.S. Perspective

Tuesday, 2 October 2018, 9.30 am - 5.00 pm
Landgoed Groenhoven, Bruchem, The Netherlands

## ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. Commerce/BIS: Materials Technical Advisory Committee to Meet on 6 Sep in Washington, DC
(Source: Federal Register, 23 Aug 2018.)

83 FR 42638: Materials Technical Advisory Committee; Notice of Partially Closed Meeting

The Materials Technical Advisory Committee will meet on September 6, 2018, 10:00 a.m., in the Herbert C. Hoover Building, Room 3884, 14th Street between Constitution & Pennsylvania Avenues NW, Washington, DC. The Committee advises the Office of the Assistant Secretary for Export Administration with respect to technical questions that affect the level of export controls applicable to materials and related technology.

## Agenda

*Open Session*

  (1) Introductions and opening remarks by senior management
  (2) Presentation by Dr. Rocco Casagrande, "UN Weapons Inspections in Pre-War Iraq"
  (3) Questions and Answers
  (4) Notice of Inquiry for Sprayers and Foggers
  (5) Open session report by regime representatives

*Closed Session*

  (6) Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 Sec. Sec. 10(a)(1) and 10(a)(3).

The open session will be accessible via teleconference to 20 participants on a first come, first serve basis. To join the conference, submit inquiries to Ms. Joanna Lewis at Joanna.Lewis@bis.doc.gov, no later than August 30, 2018.
  A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent time permits, members of the public may present oral statements to the Committee. Written statements may be submitted at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the materials should be forwarded prior to the meeting to Ms. Lewis via email.
  The Assistant Secretary for Administration, with the concurrence of the delegate of the General Counsel, formally determined on February 13, 2018, pursuant to Section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. app. 2 Sec. 10(d)), that the portion of the meeting dealing with pre-decisional changes to the Commerce Control List and the U.S. export control policies shall be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 Sec. Sec. 10(a)(1) and 10(a)(3). The remaining portions of the meeting will be open to the public.
  For more information, call Joanna Lewis at (202) 482-6440.

Joanna Lewis, Committee Liaison Officer.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2. Commerce/BIS Seeks Comments on Procedures for Submitting Request for Objections from the Section 232 National Security Adjustments of Imports of Aluminum and Steel
(Source: Federal Register, 23 Aug 2018.) [Excerpts.]

83 FR 42637-42638: Submission for OMB Review; Comment Request; Procedures for Submitting Request for Objections from the Section 232 National Security Adjustments of Imports of Aluminum and Steel ...
   - Agency: Bureau of Industry and Security ("BIS").
   - Title: Procedures for Submitting Request for Objections from the Section 232 National Security Adjustments of Imports of Aluminum and Steel.
   - Form Number(s): N/A.
   - OMB Control Number: 0694-0138. ...
   - Needs and Uses: This collection of information supports Presidential Proclamations 9704, Adjusting Imports of Aluminum into the United States and 9705, Adjusting Imports of Steel into the United States. On March 8, 2018, the President issued Proclamations 9704 and 9705 concurring with the findings of the two investigation reports submitted by the Secretary of Commerce pursuant to section 232 of the Trade Expansions Act of 1962 (19 U.S.C. 1862) and determining that adjusting imports through the imposition of duties on aluminum and steel is necessary so that imports of aluminum and steel will no longer threaten to impair the national security. ...
   Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to OIRA_Submission@omb.eop.gov.

   Sheleen Dumas, Departmental Lead PRA Officer, Office of the Chief Information Officer.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OTHER GOVERNMENT SOURCES

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Bureau of Industry and Security; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Procedures for Submitting Request for Exclusions from the Section 232 National Security Adjustments of Imports of Aluminum and Steel [Publication Date: 24 August 2018.]

* Treasury; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Comprehensive Iran Sanctions, Accountability, and Divestment Act Reporting Requirements [Publication Date: 24 August 2018.]

* Treasury; Office of Foreign Assets Control Office; NOTICES; Blocking or Unblocking of Persons and Properties [Publication Date: 24 August 2018.]

back to top

* * * * * * * * * * * * * * * * * * *

## 4. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

## 5. DHS/CBP Posts Update on Section 301 Trade Remedies Assessed on China, Drawback Claims
(Source: CSMS #18-000498, 23 Aug 2018.)

BACKGROUND:

On August 18, 2017, the Office of the United States Trade Representative (USTR) initiated an investigation under Section 301 of the Trade Act of 1974 into the government of China's acts, policies, and practices related to technology transfer, intellectual property, and innovation. On June 20, 2018, the USTR published a Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301, imposing additional import duties on a list of Chinese products. See Federal Register 83 FR 28710 (June 20, 2018).

On August 16, 2018, the USTR published a Notice of Action providing for the imposition of additional import duties on a second list of Chinese Products. The August 16, 2018 list of products covered by the Section 301 remedy, which comprises 279 eight-digit Harmonized Tariff Schedule of the United States (HTSUS) subheadings, can be found in Annex A to the USTR's August 16, 2018 notice of action. See Federal Register 83 FR 40823 (August 16, 2018).

GUIDANCE:

Products Covered by the June 20, 2018 List for the Section 301 Action

The additional import duties for Chinese goods covered by the June 20, 2018 list were effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 AM Eastern Daylight Time on July 6, 2018.

In addition to reporting the Chapters 1-97 HTSUS classification of the imported merchandise, importers shall also report the 9903.88.01 special tariff number for goods subject to the additional duty assessment of 25% ad valorem as a result of the Section 301 trade remedy.

  - 9903.88.01: 25% ad valorem additional duty for articles the product of China

*Products Covered by the August 16, 2018 List for the Section 301 Action*

The additional import duties for Chinese goods covered by the August 16, 2018 list of products subject to the Section 301 action are effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 AM Eastern Daylight Time on August 23, 2018.

Any article classified in a subheading covered by the August 16 list that is a product of China is subject to a 25% ad valorem duty rate, in addition to the general (Column 1) rate of duty for that particular subheading.

In addition to reporting the Chapter 1-97 HTSUS classification of the imported merchandise, importers shall also report the 9903.88.02 special tariff number for goods subject to the additional duty assessment of 25% ad valorem as a result of the Section 301 trade remedy.

  - 9903.88.02: 25% ad valorem additional duty for articles the product of China

*All Products Covered by Section 301 Duties*

The Section 301 duties only apply to products of China, and are based on the country of origin, not country of export.

DRAWBACK:

Section 301 duties are eligible for duty drawback.

FOR FURTHER INFORMATION:

For further information, please refer to the USTR's Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 FR 28710 (June 20, 2018); and the August 16, 2018 Notice of Action Pursuant to Section 301, 83 FR 40823 (August 16, 2018).

Questions related to Section 301 entry filing requirements should be emailed to traderemedy@cbp.dhs.gov. Questions from the importing community concerning ACE rejections should be referred to their Client Representative.

  - Related CSMS No. 18-000493, 18-000419, 18-000409

back to top

* * * * * * * * * * * * * * * * *


## 6. DHS/CBP Posts Update on Client Representative Restructuring
(Source: CSMS #18-000496, 23 Aug 2018.)

The CBP Trade Transformation Office, Client Representative Division has received a large amount of feedback from discussions with the trade regarding the new model for how we assign brokers, importer self-filers, and vendor/service centers to Client Representatives. We continue to discuss the recommendations and alternatives received, as we want to sustain and advance our high level of support to the trade community.

At this time, we have made no changes to our current model. Before we finalize the approach, we will reach out directly to the client(s) affected by any changes. The Client Representative Division will also schedule another webinar in September for all interested filers prior to implementing any changes. This information will be forthcoming in another CSMS.

  - Related CSMS No. 18-000460, 18-000473

back to top

* * * * * * * * * * * * * * * * *


## 7. Justice: "Canadian Sentenced to 3+ Years in Prison for Conspiracy to Export Restricted Goods and Technology to Iran"
(Source: Justice, 22 Aug 2018.) [Excerpts.]

Ghobad Ghasempour, 38, a Canadian national, was sentenced on Aug. 20, in U.S. District Court in Seattle to 42 months in prison for conspiracy to unlawfully export U.S. goods to Iran. ...

Ghasempour was arrested on March 28, 2017 as he entered the United States at Blaine, Washington. An investigation led by Homeland Security Investigations in San Diego, California, revealed that Ghasempour had used front companies in China and co-conspirators in Iran, Turkey and Portugal to illegally export restricted technology products to Iran.

At the sentencing hearing U.S. District Judge James L. Robart noted that Ghasempour was solely motivated by greed and money, and that the unlawful export of goods and technology was to the "the Department of

Defense for Iran -- the very group that would be the most harmful to the United States."

According to records filed in the case, between 2011 and 2017, Ghasempour and his co-conspirators illegally exported and attempted to export goods and technology to Iran that have both military and non-military uses. Ghasempour exported a thin film measurement system, manufactured by a California company, that is essentially a microscopic tape measure for liquid coatings and parts that are used in cell phones and missiles; he attempted to export an inertial guidance system test table, manufactured by a North Dakota company, used to test the accuracy of gyroscopes that assist in flying commercial and military airplanes; and the conspirators exported two types of thermal imaging cameras, manufactured by an Oregon company, that can be used in commercial security systems and military drones. Some of the items Ghasempour sought to export were intercepted by law enforcement. The conspirators falsified shipping documents and lied to U.S. manufacturers by claiming that the restricted items were being shipped to customers in Turkey and Portugal, knowing that the true destination of these goods was Iran. The Iranian customers paid the Chinese front companies owned by Ghasempour and a co-conspirator.

