* General Atomics; San Diego, CA; Director, Compliance; Requisition ID: 18549BR
* General Atomics; San Diego, CA; Associate Compliance Specialist; Requistion ID: 19856BR;
* General Atomics; San Diego, CA; Government Compliance Specialist; Requisition ID: 19499BR;
* General Atomics; San Diego, CA; Import/Export Trade Compliance Administrator - Licensing; Requisition ID: 17968BR
* General Atomics; San Diego, CA; Senior Director of Import/Export Compliance; Requisition ID: 13892BR
* General Atomics; San Diego, CA; Senior Government Compliance Specialist; Requisition ID: 19500BR;
* General Electric; Lynn, MA; Senior Export Control Specialist, Aviation; Requisition ID: 3146429
* Google; Mountain View, CA; Ethics and Compliance Associate Counsel, Export Control;
* Harris Corporation; Van Nuys, CA; Trade Compliance Senior Specialist; Requisition ID: ES20180706-25145
* Henderson Group Unlimited; Inc; Washington, DC; Defense Control Analyst;
* Henkel Corp.; Rocky Hill, CT; Global Trade Defense Information Manager; Requisition ID: 180002QT
* Honeywell International Inc.; Sunnyvale, CA or Lincolnshire, IL; Sr. Import/Export Analyst; HRD32371
* Infineon Technologies; Munich, Germany; Manager Export Control;
* Infineon Technologies; Munich, Germany; Specialist Export Control;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official / Deputy Facility Security Officer;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official;
* Johnson Controls; Boca Raton, FL; Licensing Coordinator; Requisition ID: WD30047852135
* Johnson Controls; Boca Raton, FL; Licensing Coordinator; Rquisition ID: WD30047853135
* Johnson Controls; Milwaukee, WI; Trade Compliance Analyst; Requisition ID: WD30047348124
* Johnson Controls; Tamaulipas, Matamoros, Mexico; Trade Compliance Specialist; Requisition ID: EB00064420180
* Kohls; Menomonee Falls, WI; Senior Manager, Customs Compliance
* Komatsu; Milwaukee, WI; Senior International Trade Compliance Analyst; Requisition ID: 12728
* Lam Research Corp.; Shanghai, China; Foreign Trade (FT) Analyst;
* Leonardo DRS; Arlington, VA; Trade & Compliance Director; Requisition ID: 91287
* Leonardo DRS; Cypress, CA; Contracts & Compliance Manager; Requisition ID: 91594
* Leonardo DRS; Dallas, TX; Contracts & Compliance Administrator; Requisition ID: 91611
* Leonardo DRS; Dallas, TX; Contracts & Compliance Manager; Requisition ID: 91608
* Leonardo DRS; Melbourne, FL; Senior Supply Chain Analyst - Small Business Compliance; Requisition ID: 91669

* Leonardo DRS; St. Louis; Trade Compliance Specialist; Requisition ID: 88127, or contact brandy.mormino@drs.com
* Livingston; Alberta, Canada; Senior Customs & Trade Advisor
* Livingston; CA; Import Analyst; Requisition ID: 60988
* Livingston; CA; Import Specialist; Requisition ID: 57981
* Livingston; CA; Import Specialist; Requisition ID: 59161
* Livingston; CA; Import Specialist; Requisition ID: 60644
* Livingston; FL; Import Analyst; Requisition ID: 59941
* Livingston; GA; Import Specialist; Requisition ID: 61165
* Livingston; IL; Import Specialist; Requisition ID: 60803
* Livingston; IL; Import Specialist; Requisition ID: 60905
* Livingston; IL; Client Import Analyst; Requisition ID: 60963
* Livingston; IL; Client Import Analyst; Requisition ID: 60964
* Livingston; IL; Client Import Analyst; Requisition ID: 60965
* Livingston; Itasca, IL; Release Customs Analyst; Requisition ID: 61950
* Livingston; Itasca, IL; Release Customs Analyst; Requisition ID: 61951
* Livingston; Itasca, IL; Release Customs Analyst; Requisition ID: 61952
* Livingston; NY; Client Import Analyst; Requisition ID: 57421
* Livingston; NY; Client Import Analyst; Requisition ID: 61123
* Livingston; NY; Import Specialist; Requisition ID: 61221
* Livingston; NY; Release Customs Analyst; Requisition ID: 61508
* Livingston; NY; Release Customs Analyst; Requisition ID: 61509
* Livingston; NY; Release Customs Analyst; Requisition ID: 61513
* Livingston; NY; Release Customs Analyst; Requisition ID: 61518
* Livingston; OH; Import Analyst; Requisition ID: 60702
* Livingston; Ontario, Canada; Release Classification Analyst; Requisition ID: 61613;
* Livingston; TX; Release Customs Analyst; Requisition ID: 60993
* Livingston; TX; Release Customs Analyst; Requisition ID: 61282
* Livingston; TX; Release Import Analyst; Requisition ID: 60867
* Livingston; VA; Import Specialist; Requisition ID: 61541
* Livingston; VT; Release Customs Agents; Requisition ID: 61121
* Lockheed Martin; Arlington, VA; International Trade Compliance Engineer; Job ID: 439787BR
* Lockheed Martin; Arlington, VA; Senior International Licensing Analyst; ID: 438635BR
* Lockheed Martin; Arlington, VA; International Trade Compliance Engineer; ID: 439787BR
* Lockheed Martin; Fort Worth, TX; Export and Import Compliance Investigations Lead; Job ID: 427872BR
* Lockheed Martin; Fort Worth, TX; Regulatory Compliance Analyst; Job ID: 439674BR
* Lockheed Martin; Littleton, CO; Supply Chain Management Compliance Analyst; Requisition ID: 440613BR
* Lockheed Martin; Orlando, FL; Senior International Licensing Analyst; Requisition ID: 434225BR
* Lockheed Martin; Orlando, FL; International Trade Compliance Manager; Job ID: 439904BR
* Lockheed Martin; Stratford, CT; Compliance Auditor; Job ID; 434724BR
* Luminar Technologies; Orlando, FL; Import/Export Trade Compliance Specialist;

* L-3 Warrior Sensor Systems; Londonderry, NH; Purchasing & Compliance Manager; Requisition ID:096596
* L-3 Warrior Sensor Systems; Middle East; International Business Development Manager - Middle East Region; Requisition ID: 093343
* L-3; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* Maersk/DAMCO; Agent de transit IMPORT - EXPORT; Job Ref.: DC-164022
* Medtronic; Heerlen, The Netherlands; Trade Compliance Analyst; Requisition ID: 16000DYY
* Medtronic; Minneapolis, MN; Trade Compliance Program Manager; Requisition ID: 18000BJW;
* Medtronic; Wash DC; Global Trade Lawyer; stacy.m.johnson@medtronic.com; Requisition ID: 170002ON
* Mercury Systems; Andover, MA; International Trade Compliance Director; Requisition ID: 18-165
* Mitchell Martin, Inc.; Dallas, Texas; Export Regulatory Trade Compliance Specialist; Requisition ID: 104405
* Muscogee International, LLC; Washington, D.C.; DDTC Compliance Specialist II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Policy Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Records Auditor; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Contract Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk Lead; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support I; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support III; Apply HERE or contact their recruiting team.
* Netflix; Los Angeles, CA; Manager, Trade Compliance;
* Northrop Grumman; Baltimore, MD; International Trade Compliance Analyst (level 2 or 3)- Import; Requisition ID: 18013545
* Northrop Grumman; Baltimore, MD; International Trade Compliance Analyst (level 2 or 3)- Import; Requisition ID: 18014715
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 18010381
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022803
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022805
* Northrop Grumman; Herndon, VA; International Trade Compliance Analyst 3; Requisition ID: 18007859
* Northrop Grumman; McLean, VA; International Trade Compliance Analyst 3; Requisition ID: 18012973
* Office of the Director of National Intelligence; McLean, VA; Associate General Counsel;
* Optics 1; Bedford NH, Senior Trade Compliance Administrator

* Oshkosh Corporation; Greenville, WI; Senior Global Trade Compliance Analyst - Licensing; ID: 183273
* PerkinElmer, Inc.; Shelton, CT; Systems Analyst, Trade Compliance Solutions;
* Raytheon; Billerica, MA; Import Ctl&Compliance Advisor; Requisition ID: 119749BR
* Raytheon; Billerica, MA; Mgr I Export-Import Control; Requisition ID: 118298BR
* Raytheon; El Segundo, CA; Import Control and Compliance Advisor; APPLY Requisition ID 119247BR
* Raytheon; El Segundo, CA; Manager III, Global Trade Licensing; Requisition ID: 117235BR
* Raytheon; El Segundo, CA; Fullerton, CA; Goleta, CA; Aberdeen, MD; Plano, TX; McKinney, TX; Principal Analyst, Global Trade Licensing; Requisition ID: 117247BR
* Raytheon; Tucson, AZ; Export Licensing And Compliance Specialist; Requisition ID: 114936BR
* Raytheon; Tucson, AZ; Import Ctl&Compliance Advisor; Requisition ID: 119749BR
* Raytheon; Woburn, MA; Global Trade Export Licensing & Compliance Advisor; Requisition ID:117939BR
* Raytheon; Woburn, MA; Supply Chain Compliance Advisor; Requisition ID:115557BR
* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* The Safariland Group; Jacksonville, FL; Counsel (International Trade Compliance);
* The Safariland Group; Jacksonville, FL; Sr. Export Compliance Specialist;
# Sensata Technologies; Fort Worth, TX; Global Trade Compliance Specialist;
# Sierra Nevada Corporation: Denver. CO; International Trade Compliance Analyst III; Requisition ID: R0006075
# Sierra Nevada Corporation; Denver, CO; International Trade Compliance Analyst II; Requisition ID: R0006074
* Spirent; Calabasas, CA; Global Trade Compliance Specialist; Requisition ID: 4088;
* Thales; Cambridge, UK; Trade Compliance Support Officer; Krista Helvey; Requisition ID R0034813;
* Thales; Cambridge, UK; Trade Compliance Officer; Krista Helvey; Requisition ID R0034820;
* Thales; Various Locations, UK; Trade Compliance Analyst; Requisition ID: R0035062;
* TLR; San Fransisco, CA; Import CSR; Requisition ID: 1040
* Toro; Bloomington, MN; Import - Export Compliance Manager
* United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Authorization Manager; Requisition ID: 63222BR
* Varian; Paolo Alto, CA; Senior Trade Compliance Analyst; Requisition ID: 12735BR; Contact Uyen Tran at Uyen.Tran@varian.com;
* Varian; Paolo Alto, CA; Trade Compliance Analyst; Requisition ID: 13097BR;
* Vigilant; Negotiable Location, USA; Global Trade Compliance Analyst;

* Vigilant; Negotiable Location, USA; Global Trade Account Manager;
* Virgin Galactic; Las Cruces, NM; Export Compliance Officer; Requisition ID: 2018-3558
* World Wide Technology; Edwardsville, IL; International Trade Compliance Specialist;
* Xylem, Inc.; Bangalore, Karnataka, India; Third Party Contract & Compliance Coordinator;
* Xylem, Inc; Morton Grove, IL; Trade Compliance Specialist

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EX/IM TRAINING EVENTS & CONFERENCES

## 16. ECTI Presents "IT Security, Cloud Computing, and Export Controls" Webinar, 3 Oct
(Source: Danielle Hatch, danielle@learnexportcompliance.com)

* What: IT Security, Cloud Computing, and Export Controls
* When: October 3, 2018; 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Felice Laird
* Register: Here or Danielle Hatch, 540-433-3977, danielle@learnexportcompliance.com.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 17. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)

* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

*Register today and get a 10% Early Bird discount on the course fee!*

back to top

* * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 18. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Mother Teresa** (26 Aug 1910 - 5 Sep 1997; born Anjezë Gonxhe Bojaxhiu, known in the Roman Catholic Church as Saint Teresa of Calcutta, was an Albanian-Indian Roman Catholic nun and missionary. In 1950 Teresa founded the Missionaries of Charity, a Roman Catholic religious congregation which had over 4,500 sisters and was active in 133 countries in 2012.)
  - *"Peace begins with a smile.  We shall never know all the good that a simple smile can do."*

* **Georg Wilhelm Friedrich Hegel** (27 Aug 1770 - 14 Nov 1831; was a German philosopher and an important figure of German idealism. He achieved wide renown in his day and has become increasingly influential in the analytic tradition as well.)
  - *"Genuine tragedies in the world are not conflicts between right and wrong. They are conflicts between two rights."*

**Monday is Pun Day:**
* Two atoms are walking down the street together.  One says, "I think I've lost an electron."  The other replies, "Are you sure?"  The first one says, "I'm positive."
* Don't trust atoms, they make up everything!

back to top

* * * * * * * * * * * * * * * * * *

## 19. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

DOC_0004207

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *


## 20. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *


## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White

House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ████████@fullcirclecompliance.eu

**From:** Douglas Hassebrock [Douglas.Hassebrock@bis.doc.gov]
**Sent:** 8/28/2018 12:53:55 PM
**To:** John Sonderman [John.Sonderman@bis.doc.gov]
**Subject:** FW: BIS Newsclips August 28, 2018

████████████████████████████████████████████

--
Douglas R. Hassebrock
202-482-5079

Confidentiality Notice: This e-mail message is intended only for the named recipients. It contains information that may be confidential, privileged, attorney work-product, or otherwise exempt from disclosure under applicable law. If you received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited. Please notify us immediately that you received this message in error, and delete the message.

**From:** Donna Ganoe
**Sent:** Tuesday, August 28, 2018 8:45 AM
**Subject:** BIS Newsclips August 28, 2018

1.      US and Mexico reach a preliminary trade deal that could replace NAFTA | by Kevin Liptak, Jeremy Diamond & Katie Lobosco | CNN Politics | August 27, 2018
2.      Judge Extends 3-D Printed Gun Ban Pending State Challenge | by Erik Larson | Bloomberg | August 27, 2018
3.      Iran asks UN's highest court to suspend US sanctions | by Mike Corder | AP – ABC6 News | August 27, 2018
4.      Korean trade minister: Seoul will be exempt from Section 232 auto tariffs | by Isabelle Hoagland | InsideTrade.com | August 27, 2018
5.      A Trade 'Security' Safeguard - The Pentagon these days is less protectionist than Commerce. | by The Editorial Board | WSJ | August 26, 2018
6.      Pat Toomey urges Commerce officials to speed up decisions on tariff exclusions | by Laura Olson | The Morning Call [Allentown, PA] | August 28, 2018

                    ****************************

**1.      US and Mexico reach a preliminary trade deal that could replace NAFTA | by Kevin Liptak, Jeremy Diamond & Katie Lobosco | CNN Politics | August 27, 2018**

https://www.cnn.com/2018/08/27/politics/mexico-us-trade-deal/index.html

*CNN)*The United States and Mexico have reached an agreement to change parts of NAFTA, the trade deal that President Donald Trump has derided for years as unfair.

Trump announced the agreement from the Oval Office Monday, with Mexican President Enrique Peña Nieto dialed in on a conference call.

But the deal left open the question of whether Canada, the third country in NAFTA, would agree to the changes -- and Trump himself said he wanted to throw out the name NAFTA altogether.

"They used to call it NAFTA," Trump said. "We're going to call it the United States-Mexico trade agreement. We're going to get rid of NAFTA because it has a bad connotation."

US Trade Representative Robert Lighthizer said the agreement was "absolutely terrific" and would modernize a trade deal that had "gotten seriously out of whack." He said he hoped Congress would approve it with broad bipartisan support.

On a separate call with reporters, Lighthizer highlighted some big changes that negotiators from both countries agreed to.

- Auto manufacturing: The new deal would require that 75% of the parts in any car sold in North America be produced in the United States or Mexico. Currently, about 62% of parts are required to be produced in the United States, Mexico or Canada.

- Higher labor standards: The new deal would require that 40% to 45% of auto parts in cars sold be made by workers earning at least $16 USD per hour.

- Sunset clause: The agreement will last for 16 years, and will be reviewed every six years.

Much of the business world has been worried about Trump's trade policies, and the stock market reacted positively to the news of a deal. The Dow closed nearly 260 points higher on Monday.

The agreement between the two countries could restart negotiations on NAFTA with all three parties -- the United States, Mexico and Canada.

Despite Trump's signal that the deal could lead to a bilateral trade agreement between the United States and Mexico, Peña Nieto, through a translator, expressed his "desire that now Canada will also be able to be incorporated in this."

Mexico and Canada have stood firm on the importance of maintaining the trilateral format of the NAFTA free trade deal, even as Trump has signaled a desire for individual deals with each country.

"Canada is encouraged by the continued optimism shown by our negotiating partners," said a spokesperson for Canadian Minister of Foreign Affairs Chrystia Freeland.

Progress between Mexico and the United States is a necessary requirement for any renewed NAFTA agreement," he said.

Freeland will travel to Washington on Tuesday to continue negotiations.

Negotiations on rewriting the three-country NAFTA agreement began about a year ago.

The 24-year-old trade agreement generally prevents the three parties from imposing tariffs on imports from one another. But Trump has called the agreement "the worst deal maybe ever signed" and moved ahead with tariffs earlier this year.

In May, the United States imposed steep tariffs on steel and aluminum from much of the world, including Mexico. In response, Mexico slapped tariffs on $3 billion of US goods, including steel, pork, apples, potatoes,

bourbon and different types of cheese. Canada imposed tariffs on $12.5 billion of US goods, including steel, toffee, maple syrup, coffee beans and strawberry jam.

## 2.      Judge Extends 3-D Printed Gun Ban Pending State Challenge | by Erik Larson | Bloomberg | August 27, 2018

https://www.bloomberg.com/news/articles/2018-08-27/3-d-printed-gun-ban-extended-by-judge-pending-state-challenge

A U.S. judge extended a ban on publishing blueprints for 3-D printed guns online, handing a procedural victory to states and gun-control groups that argue the practice will make it easy for criminals and terrorists to get their hands on untraceable firearms.

The injunction against Austin, Texas-based Defense Distributed was issued Monday by U.S. District Judge Robert Lasnik in Seattle, where 19 states and the District of Columbia sued to block it from making technical plans for an array of guns available globally on the internet with the government's blessing. The injunction will remain in place until the suit is resolved.

The 3-D printing of guns gained urgency after Defense Distributed reached a surprise settlement with President Donald Trump's administration resolving a 2015 government challenge. Former President Barrack Obama's administration had sued the firm on national-security grounds, alleging the publishing of gun schematics violated the federal Arms Export Control Act.

Trump said in July that allowing unfettered public access to instructions for making guns with 3-D printers doesn't "seem to make much sense," but he hasn't fought to stop it.

In Monday's ruling, Lasnik criticized the government's argument that the states won't be harmed by publication of the blueprints because the federal government is committed to battling undetectable firearms. The "very purpose" of Defense Distributed's plan is to "arm every citizen outside of the government's traditional control mechanisms," the judge said.

"It is the untraceable and undetectable nature of these small firearms that poses a unique danger," Lasnik said. "Promising to detect the undetectable while at the same time removing a significant regulatory hurdle to the proliferation of these weapons -- both domestically and internationally -- rings hollow and in no way ameliorates, much less avoids, the harms that are likely to befall the states if an injunction is not issued."

Josh Blackman, a lawyer Defense Distributed, said the company is reviewing the decision and considering all its options.

The ruling was hailed by New York Attorney General Barbara Underwood in a statement on Twitter.

Avery Gardiner, co-president of the Brady Campaign to Prevent Gun Violence, said the decision is "an unqualified success for the American public and, indeed, the global community."

"3D-printed guns represent a supreme threat to our safety and security, and we are grateful that Judge Lasnik recognized it as such," Gardiner said in a statement.

The Trump administration once appeared to back Obama's stance. In April, the U.S. urged dismissal of the company's lawsuit, highlighting the "potentially devastating" implications of online gun designs getting into the hands of terrorists, according to the Brady Center.

Weeks later, the government offered a settlement which gave the plaintiffs "everything they asked for, and more," the Brady Center said. The U.S. agreed to pay the company almost $40,000, a court filing shows.

"I'm glad we put a stop to this dangerous policy," Washington State Attorney General Bob Ferguson said in an emailed statement. "But I have to ask a simple question: Why is the Trump Administration working so hard to allow these untraceable, undetectable, 3D-printed guns to be available to domestic abusers, felons and terrorists?"

The State Department, which struck the deal with Defense Distributed, is also named in the suit. The U.S. changed the regulation after deciding firearms up to .50 caliber "would not provide a military advantage to adversaries and therefore no longer warrant export control," according to the ruling.

The U.S.'s argument that the federal government is limited in the matter to exports while the states' concerns are "purely domestic," according to Monday's ruling.

"Defendants' argument is so myopic and restrictive as to be unreasonable," Lasnik said.
"Whatever defendants' statutory authority, the fact is that the internet is both domestic and international."

— *With assistance by Kartikay Mehrotra*

### 3.    Iran asks UN's highest court to suspend US sanctions | by Mike Corder | AP – ABC6 News | August 27, 2018

https://abc6onyourside.com/news/nation-world/iran-asks-uns-highest-court-to-suspend-us-sanctions

THE HAGUE, Netherlands (AP) — Iran warned Monday that re-imposed U.S. sanctions would cripple its economy and plunge the volatile Middle East deeper into crisis as it urged the United Nations' highest court to suspend the Trump administration's economic pressure on Tehran.

In a written statement about the case at the International Court of Justice, U.S. Secretary of State Mike Pompeo called Iran's claims "meritless" and defended the sanctions as a way of keeping Americans safe.

The world court's wood-paneled Great Hall of Justice in The Hague is the latest backdrop for Washington and Tehran's high-stakes dispute about Iran's nuclear ambitions.

President Donald Trump said in May that he would pull the U.S. out of a 2015 agreement over Iran's nuclear program and would re-impose sanctions on Tehran. Washington also threatened other countries with sanctions if they don't cut off Iranian oil imports by early November.

Iran filed a case with the court in July challenging the re-imposition. Tehran alleges that the sanctions breach a 1955 bilateral agreement known as the Treaty of Amity that regulates and promotes economic and consular ties between the two countries.

The treaty was signed when the U.S. and Iran were still allies following the 1953 revolution — fomented by Britain and the U.S. — that ultimately cemented the rule of Shah Mohammad Reza Pahlavi.

However, diplomatic relations were severed following the 1979 Islamic Revolution in Iran and takeover of the U.S. Embassy and ensuing hostage crisis. Despite that dramatic deterioration in relations, the treaty remains in force.

Iran and the U.S. have a history of litigation at the International Court of Justice, in cases covering crises including the embassy seizure and the shooting down of an Iranian passenger jet mistaken by a U.S. warship for a fighter jet.

Rulings by the world court, which settles disputes between nations, are final and legally binding. However, it remains to be seen if the U.S. would abide by a court order to suspend sanctions on Iran.

At Monday's hearings, Tehran asked judges to urgently order a suspension of the sanctions while the case challenging their legality is being heard — a process that can take years. A decision on the urgent request for a suspension is likely to take weeks.

Iranian representative Mohsen Mohebi told the court the U.S. sanctions are a clear breach of the 1955 treaty because they are "intended to damage, as severely as possible, Iran's economy." He called Trump's sanctions policy "nothing but a naked economic aggression against my country."

Mohebi also warned that the sanctions could exacerbate regional tensions.

His comments came a day after Iran's defense minister said his country will continue its support of the Syrian government to ensure improved security in the region. Israel has expressed concern over Iran's growing influence in Syria, accusing Tehran of seeking to establish a foothold near the frontier with the Jewish state. The United States has been pressing for Iran to withdraw its fighters from Syria.

Iran's 2015 nuclear deal, brokered when Barack Obama was still in the White House, imposed restrictions on the Islamic Republic's nuclear program in return for the lifting of most U.S. and international sanctions against Tehran.

However, the deal came with time limits and did not address Iran's ballistic missile program or its regional policies in Syria and elsewhere. Trump called the accord the "worst deal ever."

Some U.S. allies oppose the sanctions and are seeking to keep the nuclear deal alive. Last week, the European Union announced a financial support package to help bolster Iran's flagging economy.

Pompeo called the world court challenge an attempt by Tehran "to interfere with the sovereign rights of the United States to take lawful actions, including re-imposition of sanctions, which are necessary to protect our national security."

The United States, which argues that the court does not have jurisdiction in the case, is to present its legal arguments to judges on Tuesday.

Pompeo said lawyers would "vigorously defend" the U.S. and "and we will continue to work with our allies to counter the Iranian regime's destabilizing activities in the region, block their financing of terror, and address Iran's proliferation of ballistic missiles and other advanced weapons systems that threaten international peace and stability. We will also ensure Iran has no path to a nuclear weapon — not now, not ever."

**4.     Korean trade minister: Seoul will be exempt from Section 232 auto tariffs | by Isabelle Hoagland | InsideTrade.com | August 27, 2018**

https://insidetrade.com/daily-news/korean-trade-minister-seoul-will-be-exempt-section-232-auto-tariffs

South Korean Trade Minister Kim Hyun-chong said last week he was confident the country would be exempted from any Section 232 restrictions on autos and auto parts, contending that provisions agreed to in the modernization of the U.S.-Korea Free Trade Agreement provided Seoul with protection.

"Rather than South Korea, I think [the U.S. auto tariffs will] mainly target other auto manufacturing countries, such as Mexico, Canada, Japan and the European Union," Kim said during an Aug. 21 parliamentary committee meeting, according to the state-backed Yonhap news service. "We are making our best efforts to get relief from the U.S. auto tariffs."

The Trump administration in May began a Section 232 investigation into the national security implications of auto and auto-parts imports that could lead to tariffs. President Trump has repeatedly threatened to hit auto imports with taxes.

U.S. Trade Representative Robert Lighthizer and Kim met on July 27 to discuss the next steps for updating KORUS, according to USTR. The meeting was the first for the two since the announcement of an agreement in principle on KORUS in March.

Members of the Korean National Assembly have pinned the ratification of the amended KORUS pact to the exclusion of Korean cars from U.S. tariffs, if they are imposed. The FTA amendments cannot go into force without parliamentary approval.

Kim reiterated that stance on Tuesday, adding that he was confident South Korea would be exempt because it has "already resolved auto issues in the KORUS FTA negotiations."

On March 28, the U.S. and South Korea agreed in principle to an extended phaseout of the 25 percent U.S. tariff on trucks. Under the original pact, the U.S. tariffs would have ended in 2021, but Korea agreed to extend the phaseout to 2041 – a total of 30 years following the 2012 implementation of the FTA. Korea also agreed to increase the number of U.S. cars eligible to be sold every year under U.S. car safety standards, from 25,000 per U.S. manufacturer to 50,000.

Last year, Korea exported roughly $16 billion in new passenger vehicles to the U.S. and shipped approximately $8 billion in auto parts, according to data from the U.S. International Trade Commission.

Kim also confirmed that the two countries would formally sign the revised FTA in September, as *Inside U.S. Trade* has reported. The U.S. completed its 60-day congressional consultation period on Aug. 13, according to Yonhap. The Senate Finance Committee did not respond to requests on whether the consultation period had concluded. The House Ways & Means Committee declined to comment.

Earlier this month, Troy Stangarone, senior director for congressional affairs and trade at the Korea Economic Institute, said Section 232 tariffs would severely disadvantage Seoul's auto industry, which would put South Korean automakers in a worse position than if KORUS was dissolved.

"Rather than the 2.5 percent tariff that South Korean automobiles would have faced from an end to the KORUS FTA, they would now face a tariff 10 times higher," he added, alluding to reports that Trump was considering the imposition of 25 percent tariffs as a result of the autos probe.

Last week, the National Foundation for American Policy predicted that a KORUS termination would cost U.S. households $4.6 billion annually and $22.8 billion over five years. – *Isabelle Hoagland* (ihoagland@iwpnews.com)

**5.     A Trade 'Security' Safeguard - The Pentagon these days is less protectionist than Commerce. | by The Editorial Board | WSJ | August 26, 2018**

https://www.wsj.com/articles/a-trade-security-safeguard-1535311673

As President Trump wields his tariff sword at friend and foe, Congress has been struggling to restore a check on his unilateral whim. The latest idea would put the Pentagon in charge of deciding when imports threaten national security.

The Constitution gives Congress the authority to regulate foreign trade. But with Section 232 of the Trade Expansion Act of 1962, Congress ceded to Presidents the power to impose tariffs when the Commerce Department decides that imports harm U.S. security. Presidents Nixon and Ford used the power to tax oil imports in the 1970s. But Mr. Trump has used it like no other President as a protectionist carte blanche, as Commerce has followed his orders to conjure threats from steel and aluminum imports and may soon do the same on autos and auto parts.

Enter Senate Republicans Rob Portman (Ohio) and Joni Ernst (Iowa) and Alabama Democrat Doug Jones, who are pitching the Trade Security Act. The bill's main feature would take responsibility for investigating national-security trade threats away from Commerce and give it to the Defense Department, whose business is national security.

If Defense finds a security threat, Commerce and the U.S. Trade Representative would fashion a remedy. The President would decide on the remedy, but Congress would have the right to disapprove of his decision with a joint resolution in the House and Senate. This would expand Congress's role in Section 232 cases, which is currently limited to disapproving a decision on oil imports.

Believe it or not, today's Pentagon is less protectionist than the civilian bureaucracy that is supposed to promote commerce. U.S. weapons acquisition is global, and U.S. security strategy requires allies. Countries with strong U.S. trading ties tend to be allies.

In a memo last year to Commerce on steel and aluminum imports, Defense Secretary James Mattis noted that "the U.S. military requirements for steel and aluminum each only represent about three percent of U.S. production. Therefore, DoD does not believe that the findings in the reports impact the ability of DoD programs to acquire the steel·or aluminum necessary to meet national defense requirements."

We prefer the proposal from GOP Senators Bob Corker of Tennessee and Pat Toomey of Pennsylvania that would require the President to get congressional approval before the Administration can impose 232 tariffs. But for now that doesn't have the votes to pass the House or Senate, and the Portman-Jones effort might. If nothing else it would give free-trading Senators in both parties a chance to send a message to Mr. Trump that his political leave on trade has limits. It would also give farm state Senators a chance to show they're standing against tariffs that are damaging exports and farm income.

After the Smoot-Hawley disaster of 1930, Congress ceded trade power to Presidents on the assumption that they would open foreign markets and expand commerce. Mr. Trump is the first President to use this authority largely

for protectionist ends. Restoring better judgment to Section 232 findings with Pentagon analysis and congressional oversight would restore some constitutional balance.

## 6. Pat Toomey urges Commerce officials to speed up decisions on tariff exclusions | by Laura Olson | The Morning Call [Allentown, PA] | August 28, 2018

http://www.mcall.com/news/nationworld/pennsylvania/capitol-ideas/mc-biz-pat-toomey-tariff-exclusions-lehigh-valley-20180827-story.html

The metal used in making vehicle brake lines has to meet exacting standards.

Not just any steel will pass safety requirements, and Apollo Metals hasn't been able to find the right products in the U.S. So the Bethlehem company imports what it needs for its copper and brass-plated cold rolled steel products from a sister company in the Netherlands.

But with the Trump administration's tariffs raising costs on imported steel, Apollo has sought an exemption, telling the Commerce Department in late May that it doesn't have an adequate domestic alternative.

So far, the company hasn't heard back.

It's not alone — Apollo Metals is among a list of manufacturers in Pennsylvania that have been left in limbo, according to a letter that U.S. Sen. Pat Toomey sent last week to Commerce Secretary Wilbur Ross.

Of the 28,000 requests from manufacturers and other users of steel and aluminum that have been submitted to the Department of Commerce seeking tariff exclusions, only 3,500 have been approved or denied, Toomey wrote, urging the agency to pick up the pace.

"I remain concerned that the department's exclusion process is inefficient and unnecessarily burdensome, resulting in the delay of timely determinations for American companies seeking financial relief," Toomey wrote in the Aug. 22 letter, noting that some of the same companies have been waiting since he sent a similar letter in April.

In addition to Apollo, Toomey's list of companies with pending requests includes two others with a presence in the Lehigh Valley — Tioga Pipe, which has a distribution center in Easton, and Palmerton-area Ampal Inc. Officials from those operations didn't return requests for comment Monday.

A Commerce spokesman confirmed that the agency received Toomey's letter, and said the department has been training new staffers to handle the remaining requests.

The Trump administration has imposed the steel and aluminum tariffs, citing a law allowing the president to do so if imported goods threaten national security. While it has created a process for exemptions, some companies have to fill out dozens of requests to account for a range of products.

Daniel Shackell, vice president for steel sourcing for Philadelphia-based Crown Cork & Seal, told the Associated Press last month that he was not optimistic about the company's chances of getting all 70 of its waiver requests approved. Eight had been granted by late July, primarily because the metal specified in those requests is not made in the United States, and 12 others had been denied.

Ampal officials also have filed multiple exclusion requests with the Department of Commerce, seeking to avoid the recently imposed tariffs on aluminum it imports from Canada.

The company's president, Louise Ramsey Thomas, told The Morning Call last month that there's just one U.S. smelter from which Ampal can buy the T-bar ingots compatible with its manufacturing line, and it's in Washington State. That forces the company to choose between higher transportation costs or a 10 percent tariff, with either representing a major disruption to business.

In its request to be excluded from the newly imposed steel tariffs, Apollo officials said they tried in 2012 to source the materials the company needs from domestic mills and was unable to find a facility that could meet its gauge tolerance requirements.

"Any variation in the tolerance can therefore result in brake line failure, a highly dangerous condition that the rigid automotive industry standards imposed on the input steel are designed to prevent," company officials wrote, describing the steel as a "low volume, high value product, and no U.S. producer makes it."

Apollo officials also submitted a letter from the United Steelworkers union representing its workers, arguing that granting the exemption would help support jobs at the facility.

*Morning Call reporter Andrew Wagaman contributed to this report.*

**From**: Jim Bartlett, Full Circle Compliance ████@fullcirclecompliance.eu]
**Sent**: 8/28/2018 6:52:42 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 18-0828 Tuesday "Daily Bugle"



## Tuesday, 28 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

[No items of interest noted today.]

### OTHER GOVERNMENT SOURCES

1. Items Scheduled for Publication in Future Federal Register Editions
2. Commerce/BIS: (No new postings.)
3. State/DDTC: "Registration for 19 Sep In-House Seminar Closes on Friday"

### NEWS

4. Bloomberg: "Judge Extends 3-D Printed Gun Ban Pending State Challenge"
5. Global Trade News: "India Announces Tariff Hike - U.S. and Chinese Imports to Be Impacted"
6. ST&R Trade Report: "Forced Labor Risk Management Principles Recommended for Importers"

### COMMENTARY

7. A. De Busk, M.L. Duffy & S. Kane: "U.S. Moves Cautiously to Impose Mandated Sanctions Against Russia, While Congress Mulls Further Measures"

### EX/IM TRAINING EVENTS & CONFERENCES

8. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep
9. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands

**EDITOR'S NOTES**

10.    Bartlett's Unfamiliar Quotations

11.    Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (6 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)

12.    Weekly Highlights of the Daily Bugle Top Stories



## ITEMS FROM TODAY'S FEDERAL REGISTER

[No items of interest noted today.]

back to top

* * * * * * * * * * * * * * * * * * *

## OTHER GOVERNMENT SOURCES

## 1. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Chemical Weapons Convention Provisions of Export Administration Regulations [Publication Date: 29 Aug 2018.]

* Justice/ATF; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Application for Explosives License or Permit [Publication Date: 29 Aug 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 2.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3.
## State/DDTC: "Registration for 19 Sep In-House Seminar Closes on Friday"
(Source: State/DDTC, 28 Aug 2018.)

Registration for The Directorate of Defense Trade Controls (DDTC) In-House Seminar for Wednesday, September 19th, 2018 opens August 10th and closes August 31st. Attendees will be identified on a first-come, first-serve basis. Preference will be given to new registrants and small-businesses. A completed registration form must be sent to the DDTC In-House Seminar email, as an attachment, DDTCInHouseSeminars@state.gov.

For more information, please visit the DDTC Outreach Programs page and click the "In-House Seminars" tab.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NEWS

## 4. Bloomberg: "Judge Extends 3-D Printed Gun Ban Pending State Challenge"
(Source: Bloomberg, 27 Aug 2018.) [Excerpts.]

A U.S. judge extended a ban on publishing blueprints for 3-D printed guns online, handing a procedural victory to states and gun-control groups that

argue the practice will make it easy for criminals and terrorists to get their hands on untraceable firearms.

The injunction against Austin, Texas-based Defense Distributed was issued Monday by U.S. District Judge Robert Lasnik in Seattle, where 19 states and the District of Columbia sued to block it from making technical plans for an array of guns available globally on the internet with the government's blessing. The injunction will remain in place until the suit is resolved.

The 3-D printing of guns gained urgency after Defense Distributed reached a surprise settlement with President Donald Trump's administration resolving a 2015 government challenge. Former President Barrack Obama's administration had sued the firm on national-security grounds, alleging the publishing of gun schematics violated the federal Arms Export Control Act. ...

back to top

* * * * * * * * * * * * * * * * * *


## 5. Global Trade News: "India Announces Tariff Hike - U.S. and Chinese Imports to Be Impacted"
(Source: Integration Point Blog, 27 Aug 2018.) [Excerpts.]

*India's Tariff Hike on the United States*

On June 20, 2018 India proposed a retaliatory tariff on certain goods imported in significant proportion from the U.S. The decision was reached in response to the increased tariff on steel and aluminum imposed by the U.S. in March to protect its national security. According to the notification released on August 3, 2018 by India's Ministry of Finance (Department of Revenue), the increased tariff which was to come into effect on August 4, 2018 will now come into force on September 18, 2018.

On June 14, 2018 India informed the World Trade Organization (WTO) that it would impose additional duty on 30 commodities imported from the U.S. In the revised notification submitted to the WTO Council for Trade in Goods, India argued that the suspension of concessions or other obligations on these commodities was on par to the losses India would incur due to the safeguard measures adopted by the U.S. earlier this year.

By implementing this measure India would breach the WTO mandated bound tariff rates, the rate which is applied to all the WTO member states under the most favored nation scheme. ...

*India's Tariff Hike on China ...*

back to top

* * * * * * * * * * * * * * * * * *

# 6. ST&R Trade Report: "Forced Labor Risk Management Principles Recommended for Importers"
(Source: Sandler, Travis & Rosenberg Trade Report, 28 Aug 2018.)

U.S. Customs and Border Protection has posted to its website a list of recommended business practices to address the risk of forced labor in global supply chains.

19 USC 1307 prohibits the importation of goods mined, produced, or manufactured, wholly or in part, in any foreign country by forced labor, including convict labor, forced child labor, and indentured labor. Such goods are subject to exclusion and/or seizure and may lead to criminal investigation of the importer. The Trade Facilitation and Trade Enforcement Act of 2015 closed a loophole in this law that had allowed imports of certain forced labor-produced goods if they were not produced domestically in such quantities as to meet consumptive demands. When information reasonably indicates that violative goods are being imported CBP may issue withhold release orders against those goods.

CBP encourages stakeholders to closely examine their supply chains to ensure that imported goods are not mined, produced, or manufactured, wholly or in part, with prohibited forms of labor; i.e., slave, convict, forced child, or indentured labor. To that end, the agency has recommended the Department of Labor's Comply Chain principles for creating a social compliance system as a best business practice.

*Comprehensive Supply Chain Profile*

  - Does the U. S. importer have a comprehensive understanding of the natural supply chain from sourcing of raw materials to subcontracting manufacturing to the assembly of finished goods destined for the U.S.?
  - With respect to its products, has the U.S. importer conducted a comprehensive risk assessment of forced labor in the global supply chain and conducted onsite production visits to the factory, farm, or mine for high-risk countries?
  - Is the U.S. importer engaged with industry specific multi-stakeholder initiatives?

*Written Code of Conduct*

  - Has the U.S. importer developed and applied a formal written code of conduct for all international interactions associated with the sourcing of foreign goods?
  - Is the code of conduct shared with all suppliers in the global supply chain as a stand-alone document or as addendums to purchase orders, contracts, or letters of credit?
  - Does the code of conduct include specific language as to minimum labor standards as specified by the International Labor Organization, other intergovernmental organizations, or multi-stakeholder initiatives?

*Robust Internal Control Process*

- Are the internal controls established according to professionally recognized objective audit standards?
- Does the U.S. importer have sufficient internal controls in place to effectively deter and detect instances of noncompliance with the code of conduct and other best practices?
- Does the U.S. importer conduct periodic compliance audits using in-house personnel or external audit professionals?
- Does the U.S. importer's internal control process cover every level of the product supply chain including relevant business documents?
- Does the U.S. importer have adequate corrective action plans to address noncompliance and deter weak business practices?

back to top

* * * * * * * * * * * * * * * * * *

## COMMENTARY

## 7. A. De Busk, M.L Duffy & S. Kane: "U.S. Moves Cautiously to Impose Mandated Sanctions Against Russia, While Congress Mulls Further Measures"
(Source: Dechert LLP, 27 Aug 2018.)

* Authors: Amanda DeBusk, Esq., amanda.debusk@dechert.com; Melissa L. Duffy, Esq., melissa.duffy@dechert.com; and Sean Kane, sean.kane@dechert.com. All of Dechert LLP.

On August 24, 2018, the U.S. Department of State announced a new but limited export licensing policy for defense and national security-sensitive goods and technology to Russia, effective August 27, 2018. The export licensing policy, as well as other restrictions related to arms sales and foreign assistance, were required by law following the Trump Administration's finding of Russian culpability for the March 2018 chemical poisonings in the United Kingdom. However, the State Department did not go as far as the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (the CBW Act) would have allowed; the State Department invoked its waiver authority to limit the scope of several provisions and focus the restrictions on Russian government entities, as well as state-owned and state-funded enterprises.

The licensing policy essentially formalizes current export control policies already in effect toward Russia. Although the CBW Act requires the imposition of additional sanctions in 90 days unless certain conditions are met, the limited nature of this action suggests the Administration will seek to limit the scope of further measures. Not to be deterred, however,

Congress is weighing two bills that could significantly escalate financial and trade sanctions against Russia, signaling bipartisan frustration with the Administration's use of existing authorities to counter Russia's alleged interference in U.S. elections.

### CBW Act Sanctions

On March 4, 2018, former Russian military officer and U.K. intelligence agent Sergei Skripal and his daughter fell victim to an apparent poisoning in Salisbury, England. A U.K. investigation revealed the use of a Novichok nerve agent and attributed the attack to Russia, and U.S. government officials announced their support of the U.K. government's position. Congress then submitted a request to the President under the CBW Act seeking a determination as to whether Russia had used chemical or biological weapons in violation of international law. Under the CBW Act, the President had 60 days to respond, and if he so determined or did not respond within 60 days, sanctions automatically would be triggered.

On August 6, 2018, the State Department made its formal finding, triggering a 15-day congressional notification period that ended on August 22, 2018.

On August 24, 2018, the Department of State published guidance on its imposition of sanctions under the CBW Act, which will remain in effect for at least one year. The initial sanctions include:

  - The termination of foreign assistance except for urgent humanitarian assistance and food or other agricultural commodities or products - the Administration has entirely waived this provision, thus that sanction is not being implemented;
  - The termination of foreign military sales and an export licensing ban on defense articles;
  - The termination of foreign military financing;
  - The denial of U.S. government financial assistance, including through the Export-Import Bank of the United States; and
  - A licensing policy of denial for exports of national security-sensitive goods and technology (meaning, dual-use items that would require a license or exception for Russia) to the Russian government and state-owned or funded enterprises.

The last of these measures was expected to be the most impactful. However, the Department of State invoked a national security waiver under the CBW Act to substantially narrow the scope of that provision, essentially continuing a pre-existing export licensing policy depending on the end-use and end-user. Moreover, the licensing policy does not add new licensing requirements or impact items that would not require a license for export to Russia (e.g., EAR99 items). For transactions requiring a license, exceptions are still valid for the following types of exports: U.S. government and international organization end users, certain encryption item transactions, repairs and replacements of previously authorized products, personal baggage, temporary exports (e.g., tools of trade), limited-use software and

technology, certain previously authorized re-exports, civilian end users, and aviation/vessel related end uses. [FN/1]

For the following types of transactions, currently licensed exports of dual-use items are unaffected, and new license requests will be subject to the case-by-case licensing policy in place before August 27, 2018:

  - Exports and reexports to wholly-owned U.S. subsidiaries in Russia;
  - Exports and reexports for civil fixed-wing passenger aviation safety;
  - Deemed exports and reexports of technology to Russian nationals;
  - Exports and reexports in support of government space cooperation and commercial space launches;
  - Exports and reexports for commercial end users and civil end uses in Russia.

Exports of all defense articles and services are subject to a formal licensing policy of denial, with a narrow carve-out for case-by-case license approval for space cooperation activities. Dual-use products and technology requiring a license for Russia are subject to a formal licensing policy of denial for the Russian government and state-owned or state-funded enterprises. This essentially is a continuation of the existing licensing policy already implemented informally by the U.S. government for sensitive exports to Russia.

Russia will face additional sanctions under the CBW Act unless President Trump certifies to Congress within three months of August 22 that Russia is no longer using chemical or biological weapons in violation of international law, has committed to ceasing such practices in the future, and is willing to allow inspections by the United Nations or other observers. If Russia does not meet these requirements, then the CBW Act requires the U.S. government to impose three or more of the following sanctions (which may similarly be subject to waivers):

  - A prohibition on all exports other than food and agricultural commodities;
  - Restrictions on the import of Russian goods;
  - A ban on Russian government-owned air carriers traveling to or from the United States;
  - Halting the provision of loans or credit by U.S. banks to the Russian government (except for the purchase of food or agricultural commodities);
  - Opposition by the U.S. government to any provision by international financial institutions of financial or technical assistance to Russia; or
  - A downgrading of diplomatic relations between the United States and Russia.

Some of these measures could result in a significant escalation of U.S. sanctions against Russia-most prominently, by authorizing a near-comprehensive trade embargo against Russia. However, the Administration could also meet the requirements of the CBW Act by choosing three less impactful measures-such as a downgrading of diplomatic relations, opposition to international financial institution assistance, and the prohibition on loans or credit issued to the Russian government, measures

that are largely in place already. The Administration could further soften the blow by issuing additional waivers under the CBW Act, or by invoking contract sanctity provisions that would limit the impact of sanctions on existing business. Based upon the initial application of measures under the CBW Act, it does not appear the Administration is keen to significantly and indiscriminately escalate sanctions against Russia. However, it may feel compelled to take some action in the coming months in order to alleviate pressure it is facing from Congress.

## Pending Sanctions Legislation

The U.S. Congress is weighing two bills that could expand further sanctions against Russia for its alleged role in U.S. election hacking and other acts of cybercrime. During hearings on August 21, 2018, members of the Senate Foreign Relations and Banking Committees emphasized the need to strengthen existing sanctions against Russia.

### Defending American Security from Kremlin Aggression Act of 2018

A bipartisan coalition of Senators submitted legislation in August that would establish sanctions against a wide range of Russian individuals and entities. Under the Defending American Security from Kremlin Aggression Act of 2018 (DASKAA), the President would be required to expand existing sanctions to target a wide range of Russian entities and individuals.

Specifically, the legislation would mandate sanctions against political figures, oligarchs, parastatal entities, and affiliates who facilitate illicit or corrupt activities on behalf of President Vladimir Putin. It would also require the President to impose new sanctions targeting investments in Russian energy and oil projects and Russian sovereign debt issuances, and it would block the assets of one or more key Russian financial institutions. In implementing the latter provisions, the President would be required to prescribe regulations prohibiting U.S. persons from dealing in any way with a variety of financial instruments-including bond issuances, foreign exchange swap agreements, or any other financial instruments determined to be Russian sovereign debt-with a maturity of more than 14 days.

### Defending Elections from Threats by Establishing Redlines Act of 2018

The U.S. Senate is also considering the Defending Elections from Threats by Establishing Redlines Act of 2018 (the DETER Act), which would require the Office of the Director of National Intelligence (DNI) to assess, within 30 days after any U.S. election, whether a foreign government interfered with the election in any manner and to report its findings to Congress. The bill would establish specific penalties only if the DNI finds that the Russian government interfered in an election. In such cases, the U.S. government would block the assets of a variety of Russian entities and individuals, including financial institutions, energy companies, defense and intelligence firms, state-owned entities, and political figures and oligarchs. The severity of the measures that would be automatically triggered in such an event appears to make the DETER Act less likely to gain adequate support in Congress.

In addition to establishing potential penalties against Russia, the bill would also require certain reporting by the President, who would be tasked with (1) briefing appropriate congressional committees on any governments likely to engage in election interference every 90 days and (2) submitting a report on appropriate deterrence strategies against the governments of China, Iran, North Korea, and other countries determined by the President to be likely to engage in election interference.

*Conclusion*

Although the Administration has taken a relatively cautious approach to the administration of sanctions under the CBW Act, it will face political pressure to move more aggressively against Russia in the coming months, especially if it seeks to head-off new legislation from Congress that would bind its hands even further. Under the circumstances, companies should expect an additional tightening of sanctions on Russia in the coming months, whether it is imposed under executive authorities or through new legislation.

----------

  [FN/1] The waiver permits continued use of License Exceptions GOV, ENC, RPL, BAG, TMP, TSU, APR, CIV, and AVS. See 15 C.F.R. Part 740.

back to top

* * * * * * * * * * * * * * * * * * *

## EX/IM TRAINING EVENTS & CONFERENCES

## 8. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep
(Source: S. Palmer, spalmer@exportcompliancesolutions.com.)

* What: The ECS ITAR/EAR Symposium & Boot Camp, Annapolis, MD
* When: September 11-13, 2018
* Where: Chart House Restaurant on Spa Creek
* Sponsor: Export Compliance Solutions & Consulting (ECS)
* ECS Speaker Panel:  Timothy Mooney, Commerce/BIS; Matt Doyle, Lockheed; Matt McGrath, McGrath Law, Scott Jackson, Curtiss-Wright, Suzanne Palmer & Mal Zerden.
* Register here for the three-day event or by calling 866-238-4018 or e-mail spalmer@exportcompliancesolutions.com.

back to top

* * * * * * * * * * * * * * * * * * *

## 9. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu

*Register before 2 September and get a 10% Early Bird discount on the course fee!*

back to top

* * * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 10. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Johann Wolfgang von Goethe** (28 Aug 1749 - 22 Mar 1832; was a German writer and statesman. His works include four novels; epic and lyric poetry; prose and verse dramas; memoirs; an autobiography; literary and aesthetic criticism; and treatises on botany, anatomy, and color.)
  - *"Knowing is not enough; we must apply. Willing is not enough; we must do."*
  - *"Correction does much, but encouragement does more."*

back to top

* * * * * * * * * * * * * * * * * * *

## 11. Are Your Copies of Regulations Up to Date?

(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the

official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *

## 12. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published here.

back to top

* * * * * * * * * * * * * * * * * * *

EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and

Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

DOC_0004233

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

**From:** Jim Bartlett, Full Circle Compliance ("FCC") [REDACTED]@fullcirclecompliance.eu]
**Sent:** 8/29/2018 7:07:25 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0829 Wednesday "Daily Bugle"



## Wednesday, 29 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.   Commerce/BIS Seeks Comments Concerning CWC Provisions of the EAR
2.   Justice/ATF Seeks Comments Concerning Application for Explosives License or Permit

### OTHER GOVERNMENT SOURCES

3.   Items Scheduled for Publication in Future Federal Register Editions
4.   Commerce/BIS: (No new postings.)
5.   State/DDTC: (No new postings.)
6.   Singapore Customs Releases Notice Concerning TradeXchange

### NEWS

7.   AD: "Dutch Customs Never Stopped Shipment for Controversial Russia-Crimea Bridge"
8.   Popular Mechanics: "Defense Distributed Is Selling 3D Printed Gun Files -- Through the Mail"
9.   ST&R Trade Report: "U.S., Mexico Announce Trade Agreement; Talks with Canada Expected Soon"
10.   The Verge: "Inside the United Nations' Effort to Regulate Autonomous Killer Robots"

### COMMENTARY

11.   E. McClafferty, L. van der Meer & R. Slack: "Preparing for the Worst: Licenses Needed for UK Export of Dual Use Items"

12.    M. Padovan, M. Zinzani & V. Picchiassi: "Iran: The First Package of U.S. Extraterritorial Sanctions and the Update of the EU Blocking Statute"

13.    R.C. Burns: "Newsweek Gets Confused by OFAC Travel Rules"

**EX/IM TRAINING EVENTS & CONFERENCES**

14.    FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands

**EDITOR'S NOTES**

15.    Bartlett's Unfamiliar Quotations

16.    Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (3 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (14 Feb 2018)

17.    Weekly Highlights of the Daily Bugle Top Stories



**ITEMS FROM TODAY'S FEDERAL REGISTER**

# 1. Commerce/BIS Seeks Comments Concerning CWC Provisions of the EAR
(Source: Federal Register, 29 Aug 2018.) [Excerpts.]

* AGENCY: Bureau of Industry and Security.
* ACTION: Notice.

* SUMMARY: The Department of Commerce, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other Federal agencies to take this opportunity to comment on proposed and/or continuing information collections, as required by the Paperwork Reduction Act of 1995.

* DATES: Written comments must be submitted on or before October 29, 2018.

* ADDRESSES: Direct all written comments to Jennifer Jessup, Departmental Paperwork Clearance Officer, Department of Commerce, 1401 Constitution Avenue NW, Room 6616, Washington, DC 20230 (or via the internet at *docpra@doc.gov.*

* FOR FURTHER INFORMATION CONTACT: Requests for additional information or copies of the information collection instrument and instructions should be directed to Mark Crace, BIS ICB Liaison, (202) 482-8093 or at *mark.crace@bis.doc.gov.*

* SUPPLEMENTARY INFORMATION: ... The Chemical Weapons Convention (CWC) is a multilateral arms control treaty that seeks to achieve an international ban on chemical weapons (CW). The CWC prohibits, the use, development, production, acquisition, stockpiling, retention, and direct or indirect transfer of chemical weapons. This collection implements the following export provision of the treaty in the Export Administration Regulations (EAR):

*Schedule 1 notification and report:* Under Part VI of the CWC Verification Annex, the United States is required to notify the Organization for the Prohibition of Chemical Weapons (OPCW), the international organization created to implement the CWC, at least 30 days before any transfer (export/import) of Schedule 1 chemicals to another State Party. The United States is also required to submit annual reports to the OPCW on all transfers of Schedule 1 Chemicals.

*Schedule 3 End-Use Certificates:* Under Part VIII of the CWC Verification Annex, the United States is required to obtain End-Use Certificates for exports of Schedule 3 chemicals to States that are not Party to the CWC to ensure the exported chemicals are only used for the purposes not prohibited under the Convention. ...

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden (including hours and cost) of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology. Comments submitted in response to this notice will be summarized and/or included in the request for OMB approval of this information collection; they also will become a matter of public record.

Sheleen Dumas, Departmental Lead PRA Officer, Office of the Chief Information Officer.

back to top

* * * * * * * * * * * * * * * * * *

## 2. Justice/ATF Seeks Comments Concerning Application for Explosives License or Permit

(Source: Federal Register, 29 Aug 2018.) [Excerpts.]

* AGENCY: Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Justice
* ACTION: 30-Day notice.
* SUMMARY: The Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), will submit the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995.
* DATES: The comment period for the proposed information collection published on June 28, 2018 (83 FR 30457) is reopened. Comments are encouraged and will be accepted for an additional 30 days until September 28, 2018. ...
* SUPPLEMENTARY INFORMATION: The proposed information collection was previously published in the Federal Register, on June 28, 2018 (83 FR 30457), allowing for a 60-day comment period. Written comments and suggestions from the public and affected agencies concerning the proposed collection of information are encouraged.

*Overview of This Information Collection*

  - *Type of Information Collection:* Extension, without change, of a currently approved collection.
  - *The Title of the Form/Collection:* Application for Explosives License or Permit. ...
  - *Form number:* ATF F 5400.13/5400.16.
  - *Component:* Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Department of Justice. ...
  - *Abstract:* Chapter 40, Title 18, U.S.C., provides that any person engaged in the business of explosive materials as a dealer, manufacturer, or importer shall be licensed (18 U.S.C. 842(a)(1)). In addition, provisions are made for the issuance of permits for those who wish to use explosive materials that are shipped in interstate or foreign commerce. ...

If additional information is required contact: Melody Braswell, Department Clearance Officer, United States Department of Justice, Justice Management Division, Policy and Planning Staff, Two Constitution Square, 145 N Street NE, 3E.405A, Washington, DC 20530.

  Dated: August 24, 2018.
Melody Braswell, Department Clearance Officer for PRA, U.S. Department of Justice.

back to top

* * * * * * * * * * * * * * * * *

## 3. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce/BIS;
  - RULES; Revisions to Export Administration Regulations Based on 2017 Missile Technology Control Regime Plenary Agreements; and
  - NOTICES; Meetings: Regulations and Procedures Technical Advisory Committee [Publication Dates: 30 Aug 2018.]

* State; RULES; Continued Temporary Modification of Category XI of the United States Munitions List [Publication Date: 30 Aug 2018.]

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 5. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 6. Singapore Customs Releases Notice Concerning TradeXchange
(Source: Singapore Customs, Notice 16/2018, 27 Aug 2018.)

Singapore Customs has announced that all TradeXchange services have been fully migrated and made available on the National Trade Platform (NTP) since May 2018. As such, TradeXchange will be decommissioned on 28 October 2018 at 2359 hours, and access to TradeXchange services will only be available on the NT.

For existing TradeXchange users who have yet to set up your NTP account, please do so immediately. Information on how to set up your NTP account can be found here.

Businesses are required to use their CorpPass to access the NTP and hence you will need to select the "Singapore Customs NTP" e-Service in CorpPass. Find out more and register today here.

back to top

NEWS

## 7.
## AD: "Dutch Customs Never Stopped Shipment for Controversial Russia-Crimea Bridge"
(Source: AD, 29 Aug 2018.) [Excerpts; translation by editor.]

The EU sanctions concerning the Russia-Crimea Bridge were easy to circumvent. Dutch Customs never intercepted shipments, but is now investigating ten to twenty Dutch companies that may have violated EU sanctions regulations.

The European Parliament is concerned. The EU implements sanctions more often, but they seem to lose their strength. "The credibility is at stake", says Member of Parliament Marietje Schaake (D66). For example, a Belgian company previously provided prohibited components of chemical weapons to Syria.

In recent months, Dutch customs authorities carried out an investigation among a total of "ten to twenty" companies based in the Netherlands concerning possible involvement in the construction of the controversial bridge between Russia and Crimea, according to the *Gelderlander*. ...

Whether shipments for the Crimean Bridge are not or not properly controlled via an intermediary in another country or another region, Customs does not want to say. However, a spokeswoman says: "Dutch Customs does not... have any influence on the use or forwarding of these goods after they have reached the specified destination." Companies are obliged to investigate the end-use and end-user of a controlled item. ...

The fact that consignments for the Russia-Crimea Bridge were never stopped can in theory mean Dutch companies are export compliant, according to MEP van D66 Marietje Schaake. However, she finds it "worrisome" that an increasing number of companies acted contrary to the sanctions rules. "The question is whether [these] companies deliberately circumvented the sanctions or whether [regulatory] supervision failed."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8.
## Popular Mechanics: "Defense Distributed Is Selling 3D Printed Gun Files -- Through the Mail"

(Source: Popular Mechanics, 28 Aug 2018.) [Excerpts.]

*Becoming the iTunes of gun files instead of the Napster.*

Cody Wilson, founder of Defense Distributed, has announced that while his site will comply with federal orders to halt internationally publishing CAD files of firearms on his website, such compliance comes with a catch. The site will begin selling the files via snail mail instead.

Defense Distributed has undergone a legal battle for years with its publishing of gun-related CAD files. Under President Obama in 2013, the State Department accused Wilon and Defense Distributed of violating the International Traffic in Arms Regulations (ITAR), which are meant to prevent the exporting of defense technology.

Defense Distributed and the State Department wrangled for years over issues of defense and free speech until July 10, 2018, when the federal government offered Defense Distributed a settlement in with the Department of Justice would pay $40,000 of Defense Distributed's legal fees and allow it to restart its business as usual.  ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

9.
## ST&R Trade Report: "U.S., Mexico Announce Trade Agreement; Talks with Canada Expected Soon"
(Source: Sandler, Travis & Rosenberg Trade Report, 29 Aug 2018.)

The presidents of the U.S. and Mexico announced Aug. 27 a preliminary agreement in principle on a bilateral free trade agreement that President Trump indicated will replace NAFTA. The deal is expected to be signed in late November following a 90-day congressional review period. Trump said the U.S. will also begin "pretty much immediately" trade negotiations with Canada that will result in either a separate bilateral FTA or Canada's addition to the U.S.-Mexico agreement.

Companies importing from Mexico should act now to assess the possible impact of these changes on their supply chains. Sandler, Travis & Rosenberg can help companies review their operations and import data to evaluate potential effects and responses.

Arguing that NAFTA has contributed to the growing U.S. goods trade deficit and includes many provisions that do not reflect modern standards, new technologies, or the 21st century global economy, the Office of the U.S. Trade Representative states that the U.S.-Mexico agreement includes the following provisions, among others.

*Rules of Origin and Market Access*

- 75 percent of auto content must be made in the U.S. and Mexico
- 40-45 percent of auto content must be made by workers earning at least $16 per hour
- stronger rules of origin, including for industrial products such as chemicals, steel-intensive products, glass, and optical fiber
- procedures that streamline certification and verification of rules of origin and new cooperation and enforcement provisions to help prevent duty evasion before it happens
- new provisions for transparency in import licensing and export licensing procedures
- prohibition on (a) requirements to use local distributors for importation, (b) restrictions on the importation of commercial goods that contain cryptography, and (c) import restrictions on used goods to remanufactured goods
- updated provisions for duty-free temporary admission of goods to cover shipping containers or other substantial holders used in the shipment of goods
- new provisions covering trade in specific manufacturing sectors, including information and communication technology, pharmaceuticals, medical devices, cosmetic products, and chemical substances

*Textiles and Apparel*

- limit on rules that allow for some use of non-NAFTA inputs in textile and apparel trade
- requirement that sewing thread, pocketing fabric, narrow elastic bands, and coated fabric, when incorporated in apparel and other finished products, be made in the region for those finished products to qualify for trade benefits
- textile-specific verification and customs cooperation provisions that provide new tools for strengthening customs enforcement and preventing fraud and circumvention

*Agriculture*

- agreement to not use export subsidies or World Trade Organization special agricultural safeguards for products exported to each other's market
- improved commitments to increase transparency and consultation regarding the use of export restrictions for food security purposes
- when supporting producers, agreement to consider using domestic support measures that have minimal or no trade distorting or production effects
- improved transparency for import checks
- new provisions on geographical indications
- first-ever agreement to protect the confidentiality of proprietary formulas for food products in the same manner for domestic and imported products

*IPR*

- enforcement authorities must be able to stop goods suspected of being pirated or counterfeited at all areas of entry and exit
- enforcement against counterfeits and piracy occurring on a commercial scale
- first U.S. FTA to require all of the following to protect U.S. rights holders from trade secret theft, including by state-owned enterprises: civil remedies,

criminal remedies, prohibition on impeding licensing of trade secrets, protections for trade secrets during the litigation process, and penalties for government officials who wrongfully disclose trade secrets
  - full national treatment for copyright and related rights
  - minimum copyright term extended to 75 years for works like song performances
  - ten years of data protection for biologic drugs and expanded scope of products eligible for protection

*Digital Trade*

  - prohibition on application of customs duties and other discriminatory measures to digital products distributed electronically (e-books, videos, music, software, games, etc.)
  - limit on government ability to require disclosure of proprietary computer source code and algorithms

*De Minimis*

  - Mexico will increase from $50 to $100 the value of shipments that may enter free of customs duties or taxes and with minimal formal entry procedures

*Financial Services*

  - prohibition on local data storage requirements when a financial regulator has the access to data it needs to fulfill its regulatory and supervisory mandate
  - updated provisions to allow for the cross-border transfer of data
  - a separate annex on commitments relating to cross-border trade, including application of the national treatment and market access obligation to an expanded list of cross-border services

*Labor*

  - all labor provisions brought into core of the agreement and made enforceable
  - commitment by Mexico to specific legislative actions to provide for the effective recognition of the right to collective bargaining
  - agreement to take measures to prohibit the importation of goods produced by forced labor, to address violence against workers exercising their labor rights, and to ensure that migrant workers are protected under labor laws

*Environment*

  - all environment provisions brought into core of the agreement and made enforceable
  - prohibition on some of the most harmful fisheries subsidies, such as those that benefit vessels or operators involved in illegal, unreported, and unregulated fishing
  - new protections for marine species like whales and sea turtles, including a prohibition on shark-finning

- obligations to enhance the effectiveness of customs inspections of shipments containing wild fauna and flora at ports of entry and ensure strong enforcement to combat IUU fishing
- first-ever articles to improve air quality, prevent and reduce marine litter, support sustainable forest management, and ensure appropriate procedures for environmental impact assessments

back to top

* * * * * * * * * * * * * * * * * *

## 10. The Verge: "Inside the United Nations' Effort to Regulate Autonomous Killer Robots"
(Source: The Verge, 27 Aug 2018.) [Excerpts.]

Amandeep Gill has a difficult job, though he won't admit it himself. As chair of the United Nations' Convention on Conventional Weapons (CCW) meetings on lethal autonomous weapons, he has the task of shepherding 125 member states through discussions on the thorny technical and ethical issue of "killer robots" - military robots that could theoretically engage targets independently. It's a subject that has attracted a glaring media spotlight and pressure from NGOs like Campaign to Stop Killer Robots, which is backed by Tesla's Elon Musk and Alphabet's Mustafa Suleyman, to ban such machines outright. ...

***There are some governments and NGOs that would like to see a ban of lethal autonomous weapons. Do you see that as a possibility or likelihood?***

The Convention on Conventional Weapons provides a range of possibilities for controlling weapons use, either banning systems in advance or accepting their inevitability but proscribing their use in certain scenarios, or prescribing some ways of exchanging information or warning people on their use, etc. So banning LAWs is one of the possibilities among the options. But there could be yet another option. There are some states that are quite content with leaving this to national regulations, to industrial standards. So at this point in time, there is no consensus on any option. ...

***Unlike nuclear weapons, an issue you've also worked on, the tools to build autonomous weapons are relatively accessible. Does that pose a challenge to controlling this technology?***

Any military system today uses a number of technologies that are available off the shelf. But the international community has found ways to regulate these systems, to control their proliferation, whether it is through technology export control or treaties and conventions that have broader applicability or other ways of working with industry - such as in the area of nuclear security, for example - of managing the risks and unattended consequences.

So AI is perhaps not so different from these earlier examples. What is perhaps different is the speed and scale of change, and the difficulty in understanding the direction of deployment. That is why we need to have a conversation that is open to all stakeholders. If we set out to govern these through only one

level, let's say the international treaty-making level, ignoring what is done at the national level or by industry, then our chances of success would be not that great. That is my experience of the past couple of years. But if all these different levels move in sync, move in full cognizance of what the other levels are attempting, then we have a better chance of succeeding in managing some of the risks that are associated with AI. ....

*[Editor's Note: To read the entire interview, click on the source link below the item title.]*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

### 11.
### E. McClafferty, L. van der Meer & R. Slack: "Preparing for the Worst: Licenses Needed for UK Export of Dual-Use Items"
(Source: Trade & Manufacturing Monitor, 28 Aug 2018.)

\* Authors: Eric McClafferty, Esq., emcclafferty@kelleydrye.com; and Laura van der Meer, Esq. lvandermeer@kelleydrye.com; and Robert Slack, Esq., rslack@kelleydrye.com. All of Kelley Drye & Warren LLP.

It has always been a possibility that the United Kingdom would crash out of the European Union on 30 March 2019 but "no deal" preparation is now highly recommended by both sides. For organizations that export dual-use items, the possibility of the UK becoming a "third country" vis-à-vis the EU without an exit agreement or transition period means an overnight need for export licenses where none are required today.

Seasoned international businesses understand that dual use items, which can be used for both civil and military purposes, include far more products than one might assume. In addition to the more obvious goods that may be used to produce or develop military items, such as machine tools and equipment used for chemical manufacturing, computers, drawings, technology, software, raw materials, and components also may be subject to dual use controls. Even seemingly mundane items such as protective clothing used in medical laboratories, certain commonly used chemicals, certain ball bearings, and a wide variety of other products are controlled for export and they need to be properly classified to determine if a license would be needed to ship to a UK that has left the EU. Many entities that have been operating exclusively within the EU could soon be confronted with dual use licensing requirements for the first time and global businesses may be faced with a potentially significant increase in the number of items that need be licensed.

While the export of military items, firearms and goods that may be usable for torture or capital punishment from the UK have been and will continue to be subject to specific licensing requirements, the movement of most dual use items between the 28 Member States of the European Union is possible today without any license. If the UK and EU fail to reach agreement on the UK's exit from the EU or if either the UK or European Parliament rejects the proposed EU-UK deal, the UK will no longer be part of the EU as of 11.00 GMT 30 March 2019 and a license would be needed to export many dual use items from the UK to the EU.  In addition, existing licenses for exports issued by the UK or issued by the EU27 would no longer be valid for exports from the others' territories.

In a series of technical notices released on 23 August 2018 by the UK, exporters are advised to determine what licenses may be needed should the talks fail.  Exporters were advised to put programs and procedures in place to ensure compliance. Importantly, the UK has announced that it will issue a new Open General Export License (OGEL) in advance of leaving the UK that will cover many dual use items, thus reducing the need for individual export licenses. Businesses seeking to use the new OGEL will need to register at a later stage.  The UK further advises that exporters will be able to apply for and obtain any individual licenses that may be needed prior to the end of March 2019. Unfortunately, however, it is unknown how many additional businesses will be affected and whether regulators will be able to keep pace with the demand.  Further information will be forthcoming but action can and should be taken by businesses now to examine their potential exposure and prepare contingency plans to avoid business disruption.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 12. M. Padovan, M. Zinzani & V. Picchiassi: "Iran: The First Package of U.S. Extraterritorial Sanctions and the Update of the EU Blocking Statute"
(Source: Studio Legale Padovan, 20 Aug 2018.)

\* Authors: Marco Padovan, mpadovan@studiopadovan.com; Marco Zinzani, Esq., mzinzani@studiopadovan.com; and Valerio Picchiassi, Esq., vpicchiassi@studiopadovan.com. All of Studio Legale Padovan, Milan and Rome.

The first of the so called '*wind down period*' stated by the US administration has expired on Monday 6 August 2018. These wind down periods were established as a result of Trump's pulling out from the Joint Comprehensive Plan Of Action, the 'Iran nuclear deal', on 8 May this year. The original sanctions, which were suspended by effect of the JCPOA, will as consequence revive on 7 August 2018. The new Executive Order "*Reimposing certain Sanctions With Respect to Iran*", also called "the New Iran E.O.", restores the sanctions which were lifted by the E.O. 13176 of 16 January 2016 and brings to an end the *wind-down general licenses* (GLs). Notably, as asserted by the FAQ 1.2 *Frequently Asked Questions Regarding the Re-Imposition of*

*Sanctions Pursuant to the 8 May 2018 National Security Presidential Memorandum Relating to the Joint Comprehensive Plan of Action (JCPOA)* and by the FAQs 598, 601 and 606, which form part of the additional FAQs "*Regarding Executive Order of 6 August 2018, "Reimposing Certain Sanctions With Respect to Iran*", published simultaneously with the new Executive Order, sanctions are restored and extended for the following activities:

  - sanctions on the purchase or acquisition of US dollar banknotes by the Iranian government, of US Dollars;
  - sanctions on Iran's trade in gold and precious metals;
  - sanctions on the direct or indirect sale, supply or transfer from or to Iran of graphite, raw metals or semi-finished products, such as aluminum and steel, coal and software for integrating industrial processes;
  - sanctions on "*significant*" transactions related to the purchase or sale of Iranian Rials, or the deposit of funds or the maintenance of significant bank accounts outside the territory of Iran in Iranian Rials currency;
  - sanctions on the purchase, subscription to, or facilitation of the issuance of sovereign Iranian debt;
  - sanctions on Iran's automotive sector;
  - sanctions for diverting goods intended for the Iranian population, including food, medical and agricultural products, if they are used for facilitating censorship or human rights abuses.

All of the above-mentioned sanctions bear some extraterritorial profiles. They apply to non-US companies and they apply in absence of a lien between the mentioned activities and the US jurisdiction (i.e. by the subjects involved, commodity traded or method of payment).

On November 5, 2018 a second block of US sanctions will be reinstated. These will particularly hit the port operators, and shipping and shipbuilding sectors, petroleum-related transactions and energy sector. The SDN List will grow by a number of Iranian physical and juridical persons, naming among these almost all of the Iranian banks (the so called "13599").

*The European Union's reply: the updated Blocking Statute, the Implementing Regulation and the Commission's FAQs*

The EU reaffirmed its intention to maintain the JCPOA, clearly opposing the new US position. In particular, the EU considers the extraterritorial effects of US sanctions as a violation of International Law.

The EU published the following documents on September 7, 2018, which have been waited for by business operators in order to understand how to combine the simultaneous application of the Extraterritorial US rules and the EU Blocking Regulation:

  - Commission Delegated Regulation (EU) 2018/1100 of 6 June 2018 amending the Annex to Council Regulation (EC) No 2271/96 "protecting against the effects of extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom", modifying the Annex to the Regulation (EC) n. 2271/96 of the European Council

('Blocking Regulation'). The Regulation lists the US Extraterritorial Rules which are considered unlawful by the EU, in order to protect the European operators. On August 7, the new Annex becomes legally binding;

- Commission Implementing Regulation (EU) 2018/1101 of 3 August 2018 laying down the criteria for the application of the second paragraph of Article 5 of Council Regulation (EC) No 2271/96, thus authorizing the EU operators to comply in all or in part to the Extraterritorial Sanctions.

- Frequent Questions (FAQs) on Blocking Regulation and Implementing Regulation.

At the end of July 2018, after 22 years, the EU finally defined the procedural rules of the Extra- Territorial Legislation Committee as per the article 8 of the Blocking Regulations; the mentioned Rules replicate the standard EU comitology procedures.

The EU also published a standard Template for applications for authorizations under Article 5 paragraph 2 of Council Regulation (EC) No 2271/96 (for a resume of the newly introduced rues, please see here).

*Our Opinion*

The Blocking Regulation was introduced 22 years ago to cancel, neutralize, block and anyway avoid the extraterritorial effect that could affect some European trading operators. It was adopted to protect against restrictive measures imposed by the USA against Cuba, Libya and Iran. In order to keep up to date the Extraterritorial List of US Rules, which cannot be lawfully executed in the EU, and in order to take into account the evolution of US rules along the years, also in light of Trump's declaration dated May 8, 2018, the EU has now chosen to substitute the whole Annex to the Blocking Regulation.

As we anticipated in our clients' alert last June 2018, the wording of the Annex to the Regulation is subject to some technical remarks: i.e. it is unclear if the automotive extraterritorial sanctions and those sanctions applying to certain blacklisted entities are actually embedded in the definitions of the new Annex.

The Blocking Regulation - which was applied for by our Firm in the event of the 2014 sanctions imposed by the US State Department's against Dettin S.p.A. in relation to activities which were wholly and perfectly lawful according to the National and UE regulations - provides for penalties against any European entity which, in absence of a previous authorization by the European Commission, would give execution to extraterritorial US sanctions (article 5). Furthermore, it prescribes the right to recover any damages, including legal costs, caused by the application of the extraterritorial laws specified in the Annex or by actions based thereon or resulting therefrom (Article 6). In Italy, the administrative sanction is that of the Legislative Decree n. 346 of 1998, with a maximum cap of 92.962,00 Euros.

The combined provisions of Article 5 and 6, in fact, provide that if a European company intends to pull out from a contract with European counterparts for supplies in Iran or, in absence of an agreement with the counterparts, modifies the contract terms and conditions on the basis of the sole US Regulations

without any authorizations from the European Commission, the company might face a civil action for damages plus the administrative sanction. In Italy, this sanction is imposed by the Ministry for Economic Development (MISE). Therefore, it is advisable to take prudent care in continuing contractual relations with Iranian counterparts that are subject to US sanctions, or in suspending or terminating them.

Pursuant to Article 2 of the Blocking Regulation, whenever the economic and/or financial interests of an European operator are affected, directly or indirectly, by the measures listed in the Annex to the Blocking Regulation, or by actions based thereon or derived therefrom, the operator shall inform the European Commission within thirty days from the event, directly or through the Member States competent authorities.

Subparagraph 2 of Article 5 allows the European Commission to authorize the European operators to comply, fully or in part, with the US extraterritorial sanctions, to the extent that non-compliance would seriously damage their interests or those of the Community.

It is clarified in the FAQs that such authorization is only agreed by way of waiver to the general rule and only in specific and duly motivated circumstances. The request has no suspensive effects. The authorization, granted by an implementing decision, becomes effective by the date of notification to the applicant. Until then, the EU operators are compelled to apply the Blocking Regulation.

Pursuant to Article 3 of the Implementing Regulation of the Commission (EU) n. 2018/1101, applications for an authorization as per Article 5, Subsection 2, of the Regulation (EC) n. 2271/1996 shall be in writing and shall include the name and contact details of the applicants, shall indicate the precise provisions of the listed extra-territorial legislation or the subsequent action at stake, and shall describe the scope of the authorization that is being requested and the damage that would be caused by non-compliance. In their application, the applicants shall also provide sufficient evidence that non-compliance would cause serious damage to at least one protected interest.

Where necessary, the Commission may request additional evidence from the applicants, which shall provide it within a reasonable period set by the Commission. The Commission shall inform the Committee on Extra-territorial Legislation as soon as it receives applications.

It is important to highlight that the Implementing Regulation (EU) n. 2018/1101 establishes the criteria to be considered by the Commission to decide on the seriousness of the damage (for the operators and the EU) in relation to non-compliance with US extraterritorial rules. The non- cumulative criteria include, by way of example:

  - the existence of an ongoing administrative or judicial investigation against the applicant from, or a prior settlement agreement with, the third country which is at the origin of the listed extra- territorial legislation;

- the existence of a substantial connecting link with the third country which is at the origin of the listed extraterritorial legislation or the subsequent actions; for example the applicant has parent companies or subsidiaries, or participation of natural or legal persons subject to the primary jurisdiction of the third country which is at the origin of the listed extra-territorial legislation or the subsequent actions;
- whether measures could be reasonably taken by the applicant to avoid or mitigate the damage; - the adverse effect on the conduct of economic activity, in particular whether the applicant would face significant economic losses, which could for example threaten its viability or pose a serious risk of bankruptcy;
- whether the applicant's activity would be rendered excessively difficult due to a loss of essential inputs or resources, which cannot be reasonably replaced;
- whether there is a threat to safety, security, the protection of human life and health and the protection of the environment;
- the consequences for the internal market in terms of free movement of goods, persons, services and capital, as well as financial and economic stability or key Union infrastructures;
- the systemic implications of the damage, in particular as regards its spill-over effects into other sectors.

Notably, the Commission's FAQs, which are just an interpretative guideline and not a legal act, dwell about the controlled/subsidiaries of American companies in the EU territory and, vice-versa, about the European subsidiaries in US Territory, distinguishing three situations:

When EU subsidiaries of U.S. companies are formed in accordance with the law of a Member State and have their registered office, central administration or principal place of business within the Union, they are considered EU operators. This implies that they enjoy all the rights and are subject to all the obligations under Union law, including the Blocking Statute.
Branches of U.S. companies in the Union do not fall under the previous paragraph as they do not have distinct legal personality from their parent company. They are not considered EU operators. Therefore, they are not subject to the Blocking Statute.

Subsidiaries of EU companies in the U.S. are subject to the law under which they are incorporated, which is generally that of the U.S. Therefore, they are not considered to be EU operators and are not subject to the Blocking Statue. Nevertheless, their parent company incorporated in the Union is an EU operator and, as such, it is subject to the provisions of the Blocking Statute.

back to top

* * * * * * * * * * * * * * * * * *

# 13.
## R.C. Burns: "Newsweek Gets Confused by OFAC Travel Rules"
(Source: Export Law Blog, 29 Aug 2018.) Reprinted by permission.)

* Author: R. Clifton Burns, Esq., Bryan Cave LLP, Washington DC,
Clif.Burns@bryancave.com, 202-508-6067.

Last week the State Department changed its travel advisory on Cuba from "reconsider travel" to "exercise increased caution." The "reconsider travel" warning was apparently based on the sonic attacks on diplomats in Cuba. The decision to change to "exercise increased caution" came after the State Department concluded that sonic attacks on private U.S. citizens was unlikely.

Still this business of travel warnings appear to have little, if any, relation to the actual safety of the destination. There are no warnings about the safety of travel to Belize even though between 2009 and 2016, 16 Americans were murdered in Belize. That put Belize as the seventh most dangerous country for Americans as measured by its death rate of 1.02 per 100,000 American tourists. During that same period, only two people were killed in Cuba giving it a death rate of 0.08 per 100,000 American tourists, approximately 12 times lower than that of Belize. Of course, given the U.S. homicide rate of 5.3 per 100,000, it's probably safer to travel to Cuba, or even Belize, than to stay home in the United States.

A number of news sites commented on this change. But one of them, namely *Newsweek*, caught my eye when it decided to add this statement about travel to Cuba:

> The only legal way for U.S. citizens to travel there is by applying to the Treasury Department's Office of Foreign Assets Control for a license under one of 12 categories of travel.

Good grief. Is Google not working at *Newsweek* these days? Those twelve categories mentioned in the quote are for *general licenses*, you know, the ones that do not require a specific OFAC license application. In case the *Newsweek* reporter wanders by and reads this post, here is the link to the OFAC regulation noting that general licenses are available for each of those categories.

So, as you've heard before, don't believe everything you read on the Internet unless, of course, you read it here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



The World Leading Experts in International Trade Compliance

www.fullcirclecompliance.eu

## 14. FCC to Present U.S. Export Controls Awareness Training Course for Non-U.S. Organizations, 2 Oct in Bruchem, the Netherlands
(Source: Full Circle Compliance, events@fullcirclecompliance.eu.)

Our next academy course is specifically designed for beginning compliance officers and professionals who want to enhance their knowledge on the latest ITAR/EAR requirements and best practices. The course will cover multiple topics regarding U.S. export controls that apply to organisations outside the U.S., such as: the regulatory framework, including the latest and anticipated regulatory amendments, key concepts and definitions, classification and licensing requirements, handling (potential) non-compliance issues, and practice tips to ensure compliance with the ITAR and EAR.

* What: Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective
* When: Tuesday, 2 Oct 2018, 9 AM - 5 PM (CEST)
* Where: Landgoed Groenhoven, Bruchem, the Netherlands
* Sponsor: Full Circle Compliance (FCC)
* Instructors: Ghislaine Gillessen, Mike Farrell, and Alexander P. Bosch
* Information & Registration: HERE or via events@fullcirclecompliance.eu.

*Register before 2 September and get a 10% Early Bird discount on the course fee!*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## EDITOR'S NOTES

## 15. Bartlett's Unfamiliar Quotations
(Source: Editor)

\* **John Locke** (29 Aug 1632 - 28 Oct 1704; was an English philosopher and physician, widely regarded as one of the most influential of Enlightenment thinkers and commonly known as the "Father of Liberalism".)
  - *"New opinions are always suspected, and usually opposed, without any other reason but because they are not already common."*
  - *"What worries you, masters you."*

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 16. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

\* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

\* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774

- Last Amendments: 3 Aug 2018: 83 FR 38021-38023: Revision of Export and Reexport License Requirements for Republic of South Sudan Under the Export Administration Regulations; and 83 FR 38018-38021: U.S.-India Major Defense Partners: Implementation Under the Export Administration Regulations of India's Membership in the Wassenaar Arrangement and Addition of India to Country Group A:5

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 14 Feb 2018: 83 FR 6457-6458: Amendment to the International Traffic in Arms Regulations: Addition of South Sudan [Amends ITAR Part 126.]
  - The only available fully updated copy (latest edition: 25 Apr 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the

BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * * *

## 17. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws. If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending

to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing
the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is
available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ███████@fullcirclecompliance.eu

### SETTLEMENT AGREEMENT

Defense Distributed ("DD"), Second Amendment Foundation, Inc. ("SAF"), and Conn

Williamson (collectively, "Plaintiffs,") and the United States Department of State ("State"), the

Secretary of State, the Directorate of Defense Trade Controls ("DDTC"), the Deputy Assistant

Secretary, Defense Trade Controls, and the Director, Office of Defense Trade Controls Policy

(collectively, "Defendants"), out of a mutual desire to resolve all of the claims in the case

captioned *Defense Distributed, et al. v. Dep't of State, et al.*, Case No. 15-cv-372-RP (W.D.

Tex.) (the "Action") without the need for further litigation and without any admission of liability,

hereby stipulate and agree as follows:

Plaintiffs and Defendants do hereby settle all claims, issues, complaints, or actions

described in the case captioned, and any and all other claims, complaints, or issues that have

been or could have been asserted by Plaintiffs against Defendants in accordance with the

following terms and conditions:

1.     *Consideration*: In consideration of Plaintiffs' agreement to dismiss the claims in the

Action with prejudice as described in paragraph 2, below, Defendants agree to the following, in

accordance with the definitions set forth in paragraph 12, below:

   (a)     Defendants' commitment to draft and to fully pursue, to the extent authorized by

           law (including the Administrative Procedure Act), the publication in the <u>Federal</u>

           <u>Register</u> of a notice of proposed rulemaking and final rule, revising USML

           Category I to exclude the technical data that is the subject of the Action.

   (b)     Defendants' announcement, while the above-referenced final rule is in

           development, of a temporary modification, consistent with the International

Traffic in Arms Regulations (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

(c)     Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). For the purposes of 22 C.F.R. § 125.4(b)(13) the Department of State is the cognizant U.S. Government department or agency, and the Directorate of Defense Trade Controls has delegated authority to issue this approval.

(d)     Defendants' acknowledgment and agreement that the temporary modification of USML Category I permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

(e)     Payment in the amount of $39,581.00.  This figure is inclusive of any interest and is the only payment that will be made to Plaintiffs or their counsel by Defendants under this Settlement Agreement. Plaintiffs' counsel will provide Defendants'

2

counsel with all information necessary to effectuate this payment.

The items set forth in subparagraphs (a) through (e) above constitute all relief to be provided in settlement of the Action, including all damages or other monetary relief, equitable relief, declaratory relief, or relief of any form, including but not limited to, attorneys' fees, costs, and/or relief recoverable pursuant to 2 U.S.C. § 1302, 2 U.S.C. § 1311, 2 U.S.C. § 1317, 22 U.S.C. § 6432b(g), 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d), and the Local Rules.

2.   *Dismissal with Prejudice:* At the time of the execution of this Settlement Agreement, Plaintiffs agree to have their counsel execute and provide to Defendants' counsel an original Stipulation for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) and 41(a)(1)(B).  Counsel for Defendants agree to execute the stipulation and file it with the Court in the Action, no sooner than 5 business days after the publication of the announcement described in Paragraph 1(b) of this Settlement Agreement and issuance of the letter described in Paragraph 1(c) of this Settlement Agreement. A copy of the Stipulation for Dismissal with Prejudice is attached hereto.

3.   *Release:* Plaintiffs, for themselves and their administrators, heirs, representatives, successors, or assigns, hereby waive, release and forever discharge Defendants, and all of their components, offices or establishments, and any officers, employees, agents, or successors of any such components, offices or establishments, either in their official or

3

individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, whether currently known or unknown, which Plaintiffs may have had, may now have, or may hereafter discover that were or could have been raised in the Action.

4.   *No Admission of Liability:* This Settlement Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in the Action, or of Defendants' liability therein. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor is it a concession or admission as to whether the monetary or equitable relief, attorneys' fees, costs, and expenses sought by Plaintiffs in the Action, are reasonable or appropriate. None of the terms of the Settlement Agreement may be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action other than proceedings permitted by law, if any, that may be necessary to consummate or enforce this Settlement Agreement. The terms of this Settlement Agreement shall not be construed as an admission by Defendants that the consideration to be given hereunder represents the relief that could be recovered after trial.  Defendants deny that they engaged in *ultra vires* actions, deny that they violated the First Amendment, Second Amendment, or Fifth Amendment of the United States Constitution, and maintain that all of the actions taken by Defendants with respect to Plaintiffs comply fully with the law, including the United States Constitution.

4

5.      *Merger Clause:* The terms of this Settlement Agreement constitute the entire agreement

of Plaintiffs and Defendants entered into in good faith, and no statement, remark,

agreement or understanding, oral or written, which is not contained therein, shall be

recognized or enforced. Plaintiffs acknowledge and agree that no promise or

representation not contained in this Settlement Agreement has been made to them and

they acknowledge and represent that this Settlement Agreement contains the entire

understanding between Plaintiffs and Defendants and contains all terms and conditions

pertaining to the compromise and settlement of the disputes referenced herein. Nor does

the Parties' agreement to this Settlement Agreement reflect any agreed-upon purpose

other than the desire of the Parties to reach a full and final conclusion of the Action, and

to resolve the Action without the time and expense of further litigation.

6.      *Amendments:* This Settlement Agreement cannot be modified or amended except by an

instrument in writing, agreed to and signed by the Parties, nor shall any provision hereof

be waived other than by a written waiver, signed by the Parties.

7.      *Binding Successors:* This Settlement Agreement shall be binding upon and inure to the

benefit of Plaintiffs and Defendants, and their respective heirs, executors, successors,

assigns and personal representatives, including any persons, entities, departments or

agencies succeeding to the interests or obligations of the Parties.

5

8.   *Consultation with Counsel:* Plaintiffs acknowledges that they have discussed this

Settlement Agreement with their counsel, who has explained these documents to them

and that they understand all of the terms and conditions of this Settlement Agreement.

Plaintiffs further acknowledge that they have read this Settlement Agreement, understand

the contents thereof, and execute this Settlement Agreement of their own free act and

deed. The undersigned represent that they are fully authorized to enter into this

Settlement Agreement.

9.   *Execution:* This Settlement Agreement may be executed in one or more counterparts,

each of which shall be deemed an original, and all of which together constitute one and

the same instrument, and photographic copies of such signed counterparts may be used in

lieu of the original.

10.   *Jointly Drafted Agreement:* This Settlement Agreement shall be considered a jointly

drafted agreement and shall not be construed against any party as the drafter.

11.   *Tax and Other Consequences:* Compliance with all applicable federal, state, and local tax

requirements shall be the sole responsibility of Plaintiffs and their counsel. Plaintiffs and

Defendants agree that nothing in this Settlement Agreement waives or modifies federal,

state, or local law pertaining to taxes, offsets, levies, and liens that may apply to this

6

Settlement Agreement or the settlement proceeds, and that Plaintiffs are executing this Settlement Agreement without reliance on any representation by Defendants as to the application of any such law.

12.   *Definitions*: As used in this Settlement Agreement, certain terms are defined as follows:

-   The phrase *"Published Files"* means the files described in paragraph 25 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Ghost Gunner Files"* means the files described in paragraph 36 of Plaintiffs' Second Amended Complaint.

-   The phrase *"CAD Files"* means the files described in paragraph 40 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Other Files"* means the files described in paragraphs 44-45 of Plaintiffs' Second Amended Complaint.

-   The phrase *"Military Equipment"* means (1) Drum and other magazines for firearms to .50 caliber (12.7 mm) inclusive with a capacity greater than 50 rounds, regardless of jurisdiction of the firearm, and specially designed parts and components therefor; (2) Parts and components specially designed for conversion of a semi-automatic firearm to a fully automatic firearm; (3) Accessories or attachments specially designed to automatically stabilize aim (other than gun rests) or for automatic targeting, and specially designed parts and components therefor.

-   The phrase *"technical data that is the subject of the Action"* means: (1) the Published Files; (2) the Ghost Gunner Files; (3) the CAD Files; and (4) the Other Files insofar as those files regard items exclusively: (a) in Category I(a) of the United States Munitions List (USML), as well as barrels and receivers covered by Category I(g) of the USML that are components of such items; or (b) items

7

covered by Category I(h) of the USML solely by reference to Category I(a), excluding Military Equipment.

Dated: June 29, 2018

Dated: June 29, 2018

Matthew A. Goldstein
Snell & Wilmer LLP
One South Church Ave. Ste. 1500
Tucson, Arizona 85701
*Counsel for Plaintiffs*

Dated: June 29, 2018

Eric J. Soskin
Stuart J. Robinson
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001
Tel. (202) 353-0533

*Counsel for Defendants*

8

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED; SECOND AMENDMENT FOUNDATION, INC; and CONN WILLIAMSON, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 1:15-cv-372-RP |
| UNITED STATES DEPARTMENT OF STATE; MICHAEL POMPEO, in his official capacity as Secretary of State; DIRECTORATE OF DEFENSE TRADE CONTROLS; MIKE MILLER, in his official capacity as Acting Deputy Assistant Secretary of Defense Trade Controls ; SARAH J. HEIDEMA, in her official capacity as Acting Director, Office of Defense Trade Controls Policy, Bureau of Political Military Affairs, Department of State, | § § § § § § § § § § § § | |
| Defendants. | § § | |

---

**Plaintiffs' Rule 59 Motion to Alter or Amend a Judgment
or, Alternatively, Rule 60(b) Motion for Relief from a Judgment.**

---

Plaintiffs Defense Distributed, Second Amendment Foundation, Inc., and Conn Williamson submit this Rule 59 Motion to Alter or Amend a Judgment. *See* Fed. R. Civ. P. 59. Alternatively, Plaintiffs submit this as a Rule 60 Motion for Relief from a Judgment. *See* Fed. R. Civ. P. 60(b).

## Summary

All of the parties to this case thought that it had been resolved properly. On June 29, 2018, the Plaintiffs and Defendants entered into a settlement agreement, and on July 27, 2018, they filed a Rule 41(a)(1)(A) stipulation of dismissal. Dkt. 112. Three days later, this Court entered a final judgment based on that stipulation. Dkt. 113. The stipulation is the judgment's *only* basis.

Today, both the Plaintiffs and Defendants remain committed to the settlement agreement's obligations. But nineteen states and the District of Columbia are not. To the contrary, they asked the Western District of Washington to enter a nationwide injunction against the settlement agreement's implementation. Moreover, the plaintiff states fashioned that suit in such a way that Plaintiffs could not enforce their rights under the settlement agreement in that suit. That court—which lacks personal jurisdiction over the Plaintiffs—has now entered a nationwide preliminary injunction that bars the Defendants from fulfilling their end of the settlement agreement.

The injunction is more than just incorrect as a matter of law. It violates the United States Constitution's First Amendment, Second Amendment, Supremacy Clause, and Article III. And because of the controversy's public nature, the resulting injustice tramples not just the Plaintiffs' and Defendants' rights, but those of the entire citizenry.

This situation is largely unprecedented. Unforeseeable events have jeopardized the settlement agreement and the legitimacy of the stipulation that depends upon it. Neither the Plaintiffs nor the Defendants want to upend the settlement agreement. They both wish to honor it. Reopening the case will let them to do so most effectively, in ways that the current judgment does not allow for. So, in light of extraordinary circumstances and in order to prevent a manifest injustice, Plaintiffs hereby withdraw the stipulation of dismissal and request that the Court vacate its judgment and reopen the case under Rules 59 and 60.

DOC_0004268

## Argument

Rule 59 gives the Court authority to "alter or amend" a judgment. Fed. R. Civ. P. 59(e). Rule 59 warrants relief here. The Court should permanently vacate the current judgment and reopen the proceedings. Alternatively, if the Court has doubts about that course of action, the Court should temporarily alter the current judgment and conduct a complete inquiry before deciding whether or not to let the original disposition become final. In addition to Rule 59, Rule 60(b)'s authority to "relieve a party . . . from a final judgment" warrants the same result.

## I.   To avoid manifest injustice, the order of stipulated dismissal should be vacated.

Currently, the Court's final decision orders that the action is dismissed with prejudice because of a Rule 41(a)(1)(A)(ii) stipulation. Dkt. 113. The stipulation triggering this was filed jointly by the Plaintiffs and Defendants. Dkt. 112. The stipulation was made pursuant to a settlement agreement and pursuant to Rule 41(a)(1)(A)(ii), *id.*, which provides:

a)   Voluntary Dismissal.

(1)   *By the Plaintiff.*

(A)   *Without a Court Order.* Subject to Rules 23(e), 23.1(c), 23.2, and 66 and any applicable federal statute, the plaintiff may dismiss an action without a court order by filing:
. . .
(ii)   a stipulation of dismissal signed by all parties who have appeared.

Fed. R. Civ. P. 41(a)(1)(A)(ii).

After Plaintiffs filed the stipulation, this Court entered an order dismissing the action with prejudice, allocating costs, and closing the case. Dkt. 113. That order constituted the final judgment. *See Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 324-35 (5th Cir. 2005). However, it was the stipulation and not the order that constituted the dismissal. *See, e.g., SmallBizPros, Inc. v. MacDonald*, 618 F.3d 458, 461-63 (5th Cir. 2010).

DOC_0004269

The stipulation's force is what makes the final judgment correct.  If the stipulation deserves to be withdrawn, the resulting dismissal of the Plaintiffs' case should also be no more; and if the Plaintiffs' case is no longer dismissed, the judgment should be vacated to reopen the action. *See, e.g., Littman v. Bache & Co.*, 246 F.2d 490, 492 (2d Cir. 1957) (Hand, J.) ("order 'vacating' the plaintiff's 'notice of dismissal,' . . . reopens the case for consideration upon the merits").

**A.     Plaintiffs withdraw their stipulation of dismissal.**

Stipulations are not set in stone.  They can be withdrawn at a party's behest in extraordinary circumstances, such as "manifest injustice":

> The trial court has not only the right, but the duty to relieve counsel from pretrial stipulations where necessary to *avoid manifest injustice* and adjudications based on the sporting theory.

*United States v. Texas*, 680 F.2d 356, 370 (5th Cir. 1982) (citation omitted) (emphasis added). Under this well-established rule, the "court always has the responsibility to cut a litigant from the snares and tangles of a procedural trap, whether it be created by his own or another's doings in order to prevent manifest injustice." *Assoc. Beverages Co. v. P. Ballantine & Sons*, 287 F.2d 261, 263 (5th Cir. 1961).[1]

---

[1] *Accord Rice v. Glad Hands, Inc.*, 750 F.2d 434, 438 (5th Cir. 1985) ("Care must be taken to assure, considering the peculiar circumstances of a given case, that a rigid enforcement of the stipulation does not lead to an injustice."); *Equitable Life Assur. Soc. of U.S. v. MacGill*, 551 F.2d 978, 984 (5th Cir. 1977) ("a party may be relieved of a stipulation 'to prevent manifest injustice' so long as 'suitable protective terms or conditions are imposed to prevent substantial and real harm to the adversary"); *Cent. Distributors, Inc. v. M. E. T., Inc.*, 403 F.2d 943, 946 (5th Cir. 1968) ("A stipulation of counsel originally designed to expedite a trial should not be rigidly adhered to when it becomes apparent that it may inflict manifest injustice upon one of the subscribers thereto."); *Logan Lumber Co. v. C.I.R.*, 365 F.2d 846, 855 (5th Cir. 1966) ("a party may be relieved of a stipulation 'to prevent manifest injustice' so long as 'suitable protective terms or conditions are imposed to prevent substantial and real harm to the adversary'"); *see also Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 444 (1902) ("[U]pon giving notice in sufficient time to prevent prejudice to the opposite party, counsel may repudiate any fact inadvertently incorporated therein.

DOC_0004270

Under this doctrine, trial courts are not just *allowed* to accept appropriate withdrawals of stipulations. It is their duty to do so. Precedents like *Laird v. Air Carrier Engine Services, Inc.*, 263 F.2d 948 (5th Cir. 1959), explain that each court "does have the right, and it *should never fail to exercise it*, to relieve counsel of stipulations to prevent manifest injustice." *Id.* at 953 (emphasis added).[2] Here, the Court should approve Plaintiffs' withdrawal of the stipulation of dismissal.

### B. Unforeseeable Ninth Circuit litigation produced an injunction that jeopardizes the settlement agreement to the detriment of both Plaintiffs and Defendants.

This litigation entailed a serious dispute between the Plaintiffs and the Defendants—mainly the State Department—about the applicability of "certain laws governing the export of unclassified technical data relating to prohibited munitions." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016). But now that dispute no longer exists. The Plaintiffs and Defendants are in complete agreement about the right way to resolve that matter.

---

This practice has been frequently upheld in this and other courts"); *Waldorf v. Shuta*, 142 F.3d 601, 617–18 (3d Cir. 1998) (on factors defining exceptional circumstances).

[2] Precedent rightly recognizes that Rule 41 does *not* abrogate the inherent authority "necessarily vested in courts to manage their own affairs." *Link v. Wabash R. Co.*, 370 U.S. 626, 630 (1962); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379 (1994); *see also United States v. Colomb*, 419 F.3d 292, 299 (5th Cir. 2005) ("A district court has inherent power 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). *Cf. Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("a federal district court can rescind a discharge order and recall a jury in a civil case as an exercise of its inherent powers"). Hence, courts entertain post-judgment requests to withdraw stipulations of dismissal regularly, in both the Rule 59 and Rule 60 contexts. *See, e.g., Kabbaj v. Am. Sch. of Tangier*, 445 F. App'x 541, 543 (3d Cir. 2011); *Yeldon v. Crouch*, No. No. 9:12-CV-1564, 2016 WL 4126384, at *1 (N.D.N.Y. Apr. 4, 2016), *report and recommendation adopted sub nom. Yeldon v. Caulkin*, No. 9:12-CV-1564 (N.D.N.Y. Aug. 2, 2016); *Kinney v. United States Gov't USDA Forest Serv.*, No. 1:12-CV-01008, 2014 WL 12788960, at *2 (D.N.M. Aug. 14, 2014); *Domestic Fabrics Corp. v. Sears, Roebuck & Co.*, 325 F. Supp. 2d 612, 613 (E.D.N.C. 2003).

DOC_0004271

The Plaintiffs and Defendants settled their dispute by entering into the Settlement Agreement of June 29, 2018. Ex. A; Dkt. 97-1.  As the State Department's own court filings correctly acknowledged, "[p]ursuant to the settlement and as relevant here, the Government agreed to the following":

> (a) Defendants' commitment to draft and to fully pursue, to the extent authorized by law (including the Administrative Procedure Act), the publication in the Federal Register of a notice of proposed rulemaking and final rule, revising USML Category I to exclude the technical data that is the subject of the Action.

> (b) Defendants' announcement, while the above-referenced final rule is in development, of a temporary modification, consistent with the . . . (ITAR), 22 C.F.R. § 126.2, of USML Category I to exclude the technical data that is the subject of the Action. The announcement will appear on the DDTC website, www.pmddtc.state.gov, on or before July 27, 2018.

> (c) Defendants' issuance of a letter to Plaintiffs on or before July 27, 2018, signed by the Deputy Assistant Secretary for Defense Trade Controls, advising that the Published Files, Ghost Gunner Files, and CAD Files are approved for public release (i.e., unlimited distribution) in any form and are exempt from the export licensing requirements of the ITAR because they satisfy the criteria of 22 C.F.R. § 125.4(b)(13). . . .

> (d) Defendants' acknowledgment and agreement that the temporary modification . . . permits any United States person, to include DD's customers and SAF's members, to access, discuss, use, reproduce, or otherwise benefit from the technical data that is the subject of the Action, and that the letter to Plaintiffs permits any such person to access, discuss, use, reproduce or otherwise benefit from the Published Files, Ghost Gunner Files, and CAD Files.

Ex. B at 5-6 (W.D. Wash. Dkt. 64) (footnotes omitted).

After the stipulation, the Defendants complied with the settlement agreement in part, at least for a short period. *See id.* at 6.  The rulemaking began, the temporary modification was issued, the license was issued, and the acknowledgement occurred. *See id.*

Meanwhile, opposing organizations attempted to intervene.  They asked this Court to enjoin the State Department from continuing to carry out the settlement agreement.  Dkts. 96, 97, 98, 103, 109.  The Court found that those organizations lacked standing, and denied the motion to

6

intervene.  Dkt. 111 at 5-7 ("Because the Movants cannot establish an injury in fact, they lack Article III standing to intervene in this action.").

The stipulation of dismissal with prejudice was signed by both sides and was filed on the evening of Friday, July 27, 2018.  Dkt. 112 at 1.  On Monday, July 30, this Court entered a final judgment that acknowledged the stipulated dismissal, taxed costs to the party incurring them, and ordered that the "case is DISMISSED WITH PREJUDICE."  Dkt. 113 at 1.  Then the matter took a turn for the unexpected.

In the evening of Monday, July 30, 2018, Washington and other states filed suit against this action's Defendants and Plaintiffs in the Western District of Washington.  Ex. C (W.D. Wash. Dkt. 1).  The state plaintiffs' complaint alleged that, by entering into the settlement agreement and carrying out its obligations, the State Department had "violated the Administrative Procedure Act (APA) and the Tenth Amendment of the U.S. Constitution."  *Id.* at 7.  The suit—which would ultimately include nineteen states and the District of Columbia—sought a nationwide injunction to bar the State Department from performing its obligations under the settlement agreement. *Id.*

The Plaintiffs here opposed the States' injunction request and defended the settlement agreement's obligations as perfectly lawful.  Ex. D, E, F (W.D. Wash. Dkts. 8, 11, 14).  Critically, the State Department defended the settlement agreement as well. Ex. G (W.D. Wash. Dkt. 16).

The State Department pointed out the States' extraordinary request—"[t]hey ask the Court to suspend and enjoin enforcement of actions already taken by the Government pursuant to its obligations under the Settlement Agreement"—and argued that the States lacked standing, were wrong on the merits, and had failed to demonstrate an injunction's other prerequisites such as irreparable harm.  *Id.* at 8-18.

DOC_0004273

Nevertheless, on July 31, 2018, the Western District of Washington issued a nationwide temporary restraining order. In no uncertain terms, the restraining order enjoined the State Department from fulfilling its obligations under the settlement agreement:

> For all the foregoing reasons, plaintiffs' motion for temporary restraining order is GRANTED. The federal government defendants and all their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo *ex ante* as of the modification had not occurred and the letter had not been issued.

Ex. H (W.D. Wash. Dkt. 23). The States amended their complaint, Ex. I (W.D. Wash. Dkt. 29), and moved for a preliminary injunction based on essentially the same argument as before, Ex. J (W.D. Wash. Dkt. 43); *see* Exs. K, L, M, N (W.D. Wash. Dkts. 63, 64, 68, 69) (briefs). Once again, the Plaintiffs and Defendants here agreed. But once again, our arguments were unsuccessful.

Today, the Western District of Washington issued a preliminary injunction. Ex. P (W.D. Wash. Dkt. 95). Just like the TRO, it enjoins the State Department from fulfilling its settlement agreement obligations. Three facets of the decision warrant special emphasis.

First, the decision warps Article III and the Supremacy Clause by granting the states standing to sue for a takeover of the federal government. But states have no right to make federal law. Only Congress and the President do. And yet this decision holds that the states' interest in such commandeering is a right that Article III exists to adjudicate. Politicians rightly care about their constituents' health and well-being. But those concerns are political, not legal. "*Parens patriae*" is what the law calls this—the "quasi-sovereign interest in the health and well-being" of residents—and a "State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.1 (1982). The Western District of Washington should not have decided this case at all.

DOC_0004274

Second, the decision renders an extreme holding on the merits: The First Amendment can be "abridged" so long as it is not "abrogated." Op. at 25. This holding is truly extraordinary, not just for the obvious reason—"Congress shall make no law . . . *abridging* the freedom of speech," U.S. Const. amend. I (emphasis added)—but also because of a key principle that the opinion had to acknowledge. *Without breaking any law*, the computer files at issue here "can be emailed, mailed, securely transmitted, or otherwise published within the United States." Op. at 25.

The court had to embrace this proposition because both the States and State Department conceded it, and rightly so. The State Department correctly takes the position that "even if the Court [in Washington] were to grant plaintiffs every ounce of relief that they seek in this case, *Defense Distributed could still mail every American citizen in the country the files that are at issue here*." Ex. O at 27 (emphasis added). Likewise, the state plaintiffs conceded that Defense Distributed could "hand the[ files] around domestically" and break no law. Ex. O at 23.

In this way, the issue was essentially reduced to the question of whether states are entitled to wall off disfavored parts of the internet because of what people there talk about. That ought to trigger the most serious First Amendment analysis. But instead of doing any, the preliminary injunction decision said that it need not "wade through" First Amendment issues because the First Amendment is merely being "abridged" and not "abrogated":

> The Court declines to wade through these issues based on the limited record before it and instead presumes that the private defendants have a First Amendment right to disseminate the CAD files. *That right is currently abridged, but it has not been abrogated.* Regulation under the AECA means that the files cannot be uploaded to the internet, but they can be emailed, mailed, securely transmitted, or otherwise published within the United States. The Court finds that the irreparable burdens on the private defendants' *First Amendment rights are dwarfed* by the irreparable harms the States are likely to suffer if the existing restrictions are withdrawn and that, overall, the public interest strongly supports maintaining the status quo through the pendency of this litigation.

*Id.* at 25 (emphasis added).

DOC_0004275

Most importantly for present purposes, the Western District of Washington's decision addresses its relationship to this action.  It does not do so indirectly.  It does so directly.  It says that, even if the preliminary injunction "impinges on the federal defendants' ability to perform under their settlement agreement," the Ninth Circuit litigation will *not* adjudicate the legal relationship of this case's Plaintiffs and Defendants.  Op. at 12.  "The dismissal of the Texas litigation is not under attack," the preliminary injunction says, because the States in the Washington case are merely "challenging the adequacy of agency action":

> If, as plaintiffs allege, the federal defendants exceeded their authority in entering into the settlement agreement with the private defendants, they are entitled to file suit under the APA and seek appropriate redress. *If the remedy afforded in this litigation impinges on the federal defendants' ability to perform under their settlement agreement with the private defendants, the latter may have a breach of contract claim against the former*, but there is no jurisdictional bar to this litigation in the circumstances presented here. The dismissal of the Texas litigation is not under attack: rather, the States are .

*Id.* at 12 (emphasis added).

At bottom, the decision enjoins the Defendants with an injunction of the same scope as the temporary restraining order.  It enjoins the State Department from "implementing or enforcing" the settlement agreement's two key components—the temporary modification and the licensing letter:

> For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is GRANTED. The federal defendants and all of their respective officers, agents, and employees are hereby enjoined from implementing or enforcing the "Temporary Modification of Category I of the United States Munitions List" and the letter to Cody R. Wilson, Defense Distributed, and the Second Amendment Foundation issued by the U.S. Department of State on July 27, 2018, and shall preserve the status quo ex ante as if the modification had not occurred and the letter had not been issued until further order of the Court.

*Id.*  The decision takes effect immediately.

DOC_0004276

## C.     Exceptional circumstances warrant withdrawal of the Plaintiffs' stipulation.

When the Plaintiffs and Defendants here entered the stipulation of dismissal, it was inconceivable that another federal court would allow states to mount a collateral attack on this Court's judgment.  This is not a run-of-the-mill case where one side has reneged on a settlement agreement.  Rather, this is the extraordinary case where a settlement agreement that is completely supported by both parties—one of whom is the United States of America—has been rendered a legal nullity by third parties that lack any justiciable stake in the matter whatsoever.  This situation is unprecedented.

In the more ordinary situation—one party breaching a settlement agreement and the other insisting on its enforcement—courts may deny the latter's request to withdraw a stipulation of dismissal.  But the reasons for doing that do not apply here.  In such a case, the two sides disagree about whether to carry out the settlement agreement; and in such a case, the aggrieved party can sue the opponent for breach of the settlement agreement.  Not so here.  In this case, both sides *agree* about the need to fulfill the settlement agreement; and in this case, a breach-of-contract suit would not necessarily supply such relief.  Why? The federal court in Washington has enjoined the State Department from performing the settlement agreement no matter what.

This issue arose during oral arguments before the Western District of Washington.  Both the District Court and counsel for the states made clear that the Ninth Circuit litigation will never address the issue of the settlement agreement's enforcement:

| | |
|---|---|
| [States' Counsel]: | We are attacking the government's decision to allow these 3D guns to be readily available, and the administrative process there. We're not attacking the settlement agreement itself. |
| THE COURT: | There may be contractual issues between Defense Distributed and the federal government, based on the settlement agreement. ***But it's not in front of me and it's not part of this lawsuit is what you're saying?*** |

11

DOC_0004277

[States' Counsel]:     *That's correct, Your Honor.*

THE COURT:          *I agree with that.* But I'm glad to have [Defense Distributed's Counsel] and his client here to express a point of view that obviously the federal government isn't willing to go that far. So it's very useful to have him here. But I agree with you, *I'm not touching any contract issue in the case.*

Ex. O at 46-47 (W.D. Wash. Preliminary Injunction Hearing Transcript) (emphasis added).

Hence, today's preliminary injunction decision does not hide from these implications. To its credit, the decision speaks of them candidly. Even though the injunction "impinges on the federal defendants' ability to perform under their settlement agreement," the Western District of Washington will decidedly *not* adjudicate anything about the State Department's fulfillment of obligations under the settlement agreement. Ex. P at 12. Given that the Western District of Washington believes that the "Texas litigation is *not* under attack," *id.* (emphasis added), it will never come to the defense of the instant judgment's integrity.

The Plaintiffs have exhausted every possible avenue of relief in the court that is causing the legal jeopardy. And so it is that the Plaintiffs respectfully return to this Court now, to withdraw the stipulation of dismissal and have the current judgment vacated. Withdrawals of stipulations are allowed when necessary to avoid "manifest injustice." This is the rare case in point.

Importantly, the "manifest injustice" showing does *not* require proof that the States and/or the State Department have been acting with malice or any other bad motive. Rather, the decision to "reopen a case" because of a stipulation gone awry can be justified because the parties proceeded under an "honest mistake." *Russell-Miller Mill. Co. v. Todd*, 198 F.2d 166, 169 (5th Cir. 1952). The Plaintiffs and Defendants simply assumed that a settlement would resolve the dispute without the need for a judgment codifying its obligations. The stipulation was premised on that honest and reasonable assumption. Under the Fifth Circuit's precedents, relief is warranted.

DOC_0004278

Moreover, the Plaintiffs' right to withdraw this stipulation is supported by the dispositive nature of the dismissal. Unlike minor evidentiary stipulations that merely *shape* a merits determination, dispositive stipulations such as dismissal preclude a merits determination altogether. Cases like *Central Distributors, Inc. v. M. E. T., Inc.*, 403 F.2d 943 (5th Cir. 1968), make this distinction important: withdrawal is required where, as here, denying withdrawal would "effectively bar[] a meaningful examination of the only real issues present." *Id.* at 946.

Furthermore, the Plaintiffs' right to withdraw their stipulation is supported by the Defendants' identity. Whatever may be said about trust amongst opposing private parties, all Americans are entitled to trust that the United States of America itself will deliver on the promises it makes in litigation. *See, e.g., United States v. Camp*, 723 F.2d 741, 745–46 (9th Cir. 1984) ("Appellants had every reason to rely on the factual representation made in this regard by the federal prosecutor.").

Additionally, no prejudice will result from withdrawing this stipulation. As a general matter, prejudice may result when the opposing party is denied an opportunity to present its defense's merits. *See e.g., Stavroudis v. United States*, 309 F.2d 480, 481 (2d Cir. 1962). Here, no such disability exists.

Indeed, the equitable balance tips strongly in the Plaintiffs' favor, for "it is inequitable for a party to withdraw his burdens under a contract or stipulation without forfeiting the benefits derived under that agreement." *Stephens Inst. v. N.L.R.B.*, 620 F.2d 720, 725 (9th Cir. 1980). The Defendants were temporarily freed from the settlement's burdens, albeit involuntarily. They cannot now complain about being temporarily detached from its benefits until a new, more appropriate judgment is produced.

DOC_0004279

Finally, the Plaintiffs' right to withdraw this stipulation is supported by the substantial public importance of this case's constitutional questions. In such cases, district courts have even wider latitude to permit the right to withdraw the stipulation. *See United States v. State of Tex.*, 680 F.2d 356, 370 (5th Cir. 1982).

At bottom, this case presents extraordinary circumstances. Unless the stipulation can be withdrawn, the Plaintiffs will suffer a manifest injustice. "The Rules of Civil Procedure were adopted in an effort to put an end to the sporting theory of justice." *Cent. Distributors, Inc. v. M. E. T., Inc.*, 403 F.2d 943, 946 (5th Cir. 1968). If the stipulation cannot be withdrawn, the result in this case would have "precisely the opposite effect: the sporting theory of justice is resurrected and revitalized." *Id.*

## II.  The Dismissal Should Also be Vacated under Rule 60(b).

To the extent that Rule 59 does not supply sufficient authority to grant the Plaintiffs' requested relief, Plaintiffs request that the Court do so pursuant to Federal Rule of Civil Procedure 60(b). A dismissal under Rule 41(a)(1)(A) qualifies as a "proceeding" for purposes of Rule 60(b) "proceeding." This Court's judgment is therefore subject to vacatur under Rule 60(b). *See Nat'l City Golf Fin. v. Scott*, No. 17-60283, 2018 WL 3767318 (5th Cir. Aug. 9, 2018).

In substance, the standard for relief under Rule 60(b) is essentially the same as the standard for relief under Rule 59: the Plaintiffs must show that permitting the judgment to stand would result in "manifest injustice" *Yesh Music v. Lakewood Church*, 727 F.3d 356, 363 (5th Cir. 2013). With the situation presented here, the two inquiries dovetail harmoniously as one in the same. *See Celtic Marine Corp. v. James C. Justice Companies, Inc.*, No. 11-3005, 2013 WL 2390018, at *1 (E.D. La. May 30, 2013).

DOC_0004280

For the same reasons that relief here is warranted under Rule 59, *supra* Part II.C, relief here is warranted under Rule 60(b). Precedent supporting that conclusion comes both from this Circuit, *see Yesh Music*, 727 F.3d at 361-64; *Stipelcovich v. Sand Dollar Marine, Inc.*, 805 F.2d 599, 605 (5th Cir. 1986) ("When the settlement agreement was breached Stipelcovich had two remedies available. She could have brought an action to collect the $150,000 due under the settlement, or she could have made a rule 60(b)(6) motion to vacate the prior dismissal and reinstate the case."), and others, *Keeling v. Sheet Metal Workers Int'l Assn.*, 937 F.2d 408, 410 (9th Cir. 1991) ("Repudiation of a settlement agreement that terminated litigation pending before a court constitutes an extraordinary circumstance, and it justifies vacating the court's prior dismissal order."); *Fairfax Countywide Citizens Ass'n v. Fairfax County, Va.*, 571 F.2d 1299, 1302–03 (4th Cir. 1978) ("[U]pon repudiation of a settlement agreement which had terminated litigation pending before it, a district court has the authority under Rule 60(b)(6) to vacate its prior dismissal order and restore the case to its docket").

## III.     Further Proceedings Should Occur Soon, with Flexibility.

After vacating the current judgment, the Court will retain wide latitude to craft future proceedings in a way that is fair to all sides. *See Central Distributors*, 403 F.2d at 945 ("the court is responsible for seeing that suitable protective terms are imposed to prevent substantial and real harm to the adverse party"). Specifically, the Court will have at least two paths available to it.

First, the Court can permanently vacate the current judgment. This is the most appropriate outcome because there is no need, for example, to wait and see how the Western District of Washington's injunction pans out on appeal to the Ninth Circuit. The current state of affairs is enough to warrant both permanently vacating the existing judgment and immediately preceding to a new resolution.

DOC_0004281

Second, if the Court has doubts about that course of action, it should at least *temporarily* vacate the current judgment. This approach would allow the Court to conduct a complete inquiry into the circumstances before deciding whether or not to let the original disposition become final. At that point, the Court would have the authority to either re-enter a judgment of dismissal (if it is justified) or adhere to this vacatur decision and proceed to a merits resolution.

In either case, the critical first step is to vacate the current judgment because the Plaintiffs no longer stipulate to it. The Plaintiffs and Defendants have bound themselves to a settlement agreement. But this matter is nonetheless far from settled. The dismissal order entered on July 30, 2018 should not be this Court's final judgment. The case should be reopened.

DOC_0004282

**Conclusion**

The motion should be granted and the Court should vacate the July 30, 2018 Order.


                                              Respectfully submitted,

FARHANG & MEDCOFF                             BECK REDDEN LLP

By /s/Matthew Goldstein                       By /s/ Chad Flores
Matthew Goldstein*                            Chad Flores**
D.C. Bar No. 975000                           Texas Bar No. 24059759
4801 E. Broadway Blvd., Suite 311             cflores@beckredden.com
Tucson, AZ 85711                              Mary Kate Raffetto
(202) 550-0040                                Texas Bar No. 24098296
mgoldstein@fmlaw.law                          mkraffetto@beckredden.com
                                              Dan Hammond**
                                              Texas Bar No. 24098886
By /s/Josh Blackman                           dhammond@beckredden.com
Josh Blackman                                 1221 McKinney St., Suite 4500
Virginia Bar No. 78292                        Houston, TX 77010
joshblackman@gmail.com                        (713) 951-3700
1303 San Jacinto Street
Houston, TX 77002
(202) 294-9003


*Admitted *pro hac vice*                      **Admission *pro hac vice* pending

Attorneys for Plaintiffs Defense Distributed, Attorneys for Plaintiff Defense Distributed
Second Amendment Foundation, Inc., and
Conn Williamson

17

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served to all counsel of record through the Court's CM/ECF system on this 27th day of August, 2018.

/s/ Mary Kate Raffetto
Mary Kate Raffetto

18

**From:** Jim Bartlett, Full Circle Compliance ("FCC") ███████ @fullcirclecompliance.eu]
**Sent:** 8/31/2018 8:04:37 PM
**To:** Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject:** 18-0831 Friday "Daily Bugle"



## Friday, 31 August 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events. Subscribe here for free subscription. Contact us for advertising inquiries and rates. *[N.B. The Daily Bugle will not be released on Monday, 3 September 2018, a U.S. Federal Holiday.]*

### ITEMS FROM FEDERAL REGISTER

1. Commerce/BIS Announces TRETAC Meeting on 26 Sep in Washington DC

### OTHER GOVERNMENT SOURCES

2. Items Scheduled for Publication in Future Federal Register Editions
3. Commerce/BIS: (No new postings.)
4. DHS/CBP Announces ACE Certification FQ Deployment, 1 Sep
5. DHS/CBP Announces Temporary Limitation in ACE Reports for Upgrade to SAP Business Objects Version 4.2
6. DHS/ICE: "Colorado Woman Sentenced to 3 Years in Federal Prison for Illegally Exporting Firearms to the Dominican Republic"
7. DoD/DSS Posts White Paper Discussing Outside Director/Proxy Holder Reform
8. State/DDTC: (No new postings.)

### NEWS

9. The National Law Journal: "Clifford Chance Hit with Civil Penalty in U.S. Justice Dept. Discrimination Case"
10. ST&R Trade Report: "Dates and Deadlines: Letters of Credit, Food Facilities, Import Declaration"
11. Wired: "3-D Printed Gun Blueprints Are Back, and Only New Laws Can Stop Them"

### COMMENTARY

12. A.P. Bosch & V.J.A. Goossen: "Dutch Government Presents Perspective on Recast of the EU Dual-Use Regulation"

13. C. Duan & J. Westling: "The Judge in the Latest 3D-Printed Gun Case Got 3D Printing Totally Wrong"

## EX/IM TRAINING EVENTS & CONFERENCES

14. "9th Annual 'Partnering for Compliance™' West Export/Import Control Conference" on Oct. 16-18; Ft. Worth, TX. Customs/ Import Boot Camp, Oct 19

15. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep

16. List of Approaching Events: 6 New Events Posted This Week

## EDITOR'S NOTES

17. Bartlett's Unfamiliar Quotations

18. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (30 Aug 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (30 Aug 2018)

19. Weekly Highlights of the Daily Bugle Top Stories



## ITEMS FROM TODAY'S FEDERAL REGISTER

# 1. Commerce/BIS Announces TRETAC Meeting on 26 Sep in Washington DC

(Source: Federal Register, 31 Aug 2018.) [Excerpts.]

83 FR 44566: Transportation and Related Equipment Technical Advisory Committee; Notice of Partially Closed Meeting

The Transportation and Related Equipment Technical Advisory Committee (TRETAC) will meet on September 26, 2018, 9:30 a.m., in the Herbert C. Hoover Building, Room 3884, 14th Street between Constitution & Pennsylvania Avenues NW, Washington, DC. The Committee advises the Office of the Assistant Secretary for Export Administration with respect to technical questions that affect the level of export controls applicable to transportation and related equipment or technology.

**Agenda**

*Public Session*

(1) Welcome and Introductions.
(2) Status reports by working group chairs.
(3) Public comments and Proposals.

*Closed Session*

(4) Discussion of matters determined to be exempt from the provisions relating to public meetings found in 5 U.S.C. app. 2 Sec. Sec. 10(a)(1) and 10(a)(3).

The open session will be accessible via teleconference to 20 participants on a first come, first serve basis. To join the conference submit inquiries to Ms. Yvette Springer at Yvette.Springer@bis.doc.gov no later than September 19, 2018.

A limited number of seats will be available during the public session of the meeting. Reservations are not accepted. To the extent time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate distribution of public presentation materials to Committee members, the Committee suggests that presenters forward the public presentation materials prior to the meeting to Ms. Springer via email. ...

For more information, call Yvette Springer at (202) 482-2813.

Yvette Springer, Committee Liaison Officer.

back to top

* * * * * * * * * * * * * * * * * * *

## 2. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* Commerce; Industry and Security Bureau; RULES; Entity List; Additions, Revisions, Removals [Publication Date: 4 September 2018.]

* President; PROCLAMATIONS; Trade [Publication Date: 4 September 2018.]:
  - Aluminum; Adjustment of Imports Into the U.S. (Proc. 9776)
  - Steel; Adjusting of Imports Into the U.S. (Proc. 9777)

back to top

* * * * * * * * * * * * * * * * * *

## 3.
## Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * *

## 4. DHS/CBP Announces ACE Certification FQ Deployment, 1 Sep
(Source: CSMS #18-000508, 31 Aug 2018.)

Please be advised that there will be an ACE CERTIFICATION deployment of ACE Extract Reference Query (FQ) on Saturday evening, September 1, 2018, at 2200 ET.

To be deployed:
  - Tickets# 11333875, 11321618: FQ F111 FIRMS Query by District code should return Multiple records.

back to top

* * * * * * * * * * * * * * * * * *

## 5. DHS/CBP Announces Temporary Limitation in ACE Reports for Upgrade to SAP Business Objects Version 4.2
(Source: CSMS #18-000506, 30 Aug 2018.)

ACE Reports is in the process of upgrading from SAP Business Objects version 4.1 to version 4.2, which will result in a number of new features being available to reports users.

In order to fully transition to version 4.2, there will be a temporary limitation to reports users. Starting at 9:00 PM on August, 31, 2018, reports users will not be able to save any changes made to current reports or save any ad-hoc

reports in any ACE Reports folders. However, users will be able to export any updated reports or new ad-hoc reports in the same formats that are currently available.

ACE Reports will return to normal operations on Monday, September 10, 2018 with the full upgrade to version 4.2.

We apologize for any inconvenience this may cause during this transition period and will publish a follow-up message soon on the new features available in version 4.2.

Please send any questions or concerns to the Branch Chief of the Business Intelligence/Data Warehouse team, Daniel Collier at daniel.collier@cbp.dhs.gov.

back to top

* * * * * * * * * * * * * * * * *

## 6. DHS/ICE: "Colorado Woman Sentenced to 3 Years in Federal Prison for Illegally Exporting Firearms to the Dominican Republic"
(Source: DHS/ICE, 30 Aug 2018.) [Excerpts.]

A former member of the U.S. Army stationed at Fort Carson, Colorado, was sentenced Thursday to serve three years in federal prison following her criminal conviction for illegally exporting firearms to the Dominican Republic in 2015.

On Sept. 1, 2015, a federal grand jury indicted Katherine O'Neal, 43, for numerous firearm and illegal financing-type criminal charges. A superseding indictment was handed down on Nov. 20, 2016, with a second superseding indictment returned on Dec. 5, 2017. A jury found O'Neal guilty of smuggling goods from the United States on March 6, 2018. O'Neal was acquitted on other counts alleging false information on firearm-purchase forms and money laundering.

At trial, before U.S. District Court Judge William J. Martinez, the government introduced evidence showing that O'Neal made multiple trips to the Dominican Republic shortly after purchasing firearms in Denver and Colorado Springs, Colorado. On one trip she flew from Denver to the Dominican Republic with 11 firearms in her luggage in early June 2015. O'Neal declared the firearms to the airline, but did not obtain the required State Department export license. Her bags had been misdirected by the airline and were not on her flight. When the bags arrived later, Dominican Republic officials noticed the handguns while examining her baggage. When O'Neal arrived at the airport to claim her luggage, she was arrested. The Dominican Republic has a ban on all imported firearms. A Denver jury found O'Neal guilty of smuggling goods from the United States.

O'Neal must also serve three years on supervised release after she completes her prison sentence. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 7. DoD/DSS Posts White Paper Discussing Outside Director/Proxy Holder Reform
(Source: DoD/DSS, 31 Aug 2018.)

After more than one year of research and collaboration with government and industry stakeholders, DSS has released a White Paper explaining possible reforms to the framework governing Outside Directors and Proxy Holders (OD/PH), who serve on the Boards of Directors of cleared contractors with DSS-approved FOCI mitigation agreements. OD/PH play a critical role in overseeing and protecting government interests. The goal of reforming the OD/PH framework is to empower those individuals and to strengthen their Boards. You may read the paper here.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 8. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NEWS

## 9. The National Law Journal: "Clifford Chance Hit with Civil Penalty in U.S. Justice Dept. Discrimination Case"
(Source: The National Law Journal, 29 Aug 2018.) [Excerpts.]

The firm, without admitting guilt, agreed to pay a $132,000 penalty, along with lost wages to three unidentified individuals, to resolve immigration-related claims tied to a document-review project.

In court and at the negotiation table, U.S. Justice Department prosecutors and defense lawyers from big firms often take differing views of the law. Less common is the case in which a different view of the law makes the firm, and not the client, the focus of a government investigation.

In court and at the negotiation table, U.S. Justice Department prosecutors and defense lawyers from big firms often take differing views of the law. Less common is the case in which a different view of the law makes the firm, and not the client, the focus of a government investigation.

Clifford Chance found itself in that position over its apparent misunderstanding of data-access regulations concerning the export of defense and military equipment. On Wednesday, the firm agreed to pay a $132,000 civil penalty, along with lost wages to three unidentified individuals, to resolve a Justice Department investigation into the firm's refusal last year to allow dual citizens and non-U.S. citizens to work on a document review project.

According to the Justice Department, Clifford Chance unlawfully shut out dual citizens, along with non-citizens authorized to work in the U.S., based on the firm's misreading of regulations that limit access to certain sensitive information. The settlement papers did not reveal the identity of the client.

Clifford Chance, according to the settlement document, restricted its staffing to U.S. citizens in a "good faith" effort to comply with the data access rules set by the International Traffic in Arms Regulations.

But the Justice Department said the regulations also allow U.S. nationals, lawful permanent residents, asylees and refugees to access certain sensitive information covered by those national security rules.

A spokesperson for Clifford Chance said the firm was "pleased to reach a settlement on this matter." The spokesperson declined to identify the client for the document review project.

Justice officials said ITAR regulations do not limit sensitive information to only U.S. citizens. Indeed, the regulations also give access to U.S. nationals, lawful permanent residents, asylees, and refugees, the department said. The department cautioned that employers that limit their hiring to U.S. citizens without a proper legal basis run the risk of violating the Immigration and Nationality Act's anti-discrimination provisions.

"Employers subject to the ITAR must be careful not to engage in unlawful discrimination against U.S. workers," John Gore, acting assistant attorney in charge of the Justice Department's Civil Rights Division, said in a prepared statement. "The Department of Justice is committed to ensuring that employers do not unlawfully exclude U.S. citizens and work authorized non-U.S. citizens from employment opportunities."

Clifford Chance general counsel James Paul signed the agreement for the firm, which did not admit guilt.

Under the settlement, Clifford Chance will be subject to DOJ monitoring and reporting requirements for two years. The firm must also train employees on the anti-discrimination provision of the Immigration and Nationality Act and inform clients who request citizenship-based hiring restrictions of the law's requirements. ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 10. ST&R Trade Report: "Dates and Deadlines: Letters of Credit, Food Facilities, Import Declaration"
(Source: Sandler, Travis & Rosenberg Trade Report, 31 Aug 2018.)

Following are highlights of regulatory effective dates and deadlines, federal agency meetings, and other trade-related events coming up in the next week.

  - 4 Sep: deadline for comments to CPSC on proposal for safety standard for stationary activity centers
  - 4 Sep: deadline for comments on reorganization of FTZ 78 in Tennessee
  - 4 Sep: deadline for comments to FTZ Board on requests for new, expanded production authority
  - 5 Sep: deadline for comments on proposed new FTZ subzone in North Carolina
  - 6 Sep: deadline for comments to ITC on potential IPR import restrictions on breast imaging devices
  - 6 Sep: meeting of BIS Materials Technical Advisory Committee
  - 7 Sep: deadline for comments to USDA on proposals to narrow import declaration requirements for plant products
  - 7 Sep: deadline for nominations for Emerging Technologies Technical Advisory Committee

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 11. Wired: "3-D Printed Gun Blueprints Are Back, and Only New Laws Can Stop Them"
(Source: Wired, 29 Aug 2018.)

Attorneys general from 20 states celebrated on Monday when a district court judge in Seattle extended an injunction against the sharing of 3-D printed gun blueprints online. But their victory lap was short-lived. On Tuesday afternoon, Cody Wilson, founder of the open-source gun-printing advocacy group Defense Distributed, announced he would begin selling the blueprints directly to people who want them.

Wilson said that while the preliminary injunction forbade him to share the files online for free, it expressly allowed him to sell them. At a news conference Tuesday, Wilson periodically stopped talking to check his phone when a new sale came through.

This technicality, legal experts say, really does allow Wilson to sell his blueprints. The legally tricky part is verifying that his customers are all US citizens; if not, he'll be in violation of US export law.

But the distinction between selling the blueprints and uploading them online for free underscores the problems with the current legal battle against DIY guns. The current injunction came after a last-ditch effort to ban the plans, but was never the optimal way to prevent 3-D printed gun proliferation. To do that

will require legislation, state or federal, expressly forbidding the downloading and sharing of DIY blueprints, as well as the actual printing of plastic guns.

*The Limits of Lawsuits*

The government's case against Defense Distributed centers on export law, and a deal Wilson struck with the State Department back in July. Until July, DIY gun blueprints were considered a "deemed export" by the Department of Defense, which meant that uploading them online was the same as exporting them internationally. Wilson had argued that defining online data as an arms export violated free speech. Physical publications that make information freely available aren't treated the same as online content; if Wilson had just published the blueprints in a magazine before uploading them, the State Department would have had no room for complaint.

But Wilson, a devoted cryptoanarchist, didn't do that. His blueprints were removed from his website during a four-year legal scuffle with the State Department until this summer, when the government effectively caved by transferring the export licensing of DIY gun blueprints to the Commerce Department, which defines online data in a way that allows for Wilson to distribute his plans.

This was a huge victory for Wilson, who immediately reuploaded the blueprints to his website. But his success likely had more to do with ongoing export law reform than his long-running suit.

  "Wilson wasn't likely to win, and the only thing that caused the change here was export control reform in moving .50 caliber or less arms to the Commerce Department," says Clif Burns, an attorney specializing in export controls in the DC office of Bryan Cave Leighton Paisner, who has followed the case from the beginning. "There is no reason for us to have two export agencies. Every other country in the world has one agency that does them all," says Burns.

Unlike the State Department, Commerce doesn't define online posts as exports, and never has. With small firearms exports moving out of its jurisdiction, Burns says, the State Department had no reason to keep fighting the case.

  "Why fight a battle that was going to be pointless in a matter of months? So just go ahead and settle it," Burns says. "But they were a little bit sloppy about how they settled it."

Specifically, in July State approved the Defense Distributed blueprints for public release, and it temporarily removed them from the category of small firearms below .50 calibers. That second part opened the door to the case brought by 20 attorneys general, who argued-in addition to noting the security threats-that because of the category change, State had to give Congress notice before implementing the deal.

On Monday, US District Judge Robert Lasnik in Seattle found both aspects of that argument compelling enough to extend an injunction against the

publication of the blueprints online. "The instability and inaccuracy of 3-D printed firearms pose threats to the citizens of the plaintiff States," Lasnik wrote.

To some lawyers and gun control advocates, the intention of the injunction was clearly to keep these blueprints from being used to make guns at all. "I think [selling them] is a disingenuous workaround of the judge's order. The core aim of the temporary injunction was to safeguard the public's security while the legal issues are being determined. Selling the blueprints isn't an exercise of First Amendment freedoms, but rather a subversion of a lawful judicial order," says Lawrence Gostin of Georgetown Law, who specializes in public health law.

But while that may have been the spirit of the lawsuit, and the injunction, nothing in the case precludes the sale of those same prints to US citizens in the United States. And it never did.

  "The files cannot be uploaded to the internet, but they can be emailed, mailed, securely transmitted, or otherwise published within the United States," Lasnik wrote in the decision Monday.

In fact, because the case against the blueprints has always hinged on export law, Wilson could have sold them legally within the United States all along. "For many years I chose not to sell these files. I was an open source advocate," Wilson said at his Tuesday press conference. He's selling them now for a suggested price of $10, though he will allow people to pay whatever they want, even as little as a penny. To avoid any accusation that he's uploading them to the internet, Wilson will the put the prints on flash drives and mail them to customers. He also requires customers to click a box certifying that they are US citizens, but appears to take no further action to verify their citizenship.

  "The whole issue was saying he couldn't export these plans. And what he's saying is that has nothing to do with my domestic distribution of these plans. 'That's never been controlled and I can do that,' and he's dead right on that as long as he only gives them to US citizens," agrees Burns.

*Far From Over*

Wilson is not selling the blueprints in Washington, Pennsylvania, Massachusetts or any of the 20 states whose AG's brought the case against him. If you try to order them on his website and put an address in any of those states, you're shown the following message: "451: Oops. You're behind the blue wall. Your masters say you can't be trusted with this information. Sorry, little lamb."

Each of these states has its own gun laws, which Wilson expects will explicitly ban the sale of blueprints within their borders, if they don't already.

  "Selling these files into Pennsylvania violates both our state law and the agreement Defense Distributed reached with the Commonwealth before Judge

Diamond on July 29. Putting untraceable weapons in the hands of criminals presents a clear public safety threat to Pennsylvanians, which is why I am exploring all of my legal options to stop these sales," said Pennsylvania attorney general Josh Shapiro in a statement to WIRED.

Washington State attorney general Bob Ferguson put the ball in the Trump administration's court. "Because of our lawsuit, it is once again illegal to post downloadable gun files to the internet,' Ferguson said in a statement. "I trust the federal government will hold Cody Wilson, a self-described 'crypto-anarchist,' accountable to that law. If they don't, President Trump will be responsible for anyone who is hurt or killed as a result of these weapons."

To really stop these blueprints from becoming untraceable ghost guns in the US, state and federal governments need to outlaw the sale and distribution of the plans for plastic guns directly, irrespective of their export status. "This gerrymandered system of doing it through the export control laws doesn't make any sense," says Burns. "Frankly, what that does is say that we are worried that we are putting these plastic guns in the hands of French citizens but we can't control whether that's being done in the United States or not."

For now, the blueprints are for sale in 30 states. Proceeds from the sales will go to paying Wilson's legal fees, which will continue to be considerable-and if it turns out he sells the plans to any non-US citizens or anyone outside the US, they'll be even higher.

back to top

* * * * * * * * * * * * * * * * *

## 12. A.P. Bosch & V.J.A. Goossen: "Dutch Government Presents Perspective on Recast of the EU Dual-Use Regulation"
(Source: Full Circle Compliance, 31 Aug 2018.)

* Authors: Alexander P. Bosch, Senior Associate, apbosch@fullcirclecompliance.eu; and Vincent J.A. Goossen, Program Manager, vjagoossen@fullcirclecompliance.eu. Both of Full Circle Compliance; assistant editors of the Daily Bugle.

On 29 August, the Dutch Secretary of Foreign Trade and Development  informed the Dutch House of Representatives ("*de Tweede Kamer*") about the current state of and the position of the Netherlands concerning the recast of Council Regulation 428/2019 ("the Dual-Use Regulation") [FN/1].

A proposal for the recast was presented by the European Commission on 28 September 2016. The aim of the proposed recast is to modernize and strengthen the regulations. The most relevant update concerns the strengthening of controls on cyber surveillance technology in order to enhance human rights protection. The EU commission's aim is also to create a more equal playing field and enhance transparency.

Below is a summary and unofficial translation of the letter to the Dutch House of Representatives:

### The Dutch Position: Export Controls as a Foreign Policy Tool

The Dutch position is that the EU Dual-Use Regulation has proven itself over the years as a well-functioning export control framework for the European export control authorities. The Netherlands sees "added value" in a revision and modernization of the regulation. In this review, the Netherlands will focus on the following components.

*Adding Cybersurveillance Technology*

The Netherlands considers the broadening of export control to include cybersurveillance technology as necessary. The Dual-Use Regulation is considered to be the appropriate instrument to achieve this. Cybersecurity is viewed as a growing threat to the stability of countries and becomes a more relevant theme for a secure world. An increased amount of data is stored digitally, interlinked, and shared via internet connections. This offers opportunities for trade, freedom of expression, political participation and democratization. However, there is also a downside. In a growing number of countries, governments restrict or forbid access to the internet. Some governments also follow the digital footprints of human rights activists as to trace and prosecute them. The threats of cyber-crime, cyber espionage, and digital warfare increase as well. Such topics require an EU-wide approach and the Netherlands sees export control as one of the ways to do so.

The European Commission's proposal still requires further elaboration on the cyber theme as to clearly define the concept of cybersurveillance technology and of the human rights that can be violated by it. It is essential to provide clear and predictable framework for the business community in this effort.

The Netherlands considers an export control system most effective when it is based on three pillars:

    (1)  Working on the basis of a control list,
    (2)  The safety net of the ad hoc license requirement;
    (3)  Corporate social responsibility.

In the revision of the regulation and the implementation of the aforementioned extension to cybersurveillance technology, the

Netherlands determines its commitment on the basis of these three pillars.

*(1) Implementation Control Lists*

The Netherlands is committed to work towards a control list for cybersurveillance technology. Such a list provides clarity to companies and export control authorities and brings legal certainty.

With the introduction of an EU control list for cybersurveillance technology, the EU will deviate from the lists used by multilateral export control regimes. The Netherlands is committed to safeguarding the international level playing field as well as possible by continuing to work on control through the appropriate international regimes and to deviate as little as possible from the existing export control system. However, among the participating states of the multilateral export control regimes, there is currently no consensus for export control on cybersurveillance technology. At the same time, the Netherlands believes that the risks of human rights violations due to c cybersurveillance technology must be overcome and sees a role for the EU as a leader on this issue. Overcoming the risks of human rights violations weighs heavier than maintaining the international level playing field for the Netherlands.

*(2) Ad-Hoc License Requirement*

Technology is developing at high speed, so a control list will never be entirely able to keep pace. The Netherlands sees the ad-hoc license requirement (or "catch-all" instrument) for goods that are currently not on control list, as essential for an effective export control system. Therefore, the Netherlands also wants to use the ad-hoc licensing obligation for cybersurveillance technology. This tool enables Member States to act quickly and purposefully on information about non-controlled cybersurveillance technology, which shows that this technology may be used in human rights violations.

The catch-all instrument has shown itself useful in the current Dual-Use Regulation and enables the Dutch government to act in special cases in the case of high-risk exports of non-controlled goods. With regard to the catch-all instrument for cybersecurity technology, the Netherlands receives little support from other EU member states. The reason for this is the uncertainty in the industry about how this tool will work out in practice for cybersurveillance technology. The Netherlands tries to increase the support of other member states in bilateral consultations.

*(3) Corporate Social Responsibility*

Companies taking their international corporate social responsibility is considered by the Dutch government as the third pillar of an effective export control system. The Dutch export control authorities regularly consult with companies to point out the risks that exports may entail. It

underlines that companies have their own social responsibility, must be aware of the potential safety risks of their exports and act accordingly.

The Netherlands requires companies to issue an Internal Compliance Program (ICP) for global export licenses, which, among other things, address the risk of human rights violations in the export of cyber-surveillance goods. The Netherlands considers it desirable that corporate social responsibility is explicitly mentioned in a revised Dual-Use Regulation. The European Parliament has already introduced the term "due diligence" (an approach taken from the OECD guidelines for multinational companies and the UN Guiding Principles on Business and Human Rights) in its Position on the matter. The Netherlands can support such an addition, provided that it remains sufficiently clear what is expected from exporters.

Two other elements from the Dutch position are the following.

*A Level Playing Field Within The EU*

Promoting a level playing field within the EU is undiminished a Dutch priority in the negotiations on the revision of the Dual-Use Regulation. The Netherlands, therefore, supports the Commission's proposal to level license periods within the EU and to introduce a mandatory Internal Compliance Program (ICP) when applying for global export licenses, which is already practice in the Netherlands.

*Transparency*

The EU Commission requests more and more extensive reports from the EU Member States on exports that have been licensed and on rejected license applications. The Commission also wants EU Member States to share more information about cases in which the ad-hoc license requirement is invoked. The Netherlands states that it can only support the Commission's efforts if this is done within the existing frameworks for sharing state secret and company-sensitive information. The Dutch practice is already characterized by a high degree of transparency towards the public and the Dutch Parliament. An example of this is the monthly and annual arms export reports that are published by the Ministry of Foreign Affairs. The Netherlands is still not convinced of the usefulness and necessity of more reports and wants to limit the increase in administrative burden as much as possible. The new regulation must be effective, clearly written, and executable for industry and governments.

*Slow Negotiations in the Council*

The negotiations in the Council require a lot of time in view of the technical nature of the subject. The Council is aware of the fact that the European Parliament has already taken a position [FN/2]. The Netherlands is working in various ways to keep the progress in the discussions at a pace. For example, the Netherlands, together with a

number of other EU member states, has taken the initiative to conduct informal discussions in parallel with the Council, with the aim of making the discussions in the Council as smooth as possible. The Netherlands writes position papers, and provides, as one of ten Member States, each time written comments and text suggestions on the Commission proposal. The Netherlands sends experts to Brussels to participate in technical consultations. It also scheduled a number of bilateral talks at the end of the summer to emphasize, once again, the importance of cybersecurity technology and human rights in the Dual-Use Regulation and to find a way forward in the Council discussions.

In the Council a dichotomy has become visible in recent months [FN/3]. There is a group of like-minded EU member states that can support the expansion to control cybersurveillance technology within the Dual-Use Regulation. The Netherlands is part of this group. However, other member states believe that this issue must be tackled on a national level through national measures. However, such national measures are a last resort for the Netherlands, measures on a topic such as this are particularly effective if they are designed and implemented in a comprehensive manner. The European Parliament supports an approach at the EU level and is not in favor of solely national measures in the EU Member States on this issue.

The Netherlands works together with a number of other EU Member States to maintain the momentum and to come to a Council position with the current European Parliament. The Netherlands wants to adequately tackle new threats from cyber-surveillance technology. A strong EU export control framework is part of that approach. The modernization of the Dual-Use Regulation is necessary to accomplish this.

-------------

  [FN/1] *Kamerbrief inzake stand van zaken omtrent de onderhandelingen over de dual use-verordening binnen de EU*, 29 August 2018, available here.
  [FN/2] Reference P8_TA-PROV (2018) 0006, available here.
  [FN/3] In January 2018, eleven EU Member States (Germany, Croatia, the Czech Republic, France, Italy, Poland, Portugal, Romania, Slovakia, Slovenia, and Spain) signaled their support for the EU Commission to draft rules that would place export restrictions on companies selling surveillance technologies, according to a leaked negotiating document obtained by EURACTIV.com. See here.

back to top

* * * * * * * * * * * * * * * * * *


## 13. C. Duan & J. Westling: "The Judge in the Latest 3D-Printed Gun Case Got 3D Printing Totally Wrong"
(Source: Slate, 30 Aug 2018.)

* Authors: Charles Duan, Director for Technology and Innovation Policy, cduan@rstreet.org, +1 202-900-8247; and Jeffrey Westling, Technology and Innovation Policy Associate. Both from the R Street Institute.

On Monday, a federal court in Washington state blocked Cody Wilson and his company Defense Distributed from putting his 3D-printed gun schematic online. The court's order-the latest in a years-long legal tussle that has picked up this summer-largely focuses on government rulemaking procedures, but a number of times it has to consider how technology works. When it does, it manages to get the technology remarkably wrong.

Perhaps the most comical of these is when the decision considers whether letting the schematic go online will cause "irreparable harm." Most of the files are already online, Wilson's attorneys argued, so what's the harm in putting them up yet again? Yet the court disagreed, saying those online copies might be hard to find-only "a cybernaut with a BitTorrent protocol" could locate them "in the dark or remote recesses of the internet."

Put aside that those "dark or remote recesses" are websites with URLs literally written on court filings in front of the judge. Put aside that the websites are accessed by HTTP, not BitTorrent. Put aside that "cybernaut" is Web 1.0 terminology that peaked in 1999. The phrasing "cybernaut with a BitTorrent protocol" is just grammatically weird. A protocol is computer-speak for a language-not the sort of thing one can possess. One can have a BitTorrent application, but not a BitTorrent language. Plus, no one uses the indefinite article "a" in front of a language. To a computer scientist, it's like referring to Noah Webster, armed with an English.

Other errors in the decision are deeper and more fundamental. The law that supposedly prohibits the posting of the schematic is an export control law, the Arms Export Control Act, so nothing stops Wilson from distributing the schematic inside the United States. But posting the gun schematic online necessarily exposes it to foreign countries, according to the court, because "the internet is both domestic and international."

Yet anyone who has used the internet in the last decade knows that it is not so international today. Streaming video sites regularly have different offerings per country. Corporate websites often redirect users to different sites based on location. Indeed, there are freely available code snippets for blocking users by country. Certainly skilled users can get around location-based blocking, but they are at least at the skill level of BitTorrent-cybernauts who could also find the schematics elsewhere.

Perhaps the judge can't be faulted for that error-none of the lawyers appear to have proposed country-based blocking-but one would expect the court to know how harmful 3D-printed guns actually are, in a case about the harm of 3D-printed guns. That does not appear to be the case. The judge assumes that once the schematic is out, plastic guns will show up everywhere due to the "portability and ease of a manufacturing process"-that is, 3D printing-"that can be set up virtually anywhere."

In fact, making a plastic gun is not as easy as just hitting File-Print. First, most consumer-grade 3D printers currently on the market would print duds, because the plastic that they use cannot reliably handle the intense pressure created when firing a bullet. Printers that can handle the job are not cheap: $10,000 or more according to one expert. And even the schematic and a quality printer are not enough, because 3D printing is a notoriously finicky process. Without technical expertise on how 3D printers work, you're more likely to end up with an exploding gun than a working one. In other words, Wilson's schematic does not suddenly enable portable, easy gun-printing setups virtually anywhere.

This last mistake reflects an unfortunately systemic problem in government and society: People assume that new technology is perfect and ubiquitous for its worst uses, and unusable and rare for its best. It will be difficult to shake society of this tendency, perhaps attributable to the recent rise in dystopian literature. The best that can be done, then, may be to educate government on technology. When things like the internet and 3D printing do not feel so foreign either in Washington, D.C., or in federal courts, lawmakers and judges may be less worried that such things spell out doom for everyone except the cybernauts.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



FULL CIRCLE

The World Leading Experts in International Trade Compliance

www.fullcirclecompliance.eu

## EX/IM TRAINING EVENTS & CONFERENCES

## 14. "9th Annual 'Partnering for Compliance™' West Export/Import Control Conference" on Oct. 16-18; Ft. Worth, TX. Customs/ Import Boot Camp Oct. 19.
(Source: A.E. NicPhaidin, Info@PartneringForCompliance.org)

* What: The 9th Annual "Partnering for Compliance™" West will focus intensely on a broad spectrum of export/import regulatory and compliance matters of current relevance to companies and individuals involved in global trading. Senior-level government officials and trade experts will provide first-class training.
* Where: Dallas-Fort Worth Marriott South Airport Hotel (completely renovated)
* When:
  - Tue - Thurs, 16-18 Oct: "9th Annual 'Partnering for Compliance™' West Export Control Program
  - Fri, 19 Oct: 1-Day Program "Customs/Import Boot Camp"
* Speakers confirmed: DoS/DDTL: Terry Davis & Audra Collins; DoS/DDTC: Jae Shin; DoC/BIS: Bryce Bewley & Mary Quach & OEE James Fuller; DoD/DTSA: Ken Oukrop; OFAC: Anthony D. Musa (Licensing) & Michael Szustakowski (Enforcement); Census Bureau: Dale Kelly; DHS/CBP: O'Ruill D. McCanlas; ICE: Dean Fittz; UK/EU: David Hayes Export Controls; Imports: Braumiller Law Group PLLC: Adrienne Braumiller & Bruce Leeds; and U.S. trade.
* Opening Keynote Address: TBA (Invited)
* Cost: Export 3-day program: $650. Customs/Import 1-day program: $250. Both programs: $900.
* Remarks: Maximum capacity is 200 participants to maintain informal and collaborative environment.
* As time permits, all Government and trade speakers will informally hold short "one-to-one" meetings with participants on a "first-come, first-served" basis.
* Certificates of Completion granting: 4.5 IIEI CEUs and 20 CES NCBFAA Credits for 3-day Exports program, and 6.5 CCS NCBFAA Credits for 1-day Customs/Import Boot Camp will be awarded for each program.
* More information: Here.

back to top

* * * * * * * * * * * * * * * * * * *

## 15. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com)

* What: The ECS ITAR/EAR Symposium & Boot Camp, Annapolis, MD
* When: September 11-13, 2018
* Where: Chart House Restaurant on Spa Creek
* Sponsor: Export Compliance Solutions & Consulting (ECS)
* ECS Speaker Panel:  Timothy Mooney, Commerce/BIS; Matt Doyle, Lockheed; Matt McGrath, McGrath Law, Scott Jackson, Curtiss-Wright, Suzanne Palmer & Mal Zerden.

\* Register <u>here</u> for the three-day event or by calling 866-238-4018 or e-mail <u>spalmer@exportcompliancesolutions.com</u>

<u>back to top</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# 16. List of Approaching Events: 6 New Events Posted This Week
(Sources: Editor and Event Sponsors)

Published every Friday or last publication day of the week, our overview of Approaching Events is organized to list continuously available training, training events, seminars & conferences, and webinars.

Please, submit your event announcement to Alexander Witt, Events & Jobs Editor (email: <u>awitt@fullcirclecompliance.eu</u>), composed in the below format:

> # DATE: LOCATION; "EVENT TITLE"; EVENT SPONSOR; WEBLINK; CONTACT DETAILS (email and/or phone number)

"#" = New or updated listing

### *Continuously Available Training*

\* E-Seminars: "<u>US Export Controls</u>" / "<u>Defense Trade Controls</u>"; Export Compliance Training Institute; <u>danielle@learnexportcompliance.com</u>
\* Webinar: "<u>Company-Wide US Export Controls Awareness Program</u>"; Export Compliance Training Institute; <u>danielle@learnexportcompliance.com</u>
\* E-Seminars: "<u>ITAR/EAR Awareness</u>"; Export Compliance Solutions; <u>spalmer@exportcompliancesolutions.com</u>
\* Online: "<u>Simplified Network Application Process Redesign (SNAP-R)</u>"; Commerce/BIS; 202-482-2227
\* E-Seminars: "<u>Webinars On-Demand Library</u>"; Sandler, Travis & Rosenberg, P.A.
\* Online: "<u>International Trade Webinars</u>"; Global Training Center
\* Online: "<u>On-Demand Webinars</u>"; "<u>General Training</u>"; Center for Development of Security Excellence; Defense Security Service (DSS)
\* Online: "<u>ACE Reports Training and User Guide</u>"; DHS/CBP
\* Online: "<u>Increase Your International Sales - Webinar Archive</u>"; U.S. Commercial Service
\* Web Form: "<u>Compliance Snapshot Assessment</u>"; Commonwealth Trading Partners (CTP)
\* Online: "<u>Customs Broker Exam Prep Course</u>"; The Exam Center

### *Seminars and Conferences*

\* Sep 3: Edinburgh, UK; "<u>Intermediate Seminar</u>"; UK Department for International Trade
\* Sep 4: Edinburgh, UK; "<u>Beginner's Workshop</u>"; UK Department for International Trade

* Sep 4: Edinburgh, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 4: Edinburgh, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 4: Leeds, UK; "Methods of Payment & Letters of Credit"; Chamber International
* Sep 4: London, UK; "An Introduction to Exporting"; UK Institute of Export and International Trade
* Sep 5: Aberdeen, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 5: Aberdeen, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 6: Aberdeen, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 11-13: Annapolis, MD; "ITAR/EAR Symposium & Boot Camp Global Trade Academy"; Export Compliance Solutions (ECS)
* Sep 11-13: Detroit, MI; "Export Controls Specialist Certification"; Global Trade Academy
* Sep 11: Leeds, UK; "Export Documentation and Export Procedures"; Chamber International
* Sep 12: Buffalo, NY; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 12: Melbourne, Australia; Defence Export Controls Outreach; Australian Department of Defense
* Sep 12-13: Springfield, RI; "Complying with US Export Controls"; Bureau of Industry and Security
* Sep 12-19: Chicago, IL; "Import 5-Day Boot Camp"; Global Trade Academy
* Sep 13: Buffalo, NY; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 13: Frankfurt, Germany; "BAFA/U.S. Export Control Seminar 2018";
* Sep 13-17: Galveston, TX (Cruise); "ICPA @ SEA!"; International Compliance Professionals Association (ICPA)
* Sep 16-19: Atlanta, GA; "2018 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 17: Los Angeles, CA; "Import Compliance"; Global Trade Academy
* Sep 17-20: Columbus, OH; "University Export Controls Seminar at The Ohio State University in Columbus"; Export Compliance Training Institute (ECTI); jessica@learnexportcompliance.com; 540-433-3977
* Sep 17-21: Los Angeles, CA; "Import 5-Day Boot Camp"; Global Trade Academy
* Sep 18: Anaheim, CA; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 18: Kontich, Belgium; "Export Controls Master Class"; Customs4Trade
* Sep 18: Los Angeles, CA; "Tariff Classification for Importers and Exporters"; Global Trade Academy
* Sep 18-19: London, UK; "Decoding Trade Controls, Sanctions And Regulations On Dual-Use Goods"; KNect365
* Sep 18: San Diego, CA; "12th Annual CompTIA Global Trade Compliance Best Practices Conference"; CompTIA
* Sep 19: Washington, D.C.; "DDTC In-House Seminar"; Department of State (Registration: Aug 10 - Aug 31; first come, first served)

* Sep 19: Los Angeles, CA; "NAFTA and Trade Agreements"; Global Trade Academy
* Sep 19-20: Rome, Italy; "Defense Exports 2018"; SMi
* Sep 19-20: Los Angeles, CA; "Complying With U.S. Export Controls"; BIS
* Sep 20: Pittsburgh, PA; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 20: Los Angeles, CA; "Country and Rules of Origin"; Global Trade Academy
* Sep 20: Mountain View, CA; "Assist Valuation: What Every Import Professional Needs to Know"; Professional Association of Exporters and Importers
* Sep 21: Los Angeles, CA; "Customs Valuation - The Essentials"; Global Trade Academy
* Sep 21: Pittsburgh, PA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Sep 21-24: Detroit, Michigan; "Best Customs Broker Exam Course"; GRVR Attorneys
* Sep 24: Seligenstadt, Germany; "Follow-Up Fachtagung"; FALEX
* Sep 25-26; Chicago, IL; "Financial Crime Executive Roundtable"; American Conference Institute
* Sep 25: Kansas City, MO; "Import Documentation and Procedures Seminar"; International Business Training
* Sep 25: Leeds, UK; "Understanding Exporting & Incoterms"; Chamber International
* Sep 25-26: San Francisco, CA; "11th West Coast Conference on FCPA Enforcement and Compliance"; American Conference Institute
* Sep 25-26: Toronto, Canada; "4th Forum on Economic Sanctions and Compliance Enforcement"; C5 Group
* Sep 26: Kansas City, MO; "Export Documentation and Procedures Seminar"; International Business Training
* Sep 26: McLean, VA; "EAR Basics"; FD Associates
* Sep 26: Oxford, UK; "Intermediate Seminar"; UK Department for International Trade
* Sep 27: Oxford, UK; "Beginner's Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Licenses Workshop"; UK Department for International Trade
* Sep 27: Oxford, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Sep 28: Anaheim, CA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 1-4: Austin, TX; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 2: Bruchem, Netherlands; "Awareness Course U.S. Export Controls: ITAR & EAR From a Non-U.S. Perspective"; Full Circle Compliance
* Oct 2: Leeds, UK; "Export Documentation"; Chamber International
* Oct 2: Manchester, UK; "E-Z CERT: How To Process Your Export Documentation Online" Greater Manchester Chamber of Commerce;
* Oct 3: London, UK; "Control List Classification - Combined Dual-Use and Military"; UK Department for International Trade

* Oct 4: London, UK; "Making better License Applications"; UK Department for International Trade
* Oct 5: Boston, MA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 5: Boston, MA; " Incoterms: A Strategic Approach"; International Business Training
* Oct 9: New Orleans, LA; "Import Documentation and Procedures Seminar"; International Business Training
* Oct 10: Manchester, UK; "Export Documentation Training Course"; Greater Manchester Chamber of Commerce
* Oct 10: New Orleans, LA; "Tariff Classification Seminar"; Global Learning Centre
* Oct 11: New Orleans, LA; "Export Documentation and Procedures Seminar"; International Business Training
* Oct 11: Rotterdam, NL; "Trade Compliance Congres"; SDU, Customs Knowledge, and EvoFenedex
* Oct 12: New Orleans, LA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 15-18: Amsterdam, NL; "US Export Controls on Non-US Transactions - EAR, ITAR, OFAC Regulations Impact for EU, NL, UK & other Non-US Companies"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 15-19: Chicago, IL; "Certified Classification Specialist"; Global Trade Academy
* Oct 16-18: Dallas, TX; "Partnering for Compliance West Export/Import Control Training and Education Program"; Partnering for Compliance
* Oct 16: Kontich, Belgium; "Export Control Compliance Basics"; Customs4Trade
* Oct 17: Manchester, UK; "Understanding Tariff Codes" Greater Manchester Chamber of Commerce
* October 17-18; Miami/Fort Lauderdale, FL; "11th Maritime Forwarding, Freight Logistics & Global Chain Supply Workshop"; ABS Consulting; albert@abs-consulting.net; 954 218-5285
* Oct 18-19: McLean, VA; "ITAR Fundamentals"; FD Associates
* Oct 19: Dallas TX; "Customs/Import Boot Camp"; Partnering for Compliance
* Oct 21-23: Grapevine, TX; "2018 Fall Conference"; International Compliance Professionals Association (ICPA)
* Oct 22-26: Dallas, Texas; "Best Customs Broker Exam Course"; GRVR Attorneys
* Oct 22-23: Arlington, VA; "2018 Fall Advanced Conference"; Society for International Affairs (SIA)
* Oct 23: Adelaide, Australia; Defence Export Controls Outreach; Australian Department of Defense
* Oct 23: Kontich, Belgium; "Export Control Compliance Basics"; Customs4Trade
* Oct 24: Leeds, UK; "Intermediate Seminar"; UK Department for International Trade
* Oct 25: Leeds, UK; "Beginner's Workshop"; UK Department for International Trade
* Oct 25: Leeds, UK; "Licenses Workshop"; UK Department for International Trade

* Oct 25: Leeds, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Oct 26: Louisville, KY; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Oct 26: Milwaukee, WI; "Incoterms: A Strategic Approach"; International Business Training
* Oct 29 - Nov 1: Phoenix, AZ; ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Oct 29: Seattle, WA; "Export Compliance & Controls 101"; Global Trade Academy
* Oct 30 - Nov 1: Seattle, WA; "Export Controls Specialist - Certification"; Global Trade Academy
* Oct 30: Singapore; "4th Asia Summit on Economic Sanctions"; American Conference Institute
* Oct 31 - Nov 1: Singapore; " 7th Asia Summit on Anti-Corruption"; American Conference Institute
* Nov 6: Detroit, MI; "Classification: How to Classify Parts"; Global Trade Academy
* Nov 6: Manchester, UK; "Export Control Symposium Autumn 2018"; UK Department for International Trade
* Nov 7: Detroit, MI; "Advanced Classification of Machinery and Electronics"; Global Trade Academy
* Nov 7: Manchester, UK; "Understanding Incoterms" Greater Manchester Chamber of Commerce
* Nov 7-9: London, UK; "TRACE European Forum, 2018"; TRACE Anti-Bribery Compliance Solutions
* Nov 7-9: Detroit, MI; "Advanced Classification for Machinery & Electronics"; Global Trade Academy
* Nov 8-9: Shanghai, China; "ICPA China Conference"; International Compliance Professionals Association
* Nov 12-15: Washington, D.C.; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Nov 13: Tysons Corner, VA; "Made in America, Buy America, or Buy American: Qualify your Goods and Increase Sales"; Global Trade Academy
* Nov 14: Manchester, UK; "Intermediate Seminar"; UK Department for International Trade
* Nov 15: Manchester, UK; "Beginner's Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Licenses Workshop"; UK Department for International Trade
* Nov 15: Manchester, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Nov 15: McLean, VA; "ITAR For the Empowered Official"; FD Associates
* Nov 16, San Diego, CA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training
* Nov 20: Manchester, UK; "How to Claim Duty Relief on Export and Import Processes" Greater Manchester Chamber of Commerce
* Nov 20: Sydney, Australia; Defence Export Controls Outreach; Australian Department of Defense;
* Nov 21: London, UK; "Cyber Export Controls"; UK Department for International Trade

* Nov 21: Manchester, UK; "Introduction to Exporting" Greater Manchester Chamber of Commerce
* Nov 27: Houston, TX; "Duty Drawback Specialist - Certification"; Global Trade Academy
* Dec 3-7: Tysons Corner, VA; "Certified Classification Specialist"; Global Trade Academy
* Dec 4-5: London, UK; "11th Advanced Conference on Customs Compliance held in Partnership with HMRC"; C5 Group
* Dec 4-5: Frankfurt, Germany; "US Defence Contracting and DFARS Compliance in Europe;" C5 Group
* Dec 5: London, UK; "Intermediate Seminar"; UK Department for International Trade
* Dec 6: London, UK; "Beginner's Workshop"; UK Department for International Trad
* Dec 6: London, UK; "Licenses Workshop"; UK Department for International Trade
* Dec 6: London, UK; "Control List Classification - Combined Dual Use and Military"; UK Department for International Trade
* Dec 6: London, UK; "International Documentation and Customs Compliance"; Institute of Export and International Trade
* Dec 6: Manchester, UK; "Export Documentation Training Course;" Greater Manchester Chamber of Commerce
* Dec 6: Manchester, UK; "Introduction to Export Controls and Licenses";
* Dec 10-13: Miami, FL; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; jessica@learnexportcompliance.com; 540-433-3977
* Dec 14: Philadelphia, PA; "Incoterms 2010: Terms of Sale Seminar"; International Business Training

2019

* Jan 6-7: Long Beach, CA; "Fundamentals of FTZ Seminar";
* Jan 21-24, 2019: San Diego, CA; "ITAR Defense Trade Controls / EAR Export Controls Seminar"; ECTI; 540-433-3977
# Jan 30-31: Washington, DC; "5th National Forum on CFIUS;" American Conference Institute (ACI)
* Feb 6-7: Orlando, FL; "Boot Camp: Achieving ITAR/EAR Compliance"; Export Compliance Solutions (ECS)
* Feb 12-13: Washington, D.C.; "2019 Legislative Summit"; National Association of Foreign Trade Zones (NAFTZ)
* Mar 26-27: Scottsdale, AZ; "Seminar Level II: Managing ITAR/EAR Complexities"; Export Compliance Solutions
* May 5-7: Savannah, GA; "2019 Spring Seminar"; National Association of Foreign Trade Zones (NAFTZ)
* Sep 8-11: Chicago, IL; "2019 Annual Conference and Exposition"; National Association of Foreign Trade Zones (NAFTZ)

### Webinars

* Sep 6: Webinar; "University Export Controls Program: Strength in Numbers"; ECTI; 540-433-3977
* Sep 11: Webinar; "BIS License Application 748P: How to Prepare It and How to Ensure Best Possible Approval Time"; ECTI; 540-433-3977

* Sep 12: Webinar; "Understanding the Tariff Wars: Developing Strategies to Overcome International Supply Chain Disruptions"; ECTI; 540-433-3977
* Sep 19: Webinar; "International Logistics"; International Business Training
* Sep 24: Webinar; "Tariff Classification: Using the Harmonized Tariff Schedule"; International Business Training
* Sep 25: Webinar; "NAFTA Rules of Origin"; International Business Training
# Sep 25: Webinar; "Meeting CBP's Informed Compliance and Reasonable Care Standards;" Sandler, Travis & Rosenberg, P.A. (ST&R)
* Sep 26: Webinar; "US Antiboycott Regulations: Clarified & Demystified"; ECTI; 540-433-3977
# Oct 2: Webinar; "Mitigating Section 301 Duties With First Sale Customs Valuation;" Sandler, Travis & Rosenberg, P.A. (ST&R)
#Oct 3: Webinar; "IT Security, Cloud Computing, and Export Controls;" ECTI; danielle@learnexportcompliance.com; 540-433-3977
# Oct 10: Webinar; "Advanced Classification, Part 2;" Sandler, Travis & Rosenberg, P.A. (ST&R)
* Oct 15: Webinar; "Incoterms 2010: Terms of Sale"; International Business Training
# Oct 23: Webinar; "A Practical Guide to AES Filing: When, What and How to File in the Automated Export System;" ECTI; danielle@learnexportcompliance.com; 540-433-3977
* Nov 14: Webinar; "An Export Commodity Classification Number - ECCN"; Foreign Trade Association
* Dec 3: Webinar; "Tariff Classification: Using the Harmonized Tariff Schedule"; International Business Training
* Dec 4: Webinar; "NAFTA Rules of Origin"; International Business Training
* Dec 5: Webinar; "Import Documentation and Procedures"; International Business Training
* Dec 11: Webinar; "Incoterms 2010: Terms of Sale"; International Business Training
* Dec 20: Webinar; "International Logistics"; International Business Training

back to top

* * * * * * * * * * * * * * * * * *

EDITOR'S NOTES

## 17. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Elizabeth Stuart Phelps** (Elizabeth Stuart Phelps Ward (31 Aug 1844 - 28 Jan 1911; was an early feminist American author and intellectual who challenged traditional Christian beliefs of the afterlife, challenged women's traditional roles in marriage and family, and advocated clothing reform for women.)

- *"What an immense power over the life is the power of possessing distinct aims. The voice, the dress, the look, the very motion of a person, define and alter when he or she begins to live for a reason."*

* **Lily Tomlin** (Mary Jean "Lily" Tomlin; born September 1, 1939; is an American actress, comedian, writer, singer, and producer. Tomlin began her career as a stand-up comedian, and performing Off-Broadway during the 1960s. Her breakout role was performing as a cast member on the variety show, Rowan & Martin's Laugh-In, from 1969 until 1973.)
- *"I personally think we developed language because of our deep need to complain."*

**Friday funnies:  Homographs, homophones, and heteronyms**

Homographs are words of same spelling but with more than one meaning.  Homographs that are pronounced differently are heteronyms.  Homophones are words that hae the same sound as another word but are spelled differently and have a different meaning.
  (1) The bandage was 'wound' around the 'wound'.
  (2) The farm was used to 'produce' 'produce.'
  (3) The dump was so full that it had to 'refuse' more 'refuse.'
  (4) We must 'polish' the 'Polish' furniture.
  (5) He could 'lead' if he would get the 'lead' out.
  (6) The soldier decided to 'desert' his 'dessert' in the 'desert.'
  (7) Since there is no time like the 'present,' he thought it was time to 'present' the 'present.'
  (8) A 'bass' fish was painted on the head of the 'bass' drum.
  (9) When shot at, the 'dove' 'dove' into the bushes.
  (10) I did not 'object' to the 'object'.
  (11) The insurance was 'invalid' for the 'invalid'.
  (12) There was a 'row' among the oarsmen about how to 'row'.
  (13) They were too 'close' to the door to 'close' it.
  (14) A buck 'does' funny things when 'does' are present.
  (15) A seamstress 'sewer' tripped and fell into a 'sewer' line.
  (16) To help with planting, the farmer used his 'sow' to 'sow'.
  (17) The 'wind' was too strong to 'wind' the sail.
  (18) Upon seeing the 'tear' in the painting, I shed a 'tear'.
  (19) I had to 'subject' the 'subject' to a series of tests.
  (20) How can I 'intimate' this to my most 'intimate' friend?

back to top

* * * * * * * * * * * * * * * * * * * *

## 18. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended in the Federal Register.  The latest amendments to applicable regulations are listed below.

\* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
  - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

\* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
  - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

\* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
  - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

\* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
  - Last Amendments: 30 Aug 2018: 83 FR 44216-44228: Revisions to the Export Administration Regulations Based on the 2017 Missile Technology Control Regime Plenary Agreements

\* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
  - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

\* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
  - Last Amendment: 24 Apr 2018: 83 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
  - HTS codes that are not valid for AES are available here.
  - The latest edition (30 April 2018) of Bartlett's Annotated FTR ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended.  The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

\* HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA), 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen

as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: Harmonized System Update 1812, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available here.
  - HTS codes that are not valid for AES are available here.

* INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR): 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment:  30 Aug 2018: 83 FR 44228-44229, USML Chapter XI(c).   - The only available fully updated copy (latest edition: 30 Aug 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance website. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please contact us to receive your discount code.

back to top

* * * * * * * * * * * * * * * * * *

## 19. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of Daily Bugle Top Stories" posted here.

back to top

* * * * * * * * * * * * * * * * * *


## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White House, and similar websites of Australia, Canada, U.K., and other countries and international organizations.  Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle*" of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws.  If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents cannot be relied upon as legal or expert advice.  Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources.  If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free.  Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle |  www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314 AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ████████@fullcirclecompliance.eu

**From**: Jim Bartlett, Full Circle Compliance ████@fullcirclecompliance.eu]
**Sent**: 9/4/2018 6:52:25 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 18-0904 Tuesday "Daily Bugle"



## Tuesday, 4 September 2018

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription. Contact us for advertising inquiries and rates. *[N.B. The Daily Bugle was not released on Tuesday, 4 September 2018, a U.S. Federal Holiday.]*

### ITEMS FROM FEDERAL REGISTER

1. President Adjusts Imports of Aluminum into the U.S.
2. President Adjusts Imports of Steel into the U.S.
3. Commerce/BIS Amends EAR by Adding 15 Entities to, Modifying 2 Entries on, and Removing 1 Entry from the Entity List

### OTHER GOVERNMENT SOURCES

4. Items Scheduled for Publication in Future Federal Register Editions
5. Commerce/BIS Provides Information on 232 National Security Investigation of Steel Imports, Exclusion and Objection Process
6. State/DDTC: (No new postings.)
7. UK OFSI Provides Guidance Concerning Annual Frozen Asset Review and Reporting Form

### NEWS

8. Expeditors News: "Malaysia Implements Sales and Service Tax on 1 Sep 2018"
9. Janes 360: "Israeli Aeronautics Executives Facing Export Control Violation Charges"
10. Reuters: "Long Reach of U.S. Sanctions Hits Syria Reconstruction"
11. ST&R Trade Report: "Trump Rejects EU Offer to Remove Tariffs on Industrial Goods"

## COMMENTARY

12. D. Ring & N.S. Khalid: "Hiring U.S. Citizens Only for ITAR Compliance Can Violate the Immigration and Nationality Act"

13. K.T. Scarlott & L. Muranovic: "New Sanctions Against Russia Have Unfavorable Impact on Defense Sector, with Carve-Outs Favoring Certain Aspects of the Aerospace Industry"

14. M.B. McCord: "3D-Printed Plastic Guns: Five Reasons to Worry"

15. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Changes to Export Controls in August 2018t"

## EX/IM MOVERS & SHAKERS

16. Monday List of Ex/Im Job Openings: 184 Openings Posted This Week, Including 17 New Openings

## EX/IM TRAINING EVENTS & CONFERENCES

17. "9th Annual 'Partnering for Compliance™' West Export/Import Control Conference" on Oct 16-18, Ft. Worth, TX. Customs/ Import Boot Camp Oct 19

18. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep

19. ECTI Presents "A Practical Guide to AES Filing: When, What and How to File in the Automated Export System" Webinar, 23 Oct

## EDITOR'S NOTES

20. Bartlett's Unfamiliar Quotations

21. Are Your Copies of Regulations Up to Date? Latest Amendments: ATF (15 Jan 2016), Customs (12 Jun 2018), DOD/NISPOM (18 May 2016), EAR (4 Sep 2018), FACR/OFAC (29 Jun 2018), FTR (24 Apr 2018), HTSUS (14 Aug 2018), ITAR (30 Aug 2018)

22. Weekly Highlights of the Daily Bugle Top Stories



FULL CIRCLE

Awareness Course U.S. Export Controls

ITAR & EAR from a Non-U.S. Perspective

Tuesday, 2 October 2018, 9.30 am - 5.00 pm
Landgoed Groenhoven, Bruchem, The Netherlands

# 1. President Adjusts Imports of Aluminum into the U.S.
(Source: Federal Register, 4 Sep 2018.) [Excerpts.]

83 FR 45019: Adjusting Imports of Aluminum Into the United States

*A Proclamation*

(1) On January 19, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of aluminum articles on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862). The Secretary found and advised me of his opinion that aluminum articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States. In light of this conclusion, the Secretary recommended action to adjust the imports of aluminum articles so that such imports will not threaten to impair the national security. The Secretary also recommended that I authorize him, in response to specific requests from affected domestic parties, to exclude from any adopted import restrictions those aluminum articles for which the Secretary determines there is a lack of sufficient domestic production capacity of comparable products, or to exclude aluminum articles from such restrictions for specific national security-based considerations.

(2) In Proclamation 9704 of March 8, 2018 (Adjusting Imports of Aluminum Into the United States), I concurred in the Secretary's finding that aluminum articles, as defined in clause 1 of Proclamation 9704, are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and decided to adjust the imports of these aluminum articles by imposing a 10 percent ad valorem tariff on such articles imported from most countries. I further authorized the Secretary to provide relief from these additional duties for any aluminum article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and also to provide such relief based on specific national security considerations.

(3) Consistent with the Secretary's recommendation that I authorize him to exclude from any adopted import restrictions those aluminum articles for which the Secretary determines there is a lack of sufficient domestic production of comparable products, or for specific national security-based considerations, I have determined to authorize the Secretary to provide relief from quantitative limitations on aluminum articles adopted pursuant to section 232 of the Trade Expansion Act of 1962, as amended, including those set forth in Proclamation 9758 of May 31, 2018 (Adjusting Imports of

Aluminum Into the United States), on the same basis as the Secretary is currently authorized to provide relief from the duty established in clause 2 of Proclamation 9704. ...

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 232 of the Trade Expansion Act of 1962, as amended, section 301 of title 3, United States Code, and section 604 of the Trade Act of 1974, as amended, do hereby proclaim as follows:

(1) The Secretary, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the United States Trade Representative (USTR), the Assistant to the President for National Security Affairs, the Assistant to the President for Economic Policy, and such other senior Executive Branch officials as the Secretary deems appropriate, is hereby authorized to provide relief from the quantitative limitations applicable to aluminum articles described in subheadings 9903.85.05 and 9903.85.06 of subchapter III of chapter 99 of the HTSUS for any aluminum article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality, and is also authorized to provide such relief based upon specific national security considerations. Such relief shall be provided for an aluminum article only after a request for relief is made by a directly affected party located in the United States. Such relief may be provided to directly affected parties on a party-by-party basis taking into account the regional availability of particular articles, the ability to transport articles within the United States, and any other factors as the Secretary deems appropriate. If the Secretary determines that relief should be granted to a requesting party for the importation of a particular aluminum article, the Secretary shall publicly post such determination and notify U.S. Customs and Border Protection (CBP) of the Department of Homeland Security concerning such article so that it will be excluded from the applicable quantitative limitation. Relief granted under this clause shall apply only to an article entered for consumption, or withdrawn from warehouse for consumption, on or after the date on which the request for relief is granted by the Secretary. Until such time as any applicable quantitative limitation for a particular article has been reached, CBP shall count any aluminum article for which relief is granted under this clause toward such quantitative limitation at the time when such aluminum article is entered for consumption or withdrawn from warehouse for consumption. Any aluminum article for which relief is granted under this clause shall not be subject to the additional rate of duty set forth in Proclamation 9704, as amended. Aluminum articles for which relief is granted under this clause shall be subject to the duty treatment provided in subheading 9903.85.11 of subchapter III of chapter 99 of the HTSUS, as established by the Annex to this proclamation.

(2) As soon as practicable, the Secretary shall issue procedures for the requests for exclusion described in clause 1 of this proclamation. The issuance of such procedures is exempt from Executive Order 13771 of January, 2017 (Reducing Regulation and Controlling Regulatory Costs). CBP

shall implement exclusions granted pursuant to clause 1 of this proclamation as soon as practicable.

(3) Clause 3 of Proclamation 9704, as amended by Proclamation 9710, is further amended by striking the fourth and fifth sentences and inserting in lieu thereof the following two sentences: "If the Secretary determines that a particular aluminum article should be excluded, the Secretary shall publicly post such determination and notify U.S. Customs and Border Protection (CBP) of the Department of Homeland Security concerning such article so that it will be excluded from the duties described in clause 2 of this proclamation. For merchandise entered for consumption, or withdrawn from warehouse for consumption, on or after the date the duty established under this proclamation is effective and with respect to which liquidation is not final, such relief shall be retroactive to the date the request for relief was accepted by the Department of Commerce.".

(4) Where the government of a country identified in the superior text to subheadings 9903.85.05 and 9903.85.06 of subchapter III of chapter 99 of the HTSUS notifies the United States that it has established a mechanism for the certification of exports to the United States of products covered by the quantitative limitations applicable to these subheadings, and where such mechanism meets the operational requirements for participation in an export certification system administered by the United States, CBP, in consultation with the Secretary, USTR, and other relevant executive departments and agencies, may require that importers of these products furnish relevant export certification information in order to qualify for the treatment set forth in subheadings 9903.85.05 and 9903.85.06. Where CBP adopts such a requirement, it shall publish in the Federal Register notice of the requirement and procedures for the submission of relevant export certification information. No article that is subject to the export certification requirement announced in such notice may be entered for consumption, or withdrawn from warehouse for consumption, on or after the effective date specified in such notice, except upon presentation of a valid and properly executed certification, in accordance with the procedures set forth in the notice.

(5) Subdivision (c) of U.S. note 19 to subchapter III of chapter 99 of the HTSUS is amended by inserting at the end the following new sentence: "Pursuant to subheading 9903.85.11 and superior text thereto, the Secretary may provide that any excluded product shall be granted entry into the customs territory of the United States when the applicable quantitative limitation has filled for the specified period for such good.".

(6) Subdivision (d) of U.S. note 19 to subchapter III of chapter 99 of the HTSUS is amended by inserting after "9903.85.06" the phrase "and 9903.85.11".

(7) The superior text for subheadings 9903.85.05 and 9903.85.06 of the HTSUS is amended by deleting "Aluminum" and inserting in lieu thereof: "Except as provided in subheading 9903.85.11, aluminum".

(8) To implement clause 1 of this proclamation, subchapter III of chapter 99 of the HTSUS is modified as provided in the Annex to this proclamation.

(9) The modifications to the HTSUS made by clauses 5 through 8 of this proclamation and the Annex to this proclamation shall be effective with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 30,

2018, and shall continue in effect, unless such actions are expressly reduced, modified, or terminated.

(10) Clause 5 of Proclamation 9704 is amended by inserting "for consumption" after "goods entered" in the first sentence. Clause 5 of Proclamation 9710, as amended, is amended by striking "by this proclamation" from the end of the second sentence. Clause 5 of Proclamation 9739 is amended by striking "by clause 1 of this proclamation".

(11) The Secretary, in consultation with CBP and other relevant executive departments and agencies, shall revise the HTSUS so that it conforms to the amendments directed by this proclamation. The Secretary shall publish any such modification to the HTSUS in the Federal Register.

(12) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of August, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-third.

[Presidential Sign.]

- Annex: To Modify Certain Provisions of Chapter 99 of the Harmonized Tariff Schedule of the United States

back to top

* * * * * * * * * * * * * * * * * * *

## 2. President Adjusts Imports of Steel into the U.S.
(Source: Federal Register, 4 Sep 2018.) [Excerpts.]

83 FR 45025: Adjusting Imports of Steel Into the United States

*A Proclamation*

(1) On January 11, 2018, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effect of imports of steel articles on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862). The Secretary found and advised me of his opinion that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States. In light of this conclusion, the Secretary recommended action to adjust the imports of steel articles so that such imports will not threaten to impair the national security. The Secretary also recommended that I authorize him, in response to specific requests from affected domestic parties, to exclude from any adopted import restrictions those steel articles for which the Secretary determines there is a lack of sufficient domestic production capacity of comparable products, or to exclude steel articles from such restrictions for specific national security-based considerations.

(2) In Proclamation 9705 of March 8, 2018 (Adjusting Imports of Steel Into the United States), I concurred in the Secretary's finding that steel articles, as defined in clause 1 of Proclamation 9705, as amended by clause 8 of Proclamation 9711 of March 22, 2018 (Adjusting Imports of Steel Into the United States), are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and decided to adjust the imports of these steel articles by imposing a 25 percent ad valorem tariff on such articles imported from most countries. I further authorized the Secretary to provide relief from these additional duties for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and also to provide such relief based on specific national security considerations.

(3) Consistent with the Secretary's recommendation that I authorize him to exclude from any adopted import restrictions those steel articles for which the Secretary determines there is a lack of sufficient domestic production of comparable products, or for specific national security-based considerations, I have determined to authorize the Secretary to provide relief from quantitative limitations on steel articles adopted pursuant to section 232 of the Trade Expansion Act of 1962, as amended, including those set forth in Proclamation 9740 of April 30, 2018 (Adjusting Imports of Steel Into the United States), and Proclamation 9759 of May 31, 2018 (Adjusting Imports of Steel Into the United States), on the same basis as the Secretary is currently authorized to provide relief from the duty established in clause 2 of Proclamation 9705.

(4) In addition, I have been informed that the quantitative limitations set forth in Proclamation 9740 and Proclamation 9759 have in some cases already filled for this year, and that projects in the United States employing thousands of workers may be significantly disrupted or delayed because imports of specific steel articles, which were contracted for purchase prior to my decision to adjust imports of these articles, cannot presently be entered into the United States because the quantitative limits have already been reached. In light of these circumstances, and after considering the impact on the economy and the national security objectives of section 232 of the Trade Expansion Act of 1962, as amended, I have determined to direct the Secretary to provide relief from the quantitative limitations set forth in Proclamation 9740 and Proclamation 9759 in limited circumstances. ...

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 232 of the Trade Expansion Act of 1962, as amended, section 301 of title 3, United States Code, and section 604 of the Trade Act of 1974, as amended, do hereby proclaim as follows:

(1) The Secretary, in consultation with the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the United States Trade Representative (USTR), the Assistant to the President for National Security Affairs, the Assistant to the President for Economic Policy, and such other senior Executive Branch officials as the Secretary deems appropriate, is hereby authorized to provide relief from the quantitative limitations

applicable to steel articles described in subheadings 9903.80.05 through 9903.80.58 of subchapter III of chapter 99 of the HTSUS for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality, and is also authorized to provide such relief based upon specific national security considerations. Such relief shall be provided for a steel article only after a request for relief is made by a directly affected party located in the United States. Such relief may be provided to directly affected parties on a party-by-party basis taking into account the regional availability of particular articles, the ability to transport articles within the United States, and any other factors as the Secretary deems appropriate. If the Secretary determines that relief should be granted to a requesting party for the importation of a particular steel article, the Secretary shall publicly post such determination and notify U.S. Customs and Border Protection (CBP) of the Department of Homeland Security concerning such article so that it will be excluded from the applicable quantitative limitation. Relief granted under this clause shall apply only to an article entered for consumption, or withdrawn from warehouse for consumption, on or after the date on which the request for relief is granted by the Secretary. Until such time as any applicable quantitative limitation for a particular article has been reached, CBP shall count any steel article for which relief is granted under this clause toward such quantitative limitation at the time when such steel article is entered for consumption or withdrawn from warehouse for consumption. Any steel article for which relief is granted under this clause shall not be subject to the additional rate of duty set forth in Proclamation 9705, as amended. Steel articles for which relief is granted under this clause shall be subject to the duty treatment provided in subheading 9903.80.60 of subchapter III of chapter 99 of the HTSUS, as established by the Annex to this proclamation.

  (2) The Secretary shall, on an expedited basis, grant relief from the quantitative limitations set forth in Proclamation 9740 and Proclamation 9759 and their accompanying annexes for any steel article where (i) the party requesting relief entered into a written contract for production and shipment of such steel article before March 8, 2018; (ii) such contract specifies the quantity of such steel article that is to be produced and shipped to the United States consistent with a schedule contained in such contract; (iii) such steel article is to be used to construct a facility in the United States and such steel article cannot be procured from a supplier in the United States to meet the delivery schedule and specifications contained in such contract; (iv) the payments made pursuant to such contract constitute 10 percent or less of the cost of the facility under construction; and (v) lack of relief from the quantitative limitations on such steel article would significantly disrupt or delay completion of the facility being constructed in the United States with the steel article specified in such contract. Until such time as any applicable quantitative limitation for a particular article has been reached, CBP shall count any steel article for which relief is granted under this clause toward such quantitative limitation at the time when such steel article is entered for consumption or withdrawn from warehouse for consumption. Any steel article for which relief is granted under this clause shall be subject to the additional rate of duty set forth in clause 2 of Proclamation 9705, as amended by this proclamation, when such steel

article is entered for consumption or withdrawn from warehouse for consumption. This rate of duty is in addition to any other duties, fees, exactions, and charges applicable to such steel article. Any steel article provided relief under this clause must be entered for consumption, or withdrawn from warehouse for consumption, on or before March 31, 2019, and may not be granted further relief by the Secretary under clause 3 of Proclamation 9705, as amended. Steel articles for which relief is granted under this clause shall be subject to the duty treatment provided in subheading 9903.80.61 of subchapter III of chapter 99 of the HTSUS, as established by the Annex to this proclamation.

(3) The Secretary shall grant relief under clause 2 of this proclamation only upon receipt of a sworn statement signed by the chief executive officer and the chief legal officer of the party requesting relief. Such statement shall attest that (i) the steel article for which relief is sought and the associated contract meet all of the criteria for relief set forth in clause 2 of this proclamation; (ii) the party requesting relief will accurately report to CBP, in the manner that CBP prescribes, the quantity of steel articles entered for consumption, or withdrawn from warehouse for consumption, pursuant to any grant of relief; and (iii) the quantity of steel articles entered pursuant to a grant of relief will not exceed the quantity specified in such contract for delivery on or before March 31, 2019. Upon granting relief under clause 2 of this proclamation, the Secretary shall notify CBP and publish a notice of relief for the quantity of steel articles specified in such contract that are scheduled for delivery on or before March 31, 2019. The Secretary shall revoke any grant of relief under clause 2 of this proclamation if the Secretary determines at any time after such grant that the criteria for relief have not been met and may, if the Secretary deems it appropriate, notify the Attorney General of the facts that led to such revocation.

(4) As soon as practicable, the Secretary shall issue procedures for the requests for exclusion described in clause 1 of this proclamation. The issuance of such procedures is exempt from Executive Order 13771 of January 30, 2017 (Reducing Regulation and Controlling Regulatory Costs). CBP shall implement exclusions granted pursuant to clause 1 or relief provided under clause 2 of this proclamation as soon as practicable.

(5) Clause 3 of Proclamation 9705, as amended by Proclamation 9711, is further amended by striking the fourth and fifth sentences and inserting in lieu thereof the following two sentences: "If the Secretary determines that a particular steel article should be excluded, the Secretary shall publicly post such determination and notify U.S. Customs and Border Protection (CBP) of the Department of Homeland Security concerning such article so that it will be excluded from the duties described in clause 2 of this proclamation. For merchandise entered for consumption, or withdrawn from warehouse for consumption, on or after the date the duty established under this proclamation is effective and with respect to which liquidation is not final, such relief shall be retroactive to the date the request for relief was accepted by the Department of Commerce.".

(6) In order to establish the duty rate on imports of steel articles for which relief is granted under clause 2 of this proclamation, clause 2 of Proclamation 9705, as amended, is further amended by striking the last sentence and inserting in lieu thereof the following two sentences: "All steel articles imports covered by subheading 9903.80.61, in subchapter III of

chapter 99 of the HTSUS, shall be subject to the additional 25 percent ad valorem rate of duty established herein with respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on the date specified in a determination by the Secretary granting relief. These rates of duty, which are in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from each country as specified in the preceding three sentences.".

(7) Where the government of a country identified in the superior text to subheadings 9903.80.05 through 9903.80.58 of subchapter III of chapter 99 of the HTSUS notifies the United States that it has established a mechanism for the certification of exports to the United States of products covered by the quantitative limitations applicable to these subheadings, and where such mechanism meets the operational requirements for participation in an export certification system administered by the United States, CBP, in consultation with the Secretary, USTR, and other relevant executive departments and agencies, may require that importers of these products furnish relevant export certification information in order to qualify for the treatment set forth in subheadings 9903.80.05 through 9903.80.58. Where CBP adopts such a requirement, it shall publish in the Federal Register notice of the requirement and procedures for the submission of relevant export certification information. No article that is subject to the export certification requirement announced in such notice may be entered for consumption, or withdrawn from warehouse for consumption, on or after the effective date specified in such notice, except upon presentation of a valid and properly executed certification, in accordance with the procedures set forth in the notice.

(8) Subdivision (c) of U.S. note 16 to subchapter III of chapter 99 of the HTSUS is amended by inserting at the end the following new sentence: "Pursuant to subheadings 9903.80.60 and 9903.80.61 and superior text thereto, the Secretary may provide that any excluded product shall be granted entry into the customs territory of the United States when the applicable quantitative limitation has filled for the specified period for such good.".

(9) Subdivision (d) of U.S. note 16 to subchapter III of chapter 99 of the HTSUS is amended by inserting after "9903.80.58" the phrase "and 9903.80.60 and 9903.80.61".

(10) The rate of duty specified in the HTSUS in the general column for heading 9903.80.01 is amended by striking "25%" and inserting in lieu thereof: "The duty provided in the applicable subheading + 25%".

(11) The rate of duty specified in the HTSUS in the general column for heading 9903.80.02 is amended by striking "50%" and inserting in lieu thereof: "The duty provided in the applicable subheading + 50%".

(12) The superior text for subheadings 9903.80.05 through 9903.80.58 of the HTSUS is amended by deleting "Iron" and inserting in lieu thereof: "Except as provided in subheadings 9903.80.60 and 9903.80.61, iron".

(13) To implement clauses 1 and 2 of this proclamation, subchapter III of chapter 99 of the HTSUS is modified as provided in the Annex to this proclamation.

(14) The modifications to the HTSUS made by clauses 8 through 13 of this proclamation and the Annex to this proclamation shall be effective with

respect to goods entered for consumption, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on August 30, 2018, and shall continue in effect, unless such actions are expressly reduced, modified, or terminated.

(15) Clause 5 of Proclamation 9705 is amended by inserting "for consumption" after "goods entered" in the first sentence. Clause 5 of Proclamation 9711, as amended, is amended by striking "by this proclamation" from the end of the second sentence. Clause 6 of Proclamation 9740 is amended by striking "by clause 1 of this proclamation".

(16) The Secretary, in consultation with CBP and other relevant executive departments and agencies, shall revise the HTSUS so that it conforms to the amendments directed by this proclamation. The Secretary shall publish any such modification to the HTSUS in the Federal Register.

(17) Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-ninth day of August, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-third.

[Presidential Sign.]

- Annex: To Modify Certain Provisions of Chapter 99 of the Harmonized Tariff Schedule of the United States

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 3. Commerce/BIS Amends EAR by Adding 15 Entities to, Modifying 2 Entries on, and Removing 1 Entry from the Entity List
(Source: Federal Register, 4 Sep 2018.) [Excerpts.]

83 FR 44821-44828: Addition of Certain Entities to the Entity List, Revision of Entries on the Entity List and Removal of Certain Entities From the Entity List

\* AGENCY: Bureau of Industry and Security, Commerce.
\* ACTION: Final rule.
\* SUMMARY: This final rule amends the Export Administration Regulations (EAR) by adding fifteen entities under seventeen entries to the Entity List. These fifteen entities have been determined by the U.S. Government to be acting contrary to the national security or foreign policy interests of the United States and will be listed on the Entity List under the destinations of the People's Republic of China, Hong Kong, Pakistan, Russia, Saudi Arabia, Turkey, the United Arab Emirates and the United Kingdom. This final rule also modifies two entries on the entity list: One entry under the destination

of Hong Kong and one entry under the destination of Russia. Lastly, this final rule removes one entity under the destination of Greece from the Entity List. The removal is the result of a request for removal BIS received pursuant to the EAR and a review of information provided in the removal request.

\* DATES: This rule is effective September 4, 2018. ...

\* SUPPLEMENTARY INFORMATION: ... The Entity List (15 CFR, subchapter C, part 744, Supplement No. 4) identifies entities reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States. The Export Administration Regulations (EAR) (15 CFR, Subchapter C, parts 730-774) imposes additional license requirements on, and limits the availability of most license exceptions for, exports, reexports, and transfers (in-country) to those listed. The license review policy for each listed entity is identified in the "License review policy" column on the Entity List, and the impact on the availability of license exceptions is described in the relevant Federal Register notice adding entities to the Entity List. BIS places entities on the Entity List pursuant to part 744 (Control Policy: End-User and End-Use Based) and part 746 (Embargoes and Other Special Controls) of the EAR.

The End-User Review Committee (ERC), composed of representatives of the Departments of Commerce (Chair), State, Defense, Energy and, where appropriate, the Treasury, makes all decisions regarding additions to, removals from, or other modifications to the Entity List. The ERC makes all decisions to add an entry to the Entity List by majority vote, and makes all decisions to remove or modify an entry by unanimous vote.

### ERC Entity List Decisions

#### Additions to the Entity List

This rule implements the decision of the ERC to add fifteen entities under seventeen entries to the Entity List. These fifteen entities are being added based on §744.11 (License requirements that apply to entities acting contrary to the national security or foreign policy interests of the United States) of the EAR. The seventeen entries added to the Entity List consist of two entries located in the People's Republic of China (China), five entries located in Hong Kong, two entries located in Pakistan, one entry located in Russia, one entry located in Saudi Arabia, two entries located in Turkey, three entries located in the United Arab Emirates (U.A.E.), and one entry located in the United Kingdom. There are seventeen entries for the fifteen entities because one entry is listed in three locations, resulting in two additional entries.

The ERC reviewed §744.11(b) (Criteria for revising the Entity List) in making the determination to add these fifteen entities under seventeen entries to the Entity List. Under that paragraph, persons for whom there is reasonable cause to believe, based on specific and articulable facts, that they have been involved, are involved, or pose a significant risk of being or becoming involved in, activities that are contrary to the national security or foreign policy interests of the United States, along with those acting on behalf of such persons, may be added to the Entity List. Paragraphs (b)(1)

through (5) of §744.11 provide an illustrative list of activities that could be contrary to the national security or foreign policy interests of the United States.

The ERC determined that the two entities located in China (Ma Yunong and Seajet Company Limited), as well as one entity located in Hong Kong (ZM International Company Ltd.) have been involved in activities that are contrary to the national security and foreign policy interests of the United States as set forth in §744.11(b). Specifically, the ERC determined that these parties unlawfully procured and diverted U.S.-origin armored vehicles to the Democratic People's Republic of Korea (North Korea) in violation of the EAR. For the remaining four entities located in Hong Kong (Calvin Law, CLC Holdings Limited, LHI Technology (H.K.) Company Limited, and Ray Hui), the ERC determined that these entities have been involved in activities that are contrary to the national security and foreign policy interests of the United States as set forth in §744.11(b). These four entities procured U.S.-origin items for reexport to entities in China and other countries without obtaining the necessary license(s).

The ERC determined that the U.A.E.-based company Good Luck Shipping LLC has been involved in activities contrary to the national security and foreign policy interests of the United States as set forth in §744.11(b) of the EAR; this entity has transshipped U.S.-origin items to sanctioned destinations without the required authorizations. The ERC determined that Technology Links Pvt. Ltd., located in Pakistan, be added to the Entity List based on the company's involvement in the supply of items subject to the EAR to nuclear and missile-related Entity List parties in Pakistan without the license required under §744.11 of the EAR. In addition, the ERC determined that Techcare Services FZ LLC, located in the U.A.E., and UEC (Pvt.) Ltd., located in Pakistan, Saudi Arabia and the U.A.E., made multiple attempts to acquire U.S.-origin commodities ultimately destined for Pakistan's unsafeguarded nuclear program and have provided false and misleading information to BIS during an end-use check.

The ERC also determined that the two entities located in Turkey, Huseyin Engin Borluca and 3K Aviation Consulting and Logistics, along with Evans Meridians Ltd., located in the British Virgin Islands, have engaged in transactions in violation of the U.S. embargo against Iran by transferring, or attempting to transfer, U.S.-origin aircraft engines to an Iranian customer without the required authorizations. Lastly, the ERC determined that the Joint Stock Company (JSC) NIIME be added to the Entity List under the destination of Russia. JSC NIIME operates as the de facto research and development branch of PJSC Mikron, a listed entity on the Entity List. Prior review of exports, reexports and transfers (in-country) involving JSC NIIME will enhance BIS's ability to prevent violations of the EAR.

Pursuant to §744.11(b) of the EAR, the ERC determined that the conduct of these fifteen entities raises sufficient concern that prior review of exports, reexports or transfers (in-country) of all items subject to the EAR involving these entities, and the possible imposition of license conditions or license denials on shipments to the persons, will enhance BIS's ability to prevent violations of the EAR.

For the fifteen entities under seventeen entries added to the Entity List, BIS imposes a license requirement for all items subject to the EAR, and a license review policy of presumption of denial. The license requirements

apply to any transaction in which items are to be exported, reexported, or transferred (in-country) to any of the entities or in which such entities act as purchaser, intermediate consignee, ultimate consignee, or end-user. In addition, no license exceptions are available for exports, reexports, or transfers (in-country) to the entities being added to the Entity List in this rule. The acronym "a.k.a." (also known as) is used in entries on the Entity List to identify aliases, thereby assisting exporters, reexporters and transferors in identifying entities on the Entity List.

This final rule adds the following fifteen entities under seventeen entries to the Entity List: ...

*Modifications to the Entity List*

This final rule implements the decision of the ERC to modify two existing entries on the Entity List under the destination of Hong Kong and Russia. BIS is revising the entry for Joinus Freight Systems (H.K.) Ltd. by adding an additional alias and address and modifying the entity name and an existing address. In addition, the ERC determined, with the addition of JSC NIIME to the Entity List, the existing entry for "Joint Stock Company Mikron" be revised by modifying the entity name to "PJSC Mikron" and removing its alias.

This final rule makes the following modifications to two entries on the Entity List: ...

Dated: August 24, 2018.

Richard E. Ashooh, Assistant Secretary for Export Administration.

back to top

* * * * * * * * * * * * * * * * * *

OTHER GOVERNMENT SOURCES

## 4. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* President; ADMINISTRATIVE ORDERS; Trade: Mexico and Canada; Notice of Intention To Enter Into Trade Agreements (Notice of August 31, 2018) [Publication Date: 5 Sep 2018.]

back to top

* * * * * * * * * * * * * * * * *

5.

# Commerce/BIS Provides Information on 232 National Security Investigation of Steel Imports, Exclusion and Objection Process

(Source: Commerce/BIS, 31 Aug 2018.)

*Background*

On March 8, 2018, President Trump exercised his authority under Section 232 of the Trade Expansion Act of 1962 to impose a 25 percent tariff on steel imports, with exemptions for Canada and Mexico, in order to protect our national security. The President's Section 232 decision is the result of an investigation led by the Commerce Department. U.S. Customs and Border Protection will begin collecting the tariffs on March 23, 2018.

In President Trump's proclamation establishing the tariff under Section 232, the President authorized the Secretary of Commerce, in consultation with other appropriate federal agency heads, to provide relief from the additional duties for any steel articles determined "not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and is also authorized to provide such relief based upon specific national security considerations. Such relief shall be provided for any article only after a request for exclusion is made by a directly affected party located in the United States."

*Process*

Exclusion Requests will be open for public review after being posted to the federal rulemaking portal. During the initial 30 days, U.S. parties may file objections to the exclusion request. After this initial 30 day period, approximately 60 days will be necessary for complete review and vetting of the Exclusion Request and any related Objection Filings. The total processing time for exclusion requests is estimated at 90 days.

A single response to each exclusion request and related objection filings will be posted in regulations.gov indicating if the exclusion request has been granted or denied.

On March 19, 2018, the U.S. Department of Commerce published the procedures to request exclusion from the steel tariffs in the Federal Register. See Federal Register, Vol. 83, No. 53, 12106-12112.

*Filing Exclusion Requests*

If your organization uses steel in business activities in the United States and wishes to request an exclusion from the tariff on steel article imports:

  (1) Download the *Request for Exclusion from Remedies from the Section 232 National Security Investigation of Imports of Steel* (Exclusion Request) form.

(2) Complete the form using Microsoft Excel and save a copy on your computer.

(3) Go to Docket Number BIS-2018-0006, complete the required information, and upload the completed Exclusion Request form.

A separate Exclusion Request must be submitted on each distinct type and dimension of steel product to be imported.

Exclusion Request Requirements: Only individuals or organizations operating in the United States that use steel products in business activities in the United States may submit an Exclusion Request.

For an Exclusion Request to be considered, the exclusion requester must provide factual information on 1) the single type of steel product they require using a 10-digit HTSUS code, including its specific dimension; 2) the quantity of product required (stated in kilograms) under a one-year exclusion; 3) a full description of the properties of the steel product it seeks to import, including chemical composition, dimensions, strength, toughness, ductility, magnetic permeability, surface finish, coatings, and other relevant data.

All exclusion requests will be reviewed for completeness. Only fully completed exclusion requests will be considered and posted for public review. All exclusion requests will be made available for public inspection and copying.

*Filing Exclusion Objections*

If your organization manufactures steel products in the United States and wishes to object to an existing Exclusion Request, within 30 days of the posting of the related Exclusion Request:

(1) Download the *Response Form for Organizations Filing Objections to Posted Section 232 Exclusion Requests - Steel* (Objection Filing) form.

(2) Complete the form using Microsoft Excel and save a copy on your computer.

(3) Go to Docket Number BIS-2018-0006, select the Exclusion Request to which you are objecting, complete the required information, and upload the completed Objection form.

Objection Filing Requirements:  Any individual or organization in the United States may file an objection to an Exclusion Request.  For an Objection Filing to be considered, organizations must provide factual information on 1) the steel products that they manufacture in the United States, 2) the production capabilities at steel manufacturing facilities that they operate in the United States; and 3) the availability and delivery time of the products that they manufacture relative to the specific steel product that is subject to an Exclusion Request.

Organizations submitting an Objection Filing on an Exclusion Request should provide specific information on the product that their company can provide that is comparable to the steel product that is the subject of the Exclusion

Request. This information should include 1) discussion on the suitability of its product for the application identified by the Exclusion Requestor, and 2) a full technical description of the properties of the product it manufactures relative to specifications provided in the Exclusion Request posted on regulations.gov, including information on dimensions, strength, toughness, ductility, surface finish, coatings, and other relevant data.

All Objections Filings will be reviewed for completeness. Only fully completed Objection filings will be considered and posted for public review. All Objection Filings will be made available for public inspection and copying.

*Exclusion Requests for Expedited Relief from Quantitative Limits - Existing Contract:*

*Section 232 National Security Investigations of Steel Imports*

If your organization uses steel in business activities in the United States and wishes to request an exclusion for Expedited Relief from Quantitative Limits - Existing Contract: Section 232 National Security Investigations of Steel Imports:

  (1) Download the form Expedited Relief from Quantitative Limits - Existing Contract: Section 232 National Security Investigations of Steel Imports.
  (2) Once this form is completed and certified, email it along with all necessary attachments to steel232-exp@bis.doc.gov.

*Contact*

Please email or call: Steel232@bis.doc.gov or 202-482-5642 for any steel related inquiries.

If you have issues uploading the forms on regulations,gov, please contact the Regulations.gov Help Desk at 1-877-378-5457 (toll free) or 703-454-9859.

back to top

* * * * * * * * * * * * * * * * * * * *

## 6. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * * *

## 7.
## UK OFSI Provides Guidance Concerning Annual Frozen Asset Review and Reporting Form
(Source: UK OFSI, 3 Sep 2018.)

The UK Office of Financial Sanctions Implementation (OFSI) has released a notice that provides background and guidance for the 2018 frozen asset reporting exercise, which the Treasury carries out every year to update our records to reflect any changes to accounts during the reporting period.

As part of this review, the Treasury requires all persons that hold or control funds or economic resources belonging to a designated person, to complete the reporting form and submit it to the Office of Financial Sanctions Implementation (OFSI) by Friday, 12 October 2018.

back to top

* * * * * * * * * * * * * * * * * *

## NEWS

## 8.
## Expeditors News: "Malaysia Implements Sales and Service Tax on 1 Sep 2018"
(Source: Expeditors News, 1 Sep 2018.)

On 1 September 2018, the Royal Malaysian Customs Department will implement the Malaysia Sales & Service Tax (SST) at a fixed rate of 6% on certain services, including services of clearing goods from customs control.

Businesses in Malaysia are required to register if they are providing any of the taxable services where the total amount for the past 12 months exceeds the threshold of RM500,000.

The SST Act and related legislation may be found here. Additional information may be found here.

back to top

* * * * * * * * * * * * * * * * * *

## 9.
## Janes 360: "Israeli Aeronautics Executives Facing Export Control Violation Charges"
(Source: Janes 360, 31 Aug 2018.) [Excerpts.]

Israeli unmanned systems manufacturer Aeronautics announced on the Tel Aviv Stock Exchange on 29 August that key personnel from the company had been summoned to the State Attorney's Office for a hearing on potential export control violations related to the company's Orbiter 1K loitering munition.

DOC_0004534

The disclosure noted that the company's marketing and export license for the system to a "material customer" had been suspended since September 2017.

The company stated in its release that it believed there was no basis for criminal proceedings against the firm or its employees. ...

back to top

* * * * * * * * * * * * * * * * * *

## 10.
## Reuters: "Long Reach of U.S. Sanctions Hits Syria Reconstruction"
(Source: Reuters, 2 Sep 2018.) [Excerpts.]

As Syrian President Bashar al-Assad attempts to turn military success into postwar reconstruction, Western sanctions are a major obstacle that could scare off foreign companies.

Syria has suffered immense physical destruction, while millions of workers have fled, been conscripted or killed. A U.N. agency estimates the war has cost $388 billion.

Extensive reconstruction still looks far off. Assad's allies Russia and Iran, as well as China, have made some investments in the country, but they cannot afford the cost of rebuilding and want other countries to share the burden.

Western countries say they will not approve reconstruction funding for Syria, or drop sanctions, without a political settlement. Meanwhile, sanctions are making it hard for foreign companies to work there.

Although some have managed to do business in Syria, the wide scope of the sanctions and broad U.S. powers to enforce them mean companies risk inadvertent breaches. ...

U.S. sanctions on Syria predate the crisis, but were extended after Assad's crackdown on protests in 2011 and again as the country slid into war.

The sanctions have frozen the assets of the Syrian state and hundreds of companies and individuals, including government figures, military and security personnel and others accused of involvement in making or using chemical weapons.

They ban exports, sales or supply of services, along with any new investments, into Syria by any U.S. person. They also bar any dealings by U.S. persons in Syrian oil and hydrocarbon products, or their import into the United States.

U.S. persons cannot finance or facilitate any transactions by foreigners that would fall under sanctions if done by Americans.

European Union sanctions were imposed in May 2011, for Syria's "brutal repression and violation of human rights", and have been updated several times since.

They are not as sweeping as the U.S. sanctions, but are still extensive and include asset freezes, travel bans, trade restrictions, financial sanctions and an arms embargo.

They bar trade in items that could be used militarily or for repression, luxury goods, precious stones and metals and equipment or technology for some oil and gas sectors including exploration and production, refining and gas liquefaction.

The European sanctions also target Syria's electricity network, banning E.U. companies from building power plants, supplying turbines or financing such projects.

U.S. and E.U. sanctions include exceptions for humanitarian supplies, and for items needed by United Nations missions in Syria.

The E.U. also allows companies to carry out work in the energy and power sectors covered by contracts signed before the sanctions were imposed.

*Sanctions Enforced*

  "It's not for the faint hearted," said Anna Bradshaw, a partner at law firm Peters & Peters in London, who advises on sanctions.

U.S. rules pose a bigger risk to companies involved in Syria than E.U. ones, she said.

American authorities have pursued violations more assiduously than the E.U., where enforcement may be complicated by differences among its 28 states in how to interpret rules and penalties.

U.S. sanctions, besides being wider in scope, have a longer reach: American jurisdiction extends to the worldwide activities of all "U.S. persons".

That term includes both American citizens and companies, as well as U.S. permanent residents and under some sanctions programs - at present not including Syria - foreign subsidiaries of American firms.

In April, U.S. authorities arrested a Bulgarian man working for the Bulgarian office of a U.S. company in a Syrian-related sanctions case for which three Americans were jailed in December.

Washington does not only target U.S. sanctions violators. It can also blacklist foreign companies or people who help others to skirt sanctions - naming them as foreign sanctions evaders barred from most business with Americans.

*Main Risks*

Non-U.S. companies risk trouble if any part of a transaction involves Americans or American companies.

  "If you do something that causes someone else who is subject to U.S. jurisdiction to violate U.S. sanctions, then you are on the hook as well," said Bradshaw.

Even diligent companies might inadvertently fall foul of the asset freezes by dealing with a listed individual or entity in Syria's opaque business climate.

That risk has grown as Assad has consolidated control, Bradshaw said: "The people who will be commissioning the reconstruction efforts and the people in charge are likely to be the very people targeted by financial sanctions.

  "The more you can demonstrate that your due diligence is reasonable, the better chance you have of persuading the authorities that they shouldn't pursue you," she said, warning it may not always be possible to spot that a counterparty is sanctioned. ...

back to top

* * * * * * * * * * * * * * * * * * *

## 11. ST&R Trade Report: "Trump Rejects EU Offer to Remove Tariffs on Industrial Goods"
(Source: Sandler, Travis & Rosenberg Trade Report, 3 Sep 2018.)

President Trump said Aug. 30 that a European Union offer to remove all tariffs on two-way trade in automobiles and other industrial goods is "not good enough." EU Trade Commissioner Cecilia Malmstrom said Brussels is willing to lower tariffs on such goods to zero if the U.S. does the same as part of a limited trade agreement. However, Trump suggested that he wants the EU to do more to increase imports of U.S. automobiles than eliminating its 10 percent import duty, saying "their consumer habits are to buy their cars, not to buy our cars."

According to press sources, Malmstrom's offer went beyond a commitment the U.S. and EU made in July to work toward zero tariffs, zero non-tariff barriers, and zero subsidies on industrial goods other than automobiles. The two trading partners also agreed to seek lower barriers and increased trade in services, chemicals, pharmaceuticals, and medical products; increase U.S. exports of soybeans and liquefied natural gas to the EU; establish a dialogue on standards to ease trade, reduce bureaucratic obstacles, and lower costs; reform the World Trade Organization; and resolve the U.S. additional tariffs on steel and aluminum and the EU's retaliatory tariffs on U.S. goods.

back to top

* * * * * * * * * * * * * * * * * * *

## 12.
## D. Ring & N.S. Khalid: "Hiring U.S. Citizens Only for ITAR Compliance Can Violate the Immigration and Nationality Act"
(Source: Wiggin and Dana, 31 Aug 2018.)

* Authors: David Ring, attorney, dring@wiggin.com; and Najia S. Khalid, attorney, nkhalid@wiggin.com. Both of Wiggin and Dana.

The Department of Justice (DOJ), Civil Rights Division, announced on August 29, 2018, its civil settlement with the international law firm, Clifford Chance US LLP, for violations of the Immigration and Nationality Act (INA), 8 U.S.C. 1324b, attributable to Clifford Chance's overly restrictive interpretation of who can work on projects involving data controlled by the International Traffic in Arms Regulations (ITAR).

Clifford Chance, for purposes of conducting a large scale document review involving ITAR controlled data, restricted the project to U.S. Citizens only, based on its good faith belief that only *U.S. Citizens* could work on ITAR projects. But the ITAR generally allows *U.S. Persons* to have access to ITAR controlled data, and defines a (natural) "U.S. Person" as "a lawful permanent resident as defined by 8 U.S.C. 1101(a)(20)" or "a protected individual as defined by 8 U.S.C. 1324b(a)(3)." *See* 22 C.F.R. 120.15. Thus the ITAR does not restrict access to U.S. citizens only, but also generally allows access by non-U.S. citizens who fall within the following classes, among others:

  - Nationals of the U.S. (*i.e.,* those born in the "outlaying" possessions of the U.S. meeting specified requirements, or individuals born of a parent who meet specified requirements);
  - Aliens lawfully admitted for permanent residence (*i.e.,* "green card" holders);
  - Certain refugees; and
  - Certain asylum seekers.

According to DOJ, Clifford Chance unlawfully discriminated against persons based on their citizenship by excluding eligible non-U.S. citizens from its ITAR project. DOJ rejected Clifford Chance's argument that it should be absolved of liability because it acted in good faith (there's no good faith exception to the prohibition against discrimination under 1324b), and Clifford Chance agreed to pay a $132,000 civil penalty, implement various corrective actions, and allow DOJ oversight for a two-year period.

**What does that mean for you?** *If you hire or contract with U.S. Citizens only for purposes of fulfilling your ITAR obligations, you may be violating the*

*INA.* You should review your hiring and contracting processes to make sure that you do not limit hiring or outsourcing to U.S. Citizens only, when ITAR compliance is your justification for denying job opportunities based on citizenship or national origin.

back to top

＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊

13.

K.T. Scarlott & L. Muranovic: "New Sanctions Against Russia Have Unfavorable Impact on Defense Sector, with Carve-Outs Favoring Certain Aspects of the Aerospace Industry" (Source: Baker & Hostetler LLP, 30 Aug 2018.)

* Authors: Kerry T. Scarlott, Esq., kscarlott@bakerlaw.com; and Lana Muranovic, Esq. lmuranovic@bakerlaw.com. Both of Baker & Hostetler LLP.

On Aug. 27, 2018, the U.S. State Department published new sanctions against Russia based on the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (CBW Act) after determining that the government of Russia has used chemical weapons in violation of international law or lethal chemical weapons against its own nationals. This imposition of sanctions followed reports regarding the use of a Novichok nerve agent by the government of Russia in an attempt to assassinate U.K. citizen Sergei Skripal and his daughter, Yulia Skripal. The State Department partially waived the application of certain sanctions otherwise required under the CBW Act.

As illustrated below, the new U.S. sanctions against Russia have a particular effect on persons in the defense sector, with a much more favorable impact reserved for those in the aerospace industry (including relative to the space launch of U.S.-origin non-military spacecraft by Russian parties).

*Overview of Key Aspects of New U.S. Sanctions Against Russia and Related Waivers*

Effective for at least one year from the date of publication and until further notice, the following sanctions are imposed and waived, as appropriate:

 **(1) Foreign Assistance.** A requirement under the CBW Act that would otherwise mandate the termination of foreign assistance to Russia (under the Foreign Assistance Act of 1961) is waived.
 **(2) Arms Sales.** The State Department is requiring the termination of (a) sales to Russia under the Arms Export Control Act of any defense articles, defense services, or design and construction services subject to the jurisdiction of the International Traffic in Arms Regulations (ITAR) and (b) licenses for the export to Russia of any item on the ITAR's U.S. Munitions List (USML). However, the State Department is waiving the application of this sanction with respect to the issuance of licenses in support of

government space cooperation and commercial space launches, provided that the licenses will be issued on a case-by-case basis.

**(3) Arms Sales Financing.** The State Department is terminating all foreign military financing for Russia under the Arms Export Control Act.

**(4) Denial of U.S. Government Credit or Other Financial Assistance.** The State Department is denying to Russia any credit, credit guarantees or other financial assistance by any department, agency or instrumentality of the U.S. government.

**(5) Exports of National Security (NS)-Sensitive Goods and Technology.** The State Department is prohibiting the export to Russia of any goods and technology that are controlled for NS reasons on the Commerce Control List (CCL) contained in Supplement 4 to Part 774 of the Export Administration Regulations (EAR). However, the State Department is waiving the application of this sanction with respect to exports/re-exports of goods or technology:

• Eligible under License Exceptions GOV, ENC, RPL, BAG, TMP, TSU, APR, CIV and AVS;

• Pursuant to a "new" license" and

o Necessary for the safety of flight of civil fixed-wing passenger aviation;

o For deemed exports/re-exports to Russian nationals;

o For exports/re-exports to wholly-owned U.S. subsidiaries in Russia;

o In support of government space cooperation and commercial space launches; or

o For commercial end users and civil end uses in Russia; or

• For new licenses to export NS-controlled goods or technology to Russian state-owned or state-funded enterprises, although such licenses will be subject to a "presumption of denial" policy.

*Due Diligence Considerations and Takeaways*

U.S. sanctions against Russia arising out of the violation of the CBW Act will have a substantial impact on U.S. persons engaged in the export/re-export of military goods, technology and/or services. With the prohibition against foreign military financing, general termination of new licenses authorizing the export of items on the USML to Russia, termination of the sale to Russia of defense articles and services subject to the ITAR, and termination of the sale to Russia of NS-controlled items for military end uses/users, defense contractors and service providers as well as manufacturers of militarily- and technologically-sensitive items have effectively lost an export/re-export market and must be extra vigilant to ensure that military items are not sent to Russia. Those affected should consider revising internal compliance policies and procedures, training relevant personnel, and monitoring exports and re-exports as appropriate to ensure continued compliance with U.S. export control and sanctions laws and regulations.

In contrast to those in the defense sector, U.S. persons in the aerospace industry have been allowed a number of waivers in instances when relevant activities are in support of government space cooperation and commercial space launches or for commercial end users and civil end uses in Russia. We

would be happy to work with you to determine whether contemplated transactions qualify for these and other potentially applicable waivers of otherwise sanctioned activity.

back to top

* * * * * * * * * * * * * * * * * *

14.
M.B. McCord: "3D-Printed Plastic Guns: Five Reasons to Worry"
(Source: Lawfare Blog, 31 Aug 2018.)

* Author: Mary B. McCord, Visiting Professor of Law at Georgetown University Law School and former Acting Assistant Attorney General and Principal Deputy Assistant Attorney General for National Security at the U.S. Department of Justice.

This week saw law and common sense unite in opposition to the widespread availability of dangerously untraceable, undetectable guns. A federal judge in the state of Washington issued an order barring the State Department from allowing Defense Distributed, a self-described "private defense firm," to make the blueprints for 3D-printed plastic guns freely available on the internet. The judge's order may not eradicate the threat posed by Defense Distributed's attempt to widely share recipes for lethal violence, given that the blueprints have-regrettably-already found their way to certain corners of the internet. But it's an important step, both for protecting citizens at home and abroad from gun violence and for reasserting the rule of law.

The State Department's International Trafficking in Arms Regulations sensibly ban the "export" of technical data, i.e. blueprints, related to the design, manufacture and assembly of certain firearms. Because publishing those blueprints online would make them available worldwide, such publication was an "export" prohibited under the regulations until last month, when the government dramatically reversed its legal position. After successfully defending the regulations against a lawsuit brought by Defense Distributed several years ago to permit it to publish the blueprints -- arguing that the blueprints' publication was protected by the First Amendment -- in July 2018, the government abruptly settled the lawsuit by agreeing to change State Department regulations and authorizing the company to publish the blueprints while the regulatory change is pending. It even agreed to pay Defense Distributed $40,000.

This unexpected about-face caused an immediate outcry from federal and state elected officials, law enforcement, and even the president, who tweeted:

 **Donald J. Trump** ✔
@realDonaldTrump


I am looking into 3-D Plastic Guns being sold to the public.
Already spoke to NRA, doesn't seem to make much sense!

2:03 PM - Jul 31, 2018

♡ 52.4K  ◯ 30.3K people are talking about this

On the eve of the planned online publication of the blueprints, Judge Robert
S. Lasnik issued an order temporarily banning the online posting of the
blueprints in response to a lawsuit brought by the State of Washington (and
now joined by 19 other states and the District of Columbia). This week, he
extended that order by granting a preliminary injunction.

But that will not end the lawsuit, and it appears that Defense Distributed's
owner, Cody Wilson, will do just about anything he can to sidestep the ban.
The day after the judge's order this week, Wilson began selling the
blueprints through his website, offering to ship them on thumb drives or by
email. He claims he can do this without violating the court order as long as
he sells them only in the United States.

Make no mistake: Cody Wilson's primary motive is not to vindicate what he
believes to be his First Amendment rights. That argument is window
dressing for his real goal: to put guns into the hands of every person who
wants one. Speaking about the horrific shooting at Marjory Stoneman
Douglas High School in Parkland, Fla., last February that left 17 people
dead, Wilson stated, "All this Parkland stuff, the students, all these dreams
of 'common sense gun reforms'? No. The internet will serve guns, the gun is
downloadable. No amount of petitions or die-ins or anything else can change
that." And in a new video that Wilson has shared over social media to raise
money for his legal fees, he unabashedly references violence, warning,
"Riflemen, this fight is yours and it's time to muster." This is entirely
consistent with his threats from 2016, when he was concerned that Hillary
Clinton would win the presidency and crack down on firearms: "I'd call a
militia out to defend the server, Bundy-style," Wilson told Wired. "Our only
option was to build an infrastructure where we had one final suicidal
mission, where we dumped everything into the internet."

There are many reasons for alarm, as I explained in an expert
declaration filed in the states' lawsuit. First, a plastic firearm would rarely be
detectable by metal detectors, which are the standard public safety protocol
at airports, stadiums, concert halls, public buildings like courthouses, and,
increasingly, schools. Although the federal Undetectable Firearms Act
requires guns to include enough metal to set off a metal detector, the
requirement can be evaded easily by simply not including the non-operable
piece of metal in the 3D-printed gun. And for those who say that plastic
firearms are ineffective because of their propensity to blow up, a 2013 test
by the Bureau of Alcohol, Tobacco, Firearms and Explosives of Defense

Distributed's 3D-printed handgun, the "Liberator," showed it fired without fail all eight times it was tested.

Second, plastic firearms manufactured on 3D printers in one's home without serial numbers would be entirely untraceable by law enforcement. Countless crimes are solved in the U.S. every year through successful firearms traces, which can identify the first purchaser of a gun. As I saw countless times over the course of my decades as a federal prosecutor, firearms traces often led to information relevant to solving violent crimes even if that first purchaser is not the perpetrator, including by revealing "straw" purchasers-those who purchase a gun for someone who is legally prohibited from doing so himself. Firearms traces can also help discern meaningful patterns in gun trafficking.

Third, worldwide availability of the blueprints for printing plastic guns means that would-be terrorists could make undetectable and untraceable firearms for use against Americans here in the homeland. Foreign terrorists might manufacture guns abroad and smuggle them into the U.S. for a terrorist attack here. Or they might travel to the U.S. for the purpose of manufacturing weapons and launching such an attack.

In my experience as the acting head of the National Security Division of the Department of Justice, I was well aware of calls by foreign terrorist organizations such as al-Qaeda and the Islamic State for the commission of terrorist acts with firearms on U.S. soil. The shootings at Orlando's Pulse Nightclub and in San Bernardino, Calif.-for which the shooters pledged allegiance to Abu Bakr al-Baghdadi, the head of the Islamic State-are two deadly examples. And we've certainly seen just as frightening and lethal domestic terrorism and hate-motivated crimes using firearms-the Charleston church shooting, for example-which could be expected to increase with the additional option of undetectable guns.

Fourth, the online publication of 3D-printed gun blueprints could cause destabilizing effects in foreign countries by making guns readily accessible to armed insurgent groups, transnational criminal organizations, and ordinary street criminals-thus harming U.S. relationships with those countries, especially with allies that have much more restrictive firearms laws than ours. The blueprints also would be available to foreign countries subject to U.S. or U.N. arms embargoes, such as North Korea and Iran, undermining global export control and non-proliferation regimes.

Finally, existing laws and regulations for the manufacture and sale of firearms do not protect Americans from the above-mentioned threats. The U.S. regulatory scheme is built on the premise that firearms production and distribution requires an investment of resources that makes such production feasible only for commercial entities, which must comply to maintain their licenses. The wide availability of gun blueprints and decreasing cost of 3D printers upends this regulatory regime. And, of course, the private manufacture and sale of guns bypasses background checks entirely.

It's unfortunate that some gun-making blueprints already have made their way onto the internet, but that's no reason not to take steps now to halt the spread of technical data that, in the wrong hands, will be deadly. A federal judge has already done his part to ensure that applicable laws are followed. While the lawsuit is working its way through the court system, federal and state legislators should be getting to work as well.

*Note: The author's views are her own and she does not represent the States that have filed suit against the State Department and Defense Distributed.*

back to top

* * * * * * * * * * * * * * * * * *


## 15. R.C. Thomsen II, A.D. Paytas & M.M. Shomali: "Changes to Export Controls in August 2018"
(Source: Thomsen and Burke LLP, 1 Sep 2018. Available by subscription via maher@t-b.com.)

* Authors: Roszel C. Thomsen II, Esq., roz@t-b.com; Antoinette D. Paytas, Esq., toni@t-b.com; and Maher M. Shomali, Esq., maher@t-b.com. All of Thomsen & Burke LLP.

This memo summarizes the regulatory and enforcement developments with respect to U.S. and multilateral export controls during the month of August 2018. Changes to the regulations published in the Federal Register are explained at greater length in the Regulatory Summary, as is our custom.

**REGULATORY AND LEGISLATIVE UPDATES**

*Congress Passes the National Defense Authorization Act*

As we notified you earlier in the month, the Senate overwhelmingly passed the John S. McCain National Defense Authorization Act (NDAA) for Fiscal Year 2019 (H.R. 5515). The bill has been sent to the President and he is expected to sign it. The bill strengthens the Committee on Foreign Investment in the United States (CFIUS), which reviews proposed foreign investments to weigh whether they threaten national security. It includes export control reform provisions requiring Commerce to establish export controls on emerging and foundation technologies, which are sensitive technologies not currently captured by export controls. Finally, the bill includes a government wide ban on procuring equipment or services from the Chinese telecommunications firms ZTE and Huawei. However, it does not include a provision to reinstate sanctions against ZTE and undo a deal the company recently cut with the Commerce Department. More details below:

*Export Control Reform*

The Export Controls Act of 2018 [ Sections 1741-1768 of the NDAA] provides permanent statutory authority for the existing Export

Administration Regulations (EAR). The EAR has been operating under emergency authority of the International Emergency Economic Powers Act (IEEPA) for many years, ever since the Export Administration Act of 1979 lapsed. This new authority also adds several noteworthy changes:

  - New export controls on "emerging and foundational technologies", which are not specifically identified in the legislation. Presumably, these could be items and technology that are currently classified as EAR99. [Section 1758]
  - Commerce will revise the duties of the Emerging Technology and Research Advisory Committee to help identify "emerging and foundational technologies" that may be developed over a period of 5 or 10 years. [Section 1758]
  - License applications are now required to be reviewed for impact on the US defense industrial base. Transactions that would have a "significant negative impact" on that defense industrial base can be denied. [Section 1756]
  - New requirement for the government to publish export license details for licenses involving certain terrorism-supporting countries. [Section 1754]
  - Maximum civil penalties per violation have been increased slightly to the greater of $300,000 or twice the value of the transaction. [Section 1760]

The identification of " emerging and foundational technologies" is going to be an important part of this legislation. The general requirements in the current legislation are that the technologies " are essential to the national security of the United States" and shall take into account:

  - the development of emerging and foundational technologies in foreign countries;
  - the effect export controls imposed pursuant to this section may have on the development of such technologies in the United States; and
  - the effectiveness of export controls imposed pursuant to this section on limiting the proliferation of emerging and foundational technologies to foreign countries.

*CFIUS Reform*

Congress agreed on its final version of the Foreign Investment Risk Review Modernization Act (FIRRMA) [ Sections 1701-1728 of the NDAA], which provides the first update to the Committee on Foreign Investment in the United States (CFIUS) statute in several years. FIRRMA updates and expands CFIUS's review process in many ways, by:

  - Increasing the types of transactions subject to CFIUS's jurisdiction: CFIUS currently only reviews mergers, acquisitions, or takeovers that could result in a takeover of a US business by a foreign person. FIRRMA now expands the purview of CFIUS by adding new types of "covered transactions," including "other investments involving critical infrastructure, critical technologies, or sensitive data." [Section 1706]
  - Extending the CFIUS review timeframes: FIRRMA lengthens the time period of the CFIUS process to 45 days, with a 15-day period extension for

extraordinary circumstances, and limits timing for the pre-review process. [Section 1709]
  - Making certain notifications mandatory: These include transactions involving an investment that results in the acquisition, directly or indirectly, of a "substantial interest" in a US business involved in critical infrastructure, critical technology, or sensitive data by a foreign person in which a foreign government has, directly or indirectly, a "substantial interest." [Section 1706]
  - Establishing a process for potentially expedited review and approval of certain transactions: FIRRMA also offers a potential path for some transactions to receive approval on an expedited basis following a shortened notification. [Section 1706]

FIRRMA also allows CFIUS to impose filing fees, which are up to 1% of the transaction value or $300,000. [Section 1723]

*Huawei and ZTE Implications*

Finally, Section 899 of the NDAA also places a government procurement ban on certain telecommunications equipment made by ZTE and Huawei, as well as related services. However, it does not include a provision to reinstate sanctions against ZTE and undo a deal the company recently cut with the Commerce Department.

## State Department Imposes New Russia Sanctions

The State Department has implemented the plans that it announced earlier this month to impose Chemical and Biological Weapons Control and Warfare Elimination Act sanctions on Russia ("CBW Act"). The sanctions are in response to a determination by the U.S. government that the Russian government used "Novichok", a nerve agent, in an attempt to assassinate UK citizen Sergei Skripal and his daughter Yulia Skripa. The sanctions under the CBW act are implemented in two phases. The State Department has imposed the first round of sanctions through notice in the Federal Register after a 15-day review period. These sanctions include:

  - a prohibition of exports of national security-sensitive goods and technology,
  - the termination of foreign assistance,
  - suspension of sales of defense articles or services, and
  - the denial of credit or other financial assistance by the US government.

Based on the State Department's background briefing, we believe that the prohibition on the export of national security-sensitive goods and technology applies to items requiring an export license to Russia and not to items eligible for export under a license exception. From the background briefing:

*We notified Congress today that pursuant to this act we intend to impose sanctions against the Russian Federation in a number of respects, the most significant of which is the imposition of a presumption of denial for all national security sensitive goods or technologies that are controlled by the*

*Department of Commerce pursuant to the Export Administration Regulations. These goods are currently subject to a license - a case-by-case license determination, but we are - henceforth, when these sanctions go into effect, we will be presumptively denying such applications.*

The second phase of the sanctions will be implemented on approximately November 8th . The second phase will be imposed if the executive branch cannot certify that Russia: (a) is no longer using chemical or biological weapons, (2) has provided reasonable assurances that it will not in the future use such weapons, and (3) that on-site inspections or other reliable means can be used to verify compliance. Under the CBW Act, the President must impose 3 of the following 6 sanctions:

  - Further export restrictions including a prohibition on exports to Russia of all other goods and technology (excluding food and other agricultural commodities and products).
  - Import restrictions on articles that are the growth, product, or manufacture of Russia.
  - Prohibiting U.S. banks from making any loan or providing any credit to the government of Russia, except for loans or credits for the purpose of purchasing food or other agricultural commodities or products.
  - Downgrading or suspending diplomatic relations between the United States and the government of Russia.
  - Suspending air carriers owned by the government of Russia from transporting to or from the United States and terminating any air service agreement between the United States and Russia (with an exception for emergencies).

The State Department noted that it was looking at carve outs and waivers for the second phase of sanctions. The carve outs will be a policy of case by case licensing, rather than a presumption of denial for licenses for:

  - the provision of foreign assistance to Russia and to the Russian people,
  - the safety of commercial passenger aviation,
space flight activities,
  - purely commercial end users for civilian end uses, and
  - exports to wholly-owned subsidiaries of U.S. companies and other foreign companies in Russia.

It is likely that if the President must impose the second set of sanctions, he will impose the least restrictive ones: opposing multilateral bank loans, prohibiting U.S. bank loans, and downgrading diplomatic relations.

*BIS Increases Restrictions on Export to South Sudan, and Eases Restrictions on Exports to India*

In two separate rules this month, BIS amended this EAR to increase the restrictions on exports to South Sudan, and ease the restrictions on exports to India.

First, BIS amended the EAR to conform to the Department of State's (State) amendment of February 14, 2018 to the International Traffic in Arms Regulations (ITAR) that placed restrictions on exports of defense articles (and defense services) to the Republic of South Sudan (South Sudan). The State action reflected a policy determination by the Secretary of State that it was in the best interests of U.S. foreign policy to impose such restrictions.  Consistent with the State action, in this amendment, BIS updated the EAR to restrict the export and reexport of certain items on the Commerce Control List to South Sudan. Pursuant to established procedure, BIS added South Sudan to the list of U.S. embargoed countries under Country Group D:5-U.S. Embargoed Countries, a list drawn from the list of arms embargoes in the ITAR and State Federal Register notices, and adopts a restrictive license application review policy consistent with State's review policy set forth in the ITAR.

In a separate rule later in the month, BIS amended the EAR to formally recognize and implement India's membership in the Wassenaar Arrangement (Wassenaar or WA). Further, BIS removes India from Country Group A:6 and places it in Country Group A:5. This action befits India's status as a Major Defense Partner and recognizes the country's membership in three of the four export control regimes: Missile Technology Control Regime (MTCR), WA and Australia Group (AG). This rule is another in the series of rules that implement reforms to which the United States and India mutually agreed to promote global nonproliferation, expand high technology cooperation and trade, and ultimately facilitate India's full membership in the four multilateral export control regimes (Nuclear Suppliers Group, MTCR, WA, and AG). This rule also makes conforming amendments.

### BIS Revises the EAR to reflect changes to the Missile Technology Control Regime

BIS published a final rule this month amending the EAR to reflect changes to the Missile Technology Control Regime (MTCR) Annex that were agreed to by MTCR member countries at the October 2017 Plenary in Dublin, Ireland, and the May 2017 Technical Experts Meeting (TEM) in Stockholm, Sweden. This final rule revises seventeen Export Control Classification Numbers (ECCNs) to implement the changes that were agreed to at the meetings and to better align the missile technology (MT) controls on the Commerce Control List (CCL) with the MTCR Annex.

The Missile Technology Control Regime is an export control arrangement among 35 nations, including most of the world's suppliers of advanced missiles and missile-related equipment, materials, software and technology. The regime establishes a common list of controlled items (the Annex) and a common export control policy (the Guidelines) that member countries implement in accordance with their national export controls. The MTCR seeks to limit the risk of proliferation of weapons of mass destruction by controlling exports of goods and technologies that could make a contribution to delivery systems (other than manned aircraft) for such weapons.

This final rule revises the EAR to reflect changes to the MTCR Annex agreed to at the October 2017 Plenary in Dublin, Ireland, and changes resulting from the May 2017 Technical Experts Meeting in Stockholm, Sweden. This rule also makes changes to the Commerce Control List to conform with the MTCR Annex. All of the changes in this final rule align the MT controls on the CCL with the MTCR Annex.

The ECCNs affected by this rule include 1B117, 1B118, 1C111, 1C118, 2B109, 2B120, 2B121, 2B122, 6A107, 7A105, 7A107, 7A116, 9A012, 9A101, 9A115, 9A515, 9A610.

### *OFAC Updates Iran Sanctions-related FAQs*

Earlier this month, in connection with the President's issuance of a new Iran-related Executive order "Reimposing Certain Sanctions with Respect to Iran" (New Iran E.O.), the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) is publishing Frequently Asked Questions (FAQs) relating to the New Iran E.O. OFAC is also amending existing FAQs relating to the Iran Freedom and Counter-Proliferation Act of 2012 and, in light of the revocation of certain prior E.O.s, archiving FAQs relating to E.O. 13622, Section 4 of E.O. 13628, and E.O. 13645.

In addition, OFAC published a revised statement and updated existing FAQs relating to the Administration's implementation of the President's May 8, 2018 decision to cease the United States' participation in the Joint Comprehensive Plan of Action (JCPOA) and to reimpose all sanctions lifted or waived in connection with the JCPOA. Specifically, OFAC updated FAQ 1.4 and inserted new FAQs 2.3-2.7. Today marks the last day of the 90-day wind-down of certain sanctions relief specified in the JCPOA and as set out in the FAQs.

## ENFORCEMENT ACTIONS

### *California Man Pleads Guilty to Conspiring to Violate U.S. Sanctions Against Syria*

Rasheed Al Jijakl, a Syrian-born naturalized U.S. citizen of Walnut, California, pleaded guilty this month to a charge of conspiring to export U.S.-origin tactical gear to Syria in violation of the International Emergency Economic Powers Act and Syria Sanctions.

In the factual basis filed as part of the plea agreement, Jijakli admitted that from April 2012 through March 2013, he conspired with other individuals to export tactical gear, including U.S.-origin laser boresighters, day and night vision rifle scopes, and other items (Tactical Gear) from the United States to Syria. From June through July 2012, Jijakli and one of the co-conspirators (Co-conspirator 1) purchased the Tactical Gear. On July 17, 2012, Jijakli traveled from Los Angeles, California to Istanbul, Turkey with the Tactical Gear, with the intent that it would be provided to Syrian rebels training in Turkey and fighting in Syria. Jijakli provided some of the Tactical Gear, specifically the laser boresighters, to a second co-conspirator who Jijakli

learned was a member of Ahrar Al-Sham. Jijakli also provided the goods to other armed Syrian insurgent groups in Syria and Turkey. In total, Jijakli and co-conspirators knowingly provided at least 43 laser boresighters, 85 day rifle scopes, 30 night vision rifle scopes, tactical flashlights, a digital monocular, 5 radios, and 1 bulletproof vest to Ahrar Al-Sham and other Syrian rebels in Syria, or with knowledge that the Tactical Gear was going to Syria. Also, in August and September 2012, Jijakli directed co-conspirators to withdraw thousands of dollars from Palmyra Corporation, where Jijakli was the Chief Executive Officer, to pay for Tactical Gear for Syrian rebels.

### _Canadian Man Sentenced to Prison for Conspiracy to Export Restricted Goods and Technology to Iran_

Ghobad Ghasempour, a Canadian national, was sentenced this month to 42 months in prison for conspiracy to unlawfully export U.S. goods to Iran. Ghasempour was arrested on March 28, 2017 as he entered the United States at Blaine, Washington. An investigation revealed that Ghasempour had used front companies in China and co-conspirators in Iran, Turkey and Portugal to illegally export restricted technology products to Iran.

According to records filed in the case, between 2011 and 2017, Ghasempour and his co-conspirators illegally exported and attempted to export goods and technology to Iran that have both military and non-military uses. Ghasempour exported a thin film measurement system, manufactured by a California company, that is essentially a microscopic tape measure for liquid coatings and parts that are used in cell phones and missiles; he attempted to export an inertial guidance system test table, manufactured by a North Dakota company, used to test the accuracy of gyroscopes that assist in flying commercial and military airplanes; and the conspirators exported two types of thermal imaging cameras, manufactured by an Oregon company, that can be used in commercial security systems and military drones. Some of the items Ghasempour sought to export were intercepted by law enforcement. The conspirators falsified shipping documents and lied to U.S. manufacturers by claiming that the restricted items were being shipped to customers in Turkey and Portugal, knowing that the true destination of these goods was Iran. The Iranian customers paid the Chinese front companies owned by Ghasempour and a co-conspirator.

### _Colorado Woman Sentenced to 3 Years in Federal Prison for Illegally Exporting Firearms to the Dominican Republic_

A former member of the U.S. Army stationed at Fort Carson, Colorado, was sentenced this month to serve three years in federal prison following her criminal conviction for illegally exporting firearms to the Dominican Republic in 2015. On Sept. 1, 2015, a federal grand jury indicted Katherine O'Neal, 43, for numerous firearm and illegal financing-type criminal charges. A superseding indictment was handed down on Nov. 20, 2016, with a second superseding indictment returned on Dec. 5, 2017. A jury found O'Neal guilty of smuggling goods from the United States on March 6, 2018. O'Neal was acquitted on other counts alleging false information on firearm-purchase forms and money laundering.

At trial, the government introduced evidence showing that O'Neal made multiple trips to the Dominican Republic shortly after purchasing firearms in Denver and Colorado Springs, Colorado. On one trip she flew from Denver to the Dominican Republic with 11 firearms in her luggage in early June 2015. O'Neal declared the firearms to the airline, but did not obtain the required State Department export license. Her bags had been misdirected by the airline and were not on her flight. When the bags arrived later, Dominican Republic officials noticed the handguns while examining her baggage. When O'Neal arrived at the airport to claim her luggage, she was arrested. The Dominican Republic has a ban on all imported firearms. A Denver jury found O'Neal guilty of smuggling goods from the United States.

back to top

* * * * * * * * * * * * * * * * * *

## EX/IM MOVERS & SHAKERS

## 16. Monday List of Ex/Im Job Openings: 184 Openings Posted This Week, Including 17 New Openings
(Source: Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

   "#" New or amended listing this week

* Aerojet Rocketdyne; Canoga Park, CA; Manager, Industrial Security & Compliance;
* Agility; Atlanta, GA; Ocean Import Coordinator
* Agility; Bensenville, IL; Ocean Export Coordinator;
* Agility; Basel, Switzerland; International Exhibition Coordinator
* Agility; East Boston, MA; Customs/Entry Writer Coordinator
* Agility; Houston, TX; Air Freight Export Account Executive;
* Agility; Queens, NY; Air Export Coordinator;
* Agility; Queens, NY; Air Export Coordinator;
# Airbus; Getafe, Spain; VIE Procurement Sustainability Management - Export Compliance; Requisition ID: 10409879 ER EN EXT 1
* Airschott, Inc.; Dulles, VA; Imports/Exports/International Logistics & Business
* Albemarle Corporation; Baton Rouge, LA; Logistics Specialist - Trade Compliance and Marine Specialist;
* Alcoa Group; Knoxville, TN; Trade Compliance Administrator;
* Amazon; Seattle, WA; Head, Global Trade and Product Compliance;

* Amazon; Seattle, WA; Global Trade Compliance Analyst;
* Amazon; Seattle, WA; US Export Compliance PM;
* American Trucking Associations (ATA); Arlington, VA; Mgr Customs, Immigration & Cross-Broder Ops;
* Arrow; Shanghai, China; Compliance Manager;
# AstraZeneca; Wilmington DE, Gaithersburg MD; Regional Trade Lead; Requisition ID: R-033139
* Augusta Westland; Philadelphia, PA; Manager, Import Export;
* BAE Systems; Kingsport, TN; Government Compliance Manager; Requisition ID: 41212BR
# Boeing; Adelaide, Brisbane, Canberra, Melbourne, Australia; Trade Control Specialist; Requisition ID: 1800072289.
* Boeing; Dallas, TX; Global Regulatory and Compliance Specialist 4; Requisition ID: 12795
* Boeing; Englewood, CO; Compliance Specialist 4; Requisition ID: 1268;
* Boeing; Manassas, VA; Export Control Manager; Requisition ID: 1900
* Boeing; Zoushan, China; Compliance Analyst;
* Boeing; Zoushan, China; Trade Compliance Manager;
# Booz Allen Hamilton; NY; Associate General Counsel; Requisition ID: R0035318
* Bose; Framingham, MA; Senior Trade Compliance Analyst;
* CGI, Fairfax, VA; Trade Compliance Analyst/Manager; Requisition ID: J0818-1218
* Cinemark; Plano, TX; Import Export Purchasing Analyst
# Cobham; Exeter, NH, Lansdale, PA; Export Compliance Officer; Alicia.Neice@yoh.com; Requisition ID 1611
# Cognizant; Budapest, Hungary; Ethics & Compliance Senior Manager Continental Europe;
# Cognizant;Mexico City, Mexico; Regional Ethics & Compliance Officer LATAM;
# Cognizant; Shanghai, China; Regional Ethics & Compliance Officer - APAC;
* Cobham; Lansdale, PA; Export Compliance Officer; Ali Neice Alicia.Neice@yoh.com; Requisition ID 1611
* ConvaTec; Greensboro, NC; Associate Manager, Customs & Trade;
* Destaco; Auburn Hills, MI; Manager, Global Compliance; Clenetta Frazier; cfrazier@destaco.com; Requisition ID: 16261
* Disney Parks & Resorts; Kissimmee, FL; Senior Manager, Trade Compliance; Requisition ID: 552655BR;
* DuPont; Wilmington, DE; Trade Compliance Leader; Requisition ID: 196737W-01
* DynCorp International; Tampa, FL; Foreign Disclosure Officer; Requisition ID: PR1701977
* Eaton; Hungary; Manager Global Trade Management EMEA - Imports (in any EMEA location); Requisition ID: 052687
* Eaton; Multiple Locations: Cleveland, Ohio; Moon Township, Pennsylvania; Eden Prairie, Minnesota; Peachtree City, Georgia; Galesburg, Michigan; Manager, Supply Chain Governance, Risk & Compliance; Requisition ID: 054321
* Eaton; Syracuse, NY; Global Logistics Manager; Requisition ID: 036620
* Embraer; Fort Lauderdale, FL; Compliance Specialist II; Requisition ID: 170685;

* Energizer Holdings; St. Louis, MO; Trade Compliance Analyst; Kieshana Miles,kieshana.miles@energizer.com; Requisition ID: NAM00604
* Ensign-Bickford Aerospace & Defense Co.; Moorpark, CA; Import/Export Specialist; Missy Clark; maclark@eba-d.com;
* EoTech Technologies; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* Expeditors; Amsterdam, Netherlands; Regional Compliance SME (Subject-Matter expert) Supervisor On-site;
* Expeditors; Bangkok, Thailand; Regional Trade Compliance Manager - Indochina & Philippines;
* Expeditors; Krefeld, Germany; Clerk Import / Export;
* Expeditors; Bedfont, United Kingdom; Customs Brokerage Clerk;
* Expeditors; Bedfont, United Kingdom; District Trade Compliance Manager;
* Expeditors; Detroit, MI; US Export Compliance Consultant;
* Expeditors; Dublin, IE; Consultant - Customs and Trade Compliance;
* Expeditors; Dusseldorf, Germany; Clerk, Airfreight Import;
* Expeditors; Frankfurt, Germany; Consultant - Customs and Trade Compliance (m/w), unbefristet und in Vollzeit
;
* Expeditors; Krefeld, Germany; Clerk, Airfreight Import;
* Expeditors; Plainfield, IN; District Trade Compliance Manager;
* Expeditors; Seattle, WA; Supervisor - IS Development, Customs & Compliance;
* Expeditors; Sunnyvale, CA, USA; Customs Compliance Coordinator;
* Expeditors; Sunnyvale, CA, USA; Customs Compliance Specialist;
* Expeditors; Stockholm, SE; District Trade Compliance Manager;
* Exterran; Houston, TX; Trade Control Manager;
* Flash Global; Mountain Lakes, NJ; Import and Export Specialist;
* FLIR; Arlington, VA; Senior Director, Global Export Licensing;
* FLIR; Billerica, MA; US Customs Analyst;
* FLIR; Elkridge, MD; Global Trade Compliance, Traffic Analyst OTS;
* FLIR; Meer, Belgium; GTC EMEA Customs Analyst;
* FLIR; Irving, CA; Sr. Manager Export Compliance;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Traffic;
* FLIR; Billerica, MA; Global Trade Compliance Analyst, Licensing;
* FLIR; Nashua, NH; Global Trade Compliance Analyst, Licensing;
* Full Circle Compliance; Bruchem, Netherlands; Legal Analyst, Manager;
* General Atomics; San Diego, CA; Director, Compliance; Requisition ID: 18549BR
* General Atomics; San Diego, CA; Government Compliance Specialist; Requisition ID: 19499BR;
* General Atomics; San Diego, CA; Import/Export Trade Compliance Administrator - Licensing; Requisition ID: 17968BR
* General Atomics; San Diego, CA; Senior Government Compliance Specialist; Requisition ID: 19500BR;
* General Electric; Lynn, MA; Senior Export Control Specialist, Aviation; Requisition ID: 3146429
* Google; Mountain View, CA; Ethics and Compliance Associate Counsel, Export Control;
* Harris Corporation; Van Nuys, CA; Trade Compliance Senior Specialist; Requisition ID: ES20180706-25145

* Henderson Group Unlimited; Inc; Washington, DC; Defense Control Analyst;
* Henkel Corp.; Rocky Hill, CT; Global Trade Defense Information Manager; Requisition ID: 180002QT
* Honeywell International Inc.; Sunnyvale, CA or Lincolnshire, IL; Sr. Import/Export Analyst; HRD32371
* Infineon Technologies; Munich, Germany; Manager Export Control;
* Infineon Technologies; Munich, Germany; Specialist Export Control;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official / Deputy Facility Security Officer;
* InteliTrac Global Solutions; Herndon, VA; ITAR Compliance Official;
* Johnson Controls; Boca Raton, FL; Licensing Coordinator; Requisition ID: WD30047852135
* Johnson Controls; Boca Raton, FL; Licensing Coordinator; Rquisition ID: WD30047853135
* Johnson Controls; Milwaukee, WI; Trade Compliance Analyst; Requisition ID: WD30047348124
* Johnson Controls; Tamaulipas, Matamoros, Mexico; Trade Compliance Specialist; Requisition ID: EB00064420180
* Kohls; Menomonee Falls, WI; Senior Manager, Customs Compliance
* Komatsu; Milwaukee, WI; Senior International Trade Compliance Analyst; Requisition ID: 12728
* Lam Research Corp.; Shanghai, China; Foreign Trade (FT) Analyst;
* Leonardo DRS; Cypress, CA; Contracts & Compliance Manager; Requisition ID: 91594
* Leonardo DRS; Dallas, TX; Contracts & Compliance Administrator; Requisition ID: 91611
* Leonardo DRS; Dallas, TX; Contracts & Compliance Manager; Requisition ID: 91608
* Leonardo DRS; Melbourne, FL; Senior Supply Chain Analyst - Small Business Compliance; Requisition ID: 91669
* Leonardo DRS; St. Louis; Trade Compliance Specialist; Requisition ID: 88127, or contact brandy.mormino@drs.com
* Livingston; CA; Import Analyst; Requisition ID: 60988
* Livingston; CA; Import Specialist; Requisition ID: 60644
* Livingston; FL; Import Analyst; Requisition ID: 59941
* Livingston; GA; Import Specialist; Requisition ID: 61165
* Livingston; IL; Import Specialist; Requisition ID: 60803
* Livingston; IL; Import Specialist; Requisition ID: 60905
* Livingston; IL; Client Import Analyst; Requisition ID: 60964
* Livingston; IL; Client Import Analyst; Requisition ID: 60965
* Livingston; NY; Client Import Analyst; Requisition ID: 61123
* Livingston; NY; Import Specialist; Requisition ID: 61221
* Livingston; NY; Release Customs Analyst; Requisition ID: 61518
* Livingston; OH; Import Analyst; Requisition ID: 60702
* Livingston; TX; Release Customs Analyst; Requisition ID: 61282
* Livingston; TX; Release Import Analyst; Requisition ID: 60867
* Livingston; VT; Release Customs Agents; Requisition ID: 61121
* Lockheed Martin; Arlington, VA; International Trade Compliance Engineer; Job ID: 439787BR

* Lockheed Martin; Arlington, VA; Senior International Licensing Analyst;
ID: 438635BR
* Lockheed Martin; Arlington, VA; International Trade Compliance Engineer;
ID: 439787BR
* Lockheed Martin; Fort Worth, TX; Export and Import Compliance
Investigations Lead; Job ID: 427872BR
* Lockheed Martin; Littleton, CO; Supply Chain Management Compliance
Analyst; Requisition ID: 440613BR
* Lockheed Martin; Orlando, FL; Senior International Licensing Analyst;
Requisition ID: 434225BR
* Lockheed Martin; Stratford, CT;  Compliance Auditor; Job ID; 434724BR
* Luminar Technologies; Orlando, FL; Import/Export Trade Compliance
Specialist;
* L-3 Warrior Sensor Systems; Londonderry, NH; Purchasing & Compliance
Manager; Requisition ID:096596
* L-3 Warrior Sensor Systems; Middle East; International Business
Development Manager - Middle East Region; Requisition ID: 093343
* L-3; Ann Arbor, MI; Trade Compliance Manager; Requisition ID: 092335
* Maersk/DAMCO; Agent de transit IMPORT - EXPORT; Job Ref.: DC-164022
* Medtronic; Heerlen, The Netherlands; Trade Compliance Analyst;
Requisition ID: 16000DYY
* Medtronic; Minneapolis, MN; Trade Compliance Program Manager;
Requisition ID: 18000BJW;
* Medtronic; Wash DC; Global Trade Lawyer;
stacy.m.johnson@medtronic.com; Requisition ID: 170002ON
* Mercury Systems; Andover, MA; International Trade Compliance Director;
Requisition ID: 18-165
* Mitchell Martin, Inc.; Dallas, Texas; Export Regulatory Trade Compliance
Specialist; Requisition ID: 104405
* Muscogee International, LLC; Washington, D.C.; DDTC Compliance
Specialist II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Policy
Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Records
Auditor; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Contract
Analyst; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support Desk
Lead; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Service Support
Desk; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support
I; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support
II; Apply HERE or contact their recruiting team.
* Muscogee International, LLC; Washington, D.C.; DDTC Office Support
III; Apply HERE or contact their recruiting team.
* Netflix; Los Angeles, CA; Manager, Trade Compliance;
* Northrop Grumman; Baltimore, MD; International Trade Compliance
Analyst (level 2 or 3)- Import; Requisition ID: 18013545
* Northrop Grumman; Baltimore, MD; International Trade Compliance
Analyst (level 2 or 3)- Import; Requisition ID: 18014715

* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 18010381
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022803
* Northrop Grumman; Herndon, VA; Manager, International Trade Compliance 2; Requisition ID: 17022805
* Northrop Grumman; Herndon, VA; International Trade Compliance Analyst 3; Requisition ID: 18007859
* Northrop Grumman; McLean, VA; International Trade Compliance Analyst 3; Requisition ID: 18012973
* Office of the Director of National Intelligence; McLean, VA; Associate General Counsel;
* Optics 1; Bedford NH, Senior Trade Compliance Administrator
* Oshkosh Corporation; Greenville, WI; Senior Global Trade Compliance Analyst - Licensing; ID: 183273
* PerkinElmer, Inc.; Shelton, CT; Systems Analyst, Trade Compliance Solutions;
* Raytheon; Billerica, MA; Import Ctl&Compliance Advisor; Requisition ID: 119749BR
* Raytheon; Billerica, MA; Mgr I Export-Import Control; Requisition ID: 118298BR
* Raytheon; El Segundo, CA; Import Control and Compliance Advisor; APPLY Requisition ID 119247BR
* Raytheon; El Segundo, CA; Manager III, Global Trade Licensing; Requisition ID: 117235BR
* Raytheon; El Segundo, CA; Fullerton, CA; Goleta, CA; Aberdeen, MD; Plano, TX; McKinney, TX; Principal Analyst, Global Trade Licensing; Requisition ID: 117247BR
* Raytheon; Tucson, AZ; Export Licensing And Compliance Specialist; Requisition ID: 114936BR
* Raytheon; Tucson, AZ; Import Ctl&Compliance Advisor; Requisition ID: 119749BR
* Raytheon; Woburn, MA; Global Trade Export Licensing & Compliance Advisor; Requisition ID:117939BR
* Raytheon; Woburn, MA; Supply Chain Compliance Advisor; Requisition ID:115557BR
* SABIC; Houston TX; Senior Analyst, Trade Compliance; Danielle.Cannata@sabic.com; Requisition ID: 8411BR
* The Safariland Group; Jacksonville, FL; Counsel (International Trade Compliance);
* The Safariland Group; Jacksonville, FL; Sr. Export Compliance Specialist;
* Sensata Technologies; Fort Worth, TX; Global Trade Compliance Specialist;
* Sierra Nevada Corporation: Denver. CO; International Trade Compliance Analyst III; Requisition ID: R0006075
* Spirent; Calabasas, CA; Global Trade Compliance Specialist; Requisition ID: 4088;
* Thales; Cambridge, UK; Trade Compliance Support Officer; Krista Helvey; Requisition ID R0034813;
* Thales; Cambridge, UK; Trade Compliance Officer; Krista Helvey; Requisition ID R0034820;

# Thales; Various Locations, US; Trade Compliance Analyst; Requisition ID: R0035062;

* TLR; San Fransisco, CA; Import CSR; Requisition ID: 1040

* Toro; Bloomington, MN; Import - Export Compliance Manager

# United Technologies - Pratt & Whitney; East Hartford, CT; Authorizations and Investigations Specialist; Requisition ID: 70957BR

# United Technologies - Pratt & Whitney; East Hartford, CT; Export Authorization Manager, ITC Operations; Requisition ID: 71189BR

# United Technologies - Pratt & Whitney; East Hartford, CT; ITC Site Lead, Hot Section Module Center; Requisition ID: 71012BR

# United Technologies - Pratt & Whitney; East Hartford, CT; International Trade Compliance Authorizations Manager; Requisition ID: 63222BR

# United Technologies - Pratt & Whitney; East Hartford, CT; Senior Export Operations Associate; Requisition ID: 71010BR

# United Technologies - Pratt & Whitney; East Hartford, CT; Senior Manager, Military ITC Programs; Requisition ID: 71119BR

# United Technologies - Pratt & Whitney; East Hartford, CT; Senior Manager, Digital Systems & Integration; Requisition ID: 70425BR

# United Technologies - Pratt & Whitney; East Hartford, CT; Senior Program Manager, ITC Operations; Requisition ID: 71195BR

* Varian; Paolo Alto, CA; Senior Trade Compliance Analyst; Requisition ID: 12735BR; Contact Uyen Tran at Uyen.Tran@varian.com;

* Varian; Paolo Alto, CA; Trade Compliance Analyst; Requisition ID: 13097BR;

* Vigilant; Negotiable Location, USA; Global Trade Compliance Analyst;

* Vigilant; Negotiable Location, USA; Global Trade Account Manager;

* Virgin Galactic; Las Cruces, NM; Export Compliance Officer; Requisition ID: 2018-3558

* World Wide Technology; Edwardsville, IL; International Trade Compliance Specialist;

* Xylem, Inc; Morton Grove, IL; Trade Compliance Specialist

back to top

* * * * * * * * * * * * * * * * * * *

## EX/IM TRAINING EVENTS & CONFERENCES

## 17. "9th Annual 'Partnering for Compliance™' West Export/Import Control Conference" on Oct 16-18, Ft. Worth, TX. Customs/ Import Boot Camp Oct 19.
(Source: A.E. NicPhaidin, Info@PartneringForCompliance.org)

* What: The 9th Annual "Partnering for Compliance™" West will focus intensely on a broad spectrum of export/import regulatory and compliance matters of current relevance to companies and individuals involved in global trading. Senior-level government officials and trade experts will provide first-class training.

* Where: Dallas-Fort Worth Marriott South Airport Hotel (completely renovated)
* When:
  - Tue - Thurs, 16-18 Oct: "9th Annual 'Partnering for Compliance™' West Export Control Program
  - Fri, 19 Oct: 1-Day Program "Customs/Import Boot Camp"
* Speakers confirmed: DoS/DDTL: Terry Davis & Audra Collins; DoS/DDTC: Jae Shin; DoC/BIS: Bryce Bewley & Mary Quach & OEE James Fuller; DoD/DTSA: Ken Oukrop; OFAC: Anthony D. Musa (Licensing) & Michael Szustakowski (Enforcement); Census Bureau: Dale Kelly; DHS/CBP: O'Ruill D. McCanlas; ICE: Dean Fittz; UK/EU: David Hayes Export Controls; Imports: Braumiller Law Group PLLC: Adrienne Braumiller & Bruce Leeds; and U.S. trade.
* Opening Keynote Address: TBA (Invited)
* Cost: Export 3-day program: $650. Customs/Import 1-day program: $250. Both programs: $900.
* Remarks: Maximum capacity is 200 participants to maintain informal and collaborative environment.
* As time permits, all Government and trade speakers will informally hold short "one-to-one" meetings with participants on a "first-come, first-served" basis.
* Certificates of Completion granting: 4.5 IIEI CEUs and 20 CES NCBFAA Credits for 3-day Exports program, and 6.5 CCS NCBFAA Credits for 1-day Customs/Import Boot Camp will be awarded for each program.
* More information: Here.

back to top

* * * * * * * * * * * * * * * * * *


## 18. ECS Presents "ITAR/EAR Symposium & Boot Camp" in Annapolis, MD on 11-13 Sep
(Source: Suzanne Palmer, spalmer@exportcompliancesolutions.com)

* What: The ECS ITAR/EAR Symposium & Boot Camp, Annapolis, MD
* When: September 11-13, 2018
* Where: Chart House Restaurant on Spa Creek
* Sponsor: Export Compliance Solutions & Consulting (ECS)
* ECS Speaker Panel: Timothy Mooney, Commerce/BIS; Matt Doyle, Lockheed; Matt McGrath, McGrath Law, Scott Jackson, Curtiss-Wright, Suzanne Palmer & Mal Zerden.
* Register: here for the three-day event or by calling 866-238-4018 or e-mail spalmer@exportcompliancesolutions.com

back to top

* * * * * * * * * * * * * * * * * *


## 19. ECTI Presents "A Practical Guide to AES Filing: When, What and How to File in the Automated Export System" Webinar, 23 Oct
(Source: Danielle Hatch, danielle@learnexportcompliance.com)

* What: A Practical Guide to AES Filing: When, What, and How to File in the Automated Export System
* When: October 23, 2018; 1:00 p.m. (EDT)
* Where: Webinar
* Sponsor: Export Compliance Training Institute (ECTI)
* ECTI Speaker: Jonathan Young
* Register: Here or Danielle Hatch, 540-433-3977, danielle@learnexportcompliance.com.

back to top

* * * * * * * * * * * * * * * * * * *

## EDITOR'S NOTES

## 20. Bartlett's Unfamiliar Quotations
(Source: Editor)

* **Ferdinand Porsche** (3 Sep 1875 - 30 Jan 1951; was an automotive engineer and founder of the Porsche car company. He is best known for creating the first gasoline-electric hybrid vehicle (Lohner-Porsche), the Volkswagen Beetle, the Mercedes-Benz SS/SSK, several other important developments and Porsche automobiles.)
  - *"If one does not fail at times, then one has not challenged himself."*

* **Mary Renault** (4 Sep 1905 - 13 Dec 1983; born Eileen Mary Challans, was an English and South African writer best known for her historical novels set in ancient Greece. In addition to vivid fictional portrayals of Theseus, Socrates, Plato, and Alexander the Great, she wrote a non-fiction biography of Alexander.)
  - *"Money buys many things... The best of which is freedom."*

**Yesterday was pun day:**

* Ever since I switched to wrinkle free shirts my laundry issues have been less pressing.
* When an escaped prisoner was caught camping out in the woods it was a clear case of criminal in tent.

back to top

* * * * * * * * * * * * * * * * * *

## 21. Are Your Copies of Regulations Up to Date?
(Source: Editor)

The official versions of the following regulations are published annually in the U.S. Code of Federal Regulations (C.F.R.), but are updated as amended

in the Federal Register.  The latest amendments to applicable regulations are listed below.

* ATF ARMS IMPORT REGULATIONS: 27 CFR Part 447-Importation of Arms, Ammunition, and Implements of War
   - Last Amendment: 15 Jan 2016: 81 FR 2657-2723: Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm.

* CUSTOMS REGULATIONS: 19 CFR, Ch. 1, Pts. 0-199
   - Last Amendment: 12 Jun 2018: 83 FR 27380-27407: Air Cargo Advance Screening (ACAS)

* DOD NATIONAL INDUSTRIAL SECURITY PROGRAM OPERATING MANUAL (NISPOM): DoD 5220.22-M
   - Last Amendment: 18 May 2016: Change 2: Implement an insider threat program; reporting requirements for Cleared Defense Contractors; alignment with Federal standards for classified information systems; incorporated and cancelled Supp. 1 to the NISPOM (Summary here.)

* EXPORT ADMINISTRATION REGULATIONS (EAR): 15 CFR Subtit. B, Ch. VII, Pts. 730-774
   - Last Amendment: 4 Sep 2018: 83 FR 44821-44828: Addition of Certain Entities to the Entity List, Revision of Entries on the Entity List and Removal of Certain Entities From the Entity List

* FOREIGN ASSETS CONTROL REGULATIONS (OFAC FACR): 31 CFR, Parts 500-599, Embargoes, Sanctions, Executive Orders
   - Last Amendment: 29 June 2018: 83 FR 30541-30548: Global Magnitsky Sanctions Regulations; and 83 FR 30539-30541: Removal of the Sudanese Sanctions Regulations and Amendment of the Terrorism List Government Sanctions Regulations

* FOREIGN TRADE REGULATIONS (FTR): 15 CFR Part 30
   - Last Amendment: 24 Apr 2018: 3 FR 17749-17751: Foreign Trade Regulations (FTR): Clarification on the Collection and Confidentiality of Kimberley Process Certificates
   - HTS codes that are not valid for AES are available here.
   - The latest edition (30 Apr 2018) of *Bartlett's Annotated FTR* ("BAFTR"), by James E. Bartlett III, is available for downloading in Word format. The BAFTR contains all FTR amendments, FTR Letters and Notices, a large Index, and approximately 250 footnotes containing case annotations, practice tips, Census/AES guidance, and explanations of the numerous errors contained in the official text. Subscribers receive revised copies in Microsoft Word every time the FTR is amended. The BAFTR is available by annual subscription from the Full Circle Compliance website.  BITAR subscribers are entitled to a 25% discount on subscriptions to the BAFTR. Government employees (including military) and employees of universities are eligible for a 50% discount on both publications at www.FullCircleCompiance.eu.

* <u>HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (HTS, HTSA or HTSUSA)</u>, 1 Jan 2018: 19 USC 1202 Annex. ("HTS" and "HTSA" are often seen as abbreviations for the Harmonized Tariff Schedule of the United States Annotated, shortened versions of "HTSUSA".)
  - Last Amendment: 14 Aug 2018: <u>Harmonized System Update 1812</u>, containing 27 ABI records and 6 harmonized tariff records.
  - HTS codes for AES are available <u>here</u>.
  - HTS codes that are not valid for AES are available <u>here</u>.

* <u>INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR)</u>: 22 C.F.R. Ch. I, Subch. M, Pts. 120-130.
  - Last Amendment: 30 Aug 2018: <u>83 FR 44228-44229</u>, USML Chapter XI(c).
  - The only available fully updated copy (latest edition: 30 Aug 2018) of the ITAR with all amendments is contained in *Bartlett's Annotated ITAR* ("BITAR"), by James E. Bartlett III. The BITAR contains all ITAR amendments to date, plus a large Index, over 800 footnotes containing amendment histories, case annotations, practice tips, DDTC guidance, and explanations of errors in the official ITAR text. Subscribers receive updated copies of the BITAR in Word by email, usually revised within 24 hours after every ITAR amendment. The BITAR is available by annual subscription from the Full Circle Compliance <u>website</u>. BAFTR subscribers receive a 25% discount on subscriptions to the BITAR, please <u>contact us</u> to receive your discount code.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * * * * *

## 22. Weekly Highlights of the Daily Bugle Top Stories
(Source: Editor)

Review last week's top Ex/Im stories in "Weekly Highlights of the Daily Bugle Top Stories" published <u>here</u>.

<u>back to top</u>

* * * * * * * * * * * * * * * * * * * * * *

## EDITORIAL POLICY

* The Ex/Im Daily Update is a publication of FCC Advisory B.V., compiled by: Editor, James E. Bartlett III; Assistant Editors, Alexander P. Bosch and Vincent J.A. Goossen; and Events & Jobs Editor, Alex Witt. The Ex/Im Daily Update is emailed every business day to approximately 8,000 readers of changes to defense and high-tech trade laws and regulations. We check the following sources daily: Federal Register, Congressional Record, Commerce/AES, Commerce/BIS, DHS/CBP, DOE/NRC, DOJ/ATF, DoD/DSS, DoD/DTSA, FAR/DFARS, State/DDTC, Treasury/OFAC, White

House, and similar websites of Australia, Canada, U.K., and other countries and international organizations. Due to space limitations, we do not post Arms Sales notifications, Denied Party listings, or Customs AD/CVD items.

* RIGHTS & RESTRICTIONS: This email contains no proprietary, classified, or export-controlled information. All items are obtained from public sources or are published with permission of private contributors, and may be freely circulated without further permission, provided attribution is given to "*The Export/Import Daily Bugle* of (date)". Any further use of contributors' material, however, must comply with applicable copyright laws. If you would to submit material for inclusion in the *The Export/Import Daily Update ("Daily Bugle")*, please find instructions here.

* CAVEAT: The contents of this newsletter cannot be relied upon as legal or expert advice. Consult your own legal counsel or compliance specialists before taking actions based upon news items or opinions from this or other unofficial sources. If any U.S. federal tax issue is discussed in this communication, it was not intended or written by the author or sender for tax or legal advice, and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter.

* SUBSCRIPTIONS: Subscriptions are free. Subscribe by completing the request form on the Full Circle Compliance website.

* BACK ISSUES: An archive of Daily Bugle publications from 2005 to present is available HERE.

* TO UNSUBSCRIBE: Use the Safe Unsubscribe link below.

back to top

## Stay Connected



The Daily Bugle | www.FullCircleCompliance.us

Copyright © 2018. All Rights Reserved.

FCC Advisory B.V., Landgoed Groenhoven, Dorpsstraat 6, Bruchem, 5314
AE Netherlands

SafeUnsubscribe™ labraham@doc.gov

Forward this email | Update Profile | About our service provider

Sent by ██████@fullcirclecompliance.eu

| From: | Gary Stanley ██████@glstrade.com] |
|---|---|
| Sent: | 10/5/2018 8:29:49 PM |
| To: | Mira Ricardel [Mira.Ricardel@bis.doc.gov] |
| Subject: | Defense and Export-Import Update (Oct. 3, 2018) |

**Dear All,**

**Good Day!**

**Gary Stanley's EC Tip of the Day: Copyright protections or generic property rights in the underlying physical medium are not "restrictions upon . . . further dissemination" that would disqualify information from being "published" and thus not subjec to the EAR under EAR § 734.7.**

**Today's Items:**

1. **DDTC Posts 4 New Name/Change Address Notices**
2. **BIS Issues Order Temporarily Denying Export Privileges of Eastline Technologies OU, et al.**
3. **Los Angeles-Area Woman Sentenced to Federal Prison in Scheme to Dmuggle Restricted Space Communications Technology to China**
4. **OFAC Sanctions Individuals and Companies Associated with Japan's Major Organized Crime Syndicate, the Yakuza**
5. **International Court of Justice in The Hague Rules in Favor of Iran on U.S. Sanctions with respect to Humanitarian Aid and Safety of Civil Aviation**
6. **Australia Defence Export Controls to Hold Training Event in Adelaide on Nov. 6**
7. **EU Commission's 2018 Export Control Forum Set for Dec. 13**
8. **UK Government's Export Control Joint Unit Plans Further 2018 Training Events**
9. **DoD/DSS to Hold Small Business Industry Day on Oct. 30**
10. **State Dept.'s Advisory Committee on International Economic Policy to Meet Oct. 17**
11. **Commerce/ITA's Advisory Committee on Supply Chain Competitiveness to Meet Oct. 17-1**
12. **WTO News**
13. **U.S. Government Contracting**
14. **U.S. Customs and U.S. Census/AES Updates**
15. **Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and VoteS**
16. **U.S. Government Trade Forms and Other Information Collections Open for Public Comment**

**Other Headlines**

17. **Mattis Says US-France in Talks about Loosening Export Limits on Cruise Missile**
18. **China May Face More U.S. Export Restrictions over Muslim Crackdown**
19. **U.S. Military Comes to Grips with Over-Reliance on Chinese Imports**

20. **World Court Orders U.S. to Ensure Iran Sanctions Don't Hit Humanitarian Aid**

21. **India Risks U.S. Sanctions with $5-Billion Purchase of Russian Missiles**

22. **Trump Says USMCA Trade Deal with Mexico and Canada Proves Tough Talk and Tariffs Work**

23. **Can Trump's Bullying Style Deliver More Trade Breakthroughs?**

24. **Trump's USMCA Delivers Big Wins to Drugmakers, Oil Companies and Tech Firms**

25. **Analysts Say Trump May Be Overly Optimistic on New North American Trade Deal**

26. **New Nafta Shows Limits of 'America First'**

27. **U.S. Protectionist Stance Spooks Germany's Economy**

28. **Tariffs That Send a Political Message**

29. **Army Working to Fill Air-and-Missile Defense Gaps**

30. **SB>1 Defiant Will Be Worth the Wait: Sikorsky & Boeing**

31. **Big Challenges Face Army in Quest to Revamp Network**

32. **Pentagon Searching for New Ways to Move Gear During Next War**

33. **Australia Releases RFI for at Least 16 Special Operations Helicopters**

34. **Britain Confirms Talks with Boeing over Potential $2.6B Wedgetail Aircraft Buy**

**Upcoming Export Control and Other Trade Compliance Conferences**

# 1. DDTC Posts 4 New Name/Change Address Notices

The U.S. Department of State's Directorate of Defense Trade Controls (DDTC) has posted on its website the following for new name/address change notices:

• Raufoss Offshore, AS to Thune Produkter Raufoss AS Name Change

• Split of Morgan Advanced Materials Canada, Inc. Incorporation of NP Aerospace (Canada) Limited

• AlliedSignal Aerospace Service Corporation to AlliedSignal Aerospace Service Corporation LLC Name Change

• Raytheon Canada Limited Address Change

# 2. BIS Issues Order Temporarily Denying Export Privileges of Eastline Technologies OU, et al.

(83 Fed. Reg. 49540) - The U.S. Department of Commerce's Bureau of Industry and Security (BIS) has issued an Order Temporarily Denying Export Privileges for a period of 180 days of Eastline Technologies OU ("Eastline"), Adimir OU ("Adimir"), Valery Kosmachov a/k/a Valeri Kosmachov, a/k/a Valery Kosmatsov, a/k/a Valery Kosmatshov, a/k/a Valery Kosmachev ("Kosmachov"), all located in Estonia, and Sergey Vetrov a/k/a Sergei Vetrov ("Vetrov"), located in Russia. The Order also applies to Real Components, Ltd., located in Russia, as a related person. Eastline is operated primarily for the purpose of procuring

electronic components, including those of U.S. origin. Kosmachov and Vetrov were listed as co-owners of Eastline until late 2016. The company is currently listed as being solely owned by Valeria Mihhailova, whom BIS' Office Export Enforcement ("OEE") has reason to believe is Kosmachov's daughter. Evidence presented by OEE indicates that both Kosmachov and Vetrov remain active in the business, as well as that Kosmachov also has previously represented that Eastline partners with Real Components, which is located in Moscow, Russia, is owned by Vetrov, and is Eastline's primary customer in Russia. Kosmachov also has previously identified himself as being the sole owner of Adimir, an Estonian company. Adimir shares the same business addresses as Eastline. Adimir is known to have previously been involved in the transshipment and attempted transshipment of U.S.-origin items to Russia in apparent violation of the Regulations, as described in a TDO issued by BIS on March 19, 2015, as amended on March 23, 2015 (the "March 2015 TDO"). Eastline, Adimir, Kosmachov, and Vetrov have allegedly engaged in knowing violations of the Export Administration Regulations relating to the procurement of U.S.-origin items subject to the Regulations for export to Russia, via transshipment through Estonia and Finland, while providing false or misleading information regarding the ultimate consignee and final destination of the items to U.S. suppliers and/or the U.S. Government. The ways in which their export transactions have been structured and routed appear designed to conceal or obscure the destinations, end users, and/or end uses of the U.S.-origin items they procure, including items on the Commerce Control List, thereby attempting to avoid export control scrutiny and possible detection by U.S. law enforcement.

### 3. Los Angeles-Area Woman Sentenced to Federal Prison in Scheme to Dmuggle Restricted Space Communications Technology to China

The U.S. Department of Justice (DOJ) has announced that Si Chen, 33, a Chinese national residing in Pomona, California, who pleaded guilty to participating in a scheme that illegally exported sensitive space communications technology to China, has been sentenced today to serve 46 months in federal prison. Chen, who used various aliases, included "Cathy Chen," pleaded guilty in July to conspiracy to violate the International Emergency Economic Powers Act (IEEPA), which controls and restricts the export of certain goods and technology from the United States to foreign nations. Chen also pleaded guilty to money laundering and using a forged passport with her photo but a different name that appeared to have been issued by the People's Republic of China. According to court documents, from March 2013 through the end of 2015, Chen purchased and smuggled sensitive items to China without obtaining licenses from the U.S. Department of Commerce that are required under IEEPA. Those items included components commonly used in military communications "jammers." Additionally, Chen smuggled communications devices worth more than $100,000 that are commonly used in space communications applications. Chen falsely under-valued the items on the shipping paperwork to avoid arousing suspicion. Chen received payments for the illegally exported products through an account held at a bank in China by a family member.

### 4. OFAC Sanctions Individuals and Companies Associated with Japan's Major Organized Crime Syndicate, the Yakuza

The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has taken action against two companies and four individuals in Japan associated with the Yamaguchi-gumi, the largest and most prominent Japanese Yakuza syndicate. Two Kobe, Japan-based companies, Yamaki, K.K. and Toyo Shinyo Jitsuyo K.K., along with four individuals, Utao

Morio, Chikara Tsuda, Yasuo Takagi, and Katsuaki Mitsuyasu, were designated pursuant to Executive Order 13581, which targets significant transnational criminal organizations (TCOs) and their supporters. These efforts are designed to protect the U.S. financial system from the malign influence of TCOs and to expose the companies and individuals who are supporting them or acting on their behalf. As a result of these actions, any property or interests in property of the designated persons in the possession or control of U.S. persons or within the United States must be blocked, and U.S. persons generally are prohibited from dealing with any of the designated persons. Click here for further identifying information on the designated indviduals and entities and here for a related chart.

## 5. International Court of Justice in The Hague Rules in Favor of Iran on U.S. Sanctions with respect to Humanitarian Aid and Safety of Civil Aviation

The International Court of Justice in The Hague, The Netherlands, has delivered its Order on the in *Request for the indication of provisional measures submitted by Iran in the case concerning Alleged Violations of the 1955 Treaty of Amity, Economic Relations, and Consular Rights (Islamic Republic of Iran v. United States of America)*. On 16 July 2018, Iran instituted proceedings against the United States with regard to alleged violations of the Treaty of Amity, Economic Relations and Consular Rights concluded between the two States in 1955. The same day, Iran also submitted a Request for the indication of provisional measures, seeking to preserve its rights under the 1955 Treaty pending the Court's final decision in the case. The Court found unanimously that:

• The United States of America, in accordance with its obligations under the 1955 Treaty of Amity, Economic Relations, and Consular Rights, must remove, by means of its choosing, any impediments arising from the measures announced on 8 May 2018 to the free exportation to the territory of the Islamic Republic of Iran of (i) medicines and medical devices; (ii) foodstuffs and agricultural commodities; and (iii) spare parts, equipment and associated services (including warranty, maintenance, repair services and inspections) necessary for the safety of civil aviation;

• The United States of America must ensure that licences and necessary authorizations are granted and that payments and other transfers of funds are not subject to any restriction in so far as they relate to the goods and services referred to in point (1); and

• Both Parties must refrain from any action which might aggravate or extend the dispute before the Court or make it more difficult to resolve.

Click here for the Order, here for a sumary of the Order, and here for a separate Opinion of Judge Cançado Trindade.

## 6. Australia Defence Export Controls to Hold Training Event in Adelaide on Nov. 6

The Australia Government's Defence Export Controls (DEC) has announced that its next outreach program will be Tuesday, November 6, 2018, at the University of Adelaide. There will also be an event in Sydney on Tuesday, November 13. Registration for both events opens October 15.

| Outreach Program Schedule | | | |
|---|---|---|---|
| 0900-0930 | Registration Open | | |
| Session One – SETTING THE SCENE 0930-1030 | DEC Introduction Q&A Session | | |
| 1030-1045 | Morning Tea | | |
| Session Two –WHOLE-OF-GOVERNMENT REPRESENTATION1045-1215 | Whole-of-Government Presentations<br>• Australian Border Force<br>• Department of Foreign Affairs and Trade - Sanctions<br>• Panel Discussion | | |
| 1215-1300 | Lunch | | |
| Session Three – PRACTICAL APPLICATION 1300-1530 | Academia / Research Stream Break Out Session<br>• University Representative<br>• DEC Representative<br>• DFAT Sanctions<br>Wrap Up | | Industry Stream Break Out Session<br>• Industry Representative<br>• DEC Representative<br>• Defence Industry Security Policy<br>• Centre for Defence Industry Capability<br>Wrap Up |

## 7. EU Commission's 2018 Export Control Forum Set for Dec. 13

The European Commission has posted on its website a "Save the Date" Notice that its 2018 Export Control Forum will take place on Thursday, December 13, 2018, at the Albert Borschette Conference Centre (CCAB) Room CCAB0A Rue Froissart 36, Brussels. The 2018 Export Control Forum will provide an opportunity to exchange information about ongoing export control implementation in the EU, and to review the state of play of the legislative process regarding the proposal for a modernisation of EU export controls. The 2018 Export Control Forum will be opened by representatives of the Commission, the Presidency and the European Parliament, and will convene selected panels of experts, to be followed by open dialogue with the stakeholders.

## 8. UK Government's Export Control Joint Unit Plans Further 2018 Training Events

The U.K. Government's Export Control Joint Unit has reported that places are still available in the following export control training courses for the remainder of 2018:

- Beginners' Workshop, Intermediate Seminar, Licences Workshop in Leeds during October

- Beginners' Workshop, Intermediate Seminar, Licences Workshop in Manchester during November

- Beginners' Workshop, Intermediate Seminar, Licences Workshop in London during December

- Cyber Export Controls in London, 21 November

Control List Classification courses in all locations are fully booked for the remainder of the year. For full details and how to book courses still available, see the current export control training bulletin: Export control training bulletin, March to December 2018

## 9. DoD/DSS to Hold Small Business Industry Day on Oct. 30

The U.S. Department of Defense's Defense Security Service (DSS) will hold an FY19 Small Bueiness Industry Day on Tuesday, October 30, 201,8 a tthe Gray Research Center, Marine Corps Base Quantico. More information is available on the flyer. The event is only open to 200 participants. To register, click here.

## 10. State Dept.'s Advisory Committee on International Economic Policy to Meet Oct. 17

(83 Fed. Reg. 49969) -The U.S. Department of State has announced that its Advisory Committee on International Economic Policy will meet Wednesday, October 17, 2018, 1:30 PM to 4:00 PM EDT, at 320 21st Street, N.W., Washington, DC. To obtain pre-clearance for entry, members of the public planning to attend must, no later than Friday, October 5, provide their full name and professional affiliation (if any) to Rima Vydmantas by email: VydmantasRJ@state.gov. The meeting will be hosted by the Assistant Secretary of State for Economic and Business Affairs, Manisha Singh, and Committee Chair Paul R. Charron. Topics for discussion will include concerns about Chinese global investment and the implications for U.S. business and economic interests' post-Brexit.

## 11. Commerce/ITA's Advisory Committee on Supply Chain Competitiveness to Meet Oct. 17-18

(83 Fed. Reg. 49908) - The U.S. Department of Commerce's International Trade Administration (ITA) has announced that its Advisory Committee on Supply Chain Competitiveness will meet Wednesday, October 17, 2018, 12:00 PM to 3:00 PM EDT, and Thursday, October 18, 2018, 9:00 AM to 4:00 PM EDT, at the U.S. Department of Commerce, 1401 Constitution Avenue NW, Research Library (Room 1894), Washington, DC 20230. Committee members are expected to continue to discuss the major competitiveness-related topics raised at the previous Committee meetings, including trade and competitiveness; freight movement and policy; trade innovation; regulatory issues; finance and infrastructure; and workforce development. The Committee's subcommittees will report

on the status of their work regarding these topics. The Office of Supply Chain, Professional & Business Services will post the final detailed agendas on its website at least one week before the meeting.

## 12. WTO News

- DG AZEVÊDO: "WE CAN'T PUT PROGRESS ON HOLD UNTIL WE'RE READY": In his welcome remarks to the Opening Plenary of the 2018 Public Forum on 2 October, WTO Director-General Roberto Azevêdo underlined the importance of modernizing and adapting the rules of global trade in order to manage the major social and economic challenges ahead from technological change. The DG's remarks kicked off three days of discussions and debate at the WTO regarding the future of trade and how to make it more sustainable and inclusive.

- TRADE DIALOGUES: ICC AND B20 PRESENT RECOMMENDATIONS ON STRENGTHENING GLOBAL TRADE: The International Chamber of Commerce (ICC) and B20 Argentina, the business arm of the G20, presented at the WTO Public Forum today (2 October) a list of recommendations on how to reinforce global trade in support of inclusive growth and development. Building on the outcomes of the Business Forum held in Buenos Aires at the end of 2017 and the Trade Dialogues meeting held at the WTO in June 2018, these recommendations cover e-commerce, investment facilitation, small businesses and sustainable development.

- WORLD TRADE REPORT 2018 HIGHLIGHTS TRANSFORMATIVE IMPACT OF DIGITAL TECHNOLOGIES ON TRADE: The 2018 edition of the WTO's flagship publication, the World Trade Report, finds that digital technologies - namely the Internet of Things, artificial intelligence, 3D printing and Blockchain - will have a profound impact on global trade, adding up to 34 percentage points to trade growth by 2030 thanks to lower costs and higher productivity. However, they could also create a challenging environment for those seeking to keep up with the latest innovations. The Report was launched today (3 October) at the WTO Public Forum.

- TRADE CAN MAKE A VITAL CONTRIBUTION TO MEETING THE SUSTAINABLE DEVELOPMENT GOALS - AZEVÊDO: International trade and the WTO have a crucial role to play in helping to accelerate progress in achieving the United Nations Sustainable Development Goals (SDGs), highlights a WTO publication launched at the Public Forum today (3 October 2018). In his opening remarks, Director-General Roberto Azevêdo stressed the need to strengthen the multilateral trading system to support efforts to achieve the SDGs and to underpin growth and development in the poorest countries.

- HIGH-LEVEL SESSION HIGHLIGHTS NEED FOR CLOSER LINKS BETWEEN TRADE AND ENVIRONMENT POLICIES: Linking trade and environment policies closer together can deliver benefits for prosperity and sustainability around the world, panellists said at a high-level session hosted by WTO Director-General Roberto Azevêdo and UN Environment Executive Director Erik Solheim during the WTO's Public Forum on 2 October. Key leaders from business, government and civil society called for stepped-up action to deliver pro-environment and pro-trade outcomes that propel the world towards the achievement of the Sustainable Development Goals.

## 13. U.S. Government Contracting

- NASA: Notice of Intent To Grant Exclusive Term License to practice the invention described and claimed in U.S. Patent No. 9,749,342 entitled, "System and Method for Detecting Unauthorized Device Access by Comparing Multiple Independent Spatial-Time Data Sets from Other Devices" to Equator Corporation of Stafford, Virginia

## 14. U.S. Customs and U.S. Census/AES Updates

- U.S. Customs - OMB Information Collection Submission - Ship's Store Declaration - Deadline for Public Comment: Nov. 1, 2018

- U.S. Customs - CSMS #18-000583 Title: Update to NMFS SIM program information

- U.S. Customs - CSMS #18-000584 Title: Update to Tariff Codes for Import Restrictions on Fish from Mexico Caught with Gillnets

- U.S. Customs - CSMS #18-000585 Title: Amending an Unliquidated ACS Drawback Claim in ACE

- U.S. Customs - Customs and Border Protection is Hiring Officers at Port of Washington Dulles

- U.S. Customs - CBP Announces 17 Potential Partnerships for New and Expanded Services

## 15. Commerce/Enforcement and Compliance and U.S. International Trade Commission Actions and Votes

- Commerce/E&C - Certain Frozen Warmwater Shrimp From India: Notice of Final Results of Antidumping Duty Changed Circumstances Review

- Commerce/E&C - Oil Country Tubular Goods From People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2017

- Commerce/E&C - Stainless Steel Bar From Brazil, India, Japan, and Spain: Continuation of Antidumping Duty Order (India) and Revocation of Antidumping Duty Orders (Brazil, Japan, and Spain)

- Commerce/E&C - Strontium Chromate From Austria and France: Initiation of Less-Than-Fair-Value Investigations

- USITC - USITC to Investigate the Economic Effects of Recently-Enacted Temporary Duty Suspensions and Reductions - The U.S. International Trade Commission (USITC) is seeking input for a newly instituted general factfinding investigation regarding the effects on the U.S. economy of duty suspensions and reductions enacted under the American

Manufacturing Competitiveness Act (AMCA). The investigation, American Manufacturing Competitiveness Act: Effects of Temporary Duty Suspensions and Reductions on the U.S. Economy, was triggered by the recent enactment of a miscellaneous tariff bill under the law. The USITC's report must be submitted to the U.S. House of Representatives Committee on Ways and Means and the U.S. Senate Committee on Finance not later than 12 months after the date of enactment of a miscellaneous tariff bill. Congress completed work on a miscellaneous tariff bill on September 4, 2018, and the President signed the legislation into law on September 13, 2018. As required, the USITC will provide a broad assessment of the economic effects of duty suspensions and reductions on U.S. producers, purchasers, and consumers, as well as case studies looking at the effects on individual sectors. The report will also include recommendations solicited from the public with respect to those domestic industry sectors that might benefit from permanent duty suspensions or reductions, with a particular focus on inequities created by tariff inversions. This public report will be delivered to the Committees by September 13, 2019. The USITC is seeking input for this investigation from all interested parties and requests that the information focus on the articles for which the USITC is requested to provide information and advice. The USITC will hold a public hearing in connection with the investigation at 9:30 a.m. on March 5, 2019. Requests to appear at the public hearing should be filed no later than 5:15 p.m. on February 19, 2019, with the Secretary, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. The USITC also welcomes written submissions for the record. Written submissions should be addressed to the Secretary to the Commission at the above address and should be submitted at the earliest practical date but no later than 5:15 p.m. on March 22, 2019. All written submissions, except for confidential business information, will be available for public inspection.

- USITC - Certain Unmanned Aerial Vehicles and Components Thereof: Institution of Investigation

- USITC - Large Power Transformers From Korea: Determination That Revocation of the Antidumping Duty Order Would Be Likely to Lead to Continuation or Recurrence of Material Injury

## 16. U.S. Government Trade Forms and Other Information Collections Open for Public Comment

(83 Fed. Reg. 49566) - Agency: U.S. Dept. of Homeland Security/U.S. Customs and Border Protection (CBP) - and Title: Ship's Store Declaration - Agency Form No.: CBP Forms 1303 - Type of Review: Extension (without change) - Deadline for Public Comment: Nov. 1, 2018

(83 Fed. Reg. 49922) - Agency: Export-Import Bank of the United States (EXIM) - Title: Exporter's Certificate for Loan Guarantee & MT Insurance Program - Agency Form No.: EIB 11-05 - Type of Review: Regular - Deadline for Public Comment: Nov. 2, 2018

(83 Fed. Reg. 49922) - Agency: Export-Import Bank of the United States (EXIM) - Title: Exporters Certificate for Use with a Short Term Export Credit Insurance Policy - Agency Form No.: EIB 94-07 - Type of Review: Regular - Deadline for Public Comment: Nov. 2, 2018

## Other Headlines

### 17. Mattis Says US-France in Talks about Loosening Export Limits on Cruise Missile

Defense news.com, Oct. 2 - U.S. defense officials are in detailed talks with French counterparts on a request for the sale of American components built into French cruise missiles, U.S. Defense Secretary Jim Mattis said. Asked by a French journalist about Washington blocking the sale of the Scalp long-range weapon to Egypt and Qatar, Mattis said American and French staff were meeting on that very issue even as a press conference was being held. "We discussed this," he said. "We also have our staffs meeting. We have an invitation out to France to answer two final questions. The meetings are going on as we speak." Mattis, on his first visit to Paris as defense secretary, was speaking at a joint press conference with his French counterpart, Armed Forces Minister Florence Parly, held at Brienne House. The two issues to be resolved target "certain technologies" that the United States only shares with its closest allies, including France, and whether that technology can be further transferred, and how France can protect that technology, he said.

### 18. China May Face More U.S. Export Restrictions over Muslim Crackdown

Reuters.com, Oct. 2 - The Trump administration is reviewing ways to clamp down on the export of U.S. technology that China's government could use in its surveillance and internment of minority Muslims, amid reports of mass detentions of ethnic Uighurs and others in the Xinjiang region. In a letter to the leaders of a congressional committee, seen by Reuters on Tuesday, Commerce Secretary Wilbur Ross said his department, in consultation with the State Department and other agencies, could announce export policy changes within weeks. "We are conducting this review expeditiously and expect to publish amendments to the EAR (Export Administration Regulations) later this fall," Ross said in the letter to Senator Marco Rubio and Representative Chris Smith. Ross said the review included assessing whether to add Chinese individuals, businesses and others to a list of entities subject to special license requirements, revising licensing policy and updating technologies controlled for the protection of human rights. Any sanctions decision would be a rare move on human rights grounds by President Donald Trump's administration against China, with which it is engaged in a trade war while also seeking Beijing's help to resolve a standoff over North Korea's nuclear weapons.

### 19. U.S. Military Comes to Grips with Over-Reliance on Chinese Imports

Reuters.com, Oct. 2 - A Pentagon-led review ordered by President Donald Trump has identified hundreds of instances where the U.S. military depends on foreign countries, especially China, for critical materials, U.S. officials said. The study is expected to be released in the coming weeks and aims to lessen the U.S. military's reliance on foreign countries and strengthen U.S. industry. Among the study's conclusions will be a determination the United States is too dependent on foreign suppliers for a range of items including some micro-electronics, tiny components such as integrated circuits and transistors, the officials told Reuters on condition of anonymity. These kinds of essential components are embedded in advanced electronics used in everything from satellites and cruise missiles to drones and cellphones. The focus on China reflects an effort under Trump to address the risks to U.S. national security from Beijing's growing military and economic

clout. Pentagon officials want to be sure China is not able to hobble America's military by cutting off supplies of materials or by sabotaging technology it exports.

## 20. World Court Orders U.S. to Ensure Iran Sanctions Don't Hit Humanitarian Aid

Reuters.com, Oct. 3 - The World Court ordered the United States on Wednesday to ensure that sanctions against Iran, due to be tightened next month, do not affect humanitarian aid or civil aviation safety. Judges at the International Court Of Justice handed a victory to Tehran, which had argued that sanctions imposed since May by the administration of U.S. President Donald Trump violate the terms of a 1955 Treaty of Amity between the two countries. The ruling is likely to have at most limited practical impact on the implementation of sanctions, which Washington is reimposing and tightening after pulling out of the 2015 nuclear deal that Iran signed with world powers. The court order issued on Wednesday is temporary pending a resolution of Iran's full lawsuit against Washington by the ICJ, something that could take years.

## 21. India Risks U.S. Sanctions with $5-Billion Purchase of Russian Missiles

Reuters.com, Oct. 3 - India's military wants the missile batteries, both as a deterrent against China and to gain an edge over traditional rival, Pakistan, as they are able to track and shoot down combat aircraft, even stealth planes, at unprecedented ranges. India and Russia will sign the missile deal, estimated at more than $5 billion, during Putin's visit for annual summit talks with Indian Prime Minister Narendra Modi beginning on Thursday, a Kremlin aide said. But the United States has warned countries trading with Russia's defense and intelligence sectors they would face automatic sanctions under a sweeping legislation called Countering America's Adversaries Through Sanctions Act (CAATSA) that President Donald Trump signed into law last August. The law is designed to punish Putin for the 2014 annexation of Crimea from Ukraine, involvement in the Syrian civil war and meddling in the 2016 U.S. presidential election.

## 22. Trump Says USMCA Trade Deal with Mexico and Canada Proves Tough Talk and Tariffs Work

Washington Post.com, Oct. 1 - President Trump said Monday that his successful use of economic threats and other hardball tactics to pressure Canada and Mexico into major trade concessions would serve as a model for future negotiations, putting other world leaders on notice. In a news conference, Trump said he would try a similar approach with the European Union, China, Japan and potentially Brazil and India, convinced that foreign leaders take the United States seriously only if the White House threatens to upend economic ties. "We're totally prepared to do that if they don't negotiate," Trump said, raising the prospect of new penalties if countries don't remove trade restrictions or allow more U.S. investment. Trying to head off these threats, the E.U. and Japan have begun discussions on how to address Trump's concerns, and the president said similar conversations are underway with India. Trump said it was this pressure — particularly the threat to use tariffs as a negotiating weapon — that forced Canadian Prime Minister Justin Trudeau to agree to changes Sunday night to the North American Free Trade Agreement.

## 23. Can Trump's Bullying Style Deliver More Trade Breakthroughs?

New York Times.com & Associate Press, Oct. 2 - The Trump administration has muscled Canada into joining a revamped North American trade deal, sealed a pact with South Korea and coaxed a reluctant Japan into agreeing to one-on-one trade talks. All in the past two weeks. To President Donald Trump and his allies, the results vindicate his drive to upend traditional trade policy and deploy import taxes — real and threatened — as a cudgel to bully concessions out of America's trading partners. "Without tariffs," Trump bold declared Monday after his team announced that Canada had followed Mexico in agreeing to a revamped North American deal, "we wouldn't be standing here." Some likeminded business groups agree that Trump's in-your-face style, a far more confrontational stance than his predecessors deployed, deserves credit. "Aggressive unilateral action is making deals more possible," said Michael Stumo, CEO of the Coalition for a Prosperous America, which supports a combative U.S. trade policy. . . . Critics, though, contend that Trump's apparent breakthroughs appear much more impressive than they actually are. What's more, they say, the backlash the administration could face in the future from formerly friendly trade partners could diminish whatever gains have been achieved.

## 24. Trump's USMCA Delivers Big Wins to Drugmakers, Oil Companies and Tech Firms

Washington Post.com, Oct. 2 - A handful of major industries scored big wins in President Trump's North American trade agreement — at times at the expense of ordinary consumers in the United States, Canada and Mexico. The winners include oil companies, technology firms and retailers, but chief among them are pharmaceutical companies, which gained guarantees against competition from cheaper generic drugs. The gains underscore the benefits U.S. industry will be seeking, and the pressure it will exert, as the Trump administration continues rewriting trade deals with other countries and regions. [USMCA: Who are the winners and losers of the 'new NAFTA?] Lobbyists for several industries said they hoped the U.S.-Mexico-Canada Agreement, or USMCA, would serve as a yardstick for future U.S. trade deals, including any involving China.

## 25. Analysts Say Trump May Be Overly Optimistic on New North American Trade Deal

Washington Post.com, Oct. 1 - President Trump casts his new North American trade agreement as "the biggest trade deal in the United States' history" — one that would return lost manufacturing jobs to American shores, discourage future outsourcing of factory work, and "send cash and jobs pouring into the United States." But many economists and trade experts say the president's forecast may prove overly optimistic, given the limited changes that are envisioned and the powerful economic forces that already have reshaped regional commerce. While some industries and regions would fare better than others, the sheer size of the $20 trillion U.S. economy will probably swamp those specific effects. The accord, which the president has christened the U.S.-Mexico-Canada Agreement, would require automobiles to include more North American parts to qualify for duty-free treatment, pry open a sliver of Canada's dairy market and update trading rules for the Internet economy.

## 26. New Nafta Shows Limits of 'America First'

Wall Street Journal.com, Oct. 3 - To free traders, the new Nafta is a bitter pill to swallow. It introduces managed trade to autos, waters down the foreign rights of corporations and normalizes national security as a pretext for tariffs. Many of its improvements, such as on intellectual property and labor rights, were already in the 12-nation Trans-Pacific Partnership, from which President Donald Trump has withdrawn. But the verdict is different when judged by a different standard—how the world's trading system survives the most protectionist U.S. administration in memory. The new deal shows the limits to Mr. Trump's "America First" agenda and an underlying resilience to the existing order. The reason: The resistance Mr. Trump encountered from Congress, business, his own advisers and U.S. trading partners circumscribed his leverage and may again in the future. At the outset, the U.S. held all the cards: Mexico and Canada depended far more on exports to the U.S. than vice versa. Mr. Trump shared none of his predecessors' affection for trade agreements, either on their own merits or as tools of foreign policy. His threats to abandon the North American Free Trade Agreement, the U.S.-Korea Free Trade Agreement and even the World Trade Organization weren't hollow.

## 27. U.S. Protectionist Stance Spooks Germany's Economy

Wall Street Journal.com, Oct. 1 - President Donald Trump's trade threats aren't only hurting feelings in Germany. They are beginning to weigh on the country's economy. The European Union's largest economy, whose export-oriented vigor has kept the continent afloat for more than a decade, is cooling more rapidly than expected in what economists see as the early fallout from protectionist moves by the U.S. The slowdown comes just as Europe has been gradually emerging from the economic hangover caused by the continent's debt crisis in 2010. After years of robust growth fueled by foreign demand for premium cars and engineering goods, Germany saw its annualized growth rate roughly fall by half in the first quarter of 2018. Exports have fallen in three of the first four months of the year, manufacturing orders are down and sentiment indicators are in free fall. The weakness can't be blamed on the U.S. president's "America First" policies alone. A cold winter and a bad flu epidemic appear to have slackened growth earlier this year. But the bad news has been so persistent since then that economists are now looking for other explanations.

## 28. Tariffs That Send a Political Message

New York Times.com, Oct. 3 - President Trump may have been overstating things when he argued from a United Nations podium last week that the Chinese were going after American farm products to hurt his political base because "they do not want me or us to win." But China clearly would like to send a signal to rural American voters. Mapping the counties that voted for Mr. Trump in 2016 and those affected by China's tariffs shows the extent to which Trump voters' jobs rely on the products being targeted. Beijing hopes it can convince those voters — and their elected representatives — that the president's trade war could hurt them. Over the summer, the Chinese took aim at Mitch McConnell, the Senate majority leader. In his home state, Kentucky, 18,000 jobs depend on whiskey. So they put a 25 percent tariff on it. Representative Paul D. Ryan, the House speaker, is from Wisconsin, a leading producer of cranberries. So cranberries were added to the list, for good measure. And China went after pork and soybeans, two of the leading farm products in Iowa, home of Charles E. Grassley, a powerful member of the Senate Agriculture Committee.

## 29. Army Working to Fill Air-and-Missile Defense Gaps

National Defense Magazine.org, Oct. 2 - After nearly two decades of fighting insurgents on the ground, the Army is turning its attention to threats from the air and beefing up its ability to fend off attacks. The United States military has enjoyed air supremacy for many decades. Not a single American soldier has been killed by enemy aircraft since the Korean War, Vice Chief of Staff Gen. James McConville noted recently. "We've been pretty uncontested except on the land ... but as we go into the future we're not sure that that's the way it's going to be," he said at the National Defense Industrial Association's Army Science and Technology Conference. "We believe we'll be contested [from] the air ... and so we have to develop the force and modernize the force so it can win on that battlefield." Brig. Gen. Randy McIntire, the head of the cross-functional team charged with spearheading the service's efforts to modernize its air-and-missile defense systems, said the Army will have to rebuild its capabilities after many years of neglect and underfunding.

## 30. SB>1 Defiant Will Be Worth the Wait: Sikorsky & Boeing

Breaking Defense.com, Oct. 2 - Sikorsky and Boeing are painfully aware they're a year behind archrival Bell in getting their Future Vertical Lift aircraft off the ground. But, the companies insist that when their SB>1 Defiant does take flight, hopefully this December, the Army will see a revolutionary aircraft, fast and agile, that will be well worth the wait. "We truly are inventing something here," said Boeing's FVL director, Randy Rotte. "The Army wanted... a technological leap, (but) with that great reward there will be challenges, some of which we've met and overcome, and some of which are probably still ahead of us." So, if ongoing ground testing reveals unexpected problems, I asked, could the first flight slip again, into 2019? Yes, Rotte said bluntly. "(In) the scenario you've laid out, which absolutely could happen, (where) we have to do additional work…. and that pushes us out beyond 2018, then we'll be disappointed, but so be it."

## 31. Big Challenges Face Army in Quest to Revamp Network

National Defense Magazine.org, Oct. 3 - Of the Army's top six modernization priorities, "the network" ranks number four, but it is perhaps number one in terms of its complexities and challenges, senior service leaders have said. Seth Spoenlein, deputy director of the space and terrestrial communications directorate at the Communications-Electronics Research, Development and Engineering Center, said the Army sometimes has a hard time explaining to industry what it needs because its network and the problems it faces are so complex. It touches on every other of the six priorities: long-range fires, combat vehicles, vertical lift, air-and-missile defense and soldier lethality. None of these can function on the battlefield without communication links, he said at the National Defense Industrial Association's Army Science and Technology Conference. "If you want that gun to go farther, first I have to find and fix the target. I need sensors to do that. I need to send that information back. I need to process that through mission command. I need to make a decision. Hit that button and let it launch and track it to make any inflight adjustments," he said.

## 32. Pentagon Searching for New Ways to Move Gear During Next War

Breaking Defense.com, Oct. 2 - The Pentagon is growing increasingly concerned that rival powers could block the resupply and reinforcement of its troops in upcoming conflicts by using new generations of missiles and advances in air and sea power, or cyber hacks that shut down unsecured networks. The past two decades of war in the Middle East and

Afghanistan have seen military leaders simply turn on the spigot to pump mountains of supplies into combat zones. With no air or sea threats to slow them down, the gear has been delivered when and where needed by an army of civilian contractors. But those days are over, Pentagon leaders say, as Chinese and Russian cyber attacks, advanced aircraft and long-range missiles can effectively shut the door on resupply, or at least make US forces pay a heavy price for attempting to move material. In December 2016, the head of Pentagon acquisition Frank Kendall signed a memo creating a "Survivable Logistics" task force led by the Defense Science Board with the marching orders to take a hard look at the problem. The work, being led by business leaders and several retired 3 and 4 star generals, should wrap up in the coming months, and has become something the Trump White House has taken an interest in, according to one source.

## 33. Australia Releases RFI for at Least 16 Special Operations Helicopters

DefenseNews.com, Oct. 2 - Australia's Defence Capability Acquisition and Sustainment Group issued a request for information for at least 16 special operations support helicopters. The helicopters will be acquired under Project Land 2097 Phase 4, which has not been formally approved by the Australian government but has been identified as a priority for future defense spending in the 2016 Defence White Paper. The proposed timeline calls for a request for tender in the fourth quarter of 2019, with the major delivery of equipment to follow in 2022. "The project is currently in the exploratory phase, collecting information and proposals to inform concepts for capability realisation," according to the RFI's cover letter, authored by CASG's acting first assistant secretary of the helicopter division, Brigadier Jeremy King, and the head of land capability at Army Headquarters, Maj. Gen. Kath Toohey.

## 34. Britain Confirms Talks with Boeing over Potential $2.6B Wedgetail Aircraft Buy

DefenseNews.com, Oct. 2 - Britain's defense secretary has revealed the government held discussions with Boeing over the purchase of a fleet of Wedgetail E-7 airborne warning and control aircraft. Discussions are also taking place with Australia about cooperating in the use of the aircraft, Gavin Williamson said. Williamson said the Ministry of Defence had undertaken market analysis and discussions with other potential providers, concluding "that the potential procurement of the E-7 represents the best value for money option for the U.K. against need, whilst representing a significant opportunity for increased defense cooperation and collaboration with our key ally Australia." "The Wedgetail is the stand-out performer in our pursuit of a new battlespace surveillance aircraft, and has already proved itself in Iraq and Syria," Williamson said. The MoD said in a statement that further discussions are set to take place prior to an investment decision. "If selected, U.K. industry could be involved significantly with the program, from modification work to through life support," the MoD said.

## Upcoming Export Control and Other Trade Compliance Conferences

**Oct. 4 - Massachusetts Export Center - Tariff Wars: Strategies for Managing Change and a Volatile Global Trade Environment - Webinar - 9:00 AM to 10:30 AM EDT**

**Oct. 10 - OCR Services- Accessing Export Reports in the Automated Commercial Environment Portal - FREE ONLINE WEBINAR - 2:00 - 3:00 PM EDT**

**Oct. 12 - Massachusetts Export Center - The New Export Control Reform Act and Foreign Investment Risk Review Modernization Act: Implications for Trade and Investment - Webinar - 11:30 AM to 1:00 PM EDT**

**Oct. 16-18 - Partnerships International, inc. - "Partnering for Compliance™" West 2018 - Fort Worth - Dallas-Fort Worth Marriott South Airport Hotel**

**Oct. 17 - U.S. Dept. of Commerce/U.S. Census Bureau & North Texas Customs Brokers and Freight Forwarders Association - ACE Export Compliance Seminar - Dallas - Las Colinas Country Club**

**Oct. 18 - Massachusetts Export Center - Developing Your Export Compliance Program - Webinar - 11:00 AM to 1:00 PM EDT**

**Oct. 18-21 - The Pacific Coast Council of Customs Brokers and Freight Forwarders Assns. Inc. (PCC) - 2018 WESCON - Riviera Palm Springs**

**Oct. 21-23 - International Compliance Professionals Association (ICPA) - 2018 ICPA Fall Conference - Grapevine, TX - Embassy Suites DFW Airport North**

**Oct. 22-23 - Society for International Affairs - 2018 Fall Advanced Conference - Arlington, Virginia - Crystal Gateway Marriott Hotel**

**Oct. 23-24 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Louisiana District Export Council - Complying with U.S. Export Controls - New Orleans - Bourbon Orleans Hotel**

**Oct. 24 - Society for International Affairs - SIA 2018 Information Technology & Export Controls Seminar - Arlington, VA - Crystal Gateway Marriott Hotel**

**Oct. 25 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The Louisiana District Export Council - How to Develop an Export Compliance Program - New Orleans - Bourbon Orleans Hotel**

**Oct. 30 - American Conference Institute - 4th Asia Pacific Economic Sanctions Compliance and Enforcement - Singapore - Marriott Singapore Tang Plaza Hotel**

**Oct. 31 - Nov. 1 - American Conference Institute - 7th Asia Pacific Summit on Anti-Corruption Compliance and Risk Management - Singapore - Marriott Singapore Tang Plaza Hotel**

**Nov. 1 - Massachusetts Export Center - Best Practices for Export Control Classification and Licensing - 9:30 AM 12:00 PM EDT - North Reading, Massachusetts - Teradyne, Inc., 600 Riverpark Drive**

**Nov. 2 - Massachusetts Export Center - Establishing, Managing and Motivating International Distribution Channels - 8:30 AM to 12 noon p.m. EDT - Mansfield, Massachusetts - HarboOne U, Mansfield Campus, 131 Copeland Drive**

**Nov. 6-7 - NielsonSmith - Customs Compliance in Europe 2018 - Dusseldorf, Germany - Steingenberger Parkhotel**

**Nov. 7 - Massachusetts Export Center - Tariff Management: Rethinking Your Supply Chain for Today's International Trade Climate - 8:30 AM 12:00 PM EST - Westborough, Massachusetts - Massachusetts Technology Collaborative, Karl Weiss Center, 75 North Drive**

**Nov. 8-9 - International Compliance Professionals Association (ICPA) - 2018 Annual China Conference - Shanghai - Four Seasons Hotel**

**Nov. 9 - The Law Society of England and Wales and The Association of Professional Responsibility Lawyers - Crisscrossing the Pond: Transatlantic Issues in Legal Ethics and Law Firm Regulation - Washington, DC - Kimpton Hotel Monaco**

**Nov. 14-15 - U.S. Dept. of Commerce/Bureau of Industry and Security (BIS) & The New Jersey District Export Council - Complying with U.S. Export Controls - Newark**

**Nov. 20-21 - NielsonSmith - The European Anti-Corruption & Ethics Summit 2018 - Munich, Germany - Hotel Königshof**

**Nov. 27-30 - American Conference Institute - 35th International Conference on the Foreign Corrupt Practices Act - Washington, DC - Gaylord Natonal Resort & Convention Center**

**Dec. 7 - Society for International Affairs - 2018 Holiday Party - Washington, DC - Nationals Park, 1500 South Capitol St., S.E.**

**Dec. 7 - Massachusetts Export Center - Export Expo - 9:30 AM to 4:00 PM EST - Boston, Massachusetts - State Transportation Building, 2nd Floor Conference Center, 10 Park Plaza**

**Dec. 10-12 - U.S. Dept. of Commerce & Utah District Export Council - Discover Global Markets: Indo-Pacific, Opportunities at the Convergence of Aerospace + Defense + Security - Salt Lake City, UT**

**Jan. 30-31 - NielsonSmith - Export Compliance in Europe 2019 - Munich, Germany - Le Meridien Hotel**

**March 4-6 - Society for International Affairs - 2019 Winter Back to Basics Conference - Savannah, Georgia - Savannah Marriott Riverfront Hotel**

**March 24-27 - International Compliance Professionals Association (ICPA) - 2019 ICPA Annual Conference - Orlando, Florida - Disney Coronado Springs Resort**

**May 6-7 - Society for International Affairs - 2019 Spring Conference - Atlanta, Georgia - Sheraton Atlanta Hotel**

**July 8-10 - Society for International Affairs - 2019 Summer Back to Basics Conference - Washington, DC - Gaylord National Resort and Convention Center**

We hope this update proves helpful. If you have questions about any of these developments, please do not hesitate to call us. If you received this free newsletter from a colleague or friend and would like to subscribe directly, please just e-mail your name, title, company, and e-mail address to ███████@glstrade.com.

Cordially yours,

Gary L. Stanley
President
Global Legal Services, PC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.20015
Tel. ███████
Fax ███████
Mobile ███████
E-mail ███████@glstrade.com



Office of Information and Regulatory Affairs (OIRA)
Executive Order Submissions with Review Completed in Last 30 Days
December 14, 2018

Department of Commerce

**AGENCY:** DOC-BIS                  **RIN:** 0694-AF47                  **Status:** Concluded

**TITLE:** Revisions to the Export Administration Regulations: Control of Firearms and Related Articles the President Determines No Longer Warrant Control Under the United States Munitions List

**STAGE:** Final Rule                  **ECONOMICALLY SIGNIFICANT:** No

**RECEIVED DATE:** 11/07/2018          **LEGAL DEADLINE:** None

**\*\* COMPLETED:** 12/13/2018         **COMPLETED ACTION:** Consistent with Change

**Note:** "\*\*" denotes recent change in status.

DOC_0037375

**From**: Jim Bartlett, Full Circle Compliance [jebartlett@fullcirclecompliance.eu]
**Sent**: 2/11/2019 10:58:15 PM
**To**: Abraham, Liz (Federal) [LAbraham@doc.gov]
**Subject**: 19-0211 Monday "Daily Bugle"



## Monday, 11 February 2019

The Daily Bugle is a free daily newsletter from Full Circle Compliance, containing changes to export/import regulations (ATF, DOE/NRC, Customs, NISPOM, EAR, FACR/OFAC, FAR/DFARS, FTR/AES, HTSUS, and ITAR), plus news and events.  Subscribe here for free subscription.  Contact us for advertising inquiries and rates.

### ITEMS FROM FEDERAL REGISTER

1.	Commerce Seeks Comments Concerning Procedures Related to Section 232 National Security Adjustments of Imports of Steel and Aluminum
2.	DHS/CBP Announces COAC Meeting on 27 Feb in Washington DC
3.	Treasury Lists Countries Requiring Cooperation with an International Boycott

### OTHER GOVERNMENT SOURCES

4.	Items Scheduled for Publication in Future Federal Register Editions
5.	Commerce/BIS: (No new postings.)
6.	DHS/CBP Releases Notice Concerning Filing PRE-TFTEA (CORE) and TFTEA Drawback Claims with Section 301 and/or 201 Duties
7.	DHS/CBP Releases Notice Concerning Submitting Imports of Products Excluded from Section 301 Duties
8.	State/DDTC: (No new postings.)
9.	Treasury/OFAC Issues Venezuela-related General Licenses, Amends FAQs
10.	Singapore Customs Updates of Interest

### NEWS

11.	Defense News: "French Air Force Chief: France And Germany Working on Export Controls for Future Fighter"
12.	NBC News: "New Trump Rules Make it Easier for U.S. Gun Makers to Sell Overseas"

13.    Radio Free Europe: "German Tech Firm's Turkmen Ties Trigger Surveillance Concerns"

14.    ST&R Trade Report: "Export, FTZ, Other Violations See Increased Civil Penalty Amounts"

15.    The Washington Times: "3D-Printed Gun Blueprint Website Owner Sues New Jersey Attorney General in Free Speech Challenge"

## COMMENTARY

16.    B. Adkins, U. Johnston & S. Giles: "UK Publishes No Deal Export License for Dual-Use Products"

17.    J.E. Smith, J.P. Carlin & N.J. Spiliotes: "OFAC Has Been Talking About Compliance Through Enforcement" (Part I of II)

## EX/IM MOVERS & SHAKERS

18.    Monday List of Ex/Im Job Openings: 161 Openings Posted This Week, Including 22 New Openings

## EX/IM TRAINING EVENTS & CONFERENCES

19.    ECS Presents "Managing ITAR/EAR Complexities" on 26-27 Mar in Scottsdale, AZ

20.    Madison Int'l Trade Assn Meeting Tomorrow in Madison, WI, is Canceled

21.    FCC Presents U.S. Export Controls Awareness Course: "ITAR & EAR from a non-U.S. Perspective", 9 April in Bruchem, the Netherlands

## EDITOR'S NOTES

21.    Bartlett's Unfamiliar Quotations

22.    Are Your Copies of Regulations Up to Date? Latest Amendments: DHS/Customs (14 Jan 2019), DOC/EAR (20 Dec 2018), DOC/FTR (24 Apr 2018), DOD/NISPOM (18 May 2016), DOE/AFAEC (23 Feb 2015), DOE/EINEM (20 Nov 2018), DOJ/ATF (26 Dec 2018), DOS/ITAR (4 Oct 2018), DOT/FACR/OFAC (15 Nov 2018), HTSUS (1 Jan 2019)

23.    Weekly Highlights of the Daily Bugle Top Stories



From the publisher of WorldECR and The Export Compliance Manager's Handbook

# THE CFIUS BOOK

A new guide on how to navigate an investment or acquisition in sensitive industries or companies in the US, past the bureaucratic obstacles and hidden pitfalls to a successful conclusion. To find out more, CLICK HERE or go to www.worldecr.com/books

# 1. Commerce Seeks Comments Concerning Procedures Related to Section 232 National Security Adjustments of Imports of Steel and Aluminum

(Source: Federal Register, 11 Feb 2019.) [Excerpts.]

84 FR 3142-3143: Submission for OMB Review; Comment Request

The Department of Commerce will submit to the Office of Management and Budget (OMB) for clearance the following proposal for collection of information under the provisions of the Paperwork Reduction Act.

 - Agency: Bureau of Industry and Security.
 - Title: Procedures for Submitting Rebuttals and Surrebuttals Requests for Exclusions from and Objections to the Section 232 National Security Adjustments of Imports of Steel and Aluminum.
 - Form Number(s): 0694-0141.
 - OMB Control Number: 0694-0141.
 - Type of Review: Regular submission. ...
 - Needs and Uses: On September 11, 2018, Bureau of Industry and Security (BIS) published a second interim final rule, Revisions to the Requirements for Submissions Requesting Exclusions from the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel into the United States and Adjusting Imports of Aluminum into the United States; and the filing of Objections to Submitted Exclusion Requests for Steel and Aluminum. This second interim final rule that was published by BIS, on behalf of the Secretary, made changes to the two supplements added in the March 19 rule: Supplement No. 1 to Part 705 -- Requirements for Submissions Requesting Exclusions from the Remedies Instituted in Presidential Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Articles into the United States; and to Supplement No. 2 to Part 705 -- Requirements for Submissions Requesting Exclusions from the Remedies Instituted in Presidential Proclamation 9704 of March 8, 2018 to Adjusting Imports of Aluminum into the United States.

This collection of information gives U.S. Companies the opportunity to submit rebuttals to objections received on posted exclusion requests and also allows U.S. companies the opportunity to submit surrebuttals for objections they submitted that receive rebuttals under the Section 232 exclusion process. ...
This information collection request may be viewed at reginfo.gov, http://www.reginfo.gov/public/. Follow the instructions to view Department of Commerce collections currently under review by OMB.
Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to OIRA_Submission@omb.eop.gov.

Sheleen Dumas, Departmental Lead PRA Officer, Office of the Chief Information Officer, Commerce Department.

back to top

* * * * * * * * * * * * * * * * * * *

## 2. DHS/CBP Announces COAC Meeting on 27 Feb in Washington DC

(Source: Federal Register, 11 Feb 2019.) [Excerpts.]

84 FR 3217-3218: Commercial Customs Operations Advisory Committee

* AGENCY: U.S. Customs and Border Protection (CBP), Department of Homeland Security (DHS).
* ACTION: Committee Management; Notice of Federal Advisory Committee Meeting.
* SUMMARY: The Commercial Customs Operations Advisory Committee (COAC) will hold its quarterly meeting on Wednesday, February 27, 2019, in Washington, DC. The meeting will be open to the public.
* DATES: The COAC will meet on Wednesday, February 27, 2019, from 1:00 p.m. to 5:00 p.m. EST. Please note that the meeting may close early if the committee has completed its business.
* ADDRESSES: The meeting will be held at the Ronald Reagan Building and International Trade Center, 1300 Pennsylvania Avenue NW, Horizon Ballroom, Washington, DC 20004. For information on facilities or services for individuals with disabilities or to request special assistance at the meeting, contact Ms. Florence Constant-Gibson, Office of Trade Relations, U.S. Customs & Border Protection, at (202) 344-1440 as soon as possible.
  - Pre-Registration: Meeting participants may attend either in person or via webinar after pre-registering using one of the methods indicated below:
  For members of the public who plan to attend the meeting in person, please register by 5:00 p.m. EST February 26, 2019, either online here by email to tradeevents@dhs.gov; or by fax to (202) 325-4290. You must register prior to the meeting in order to attend the meeting in person.
  For members of the public who plan to participate via webinar, please register online here by 5:00 p.m. EST on February 26, 2019.
  Please feel free to share this information with other interested members of your organization or association.
  Members of the public who are pre-registered to attend via webinar and later need to cancel, please do so by February 26, 2019, utilizing the following links: here to cancel an in person registration; or here to cancel a webinar registration.
  To facilitate public participation, we are inviting public comment on the issues the committee will consider prior to the formulation of recommendations as listed in the Agenda section below.
  Comments must be submitted in writing no later than February 26, 2019, and must be identified by Docket No. USCBP-2019-0005, and may be submitted by one (1) of the following methods:
  - Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments.

- Email: tradeevents@dhs.gov. Include the docket number in the subject line of the message.
 - Fax: (202) 325-4290, Attention Florence Constant-Gibson.
 - Mail: Ms. Florence Constant-Gibson, Office of Trade Relations, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW, Room 3.5A, Washington, DC 20229.
 - Instructions: All submissions received must include the words "Department of Homeland Security" and the docket number (USCBP-2019-0005) for this action. Comments received will be posted without alteration at http://www.regulations.gov. Please do not submit personal information to this docket.
 - Docket: For access to the docket or to read background documents or comments, go to http://www.regulations.gov and search for Docket Number USCBP-2019-0005. To submit a comment, click the "Comment Now!" button located on the top-right hand side of the docket page.
 - There will be multiple public comment periods held during the meeting on February 27, 2019. Speakers are requested to limit their comments to two (2) minutes or less to facilitate greater participation. Contact the individual listed below to register as a speaker. Please note that the public comment period for speakers may end before the time indicated on the schedule that is posted on the CBP web CBP web page.
* FOR FURTHER INFORMATION CONTACT: Ms. Florence Constant-Gibson, Office of Trade Relations, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW, Room 3.5A, Washington, DC 20229; telephone (202) 344-1440; facsimile (202) 325-4290; or Mr. Bradley Hayes, Executive Director and Designated Federal Officer at (202) 344-1440.
* SUPPLEMENTARY INFORMATION: ... The Commercial Customs Operations Advisory Committee (COAC) provides advice to the Secretary of Homeland Security, the Secretary of the Treasury, and the Commissioner of U.S. Customs and Border Protection (CBP) on matters pertaining to the commercial operations of CBP and related functions within the Department of Homeland Security and the Department of the Treasury.

*Agenda*

The COAC will hear from the current subcommittees on the topics listed below and then will review, deliberate, provide observations, and formulate recommendations on how to proceed:
 1. The Secure Trade Lanes Subcommittee will present plans for the scope and activities of the Trusted Trader and CTPAT Minimum Security Criteria Working Groups. Recommendations will be presented regarding the proposed Forced Labor Trusted Trader Strategy. The subcommittee will also deliver recommendations from the Petroleum Pipeline Working Group for CBP to develop and codify uniform reporting procedures for pipeline carriers as well as entry and bonding procedures for importers. The subcommittee will also deliver recommendations from the In-Bond Working Group regarding potential automation and process enhancements.
 2. The Intelligent Enforcement Subcommittee will provide necessary updates from the Anti-Dumping and Countervailing Duty, Bond, and Forced Labor Working Groups and recommendations from Intellectual Property Rights Working Group.

3. The Next Generation Facilitation Subcommittee will discuss the E-Commerce Working Group's progress on mapping the supply chains of various modes of transportation to identify the differences between e-commerce and traditional channels to address CBP's strategic plan regarding e-commerce threats and opportunities for both the government and trade. The subcommittee will also provide an update on the status of the Emerging Technologies Working Group's NAFTA/CAFTA and Intellectual Property Rights Blockchain Proof of Concept Projects. Finally, the subcommittee will provide recommendations from the Regulatory Reform Working Group upon completing its review of Title 19 of the Code of Federal Regulations to identify regulations for potential repeal or modification to eliminate or reduce costs and burdens for U.S. businesses.

Meeting materials will be available by February 25, 2019 here.

Dated: February 6, 2019.
Bradley F. Hayes, Executive Director, Office of Trade Relations.

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


# 3. Treasury Lists Countries Requiring Cooperation with an International Boycott
(Source: Federal Register, 6 Feb 2019.)

84 FR 2337: List of Countries Requiring Cooperation with an International Boycott

In accordance with section 999(a)(3) of the Internal Revenue Code of 1986, the Department of the Treasury is publishing a current list of countries which require or may require participation in, or cooperation with, an international boycott (within the meaning of section 999(b)(3) of the Internal Revenue Code of 1986).

On the basis of the best information currently available to the Department of the Treasury, the following countries require or may require participation in, or cooperation with, an international boycott (within the meaning of section 999(b)(3) of the Internal Revenue Code of 1986).

- Iraq
- Kuwait
- Lebanon
- Libya
- Qatar
- Saudi Arabia
- Syria
- United Arab Emirates Yemen

Dated: December 31, 2018.
Douglas Poms, International Tax Counsel, (Tax Policy).

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 4. Items Scheduled for Publication in Future Federal Register Editions
(Source: Federal Register)

* DHS/CBP; NOTICES; Meetings: 21st Century Customs Framework; Change of Location [Pub. Date: 12 Feb 2019.]

* Justice/ATF; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals: Voluntary Magazine Questionnaire for Agencies/Entities Who Store Explosive Materials [Pub. Date: 12 Feb 2019.]

* State; NOTICES; Agency Information Collection Activities; Proposals, Submissions, and Approvals:
  - Annual Brokering Report;
  - Brokering Prior Approval; and
  - United States Munitions List, Categories I, II and III [Pub. Dates: 12 Feb 2019.]

back to top

* * * * * * * * * * * * * * * * * * *

## 5. Commerce/BIS: (No new postings.)
(Source: Commerce/BIS)

back to top

* * * * * * * * * * * * * * * * * * *

## 6.
## DHS/CBP Releases Notice Concerning Filing PRE-TFTEA (CORE) and TFTEA Drawback Claims with Section 301 and/or 201 Duties
(Source: CSMS# 19-000050, 8 Feb 2019.)

* GUIDANCE: Effective immediately, drawback filers can submit claims related to Section 301 and/or 201 duties. Filers will no longer receive error messages related to unit of measure (UOM) when transmitting drawback claims for Section 301 and/or 201 duties. Previously, filers received a UOM mismatch error because the underlying import did not have a UOM associated to a Chapter 99 HTSUS. If the filer left the UOM blank, they received an additional error message because the UOM is a mandatory data element field.
* FILING REQUIREMENTS: Filers are required to provide the Chapter 99

HTSUS tariff number related to Section 301 and/or 201 duties, and the associated Chapter 1 to 97 HTSUS tariff number on ALL claims.

If any drawback claim subject to Section 301 and/or 201 duties was previously filed and accepted in ACE, the filers are required to "perfect" the claim. To "perfect" a claim, filers must contact their Drawback Specialist and request the claim be returned to trade control. The filers are then required to list both HTSUS tariff numbers (as described above) on their claims and resubmit to CBP within 5 business days.

* SUBSTITUTION AND NAFTA DRAWBACK CLAIM GUIDANCE: This guidance applies to both Section 301 and 201 duties. Goods subject to Section 232 are ineligible for refund of 232 duties, per Presidential Proclamation 9739 and 9740.

 - Pre-TFTEA Substitution Claims: 301/201 duties are refundable, in full, on pre-TFTEA substitution claims.

 - TFTEA Substitution Claims: 301/201 duties are refundable on TFTEA substitution claims, even if subject to the TFTEA lesser of [value] rule. If subject to the TFTEA lesser of [value] rule, the amount will be limited by the value of the substituted merchandise when it is lower than the value of the imported merchandise.

 - NAFTA Claims (pre and post TFTEA): 301/201 duties may be refundable on NAFTA claims subject to the lesser of [duty] rule, but only when the total amount of Canadian/Mexican duties paid is higher than the total amount of duties paid in the United States. The amount of 301/201 duties refunded under the NAFTA lesser of [duty] rule will be limited by the total amount of duties paid on the merchandise imported into Canada/Mexico.

* 19 U.S.C 1313(p) CLAIMS: Due to a pending technical fix, please do not file any 19 U.S.C. 1313(p) claims with the subject duties at this time. Future guidance will be sent once this issue has been resolved. If you have a 1313(p) claim on file with Section 301 and/or 201 duties, please do not request to "perfect" this claim until further guidance has been received.

* RESOURCES: The list of impacted tariff classifications for Section 301 are found at the following links: Section 301 Trade Remedies to be Assessed on Certain Products from China, Section 301 HTSUS Reference Guide, 83 FR 28710, 83 FR 40823, 83 FR 47974, 83 FR 65198.

For more information regarding Section 201 duties, please reference the following link: here

Contact your Client Representative for assistance with technical questions regarding the input of the required tariff numbers.

Direct questions regarding this update to OTDRAWBACK@cbp.dhs.gov.

back to top

* * * * * * * * * * * * * * * * * * *

# 7. DHS/CBP Releases Notice Concerning Submitting Imports of Products Excluded from Section 301 Duties
(Source: CSMS# 19-000052, 8 Feb 2019.)

* BACKGROUND: On December 28, 2018, the U.S. Trade Representative

published a Federal Register Notice (83 FR 67463) announcing the decision to grant certain exclusion requests from the 25 percent duty assessed under the Section 301 investigation related to goods from China (Tranche 1). The product exclusions announced in this notice will be retroactive as of the July 6, 2018 effective date (see 83 FR 28710). The exclusions will extend for one year after the December 28, 2018 Federal Register notice (83 FR 67463).

The exclusions are available for any product that meets the description in the Annex to 83 FR 67463, regardless of whether the importer filed an exclusion request. Further, the scope of each exclusion is governed by the scope of the 10-digit headings and product descriptions in the Annex to 83 FR 67463, and not by the product descriptions set out in any particular request for exclusion.

The functionality for the acceptance of products excluded from Section 301 duties will be available in the Automated Commercial Environment (ACE) on February 10, 2019.

* INSTRUCTIONS FOR FILING ENTRIES SUBJECT TO PRODUCT EXCLUSIONS: Instructions on submitting entries to CBP containing products granted exclusions by USTR from the Section 301 measures are as follows:

In addition to reporting the regular Chapters 84, 85 & 90 classification of the Harmonized Tariff Schedule of the United States (HTSUS) for the imported merchandise, importers shall report the HTSUS classification 9903.88.05 (Articles the product of China, as provided for in U.S. note 20(h) to this subchapter, each covered by an exclusion granted by the U.S. Trade Representative) for imported merchandise subject to the exclusion.

Do not submit the corresponding Chapter 99 HTS number for the Section 301 duties when HTS 9903.88.05 is submitted.

* ADDITIONAL INFORMATION: Duty exclusions granted by USTR are retroactive on imports to the initial effective date of July 6, 2018. To request an administrative refund for previous imports of duty-excluded products granted by USTR, importers may file a Post Summary Correction (PSC) following the same entry filing instructions above.

If the entry has already liquidated, importers may protest the liquidation.

Reminder: When submitting an entry summary in which a heading or subheading in Chapter 99 is claimed on imported merchandise, please refer to CSMS 18-000657 (Entry Summary Order of Reporting for Multiple HTS in ACE).

Imports which have been granted a product exclusion from the Section 301 measures, and which are not subject to the Section 301 duties, are not covered by the FTZ provisions of the Section 301 Federal Register notices, but instead are subject to the FTZ provisions in 19 CFR part 146.

For more information, please refer to the December 28, 2018 Federal Register notice (83 FR 67463).

Questions from the importing community concerning ACE entry rejections involving product exclusion numbers should be referred to their CBP Client Representative. Questions related to Section 301 entry filing requirements should be emailed to Traderemedy@cbp.dhs.gov.

- Related CSMS No. 18-000757, 18-000752, 18-000624

back to top

* * * * * * * * * * * * * * * * * * *

## 8. State/DDTC: (No new postings.)
(Source: State/DDTC)

back to top

* * * * * * * * * * * * * * * * * * *

## 9. Treasury/OFAC Issues Venezuela-related General Licenses, Amends FAQs
(Source: Treasury/OFAC, 11 Feb 2019.)

The Department of the Treasury's Office of Foreign Assets Control (OFAC) is issuing General License 3C, "Authorizing Transactions Related to, Provisions of Financing for, and Other Dealings in Certain Bonds," and General License 9B, "Authorizing Transactions Related to Dealings in Certain Securities." Additionally, OFAC is revising Frequently Asked Questions (FAQs) 650, 661, and 662.

back to top

* * * * * * * * * * * * * * * * * * *

## 10. Singapore Customs Updates of Interest
(Source: Singapore Customs, 8 Feb 2019.)

Singapore Customs has released the following document(s) on its website:

* Changes to the prohibition of imports, exports, transshipments and goods in transit to and from South Sudan and Eritrea (Circular No: 02/2019)

back to top

* * * * * * * * * * * * * * * * * * *

## NEWS

## 11. Defense News: "French Air Force Chief: France And Germany Working on Export Controls for Future Fighter"
(Source: Defense News, 9 Feb 2019.)

The French Air Force chief of staff provided top cover for the future Franco-German fighter at a time when the French defense industry is increasingly concerned that cooperation with Germany could curtail its ability to export the system.

  "There is a real determination" at the highest levels of government - including French President Emmanuel Macron and German Chancellor Angela Merkel - to agree on export controls, said Gen. Philippe Lavigne during a Feb. 7 roundtable with reporters.

"It's a need for our security, but it's also a need for our industry, and we have to develop this," he said, adding that Spain has already signed on as an observer to the program and that others are expected to follow.

The French government is generally seen as more supportive of arms sales than its partner in the sixth-generation fighter program, called the Future Combat Air System, or FCAS. While enthusiasm for the program remains high, some French defense industry officials are concerned that Germany's involvement could prevent sales to countries that Berlin considers rogue actors.

But settling an export policy is just one of the many questions about the FCAS program that are still yet to be answered.

So far, France and Germany's concept for FCAS involves a network of swarming UAVs, new weapons and a sixth-generation fighter that can exchange information with each other. FCAS would replace France's Rafale and Germany's Eurofighter around 2040.

"We haven't decided what will be the architecture," Lavigne said. "Will it be this type of aircraft? Will it be this type of [UAV]? Will it be this type of unmanned combat air vehicle? Will it be this type of missiles? But we know that we will share an architecture.

"The gamechanger is the connectivity between different platforms."

Earlier this week, the French and German governments awarded €65 million (U.S. $74 million) to Dassault and Airbus for the two-year study that will solidify a path forward for FCAS, and the companies plan to announce demonstrator programs at the Paris Air Show this summer.

Lavigne wasn't clear on how the governments would reconcile different requirements, like France's intention to launch FCAS from aircraft carriers, which could drive different design attributes than a fighter that takes off and lands conventionally.

"Of course we will have national interests in France with the nuclear deterrence. Germany will have different national interests," he said. However, he stopped short of saying how much commonality is expected between the two militaries.

Until the study is complete, it is "too early to say" whether FCAS will be manned or unmanned. However, Lavigne said a human will continue to be in the loop - especially for nuclear deterrence missions - whether a human is in the cockpit or it is remotely piloted.

"We are open to look at the technical solution," he said. "For me, it's optionally piloted."

FCAS' system-of-systems approach is similar to the U.S. Air Force's vision for Penetrating Counter Air, its future air superiority concept. The Air Force hasn't shared which defense companies are involved in conceptualizing or prototyping future technologies that could be pulled into a PCA program of record, but it requested $504 million in fiscal 2019 to push the effort forward, with investments projected to hit $3 billion in FY22.

back to top

* * * * * * * * * * * * * * * * * *

## 12. NBC News: "New Trump Rules Make it Easier for U.S. Gun Makers to Sell Overseas"
(Source: NBC News, 7 Feb 2019.) [Excerpts.]

Manufacturers will no longer need State Department licenses to export dozens of weapons.

Semi-automatic weapons, flamethrowers, and even some grenades will become easier for U.S. weapons manufacturers to export overseas under new rules being put in place by the Trump administration and obtained by NBC News.

Under the new rules, set to take effect in just under a month, gun-makers will no longer need licenses from the Department of State to sell dozens of types of weapons to other countries, including semi-automatic assault weapons such as the AR-15 that has been employed in many of America's worst mass shootings. Instead, sellers will need only a no-fee license from the Department of Commerce, which has a less onerous licensing process and a smaller global footprint, making it harder to track how the weapons are ultimately used overseas. ...

back to top

* * * * * * * * * * * * * * * * * *

## 13. Radio Free Europe: "German Tech Firm's Turkmen Ties Trigger Surveillance Concerns"
(Source: Radio Free Europe, 8 Feb 2019.) [Excerpts.]

One year ago this month, Turkmenistan's state news agency reported on a meeting between the country's authoritarian president and a visiting executive from a German electronics firm that supplies surveillance and encryption technology to governments and militaries.

Hartmut Jaeschke of the Munich-based Rohde & Schwarz, according to the report, told President Gurbanguly Berdymukhammedov during the talks that the company sought "to gain a stronger foothold" in Turkmenistan, whose government is consistently ranked among the world's most repressive.

Jaeschke's visit caught the eye of Human Rights Watch (HRW), which said it had been told by a knowledgeable source that Turkmen authorities were

DOC_0037546

seeking "technology for monitoring and blocking mobile and satellite communications, which would also enable the government to block Internet access." ...

The issue of spyware deliveries to authoritarian regimes has prompted proposed legislation in the European Parliament. The legislation aims to tighten export controls to prevent "the abuse of certain cyber-surveillance technologies by regimes with a questionable human rights record." ...

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 14. ST&R Trade Report: "Export, FTZ, Other Violations See Increased Civil Penalty Amounts"
(Source: Sandler, Travis & Rosenberg Trade Report, 11 Feb 2019.)

The Department of Commerce is increasing for inflation the civil monetary penalty amounts that may be assessed for the following regulatory violations after March 1, including when the associated violation occurred before that date. However, the DOC notes that the actual penalty assessed for a particular violation will be dependent on a variety of factors.

  * false or fraudulent claims under the Program Fraud Civil Remedies Act (31 USC 3802(a)(1) and (2)) - maximum increased from $ 11,181 to $11,463
  * knowing use of false record or statement material to an obligation to pay or transmit money or property to the federal government (31 USC 3729(a)(1)(G)) - minimum increased from $11,181 to $11,463, maximum increased from $22,363 to $22,927
  * Fastener Quality Act violations (15 USC 5408(b)(1)): maximum increased from $46,192 to $47,357
  * prohibited acts relating to inspections or record-keeping violations under the Chemical Weapons Convention Implementation Act (22 USC 6761(a)(1)(A) and (B)) - maximums increased from $37,601 to $38,549 and from $7,530 to $7,710, respectively
  * violations of the International Emergency Economic Powers Act (50 USC 1705(b)) - maximum increased from $295,141 to $302,584
  * violation of Export Controls Act of 2018 (50 USC 4819) - maximum of $300,000 (new penalty)
  * failure to file export information or reports required by 13 USC 304 within prescribed period - maximum for each day's delinquency increased from $1,360 to $1,394, maximum per violation increased from $13,605 to $13,948
  * other unlawful export information activities under 13 USC 305 - maximum increased from $13,605 to $13,948
  * failure to furnish any information required under 22 USC Chapter 46 (international investment and trade in services survey) - minimum increased from $4,619 to $4,735, maximum increased from $46,192 to $47,357
  * foreign-trade zone violations (19 USC 81s): maximum increased from $2,852 to $2,924

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## 15. The Washington Times: "3D-Printed Gun Blueprint Website Owner Sues New Jersey Attorney General in Free Speech Challenge"
(Source: The Washington Times, 10 Feb 2019.) [Excerpts.]

The man behind a website devoted to sharing online blueprints for 3D-printed gun is suing the attorney general of New Jersey, after being alerted that the activity was violating a new gun control law.

The lawsuit is the latest salvo in the fight to publish the plans online and challenges a law signed late last year that gun-rights advocates say criminalizes their free speech rights to post the blueprints.

"Whatever their claimed motive or agenda is, we know that their actual agenda is the disarmament of the people of New Jersey," said Brandon Combs, president of the Firearms Policy Coalition. "And if they have to infringe speech rights in order to red-line the right to keep and bear arms in their state, I think that they're willing to do whatever it takes to do that."

back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMMENTARY

## 16. B. Adkins, U. Johnston & S. Giles: "UK Publishes No-Deal Export License for Dual-Use Products"
(Source: Gowling WLG, 7 Feb 2019.)

The UK's export licensing authority has published a new Open General Export License for the export of dual use goods to the EU which will come into force on 29 March 2019 in event of a no deal Brexit.

UK businesses that hold an existing OGEL and businesses that will require an OGEL after Brexit (i.e. because they are currently exporting dual use goods into the EU) can register now for the new OGEL.

On 1 February 2019, the Export Control Joint Unit (("ECJU") - the UK's export licensing authority - published a new Open General Export License ("OGEL") for the export of dual use goods to the EU. The OGEL is intended to come into force at 11pm, 29 March in the event that there is no Brexit deal.

**"Nothing has changed"?**

The OGEL follows the <u>guidance on the export of controlled goods if there is no Brexit deal</u> that was first issued by the Department for International Trade in August. Council Regulation (EC) 428/2009, currently governs the scope of export authorizations (among other things) for dual use goods across the EU, including the UK. This Regulation will be preserved as applying in UK law, as part of the new species of 'Retained EU Law' created by the EU (Withdrawal) Act 2018). As such, the UK's post-Brexit export controls regime will, in the short-term, continue to follow the EU framework.

However, the retention of the EU framework will not prevent a change in the way UK exporters operate. This is because the transfer of goods to the EU from the UK will become an 'export' post-Brexit, triggering the need for export licenses in relation to controlled goods.  Exporters of dual use goods - that is, goods that may have both a military and non-military application - will therefore require authorization in order to export goods into the EU, as well as to the rest of the world.

More importantly, OGELs for the export of dual use goods from the EU will cease to cover the UK in a no deal Brexit. Consequently, exporters will need to obtain a new authorization from either the UK authorities (if they are exporting from the UK) or the relevant EU Member State (if they are exporting from the EU to the UK).

**What if there is a deal?**

The Withdrawal Agreement, agreed by the Prime Minister and the EU in November 2018, commits the UK and EU to an 'implementation period' whereby the UK would in effect be treated as an EU member for the purposes of the EU export control regime until 31 December 2020. The relationship between the UK and EU export control regimes after the end of the implementation period is not addressed in the political declaration on the future UK-EU trading relationship. This means there is still uncertainty as to the mutual recognition or otherwise of OGELs from 1 January 2021.

It is still uncertain whether the Withdrawal Agreement will be ratified by the UK Parliament. The publication of the OGEL provides some certainty to business as to the process for exporting dual-use goods from 29 March in the event that the Withdrawal Agreement is not ratified.

**What should business do now?**

UK businesses that hold an existing OGEL and businesses that will require an OGEL after Brexit (i.e. because they are currently exporting dual use goods into the EU) are able to register to use the new OGEL before it comes into force.

Registration is possible via SPIRE, the ECJU's licensing system. As part of the application process, businesses will need to confirm to the ECJU where records of exports will be retained between now and Brexit day.

back to top

## 17.
## J.E. Smith, J.P. Carlin & N.J. Spiliotes: "OFAC Has Been Talking About Compliance Through Enforcement" (Part I of II)
(Source: Morrison Foerster, 5 Feb 2019.)

\* Authors: John E. Smith, Esq., johnsmith@mofo.com; John P. Carlin, Esq., jcarlin@mofo.com; and Nicholas J. Spiliotes, Esq., nspiliotes@mofo.com. All of Morrison Foerster.

*Have You Been Listening?*

Last Thursday, January 31, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) issued its first enforcement action of 2019, a fascinating case involving *false eyelashes* that teaches that virtually any company in any industry selling any product can find itself in OFAC's cross-hairs (pun intended). This year also marks a decade since OFAC published its tried-and-true Enforcement Guidelines, which outline the agency's standard operating procedure for reviewing and enforcing violations of U.S. economic sanctions.

Last week's case involving e.l.f. Cosmetics, like another half dozen OFAC enforcement cases resolved over the past several months, serves as yet another indication that OFAC has, with relatively little fanfare, embarked upon one of the most sweeping elaborations of its enforcement policy since its Enforcement Guidelines were published a decade ago. Few have paid attention to the lessons from these recent cases. You should.

In fact, you might be forgiven if you believed that OFAC's enforcement of economic sanctions had waned during the early years of the Trump Administration, because various media reported the nadir of sanctions enforcement last year with one only case finalized in the first half of 2018 and only sevenpublished all year, the lowest number in more than a decade. The penalties and settlement amounts per enforcement case last year ranged from $88,000 to $54 million, totaling nearly $72 million for all of 2018.

After a lull in issuing final enforcement actions for much of the first three-quarters of last year, however, OFAC began pumping them out again last fall, but the new cases have differed from the old. Over the past several months, OFAC's enforcement cases have offered far more detail of the agency's expectations regarding sanctions compliance than ever before, expanding upon the agency's informal mantra of "better compliance through enforcement."

In a December 2018 speech to the American Bankers Association/American Bar Association Financial Crimes Enforcement Conference, Treasury Under

Secretary Sigal Mandelker formally announced the changes - which began last fall - noting that, "To aid the compliance community in strengthening defenses against sanctions violations, OFAC will be outlining the hallmarks of an effective sanctions compliance program. . . . Going forward, these types of compliance commitments will become an essential element in settlement agreements between OFAC and apparent violators."

So, without further ado, here are the Top 20 lessons recent OFAC cases - including all those issued last year - have been trying to teach you:

**1. If you are a U.S. company, beware your touchpoints to the global economy, particularly when involved in high-risk industries or high-risk jurisdictions.** You may be exposed to sanctions risk because of, for example, your (A) **international financial transactions**, (B) **overseas subsidiaries or employees**, (C) **supply chains**, and (D) **distribution chains**. Recent OFAC cases have touched upon each of these risks:

  - **International Financial Transaction Risk**. The twin JP Morgan cases from October demonstrate the continued risks to U.S. financial institutions and companies emanating from global financial transactions. The first of the two cases involved the bank's operation of a net settlement mechanism that resolved billings among global airlines and other airline participants, some of which involved sanctioned entities. The second of the two involved the bank's delay in remedying a historic deficiency in its screening software that failed to identify customer names with hyphens, initials, or additional middle or last names as potential matches to similar names on the OFAC List of Specially Designated Nationals and Blocked Persons ("SDN List").
  - **Overseas Subsidiaries or Employees Risk.** In the Zoltek case from December, OFAC took action against a Missouri company that reviewed and approved its Hungarian subsidiary's purchase of chemicals from a subsidiary of a designated Belarusian entity. OFAC noted that the "enforcement action highlights the risks for companies with overseas operations that do not implement OFAC compliance programs or that implement compliance programs that fail to address the sanctions regulations administered by OFAC."
  - **Supply Chain Risk.** The e.l.f. Cosmetics case issued last week involved a California company that imported false eyelash kits from Chinese suppliers that contained materials from North Korea. OFAC noted that the company "appears not to have exercised sufficient supply chain due diligence while sourcing products from a region that poses a high risk to the effectiveness of the NKSR [North Korea Sanctions Regulations]." Don't be complacent, however, if you source materials far closer to home; manufacturers have occasionally found themselves importing items such as cobalt or nickel from Canada and then belatedly realizing that the material originally may have been sourced from Cuba.
  - **Distribution Chain Risk.** In the Cobham case from November, a U.S. company's subsidiary - a global provider of technology and services in aviation, electronics, communications, and defense - sold several parts through distributors in Canada and Russia to an entity 51 percent owned by a Russian entity on the SDN List, making the subsidiary entity automatically

sanctioned under OFAC's 50 Percent Rule. The SDN and its Russian subsidiary both contained the similar names "Almaz Antey," but the U.S. company used a third-party screening software that required "an all word match criteria that would only return matches containing all of the searched words." Similarly, in the Epsilon action settled in September, OFAC acted against a U.S. company that exported its products to a Dubai company, with knowledge or reason to know that company distributed most, if not all, of its products to Iran.

**2. If you are not a U.S. company, beware your touchpoints to the United States - including use of** (A) **the U.S. financial system,** (B) **U.S. persons, or** (C) **U.S.-origin goods and services - for transactions that may violate U.S. sanctions.** Recent OFAC cases have dealt with a few of these risks.

   **- Use of the U.S. Financial System.** The Société Générale case from November marked the latest in a long line of OFAC enforcement actions targeting a foreign bank's "stripping" of information regarding sanctioned parties from transactions sent through U.S. banks, serving as a reminder for foreign financial institutions and companies to avoid sending non-transparent financial or other transactions through the United States that violate U.S. sanctions.
   **- U.S. Persons.** In the Ericsson case from last June, employees of Swedish and U.S. subsidiaries of a Swedish electronics company cooperated with respect to the provision of services by the Swedish subsidiary to a Sudanese entity and worked together to obtain a U.S.-origin product for shipment to a third country and then on to Sudan, in apparent violation of U.S. sanctions.
   **- U.S.-Origin Goods and Services.** In the Jereh Group case from December, OFAC and the Department of Commerce's Bureau of Industry and Security acted against a Chinese oilfield services company and its affiliated companies and subsidiaries worldwide that re-exported U.S.-origin goods to Iran by way of China, as well as exported U.S.-origin goods with knowledge they were to be used for production of, for commingling with, or for incorporation into goods made in China to be sent to Iran.

**3. If at first you don't succeed, remediate.** "Compliance commitments," to use Under Secretary Mandelker's terminology, are a key focus of recent OFAC enforcement cases. OFAC is providing far more detailed explanations in its enforcement case summaries of corporate remediation efforts constituting mitigating factors warranting penalty reductions. In all the enforcement cases issued in recent months, OFAC has listed detailed summaries of the companies' remedial **sanctions compliance commitments, many of which are detailed below and should serve as a template for OFAC's expectations regarding the sufficiency of sanctions compliance programs**.

**4. Expand and stress test compliance programs.** Under Secretary Mandelker emphasized that hallmarks of effective sanctions compliance programs include senior management commitment to compliance and "frequent risk assessments to identify and mitigate sanctions-specific risks within an institution and its products, services, and customers." Recent

enforcement cases demonstrate the importance to OFAC of corporate actions that strengthen, or fail to strengthen, sanctions compliance programs. In the Zoltek case, for example, OFAC noted that the U.S. parent had expanded its Director of Global Compliance position to include sanctions as well as export/import controls. In the Jereh Group matter, OFAC credited the company for hiring "an external organization with specialized experience in U.S. economic and trade sanctions and export control laws and regulations, which conducted an internal review of the company and developed a trade and sanctions compliance program." (*Hey, we at MoFo's National Security Group are available to assist. Just sayin'.*)

**5. Money matters.** In several recent enforcement cases, OFAC specifically highlighted compliance commitments by companies to provide additional staffing and resources. For example, the Jereh Group hired full-time compliance personnel and new senior managers with compliance backgrounds. In Société Générale, the bank "increased the number of personnel within compliance staffing, and SG's total budget for sanctions compliance has also increased." Similarly, in the first of the two JP Morgan cases, OFAC noted the bank had increased its compliance staff. In Cobham, OFAC bluntly declared its expectations: "OFAC expects companies settling apparent violations of its regulations to ensure their compliance units receive adequate resources, including in the form of human capital, information technology, and other resources, as appropriate."

**6. Sound screening software is a must.** In the Zoltek case, OFAC noted that the company's new screening software would be used to screen "its vendors, and their parent and subsidiary companies," against OFAC and other government restricted lists on a daily basis. In Cobham, the company "acquired and implemented new and enhanced sanctions screening software . . . that is capable of identifying and flagging potential matches to persons with close name variations to parties identified on the SDN List." And in both of the JP Morgan cases, OFAC noted that the bank had implemented new screening software. Companies should not become complacent, however, with this tool; as Under Secretary Mandelker noted, a company's sanctions compliance "resources must go far beyond merely screening the SDN List."

**7. Don't delay.** In the second of the two JP Morgan cases resolved in October, OFAC issued a finding of violation against the bank for delays in addressing known deficiencies in its screening system. As OFAC noted, "JPMC engaged in a pattern of conduct over a two-year period where the apparent violations stemmed from the same screening issue; although JPMC identified this screening issue and implemented multiple screening enhancements, it took over three years to fully address a known deficiency in the vendor-provided screening system." When technological solutions require a longer period to address, OFAC emphasizes that "compensating controls" are needed to address the risk of the known deficiencies. As OFAC summarized, "This enforcement action highlights the importance of financial institutions remediating known compliance program deficiencies in an expedient manner, and when that is not possible, the importance of

implementing compensating controls to mitigate risk until a comprehensive solution can be deployed."

**8. Screen, screen, and screen again.** Cobham demonstrates the need to re-screen regularly and at all phases of a transaction. In that case, when the U.S. company's subsidiary agreed to ship parts through its distributors to Russia, and at the time of its first shipment, neither the Russian company nor its parent was sanctioned. By the time of subsequent shipments, they were.

**9. Beware the 50 Percent Rule.** Zoltek involved a U.S. company's review and approval of its overseas subsidiary's dealings with a non-designated subsidiary of a sanctioned entity. While OFAC characterized as egregious the U.S. parent's continued involvement in its subsidiary's dealings after numerous high-level conversations revealed its awareness that purchases were being made from a subsidiary of a sanctioned entity, OFAC also included the previous non-egregious dealings with the sanctioned subsidiary as part of the penalty calculation. Similarly, Cobham involved a U.S. company's sales of goods through Canadian and Russian distributors to an entity owned 51 percent by an SDN; OFAC pursued an enforcement action because of the similarity of names of the SDN parent and subsidiary. Both cases demonstrate the urgency of the need for sanctions compliance screening of entities beyond the SDN List itself. Indeed, OFAC highlighted that, as a remedial measure, "Cobham acquired and implemented a screening and business intelligence tool with the capability of identifying and flagging persons known to be owned by parties identified on the SDN List, and has developed a process for employing the business intelligence tool to conduct enhanced due diligence on high-risk transactions from an OFAC sanctions perspective, to include any transaction involving a Cobham U.S. entity and any party in either Russia or Ukraine."

*[Part II will be published in tomorrow's Daily Bugle.]*



back to top

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FULL CIRCLE

U.S. Export Controls:
ITAR & EAR from a non-U.S. Perspective

Tuesday, 9 April 2019
Bruchem, The Netherlands

Register Now and get an Early-Bird Discount!

## 18. Monday List of Ex/Im Job Openings: 161 Openings Posted This Week, Including 22 New Openings
(Source: Events & Jobs Editor)

Published every Monday or first business day of the week. Please, send job openings in the following format to jobs@fullcirclecompliance.eu.

* COMPANY; LOCATION; POSITION TITLE (WEBLINK); CONTACT INFORMATION; REQUISITION ID

  "#" New or amended listing this week

* Adient; Bratislava, Slovakia; Customs Specialist (EMEA); Requisition ID: R-02990;
* AeroVironment; Simi Valley, CA; Trade Compliance Specialist II; Requisition ID: 333;
* Agility; Basel, Switzerland; SachbearbeiterIn Ocean Freight Export;
* Agility; Charlotte, NC; Import Manager/Licensed Customs Broker;
* Agility; Dallas, TX; Ocean Export Coordinator;
* Agility; Houston, TX; Ocean Export Coordinator;
* Agility; Houston, TX; Ocean Export Team Leader;
* Airbus; Manching, Germany; Internship within Procurement Compliance, Regulations & Risks; Requisition ID: 10438469 NU EN EXT 1;
* AM General; Auburn Hills, MI; International Compliance Analyst;
* Amazon EU; Luxembourg City, Luxembourg; Trade Compliance Manager; Requisition ID: 780313;
* Amazon Web Services; Seattle, WA; Trade Compliance Manager, Export Controls & Classification; Requisition ID: 787194;
* Analog Devices; Chelmsford, MA; Import-Export Analyst;
* Arconic; Pittsburgh, PA; Global Director Export Compliance, EPS Liaison;
* Arconic; Pittsburgh, PA; Global Director Import Compliance, TCS Liaison;
* Ascent Aerospace; Lake Orion and Macomb Township, MI; ITAR/EAR/Export Compliance Manager; Requisition ID: 1399;
* Arconic; Cleveland, OH; Global Trade Compliance Manager;
* Ascent Aerospace; Lake Orion and Macomb Township, MI; ITAR/EAR/Export Compliance Manager; Requisition ID: 1399;
* BAE Systems; Farnborough, United Kingdom; Counsel, Group Export Control; Requisition ID: 00058679;

* BAE Systems; Nashua, NH; Procurement Compliance; Requisition ID: 44996BR

* BAE Systems; Poznań, Poland; Export Control Officer;

* BAE Systems; Sterling Heights, MI; Senior Procurement Compliance Analyst; Requisition ID: 4BR

# * Baker Hughes; Aberdeen, United Kingdom; Trade Compliance Classification Analyst; Requisition ID: 1902478;

* Beiersdorf; Hamburg, Germany; International Trade Expert;

* Bell Flight; Fort Worth, TX; Trade Classification Specialist I; Requisition ID: 270536;

# * Boeing; Berlin and Frankfurt am Main, Germany; Trade Control Specialist m/f; Requisition ID: 1900016657;

# * Boeing; Dubai and Abu Dhabi, UAE; Senior Trade Control Specialist; Requisition ID: 1900019092;

# * Boeing; multiple locations, United States; Trade Control Specialist; Requisition ID: 1900020123;

* Boeing; Dallas, TX; Global Regulatory and Compliance Specialist 4; Requisition ID: 12795;

* Boeing; Zoushan, China; Compliance Analyst;

* Boeing; Zoushan, China; Trade Compliance Manager;

* Bosch USA; Owatonna, MN; Import/Export Compliance Analyst;

* Bristol-Myers Squibb; New Brunswick, NJ; Director Global Customs & Trade;

* Brookhaven National Laboratory; Upton, NY; Mgr Export Control Program; Requisition ID: 1563;

# * Carnegie Mellon University; Pittsburgh, PA; Export Compliance Manager;

* CISCO; Amsterdam, The Netherlands; Global Export Trade Manager - EMEAR;

* Cobham Advanced Electronic Solutions; Colorado Springs, CO; Export Compliance Manager; Requisition ID: req2102;

* ConvaTec; Flexible location, U.S.; Associate Manager, Customs & Trade; Requisition ID: JR0000536

* Danfoss; Rødekro, Denmark; Global Trade Compliance Specialist and Coordinator; Requisition ID: 14732BR;

* DB Schenker; Düsseldorf, Germany; Head of Ocean Freight Import; Requisition ID: 201811140002;

# * Defense Technology Security Administration; Alexandria, VA; Export Control Analyst; Requisition ID: DE-10413785-19-TB;

* Deloitte Belgium; Ghent, Belgium; Manager Global Trade Advisory;

* DHL; Erlanger, KY; OFAC Agent; Requisition ID: req72731;

* Doosan; West Fargo, ND; Director Customs & Trade Compliance;

* DuPont; Neu-Isenburg, Germany; Logistics Specialist Customs & Trade Compliance EMEA; Requisition ID: SOU00001629;

* EDCO; Eindhoven, the Netherlands; Customs & Trade Compliance Coordinator;