Ghasempour pleaded guilty in April 2018. ...

back to top

* * * * * * * * * * * * * * * * * *

## 8. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * *

## 9. UK/DIT Amends Export Control Order
(Source: Legislation.gov.uk, 22 Aug 2018.)

In summary this instrument will update and restructure the lists of firearms that require an export license from the UK.

Specifically, the Export Control (Amendment) (No. 2) Order 2018 ("the 2018 Order") amends parts of Schedules 2 and 3 to the Export Control Order 2008 ("the 2008 Order"). The 2018 Order implements Directive 2017/853 of 17 May 2017 ("the 2017 Directive"). This Directive updates the list of firearms that are subject to export control by amending the list originally set out in Directive 91/477/EEC of 18 June 1991 ("the 1991 Directive").

Schedules 2 and 3 to the 2008 Order have also been amended on a national basis to restructure the lists of firearm controls to align with the various European and international obligations on firearms.

The 2018 Order also makes a change to Schedule 1, Part 2 to ensure that Trade controls apply to all non-military firearms following the restructuring of the lists of firearms.

There are two minor changes to the control entries in ML7 and ML10 that correct previously identified typographical errors.

The explanation memorandum to the 2018 Order can be found here.

back to top

* * * * * * * * * * * * * * * * * *

## 10. UK ECJU Posts "No Deal" Technical Notice on Export Control Regulation
(Source: UK ECJU, 23 Aug 2018.)

The government has published a technical notice to inform stakeholders how export controls would be affected if the UK leaves the EU with no deal.

This notice explains:
  - how export licensing requirements for different groups of items would change
  - what the UK government would do to simplify licensing
  - where exporters of military and dual-use items, civilian firearms, and other goods can find relevant information

Read the technical notice here.

back to top

* * * * * * * * * * * * * * * * * *

NEWS

## 11. American Shipper: "Quicker Rulings Mulled as Part of CTPAT"
(Source: American Shipper, 22 Aug 2018.) [Excerpts.]

U.S. Customs and Border Protection is considering development of an indicator for trusted members of the Customs-Trade Partnership Against Terrorism (CTPAT) for expedited customs rulings and to submit confidential manifest requests in the CTPAT portal, CBP CTPAT Director Elizabeth Schmelzinger said last Wednesday during the CBP 2018 Trade Symposium in Atlanta.

A 20-day turnaround for rulings would be "the perfect goal," she said. "But if any of you have submitted a ruling, you understand that really depends upon the complexity of the ruling. ... There's all sorts of issues that can slow

that up. But there's a sincere commitment from the agency to recognize our trusted partners in a way that's meaningful."

In addition to expedited rulings, CBP wants to provide trusted CTPAT members with an opportunity to submit confidential manifest requests in the CTPAT online portal, which would mean that such requests "would live in the portal" and members won't have to "retype that request every two years," Schmelzinger said.

Another benefit that CBP has developed is CTPAT Defender, which Schmelzinger described as "like LifeLock for your [importer of record] IOR number."

She added. "Basically what we do is monitor the activity, and when something doesn't seem right, we'll send you an email. You can answer 'yes' or 'no.' There'll be some information in there about the shipment. If it's not your shipment, it doesn't automatically mean that the shipment's going to get offloaded, but it does mean that we'll probably ask you a few more questions to verify that or to make sure that it is a solid 'no.'" ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. The Daily World: "Judge to Congress, Executive Branch: Face up to Problems of 3-D Printed Guns"
(Source: The Daily World, 22 Aug 2018.)

Congress and the Trump administration need to face up to the potential problems of guns that can be created by 3-D printers from files off the internet, a federal judge said Tuesday.

U.S. District Judge Robert Lasnik had tough questions for the Justice Department attorney who tried to defend a recent change in the Arms Export Control Act that would allow files to be posted on the internet by their creator, saying the undetectable and untraceable guns mean the United States "could end up with other 9-11 situations."

Attorney Steven Meyers had said the federal government agreed the guns do pose a danger, but the federal government and the states - which are trying to keep the files off the internet - have laws in place to deal with those dangers if they occur.

Lasnik seemed unconvinced: "We don't just wait for heroin to be produced and try to find it," he said. Instead, the government tries to stop people from producing the drug.

Washington, 18 other states and the District of Columbia are suing the federal government for its decision to remove the files to create the guns from a list that would essentially allow them to be easily accessible on the internet. Earlier this year, it decided to lift the ban on exporting certain

weapons that were less than .50 caliber and not automatic, under the theory that those weapons are readily available at stores.

Last month, Lasnik issued a temporary restraining order to keep the files from being released by Defense Distributed, the company that created them.

On Tuesday, attorneys for the states were asking him to extend the order, while the federal government and an attorney for the company argued it should be lifted. Lasnik said he'd make his decision on extending the ban by Monday, the day before the temporary restraining order is set to expire.

Lasnik called the case the most significant he's had as a federal judge. He said it wasn't his job to decide the larger issues behind the potential for easy access to 3-D guns, but to determine whether the rules were followed.

  "This is an issue that should be solved by the political branches of government," he said. "I wish the legislative and executive branches would step up to this."

The federal government's proposed changes to the arms export list reversed a 5-year-old ban on placing the plans on the internet. Jeffrey Rupert, an assistant Washington attorney general, argued the federal government didn't follow the proper procedures for making that change, that its ruling was arbitrary and could result in substantial harm to the state residents.

The federal government previously defended the ban by saying terrorist groups could use the guns against the United States, Rupert said. They wouldn't be detected by metal detectors at airports, prisons or schools.

  "If the school has a 3-D printer, the gun could be printed in school," he said.

Chad Flores, an attorney for Defense Distributed, said the current ban fails to recognize that the files already are available,

  "The cat is out of the bag," Flores said. "My clients could mail the plans to anyone in the country and violate no laws."

Rupert countered: "It's one thing to have them out there on the far reaches of the internet. It's another thing to have them readily available."

back to top

* * * * * * * * * * * * * * * * * *

COMMENTARY

## 13. Global Trade News: "Weise Wednesday: Where Are We with NAFTA Renegotiations?"

(Source: <u>Integration Point Blog</u>, 22 Aug 2018.)

Welcome to Weise Wednesday! Twice a month we will share a brief Q&A with the former U.S. Commissioner of Customs, Mr. George Weise. If you have questions, we encourage you to send them to <u>AskGeorge@IntegrationPoint.com</u>.

*Q. With all that has been happening relating to steel and aluminum tariffs and the U.S.-China trade dispute, I haven't heard much recently about the status of NAFTA renegotiations. Can you bring us up-to-date on what is happening?*

A. Although this issue appeared to be dormant for several months, it looks like tangible progress has been made in recent weeks. Back in May, negotiations between the three parties were halted, reportedly over the U.S. insistence that a five-year sunset provision be included in the agreement. Over the past four weeks, however, bilateral negotiations have taken place between U.S. Trade Representative Robert Lighthizer and Mexican Economy Minister Ildefonso Guajardo in an effort to resolve outstanding issues between the two governments. Canada has not participated in these talks.

Besides the sunset provision, one of the most challenging issues being addressed relates to the rule of origin for automobiles. Currently, NAFTA requires that 62.5% of an automobile must be built from parts originating in the three signatory countries. The U.S. had proposed that NAFTA be modified to change the 62.5% requirement to 85%, but agreed to lower the threshold to 75% if a certain percentage of parts was made by workers who were paid at least $16 per hour. The effect of such a provision would guarantee that the work on those parts was done in the U.S. or Canada.

Recent signs indicate that substantial progress has been made in the bilateral talks between the U.S. and Mexico on these issues. But a final NAFTA deal would require the agreement of Canada as well. A recent tweet from President Trump, however, raises the question of whether the President would move to replace NAFTA with bilateral agreements with Mexico and Canada. He tweeted-

> Deal with Mexico is coming along nicely. Autoworkers and farmers must be taken care of or there will be no deal. New President of Mexico has been an absolute gentleman. Canada must wait. Their Tariffs and Trade barriers are far too high. Will tax cars if we can't make a deal.

At this point, it is not clear if this is just posturing on the part of the U.S. to move Canada to accept the provisions that emerge from the U.S.-Mexico talks or whether the threat to move to bilateral agreements is real. All of this should come into clearer focus in the coming weeks because Mexican and U.S. negotiators are hoping to reach an agreement on outstanding issues by the end of August. All eyes will then be on Canada to see if they re-engage in the talks. Stay tuned and stay engaged.

DOC_0003974

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14. M. Volkov: "DOJ Expands FCPA Corporate Enforcement Policy"
(Source: Volkov Law Group Blog, 20 Aug 2018.) Reprinted by permission.)

\* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

The Justice Department's FCPA Corporate Enforcement Policy was announced in November 2017 with much fanfare - it was the culmination of a step-by-step process beginning with the FCPA Pilot Program. The FCPA Corporate Enforcement Policy enshrined the potential benefit of a presumption of a declination if a corporation: (1) voluntarily disclosed the misconduct; (2) implemented timely and appropriate remediation; and (3) fully cooperated with the government's investigation.

The three specific conditions impose significant obligations. A company has to meet a lengthy list of criteria and expectations within each category. Specifically, assuming the company voluntarily discloses the misconduct to the government in a timely manner, the company has to:

  - cooperate fully with the Department of Justice (DOJ) investigation by providing all relevant facts about all individuals involved in the misconduct, and de-conflicting any corporate internal investigation with the government's investigation;
  - remediate the conditions that gave rise to the corrupt activities, including by disciplining or terminating employees involved in the misconduct and remediating deficiencies in the company's existing compliance program; and
  - disgorge any profits that resulted from the FCPA violation.

In exchange the company can earn a complete declination, but will still be required to pay disgorgement. In cases where aggravating factors are present (e.g. pervasiveness of the misconduct, executive management involvement, or a company's recidivist status), the company can earn a 50 percent reduction from the bottom of the sentencing guidelines range if the requirements are otherwise satisfied. Even if a company does not meet the first prong of voluntary disclosure, the company can earn a 25 percent reduction from the bottom of the sentencing guidelines range if it satisfies the other two prongs - remediation and cooperation.

Whether the FCPA Corporate Enforcement Policy has resulted in an increase in the number of corporations voluntarily disclosing in the hopes of securing a declination is unknown. I suspect that the Justice Department has seen an uptick in the number of corporations voluntarily disclosing potential FCPA misconduct.

Aside from the issue of incentives, the Justice Department appears pleased with the FCPA Corporate Enforcement Policy. The criticisms against the new policy have been relatively few (except for the usual suspects who enjoy howling at the moon), and the policy appears to be working fairly well and bringing a new era of transparency to FCPA enforcement.

Since the adoption of the FCPA Corporate Enforcement Policy, the Justice Department has expanded the policy to include: (1) all criminal corporate enforcement matters (except criminal antitrust prosecutions which continue to be subject to the Antitrust Division's Criminal Leniency Program); and (2) corporate mergers and acquisitions which create successor liability risks.

In March 2018, the then-Acting Assistant Attorney General of the Criminal Division John P. Cronan, announced that the Criminal Division would consider the FCPA Corporate Enforcement Policy as "nonbinding guidance" in all corporate criminal cases, not just those involving violations of the FCPA. Even though the policy is not binding on non-FCPA corporate criminal prosecutions, the application of this policy revealed that the Justice Department believes strongly in the positive incentives and transparency benefits of the corporate enforcement policy. While the Justice Department's rationale makes sense, there are still significant interpretation issues in connection with non-FCPA corporate criminal cases.

In a subsequent development, on July 25, 2018, Deputy Assistant Attorney General Matt Miner delivered a speech announcing that DOJ would apply the principles of its FCPA Corporate Enforcement Policy to successor companies that identify wrongdoing in relation to a merger or acquisition. Under this policy, a successor company that voluntarily discloses wrongdoing to the DOJ (typically discovered in pre-closing due diligence or post-closing audits), cooperates with the government investigation and implements remedial measures can earn a presumption of a declination. The policy expansion is intended to encourage "companies with robust compliance programs" taking over "problematic companies" to implement strong compliance practices quickly after acquiring another company.

Speaking about the FCPA Corporate Enforcement Policy, Deputy Attorney General Rod Rosenstein underscored the policy's intent to motivate and reward "companies that want to do the right thing and voluntarily disclose misconduct."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. T. Townsend & J. Butcaris: "Recent Rule Reduces Export License Requirements for India"
(Source: Wiggin & Dana LLP, 22 Aug 2018.)

\* Authors: Tahlia Townsend, Esq., ttownsend@wiggin.com, +1 203-498-4339; and Jessica Butcaris, Esq., jbutcaris@wiggin.com, +1 203-498-4305. Both of Wiggin & Dana LLP.

*What Happened?*

On August 3, 2018, the U.S. Department of Commerce, Bureau of Industry and Security (BIS) published a final rule (83 FR 38018) (the Rule) amending the Export Administration Regulations (EAR) by:
   - Moving India from Country Group A:6 to Country Groups A:1 and A:5
   - Removing license requirements for India based on National Security Column 2 (NS2)
   - Removing the requirement to file Electronic Export Information (EEI) for exports to India of items controlled for Crime Control (CC) Columns 1 and 3 and Regional Stability (RS) Column 2, regardless of value.

These changes expand the range of U.S. goods that may be exported/re-exported to India under the authority of No License Required (NLR) or License Exceptions STA, GOV, and APR, and should particularly benefit the aerospace, defense and other high-tech manufacturing sectors.

*License Exception Strategic Trade Authorization (STA)*

One of the most significant consequences of the changes is that, due to India's addition to Country Group A:5, it is now possible to use paragraph (c)(1) of License Exception STA to authorize exports, re-exports, and transfers to India, and from India to destinations in Country Group A:5, of U.S. goods for which the applicable reasons for control are limited to one or more of national security (NS), chemical or biological weapons (CB), nuclear nonproliferation (NP), regional stability (RS), crime control (CC), and/or significant items (SI), subject to certain exclusions and requirements. [FN/1] Under STA par. (b)(3)(ii), India's accession to Country Group A:5 also means that STA par. (c) may be used for exports/re-exports/transfers of **600-series goods,** subject to certain exceptions specified elsewhere in STA,[FN/2] and the conditions on end-user and end-use set out in par. (b)(3)(ii).[FN/3] In addition, in a development that may benefit some in the life sciences sector, per STA par. (b)(2)(vi), recipients in India are now eligible to receive under STA up to six shipments per calendar year containing no more than 100 milligrams (per toxin) of toxins controlled by ECCN 1C351.d.1 through 1C351.d.10 and 1C351.d.13 through 1C351.d.18. [FN/4]

*License Exception Gov For 600-Series and Sensitive List Items*

Paragraph (c) of License Exception GOV [FN/5] authorizes certain exports/re-exports to agencies of (i) NATO, (ii) Country Group A:1 governments, and (iii) the national governments of Hong Kong, Singapore, and Taiwan. The addition of India to Country Group A:1 means that it will now be possible to export/re-export goods to Indian government agencies without a license, under GOV. Further, the addition of India to Country Group A:5 means that it will also be possible to use GOV to authorize exports/re-exports to Indian government agencies of 600-series items and items on the Sensitive List (Supplement No. 6 to part 774 of the EAR), a

particular boon to the aerospace, defense and high-tech manufacturing sectors.

*License Exception Additional Permissive Re-exports (APR)*

India's addition to Country Group A:1 also opens up use of License Exception APR,[FN/6]paragraphs (a), (b) and (j), to authorize a broad range of re-exports of U.S. goods to and from India, primarily re-exports from India to other Country Group A:1 countries and Hong Kong, and to India from other Country Group A:1 countries and Hong Kong, subject to requirements that vary with the authorizing paragraph (including but not limited to a requirement for consumption in Hong Kong or a Country Group A:1 country under paragraph (b), and, under paragraphs (a) and (b), restrictions on certain ECCNs and reasons for control, as well as on items previously exported under License Exception STA).

*Expanded Use of "No License Required"*

In addition to the Country Group changes and consequences described above, the Rule updates the Commerce Country Chart, Supplement No. 1 to Part 738, by removing the "X" for India in NS Column 2. As a result, a significant number of items that previously required use of a license or license exception for export/re-export to India can now be exported/re-exported to India under the authority of No License Required (NLR). These items include the following:

| Category | ECCN | Broad Description of Affected Items |
| --- | --- | --- |
| 0 | 0A606.b | Unarmed ground vehicles derived from civilian vehicles; certain parts and components for ground vehicles |
| 1 | 1A001, 1A002 (except items controlled by 1A002.b.1 in the form of tubes with an inside diameter between 75 mm and 400 mm), 1A003, 1A004, 1A005, 1A006, 1A007 (except 1A007.a when the detonator firing set meets certain parameters and .b), 1A008, 1B001.d.4 (except equipment in 1B001.d that meet or exceed the parameters of 1B101), 1B001.e, 1B001.f, 1B002, 1B003, 1C002 (except 1C002.b.3 or b.4 if they exceed the parameters stated | Aerospace parts and components made from fluorinated compounds (such as seals, gaskets, sealants); composite structures; protective equipment; detection equipment; biological agents; body armor; explosive devices and related equipment; charges and related equipment; metals and equipment and tooling for producing metals; conductors; certain fluids, powders, and lubricating |

| | | |
|---|---|---|
| | in 1C202), 1C003, 1C004, 1C005, 1C006, 1C007 (except items in 1C007.c when the dielectric constant is less than 6 at any frequency from 100 MHz to 100 GHz for use in "missile" radomes), 1C008, 1C009, 1C010 (except certain fibrous or filamentary materials controlled in 1C010.a, .b, and e.1), 1D003, 1E001 "technology" for items controlled by ECCN 1A004, 1E002.g | materials; related software and technology |
| 2 | 2A001 (except certain radial ball bearings), 2B001 (except 2B001.a, .b, .c, and .d and there are additional exceptions for certain turning machines, bar machines, and milling machines), 2B002, 2B003, 2B005, 2B006 (except items in 2B006.a and .b that meet or exceed the technical parameters in 2B206), 2B007 (except equipment that meets or exceeds criteria in 2B207), 2B008, 2B009 (except certain spin-forming and flow-forming machines), 2D003 | Bearings and related systems; machine tools for grinding; equipment for inorganic overlays; measuring and image processing machines; spin-forming and flow-forming machines; certain robots; related software |
| 3 | 3A001 (except: "Monolithic Microwave Integrated Circuit" ("MMIC") amplifiers in 3A001.b.2 and discrete microwave transistors in 3A001.b.3, except those 3A001.b.2 and b.3 items being exported or reexported for use in civil telecommunications applications; 3A001.a.1.a when usable in "missiles"; 3A001.a.5.a when "designed or modified" for military use, hermetically sealed and rated for operation in a certain temperature range; pulse discharge capacitors in 3A001.e.2 and superconducting solenoidal electromagnets in 3A001.e.3 that meet or exceed certain | Electronic items (such as integrated circuits, microcircuits, and optical waveguides); electronic assemblies and components; equipment related to semiconductor devices and materials; thermal management systems; certain compounds and materials |

| | | |
|---|---|---|
| | technical parameters), 3A002 (except 3A002.h when the parameters in 3A101.a.2.b are met or exceeded), 3A003, 3B001, 3B002, 3C001, 3C002, 3C003, 3C004, 3C005, 3C006 | |
| 4 | 4A001 (except items in 4A001.a when the parameters in 4A101 are met or exceeded), 4A003.e, 4A003.g, 4A004 | Certain computers and related equipment (e.g., radiation-hardened, systolic array) |
| 5 | 5A001.b (except 5A001.b.5), 5A001.c, 5A001.d, 5A001.f (except 5A001.f.1 and 5A001.f.3), 5A001.g, 5B001, 5A003 | Certain telecommunication and information security systems and equipment |
| 6 | 6A001, 6A002 (except 6A002.a.1, a.2, a.3 (except a.3.d.2.a and a.3.e for lead selenide based focal plane arrays), and .c), 6A003 (except certain items controlled in 6A003.a.2, a.3, a.4, a.6, 6A003.b.3, b.4.a, b.4.b, or b.4.c), 6A004, 6A005 (except lasers controlled by 6A005.a.2, a.3, a.4, b.2.b, b.3, b.4, b.6.c, c.1.b, c.2.b, d.2, d.3.c, or d.4.c that meet or exceed the technical parameters described in 6A205), 6A006, 6A007 (except 6A007.b and .c when the accuracies in 6A007.b.1 and b.2 are met or exceeded), 6A008 (except 6A008.j.1 and certain items designed for airborne applications and that are usable in systems controlled for MT reasons), 6B004, 6B007, 6C002, 6C004, 6C005 | Acoustic systems and equipment; optical equipment and materials; magnetometers and subsystems; gravimeters and related equipment; laser materials; radar systems, equipment, and assemblies |

| 7 | 7A008 | Certain underwater sonar navigation systems |
|---|---|---|
| 8 | 8A001, 8A002, 8B001, 8C001 | Submersible vehicles and surface vessels; related equipment; water tunnels; materials for underwater use |
| 9 | 9A002, 9A003, 9B006, 9B008, 9B009 | Marine gas turbine engines and related components and tooling; acoustic vibration test equipment; direct measurement wall skin friction transducers |

*Removal of Certain EEI Filing and Reporting Requirements*

Before the Rule, 15 C.F.R. 758.1(b)(9) made it mandatory to file EEI for exports to India of items controlled for CC Columns 1 and 3, or RS Column 2, even if the value of the export fell below the usual $2,500 threshold for EEI. The Rule removed this requirement. However, the requirement to file EEI for exports that require submission of a license application remains and, although BIS previously removed license requirements for India based on CC1, CC2 and RS2, per Note 7 to the Commerce Country Chart, a license (and thus EEI filing) is still required for exports to India of ECCN 6A003.b.4.b and 9A515.e items for RS2 reasons.

Finally, the Rule added India to the list of Wassenaar member countries identified in Supplement 1 to Part 743. As a result, exports/re-exports to India are exempted by 743.1(d) from the Part 743.1 reporting requirements otherwise applicable to exports of items on the Sensitive List under License Exceptions GBS, CIV, TSR, LBS, APP, certain sections of GOV, STA, and the Validated End-User authorization.

*What To Do Next*

If you believe the export/re-export of your item to/from India may now be eligible for a license exception, carefully review Part 740 of the EAR, paying particular attention to the restrictions for use in the text of the specific license exception, as well as the general restrictions on license exceptions in 740.2, and the CCL-based, end-user, end-use, and other special controls in Parts 742 and 744. Exporters who have been using licenses or license exceptions for transfers to India of items that, due to the changes in NS2, no longer require a license, should also be sure to check Parts 742 and 744 before making transfers under the authority of No License Required.

If you already have BIS export licenses for transactions that are now eligible for use of a license exception, you may either continue to use the license, or switch to using the relevant license exception (so long as all requirements are met).

-------------

[FN/1] Requirements include that the purchaser, intermediate consignee, ultimate consignee, and end user all have been approved at some prior time on a BIS or DDTC license, agreement, or General Correspondence, and that the exporter/re-exporter/transferor complies with the conditions in paragraph (d)(1) (including furnishing the ECCN of each item, obtaining a Prior Consignee Statement, and providing the consignee with written notice about which shipments or parts of shipments are authorized under STA). In addition, the items must not be excluded from the scope of STA. For example, STA may not be used for any item that is controlled for reason of encryption items (EI), short supply (SS), surreptitious listening (SL), missile technology (MT), or chemical weapons (CW), or for ECCNs 0A981, 0A982, 0A983, 0A985, 0E982, or 0E987, 1C351.a, .b, .c, d.11, .d.12 or .e, 1C353, 1C354, 1E001, 3A001.b.2 or b.3 (except use in civil telecommunications), certain 3E001 technology, 6A002, 6A990, 6D002, 6D003.c, 6D991, 6E001, 6E002, 6E990, 7E004 (except 7E004.a.7), certain 9D001, 9D002, 9D004 software, certain 9E001, 9E002, and 9E003 technology, and 600-series items identified in the ECCN entry as ineligible for STA, 600-series items that qualify as "600 Series Major Defense Equipment" and have a contract value over $25,000,00. It also may not be used to transfer items controlled under ECCNs 0A606.a, 8A609.a, 8A620.a or .b, or 9A610.a unless and until BIS approves use of STA under the procedures set out in §740.20(g).

[FN/2] See footnote 1, above.

[FN/3] In particular: (i) the ultimate end user must be the armed forces, police, paramilitary, law enforcement, customs, correctional, fire, or a search and rescue agency of a government of the U.S. Government or a Country Group A:5 government; (ii) the transfer must be for the "development," "production," operation, installation, maintenance, repair, overhaul, or refurbishing, in the U.S. or a Country Group A:5 country, of an item that is ultimately either (a) to be used by such government agencies in the U.S. or a Country Group A:5 country, or (b) sent to a person in the U.S. and not for subsequent export under §740.9(b)(1), or (c) for an end-use already authorized by the U.S. Government via a license or other authorization that is still in effect, where the consignee verifies in writing that such authorization exists and has provided the license or other approval identifier to the exporter/re-exporter/transferor.

[FN/4] The 1C351.d toxins at issue are: d.1. Abrin; d.2. Aflatoxins; d.3. Botulinum toxins; d.4. Cholera toxin; d.5. Clostridium perfringens alpha, beta 1, beta 2, epsilon and iota toxins; d.6. Conotoxins; d.7. Diacetoxyscirpenol; d.8. HT-2 toxin; d.9. Microcystins (Cyanginosins); d.10. Modeccin; d.13. Shiga toxins (shiga-like toxins, verotoxins, and verocytotoxins); d.14. Staphylococcus aureus enterotoxins, hemolysin alpha toxin, and toxic shock syndrome toxin (formerly known as Staphylococcus enterotoxin F); d.15. T-2 toxin; d.16. Tetrodotoxin; d.17. Viscumin (Viscum album lectin 1); d.18. Volkensin. We note that 15 C.F.R. 740.20 (b)(2)(vi) also refers to 1C351.d.19, but that entry was removed in early December 2016, when the content of old d.17 ("Verotoxin and other Shiga-like ribosome inactivating proteins") was consolidated into a parenthetical in revised d.13 ("Shiga toxins (shiga-like toxins, verotoxins, and verocytotoxins"), resulting in a list that is one entry shorter.

[FN/5] License Exception "Governments, International Organizations, International Inspections under the Chemical Weapons Convention, and the International Space Station," 15 C.F.R. 740.11.

[FN/6] 15 C.F.R. 740.16

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. R.C. Burns: "The Export Control Reform Act: Long on Control, Short on Reform"
(Source: Export Law Blog, 22 Aug 2018. Reprinted by permission.)

\* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Wash DC, Clif.Burns@bryancave.com, 202-508-6067).

The John McCain National Defense Authorization Act of 2018, in addition to passing the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), which reforms the CFIUS process, also enacted the Export Control Reform Act of 2018 ("ECRA"). That name is, I think, something of a misnomer given what the ECRA actually does. Perhaps a better name would have been the Export Administration Act Reenactment Act. After Congress in 1994 was unable to renew the Export Administration Act ("EAA"), which was the statutory authority for the parts of the U.S. export control regime covering dual use items and administered by the Commerce Department's Bureau of Industry and Security ("BIS"), every U.S. President has resurrected the dead statute each year with an executive order under the International Emergency Economic Powers Act. With the passage of ECRA, that is one less executive order that the White House will need to issue each year.

Most of what ECRA does is provide the statutory authority for BIS that it previously had under the EAA and the yearly executive orders, although now with higher penalties for violations, which have been upped to $300,000 per violation. Why, after all, pass a law if you can't raise the penalties? The only thing in ECRA which might be called a reform in a traditional sense of making life easier for regulated parties is section 1757 which says the President may authorize BIS to provide export counseling to exporters. This provision has generated so much excitement among exporters that U.S. exporters were popping bottles of Dom Perignon in celebration. Sorry, just kidding.

Rather than making life easier for exporters, the ECRA contains new controls certain to make exporters' lives more difficult. (In addition to the higher penalties. Did I already mention those?) License applications will now have to explain why the export of an item will not have a negative impact on the U.S. defense industrial base. The law also mandates that BIS consider stopping exports of items on the Commerce Control List to countries that are subject to State Department arms embargoes. (Ahem, does anybody think that's a dog whistle for restricting more exports to China?)

But the biggest change, and potential headache for exporters aside from higher penalties, is section 1758, which requires BIS, in cooperation with the Departments of State, Energy and Defense to identify and control "emerging and foundational technologies." What on earth, you rightly wonder, is an emerging and foundational technology? The act only says that they are technologies that are "essential to the national security of the United States" but not already subject to export controls. Basically, since all export controls are based on national security, the only real definition of an emerging and foundational technology is something that is not already export controlled but should be. Your guess is as good as mine (and Congress's) as to what these four agencies will decide to control under this new rubric.

Once the list of these new export controlled items is in force, then the ECRA requires as a minimum level of control that export of this technology to a "country subject to an embargo, including an arms embargo, imposed by the United States" would require a license. (Hello, China!) Embargo is not defined, so it's not clear if a license would be required for these technologies with respect to a country to which the United States prohibited only a few types of goods or arms. A more significant issue is how this requirement, which applies to any "country" subject to an embargo would affect exports of emerging technologies to the Crimean territory, which is subject to a comprehensive embargo. This provision would impose the license requirement on either Russia or Ukraine depending on which country is considered to own Crimea and whether an embargo of a territory of a country means that the country is subject to an embargo.

The last thing to note about section 1758 is that the license requirement would not apply to what the Senate version referred to as "ordinary business transactions." In the legislation as passed, these ordinary business transactions are described, for example, as

> The sale or license of a finished item and the provision of associated technology if the United States person that is a party to the transaction generally makes the finished item and associated technology available to its customers, distributors, or resellers.

For those used to the EAR's treatment of technology this provision seems odd and unnecessary. "Associated technology" generally made available to customers would be "published," as defined in section 734.7 of the EAR, and thus not subject to the EAR or any license requirement, making this exception completely unnecessary. I suspect that the ECRA, which never defines "technology," is using the term in a loose sense that would cover physical goods in addition to information. In any event, count on these exceptions to cause much confusion when the list of emerging and foundational technologies finally appears.

Oh, and did I mention the higher penalties?

back to top

✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳ ✳

## 17. ECS Presents "Seminar Level II: Managing ITAR/EAR Complexities" in Scottsdale, AZ on 26-27 Mar 2019
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com.)

* What: Seminar Level II: Managing ITAR/EAR Complexities; Scottsdale, AZ
* When: March 26-27, 2019
* Where: Doubletree Resort by Hilton Paradise Valley
* Sponsor: Export Compliance Solutions (ECS)
* ECS Instructors: Suzanne Palmer; Lisa Bencivenga
* Register: here or by calling 866-238-4018 or e-mail
spalmer@exportcompliancesolutions.com

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 18. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices.  The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

*Register today and get a 10% Early Bird discount on the course fee!*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 19. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **William Wilberforce** (24 Aug 1759 - 29 Jul 1833; was an English politician known as a leader of the movement to stop the slave trade.)
 - *"If you love someone who is ruining his or her life because of faulty thinking, and you don't do anything about it because you are afraid of what others might think, it would seem that rather than being loving, you are in fact being heartless."*

* **Thomas Babington Macaulay** (Thomas Babington Macaulay, 1st Baron Macaulay; 25 Oct 1800 - 28 Dec 1859; was a British historian and Whig politician. He wrote extensively as an essayist, on contemporary and historical sociopolitical subjects, and as a reviewer. His *The History of England* was a seminal and paradigmatic example of historiography, and its literary style has remained an object of praise since its publication.)
 - *"Nothing except the mint can make money without advertising."*

back to top

* * * * * * * * * * * * * * * * * * *

## 20. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
 - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
 - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
 - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
 - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the

Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

\* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle

Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us
to receive your discount code.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 21. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITORIAL POLICY

\* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

\* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

\* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing
the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present
is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ████████@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance ▮▮▮▮@fullcirclecompliance.eu]
**Sent**: 8/27/2018 7:07:08 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 18-0827 Monday "Daily Bugle"



## Monday, 27 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.    State Implements New Russia Sanctions Pursuant to Chemical and Biological Weapons Control and Warfare Elimination Act of 1991

### OTHER GOVERNMENT SOURCES

2.    Items Scheduled for Publication in Future Federal Register Editions

3.    Commerce/BIS: Citibank, NA, to Pay $60,000 to Settle Alleged Antiboycott Violations

4.    State/DDTC: (No new postings.)

5.    WCO Publishes New Guides Supporting Implementation of AEO Programs and MRAs

### NEWS

6.    Expeditors News: "Changing Trade Environment Generates Interest at CBP Trade Symposium"

7.    Reuters: "U.S., Mexico Reach NAFTA Deal as Pressure Turns to Canada"

8.    Seattle Times: "Seattle Judge Blocks Release of Downloadable Blueprints for Producing 3d-Printable Guns"

9.    ST&R Trade Report: "Imports of 29 Chemical Substances to Require Advance Notice"

10.    Xinhua: "Laos Adapts ASEAN Tarriff Code"

### COMMENTARY

11.     M. Volkov: "Episode 53 - How to Test and Evaluate Your Compliance Program"

12.     M.A. Srere: "Second Circuit Checks DOJ's Overbroad Interpretation of FCPA Jurisdiction"

13.     S. Ross: "New Law Imposes Disclosure Requirements on Software Licensors"

### EX/IM MOVERS & SHAKERS

14.     Roscoe Howard to Head Team Overseeing ZTE Export Compliance

15.     Monday List of Ex/Im Job Openings: 193 Openings Posted This Week, Including 9 New Openings

### EX/IM TRAINING EVENTS & CONFERENCES

16.     ECTI Presents "IT Security, Cloud Computing, and Export Controls" Webinar, 3 Oct

17.     FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands

### EDITOR'S NOTES

18.     Bartlett's Unfamiliar Quotations

19.     Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)

20.     Weekly Highlights of the Daily Bugle Top Stories



ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. State Implements New Russia Sanctions Pursuant to Chemical and Biological Weapons Control and Warfare Elimination Act of 1991

(Source: <u>Federal Register</u>, 27 Aug 2018.) [Excerpts.]

83 FR 43723-43724: Determinations Regarding Use of Chemical Weapons by Russia Under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991

* AGENCY: Bureau of International Security and Nonproliferation, Department of State.
* ACTION: Notice.
* SUMMARY: The Department of State, acting under authority delegated to the Secretary of State pursuant to Executive Order 12851, has determined pursuant to Section 306(a) of the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 that the Government of the Russian Federation has used chemical weapons in violation of international law or lethal chemical weapons against its own nationals. In addition, the Department of State has determined and certified to Congress pursuant to Section 307(d) of the Act that it is essential to the national security interests of the United States to partially waive the application of the sanctions required under Section 307(a) of the Act with respect to foreign assistance, the licensing of defense articles and services, and the licensing of national security-sensitive goods and technology. The following is a notice of the sanctions to be imposed pursuant to Section 307(a) of the Act, subject to these waivers.
* DATES: **The determination is effective on August 27, 2018**. ...
* SUPPLEMENTARY INFORMATION: Pursuant to Sections 306(a), 307(a), and 307(d) of the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991, as amended (22 U.S.C. Section 5604(a) and Section 5605(a)), on August 6, 2018, the Deputy Secretary of State determined that the Government of the Russian Federation has used chemical weapons in violation of international law or lethal chemical weapons against its own nationals. As a result, the following sanctions are hereby imposed:

  (1) **Foreign Assistance**: Termination of assistance to Russia under the Foreign Assistance Act of 1961, except for urgent humanitarian assistance and food or other agricultural commodities or products.
  The Department of State has determined that it is essential to the national security interests of the United States to waive the application of this restriction.
  (2) **Arms Sales**: Termination of (a) sales to Russia under the Arms Export Control Act of any defense articles, defense services, or design and construction services, and (b) licenses for the export to Russia of any item on the United States Munitions List.
  The Department of State has determined that it is essential to the national security interests of the United States to waive the application of this sanction with respect to the issuance of licenses in support of government

space cooperation and commercial space launches, provided that such licenses shall be issued on a case-by-case basis and consistent with export licensing policy for Russia prior to the enactment of these sanctions.

(3) **Arms Sales Financing**: Termination of all foreign military financing for Russia under the Arms Export Control Act.

(4) **Denial of United States Government Credit or Other Financial Assistance**: Denial to Russia of any credit, credit guarantees, or other financial assistance by any department, agency, or instrumentality of the United States Government, including the Export-Import Bank of the United States.

(5) **Exports of National Security-Sensitive Goods and Technology**: Prohibition on the export to Russia of any goods or technology on that part of the control list established under Section 2404(c)(1) of the Appendix to Title 50.

The Department of State has determined that it is essential to the national security interests of the United States to waive the application of this sanction with respect to the following:

**License Exceptions**: Exports and reexports of goods or technology eligible under License Exceptions GOV, ENC, RPL, BAG, TMP, TSU, APR, CIV, and AVS.

**Safety of Flight**: Exports and reexports of goods or technology pursuant to new licenses necessary for the safety of flight of civil fixed-wing passenger aviation, provided that such licenses shall be issued on a case-by-case basis, consistent with export licensing policy for Russia prior to enactment of these sanctions.

**Deemed Exports/Reexports**: Exports and re-exports of goods or technology pursuant to new licenses for deemed exports and reexports to Russian nationals, provided that such licenses shall be issued on a case-by-case basis, consistent with export licensing policy for Russia prior to enactment of these sanctions.

**Wholly-Owned U.S. Subsidiaries**: Exports and reexports of goods or technology pursuant to new licenses for exports and reexports to wholly-owned U.S. subsidiaries in Russia, provided that such licenses shall be issued on a case-by-case basis, consistent with export licensing policy for Russia prior to enactment of these sanctions.

**Space Flight**: Exports and reexports of goods or technology pursuant to new licenses in support of government space cooperation and commercial space launches, provided that such licenses shall be issued on a case-by-case basis, consistent with export licensing policy for Russia prior to enactment of these sanctions.

**Commercial End-Users**: Exports and reexports of goods or technology pursuant to new licenses for commercial end-users civil end-uses in Russia, provided that such licenses shall be issued on a case-by-case basis, consistent with export licensing policy for Russia prior to enactment of these sanctions.

**SOEs/SFEs**: Exports and reexports of goods or technology pursuant to new licenses for Russian state-owned or state-funded enterprises will be reviewed on a case-by-case basis, subject to a "presumption of denial" policy.

These measures shall be implemented by the responsible departments and agencies of the United States Government and will remain in place for at least one year and until further notice.

Christopher A. Ford, Assistant Secretary of State, International Security and Nonproliferation.

back to top

* * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * *

## 3. Commerce/BIS: Citibank, NA, to Pay $60,000 to Settle Alleged Antiboycott Violations
(Source: Commerce/BIS, 27 August 2018.) [Excerpts.]

* Respondent: Citibank, NA
* Case No: 17.04
* Charges: *20 Violations of 15 CFR 760.2(d), Furnishing Information about Business Relationships with Boycotted Countries or Blacklisted Persons*.
During the period of January 2012 through March 2016, the Citibank, NA engaged in transactions involving the sale and/or transfer of goods or services (including information) from the United States to Kuwait, Lebanon, Oman, Pakistan, Qatar and the United Arab Emirates, activities in the interstate or foreign commerce of the United States, as defined in Section 760.1(d) of the Export Administration Regulations.
In connection with these activities, on twenty occasions, Citibank, NA, with intent to comply with, further or support an unsanctioned foreign boycott, furnished information, concerning another person's business relationships with other persons known or believed to be restricted from having any business relationship with or in a boycotting country, an activity prohibited by Section 760.2(d) of the EAR, and not excepted.
* Civil Settlement: A civil penalty of $60,000
* Debarred or Suspended from Export Transactions: Not if penalty is paid as agreed.
* Date of Order: 2 August 2018

back to top

* * * * * * * * * * * * * * * * * *

## 4. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. WCO Publishes New Guides Supporting Implementation of AEO Programs and MRAs
(Source: WCO, 24 Aug 2018.)

The World Customs Organization (WCO) has published two key documents that will provide detailed guidance and further support for the implementation of Authorized Economic Operator (AEO) programs and their complementary Mutual Recognition Arrangements/Agreements (MRAs) in a more effective and harmonized manner globally: the **Customs AEO Validator Guide** and the **MRA Strategy Guide**.

The Customs AEO Validator Guide is primarily intended to build capacities in Customs administrations with regard to the AEO validation process, in particular the validation of security related provisions and management policies. The Guide can also be useful to the private sector in better understanding and preparing for AEO validation, thus contributing to more transparency and predictability in the AEO certification process, leading, in time, to a greater trust between Customs and economic operators. It is also expected that the Guide will contribute towards bringing harmonization to AEO programs around the world, thus facilitating the negotiation of MRAs.

The MRA Strategy Guide is aimed at assisting Customs administrations with the development of MRAs, including the negotiation and implementation thereof. The Guide takes a comprehensive strategic approach to MRAs, laying down a clear vision and roadmap with a set of activities to be undertaken to reach the pre-defined goals in terms of planning, negotiating, and implementing MRAs with partner Customs administrations. It sets out some of the key enablers that are required for the successful negotiation and implementation of MRAs, and includes working examples and best practices. In addition, the Guide recommends a regional or plurilateral approach to MRAs as the way forward. This approach would potentially reduce or even eliminate the need to negotiate and implement bilateral MRAs and the associated administrative costs required in such a process.

Besides developing guidance, the WCO also provides direct technical assistance to support its Members and their stakeholders in their pursuit to strengthen the security of the international trade supply chain while ensuring maximum facilitation for legitimate goods flowing across borders.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. Expeditors News: "Changing Trade Environment Generates Interest at CBP Trade Symposium"
(Source: Expeditors News, 24 August 2018.)

On August 14 & 15, 2018, U.S. Customs and Border Protection (CBP) hosted their Trade Symposium in Atlanta. The Trade Symposium focused on diverse topics including the recent trade remedies, e-commerce, CBP priorities in recruiting and technology, free trade, forced labor, and other matters.

Speaking about the recent trade remedies, CBP Commissioner Kevin McAleenan mentioned that CBP has "...been working very hard to explain how this works in practice in terms of changing a tariff or making a tariff rate quota, and putting that in place." The Commissioner also spoke about CBP's priorities in recruiting and retaining a quality workforce, and deploying new technologies to take on the challenges CBP faces. One such challenge Commissioner McAleenan spoke about was the increase in small shipments as the result of e-commerce, "We doubled small shipments from 300 million to 600 million parcels in one fiscal year."

Several breakout sessions were held on the second day of the symposium, including a number of panel discussions and one-on-one meetings with the directors of CBP's Centers of Excellence and Expertise.

CBP confirmed that a record 1,100 + members of the trade community attended from all over the world.

The CBP press release may be found here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. Reuters: "U.S., Mexico Reach NAFTA Deal as Pressure Turns to Canada"
(Source: Reuters, 27 Aug 2018.) [Excerpts.]

The United States and Mexico agreed on Monday to overhaul the North American Free Trade Agreement (NAFTA), putting pressure on Canada to agree to the new terms on auto trade and other issues to remain part of the three-nation pact.

U.S. President Donald Trump and outgoing Mexican President Enrique Pena Nieto said talks with Canada would begin immediately, though Trump threatened he could put tariffs on Canadian-made cars if a three-way deal could not be reached. ...

Negotiations between the three trade partners have dragged on for more than a year and repeated threats by Trump that he would ditch the 1994 accord have roiled financial markets, putting pressure on the Mexican peso and the Canadian dollar.

Officials said they hope Canada will agree to the terms by Friday, when the White House plans to formally notify Congress that Trump will sign the deal in 90 days. Congress has to approve it.

"There are still issues with Canada but I think they could be resolved very quickly," a senior trade official told Reuters in an interview.

If talks with Canada are not wrapped up by the end of this week, Trump plans to notify Congress that he has reached a deal with Mexico, but would be open to negotiations with Canada to join the pact, U.S. Trade Representative Robert Lighthizer told reporters on Monday. ...

Canada plans to continue to negotiate, but would only sign a new agreement that is good for the country, a spokesman for Canadian Foreign Minister Chrystia Freeland said. Trump said he would talk to Canadian Prime Minister Justin Trudeau soon.

NEW AUTO RULES

The United States, Mexico and Canada do more than 1 trillion dollars in trade between them every year. The announcement of a U.S.-Mexico agreement lifted financial markets.

Trudeau spoke to Pena Nieto on Sunday and shared their commitment to reaching a successful conclusion of NAFTA "for all three parties" the prime minister's office said.

The Trump administration said the deal improves labor provisions. The Mexico-U.S. discussions focused on crafting new rules for the automotive industry, which Trump has put at the heart of his drive to rework the pact he has repeatedly described as a "disaster" for American workers. ...

The deal would require 75 percent of auto content to be made in the NAFTA region, up from the current level of 62.5 percent, a U.S. trade official said. A fact sheet describing the bilateral agreement specified the content would be made in the United States and Mexico.

The deal also would require 40 percent to 45 percent of auto content to be made by workers earning at least $16 per hour.

The United States and Mexico also agreed to a 16-year lifespan for the North American Free Trade agreement, with a review every six years that can extend the pact for 16 years, U.S. Trade Representative Lighthizer said.

The plan would not contain an automatic expiration for NAFTA as proposed in the prior U.S. demand for a "sunset clause." Mexico also agreed to

eliminate dispute settlement panels for certain anti-dumping cases, a move that could complicate talks with Canada. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. Seattle Times: "Seattle Judge Blocks Release of Downloadable Blueprints for Producing 3d-Printable Guns"
(Source: Seattle Times, 27 Aug 2018.)

A federal judge in Seattle issued a preliminary injunction Monday against a self-proclaimed "crypto-anarchist," blocking the Texas man from publishing downloadable internet blueprints for producing 3D-printable guns.

U.S. District Court Judge Robert Lasnik's ruling extends a temporary restraining order he issued on July 31 that prevented Cody Wilson, a 30-year-old Austin, Texas, gun-rights advocate, from publishing the computer files containing the plans for printing the plastic guns on his company's website while a legal dispute over the matter was resolved.

Led by Washington Attorney General Bob Ferguson, 19 states along with the District of Columbia joined the lawsuit seeking a preliminary injunction, contending that the federal government's decision earlier this year to drop its own five-year litigation against Wilson and allow his company to post the blueprints would have provided broad, unregulated access to dangerous weapons.
"The Court finds that the irreparable burdens on the private defendants' First Amendment rights are dwarfed by the irreparable harms the States are likely to suffer if the existing restrictions are withdrawn and that, overall, the public interest strongly supports maintaining the status quo through the pendency of this litigation," Lasnik wrote in the 25-page ruling.

The U.S. State Department had fought Wilson since 2013 to prevent his nonprofit firm, Defense Distributed, from disseminating the blueprints online, arguing that doing so violated the federal Arms Export Control Act (AECA) and the International Traffic in Arms Regulations (ITAR), which restrict exports of certain weapons.

But in April, the federal agency reversed course, agreeing to settle a lawsuit brought by Wilson that would have allowed his firm to distribute the plans online.

Last week, Lasnik heard oral arguments from lawyers in the case before expressing his own frustrations that neither President Donald Trump nor Congress had resolved the issue, leaving a decision up to the court.

Assistant Washington Attorney General Jeffrey Rupert argued, among other points, that the State Department's actions to remove all nonautomatic firearms up .50 caliber from the U.S. Munitions List that regulates what

weapons can be exported - which effectively allows for the 3D printable gun blueprint files to be dispersed online - would cause "irreparable harm."

The action raises public-safety concerns by potentially giving terrorists and other criminals access to undetectable and untraceable firearms, Rupert said. And, because printable guns are plastic and don't set off metal detectors, governments would face the costly burden of updating security methods at airports, courts and other public institutions, he said.

The states also argued the federal government violated multiple statutory requirements, including not giving Congress a required 30-day notice when modifying the munitions list to create an exemption allowing for the 3D printable guns files to be shared online.

Steven Myers, the lawyer representing the State Department, countered that revisions made to the federal munitions list were technical in scope and didn't make substantive changes requiring congressional notice.

If someone actually printed out a 3D plastic gun and used it in a crime, Myers added, such actions wouldn't be the result of the State Department's actions. He noted existing laws now prohibit anyone from manufacturing or possessing 3D-printable guns, which the federal government is "committed to vigorously enforcing."

Wilson's attorney, Chad Flores, also argued that other blueprint files for 3D plastic guns already are available online, and that nothing legally prevents Wilson from disseminating the blueprints through other means, such as through the U.S. mail.

Shortly after Lasnik issued the temporary restraining order in the case last month, President Donald Trump tweeted: "I am looking into 3-D Plastic Guns being sold to the public. Already spoke to NRA, doesn't seem to make much sense!"

The White House later said the Justice Department had struck a deal in the Wilson case without Trump's approval and that the president was "glad this effort was delayed."

But Lasnik, when taking the case under advisement last week, noted no further clarification on the issue came from the federal government's executive or congressional branches, leaving a decision on the matter up to him.

  "You know, it's a little bit frustrating to be sitting in this chair as a United States District Court judge and seeing this is an issue that should be solved by the political branches of government," Lasnik said.

back to top

* * * * * * * * * * * * * * * * * *

## 9. ST&R Trade Report: "Imports of 29 Chemical Substances to Require Advance Notice"
(Source: Sandler, Travis & Rosenberg Trade Report, 27 Aug 2018.)

The Environmental Protection Agency has issued separate direct final rules that together will require persons who intend to manufacture (including import) or process any of 29 specified chemical substances for an activity designated as a significant new use by one of these rules to notify the EPA at least 90 days before commencing that activity. Persons may not commence manufacture or processing for the significant new use until the EPA has conducted a review of the notice, made an appropriate determination, and taken such actions as are required with that determination.

Importers must certify that shipments of these substances comply with all applicable rules and orders under the Toxic Substances Control Act, including any SNUR requirements. In addition, any persons who export or intend to export any of these substances on or after Sept. 26 are subject to the export notification provisions of 15 USC 2611(b) and must comply with the export notification requirements in 40 CFR part 707, subpart D.

These rules will be effective as of Oct. 26. If the EPA receives written adverse or critical comments, or notice of intent to submit such comments, by Sept. 26 will withdraw the relevant sections of this rule before Oct. 26 and proceed with a related proposed rule.

View Document(s):
- EPA notice 2
- EPA notice 1

back to top

* * * * * * * * * * * * * * * * * *


## 10. Xinhua: "Laos Adapts ASEAN Tarriff Code"
(Source: Xinhua, 23 Aug 2018.)

The Lao Ministry of Finance said it has adopted a new ASEAN tariff code, giving a signal that Laos is ready to become part of the single regional market of 600 million consumers, local daily Vientiane Times reported Thursday.

According to the announcement, posted on the Lao Trade Portal, an official website that provides information on trade services, Laos has put into practice the ASEAN Harmonized Tariff Nomenclature 2017 since May.

The adoption of the ASEAN tariff code is in line with the Lao government's policy to implement regional obligations to which the country is committed, the Finance Ministry said.

The updated version of the ASEAN tariff code provides a clearer definition of goods and services in which ASEAN member countries are trading. This will make it easier for Lao customs officials to implement the government policy to facilitate cross-border trade and become part of the regional market.

In the past, customs officials faced difficulties in levying tariffs and taxes on particular goods from ASEAN countries as there was no single definition of the goods and tariff code. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

## 11. M. Volkov: "Episode 53 - How to Test and Evaluate Your Compliance Program"
(Source: Volkov Law Group Blog, 26 Aug 2018. Reprinted by permission.)

* Author: Michael Volkov, Esq., Volkov Law Group, mvolkov@volkovlaw.com, 240-505-1992.

An effective compliance program requires that companies review and improve their compliance programs. A company should regularly review and test its controls, and address potential weaknesses in its compliance program. The Justice Department and the SEC have encouraged companies to conduct regular tests and reviews to create a sustainable compliance program. Companies should design and implement a proactive evaluation program to ensure that their compliance program continuously improves.

In this episode, Michael Volkov discusses strategies for companies to conduct proactive evaluation programs to assess their compliance program.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. M.A. Srere: "Second Circuit Checks DOJ's Overbroad Interpretation of FCPA Jurisdiction"
(Source: Bryan Cave Leighton Paisner LLP, 24 Aug 2018.)

* Author: Mark, A. Srere, Esq., Bryan Cave Leighton Paisner LLP, mark.srere@bclplaw.com, +1 202-508-6000.

In a case that demonstrates the need to challenge in court the U.S. government's interpretation of how far the FCPA reaches, the United States Court of Appeals for the Second Circuit rejected DOJ's attempt to use aiding

and abetting and conspiracy theories to prosecute an individual who otherwise was not covered by the FCPA. To the question it posed - "can a person be guilty as an accomplice or a co-conspirator for an FCPA crime that he or she is incapable committing as a principal?" - it resoundingly answered No.

In *United States v. Hoskins*, the government charged Mr. Hoskins, a non-U.S. citizen who worked for a UK subsidiary of Alstom S.A. with violations of the FCPA. Mr. Hoskins was assigned to work with a French subsidiary of Alstom on a project in Indonesia. The government alleged that Alstom's U.S. subsidiary retained two consultants to bribe Indonesian officials to get the project work. The government alleged that Hoskins was involved in the selection of, and authorizing payments to, the consultants knowing that some of the money would be used to pay a bribe. The government concedes that Hoskins never traveled to the U.S., but he called and emailed "U.S.-based coconspirators" while they were in the U.S. The government charged Hoskins under two theories - that he was an agent of the U.S. subsidiary and that he aided or abetted or conspired with the U.S. subsidiary. The government applied these two theories to both FCPA jurisdiction over U.S. domestic concerns (15 U.S.C. § 78dd-2) and FCPA jurisdiction over any person that commits part of the violation while in the territory of the U.S. (15 U.S.C. § 78dd-3).

In ruling in favor of Mr. Hoskins, the Second Circuit relied on an exception to the general rule that accomplice and conspiracy liability applies to criminal conduct - "conspiracy and accomplice liability will not lie when Congress demonstrates and affirmative legislative policy to leave some type of participant in a criminal transaction unpunished." It continued that such "an affirmative legislative policy can be discerned by looking to the statute's text, structure, and legislative history." The Court reviewed the FCPA and it legislative history and concluded:

> ... The carefully tailored text of the statute, read against the backdrop of a well-established principle that U.S. law does not apply extraterritorially without express congressional authorization and a legislative history reflecting that Congress drew lines in the FCPA out of specific concern about the scope of extraterritorial application of the statute, persuades us that Congress did not intend for persons outside of the scope of the statute's carefully delimited categories to be subject to conspiracy or complicity liability.

This holding is directly contrary to the "guidance" that the DOJ and SEC issued with respect to the FCPA's reach. In its 2012 *Resource Guide*, the government states:

> Individuals and companies, including foreign nationals and companies, may also be liable for conspiring to violate the FCPA-i.e., for agreeing to commit an FCPA violation-even if they are not, or could not be, independently charged with a substantive FCPA violation.

The Second Circuit *Hoskins* decision makes it clear that this is not the case - either for conspiracy charges or for aiding and abetting charges. One can

only hope that the amendments to the *Resource Guide* will be issued quickly in the wake of this decision.

The Court affirmed that the government could prosecute Mr. Hoskins as an agent of the U.S. subsidiary because that is a category of persons covered by the FCPA.  The opinion provides a good synopsis of who is covered by the FCPA:

  (1) American citizens, nationals, and residents, regardless of whether they violate the FCPA domestically or abroad;
  (2) most American companies, regardless of whether they violate the FCPA domestically or abroad;
  (3) agents, employees, officers, directors, and shareholders of most American companies, when they act on the company's behalf, regardless of whether they violate the FCPA domestically or abroad;
  (4) foreign persons (including foreign nationals and most foreign companies) not within any of the aforementioned categories who violate the FCPA while present in the United States.

It is this guidance companies and individuals should look to in determining the reach of the FCPA.  This has the force of law.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


# 13. S. Ross: "New Law Imposes Disclosure Requirements on Software Licensors"
(Source: Data Protection Report, 24 Aug 2018.)

\* Author: Susan Ross, Senior Counsel, susan.ross@nortonrosefulbright.com, Norton Rose Fullbright, New York.

As a result of the 2019 National Defense Authorization Act, the Secretary of Defense implemented new disclosure obligations on software licensors whose software code has been reviewed or accessed by a foreign government. The Act was signed into law on August 13, 2018 and will significantly impact software licensors who engage with the federal government's defense agencies relating to "obligations to foreign governments."

Under the law, the Department of Defense is prohibited from using any "product, service, or system relating to information or operational technology, cybersecurity, an industrial control system, a weapons system, or computer antivirus provided by a 'person'" unless that person has allowed a foreign government to review or access the code for the product or service or if that person is under any obligation "as a condition of entering into an agreement for sale or other transaction with a foreign government or with a foreign person on behalf of such a government" to do so.

Moreover, if the person is a US person or affiliate, the person must disclose whether he or she has ever sought or currently holds a license under the Export Administration Regulations (EARs) or International Traffic in Arms Regulations (ITARs), as such disclosures are exempt from FOIA or corresponding state access to information laws.

Finally, the government will revise its current procurement contracts to include a clause requiring that the above information be disclosed during the term of the agreement. This includes "any mitigation measures taken or anticipated." The Secretary of Defense will determine any mitigation measures and may condition the procurement agreement.

Software licensors that are government defense contractors (even to US-only customers) should review their supply chains for compliance with these new disclosure obligations.

To learn more about recent developments impacting software licensors, please click here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM MOVERS & SHAKERS

## 14. Roscoe Howard to Head Team Overseeing ZTE Export Compliance
(Source: Law360, 24 Aug 2018.) [Excerpts; subscription required.]

The U.S. Department of Commerce announced Friday that Barnes & Thornburg LLP partner Roscoe Howard will head the team overseeing ZTE Corp.'s compliance with U.S. export control laws, part of a $1.76 billion penalty announced in June over the telecom giant's illicit sales to Iran and North Korea.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. Monday List of Ex/Im Job Openings: 193 Openings Posted This Week, Including 9 New Openings
(Source: Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

\* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

"#" New or amended listing this week

* Aerojet Rocketdyne; Canoga Park, CA; Manager, Industrial Security & Compliance;
* Agility; Atlanta, GA; Ocean Import Coordinator
* Agility; Bensenville, IL; Ocean Export Coordinator;
* Agility; Basel, Switzerland; International Exhibition Coordinator
* Agility; East Boston, MA; Customs/Entry Writer Coordinator
* Agility; Houston, TX; Air Freight Export Account Executive;
* Agility; Queens, NY; Air Export Coordinator;
* Agility; Queens, NY; Air Export Coordinator;
# Airschott, Inc.; Dulles, VA; Imports/Exports/International Logistics & Business
* Albemarle Corporation; Baton Rouge, LA; Logistics Specialist - Trade Compliance and Marine Specialist;
* Alcoa Group; Knoxville, TN; Trade Compliance Administrator;
* Amazon; Seattle, WA; Head, Global Trade and Product Compliance;
* Amazon; Seattle, WA;  Global Trade Compliance Analyst;
* Amazon; Seattle, WA; US Export Compliance PM;
# American Trucking Associations (ATA); Arlington, VA; Mgr Customs, Immigration & Cross-Broder Ops;
* Arrow; Shanghai, China; Compliance Manager;
* Augusta Westland; Philadelphia, PA; Manager, Import Export;
* BAE Systems; Kingsport, TN; Government Compliance Manager; Requisition ID: 41212BR
* BAE Systems; Rockville, MD; Compliance Specialist Senior; Requisition ID: 35809BR
* BAE Systems; Sterling, VA; Compliance Specialist Senior; Requisition ID: 36370BR
* Boeing; Dallas, TX; Global Regulatory and Compliance Specialist 4; Requisition ID: 12795
* Boeing; Englewood, CO; Compliance Specialist 4; Requisition ID: 1268;
* Boeing; Manassas, VA; Export Control Manager; Requisition ID: 1900
* Boeing; Zoushan, China;  Compliance Analyst;
* Boeing; Zoushan, China; Trade Compliance Manager;

# Bose; Framingham, MA; Senior Trade Compliance Analyst;
* CGI, Fairfax, VA; Trade Compliance Analyst/Manager; Requisition ID: J0818-1218
 * Cinemark; Plano, TX; Import Export Purchasing Analyst
* Cobham; Lansdale, PA; Export Compliance Officer; Ali Neice Alicia.Neice@yoh.com; Requisition ID 1611
# ConvaTec; Greensboro, NC; Associate Manager, Customs & Trade;
* Cree, Inc.; Durham, NC; Export Compliance Specialist; Contact asignorelli@cree.com; Requisition ID: 2018-6300
* Destaco; Auburn Hills, MI; Manager, Global Compliance; Clenetta Frazier; cfrazier@destaco.com; Requisition ID:  16261
* Disney Parks & Resorts; Kissimmee, FL; Senior Manager, Trade Compliance; Requisition ID: 552655BR;
* DuPont; Wilmington, DE; Trade Compliance Leader; Requisition ID: 196737W-01

* DynCorp International; Tampa, FL; Foreign Disclosure Officer; Requisition ID: PR1701977
* Eaton; Hungary; Manager Global Trade Management EMEA - Imports (in any EMEA location); Requisition ID: 052687
* Eaton; Multiple Locations: Cleveland, Ohio; Moon Township, Pennsylvania; Eden Prairie, Minnesota; Peachtree City, Georgia; Galesburg, Michigan; Manager, Supply Chain Governance, Risk & Compliance; Requisition ID: 054321
* Eaton; Syracuse, NY; Global Logistics Manager; Requisition ID: 036620
* Embraer; Fort Lauderdale, FL; Compliance Specialist II; Requisition ID: 170685;
# Energizer Holdings; St. Louis, MO; Trade Compliance Senior Analyst; Kieshana Miles,kieshana.miles@energizer.com; Requisition ID: NAM00588
# Energizer Holdings; St. Louis, MO; Trade Compliance Analyst; Kieshana Miles,kieshana.miles@energizer.com; Requisition ID: NAM00604
* Ensign-Bickford Aerospace & Defense Co.; Moorpark, CA; Import/Export Specialist; Missy Clark; maclark@eba-d.com;
* EoTech Technologies; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* Expeditors; Amsterdam, Netherlands; Regional Compliance SME (Subject-Matter expert) Supervisor On-site;
* Expeditors; Bangkok, Thailand; Regional Trade Compliance Manager - Indochina & Philippines;
* Expeditors; Krefeld, Germany; Clerk Import / Export;
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk;
* Expeditors; Bedfont, United Kingdom; District Trade Compliance Manager;
* Expeditors; Detroit, MI; US Export Compliance Consultant;
* Expeditors; Dublin, IE; Consultant - Customs and Trade Compliance;
* Expeditors; Dusseldorf, Germany; Clerk, Airfreight Import;
* Expeditors; Frankfurt, Germany; Consultant - Customs and Trade Compliance (m/w), unbefristet und in Vollzeit
;
* Expeditors; Krefeld, Germany; Clerk, Airfreight Import;
* Expeditors; Plainfield, IN; District Trade Compliance Manager;
* Expeditors; Seattle, WA; Supervisor - IS Development, Customs & Compliance;
* Expeditors; Sunnyvale, CA, USA; Customs Compliance Coordinator;
* Expeditors; Sunnyvale, CA, USA; Customs Compliance Specialist;
* Expeditors; Stockholm, SE; District Trade Compliance Manager;
* Exterran; Houston, TX; Trade Control Manager;
* Flash Global; Mountain Lakes, NJ; Import and Export Specialist;
* FLIR; Arlington, VA; Senior Director, Global Export Licensing;
* FLIR; Billerica, MA; US Customs Analyst;
* FLIR; Elkridge, MD; Global Trade Compliance, Traffic Analyst OTS;
* FLIR; Elkridge, MD; Global Trade Compliance Traffic Analyst Detection;
* FLIR; Meer, Belgium; GTC EMEA Customs Analyst;
* FLIR; Irving, CA; Sr. Manager Export Compliance;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Licensing;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Licensing;
* Full Circle Compliance; Bruchem, Netherlands; Legal Analyst, Manager;